IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| IN RE:<br>CAMP LEJEUNE WATER LITIGATION<br><br><br>This Document Relates To:<br>ALL CASES | Case No. 7:23-CV-897<br><br>UNITED STATES' MEMORANDUM IN SUPPORT OF PROPOSED MOTION FOR A CONSOLIDATED CASE MANAGEMENT ORDER AND FOR EXTENSION OF TIME<br><br>ORAL ARGUMENT REQUESTED |

**INTRODUCTION**

The Camp Lejeune Justice Act ("CLJA") litigation may become one of the largest mass torts matters in American history. Four months after the administrative exhaustion period expired for the first claimants, nearly one thousand cases have already been filed in this Court, and approximately 70,000 plaintiffs have already filed administrative claims with the Department of the Navy.

This Court has signaled—both at the April 5, 2023, initial status conference before the Honorable Judge James C. Dever III, and in the April 25, 2023, initial case management order signed by all four active District Judges—that the forthcoming guidance of consolidated case management procedures across all CLJA cases will alleviate the burden on this Court and parties, ensure consistent adjudication throughout the litigation, and set the litigation on a course for efficient and expeditious global resolution. *In re: Camp Lejeune Water Litigation*, No. 7:23-cv-00897-RJ, at Dkt. 1 (E.D.N.C. April 25, 2023) ("April 25 Order"). Citing the pathbreaking case management procedures employed by Judge Hellerstein in the 9/11 litigation, this Court has indicated that it anticipates entering global case management orders that will address such topics

1

as plaintiff leadership, a master complaint, a master answer or other responsive pleading, consolidated and coordinated discovery, phased discovery on certain issues, coordinated expert-related and dispositive motions, bellwether selection and trials, and settlement. The Court further indicated in its April 25 Order that it would solicit the input of the parties on these issues.

The United States fully supports the vision of consolidated case management described in the Court's April 25 Order and eagerly anticipates implementation. In the interim, however, the cases are beginning to proceed on divergent paths. In anticipation of the implementation of consolidated case management, including a master complaint/master answer process and coordinated discovery, the United States requested extensions of time to file its responsive pleading until after a case management order was issued. Chief Judge Myers, Judge Flanagan, and Judge Dever have granted the United States extensions of time to file responsive pleadings, while Judge Boyle has denied extensions of time, requiring individual answers to be filed, individual discovery conferences, and individual discovery plans in the cases assigned to him. A fundamental tension exists between the April 25 Order signed by all four judges, which signals that all cases will be handled in a consolidated fashion along the lines of the 9/11 litigation before Judge Hellerstein, and the orders in the cases assigned to Judge Boyle, which are moving forward a subset of individual cases without consolidated treatment.

Many procedural and legal issues in the CLJA litigation will have to be resolved in a uniform fashion across all cases for this litigation to reach resolution as quickly and efficiently as possible. Therefore, as explained herein, the United States urges the Court to adopt a global case management order that applies to all CLJA cases and implements procedures as contemplated in the Court's April 25 Order. With additional responsive pleadings due on June 23, 2023, alone in 663 individual cases—cases filed by an array of different law firms—and many more deadlines

impending shortly thereafter, the United States further requests that the Court extend its responsive-pleading deadlines and individual discovery deadlines in all CLJA cases until a global case management order is issued that sets consolidated deadlines for these matters.

## BACKGROUND

### A. The Court has stated its intent to organize the CLJA cases to promote the just, speedy, inexpensive, and efficient resolution of the cases.

The first timely cases brought under the Camp Lejeune Justice Act of 2022 ("CLJA"), Pub. L. No. 117-168, § 804, 136 Stat. 1802, 1802-04 (2022), were filed in this Court on February 11, 2023. As of the filing of this document, pending before this Court are 998 individual CLJA cases, and the Navy has received approximately 70,000 administrative claims under the CLJA.

On April 5, 2023, the Honorable James C. Dever III held a status conference in all the CLJA cases then assigned to him. *See, e.g.*, *Reese v. United States*, 4:23-cv-22 at Dkt. 7, 10 (order setting & minute entry for hearing). At the conference, Judge Dever detailed the practical limitations on the Court's ability to proceed through the anticipated volume of CLJA cases individually, observing, in part, that "[i]f we exclusively did 100,000 trials, the one-day trials, five days a week, 52 weeks a year, it would take us 96 years." *Id.* at Dkt. 12, pp. 8-9. Judge Dever stated that a management order applicable to all CLJA cases would likely issue. *Id.* at pp. 12-13.

On April 25, 2023, the four active District Judges of this Court jointly issued an initial case management order announcing a Master Docket for CLJA cases. In addition to inviting submissions from those interested in serving as plaintiffs' leadership, the order anticipated coordinating litigation across CLJA cases, including by creating a "master complaint" and "master answer or other responsive pleading." *Id.* The Court further expressed its intent to establish a global "process for consolidating discovery, a process for phased discovery, a process

for coordinating expert-related motions, a process for coordinating dispositive motions, a process for bellwether selection, a process for trials, and a process for settlement negotiations." *Id.* With respect to discovery, the Court pointed to the 9/11 litigation before Judge Hellerstein as a model, and the Court stated that it "anticipates formulating an ESI protocol, resolving issues associated with the scope of discovery, seeking input on use of stipulations to streamline discovery, and seeking input on some form of database with narrowly tailored questions seeking case-crucial information for each plaintiff and the defendant." *Id.* The Court's April 25 Order expressly contemplated "seeking input" from plaintiffs and from the United States on these issues. *Id.*

Prior to the Court's April 25 Order, the United States and several plaintiffs had filed joint motions for coordination or partial consolidation in several CLJA cases. *See, e.g.*, *Partain v. United States*, 7:23-cv-110-BO-RJ at Dkt. 9 (March 23, 2023). After the Court issued its April 25 Order, Chief Judge Myers and Judge Boyle denied those motions "[i]n light of the Order filed in the case styled, *In re: Camp Lejeune Water Litigation*, No. 7:23-CV-00897-RJ ('Master Docket Order') [DE 1]." *Partain*, 7:23-cv-110-BO-RJ, at May 17, 2023 text order; *Paoletti v. United States*, 7:23-cv-296-M-BM, Dkt. 14 (Apr. 27, 2023). Chief Judge Myers added: "The parties shall follow all instructions for management of this case in the Master Docket Order and in all subsequent applicable orders issued in that case." *Paoletti*, 7:23-cv-296-M-BM, Dkt. 14.[1]

### B. The cases are now on a divergent path that is inconsistent with the global case management that the Court previewed in its April 25 Order.

As of the date of this filing, the Court has solicited applications for plaintiff leadership, but plaintiff leadership has not yet been appointed; consequently, the global case management

---

[1] Judge Flanagan and Judge Dever have not ruled on the parties' joint motions for coordination or partial consolidation. *See, e.g.*, *Kuczma v. United States*, 7:23-cv-294-D-RJ; *Moriarty v. United States*, 7:23-cv-297-FL.

procedures signaled in the April 25 Order have not yet been established. Starting in mid-April, in light of the expectation that global case management is forthcoming, the United States began requesting extensions of time for its individual responsive pleadings—pleadings which would trigger time consuming and individualized case management proceedings, which would then be overtaken by the global case management approach that would potentially call for a new master complaint/master answer process and different case management deadlines. Following the April 25 Order, Chief Judge Myers and Judge Dever *sua sponte* further extended the time for the United States to answer or otherwise respond to all CLJA complaints pending before them until at least June 23, 2023. *See, e.g.*, Text Order, *Williams et al v. United States*, No. 7:23-cv-22 (E.D.N.C. May 1, 2023) (noting extension in all CLJA cases assigned to Judge Dever to June 23, 2023); Text Order, *Agee v. United States*, No. 7:23-cv-33 (E.D.N.C. May 3, 2023) (noting extension in all CLJA cases assigned to Judge Myers to June 23, 2023). The United States also moved to extend the time for it to answer or otherwise respond in the cases assigned to the Honorable Louise W. Flanagan, and those motions were recently granted. *See, e.g.*, Text Order, *Girard v. United States*, No. 2:23-cv-9 (E.D.N.C. June 9, 2023). As a result, in the 755 CLJA cases assigned to Judges Dever, Flanagan, and Myers, the parties have not proceeded into individualized litigation over responsive pleadings, discovery, and other case management procedures.

In contrast, the United States has already filed answers in 189 individual CLJA cases assigned to Judge Boyle, and is filing 9 more answers today for a total of 198. Prior to the April 25 Order, the United States had sought additional time to answer in these cases; however, on April 17, 2023, the Court ruled orally, in a hearing announced the same day, that it was "not readily apparent that the Government needs additional time" and gave the United States until

April 30, 2023, to answer the CLJA complaints that were otherwise due before that date. *See, e.g.*, Oral Order, *Akers v. United States*, 7:23-cv-120-BO (April 17, 2023). These cases have continued to move ahead individually as soon as answers are filed. In each case where the United States filed an answer, the Court has issued an Order for Discovery Plan requiring a Rule 26(f) meeting between the parties for that individual case within approximately three weeks, and requiring the parties to submit a discovery plan to the Court in that individual case within fourteen days of the Rule 26(f) meeting. *See, e.g.*, Order for Discovery Plan, Dkt. 11, *Shine v. United States*, 7:23-cv-23-BO-BM (May 17, 2023).

In addition, each of the United States' 198 answers triggered the start of a 21-day period for the plaintiff to file motions to strike affirmative defenses under Rule 12. *See* Fed. R. Civ. P. 12(f)(2). To date, the plaintiffs in 125 of the 198 answered cases have filed motions to strike affirmative defenses. In an additional 73 cases, the date by which such motions must be filed has not passed. *See* Fed. R. Civ. P. 12(f)(2). The United States moved for extensions of time to respond to plaintiffs' pending motions to strike affirmative defenses; on June 9, 2023, the Court scheduled a motion hearing on the plaintiffs' motions to strike for June 21, 2023; and on June 15, 2023, the Court denied the United States' motions for extension of time to respond to the plaintiffs' motions to strike. *See, e.g.*, *Boggess v. United States*, 7:23-cv-242-BO-RJ, Motion for Extension of Time, Dkt. 13 (June 9, 2023); *id.*, Notice of Hearing, Dkt. 14 (June 9, 2023); *id.*, Text Order (June 15, 2023).

### C. **Many issues in the CLJA litigation call for uniform global resolution, as contemplated in the Court's April 25 Order.**

The Court's April 25 Order, signed by all four District Judges, rightly identifies an array of issues to be addressed through the Court's overall case management process for the CLJA litigation (and on which the Court states that it anticipates seeking input from the parties).

Indeed, many of these issues must be resolved on a global basis applicable to all CLJA cases, or the Court and parties will face inconsistent rulings that will frustrate the efficient and equitable resolution of this litigation. Some of the issues include:

<u>Plaintiff fact sheets and database</u>. An indispensable part of resolving this litigation in any reasonable time frame will be a global system for collecting essential plaintiff-specific data for each of the thousands of plaintiffs via a questionnaire or fact sheet, as has been done in many mass tort cases, including the 9/11 litigation before Judge Hellerstein. *See* Alvin K. Hellerstein, James A. Henderson Jr., and Aaron D. Twerski, *Managerial Judging: The 9/11 Responders' Tort Litigation*, 98 Cornell L. Rev. 127 (2012); *see also In re World Trade Ctr. Disaster Site Litig.*, 598 F. Supp. 2d 498, 506-22 (S.D.N.Y. 2009) (cited by the Court in the April 25 Order). Plaintiff-specific data should be collected in a master database, as Judge Hellerstein ordered in the 9/11 litigation. *Id.* The importance of a robust CLJA plaintiff database is already apparent: hundreds of the CLJA complaints filed so far lack any specific allegations as to when the plaintiff was at Camp Lejeune, where on base the plaintiff lived or worked, or what particular injury the plaintiff suffered as a result of exposure to Camp Lejeune water. Missing information, such as the plaintiff's medical history, medical providers, and employment history, will be essential to the consideration of each plaintiff's exposure, health, and disease impact for resolution of this litigation on a global basis.

The United States has already been working to develop a plaintiff fact sheet for entry of information into a database, and the United States has had initial discussions with some groups of plaintiffs' counsel toward that goal. Once plaintiff leadership is in place, the United States would like to work with that leadership to continue this effort and finalize the contents of the plaintiff fact sheet and select a database vendor to house the data. As was done in the 9/11

litigation, a third-party neutral could help the parties select a vendor and resolve any disputes regarding the plaintiff fact sheet.

It will be critical that the plaintiff fact sheet and database are implemented consistently and uniformly across all CLJA cases in litigation.[2] If a subset of plaintiffs does not complete the agreed-upon fact sheet and does not appear in the database, the database will be far less useful as a tool for selecting representative bellwethers, understanding the universe of claims, and ultimately reaching an equitable global settlement to resolve the litigation.

<u>Initial disclosures and other discovery from plaintiffs</u>. If the Court implements consolidated case management for all CLJA cases, so that the parties are not litigating individual CLJA cases outside of the consolidated process, the United States envisions that most plaintiffs would not be required to complete discovery beyond the plaintiff fact sheet. Only a subset of plaintiffs selected for an initial bellwether discovery pool would be required to complete initial disclosures and be subject to full discovery, such as depositions, document requests, and submission of expert reports. Without fully consolidated case management and with some cases proceeding independently on a separate path to trial, the burden on the Court and the parties will be much greater because the independent cases will be proceeding on their own tracks with discovery, motions practice, and trials. Crucially, that undue burden on the Court and the parties in individually proceeding to trial outside of global case management will not yield proportionate benefits in advancing the ultimate resolution of this litigation, because the cases will not necessarily be representative of the wider pool of cases in a way that informs settlement discussions.

---

[2] The plaintiff fact sheet and database could also apply to administrative claims filed with the Department of the Navy to streamline resolution and avoid further litigation.

Discovery from the United States. Discovery from the federal government should be coordinated across all CLJA cases with respect to depositions of federal government witnesses, identification of relevant custodians, entry of a global electronic discovery protocol, identification of relevant search terms and/or criteria for use of technology assisted review, production of documents, and establishment of a repository for federal government documents, among other things.

Marine Corps Base Camp Lejeune has been extensively studied and investigated resulting in a large universe of discovery materials. These materials include historical documents, electronic data, analytical data, maps, reports, and contracts from military services and federal agencies. They reside with entities including the Naval Facilities Engineering Command; the United States Marine Corps; the U.S. Environmental Protection Agency, in relation to Camp Lejeune itself and the off-base, now-defunct ABC Cleaners; and the Department of Health and Human Services, Agency for Toxic Substances Disease Registry (ATSDR). Avoiding duplicative and inconsistent discovery requests will be essential to the ultimate resolution of this litigation.

The United States also recognizes the need to obtain individual records from federal agencies regarding plaintiffs who lived at or were stationed at Camp Lejeune, such as housing records, service records, and Veterans Affairs records. The United States has begun working with these agencies to establish processes for obtaining these records. Here too, a global approach will be necessary to streamline the process of obtaining records and ensure that the necessary identifying information is retrieved for all CLJA cases.[3]

---

[3] Upon execution of a Federal Rule of Evidence 502(d) protective order, the United States can produce certain discovery materials that had been produced as part of the Federal Tort Claims Act (FTCA) Camp Lejeune litigation, including: (1) documents collected by the Marine Corps (continued…)

Early resolutions on general causation. The Court and parties could prioritize determinations on general causation, i.e., whether a given disease can be caused by the types of chemicals that were in the Camp Lejeune water. The ATSDR and the National Academy of Sciences have studied environmental exposures and veterans' health to inform the Department of Veterans Affairs presumptive disability decision-making process for several decades. Applying a presumptive service connection standard in its 2017 report, the ATSDR has identified several diseases that are potentially related to the contaminated water at Camp Lejeune. The National Academy of Sciences in its 2009 report did not identify any diseases where there was sufficient evidence of a causal relationship or an association between trichloroethylene, perchloroethylene, or solvent mixtures in the Camp Lejeune water. Obtaining clarity from the Court on whether there is reliable evidence that particular diseases can be caused by chemicals in the Camp Lejeune water will be essential to reaching a resolution of this litigation. Resolution will be expedited by making these determinations early in the litigation through phased discovery proceedings and *Daubert* motions.

Toward that end, the Court could hear from the parties and consider, for example, a three-track system of discovery based on the claimed disease, front-loading general causation determinations for certain alleged diseases,[4] or some other phased process to streamline

---

that are Bates stamped with the prefix CLW, and (2) documents collected by the "Drinking Water Fact-Finding Panel for Camp Lejeune." The United States will also consider, after investigation into the files, production of other discovery material from the FTCA litigation, including other document productions and deposition transcripts. Determinations of what other discovery materials to produce from the prior FTCA litigation should be coordinated with plaintiff leadership and should apply to all CLJA cases.

[4] The United States has shared with some plaintiffs' counsel its initial proposal to establish a three-track system of discovery. Track 1 would consist of Plaintiffs alleging kidney cancer, liver cancer, non-Hodgkin's lymphoma, leukemia, bladder cancer, qualifying cardiac defects, multiple myeloma, Parkinson's disease, kidney disease (end-stage renal disease), and systemic sclerosis/scleroderma. Track 1 cases would proceed to discovery on all issues in the ordinary (continued…)

discovery. Once bellwether cases are selected, they could proceed along the appropriate discovery tracks.

Consistent resolutions on other global discovery issues. Other discovery issues will arise that demand global resolution. For example, the parties will need to establish limits on how many times the same witness can be subject to deposition. To take another example, the United States may argue that plaintiffs should use the same experts for the same causation issues across different cases; plaintiffs may or may not have a different view. The Court will inevitably confront many other globally-applicable discovery issues, including questions about the appropriate scope of discovery on plaintiffs and on the United States. These issues should be handled in a consistent and coordinated fashion.

Consistent resolutions on global legal issues. The CLJA is a novel statute that has never been litigated. The United States anticipates that the parties and Court will have to address legal questions applicable to all CLJA cases. Based on early comments by some plaintiffs' counsel, the United States expects that disputed global legal issues may include, among other things, the appropriate standard for causation in CLJA cases, and who the appropriate representative is for deceased plaintiffs. Further, the United States expects that other disputed global legal issues may include, among other things, whether and to what extent the Federal Tort Claims Act supplies the

---

fashion, although the United States would reserve the right to challenge general causation and all other issues. Track 2 would consist of the cases of plaintiffs alleging other diseases that appear frequently across the CLJA cases, such as lung cancer, prostate cancer, breast cancer, and others. Track 2 cases would be phased so that initial discovery would be limited to general causation, followed by *Daubert* motions on general causation. General causation would have to be established first via reliable expert testimony before the case could proceed to discovery on all other issues, such as specific causation and damages. Track 3 would be comprised of plaintiffs alleging any other injury; they would be required to come forward with an expert affidavit stating that their injury is at least as likely as not to have been caused by exposure to water at Camp Lejeune. Track 3 plaintiffs who can present such an affidavit would then be moved into Track 2. The United States anticipates that plaintiff leadership, once selected, may have other recommendations.

11

appropriate legal standard and fills the gaps in the CLJA. Many other mixed questions of law and fact may arise on a global or near-global basis, such as the admissibility of certain types of evidence or testimony, or the application of the CLJA's damages offset provisions in section 804(e)(2). These and any other globally-applicable legal questions should be resolved consistently across all CLJA cases.

## DISCUSSION

**A.  Consistent with the Court's April 25 Order, the Court should adopt a consolidated case management order applicable to all CLJA cases, to ensure consistent global resolution of issues and efficient resolution of this litigation.**

Piecemeal litigation of individual cases in advance of accomplishing the many steps outlined above will create inefficiencies, prejudicing all parties. Moving individual cases forward outside of a consolidated case management structure will almost certainly lead to inconsistent rulings by different Judges within this Court, which will create a significant obstacle to global resolution: "[s]hould these cases proceed separately, one would reach judgment before the other . . . and could thereby significantly impair the rights of the parties." *Seabrooks v. Evans Delivery Co.*, Civil Action No. 5:20-cv-00039, 2020 U.S. Dist. LEXIS 191649, at *8 (W.D. Va. Oct. 16, 2020). Piecemeal litigation will divert the parties' resources—including resources that otherwise could be committed to working through the many challenges of global management and resolution—toward litigation of cases that have not been selected through a systematic bellwether process and therefore are not necessarily representative of the wider pool in a way that would inform global resolution. What is more, the farther the individual cases move through discovery and motions practice outside of the global process, the greater the prejudicial impact on the parties. *Id.* For these and other reasons, the Manual for Complex Litigation (Fourth ed.) ("MCL") states that with respect to mass tort cases, "[a]ggregation of similar claims can maximize fair and efficient case management, minimize duplication, reduce cost and delay,

enhance the prospect of settlement, promote consistent outcomes, and increase procedural fairness." MCL § 22.312.

Principles for handling multidistrict litigations apply to the CLJA litigation. *See* Proposed Fed. R. Civ. P. 16.1 (containing case management guidelines for multidistrict litigation), and proposed note (recognizing that "multiple actions in a single district" may present "similar management challenges" to a multidistrict litigation). In addition to the MCL, helpful guidance comes from the Duke Law School Guidelines and Best Practices for Large and Mass-Tort MDLs. *See* Bolch Judicial Institute, Duke Law School, *Guidelines and Best Practices for Large and Mass Tort MDLs* (2d ed. Sept. 2018). The first guideline states that the objectives of case management are: "(1) the elimination of duplicative discovery; (2) avoiding conflicting rulings and schedules among courts; (3) reducing litigation costs; (4) saving the time and effort of the parties, attorneys, witnesses, and courts; (5) streamlining key issues; and (6) moving cases toward resolution (by trial, motion practice, or settlement)." *Id.* at 2. This is not accomplished by piecemeal litigation of individual cases, but by giving priority "to deciding issues broadly applicable to multiple claimants," Best Practice 1(B)(iii); by "collaboratively develop[ing] a discovery plan," Best Practice 1(C); and by "issuing a case management order approving plaintiff and defendant fact sheets, which can provide information useful for case management, relevant to selecting bellwether trials, and valuable for conducting settlement negotiations," Best Practice 1(C)(v). *Id.* at 5, 10. These well-established principles for multi-action case management were recognized by this Court's April 25 Order.

Efficient case management requires identifying individual plaintiffs whose cases will most broadly promote resolution of other CLJA cases. As this Court explained, this will likely occur through a "master complaint, . . . master answer or other responsive pleading to the master

complaint, a process for consolidating discovery, a process for phased discovery, a process for coordinating expert-related motions, a process for coordinating dispositive motions, a process for bellwether selection, a process for trials, and a process for settlement negotiations." *See* April 25 Order. It is unlikely to occur through duplicative and potentially inconsistent litigation based on which case first reached the courthouse. Proceeding on an individualized basis encumbers the process of substantially moving *all* plaintiffs' claims forward as expeditiously as possible. Conducting discovery and trial for cases that are filed earliest will not advance the global resolution of the litigation, but rather will divert the Court's and parties' resources.

      Even in this large-scale litigation, the parties' and the Court's resources are finite. The United States is the defendant in every case, and at this time, the vast majority of the parties' resources are engaged in the procedural management of individual cases. The United States is committed to moving the CLJA litigation toward an equitable resolution as efficiently and quickly as possible. Indeed, in anticipation of consolidation or coordination of these cases, and in order to facilitate timely and efficient service of process, the United States agreed to accept service of the complaints through the Court's Case Management/Electronic Case Files system and agreed to refrain from raising an objection or seeking dismissal under Fed. R. Civ. P. 12(b)(5) for insufficient service of process under Fed. R. Civ. P. 4(i)(1) for complaints served in compliance with the Court's Standing Order on service of process. This has enabled speedier service of hundreds of complaints, but that process, coupled with the divergent case management approaches that are now emerging, impacts the United States as the sole defendant responding to a substantial subset of those complaints individually.

      Notwithstanding the parties' best efforts, litigating one-quarter of the CLJA cases individually, in the manner that has been taking place in recent weeks, will likely prove

unsustainable. Across the nearly 1,000 CLJA cases filed to date, the United States has filed answers in 198 cases, held eight Rule 26 conferences with approximately 11 different plaintiff firms regarding more than 180 plaintiffs (with more on the horizon as individual deadlines move forward in the growing number of answered cases), and is addressing motions to strike affirmative defenses in 125 cases. Litigating individual cases in this manner diverts resources from global efforts, such as working on plaintiff fact sheets, coordinating with agencies to identify and collect relevant documents, and working with the Navy to review administrative claims. Much of the efforts in the individually answered cases—answering complaints, holding discovery conferences with different plaintiffs' firms, and engaging in motion practice—will likely be mooted by the global case management process contemplated in the Court's April 25 Order. Individual complaints and answers may be superseded by a master complaint and master answer. The pending motions to strike in scores of cases could be superseded by a master complaint and a master answer, or subject to a conflicting ruling in a global process. Furthermore, discovery on a global basis will differ from discovery in the individual cases currently being moved forward; global discovery will be guided by the master complaint, master answer, and globally-binding decisions about factual and legal questions common across all CLJA cases.

For all these reasons, the United States urges the Court to enter an order establishing consolidated case management across all CLJA cases as contemplated in the Court's April 25 Order. Dates in individual cases should not be set until the Court appoints plaintiff leadership, receives input from the parties on the topics contemplated in the April 25 Order, and enters a consolidated case management order governing all CLJA cases. *See* April 25 Order.

**II.     The Court should grant extensions for individual deadlines in the CLJA cases pending the Court's issuance of a global case management order as described in the April 25 Order.**

To promote the efficiency and organization contemplated in the April 25 Order, the United States requests that in the interim, the Court extend individualized deadlines in the CLJA cases, including responsive pleading deadlines, discovery deadlines, and all other individual case deadlines. Currently, the United States faces a responsive-pleading deadline of June 23, 2023, in 663 individual CLJA cases, with many more deadlines following shortly thereafter. Answering those complaints would trigger the same individualized and divergent case management procedures discussed above. The United States requests that the Court extend individual case deadlines until a global case management order is issued that sets appropriate consolidated deadlines for these matters, as contemplated in the Court's April 25 Order.

An extension of time may be granted on a showing of good cause following a good faith attempt to confer with all parties whose interests are directly affected by the motion. *See* Fed. R. Civ. P. 6(b)(1) ("When an act may or must be done within a specified time, the court may, for good cause, extend the time[.]"); Local R. Civ. P. 6.1(a) (adding conference requirement).

Here, extending responsive-pleading deadlines, discovery deadlines, and all other deadlines for the United States across all CLJA cases will promote judicial economy and avoid an undue burden on this Court's resources, to many individual plaintiffs, and to the United States. An extension is in the interest of judicial economy because there is otherwise a significant risk of duplicative litigation. *See United States for use and benefit of Schneider Electric Building Americas, Inc. v. CBRE Heery, Inc.*, No. 5:20-cv-00257-BR, 2021 WL 3184539 at *2 (E.D.N.C. June 9, 2021) (the interests of judicial economy include "the potential avoidance of duplicative litigation"). The Court's April 25 Order, signed by all four active judges, contemplates a master complaint and master answer or other responsive filing, as well as consolidated discovery

procedures across all CLJA cases. It would be fully consistent with the Court's April 25 Order to extend the United States' responsive-pleading and discovery deadlines until a global case management order is issued that sets appropriate deadlines for these matters.

Granting this global extension of time will preserve the Court's resources which would otherwise be necessary for addressing many hundreds, soon to be thousands, of individual requests for extension of time. It will also avoid an undue burden on the parties, who are simultaneously trying to comply with both the Court's April 25 Order contemplating broad, CLJA-wide case management, and orders in the cases proceeding individually.

As noted above, the parties' work is underway to advance several key topics that the Court addressed in its April 25 Order and that Judge Dever discussed at the April 5, 2023, Status Conference. The plaintiffs have prepared and submitted leadership proposals. The United States is preparing for discovery, including protocols for obtaining pertinent records from its agencies, construction of a plaintiff fact sheet or questionnaire, identification of requirements for a unified database for critical plaintiff-specific information, and coordination regarding the Navy's CLJA administrative claim process. Granting an extension to allow the parties to focus on these matters, rather than expending resources to respond and reply to obligations in individual cases, will promote the just, speedy, and inexpensive administration of this litigation. Fed. R. Civ. P. 1.

Therefore, in the interest of judicial economy and furthering a fair, efficient, and equitable process for all parties, the United States respectfully moves for an extension of time for individual responsive pleading deadlines, discovery deadlines, and all other deadlines in the individualized CLJA cases, until a global case management order is issued that sets appropriate deadlines for consolidated case management procedures across all CLJA cases, as contemplated in the Court's April 25 Order.

* * *

The United States respectfully requests a hearing and the opportunity to be heard on these CLJA-wide litigation management issues.

DATED this 20th day of June, 2023.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

J. PATRICK GLYNN
Director, Torts Branch
Environmental Torts Litigation Section

BRIDGET BAILEY LIPSCOMB
Assistant Director, Torts Branch
Environmental Torts Litigation Section

*/s/ Adam Bain*
ADAM BAIN
Senior Trial Counsel, Torts Branch
Environmental Torts Litigation Section
U.S. Department of Justice
P.O. Box 340, Ben Franklin Station
Washington, D.C. 20044
E-mail: adam.bain@usdoj.gov
Telephone: (202) 616-4209
Fax: (202) 616-4473

LACRESHA A. JOHNSON
DANIEL C. EAGLES
Trial Attorneys, Torts Branch
Environmental Torts Litigation Section

Attorney inquiries to DOJ regarding the
Camp Lejeune Justice Act:
(202) 353-4426

## CERTIFICATE OF SERVICE

I hereby certify that on June 20, 2023, a copy of the foregoing document was filed via the Court's ECF system and served on counsel of record through the ECF system.

*/s/ Daniel C. Eagles*
Daniel C. Eagles
