IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:23-CV-897

| | |
|---|---|
| IN RE: | ) |
| CAMP LEJEUNE WATER LITIGATION | ) |
| THIS PLEADING RELATES TO: | ) |
| ALL CASES | ) |

## PLAINTIFFS' LEADERSHIP GROUP'S OPPOSITION TO MOTION FOR RECONSIDERATION OF JULY 19, 2023 ORDER

For the following reasons, the Plaintiffs' Leadership Group appointed by this Court respectfully opposes the motion for reconsideration of the order appointing leadership filed by attorneys Roy T. Willey, IV and Blake G. Abbott (DE 13).

### INTRODUCTION

After a careful and deliberate process in which the Court considered dozens of candidates, every active member of the Court signed an order appointing an experienced and diverse slate to lead this critically important litigation on behalf of thousands of victims of the toxic water at Camp Lejeune. Although numerous qualified attorneys were not selected, only one group of attorneys, led by Roy T. Willey, IV, has sought reconsideration of the Court's order, offering up the same meritless argument that Willey raised when the Court first solicited comment on its proposal for a leadership-selection process. Willey's sole contention—that this Court lacks authority to appoint leadership because this case has not been designated as Multidistrict Litigation (MDL)—is wrong. For well over 60 years, since before the advent of MDLs, federal courts have exercised their power under Federal Rule of Civil Procedure 42(a) to appoint lead counsel to resolve common issues in pretrial proceedings in complex litigations involving numerous plaintiffs. *See, e.g.*, *In re Air Crash Disaster at Fla. Everglades on Dec. 29, 1972*, 549 F.2d 1006, 1014 (5th Cir. 1977) ("*Florida*

*Everglades*"); *MacAlister v. Guterma*, 263 F.2d 65, 68-69 n.2 (2d Cir. 1958). Indeed, the *Manual for Complex Litigation* advises courts to appoint leadership in virtually all complex cases, regardless of whether they have been designated as MDLs. And in this unprecedented litigation, which may ultimately involve thousands of plaintiffs and which will demand protracted negotiations with the United States government over discovery, trial procedures, and settlement, there is no realistic alternative to the leadership structure that the Court instituted. Willey has thus not come close to demonstrating that this Court's order appointing leadership rested on clear error or resulted in a manifest injustice—the only cognizable grounds for reconsideration cited in his motion. His motion should be denied.

## BACKGROUND

Congress enacted the Camp Lejeune Justice Act (CLJA) in 2022 to provide relief to the many servicemembers and others who were exposed to toxic water at Camp Lejeune over a period of decades and as a result developed a wide range of deadly diseases. Pub. L. No. 117-168, § 804, 136 Stat. 1759, 1802 (to be codified at 28 U.S.C. § 2671). The CLJA creates broad eligibility criteria for plaintiffs—exposure to water at Camp Lejeune for at least 30 days between August 1953 and December 1987—and gives this Court exclusive jurisdiction over CLJA claims. *Id.* § 804(b), (d). To date, tens of thousands of people have filed administrative claims under the CLJA, many of whom will likely file actions in this Court once their administrative claims are exhausted.

Although Congress undoubtedly understood that a large number of CLJA claims would be filed given that over one million people were exposed to contaminated water at Camp Lejeune over the 34-year statutory period, it did not require this Court to adopt any specific case-management structure, instead leaving that decision to this Court's sound discretion. In exercising

that discretion, the Court has worked diligently to develop a case-management structure that will be efficient and fair and that will ensure that CLJA plaintiffs with meritorious claims—many of whom are quite aged or seriously ill—receive compensation as soon as possible.

On April 25, 2023, the Court invited attorneys interested in serving on leadership to apply to the Court by May 26. Over the following month, applications on behalf of numerous attorneys were submitted. On June 20, this Court announced a proposed process for interviewing candidates for leadership. DE 6, at 1. The Court's proposal explained that the selected candidates would then be responsible for "proposing any additional Plaintiff leadership structure, including subcommittees, that it anticipates will help facilitate an efficient resolution of this litigation," a structure called the "Plaintiffs' Leadership Group" (PLG). *Id.* The Court stated that the PLG, "in consultation with the attorneys for the United States, would be initially responsible for submitting case management proposals" relating to several issues, including master pleadings, consolidated discovery, dispositive motions, trials, and settlement negotiations. *Id.*

The Court's June 20 order invited anyone who objected to the proposed process to notify the Court. DE 6, at 2. To the PLG's knowledge, the only attorney who objected was Willey. In a letter to the Court, he argued that "the class action mechanism is the most efficient and effective course of action" given the number of expected claims and stated, incorrectly, that he had filed "the first, and only, class action under the act." DE 9, at 1, 2.[1] He argued that because "this

---

[1] Willey filed a putative class action on February 11, 2023. *See* DE 1, *Williams v. United States*, No. 7:23-cv-00022-D-KS. The following day, another class action complaint was filed by attorneys from the law firm of the later-appointed Lead Counsel. *See* DE 1, *In re: Camp Lejeune Toxic Water Exposure Litigation*, No. 7:23-cv-00098-D-BM (Feb. 12, 2023). A putative class action had earlier been filed by Lead Counsel's firm on August 14, 2022, but was dismissed without prejudice for failure to administratively exhaust. *See* DE 1, *Stringfellow v. United States*, No. 7:22-cv-00145-M-KS (Aug. 14, 2022); DE 25, *id.* (Feb. 14, 2023).

3

litigation is not a formal MDL . . . forcing consolidation on Plaintiffs' counsel is improper and against the spirit of the law[.]" *Id.*

On July 19, after interviewing several candidates for leadership, this Court selected one Lead Counsel and six Co-Lead Counsels. DE 10. The Court's order ("Leadership Order") directed the selected attorneys "to collaboratively lead and coordinate the activities of all plaintiffs' attorneys in this Litigation." *Id.* at 2. The Court enumerated a list of responsibilities for the attorneys or their delegees, including submitting motions and oppositions to the Court on behalf of plaintiffs, negotiating and entering into stipulations with the government, conducting scientific research into plaintiffs' illnesses, exploring settlement options, and making strategic litigation decisions. *Id.* at 2-5. The Court further directed the Lead Counsel and Co-Lead Counsels to appoint both an Executive Committee "charged with forming and populating subcommittees to carry out a comprehensive Litigation plan and ensure oversight, accountability, and coordination," and a Steering Committee to "assist in guiding the work of said subcommittees to efficiently advance the Litigation." *Id.* at 5-8. The Court separately appointed two attorneys to serve as Liaison Counsel, who are responsible for (among other things) "[p]rovid[ing] periodic reports to plaintiffs' counsel who are not on Plaintiffs' Executive Committee or Plaintiffs' Steering Committee concerning the status of the Litigation on no less than a quarterly basis." *Id.* at 2, 4. The Leadership Order provides that "[a]ll appointments are made for a one-year period and will expire on July 31, 2024," and that "[c]ounsel may apply for reappointment when their terms expire." *Id.* at 9.

Eight days after the Court issued the Leadership Order, the PLG submitted a letter to the Court identifying the attorneys selected for the Plaintiffs' Executive Committee and the Plaintiffs'

4

Steering Committee. The PLG filed the same information in a report on the public docket on August 18. DE 14.

On August 15, Willey and his law-firm colleagues wrote a letter to the Lead Counsel and Co-Lead Counsels seeking appointment to a subcommittee, noting that their "preferred roles would be on the committees for Bellwether, Resolution, or Discovery." Decl. of John F. Bash, Ex. A, at 2. The letter reiterated Willey's earlier claim that this Court had "no authority" to "consolidate this action" and that "the most appropriate course would be to consolidate under the first filed class action," *i.e.*, the one filed by Willey. *Id.* The letter then stated: "For this reason, we are concerned that if we are not named to a committee role and have no say in the direction of the case as it pertains to our clients, we will be forced to appeal this order so as to protect our clients' interest in these cases and the processes used to move them toward resolution." *Id.*[2]

The following day, Willey filed a motion for reconsideration of the Leadership Order. DE 13 ("Mot."). The motion reiterates the same objection that Willey raised in his previous letter, *i.e.*, that the Court lacks authority to "force the parties to consolidate" because this litigation is not an MDL, and that class certification would be a superior vehicle. *Id.* at 4-10.

**LEGAL STANDARD**

This Court has the inherent power to reconsider its interlocutory orders.[3] But reconsideration is granted only "in narrow circumstances: (1) the discovery of new evidence, (2) an

---

[2] The letter also stated that "[w]e have attempted to reach many of you by phone, text and email and to this point, have been unable to schedule a time to speak with you all." Decl. of John F. Bash, Ex. A, at 1. In fact, Co-Lead Counsel Zina Bash had "made time to speak with [one of Willey's colleagues] within 24 hours of his asking for a call[.]" *Id.* Ex. C; *see id.* Ex. B.

[3] Opinions of this Court have at times located that power in Federal Rule of Civil Procedure 54(b). Other federal courts have referred solely to their inherent power, perhaps because Rule 54(b) arguably pertains only to interlocutory orders that dispose of claims or resolve the rights and liabilities of parties, not to purely procedural orders. Regardless of the source of the power to

5

Case 7:23-cv-00897-RJ    Document 16    Filed 08/28/23    Page 5 of 14

intervening development or change in the controlling law, or (3) the need to correct a clear error or prevent manifest injustice." *Reale v. Wake Cnty. Hum. Servs.*, No. 5:11-CV-682-D, 2013 WL 2635181, at *5 (E.D.N.C. June 12, 2013) (internal quotation marks omitted).

Willey's motion invokes Federal Rule of Civil Procedure 59. Mot. 10. That rule addresses only motions for a new trial and motions to alter or amend a judgment and so does not apply here.

## ARGUMENT

I. **THIS COURT ALREADY CONSIDERED AND REJECTED WILLEY'S ARGUMENT**

As a threshold matter, Willey's motion should be denied because it just recycles the same objection that he already raised in response to this Court's order proposing a leadership-selection process. DE 9. As this Court has repeatedly explained to litigants, "a motion for reconsideration is not properly brought to revive questions already decided on arguments previously briefed or to present a more compelling argument that could have been raised earlier." *Jimenez-Orozco v. Baker Roofing Co.*, No. 5:05-CV-34-FL, 2006 WL 8438693, at *7 (E.D.N.C. Mar. 28, 2006); *see, e.g., McLaurin v. East Jordan Iron Works, Inc.*, 666 F. Supp. 2d 590, 596 (E.D.N.C. 2009) ("Generally, motions to reconsider are not appropriate vehicles to advance arguments already rejected by the Court or new legal theories not argued before the ruling." (internal quotation marks omitted)); *see also Bald Head Island Ltd., LLC v. Ironshore Specialty Ins. Co.*, No. 7:21-CV-177-BO, 2022 WL 17637455, at *3 (E.D.N.C. Dec. 13, 2022); *Buckner v. United Parcel Serv., Inc.*, 2011 WL 1134219, at *1 (E.D.N.C. Mar. 24, 2011). On that ground alone, the motion should be denied.

---

reconsider interlocutory orders, all courts apply a strict standard to avoid endless relitigation of settled procedural disputes.

## II. WILLEY HAS NOT IDENTIFIED ANY CLEAR ERROR OR MANIFEST INJUSTICE IN THE LEADERSHIP ORDER

Because Willey does not claim that any new evidence or intervening precedent provides a basis for reconsideration of the Leadership Order, reconsideration would be warranted only if he had identified a "clear error" or "manifest injustice," as he appears to concede. *See* Mot. 4, 8; *Reale*, 2013 WL 2635181, at *5. But his motion has demonstrated no such error or injustice. Indeed, the only "clear errors" are contained in the motion itself.

In particular, Willey's argument rests on a basic legal error. His central claim is that "no controlling case law or statute" gives this Court authority to appoint leadership counsel "at this stage of the litigation." Mot. 4. But he has overlooked Federal Rule of Civil Procedure 42(a)(3). That rule states that "[i]f actions before the court involve a common question of law or fact," the court not only may consolidate the cases or join them for trial, but also "may . . . issue any other orders to avoid unnecessary cost or delay." Since well before the MDL statute was enacted in 1968, federal courts have relied on Rule 42(a)(3) to appoint leadership when necessary to manage litigation involving large numbers of plaintiffs and common questions outside of the context of class actions. As the Fifth Circuit explained in its seminal 1977 decision on the issue, "[i]t is not open to serious question that a federal court in a complex, consolidated case may [under Rule 42(a)] designate one attorney or set of attorneys to handle pre-trial activity on aspects of the case where the interests of all co-parties coincide." *Florida Everglades*, 549 F.2d at 1013-14 (describing *MacAlister*, *supra*, as "perhaps the leading case on the court's power to appoint and rely on lead counsel"); *see Vincent v. Hughes Air W., Inc.*, 557 F.2d 759, 774 (9th Cir. 1977) (noting that by 1972 "the authority of the district courts regarding lead counsel was well-established").

Courts around the country regularly appoint lead counsel in cases that are neither designated as MDLs nor certified as class actions. *See, e.g.*, *Malden Transportation, Inc. v. Uber Techs., Inc.*, 323 F.R.D. 118, 120 (D. Mass. 2017); *KBC Asset Mgmt. NV on behalf of Chemed Corp. v. McNamara*, 78 F. Supp. 3d 599, 607-08 (D. Del. 2015); *Resnik v. Woertz*, 774 F. Supp. 2d 614, 625-27 (D. Del. 2011); *Horn v. Raines*, 227 F.R.D. 1, 3-4 (D.D.C. 2005). That is essential to ensuring efficiency and fairness in complex cases with large numbers of common issues. As one federal judge described the power of a district court to appoint lead counsel under Rule 42(a), "[l]itigation of this magnitude can only be tried by a small number of counsel responsible for administering the suit and coordinating its prosecution," and "[s]ociety, the judicial system, and the litigants all benefit from the resulting efficiency and concentration of resources." *In re Richardson-Merrell, Inc. Bendectin Prod. Liab. Litig.*, 624 F. Supp. 1212, 1246 (S.D. Ohio 1985) (Rubin, C.J.), *aff'd sub nom. In re Bendectin Litig.*, 857 F.2d 290 (6th Cir. 1988) (citing *Vincent*, *supra*; *Florida Everglades*, *supra*)).

Although Willey claims that the Court lacks authority to appoint leadership, the Court's power to do so is quite literally hornbook law. The Wright & Miller treatise explains in its section on Rule 42 that "the appointment of lead counsel is now commonplace in complex litigation" because "in very large litigation, the designation of an organized structure of representation may reduce legal costs, minimize scheduling conflicts, and ameliorate communication problems." 9 Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 2385 (2d ed. 1994 & Supp.2005). While the appointment of leadership is "especially" common in MDLs, *id.*, nothing limits a court's power to that context. The authority to appoint lead counsel in MDLs, after all, is not conferred by the MDL statute, 28 U.S.C. § 1407, which does not speak to that issue,

but rather by Rule 42(a)(3).[4] And the interests supporting the appointment of leadership in MDLs apply equally to complex litigation brought in one district.

That is why the *Manual for Complex Litigation* advises judges that in most complex cases (whether or not designated as MDLs) "the court will need to institute procedures under which one or more attorneys are selected and authorized to act on behalf of other counsel and their clients with respect to specified aspects of the litigation." MANUAL FOR COMPLEX LITIGATION § 10.22 (4th ed. 2004). The manual explains that typically lead counsel "act for the group—either personally or by coordinating the efforts of others—in presenting written and oral arguments and suggestions to the court, working with opposing counsel in developing and implementing a litigation plan, initiating and organizing discovery requests and responses, conducting the principal examination of deponents, employing experts, arranging for support services, and seeing that schedules are met." *Id.* § 10.221; *see also id.* §§ 10.221-10.224 (setting forth other guidelines for appointing and overseeing lead counsel). That is precisely the structure that this Court has instituted. It is designed to avoid the inefficiency and chaos that would ensue in litigation of this magnitude if the Court adhered to "[t]raditional procedures in which all papers and documents are served on all attorneys, and each attorney files motions, presents arguments, and examines witnesses"—an approach that "may waste time and money, confuse and misdirect the litigation, and burden the court unnecessarily." *Id.* § 10.22.

---

[4] Indeed, this Court's plenary jurisdiction over CLJA cases is far broader than an MDL transferee court's jurisdiction, which is limited to discovery and pretrial matters, so it would be incongruous to conclude that this Court's power to manage this litigation is more constrained. *See* 28 U.S.C. § 1407(a) ("Each action so transferred shall be remanded by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated[.]"). Although many MDLs involve bellwether trials or settlements, those can occur only where the transferee court otherwise has proper venue or the parties consent.

In addition, this Court's authority to appoint leadership under Rule 42(a)(3) is fortified by its broad power under Federal Rule of Civil Procedure 16(c)(2)(L) to "adopt[] special procedures for managing potentially difficult or protracted actions that may involve complex issues, multiple parties, difficult legal questions, or unusual proof problems."  It is hard to imagine a better description of litigation under the CLJA.

Accordingly, Willey's claim that this Court lacks authority to appoint lead counsel has no merit.  Tellingly, Willey does not mention Rule 42(a)(3), much less distinguish the extensive body of precedent and authoritative guidance holding that a court has the power under that rule to appoint lead counsel to litigate common issues.  And he provides no other argument that this Court's Leadership Order rested on clear error or manifest injustice.  That suffices to dispose of his motion.

In reality, this Court's Leadership Order reflected a careful balancing of the rights of individual plaintiffs to control their cases and the practical and moral imperative to ensure that all CLJA plaintiffs with meritorious claims can obtain relief as soon as possible with a minimum of litigation costs.  The Leadership Order makes unmistakably clear that counsel to individual plaintiffs, whether or not part of the PLG, "shall continue to be responsible for each individual plaintiff's case."  Leadership Order 10.  It also preserves "the right of any plaintiffs counsel to present any non-repetitive positions that uniquely affect an individual plaintiff, so long as the presentation does not unduly delay the proceedings," *id.* at 2; assures the authority of individual plaintiffs' counsel to respond "to matters specifically directed to individual plaintiffs and their counsel," *id.* at 3; and withholds from the Executive Committee the power to determine positions on matters "solely related to an individual plaintiff," *id.* at 6.  Willey is thus incorrect that this

10

Court "has effectively made individual counsel unable to provide any direction or input to their clients' cases." Mot. 9.

At the same time, the Leadership Order directs the experienced and diverse leadership group to litigate issues common to all plaintiffs—with a corresponding duty to vigorously represent the interests of all plaintiffs. And it establishes guardrails around that delegation of authority by (among other things) requiring reappointment of leadership counsel annually and directing separate Liaison Counsel to keep other attorneys informed about the PLG's decisions and progress. That balanced structure is the only sensible approach in litigation involving tens of thousands of claimants with an urgent need for recovery as soon as possible.

## III. APPOINTMENT OF CLASS COUNSEL WOULD BE PREMATURE AT THIS EARLY STAGE

Willey's only response to the infeasibility of allowing every individual plaintiff to litigate common issues is to ask this Court to certify a class action and to appoint interim class counsel under Federal Rule of Civil Procedure 23(g)(3) in lieu of a traditional leadership structure. Willey apparently believes that because he filed the first class action (by one day, *see supra* note 1), he would be appointed class counsel.[5]

There is nothing to recommend that approach. While class certification may ultimately be a worthwhile option to consider as the Court seeks to manage this case as efficiently as possible— for example, by certifying discrete issue classes for certain groups of plaintiffs to address common fact questions—that decision would be premature at this point. Willey identifies no benefit of appointing class counsel in lieu of the leadership structure that the Court has already put in place;

---

[5] It is well accepted that "'first to file' by itself has little to do with who is best qualified to lead [a] case[.]" *Michelle v. Arctic Zero, Inc.*, No. 12CV2063-GPC NLS, 2013 WL 791145, at *2 (S.D. Cal. Mar. 1, 2013) (citing cases).

his argument hinges exclusively on the erroneous view that the Court lacks authority to appoint leadership outside of Rule 23(g)(3). And invoking Rule 23(g)(3) to appoint leadership would presumably leave the plaintiffs rudderless should the Court ultimately determine that class certification is not warranted. There is thus no reason to prefer that approach over the structure that the Court has already instituted.

More broadly, it is not plausible that Congress gave this Court only two options: certifying a class comprising all CLJA plaintiffs or leaving thousands of plaintiffs to litigate individual claims with no centralization of common issues. Had Congress intended to impose that limited range of case-management options, it would have specified its preference for the use of class procedures in the CLJA. Instead, Congress entrusted the decision on how best to manage this vital and complex litigation to the sound discretion of this Court. And the Court has exercised that discretion in a way that conforms to decades of judicial practice, follows the guidance of the *Manual for Complex Litigation*, and ensures the fairest and most efficient path to fulfilling Congress's promise to deliver justice to the victims of Camp Lejeune's toxic water.

# CONCLUSION

The motion for reconsideration should be denied.

August 28, 2023

Respectfully submitted,

/s/ *John. F. Bash*
John F. Bash (admitted *pro hac vice*)
Quinn Emanuel Urquhart & Sullivan LLP
300 W. 6th St., Suite 2010
Austin, TX 78701
Telephone: (737) 667-6100
johnbash@quinnemanuel.com

*Member, Plaintiffs' Executive Committee*
*Co-Chair, Law and Briefing Subcommittee*

/s/ *Elizabeth Cabraser*
Elizabeth Cabraser (admitted *pro hac vice*)
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, Suite 2900
San Francisco, CA 94111
Telephone: (415) 956-1000
ecabraser@lchb.com

*Co-Lead Counsel*

/s/ *W. Michael Dowling*
W. Michael Dowling (N.C. Bar No.: 42790)
The Dowling Firm PLLC
Post Office Box 27843
Raleigh, NC 27611
Telephone: (919) 529-3351
mike@dowlingfirm.com

*Co-Lead Counsel*

/s/ *James A. Roberts, III*
James A. Roberts, III (N.C. Bar No.: 10495)
Lewis & Roberts, PLLC
3700 Glenwood Avenue, Suite 410
P. O. Box 17529
Raleigh, NC 27619
Telephone: (919) 981-0191
jar@lewis-roberts.com

*Co-Lead Counsel*

/s/ *J. Edward Bell, III*
J. Edward Bell, III (admitted *pro hac vice*)
Bell Legal Group, LLC
219 Ridge Street
Georgetown, SC 29440
Telephone: (843) 546-2408
jeb@belllegalgroup.com

*Lead Counsel*

/s/ *Zina Bash*
Zina Bash (admitted *pro hac vice*)
Keller Postman LLC
111 Congress Avenue, Suite 500
Austin, TX 78701
Telephone: (956) 345-9462
zina.bash@kellerpostman.com

*Co-Lead Counsel and Government Liaison*

/s/ *Robin Greenwald*
Robin L. Greenwald (admitted *pro hac vice*)
Weitz & Luxenberg, P.C.
700 Broadway
New York, NY 10003
Telephone: (212) 558-5802
rgreenwald@weitzlux.com

*Co-Lead Counsel*

/s/ *Mona Lisa Wallace*
Mona Lisa Wallace (N.C. Bar No.: 009021)
Wallace & Graham, P.A.
525 North Main Street
Salisbury, NC 28144
Telephone: (704) 633-5244
mwallace@wallacegraham.com

*Co-Lead Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on this date, a true and correct copy of the foregoing Opposition to Motion for Reconsideration and corresponding exhibits were filed with the Clerk of Court using the CM/ECF system, which automatically sends e-mail notification of such filing to all attorneys of record.

This 28th day of August, 2023.

/s/ *J. Edward Bell, III*
J. Edward Bell, III