**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**SOUTHERN DIVISION**
**No. 7:23-CV-897**

| | |
|---|---|
| **IN RE:** | **PLAINTIFFS' MASTER COMPLAINT** |
| **CAMP LEJEUNE WATER LITIGATION** | **Jury Trial Demanded** |
| **This Document Relates to:** | |
| **ALL CASES** | |

## I.  INTRODUCTION

1.      This Complaint arises under the Camp Lejeune Justice Act of 2022 ("CLJA")[1] and is filed pursuant to the provisions of Section VI of the September 26, 2023, Case Management Order No. 2 (ECF No. 23), for adoption by reference to individual CLJA actions and in conjunction with the Court-approved Short Form Complaint.

2.      Marine Corps Base Camp Lejeune ("Camp Lejeune") is a military base operated by the United States, located outside of Jacksonville, in Onslow County, North Carolina. The base is located on the coast of the Atlantic Ocean, with approximately 11 miles of usable shoreline, and occupying approximately 156,000 acres (244 square miles) in total. Camp Lejeune supports a current population of approximately 170,000 people.

3.      The story of Camp Lejeune has been described by scientists as the worst public drinking water contamination crisis in our nation's history.

4.      At this point in time, it is undisputed and well-documented that, between at least 1953 and 1987, Camp Lejeune provided contaminated water to those on base. It is estimated that

---

[1] Pub. L. No. 117–168, title VIII, § 804 (2022) (one section under the broader "Honoring our PACT Act of 2022").

as many as one million people may have been exposed to this water, including service members, civilian staff, and their respective families and dependents.

5. During this timeframe, contaminant levels in finished water—such as the water coming out of taps in housing, buildings, elementary schools, and hospital wards—reached at least 280 times higher than what the Environmental Protection Agency ("EPA") today considers safe.[2]

6. The list of diseases, illnesses, injuries, and conditions connected to the contaminants in Camp Lejeune's water supply is long and grave, including but not limited to: leukemia, non-Hodgkin's lymphoma, bladder cancer, kidney cancer, lung cancer, esophageal cancer, breast cancer, Parkinson's Disease, female infertility, miscarriages, and more. Many of these diseases, illnesses, injuries, and conditions have been acknowledged by the United States as causally connected to the contaminants at Camp Lejeune.[3]

7. The handling of this issue by the United States reveals a disregard for internal military water quality standards, a failure to respond to the contamination, the ignoring of warnings of the risk of contamination coupled with repeated test results showing that contamination was present, and the withholding of information from even Defendant's own scientists initially investigating the crisis.

8. As a result, scientists attempting to identify the true scale of contamination were misled for decades, resulting in a loss of contemporaneous investigatory ability, and requiring water modeling to retroactively calculate contamination levels.

---

[2] *See* William R. Levesque, Veterans Dep't, St. Lawrence Cnty., *Camp Lejeune Water Contamination History* (Oct. 18, 2009), https://stlawco.org/Departments/Veterans/CampLejeuneWaterContaminationHistory (last visited Jun. 27, 2023).
[3] *See, e.g.*, Agency for Toxic Substances and Disease Registry (ATSDR), Ctrs. for Disease Control and Prevention, Dep't of Health and Hum. Servs., *ATSDR Assessment of the Evidence for the Drinking Water Contaminants at Camp Lejeune and Specific Cancers and Other Diseases* 13 (Jan. 13, 2017) ("ATSDR Evidence Assessment"), available at https://www.atsdr.cdc.gov/sites/lejeune/docs/ATSDR_summary_of_the_evidence_for_causality_TCE_PCE_508.pdf (last visited Jun. 27, 2023).

9.      On August 10, 2022, the CLJA was signed into law. After many years of having no legal recourse, the thousands of people seeking justice for their injuries and for deaths caused by the contaminated water at or from Camp Lejeune were now able to file administrative claims seeking compensation.

10.     Importantly, the requirements to prevail on an action under the CLJA exclude any obligation that the claimants prove negligence or fault. The CLJA specifies the requirements claimants must satisfy as showing harm and a sufficient causal connection between that harm and the contaminants at Camp Lejeune, waiving any obligation to prove that the United States owed or breached a duty to those affected.

11.     Moreover, as to causation, claimants need only satisfy an equipoise standard, showing that such a causal relationship is at least as likely as not.

12.     Upon information and belief, as of the date of filing, the vast majority of the administrative claims submitted under the CLJA have not received a response.

13.     This is the position from which Plaintiffs bring their actions. After being exposed to contaminated water at or from Camp Lejeune, Plaintiffs suffered severe diseases, illnesses, injuries, and conditions, leading to death in many cases. Those who had been injured or died were misled for decades to believe that these injuries were not connected to the contaminated water at or from Camp Lejeune. Then, after this connection was later admitted, Plaintiffs were told that they were barred from any legal recourse, even as more and more details came to light about the ongoing disregard for water safety that led to the problem. Those who had been exposed were left abandoned until the CLJA was passed. Now, after seeking compensation through an administrative claim, Plaintiffs have not had their claims resolved through the administrative claims process and thus seek recourse through the instant lawsuits under the CLJA.

3

## II.    **NATURE OF THIS MASTER COMPLAINT**

14.    Each individual Plaintiff brings or will bring their own individual action through an individual complaint, including Short Form Complaints. This Master Complaint sets forth common allegations of fact and law applicable to all Plaintiffs who adopt these allegations by filing individual Short Form Complaints by the relevant deadlines set by the CLJA and this Court. This Master Complaint is meant to be read in concert with the individual Short Form Complaints and does not include individualized allegations about each Plaintiff's experiences. For any given Plaintiff who adopts the Master Complaint's allegations, the totality of that Plaintiff's allegations includes both the common allegations of the Master Complaint plus the individual allegations in that Plaintiff's Short Form Complaint.

15.    This Master Complaint does not constitute a waiver or dismissal of any actions or claims asserted in any individual complaints, nor does it waive any Plaintiff's rights, including their right to amend their individual complaints.

## III.    **JURISDICTION, VENUE, AND CONDITIONS PRECEDENT**

16.    The CLJA creates a "federal cause of action relating to water at Camp Lejeune, North Carolina." Thus, pursuant to the CLJA, the United States has waived its sovereign immunity and has authorized the instant lawsuit.

17.    CLJA Section 804(d) provides that the "United States District Court for the Eastern District of North Carolina shall have exclusive jurisdiction over any [CLJA action] and shall be the exclusive venue for such an action." Thus, both jurisdiction and venue are proper before this Court.

18.    Plaintiffs have each filed administrative claims with the Department of the Navy addressing the issues raised in this Master Complaint no less than six months prior to their filing

4

of an individual complaint. Plaintiffs' claim numbers are unavailable because the Department of the Navy has not yet assigned claim numbers. Plaintiffs' administrative claims have either (a) received a final denial or (b) been deemed a final denial because six months have passed since the claims were filed with the Department of the Navy and they remain without a final disposition. The conditions precedent required by 28 U.S.C. § 2675 and CLJA § 804(h) are satisfied.

## IV.    PARTIES

19.    Plaintiffs are individuals—including present and former Marines and other military service members, civilian employees, and family members or guests of former service members or civilian employees—who resided, worked, or were otherwise exposed to water contamination at or from Camp Lejeune for not less than 30 days during the period between August 1, 1953, and December 31, 1987. At all times Plaintiffs resided, worked, or were otherwise exposed to water contamination at or from Camp Lejeune. Plaintiffs' claims may in certain instances be brought by authorized legal representatives on their behalf.

20.    Defendant, United States of America ("United States"), owned, operated, and managed Camp Lejeune at all relevant times, by and through its Department of the Navy ("Navy") and the Navy's component, the United States Marine Corps ("Marine Corps"). Congress, through the CLJA, has recognized that Defendant United States should provide compensation for those who were harmed by exposure to the contaminated water at Camp Lejeune.

21.    The Navy and the Marine Corps are branches of the United States military. The United States is responsible for both branches and all related facilities, including Camp Lejeune.

## V.    FACTUAL ALLEGATIONS

22.    In 1941, Congress authorized funding for the project and construction of the base began. Between 1941 and 1943, Camp Lejeune underwent massive construction and expansion.

In 1942, the base was named Marine Barracks Camp Lejeune, and renamed Marine Corps Base Camp Lejeune in 1944. It has played a significant role in United States military operations ever since. Yet, despite its immeasurable contributions, the United States allowed these Marines and service members—along with their families and others who lived or worked at or near Camp Lejeune—to be poisoned for decades through the water provided on base.

## A.   BACKGROUND INFORMATION

23.     At all relevant times, Camp Lejeune was divided into various water distribution systems. It is important to distinguish these areas to understand where the contamination and exposure occurred. The relevant water distribution systems included Hadnot Point, Holcomb Boulevard, and Tarawa Terrace. These water distribution systems are identified on the map below ("Area Map").[4]



---

[4] U.S. Marine Corps, *Camp Lejeune Drinking Water System Service Areas*, https://clnr.hqi.usmc.mil/clwater/pages/map.aspx (last visited Jun. 26, 2023).

24.     Each of these water distribution systems received water from its individual water treatment plant. A conceptual representation of the flow of water within each water distribution system is provided below.[5] Untreated water flows from a number of wells in each water distribution system to that area's water treatment plant, where the water is filtered and treated. Water that has undergone filtration and treatment at the treatment station ("finished water") then flows to a reservoir, where it waits until it is needed, at which point it flows to the base facility for delivery.



25.     The water treatment plants employed "a lime softening process, using a catalytic precipitation lime contact tank and pressure filters."[6] This process is ineffective for removing volatile organic compounds ("VOCs")—a category which includes each of the primary contaminants detected in Camp Lejeune water—allowing them to pass through the water treatment plant into the reservoir, and flow through the system to the point of delivery.

_____

[5] U.S. Marine Corps, *Camp Lejeune Water System*, https://clnr.hqi.usmc.mil/clwater/pages/WaterSystem.aspx (last visited Jun. 27, 2023).
[6] *Study of Two Water Plants, Tarawa Terrace – Montford Point* (April 1979), at 1, available at https://tftptf.com/CLW_Docs/CLW0188.pdf (last visited Jun. 27, 2023).

7

26.     The following map ("Well Map") shows the locations of certain supply wells within the Hadnot Point, Holcomb Boulevard, and Tarawa Terrace water distribution systems.[7] It also highlights three of the primary contamination sources: the Hadnot Point Industrial Area, the Hadnot Point Landfill Area, and ABC One-Hour Cleaners.



---

[7] Morris L. Maslia et al., *Reconstructing Historical VOC Concentrations in Drinking Water for Epidemiological Studies at a U.S. Military Base: Summary of Results*, 8 Water 449 (2016), available at https://pubmed.ncbi.nlm.nih.gov/28868161/#&gid=article-figures&pid=figure-1-uid-0 (last visited Jun. 27, 2023).

27.     There were times when the demand in one water distribution system exceeded the supply from its wells. During these times, water from one water distribution system's reservoir would be pumped to another water distribution system to fill the need.

28.     Base facilities could receive contaminated water in one of two ways. First, if a source well in its water distribution system was contaminated, that water would be mixed with the water from all other wells in its water distribution system whenever it was in use, leading to all finished water in the system's reservoir being contaminated. Second, even if no source wells within the immediate water distribution system were contaminated, if the water distribution system drew supplemental finished water from a water distribution system that did have contaminated wells, that contaminated finished water would also be delivered in the supplemented water distribution system.

29.     A number of contaminants have been detected in the Camp Lejeune water supply. The five that have been identified to date as the most harmful and widespread are all classified as volatile organic compounds: tetrachloroethylene ("PCE"), trichloroethylene ("TCE"), dichloroethylene ("DCE"), vinyl chloride, and benzene.

30.     Today, the EPA regulates the maximum contaminant levels ("MCL") for each of these five contaminants. The MCL indicates the level of exposure at which there are no known or anticipated adverse health effects. When individuals are exposed to these contaminants at levels that exceed these MCLs, it is understood that there is a risk of adverse health effects.

31.     Units of parts-per-billion ("ppb") are used in measuring water contamination. A measurement of 1 ppb means that among a sample of 1 billion particles, 1 particle of the measured substance is present. 1 ppb is equal to 1 microgram-per-liter ("µg/L"). 1,000 ppb (or 1,000 µg/L) is equal to 1 part-per-million ("ppm") or 1 milligram-per-liter ("mg/L").[8]



32.     The current EPA MCL for PCE is 5 ppb. Finished water at Camp Lejeune reached at least 215 ppb of PCE.

33.     The current EPA MCL for TCE is 5 ppb. Finished water at Camp Lejeune reached at least 1,400 ppb of TCE.

34.     The current EPA MCL for DCE is 7 ppb. Finished water at Camp Lejeune reached at least 406 ppb of DCE.

35.     The current EPA MCL for vinyl chloride is 2 ppb. Finished water at Camp Lejeune reached at least 2.9 ppb of vinyl chloride.

36.     The current EPA MCL for benzene is 5 ppb. Finished water at Camp Lejeune reached at least 2,500 ppb of benzene.

---

[8] Okla. Dep't Env't Quality, *Test Result Interpretation*, https://www.deq.ok.gov/state-environmental-laboratory-services/technical-assistance/test-result-interpretation/ (last visited Jun. 27, 2023).

1. **HADNOT POINT**

37. Hadnot Point is the southernmost highlighted area on both the Area Map and the Well Map, located below Holcomb Boulevard, and Tarawa Terrace.

38. Much of the infrastructure of Hadnot Point was built during the early construction of Camp Lejeune in 1941. This included the Hadnot Point Water Treatment Plant, as well as many of the source wells.

39. The Hadnot Point Fuel Farm was also constructed in 1941, comprised of one 600,000-gallon aboveground tank, six 12,000-gallon underground tanks, and eight 15,000-gallon underground tanks. In total, these tanks held up to 792,000 gallons of fuel.

40. The Hadnot Point Fuel Farm was built in close proximity to important supply wells which provided water to the Hadnot Point Water Treatment Plant. In particular, the fuel farm was a mere 1,200 feet from supply well HP-602.

41. In 1972, supply well HP-651 was installed adjacent to the defense property disposal compound (labeled "Hadnot Point Landfill Area" in the Well Map above), which had been functioning as a junkyard and solvent disposal area for decades.

42. At all relevant times, Hadnot Point has been one of the primary housing areas on base, containing a majority of the barracks for unmarried military personnel. The Hadnot Point water distribution system includes Hospital Point housing, French Creek barracks, and Hadnot Point barracks.

43. In addition, Hadnot Point provided water to all of Holcomb Boulevard until the Holcomb Boulevard water distribution system was established in or about June of 1972. This included Midway Park housing, Paradise Point general officer housing, Paradise Point two-story

housing, Paradise Point cracker box housing, Paradise Point Cape Cod housing, Paradise Point Capehart housing, Watkins Village housing, and Berkeley Manor housing.

44.     Hadnot Point also contained the Hadnot Point Industrial Area, which included the Hadnot Point Fuel Farm and major maintenance facilities. When Camp Lejeune first came under scrutiny, the United States disclosed a fuel leak here of 20,000 to 30,000 gallons in 1979. It was later revealed that upwards of approximately 1.1 million gallons of fuel were lost into the soil at Hadnot Point Fuel Farm, with an average of more than 20,000 gallons per year.

45.     Hadnot Point also included a number of other areas believed to have contributed to groundwater contamination, such as the base dump, which included a dump for chemical drums, a liquid-disposal dumping area, a former burn dump, a fuel tank sludge dumping area, an industrial fly-ash dump, a transformer storage lot, an open storage pit, and a junkyard. Also, Hadnot Point had a former fire training area and a former on-base dry-cleaning service.

46.     Hadnot Point was also one of many locations on the base where marines used TCE (at the instruction of the United States) as a degreaser to remove grease, oils, and waxes from all variety of metal equipment and vehicles.

47.     In 1980, a U.S. Army Lab conducted testing on water samples from Hadnot Point. The Laboratory Services Chief included a handwritten note on the report stating "[w]ater is highly contaminated with low molecular weight halogenated hydrocarbons."[9]

48.     In 1981, the same U.S. Army Lab sent a subsequent communication, with the Laboratory Services Chief emphasizing in another handwritten note that "[w]ater is highly contaminated with other chlorinated hydrocarbons (solvents)!"[10]

---

[9] *TTHM Surveillance Report Form* (Collected Oct. 21, 1980), available at https://tftptf.com/CLW_Docs/CLW 0436.pdf (last visited Jun. 27, 2023).
[10] *TTHM Surveillance Report Form* (Collected Feb. 26, 1981), available at https://tftptf.com/CLW_Docs/CLW 0443.pdf (last visited Jun. 27, 2023).

49.    In 1982, the United States retained Grainger Laboratories ("Grainger") as a consultant to study the water supply at Camp Lejeune. Grainger was not informed of the previous testing and the elevated levels that had been detected.

50.    In May of 1982, Grainger detected elevated levels of PCE and TCE in the water supply at Hadnot Point.[11] In particular, a sample taken from the Naval Hospital was found to contain 1,400 ppb of TCE.

51.    In at least July of 1982, December of 1982, and March of 1983, Grainger warned relevant personnel that these contaminants required attention.

52.    In July 1984, supply well HP-602 was sampled and found to contain 380 ppb of benzene.

53.    On November 30, 1984, supply well HP-602 was closed. A few days later, it was sampled again and found to contain 121 ppb of benzene, 24 ppb of PCE, and 1,600 ppb of TCE.

54.    In December of 1984, multiple wells in Hadnot Point were sampled again, and wells 601, 608, 634, and 637 were closed due to contamination.

55.    On January 8, 1985, a communication noted that benzene is a highly volatile compound which may not be detected in tests if there is a delay in analysis.[12]

56.    On January 16, 1985, additional samples were taken of Hadnot Point wells.

57.    In late January of 1985, Hadnot Point supplied water to the Holcomb Boulevard water distribution system while the Holcomb Boulevard water treatment plant was offline.

58.    On January 31, 1985, water samples were collected from locations throughout Holcomb Boulevard, which was receiving water from Hadnot Point at the time. These samples

---

[11] *See* May 6, 1982, Call Notes, available at https://tftptf.com/CLW_Docs/CLW0542.pdf (last visited Jun. 27, 2023).
[12] *See Volatile Organic Chemical Analysis Reports*, at *2, available at https://tftptf.com/CLW_Docs/CLW5237.pdf (last visited Aug. 28, 2023).

contained high levels of TCE, revealing that Hadnot Point water was still contaminated. The highest known reading, in a sample taken from an elementary school, was at 1,148.4 ppb.

59.    On February 4, 1985, the Holcomb Boulevard water treatment plant was reactivated, both the Holcomb Boulevard and Hadnot Point systems were flushed, and the results of the January 16, 1985, samples were received. Hadnot Point supply well HP-651 was revealed to contain 3,200 ppb of TCE. HP-651 was closed at this time and resampled.[13]

60.    The results of this resampling were even higher: 18,900 ppb of TCE, 8,070 ppb of DCE, 400 ppb of PCE, and 179 ppb of vinyl chloride.[14]

61.    In the same series of samples, a February 5, 1985, sample from the Hadnot Point water treatment plant was found to still contain 429 ppb of TCE, even though wells HP-602 and HP-651 were both closed.[15]

62.    On November 19, 1985, a water sample from the Hadnot Point water treatment plant tested at 2,500 ppb of benzene.

63.    Another water sample, on December 10, 1985, tested at 38 ppb of benzene.

64.    A January 24, 1986, memorandum analyzing these results stated that "[w]hile the periodic readings for Benzene are felt to be a quality control problem in sampling and/or laboratory analysis, samples of each active raw water well for Hadnot Point was [sic] taken … last week. Results are anticipated in early February."[16] Upon information and belief, these results are missing.

65.    On January 13, supply well HP-645 was closed due to benzene contamination.[17]

---

[13] Feb. 26, 1985, Chronology prepared by Elizabeth Betz, available at https://tftptf.com/CLW_Docs/CLW4546.pdf (last visited Aug. 27, 2023).

[14] *Id.*

[15] *See Volatile Organic Chemical Analysis Reports*, at \*30, available at https://tftptf.com/CLW_Docs/CLW5237.pdf (last visited Aug. 28, 2023).

[16] *Analysis of Drinking Water Systems Aboard Camp Lejeune/MCAS, New River* (Jan. 24, 1986), available at https://tftptf.com/CLW_Docs/CLW1406.pdf (last visited Jun. 27, 2023).

[17] *See Review of N.A.C.I.P. Program, Marine Corps Base, Camp Lejeune* (Jan. 21, 1987), at \*6, available at https://tftptf.com/CLW_Docs/CLW4963.pdf (last visited Jun. 27, 2023).

66. On February 5, 1987, a project was proposed to replace and relocate the leaking Hadnot Point Fuel Farm, including a plan for temporary measures to be used while the project was underway that would avoid continued use of the Hadnot Point Fuel Farm.[18] As of May 18, 1988, that project was still pending funding.

67. On March 29, 1988, a letter from a Marine Corps attorney urged the immediate replacement of the fuel tanks at the Hadnot Point Fuel Farm, which were estimated to be leaking approximately 1,500 gallons of fuel per month. This letter stated in part: "From an attorney's perspective, concerned with responding to potential litigation, it appears patently unreasonable to wait until out-years to replace the tanks. Such delay will result in an indefensible waste of money, and a continuing potential threat to human health and the environment."[19]

68. A December 1988 study of the groundwater near the Hadnot Point Fuel Farm noted several points of concern. In particular, it found a plume of contamination of up to 15 feet in thickness and that the local geology consisted primarily of silty sand, meaning the contamination was not confined to the local area.[20]

69. In or about 1990-91, the Hadnot Point Fuel Farm was replaced and closed.

70. The United States has since conceded that benzene levels in drinking water exceeded safe levels for both children and adults from at least 1979 until 1984.[21] However, the later disclosure of the hidden information contained in the Navy's UST archive, showing that an

---

[18] See Response to Documented Groundwater Contamination at Hadnot Point Fuel Farm (May 18, 1988), available at https://tftptf.com/CLW_Docs/CLW1737.pdf (last visited Jun. 27, 2023).
[19] Construction Contract 89-B-2611, Temporary Fuel Farm (Aug. 9, 1989), at 33-34, available at https://www.tftptf.com/CERCLA/00096.pdf (last visited Jun. 27, 2023).
[20] See Contaminated Ground Water Study, Marine Corps Base Camp Lejeune, N.C., Hadnot Point Area (December 1988), at 11, 14, available at https://www.tftptf.com/CERCLA/00417.pdf (last visited Jun. 27, 2023).
[21] See Agency for Toxic Substances and Disease Registry (ATSDR), Ctrs. for Disease Control and Prevention, Dep't of Health and Hum. Servs., Public Health Assessment for Camp Lejeune Drinking Water 9 (Jan. 20, 2017) ("ATSDR 2017 PHA"), available at https://www.atsdr.cdc.gov/HAC/pha/MarineCorpsBaseCampLejeune/Camp_Lejeune_Drinking_Water_PHA(final)_%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_508.pdf (last visited Jun. 27, 2023).

average of more than 21,000 gallons of fuel were lost into the soil each year, suggests that benzene contamination began much earlier.[22]

71.     The United States has further conceded that, within the Hadnot Point water distribution system, at least one volatile organic compound has exceeded its current EPA MCL at all times between at least August 1953 and January 1985.[23]

2.     HOLCOMB BOULEVARD

72.     Holcomb Boulevard is the middle-highlighted area on both the Area Map and the Well Map, located north of Hadnot Point and south of Tarawa Terrace.

73.     During the relevant time period, finished water at Holcomb Boulevard had high levels of contamination through 1972 by way of being served by the Hadnot Point water treatment plant.

74.     In 1972, the Holcomb Boulevard water distribution system was established. This included the drilling of a number of new supply wells, as well as the construction of a new water treatment plant and reservoirs for this water distribution system. However, from 1972 to 1987, the Holcomb Boulevard water distribution system received supplemental water from Hadnot Point, leading to continued contamination in Holcomb Boulevard finished water.

75.     At all relevant times, Holcomb Boulevard has been one of the primary housing areas on base. The Holcomb Boulevard water distribution system includes Midway Park housing, Paradise Point general officer housing, Paradise Point two-story housing, Paradise Point cracker

---

[22] H.R. Rep. No. 111-108 (Sept. 16, 2010), at 6, available at https://www.govinfo.gov/content/pkg/CHRG-111hhrg58485/pdf/CHRG-111hhrg58485.pdf (last visited Jun. 27, 2023).

[23] *See* Agency for Toxic Substances and Disease Registry (ATSDR), Ctrs. for Disease Control and Prevention, Dep't of Health and Hum. Servs., *Camp Lejeune, Background* (page last reviewed Jan. 16, 2014), https://www.atsdr.cdc.gov/sites/lejeune/background.html (last visited Jun. 27, 2023).

box housing, Paradise Point Cape Cod housing, Paradise Point Capehart housing, Watkins Village, and Berkeley Manor housing.

76.     Although the Holcomb Boulevard water distribution system (once opened) did not have the significant sources of contamination that the Hadnot Point water distribution system did, the Holcomb Boulevard water distribution system remained interconnected with the Hadnot Point water distribution system, and raw or finished water could be and indeed was pumped from one water distribution system to the other. This exchange was controlled by two isolation valves, referred to as Booster Pump 742 and the Marston Pavilion Valve.

77.     The United States has conceded that, during times when Hadnot Point water was transferred to Holcomb Boulevard, TCE levels in Holcomb Boulevard finished water were anywhere from two to twelve times the levels permitted by current EPA MCLs.[24]

78.     In January of 1985, a gas line feeding a generator at the Holcomb Boulevard water treatment plant leaked gasoline into the Holcomb Boulevard water system. As a result, the Holcomb Boulevard water treatment plant was offline for nine days, during which time water from Hadnot Point was pumped to the Holcomb Boulevard water distribution system. During this period, finished water in housing areas throughout Holcomb Boulevard exceeded 50 ppb of TCE.[25] This recorded instance is illustrative of the effect of distributing Hadnot Point water to Holcomb Boulevard.

---

[24] *See* Agency for Toxic Substances and Disease Registry (ATSDR), Ctrs. for Disease Control and Prevention, Dep't of Health and Hum. Servs., *Analyses and Historical Reconstruction of Groundwater Flow, Contaminant Fate Transport, and Distribution of Drinking Water Within the Service Areas of the Hadnot Point and Holcomb Boulevard Water Treatment Plants and Vicinities, U.S. Marine Corps Base Camp Lejeune, North Carolina, Chapter A: Summary and Findings* (March 2013) ("ATSDR Reconstruction"), at A67, available at https://www.atsdr.cdc.gov/sites/lejeune/docs/chapter_A_hadnotpoint.pdf (last visited Jun. 27, 2023).
[25] ATSDR Reconstruction at A68.

79.     The official position of the United States is that occasions where Hadnot Point water was pumped to Holcomb Boulevard were infrequent.[26] The estimates put forth by the United States as to the frequency of this exchange, as well as the derivative reconstructed estimates of contamination levels at Holcomb Boulevard, are based upon review of incomplete water utility logbooks from Booster Pump 742 and Marston Pavilion. The United States concedes that the "valve openings are only partially documented."[27]

80.     The treated water from the Holcomb Boulevard water treatment plant was used to water the greenery on two base golf courses, routinely drawing 300,000 to 500,000 gallons of water per day. This resulted in frequent shortages of treated water in the Holcomb Boulevard water distribution system, requiring supplemental treated water from Hadnot Point.

81.     Upon information and belief, the Marston Pavilion valve was regularly activated.

82.     Some or all of the relevant logbooks and documents related to the operation of the control valves at Marston Pavilion and Booster Pump 742 are missing.

83.     As demonstrated by the 1,148.4 ppb TCE reading at the Berkley Manor Elementary school on February 7, 1985, at the times when this exchange was activated and Hadnot Point water was provided to Holcomb Boulevard, Holcomb Boulevard residents were exposed to high levels of contamination.

3.     TARAWA TERRACE

84.     Tarawa Terrace is the northeastern region on the Area Map, and the northern region on the Well Map, north of Holcomb Boulevard, and east of Camp Johnson.

---

[26] ATSDR Reconstruction at A13.
[27] ATSDR Reconstruction at A64.

85.     In 1952, construction was completed on a new Camp Lejeune subdivision named Tarawa Terrace. This subdivision included its own water treatment plant and water distribution system.

86.     Three of the initial supply wells providing water to Tarawa Terrace were constructed down gradient from dry cleaning businesses, car repair shops, and gas stations.

87.     In 1952, supply well TT-26 was constructed at the very edge of the Camp Lejeune property line, along Lejeune Boulevard. At the time of construction, this was already down-gradient from Glamorama dry cleaners, car repair shops, and gas stations. Nevertheless, the well was drilled to a depth of only 95 feet. It is unknown why this well was not drilled deeper, despite the average well on Camp Lejeune being approximately 180 feet.

88.     In 1953, ABC One Hour Dry Cleaner ("ABC") began operating across Lejeune Boulevard from well TT-26, only 900 feet away. Once it began operating, ABC used approximately 110-165 gallons of PCE per month. The PCE used by ABC generated two types of waste: solid and liquid.

89.     The liquid PCE waste, contained in wastewater, was disposed of through a soil absorption septic tank. In other words, it was dumped into the ground approximately 900 feet from well TT-26.

90.     The solid PCE waste was used to fill potholes, or otherwise disposed of in the ground behind the building of ABC, where rainwater caused additional PCE to leach into the soil, approximately 900 feet from well TT-26.

91.     The United States has conceded that estimated PCE levels were above current MCLs from at least November of 1957 until January of 1985.[28]

92.     Following the January 1985 generator fuel line leak at the Holcomb Boulevard water treatment plant, additional testing was also conducted at Tarawa Terrace. Supply well TT-26 was found to contain 1,580 ppb of PCE, as well as 57 ppb of TCE, 92 ppb of DCE, and 27 ppb of vinyl chloride. In addition, supply well TT-23 was found to contain 132 ppb of PCE, 5.8 ppb of TCE, and 11 ppb of DCE.

93.     Both wells were shut off on February 8, 1985.

94.     Yet, one or more of these contaminated wells were reactivated in times of water supply shortage until the Tarawa Terrace water treatment plant was closed in March of 1987. A memorandum discussing this decision noted that "the potential health hazards must be weighed against the need and cost of providing water from other sources."[29]

95.     The United States has conceded that estimated PCE levels remained elevated until the Tarawa Terrace water treatment plant was closed in March of 1987, exceeding current MCLs in all but two months.[30]

96.     The Tarawa Terrace water distribution system and the Camp Johnson water distribution system were "joined together" and capable of exchanging water.[31]

---

[28] ATSDR Reconstruction App'x A2 at A83-A93, available at https://www.atsdr.cdc.gov/sites/lejeune/docs/Reconstructed%20TTWTP%20Concentrations_ATSDR_Chapter%20A%20Report_Camp%20Lejeune.pdf (last visited Jun. 27, 2023).
[29] *Alternatives for Providing Water to the Tarawa Terrace Area* (Mar. 1, 1985), available at https://tftptf.com/CLW_Docs/CLW1129.pdf (last visited Jun. 27, 2023).
[30] ATSDR Reconstruction App'x A2 at A93, available at https://www.atsdr.cdc.gov/sites/lejeune/docs/Reconstructed%20TTWTP%20Concentrations_ATSDR_Chapter%20A%20Report_Camp%20Lejeune.pdf (last visited Jun. 27, 2023).
[31] *Inadequate Raw Water Supply at Tarawa Terrace and Camp Johnson* (Mar. 30, 1983), available at https://tftptf.com/CLW_Docs/CLW0707.pdf (last visited Jun. 27, 2023).

97. The Tarawa Terrace water distribution system and Camp Johnson water distribution system were interconnected enough to jointly supply water to the Knox Trailer Park.

98. Upon information and belief, contaminated water may have also been present within the Camp Johnson water distribution system during the relevant time period.

### 4. WATER BUFFALOES

99. In the military context, a water buffalo refers to a portable water tank, typically a 400-gallon tank mounted on a towable trailer, used for storing and transporting water.

100. Upon information and belief, during field training exercises, the Marine Corps routinely uses water buffaloes, including during all relevant times at Camp Lejeune. By using water buffaloes, service members at Camp Lejeune were able to leave the main areas of the base to conduct field training exercises away from water supplies, relying on the water buffaloes to supply water throughout the training.

101. Upon information and belief, service members at Camp Lejeune were typically spending an average of three days per week engaged in such field training exercises.[32]

102. Upon information and belief, these trainings were often for extended periods of time, lasting for several hours or more. Throughout the duration of these trainings, the water buffaloes were the primary source of drinking water for all participants.

103. The United States has conceded that water buffaloes filled with Hadnot Point water provided contaminated drinking water to service members during trainings.[33]

---

[32] Agency for Toxic Substances and Disease Registry (ATSDR), Ctrs. for Disease Control and Prevention, Dep't of Health and Hum. Servs., *Twenty-Seventh Meeting of Camp Lejeune Community Assistance Panel (CAP) Meeting Transcript* (Apr. 4, 2014), at 64, available at https://www.atsdr.cdc.gov/sites/lejeune/docs/transcript-4_14.pdf (last visited Jun. 27, 2023).

[33] Agency for Toxic Substances and Disease Registry (ATSDR), Ctrs. for Disease Control and Prevention, Dep't of Health and Hum. Servs., *Camp Lejeune Public Meeting (9-19-2020) – Q&A*, at *42, available at https://www.atsdr.cdc.gov/sites/lejeune/docs/transcripts/CAP-Public-meeting-QA-Sept-2020-508.pdf (last visited Jun. 27, 2023).

104.    Upon information and belief, at all relevant times, contaminated water from the Hadnot Point water distribution system and/or other contaminated sources was used to fill water buffaloes routinely used for field training exercises conducted throughout the base.[34] This included at least all regions on the east side of the New River, including Camp Johnson, Tarawa Terrace, Paradise Point, Holcomb Boulevard, Hadnot Point, Courthouse Bay, Onslow Beach, and the broader Camp Lejeune Military Reservation. Moreover, this potentially included regions on the west side of the New River, including Camp Geiger, Stone Bay, and Marine Corps Air Station New River.

105.    Further, upon information and belief, water buffaloes filled with contaminated water from the Hadnot Point water distribution system and/or other contaminated sources were also used for extended field training exercises conducted outside of Camp Lejeune, including at Marine Corps Auxiliary Field Bogue, also known as Bogue Field.

106.    Upon information and belief, water from Hadnot Point contaminated with PCE, TCE, DCE, vinyl chloride, and benzene was provided to Marines and other service members from all over the base who conducted field training exercises at any of the above-referenced locations.

107.    Upon information and belief, virtually all Marines and other service members who engaged in field training at Camp Lejeune did so at least in part on the east side of the New River, including those attending recruit training or infantry training at Camp Geiger.

108.    Upon information and belief, during warm weather, water buffaloes were also placed in many locations around the base to provide easy access to water and encourage hydration,

---

[34] *See id.*; *see also* Agency for Toxic Substances and Disease Registry (ATSDR), Ctrs. for Disease Control and Prevention, Dep't of Health and Hum. Servs., *Twenty-Sixth Meeting of Camp Lejeune Community Assistance Panel (CAP) Meeting Transcript* (Sep. 6, 2013), at 101, available at https://www.atsdr.cdc.gov/sites/lejeune/docs/CAP transcript_9_13.pdf (last visited Jun. 27, 2023).

many or all of which were filled using contaminated water from the Hadnot Point water distribution system and/or other contaminated sources.

109. The United States has conceded that "we assume that everybody at [Camp] Lejeune had some exposure because even if you didn't live in a residence on base that received contaminated water, you did visit the main side, you did train, you drank [from] the water buffaloes that were served – provided by Hadnot Point water, so on and so forth. So everyone was exposed[.]"[35]

110. During the relevant time period, people living or working at Camp Lejeune were exposed to the contaminated water through a number of cumulative exposure pathways. These included drinking, showering, bathing, toiletry, swimming, food preparation, dishwashing, laundry, inhalation from volatilization (i.e., one or more of the chemicals can turn into a gas at room temperature), inhalation from vapor intrusion from groundwater through soil, and more. Harmful exposure could and did occur through ingestion, inhalation, and dermal contact.

111. Moreover, marines in training drink water and shower more than most people. The United States has recognized that "[a] marine in training at Camp Lejeune consumes an estimated 6 liters of water per day for three days per week and 3 liters per day the rest of the week. Under warm weather conditions, a marine may consume between 1 and 2 quarts of water per hour and shower twice a day. It is likely that during training, the water supplied in the field came from the Hadnot Point water system with both measured and estimated levels of TCE and PCE substantially higher than their MCLs."[36]

---

[35] Agency for Toxic Substances and Disease Registry (ATSDR), Ctrs. for Disease Control and Prevention, Dep't of Health and Hum. Servs., *Forty-Second Meeting of Camp Lejeune Community Assistance Panel (CAP) Meeting Transcript* (Apr. 24, 2019), available at https://www.atsdr.cdc.gov/sites/lejeune/docs/transcripts/cap_april_2019_508.pdf (last visited Jun. 27, 2023).
[36] ATSDR Evidence Assessment at 3.

5.     <u>ADDITIONAL WATER CONTAMINATION FACTS</u>

112.    The United States played a significant role in causing and allowing the continuance of the water contamination at Camp Lejeune, including its efforts to conceal the presence and extent of the contamination.

113.    In 1948, a study conducted by the American Petroleum Institute concluded that the only safe concentration for benzene is zero.[37]

114.    Placing and operating a major supply well (HP-602) only 1,200 ft—less than a quarter mile—from the base's primary fuel depot risked contaminating the water supply.

115.    Placing and operating a major supply well (TT-26) only 900 ft—just over an eighth of a mile—down-gradient from a business which dumped chemicals into the ground risked contaminating the water supply.

116.    Placing and operating a major supply well (HP-651) adjacent to a base dump, including a junkyard, both of which housed metal waste exposed to metal degreasers containing TCE, risked contaminating the water supply.

117.    A 1958 study conducted by a government contractor (Legrand) concluded that the wells used at Camp Lejeune would require frequent maintenance inspections and repairs. These inspections and repairs were not completed.

118.    A 1959 study by Legrand found that the aquifer beneath Camp Lejeune was not well-protected from surface contamination because the layers of clay, which can serve as a barrier to restrict the movement of contaminants, were thin and not continuous. No changes were made to reduce this risk or monitor for the predicted contamination.

---

[37] *See* Am. Petroleum Inst., *API Toxicological Review, Benzene* 4 (Sept. 1948), available at https://fixourfuel.com/wp-content/uploads/2016/05/API-Benzene-Toxicology-Review-2.pdf (last visited Jun. 27, 2023).

119.    Also in 1959, the Navy's Bureau of Medicine and Surgery ("BUMED") issued instruction 6240.3A, regarding Navy standards for potable water. Among other things, instruction 6240.3A recognized that "irregularity in quality is an indication of potential danger."[38] Thus, by at least 1959, the United States understood that water samples showing contamination cannot be disregarded because the contamination levels are irregular.

120.    In 1963, BUMED issued NAVMED P-5010-5, governing potable water at onshore Navy facilities such as Camp Lejeune. It was recognized in the document that "well waters obtained from aquifers beneath impervious strata . . . are usually considered sufficiently protected to preclude need for purification," highlighting by contrast that the Camp Lejeune aquifer's thin and discontinuous clay layers left the water supply under-protected. This document recognized that carbon chloroform extract ("CCE") tests were a practical measure of water quality at the time, and that "water supplies containing over 200 micrograms CCE/1 of water represent an exceptional and unwarranted dosage of the water consumer with ill-defined chemicals." Moreover, it further directed that water sampling be conducted once per year on finished water, the primary supply of raw water, and raw water from each supply well[39] during the relevant time period.

121.    Later in 1963, BUMED issued instruction 6240.3B. This new regulation prohibited not only substances known to be toxic, but also substances for which the physiological effects were unknown, from being permitted to reach the water consumers.[40]

122.    In 1972, BUMED issued instruction 6240.3C. This document reduced the total allowable detection under a CCE test from 200 ppb to 150 ppb. It also provided that a detection of

---

[38] Bureau of Med. & Surgery, Dep't of the Navy, *BUMED Instruction 6240.3A* (Dec. 24, 1959), at 2, available at https://tftptf.com/CLW_Docs/BUMED62403A.pdf (last visited Aug. 9, 2023).
[39] Bureau of Med. & Surgery, Dep't of the Navy, *Manual of Naval Preventive Med., Chapter 5: Water Supply Ashore* (Aug. 1963), at 14, 32, 40, available at https://www.tftptf.com/New_ATSDR1/NAVMED_P-5010-5_1963.pdf (last visited Aug. 9, 2023).
[40] Bureau of Med. & Surgery, Dep't of the Navy, *BUMED Instruction 6240.3B* (Sept. 30, 1963), at 3, available at https://tftptf.com/CLW_Docs/BUMED62403B.pdf (last visited Aug. 9, 2023).

25

only 3 to 100 ppb of chlorinated hydrocarbons constituted grounds for rejection of the water supply. During the relevant time, contaminants of concern at Camp Lejeune included chlorinated hydrocarbons, which were often found in concentrations exceeding the established range.

123.    In 1977, a government contractor (SCS Engineers) prepared a report for the Atlantic Division Naval Facilities Engineering Command ("LantNavFacEngCom") on an oil pollution survey at Camp Lejeune conducted in 1976. Upon information and belief, the United States has refused to release the uncensored version of this report to this day.

124.    Also in 1977, a government contractor (Southern Testing and Research Laboratories) was retained by Camp Lejeune to test water for four chlorinated hydrocarbons and two herbicides.

125.    On February 28, 1978, in a letter to Charles Rundgren of the North Carolina Division of Health Services, the United States committed to submit all monitoring data, operational logs, and special analyses concerning Marine Corps activities within the state. This commitment was not maintained.[41]

126.    In 1979, a government contractor (Henry Von Oesen and Associates) conducted a study of the Tarawa Terrace water treatment plant. Observations included that "[s]erious operating problems have been experienced at Tawara Terrace due to inability to properly control the process, including cementing of filter sands, structural damage to the filter bed supports, and short filter runs."[42] In addition, the report findings confirmed that "filter backwash [was] discharged into the storm drainage system without treatment."[43]

---

[41] *Letter from J.G. Leech to Charles E. Rundgren* (Feb. 28, 1978), available at https://tftptf.com/CLW_Docs/CLW0176.pdf (last visited Aug. 9, 2023).

[42] *Study of Two Water Plants, Tarawa Terrace – Montford Point* (April 1979), at 2, available at https://tftptf.com/CLW_Docs/CLW0188.pdf (last visited Jun. 27, 2023).

[43] *Id.*

127.    In March of 1980, the State of North Carolina assumed primary enforcement responsibilities under the Safe Drinking Water Act for all public water systems in the state.

128.    In October of 1980, concerned that the State of North Carolina might find problems with Camp Lejeune's potable water, LantNavFacEngCom initiated a surveillance program at Camp Lejeune, intended to detect total trihalomethanes ("TTHMs") in the water supply. LantNavFacEngCom indicated that it would take a composite sample of all potable water supplies and run a full spectrum analysis, with the understanding that if any potential problems were identified, further testing would be conducted to locate the source. Both Jennings Laboratories and the U.S. Army Environmental Hygiene Agency ("USAEHA") were to conduct these tests.

129.    On October 30, 1980, the United States received the results of this test from Jennings Laboratories, showing the presence of TCE, DCE, and vinyl chloride.[44]

130.    On the same date, the United States received the USAEHA test results. The results included a handwritten warning: "Water is highly contaminated with low molecular weight halogenated hydrocarbons. Strong interference in the region of ChCl2BR. Cannot determine the value of that compound."[45]

131.    On December 18, 1980, additional samples were taken from the Hadnot Point area. In a January 1981 analysis of these samples, the USAEHA laboratory services chief issued another warning, reading: "Heavy Organic interference at CHCL2BR. You need to analyze for chlorinated organics by GC/MS."[46]

---

[44] Jennings Lab'ys, Inc., *Certificate of Analysis* (Oct. 31, 1980), available at https://tftptf.com/CLW_Docs/CLW0430.pdf (last visited Aug. 9, 2023).
[45] *TTHM Surveillance Report Form* (Collected Oct. 21, 1980), available at https://tftptf.com/CLW_Docs/CLW0436.pdf (last visited Aug. 9, 2023).
[46] *TTHM Surveillance Report Form* (Collected Dec. 29, 1980), available at https://tftptf.com/CLW_Docs/CLW0438.pdf (last visited Aug. 9, 2023).

132.    On February 26, 1981, more samples were taken. In the results analyzed on March 9, 1981, the USAEHA laboratory services chief again warns: "Water is highly contaminated with other chlorinated hydrocarbons (solvents)!"[47]

133.    On August 27, 1981, the Commanding General of Camp Lejeune sent a letter to the North Carolina state official, Mr. Rundgren. The letter discussed the analysis of the Rifle Range water distribution system, as well as the upcoming Naval Assessment and Control of Installation Pollutants ("NACIP") Initial Assessment Study but withheld all information about the broader TTHM testing and the multiple warnings of contamination.[48]

134.    On January 14, 1982, in response to a memo from the Department of Defense, the United States launched the NACIP Initial Assessment Study at Camp Lejeune. The objective of this study was to identify, assess, and control contamination at military installations such as Camp Lejeune.[49]

135.    On April 19, 1982, the base began collecting water samples from each of the eight water distribution systems, to be analyzed by Grainger. All information about prior detection of contamination by Jennings Laboratories and ESAEHA was withheld from Grainger.[50]

136.    On May 6, 1982, Grainger informed the United States that it had detected chlorinated hydrocarbons in the samples from Hadnot Point and Tarawa Terrace.[51]

---

[47] *TTHM Surveillance Report Form* (Collected Feb. 26, 1981), available at https://tftptf.com/CLW_Docs/CLW0443.pdf (last visited Aug. 9, 2023).

[48] *Letter from C.G. Cooper, Major Gen. U.S. Marine Corps, to Charles E. Rundgren (*Aug. 27, 1981), available at https://tftptf.com/CLW_Docs/CLW6124.pdf (last visited Aug. 9, 2023).

[49] *Memorandum from Officer in Charge, Dept. of the Navy, to Distribution* (Jan. 14, 1982), available at https://tftptf.com/CLW_Docs/CLW0455.pdf (last visited Aug. 9, 2023).

[50] *Memorandum from Ms. Betz, Quality Control Lab, Env't'l. Section* (Apr. 26, 1982), available at https://tftptf.com/CLW_Docs/CLW0537.pdf (last visited Aug 9, 2023).

[51] *Memorandum of Grainger Lab Call* (May 6, 1982), available at https://tftptf.com/CLW_Docs/CLW0542.pdf (last visited Aug 9, 2023).

137.    On July 28, 1982, additional samples were taken from Hadnot Point and Tarawa Terrace and sent to Grainger. In the results analyzed on August 10, 1982, Grainger reported that the chlorinated hydrocarbons were still detected, including identifying two specific contaminants: TCE at 1,400 ppb and PCE at 104 ppb. This report indicated that these contaminants were at high levels, such that they were "more important from a health standpoint than the total Trihalomethane content."[52]

138.    On July 29, 1982, the supervisory base chemist, Elizabeth Betz, had a phone call with the State of North Carolina. The two discussed reporting requirements as to total trihalomethanes. Ms. Betz inquired about reporting requirements pertaining to secondary contaminants, other than trihalomethanes, but did not mention that the United States had already detected multiple contaminants at Camp Lejeune or inquire about the state's view on any of these specific contaminants.[53]

139.    The United States has claimed that the Marine Corps shared information about the contamination detected at Camp Lejeune with North Carolina state officials in August of 1982. However, this position was later contradicted by documentary evidence and retracted. The United States in fact withheld this information from the state for years.

140.    In contrast, on August 18, 1982, the United States issued a memorandum purporting to note that there were no problems detected in the Hadnot Point, Tarawa Terrace, or Holcomb Boulevard water distribution systems, and reduced sampling in these areas from monthly to quarterly.[54]

---

[52] *Letter from Bruce A. Babson, Chemist to Commanding Gen. Marine Corps* (Aug. 10, 1982), available at https://tftptf.com/CLW_Docs/CLW0592.pdf (last visited Aug 9, 2023).

[53] *Memorandum from Ms. Betz, Quality Control Lab, Envt'l. Section* (July 29, 1982), available at https://tftptf.com/CLW_Docs/CLW0587.pdf (last visited Aug 9, 2023).

[54] *Memorandum from Ms. Betz, Quality Control Lab, Envt'l. Section* (Aug. 18, 1982), available at https://tftptf.com/CLW_Docs/CLW0605.pdf (last visited Aug 9, 2023).

141.    On August 25, 1982, the Commanding General of Camp Lejeune sent a letter via his representative to the officer in charge of the NACIP Initial Assessment Study, recommending obscuring evidence of contamination. His letter reads: "Discussion of Trihalomethane content of Rifle Range on page 2-18 and extensive data shown on pages 6-12 through 6-18 overly stresses relationship with hazardous materials/waste disposal. It is important to note that accuracy of data provided by U.S. Army laboratory is questionable. It is recommended that TTHM information be de-emphasized throughout the report."[55]

142.    A few weeks later, taking effect on October 1, 1982, the Natural Resources and Environmental Affairs Branch—which had worked in conjunction with the NACIP scientists to complete the Initial Assessment Study—was reassigned to report to the base Facilities Assistant Chief of Staff, rather than operating within the Base Maintenance Division.[56] This placed the scientists studying contamination at Camp Lejeune under the control of base leadership.

143.    On November 29, 1982, additional samples were taken from all eight water distribution systems and sent to Grainger.[57] In the results analyzed on December 9, 1982, Grainger noted continued elevated levels of contamination.[58] A Grainger scientist expressed concern over these levels on a subsequent call discussing these results on December 21, 1982.[59]

---

[55] *Letter from Commanding Gen. to Officer-in-Charge, Naval Energy and Envt'l. Support Activity* (Aug. 25, 1982), available at https://tftptf.com/CLW_Docs/CLW6332.pdf (last visited Aug 9, 2023).
[56] *Letter from Assistant Chief of Staff, Facilities to Base Maintenance Officer* (Oct. 1, 1982), available at https://tftptf.com/CLW_Docs/CLW3882.pdf (last visited Aug 9, 2023).
[57] *Trihalomethane Sampling Form* (Collected Nov. 29, 1982), available at https://tftptf.com/CLW_Docs/CLW0688.pdf (last visited Aug 9, 2023).
[58] *Letter from Bruce A. Babson, Chemist, Grainger Laboratories, to Commanding General, Marine Corps Base* (Dec. 9, 1982), available at https://tftptf.com/CLW_Docs/CLW0691.pdf (last visited Aug 9, 2023).
[59] *Memorandum from Ms. Betz, Quality Control Lab, Envt'l. Section, to Mr. Sharpe, Supervisory Ecologist, Envt'l. Section* (Dec. 21, 1982), available at https://tftptf.com/CLW_Docs/CLW0698.pdf (last visited Aug 9, 2023).

144.    On December 13, 1982, the North Carolina Division of Health Services sent a letter to Camp Lejeune, reminding of and requesting compliance with an earlier agreement as to annual water testing, including for Total Organic Halogens.[60]

145.    On February 24-25, 1983, additional samples were taken from all eight water distribution systems and sent to Grainger.[61] In the results analyzed on March 16, 1983, Grainger noted continued elevated levels of contamination.[62]

146.    On April 14, 1983, LantNavFacEngCom completed an Environmental Engineering Survey for Camp Lejeune. Despite discussing the total trihalomethane testing which led to the discovery of the elevated PCE and TCE levels, all mention of these detected contaminants was omitted from the Survey.[63]

147.    Also in April of 1983, the final draft of the NACIP Initial Assessment Study for Camp Lejeune was published. The Study omitted discussion of any of the dangerous contamination that had already been detected at Hadnot Point and Tarawa Terrace, with the only discussion of TTHM and organic solvent contamination detection being in reference to the Rifle Range water distribution system.

148.    On May 31, 1983, additional samples were taken from all eight water distribution systems and sent to Grainger. In the results analyzed on June 15, 1983, Grainger noted continued elevated levels of contamination.[64]

---

[60] *Letter from Gary D. Babb, Geologist, State of N. Carolina to Commanding General, U.S. Marine Corps* (Dec. 13, 1982), available at https://tftptf.com/CLW_Docs/CLW3993.pdf (last visited Aug 9, 2023).
[61] *Trihalomethane Sampling Form* (Collected Feb. 24, 1983), available at https://tftptf.com/CLW_Docs/CLW6393.pdf (last visited Aug 9, 2023).
[62] *Letter from Bruce A. Babson, Chemist, Grainger Laboratories, to Commanding General, Marine Corps Base* (March 16, 1983), available at https://tftptf.com/CLW_Docs/CLW6393.pdf (last visited Aug 9, 2023).
[63] *Memorandum from Commander, Atlantic Div. to Commander General Marine Corps Base* (Apr. 14, 1983), available at https://tftptf.com/CLW_Docs/CLW6141.pdf (last visited Aug 9, 2023).
[64] *Letter from Bruce A. Babson, Laboratory Supervisor, Grainger Laboratories, to Commanding General, Marine Corps Base* (June 15, 1983), available at https://tftptf.com/CLW_Docs/CLW6380.pdf (last visited Aug 9, 2023).

149.     On June 1, 1983, the Facilities Assistant Chief of Staff sent a letter to the North Carolina Division of Health Services containing information about the water sampling conducted at Camp Lejeune. Instead of including copies of the original lab reports from Grainger, which contained repeated warnings about contamination, the letter included only a compiled table of the data contained in these reports.[65]

150.     On June 21, 1983, the North Carolina Division of Health Services sent a response letter to the Facilities Assistant Chief of Staff, indicating that the state required the original analytical data received from Grainger.[66] Upon information and belief, this push was because officials at the North Carolina Division of Health Services had received a tip that the results were concerning.

151.     On July 27, 1983, additional samples were taken from all eight water distribution systems and sent to Grainger.[67] These samples were said to be lost in the mail.[68] Upon information and belief, these samples were not in the typical postal mail, but rather under special shipment, as they were required to be transported on ice.

152.     On August 25, 1983, additional samples were taken from all eight water distribution systems and sent to Grainger.[69] In the results analyzed on August 29, 1983, Grainger noted continued elevated levels of contamination.[70]

---

[65] *Letter from J.T. Marshall, Colonel, U.S. Marine Corps, to Charles E. Rundgren, Head, Div. of Health Services* (June 1, 1983), available at https://tftptf.com/CLW_Docs/CLW0934.pdf (last visited Aug 9, 2023).
[66] *Letter from Wm. Larry Elmore, Envt'l. Eng'r, Div. of Health Services, to J.T. Marshall, Colonel, U.S. Marine* (June 21, 1982), available at https://tftptf.com/CLW_Docs/CLW0940.pdf (last visited Aug 9, 2023).
[67] *Trihalomethane Sampling Form* (Collected July 27, 1983), available at https://tftptf.com/CLW_Docs/CLW6377.pdf (last visited Aug 9, 2023).
[68] *Id.*
[69] *Trihalomethane Info Form* (Aug. 25, 1983), available at https://tftptf.com/CLW_Docs/CLW0949.pdf (last visited Aug 9, 2023).
[70] *Letter from Bruce A. Babson, Laboratory Supervisor, Grainger Laboratories, to Commanding General, Marine Corps Base* (Aug. 29, 1983), available at https://tftptf.com/CLW_Docs/CLW0952.pdf (last visited Aug 9, 2023).

153. On December 12, 1983, the Facilities Assistant Chief of Staff sent a response letter to the North Carolina Division of Health Services, including two additional tables explaining the compiled results previously provided, but noting that the original analytical data from Grainger was not included.[71] Moreover, this letter stated that voluntary monitoring of most water distribution systems had been discontinued and requested to reduce sampling at Hadnot Point to once per year.[72]

154. On December 30, 1983, additional samples were taken from the Hadnot Point water distribution system and sent to Grainger. In the results analyzed on January 18, 1984, Grainger noted continued elevated levels of contamination.

155. On January 20, 1984, the North Carolina Division of Health Services sent a response letter to the Facilities Assistant Chief of Staff, granting permission to reduce sampling at Hadnot Point to one sample, once per quarter.[73]

156. On or about April 1, 1984, one sample was collected from the Hadnot Point water distribution system and sent to Grainger. In the results analyzed on April 9, 1984, Grainger noted continued elevated levels of contamination.

157. In July of 1984, the United States collected samples from the Hadnot Point Industrial Area, including nearby supply well HP-602. Benzene was detected at 380 ppb and DCE was detected at 46 ppb.

---

[71] *Letter from M.G. Lilley, Colonel, U.S. Marine Corps, to Charles E. Rundgren, Div. of Health* Services (Dec. 12, 1983), available at https://tftptf.com/CLW_Docs/CLW6348.pdf (last visited Aug 9, 2023).
[72] *Id.*
[73] *Letter from Charles E. Rundgren, Head, Div. of Health Services, to Colonel M.G. Lilley, U.S. Marine Corps* (Jan. 20, 1984), available at https://tftptf.com/CLW_Docs/CLW0977.pdf (last visited Aug 9, 2023).

33

158. Also in July of 1984, the United States collected samples from eight wells in the Tawara Terrace water distribution system. Three of these wells were found to contain contamination, including TCE.

159. On or about July 1, 1984, one sample was collected from the Hadnot Point water distribution system and sent to Grainger. In the results analyzed on July 10, 1984, Grainger noted continued elevated levels of contamination.

160. On November 30, 1984, supply well HP-602 was shut down.[74] Despite the numerous and widespread detections of contamination over more than four years, this was the first action taken to address the contaminated water supply at Camp Lejeune.

161. On December 3, 1984, supply well HP-602 was sampled again.[75] Detected contaminants included PCE at 24 ppb, TCE at 1,600 ppb, DCE at 630 ppb, and benzene at 121 ppb.[76] For decades, the United States insisted that this sample was the reason supply well HP-602 was shut down, but it was later revealed that this sample wasn't collected until days after HP-602 was shut down on November 30, 1984.

162. Other wells in the Hadnot Point water distribution system were also sampled on the same day. In the results analyzed on December 6, 1984, TCE contamination was detected in wells HP-601, HP-603, and HP-608, as well as in the finished water at the Hadnot Point water treatment plant.[77] Supply wells HP-601 and HP-608 were closed at this time.[78]

---

[74] *Memorandum from Utilities Systems General Forman to Director, Utilities Branch* (July 27, 1987), available at https://tftptf.com/CLW_Docs/CLW4971.pdf (last visited Aug 9, 2023).

[75] *Telephone Conversation Record* (Dec. 6, 1984), available at https://www.tftptf.com/CERCLA/00250.pdf (last visited Aug 9, 2023).

[76] *Hadnot Point Water Treatment Plant Results* (Dec. 4, 1984), available at https://tftptf.com/CLW_Docs/CLW1054.pdf (last visited Aug 9, 2023).

[77] *Id.*

[78] *Memorandum from M.P. Bell, Regional Eng'r, Div. of Health Services, to Charles E. Rundgren, Head, Div. of Health Services* (Dec. 11, 1984), available at https://tftptf.com/CLW_Docs/CLW1051.pdf (last visited Aug 9, 2023).

163.    On December 4, 1984, even more samples were collected from supply wells in the Hadnot Point water distribution system. In the results analyzed on December 10, 1984, contamination was again confirmed in supply wells HP-601, HP-602, HP-603, and HP-608, and detected in HP-634, HP-637, and HP-642.

164.    On December 10, 1984, Camp Lejeune Base Environmental Engineer Robert Alexander contacted the State of North Carolina and admitted that volatile organic compounds had been detected in the Camp Lejeune water supply.[79]

165.    Two days later, on December 12, 1984, Mr. Alexander was quoted in a news article saying that "every effort will be made to maintain the excellent quality water supply traditionally provided to residents of Camp Lejeune."[80]

166.    On December 14, 1984, supply wells HP-634 and HP-637 were shut down.[81]

167.    On January 14, 1985, Environmental Science and Engineering released a NACIP-related report on the contamination observed at Camp Lejeune.[82] However, a number of important documents contemplated in the schedule appear to be now missing, including the monthly NACIP progress reports for August through November of 1984, an evaluation of data, and a draft report.

168.    On January 25, 1985, samples were collected from Tarawa Terrace supply wells TT-23 and TT-26. In the results analyzed on February 5, 1985, levels of PCE at 132 ppb, TCE at 5.8 ppb, and DCE at 11 ppb were detected in TT-23, and levels of PCE at 1580 ppb, TCE at 57 ppb, DCE at 92 ppb, and vinyl chloride at 27 ppb were detected in TT-26. Supply well TT-26 was

---

[79] *Id.*

[80] Globe Staff, *Camp Lejeune water testing underway,* The Globe (Dec. 12, 1984), available at https://www.tftptf .com/CERCLA/00523.pdf (last visited Aug 9, 2023).

[81] *Summary of VOC, Chloride, and Flouride Analysis for Hadnot Point and Holcomb Blvd.*, available at https://tftptf .com/CLW_Docs/CLW1647.pdf (last visited Aug 9, 2023).

[82] Environmental Science and Engineering, Inc., *Evaluation of Data from First Round of Verification of Sample Collection and Analysis* (Jan. 14, 1985), available at https://tftptf.com/Misc/Timeline_Linked_March_2012.pdf (last visited Aug 9, 2023).

35

closed at this time. Supply well TT-23 was also closed at this time, but only temporarily. Due to a recurring water supply shortage in the Tarawa Terrace water distribution system, TT-23 was reactivated on a number of occasions.

169.    On January 27, 1985, a fuel leak was detected at the Holcomb Boulevard water treatment plant.[83] The plant was taken offline, the reservoir was drained, and the bypass valves between the Hadnot Point and Holcomb Boulevard water distribution systems were activated.[84] The Hadnot Point water distribution system provided all water needed for the Holcomb Boulevard water distribution system until February 4, 1985.[85]

170.    On January 31, 1985, the State of North Carolina collected water samples from the Holcomb Boulevard water treatment plant to determine whether the fuel leak had been resolved.[86] In the results analyzed on February 4, 1985, no fuel product was found, but TCE was detected throughout the Holcomb Boulevard water distribution system.

171.    On February 4, 1985, the Holcomb Boulevard water distribution system was reactivated, and both the Holcomb Boulevard and Hadnot Point water distribution systems were flushed.[87]

172.    On the same date, results were received from a January 16, 1985, sample of Hadnot Point supply wells.[88] HP-651 was identified as having high levels of contaminants, including PCE at 386 ppb, TCE at 3,200 ppb, DCE at 3,400 ppb, and vinyl chloride at 655 ppb.[89] Supply well HP-

---

[83] *Operator Log* (Jan. 27, 1985), available at https://tftptf.com/CLW_Docs/CLW4514.pdf (last visited Aug 9, 2023).
[84] *Chronology* (Feb. 26, 1985), available at https://tftptf.com/CLW_Docs/CLW4546.pdf (last visited Aug 9, 2023).
[85] *Id.*
[86] *Operator Log* (Jan. 27, 1985), available at https://tftptf.com/CLW_Docs/CLW4514.pdf (last visited Aug 9, 2023).
[87] *Chronology* (Feb. 26, 1985), available at https://tftptf.com/CLW_Docs/CLW4546.pdf (last visited Aug 9, 2023).
[88] *Report #17 Laboratory Analysis on Naval Samples* (Feb. 6, 1985), available at https://tftptf.com/CLW_Docs/CLW5594.pdf (last visited Aug 9, 2023).
[89] *Id.*

36

651 was closed at this time.[90] Supply wells HP-652 and HP-653 also showed contamination in these results, although at much lower levels, and were closed on February 8, 1985.[91]

173.   On February 7, 1985, finished water at the Berkeley Manor Elementary School, serviced by the Holcomb Boulevard water distribution system, continued to test at 135.1 ppb of TCE.[92]

174.   On February 8, 1985, supply wells HP-652 and HP-653 were shut down.[93]

175.   On February 22, 1985, after closing all of the supply wells noted above, finished water from the Hadnot Point water treatment plant tested at 1 ppb of TCE.[94]

176.   On March 1, 1985, the Facilities Assistant Chief of Staff provided an action brief discussing potential solutions to an anticipated water shortage at Tarawa Terrace, due to the closure of supply wells TT-23 and TT-26. One option presented was to build a water line to draw water from another water distribution system; this option was selected but was not implemented until years later. Another option was to re-activate wells known to be contaminated when needed to maintain supply, because "the potential health hazards must be weighed against the need and cost of providing water from other sources."[95]

177.   On March 8, 1985, supply well HP-651 was retested, yielding high contamination levels, including 400 ppb of PCE, 18,900 ppb of TCE, 7,580 ppb of DCE, and 168 ppb of vinyl chloride.[96]

---

[90] *Chronology* (Feb. 26, 1985), available at https://tftptf.com/CLW_Docs/CLW4546.pdf (last visited Aug 9, 2023).
[91] *Id.*
[92] *Analysis Report* (Feb. 7, 1985), available at https://tftptf.com/CLW_Docs/CLW5369.pdf (last visited Aug 9, 2023).
[93] *Well History* (Feb. 8, 1985), available at https://tftptf.com/CLW_Docs/CLW5095.pdf (last visited Aug 9, 2023).
[94] *G C Report Sheet* (Feb. 22, 1985), available at https://tftptf.com/CLW_Docs/CLW4533.pdf (last visited Aug 9, 2023).
[95] *Action Brief from M.G. Lilley* (Mar. 1, 1985), available at https://tftptf.com/CLW_Docs/CLW1129.pdf (last visited Aug 9, 2023).
[96] *Volatile Organic Chemical Analysis Reports* (Mar. 8, 1985), available at https://tftptf.com/Misc/Timeline_Linked_March_2012.pdf (last visited Aug 9, 2023).

178.    On March 21, 1985, a meeting was held to discuss the options to address the water shortage at Tarawa Terrace. Because the use of water from the contaminated wells was deemed to not pose an "extreme health threat" to recipients of the contaminated water, as-needed use of the contaminated water was approved.[97]

179.    In September of 1985, supply well TT-25 was found to be contaminated with PCE.

180.    On November 19, 1985, the water at the Hadnot Point water treatment plant was found to contain 2,500 ppb of benzene.[98] This is 500 times the level of benzene exposure permitted by the EPA's current MCLs. In the results summary of this sample, a handwritten note dismissed this finding as "not representative".[99]

181.    On December 10, 1985, the water at the Hadnot Point water treatment plant was still found to contain 38 ppb of benzene.[100]

182.    On January 13, 1987, Hadnot Point supply well HP-645 was shut down due to benzene contamination. Despite the numerous detections of benzene, benzene contamination was dismissed on the grounds of quality control errors. This contamination was discounted and not properly investigated, despite later revelations that there was a significant fuel leakage at the fuel farm.

183.    On January 14, 1987, Tarawa Terrace supply well TT-25 was closed.

184.    After the first detection of water contamination in October of 1980, it took more than six years for the United States to identify, acknowledge, and address the poisonous water supply at Camp Lejeune.

---

[97] *Meeting Notes: Volatile Organic Chemicals (VOC) in the Camp Lejeune Water Supply* (Mar. 21, 1985), available at https://tftptf.com/CLW_Docs/CLW6596.pdf (last visited Aug 9, 2023).
[98] *Memorandum from Director, Natural Resources and Environmental Affairs Division, to Environmental Engineer, Facilities Department* (Jan. 24, 1986), available at https://tftptf.com/CLW_Docs/CLW1406.pdf (last visited Aug 9, 2023).
[99] *Id.*
[100] *Id.*

185.    Over the years and decades that followed, there have been a number of significant studies conducted to identify the massive, life-changing, and widespread harm caused by this contaminated water. These studies were hindered for years by the United States withholding information.

186.    By 1994, the ATSDR was writing letters to the Marine Corps complaining of a lack of cooperation and access to important records for researching the extent of contamination and health impacts.

187.    In 1997, on behalf of the United States, the ATSDR published a public health assessment on the water contamination at Camp Lejeune. In 2009, the ATSDR retracted this public health assessment, due in large part to hidden information coming to light. This was the first time in the history of the ATSDR that a public health assessment was retracted.

188.    In 2007, the Government Accountability Office issued a report reviewing the ATSDR's attempt to study the contamination. This report is recognized to be flawed because it evaluated the 1997 ATSDR public health assessment which was later retracted, and thus did not include the new information leading to the retraction.

189.    In 2009, the National Research Council published a report on the water contamination at Camp Lejeune. This report was structured by the Navy and has been widely criticized as overlooking key data and having significant gaps in reasoning.

190.    Also in 2009, ATSDR staff gained access to a previously undisclosed electronic database containing more than 700,000 pages of Navy and Marine Corps documents about contamination at Camp Lejeune. Among these documents, the ATSDR found information documenting that as much as 1.1 million gallons of fuel were lost into the ground at Hadnot Point. Prior to this information being learned, the United States had insisted that no more than 50,000

gallons had been lost. This newly found data was a major factor leading to the retraction of the ATSDR's 1997 public health assessment.

191.    The U.S. House of Representatives Committee on Science and Technology, Subcommittee on Investigations and Oversight, recognized that "[i]t is difficult to provide clear scientific analyses when you cannot be certain that the records you are relying on for that analysis are complete."[101]

192.    For at least three of the contaminants at issue, there are actual measurements of contamination levels that are even more elevated than the highest projected measurements of the reconstructed models contained in ATSDR reports.[102]

193.    Because key information was withheld from early investigators, which led to crucial delays, or was otherwise withheld, lost, or destroyed over time, the full extent of contamination at Camp Lejeune may be even greater than what studies to date have identified.

194.    Plaintiffs reserve the right to seek a spoliation instruction.

---

[101] H.R. Rep. No. 111-108 (2010), at 6, available at https://www.govinfo.gov/content/pkg/CHRG-111hhrg58485/pdf/CHRG-111hhrg58485.pdf (last visited Aug. 9, 2023).

[102] *Compare* Agency for Toxic Substances and Disease Registry (ATSDR), Ctrs. for Disease Control and Prevention, Dep't of Health and Hum. Servs., *Chemicals at Camp Lejeune (FAQs)*, https://www.atsdr.cdc.gov/sites/lejeune/faq_chemicals.html (last visited Jun. 27, 2023) ("The maximum level [of PCE] detected in drinking water was 215 parts per billion…") *with* ATSDR Reconstruction App'x A2 at A92, available at https://www.atsdr.cdc.gov/sites/lejeune/docs/Reconstructed%20TTWTP%20Concentrations_ATSDR_Chapter%20A%20Report_Camp%20Lejeune.pdf (last visited Jun. 27, 2023) (highest simulated PCE level in Tarawa Terrace finished water was 182.13 ppb); *compare* Agency for Toxic Substances and Disease Registry (ATSDR), Ctrs. for Disease Control and Prevention, Dep't of Health and Hum. Servs., *Chemicals at Camp Lejeune (FAQs)*, https://www.atsdr.cdc.gov/sites/lejeune/faq_chemicals.html (last visited Jun. 27, 2023) ("The maximum level [of TCE] detected in drinking water was 1,400 [ppb]…") *with* ATSDR Reconstruction App'x A7 at A168, available at https://www.atsdr.cdc.gov/sites/lejeune/docs/Reconstructed%20HPWTP%20Concentrations_ATSDR_Chapter%20A%20Report_Camp%20Lejeune.pdf (last visited Jun. 27, 2023) (highest simulated TCE level in Hadnot Point finished water was 783 ppb); *compare* H.R. Rep. No. 111-108 (Sept. 16, 2010), at 35, available at https://www.govinfo.gov/content/pkg/CHRG-111hhrg58485/pdf/CHRG-111hhrg58485.pdf (last visited Jun. 27, 2023). ("...the treated water at the Hadnot Point [water treatment plant] was sampled and found to contain benzene in the extreme amount of 2,500 ppb.") *with* ATSDR Reconstruction App'x A7 at A168, available at https://www.atsdr.cdc.gov/sites/lejeune/docs/Reconstructed%20HPWTP%20Concentrations_ATSDR_Chapter%20A%20Report_Camp%20Lejeune.pdf (last visited Jun. 27, 2023) (highest simulated benzene level in Hadnot Point finished water was 12 ppb).

## B.     PLAINTIFFS' INJURIES

195.     During the relevant time period, Plaintiffs used water from the Hadnot Point water distribution system, the Holcomb Boulevard water distribution system, the Tarawa Terrace water distribution system, and/or the Camp Johnson water distribution system, exposing Plaintiffs to unsafe amounts of contaminated water.

196.     During the relevant time period, many Plaintiffs used water from water buffaloes which were filled with water from the Hadnot Point water distribution system and/or other contaminated sources, exposing Plaintiffs to unsafe amounts of contaminated water.

197.     The above conduct caused the Plaintiffs to sustain personal injuries or death, as more particularly alleged in Plaintiffs' Short Form Complaints.

198.     At the current time, the Unites States has conceded that exposure to the contaminated water at Camp Lejeune meets an equipoise or greater standard for certain diseases, including but not limited to kidney cancer, liver cancer, bladder cancer, non-Hodgkin's lymphoma, multiple myeloma, acute lymphocytic leukemia, chronic lymphocytic leukemia, chronic myeloid leukemia, other forms of leukemia, Parkinson's disease, end-stage renal disease, scleroderma, systemic sclerosis, cardiac birth defect, aplastic anemia, and myelodysplastic syndrome.[103]

199.     Upon information and belief, during the relevant time period, in addition to the specific contaminants alleged above, there have been one or more additional contaminants in the water at Camp Lejeune that have not yet been studied, are being studied, or have not yet been made publicly available but that are believed to be the cause of additional medical and/or psychological conditions and/or diseases of Plaintiffs.

---

[103] *See generally* ATSDR Evidence Assessment.

200.    Moreover, there is ample scientific evidence as of today demonstrating that exposure to the contaminated water at Camp Lejeune meets an equipoise or greater standard of causation for other cancers and non-cancer diseases. Upon information and belief, additional studies are also underway that are reviewing the causal link between the contaminants at Camp Lejeune and other conditions and/or diseases.

201.    There is a sufficient causal link between Plaintiffs' injuries and the toxic water Plaintiffs were exposed to at or from Camp Lejeune.

202.    As a direct and proximate result of Plaintiffs' exposure to toxic water at or from Camp Lejeune, Plaintiffs have been forced to endure significant physical and mental pain and suffering and to undergo significant and extensive medical treatment, and in some instances caused their death.

203.    Further, as a result of Plaintiffs' exposure to toxic water at or from Camp Lejeune, Plaintiffs have suffered other damages. These damages include, but are not limited to: medical expenses, medication expenses, medical supply expenses, transportation expenses related to medical treatment, food expenses related to medical treatment, lost income, and other damages as further detailed in each Plaintiff's Short Form Complaint.

## VI.    COUNT 1: RELIEF UNDER THE CAMP LEJEUNE JUSTICE ACT

204.    Plaintiffs incorporate by reference each of the allegations 1 through 203 above.

205.    The CLJA provides that:

An individual, including a veteran (as defined in section 101 of title 38, United States Code), or the legal representative of such an individual, who resided, worked, or was otherwise exposed (including in utero exposure) for not less than 30 days during the period beginning on August 1, 1953, and ending on December 31, 1987, to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States may bring an action in the United States District Court for the Eastern District of North Carolina to obtain appropriate relief for harm that was caused by exposure to the water at Camp Lejeune.

206.     Plaintiffs were on the Marine Corps base at Camp Lejeune sometime during the period between August 1, 1953, and December 31, 1987, and were exposed to the contaminated water at or from Camp Lejeune.

207.     Each Plaintiff's exposure to water at or from Camp Lejeune totaled not less than 30 days between August 1, 1953, and December 31, 1987.

208.     The water Plaintiffs were exposed to at or from Camp Lejeune during this time was supplied by, or on behalf of, Defendant United States.

209.     The water Plaintiffs were exposed to at or from Camp Lejeune was polluted and contaminated with chemicals and volatile organic compounds including but not limited to PCE, TCE, DCE, vinyl chloride, and benzene.

210.     As a result of Plaintiffs' exposure to polluted and contaminated water at or from Camp Lejeune, Plaintiffs suffered and will continue to suffer serious harm or Plaintiffs have died.

211.     This harm was caused by exposure to the water at or from Camp Lejeune.

212.     There is ample scientific evidence demonstrating that exposure to the contaminated water at or from Camp Lejeune meets an equipoise or greater standard of causation for Plaintiffs' injuries or death.

213.     Plaintiffs have filed administrative claims with the Navy addressing the issues raised in their Short Form Complaints. Plaintiffs' administrative claims have either (a) received a final denial or (b) been deemed a final denial because six months have passed since the claims were filed with the Navy and they remain without a final disposition.

214.     Under the CLJA, Plaintiffs suffered harm or death as a result of exposure to the water at or from Camp Lejeune and are entitled to appropriate relief.

43

## VII. CLAIM FOR RELIEF

Plaintiffs respectfully request that the Court enter judgment against the United States under the CLJA and award damages and all other appropriate relief for the harm that they have endured as a result of exposure to contaminated and unsafe water at or from Camp Lejeune, including but not limited to personal injuries or death, along with all related costs and damages.

## VIII. JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38 and CLJA § 804(d), Plaintiffs demand a trial by jury.

Dated: October 6, 2023

Respectfully submitted,

| | |
|---|---|
| /s/ *J. Edward Bell, III* | /s/ *Zina Bash* |
| J. Edward Bell, III (admitted *pro hac vice*) | Zina Bash (admitted *pro hac vice*) |
| Bell Legal Group, LLC | Keller Postman LLC |
| 219 Ridge St. | 111 Congress Avenue, Suite 500 |
| Georgetown, SC 29440 | Austin, TX 78701 |
| Telephone: (843) 546-2408 | Telephone: 956-345-9462 |
| jeb@belllegalgroup.com | zina.bash@kellerpostman.com |
| | |
| *Lead Counsel for Plaintiffs* | *Co-Lead Counsel for Plaintiffs and Government Liaison Counsel* |
| | |
| /s/ *Elizabeth J. Cabraser* | /s/ *W. Michael Dowling* |
| Elizabeth J. Cabraser (admitted *pro hac vice*) | W. Michael Dowling (NC Bar No. 42790) |
| Lieff Cabraser Heimann & Bernstein, LLP | The Dowling Firm PLLC |
| 275 Battery Street, 29th Floor | Post Office Box 27843 |
| San Francisco, CA 94111 | Raleigh, North Carolina 27611 |
| Telephone: (415) 956-1000 | Telephone: (919) 529-3351 |
| ecabraser@lchb.com | mike@dowlingfirm.com |
| | |
| *Co-Lead Counsel for Plaintiffs* | *Co-Lead Counsel for Plaintiffs* |

/s/   Robin L. Greenwald

Robin L. Greenwald (admitted *pro hac vice*)
Weitz & Luxenberg, P.C.
700 Broadway
New York, NY 10003
Telephone: 212-558-5802
rgreenwald@weitzlux.com

*Co-Lead Counsel for Plaintiffs*


/s/   Mona Lisa Wallace

Mona Lisa Wallace (N.C. Bar.: 009021)
Wallace & Graham, P.A.
525 North Main Street
Salisbury, North Carolina 28144
Tel: 704-633-5244
mwallace@wallacegraham.com

*Co-Lead Counsel for Plaintiffs*


/s/   Hugh R. Overholt

Hugh R. Overholt (NC Bar No. 016301)
Ward and Smith P.A.
Post Office Box 867
New Bern, NC 28563-0867
Telephone: (252) 672-5400
hro@wardandsmith.com

*Liaison Counsel*


/s/   James A. Roberts, III

James A. Roberts, III (N.C. Bar No.: 10495)
Lewis & Roberts, PLLC
3700 Glenwood Avenue, Suite 410
P. O. Box 17529
Raleigh, NC 27619-7529
Telephone: (919) 981-0191
jar@lewis-roberts.com

*Co-Lead Counsel for Plaintiffs*


/s/   A. Charles Ellis

A. Charles Ellis (N.C. Bar.: 010865)
Ward and Smith P.A.
Post Office Box 8088
Greenville, NC 27835-8088
Telephone: (252) 215-4000
ace@wardandsmith.com

*Liaison Counsel*