# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

IN RE:                              )
                                    )
CAMP LEJEUNE WATER LITIGATION  )         Docket No.
                                    )         7:23-CV-897
                                    )
                                    )


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

MONDAY, OCTOBER 30, 2023
STATUS CONFERENCE HEARING
BEFORE THE HONORABLE:
RICHARD E. MYERS, II, CHIEF DISTRICT JUDGE
TERRENCE W. BOYLE, DISTRICT JUDGE
JAMES C. DEVER, III, DISTRICT JUDGE
ROBERT B. JONES, JR., MAGISTRATE JUDGE
In Greenville, N.C.


APPEARANCES:

On Behalf of the Plaintiffs:

J. Edward Bell, III, Zina Bash, James A. Roberts, III,
W. Michael Dowling, Mona Lisa Wallace, Elizabeth J.
Cabreser, Robin L. Greenwald, Hugh R. Overholt, A.
Charles Ellis

On Behalf of the Defendant:

J. Adam Bain, Bridget Bailey Lipscomb, Nathan Jisu Bu


JENNIFER C. CARROLL, RMR, CRR, CRC
Official Court Reporter
United States District Court
Raleigh, North Carolina
Stenotype with computer-aided transcription

```
 1              (Monday, October 30, 2023, at 11:03 a.m.)
 2                    P R O C E E D I N G S
 3         JUDGE MYERS:  All right.  Good morning,
 4  everyone.  We're here today in -- for our first of what
 5  I believe will become multiple status conferences in the
 6  case of the Camp Lejeune Water Litigation.  I'll ask
 7  counsel who are here to just make your appearance for
 8  the record so we know who is here, and then we will --
 9  we'll start with the United States.
10         MR. BAIN:  Your Honor, Adam Bain for the
11  United States.
12         MS. LIPSCOMB:  Bridget Bailey Lipscomb for
13  the United States.
14         MR. BU:  Nathan Bu for the United States.
15         MR. BELL:  Good morning, Your Honor.  Edward
16  Bell for the plaintiffs.
17         MS. BASH:  Zina Bash for the plaintiffs.
18         MR. ROBERTS:  Good morning, Your Honor.  Jim
19  Roberts appearing on behalf of the plaintiffs.
20         MR. DOWLING:  Good morning, Your Honor.
21  Mike Dowling on behalf of the plaintiffs as well.
22         MS. WALLACE:  Good morning, Your Honor.
23  Mona Lisa Wallace for plaintiffs.
24         MS. CABRESER:  Good morning, Your Honors.
25  Elizabeth Cabreser for plaintiffs.
```

|  |  |
|---|---|
| 11:04:46 | 1 |
| 11:04:47 | 2 |
| 11:04:49 | 3 |
| 11:04:50 | 4 |
| 11:04:55 | 5 |
| 11:04:57 | 6 |
| 11:05:03 | 7 |
| 11:05:06 | 8 |
| 11:05:11 | 9 |
| 11:05:19 | 10 |
| 11:05:22 | 11 |
| 11:05:25 | 12 |
| 11:05:28 | 13 |
| 11:05:30 | 14 |
| 11:05:34 | 15 |
| 11:05:38 | 16 |
| 11:05:40 | 17 |
| 11:05:43 | 18 |
| 11:05:47 | 19 |
| 11:05:49 | 20 |
| 11:05:53 | 21 |
| 11:06:01 | 22 |
| 11:06:04 | 23 |
| 11:06:10 | 24 |
| 11:06:13 | 25 |

1     MS. GREENWALD: Good morning, Your Honors.
2 Robin Greenwald for the plaintiffs.
3     MR. OVERHOLT: Good morning, Your Honor.
4 Hugh Overholt, liaison counsel.
5     MR. ELLIS: Good morning. Charles Ellis on
6 behalf of plaintiffs as liaison counsel.
7     JUDGE MYERS: All right. Well, this is --
8 the status conference is to find out where we are. We
9 have multiple questions that need to approach -- I'm
10 speaking as Chief just for a moment. And I'll hold to
11 my colleagues to fully participate. We are here today
12 with Judge Jones, who is going to become our lead
13 discovery magistrate for the entire litigation, and we
14 thought it was important that he be with us because I
15 suspect that a significant amount of the time that is
16 actually spent -- with members of the bench will be
17 spent between you and Judge Jones trying to figure out
18 how best to proceed in this matter.
19     We're at the point now where we have
20 multiple standing orders that are designed to streamline
21 this litigation, hopefully move us forward. And we have
22 begun the process, it looks like, of making some offers
23 and the process of settling at least the first discovery
24 and participating in the Track One settlements that are
25 appropriate in this matter.

| | | |
|---|---|---|
| 11:06:15 | 1 | With that in mind, I'll start with just |
| 11:06:18 | 2 | asking where we stand in regards to what we believe are |
| 11:06:25 | 3 | the claims, what claims we think are going to be moving |
| 11:06:28 | 4 | from the Navy back to the Court, and how we're doing |
| 11:06:31 | 5 | initially regarding Track One for settlement, Track One |
| 11:06:38 | 6 | for litigation, how much do we think is going to move |
| 11:06:40 | 7 | out of settlement and back into litigation. As I've |
| 11:06:42 | 8 | been looking at the case filings, it looks like we have |
| 11:06:45 | 9 | less -- that's my principal area of concern. I'll ask |
| 11:06:49 | 10 | Judge Dever to sort of set for you -- the stage for you |
| 11:06:53 | 11 | about what he's thinking about and then I'll proceed to |
| 11:06:55 | 12 | Judge Boyle. |
| 11:06:59 | 13 | JUDGE DEVER: Sure. So, I mean, I have |
| 11:06:59 | 14 | questions just about -- I know under Case Management |
| 11:07:01 | 15 | Order No. 2, there was -- I think it's later. It might |
| 11:07:06 | 16 | be in about a week, the status of the discovery pool |
| 11:07:09 | 17 | profile form. So I would like to get an update on that |
| 11:07:11 | 18 | to see where y'all are. I appreciate all of the work |
| 11:07:14 | 19 | that's gone into getting us to this point. But that |
| 11:07:18 | 20 | would be a helpful piece of information. |
| 11:07:22 | 21 | It would appear that, at least on my |
| 11:07:26 | 22 | count -- and I stand ready to be corrected. I think |
| 11:07:29 | 23 | that there have been a total of 47 short-form complaints |
| 11:07:35 | 24 | filed. I know there's still time for those to be filed. |
| 11:07:39 | 25 | And I know lawyers often work to deadlines. And so if |

| | | |
|---|---|---|
| 11:07:42 | 1 | the deadline hasn't arisen yet, the lawyers think, *Well,* |
| 11:07:46 | 2 | *I've still got plenty of time.* But I think it's |
| 11:07:48 | 3 | important for everybody to realize for us to get a |
| 11:07:54 | 4 | representative sample of jury verdicts, if the only |
| 11:08:00 | 5 | thing that get filed -- if there are only 47 short-form |
| 11:08:04 | 6 | complaints and they're all the best kinesis from the |
| 11:08:05 | 7 | plaintiff's perspective, I would completely understand |
| 11:08:09 | 8 | the Department of Justice saying these are not |
| 11:08:10 | 9 | representative verdicts, at whatever point we get |
| 11:08:13 | 10 | verdicts next year. |
| 11:08:14 | 11 | And so I just say that to y'all that I |
| 11:08:18 | 12 | realize there's still some time, but it's something to |
| 11:08:24 | 13 | consider. Because I just think that's a litigation |
| 11:08:26 | 14 | reality of us going through this track system, which I |
| 11:08:30 | 15 | think makes perfect sense to do it, assuming that we |
| 11:08:37 | 16 | actually get some representative cases that actually get |
| 11:08:41 | 17 | filed so that each side, as sort of topic of settlement |
| 11:08:46 | 18 | is discussed, can say we think this actually is |
| 11:08:50 | 19 | representative. Because if it's not, I mean, I think |
| 11:08:54 | 20 | the Department of Justice could, understandably, say |
| 11:08:56 | 21 | we'll try these cases for decades. And that -- it would |
| 11:09:04 | 22 | certainly be, at some level, understandable, but it |
| 11:09:07 | 23 | would be a shame for people who actually are old, sick |
| 11:09:12 | 24 | Marines. And so I would just hope that the lawyers |
| 11:09:19 | 25 | realize that. And I think y'all do. And again, I know |

11:09:21   1    there's still time.  But that was what was kind of

11:09:25   2    striking to me.

11:09:27   3          And with that, I'll yield to Judge Boyle.

11:09:32   4          JUDGE BOYLE:  Well, I don't have too much to

11:09:33   5    say.  I'm appreciative very much of my colleagues.

11:09:40   6    Certainly Chief Judge Myers and Judge Dever taking the

11:09:45   7    laboring oar in the structure and management of all of

11:09:49   8    these cases.  It's a daunting challenge.

11:09:55   9          I'm ready to go ahead and -- of course,

11:09:57  10    remember, that we all have our separate cases.  So while

11:10:01  11    we're here together collectively, we have -- including

11:10:09  12    Judge Flanagan, we have 25 percent of the filed cases

11:10:14  13    each, or just about that.  And so I'm here ready and

11:10:21  14    willing and able, hopefully, to try cases when the time

11:10:25  15    comes.  And that time will come sooner rather than

11:10:32  16    later.  I think that from my perspective some insight

11:10:36  17    into what the cases are really worth was a valuable --

11:10:39  18    will be a valuable tool.  And that's where I stand.

11:10:49  19          JUDGE MYERS:  Judge Jones is going to be

11:10:50  20    our, as I said, lead magistrate for discovery matters.

11:10:54  21    Some of the things I think that are going to fairly be

11:10:56  22    on the table pretty quickly are:  What's being

11:11:00  23    stipulated to?  What do we agree?  Do we have general

11:11:03  24    causation or specific causations as to which diseases?

11:11:07  25    Are there any diseases the United States is willing to

11:11:09  1   stipulate as meeting general causation, and we can move

11:11:13  2   to specific causation and sort those out.  The

11:11:17  3   settlement proposal that we all read makes no said

11:11:25  4   promises.  But there are different tracks with different

11:11:28  5   diseases.

11:11:29  6            I'll tell you in my own cases -- and I'll

11:11:31  7   forecast this -- I'm interested in the possibility of

11:11:36  8   bifurcating discovery, doing early discovery on the

11:11:39  9   non-Track One diseases.  To the extent it's necessary on

11:11:41 10   the Track One diseases on causation, Daubert, getting

11:11:45 11   those set so that we can know where we are and if we're

11:11:47 12   moving forward, before we spend a lot of attorney time

11:11:52 13   and a lot of plaintiff time as well as the Government's

11:11:56 14   time on individualized cases.  If we can't get through

11:11:59 15   the science first -- I think going through the science

11:12:01 16   first has been very successful in other litigation of

11:12:04 17   similar type.  So in my own cases, I will be very

11:12:08 18   interested in early Daubert, particularly for those

11:12:11 19   cases where we don't have stipulation as to general

11:12:13 20   causation.

11:12:16 21            I think at this point it might be best for

11:12:18 22   us to hear from you as to where you stand, what you

11:12:23 23   think we need to know.  In part, we wanted to do this

11:12:29 24   early to be sure that everybody knows that Judge Jones

11:12:32 25   has the full imprimatur of the Court.  And it's unusual

| | | |
|---|---|---|
| 11:12:35 | 1 | that there are four different judges with a quarter of |
| 11:12:38 | 2 | the cases in litigation of this kind.  This is crafted |
| 11:12:43 | 3 | from whole -- the whole thing is new for everyone. |
| 11:12:46 | 4 | Ordinarily, these all end up before a single judge and |
| 11:12:49 | 5 | you have a single district judge managing it.  But Judge |
| 11:12:52 | 6 | Jones will speak with a uniformed voice for us on the |
| 11:12:56 | 7 | issues related to discovery, and we are intending to |
| 11:12:57 | 8 | fully empower him publicly as the magistrate judge.  Of |
| 11:13:03 | 9 | course, there are issues that will be appealable -- I |
| 11:13:07 | 10 | understand that -- from the way things are being |
| 11:13:09 | 11 | managed.  But he has our imprimatur, and we want it to |
| 11:13:09 | 12 | be clear. |
| 11:13:12 | 13 | So with that in mind, I think we will -- we |
| 11:13:14 | 14 | will start with the plaintiffs and let us -- you let us |
| 11:13:18 | 15 | know how things are going and what you think we need to |
| 11:13:21 | 16 | know at this stage. |
| 11:13:22 | 17 | MR. BELL:  Good morning, Your Honor.  We |
| 11:13:25 | 18 | totally agree with what you're saying.  The streamlining |
| 11:13:30 | 19 | of these cases is important, but maybe you'll hear some |
| 11:13:34 | 20 | things this morning that might give you some doubt that |
| 11:13:36 | 21 | that's equally thought on both sides.  We're concerned |
| 11:13:40 | 22 | about that. |
| 11:13:42 | 23 | So, Your Honor, Judge Dever, we anticipate |
| 11:13:45 | 24 | by Friday that most of the cases that are filed on |
| 11:13:49 | 25 | short-form complaints, there will be an additional |

| | |
|---|---|
| 11:13:52 | 1 |
| 11:13:55 | 2 |
| 11:13:59 | 3 |
| 11:14:03 | 4 |
| 11:14:05 | 5 |
| 11:14:10 | 6 |
| 11:14:13 | 7 |
| 11:14:16 | 8 |
| 11:14:19 | 9 |
| 11:14:22 | 10 |
| 11:14:24 | 11 |
| 11:14:29 | 12 |
| 11:14:33 | 13 |
| 11:14:34 | 14 |
| 11:14:38 | 15 |
| 11:14:43 | 16 |
| 11:14:47 | 17 |
| 11:14:49 | 18 |
| 11:14:53 | 19 |
| 11:14:57 | 20 |
| 11:15:01 | 21 |
| 11:15:05 | 22 |
| 11:15:10 | 23 |
| 11:15:15 | 24 |
| 11:15:19 | 25 |

number filed that will give the Court plenty to choose from. So I don't want to say, "Don't worry about it," but I do -- I do know that we've had three different committees working, Judge, and they're working on weekends and working at night. Obviously, there is a case here or there that might have some problems that were unanticipated that will be not in the pool and they will file their short form after the deadline. But generally we expect to have plenty. In fact, we would like to ask the Court at another time when you're ready to hear, we have some additional ideas of how we might can streamline it further up to now, seeing what we have, things like that.

So -- and just following your order, we have had a number of stipulations. These are not necessarily trial stipulations; mostly, process stipulations. As you can imagine, sometimes your trial stipulations are -- they may be premature at this stage. But to be honest with you, Judge, we had three stipulations that kind of surprised us that we couldn't get done. One, of course, we asked the Government to stipulate to the ATSDR 2017 health study. This was the study upon which the statute was based. It's the largest epidemiological study in U.S. history. They declined to do so.

We asked the Government to give us whether

11:15:22 1    they would stipulate to general causation for the Track

11:15:26 2    One diseases. Response was, "We're checking with our

11:15:30 3    experts. We'll let you know."

11:15:35 4          And then we have a pretty important issue,

11:15:38 5    Your Honor, having to do with what we're calling a

11:15:42 6    base-wide model versus a site-specific model of

11:15:48 7    exposure. Now, the ATSDR model was used as a base-wide

11:15:54 8    model. If you're at the base for 30 days and you got

11:15:58 9    one of the target diseases, then you've met the statute.

11:16:03 10    The Government wants to take and cherry pick where you

11:16:07 11    lived. So if someone lived at Tarawa Terrace and their

11:16:12 12    exposure was less than someone who lived at Hadnot

11:16:16 13    Point, they want to take that and run with that and not

11:16:18 14    have a base-wide model. But, of course, everybody on

11:16:20 15    the base has a lifecycle that they go through.

11:16:26 16          Someone mentioned the other day, well, why

11:16:28 17    didn't they give these folks water bottles. They didn't

11:16:31 18    have water bottles back then. And like a lot of us went

11:16:34 19    to go play baseball, we drank out of a hose. If you

11:16:37 20    played football in high school, you drank out of a hose.

11:16:39 21    You drank out of something else. The Marines in

11:16:42 22    training, they got -- they drank out of the water

11:16:46 23    containers. Back then, the -- all the bases had to be

11:16:51 24    built based on local building codes. North Carolina

11:16:54 25    codes back then required every building to have water

11:16:57   1    fountains.  So where you worked, where you lived, where

11:16:59   2    you played, where you ate dinner, where you went

11:17:02   3    shopping, everybody went to the water fountain and

11:17:05   4    drank.  And so to say that someone lived at Tarawa

11:17:09   5    Terrace had less of an exposure on certain chemicals

11:17:12   6    than otherwise is not what the ATSDR did.

11:17:15   7           And you can imagine if we had to do a

11:17:17   8    separate, independent epidemiological study for each

11:17:21   9    plaintiff, Your Honor, we would be in triple Roman

11:17:24  10    times, not just one Roman time.

11:17:28  11           So Congress passed the statute that said if

11:17:33  12    you were there 30 days, not if you were there 30 days at

11:17:36  13    this location or this location.  If you were there 30

11:17:40  14    days and they recognize this problem.  How is Mrs. Jones

11:17:44  15    who had three kids that goes to three different schools,

11:17:47  16    how are you going to say their exposure was less when

11:17:50  17    they were in schools in another location that had a

11:17:53  18    higher exposure?  Which it's a good model, and it works.

11:17:57  19           And 30 days with these dangerous chemicals

11:18:00  20    is a fairly short time.  But once we, hopefully, can

11:18:03  21    show you how dangerous they are, that kind of exposure

11:18:06  22    really creates bedlam.  But if you were there six

11:18:09  23    months -- I know the last study we looked at, the

11:18:14  24    average stay was around 1100 days.  Only 1 percent of

11:18:18  25    the cases we know of even met that five-year requirement

11:18:21  1    the Government put out on the EO.

11:18:25  2            So we would like the Court to initially

11:18:28  3    address for us this issue of whether we're looking at a

11:18:32  4    base-wide model or a site-specific model because that

11:18:38  5    affects how we hire experts, who we get to do these

11:18:41  6    things.  Because of the Government's position, we've

11:18:44  7    been talking to modelers to come up with a lifecycle

11:18:47  8    model and to show the Court what does someone do on an

11:18:52  9    average day at Camp Lejeune.  Well, we've got to do that

11:18:54  10   over 33 years.  It's a hugely expensive proposition.

11:18:59  11   We're talking about maybe a million dollars to put this

11:19:02  12   model together, and we think that's not needed.  We

11:19:05  13   think the statute doesn't say we're supposed to do that.

11:19:07  14   And Congress knew that.  We need some help on that.

11:19:13  15           The ATSDR, Your Honor, we would love the

11:19:17  16   Court to have a conversation with us and maybe talk

11:19:21  17   about whether that is a legitimate model.  I mean, ATSDR

11:19:28  18   has this unique causation, as you're aware, it's called

11:19:32  19   in there equipoise.  Equipoise is a medical term; it's

11:19:36  20   not a legal term.  But in the ATSDR, all five of the

11:19:40  21   Track One diseases are equipoise and above.  It's the

11:19:44  22   highest level of proof.  But, yet, the Government,

11:19:47  23   "Well, we aren't sure.  We can let our scientists tell

11:19:51  24   us what to do."  That's not what the law says.

11:19:54  25           So I think those are the kinds of things,

11:19:56  1  Your Honor, that we are hearing now.  And then, of
11:19:58  2  course, with the recent filing on Friday, it's crazy.
11:20:02  3          But those are the things that we've got to
11:20:04  4  get past.  Because if we don't get past those, we're
11:20:08  5  going to be here two years from now before we can try
11:20:11  6  the first case.  And so it's that important.  So we
11:20:14  7  would ask the Court to let us know when it's convenient
11:20:16  8  for us to present what we need to present preliminarily.
11:20:20  9  We would like to do that.  We're ready to do it at your
11:20:22 10  convenience and ask the Court for some guidance.
11:20:28 11          Your Honor, the next thing the Court asked
11:20:30 12  was for how are we doing in discovery.  We've sent out
11:20:34 13  now three discovery requests.  The first request, Your
11:20:38 14  Honor -- Judge Boyle, you might get a little interest in
11:20:42 15  this.  You remember in what we call Camp Lejeune One,
11:20:47 16  the earlier cases, and then there was an MDL established
11:20:51 17  way back?  Well, the Government at the MDL hearing told
11:20:55 18  the MDL panel that they wanted the cases in Atlanta
11:20:58 19  because that's where all of the documents were.  We
11:21:02 20  argued to keep it here in North Carolina.  Well, the MDL
11:21:06 21  court bought that argument and sent it down to Atlanta.
11:21:09 22  And that's where ATSDR is located.  But now we've asked
11:21:13 23  for all of those databases.  We know of six databases
11:21:17 24  that ATSDR has used or put together, and we want access
11:21:23 25  to those.  We want unfettered access to those.  Because

11:21:27  1    they have all of the science, all of the data.  And then

11:21:29  2    we have things we could add to it to actually make the

11:21:33  3    epidemiological study better.  But we have to get that

11:21:37  4    access.

11:21:38  5          So we sent out a 30(b)(6) notice.  We're

11:21:44  6    hopefully going to get a date some time soon.  We're

11:21:47  7    working on that.  At least we're waiting to get one.

11:21:50  8          And then that then began to present a

11:21:54  9    problem that we didn't anticipate with the CMO.  And the

11:21:59  10   CMO, the Court ordered only one witness for the

11:22:03  11   Government -- in other words, a governmental witness can

11:22:05  12   only be deposed one time.  But, Judge, I know the exact

11:22:10  13   person that can give us information on those six

11:22:12  14   databases.  Could notice them today.  I don't need them

11:22:17  15   telling me which expert or which witness they're going

11:22:20  16   to present and prepare.  I know someone who works them

11:22:23  17   every day, and we could do that, but then that would use

11:22:26  18   up our one time to take his deposition.  I think to

11:22:29  19   streamline that and give us the opportunity to maybe

11:22:33  20   rethink that.  Obviously, we're not going to abuse it.

11:22:38  21   If we did, then the Government would surely tell us.

11:22:42  22          But this guy is there.  He's the primary

11:22:45  23   mover at the ATSDR right now -- or the three people.

11:22:49  24   Two of them are retired.  He's ready to do this, and I

11:22:53  25   think we can get this done in ten days instead of 30

| | |
|---|---|
| 11:22:55 | 1 |
| 11:22:58 | 2 |

days.  So those are the kind of things we need some help
on.

We have sent out now two requests for
production.  One is actually due today.  That has to do
with all of the databases we're asking about.  We don't
know what the Government's response is going to be.  I'm
not really confident that we're going to get a good
response.  We might, and I hope we will.  But we'll see.
Supposed to get it today.  So we would like to address
that if it comes up in a quick response.

Your Honor, we've put together an incredible
team that says if we get all of the information we need
that is -- that is publicly available, then about 80 to
90 percent of our clients we can prove are on the base
at a certain time and what they did and where they
lived.  We could do that ourselves.  Even with someone
who's dead who can't give us testimony, we can find out
what unit they were in, where they stayed, how long they
stayed.  We can prove that up, and it's easy.  But we
have to get access to the database.

We're getting ready to choose our
bellwethers.  They have access.  They can use those
right now to help them choose bellwethers.  We don't
have access, so we're at a great disadvantage.  So we
would ask some help from the Court on that, if needed.

|          |    |                                                          |
|----------|----|----------------------------------------------------------|
| 11:24:15 | 1  | We know, Your Honor -- and the second                    |
| 11:24:17 | 2  | request for production is now -- the first one had to do |
| 11:24:20 | 3  | with databases mostly.  The second one is focusing on    |
| 11:24:24 | 4  | health studies.  We know there is a health study that's  |
| 11:24:28 | 5  | sitting there right now.  It's completed and there's a   |
| 11:24:32 | 6  | big disagreement between the Government and the ATSDR    |
| 11:24:35 | 7  | whether to release it.  It's a follow-up cancer study,   |
| 11:24:38 | 8  | and it could directly affect three fourths of our        |
| 11:24:42 | 9  | clients.  They haven't released it.  They won't release  |
| 11:24:44 | 10 | it.  I don't know when it's going to be released.  It    |
| 11:24:47 | 11 | may get released tomorrow after I've now brought it up.  |
| 11:24:49 | 12 | But we do know, though, there was a study                |
| 11:24:51 | 13 | during the Trump Administration that ATSDR wanted to put |
| 11:24:55 | 14 | out and the Administration blocked that study from being |
| 11:24:57 | 15 | published.  So we've asked for studies that have been    |
| 11:25:00 | 16 | published, studies that haven't been published, and we   |
| 11:25:04 | 17 | also understand now that when a study is done with        |
| 11:25:09 | 18 | ATSDR, then it's -- after it's peer-reviewed, it's then  |
| 11:25:12 | 19 | vetted.  And apparently some folks who might be involved |
| 11:25:15 | 20 | in litigation are trying to change some -- they don't    |
| 11:25:19 | 21 | want the language changed.                               |
| 11:25:21 | 22 | But we want all of that background                       |
| 11:25:22 | 23 | information.  We want to know what the drafts looked      |
| 11:25:25 | 24 | like.  What was the -- what was the sequence.  What was  |
| 11:25:27 | 25 | the lifecycle of that study and how did it get to the    |

current report.  We want to know what the original
scientists' opinions were.  So that's the second request
for production we've got.

There's a study being done.  We think it's
completed, called a vapor study.  It's another one of
the things we've requested.  During the workup of the
Camp Lejeune Justice Act, this was not something that
came to our attention, that was not necessarily spoke of
or even though ATSDR didn't speak about it very much.
So there is a vapor study being done.  It may very well
affect some people, might not affect everybody.  But it
is important and goes to the exposure.

So that's kind of where we are right now,
Your Honor, with discovery.  I think it's gotten started
well.  We're trying to target our discovery.  We haven't
asked for a lot of things.  But we were talking last
night, Judge, and, you know, it would be nice if the
Court would consider telling the Government to produce
everything they got, instead of all of this back and
forth which is going to take months and it's going to
take Judge Jones a lot of work.  Why not just put --
give it -- all of it to us now without any kind of
guidelines?  Some of it may be relevant, some of it
might not be.  But most of it will probably be helpful.
So that might be something worth considering, we think.

| | | |
|---|---|---|
| 11:27:03 | 1 | It's something worth doing. |
| 11:27:05 | 2 | So, Judge, the next thing on your list was |
| 11:27:07 | 3 | resolution. Our resolution committee. So our |
| 11:27:20 | 4 | resolution committee is working hard on doing exactly, |
| 11:27:24 | 5 | Judge Dever, what you have mentioned. So maybe, if you |
| 11:27:28 | 6 | don't mind, I'll try to give you a little example of |
| 11:27:31 | 7 | what we're doing. |
| 11:27:32 | 8 | We think, just like most of you do, that |
| 11:27:36 | 9 | learning a little bit about value of different kinds of |
| 11:27:40 | 10 | case -- different kinds of -- what's the term I'm |
| 11:27:45 | 11 | looking for? Well, for example, kidney cancer. It's in |
| 11:27:49 | 12 | the Track One diseases. It's probably one of the most |
| 11:27:54 | 13 | curable cancers that we have, if you catch it early. So |
| 11:27:59 | 14 | if someone has kidney cancer, got treated -- and with |
| 11:28:03 | 15 | kidney cancer, you get treated with excise the tumor |
| 11:28:06 | 16 | without any radiation, without any kind of chemotherapy, |
| 11:28:09 | 17 | and for the most -- most times, it's curable and move |
| 11:28:13 | 18 | on. |
| 11:28:13 | 19 | Well, that, we think, is the minimum kidney |
| 11:28:15 | 20 | cancer case. We want to know what that's worth. We |
| 11:28:19 | 21 | also have people who have advanced stages and had -- had |
| 11:28:23 | 22 | all kinds of posttreatment problems. It might have |
| 11:28:27 | 23 | metastasized, they've died. So we're trying to take the |
| 11:28:30 | 24 | cycle of each disease and come up with some stages that |
| 11:28:36 | 25 | we can get the jury to give us value for those stages. |

|          |    |                                                        |
|----------|----|--------------------------------------------------------|
| 11:28:40 | 1  | So if, for example, we had ten kidney cancer           |
| 11:28:45 | 2  | cases, we're trying to get some that are the minimum and|
| 11:28:48 | 3  | some that are the worst so the jury can give us what are|
| 11:28:51 | 4  | the values between those.  And if we have the same jury |
| 11:28:56 | 5  | do that, then we end up having a better idea of what it |
| 11:29:01 | 6  | looks like.  Then if we have four judges doing the same |
| 11:29:04 | 7  | thing with four different groups, it would really have a|
| 11:29:08 | 8  | great spread of what things look like.  Different       |
| 11:29:11 | 9  | courts, different jury panels, I think it looks good.   |
| 11:29:15 | 10 | And I think that then gives us this idea, what are the  |
| 11:29:18 | 11 | values of these cases?                                  |
| 11:29:19 | 12 | One of the diseases, Parkinson's,                       |
| 11:29:22 | 13 | unfortunately is not curable.  But now we know of these |
| 11:29:25 | 14 | lifesaving brain surgeries that are being performed now |
| 11:29:30 | 15 | in some of the leading hospitals that can -- it's       |
| 11:29:33 | 16 | amazing what is happening.  But those are million,      |
| 11:29:37 | 17 | $2 million surgeries.  So we need to -- once you get    |
| 11:29:40 | 18 | Parkinson's, the lifecycle of that is different for     |
| 11:29:43 | 19 | everybody.  Some people it's slower than others, some   |
| 11:29:46 | 20 | people it is bad.  So we're trying to put all of that   |
| 11:29:51 | 21 | together.  And our argument one day we hope we'll have a|
| 11:29:56 | 22 | chance to make is that's why we believe multiple        |
| 11:29:59 | 23 | plaintiff cases are out to give us a better value of the|
| 11:30:03 | 24 | whole spectrum of these diseases.                       |
| 11:30:08 | 25 | So we would like to one day, at your                    |

11:30:11 1    convenience, talk to you about how these trials would be

11:30:13 2    heard -- or held.  I know that each court, each judge

11:30:16 3    might have a different way of doing theirs, and we

11:30:19 4    respect that.  We just need some guidance on that.

11:30:24 5          The Track Two and Track Three cases, we

11:30:27 6    would like to start working on how we're going to choose

11:30:30 7    those diseases so we can go ahead and get our experts up

11:30:34 8    front and get them loaded for them, get that started so

11:30:37 9    we're not behind when we're ready to go on those.  We

11:30:41 10   need just to get some guidance from the Court on how you

11:30:44 11   would like those to be selected.

11:30:49 12         We do have some questions, Your Honor, that

11:30:52 13   we also need guidance on.  One of the first things we

11:30:55 14   have is we need some help on the probate issues.  We

11:31:02 15   believe this case is a case in federal common law and we

11:31:07 16   can't just say we're going to take North Carolina and do

11:31:11 17   it.  There are a number of cases in the country that

11:31:14 18   have -- that the courts have fashioned an alternative

11:31:19 19   remedy.  The case out of the -- one of the cases that

11:31:24 20   involved asbestos with government ships, they had an

11:31:30 21   appointed probated administrator for all of the cases

11:31:35 22   that were filed and didn't require people to file their

11:31:37 23   probate before trial.  Those who are got settlements

11:31:41 24   obviously have to go through some process, obviously, to

11:31:43 25   distribute that.  But initially, the cost of these

probate filings is expensive.  Down in Florida, for
example, it might be $7,000 just to open up an estate.
We're trying to figure out a way not to have our clients
have to pay that.  And so we have some -- we have some
proposals we would like to present to the Court.  If
it's okay with you, we'll put those together and file
them with the Court and ask for guidance on that.

The wrongful death statutes -- excuse me,
the wrongful death part of the statute, again, the Court
could adopt the aspects of the North Carolina.  But in
the federal common law, we should at least go through
that required process so that when the Court decides
what are the appropriate wrongful death parameters, that
we have met the federal common law requirements.  We
would be glad to -- if the Court would desire, be glad
to give a memorandum and ask the Court to consider it.

We would like to also, Your Honor, start
working on our jury charges so that we can have some
idea upfront what they'll look like so we know what we
need to prove.  And your help on that would be -- Judge,
we're ready to present to you our proposed jury charges
at your convenience.

I think that covers what I wanted to talk
about, Your Honor.  I have a couple of other things that
I may get into later depending on where we go.  Thank

11:33:19    1    you.

11:33:19    2                JUDGE MYERS:  Thank you, counsel.

11:33:24    3                Mr. Bain, we'll hear from you first -- or

11:33:27    4    next.

11:33:28    5                MR. BAIN:  Thank you, Your Honors.

11:33:30    6                So going through the items that were on the

11:33:32    7    agenda:  As of Friday, there are 1309 cases before the

11:33:38    8    Court.  A little over 300 with each judge.  With respect

11:33:44    9    to the status of the administrative claims with the

11:33:47   10    Department of the Navy, there are currently 117,000

11:33:50   11    administrative claims on file with the Department of the

11:33:52   12    Navy.  The Navy is standing up a database which will

11:33:58   13    significantly expedite efforts and allow it to intake

11:34:02   14    batches of claims, organize claims, and analyze claims

11:34:05   15    for the purposes of evaluation for settlement.  So that

11:34:07   16    should be online fairly soon.

11:34:10   17                The Navy has been coordinating with the

11:34:13   18    Veterans Administration to gain access to obtain the

11:34:17   19    Veterans Administration information which is needed to

11:34:19   20    evaluate the claims of the claimants.

11:34:23   21                The Navy has been coordinating with the

11:34:27   22    plaintiff's leadership counsel to coordinate procedures

11:34:29   23    for obtaining information that the plaintiff's

11:34:33   24    leadership counsel might have in order to evaluate the

11:34:35   25    claims for settlement offers.

11:34:39 1        With respect to the stipulations between the

11:34:41 2   parties, each side has proposed stipulations regarding

11:34:46 3   scientific studies that were done.  Mr. Bell is correct

11:34:51 4   that the plaintiff proposed several stipulations related

11:34:54 5   to the ATSDR's work.  The Government agreed to six of

11:34:58 6   those stipulations.  The Government proposed

11:35:01 7   stipulations related to the work of the National

11:35:04 8   Research Council from the National Academies of

11:35:06 9   Sciences, which also studied the Camp Lejeune water

11:35:09 10  situation.  As of yet, the plaintiffs have not provided

11:35:12 11  us with a response on those stipulations.

11:35:16 12       Based on the allegations in the plaintiff's

11:35:20 13  master complaint, the United States anticipates that it

11:35:22 14  will be able to stipulate to many factual matters that

11:35:25 15  are outlined in that complaint.  We have retained

11:35:29 16  experts who are evaluating the scientific issues to

11:35:33 17  determine whether further stipulations are warranted

11:35:35 18  with respect to general causation.  So we are looking at

11:35:41 19  that.  We're asking them their opinions on that.  And if

11:35:44 20  they do give us those opinions, we could make

11:35:46 21  stipulations on general causation.

11:35:50 22       I do want to address the base-wide versus

11:35:54 23  site-specific model that Mr. Bell alluded to.  The

11:35:59 24  Government adopted a base-wide model for purposes of the

11:36:03 25  elective option for settlement purposes because those

11:36:06 1     were an early offer of settlement.  However, if

11:36:11 2     plaintiffs choose to go the litigation route, the

11:36:14 3     statute clearly says that they must prove that the

11:36:17 4     exposure was as likely as not a cause of their injury.

11:36:21 5     That involves an evaluation of exposure.

11:36:24 6               I think Judge Dever's recent opinion in the

11:36:29 7     PFAS litigation made it clear that exposure is a

11:36:30 8     critical element of proving causation in a toxic court

11:36:35 9     case.  In Camp Lejeune, only two of several water

11:36:38 10    systems were contaminated.  The one at Tarawa Terrace

11:36:42 11    and the one at Hadnot Point.  The other systems were not

11:36:45 12    contaminated.  So depending on where you were on base is

11:36:48 13    critical to what type of exposure you might have had.

11:36:51 14    If you're familiar with Camp Lejeune, it's divided by a

11:36:54 15    river.  There's some people who work and train and live

11:36:58 16    on one side of the river.  Some people are exclusively

11:37:01 17    on the other side of the river.  One side of the river

11:37:03 18    did not have contaminated water, yet those people are

11:37:06 19    eligible to file claims under the Camp Lejeune Justice

11:37:11 20    Act.  So that's an important point, I believe.

11:37:15 21              With respect to the discovery that's been

11:37:18 22    conducted so far, the plaintiffs did serve 20 very broad

11:37:23 23    requests for discovery from the Government.  As Mr. Bell

11:37:26 24    alluded to, they're asking for the entire ATSDR

11:37:30 25    databases which has personal information of everyone

11:37:34  1   that the ATSDR studied, including thousands of people

11:37:37  2   who are not parties to this litigation and likely

11:37:40  3   thousands of people who did not file administrative

11:37:42  4   claims.  The personal identifiable information of those

11:37:46  5   people are subject to certain protections.  It can't

11:37:49  6   just be turned over.  So that's something that we have

11:37:52  7   to look at and have to be very careful about the

11:37:55  8   Government turning over other people's personally

11:37:57  9   identifiable information who are not even parties to the

11:38:00  10  litigation.

11:38:03  11          We will --

11:38:05  12          JUDGE DEVER:  Why doesn't the protective

11:38:06  13  order cover that?  I mean, I understand that concern.

11:38:09  14  But why doesn't the protective order address that issue?

11:38:14  15  I mean, everybody that's on the plaintiff's side is an

11:38:18  16  officer of the court, and we have a protective order.

11:38:20  17  And this type of information gets released in all kinds

11:38:26  18  of cases.  I'm trying to understand what's different

11:38:29  19  about it.

11:38:30  20          MR. BAIN:  Well, we're discussing that with

11:38:32  21  the ATSDR, and they have certain protections in place.

11:38:36  22  They make certain agreements when they get this

11:38:39  23  information from the agencies from which they receive

11:38:41  24  it.  So we are talking with our lawyers.  We've given

11:38:43  25  them the protective order.  And so we're in continuing

11:38:46  1   discussions with that.  But I just wanted to point out

11:38:48  2   that these requests are very, very broad and include a

11:38:52  3   lot of information that is of other people that is not

11:38:56  4   really relevant to the plaintiff's case.

11:39:00  5          JUDGE MYERS:  You anticipate potential

11:39:02  6   future litigation on the -- from the stakeholders who

11:39:06  7   have the privacy interests?  That is, are there -- we

11:39:09  8   always treat the United States as monolithic.  It's not.

11:39:13  9   But in some cases, it's good to treat it as a single

11:39:16  10  party because it's in the coordination position.  You

11:39:20  11  anticipate stakeholder litigation that says protective

11:39:23  12  order is insufficient?

11:39:25  13         MR. BAIN:  I would hope not.  But we need to

11:39:28  14  make sure that we go through all of our processes and

11:39:30  15  check with all of the agencies that have a stake in this

11:39:32  16  information.  The agencies that provided to the ATSDR,

11:39:36  17  the ATSDR itself, it includes both defense information

11:39:40  18  and also some information they obtain from different

11:39:43  19  states through different agreements they had with them.

11:39:45  20  So we just need to make sure that we -- we go through

11:39:50  21  all the processes with those lawyers to make sure what

11:39:53  22  we're doing is appropriate.  And we have provided the

11:39:56  23  protective order to them.

11:40:02  24         We've been in contact with the Government

11:40:04  25  agencies, including the Navy, the Marine Corps, the

```
11:40:07  1    Veterans Administration, the National Archives, ATSDR,
11:40:11  2    the EPA, and the GAO regarding these broad requests that
11:40:15  3    the plaintiffs have made.  We are responding later
11:40:16  4    today.  But there's a lot of information requested from
11:40:20  5    a lot of different agencies, so we are trying to contact
11:40:24  6    all of them and make sure that we're turning over what's
11:40:27  7    appropriate and making appropriate objections where
11:40:30  8    necessary.
11:40:32  9          We've entered an e-discovery order with
11:40:35  10   plaintiff's leadership counsel, and we intend to start
11:40:37  11   negotiating regarding electronic information, from what
11:40:41  12   custodians we need to collect it from, what shared
11:40:44  13   systems we need to collect it from, what search terms we
11:40:47  14   need to run across that information so that we can get
11:40:50  15   it produced in a timely manner.  So we've begun that
11:40:53  16   process.  We've negotiated an order and will begin those
11:40:56  17   discussions soon.
11:40:58  18         The plaintiffs have requested several
11:41:00  19   30(b)(6) witness examinations.  We've contacted the
11:41:04  20   agencies regarding those and hope to be able to identify
11:41:07  21   witnesses next month for those depositions.
11:41:14  22         With respect to settlement efforts, as you
11:41:18  23   know, in September the Department announced the Elective
11:41:21  24   Option to settlement program.  That process is just
11:41:24  25   beginning.  The Department of Justice and the Department
```

11:41:28  1   of the Navy have been working with the plaintiff's

11:41:30  2   leadership committee to get the information that we need

11:41:33  3   to determine eligibility for settlement offers under the

11:41:36  4   program.  To date -- and I emphasize we're just

11:41:41  5   starting -- 23 settlement offers have been made.  Most

11:41:44  6   of the offers are still pending.  The claimants have 60

11:41:49  7   days to accept or reject the offer.  Three have been

11:41:53  8   accepted and two have already been paid.

11:41:56  9           JUDGE BOYLE:  How much were they?  How much

11:41:58  10  were the three that have been accepted and paid?

11:42:01  11          MR. BAIN:  Just a minute, Your Honor.  I

11:42:06  12  think we have that.

11:42:09  13          JUDGE BOYLE:  You don't have it?

11:42:10  14          MR. BAIN:  I don't have it right --

11:42:11  15          JUDGE BOYLE:  You didn't think that would be

11:42:13  16  important today?

11:42:14  17          MR. BAIN:  Well, I thought you would be

11:42:15  18  interested in the numbers that were actually settled.

11:42:17  19  But they're in the hundreds of thousands of dollars.

11:42:20  20          JUDGE BOYLE:  Like 900,000?  800,000?

11:42:23  21  500,000?  400,000?

11:42:25  22          MR. BAIN:  Your Honor, there's a specific

11:42:27  23  grid of criteria.

11:42:28  24          JUDGE BOYLE:  Yeah, I understand.  I'm just

11:42:30  25  being facetious.

| | | |
|---|---|---|
| 11:42:32 | 1 | So how much? |
| 11:42:34 | 2 | MR. BAIN:  We can get that information to |
| 11:42:35 | 3 | you.  I might have it with me. |
| 11:42:36 | 4 | JUDGE BOYLE:  Don't worry about it. |
| 11:42:38 | 5 | MR. BAIN:  I might have it with me. |
| 11:42:40 | 6 | JUDGE BOYLE:  Don't worry about it. |
| 11:42:43 | 7 | MR. BAIN:  I'm sorry, Your Honor.  If I look |
| 11:42:45 | 8 | through my materials, I might be able to -- |
| 11:42:45 | 9 | JUDGE BOYLE:  The whole point of this |
| 11:42:46 | 10 | hearing is to make progress. |
| 11:42:47 | 11 | MR. BAIN:  Yes. |
| 11:42:48 | 12 | JUDGE BOYLE:  Yeah.  Settling cases out of |
| 11:42:50 | 13 | court is considered progress.  We would like to know |
| 11:42:52 | 14 | about that. |
| 11:42:54 | 15 | MR. BAIN:  Yes, Your Honor. |
| 11:42:56 | 16 | JUDGE BOYLE:  Go ahead. |
| 11:42:57 | 17 | MR. BAIN:  So, yeah, we're working toward |
| 11:42:59 | 18 | that, trying to make as many as we can that satisfy the |
| 11:43:02 | 19 | criteria in the program that we put together. |
| 11:43:06 | 20 | JUDGE BOYLE:  So far you've had three and |
| 11:43:08 | 21 | you said there are 120,000 claims. |
| 11:43:09 | 22 | MR. BAIN:  Uh-huh.  We're just getting |
| 11:43:11 | 23 | started, though, Your Honor.  And we need to get -- one |
| 11:43:13 | 24 | thing is we need to get the information from the |
| 11:43:16 | 25 | plaintiffs to be able to determine whether the |

| | |
|---|---|
| 11:43:18 | 1 |
| 11:43:22 | 2 |
| 11:43:27 | 3 |
| 11:43:30 | 4 |
| 11:43:32 | 5 |
| 11:43:33 | 6 |
| 11:43:35 | 7 |

plaintiffs meet the criteria under the program.

So, for example, we need to know what the disease they had is, how long they were at Camp Lejeune, when they got the disease.

JUDGE BOYLE:  So you think the plaintiffs haven't been forthcoming?

MR. BAIN:  We've been working with them and they've been forthcoming recently.  We asked them for getting the date of birth information, Social Security number that we need to take to the Government agencies to get the medical records and the service records that we need.  We've been talking with plaintiff's leadership counsel about getting other information and then putting packages together for us so we can determine eligibility for EO offers.

So we have been working with them.  They recently provided us with information for approximately 400 individuals who are plaintiffs in litigation.  So those are people who have cases before this Court.  So we would be getting the information for those individuals to see whether they qualify for an offer under the program.

On the other hand -- or also, at the same time, the Navy has been reaching out to plaintiff's counsel to discuss with them coordinating getting

packages of information sent to the Navy for people who
may qualify for offers under the program.  So we're
making progress, and we think a lot more offers will be
made in the coming months.

JUDGE DEVER:  As the Navy is building out
this database -- I mean, have you been -- has the Navy
been in touch with -- I mean, I know the plaintiffs have
been, I gather from an earlier hearing, trying to create
a database that in terms of information that each side
thinks is relevant to value a case.

I mean, I hope that y'all are talking to
each other and that if you're -- won't make a lot of
sense if the Navy builds a database that doesn't have
information that the plaintiffs thinks are material to
evaluating a value.  So, I mean, I would just hope that
y'all are talking to one another.  And if the plaintiffs
think that there's some glaring deficiency in the
database that the Navy is building, that -- in terms of
just the database.  I mean, nothing -- nothing requires
the Navy to make an offer anyway.  But it seems like a
waste of time if the Navy builds out a big database
without getting information from the plaintiffs as to
what the plaintiff thinks is -- are material factors
that ought to be in any database to try and categorize
cases.

11:45:52  1          So I just offer that to you as a -- as a

11:45:55  2   matter of this process.  Because as I talked about at

11:46:02  3   the very first hearing -- I mean, by design, a design of

11:46:06  4   the statute is that the cases are -- the vast majority

11:46:11  5   are to be resolved administratively.  So I hope that

11:46:14  6   there is a real robust dialogue between the plaintiffs

11:46:18  7   and the Department of Justice as the DOJ is building out

11:46:21  8   a database.  Because if the -- if the Navy or the DON,

11:46:26  9   the Navy database doesn't have things that plaintiffs

11:46:30  10  think are material, then -- then we're going to waste a

11:46:36  11  lot of time.  Because eventually that's going to need to

11:46:38  12  be done.  So I'm just -- if you could please let the

11:46:41  13  Navy know that that strikes me as being really

11:46:44  14  important.

11:46:44  15          MR. BAIN:  I will do, Your Honor.  And we've

11:46:46  16  had several calls with plaintiff's counsel and Navy

11:46:50  17  counsel and Department of Justice counsel talking about

11:46:52  18  the information needed to make settlement offers under

11:46:56  19  this program.  And so that the Navy's database, which is

11:46:59  20  receiving information, should be able to do all of the

11:47:02  21  evaluation necessary under the administrative program.

11:47:05  22  At the same time we've been talking with plaintiffs

11:47:07  23  about setting up a database that eventually, hopefully

11:47:11  24  will globally resolve the entire litigation.  So we're

11:47:14  25  in talks with them now and we've been following the

| | |
|---|---|
| 11:47:17 | 1 | model by -- used by Judge Hellerstein in the first |
| 11:47:20 | 2 | responder litigation. We're in talks with them now |
| 11:47:24 | 3 | about a census of questions that will be necessary to |
| 11:47:27 | 4 | populate a global resolution database. We've been |
| 11:47:30 | 5 | exchanging the questionnaire with the plaintiffs. We |
| 11:47:35 | 6 | got feedback from them. We had some additional |
| 11:47:39 | 7 | responses to their feedback. And so we're continuing to |
| 11:47:42 | 8 | try to finalize a database of the information that will |
| 11:47:47 | 9 | be needed for a global resolution, including both |
| 11:47:50 | 10 | litigation and any outstanding claims. At some point we |
| 11:47:54 | 11 | may need a neutral to assist us with finalizing that |
| 11:47:58 | 12 | census if we have any disputes that we can't resolve |
| 11:48:01 | 13 | ourselves. |

<table>
<tr><td>11:48:02</td><td>14</td><td>JUDGE DEVER: Well, I know one of the topics</td></tr>
<tr><td>11:48:04</td><td>15</td><td>that we have on here is whether to appoint a settlement</td></tr>
<tr><td>11:48:07</td><td>16</td><td>master. So I'm sure we'll talk about it at some point</td></tr>
<tr><td>11:48:11</td><td>17</td><td>today.</td></tr>
<tr><td>11:48:12</td><td>18</td><td>JUDGE BOYLE: I wanted to ask: Have you</td></tr>
<tr><td>11:48:13</td><td>19</td><td>ever answered the question as to whose budget this</td></tr>
<tr><td>11:48:17</td><td>20</td><td>settlement comes out of? Does it come out of the</td></tr>
<tr><td>11:48:19</td><td>21</td><td>general Treasury, or out of Marine and Navy budget?</td></tr>
<tr><td>11:48:22</td><td>22</td><td>MR. BAIN: It comes out the U.S. Treasury,</td></tr>
<tr><td>11:48:24</td><td>23</td><td>the judgment fund. The fund that pays all government</td></tr>
<tr><td>11:48:28</td><td>24</td><td>settlements or cases in litigation.</td></tr>
<tr><td>11:48:29</td><td>25</td><td>JUDGE BOYLE: So it's not competing with</td></tr>
</table>

| | |
|---|---|
| 11:48:30 | 1 |
| 11:48:34 | 2 |
| 11:48:36 | 3 |
| 11:48:38 | 4 |
| 11:48:39 | 5 |
| 11:48:40 | 6 |
| 11:48:43 | 7 |
| 11:48:46 | 8 |
| 11:48:53 | 9 |
| 11:48:57 | 10 |
| 11:48:59 | 11 |
| 11:49:03 | 12 |
| 11:49:07 | 13 |
| 11:49:10 | 14 |
| 11:49:14 | 15 |
| 11:49:19 | 16 |
| 11:49:21 | 17 |
| 11:49:24 | 18 |
| 11:49:26 | 19 |
| 11:49:31 | 20 |
| 11:49:33 | 21 |
| 11:49:38 | 22 |
| 11:49:41 | 23 |
| 11:49:47 | 24 |
| 11:49:49 | 25 |

military apportionment?

MR. BAIN:  No, it's not coming out of the military appropriations.

JUDGE BOYLE:  Okay.

MR. BAIN:  And, Your Honor, I will have that specific information regarding settlements at future conferences, you can be assured, if I don't have it here today.

So one of the things that we need to do in order to move forward on the global settlement front is to agree on a database vendor.  So a vendor that can be a third party that the Government and the plaintiffs can both contribute to and will house the data that will be used to ultimately reach a global resolution.  Before the statute even passed, we consulted with the civil division's chief information officer about the Hellerstein model that was used to figure out if we could do that type of a system and what requirements there might be for it.  The Government requires security for any system it uses that has personal information in it.  It's called FedRAMP Moderate, and it's a requirement that is set by law that certain security systems must be in place.  We informed plaintiff's counsel of this many, many months ago, even before plaintiff's leadership committee was selected, that this

11:49:53  1   is a requirement needed for a database vendor.  We are

11:49:57  2   waiting for the plaintiffs to propose vendors to us that

11:50:00  3   meet this requirement.  And we're still waiting for

11:50:03  4   that.  And we know that there's a deadline in the Case

11:50:07  5   Management Order for agreeing to a database vendor.  And

11:50:11  6   we're continuing our discussions with the plaintiff's

11:50:15  7   leadership committee regarding that.

11:50:21  8            And then with respect to the settlement

11:50:23  9   master, we raised this issue with the plaintiff's

11:50:28  10  leadership last week because we knew it would likely

11:50:31  11  come up at this conference.  And we agree the special

11:50:34  12  master are neutral, would be useful in resolving issues

11:50:38  13  that are necessary for the progress of the litigation.

11:50:41  14  As I mentioned, I think the most immediate concerns are

11:50:45  15  this global database and vendor that need to be

11:50:48  16  selected.  We have consulted with the U.S. Attorney's

11:50:51  17  Office about potential settlement masters and have some

11:50:56  18  names that we can discuss with the plaintiff's counsel

11:50:59  19  when appropriate.

11:51:01  20            I will say --

11:51:03  21            JUDGE DEVER:  Go ahead and have those

11:51:04  22  discussions.  It's appropriate.  Go ahead and have them.

11:51:06  23  You don't have to have them right now, but...

11:51:08  24            MR. BAIN:  Okay.

11:51:10  25            The one thing I do need to point out is that

| | | |
|---|---|---|
| 11:51:15 | 1 | U.S. can agree to a settlement administrator that makes |
| 11:51:19 | 2 | offers on behalf of the United States.  So there's |
| 11:51:21 | 3 | certain authority that the Attorney General has that |
| 11:51:23 | 4 | cannot be delegated to a third party. |
| 11:51:27 | 5 | JUDGE DEVER:  I mean, of course.  If this is |
| 11:51:28 | 6 | just a separate track facilitator that helps there to be |
| 11:51:34 | 7 | a dialogue to -- to move cases. |
| 11:51:39 | 8 | MR. BAIN:  Right. |
| 11:51:40 | 9 | JUDGE DEVER:  Administratively. |
| 11:51:42 | 10 | Administrative cases.  And then even cases that are |
| 11:51:44 | 11 | here.  But it's -- that's the whole point of a |
| 11:51:46 | 12 | settlement master under Rule 53.  So I would encourage |
| 11:51:51 | 13 | y'all to -- you know, after the hearing to talk about |
| 11:51:54 | 14 | that because it's -- I think it's important. |
| 11:51:59 | 15 | MR. BAIN:  Yes.  And we've used special |
| 11:52:01 | 16 | masters before in a Rule 53.  In multidistrict |
| 11:52:05 | 17 | litigations, they're very helpful.  So we would totally |
| 11:52:09 | 18 | support that. |
| 11:52:10 | 19 | And to address one of the things that |
| 11:52:17 | 20 | Mr. Bell raised with respect to the probate matter, we |
| 11:52:20 | 21 | also agree that this should be something that should be |
| 11:52:22 | 22 | resolved fairly quickly.  But our position is that North |
| 11:52:27 | 23 | Carolina law should apply to that. |
| 11:52:29 | 24 | JUDGE DEVER:  Well, you agree, though, it's |
| 11:52:30 | 25 | a matter of federal common law. |

| | |
|---|---|
| 11:52:32 | 1 |

MR. BAIN:  No.

THE DEFENDANT:  You don't.  Why?

MR. BAIN:  We believe the Federal Tort Claims Act applies to fill any gaps in the Camp Lejeune Justice Act.  That law references the substantive law of this State where the act or omission occurred.  So that would be North Carolina law.  So there's no need to create some federal common law.  The Federal Tort Claims Act, which supplies the waiver for the Camp Lejeune Justice Act, references state substantive law.  And so North Carolina law should apply to who is an appropriate representative in a wrongful death case.  And once we get that resolved, that will facilitate settlements in other matters for cases where it's a wrongful death situation or survivorship action.

Let me just check with cocounsel.  I think those were the primary things I wanted to address first.

Oh.  Your Honors did issue the three of the four orders that we submitted.  The one order which also is necessary before we can produce a lot of information is an order on confidentiality.  And so I just wanted to raise that in case the Court has any questions about that.

With respect to our responses to the plaintiff's request for production which are due today,

11:53:56  1   we have a number of materials that we're ready to
11:53:58  2   produce, along with our written responses, but until we
11:54:02  3   have that protective order in place, we can't produce
11:54:04  4   all of that material.
11:54:08  5            JUDGE DEVER:  Give us the docket entry
11:54:10  6   number of that -- that draft.  Do you have it?
11:54:23  7            MR. BAIN:  It was submitted on the same date
11:54:24  8   as the other three, which I believe was the...
11:54:32  9            I have --
11:54:32 10            JUDGE DEVER:  Oh.  So that's the 32-1?  Is
11:54:37 11   that right?
11:54:37 12            MR. BAIN:  I believe so.
11:54:40 13            JUDGE DEVER:  I mean, it's docket entry 32.
11:54:49 14            MR. BAIN:  It was filed with docket 26.
11:54:54 15            JUDGE DEVER:  26.
11:54:55 16            MR. BAIN:  Yeah.
11:55:33 17            Judge Boyle, I do have that information now
11:55:36 18   if you would like that.
11:55:52 19            The three claimants who have accepted
11:55:54 20   settlement offers, one was for $250,000, one was for
11:55:59 21   $300,000, and one was for $300,000.
11:56:03 22            JUDGE BOYLE:  Thank you.
11:56:09 23            JUDGE DEVER:  Mr. Bell.
11:56:10 24            MR. BELL:  Your Honor, normally, I don't get
11:56:13 25   too aggrieved at things, but if you'll allow me.  Almost

| | | |
|---|---|---|
| 11:56:21 | 1 | 12 years we've litigated Camp Lejeune, and the |
| 11:56:24 | 2 | Government couldn't wait to tell me every time they |
| 11:56:26 | 3 | could that the Federal Tort Claims Act doesn't apply, |
| 11:56:31 | 4 | you can't win in this act; under North Carolina, you'll |
| 11:56:34 | 5 | get kicked out.  If there was any way we thought about |
| 11:56:38 | 6 | drafting this bill, it included the Federal Tort Claims |
| 11:56:43 | 7 | Act we have instituted.  This is a standalone bill where |
| 11:56:46 | 8 | federal common law applies. |
| 11:56:48 | 9 | What makes it interesting, Judge -- and I |
| 11:56:50 | 10 | think it's something that, to me, is ethically |
| 11:56:53 | 11 | controlling -- is when you have an Elective Option, that |
| 11:57:00 | 12 | they're making offers which they have admitted is |
| 11:57:02 | 13 | drastically reduced offers -- they've admitted that. |
| 11:57:05 | 14 | That doesn't bother me so much.  We can handle that. |
| 11:57:07 | 15 | But in order to accept the offer, the lawyer has to sign |
| 11:57:11 | 16 | an agreement that this is being made under the Federal |
| 11:57:15 | 17 | Tort Claims Act.  Which I think is wrong.  I think |
| 11:57:19 | 18 | that's illegal.  I think it's improper, and I'm not |
| 11:57:23 | 19 | going to do it.  Because this is what we fought this |
| 11:57:26 | 20 | case all about.  This is why Congress said we're not |
| 11:57:30 | 21 | going to do it. |
| 11:57:31 | 22 | If you fill in the gaps like they talk |
| 11:57:33 | 23 | about, what they're doing is just bringing into play |
| 11:57:36 | 24 | what they've for 12 years told these courts was not in |
| 11:57:40 | 25 | play.  And I would be surprised if -- if Congress knew |

| | | |
|---|---|---|
| 11:57:48 | 1 | at the time they were drafting this bill that this would |
| 11:57:51 | 2 | bring it back under what the Government had already said |
| 11:57:55 | 3 | didn't apply.  So I just bring that up to Your Honor. |
| 11:57:59 | 4 | However that decision -- we would appreciate |
| 11:58:02 | 5 | an order on that.  Or at least if we need to brief it, |
| 11:58:05 | 6 | we'll be glad to. |
| 11:58:06 | 7 | JUDGE MYERS:  Well, it seems to me that we |
| 11:58:08 | 8 | need a case or controversy that says we need a |
| 11:58:11 | 9 | declaratory judgment.  We have a settlement offer |
| 11:58:13 | 10 | between these two parties.  That settlement offer says |
| 11:58:16 | 11 | that it's pursuant to the Federal Tort Claims Act.  We |
| 11:58:18 | 12 | disagree, we believe it should fall under federal common |
| 11:58:20 | 13 | law, and then brief it.  Bring one that's before one of |
| 11:58:23 | 14 | us. |
| 11:58:23 | 15 | MR. BELL:  Judge, we actually had one that |
| 11:58:26 | 16 | we were going to do.  Our husband and wife both have |
| 11:58:31 | 17 | identical cancers.  They're not related.  Both were |
| 11:58:34 | 18 | exposed almost identically.  One of them has since died. |
| 11:58:38 | 19 | They were there over the five years, which was part of |
| 11:58:40 | 20 | the option.  But they didn't -- they didn't meet the |
| 11:58:45 | 21 | latency requirement which was artificially done.  And |
| 11:58:48 | 22 | about 75 percent of the clients out there do not meet |
| 11:58:52 | 23 | that.  But, yet, while we might would have wanted to |
| 11:58:57 | 24 | accept the offer, then they require the lawyers to say |
| 11:59:00 | 25 | this is under the Tort Claims Act, is something we |

think -- we brought that up to the Government explaining to them that we thought it was improper.  They say they're looking into that, and we haven't heard back from them.

JUDGE DEVER:  Well, I mean, I think on the larger point of the Chief is that we're happy to rule on things.  That's what we do for a living.  And -- but it has to be in the context of we just can't, sort of, write a letter back to y'all and say this is our view of things.  It has to be in the context of an actual dispute between somebody.

But in terms of these -- to the extent they're important preliminary issues, you know, I think we would be ready to rule on those things, but it just needs to be filed.  And we put in the Case Management Order very deliberately citing the Third Circuit case that as a general matter, we anticipate following the orders in our other cases, so that we're not reinventing the wheel every short-form complaint.

And so again, in terms of that issue, for us to resolve it, it just -- it needs to be in the context of some kind of a dispute.  And if we get it, we'll act on it.

MR. BELL:  I understand, Your Honor.

JUDGE DEVER:  And then we would anticipate,

12:00:23 1  just so that y'all know, absent something unusual, we

12:00:26 2  have the language in Case Management Order 2, we follow

12:00:29 3  it.

12:00:30 4  And I would just say on the issue of the --

12:00:33 5  the one deposition, and, I mean, we have a good cause

12:00:36 6  out, and that doesn't mean impossible or anything like

12:00:39 7  that.  And to the extent that there's some 30(b)(6)

12:00:44 8  deposition that could be taken early, I know my own view

12:00:48 9  would be, well, I mean, if you needed to take a

12:00:50 10  deposition of that person that works for the Government

12:00:52 11  or used to work for the Government again, it will be

12:00:55 12  like, okay.  I mean, I would let it.

12:01:00 13  And to the protective order point, Mr. Bain,

12:01:04 14  I mean, we will -- to the extent there's some

12:01:07 15  confidentiality order we need to get entered, we'll get

12:01:10 16  it entered.  But I'm just at a loss to understand how

12:01:16 17  much extensive negotiation or coordination there has to

12:01:19 18  be with other people to the extent that their

12:01:24 19  information was submitted as part of some study.  If

12:01:27 20  it's being produced to officers of the court pursuant to

12:01:31 21  a confidentiality order, that would prohibit that being

12:01:38 22  produced.  And, obviously, the benefit of it is it

12:01:44 23  allows the plaintiffs to get the information that they

12:01:47 24  think they need.  It's not, you know, sort of arguing

12:01:50 25  about relevance or it has people that are being studied

| | |
|---|---|
| 12:01:53 | 1 |
| 12:01:56 | 2 |
| 12:01:58 | 3 |
| 12:02:01 | 4 |
| 12:02:09 | 5 |
| 12:02:14 | 6 |
| 12:02:19 | 7 |
| 12:02:22 | 8 |
| 12:02:26 | 9 |
| 12:02:32 | 10 |

1  for something else.  It's like, well, I mean, there's a
2  lot of irrelevant stuff that gets produced in discovery
3  that never sees the light of day in an actual trial.
4  But I just -- I'm just not aware of anything that would
5  inhibit or should prevent y'all from producing this
6  information about the studies subject to the
7  confidentiality order, and then there can be later
8  fights about legal issues.  But not producing the
9  information, we're just wasting time.  And time is the
10  gift necessary for all other gifts.
11          MS. BASH:  Your Honor, may I say a little
12  bit, just a few comments on things that have come up?
13  One is on -- well, first of all on this FTCA issue, we
14  have spoken a lot with DOJ, and they have brought it up
15  in several contexts, that the FTCA fills the gaps.  And
16  the latest was this filing on Friday.  So we will
17  respond to that, understanding that it's not a case or
18  controversy, but we've also been waiting for a place to
19  tee it up, and we will do it in one of these estate
20  cases.  Because, again, that just -- the issue is very
21  broad.  It affects all of the clients.  It will, I
22  think, determine how the litigation goes.  And so we're
23  trying to get that in front of you early, and we will.
24          On resolution:  So we were not involved at
25  all in the EO.  It was a secret to us.  We found out it

12:03:26  1   was coming and asked if we could give some feedback

12:03:29  2   because we do think that, you know, with a few tweaks,

12:03:32  3   it could have applied much more broadly than it is going

12:03:35  4   to apply, including with respect to latency.

12:03:38  5   Nevertheless, we are helping DOJ.  They asked us to give

12:03:42  6   them some information for clients who are before the

12:03:44  7   Court.  And so we're giving them dates of birth, Social

12:03:47  8   Security numbers so that they can see if people, you

12:03:50  9   know, are compliant with what they want.  We've had

12:03:54  10  mixed reactions, you know, as you could expect.

12:03:57  11           Judge Dever, as you said in the first

12:03:59  12  hearing, some people just want to get off the train now

12:04:01  13  and they're, you know, deeply discounted offers.  I

12:04:04  14  think DOJ has said as much.  But they're ripe for some

12:04:08  15  people, and so we want to get as many of those in

12:04:11  16  people's hands.

12:04:11  17           The tricky thing is this divide between the

12:04:14  18  Navy and DOJ.  The Navy seems to just be moving much

12:04:18  19  more slowly.  The bulk of the cases are there.  And so

12:04:22  20  we actually -- my firm tried to get a bunch of people

12:04:26  21  here in court after that was announced to see if we

12:04:29  22  could move them more quickly for DOJ.  But that is also

12:04:33  23  a little bit of the reason there's the delay in your

12:04:35  24  seeing the short-form complaints.  Once they come over

12:04:38  25  here, they're no longer entitled to receive that offer.

| | | |
|---|---|---|
| 12:04:40 | 1 | And so, you know, every time before we file a short-form |
| 12:04:43 | 2 | complaint, we need to call the client and say, you know, |
| 12:04:46 | 3 | you're getting off -- you're no longer eligible to |
| 12:04:48 | 4 | receive that.  And so this isn't a delay where we're |
| 12:04:52 | 5 | trying, you know, to pick our best plaintiffs or |
| 12:04:54 | 6 | anything like that.  We're very much, as Ed said, |
| 12:04:57 | 7 | cognizant of wanting to resolve these quickly.  We think |
| 12:05:01 | 8 | the only way to resolve these quickly is to get a range, |
| 12:05:03 | 9 | you know, in the trials so that when we're at the |
| 12:05:06 | 10 | resolution stage with DOJ -- |
| 12:05:08 | 11 | JUDGE BOYLE:  Do you think there's any room |
| 12:05:09 | 12 | for summary judgment in this process? |
| 12:05:12 | 13 | MS. BASH:  Absolutely. |
| 12:05:13 | 14 | JUDGE BOYLE:  That gets done quickly. |
| 12:05:16 | 15 | MS. BASH:  Yes.  Yes.  We have -- we're in |
| 12:05:17 | 16 | the process of writing a couple of motions for summary |
| 12:05:20 | 17 | judgment -- partial summary judgment. |
| 12:05:21 | 18 | JUDGE BOYLE:  I mean, the schedule for |
| 12:05:23 | 19 | trials is remote; summary judgment is immediate. |
| 12:05:29 | 20 | MS. BASH:  Yes.  No, absolutely.  We plan to |
| 12:05:31 | 21 | start there. |
| 12:05:34 | 22 | JUDGE BOYLE:  And if it doesn't play out, |
| 12:05:36 | 23 | people in Richmond will tell us, and it will come back |
| 12:05:39 | 24 | and no harm, no foul. |
| 12:05:41 | 25 | MS. BASH:  Yes.  No, absolutely.  We have -- |

12:05:43  1    we have a great briefing committee and we have a couple

12:05:46  2    of drafts just waiting -- waiting to be filed.  And we

12:05:50  3    will file them soon.  Again --

12:05:52  4         JUDGE BOYLE:  And it's finite.  You file it,

12:05:54  5    they have to respond or else it's admitted.

12:05:56  6         MS. BASH:  Right.  Yes.  They're coming.

12:06:01  7         But so I just wanted to say on resolution

12:06:04  8    specifically:  We are working toward a database.  We've

12:06:08  9    chosen a vendor for the plaintiffs in court.  Unlike in

12:06:11  10   Hellerstein where the entire universe was before the

12:06:16  11   court; here, they're not.  Most of them are sitting

12:06:19  12   before the Navy.  And we don't want to flood the Court

12:06:21  13   unnecessarily just for the purposes of doing something

12:06:23  14   like that.  And so I do think it will be a little bit

12:06:26  15   more bifurcated with, you know, they have a database and

12:06:29  16   we have -- we have, you know, our information of

12:06:30  17   clients.  But we very much do want to work with them,

12:06:32  18   and we'll continue to do that.

12:06:34  19         And the FedRAMP issue is a tricky one.  He

12:06:38  20   just said -- you know, Mr. Bain just said that they need

12:06:40  21   it for purposes of putting personal information in

12:06:43  22   there.  But our point is if we have the information

12:06:46  23   ourselves -- right -- if you've produced it in

12:06:48  24   discovery, we can put it wherever we want.  We don't

12:06:50  25   necessarily have to comply with some of those things.

| | |
|---|---|
| 12:06:52 | 1 |
| 12:06:54 | 2 |
| 12:06:56 | 3 |
| 12:07:00 | 4 |
| 12:07:04 | 5 |
| 12:07:08 | 6 |
| 12:07:08 | 7 |
| 12:07:10 | 8 |
| 12:07:12 | 9 |
| 12:07:16 | 10 |
| 12:07:20 | 11 |
| 12:07:24 | 12 |
| 12:07:27 | 13 |
| 12:07:30 | 14 |
| 12:07:33 | 15 |
| 12:07:36 | 16 |
| 12:07:38 | 17 |
| 12:07:40 | 18 |
| 12:07:42 | 19 |
| 12:07:43 | 20 |
| 12:07:47 | 21 |
| 12:07:52 | 22 |
| 12:07:56 | 23 |
| 12:07:59 | 24 |
| 12:08:02 | 25 |

The vendors that the Government uses and having worked
in Government for a very long time, sometimes the
vendors that are acceptable to the Government are kind
of the older, dinosaur, slower vendors.  And so we're
trying to work with somebody that will move quickly.
Get all of the information there --

JUDGE DEVER:  Perfect is the enemy of
better.  Just don't -- I mean, again -- I mean, I
realize that y'all are really doing your best for your
clients.  But perfect is the enemy of better.  And it's
better for y'all to talk and agree on a vendor and --

MS. BASH:  No.  Absolutely.  So that's -- so
that's part of it, though.  Right?  So some of the newer
vendors who do this repeatedly who are not FedRAMP
certified will be much faster, because they have the
system built.  And give them the information and it's
there.  And so it's actually in this case, I do think
that those match up.

JUDGE DEVER:  And I have no idea.  I mean,
there's -- we live in a world of acronyms and, you know,
maybe it would incentivize one of these new folks to get
the FedRAMP certification.  It doesn't matter to me, but
it would seem to me that if it matters to the DOJ, y'all
need to work to figuring that out.  I think it's also
one of the benefits of having a settlement master that

```
12:08:06   1    would have -- in my vision of what that person would do,
12:08:10   2    that person would have insight not just into the 1300 or
12:08:15   3    so cases that our court has, but in the 117,000 to try
12:08:19   4    and help facilitate resolution.  Whether that involves
12:08:24   5    one or two people, you know, we would be open to your
12:08:27   6    suggestions on that.  But I would ask y'all to add that
12:08:30   7    to your list of things to talk about because having
12:08:33   8    somebody facilitating a dialogue on the topic of global
12:08:39   9    resolution is in everybody's interest.
12:08:41  10            MS. BASH:  So absolutely.  And it is a
12:08:45  11    priority.  It is not yet the bottleneck, because what
12:08:47  12    we're doing is -- I'm again analogizing to the
12:08:50  13    Hellerstein model, is negotiating the data fields.  And
12:08:52  14    that is moving forward, I think, very well.  We're
12:08:55  15    supposed to get a new draft from the DOJ soon.  And
12:08:59  16    because unlike in Hellerstein, we don't have everybody
12:09:01  17    before us.  You know, the 117,000 people, we can't order
12:09:05  18    them.  You know, we're not -- we don't rule over them.
12:09:09  19    And so we want to have that data set complete to go to
12:09:13  20    them one time and say, "Fill all of this out."  And the
12:09:18  21    carrot is -- unlike, you know, a court order, the carrot
12:09:21  22    is this is what DOJ had said they will settle the cases
12:09:25  23    on, this is what we think we need, and then we hopefully
12:09:27  24    can spit out a number either earlier or after the trials
12:09:30  25    get going.  But that's what we're actively negotiating.
```

|          |    |                                                                    |
|----------|----|--------------------------------------------------------------------|
| 12:09:36 | 1  | JUDGE DEVER:  I mean, that's good to hear.                         |
| 12:09:37 | 2  | Because that's -- I mean, if the DOJ says we're not               |
| 12:09:38 | 3  | going to settle unless we have this information, well --          |
| 12:09:42 | 4  | MS. BASH:  There's your carrot.  That's                           |
| 12:09:43 | 5  | right.                                                             |
| 12:09:44 | 6  | JUDGE DEVER:  -- the plaintiffs need to know                      |
| 12:09:45 | 7  | that.  And then the plaintiffs can say, "Well, then I'm           |
| 12:09:46 | 8  | going to have my trial 20 years from now," and they can          |
| 12:09:48 | 9  | live with that.  But it's really important for, like you         |
| 12:09:53 | 10 | say, that process for if DOJ tells you if we don't have          |
| 12:09:58 | 11 | this data -- and even if it's some issue that you see            |
| 12:10:00 | 12 | being litigated later on an exposure issue about where          |
| 12:10:04 | 13 | you were on the base or something, to the extent that            |
| 12:10:07 | 14 | DOJ is -- and you have the information, just because you         |
| 12:10:11 | 15 | agree to it in some administrative database doesn't mean        |
| 12:10:14 | 16 | that we've ruled on it.  It just means it's a potential          |
| 12:10:17 | 17 | way to facilitate some resolution for the people that           |
| 12:10:22 | 18 | have claims back to, potentially, 1953.                          |
| 12:10:26 | 19 | MS. BASH:  Right.                                                 |
| 12:10:27 | 20 | JUDGE DEVER:  So I'm glad that y'all are                          |
| 12:10:28 | 21 | talking, and I would encourage that to continue.  And           |
| 12:10:32 | 22 | again, you don't have to, sort of, fight the fights of,         |
| 12:10:35 | 23 | you know, if we let this be in a database, then that            |
| 12:10:38 | 24 | means we're agreeing to the relevance of this or that in        |
| 12:10:41 | 25 | court.  It's like, no, it doesn't.  It means you're             |

| | | |
|---|---|---|
| 12:10:46 | 1 | agreeing to information in the database. |
| 12:10:48 | 2 | MS. BASH: Yeah. No. And I completely |
| 12:10:50 | 3 | agree. The hesitation with is going -- it's an older |
| 12:10:54 | 4 | population. It's an ill population. Pinging them many |
| 12:10:57 | 5 | times for incremental data will reduce responses, we |
| 12:11:01 | 6 | know from experience. And so we do -- we would like to |
| 12:11:04 | 7 | complete -- it will never be perfect. But as much as we |
| 12:11:08 | 8 | can, I think we're very close. And then as soon as we |
| 12:11:11 | 9 | get agreement on that, we can go out to people one time, |
| 12:11:13 | 10 | collect as much as we can, and then go from there. |
| 12:11:16 | 11 | But in the meantime, for purposes of giving |
| 12:11:18 | 12 | them a sense, we have aggregate data. You know, this -- |
| 12:11:21 | 13 | the people here at the table represent a very large |
| 12:11:23 | 14 | number of clients and we're able to give -- you know, |
| 12:11:25 | 15 | figure out the average latency for a kidney cancer and |
| 12:11:28 | 16 | so that -- so relevant data points. |
| 12:11:31 | 17 | And then the last thing I wanted to address, |
| 12:11:32 | 18 | you asked about the discovery pool profile form. So |
| 12:11:35 | 19 | we're -- that's due, I think, next week to the Court. |
| 12:11:37 | 20 | And we're negotiating it with DOJ. We owe them a draft. |
| 12:11:41 | 21 | We just spoke last week and agree that they were going |
| 12:11:44 | 22 | to serve, kind of, in the place of interrogatories to |
| 12:11:46 | 23 | streamline that process. And so we want to add a few |
| 12:11:48 | 24 | more things to our proposal before sending it over. And |
| 12:11:52 | 25 | we'll do that, I hope, tomorrow. You know, tomorrow or |

| | |
|---|---|
| 12:11:55 | 1 |
| 12:11:57 | 2 |
| 12:11:58 | 3 |
| 12:12:01 | 4 |
| 12:12:05 | 5 |
| 12:12:07 | 6 |
| 12:12:14 | 7 |
| 12:12:19 | 8 |
| 12:12:22 | 9 |
| 12:12:26 | 10 |
| 12:12:30 | 11 |
| 12:12:34 | 12 |
| 12:12:37 | 13 |
| 12:12:41 | 14 |
| 12:12:42 | 15 |
| 12:12:44 | 16 |
| 12:12:46 | 17 |
| 12:12:50 | 18 |
| 12:12:54 | 19 |
| 12:12:59 | 20 |
| 12:13:00 | 21 |
| 12:13:02 | 22 |
| 12:13:04 | 23 |
| 12:13:07 | 24 |
| 12:13:12 | 25 |

the next day.  So...

JUDGE DEVER:  And then, Mr. Bell, I know y'all had submitted -- and whoever on your team can answer this.  I know you have the draft common benefit order that you had submitted.  And, obviously, DOJ filed the response it filed Friday.  Do you think we need to resolve that -- the FTCA issue that they -- that the Department raised in order to enter that?

MR. BELL:  No, Your Honor.  Please refer to page 25 and 26.  It clearly states how that holdback is to be applied to the gross settlement.  It has nothing to do with fees.  I do take issue with some of the things in that filing.  We'll --

JUDGE DEVER:  Right.  But in terms of just -- and I want to ask the same thing to Mr. Bain.  I mean, I know -- I read the filing.  But is there anything in the draft that you think would prevent us from entering that, Mr. Bain?  I mean, it's not with prejudice to your position on the FTCA issue that you raised, right?

MR. BAIN:  No, Your Honor.  I think that, you know, we just wanted to point out that in determining the holdback rate, need to balance those interests and know that the FTCA cap applies.  Our position, just in response briefly to what Mr. Bell

| | | |
|---|---|---|
| 12:13:16 | 1 | said, is that the CLJA refers to the FTCA administrative |
| 12:13:20 | 2 | process which provides the authority to settle |
| 12:13:22 | 3 | administrative claims, which in turn provides the fee |
| 12:13:26 | 4 | cap.  So that's why that argument, we believe, is |
| 12:13:31 | 5 | supported by the CLJA itself.  So -- |
| 12:13:34 | 6 | JUDGE DEVER:  Right.  And that's a legal |
| 12:13:35 | 7 | issue.  We'll have to resolve it.  It's a little ripe, |
| 12:13:39 | 8 | but it's not ripe yet. |
| 12:13:41 | 9 | MR. BELL:  Your Honor is on the gross |
| 12:13:43 | 10 | settlement, not on -- not on the amount of the fee.  So |
| 12:13:48 | 11 | in our opinion, it has nothing to do with what's |
| 12:13:52 | 12 | presently before the Court by the Government. |
| 12:13:55 | 13 | MR. BAIN:  Your Honor, if I can just make |
| 12:13:57 | 14 | one other point.  I think I need to clear one thing that |
| 12:14:00 | 15 | was said in the record.  I think a couple of times it's |
| 12:14:02 | 16 | been said that the Government admits the EO offers are |
| 12:14:06 | 17 | discounted or deeply discounted.  I would just point out |
| 12:14:08 | 18 | that that program is a base-wide approach.  It waives |
| 12:14:13 | 19 | all offsets -- Medicare, Medicaid, and VA offsets.  So |
| 12:14:19 | 20 | in our view, it's not a discount -- it's a very fair |
| 12:14:22 | 21 | program. |
| 12:14:37 | 22 | JUDGE MYERS:  Judge Jones, we're going to |
| 12:14:39 | 23 | turn it over to you to say anything you would like to |
| 12:14:41 | 24 | say as the person who will now become a significant |
| 12:14:45 | 25 | feature in the lives of everyone present. |

|          |    |                                                            |
|----------|----|------------------------------------------------------------|
| 12:14:48 | 1  | JUDGE JONES:  Thank you. |
| 12:14:50 | 2  | I really had two -- two questions, and they |
| 12:14:56 | 3  | were answered, sort of, at the outset.  The first |
| 12:14:59 | 4  | question was the status of discovery.  And I think |
| 12:15:04 | 5  | that's been -- that's been answered.  And my second |
| 12:15:08 | 6  | question was, really, as the one that's handling -- |
| 12:15:15 | 7  | well, probably will be handling -- who will probably be |
| 12:15:18 | 8  | handling discovery speaks, I want to get kind of an idea |
| 12:15:21 | 9  | of the nature of those disputes in cases such as this. |
| 12:15:26 | 10 | And I guess I've kind of gleaned a sense of that from |
| 12:15:31 | 11 | our discussions about the database and health studies. |
| 12:15:37 | 12 | And maybe those will be disputes to bring to the Court |
| 12:15:42 | 13 | in the future. |
| 12:15:44 | 14 | But that discussion sort of prompted a third |
| 12:15:47 | 15 | question.  This may be a fundamental question, sort of |
| 12:15:53 | 16 | new to this litigation.  Mr. Bain has described 12 years |
| 12:15:58 | 17 | of litigation in these -- with these claims.  How much |
| 12:16:01 | 18 | of this information has been traded between the parties |
| 12:16:05 | 19 | such that y'all really don't need to fight about it? |
| 12:16:08 | 20 | The Government's got it or the plaintiffs have it, and |
| 12:16:11 | 21 | maybe you've -- maybe you've covered that in what you're |
| 12:16:15 | 22 | talking about the stipulations. |
| 12:16:15 | 23 | MR. BELL:  No, Your Honor.  We got some |
| 12:16:17 | 24 | information at the beginning.  In the first cases, there |
| 12:16:20 | 25 | were actually just four depositions taken.  And this was |

12:16:23 1   a preliminary allowance by the Court for the purpose of

12:16:28 2   looking into the motions to dismiss.  We do have some

12:16:32 3   data but we don't have a lot.

12:16:34 4         I'll give you an example, Judge.  For many,

12:16:38 5   many years the Government told the public and told

12:16:41 6   everybody that the contamination came from an offsite

12:16:46 7   dry-cleaning service.  It was only after we -- in fact,

12:16:50 8   in filing those original claims, we allege that.  But

12:16:55 9   later learned that, in fact, a lot of the pollution

12:16:58 10  contamination comes from their own internal leaking

12:17:02 11  wells -- and not wells, but tanks.  So we got some

12:17:07 12  information.

12:17:08 13        I'm under the impression or understand that

12:17:10 14  there's -- I call it "the leaking tank database," but

12:17:13 15  they call it something else.  But we haven't gotten

12:17:16 16  that, we don't think.  So there's some things out there

12:17:18 17  that we think might matter if we're going to have to go

12:17:21 18  through this arduous process of this epidemiological

12:17:26 19  workup that we don't think is necessary.  A lot of this

12:17:29 20  might not be necessary at all.

12:17:31 21        And of course Judge Dever mentioned we're

12:17:33 22  not looking at fault, but we think that there's a lot

12:17:40 23  out there that we don't have.  Especially studies.  We

12:17:43 24  are aware that there were private contractors hired.

12:17:46 25  I'm not aware of whether we have all of those or have

| | | |
|---|---|---|
| 12:17:49 | 1 | any of them yet.  So there are some things we're looking |
| 12:17:51 | 2 | for. |
| 12:17:54 | 3 | JUDGE JONES:  Mr. Bain. |
| 12:17:54 | 4 | MR. BAIN:  So, Your Honor, yes, we have |
| 12:17:56 | 5 | turned over a lot of information as a result of the |
| 12:17:58 | 6 | prior litigation, and we're offering and going to turn |
| 12:18:01 | 7 | over all of that information again just to make sure |
| 12:18:03 | 8 | that they have it.  There's a lot of public information. |
| 12:18:08 | 9 | The EPA has published a website which has their whole |
| 12:18:13 | 10 | site file.  The Navy has their environmental information |
| 12:18:18 | 11 | online.  The ATSDR reports are, of course, online.  This |
| 12:18:23 | 12 | site has been extensively studied by the Marine Corps |
| 12:18:27 | 13 | itself, by the general accountability office -- or |
| 12:18:30 | 14 | Government Accountability Office, by the EPA.  So a lot |
| 12:18:33 | 15 | of that information has already been gathered. |
| 12:18:35 | 16 | With respect to other databases that the |
| 12:18:37 | 17 | plaintiffs claim that they don't have, we will try to |
| 12:18:40 | 18 | make those available to the plaintiffs.  But as far as |
| 12:18:44 | 19 | the ongoing ATSDR studies, that's one thing that may not |
| 12:18:49 | 20 | have been covered by the past litigation because that's |
| 12:18:50 | 21 | more recent work.  But the studies themselves are |
| 12:18:52 | 22 | available, and I think then the issue is what about all |
| 12:18:55 | 23 | of the work that's been done by ATSDR and how much of |
| 12:18:58 | 24 | that can be made available to the plaintiffs.  So we'll |
| 12:19:02 | 25 | be looking into that. |

|         |    |                                                              |
|---------|----|--------------------------------------------------------------|
| 12:19:03 | 1  | JUDGE JONES:  The next question I had is                    |
| 12:19:05 | 2  | housekeeping.  We have a conference scheduled the first     |
| 12:19:08 | 3  | and third Tuesday of every month.  The first Tuesday of     |
| 12:19:15 | 4  | November is not that far away.  I don't know if it's        |
| 12:19:19 | 5  | worthwhile to forego that meeting and meet on the third     |
| 12:19:25 | 6  | Tuesday of November.  Do the parties have any opinion       |
| 12:19:32 | 7  | about that?                                                  |
| 12:19:33 | 8  | MR. BAIN:  Your Honor, if I may suggest --            |
| 12:19:36 | 9  | of course, it's totally at the Court's discretion.          |
| 12:19:38 | 10 | Maybe the second Tuesday because the third Tuesday is in     |
| 12:19:40 | 11 | Thanksgiving week.  But --                                   |
| 12:19:43 | 12 | JUDGE JONES:  Well, I wanted to set a day             |
| 12:19:46 | 13 | that we could make a permanent day so that the Tuesday      |
| 12:19:50 | 14 | in November doesn't conflict with -- or the day we          |
| 12:19:54 | 15 | picked in November doesn't fall in Christmas week or        |
| 12:20:00 | 16 | July the 4th week.  And Tuesdays -- if you didn't know      |
| 12:20:05 | 17 | this, Tuesdays during the calendar are the best day to      |
| 12:20:09 | 18 | meet because there's -- it avoids Thanksgiving and other    |
| 12:20:14 | 19 | holidays.  So Tuesdays seem to be the best time to meet.    |
| 12:20:19 | 20 | MR. BELL:  Judge, maybe it would be best if           |
| 12:20:22 | 21 | we did have the nearer Tuesday.  We'll know today           |
| 12:20:27 | 22 | whether we need to talk with you about that important       |
| 12:20:30 | 23 | discovery.                                                   |
| 12:20:30 | 24 | JUDGE JONES:  Okay.                                    |
| 12:20:31 | 25 | MR. BELL:  Maybe by then we'll have had some          |

|           |    |                                                                    |
|-----------|----|--------------------------------------------------------------------|
| 12:20:33  | 1  | answer to our request for our 30(b)(6).  So maybe a                |
| 12:20:36  | 2  | conversation will --                                               |
| 12:20:36  | 3  | JUDGE JONES:  Well, let's keep it on the                           |
| 12:20:38  | 4  | calendar.  And if the parties come to some agreement,              |
| 12:20:41  | 5  | the -- maybe three days before the Tuesday that there's            |
| 12:20:44  | 6  | no need to meet -- we don't need to meet just to meet.             |
| 12:20:47  | 7  | I want our meets to be productive.  So we'll put -- keep           |
| 12:20:51  | 8  | it on the calendar.  And if there's a consensus that we            |
| 12:20:53  | 9  | don't need to meet, then maybe we can not do that.                 |
| 12:20:57  | 10 | MR. BELL:  The order requires a status                             |
| 12:20:58  | 11 | conference -- status report for next Tuesday by                    |
| 12:21:01  | 12 | tomorrow.  Can we, at least for the first one, forego              |
| 12:21:04  | 13 | that one?                                                          |
| 12:21:05  | 14 | JUDGE JONES:  The status report?                                   |
| 12:21:06  | 15 | MR. BELL:  Yes, sir.                                               |
| 12:21:07  | 16 | JUDGE JONES:  Yes, sir.                                            |
| 12:21:08  | 17 | MR. BELL:  Thank you.                                              |
| 12:21:12  | 18 | JUDGE MYERS:  Anything further that needs to                       |
| 12:21:13  | 19 | be brought before the Court during the status conference           |
| 12:21:15  | 20 | by any other participant on either side?                           |
| 12:21:22  | 21 | (No response.)                                                     |
| 12:21:24  | 22 | JUDGE MYERS:  All right.  Seeing none,                             |
| 12:21:26  | 23 | seeing none, thank you everybody.  We are now going to             |
| 12:21:29  | 24 | turn this over to Judge Jones for the purposes of these            |
| 12:21:33  | 25 | meetings.  As I noted earlier, and as Judge Dever                  |

| | |
|---|---|
| 12:21:39 | 1 |
| 12:21:42 | 2 |
| 12:21:45 | 3 |
| 12:21:49 | 4 |
| 12:21:52 | 5 |
| 12:21:54 | 6 |
| 12:22:01 | 7 |
| 12:22:04 | 8 |
| 12:22:05 | 9 |
| 12:22:10 | 10 |
| 12:22:12 | 11 |
| 12:22:16 | 12 |
| 12:22:19 | 13 |
| 12:22:21 | 14 |
| 12:22:23 | 15 |
| 12:22:24 | 16 |
| 12:22:27 | 17 |
| 12:22:29 | 18 |
| 12:22:34 | 19 |
| 12:22:36 | 20 |
| 12:22:40 | 21 |
| 12:22:44 | 22 |
| 12:22:49 | 23 |
| 12:22:53 | 24 |
| 12:22:56 | 25 |

reified, we're not -- I wish we were -- this was a one-judge operation sometimes and that these were not all individual cases.  It would simplify things for you-all to only be dealing with only one of us.  I understand that.  But the nature of this litigation is such that having particularized facts with a live issue that we can then rule on will give you your best opportunity to get answers.  They're not going to be a forecast of what one judge might think, but then be an order of the court that the others of us are going to look at and give great deference to.  They will not be controlling but they will receive great deference amongst the judges of this court.  We have discussed that.  It's in the standing orders that are now before you.

So unlike the ordinary litigation where you have a single judge and that judge can tell you where they're leaning, this isn't that, unfortunately.  So the answers to some of these questions, I think, might be slightly different amongst the four of us.  Judge Flanagan is not here to nod vigorously.  But they might be slightly different amongst the four of us.  We will do our best, though, to rule expeditiously and try not to become your bottleneck.  We want to keep you moving.  But to make this litigation work given its unique

12:23:00 1 nature, I think we need to have things that are before

12:23:04 2 the Court, briefed and ruled upon in ways that are going

12:23:07 3 to be helpful to you. We commit to doing that.

12:23:10 4 JUDGE DEVER: And I would add that I

12:23:12 5 would -- you should anticipate that we're -- we're not

12:23:16 6 going to have multiple 702 hearings per disease. I

12:23:20 7 mean, one judge is going to get a disease or -- and rule

12:23:27 8 on that. You're not going to get four Daubert rulings

12:23:30 9 from four judges. That ultimately when we get to that

12:23:34 10 stage, that we have talked about that. And that just

12:23:37 11 seems to me to make the most sense. And -- but I echo

12:23:42 12 everything else -- everything that the Chief said about

12:23:44 13 the process. I mean, we're ready to -- to move on these

12:23:51 14 things and grateful to Judge Jones for agreeing to have

12:23:56 15 those meetings. And part of it, why we had them all on

12:24:01 16 a certain date, is that to the extent any district judge

12:24:05 17 wants to attend, they just might attend.

12:24:11 18 JUDGE MYERS: All right. Thank you,

12:24:13 19 everybody.

12:25:04 20 (The proceedings concluded at 12:25 p.m.)

21 *     *     *

22

23

24

25

```
1                    UNITED STATES DISTRICT COURT

2                EASTERN DISTRICT OF NORTH CAROLINA

3

4

5                 CERTIFICATE OF OFFICIAL REPORTER

6

7               I, Jennifer C. Carroll, RMR, CRR, CRC,

8     Federal Official Court Reporter, in and for the United

9     States District Court for the Eastern District of North

10    Carolina, do hereby certify that pursuant to Section

11    753, Title 28, United States Code, that the foregoing is

12    a true and correct transcript of the stenographically

13    reported proceedings held in the above-entitled matter

14    and that the transcript page format is in conformance

15    with the regulations of the Judicial Conference of the

16    United States.

17

18

19    Dated this 1st day of November, 2023.

20

21

22                              /s/ Jennifer C. Carroll
                                Jennifer C. Carroll, RMR, CRR, CRC
23                              U.S. Official Court Reporter

24

25
```