**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION**
No. 7:23-cv-897

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| **IN RE:** | ) | |
| | ) | |
| | ) | **UNITED STATES' ANSWER** |
| **CAMP LEJEUNE WATER LITIGATION** | ) | **TO THE MASTER COMPLAINT** |
| | ) | |
| **This Document Relates to:** | ) | |
| **ALL CASES** | ) | |
| | ) | |

## I. INTRODUCTION

1.      Admit.

2.      Admit.

3.      The United States is without knowledge as to which "scientists" this allegation refers to. The United States denies the allegations contained in Paragraph 3.

4.      The United States admits that the Agency for Toxic Substances and Disease Registry ("ATSDR") has determined that, between at least 1953 and 1987, Camp Lejeune may have provided contaminated water to those who obtained water from certain water systems on base.  The United States admits that the ATSDR has estimated that as many as one million people may have been exposed to contaminated water at Camp Lejeune, including service members, civilian staff, and their respective families and dependents.  The United States denies the allegations contained in Paragraph 4 to the extent they imply that the extent of contamination is "undisputed and well-documented," because the ATSDR's determination was based on

1

conservative, health-protective models due to the lack of water sampling data prior to 1982. The United States denies the remaining allegations in Paragraph 4.

5. The United States admits that concentrations of TCE were reported in finished water at one of the eight water systems from 1 µg/L to 1,400 µg/L, which is 280 times the current EPA "maximum contaminant level" ("MCL"). The United States denies that a measured or simulated concentration above an MCL is necessarily unsafe or that the MCL was in effect at the time these concentrations were reported. The United States denies the remaining allegations in Paragraph 5.

6. The United States admits that the ATSDR has determined that there is at least some evidence connecting certain chemicals detected in Camp Lejeune's water supply to illnesses and injuries, including leukemia, non-Hodgkin's lymphoma, bladder cancer, kidney cancer, lung cancer, esophageal cancer, breast cancer and Parkinson's disease. The United States denies that the ATSDR's Assessment of the Evidence reached conclusions based on the levels of contaminants as a result of modeling for certain Camp Lejeune water systems. The United States asserts that the ATSDR's determinations were based on conservative, health-protective models due to the lack of water sampling data prior to 1982. The United States admits that the ATSDR determined there was "sufficient" or "equipoise and above" evidence for causation under the methodology it employed for at least some of these illnesses and injuries, such as leukemia and benzene. The United States denies the remaining allegations in Paragraph 6.

7. The United States denies the allegations contained in Paragraph 7.

8. The United States denies the allegations contained in Paragraph 8.

9.      The United States admits that the CLJA was signed into law on August 10, 2022, and permitted individuals to file administrative claims seeking compensation for injuries or deaths.  The United States denies the remaining allegations in Paragraph 9.

10.      The allegations of this paragraph are legal conclusions rather than factual allegations that do not require a response, as the statute speaks for itself.  The United States will not demand proof of negligence or fault for claimants who prove a harm with the required causal connection between exposure to perchloroethylene ("PCE"), trichloroethylene ("TCE"), trans-1,2-dichloroethylene ("1,2-tDCE"), vinyl chloride ("VC"), or benzene in Camp Lejeune water. The United States denies the remaining allegations and characterizations in Paragraph 10.

11.      The United States admits that the CLJA, § 804(c)(2) states: "To meet the burden of proof described in paragraph (1) [of Section 804(c)], a party shall produce evidence showing that the relationship between exposure to the water at Camp Lejeune and the harm is—(A) sufficient to conclude that a causal relationship exists; or (b) sufficient to conclude that a causal relationship is at least as likely as not."  The United States denies the remaining allegations in Paragraph 11.

12.      The United States admits that, as of November 14, 2023, approximately 129,158 administrative claims have been submitted under the CLJA. The United States admits that the Department of Navy along with the Department of Justice created an administrative settlement program entitled, the Elective Option ("EO"), which provides a manageable process for the Navy to quickly review large numbers of administrative claims and offer settlements to claimants who meet the qualification of the EO.  The United States denies the remaining allegations in Paragraph 12.

3

13.     The United States admits that the Department of Navy along with the Department of Justice created an administrative settlement program entitled, the Elective Option ("EO"), which provides a manageable process for the Navy to quickly review large numbers of administrative claims and offer settlements to claimants who meet the qualification of the EO. The United States is without knowledge sufficient to admit or deny the allegations contained in Paragraph 13, except that it denies admitting a connection between a Plaintiff's injury and exposure to contaminated water at Camp Lejeune, and it denies that all Plaintiffs were "barred from any legal recourse" or were "left abandoned until the CLJA was passed."

## II. NATURE OF THE MASTER COMPLAINT

14.     The United States admits that the Master Complaint contains allegations suitable for adoption by reference in individual CLJA actions and that individual CLJA actions shall use the Short Form Complaint, which will allow the Parties to assess which portions of the Master Complaint apply in each individual CLJA action. The United States is without knowledge sufficient to admit or deny the remaining allegations contained in Paragraph 14.

15.     The United States is without knowledge sufficient to admit or deny the allegations contained in Paragraph 15.

## III. JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

16.     The United States admits that the CLJA is titled "Federal Cause of Action Relating to Water at Camp Lejeune, North Carolina." The United States admits that 28 U.S.C. § 1346(b)(1) provides a limited waiver of sovereign immunity and subject matter jurisdiction for the CLJA remedy. The United States denies the remaining allegations in Paragraph 16.

17.     The United States admits that CLJA, § 804(d) provides that the "United States District Court for the Eastern District of North Carolina shall have exclusive jurisdiction over

any [CLJA action] and shall be the exclusive venue for such an action." The United States admits that venue is proper before this Court. The United States admits that 28 U.S.C. § 1346(b)(1) provides a limited waiver of sovereign immunity and grant of subject matter jurisdiction for the CLJA remedy. The United States denies the remaining allegations in Paragraph 17.

18.     The United States is without knowledge sufficient to admit or deny the allegations contained in Paragraph 18.

## IV. PARTIES

19.     The United States is without knowledge sufficient to admit or deny the allegations contained in Paragraph 19, except that it admits CLJA, § 804(b) permits claims to be asserted by the authorized legal representative of an individual.

20.     The United States admits that it owned, operated, and managed Camp Lejeune between August 1, 1953, and December 31, 1987, by and through the Navy and Marine Corps. The United States admits that the CLJA, § 804(b) provides that an individual "who resided, worked, or was otherwise exposed (including in utero exposure) for not less than 30 days during the period beginning on August 1, 1953, and ending on December 31, 1987, to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States may bring an action in the United States District Court for the Eastern District of North Carolina to obtain appropriate relief for harm that was caused by exposure to the water at Camp Lejeune." The United States asserts that the statute speaks for itself and denies the characterizations and remaining allegations in Paragraph 20.

21.     The United States admits that the United States Navy and United States Marine Corps are branches of the United States military, both of which are part of the Department of the

5

Navy. The United States admits that it may be held liable for the conduct of the Navy or the Marine Corps related to water at Camp Lejeune. The United States is without knowledge sufficient to admit or deny the remaining allegations contained in Paragraph 21, including its responsibility as to "all related facilities."

## V. FACTUAL ALLEGATIONS

22. The United States admits that Congress authorized funding for the construction of what would become Marine Corps Base Camp Lejeune in 1941. The United States admits that between 1941 and 1943, Camp Lejeune underwent construction and expansion. The United States admits that in 1942 the base was named Marine Barracks Camp Lejeune and was renamed Marine Corps Base Camp Lejeune in 1944, and that the Base has played a significant role in United States military operations. The United States denies the remaining allegations in Paragraph 22.

### A. BACKGROUND INFORMATION

23. Admit.

24. The United States admits that the figure within the Master Complaint is intended to represent the flow of water throughout Marine Corps Base Camp Lejeune. The United States asserts that the referenced material speaks for itself and denies any characterizations and remaining allegations in Paragraph 24.

25. The United States admits that, in general, the water-treatment processes used by the Marine Corps included lime softening. The United States admits that some volatile organic compounds ("VOCs") entered the reservoirs used by the Hadnot Point and Tarawa Terrace water supply systems (and the Holcomb Boulevard system, when connected to the Hadnot Point

6

system) and would flow through the system to the point of delivery. The United States denies the remaining allegations in Paragraph 25.

26.     Admit.

27.     The United States admits that, during the relevant time period, there were times when demand in one water distribution system exceeded the supply from its wells. The United States further admits that at times the Hadnot Point water supply system was used to supplement the Holcomb Boulevard water supply system due to demand. The United States is otherwise without knowledge sufficient to admit or deny the allegations in Paragraph 27.

28.     The United States admits that, if a source well provided water containing VOCs, that water would be mixed with water from other wells in the same water distribution system whenever it was in use and that finished water from the system could contain VOCs. The United States admits that even if no source well within the immediate water distribution system provided water containing VOCs, if the water distribution system drew supplemental finished water from a water distribution system that did provide water containing VOCs, that water containing VOCs would also be delivered in supplementing another water distribution system. The United States denies the remaining allegations in Paragraph 28.

29.     The United States admits that contaminants were detected in water at Camp Lejeune, including five VOCs: tetrachloroethylene ("PCE"), trichloroethylene ("TCE"), dichloroethylene ("DCE"), vinyl chloride, and benzene. The United States denies the remaining allegations in Paragraph 29.

30.     The United States admits that in 1974 Congress passed the Safe Drinking Water Act of 1974, 42 U.S.C. § 300f, which required US EPA to specify contaminants that "may have any adverse effect on the health of persons" and to specify a maximum contaminant level

("MCL") for each such contaminant in public water systems. The Safe Drinking Water Act defines a maximum contaminant level as "the maximum permissible level of a contaminant in water which is delivered to any user of a public water system[.]" 42 U.S.C. § 300(f)(3). The United States admits that, today, the EPA regulates the MCL for each of these five contaminants. The United States denies that the MCL indicates the level of exposure at which there are no known or anticipated adverse health effects. The United States denies the allegations in Paragraph 30 to the extent they imply that the MCLs used today were in effect before 1987 or that concentrations above an MCL are necessarily unsafe. The United States denies the remaining allegations in Paragraph 30.

31.     Admit.

32.     The United States admits that the current EPA MCL for PCE is 5 ppb. The United States admits that the maximum reported PCE concentration in the finished water at the Tarawa Terrace Water Treatment Plant was 215 ppb. The United States denies the remaining allegations in Paragraph 32.

33.     The United States admits that the current EPA MCL for TCE is 5 ppb. The United States admits that concentrations of TCE reported in finished water at the Hadnot Point Water Treatment Plant ranged from less than 1 ppb to 1,400 ppb, but asserts that the data measurement of 1,400 ppb was reported as unreliable. The United States denies the remaining allegations in Paragraph 33.

34.     The United States admits that the current EPA MCL for 1,1-Dichloroethylene is 7 ppb. The United States denies that finished water at Camp Lejeune reached at least 406 ppb of 1,1-Dichloroethylene. The United States admits that the current EPA MCL for trans-1,2-Dichloroethylene is 100 ppb. The United States admits that the maximum observed trans-1,2-

8

Dichloroethylene concentration in finished water at the Hadnot Point Water Treatment Plant was 406.6 ppb. The United States denies the remaining allegations in Paragraph 34.

35.     The United States admits that the current EPA MCL for vinyl chloride is 2 ppb. The United States admits that it is reported that the maximum estimated vinyl chloride concentration in water collected at the Hadnot Point Water Treatment Plant was 2.9 ppb. The United States is without knowledge sufficient to admit or deny whether the water was considered finished water at the time of sampling. The United States denies the remaining allegations in Paragraph 35.

36.     The United States admits that the current EPA MCL for benzene is 5 ppb. The United States admits that reported benzene concentrations in water at the Hadnot Point Water Treatment Plant ranged from 1 ppb to 2,500 ppb, although the sample reporting 2,500 µg/L of benzene was noted to be potentially contaminated and not representative. However, the United States is without sufficient information to admit or deny whether the water was considered finished water at the time of sampling.

## 1.     HADNOT POINT

37.     The United States admits that a Marine Corps website included maps depicting the Hadnot Point-Holcomb Boulevard Water Distribution Areas, similar to the one reproduced in the Master Complaint. The United States asserts that the referenced material speaks for itself and denies any characterizations and remaining allegations in Paragraph 37.

38.     The United States admits that Hadnot Point, including the Hadnot Point Water Treatment Plant, and 21 original water-supply wells were built early in the construction of Camp Lejeune beginning in 1941. The United States denies the remaining allegations in Paragraph 38.

9

39.     The United States admits that the Hadnot Point Fuel Farm was constructed in 1941 and consisted of 15 fuel storage tanks: 1 aboveground tank with a capacity of 600,000 gallons, six underground storage tanks with capacities of 12,000 gallons each, and eight underground storage tanks with capacities of 15,000 gallons each.  The United States admits that in 1941, the maximum total capacity of the Hadnot Point Fuel Farm was 792,000 gallons of fuel but is without sufficient information to admit or deny whether this is representative of the actual utilized capacity at any given time.

40.     The United States admits that HP-602 was approximately 1,200 feet from the Hadnot Point Fuel Farm.  The United States denies any characterizations and remaining allegations contained in Paragraph 40.

41.     The United States admits that HP-651 was constructed and entered service in 1972.  The United States admits that the ATSDR has described HP-651's location as "adjacent" to a 46-acre storage/disposal lot constructed in the Hadnot Point Landfill Area in the 1940s.  The United States admits that other areas of the Hadnot Point Landfill Area were used for VOC disposal.  The United States denies the remaining allegations and characterizations in Paragraph 41.

42.     The United States admits that Hadnot Point Water Treatment Plant serviced Hadnot Point barracks and Hospital Point from 1943 to 2000, and French Creek barracks from 1947 to 2000. The United States admits that ATSDR stated, "Until the summer of 1972, all finished water distributed to bachelor and family housing units and all other facilities within the study was supplied by the HPWTP."  The United States denies the remaining allegations and characterizations in paragraph 42.

43.     Admit.

10

44.    The United States admits that an engineering report regarding a 1979 leak at Hadnot Point Fuel Farm estimated that during the reported period, the fuel farm lost at least 20,000 gallons of fuel and further admits that the ATSDR stated "Fuel inventory records indicate that approximately 20,000 to 30,000 gal of losses occurred from the tank farm during the eight recorded loss events between 1979 and 1987 . . . The total fuel mass in the subsurface at the [Hadnot Point Fuel Farm] was estimated . . . to range from 400,000 gal to 1,100,000 gal." The United States denies the remaining allegations and characterizations in Paragraph 44.

45.    The United States admits that the ATSDR attributed contamination at Hadnot Point to other areas, such as a liquids disposal area, a former burn dump, a fuel tank sludge area, an industrial area fly ash dump, a transformer storage lot, and/or the Hadnot Point landfill area. The United States admits that the Hadnot Point landfill area included storage lots and a VOC disposal area. The United States denies that these sites were included within the Hadnot Point landfill area. Except for the liquids disposal area, the United States denies that these sites contributed to VOC or chlorinated solvent contamination in groundwater. The United States admits that Hadnot Point had a firefighting training pit and an on-base dry cleaners. The United States denies the remaining allegations in Paragraph 45.

46.    The United States admits that government supplied TCE that was used as a degreaser in some buildings in the Hadnot Point Industrial Area in working with metal equipment and vehicles. The United States denies the remaining allegations in Paragraph 46.

47.    The United States admits that U.S. Army Environmental Hygiene Agency laboratory personnel developed Total Trihalomethanes Surveillance Report forms for the detection of trihalomethanes in the water supply. The United States admits that a report from on or around October 1980 includes a handwritten note stating, "Water is highly contaminated with

11

low molecular weight halo-genated hydrocarbons" and that a report from on or around March 1981 includes a handwritten note stating, "Water highly contaminated with other chlorinated hydrocarbons (solvents)!". The United States admits that trihalomethanes were a potential by-product of water chlorination. The United States admits that samples indicated interference with trihalomethane measurements. The United States denies the remaining allegations in Paragraph 47.

48.     The United States admits that U.S. Army Environmental Hygiene Agency laboratory personnel developed Total Trihalomethanes Surveillance Report forms for the detection of trihalomethanes in the water supply. The United States admits that a report from on or around March 1981 includes a handwritten note stating, "Water highly contaminated with other chlorinated hydrocarbons (solvents)!". The United States admits that trihalomethanes were a potential by-product of water chlorination. The United States admits that samples indicated interference with trihalomethane measurements. The United States denies the remaining allegations in Paragraph 48.

49.     The United States admits that Grainger Laboratories was retained to analyze water in 1982, however, the United States is without knowledge sufficient to admit or deny whether Grainger was informed of the previous testing.

50.     The United States admits that in or about April or May 1982, Grainger Laboratories reported that the presence of cleaning solvents interfered with its analysis of trihalomethane samples at Tarawa Terrace and Hadnot Point. The United States admits that Grainger Laboratories reported that the level of TCE in one water sample collected at the Naval Hospital was 1400 µg/l, but asserts that this sample was reported as unreliable because the cap

sealing the sample bottle was found to be loose prior to analysis of the sample. The United States denies the remaining allegations in Paragraph 50.

51.     The United States admits that in 1982 and 1983 Grainger supplied testing results to the Base. The United States admits that Grainger addressed a letter the Commanding General, Marine Corps Base Camp Lejeune, on August 10, 1982, reporting testing results of samples received July 29, 1982. The United States admits that this letter says, "Previously all samples from site TT and HP presented difficulties in performing the monthly Trihalomethane analyses. Interferences which were thought to be chlorinated hydrocarbons hindered the quantitation of certain Trihalomethanes. These appeared to be at high levels and hence more important from a health standpoint than the total Trihalomethane content. For these reasons we called the situation to the attention of Camp Lejeune [sic] personnel." The United States admits that in a December 21, 1982, memorandum, supervisory chemist Elizabeth Betz noted that she had spoken to Bruce Babson at Grainger and that Mr. Babson had "expressed concern over the solvents that interfere with Tarawa Terrace and Hadnot Point samples, particularly Hadnot Points [sic]. He stated that the levels had dropped from a while. However in these last samples the levels were relatively high again." The United States asserts that the referenced documents speak for themselves and denies the remaining allegations of Paragraph 51.

52.     The United States admits that Environmental Science and Engineering reported July 6, 1984, sampling analysis results for well HP-602. The United States admits that those results showed benzene at 380 ug/L. The United States denies the remaining allegations in Paragraph 52.

53.     The United States admits that JTC Environmental Consultants received groundwater samples as part of laboratory quality control processes. The United States admits

13

that one quality control water sample from Hadnot Point well 602, contemporaneously or shortly after it was shut down on November 30, 1984, reported 121µg/l of benzene, 24 µg/l of PCE, and 1,600 µg/l ppb of TCE.  The United States denies the remaining allegations in Paragraph 53.

54.     The United States admits that HP-602 was shut down on November 30, 1984, seven additional wells were shut down based on the detection of VOCs by February 8, 1985, including wells HP-601 (shut down on December 6, 1984); HP-608 (shut down on December 6, 1984); HP-634 (shut down on December 14, 1984); and HP 637 (shut down on December 14, 1984).  The United States denies the allegations in Paragraph 54.

55.     The United States admits that JTC Environmental Consultants analyzed groundwater samples as part of laboratory quality control processes.  The United States admits that the Naval Facilities Engineering Command states that benzene "may have volatized off due to delay in analysis; however, lab to recheck."  The United States denies the remaining allegations in Paragraph 55.

56.     The United States admits that, on or about January 16, 1985, water samples were taken from HP-652.  The United States denies the remaining allegations in Paragraph 56.

57.     The United States admits that between January 28 and February 4, 1985, water was provided from Hadnot Point to the Holcomb Blvd water distribution system while the Hadnot Point Plant was offline.  The United States denies the remaining allegations in Paragraph 57.

58.     The United States admits that numerous samples were taken at multiple points in the water distribution system, including Holcomb Boulevard, to determine the source of the contamination.  The United States admits that an analysis of water sampled in or about January 1985 from the Berkeley Manor Elementary School which was served by the Holcomb Boulevard

14

water distribution system reported a TCE concentration 1,148.4 µg/l. The United States denies the remaining allegations in Paragraph 58.

59.     The United States admits that both the Holcomb Boulevard and Hadnot Point distribution systems were flushed and that the Holcomb Boulevard water treatment plant was subsequently reactivated on February 4, 1985. The United States admits that JTC Environmental Consultants analyzed groundwater samples from HP-651 collected on January 16, 1985, reported a TCE concentration 3200 ppb. The United States admits that HP-651 was shut down on February 4, 1985. The United States denies the remaining allegations in Paragraph 59.

60.     The United States admits that JTC Environmental Consultants analyzed groundwater samples as part of laboratory quality control processes and duplicate samples were taken to estimate precision. The United States admits that JTC Environmental Consultants analyzed groundwater samples from HP-651 collected contemporaneously with well shut down on February 4, 1985. The United States admits that an analysis of water sampled on February 4, 1985, from HP-651 reported a TCE concentration range of 17,600-18,900 ppb, a DCE concentration range of 7580-8070 ppb, a PCE concentration range of 397-400 ppb, and a vinyl chloride concentration range of 168-179 ppb. The United States denies the remaining allegations in Paragraph 60.

61.     The United States admits that JTC Environmental Consultants analyzed groundwater samples as part of laboratory quality control processes. The United States admits that JTC Environmental Consultants analyzed water collected on February 5, 1985, from HP-20 reported a TCE concentration of 429 ppb. The United States denies the remaining allegations in Paragraph 61.

15

62.     The United States admits that an analysis of water sampled on November 19, 1985, from Hadnot Point water treatment system reported a benzene concentration of 2,500 ppb, but this sample was indicated to be potentially contaminated and not representative. However, the United States is without sufficient information to admit or deny whether the water was considered finished water at the time of sampling.

63.     The United States admits that an analysis of water sampled on December 10, 1985, from Hadnot Point water treatment system reported a benzene concentration of 38 ppb. However, the United States is without sufficient information to admit or deny the location of the water sampling.

64.     The United States admits that a January 24, 1986, memorandum contains the quoted language.  The United States is without knowledge sufficient to admit or deny whether the results are missing.

65.     The United States denies the allegations contained in Paragraph 65 due to the uncertainty of the time of the act.

66.     The United States admits that Marine Corps Base Camp Lejeune requested expedited funding for a new fuel storage facility to alleviate the contamination of Hadnot Point. The United States denies the remaining allegations in Paragraph 66.

67.     The United States admits that the referenced letter speaks for itself and denies any characterizations and the remaining allegations contained in Paragraph 67.

68.     The United States admits that the Department of Navy conducted hydrogeologic evaluations and investigation of the Hadnot Point Fuel Farm. The United States admits that site investigation was conducted to determine the source of the contamination for soil and water

16

remediation.  The United States denies the remaining allegations and characterizations in Paragraph 68.

69.     The United States admits that the Hadnot Point Fuel Farm was closed in 1988.

70.     The United States admits that in 2017 the ATSDR performed modeling to estimate historic concentrations of certain chemicals, including benzene, in Camp Lejeune drinking water before there was any enforceable EPA MCL.  The United States admits that the ATSDR studies are based on conservative, health-protective models due to the lack of water sampling data prior to 1982.  The United States admits that the ATSDR studies estimated that benzene levels in drinking water exceeded the chronic environmental media evaluation guide (EMEG) for children from November 1979 to November 1984.  The United States denies that the chronic EMEG for adults was exceeded.  The United States denies any concession as alleged. The United States denies the remaining allegations in Paragraph 70.

71.     The United States admits that the ATSDR performed conservative, health-protective modeling to estimate historic concentrations of certain chemicals in the Hadnot Point drinking water systems at time before there was any enforceable EPA MCL.  The United States denies any concession as alleged.  The United States denies the remaining allegations in Paragraph 71.

## 2. HOLCOMB BOULEVARD

72.     The United States admits that in 2017 the ATSDR published a report that included a map depicting the Hadnot Point-Holcomb Boulevard Water Distribution Areas, similar to the one reproduced in the Complaint.  The United States asserts that the referenced material speaks for itself and denies any characterizations and remaining allegations in Paragraph 72.

17

73.     The United States admits that the Holcomb Boulevard distribution system was intermittently supplied water by the Hadnot Point distribution system between 1972 and 1985. The United States also admits that prior to 1972, the Holcomb Boulevard area was supplied with water by the Hadnot Point system. The United States denies the remaining allegations in Paragraph 73.

74.     The United States admits that the ATSDR has reported that water distribution began at Holcomb Boulevard in June 1972, and at Hadnot Point in 1942. The United States admits that the Holcomb Boulevard distribution system has intermittently supplied water by the Hadnot Point distribution system between 1972 and 1985. The United States also admits that prior to 1972, the Holcomb Boulevard area was supplied with water by the Hadnot Point system. The United States denies the remaining allegations in Paragraph 74.

75.     The United States admits that, during the relevant time period, the Holcomb Boulevard water distribution system included Midway Park housing, Paradise Point general officer housing, Paradise Point two-story housing, Paradise Point cracker box housing, Paradise Point Cape Cod housing, Paradise Point Capehart housing, Watkins Village, and Berkeley Manor housing. The United States denies the remaining allegations in Paragraph 75.

76.     The United States admits that the Holcomb Boulevard distribution system was intermittently supplied finished water by the Hadnot Point distribution system between 1972 and 1985. The United States also admits that the two systems were linked near Holcomb Boulevard and Wallace Creek at booster pump 742 and at the Marston Pavilion valve. The United States denies the remaining allegations in Paragraph 76.

77.     The United States admits that the Holcomb Boulevard distribution system was intermittently supplied water by the Hadnot Point distribution system between 1972 and 1985.

The United States also admits that prior to 1972, the Holcomb Boulevard area was supplied with water by the Hadnot Point system. The United States admits that ATSDR reported simulated finished water based on conservative, health-protective modeling that showed TCE concentrations exceeding current MCL by factors of about 2-12 between July 1972 and February 1985 due to intermittent water transfers. The United States admits that the EPA's current MCL for TCE is 5 μg/l. The United States denies any concessions as alleged. The United States denies the remaining allegations in Paragraph 77.

78. The United States admits that on January 27, 1985, the Holcomb Boulevard water treatment plant was taken offline, and its reservoir drained after a fuel odor was detected near its auxiliary engines. The United States admits that it remained offline through February 4, 1985, and that while it was offline, the Hadnot Point water distribution system provided water for the Holcomb Boulevard water distribution system. The United States denies the remaining allegations in Paragraph 78.

79. The United States admits that the Holcomb Boulevard distribution system was intermittently supplied water by the Hadnot Point distribution system between 1972 and 1985. The United States admits that the ATSDR has estimated the frequency of this exchange, as well as the derivative reconstructed estimates of contamination levels at Holcomb Boulevard, which are based upon, in part, available water utility logbooks. The United States admits that ATSDR has reported that operational records indicating booster pump 742 operations and Marston Pavilion valve openings are only partially documented. The United States denies any concession as alleged. The United States denies the characterization of "the official position of the United States." The United States denies the remaining allegations contained in Paragraph 79.

19

80.     The United States admits that the golf course was intermittently supplied water by the Holcomb Boulevard distribution system.  The United States denies the remaining allegations in Paragraph 80.

81.     The United States admits that the Marston Pavilion was opened for an 8-day period from January 28 to February 4, 1985, owing to the shutdown of the Holcomb Boulevard water treatment plant.  The United States denies the remaining allegations contained in Paragraph 81.

82.     The United States is without knowledge sufficient to admit or deny the allegations contained in Paragraph 82.

83.     The United States admits that an analysis of water sampled from the Berkeley Manor Elementary School area on or around January 31, 1985, reported a TCE concentration 1,148.4 µg/l, during a time when Hadnot Point water was supplied to Holcomb Boulevard.  The United States denies that this sample is representative of exposures to Holcomb Boulevard residents because the sample occurred during an 8-day period when the entire Holcomb Boulevard water treatment plant was shutdown and significantly exceeds the 54 ppb maximum reconstructed-mean monthly TCE concentration that ATSDR estimated under its conservative health-protective modeling.  The United States denies the remaining allegations contained in Paragraph 83.

### 3. TARAWA TERRACE

84.     The United States admits that in 2017 the ATSDR published a report that included a map depicting the Hadnot Point-Holcomb Boulevard Water Distribution Areas, similar to the one reproduced in the Complaint.  The United States asserts that the referenced

material speaks for itself and denies any characterizations and remaining allegations in Paragraph 84.

85.     Admit.

86.     The United States is without knowledge sufficient to admit or deny the vague allegations in Paragraph 86.

87.     The United States admits that Marine Corps Base Camp Lejeune has on base wells and water treatment facilities for military operations, businesses, and residents. The United States admits that water distribution systems included Tawara Terrace. The United States admits that supply well TT-26 was constructed in May 1951 less than 900 feet from SR 24 (today known as Lejeune Boulevard), which serves as a boundary for Camp Lejeune. The United States is without knowledge sufficient to admit or deny the remaining vague allegations contained in Paragraph 87.

88.     The United States admits that the ATSDR reported that ABC One Hour Dry Cleaner began operations in 1953 and that TT-26 was located about 900 feet southeast of ABC One Hour Dry Cleaner. The United States is without knowledge sufficient to admit or deny the PCE usage and waste generated by ABC Cleaners.

89.     The United States admits that ATSDR reported that the primary pathway of contaminants from ABC Cleaners to groundwater was through a septic system. The United States is without knowledge sufficient to admit or deny the remaining allegations contained in Paragraph 89.

90.     The United States admits that ATSDR reported that reclaimed materials, which included spent PCE, was generally disposed of by filling potholes. The United States is without knowledge sufficient to admit or deny the remaining allegations contained in Paragraph 90.

91.     The United States admits that ATSDR performed modeling to estimate historic concentrations of certain chemicals in the Tarawa Terrace drinking water systems at a time before there was any enforceable EPA MCL.  The United States admits that ATSDR has estimated based on conservative, health-protective modeling that PCE levels at the Tarawa Terrace water treatment plant exceeded the current MCL from November 1957 to February 1987, except for July-August 1980 and January-February 1983.  The United States denies any concession alleged in Paragraph 91.

92.     The United States admits that on January 25, 1985, JTC Environmental Consultants received a sample from Tarawa Terrace well TT-26 that it analyzed on February 5, 1985, and reported detecting PCE at 1580 ug/L, TCE at 57 ug/L, t-1,2 DCE at 92 ug/L, and vinyl chloride at 27 ug/L The United States admits that laboratory analyses of water samples obtained January 16, 1985 from supply well TT-23 indicated concentrations of 132 ppb of PCE, 5.8 ppb of TCE, and 11 ppb of 1,2,-tDCE.  The United States denies the remaining allegations contained in Paragraph 92.

93.     The United States admits that TT-23 and TT-26 were shut down on February 8, 1985.

94.     The United States admits that well TT-23 was used briefly on March 11-12, 1985, and on April 22-23, and 29, 1985.  The memorandum speaks for itself and the United States denies any characterizations thereon.  The United States denies the remaining allegations contained in Paragraph 94.

95.     The United States admits that ATSDR has estimated based on conservative, health-protective modeling that PCE levels at the Tarawa Terrace water treatment plant exceeded

22

the current MCL from November 1957 to February 1987, except for July-August 1980 and January-February 1983. The United States denies any concession as alleged in Paragraph 95.

96. The United States admits that in 1986, a pipeline was constructed connecting the Tarawa Terrace water distribution system and a storage tank in the Camp Johnson water-distribution system and that this storage tank was capable of receiving finished water from Tarawa Terrace but did not convey finished water on a continuous basis prior to 1987. The United States denies the remaining allegations contained in Paragraph 96.

97. The United States admits that ATSDR has reported that the Camp Knox Trailer Park was served by Tarawa Terrace and Montford Point water supplies. The United States denies the remaining allegations contained in Paragraph 97.

98. The United States denies the allegations contained in Paragraph 98.

### 4. WATER BUFFALOES

99. The United States admits that, in a military context, "water buffalo" refers to various models of M107, M149, and M1112 trailers used for storing and transporting water.

100. The United States admits that the Marine Corps used water buffaloes at Camp Lejeune. The United States is unable to admit or deny Plaintiffs' "upon information and belief" allegations. The United States is without knowledge sufficient to admit or deny when water buffaloes were used, where water buffaloes were placed on Camp Lejeune, or how frequently water buffaloes were used on Camp Lejeune.

101. The United States admits that some service members stationed at Camp Lejeune engaged in field training exercises as required by their military occupation or orders. The United States is unable to admit or deny Plaintiffs' "upon information and belief" allegations. The United States denies the remaining allegations in Paragraph 101.

23

102.    The United States admits that some service members stationed at Camp Lejeune engaged in field training exercises as required by their military occupation or orders. The United States admits that the Marine Corps used water buffaloes at Camp Lejeune in support of some training events. The United States is unable to admit or deny Plaintiffs' "upon information and belief" allegations. The United States denies the remaining allegations in Paragraph 102.

103.    The United States denies any concession as alleged. The United States denies the remaining allegations contained in Paragraph 103.

104.    The United States is unable admit or deny Plaintiffs' "upon information and belief allegations." The United States denies the remaining allegations contained in Paragraph 104.

105.    The United States is unable to admit or deny Plaintiffs' "upon information and belief" allegations. The United States otherwise denies the allegations contained in Paragraph 105.

106.    The United States is unable to admit or deny Plaintiffs' "upon information and belief" allegations. The United States otherwise denies the allegations contained in Paragraph 106.

107.    The United States is unable to admit or deny Plaintiffs' "upon information and belief" allegations. The United States otherwise denies the allegations contained in Paragraph 107.

108.    The United States admits that, at times, water was provided to servicemembers on Camp Lejeune from water buffaloes. The United States is unable to admit or deny Plaintiffs' "upon information and belief" allegations. The United States is without knowledge sufficient to admit or deny when water buffaloes were made available to servicemembers and where those water buffaloes were placed on Camp Lejeune. The United States is without knowledge

24

sufficient to admit or deny whether the water buffaloes were filled with water from the Hadnot Point water system.  The United States denies the remaining allegations in Paragraph 108.

109.    The United States admits that during a Camp Lejeune Community Assistance Panel meeting on April 24, 2019, Dr. Frank Bove of the ATSDR discussed the ATSDR's cancer incident studies and made the statement quoted in Paragraph 109.  The United States asserts that the statement is not an admission by the United States and that it speaks for itself.  The United States denies any concession as alleged. The United States denies the remaining allegations in Paragraph 109.

110.    The United States admits that before December 31, 1987, chemicals from sources on or around Camp Lejeune had seeped into the groundwater below Camp Lejeune.  The United States also admits that between August 1, 1953, and December 31, 1987, men and women working or residing on base drank, cooked with, bathed in, and otherwise came into contact with water sourced from the groundwater below Camp Lejeune.  The United States is without knowledge sufficient to admit or deny which individuals were exposed to the contaminated water or the number of people who may have been injured as a result of contact with this water.  The United States denies the remaining allegations in Paragraph 110.

111.    The United States admits that the ATSDR assumed, based on a published article, that a marine in training at Camp Lejeune consumes an estimated 6 liters of water per day for three days per week and 3 liters per day the rest of the week.  The United States admits that ATSDR assumed, based on an article, that under warm weather conditions, a marine may consume between 1 and 2 quarts of water per hour and shower twice a day.  The United States admits that TCE and PCE levels were measured and estimated at times before there was any enforceable EPA maximum contaminant level.  The United States is without knowledge

25

sufficient to admit or deny whether water supplied in the field came from the Hadnot Point water system. The United States denies the remaining allegations Paragraph 111.

112. The United States denies the allegations contained in Paragraph 112.

## 5. ADDITONAL WATER CONTAMINATION FACTS

113. The United States admits that a study published in September 1948 by the Medical Advisory Committee of the American Petroleum Institute states that, "[i]nasmuch as the body develops no tolerance to benzene, and as there is a wide variation in individual susceptibility, it is generally considered that the only absolutely safe concentration for benzene is zero." The United States denies the remaining allegations in Paragraph 113.

114. The United States denies the allegations contained in Paragraph 114.

115. The United States denies the allegations contained in Paragraph 115.

116. The United States denies the allegations contained in Paragraph 116.

117. The United States admits that, in or about October 23, 1958, Harry E. LeGrand, a consulting geologist, issued a report entitled "Preliminary Ground-Water Report for Camp Lejeune, N.C." The United States admits that the report "summarizes the geology and the ground-water conditions at . . . Camp Lejeune, . . . and designates the number, location, and depth of test holes that are to precede new production wells." The United States admits that on or about April 2, 1959, Mr. LeGrand issued an "Interim Report of Ground Water Conditions at Tarawa Terrace Camp LeJeune, N.C.[,]" which stated that the disadvantages of relying on shallow 30- to 35-feet-deep wells for Tarawa Terrace "include frequent maintenance inspections and repairs and all problems that result from the corrosiveness of the [salt-]water." The United States denies the remaining allegations in Paragraph 117.

26

118.     The United States admits that in or about May 1959, Harry E. LeGrand, a consulting geologist, was contracted to determine the location of production wells based on water yield, water condition, and geological conditions of the aquifer.  The United States also admits that the report states "[n]one of the artesian beds are perfect, and there is considerable leakage of water between them where a significant hydraulic gradient exists.  This situation arises from the fact that the clayey confining beds are not completely impermeable and from the fact that some beds are not persistent but are somewhat lenticular."  The United States asserts that the referenced material speaks for itself.  The United States denies the remaining allegations in Paragraph 118.

119.     The United States admits that the U.S. Navy Bureau of Medicine and Surgery promulgated medical policy and best practices for potable water at U.S. Navy and U.S. Marine Corps units.  The United States admits that, on or about December 24, 1959, the Bureau of Medicine and Surgery promulgated BUMED 6240.3A, which stated that "[a]dequate protection [of potable water] by artificial treatment" embraces "a recognized principle [] that irregularity in quality is an indication of potential danger."  The United States asserts that the referenced material speaks for itself.  The United States denies the remaining allegations in Paragraph 119.

120.     The United States admits that, in or about August 1963, the U.S. Navy Bureau of Medicine and Surgery promulgated medical policy and best practices for potable water at U.S. Navy and U.S. Marine Corps units in materials entitled NAVMED P-5010-5.  The United States admits that the Bureau of Medicine and Surgery stated that "[w]ell waters obtained from aquifers beneath impervious strata, and not connected with fragmented or cavernous rock, are usually considered sufficiently protected to preclude the need for purification."  The United States also admits that the Bureau of Medicine and Surgery refers to the use of carbon chloroform extract

27

(CCE) as "a technically practical procedure which [] afford[s] a large measure of protection against the presence of undetected toxic materials in finished drinking water." The United States also admits that the Bureau of Medicine and Surgery stated that "[a]nalysis of data available indicates that water supplies containing over 200 micrograms CCE/1 of water represent an exceptional and unwarranted dosage of the water consumer with ill-defined chemicals." The United States also admits that the Bureau of Medicine and Surgery stated that "[o]ne (1) complete chemical analysis of the water supply shall be made annually," including raw and treated water from the supply well. The United States denies the remaining allegations in Paragraph 120.

121. The United States admits that, on or about September 30, 1963, the Bureau of Medicine and Surgery promulgated BUMED 6240.3B, which prohibited drinking water from "contain[ing] impurities in concentrations which may be hazardous to the health of consumers[,]" as well as "[s]ubstances which may have deleterious physiological effect, or for which physiological effects are not known[.]" The United States denies the remaining allegations in Paragraph 121.

122. The United States admits that, on or about August 25, 1972, the Bureau of Medicine and Surgery promulgated BUMED 6240.3C, which prohibited a water supply from having an excess of 0.15 mg/1 (ppm) of CCE. The United States also admits that the previous regulation, BUMED 6240.3B, prohibited a water supply from having an excess of 0.2 mg/1 (ppm). The United States denies the remaining allegations in Paragraph 122.

123. The United States admits that SCS Engineers prepared a report dated March 31, 1977, for the U.S. Department of the Navy, Atlantic Division, Naval Facilities Engineering Command (LANTNAVFACENGCOM). The United States further admits that the report is

entitled "Final Report Oil Pollution Survey for Marine Corps Base Camp Lejeune Jacksonville, North Carolina." The United States is unable to admit or deny Plaintiffs' "upon information and belief" allegations. The United States denies that the report was withheld. The report is publicly available on the North Carolina Department of Environmental Quality, Division of Waste Management's document management website.

124. The United States admits that Southern Testing and Research Laboratories, Inc, was retained on or around 1977. The United States also admits that, in a document dated October 24, 1977, Southern Testing and Research Laboratories, Inc. reported that certain chlorinated hydrocarbons and herbicides were not detected in water samples from the eight distribution systems.

125. The United States admits that, in a letter dated February 28, 1978, addressed to Charles R. Rundgren of the North Carolina Division of Health Services, the Department of the Navy, Atlantic Division indicated that, based on a prior memorandum, "all monitoring data, operating logs, requests for either laboratory certification or special analysis [regarding U.S. Marine Corps activities] w[ould] be submitted to the State." The United States denies the remaining allegations in Paragraph 125.

126. The United States admits that, in or about April 1979, Henry Von Oesen and Associates, Inc. reported that "[s]erious operating problems have been experienced at Tarawa Terrace due to the inability to properly control the process, including cementing filter sands, structural damage to filter bed supports, and short filter runs." The United States also admits that Henry Von Oesen and Associates, Inc. reported that "[t]he filter backwash [was] discharged into the storm drainage system without treatment." The United States denies the remaining allegations in Paragraph 126.

29

127.     Admit.

128.     The United States admits that, in a memorandum dated August 31, 1982, Elizabeth Betz, Supervisory Chemist at Camp Lejeune, stated to Danny Sharpe, Supervisory Ecologist at Camp Lejeune, that LANTNAVFACENGCOM "was concerned that after the State of North Carolina received primacy for the Safe Drinking Water Act, the State might find a problem with the potable water at MCB Camp Lejeune that the Navy had not previously uncovered." The United States also admits that Ms. Betz's memorandum states that, on October 1, 1980, the LANTNAVFACENGCOM explained "[o]ne composite sample would be made and a full spectrum analysis would be run. If any parameters showed potential problems, further analysis of the eight individual system samples would be done to locate the source of the problem." The United States also admits that Jennings Laboratories was to complete the analysis. The United States denies the remaining allegations in Paragraph 128.

129.     The United States admits that, in a document dated October 31, 1980, Jennings Laboratories, Inc. reported test results regarding a composite sample from the eight water distribution systems. The United States also admits that the report shows whether any among numerous chemicals tested were detected in the sample. The United States also admits that the report states that TCE, DCE, and vinyl chloride were detected in the sample. The United States denies the remaining allegations in Paragraph 129.

130.     The United States admits that U.S. Army Environmental Hygiene Agency laboratory personnel developed Total Trihalomethanes Surveillance Report forms for the detection of trihalomethanes in the water supply. The United States admits that a report from on or around October 1980 includes a handwritten note stating: "Water is highly contaminated with low molecular weight halo-genated hydrocarbons. Strong interference in the region of ChCl2Br.

30

Cannot determine true value of that compound." The United States denies the remaining allegations in Paragraph 130.

131.    The United States admits that a report from on or around January 1981 includes a handwritten note stating: "Heavy organic interference at CHCl2Br. You need to analyze for chlorinated organics by GC/MS." The United States denies the remaining allegations in Paragraph 131.

132.    The United States admits that a report from on or around March 1981 includes a handwritten note stating: "Water highly contaminated with other chlorinated hydrocarbons (solvents)!" The United States admits that the samples indicated interference with trihalomethane measurements. The United States denies the remaining allegations in Paragraph 132.

133.    The United States admits that the Commanding General of Camp Lejeune forwarded a letter dated August 27, 1981, to Charles E. Rundgren regarding "the Camp Lejeune Chemical Landfill and potable water system at the Rifle Range." The United States also admits that the letter states that the LANTNAVFACENGCOM "concluded that the Rifle Range drinking water meets current drinking water standards, however, they recommend that careful monitoring continue." The United States also admits that the letter states that an IAS in the NACIP Program had been scheduled. The United States asserts that the referenced material speaks for itself. The United States denies the remaining allegations in Paragraph 133.

134.    The United States admits that, in or about January 14, 1982, a memo was issued stating that the Naval Energy and Environmental Support Activity (NEESA) was conducting an Initial Assessment Study (IAS) to identify, assess, and control contamination of the environment from past operations. The United States denies the remaining allegations in Paragraph 134.

31

135.     The United States admits that, on or about April 19, 1982, Grainger began sampling all eight water systems for TTHMs.  The United States denies the remaining allegations in Paragraph 135.

136.     The United States admits that a handwritten note states that, based on a telephone conversation with Grainger Lab on May 6, 1982, Grainger Lab had detected "perclene" and TCE in samples from Tarawa Terrace and Hadnot Point.  The United States denies the remaining allegations in Paragraph 136.

137.     The United States admits that, on or about July 28, 1982, additional samples were taken from Hadnot Point and Tarawa Terrace and sent to Grainger Laboratories for testing.  The United States also admits that on or about August 10, 1982, Grainger Laboratories reported to the Commanding General at Camp Lejeune that well fields at Tarawa Terrace and Hadnot Point showed contamination that interfered with trihalomethane testing.  The United States also admits that Grainger Laboratories reported that the level of TCE in one water sample, which was taken from Hadnot Point on or about May 27, 1982, was 1400 μg/l.  The United States also admits that Grainger Laboratories reported that the level of PCE in one water sample, which was taken from Tarawa Terrace on or about July 28, 1982, was 104 μg/l.  The United States also admits that Grainger Laboratories reported that contaminants contained in samples taken from Hadnot Point and Tarawa Terrace "appeared to be at high levels and hence more important from a health standpoint than the total Trihalomethane content."  The United States denies the remaining allegations in Paragraph 137.

138.     The United States admits that, on July 29, 1982, the Supervisory Chemist, Elizabeth Betz, called the Water Supply Branch of the North Carolina Department of Human Resources regarding TTHM Regulations.  The United States also admits that Ms. Betz was

connected with Linda Sewall, an engineer with the Water Supply Branch. The United States also admits that Ms. Betz inquired about reporting requirements regarding secondary contaminants. The United States also admits that Ms. Sewall stated that North Carolina included three secondary contaminants on the primary contaminant list: lead, manganese, and pH. The United States denies the remaining allegations in Paragraph 138.

139. The United States admits that Mike Bell, a Regional Engineer at the Wilmington Regional Office of the Public Water Supply Section of the North Carolina Department of Environmental Health, sent a letter dated January 4, 2000, to Jessica Miles, Chief of the Public Water Supply Section. The United States admits that Mr. Bell stated that he did not find records of reports of VOC contamination for 1982 and speculates the reports were sent to a different office North Carolina Department of Environmental Health. The United States denies the remaining allegations in Paragraph 139.

140. The United States admits that Supervisory Chemist, Elizabeth Betz, issued a memorandum dated August 18, 1982, which stated that "[s]ince monthly sampling from April through July, [1982,] did not show any problems in the Hadnot Point, Tarawa Terrace, Montford Point (Camp Johnson), Holcomb Blvd., Courthouse Bay or Onslow Beach systems, these systems were reduced to quarterly sampling." The United States denies the remaining allegations in Paragraph 140.

141. The United States admits that the Commanding General of Camp Lejeune forwarded a letter to the Officer-in-Charge of NEESA regarding the IAS. The United States also admits that the letter states that "[d]iscussion of trihalomethane (TTHM) content of Rifle Range on the page 2-18 and extensive data shown on pages 6-12, 6-13, 6-14, 6-17, and 6-18 overly stresses relationship with hazardous material/waste disposal. It is important to note that accuracy

33

of data provided by U.S. Army laboratory is questionable. It is recommended that TTHM information be de-emphasized throughout the report." The United States denies the remaining allegations in Paragraph 141.

142. The United States admits that, on or about October 1, 1982, the Natural Resources and Environmental Affairs Branch from the Base Maintenance Division was reassigned to the supervisory control of the Facilities Assistant Chief of Staff. The United States denies the remaining allegations in Paragraph 142.

143. The United States admits that, on or about November 29, 1982, samples from all eight water distribution systems were collected and sent to Grainger Laboratories for testing. The United States admits that a Grainger Laboratory report dated December 9, 1982, reflects that the samples were received on December 2, 1982. The United States admits that Elizabeth Betz wrote a letter dated December 21, 1982, to the Supervisory Ecologist, Danny Sharpe, in which she discussed a phone call she had with Bruce Babson, the Grainger chemist who processed the samples. The United States further admits that, in the letter, Ms. Betz stated that Mr. Babson "expressed concern over the solvents that interfer[ed] with Tarawa Terrace and Hadnot Point samples." The United States denies the remaining allegations in Paragraph 143.

144. The United States admits that the Marine Corps received a letter dated November 12, 1982, from a geologist at the North Carolina Division of Health Services, with subject line "Groundwater Monitoring at Camp Lejeune Sanitary Landfill – Permit #67-03." The United States admits that the letter included an "enclosure for action" that directed analysis of "Total Organic Halogen" of samples from "four groundwater monitoring wells" at least annually and referenced an "approved operational plan of July 20, 1982[.]" The United States asserts that the

34

referenced material speaks for itself. The United States denies the remaining allegations in Paragraph 144.

145. The United States admits that on February 24-25, 1983, water samples were taken from the Tarawa Terrace, Montford Point, New River, Holcomb Blvd, Rifle Range, Courthouse Bay, Onslow Beach, and Hadnot Point water distribution systems at Marine Corps Base Camp Lejeune. The United States admits that these samples were sent to Grainger for analysis. The United States admits that Grainger's March 16, 1983, letter conveying the results to the Commanding General, Marine Corps Base, Camp Lejeune said that in five samples, TCE was interfering with the bromodichloromethane determination. The United States denies the remaining allegations in Paragraph 145.

146. The United States admits that in April of 1983, the Utilities, Energy and Environmental Division, Naval Facilities Engineering Command, produced an Environmental Engineering Survey of Marine Corps Base Camp Lejeune. The United States admits that this report discussed trihalomethane testing results at the New River water distribution system. The United States admits that this discussion of trihalomethane testing results at the New River water distribution system did not include a discussion of the reported detection of TCE in samples from the Hadnot Point water distribution system. The United States denies the remaining allegations in Paragraph 146.

147. The United States admits that in April of 1983, Naval Energy and Environmental Support Activity (NEESA) published an "Initial Assessment Study of Marine Corps Base Camp Lejeune North Carolina." The United States denies that this study's only discussion of total trihalomethane and organic solvent contamination is in reference to the Rifle Range water distribution system. The United States denies the remaining allegations in Paragraph 147.

148.    The United States admits that on June 15, 1983, Grainger reported trihalomethane analysis results for a total of 37 samples from all eight water distribution systems at Marine Corps Base Camp Lejeune.  The United States admits that Grainger received the samples on May 31, 1983.  The United States admits that Grainger reported "interference" in the bromodichloromethane results from 4 of these 37 samples.  The United States denies the remaining allegations in Paragraph 148.

149.    The United States admits that on June 1, 1983, the Assistant Chief of Staff, Facilities, at Marine Corps Base Camp Lejeune sent a letter to the North Carolina Division of Health Services reporting the results of inorganic chemical and corrosivity analyses from water samples taken from the eight water distribution systems at Marine Corps Base Camp Lejeune. The United States admits that the letter included a compiled table of these inorganic chemical and corrosivity results and did not include Grainger's original reports, which also included organic chemical results.  The United States admits that Grainger's original reports of its testing results for organic chemicals noted "interference."  The United States denies the remaining allegations in Paragraph 149.

150.    The United States admits that on June 21, 1983, the North Carolina Division of Health Services sent a letter to the Assistant Chief of Staff, Facilities, at Marine Corps Base Camp Lejeune that said "We appreciate the summary format in which you submitted the data; however, such a format does not contain all of necessary [sic] information required by this office.  According to the information you supplied, Grainger Laboratory conducted almost all the analyses. Please submit to this office the forms on which Grainger Laboratory submitted the analytical results to you. Grainger Laboratory should have submitted the results of these tests on a form which is similar to the enclosed blank forms."  The United States is without knowledge

36

sufficient to admit or deny why the North Carolina Division of Health Services requested Grainger's forms. The United States is unable to admit or deny the Plaintiffs' "upon information and belief" allegations. The United States denies the remaining allegations in Paragraph 150.

151. The United States admits that water samples were taken from all eight water distribution systems at Marine Corps Base Camp Lejeune on July 27, 1983. The United States admits that these samples were lost in the mail. The United States is unable to admit or deny Plaintiffs' "upon information and belief" allegations. The United States otherwise is without knowledge sufficient to admit or deny the allegations contained in Paragraph 151.

152. The United States admits that on August 25 and 26, 1983, additional samples were collected from all eight water distribution systems and sent to Grainger. The United States admits that Grainger received the samples on August 29, 1983, and analyzed them on September 8, 1983. The United States admits that Grainger reported that the samples from Tarawa Terrace "exhibit contamination from Tetrachloroethylene." The United States admits that Grainger reported that the samples from Hadnot Point "exhibit contamination from both Trichloroethylene and Tetrachloroethylene." The United States denies the remaining allegations in Paragraph 152.

153. The United States admits that on December 12, 1983, the Assistant Chief of Staff, Facilities, for Marine Corps Base Camp Lejeune sent a letter to the North Carolina Division of Health Services. The United States admits that this letter stated: "In accordance with guidance from Mr. Dick Casper, Water Supply Branch by telephone on 30 November 1983, the Grainger Laboratory sheets requested by Mr. Elmore have not been included." The United States admits that this letter also stated that voluntary monitoring at six water distribution systems had been discontinued. The United States admits that this letter requested permission to reduce

37

monitoring frequency at the Hadnot Point water distribution system to once per year. The United States denies the remaining allegations in Paragraph 153.

154.    The United States admits that on December 30, 1983, additional samples were collected from the Hadnot Point water distribution system and sent to Grainger. The United States admits that Grainger analyzed the samples on January 12, 1984, and reported interference in chloroform testing and a probable upper limit on total trihalomethane. The United States denies the remaining allegations in Paragraph 154.

155.    Admit.

156.    The United States admits that in March of 1984, a sample was collected from the Hadnot Point water distribution system and sent to Grainger for analysis. The United States admits that Grainger's report of its April 5, 1984, analysis of this sample says the results for chloroform and trihalomethane "[r]epresent[] a probable upper limit on the concentration. There is interference in this sample on the chloroform determination." The United States denies the remaining allegations in Paragraph 156.

157.    The United States admits that Environmental Science and Engineering reported July 6, 1984, sampling analysis results for well HP-602. The United States admits that those results showed benzene at 380 µg/L and 1,2-dichloroethane at 46 µg/L. The United States denies that dichloroethylene was detected at 46 µ g/L. The United States denies the remaining allegations in Paragraph 157.

158.    The United States admits that in July of 1984, samples from the wells in the Tarawa Terrace distribution system were collected and analyzed. The United States admits that the reported results of that analysis were TCE in TT-23 at 37 ppb, trace amounts of TC in TT-25,

and TCE in TT-26 at 3.9 ppb. The United States denies the remaining allegations in Paragraph 158.

159.     The United States admits that a sample was taken from the Hadnot Point water distribution system on June 27, 1984, and sent to Grainger. The United States admits that Grainger's report of its July 10, 1984, analysis of this sample says "[t]here is an interferent in this sample which prohibits the quantitation of chloroform." The United States denies the remaining allegations in Paragraph 159.

160.     The United States admits that on November 30, 1984, well HP-602 was shut down. The United States denies the remaining allegations in Paragraph 160.

161.     The United States admits that on or about November 30, 1984, samples were taken from well HP-602. The United States admits that the reported results of analysis of these samples were 1,1,2,2-PCE at 24 ppb, TCE at 1600 ppb, trans-1,2 DCE at 630 ppb, and benzene at 121 ppb. The United States admits that well 602 was shut down on November 30, 1984. The United States denies the remaining allegations in Paragraph 161.

162.     The United States admits that on December 4, 1984, samples were taken from Hadnot Point wells HP-601, HP-603, HP-608, HP-634, HP-637, and HP-642, and from raw and treated water at Hadnot Point Water Treatment Plant. The United States admits that TCE was detected in the samples from the treated water and wells HP-601, HP-603, and HP-608. The United States admits that wells HP-601, HP-603, and HP-608 were shut down on December 6, 1984. The United States denies the remaining allegations in Paragraph 162.

163.     The United States admits that on December 10, 1984, samples were taken from wells HP-601, HP-602, HP-603, HP-608, HP-34, HP-637, and HP-642. The United States admits that these samples were shipped for analysis on December 11, 1984. The United States

39

admits that the reported results of analysis of these samples were benzene in well HP-602; TCE in wells HP-601, HP-602, and HP-608; trans-1,2 DCE in wells HP-601, HP-602, and HP-608; and methylene chloride in wells HP-601, HP-608, HP-634, HP-637, and HP-642. The United States denies the remaining allegations in Paragraph 163.

164. The United States admits that on December 10, 1984, Bob Alexander, an Environmental Engineer at Marine Corps Base Camp Lejeune, called the North Carolina Division of Health Services to report that an in-house monitoring program had detected suspected benzene and TCE contamination in four wells that had been removed from service. The United States denies the remaining allegations in Paragraph 164.

165. The United States admits that a December 1984 article in the Globe, a weekly newspaper for Marine Corps Base Camp Lejeune, contains the language quoted in Paragraph 165 and attributed to Bob Alexander. The United States denies the remaining allegations in Paragraph 165.

166. Admit.

167. The United States admits that on January 14, 1985, Environmental Science and Engineering, Inc., released a report entitled "Evaluation of Data from First Round of Verification Sample Collection and Analysis Confirmation Study to Determine Existence and Possible Migration of Specific Chemicals in Situ, Marine Corps Base Camp Lejeune, North Carolina." The United States admits that Environmental Science and Engineering, Inc.'s monthly progress reports for August, September, October, and November 1984; a draft report; and an evaluation of data scheduled for completion by September 1984 in the May 1984 Work and Safety plan for the Confirmation study are missing. The United States denies the remaining allegations in Paragraph 167.

40

168.     The United States admits that on January 25, 1985, JTC Environmental Consultants received a sample from Tarawa Terrace well TT-26 that it analyzed on February 5, 1985, and reported detecting PCE at 1580 µg/L, TCE at 57 µg/L, t-1,2 DCE at 92 µg/L, and vinyl chloride at 27 µg/L.  The United States admits that on January 25, 1985, JTC received a sample from well TT-23, also called New Well, that it analyzed on February 6, 1985, and reported detecting PCE at 132 µg/L, TCE at 5.8 µg/L, and 1,2-trans DCE at 11 µg/L.  The United States admits that wells TT-23 and TT-26 were closed on February 8, 1985.  The United States admits that well TT-23 was subsequently operated for 24 hours on March 11, 1985, and for 7 hours on April 22, 1985, April 23, 1985, and April 29, 1985, with samples taken and analyzed for volatile organic compounds after each use.  The United States admits that use of well TT-23 for up to 7 hours in a 24-hour period was subsequently authorized during periods of water supply shortage, subject to expedited sampling and analysis, until an auxiliary line connecting Tarawa Terrace to Holcomb Boulevard was completed in June 1985.  The United States denies the remaining allegations in Paragraph 168.

169.     The United States admits that on January 27, 1985, the Holcomb Boulevard water treatment plant was taken offline, and its reservoir drained after a fuel odor was detected near its auxiliary engines.  The United States admits that it remained offline through February 4, 1985, and that while it was offline, the Hadnot Point water distribution system provided water for the Holcomb Boulevard water distribution system.  The United States denies the remaining allegations in Paragraph 169.

170.     The United States admits that on February 7, 1985, samples were taken from the Holcomb Boulevard water treatment plant and a few other buildings in the Holcomb Boulevard water distribution system.  The United States admits that the samples were analyzed on February

8, 1985, and the reported results said TCE was detected. The United States is otherwise without knowledge sufficient to admit or deny the allegations contained in Paragraph 170.

171.    Admit.

172.    The United States admits that on or about February 4, 1985, the Marine Corps received JTC Environmental Consultants, Inc.'s analysis of samples taken from Hadnot Point distribution system wells on January 16, 1985. The United States admits that analysis of the sample from well HP-651 reported detection of PCE at 386 µg/L, TCE at 3200 µg/L, t-1,2 DCE at 3400 µg/L, and vinyl chloride at 655 µg/L. The United States admits that well HP-651 was shut down on or about February 4, 1985. The United States admits that analysis of a sample from well HP-652 detected TCE at 9 µg/L and analysis of a sample from well HP-653 detected TCE at 5.5 µg/L. The United States admits that wells HP-652 and HP-653 were shut down on February 8, 1985. The United States denies the remaining allegations in Paragraph 172.

173.    The United States admits that a water sample from Berkely Manor Elementary School in the Holcomb Boulevard water distribution system was received for analysis on February 7, 1985, with reported results of 135.1 µg/L of TCE. The United States denies the remaining allegations in Paragraph 173.

174.    Admit.

175.    The United States admits that finished water from Building 65 in the Hadnot Point water distribution system was sampled on February 21, 1985, after wells HP-651, HP-652, and HP-653 were closed, and found to contain 1 ppb of TCE. The United States denies the remaining allegations in Paragraph 175.

176.    The United States admits that the Assistant Chief of Staff, Facilities, for Marine Corps Base Camp Lejeune provided an action brief on March 1, 1985, with subject "Alternatives

for Providing Water to the Tarawa Terrace Area." The United States admits that the referenced document contains the text quoted in Paragraph 176. The United States asserts that the document speaks for itself. The United States denies the remaining allegations in Paragraph 176.

177.   The United States admits that an additional sample taken from well HP-651 on or around February 4, 1985, was analyzed and the results reported March 8, 1985, were 400 ppb of PCE, 18,900 ppb of TCE, 7,580 ppb of t-1,2 DCE, and 168 ppb of vinyl chloride. The United States denies the remaining allegations in Paragraph 177.

178.   The United States admits that a meeting was held on March 21, 1985, to discuss mid- and long-term responses to water supply deficiencies at Tarawa Terrace. The United States admits that notes from this meeting say that "data suggests interim use of the TT new well for contingency purposes would not pose any extreme health threat to the TT residents" during construction of an alternative auxiliary raw water line. The United States denies the remaining allegations in Paragraph 178.

179.   The United States admits that a December 1985 report by Rick Shriver of the North Carolina Department of Natural Resources and Community Development states that well TT-25 "contains a measurable concentration of tetrachloroethylene." The United States denies the remaining allegations in Paragraph 179.

180.   The United States admits that laboratory analysis noted that a sample on or around November 19, 1985, contained 2,500 ppb benzene, although this sample was noted to be potentially contaminated and not representative. The United States is without sufficient information to admit or deny whether the water was considered finished water at the time of sampling. The United States admits that the current MCL for benzene is 5 ppb. The United

States admits that the laboratory analysis included a note that reads "Not Representative." The United States denies the remaining allegations in Paragraph 180.

181.    The United States admits that laboratory analysis noted that a sample on or around December 10, 1985, contained 38 ppb benzene. The United States denies the remaining allegations in Paragraph 181.

182.    The United States admits that HP-645 was shutdown on or around November 1986. The United States denies the remaining allegations in Paragraph 182.

183.    The United States denies the allegations contained in Paragraph 183.

184.    The United States denies the allegations contained in Paragraph 184.

185.    The United States admits that the ATSDR conducted numerous studies of Camp Lejeune based on conservative, health-protective models due to the lack of water sampling data prior to 1982. including, a Public Health Assessment ("PHA") of Camp Lejeune as required by CERCLA. The United States denies the remaining allegations in Paragraph 185.

186.    The United States admits that the ATSDR sent a letter to the Department of the Navy on or around September 1994 regarding the documents needed for the ATSDR's public health assessments of Camp Lejeune. The United States admits that the GAO Report states, "Despite difficulties, ATSDR officials said the agency's Camp Lejeune-related work had not been significantly delayed or hindered by DOD. Officials said that while funding and access to records were probably slowed down and made more expensive by DOD officials' actions, their actions did not significantly impede ATSDR's health study efforts." The United States denies the remaining allegations in Paragraph 186.

187.    The United States admits that in 1997 the ATSDR published a Public Health Assessment ("PHA") of Camp Lejeune as required by CERCLA. The United States admits that

44

since the 1997 Public Health Assessment, additional scientific information expanded the knowledge base related to exposures to contaminants of concern in drinking at Camp Lejeune. The Unites States further admits that the 1997 PHA was removed from the ATSDR website in 2009 and was replaced with an updated Public Health Assessment. The United States denies the remaining allegations in Paragraph 187.

188. The United States admits that the Government Accountability Office issued a report in or around May 2007 titled "Activities Related to Past Drinking Water Contamination at Marine Corps Base Camp Lejeune." The United States asserts that the Report speaks for itself. The United States denies the remaining allegations in Paragraph 188.

189. The United States admits that in or around 2009 the National Research Council published a report titled "Contaminated Water Supplies at Camp Lejeune: Assessing Potential Health Effects." The United States denies that the report titled "Contaminated Water Supplies at Camp Lejeune: Assessing Potential Health Effects" was structured by the Navy. The United States asserts that the Report speaks for itself. The United States denies the remaining allegations in Paragraph 189.

190. The United States is without knowledge sufficient to admit or deny the allegations contained in Paragraph 190.

191. The United States admits that the House of Representatives Committee on Science and Technology, Subcommittee on Investigations and Oversight published a transcript of a hearing titled "Camp Lejeune: Contamination and Compensation, Looking Back, Moving Forward" that was held on September 16, 2010. The United States admits the transcript includes the quote "It is difficult to provide clear scientific analyses when you cannot be certain that the

45

records you are relying on for that analysis are complete." The United States asserts that the transcript speaks for itself. The United States denies the remaining allegations in Paragraph 191.

192. The United States is without knowledge sufficient to admit or deny the allegations contained in Paragraph 192.

193. The United States denies the allegations contained in Paragraph 193.

194. The United States is without knowledge sufficient to admit or deny the Plaintiffs' reservation contained in paragraph 194 but asserts that a spoilation instruction is not warranted.

## B. PLAINTIFFS' INJURIES

195. The United States is without knowledge sufficient to admit or deny the allegations contained in Paragraph 195.

196. The United States is without knowledge sufficient to admit or deny when water buffaloes were used, where water buffaloes were placed on Camp Lejeune, or how frequently water buffaloes were used on Camp Lejeune. The United States is without knowledge sufficient to admit or deny the remaining allegations contained in Paragraph 196.

197. The United States is without knowledge sufficient to admit or deny whether the Plaintiffs were exposed to contaminated water and whether any exposure caused their injuries. The United States is without knowledge to admit or deny the remaining allegations contained in Paragraph 197.

198. The United States denies any concessions alleged. The United States admits that the ATSDR has determined that there is at least some evidence connecting certain chemicals detected in Camp Lejeune's water supply to illnesses and injuries, including leukemia, non-Hodgkin's lymphoma, bladder cancer, kidney cancer, lung cancer, esophageal cancer, breast cancer and Parkinson's disease. The United States denies that the ATSDR's Assessment of the

Evidence reached conclusions based on the levels of contaminants as a result of modeling for certain Camp Lejeune water systems. The United States asserts that the ATSDR's determinations were based on conservative, health-protective models due to the lack of water sampling data prior to 1982. The United States admits that the ATSDR determined there was "sufficient" or "equipoise and above" evidence for causation under the methodology it employed for at least some of these illnesses and injuries, such as leukemia and benzene. The United States denies the remaining allegations contained in Paragraph 198.

199.    The United States is unable to admit or deny Plaintiffs' "upon information and belief" allegations. The United States asserts that Camp Lejeune has been thoroughly investigated for many years and many reports, including conservative, health-protective models, have been produced on Camp Lejeune water. The United States is without knowledge sufficient to admit or deny the remaining allegations contained in Paragraph 199.

200.    The United States admits that the causal link between chemicals detected in the Camp Lejeune water and conditions and diseases continues to be studied. The United States denies the remaining allegations contained in Paragraph 200.

201.    The United States asserts that scientific evidence is required to show a causal link between any of the Plaintiffs' injuries and the Camp Lejeune water. Therefore, the United States is without knowledge to admit or deny the allegations contained in Paragraph 201.

202.    The United States is without knowledge sufficient to admit or deny the allegations contained in Paragraph 202.

203.    The United States is without knowledge sufficient to admit or deny the allegations contained in Paragraph 203. The United States asserts that it is entitled to offsets as allowed by law related to Plaintiffs exposure to Camp Lejeune water.

47

## VI. COUNT 1: RELIEF UNDER THE CAMP LEJEUNE JUSTICE ACT

204.    The United States incorporates by reference its responses to the allegations in the corresponding preceding paragraphs.

205.    The United States admits that CLJA § 804(b) provides:

> (b) IN GENERAL.—An individual, including a veteran (as defined in section 101 of title 38, United States Code), or the legal representative of such an individual, who resided, worked, or was otherwise exposed (including in utero exposure) for not less than 30 days during the period beginning on August 1, 1953, and ending on December 31, 1987, to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States may bring an action in the United States District Court for the Eastern District of North Carolina to obtain appropriate relief for harm that was caused by exposure to the water at Camp Lejeune.

The United States asserts that the referenced statute speaks for itself.  The United States denies the remaining allegations in Paragraph 205.

206.    The United States is without knowledge sufficient to admit or deny the allegations contained in Paragraph 206.

207.    The United States is without knowledge sufficient to admit or deny the allegations contained in Paragraph 207.

208.    The United States is without knowledge sufficient to admit or deny the allegations contained in Paragraph 208.

209.    The United States is without knowledge sufficient to admit or deny the allegations contained in Paragraph 209.

210.    The United States is without knowledge sufficient to admit or deny the allegations contained in Paragraph 210.

211. The United States is without knowledge sufficient to admit or deny the allegations contained in Paragraph 211.

212. The United States asserts that scientific evidence must be presented in court for a determination on general and specific causation. Therefore, United States is without knowledge sufficient to admit or deny the allegations contained in Paragraph 212.

213. The United States is without knowledge sufficient to admit or deny the allegations contained in Paragraph 213.

214. The United States is without knowledge sufficient to admit or deny the allegations contained in Paragraph 214.

## VII. CLAIM FOR RELIEF

The United States denies that all Plaintiffs are entitled to relief under the Camp Lejeune Justice Act of 2022 ("CLJA") Pub. L. No. 117-168, § 804, 136 Stat. 1802, 1802-04 (2022).

## VIII. JURY TRIAL DEMAND

The United States denies that Plaintiffs are entitled to a jury trial.

## AFFIRMATIVE DEFENSES

The United States shall provide notice of its affirmative defenses to Plaintiffs' Leadership in a timely manner so as not to prejudice any Plaintiff. *See* CMO 2, § VI. Such affirmative defenses may include, but are not limited to, the following:

1. AFFIRMATIVE DEFENSE

The United States' liability, if any, is limited to the same manner and to the same extent as a private individual under like circumstances, unless that limitation conflicts with the CLJA. As the United States has previously asserted, the CLJA "adopts the conditions of the

FTCA's waiver . . . that were not abrogated by the CLJA." *See* D.E. 34 at 6 (citing *Lehman v. Nakshian*, 453 U.S. 156, 161 (1981)).  Accordingly, the United States is entitled to assert defenses available under applicable state law, including state law describing recoverable damages or state law describing capacity to represent a decedent's estate.

2.      AFFIRMATIVE DEFENSE

        Any award is limited to compensatory damages.

3.      AFFIRMATIVE DEFENSE

        Any award is limited to the amount stated in the administrative claim, and any relief requested over and above that amount is barred.

4.      AFFIRMATIVE DEFENSE

        Any award is subject to appropriate offsets under the law.

5.      AFFIRMATIVE DEFENSE

        The United States' liability, if any, is subject to appropriate offsets for services or care which the United States has already paid.

6.      AFFIRMATIVE DEFENSE

        The United States' liability under the CLJA, if any, is limited to claims accruing before August 10, 2022.  *See* CLJA, § 804(j)(1).

7.      AFFIRMATIVE DEFENSE

        The United States is entitled to contribution or indemnity from any culpable third parties.

8.      AFFIRMATIVE DEFENSE

        The United States' liability, if any, does not extend to claims or actions arising out of the combatant activities of the Armed Forces as articulated in the CLJA.  The Master

50

Complaint does not address whether any claims are related to such combatant activities. To the extent Plaintiffs seek relief for a claim arising out of such combatant activities in the limited circumstances covered by the combatant activities exception of the CLJA, such claims are barred. CLJA, § 804(i).

9.      AFFIRMATIVE DEFENSE

Where a claim is asserted by a legal representative, D.E. 25 at ¶ 19, the United States' liability, if any, is limited to the appropriately authorized legal representative. To the extent Plaintiffs are asserting claims as a legal representative and are not authorized to represent individuals exposed to water at Camp Lejeune, such claims are barred. *See* CLJA, § 804(b).

10.     AFFIRMATIVE DEFENSE

The United States reserves the right to plead and prove additional defenses and affirmative defenses as they become known during discovery and litigation. *See* CMO 2, §

Dated:  November 20, 2023                    Respectfully Submitted,


                                             BRIAN M. BOYNTON
                                             Principal Deputy Assistant Attorney General
                                             Civil Division

                                             J. PATRICK GLYNN
                                             Director, Torts Branch

                                             BRIDGET BAILEY LIPSCOMB
                                             Assistant Director


                                             */s/ Adam Bain*
                                             ADAM BAIN
                                             Senior Trial Counsel, Torts Branch
                                             Environmental Torts Litigation Section
                                             United States Department of Justice

P.O. Box 340, Ben Franklin Station
Washington, DC 20044
adam.bain@usdoj.gov
(202) 616-4209

LACRESHA A. JOHNSON
HAROON ANWAR
DANIEL C. EAGLES
NATHAN J. BU
Trial Attorneys, Torts Branch
Environmental Torts Litigation Section
*Counsel for Defendant United States of America*

## CERTIFICATE OF SERVICE

I hereby certify that on November 20, 2023, a copy of the foregoing document was served on all counsel of record by operation of the court's electronic filing system and can be accessed through that system.

__/s/ Adam Bain_____
Adam Bain
