IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:23-CV-897

| | |
|---|---|
| IN RE: | ) |
| CAMP LEJEUNE WATER LITIGATION | ) |
| THIS PLEADING RELATES TO: | ) |
| ALL CASES | ) |

## PLAINTIFFS' LEADERSHIP GROUP'S OPPOSITION TO THE UNITED STATES' MOTION TO STRIKE THE DEMAND FOR A JURY TRIAL

For the following reasons, the Plaintiffs' Leadership Group (PLG) respectfully opposes the government's Motion to Strike Jury Trial Demand, D.E. 51 (Nov. 20, 2023).

## INTRODUCTION

Enacted last year to provide relief to long-suffering victims of Camp Lejeune's toxic water after decades of deception by government officials, the Camp Lejeune Justice Act (CLJA) expressly recognizes "the right of any party to a trial by jury." Pub. L. No. 117-168, § 804(d), 136 Stat. 1759, 1802, 1802-04 (2022). The government nevertheless has submitted a motion to strike every plaintiff's jury demand on the ground that the statute does not authorize jury trials. *See* Memorandum in Support of Motion to Strike Jury Trial Demand, D.E. 51-1 ("Mot."). The government's motion misinterprets Supreme Court precedent and would require the Court to effectively excise an entire sentence from the CLJA. It should be denied.

## BACKGROUND

Congress enacted the CLJA in 2022 to provide relief to the many servicemembers and others who were exposed to toxic water at Camp Lejeune and as a result developed a wide range of deadly diseases. To do so, the CLJA provides broad eligibility criteria—exposure to water at

Camp Lejeune for at least 30 days between August 1953 and December 1987. *Id.* § 804(b). And it sets out certain substantive and procedural requirements for claims. *See id.*

As relevant here, Section 804(d) addresses the question of which bodies adjudicate CLJA actions. The first sentence vests this Court with "exclusive jurisdiction over any action filed under [the statute]" and provides that this Court "shall be the exclusive venue for such an action." It thereby confers on this Court sole authority over questions of law (subject to appellate review) and the power to oversee CLJA cases. But the second sentence makes clear that the first sentence does not extend to questions of *fact*. Although the default presumption is that the vesting of jurisdiction in a district court over claims against the United States authorizes only bench trials, Section 804(b) rebuts that presumption by providing that "[n]othing in this subsection shall impair the right of any party to a trial by jury."

Consistent with that statutory text, this Court has repeatedly recognized that the CLJA authorizes jury trials, *see* Order dated Sept. 15, 2023, D.E. 22 at 2; *Cline v. United States*, 2022 WL 17823926, at *2 (E.D.N.C. Dec. 20, 2022), an understanding echoed by the congressional sponsors of the CLJA, Decl. of John F. Bash ("Bash Decl."), Ex. A, Statement of Representative Cartwright dated Nov. 1, 2023.[1] Indeed, the Department of Justice itself told Congress during the legislative process that the statute provides for jury trials and unsuccessfully urged legislators to remove that guarantee from the bill. Bash Decl., Ex. B, Department of Justice Technical Assistance to the Senate Committee on Veterans Affairs.[2]

---

[1] https://www.congress.gov/118/crec/2023/11/01/169/180/CREC-2023-11-01 -extensions.pdf.

[2] https://www.govinfo.gov/content/pkg/CHRG-117shrg52301/pdf/CHRG -117shrg52301.pdf.

2

But having failed in its lobbying effort, the government has now abruptly reversed course, claiming that the statutory language does not mean what it says and moving to strike every plaintiff's jury demand. The PLG opposes that motion.

## ARGUMENT

Section 804(d) of the CLJA provides that "[n]othing in this subsection shall impair the right of any party to a trial by jury." Under the ordinary tools of statutory interpretation, there can be no question that the plain meaning of that sentence is that CLJA plaintiffs have the right to a trial by jury. The text affirms that plaintiffs have "the right"—not merely a hypothetical right—to a jury trial. And because no other statute authorizes trial by jury for CLJA actions, that sentence of Section 804(d) would have no function whatsoever—as the government essentially concedes—if it did not authorize jury trials. That cannot be correct. It is a foundational principle of statutory interpretation, after all, that a court may not render meaningless any statutory word, much less an entire sentence. Congress's intent is therefore clear on the face of the CLJA.

The government, however, asks this Court to depart from the plain meaning of Section 804(d). It claims that, under *Lehman v. Nakshian*, 453 U.S. 156 (1981), the CLJA does not "clearly and unequivocally" grant a right to a jury trial and so does not overcome the presumption that claims against the United States must be tried to the bench. Mot. 2-5. The government misunderstands *Lehman*. *Lehman* held that statutes that only arguably or obliquely suggest a right to jury trials (*e.g.*, statutes authorizing "legal relief" or vesting jurisdiction in district courts rather than the Court of Federal Claims) lack the requisite clarity. But no court has ever held that a statute that **expressly** acknowledges the right to trial by jury fails that standard or that a necessary implication from the statutory text must be ignored. Rather, under *Lehman*, a court must still consult the ordinary tools of statutory interpretation in discerning congressional intent. And

3

critically, *Lehman* itself relied on the Supreme Court's earlier precedent in *Galloway v. United States*, 319 U.S. 372 (1943), which found a clear jury-trial right against the government based solely on an inference from a statute's amendment history, without any express textual reference to jury trials at all. The CLJA is much clearer than that.

This Court should therefore reject the government's misguided effort to deprive long-suffering Camp Lejeune victims of their statutorily guaranteed right to a jury trial.

**A.  A Statute Can "Clearly And Unequivocally" Authorize Jury Trials Against The Federal Government By Necessary Implication From Its Plain Text Or Context**

The United States enjoys presumptive immunity from suit, and the Supreme Court has held that "a waiver of sovereign immunity must be 'unequivocally expressed' in statutory text." *FAA v. Cooper*, 566 U.S. 284, 290 (2012) (*Cooper*) (citation omitted). Because the submission to jury trials "is one of the terms of [the Government's] consent to be sued," it also must be "unequivocally expressed." *Lehman*, 453 U.S. at 160-61 (internal quotation marks omitted; brackets in original). But the Court has "never required that Congress use magic words" to waive immunity; the only requirement is that Congress's intent be "clearly discernable from the statutory text in light of traditional interpretive tools." *Cooper*, 566 U.S. at 291. For that reason, "[t]here is no need for [a court] to resort to the sovereign immunity canon" when, after exhausting the ordinary tools of statutory construction, "there is no ambiguity left for [a court] to construe." *Richlin Sec. Serv. Co. v. Chertoff*, 553 U.S. 571, 590 (2008). And the canon does not require statutory provisions "to be given a meaning that is implausible." *United States v. Williams*, 514 U.S. 527, 541 (1995) (Scalia, J. concurring).

4

The two leading precedents on jury-trial waivers—*Galloway* and *Lehman*—both follow those settled principles in their analysis. Together, they demonstrate that clear inferences from statutory text, structure, or history suffice to authorize jury trials against the government.

1. *Galloway* addressed whether the Seventh Amendment applied to suits against the United States under a World War I-era statute authorizing compensation to injured servicemembers. 319 U.S. at 373 n.1, 388. The Court began by noting that the Seventh Amendment did not by its own force apply to the suits because "under the common law in 1791" there was no right to a jury trial "for persons asserting claims against the sovereign." *Id.* at 388; *see also, e.g.*, *McElrath v. United States*, 102 U. S. 426, 440 (1880). But the Court concluded that "Congress, in the legislation cited, has made [the Seventh Amendment] applicable" by providing for jury trials against the federal government. *Galloway*, 319 U.S. at 388-89 & n.18.

Critically, that congressional choice was ***not*** reflected in the actual text of the statute, but rather was a necessary implication from its amendment history. The original version of the statute had been interpreted to authorize jury trials, despite the fact that it "did not explicitly make the[ actions] triable by jury." *Id.* at 389 n.18 (quoting *Law v. United States*, 266 U.S. 494, 496 (1925)) (citing An Act to Amend an Act Entitled "An Act to Authorize the Establishment of a Bureau of War Risk Insurance in the Treasury Department," ch. 105, § 405, 40 Stat. 398, 410 (Oct. 6, 1917), Bash Decl., Ex. C). But as *Galloway* explained, in 1924, Congress had amended the statute to generally require that "the 'procedure in such suits shall . . . be the same as that provided for suits' under the Tucker Act," which "were tried without a jury." *Id.* (quoting World War Veterans' Act, 1924, ch. 320, § 19, 43 Stat. 607, 613 (June 7, 1924), Bash Decl., Ex. D). The following year, however, Congress amended the statute again "with the intention to 'give the claimant the right to a jury trial.'" *Id.* (quoting H.R. Rep. No. 1518, 68th Cong., 2d Sess. 2, Bash Decl., Ex. E). That

5

last amendment did not say a word about jury trials. Rather, it merely amended the cross-reference to the Tucker Act to provide that only specified sections would apply to suits under the statute, and those provisions did not include the bar on jury trials contained in Section 2 of the Tucker Act. *See* An Act to Amend the World War Veterans' Act, 1924, ch. 553, § 2, 43 Stat. 1302, 1303 (Mar. 4, 1925), Bash Decl., Ex. F.

That sufficed to infer the United States' unequivocal consent to jury trials. *See Galloway*, 319 U.S. at 389 n.18. As a Fifth Circuit decision cited approvingly by *Galloway* explained, "[t]he conclusion is irresistible . . . that by omitting section 2 of [the Tucker Act]" in the 1925 amendment, "Congress intended to give litigants the right of trial by jury as in ordinary cases." *Hacker v. United States*, 16 F.2d 702, 704 (5th Cir. 1927) (cited in *Galloway*, 319 U.S. at 389 n.18). *Galloway* thus establishes that no particular declarative formulation—or any express textual indication at all—is necessary to establish the United States' consent to jury trials. Rather, the question in all cases is whether Congress's intent is clear, and that can be discerned from both text and context.

2. *Lehman*'s standard for construing a statute to permit jury trials against the United States must be understood in light of its predecessor decision in *Galloway*. *Lehman* held that amendments to the Age Discrimination in Employment Act of 1967 (ADEA) that authorized suit against the federal government for "'such legal or equitable relief as will effectuate the purposes of this Act'" did not permit jury trials. 453 U.S. at 157-58, 168-69 (quoting Fair Labor Standards Amendments of 1974, Pub. L. No. 93-259, § 28(b)(2), 88 Stat. 55, 75). Relying on *Galloway*, the Court explained that the Seventh Amendment does not by its own force authorize jury trials against the federal government, and so any such right must be granted by statute. *Lehman*, 453 U.S. at 160 (quoting *Galloway*, 319 U.S. at 388-89). *Lehman* further explained that because the United

States enjoys sovereign immunity unless it consents to suit and because Congress may delineate the scope of that consent, any grant of a jury-trial right should be considered one of "the terms of its consent to be sued." *Id.* (quoting *United States v. Testan*, 424 U.S. 392, 399 (1976)). For that reason, like sovereign-immunity waivers generally, the government's consent to jury trials must be "unequivocally expressed." *Id.* at 160-61 (quoting *United States v. Mitchell*, 445 U.S. 535, 538 (1980)).

*Lehman* went on to illustrate the demarcation point between provisions that are insufficiently clear to establish a jury-trial right against the government and those that pass muster. The Court first pointed to a number of exemplar statutes that do not grant a clear and unequivocal right to a jury trial. *Lehman*, 453 U.S. at 161. The common denominator for all of those statutes was that they either expressly prohibited jury trials, *e.g.*, Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b) (1976), or said nothing at all about jury trials, *e.g.*, 28 U.S.C. § 1491 (1976) (Court of Claims jurisdiction). Gleaning from those statutes a default congressional preference for bench trials, the Court held that a statute will not be read to permit jury trials unless "Congress clearly and unequivocally departed from its usual practice in this area." *Id.* at 161-62.

The Court then explained that an ADEA provision other than the one at issue "*expressly* provide[d] for jury trials" against state and local governments. 453 U.S. at 162 (emphasis in original). Quoting *Galloway*, the Court stated that "Congress accordingly demonstrated that it knew how to provide a statutory right to a jury trial when it wished to do so elsewhere in the very 'legislation cited.'" *Id.* (quoting *Galloway*, 453 U.S. at 162). The implication of that passage was that *Galloway* itself provides a template for how Congress may authorize jury trials. And given the express jury-trial right in the other ADEA provision, *Lehman* drew the negative inference that Congress had not consented to jury trials in the provision at issue. *Id.* at 162-63, 168.

7

The remainder of *Lehman*'s analysis further illustrated how, consistent with *Galloway*, statutory context could express Congress's clear intent to authorize jury trials. For example, the Court distinguished *Lorillard v. Pons*, 434 U.S. 575 (1978), which had inferred a jury-trial right from the phrase "legal or equitable relief" in an earlier version of the other ADEA provision, on the ground that the earlier provision had "incorporate[d] the enforcement scheme of the Fair Labor Standards Act," which included the "practice of making jury trials available." *Lehman*, 453 U.S. at 162-63; *see id.* at 166-68. In contrast, the ADEA provision at issue in *Lehman* was patterned after Title VII's federal-employee provisions, under which "there is no right to trial by jury." *Id.* at 162-63; *see id.* at 166-67. There again, *Lehman* made clear that statutory context—not only a particular declarative phrasing—can supply the necessary clarity to discern (or reject) a jury-trial right. *See id.*; *accord Marcella v. Brandywine Hosp.*, 47 F.3d 618 (3d Cir. 1995) (holding that Red Cross was subject to jury trial, despite lack of specific references to jury trials in its charter).

Ultimately, *Lehman* held that the ADEA provision's reference to "legal and equitable relief" was insufficiently clear for three reasons taken together: (i) neither the vesting of jurisdiction "in the district courts rather than the Court of Claims, nor the use of the word 'legal' in that section evinces a Congressional intent" to authorize jury trials; (ii) a negative inference arose from the fact that "Congress expressly provided for jury trials" in the other ADEA provision; and (iii) Congress "patterned [the ADEA's federal-government] section after provisions in another Act under which there is no right to trial by jury." 453 U.S. at 168. That holding rested on a comprehensive analysis of all sources of statutory meaning—consistent with the basic principle that waivers of immunity must be clear after applying the full statutory-construction toolkit. *Cooper*, 566 U.S. at 291. That holistic approach to statutory meaning must be applied to the CLJA's jury-trial provision as well.

8

**B.** **Congress's Intent To Authorize Jury Trials Is Clearly Discernible In The Plain Text Of Section 804(d) And From Its Context**

Section 804(d) readily satisfies *Lehman*'s "clear[] and unequivocal[]" standard. 453 U.S. at 162. That section expressly acknowledges "the right of any party to a trial by jury." To have any meaning at all, that section must establish that CLJA plaintiffs have the right to a jury trial. And Section 804(d) is nothing like statutes that *Lehman* deemed insufficiently clear. Indeed, never before has a court held that a statute that expressly refers to trial by jury is insufficient under the *Lehman* standard.

1. The plain text of Section 804(d) expressly affirms the existence of the right to trial by jury. That conclusion follows in part from Congress's use of the definite article: "Nothing in this subsection shall impair ***the*** right of any party to a trial by jury." CLJA § 804(d) (emphasis added). The "use of the definite article" connotes that the noun that follows—here, "right"—is "specifically provided for.'" *Nielsen v. Preap*, 139 S. Ct. 954, 965 (2019) (quoting *Work v. United States ex rel. McAlester-Edwards Co.*, 262 U.S. 200, 208 (1923)). The text thus refers to a right that *actually* exists, not merely the abstract possibility that a jury-trial right *might* exist. *See id.* ("[G]rammar and usage establish that 'the' is a function word . . . indicat[ing] that a following noun or noun equivalent is definite or has been previously specified by context.'") (quoting MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1294 (11th ed. 2005)). If Congress had intended the latter connotation, it would have employed a phrase like "any right to a trial by jury that a party may have" or inserted some contingent modifier into the sentence, such as "possible." But instead, Congress conveyed unmistakably that "the right" specified in the sentence is an existing one. The government is thus wrong that Section 804(d) "does not address the existence of" a jury-trial right. Mot. at 4. It explicitly affirms such a right.

9

In addition, the structure of the sentence—providing that nothing shall "impair" the right rather than stating that the right "exists" or "is granted"—parallels other prominent rights-conferring laws. Most obviously, key provisions of the Bill of Rights employ the same syntax, which, read mostly literally, presumes that the right being granted already exists and provides that it shall not be violated. *See, e.g.*, U.S. Const., amend. II ("[T]he right of the people to keep and bear arms, shall not be infringed"); U.S. Const., amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."). The Seventh Amendment jury-trial right itself uses a similar construction: "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." U.S. Const., amend. VII. Congress drew on this traditional sentence structure in drafting Section 804(d)'s jury-trial provision.

Further, the sentence's placement in Section 804(d) accords with its basic purpose to ensure jury trials and helps account for its unique phrasing. Section 804(d) is the provision of the CLJA concerned with the question of *who* adjudicates CLJA actions. Its first sentence provides for exclusive jurisdiction and venue in the Eastern District, ensuing that this Court will resolve all legal questions under the CLJA (subject, of course, to appellate review) and can establish a uniform administrative scheme akin to Multi-District Litigation. Its second sentence, however, makes clear that the granting of exclusive jurisdiction in this Court does not authorize the Court to resolve questions of *fact*, despite the default presumption that the vesting of jurisdiction in a district court over claims against the United States should be construed to permit only bench trials. *Lehman*, 453 U.S. at 164-65 & n.13. The proviso-like phrasing of the second sentence ("Nothing in this subsection shall impair") acknowledges that the grant of a jury-trial right in the second sentence represents a departure from how the first sentence would otherwise be construed.

10

2. In harmony with Section 804(d)'s plain meaning, the traditional tools of statutory construction confirm that the statute provides for a jury-trial right. In particular, as the government all but concedes, Section 804(d)'s second sentence would have no "function" at all if jury trials are barred. Mot. at 4 n.1 ("[I]t is not immediately clear what function this provision is meant to have, if any."). That is, if anything, an understatement. Were this Court to adopt the government's interpretation of Section 804(d), it would render that entire sentence of the statute nugatory: It would preserve a right to a jury trial that never existed. It is undisputed, after all, that no other provision of federal law provides for a jury-trial right for any subset of CLJA claims. Accordingly, the only right that Section 804(d) could possibly be referring to is a jury-trial right created by the CLJA itself. If the CLJA were construed to require bench trials, therefore, Section 804(d)'s second sentence would be pointless.

This Court should reject that self-negating interpretation. "[O]ne of the most basic interpretive canons" is that "[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)). And "just as the court may not rewrite a statute due to a perceived Congressional drafting error, the court most certainly may not ignore the language contained in the statute." *United States v. Childress*, 104 F.3d 47, 52 (4th Cir. 1996), *superseded by statute as stated in U.S. v. Kelly*, 510 F.3d 433, 441 n.8 (4th Cir. 2007). Construing Section 804(d) not to grant a jury-trial right would violate these bedrock principles of statutory construction by leaving the second sentence devoid of meaning—as if the Court were to smear white-out across a line of the U.S. Statutes at Large.

The government speculates that "Congress included a sentence about jury trials in Section 804(d) 'in a more general excess of caution' to alleviate concerns that restricting venue to this

11

Court might restrict other rights." Mot. at 4 n.1 (quoting *Cyan, Inc. v. Beaver Cnty. Employees Ret. Fund*, 583 U.S. 416, 435 (2018)). But Section 804(d) is not a general disclaimer about "other rights"; it refers specifically and exclusively to *the* right to a jury trial. The government's proffered explanation thus makes no sense.[3] The government's position appears essentially to be that Congress was ignorant of whether jury trials might be required for CLJA claims and simply chose to keep the status quo, whatever that might be. But the government cites no precedent construing a statute on the assumption that Congress was unaware of relevant preexisting provisions of federal law—a view that would flout the Supreme Court's instruction to "assume that Congress is aware of existing law when it passes legislation." *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990). And it is deeply implausible that Congress, in enacting a major new cause of action subjecting the U.S. Treasury to substantial liability, decided to express no preference on whether jury trials would be available.

The government also hypothesizes that Congress might have had in mind "a third-party complaint or cross claim." Mot. at 4 n.1. That conjecture—apparently resting on the view that the government might sue some other party to offset its own liability for Camp Lejeune's poisoned water—is even less defensible. The CLJA does not itself authorize any cross-claims or third-party claims, *see* CLJA § 804(b), and the United States has not identified any common-law claims that are not time-barred (nor has it pleaded any such claims in any of the pending Camp Lejeune cases).

---

[3] The sort of statutory provision at issue in *Cyan* is different. In that case and the others that the Court cited, Congress enacted a *redundant* clause out of a "general excess of caution." 583 U.S. at 435. For example, in *Cyan* itself, Congress granted state courts jurisdiction over a certain class of federal securities claims "except as provided" in another section, but that section barred only state-law claims, so there was no overlap. *Id.* at 434. The problem with the government's interpretation of the CLJA is not that it renders Section 804(b)'s second sentence a belt-and-suspenders provision—redundant but understandable—but that it construes the sentence to refer to a nonexistent right, apparently on the view that Congress does not know what its own statutes say.

12

That the government must resort to such flights of fancy to sustain its position only underscores the position's basic implausibility.

3. Further, Section 804(d) has no resemblance to the statutes that *Lehman* said fail to meet its standard—and it is far clearer than the *Galloway* statute that *did* meet it. Section 804(d) does not bar jury trials, it is not silent on the issue, and it does not use an inherently ambiguous term like "legal relief." Rather, it expressly affirms "the right" to a jury trial. As far as the PLG has determined, no statute expressly referring to a jury-trial right in connection with suits against the federal government has ever been held to fail the *Lehman* standard.

Section 804(d) in fact far more clearly establishes a jury-trial right than the statute in *Galloway*. Unlike that statute, which the Supreme Court found to authorize a jury-trial right because of a negative implication from the statute's amendment history, Section 804(d) indicates on its face that CLJA plaintiffs enjoy "the right" to a trial by jury. It does not require the Court to trace back cross-references through multiple versions of the statute to divine congressional intent, as in *Galloway*. It follows *a fortiori* that if congressional intent was clear from the removal of a cross-reference in *Galloway*, it is clear from the express affirmation of a jury-trial right here.

Moreover, as in *Galloway*, the CLJA's legislative provenance also supports a jury-trial right. The CLJA was enacted to "provide[] an alternative remedy to the FTCA" for individuals who were harmed by the water at Camp Lejeune. *Clendening v. United States*, 143 S.Ct. 11, 12 n.2 (2022) (Mem). Congress chose to make some features of the FTCA applicable to the CLJA, either through incorporation by reference (*e.g.*, administrative exhaustion) or through the enactment of a functionally identical provision (*e.g.*, bar on punitive damages). *See* 28 U.S.C. § 2675; CLJA § 804(g); *see also* Plaintiff's Memorandum in Support of Plaintiff's Motion for Partial Summary Judgment, D.E. 42 at 23. But Congress did not incorporate the FTCA's bar on

13

jury trials. Instead, it used language affirming "the right of any party to a trial by jury," and it was even told by the Department of Justice that the language would require jury trials, *see* Bash Decl., Ex. B; *see* p. 17, *infra*. Thus, as with the amendments to the statute in *Galloway*, Congress's language choice in Section 804(d) was almost assuredly deliberate and should be given its intended effect—granting CLJA plaintiffs the right to a jury trial.

### C. The Government's Arguments Lack Merit

The government's arguments in support of its motion amount to little more than the *ipse dixit* that Section 804(d) does not "clearly and unequivocally" provide for jury trials. The government does not seriously attempt to apply the nuanced standard that the Supreme Court actually established in *Galloway* and *Lehman*, which does not require any particular verbal formulation, nor does it grapple with the more general standard for waivers of sovereign immunity, which require courts to exhaust all of the tools of statutory construction before assessing the statute's clarity. The few contextual arguments that the government offers only confirm that Congress gave CLJA plaintiffs a right to a jury trial.

1. The primary flaw in the government's argument is that it construes *Lehman* as instituting a magic-words test: Unless a statute provides that cases "shall be tried by jury" or that a "party may demand a jury trial" or includes a similarly declarative phrase, the statute does not authorize jury trials against the government—no matter how clear it is that Congress intended to provide for jury trials. *E.g.*, Mot. at 5 (citing 28 U.S.C. § 2402). That understanding is demonstrably incorrect. The government's error first rests on its failure to address the case on which *Lehman*'s rule is based—the Supreme Court's 1943 decision in *Galloway*, which is not even cited in the government's brief—and the nuanced analysis of statutory context that the Court conducted in

14

*Lehman* itself, which bears scant resemblance to the government's view that Congress must use specific declarative formulations.  *See* pp. 4-8, *supra*.

Moreover, the fact that in hindsight Congress could have worded the CLJA differently is not the relevant question.  "Congress need not state its intent in any particular way," and the Supreme Court "ha[s] never required that Congress use magic words."  *Cooper*, 566 U.S. at 291; Amy Coney Barrett, *Substantive Canons and Faithful Agency*, 90 BOSTON UNIV. L. REV. 109, 166-67 (2010) ("[R]equring Congress to use magic words to accomplish a particular result . . . violates the baseline rule of legislative supremacy.").  Rather, the question under *Lehman* is simply whether "Congress clearly and unequivocally" granted the right to jury trials to CLJA plaintiffs.  453 U.S. at 162.

2. The government also asserts that permitting jury trials for CLJA actions would depart from the history of tort claims against the government under the FTCA, which expressly bars jury trials.  Mot. at 5.  But the FTCA's prohibition is actually powerful evidence *against* the government's position.  Despite the fact that both the CLJA and the FTCA authorize relief against the government for tortious conduct and that the CLJA incorporates certain provisions of the FTCA expressly, Congress conspicuously chose *not* to incorporate the FTCA's bar on jury trials. 28 U.S.C. § 2402.  The venerable canon of *expressio unius est exclusio alterius*—and common sense—counsel that Congress's choice was deliberate.

More broadly, as explained in the PLG's motion for partial summary judgment regarding legal representatives, CLJA actions are simply not actions under the FTCA.  Plaintiff's Memorandum in Support of Plaintiff's Motion for Partial Summary Judgment, D.E. 42 at 20-22. Instead, Congress "created a new federal cause of action" in the CLJA.  *Id.* (quoting D.E. 22 at 1);

15

*accord Clendening*, 143 S.Ct. at 12 n.2 (the CLJA "provides an alternative remedy to the FTCA").[4] Thus, the United States' statutory immunity from jury trials under the FTCA does not apply here.

In fact, Congress had good reasons to depart from that model in designing the CLJA. CLJA plaintiffs consist largely of servicemembers and their families who have developed deadly diseases because the United States exposed them to the worst public drinking water contamination crisis in our Nation's history. For decades, the government has ruthlessly evaded compensating the plaintiffs for their years of suffering, lost opportunities, and death—first by covering up the contamination and then by invoking a host of technical legal arguments to evade liability under existing law. Given that shameful history, Congress undoubtedly wanted to assure CLJA victims that their claims would be heard by a jury of their peers. As Representative Matt Cartwright put it, "[w]hen we drafted the Act, it was our clear, unambiguous, and unequivocal express intent to provide all those covered by the Act with the right to a trial by jury against the United States of America for the harm they suffered at Camp Lejeune" because "it was critically important that people who had been betrayed and misled by the government for decades would have a right to have their claims decided by a jury of their peers." Bash Decl., Ex. A at 4.

---

[4] CLJA actions also differ markedly from FTCA actions in numerous respects. D.E. 42 at 20-21. And because the FTCA's waiver of sovereign immunity applies only to government liability "in accordance with the law of the place where the act or omission occurred," 18 U.S.C. § 1346(b)(1)—*i.e.*, liability under state law—it does not waive immunity from federal causes of action such as the CLJA, *FDIC v. Meyer*, 510 U.S. 471, 479 (1994) (federal constitutional tort was not cognizable under Section 1346(b)(1)). The CLJA instead contains its own waiver of sovereign immunity authorizing "appropriate relief" against the United States if the CLJA's unique legal standards are met, without stating that any of the requirements of the FTCA must also be satisfied. CLJA § 804(b). And at any rate, even if the CLJA could be construed to implicitly incorporate certain provisions of the FTCA, *but see* D.E. 42 at 22-32, at a bare minimum the language of Section 804(d) dispels the inference that the FTCA's jury-trial bar is incorporated.

16

3. Finally, the government claims that "[t]he CLJA was not preceded by significant legislative consideration of, or attention to, the consequences of allowing jury trials in this specific context." Mot. at 5. But that is strikingly inaccurate. It is true that the CLJA as a whole garnered little attention in the legislative history of the PACT Act in which it is embedded (perhaps because righting a grave historical wrong was uncontroversial). But one provision *did* attract discussion: the jury-trial right.

As the government sheepishly admits in a footnote, Mot. at 6 n.2, during the enactment of the CLJA, the Department of Justice submitted "Technical Assistance" to the Senate Committee on Veterans Affairs urging it to remove the jury-trial provision. That submission explained that the language authorized jury trials:

> [W]e worry that [the CLJA], as currently drafted, would result in differing recoveries to similarly situated plaintiffs. Especially if **damages awards are to be decided by a jury, <u>as the statute contemplates</u>**, it is likely that litigation will produce a broad range of remedial outcomes even among plaintiffs who have suffered similar harms. The potential unfairness of those outcomes may undermine the statute's goal of providing redress for those affected by contamination at Camp Lejeune.

Bash Decl., Ex. B at 61 (emphasis added). Congress obviously disagreed with the Department's objection—which essentially amounted to a blanket attack on the right to a jury trial in general, since there is always the risk that different juries will yield "a broad range of remedial outcomes" on similar claims. But it is simply not accurate to assert that the jury-trial provision did not receive legislative attention when it was the focus of a key objection by the Department.

Moreover, Congress's demonstrable awareness that the Department of Justice construed the language to codify a right to a jury trial—and its ensuing decision to retain that language—confirm its intent to authorize jury trials. *Cf. Davis v. Devine*, 736 F.2d 1108, 1113 (6th Cir. 1984) ("[W]hen an agency alerts the Congress of its statutory interpretation of existing legislation, and

17

the legislature does not alter the tendered interpretation when provided the opportunity to do so, then courts must presume that the agency has correctly discerned the legislative intent."); *see also Bd. of Ed. of City Sch. Dist. of City of New York v. Harris*, 444 U.S. 130, 149 (1979) (construing statute to reflect agency's interpretation when Congress did not take up committee witness's request to change language to nullify agency's view). And it further undermines the government's fanciful theory that the provision was designed as a cautionary proviso for imaginary rights, because the Department's warning to Congress made clear that no preexisting jury-trial right applied.

At any rate, the quantity of "legislative consideration" the jury-trial right received in the Congressional Record is not relevant to the interpretation of the CLJA. As the government itself points out, statutes are not interpreted according to how much legislative discussion they receive; they are interpreted according to their plain meaning. Mot. at 6. The government cites *Lehman*'s statement that Congress granted jury trials in tax-refund cases "[o]nly after much debate." *Id.* (citing *Lehman*, 453 U.S. at 161 n.8). But the government misunderstands the point of that discussion. The Supreme Court was merely explaining why Congress had historically been reluctant to authorize jury trials, noting the objections raised in the tax-refund context; it was not identifying a relevant consideration for construing statutes going forward. *See Lehman*, 453 U.S. at 161 n.8. Tellingly, in summarizing its reasons for rejecting a right to jury trials in the ADEA provision, *Lehman* did not cite the amount of "legislative consideration" the issue had received. *See id.* at 168-69.

### D. Every Party To Have Addressed The Question Has Recognized That The CLJA Authorizes Jury Trials

For the foregoing reasons, the CLJA clearly grants a jury trial right to plaintiffs. But this Court need not take the PLG's word for it: Every party to have considered the statute immediately

18

recognized that it authorizes jury trials. Even the Department of Justice itself acknowledged a jury-trial right only a short time ago and changed its position only after failing to convince Congress to remove the provision.

Start with this Court. Judges in this District have recognized a right to a jury trial in issued orders. Shortly after the CLJA's enactment, Judge Dever wrote that the CLJA "created a new federal cause of action" in which Congress "provided for jury trials." *Cline v. United States*, 2022 WL 17823926, at *2 (E.D.N.C. Dec. 20, 2022). And less than three months ago, this Court stated that "[i]n the CLJA, Congress . . . provided for jury trials." Order dated Sept. 15, 2023, D.E. 22 at 2. Although the question was not presented in those orders, they presumably noted the availability of jury trials because it is so clear on the face of the statute.

Until recently, the government held the same position. As explained above, the Department of Justice specifically recognized during the legislative process that the statutory text "permits jury trials that would not be available under the FTCA." Bash Decl., Ex. B at 60. The Department thus (correctly) read the plain text of the CLJA to grant a right to a jury trial. Now, however, having lost before Congress, the government has jettisoned its original view in favor of the countertextual position that the CLJA's affirmation of "the right of any party to a trial by jury" actually means that all CLJA claims must be tried to the bench.

Finally, the Members of Congress who sponsored the CLJA agree with the Department's original assessment. As the government has acknowledged, Representative Cartwright was the principal drafter of the CLJA. United States' Statement of Interest Regarding Attorneys' Fees, D.E. 34 at 10 n.34. After learning of the government's about-face, he expressed nothing short of bafflement. "When writing the Camp Lejeune Justice Act," he stated, "we understood that the only way the veterans, their families and others could get fair and just compensation was through

19

a jury trial." Bash Decl., Ex. A at 4. Congress's "unequivocal expression our intent, from the inception of the bill through final passage and into enactment" was that "the claimants who have suffered so intensely as a result of the toxic water at Camp Lejeune have the right to a trial by jury." *Id.* Although Congress was "aware of how the Federal Tort Claims Act worked, through a bench trial," it "specifically rejected that model" and "expressly included a provision in subsection (d) of the Act confirming every plaintiff['s] right to a jury trial." *Id.* "The Department of Justice," Representative Cartwright protested, "is inexplicably reading this provision out of the statute." *Id.* But "[t]hose who have steadfastly defended our country rate no less than the rights they deserve as American citizens." *Id.*

The government claims that a post-enactment statement from a Member of Congress "is not a legitimate tool of statutory interpretation," Mot. at 7, but the Supreme Court has found that sort of statement "relevant to the extent it is persuasive." *United States v. Woods*, 571 U.S. 31, 48 (2013). Indeed, the government itself has had no qualms about citing post-enactment statements on other issues. United States' Statement of Interest Regarding Attorneys' Fees, D.E. 34 at 11 n.4. Here, the ***key sponsor*** of the CLJA vehemently disagrees with the government's interpretation of the CLJA only one year after the statute was enacted. Especially given that the statement accords with this Court's own stated understanding of the statutory text, that is compelling evidence that the CLJA means what it says: A plaintiff has a right to a jury trial.

20

## CONCLUSION

The United States' motion to strike the jury-trial demand should be denied.

December 4, 2023                                 Respectfully submitted,

/s/ *John. F. Bash*                              /s/ *J. Edward Bell, III*
John F. Bash (admitted *pro hac vice*)           J. Edward Bell, III (admitted *pro hac vice*)
Quinn Emanuel Urquhart & Sullivan LLP            Bell Legal Group, LLC
300 W. 6th St., Suite 2010                       219 Ridge Street
Austin, TX 78701                                 Georgetown, SC 29440
Telephone: (737) 667-6100                        Telephone: (843) 546-2408
johnbash@quinnemanuel.com                        jeb@belllegalgroup.com

*Member, Plaintiffs' Executive Committee*        *Lead Counsel*
*Co-Chair, Law and Briefing Subcommittee*


/s/ *Elizabeth Cabraser*                         /s/ *Zina Bash*
Elizabeth Cabraser (admitted *pro hac vice*)     Zina Bash (admitted *pro hac vice*)
Lieff Cabraser Heimann & Bernstein, LLP          Keller Postman LLC
275 Battery Street, Suite 2900                   111 Congress Avenue, Suite 500
San Francisco, CA 94111                          Austin, TX 78701
Telephone: (415) 956-1000                        Telephone: (956) 345-9462
ecabraser@lchb.com                               zina.bash@kellerpostman.com

*Co-Lead Counsel*                                *Co-Lead Counsel and Government Liaison*


/s/ *W. Michael Dowling*                         /s/ *Robin Greenwald*
W. Michael Dowling (N.C. Bar No.: 42790)         Robin L. Greenwald (admitted *pro hac vice*)
The Dowling Firm PLLC                            Weitz & Luxenberg, P.C.
Post Office Box 27843                            700 Broadway
Raleigh, NC 27611                                New York, NY 10003
Telephone: (919) 529-3351                        Telephone: (212) 558-5802
mike@dowlingfirm.com                             rgreenwald@weitzlux.com

*Co-Lead Counsel*                                *Co-Lead Counsel*


/s/ *James A. Roberts, III*                      /s/ *Mona Lisa Wallace*
James A. Roberts, III (N.C. Bar No.: 10495)      Mona Lisa Wallace (N.C. Bar No.: 009021)
Lewis & Roberts, PLLC                            Wallace & Graham, P.A.
3700 Glenwood Avenue, Suite 410                  525 North Main Street
P. O. Box 17529                                  Salisbury, NC 28144
Raleigh, NC 27619                                Telephone: (704) 633-5244
Telephone: (919) 981-0191                        mwallace@wallacegraham.com
jar@lewis-roberts.com

*Co-Lead Counsel*                                *Co-Lead Counsel*

21

<u>*/s/ Hugh R. Overholt*</u>
Hugh R. Overholt (NC Bar No. 016301)
Ward and Smith P.A.
Post Office Box 867
New Bern, NC  28563-0867
Telephone:  (252) 672-5400
hro@wardandsmith.com
*Liaison Counsel for Plaintiffs*

<u>*/s/ A. Charles Ellis*</u>
A. Charles Ellis (N.C. Bar No.:  010865)
Ward and Smith P.A.
Post Office Box 8088
Greenville, NC  27835-8088
Telephone:  (252) 215-4000
ace@wardandsmith.com
*Liaison Counsel for Plaintiffs*

22