# EXHIBIT 13

Transcript of Status Conference Hearing
on April 5, 2023

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NORTH CAROLINA


APRIL 5, 2023
STATUS CONFERENCE
BEFORE THE HONORABLE JAMES C. DEVER III
UNITED STATES DISTRICT JUDGE


- - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | |
|---|---|
| MICHAEL REESE | 4:23-CV-22-D |
| SUSAN LAURION | 4:23-CV-33-D |
| FELICIA BAZEMORE, as personal representative of the estate of Allen Ray Hardy | 5:23-CV-66-D |
| THELMA S. FIGGS, as personal representative of the estate of Robert A. Figgs, Sr. | 5:23-CV-78-D |
| ISAIAH WILSON, JR., as personal representative of the estate of Jerone Wilson | 5:23-CV-79-D |
| GLANZER F. JOLLY | 5:23-CV-80-D |
| BILL WOODARD | 5:23-CV-116-D |
| STEPHEN M. WILLIAMS, MOSES R. JENKINS, JR., on behalf of themselves and all others similarly situated | 7:23-CV-22-D |
| MOSES R. JENKINS, JR. | 7:23-CV-25-D |
| THADDEUS KASSAB | 7:23-CV-31-D |
| RICHARD WUENST | 7:23-CV-41-D |
| RODNEY JAMES PENLAND | 7:23-CV-44-D |
| CHERYL DURRANT and JERRY DURRANT | 7:23-CV-45-D |
| MICHAEL ANTHONY CHIEFFO | 7:23-CV-50-D |
| WESLEY SCOTT BITNER | 7:23-CV-55-D |
| SANDRA GORDON | 7:23-CV-61-D |
| CYNTHIA BLACKMER, as personal representative of the estate of David F. Blackmer | 7:23-CV-68-D |
| JOHN R. BELT, JR. | 7:23-CV-69-D |
| JAMES FLENOURY | 7:23-CV-76-D |
| FRANCES CARTER, as personal representative of the estate of Ronald Carter | 7:23-CV-79-D |
| JACK GONZALEZ | 7:23-CV-80-D |
| JOHN WILLIAM McDANIEL | 7:23-CV-88-D |
| LAWRENCE EVANS | 7:23-CV-90-D |
| LINDA CRISP, as personal representative of the estate of Michelle Causey | 7:23-CV-92-D |
| JOSEPHINE DELVALLE, as personal representative of the estate of Raymond DelValle | 7:23-CV-97-D |
| WILLIAM G. GILLIAM, on behalf of himself and all others similarly situated | 7:23-CV-98-D |

```
PATTY NELSON JESSUP, as personal representative
of the estate of Gary Jessup, Sr.              7:23-CV-101-D
RUSSELL DRAYTON                                 7:23-CV-109-D
EVELYN DONEGHY                                  7:23-CV-111-D
CATHLEEN W. MAKLEY, as executor of the estate
of Morgan W. Makley                             7:23-CV-112-D
VERNE HALL                                      7:23-CV-115-D
CATHLENE HOPKINS BREWER                         7:23-CV-124-D
GERIE HEARD                                     7:23-CV-129-D
JAMES T. MAXWELL                                7:23-CV-131-D
SILAS ROLLINS                                   7:23-CV-132-D
GARY MILLER                                     7:23-CV-141-D
SUSAN SHEEHAN                                   7:23-CV-145-D
ERNEST WELLS, JR.                               7:23-CV-147-D
MARY J. YOUNG                                   7:23-CV-148-D
BRENDA SIMPSON                                  7:23-CV-160-D
LORI LYNN FRESHWATER, individually and as executor
of the estate of Mary C. Freshwater Grady       7:23-CV-167-D
ELIZABETH ELLINGHAM                             7:23-CV-185-D
DAVID R. JOBES                                  7:23-CV-190-D
RICHARD MOTA                                    7:23-CV-193-D
SHARON MARTIN                                   7:23-CV-198-D
MAJOR LEE PARKER                                7:23-CV-199-D
DAVID PETRIE                                    7:23-CV-202-D
MARK WEST                                       7:23-CV-207-D
ROBERT ERNEST LAPOINTE                          7:23-CV-210-D
JON V. GRAZIANO                                 7:23-CV-212-D
JULIAN O. HUGHES, JR.                           7:23-CV-213-D
AARON JOBBIE HARRIS                             7:23-CV-214-D
APRIL DIAZ                                      7:23-CV-229-D
TONYA COOPER GAVIN                              7:23-CV-235-D
CLAUDIA McCLARRIN                               7:23-CV-248-D
WILLIAM D. RANDALL                              7:23-CV-250-D
JAMES H. KITHCART                               7:23-CV-257-D
DENNIS F. MONROE, SR.                           7:23-CV-276-D
ROBERT RUSSELL PARK and JENNIFER PARK           7:23-CV-278-D
LINDA RANES                                     7:23-CV-289-D
DELORES D. LEGRAND                              7:23-CV-293-D
HARRY JAMES KUCZMA                              7:23-CV-294-D
HOMER CAMPBELL                                  7:23-CV-300-D
TIMOTHY SHEA                                    7:23-CV-301-D
EDWARD GELO                                     7:23-CV-307-D
LARRY COLE                                      7:23-CV-309-D
RAYMOND AYLOR                                   7:23-CV-310-D
BONITA BAUGHMAN                                 7:23-CV-311-D
MICHAEL BLACK                                   7:23-CV-312-D
LEONA OPTEKAR                                   7:23-CV-315-D
FRANK CARRANO                                   7:23-CV-321-D
WILLIE STEWART, JR.                             7:23-CV-323-D
JOHNATHAN LETT                                  7:23-CV-325-D
```

| | |
|---|---|
| JEANETTE HALL | 7:23-CV-326-D |
| WILLIAM BARBER | 7:23-CV-331-D |
| KAREN ALEXANDER-WEBSTER | 7:23-CV-333-D |
| DARCY BETTENBOURT-EMMONS | 7:23-CV-334-D |
| LEONA MARTAIN | 7:23-CV-341-D |
| WAYNE COVERT | 7:23-CV-344-D |
| OTIS CRAWFORD | 7:23-CV-346-D |
| DEBORAH CROGHAN | 7:23-CV-350-D |
| THOMAS DENOMME | 7:23-CV-352-D |
| IDA DIAZ | 7:23-CV-354-D |
| SCOTT DUNCAN | 7:23-CV-355-D |
| TERRY DYER | 7:23-CV-357-D |
| KIM REILLY | 7:23-CV-363-D |
| ROBERT ROCHELLE | 7:23-CV-369-D |
| MICHAEL SEGURA, JR. | 7:23-CV-373-D |
| INA GUTHRIE | 7:23-CV-374-D |
| MARGARET SERAFIN | 7:23-CV-375-D |
| JAMES HUFF | 7:23-CV-380-D |
| MELANIE SILVANO | 7:23-CV-385-D |
| CLYDE SIMPSON | 7:23-CV-386-D |
| LEO SWEENEY | 7:23-CV-391-D |
| ANN TARCHENSKI | 7:23-CV-392-D |
| GEORGE BRZECZEK | 7:23-CV-406-D |
| EUGENE BURK, JR. | 7:23-CV-408-D |
| SCOTT CAMPBELL | 7:23-CV-409-D |
| LOLA BURNS | 7:23-CV-410-D |
| ANTOINETTE CHINIVERE | 7:23-CV-426-D |
| STEVEN CLAUS | 7:23-CV-431-D |
| CARRIE FULLER | 7:23-CV-432-D |
| GERRY GIRARD | 7:23-CV-434-D |
| LAWRENCE CRITELLI | 7:23-CV-435-D |
| DANIEL FARNUM | 7:23-CV-444-D |
| ROBERT FISH | 7:23-CV-445-D |
| WILLIAM HOPKINS | 7:23-CV-450-D |
| CHARLES "CHUCK" CROGHAN | 7:23-CV-451-D |
| RONALD LODAR | 7:23-CV-460-D |
| RONALD BALDWIN | 7:23-CV-462-D |
| FREDERICK JUILLERAT | 7:23-CV-467-D |
| JOSEPH MANUTO | 7:23-CV-469-D |
| JONATHAN NOOKS, SR. | 7:23-CV-471-D |
| ELLEN SCOTT | 7:23-CV-480-D |
| TIMOTHY SMITH | 7:23-CV-482-D |
| MICHAEL HERRERA | 7:23-CV-483-D |
| PRESTON WARREN, JR. | 7:23-CV-500-D |
| VICTORIA WASHINGTON | 7:23-CV-501-D |
| BERNARD WEIHRICH, JR. | 7:23-CV-505-D |
| JAMES WHEELER | 7:23-CV-521-D |
| JEANNE WIERMAN | 7:23-CV-523-D |
| DANNY WILLIAMS | 7:23-CV-525-D |
| JOHN MARTINEZ | 7:23-CV-529-D |

| | |
|---|---|
| CHARLES PEASLEE | 7:23-CV-541-D |
| JEFFERY RAGER | 7:23-CV-545-D |
| DAVID SHOEMAKER | 7:23-CV-551-D |
| RICHARD RITTER | 7:23-CV-552-D |
| CATHERINE SONGER | 7:23-CV-555-D |
| KAREN SPEKTOR | 7:23-CV-556-D |
| CHARLES STRADER, JR. | 7:23-CV-559-D |

        Plaintiffs,

                      vs.

   UNITED STATES OF AMERICA,

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - -

ATTORNEYS FOR PLAINTIFFS PRESENT:

Elliot Sol Abrams, Joseph L. Anderson, Brian H. Barr, Zina Bash, James Edward Bell, III, Elizabeth Joan Cabraser, Jayne Conroy, Kevin R. Dean, Mark A. DiCello, Mark P. Doby, Paul Doolittle, William Michael Dowling, A. Charles Ellis, Lynwood Evans, Eric W. Flynn, Robin L. Greenwald, Gary W. Jackson, Randolph Lee, Donald W. Marcari, Chad A. McGowan, Howard Nations, H. Scott Overholt, Hugh R. Overholt, Warren D. Postman, Matthew D. Quinn, Joseph F. Rice, Joel R. Rhine, James A. Robert, III, John F. Romano, Eric Robert Schaefer, Hunter J. Shkolnik, Raymond C. Silverman, James L. Ward, Jr., Mona Lisa Wallace, Roy T. Willey, IV, Whitney Wallace Williams, Thomas Matthew Wilmoth, and Nevin Wisnoski.

ATTORNEYS FOR DEFENDANT PRESENT:

John A. Bain, Daniel Charles Eagles, Bridget Bailey Lipscomb, and Katherine Paige O'Hale.

                AMY M. CONDON, CRR, RPR, CSR
                   Official Court Reporter
               United States District Court
                  Raleigh, North Carolina
        Stenotype with computer-aided transcription

```
 1            (Wednesday, April 5th, 2023, commencing at 1:00 p.m.)
 2                       P R O C E E D I N G S
 3            THE COURT:  Good afternoon, and welcome to the United
 4   States District Court for the Eastern District of North
 5   Carolina.
 6            We're here for a status conference in a series of
 7   PACT Act cases.  I have a list of the lawyers who are here on
 8   behalf of various plaintiffs.  I also have a list of the
 9   lawyers here on behalf of the United States.
10            Is it Mr. Bain?
11            MR. BAIN:  Yes, Your Honor.
12            THE COURT:  And is it Ms. Lipscomb?
13            MS. LIPSCOMB:  Yes, Your Honor.
14            THE COURT:  Mr. Eagles.
15            MR. EAGLES:  Good afternoon, Your Honor.
16            THE COURT:  Ms. O'Hale.
17            MS. O'HALE:  Good afternoon, Your Honor.
18            THE COURT:  And then I won't do a roll call of all
19   the plaintiffs' lawyers, but I have a list.
20            Mr. Bain, are you the lead lawyer for the United
21   States?
22            MR. BAIN:  Yes, I am, Your Honor.
23            THE COURT:  How long was the Roman Empire in
24   existence?
25            MR. BAIN:  I didn't prepare to answer that question
```

1  today, Your Honor.

2          THE COURT:  Do any of your colleagues at your table

3  have an approximate idea about how long the Roman Empire was in

4  existence?

5          MS. LIPSCOMB:  Unfortunately not.

6          THE COURT:  Y'all need to read more.

7          The Roman Empire began in 610 BC.  The age of kings

8  lasted until 510.  Governance by the senate began at that point

9  until Julius Caesar became the dictator, never the emperor.

10          After he was assassinated, Caesar Augustus became the

11  first emperor, and a succession of emperors then served until

12  Rome was toppled in 476; a lifespan of 1,101 years.

13          Of course, Rome was divided, the Empire, into two;

14  West and East, in 286.  And the eastern portion of the Roman

15  Empire survived until 1453 when the Turks toppled

16  Constantinople.  So you can look at that as 1,167 years; or if

17  you give the eastern part of the Empire credit, it's 2,078

18  years in total.

19          Why do I bring this up?  We're here today for the

20  first status conference in cases under the Camp Lejeune Justice

21  Act, as you know, and as all these other fine folks who are

22  here know, an Act that focuses on a time period between August

23  of 1953 and December of 1987, establishes a single cause of

24  action, requires administrative exhaustion, excludes punitive

25  damages, expressly provides no claim arising out of combatant

1  activities.

2       Congress, in its wisdom, has assigned all of these

3  cases to the United States District Court for the Eastern

4  District of North Carolina, a court of which I am proud to be a

5  member.

6       I have three wonderful colleagues and friends who

7  also serve as United States District Judges in this district.

8  To date each of us has about 200 of these cases, a little more.

9  I know in my cases there are 27 diseases or defects mentioned,

10 and about 90 of the cases just use a catchall without

11 specificity of multiple, serious, life-threatening illnesses.

12      I bring up the time about the length of the Roman

13 Empire because that time is in play if the administrative

14 process that Congress enacted as part of the law is not

15 followed with serious discussion and offers being made and

16 cases being resolved, and likewise, questions about how to

17 handle all of these cases that are exclusively in this court.

18      And, of course, I see a number of lawyers here who I

19 don't know, and I see a number of lawyers who I do know; but

20 all should know that even prior to the enactment of this law,

21 this was a very busy court.

22      The latest statistics I have for the end of the last

23 quarter are that Chief Judge Myers and Judge Boyle have just

24 under a total of 800 cases.  Judge Flanagan and I have just

25 over a total of 900 cases.  Of course, about a third of those

1  cases are criminal cases where people have both statutory and
2  constitutional rights to speed with respect to the disposition
3  of their cases.

4      I don't watch a lot of TV; but like anyone else in
5  this state, if I credit any of the advertising I've seen, there
6  may be a million cases coming to the Eastern District of North
7  Carolina.

8      And I talked about the life of the Roman Empire
9  because if we were to have a million cases among the four
10  judges of our court and we worked five days a week, 52 weeks a
11  year exclusively on Camp Lejeune Justice Act cases and
12  everybody got a one-day jury trial -- and if you practice in
13  this district you're familiar with the one-day jury trial,
14  because we try a lot of cases and we have a lot of cases.  If
15  we were to do a one-day jury trial in a million Camp Lejeune
16  Justice Act cases and only worked on those cases and did
17  nothing else, it would take us 961-and-a-half years.

18      And you may say, "Well, Judge, we realize you've got
19  some other cases, so we know you got to do some other work,
20  maybe half the time."  Do half the time, then we get into the
21  life of the entire Roman Empire, 1,923 years is what it would
22  take us to have a million jury trials.

23      Let's say the order of magnitude is off and it's only
24  100,000.  If we exclusively did 100,000 trials, the one-day
25  trials, five days a week, 52 weeks a year, it would take us 96

1  years.  We cut it in half, it would take us 192 years.

2          If we're off by another order of magnitude, 25,000,

3  and only did these cases one day at a time, it would take us 24

4  years.

5          Of course, if we spent the other half of each trial

6  day that we would have, it would take us 48 years.

7          Now, we do have -- and I tell jurors, and this is

8  actually a book that he published.  Our district is unique.

9  Judge Henry Potter, the longest-serving federal judge active in

10  the history of the United States.  He was appointed by

11  President Jefferson.  He served for 55 years, served into the

12  Buchanan Administration.  My colleagues and I do our very best

13  to take care of ourselves, but I don't know if any of us have

14  another 55 years in us, much less the time period for the life

15  of the Roman Empire.

16          And so part of what I wanted to talk about -- and

17  today begins a conversation that will ultimately include

18  obviously all of the judges of this court because to say the

19  least, this is more than a one-judge series of cases.  We're

20  going to need to kind of work through a process to try and get

21  these cases resolved in something hopefully short than all of

22  our lifetimes; and to do that, we're going to have to find and

23  seize the elasticity in Rule 16 of the Federal Rules of Civil

24  Procedure in managing the cases.

25          There's going to have to be cooperation among those

1  who are representing plaintiffs in these cases and those who
2  are representing the defendant.

3          There's going to have to be -- and I'm interested in
4  hearing actually what the status is of what the Navy is doing
5  in the administrative process.

6          Do you have any information on the number of claims
7  that have been filed?  Do y'all know that?

8          MR. BAIN:  Yes, Your Honor.  It's a little over
9  20,000 right now.

10          THE COURT:  Okay.  And how many of those have been
11  resolved?

12          MR. BAIN:  None of those cases have been resolved
13  yet.  We have been working with the Navy to identify cases in
14  which further substantiation has been requested of counsel and
15  they have received some in a couple of cases, but that is a
16  process that is ongoing.

17          THE COURT:  Again, obviously, all four judges issued
18  orders requiring exhaustion in accordance with the Act, and I
19  will just say that it's disappointing to hear that there
20  haven't been any offers, because Congress had to have enacted
21  this legislation knowing that there are four United States
22  District Judges in this district; knowing that if we tried a
23  case every day, five days a week, 52 weeks in the year, right,
24  that's 260 trial days that we each have.  Prior to the
25  enactment of this, we typically tried anywhere from 10 to 20

1    cases to verdict every year and none of those cases are going
2    away.

3         So it would certainly be important to remind the
4    Department of the Navy how critically important the
5    administrative process is to the enactment of this law.
6    Because presumably at least some members of Congress are aware
7    of how long the life of the Roman Empire was and are aware that
8    there are four United States District Judges in this court, and
9    that Congress had hoped that it would take less than 1,900
10   years to resolve all of these cases.

11        Now, with respect to topics, I know we've gotten some
12   submissions associated with lawyers referencing a leadership
13   counsel, and the Department of Justice isn't taking a position
14   as such on that on sort of, on who that might be, and at least
15   some of the lawyers have weighed in.  I think, again, this is
16   sort of the beginning of a conversation about how to help
17   manage and move forward this litigation.  And I think anybody
18   who wants to or believes that there is some need for leadership
19   counsel or some anticipated structure, we will certainly
20   entertain it.  We obviously, in accordance with ordinary
21   process in these types of cases, will have to assess ourselves
22   whether we think there is utility in that from that side to
23   coordinate these issues.

24        I gather, even though you don't take a position on
25   sort of the details of that, that the Department of Justice, is

1  it fair to say, would like there to be some leadership

2  structure on the other side?

3        MR. BAIN:  That's right, Your Honor.

4        If I can just address -- we appreciate what you said

5  about the burden that this places on this court, and we have

6  already been in communication with certain plaintiffs' groups

7  to try to think about ways outside of court that we can start

8  to get information to help to resolve these cases.  So we've

9  already been making those outreaches, having those

10 conversations.

11       The difficulty we have is that we don't have

12 plaintiffs that we can deal with that we know combine most or

13 all of the plaintiff population.  So, for example, we can't

14 reach agreement on what information should be put into a

15 plaintiff fact sheet unless we know that we're dealing with a

16 group of attorneys who can combine most or all of the

17 plaintiffs.

18       So it would be very helpful for the Department of

19 Justice to try and work with plaintiffs in coming up with not

20 only alternatives to litigation, but also how to manage the

21 cases that are in litigation to have a plaintiff leadership

22 structure.

23       THE COURT:  I would anticipate that after this

24 hearing at some point we will issue an order in connection with

25 all of these cases dealing with a variety of topics, but one of

1    those topics I would anticipate would be inviting a proposed
2    leadership structure and let the lawyers who are representing
3    plaintiffs in this case -- cases try to work among themselves,
4    and then set some kind of a deadline for them to submit some
5    proposal, and then we would end up picking it after -- if there
6    was an inability among the plaintiffs' lawyers to reach an
7    agreement on that.  But it's helpful to know that the
8    Department of Justice thinks that that would help to move the
9    case along.

10        As part of that, I want to give a citation to you and
11   all the counsel for the plaintiffs for a case that I think you
12   should read.  It's *In re World Trade Center Disaster Site*
13   *Litigation,* 598 F.Supp.2d 498 (S.D.N.Y 2009).

14        Judge Hellerstein of the District Court of the
15   Southern District of New York was assigned all of the cases
16   involving first responders after 9/11.  And for three years or
17   more that case went nowhere because of an inability, among
18   other things, of the multitude of lawyers to begin a process of
19   agreeing about certain basic facts and getting those facts into
20   a database to be able to evaluate -- in that case, I think it
21   was about 10,000 cases.  And finally, after about three
22   years -- and if you look in particular at Attachment 1 to that
23   opinion -- and I'm not saying all of those questions
24   specifically apply in this situation, but I think it's a useful
25   tool to think about, and he certainly did, because ultimately

1  they were able to get that case resolved and get some money to
2  the first responders who had become ill by responding to the
3  World Trade Center site in the immediate aftermath of 9/11.

4  And so I think that at least -- again, if -- when you
5  read that opinion, he talks about the frustration of initially
6  trying to follow ordinary process and practice with a multitude
7  of lawyers who could hardly agree on anything other than what
8  day it is.  And we all have to do better than that.

9  I think that at least gives us some model -- and
10  we're certainly open to other suggestions.  But he talked about
11  how that database and the questions that resulted where the
12  lawyers could input it and then everybody -- it was very
13  transparent, everyone had access to this basic information that
14  could then be used, for example, to select potential bellwether
15  cases, to go through a bellwether process, instead of --
16  obviously in that instance, right, the 10,000 cases assigned to
17  one judge, he would have been trying them alone, I'm sure, for
18  50 years, if he could have lived that long.

19  So we need to think about ways to do something like
20  that.  And I suspect that you'd be able perhaps to get access
21  to that database and perhaps that being a starting point for
22  folks to think about certain basic information associated with
23  the claims.  Because even with 800 cases and more to come, I
24  think sort of ordinary case processing is not really viable.

25  I do want to hear from the Government on, well,

1  pretrial motions.  I mean, again, we have -- obviously we've
2  made the rulings on exhaustion.  We have, at least if my cases
3  are any guide, most people most of the time specifying the
4  disease, most people most of the time not specifying the date
5  of exposure which certainly would be a helpful piece of
6  information, but that can be pulled out.

7        Do you anticipate motions to dismiss in connection
8  with these cases, or do you anticipate to the extent that
9  there's motions for summary judgment that those motions are
10  going to come once we work our way through *Daubert* motions on
11  general causation and specific causations; and depending on the
12  result of those motions, you obviously decide whether to seek
13  summary judgment or not?

14        Do you anticipate motions to dismiss under 12(b)(6)?
15        MR. BAIN:  Well, as Your Honor identified, some of
16  the allegations are bareboned without any specificity, so there
17  might be.

18        What might be helpful in this litigation were if
19  there was some type of master pleading that the Government
20  could respond to.  We're looking at over 600 complaints that we
21  will have to file answers to over the next two months so, as
22  well as the burden on the Court, that creates a burden on the
23  Government to do that.  Whereas in a lot of cases like this
24  there is a master complaint with individual supplements or
25  appendices that make it easier for the Government to raise

1 global issues that would normally be raised in individual
2 motions to dismiss.

3        THE COURT:  Do you have an example of a master
4 complaint in some other case that y'all could submit to us?

5        MR. BAIN:  We can find one, yes.  We can do that.

6        THE COURT:  That would be helpful.

7        MR. BAIN:  Okay.

8        THE COURT:  Because that would help streamline the
9 process where plaintiffs advise the defense and advise the
10 Court when -- because, again, you can have a scenario where
11 somebody went TDY to Camp Lejeune for 30 days between 1953 and
12 1987 and was there one day in one year and came on post for a
13 portion of the day, and that person obviously is not similarly
14 situated to somebody who lived and worked and spent an entire
15 career on Camp Lejeune for 20 years between 1957 and 1977.

16        So that would be helpful if you could submit to us a
17 sample master pleading that we might think about ordering to be
18 used so that we can actually get focused on the process of
19 trying to move these cases along and manage them.

20        I do anticipate that we will open at some point soon
21 some kind of a master docket associated with these cases.

22        Obviously, again, speaking for myself, when I think
23 about the so far 29 diseases in the 208 cases that I have,
24 right, I mean, issues of general causation and specific
25 causation come up in each case, there's going to be an overlap

1   of the diseases among the cases that all four of us have, and I

2   don't think it's in our interest as a court to reinvent the

3   wheel every time.  But each judge is going -- each judge has

4   the cases that he or she has.

5           A master pleading and an identification of issues

6   associated with determining general causation and specific

7   causation and whether somebody can get to a jury is -- at least

8   my impression of these cases at first is going to be a decision

9   point in them, unlike many cases where in the post

10  Iqbal-Twombly world just sort of becomes a matter of course and

11  practice.

12          This claim is pretty straightforward to me.  So it

13  would be helpful to me to get that master pleading so that all

14  the judges can see it and then, likewise, I anticipate that

15  we'll have a master docket of some kind that we will use in

16  these cases, again, so that to the extent that there are

17  decisions that are issued, people can have access to them.

18          And part of what we've got to find out is when we

19  think about issues, again, are just the exposure; what are the

20  exposure dates; when was the person actually on post; what is

21  the claimed injury; and what is the evidence associated with

22  general and specific causation.

23          Again, from the defendant's perspective, did someone

24  at this table, did y'all handle -- did you represent the United

25  States at all in the MDL?

1        MR. BAIN:  I did, Your Honor.  I represented the U.S.
2   in the MDL.

3        THE COURT:  How much of that evidence that you
4   gathered and information that you gathered in that is -- I
5   mean, that should at least hopefully move the ball along here.

6        MR. BAIN:  Well, the information that is about the
7   base, where the contamination was, what the levels were, what
8   years it was, that has been accumulated and collected and the
9   site has been investigated very thoroughly.  So that
10  information has been gathered.  It has been produced in some of
11  the prior cases.

12       But to your point, we do believe that general and
13  specific causation are going to be very important in this
14  litigation.

15       Congress, through this statute, appreciated that
16  certain people were likely injured as a result of exposure to
17  contaminated water at Camp Lejeune, so this litigation and this
18  whole process will be to determine what those diseases are,
19  what people are entitled to compensation, and we'll try to do
20  that as expeditiously as we can.

21       THE COURT:  I mean, again, you don't have to tell me
22  right now, but in terms of to the extent that you have spent
23  those years in that process to the extent that there are
24  potential stipulations that you could enter about what
25  chemicals were in the water where in what years, that is,

1 | again, a data point that would be helpful in moving these
2 | things along.

3 | I know some of these complaints are chock-full of
4 | information about the Navy knew this and the Navy knew that and
5 | how awful the Navy was. Well, I can tell you, at least in the
6 | one-day trials that I'm going to hold in this case, I don't see
7 | how any of that is relevant. Once somebody gets over general
8 | and specific causation, they can present their experts if the
9 | Government contests it, the person can talk about their injury;
10 | but as I read the elements of this statute and this claim, none
11 | of it has anything to do with what the Navy knew or didn't
12 | know. If the chemicals were in the water and or more likely
13 | than not the cause of an injury or as likely as not the cause
14 | of an injury, you get to the jury and the jury gets to decide.

15 | So it's not -- I mean, I can just give a forecast on
16 | discovery. Begin with the end in mind on each side. The
17 | elements of this are straightforward, and we're not going to
18 | waste time in discovery on things that will never be admitted
19 | into evidence, because I can assure you -- and the lawyers who
20 | practice in this district know it -- that we will be good
21 | stewards of the jury's time, and we just won't let people waste
22 | it. So there's no need to waste it in discovery either,
23 | wasting time on information that's not relevant to resolving a
24 | claim under the statute.

25 | But, again, the chemicals in the water at a given

1  time in a given place is informative to the extent that you can

2  work towards talking about that to help narrow the focus of the

3  issues associated with general and specific causation with

4  respect to whatever the diseases are, the disease or disease or

5  malady, or whatever, that the person claims to have received as

6  a part of the exposure.

7          With respect to the bellwether process, again, I know

8  some of the information I would -- we'll certainly receive

9  input about that; but, again, I think that Judge Hellerstein's

10  order and the attachment provides a good way for each side to

11  gather relevant information and then to provide input to the

12  court.

13          I mean, you know, I've been around enough to know

14  everybody is going to want their best case to be their

15  bellwether on each side.  I won't bore you with the details,

16  but I can just imagine that the perfect case that the

17  plaintiffs will want for their bellwether and the perfect case

18  that the Department of Justice wants for their bellwether, and

19  neither of those are going to be in the bellwethers.  Because,

20  again, we're trying to avoid a situation where this litigation

21  potentially has the life of the Roman Empire.  And so we got to

22  be cooperative in thinking about those things, and we will --

23  not obviously now, but I think we're sort of at the beginning

24  stages of trying to gather information.

25          Again, to the extent that either the Department of

1 Justice or plaintiffs' lawyers think that there are helpful
2 prior instances of cases in terms of management, of database
3 management, of information gathering of fact sheets to try and
4 move these cases to resolution so that this, again, that we
5 just don't -- we really are trying at the outset here to avoid
6 what apparently happened in the World Trade Center litigation
7 where for years we just try and say, "Well, maybe the lawyers
8 will be able to work it out." And then you get three years
9 down the road, no person who was hurt is any closer to any
10 recovery and we've wasted three years. That is just no way to
11 operate, and we won't operate that way.

12          So to the extent that anybody on the plaintiffs' side
13 has examples and they want to submit those, I read for a
14 living, so I will read if you have examples that you think
15 would be helpful.

16          Again, you can submit them to the Department of
17 Justice, because hopefully -- to each side of the "v" in the
18 litigation, if there's not a sense of being cooperative -- and
19 I know there are a lot of members of the bar of our court here,
20 it's the hallmark of the practice in this district. If it's
21 not the hallmark of where you practice, you better learn it or
22 you won't be here for long, because it's how we do it here.
23 It's how we have to do it here, particularly in this case.

24          So, again, whether you send it to us or you send it
25 to Mr. Bain and his colleagues, we're all ears for examples of

1  ways to get information gathered so that we can move toward a
2  process of getting discovery done and then getting whatever
3  motions practice there is, whether that's by disease on general
4  causation and specific causation, identifying some bellwethers,
5  getting some cases tried, and then potentially being in a
6  position to get more resolved.

7          I mean, I will say -- and obviously there's a
8  process, and it's, as I said earlier, disappointing to hear
9  that there haven't been any offers made and any cases settled
10  in the administrative process -- the Navy needs to step up its
11  game.

12          But with that said, we will make available the
13  magistrate judges to the extent that the Department of Justice
14  is prepared -- I mean, there are still some people in the world
15  who recognize the truism that $10 today is worth more than $100
16  ten years from now. It just is. And there may well be some
17  plaintiffs who if they haven't got an offer would just like
18  somebody on the other side of the table to negotiate. And if
19  they are here in court and they want to do it, we will make
20  that available to them to try and see if there's some way that
21  they can get closure and move on, if that's what they choose.
22  They each have their own decisions to make, but we will do that
23  as a court, not just now but sort of throughout this process,
24  and the parties should know that.

25          Are there any other sort of discovery issues that the

1  Department wanted to talk about today?

2           MR. BAIN:  No, Your Honor.

3           I would just say that we appreciate your citation to

4  Judge Hellerstein's process, and we've already been looking at

5  that.

6           In fact, we put together a questionnaire based

7  largely on what was done in that litigation, and we shared it

8  with some of the plaintiffs' counsel and we started talking

9  about that.  So I think we've started to make some progress in

10  looking at the questions that we will need answered and

11  thinking about how we put a process together such as was used

12  in Judge Hellerstein's litigation, which will hopefully end up

13  resolving not only this litigation, but also help resolve the

14  administrative claims that aren't filed as part of litigation.

15           THE COURT:  No.  I think that's sort of the beauty of

16  the model that Judge Hellerstein came up with is it allows

17  everybody to put in, in the data and then you get a sense of

18  categories, and then, as he describes it in that opinion

19  ultimately and then in some subsequent opinions in that case,

20  in a case that culminated in there being a global resolution of

21  that case, that it helped everybody put a value on the cases;

22  and, again, at the end of the process result in a fair

23  resolution for all those involved.  And hopefully, by each side

24  acting cooperatively and using at least that as an initial

25  starting point we avoid wasting years and years of time until

1  we kind of realize that, hey, there's at least a process here
2  that was used in a case that had 10,000 plaintiffs
3  approximately.  But at least it allowed for there to be an
4  assessment and then a valuation and then ultimately a global
5  resolution on behalf of those folks who were the first
6  responders after 9/11, right?  Who ultimately, then, waited
7  years, but there was some -- there was some resolution of that.
8          The other topics that -- I identified some topics in
9  the order setting the case for schedule about -- that I'd like
10  as part of what you're talking about with the other lawyers,
11  because, again, I anticipate this just to be the first of many.
12  It may well be that we ultimately, for discovery purposes,
13  assign one magistrate judge to sort of oversee the discovery
14  process.
15          But I cannot emphasize enough to those lawyers who
16  are not from around here how important cooperation is and
17  civility is and how it's expected and how it's the culture of
18  this district and how anything other than that just will not be
19  tolerated.  It's just no way to live.
20          Everybody is doing their best for the folks they
21  represent, and we all get that.  And you can disagree about
22  things; and things you disagree about, we're happy to decide
23  the issues.  We have a lot of cases; happy to make decisions.
24          But it's just important that in the process of
25  identifying a path forward for managing the discovery process

1 | between the plaintiffs and the Department, don't let perfect be
2 | the enemy of good.

3 | And it's discovery, right? It's discovery, right?
4 | And the facts are what they are, right? It's trying to move us
5 | through that process so that we can get to the process where
6 | we're dealing with issues of general and specific causation and
7 | then identifying bellwethers and trying cases.

8 | And then to the extent in between the process yields
9 | a better ability for you who are advising your clients in how
10 | to value your case, to be able to provide that information in a
11 | transparent way to all of you, because I don't have any doubt
12 | that, again, throughout the process there are going to be some
13 | folks who say, you know, "I want to get off this train. I want
14 | to get off this train and get on with my life." We ought to
15 | set up a process that lets those who want to do that, do that.
16 | And those that want to try cases, that's what we do here. A
17 | lot. And what we'll do in these cases.

18 | But identifying those issues associated with -- and
19 | thinking about, like, from the Department's perspective, again,
20 | to the extent that there can be an identification or an
21 | agreement about, you know, these chemicals were in the water
22 | here and on these different dates, it's just, it's a helpful
23 | piece of information to inform issues associated with general
24 | causation and then ultimately specific causation, and that
25 | helps move the cases along.

1    I'm almost hesitant to do it, but I'll just go ahead
2 and jump in any way.  I know there's a lot of lawyers here
3 representing a lot of plaintiffs, and I know the Department is
4 up here at this table and all of you are not inside the well,
5 and it's good to have all of you here.

6    Is there anyone among the group of plaintiffs'
7 lawyers who are here who would like to say something to me
8 today?  Tell me who you are and tell me if you're a member of
9 the bar of our court.

10    MS. WALLACE:  Yes, sir, Your Honor.  Mona Lisa
11 Wallace.  Wallace & Graham.  I'm a member of the North Carolina
12 bar, unfortunately, Your Honor, for about 40 years.  Thank you.

13    MR. RHINE:  Your Honor, I'm Joel Rhine from
14 Wilmington with the North Carolina bar since -- 30 years, 35
15 years.  I don't like to add it up anymore.

16    THE COURT:  Okay.

17    Yes, sir.

18    MR. SHKOLNIK:  Hunter Shkolnik, law firm of Napoli
19 Shkolnik.  We have -- or I have a special appearance.  I don't
20 have the pleasure of being admitted down here, but also been
21 practicing about 40 years, 37 years.

22    THE COURT:  Okay.

23    MR. DiCELLO:  Mark DiCello, Your Honor, from DiCello
24 Levitt.  I'm in the same situation as my colleague, Hunter.
25 I've been a lawyer 29 years, not admitted here, but on special

1    appearance.

2         THE COURT:  Okay.  Thank you.

3         MR. ROBERTS:  Good morning, Your Honor.  I'm Jim

4    Roberts.  I've been practicing for this court since 1982.  And

5    we certainly appreciate Your Honor's interest in, number one,

6    having this hearing and the issues that were in your order.  I

7    think it's an excellent starting point for everybody, and we

8    appreciate your effort on this.

9         THE COURT:  Thank you, Mr. Roberts.

10        MR. DOWLING:  Good afternoon, Judge Dever.  Mike

11   Dowling, a member of the bar, Eastern District of North

12   Carolina.  I have with me here by special appearance Mr. Warren

13   Postman and Zina Bash.  I am local counsel in many of these

14   matters, Your Honor.

15        THE COURT:  Good afternoon.

16        MR. LEE:  Good afternoon, Your Honor.  Randy Lee.

17   Member of the bar here in the Eastern District as well.

18   Special appearance we have Ed Bell.

19        Eric Flynn can introduce himself.

20        THE COURT:  Okay.

21        MR. FLYNN:  Good afternoon, Your Honor.  Eric Flynn,

22   Bell Legal Group, not a member of the bar here.  And like

23   Mr. Roberts, we appreciate your interest and also your

24   admonition on collaboration and civility.

25        THE COURT:  All right.

```
 1              MR. ANDERSON:  Good afternoon, Your Honor.  Joseph
 2   Anderson from Forsyth County Bar.  Thank you for your
 3   hospitality.
 4              THE COURT:  Good to have y'all here.
 5              MR. SHIPMAN:  Judge, good afternoon.  Gary Shipman.
 6   I've met many of the lawyers in here, but I would echo the
 7   things that you have said about the way we do things around
 8   here, and I appreciate you reminding everyone.
 9              THE COURT:  Well, again -- well, I'll start with
10   Mr. Roberts and anyone else who is still standing.  Is there
11   anything specific that y'all want to say today that we haven't
12   covered?
13              And, again, I know I worked off of -- I think
14   Ms. Wallace had made a submission, and I've touched on some of
15   the topics she and Mr. Rhine had put in their submission, and I
16   appreciate y'all submitting that.
17              And, again, I view this as the beginning of a
18   dialogue on this; that it's not only a dialogue with us, but
19   it's a dialogue with the Department about ways to try and get
20   information to each side so that we can move the cases toward
21   some resolution in a lifespan shorter than the life of the
22   Roman Empire.  So --
23              MR. BELL:  Your Honor, I think Mr. Bain is good to
24   work with, and I anticipate you'll see a lot of cooperation
25   that will warm your heart.
```

1          THE COURT:  Well, good.  I'm glad.

2          And again, as I said, I know there is some really

3    experienced lawyers here that have worked in a lot of different

4    cases, maybe not exactly like this, because it's a unique

5    statute and unique claim and a unique situation, but we just

6    need to avoid wasting three or four years of time like happened

7    in New York.  And then they ultimately got there, but let's try

8    and build out on things that had been good ways to try and get

9    information to one another to evaluate the cases, to let those

10   who want to get off the train, get off the train with something

11   that they feel is fair, if not perfect, right?  I mean, it

12   applies to litigants as well, right?  That's the whole thing

13   about compromise, but I get the initial part is getting some of

14   that information to each other.

15          Again, I anticipate we will issue some orders as a

16   court that deal with next steps, but I really do think that the

17   judge's order from that other case is a good way to start, and

18   if the Department -- to start the dialogue with the groups of

19   folks representing the plaintiffs, and then we'll set up a

20   schedule, I'm sure, to invite some submission.

21          Again, y'all can talk among each other; and if you

22   reach some agreement about leadership and process and utility,

23   we'll consider it.

24          I know there was some issue about submissions of

25   common fund.  And, you know, it's a little different, I think,

1   this scenario than some other MDLs.  I mean, it's not an MDL.
2   People can stay in the administrative process for a good, long
3   while, right?  They don't have to file.  And that, again, I
4   think is -- I would ask the Department to go back to the
5   Department of the Navy and emphasize that Congress could not
6   have envisioned our court trying to try a million cases over
7   the next 1,900 years.  Just couldn't have.  Got to believe that
8   there was more rationality than that.  I have to believe it.

9           And I think part of it begins in that administrative
10  process of working toward resolution in that.  And, again, part
11  of this is setting up a database that will allow lawyers to do
12  their evaluation whether they are -- they are all going to
13  initially advise clients in the administrative process.

14          Mr. Roberts?

15          MR. ROBERTS:  I would like to introduce Ed Bell.  Mr.
16  Bell is here with me.

17          THE COURT:  Hello, Mr. Bell.

18          MR. ROBERTS:  He's been instrumental in drafting the
19  statute and we've been working very closely with Mr. Bell's law
20  firm.

21          MR. BELL:  My apologies, Your Honor, in imposing on
22  this Court a thousand years of litigation.

23          THE COURT:  Well, we are going to do our best --
24  that's setting the bar really low, but I'm confident we can do
25  it in less than a thousand years; and I'm really confident that

1  if it takes that long, I won't be here and nobody else will be

2  either that's in this room.  So it's in everybody's interest to

3  be cooperative and gather the necessary information to evaluate

4  the cases in a way that allows there to be some resolution.

5        Yes, sir.  Mr. Rhine.

6        MR. RHINE:  Yes.  Your Honor, thank you for these

7  remarks, and we must tell you that we're 100 percent behind

8  this.  This is exactly what we were going to come to you today.

9        Our whole assessment of this is that this is very

10 close to what Judge Hellerstein was dealing with.

11        We have some less complexities because we only have

12 one defendant.  We don't have insurance issues.  We don't have

13 immunity issues.

14        THE COURT:  Exactly.  I think we are in a better

15 position than he was in that case for those reasons and others.

16 I mean, it was -- and that was -- part of that complexity

17 delayed the beginning.  It wasn't all just noncooperation, but

18 everything I've read -- and not to cast aspersions to lawyers

19 from New York, but I think there was a lot of noncooperation up

20 there to begin with among some.  I'm sure none in this room,

21 but among some others who are not here, they weren't very

22 cooperative.

23        MR. RHINE:  Judge, we've been here for a while and

24 explained how we do things.  What we're encouraged to hear is

25 if we get this database together -- and the difference between

1  this database and the database that was done in New York is
2  that a lot of this information the Government has.  Our people
3  were there 40 years ago.  They don't have a whole lot of stuff.
4       They have -- we've been doing these Rule 27 motions,
5  Judge, and we're getting thousands of pages from the
6  Government.  It's taking them over 100 hours to get this
7  information together.  So when you multiply that times what
8  we're dealing with, we have to work cooperatively with the
9  Government.  That's why we've already started this process, and
10 we've got -- we've already hired people to put the data in and
11 we're trying to create this database.
12      The other thing that I'm really thrilled to hear, and
13 it probably may stop this rush to the courthouse to file these
14 cases, we saw loud and clear that when you had your order
15 dismissing those cases for the failure to exhaust
16 administrative remedies, you said the Department of the Navy
17 needs to have a chance to deal with this.  Well, filing these
18 cases 181 days after they were -- they had a chance to look at
19 it is not what we thought this Court wanted us to do.
20      So it's no longer a race to the courthouse, the first
21 filed, the first tried; but if we use this database and create
22 bellwethers, have your magistrates or your special masters or
23 whomever assist us in doing that, the Government chooses some
24 of the cases, we choose some of the cases, and the Court
25 chooses some of the cases, just like they did in New York, that

1  makes sense.  That is a scientific method in order to choose

2  bellwethers which will then proceed.

3          Third, what's really important to us is that we don't

4  have 500 trials with over 100 witnesses.  How many *Daubert* --

5          THE COURT:  I can assure you that we're going to have

6  zero 100-witness trials.  Absolutely guaranteed.  Put your

7  minds at ease.  Not one of these trials will have 100

8  witnesses.  Not anywhere close.

9          MR. RHINE:  Thank you, Your Honor.

10         And we think that not only should we have a robust

11  trial schedule, just like they did in New York -- he had the

12  set trials -- but we have to have a robust settlement track.

13  And that's why we're trying to work with the Department of

14  Justice to get this done.  It's important, both tracks are

15  important.  I understand how bellwethers create value.  I mean,

16  I get it.  But our people -- Jerry Ensinger's had 27 years to

17  waste.  We got people that are sick, that are ill, a lot of

18  them are in financial distress.  They need the money.

19         THE COURT:  I understand it.  And that's why, again,

20  the database will allow the Navy and the lawyers representing

21  the plaintiffs to have enough information to make an informed

22  choice.

23         And, again, I have to believe, just because of the

24  numbers and because Congress sent this to a court with four

25  district judges, that Congress believed that the administrative

1  process would yield fair resolutions for folks.

2  　　　　MR. RHINE:  Your Honor, one last comment.

3  I see that you quoted Rule 16.  I'm sure what you're referring

4  to is the Cornell Law Review where the special masters talked

5  about managerial judges, and if there's a situation where we do

6  the Government's oversight and we do the situation where -- you

7  know, this is a public case and we need accountability, and we

8  need -- we might need some of that managerial judging.

9  　　　　The other thing I would suggest is in the article

10  that Judge Hellerstein wrote how, you know, transparency was

11  not just a goal, it was the bedrock of what we're doing, I

12  think that is absolutely necessary.  And I apologize for

13  messing -- he basically said, if I can just quote, "It's more

14  than a slogan -- transparency is more than a slogan.  It's a

15  deeply held conviction about the management of the cases."  We

16  are all in favor, at least our colleagues, of resolutions, of

17  transparency, of collaborations both with the Government and

18  with Mr. Bell and his team.  We really look forward to it.

19  　　　　THE COURT:  Thank you.

20  　　　　MS. WALLACE:  Your Honor, if I may.

21  　　　　THE COURT:  Yes, ma'am.

22  　　　　MS. WALLACE:  Your Honor, I wanted to share that we

23  had teams of lawyers, and behind me these lawyers have over

24  50,000 cases or claims.  The Court is not aware, but we've had

25  unbelievable cooperation and collaboration.

1        In fact, the database that one of the attorneys has

2   behind me, it has 97,000 claimants in it.  And, Your Honor,

3   when you look at the statistics, it is every word that you've

4   said, if you had talked to these people every day and every

5   night and weekends, like so many of these lawyers have, Your

6   Honor, almost 20 percent of them are deceased.  According to

7   our database, the average age of the remaining clients,

8   Veterans, family members, even counting in children, Your

9   Honor, is something like 66.7 years.

10        So, Your Honor, we reached out early on to the

11  Department of Justice, the lawyers behind me, about 40 firms,

12  we've been working together and have weekly calls.  We have

13  experts, we share that.  We have great respect for Mr. Bell and

14  all those lawyers.  We have the best lawyers, Your Honor, in

15  the country here.  It's an honor to be standing here.

16        But, Your Honor, we know from everyone who calls and

17  from what Your Honor started this with, we have to cooperate

18  together.

19        And there's one part of it, Your Honor, that I feel

20  like we need some direction.  Our firm, for example, we've only

21  filed eight cases, I believe.  We have thousands of cases.

22  Some of these law firms have tens of thousands of cases.  The

23  problem is if we file a case before Your Honor, it takes it out

24  of negotiations with the Department of the Navy.  And so that's

25  our dilemma in the kind of common sense of being here with you

1 today.

2       THE COURT: Right.

3       MS. WALLACE: And I don't know what direction, but

4 we're pushing this early resolution process and we're ready to

5 move forward, but how do we handle that part of it?

6       THE COURT: Well, I mean, again -- I'm not giving

7 anyone legal advice. But I think the genius of Judge

8 Hellerstein's database and that information, that type of a

9 framework that is then available for everybody, whether they

10 are already here or the thousands that aren't, right?

11       I mean, as I said, we roughly have 800 cases that I

12 know about divided among the four of us. And it's getting that

13 information input, getting the information developed that I

14 really do think -- and having it be transparent, for the

15 reasons that Mr. Rhine referenced and that Judge Hellerstein

16 talked about throughout the course of that litigation, to let

17 folks have that information in the administrative process to

18 decide that, "Yeah, I want to get off this train. I'm ready to

19 move on with my life."

20       And to make that information, so the way I see it --

21 I'm not sure if this is answering your question, Ms. Wallace.

22 But the way I see it is that database, when we get it built

23 out, is one that the information can be put in by those in the

24 administrative process because they're getting advice from all

25 the folks in this room; and many of them they are going to --

1  that client is going to ask that lawyer, you know, "Is this
2  good enough?  Is this fair?"  And then every person that has a
3  claim has to make his or her own decision evaluation in saying,
4  "I don't want to wait.  I don't want to wait.  It's okay.  I'm
5  going to move on with my life right now," and I get that.

6          But that's -- I certainly envision -- and especially
7  with the information that a lot of, sort of the background
8  information that can go in and inform general and specific
9  causation is information that the Government has about sort of
10 what was in the water, when was it in the water, so that people
11 can then say, I was on Camp Lejeune.  I worked there this time
12 period.  I mean, it sort of -- time periods that predated that,
13 that's not useful information to them, but I imagine that there
14 are people that have claims that are from anywhere in the time
15 period in the Act.

16          Mr. Roberts.

17          MR. ROBERTS:  Your Honor, your points about
18 cooperation with the Government are extremely well-taken.

19          I think Mr. Bell's group of clients -- we've got
20 200,000 cases, so I would also suggest that there needs to be
21 cooperation.  We can all come up with a separate matrix, but
22 seems to us to cooperate among plaintiffs' counsel to agree on
23 what that matrix looks like rather to have convening --

24          THE COURT:  Well, again, I agree, Mr. Roberts.  And
25 again, I think it's going to require collaboration among the --

1  among all of you, otherwise -- again, we had a situation where
2  we look at the case in New York, that for three years -- again,
3  there were some insurance and immunity issues that delayed that
4  in part that we don't have, thankfully.  We don't have that,
5  right?  And so then --

6      MR. RHINE:  We've worked with Mr. Roberts, been
7  working with him for years.

8      THE COURT:  Right.  So I just think that that's part
9  of what the process is, is -- again, we'll have a follow-up
10 order, I'm sure, inviting information about leadership and
11 things like that.

12     But identifying what information is important to get
13 input on each side -- and really -- and then, you know, that's
14 sort of between the "v" from the Department saying this is the
15 basic information that we really need from every, every
16 plaintiff and to consult with the Navy, because it's sort of
17 like if DOJ is saying this is what we need, but the Navy has
18 some other formula that they're not sharing and that's why
19 there have been no offers, well, it's like, Well, what do they
20 think they need?  Because I at least envision this database
21 being available for everybody at whatever stage they're in.

22     And part of the legislative design, in my mind, has
23 to be that there will be a way to fairly evaluate the cases in
24 the administrative process so that somebody that has a valid
25 claim can get a legitimate offer and can get closure and never

1  experience the joy of a trial with less than 100 witnesses.

2        MR. DiCELLO:  Your Honor, this is Mark DiCello.  I've

3  been working with some of these lawyers, a few of the lawyers

4  for a very long time, and there's a lot of lawyers that looks

5  like they've just jumped in.

6        Mr. Bain can speak to this later or whenever, but we

7  started to engage with the Department of Justice in the fall on

8  resolution.  By December we were in meetings talking about the

9  Hellerstein model.  We've already produced a tremendous amount

10  of information, including the architects of Hellerstein.  We

11  are six months into that now.  Mr. Bain has been wonderfully

12  cooperative.  He's speaking exactly as to what we discussed.

13  Until there is more of a claimant base that he can rely upon,

14  he wanted to hold off on final steps.

15        But there have been a few of us that have been

16  working for months and months and months visiting with him, and

17  I think those of us who have done that would just like the

18  opportunity to continue leading that throughout the next

19  hearing.  And hopefully we can do this in a much more, I think,

20  efficient way than your comments were implying.

21        There's been a tremendous amount of cooperation too

22  because the science that we're using we got from Mr. Bain, we

23  got from Mr. Bell's group, we got from ourselves.  So I think

24  all of the -- all of the seeds to grow this thing are already

25  in place, and I think they are already taking root.  So

1  hopefully they'll continue in that way.

2      THE COURT:  I'm confident that they will.

3      MR. BELL:  Your Honor --

4      THE COURT:  I want to hear from Mr. Dowling, and then

5  I'll hear from Mr. Bell.

6      MR. DOWLING:  Thank you, Your Honor.

7      I can probably speak for everyone when I say we are

8  very appreciative of this platform, this opportunity, the time

9  you're taking.  I know from experience how hard this Court

10  works and we all look forward to continuing the hard work.

11      My colleague, Ms. Bash, would briefly, very briefly

12  like to address the Court.

13      MS. BASH:  Your Honor, thank you for your time today.

14      Mr. Dowling has spoken very highly about practicing

15  before you, and we are looking forward to it.

16      I just wanted to pull on one thread that you

17  mentioned about the magistrate and potentially providing

18  opportunity there.

19      My partner, Warren Postman, and I, we represent

20  17,000 of the 20,000 filed claims with the Navy.  So we are,

21  you know, rushing to kind of get to the Navy and are also very

22  disappointed that that process has seemingly stalled.  And for

23  that reason, too, back in the fall we opened a line of

24  communication with the Department of Justice because we

25  understood that there would have to be two separate processes,

1  right?  There was the Navy process that might settle, and then
2  the DOJ needing to run kind of its own.  So the availability of
3  something like the magistrate for these 17,000 cases filed here
4  we think would move things along.

5       And to your point about $10 today to 100 later, we
6  hear it from those clients all the time.  "I just want to
7  afford my chemo treatment today so that I can live for the next
8  five years and not have, you know, 10X that in five years."  So
9  I just wanted to pull on that thread and say that we would be
10 very appreciative, our clients would be very appreciative of
11 that opportunity.

12      THE COURT:  And we will, and I would anticipate that
13 we will be able to supplement not just our magistrate judges,
14 but others who are not involved in the litigation to mediate.

15      Again, we have to, as part of a multi-facetted
16 approach to resolving this in less than 1000 or 2000 years, to
17 try and afford opportunities for those who want to -- want to
18 settle to do that sooner rather than later and to have
19 sufficient information to be informed about it.  And so I
20 appreciate your comments, Ms. Bash.

21      MS. BASH:  I would be remiss to say, I think, if I
22 were to say that Mr. Bain and Ms. Lipscomb have been, I think,
23 as eager to move things forward in proposing the questionnaire,
24 except maybe that the Navy, I would say, have been kind of a
25 black box.  But they've been quite the opposite, so we

1  appreciate that.

2          THE COURT:  Mr. Bain.

3          MR. BAIN:  I will say, Your Honor, that I do believe

4  that the database that we're trying to create will be useful

5  both for the litigation and the administrative process, and

6  we'll work with the Navy to make sure we get the information

7  that they need as well.

8          We have been talking --

9          THE COURT:  And I would ask you to stress to the

10 Department of the Navy how important the administrative process

11 is in the statutory scheme.  Because, again, I know Congress

12 knew that we have four judges, very hard-working, but I did the

13 math for y'all.  I did the math.

14         And so obviously -- so, again, I mean, in building

15 out the database, gathering information, being cooperative in

16 discussing between whatever the lawyers are, you know, to the

17 extent that it's, like, we need this information from our side,

18 I mean, if there's -- depending on -- I mean, part of it too is

19 building out on all the knowledge that you gained in doing the

20 MDL work.  And I know Mr. Bell and other lawyers in this room

21 worked on that, so there's information that's been learned that

22 can be rolled into adding the information for folks to be able

23 to make an informed decision.  And then those that want to work

24 towards -- work through the litigation process, well, that's

25 what we do.

1    MR. BAIN:  Your Honor, thank you for that message and
2  we will definitely convey that to the Navy.  We're meeting with
3  Navy leadership next week and that's a very timely message to
4  convey to them.

5    I do think it's important that we have some plaintiff
6  leadership in place.  The sooner we get that, the sooner we can
7  move things along because we can reach agreements.

8    As I mentioned earlier, we have these complaints,
9  hundreds of complaints that answers are due within the next
10  weeks and any relief that you could give us from that while we
11  try to get a master complaint process would be very helpful to
12  us, because we're going to be devoting a lot of resources to
13  just the technical aspect of getting those answers filed.

14    I know you can only speak for yourself, but we have
15  hundreds of complaints that need to be answered over the next
16  two months.

17    THE COURT:  Okay.  Thank you for that.
18    Yes, sir, Mr. Rhine.
19    MR. RHINE:  Your Honor, one last thing.

20    Would you agree or allow us to have 30 days to
21  consult with the other stakeholders on the plaintiffs' side to
22  try to propose to you a slate of leaders to be able to preside
23  over this?  I think that we will be able to move the case much
24  quicker at that time.  I look forward to speaking with
25  Mr. Roberts on this.

```
 1            THE COURT:  I'll hear from Mr. Roberts and Mr. Bell,
 2   and then Mr. Dowling and Ms. Bash, and whoever else, within
 3   reason.
 4            MR. BELL:  Your Honor, may it please the Court.
 5            Ms. Bash has been our kind of contact with our group
 6   and the DOJ and has been delightful with them.  Of course, I
 7   worked with Adam when we were both younger and we worked
 8   together for a long time.
 9            There's something that I -- I don't want us to
10   forget; that while a proposed database is out there is good for
11   those clients who have a presumed case, a presumed illness, but
12   about 70 percent of these people out there were not studied by
13   the ATSDR.  In fact, the VA asked the ATSDR to exclude some
14   illnesses, do not study those, because they were worried it
15   would cost too much for the VA.
16            So our goal is a little different, and I want to
17   stress that to the Court.  We don't believe our clients are
18   commodities.
19            THE COURT:  I couldn't hear you.
20            MR. BELL:  We don't believe our clients are
21   commodities, and we don't want to lose those 70 percent of
22   people that most likely have a compensable disease but is not
23   part of the ATSDR.  So our database is a little different, our
24   proposed database.  We've already started that.  We started
25   that years ago.
```

1      And our questionnaire goes along with the ATSDR
2  epidemiological study so that we can utilize the database as a
3  way to determine whether Mrs. Jones's illness is not part of
4  the presumed illnesses could very well be a compensable
5  disease.  So I look forward to talking to the other side about
6  that.  That to me is very dear to my heart.  These folks that
7  have presumed diseases I can see how a simple database would be
8  beneficial for early settlement.  We can't forget those others
9  out there.
10      THE COURT:  Again, let me assure you, anybody who
11  eventually wants to have a trial, it's what we do here.  I
12  mean, it's what we do here.
13      But, again -- and y'all are -- you're in the weeds on
14  this disease, that disease, and that's fine.  I mean, it's what
15  you do.  But my initial reaction is I don't see the mutual
16  exclusivity of gathering information about basic information
17  associated with the idea of exposure to what chemicals, what
18  disease, when did the person get the disease, and then what
19  information do we have about general and specific causation.
20      Again, this is an information -- I just don't see the
21  why -- what at least I've heard so far is somehow mutually
22  exclusive.  It's a build-out of information, and for a lot of
23  people it's going to be -- right?  I mean, everybody has filled
24  out forms before, in connection with anything, not applicable,
25  you know, it's not applicable to my client, right?  That's

1  fine.  That's just in -- what is in part of the database.  But

2  a lot of it is what does the Government have, what does the

3  Government know in terms of what was in the water at a given

4  time.

5      So, again, I would just really stress that the idea

6  of being cooperative -- Mr. Rhine, I'm happy to say that y'all

7  can have 30 days to consult about leadership and then we'll set

8  some time more than 30 days from now to invite a time to do it,

9  but it won't be any time shorter than 30 days.  And, again, I

10  realize, just like anything else, maybe there won't be an

11  agreement and we get multiple submissions.  We're very

12  comfortable making decisions.

13      MR. RHINE:  Thank you, Judge.  We know it all too

14  well.

15      THE COURT:  Yes, sir.

16      MR. DiCELLO:  Your Honor, I'd just like to add, as

17  Zina's been the contact for that group with DOJ, I've been the

18  contact for our group with DOJ.

19      We've never lost sight of the fact that there are

20  people that will demand trials.  I'm a former prosecutor.  I

21  tried a lot of cases, and I know what that's like.  I know when

22  it has to happen.  Nothing that -- that we would propose, and

23  we've been discussing it with Mr. Bain, would stop any of that

24  from happening.

25      Like we said before, what we'd like to do is

continue -- by the way, Hunter Shkolnik, I don't know if any of
your comments about 9/11 were directed to him, but he was the
leader in getting that resolved and -- well, his partner too,
but he likes -- now he's telling the truth.  Before it was
completely Hunter, as far as I knew.

But he's been incredibly helpful in sort of
communicating all of the criticisms that the Hellerstein model
got when it was being implemented, so that became paramount for
us to try to develop this model in a way it's not Hellerstein
2.0.  Honestly, it's just a Camp Lejeune model.

THE COURT:  No.  And that's what I mean.

I absolutely realize this is going to be a Camp
Lejeune model, right?  But we can build out from things that --
take the things that are good from other models, discard the
things that didn't work, discard the process that wasted three
or four years in that case.  It was three or four years of
delay before folks who had gotten sick from responding to
Ground Zero got some money and got to move on with their lives,
right?  I mean that -- and part of that build-out is on the
information side.

So I appreciate everybody -- again, I just remind
everybody that this is the discovery process, the beginning of
information-gathering where I think the legislative design was
once the lawyers had sufficient information to advise the
client in the administrative process and a reasonable offer was

1  made in that process to that person -- because it's not the
2  lawyer's case, it's the client's case.  It's the client's
3  decision.  And for those who decide they want to have a trial,
4  they'll eventually get one, but the administrative process has
5  to be built on them getting some information in terms of an
6  offer or an explanation of why they are not getting one, right?
7  In terms of their own litigation risk or problems with the case
8  or whatever it is, and then all of that information being
9  available so folks can advise their client so the clients can
10 make their decisions about how they want to proceed.  It's
11 their case.  It's not my case.  It's not the Department of
12 Justice's case.  It's not the plaintiffs' lawyers case.  It's
13 the client's case.

14        MR. DiCELLO:  One last thing.  Since we've been, Zina
15 and myself, have been identified as point of contact, it may be
16 helpful, I would suggest, that her and I have an opportunity in
17 the next 30 days to continue communicating with Mr. Bain,
18 because I think that would probably --

19        THE COURT:  Look, nothing I said today should make
20 any of you feel inhibited from cooperating and communicating
21 with one another.  While you are doing all that cooperating and
22 communicating, I will be trying two cases, neither of which
23 will have a 100 witnesses.

24        Ms. Bash.

25        MS. BASH:  Your Honor, sorry.  One point of

1  clarification, what the gentleman said over there about the 30

2  days.  Do we come back to you in 30 days with a joint proposal

3  or applications to kind of get things moving?

4        THE COURT:  What I anticipate is, I anticipate we'll

5  enter some kind of an order that will reflect where we are on

6  some issues as a court and we will not -- any invitation for

7  any leadership information will not have a deadline within the

8  next 30 days.  This is sort of a 30-day period for whoever

9  wants to talk and be cooperative with one another, please feel

10  free to do so.

11        And whatever deadline we establish for inviting some

12  submissions -- now, I mean, who knows.  Maybe at the end of

13  that communication and cooperation process, they'll be a joint

14  motion of proposed leadership.  Who knows.  It might happen.

15  And if we got -- if we got such a motion, well, we would read

16  it and act upon it, I'm confident about that too.

17        Anything else from the Department for today?

18        MR. BAIN:  No, Your Honor.  Thank you today.

19        THE COURT:  And as part of that, I can tell you, Mr.

20  Bain, so it was sort of relief from the answer and master

21  complaint.

22        Were there any other things that you want -- that you

23  needed in the short term?

24        MR. BAIN:  No, Your Honor.

25        THE COURT:  Okay.  Okay.  All right.

1          Again, I want to tell all gathered how appreciative I
2     am for us having this hearing together and you dutifully
3     complying with the order to be here, and I look forward to
4     working with you.
5          And I know all the judges of our court are committed
6     and recognize the unique statute that's been enacted and the
7     unique responsibility that all of us have in connection with
8     cases under this statute and look forward to working through
9     the cases with all of you and doing it in a cooperative and
10    productive manner.
11         So with that, we'll be in recess.  Thank you.
12                         *       *       *
13              (The proceedings concluded at 2:30 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

1                    UNITED STATE DISTRICT COURT

2                  EASTERN DISTRICT OF NORTH CAROLINA

3

4

5                  CERTIFICATE OF OFFICIAL REPORTER

6

7          I, Amy M. Condon, CRR, RPR, CSR, Federal Official

8    Court Reporter, in and for the United States District Court for

9    the Eastern District of North Carolina, do hereby certify that

10   pursuant to Section 753, Title 28, United States Code, that the

11   foregoing is a true and correct transcript of the

12   stenographically reported proceedings held in the

13   above-entitled matter and that the transcript page format is in

14   conformance with the regulations of the Judicial Conference of

15   the United States.

16

17

18   Dated this 27th day of April, 2023.

19

20                                    *Amy M. Condon*
                                      _____

21                                    /s/ Amy M. Condon
                                      Amy M. Condon, CRR, CSR, RPR
22                                    U.S. Official Court Reporter

23

24

25