IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:23-CV-897

IN RE:

CAMP LEJEUNE WATER LITIGATION

This Document Relates to:

*Merritt v. United States*, No. 7:23-cv-1367-D

**PLAINTIFF'S REPLY IN SUPPORT OF PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

# REPLY MEMORANDUM

At a status conference two months ago, the government argued that North Carolina law governs who qualifies as a "legal representative" under the Camp Lejeune Justice Act ("CLJA") because the Federal Tort Claims Act ("FTCA") "applies to fill any gaps" in the CLJA. 10/30 Hr'g. Tr., D.E. 38, at 37. From that unexplained premise, the government maintained that estate representatives appointed by courts of the forty-nine other States must open ancillary estates in North Carolina before they may seek relief under the CLJA. As the Plaintiffs' Leadership Group ("PLG") explained in its opening memorandum, that argument is clearly wrong for multiple independent reasons: the term "legal representative" has an established meaning in the law, and so there is no "gap" to fill, Plaintiff's Memorandum in Support of Plaintiff's Motion for Partial Summary Judgment ("Mot."), D.E. 42, at 6-11; the FTCA does not apply to federal statutes like the CLJA, and the CLJA does not incorporate the FTCA by reference, *id.* at 11-25; and the government had mistakenly relied on a requirement specific to North Carolina's wrongful-death cause of action, which is irrelevant to the CLJA, *id.* at 25-26.

Confronted with those defects in its announced position, the government has now pivoted to a new lead argument: that Federal Rule of Civil Procedure 17 requires out-of-state representative plaintiffs to open ancillary North Carolina estates. United States' Response to Plaintiffs' Motion for Partial Summary Judgment ("Opp."), D.E. 71, at 6-11. But that argument is just as clearly wrong. Although Rule 17 requires certain plaintiffs to meet the capacity-to-sue requirements of the forum state's law, North Carolina law grants capacity to any executor or administrator, as well as to any other person with statutory authorization to sue; it does not require the opening of an ancillary estate. N.C. Gen. Stat. § 1A-1, R. 17(a). The government appears to have simply overlooked the North Carolina statute governing capacity.

Tellingly, the government has been forced to make increasingly far-fetched claims in order to justify its legal position. In its opposition brief alone, the government asserts or suggests that the CLJA includes an unwritten negligence element, Opp. 18 n.6, that a CLJA action is actually a state-law tort, Opp. 19, and that Congress has prohibited dishonorably discharged servicemembers poisoned by Camp Lejeune's water from seeking compensation, Opp. 16 n.5. Rather than following the government along

these detours from plain meaning, this Court should stick to the text of the statute, which says nothing about state law. Representative plaintiffs who have already opened an estate *and* exhausted the administrative process should not be forced to initiate yet another legal proceeding before filing a CLJA action.

## ARGUMENT

**I.	The PLG's Motion Is Ripe Because There Is No Dispute Of Material Fact**

As a threshold matter, this Court should reject the government's alarming request that the Court delay resolution of this critical gateway issue until after the close of Track 1 (or even Track 2) discovery. Opp. 3-5. Given the scale of the Camp Lejeune disaster, numerous representative plaintiffs are likely to bring suit. They need to know as soon as possible what they must do to perfect their claims.

The government's ostensible basis for such a protracted delay—that it needs discovery—makes no sense. The PLG has asked this Court to grant partial summary judgment to Plaintiff Deborah Merritt on the ground that a court of competent jurisdiction has appointed her the legal representative of her father's estate. That fact is established conclusively by the letters testamentary from a Missouri state court appended to the motion. So unless the government contends that the document is a forgery (which it could easily assess through an inquiry with the Missouri court), there are no disputed material facts. The other facts that the government identifies are irrelevant to the legal standard proposed by the PLG. *Cf. Bartel v. Farrell Lines*, 189 N.Y.S. 3d 14, 22 (1st Dep't 2023) (explaining that probate-court decisions are not subject to non-jurisdictional collateral attack). Nor does the government's own position that Ms. Merritt must open an ancillary estate turn on any disputed fact.

Of course, this Court might reject the parties' views and rule that some other showing is required to establish legal-representative status. But in that case, the Court would simply deny summary judgment, and its opinion could identify the requirements that representative plaintiffs must meet. This issue is thus well-suited to judicial resolution now.[1]

---

[1] Should the Court deem discovery necessary, the PLG would be ready to facilitate expedited discovery into Ms. Merritt's representative status so that this issue may be resolved as soon as possible.

**II.    The Government's New Capacity Argument Is Both Irrelevant And Incorrect**

After relying on the FTCA in prior statements to this Court and the PLG, the government now leads with a totally different argument: that Ms. Merritt lacks capacity to sue under Federal Rule of Civil Procedure 17(b)(3) because she has not opened an ancillary estate in North Carolina. Opp. 6-11. But that argument is irrelevant to the motion. The PLG has sought only partial summary judgment that Ms. Merritt qualifies as a "legal representative" under the CLJA. The government must raise any capacity objection by its own motion, at which point the PLG will have a full opportunity to brief the question (and would welcome an expedited briefing schedule). 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1294 (4th ed.) (lack of capacity can be raised in "[a] motion to strike, a motion for judgment on the pleadings, or a motion for summary judgment").

At any rate, the argument is incorrect. Rule 17(b)(3) provides that "[c]apacity to sue or be sued is determined" for an individual acting in a representative capacity "by the law of the state where the court is located." Fed. R. Civ. P. 17(b)(3). Under North Carolina law, capacity is governed by Rule 17 of the North Carolina Rules of Civil Procedure, which the state legislature enacted as part of the General Statutes and which is titled "Parties plaintiff and defendant; *capacity*." N.C. Gen. Stat. § 1A-1, R. 17 (emphasis added). Subsection (a) of that rule states that "an executor, administrator, . . . or a party authorized by statute may sue in his own name"—words that signify capacity to sue. *See United States v. Outlaws Club*, 94 F.3d 643 (Table), 1996 WL 467646, at *1 n.1 (4th Cir. 1996) (holding that a North Carolina statute stating that unincorporated associations "may sue or be sued under the name by which they are commonly known," N.C. Gen. Stat. § 1-69.1, grants capacity to sue); *Cherokee Home Demonstration Club v. Oxendine*, 100 N.C. App. 622, 625-26 (N.C. App. 1990) (same); *see also, e.g.*, N.C. Gen. Stat. § 1-69.1 (granting capacity for unincorporated associations); N.C. Gen. Stat. § 153A-11 (granting capacity for counties). And although the rule sets out special limitations on the capacity of certain parties, it nowhere requires a foreign executor

or administrator to open an ancillary estate.[2]

That rule ends the matter. Ms. Merritt is an "executor" and "administrator" under the plain meaning of those terms, because she was named in Colonel Marsden's will and appointed as an administrator by a Missouri court. *See Executor*, BLACK'S LAW DICTIONARY (11th ed. 2019); *Foreign Administrator*, BLACK'S LAW DICTIONARY (11th ed. 2019). And in any event, she is "authorized by statute" to sue because the CLJA states that a "legal representative . . . may bring an action" in this District. CLJA § 804(b); *see* Mot. 6-11. Thus, North Carolina law grants her the capacity to sue, and Federal Rule 17(b)(3) is satisfied.

Remarkably, the government does not even mention North Carolina's general capacity-to-sue provision, and it identifies no provision of North Carolina law imposing an ancillary-estate requirement. Instead, it relies on *dicta* in *Davis v. Piper Aircraft Corp.*, 615 F.2d 606 (4th Cir. 1980), stating that a foreign personal representative may bring suit under North Carolina's wrongful-death statute only by first qualifying as an ancillary administrator, *id.* at 609-10. That point was not disputed by the parties, which joined issue only on whether a change in capacity could relate back to an earlier-filed complaint, and neither party mentioned North Carolina Rule 17. *See* Appellant's Br., *Davis*, 615 F.2d at 606 (No. 77-2478), 1978 WL 220804; Appellee's Br., *Davis*, 615 F.2d at 606 (No. 77-2478), 1978 WL 220805. The Fourth Circuit therefore had no occasion to decide whether that rule grants capacity to foreign representatives.

Moreover, *Davis* relied on the facts that North Carolina's wrongful-death statute authorizes suit by the "personal representative" of the decedent and that the same chapter of the North Carolina General Statutes prescribes the procedure for a "personal representative" to become an ancillary administrator. 615 F.2d at 609-10 (citing N.C. Gen. Stat. §§ 28A-18-2, 28A-18-3, and 28A-26-3). A CLJA action, of course, is not a North Carolina wrongful-death action subject to the requirements of that chapter, *see* Mot. 25-26; those requirements no more apply to a CLJA action than to a federal antitrust or ERISA action brought by

---

[2] Although subsection (a) is titled "Real Parties in Interest," the language "may sue" also grants capacity to sue. The remainder of the rule addresses carve-outs from this broad grant of capacity, such as for "infants" and "incompetents," who must be represented by a guardian. N.C. Gen. Stat. § 1A-1, R. 17(b) and (c). No such carve-outs exist for executors or administrators.

4

an estate representative. *Davis* also cited a 1947 North Carolina Supreme Court decision that held that there was "no statutory authority which authorizes a foreign executor or administrator to come into our courts and prosecute or defend an action in his representative capacity." *Cannon v. Cannon*, 45 S.E.2d 34, 34 (N.C. 1947). That decision, however, was issued two decades before the legislature enacted Rule 17 and so did not consider whether that rule provides the requisite statutory authority.[3]

At any rate, even if North Carolina law did impose an ancillary-estate requirement, it would not apply to the CLJA. Although courts disagree on the question, the better view is that Rule 17(b)(3) applies only in diversity cases, not federal-question cases—as Judge Learned Hand held for the Second Circuit in *Briggs v. Pennsylvania R. Co.*, 153 F.2d 841, 842-43 (2d Cir. 1946); *see Complaint of Cosmopolitan Shipping Co., S. A.*, 453 F. Supp. 268, 269 (S.D.N.Y. 1978) ("[I]n order to qualify as a personal representative for . . . federal causes of action . . . ancillary letters of administration . . . were [n]ot necessary[.]"). Indeed, the Fourth Circuit in *Davis* limited its discussion to the diversity-jurisdiction context. 615 F.2d at 609. That limitation is necessary because "the Rules Enabling Act forbids interpreting [a Federal Rule] to 'abridge, enlarge or modify any substantive right,' 28 U.S.C. § 2072(b)." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011). An interpretation of Rule 17(b)(3) that barred suit by a person authorized by an act of Congress to bring a federal claim would violate that provision.

At a bare minimum, when a federal statute like the CLJA specifically authorizes a "legal representative" to bring suit, Rule 17(b)(3) could not be construed to bar a person falling within the plain meaning of that term from filing an action. That result would violate both the Rules Enabling Act and the presumption that a more specific (and later enacted) statute governs over an earlier, more general provision. *Varity Corp. v. Howe*, 516 U.S. 489, 511 (1996); *United States v. Estate of Romani*, 523 U.S. 517, 532

---

[3] The government's other two Fourth Circuit cases did not apply North Carolina law. *See Fennell v. Monongahela Power Co.*, 350 F.2d 867, 868 (4th Cir. 1965) (construing West Virginia statute); *Holt v. Middlebrook*, 214 F.2d 187, 189 (4th Cir. 1954) (construing Virginia statute). Moreover, both decisions relied on *Rybolt v. Jarrett*, 112 F.2d 642 (4th Cir. 1940), which held that although the term "personal representative" is ordinarily "broad enough to include a personal representative appointed in a[nother] state," the context of the particular state statutes at issue "force[d]" a narrower reading. *Id.* at 643-44.

(1998).

But the Court need not reach those questions. The government's new capacity argument has not been properly raised, and in any event it overlooks the statute governing capacity in North Carolina courts.

## III. The Plain Text Of The CLJA Authorizes Suits By Out-of-State Representatives

The government's mistaken capacity-to-sue argument aside, the question here is straightforward under the plain text of the CLJA. The government does not seem to contest that the ordinary meaning of "legal representative" includes appointed executors and administrators of estates. *See, e.g.*, *Briggs v. Walker*, 171 U.S. 466, 471 (1898). Accordingly, so long as an executor or administrator has been appointed by a "proper court," *id.*—*i.e.*, a court with jurisdiction to make such an appointment—then the statutory requirement is met. Nothing in the text of the CLJA restricts the meaning of "legal representative" to "legal representative appointed by a North Carolina court." And contrary to the government's arguments, Opp. 11, the PLG's rule is readily administrable: When the issue is contested, this Court need only verify that an estate representative has been appointed by a court with the power to do so.

The government erroneously claims that the precedents cited by the PLG "favor[] a narrower definition of 'legal representative.'" Opp. 9 (emphasis omitted). The government conflates those cases' discussion of the capacity-to-sue requirement—which is met here for the reasons explained above—with the separate question of who qualifies as a "legal representative" authorized to bring suit. Consistent with Federal Rule of Civil Procedure 9, courts have long drawn a distinction between "capacity to sue" (governed by forum state law in diversity cases) and "authority to sue . . . in a representative capacity." Fed. R. Civ. P. 9(a)(1); *see Museum Boutique Intercontinental, Ltd. v. Picasso*, 886 F. Supp. 1155, 1159 (S.D.N.Y. 1995). Here, the cited precedents support the PLG's view that the term "legal representative" as used in the CLJA authorizes suit by any executors or administrators appointed by a court of competent jurisdiction.

## IV. The Government's FTCA "Gap-Filling" Argument Is Meritless

Although the government now urges the Court to avoid the question, it continues to maintain that the FTCA (and thus North Carolina law) serves as a "gap filler" for the CLJA. Opp. 11-22. But there is

no "gap" to fill: The CLJA authorizes a "legal representative" to sue, and that term has an established meaning that includes appointed executors and administrators. And even if there were a "gap," and even if it were somehow appropriate to look to state law to fill it, North Carolina law does not require all foreign representative plaintiffs to open ancillary estates. Rather, as the PLG explained in the opening brief, the ancillary-estate requirement is limited to North Carolina's wrongful-death statute, and a CLJA action is not brought under that statute. Mot. 25-26. The government's statement that the PLG "does not appear to dispute that an ancillary estate is required as a matter of North Carolina law" is thus perplexing. Opp. 7. The PLG directly refuted that point, Mot. 25-26, and the government offers no response.

At any rate, the government's "gap-filling" theory lacks a coherent basis. Congress could easily have stated that the CLJA incorporates the FTCA by reference, but it did not do so. And the FTCA's cause of action and corresponding waiver of sovereign immunity apply only to *state-law* liability. *FDIC v. Meyer*, 510 U.S. 471, 478 (1994). That is why both the Supreme Court and the Fourth Circuit have held that federal torts are not subject to the FTCA. *Id.*; *Global Mail Ltd. v. U.S. Postal Serv.*, 142 F.3d 208, 211 (4th Cir. 1998). The CLJA, of course, is a federal tort: It imposes liability in accordance with federal standards, not state tort law. CLJA § 804(b) and (c). It therefore is not subject to the FTCA and does not depend on the FTCA's waiver of immunity from state-law liability. Nothing in the government's arguments overcomes that basic logical flaw in its position.

1. The government attempts to distinguish *Meyer* and *Global Mail* on grounds that bear no relation to their holdings or analyses. Opp. 18-19. The actual ***rule*** applied by those decisions is that the FTCA does not apply to "federal statutory tort[s]"—full stop. *Global Mail*, 142 F.3d at 211. That defeats the government's position here. Nor does the government grapple with the blackletter rule that under *Feres v. United States*, 340 U.S. 135 (1950), the FTCA (and its state-law liability standards) cannot apply to claims arising from military service absent an "express congressional command." *Id.* at 146. Even if the Court were to indulge all of the government's interpretive gymnastics, they hardly add up to an "express congressional command" to apply state-law standards of liability to CLJA actions.

2. The government repeats its claim that the sole function of the CLJA is to abrogate the three

7

specific defenses that the government had successfully raised against FTCA actions arising out of Camp Lejeune. Opp. 13-16. But that cannot be squared with the text of the statute, which establishes a new cause of action that does much more than abrogate those defenses, such as dispensing with any fault requirement and setting the causation standard at equipoise. The CLJA thus does not parallel the FTCA or state law in any meaningful respect. In a head-scratching footnote, Opp. 18 n.6, the government suggests that the CLJA implicitly includes a negligence element and that the government has simply elected not to dispute it. But Congress doesn't legislate through silence, and the CLJA manifestly does not require proof of negligence.

Moreover, nothing about the way that Congress precluded the three specific defenses supports the government's theory. Take the CLJA's override of the discretionary-function exception, 28 U.S.C. § 2680(a). The government does not dispute that, unlike other FTCA provisions, Section 2680(a) expressly applies to *all* of Chapter 171—which includes the CLJA—and that at any rate it merely codifies how Congress expected courts to construe tort-like causes of action against the government. Mot. 21-23. Congress thus needed to exempt CLJA actions from Section 2680(a) to prevent the government from asserting that defense. That it did so does not imply that Congress *sub silentio* incorporated the remainder of the FTCA.

Likewise, the CLJA's preclusion of the *Feres* and statute-of-repose defenses is not the result of any surgical extraction of those defenses from an otherwise-applicable FTCA framework. Rather, the CLJA falls outside of the *Feres* doctrine simply because it is a federal statute, and the North Carolina statute of repose does not apply because Congress created an exclusive new limitations period for CLJA actions.[4] Mot. 21. Although the government claims that the CLJA's preclusion of "other 'applicable statute[s] of repose'" indicates that Congress believed that North Carolina's statute of repose would otherwise apply via

---

[4] The government appears to acknowledge that the FTCA's reference to a "veteran" is insufficient to overcome *Feres* for certain classes of servicemember plaintiffs, including those who were dishonorably discharged. Opp. 16 n.5. But stunningly, the government suggests that a dishonorably discharged servicemember who contracted cancer from the poisoned water at Camp Lejeune may not be eligible for relief under the CLJA. *Id.* There is no plausible reason to believe that Congress intended to exempt this one group of victims from CLJA relief.

the FTCA, Opp. 13-14 (emphasis omitted), its argument omits a key word: "[*a*]*ny* applicable statute of repose," CLJA § 804(j)(3). The use of "any" indicates that Congress did not conclude that a particular statute of repose would otherwise apply, but merely sought to foreclose any argument that CLJA claims could be subject to other time bars—in keeping with its overriding purpose of streamlining CLJA litigation. *See United States v. Gonzales*, 520 U.S. 1, 5 (1997) ("Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'") (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 97 (1976)). Congress would have simply barred application of North Carolina's statute of repose if that is all it intended—as it did with the discretionary-function exception.

3. The government has little explanation for why Congress incorporated a select few FTCA limitations into the CLJA if it intended the FTCA as a whole to apply to CLJA actions. Opp. 16-17. The government contends that the CLJA might otherwise have been construed to "abrogate[]" those limitations, such as the bar on punitive damages, so it was necessary to state them expressly in the CLJA. Opp. 17. But that explanation doesn't solve the problem because the same abrogation concern would apply equally to other FTCA provisions that are not expressly included in the CLJA. For example, just as the phrase "appropriate relief" in Subsection (b) of the CLJA could be read (absent the CLJA's contrary provision) to authorize punitive damages, Opp. 16, it could also be read to permit this Court or the jury to determine the appropriate measure of compensatory damages—an issue that the government asserts must be resolved under state law via the FTCA and on which the CLJA is silent, *see* Opp. 12. So the government is still left with no coherent explanation for why, under its "gap-filling" theory, Congress specified that certain FTCA rules would apply but said nothing about others. By far the most likely explanation is that Congress intended to adopt only those FTCA provisions expressly mentioned.[5]

Indeed, the purported "gaps" in the CLJA are not gaps at all; they are ordinary policy judgments, which the government now asks this Court to second-guess. For example, while the government considers

---

[5] The government repeats the puzzling argument that the CLJA is not listed as an exception in the FTCA—a *non-sequitur* given that Congress had no reason to exempt statutes to which the FTCA does not apply.

9

the lack of any attorneys-fee ceiling to be a "gap," many federal statutes lack any limitation on fees. That is a policy choice—one that Congress specifically considered when deliberating on the CLJA. Mot. 24.

Some of the government's other policy concerns are implausible. The government objects, for example, that under the PLG's position, individual government employees could be liable under the CLJA. Opp. 20. But even assuming (dubiously) that the CLJA permits suits against individuals, Congress presumably did not see a serious risk that any surviving military decisionmakers who served at Camp Lejeune between 35 and 69 years ago would be sued. Likewise, the government expresses the concern that if the Military Claims Act, 10 U.S.C. § 2733(b)(4), provides the government's authority to settle CLJA claims, some fraction of CLJA judgments would be paid from the Navy's budget. Opp. 20. But the government offers no explanation for why Congress would have found that accounting structure objectionable.[6]

Finally, the government resorts to legislative history and the canon against construing sovereign-immunity waivers broadly. Opp. 14, 21. But two stray press releases (not even floor statements) by individual Representatives can hardly carry the weight of the government's legislative-history argument. As to sovereign immunity, the CLJA itself unequivocally waives the government's immunity, *see* CLJA § 804(b), (d), and the canon does not justify incorporating limitations from the FTCA's waiver, which on its face applies only to claims resting on state-law liability. The more relevant canons of construction are the canon in favor of veterans, which counsels against erecting arbitrary hurdles to recovery under the CLJA, and the rule of lenity, which disfavors extending the criminal penalties of the FTCA's fee-cap provisions to CLJA actions without any textual basis to do so.

## CONCLUSION

For the foregoing reasons, the motion for partial summary judgment should be granted.

---

[6] The government argues that the Military Claims Act also refers to the "law of the place" (*i.e.*, state law), Opp. 20, but the act does so only with respect to offsets for the *plaintiff's* negligence, not the government's liability. The statute therefore authorizes settlement of CLJA clams.

| | |
|---|---|
| December 21, 2023 | Respectfully submitted, |
| /s/ *John. F. Bash* | /s/ *J. Edward Bell, III* |
| John F. Bash (admitted *pro hac vice*) | J. Edward Bell, III (admitted *pro hac vice*) |
| Quinn Emanuel Urquhart & Sullivan LLP | Bell Legal Group, LLC |
| 300 W. 6th St., Suite 2010 | 219 Ridge Street |
| Austin, TX 78701 | Georgetown, SC 29440 |
| Telephone: (737) 667-6100 | Telephone: (843) 546-2408 |
| johnbash@quinnemanuel.com | jeb@belllegalgroup.com |
| *Member, Plaintiffs' Executive Committee* | *Lead Counsel* |
| *Co-Chair, Law and Briefing Subcommittee* | |
| /s/ *Elizabeth Cabraser* | /s/ *Zina Bash* |
| Elizabeth Cabraser (admitted *pro hac vice*) | Zina Bash (admitted *pro hac vice*) |
| Lieff Cabraser Heimann & Bernstein, LLP | Keller Postman LLC |
| 275 Battery Street, Suite 2900 | 111 Congress Avenue, Suite 500 |
| San Francisco, CA 94111 | Austin, TX 78701 |
| Telephone: (415) 956-1000 | Telephone: (956) 345-9462 |
| ecabraser@lchb.com | zina.bash@kellerpostman.com |
| *Co-Lead Counsel* | *Co-Lead Counsel and Government Liaison* |
| /s/ *W. Michael Dowling* | /s/ *Robin Greenwald* |
| W. Michael Dowling (N.C. Bar No.: 42790) | Robin L. Greenwald (admitted *pro hac vice*) |
| The Dowling Firm PLLC | Weitz & Luxenberg, P.C. |
| Post Office Box 27843 | 700 Broadway |
| Raleigh, NC 27611 | New York, NY 10003 |
| Telephone: (919) 529-3351 | Telephone: (212) 558-5802 |
| mike@dowlingfirm.com | rgreenwald@weitzlux.com |
| *Co-Lead Counsel* | *Co-Lead Counsel* |
| /s/ *James A. Roberts, III* | /s/ *Mona Lisa Wallace* |
| James A. Roberts, III (N.C. Bar No.: 10495) | Mona Lisa Wallace (N.C. Bar No.: 009021) |
| Lewis & Roberts, PLLC | Wallace & Graham, P.A. |
| 3700 Glenwood Avenue, Suite 410 | 525 North Main Street |
| P. O. Box 17529 | Salisbury, NC 28144 |
| Raleigh, NC 27619 | Telephone: (704) 633-5244 |
| Telephone: (919) 981-0191 | mwallace@wallacegraham.com |
| jar@lewis-roberts.com | |
| *Co-Lead Counsel* | *Co-Lead Counsel* |
| */s/ Hugh R. Overholt* | */s/ A. Charles Ellis* |
| Hugh R. Overholt (NC Bar No. 016301) | A. Charles Ellis (N.C. Bar No.: 010865) |
| Ward and Smith P.A. | Ward and Smith P.A. |
| Post Office Box 867 | Post Office Box 8088 |
| New Bern, NC 28563-0867 | Greenville, NC 27835-8088 |
| Telephone: (252) 672-5400 | Telephone: (252) 215-4000 |
| hro@wardandsmith.com | ace@wardandsmith.com |
| *Liaison Counsel for Plaintiffs* | *Liaison Counsel for Plaintiffs* |