IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:23-CV-897

| | |
|---|---|
| IN RE: | ) |
| CAMP LEJEUNE WATER LITIGATION | ) |
| THIS PLEADING RELATES TO: | ) |
| ALL CASES | ) |

**PLAINTIFFS' LEADERSHIP GROUP'S RESPONSE IN OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR PROTECTIVE ORDER**

The Plaintiffs' Leadership Group ("PLG") respectfully opposes Defendant's Cross-Motion for Protective Order (the "Cross-Motion") [D.E. 93] because the Cross-Motion violates the Court's Amended Order and the PLG's Corrected First Set of Request for Production (the "First Request") is not overly broad and does not seek irrelevant documents. In addition, the PLG, in an effort to avoid taking up the Court's time unnecessarily, plans to withdraw several ESI requests in the First Request and additionally plans to otherwise reduce the scope of the First Request.[1]

**INTRODUCTION**

The PLG and Defendant United States of America ("Defendant") have exchanged numerous letters concerning Defendant's slow document production in response to the First Request. [D.E. 81-4 to 81-10 & 81-17]. With exception of a single sentence concerning a single request for production (Request No. 6), Defendant has not argued or even suggested that the PLG's production requests are overly broad or seek irrelevant documents.

Now, totally out of the blue, Defendant has filed the Cross-Motion asking the Court "to bar the discovery of overly broad and irrelevant documents." [D.E. 91, at p 1]. In making this brand

---

[1] The PLG scheduled a meet and confer on January 2, 2024 to discuss withdrawing certain ESI requests and otherwise reduce the scope of the First Request.

new argument, Defendant identified only three requests which it contends are overbroad or seek irrelevant materials. Apparently, the PLG and the Court must guess which of the other individual requests within the First Request are overbroad or seek irrelevant documents.

Further, in filing the Cross-Motion, Defendant failed to comply with the Court's Amended Order, which requires that discovery motions be filed only "after a good faith effort between the parties to resolve the matter." [D.E. 55]. Had Defendant engaged the PLG about the matters raised in the Cross-Motion, the parties could have reached a compromise that would have avoided the need for the Cross-Motion. Indeed, as described herein, the PLG plans to withdraw certain ESI requests within the First Request.

In any event, Defendants' arguments concerning the breadth of the PLG's First Request are especially unavailing considering Defendant's own scorched-earth policy in this litigation. In fact, the PLG's discovery requests are directly motivated by—and proportional to—Defendant's own strategy of contesting every single issue in this action. For instance, Defendant has disavowed the conclusions of its own agency, the Agency for Toxic Substances and Disease Registry ("ATSDR"), that there is sufficient evidence of a connection between the poisoned water at Camp Lejeune and the Track 1 diseases. Where groundwater sampling results show elevated concentrations of cancer-causing chemicals, Defendant has simply denied the accuracy of the test results. Where Defendant's own contractors found elevated levels of contamination, Defendant has rejected the conclusions of its own contractors.

This Court has been clear about the need for "stipulations . . . . . about what chemicals were in the water where in what years" as a necessary means of "moving these things along." [Tr. of Hr'g on April 5, 2023, D.E. 9, at pp 18:23-19:2]. On the other hand, Defendant's policy of contesting everything has required that the PLG conduct extensive discovery designed to prove

1

"what chemicals were in the water where in what years," even though Defendant's own agency has already found a connection between the water at Camp Lejeune and the Track 1 diseases. The PLG's discovery requests are consistent under the Federal Rules of Civil Procedure. Indeed, the PLG's production requests are a direct result of Defendant's own conduct. The Cross-Motion should be denied.

## BACKGROUND

From the outset of this litigation, the Court has been clear about the need for the parties to work together to narrow the issues for trial. For instance, during the Status Conference on April 5, 2023, Judge Dever stated the following:

> But, again, the chemicals in the water at a given time in a given place is informative to the extent that you can work towards talking about that to help narrow the focus of the issues associated with general and specific causation with respect to whatever the diseases are, the disease or disease or malady, or whatever, that the person claims to have received as a part of the exposure.

[Tr. of Hr'g on April 5, 2023, D.E. 9, at pp 19:25-20:6]. Later during the same Status Conference, Judge Dever reemphasized the need to reach agreement on obvious issues as a means of progressing the CLJA litigation:

> . . . to the extent that there can be an identification or an agreement about, you know, these chemicals were in the water here and on these different dates, it's just, it's a helpful piece of information to inform issues associated with general causation and then ultimately specific causation, and that helps move the cases along.

[Tr. of Hr'g on April 5, 2023, D.E. 9, at p 25:20-20:25].

There are several issues that should be the subject of easy stipulation, which would in turn eliminate the need for extensive discovery. The ATSDR's study of the water at Camp Lejeune and its impact upon human health are prime examples.

The ATSDR "is a federal public health agency of the U.S. Department of Health and Human Services [that] protects communities from harmful health effects related to exposure to natural and man-made hazardous substances."[2] For this reason, Congress mandated that the ATSDR study the health impacts from exposure to contaminated water at Camp Lejeune.

Following extensive study, the ATSDR identified several health conditions where there is either "sufficient evidence for causation" or "evidence that is equipoise and above for causation" with the contaminated water at Camp Lejeune.[3] All of the Track 1 illnesses appear on the ATSDR's lists of conditions where there is evidence of at least equipoise and above for causation, namely: bladder cancer, kidney cancer, leukemias, Parkinson's disease, and non-Hodgkin's lymphoma. Indeed, at the time of the present Response, the ATSDR's website—*i.e.*, a United States government website—states that there is either "sufficient evidence for causation" or "evidence that is equipoise and above for causation" for each of these Track 1 diseases and the water at Camp Lejeune.[4]

Surprisingly, however, Defendant has indicated that it will contest the issue of general causation with respect to these Track 1 diseases. In October 2023, the PLG proposed the following stipulations:

- "The ATSDR has listed certain diseases as ones where there is sufficient evidence for causation in people exposed occupationally or environmentally to the chemicals detected in the drinking water at Camp Lejeune, which diseases include: (1) bladder cancer, (2) kidney cancer, (3) leukemia, (4) Parkinson's disease, and (5) non-Hodgkin's lymphoma."

---

[2] *Agency for Toxic Substances and Disease Registry* (last reviewed Dec. 26, 2023), https://www.atsdr.cdc.gov/index.html.

[3] *See also*, *Health effects linked with trichloroethylene (TCE), tetrachloroethylene (PCE), benzene, and vinyl chloride exposure* (last visited Dec. 26, 2023), https://www.atsdr.cdc.gov/sites/lejeune/tce_pce.html.

[4] *Id.*

3

- "The Defendant does not contest general causation for the *Track 1* conditions of bladder cancer, kidney cancer leukemia, Parkinson's disease, and non-Hodgkin's lymphoma under the causation standards as set forth by the CLJA."

[Ex. 1, The PLG's Proposed Stipulation Nos. 7 & 13]. Defendant, however, declined to stipulate to these proposals.

Defendant's refusal to stipulate to seemingly non-controversial issues has permeated this entire litigation and contributes to the delays. For example, in its Answer, Defendant disavowed the findings of the ATSDR as being too "conservative," "health-protective," or based on a "lack of water sampling data." [D.E. 50, at ¶¶ 4 & 6]. Further, Defendant has self-servingly disavowed the conclusions of the ATSDR's Senior Epidemiologist, Dr. Frank Bove. On April 24, 2019, Dr. Bove participated in a Camp Lejeune Community Assistance Panel and stated that "everybody at Camp Lejeune had some exposure because even if you didn't live in a residence on base that received contaminated water, you did visit the main site, you did train, you drank from the water buffaloes that were served – provided by Hadnot Point, so on and so forth." [D.E. 25, at ¶ 109]. In its Answer, Defendant denied that Dr. Bove, the Senior Epidemiologist with ATSDR, was speaking on behalf of the government. [D.E. 50, at ¶ 109]. In short, the ATSDR study supports causation as to the Track 1 diseases, so Defendant's rejections are unfounded.

The Defendants' rejections of the obvious extend beyond the ATSDR. For example, Defendant has denied that the exceedance of a "maximum contaminant level" ("MCL") set by the Environmental Protection Agency is "necessarily unsafe." [D.E. 50, at ¶¶ 5, 31]. Further, Defendant's Answer repeatedly minimized or outright rejected unfavorable groundwater sampling results as "unreliable," "not representative," or "potentially contaminated." [D.E. 50, at ¶¶ 33, 36, 50, 62, 83, 159 & 180]. Frequently, Defendant's own contractors were responsible for the water sampling that Defendant so conveniently rejects now. *E.g.*, [D.E. 50, at ¶¶ 49 & 159]. The PLG's

4

Master Complaint alleged that a 1,148.4 ppb TCE reading at the Berkley Manor Elementary school on February 7, 1985 indicated that "Holcomb Boulevard residents were exposed to high levels of contamination." [D.E. 25, at ¶ 83]. This should be an obvious admission given that the currently existing MCL for TCE is 5 ppb. [D.E. 25, at ¶ 33]. Yet Defendant denied the allegation because the result was supposedly not "representative." [D.E. 50, at ¶ 83].

Another example involves the Department of Navy ("Navy") study from December 1988 of the groundwater near the Hadnot Point Fuel Farm that identified several points of concern, including a plume of contamination of up to 15 feet in thickness. [D.E. 25, at ¶ 68]. Even though the study was conducted by the Navy, Defendant has rejected the conclusions of that study. [D.E. 50, at ¶ 68].

Defendant's Answer clearly represents an intent to contest *everything*. Despite the ATSDR's thorough study of the poisoned water at Camp Lejeune, the PLG is now confronted with the responsibility of proving what chemicals were in the water, when the chemicals were in the water, the location of the chemicals in the water, the concentration of the chemicals in the water, and the effect of those concentrations upon human health. This heavy load is the direct result of Defendant's chosen scorched-earth litigation strategy. For the PLG to fulfill its responsibilities to the Marines injured by Defendant at Camp Lejeune, extensive discovery is necessary. It is within this context that the PLG served the First Request.

## ARGUMENT

### I. Defendant's Cross-Motion Violated the Amended Order.

On November 21, 2023, the Court entered the Amended Order "[t]o facilitate the efficient and timely resolution of discovery disputes." [D.E. 55, at p 1]. Among other things, the Amended Order provided that discovery motions should not be filed until "after a good faith effort between

5

the parties to resolve the matter." [D.E. 55, at ¶ 1]. This requirement is consistent with the Local Rules, which require that a party filing a discovery motion "must also certify that there has been a good faith effort to resolve discovery disputes prior to the filing of any discovery motions." Local Rule 7.1(c)(2).

Defendant's Cross-Motion represents a seismic shift in Defendant's position on the First Request. The parties have exchanged at least seven letters concerning the First Request. [D.E. 81-5 to 81-10 & 81-17]. In a single sentence in a single letter, Defendant stated that individual Request No. 6 is "overly burdensome" and will "not necessarily lead to the discovery of relevant information." [D.E. 81-17, at p 3]. Otherwise, during the parties' negotiations over Defendant's document production, Defendant has never taken the position that the First Request was so burdensome, disproportionate or irrelevant that Defendant was not obligated to produce responsive documents. [D.E. 81-5 to 81-10 & 81-17]. Had Defendant raised this issue previously, the parties could have discussed the scope of the First Request and potentially avoided the Cross-Motion.

Defendant's shifting position on the scope of the First Request illustrates two points clearly. *First*, the First Request is not *seriously* objectionable because Defendant, in its discovery letters, never raised the issue previously. To the contrary, Defendant's complaints in the Cross-Motion about the scope of the First Request are merely an effort to explain away Defendant's own slow document production. *Second*, the parties have not engaged in the mandatory "good faith effort" to resolve disputes over the scope of the First Request prior to Defendant's filing the Cross-Motion. [D.E. 55, at ¶ 1]. The Cross-Motion should therefore be denied.

**II.     The First Request Is Not Overly Broad and Does Not Seek Irrelevant Documents.**

Defendant's Cross-Motion argues that the Court should enter a protective order "to bar the discovery of overly broad and irrelevant documents." [D.E. 93]. To the contrary, the First Request

6

is necessary because of Defendant's policy of unnecessarily contesting *every* issue. As discussed above, Defendant has disavowed the conclusions of its own agency, namely the ATSDR; rejected the groundwater sampling results of its own contractors; and denied the findings of the Navy concerning the extent of a groundwater contamination plume. *See infra*, at pp 3-5. Defendant has required that the PLG prove what chemicals were in the water, when the chemicals were in the water, the location of the chemicals in the water, the concentration of the chemicals in the water, and the effect of those concentrations upon human health. Robust discovery is necessary to address each of these issues. In fact, this Court's decisions have recognized that "Rule 26 provides for a broad scope of discovery," and that "[t]he rules of discovery, including Rule 26, are to be given broad and liberal construction." *Christopher v. Trawler Cameron Scott, LLC*, No. 4:23-CV-36, 2023 U.S. Dist. LEXIS 2017013, at *3 (E.D.N.C. Nov. 20, 2023).

While Defendant complains in broad terms about the supposed overbreadth of the First Request, Defendant's supporting memorandum discusses only three individual requests that are supposedly overbroad or irrelevant: Request Nos. 10, 16 & 17. [D.E. 92, at pp 2, 5-7]. Given Defendant's conduct in this litigation, particularly its strategy to contest any and every issue, these requests are neither overbroad nor irrelevant. In fact, the information sought by these requests is essential:

*Request No. 10* seeks "unredacted copies of all documents and ESI, as defined herein, in the possession, custody or control of the DON related to the Navy's underground storage tank (UST) program records and contents of the UST electronic portal relating to Camp Lejeune." [D.E. 81-3, at p 12]. A central allegation of the PLG's Master Complaint is that the Hadnot Point Fuel Farm, including six 12,000 gallon underground tanks and eight 15,000 gallon underground tanks, leaked benzene into the groundwater. [D.E. 25, at ¶¶ 39, 44 & 70]. In the Answer, however,

Defendant declined to make basic admissions about the capacity of these underground storage tanks and the extent of a plume emanating from the Hadnot Point Fuel Farm [D.E. 50, at ¶¶ 39 & 68]. The ATSDR concluded that benzene levels in drinking water exceeded safe levels for both children and adults from at least 1979 to 1984, however, a disclosure of hidden information contained "in the Navy's UST archive, showing that an average of more than 21,000 gallons of fuel were lost into the soil each year, suggests that benzene contamination began much earlier." [D.E. 25, at ¶ 70].

Defendant largely denied these allegations [D.E. 50, at ¶ 70], thereby requiring that the PLG conduct discovery concerning the "Navy's UST archive" and its tendency to prove the extent that the fuel farm caused groundwater contamination and the dates during which that contamination was ongoing. This "UST archive" referenced in the Master Complaint is precisely what Request No. 10 requests, and based upon Defendant's Answer, discovery should be allowed.[5]

*Request No. 16* sought "unredacted copies of all documents and ESI . . . in the possession, custody or control of the Department of the Navy related to third party vendors or consultants that performed or were contracted to perform work related to water contamination issues at Camp Lejeune, including drafts."[6] [D.E. 81-3, at p 14]. Defendant claims that this request "seeks

---

[5] In its memorandum, Defendant states, without citation, that "[r]ecords concerning USTs will not speak to general or specific causation, as these records relate to the assessment and clean-up of contamination from leaking USTs." [D.E. 92, at p 6] Defendant's failure to support this claim with any sort of source is sufficient grounds to summarily reject Defendant's argument about Request No. 10. In any event, the "assessment and clean-up of contamination" would presumably bear directly upon the extent of the plume from the fuel farm and therefore the location of contaminated groundwater—issues closely wrapped up with both general and specific causation.

[6] Defendant claims that it "has attempted to meet and confer with Plaintiffs in an effort to narrow this and other Requests." Defendant's statement is not correct. The parties' letters concerning the First Request were attached to the PLG's Motion to Compel Document Production in Response to First Set of Request for Production. [D.E. 81-5 to 81-10 & 81-17]. Defendant never requested that the PLG "narrow" the scope of Request No. 16.

8

practically every document the Navy has ever created with respect to Camp Lejeune." [D.E. 92, at p 5]. Self-evidently, that is not true. Request No. 16 seeks documents related to those third party vendors or consultants performing work related to water contamination. As set out in the Master Complaint, there were a number of responsive third party vendors testing that groundwater, and the documents generated by these vendors would tend to establish the locations, dates and concentrations of chemicals in the water. *E.g.*, [D.E. 25, at ¶¶ 49, 123, 124, 126]. Consistent with its scorch-earth strategy, Defendant's Answer disavowed the groundwater contamination levels identified by these third party vendors and consultants. *E.g.*, [D.E. 50, at ¶¶ 49 & 159] In light of Defendant's self-serving rejection of the test results generated by its own contractors, Request No. 16, which seeks the documents generated by these contractors, is both relevant and proportional to the needs of this action.

*Request No. 17* requested "all documents and ESI . . . in the possession, custody or control of LANTDIV (Atlantic Division Naval Facilities Engineering Command) relating to any work, investigation, research, discussion, or correspondence, memos or documents or data of any form regarding any water contamination issues at Camp Lejeune." [D.E. 81-3, at p 15]. LANTDIV prepared an oil pollution survey at Camp Lejeune in 1976, and initiated a surveillance program at Camp Lejeune intended to detect total trihalomethanes. [D.E. 25, at ¶¶ 123 & 128]. As a result of LANTDIV's work, test results dated October 30, 1980 indicated the presence of TCE, DCE and vinyl chloride. [D.E. 25, at ¶ 129]. Given its role in investigating water contamination at Camp Lejeune, LANTDIV clearly possesses relevant documents. As noted, the parties have exchanged numerous letters concerning Defendant's responses to the First Request. At no point during these discussions did Defendant indicate that Request No. 17 was overly broad or disproportionate to the issues in this action. [D.E. 81-6, 81-8, 81-9, & 8-17]. To the contrary, Defendant, without

9

reference to the supposed irrelevance or overbreadth of Request No. 17, has made hardcopy documents available for inspection and indicated that it is "in the process of scanning one box of responsive documents and will produce such documents as they are received and reviewed for privilege." [D.E. 81-8, at p 4].

**III.     In an Effort to Avoid Taking up the Court's Time, the PLG Is Reducing the Scope of the First Request.**

In addition to its arguments about the breadth and relevance of the First Request, Defendant's Cross-Motion requested a protective order concerning "the discovery of Electronically Stored Information ('ESI') sources until the Parties have negotiated an ESI protocol under the ESI Order." [D.E. 93, at p 1]. While the First Request was completely consistent with the discovery rules, the PLG is voluntarily reducing the scope of those requests in two ways. First, the PLG plans to withdraw several ESI requests in the First Request, reserving our right to address them at a later time. Second, over the next several days, the PLG will work with the Defendant to limit the scope of certain requests within the First Request. For these reasons, the Cross-Motion is unnecessary and should be denied.

## CONCLUSION

For the foregoing reasons, the Defendant's Cross-Motion should be denied.

*[Signatures Follow on Next Page]*

DATED this 28th day of December, 2023.

| | |
|---|---|
| */s/ J. Edward Bell, III* | */s/ Zina Bash* |
| J. Edward Bell, III (admitted *pro hac vice*) | Zina Bash (admitted *pro hac vice*) |
| Bell Legal Group, LLC | Keller Postman LLC |
| 219 Ridge St. | 111 Congress Avenue, Suite 500 |
| Georgetown, SC 29440 | Austin, TX 78701 |
| Telephone: (843) 546-2408 | Telephone: 956-345-9462 |
| jeb@belllegalgroup.com | zina.bash@kellerpostman.com |
| | |
| *Lead Counsel for Plaintiffs* | *Co-Lead Counsel for Plaintiffs and Government Liaison Counsel* |
| | |
| */s/ Elizabeth J. Cabraser* | */s/ W. Michael Dowling* |
| Elizabeth J. Cabraser (admitted *pro hac vice*) | W. Michael Dowling (NC Bar No. 42790) |
| Lieff Cabraser Heimann & Bernstein, LLP | The Dowling Firm PLLC |
| 275 Battery Street, 29th Floor | Post Office Box 27843 |
| San Francisco, CA 94111 | Raleigh, North Carolina 27611 |
| Telephone: (415) 956-1000 | Telephone: (919) 529-3351 |
| ecabraser@lchb.com | mike@dowlingfirm.com |
| | |
| *Co-Lead Counsel for Plaintiffs* | *Co-Lead Counsel for Plaintiffs* |
| | |
| */s/ Robin L. Greenwald* | */s/ James A. Roberts, III* |
| Robin L. Greenwald (admitted *pro hac vice*) | James A. Roberts, III |
| Weitz & Luxenberg, P.C. | Lewis & Roberts, PLLC |
| 700 Broadway | 3700 Glenwood Ave., Ste. 410 |
| New York, NY 10003 | Raleigh, NC 27612 |
| Telephone: 212-558-5802 | Telephone: (919) 981-0191 |
| rgreenwald@weitzlux.com | jar@lewis-roberts.com |
| | |
| *Co-Lead Counsel for Plaintiffs* | *Co-Lead Counsel for Plaintiffs* |

*/s/ Mona Lisa Wallace*
Mona Lisa Wallace (N.C. Bar No.: 009021)
Wallace & Graham, P.A.
525 North Main Street
Salisbury, North Carolina 28144
Tel: 704-633-5244
mwallace@wallacegraham.com

*Co-Lead Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I, J. Edward Bell, III, hereby certify that the foregoing document was electronically filed on the Court's CM/ECF system on this date, and that all counsel of record will be served with notice of the said filing via the CM/ECF system.

This the 28th day of December, 2023.

*/s/ J. Edward Bell, III*
J. Edward Bell, III
