IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
Case No. 7:23-cv-897

IN RE: )
)
CAMP LEJEUNE WATER LITIGATION )
)
This Document Relates To: )
ALL CASES )
)

**PLAINTIFFS' LEADERSHIP APPEAL OF ORDER DENYING MOTION TO COMPEL**

# INTRODUCTION

Camp Lejeune Marines, families, and employees have waited decades for the truth and justice. The government has developed important information on their exposure and resulting diseases which shape the course of this litigation and public health; it should be shared with them without further delay.

The importance of this information cannot be overstated. In 1987, the government replaced the water system at Camp Lejeune but waited ten years until the North Carolina statute of repose had run to publish its testing showing contaminated drinking water. In 2016, the Agency for Toxic Substances and Disease Registry ("ATSDR") began the Cancer Incidence Study ("CIS") "to determine whether residential or workplace exposures to the drinking water contaminants at Camp Lejeune are associated with increased risks of specific cancers in Marines/Navy personnel and civilian employees."[1] The CIS's release was expected within five years;[2] eight years later, as veterans continue to die from this exposure, and the author of the CIS says it should be released, the government refuses to publicly release or produce the CIS. It is obvious why: its findings "increase[] the known number of cancers linked to contaminated drinking water at the base" and "provide the strongest evidence to date that contaminated water caused cancer."[3]

The CIS is an explosive, one-of-a-kind document that provides critical factual evidence that is highly relevant to Plaintiffs' claims. Judge Jones recognized that "the draft CIS and supporting documents identified on Defendant's privilege log ***are undoubtedly relevant*** and ***solely in Defendant's possession***."

---

[1] *ATSDR Timeline of Public Health Activities at Camp Lejeune, North Carolina*, ATSDR (last reviewed Jan. 2017), https://www.atsdr.cdc.gov/sites/lejeune/docs/camp_lejeune_timeline.pdf [hereinafter *ATSDR Timeline*]. The ATSDR is statutorily mandated to conduct studies like the CIS. *Agency for Toxic Substances and Disease Registry*, FEDERAL REGISTER (last visited Nov. 21, 2023), https://www.federalregister.gov/agencies/agency-for-toxic-substances-and-disease-registry#:~:text=As%20the%20lead%20Agency%20within%20the%20Public%20Health,about%20health%20effects%20from%20exposure%20to%20hazardous%20substances.

[2] *Cancer Incidence Study*, ATSDR (last reviewed Dec. 11, 2019), https://www.atsdr.cdc.gov/sites/lejeune/cancer-incidence-study.html.

[3] M.B. Pell, *Unpublished Study Finds Elevated Cancer Rates at US Military Base*, REUTERS (Nov. 10, 2023), https://www.reuters.com/world/us/unpublished-study-finds-elevated-cancer-rates-us-military-base-2023-11-10/. Sadly, it is no surprise that Marines have a saying: "deny, deny, deny, until they die." Herridge, C., *"Deny Until They Die": Some Veterans Say VA Wrongly Rejects Claims for Illnesses They Blame on Camp Lejeune's Contaminated Water*, CBS NEWS (Feb. 16, 2022), https://www.cbsnews.com/news/va-camp-lejeune-contaminated-water-veterans-disability-claims/.

D.E. 85 at 11 (emphasis added). The ATSDR director admits that "ATSDR's public health work related to Camp Lejeune exposures is of interest to litigants in this case." D.E. 74-1 at ¶ 3. Dr. Cantor, a former National Cancer Institute epidemiologist, called it "ground-breaking."[4] And CIS author Dr. Bove, senior epidemiologist at the ATSDR and Center for Disease Control (CDC) and author of over 20 ATSDR studies, stated he is "frustrated by the process" and that the **study should have been released by now**. *Id.* The government cannot hide the CIS under the guise of the deliberative process privilege (DPP).

The Order denying Plaintiffs' motion to compel production of the CIS and its data files was error. *First*, in holding that the DPP applies, the Order accepted Defendant's conclusory assertions that the entirety of *all* 30 documents withheld were related to the peer review process. Defendant's assertions are dubious. For example, Defendant claims that four *data files* (.sav files) withheld in their entirety somehow contain analysis. That cannot be true; it is one reason why, at minimum, an *in camera* review and severability analysis should be ordered to determine what parts of the documents contain facts, including statistics, that are not deliberative. Indeed, the Order seems to rely on the assumption that Plaintiffs are seeking peer-reviewers' notes and comments. Not so. Plaintiffs seek only the factual study and its underlying data. Relatedly, the Order's conclusion that the entirety of the CIS is not a factual document simply because the study must undergo another peer review is also incorrect. That finding should have only been made after an *in camera* review.

Having improperly accepted the government's assertions at face value to support the DPP, the Order also did not properly weigh the factors courts apply to determine if the needs of the Plaintiffs to access privileged information outweigh Defendant's interest in protecting any "deliberative" elements. The study, which contains the most up-to-date causation data, is undisputedly one of the most – if not *the* most – important documents in this case. The government's refusal to produce it impedes Plaintiffs' ability to effectively litigate this action for the benefit of all Plaintiffs. Others might be prevented from bringing a claim altogether without this new cancer incidence data, all while the government idly passes the CIS

---

[4] M.B. Pell, *supra* note 3.

through bureaucratic channels. The finding that releasing the CIS could chill the integrity of the scientific review process is incorrect because Plaintiffs seek the factual elements of the study and its data, not comments of peer reviewers, which can be redacted. Indeed, the Order's chilling effect analysis has it exactly backwards: allowing the government to hide the CIS and its underlying data *will* severely chill the rights of hundreds of thousands of victims. If the Order stands, any document the government stamps "DRAFT" and claims is "deliberative" will qualify for the DPP. If the Order stands, the government would be incentivized *never* to convert the study from "draft" to final, at least not until this litigation is over. This strategic delay is likely already occurring. This Court should put a stop to such gamesmanship.

## PROCEDURAL BACKGROUND

On December 4, 2023, Plaintiffs filed a Motion to Compel Production of the ATSDR CIS ("Motion"). D.E. 64–65. Defendant opposed, submitting a never-before-seen privilege log and declaration from Dr. Aaron Bernstein, Director of the National Cancer Center for Environmental Health at the CDC and the ATSDR, asserting the DPP over the entirety of 30 documents. *See* D.E. 74. On December 19, 2023, the Honorable Robert B. Jones denied Plaintiffs' Motion, finding the DPP applied to the entirety of the CIS and its data and that the relevant balancing factors weighed in favor of Defendant. D.E. 85.

## LEGAL STANDARD

Under LOCAL R. 72.4, Plaintiffs have 14 days to appeal the Order. The Court "shall consider the appeal and set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law." *Id.*; *see also* FED. R. CIV. P. 72(a) (reiterating "clearly erroneous or contrary to law" standard); 28 U.S.C. § 636(b)(1)(A) (same). As explained herein, the Order is clearly erroneous and contrary to law.

## ARGUMENT

The Order is clear error because it improperly accepts Defendant's conclusory and contradictory assertions in concluding that the DPP applies to all parts of all documents. At a minimum, an *in camera* review is warranted to test Defendant's conclusory and contradictory assertions and, where appropriate, segregate factual portions of the documents to which the DPP does not apply. The Order also incorrectly balances the factors courts use to determine whether the need for the information outweighs the public

3

interest (if any) in non-disclosure.

I. **The Order Incorrectly Concluded That the Deliberative Process Privilege Applies.**

For Defendant to "invoke the [DPP] successfully, [it] must show that, in 'the context in which the materials are used,' the documents are both predecisional and deliberative." *U.S. v. Bertie Ambulance Serv., Inc.*, No. 2:14-CV-53-F, 2015 WL 3932167, at *3 (E.D.N.C. June 25, 2015) (quoting *City of Va. Beach v. U.S. Dep't of Commerce*, 995 F.2d 1247, 1253 (4th Cir. 1993)). A document is "predecisional" if it was "prepared in order to assist an agency decisionmaker in arriving at his decision." *Id.* (quotation omitted). A document is "deliberative" if it "reflects the give-and-take of the consultative process by revealing the manner in which the agency evaluates possible alternative policies or outcomes." *Id.* (emphasis added) (quoting *City of Va. Beach*, 995 F.2d at 1253). The DPP "is to be construed narrowly, and the burden rests upon the government to be precise and conservative in its privilege claims." *Ethyl Corp. v. U.S. E.P.A*, 25 F.3d 1241, 1248 (4th Cir. 1994). Courts cannot rely on conclusory assertions of privilege. *See id.* at 1249.

A. **The Order Should Not Have Relied on Defendant's Conclusory and Contradictory Privilege Assertions Without Conducting an *In Camera* Review.**

In determining that every line and data field of all 30 documents are subject to the DPP, the Order relies solely on Defendant's conclusory assertions. D.E. 85 at 6 ("Defendant asserts that of the 30 documents withheld, 26 contain 'revisions,' 'comments,' or else are directly related to the peer review process."). Defendant asserts that documents contain "revisions, "comments," or are "data files," DE-74-2, all of which it claims "contain deliberative and pre-decisional analyses," and includes a bare-bones Declaration stating that the CIS is a draft undergoing peer review and the "underlying study data and analytical files . . . are part of the deliberative review and intertwined with the Cancer Incidence Study's analysis," DE-74-1 at ¶ 9; *see also* D.E. 85 at 5–8.

Courts are clear that a defendant does not meet its burden to demonstrate that the DPP applies where, as here, it submits "privilege log descriptions [that] provide only conclusory assertions." *Harrison v. Shanahan*, No. 1:18-cv-641 (LMB/IDD), 2019 WL 2216474, at *5 (E.D. Va. May 22, 2019) (defendant's burden likely not met if "[m]any of the privilege log entries use the same description for several

4

documents"); *see also Heartland Alliance for Human Needs & Human Rights v. U.S. DHS*, 291 F. Supp. 3d 69, 79 (D.D.C. 2018) ("A mere recitation of the [DPP] standard . . . is not insufficient."). Courts likewise find that "conclusory descriptions do not supply the 'specific facts' needed to justify defendants' invocation of the privilege." *Harrison*, 2019 WL 2216474, at *5. Here, the privilege log and declaration contain few factual details, leaving the court "entirely dependent upon the [government]'s own assertions that the release of the documents in question would 'significantly curtail . . . the expression of such opinions, analyses, and recommendations in future deliberations.'" *Ethyl Corp.*, 25 F.3d at 1250. The government failed to "carry its burden of satisfying the requirements of demonstrating" that the DPP applies. *Id.* Thus, "some other means of review must be undertaken, such as *in camera* review." *Id.*

For example, the government withholds four data files in their entirety, asserting the files contain "ATSDR's analyses of the data." D.E. 74-2, no. 7. It is impossible to square how a .sav statistical data file contains a deliberative *analysis* of the data. Dr. Bernstein's declaration conclusively asserts that the underlying data is "part of the deliberative review" without explaining how or why. D.E. 74-1 at ¶ 9. And the declaration contradicts the privilege log by treating "the underlying study data" as separate and distinct from the "analytical files." *Id*. (referring to "underlying data *and* analytical files"); *see also* D.E. 74 at 10 (asserting that "the data underpinning the draft CIS, [] is separate and apart from the analytical data sets"). Defendant's inconsistent assertions do not pass the smell test.

Finally, the cases cited in the Order support an *in camera* review. The Order relies on *Hooker v. U.S. Dept. of H.H.S.* to conclude that the privilege applies, but there, the district court had conducted an *in camera* review to determine whether the DPP was properly applied and whether the government acted in bad faith. 887 F. Supp. 2d 40, 56 (D.D.C. 2012), *aff'd* No. 13-5280, 2014 WL 3014213 (D.C. Cir. May 13, 2014). As the Supreme Court has explained, "[i]f the evidence establishes that an agency has hidden a functionally final decision in draft form, the [DPP] will not apply." *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 273 (2021). Here, Defendant has not provided sufficient information to ensure it is not manipulating the privilege, and the government unfortunately has a track record of hiding critical information from its veterans regarding contamination at Camp Lejeune. *See Rein v. U.S.P.T.O.*, 553 F.3d

5

353, 366–68 (4th Cir. 2009) (describing the level of specificity required to avoid *in camera* review); *accord Ethyl Corp.*, 25 F.3d at 1250. Thus, the Court should have conducted an *in camera* review to ensure that Defendant is not improperly hiding a functionally final study.

      **B.**      <u>**The Order Failed to Consider Whether Parts of Documents Were Segregable.**</u>

"A court errs if it simply approve[s] the withholding of an entire document without entering a finding on segregability, or the lack thereof." *Heartland Alliance*, 291 F. Supp. 3d at 82 (quotation omitted); *see also City of Va. Beach, Va.*, 995 F.2d at 1256. Defendant bears the burden of establishing that factual material is so "inextricably intertwined" with privileged material that it cannot be excised. *See Heartland Alliance*, 291 F. Supp. 3d at 82–83; *City of Va. Beach*, 995 F.2d at 1253 ("[P]urely factual material does not fall within the exemption unless it is inextricably intertwined with policymaking processes." (quotation omitted)). Thus, Plaintiffs are entitled, at a minimum, to any data and other similar files that are segregable from draft word documents analyzing the data. An *in camera review* would likely discover that such technical data does not qualify for the DPP because it does "not involve the kind and scope of discretion . . . of such significance that disclosure genuinely could be thought likely to diminish the candor of agency deliberations in the future." *See NAACP v. Bureau of Census*, 401 F. Supp. 3d 608, 616–17 (D. Md. 2019) (quotation omitted) (technical spreadsheets not protected by the DPP). Instead, the Order approved the withholding of the entirety of all 30 documents without a finding on segregability. Returning to the data file example, even taking the government's confusing assertion at face value, surely parts of the files contain data that is segregable. The same holds for word documents: "Comments from three external peer reviewers," D.E. 74-2, no. 6, can surely be redacted from other factual portions of the CIS. Defendant failed to meet its burden "to be precise and conservative in its privilege claims," *Ethyl Corp.*, 25 F.3d at 1248, and so the Order erred by failing to make a meaningful finding on segregability.

      **C.**      <u>**The Order Improperly Treated Factual Information as Deliberative.**</u>

The DPP applies to "'opinions' [but] it does not cover 'facts.'" *Cipollone v. Liggett Grp. Inc.*, 812 F.2d 1400 (Table) (4th Cir. 1987). It only covers "subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Hooker*, 887 F. Supp. 2d at 56.

By its nature, a cancer incidence study does not involve traditional decision-making or opinions. It reports objective results. Indeed, "incidence" is defined by ATSDR as: "[t]he number of new cases of disease in a defined population over a specific time period."[5] Incidence is represented by the formula: Incidence rate = (New cancers / Population) × 100,000.[6] Thus, the CIS reports scientific, mathematical results, not opinions or policies. Also, the government's assertion that "[t]he collection and management of this data is also intertwined in the ATSDR study authors' preliminary analysis and draft conclusions" is insufficient. D.E. 74-1 at ¶ 9. In *Heartland*, the court stated that while "the act of compiling facts and selecting data to include in a summary or report may itself be deliberative," if an agency "determined, and shared publicly, which information and metrics would be included in the statistical reports," there are no decisions being made by the drafter. 291 F. Supp. 3d at 82–83. ATSDR's "collection and management" of data is insufficient to support the DPP because its website identifies the data sources it intends to use.[7]

### D. The Order Failed to Identify a Proper "Decision" to Which the DPP Applies.

First, the Order accepted the government's blanket assertions that the documents qualify for the DPP merely because the study must undergo more review before publishing. D.E. 85 at 6–8; *see also* D.E. 74 at 6. But if this were the law, the government could simply delay publishing any study that contained damning facts about its conduct by submitting it to endless peer-review. The Order also concluded that all the documents are deliberative because they relate to the government's "decision" to "publish a hypothetical final CIS." D.E. 85 at 6.[8] But this cannot be so because it would license the government to call any unfavorable document a draft and simply argue that the DPP applies because the "decision" at issue is whether to publish it. *See Heartland Alliance*, 291 F. Supp. 3d at 79 ("The fact that [] documents are drafts

---

[5] *Glossary of Terms*, ATSDR (last reviewed Jan. 1, 2009), https://www.atsdr.cdc.gov/glossary.html; *see also* Tenny, S. et al., *Incidence*, NAT'L LIB. OF MED.: NAT'L CTR. FOR BIOTECH. INFO. (last updated Apr. 10, 2023), https://www.ncbi.nlm.nih.gov/books/NBK430746/.
[6] *Cancer Incidence Rates*, NAT'L CANCER INST.: SURVEILLANCE, EPIDEMIOLOGY, AND END RESULTS PROGRAM, https://seer.cancer.gov/statistics/types/incidence.html.
[7] *Cancer Incidence Study*, *supra* note 2.
[8] Plaintiffs explain why the CIS is unrelated to any decision in their Memorandum in Support of Motion to Compel, D.E. 65 at 5–6. But in any event, the CIS is not hypothetical, as the ATSDR indicates its intention to publish the CIS on its website. *Cancer Incidence Study*, *supra* note 2.

7

and contain edits does not, alone, qualify them for protection under the deliberative process privilege."). Moreover, *even if* the decision to publish were the relevant inquiry, the DPP still fails because Defendant did not "explain how that decision was made, aside from averring that the process included peer review." *Pavement Coatings Tech. Council v. U.S. Geo. Survey*, 995 F.3d 1014, 1021–22 (D.C. Cir. 2021) (where the agency "fail[s] to explain in detail" whether the requested information "w[as] shared with peer reviewers and what role, if any, [it] played in the peer review process," the agency improperly "conflates the deliberative process of *coming to a reliable scientific result* with the approving officials' *decision to publish*" the study). An agency must "establish how its decision to publish [a study] was reached; what information was shared with reviewers, internal and external; whether drafts reviewed by agency officials making the publication decision included the underlying [requested data]; and how the [requested information] influenced the decision to publish or the form the final publication would take." *Id.* Defendant did not satisfy its burden here. Second, even if the CIS reflects ASTDR's "choice, weighing and analysis of facts," "a report does not become part of the deliberative process merely because it contains only those facts which the person making the report thinks material." *Playboy Enters., Inc. v. Dept. of Justice*, 677 F.2d 931, 935 (D.C. Cir. 1982).

## II. Even If the Privilege Applies, the Order Improperly Weighed the Balancing Factors.

The Order erred in its application of the four-factor balancing test used to weigh the "public interest in nondisclosure [against] the need for the information as evidence." *Stone v. Trump,* 453 F. Supp. 3d 758, 765 (D. Md. 2020) (quotation omitted); D.E. 85 at 8 (evaluating: (1) relevance of evidence; (2) availability of alternatives; (3) Government's role in the litigation; and (4) effect of disclosure).

### A. The Order Fails to Acknowledge the CIS's Centrality to Plaintiffs' Claims.

The Order is correct in its conclusion that the first factor weighs in Plaintiffs' favor of because the study is "undoubtedly relevant" to this litigation, D.E. 85 at 11, but it minimized the importance of this factor. It concludes that the CIS is "just one of numerous studies regarding potential health effects from exposure to Camp Lejeune," D.E. 85 at 8. But this analysis speaks to Factor 2, and the CIS is *not* "just one of numerous studies." No other study offers the same, up-to-date information uniquely tailored to

8

Case 7:23-cv-00897-RJ   Document 101   Filed 01/02/24   Page 9 of 13

incidences of cancer related to Camp Lejeune contamination. Dr. Cantor, who read the CIS, stated that its results "increase[] the known number of cancers linked to contaminated drinking water at the base" and "provide the strongest evidence to date that contaminated water caused cancer."[9] The CIS is vital to Plaintiffs' causation arguments under the CLJA and necessary for ongoing litigation decisions, including selecting future track diseases and bellwether plaintiffs. This factor weighs *heavily* in favor of disclosure.

### B. The Order Incorrectly Finds Alternative Evidence Is Available to Plaintiffs.

The Order incorrectly concludes Factor 2 is neutral, despite acknowledging that "there is no dispute that the draft CIS and supporting documents . . . are in the exclusive possession of ATSDR and unavailable to Plaintiffs." D.E. 85 at 9. While other studies exist, Plaintiffs do not have access to the most up-to-date data on cancer incidences at Camp Lejeune. Indeed, the example cited in the Order as an alternative to the CIS is a seven-year-old report that covers only 16 diseases. *Id.* at 9 n.3. Plaintiffs remain on an uneven playing field with Defendant so long as Defendant gatekeeps critical, relevant, and current data.

Also, that *some* of the CIS's underlying data *may* be public, *see* D.E. 85 at 9 (citing D.E. 74 at 11), does not render this factor neutral.[10] If anything, it cuts against the application of the DPP because it shows the CIS did not involve "decision-making." *Heartland Alliance*, 291 F. Supp. 3d at 82–83. Moreover, it is contrary to the just, efficient, and speedy resolution of this litigation to require Plaintiffs to obtain information from outside sources that is already in the government's possession. *See* FED. R. CIV. P. 1.

### C. The Order Correctly Found That Factor 3 Weighs in Favor of Plaintiffs.

The Order correctly found that "[f]actor three weighs in Plaintiffs' favor, as the government is the Defendant … [and] controlled day-to-day operations at Camp Lejeune." D.E. 85 at 9.

### D. The Order Misapplies the Law Concerning the Chilling Effect of Disclosure.

The Order committed clear error in finding that Factor 4 "weighs heavily in favor of Defendant," citing the government's conclusory statement that release of the CIS would "suppress the routine scientific

---

[9] M.B. Pell, *supra* note 3.
[10] Some, *but certainly not all*, of the data underlying the CIS is available to Plaintiffs. For example, data relevant to Camp Pendleton –used as a control – is not available to Plaintiffs.

review process and have a chilling effect on deliberations." D.E. 85 at 9 (citing D.E. 74-1 at ¶ 10). It cites to a single case upholding the DPP over a letter with reviewers' notes because the "release of reviewers' editorial comments would very likely have a chilling effect . . . [and] a government author is likely to be less willing to submit her work to a [] journal [] if critical reviews could come to light somewhere down the line." D.E. 85 at 10 (citing *Formaldehyde Inst. v. Dep't of H.H.S.*, 889 F.2d 1118, 1125 (D.C. Cir. 1989)). But here: (1) Plaintiffs do not seek reviewers' comments, so there is no concern that reviewers will be chilled in providing them; and (2) the ATSDR will not be less likely to submit its work for review because CERCLA **statutorily requires** it to do so. Also, Plaintiffs do not request a first draft, but rather a near-final study that has been through *two* rounds of peer review.[11] *See S. Enviro. L. Ctr. v. Council on Enviro. Quality*, 507 F. Supp. 3d 694, 701 (W.D. Va. 2020) (ordering disclosure of draft documents containing final edits after *in camera* review "showed scant risk" of chilling the review process or confusing the public).

The Order's final concern, that "compelling production of an incomplete CIS subject to change would garner significant [media] attention" and cause public confusion, D.E. 85 at 10, is unsupported.[12] Although "public confusion" is "a ground for withholding deliberative materials[,] . . . the privilege's 'ultimate aim' is to 'prevent injury to the quality of agency decisions.'" *Pavement Coatings Tech. Council*, 995 F.3d at 1022 (quotation omitted). Such concerns are considered in light of the "obligat[ion] to construe the [DPP] narrowly and focus on whether disclosure will harm intra-agency candor and efficiency." *Id.* (citation omitted). Here, Plaintiffs do not seek reviewer comments, so there is no concern that "scientists will cease to conduct" similar analysis "in the future or do them differently" if disclosure is compelled. *Id.* at 1023. Lastly, any concerns about media attention can be alleviated through a protective order.

## CONCLUSION

For the above reasons, the Court should order production of the CIS, order an *in camera* review, or hold an evidentiary hearing to determine whether grounds exist for the government's DPP assertion.

---

[11] The CIS has received comments from *six* peer-reviewers, yet it sits in an indefinite limbo. D.E. 74-2.
[12] Notably, it is the ***failure*** of the ATSDR to publish the CIS that is the subject of media attention. *See* M.B. Pell, *supra* note 3.

DATED this 2nd day of January, 2024.

| | |
|---|---|
| /s/   J. Edward Bell, III | /s/   Zina Bash |
| J. Edward Bell, III (admitted *pro hac vice*) | Zina Bash (admitted *pro hac vice*) |
| Bell Legal Group, LLC | Keller Postman LLC |
| 219 Ridge St. | 111 Congress Avenue, Suite 500 |
| Georgetown, SC 29440 | Austin, TX 78701 |
| Telephone: (843) 546-2408 | Telephone: 956-345-9462 |
| jeb@belllegalgroup.com | zina.bash@kellerpostman.com |
| | |
| *Lead Counsel for Plaintiffs* | *Co-Lead Counsel for Plaintiffs and Government Liaison Counsel* |
| | |
| /s/   Elizabeth J. Cabraser | /s/   W. Michael Dowling |
| Elizabeth J. Cabraser (admitted *pro hac vice*) | W. Michael Dowling (NC Bar No. 42790) |
| Lieff Cabraser Heimann & Bernstein, LLP | The Dowling Firm PLLC |
| 275 Battery Street, 29th Floor | Post Office Box 27843 |
| San Francisco, CA 94111 | Raleigh, North Carolina 27611 |
| Telephone: (415) 956-1000 | Telephone: (919) 529-3351 |
| ecabraser@lchb.com | mike@dowlingfirm.com |
| | |
| *Co-Lead Counsel for Plaintiffs* | *Co-Lead Counsel for Plaintiffs* |
| | |
| /s/   Robin L. Greenwald | /s/   James A. Roberts, III |
| Robin L. Greenwald (admitted *pro hac vice*) | James A. Roberts, III |
| Weitz & Luxenberg, P.C. | Lewis & Roberts, PLLC |
| 700 Broadway | 3700 Glenwood Ave., Ste. 410 |
| New York, NY 10003 | Raleigh, NC 27612 |
| Telephone: 212-558-5802 | Telephone: (919) 981-0191 |
| rgreenwald@weitzlux.com | jar@lewis-roberts.com |
| | |
| *Co-Lead Counsel for Plaintiffs* | *Co-Lead Counsel for Plaintiffs* |

/s/   Mona Lisa Wallace
Mona Lisa Wallace (N.C. Bar No.: 009021)
Wallace & Graham, P.A.
525 North Main Street
Salisbury, North Carolina 28144
Tel: 704-633-5244
mwallace@wallacegraham.com

*Co-Lead Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I, J. Edward Bell, III, hereby certify that the foregoing document was electronically filed on the Court's CM/ECF system on this date, and that all counsel of record will be served with notice of the said filing via the CM/ECF system.

This the 2nd day of January, 2024.

*/s/ J. Edward Bell, III*_____<br>
J. Edward Bell, III