**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:23-CV-897**

**In re**
**Camp Lejeune Water Litigation**

**This document applies to:**
**ALL CASES**

**MEMORANDUM IN SUPPORT OF
PLAINTIFFS' LEADERSHIP GROUP'S MOTION FOR
PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................5

    A.    Congress Established The VA System To Compensate Veterans For Disabilities Based On Presumptions Of A Service Connection ............................5

    B.    The IOM Recommends A New Classification Scheme............................................7

    C.    The Agency For Toxic Substances And Disease Registry Determines In 2017 That Multiple Health Conditions Are Causally Linked To Water At Camp Lejeune ............................................................................................................9

    D.    Congress Passes The PACT Act And Partially Incorporates The 2008 IOM Classification Scheme ............................................................................................9

LEGAL STANDARD........................................................................................................11

ARGUMENT ....................................................................................................................12

I.     The Text And Structure Of The CLJA Requires Plaintiffs To Prove General Causation, Not Specific Causation ........................................................................12

    A.    The CLJA Adopts A Bright-Line Exposure Requirement And A Lower Burden To Establish Causation........................................................................13

    B.    The CLJA's Statutory Causation Standard Refers To Evidence Associated With General Causation ................................................................................15

    C.    The CLJA's Causation Standard Does Not Require Specific Causation................18

II.    The Legislative Context Confirms That The CLJA Requires Only General Causation..................................................................................................................20

III.   Construing The Plaintiffs' Burden To Require Only Exposure And General Causation Furthers Congress's Purposes ...............................................................22

IV.   Precedent Interpreting Other Federal Statutory Torts Confirms This Reading Of The CLJA's Special Causation Standard................................................................24

V.    If The CLJA Were Unclear, The Veteran's Canon Requires Ruling For Plaintiffs .........26

CONCLUSION................................................................................................................27

Case 7:23-cv-00897-RJ   Document 111   Filed 01/15/24   Page 2 of 36

# TABLE OF AUTHORITIES

**Cases**

*Baber v. Hosp. Corp. of Am.*,
  977 F.2d 872 (4th Cir. 1992) ...................................................................................12

*Bd. of Trs. of Leland Stanford Jr. Univ. v. Roche Molecular Sys., Inc.*,
  563 U.S. 776 (2011) ...............................................................................................17

*Bershad v. McDonough*,
  428 F.2d 693 (7th Cir. 1970) ...................................................................................23

*Brown v. Gardner*,
  513 U.S. 115 (1994) ...............................................................................................26

*Clodfelter v. Rep. of Sudan*,
  720 F.3d 199 (4th Cir. 2013) ...................................................................................24

*Consol. Rail Corp. v. Gottshall*,
  512 U.S. 532 (1994) ...............................................................................................25

*CSX Transp., Inc. v. McBride*,
  564 U.S. 685 (2011) ...................................................................................13, 14, 25

*Davidson v. United Auto Credit Corp.*,
  65 F.4th 124 (4th Cir. 2023) ...................................................................................27

*Desert Palace, Inc. v. Costa*,
  539 U.S. 90 (2003) ...........................................................................................14, 25

*George v. McDonough*,
  596 U.S. 740 (2022) ...............................................................................................21

*Gordon v. Pete's Auto Serv. of Denbigh, Inc.*,
  637 F.3d 454 (4th Cir. 2011) ...................................................................................27

*Hemi Grp., LLC v. City of New York, N.Y.*,
  559 U.S. 1 (2010) ...................................................................................................25

*King v. St. Vincent's Hosp.*,
  502 U.S. 215 (1991) ...............................................................................................26

*Le Maistre v. Leffers*,
  333 U.S. 1 (1948) ...................................................................................................27

Case 7:23-cv-00897-RJ   Document 111   Filed 01/15/24   Page 3 of 36

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig. (No. II)*,
892 F.3d 624 (4th Cir. 2018) ...................................................................................14, 16, 23

*Little v. Shell Expl. & Prod. Co.*,
690 F.3d 282 (5th Cir. 2012) ...........................................................................................18

*Monahan v. Cnty. of Chesterfield, VA.*,
95 F.3d 1263 (4th Cir. 1996) ...........................................................................................24

*Nehmer v. U.S. Dep't of Veterans Affs.*,
494 F.3d 846 (9th Cir. 2007) .............................................................................................6

*Nehmer v. U.S. Veterans' Admin.*,
32 F. Supp. 2d 1175 (N.D. Cal. 1999) ....................................................................7, 8, 10

*Nehmer v. U.S. Veterans' Admin.*,
712 F. Supp. 1404 (N.D. Cal. 1989) ..................................................................................7

*In re Nexium Esomeprazole*,
662 F. App'x 528 (9th Cir. 2016) .....................................................................................19

*Norfolk S. Ry. Co. v. Sorrell*,
549 U.S. 158 (2007).....................................................................................................13, 14

*Norris v. Baxter Healthcare Corp.*,
397 F.3d 878 (10th Cir. 2005) ..........................................................................................19

*Reliance Elec. Co. v. Emerson Elec. Co.*,
404 U.S. 418 (1972).........................................................................................................23

*Rogers v. Mo. Pac. R. Co.*,
352 U.S. 500 (1957).........................................................................................................14

*Shedden v. Principi*,
381 F.3d 1163 (Fed. Cir. 2004)...........................................................................................5

*Staub v. Proctor Hosp.*,
562 U.S. 411 (2011).........................................................................................................25

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*,
552 U.S. 148 (2008).........................................................................................................14

*Taggart v. Lorenzen*,
139 S. Ct. 1795 (2019)......................................................................................................21

*United States v. Muniz*,
374 U.S. 150 (1963).........................................................................................................14

*Univ. of Texas Sw. Med. Ctr. v. Nassar*,
  570 U.S. 338 (2013) .................................................................................13, 14

*Wells v. SmithKline Beecham Corp.*,
  601 F.3d 375 (5th Cir. 2010) ..............................................................................19

*Westberry v. Gislaved Gummi AB*,
  178 F.3d 257 (4th Cir. 1999) ...................................................................14, 18, 23

**Statutes**

28 U.S.C. § 2674 ......................................................................................................14

38 U.S.C. § 1110 ........................................................................................................5

38 U.S.C. § 1116(b)(1) (2021) ................................................................................7, 8

38 U.S.C. § 1116(b)(3) (2021) ...................................................................................7

38 U.S.C. § 1131 ........................................................................................................5

38 U.S.C. § 1172(b)-(d) ...........................................................................................17

38 U.S.C. § 1173(a) ..................................................................................................17

38 U.S.C. § 1173(c)(2)(A)-(B) .................................................................................17

42 U.S.C. § 2000e-2(m) ...........................................................................................25

45 U.S.C. § 51 ..........................................................................................................25

50 U.S.C. § 4042 ......................................................................................................26

Agent Orange Act of 1991, Pub. L. No. 102-4, 105 Stat. 11 ....................................6

Camp Lejeune Justice Act, Pub. L. No. 117-168, § 804, 136 Stat. 1802, 1802-04
  (2022) (to be codified at 28 U.S.C. § 2671 note) .....................................................1

  § 804(b) ............................................................3, 10, 12, 13, 14, 23
  § 804(c) ..........................................................1, 11, 12, 17, 18, 22
  § 804(c)(1) ....................................................................................13
  § 804(c)(2) ......................................................2, 11, 12, 13, 15, 17
  § 804(c)(2)(A) ...............................................................................11
  § 804(c)(2)(B) ...............................................................................11
  § 804(f) .............................................................3, 10, 12, 13, 14, 23
  § 804(g) ..........................................................................................10
  § 804(j)(3) ........................................................3, 10, 12, 13, 14, 23

National Defense Authorization Act for Fiscal Year 2004, Pub. L. No. 108-136,
117 Stat. 1392 (2003).....................................................................................................7

Persian Gulf War Veterans' Benefits Act, Pub. L. No. 103-446, 108 Stat. 4647
(1994).................................................................................................................................6

Racketeer Influenced & Corrupt Organizations Act, 18 U.S.C. § 1964(c) ....................25

Radiation-Exposed Veterans Compensation Act of 1988, Pub. L. No. 100-321,
102 Stat. 485 ....................................................................................................................6

Sergeant First Class Heath Robinson Honoring Our Promise to Address
Comprehensive Toxics Act of 2022 ..............................................................................2

§ 202(a) ...............................................................................................................17, 18
§ 1172(d) .............................................................................................................10, 18
§ 1173(c)(2) ...............................................................................................................10

Servicemembers Civil Relief Act, 50 U.S.C. § 3901 *et seq.* .........................................26

War Risk Insurance Act, Pub. L. No. 67-47, ch. 57, 42 Stat. 147 (1921) .......................6

**Rules**

Fed. R. Civ. P. 56(a) ................................................................................................11, 12

Fed. R. Civ. P. 1 ...............................................................................................................4

Fed. R. Civ. P. 16(a) ........................................................................................................4

Fed. R. Civ. P. Rule 16(c)(2)(A) .....................................................................................4

Fed. R. Civ. P. Rule 16(c)(2)(C) .....................................................................................4

Fed. R. Civ. P. Rule 16(c)(2)(D) .....................................................................................4

Fed. R. Civ. P. Rule 16(c)(2)(E) ...................................................................................4, 5

**Other Authorities**

38 C.F.R. § 3.307(a)(5) ....................................................................................................6

38 C.F.R. § 3.307(a)(6)(ii) ...............................................................................................6

38 C.F.R. § 3.307(a)(7)(ii) ...............................................................................................6

168 Cong. Rec. H1219 (daily ed. Mar. 2, 2022)..............................................................9

Agency for Toxic Substances and Disease Registry, *Assessment of the Evidence for the Drinking Water Contaminants at Camp Lejeune and Specific Cancers and Other Diseases* (2017), https://www.atsdr.cdc.gov/sites/lejeune/docs/atsdr_summary_of_the_evidence_for_causality_tce_pce-508.pdf.............................................................................9, 16, 19, 20

Austin Bradford Hill, *The Environment and Disease: Association or Causation?* 58 Proc. Royal Soc'y Med. 295 (1965)......................................................................................16

Instit. of Med., *Improving the Presumptive Disability Decision-Making Process for Veterans*, at 71 (Nat'l Academies Press 2008), https://doi.org/10.17226/11908...............................................................6, 8, 20, 23

Michael D. Green et al., Reference Guide on Epidemiology, in *Reference Manual on Scientific Evidence* 566 (3d ed. 2011).......................................................15, 16, 18, 19, 21

Remarks by President Biden at Signing of S. 3373, "The Sergeant First Class Heath Robinson Honoring Our Promises to Address Comprehensive Toxics (PACT) Act of 2022," 2022 WL 3225418 (Aug. 10, 2022)...................................................11

Restatement (Third) of Torts: Phys. & Emot. Harm § 28 (2010)................................12, 13, 14, 15

Sidath Viranga Panangala, Cong. Rsch. Serv., R41405, *Veterans Affairs: Presumptive Service Connection and Disability Compensation* 3-4 (updated Nov. 18, 2014), https://crsreports.congress.gov/product/pdf/R/R41405 .............................5, 7

## INTRODUCTION

Between 1953 and 1987, the water at the Marine Corps Base Camp Lejeune in North Carolina ("Camp Lejeune") poisoned roughly one million people. That water contained toxic chemicals known to cause cancer and other severe illnesses. Rather than address the harm these toxins caused, the government denied all knowledge and refused to compensate the affected marines, civilian staff, and family members. In 2022, thirty-five years after the last toxic water plant closed and nearly seven decades after the first person sipped or bathed in the poisoned water, Congress addressed this injustice by passing the Camp Lejeune Justice Act (the "CLJA"), Pub. L. No. 117-168, § 804, 136 Stat. 1802, 1802-04 (2022) (to be codified at 28 U.S.C. § 2671 note).

The CLJA creates a novel blend of tort and administrative procedures. On the one hand, the CLJA waives sovereign immunity, waives statutes of limitations and repose, creates a cause of action under federal law enabling plaintiffs to bring a tort claim against the United States in court, and preserves the right to jury trials. On the other hand, the CLJA requires that all claims first proceed through an administrative process, bars punitive damages, and—critically here—provides a special, simplified method of proving causation. In keeping with this compromise, the CLJA's causation standard differs from the background common-law rule. Under the common law, plaintiffs injured by a toxic substance must prove (1) "exposure" to the substance; (2) that the substance can cause the injury ("general causation"); and (3) that the exposure to the substance, rather than something else, caused the injury ("specific causation")—all by a preponderance of the evidence. The text, structure, legislative context, and purpose of the CLJA all confirm that the statute purposely departed from these elements, creating a unique statutory causation standard.

First, the text of the CLJA sets out an exclusive and exhaustive statutory causation standard that turns on a group-level analysis, not individual traits. The CLJA expressly defines the "Burdens And Standard Of Proof" that govern a claim. CLJA § 804(c). Under that definition, a

plaintiff meets his burden of proof if he shows that "the relationship between exposure to the water at Camp Lejeune and the harm is . . . sufficient to conclude that a causal relationship is at least as likely as not." CLJA § 804(c)(2). In other words, a plaintiff satisfies his burden of proof by demonstrating that exposure to the Camp Lejeune water, during the statutory time period, is at least as likely as not a cause of the type of injury he suffered. This question is the functional equivalent of general causation, which asks whether exposure to a substance is capable of causing a disease in *any* person, rather than whether exposure to the substance was a cause of disease in a *particular* person. A plaintiff who demonstrates this relationship—and 30 days on base—satisfies the CLJA's causation standard. No individualized showing that rules out other potential causes (traditional specific causation) is required.

Second, statutory context and structure bolster this interpretation. The CLJA is one part of the Sergeant First Class Heath Robinson Honoring Our Promise to Address Comprehensive Toxics Act of 2022 (the "PACT Act"), which broadly updated the U.S. Department of Veterans Affairs' (the "VA") system of compensating veterans for disabilities. Under the VA's system, sufficiently strong scientific evidence linking a type of injury to military service allows the VA to *presume* that a veteran's injury was connected to military service, *without* individualized causation evidence. Section 202 of the PACT Act reformed the VA system using almost verbatim the standard adopted in the CLJA, confirming the tight connection between these two systems. Other sections throughout the PACT Act use the same terms in the same context—always to indicate a group-level inquiry.

Third, legislative context makes clear that Congress adopted the CLJA's statutory causation standard from VA regulations and scientific studies. Congress borrowed the CLJA's terms for classifying the strength of the causal relationship from a 2008 Institute of Medicine (the

"IOM") classification scheme (the "2008 IOM Classification"). The IOM's system is unmistakably a group-level analysis and cannot be used to assess individualized causation. In 2017, the Agency for Toxic Substances and Disease Registry (the "ATSDR") used the 2008 IOM Classification in a study of relationships between toxins in the water at Camp Lejeune and various diseases, again, addressing only group-level general causation. IOM and ATSDR required only general causation because the IOM Classification and 2017 study were intended to be used by the VA in administering its presumption system. By defining the burden of proving causation under the CLJA as *the very same inquiry described by IOM and performed by ATSDR*, Congress foreclosed any argument that a plaintiff must make a further individualized showing that nothing else caused his injury.

Fourth, creating a special causation standard is consistent with the central purpose of the CLJA. Congress sought to compensate Camp Lejeune victims through the CLJA notwithstanding the passage of *35-70 years* since exposure to the toxic water. This amount of time poses significant challenges in proving individualized facts. Accordingly, Congress used bright-line rules to ease the challenge of fully litigating all individual issues decades later. One such rule is the 30-days-on-base exposure threshold. CLJA § 804(b). Another is the requirement to prove general causation only, which can be done for entire groups of veterans at once. Requiring proof of specific causation would bog down litigation in highly individualized inquiries that could last for years. Congress did not intend for hundreds of thousands of plaintiffs to retain specific causation experts to conduct an individualized analysis ruling out alternative possible causes and detailing exposure facts for toxic water from a lifetime ago based on medical records that may not even be available.

Finally, even if the tools of statutory interpretation left the causation question open, the Court should grant the motion under the Veteran's Canon. This Canon provides that because Congress consistently intends to protect veterans, where a statute is unclear, courts best effectuate congressional intent by construing the statute in the way that favors the interests of veterans. Here, granting the motion undoubtedly furthers veterans' interests.

It would be counterproductive—and contrary to the statute's text and purpose—for the parties, the Court, or the limited resource that is this district's jury pool to expend time and money on fact discovery, expert reports, and witnesses that are unnecessary to prove causation under the CLJA. The function of trials in this litigation is to generate an array of damages verdicts from which the parties can extrapolate to reach a global resolution. At least for the conditions where the government's own scientists agree that a causal relationship is at least as likely as not, this can be accomplished through fast trials of one or a few days of testimony: "I was present at Camp Lejeune for more than 30 days; I was diagnosed with an illness that as likely as not can be caused by exposure to the water at Camp Lejeune; and I have suffered the following harm from that illness." Damages testimony from medical treaters and economic experts would round out what the statute enables, and what this Court has urged: a one or two-day trial.

This Court has consistently invoked Rule 1 to focus on just, speedy, and inexpensive adjudication. Fed. R. Civ. P. 1. Rule 16 provides a detailed template for achieving those goals through pretrial case management and determinations that discourage wasteful pretrial activities, improve the quality of trial, and facilitate settlement. Fed. R. Civ. P. 16(a). This motion does just that. Rule 16(c)(2)(A), (C), (D), and (E) authorize the Court to simplify the issues, use the admissions of the government's own studies to avoid unnecessary proof, and limit the use of expert

testimony. These techniques are especially relevant—and needed—in this litigation, where thousands of veterans have waited decades for justice.

The Court should decide now what Plaintiffs must prove. Granting this Motion will save many days of trial for each case, millions of dollars, and months of time from being wasted on unnecessary experts. Finally, Rule 16(c)(2)(E) enables the Court to determine "the appropriateness and timing of summary adjudication under Rule 56." With Track 1 trials fast approaching, the Plaintiffs' Leadership Group ("PLG") respectfully urges that the time is now.

## BACKGROUND

Congress did not write the CLJA on a blank slate. For decades, Congress has authorized the VA to compensate veterans for service-related injuries. Before passing the CLJA, Congress held hearings on the contamination at Camp Lejeune and required extensive studies to be performed, culminating in a substantial report in 2017. Congress drew on the VA system and the 2017 ATSDR report in crafting the CLJA's unusual burden of proof provisions.

### A. Congress Established The VA System To Compensate Veterans For Disabilities Based On Presumptions Of A Service Connection

Congress has long provided disability compensation for veterans whose conditions were incurred or aggravated during military service. 38 U.S.C. §§ 1110, 1131. To demonstrate eligibility for compensation, a veteran must show a "service connection" for the disability. *See, e.g.*, *Shedden v. Principi*, 381 F.3d 1163, 1166-67 (Fed. Cir. 2004); *see also* Sidath Viranga Panangala, Cong. Rsch. Serv., R41405, *Veterans Affairs: Presumptive Service Connection and Disability Compensation* 3-4 (updated Nov. 18, 2014), https://crsreports.congress.gov/product/pdf/R/R41405 [hereinafter R41405]. For more than a century, Congress has recognized that veterans may struggle to meet this standard when an injury manifests long after service. After World War I ended, veterans found it "increasingly difficult to

establish service connection for some ailments, particularly tuberculosis." H. Comm. on Veterans' Affs., 84th Cong., 1st sess., Rep. on The Provision of Federal Benefits for Veterans, An Historical Analysis of Major Veterans Legislation, 1862-1954, H. Prt. No. 171 (Comm. Print Dec. 28, 1955). This led Congress to pass the 1921 Amendment to the War Risk Insurance Act, Pub. L. No. 67-47, ch. 57, 42 Stat. 147 (1921). Those Amendments provided that tuberculosis diagnosed within two years of separation "shall be considered" service-related, without individualized proof. *Id.* § 18. In other words, no proof of specific causation was required.

In the following century, Congress created presumptions for other exposures, including radiation, Agent Orange, and the Persian Gulf War. *See* Radiation-Exposed Veterans Compensation Act of 1988, Pub. L. No. 100-321, 102 Stat. 485; Agent Orange Act of 1991, Pub. L. No. 102-4, 105 Stat. 11; Persian Gulf War Veterans' Benefits Act, Pub. L. No. 103-446, 108 Stat. 4647 (1994).

If a presumption applies, a veteran need only show a relevant exposure—for example, participation in atomic bomb testing—and a specified condition, usually "at any time after . . . active service."[1] *See* Instit. of Med., *Improving the Presumptive Disability Decision-Making Process for Veterans*, at 71 (Nat'l Academies Press 2008), https://doi.org/10.17226/11908 [hereinafter IOM, *Improving the Process*]. This difference "dramatically alter[s] the process": instead of "*individual* adjudicatory proceedings [over] whether a *particular* veteran's claimed disease was caused by" a particular exposure, there is only a general causation determination. *Nehmer v. U.S. Dep't of Veterans Affs.*, 494 F.3d 846, 850 (9th Cir. 2007) (emphasis added) (internal quotation marks and citations omitted).

---

[1] *E.g.*, 38 C.F.R. §§ 3.307(a)(5) (prisoners of war); (6)(ii) (herbicides); (7)(ii) (Camp Lejeune).

Unlike the 1921 Amendments, the modern regime often delegates the selection of presumptive conditions to agencies. The 1991 Agent Orange Act established a process for creating presumptions. *See* R41405 at 13. Under that Act, the VA, in partnership with the IOM at the National Academy of Sciences, would receive periodic reports that "review and summarize the scientific evidence, and assess the strength concerning the association between exposure . . . and each disease suspected to be associated with such exposure." *Id.* at 14. And "[w]henever the Secretary [of the VA] determines . . . that a positive association exists . . . the Secretary shall prescribe regulations providing that a presumption of service connection is warranted." 38 U.S.C. § 1116(b)(1) (2021).[2] Until the passage of the CLJA, the provision noted that an association "shall be considered to be positive . . . if the credible evidence for the association *is equal to or outweighs* the credible evidence against the association." 38 U.S.C. § 1116(b)(3) (2021) (emphasis added). Courts vacated VA regulations "requiring proof of a causal relationship," since only an "association" is required by statute. *Nehmer v. U.S. Veterans' Admin.*, 712 F. Supp. 1404, 1420 (N.D. Cal. 1989). The VA acquiesced to this ruling. 32 F. Supp. 2d 1175 (N.D. Cal. 1999).

In sum, the VA has long adopted a system that (1) recognizes a presumptive service connection whenever studies show a positive association (not a causal relationship), (2) gives a veteran benefits based on this presumptive connection on a *groupwide basis*, and (3) does *not* require an affirmative showing by the veteran ruling out other possible causes (*i.e.*, specific causation).

B.      **The IOM Recommends A New Classification Scheme**

In 2004, Congress directed the IOM to review VA processes to propose improvements. National Defense Authorization Act for Fiscal Year 2004, Pub. L. No. 108-136, 117 Stat. 1392

---

[2] As explained below, the CLJA amended this provision in 2022.

(2003). The IOM (1) "describe[d] and evaluate[d] the current model used to recognize diseases that are subject to service connection on a presumptive basis" and, (2) "propose[d] a scientific framework that would justify recognizing or not recognizing conditions as presumptive." IOM, *Improving the Process*, at 29. To standardize "variable approaches" and provide a "scientifically coherent rendering of the language employed by Congress," the IOM proposed a four-level classification scheme for evaluating scientific evidence. *Id.* at 13, 16. This would involve "a systematic review of all relevant data," followed by an evaluation of "the strength of evidence for causation, using one of four categories:"

- **Sufficient**: The evidence is sufficient to conclude that a causal relationship exists.

- **Equipoise and Above**: The evidence is sufficient to conclude that a causal relationship is at least as likely as not, but not sufficient to conclude that a causal relationship exists.

- **Below Equipoise**: The evidence is not sufficient to conclude that a causal relationship is at least as likely as not, or is not sufficient to make a scientifically informed judgment.

- **Against**: The evidence suggests the lack of a causal relationship.

*Id.* at 19-20. If the scientific evidence for causation were "sufficient" or "equipoise," the VA "would consider a presumptive service connection." *Id.* at 20. The report extensively discussed the difference between the statutory "positive association" standard, 38 U.S.C. § 1116(b)(1) (2021), and the "causal relationship" standard (barred by *Nehmer*). *See id.* at 136 ("Chapter 7 makes explicit what is meant by *cause* in contrast to statistical *association*"); 150-73 (Chapter 7); *see also id.* at 76-77, 317 (discussing *Nehmer*). "One of the most critical matters" for congressional reform was the IOM's "recommend[ation] that causation, not just association, should be the basis of presumptive compensation." *Id.* at 317.

**C.** **The Agency For Toxic Substances And Disease Registry Determines In 2017 That Multiple Health Conditions Are Causally Linked To Water At Camp Lejeune**

Spurred on by multiple congressional hearings, in 2017, the ATSDR issued a report that assessed scientific evidence "supporting causality of adverse health effects from exposures to the drinking water contaminants at Camp Lejeune." ATSDR, *Assessment of the Evidence for the Drinking Water Contaminants at Camp Lejeune and Specific Cancers and Other Diseases*, at 2 (2017), https://www.atsdr.cdc.gov/sites/lejeune/docs/atsdr_summary_of_the_evidence_for_causality_tce_pce-508.pdf [hereinafter ATSDR, *2017 Assessment of Diseases*]. The ATSDR adopted the 2008 IOM Classification scheme. *Id.* at 5.

Using the 2008 IOM Classification scheme, the ATSDR examined more than a dozen conditions and each condition's causal relationship with multiple chemicals (including TCE, PCE, DCE, vinyl chloride, and benzene). It found multiple causal relationships. For example, the ATSDR found "sufficient evidence" for a causal relationship between Non-Hodgkin Lymphoma ("NHL") and TCE, *and* between NHL and benzene. It also found the evidence to be "equipoise and above" for a causal relationship between NHL and PCE. *Id.* at 13. The ATSDR examined an additional 44 disease/chemical combinations. *Id.*

**D.** **Congress Passes The PACT Act And Partially Incorporates The 2008 IOM Classification Scheme**

In 2022, Congress passed the PACT Act, "deliver[ing] comprehensive toxic exposure legislation." 168 Cong. Rec. H1219, H1229 (daily ed. Mar. 2, 2022) (statement of Rep. Mark Takano). The PACT Act "address[es] the full scope of issues affecting toxic-exposed veterans' access to VA care and benefits while reforming VA's presumptive decisionmaking process." *Id.*

Congress reformed the process for creating new presumptions by adopting the 2008 IOM Classification scheme for evaluating scientific evidence, with one key change. Section 1173 states

9

that in evaluating evidence of the "relationship between an exposure to an environmental hazard and adverse health outcomes in humans," the Secretary of the VA shall "determine the strength of evidence for a *positive association* based on the following four categories:"

> (A) The "**sufficient**" category, where the evidence is sufficient to conclude that a positive association exists.

> (B) The "**equipoise and above**" category, where the evidence is sufficient to conclude that a positive association is at least as likely as not, but not sufficient to conclude that a positive association exists.

> (C) The "**below equipoise**" category, where the evidence is not sufficient to conclude that a positive association is at least as likely as not, or is not sufficient to make a scientifically informed judgment.

> (D) The "**against**" category, where the evidence suggests the lack of a positive association.

PACT Act, §§ 1172(d), 1173(c)(2) (emphases added). The key change: Congress declined to require "causation" rather than "association," retaining *Nehmer* over IOM's recommendation.

The PACT Act also contained the CLJA, which created a new cause of action for Camp Lejeune victims. An individual who "resided, worked, or was otherwise exposed (including in utero exposure) for not less than 30 days" to Camp Lejeune water between 1953 and 1987 can obtain "appropriate relief for harm that was caused by exposure." CLJA § 804(b). And it waives sovereign immunity and time-bar defenses. *Id.* §§ 804(f), (j)(3). At the same time, the law mixes in some concepts more akin to an administrative regime. The law, unlike typical tort actions, bars punitive damages, *id.* § 804(g) and requires "administrative exhaustion" with the Navy before filing suit in court. Finally, the law specifies a lower "burden of proof" and "standard" for meeting that burden:

> (1) IN GENERAL.—The burden of proof shall be on the party filing the action to show one or more relationships between the water at Camp Lejeune and the harm.

(2) STANDARDS.—To meet the burden of proof described in paragraph (1), a party shall produce evidence showing that the relationship between exposure to the water at Camp Lejeune and the harm is—

(A) sufficient to conclude that a causal relationship exists; or

(B) sufficient to conclude that a causal relationship is at least as likely as not.

*Id*. § 804(c).

Critically, the standards set forth in Section 804(c)(2) correspond to the first two categories of the 2008 IOM Classification scheme—that is, "sufficient" and "equipoise and above." And here (unlike in the VA provisions of the PACT Act), Congress adopted the IOM's preferred standard by requiring proof "as likely as not," of a "*causal* relationship." *Id.* § 804(c)(2)(A) & (B). In other provisions of the PACT Act, Congress kept the VA's standard a touch lower. Congress also declined to include any provision in the CLJA that allowed the government to *rebut* a plaintiff's showing of causation using individualized facts.

On August 10, 2022, the President signed the PACT Act into law. At signing, he recounted that the government "learned a horrible lesson in Vietnam," where "harmful effects to exposure of Agent Orange took years to manifest itself in the veterans, leaving too many veterans unable to access the care they needed and deserve." Remarks by President Biden at Signing of S. 3373, "The Sergeant First Class Heath Robinson Honoring Our Promises to Address Comprehensive Toxics (PACT) Act of 2022", 2022 WL 3225418 (Aug. 10, 2022), at *3. As he put it, the PACT Act is "the least we can do" for these veterans and reflects "efforts to pioneer new ways to link toxic exposure to diseases and help more veterans get the care they need." *Id.* at *4.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Partial summary

judgment may be granted on a "part of each claim or defense." *Id.* "[T]he interpretation of a statute is a question of law." *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 876 (4th Cir. 1992).

## ARGUMENT

To establish an entitlement to "appropriate relief" under the CLJA, a plaintiff must satisfy three requirements. First, the plaintiff must establish exposure by showing he was present at Camp Lejeune for at least 30 days during the statutory period. § 804(b). Second, he must establish that he suffered "harm." *Id.* Third, he must show that the harm he experienced is the *type* of harm that can be caused by Camp Lejeune water, *i.e.*, he must "produce evidence showing that the relationship between exposure to the water at Camp Lejeune and the harm is . . . sufficient to conclude that a causal relationship exists" or "that a causal relationship is at least as likely as not." § 804(c)(2). Under a proper interpretation of Section 804(c), that requirement demands only that the plaintiff produce evidence showing that, as likely as not, exposure to Camp Lejeune contaminated water is causally related to the plaintiff's disease—a concept that courts traditionally call "general causation." Section 804(c) does not require a plaintiff to show that *nothing else besides* his exposure caused his particular injury—a concept traditionally called "specific causation." That construction of the CLJA follows from the text, structure, legislative context, and purpose of the statute.

## I. The Text And Structure Of The CLJA Requires Plaintiffs To Prove General Causation, Not Specific Causation

Congress departed from background tort law in passing the CLJA. Under background tort law, toxic torts involve a causation "trilogy." Restatement (Third) of Torts: Phys. & Emot. Harm § 28 cmt. c(1) (2010). Courts first ask "whether the plaintiff was exposed to the substance." *Id.* cmt. c(2). Courts then inquire into "general causation," meaning whether the substance "is capable of causing a given disease." *Id.* Finally, courts ask whether "exposure to an agent" rather than

some other factor, "caused a particular plaintiff's disease." *Id.*[3]  Under the CLJA's statutory

causation standard, a plaintiff must show at least 30 days on base, § 804(b), and "one or more

relationships between the water at Camp Lejeune and the harm." § 804(c)(1).  Subsection (c)(2)

in turn describes how a plaintiff meets that burden: he must "produce evidence showing that the

relationship between exposure to the water at Camp Lejeune and the harm is . . . sufficient to

conclude" either "that a causal relationship exists" or "that a causal relationship is at least as likely

as not." § 804(c)(2).

The CLJA departs from common-law causation in several respects.  First, it sets a bright-

line exposure requirement—30 days.  Second, it reduces the plaintiff's burden from a

preponderance of the evidence to "as likely as not."  Third, it omits any need for individualized

(specific) causation.

### A.      The CLJA Adopts A Bright-Line Exposure Requirement And A Lower Burden To Establish Causation

The CLJA's text, structure, and legislative context signal a departure from the common-

law rule.  The Supreme Court construes federal statutes defining the "requisite relation between

prohibited conduct and compensable injury" against the background of the common-law "law of

torts." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 342 (2013).  But courts pay special

attention when Congress "expressly depart[s] from the common law."  *Norfolk S. Ry. Co. v.

Sorrell*, 549 U.S. 158, 168 (2007).  The Supreme Court has held that statutory causation standards

depart from common-law default rules where a statute's text differs from the common-law rule,

*see, e.g.*, *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 691-94 (2011) (interpreting the Federal

---

[3] Even under tort common law, all three of these traditional aspects of causation are not always
required.  While "courts often address 'exposure,' 'general causation,' and 'specific
causation,' . . . these items are not 'elements' of a plaintiff's cause of action, and in some cases
may not require separate proof."  *Id*. cmt. c(1).

Employers' Liability Act ("FELA")); *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98-99 (2003) (interpreting the Civil Rights Act of 1991), its structure suggests departure, *see e.g.*, *McBride*, 539 U.S. at 691-92 (FELA); *Nassar*, 570 at 353-54 (comparing Title VII discrimination and retaliation), or its legislative history and context indicate a different rule, *see, e.g.*, *Rogers v. Mo. Pac. R. Co.*, 352 U.S. 500, 507-08 (1957) (FELA); *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 160-61 (2008) (Securities Exchange Act of 1934, § 10(b)). These federal statutes— like the CLJA—differ from the Federal Tort Claims Act, which incorporates state tort law rather than furnishing a federal standard.[4]

Under the common law, a plaintiff must demonstrate the "'plaintiff's actual level of exposure.'" *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig. (No. II)*, 892 F.3d 624, 639 (4th Cir. 2018) (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 263 (4th Cir. 1999)). That can be challenging to prove in "groundwater-pollution cases," like those under the CLJA, which "may require complicated scientific evidence, such as dispersion modeling" and in which "intensity and duration of exposure . . . affects the magnitude of the risks posed." Restatement (Third) of Torts: Phys. & Emot. Harm § 28 cmt. c(2) (2010). Exposure is "frequently disputed." *Id.*

The CLJA "expressly reject[s]" the common-law rule. *Sorrell*, 549 U.S. at 168. Instead of requiring exposure to be established case-by-case, the CLJA enacts a bright-line rule: a plaintiff must have "resided, worked, or [been] otherwise exposed (including in utero exposure) ***for not less than 30 days*** during the period beginning on August 1, 1953, and ending on December 31, 1987, to water at Camp Lejeune." CLJA § 804(b) (emphasis added). This clear textual threshold

---

[4] *See* 28 U.S.C. § 2674; *United States v. Muniz*, 374 U.S. 150, 153 (1963) (noting, under the FTCA, that liability "depend[s] upon whether a private individual under like circumstances would be liable under state law.").

supersedes the standard tort-law exposure inquiry. If *20* days on base would be enough under ordinary tort law—or if exposure from January to July, 1953 would be enough—a plaintiff still loses. If ordinary tort law would require more, a plaintiff can still prevail with 30 days on base. This express departure from the common-law rule reinforces Congress's intent to establish a distinct causation framework under the CLJA.

So, too, does Congress's choice to lower the causation burden. Black-letter tort law requires proof of "causation . . . more likely than not." Restatement (Third) of Torts: Phys. & Emot. Harm § 28 (2010). The CLJA expressly requires only proof that causation is "*at least as likely as not*." § 804(c)(2) (emphasis added).

### B. The CLJA's Statutory Causation Standard Refers To Evidence Associated With General Causation

Beyond specifying a precise exposure and level-of-evidence requirement, the CLJA uses special language that focuses on showing that the toxins in the water at Camp Lejeune are capable of causing a type of injury. Specifically, Section 804(c)(2) requires a plaintiff to "produce evidence showing that the *relationship* between exposure to the water at Camp Lejeune and the harm is . . . sufficient to conclude that a *causal relationship* is *at least as likely as not*." § 804(c)(2) (emphases added). This language focuses only on relationships between the contaminants and the disease, not any individual's risk factors.

Determining whether a relationship is as-likely-as-not causal necessarily calls for a scientific inquiry into epidemiology, animal data, and mechanistic data, which is inherently about the disease generally, rather than any individual. Epidemiology, for example, is "ultimately interested in whether a *causal relationship* exists between an agent and a disease." Michael D. Green et al., Reference Guide on Epidemiology, in *Reference Manual on Scientific Evidence* 566 (3d ed. 2011) [hereinafter *Reference Manual*] (emphasis added). To assess the causal relationship,

epidemiologists commonly use the "[Bradford] Hill criteria," *Reference Manual* at 600, which are nine criteria used to evaluate "relationships between sickness, injury, and conditions," Austin Bradford Hill, *The Environment and Disease: Association or Causation?* 58 Proc. Royal Soc'y Med. 295 (1965). The "Hill criteria are a series of factors used by epidemiologists to determine whether an observed *association* between two variables is *causal*." *In re Lipitor*, 892 F.3d at 638 (emphasis added). The CLJA requires a plaintiff to show a relationship is at least as likely to be causal as it is to be spurious—a question answered by group-level analysis. Notably, the ATSDR employed the Hill criteria in its analysis. *See generally* ATSDR, *2017 Assessment of Diseases* (citing Hill 17 separate times).

Congress easily could have written a statute requiring individualized causation. The text would read as follows: "An individual may bring an action to obtain appropriate relief for harm that was at least as likely as not caused by exposure to the water at Camp Lejeune." That language would have been far simpler, as shown below:

> (b) IN GENERAL.—An individual … may bring an action … to obtain appropriate relief for harm that was caused [at least as likely as not] by exposure to the water at Camp Lejeune.
>
> ~~(c) BURDENS AND STANDARD OF PROOF.—~~
>
> ~~(1) IN GENERAL. The burden of proof shall be on the party filing the action to show one or more relationships between the water at Camp Lejeune and the harm.~~
>
> ~~(2) STANDARDS. To meet the burden of proof described in paragraph (1), a party shall produce evidence showing that the relationship between exposure to the water at Camp Lejeune and the harm is—~~
>
> ~~(A) sufficient to conclude that a causal relationship exists; or~~
>
> ~~(B) sufficient to conclude that a causal relationship is at least as likely as not.~~

Instead of that simple phrasing, Section 804(c) stresses that plaintiffs must show an association ((c)(1)), that is as likely as not causal ((c)(2)). Congress's decision to specify a more detailed standard should be given meaning, as courts should be "reluctan[t] to treat statutory terms as surplusage." *Bd. of Trs. of Leland Stanford Jr. Univ. v. Roche Molecular Sys., Inc.*, 563 U.S. 776, 788 (2011) (citation omitted).

Parallel sections of the PACT Act confirm that Section 804(c)(2) calls for a general-causation analysis. For example, Section 202 of the PACT Act creates a process under which the VA formally evaluates the connection between toxic exposures and illnesses for the purposes of VA benefits. § 202(a) (codified at 38 U.S.C. §§ 1172(b)-(d), 1173(a)). That evaluation must classify evidence into categories that are almost identical to the standards recommended by the IOM:

> (A) The "sufficient" category, where the evidence is sufficient to conclude that a positive association exists.
>
> (B) The "equipoise and above" category, where the evidence is *sufficient to conclude that a positive association is at least as likely as not*, but not sufficient to conclude that a positive association exists.

*Id.* (codified at 38 U.S.C. § 1173(c)(2)(A)-(B)) (emphases added). Like the IOM standards, Section 202(a) refers to associations between an exposure and population-level harm (including evidence like "human, toxicological, animal and methodological studies"), not anything resembling specific causation for particular individuals. PACT Act § 202(a) (codified at 38 U.S.C. § 1173(b)(1)). Congress incorporated this same "equipoise" concept, using the exact same phrase, "at least as likely as not," in Section 804(c)(2). To be sure, Congress required a higher degree of connection in Section 804(c)(2)—*i.e.*, it required a "causal relationship" rather than mere "positive association." But this distinction only confirms that Congress was carefully delineating the *level*

*of evidence* (also considering human, toxicological, animal, and methodological studies) that would be required to establish causation under the CLJA.

Other provisions in the PACT Act use the term "relationship" in the same way. Section 202(a) provides for research into the "relationship between an exposure to an environmental hazard and adverse health outcomes in humans." § 202(a) (codified at 38 U.S.C. § 1172(d)). That expressly refers to a hazard's general capacity to cause harm in humans. Section 507 likewise requires studying "possible relationships between toxic exposures experienced during service in the Armed Forces" and mental health illnesses. *Id*. § 507. That provision also refers to general-causation evidence.

Such consistent use of the word "relationship" throughout the statute is powerful evidence that the CLJA's use of the same term connote a general-causation analysis: "A normal rule of statutory interpretation is that when Congress uses the same word in different parts of a statute, it intended each to carry the same meaning." *Little v. Shell Expl. & Prod. Co.*, 690 F.3d 282, 286 (5th Cir. 2012).

### C. The CLJA's Causation Standard Does Not Require Specific Causation

Section 804(c) requires only a showing that general causation is as likely as not. When courts speak of demonstrating that an association is causal using epidemiological, toxicological, and/or biological-mechanism studies, they do so almost exclusively in the context of general causation. General causation is the showing that "an agent increases the incidence of disease," *Reference Manual* at 623, which "rule[s] in" a given exposure "as a possible cause" of that disease. *E.g.*, *Westberry*, 178 F.3d at 263 (internal quotation marks omitted). Case law addressing general causation frequently turns on whether the plaintiff's expert reliably demonstrated a "causal

relationship," applying sound scientific principles such as the Hill criteria.[5] The Restatement's section on "general causation" describes the inquiry as "applying the Hill guidelines to determine whether an association truly reflects a causal relationship." Restatement (Third) of Torts: Phys. & Emot. Harm § 28 cmt. c(3) (2010). The *Reference Manual* is even clearer in linking epidemiology to general causation: "Epidemiology focuses on the question of general causation (*i.e.*, is the agent capable of causing disease?) rather than that of specific causation (*i.e.*, did it cause disease in a particular individual?)." *Reference Manual* at 552.[6] A plaintiff can show general causation without relying on epidemiology, of course. For example, for several conditions, the ATSDR found that "epidemiological evidence . . . is insufficient," but nonetheless determined the evidence was "equipoise and above" based on animal and mechanistic studies. ATSDR, *2017 Assessment of Diseases*, at 43 (TCE and multiple myeloma); *see also id.* at 99 (TCE and Parkinson's). Whatever the type of evidence used, the analysis the CLJA contemplates is clearly about the disease rather than any individual.

Plaintiffs who satisfy the showing set out by the statute—general causation and the 30-day exposure requirement—have met their burden of proof. Because Congress expressly defined the burden of proof, there is no basis to add any other requirements.

---

[5] *See, e.g.*, *Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 379 (5th Cir. 2010) ("evidence that [an exposure] actually causes [a condition] is insufficient to establish ***causal relationships***."); *In re Nexium Esomeprazole*, 662 F. App'x 528, 530 (9th Cir. 2016) (expert improperly "inferred a ***causal relationship*** from epidemiological studies that did not come to such a conclusion themselves"); *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 882 (10th Cir. 2005) ("unlike the case at hand, there was no body of epidemiological evidence demonstrating the absence of a ***causal relationship***") (emphases added).

[6] *See also Reference Manual* at 608-09 ("[E]pidemiologic studies do not address the question of the cause of an individual's disease. This question, often referred to as specific causation, is beyond the domain of the science of epidemiology."); Restatement (Third) of Torts: Phys. & Emot. Harm § 28 cmt. c(4) (2010) ("Scientists who conduct group studies do not examine specific causation in their research. No scientific methodology exists for assessing specific causation for an individual based on group studies.").

## II. The Legislative Context Confirms That The CLJA Requires Only General Causation

The legislative context confirms that Congress sought to require only general causation when it created the distinctive causation standard in the CLJA. Specifically, the CLJA draws on IOM and VA analysis of presumptions in awarding veterans benefits. By importing the same specialized terminology into the CLJA Congress adapted the VA's presumption-based system for benefits into a judicial cause of action.

Congress adopted the IOM's recommendation of using "categories" to describe the "strength of evidence for causation" between an exposure and a disease. IOM, *Improving the Process*, at 19. The first two IOM categories use language that is *identical* to Section 802(c)(2) of the CLJA:

- **Sufficient**: The evidence is sufficient to conclude that a causal relationship exists.

- **Equipoise and Above**: The evidence is *sufficient to conclude that a causal relationship is at least as likely as not*, but not sufficient to conclude that a causal relationship exists.

*Id.* (emphases added). After IOM developed its classification scheme, the ATSDR employed the scheme to evaluate harms from exposure to Camp Lejeune water. This *2017 Assessment of Diseases* evaluated potential causal relationships between particular *contaminants* in the water and various conditions, proceeding *contaminant-by-contaminant*. Then, using the same terminology that Congress later codified in the CLJA, the ATSDR found that "[t]he evidence is *sufficient to conclude that a causal relationship exists*" between exposure to particular toxic chemicals and specific conditions, and that "[t]he evidence is *sufficient to conclude that a causal relationship is at least as likely as not*" for others. ATSDR, *2017 Assessment of Diseases*, at 6, 13-14.

For example, according to the *2017 Assessment of Diseases*, there are *three* relevant relationships between the water at Camp Lejeune and the harm of NHL: the relationship between

trichloroethylene (TCE) and NHL, the relationship between tetrachloroethylene (PCE) and NHL, *and* the relationship between benzene and NHL. All three contaminants are in the water, and all three relationships are either sufficient to find causation (TCE and Benzene) or at equipoise (PCE). Clearly, the history of studies into these contaminant-by-contaminant "relationships" are why Congress used the phrasing "one or more relationships" in the CLJA. [7]

Congress was keenly aware of IOM's recommendations, the *2017 Assessment of Diseases*, and the VA presumptions when it enacted the CLJA. It was Congress, after all, that required the VA to work with IOM to develop the new standards, *see* pp. 8-9, *supra*, and it relied on the *2017 Assessment of Diseases* in passing the PACT Act. "Where Congress employs a term of art 'obviously transplanted from another legal source,' it 'brings the old soil with it.'" *George v. McDonough*, 596 U.S. 740, 741 (2022) (quoting *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019)) (internal quotation marks omitted). That principle applies with special force where "Congress used an unusual term that had a long regulatory history in this very context," such as a meaning that "the VA had long applied." *Id.* at 746. That is precisely what Congress did here: use the same language to invoke the same concepts that the VA and the ATSDR were already using to analyze the exposure of hundreds of thousands of Americans to the Camp Lejeune water.

---

[7] Section 804(c)(1) confirms this reading. It requires plaintiffs "to show one or more relationships between the water at Camp Lejeune and the harm." This is not a normal way to describe a requirement to show that exposure caused a particular injury, since causation there would be singular (exposure either causes it, or it does not). Instead, this compels using group-level evidence such as "[e]pidemiological evidence," which, at its core, "identifies *agents* that are *associated* with an *increased risk of disease* in groups of individuals." *Reference Manual* at 552 (emphasis added). Here, the "agents" are the toxins in the water (for example, benzene or TCE). One or more of those toxins must be "associated" (that is, a relationship must exist) with the harm (the disease). The phrasing, especially the plural "relationships," makes no sense if causation is an individualized inquiry.

Accordingly, the IOM Classification scheme and the *2017 Assessment of Diseases* make Congress's textual choices in Section 804(c) even clearer. Congress directly borrowed from the *2017 Assessment of Diseases* and IOM Classification standards and stated that a plaintiff can meet his burden of proof by showing that the connection between his injury and the water at Camp Lejeune—as established by epidemiological, toxicological, and/or biological-mechanism studies—shows that a "causal" connection is "at least as likely as not."

## III. Construing The Plaintiffs' Burden To Require Only Exposure And General Causation Furthers Congress's Purposes

Understanding the CLJA as a judicially administered version of the VA presumption system accords with its broader statutory context. The CLJA was enacted as part of comprehensive toxic-exposure reform that expanded veterans' opportunities to obtain compensation for toxic exposure. Several provisions of the PACT Act advance that purpose through reforms to the VA's presumption system. It is thus hardly surprising that Congress adopted a near-parallel framework to compensate Camp Lejeune victims. Indeed, for over a century, Congress has recognized that requiring victims to prove the specific circumstances of their exposure would place recovery out of reach for many. And for decades, Congress expanded the use of presumptions to compensate victims of toxic exposure who are not able to show the specific facts of their exposure. The same rationale applies strongly to CLJA claims, which is why Congress expressly defined the requirements for exposure and general causation, but nothing more.

Any inference that background tort law on specific causation applies here runs headlong into Congress's intentional abrogation of those standards. The most obvious is the "at least as likely as not" standard, rather than preponderance, but equally clear is the statutory definition of exposure. In typical tort cases, "'to carry the burden of proving a plaintiff's injury was caused by exposure to a specified substance, the plaintiff must demonstrate the *levels of exposure* that are

hazardous to human beings generally as well as the plaintiff's actual *level of exposure*.'" *In re Lipitor*, 892 F.3d at 639 (quoting *Westberry*, 178 F.3d at 263). Exposure can be especially difficult to prove in "groundwater-pollution cases," like these. Congress rejected this standard, determining that plaintiffs could establish the requisite exposure under the CLJA by proving they "resided, worked, *or w[ere] otherwise exposed* . . . for not less than 30 days." CLJA § 804(b) (emphasis added). Congress rejected any notion of litigating the precise exposure on a condition-by-condition and year-by-year basis with complicated scientific evidence. Instead, "to achieve its goals, Congress chose a relatively arbitrary rule capable of easy administration." *Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422 (1972) (quoting *Bershad v. McDonough*, 428 F.2d 693, 696 (7th Cir. 1970)). The clear rule Congress crafted allows this Court—and the Navy's administrative process—to resolve claims more quickly than would be possible under the ordinary exposure standard. That clear rule is: 30 days on base and a diagnosis with a disease that as likely as not is causally related to one of the contaminants in the water at Camp Lejeune.

Requiring specific causation in addition to time-on-base and general causation would frustrate Congress's intent and the remedial purpose of the statute. All actionable exposure at Camp Lejeune took place 35 to 70 years ago, and *every* claim is time-barred under ordinary tort law. Reconstructing the circumstances of each victim's water exposure is more difficult as memories fade, treating physicians retire, and documentary evidence is lost. Government secrecy prevented much evidence from being developed when it would have been available and could have been preserved. The IOM noted that "even with perfect information it is seldom, if ever, possible with current methods to identify which particular cases of a disease with multiple causes were caused by the exposure and which were not." IOM, *Improving the Process*, at 199. Here, information is stale: the oldest plaintiffs in this litigation were exposed in the early 1950s—seventy

years ago. Difficulties of proof are why Congress required the VA to use the presumption system in the first place and the reason why Congress enacted the CLJA's special causation standard.

Remedial statutes like the CLJA are "construed liberally to apply to the further reaches consistent with congressional direction," which here counsels enforcing the settled meaning of the specialized terminology that Congress saw fit to enact. *Monahan v. Cnty. of Chesterfield, VA.*, 95 F.3d 1263, 1267 (4th Cir. 1996) (citation and internal quotation marks omitted); *see also Clodfelter v. Rep. of Sudan*, 720 F.3d 199, 211-12 (4th Cir. 2013).

Requiring only statutorily defined exposure and general causation is also consistent with the rapid administrative resolution of claims, which Congress clearly intended. Congress required plaintiffs to seek compensation from the Navy first, then wait six months to bring an action in court. The Navy could not possibly apply a specific-causation standard when performing this evaluation—it could not obtain and review medical records, retain experts to evaluate the interplay of various risk factors, and so on—for hundreds of thousands of claims filed based on exposures from up to seven decades ago. Nor did it ask for such information in the CLJA claim forms. Demanding specific causation would nullify the efficiencies gained by defining the exposure criteria as 30 days on base. In contrast, construing the statute to require only general causation enables the sort of streamlined proceedings that Congress expected. By relying on epidemiological, toxicological, and biological-mechanistic evidence—including the studies compiled and analyzed by the ATSDR—the Navy or a jury can quickly decide which claimants are entitled to compensation.

## IV.     Precedent Interpreting Other Federal Statutory Torts Confirms This Reading Of The CLJA's Special Causation Standard

The Supreme Court has consistently interpreted federal statutory torts to depart from common-law causation rules when the text, structure, legislative history, and purpose of the statute

so require.  Take FELA's statutory causation standard.  In *CSX Transportation, Inc. v. McBride*, the Court held that FELA—which provides a federal cause of action for employees of railroad common carriers to recover for injuries "resulting in whole or in part from the negligence of" the carrier, 45 U.S.C. § 51—"does not incorporate 'proximate cause' standards developed in nonstatutory common-law tort actions." 564 U.S. at 688-91.  To arrive at that result, the Court first pointed to "the breadth of" the statute's distinct textual causation standard.  *Id.* at 691-92 (citing *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 542-43 (1994)).  It then noted Congress's "humanitarian and remedial goals" and Congress's desire to reject the "harsh and technical rules of state common law," which "had made recovery difficult or even impossible for injured railroad workers." *Id.* at 691-96 (internal quotation marks omitted).  Further, the Court looked to the overall statutory structure, observing that other provisions of FELA served some of the function of a common-law proximate cause inquiry by "confin[ing] the universe of compensable injuries to those sustained by employees, during employment." *Id.* at 704.

Similarly, the Supreme Court has upheld the use of a more lenient causation standard, and rejected a but-for causation requirement, in Title VII employment discrimination cases based on the statute's distinct "motivating factor" causation language and the provision's legislative history. *Desert Palace*, 539 U.S. at 94 (quoting 42 U.S.C. § 2000e-2(m)).  The Court has also found that federal civil RICO, 18 U.S.C. § 1964(c), requires only one component of common-law proximate causation ("directness of the relationship between the conduct and the harm") and rejects other proximate cause concepts (including the "concept of foreseeability").  *Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 12 (2010).  Thus, although the Court "start[s] from the premise that when Congress creates a federal tort it adopts the background of general tort law," *Staub v. Proctor*

*Hosp.*, 562 U.S. 411, 417 (2011), the Court's cases give full effect to departures from common-law causation.

Here, as with FELA and Title VII, the CLJA uses distinct textual causation language that substitutes a bright-line statutory exposure requirement, and relaxes other common-law causation requirements. And like civil RICO, the CLJA incorporates a causal term of art that must guide a court's interpretation. In short, to impose an atextual specific-causation requirement on the CLJA would defy not only Congress's intent, but also the Supreme Court's clear guidance for interpreting federal statutory torts.

## V.    If The CLJA Were Unclear, The Veteran's Canon Requires Ruling For Plaintiffs

The text, structure, and context of the CLJA make clear that Plaintiff need only show general causation. But if there were any question, the Court must apply the "rule that interpretive doubt is to be resolved in the veteran's favor." *Brown v. Gardner*, 513 U.S. 115, 118 (1994). "[P]rovisions for benefits to members of the Armed Services [like the CLJA] are to be construed in the beneficiaries' favor." *King v. St. Vincent's Hosp.*, 502 U.S. 215, 220 n.9 (1991).

To the extent the government argues that the Veteran's Canon does not apply to the CLJA, it cannot distinguish the CLJA from other statutes where the canon applies. For example, the Servicemembers Civil Relief Act (SCRA), 50 U.S.C. § 3901 *et seq.*, is not a traditional benefits program administered by an agency, but a rights-conferring statute. The SCRA's protections extend beyond servicemembers to Americans "serving with the forces of a[n] . . . all[y]," *id.* § 3914, or, for many of the protections, the spouse or "dependent of a servicemember," *e.g.*, *id.* § 3959. Its private right of action authorizes suit by "[a]ny person aggrieved by a violation of this chapter," not just servicemembers. 50 U.S.C. § 4042. Nevertheless, in construing that private right of action, the Fourth Circuit highlighted that "the SCRA—like its predecessors—'must be read with an eye friendly to those who dropped their affairs to answer their country's call.'"

*Gordon v. Pete's Auto Serv. of Denbigh, Inc.*, 637 F.3d 454, 458 (4th Cir. 2011) (quoting *Le Maistre v. Leffers*, 333 U.S. 1, 6 (1948)).

The Veteran's Canon only "applies to resolve statutory ambiguity when it is obvious what interpretation most benefits servicemembers," *Davidson v. United Auto Credit Corp.*, 65 F.4th 124, 129 n.8 (4th Cir. 2023), but here, there is no question that granting the motion would most benefit servicemembers. The canon applies, meaning that the contrary reading of the statute would have to be *clear* and *unambiguous* for the Court to deny this motion.

<u>**CONCLUSION**</u>

The PLG respectfully requests that this Court grant Plaintiffs' motion for partial summary judgment and determine that, with respect to causation, the CLJA requires only a statutorily defined exposure (30-day presence on base) and general causation (a relationship between disease and the water at Camp Lejeune that is at least as likely as not causal).

Dated: January 15, 2024                         Respectfully submitted,

/s/ J. Edward Bell
J. Edward Bell, III (admitted *pro hac vice*)
Bell Legal Group, LLC
219 Ridge Street
Georgetown, SC 29440
Phone (843) 546-2408
Fax (843) 546-9604
jeb@belllegalgroup.com
*Lead Counsel*

/s/ Elizabeth Cabraser
Elizabeth Cabraser (admitted *pro hac vice*)
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, Suite 2900
San Francisco, CA 94111
Phone (415) 956-1000
Fax (415) 956-1008
ecabraser@lchb.com
*Co-Lead Counsel for Plaintiffs*

/s/ W. Michael Dowling
W. Michael Dowling (NC Bar No. 42790)
The Dowling Firm PLLC
Post Office Box 27843
Raleigh, North Carolina 27611
Telephone: (919) 529-3351
Fax: (919) 529-3351
mike@dowlingfirm.com
*Co-Lead Counsel*

/s/ James A. Roberts, III
James A. Roberts, III (N.C. Bar No.: 10495)
Lewis & Roberts, PLLC
3700 Glenwood Avenue, Suite 410
P. O. Box 17529
Raleigh, NC 27619-7529
Telephone: (919) 981-0191
Fax: (919) 981-0199
jar@lewis-roberts.com
*Co-Lead Counsel*

/s/ Zina Bash
Zina Bash (admitted *pro hac vice*)
Keller Postman LLC
111 Congress Avenue
Suite 500
Austin, TX 78701
Telephone: 956-345-9462
zina.bash@kellerpostman.com
*Co-Lead Counsel and Government Liaison*

/s/ John. F. Bash
John F. Bash (admitted *pro hac vice*)
Quinn Emanuel Urquhart & Sullivan LLP
300 W. 6th St., Suite 2010
Austin, TX 78701
Phone (737) 667-6100
johnbash@quinnemanuel.com
*Member, Plaintiffs' Executive Committee*
*Co-Chair, Law and Briefing Subcommittee*

/s/ Robin Greenwald
Robin L. Greenwald (admitted *pro hac vice*)
Weitz & Luxenberg, P.C.
700 Broadway
New York, NY 10003
Telephone: 212-558-5802
rgreenwald@weitzlux.com
*Co-Lead Counsel*

/s/ Mona Lisa Wallace
Mona Lisa Wallace (N.C. Bar No.: 009021)
Wallace & Graham, P.A.
525 North Main Street
Salisbury, North Carolina 28144
Tel: 704-633-5244
Fax: 704-633-9434
*Co-Lead Counsel*

Case 7:23-cv-00897-RJ   Document 111   Filed 01/15/24   Page 35 of 36

## CERTIFICATE OF SERVICE

I hereby certify that on January 15, 2024, a copy of the foregoing document was served on all counsel of record by operation of the court's electronic filing system and can be accessed through that system.

 */s/ J. Edward Bell*
J. Edward Bell III