IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| IN RE: | ) | |
| CAMP LEJEUNE WATER LITIGATION | ) | Case No: 7:23-cv-897 |
| | ) | |
| | ) | UNITED STATES' RESPONSE TO |
| This Document Relates To: | ) | PLAINTIFFS' MOTION FOR |
| ALL CASES | ) | PARTIAL SUMMARY JUDGMENT |

# TABLE OF CONTENTS

Introduction .................................................................................................................... 1

Background ................................................................................................................... 2

Legal Standard ............................................................................................................. 3

Discussion .................................................................................................................... 4

    I.    The CLJA's Text and Structure Require Plaintiffs to Show that the Harm "Was Caused by" Exposure to Water at Camp Lejeune. ................................................................ 4

        A.   "Caused By" Requires Both General Causation and Specific Causation. ...................... 4

        B.   The CLJA's Standard of Proof Reflects a Specific Causation Requirement. ................. 7

        C.   The 30-Day Exposure Requirement Does Not Abrogate Specific Causation. ................ 8

        D.   The CLJA Differs from Other Statutes That Presume Causation. ............................... 10

    II.    The History and Context of the CLJA Demonstrate that Congress Rejected a Presumptive Framework. ......................................................................................................... 13

        A.   Congress Intended the CLJA to Operate Within the Already-Established Tort Law Background. ................................................................................................. 13

        B.   Congress Rejected an Expansion of the VA Presumptive System. ................................ 16

        C.   Congress Rejected Adoption of the IOM Framework and ATSDR's Findings. ............ 20

        D.   Congress Could Not Have Intended the Consequences That Would Result From the PLG's Proposal to Dispense With Proof of Specific Causation. ........................................ 23

    III.   The CLJA's Causation Language Is Not Ambiguous, so the Veteran's Canon Is Inapplicable. ......................................................................................................... 24

# **TABLE OF AUTHORITIES**

### CASES

*Anderson v. Liberty Lobby, Inc*,
    477 U.S. 242 (1986)................................................................................................ 3

*Ayes v. U.S. Dep't of Veterans Affairs*,
    473 F.3d 104 (4th Cir. 2006) ................................................................................ 4

*Babb v. Wilkie*,
    140 S. Ct. 1168 (2020)........................................................................................... 8

*Barry v. McDonough*,
    35 Vet. App. 111 (Ct. App. Vet. Affairs 2022) ................................................... 24

*Canadian Aviator v. United States*,
    324 U.S. 215 (1945).............................................................................................. 6

*CSX Transp., Inc. v. McBride*,
    564 U.S. 685 (2011)............................................................................................ 12

*F.A.A. v. Cooper*,
    566 U.S. 284 (2012)............................................................................................ 26

*Gilbert v. Derwinski*,
    1 Vet. App. 49 (Ct. App. Vet. Affairs 1990). ..................................................... 21

*Gordon v. Pete's Auto Serv. of Denbigh, Inc.*,
    637 F.3d 454 (4th Cir. 2011) .............................................................................. 24

*Grant v. Sec. of Dep't of Health and Hum. Servs.*,
    956 F.2d 1144 (Fed. Cir. 1992)........................................................................... 11

*Hughes Aircraft Co. v. Jacobson*,
    525 U.S. 432 (1999).............................................................................................. 4

*In re Camp Lejeune N. C. Water Contamination Litig.*,
    263 F. Supp. 3d 1318 (N.D. Ga. 2016), *aff'd*, 774 F. App'x 564 (11th Cir. 2019) ................... 2

*In re Lipitor (Atorvastatin Calcium Mktg.), Sales Practices and Prods. Liab. Litig. (No II)*,
    892 F.3d 624 (4th Cir. 2018) ................................................................................ 6

*Junk v. Terminix Intern. Co.*,
    628 F.3d 439 (8th Cir. 2010) ................................................................................ 6

*Kisor v. McDonough*,
    995 F.3d 1347 (Fed. Cir. 2021)........................................................................... 24

*Lehman v. Nakshian*,
    453 U.S. 156 (1981)............................................................................................ 26

*Microsoft Corp. v. I4I Ltd. P'ship*,
    564 U.S. 91 (2011)........................................................................................... 5, 7

*Neder v. United States*,
    527 U.S. 1 (1999)................................................................................................. 5

*Nielsen v. Preap*,
    139 S. Ct. 954 (2019)........................................................................................... 8

*Nix v. Chemours Co. FC*,
    No. 7:12-cv-189-D, 2023 WL 6471690 (E.D.N.C. Oct. 4, 2023). ......................... 6

*Norfolk Sothern Ry. Co. v. Sorrell*,
    549 U.S. 158 (2007)......................................................................................... 5, 7

Case 7:23-cv-00897-RJ   Document 139   Filed 02/19/24   Page 3 of 33

*Parrott v. Shulkin*,
 851 F.3d 1242 (Fed. Cir. 2017)...................................................................... 25
*Pryor v. Am. President Lines*,
 520 F.2d 974 (4th Cir. 1975). ........................................................................ 6
*Republic of Sudan v. Harrison*,
 139 S. Ct. 1048 (2019) .................................................................................... 4
*Rubin v. Islamic Republic of Iran*,
 138 S. Ct. 816 (2018) .................................................................................... 11
*Russello v. United States*,
 464 U.S. 16 (1983)................................................................................... 16, 23
*United States v. Perkins*,
 67 F.4th 583 (4th Cir. 2023) ........................................................................ 19
*United States v. Texas*,
 507 U.S. 529 (1993)........................................................................................ 5
*Univ. of Texas Sw. Med. Ctr. v. Nassar*,
 570 U.S. 338 (2013)...................................................................................... 12
*W.C. v. Sec. of Health and Hum. Servs.*,
 704 F.3d 1352 (Fed. Cir. 2013)................................................................... 10
*Waste Mgmt. Holdings, Inc., v. Gilmore*,
 252 F.3d 316 (4th Cir. 2001)....................................................................... 13
*Westberry v. Gislaved Gummi AB*,
 178 F.3d 257 (4th Cir. 1999) ......................................................................... 6
*Winkler v. Sec. of Health and Hum. Servs.*,
 88 F.4th 958 (Fed. Cir. 2023) ..................................................................... 10

<u>STATUTES</u>

18 U.S.C. § 2333 ................................................................................................... 9
38 U.S.C. § 1710.................................................................................... 11, 16, 17
38 U.S.C. § 1787................................................................................................ 16
42 U.S.C. § 2000e-2 .......................................................................................... 12
42 U.S.C. § 2000e-3 .......................................................................................... 12
42 U.S.C. § 300aa-11 ................................................................................... 10, 11
45 U.S.C. § 51 .................................................................................................... 6
46 U.S.C. § 30101 ............................................................................................... 6
46 U.S.C. § 31102 ............................................................................................... 6
47 U.S.C. § 227.................................................................................................... 9
50 U.S.C. § 3914 ............................................................................................... 25
50 U.S.C. § 3959 ............................................................................................... 25
Honoring America's Veterans and Caring for Camp Lejeune Families Act of 2012, Pub. L. 112-154, 126 Stat. 1167 (Aug. 6, 2012)..................................................................... 16
Camp Lejeune Justice Act of 2022, Pub. L. No. 117-168, § 804, 136 Stat. 1802, 1802–04 (2022) ........................................................................................................ passim
Sergeant First Class Heath Robinson Honoring Our Promise to Address Comprehensive Toxics Act of 2022 ("PACT Act"), Pub. L. No. 117-168, 136 Stat. 1759 ......................................... 2,3

iv

## RULES

Fed. R. Civ. P. 56(a) ................................................................................................ 3
Fed. R. Evid. 702 ................................................................................................... 21

## REGULATIONS

42 C.F.R. § 100.3 .................................................................................................. 11
42 C.F.R. § 3.309 (f). ........................................................................................... 19

## OTHER AUTHORITIES

Michael D. Green, D. Michal Freedman & Leon Gordis, *Reference Guide on Epidemiology*, FJC
    Ref. Manual on Sci. Evid. (3d ed. 2011) ........................................................ 5
Restatement (Third) of Torts; Phys. & Emot. Harm, § 28 (2010) ................................. 9

## INTRODUCTION

The Camp Lejeune Justice Act ("CLJA") allows certain individuals to bring an action before this Court "to obtain appropriate relief for harm that was caused by exposure to the water at Camp Lejeune." Pub. L. No. 117-168, § 804(b), 136 Stat. 1802, 1802–04 (2022). Congress enacted the CLJA to allow a tort cause of action where one was previously barred by certain conditions of the Federal Tort Claims Act ("FTCA"). In the CLJA, Congress could not have been clearer—to obtain relief, a CLJA plaintiff must show his or her injury "was caused by exposure to the water at Camp Lejeune." *Id.*

Notwithstanding the CLJA's text, or its history and context, Plaintiffs' Leadership Group ("PLG") seeks to discard the bedrock requirement that plaintiffs in toxic tort litigation must show specific causation—that is, that the contaminated water actually caused their injuries as opposed to something else. Specific causation ensures that compensation goes to individuals whose harms were caused by exposure to the water at Camp Lejeune, as Congress said. PLG instead asserts that plaintiffs can obtain relief merely by showing that they were present at Camp Lejeune for 30 days and that they have an illness that "*can* be caused" by Camp Lejeune water as a matter of general causation. D.E. 111 (PLG Mem.) at 4 (emphasis added).

PLG's interpretation not only disregards established tort law relating to causation—it also contradicts the CLJA's plain language limiting relief to harms "caused by exposure to the water at Camp Lejeune" and requiring an individual to show "a causal relationship" between "exposure to the water at Camp Lejeune and the harm." *Id.* § 804(b). Although Congress changed the *standard of proof* from traditional tort litigation—lowering the standard from "more likely than not" to "at least as likely as not"—Congress did not alter the basic requirement that plaintiffs prove that their injuries were caused by Camp Lejeune water. PLG's interpretation defies common sense by

allowing recovery where an injury was *more* likely than not (or, indeed, even certainly) caused by something other than Camp Lejeune water. PLG's motion should be denied.

## BACKGROUND

Congress enacted the CLJA in response to previously dismissed litigation under the FTCA. *See generally* D.E. 133 (Order Granting Motion to Strike Jury Trial Demand) at 5–6; *In re Camp Lejeune N. C. Water Contamination Litig.*, 263 F. Supp. 3d 1318, 1332–60 (N.D. Ga. 2016), *aff'd*, 774 F. App'x 564 (11th Cir. May 22, 2019). The CLJA allows certain individuals to bring a tort claim against the government that would otherwise be barred by particular provisions of the FTCA. CLJA § 804(b).

The CLJA arose after Congress began considering several bills to abrogate the legal grounds that had barred prior FTCA claims related to water contamination at Camp Lejeune. The bills were an effort to "correct an anomaly in North Carolina law [i.e., its statute of repose] by providing a legal pathway for affected veterans and their families to pursue fair compensation, which would already be permitted had their exposure occurred anywhere else except the State of North Carolina." *See* Ex. 1, Congressional Record, H1192, March 1, 2022. One of the Senators that introduced the bill said it would enable individuals affected by toxic exposure at Camp Lejeune "to bring suit before the district court for the Eastern District of North Carolina to present evidence for injuries caused by exposure to [Camp Lejeune Contaminated Water]."[1]

After several iterations, Congress enacted the CLJA as part of the Sergeant First Class Heath Robinson Honoring Our Promise to Address Comprehensive Toxics Act of 2022 ("PACT Act"), Pub. L. No. 117-168, 136 Stat. 1759 (2022). Generally, the PACT Act significantly expanded the benefits and services available for veterans exposed to toxic substances, reworked

---

[1] Ex. 2, *Tillis, Blumenthal, Burr, and Peters Introduce the Camp Lejeune Justice Act to Ensure Legal Rights for Water Contamination Victims*, (Nov. 4, 2021) https://perma.cc/LHF6-QX8G.

Department of Veterans Affairs' ("VA's") process for identifying illnesses and conditions that should be treated as presumptively service-connected, and directed the VA to work with other agencies to conduct additional research on toxic exposures. The PACT Act relates to a broad range of exposures, including exposures to radiation, herbicides, and burn pits. *See, e.g.*, PACT Act, §§ 401–406.

The CLJA, however, was not included with these other provisions relating to the VA process or benefits. Rather, the CLJA was included in the PACT Act under a Title for "Records and Other Matters," as a section titled "Federal cause of action relating to water at Camp Lejeune, North Carolina." The CLJA's general provision states that "an individual . . . may bring an action . . . to obtain appropriate relief for harm that was caused by exposure to the water at Camp Lejeune." CLJA § 804(b). In a section titled "Burdens and Standard of Proof," the CLJA assigns the burden of proof to "the party filing the action to show one or more relationships between the water at Camp Lejeune and the harm." *Id.* § 804(c)(1). To meet that burden of proof, "a party shall produce evidence showing that the relationship between exposure to the water at Camp Lejeune and the harm is—(A) sufficient to conclude that a causal relationship exists; or (B) sufficient to conclude that a causal relationship is at least as likely as not." *Id.* § 804(c)(2).

## LEGAL STANDARD

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. *Anderson*, 477 U.S. at 249.

**DISCUSSION**

**I.  The CLJA's Text and Structure Require Plaintiffs to Show that the Harm "Was Caused by" Exposure to Water at Camp Lejeune.**

Defining the elements of a CLJA claim "begin[s] where all such inquiries begin: with the language of the statute itself." *Republic of Sudan v. Harrison*, 139 S. Ct. 1048, 1055 (2019) (internal quotation omitted). Here, the CLJA authorizes an "individual" to bring an action to obtain "appropriate relief for harm that was caused by exposure to the water at Camp Lejeune." CLJA § 804(b).  A CLJA plaintiff must also prove a "causal relationship" between "exposure to the water at Camp Lejeune and the harm." *Id.* § 804(c). Accordingly, a CLJA plaintiff can *only* recover for harm that "was caused by" and is "causal[ly] relat[ed]" to exposure to Camp Lejeune water. PLG offers no support for their extraordinary view that the CLJA permits a recovery for harms that were in fact caused by "something else," other than exposure to Camp Lejeune water. D.E. 111 at 1. Because "the statutory language provides a clear answer," this Court's analysis may "end[] there as well." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999).

*A.  "Caused By" Requires Both General Causation and Specific Causation.*

"In interpreting a statute, a court should always turn first to one, cardinal canon of construction before all others: the plain meaning rule." *Ayes v. U.S. Dep't of Veterans Affairs*, 473 F.3d 104, 108 (4th Cir. 2006) (internal quotation omitted). As a verb, Black's Law Dictionary defines "cause" as "[t]o bring about or effect," for example, "dry conditions caused the fire." *Cause*, Black's Law Dictionary (11th ed. 2019); *see also Cause*, Merriam Webster Online Dictionary, https://www.merriam-webster.com/dictionary/cause (last visited January 31, 2024) ("a reason for an action or condition : MOTIVE; something that brings about an effect or a result"). And as PLG concedes, a specific causation analysis is normally required to determine "whether 'exposure to an agent' rather than some other factor, '*caused* a particular plaintiff's disease.'" D.E.

111 at 19–20 (quoting Restatement (Third) of Torts; Phys. & Emot. Harm, § 28 cmt. c(2) (2010)) (emphasis added). While "general causation" refers only to the question of "is the agent *capable of causing* disease?", "specific causation" addresses the question of "*did it cause* disease in a particular individual?" Michael D. Green, D. Michal Freedman & Leon Gordis, *Reference Guide on Epidemiology*, FJC Ref. Manual on Sci. Evid. 552 (3d ed. 2011) (emphasis added). Thus, specific causation is required to satisfy the "was caused by" element of the CLJA. CLJA § 804(b).

Where, as here, the meaning of "was caused by" has "accumulated settled meaning under . . . the common law," "a court must infer, unless the statute otherwise dictates, that Congress mean[t] to incorporate the established meaning of these terms." *Neder v. United States*, 527 U.S. 1, 21 (1999) (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322 (1992)); *see also United States v. Texas*, 507 U.S. 529, 534 (1993) (describing the "longstanding" principle that "statutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident") (quoting *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783 (1952)). Unless common law principles are "expressly rejected in the text of the statute, they are entitled to great weight in our analysis." *Norfolk Sothern Ry. Co. v. Sorrell*, 549 U.S. 158, 168 (2007). It is not enough that a statute "fails to reiterate it expressly." *Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 102 (2011).

PLG concedes that "[u]nder the common law, plaintiffs injured by a toxic substance must prove . . . that the exposure to the substance, rather than something else, caused the injury ('specific causation')." D.E. 111 at 1. In fact, proof of both general and specific causation is a universal and fundamental requirement for toxic tort causes of action. As this Court has recently observed in another toxic tort case, determining the "cause" of a harm "generally will depend on a qualified expert witness establishing both 'general causation and specific causation.'" *Nix v. Chemours Co.*

*FC*, No. 7:12-cv-189-D, 2023 WL 6471690 at *8 (E.D.N.C. Oct. 4, 2023) (Dever, J.). Courts of appeals—including the Fourth Circuit—are similarly unanimous in requiring proof of both general causation and specific causation in toxic tort litigation. *See, e.g., In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices and Prods. Liab. Litig. (No. II)*, 892 F.3d 624, 644 (4th Cir. 2018) (describing specific causation as "accounting for the development of the disease in a particular plaintiff" and distinguishing specific causation from "an increased risk of [disease] not withstanding certain other risk factors"); *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 263 (4th Cir. 1999) (plaintiff must show both "levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure") (collecting cases); *see also Junk v. Terminix Intern. Co.*, 628 F.3d 439, 450 (8th Cir. 2010) ("To prevail in a toxic tort case such as this, the plaintiff must show both general and specific causation.") (citation omitted).

Congress has used similar "caused by" language in other federal tort contexts, each of which also requires individual proof of causation as that is customarily understood. For example, the Public Vessels Act allows recovery against the United States in certain cases for "damages *caused by* a public vessel of the United States." 46 U.S.C. § 31102(a)(1) (emphasis added). In that context, "caused by" adopts its "customary legal terminology of admiralty law," including harms attributable to the public vessel as a juristic person. *Canadian Aviator v. United States*, 324 U.S. 215, 224 (1945). The Admiralty Extension Act also uses similar "caused by" language to extend admiralty and maritime jurisdiction to "cases of injury . . . *caused by* a vessel on navigable waters." 46 U.S.C. § 30101 (emphasis added). In that context, a plaintiff must prove causation based on individualized facts, including both cause in fact and proximate cause. *See Pryor v. Am. President Lines*, 520 F.2d 974, 980 (4th Cir. 1975).

Although these statutes do not relate specifically to toxic torts, there is no less reason "caused by" should mean anything other than its customary meaning here. *See* Restatement (Third) of Torts; Phys. & Emot. Harm, § 28 cmt. c(1) (2010) ("In all of these cases, the requirement to prove factual causation remains the same[.]"). To abrogate the longstanding and universal requirement that a toxic tort plaintiff prove specific causation, Congress must have "expressly rejected" that requirement in "the text of the [CLJA]." *Sorrell*, 549 U.S. at 168. It did not. Congress only said "caused by," which in the toxic tort context requires both general and specific causation.

### B. *The CLJA's Standard of Proof Reflects a Specific Causation Requirement.*

PLG asserts that Congress departed from the common law on general and specific causation by lowering "the causation burden." D.E. 111 at 22. If anything, Congress's explicit displacement of the usual standard of proof underscores that Congress did not also displace the requirement that a plaintiff provide evidence that water contamination actually harmed the plaintiff. In altering the standard of proof from a preponderance of the evidence—i.e., "more likely than not"— to "at least as likely as not," CLJA § 804(c)(2), Congress did not change the substance of *what* plaintiffs must prove. Changing the standard of proof only affects "which party loses if the evidence is balanced." *I4I*, 564 U.S. at 100 n. 4; *Standard of Proof*, Black's Law Dictionary (11th ed. 2019) ("The degree or level of proof demanded in a specific case, such as 'beyond a reasonable doubt' or 'by a preponderance of the evidence'; a rule about the quality of the evidence that a party must bring forward to prevail."). The standard of proof does not affect what the plaintiff is obligated to prove.

Subsection (c) provides additional textual clues that the CLJA requires specific causation. Subsection (c) reiterates that the standard of proof relates to proof of "a causal relationship." CLJA § 804(c)(2). The "relationship" must be "between the exposure to the water at Camp Lejeune and

the harm." *Id.* Although PLG asserts that this relationship refers only to general causation, subsection (c)'s reference to "the harm" makes clear that the relationship means both general and specific causation. According to the CLJA's general section, "the harm" determines the "appropriate relief" that an "individual" can seek. *Id.* § 804(b). "The harm" is thus defined by the individual bringing the action—it is the particular injury as it affects that individual, as opposed to some general or vague conception of a category of injuries. *See Nielsen v. Preap*, 139 S. Ct. 954, 965 (2019) ("[G]rammar and usage establish that 'the' is a 'function word indicating that a following noun or noun equivalent is definite or has been previously specified by context.'") (quoting Merriam Webster's Collegiate Dictionary 1294 (11th ed. 2005)) (alterations omitted). There is no indication that Congress intended plaintiffs to prove either their "harms" or "causal relationships" on a collective or generalized basis. Each plaintiff must prove that his or her own harm was the result of exposure to water at Camp Lejeune.

PLG's interpretation of the CLJA lacks merit because it would allow individualized recoveries without individualized proof. PLG maintains that individualized damages are recoverable, as proven through "[d]amages testimony from medical treaters and economic experts." D.E. 111 at 4. But just as the CLJA contemplates an "individual" recovering for his or her harm, it also contemplates that individual providing evidence of "a causal relationship" specific to his or her harm. "It is bedrock law that 'requested relief' must 'redress the alleged injury.'" *Babb v. Wilkie*, 140 S. Ct. 1168, 1177 (2020) (quoting *Steel Co v. Citizens for Better Env't*, 523 U.S. 83, 103 (1998)). There is no indication that Congress departed from this principle here.

### C. The 30-Day Exposure Requirement Does Not Abrogate Specific Causation.

PLG also asserts that the CLJA's 30-day exposure requirement is an "express departure from the common-law rule" because it supplants the exposure analysis in "ordinary tort law." D.E. 111 at 22. But the 30-day exposure requirement specifies who may "*bring an action* to obtain

appropriate relief"—not who is automatically entitled to appropriate relief. CLJA § 804(b) (emphasis added). The 30-day exposure requirement is akin to other eligibility requirements that determine who can get past the courthouse doors, without resolving what relief (if any) may be granted. *See, e.g.*, 47 U.S.C. § 227(c)(5) (limiting the private right of action for Telephone Consumer Protection Act claims to a "person who has received more than one telephone call within any 12-month period by or on behalf of the same entity"); 18 U.S.C. § 2333(a) (limiting the cause of action under the Anti-Terrorism Act to "[a]ny national of the United States . . . or his or her estate, survivors, or heirs"). The CLJA's 30-day exposure requirement may have been enacted to reduce the burden on the courts that would be posed by potentially tens of thousands of claims with only a tenuous connection to Camp Lejeune.

There is also no support for PLG's contention that Congress considered the 30-day "resided, worked, or was otherwise exposed" requirement to be a proxy for actual exposure in the general and specific causation analysis. Treating all periods at Camp Lejeune of 30 days or more in the same way ignores that the likelihood and magnitude of exposure vary significantly between individuals in a way that could affect whether the harm "was caused by" the exposures. Someone who resided at Camp Lejeune for several years is not similarly situated to someone who was otherwise exposed there for 30 days, such as recreational visits. Moreover, there were different levels of contamination at different water systems at different times, and, notably, several water systems at Camp Lejeune were never contaminated. *See* ATSDR, *Public Health Assessment of Drinking Water* 1 (January 20, 2017) ("Three of the eight distribution systems were contaminated and therefore were evaluated in this public health assessment: Tarawa Terrace, Hadnot Point, and Holcomb Boulevard."). As PLG has acknowledged, these are critical distinctions in the causation analysis. *See, e.g.*, D.E. 25 (Master Complaint) at ¶ 23 ("At all relevant times, Camp Lejeune was

divided into various water distribution systems. It is important to distinguish these areas to understand where the contamination and exposure occurred.").[2]

### D. The CLJA Differs from Other Statutes That Presume Causation.

When Congress intends to dispense with a specific causation requirement in a statute, it does so in a clear and unambiguous way. For example, the National Childhood Vaccine Injury Act ("Vaccine Act") specifically distinguishes two ways of establishing causation—one way requires proof of causation and the other way presumes causation. Generally, a claimant can recover only if the claimant shows that the injury "*was caused by* a vaccine." 42 U.S.C. § 300aa-11(c)(1)(ii) (emphasis added). This causation standard means that the claimants "must show the vaccine *actually caused* the significant aggravation"—i.e., the injury. *W.C. v. Sec. of Health and Hum. Servs.*, 704 F.3d 1352, 1357 (Fed. Cir. 2013) (emphasis added). A Vaccine Act claimant meets this requirement by establishing "a medical theory causally connecting the vaccination and the injury," an individualized showing of "a logical sequence of cause and effect showing that the vaccination was the reason for the injury," and "a proximate temporal relationship between vaccination and injury." *Winkler v. Sec. of Health and Hum. Servs.*, 88 F.4th 958, 961 (Fed. Cir. 2023) (quoting *Althen v. Sec. of Health and Hum. Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005)).

However, the Vaccine Act also created a "Vaccine Injury Table," which associates certain vaccines with certain injuries, if the injury manifests within a certain period of time. 42 C.F.R.

---

[2] Although the 30-day exposure requirement mirrors the exposure requirements for other statutes related to VA benefits, ATSDR has noted that "it is unclear how this minimum duration was established for this legislation." Ex. 3, *ATSDR Assessment of the Evidence for Drinking Water Contaminants at Camp Lejeune and Specific Cancers and Other Diseases*, Agency for Toxic Substances and Disease Registry 11 (Jan. 13, 2017) (excerpted by counsel) [hereinafter "*Assessment of the Evidence*"]. "[A] decision to establish a specific minimum exposure duration for policy purposes will primarily be based on social, economic and legal factors." *Id.* One straightforward explanation for including the same 30-day exposure requirement in the CLJA as for VA benefits is that doing so encourages symmetry between CLJA recoveries and offsets. *See* CLJA § 804(e)(2).

§ 100.3; *see also* 42 U.S.C. § 300aa-14. If a claimant can show an injury as "set forth in the Vaccine Injury Table in association with the vaccine," then causation is presumed; no additional evidence of causation is required. 42 U.S.C. § 300aa-11(c)(1)(i). For these types of injuries, "[t]he Vaccine Table, in effect, determines by law that the temporal association of certain injuries with the vaccination suffices to show causation." *Grant v. Sec. of Dep't of Health and Hum. Servs.*, 956 F.2d 1144, 1147 (Fed. Cir. 1992). By allowing recovery for certain claims through the Vaccine Table, Congress expressly recognized that the Vaccine Act "may provide compensation to some children whose illness is not, in fact, vaccine-related." *Id.* at 1147 (quoting H.R. Rep. No. 908, 99th Cong., 2d Sess., pt 1, at 18 (1986)). Congress also recognized that, as additional scientific evidence regarding causation developed, the Secretary of Health and Human Services could revise the Vaccine Table by regulation. *Id.*; *see also* 42 U.S.C. § 300aa-14(c). But for ordinary, off-Table claims, Congress required that "the petition must affirmatively demonstrate that the injury or aggravation was caused by the vaccine," such as through "evidence in the form of scientific studies or expert medical testimony." *Grant*, 956 F.2d at 1147–78 (quoting H.R. Rep. No. 908, 99th Cong., 2d Sess., pt. 1 at 15 (1986)) (emphasis omitted).

For the CLJA, Congress declined to include an injury table or allow for similar recovery based on "association" with the contaminants detected in Camp Lejeune water. It also declined to permit recovery "notwithstanding . . . insufficient medical evidence" of causation, as it had done in creating presumptive service connections for certain conditions when awarding VA disability benefits. 38 U.S.C. § 1710(e)(1)(F). Had Congress intended for the CLJA to allow individual tort damages based only on general causation or some other presumptive framework, "it knew how to say so." *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 826 (2018). Rather, Congress used "caused by" language, which requires CLJA claimants to make an individual, affirmative showing

of causation, as with off-Table Vaccine Act claims and claims under other statutes that use identical language.

PLG's analogies to other statutes that apply a lower causation standard lack merit. *See* D.E. 111 at 31–32. Unlike the CLJA, the Federal Employees' Liability Act ("FELA") expressly allows recovery for injuries or deaths "resulting in whole *or in part*" from the defendant's negligence. 45 U.S.C. § 51 (emphasis added). By expressly allowing recovery for injuries that result in any way from a defendant's negligence, Congress abrogated the common law requirement of "proximate cause." *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 688 (2011). But Congress did not permit recovery under the CLJA for harms caused "in part" by exposure to water at Camp Lejeune; it limited recovery to harm that "was caused by" such exposure. CLJA § 804(b). And Plaintiffs' theory would go further still, encompassing harms with entirely separate causes, so long as they hypothetically could have been caused by contaminated water under some different set of facts.

Nor is the CLJA's text comparable to the Civil Rights Act of 1991's discrimination provisions. The Civil Rights Act of 1991 expressly allows recovery where discrimination "was a *motivating factor* for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m) (emphasis added). "This, of course, is a lessened causation standard." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 349 (2013). The CLJA, however, contains no similar language that would allow recovery where exposure to water at Camp Lejeune was merely one of many "factors." Instead, Congress adopted an ordinary causation standard— "caused by." CLJA § 804(b); *cf.* 42 U.S.C. § 2000e-3(a) (using "because of"). As the Supreme Court held in *Nassar*, a "because of" standard "require[s] proof that the desire to retaliate was the but-for cause of the challenged employment action." 570 U.S. at 352. Similarly, here, the CLJA's

"caused by" standard requires proof that the exposure actually caused the alleged harm—specific causation.

## II. The History and Context of the CLJA Demonstrate that Congress Rejected a Presumptive Framework.

In addition to the plain language and structure of the CLJA, the statute's history and context show that Congress intended an individualized showing of specific causation. In enacting the CLJA, Congress recognized that certain FTCA exceptions, as well as the North Carolina statute of repose (which was incorporated as substantive law into the FTCA), had prevented individuals from litigating the merits of prior claims related to Camp Lejeune water. To remedy this, Congress removed these barriers in the CLJA to allow individuals to bring tort actions in federal court to seek tort damages. *See* CLJA §§ 804(f); (j)(3). There is no indication that Congress intended to abrogate the specific causation requirement that is a central element of tort litigation against the government—and everyone else.

### A. Congress Intended the CLJA to Operate Within the Already-Established Tort Law Background.

The legislative history shows that Congress was legislating against the background of the FTCA. In a press release on the proposed bill prior to enactment, Representative Murphy, one of the authors of the CLJA, explained, "This type of claim would already be permitted anywhere else in the United States, but because of a unique provision in North Carolina law, this legislation is necessary for those harmed at Camp Lejeune finally to seek justice."[3] Senator Tillis, another

---

[3] Ex. 4, *Cartwright, Murphy, Price Introduce Camp Lejeune Justice Act*, U.S. Congressman Gregory F. Murphy, (Mar. 26, 2021) https://perma.cc/HT68-4VZB. Courts have relied on congressional press releases to determine legislative intent of a statute. *See, e.g.*, *Waste Mgmt. Holdings, Inc., v. Gilmore*, 252 F.3d 316 (4th Cir. 2001) (relying on press releases from a state senator that sponsored the statutory provisions at issue to determine that no reasonable juror could find that Virginia's legislature acted without a discriminatory purpose in enacting the statutory provisions).

sponsor of the bill, emphasized Congress's intent for the presentation of evidence prior to enactment: "This enables individuals affected by toxic exposure at Camp Lejeune to bring suit before the district court for the Eastern District of North Carolina *to present evidence for injuries caused by exposure to [Camp Lejeune Contaminated Water]*."[4] In promoting the bill to the Senate, Senator Tillis emphasized the purpose was to provide "access to courts and the judicial system [as provided] in other states and territories."[5] Other pre-enactment statements similarly focused on "providing a legal pathway for affected veterans and their families to pursue fair compensation," without dispensing with normal causation requirements or implying a desire to compensate individuals whose harms were not caused by Camp Lejeune water. *See* Ex. 1, Congressional Record, H1192, March 1, 2022; *see also* Ex. 5, Congressional Record, E215 (March 3, 2022) (Representative Eshoo stating that the CLJA "puts into place a legal recourse" for claims that had been denied "because of an anomaly in North Carolina state law").

Against this legislative record, PLG nevertheless asserts that "litigating the precise exposure on a condition-by-condition and year-by-year basis with complicated scientific evidence," as a typical toxic tort case would proceed, would frustrate Congress's purpose. D.E. 111 at 30. PLG further claims that "construing the statute to require only general causation enables the sort of streamlined proceedings that Congress expected." *Id.* at 31.[6]

---

[4] Ex. 2, *Tillis, Blumenthal, Burr, and Peters Introduce the Camp Lejeune Justice Act to Ensure Legal Rights for Water Contamination Victims*, Thom Tillis U.S. Senator for North Carolina, (Nov. 4, 2021) https://perma.cc/LHF6-QX8G (emphasis added).

[5] *Id.*

[6] PLG's description of the CLJA in their motion contradicts the advocacy of many of its own members for court-appointed leadership. Those PLG members represented that they were "uniquely suited to undertake and coordinate these efforts," including "[d]elving into case-specific issues, including general *and specific causation*, and collaborating with myriad experts to marshal the scientific evidence [which] will be both complex and expensive." Ex. 6, Bell Legal Group Application at 7 (emphasis added); *see also id.* at 11 ("Numerous complex issues will be disputed . . . [including] *issues related to specific causation*.") (emphasis added). PLG also explained that

PLG's claims are without merit. Congress rejected an administrative, non-adversarial compensation program. *See* D.E. 133 at 32 (discussing Technical Assistance). Instead, Congress provided a federal tort action that generally mirrored the FTCA except where Congress (1) specifically abrogated conditions that had previously prevented prior FTCA actions and (2) altered the burden of proof standard. Like the FTCA, the CLJA provides an administrative exhaustion procedure to allow the government an opportunity to administratively settle the tort claims without the necessity of litigation in federal court. Indeed, Department of Justice and Department of the Navy have established an Elective Option program ("EO") to enable certain plaintiffs with qualifying injuries to more easily settle their claims through that administrative process. Other administrative claims may be resolved through a global resolution based on decisions made in this litigation.[7]

Congress's rejection of earlier Camp Lejeune legislation confirms its intent to retain tort principles, including causation. A 2021 version of the statute would have expressly permitted recoveries for harms based on four different causation standards: (1) "caused by exposure to the water;" (2) "associated with exposure to the water;" (3) "linked to exposure to the water'" and (4) "the exposure to the water increased the likelihood of such harm." Ex. 7, H.R. 2192, 11th Cong., 1st Sess. (2021) (Camp Lejeune Justice Act of 2021). Congress chose not to enact a tort remedy based on these greatly relaxed standards of general and specific causation, which expressly depart

---

it expected to staff a subcommittee specifically for "exposure mapping and contaminant pathways," as well as other scientific subcommittees "[g]iven the magnitude of science-based issues in this case." *Id.* at 6.

[7] Although a plaintiff must prove specific causation before a Court may award tort damages, the parties may choose to settle cases based on the litigation risk and uncertainty regarding what *might* be proven at trial. For this reason, the EO facilitates settlements and earlier resolution of claims by forgoing an individualized showing of specific causation (as well as an individualized showing of damages). That approach is distinguishable from what may be required in a litigation setting.

from the causation standard in ordinary tort litigation. Instead, the CLJA, as enacted, allows tort damages only where a plaintiff can prove that the harm was "caused by" exposure to water at Camp Lejeune and the plaintiff proves a "causal relationship." CLJA §§ 804(b), (c). Congress's rejection of lower causation standards is a further indication that it intended to retain the traditional inquiry of both general and specific causation. *See Russello v. United States*, 464 U.S. 16, 23–24 (1983) ("Where Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended.").

*B. Congress Rejected an Expansion of the VA Presumptive System.*

PLG argues that the Court should read the "CLJA as a judicially administered version of the VA presumption system." D.E. 111 at 22. Had Congress intended to create a version of the VA presumptive system, it would have expanded the already established VA programs. Indeed, that is precisely what Congress did with other provisions of the PACT Act. But Congress set the CLJA aside from those provisions describing the VA system, and instead created a distinct tort remedy. By creating a remedy distinct from VA benefits, Congress intended an approach to tort compensation distinct from VA presumptions for medical care and disability benefits.

PLG's argument ignores that the VA presumption system already exists for Plaintiffs through the VA. For over a decade prior to the CLJA's enactment, the United States provided various remedies to veterans exposed to Camp Lejeune water through the VA. In 2012, Congress enacted the Honoring America's Veterans and Caring for Camp Lejeune Families Act of 2012, Pub. L. 112-154, 126 Stat. 1167, 1176 (2012) ("the Janey Ensminger Act"). This statute made certain veterans who served at Camp Lejeune for at least 30 days eligible for hospital care and medical services through the VA. 38 U.S.C. § 1710. The statute also expanded health care benefits to family members of veterans who resided at Camp Lejeune or who were exposed in utero while the mother resided at Camp Lejeune. *Id.* § 1787 Under the Janey Ensminger Act, veterans and

their family members with any of fifteen different illnesses and conditions can receive hospital care and medical services "notwithstanding that there is insufficient medical evidence to conclude that such illnesses or conditions are attributable to such service." *Id.* § 1710(e)(1)(F). Although an individual can seek relief for the same injury under both these VA programs and the CLJA, the development of these VA administrative programs contrasts with the CLJA's allowance of a cause of action in federal court with respect to the required showing of both general and specific causation.

Beyond medical care for fifteen illnesses identified in the Janey Ensminger Act, the VA continued to examine whether it could presume that those or other illnesses were caused by Camp Lejeune water for purposes of disability benefits. To facilitate this, the VA requested assistance from the Agency for Toxic Substances and Disease Registry ("ATSDR").[8] In 2015, the Secretary of VA, along with Senators Isakson, Burr, and Tillis, requested that ATSDR complete this process "quickly and rapidly and efficiently."[9]

ATSDR was given a "very specific charge" and did so "giving the benefit of the doubt . . . as much as possible to the veteran."[10] *Id.* at 94:8–11. In a matter of weeks, ATSDR scientists quickly created a document based, in part, on the conditions originating from the VA's

---

[8] Ex. 8, February 13, 2020 Transcript, Camp Lejeune Community Assistance Panel (CAP) Meeting at 49, https://www.atsdr.cdc.gov/sites/lejeune/docs/transcripts/CAP_February_2020_508.pdf (excerpted by counsel) ("[S]o the original assessment we made of the strength of evidence was done on behalf of the VA, a request from the VA.").

[9] Ex. 9, August 27, 2015 Transcript, Camp Lejeune Community Assistance Panel (CAP) Meeting at 89:9, https://www.atsdr.cdc.gov/sites/lejeune/docs/transcript8_2015.pdf (excerpted by counsel).

[10] *Id.* at 94:8–11 ("[T]his was a very specific charge we were given at a meeting from the Secretary in front of, you know, three senators, and we're taking that charge very seriously."); *Id.* at 98:22–99:1 ("[T]he challenge to us is to sort through that and come up with what we think makes sense and maybe what's, you know, giving the benefit of the doubt, as the VA likes to say, as much as possible to the veteran").

implementation of the Janey Ensminger Act. *Id.* at 89:1–18. ATSDR also included a handful of additional diseases for which ATSDR could identify some scientific evidence to support inclusion of the disease in that short period of time. *Id.* This document was later made accessible on ATSDR's website as *ATSDR Assessment of the Evidence for Drinking Water Contaminants at Camp Lejeune and Specific Cancers and Other Diseases*.

The *Assessment of the Evidence* was ATSDR's review of the existing scientific literature "to assess the strength of the evidence supporting causality of adverse health effects from exposures to the drinking water contaminants at Camp Lejeune." Ex. 3, at 2, 4.[11] As a briefing document for the VA, the *Assessment of the Evidence* derived its system for classifying the scientific literature from a 2008 report published by the Institute of Medicine ("IOM") of the National Academies of Science. Ex. 3, *Assessment of the Evidence* at 5; *see also* Ex. 10, Institute of Medicine, *Improving the Presumptive Disability Decision-Making Process for Veterans*, 189 (Nat'l Academs. Press, 2008) (excerpted by counsel) [hereinafter "IOM Report"]. The 2008 IOM report committee was, in part, charged with "proposing a scientific framework for making such presumptive decisions in the future." *Id.* at xi. The report explained that "[p]resumptions are made when there are gaps in the information related to exposure and causal classification" including

---

[11] In light of the charge from the VA and the short turnaround, the *Assessment of the Evidence* is merely a literature review. ATSDR did not conduct its own meta-analysis to complete this report. Ex. 3, at 2. Rather, ATSDR reviewed the scientific literature on TCE, PCE, vinyl chloride, and benzene. *Id.* at 2. ATSDR began with a review of agency studies and meta-analysis by the Environmental Protection Agency ("EPA"), National Toxicology Program ("NTP"), and International Agency for Research on Cancer ("IARC"). *Id.* at 4. Additionally, ATSDR conducted a literature search using PubMed for epidemiological studies conducted after the meta-analysis and reviews were completed by the agencies. *Id.* ATSDR did not include animal studies in their literature search. *Id.* at 5. The animal studies reviewed and included in ATSDR Report were those included in the EPA, IARC, and NTP reports and published articles. *Id.*

"incomplete scientific evidence as to whether an exposure during service causes the health condition of concern." Ex. 10, IOM Report at 1, 138.

The IOM committee proposed four categories to characterize the strength of the evidence for or against a causal relationship for presumptive decision-making at the administrative level: (1) Sufficient; (2) Equipoise and Above; (3) Below Equipoise; and (4) Against. *See* Ex. 10, IOM Report at 189.[12] The 2008 IOM Report concluded that "the scientific community should categorize the overall evidence as making it more confident in the existence of a causal relationship than in the non-existence of a causal relationship, *but not sufficient to conclude causation*." Ex. 10, IOM Report at 191 (emphasis added). Based on this evaluation, the VA provided for presumptive service-connection for VA disability benefits for eight diseases that fell in the "sufficient" or "equipoise and above" categories. *See* 38 C.F.R. § 3.309(f).

Fully aware of these administrative benefits, Congress chose not to extend this administrative presumption scheme for medical and disability benefits to civil actions seeking broader relief. Instead, Congress created a tort cause of action for the broader tort relief that had previously been denied under the FTCA. *See United States v. Perkins*, 67 F.4th 583, 611 (4th Cir. 2023) ("As a matter of statutory construction, federal courts presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts.") (internal citations and quotations omitted). In line with the public statements of the authors and co-sponsors of the CLJA, the CLJA was intended to remove the legal barriers that prevented the previous FTCA claims from

---

[12] Notably, no other National Academy of Science committee tasked with assessing the evidence of health effects related to exposures encountered during military service had adopted the use of these categories specifically for this purpose. *See* Ex. 11, *The National Academies Report, Assessing Military-Related Exposures and Health Outcomes Before H. Comm. Veterans' Affs.*, 117th Cong. (statement of Karl Kelsey, Member, National Academy of Sciences), https://www.nationalacademies.org/ocga/testimony-before-congress/the-national-academies-reports-assessing-military-related-exposures-and-health-outcomes.

being litigated on their merits. The statute explicitly abrogated North Carolina's statute of repose and the FTCA jurisdictional exceptions in order to remove the barriers for litigation. CLJA §§ 804(f); (j)(3). Yet, tellingly, Congress did not include a provision altering the traditional toxic tort requirement that a plaintiff prove both general and specific causation. The Court should not impute dramatic changes to standard tort principles without clear direction from Congress.

PLG's arguments regarding the CLJA's passage as part of the PACT Act cut against them. D.E. 111 at 22. The other provisions of the PACT Act differ starkly from the CLJA and show that Congress did not intend the CLJA to function as a judicially administered VA system. The PACT Act serves veterans in many ways, including expanding benefits, clarifying administrative rulemaking, establishing presumptive frameworks, and directing epidemiological research for a broad range of exposures. Pub. L. No. 117-168, 136 Stat. 1759. In contrast, the CLJA provides for litigation by allowing an "individual" to "bring an action in the United States District Court for the Eastern District of North Carolina to obtain appropriate relief for harm that was caused by exposure to the water at Camp Lejeune." CLJA § 804(b). The CLJA also distinguishes itself as an "exclusive remedy" and distinguishes itself from more limited medical and disability benefits provided through the VA and other government programs. *See* CLJA § 804(e). Moreover, the CLJA is codified in the U.S. Code with the remainder of the FTCA apart from the other provisions of the PACT Act. *See* 28 U.S.C. Chapter 171 ("Tort Claims Procedure"), note. Consequently, the inclusion of the CLJA in the PACT Act shows that Congress knew how to expand VA programming and, while doing that in many respects elsewhere in the PACT Act, expressly declined to do so with the CLJA.

### C. Congress Rejected Adoption of the IOM Framework and ATSDR's Findings.

Even though Congress was cognizant of both ATSDR's *Assessment of the Evidence* and the IOM Framework, it did not refer to either in the text of the CLJA. The *Assessment of the*

*Evidence* was a policy document. It was drafted for the Secretary of the VA to make policy decisions with respect to VA benefits. The ATSDR was given a "very specific charge" for the *Assessment of Evidence* and came to conclusions based on its review of the scientific literature "giving the benefit of the doubt . . . as much as possible to the veteran."[13] The ATSDR utilized the IOM's standard—a standard used for government policymaking, and not for reliably determining causation pursuant to the requirements of Fed. R. Evid. 702.

The IOM categories, such as "equipoise and above," embrace the presumptive decision-making process of the VA, which is inherently deferential to the veteran and inconsistent with tort law and the evidentiary admissibility requirements of Fed. R. Evid. 702. The IOM Report explains that the definition of equipoise is derived from the benefit of the doubt standard, Ex. 10, IOM Report at D-12, which "is similar to the rule deeply embedded in sandlot baseball folklore that 'the tie goes to the runner,'" *Gilbert v. Derwinski*, 1 Vet. App. 49, 55 (Ct. App. Vet. Affairs 1990). The IOM Report recognizes that "social, economic, political, and legal factors beyond the scope of scientific evidence [] may influence the presumptive disability decision-making process." Ex. 10, IOM Report at 22. In line with this perspective, the IOM instructed on its "equipoise or above standard" that "the scientific community should categorize the overall evidence as making it more confident in the existence of a causal relationship than in the non-existence of a causal relationship, *but not sufficient to conclude causation*." Ex. 10, IOM Report at 191 (emphasis added).

Had Congress intended the *Assessment of the Evidence* and its findings to be controlling for CLJA claims, Congress could have explicitly referenced the report or used the language of the IOM categories. Yet, the IOM term "equipoise and above" is not explicitly included in the CLJA.

---

[13] Ex. 9, August 27, 2015 Transcript, Camp Lejeune Community Assistance Panel (CAP) Meeting at 89:9, https://www.atsdr.cdc.gov/sites/lejeune/docs/transcript8_2015.pdf.

PLG argues that where Congress employs a term of art, the regulatory history for that term of art must be incorporated. D.E. 111 at 21. However, Congress did not adopt the term of art that PLG wishes to read into the CLJA to eliminate specific causation: "equipoise and above." Rather, Congress used the term "sufficient" in its description of the CLJA's standard of proof. CLJA § 804(c)(2). While Congress used the phrase "at least as likely as not," which is superficially similar to "equipoise and above," the context is quite different. Congress used the phrase "at least as likely as not" in the context of a CLJA plaintiff's individual standard of proof to show causation in a tort action, whereas ATSDR used the phrase "equipoise and above" in the context of its evaluation of the body of scientific literature to support presumptive decision-making for administrative remedies. The fact that Congress used different words for a different context shows that Congress did not intend for the ATSDR *Assessment of the Evidence* to be dispositive. Congress could have incorporated the ATSDR's findings by providing a list of presumptive diseases, just as it did when it authorized medical care through the VA for certain individuals exposed to Camp Lejeune water or when it allowed Vaccine Act claims for certain individuals who received certain vaccines. Instead, Congress simply chose to relax the traditional civil burden of proof standard. Thus, the Court should not read policy-based presumptions into the CLJA given its plain statutory language on causation.

Just as Congress declined to enact a prior version of the CLJA that allowed recovery based on an "association" or "increased likelihood" of harm, Congress also declined to enact a version of the CLJA that would have allowed certain study findings to satisfy a plaintiff's burden of proof. A 2021 bill specifically referenced the use of studies.

> (2) USE OF STUDIES.—A study conducted on humans or animals, or from an epidemiological study, which ruled out chance and bias with reasonable confidence and which concluded, with sufficient evidence, that exposure to the water described in

> subsection (a) is one possible cause of the harm, shall be sufficient
> to satisfy the burden of proof described under paragraph (1).

Ex. 7, H.R. 2192, 11th Cong., 1st Sess. (2021) (Camp Lejeune Justice Act of 2021). The enacted version of the CLJA did not include this language. *See generally* CLJA § 804; *see also Russello*, 464 U.S. at 23–24 (removal of limiting language before enactment shows Congress did not intend the limitation). Fully aware of the VA's remedies for Camp Lejeune veterans and family members, as well as ATSDR's *Assessment of Evidence*, Congress used language of a tort cause of action rather than that of an administrative remedy based on scientific study findings.

PLG posits that "Congress easily could have written a statute requiring individualized causation." D.E. 111 at 23. But Congress did just that in allowing "[a]n individual . . . [to] bring an action . . . to obtain appropriate relief for harm that was caused by exposure to the water at Camp Lejeune." CLJA § 804(b). Had Congress intended to allow recoveries based merely on an "association" between Camp Lejeune water exposures and a type of harm, or based merely on an "increased likelihood" of a type of harm, it would have used those terms.

### D. Congress Could Not Have Intended the Consequences That Would Result From the PLG's Proposal to Dispense With Proof of Specific Causation.

Eliminating specific causation would lead to disparate results that Congress could not have intended. An individual on the west side of the base with no exposure to contamination could receive the same tort compensation as a person on the east side of the base with the same disease who was exposed to contaminated water for years. *See* ATSDR, *Public Health Assessment of Drinking Water* 1 (January 20, 2017) ("Three of the eight distribution systems were contaminated and therefore were evaluated in this public health assessment: Tarawa Terrace, Hadnot Point, and Holcomb Boulevard."). A person with a long history of smoking could receive the same tort compensation as a person with the same disease with no smoking history. Without a clear directive, Congress could not have intended such differently situated claimants to be equally entitled to the

same compensation. Requiring proof of both general and specific causation as a prerequisite to an award of tort damages ensures that an individual's injury was in fact caused by the exposure. *See In re Lipitor*, 892 F.3d at 642.

### III. The CLJA's Causation Language Is Not Ambiguous, so the Veteran's Canon Is Inapplicable.

The CLJA's causation language is not ambiguous and, therefore, the Court need not look beyond the statute and employ any normative canons of interpretation, including the veteran's canon. The CLJA is not ambiguous simply because the parties disagree about the proper interpretation. *See generally Barry v. McDonough*, 35 Vet. App. 111, 120 (Ct. App. Vet. Affairs 2022) (concluding that a regulation "is not ambiguous simply because both parties insist that the plain meaning supports his or her position and neither party's interpretation is unreasonable to the Court"). "The pro-veteran canon should be considered only after descriptive tools fail to yield a best meaning of the provision." *Kisor v. McDonough*, 995 F.3d 1347, 1351 (Fed. Cir. 2021) (Prost, C.J., concurring). Even a statute written with servicemembers in mind, like the Servicemembers Civil Relief Act ("SCRA"), cannot be bent beyond what its plain text and "classical" tools of interpretation permit. *Gordon v. Pete's Auto Serv. of Denbigh, Inc.*, 637 F.3d 454, 458 (4th Cir. 2011).

Indeed, the veteran's canon "applies only when there is 'interpretive doubt.'" *Kisor*, 995 F.3d at 1350–51 (citing *Brown v. Gardner*, 513 U.S. 115, 117 (1994)) (collecting cases). PLG's reliance on *Gordon v. Pete's Auto Serv. of Denbigh, Inc.*, 637 F.3d 454, 458 (4th Cir. 2011), highlights this point. *Gordon* involved interpretation of the SCRA, a consumer protection law that unambiguously protects active duty servicemembers and allows for private litigation to enforce its terms. In *Gordon*, the Fourth Circuit recognized that the SCRA and its analogous predecessor statute should be read with an eye towards the servicemember. *Id.* However, the court did not

employ the veteran's canon, because it did not need to interpret an ambiguous provision. *Id.* The court explained: "But in determining whether to apply SCRA § 802 here, we need only reference the classical retroactivity analysis of *Landgraf v. USI Film Products*[.]" *Id.* (internal citation omitted). Without interpretive doubt, the court resolved the matter without considering the veteran's canon.

In the present case, there is likewise no interpretative doubt; the plain language, structure, context, and the legislative history of the CLJA all confirm that it requires proof of both general and specific causation just like any other toxic tort. Because of the CLJA's clear causation requirements, the Court should not strain to reach a result that runs contrary to the statute's unambiguous language.

Moreover, the Court should not apply the veteran's canon to the CLJA because the CLJA is not limited to veterans. The CLJA unambiguously extends beyond veterans to also include any "individual" who "resided, worked, or was otherwise exposed" to water at Camp Lejeune. CLJA § 804(b). As the Federal Circuit has recognized, the veteran's canon applies to veterans' benefit statutes, not to a statute of general applicability, such as the CLJA. *See generally Parrott v. Shulkin*, 851 F.3d 1242, 1251 (Fed. Cir. 2017). PLG cites the SCRA, but that statute is in essence a statute for active servicemembers, not a statute of generable applicability. By its terms, the SCRA is intended to provide benefits to active military and "shall terminate on the date of discharge or release from such service." 50 U.S.C. § 3914. A subchapter of protections extends to their dependents only "if the dependent's ability to comply with a lease, contract, bailment, or other obligation is materially affected by reason of the servicemember's military service." *Id.* § 3959. In contrast, the CLJA does not require the term "individual" to have a connection to military service. Rather, the CLJA broadens the term individual to make clear that the statute extends to an

Case 7:23-cv-00897-RJ    Document 139    Filed 02/19/24    Page 30 of 33

"individual, including a veteran . . . or the legal representative of such an individual." CLJA § 804(b).

To the extent PLG argues that the CLJA should be construed liberally in favor of veterans, their proposed reading would violate the strict prohibition against implied waivers of sovereign immunity. This Court has recognized that "limitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied." D.E. 133 at 8 (quoting *Soriano v. United States*, 352 U.S. 270, 276 (1957)). Here, there is no basis from which to imply that Congress intended to waive immunity without regard to causation. *See F.A.A. v. Cooper*, 566 U.S. 284, 291 (2012) ("For the same reason that we refuse to enforce a waiver that is not unambiguously expressed in the statute, we also construe any ambiguities in the scope of a waiver in favor of the sovereign."). Further, the sovereign immunity canon is not merely a tool to resolve statutory ambiguity—it embodies a clear-statement rule that "define[s] that court's jurisdiction to entertain the suit." *Lehman v. Nakshian*, 453 U.S. 156, 160 (1981). PLG's attempts to manufacture ambiguity and apply an inapplicable canon should be rejected.

## CONCLUSION

The United States appreciates the need to litigate these cases efficiently. But "efficiency" cannot come at the expense of compromising the CLJA's plain language. Nor is there any indication in the legislative history and backdrop of the CLJA that Congress intended to deviate from the standard toxic tort litigation principle that plaintiffs must show specific causation. PLG's motion should be DENIED.

Respectfully submitted on February 19, 2024.

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

J. PATRICK GLYNN
Director, Torts Branch
Environmental Torts Litigation Section


BRIDGET BAILEY LIPSCOMB
Assistant Director, Torts Branch
Environmental Torts Litigation Section

ADAM BAIN
Special Litigation Counsel, Torts Branch
Environmental Torts Litigation Section

NATHAN BU
SARA MIRSKY
HAROON ANWAR
DANIEL C. EAGLES
Trial Attorney
Environmental Torts Litigation Section


*/s/ Elizabeth K. Platt*
ELIZABETH K. PLATT
DC Bar No. 1672052
Trial Attorney, Torts Branch
Environmental Tort Litigation Section
United States Department of Justice
P.O. Box 340, Ben Franklin Station
Washington, D.C. 20044
E-mail: Elizabeth.k.platt@usdoj.gov
Telephone: (202) 305-5871
Fax: (202) 616-4473

Attorney inquiries to DOJ regarding the
Camp Lejeune Justice Act:
(202) 353-4426

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on February 19, 2024, a copy of the foregoing document was filed

via the Court's ECF system and served on counsel of record through the ECF system.

*/s/ Elizabeth K. Platt*
ELIZABETH K. PLATT
