# Exhibit 6

# <u>APPLICATION FOR APPOINTMENT OF PROPOSED LEADERSHIP GROUP TO LEAD CAMP LEJEUNE WATER LITIGATION</u>

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
No. 7:23-cv-897**

| | |
|---|---|
| IN RE: | APPLICATION FOR APPOINTMENT OF PROPOSED LEADERSHIP GROUP TO |
| CAMP LEJEUNE WATER LITIGATION | LEAD THE CAMP LEJEUNE WATER LITIGATION |

Pursuant to this Court's April 25, 2023, Order, Dkt. 1, undersigned counsel, on behalf of 874 plaintiffs before the Court, (the "Proposed Leadership Group" or "PLG") move for the appointment of the leadership structure detailed below. Each undersigned attorney submits this application both individually and as a group, in support of each other.[1] Counsel respectfully submit that appointment of the PLG will best serve the interests of all Camp Lejeune claimants.

*First*, the PLG has extensive experience and expertise relevant to complex, mass-action litigation, in general, and to these cases in particular. Members of the PLG, for example, litigated precursor cases under the Federal Tort Claims Act ("FTCA"), which gives them specific experience with the scientific and factual questions at issue in the Camp Lejeune Water Litigation. In fact, in the previous FTCA litigation, Ed Bell, proposed Lead Counsel here, worked with the same counsel for the Department of Justice ("DOJ") who now leads DOJ in this litigation, Mr. Adam Bain. Adding to the PLG's expertise, prominent and well-respected practitioners of the Eastern District of North Carolina have helped guide the group since its inception. And the PLG counts among its members many of the most accomplished and respected mass-tort attorneys from across the country with experience successfully leading—and resolving—precisely this type of complex litigation. Specifically, PLG members have been appointed Lead or Co-Lead Counsel in

---

[1] The undersigned attorneys are not members of any other proposed leadership structure that might be submitted to the Court and have not consented to being listed in any application that will be submitted to the Court aside from this one. They have each determined that the PLG, as assembled, will work together most effectively, efficiently, and agreeably, to the benefit of all Camp Lejeune claimants. That said, they defer to the judgment of this Court and will, as always, faithfully follow its orders.

1

over 20 mass-tort litigations, and they have served as members of the Plaintiffs' Executive Committee or Plaintiffs' Steering Committee in approximately 60 mass-tort matters. Multiple members of the PLG have also served as lead trial counsel in numerous mass-tort bellwether trials, including in litigation relating to prescription opiates, 3M earplugs, and the Deepwater Horizon oil spill. And several members of the PLG have negotiated and resolved complex litigations for billions of dollars, including $15 billion in the Deepwater Horizon litigation and nearly $60 billion to date in the National Prescription Opiate Litigation.

*Second*, appointment of the PLG will align leadership of this litigation with the individual choices of the plaintiffs whom leadership must serve. Over 90 percent of the plaintiffs before the Court have chosen members of the PLG to represent them. The PLG also represents over 60,000 additional clients with claims pending before the Department of the Navy ("Navy"), and over 200,000 clients in total. Appointing the PLG to lead this litigation would vest responsibility for guiding these cases in the attorneys who directly represent the large majority of plaintiffs before this Court and who may file suit in the future. It would also substantially improve efficiency— after all, agreements reached between DOJ and attorneys who directly represent 90 percent of plaintiffs will, by definition, likely be acceptable to 90 percent of plaintiffs. So time spent negotiating such agreements would not be wasted.

*Third*, the PLG has shown that it will bring the persistence and urgency needed to advance plaintiffs' cases. The Camp Lejeune Justice Act ("CLJA") gives victims of water poisoning a remedy that has been decades in the making. But ensuring that the government delivers on that promise will require a tremendous amount of work from plaintiffs' counsel: They must investigate hundreds of thousands of individual cases, file those cases with the Navy, litigate them effectively in court, and ultimately reach a resolution with DOJ that can apply globally. Having waited up to

70 years for a remedy, Camp Lejeune victims deserve counsel who will advance their cases with urgency.

Members of the PLG have been working together to prepare for this litigation since before the CLJA became law, including by tirelessly advocating for the CLJA itself. The group has spent the last year analyzing the legal issues underlying the CLJA and investigating the scientific and medical topics necessary to prove plaintiffs' cases. Indeed, since last summer, the PLG has been assembling the existing research and evidence available to forcefully pursue CLJA claims. And they have retained over 40 top experts in the relevant fields, including the former Senior Environmental/Water Resources Engineer of the Agency for Toxic Substances and Disease Registry ("ATSDR") who was responsible for modeling historical levels of water contamination at Camp Lejeune, his consulting expert, and three epidemiologists consulted by the ATSDR.

At the same time, the PLG has understood that—in parallel to advancing litigation—it must work with the government to devise a process for global resolution. The group's Government Liaison reached out to both DOJ and the Navy even before the CLJA became law and has been in regular contact with both agencies since then, including over 20 calls and meetings with DOJ, to lay the groundwork for a comprehensive resolution. As evidenced by the group's tens of thousands of clients before the Navy and this Court, the group has done the extensive work necessary to advance their clients' cases. Their proven diligence and resolve will continue to serve all plaintiffs over the course of this litigation.

*Fourth*, the PLG will provide the significant human and monetary resources needed to prosecute litigation of this magnitude. Given the numerous injuries and contaminants at issue, and the larger number of likely plaintiffs, considerable resources will be required to effectively represent all plaintiffs. As detailed below, the PLG includes an impressive collection of formidable law firms and specialist litigators, all of whom have committed to contribute—and have already

3

contributed—substantial resources to serve Camp Lejeune plaintiffs, including $1,000,000 in PLG assessments and over $400,000 in court filing fees to date.

*Fifth*, the PLG has a proven record of commanding the respect of their colleagues and working cooperatively with fellow plaintiffs' counsel, the government, and the Court. The group includes preeminent litigators who have been court-appointed leads in many of the largest litigations in the country, and yet the group has self-organized into an effective team to jointly lead this litigation. The efforts of the PLG have been remarkable for their civility and collaboration. Over months of cooperation, the PLG has reached all decisions through consensus. Likewise, the PLG has worked congenially with plaintiffs' counsel who are not part of the PLG. For example, when DOJ has raised case-management issues with the group's Government Liaison, she has served as a liaison between the government and all counsel with cases pending before the Court, seeking their input and efficiently providing a consensus position on behalf of all plaintiffs. And when this Court urged plaintiffs' attorneys at the April 5 hearing to increase their collaboration, the PLG sought out additional attorneys who had shown a similar, early commitment to this litigation and to the spirit of collegiality. Many of those attorneys are now members of the PLG. A clear endorsement of the PLG's strong reputation for effectiveness and collaboration is also evident from the fact that over 400 separate law firms—representing tens of thousands of clients— have chosen members of the PLG to serve as litigating co-counsel for their clients' cases.

For the above reasons, the PLG is best positioned to successfully advance the interests of all plaintiffs through litigation and, in parallel, a global-settlement process.

## I. The PLG proposes a leadership structure that reflects the collaboration and cooperation among several leading firms over the last year.

The PLG proposes the following leadership structure, with members serving two-year terms, subject to renewal by the Court. The group's deliberate approach has resulted in "a cohesive group" that "mesh[es] well together" and "that is committed to the team." *In re Syngenta AG*

4

*MIR162 Corn Litig.*, No. 14-md-2591, 2015 WL 13679782, at *2 (D. Kan. Feb. 13, 2015). Courts have noted the benefits of appointing such a leadership slate, as self-selected by its members: "[H]aving thought this through well in advance," the group "put together a team which certainly is not lacking in talent and has the distinct advantage of having committed itself in advance to solving this problem together." *Id.* The PLG respectfully requests that the Court adopt the below proposed structure by appointing the following Liaison Counsel, Lead Counsel, Co-Lead Counsel, Government Liaison, Plaintiffs' Executive Committee, and Plaintiffs' Steering Committee:

| | |
|---|---|
| **Liaison Counsel** | Charles Ellis, Ward & Smith |
| | Hugh Overholt, Ward & Smith |
| | Mike Dowling, The Dowling Firm |
| **Lead Counsel** | Ed Bell, Bell Legal Group |
| **Co-Lead Counsel & Government Liaison** | Zina Bash, Keller Postman |
| **Co-Lead Counsel** | Jim Roberts, Lewis & Roberts |
| **Co-Lead Counsel** | Brian Barr, Levin Papantonio Rafferty |

| **Plaintiffs' Executive Committee** | **Plaintiffs' Steering Committee** |
|---|---|
| John Bash, Quinn Emanuel | Elliot Abrams, Cheshire Parker Schneider |
| Elizabeth Cabraser, Lieff Cabraser | Joseph Anderson, Pangia Law |
| Jayne Conroy, Simmons Hanly Conroy | Janet Ward Black, Ward Black Law |
| Kevin Dean, Motley Rice | Alejandro Blanco, The Blanco Law Firm |
| Lynwood Evans, Ward & Smith | Greg Cade, Environmental Law Group |
| Robin Greenwald, Weitz & Luxenberg | Grant Davis, Davis Bethune & Jones |
| Rhon Jones, Beasley Allen | Paul Farrell, Farrell & Fuller |
| Robert Kinsman, Krause & Kinsman | Gary Jackson, James Scott Farrin |
| Howard Nations, The Nations Law Firm | David Kirby, Edwards Kirby |
| James Onder, Onder Law | Roopal Luhana, Chaffin Luhana |
| John Romano, Romano Law Group | Mark Mandell, Mandell Boisclair & Mandell |
| Aimee Wagstaff, Wagstaff Law Firm | Stacy Miller, Miller Law Group |
| Patrick Wallace, Milberg | Scott Overholt, Overholt Law Firm |
| Jay Ward, McGowan, Hood, Felder & Phillips | Adam Pulaski, Pulaski Kherkher |
| | David A. Wenner, Snyder & Wenner |

The PLG would further be organized into the following committees and subcommittees,

which reflect the specific needs of this complex litigation:

| | |
|---|---|
| **Plaintiff Criteria/Bellwether** | Responsible for planning for and coordinating the trial of individual cases. |
| **Government Liaison, Database Development, and Resolution** | Responsible for coordinating with the Navy and DOJ, including with regard to the construction of a database for ultimate resolution. |
| **Science and Experts** | Responsible for developing the science and managing the scientific experts. Given the magnitude of science-based issues in this case, the PLG expects to staff at least seven subcommittees to cover the following areas:<br><br>1. Exposure mapping and contaminant pathways<br>2. Digestive and respiratory organ cancers<br>3. Hematopoietic cancers<br>4. Urinary-system and sex-specific cancers<br>5. Neurological conditions<br>6. Birth and fertility conditions<br>7. Emerging illnesses |
| **Administrative and Common Benefit** | Responsible for updating all counsel for plaintiffs, and pro se plaintiffs, of the status of the litigation, tracking case deadlines and docketing issues, and monitoring attorney work and expenses. |
| **Law and Briefing** | Responsible for briefing projects such as drafting master and short-form complaints, and briefing and arguing dispositive motions, procedural motions, and motions in limine. |
| **Discovery and ESI** | Responsible for coordinating discovery, ESI, and protective-order issues. |

The PLG's proposed leadership structure is extensive by design, to comprehensively address the web of legal, factual, and scientific issues that will arise throughout the litigation and resolution process. Hundreds of thousands of victims have suffered from dozens of different injuries caused by several different toxins, which appeared in the water at varying concentrations over a thirty-year period that began more than seventy years ago. Delving into case-specific issues, including general and specific causation, and collaborating with myriad experts to marshal the scientific evidence will be both complex and expensive. Moreover, the amount of information that will need to be collected and analyzed for the countless victims will require a substantial leadership group to process the information in a timely way.

6

The PLG is uniquely suited to undertake and coordinate these efforts. The above structure reflects the culmination of nearly a year of collaboration. Led by Ed Bell, a core group of firms who were advocating for victims of Camp Lejeune began working together even before the CLJA became law. Bell, Hugh Overholt, and other attorneys from PLG firms worked for years to champion passage of the CLJA. And, since then, the group has continued to add firms from North Carolina and throughout the United States to reflect the broad spread of Camp Lejeune victims across the country. These firms had one common thread: They all demonstrated the same early commitment to the litigation and an approach to collaboration that is both constructive and congenial. As the group has grown, the PLG has divided responsibilities to ensure full coverage of all aspects of the litigation—and the rapport and respect among group members has endured.[2]

## II. This Court has broad authority to appoint leadership counsel and such appointment is warranted here.

This Court has authority to appoint leadership counsel under Federal Rule of Civil Procedure 42, which authorizes the issuance of orders "to avoid unnecessary cost or delay" where, as here, "actions before the court involve a common question of law or fact." Fed. R. Civ. P. 42(a)(3); *see also In re Cook Med., Inc.*, 365 F. Supp. 3d 685, 695 (S.D. W. Va. 2019).

Courts routinely appoint leadership in the analogous context of multidistrict litigations ("MDLs"). Because MDLs involve overlapping issues of fact and law, appointment of leadership counsel serves as an administrative tool for efficiently "conducting common discovery, briefing and arguing key motions, taking the lead in bellwether trials, appearing at major conferences and

---

[2] Under the PLG's proposed leadership structure, its constituent firms will lead the litigation and resolution process, but they will also welcome collaboration by other exceptional attorneys who have shown a similar commitment to this litigation and to civility. Such attorneys whose expertise might be called on to assist plaintiffs in this litigation include, for example, R. Sadler Bailey of Bailey & Greer, Cate E. Edwards of Edwards Beightol, James F. Hopf of Gaylord, McNally, Strickland, Snyder & Wells, Robert Jackson of Robert B. Jackson IV LLC, Andrew Pickett of Andrew Pickett Law, Ronnie Sabb of Sabb Law Group, Terry Richardson of Richardson Thomas, Camden Webb of Williams Mullen, and Tim Young of The Young Law Firm.

7

hearings, conducting settlement discussions, and making decisions and recommendations on the overall management of the litigation." Robert Klonoff, *Federal Multidistrict Litigation in a Nutshell* 173 (1st ed. 2020).

Though the Camp Lejeune Water Litigation is not an MDL, the appointment of a leadership group here would serve a similarly valuable function. Because the claims involve numerous common issues of fact and law, appointing a single, well-coordinated group to lead the litigation would create significant efficiencies for plaintiffs, the government, and the Court. Those efficiencies become especially pronounced when the members of the leadership group already represent the large majority of plaintiffs. In that situation, the vast majority of plaintiffs will likely agree with any decisions reached by the leadership group because it will be their individually retained counsel—their chosen representatives—making those decisions.

## III.    The Court should appoint the PLG to serve as leadership counsel in this litigation.

Courts have recognized that, in appointing leadership counsel, the overarching inquiry is to assess which group will best serve the interests of plaintiffs currently before the Court and those soon to be before the Court. *See* Federal Judicial Center, *Manual for Complex Litigation, Fourth* § 10.22 (2004) ("*Manual for Complex Lit.*") (Courts should "ensure that counsel appointed to leading roles are qualified and responsible, [and] that they will fairly and adequately represent all of the parties on their side."); *In re Gas Nat., Inc*., No. 1:13-cv-02805, 2014 WL 12591684, at *1 (N.D. Ohio Mar. 7, 2014) ("who will best serve the interest of the plaintiffs") (internal quotation marks and citation omitted); *In re Parking Heaters Antitrust Litig*., 310 F.R.D. 54, 57 (E.D.N.Y. 2015) (similar). Here, five factors are particularly important.

*First*, the expertise and experience of leadership counsel in the many areas relevant to this litigation informs how effectively they will serve plaintiffs. *See, e.g.*, *Bloom v. Anderson*, No. 2:20-cv-04534, 2020 WL 6710429, at *8 (S.D. Ohio Nov. 16, 2020) ("Courts consider the credentials

8

and resumes of the attorneys, their access to resources, and their drive to litigate the case on behalf of the plaintiffs."); *Manual for Complex Lit.* § 10.224 (highlighting the importance of "qualifications" and "competence for assignments"). Camp Lejeune cases present: (1) complex scientific questions involving the connection between at least four contaminants and dozens of injuries over a 30-year period, (2) questions of law arising from a novel statute that has never been applied or construed, (3) a defendant, the United States, with unique institutional interests, and (4) claims so numerous that a complex and sophisticated global-settlement process will be indispensable. Counsel's expertise in these areas will be critical to serving plaintiffs' interests.

*Second*, in assessing which counsel will best serve plaintiffs, considerable weight should be given to the plaintiffs' own choice of attorneys. *In re Apple Inc. S'holder Derivative Litig.*, No. 19-cv-05153, 2020 WL 3507426, at *1 (N.D. Cal. June 29, 2020) ("[T]he fact that a large majority of plaintiffs favor one of two proposed leadership structures carries considerable weight."); *In re Disposable Contact Lens Antitrust Litig.*, No. 3:15-md-2626 at 3 (M.D. Fla. Oct. 7, 2015), Dkt. 116 (appointing lead firms who had "91% of the class cases and approximately 94% of the named plaintiffs"); *In re Ashley Madison Customer Data Sec. Breach Litig.*, No. 4:15-md-02669 at 1 (E.D. Mo., Feb. 5, 2016), Dkt. 87 (appointing leadership group that "most closely meets the 'private ordering'" (citing *Manual for Complex Lit.*), "because it has support of the larger number of Plaintiffs and attorneys involved"); *In re Genetically Modified Rice Litig.*, No. 4:06-md-01811 (E.D. Mo. Apr. 18, 2007), Dkt. 13-7 (same). As explained further below, this factor carries particular weight where, as here, plaintiffs before the Court and soon to be before the Court have overwhelmingly chosen to be represented by attorneys in a single leadership group.

*Third,* the degree to which counsel have already worked to move this litigation forward in the past is a strong indicator of how effectively they will work on plaintiffs' behalf in the future. *In re Clearview AI, Inc., Consumer Privacy Litig.*, No. 135-md-2801 at 2 (N.D. Ill. Mar. 10, 2021)

9

(appointing the firm who "has taken the lead in aggressively moving this litigation forward"); *Nicolow v. Hewlett Packard Co.*, No. 12-05980 CRB, 2013 WL 792642, at *8 (N.D. Cal. Mar. 4, 2013) (concluding that the appointment turns on "which movant has demonstrated a superior ability to move this litigation forward effectively and efficiently"); *In re Disposable Contact Lens Antitrust Litig.*, No. 3:15-md-2626 at 3 (M.D. Fla. Oct. 7, 2015) (appointing firms who "have conducted virtually all of the work to date in investigating and bringing the claims"). This factor is crucial here because the administrative process that was designed to provide expedited relief has yielded zero settlement offers. Given that delay, there is every reason for plaintiffs to favor counsel who are prepared to immediately advance their cases in court, creating the best environment for a global settlement that delivers just compensation to victims.

*Fourth*, the ability and willingness of leadership counsel to devote substantial human and monetary resources to this case is vital in litigation of this magnitude. *Manual for Complex Lit.* § 10.224 (highlighting the importance of "the attorneys' resources, commitment, and qualifications to accomplish the assigned tasks"); Bolch Judicial Institute, Duke Law School, *Guidelines and Best Practices for Large and Mass-Tort MDLs* 33-34 (2d ed. Sept. 2018) ("[A]n important function of the steering committee in large and mass-tort MDLs is to finance the litigation. . . . [P]articularly large and complex mass-tort MDLs may require a larger steering committee to ensure that the plaintiffs are not at a disadvantage in funding pretrial discovery and have sufficient personnel and financial resources."). Numerous complex issues will be disputed, such as the general link between toxins and dozens of injuries, including injuries that the government has not deemed "presumptively" linked to relevant toxins, and issues related to specific causation. To properly address these and other disputes, the PLG would seek to staff at least six committees and seven subcommittees with qualified attorneys. The group also believes that the cost of experts needed to properly advance plaintiffs' cases will reach into the tens of

10

millions of dollars. Plaintiffs deserve leadership counsel who have the demonstrated ability and commitment to devote the resources needed to prosecute this litigation.

*Fifth*, leadership counsel should command the respect of their colleagues and work cooperatively with each other, opposing counsel, counsel for other plaintiffs, and the Court. This will avoid inefficiencies that stem from interpersonal friction. *Manual for Complex Lit.* § 10.224 (noting importance of the "ability to command the respect of their colleagues and work cooperatively with opposing counsel and the court"). Plaintiffs deserve leadership counsel who have the reputation of being exceptional attorneys while also being honest, congenial, and collaborative. Those qualities will allow litigation and resolution to move forward apace.

Along each of these metrics, the PLG is best positioned to lead the Camp Lejeune Water Litigation. Below are a few highlights, with more detail available in PLG members' individual sections and attached declarations and curricula vitae.

### A. The PLG has the experience and expertise to best represent plaintiffs.

This litigation requires experience and expertise along several unique dimensions, and the PLG includes renowned attorneys from North Carolina and across the country with significant experience across those dimensions. They are also backed by respected law firms with substantial resources and over 1,500 attorneys, who have collectively been appointed by courts to over 300 leadership positions in mass-action litigations. Attorneys in the PLG have, for example:

1)      Practiced in the Eastern District of North Carolina for decades. Members of the PLG have significant experience litigating in this District and have developed a keen understanding of local practice. The deep knowledge of this Court's rules, procedures, and traditions will enable the group to sprint toward a resolution for plaintiffs without stumbling in ways that delay progress.

11

2) <u>Litigated Camp Lejeune cases in the past</u>. Members of the PLG, in particular Ed Bell, were involved in the Camp Lejeune MDL that was dismissed in 2016. They have experience with the precise factual and scientific issues involved in this litigation and access to discovery from the earlier litigation. They have also made concrete progress in ways that will advance this litigation. For example, they previously began negotiating plaintiff fact sheets and other pre-trial documents with DOJ, and the PLG has already discussed with DOJ building from that past work. After all, the DOJ lead on this case, Mr. Adam Bain, was also Bell's counterpart in the Camp Lejeune MDL. To re-tread old ground would serve only to further delay justice for plaintiffs.

3) <u>Served in court-appointed leadership roles in environmental-tort and other mass-tort cases</u>. The PLG includes many of the most experienced and accomplished attorneys in the country. They have served in court-appointed leadership roles in environmental-tort and mass-tort cases for over 40 years, including in the Exxon Valdez litigation, the Deepwater Horizon litigation, the Volkswagen "Clean Diesel" litigation, and the national prescription opiate litigation. They have also led law-and-briefing committees, discovery committees, expert committees, and resolution committees, among others.

4) <u>Successfully settled sprawling mass-tort litigations, including against the government</u>. Members of the PLG have structured the resolution of some of the largest environmental-tort and mass-tort cases over the last several decades. Many resulted in multi-billion-dollar settlements, including $15 billion in the Deepwater Horizon litigation, $12 billion in the Volkswagen litigation, and nearly $60 billion to date in the prescription opiates litigation. Notably, success in these cases required daily communication, coordination, and cooperation with multiple federal and state government agencies.

5) <u>Served in all branches of government and litigated alongside and against DOJ</u>. Members of the PLG have served in various capacities in all branches of government, including

in DOJ as a Senate-confirmed U.S. Attorney, an Assistant to the Solicitor General, and the Assistant Chief in the Environment and Natural Resources Division; in the U.S. Supreme Court as law clerks; in the Senate as Senior Counsel to the Senate Judiciary Committee; in the White House as Special Counsel to the President; and in the Navy as a Captain and JAG officer with the Marines stationed at Camp Lejeune. They have litigated alongside and against DOJ, and they understand the dynamics that affect government decision-making in litigation and settlement.

6)    <u>Worked with first-class experts on water-contamination issues and briefed *Daubert* questions on many of the precise diseases at issue in this case</u>. One of the critical aspects of litigating these cases will be briefing the scientific questions regarding the link between the contaminants found at Camp Lejeune and the many types of harms suffered by plaintiffs. Members of the PLG have deep experience working with experts on these issues and briefing comparable issues under *Daubert* for many of the injuries relevant here. This experience will be critical to moving plaintiffs' cases forward and defining the context in which a global settlement can be negotiated.

7)    <u>Designed and constructed databases to aid global resolutions and led data-heavy, mass-action resolutions and settlement administrations</u>. Members of the PLG are well-versed in database design and construction and how to use technological tools to serve the practical requirements of mass settlements. That process involves the marriage of legal analysis with an understanding of technical and administrative requirements. Design of a database cannot simply be delegated to a database vendor; rather, it requires attorneys with a deep understanding of the legal and technical issues to identify the relevant datapoints under the law and then design a process to efficiently substantiate and track them. Members of the PLG have both the legal acumen and the extensive experience with database design to excel in this process.

13

### B. A super-majority of plaintiffs have selected members of the PLG to represent them.

The PLG will best serve plaintiffs' interests in this litigation because plaintiffs have overwhelmingly selected attorneys from the PLG to represent them. Specifically, nearly *90 percent* of plaintiffs before this Court are represented by two firms, both of which are members of the PLG: Bell Legal Group and Keller Postman. And these firms expect to continue to represent the vast majority of plaintiffs before the Court for the foreseeable future. It was recently reported that "[m]ore than 45,000 claims have been filed" with the Navy. *See* Kaustuv Basu, *Veterans on Borrowed Time Fume Over Delays on Toxic Water Claims*, US Law Week (May 8, 2023, 3:05 AM), https://news.bloomberglaw.com/us-law-week/veterans-on-borrowed-time-fume-over-delays-on-toxic-water-claims. At this point, members of the PLG have filed over 60,000 of their clients' claims with the Navy. Because the group represents a substantial majority of claims before the Navy, they expect to continue representing a substantial majority of plaintiffs in this Court. And the PLG represents over 200,000 clients with Camp Lejeune claims in total. It is therefore predictable that members of the PLG will represent the majority of plaintiffs that come before this Court in the future.

Plaintiffs' choice of counsel is important to the Court's appointment for two reasons.

First, plaintiffs' selecting particular attorneys signals that they believe these attorneys will best serve their interests. Leadership counsel will be responsible for making significant strategic decisions on behalf of all plaintiffs, both in the litigation and in negotiating a resolution. When 90 percent of plaintiffs before this Court have chosen to be represented by attorneys in the PLG, it follows that these plaintiffs would prefer the PLG to make those types of strategic decisions.[3]

---

[3] This is particularly true given the expansive options that plaintiffs have had in choosing attorneys. Because of the extensive attorney advertising surrounding Camp Lejeune claims, plaintiffs have had a broad selection of law firms and an opportunity to carefully consider which firms to retain.

14

Second, taking into account plaintiffs' choice of individual counsel in appointing leadership promotes efficiency. Leadership counsel will "not serve as counsel" for all plaintiffs. *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-mc-2543, 2016 WL 1441804, at *7 (S.D.N.Y. Apr. 12, 2016). Rather, while leadership counsel have "the authority to make any number of decisions that are binding, either literally or effectively, on all" plaintiffs and "speak[] on their behalf (to both [defendant] and the Court)," each plaintiff is still ultimately "represented by counsel of his or her choice." *Id.*; *see also In re Fluoroquinolone Prod. Liab. Litig.*, No. 0:15-md-02642, 2020 WL 1677966, at *2 (D. Minn. Apr. 6, 2020). In other words, individual counsel retain some responsibility for their clients' cases. And their role may be even more pronounced in this litigation if cases are not fully consolidated. Therefore, appointing leadership counsel that includes the attorneys who have been overwhelmingly selected as individual counsel by plaintiffs will substantially improve efficiency. Specifically, it will be worth the time and energy for DOJ to negotiate with a leadership group that includes attorneys who represent 90 percent of plaintiffs because, by definition, the result of those negotiations will likely be acceptable to 90 percent of plaintiffs. But decisions approved by a leadership group that includes attorneys who represent only 10 percent of plaintiffs may not be worth the time and energy to negotiate because 90 percent of plaintiffs might ultimately reject those decisions. This example underscores that appointing the PLG will minimize coordination costs among plaintiffs, streamline negotiations between plaintiffs and DOJ, and preserve the resources of the parties and the Court.

### C. The PLG has shown that it will effectively move forward the litigation with urgency, in tandem with its pursuit of a global resolution.

The work done by the PLG to date underscores the group's sense of urgency and their commitment to simultaneously pursuing both litigation and a global resolution on behalf of their clients. The CLJA provides claimants with two avenues for relief: an administrative process before the Navy and a right to trial by jury. While the PLG is eager to resolve their clients' claims, they

15

know that the right to litigate cases provides a critical backstop and benchmark against which to assess settlement offers by the Navy and DOJ. PLG members therefore moved promptly to engage in the time-intensive work of investigating thousands of their clients' claims and filing them with the Navy, giving their clients an early right to file their cases in court, even while discussing a global resolution with the government. This has put their clients in the best position to demand just compensation for their injuries.

The PLG's sense of urgency has proven to serve its clients well because all evidence suggests that the Navy will not be offering any sort of global resolution any time soon. The Navy has made no settlement offers to date. And the promised online portal to file claims and submit substantiating documents does not exist. The administrative process therefore appears to be years away from resolving a meaningful number of cases, and a global resolution with DOJ through the court system appears to be plaintiffs' best option for a speedier resolution.

In addition to swiftly investigating and filing their clients' claims with the Navy and in court, the PLG has been preparing cases for litigation. As discussed below, proposed Lead Counsel Ed Bell has been involved in Camp Lejeune litigation since the early days of the FTCA actions in the 2000s. When that earlier litigation was dismissed on state statute-of-repose grounds, he refused to abandon his clients and continued to advocate for their rights before any governmental bodies that could possibly come to their aid—from the North Carolina state legislature, to the U.S. House of Representatives, to the U.S. Senate, to the White House. Ultimately, after Bell had met with most members of Congress, the CLJA became law and he began expanding the PLG, whose core— including well-respected North Carolina attorneys—had formed while the CLJA was pending.

Since that time, the PLG has met weekly to discuss litigation strategy and a global resolution of claims. Forecasting issues that could be relevant to plaintiffs' claims, the PLG has engaged experts on water modeling and exposure, including a former ATSDR engineer and former

ATSDR consultants on water modeling and toxin exposure. These experts have developed detailed models that show the levels and flow of contaminated water across Camp Lejeune, month by month, since 1953. In addition, the group has retained a committee member of the 2009 National Research Council Report on Contaminated Drinking Water at Camp Lejeune, with particular expertise in groundwater contamination and risk assessment. The PLG has also engaged top experts in the fields of toxicology and epidemiology from world-class institutions including Boston University, Johns Hopkins, and Harvard. The work of these experts is foundational in their respective fields. For example, the work of the PLG's expert on trichloroethylene ("TCE"), one of the key contaminants at issue, is widely regarded as the definitive source material for others studying TCE and its effects on the human body.

Aside from consulting with experts, PLG members have developed a catalog of legal issues they expect will arise in litigation and have conducted research to be prepared to brief those issues. They have investigated the science underlying various diseases that their clients suffer from. They have strategized about how to induce the Navy to move more expeditiously, as they have seen clients die from cancer while waiting for their day in court. They have interviewed and analyzed the offerings of multiple technology vendors and have discussed database design in detail. And the group's Government Liaison has been in consistent contact with DOJ—meeting with Department attorneys 20 times between August 8, 2022, and April 5, 2023—to lay the foundation for a global resolution. Members of the PLG have also been working closely with the Navy to identify ways to expedite adjudication of their clients' claims, and those of all victims of Camp Lejeune. Recently, the Government Liaison's collaborative relationship led the Navy to ask her to participate in a test of its medical-review process with a subset of her clients' claims.

In short, the PLG has worked collaboratively since before the CLJA was enacted to advance their clients' interests, and those of all victims. Veterans, their families, and others injured

17

at Camp Lejeune have waited up to 70 years for justice, and the PLG is equipped to lead their cases with urgency. The group takes to heart the Court's admonition to move quickly, intensively, and tenaciously to deliver long-delayed relief for those who served and worked at Camp Lejeune without yet more years of delay. The group pledges its efforts, resources, and cooperation with the Court and the parties "to secure the just, speedy, and inexpensive determination"—and resolution—of these proceedings. Fed. R. Civ. P. 1.

### D. The PLG has shown that they will contribute significant resources to this litigation.

Effectively advancing plaintiffs' cases will require enormous investments of time and money. Plaintiffs are pursuing claims based on the link between numerous contaminants and dozens of injuries. Four contaminants at Camp Lejeune have been studied by the government's ATSDR, and these studies have identified a link between the contaminants and several injuries. But the government will likely dispute the scientific connection between those contaminants and other injuries, and also dispute issues related to specific causation. To move plaintiffs' cases forward effectively, leadership counsel will need to do extensive work, including collaborating with experts in many different fields.

The PLG attorneys are members of renowned law firms from across the country that have substantial resources and a track record of litigating the most complex torts. And they have demonstrated that they will devote the necessary resources to serve the victims of Camp Lejeune. The PLG has invested thousands of hours and hundreds of thousands of dollars in these cases. In particular, the PLG has identified and retained over 40 experts and contributed more than $1,000,000 in funds to be used to advance plaintiffs' interests.[4] And they have committed to ongoing leadership assessments to meet the needs of the litigation with a clear understanding that

---

[4] Members of the PLG have also paid over $400,000 in filing fees and other fees, demonstrating that they can and will commit the resources needed to advance plaintiffs' cases without delay.

18

this will likely require close to a million dollars of contributions from Steering Committee members and millions of dollars of contributions from the Lead, Co-Leads, and Executive Committee members. Further, as described above, the PLG has thoughtfully devised a detailed structure that will allow the group to move these cases forward expeditiously.

### E. The PLG has a proven record of commanding the respect of their colleagues and working cooperatively among each other, with the government, and with the Court.

The core of the PLG has been working effectively together for nearly a year. It includes attorneys who, because of their character and achievements, have the respect of their peers, their opponents, and the courts. Since inception, the group has continually evaluated attorneys who have long been dedicated to the litigation and absorbed accomplished and congenial attorneys who have demonstrated a commitment to these cases through their actions and investments. While the group includes preeminent litigators from around the country, who have themselves been court-appointed to lead many of the largest litigations in the country, the group has been notable—and noted[5]—for its collaboration and congeniality. At every turn, the group has reached decisions by consensus. What's more, after this Court urged plaintiffs' attorneys at the April 5 hearing to increase collaboration, the PLG redoubled its efforts and sought out several additional attorneys with these same attributes to join the leadership structure. Many of those attorneys are now members of the PLG.

The respect commanded by the PLG is further demonstrated by the substantial number of law firms that have chosen to affiliate as co-counsel with members of the group. When law firms are retained by a large number of clients with tort claims, they often seek the assistance of firms

---

[5] At the hearing on April 5, Mr. Mark DiCello highlighted the "tremendous amount of cooperation" he has seen from the PLG, especially on the "science," which he said he "got," in part "from Ed Bell's group." Transcript of Status Conference at 39:21-23 (Apr. 5, 2023) ("4/5/23 Hr'g Tr."). Ms. Mona Lisa Wallace also noted the "great respect" she had "for Mr. Bell and all those lawyers," praising the "database" with "97,000 claimants in it," most of which are Ed Bell's clients. *Id.* at 35:1-14.

with the resources and ability to advance such claims through litigation. These firms know well the law firms with which they might co-counsel and have the incentive to select co-counsel that will achieve the best possible recovery for their clients. Over 400 separate law firms representing tens of thousands of clients have chosen members of the PLG to co-counsel with on CLJA cases. These decisions reflect the strongest possible vote of confidence in the PLG by other firms with CLJA clients.

The PLG has also demonstrated its members will communicate well and can build consensus with counsel for plaintiffs beyond their group. For example, two weeks after the CLJA passed, when DOJ joined members of the PLG in seeking consolidation of the earliest-filed cases, those PLG members reached out to invite all counsel with cases on file to join the motion. Likewise, in March, when DOJ solicited views on partial consolidation from members of the PLG, the group reached out to counsel for every case on file to invite them to join in a proposal for partial consolidation.

## IV. The Court Should Enter an Initial Common Benefit Order.

This Court's April 25, 2023, Order also asked parties to address "common fund issues." Order, Dkt. 1. The PLG respectfully submits that a common benefit order is appropriate in this litigation and would be eager to file a proposed initial common benefit order to provide a potential starting point for the Court's consideration.

A common benefit structure is a critical protection for plaintiffs in two respects.

First, it avoids wasteful spending and ensures that litigation costs are fairly and efficiently shared. This litigation will entail considerable costs, including expert costs. Necessary costs, in fairness, should be shared by all plaintiffs who benefit from them, not only those who initially bear the costs because they file their cases early in Court or are selected for bellwether trials. A common benefit structure provides relief for such plaintiffs. A common benefit structure also avoids unfair,

wasteful, and duplicative spending by bringing judicial supervision over costs incurred on behalf of plaintiffs and setting rules to shape how funds are spent.[6] For this oversight, courts often appoint special masters to assist in monitoring expenditures in real-time, rather than waiting until the end of the litigation when effective oversight is more cumbersome. Should the Court deem a common benefit structure appropriate in this litigation, PLG believes that this case would warrant a lower common benefit deduction than in many MDLs. A common benefit structure should fairly compensate leadership counsel for the work they have done to benefit other plaintiffs' counsel, but it should not represent a windfall or be treated as an opportunity for law firms to be paid for unnecessary work. The PLG is committed to avoiding such waste.

Second, a common benefit order addressing time-billing and proper costs will assist both the plaintiffs and the Court to manage the time and effort of counsel working for the common benefit of all plaintiffs. A common benefit order will also institute a process for recording and monitoring attorney work on a monthly basis, so that, should the Court determine a common benefit award is appropriate, the Court can oversee allocation of common benefit fees with appropriate documentation.

The PLG proposes that the Court first adopt a process for tracking expenses and time along with a general outline for a common benefit fund. As is common in MDLs, this proposed order would not immediately set a specific percentage of the total recoveries to earmark for a common benefit fund. Instead, that percentage would be set once the contours of the litigation have become clear. As the demands of the case evolve, the Court can better decide what percentage, if any, is appropriate.

---

[6] Notably, appointing to leadership a group like PLG whose attorneys represent the vast majority of plaintiffs properly aligns the incentives of leadership counsel with those of the plaintiffs to minimize costs and resolve the litigation efficiently.

21

## V. The PLG and their firms are ideally suited for leadership.

Undersigned counsel have thoughtfully composed a slate of attorneys who have been working collaboratively and who bring the diverse set of experiences and skills needed to best serve all plaintiffs. Further detail on each member of the PLG and their firms is provided below.

### A. Lead Counsel

**Ed Bell, Bell Legal Group.** Ed Bell has worked relentlessly for nearly two decades to obtain a remedy for the victims of water contamination at Camp Lejeune. His tireless efforts have left him with unparalleled familiarity with the issues in these cases, a deep connection to the community of victims pursuing PACT Act claims, and a demonstrated sense of urgency and commitment that will serve all plaintiffs in these cases. Bell was closely involved in the previous Camp Lejeune MDL until its termination in 2016. After the MDL court dismissed the MDL cases under North Carolina's ten-year statute of repose, Bell led a successful grassroots advocacy effort to get the North Carolina legislature to amend its statute of repose to exclude groundwater contamination claims. However, federal courts held that amendment could not be applied retroactively. Undaunted, Bell worked closely with veterans, family members, and other victims of Camp Lejeune Water contamination to advocate for the passing of the CLJA. Over the course of several years, Bell and his team participated in countless calls and town halls with veterans and victims, and hundreds of meetings with legislators, including a majority of the U.S. House and Senate.

Bell's unique involvement with the CLJA and deep engagement with the community of veterans and civilians exposed to toxic water at Camp Lejeune makes him the natural leader for this litigation. The CLJA creates a novel statutory regime that includes, among other features, an administrative-exhaustion provision and a special causation standard. Bell has already spent countless hours thinking about how this regime will operate. He has spent years immersed in the

22

historical and scientific issues that will be relevant to this litigation. Most importantly, Bell is deeply involved in the affected community. For almost 15 years, Bell and his team have regularly met with veterans and civilians injured by the water at Camp Lejeune. The community considers him their champion—and he is.

Beyond his efforts for the victims of Camp Lejeune, Bell has over 40 years of practice and has been recognized as one of the premier plaintiffs' firms in the nation. A true trial lawyer, Bell has taken over 400 trials to verdict. Bell has also held key leadership positions in complex mass tort cases. Such matters include successful actions against government agencies and utilities. Most recently, Bell led a successful action against a utility that resulted in recovery of $2.8 billion, a figure representing a full recovery for each one of the millions of South Carolina rate-payer plaintiffs. He has served on leadership in other mass tort and class actions, both as lead counsel and on leadership.

Bell will effectively and efficiently manage this litigation on behalf of all plaintiffs.

### B. Co-Lead Counsel and Government Liaison

*Zina Bash, Keller Postman.* Ms. Bash brings a unique combination of government experience and complex litigation expertise that makes her ideally suited to serve as Co-Lead and Government Liaison in this case. She has worked with public institutions at the highest levels of federal and state government. Ms. Bash was Special Assistant to the President for Legal Policy at the White House, a Landing Team member in the Environmental Division at DOJ, Special Counsel to the White House Counsel, Senior Counsel to Senator John Cornyn and the Senate Judiciary Committee, and a Law Clerk to Justice Samuel Alito of the Supreme Court and to Justice Brett Kavanaugh when he served on the U.S. Court of Appeals for the D.C. Circuit. Most recently in the public sphere, Ms. Bash was Senior Counsel to the Texas Attorney General, where she helped oversee consumer-protection matters on behalf of the State for harms caused by opioid

manufacturers, top technology companies, and other large corporate defendants. She also acted as liaison to DOJ for joint federal-state investigations and litigation, resulting in strong working relationships with DOJ attorneys.

Ms. Bash has served as co-lead counsel in numerous complex civil actions, including as: Co-Lead of an MDL on behalf of seven States and their citizens against Google alleging that Google engaged in deceptive practices in connection with its use of consumer data; Interim Co-Lead Counsel for consolidated actions in the Western District of Washington against Amazon alleging that the e-commerce company has unlawfully inflated prices across online markets; Co-Lead counsel in a major privacy case on behalf of Texas and its residents against Meta Platforms; and counsel for a State and several municipalities in *In re National Prescription Opiate Litigation*, No. 1:17-md-2804 (N.D. Ohio).

Ms. Bash brings the full commitment and considerable resources of Keller Postman to this litigation. Since its founding in 2018, Keller Postman has risen rapidly to prominence as one of the preeminent mass claims firms in the country. In only five years' time, the firm's attorneys have been appointed to leadership positions in the largest mass-tort MDLs in the country, including: *In re Acetaminophen – ASD-ADHD Prods. Liability Litig.*, No. 22-md-8830 (S.D.N.Y.); *In re Paragard IUD Prods. Liability Litig.*, 1:20-md-2974 (N.D. Ga.); *In re 3M Combat Arms Earplug Prods. Liability Litig.*, 3:19-md-02885 (N.D. Fla.); *In re Zantac (Ranitidine) Prods. Liability Litig.*, 9:20-md-02924 (S.D. Fla.); and *In re Onglyza (Saxagliptin) and Kombiglyze (Saxagliptin and Metformin) Prods. Liability Litig.*, 5:18-md-2809 (E.D. Ky.). In addition to its first-rate lawyers, Keller Postman has also built a unique in-house team—composed of over 140 non-lawyer professionals—dedicated to serving large numbers of mass tort clients. This team includes a 20-person data and technology team led by an MIT graduate, which leaves Keller Postman ideally suited to engage with the task of developing and administering a claims database.

24

Reflecting Keller Postman's commitment to this litigation, the firm's managing partner, Warren Postman, has joined Ms. Bash in each of their more than 20 meetings and calls with DOJ, participated in multiple team meetings each week for nearly a year, and regularly hosts town halls with Ms. Bash to update and answer questions from the firm's Camp Lejeune clients. In short, the firm has treated the Camp Lejeune litigation as a top priority since inception. That commitment has been recognized by other law firms, who have sought out Keller Postman to co-counsel with them on Camp Lejeune claims; in fact, the majority of Keller Postman's Camp Lejeune clients were referred to Keller Postman by over 30 separate law firms.

### C. Co-Lead Counsel

***Jim Roberts, Lewis & Roberts, PLLC***. Lewis & Roberts has been one of the preeminent litigation law firms in the Eastern District of North Carolina for over twenty-five years. However, the firm's connection to the Eastern District of North Carolina goes back much further: the founders of Lewis & Roberts, including James A. Roberts, III, were partners at one of the preeminent law firms in North Carolina, namely Maupin Taylor & Ellis, PA.

Mr. Roberts manages the litigation department of Lewis & Roberts. Jim has spent over forty years trying cases to a jury. As a result, Jim is a member of the American Board of Trial Advocates ("ABOTA"), and he has been named as one of the Best Lawyers in America in the practice areas of commercial litigation, personal injury litigation, bet-the-company litigation and construction law. Jim has handled numerous cases in the Eastern District of North Carolina, and he is a member of the Rules Committee for this District. Mr. Roberts has been a member of the Eastern District of North Carolina since 1982.

When the CLJA was passed, Lewis & Roberts appointed a team of six lawyers and numerous support staff to represent the Marines and other persons injured by the contamination at Camp Lejeune. This collection of lawyers brings decades of experience in trying cases, negotiating

settlements, and litigating in federal court. The lawyers at Lewis & Roberts understand how to prepare and litigate cases pending in federal court.

**Brian Barr, Levin Papantonio Rafferty.** Mr. Barr has worked on mass tort litigation his entire twenty-two-year career. He is presently serving on the Executive Committee in *In re Hair Relaxer Marketing Sales Practices and Products Liability Litigation*, No. 1:23-cv-00818 (N.D. Ill.) before Judge Mary M. Rowland and as Co-Liaison Counsel/Executive Committee in *In re 3M Combat Arms Earplug Litigation*, No. 3:12-md-02885 (N.D. Fla.) before Judge Casey Rodgers. At its height, the Combat Arms Litigation consisted of nearly 300,000 plaintiffs. As part of his work in the Combat Arms Litigation, Mr. Barr served as lead trial counsel for one of the three consolidated bellwether plaintiffs in the first Combat Arms bellwether trial.

Prior to his appointment in the *Combat Arms Litigation*, Mr. Barr served as Co-Lead Counsel in *In re Xarelto (Rivoroxaban) Products Liability Litigation*, MDL No. 2592 (E.D. La.) before Judge Eldon Fallon. As Co-Lead Counsel, Mr. Barr was responsible for the management and oversight of all phases of the litigation. In addition to the responsibilities of Co-Lead Counsel, Mr. Barr served as lead trial counsel in three of the six bellwether trials. Under his leadership, Mr. Barr, along with his Co-Lead Counsel, was able to negotiate a $775 million settlement that resolved approximately 28,000 claims and effectively resolved the entire litigation.

Mr. Barr also served as one of four members of the Plaintiffs Executive Committee in *In re Deepwater Horizon Litigation*, MDL No. 2179 (E.D. La.) related to the BP oil spill before Judge Carl Barbier in the Eastern District of Louisiana. The Executive Committee was required to manage a massive team of lawyers whose mission was to fully discover and try the case on the merits as quickly as possible. Well over 300 depositions were taken over a truncated period of time. At the same time as the liability discovery was proceeding, Mr. Barr, as Co-Chair of the Science Working Group, was tasked with building a team of experts to determine both the amount

of oil that flowed from the well and the full extent of the environmental/ecological damage. As a result of these efforts, a class settlement provided approximately $15 billion in compensation to members of the class.

Mr. Barr has also served as class counsel in multiple environmental class actions. One such class action, *Perrine v. Dupont*, ultimately proceeded to trial after years of litigation. After a two-month trial, a jury awarded more than $300 million in damages. Mr. Bar's firm, Levin Papantonio Rafferty, has been a leader in mass tort litigation for decades. With more than 40 lawyers and 200 personnel on staff, the firm has the time and resources to dedicate to this litigation. Lawyers with the firm have been appointed to leadership in 70 different MDL proceedings in 30 different courts. Mr. Barr and his firm have the experience and resources needed to lead this case to conclusion.

### D. Plaintiff's Executive Committee

**John Bash, Quinn Emanuel.** Mr. Bash is the Managing Partner of his firm's Austin office. Before entering private practice, he served in DOJ, first as an Assistant to the Solicitor General, during which time he argued ten cases before the Supreme Court and briefed many others, and then as a U.S. Attorney from 2017 to 2020. In that role, he oversaw virtually all civil litigation involving the federal government in one of the largest judicial districts in the country, including a range of tort cases. His experience litigating for the government, as well as his appellate expertise, will be invaluable in multiple aspects of these consolidated cases. Moreover, Quinn Emanuel is the world's largest litigation-only firm, with over 900 attorneys in offices worldwide. The firm is committed to ensuring that plaintiffs in this litigation are able to draw on enormous resources for this mass action, from a law firm with a proven track record of success in the most high-stakes disputes in the country. Such matters include the ongoing *3M Combat Arms Earplug Products Liability Litigation*, MDL No. 2885 (N.D. Fla.). Members of the firm have helped run that matter since inception and have tried (and won) three bellwether trials to date.

**Elizabeth Cabraser, Lieff Cabraser Heimann & Bernstein.** Elizabeth J. Cabraser has served in court-appointed leadership roles in scores of mass tort litigations for over four decades. These appointments included serving on leadership for some of the largest environmental disaster cases in our nation's history, including *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, MDL No. 2179 (E.D. La.), *In re Exxon Valdez Oil Spill Litigation*, No. 3:89-cv-0095 (D. Al.), and *Northern California Fire Cases (2017 North Bay Fires and 2018 Camp Fire)*, JCCP No. 4955 (2017 North Bay Fires), JCCP No. 4995 (2018 Camp Fire) (Cal. Super. Ct.). Ms. Cabraser served as Lead Counsel, PSC/Class Counsel, and PEC/Settlement Negotiating Committee Counsel, respectively—and in these roles participated in negotiations culminating in three of the largest mass resolutions in history—in *In re: Volkswagen "Clean Diesel,"* 15-md-2672, MDL No. 2672 (N.D. Cal.), *Deepwater Horizon*, and *Nat'l Prescription Opiate Litig.*, MDL No. 2804 (N.D. Ohio), totaling well over $75 billion. In addition, Lieff Cabraser attorneys have served in leadership in numerous environmental mass litigations. *See, e.g.*, *Gutierrez v. Amplify Energy Corp.*, 8:21-cv-01628 (C.D. Cal) (Interim Co-Lead Counsel; negotiated settlements totaling $95 million for individuals and companies affected by Southern California oil spill).

Lieff Cabraser is a 120-plus lawyer firm that has been recognized repeatedly as one of the nation's top plaintiffs' law firms. The firm has served as lead MDL counsel, lead class counsel, lead counsel in California Judicial Counsel Coordination Proceedings, and other court-appointed leadership roles in dozens of cases, and has recovered more than $127 billion for its clients. Lieff Cabraser possesses sophisticated legal skills and the financial resources necessary for handling large, complex cases, and for litigating against well-financed and well-counseled defendants.

**Jayne Conroy, Simmons Hanly Conroy**. Ms. Conroy is a founding member of Simmons Hanly Conroy, LLC, a firm with close to 100 lawyers and offices around the country. She is presently serving as Co-Lead Counsel in the East Palestine Train Derailment Litigation before

Judge Benita Pearson in the Northern District of Ohio and as Co-Lead Counsel of the *In re National Prescription Opiate Litigation* before Judge Dan Polster in the Northern District of Ohio. The National Opiate Litigation is considered one of the largest and most complex cases in United States history. As Co-Lead, Ms. Conroy has been involved in all aspects of the MDL from its inception, including discovery matters, settlement negotiations, and as trial counsel in both jury and bench bellwether trials. Ms. Conroy's work as Co-Lead in the opiate litigation has, to date, resulted in nearly $60 billion in settlements and requires extensive coordination and cooperation among the MDL leadership, state Attorneys General, municipalities, government officials, and private counsel throughout the country. Prior to her work in the opiate litigation, Ms. Conroy has served in an appointed leadership capacity in a number of MDLs.

**Kevin Dean, Motley Rice.** Mr. Dean, a member of one of the nation's largest plaintiffs' litigation firms, brings decades of experience litigating vehicle defect cases and managing complex litigation, including a recent appointment to serve as a Co-Lead on the Plaintiffs' Leadership Committee for the ARC Inflators MDL. He also filed one of the first Takata airbag-rupture cases. Those cases resulted in Takata's filing for bankruptcy. In 2017, Mr. Dean petitioned for the creation of a Tort Creditors' Committee, which established the framework for a $300 million victims-compensation fund, and he was appointed by the bankruptcy court to serve as a member of Takata's Trust Advisory Committee. Recently, Mr. Dean received a multi-million-dollar verdict in an auto-defect case against BMW in *Alexander v. BMW* (D.S.C. 7:18-cv-03065). Motley Rice regularly litigates matters that other firms are unable or unwilling to pursue. Its lawyers gained national recognition for representing asbestos victims in the 1970s and 1980s. In the 1990s, Motley Rice attorneys took on the tobacco industry, leading negotiations for the $246 billion Master Settlement Agreement, the largest civil settlement in history. The firm has secured some of the largest verdicts and settlements in history. Mr. Dean had a role in the Volkswagen's "Clean Diesel"

Litigation, which included coordinating discovery and providing support to Joe Rice, who served on the PSC for the federal MDL and led negotiations for the nearly $15 billion settlement for 2.0-liter vehicles—at the time, the largest auto-related consumer class action in history, as well as the multi-billion-dollar settlement for owners and lessees of 3.0-liter vehicles. Mr. Dean serves on the Board of Governors Executive Committee for the SC Association for Justice and the Executive Board for the Attorneys Information Exchange.

*Lynwood P. Evans, Ward and Smith, P.A.* The firm is the successor to a practice founded in 1895 in New Bern, North Carolina. The firm has since grown to 100 lawyers, 32 of which are full-time litigators who live within the geographic confines of the Eastern District, with offices in Greenville, New Bern, Wilmington, and Raleigh. Mr. Evans is the leader of the litigation section of the firm, and leads the firm's Camp Lejeune team. Mr. Evans has tried more than 30 cases to jury verdict and has been recognized by Super Lawyers, Legal Elite, The Best Lawyers in America, is a Fellow of the Litigation Counsel of America, and a member of the American Board of Trial Advocates. Major General Hugh Overholt began the firm's involvement in this cause when he was asked by Bell to assist with passage of the CLJA. The firm's Camp Lejeune team now comprises 9 attorneys, including 3 former Eastern District Judicial Clerks (Jenna F. Butler, Isabelle M. Chammas, and Josey L. Newman), and is organized into working groups to manage referring attorney relationships, client case investigations, legal research and drafting, strategy, and litigation. To date, the firm has invested in excess of 4000 hours in the effort. The firm's unique position, reputation, legal acumen, and capabilities to litigate these cases have been recognized by referring firms in North Carolina and from around the country resulting in more than 20 law firms referring clients to Ward and Smith to litigate their Camp Lejeune claims.

*Robin Greenwald, Weitz & Luxenberg.* Ms. Greenwald spent 19 years working for the federal government, first as an Assistant U.S. Attorney for the Eastern District of New York, where

she was Deputy Chief of the Civil Division and also the Chief Environmental Attorney for the office, and next as an Assistant Chief of the Criminal Division of the Environment and Natural Resources Division of DOJ in Washington, D.C. She then became General Counsel of the Office of the Inspector General for the U.S. Department of the Interior. In private practice, Ms. Greenwald manages the Environmental Unit at Weitz & Luxenberg, a law firm with about 100 attorneys that for 35-plus years has represented individuals, groups, communities, and classes across the country to obtain redress from corporate wrongdoing. She was co-lead counsel for the medical settlement for the BP Oil Spill MDL before Judge Carl Barbier in the Eastern District of Louisiana, where she negotiated with BP a class settlement for acute injuries and a back-end litigation option for latent injuries for approximately 30,000 class members/individuals who were either oil spill clean-up workers or local residents. She was also on plaintiffs' leadership in the Volkswagen "Clean Diesel" MDL in the Northern District of California. In that litigation, a key to achieving settlement was developing a working relationship of trust among federal agencies and between those agencies and private counsel for the plaintiffs. Her experiences in government and appreciation for the institutional interests and perspectives of DOJ and other agencies played a key role in building and sustaining the relationship and a successful settlement.

**Rhon Jones, Beasley Allen**. Mr. Jones has extensive experience in mass tort litigation. Mr. Jones served on the Plaintiffs Steering Committee of the BP Deepwater Horizon MDL as well as class counsel in the economic and property damages class settlement against BP. He is currently serving as counsel for the State of Alabama and the State of Georgia in the prescription opiate litigation, having previously represented the State of Alabama in the BP Deepwater Horizon Litigation. Mr. Jones also has extensive expertise and experience in contaminated water cases. He has represented thousands of individuals who suffered similar injuries to those involved in the

31

Camp Lejeune Water Litigation. The Veterans of Foreign Wars (VFW) and the Vietnam Veterans of America have endorsed Mr. Jones's application to help lead this litigation.

***Robert Kinsman, Krause & Kinsman***. Mr. Kinsman has held a variety of leadership roles in his career. He and his firm have held leadership appointments in *In re Acetaminophen Products Liability Litigation* (MDL Case No. 22-md-3043), *In re Zantac (Ranitidine) Products Liability Litigation* (MDL Case No. 20-MD-2924 and state court litigations), *In re Paragard IUD Products Liability Litigation* (MDL Case No. 20-md-2974), *The Coalition of Abused Scouts for Justice* (Case No. Bankr. D. 20-10343), and *In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Products Liability Litigation* (MDL Case No. 18-md-2846). The firm handles all aspects of litigation and takes pride in its operational versatility. Most recently in the Boy Scouts of America bankruptcy, the firm was part of a coalition that helped draft and negotiate one of the largest and most inclusive Trust Distribution Plans in history, founded on the principles of justice and transparency with the goal of securing a rigorous, but reliable, speedy, and cost-efficient determination of every claim. The firm's interest in this case stems from a family member's experience with a disease that affects the nervous system due to exposure to toxins while serving in government. Victims deserve answers and a just resolution through global settlement. Krause & Kinsman is well-suite to help lead each phase of the litigation and resolution process.

***Howard Nations, Nations Law Firm.*** Mr. Nations and The Nations Law Firm have years of experience in positions of leadership in MDLs and class actions as reflected in his attached curriculum vitae. He currently serves on the Executive Committee, as Chairman of the Common Benefit Committee, and as Plaintiffs Lead Negotiator in MDL No 2641: *In re Bard IVC Filters Products Liability Litigation* before the Hon. David G Campbell in the U.S. District Court, for the District of Arizona. Mr. Nations is also currently engaged in military consolidated case litigations in the District of Columbia and the Eastern District of New York

**John Romano, Romano Law Group.** Mr. Romano has significant experience handling, litigating, and taking to verdict product-liability cases involving catastrophic injury to both children and adults. The first mass tort in which Mr. Romano was involved related to the drug Bendectin in the late 1970s. Throughout the 1980s, Mr. Romano litigated and took to verdict cases involving the DPT Vaccine and Intrauterine Devices. He has been more recently active in the Stryker Hip cases, DePuy Hip cases, Gulf Oil spill disaster cases, Actos Bladder cancer cases, the prescription opiate litigation, and NEC infant-formula cases. Mr. Romano served as a Captain with the Marines and as a member of the Judge Advocate Division. He was stationed at Camp Lejeune between 1975 and 1977 and this experience enhances his ability to provide seasoned advice to the PLG and to the veterans and families we are and will be representing.

**Aimee Wagstaff, Wagstaff Law Firm.** Ms. Wagstaff has worked in mass litigation for almost 15 years and has been appointed by both federal and state courts to lead some of the country's largest and most complicated mass actions. Most recently, Ms. Wagstaff led the federal toxic tort litigation against Monsanto alleging that its weedkiller Roundup caused non-Hodgkin's lymphoma. Ms. Wagstaff also was Co-Lead counsel of MDL 2652: *In re Ethicon, Inc., Power Morcellator Products Liability Litigation*, in the United States District Court for the District of Kansas; a member of Plaintiffs' Steering Committee in JCCP 4775: *In re Risperdal Product Liability Case*; a member of the Plaintiffs' Steering Committee of seven transvaginal mesh MDLs before the Honorable Joseph R. Goodwin of the Southern District of West Virginia; and Plaintiffs' Co-leadership counsel in JCCP 4615, *In re Infusion Pump Cases* in the California Superior Court of Orange County. Each of these cases involved complex procedural and substantive issues, including substantial work with experts. Ms. Wagstaff and her law firm possess the experience and the resources to help manage and advance complex cases like this one.

***Patrick Wallace, Milberg Coleman Bryson Phillips Grossman.*** North Carolina partner Patrick Wallace leads the firm's CLJA efforts, where he represents thousands of clients and has been active in organizing and teaching on the CLJA; Mr. Wallace organized efforts at the North Carolina Advocates for Justice by hosting its first webinar for North Carolina attorneys on the Act and has spoken at other Camp Lejeune CLEs. Mr. Wallace draws support from Milberg's vast roster of attorneys, including co-founding partner Daniel Bryson who has grown Milberg's North Carolina office into one of the state's preeminent leaders of complex litigation, and co-founding partner Marc Grossman, who has been instrumental in securing millions in mass tort settlements. Partners David Miceli and John Restaino also lend their considerable experience working on over twenty MDLs and frequently leading science committees. On that front, Milberg has actively advanced the science on this case, having retained and consulted with a wide number of well-regarded experts, including a hydrologist, a toxicologist, two epidemiologists, two oncologists, and a neurologist.

***James Ward, Jr., McGowan, Hood, Felder, and Phillips.*** James L. Ward, Jr., is an attorney at McGowan, Hood, Felder & Phillips, LLC, where he leads the Class Action, Mass Tort & Government Representation practice area out of the firm's office in Mount Pleasant, South Carolina. Mr. Ward is a veteran litigator with over 25 years of complex litigation experience. He was admitted to the North Carolina Bar in 1997 and the Eastern District of North Carolina in 2001. Throughout his career, Mr. Ward has played significant roles, including lead and liaison counsel roles, in complex class action and MDLs involving defective products, consumer protection, pharmaceutical drugs and medical devices, healthcare fraud, construction, and antitrust. Mr. Ward has also focused a large portion of his practice on the representation of states and local governments as special counsel in complex litigation. In addition, he has extensive experience handling a variety of catastrophic personal injury and wrongful death cases. Mr. Ward has been

34

appointed to leadership roles in numerous MDLs and coordinated proceedings. And he has led numerous class actions during his career, including recent cases that collectively delivered over $850 million in cash benefits and over $3 billion in total benefits to the class members.

*      *      *      *      *

The above leadership group has been working as a cohesive group to organize this litigation for almost a year. The proposed appointments would serve the effective administration of this litigation given the volume of expected claims, the unique theories of causation, the urgency of work toward a global resolution, and the possibility that the Court will establish multiple tracks of litigation. *See Manual for Complex Lit.* § 10.22 (noting that "[i]nstituting special procedures for coordination of counsel early in the litigation will help to avoid [attendant coordination] problems").

Attached as Exhibits B through T are declarations and curricula vitae for members of the proposed leadership team, providing the Court with further detail about the PLG's membership.

## VI. Conclusion

For the above reasons, undersigned counsel respectfully request that the Court appoint the Plaintiffs' PLG to lead this litigation. A proposed order appointing a Lead, Co-Leads, a Government Liaison, a Plaintiffs' Executive Committee, and a Plaintiffs' Steering Committee is attached as Exhibit A.

Date: May 26, 2023

<table>
<tr><td>/s/ J. Edward Bell, III</td><td>/s/ Zina Bash</td></tr>
<tr><td>J. Edward Bell, III (by Special Appearance)</td><td>Zina Bash (by special appearance)</td></tr>
<tr><td>Bell Legal Group, LLC</td><td>Keller Postman LLC</td></tr>
<tr><td>219 Ridge St.</td><td>111 Congress Avenue</td></tr>
<tr><td>Georgetown, SC 29440</td><td>Suite 500</td></tr>
<tr><td>Telephone: (843) 546-2408</td><td>Austin, TX 78701</td></tr>
<tr><td>Fax: (843) 546-9604</td><td>Telephone: 956-345-9462</td></tr>
<tr><td>jeb@belllegalgroup.com</td><td>zina.bash@kellerpostman.com /</td></tr>
</table>

35

/s/ James A. Roberts, III
James A. Roberts, III (N.C. Bar No.: 10495)
Lewis & Roberts, PLLC
3700 Glenwood Avenue, Suite 410
P. O. Box 17529
Raleigh, NC 27619-7529
Telephone: (919) 981-0191
Fax: (919) 981-0199
jar@lewis-roberts.com

/s/ Brian H. Barr
Brian H. Barr (Florida Bar No. 0493041)
Levin Papantonio Rafferty Proctor
Buchanan O'Brien Barr & Mougey
316 S. Baylen Street,
Suite 600
Pensacola, FL 32503
Telephone: (850) 435-7000
Fax :(850) 436-6044b
barr@levinlaw.com

/s/ Hugh R. Overholt
Hugh R. Overholt (NC Bar No. 016301)
Ward and Smith P.A.
Post Office Box 867
New Bern, NC 28563-0867
Telephone: (252) 672-5400
Fax: (252) 672-5477
hro@wardandsmith.com

/s/ W. Michael Dowling
W. Michael Dowling (NC Bar No. 42790)
The Dowling Firm PLLC
Post Office Box 27843
Raleigh, North Carolina 27611
Telephone: (919) 529-3351
Fax: (919) 529-3351
mike@dowlingfirm.com

/s/ A. Charles Ellis
A. Charles Ellis (N.C. Bar No.: 010865)
Ward and Smith P.A.
Post Office Box 8088
Greenville, NC 27835-8088
Telephone: (252) 215-4000
Fax: (252) 215-4077
ace@wardandsmith.com

/s/ John F. Bash
John. F. Bash (TX Bar No. 24067504)
Quinn Emanuel Urquhart & Sullivan, LLP
300 W. 6th St.
Austin, TX 78701
Telephone: (737) 667-6100
Fax (737) 667-6110
johnbash@quinnemanuel.com

275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
Fax: (415) 956-1008
ecabraser@lchb.com

/s/ Jayne Conroy
Jayne Conroy (NY 2796134)
Simmons Hanly Conroy
112 Madison Ave, 7th Floor
New York, NY 10016
Telephone: (212) 257-8482

/s/ Elizabeth J. Cabraser
Elizabeth J. Cabraser (CA Bar No. 083151)
Lieff Cabraser Heimann & Bernstein, LLP

36

Fax: 212-213-5949
jconroy@simmonsfirm.com

/s/ Kevin R. Dean
Kevin R. Dean (SC Bar No. 70347)
Motley Rice LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
Telephone: (843) 216-9000
Fax: (843) 216-9440
kdean@motleyrice.com

/s/ Lynwood P. Evans
Lynwood P. Evans (NC Bar No. 026700)
Post Office Box 8088
Greenville, NC 27835-8088
Telephone: (252) 215-4000
Fax: (252) 215-4077
lpe@wardandsmith.com

/s/ Robin Greenwald
Robin L. Greenwald (IL Bar No. 6183798)
Weitz & Luxenberg, P.C.
700 Broadway
New York, NY 10003
Telephone: 212-558-5802
rgreenwald@weitzlux.com

/s/ Rhon E. Jones
Rhon E. Jones (AL Bar No. 7747E52R)
Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.
218 Commerce Street
Post Office Box 4160 (36103-4160)
Montgomery, Alabama 36104
Telephone: (334) 269-2343
Fax: (334) 954-7555
Rhon.Jones@BeasleyAllen.com

/s/ Robert L. Kinsman
Robert L. Kinsman (MO Bar No. 67427)
Krause & Kinsman
4717 Grand Ave., Suite 300
Kansas City, MO 64112
Telephone: (816) 760-2700
Fax: (816) 760-2800

robert@krauseandkinsman.com

/s/ Howard L. Nations
Howard L. Nations (TX Bar No. 14823000)
The Nations Law Firm
9703 Richmond Ave., Suite 200
Houston, TX 77042
Phone (713) 807-8400
Fax (713) 807-8423
nations@howardnations.com

/s/ James G. Onder
James G. Onder (MO Bar No. 38049)
Onder Law LLC
110 East Lockwood, 2nd Floor
Saint Louis, MO 63119
Telephone: (314) 963-9000
Fax: (314) 963-1700
onder@onderlaw.com

/s/ John Romano
John F. Romano (Florida Bar No. 175700)
Romano Law Group
P.O. Box 21349
West Palm Beach, Fl. 33416-1349
Telephone: 561-533-6700
Fax: 561-533-1285
john@romanolawgroup.com

/s/ Aimee Wagstaff
Aimee Wagstaff (Colo. Bar No. 36819)
Wagstaff Law Firm
940 Lincoln Street
Denver, CO 80203
Telephone: 303-376-6360
awagstaff@wagstafflawfirm.com

/s/ Patrick M. Wallace
Patrick M. Wallace (NC Bar No. 48138)
Milberg Coleman Bryson
Phillips Grossman PLLC
900 W. Morgan St.
Raleigh, NC 27615
Telephone: (919) 600-5000
Fax: (919) 600-5035
pwallace@milberg.com

/s/ James L. Ward

37

James L. Ward, Jr. (NC Bar No. 24595)
McGowan, Hood, Felder, & Phillips, LLC
10 Shem Drive, Suite 300
Mount Pleasant, SC 29464

Telephone: (843) 388-7202
Fax: (843) 388-3194
jward@mcgowanhood.com

/s/ Elliot S. Abrams
Elliot S. Abrams (NC Bar No. 42639)
Cheshire Parker Schneider, PLLC
P. O. Box 1029
Raleigh, NC 27602
Telephone: (919) 833-3114
Fax: (919) 832-0739
elliot.abrams@cheshirepark.com

/s/ Joseph L. Anderson
Joseph L. Anderson (NC Bar No. 19533)
Pangia Law
1862 Lake Point Drive
Winston Salem, NC 27103
Telephone: (202) 955-6153
Fax: (202) 393-1725
janderson@pangialaw.com

/s/ Janet Ward Black
Janet Ward Black (NC Bar No. 12869)
Ward Black Law
208 W. Wendover Avenue
Greensboro, NC 27401
Telephone: (336) 333-2244
Fax: (336) 510-2168
jwblack@wardblacklaw.com

/s/ Alejandro D. Blanco
Alejandro D. Blanco (CA Bar No. 133073)
The Blanco Law Firm PC
535 N. Brand Boulevard, Suite 700
Glendale, CA 91203
Telephone: (661) 948-6000
Fax: (888) 611-2060

ablanco@theblancolawfirm.com

/s/ Gregory A. Cade
Gregory A. Cade (AL Bar. No. 6088-G68C)
Environmental Litigation Group, P.C.
2160 Highland Avenue South
Birmingham, AL 35205
Telephone: 205-328-9200
gregc@elglaw.com

/s/ Grant L. Davis
Grant L. Davis (MO Bar No.: 34799)
Davis Bethune Jones
1100 Main Street #2930
Kansas City, Missouri 64105
Telephone (816) 421-1600
Fax: (816) 472-5972
gdavis@dbjlaw.net

/s/ Paul T. Farrell, Jr.
Paul T. Farrell, Jr. (WV Bar No. 7443)
Farrell & Fuller, LLC
270 Munoz Rivera Ave., Suite 201
San Juan, Puerto Rico 00918
Telephone:  (304) 654-8281
paul@farrellfuller.com

/s/ David F. Kirby
David F. Kirby (NC Bar No. 7841)
Edwards Kirby, LLP
3201 Glenwood Avenue, Suite 100
Raleigh, North Carolina 27612

38

Telephone: (919) 780-5400
Fax: (919) 800-3099
dkirby@edwardskirby.com


/s/ Gary W. Jackson
Gary W. Jackson (NC Bar No. 13976)
James Scott Farrin
555 S. Mangum Street, Suite 800
Durham, North Carolina 27701
Telephone: (919) 226-1913
Fax: (984) 227-6962
gjackson@farrin.com


/s/ Roopal P. Luhana
Roopal P. Luhana (NY Bar No. 4127841)
Chaffin Luhama LLP
600 Third Ave, Floor 12
New York, NY 10016
Telephone: (888) 480-1123
Fax: (888) 499-1123
luhana@chaffinluhana.com


/s/ Mark S. Mandell
Mark S. Mandell (RI Bar No. 0502)
Mandell, Boisclair & Mandell
One Park Row
Providence, RI 02903
Telephone: (401) 273-8330
Fax: (401) 751-7830 – Fax
mmandell@mbmjustice.com


/s/ W. Stacy Miller, II
W. Stacy Miller, II (NC Bar No. 21198)
Miller Law Group, PLLC
Post Office Box 1769
Raleigh, North Carolina 27602
Telephone: (919) 348-4361

Fax: (919) 729-2953
stacy@millerlawgroupnc.com


/s/ H. Scott Overholt
H. Scott Overholt (NC Bar No.: 18462)
The Overholt Law Firm, PC
2505 S. College Road
Wilmington, NC 28412
Telephone: (910) 798-5900
Fax: (910) 799-8496
Scott@overholtlaw.com


/s/ Adam Pulaski
Adam Pulaski (TX Bar No. 16385800)
Pulaski Kherkher, PLLC
2925 Richmond Avenue, Suite 1725
Houston, TX 77098
Telephone: 713-664-4555
Fax: 713-664-7543
adam@pulaskilawfirm.com


/s/ David Wenner
David Wenner (AZ Bar No. 009886)
Snyder & Wenner, P.C.
8800 N. Gainey Center Dr.
Suite 7265
Scottsdale, Arizona 85258
Telephone: (602) 224-0005
Fax: (602) 3 81-8997
david@snyderwenner. Com