# Exhibit 9

**THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**AGENCY FOR TOXIC SUBSTANCES AND DISEASE REGISTRY**

convenes the

THIRTY-SECOND MEETING

**CAMP LEJEUNE COMMUNITY ASSISTANCE**

**PANEL (CAP) MEETING**

August 27, 2015

The verbatim transcript of the
Meeting of the Camp Lejeune Community Assistance
Panel held at the ATSDR, Chamblee Building 106,
Conference Room 1B, Atlanta, Georgia, on
August 27, 2015.

STEVEN RAY GREEN AND ASSOCIATES
NATIONALLY CERTIFIED COURT REPORTING
404/733-6070

# C O N T E N T S

August 27, 2015

| | |
|---|---|
| WELCOME, INTRODUCTIONS AND ANNOUNCEMENTS<br>DR. PATRICK BREYSSE | 5 |
| ACTION ITEMS FROM PREVIOUS CAP MEETING<br>DR. ANGELA RAGIN | 11 |
| PUBLIC HEALTH ASSESSMENT REVIEW PROCESS<br>RICK GILLIG, ROB ROBINSON, MARK JOHNSON | 47 |
| SOIL VAPOR INTRUSION UPDATE<br>RICK GILLIG | 64 |
| UPDATES ON HEALTH STUDIES<br>FRANK BOVE, PERRI RUCKART | 65 |
| VA UPDATES<br>BRAD FLOHR, BRADY WHITE | 72 |
| CAP UPDATES AND CONCERNS<br>CAP MEMBERS | 125 |
| SUMMARY OF ACTION ITEMS<br>SHEILA STEVENS | 146 |
| QUESTIONS FROM AUDIENCE<br>DR. PATRICK BREYSSE | 150 |
| WRAP-UP<br>DR. PATRICK BREYSSE, SHEILA STEVENS | 175 |
| COURT REPORTER'S CERTIFICATE | 178 |

## TRANSCRIPT LEGEND

The following transcript contains quoted material. Such material is reproduced as read or spoken.

In the following transcript: a dash (--) indicates an unintentional or purposeful interruption of a sentence. An ellipsis (. . .) indicates halting speech or an unfinished sentence in dialogue or omission(s) of word(s) when reading written material.

-- (sic) denotes an incorrect usage or pronunciation of a word which is transcribed in its original form as reported.

-- (ph) indicates a phonetic spelling of the word if no confirmation of the correct spelling is available.

-- "uh-huh" represents an affirmative response, and "uh-uh" represents a negative response.

-- "*" denotes a spelling based on phonetics, without reference available.

-- "^" represents unintelligible or unintelligible speech or speaker failure, usually failure to use a microphone or multiple speakers speaking simultaneously; also telephonic failure.

# P A R T I C I P A N T S

(alphabetically)

```
BOVE, DR. FRANK, ATSDR
BREYSSE, DR. PATRICK, NCEH/ATSDR
CLAPP, DR. RICHARD, CAP MEMBER
CORAZZA, DANIELLE, CAP MEMBER
ENSMINGER, JERRY, CAP MEMBER
FLETCHER, CHRIS, ATSDR
FLOHR, BRAD, VBA
FORREST, MELISSA, NAVY/MARINE CORPS
FRESHWATER, LORI, CAP MEMBER
GILLIG, RICHARD, ATSDR
HODORE, BERNARD, CAP MEMBER
MASLIA, MORRIS, ATSDR
ORRIS, CHRISTOPHER, CAP MEMBER
PARTAIN, MIKE, CAP MEMBER
RAGIN, DR. ANGELA, ATSDR
RUCKART, PERRI, ATSDR
SCHEEL, CHRISTIAN, ATSDR
STEVENS, SHEILA, ATSDR, CAP LIAISON
TEMPLETON, TIM, CAP MEMBER
WHITE, BRADY, VHA
WILKINS, KEVIN, CAP MEMBER
```

1

1           we're having audio problems, and I have to
2           actually -- and this might be a good place where I
3           can hang up and patch people back in so the people
4           who are viewing this and watching this can actually
5           hear the VA.  They can't hear the VA side or anybody
6           on the phone.  All they can hear is the people in
7           the room.  So they were fixing that over in the IT
8           section right now, and they think they have a fix to
9           it.
10                  **DR. BREYSSE:**  So tell me what I need to do.
11                  **MS. STEVENS:**  I'm going to hang up and then
12          recall, and then we'll be back on hopefully.
13                  **DR. BREYSSE:**  So we'll be on pause until you do
14          that?
15                  **MS. STEVENS:**  Yeah.
16                  **DR. BREYSSE:**  Okay.
17                  **MS. STEVENS:**  So if we can just take like a
18          two-minute quick break, and I'll re-patch us in.
19                  **DR. BREYSSE:**  Time out.  (pause)  All right,
20          where were we?  So I was about to give an update on
21          the interactions we've had.  So we were asked to
22          meet with the Secretary of the Veterans -- VA, with
23          ATSDR and the VA in the presence of Senators
24          Isakson, Burr and Tillis, to discuss how ATSDR and
25          the VA can work together.

1     And at that meeting the Secretary announced
2     that they were going to consider service-related
3     presumption for certain conditions associated with
4     exposure at Camp Lejeune. And he turned to me and
5     said, can ATSDR help us work this out? I don't know
6     if that was his exact words but essentially along
7     those lines. And the feedback we got from the
8     senators and their staff was we should do this
9     quickly and rapidly and efficiently.
10    And to that end we had a meeting between ATSDR,
11    the scientists and the VA on August 19th, and we
12    began those discussions. What we're doing now is
13    ATSDR is presenting what we think the weight of
14    evidence is that associates specific disease
15    conditions from exposure at Camp Lejeune. We're
16    focusing on the conditions listed in the Ensminger
17    Act, but we're going to beyond that to things that
18    we also think there's strong evidence to support.
19    And we are preparing that summary now. It's
20    being reviewed externally and internally, and we're
21    going to contact the VA tomorrow to discuss setting
22    up a follow-up meeting sometime after Labor Day, to
23    review that final version. And so at that point we
24    will provide the VA what we think our assessment is
25    of the strengths of evidence for service-

1  relatedness, and we'll discuss what that means going
2  forward at that time.  Is that fair, Brad?
3       **MR. FLOHR:**  Yes, it is, Pat.  And once again, I
4  want to thank you and Frank and Perri and others on
5  your staff that made the meeting we had last week
6  very positive.  And, you know, you were very well
7  prepared and it was very helpful.
8       **MR. ENSMINGER:**  Now, just a question.  I
9  understand that there's some discussion or some
10 heartburn with some folks from the VA, and they're
11 going to try to drag this thing out by using
12 duration of exposure.  I'm going to tell you right
13 now, if Dr. Eriksson thinks that he's going to drag
14 this thing out by using duration of exposure, you
15 better think -- he's got another thing coming.
16      **DR. BREYSSE:**  So if I can -- I can address
17 that.  So I left that out.  Part of our charge was
18 to look at what the service-related connection is in
19 terms of the presence or absence of disease, but
20 also to look what evidence there is to suggest what
21 the length of exposure we need to have, the minimum
22 we need to have in order to likely have a disease to
23 occur.
24      And so we're also assessing that evidence, but
25 as Frank could tell you, if he wants to jump in,

1  that evidence is spotty. So that's going to be a
2  tougher call in terms of, you know, is it one day?
3  Is it ten years? Somewhere probably between one day
4  and ten years? And we're looking at what we think
5  the weight of evidence is, and where there's
6  evidence we'll build on that. But there's going to
7  be a judgment call, and as the public health
8  experts, ATSDR, we will provide what we think our
9  best assessment is for that call, but recognizing
10 that there isn't a lot of data to say, you know, was
11 there -- is it three months? Is it six months? Is
12 it one year? Is it two years?
13     **MR. ENSMINGER:** Is it one month. We have a
14 precedence for that.
15     **MS. FRESHWATER:** Yeah.
16     **DR. BREYSSE:** And so we're struggling with
17 that.
18     **MS. FRESHWATER:** Can you clarify, because the
19 law says that it's 30 days, so I don't understand
20 why we're going to into this -- to a conversation
21 about duration.
22     **MR. ENSMINGER:** Well, because somebody brought
23 it up, and that's what they're going to try to use,
24 okay, to fight this. That's why I brought it up.
25     **MS. FRESHWATER:** Well, the law says the 30

1     days, correct?
2         **DR. BREYSSE:** Well, we know the law says 30
3     days, and there's been some back-and-forth about
4     where that 30 days came from, and I have not found
5     any evidence to -- not evidence, but any record that
6     says what -- where that came from and how that
7     number was -- came up with. So absent that --
8         **MS. FRESHWATER:** But why does it matter where
9     it came from, I guess, is what I'm saying.
10    Shouldn't we just be dealing with the law that's on
11    the record?
12        **DR. BREYSSE:** Well, we're talking about a
13    different process now than the law. So this is a
14    presumption of service-relatedness for compensation
15    purposes, and it's going to go beyond the law.
16    We're not restricting ourselves in terms of the
17    diseases that we're proposing if we're looking at
18    the evidence based in the law. And so we're not
19    following that law, per se, but what we do want to
20    know is what does the science say? Our job is to
21    interpret science. And when the science is
22    uncertain, we'll indicate the uncertainty around the
23    science. And we will tell you what our best
24    judgment is and what seems reasonable in terms of a
25    minimum amount of time needed to result in some

1  health effects somewhere down the road.  Now, that
2  might depend on your one cancer might not be the
3  same as another cancer; a birth defect, you know, is
4  different than a cancer, 'cause obviously the time
5  window there is more, more defined.  And so, you
6  know, it's not always as straightforward as you
7  think.  And unfortunately the evidence base in which
8  to make this scientific call is not all that solid.
9  So we will make the call, but I don't think we're
10  just going to defer a priori to the one month that's
11  written in the law.  That doesn't mean --
12       **MS. FRESHWATER:**  Well, I'm asking again, you
13  know, just because I know veterans will have that,
14  that same question.  But I appreciate you clarifying
15  that.
16       **MR. WHITE:**  Yeah, and Dr. Breysse, this is
17  Brady, and this is where sometimes it might be
18  confusing but what you're talking about there is
19  specifically for veterans and service connectedness.
20  And unfortunately on the family member side, we are
21  still limited to just the 15 conditions that are in
22  the law.
23       **DR. BREYSSE:**  Yeah, so that creates a -- that
24  creates a lot of confusion, but you're absolutely
25  right.  We are dealing with -- we were asked to help

1    the VA to establish guidance on service-related
2    presumption for veterans at this point, and that's
3    where we're starting.  That does not mean we're not
4    interested in the civilians and nonservice-related
5    exposures.  It doesn't mean we're not thinking about
6    that.  It doesn't mean our science doesn't speak to
7    that.  It doesn't mean we aren't going to address
8    what our science speaks to.  But this was a very
9    specific charge we were given at a meeting from the
10   Secretary in front of, you know, three senators, and
11   we're taking that charge very seriously.
12        **MR. ENSMINGER:**  Well, and this length of
13   duration of exposure was purposely, in my opinion,
14   is being used by a certain individual at the VA to
15   throw a wrench in this whole thing.  And, you know,
16   you can question all kinds of things when you're the
17   perpetrator, and you're the one that's responsible.
18   You can say, well, I only poisoned you for a week,
19   so I say that that didn't harm you.  So it's bull.
20        **MR. HODORE:**  And Mr. Flohr, I have a question
21   for you, Mr. Flohr.  Suppose these veterans have an
22   appeal in, and the appeals are quite lengthy, you
23   know, sometime it take you up to five years to get
24   an appeal process through.  So what happened to all
25   this time that these people wait for this appeal