IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:23-CV-897

| | |
|---|---|
| IN RE: | ) |
| CAMP LEJEUNE WATER LITIGATION | ) |
| | ) |
| This Pleading Relates to: | ) |
| ALL CASES | ) |

**PLAINTIFFS' LEADERSHIP GROUP'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF THE ATSDR'S WATER
MODELING PROJECT FILE IN NATIVE FORMAT**

The Plaintiffs' Leadership Group ("PLG") respectfully requests that the Court grant the Motion to Compel Production of the ATSDR's Water Modeling Project File in Native Format.

**INTRODUCTION**

The Agency for Toxic Substances and Disease Registry ("ATSDR") was statutorily mandated to study the historic contamination levels at Camp Lejeune. As a result of the ATSDR's water modeling, it was proven that, between at least 1953 and 1987, the groundwater at Camp Lejeune was poisoned with chemicals and volatile organic compounds. Inexplicably, the government insists upon providing the ATSDR's water modeling project file (the "project file") disassembled and largely unusable. This Court should require the government to produce the project file in native format so that it is fully functional—just as the ATSDR used it.

The ATSDR's water modeling project file is clearly discoverable. In fact, the government has agreed to produce the entirety of the project file (subject to privilege objections) pursuant to the electronically stored information ("ESI") guidelines of the Stipulated Order Establishing Protocol for Document Collection and Production (the "ESI Protocol"). [D.E. 52].

Unfortunately, production of the project file pursuant to the ESI Protocol will involve breaking apart the project file into many separate pieces, completely destroying the file's organization and thereby rendering significant portions of the file unusable. The project file consists of thousands or perhaps tens of thousands of individual files. Many of these individual files cross-reference—or "link"—to other individual files within the overall water modeling project file. If the file is deconstructed, those links will not lead to actual data sources, and the file will not function in the same manner intended by the ATSDR.

For these reasons, the PLG has asked the government to produce a "mirror" copy of the water modeling project file as it exists in its native format. This mirror copy could be compared to

the government's own mirror copy to ensure the integrity of any data used by the PLG. Further, the PLG has no objection to the government's producing an additional copy—which would include bates labels—pursuant to the ESI Protocol.

The government has declined to produce the mirror copy of the ATSDR's water modeling project file. There is a clear need for the native project file, and production of the same would not be burdensome or otherwise prejudicial. The PLG therefore asks the Court to compel production of a native copy of the project file.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. The ATSDR's Water Modeling of Camp Lejeune

The ATSDR "is a federal public health agency of the U.S. Department of Health and Human Services" and is tasked with "protect[ing] communities from harmful health effects related to exposure to natural and man-made hazardous substances."[1] The ATSDR is "charged under the Superfund Act to assess the presence and nature of health hazards at specific Superfund sites," including Camp Lejeune.[2] The "ATSDR has been assessing the health risks from hazardous substances in the drinking water at Camp Lejeune since the late 1980s."[3] In sum, the ATSDR is statutorily tasked under the Superfund Act to evaluate historic contamination at Camp Lejeune.

In the 2004-2005 time period, the ATSDR began its "Water Contamination Reconstruction" project. As part of this project, the ATSDR conducted a "historical reconstruction of Tarawa Terrace and Hadnot Point water treatment plant service areas to determine where and

---

[1] ATSDR, *Agency for Toxic Substances and Disease Registry* (last visited Feb. 15, 2024), https://www.atsdr.cdc.gov/.
[2] *ATSDR*, FEDERAL REGISTER (last visited Feb. 15, 2024), https://www.federalregister.gov/agencies/agency-for-toxic-substances-and-disease-registry.
[3] ATSDR, *Camp Lejeune, North Carolina* (last visited Feb. 15, 2024), https://www.atsdr.cdc.gov/sites/lejeune/index.html

2

when certain areas at Camp Lejeune received VOC [volatile organic compound]-contaminated drinking water."[4] Eventually, the ATSDR used water modeling to reconstruct the historical levels of numerous pollutants in the groundwater of the Tarawa Terrace, Hadnot Point and Holcomb Boulevard areas of Camp Lejeune.

## II. The PLG's Requests for the ATSDR's Water Modeling Project File

As a result of the ATSDR's water modeling of Camp Lejeune, the Camp Lejeune Justice Act ("CLJA") was signed into law on August 10, 2022,. *See* Pub. L. No. 117-168, § 804, 136 Stat. 1759, 1802-04. The PLG's First Request for Production of Documents (the "First Request") was served on September 28, 2023. [D.E. 81-2].[5] The government's responsive document production was painfully slow and threatened to upend the Court's discovery schedule. Therefore, the PLG filed a Motion to Compel Document Production in Response to First Set of Request for Production on December 14, 2023 (the "Prior MTC"). [D.E. 81]. As relevant to the present motion, the PLG's Prior MTC requested that the Court compel the government to produce documents responsive to Request No. 8, which sought the following documents:

> 8. Please produce unredacted copies of all documents and ESI, as defined herein, relied upon by or in the possession, custody or control of the ATSDR related to any publication, report, or study concerning water contamination issues at Camp Lejeune, including drafts. . . .

[D.E. 81-3, at p 9; *see also* D.E. 82, at pp 4-5].

In an effort to resolve the Prior MTC, the parties held a meet and confer on January 5, 2024, and the PLG memorialized the parties' discussion in a letter of January 8, 2024. [Ex. 3]. The

---

[4] ATSDR, *ATSDR Timeline of Public Health Activities at Camp Lejeune, North Carolina* (last visited Feb. 15, 2024), at p 1, https://www.atsdr.cdc.gov/sites/lejeune/docs/camp_lejeune_timeline.pdf.
[5] For purposes of correcting a few non-substantive typographical errors, the PLG served a Corrected First Set of Request for Production on October 4, 2023. [D.E. 81-3].

PLG was deeply concerned about the slow pace of document production. And therefore, the PLG proposed the following compromise with respect to Request No. 8:

> As discussed below, the PLG proposes a compromise to resolve the parties' disputes concerning the government's document productions. That compromise involves the production of the ATSDR's "water modeling" and "health effects"[6] complete project files. Among other things, this compromise would close any outstanding issues concerning the government's response to Request No. 8.

[Ex. 3, at p 8].

The PLG's proposal was designed to achieve a quick and efficient production of the single, cohesive ATSDR water modeling project file *in lieu* of the government's protracted efforts in response to Request No. 8. The government has never contended that the project file is not discoverable. Had the government accepted this compromise, and immediately produced the complete project file, the present discovery dispute would have been resolved in early January 2024. Indeed, the government initially espoused interest, and therefore, the Court held the Prior MTC in abeyance so that the parties could work out the terms of a compromise. [D.E. 105].

But ultimately, the government has erected repeated roadblocks to the efficient production of the project file. On January 22, 2024, the government recommended instead that the PLG select 20 folders within the project file for priority production. [Ex. 4]. In response, the PLG noted that "[t]he project files could be conveniently produced with little burden by simply uploading the same to an external hard drive and mailing the hard drive to the PLG." [Ex. 5].

Next, on January 26, 2024, the government insisted that production of the project file must be delayed so that the production could be completed pursuant to the detailed steps of the ESI Protocol. [Ex. 6]. Unfortunately, the government's insistence upon a production pursuant to the

---

[6] The parties continue to discuss the production of the ATSDR's "health effects" project file. The "health effects" project file is not part of the present motion.

4

ESI Protocol will delay production of the project file for at least 45 days. [Ex. 9]. On at least two occasions, the PLG has proposed systems designed to achieve the immediate production of the entire project file while simultaneously implementing a bates-labeling system that would enable the parties to track all components of the project file. [Exs. 7 & 10]. The government declined.

In a Text Order of February 7, 2024, the Court required that the PLG file any motion to compel concerning the project file within 10 days. [D.E. 134]. In a last-ditch effort at compromise, the parties held a meet and confer on February 14, 2024. During that meet and confer, the PLG explained the problems posed by production of the project file pursuant to the ESI Protocol—including that compliance with the protocol would disassemble the project file, rendering it largely unusable unless reconstructed. The government was unmoved.

## ARGUMENT

As discussed below, the ATSDR's water modeling project file does not function unless produced in native format while also retaining the original folder/subfolder structure. If the project file is disassembled, the cross-references utilized by the project file become broken, and the project file does not function. Thus, the project file should be produced in native format with its original folder structure so that it functions as designed by the ATSDR.

The government insists upon producing the project file exclusively pursuant to the ESI Protocol. For purposes of tracking files with bates labels, the PLG does not object to a production pursuant to the ESI Protocol. However, there should be an additional production of a "mirror" of the project file. There is no prejudice to producing a mirror of the project file—that project file is a cohesive whole that could be uploaded to a $119 external hard drive and mailed to the PLG today. The government's intransigence on this issue is difficult to understand.

5

**I.      The Project File Will Be Largely Unusable if Produced Pursuant to the ESI Protocol.**

The project file is like a jigsaw puzzle, and the government possesses the assembled puzzle. The government proposes to break apart the jigsaw puzzle and produce the thousands—or tens of thousands—of pieces to the PLG separately, thereby requiring the PLG to reassemble the puzzle.

The PLG has retained a team of non-testifying consultants to assist with technology, database and document production issues. The leader of that team is Bill Williams ("Mr. Williams"). In support of the present motion, Mr. Williams prepared a declaration that is attached hereto as Exhibit 1. Further, Mr. Williams prepared a slide deck to illustrate, with visual aids, his testimony as set forth in the declaration. The slide deck is attached hereto as Exhibit 2.

As demonstrated by Mr. Williams' declaration and slide deck, production of the project file pursuant to the ESI Protocol will render the project file largely unusable. [Ex. 1, at ¶ 5]. The ATSDR's water modeling project file consists of thousands or tens of thousands of files that are organized in a logical manner pursuant to a structure involving folders, subfolders and files. [Ex. 1, at ¶ 3; Ex. 2, at p 3]. Throughout the project file, there are cross-references or "links" to other portions of the project file. [Ex. 1, at ¶ 3] As described by Mr. Williams, the links will not function if the project file is disassembled, because the links will not lead to actual data sources. *Id.*

Unfortunately, production of the project file pursuant to the ESI Protocol will take the folder and subfolder structure of the project file and "flatten[]" the folder structure for purposes of renaming all files with bates numbers. [Ex. 2, at p 4]. Under this process, all individual files within the overall project file will be renamed according to a bates label prefix and numbering sequence. [Ex. 2, at p 5]. Hence, the ESI Protocol will both undo the folder/subfolder structure of the project file and also rename individual files within the overall project file. [Ex. 2, at pp 3-6]. Since the

6

name and location of these files will be changed, the cross-references or "links" within the project file will be broken and nonfunctional. [Ex. 2, at p 7].

Mr. Williams provided an example, with visual aids, of how the project file depends upon the functionality of these cross-references. The Geographic Information System ("GIS") portion of the project file draws upon a database of pathways connecting various parts of the overall project file. [Ex. 2, at pp 11-13]. Hence, the GIS will follow these pathways to access various data sources within the overall project file and thereby display, for instance, certain map layers used in the ATSDR's water modeling of Camp Lejeune. *Id.* If the project file is broken apart, these links will not function, and the GIS will not display the map layers created and relied upon by the ATSDR. [Ex. 2, at pp 15-17]. The ESI Protocol will render the GIS unusable.

The government is producing "tree-sized directories" with its rolling production of the project file pursuant to the ESI Protocol. [Ex. 1, at ¶ 8]. These directories serve as a map that will allow the PLG to reconstruct the project file. *Id.* However, this reconstruction will be a work-intensive process, and this unnecessary step will increase the likelihood that errors could be introduced into the reconstructed project file during the rebuilding process. [Ex. 2, at ¶ 9].

These resources could be preserved, and these errors could be avoided, if the government simply produces a copy of the project file now. It should not be necessary for the government to disassemble the project file—only for the PLG to then reconstruct the file into its existing format.

## II. The Government Will Not Be Prejudiced by Production of a "Mirror Image" of the Project File.

The government will not sustain prejudice if a "mirror image" of the project file is produced. The project file is a single, cohesive file that can be conveniently and quickly transferred to an external hard drive. [Ex. 1, at ¶ 2; Ex. 2, at p 23; Ex. 5]. An external hard drive large enough to store the project file currently costs $119 at Walmart. [Ex. 2, at p 25].

The government may argue that production of the "mirror image" could result in confusion because the files would not be bates labeled. This argument should be rejected for at least three reasons. *First*, the government could retain its own copy of the project file, and any data cited within the project file by the PLG could be compared to the government's own copy. *Second*, the PLG does not object to the government's production, in addition to a "mirror image," of the project file pursuant to the ESI Protocol. This production pursuant to the ESI Protocol would include bates labeling and enhance the parties' ability to track all components of the project file. *Finally*, on at least two separate occasions, the PLG has proposed systems designed to achieve the immediate production of the entire project file while simultaneously implementing a bates-labeling system that would enable the parties to track all components of the project file. [Exs. 7 & 10].

**III.      The Federal Rules of Civil Procedure and Case Law Recognize that Native Format Production Is Appropriate Where the Functionality of the Native Files Is Important.**

The Federal Rules of Civil Procedure contemplate production of native format files. For instance, Rule 34 discusses that, in many cases, "[a] party must produce documents as they are kept in the usual course of business."[7] Fed. R. Civ. P. 34(b)(2)(E)(i). With respect to ESI, the rules provide that, "[i]f a request does not specify a form for producing electronically stored information, a party must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form." Fed. R. Civ. P. 34(b)(2)(E)(ii). The Advisory Committee Notes provide further detail concerning the appropriateness, in many circumstances, of producing ESI in native format:

> The rule does not require a party to produce electronically stored information in the form it is ordinarily maintained, as long as it is produced in a reasonably usable form. But the option to produce in a reasonably usable form *does not mean that a responding party is free to convert electronically stored information from the form in which it*

---

[7] The rule specifies that the parties may stipulate out of these requirements, and the government will surely argue that the ESI Protocol constitutes such a stipulation. This issue will be addressed below.

> *is ordinarily maintained to a different form that makes it more difficult or burdensome for the requesting party to use the information efficiently in the litigation. If the responding party ordinarily maintains the information it is producing in a way that makes it searchable by electronic means, the information should not be produced in a form that removes or significantly degrades this feature.*

Fed. R. Civ. P. 34, Advisory Committee's Note – 2006 Amendment (emphasis added).

These rules boil down to the following principle: Fed. R. Civ. P. 34(b) requires a producing party to produce information is a reasonably *usable* format, which may include native production. *See, e.g.*, *Haywood v. Wexford Health Sources, Inc.*, No. 16 CV 3566, 2021 WL 2254968 (N.D. Ill. June 3, 2021) (finding defendants' production of Excel spreadsheets in PDF violated Rule 34(b)'s reasonably usable production requirement, and compelling defendants to produce the documents in native format); *Corker v. Costco Wholesale*, No. C19-0290, 2020 WL 1987060 (W.D. Wash. Apr. 27, 2020) (holding that the static PDF images of the spreadsheet as produced by defendants were not "reasonably useable" as required by Fed. R. Civ. P. 34(b)(2)(E), as the data could not be sorted or filtered as it would in an active spreadsheet). Indeed, there are numerous cases recognizing that, where the functionality of native files is important, the files may be produced in native format. *See*, *e.g.*, *Laub v. Horbaczewski*, 331 F.R.D. 516, 527 (C.D. Cal. 2019) ("the drafters of Rule 34(b)(2)(E) expected that parties producing electronically stored information would provide it in a form that permitted 'text searching technologies, like filtering, grouping, and ordering' so that the requesting parties could organize it themselves"); *Freeman v. Deebs-Elkenaney*, No. 22-CV-2435, 2023 U.S. Dist. LEXIS 48942, at *1 (S.D.N.Y. Mar. 22, 2023) ("if ESI is kept in an electronically-searchable form, it should not be produced in a form that removes or significantly degrades this feature.").

**IV.     The ESI Protocol Does Not Prohibit Production of the Native Project File.**

The government will argue that the PLG's motion should be denied as inconsistent with the ESI Protocol, and the PLG acknowledges the case law in this District concerning the importance of adhering to a mutually agreed upon ESI protocol. Nonetheless, there are several reasons why the present circumstances require production of the native project file.

*First*, the government's proposal amounts to the manipulation of the project file data from how it was maintained by the ATSDR, thereby making it unusable. That certainly was not the intent or spirit of the ESI Protocol—or of the discovery rules. *See* Fed. R. Civ. P. 34 advisory committee's note to 2006 ("But the option to produce in a reasonably usable form does not mean that a responding party is free to convert electronically stored information from the form in which it is ordinarily maintained to a different form that makes it more difficult or burdensome for the requesting party to use the information efficiently in the litigation."). *Second*, the PLG could not have foreseen the above-described difficulties with production of the project file when it agreed to the ESI Protocol. *Third*, in addition to a mirror image of the project file, the PLG does not object to the additional production of the project file pursuant to the ESI Protocol. *Finally*, the ESI Protocol contemplates that it may need to be adapted to meet novel circumstances. For instance, the protocol empowers the Court to amend the terms of the ESI Protocol. [D.E. 52, at ¶ 9(c) ("Except as otherwise provided in this Order, its terms may be amended only by written stipulation of the Parties approved by the Corut, or by order of the Court, on notice motion."). To the extent necessary, the PLG moves the Court to amend the ESI Protocol to the extent needed to permit production of the native project file.

## CONCLUSION

For the foregoing reasons, the PLG requests that the Court grant the present motion.

DATED this 20th day of February, 2024.

| | |
|---|---|
| */s/ J. Edward Bell, III* | */s/ Zina Bash* |
| J. Edward Bell, III (admitted *pro hac vice*) | Zina Bash (admitted *pro hac vice*) |
| Bell Legal Group, LLC | Keller Postman LLC |
| 219 Ridge St. | 111 Congress Avenue, Suite 500 |
| Georgetown, SC 29440 | Austin, TX 78701 |
| Telephone: (843) 546-2408 | Telephone: 956-345-9462 |
| jeb@belllegalgroup.com | zina.bash@kellerpostman.com |
| | |
| *Lead Counsel for Plaintiffs* | *Co-Lead Counsel for Plaintiffs and Government Liaison Counsel* |
| | |
| */s/ Elizabeth J. Cabraser* | */s/ W. Michael Dowling* |
| Elizabeth J. Cabraser (admitted *pro hac vice*) | W. Michael Dowling (NC Bar No. 42790) |
| Lieff Cabraser Heimann & Bernstein, LLP | The Dowling Firm PLLC |
| 275 Battery Street, 29th Floor | Post Office Box 27843 |
| San Francisco, CA 94111 | Raleigh, North Carolina 27611 |
| Telephone: (415) 956-1000 | Telephone: (919) 529-3351 |
| ecabraser@lchb.com | mike@dowlingfirm.com |
| | |
| *Co-Lead Counsel for Plaintiffs* | *Co-Lead Counsel for Plaintiffs* |
| | |
| */s/ Robin L. Greenwald* | */s/ James A. Roberts, III* |
| Robin L. Greenwald (admitted *pro hac vice*) | James A. Roberts, III |
| Weitz & Luxenberg, P.C. | Lewis & Roberts, PLLC |
| 700 Broadway | 3700 Glenwood Ave., Ste. 410 |
| New York, NY 10003 | Raleigh, NC 27612 |
| Telephone: 212-558-5802 | Telephone: (919) 981-0191 |
| rgreenwald@weitzlux.com | jar@lewis-roberts.com |
| | |
| *Co-Lead Counsel for Plaintiffs* | *Co-Lead Counsel for Plaintiffs* |

*/s/ Mona Lisa Wallace*
Mona Lisa Wallace (N.C. Bar No.: 009021)
Wallace & Graham, P.A.
525 North Main Street
Salisbury, North Carolina 28144
Tel: 704-633-5244
mwallace@wallacegraham.com

*Co-Lead Counsel for Plaintiffs*

# CERTIFICATE OF SERVICE

I, J. Edward Bell, III, hereby certify that the foregoing document was electronically filed on the Court's CM/ECF system on this date, and that all counsel of record will be served with notice of the said filing via the CM/ECF system.

This the 20th day of February, 2024.

*/s/ J. Edward Bell, III*_____
J. Edward Bell, III