IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:23-CV-897

In re
Camp Lejeune Water Litigation

This document applies to:
ALL CASES

# PLAINTIFFS' LEADERSHIP GROUP'S REPLY IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

# INTRODUCTION

Congress could have provided simply that veterans can recover "for harm that was caused by exposure to the water at Camp Lejeune," with no further elaboration. CLJA § 804(b). That sparse text would have invoked the familiar common-law causation standard. Instead, Congress expressly defined how veterans must prove causation in a 94-word subsection with four distinct parts that "sets forth a standard of proof unique to this action." *Girard v. United States*, No. 2:22-cv-22, 2023 WL 115815, at *2 (E.D.N.C. Jan. 5, 2023). That unique standard of proof, enshrined in section 804(c), reflects a considered choice to depart from the common law.

Astoundingly, the government's brief quotes section 804(c) just once, in the background section, then pretends it does not exist, treating the general "was caused by" language of section 804(b) as the operative causation standard. The government's approach defies the bedrock textual maxim that the *specific* governs the general—not the other way around. Worse, the government treats the section as surplusage, with no meaning apart from lowering the standard for common-law causation to "at least as likely as not." That interpretation fails "to give effect, if possible, to every clause and word of a statute." *United States v. Menasche*, 348 U.S. 528, 538-39 (1955). Section 804(c) was adopted verbatim from a general-causation standard designed for Congress's and the Department of Veterans Affairs' ("VA") use, and it carries that context with it. If the Court finds the question close, Plaintiffs prevail under the Veteran's Canon.

The government analyzes only part of the CLJA's causation standard, Dkt. 139, at 4-7; discards the text it dislikes, *id.* at 7-9; misapplies Plaintiffs' precedents and misconstrues its own, *id.* at 6-7, 10-12; cherry-picks legislative history, *id.* at 13-16; insists that its agency's general-causation framework has nothing to do with general causation, *id.* at 17-20; denies that the key CLJA text was copied and pasted from the VA, *id.* at 20-23; and advances novel and unsupported theories to abrogate the Veteran's Canon, *id.* at 24-26. In the end, the government is left with a policy argument: that applying the statute as written would yield "disparate results." *Id.* at 23-24.

1

Case 7:23-cv-00897-RJ   Document 152   Filed 03/03/24   Page 2 of 13

But Plaintiffs' contrary policy arguments are overwhelming. Seventy-one years after the first Plaintiffs were exposed to the contaminated water, many Plaintiffs, their relatives, and other witnesses who could testify to their specific exposures have died or become unavailable. Housing, employment, and medical records have been lost or destroyed. Groundwater models cannot be supplemented or redone. If forced to make the specific causation showing that Congress abrogated, many Plaintiffs would struggle owing to the *government's* decades-long delays. The Court will pay for the government's stonewalling as well, as reconstructing the facts to prove specific causation from decades ago will require vastly more expert work, longer trials, more extensive discovery, and, in the end, would be as likely to exclude meritorious claims as to weed out unsound ones. Congress foresaw *those* disparate results and curtailed them through a streamlined causation standard. This Court should effectuate Congress's choice.

## ARGUMENT

**I.     The CLJA's Text Sets Out a Statutory Causation Standard Lifted Verbatim from the Institute of Medicine Framework.**

Congress intentionally defined the causation standard under the CLJA to match the general-causation standard recommended for use in the VA's presumptive benefits program. The CLJA provides that "IN GENERAL," a plaintiff can sue for "appropriate relief for harm that was caused by exposure to the water at Camp Lejeune." CLJA § 804(b). The "burden of proof" is on the plaintiff to "show one or more relationships between the water at Camp Lejeune and the harm." *Id.* § 804(c)(1). A plaintiff can "meet the burden of proof" by "showing that the relationship between exposure to the water at Camp Lejeune and the harm"—that is, one of the "one or more relationships" specified in (c)(1)—is either "(A) ***sufficient to conclude that a causal relationship exists***; or (B) ***sufficient to conclude that a causal relationship is at least as likely as not***." *Id.* § 804(c)(2) (emphasis added). This "causal relationship" standard departs from the common law.

The standard originated in 2008 with the Institute of Medicine ("IOM"). The IOM

recommended to the VA and Congress a "classification scheme for characterizing the strength of evidence in support of a general causal relationship" between military-related exposures and diseases.[1] The IOM recommended designating a condition presumptively service-related when the evidence that exposure can cause a condition was either "Sufficient: The evidence is ***sufficient to conclude that a causal relationship exists***" or "Equipoise and Above: The evidence is ***sufficient to conclude that a causal relationship is at least as likely as not***." *Id.* at 333-34 (emphases added). This standard prescribed a general-causation inquiry based on "epidemiologic studies of veterans and other exposed groups, . . . toxicological studies of animals or tissues, mechanistic studies . . . and any other relevant scientific evidence." *Id.* at 334. In 2017, the Agency for Toxic Substances and Disease Registry ("ATSDR") applied the IOM's 2008 classification scheme to evaluate "the evidence supporting causality of adverse health effects from exposures to the drinking water contaminants at Camp Lejeune" using exactly those forms of general-causation evidence. Dkt. 139-4 at 2, 5-7 [hereinafter ATSDR, *2017 Assessment of Diseases*].

Congress "obviously transplanted" the unique, identical phrasing of the IOM "causal relationship" standard to section 804(c)(2), importing "an unusual term that had a long regulatory history in this very context." *George v. McDonough*, 596 U.S. 740, 746 (2022). If that were not clear enough, consider the parallel between the "one or more relationships" language in section 804(c)(1) and ATSDR's 2017 analysis, which examined five different *contaminants* in the water and their "relationships" to various conditions to assess which were "causal relationships" under IOM's standard. A plaintiff's burden is the same: to show that one or more relationships between his condition and the water contaminants meet the IOM's standard to be "causal relationships."

When the government eventually grapples with the IOM and ATSDR standards, it insists that

---

[1] Inst. of Med., *Improving the Presumptive Disability Decision-Making Process for Veterans* 137 (Nat'l Academies Press 2008), https://doi.org/10.17226/11908 [hereinafter IOM, *Improving the Process*].

"Congress did not adopt the term of art" that would be required "to eliminate specific causation: 'equipoise and above,'" but instead "used the term 'sufficient.'" Dkt. 139 at 22. This argument is difficult to credit. The IOM *defined* "equipoise and above" as: "The evidence is ***sufficient to conclude that a causal relationship is at least as likely as not*** . . . ." IOM, *Improving the Process*, at 333-34 (emphasis added). Congress inserted the IOM's *definition* of "equipoise and above" into the CLJA, word for word. The terms are not "superficially similar," Dkt. 139 at 22—they are unmistakably identical, and intentionally so. Retreating from the text, the government proffers the *non-sequitur* that Congress did not incorporate the IOM framework because ATSDR's study applying that framework is not "reliabl[e]" under "Fed. R. Evid. 702." Dkt. 139 at 21. Tellingly, the government never even suggests that Congress—or anyone else—believed the ATSDR study was unreliable when it passed the CLJA, making its critique irrelevant to a motion that asks the Court to determine the meaning of words Congress wrote into law.[2]

## II. The Government Runs from the Text.

The government does not dispute that the "causal relationship" standard originated with IOM, nor does it contend that the identical text in section 804(c)(2) was drawing from any other source. It concedes that "Congress was cognizant of both ATSDR's Assessment of the Evidence and the IOM Framework." Dkt. 139 at 20. And it does not dispute that the inquiry recommended by IOM and performed by ATSDR is a general-causation inquiry. Rather, it argues that Congress intended the same "causal relationship" standard to mean something completely different in the CLJA from what it meant in the IOM framework and ATSDR's 2017 study. Its arguments fail.

---

[2] The government's insistence on denying the validity of a study conducted by its own agency, albeit irrelevant here, is striking. The government has made major decisions in reliance on ATSDR's Camp Lejeune assessments, including (a) its selection of presumptive diseases for Camp Lejeune-related VA benefits, *see* Proposed Rule, Diseases Associated with Exposure to Contaminants in the Water Supply at Camp Lejeune, 81 Fed. Reg. 62419, 62420 (Sept. 9, 2016), and (b) its selection of diseases for EO eligibility, *see* Dkt. 20-1 at 2-4, 8.

### A. The Government's Reading Ignores Section 804(c).

The government's first argument, Dkt. 139 at 4-7, relies on elevating section 804(b) over section 804(c). On the government's reading, "a plaintiff can *only* recover for harm that 'was caused by' and is 'causal[ly] relat[ed]' to exposure to Camp Lejeune water." *Id.* at 4 (alterations in original) (quoting CLJA §§ 804(b), (c)(2)). This argument founders on the "commonplace of statutory construction that the specific governs the general." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (quoting *Morales v. TransWorld Airlines, Inc.*, 504 U.S. 374, 384 (1992)). Section 804(c) defines, in four detailed subparts, the "standard of proof" for causation. The "burden of proof shall be on the" plaintiff, and the plaintiff can "meet the burden of proof" by producing evidence that satisfies either subsections 804(c)(2)(A) or (c)(2)(B). If the government were right, Plaintiffs actually *cannot* "meet the burden of proof" for causation through section 804(c)(2), because they must *independently* show that their harm "was caused by" the water under section 804(b). Since "was caused by" is a higher standard, the government's reading would make section 804(c) entirely superfluous and section 804(c)(2) contradictory. The better reading is that the specific language in section 804(c) governs over section 804(b)'s general language, to escape the "contradiction" or "superfluity of a specific provision that is swallowed by the general one." *RadLAX*, 566 U.S. at 645.

Next, the government argues that "displacement of the usual" preponderance standard "underscores" that specific causation was retained. Dkt. 139 at 7. The CLJA changed much more than the six-word preponderance standard, though. The government's reading of section 804(c) ignores all but those six words, leaving multiple subsections with "no work left . . . to do." *Polselli v. Internal Revenue Serv.*, 598 U.S. 432, 441 (2023). As Plaintiffs showed in their motion, the "at least as likely as not" language could easily have been added to *section 804(b)* if that is all Congress wanted to change. *See* Dkt. 111 at 16. Instead, it specified that "one or more relationships" must be shown to be "causal relationships," using, verbatim, a 22-word standard designed by the IOM to address general

5

causation. The government also argues that phrase "the harm" in section 804(c)(1) shows that both specific and general causation are required, Dkt. 139 at 8, but the opposite is true. It is entirely sensible to speak of "one or more" *general*-causation "relationships" between the contaminants in the water and a particular plaintiff's injury. It is nonsensical to require a showing of "one or more" *specific*-causation "relationships."[3]

### B. Exposure Means the Same Thing Throughout Section 804.

The CLJA authorizes suit by anyone who "resided, worked, or was *otherwise* exposed" to the water for at least 30 days between specified dates. CLJA § 804(b). The "otherwise" makes clear that any plaintiff who meets this condition has proven *exposure* under the statute. The same subsection specifies that the "water" must have been "supplied by . . . the United States." *Id.* The next subsection requires plaintiffs to show one or more causal relationships between "exposure to the water at Camp Lejeune" and "the harm." § 804(c)(2). The government argues that "exposure" means two *different* things in these subsections. Dkt. 139 at 9. But "similar language contained within the same section of a statute must be accorded a consistent meaning." *Nat'l Credit Union Admin. v. First Nat'l Bank & Tr. Co.*, 522 U.S. 479, 501 (1998). Here, there is no reason to think the term "exposure" in section 804(c) is referring to something wholly different than the 30-day exposure period in the previous section, any more than one would read "water" in section 804(c) to include Camp Lejeune water that was *not* supplied by the United States.[4]

---

[3] Because the CLJA's causation standard is carefully defined, the government's reliance on statutes whose causation standards *are* limited to "caused by" fails. *See* Dkt. 139 at 6-7. Plaintiffs and the government agree on the basic rule: when a statute says "caused by" and nothing else, it means common-law causation; but when the statute imposes a detailed causation framework, that more specific framework changes the proper interpretation of "caused by" in a general provision. The CLJA changes the default rule, as do Plaintiffs' other examples. *See* Dkt. 111 at 13-14, 24-26.

[4] The government raises the Telephone Consumer Protection Act ("TCPA") as a counterexample, but the terms there have the same meaning. Dkt. 139 at 9. The TCPA authorizes suit by any "person who has received more than one telephone call within any 12-month period . . . in violation of the regulations." 47 U.S.C. § 227(c)(5). That person can recover "$500 in damages for each such violation." *Id.* § 227(c)(5)(B). The "violation" in both subsections mean the same thing, and the same violation allows a person to sue and constitutes the basis for recovery.

The bright-line rule Congress chose is a compromise. It excludes some veterans who would prevail under the common law rule (say, those exposed before August 1953), and includes some who would lose. As the government concedes, the CLJA's 30-day exposure requirement matches the 30-day exposure requirement for Camp Lejeune-related VA benefits, which makes the offsets more administrable. *See* 38 C.F.R. § 3.307(a)(7); Dkt. 139 at 10 n.2 (conceding that the CLJA and VA benefits "include[] the same 30-day exposure requirement"). The government laments that variance in exposure "could affect whether the harm 'was caused by' the exposures," Dkt. 139 at 9, but misses that Congress was balancing the risk of over-paying some veterans with low exposure against the serious concern of *under*-paying thousands of injured veterans who would struggle to prove precise exposure from decades ago.[5] Congress knew that the existing science "provide[d] very limited information concerning the level or duration of exposure associated with an increased risk of a cancer or other disease" for the Camp Lejeune "contaminants and . . . diseases." ATSDR, *Assessment of Diseases* at 11; *see also* IOM, *Improving the Process* at 138 (explaining that exposure presumptions are often necessary "when there are gaps in the information related to exposure and causal classification"). Congress legislated against that scientific and regulatory background in adopting the CLJA's bright-line exposure rule.

C.     **The Government's Contextual Arguments Are Makeweight.**

The government's legislative history quotations are of the weakest possible form (press releases from individual representatives) and, in any event, say nothing about whether specific causation is required. Dkt. 139 at 13-14. The government cannot refute Plaintiffs' arguments that Congress sought efficiency and speed, which are simply true. The prior version of the CLJA the

---

[5] The absurdity of the argument is highlighted in ongoing depositions of Track 1 Plaintiffs, at which the government attorneys ask plaintiffs questions about mundane activities when they were in their late teens/early 20s from 35-plus years ago, such as how many showers did they take a day and how long was each shower, was their showering habit different on the weekend, was there a window in the shower, what type of ventilation did the shower area have, how many shower heads were in the shower room, how often they shaved, washed dishes, did laundry, etc.

7

government cites is quite different from the standard Plaintiffs are requesting in the motion. That prior version required proof "by a preponderance" and provided that a single "study conducted on . . . animals" showing "that exposure to the water . . . is one possible cause" would "be sufficient to satisfy the burden of proof." Dkt. 139-8 at 2-3. By contrast, Plaintiffs simply want to use the IOM's standard, which looks to all the evidence (not a single study), and which is verbatim what Congress enacted. The government's arguments about the differences from the PACT Act have no bearing. Dkt. 139 at 20. There is no dispute that the CLJA is a tort remedy, rather than "medical and disability benefits." *Id.* But there is likewise no dispute that the text of the *causation standard* in section 202(a) of the PACT Act—applying to presumptive conditions—is nearly identical to section 804(c); it merely retains "positive association" rather than "causal relationship," showing Congress was parsing distinctions finely. 38 U.S.C. § 1173(c)(2)(A)-(B).

The National Childhood Vaccine Injury Act supports Plaintiffs' argument. That Act allows plaintiffs to prove causation either under common-law causation, 42 U.S.C. § 300aa-11(c)(1)(C)(ii), or by using the statutory Vaccine Injury Table, *see id.* § 300aa-14(a). The specific does not govern the general when the provisions are *disjunctive* and *permissive*. And though the Act does list presumptive conditions while the CLJA does not, Dkt. 139 at 11, that is because listing of presumptive conditions eliminates the need to prove *general* causation. 42 U.S.C. § 300aa-14(a).[6]

### III.   The Veteran's Canon Requires Resolving Any Ambiguities in Favor of Plaintiffs.

If the Court is uncertain of the best reading of the CLJA, the Veteran's Canon tips the scales. *See* Dkt. 111 at 26-27. The government argues that the Canon does not apply because the CLJA is "not ambiguous" in requiring common-law causation "just like any other toxic tort," but Congress's express

---

[6] That Congress did not include the phrase "notwithstanding . . . insufficient medical evidence to [the contrary]," 38 U.S.C. § 1710(e)(1)(F), is also irrelevant. *See* Dkt. 139 at 11. That provision, too, eliminates the need to prove *general* causation. The CLJA, on the other hand, incorporates a scientific standard, the application of which *requires* proof of general causation (a requirement that, for some conditions, the ATSDR's analysis may satisfy).

8

codification of a non-common-law causation standard *at minimum* gives reason to "doubt" that argument—if not reject it outright. Dkt. 139 at 24-25.

Amazingly, the government next argues that the CLJA does not favor veterans at all: it is a "statute of general applicability" because it "does not require [a plaintiff] to have a connection to military service." Dkt. 139 at 25. That characterization would come as a surprise to President Biden, who called it "the most significant law our nation has ever passed to help millions of veterans who were exposed to toxic substances." Remarks by President Biden at Signing of S. 3373, 2022 WL 3225418, at *2 (Aug. 10, 2022). The CLJA applies *only* to those present for 30 days on Camp Lejeune, which is a *military base* with restrictive access. The government cites no precedent reserving the Veteran's Canon for statutes that *exclusively* benefit veterans, and no such case exists. Dkt. 139 at 25. Multiple provisions of the SCRA, for example, cover dependents, many without the limitation the government invokes. *See* 50 U.S.C. §§ 3951, 3955, 3956, 3959.

Last, the government ventures that the Veteran's Canon does not apply where a statute waives sovereign immunity, Dkt. 139 at 26, but no case has declined to apply the Veteran's Canon on that basis. For example, the Veterans' Judicial Review Act ("VJRA"), 38 U.S.C. § 511, "provides a limited waiver of sovereign immunity," *Judkins v. Veterans Admin.*, 415 F. Supp. 2d 613, 616-17 (E.D.N.C. 2005), but courts routinely apply the Veteran's Canon in VJRA cases. *See, e.g.*, *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 441 (2011).

### IV. Congress Avoided the Disparities of a Specific Causation Standard.

The core purpose that pervades the CLJA's legislative history and text is providing for efficient litigation and resolution of claims after decades of unjust delays. For more than a decade prior to the Act's passage, Congress held hearings and took evidence regarding the government's delays in

9

remediating, disclosing, and studying the water contamination at Camp Lejeune.[7]

Congress's textual choices to eliminate specific causation, specify the general-causation burden, and simplify exposure to proof of 30 days on base addressed exactly the delays that concerned Congress. After all, it is precisely because of the government's decades-long delays that exposure evidence is old or no longer available; witnesses have died or deteriorated; and long-deceased Plaintiffs' medical histories may be unavailable.[8] The government's objections to this approach ring hollow because their *own* EO settlement process similarly jettisons specific causation. No one thinks the mass of claims in this proceeding can be adjudicated with long trials on individualized causation issues.

Granting the motion would not only give effect to congressional intent, it also would profoundly aid judicial economy. The Court remarked when this proceeding began that resolving every case at an ordinary pace may require more time than the rise and fall of the Roman Empire. Specific causation and exposure testimony will require numerous expert witnesses, multiple additional reports for each plaintiff and additional *Daubert* hearings, vastly more discovery into medical records, and exponentially longer trials. Bench trials before this Court on general causation (under the CLJA's unique standard), statutory exposure, and damages can be condensed into short, but fair, trials providing consistency and certainty that will aid global resolution.

## **CONCLUSION**

The PLG respectfully requests that this Court grant Plaintiffs' motion.

---

[7] *See, e.g.*, *Camp Lejeune: Contamination and Compensation, Looking Back, Moving Forward: Hearing Before the Subcomm. on Investigations & Oversight of the H. Comm. on Sci. & Tech.*, 111th Cong. 111-108, at 27-44, 67-68, 103-04 (2010) (excerpts attached hereto as Exhibit A); *Honoring Our Promise to Address Comprehensive Toxics Act of 202: Hearing Before the S. Comm. on Veterans' Affairs*, 117th Cong. 117-584, at 32-33 (2022) (excerpts attached hereto as Exhibit B).

[8] As a result of this loss or destruction of evidence, plaintiffs are entitled to use the existing "best evidence"—here, the government's own long-term studies—to prove CLJA statutory causation at trial. Remedial statutes do not create impossible hurdles for their beneficiaries. *See Tyson Foods, Inc. v Bouaphakeo*, 577 U.S. 442, 456-57 (2016) (employer failure to keep records enabled employees to use statistical evidence of the quantum of uncompensated time in a Fair Labor Standards Act trial).

10

Case 7:23-cv-00897-RJ   Document 152   Filed 03/03/24   Page 11 of 13

Dated: March 3, 2024                                         Respectfully submitted,

| /s/ J. Edward Bell | /s/ Zina Bash |
|---|---|
| J. Edward Bell, III (admitted *pro hac vice*) | Zina Bash (admitted *pro hac vice*) |
| Bell Legal Group, LLC | Keller Postman LLC |
| 219 Ridge Street | 111 Congress Avenue |
| Georgetown, SC 29440 | Suite 500 |
| Phone (843) 546-2408 | Austin, TX 78701 |
| Fax (843) 546-9604 | Telephone: 956-345-9462 |
| jeb@belllegalgroup.com | zina.bash@kellerpostman.com |
| *Lead Counsel* | *Co-Lead Counsel and Government Liaison* |
| | |
| /s/ Elizabeth Cabraser | /s/ John. F. Bash |
| Elizabeth Cabraser (admitted *pro hac vice*) | John F. Bash (admitted *pro hac vice*) |
| Lieff Cabraser Heimann & Bernstein, LLP | Quinn Emanuel Urquhart & Sullivan LLP |
| 275 Battery Street, Suite 2900 | 300 W. 6th St., Suite 2010 |
| San Francisco, CA 94111 | Austin, TX 78701 |
| Phone (415) 956-1000 | Phone (737) 667-6100 |
| Fax (415) 956-1008 | johnbash@quinnemanuel.com |
| ecabraser@lchb.com | *Member, Plaintiffs' Executive Committee* |
| *Co-Lead Counsel for Plaintiffs* | *Co-Chair, Law and Briefing Subcommittee* |
| | |
| /s/ W. Michael Dowling | /s/ Robin Greenwald |
| W. Michael Dowling (NC Bar No. 42790) | Robin L. Greenwald (admitted *pro hac vice*) |
| The Dowling Firm PLLC | Weitz & Luxenberg, P.C. |
| Post Office Box 27843 | 700 Broadway |
| Raleigh, North Carolina 27611 | New York, NY 10003 |
| Telephone: (919) 529-3351 | Telephone: 212-558-5802 |
| Fax: (919) 529-3351 | rgreenwald@weitzlux.com |
| mike@dowlingfirm.com | *Co-Lead Counsel* |
| *Co-Lead Counsel* | |
| | |
| /s/ James A. Roberts, III | /s/ Mona Lisa Wallace |
| James A. Roberts, III (N.C. Bar No.: 10495) | Mona Lisa Wallace (N.C. Bar No.: 009021) |
| Lewis & Roberts, PLLC | Wallace & Graham, P.A. |
| 3700 Glenwood Avenue, Suite 410 | 525 North Main Street |
| P. O. Box 17529 | Salisbury, North Carolina 28144 |
| Raleigh, NC 27619-7529 | Tel: 704-633-5244 |
| Telephone: (919) 981-0191 | Fax: 704-633-9434 |
| Fax: (919) 981-0199 | *Co-Lead Counsel* |
| jar@lewis-roberts.com | |
| *Co-Lead Counsel* | |

## CERTIFICATE OF SERVICE

I hereby certify that on March 3, 2024, a copy of the foregoing document was served on all counsel of record by operation of the court's electronic filing system and can be accessed through that system.

/s/ J. Edward Bell
J. Edward Bell, III
