# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION


*******************************
IN RE:  AQUEOUS FILM-FORMING   *  MDL No. 2:18-mn-2873
FOAMS PRODUCTS LIABILITY       *
LITIGATION                     *  October 31, 2023
*******************************

TRANSCRIPT OF TELEPHONIC STATUS CONFERENCE

BEFORE THE HONORABLE RICHARD M. GERGEL
UNITED STATES DISTRICT JUDGE, presiding


A P P E A R A N C E S:

For the Plaintiffs:     Motley Rice LLC
                        BY:  JOSEPH F. RICE, ESQ.
                             FRED THOMPSON III, ESQ.
                        28 Bridgeside Boulevard
                        Mt. Pleasant, SC 29464

                        Douglas and London PC
                        BY:  MICHAEL A. LONDON, ESQ.
                        59 Maiden Lane, 6th Floor
                        New York, NY 10038

                        Napoli Shkolnik PLLC
                        BY:  PAUL J. NAPOLI, ESQ.
                        1301 Avenue of the Americas
                        10th Floor
                        New York, NY 10019

                        Baron and Budd
                        BY:  SCOTT SUMMY, ESQ.
                        3102 Oak Lawn Avenue, Suite 1100
                        Dallas, TX 75219

For the Defendants:     Duffy and Young LLC
                        BY:  BRIAN C. DUFFY, ESQ.
                        96 Broad Street
                        Charleston, SC 29401

                        Nelson Mullins
                        BY:  AMANDA S. KITTS, ESQ.
                        1320 Main Street, 17th Floor
                        Columbia, SC 29201

```
                        Williams & Connolly LLP DC
                        BY:  JOSEPH G. PETROSINELLI, ESQ.
                        725 12th Street NW
                        Washington, DC 20005

                        Mayer Brown LLP
                        BY:  MICHAEL A. OLSEN, ESQ.
                             DAN RING, ESQ.
                        71 S. Wacker Drive
                        Chicago, IL 60606

For the United States   US Department of Justice
of America:             BY:  CHRISTINA M. FALK, ESQ.
                             HAROON ANWAR, ESQ.
                             ANDREW KNUDSEN, ESQ.
                        Environmental Torts, Civil Div.
                        175 N Street NE
                        Washington, DC 20002

Also Appearing:         RICH BULGER, ESQ.
                        BRENT DWERLKOTTE, ESQ.
                        MICHAEL CARPENTER, ESQ.
                        MARGARET RAYMOND-FLOOD, ESQ.
                        MOLLY CRAIG, ESQ.
                        KATE ROIN, ESQ.
                        TALLY CASEY, ESQ.
                        ADDIE RIES, ESQ.
                        KEITH SMITH, ESQ.
                        CALEB HOLMES, ESQ.
                        ELIZABETH KNAUER, ESQ.
                        MATT HOLIAN, ESQ.
                        STEVE WEBER, ESQ.
                        MARK CHEFFO, ESQ.

Court Reporter:         KAREN E. MARTIN, RMR, CRR
                        PO Box 835
                        Charleston, SC 29402

    Proceedings reported by stenographic court reporter.
    Transcript produced with computer-aided transcription
                        software.
```

1          Tuesday, October 31, 2023

2          (WHEREUPON, court was called to order at 10:00 AM.)

3                    THE CONFERENCE COORDINATOR:  Your Honor, would

4     you like to join the call in now?

5                    THE COURT:  Are counsel who need to be here in

6     the speakers area here already?

7                    MR. LONDON:  Yes.

8                    THE COURT:  Okay.  Sure, let's join.

9                    THE CONFERENCE COORDINATOR:  Okay.  Thank you.

10    If you would please all give me a moment of silence.  If

11    you can self-mute your lines, I'm going to transfer

12    everybody into the main conference.  Then I'll do a brief

13    opening statement and hand the call over to Judge Gergel.

14    So one moment of silence, please.

15                   THE COURT:  Thank you.

16                   THE CONFERENCE COORDINATOR:  Thank you.

17    (Pause.)

18                   Good day, everyone, and welcome to today's AFFF

19    MDL October Status Conference call.  At this time all

20    participants are in a listen-only mode.  I will stand by

21    if you should need any assistance.  It is now my pleasure

22    to turn the conference over to Judge Richard Gergel.

23                   Please go ahead, Your Honor.

24                   THE COURT:  Thank you very much.

25                   Good morning, everyone.  This is the matter of

1    the October 31, 2023, status conference.  Could counsel

2    for plaintiff who will be speaking identify themselves for

3    the record, please?

4            **MR. LONDON:**  Yes.  Good morning, Your Honor.

5    Michael London for the PEC.  With me on the line I believe

6    is Mr. Summy, Mr. Napoli, Mr. Rice, and Mr. Thompson.

7            **UNIDENTIFIED SPEAKER:**  Good morning, Your Honor.

8            **THE COURT:**  Good morning, everyone.

9            And for defense counsel leadership,

10   Mr. Petrosinelli, could you identify who could be speaking

11   for the defense?

12           **MR. PETROSINELLI:**  Good morning, Your Honor.

13   Joe Petrosinelli here, one of the defense Co-Leads, joined

14   on the phone with Mike Olsen, the other Co-Lead.  And

15   then, as usual, we have on the phone lawyers for several

16   defendants who may speak depending on exactly what comes

17   up today.

18           **THE COURT:**  Very good.  Thank you.

19           And for the United States?

20           **MS. FALK:**  Good morning, Your Honor.  Christina

21   Falk on behalf of the United States.  We have other

22   attorneys available as needed.  Thank you.

23           **THE COURT:**  Thank you, Ms. Falk.

24           Okay.  Mr. London, do you want to walk us

25   through the highlights of the Joint Status Report?

1    **MR. LONDON:** Yes, good morning, Your Honor,

2    thank you. I will keep it to the highlights here.

3    The document production, Your Honor, does

4    continue in the case, continue to be produced. The

5    depositions as well continue. I think since the last

6    report in July we've had ten depositions taken, and eight

7    are scheduled. Many of those were in the Dupont matter,

8    those claims.

9    The settlement report update, Your Honor, in the

10    Joint Status Report, it's addressed later in more detail.

11    But Your Honor's well aware that the Dupont Public Water

12    Supplier settlement once it received preliminary approval

13    in August and there have been various filings since then.

14    And likewise for 3M Public Water Supplier settlement

15    received preliminary approval on the 29th.

16    Likewise, the bellwether report here is the

17    summary of the report and what's proceeding, CMO 27 or the

18    telomer water provider cases, four were selected on

19    September 27th. And those are going through the Tier One

20    discovery now. And the nominees to advance to Tier Two,

21    two of those will be due to the Court November 21st.

22    The CMO 26, which is the personal injury leach

23    cases, those selections are due to the Court December 1st.

24    The PEC and the DCC is working on assessing those and

25    reviewing those with the goal, which I'm confident we will

1  try and make, to have an agreed-upon selection of 28 cases

2  to the Court.

3       Continuing through, I am happy to report that

4  there are no recently arising potential disputes between

5  the parties.  So that's an accomplishment for this Joint

6  Status Report.

7       Continuing, Judge, for the discovery updates by

8  each defendant, the large part of the Joint Status Report,

9  I don't think there's much beyond the report to discuss or

10  address.  Certainly, I would bring the Court's attention

11  to on Page 17 to 19 and the Kidde update, nothing beyond

12  the report but simply that there is a lot going on in

13  Kidde bankruptcy world.  Again, nothing beyond the report

14  but I think it's certainly worth noting.

15       **THE COURT:**  Does -- Mr. London, on the Kidde, is

16  it basically you're understanding it's going to be a

17  liquidation or how do you understand that status?

18       **MR. LONDON:**  I understand it as a potential sale

19  of the company, liquidation, correct.  There's quite a bit

20  of happening going on right now with the mediation order

21  being submitted.  I'm happy to report, Judge, Judge

22  Phillips has been engaged as well as Judge --

23       **THE COURT:**  Hello?

24       **MR. LONDON:**  Can you hear me, Your Honor?

25       **MR. RICE:**  Judge Gergel, this is Joe Rice.  I

1    have been on the Kidde calls recently.  And the bankruptcy

2    is morphing into an attempt to have a number of other

3    non-debtor parties involved because of the potential

4    liability that others may have for the same products that

5    Kidde has liability for.  So the injunction has been

6    extended.  The court's sending a large number of parties,

7    including Carrier, to a mediation process.  That's to

8    begin the first part of December.  And the parties have

9    not filed any mediation statements or anything yet.  So

10   we're not sure the total scope of that.

11            **THE COURT:**  Okay.  Thank you.

12            Mr. London, do you want to continue?

13            **MR. LONDON:**  Surely, Your Honor.  I think that

14   probably brings us to the United States section.  I don't

15   think there's much else to report.

16            I would note that the Turnout Gear defendants

17   and all kind of counsel have made significant progress

18   since the filing of the Joint Status Report.  As usual,

19   leading up to a conference, parties got together so good

20   work was done there by the parties.

21            Which brings us to Page 29 and the United

22   States.

23            **MR. NAPOLI:**  Judge, Michael, just with the

24   United States and I will tell the Court that we've been

25   working with Ms. Falk and her team.  We've recently served

1  a request for production of documents, which is consistent

2  with the order Your Honor entered.  We're meeting and

3  conferring on the production of those documents and

4  interrogatories, which are forthcoming to them.  We're

5  also working on scheduling depositions.  And we're well

6  within the timeframe to do the briefing that the Court has

7  ordered.

8          **THE COURT:**  Very good.  And just for the record,

9  that was Mr. Napoli.  Mr. Napoli, is your -- all that you

10 were just describing to me, the discovery, that is for the

11 -- relating to the Government's immunity issue; is that

12 correct?

13         **MR. NAPOLI:**  That's correct, to the Government's

14 briefing on immunity issues.

15         **THE COURT:**  Very good.

16         Okay.  Ms. Falk, do you want to share with us

17 anything?

18         **MS. FALK:**  No, Your Honor.  I think Mr. Napoli's

19 aptly summed up where we're at.  They've served us

20 discovery.  We intend to answer it.  If we need to meet

21 and confer, we will.  We've substantially completed the

22 document request production for Cannon Air Force Base.

23 And I believe that we're moving right along and we're

24 happy to work with Mr. Napoli.

25         In addition, the manufacturers and the

1  plaintiffs have requested the assistance of the Department

2  of Justice in obtaining some sampling work done.  The

3  DOD's done extensive work at all the sites.  And in

4  particular, the cases are potential bellwether PI cases.

5  So we're assisting them in terms of collecting all the

6  sampling data so that they have that opportunity to review

7  that to make their decisions.

8          **THE COURT:**  Very good.  Thank you.

9          And I have not heard from the defendants

10  regarding the United States.  Anything else you wish to

11  add, Mr. Petrosinelli or Mr. Olsen?

12          **MR. OLSEN:**  This is Mike Olsen, Your Honor, I

13  don't think so.  Ms. Falk just hit the issue.  The only

14  issue we had was the off-site sampling data.  And with the

15  amendment to the protective order we expect that soon and

16  don't envision any problems.

17          **THE COURT:**  Very good.

18          Okay.  Mr. London, do you want to continue?

19          **MR. LONDON:**  Certainly, Your Honor.  Thank you.

20  That brings us to Section 6 and the deposition report.

21  Again, I think we can skip over that.  There's nothing

22  beyond the status report.

23          Which then brings us to the plaintiff fact sheet

24  update.  And I'll defer to Mr. Petrosinelli if he has

25  anything to report on the plaintiff fact sheets.

1    MR. PETROSINELLI:  That is Joe Petrosinelli.

2  No, Your Honor.

3    THE COURT:  Very good.  Okay?

4    MR. LONDON:  And likewise for defense fact

5  sheets, nothing beyond the Joint Status Report.

6    The update on the non-MDL cases, again, I don't

7  believe anything beyond the Joint Status Report to report.

8    Which brings us to Page 44 and a more detailed

9  report on the bellwether process if the Court is inclined.

10  I think I covered it.

11    The only thing to note, Your Honor, we were

12  chatting this morning with the defense that under CMO 27,

13  the telomer water provider bellwether cases, there is a --

14  the parties owe the Court a proposed plan with respect to

15  the extent and scope of Tier Two depositions.  That's due

16  to the Court November 1st.  We're still working together.

17  Actually a meet and confer was set for this afternoon.  We

18  may be asking the Court for a little extra time to submit

19  that proposed deposition plan for those Tier Two cases.

20    THE COURT:  Okay.

21    (Indiscernible crosstalk.)

22    THE COURT:  But this is just on the Tier Two,

23  the narrowed down to -- I'm looking at Page 44, those are

24  those four parties, is that what we're talking about

25  there?

1    MR. LONDON:  That's correct, Your Honor.  So

2  those four parties, those four cases will be winnowed

3  down, narrowed down to two cases on or about

4  November 21st.  And so what we're looking to do is define

5  a scope and extent of the depositions for those narrowed

6  down cases.  We owe the Court a proposal on November 1st.

7  We might need a little bit of extra time to get that

8  proposal.

9          THE COURT:  Okay.  Okay.  Just let me know.

10         MR. LONDON:  Thank you.

11         THE COURT:  Anything further, Mr. London?

12         MR. LONDON:  I think just lastly, Your Honor,

13  just the update on the other categories of bellwether

14  cases.  The state and sovereign bellwether plan, the state

15  sovereigns have submitted a proposed plan for state

16  sovereign bellwether track of cases to the DCC a couple of

17  weeks ago and there's a meet and confer set on that.  I

18  just wanted to put this on the Court's radar.  Nothing to

19  report at this time.  And the parties can report on the

20  status at the next CMC.  And the PEC is working --

21         THE COURT:  Mr. London, let me break it down

22  just to understand what you're talking about.  The state

23  sovereigns want -- you're telling me they want a

24  bellwether, is that it?  Or they -- there's some working

25  up of their claims?  Tell me about that.

1    **MR. LONDON:**  Yes, Your Honor.  So they are

2    proposing a bellwether plan to address working up their

3    claims, exactly that.

4         **THE COURT:**  Okay.  And we're in the middle of

5    discussions about a potential CMO on that, correct?

6         **MR. LONDON:**  I'd probably say we're not at the

7    middle, but we are starting those discussions.  The first

8    meet and confer is set for this Friday.  We will hear the

9    DCC's reactions to such a plan.

10        **THE COURT:**  Okay.

11        **MR. PETROSINELLI:**  Your Honor, this is Joe

12   Petrosinelli.  Could I just make a comment on that and

13   maybe just a couple of things on these bellwether issues?

14        **THE COURT:**  Yes.

15        **MR. PETROSINELLI:**  On the state AG issue, as

16   Mr. London said, we did get an outreach from the lawyers

17   who are representing AGs to ask about starting up some

18   kind of bellwether process.  And as Mr. London said, we

19   have our first meet and confer coming up.  I mean, my --

20   it's the defense view that we have a lot of other stuff

21   going on.

22        **THE COURT:**  Really?  I hadn't noticed that.

23        **MR. PETROSINELLI:**  I mean, the bellwethers on

24   the telomer water providers, the bellwethers on the

25   personal injuries, the US immunity motion.  So, I mean,

1  we're, of course, happy to talk to them.  But as

2  Mr. London said, it's not in the middle of discussions.  I

3  mean, we've just gotten this outreach.  And I mean, we'll

4  report back to the Court our views.  But our view is

5  generally that we'll wait and hear what they have to say

6  and we'll come back to the Court and talk about our

7  reaction.

8          **THE COURT:**  Okay.  Very good.  Anything else

9  from the defense on any of these other issues you wish to

10  comment, Mr. Petrosinelli?

11          **MR. PETROSINELLI:**  Just one thing, Your Honor.

12  On the -- nothing to deal with right now, but just in

13  terms of the personal injury bellwether cases.  As

14  Mr. London said, we have -- we're working together to come

15  up with -- try to come up with an agreed list of 28 cases.

16  And that's owed to the Court on December 1st.

17          I just wanted to let the Court know just one

18  thing has happened since we've submitted this Joint Status

19  Report, which is that in the last couple of days we've

20  gotten production of a number of blood test reports for

21  plaintiffs who are eligible.  There's about 500-and-some

22  plaintiffs who are eligible for selection.  And obviously,

23  PFAS blood levels is sort of a relevant fact in

24  determining representativeness of cases.  So we've just

25  gotten those and we're sort of working through as quickly

Case 7:23-cv-00897-RJ  Document 167-5  Filed 04/08/24  Page 14 of 32

1     as we can to look at them and consider them.  And I just

2     wanted the Court to know that.

3             We're going to try to continue to work to get

4     these selections to the Court on December 1st.  But that's

5     sort of a new piece of information that impacts, I think,

6     both sides, frankly, in terms of picking what are

7     representative cases.  It wasn't noted in the JSR because

8     this just happened in the last week, and I just wanted to

9     let the Court know that.

10            THE COURT:  You know, one of the things,

11    Mr. Petrosinelli, we recently discussed at the Judge's MDL

12    Conference in Florida this past week was that it's very

13    important when picking bellwethers that we pick cases that

14    are truly representative so that a result means something.

15    If we pick cases -- in the old days, they let the

16    plaintiffs pick their best case and the defense pick their

17    best case.  If it didn't come out the way the parties --

18    somebody liked, they blamed, well, it wasn't

19    representative.  So I think it's very important that we

20    pick cases that are not outliers, that they truly are

21    representative so they provide all of us some guidance as

22    to both liability and potential damages.

23            And I've always maintained through all of our

24    CMOs that in the end I'm going to make the choice.  And

25    that's just a backstop to make sure we have representative

1    cases.  And I know when we were picking for the first

2    round, ended up with the City of Stuart, you know, I

3    always reserve to the end that option.  And I reiterated

4    it to the parties and I thought y'all did a very good job.

5    Every case is going to have its unique quality.  But I do

6    think as we move to picking bellwethers first for the

7    telomer cases and then for the PI leach cases that we

8    really try to pick cases that the other side would find

9    the result meaningful.  So I think that's -- I just want

10   to reiterate that to counsel.

11           MR. PETROSINELLI:  Yes, thank you, Your Honor.

12   The defense totally agrees with that.  And I must say,

13   we've been working with the PEC I think pretty

14   cooperatively in trying to do that and not propose the

15   outlier cases.  So I hope, like I said, on these PI cases

16   where representativeness is to my mind particularly

17   important.  We hope to have an agreed list of 28 rather

18   than sort of competing lists.  But I totality agree with

19   Your Honor's sentiment on that.

20           THE COURT:  On the 28, how do they break down in

21   terms of different leach diseases?

22           MR. PETROSINELLI:  They are -- so remember there

23   are four leach injuries that are at sort of issue in these

24   28 cases.  And for three of them, kidney cancer,

25   testicular cancer, and thyroid disease, that would be

1    eight apiece, so that gets you to 24; and then four with

2    ulcerative colitis.  So that's the 28.

3         **THE COURT:**  I just want to remind y'all, I don't

4    have any fixed views on this.  But I don't want a case in

5    which the diseases are so different that the jurors would

6    become confused.  So when we're thinking about this, I am

7    going to have to -- we're going to have to -- I just want

8    to make sure that whatever we present to the jury is

9    comprehensible.  Because in a normal personal injury case,

10   you don't have multiple diseases trying to be analyzed at

11   the same time, some of which are quite different from each

12   other.

13        So let's just all keep that in our mind about

14   how do we ultimately get that down to bellwethers that

15   mean something.  And it may be that we will do different

16   bellwethers on different diseases.  I want to alert you

17   that I've had that concern not to overwhelm my jurors.

18        **MR. PETROSINELLI:**  Yes, Your Honor.  I think

19   that in terms of picking the cases themselves, just with

20   single plaintiffs, we're trying to avoid a situation, at

21   least on a defense side, where you have one plaintiff that

22   has two of these diseases instead of one.  Although that

23   wouldn't be disqualifying, it seems to me that would

24   complicate things.

25        And then, certainly, our view and we've talked

1  to Your Honor about this and certainly been to many MDL

2  judge conferences on this, that sort of having these

3  single plaintiff cases rather than with diseases rather

4  than binding cases together, certainly our view as to the

5  way to go, otherwise it sort of risks jury confusion, and

6  length of the trial, and the like.  So I think these are

7  all things we'll be talking about with the PEC.  But it's

8  good to have your views on it.

9           **THE COURT:**  Anything further, Mr. Petrosinelli,

10  from the defense committee?

11          **MR. PETROSINELLI:**  No, Your Honor.  Thank you

12  very much.

13          **THE COURT:**  Mr. London, did we finish with you?

14  Were there further things you wanted to cover?

15          **MR. LONDON:**  I think that covers it, Your Honor.

16  And certainly these conversations about the leach injury

17  trials and selection were in discussions last September

18  and how we group potential cases for trial.  And I think

19  the CMO is, you know, 26 is -- it sets that out well by

20  just limiting cases to two sites in the injury category.

21  So we will be guided towards keeping trials simple and

22  possibly with the multi-plaintiffs, I think your guidance

23  is helpful.

24          But in the report, nothing further, Your Honor.

25  Although, the last section, to the extent the Court has

Case 7:23-cv-00897-RJ   Document 167-5   Filed 04/08/24   Page 18 of 32

1    any questions, is a more detailed analysis of the

2    settlement posture on Pages 45 and 46.  Not sure if

3    there's anything beyond that that the Court wishes to

4    discuss.

5              THE COURT:  I've been -- obviously, I have

6    followed the filings regarding the efforts to communicate

7    with plaintiffs in the 3M and Dupont settlements.  I want

8    to commend y'all.  I think y'all are doing a very

9    comprehensive job.

10             It's very predictable that when money hits the

11   table, people who are strangers to us suddenly show up.

12   That is a well known phenomena and we'll address that and

13   address their issues as they arise.  But I think y'all are

14   doing a yeoman's work in trying to counteract

15   misinformation.

16             And it's a complicated settlement.  It's subject

17   to confusion.  And I think that the best anecdote to

18   misrepresentations is to be out there repeatedly telling

19   the story and telling it accurately and precisely.

20             MR. LONDON:  Well, thank you, Your Honor.  This

21   is certainly -- Mr. Petrosinelli noted that we're busy.

22   This is certainly another busy, busy front for some of us.

23   So I thank you and we'll continue apace.

24             MR. RICE:  Judge Gergel?

25             THE COURT:  Yes?

1           **MR. RICE:**  This is Joe.  When you're talking on

2      that, can we get some guidance at some point in time from

3      you on how you'd like to have the standards hearing

4      conducted, whether you're looking to hear from experts or

5      exactly what your interest is in the fairness hearing?

6           **THE COURT:**  Let's see what the objections are.

7      I think that's the key here.  And when I get the

8      objections in, that will help me sort out about what we

9      might need.  So I will alert you ahead of time if there

10     are specific people I want present.  But a lot of it is

11     going to be guided by objections that are made.

12          **MR. RICE:**  All right.  Thank you, sir.  And if I

13     can, Your Honor?  Since -- in the last two months we have

14     held two very well attended PEC meetings that had 60 to 70

15     attorneys in both.  One was held in Florida and one was

16     held here in Charleston.  And the group wants to get

17     together again in December.

18          The PEC is concerned about the growth of this

19     MDL, which I know Your Honor's also concerned about.  And

20     we also have defendants that are looking for us to be able

21     to give them a more comprehensive scope of relief than

22     just the -- the water providers are just one segment.  So

23     we're in the process of trying to get our arms around all

24     of the pieces of this MDL.

25          We have brought a lot of attention to people

Case 7:23-cv-00897-RJ  Document 167-5  Filed 04/08/24  Page 20 of 32

1   looking at their filings on the personal injury cases and

2   to the injuries that they have asserted.  And we are

3   trying to get people to dig down deeper on that and go

4   back and double check their science on it.  We appreciate

5   the involvement of Judge Seymour.  And we have been

6   dealing with her and hopefully getting her more up to

7   speed on what she is going to be focused on.

8           But we are concerned about not having more

9   tracks to move things simultaneously so we can get our

10  arms around it so we can help the defendants get a more

11  robust resolution instead of a piecemeal process.  So I

12  just wanted to bring to the Court's attention that those

13  are in process.  And at some point in time we would like

14  to revisit with the Court when we have our ducks a little

15  bit better, the concept of multi-tracking in order to try

16  to move this MDL in a reasonable period of time versus

17  what could end up being a decade.

18          **THE COURT:**  Well, I share your concern.  And

19  Mr. Rice, I want you to know that when I was at the

20  conference this year, multiple members of the

21  multi-district panel expressed concern to me that, you

22  know, they've been trying to put the brakes on the

23  expansion of the MDL, which I have encouraged them to do.

24  We've got to have some -- number one, we have to have some

25  limitation on what this MDL is.

Case 7:23-cv-00897-RJ   Document 167-5   Filed 04/08/24   Page 21 of 32

1          And then secondly, the defendants are entitled

2    to some peace if, you know, things are worked out.  And we

3    can't have this thing in sort of endless litigation where

4    there's never finality.

5          So I do think thinking strategically about how

6    we -- what's the end game here is important.  I'll be

7    candid with you, I do think we need to take a hard look at

8    sciences, of the science on personal injury cases, that

9    y'all have peer reviewed backup for connecting to AFFF.

10   All of us know that when you get down to personal injury

11   cases it gets more challenging than in something like the

12   water district cases.  Because the water districts don't

13   have to prove causation other than the cause that the

14   toxic chemical is in their water.  It gets more

15   complicated.

16          And because of the earlier work done and

17   regarding the Dupont case, we have these leach studies

18   that provides some data.  But when we get beyond that, and

19   I'm told these other personal injury cases have been

20   referred to as non-leach cases, you know, I do think we

21   need to bring some rigor to this thing and in trying to

22   design something that, you know, recovers -- that provides

23   recovery for injured people and provides defendant's

24   peace.  I think that big picture needs to be in our

25   sights.

1          **MR. RICE:**  And Your Honor, we recognize that --

2          (Indiscernible crosstalk.)

3          **MR. RICE:**  And we also want to move in that

4    direction.

5          **MR. LONDON:**  Sorry, Joe.  I was speaking over

6    you.  It's Michael London.

7          And Your Honor, I think that's noted as well in

8    CMO 26 and 26A plans.  And we discussed it with

9    defendants, with Joe, a plan to use the non-leach personal

10   injury cases.  And as Joe indicated, Judge Seymour, who

11   we've visited with a few times, is really getting up to

12   speed and I think is going to be very helpful and thank

13   the Court for that.

14         **THE COURT:**  And I will just be candid.  I told

15   Judge Seymour that if there is a significant difference

16   between plaintiffs and defendants on the merits and value

17   of these cases, you know, down the road I've obviously got

18   a lot going on here, down the road doing a bellwether or

19   two, you know, to ask the questions can they survive

20   Daubert?  Can they otherwise survive summary judgment?

21   That might be something that if the parties can't get

22   together, that's probably where we need to go.  And I'm

23   also open --

24         (Indiscernible crosstalk.)

25         **THE COURT:**  Let me also say, I have also

Case 7:23-cv-00897-RJ  Document 167-5  Filed 04/08/24  Page 23 of 32

1   mentioned to Judge Seymour that not right this moment, but

2   at some point it may be worthwhile to think about a

3   Science Day on those non-leach injuries to see just where

4   the science is.  And, you know, it's been a number of

5   years since the leach studies so there might be other data

6   out there worth looking at.

7          **MR. NAPOLI:**  And that's what -- this is Paul

8   Napoli.  That's what I was going to say, Judge.  A lot has

9   happened since leach, a lot of studies at universities,

10  federal studies from, you know, ATFDR, the CDC, but also

11  the universities, nationally and internationally.  And

12  we're learning a lot more about these chemicals that years

13  ago you couldn't test for in the blood at these levels and

14  years ago scientists weren't aware of.

15         So I hate to categorize things in leach and

16  non-leach.  It's sort of just levels of understanding.

17  And certainly we understand the rigors that you look for

18  when it comes to these types of injuries.  And we are

19  working with the defendants to try to come to some

20  agreement, not only on the plaintiffs, but the injuries

21  that would survive a Daubert challenge now.

22         And, of course, things happen today.  And as

23  science develops we hate to preclude people in the future

24  forever as science develops.  You know, a hundred years

25  ago or more, they didn't know mesothelioma was or they

Case 7:23-cv-00897-RJ  Document 167-5  Filed 04/08/24  Page 24 of 32

didn't know it was associated with asbestos. So, you
know, I think there's some of that going on here, too.
The science is developing not only at the water level and
understanding its consequences to humans, but also to
human health.

**THE COURT:** Well, you know, I thought -- we
spent a lot of time a couple of years ago working about
the Tyco factory settlement. And, you know, we dealt with
people who had exposure but no documented injury at that
time. And I thought that the parties were pretty creative
about fashioning a path where there might be some
compensation for exposure. There was a tolling of the
statute of limitations. And a possibility that if a
recognizable injury arose, the statute -- the case could
still be brought, the statute would have been tolled. So
I mean, I commend y'all to think back about those. I know
I drove Mr. Petrosinelli crazy reviving those documents.
But I really did think they were potentially our blueprint
for some of this.

**MR. NAPOLI:** And we certainly are talking, and
Judge Seymour is going to help us. And I think some of
the challenges come with is it national, is it site by
site, is it occupational, is it drinking water? And we're
trying to tackle some of those issues. So we are hard at
work even though, you know, we're not, you know, here in

Case 7:23-cv-00897-RJ   Document 167-5   Filed 04/08/24   Page 25 of 32

1  court talking about it for obvious reasons.  But we think

2  about those things on the plaintiff's side, and Mr. Rice

3  talked about our meeting a couple of weeks ago.  And we

4  meet regularly to try to work through these issues.  And

5  we're hard at work at it, Your Honor.

6          **THE COURT:**  Good.

7          **MR. PETROSINELLI:**  Your Honor, this is Joe

8  Petrosinelli.  I do remember you putting me through my

9  paces on the Tyco factory settlement.  I think, you know,

10  from the defense perspective, not to lighten the

11  conference today, but just one comment which is that I go

12  back to -- and I agree with what Mr. Rice said, which is

13  the problem is the sort of mushrooming of the filings,

14  particularly personal injury filings.  There are people

15  now -- I mean, there are over 200, I think, injuries that

16  people have alleged, which is just crazy, honestly.  And

17  the problem is when you get beyond the four leach

18  injuries, because you'll remember one of the leach

19  injuries was high cholesterol, which I think --

20          **THE COURT:**  Unmanageable, right?  You couldn't

21  do that.

22          **MR. PETROSINELLI:**  Just crazy in terms of the

23  science and the specific causation questions.  But you

24  remember the settlement we did on the Tyco factory thing,

25  which was just two years ago, it was the four leach

Case 7:23-cv-00897-RJ  Document 167-5  Filed 04/08/24  Page 26 of 32

1  injuries.  And then as Your Honor pointed out, we had some

2  provisions about people who just had exposure and didn't

3  have one of those injuries yet, that there were ways to

4  deal with that.

5         But I totally agree with the sentiment that Your

6  Honor expressed, and I'm sure we'll be talking to Judge

7  Seymour about, which is at some point we're going to have

8  to deal with the fact that there are people who are

9  alleging all these other injuries that weren't supported

10 by the leach panel, because the leach panel looked at all

11 these other injuries and didn't find anything, any

12 connection other than the four that we're talking about.

13        So I think at some point, whether it's through

14 agreement or teeing up Daubert proceedings, a Science Day

15 as you say, as Mr. Rice says, if we're going to wind down

16 this MDL as opposed to having it explode, we have to deal

17 with those situations.  And we'll be prepared to do it.

18        **THE COURT:**  And Mr. Petrosinelli, I want to

19 mention that to the extent you or the plaintiffs see the

20 panel preparing to add things that you think will, you

21 know, expand unnecessarily the scope of this MDL, I wish

22 you would alert me to it.  Because the panel wants to hear

23 from me if I have concerns.

24        **MR. PETROSINELLI:**  Will do, Your Honor.  Thank

25 you.

1      MR. LONDON:  And Your Honor, we went down this

2   road of these non-leach perfunctory cases -- I'm sorry,

3   this is Michael London.  And this has always been

4   something that the PEC has envisioned with the DCC

5   assessing, following the leach bellwether plants, and

6   frankly, working in parallel conjunction.

7          And I think Joe brought this up, Mr. Rice

8   brought this up, excuse me.  And I think our plan and the

9   DCC is on board with this is to assess these non-leach

10  injury cases as to which of the Mr. Petrosinelli indicated

11  200, which of the 200 injuries can and should be culled

12  out through some process, and then which have advanced in

13  the sciences Mr. Napoli was talking about.  Because those

14  leach studies started in 2005 and culminated in '12.  And

15  we are now 11 years post-leach, the leach studies CA

16  plaintiff's panel, so a lot has changed.

17          But suffice it to say, this is on our radar.

18  This was addressed in CMO 26.  And we will be working with

19  the defendants and Judge Seymour to come up with a plan to

20  advance the cases that should be advanced.  And we hope to

21  do that I think in the fist part of 2024, just to put this

22  on the Court's radar.  There's a lot going on and I think

23  that's the plan that we discussed with the defendants that

24  makes sense and will allow us to get our arms around it

25  and prep them as well.

1    THE COURT:  I mean, I don't think there is any

2    lawyer in a case who is following it closely has ignored

3    my order on In Re: Lipitor or orders, plural, on

4    causation.  I would just -- I believe that's the correct

5    standard.  It was affirmed by the Fourth Circuit.  It's

6    been a widely followed order around the country.  And I

7    just would say that's your roadmap.  That's the barrier

8    you have to overcome to establish causation.

9         MR. NAPOLI:  We thought so, Your Honor.  Thank

10   you.

11        MR. RICE:  Your Honor, this is Joe Rice.

12        THE COURT:  Yes, Mr. Rice?

13        MR. RICE:  One of the other concepts that we've

14   been looking at following up on the history around leach

15   is the medical monitoring process.  And a medical

16   monitoring process that tolls the statute of limitations

17   on injuries that science hasn't definitively gone one way

18   or the other on is something that we're also hoping to

19   discuss with the Court and the defendants.

20        THE COURT:  Mr. Rice, here's a complication --

21   there are several complications with medical monitoring.

22   One of them is, you know, unless it's voluntary, a lot of

23   states don't recognize it.  But to me, additionally

24   significant is the plaintiffs allege almost universal

25   exposure to PFAS.  If that's true, then we're talking

1  about medically monitoring every citizen in America.

2  That's not practical.  That's just not practical.

3          MR. RICE:  Agreed.

4          THE COURT:  Again, that's part of the

5  containment that we have to -- this is not like a discrete

6  regional area where we're monitoring.  This is the entire

7  United States, some would argue the entire world.

8          MR. RICE:  But we have before us a universe of

9  people that have come forward and made allegations that we

10  could unite in some type of class approach to limit it, to

11  give them some peace that they're scared now, they don't

12  know what's going to happen.  So we're just trying to

13  figure out how to address that side of the equation as

14  well.

15          THE COURT:  Well, I think it's worthy of y'all

16  talking among yourselves.  You know, again, medical

17  monitoring out of control is no relief.  I mean, that's

18  just -- that can be very expensive.  I think an

19  understanding that involves tolling statute of limitation,

20  now that, to me, would be an essential element there for

21  people who don't have a documented injury but have

22  documented exposure.

23          So, listen, I'm open to learning more.  There

24  have been a number of years since leach, so is there new

25  data that would meet Daubert standards?  Well, you know,

Case 7:23-cv-00897-RJ  Document 167-5  Filed 04/08/24  Page 30 of 32

1  at some point we could tee it up with some bellwethers.

2  And then we could have a definitive answer as to that.

3       Okay.  From the United States, is there anything

4  further, Ms. Falk?

5       **MS. FALK:**  No, Your Honor.

6       **THE COURT:**  Folks, in addition to all that we

7  have discussed and I'm sure most of you are aware of this,

8  that there is an insurance coverage dispute involving one

9  of the telomer defendants, Tyco.  And as if I didn't have

10  enough to do, I have determined I do have jurisdiction

11  over those coverage claims.  I'm not going to abstain.

12  And I'm going to have all the discovery done and the

13  briefing done on any coverage issues by June 1.  And I

14  intend to rule in advance of the bellwether trial because

15  I do think leaving the coverage issue unresolved presents

16  problems for resolution.  So I presume a whole nother set

17  of lawyers are involved in that from Tyco.  Is that

18  correct, Mr. Petrosinelli?

19       **MR. PETROSINELLI:**  Yes, Your Honor, it is.

20       **THE COURT:**  Yeah.  So, you know, as if I didn't

21  have enough to do, I'm now doing this.  But I do think --

22  if I didn't think it was important, I wouldn't be doing

23  it.  And I do think I'm persuaded that it is a necessary

24  set of decisions that need to be made to determine whether

25  there could be a negotiated resolution of the telomer

1  cases.

2          Okay.  Anything further to come before the

3  Court?  First from the plaintiff?

4          **MR. LONDON:**  Michael London, Your Honor.  I

5  don't believe so.  So thank you.

6          **THE COURT:**  Very good.

7          And from the defense?

8          **MR. PETROSINELLI:**  No, Your Honor.  Joe

9  Petrosinelli here.  Thank you.

10          **THE COURT:**  And Ms. Falk, again, you have

11  nothing further?

12          **MS. FALK:**  That's correct, Your Honor.  Thank

13  you.

14          **THE COURT:**  Everyone be safe.  This hearing is

15  adjourned.  Thank you.

16          **ATTORNEYS IN UNISON:**  Thank you, Your Honor.

17       (WHEREUPON, court was adjourned at 10:43 AM.)

18                              * * *

19  I certify that the foregoing is a correct transcript from

20  the record of proceedings in the above-entitled matter.

21     s/Karen E. Martin              10/31/2023

22  _____        _____
    Karen E. Martin, RMR, CRR         Date

23

24

25