# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**No. 7:23-cv-897**

| | |
|---|---|
| **IN RE: CAMP LEJEUNE WATER LITIGATION**<br><br>**This Document Relates to:**<br>**ALL PLAINTIFFS** | |

**PLAINTIFFS' REQUEST FOR DEFENDANT TO SUPPLEMENT DISCOVERY**
**(Fed. R. Civ. P. 26(e)(1))**

Plaintiffs, through Plaintiffs' Leadership Counsel, hereby request that Defendant supplement all discovery requests previously served in this action or any other disclosure obligations pursuant to Fed. R. Civ. P. 26(e)(1), including but not limited to Defendant's responses to requests for production Nos. 19 and 20 of Plaintiffs' corrected first requests for production served on October 4, 2023 which had been previously held in abeyance until Track 1 Plaintiffs were chosen, which has now occurred. Plaintiffs request that Defendant timely supplement with any new information not previously disclosed, information developed since the last disclosure/response, as well as any information previously requested and not yet produced, including documents you withheld under claims of privilege. Also, Plaintiffs request updated and consolidated detailed Privilege Logs for all documents withheld to date.

Respectfully submitted this the 28th day of March, 2024.

1

Respectfully submitted this 28th day of March, 2024.

/s/   J. Edward Bell, III
J. Edward Bell, III (admitted *pro hac vice*)
Bell Legal Group, LLC
219 Ridge St.
Georgetown, SC 29440
Telephone: (843) 546-2408
jeb@belllegalgroup.com

*Lead Counsel for Plaintiffs*


/s/   Elizabeth J. Cabraser
Elizabeth J. Cabraser (admitted *pro hac vice*)
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
ecabraser@lchb.com

*Co-Lead Counsel for Plaintiffs*


/s/   Robin L. Greenwald
Robin L. Greenwald (admitted *pro hac vice*)
Weitz & Luxenberg, P.C.
700 Broadway
New York, NY 10003
Telephone: 212-558-5802
rgreenwald@weitzlux.com

*Co-Lead Counsel for Plaintiffs*


/s/   Mona Lisa Wallace
Mona Lisa Wallace (N.C. Bar No.: 009021)
Wallace & Graham, P.A.
525 North Main Street
Salisbury, North Carolina 28144
Tel: 704-633-5244
mwallace@wallacegraham.com

*Co-Lead Counsel for Plaintiffs*


/s/   Zina Bash
Zina Bash (admitted *pro hac vice*)
Keller Postman LLC
111 Congress Avenue, Suite 500
Austin, TX 78701
Telephone: 956-345-9462
zina.bash@kellerpostman.com

*Co-Lead Counsel for Plaintiffs and
Government Liaison Counsel*


/s/   W. Michael Dowling
W. Michael Dowling (NC Bar No. 42790)
The Dowling Firm PLLC
Post Office Box 27843
Raleigh, North Carolina 27611
Telephone: (919) 529-3351
mike@dowlingfirm.com

*Co-Lead Counsel for Plaintiffs*


/s/   James A. Roberts, III
James A. Roberts, III (N.C. Bar No.:
10495)
Lewis & Roberts, PLLC
3700 Glenwood Avenue, Suite 410
P. O. Box 17529
Raleigh, NC 27619-7529
Telephone: (919) 981-0191
jar@lewis-roberts.com

*Co-Lead Counsel for Plaintiffs*

2

**CERTIFICATE OF SERVICE**

This is to certify that on the below-indicated date, I served a copy of the foregoing document upon counsel for the Defendant by electronic mail at the following electronic mail address: adam.bain@usdoj.gov.

/s/  J. Edward Bell, III

J. Edward Bell, III
*Lead Counsel for Plaintiffs*

Date: March 28, 2024.

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**No. 7:23-cv-897**

| | |
|---|---|
| **IN RE: CAMP LEJEUNE WATER LITIGATION**<br><br>**This Document Relates to:**<br>**ALL PLAINTIFFS** | |

**PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION FOR
TRACK 1 DISCOVERY PLAINTIFFS**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiffs request that Defendant respond to the following requests for production served for the Track 1 Discovery Plaintiffs who have alleged one or more of the Track 1 diseases herein (Leukemia, Kidney Cancer, Non-Hodgkin's Lymphoma, Bladder Cancer, Parkinson's Disease).

**REQUESTS FOR PRODUCTION**

1.      If the Defendant disputes the accuracy of the water modeling conducted by the Agency for Toxic Substances and Disease Registry ("ATSDR") with regard to Camp Lejeune, then please produce all Documents Defendant contends supports its position.

**RESPONSE:**

2.      If the Defendant disputes the reliability of the water modeling conducted by the ATSDR with regard to Camp Lejeune, then please produce all Documents Defendant contends supports its position.

**RESPONSE:**

1

3.      If the Defendant disputes the results of the water modeling conducted by the ATSDR with regard to Camp Lejeune, then please produce all Documents Defendant contends supports its position.

**RESPONSE:**


4.      If the Defendant disputes the accuracy of the health assessments conducted by the ATSDR with regard to Camp Lejeune, then please produce all Documents Defendant contends supports its position.

**RESPONSE:**


5.      If the Defendant disputes the reliability of the health assessments conducted by the ATSDR with regard to Camp Lejeune, then please produce all Documents Defendant contends supports its position.

**RESPONSE:**


6.      If the Defendant disputes the relevance or the reliability of the ATSDR's water distribution system modeling to assess the health risks associated with contaminants in the water at Camp Lejeune, then please produce all Documents Defendant contends supports its position.

**RESPONSE:**


7.      If the Defendant disputes the relevance or the reliability of the ATSDR's epidemiological studies to assess the health risks associated with contaminants in the water at Camp Lejeune, then please produce all Documents Defendant contends supports its position.

2

**RESPONSE:**


8.      If Defendant disputes whether the groundwater modeling conducted by the ATSDR for Camp Lejeune used reliable scientific methodologies, then please produce all Documents Defendant contends supports its position.

**RESPONSE:**


9.      As Defendant is aware, in 2017 the ATSDR released its report entitled, "ATSDR Assessment of the Evidence for the Drinking Water Contaminants at Camp Lejeune and Specific Cancers and Other Diseases," dated January 13, 2017, available at the ATSDR website (the "2017 ATSDR Assessment"). If Defendant disputes whether the 2017 ATSDR Assessment used reliable scientific methodologies, then please produce all Documents Defendant contends supports its position.

**RESPONSE:**


10.     As Defendant is aware, in 2018 the ATSDR released its report entitled, "Morbidity Study of Former Marines, Employees, and Dependents Potentially Exposed to Contaminated Drinking Water at U.S. Marine Corps Base Camp Lejeune," dated April 2018.  If Defendant disputes whether this 2018 ATSDR report used reliable scientific methodologies, then please produce all Documents Defendant contends supports its position.

**RESPONSE:**

11.     As Defendant is aware, the 2017 ATSDR Assessment determined the association between TCE exposure and Kidney Cancer was sufficient evidence for causation. If Defendant

disputes this finding in the 2017 ATSDR Assessment, then please produce all Documents Defendant contends supports its position.

**RESPONSE:**


12.     As Defendant is aware, the 2017 ATSDR Assessment determined the association between TCE exposure and Non-Hodgkin Lymphoma was sufficient evidence for causation. If Defendant disputes this finding in the 2017 ATSDR Assessment, then please produce all Documents Defendant contends supports its position.

**RESPONSE:**


13.     As Defendant is aware, the 2017 ATSDR Assessment determined the association between PCE exposure and Non-Hodgkin Lymphoma was equipoise and above for causation. If Defendant disputes this finding in the 2017 ATSDR Assessment, then please produce all Documents Defendant contends supports its position.

**RESPONSE:**


14.     As Defendant is aware, the 2017 ATSDR Assessment determined that for benzene, there was sufficient evidence for causation generally. If Defendant disputes this finding in the 2017 ATSDR Assessment, then please produce all Documents Defendant contends supports its position.

**RESPONSE:**


15.     As Defendant is aware, the 2017 ATSDR Assessment determined the association between TCE exposure and Multiple Myeloma was equipoise and above for causation. If Defendant

disputes this finding in the 2017 ATSDR Assessment, then please produce all Documents Defendant contends supports its position.

**RESPONSE:**


16.     As Defendant is aware, the 2017 ATSDR Assessment determined the association between benzene exposure and Multiple Myeloma was equipoise and above for causation. If Defendant disputes this finding in the 2017 ATSDR Assessment, then please produce all Documents Defendant contends supports its position.

**RESPONSE:**


17.     As Defendant is aware, the 2017 ATSDR Assessment determined the association between TCE exposure and all types of Leukemias was equipoise and above for caution. If Defendant disputes this finding in the 2017 ATSDR Assessment, then produce all Documents Defendant contends supports its position.

**RESPONSE:**


18.     As Defendant is aware, the 2017 ATSDR Assessment determined  the association between benzene and all types of Leukemias was sufficient evidence for causation.  If Defendant disputes this finding in the 2017 ATSDR Assessment, then please produce all documents Defendant contends supports its position.

**RESPONSE:**

5

19.     As Defendant is aware, the 2017 ATSDR Assessment determined the association between TCE and Liver Cancer was equipoise and above evidence for causation. If Defendant disputes this finding in the 2017 ATSDR Assessment, then please produce all documents Defendant contends supports its position.

**RESPONSE:**


20.     As Defendant is aware, the public VA website includes a statement that as to "Adult leukemia,… Bladder cancer, Kidney cancer,… Non-Hodgkin's lymphoma" and "Parkinson's disease" the "Evidence shows a link between these conditions and exposure to chemicals found in the drinking water at Camp Lejeune and MCAS New River during this time." If Defendant disputes this VA website statement, then please produce all documents Defendant contends supports its position.

**RESPONSE:**


        Respectfully submitted this 28th day of March, 2024.

/s/   J. Edward Bell, III
J. Edward Bell, III (admitted *pro hac vice*)
Bell Legal Group, LLC
219 Ridge St.
Georgetown, SC 29440
Telephone: (843) 546-2408
jeb@belllegalgroup.com

*Lead Counsel for Plaintiffs*


/s/   Elizabeth J. Cabraser

/s/   Zina Bash
Zina Bash (admitted *pro hac vice*)
Keller Postman LLC
111 Congress Avenue, Suite 500
Austin, TX 78701
Telephone: 956-345-9462
zina.bash@kellerpostman.com

*Co-Lead Counsel for Plaintiffs and Government Liaison Counsel*


/s/   W. Michael Dowling

6

Elizabeth J. Cabraser (admitted *pro hac vice*)
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
ecabraser@lchb.com

*Co-Lead Counsel for Plaintiffs*

/s/   Robin L. Greenwald
Robin L. Greenwald (admitted *pro hac vice*)
Weitz & Luxenberg, P.C.
700 Broadway
New York, NY 10003
Telephone: 212-558-5802
rgreenwald@weitzlux.com

*Co-Lead Counsel for Plaintiffs*

/s/   Mona Lisa Wallace
Mona Lisa Wallace (N.C. Bar No.: 009021)
Wallace & Graham, P.A.
525 North Main Street
Salisbury, North Carolina 28144
Tel: 704-633-5244
mwallace@wallacegraham.com

*Co-Lead Counsel for Plaintiffs*

W. Michael Dowling (NC Bar No. 42790)
The Dowling Firm PLLC
Post Office Box 27843
Raleigh, North Carolina 27611
Telephone: (919) 529-3351
mike@dowlingfirm.com

*Co-Lead Counsel for Plaintiffs*

/s/   James A. Roberts, III
James A. Roberts, III (N.C. Bar No.:
10495)
Lewis & Roberts, PLLC
3700 Glenwood Avenue, Suite 410
P. O. Box 17529
Raleigh, NC 27619-7529
Telephone: (919) 981-0191
jar@lewis-roberts.com

*Co-Lead Counsel for Plaintiffs*

7

**CERTIFICATE OF SERVICE**

This is to certify that on the below-indicated date, I served a copy of the foregoing document upon counsel for the Defendant by electronic mail at the following electronic mail address: adam.bain@usdoj.gov.

/s/  J. Edward Bell, III

J. Edward Bell, III
*Lead Counsel for Plaintiffs*

Date: March 28, 2024.

# Exhibit 3

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**No. 7:23-cv-897**

| | |
|---|---|
| **IN RE: CAMP LEJEUNE WATER LITIGATION** <br><br> **This Document Relates to:** <br> **ALL PLAINTIFFS** | |

**PLAINTIFFS' SECOND SET OF INTERROGATORIES FOR**
**TRACK 1 DISCOVERY PLAINTIFFS**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiffs request that Defendant respond to the following interrogatories for the Track 1 Discovery Plaintiffs who have alleged one or more of the Track 1 diseases herein (Leukemia, Kidney Cancer, Non-Hodgkin's Lymphoma, Bladder Cancer, Parkinson's Disease).

## INTERROGATORIES

1.      If the Defendant disputes the accuracy of the water modeling conducted by the Agency for Toxic Substances and Disease Registry ("ATSDR") with regard to Camp Lejeune, then please describe in detail all factual bases on which Defendant relies, identify any persons with knowledge on the issue, and identify all Documents Defendant contends supports its position.

**RESPONSE:**


2.      If the Defendant disputes the reliability of the water modeling conducted by the ATSDR with regard to Camp Lejeune, then please describe in detail all factual bases on which Defendant relies, identify any persons with knowledge on the issue, and identify all Documents Defendant contends supports its position.

**RESPONSE:**

1

3.     If the Defendant disputes the results of the water modeling conducted by the ATSDR with regard to Camp Lejeune, then please describe in detail all factual bases on which Defendant relies, identify any persons with knowledge on the issue, and identify all Documents Defendant contends supports its position.

**RESPONSE:**


4.     If the Defendant disputes the accuracy of the health assessments conducted by the ATSDR with regard to Camp Lejeune, then please describe in detail all factual bases on which Defendant relies, identify any persons with knowledge on the issue, and identify all Documents Defendant contends supports its position.

**RESPONSE:**


5.     If the Defendant disputes the reliability of the health assessments conducted by the ATSDR with regard to Camp Lejeune, then please describe in detail all factual bases on which Defendant relies, identify any persons with knowledge on the issue, and identify all Documents Defendant contends supports its position.

**RESPONSE:**

6.     If the Defendant disputes the relevance or the reliability of the ATSDR's water distribution system modeling to assess the health risks associated with contaminants in the water at Camp Lejeune, then please describe in detail all factual bases on which Defendant relies, identify any persons with knowledge on the issue, and identify all Documents Defendant contends supports its position.

2

**RESPONSE:**


7.     If the Defendant disputes the relevance or the reliability of the ATSDR's epidemiological studies to assess the health risks associated with contaminants in the water at Camp Lejeune, then please describe in detail all factual bases on which Defendant relies, identify any persons with knowledge on the issue, and identify all Documents Defendant contends supports its position.

**RESPONSE:**


8.     If Defendant disputes whether the groundwater modeling conducted by the ATSDR for Camp Lejeune used reliable scientific methodologies, then please describe in detail all factual bases on which Defendant relies, identify any persons with knowledge on the issue, and identify all Documents Defendant contends supports its position.

**RESPONSE:**


9.     As Defendant is aware, in 2017 the ATSDR released its report entitled, "ATSDR Assessment of the Evidence for the Drinking Water Contaminants at Camp Lejeune and Specific Cancers and Other Diseases," dated January 13, 2017, available at the ATSDR website (the "2017 ATSDR Assessment"). If Defendant disputes whether the 2017 ATSDR Assessment used reliable scientific methodologies, then please describe in detail all factual bases on which Defendant relies, identify any persons with knowledge on the issue, and identify all Documents Defendant contends supports its position.

**RESPONSE:**

3

10. As Defendant is aware, in 2018 the ATSDR released its report entitled, "Morbidity Study of Former Marines, Employees, and Dependents Potentially Exposed to Contaminated Drinking Water at U.S. Marine Corps Base Camp Lejeune," dated April 2018. If Defendant disputes whether this 2018 ATSDR report used reliable scientific methodologies, then please describe in detail all factual bases on which Defendant relies, identify any persons with knowledge on the issue, and identify all Documents Defendant contends supports its position.

**RESPONSE:**


11. As Defendant is aware, the 2017 ATSDR Assessment determined the association between TCE exposure and Kidney Cancer was sufficient evidence for causation. If Defendant disputes this finding in the 2017 ATSDR Assessment, then please describe in detail all factual bases on which Defendant relies, identify any persons with knowledge on the issue, and identify all Documents Defendant contends supports its position.

**RESPONSE:**


12. As Defendant is aware, the 2017 ATSDR Assessment determined the association between TCE exposure and Non-Hodgkin Lymphoma was sufficient evidence for causation. If Defendant disputes this finding in the 2017 ATSDR Assessment, then please describe in detail all factual bases on which Defendant relies, identify any persons with knowledge on the issue, and identify all Documents Defendant contends supports its position.

**RESPONSE:**

4

13.     As Defendant is aware, the 2017 ATSDR Assessment determined the association between PCE exposure and Non-Hodgkin Lymphoma was equipoise and above for causation.  If Defendant disputes this finding in the 2017 ATSDR Assessment, then please describe in detail all factual bases on which Defendant relies, identify any persons with knowledge on the issue, and identify all Documents Defendant contends supports its position.

**RESPONSE:**


14.     As Defendant is aware, the 2017 ATSDR Assessment determined that for benzene, there was sufficient evidence for causation generally. If Defendant disputes this finding in the 2017 ATSDR Assessment, then please describe in detail all factual bases on which Defendant relies, identify any persons with knowledge on the issue, and identify all Documents Defendant contends supports its position.

**RESPONSE:**


15.     As Defendant is aware, the 2017 ATSDR Assessment determined the association between TCE exposure and Multiple Myeloma was equipoise and above for causation.  If Defendant disputes this finding in the 2017 ATSDR Assessment, then please describe in detail all factual bases on which Defendant relies, identify any persons with knowledge on the issue, and identify all Documents Defendant contends supports its position.

**RESPONSE:**


16.     As Defendant is aware, the 2017 ATSDR Assessment determined the association between benzene exposure and Multiple Myeloma was equipoise and above for causation. If

Defendant disputes this finding in the 2017 ATSDR Assessment, then please describe in detail all factual bases on which Defendant relies, identify any persons with knowledge on the issue, and identify all Documents Defendant contends supports its position.

**RESPONSE:**

17.     As Defendant is aware, the 2017 ATSDR Assessment determined the association between TCE exposure and all types of Leukemias was equipoise and above for caution. If Defendant disputes this finding in the 2017 ATSDR Assessment, then please describe in detail all factual bases on which Defendant relies, identify any persons with knowledge on the issue, and identify all Documents Defendant contends supports its position.

**RESPONSE:**

18.     As Defendant is aware, the 2017 ATSDR Assessment determined the association between benzene and all types of Leukemias was sufficient evidence for causation.  If Defendant disputes this finding in the 2017 ATSDR Assessment, then please describe in detail all factual bases on which Defendant relies, identify any persons with knowledge on the issue, and identify all documents Defendant contends supports its position.

**RESPONSE:**

19.     As Defendant is aware, the 2017 ATSDR Assessment determined the association between TCE and Liver Cancer was equipoise and above evidence for causation.  If Defendant disputes this finding in the 2017 ATSDR Assessment, then please describe in detail all factual bases

6

on which Defendant relies, identify any persons with knowledge on the issue, and identify all documents Defendant contends supports its position.

**RESPONSE:**


20.     As Defendant is aware, the public VA website includes a statement that as to "Adult leukemia,... Bladder cancer, Kidney cancer,... Non-Hodgkin's lymphoma" and "Parkinson's disease" the "Evidence shows a link between these conditions and exposure to chemicals found in the drinking water at Camp Lejeune and MCAS New River during this time." If Defendant disputes this VA website statement, then please describe in detail all factual bases on which Defendant relies, identify any persons with knowledge on the issue, and identify all documents Defendant contends supports its position.

**RESPONSE:**


Respectfully submitted this 28th day of March, 2024.

| | |
|---|---|
| */s/   J. Edward Bell, III* | */s/   Zina Bash* |
| J. Edward Bell, III (admitted *pro hac vice*) | Zina Bash (admitted *pro hac vice*) |
| Bell Legal Group, LLC | Keller Postman LLC |
| 219 Ridge St. | 111 Congress Avenue, Suite 500 |
| Georgetown, SC 29440 | Austin, TX 78701 |
| Telephone: (843) 546-2408 | Telephone: 956-345-9462 |
| jeb@belllegalgroup.com | zina.bash@kellerpostman.com |
| | |
| *Lead Counsel for Plaintiffs* | *Co-Lead Counsel for Plaintiffs and Government Liaison Counsel* |
| | |
| */s/   Elizabeth J. Cabraser* | */s/   W. Michael Dowling* |

7

Elizabeth J. Cabraser (admitted *pro hac vice*)
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
ecabraser@lchb.com

*Co-Lead Counsel for Plaintiffs*

/s/   Robin L. Greenwald

Robin L. Greenwald (admitted *pro hac vice*)
Weitz & Luxenberg, P.C.
700 Broadway
New York, NY 10003
Telephone: 212-558-5802
rgreenwald@weitzlux.com

*Co-Lead Counsel for Plaintiffs*

/s/   Mona Lisa Wallace

Mona Lisa Wallace (N.C. Bar No.: 009021)
Wallace & Graham, P.A.
525 North Main Street
Salisbury, North Carolina 28144
Tel: 704-633-5244
mwallace@wallacegraham.com

*Co-Lead Counsel for Plaintiffs*

W. Michael Dowling (NC Bar No. 42790)
The Dowling Firm PLLC
Post Office Box 27843
Raleigh, North Carolina 27611
Telephone: (919) 529-3351
mike@dowlingfirm.com

*Co-Lead Counsel for Plaintiffs*

/s/   James A. Roberts, III

James A. Roberts, III (N.C. Bar No.:
10495)
Lewis & Roberts, PLLC
3700 Glenwood Avenue, Suite 410
P. O. Box 17529
Raleigh, NC 27619-7529
Telephone: (919) 981-0191
jar@lewis-roberts.com

*Co-Lead Counsel for Plaintiffs*

8

**CERTIFICATE OF SERVICE**

This is to certify that on the below-indicated date, I served a copy of the foregoing document upon counsel for the Defendant by electronic mail at the following electronic mail address: adam.bain@usdoj.gov.

/s/  *J. Edward Bell, III*

J. Edward Bell, III
*Lead Counsel for Plaintiffs*

Date: March 28, 2024.

# Exhibit 4

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**No. 7:23-cv-897**

| | |
|---|---|
| **IN RE: CAMP LEJEUNE WATER LITIGATION** <br><br> **This Document Relates to:** <br> **ALL PLAINTIFFS** | |

**PLAINTIFFS' REQUESTS FOR ADMISSION**
**FOR TRACK 1 DISCOVERY PLAINTIFFS**

Pursuant to Rules 33 and 36 of the Federal Rules of Civil Procedure, Plaintiffs request that Defendant respond to the following Requests for Admissions for the Track 1 Discovery Plaintiffs who have alleged one or more of the Track 1 diseases herein (Leukemia, Kidney Cancer, Non-Hodgkin's Lymphoma, Bladder Cancer, Parkinson's Disease).

## REQUESTS FOR ADMISSION

Please admit the following:

1.      Admit that Congress created the Agency for Toxic Substances and Disease Registry ("ATSDR") in 1980 as part of the Comprehensive Environmental Response, Compensation, and Liability ("CERCLA") Act of 1980, to implement the health-related sections of laws that protect the public from hazardous wastes and environmental spills of hazardous substances.

**RESPONSE**:


2.      Admit that the ATSDR is a federal public health agency within the United States Department of Health and Human Services ("HHS").

**RESPONSE**:

1

3.     Admit that HHS is a cabinet-level executive branch department of the U.S. federal government created to protect the health of the U.S. people.

**<u>RESPONSE</u>**:


4.     Admit that the ATSDR has estimated that as many as one million people may have been exposed to contaminated water at Camp Lejeune, including service members, civilian staff, and their respective families and dependents.

**<u>RESPONSE</u>**:


5.     Admit that the U.S. Environmental Protection Agency ("EPA") is an agency of the U.S. federal government that protects people and the environment from significant health risks, sponsors and conducts research and develops and enforces environmental regulations.

**<u>RESPONSE</u>**:


6.     Admit that CERCLA, also known as the "Superfund Act," provided a Congressional mandate to remove or clean up abandoned and inactive hazardous waste sites and to provide federal assistance in toxic emergencies.

**<u>RESPONSE</u>**:


7.     Admit that a "Superfund Site" is a location contaminated by hazardous waste that has been designated by the EPA for management and cleanup and is listed on EPA's National Priorities List ("NPL") of sites.

**<u>RESPONSE</u>**:

2

8.     Admit that Camp Lejeune was designated by the EPA as an NPL (Superfund) site in 1989.

**<u>RESPONSE</u>**:


9.     Admit that amendments made to the Resource Conservation and Recovery Act of 1976 ("RCRA") authorized the ATSDR to conduct public health assessments at NPL (Superfund) Sites.

**<u>RESPONSE</u>**:


10.     Admit that the ATSDR has been and is authorized to assist the EPA in determining the levels at which substances may pose a threat to human health.

**<u>RESPONSE</u>**:


11.     Admit that the ATSDR has conducted groundwater modeling to assess the health risks associated with contaminants in the water at Camp Lejeune.

**<u>RESPONSE</u>**:


12.     Admit that the ATSDR has conducted fate and transport modeling to assess the health risks associated with contaminants in the water at Camp Lejeune.

**<u>RESPONSE</u>**:


13.     Admit that the ATSDR has conducted water distribution system modeling to assess the health risks associated with contaminants in the water at Camp Lejeune.

**<u>RESPONSE</u>**:

3

14.    Admit that the ATSDR conducted epidemiological studies to assess the health risks associated with contaminants in the water at Camp Lejeune.

**RESPONSE**:


15.    Admit that the groundwater modeling conducted by the ATSDR for Camp Lejeune used reliable scientific methodologies.

**RESPONSE**:


16.    Admit that the groundwater modeling conducted by the ATSDR for Camp Lejeune used modeling standards in the fields of groundwater flow, contaminant fate and transport, and water distribution system analysis.

**RESPONSE:**


17.    Admit that the groundwater modeling conducted by the ATSDR for Camp Lejeune used accepted modeling standards in the fields of groundwater flow, contaminant fate and transport, and water distribution system analysis.

**RESPONSE**:


18.    Admit that the numerical groundwater flow model referred to as MODFLOW was developed by the U.S. Geological Survey and is in the public domain.

**RESPONSE**:


4

19.     Admit that MODFLOW and its publicly available variants are considered an accepted method for modeling, simulating, and predicting groundwater flow conditions and groundwater/surface-water interactions.

**RESPONSE**:


20.     Admit that MODFLOW is a thoroughly documented modeling tool in the public domain that can be used to evaluate and predict the flow of groundwater under steady state and transient state conditions.

**RESPONSE**:


21.     Admit that MT3DMS is a model was developed by the U.S. Army Engineer Research and Development Center, Vicksburg, MS, in 1999.

**RESPONSE**:


22.     Admit that MT3DMS is a three-dimensional multi-species solute transport model for solving advection, dispersion, and chemical reactions of contaminants in saturated groundwater flow systems.

**RESPONSE**:


23.     Admit that MT3DMS is a well-documented modeling tool, available in the public domain and used to evaluate and predict fate and transport of contaminants in groundwater.

**RESPONSE**:

5

24.     Admit that MT3DMS can interface directly with the U.S. Geological Survey finite-difference groundwater flow model MODFLOW.

**<u>RESPONSE</u>**:


25.     Admit that since its first release in 1990 as MT3D for single-species mass transport modeling, MT3DMS has been widely used in research projects and practical field applications.

**<u>RESPONSE</u>**:


26.     Admit that the groundwater modeling conducted by the ATSDR for Camp Lejeune used scientifically reliable methodologies, including, MT3DMS, and EPANET, that are in the public domain and that are accepted modeling methods in the fields of groundwater flow, contaminant fate and transport, and water-distribution system analysis.

**<u>RESPONSE</u>**:


27.     Admit that the water supply wells used at Camp Lejeune historically created "cones of depression" within the Tarawa Terrace Aquifer and Castle Hayne Aquifer Systems (known as potentiometric or piezometric surfaces).

**<u>RESPONSE</u>**:


28.     Admit the ATSDR has found that hazardous materials, including industrial solvents, contaminated the groundwater that supplied wells used by the Tarawa Terrace and Hadnot Point Water Treatment Plants ("WTPs") at Camp Lejeune historically.

**<u>RESPONSE</u>**:

29.     Admit that the water supplied to Camp Lejeune by the Tarawa Terrace and Hadnot Point WTPs historically contained industrial solvents, including tetrachloroethylene (perchloroethylene or PCE), trichloroethylene (TCE), *trans*-1,2-dichloroethylene (1,2-tDCE), vinyl chloride, and benzene.

**<u>RESPONSE</u>**:


30.     Admit that three water distribution systems, named the Tarawa Terrace, Hadnot Point, and Holcomb Boulevard systems, supplied drinking water to the majority of base family housing units, enlisted personnel barracks, workplaces, and common places at Camp Lejeune during the time period beginning on August 1, 1953, and ending on December 31, 1987.

**<u>RESPONSE</u>**:


31.     Admit that three water distribution systems (Tarawa Terrace, Hadnot Point, and Holcomb Boulevard) supplied drinking water to the majority of base family housing units, enlisted personnel barracks, workplaces, and common places at Camp Lejeune during the time period alleged at Short Form Complaint ¶¶ 13-14 of each Track 1 Plaintiff's Short Form Complaint.

**<u>RESPONSE</u>**:


32.     Admit that over time, hazardous materials, including industrial solvents, contaminated the groundwater that supplied water supply wells that were historically used by the Tarawa Terrace and Hadnot Point WTPs at Camp Lejeune including between 1953 and 1987.

**<u>RESPONSE</u>**:


7

33.    Admit that in the early 1980s, it was discovered that two on-base water-supply systems at Camp Lejeune were contaminated with the volatile organic compounds (VOCs) trichloroethylene (TCE), a metal degreaser, and perchloroethylene (PCE), a dry cleaning agent. The main source of TCE contamination was on-base industrial activities, while the main source of PCE was an off-base dry cleaning facility.  Benzene, vinyl chloride, and other VOCs were also found to be contaminating the water-supply systems.  These water systems served housing, administrative, and recreational facilities, as well as the base hospital.

**RESPONSE**:


34.    Admit that as the ATSDR summarized at page three of its report entitled, "ATSDR Assessment of the Evidence for the Drinking Water Contaminants at Camp Lejeune and Specific Cancers and Other Diseases," and dated January 13, 2017, a true and accurate copy of which is available at the ATSDR website (the "2017 ATSDR Assessment") that the Hadnot Point treatment plant provided drinking water to the main portion of the base at Camp Lejeune, including most of the barracks and workplaces.

**RESPONSE**:


35.    Admit that as described in the 2017 ATSDR Assessment, samples of the Hadnot Point distribution system were conducted by the base in May and July 1982, December 1984, and throughout 1985. During the 1982 sampling, measured levels of TCE and PCE in the distribution system of Hadnot Point were as high as 1,400 ppb and 100 ppb, respectively. Vinyl chloride and benzene were also detected in the Hadnot Point distribution system during sampling conducted on or after December 1984.

8

**RESPONSE**:


36.    Admit that as described in the 2017 ATSDR Assessment, the Tarawa Terrace treatment plant provided drinking water to the Tarawa Terrace housing area at the base.

**RESPONSE**:


37.    Admit that as described in the 2017 ATSDR Assessment, samples of the Tarawa Terrace distribution system were conducted by the base in May and July 1982, and February 1985 onward. During the July 1982 distribution system sampling, PCE was measured as high as 104 ppb and reached a maximum of 215 ppb during the February 1985 sampling.

**RESPONSE:**


38.    Admit that the 2017 ATSDR Assessment is admissible under the Federal Rules of Evidence.

**RESPONSE:**


39.    Admit that the ATSDR-published study entitled, "Morbidity Study of Former Marines, Employees, and Dependents Potentially Exposed to Contaminated Drinking Water at U.S. Marine Corps Base Camp Lejeune," and dated April 2018, is admissible under the Federal Rules of Evidence.

**RESPONSE:**

9

40.     Admit that the water supplied to Camp Lejeune by the Tarawa Terrace and Hadnot Point WTPs during the time period alleged at Short Form Complaint ¶¶ 13-14 for each Track 1 Plaintiff, contained industrial solvents, including tetrachloroethylene (also known as perchloroethylene or PCE), trichloroethylene (TCE), *trans*-1,2-dichloroethylene (1,2-tDCE), vinyl chloride, and/or benzene.

**RESPONSE**:


41.     Admit that the ATSDR has determined that there is at least some evidence connecting certain chemicals detected in Camp Lejeune's water supply to illnesses and injuries, including the five Track 1 diseases (leukemia, non-Hodgkin's lymphoma, bladder cancer, kidney cancer, and Parkinson's disease).

**RESPONSE**:


42.     Admit that general causation means the ability of a substance to cause a disease in people generally.

**RESPONSE**:


43.     Admit that in the 2017 ATSDR Assessment, the ATSDR determined the association between TCE exposure and Kidney Cancer was sufficient evidence for causation.

**RESPONSE**:


44.     Admit that in the 2017 ATSDR Assessment, the ATSDR determined the association between TCE exposure and Non-Hodgkin Lymphoma was sufficient evidence for causation.

10

**RESPONSE**:


45.     Admit that in the 2017 ATSDR Assessment, the ATSDR determined that the association between PCE exposure and Non-Hodgkin Lymphoma was equipoise and above evidence for causation.

**RESPONSE**:


46.     Admit that in the 2017 ATSDR Assessment, the ATSDR determined that with regard to exposure of benzene, there was sufficient evidence for causation.

**RESPONSE**:


47.     Admit that in the 2017 ATSDR Assessment, the ATSDR determined the association between TCE exposure and Multiple Myeloma was equipoise and above evidence for causation.

**RESPONSE**:


48.     Admit that in the 2017 ATSDR Assessment, the ATSDR determined the association between benzene and Multiple Myeloma was equipoise and above evidence for causation.

**RESPONSE**:


49.     Admit that in the 2017 ATSDR Assessment, the ATSDR determined the association between TCE exposure and all types of Leukemias was equipoise and above evidence for causation.

**RESPONSE**:


11

50.     Admit that in the 2017 ATSDR Assessment, the ATSDR determined the association between benzene exposure and all types of Leukemias was sufficient evidence for causation for all types of Leukemia generally.

**RESPONSE**:


51.     Admit that in the 2017 ATSDR Assessment, the ATSDR determined the association between TCE exposure and Liver Cancer was equipoise and above evidence for causation generally.

**RESPONSE**:


52.     Admit that true and accurate copies of the ATSDR-published studies are located online at the website address of the ATSDR for the public to view.

**RESPONSE:**


53.     Admit that the public may rely on the contents of the ATSDR website.

**RESPONSE:**

54.     Admit that Defendant agrees with the reliability of the findings made by the ATSDR in the study entitled, "Assessment of the Evidence for the Drinking Water Contaminants at Camp Lejeune and Specific Cancers and Other Diseases," dated January 13, 2017.

**RESPONSE**:


55.     Admit that the ATSDR-published study entitled, "Morbidity Study of Former Marines, Employees, and Dependents Potentially Exposed to Contaminated Drinking Water at U.S.

Marine Corps Base Camp Lejeune," dated April 2018 is admissible under the Federal Rules of Evidence.

**RESPONSE:**

56. Admit that the ATSDR website states in part that "Health effects with sufficient evidence for causation for TCE" include "Kidney cancer."

**RESPONSE:**

57. Admit there is sufficient evidence to show that exposure to TCE can cause kidney cancer.

**RESPONSE:**

58. Admit that the ATSDR website states in part that "Health effects with sufficient evidence for causation for TCE" include "Non-Hodgkin lymphoma."

**RESPONSE:**

59. Admit there is sufficient evidence to show that exposure to TCE can cause Non-Hodgkin Lymphoma.

**RESPONSE:**

60. Admit that the ATSDR website states in part that "Health effects with sufficient evidence for causation for PCE" include "Bladder cancer."

**RESPONSE:**

13

61.     Admit there is sufficient evidence to show that exposure to PCE can cause bladder cancer.

**RESPONSE:**


62.     Admit that the ATSDR website states in part that "Health effects with sufficient evidence for causation for benzene" include "Leukemias."

**RESPONSE:**


63.     Admit there is sufficient evidence to show that exposure to benzene can cause leukemia.

**RESPONSE:**


64.     Admit that the ATSDR website states in part that "Health effects with sufficient evidence for causation for benzene" include "Non-Hodgkin lymphoma."

**RESPONSE:**


65.     Admit there is sufficient evidence to show that exposure to benzene can cause Non-Hodgkin Lymphoma.

**RESPONSE:**


66.     Admit that the ATSDR website states in part that "Health effects with sufficient evidence for causation for vinyl chloride" include "Liver cancer."

**RESPONSE:**

14

67.    Admit there is sufficient evidence to show that exposure to vinyl chloride can cause liver cancer.

**RESPONSE:**


68.    Admit that the ATSDR in the study entitled, "Assessment of the Evidence for the Drinking Water Contaminants at Camp Lejeune and Specific Cancers and Other Diseases," dated January 13, 2017, stated that for "Kidney Cancer" there was "Sufficient evidence for causation."

**RESPONSE:**


69.    Admit that the ATSDR in the study entitled, "Assessment of the Evidence for the Drinking Water Contaminants at Camp Lejeune and Specific Cancers and Other Diseases," dated January 13, 2017, stated that for "Non-Hodgkin Lymphoma" with regard to "TCE" there was "Sufficient evidence for causation."

**RESPONSE:**

70.    Admit that the ATSDR in the study entitled, "Assessment of the Evidence for the Drinking Water Contaminants at Camp Lejeune and Specific Cancers and Other Diseases," dated January 13, 2017, stated that for "Non-Hodgkin Lymphoma" with regard to "PCE" there was "Equipoise and above evidence for causation."

**RESPONSE:**


71.    Admit that the ATSDR in the study entitled, "Assessment of the Evidence for the Drinking Water Contaminants at Camp Lejeune and Specific Cancers and Other Diseases," dated

15

January 13, 2017, stated that for "Non-Hodgkin Lymphoma" with regard to "Benzene" there was "Sufficient evidence for causation."

**RESPONSE:**


72.     Admit that the ATSDR in the study entitled, "Assessment of the Evidence for the Drinking Water Contaminants at Camp Lejeune and Specific Cancers and Other Diseases," dated January 13, 2017, stated that for "Leukemias" with regard to "TCE" there was "Equipoise and above evidence for causation for all types of leukemia."

**RESPONSE:**


73.     Admit that the ATSDR in the study entitled, "Assessment of the Evidence for the Drinking Water Contaminants at Camp Lejeune and Specific Cancers and Other Diseases," dated January 13, 2017, stated that for "Leukemias" with regard to "Benzene" there was "Sufficient evidence for causation for all types of leukemia."

**RESPONSE:**

74.     Admit that available on the ATSDR public website is a true and accurate copy of a document dating from 2007 and which may be cited as Maslia ML, Sautner JB, Faye RE, Suárez-Soto RJ, Aral MM, Grayman WM, Jang W, Wang J, Bove FJ, Ruckart PZ, Valenzuela C, Green JW Jr, and Krueger AL. Analyses of Groundwater Flow, Contaminant Fate and Transport, and Distribution of Drinking Water at Tarawa Terrace and Vicinity, U.S. Marine Corps Base Camp Lejeune, North Carolina: Historical Reconstruction and Present-Day Conditions—Executive Summary. Atlanta, GA: Agency for Toxic Substances and Disease Registry; 2007a ("Maslia et al. 2007a").

**RESPONSE:**


75.    Admit that Maslia et al. 2007a is reliable.

**RESPONSE:**


76.    Admit that available on the ATSDR public website is a true and accurate copy of a document dating from 2007 and which may be cited as Maslia ML, Sautner JB, Faye RE, Suárez-Soto RJ, Aral MM, Grayman WM, Jang W, Wang J, Bove FJ, Ruckart PZ, Valenzuela C, Green JW Jr, and Krueger AL. Analyses of Groundwater Flow, Contaminant Fate and Transport, and Distribution of Drinking Water at Tarawa Terrace and Vicinity, U.S. Marine Corps Base Camp Lejeune, North Carolina: Historical Reconstruction and Present-Day Conditions—Chapter A: Summary of Findings. Atlanta, GA: Agency for Toxic Substances and Disease Registry; 2007b ("Maslia et al. 2007b").

**RESPONSE:**


77.    Admit that Maslia et al. 2007b is reliable.

**RESPONSE:**


78.    Admit that the public VA website includes a statement that as to "Adult leukemia,… Bladder cancer, Kidney cancer,… Non-Hodgkin's lymphoma" and "Parkinson's disease" the "[e]vidence shows a link between these conditions and exposure to chemicals found in the drinking water at Camp Lejeune and MCAS New River during this time."

**RESPONSE:**

17

79.     Admit that the ATSDR is a federal public health agency within the United States Department of Health and Human Services.[1]

**RESPONSE:**

80.     Admit that the ATSDR focuses on minimizing human health risks associated with exposure to hazardous substances.[2]

**RESPONSE:**

81.     Admit that the ATSDR works closely with other federal, state, and local agencies; tribal governments; local communities; and healthcare providers.[3]

**RESPONSE:**

82.     Admit that the ATSDR's mission is to "[s]erve the public through responsive public health actions to promote healthy and safe environments and prevent harmful exposures."[4]

**RESPONSE:**

83.     Admit that the ATSDR was created as an advisory, nonregulatory agency by the Superfund legislation and was formally organized in 1985.[5]

**RESPONSE:**

---

[1] https://en.wikipedia.org/wiki/Agency_for_Toxic_Substances_and_Disease_Registry
[2] https://en.wikipedia.org/wiki/Agency_for_Toxic_Substances_and_Disease_Registry
[3] https://en.wikipedia.org/wiki/Agency_for_Toxic_Substances_and_Disease_Registry
[4] https://en.wikipedia.org/wiki/Agency_for_Toxic_Substances_and_Disease_Registry
[5] https://en.wikipedia.org/wiki/Agency_for_Toxic_Substances_and_Disease_Registry

18

84.     Admit that the ATSDR protects communities from harmful health effects related to exposure to natural and man-made hazardous substances.[6]

**RESPONSE:**


85.     Admit that the ATSDR responds to environmental health emergencies; investigates emerging environmental health threats; conducts research on the health impacts of hazardous waste sites; and builds capabilities of and provides actionable guidance to state and local health partners.[7]

**RESPONSE:**


86.     Admit that the water quality modeling is a powerful tool for analyzing the fate and effect of contaminant transport in drinking water plants and distribution systems.[8]

**RESPONSE:**


87.     Admit that the modern era of water quality modeling in the United States began in the 1960s.[9]

**RESPONSE:**


88.     Admit that the pushed by advances in computer technology as well as environmental sciences, water quality modeling evolved through five broad periods: (1) initial model development with mainframe computers (1960s – mid 1970s), (2) model refinement and generalization with

---

[6] https://www.atsdr.cdc.gov/index.html
[7] https://www.atsdr.cdc.gov/index.html
[8] https://www.awwa.org/Resources-Tools/Resource-Topics/Engineering-Modeling-Applications
[9] https://www.eeer.org/upload/eer-14-4-200-.pdf

19

minicomputers (mid 1970s – mid 1980s), (3) model standardization and support with microcomputers (mid 1980s – mid 1990s), (4) better model access and performance with faster desktop computers running Windows and local area networks linked to the Internet (mid 1990s – early 2000s), and (5) model integration and widespread use of the Internet (early 2000s – present).[10]

**RESPONSE:**

89.     Admit that improved computer technology continues to drive improvements in water quality models, including more detailed environmental analysis (spatially and temporally), better user interfaces and geographic information system software, more accessibility to environmental data from on-line repositories, and more robust modeling frameworks linking hydrodynamics, water quality, watershed and atmospheric models.[11]

**RESPONSE:**

90.     Admit that driven by regulatory needs and advancing technology, water quality modeling is likely to continue to improve in the future.[12]

**RESPONSE:**

91.     Admit that water modeling has been used for a variety of contexts.

**RESPONSE:**

92.     Admit that the National Weather System uses water modeling.

**RESPONSE:**

---

[10] https://www.eeer.org/upload/eer-14-4-200-.pdf
[11] https://www.eeer.org/upload/eer-14-4-200-.pdf
[12] https://www.eeer.org/upload/eer-14-4-200-.pdf

20

93.     Admit that the National Water Model (NWM) is a hydrologic modeling framework that simulates observed and forecast streamflow over the entire continental United States (CONUS), southern Alaska (Cook Inlet, Copper River Basin, and Prince William Sound regions), Hawaii, Puerto Rico and the US Virgin Islands. Additionally, it produces total water level guidance for the coastlines of those same regions except Alaska. The NWM simulates the water cycle with mathematical representations of the different processes and how they fit together. This complex representation of physical processes such as snowmelt and infiltration and movement of water through the soil layers varies significantly with changing elevations, soils, vegetation types and a host of other variables. Additionally, extreme variability in precipitation over short distances and times can cause the response on rivers and streams to change very quickly. Overall, the process is so complex that to simulate it with a mathematical model means that it needs a very high powered computer or supercomputer in order to run in the time frame needed to support decision makers when flooding is threatened.[13]

**RESPONSE:**


94.     Admit that the NWM produces hydrologic guidance at a very fine spatial and temporal scale. It complements official NWS (National Weather System) river forecasts at approximately 4000 locations across the Continental United States and produces guidance at millions of other locations that do not have a traditional river forecast.[14]

**RESPONSE:**

---

[13]https://water.noaa.gov/about/nwm#:~:text=The%20National%20Water%20Model%20(NWM,and %20the%20US%20Virgin%20Islands.
[14]https://water.noaa.gov/about/nwm#:~:text=The%20National%20Water%20Model%20(NWM,and %20the%20US%20Virgin%20Islands.

95. Admit that the EPA uses water modeling.

**RESPONSE:**


96. Admit that the EPA's website says that "Surface water quality models are critically important tools for managing our nation's surface waters. Quantitative models help local communities and environmental managers better understand how surface waters change in response to pollution and how to protect them."[15]

**RESPONSE:**


97. Admit that the EPA's website says that "Water quality specialists use models for many purposes" including "Assessing water quality conditions and causes of impairment," "Predicting how surface waters will respond to changes in their watersheds and the environment (e.g., future growth, climate change)," "Developing Total Maximum Daily Loads (TMDLs) and National Pollutant Discharge Elimination Systems (NPDES) permits," and "Forecasting quantitative benefits of new surface water protection policies."[16]

**RESPONSE:**


98. Admit that the U.S. Navy uses water modeling.

**RESPONSE:**

---

[15] https://www.epa.gov/waterdata/surface-water-quality-modeling
[16] https://www.epa.gov/waterdata/surface-water-quality-modeling

99.     Admit that the US Navy applies antifouling paints on its ships' hulls to reduce barnacle growth, enhancing fuel efficiency. Some of these antifouling paints contain pollutants which can leach and contaminate waterbodies. The US Navy selected a contractor called GKY to develop computer models that can predict the transport and fate of pollutants in naval harbors and surrounding waterbodies.[17]

**RESPONSE:**


100.    Admit that water modeling can be a reliable tool.

**RESPONSE:**


101.    Admit that modeling is frequently used to help build understanding of a water quality problem.[18]

**RESPONSE:**


102.    Admit that the EPA public website says: "When EPA's Office of Pesticide Programs (OPP) assesses the risk of a pesticide, it considers the exposure to the pesticide as well as the toxicity of the pesticide. For both drinking water and aquatic exposure assessments, reliable field monitoring data, when available, as well as mathematical models can be used to generate exposure estimates. Monitoring and modeling are both important tools for assessing pesticide concentrations in water and can provide different types of information. Monitoring tells the user what is happening under current use practices and under typical conditions. Although monitoring data can provide a direct estimate of

---

[17] https://gky.com/project/nationwide-water-quality-and-hydrodynamic-modeling-for-the-us-navy/
[18] https://cfpub.epa.gov/watertrain/moduleFrame.cfm?parent_object_id=1095

the concentration of a pesticide in water at a particular time and at a particular location, it may not provide reliable estimates for exposure assessments because sampling may not occur where and when the highest concentrations of a pesticide are found."[19]

**RESPONSE:**


103. Admit that the EPA's public website says: "For drinking water and aquatic exposures assessments, OPP typically relies on mathematical models to generate exposure estimates. These models calculate estimated environmental concentrations (EECs) using laboratory data that describe how fast the pesticide breaks down to other chemicals and how it moves in the environment. The guidelines for these laboratory studies can be found at the following website: Series 835 - Fate, Transport and Transformation Test Guidelines. Although computer modeling provides an indirect estimate of pesticide concentrations, models can estimate concentrations continuously over long periods of time and for vulnerable areas of interest for a particular pesticide. Modeling can also be used to compare estimated concentrations with toxicity data to determine the risk a pesticide poses to both drinking water and aquatic systems. Another benefit of computer modeling is in determining how various mitigation practices affect the amount of the pesticide that can run off into water."[20]

**RESPONSE:**


104. Admit that water modeling may be used to estimate past characteristics of water.

**RESPONSE:**

---

[19] https://19january2017snapshot.epa.gov/pesticide-science-and-assessing-pesticide-risks/about-water-exposure-models-used-pesticide_.html
[20] https://19january2017snapshot.epa.gov/pesticide-science-and-assessing-pesticide-risks/about-water-exposure-models-used-pesticide_.html

105. Admit that in a 2024 publication, it was reported that water modeling was used to present a reconstruction of historical hourly (1979–2015) and monthly (1900–2015) coastal water levels.[21]

**RESPONSE:**


106. Admit that a study published in 2023 described a project to perform numerical modeling and historical reconstruction as applied to the Seine River in the Normandy region of France at four quality stations, in which it was reported that the deep learning models accurately reconstructed 15 years of water quality data using only six and a half years of modeling data.[22]

**RESPONSE:**


107. Admit that the EPA Center for Exposure Assessment Modeling (CEAM) distributes simulation models and database software designed to quantify the movement and concentration of subsurface contaminants.[23]

**RESPONSE:**


108. Admit that inverse methods are one set of tools that can be used to investigate the history of groundwater contamination. Such methods use modeling and statistical tools to determine

---

[21] https://essd.copernicus.org/articles/16/1121/2024/
[22] https://www.mdpi.com/2073-4441/15/9/1773
[23] https://www.epa.gov/hydrowq/groundwater-models-assess-exposures#:~:text=The%20EPA%20Center%20for%20Exposure,and%20concentration%20of%20subsurface%20contaminants.

25

the historical distribution of observed contamination, the location of contaminant sources, or the release history from a known source.[24]

**RESPONSE:**


109.    Admit that information from a March 2013 publication of the ATSDR is located on the public website of the USGS, the United States Geological Survey which is part of the United States Department of the Interior.

**RESPONSE:**


110.    Admit that a March 2013 ATSDR publication bears the title, "Analyses and Historical Reconstruction of Groundwater Flow, Contaminant Fate and Transport, and Distribution of Drinking Water Within the Service Areas of the Hadnot Point and Holcomb Boulevard Water Treatment Plants and Vicinities, U.S. Marine Corps Base Camp Lejeune, North Carolina, Chapter A: Summary and Findings," and was authored by Morris L. Maslia, René J. Suárez-Soto, Jason B. Sautner, Barbara A. Anderson, L. Elliot Jones, Robert E. Faye, Mustafa M. Aral, Jiabao Guan, Wonyong Jang, Ilker T. Telci, Walter M. Grayman, Frank J. Bove, Perri Z. Ruckart, and Susan M. Moore.

**RESPONSE:**


111.    Admit that as stated on the USGS website, as of 2013, the ATSDR was conducting epidemiological studies to evaluate the potential for health effects from exposures to volatile organic compounds (VOCs) in finished water supplied to family housing units at U.S. Marine Corps Base Camp Lejeune, North Carolina (USMCB Camp Lejeune). The core period of interest for the

---

[24] https://agupubs.onlinelibrary.wiley.com/doi/full/10.1029/2004WR003214

26

epidemiological studies was 1968 to 1985. VOCs of major interest to the epidemiological studies included tetrachloroethylene (PCE), trichloroethylene (TCE), trans-1,2-dichloroethylene (1,2-tDCE), vinyl chloride (VC), and benzene.[25]

**RESPONSE:**


112.    Admit that as stated on the USGS website, as of 2013, the ATSDR was reporting that eight water-distribution systems had supplied or currently (2013) were supplying finished water to family housing and other facilities at USMCB Camp Lejeune. The three distribution systems of interest to the ATSDR study—Tarawa Terrace, Hadnot Point, and Holcomb Boulevard—had historically supplied finished water to the majority of family housing units at the Base. Historical exposure data needed for the epidemiological studies was limited or unavailable. To obtain estimates of historical exposure, water-modeling methods were used to quantify concentrations of particular contaminants in finished water and to compute the level and duration of human exposure to contaminated finished water.[26]

**RESPONSE:**


113.    Admit that as stated on the USGS website, during 2007–2009, ATSDR published historical reconstruction results for contaminants delivered in finished water to Tarawa Terrace family housing areas and vicinity.  Then, in 2013, corresponding results for Hadnot Point and Holcomb Boulevard family housing areas and vicinity were presented here as a series of reports supporting ATSDR's health studies at USMCB Camp Lejeune.[27]

---

[25] https://www.usgs.gov/publications/chapter-a-summary-and-findings
[26] https://www.usgs.gov/publications/chapter-a-summary-and-findings
[27] https://www.usgs.gov/publications/chapter-a-summary-and-findings

27

**RESPONSE:**


114.    Admit that as stated on the USGS website, the ATSDR reports and associated supplements provide comprehensive descriptions of information, data analyses and interpretations, and modeling results used to reconstruct historical contaminant concentration levels in finished water delivered within the service areas of the Hadnot Point and Holcomb Boulevard water treatment plants (WTPs) and vicinities.[28]

**RESPONSE:**


115.    Admit that as stated on the USGS website, the ATSDR 2013 report, in its Chapter A: Summary and Findings, summarized analyses and results of reconstructed VOC concentrations in groundwater, in water-supply wells, and in finished water delivered by the Hadnot Point WTP (HPWTP) and Holcomb Boulevard WTP (HBWTP) to family housing areas and vicinities.[29]

**RESPONSE:**


116.    Admit that as stated on the USGS website, for the ATSDR 2013 report, the methods and approaches to complete the historical reconstruction process for the Hadnot Point–Holcomb Boulevard study area included (1) information discovery and data mining, (2) three-dimensional, steady-state (predevelopment) and transient groundwater-flow modeling using MODFLOW-2005 and objective parameter estimation using PEST-12, (3) determining historical water-supply well scheduling and operations using TechWellOp, (4) three-dimensional contaminant fate and transport

---

[28] https://www.usgs.gov/publications/chapter-a-summary-and-findings
[29] https://www.usgs.gov/publications/chapter-a-summary-and-findings

28

modeling for VOCs dissolved in groundwater using MT3DMS-5.3, (5) estimating the volume of light nonaqueous phase liquid (LNAPL) released to the subsurface at the Hadnot Point Industrial Area using TechNAPLVol, (6) analysis of LNAPL and dissolved phase fate and transport using TechFlowMP, (7) reconstruction of water-supply well concentrations at the Hadnot Point landfill using the linear control theory model (LCM) TechControl, (8) computation of flow-weighted average concentrations of VOCs assigned to finished water delivered by the HPWTP using a materials mass balance (simple mixing) model, (9) extended period simulation of hydraulics and water quality of the Holcomb Boulevard water-distribution system using EPANET 2, (10) sensitivity analysis of hydraulic, fate and transport, and numerical-model parameter values, (11) uncertainty analysis by coupling Kalman filtering with Monte Carlo simulation within the LCM methodology, and (12) probabilistic analysis of intermittent connections (1972–1985) of the Hadnot Point and Holcomb Boulevard water-distribution systems using the TechMarkov-Chain model. The end result of the historical reconstruction process was the estimation of monthly mean concentrations of selected VOCs in finished water distributed to housing areas served by the HPWTP and HBWTP.[30]

**RESPONSE:**


117.   Admit that as stated on the USGS website, the ATSDR 2013 report's historical reconstruction results provided considerable evidence that concentrations of several contaminants of interest in finished water delivered by the HPWTP substantially exceeded current maximum contaminant levels (MCLs) during all or much of the epidemiological study period of 1968–1985.

**RESPONSE:**

_____

[30] https://www.usgs.gov/publications/chapter-a-summary-and-findings

118.    Admit that as stated on the USGS website, the ATSDR 2013 report described: Reconstructed concentrations of TCE exceeded the current MCL of 5 micrograms per liter (μg/L) prior to and during the entire epidemiological study period and reached a maximum reconstructed concentration of 783 μg/L during November 1983. The most likely date that TCE first exceeded its current MCL is during August 1953; however, this exceedance could have been as early as November 1948. Corresponding finished-water concentrations of PCE exceeded the current MCL of 5 μg/L during most of the period 1975–1985 and also reached a maximum concentration of 39 μg/L during November 1983. Similar results for 1,2-tDCE and VC were also noted during the period 1975–1985. The maximum reconstructed concentrations of 1,2-tDCE and VC were 435 and 67 μg/L, respectively, and also occurred during November 1983. The respective current MCLs for these contaminants are 100 and 2.0 μg/L.[31]

**RESPONSE:**


119.    Admit that as stated on the USGS website, the ATSDR 2013 report described: Substantial volumes of liquid hydrocarbon fuels were lost due to leakage to the subsurface within the Hadnot Point Industrial Area. This area contained as many as 10 active water-supply wells. Despite the large volumes lost, finished-water concentrations of benzene only slightly exceeded the current MCL of 5 μg/L during the period 1980–1985. The maximum reconstructed concentration of 12 μg/L of benzene occurred during April 1984.[32]

**RESPONSE:**

---

[31] https://www.usgs.gov/publications/chapter-a-summary-and-findings
[32] https://www.usgs.gov/publications/chapter-a-summary-and-findings

120.    Admit that as stated on the USGS website, the ATSDR 2013 report described: Within the HBWTP service area, only TCE routinely exceeded its current MCL during intermittent periods (1972–1985). The TCE resulted from transfers of finished water from the Hadnot Point water-distribution system to the Holcomb Boulevard water-distribution system. The maximum reconstructed TCE concentration of 51 μg/L occurred during June 1978 at the Berkeley Manor housing area. During the 8-day period of January 28 through February 4, 1985, the HBWTP was out of service, and the HPWTP continuously supplied finished water to the Holcomb Boulevard housing area. During this period, the maximum reconstructed TCE concentration at the HPWTP was 324 μg/L, which resulted in a maximum reconstructed monthly mean concentration of 66 μg/L within the Paradise Point housing area.[33]

**RESPONSE:**


121.    Admit that in 2016, a paper was published which may be cited as Maslia ML, Aral MM, Ruckart PZ, Bove FJ. Reconstructing Historical VOC Concentrations in Drinking Water for Epidemiological Studies at a U.S. Military Base: Summary of Results. Water (Basel). 2016;8(10):449. doi: 10.3390/w8100449. Epub 2016 Oct 13. PMID: 28868161; PMCID: PMC5580837 (the "Maslia et al. 2016 paper").

**RESPONSE:**


122.    Admit that the Maslia et al. 2016 paper went through peer-review before it was published.

**RESPONSE:**

---

[33] https://www.usgs.gov/publications/chapter-a-summary-and-findings

123.    Admit that the Maslia et al. 2016 paper states in its abstract as follows: "A U.S. government health agency conducted epidemiological studies to evaluate whether exposures to drinking water contaminated with volatile organic compounds (VOC) at U.S. Marine Corps Base Camp Lejeune, North Carolina, were associated with increased health risks to children and adults. These health studies required knowledge of contaminant concentrations in drinking water—at monthly intervals—delivered to family housing, barracks, and other facilities within the study area. Because concentration data were limited or unavailable during much of the period of contamination (1950s–1985), the historical reconstruction process was used to quantify estimates of monthly mean contaminant-specific concentrations. This paper integrates many efforts, reports, and papers into a synthesis of the overall approach to, and results from, a drinking-water historical reconstruction study. Results show that at the Tarawa Terrace water treatment plant (WTP) reconstructed (simulated) tetrachloroethylene (PCE) concentrations reached a maximum monthly average value of 183 micrograms per liter (μg/L) compared to a one-time maximum measured value of 215 μg/L and exceeded the U.S. Environmental Protection Agency's current maximum contaminant level (MCL) of 5 μg/L during the period November 1957–February 1987. At the Hadnot Point WTP, reconstructed trichloroethylene (TCE) concentrations reached a maximum monthly average value of 783 μg/L compared to a one-time maximum measured value of 1400 μg/L during the period August 1953–December 1984. The Hadnot Point WTP also provided contaminated drinking water to the Holcomb Boulevard housing area continuously prior to June 1972, when the Holcomb Boulevard WTP came on line (maximum reconstructed TCE concentration of 32 μg/L) and intermittently during the period June 1972–February 1985 (maximum reconstructed TCE concentration of 66 μg/L). Applying the historical reconstruction process to quantify contaminant-specific monthly drinking-water

32

concentrations is advantageous for epidemiological studies when compared to using the classical exposed versus unexposed approach."[34]

**RESPONSE:**


124.    Admit that the ATSDR is listed as the author of a publication entitled, Toxicological profile for tetrachloroethylene. Atlanta: U.S. Department of Health and Human Services; 2019.

**RESPONSE:**


125.    Admit that a peer-reviewed study was published with regard to Camp Lejeune in 2014 which may be cited as follows:  Bove FJ, Ruckart PZ, Maslia M, Larson TC. Evaluation of mortality among marines and navy personnel exposed to contaminated drinking water at USMC base Camp Lejeune: a retrospective cohort study. Environ Health. 2014;13(1):10.

**RESPONSE:**


126.    Admit that a peer-reviewed study was published with regard to Camp Lejeune in 2014 which may be cited as follows:  Bove FJ, Ruckart PZ, Maslia M, Larson TC. Mortality study of civilian employees exposed to contaminated drinking water at USMC Base Camp Lejeune: a retrospective cohort study. Environ Health. 2014;13:68.

**RESPONSE:**


127.    Admit that in 2024 a study was released and subsequently published after peer review which was entitled, Evaluation of cancer incidence among Marines and Navy personnel and civilian

---

[34] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5580837/

33

workers exposed to contaminated drinking water at USMC Base Camp Lejeune: a cohort study, Frank J. Bove, Agency for Toxic Substances and Disease Registry.[35]

**RESPONSE:**


128.    Admit that in 2011 Morris Maslia received the J. James R. Croes Medal, awarded by the American Society of Civil Engineers (ASCE).[36]

**RESPONSE:**


129.    Admit that in 2015, the American Academy for Environmental Engineers & Scientists (AAEES) awarded the ATSDR the 2015 Grand Prize in the Research.[37]

**RESPONSE:**

---

[35] https://www.medrxiv.org/content/10.1101/2024.01.27.24301873v1.full.pdf
[36] https://blogs.cdc.gov/yourhealthyourenvironment/2012/06/20/meet-the-scientist-morris-maslia/
[37] https://www.linkedin.com/pulse/2015-aaees-grand-prize-research-morris-l-maslia?trk=portfolio_article-card_title

Respectfully submitted this 28th day of March, 2024.

| | |
|---|---|
| /s/   J. Edward Bell, III | /s/   Zina Bash |
| J. Edward Bell, III (admitted *pro hac vice*) | Zina Bash (admitted *pro hac vice*) |
| Bell Legal Group, LLC | Keller Postman LLC |
| 219 Ridge St. | 111 Congress Avenue, Suite 500 |
| Georgetown, SC 29440 | Austin, TX 78701 |
| Telephone: (843) 546-2408 | Telephone: 956-345-9462 |
| jeb@belllegalgroup.com | zina.bash@kellerpostman.com |
| | |
| *Lead Counsel for Plaintiffs* | *Co-Lead Counsel for Plaintiffs and Government Liaison Counsel* |
| | |
| /s/   Elizabeth J. Cabraser | /s/   W. Michael Dowling |
| Elizabeth J. Cabraser (admitted *pro hac vice*) | W. Michael Dowling (NC Bar No. 42790) |
| Lieff Cabraser Heimann & Bernstein, LLP | The Dowling Firm PLLC |
| 275 Battery Street, 29th Floor | Post Office Box 27843 |
| San Francisco, CA 94111 | Raleigh, North Carolina 27611 |
| Telephone: (415) 956-1000 | Telephone: (919) 529-3351 |
| ecabraser@lchb.com | mike@dowlingfirm.com |
| | |
| *Co-Lead Counsel for Plaintiffs* | *Co-Lead Counsel for Plaintiffs* |
| | |
| /s/   Robin L. Greenwald | /s/   James A. Roberts, III |
| Robin L. Greenwald (admitted *pro hac vice*) | James A. Roberts, III (N.C. Bar No.: 10495) |
| Weitz & Luxenberg, P.C. | Lewis & Roberts, PLLC |
| 700 Broadway | 3700 Glenwood Avenue, Suite 410 |
| New York, NY 10003 | P. O. Box 17529 |
| Telephone: 212-558-5802 | Raleigh, NC 27619-7529 |
| rgreenwald@weitzlux.com | Telephone: (919) 981-0191 |
| | jar@lewis-roberts.com |
| *Co-Lead Counsel for Plaintiffs* | |
| | *Co-Lead Counsel for Plaintiffs* |
| | |
| /s/   Mona Lisa Wallace | |
| Mona Lisa Wallace (N.C. Bar No.: 009021) | |
| Wallace & Graham, P.A. | |
| 525 North Main Street | |
| Salisbury, North Carolina 28144 | |
| Tel: 704-633-5244 | |
| mwallace@wallacegraham.com | |
| | |
| *Co-Lead Counsel for Plaintiffs* | |

## CERTIFICATE OF SERVICE

This is to certify that on the below-indicated date, I served a copy of the foregoing document upon counsel for the Defendant by electronic mail at the following electronic mail address: adam.bain@usdoj.gov.

/s/  J. Edward Bell, III

J. Edward Bell, III
*Lead Counsel for Plaintiffs*

Date: March 28, 2024.

# Exhibit 5

| | |
|---|---|
| **From:** | J Edward Bell <jeb@belllegalgroup.com> |
| **Sent:** | Friday, April 5, 2024 10:40 AM |
| **To:** | Mirsky, Sara J. (CIV); Zina Bash |
| **Cc:** | Lipscomb, Bridget (CIV); Bain, Adam (CIV); CL Core Litigation Group; CL | CO-LEAD & LIAISON COUNSEL; Dawn Bell |
| **Subject:** | [EXTERNAL] Re: CLJA - Plaintiffs' Discovery Requests |

Good morning, Sara,

In regard to your request for an extension to our recent discovery to the Government, we do not consent to the United States' request for a 30-day extension to respond to the discovery requests. Frankly, if the United States had fully and timely responded to our prior requests, most of what is in these new requests would have already been addressed.

However, we would consider granting extensions on an as needed basis if there are particular issues that make it difficult to accomplish. We are concerned that DOJ has never answered our concerns about the Government's discovery responses that indicate that the discovery will be accomplished prior to the end of fact discovery.

You also asked that we define "documents" for purposes of the requests. We can define it the same way the United States did in its own Rule 34 requests dated December 11, 2023

> **"Document" or "Record" encompasses the full meaning of the word, and refers to, without limitation, any written, printed, typed, recorded on a computer, electronic mail, photographed, taped, filmed, or otherwise recorded information in your possession or control, or known by you to exist, including originals, reproductions, copies or drafts.**

Please let me know if you have any further questions.

Thanks.

Ed Bell



## BELL LEGAL GROUP

### CHARLESTON
SCHOOL OF LAW

**Ed Bell**
*Founding Partner*
*President | Charleston School of Law*
**219 Ridge Street**
**Georgetown, SC 29440**
*o:* **843.546.2408**
*f:* **843.546.9604**
jeb@belllegalgroup.com
www.belllegalgroup.com
www.charlestonlaw.edu

  



---

**From:** Mirsky, Sara J. (CIV) <Sara.J.Mirsky@usdoj.gov>
**Date:** Thursday, April 4, 2024 at 3:28 PM
**To:** J Edward Bell <jeb@belllegalgroup.com>, Zina Bash <zina.bash@kellerpostman.com>
**Cc:** Lipscomb, Bridget (CIV) <Bridget.Lipscomb@usdoj.gov>, Bain, Adam (CIV) <Adam.Bain@usdoj.gov>
**Subject:** CLJA - Plaintiffs' Discovery Requests

Ed and Zina,

We are in receipt of Plaintiffs' discovery requests of March 28, 2024, which included, *inter alia*, (i) 20 Requests for Production, (ii) 20 Interrogatories, (iii) 129 Requests for Admission, and (iv) a request for supplementation for each set of prior Requests for Production and Interrogatories served on behalf of each Track 1 Plaintiff. The United States is working on a specific response to Ed's letter accompanying these requests and will be sending that in the next week.

Given the volume and breadth of these requests, the United States requests a 30-day extension to respond to the discovery requests (making the deadline Tuesday, May 28).

The United States also wants to bring another issue to Plaintiffs' attention up front. Neither the Requests for Production nor the Interrogatories define "Documents." The definition of this term could greatly impact the United States' responses to these requests. The United States invites Plaintiffs to serve corrected versions of the Requests for Production and the Interrogatories with the definition of "Documents" and any other additional definitions needed

without changing the proposed May 28 response deadline, so long as the corrected requests solely revise any necessary definitions and are received within a week of this email.

Please let us know if Plaintiffs agree to the proposed extension.

Thanks,
Sara



**Sara J. Mirsky**
Trial Attorney
Environmental Torts Litigation
U.S. Department of Justice
**202.616.8362 (Office)**
**202.451.7726 (Mobile)**
sara.j.mirsky@usdoj.gov

*This email and any attachments may contain information that is privileged, confidential, or otherwise protected from disclosure under applicable law. If the reader of this transmission is not the intended recipient, you are hereby notified that any dissemination, distribution, copying, or use of this transmission or its contents is strictly prohibited. If you have received this transmission in error, please notify the sender immediately and delete or destroy the original transmission and any copies (electronic or paper).*

# Exhibit 6

| Set No. | RFP No. | First Bates Value | Last Bates Value |
|---------|---------|-------------------|------------------|
| 1 | 1 | CLJA_ATSDRSUPP-0000000001 | CLJA_ATSDRSUPP-0000000116 |
| 1 | 3 | CLJA_MUSTERROLLS01-0000000001 | CLJA_MUSTERROLLS01-0000676209 |
| 1 | 4 | ATSDR 01 00001 | ATSDR 01 06686 |
| 1 | 4 | CLJA_2019ATSDR04-0000000001 | CLJA_2019ATSDR04-0000003026 |
| 1 | 4 | CLJA_2019-EPA02-0000000001 | CLJA_2019-EPA02-0000016715 |
| 1 | 4 | GAO 00001 | GAO 06518 |
| 1 | 4 | USMC01 00001 | USMC01 00009 |
| 1 | 4 | USMC02 00001 | USMC02 00093 |
| 1 | 4 | USMC03 00001 | USMC03 00069 |
| 1 | 4 | USMC04 00001 | USMC04 00034 |
| 1 | 5 | CLDEP0000000001 | CLDEP0000001942 |
| 1 | 5 | CLJADep_supp-0000000001 | CLJADep_supp-00000000470 |
| 1 | 6 | CLDEP000001943 | CLDEP000002630 |
| 1 | 7 | CLJA_CCLWDPP-0000000001 | CLJA_CLWDPP-0000000062 |
| 1 | 7 | CLJA_CLW0000000001 | CLJA_CLW0000008790 |
| 1 | 8 | ATSDR_HC-0000000001 | ATSDR_HC-0000005976 |
| 1 | 8 | CLJA_ATSDR1-RFP8-0000000001 | CLJA_ATSDR1-RFP8-0000003839 |
| 1 | 8 | CLJA_ATSDRSUPP02-0000000001 | CLJA_ATSDRSUPP02-0000000685 |
| 1 | 8 | CLJA_WATERMODELING_01-0000000001 | CLJA_WATERMODELING_01-0000854197 |
| 1 | 8 | CLJA_WATERMODELING_04-0000000001 | CLJA_WATERMODELING_04-0000117996 |
| 1 | 8 | CLJA_WATERMODELING_05-0000000001 | CLJA_WATERMODELING_05-0001394405 |
| 1 | 8 | CLJA_WATERMODELING_07-0000000001 | CLJA_WATERMODELING_07-0001738892 |
| 1 | 8 | CLJA_WATERMODELING_08-0000000001 | CLJA_WATERMODELING_08-0000193508 |
| 1 | 8 | CLJA_WATERMODELING_09-0000000001 | CLJA_WATERMODELING_09-0000547124 |
| 1 | 8 | CLJA_WATERMODELING-0000000001 | CLJA_WATERMODELING-0000209307 |
| 1 | 9 | CLJA_CLHousing-0000000001 | CLJA_CLHousing-0000009197 |
| 1 | 9 | CLJA_Housing-0000000001 | CLJA_Housing-0000238064 |
| 1 | 10 | CLJA_ATSDR0102-0000000001 | CLJA_ATSDR0102-0000000301 |
| 1 | 10 | CLJA_UST01-0000000001 | CLJA_UST01-0000221431 |
| 1 | 10 | CLJA_UST02-0000000001 | CLJA_UST02-0004317668 |
| 1 | 11 | CLJA_VA-RFP11-0000000001 | CLJA_VA-RFP11-0000033401 |
| 1 | 11 | VARFP11-0000000001 | VARFP11-0000000019 |

| Set No. | RFP No. | First Bates Value | Last Bates Value |
|---------|---------|-------------------|------------------|
| 1 | 15 | CLJA_EPA01-0000000001 | CLJA_EPA01-0000383090 |
| 1 | 16 | CLJA_USMC_0000000001 | CLJA_USMC_0000000002 |
| 1 | 17 | CLJA_NAVLANT-0000000001 | CLJA_NAVLANT-0000012816 |
| 1 | 11,16, 17 | CLJA_LANTDIV01-0000000001 | CLJA_LANTDIV01-0000002976 |
| 1 | 16, 17 | CLJA_LANTDIV-0000000001 | CLJA_LANTDIV-0000446786 |
| 1 | 4, 5 | USPROD_0000000001 | USPROD_0000000738 |
| 1 | 4, 8 | CLJA_2019ATSDR03-00000000001 | CLJA_2019ATSDR03-0000000609 |
| 1 | 4, 8 | CLJA_2019EPA-0000000001 | CLJA_2019EPA-0000016713 |
| 1 | 8, 16 | CLJA_USMCSUPP01-0000000001 | CLJA_USMCSUPP01-0000000147 |
| 2 | 1 | CLJA_ATSDR01-0000000001 | CLJA_ATSDR01-0000000030 |
| 2 | 1 | CLJA_ATSDR0102-0000000096 | CLJA_ATSDR0102-0000000276 |
| 2 | 1 | CLJA_ATSDR02-0000000001 | CLJA_ATSDR02-0000000004 |
| 2 | 1 | CLJA_ATSDRWM01-0000000001 | CLJA_ATSDRWM01-0000189563 |
| 2 | 2 | CLJA_HEALTHEFFECTS-0000000001 | CLJA_HEALTHEFFECTS-0000000959 |
| 3 | 1 | USRETPOLS_0000000001 | USRETPOLS_00000001829 |
| 4 | 1, 2, 3 | CLJA_VA_RFP_4THSET_0000000001 | CLJA_VA_RFP_4THSET_0000194704 |
| 5 | 5 | CLJA_VAPOR01-0000000001 | CLJA_VAPOR01-0000000118 |

# Exhibit 7



March 28, 2024

**VIA EMAIL ONLY**
Adam Bain, Esquire
Bridget Lipscomb, Esquire
U.S. Department of Justice
Civil Division, Torts Branch
P.O. Box 340, Ben Franklin Station
Washington, D.C. 20044

IN RE:      **Camp Lejeune Water Litigation**
                **C/A No: 7:23-cv-897**

Dear Adam and Bridget:

Please consider this letter Plaintiff Leadership Group's ("PLG") obligation to meet- and-confer on the discovery items contained herein. As you know, the current deadline to complete track one fact discovery is June 17, 2024. Doc. 130, pp. 3-4. Plaintiffs must then designate their experts on July 17, 2024. Based on these approaching deadlines, the PLG believes the Defendant has a duty, pursuant to Federal Rules of Civil Procedure 26, 33, and 34, to timely respond to our relevant discovery requests and to supplement any deficient responses.  We are also sending a formal Request for Defendants to Supplement and additional track one discovery requests and emphasize that any further delay cannot be permitted for this discovery.

Defendant has objected to numerous discovery requests that were aimed at understanding any allegations the Defendant seeks to contest regarding exposure and causation. Specifically, the PLGs' discovery requests seek to understand the factual basis and documents the Defendant plans to rely on in contesting any allegations found in the Master Complaint.  Yet the Defendant's responses to date merely recite objections and all too often fail to answer the substance of the interrogatories or produce the names of witnesses or produce relevant documents, if any.

The Defendant's failure to properly respond to the PLG's discovery requests is disrupting our ability to obtain timely production of facts and documents in support of the contentions the Government plans, or does not plan, to contest.  Additionally, the Government's refusal to stipulate to basic issues regarding exposure and causation is also delaying the PLG's discovery process. For example, the Defendant has refused to stipulate as to the reliability of the ATSDR studies or the relevance of the agency's conclusions to the general causation issues for track one. Given this refusal, the PLG propounded specific discovery requests to obtain answers from the Government. The Government is refusing to properly answer those requests. The PLG should not have to wait

*office:* 843.546.2408  |  *fax:* 843.546.9604  |  www.BellLegalGroup.com

until the Government discloses its experts to understand what the Government's positions are on basic merits issues and what documents or witnesses the Government intends to rely on.

As it stands, the Government has objected and refused to fully answer discovery on many key points. For example, Plaintiffs' First Set of Requests for Production, corrected, dated 10/4/23, request number 18, sought the following: "Please produce all documents as defined herein, that Defendant may rely on to support its denial of any allegation alleged in the Master Complaint." To date, the Defendant has objected and merely vaguely promises rolling document production of unspecified extent. That is insufficient.

Likewise, the PLG served targeted discovery in the form of Plaintiffs' First Set of Interrogatories for track one Plaintiffs, dated 12/22/23. These included:

- 1. Please provide the names and addresses of persons known to Defendant or counsel to be witnesses concerning the facts of the case and indicate whether or not written or recorded statements have been taken from the witnesses and indicate who has possession of such statements.

- 2. Please provide the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information— that the Defendant may use to support its defenses as to the claim of the Plaintiff (or Plaintiff's Decedent), unless the use would be solely for impeachment.

- 3. If Defendant denies that Plaintiff (or Decedent) was exposed to contaminated water at Camp Lejeune for the time period alleged at Short Form Complaint paragraphs 13 and 14, then please a) identify all facts on which Defendant relies to support that denial, b) identify the individuals with knowledge supporting your denial, and c) identify the documents relied upon to support any such denial.

- 4. If Defendant denies that Plaintiff (or Decedent) suffered any of the illnesses or conditions alleged in paragraph 19 of Plaintiff's Short Form Complaint as a result of exposure to contaminated water at Camp Lejeune, then please a) identify all facts on which Defendant relies to support that denial, b) identify the individuals with knowledge supporting your denial, and c) identify the documents relied upon to support any such denial.

- 5. If Defendant denies any allegation in Plaintiff's Short Form Complaint, then please a) identify all facts on which Defendant relies to support that denial, b) identify the individuals with knowledge supporting your contention, and c) identify the documents relied upon to support such denial.

The above interrogatories require the Defendant to describe any denials it is making as to the track one plaintiffs' claims and to disclosure of the facts, witnesses and documents relevant in that regard. For example, if the Defendant intends to challenge the accuracy of the ATSDR water modeling and its relevance to the claims of any of the track one plaintiffs, then the PLG is entitled to full discovery on that contention. Yet to date all we have received are objections and delay.

office: 843.546.2408  |  fax: 843.546.9604  |  www.BellLegalGroup.com

Along with the 12/22/23 Interrogatories, the PLG also served Plaintiffs' First Set of Document Requests for track one Plaintiffs, dated 12/22/23. Again, the scope of these requests was tailored to require the Government to provide any evidence supporting its position:

- 1. All documents, ESI and things in your possession, custody, or control that are identified in or relied upon to formulate Defendant's responses to the Plaintiffs' First Set of Interrogatories Concerning Track 1 Discovery Pool Plaintiffs, served herewith.

- 2. To the extent not previously produced in response to Plaintiffs' prior requests for production served herein, please produce any documents in Defendant's possession, custody, or control concerning any allegation in the Track 1 Plaintiff's Short Form Complaint or any defense Defendant will use during the trial of Plaintiff's individual action.

- 3. To the extent not previously produced in response to Plaintiffs' prior requests for production served herein, please produce all documents in Defendant's possession, custody, or control that Defendant contends support that the injuries, physical symptoms, or damages alleged in the Complaint to have occurred to the Plaintiff were not caused by exposure to contaminated water at Camp Lejeune.

- 4. To the extent not previously produced in response to Plaintiffs' prior requests for production served herein, please produce all documents in Defendant's possession, custody, or control that Defendant contends tend to deny, refute or disprove that Plaintiff was exposed to contaminated water at Camp Lejeune that proximately caused the illnesses or conditions alleged at Short Form Complaint ¶ 19.

Again, to date Defendant refuses to stipulate to various issues or to answer this and other discovery fairly. The PLG believes the Government has a duty to fully respond to our relevant discovery requests and to supplement any deficient responses based on the scope of the existing discovery outlined above, and to do so immediately.

With kindest regards, I am

Your very truly,

/s/ *J. Edward Bell, III*

J. Edward Bell, III

JEBIII/djb

cc:     Plaintiffs' Co-Lead Counsel

office: 843.546.2408  |  fax: 843.546.9604  |  www.BellLegalGroup.com