```
 1            UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF NORTH CAROLINA
 2                    SOUTHERN DIVISION

 3
     IN RE:                          )
 4                                   )
     CAMP LEJEUNE WATER LITIGATION ) Docket No.
 5                                   )   7:23-cv-897
                                     )
 6                                   )

 7        ********************************

 8             TUESDAY, MARCH 19, 2024
             STATUS CONFERENCE HEARING
 9              BEFORE THE HONORABLE:
         ROBERT B. JONES, JR., MAGISTRATE JUDGE
10                 In Wilmington, NC

11   APPEARANCES:

12   On behalf of the Plaintiffs:

13   J. Edward Bell, III; Eric Flynn; Hugh R. Overholt

14   On Behalf of the Defendant:

15   John Adam Bain, Sara Mirsky, Bridget Bailey Lipscomb,
     Joseph Turner, Michael Cromwell
16

17   Court Reporter:        Tracy L. McGurk, RMR, CRR
                            Official Court Reporter
18                          413 Middle Street
                            New Bern, NC 28560
19                          (419) 392-6626

20

21
     Proceedings recorded by mechanical stenography,
22   transcript produced by notereading.

23

24

25
```

```
 1                (Commenced at 10:58 a.m.)

 2                THE COURT:  Good morning, everyone.   As you

 3     can see, we're in a new courtroom this morning.   This

 4     is our hearing room.  It's new to the building.   It

 5     historically was Courtroom 2 on the second floor.   In

 6     this building we have Courtroom 3 on the first floor;

 7     Courtroom 1 on the second floor, and now we have

 8     Courtroom 2 on the third floor.   But thank you for

 9     being here.

10                So I've read the status report.   And as we

11     do in each of these, let me know what -- I think I know

12     the answer, but let me know what you guys are waiting to

13     hear from the Court on as far as motions that have

14     ripened as mature.

15                MR. BELL:  Your Honor, the two motions

16     that -- or the two issues that we would like to bring to

17     your attention is there is, of course, a motion for

18     partial summary judgment, and that's pending.   There's

19     also competing orders or competing proposed orders on

20     the Track 2 discovery issues.

21                THE COURT:  Before we get to the tracks,

22     I've printed off a motions report, and I've got -- if

23     anyone has their docket sheet or the docket opened, it's

24     109, a Motion For Relief from E.D.N.C. Local Rule.

25     That's relative to the summary judgment motion.
```

```
 1              So you've got a Partial Summary Judgment
 2   Motion on Causation, and there's a Motion For Leave to
 3   Appeal.
 4              MR. BELL:  That's correct.
 5              THE COURT:  And that's my understanding.
 6   Those are the three motions that have ripened that
 7   you're waiting for the Court to issue a ruling on.
 8   That's correct?
 9              MR. BELL:  Yes, sir.  And the Track 2
10   issues.
11              THE COURT:  Okay.
12              MR. BELL:  I'm not sure that's actually a
13   motion, but we were required to submit a proposed
14   scheduling order.  I use that term --
15              THE COURT:  Right.
16              MR. BELL:  And so because Track 2 has now
17   been chosen, we're already in deadline periods.  That
18   order is pretty important.
19              THE COURT:  Okay.  Tell me first, before we
20   get to the tracks, tell me first, or just confirm:
21   Everything but Track 1 is in place?  You guys are
22   discovering, taking depositions --
23              MR. BELL:  Every day.
24              THE COURT:  -- and heeding deadlines?
25              I think that fact discovery was changed,
```

1  right?

2          MR. BAIN:  The deadline is mid June, Your

3  Honor, for fact discovery.  And then the expert

4  disclosures start after that.

5          THE COURT:  So update on Track 2.  I know

6  the diseases have been selected.  Right?

7          MR. BELL:  Yes.

8          THE COURT:  And so what's next?

9          MR. BELL:  We were supposed to submit a

10  joint scheduling order; if we couldn't agree, submit

11  separate ones.   There were a couple areas we weren't

12  able to agree on, so we've submitted counterproposals,

13  if you will.

14          THE COURT:  Right.

15          MR. BELL:  And those are kind of important,

16  Your Honor, because we are now going into some of those

17  deadlines, depending on which order is going to be

18  chosen.

19          THE COURT:  So kind of for those who are

20  listening at home, can you summarize what those issues

21  are that you want to be heard from the Court on?

22          MR. BELL:  Off the top of my head, Your

23  Honor, one has to do with the time period for when the

24  selection of the bellwether plaintiffs will be.   And

25  that's important, of course.   So that's the major thing

1   that we're concerned about.

2           The time to do the depositions and things

3   like that, I think we're ready to go on all that.

4           THE COURT:  I'm sorry; could you repeat

5   that?

6           MR. BELL:  There was a motion, I think by

7   the government, to reduce that number from ten to

8   eight -- or not a motion, but part of their proposal.

9   So there's a couple of things that would be important

10  for us to know.

11          THE COURT:  You said the number of

12  depositions in Track 2?

13          MR. BELL:  I'm sorry, Your Honor.  We're

14  supposed to select ten per side for each disease.

15          THE COURT:  I see.

16          MR. BELL:  And so the government has said,

17  or has asked, could you do eight per side?

18          MR. BAIN:  Four per side.

19          MR. BELL:  Excuse me.  I'm sorry.  Four per

20  side, with a total of eight.

21          MR. BAIN:  Eight for each disease.

22          MR. BELL:  We thought that the ten per side

23  was better, gave us a better way to have representative

24  samples.  Four would only give two each -- or four

25  each?

1          MR. BAIN:  Four per side.

2          MR. BELL:  That's kind of --

3          Is that per judge?

4          MR. BAIN:  No, it's per disease.

5          MR. BELL:  So if you had four, some judge

6    may only get one, or maybe none on that particular

7    disease, depending on where the selections fall.

8          If there's a need to reduce that number, we

9    should probably look at it after we make our selection.

10   That's our position.

11         MR. BAIN:  So our proposal is that we should

12   use some of the lessons we've learned in Track 1 in how

13   we do Track 2.   It seems apparent to us that 100

14   plaintiffs is too many and is not necessary to get the

15   information that we need for these diseases going

16   forward in Track 2.   And because of us going forward in

17   Track 1, it may be that we'll be able to make Track 2

18   more efficient.

19         We propose that the discovery be bifurcated

20   so that the plaintiffs in Track 2 establish general

21   causation first before we get into individual causation

22   for the individual plaintiffs.   That doesn't mean we

23   can't go forward and select the plaintiffs and start

24   gathering the records for them.   But they should come

25   forward with some evidence showing that the diseases

1   that are in Track 2 are connected to the water at Camp

2   Lejeune before going forward with more fact-based

3   discovery.

4           We're doing 100 depositions right now in

5   Track 1 for the diseases that are most likely --

6           THE COURT:  You've done two-thirds of them,

7   haven't you?

8           MR. BAIN:  We've scheduled, I think, almost

9   every one of them.  And we're now going on to fact

10  witness and treating physician depositions.

11          So we think that we'll have discovery done

12  well on all cases by the June 15th deadline for Track 1.

13  And we should use some of the things that we've learned

14  from that process to go forward through Track 2.

15          MR. BELL:  I don't disagree with the concept

16  of lessons learned is a good thing, but I'm concerned

17  that if we pick a lower number now, the spread for the

18  judges will be uneven.  So we would like to go do the

19  ten and ten like we did do, then come back to the Court

20  and say:  All right, let's rethink that and maybe have

21  some that are prioritized.  So you could take the ten

22  and ten and say:  All right, guys, you all get ready for

23  half of those, or something like that.  And that way we

24  think it's a better process.

25          MR. BAIN:  If I could say one more thing,

1    Your Honor.

2         One thing we've learned in Track 1 is that a

3    lot of plaintiffs who are alleging not only that the

4    Track 1 disease is related to the contamination, but

5    they have some other condition that's also independently

6    related to the contamination.  And so our thought with

7    the Track 1 is we're just supposed to be focussing on

8    those diseases that were selected for Track 1.  So with

9    these plaintiffs with multiple illnesses, it makes it

10    difficult because we have to get experts to look at

11    these different illnesses and say whether or not there's

12    any relationship between these other illnesses for these

13    other plaintiffs.

14         So we've asked the plaintiffs to let us know

15    how many of their plaintiffs in Track 1 are alleging

16    that additional diseases besides the Track 1 disease

17    related to the contamination.  And maybe we can come up

18    with an agreement that we put those plaintiffs aside,

19    because they're going to be more difficult, going to

20    require more experts, and that's really not what Track 1

21    is supposed to be focused on, and focus on those people

22    who are only claiming the Track 1 disease is related to

23    the contamination.

24         So that's another issue that we brought up

25    in the Track 2 proposal, that the only plaintiffs

1  selected for Track 2 are those people who have just the

2  Track 2 diseases related to the water.

3          MR. BELL:  It's going to be difficult,

4  Judge, because most of our clients have multiple

5  illnesses.  Most of them, the majority.

6          THE COURT:  Illnesses that are in the

7  lawsuit or illnesses that are not in the lawsuit?

8          MR. BELL:  Either filed or to be filed.

9  So, for example, we have a client who has Parkinson's

10  but also has prostate cancer.  So both of those, from

11  our standpoint, we believe are related.

12          THE COURT:  Are these all diseases that have

13  been identified?

14          MR. BELL:  Yes, Your Honor.

15          THE COURT:  In other words, are they --

16  you've seen the list.

17          MR. BELL:  Yes, sir.  Most of the ones

18  we're talking about have --

19          THE COURT:  Will at some point be on a

20  track?

21          MR. BELL:  Yes, sir.

22          So at one time there was a thought:  Well,

23  just try one at a time.

24          And you can't do that because then you're

25  required to try your entire case.

1          But there are very few -- and we're doing

2   the research, as Mr. Bain has asked us to do.  But

3   there are very few of ours that don't have -- when I say

4   "ours," I'm talking Plaintiffs' Leadership -- that don't

5   have multiple problems.

6          So we are submitting, I think tomorrow, a

7   proposal to the judges on a Rule 16 conference.  And it

8   might be a good time to discuss that.

9          But one of the things we have coming up,

10   Judge, is we have a March 27th deadline to opt out of

11   the Track 2.  And because those two orders haven't been

12   signed, we're concerned about that deadline without us

13   having identified Track 2 plaintiffs.

14          So that's kind of where we are on that.

15          THE COURT:  Are there other issues that you

16   wanted to address within Track 2?  I just want to flesh

17   this out.  I understand they may be in your motion, but

18   I just want to flesh it out at this point.

19          MR. BELL:  We don't disagree that picking a

20   cohort of cases out of the hundred to concentrate on is

21   a good idea.

22          I think -- for example, we have a couple

23   folks, and we're getting ready to file some motions on

24   them, that all of a sudden they have an end-of-life

25   diagnosis.  So we're working on that.  And we've

1    talked to the government about that.

2           So it may be that we should sit down soon

3    and go through that Rule 16.  We think there's some good

4    give and take on both sides to work that out.    But

5    we're probably going to need some guidance to get it

6    resolved.

7           THE COURT:  Is that it?

8           MR. BAIN:  I think that's the main thing.

9    I mean, we believe that discovery of Track 2 should be

10   staged after Track 1 has been finished and that it

11   should be bifurcated.  Those are our main issues.  And

12   that the plaintiff pool should be reduced.

13          THE COURT:  And you laid that out in your

14   filing?

15          MR. BAIN:  Yes.

16          THE COURT:  What about Track 3?  Is there

17   anything to discuss as to Track 3?

18          MR. BELL:  There's a time frame in the CMO.

19   I don't know what the date is right off the top of my

20   head.

21          MR. BAIN:  I think we both submitted

22   diseases for Track 3.

23          MR. BELL:  You're right.  I'm sorry.  The

24   Court chose three of our proposals --

25          THE COURT:  Yours was contingent, I think,

1   on what was selected for Track 2.   I remember that.

2           MR. BELL:  I don't want to be presumptuous

3   to assume, but I'm assuming that maybe the Track 3 would

4   be the balance of those five others.   That's kind of

5   what we're going on.

6           THE COURT:  All right.

7           Well, how about our favorite topic,

8   discovery.

9           There are two motions on my motions report:

10          Docket Entry 81, which is Plaintiff's Motion

11  to Compel Document Production in Response to the First

12  Set of Request For Production, filed on 12/14.

13          And then it looks like Defendant's

14  Cross-Motion for Protective Order at Docket Entry 93,

15  filed 12/21.

16          Are those moot, or is there still stuff

17  we're talking about?

18          MR. BELL:  Well, here's our issue, Judge.

19  We need to have some help.  And I'm not sure if that

20  would help the government or not.  But we're getting

21  rolling production.  And we don't know when that's

22  going to be finished.  The formal response says:  We'll

23  get it to you before the end of fact discovery, which

24  means, if you use that deadline, we could get documents

25  or production the week before the deadline in June.

1          Up until now we haven't gotten any privilege

2     logs of any substance.  We had some from the prior

3     cases.   But I recognize it's hard to do a privilege log

4     until you've completed the discovery.  We understand the

5     issue.  But we still have got to have some finality on

6     our request.

7          And that motion is pending, but I'm not sure

8     it's ripe.  We could argue it, but then if they're still

9     getting documents and looking and trying, I see that as

10    well.

11         THE COURT:  I think there were parts of the

12    motion that we've already addressed.

13         MR. BELL:  That's correct.

14         THE COURT:  And so I just want to know what

15    remains in that.

16         MR. BELL:  Our first request to the Court is

17    that we get some date by which we can say this is -- in

18    other words, your production is complete, and how long

19    after that or at that same time will we get privilege

20    logs?

21         Now, privilege logs are important, Your

22    Honor.   Just for an example, early on in this case we

23    learned through the government that they are going to

24    rely on a 2009 scientific study.   And we anticipate

25    that there will be privilege logs on that study.  We

1    have already seen large redactions of information from

2    the study, or from the materials.   And so we obviously

3    need to address that.

4            But we don't want to file a motion until

5    we've had a chance to know:  All right, this is your

6    privilege log; let's have a meet and confer; let's try

7    to work it out and see where we go.

8            So timing is important.  We just need to

9    know those dates.

10           THE COURT:  Okay.

11           Mr. Bain?

12           MR. BAIN:  I'd like Ms. Mirsky to address

13   this.

14           MS. MIRSKY:  Sarah Mirsky for the United

15   States.

16           We can provide plaintiffs with a written

17   update on the status of the various productions.  We

18   have largely completed those productions.   But we can

19   provide an updated timeline shortly.

20           As to the privilege logs --

21           THE COURT:  So you're doing the rolling

22   production, and they just don't know what's coming next?

23           MS. MIRSKY:  Yes.

24           THE COURT:  So you can give them closure on

25   that, a status of:  Hey, guys, RFP 2 is done; it's

1    complete.    Expect no more.    Is that right?

2                 MS. MIRSKY:  Yes, sir.  We can do that, and

3    we can also update --

4                 THE COURT:  Is that helpful?

5                 MR. BELL:  Yes, of course it is.

6                 THE COURT:  Okay.

7                 MS. MIRSKY:  And we can update our formal

8    responses as well so that they reflect that information

9    so that we're all working off of the same set of

10   information.

11                THE COURT:  Okay.

12                MS. MIRSKY:  As to the privilege logs, I

13   believe there is one outstanding from the EPA.    They're

14   reviewing 37 documents out of thousands that we've

15   produced.    And we expect to have that privilege log

16   ready in the next few weeks.

17                There are privilege logs that are being

18   reviewed by ATSDR currently.    And we have let

19   plaintiffs know that we will be producing those on a

20   rolling basis as well.

21                So we can work with plaintiffs to make sure

22   that they have the information that they need.

23                MR. BELL:  That's all I can ask for.

24                But I'm a little worried that the -- well,

25   we'll look at their final -- their notice, Judge.    But

1  our concern, of course, is we've got to get some of this

2  information to experts.

3          THE COURT:  Right.

4          I mean, you see the concern, right?  They've

5  got a deadline.

6          MS. MIRSKY:  I do.  And the United States

7  has been producing millions of pages of documents.  And

8  we are working with plaintiffs to try to prioritize

9  anything that they need more expeditiously.

10          As I said, I believe that most of our

11  productions from the agency-specific documents are

12  complete at this point.  But we will work with

13  plaintiffs to find out if there's anything else that

14  they need at this time.

15          THE COURT:  Is that good?

16          MR. BELL:  Yes, Your Honor.  In fact, we

17  have a meet and confer after the hearing today on a

18  couple of issues.

19          THE COURT:  All right.  Good.

20          I wanted to ask about a settlement matrix,

21  but I think that's probably premature.  Is it?  We

22  don't have anything to put in it, right?

23          MR. BELL:  We'd be glad to put some numbers

24  in it, Your Honor.  I'm not sure that's --

25          THE COURT:  Is the one at the DON the one

the Navy is doing?

MR. BAIN:  The Navy is working on their database, and they're ingesting all the -- they've got it online now, and they're ingesting historical material into it that they've accumulated.

I think what we need to do -- and we need to work with the Plaintiffs Resolution Committee -- is to try to see how far we can get on the questionnaire that we've been working on, which is going to provide information that will go into a settlement matrix.  So that's where we are right now in that global settlement process.  There are a few issues on the questionnaire that still need to be resolved.  And that's where we were looking down the line possibly a settlement master getting involved and helping us to resolve those issues.

Once those issues are resolved, then what values are put into the matrix, whether that requires feedback from decisions of the Court or whether a special master can help us get those values set, that's further down the line.

The questionnaire is the first part of the process.  And then whether we need a database to house the information from the questionnaire separate from the Navy's database -- hopefully the Navy's database information can be transferred to the other database or

1   be used, because they're accumulating a lot of

2   information on the disease, the plaintiff, the

3   representative, where they lived, things like that.

4           So I think we're making some progress.  We

5   kind of stopped for a while as we were seeing if a

6   settlement master was going to be appointed.  But based

7   on the conference we had two weeks ago, we need to

8   restart that process, I think, and keep it going.  So

9   that's where we are on that.

10          THE COURT:  Would it be helpful for the

11  Court to give some instructions on that?

12          MR. BELL:  Yes.  Especially if there's

13  going to be some movement toward a master or not.  If

14  we knew that, then that would tell us what we need to

15  do.

16          We have a little bit of a procedural -- we

17  believe certain things need to be done first before

18  certain, you know --

19          THE COURT:  Right.

20          MR. BELL:  And we're at odds on that, and

21  I'm a not sure it can be resolved without some help.

22          MS. BASH (telephonically):  Can you hear me,

23  Your Honor?  I don't know if others can hear me.

24          THE COURT:  I don't know who you are, but I

25  can hear you.

```
 1                    MS. BASH:  This is Zina Bash from the
 2      Plaintiffs' Leadership Group.   May I speak on this?
 3                    THE COURT:  Sure.
 4                    MS. BASH:  I'm sorry I wasn't able to be
 5      there today.
 6                    But just echoing some of what Mr. Bain said,
 7      we have been making, I think, substantial progress on
 8      the questionnaire itself.
 9                    And when we talk about a matrix, what we see
10      the questionnaire doing is feeding into or becoming
11      visually a matrix.   And so when we talk about a
12      questionnaire, it will actually become data fields in a
13      matrix.
14                    And we did pause, as Mr. Bain said, when we
15      thought that the appointment of a settlement master was
16      imminent, kind of to give him a chance to catch up to
17      where we were, see where we had reached points of
18      disagreement, and go from there.
19                    But we can easily pick back up where we left
20      off and continue to make progress until there is a
21      settlement master in place.   And that's actually on my
22      plate.   And I plan to put kind of our turn, the PLD's
23      turn of the questionnaire back to the DOJ this week.
24                    MR. BELL:  We probably need to discuss that,
25      Your Honor, within our group.
```

 1             THE COURT:  Okay.

 2             What else should I know about anything?

 3             MR. BELL:  Well, obviously our concern early

 4   on was that the government didn't include us at all in

 5   their values they put into the EO option.  They won't

 6   negotiate --

 7             THE COURT:  That's just an offer, right?

 8             MR. BELL:  It is.  But we think a

 9   settlement master or someone should help us with the

10   methodology of what we're going to do with the matrix.

11   In other words, if the matrix is going to be taken and

12   then they're going to make an offer, and that's it, then

13   they can make an offer already.  So it's the process

14   we're concerned about right now.

15             THE COURT:  I would expect, if you're

16   talking about the lawsuits versus the admin claims, I

17   would assume that the settlement discussions -- however

18   you want to describe them -- in the lawsuit will be more

19   of a give and take like a typical mediation versus what

20   I'm describing as the admin claims through the EO.

21   Right?

22             MR. BELL:  Yes and no.  We haven't gotten

23   any indication that there would be anything like that.

24   They are taking it, in essence, Judge -- and this

25   happens in every case -- they're taking our very best

```
1    cases and trying to get those settled in the EO, which
2    is interesting.  But we are not able to call them back
3    and say:  Well, we'll take X.   They won't let us
4    counteroffer.   So there's really nothing right now
5    going on in that regard.
6              MR. BAIN:  Yes, Your Honor.  The EO was
7    intended, as I think Judge Dever said, an off-ramp to
8    litigation, so that people could get an offer early.
9    The negotiated settlements are going to take time.
10             THE COURT:  But it's not negotiated.  It's
11   just an offer.
12             MR. BAIN:  It's just an offer, right.   And
13   it's been successful.   Forty-three to date have been
14   accepted.   That's a very high percentage of the offers
15   that have been made, both in the litigation and in the
16   administrative process.
17             THE COURT:  Of the ones -- of the cases that
18   have come into the court, how many of those have done
19   the off-ramp?
20             MR. BAIN:  Eighteen.
21             THE COURT:  Eighteen?
22             MR. BAIN:  Yes.
23             And so far only 11 have been explicitly
24   rejected; 35 have expired by the terms; and some are
25   still pending.   But we're continuing to examine cases
```

1    to see whether they're eligible for this, both in the

2    administrative process and in the litigation.

3           In fact, we think we'll be finished with

4    looking at the cases in litigation sometime this summer

5    or fall, so we'll have gone through all those cases to

6    see whether they're eligible for EO offers.

7           The administrative claims, of course, is

8    much more open, and there could be a lot more in that

9    process that would be eligible.

10           THE COURT:  The administrative claims

11    process closes in August; is that right?

12           MR. BELL:  Well, as of -- there's an issue

13    there.

14           THE COURT:  Isn't there a deadline?

15           MR. BELL:  The way the statute reads, there

16    actually may not be.  If you read the statute, it says

17    the deadline is this and this.  But the deadline is your

18    illness has to accrue prior to the statute passing,

19    which is August 2022.

20           But then there's a provision in there

21    that -- there's no provision that says you've got to

22    file your claim prior to August 10, 2024.  It just says

23    you can't file it if it doesn't accrue before that.

24           MR. BAIN:  Our position is that there is a

25    limitations period, and the claims do have to be filed

1    by August 10, 2024.   So we hope at that time we'll have

2    a picture of what the global number of claims is.

3                THE COURT:  Have we talked about all the

4    discovery?   I thought there was some water -- ATSDR

5    water health project files.  Is that right?

6                MR. BELL:  We're trying to save the best for

7    last.

8                Eric Flynn, who is one of my law partners,

9    Your Honor, is going to address your order that was

10   issued on the files of ATSDR.  The issue is on the

11   water --

12               THE COURT:  Which is different, right?

13               MR. BELL:  Different --

14               THE COURT:  Water Modeling versus --

15               MR. BELL:  We are the ones that are trying

16   to put our stuff together for them.   They haven't

17   gotten that yet because we haven't completed.   We're

18   trying to get our technical people to see how we could

19   search their database.  If you recall, the protected

20   state registries is what we're talking about on that

21   one.   That's a separate issue.   But we're working on

22   that.

23               But the issue of the -- remember the mirror

24   image motion we had?  The order came down.  We have a

25   request to reconsider that.

```
 1              THE COURT:  Following the order?

 2              MR. BELL:  Following the order.

 3              THE COURT:  I didn't resolve it all?   I

 4    created more problems?

 5              MR. BELL:  I think so -- well, most

 6    respectfully, Your Honor, we see some potential

 7    problems, and we're concerned about it.

 8              And I'll ask Mr. Flynn if he can address it.

 9              THE COURT:  Okay.

10              Do you know of this, Mr. Bain?

11              MR. BAIN:  I wasn't -- I thought they might

12    seek some type of reconsideration, but they have not met

13    with us.

14              THE COURT:  You all haven't talked about it?

15              MR. BAIN:  Well, Mr. Bell did make some

16    remarks late last week about it, but we didn't have any

17    type of meet-and-confer negotiation about it.

18              THE COURT:  I just wondered how much I need

19    to hear about it today versus --

20              MR. BELL:  We're not going into the facts.

21    We're going to talk about procedural issues.

22              THE COURT:  Okay.  Go ahead.

23              MR. FLYNN: Good morning, Your Honor.  Eric

24    Flynn from Bell Legal Group.   It's short; I promise.

25              So I think what we would request
```

```
 1    respectfully is that we have a time period within which
 2    to file a motion for reconsideration.  I think it's
 3    going to take the government a little bit longer than
 4    that time period to provide us the information.  We
 5    would just ask that we hold that time period in abeyance
 6    so we can just look at what's there and then make a
 7    decision as to whether or not to seek reconsideration.
 8              THE COURT:  What do I need to reconsider?  I
 9    thought I gave you what you wanted.
10              MR. BELL:  No, Your Honor.
11              THE COURT:  No, I didn't?
12              MR. BELL:  None of the -- the mirror image
13    file was not allowed.  And so what we'd ask -- this
14    Friday is the deadline for reconsideration.  But the
15    government still has time to produce everything.
16              THE COURT:  And they're in the process of
17    doing that; is that right?
18              MR. BELL:  Right.
19              So what we're asking is just allow us to
20    have an extension or hold in abeyance, and let's see
21    what they produce.  If we can put it back together, we
22    won't need to come back to see you.
23              THE COURT:  What do you want, like, 14 days
24    after they produce?
25              MR. BELL:  That would be great, Your Honor.
```

```
 1              THE COURT:  Any objection to that?

 2              MR. BAIN:  No, Your Honor.

 3              THE COURT:  Okay.

 4              MR. BELL:  Thank you.

 5              MR. FLYNN: Thank you.

 6              THE COURT:  Anything else?

 7              MR. BAIN:  Well, I want to bring up again

 8   the issue raised last time, which is the Common Benefit

 9   Order.  And I know Mr. Bell was going to look into

10   that, that it doesn't apply to the EO offers that were

11   made either as part of the litigation or the Navy.

12   Hopefully Mr. Bell has had time to talk with colleagues

13   about it.  I just wanted to make sure that that's clear

14   on the record, that both parties agree that the holdback

15   does not apply to those settlements.

16              MR. BELL:  Well, we're working on that,

17   because it's tricky, Judge.

18              Without getting into the facts now, we're

19   trying to figure out when that particular group of EO

20   offers ends.  In other words, if that EO goes for the

21   life of the case, then we have a problem with that in

22   regards to the way the CMO may apply to that.  So we're

23   working on that.  We'll get with the government on it.

24   We're trying to wade through it ourselves.

25              THE COURT:  Is there a preferred time to
```

1  rule on that issue or make a decision on that?

2          MR. BAIN:  Well, we'd like to have it

3  clarified.  We're making payments without doing a

4  holdback from these payments.  So if that's not what

5  was intended in the order, which we think it was

6  intended in the order, then we need to know that sooner

7  rather than later.

8          I think, talking to others on the

9  plaintiffs' committee, that that's the understanding.

10 But I want to make sure that all the plaintiffs are in

11 agreement to that.  And so it may be that we just need

12 to talk further and make sure it's clarified.  But I

13 just -- I don't want to hang it out there too long and

14 us not to get it set on the record what the

15 understanding is.

16          THE COURT:  Okay.

17          Anything else?

18          MR. BELL:  Nothing right now, Your Honor.

19          As we discussed last time, we think the next

20 hearing would be in a month instead of two weeks.

21          THE COURT:  A month?  Is that a sign that

22 progress is being made?

23          MR. BELL:  Well, I thought it was a pretty

24 good day today.  So we've also, Your Honor, pursuant to

25 the Court's request, brought some updated data for the

```
 1   Court.
 2                 THE COURT:  Census?
 3                 MR. BELL:  Yes, Your Honor.
 4                 THE COURT:  Excellent.
 5                 What do you think?
 6                 MR. BAIN:  I'm fine with skipping the next
 7   hearing and having it, what, four weeks from now?
 8                 MR. BELL:  Yes.
 9                 And if it's okay, Judge, if we need you, as
10   you indicated early on in your order, we could give you
11   a ring.
12                 THE COURT:  Any time.   I'm available any
13   time.
14                 I would assume that the value of these is
15   more than what we're just talking about here in the
16   courtroom.   You guys see each other face to face;
17   you're working things out, planning things.
18                 MR. BELL:  We have a meet and confer today.
19                 THE COURT:  That's what's going on, right?
20                 MR. BAIN:  Uh-huh.
21                 THE COURT:  I would assume that you're doing
22   that when you're not here as well.
23                 So I guess that's April, mid April, late
24   April?
25                 MR. BELL:  April 19, I believe, Your Honor.
```

```
 1                    THE COURT:  So I selected, of the days in

 2      the week when I set these dates, I surveyed the calendar

 3      for the day of the week that seems to avoid public

 4      holidays, and that was Tuesday.  Are Tuesdays good?

 5                    MR. BELL:  They're good for us, Your Honor.

 6                    THE COURT:  So on April 16th I start a

 7      three-day stretch of criminal matters in New Bern.   I

 8      don't think I'm going to have time for a status

 9      conference.  I could do it maybe the 15th.  That's a

10      Monday.  Or we could set it for the 23rd, which is a

11      Tuesday.

12                    MR. BELL:  The 15th sounds good to us.

13                    MR. BAIN:  Personally the 23rd would be

14      better for me.  I'll be somewhere else that weekend

15      before the 15th for a wedding.  It will be hard to get

16      here the morning of the 16th for me.

17                    MR. BELL:  We always agree to a wedding.

18                    THE COURT:  Mr. Bell, the 23rd?

19                    MR. BELL:  Yes, Your Honor.

20                    THE COURT:  Do you all think taking a month

21      off, at least from coming to see me, is going to be

22      problematic?

23                    MR. BELL:  Judge, if you wanted to have a

24      telephone conference or something, if you'd like.

25                    THE COURT:  Why don't we consider that.   If
```

```
 1  we could do that, maybe --
 2              MR. BELL:  We could do it --
 3              THE COURT:  -- two weeks' time?
 4              MR. BELL:  Yes.
 5              THE COURT:  I'll look at that.
 6              MR. BELL:  Maybe zoom or something like
 7  that.
 8              MR. BAIN:  That would be fine, Your Honor.
 9              MR. BELL:  Your Honor, maybe I'll take a tie
10  with me on my vacation.
11              MR. BAIN:  I wanted to let you know we've
12  hired a couple staff who will be in North Carolina at
13  the courthouse in Raleigh.  We have Michael Cromwell
14  here today, he is an attorney; and Davalene Flowers, a
15  paralegal.   They will be -- ultimately they'll be at
16  the courthouse in Raleigh.  We'll have some people
17  locally here.
18              THE COURT:  Okay.  Thank you very much.
19              MS. BASH:  Your Honor -- Your Honor --
20              THE COURT:  Yes, ma'am.
21              MS. BASH:  Zina Bash again.   I just wanted
22  to say one more thing about the settlement master.
23              I think Mr. Bain would agree with this.  But
24  while we are making progress on the questionnaire
25  itself, and I think we'll continue to make good
```

```
 1    progress, I do think that it would be very helpful to us
 2    for the process of a settlement master to be appointed
 3    if there is going to be a new process.   There are some
 4    things that it would be helpful to get clarity on early
 5    on so that we don't go too far down a path of the
 6    questionnaire without some macro -- what I call kind of,
 7    like, macro-level design questions to be adjudicated
 8    between the parties.   So to the extent that the Court
 9    is considering that, we, on the plaintiffs' side, think
10    it would be very helpful to have somebody appointed to
11    do that.   And I think DOJ would agree.   I'm not in the
12    room, so I can't see what Mr. Bain is thinking.   But I
13    just wanted to leave that with the Court.
14             THE COURT:  So the Court would weigh in on
15    the contents of the questionnaire?  Is that what you're
16    saying?  Or you just want --
17             MS. BASH:  No, not the content of the
18    questionnaire.   Kind of what Your Honor had talked
19    about before with appointing somebody to help resolve
20    disputes.  Right?  So kind of discrete disputes that
21    come up along the way.   So maybe it would be the
22    questionnaire, but I don't think -- it would kind of
23    just be designing the questionnaire and answering some
24    of the bigger level questions.
25             DOJ, for example, has resisted some of the
```

1    plaintiffs' proposals.  But they have also said that if

2    we did have a neutral hear both sides and adjudicate,

3    let's say, for example, that design dispute, then they

4    would be willing under many circumstances to abide by

5    the decision of the neutral to kind of break a logjam.

6              So it would be in that capacity that we had

7    envisioned the settlement master and had discussed

8    having a settlement master to adjudicate those things.

9    We, on the plaintiffs' side, still believe that would be

10   a helpful person to be involved in the discussions.

11             MR. BELL:  I think you said earlier, Your

12   Honor, that we'll be hearing from the Court on that.

13   So I think some of this is premature until we hear.

14             THE COURT:  What do you think?

15             MR. BAIN:  Yes, Your Honor, I agree with Ms.

16   Bash that we had been talking about the questionnaire,

17   and we had kind of reached some points where we had some

18   differences that a settlement master would help us

19   resolve with respect to how we, for example, value

20   economic losses.  And so that's when we kind of came to

21   the Court and said we think a settlement master would be

22   helpful to help us talk through those and maybe reach

23   some agreements on how we do that.

24             THE COURT:  My recollection is it sounded

25   like that was -- you all were expecting that to be baked

1   into that person's role, that they would reach a

2   decision on what's in that questionnaire.

3               MR. BELL:  Help guide us through.

4               THE COURT:  All right.

5               MR. BELL:  So I guess what we're saying is

6   if there's going to be a settlement master, we don't

7   want to proceed on another track.

8               If there's not going to be one, we need to

9   know that as well.

10              THE COURT:  Because he or she may undo what

11  you've done.  I've got it.

12              All right.  Thank you very much.

13              (Concluded at 11:36 a.m.)

14                      - - -

15

16

17

18

19

20

21

22

23

24

25

1                      **C E R T I F I C A T E**

2

3      I, Tracy L. McGurk, RMR, CRR, Federal Official Court

4    Reporter, in and for the United States District Court

5    for the Eastern District of North Carolina, do hereby

6    certify that the foregoing is a correct transcript from

7    the record of proceedings in the above-entitled matter.

8

9    /s/ Tracy L. McGurk_____            ___3/21/2024___

10   Tracy L. McGurk, RMR, CRR                  Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25