IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
Case No. 7:23-cv-897

| | |
|---|---|
| IN RE: ) | |
| ) | |
| CAMP LEJEUNE WATER LITIGATION ) | **JOINT STATUS REPORT** |
| ) | |
| This Document Relates To: ) | |
| ALL CASES ) | |
| ) | |

The Plaintiffs' Leadership Group (the "PLG"), together with the Defendant United States of America ("Defendant" or the "United States") (collectively, the "Parties"), jointly file this Joint Status Report pursuant to the Court's Notice of Hearing issued on April 26, 2024. The matters required to be addressed in a Joint Status Report pursuant to Case Management Order No. 2 ("CMO-2") (D.E. 23) are set forth below. In this Joint Status Report, the PLG and the United States also provide the Court an overview of their experience with the "Elective Option" program and the resolution process, more generally.

**(1) An update on the number and status of CLJA actions filed in the Eastern District of North Carolina**

From February 11, 2023 to May 9, 2024, 1,764 Camp Lejeune Justice Act ("CLJA") complaints have been filed in this district. Twenty-five cases have been dismissed; twenty-one of those were voluntary dismissals and the four others were pro se cases. The cases are divided as follows: Judge Dever – 442 cases; Judge Myers – 447 cases; Judge Boyle – 430 cases; and Judge Flanagan – 445 cases.

**(2) An update on the number and status of administrative claims with the Department of Navy**

There are approximately 227,309 administrative claims on file with the Department of Navy ("Navy"). The Navy publicly announced the CLJA claims management portal on April 10,

1

2024. The Navy is currently focused on intake and processing of CLJA claims in parallel with efforts to ingest the remaining inventory of existing claims into the portal. The final tranche of claims is identified and prepared for ingestion over the coming weeks. All new claims are now received through the claims management portal resulting in a higher level of claim data quality and enhanced communication between filers and the Navy. The Navy continues to review feedback from filers on the filing experience and is working to identify fixes and enhancements to facilitate the filing process where feasible. Of approximately 551 CLJA claims containing necessary substantiation, the Department of the Navy identified 119 CLJA claims that may be eligible for settlement.

**(3) An update on stipulations entered into between the Parties since the last status conference**

On April 19, 2024, the Parties filed a joint Stipulation Regarding Production of Plaintiffs' Medical Records and Social Security Records. Further, the PLG proposed a set of stipulations based upon the government's Answer to the Master Complaint on April 4, 2024. The United States has provided an initial response to certain stipulations, offered additional stipulations for consideration, and suggested a meet and confer during the week of May 13, 2024 to discuss stipulations further. The Parties will continue to evaluate and discuss potential stipulations for purposes of promoting the efficiency of discovery and trials in this matter.

**(4) A summary of the discovery conducted since the last status conference:**

The Parties have agreed to file separate summaries of the discovery conducted since the last status conference. The Parties' respective summaries appear below:

**The PLG's Position:**

The PLG continues to dedicate significant time and resources to conducting discovery in this matter, and the PLG is committed to taking all actions necessary to meet the deadlines set

forth in the Court's various scheduling orders. Since the most recent Status Conference on April 26, 2024, the PLG has been defending depositions on a near daily basis, scheduling treating physician depositions, and otherwise conducting discovery. The PLG believes that the discovery process is on pace to meet all applicable deadlines. What follows is a brief description of some recent discovery issues.

ATSDR Water Modeling Project Files

The government has not completed its privilege review of the ATSDR's water modeling project file, and therefore, the government has not produced documents tentatively withheld on the basis of privilege or a final privilege log. Notwithstanding these privilege issues, the PLG has dedicated substantial resources to an attempt at reconstructing the water modeling project file. Unfortunately, however, the PLG is unable to confirm that the model that it has constructed is the *same model* used by the ATSDR. Therefore, on May 3, 2024, the PLG filed a Motion to Reconsider Order Granting in Part and Denying in Part Plaintiff's Motion to Compel Production of the ATSDR's Water Modeling Project File in Native Format. [D.E. 194]. In the said motion, the PLG requests that the Court compel the government to produce the ATSDR's water modeling project file in native format.

Muster Rolls

On March 8, 2024, the Court entered an Order [D.E. 157] denying as moot the PLG's Motion to Compel Production of Certain Digitized Muster Rolls [D.R. 140]. In the said Order, the Court found that the PLG's motion was moot because the government had committed to producing the digitized muster rolls contained on a Network Attached Storage ("NAS") located at Quantico, VA. The government has completed this production, and the PLG has confirmed that the digitized muster rolls on the NAS were not the same muster rolls requested by the PLG. Additionally, the

government recently produced a document (seemingly a PowerPoint presentation) indicating that the requested muster rolls or a nearly identical collection of searchable personnel records for Camp Lejeune exist but have not been produced. Therefore, on May 3, 2024, the PLG filed a Motion to Reconsider Order Denying Plaintiff's Motion to Compel Production of Certain Digitized Muster Rolls. [D.E. 192]. In a responsive filing on May 8, 2024, the government again argued that the PLG has been provided with the requested digitized muster roll. While skeptical, the PLG is evaluating the government's response.

Subpoena of the National Academy of Sciences

The National Academy of Sciences ("NAS") is a private, nonprofit institution established for purposes of providing expert advice to the nation on scientific issues. The National Research Council ("NRC") is a research committee of the NAS. The Navy sponsored a study by the NRC concerning associations between adverse health effects and the contaminated water at Camp Lejeune (the "NRC 2009 Report"). The PLG has issued and properly served a Subpoena upon the NAS requiring production of the NRC 2009 Report and related documents. As a basis for withholding document, the NAS has cited to certain dubious privileges that have never been recognized by this Court. The PLG is considering whether to file a motion to compel compliance with the referenced Subpoena of the NAS. The PLG has just learned of the NAS motion to quash or modify PLG's subpoena, or in the alternative for a protective order filed in the United States District Court for the District of Columbia and will respond accordingly.

Claims Management Portal

During the Status Conference on April 26, 2024, the PLG discussed with the Court certain difficulties with the government's new "Claims Management Portal" for CLJA administrative claims (the "Claims Portal"). The Claims Portal makes it exceedingly difficult to submit

administrative claims, which is a time-sensitive issue given the government's position that August 10, 2024 is a deadline for administrative claims. The Parties are engaged in discussions about this matter.

Access to Housing Records

The government produced to the PLG a collection of Camp Lejeune "Occupant Housing Records." The Occupant Housing Records are an important resource for corroborating the periods that servicemembers and their families resided at Camp Lejeune. Indeed, these housing records are crucial for both plaintiffs and claimants in the administrative process. The government has taken the position that access to these Occupant Housing Records may be restricted to plaintiffs whose claims are pending with this Court. The Parties are presently engaged in discussions that will hopefully address and resolve these issues without need for motions practice.

Pretrial Conference on Discovery

On March 7, 2024, the PLG filed a Notice of Filing of the PLG's Proposed Track 2 Scheduling Order (the "Notice"). [D.E. 155]. In that Notice, the PLG requested a Fed. R. Civ. P. 16 pretrial conference for purposes of discussing procedures that would significantly reduce the scope and expense of discovery and trials and thereby speed up this litigation and promote a global resolution.

The PLG has dedicated substantial time and resources to the discovery process, including both paper discovery and depositions. The PLG believes that discovery is progressing at a reasonable pace and that the Parties will be able to meet all deadlines set forth in Case Management Order No. 2.

**United States' Position:**

The United States continues to provide rolling productions of documents in response to Plaintiffs' discovery requests, and is producing documents to Plaintiffs on a near-daily basis. To date, in response to these discovery requests, the United States has produced over 1.1 million files, totaling over 15.7 million pages of records. The United States is working diligently to produce all responsive, non-privileged documents prior to the close of fact discovery.

ATSDR Water Modeling Project Files

The United States has completed its production of nearly all of the ATSDR water modeling project files, including the native production of the exotic modeling files in compliance with the Court's March 12, 2024, Order [D.E. 159]. The United States is finishing its review of potentially privileged documents (all of which are "non-exotic") from the water modeling project files and is making rolling productions of the documents that are determined to be not privileged. The United States will be responding to Plaintiffs' Motion to Reconsider Order Granting in Part and Denying in Part Plaintiff's Motion to Compel Production of the ATSDR's Water Modeling Project File in Native Format. [D.E. 194] on Friday, May 10, 2024. Generally, the United States will argue that the Court's Order regarding the water modeling project files should not be reconsidered because Plaintiffs have not offered any "new evidence" that the United States' prior methods of production were insufficient for Plaintiffs to use and analyze the water modeling files.

Muster Rolls

On May 8, 2024, the United States filed its Opposition to Plaintiffs' Motion for Reconsideration of the Court's Order Denying Plaintiffs' Motion to Compel Production of Muster Rolls. [D.E. 199]. The United States asserts again that it has already produced the only existing version of the records and associated database resulting from the 2013 scanning project. Plaintiffs' Motion focused on a PowerPoint Dr. Patricia Hastings from Veteran's Affairs drafted that

referenced a Marine Corps Unit Diary Database ("MUDD"). The United States included a declaration from Dr. Hastings with its Opposition filing. Dr. Hastings's Declaration confirmed that she learned of the "MUDD" from Scott Williams, a Program Manager for the US Marine Corps Camp Lejeune Program and originator of the term "MUDD." The United States also included a declaration from Mr. Williams, who confirmed that the "MUDD" is the same as the database contained on the Network Attached Storage ("NAS"). The United States has already produced all records and the related database on the NAS. As such, the United States maintains that it has no further documents to produce with respect to the First Set of Plaintiffs' Request for Production, Request No. 3.

Depositions

As of May 9, 2024, the United States has requested dates for 100 depositions of Track 1 Discovery Plaintiffs, scheduled and taken 100 of those depositions. The United States has also requested dates for 294 fact witness and treating physician depositions, has scheduled 180 of those depositions, and taken 70 of those depositions.

Subpoena of the National Academy of Sciences

The United States understands that on May 8, 2024, the National Academy of Sciences ("NAS") filed in the United States District Court for the District of Columbia a motion to quash or modify PLG's subpoena, or in the alternative for a protective order. The United States has not coordinated with the NAS counsel with respect to the NAS's responses to PLG's discovery requests, other than to request copies of documents produced.

Access to Defense Manpower Data Center Data

Plaintiffs reference a collection of Camp Lejeune "Occupant Housing Records" the United States previously produced. The United States believes that for purposes of this discussion,

7

Plaintiffs are actually referring to data from the Defense Manpower Data Center ("DMDC"). The United States notes at the outset that this dataset was produced as confidential under the Protective Order in place in this litigation. This dataset was produced to be used for purposes of this litigation only. To the extent Plaintiffs' counsel, or claimants' counsel in the administrative process, are using the DMDC data outside of this litigation, the United States asserts that this a potential violation of the Protective Order. In addition, the United States has concerns about the reliability of the DMDC data for purposes of substantiating administrative claimants' claims. Nevertheless, the United States is investigating whether there is a way to provide claimants' counsel to DMDC data while maintaining confidentiality, and is working with the DMDC and other government agencies to confirm the United States' position.

Pretrial Conference

On May 8, 2024, the United States filed its response to PLG's proposed topics for a Rule 16 conference, explaining why it would be premature to resolve many of the issues at this time, as well as inconsistent with the procedures established in Case Management Order 2. The United States submits that more appropriate times for a Rule 16 conferences are (1) after the completion of fact discovery and (2) after the completion of expert discovery.

**(5) Update on individual and global settlement efforts:**

The Parties' respective perspectives on the resolution process, including both individual and global, appear below.

**The PLG's Position:**

Seven months have passed since the United States announced its Elective Option ("EO") settlement program, and it has yet to make any real progress extending offers to the many thousands of claimants expected to be eligible for and amenable to settlement under the program.

Contra the United States's presentation of the EO as an efficient way to "get veterans and their families paid more quickly,"[1] most claimants have experienced it as little more than the latest in a long line of empty promises by the federal government.

Part of the delay stems from the government's failure to develop a process for efficiently accessing records held by other federal agencies. Many claimants currently receive certain veterans' benefits premised on their service at Camp Lejeune and related to the same injury for which they are seeking damages under the CLJA. The Department of Veterans Affairs ("VA") therefore holds records that would confirm EO eligibility for many thousands of claimants. Soon after the EO was announced, the government claimed it was developing a technical link with the VA that would allow bulk eligibility verification. But the government has since abandoned that effort and is now accessing the wealth of data held by the VA in a rudimentary and inefficient manner: by logging into a VA system and searching for claimants *one by one*.

While failing to develop an efficient, bulk method to obtain and review the records in its possession, the government has also, on multiple occasions and in multiple ways, asked for and received substantiating documentation for eligible claimants. In other words, the government *already possesses* substantiating documents for many eligible claimants but has simply failed to review them and extend offers. By way of example, the Navy's Tort Claims Unit contacted several firms in May 2023 requesting documentation for "100 test cases" with diseases "presumptively" linked to the toxins at Camp Lejeune. The firms expended substantial resources producing the requested documents, but the Navy never followed up. Submitting documentation through the government's new claims-management portal has not produced better results. The PLG knows of

---

[1] Diana Novak Jones, *Navy, Justice Dept. Offer Payouts in Bid to Speed up Camp Lejeune Claims*, REUTERS (Sept. 6, 2023), https://www.reuters.com/legal/litigation/navy-doj-offer-payouts-bid-speed-up-camp-lejeune-claims-2023-09-06/.

no offer that has been extended through the portal, even though claims with clear, substantiating documentation were submitted since at least February 2024.

The government's new portal itself has already become a source of frustration for claimants and their attorneys. Launched recently after months of delays, it has caused significant confusion because its design does not align with the legal categories created by the CLJA and other relevant federal laws. Moreover, it requires attorneys to adopt *new* claim IDs for all of their previously filed claims and adjust filing procedures that had been dictated by the government for almost two years—all for very uncertain benefit, given that the government has not acted promptly on claims submitted and substantiated through the portal. Under these circumstances, even claimants who are eligible for an offer *under the government's own standards* have an uncertain and long-winding path to settling their claim under the EO program.

If the path to settlement for a claimant in actual possession of substantiating documents is difficult, the path for a claimant *without* those documents is effectively non-existent. Since as early as October 2022, the government has directed claimants not to request their own records from the National Archives and Records Administration (NARA), and NARA has not acted on requests with any evident urgency. Then, at some point in the last two months, the government closed the doors to NARA entirely by requiring all users of the Archives' eVetRecs request portal to state whether their request "pertain[s] to the Camp Lejeune Justice Act of 2022" and *preventing the user from proceeding if the answer is "yes."* It is difficult to see how the government intends to make any meaningful progress settling claims under the EO program when it is not acting promptly on claims substantiated by claimants, not independently verifying claims with any efficiency, and now not allowing claimants to request their own records to self-substantiate claims.

Unfortunately, these issues are nothing new. Since the enactment of the Camp Lejeune Justice Act, the government has repeatedly failed to establish a claims-processing system capable of handling the immense volume of CLJA claims. For an entire year, the Navy's Tort Claims Unit ("TCU") wasted valuable time and resources on ill-fated tech projects and operational missteps,[2] and it repeatedly indicated that the TCU was attempting to process tens of thousands of claims manually.[3] Even as the TCU has added staff and prioritized the development of the claims portal, it has been unable to speed up claims processing materially—and it has continued to make basic errors.[4]

Most troublingly of all, the government continues to refuse to articulate a positive vision of a scalable settlement process for this litigation. Understanding the enormity of the task before both Parties, the PLG through the Government Liaison has, on multiple occasions, presented the government with a vision of the legal and administrative apparatus necessary to resolve tens of thousands of claims in a reasonable amount of time and a roadmap to get that apparatus up and running. While the United States has reacted to these proposals with varying degrees of resistance, it has never put forward any vision of its own for a resolution of this litigation. Instead, the government has noted that it has an EO program already in place and that it will not settle claims outside of the EO program *at least until Track 1 trials conclude*. And it continues to take positions

---

[2] In March 2023, for example, the TCU sent out dozens of erroneous *Parker* denials. Some of the *Parker* denials were sent to attorneys other than the attorneys representing the claimants. Others purported to deny the claims of individuals who had not filed actions in this Court but shared common names (e.g., "Gary Miller") with claimants who had done so.

[3] A November 30, 2022, email from the TCU indicated in multiple places that TCU personnel, including the lead attorney for CLJA claims, were manually reviewing and "normalizing" batch filings, sometimes taking as long as "6 hours cleaning up one CSV"—time that could "be spent answering the 400 unread emails in [the lead attorney's] inbox instead."

[4] For example, a recent EO offer misstated the length of the claimant's exposure and was addressed to an attorney at an altogether separate firm from the one representing the claimant.

11

that at fundamentally inconsistent with efficient global resolution. For example, the government claims that it is interested in pursuing a matrix-based settlement similar to the one used in the 9/11 litigation presided over by Judge Hellerstein. But Judge Hellerstein's approach, like the approach taken routinely in other large-scale litigations, relied on discrete proxies to estimate economic damages in a streamlined way; the government has instead insisted on each claimant providing individualized documentation of economic damages, which the government plans to review one by one. Contrary to the DOJ's assertion, the PLG has not resisted establishing a plaintiff-side database for questionnaire information. Quite the opposite: the PLG is eager to finalize a questionnaire precisely to build such a database to ensure that, as soon as trials for a given disease conclude, the PLG will have the information the Parties mutually agree is necessary for purposes of globally resolving claims alleging that disease. What the PLG has objected to is the government's demand that a population of mostly elderly and ill individuals complete a burdensome survey seeking data points that are unlikely to factor into any conceivable resolution matrix.

Unfortunately, it has become increasingly clear that—like its assertions about the EO program—the government's claims that it is interested in a matrix-based settlement do not match its actions. In reality, the government has insisted on a fully individualized analysis of over one-hundred thousand claims, which would make this process last at least as long as the Roman Empire. The PLG is hopeful that a settlement master, if appointed, can help the government understand the incompatibility of its positions with its stated interest in global resolution—and thereby help the Parties make progress even before Track 1 trials conclude.

**United States' Position:**

Contrary to PLG's complaint, the United States believes that the Elective Option ("EO") has served as an effective "off ramp" from litigation, as Judge Dever suggested at the first status conference in this litigation. There has been great interest in the EO, and may litigants and claimants have taken advantage of the program. Given the recent enhanced functionality of the Navy's claims management portal, with the ability to provide substantiation directly into the portal electronically, the United States expects there to be a great increase in offers and settlements under the EO.

The latest statistics bear out the effectiveness of the EO program. As of May 7, 2024, the Department of Justice has determined that sixty (63) cases in litigation meet the Elective Option ("EO") criteria through documentary verification. The case breakdown by injury includes: 17 Bladder Cancer, 18 Kidney Cancer, 12 non-Hodgkin's Lymphoma, 6 Kidney Disease, 4 Parkinson's Disease, 4 Leukemia, and 2 Multiple Myeloma. Twenty-three (23) offers have been accepted by plaintiffs on 6 cases of Bladder Cancer ($150,000; $150,000; $300,000; $300,000; $300,000; $450,000), 4 cases of Kidney Disease (End Stage Renal Disease) ($250,000; $250,000; $100,000; $100,000), 5 cases of Kidney Cancer ($300,000; $300,000; $300,00; $300,000; $150,000), 4 cases of non-Hodgkin's Lymphoma ($150,000; $150,000; $300,000; $300,000), 1 case of Multiple Myeloma ($250,000), 2 cases of Parkinson's Disease ($400,000; $100,000), and 1 case of Leukemia ($300,000). Nine (9) offers were rejected by plaintiffs, including 4 cases of Bladder Cancer, 2 cases of Kidney Cancer, 1 case of Multiple Myeloma, 1 case of Kidney Disease, and 1 case of Parkinson's Disease. Sixteen (16) offers have expired, including 5 cases of Kidney Cancer, 6 cases of non-Hodgkin's Lymphoma, 2 cases of Bladder Cancer, 2 cases of Leukemia, and one case of Parkinson's Disease. The other fifteen (15) settlement offers are pending.

Further, the Department of Justice has approved offers for sixty-two (62) claimants in reliance on information provided by the Navy. Thirty-one (31) settlement offers have been accepted. Two (2) offers have been rejected. Twenty-five (25) offers have expired, and the other four (4) offers are pending.

Payments have been sent for sixteen (16) accepted settlement offers made by the Navy and twenty (20) accepted settlement offers from DOJ, totaling $9,000,000. Nine cases of Bladder Cancer resulted in total payments of $2,400,000. Five cases of Leukemia resulted in total payments of $1,350,000. Four cases of non-Hodgkin's Lymphoma resulted in total payments of $900,000. Three cases of Parkinson's Disease resulted total payments of $750,000. Nine cases of Kidney Cancer resulted total payments of $2,550,000. Five cases of Kidney Disease resulted in total payments of $800,000. One case of Multiple Myeloma resulted in a payment of $250,000.

Unfortunately, the United States has learned that in certain instances PLG counsel failed to timely communicate EO offers to clients, or clients were unaware of the time limit for expiration of EO offers. Consequently, the United States has started reminding plaintiffs' counsel of outstanding EO offers and expiration dates as the expiration dates approach. The United States has also entertained reasonable requests for reconsideration of EO offers, and, in certain circumstances, has raised the amount of EO offers based upon evidence presented.

The United States has continued to receive complaints from plaintiffs' counsel about the condition in EO settlements that limits attorney fees consistent with the fee caps established in 28 U.S.C. § 2675. The United States believes that a Court ruling that the fee caps of 28 U.S.C. § 2675 apply to CLJA judgments and settlements will facilitate settlement of cases, both through the EO process and the ultimate global resolution of cases and claims. [See D.E. 34].

With respect to cases in litigation, the United States expedited requests for substantiation of certain cases outside of Track 1 in order to make EO settlement offers. The United States has requested plaintiffs' counsel to provide dates of birth and social security numbers to access records, or substantiation to review claims, and acted on those requests promptly. The United States expects to make a bulk request for dates of birth and social security information soon to perform record reviews and seek further substantiation for all cases in litigation that are potentially eligible for EO offers, even though those cases did meet EO evidentiary standards upon the Department's initial review.

The Navy used determinations by the Veterans Benefits Administration to expedite determination of eligibility for EO offers prior to its claims management portal reaching full functionality. As mentioned, with the increased functionality of the portal, the Navy expects the number of EO offers to increase in the coming months. PLG's complaint about their inability to obtain NARA records is misplaced. Regardless of whether a request is connected to the CLJA, a veteran or next-of-kin of a deceased veteran may still use NARA's website to order a copy of their military records. *See* D.E. 193-2. On NARA's website, when "Yes" is selected in response to "[d]oes your request pertain to the Camp Lejeune Justice Act of 2022 or the PACT Act?," the screen will display the following text:

> Supporting documents are not needed to submit an initial claim under the Camp Lejeune Justice Act of 2022. The Navy Judge Advocate General may request records for claimants at a later date, but not as a part of the initial claim filing…**If you wish to proceed with submitting a request, please scroll back up and change your answer to the previous question to "No."**

*See* D.E. 193-2 at 1-2 (emphasis added). Thus, the NARA website give individuals permission to change their response to "No" when requesting records related to the CLJA in order for the NARA system to process the records request.

Additionally, the Department of Justice spent several months in advance of the start of fact discovery coordinating with multiple agencies to streamline the request, digitization, and production of agency records, including military records stored at NARA by the service branches. *See* D.E. 199-5 (letter from the United States to Plaintiffs dated November 20, 2024). As of May 8, 2024, the United States has produced approximately 31,103 pages of records stored at NARA in response to Plaintiff's First Request for Production, Request No. 19.

PLG has also mischaracterized the status of the global settlement processes. It was the United States, not PLG, that first initiated a vision for the global settlement of this litigation by pointing plaintiffs' counsel to the approach Judge Hellerstein used in the World Trade Center litigation, including providing the law review articles discussing that approach to various groups of plaintiffs' lawyers (including current PLG attorneys) before any plaintiff leadership group was selected. The United States even developed a questionnaire of information needed for global resolution before the appointment of plaintiff leadership. Once PLG was appointed, PLG resisted efforts that the United States offered to facilitate global resolution, including establishing a database for the questionnaire information that met government security requirements. The parties have discussed how to model parts of the global settlement after the World Trade Center litigation to fit the needs of this litigation. However, PLG has failed to acknowledge how the CLJA litigation presents unique circumstances that differ from the World Trade Center litigation, such as the decades of varying exposures and the wide range of alleged injuries.

With respect to the United States' proposed questionnaire, PLG removed sections addressing non-cancer diseases, then later added back sections for Parkinson's Disease, non-cancer liver disease, and non-cancer kidney diseases. To date, PLG has failed to provide any feedback to other disease-specific questions, including those involving diseases on Short Form Complaints.

16

Instead of meaningfully engaging on these issues, PLG offered an unrealistic "roadmap" that sought to short-circuit crucial issues raised by the CLJA, such as how to account for varying exposures, types of diseases, and necessary offsets. The parties' most significant disagreement is the amount of case-specific information that should be required to resolve claims. PLG has continually resisted providing case specific information without knowing what the payout will be, even though administrative claims typically request twenty-five to fifty million dollars. PLG unrealistically anticipates hundreds of thousands of compensable cases based on the number of claims generated through an aggressive advertising campaign. The United States is hopeful that a Settlement Master, if appointed, can help PLG understand the incompatibility of its positions with the elements required to prove claims under the statute.

**(6) Any other issues that the parties wish to raise with the Court:**

The following motions are presently pending before the Court:

- (a) the PLG's request for a Rule 16 conference [D.E. 155];
- (b) the PLG's Motion for Partial Summary on the Issue of Specific Causation [D.E. 110];
- (c) the PLG's motions to expedite trials in three separate CLJA actions;[5]
- (d) the PLG's Motion to Certify for Appeal the Order Granting Defendants' Motion to Strike the Demand for a Jury Trial [D.E. 137];
- (e) the Parties' respective proposed discovery plans for Track 2 illnesses [D.E. 155 & 156];

---

[5] *McElhiney v. United States*, Docket No. 7:23-cv-1368; *Peterson v. United States*, Docket No. 7:23-cv-1576; *Dunning v. United States*, Docket No. 7:23-cv-1364.

17

Case 7:23-cv-00897-RJ   Document 201   Filed 05/09/24   Page 17 of 20

(f)  the United States' Motion to Amend Track 1 Order to Prioritize Trials of Track 1 Single Disease Plaintiffs [D.E. 167];

(g)  the United States' Motion for Reconsideration of Case Management Order No. 10 Regarding Opt-Out Provision [D.E. 169];

(h)  the PLG's Motion for Partial Summary Judgment on CLJA Legal Representative Procedure [D.E. 184];

(i)  the PLG's Motion for Reconsideration of the Court's Order Denying Motion to Compel Production of Certain Digitized Muster Rolls [D.E. 192]; and

(j)  Motion for Reconsideration Regarding Order on Motion to Compel Production of the ATSDR Water Modeling Project File [D.E. 194].

*[Signatures follow on next page]*

DATED this 9th day of May, 2024.

Respectfully submitted,

*/s/ J. Edward Bell, III*
J. Edward Bell, III (admitted *pro hac vice*)
Bell Legal Group, LLC
219 Ridge St.
Georgetown, SC 29440
Telephone: (843) 546-2408
jeb@belllegalgroup.com
*Lead Counsel for Plaintiffs*

*/s/ Zina Bash*
Zina Bash (admitted *pro hac vice*)
Keller Postman LLC
111 Congress Avenue, Ste. 500
Austin, TX 78701
Telephone: 956-345-9462
zina.bash@kellerpostman.com
*Co-Lead Counsel for Plaintiffs*
*and Government Liaison*

/s/ *Robin Greenwald*
Robin L. Greenwald (admitted *pro hac vice*)
Weitz & Luxenberg, P.C.
700 Broadway
New York, NY 10003
Telephone: 212-558-5802
rgreenwald@weitzlux.com
*Co-Lead Counsel for Plaintiffs*

*/s/ Elizabeth Cabraser*
Elizabeth Cabraser (admitted *pro hac vice*)
LIEFF CABRASER HEIMANN &
 BERNSTEIN, LLP
275 Battery Street, Suite 2900
San Francisco, CA 94111
Phone (415) 956-1000
ecabraser@lchb.com
*Co-Lead Counsel for Plaintiffs*

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

J. PATRICK GLYNN
Director, Torts Branch
Environmental Torts Litigation Section

BRIDGET BAILEY LIPSCOMB
Assistant Director, Torts Branch
Environmental Torts Litigation Section

*/s/ Adam Bain*
ADAM BAIN
Special Litigation Counsel
Environmental Torts Litigation Section
U.S. Department of Justice
P.O. Box 340, Ben Franklin Station
Washington, D.C. 20044
E-mail: adam.bain@usdoj.gov
Telephone: (202) 616-4209

LACRESHA A. JOHNSON
HAROON ANWAR
DANIEL C. EAGLES
NATHAN J. BU
Trial Attorneys, Torts Branch
Environmental Torts Litigation Section
*Counsel for Defendant United States of America*

*/s/ W. Michael Dowling*
W. Michael Dowling (NC Bar No. 42790)
The Dowling Firm PLLC
Post Office Box 27843
Raleigh, North Carolina 27611
Telephone: (919) 529-3351
mike@dowlingfirm.com
*Co-Lead Counsel for Plaintiffs*

*/s/ James A. Roberts, III*
James A. Roberts, III (N.C. Bar No.: 10495)
Lewis & Roberts, PLLC
3700 Glenwood Avenue, Suite 410
P. O. Box 17529
Raleigh, NC 27619-7529
Telephone: (919) 981-0191
Fax: (919) 981-0199
jar@lewis-roberts.com
*Co-Lead Counsel for Plaintiffs*

*/s/ Mona Lisa Wallace*
Mona Lisa Wallace (N.C. Bar No.: 009021)
Wallace & Graham, P.A.
525 North Main Street
Salisbury, North Carolina 28144
Tel: 704-633-5244
*Co-Lead Counsel for Plaintiffs*