IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
Civil Action No.: 7:23-CV-897

IN RE:

CAMP LEJEUNE WATER LITIGATION

This Document Relates to:

ALL CASES

**PLAINTIFFS' LEADERSHIP GROUP OPPOSITION TO UNITED STATES' MOTION TO PREVENT THE DEPOSITION OF DR. CHRISTOPHER PORTIER**

## Introduction

The Agency for Toxic Substances and Disease Registry (ATSDR), in its role as the lead governmental agency on impacts to human health caused by hazardous exposures, conducted multiple health studies concluding that exposure to the water at Camp Lejeune is associated with increased rates of numerous cancers and neurological diseases such as non-Hodgkin lymphoma, bladder cancer, and Parkinson's disease. Dr. Portier was the Director of the ATSDR while the agency performed water modeling and health studies for Camp Lejeune, and he oversaw and was involved in that work; his testimony is front and center to this litigation. But the government's litigation strategy is to disavow its own agency's studies. Instead, the government's opportunistic litigation strategy is to embrace a report by a private entity, the National Academy of Sciences' (NAS) National Research Council (NRC), which criticized elements of the ATSDR's studies.

In response to the NRC, Dr. Christopher Portier, in his capacity as Director of the ATSDR, took it upon himself to issue a letter in October 2010 that defended the ATSDR's health studies and corrected the NRC's errors about the same. Self-evidently, Dr. Portier is an important witness – his testimony may go to the heart of the government's main defense.

Perhaps it is predictable that the government's motion for protective order seeks to prevent Dr. Portier's deposition. *See* D.E. 211–213. Dr. Portier has volunteered to testify. The Plaintiffs' Leadership Group (PLG) is committed to taking all reasonable steps, at its own expense, to ensure that the deposition is conducted consistent with all applicable international laws. Seemingly, the government's only cause for concern is that it will be forced to pay for a plane ticket and lodging. Given that Dr. Portier will provide highly relevant testimony that is critical to the PLG's ability to rebut the government's defense in this litigation, the government's motion should be denied.

2

**Factual Background**

On May 10, 2024, the PLG noticed the deposition of Dr. Portier pursuant to Federal Rules of Civil Procedure 30(b)(1) and 26. *See* Exhibit 1. The deposition was to be taken on May 28, 2024 in Domodossola, Italy "at a location to be determined." *Id.* Dr. Portier, an American citizen, is the former ATSDR Director and volunteered to be deposed without a subpoena. Unfortunately, Dr. Portier – due to health constraints – must remain within 2 hours of the hospital near his home in Switzerland and is thus unable to travel long distances to be deposed.

When Dr. Portier became ATSDR Director, the NAS's[1] NRC,[2] at the request of the U.S. Department of the Navy, had "convened the Committee on Contaminated Drinking Water at Camp Lejeune," and created a report (2009 NRC Report) which "focuse[d] on what scientific evidence can say about the causal relationship of past exposures and health outcomes." *Id.* at ix–x. The Committee's charge was narrowly defined and consisted of the following three tasks:

> One was to review the scientific evidence about the kinds of adverse health effects that could occur after exposure to TCE, PCE, and other contaminants. The second was to evaluate studies that were performed or that are under way on former residents of the base and to consider how useful it will be to conduct additional studies. The third element was to identify scientific considerations that could help the Navy set priorities on future activities.

---

[1] The NAS is a "private, nonprofit, self-perpetuating society of distinguished scholars engaged in scientific and engineering research, dedicated to the furtherance of science and technology and to their use for the general welfare," whose mandate is "to advise the federal government on scientific and technical matters." NRC, *Contaminated Water Supplies at Camp Lejeune: Assessing Potential Health Effects* (Nat'l Academies Press 2009), *available at* https://nap.nationalacademies.org/download/12618 [hereinafter 2009 NRC Report].

[2] The NRC was organized by the NAS in 1916 "to associate the broad community of science and technology with the Academy's purposes of furthering knowledge and advising the federal government. . . . [NRC] is administered jointly by both [NAS] and the Institute of Medicine." *Id.*

3

*Id.* at 1. The 2009 NRC Report was, in many respects, skeptical of the epidemiological and toxicological studies relating to common Camp Lejeune diseases, as well as the water-modeling historical reconstruction conducted by the ATSDR for Tarawa Terrace.

As a matter of background, the ATSDR is "a federal public health agency of the U.S Department of Health and Humans Services,"[3] the "lead Agency . . . for implementing the health-related provisions of CERCLA," and "charged under the Superfund Act to assess the presence and nature of health hazards at specific Superfund sites," such as Camp Lejeune.[4] For decades, the ATSDR has been involved in producing governmental studies and reports on the contaminated water at Camp Lejeune. This work includes conducting a historical reconstruction of the contaminant levels present at Camp Lejeune prior to 1987 because, owing to the government's failures, "[l]ittle data exists about how chemicals have affected the base's water in the past."[5] At the time that the 2009 NRC Report was released, the ATSDR had only completed its water-modeling historical reconstruction for Tarawa Terrace; the historical reconstruction for Hadnot Point was not yet complete.

Although the ATSDR – *the lead agency* of the U.S. government tasked with evaluating the health effects of toxic exposures – has spoken numerous times on the exposures to, and health effects associated with, the Camp Lejeune contaminated water, the government has made clear that its defense in this litigation will center around discrediting and disavowing the work of its own

---

[3] ATSDR, *Agency for Toxic Substances and Disease Registry* (last reviewed May 21, 2024), *available at* https://www.atsdr.cdc.gov/index.html.
[4] Fed. Register, *Agency for Toxic Substances and Disease Registry*, *available at* https://www.federalregister.gov/agencies/agency-for-toxic-substances-and-disease-registry#:~:text=As%20the%20lead%20Agency%20within,illnesses%20that%20result%20from%20such.
[5] ATSDR, *Water Modeling (FAQs)* (last reviewed Jan. 16, 2014), *available at* https://www.atsdr.cdc.gov/sites/lejeune/faq_water.html.

agency. Instead, the government intends to hang its hat on the 2009 NRC Report, written by a non-governmental, private company and operating under a narrow charge, to support its defenses. The government has therefore made the 2009 NRC Report not only relevant, but front and center in this litigation by rejecting its own ATSDR findings and embracing the NRC's work. The government's intended reliance on the 2009 NRC Report is highlighted by its recently-issued subpoena for purposes of deposing Dr. David Savitz, Chair of the NRC Committee on Contaminated Drinking Water at Camp Lejeune that drafted the 2009 NRC Report. *See* Exhibit 2.

That Dr. Portier – as ATSDR Director following release of the 2009 NRC Report and when the ATSDR was assessing the scope of contamination and health outcomes from Marines' exposure to the contaminants – has highly relevant knowledge of the both the ATSDR and the NRC's involvement in Camp Lejeune matters is indisputable. In fact, in October 2010, Dr. Portier wrote and signed, as ATSDR Director, a letter to the Navy to clear up "confusion regarding the position of the ATSDR regarding the [2009 NRC Report]," "[b]ecause of [the Navy and ATSDR's] collaboration and joint concern regarding exposures to military personnel, their families and others at Camp Lejeune." Exhibit 3, at 1. His letter, highly critical of the 2009 NRC Report, devoted pages to explaining the shortcomings of the NRC's approach and conclusions and unequivocally stated his position: "***Thus, let me be perfectly clear; there was undoubtedly a hazard associated with drinking the contaminated water at Camp Lejeune.***" *Id.* at 2 (emphasis added). It is thus no surprise that the government now goes to great lengths to prevent Dr. Portier's testimony here.

## Legal Standard

Federal Rule of Civil Procedure 26(c) provides that a "party or any person from whom discovery is sought may move for a protective order," and the "court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden

or expense." FED. R. CIV. P. 26(c). "The party seeking a protective order bears the burden of showing 'good cause.'" *Talbot for R.T. v. Kohl's Dep't Stores, Inc.*, No. 7:08-CV-129-BO, 2010 WL 11622807, at *2 (E.D.N.C. Feb. 3, 2010).

## Argument

### I. The Government Failed to Carry Its Burden to Prove That a Protective Order Should Be Entered.

Where a party moves for a protective order under Rule 26 – as the government has done here – it "must make a particular request and a specific demonstration of facts in support of the request as opposed to conclusory or speculative statements about the need for a protective order and the harm which would be suffered without one[,] . . . preferably made by affidavits from knowledgeable persons . . . ." *Id.* at *3 (citations omitted) (denying plaintiffs' motion for protective order where plaintiffs "only submitted an affidavit from . . . an interested party in this litigation"). The government's motion falls woefully short of this standard, containing musings, without factual support, devoid of any reason why Dr. Portier's deposition is not relevant. Indeed, the government *assumes* – without providing any affidavit from a non-interested party with knowledge or any other specific facts – that Dr. Portier "had little firsthand involvement in the ATSDR Camp Lejeune studies," D.E. 212, at 5, and his testimony is thus supposedly irrelevant. In place of a "particular request and a specific demonstration of facts in support of the request," the government's motion makes only "conclusory [and] speculative statements about the need for a protective order," *Talbot*, 2010 WL 11622807, at *3, and thus fails to meet its burden for a protective order.

## II. Dr. Portier's Testimony Is Highly Relevant.

Dr. Portier's testimony as former ATSDR Director is unquestionably relevant – particularly given the government's intended reliance on the 2009 NRC Report in this case.[6] The government makes the curious argument that "before the depositions of the two key scientists involved in the ATSDR's Camp Lejeune studies [Dr. Frank Bove and Morris Maslia] have occurred it is unclear what, if any, relevant information Dr. Portier will have to add." D.E. 212, at 5. The government's relevance arguments ring hollow when it is the *government* who places the ATSDR's conclusions in dispute, when it is the *government* who disclaims the findings and conclusions of its own agency, when it is the *government* who places the 2009 NRC Report at the center of its defense, and when Dr. Portier was the decisionmaker of the ATSDR at relevant times. *See, e.g.*, D.E. 50, at 1–2 (U.S. Answer to Master Compl.) ("The United States denies the allegations . . . to the extent that they imply that the extent of contamination is 'undisputed and well-documented,' because the ATSDR's determination was based on conservative, health protective models . . . .").

Even setting aside Dr. Portier's position as the former ATSDR Director – which the government erroneously claims means he has "little firsthand involvement in the ATSDR Camp

---

[6] The United States submits that it has standing under Rule 26(c) to seek a protective order to prevent the deposition of non-party Dr. Portier because it claims that its "own interests would be jeopardized if this deposition were to move forward." D.E. 212, at 3. Plaintiff notes that the government cites only two out-of-circuit cases in support of its argument for standing, both of which address the ability of a party to move for a protective order where a third party is **subpoenaed**. Here, Dr. Portier's deposition was noticed *without* a subpoena because Dr. Portier is a *willing witness*; thus, the cases the government cites are factually distinguishable. *Cf. G.K. Las Vegas Ltd. P'ship v. Simon Prop. Grp., Inc.*, No. 2:04-CV-01199-DAE-GWF, 2007 WL 119148, at *3–4 (D. Nev. Jan. 9, 2007) (stating that "[a] party can, however, move for a protective order ***in regard to a subpoena issued to a non-party*** if it believes its own interest is jeopardized by discovery sought from a third party," and noting that "[i]n this case, some . . . of the non-party tenants **have objected to the subpoenas**" (emphasis added)); *Auto-Owners Ins. Co. v. Se. Floating Docks, Inc.*, 231 F.R.D. 426, 429–430 (M.D. Fla. 2005) (**denying** Defendant's motion to quash subpoenas and finding that "Defendants [] have made no showing of undue burden," but granting motion for protective order only "as to the financial information sought by the subpoenas").

Lejeune studies," D.E. 212, at 5 – Dr. Portier wrote and signed a letter detailing the ATSDR's position on the 2009 NRC Report and refuting the NRC Committee's conclusions and methodology. It is unclear how the government can argue that Dr. Portier's testimony is irrelevant, or that the deposition testimony of Dr. Frank Bove and Morris Maslia (two ATSDR scientists) should come first, *see* D.E. 212, at 5–6, when it is Dr. Portier's name – and not Dr. Bove's or Mr. Maslia's name – on that letter, which was written by, and only by, Dr. Portier.[7] **Indeed**, the government's suggestion that the letter may be based on the opinions of Dr. Bove and Mr. Maslia, without an iota of proof, instead of Dr. Portier is belied by the fact that Dr. Portier's letter is **written in the first person**. *See* Exhibit 3, at 1 ("***I*** recently met with Senator Kay Hagan (D-NC) regarding our work on the potential for health effects from health effects from exposure to contaminated drinking water at Marine Corp Base Camp Lejeune . . . ***I*** wanted to be certain you understood our position regarding this report." (emphasis added)); *see also* U.S. Dep't Health & Human Servs., ATSDR, *Camp Lejeune Community Assistance Panel* (Apr. 2, 2012), *available at* https://www.atsdr.cdc.gov/sites/lejeune/docs/captranscript_04_12.pdf (Dr. Portier speaking at the Camp Lejeune CAP meeting about ATSDR's water modeling).

Despite the overwhelming relevance of Dr. Portier's testimony, for the PLG to defeat the instant motion, his testimony need only have "some relevance," and "[w]hile Rule 26 does not define what is deemed relevant for purposes of the rule, relevance has been 'broadly construed to encompass "***any possibility*** that the information sought ***may be relevant*** to the claim or defense of any party."'" *Allegood v. Graham*, No. 5:17-CV-282-FL, 2018 WL 4305766, at *2, 4 (E.D.N.C. Sept. 10, 2018) (Jones, J.) (emphasis added, citations omitted) (denying in part motion to quash

---

[7] What's more, that the government omits mention of its upcoming deposition of Dr. Savitz is undoubtedly not an oversight, as it well knows that notice establishes Dr. Portier's relevance.

subpoenas).[8] Dr. Portier's testimony is dually relevant: he was both the ATSDR Director while the ATSDR was working on Camp Lejeune studies and reports, *and* he evaluated the 2009 NRC Report (the very report the government intends to rely on in its defense) and wrote a letter to the Navy disagreeing with it.

**III.  The Government Would Not Be Unduly Burdened by Dr. Portier's Deposition, and the Benefit of Deposing Him Outweighs Any Possible Burden.**

The government makes the hollow argument that the "burden and expense of proceeding with this deposition in Italy at this time far outweighs any possible benefit." D.E. 212, at 3. Its assertion of "significant travel and lodging expenses," *id.* at 4, is laughable when the government has conducted 98 plaintiff depositions and taken (or scheduled) 120 additional discovery plaintiff fact-witness depositions, covering travel to 26 states across the country, and has taken (or has scheduled) approximately 148 treating physician depositions. Moreover, the PLG is confident that the government can easily acquire any necessary passports, clearance, and/or visas – just as the PLG would be required to do.[9] These administrative checkboxes are not hurdles that warrant depriving the Plaintiffs of discovery critical to refuting the government's defenses in this case.[10]

Moreover, the government cites but misapplies the Fed. R. Civ. P. 26(b)(1) factors for the scope of discovery. Here, (1) Dr. Portier's testimony is unquestionably relevant, *see supra* Section II; (2) Dr. Portier's testimony is critical to understanding the pitfalls of the 2009 NRC Report, which the government places at the center of its defense; (3) Dr. Portier's opinions would relate to

---

[8] Notably, the government seems to agree that once the depositions of Dr. Bove and Mr. Maslia are taken, Dr. Portier's testimony may be relevant. *See* D.E. 212, at 6 n.1.

[9] The PLG suggested that the government can attend remotely should it choose to cost-save.

[10] Moreover, the government's argument that Dr. Portier's testimony is likely to be "duplicative of other testimony," D.E. 212, at 6, is unsupported and ignores that he served a different role than either Dr. Bove or Mr. Maslia – neither of whom issued criticisms of the 2009 NRC Report and both of whom had access to far less information across multiple federal agencies than Dr. Portier.

*all* cases under the Camp Lejeune Justice Act, so the amount in controversy is significant;[11] (4) it is the ***government**, not PLG*, that has far greater access to government-related information; (5) the government has significant resources; (6) Dr. Portier's testimony is critical to resolving questions of causation and exposure; and (7) the burden on the government to travel to Italy does not outweigh the benefit of Dr. Portier's testimony, especially as it can appear at the deposition via Zoom.[12] Importantly, Dr. Portier volunteered to be deposed without need for compulsory process such as a subpoena, which should counsel in favor of the relevance of his deposition outweighing any burden. *See Allegood*, 2018 WL 4305766, at *3 ("In the context of evaluating subpoenas issued to third parties, a court 'will give extra consideration to the objections of a non-party, non-fact witness in weighing burdensomeness versus relevance." (internal citations omitted)).

Finally, the government's suggestion that PLG can rely on Dr. Portier's testimony before Congress, rather than depose him in this litigation, is mistaken. If that were the standard, then certainly the government would not be entitled to take Dr. Savitz's deposition, as the government has his full multi-hundred-page report. What's more, the government well knows that Congressional testimony does not equate with deposition or trial testimony, either in scope, breadth, or the PLG's intended focus: to support the claims of hundreds of thousands of Plaintiffs in this litigation harmed by government's actions and about which Dr. Portier has vital information.

---

[11] Of course, that Dr. Portier's testimony will be available for use in all Camp Lejeune Justice Act trials also makes the time and effort to obtain it highly proportional.

[12] PLG counsel represented to government counsel during the parties' meet and confer that she would take the deposition in a different room than Dr. Portier if the government opts to appear at the deposition remotely; thus, there is zero expense or other burden on the government if it selects that option. Its burden and expense arguments are a smokescreen.

### IV. The PLG Is Cognizant of and Will Comply with All Applicable Law.

In a last-ditch attempt to prevent Dr. Portier from giving testimony that will undermine its defense, the government expends 2.5 pages of its motion on the PLG's obligations to comply with Italian law. ***To be clear, the PLG wholly intends to comply with all applicable law in conducting Dr. Portier's deposition, and it so informed the government during the meet and confer.*** Indeed, the PLG has made clear to the government that (1) the Portier deposition will comply with all laws, or it won't be conducted, and (2) the PLG will take the burden upon itself to ensure that all Italian laws are satisfied. The government misrepresents the PLG's intent.

The government correctly identifies that Italy and the United States are parties to the Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, Mar. 18, 1970, 23 U.S.T. 2555, T.I.A.S No. 7444 (Hague Evidence Convention). But its motion flat-out misrepresents the PLG's intentions and the PLG's representations made during the parties' meet and confer on the issue of compliance with foreign law in taking Dr. Portier's deposition. What's more, the government selectively quotes or summarizes passages from Articles 15 and 17 of Chapter II of the Hague Evidence Convention to bring confusion to an issue that is not in dispute: the PLG will comply with Italian law regarding the Portier deposition.[13] The government's detour into what is

---

[13] The government also misrepresents the PLG's statement that "Dr. Portier has been deposed in other cases in Italy without following the consular depositions procedure." D.E. 212, at 7. Such a statement makes it seem as if the depositions of Dr. Portier in Italy in other litigations have occurred in violation of Italian law; but the PLG made no such representation and merely noted that the fact that these depositions of Dr. Portier *have occurred* in Italy means that the process *is possible, whatever the requirements of that process might be.* In any event, PLG counsel were not counsel in the litigation where Dr. Portier was deposed in Italy (and said so in the meet and confer). Any suggestion that PLG counsel have *previously* defied Italian law by themselves deposing Dr. Portier or anyone else in Italy is misrepresentative.

required of the PLG under Italian law does not speak to any undue burden *on the United States;* the government's arguments related to Italian law should be summarily ignored.[14]

## Conclusion

For the foregoing reasons, the PLG respectfully requests that this Court deny the United States' motion for a protective order and permit the deposition of Dr. Portier to go forward once the proper international procedures are determined.

Date: May 30, 2024                                                Respectfully Submitted

| | |
|---|---|
| /s/ J. Edward Bell, III | /s/ Zina Bash |
| J. Edward Bell, III (admitted pro hac vice) | Zina Bash (admitted pro hac vice) |
| Bell Legal Group, LLC | Keller Postman LLC |
| 219 Ridge St. | 111 Congress Avenue, Ste. 500 |
| Georgetown, SC 29440 | Austin, TX 78701 |
| Telephone: (843) 546-2408 | Telephone: 956-345-9462 |
| jeb@belllegalgroup.com | zina.bash@kellerpostman.com |
| *Lead Counsel for Plaintiffs* | *Co-Lead Counsel for Plaintiffs and Government Liaison* |
| | |
| /s/ Elizabeth Cabraser | /s/ W. Michael Dowling |
| Elizabeth Cabraser (admitted pro hac vice) | W. Michael Dowling (NC Bar No. 42790) |
| Lieff Cabraser Heimann & Bernstein, LLP | The Dowling Firm PLLC |
| 275 Battery Street, Suite 2900 | Post Office Box 27843 |
| San Francisco, CA 94111 | Raleigh, North Carolina 27611 |
| Phone (415) 956-1000 | Telephone: (919) 529-3351 |
| ecabraser@lchb.com | mike@dowlingfirm.com |
| *Co-Lead Counsel for Plaintiffs* | *Co-Lead Counsel for Plaintiffs* |

---

[14] The government's motion also boldly misrepresents the PLG's intention to take Dr. Portier's deposition pursuant to, and in violation of, Article 15 of the Hague Evidence Convention. Its citation to an email from May 19, 2024, D.E. 212, Ex. 3, – **before** the Parties' May 20, 2024 meet and confer – **ignores** that at the end of the meet and confer, PLG-counsel stated that the PLG would look more into Articles 15–17 of the Hague Evidence Convention and the government's position on Italian law. And since the meet and confer, the PLG has been doing exactly that.

/s/ Robin Greenwald
Robin L. Greenwald (admitted pro hac vice)
Weitz & Luxenberg, P.C.
700 Broadway
New York, NY 10003
Telephone: 212-558-5802
rgreenwald@weitzlux.com
*Co-Lead Counsel for Plaintiffs*

/s/ James A. Roberts, III
James A. Roberts, III (N.C. Bar No.: 10495)
Lewis & Roberts, PLLC
3700 Glenwood Avenue, Suite 410
P. O. Box 17529
Raleigh, NC 27619-7529
Telephone: (919) 981-0191
Fax: (919) 981-0199
jar@lewis-roberts.com
*Co-Lead Counsel for Plaintiffs*

/s/ Mona Lisa Wallace
Mona Lisa Wallace (N.C. Bar No.: 009021)
Wallace & Graham, P.A.
525 North Main Street
Salisbury, North Carolina 28144
Tel: 704-633-5244
*Co-Lead Counsel for Plaintiffs*

# CERTIFICATE OF SERVICE

I, J. Edward Bell, III, hereby certify that the foregoing document was electronically filed on the Court's CM/ECF system on this date, and that all counsel of record will be served with notice of the said filing via the CM/ECF system.

This the 30th day of May, 2024.

                        */s/ J. Edward Bell, III*
                        J. Edward Bell, III