IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
7:23-CV-897

| | |
|---|---|
| IN RE: ) | |
| ) | |
| CAMP LEJEUNE WATER LITIGATION ) | ORDER |
| ) | |
| **This Document Relates to:** ) | |
| ALL CASES ) | |

On January 15, 2024, Plaintiffs' Leadership Group ("PLG" or "Plaintiffs") moved for partial summary judgment on the issue of specific causation, [D.E. 110], and filed a memorandum in support ("Motion"). [D.E. 111].[1] Plaintiffs contemporaneously moved for leave to file the Motion without an accompanying Statement of Material Facts. [D.E. 109]. On February 19, 2024, the United States of America ("United States" or "Defendant") responded in opposition to the Motion. [D.E. 139]. On March 3, 2024, Plaintiffs replied. [D.E. 152]. As detailed below, individuals pursuing actions under the Camp Lejeune Justice Act of 2022 ("CLJA") bear the burden of demonstrating their harm was caused by exposure, necessitating they establish both general and specific causation. Thus, the court denies Plaintiffs' Motion.

I. Background

In August 2022, Congress enacted and President Biden signed the CLJA. *See* CLJA, Pub. L. No. 117-168, § 804, 136 Stat. 1759, 1802–04. The CLJA was part of the larger Honoring our PACT Act of 2022 ("PACT Act"). *See* PACT Act, Pub. L. No. 117-168, §§ 101–909, 136 Stat. 1759, 1759–1817. On August 10, 2022, the CLJA became effective.[2] The CLJA reads in relevant part:

---

[1] References to page numbers from Plaintiffs' memorandum in support, [D.E. 111], correspond to Plaintiffs' page numbers in the original document.
[2] The court has discussed the Camp Lejeune toxic water litigation history in its prior orders. *See, e.g.,* [D.E. 133] 5–6 (Order Granting Motion to Strike Jury Trial Demand).

> (b) IN GENERAL.—An individual, including a veteran . . . or the legal representative of such an individual, who resided, worked, or was otherwise exposed (including in utero exposure) for not less than 30 days during the period beginning on August 1, 1953, and ending on December 31, 1987, to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States may bring an action in the United States District Court for the Eastern District of North Carolina to obtain appropriate relief for harm that was caused by exposure to the water at Camp Lejeune.
>
> (c) BURDENS AND STANDARD OF PROOF.—
>
> (1) IN GENERAL.—The burden of proof shall be on the party filing the action to show one or more relationships between the water at Camp Lejeune and the harm.
>
> (2) STANDARDS.—To meet the burden of proof described in paragraph (1), a party shall produce evidence showing that the relationship between exposure to the water at Camp Lejeune and the harm is—
>
> (A) sufficient to conclude that a causal relationship exists; or
>
> (B) sufficient to conclude that a causal relationship is at least as likely as not.

CLJA § 804(b)–(c).

Claimants have filed approximately 227,309 administrative claims with the Department of the Navy under subsection 804(h). *See* [D.E. 201] 1; CLJA § 804(h). Plaintiffs have collectively filed more than 1,764 civil actions in the United States District Court for the Eastern District of North Carolina seeking relief under subsection 804(b). *See* [D.E. 201] 1; CLJA § 804(b).

II. Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Partial summary judgment may be granted for "part of each claim or defense." *Id.* Issues of statutory interpretation are questions of law which the court may properly resolve on summary judgment. *See United States v. West Virginia*, 339 F.3d 212, 214 (4th Cir. 2003) ("Because this dispute ultimately turns

entirely on a question of statutory interpretation, the district court properly proceeded to resolve the case on summary judgment.").

III. Discussion

Determining if the phrase "caused by exposure" in subsection 804(b) of the CLJA replaces "but-for causation" with general causation requires the court to analyze the CLJA's ordinary meaning, construe specific CLJA provisions contextually, and apply standard interpretive canons. CLJA § 804(b); *see In re Camp Lejeune Water Litig.*, ___ F. Supp. 3d. ___, 2024 WL 457770, at *4 (E.D.N.C. Feb. 6, 2024) (collecting cases). Still, "unless there is some ambiguity in the language of a statute, a court's analysis must end with the statute's plain language." *In re Sunterra Corp.*, 361 F.3d 257, 265 (4th Cir. 2004) (quoting *Hillman v. I.R.S.*, 263 F.3d 338, 342 (4th Cir. 2001). In interpreting the plain language of a statute, terms are given their "ordinary, contemporary, common meaning, absent an indication Congress intended [it] to bear some different import." *North Carolina ex rel. Cooper v. Tenn. Valley Auth.*, 515 F.3d 344, 351 (4th Cir. 2008) (internal quotation marks omitted).

The court need look no further than the plain language of subsections 804(b) and 804(c) of the CLJA. In prior consolidated Federal Tort Claims Act ("FTCA") litigation concerning toxic water exposure at Camp Lejeune, the United States District Court for the Northern District of Georgia dismissed plaintiffs' claims and held in part that: (1) North Carolina's ten-year statute of repose applied to plaintiffs' claims; and (2) under North Carolina law, the ten-year limitations period began to run on the date the allegedly contaminated wells were taken out of use. *See In re Camp Lejeune N.C. Water Cont. Litig.*, 263 F. Supp. 3d 1318, 1336–60 (N.D. Ga. 2016).[3]

---

[3] The United States Court of Appeals for the Eleventh Circuit affirmed. *See In re Camp Lejeune, N.C. Water Cont. Litig.*, 774 F. App'x 564, 566–68 (11th Cir. 2019) (per curiam) (unpublished). The Supreme Court denied certiorari. *See Douse v. United States*, 140 S. Ct. 2824 (2020).

3

Subsection 804(b) circumvents North Carolina's ten-year statute of repose by providing a new federal "action . . . to obtain appropriate relief for harm that was caused by exposure to the water at Camp Lejeune." CLJA § 804(b). Furthermore, subsection 804(b) states that an "individual[ ] who resided, worked, or was otherwise exposed (including in utero exposure) for not less than 30 days during the period [from August 1, 1953, to December 31, 1987,] to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States" may bring suit. *Id.*

For those "individual[s]" eligible to bring suit, the CLJA instructs them how to show their harm was "caused by exposure to the water at Camp Lejeune." *Id.* They can prove that their individual exposure caused their harm by proof "sufficient to conclude that a causal relationship exists" between exposure and harm or by a reduced burden of proof ("sufficient to conclude that a causal relationship [between exposure and harm] is at least as likely as not"). *Id.* § 804(c)(2)(A)–(B). "[C]ausal relationship" entails an "act [that] is a factual cause of an outcome." Restatement (Third) of Torts: Phys. & Emot. Harm § 26 cmt. (b) (2010); CLJA § 804(c)(2). Or the counterfactual, "in the absence of the act, the outcome would not have occurred." Restatement (Third) of Torts: Phys. & Emot. Harm § 26 cmt. (b). In other words, but-for analysis. *See id.*

Ordinarily, toxic exposure torts proceed in two steps—an expert demonstrates that a particular type of harm can be caused by the exposure to a degree of scientific certainty (general causation) and an expert opines that this plaintiff's exposure was a cause in fact of his or her harm (specific causation). *See id.* at § 28 cmt. (c)(1)–(4); *Nix v. Chemours Co. FC*, No. 7:17-CV-189, 2023 WL 6471690, at *8 (E.D.N.C. Oct. 4, 2023) (unpublished).

The separation of causation into exposure, general causation, and specific causation is an exercise designed to ensure that issues of causation simpliciter are fully considered. They are not separate "elements" of a CLJA claim. Causation subsumes all three. *See Cause*, Black's Law

4

Dictionary (11th ed. 2019) ("Cause" means "[t]o bring about or effect."); Restatement (Third) of Torts: Phys. & Emot. Harm § 28 cmt. (c)(1) (noting that despite parsing of causation in toxic torts, "[s]o long as the plaintiff introduces admissible and sufficient evidence of factual causation, the burden of production is satisfied").

Congress could have written the CLJA differently. Rather than require claimants to establish that his or her harm was "caused by exposure to the water at Camp Lejeune," CLJA § 804(b), it could have required claimants to establish that they suffer from harm "of a type that can be caused" by exposure to the water at Camp Lejeune. It did not do so. Again, the court need look no further than the plain language of the statute. *See In re Sunterra Corp.*, 361 F.3d at 265.

Plaintiffs' preferred reading seeks to dispense with specific causation and individual exposure. *See* [D.E. 110] 1. Plaintiffs envision "fast trials" during which a plaintiff shows "'I was present at Camp Lejeune for more than 30 days [exposure]; I was diagnosed with an illness that as likely as not can be caused by exposure to the water at Camp Lejeune [general causation]; and I have suffered the following harm from that illness [damages].'" [D.E. 111] 4. Plaintiffs' view conflicts with the plain language of the statute. Nonetheless, Plaintiffs ask the court to consider various canons of statutory construction and the CLJA's structural context. Though not necessary to its ruling, the court considers these arguments below.

### A.

First, Plaintiffs argue that the CLJA's causation standard departs from common-law tort default rules and that plaintiffs need not prove specific causation. *See* [D.E. 111] 13–15. By way of illustration, Plaintiffs compare "expos[ure]" in the CLJA to exposure generally in toxic torts.

Plaintiffs compare the "challenging" common-law "exposure" standard, which often "require[s] complicated scientific evidence," with the CLJA's "bright-line rule:" 30 or more days

5

of residing, working, or otherwise being exposed to water at Camp Lejeune that was supplied by, or on behalf of, the United States between August 1, 1953, and December 31, 1987. *Id.* at 14 (citing Restatement (Third) of Torts: Phys. & Emot. Harm at § 28 cmt. c(2); CLJA § 804(b)). In Plaintiffs' view, the term "otherwise" in subsection 804(b) "makes clear that any plaintiff who meets [the 30-day condition] has proven exposure under the statute." [D.E. 152] 7 (emphasis omitted). Plaintiffs' reading treats "otherwise exposed" in subsection 804(b) as identical to "exposure" in subsection 804(c)(2). *Id.* (citing *Nat'l Credit Union Admin. v. First Nat'l Bank & Tr. Co.*, 522 U.S. 479, 501 (1998) (holding "similar language contained within the same section of a statute must be accorded a consistent meaning")). According to Plaintiffs, the text of subsections 804(b) and 804(c) amounts to an "express[ ] depar[ture]" from the common-law exposure standard and should caution this court against applying common-law tort principles. [D.E. 111] 13 (citing *Norfolk S. Ry. v. Sorrell*, 549 U.S. 158, 168 (2007)).

In *Sorrell*, the Supreme Court considered conflicting negligence causation standards under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. §§ 51–60, which makes a railroad liable for an employee's injuries "resulting in whole or in part from [the railroad's] negligence." *Sorrell*, 549 U.S. at 160 (citing 45 U.S.C. § 51). Specifically, the Supreme Court analyzed whether the "whole or in part" modifier applied to the employee contributory negligence provision in 45 U.S.C. § 53, which contained no explicit causation standard. *Id.* The Supreme Court held it did apply. *Id.* After all, "at common law the causation standards for negligence and contributory negligence were the same," and "[a]bsent express language to the contrary, the elements of a FELA claim are determined by . . . common law." *Id.* at 156–66 (citations omitted); *cf. Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 544 (1994) (holding that the express language in 45 U.S.C. § 53 that "contributory language shall not bar a recovery" signaled Congress eliminated the common-law

6

contributory negligence defense). And though 45 U.S.C. § 53 did not specify a contributory negligence standard, "[t]he inclusion of [the 'whole or in part' modifier] in one section and not the other does not alone justify a departure from the common-law practice." *Sorrell*, 549 U.S. at 170.

*Sorrell* supports the conclusion that Congress included common-law tort causation in the CLJA. *Sorrell* teaches "[a]bsent express language," "the elements of a [CLJA] claim are determined by . . . common law." *Sorrell*, 549 U.S. at 156–66. Restated, the court must infer that "Congress intend[ed] to incorporate the well-settled [common law] meaning of [exposure]" in subsections 804(b) and (c)(2). *Jam v. Int'l Fin. Corp.*, 586 U.S. 199, 211 (2019) (quoting *Neder v. United States*, 527 U.S. 1, 23 (1999)). And under the common law, to show a causal "relationship" between "exposure" and "harm," *see* CLJA 804(c)(2), claimants must "demonstrate the levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure." *Nix*, 2023 WL 6471690, at *8 (quoting *Rhyne v. U.S. Steel Corp.*, 474 F. Supp. 3d 733, 743 (W.D.N.C. 2020)); *see In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig. (No II) MDL 2502*, 892 F.3d 624, 644 (4th Cir. 2018); *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 263 (4th Cir. 1999).

The purported "bright-line [exposure] rule" in CLJA subsection 804(b) does not "expressly reject[]" the common-law causation rule because the common law does not consider exposure in isolation, and neither does the CLJA. [D.E. 111] 14; *see Gottshall*, 512 U.S. at 544. Congress determined that only an individual who "resided, worked, or was otherwise exposed (including in utero exposure) for not less than 30 days [between] August 1, 1953, and . . . December 31, 1987, to water at Camp Lejeune, North Carolina, that was supplied, by or on behalf of, the United States may bring an action . . . to obtain appropriate relief for harm that was caused by exposure to the water at Camp Lejeune." CLJA § 804(b). The statutorily defined "exposure" is a prerequisite to

7

bringing a suit. *See id.* Exposure, however, does not presume harm. *See Exposure*, Oxford English Dictionary, Oxford UP, March 2024, https://doi.org/10.1093/OED/7353587158 (exposure defined as "the action of subjecting, the state or fact of being subjected, to any external influence"). The plain language of the statute confirms this logical progression. First, a plaintiff must prove the statutorily defined exposure. *See* CLJA § 804(b). Second, a plaintiff must "show one or more relationships between the water at Camp Lejeune and the harm"; that is, plaintiff must produce evidence "sufficient to conclude that a causal relationship [between exposure and harm] exists" or "is at least as likely as not." *Id.* § 804(c).

Plaintiffs contend that "any plaintiff who meets [the 30-day requirement] has proven exposure under the statute," which "supersedes the standard tort-law exposure inquiry." [D.E. 152] 7; [D.E. 111] 15. According to plaintiffs, to conclude otherwise would impermissibly read "expos[ure]" as "two different things in [ ] subsections [804(b) and 804(c)(2)]. [D.E 152] 7 (citing *Nat'l Credit Union Admin.*, 522 U.S. at 501). Plaintiffs elaborate:

> [T]here is no reason to think the term "exposure" in section 804(c) is referring to something wholly different than the 30-day exposure period in the previous section, any more than one would read "water" in section 804(c) to include Camp Lejeune water that was not supplied by the United States.

*Id.* at 7–8 (emphasis omitted).

"[E]xpos[ure]" means the same thing in the CLJA. But not the meaning Plaintiffs want— a reading that the plain language of the statute belies. The CLJA creates a cause of action for "[a]n individual . . . who . . . was . . . exposed" to the water at Camp Lejeune "that was supplied by, or on behalf of, the United States" for "no less than 30 days." CLJA § 804(b). The statute does not say *any* exposure for "not less than 30 days." It specifically refers to an "individual['s] . . . exposure." CLJA § 804(b). Individual exposure is essential to the CLJA's causation requirement.

8

Someone who stands outside during a thunderstorm has been "exposed" to lightning. Such exposure does not mean the person was struck. Likewise, an individual who resided, worked, or was otherwise exposed (including in utero exposure) for not less than 30 days during the period beginning on August 1, 1953, and ending on December 31, 1987, to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States was, by definition, exposed to that water. *See Exposure*, Oxford English Dictionary; CLJA § 804(b). Congress, however, set a threshold individual exposure requirement of no less than 30 days. That requirement does not mean a hypothetical mail carrier who drank out of a Camp Lejeune water fountain on October 1, 1960, was not "otherwise exposed" to the water. On the contrary, he was. But that hypothetical mail carrier cannot bring a claim because his individual "expos[ure]" does not meet the separate 30-day requirement.[4] "Expos[ure]" is tethered to the "individual" claimant, here a hypothetical mail carrier. *See* CLJA § 804(b), (d); *id.* § 804(c) (referencing "the party filing the action").

If Plaintiffs are correct that "any plaintiff who meets [the 30-day requirement] has proven exposure under the statute" and need not prove general and specific causation, the court must impute some actual static exposure dose[5] to every claimant to determine if a "[general] causal relationship" exists for their "harm."[6] CLJA § 804(c)(2). The court also could not, for instance, consider the specific claimant's age at time of exposure, sex, or role on base when determining a

---

[4] The Telephone Consumer Protection Act ("TCPA") is another example of Congress "determin[ing] who can get past the courthouse doors." [D.E. 139] 13–14 (citing 47 U.S.C. § 227(c)(5)). The TCPA authorizes suit by any "person who has received more than one telephone call within any 12-month period . . . in violation of the regulations." 47 U.S.C. § 227(c)(5). Like the hypothetical mail carrier, a hypothetical call recipient that only received one call in a 12-month period still receives a "viola[tive]" call, just as the mail carrier was "exposed" when he drank from the fountain. Yet neither meets the prerequisite for bringing a claim for relief.

[5] "Exposure dose," often "synonymous with 'dose'," is "[t]he [chemical] dose entering the body (through inhalation or ingestion, through the skin, and through other routes." Federal Judicial Center, Reference Manual on Scientific Evidence 507 (3d ed. 2011)

[6] "Exposure science comes into play in [toxic tort] cases because the likelihood that any given disease or injury was induced because of exposure to one or more chemicals depends in large part on the size of that exposure." Federal Judicial Center, Reference Manual, 512.

9

"causal relationship." *See Rhyne*, 474 F. Supp. 3d at 743 ("General causation exists when exposure to an agent can cause the disease at issue," meaning "the levels of exposure that are hazardous to human beings generally." (citations omitted)).

These distinctions fundamentally shaped the Agency for Toxic Substances and Disease Registry's ("ATSDR") methodology in its 2017 Public Health Assessment for Camp Lejeune (which Plaintiffs argue "Congress drew on . . . in crafting the CLJA[,]" [D.E. 111] 5). *See* ATSDR, *Public Health Assessment for Camp Lejeune Drinking Water* (2017), https://www.atsdr.cdc.gov/HAC/pha/MarineCorpsBaseCampLejeune/Camp_Lejeune_Drinking_Water_PHA(final)_%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_508.pdf (*2017 Public Health Assessment*). For instance, the ATSDR did not develop one but several "estimates of exposure doses" for "groups who lived or worked at . . . Camp Lejeune." ATSDR, *2017 Public Health Assessment*, 20. Those included estimates for:

- Children who lived onbase with their families
- Adults who lived onbase (including pregnant women)
- Workers employed at the base, but who lived off-base
- Marine and naval personnel who trained and lived onbase

*Id.* (cleaned up). The ATSDR estimated different exposure time periods for each group. *See id.* It also considered different exposure scenarios for each group. *See id.* ("The exposure scenario for typical workers would include drinking water ingestion and one shower on-base per day. The exposure for workers with more intensive daily water exposure (e.g., laundry, kitchen work) were assessed separately.") The ATSDR identified how immutable group differences change exposure dose analysis. *See, e.g., id.* at 21 ("ATSDR did not use the 3-year average concentrations to evaluate exposures to pregnant women. We had concerns associated with fetal heart defects and other potential birth outcomes that might occur from TCE exposures during the first trimester of pregnancy."). Moreover, the ATSDR siloed its exposure conclusions for each water system on

10

base. *See, e.g., id.* at xii ("Conclusion 1-Hadnot Point Water System").

The CLJA does not contain Plaintiffs' preferred one-size-fits-all "exposure" element. Each CLJA claimant's "individual . . . expos[ure]" determines whether he or she meets the 30-day prerequisite and must be considered to see if that claimant can establish causation. CLJA § 804(b)–(c).

B.

Plaintiffs also highlight the replacement of the common law "more likely than not" standard of proof with the burden of proof described in subsection 804(c). [D.E. 111] 15 (citing Restatement (Third) of Torts: Phys. & Emot. Harm § 28). According to Plaintiffs, this "express departure from the common-law rule reinforces Congress's intent to establish a distinct causation framework under the CLJA." *Id.*

In the CLJA, Congress "expressly departed" from the common-law preponderance burden of proof standard. *Sorrell*, 549 U.S. at 168. Under the "BURDENS AND STANDARD OF PROOF" heading, it wrote:

> (2) To meet the burden of proof described in paragraph (1), a party shall produce evidence showing that the relationship between exposure to the water at Camp Lejeune and the harm is—
> (A) sufficient to conclude that a causal relationship exists; or
> (B) sufficient to conclude that a causal relationship is at least as likely as not.

CLJA § 804(c). Subsections 804(c)(2)(A)–(B) supplant the common-law preponderance standard. *See Gottshall*, 512 U.S. at 544 (stating that "contributory language shall not bar a recovery" reflected Congress's intent to eliminate the common-law contributory negligence defense).

Yet Congress's express alteration of the burden of proof in subsection 804(c) does not demonstrate Congress's intent to replace the common-law causation framework. *See Standard of Proof*, Black's Law Dictionary (11th ed. 2019) ("The degree or level of proof demanded in a

11

specific case, such as 'beyond a reasonable doubt' or 'by a preponderance of the evidence'; a rule about the quality of the evidence that a party must bring forward to prevail."). "[W]here Congress uses a common-law term in a statute, we assume the term comes with a common law meaning, absent anything pointing another way." *Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 101 (2011) (cleaned up) (citing *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 58 (2007)).

The CLJA allows an "individual" to bring an action for "appropriate relief for harm that was caused by exposure to the water at Camp Lejeune." *See* CLJA § 804(b). An individual does so by "produc[ing] evidence . . . sufficient to conclude that a causal relationship [between exposure and the harm] is at least as likely as not." *Id.* § 804(c). The CLJA creates a claim that provides redress for harm "caused by" the individual's exposure to the water at Camp Lejeune in the relevant time period. *Id.* § 804(b). Thus, common-law tort principles apply by default. "In toxic tort cases, causation generally will depend on a qualified expert witness establishing both 'general causation and specific causation.'" *Nix*, 2023 WL 6471690, at *8 (quoting *Rhyne*, 474 F. Supp. 3d. at 743); *see also In re Lipitor*, 892 F.3d at 644.

The CLJA specifies how a party succeeds. The party must "show one or more relationships between the water at Camp Lejeune and [claimant's] harm." CLJA § 804(c)(1). The party must "produce evidence" to show "that the relationship between exposure to the water at Camp Lejeune and the harm is (A) sufficient to conclude that a causal relationship exists; or (B) sufficient to conclude that a causal relationship is at least as likely as not." *Id.* § 804(c)(2). This court will not give two different meanings to "caused by" in subsection 804(b) and "causal relationship" in subsection 804(c)(2). *See Nat'l Credit Union Admin.*, 522 U.S. at 501 (noting "the established canon of construction that similar language contained within the same section of a statute must be accorded a consistent meaning").

12

The causal framework for a CLJA claim and the burden of proof applicable to that framework are interlocking parts, but Congressional change to one portion does not necessitate a change to the other. *See, e.g., Sorrell*, 549 U.S. at 168 (recognizing FELA "expressly departed from the common law" in some ways and not in others). Based on the CLJA's plain language, Congress established a CLJA action as a modified form of toxic tort claim, requiring evidence of both general and specific causation, with a modified burden of proof.

C.

Next, Plaintiffs argue the court must construe the CLJA to include Congress's alleged wider PACT Act purpose of comprehensively revamping the Department of Veterans Affairs's ("VA") presumption system for toxic exposures. *See* [D.E. 111] 22. Specifically, Plaintiffs argue that by "importing the same specialized terminology into the CLJA, Congress adapted the VA's presumption-based system for benefits into a judicial cause of action." *Id.* at 20. In support, Plaintiffs note that the burden of proof requirements in subsection 804(c)(2) appear similar to the Institute of Medicine's ("IOM") 2008 classification scheme; the scheme that the ATSDR used in the 2017 Health Assessment for Camp Lejeune and that Congress allegedly incorporated into PACT Act "presumption" reform elsewhere. *See* Inst. of Med., *Improving the Presumptive Disability Decision-Making Process for Veterans* (Nat'l Academies Press 2008); ATSDR, *Assessment of the Evidence for the Drinking Water Contaminants at Camp Lejeune and Specific Cancers and Other Diseases* 5 (2017), https://www.atsdr.cdc.gov/sites/lejeune/docs/ATSDR_summary_of_the_evidence_for_causality_TCE_PCE_508.pdf; 38 U.S.C. §§ 1172(d), 1173(c)(2).

Section 202 of the PACT Act is entitled "Improvements to Ability of Department of Veterans Affairs to Establish Presumptions of Service Connection Based on Toxic Exposure." *See*

136 Stat. at 1766; 38 U.S.C. §§ 1171–76 ("PACT Act § 202"). It establishes the process for evaluation of recommendations made by the VA "Working Group." *See* 38 U.S.C. § 1172. Under section 1172(b)(2), the "Working Group" includes "personnel of the Veterans Health Administration and the Veterans Benefits Administration." *Id.* § 1172(b)(2). The Working Group develops "recommendations":

> (1) Following an assessment of a case of the toxic exposure of veterans that occurred during active military, naval, air, or space service under subsection (c), or their dependents, the Working Group may develop a recommendation for formal evaluation under section 1173 . . . to conduct a review of the health effects related to the case of exposure if the Working Group determines that the research may change the current understanding of the relationship between an exposure to an environmental hazard and adverse health outcomes in humans.
> (2) Upon receipt of evidence suggesting that previous findings regarding the periods and locations of exposure covered by an existing presumption of service connection are no longer supported, the Working Group may nominate such evidence for formal evaluation under section 1173 of this title to modify the periods and locations.

*Id.* § 1172(d). In turn, the Secretary "shall ensure that each . . . evaluation [of a Working Group recommendation]":

> (i) evaluates the likelihood that a positive association exists between an illness and a toxic exposure while serving in the active military . . . service; and
> (ii) assesses the toxic exposures and illnesses and determines whether the evidence supports a finding of a positive association between the toxic exposure and the illness.

*Id.* § 1173(c)(1)(B). Congress also specified how to determine whether a "positive association" exists:

> In carrying out paragraph (1)(B)(ii), a formal evaluation under subsection (a) shall include reviewing all relevant data to determine the strength of evidence for a positive association based on the following four categories:
> (A) The "sufficient" category, where the evidence is **sufficient to conclude that a positive association exists**.

> (B) The "equipoise and above" category, **where the evidence is sufficient to conclude that a positive association is at least as likely as not**, but not sufficient to conclude that a positive association exists.
> (C) The "below equipoise" category, where the evidence is not sufficient to conclude that a positive association is at least as likely as not, or is not sufficient to make a scientifically informed judgment.
> (D) The "against" category, where the evidence suggests the lack of a positive association.

*Id.* § 1173(c)(2) (emphasis added). After completing the required evaluation, the evaluators "shall submit to the Secretary a recommendation with respect to establishing a presumption of service connection for the toxic exposure and illness." *Id.* § 1173(d).

Beyond certain similarities, 38 U.S.C. § 1173 and the CLJA are distinct. First, "[t]he normal rule of statutory construction assumes that identical words used in difference parts of the same act are intended to have the same meaning." *Sorenson v. Sec'y of Treasury of U.S.*, 475 U.S. 851, 860 (1986) (quotations omitted); *see also Nat'l Credit Union Admin.*, 522 U.S. at 501. But 38 U.S.C. § 1173 and the CLJA do not use "identical words." *Sorenson*, 475 U.S. at 860. The PACT Act at 38 U.S.C. § 1173(c)(2)(A) refers to evidence "sufficient" to show a "positive association." 38 U.S.C. § 1173(c)(2)(A). The CLJA refers to evidence "sufficient" to show a "causal relationship." CLJA § 804(c)(2). Although the same language canon could apply to the phrase "as likely as not," that phrase pertains to burdens of proof, not causation. Plaintiffs invite the court to read "positive associations" and "causal relationships" as equivalents. But Congress chose different words with different meanings. *Compare* 38 U.S.C. § 1173(c)(2), *with* CLJA § 804(b)–(c). The court declines Plaintiffs' invitation.

Plaintiffs similarly argue that different uses of "relationship" in other sections of the PACT Act show Congress intended for CLJA claimants to only prove general causation. *See* [D.E. 111] 18 (citing PACT Act § 202; Pub. L. No. 117-168, § 507, 136 Stat. 1759, 1789–90 ("PACT Act §

15

507")). But PACT Act section 202 only discusses a "relationship between an exposure to an environmental hazard and adverse health outcomes in humans." 38 U.S.C. § 1172(d)(1). And PACT Act section 507 only discusses "possible relationships between toxic exposures experienced during service in the Armed Forces" and mental illness. PACT Act § 507(a). The word "causal" never appears. As discussed, a "causal relationship" is a specific type of relationship and is different from a "positive association." Because these terms are different, the same meaning presumption does not apply.

Second, PACT Act section 202 and the CLJA refer to different remedial structures. *Compare* Pact Act § 202, *with* CLJA § 804. Section 202 refers to VA benefits. *See* 38 U.S.C. § 1101. The CLJA refers to a distinct federal cause of action for "harm . . . caused by exposure to the water at Camp Lejeune." CLJA § 804(b). This distinction matters. Although CLJA claimants cannot recover punitive damages, *see id.* § 804(g), they can recover "appropriate relief for harm" that extends beyond an order granting VA benefits.[7] *See id.* § 804(b); *cf.* [D.E. 152] 9 ("There is no dispute that the CLJA is a tort remedy, rather than 'medical and disability benefits.'"). The CLJA also applies to "individual[s]" defined in subsection 804(b), not just "veteran[s]." CLJA § 804(b). The pool of "individual[s]" who may have a claim under subsection 804(b) is much larger pool than those eligible for VA benefits. *Id.*

Under Plaintiffs' preferred reading, CLJA claimants would face a lower bar than veterans claiming a Camp Lejeune "presumptive service connection" for purposes of VA benefits. Under the VA compensation scheme,

> A veteran . . . who had no less than 30 days (consecutive or nonconsecutive) of service at Camp Lejeune during the period beginning on August 1, 1953, and ending on December 31, 1987,

---

[7] Congress implicitly recognized this distinction in the CLJA, which also provides that any award made under the CLJA "shall be offset" by amounts received "under any program under the laws administered by the Secretary of Veterans Affairs." CLJA § 804(e)(2)(A)(i).

16

> shall be presumed to have been exposed during such service to the contaminants in the water supply, unless there is affirmative evidence to establish that the individual was not exposed to contaminants in the water supply during that service.

38 C.F.R. § 3.307(a)(7)(iii). In contrast, according to Plaintiffs, any CLJA claimant who "meets [the 30-day requirement] has proven exposure under the statute" and need not prove general or specific causation. [D.E. 152] 7.

For VA benefits, "[e]xposure" under 38 C.F.R. § 3.307(a)(7)(iii) creates a presumptive service connection if the veteran develops a disease listed in 38 C.F.R. § 3.309(f). The veteran's "presumption," however, can be rebutted. Specifically, under 38 C.F.R. § 3.307(d)(1),

> Evidence which may be considered in rebuttal of service incurrence of a disease listed in § 3.309 will be any evidence of a nature usually accepted as competent to indicate the time of existence or inception of disease, and medical judgment will be exercised in making determinations relative to the effect of intercurrent injury or disease. The expression "affirmative evidence to the contrary" will not be taken to require a conclusive showing, but such showing as would, in sound medical reasoning and in the consideration of all evidence of record, support a conclusion that the disease was not incurred in service.

*Id.* § 3.307(d)(1). In other words, veterans showing 30-days exposure and alleging a disease under 38 C.F.R. § 3.309 do not receive benefits if the VA receives sufficient "evidence . . . that the disease was not incurred in service." *Id.* § 3.307(d). The VA has denied presumptions on the merits for veterans alleging diseases under 38 C.F.R. § 3.309 who satisfy the 30-day service requirement. *See, e.g.*, (Title Redacted by Agency), No. 20-21 026, Bd. Vet. App. 24002314, 2024 WL 1013774, at *3 (Jan. 16, 2024) (unpublished) (denying presumption where "examiner determined that there was insufficient evidence to support a current diagnosis of Parkinson's disease and as such the claimed condition was less likely than not caused by or due to contaminated water at Camp Lejeune").

Under Plaintiffs' theory, if the claimant resided, worked, or was otherwise exposed for not

17

less than 30 days during the relevant time period to water at Camp Lejeune and suffers from a disease generally caused by exposure to toxins in the water, the factfinder in a CLJA case cannot take any individualized facts into account concerning causation. *See* [D.E. 111] 11. But VA benefits and potential tort damages differ in kind, not degree. Interpreting the CLJA to require less from claimants than a veteran must show to recover VA benefits defies the plain language of the statute and would produce "absurd results . . . to be avoided if alternative interpretations consistent with legislative purpose are available." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982); *see also Aqua Prods., Inc. v. Matal*, 872 F.3d 1290, 1308 (Fed. Cir. 2017).

Third, to the extent that it is relevant, the legislative history supports treating the CLJA as distinct from the rest of the PACT Act. The Statement of Administration Policy for the PACT Act details:

> H.R. 3967 would . . . make changes to the Department of Veteran Affairs (VA's) process for determining presumptive service connection and mandate several research studies related to military related environmental exposures . . . . H.R. 3697 also would allow a Federal cause of action related to contaminated water at Camp Lejeune, North Carolina . . . .

117-2 Cong. Rec. H1188 (daily ed. Mar. 1, 2022) (statement of Rep. Jim McGovern). The "changes" to "presumptive service connection" stand apart from the "Federal cause of action related [to Camp Lejeune water]." *Id.* Indeed, several bill sponsors stated the purpose of the CLJA was to create a tort cause of action otherwise prevented by North Carolina's statute of repose. *See* [D.E. 139-5] (noting that a CLJA claim "would already be permitted anywhere else in the United States, but because of a unique provision in North Carolina law, this legislation is necessary"); [D.E. 139-3] 3 ("The [CLJA] proposes to correct unfair legal barriers unique to Marine families stationed at Camp Lejeune due to an anomaly in the application of North Carolina law in the federal court system . . . ."). And their statements accord with the plain reading of the statute.

18

Plaintiffs respond that the "CLJA was enacted as part of comprehensive toxic-exposure reform that expanded veterans' opportunities to obtain compensation for toxic exposure." [D.E. 111] 22. Even so, "it frustrates rather than effectuates legislative intent simplistically to assume that whatever furthers the statute's primary objective must be the law." *Rodriguez v. United States*, 480 U.S. 522, 526 (1987) (per curiam). The court infers from the statute's plain text and legislative history that Congress intended to distinguish the CLJA cause of action from the rest of the PACT Act's "comprehensive . . . reform." [D.E. 111] 22.

### D.

Finally, the parties dispute whether the "veterans canon" requires reading the CLJA in Plaintiffs' favor. *See* [D.E. 111] 26–27; [D.E. 139] 29–31. Courts, however, apply the veterans canon where "interpretive doubt" exists. *Brown v. Gardner*, 513 U.S. 115, 118 (1994) (holding canon did not apply to an unambiguous provision and "[a]mbiguity is a creature not of definitional possibilities but of statutory context"). The court concludes that the CLJA's text is unambiguous. Thus, the court need not invoke the veterans canon. *See Rudisill v. McDonough*, 601 U.S. 294, 314 (2024); *cf. id.* at 314–18 (Kavanaugh, J., concurring) (describing some practical and constitutional questions about the justification for a benefits-related canon (such as the veterans canon)); *id.* at 329 (Thomas, J., dissenting) (noting the "uncertain foundations" of the veterans canon).

### IV. Conclusion

In sum, the court DENIES Plaintiffs' Motion for Partial Summary Judgment on the Issue of Specific Causation, [D.E. 110], and GRANTS Plaintiffs' Motion for Leave to File Without an Accompanying Statement of Material Facts, [D.E. 109].

SO ORDERED. This  5  day of June, 2024.

_____
RICHARD E. MYERS II
Chief United States District Judge

_____
TERRENCE W. BOYLE
United States District Judge

_____
LOUISE W. FLANAGAN
United States District Judge

_____
JAMES C. DEVER III
United States District Judge

20