IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

No. 7:23-CV-897

| | |
|---|---|
| IN RE: ) | |
| ) | |
| CAMP LEJEUNE WATER LITIGATION ) | |
| ) | O R D E R |
| This Document Relates to: ) | |
| ) | |
| ALL CASES ) | |
| ) | |

This matter is before the court on the motion of Defendant United States of America seeking a protective order to prevent the deposition of Dr. Christopher Portier ("Motion"). [DE-211]. Specifically, Defendant asserts that the burden of taking Dr. Portier's deposition outweighs the utility of his testimony. [DE-212] 1. Plaintiffs' Leadership Group ("PLG" or "Plaintiffs") oppose the Motion. [DE-218]. For the foregoing reasons, the Motion is denied.

I. Background

This litigation concerns the more than eighteen hundred individual lawsuits filed under the Camp Lejeune Justice Act ("CLJA") in this district. *See* Pub. L. No. 117-168, § 804, 135 Stat. 1759, 1802–04. With the CLJA, Congress created a new federal cause of action permitting "appropriate relief for harm that was caused by exposure to the water at Camp Lejeune" for individuals who resided, worked, or were otherwise exposed for not less than 30 days during the period between August 1, 1953, and December 31, 1987. *See id.* § 804(b). To better manage this litigation, the court appointed a Plaintiffs' Leadership Group, *see* [DE-10], and entered case management orders streamlining pretrial procedures in all CLJA cases. *See, e.g.,* [DE-23].

Dr. Portier is the former Director of the Agency for Toxic Substances and Disease Registry

("ATSDR"). [DE-212] 1. In the 2000s, ATSDR began "publish[ing] historical reconstruction results for contaminants delivered in finished water" on base ("ATSDR Model").[1] Plaintiffs cite the ATSDR Model multiple times in the Master Complaint. *See, e.g.* [DE-25] ¶¶ 77–79, 91, 95, 192.

In 2009, the National Academy of Science's National Research Council, ("NAS" and "NRC," respectively), released its own report on Camp Lejeune water contamination "in response to a request from the U.S. Navy" ("NRC Report"). NRC, *Contaminated Water Supplies at Camp Lejeune: Assessing Potential Health Effects* (Nat'l Academies Press 2009), at 1, https://nap.nationalacademies.org/download/12618. That request had "several elements," specifically:

> One was to review the scientific evidence about the kinds of adverse health effects that could occur after exposure to TCE, PCE, and other contaminants. The second was to evaluate studies that were performed or that are under way on former residents of the base and to consider how useful it will be to conduct additional studies. The third element was to identify scientific considerations that could help the Navy set priorities on future activities.

NRC Report at 1. The NRC Report directly questioned the utility of the ATSDR Model. For example: "[s]ome of the modeling approaches used by ATSDR were 'cutting-edge,' meaning that they used . . . modeling techniques that are still in the research stage and have yet to be validated"; "[t]he absence of measurement data for the first 30 years of the contamination period means the predictions . . . cannot be evaluated for accuracy[]"; and "[o]ther uncertainties were introduced

---

[1] Preliminary results were isolated to the Tarawa Terrace family housing areas and vicinity only; in 2013 ATSDR published an expanded reconstruction for Hadnot Point and Holcomb Boulevard family housing areas. *See* ATSDR, Ctrs. for Disease Control and Prevention, Dep't of Health and Hum. Servs., *Analyses and Historical Reconstruction of Groundwater Flow, Contaminant Fate Transport, and Distribution of Drinking Water Within the Service Areas of the Hadnot Point and Holcomb Boulevard Water Treatment Plants and Vicinities, U.S. Marine Corps Base Camp Lejeune, North Carolina, Chapter A: Summary and Findings* (March 2013), at A1, https://www.atsdr.cdc.gov/sites/lejeune/docs/chapter_A_hadnotpoint.pdf.

2

into the models because assumptions had to be made about how the water system was operating." NRC Report at 4. The NRC Report concludes that "[g]iven the multiple uncertainties and likely variation in contaminant concentrations . . . the Tarawa Terrace [ATSDR] modeling predictions should only be used to provide a general estimate of the timeframe and magnitude of exposure[,]" and "should not be used to characterize exposure of individual people." *Id*. at 4–5. The NRC Report was similarly dubious of prior and concurrent ATSDR toxicologic and epidemiologic studies. *See, e.g.*, *id*. at 10–11.

While serving as ATSDR Director, Dr. Portier sent a letter to Navy and Marine personnel in 2010 describing "the position of the ATSDR regarding the [NRC Report] ("2010 Letter"). [DE-212-5] 1. In the 2010 Letter, Dr. Portier outlines ATSDR's criticism of the NRC Report. *See generally id*.

Plaintiffs noticed the 30(b)(6) deposition of Dr. Portier to be held Domodossola, Italy, near where he resides. *See* [DE-212-2]. Due to health constraints, Dr. Portier must remain within two hours of his residence in Switzerland. [DE-218] 3.

II. Standard of Review

The general rule regarding the scope of discovery is found in Fed. R. Civ. P. 26(b)(l):

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

"Relevancy under this rule has been broadly construed to encompass any possibility that the information sought may be relevant to the claim or defense of any party." *Prasad v. Nallapati*, 597 F. Supp. 3d 842, 846 (E.D.N.C. 2022) (first quoting *Equal Emp't Opportunity Comm'n v.*

3

*Sheffield Fin. LLC*, No. l:06-CV-889, 2007 WL 1726560, at \*3 (M.D.N.C. June 13, 2007); then citing *Mainstreet Collection, Inc. v. Kirkland's, Inc.*, 270 F.R.D. 238, 240 (E.D.N.C. 2010) ("During discovery, relevance is broadly construed 'to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case.'") (quoting *Oppenheimer Fund., Inc. v. Sanders*, 437 U.S. 340, 351 (1978))). Nevertheless, "[t]he parties and the court have a collective responsibility to consider the proportionality of all discovery and consider it in resolving discovery disputes." *Walls v. Ford Motor Co.*, No. 1:20CV98, 2021 WL 1723154, at \*4 (M.D.N.C. Apr. 30, 2021) (citations omitted).

Discovery is not limitless. Federal Rule of Civil Procedure 26(c) authorizes a court to grant, "for good cause," a protective order restricting or prohibiting discovery in order "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c). "A party moving for a protective order has the burden of making a particularized showing of why discovery should be denied, and conclusory or generalized statements in the motion fail to meet this burden." *EEOC v. Luihn Food Sys., Inc.*, No. 5:09-CV-387-D, 2011 WL 649749, at \*2 (E.D.N.C. Feb. 11, 2011).

"Generally, a party lacks standing to challenge a subpoena issued to a nonparty." *Artis v. Murphy-Brown LLC*, No. 7:14-CV-237-BR, 2018 WL 3352639, at \*2 (E.D.N.C. July 9, 2018) (citing *In re C.R. Bard, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, 287 F.R.D. 377, 382 (S.D.W.Va. July 12, 2012)). But "where the challenging party has moved for a protective order, the court is permitted to consider its position on the merits." *Id.* (citing *EEOC v. Bojangles Restaurants*, Inc., No. 5:16-CV-654, 2017 WL 2889493, at \*4 (E.D.N.C. July 6, 2017)).

III. Discussion

A. The Court may Consider the Motion on its Merits.

First, the court need not determine Defendant's standing to challenge Dr. Portier's deposition. Indeed, the court can properly consider Defendant's Motion, made under Rule 26(c), regardless of Defendant's standing.[2] *See Artis*, 2018 WL 3352639 at *3 (citing *Bojangles*, 2017 WL 2889493, at *4 ("[E]ven if plaintiff were deemed not to have standing to challenge the subpoena, plaintiff has also moved for a protective order, permitting the court order to consider its position on the merits."); *see also CTB, Inc. v. Hog Slat, Inc.*, No. 7:14-CV-157-D, 2016 WL 1244998, at *5 (E.D.N.C. Mar. 23, 2016) (concluding that even if a party did not have standing to challenge a subpoena to a nonparty, the court could consider the party's motion for protective order challenging the subpoena on the merits) (citation omitted).

B. Dr. Portier's Testimony is Relevant.

Dr. Portier's service as Director while the ATSDR investigated Camp Lejeune's toxic water exposure health impacts makes his testimony likely relevant. Also at this time, the NRC completed its own analysis of toxic water exposure in its 2009 NRC Report, which leveled several criticisms at prior and concurrent work by the ATSDR—work possibly overseen by Dr. Portier. "While Rule 26 does not define what is deemed relevant for purposes of the rule, relevance has been broadly construed to encompass any possibility that the information sought may be relevant to the claim or defense of any party." *Allegood v. Graham*, No. 5:17-CV-282-FL, 2018 WL

---

[2] Dr. Portier was noticed without a subpoena, a distinction that does not change the court's ability to consider the Motion. "[A] party may move for a protective order [under 26(c)] to protect itself from 'annoyance, embarrassment, oppression, or undue burden or expense' . . . as long as the moving party can tie the protected information to an interest listed in the rule . . . ." *HDSherer LLC v. Nat. Molecular Testing Corp.*, 292 F.R.D. 305, 307–08 (D.S.C. 2013) (citations omitted).

4305766, at *2 (E.D.N.C. Sept. 10, 2018) (citations omitted); *Prasad*, 597 F.Supp.3d at 846; *Mainstreet Collection, Inc.*, 27 F.R.D. at 240.

As the court recently explained, "individuals pursuing actions under the [CLJA] bear the burden of demonstrating their harm was caused by exposure, necessitating they establish both general and specific causation." [DE-227] 1 (Order Denying Motion for Partial Summary Judgment on Causation). Restated, "[i]ndividual exposure is essential to the CLJA's causation requirement." *Id*. at 8. To demonstrate "exposure," Plaintiffs must establish where the toxic water was present on base, at what levels of toxicity, and at what times. *See* [DE-207] (Transcript of May 16, 2024 Status Conference) 9:8–11 ("[T]his case is about water[.]").

Plaintiffs represent that their experts are "depending on the [ATSDR] model" to create reports to establish exposure. [DE-207] 7:24–8:5. Simultaneously, the government has stated that "there is going to be an issue regarding what the [toxicity] levels were in the past based on the [ATSDR] model that was done." *Id*. at 7:18–22; *see also* [DE-50] 1–2. The NRC Report similarly concludes that "[ATSDR's] modeling predictions should only be used to provide a general estimate of the timeframe and magnitude of exposure[,]" and "should not be used to characterize exposure of individual people." NRC Report at 4–5.

Indeed, the 2010 Letter, written in the first person and signed by Dr. Portier, suggests that while ATSDR Director he was intimately involved in the back and forth between the ATSDR, NRC, federal lawmakers, and other federal officials regarding toxic water at Camp Lejeune. *See generally* 2010 Letter. For instance, Dr. Portier directs the 2010 Letter to Mr. Donald R. Shregardus, Deputy Assistant Secretary of the Navy (Environment) and Marine Corps Lt. General Frank A. Panter, Deputy Commandant, Installations and Logistics. *Id*. at 1. He references a meeting with "Senator Kay Hagan regarding [ATSDR's] work on the potential for health effects

from exposure to contaminated drinking water at [Camp Lejeune]." *Id*. He speaks with apparent firsthand knowledge about those "health effects": "let me be perfectly clear; there was undoubtedly a hazard associated with drinking the contaminated water at Camp Lejeune." *Id*. at 2. And he spends more than three pages "clarify[ing] [the ATSDR's] position" regarding the NRC Report. *See generally id*. At minimum, Dr. Portier's testimony is "possib[ly] relevant." *See Allegood*, 2018 WL 4305766 at *2, 4.

C. Defendant has not Demonstrated an Undue Burden

Defendant has not shown that the "burden or expense [of attending Dr. Portier's deposition] outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). Defendant is particularly concerned with the "undue burden and expense placed on the United States in preparing for and traveling to defend Dr. Portier's deposition" in Italy. [DE-212] 4. Defendant explains that "any attorney from the Department of Justice traveling . . . would require an official passport, e-country clearance, and any applicable visa." *Id*. But Defendant is nonspecific as to what each of these alleged "burdens" entails. *See Luihn Food Sys., Inc.*, 2011 WL 649749 at *2 (movant must make "a particularized showing of why discovery should be denied, and conclusory or generalized statements in the motion fail to meet this burden."). And courts have found that travel costs alone do not militate against holding depositions abroad. *See, e.g.*, *Swimways Corp. v. Zuru, Inc.*, No. 2:13CV334, 2014 WL 12603190, at *2 (E.D. Va. June 6, 2014) (holding travel expenses to Hong Kong not enough for court to move 30(b)(6) deposition location).

This is no ordinary litigation. When Congress enacted the CLJA, the Congressional Budget Office estimated the costs of settlement payouts and legal expenses to be $6.1 billion. *See* Congressional Budget Office, *Estimated Budgetary Effects of Rules Committee Print 117-33 for H.R 3967. Honoring our PACT Act of 2021* (Feb. 18, 2022). Claimants' demands in the

7

administrative process under CLJA subsection 804(h) exceed $3.3 trillion.  *See* [DE-34] 15; CLJA § 804(h).  Based on the 2010 Letter alone, Mr. Portier's testimony may affect every claimant's case.  Defendant has not demonstrated that travel burdens exceed the potential import of Dr. Portier's testimony.  *See* Fed. R. Civ. P. 26(b)(1).

Additionally, Dr. Portier's deposition must be put in the larger context of fact discovery. Just for Track 1, Defendant has requested and completed depositions of all 100 Track 1 Discovery Plaintiffs.  [DE-229] 8.  Additionally, Defendant has requested depositions of 348 fact witness and treating physician depositions, of which it has completed 192.  *Id*.  Plaintiffs represent that these have involved "travel to 26 states across the country."  [DE-218] 9; *see In re Aramark Sports & Ent. Servs., LLC*, 289 F.R.D. 662, 665 (D. Utah 2013) (finding plaintiffs' undue burden argument for deposition travel unpersuasive where plaintiffs "apparently already traveled to several states to conduct depositions of a number of different witnesses").

Moreover, Defendant's doubts about Mr. Portier's relevance conflict with its unwillingness to attend the deposition remotely.  In response to Plaintiffs' offer to allow remote participation, Defendant states that:

> Dr. Portier is a former high-ranking government employee who PLG has signaled will testify adverse to the United States' interests in this litigation; if PLG were to proceed with this deposition in person, the United States would have a right, and strong interest, in being present in-person for this deposition.

[DE-212] 5.  "[A]dverse" testimony from a "former high-ranking government employee" on the issues described in the 2010 Letter is not likely to be "irrelevant to the issues in this case."  *Id*. at 2, 5.  Defendants seem to concede this point in citing its "strong interest[ ] in being present in-person."  *Id*. at 5.

Finally, Defendant's arguments regarding the burden of compliance with international and

Italian law are unavailing. *See* [DE-212] 6–9. Plaintiffs noticed Dr. Portier's deposition and have accepted it is their burden to "ensure that all Italian laws are satisfied." [DE-218] 10. According to Plaintiffs, Dr. Portier's deposition "will comply with all laws, or it won't be conducted." *Id.*

IV. Conclusion

For the foregoing reasons, the Motion [DE-211] is DENIED.

So ordered, the 11th day of June 2024.

Robert B. Jones, Jr.
United States Magistrate Judge