IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
Case No. 7:23-cv-897

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| CAMP LEJEUNE WATER LITIGATION | ) | **JOINT STATUS REPORT** |
| | ) | |
| This Document Relates To: | ) | |
| ALL CASES | ) | |
| | ) | |

The Plaintiffs' Leadership Group (the "PLG"), together with the Defendant United States of America ("Defendant" or the "United States") (collectively, the "Parties"), jointly file this Joint Status Report. The matters required to be addressed in a Joint Status Report pursuant to Case Management Order No. 2 ("CMO-2") (D.E. 23) and the Court's Order of August 8, 2024 (D.E. 271) are set forth below.

**(1) An update on the number and status of CLJA actions filed in the Eastern District of North Carolina**

From February 11, 2023 to October 11, 2024, 2,185 Camp Lejeune Justice Act ("CLJA") complaints have been filed in this district. Sixty-nine cases have been dismissed; sixty-four of those were voluntary dismissals and the five others were pro se cases. The cases are divided as follows: Judge Dever – 548 cases; Judge Myers – 547 cases; Judge Boyle – 532 cases; and Judge Flanagan – 558 cases.

**(2) An update on the number and status of administrative claims with the Department of Navy**

There are more than 550,000 administrative claims on file with the Department of the Navy ("Navy"). The Navy completed automated ingestion efforts and is currently focused on completing final manual data entry of several thousand CLJA claims received up to August 10, 2024. So far, the Navy has identified several thousand duplicate CLJA claims filed since the

1

passage of the statute. For that reason, the Navy's immediate focus after manual entry of claims is reconciling claims records to address situations where multiple claims were filed by or on behalf of a single claimant.

### (3) An update regarding agreements reached between the Parties concerning the elements of a CLJA claim and the general framework for trial

A. **Elements of the CLJA Claim**

The Parties are presently engaged in active and detailed discussions concerning the types of proof required to satisfy the PLG's burdens under Phase I (water contamination), Phase II (general causation), and Phase III (specific causation and residual experts). The Parties anticipate continued discussions on Phase III (specific causation and residual experts). With respect to Phase I and Phase II, the Parties are largely in agreement but differences remain. The Parties' respective positions on Phase I and Phase II are set forth below.

**The PLG's Position**

The PLG proposes the following statement for Phase I:

> In Phase 1, the Court will be presented with evidence of water contamination in the water at Camp Lejeune from 1953 to 1987, including evidence of monthly concentration levels in the finished water, vapor intrusion and emissions evidence, and/or other evidence supporting the contamination. To help the court "understand the chemicals in the water at Camp Lejeune during the operative period," D.E. 247 at 2, the parties may present evidence in the fields of history, civil engineering, hydrogeology, environmental sciences and modeling pertinent to the fate and transport of contaminants in groundwater, in drinking (finished) water, and in vapor emissions for family housing areas and other facilities at Camp Lejeune from 1953 to 1987. This evidence may include the contaminant sources, the fate and transport of the contaminants within the groundwater underlying Camp Lejeune, the supply of water through wells to the various water treatment plants at Camp Lejeune, vapor emissions, and the distribution of the water from the treatment plants to relevant areas of Camp Lejeune during this time frame.

The PLG proposes the following statement for Phase II:

In Phase 2, Plaintiffs must satisfy their general causation burden for each Track 1 illness. To meet this burden of proof, "…a party shall produce evidence showing that the relationship between exposure to the water at Camp Lejeune and each of the Track 1 diseases is (A) sufficient to conclude that a causal relationship exists; or (B) sufficient to conclude that a causal relationship is at least as likely as not." See CLJA, Sec.804(c)(2)(A)-(B). This exposure can be proven qualitatively and/or quantitatively. The parties will present evidence from experts in several fields, including but not limited to toxicology, epidemiology, and other medical and/or scientific disciplines that have relevance to determining that exposure to the water at Camp Lejeune is hazardous to human beings generally for each of the Track 1 diseases.

**Brief Statement in Support:**

With respect to Phase I, the PLG understands that the United States opposes the introduction of evidence regarding vapor intrusions and emissions. However, the PLG asserts that such evidence is relevant to Phase I as vapor and emission evidence goes to the "fate and transport" of water at Camp Lejeune, a subject the United States wants to present evidence on. Emission and vapor evidence is simply additional evidence of the fate of the water at Camp Lejeune. Notwithstanding the foregoing, PLG is willing to stay the presentation of evidence regarding vapor intrusions and emissions during Phase I, if the United States agrees to not object to the presentation of such evidence during Phases II and III.

With respect to Phase II, the PLG's statement of examination aligns with this Court's positions regarding the requirements of general causation. By contrast, the United States' position conflates general and specific causation and fails to recognize the flexibility inherent in the analysis of causation.

The PLG agrees that general causation must be established, which "involves showing 'that a particular type of harm can be caused by the exposure to a degree of scientific certainty (general causation)." [DE-227] at 4. The PLG's proposed Phase II language ("exposure to the water at Camp Lejeune is hazardous to human beings generally for each of the Track 1 diseases")

3

acknowledges this need and accommodates the unique circumstances of this case, the flexibility inherent in the analysis of causation, and the different types of proof that have been accepted by this Court when analyzing causation. *See Nix v. Chemours Co. FC*, 2023 WL 6471690 at *8 (E.D.N.C. Oct. 4, 2023) quoting *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices and Prods. Liab. Litig. (No II)* MDL 2502, 892 F.3d 624, 639 (4th Cir. 2018) ("The appropriate level of analysis will depend on the circumstances of the case and the capacity of current scientific methods.") The PLG's proposed language allows the Court to consider the full breadth of scientific evidence on the question of the general capacity of a chemical to cause a specific disease, as this Court has accepted in *Yates v. Ford Motor Co.*, 113 F. Supp. 3d 841, 851 (E.D.N.C. 2015) ("the general level of hazardous exposure need not be expressly established by a particular scientific study, so long as the expert is able to establish that he uses a scientifically reliable method to extrapolate the results from scientific literature."). To do otherwise, would potentially lock the parties into a single prism of scientific inquiry, for example on the question of "level". Given the unique circumstances of this case, the need to account for the passage of time and the evolving scientific methods available for evaluating long-term exposures is critical to ensure a fair and broad range of scientific inquiry to determine general causation.

The United States's position, however, seeks to go beyond the question of whether "a particular type of harm can be caused by the exposure to a degree of scientific certainty" and includes in Phase II "an examination of the concentration levels of contaminants in the water at Camp Lejeune, rather than looking only at whether those contaminants are capable of causing a disease in the abstract." This additional inquiry is not appropriate at Phase II as it inherently involves a discrete and individual analysis of exposure for each Trial Plaintiff, including the specific chemicals in the water at the time of their presence at the base, as well as their duration of

4

exposure, intensity of exposure, manner of exposure and other unique individual factors for that person. These are definitional inquiries of specific causation and should not be predetermined as mandatory during the general causation phase.

Furthermore, the PLG notes that none of the toxic-tort cases cited by the United States involve a fully bifurcated inquiry into general and specific causation. In each case, the court examined both general and specific causation in the same inquiry but may have made findings about each part of the causal inquiry chain separate from the other. The United States' attempt to introduce concentration levels in Phase II would improperly shift the focus to specific causation, undermining the clear distinction between the two phases.

**The United States' Position:**

Proposed Statement of Nature of Proof for Phase 1 and Phase 2

In Phase 1, the Court will be presented with evidence of the monthly concentration levels for the chemicals in drinking (finished) water at Camp Lejeune from 1953 to 1987. To help the court "understand the chemicals in the water at Camp Lejeune during the operative period," D.E. 247 at 2, the parties may present evidence from experts in the fields of history, civil engineering, hydrogeology, environmental sciences and mathematical modeling pertinent to the fate and transport of contaminants in groundwater and in drinking (finished) water for family housing areas and other facilities at Camp Lejeune from 1953 to 1987. This evidence will include the contaminant sources, the fate and transport of the contaminants within the groundwater underlying Camp Lejeune, the supply of water through wells to the various water treatment plants at Camp Lejeune, and the distribution of the water from the treatment plants to relevant areas of Camp Lejeune during this time frame.

In Phase 2, "Plaintiffs must satisfy their general causation burden for each Track 1 Illness. Restated, Plaintiffs must prove a 'causal relationship' between exposure to the chemicals in the water at Camp Lejeune and each Track 1 Illness generally. CLJA § 804(c)(2); *see* [DE-227] 4-8." [DE-247] at 2. This involves showing "that a particular type of harm can be caused by the exposure to a degree of scientific certainty (general causation)," [DE-227] at 4, meaning "the levels of exposure that are hazardous to human beings generally." *Id.* at 10 quoting *Rhyne v. US. Steel Corp.*, 474 F. Supp. 3d 733, 743 (W.D.N.C. 2020). *See also Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 263 (4th Cir. 1999); *Nix v. Chemours Co.*, No. 7:17-CV-

5

189, 2023 WL 6471690, at *8 (E.D.N.C. Oct. 4, 2023) (unpublished)) Thus, for general causation, the Court should determine whether the levels of the individual chemicals (i.e., trichlorethylene (TCE), perchloroethylene (PCE), vinyl chloride, benzene, or trans-1, 2 dichloroethylene (DCE)) in the Camp Lejeune water can cause the diseases at issue. For example, can the levels of TCE in the Camp Lejeune water cause non-Hodgkin's lymphoma? The parties will present evidence from experts in the fields of toxicology, epidemiology, and the Track 1 diseases pertinent to determining general causation for each of Track 1 diseases.

Brief Statement of Support

In Phase 1, the Parties had agreed on the language with the exception of the PLG's suggestion of including "vapor intrusion and emissions." Putting aside whether vapor intrusion and emissions are even covered by the CLJA, the levels are dependent on the specific circumstances of the groundwater at different places on the base, individual buildings, and the particular environment; "vapor intrusion and emissions" cannot be generally determined like contaminant concentrations in water in a drinking water system. Vapor intrusion also goes significantly beyond the specific question identified by the Court for the water contamination phase in its June 28 Order. *See* D.E. 247 at 2 ("For example, what were the levels of benzene, TCE, PCE, and vinyl chloride present at the Hadnot Point, Holcomb Boulevard, and Tarawa Terrace water distribution systems in 1977?").

In Phase 2, the Court should clarify that general causation includes "the levels of exposure that are hazardous to human beings generally." Including an examination of the concentration levels of contaminants in the water at Camp Lejeune, rather than looking only at whether those contaminants are capable of causing a disease in the abstract, follows this Court's description of each Plaintiffs' burden to prove causation. Specifically, each Plaintiff must prove "the levels of exposure that are hazardous to human beings generally." D.E. 227 at 10 (quoting *Rhyne*, 474 F. Supp. 3d at 743). Moreover, this approach matches those taken in other toxic tort cases in this circuit. *See, e.g.*, *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices and Prods. Liab.*

6

*Litig. (No II) MDL 2502*, 892 F.3d 624, 639 (4th Cir. 2018); *Yates v. Ford Motor Co.*, 113 F. Supp. 841, 850 (E.D.N.C. 2015) (Flanagan, J.); *also* Reference Manual on Sci. Evid. (3d ed., 2011) at 512 ("Chemicals known to cause diseases under certain exposure conditions will not do so under all exposure conditions.").

Including an examination of the concentration levels of contaminants in the water at Camp Lejeune will also further global resolution for the broader litigation. Phase 1 will show evidence of the monthly concentration levels for the chemicals in drinking (finished) water at Camp Lejeune. Phase 2 should consider whether those levels are capable of causing the harms that Plaintiffs allege. Siloing the Court's Phase 1 determinations from the issues presented in Phase 2 would be an inefficient use of the Court's and the Parties' resources.

Further, this Court has already described how "[o]rdinarily, toxic exposure torts proceed in two steps—an expert demonstrates that a particular type of harm can be caused by the exposure to a degree of scientific certainty (general causation) and an expert opines that this plaintiff's exposure was a cause in fact of his or her harm (specific causation)." D.E. 227 at 4 (citing Restatement 3d Torts, § 28 cmt. (c)(1)-(4). Similarly, there are two "levels of exposure" each Plaintiff must prove—"to show a causal relationship between exposure and harm, claimants must demonstrate the levels of exposure that are hazardous to human beings *generally* as well as the plaintiff's *actual* level of exposure." D.E. 227 at 7 (emphasis added) (internal quotations and citations omitted). In Phase 2, the Court can resolve the threshold, common questions of fact for each Track 1 Illness—"the levels of exposure that are hazardous to human beings generally" for that particular illness. *Nix,* 2023 WL 6471690, at *8. Then, the Court can make comparisons between its common findings at Phase 2 to its individual findings regarding "the plaintiff's actual level of exposure," as determined in each individual case. *Id.* Addressing causation in this manner

7

ensures a consistent reference point across trials and limits the issues to be resolved at individual trials, thereby "promot[ing] efficiency" without "unduly prejudic[ing] plaintiffs." *In re Bendectin Litig.*, 857 F.2d 290, 320 (6th Cir. 1988) (approving of trifurcation in toxic tort litigation).

PLG's proposal fails to clarify what evidence must be produced to prove general causation, and what evidence should instead be deferred to Phase 3. Instead, PLG merely restates the CLJA's burden of proof—"a party shall produce evidence showing that the relationship between exposure to the water at Camp Lejeune and the harm is (A) sufficient to conclude that a causal relationship exists; or (B) sufficient to conclude that a causal relationship is at least as likely as not." *See* CLJA, § 804(c)(2). But, this Court has already held that the CLJA's "causal relationship" standard "require[es] evidence of both general *and specific* causation." D.E. 227 at 13 (emphasis added). For example, the Court has indicated it should "consider the specific claimant's age at time of exposure, sex, or role on base when determining a 'causal relationship.'" D.E. 227 at 9–10 (citing *Rhyne*, 474 F. Supp. 3d at 743). Whereas these plaintiff-specific considerations are appropriate for Phase 3, the Court should clarify that Phase 2 will require evidence that the levels of the individual chemicals in the Camp Lejeune water can cause the diseases at issue generally.

### B. General Framework for Trial

The Parties have agreed to propose that the Track 1 Leukemia and Non-Hodgkin's Lymphoma cases be tried before the same judge given the nature of those cases. These two diseases may raise common questions of fact, *see* Fed. R. Civ. P. 42(a), including the reclassification of certain subtypes from "leukemias" to "lymphomas." The Parties have further agreed to propose that those ten cases be divided into logical subgroups for purposes of trials.

Leukemia and non-Hodgkin's lymphoma are umbrella terms for a variety of subtypes of blood cancers, the subclassification of which has not always been consistent. Among the subtypes

8

whose classifications have changed is chronic lymphocytic leukemia, which is now classified as a non-Hodgkin's lymphoma. Chronic lymphocytic leukemia is alleged by three of the Track 1 Trial Plaintiffs selected as alleging leukemia.

The Parties therefore propose that general causation of leukemia and non-Hodgkin's lymphoma be decided by the same judge, and they further propose that trials of the Track 1 Trial Plaintiffs be grouped by subtype, as set out below:

> Acute Myeloid and Lymphocytic Leukemias
> 1. *Karen Amsler v. United States*, 7:23-cv-00284
> 2. *Stephen Connard v. United States*, 7:23-cv-01557
>
> Chronic Lymphocytic Leukemia
> 1. *Robert Fiolek v. United States*, 4:23-cv-00062
> 2. *Joseph Gleesing v. United States*, 7:23-cv-01486
> 3. *Bruce Hill v. United States*, 7:23-cv-00028
>
> Diffuse B-Cell, Mantle, and Marginal Zone Lymphomas
> 1. *Scott Keller v. United States*, 7:23-cv-01501
> 2. *Robert Kidd v. United States*, 7:23-cv-01489
> 3. *Jose Vidana v. United States*, 7:23-cv-01575
> 4. *Ronald Carter v. United States*, 7:23-cv-0156
> 5. *Cometto Davis v. United States*, 7:23-cv-00043

**(4) An update on stipulations entered into between the Parties since the last status conference**

<u>Factual Stipulations</u>

The Parties continue to meet and confer on a monthly basis regarding stipulations, consistent with CMO-2. The Parties plan to meet and confer on October 16, 2024. Since the last status conference, the United States has proposed additional stipulations to PLG, including stipulations related to the different water systems at Camp Lejeune and demonstrative maps depicting the development of those systems over time. Further, the United States continues to

explore potential stipulations on other topics, including sampling data and service histories for individual wells.

The Parties expect that the areas of agreement and dispute will continue to sharpen as expert discovery progresses. The United States hopes to propose additional stipulations relevant to the Water Contamination Phase after PLG discloses its Phase 1 experts on October 25, 2024. The Parties also continue to determine if there are other topics or subjects that warrant stipulation negotiations.

<u>Expert Discovery</u>

The Parties have reached an agreement in principle regarding the matters to be disclosed as "reliance files" (i.e. all facts or data considered by the expert in forming opinions) for retained expert witnesses who must provide disclosures under Fed. R. Civ. P. 26(a)(2)(B). The Parties have agreed that these witnesses need not produce copies of previously produced documents, as long as those documents are identified by bates-number, or published literature that is appropriately identified and readily available. The Parties have further agreed that demonstrative exhibits to be used at a hearing or trial need not be disclosed as part of the Fed. R. Civ. P. 26(a)(2)(B) disclosures as reliance files or as an exhibit to be used to summarize or support an opinion. The Parties intend to negotiate a separate timeline for disclosure of demonstrative exhibits. The Parties are working on a formal protocol on these and related matters to file before the next Status Conference.

PLG informed the United States in mid-September of their neurologist's intent to conduct medical examinations of certain Parkinson's Disease Bellwether Plaintiffs. The parties have met and conferred on three occasions regarding the procedure for independent medical examinations of Trial Plaintiffs more broadly. The United States proposed an equal opportunity for the United States' experts to conduct similar examinations as those conducted by the PLG's experts. On

October 4, 2024, PLG sent an e-mail agreeing in principle to "mirrored" examinations and the parties have held constructive discussions about the details of this arrangement. On October 10, 2024, the Parties discussed amending CMO 11 to memorialize this agreement. As such, on October 11, 2024, the United States sent proposed language amending CMO 11 to PLG and requested revisions or a counter proposal by October 18, 2024.

**(5) A summary of the discovery conducted since the last status conference:**

The Parties have agreed to file separate summaries of the discovery conducted since the last status conference. The Parties' respective summaries appear below:

**The PLG's Position:**

The PLG continues to dedicate significant time and resources to conducting discovery in this matter, and the PLG is committed to taking all actions necessary to meet the deadlines set forth in the Court's various scheduling orders. The PLG believes that the discovery process is on pace to meet all applicable deadlines. What follows is a brief description of some recent discovery issues.

<u>Subpoena of the National Academy of Sciences</u>

In docket number 7:24-mc-00005-RJ, counsel for the PLG and the National Academy of Sciences ("NAS") filed a Confidential Document Review Resolution Notice on October 10, 2024, stating that "the PLG no longer seeks the production of any of the documents at issue." (D.E. 34) The PLG will notify the Court if further issues arise with the NAS.

<u>Depositions</u>

With the agreement of all Parties, the PLG is in the process of completing a few final fact-witness depositions. For example, the deposition of Susan Martel was withdrawn pending resolution of the above-referenced dispute with the NAS. The Parties are in the process of

11

rescheduling this deposition. Furthermore, Frank Bove's deposition is scheduled for October 17, 2024. Mr. Bove was the senior epidemiologist with the ATSDR responsible for multiple health-effects studies related to the water contamination at Camp Lejeune.

The Parties conducted substantial negotiations concerning a Rule 30(b)(6) Deposition of the ATSDR and a Rule 34(a) Request for Inspection related to the ATSDR's Cancer Incidence Study (the "Notice and Request"). On October 8, 2024, the Parties achieved a compromise that resolved their differences concerning the Notice and Request. In light of this compromise, it may be unnecessary to conduct the Rule 30(b)(6) Deposition of the ATSDR, although the Parties agreed that the PLG could request this deposition on topics over which Mr. Bove lacked knowledge during his own deposition.

Discovery Relevant to Economic Damages

Following considerable time and effort, the PLG served upon the government Damages Assessment Forms for every Track 1 Trial Plaintiff. Subsequent to this initial batch of Damages Assessment Forms, the PLG served several amended and supplemented Damages Assessment Forms in full compliance with Fed. R. Civ. P. 26(e). In fact, the PLG's understanding is that such supplementations are actually required by Fed. R. Civ. P. 26(e). The government recently expressed concerns about these supplementations and requested the right to conduct additional discovery in response. The PLG's position is that these disclosures were consistent with Fed. R. Civ. P. 26(e), and in any event, the government has not suffered any prejudice as a result of these supplementations because the relevant expert disclosure deadlines pertinent to damages are many months off and no trial dates have been set. Notwithstanding this disagreement, the Parties are actively discussing this matter.

The PLG has dedicated substantial time and resources to the discovery process, including both paper discovery and depositions. The PLG believes that discovery is progressing at a reasonable pace and that the Parties will be able to meet all deadlines set by the Court.

**United States' Position:**

The United States has completed substantially all of its general discovery responses, and is in the processing of finishing a small number of remaining document productions. The United States will continue to produce any Track 1 Trial Plaintiff-related documents that are received from third parties or supplemented by government agencies on a rolling basis.

Depositions

The United States confirms that almost all fact depositions have been taken at this point. The United States recognizes additional depositions related to certain Track 1 Trial Plaintiffs may be necessary based on changing conditions between now and trial, subject to agreement of the Parties or Order of the Court.

Dr. Frank Bove, formerly ATSDR's health studies epidemiologist will be deposed on October 17-18, 2024. Susan Martel, formerly of the National Academy of Sciences, is scheduled to be deposed on November 12, 2024. Scott Williams of the United States Marine Corps is scheduled to be deposed on November 15, 2024. This will conclude all of the outstanding non-plaintiff fact depositions, with the exception of the 30(b)(6) ATSDR witness PLG may still be seeking as addressed below.

On that front, the Parties reached an agreed compromise regarding PLG's requested Fed. R. Civ. P. 34(a) search of certain ATSDR data related to the Cancer Incidence Study. The United States provided PLG with the most complete dataset with personal identifiable information that the United States can provide without violating the protections of relevant Data Use Agreements

13

and compromising ATSDR's relationships with cancer registries. PLG has therefore agreed to withdraw its Fed. R. Civ. P. 34(a) inspection request.

The Parties have also agreed that any ATSDR Fed. R. Civ. P. 30(b)(6) deposition should take place after Dr. Bove's deposition, as some of the topics listed in the most-recent Fed. R. Civ. P. 30(b)(6) notice may be covered by Dr. Bove's testimony. PLG has agreed to provide a revised, narrowed Fed. R. Civ. P. 30(b)(6) notice within seven days of Dr. Bove's deposition, if PLG believes such a deposition is still necessary at all.

Discovery Relevant to Economic Damages

The United States has received all 25 Damages Assessment forms. Recently, PLG has been sending amended Damages Assessment forms for certain Track 1 Trial Plaintiffs. The United States understands that some supplementation of these forms is necessary and appropriate. However, some of these Amended Damages Assessment forms have added categories of damages that were (i) not included in the plaintiff's original Damages Assessment form, and (ii) based on discovery that was available to PLG prior to the disclosure of the original Damages Assessment form. The Parties had previously agreed that while supplementation would be permissible, the addition of new categories of damages would not. The United States advised PLG that if they continue to assert new categories of damages, the United States reserves its right to seek additional discovery as needed on a case-by-case basis. The United States further advised that if PLG refuses to allow such needed additional discovery, the United States may seek Court intervention. The Parties are continuing to meet and confer on this issue.

The United States therefore continues to reserve its right to object and respond to the original and Amended Damages Assessment forms, to conduct permissible follow-up discovery,

14

and, if necessary, file any appropriate motions in the same manner permitted in response to its original written discovery requests.

PLG's Document Depository

On April 29, 2024, the Court entered an Order establishing an evidence depository protocol for this litigation (D.E. 180). The Order established a depository for the parties to store "all originals or true copies of all hard copy documents produced by or to a party" in this litigation. (D.E. 180, at 3.III.a.). The depository is located at a law firm in Raleigh, North Carolina. The United States has been attempting to understand PLG's use of the depository for some time. After several communications and requests to inspect the depository, the United States was able to conduct an initial inspection of the depository on October 3, 2024.

Many of the documents in the depository had been previously digitized and produced by PLG. The production copies of those documents indicate that Michael Partain, a member of ATSDR's Community Assistance Panel, was at some point a custodian of the documents. However, Mr. Partain is not identified as such on the Chain of Custody forms provided by PLG on October 10, 2024. This apparent gap is inconsistent with the Court's Order, which requires Chain of Custody forms for all documents or objects in the depository that identify, inter alia, each item's "original location" and "transportation." (D.E. 180, at 3.III.e.) The United States has alerted PLG that it is reserving all rights to challenge at trial the authenticity and admissibility of the documents in the depository that are not identified properly under the Court's Order (D.E. 180).

**(6) Any other issues that the parties wish to raise with the Court:**

At present, the following motions are pending before the Court:

(1) the PLG's request for a Rule 16 conference [D.E. 155].

(2) the Parties' respective proposed discovery plans for Track 2 illnesses [D.E. 155 & 156].

*[Signatures follow on next page]*

DATED this 15th day of October, 2024.

Respectfully submitted,

/s/ J. Edward Bell, III
J. Edward Bell, III (admitted *pro hac vice*)
Bell Legal Group, LLC
219 Ridge St.
Georgetown, SC 29440
Telephone: (843) 546-2408
jeb@belllegalgroup.com
*Lead Counsel for Plaintiffs*

/s/ Zina Bash
Zina Bash (admitted *pro hac vice*)
Keller Postman LLC
111 Congress Avenue, Ste. 500
Austin, TX 78701
Telephone: 956-345-9462
zina.bash@kellerpostman.com
*Co-Lead Counsel for Plaintiffs*
*and Government Liaison*

/s/ Robin Greenwald
Robin L. Greenwald (admitted *pro hac vice*)
Weitz & Luxenberg, P.C.
700 Broadway
New York, NY 10003
Telephone: 212-558-5802
rgreenwald@weitzlux.com
*Co-Lead Counsel for Plaintiffs*

/s/ Elizabeth Cabraser
Elizabeth Cabraser (admitted *pro hac vice*)
LIEFF CABRASER HEIMANN &
 BERNSTEIN, LLP
275 Battery Street, Suite 2900
San Francisco, CA 94111
Phone (415) 956-1000
ecabraser@lchb.com
*Co-Lead Counsel for Plaintiffs*

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

J. PATRICK GLYNN
Director, Torts Branch
Environmental Torts Litigation Section

BRIDGET BAILEY LIPSCOMB
Assistant Director, Torts Branch
Environmental Torts Litigation Section

/s/ Adam Bain
ADAM BAIN
Special Litigation Counsel
Environmental Torts Litigation Section
U.S. Department of Justice
P.O. Box 340, Ben Franklin Station
Washington, D.C. 20044
E-mail: adam.bain@usdoj.gov
Telephone: (202) 616-4209

LACRESHA A. JOHNSON
HAROON ANWAR
DANIEL C. EAGLES
NATHAN J. BU
Trial Attorneys, Torts Branch
Environmental Torts Litigation Section
*Counsel for Defendant United States of America*

*/s/ W. Michael Dowling*
W. Michael Dowling (NC Bar No. 42790)
The Dowling Firm PLLC
Post Office Box 27843
Raleigh, North Carolina 27611
Telephone: (919) 529-3351
mike@dowlingfirm.com
*Co-Lead Counsel for Plaintiffs*

*/s/ James A. Roberts, III*
James A. Roberts, III (N.C. Bar No.: 10495)
Lewis & Roberts, PLLC
3700 Glenwood Avenue, Suite 410
P. O. Box 17529
Raleigh, NC 27619-7529
Telephone: (919) 981-0191
Fax: (919) 981-0199
jar@lewis-roberts.com
*Co-Lead Counsel for Plaintiffs*

*/s/ Mona Lisa Wallace*
Mona Lisa Wallace (N.C. Bar No.: 009021)
Wallace & Graham, P.A.
525 North Main Street
Salisbury, North Carolina 28144
Tel: 704-633-5244
*Co-Lead Counsel for Plaintiffs*