IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
Civil Action No.: 7:23-CV-00897

| | |
|---|---|
| IN RE: ) | |
| ) | PLATINIFFS' LEADERSHIP |
| CAMP LEJEUNE WATER LITIGATION ) | GROUP'S MEMORANDUM OF LAW |
| ) | IN SUPPORT OF MOTION TO |
| This Pleading Relates to: ) | EXCLUDE EVIDENCE RELATED |
| ) | TO DR. REMY HENNET'S |
| ALL CASES. ) | FEBRUARY 2025 SITE VISIT |
| ) | |
| ) | |

**PLATINIFFS' LEADERSHIP GROUP'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE EVIDENCE RELATED TO DR. REMY HENNET'S FEBRUARY 2025 SITE VISIT**

For the following reasons, the Plaintiffs' Leadership Group ("PLG") respectfully requests that the Court grant the Motion to Exclude Evidence Related to Dr. Remy Hennet's February 2025 Site Visit.

**INTRODUCTION**

This motion seeks an order excluding all observations, opinions, measurements, experiments, notes, videos and photographs related to Dr. Remy Hennet's February 2025 site visit. Dr. Hennet is a geochemist who was hired by the U.S. Department of Justice "to evaluate and respond to the Plaintiffs' expert reports regarding groundwater contamination" at Camp Lejeune. [Ex. 1, Hennet Report, at 1-1] Pursuant to this Court's Pretrial Scheduling Orders [DE-270, as amended by DE-312], the deadline for the United States to disclose its Water Contamination experts was December 9, 2024, and the expert reliance files were due 7 days thereafter. The United States disclosed an expert report and reliance materials for Dr. Hennet consistent with those orders;

1

however, more than two months later, the DOJ produced notes, photographs and videos taken during a February 11, 2025 visit by Dr. Hennet to Camp Lejeune.

As set forth below, Defendant United States' late production of new expert reliance materials generated during a fact-gathering mission of its expert conducted one month after Plaintiffs produced their rebuttal expert reports is in violation of the Federal Rules of Civil Procedure and this Court's orders. Plaintiffs ask this Court to enter an order excluding all of the fruits of Dr. Hennet's out-of-time site visit.

## STATEMENT OF FACTS

On February 25 and 28, 2025, the government disclosed new expert reliance materials concerning Dr. Remy Hennet's February 11th site inspection of Camp Lejeune. At his deposition on March 20, 2025, Dr. Hennet testified that this was his third visit to Camp Lejeune, and that it was conducted in order to respond to Plaintiffs' rebuttal expert Dr. Sabatini. [Ex. 2, Hennet Dep., at 143:2-20; 256:23-257:10]

In his December 2024 report, Dr. Hennet raised the issue of volatilization, claiming that the contaminants of concern volatilized into the air during the water treatment process and within water buffaloes (which were used to distribute water to marines at the base). Volatilization had been raised by the Navy decades earlier, and as a result the Environmental Management Division, Camp Lejeune, hired its consultant AH Environmental Consultants, Inc. ("AH"), to investigate. AH interviewed base personnel, conducted site visits, examined design drawings, and issued a report in December 2004 in which it concluded that "the only significant VOC [volatile organic compound] removals must have occurred at the spirator effluent pipe" and that "the removals for TCE and PCE were likely to be less than 15%."[1] [Ex. 3, AH report, at 2-5; 4-1; 5-1]

---

[1] During the 2005 ATSDR Expert Panel meeting, AH engineer Dr. Peter Pommerenk opined that "removal

Dr. Sabatini responded to Dr. Hennet's volatilization opinions, relying in part on AH, including AH's schematic showing the fall height of spiractors at Hadnot Point, which was reproduced in Dr. Hennet's Dec. 2024 report. [Ex. 3 at 3-10; Ex. 1 at 5-4; Ex. 5, Sabatini Report, at 8-9] Dr. Sabatini also responded to Dr. Hennet's opinions related to water buffaloes. Relying for the most part on documentation within the file materials of Defendants' historian expert Dr. Brigham and on publicly available information, Dr. Sabatini pointed out that Dr. Hennet's water buffalo calculations are largely irrelevant because they relied on a filling technique (through a filler pipe with a strainer as opposed to the manhole) that was rarely used. [Ex. 1, at 5-40; Ex. 5, 20-21 & Appendix A]

During his Feb. 2025 site visit, Dr. Hennet held a meeting with four to five Hadnot Point Water Treatment Plant ("HP WTP") employees; reviewed data on plant monitors regarding water levels and other data points; took approximately 100 photographs of the site; directed, watched, and timed the filling of a water buffalo; and took or directed the taking of numerous measurements of various parts of the HP WTP, including the spiractors. [Ex. 2, Hennet Dep., at 127:10-14; 160:2-6; 161:1-6; 162:10-163:14; 167:4-168:4; 265:12-266:3] Regarding the water buffaloes, although he did not perform any additional calculations, Dr. Hennet concluded that there would be "substantial loss that is comparable to what I calculated for the strainer" based on his observations. *Id*. at 265:24-266:3. Dr. Hennet did not submit a revised or supplemental report regarding his site visit; instead, he submitted two pages of notes documenting his observations and conclusions. [Ex. 6, HENNET_USA_0000000034 & 76]

Dr. Hennet had visited Camp Lejeune, including the HP WTP, twice before completing his expert report. [Ex. 2, at 138:14-139:2] He could have done all of what he did in Feb. 2025 earlier

---

due to volatilization was negligible," – at most 10%. [Ex. 4, 3/28/2005 Expert Panel Transcript, at 56:2-57:14]

– *e.g.*, taken the photos and videos; observed and timed the filling of a water buffalo through a manhole; talked to plant employes; and measured the HP WTP spiractors. He was aware of the AH report documenting the fall height of the Hadnot Point spiractors being one foot instead of the two feet that he used for his calculations; yet, prior to issuance of his report, he only obtained measurements of Holcomb Boulevard spiractors. [Ex. 2, at 139:1-12; 141:4-143:20] Likewise, documentation regarding the historical use of water buffaloes of various types was available to him and his fellow experts prior to Dec. 2024.[2] Additional observations made in Dr. Hennet's notes, including about vents, water level fluctuations of the raw water reservoir, finished water reservoir and water tower, and alleged turbulent flow and air bubbling at four different locations at the HP WTP could have been made and documented previously. *See* Ex. 6.

The site visit occurred two months after Dr. Hennet's report was served, one month after the PLG's Water Contamination Expert rebuttal reports were served, and six months after fact discovery for Track 1 concluded. In an effort to resolve this dispute, the PLG offered to waive its objections if Dr. Sabatini was permitted to tour the site and provided the same access that was allowed to Dr. Hennet. The DOJ rejected this proposal. [Ex. 7, 3/28/25 letter] Instead, in exchange for Dr. Sabatini being afforded a site visit, DOJ demanded that it be allowed to take depositions of two entirely new witnesses with expert knowledge (one of whom is a PLG consulting expert and the other is an author of the NRC report). These new witnesses (which were known to the DOJ during fact discovery) have no knowledge related to the issues addressed in Dr. Hennet's out-of-time site visit. In essence, the DOJ demanded more late discovery in order for PLG to be put on equal footing regarding Dr. Hennet's new facts, data, experiments, observations and opinions from

---

[2] The references relied upon by Dr. Sabatini for historical use of water buffaloes are either from Defendants' historian expert Dr. Brigham's file or are publicly available. *See* Ex. 5, Appendix A.

4

the Feb. 2025 site visit.[3]

In support of this motion, Plaintiffs show as follows:

## **LEGAL STANDARD**

The schedule for expert disclosure in this case was set by this Court's Pretrial Scheduling Orders [DE-270, as amended by DE-312]. The Court's scheduling orders "may be modified only for good cause and with the judge's consent." FRCP 16(b)(4). Here, Defendants did not seek permission of the Court before sending Dr. Hennet to Camp Lejeune for a third site visit two months after his report deadline and disclosing voluminous new expert reliance materials thereafter. Federal Rule of Civil Procedure 16(f) provides that this court may issue any just orders, including those authorized by Rule 37(b)(2)(A)(ii)-(vii) if a party fails to obey a pretrial order. The question is not whether PLG has been prejudiced, but whether DOJ "has shown good cause for its failure to timely disclose." *Akeva L.L.C. v. Mizuno Corp.*, 212 F.R.D. 306, 309 (M.D. N.C. 2002); *Severn Peanut Co., Inc. v. Industrial Fumigant Co*., No. 2:11-CV-00014-BO, 2014 WL 198217, at *3 (E.D. N.C. Jan. 15, 2014).

The Court has broad discretion in employing sanctions for violation of Rule 16(f). *Akeva*, 212 F.R.D. at 311. Factors that courts have considered include: "(1) the explanation for the failure to obey the order; (2) the importance of the expert opinion; (3) the prejudice to the opposing party by allowing the disclosures; and (4) the availability of alternative or lesser sanctions. Additional relevant factors, include: (1) the interest in expeditious resolution of litigation; (2) a court's need to manage its docket; and (3) public policy favoring disposition of cases on the merits." *Akeva*, 212 F.R.D. at 309(citations omitted). *See also Severn Peanut*, 2014 WL 198217, at *3.

---

[3] In an attempt to justify the Feb. 2025 site visit, DOJ points to unrelated issues from different experts that are entirely distinguishable. PLG submits that to the extent DOJ takes the position that PLG experts impermissibly supplemented their expert disclosures, DOJ should meet and confer with PLG and then file a motion.

## ARGUMENT

The PLG contends that DOJ has violated this Court's Pretrial Scheduling Orders. Those orders provided for disclosure of Dr. Hennet's opinions and the basis for them in December 2024. DOJ could have met and conferred with PLG and/or sought Court approval for an additional site visit and expert report supplementation, but chose not to do so.

DOJ argues that Dr. Hennet's site visit merely "served to confirm his opinions, and he was not offering new ones." [DE-345 at 13] First, as a factual matter, that is not correct. Prior to his third site visit, Dr. Hennet had not offered an opinion or calculation regarding the extent of volatilization through a manhole of a water buffalo, nor had he timed the filling of same. He had not measured the fall height of the Hadnot Point spiractors, though he was aware of the need to do so and had requested same from counsel. [Ex. 2, at 141:4-142:22] Despite having been on-site twice before, Dr. Hennet had not noted the venting of reservoirs or water towers, or the water level fluctuations of same. He had not observed turbulent flow and air bubbling at the recarbonation basin, sand filters, spiractor basin or reservoir entry. All of the above is documented in Dr. Hennet's notes from his out-of-time site visit,[4] but none of it appears in his Dec. 2024 report or reliance materials.

Second, Rule 26(e) does not allow "supplementation" of the kind attempted by DOJ here. "Rule 26(e) envisions supplementation when a party's discovery disclosures happen to be defective in some way so that the disclosure was incorrect or incomplete and, therefore, misleading. It does not cover failures of omission because the expert did an inadequate or incomplete preparation." *Akeva*, 212 F.R.D. at 310 (citations omitted). In *Aveka*, the plaintiff attempted to "supplement" its expert report with the results of an additional test after receiving the

---

[4] *See* Exhibit 6.

defense expert report.  The plaintiff argued that the new test constituted proper supplementation because the expert's initial opinion was "incomplete," but the court disagreed, holding: "The Court cannot accept a definition of supplementation which would essentially allow for unlimited bolstering of expert opinions."  *Id*.  The Court further noted: "To construe supplementation to apply whenever a party wants to bolster or submit additional expert opinions would reek havoc in docket control and amount to unlimited expert opinion preparation."  *Id*.

Similarly, in *Severn Peanut*, the plaintiffs performed post-disclosure testing and issued a supplemental report prior to the expert's deposition.  This Court found that the supplemental report and testing were not proper supplementation but rather were untimely disclosures, holding that "[t]he only appropriate supplementation occurs when the previous disclosures 'happen to be defective in some way so that the disclosure was incorrect or incomplete and, therefore, *misleading*.'"  *Severn Peanut*, 2014 WL 198217, at *2 (citations omitted; emphasis in original).

Defendant United States has engaged in the same discovery abuse as the plaintiffs in *Akeva* and *Severn Peanut.*  DOJ, like the *Akeva* plaintiff, appears to claim it was surprised by Dr. Sabatini's rebuttal report.  However, as in *Akeva*, the surprise is not justified.  Dr. Sabatini's opinions are based on documents discussed in the Defendants' expert reports and reliance materials, along with publicly available information. DOJ does not claim that Dr. Hennet's initial opinions were *misleading* because they were incorrect or incomplete.  As in *Akeva* and *Severn Peanut,* the "supplementation" here is improper bolstering.  As in *Akeva* and *Severn Peanut,* the PLG urges this Court to find that DOJ has failed to advance just cause for addressing the matters taken up by Dr. Hennet at the third site visit earlier, and that DOJ violated this Court's Pretrial Scheduling Orders by attempting to introduce additional expert testimony and materials at times not authorized by the Court's orders.

PLG submits that the appropriate sanction here is that Dr. Hennet may not rely on any facts, data, opinions, observations, measurements or interviews from his February 2025 site visit.[5] Factors that support this sanction include the fact that DOJ failed to seek Court permission for its untimely site visit and "supplementation," and offers no explanation for its failure to obey this Court's order. Furthermore, DOJ rejected an opportunity to correct its gamesmanship by allowing Dr. Sabatini to have a similar site visit. Dr. Sabatini's site visit could have taken place before his deposition, and this would have evened the playing field. Instead, DOJ improperly sought to extract additional late discovery from PLG (namely, two depositions of individuals with expert knowledge on subjects not related to volatilization) in exchange for a Sabatini site visit.

An additional factor supporting this sanction is the prejudice to PLG. DOJ claims that PLG has not been prejudiced and that its late disclosure is harmless because PLG had an opportunity to question Dr. Hennet about the untimely site visit at his deposition. [DE-345 at 13] This is not correct for multiple reasons. First, the necessity to ask questions about the third site visit took up an inordinate amount of deposition time. PLG's counsel was not able to finish asking all of the questions they had planned to ask, and DOJ's counsel cut the deposition off, with no willingness to compromise under the circumstances. [Ex. 2 at 285:5-286:22][6] Second, PLG's counsel only had time to ask about a handful of the 100 or so photographs and videos. Third, Dr. Hennet did not write a supplemental report or adequately document his observations, and he had a poor memory of the facts he observed. For example, he was not able to identify by name any of the individual employees he questioned at the HP WTP, nor did he know how long they had worked

---

[5] This can be enforced by limiting Dr. Hennet to testify about the matters (data, measurements, observations, and opinions) explicitly discussed in his December 2024 expert report, which in any event is contemplated by the Federal Rules.

[6] Although PLG's counsel indicated he just wanted his "last question" answered (which was not answered pursuant to DOJ's counsel's instructions), the reality is that PLG had several more hours of questions to ask due to the necessity to question Dr. Hennet about the Feb. 2025 site visit.

there.  [Ex. 2 at 159:21-160:6; 162:16-20; 164:23-165:18; 169:12-20]  He did not print out or take a photograph of the data he observed on the monitors at the plant.  [Ex. 2 at 167:9-169:4] Dr. Hennet also did not videotape the filling of the water buffalo so that PLG could see what he saw. [261:21-262:20] Thus, if Dr. Hennet is allowed to testify about his observations and interviews at the site, he may do so with impunity, as PLG is unable to cross on photos that were not asked about, or videos that were not taken, or interviews that were not transcribed, or regarding unidentified employees with unknown job titles and work histories who provided facts that are not documented anywhere other than in Dr. Hennet's possibly selective memory.

DOJ also claims that Dr. Hennet's disclosure is "substantially justified" given the "incorrect representations made for the first time in Dr. Sabatini's report."  [DE-345 at 13]  First, Dr. Sabatini is a rebuttal expert, and the issue of volatilization was raised by DOJ via Dr. Hennet's report, so there is nothing inappropriate about Dr. Sabatini responding for "the first time" to these issues in his rebuttal report.  Second, Dr. Sabatini based his "representations" on the AH report prepared by the Navy's consultant and on documents in the DOJ's historian's file, along with publicly available information.  To the extent any of Dr. Sabatini's "representations" are incorrect, DOJ may cross examine Dr. Sabatini about them.  If there was truly a need for Dr. Hennet to go to the site for a third time, nothing prevented DOJ from seeking Court approval for same.

Docket control also weighs in favor of exclusion. Given the number of experts in this case, bolstering like that attempted here by DOJ, if allowed, threatens to reek havoc on this Court's docket. "The factors involving docket control planning are sufficiently important to alone justify the exclusion of an untimely disclosed expert report or opinion even in absence of prejudice to the opposing party."  *Akeva*, 212 F.R.D. at 309.

## **CONCLUSION**

For the foregoing reasons, the PLG respectfully requests the Court to exclude all observations, opinions, measurements, experiments, notes, and photographs related to Dr. Remy Hennet's February 2025 site visit as evidence in this case.

*[Signature page to follow.]*

DATED this 10th day of April 2025.

Respectfully submitted,

 /s/  J. Edward Bell, III
J. Edward Bell, III (admitted *pro hac vice*)
Bell Legal Group, LLC
219 Ridge St.
Georgetown, SC 29440
Telephone: (843) 546-2408
jeb@belllegalgroup.com

*Lead Counsel for Plaintiffs*

 /s/  Elizabeth J. Cabraser
Elizabeth J. Cabraser (admitted *pro hac vice*)
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
ecabraser@lchb.com

*Co-Lead Counsel for Plaintiffs*

 /s/  Robin L. Greenwald
Robin L. Greenwald (admitted *pro hac vice*)
Weitz & Luxenberg, P.C.
700 Broadway
New York, NY 10003
Telephone: 212-558-5802
rgreenwald@weitzlux.com

*Co-Lead Counsel for Plaintiffs*

 /s/  Zina Bash
Zina Bash (admitted *pro hac vice*)
Keller Postman LLC
111 Congress Avenue, Suite 500
Austin, TX 78701
Telephone: 956-345-9462
zina.bash@kellerpostman.com

*Co-Lead Counsel for Plaintiffs and Government Liaison Counsel*

 /s/  W. Michael Dowling
W. Michael Dowling (NC Bar No. 42790)
The Dowling Firm PLLC
Post Office Box 27843
Raleigh, North Carolina 27611
Telephone: (919) 529-3351
mike@dowlingfirm.com

*Co-Lead Counsel for Plaintiffs*

  /s/  James A. Roberts, III
James A. Roberts, III
Lewis & Roberts, PLLC
3700 Glenwood Ave., Ste. 410
Raleigh, NC 27612
Telephone: (919) 981-0191
jar@lewis-roberts.com

*Co-Lead Counsel for Plaintiffs*

*/s/  Mona Lisa Wallace*
Mona Lisa Wallace (N.C. Bar No.: 009021)
Wallace & Graham, P.A.
525 North Main Street
Salisbury, North Carolina 28144
Tel: 704-633-5244
mwallace@wallacegraham.com

*Co-Lead Counsel for Plaintiffs*

# CERTIFICATE OF SERVICE

I, J. Edward Bell, III, hereby certify that the foregoing document was electronically filed on the Court's CM/ECF system on this date, and that all counsel of record will be served with notice of the said filing via the CM/ECF system.

This the 10th day of April 2025.

*/s/ J. Edward Bell, III*
J. Edward Bell, III