IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
Case No. 7:23-cv-897

| | |
|---|---|
| IN RE: )<br>)<br>CAMP LEJEUNE WATER LITIGATION )<br>)<br>This Document Relates To: )<br>)<br>ALL CASES )<br>) | **UNITED STATES' OPPOSITION TO PLATINIFFS' LEADERSHIP GROUP'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE EVIDENCE RELATED TO DR. REMY HENNET'S FEBRUARY 2025 SITE VISIT** |

**INTRODUCTION**

Plaintiffs seek to exclude information from Dr. Hennet's February 2025 site visit which would be helpful to the Court in assessing contamination at Hadnot Point because it is unfavorable to them. They have suffered no prejudice, which, contrary to their assertion, is required to justify exclusion, and the visit was substantially justified because of their own late disclosures and the great importance of a measurement Dr. Hennet took during the site visit. Accordingly, the Court should deny the Plaintiffs' Motion to Exclude.

**STATEMENT OF FACTS**

**I.      The Parties' Experts Disagree About VOC Losses in the Hadnot Point WTP.**

*Dr. Sabatini Introduced Ambiguity about a Measurement Used to Calculate VOC Losses in the Hadnot Point WTP Spiractor Effluent Pipe.*

In December 2024, the United States disclosed an expert report from Dr. Hennet that calculated the percentage of the VOCs at issue that were lost during water treatment and storage at the Hadnot Point water treatment plant ("WTP"). Mot. Ex. 1 at Opinion 2. Plaintiffs disclosed a rebuttal report by Dr. Sabatini, a retired engineering professor, about these losses. Dr. Sabatini agreed with the methods Dr. Hennet employed to calculate the losses, but he differed in the calculated amount. Mot. Ex. 5 at 14.

1

Driving the difference in Dr. Sabatini's and Dr. Hennet's calculations of VOCs lost during storage and treatment are different conclusions about the distance water fell at the Hadnot Point WTP as it entered parts of the plant called spiractor effluent pipes. Opp. Ex. 1 at 141:8-18. Dr. Hennet relied on records, personal observations, and measurements to determine that the fall at the spiractor effluent pipes was two feet. *See* Mot. Ex. 1 at 5-5. Records showed that the Hadnot Point and Holcomb Boulevard spiractors had the same capacity and purpose; Dr. Hennet observed during two pre-report site visits that the Holcomb Boulevard and Hadnot Point spiractors had the same general appearance, though the Hadnot Point spiractors had unremovable covers; two pre-report sets of measurements of a spiractor effluent pipe fall height at Holcomb Boulevard yielded the same results: a drop of two feet. *See* Mot. Ex. 1 at 4-8&9, 5-4&5.

Dr. Sabatini relied on a 2004 "visual estimate" by a Navy-contracted ATSDR consultant, AH Environmental Consultants, Inc ("AH"), to determine the fall height was one foot. Mot. Ex. 3 at 3-7; Mot. Ex. 5 at 8-9; Opp. Ex. 1 at 142:22-24. The photo used for this "estimate" lacked a scale. Mot. Ex. 3 at 3-8&9.

***Dr. Hennet Returned to Camp Lejeune to Ensure the Spiractor Effluent Pipe Fall Height Measurement is Accurate.***

Because of the importance of the spiractor effluent pipe fall height to VOC loss calculations and Dr. Sabatini's opinion that the AH Environmental report's "visual estimate" of it was reliable, Dr. Hennet returned to Camp Lejeune on February 11, 2025, to measure the fall height at one of Hadnot Point's spiractor effluent pipes. *See generally* Mot. Ex. 2 at 142:23-143:20. This was a difficult measurement. Because the cover could not be removed, it was accomplished by feeding equipment through the opening of a spiractor's cover and out to the effluent pipe opening in the center of the spiractor, then adjusting the equipment for the measurement from the edge of the opening in the spiractor's cover. Below the opening was a 15-20 feet drop to the bottom of the

spiractor, which had to be emptied to take the measurement. Dr. Hennet documented his measurements of the effluent pipe fall height through photographs and notes that were provided to Plaintiffs on February 25, 2025, more than three weeks before his deposition. After measuring the spiractor effluent pipe at Hadnot Point, Dr. Hennet's opinions remained "unchanged" as the measurement "support[ed] or confirm[ed]" his prior opinion. Mot. Ex. 2 at 121:1-12. He did not write any new opinions or do any new calculations. *Id.* at 121:13-21.

Dr. Hennet spent approximately an hour at the Hadnot Point WTP. In addition to measuring the spiractor effluent pipe fall height, Dr. Hennet took photographs of the recarbonation basin, the sand filters, and vents at the raw and treated water reservoirs—all of which he was seeing for the third time. Dr. Hennet also asked base personnel about fluctuations in the Hadnot Point reservoir levels and observed monitoring equipment data on fluctuations in the Hadnot Point water towers. Mot. Ex. 2 at 159:9-162:9.

***Dr. Sabatini Testified That He Could Not Get Better Information From A Site Visit & Assumed Venting & Water Level Fluctuation.***

Prior to submitting his report in January 2025, Dr. Sabatini had never been, or asked to go, to Camp Lejeune, Opp. Ex. 1 at 74:6-9, and he dismissed any need for such a visit at his deposition. He testified that he "d[id]n't need to" go because he "had all the information [he] needed in the [AH Report] to do [his] calculations." *Id.* at 74:20-75:18; 77:17-78:6.[1] He further testified that he believes the AH Report (Mot. Ex. 3) because it was made closer in time to the statutory period, and is a better source for information about Camp Lejeune's infrastructure than information he could get from a site visit in 2025. *Id.* at 326:25-327:18. He also testified that if he were to go to the Hadnot Point WTP, he would want to measure the effluent pipe fall height while the spiractor was operating, but he

---

[1] Plaintiffs filed this motion on the eve of Dr. Sabatini's deposition and, therefore, were not able to include his position on visiting Camp Lejeune. Although, presumably, they were aware of it.

acknowledged this would be difficult to do and could not identify a way to take such a measurement. *Id.* at 153:18-154:11; 157:12-19.

Although it was not apparent from his rebuttal report, Dr. Sabatini also testified that he assumed the Hadnot Point WTP reservoirs had the venting and water level fluctuations Dr. Hennet noted in his February 2025 site visit. Dr. Sabatini testified that it would "be the normal course" for a reservoir to be vented, Opp. Ex. 1 at 104:2-4, and that "in general[,]" the vents in the photographs from Dr. Hennet's February 2025 site visit were "similar to other vents [he's] seen on the top of a water reservoir." *Id.* at 106:12-15. He also testified that "under the normal course of operation, you would expect [fluctuation at the water reservoirs and towers,]" *Id.* at 177:8-16, and in his opinions, he "assumed that there would be some fluctuation." *Id.* at 179:9-20.

## II. VOC Losses in the Filling of Water Buffaloes

Dr. Hennet's report also calculated VOC losses from the filling of portable, 400-gallon water tanks, commonly called water buffaloes. Mot. Ex. 1 at Opinion 13. As with VOC losses from storage and treatment, Dr. Sabatini agreed with the methods Dr. Hennet employed to calculate these, but he differed in the calculated amount based on different assumptions. Mot. Ex. 5 at 22.

Driving the difference in Dr. Hennet's and Dr. Sabatini's calculations of VOC losses in water buffaloes were assumptions about how they were filled. Mot. Ex. 2 at 256:16-257:10. Dr. Sabatini relied on two plaintiffs' affidavits disclosed *with his report* to opine that prior to 1972, Marines did not follow the water buffalo manuals' instructions to fill the water buffaloes through a fill hatch and instead filled them through a manhole. *See* Mot. Ex. 5 at Water Buffalo Appx. at 21; *see also* Opp. Ex. 1 at 287:1-8. The Plaintiffs had failed to identify either of these plaintiffs as having knowledge of the water buffaloes in their interrogatory responses. Opp. Ex 2 at 2.

During his February 2025 site visit, Dr. Hennet measured the time it took to fill a water buffalo through the manhole and determined that it was consistent with Dr. Sabatini's conclusions

4

about the time to fill a water buffalo in this manner. Mot. Ex. 2 at 260:22-261:5. Dr. Hennet also reviewed the materials Dr. Sabatini relied on in his calculations of losses at water buffaloes. Mot. Ex. 5 at Water Buffalo Appx. at 21-25.

Dr. Hennet documented the filling of a water buffalo through the manhole with photographs and notes that, like his documentation of his visit to the HP-WTP, were provided to Plaintiffs on February 25, 2025, more than three weeks before his deposition. He did not write any new opinions or do any new calculations. Mot. Ex. 2 at 121:1-21.

### III. Plaintiffs Examined Dr. Hennet About His February 2025 Site Visit.

Plaintiffs deposed Dr. Hennet twenty-four days after the United States disclosed all of the notes and photographs from his February 2025 site visit. At that deposition, Plaintiffs inquired extensively about his February 2025 visit and its impact on his opinions. He was clear that his "opinions [we]re unchanged[,]" and that he "didn't do calculations per se, but [he] just basically thought about what [he] observed on February 11, especially under filling of the water buffalo that [he] witnessed. But [he] didn't write anything or [he] did not calculate anything." Mot. Ex. 2 at 121:1-21.

### III. The United States Tried to Resolve This Dispute.

Following Dr. Hennet's deposition, which took place after the close of Phase I expert discovery, Plaintiffs demanded that Dr. Sabatini be offered "the same access" to the Hadnot Point WTP and personnel as Dr. Hennet had in his February 2025 site visit, including that a spiractor *not* be running. Mot. Ex. 7 at 3. The United States offered to agree to the Plaintiffs' late and irregular request for entry onto land for inspection under Rule 34 in exchange for depositions of two fact witnesses involved in the ATSDR's Camp Lejeune water modeling who the United States had been unable to locate or fit in to the deposition schedule during the discovery period – Robert Faye, the ATSDR's groundwater modeler, and Prabhakar Clement, the National Research Council's modeling

expert who reviewed the ATSDR's model. Plaintiffs refused.

## LEGAL STANDARD

Plaintiffs allege that Dr. Hennet's February 11, 2025, site visit violated the Court's scheduling order for Phase I expert disclosures under Rule 26(a) by failing to timely disclose considered materials.[2] D.E. 349 at 2. Such a violation is governed by Rule 37(c), which provides in pertinent part that "[i]f a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . unless the failure was substantially justified or is harmless."

Appropriate sanctions are evaluated under the five-factor test adopted by the Fourth Circuit in *Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592 (4th Cir. 2003): "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." *Pac. AG Grp. v. H. Ghesquiere Farms, Inc.*, 2007 WL 7615426, at *2 (E.D.N.C. Jan. 19, 2007). *See also Salami v. N. Carolina Agr. & Tech. State Univ.*, 394 F. Supp. 2d 696, 710 (M.D.N.C. 2005), aff'd, 191 F. App'x 193 (4th Cir. 2006). The first four factors relate primarily to harmlessness and the last relates primarily to justification. *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 190 (4th Cir. 2017). Because "the central purpose of Rule 37(c)(1) is to prevent last minute surprise to an opposing party, . . . [c]ourts within the Fourth Circuit generally deny motions to strike in cases where the surprise is curable." *SAS Inst. Inc. v. Akin Gump Strauss Hauer & Feld, LLP*, 2012

---

[2] To the extent Plaintiffs argue that the United States violated Rule 26(e), they have failed to adequately brief this claim because their motion does not explain how the United States' disclosures related to the site visit failed to comply with Rule 26(e). D.E. 349 at 6-7. Rule 26(e) requires a party to supplement if in any "material respect the disclosure or response is incomplete or incorrect[.]" That is exactly what happened here. After Dr. Hennet returned to the base, the United States promptly disclosed to Plaintiffs new materials that he considered, preventing an incomplete disclosure. As described in other parts of this opposition, Plaintiffs have repeatedly done this for their own experts.

6

U.S. Dist. LEXIS 200356, at *10 (E.D.N.C. Dec. 11, 2012).

Plaintiffs assert that prejudice is irrelevant based on a district court case that analyzed scheduling order violations under Rule 16(f). D.E. 349 at 5 (citing *Akeva L.L.C. v. Mizuno Corp.*, 212 F.R.D. 306, 308 (M.D.N.C. 2002)). But the Fourth Circuit has considered prejudice in evaluating expert disclosures made after a court-ordered discovery deadline, *see Bresler*, 855 F.3d at 191, 193, and this district regularly looks to Rule 37(c) to analyze discovery plan violations, *see, e.g.*, *Pac. AG Grp.*, 2007 WL 7615426, at *2; *Gallagher v. Southern Source Packaging, LLC*, 568 F.Supp2d 624, 628, 631 (E.D.N.C. June 2-, 2008). Moreover, even when this district analyzes scheduling order violations under Rule 16(f), it still considers the *Southern States* factor of "prejudice to the opposing party by allowing the disclosures[.]" *Severn Peanut Co. v. Indus. Fumigant Co.*, 2014 WL 198217, at *3 (E.D.N.C. Jan. 15, 2014). It follows that exclusion of late-disclosed expert materials is appropriate only if a late disclosure is both prejudicial and unjustified.

## ARGUMENT

### I. Dr. Hennet's February 2025 Site Visit Was Harmless & Substantially Justified.

Plaintiffs' requested sanction, "that Dr. Hennet may not rely on any facts, data, opinions, observations, measurements, or interviews from his February 2025 site visit," is unwarranted because the disclosure was substantially justified and harmless. DE 349 at 8. The site visit itself was "substantially justified" in light of the factual assertions raised in Dr. Sabatini's report, Plaintiffs' late disclosures of factual declarations to support Dr. Sabatini's opinions, and a dispute in this case regarding contaminant volatilization at the spiractors.

Moreover, the disclosure of the additional materials was "harmless" given that it was made weeks before Dr. Hennet's deposition and Plaintiffs had ample time to prepare to question Dr. Hennet on the visit, and, in fact spent substantial time in the deposition doing so. Under the Fourth Circuit's five factor test, exclusion is not warranted.

### a. Plaintiffs Were Not Surprised by Information from Dr. Hennet's Site Visit that Confirmed the Opinions in Dr. Hennet's December 2024 Report.

First, "the surprise to the party against whom the evidence would be offered," is minimal. *Salami*, 394 F. Supp. 2d at 710. The only meaningful new measurement was the Hadnot Point spiractor effluent pipe's fall height, which did not change any opinions. This merely confirmed Dr. Hennet's original opinion. Further, Dr. Sabatini testified that he assumed much of the information from Dr. Hennet's February 2025 site visit that Plaintiffs seek to exclude. Notably, he testified that he assumed water fluctuations in his calculations and knew that water reservoirs and towers were vented. Opp. Ex. 1 at 104:2-4; 179:10-20.

### b. To the Extent Plaintiffs Were Surprised, it was Cured at Dr. Hennet's Deposition or by Dr. Sabatini's Assumptions that the Information Dr. Hennet Confirmed was True.

Second, "the ability of that party to cure the surprise" weighs heavily in favor of Dr. Hennet's visit being harmless. *Salami*, 394 F. Supp. 2d at 710. Plaintiffs argue that they have been prejudiced because they had "hours" of questions for Dr. Hennet unrelated to his site visit and did not have their preferred documentation. DE 349 at 8-9. These claims of prejudice fall flat. Whatever questions Plaintiffs had about a site visit would exist whether it was taken in 2025 or 2023. Plaintiffs had ample opportunity to question Dr. Hennet about all of his site visits and fail to identify any areas of questioning that they were unable to cover.

Plaintiffs also had over three weeks to review the notes and photographs before Dr. Hennet's deposition, and they failed to request more time for the seven-hour deposition before it began. The notes and photographs also documented much of Dr. Hennet's visit including, importantly, the fall height measurement. Pl. Ex. 6. Plaintiffs' complaints about missing information are without any context. For example, Plaintiffs accurately state that Dr. Hennet "did not print out or take a photograph of the data he observed on the monitors of the plant." DE 349 at 9. They fail to explain,

however, how they were surprised by information Dr. Hennet saw on the monitors related to water level fluctuation—a fact of little import to either his or Dr. Sabatini's opinions as they both assumed such a standard phenomenon in their calculations. Mot. Ex. 2 at 164:23-167:17; Opp. Ex. 1 at 177:8-16; 179:6-20; 180:15-21. *See also Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 194 (4th Cir. 2017)("Thus, the record does not show that Pugh's supplementary calculations and their timing affected Wilmington's ability to conduct its defense in any material respect."). Dr. Sabatini also testified, after reviewing Dr. Hennet's deposition, that "[he] do[es]n't need to" visit the Hadnot Point WPT because he "had all the information [he] needed in the [AH Report] to do his calculation." Opp. Ex. 1 at 75:10-18.

### c. Allowing the Evidence from Dr. Hennet's Site Visit Will Not Interrupt the Court's Case Management, But Excluding it Could Unnecessarily Prolong Hearings.

Third, "the extent to which allowing the evidence would disrupt the trial" heavily favors harmlessness because there is no hearing date. *Richardson v. United States*, No. 5:08-CV-620-D, 2010 WL 3855193, at *6 (E.D.N.C. Sept. 30, 2010) ("Defendant will be given an opportunity to depose plaintiffs' experts and allowing a brief delay for such discovery will not disrupt the trial, which again has not yet been scheduled, or any of the other proceedings in this case."). Declining to exclude Dr. Hennet's site visit will not "reek havoc on the Court's docket[,]" DE 349 at 9, as Plaintiffs allege, and, in fact, it did not even disrupt the Phase I expert schedule. Plaintiffs have dropped any request for Dr. Sabatini to visit the water treatment plant, and Dr. Sabatini testified that he has all the information he needs. Excluding the site visit would only prolong testimony about fall heights.

### d. Fall Height at the Spiractor Effluent Pipe is *the* Disputed Fact for Calculation of VOC Losses at the Spiractors, which Both Drs. Hennet and Sabatini Agree Were the Largest Losses During Water Treatment and Storage.

Fourth, "the importance of the evidence," also favors inclusion of the site visit. *Salami*, 394 F. Supp. 2d at 710. The effluent pipe's fall height is the key factual dispute driving the difference of

9

opinions in VOC losses at the water treatment plant because Dr. Hennet and Dr. Sabatini agree both that VOC losses were most significant at the spiractor effluent pipes and that an important parameter for calculating those losses is the fall height. Thus, whether Dr. Hennet is correct that the fall height was two feet or Dr. Sabatini is correct that the fall height was one foot is significant.

### e. Dr. Hennet had Good Reasons to Conduct the February 2025 Site Visit.

Fifth and finally, "the nondisclosing party's explanation for its failure to disclose the evidence," favors inclusion of the site visit. *Id.* Dr. Hennet had just reasons for returning to Camp Lejeune. He observed the filling of a water buffalo through a manhole because Dr. Sabatini relied on late-disclosed affidavits to opine that water buffaloes were *always* filled through a manhole. He measured the spiractor effluent pipe fall height at the Hadnot Point WTP, even though it was difficult and dangerous to do, and even though a safer and easier measurement had been taken and produced at the Holcomb Boulevard WTP, because the fall height is so central to the dispute about VOC losses at the spiractor effluent pipe. As in *Aveka*, exclusion is inappropriate because the United States acted "expeditiously" to obtain and disclose new information that was "important to the merits of the case" that would "reduce . . . confusion or misunderstanding[.]"*Akeva L.L.C.*, 212 F.R.D. at 312.

## II. Plaintiffs Have Made Numerous and Repeated Supplemental Disclosures.

If the Court were to rule that Dr. Hennet cannot reference information from the 2025 site visit because it was not conducted prior to the submission of his expert report, Plaintiffs' numerous and repeated supplemental expert disclosures would also be subject to exclusion. Plaintiffs' late Phase I disclosures include: (1) calculations for a sensitivity analysis on the biodegradation rate of PCE at Tarawa Terrace that Plaintiffs' experts Norman Jones and Jeffrey Davis performed and that Plaintiffs' counsel produced **at 10:45 pm the night before** Dr. Jones' deposition, Opp. Ex. 3; (2) a "supplement" report that Plaintiffs' produced two weeks *after* Dr. Jones' deposition that purported to fill in gaps of information that Mr. Davis and Dr. Jones forgot during their depositions, Opp. Ex.

10

4; and (3) a recalculation of geometric bias of the Tarawa Terrace water model and "notes" about this calculation that Plaintiffs' expert Morris Maslia disclosed *during his deposition.* Opp. Ex. 5 at 41:12-17. Plaintiffs' late disclosures have continued in Phase II, where Plaintiffs have repeatedly supplemented their materials considered lists on the eve of an expert's deposition with materials that were available and should have been disclosed at the time of the reports. Opp. Ex. 6.

## Conclusion

For the foregoing reasons, the United States requests that the Court deny the Plaintiffs' Motion to Exclude Evidence Related to Dr. Remy Hennet's February 2025 Site Visit.

Dated: April 17, 2025

Respectfully submitted,

YAAKOV ROTH
Acting Assistant Attorney General,
Civil Division

MICHAEL D. GRANSTON
Deputy Assistant Attorney General,
Torts Branch

J. PATRICK GLYNN
Director,
Environmental Torts Litigation Section

BRIDGET BAILEY LIPSCOMB
Chief, Camp Lejeune Unit

ADAM BAIN
Special Litigation Counsel

<u>/s/Allison M. O'Leary</u>
ALLISON M. O'LEARY
Trial Attorney, Torts Branch
Environmental Torts Litigation Section
U.S. Department of Justice
P.O. Box 340, Ben Franklin Station
Washington, D.C. 20044
E-mail: allison.o'leary@usdoj.gov
Telephone: (202) 374-0045
Fax: (202) 616-4473

Attorney inquiries to DOJ regarding CLJA:
(202) 353-4426

*Attorneys for Defendant,*
*United States of America*

## II. Certificate of Service

I hereby certify that on April 17, 2025, I electronically filed the foregoing using the Court's Electronic Case Filing system, which will send notice to all counsel of record.

*/s/ Allison M. O'Leary*
