IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:23-CV-897

| | |
|---|---|
| IN RE: ) | MEMORANDUM IN SUPPORT OF |
| ) | MOTION TO EXCLUDE |
| CAMP LEJEUNE WATER LITIGATION ) | THE OPINION TESTIMONY OF |
| ) | MR. R. JEFFREY DAVIS AND |
| This Document Relates To: ) | DR. NORMAN L. JONES |
| ALL CASES ) | Fed. R. Evid. 702 |

## INTRODUCTION

The United States files this memorandum in support of its Motion to Exclude the Opinion Testimony of Mr. R. Jeffrey Davis and Dr. Norman L. Jones regarding (i) the soundness of the methodology employed by the Agency for Toxic Substances and Disease Registry ("ATSDR") in conducting water modeling for the Tarawa Terrace water distribution system at Marine Corps Base Camp Lejeune, and (ii) the accuracy of the results of those modeling simulations.

The United States does not dispute the soundness of ATSDR's methodology in simulating average monthly contaminant concentrations in drinking water for the purpose that ATSDR intended—to provide relative exposure level estimates to inform ATSDR's epidemiological studies. However, the United States does dispute that ATSDR's methodology was intended to provide sufficiently accurate contaminant concentrations for historic individual exposure levels. To the extent Mr. Davis and Dr. Jones are offering opinions about the soundness of ATSDR's methodology and accuracy of the Tarawa Terrace water model for any purpose, those opinions should be excluded as unreliable under *Daubert* and Fed. R. Evid. 702.[1] Any

---

[1] The United States is moving independently to exclude all of Plaintiffs' experts' opinions related to the use of ATSDR's water modeling for a purpose other than the one for which it was intended, i.e., to be used in epidemiological studies to determine relative levels of exposure to contamination at Camp Lejeune. As outlined in this memorandum, irrespective of the intended use of the modeling, Mr. Davis and Dr. Jones cannot testify as to the methodology employed by ATSDR to develop that model.

1

opinions Mr. Davis and Dr. Jones have offered or will offer about ATSDR's methodology and the accuracy of the modeling results are unreliable because Mr. Davis and Dr. Jones did not consider sufficient facts or data or employ a reliable methodology in forming them.

## NATURE OF THE CASE

Plaintiffs have filed actions for personal injury and wrongful death related to exposure to contaminated water pursuant to the Camp Lejeune Justice Act of 2022, Pub. L. No. 117–168, § 804, 136 Stat. 1759, 1802–04 (2022).

## STATEMENT OF FACTS

The Plaintiffs' Leadership Group ("PLG") disclosed jointly authored expert reports by engineers Mr. R. Jeffrey Davis and Dr. Norman L. Jones in the Water Contamination Phase of this case. The United States deposed both witnesses. Mr. Davis and Dr. Jones's expert reports center on ATSDR's water modeling efforts related to the Tarawa Terrace water distribution system at Camp Lejeune. Based on limited contaminant concentration sampling data from 1982 and 1985, ATSDR utilized computer modeling to estimate historic average monthly concentrations of perchloroethylene ("PCE") and its biodegradation byproducts (trichloroethylene, *trans*-1,2-dichloroethylene, and vinyl chloride) in drinking water at Tarawa Terrace from 1951 to 1987. *See generally* Exhibit 1, Morris L. Maslia et al., *Analyses of Groundwater Flow, Contaminant Fate and Transport, and Distribution of Drinking Water at Tarawa Terrace and Vicinity, U.S. Marine Corps Base Camp Lejeune, North Carolina: Historical Reconstruction and Present-Day Conditions – Chapter A: Summary of Findings* (2007).

Mr. Davis and Dr. Jones performed what is known as a "post-audit" on ATSDR's water model for Tarawa Terrace. According to Mr. Davis, a post-audit is the process whereby one takes "an existing calibrated groundwater flow and transport model . . . and extend[s] it forward

2

in time and look[s] at the results of that model compared to data that existed within that extended time." Exhibit 2, Davis Dep. Tr. 45:12–22; *see also* Exhibit 3, Davis and Jones Initial Report, at vi ("The audit extends the original model's simulation period from 1995 to 2008 and assesses the accuracy of its predictions by comparing simulated PCE concentrations to actual concentrations measured at monitoring wells during this extended period.").

Mr. Davis and Dr. Jones offer the following opinion in their report regarding the accuracy of ATSDR's water modeling results and the methods used to develop them:

> In summary, the extended model demonstrates that the original model was developed using sound methods, and the model remains a reliable tool for understanding the general trends of contaminant migration in the Tarawa Terrace region. Based on this post-audit, we can find no significant evidence that would invalidate the analyses performed by ATSDR with the original model.

Exhibit 3, Davis and Jones Initial Report, at 6-1; *see also* Exhibit 4, Davis and Jones Rebuttal Report, at 3-13 ("The model effectively simulates long-term trends in contaminant migration, and we can find no significant evidence that would invalidate the analyses performed by ATSDR with the original model."); Exhibit 5, Jones Dep. Tr. 231:18–232:13 ("[T]he opinions we've rendered on the model was that in terms of the -- how the model simulates concentrations at the water treatment plant, it -- it is a reasonably accurate model developed using sound scientific and engineering principles.").

Mr. Davis and Dr. Jones both admitted under oath that they did not read substantial portions of the ATSDR chapter reports (i.e., individual "chapters") for the Tarawa Terrace model that they opine was developed using sound methods. For example, Mr. Davis testified:

> Q. . . . You read Chapters A, C, and F; is that correct?
> A. Correct.
> Q. And those are the only chapters that you reviewed; correct?
> A. Correct.

3

Exhibit 2, Davis Dep. Tr. 118:16–21. This means that Mr. Davis failed to review the six other chapters detailing ATSDR's water modeling efforts for Tarawa Terrace before opining on the reliability of the model. Mr. Davis therefore cannot know what those six chapters describe, and whether they support or disprove his opinions. The chapters Mr. Davis chose not to review include:

(1) Robert E. Faye, *Chapter B: Geohydrologic Framework of the Castle Hayne Aquifer System* (2007);

(2) Stephen J. Lawrence, *Chapter D: Properties and Degradation Pathways of Common Organic Compounds in Groundwater* (2007);

(3) Robert E. Faye et al., *Chapter E: Occurrence of Contaminants in Groundwater* (2007);

(4) Wonyong Jang et al., *Chapter G: Simulation of Three-Dimensional Multispecies, Multiphase Mass Transport of Tetrachloroethylene (PCE) and Associated Degradation By-Products* (2008);

(5) Jinjun Wang et al., *Chapter H: Effect of Groundwater Pumping Schedule Variation on Arrival of Tetrachloroethylene (PCE) at Water-Supply Wells and the Water Treatment Plant* (2008); and

(6) Morris L. Maslia et al., *Chapter I: Parameter Sensitivity, Uncertainty, and Variability Associated with Model Simulations of Groundwater Flow, Contaminant Fate and Transport, and Distribution of Drinking Water* (2009).

Similarly, Dr. Jones testified:

> Q. . . . So according to this [Materials Considered] list, you considered ATSDR's Tarawa Terrace Chapters A, F, and C; is that correct?
> A. Correct.
> Q. Did you review any other chapters of ATSDR's Tarawa Terrace reports?
> A. I skimmed through some of the others, but not in the same detail that I read Chapters A, C, and F.

Exhibit 5, Jones Dep. Tr. 85:2–10. Dr. Jones further testified: "I believe I skimmed through all of them, but -- just to see what was there, but I -- I did not do a -- as thorough a reading of those chapters as I did of A, C, and F." *Id.* at 86:4–10. In fact, Dr. Jones testified that he intentionally did not review the remaining chapters:

> Chapter A is kind of a comprehensive summary, as I understand it, of all of the work that was done, including what was put in those other chapters. And so I felt like I had a reasonably good exposure to the overall methods and processes that were used and then described in more detail in those chapters.

*Id.* at 87:18–25. Contrary to Dr. Jones's belief, the chapters these experts either ignored or "skimmed" lay out in detail the methodology on which Mr. Davis and Dr. Jones purport to offer opinions. Mr. Davis and Dr. Jones both read Chapter A, which specifically stated that the "[r]eports for Chapters B–K present detailed information, data, and analyses," Exhibit 1 at A5, yet Mr. Davis and Dr. Jones failed to conduct a meaningful review of several of these chapters.[2]

In addition to reading only a subset of the chapters, Mr. Davis and Dr. Jones did not independently evaluate the appropriateness of the parameters, or model inputs, used by ATSDR in its modeling effort. Exhibit 5, Jones Dep. Tr. 165:4–7 ("Q: Did you perform any independent evaluation of the appropriateness of those parameters? A: No."). Moreover, Mr. Davis and Dr. Jones did not consider any of the many outside criticisms of ATSDR's water model for Tarawa Terrace. For example, the Naval Facilities Engineering Command of the Department of the Navy ("Navy") issued a letter to ATSDR providing recommendations and documenting critiques of the Tarawa Terrace model. ATSDR responded to this letter, addressing the criticisms and concerns raised by the Navy. *See generally* Exhibit 6, Response to the Department of the Navy's Letter on: Assessment of ATSDR Water Modeling for Tarawa Terrace. At deposition, Mr. Davis

---

[2] The words "report" and "chapter" are used interchangeably by both Parties' experts to describe the subsections of ATSDR's water modeling analysis at Tarawa Terrace. Additionally, Chapters J and K were never published, but the United States produced drafts of each during fact discovery.

confirmed that he did not review the Navy's evaluation of the Tarawa Terrace model or ATSDR's response. He stated:

> Q. BY MS. SILVERSTEIN: When you were working on the post-audit for the Tarawa Terrace drinking water system, did you consider the Navy's criticism on the ATSDR model in forming your opinion?
> MS. BAUGHMAN: Objection. Form.
> THE WITNESS: I wasn't aware of the Navy's criticism.
> Q. BY MS. SILVERSTEIN: So then were you aware of [then-ATSDR employee] Mr. Maslia's response to the Navy criticism?
> MS. BAUGHMAN: Objection. Form.
> THE WITNESS: No.

Exhibit 2, Davis Dep. Tr. 70:4–18. Additionally, the National Research Council ("NRC"), a body of the National Academies of Sciences, Engineering, and Medicine, published a review of ATSDR's work at Camp Lejeune. Exhibit 7, NRC, *Contaminated Water Supplies at Camp Lejeune: Assessing Potential Health Effects* (2009). The NRC concluded that ATSDR's Tarawa Terrace model was "suitable only for estimating long-term exposure *qualitatively*." *Id.* at 65 (emphasis added). Dr. Jones testified that he only "skimmed" the NRC's evaluation of ATSDR's Tarawa Terrace model in forming opinions about the soundness of ATSDR's methodology. He stated:

> Q. BY MR. ANTONUCCI: Dr. Jones, you've mentioned you're aware of the NRC critique of -- or the NRC's review of the Camp Lejeune modeling done by ATSDR; is that right?
> A. That's correct.
> Q. Have you read [it] before?
> A. I have skimmed through it, and I can't say I've read every part of it, no.

Exhibit 5, Jones Dep. Tr., 166:24–167:7. Taken together, Mr. Davis and Dr. Jones's incomplete review fails to provide the necessary support for their broad conclusions on the accuracy of ATSDR's water model and the methodology employed to create it.

## LEGAL STANDARD

Under Fed. R. Evid 702, expert testimony is admissible if it (a) "will help the trier of fact to understand the evidence or to determine a fact in issue," (b) "is based on sufficient facts or data," (c) "is the product of reliable principles and methods," and (d) "reflects a reliable application of the principles and methods to the facts of the case." Under this Rule, courts must "ensur[e] that an expert's testimony . . . rests on a reliable foundation." *Belville v. Ford Motor Co.*, 919 F.3d 224, 232 (4th Cir. 2019) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). The Court must assess "whether the reasoning or methodology underling the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93.

## ARGUMENT

The proffered opinions of Mr. Davis and Dr. Jones that "the ATSDR model was developed using a methodology that is scientifically sound" and is accurate must be excluded because Mr. Davis and Dr. Jones lacked sufficient facts and data to render these opinions, and they failed to employ a reliable methodology in forming them. Exhibit 4, Davis and Jones Rebuttal Report, at 3-13; Exhibit 5, Jones Dep. Tr. 231:18–232:13. Prior to opining that ATSDR used a scientifically sound methodology, Mr. Davis and Dr. Jones had not read the majority of the reports containing the analysis they opined upon. Mr. Davis and Dr. Jones also failed to address criticisms of ATSDR's work put forward by the Navy or NRC. Their opinion testimony regarding the accuracy and soundness of ATSDR's methodology is based solely on their reading of a small subset of ATSDR's reports and must therefore be excluded under Fed. R. Evid. 702.

I.  **Mr. Davis and Dr. Jones Failed to Consider the Majority of the Report Chapters About the Model They Claim Utilized Sound Methodology, and They Ignored Contrary Scientific Literature.**

Mr. Davis and Dr. Jones's opinion regarding the soundness of ATSDR's methodology and accuracy of ATSDR's water model was not based on sufficient facts or data. Mr. Davis opined that he evaluated the methodology used by ATSDR by "read[ing] the process that they went through." Exhibit 2, Davis Dep. Tr. 267:19–25. Yet, he testified he did not read six of the nine chapters that describe that very process. Similarly, Dr. Jones testified that his evaluation of ATSDR's probabilistic analysis was limited to reading a summary about the analysis in question. Exhibit 5, Jones Dep. Tr. 164:17–23. As with Mr. Davis, Dr. Jones failed to closely or thoroughly read six of the nine chapters that make up ATSDR's Tarawa Terrace water modeling reports. Exhibit 5, Jones Dep. Tr. 86:4–10. Accordingly, Mr. Davis and Dr. Jones's opinion regarding the accuracy and soundness of ATSDR's modeling is based entirely on their reading of only a portion of the chapters describing those methods, while ignoring the majority of the chapters. The paucity of information on which Mr. Davis and Dr. Jones formed their opinion makes clear that their conclusion that ATSDR used a reliable methodology is based solely on their *ipse dixit*. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (holding that "a court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

In *E.E.O.C. v. Freeman*, the Fourth Circuit affirmed the exclusion of an expert witness where the witness "cherry-picked" data. 778 F.3d 463, 468–73 (4th Cir. 2015). In *Freeman*, the District Court found that the E.E.O.C.'s industrial psychologist ignored materials produced during discovery when rendering an opinion on the defendant's credit check policy. *Id.* The Fourth Circuit recognized that the expert in *Freeman* drew "broad conclusions from incomplete data." *Id.* at 468–69 (Agee, J., concurring). This expert omitted "important information from

8

relevant periods and locations" and "ignored relevant criminal background check data . . . ." *Id.* at 469. Accordingly, that witness's testimony was found unreliable and excluded. *Id.* at 468.

Here, as with the excluded witness in *Freeman*, Mr. Davis and Dr. Jones disregarded readily available and relevant information on their own accord. The United States is not arguing that Mr. Davis and Dr. Jones should be excluded simply because they failed to review available discovery; rather, the information they disregarded is central to the opinions that they are offering.[3] All chapters of ATSDR's water modeling reports on Tarawa Terrace were both publicly available and produced to PLG over the course of fact discovery in this litigation. These chapters provide detailed analysis of topics on which Mr. Davis and Dr. Jones opine. For example, Dr. Jones testified, "I think they did a reasonable job of simulating or estimating uncertainty in the model through their Monte Carolo analysis and presenting that to the public in their reports." Exhibit 5, Jones Dep. Tr. 175:1–6. However, Chapter I, which Mr. Davis and Dr. Jones failed to review in meaningful detail, contains detailed information and interpretations of uncertainty associated with the model simulations. Exhibit 1, at A12. Dr. Jones testified that he "may have read [Chapter I] a little more carefully than the others, but certainly not to the same depth of analysis as" Chapters A, C, and F. Exhibit 5, Jones Dep. Tr. 87:7–17. Rather than reviewing this "detailed" information, Mr. Davis and Dr. Jones chose instead to draw a broad conclusion from a summary of this chapter. *Id.* at 87:18–25.

---

[3] This makes the instant situation distinguishable from that of *SAS Institute, Inc. v. World Programming Ltd.*, 125 F. Supp. 3d 579, 590 (E.D.N.C. 2015), *aff'd*, 874 F.3d 370 (4th Cir. 2017). In *SAS Inst., Inc.,* this Court found that an expert need not review all available evidence where such evidence would have been irrelevant to his methodology and did not impact his overall conclusion. Unlike *SAS Inst., Inc.*, the information Mr. Davis and Dr. Jones ignored here was highly relevant. It stands to reason that, where an expert's methodology consists of "read[ing] the process[,]" actually reading all the chapters detailing "the process" is essential to that methodology. Exhibit 2, Davis Dep. Tr. 267:19–25. The report chapters Mr. Davis and Dr. Jones skimmed or outright ignored contained "detailed information, data, and analyses" of topics on which Mr. Davis and Dr. Jones directly opined. Exhibit 1 at A5.

9

Moreover, Mr. Davis and Dr. Jones entirely ignored or "skimmed" information that contradicted their opinions, such as the Navy letter and NRC report that offered detailed criticisms of aspects of ATSDR's Tarawa Terrace model. These documents discuss topics central to Mr. Davis and Dr. Jones's opinions, such as the purported level of accuracy of the model, the uncertainty of the results, and the methodology employed in reaching ATSDR's conclusions. *See generally* Exhibit 7, NRC Report, at 28–66; Exhibit 6, Response to the Department of the Navy's Letter on: Assessment of ATSDR Water Modeling for Tarawa Terrace.

In *Yates v. Ford Motor Co.*, this Court found an expert's opinion to be unreliable and excludable where the expert failed to acknowledge or account for evidence tending to refute the expert's theory. 113 F. Supp. 3d 841, 858 (E.D.N.C. 2015). In *Yates*, the expert failed to account for two scientific studies produced by the plaintiffs that contradicted his ultimate opinion. *Id.* Here, as in *Yates*, Mr. Davis and Dr. Jones failed to acknowledge the Navy letter which directly contradicted their ultimate conclusions on the accuracy of ATSDR's model and the methodology employed to create it. *See generally* Exhibit 3, Davis and Jones Initial Report; Exhibit 4, Davis and Jones Rebuttal Report.

Curiously, Mr. Davis and Dr. Jones cited the NRC's report in their Rebuttal Report, despite testifying that they only "skimmed" it. Exhibit 4, Davis and Jones Rebuttal Report, at 3-7; Exhibit 5, Jones Dep. Tr., 166:24–167:7. However, Mr. Davis and Dr. Jones chose only to engage with the portion of the report with which they agreed. Exhibit 4, Davis and Jones Rebuttal Report, at 3-7 ("The National Research Council review of the ATSDR modeling studies noted that the calibration target was arbitrary.").[4] The remainder of their Rebuttal Report makes no mention of NRC's conclusion, contrary to their own, that ATSDR's reporting of precise

---

[4] The arbitrary nature of model calibration targets is not in dispute.

simulated concentrations of contaminants without error bounds "leads to a misleading perception that reactive transport models can make accurate predictions." Exhibit 7, NRC Report, at 49. Like the expert in *Yates*, Mr. Davis and Dr. Jones did not account for contrary scientific opinions. 113 F. Supp. at 858. Mr. Davis and Dr. Jones's failure to account for the Navy and the NRC's criticisms of ATSDR's work makes their opinions subject to exclusion because they rest on an incomplete set of facts and data.

II. **In Opining about the Soundness ATSDR's Methodology, Mr. Davis and Dr. Jones Failed to Evaluate the Underlying Conceptual Model, the Input Parameters, and Assumptions Upon Which the Model Relied.**

Mr. Davis and Dr. Jones did not attempt to evaluate the methodology employed in ATSDR's water modeling, let alone the assumptions or data underlying the modeling, despite offering the opinion that the water modeling was based on sound methodologies. Mr. Davis and Dr. Jones acknowledged that their post-audit merely extended ATSDR's groundwater model several years into the future without independently assessing the inputs to the model, the appropriateness of the conceptual model underpinning the numerical model, or otherwise testing ATSDR's methods.[5] Exhibit 2, Davis Dep. Tr. 119:9–16.

Specifically, Mr. Davis and Dr. Jones failed to review or analyze the conceptual model or input parameters underlying the ATSDR Tarawa Terrace water model. The reliability of the model is dependent on both the underlying conceptual model and input parameters—if these are not appropriate or reliable, the model results, by definition, are also not appropriate or reliable. *See Sommerville v. Union Carbide Corp.*, No. 2:19-CV-00878, 2024 WL 1204094, at *11

---

[5] A conceptual model is "a hypothesis for how a system or process operates." Exhibit 8, Konikow Dep. Tr. 106:23–108:4. The conceptual model informs model development. Exhibit 8, Konikow Dep. Tr. 182:4–7. Parameters are model inputs similar to coefficients in an equation. Exhibit 8, Konikow Dep. Tr. 118:7–22.

(S.D.W. Va. Mar. 20, 2024) (excluding evidence of air dispersion modeling where parameter selection was based only on the witness's *ipse dixit*).

The conceptual model is the basis for the contaminant flow and transport model that Mr. Davis and Dr. Jones opine is reliable. Mr. Davis and Dr. Jones only evaluated ATSDR's conceptual model "to the extent [it was] specified" in the chapters that they read. Exhibit 2, Davis Dep. Tr. 118:16–119:8. Mr. Davis and Dr. Jones similarly evaluated the selection of boundary and initial conditions (hydrologic properties important for ensuring the model reflects real-world conditions) "only to the extent of reading the reports." Exhibit 2, Davis Dep. Tr. 119:17–21.

Dr. Jones also admitted that he and Mr. Davis failed to perform any independent evaluation of the appropriateness of the input parameters that ATSDR used. Exhibit 5, Jones Dep. Tr. 165:4–7. Instead, the methodology Mr. Davis and Dr. Jones utilized to evaluate ATSDR's assumptions for the model parameters and inputs was to "assume[] that the numbers that [ATSDR] reported in the document were reliable." Exhibit 2, Davis Dep. Tr. 268:1–10.

Notably, the chapters Mr. Davis and Dr. Jones read did not include ATSDR's description of parameter sensitivity, uncertainty, and variability, rendering it impossible for Mr. Davis and Dr. Jones to have had adequate information to make a determination about the model's accuracy. In the analogous context of air dispersion modeling, the Southern District of West Virginia was troubled by an expert's failure to evaluate the appropriateness of air dispersion model inputs and parameters. *Union Carbide*, 2024 WL 1204094, at *11–14. As in *Union Carbide*, Mr. Davis and Dr. Jones took for granted the assumptions and parameters ATSDR built into its model. Ultimately, Mr. Davis acknowledged that analyzing ATSDR's methodology was tangential to

12

the task they were given, as they were "asked to extend the model, not critique . . . the model." Exhibit 2, Davis Dep. Tr. 119:9–16.

Mr. Davis and Dr. Jones's post-audit cannot serve as the basis for their opinions about the soundness of ATSDR's modeling methodology or the accuracy of its results.[6] First, Mr. Davis and Dr. Jones disclaimed that their post-audit was the basis for the opinion that the ATSDR model was reliable. Instead, Mr. Davis explained that he and Dr. Jones only evaluated the methodology used by ATSDR "to the extent that [they] read the process that [ATSDR] went through." Exhibit 2, Davis Dep. Tr. 267:19–25. Mr. Davis further conceded that it "would be fair to say that [his] opinion that ATSDR's model was developed using a scientifically sound methodology is limited to the methodology discussed in Chapters A, C, and F of the Tarawa Terrace models . . . ." *Id.* at 269:9–18.

Second, even if Mr. Davis and Dr. Jones had relied on the post-audit as the basis for their opinion that the ATSDR model is reliable, Mr. Davis and Dr. Jones did not evaluate the model input parameters. Instead, they used model input parameters that were provided to them by PLG. Exhibit 5, Jones Dep. Tr. 265:13–17 ("Q: Okay. Dr. Jones, in the post-audit you used the model input parameters that were provided to you by the legal team; right? A: Yes."). Mr. Davis admitted that he had no opinion on whether ATSDR "used reliable processes to determine those parameters[.]" Exhibit 2, Davis Dep. Tr. 268:22–269:3. Accordingly, Mr. Davis and Dr. Jones's opinion regarding the methodology employed by ATSDR is based solely on their review of the published reports, of which they have carefully read only three of the nine total chapters. Mr. Davis and Dr. Jones also did not take into account the Navy or the NRC's critiques of ATSDR's

---

[6] Assuming, *arguendo*, that a post-audit could be used to effectively evaluate the model's performance between 1995 and 2008, the period for which Mr. Davis and Dr. Jones had additional data to compare to the model simulated values, this does not indicate that the methodology employed was sound. Nor would it indicate that the model accurately predicted concentrations for the period before 1995.

13

modeling. This is not a reliable methodology, and the opinion should therefore be excluded under Fed. R. Evid. 702.

## CONCLUSION

Mr. Davis and Dr. Jones's evaluation of ATSDR's methodology and the accuracy of the Tarawa Terrace water model results was limited merely to their reading of a subset of the report dedicated to the modeling efforts, ignoring six of the nine chapters and contrary scientific opinions. Mr. Davis and Dr. Jones's choice to base their opinions on a selective reading of the evidence—in some instances cherry-picking quotations that support their opinions from a report that ultimately contradicts their conclusions—is illustrative of their disregard for critical evidence in this case. Their opinion that the model employed a sound methodology and was accurate for determining the historic concentrations of contaminants in drinking water is therefore unsupported by sufficient facts and data and was not formed based on reliable principles and methods. For these reasons, Mr. Davis and Dr. Jones's opinion regarding soundness of the methodology employed in ATSDR's water model, and the accuracy of any results from that model, must be excluded under Fed. R. Evid. 702.

*[Signature page to follow.]*

Dated: April 29, 2025                    Respectfully submitted,

YAAKOV ROTH
Acting Assistant Attorney General
Civil Division

JONATHAN GUYNN
Deputy Assistant Attorney General
Torts Branch

J. PATRICK GLYNN
Director
Environmental Torts Litigation Section

BRIDGET BAILEY LIPSCOMB
Chief, Camp Lejeune Unit

ADAM BAIN
Special Litigation Counsel

HAROON ANWAR
ALANNA R. HORAN
ALLISON M. O'LEARY
KAILEY SILVERSTEIN
Trial Attorneys

 /s/ Giovanni Antonucci
GIOVANNI ANTONUCCI
Trial Attorney
United States Department of Justice
Civil Division, Torts Branch
Environmental Torts Litigation
1100 L Street, NW
Washington, DC 20005
(202) 616-8364
Fax (202) 616-4473
giovanni.antonucci@usdoj.gov
N.Y. Bar No. 6096671

Attorney inquiries to DOJ regarding the
Camp Lejeune Justice Act:
(202) 353-4426

*Attorneys for Defendant,*
*United States of America*

15

**CERTIFICATE OF SERVICE**

I hereby certify that on April 29, 2025 I electronically filed the foregoing using the Court's Case Management/Electronic Case Files system, which will send notice to all counsel of record.

*/s/ Giovanni Antonucci*
GIOVANNI ANTONUCCI
