# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### SOUTHERN DIVISION
### Case No. 7:23-CV-897

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | **MEMORANDUM IN SUPPORT** |
| **CAMP LEJEUNE WATER LITIGATION** | ) | **OF THE UNITED STATES'** |
| | ) | **MOTION TO EXCLUDE THE** |
| | | **TESTIMONY OF DR. RODNEY** |
| **This Document Relates To:** | ) | **KYLE LONGLEY** |
| | ) | **Fed. R. Evid. 702** |
| **ALL CASES** | ) | |

## INTRODUCTION

The United States of America moves to exclude the testimony and opinions of plaintiffs' proffered expert, Dr. Rodney Kyle Longley ("Dr. Longley"). Under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Dr. Longley's testimony is inadmissible in its entirety because his opinions are based upon an unreliable application of a standard historian's methodology to the facts of this case. *See* Fed. R. Evid. 702, Advisory Committee Note to 2000 Amendments (explaining that *Daubert* applies to all technical or specialized testimony).

## BACKGROUND

On August 10, 2022, the Camp Lejeune Justice Act of 2022 ("CLJA") was enacted as § 804 of the Honoring Our Promise to Address Comprehensive Toxics Act of 2022, Pub. L. No. 117–168, § 804, 136 Stat. 1759, 1802–04 (2022). The CLJA allows individuals to recover for injuries caused by exposure to contaminated water at Camp Lejeune between 1953 and 1987 (the "Statutory Period").

On August 7, 2024, the Court entered an Order outlining a three-phased approach to expert discovery. Aug. 7, 2024 Pretrial Scheduling Order, D.E. 270. The first phase is the "Water

Contamination Phase" (hereinafter "Phase 1"), the second phase is the "General Causation Phase," and the third phase is the "Residual Expert Phase." *Id*. at 2. Because the events at issue in the CLJA litigation occurred decades ago and the water distribution systems at Camp Lejeune continued to evolve throughout that period, the Parties agreed to include historical evidence in Phase 1. The Parties agreed that the purpose of Phase 1 is:

> To help the Court "understand the chemicals in the water at Camp Lejeune during the operative period," D.E. 247 at 2, the Parties may present evidence from experts in fields **such as history**, engineering, hydrology, environmental sciences and mathematical modeling pertinent to the fate and transport of contaminants in groundwater and in drinking (finished) water for family housing areas and other facilities at Camp Lejeune from 1953 to 1987.

Mar. 3, 2025 Jt. Not. Regarding Hr'g on Mar. 25, 2025, D.E. 329, at ¶ 4 (emphasis added).

In July 2024, Plaintiffs Leadership Group ("PLG") retained Dr. Longley as an expert historian in this litigation. Dr. Longley authored three expert reports in this litigation dated December 7, 2024, January 13, 2025, and March 17, 2025. *See* **Exhibit 1**, Dec. 7, 2024 Rep. of Dr. Longley; **Exhibit 2**, Jan. 13, 2025 Rep. of Dr. Longley; **Exhibit 3**, Mar. 17, 2025 Rep. of Dr. Longley. Dr. Longley's second and third reports relied upon the research and analysis of his December 7, 2024 report. *See* Ex. 2 at 1; Ex. 3 at 32.

Dr. Longley opined in his reports on water consumption and use at Camp Lejeune. For example, Dr. Longley opined that the "[d]esigners of the base intentionally directed the occupants to stay within the base boundaries. If occupants spent more time on the base grounds, all else being equal, they had more time exposed to its water." Ex. 1 at 2. Dr. Longley also opined that Camp Lejeune was "self-contained" with "ample opportunities for social recreational, and other such events on base, including at facilities geographically located in Hadnot Point, Tarawa Terrace, and Holcomb Boulevard." *Id.* at 3. For these and other opinions, Dr. Longley relied upon plaintiffs' statements that he obtained from deposition transcripts, interviews, and what he refers to as "oral

histories." Dr. Longley claims to have "more than thirty years of experience employing oral history," and he personally conducted most of the interviews and "oral histories" that he relied upon in his reports. *Id.* at 47.

Dr. Longley had planned on taking 30 to 40 of these "oral histories," but he "ran out of time." **Exhibit 4**, Apr. 3, 2025 Dep. Tr. of Dr. Longley, at 130:3-23. Dr. Longley did not record, transcribe, or archive most of the "oral histories" he conducted, as the standard practice among oral historians requires, because he "ran out of time." *Id*. at 97:10-23; 129:23-130:6. Dr. Longley did not thoroughly document his sources in his reports because, again, he "ran out of time." *Id*. at 75:18-76:5. During his deposition, Dr. Longley testified dozens of times that he either had insufficient resources, "ran out of time," or both, when working on his reports. *See, e.g.*, *id*. at 22:16-20; 54:9-21; 75:18-25; 78:10-79:6; 80:13-81:2; 97:10-23; 113:22-114:3; 122:19-123:2; 123:19-124:5; 127:7-128:8; 129:23-131:3; 132:14-133:25; 135:2-136:8; 149:24-150:15; 155:7-11; 187:12-18; 226:12-17; 319:21-321:10; 331:4-332:4; and 334:9-335:24.   As discussed in greater detail below, insufficient resources or running out of time is simply not an acceptable excuse for Dr. Longley's failure to use a reliable historian's method.

Additionally, Dr. Longley's opinions suffer from numerous fatal deficiencies, including reliance on unsupported assumptions or limited, uncorroborated, cherry-picked, and biased sources. Because Dr. Longley failed to reliably apply the accepted historian's methodology when researching and formulating his opinions, Dr. Longley's opinions should be barred in their entirety under *Daubert* and Federal Rule of Evidence 702.

## LEGAL STANDARD

The proponent of expert testimony bears the burden of establishing its admissibility by "a preponderance of proof." *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001); Fed. R. Evid. 702. An expert may offer opinion testimony when the expert's "scientific, technical, or

3

other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," so long as the expert's opinion is "based on sufficient facts or data," "is the product of reliable principles and methods," and those "principles and methods" have been reliably applied "to the facts of the case." Fed. R. Evid. 702.

Implicit in Rule 702 is a district court's gatekeeping responsibility "to 'ensur[e] that an expert's testimony both rests on a *reliable* foundation and is *relevant* to the task at hand.'" *Nease v. Ford Motor Co*., 848 F.3d 219, 229 (4th Cir. 2017) (emphasis in original) (quoting *Daubert,* 509 U.S. at 597). Expert testimony is reliable when it is "based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods." *Id*. (emphasis omitted) (quoting *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999)).

As gatekeeper, the Court's role is to "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). The Court's gatekeeping responsibility is not limited to "scientific" expert testimony, it applies to all expert testimony. *See id*.

The reliability of an expert's methods "may be indicated by testing, peer review, evaluation of rates of error, and general acceptability." *Oglesby,* 190 F. 3d at 250 (citing *Daubert*, 509 U.S. at 593-94). However, district courts are not limited to these factors listed in *Daubert*; rather, "the court's evaluation is always a flexible one, and the court's conclusions necessarily amount to an exercise of broad discretion guided by the overarching criteria of relevance and reliability." *Oglesby,* 190 F.3d at 250. "While the relevant factors for determining reliability will vary from expertise to expertise. . . [Rule 702] rejects the premise that an expert's testimony should be treated

more permissively simply because it is outside the realm of science." Fed. R. Evid. 702 advisory committee's note (citing *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 991 (5th Cir. 1997)).

## ARGUMENT

### I.    DR. LONGLEY DID NOT RELIABLY APPLY THE BASIC PRINCIPLES AND METHODS USED BY HISTORIANS

As with all purported experts, historians offering opinions about the past must employ reliable methodologies to be helpful to the trier of fact.  *See, e.g., Burton v. Am. Cyanamid*, No. 07-CV-0303, 2018 U.S. Dist. LEXIS 139727 3954858, at *18-19 (E.D. Wis. Aug. 16, 2018) (collecting cases), *rev'd on other grounds*, 994 F.3d 791 (7th Cir. 2021).  However, Dr. Longley's testimony will offer no value to the trier of fact because it is based on an unreliable application of the historical method. It therefore results only in "[c]onjectures that are probably wrong [and] are of little use . . . in the project of reaching a quick, final, and binding legal judgment—often of great consequence—about a particular set of events in the past." *Daubert*, 509 U.S. at 597. A reliable application of a historian's methodology involves (1) "surveying the full array of available sources," (2) "a critical awareness of the historian's own biases," (3) "evaluating the reliability of the sources," and (4) a "thorough documentation of sources," *Burton*, 2018 U.S. Dist. LEXIS 139727, at *19-20. Dr. Longley's failure to reliably apply these rudimentary principles and methods has resulted in an unreliable narrative of the past that does not satisfy Rule 702 and *Daubert*, and his opinions should therefore be barred.

### A. Dr. Longley Did Not Survey the Full Array of Sources to Support his Broad Opinions.

A proper application of the historical method involves "surveying the full array of available sources" to assemble a reliable narrative of the past. *Id*. at *19 (citing *Langbord v. U.S. Dep't of the Treasury*, 832 F.3d 170, 195 (3d Cir. 2016.)) In other words, "historians seek multiple source

sets to view events from more than one perspective" and report their findings accurately. **Exhibit 5**, Zachary M. Schrag, *The Princeton Guide to Historical Research* (2021), at 110.

Dr. Longley's opinions about water use and daily activities at Camp Lejeune are primarily supported by plaintiffs' statements in deposition transcripts, declarations, interviews, and "oral histories." Dr. Longley stated in his deposition that "as the historian what I want to do is just try to get to the heart of the story as much as possible…and I had 30 to 40 [oral histories] planned but ran out of time." Ex. 4 at 130:20-23. Dr. Longley further elaborated that he would have preferred "[n]ot to use only depositions, not only to use plaintiffs, but [to] use people who were there…so the argument of bias can be reduced," but insufficient time and resources prevented him from doing so. *Id*. at 130:8-10, 130:24-131:2. Of course, insufficient time or resources is not an acceptable excuse for performing sub-standard work. *See generally Tovey v. Nike, Inc.*, 2014 U.S. Dist. LEXIS 93905 at *17 (N.D. Ohio Apr. 2, 2014) (plaintiff's expert's failure to provide opinions that met Rule 702 standards was not excused simply because plaintiff provided the expert with insufficient resources). Dr. Longley could have narrowed the scope of his reports to adequately support each assertion with sources, but he chose not to do so. *See* Ex. 4 at 73:10-25.

**B. Dr. Longley Did Not Account for His Own Biases, Ignored Inconsistent Facts, and Relied on Cherry-Picked Sources.**

In addition to failing to access sufficient resources to provide a complete, accurate, and objective historical narrative, Dr. Longley failed to account for his own biases and cherry-picked sources that tended to support a particular story. While "it is well established that an expert's bias is not a proper basis to bar testimony under *Daubert*," Dr. Longley skipped a critical step in the standard historian's methodology when he failed to evaluate and account for his own biases and the biases of his sources. *See In re Lipitor Atorvastatin Calcium Mktg., Sales Practices & Prods.*

6

*Liab. Litig.*, No. MDL No. 2:14-mn-02502-RMG, 2016 U.S. Dist. LEXIS 68830, at *16 (D.S.C. May 6, 2016) (collecting cases).

A proper application of the historian's method requires "a critical awareness of the historian's own biases." *Burton*, 2018 U.S. Dist. LEXIS 139727, at *19-20. But Dr. Longley was unaware of his own biases and blurred the line between his own opinion and input from his clients and sources. For example, Dr. Longley used "we" and "our" when referring to his opinions, despite testifying in his deposition that he had no assistance in preparing his report. *Compare* Ex. 4 at 320:9 ("What you see [in my reports] is *one person's* work.") (emphasis added); *with* Ex. 3 at 6 ("*we* do not deny that Marines could take leave or go off-base to places such as Jacksonville, NC") (emphasis added); *see also* Ex. 3 at 22 ("Dr. Brigham fails to provide much detail for countering *our* points about the centrality of Hadnot Point.") (emphasis added).

At other times, Dr. Longley relied on cherry-picked sources and omitted inconsistent facts. Courts have consistently ruled that "expert testimony that cherry-picks relevant data" is unreliable and does not satisfy *Daubert*. *E.E.O.C. v. Freeman*, 778 F.3d 463, 469-70 (4th Cir. 2015) (collecting cases). When there is evidence "tending to refute the expert's theory and the expert does not acknowledge or account for that evidence, the expert's opinion is unreliable." *Yates v. Ford Motor Co.*, 113 F. Supp. 3d 841, 858-59 (E.D.N.C. 2015) (quoting *In re Rezulin Prods. Liab. Litig.*, 369 F. Supp. 2d 398, 425 (S.D.N.Y. 2005)).

For example, Dr. Longley opined in his December 7, 2024 report that "field training constituted a major part of the training experience and involved use of water from Hadnot Point" that was carried in wheeled water tanks known as water buffaloes. Ex. 1 at 36-37. However, Dr. Longley does not acknowledge in this report that other sources contain contradictory statements indicating that water buffaloes were also filled at other locations that were serviced by

uncontaminated water systems, including Courthouse Bay and Camp Geiger. *See, e.g.*, **Exhibit 6**, Mar. 5, 2024 Dep. Tr. of Gary McElhiney, Sr., Vol. 1, at 55:22-24 ("I know of two water points. One was south by Courthouse Bay, and the other was at the fuel depot in the industrial area."); **Exhibit 7**, May 28, 2024 Dep. Tr. of Anthony Zinni at 62:11-22 ("I remember there were fill-up points out at Camp Geiger. Pretty self-contained out there."); **Exhibit 8**, Nov. 13, 2024 Dep. Tr. of Benjamin Urquhart at 74:5-13 (Water station or fill points were "throughout Camp Lejeune. . . wherever your closest water site was where you went and got [the water buffalo] filled.")[1]

Dr. Longley also failed to include in his December 7, 2024 and January 13, 2025 reports information contradicting his opinion that various recreational opportunities at Hadnot Point, Tarawa Terrace, and Holcomb Boulevard drew people to the areas of the base serviced by contaminated water. Ex. 1 at 3, 13-15; Ex. 2 at 5. Dr. Longley did not acknowledge that recreational activities were available in the outlying areas of the base, even when the *Leatherneck* article cited in both of his reports discussed at length recreational activities occurring in other parts of Camp Lejeune. *See* **Exhibit 9**, Robert Suhosky, *Lejeune Recreation*, Leatherneck, Apr. 1955. For example, Dr. Longley selectively quoted the *Lejeune Recreation* article, stating "[t]he Hadnot Point Staff NCO Club's Mirror Room is one of the plushest niteries in the Corps," but omitted the immediately preceding sentence: "Service Clubs, nee Slopchutes, dot every area on the station and house snack bars, bowling alleys, pool, card, game and ping-pong tables and branches of the big central library." *Compare* Ex. 2 at 3, *with* Ex. 9 at 27.

---

[1] Exhibits 6, 7, and 8 contain deposition excerpts. The full deposition transcripts of Gary McElhiney, Sr., Anthony Zinni, and Benjamin Urquhart contain or potentially contain personally identifiable and protected health information. Full deposition transcripts are available upon request.

8

Dr. Longley also cites the January 2, 1970 edition of *The Globe* on page 13 of his December 7, 2024 report for the proposition that "people naturally regularly traveled back and forth between their homes and work, school, military or other activities, including the main attractions *at Hadnot Point*," Ex. 1 at 3 (emphasis added). But fails to note that the same newspaper referenced numerous activities available at other areas of the base without contaminated water, including an auction at New River Air Station; musical performances at Camp Geiger and Monford Point; and movies at Onslow Beach, Montford Point, Camp Geiger, and New River Air Station. **Exhibit 10**, *The Globe*, Jan. 2, 1970, at 5, 11. It is clear that Dr. Longley omitted evidence contradicting his preferred narrative of individuals gravitating to Hadnot Point in order to support PLG's position regarding exposure. Such blatant one-sidedness falls well below the standards, methods, and practices of historians.

### C. Dr. Longley's Failure to Critically Evaluate or Corroborate His Sources Made Him a Mere Mouthpiece for Plaintiffs' Testimony.

Historians are taught to never trust historical evidence blindly. **Exhibit 11**, Marc Bloch, *The Historian's Craft* (1953), at 64, 79. Instead, historians must always question their sources and recognize that the words they record are not "unvarnished history." **Exhibit 12**, Donald A. Ritchie, *Doing Oral History* (3d ed. 2014), at 13. The historian's method requires "evaluating reliability and providing a basis for a reliable narrative about the past." *Burton*, 2018 U.S. Dist. LEXIS 139727, at *19; *accord Langbord*, 832 F.3d at 194-95; *United States v. Kantengwa*, 781 F.3d 545, 561-63 (1st Cir. 2015). Historians evaluate the reliability of their sources by considering the conditions under which a source was created and why. *Burton*, 2018 U.S. Dist. LEXIS 139727, at *19-20. Dr. Longley, however, did not evaluate or corroborate his sources, many of which were plaintiffs themselves or other biased sources provided to him by PLG. His unquestioning use of the verbal and written statements of plaintiffs goes beyond mere consideration of a source of

information that can be assessed and considered through corroboration. Instead, he relies on these sources uncritically, and cloaks them in the authority of expert analysis.

For example, on January 9, 2025, the United States requested that Dr. Longley provide a transcript, recording, or other memorialization of his "oral history" of plaintiffs Jerome Ensminger and Allan Howard. **Exhibit 13**, Letter from Dep't of Justice to PLG (Jan. 9, 2025). In response, PLG informed the United States that Dr. Longley "simply asked the individuals questions and put the information [from plaintiffs] directly into his report." **Exhibit 14**, Letter from PLG to Dep't of Justice (Jan. 16, 2025). "When an expert's proffered opinion merely parrots information provided to [him] by a party, that opinion is generally excluded." *Brightview Grp., LP v. Teeters*, No. SAG-19-2774, 2021 U.S. Dist. LEXIS 28015, at *21 (D. Md. Feb. 8, 2021) (quoting *King-Indiana Forge, Inc. v. Millennium Forge, Inc.*, No. 1:07-CV-00341-SEB-DML, 2009 U.S. Dist. LEXIS 96131, at *4 (S.D. Ind. Sept. 29, 2009)); *see generally United States v. Wittje*, 333 F. Supp. 2d 737, 743 (N.D. Ill. 2004) (excluding sections of an expert historian's affidavit that recited facts from defendant's deposition as "mere recitation of the contents of documents does not authenticate them or provide foundation for admissibility"). Further, Rule 702 is "not intended to abolish the hearsay rule and to allow a witness, under the guise of giving expert testimony, in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion." *Avondale Mills, Inc. v. Norfolk S. Corp.*, No. 1:05-2817-MBS, 2008 U.S. Dist. LEXIS 111213, at *11 (D.S.C. Feb. 21, 2008) (quoting *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F.Supp.2d 794, 808 (N.D. Ill. 2005) (collecting cases)); *see also Marvel Characters, Inc. v. Kirby*, 726 F. 3d 119, 136 (2d Cir. 2013) (upholding the lower court's decision to exclude historians whose reports were "by and large undergirded by hearsay statements")

Dr. Longley's information was not gathered independently and objectively, but largely supplied by counsel or plaintiffs themselves. At his deposition, Dr. Longley testified that PLG identified and selected many of the sources he relied upon including deposition transcripts and photographs. Ex. 4 at 21:23-23:2 (depositions); 323:3-324:2 (photographs). Dr. Longley also admitted that PLG provided him with these sources so that he could pull information concerning the "use of water buffaloes" and "descriptions of life on base." *Id*. at 22:11-23:2. Additionally, Dr. Longley conceded that the only interviews and "oral histories" he conducted were of CLJA plaintiffs.[2]

Dr. Longley further failed to reliably apply proper methodology because he did not corroborate or evaluate his sources. For example, Dr. Longley included on page 34 of his December 7, 2024 report a photograph captioned "Marines fill water buffalo, Hadnot Point." Ex. 1 at 34. However, this photograph was neither taken at Camp Lejeune nor did it depict Marines. The photograph was actually of the New Jersey Army National Guard filling a water buffalo in preparation for Hurricane Sandy in Lawrenceville, New Jersey in October 2012.[3] **Exhibit 15**, (Apr. 3, 2025 Longley Dep. Ex. 26.) When asked during his deposition whether the photograph was of Marines, Dr. Longley quickly answered "no, these are Army . . . I can tell by the uniforms," revealing that if he had properly reviewed this photograph before including it in his report, he would have realized that the caption was incorrect. Ex. 4 at 323:3-9. Dr. Longley further testified

---

[2] The only potential exception being an "informal discussion" Dr. Longley had with one of his current students. *See*, Ex. 4 at 23:15-20.

[3] News Images, U.S. NAT'L GUARD, https://www.nationalguard.mil/Resources/Image-Gallery/News-Images/igphoto/2000709524/ (last visited Apr. 24, 2025).

that he (inexplicably) never corroborated this photograph, explaining that it was one of approximately forty photographs provided to him by PLG. *Id.* at 323:25-324:2; 325:23-24.

Two sources frequently referenced by Dr. Longley in his reports are Jerome Ensminger and Mike Partain. Both individuals have a vested interest in the outcome of this litigation as non-bellwether plaintiffs and both have testified before Congress in support of individuals seeking to recover for various harms allegedly caused by Camp Lejeune water, including for the Janey Ensminger Act and the Camp Lejeune Justice Act of 2022. *See, e.g., Ensminger v. United States*, No. 7:23-cv-00161-M-RN (E.D.N.C.); *Partain v. United States*, No. 7:23-cv-00110-BO-RJ (E.D.N.C.); *Poisoned Patriots: Contaminated Drinking Water at Camp Lejeune: Hearing Before the Subcomm. on Oversight & Investigations*, 110th Cong. 56 (2007) (statement of Jerome Ensminger); *Hearing on Pending Legislation Before the Comm. on Veterans' Affairs*, 114th Cong. 702 (2016) (statement of Jerome Ensminger); *VA/DOD Response to Certain Military Exposures: Hearing Before the Comm. on Veterans' Affairs*, 111th Cong. 437 (2009) (statement of Mike Partain); *Camp Lejeune: Contamination Compensation, Looking Back, Moving Forward: Hearing Before the Subcomm. on Investigations and Oversight*, 111th Cong. 108 (2010) (statement of Mike Partain). In fact, they were both featured as activists in a documentary film about the Camp Lejeune contamination. *See Semper Fi: Always Faithful* (Wider Film Projects 2011). Mr. Partain and Mr. Ensminger also currently serve as non-testifying expert consultants for PLG. *See* Ex. 4 at 17:7-22. Dr. Longley does not mention in his reports how, or even if, he accounted for the potential biases of Mr. Ensminger and Mr. Partain in constructing his historical narrative.

Dr. Longley testified that he did not include any accounting for the potential of biases of sources in his reports because it is "understood," and that "in any form of writing that [he has] ever done, whether it is a book, whether it is an article. . . that is not something that is accepted as a

common practice." Ex. 4 at 91:12-17. However, as described above, accounting for potential biases is standard methodology for historians. *See generally Langbord*, 832 F.3d at 194-95 (discussing the importance of historians critically evaluating their sources); *accord Kantengwa*, 781 F.3d at 561-63. In fact, Dr. Longley himself accounted for potential bias in his book *Grunts: The American Combat Soldier in Vietnam*: "There are many challenges in the use of materials employed in this study. . . a distance of time from an event can lead to errors," and "bias always enters into the process, especially after the fact, when people rarely seek to portray themselves in a negative light." **Exhibit 16**, Rodney K. Longley, *Grunts: The American Combat Soldier in Vietnam*, (2008) at xx-xxi; In *Grunts*, Dr. Longley accounted for the challenge of potentially biased sources by corroborating information provided by them. *Id.* Here, by contrast, Dr. Longley did not corroborate his sources because he "ran out of time:"

> Q.     I'm just trying to understand what [was] your understanding of the potential biases of Mike Partain.
>
> A.      No, I understand exactly what potential biases are. I understand they are plaintiffs. I understand they have a vested interest. I understand – and like you say, typically I would work hard to corroborate on general information.
>
> Q.     Okay. But nonetheless, there were assertions in your report from Mike Partain that were uncorroborated but still made it into your report?
>
> A.     Yes.
>
> Q.     Okay. Is that typical practice in your report history?
>
> A.     When you are under the gun in terms of meeting deadlines, sometimes you don't have the chance to go back and go line by line to do so.

Ex. 4 at 319:13-320:5. Even setting aside Dr. Longley's alleged time constraints, Dr. Longley's failure to account for or even acknowledge the obvious biases of plaintiffs in this report departs from his own practice outside of litigation and reliable historian methodology. An important factor in assessing admissibility under Rule 702 is "[w]hether the expert 'is being as careful as he

13

would be in his regular professional work outside his paid litigation consulting.'"  Fed. R. Evid.

702 Advisory Committee's Notes to 2000 Amendments (quoting *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997).  *See also Kumho Tire*, 566 U.S. at 152;  *Cooper*, 259 F.3d at 200. Dr. Longley's work clearly fails this test.

### D. Dr. Longley's Failure to Accurately and Thoroughly Document His Sources Resulted in an Unreliable Historical Narrative That Cannot Be Verified.

Dr. Longley sparsely cited his sources in his reports and failed to provide any cites for many of his assertions. A proper application of the historian's method requires "thorough documentation of sources." *Burton*, 2018 U.S. Dist. LEXIS 139727, at *19. The American Historical Association notes in its Statement of Standards on Professional Conduct that "[h]onoring the historical record also means leaving a clear trail for subsequent historians to follow. . . . The sloppier their apparatus [(i.e., citations)], the harder it is for other historians to trust their work." **Exhibit 17**, Am. Historical Ass'n, *Statement on Standards of Professional Conduct* (2023), at 3. Historians must cite their sources honestly, carefully, and transparently, offering colleagues an opportunity to assess their analyses and conclusions. Dr. Longley stated in his deposition that he simply did not have time to "pad the bibliography," meaning that he would have "fill[ed] in…gaps and put in footnotes," but once again he "ran out of time." Ex. 4 at 75:20-25.

Dr. Longley's poor citation practices make it difficult, if not impossible, to know whether the assertions in his report are supported or are inadmissible "*ipse dixit*." *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). An expert who reaches his conclusions "without explaining at all how" he arrived at them engages in "quintessential *ipse dixit*," i.e., "[i]t is so because I, the expert, say it is so," which " is precisely that kind of opinion that *Daubert*, *Kumho*, and *Joiner* require district courts to exclude" under Rule 702. *ePlus, Inc. v. Lawson Software, Inc.*, 764 F. Supp. 2d 807, 814-15 (E.D. Va. 2011), *aff'd*, 700 F.3d 509 (Fed. Cir. 2012); *see generally In re*

14

*Terrorist Attacks on Sept.11, 2001*, No. 03-MD-01570 (GBD) (SN), 2023 U.S. Dist. LEXIS 73171, at *45-47 (S.D.N.Y. Apr. 27, 2023) (excluding the testimony of a social scientist as *ipse dixit* when he used "sparse citations" and "mischaracterize[d] the provenance of [a] quote"); *see also Elshelman v. Puma Biotech., In*c., No. 7:16-CV-18-D, 2019 U.S. Dist. LEXIS 37517, at *16 (E.D.N.C. Mar. 18, 2019) (granting motion to exclude expert in part because his opinion was connected to the data only by the "*ipse dixit*" of the expert).

Dr. Longley's lack of citations leaves several assertions in his reports fully unsupported. For example, in his December 7, 2024 report, in the span of four paragraphs containing only a single citation, Dr. Longley asserts that: (1) the base infrastructure at Camp Lejeune required large numbers of civilians, (2) the United States Marine Corps ("USMC") provided a security apparatus at Camp Lejeune to prevent crime, (3) it was the USMC's goal to keep Marines on base to prevent challenges from developing between Marines and the local Jacksonville residents, and (4) the USMC wanted Marines to stay on base so that their money went back into "government coffers." Ex. 1 at 11-12. When questioned about the sources for these assertions, Dr. Longley testified that the cited source only supported a portion of one paragraph and that the rest of the assertions were supported by "general knowledge." Ex. 4 at 75:1-25, 76:9-18. Dr. Longley admitted in his deposition that he would have provided support for these assertions if he had not "run out of time." *Id*. at 76:9-77:23 ("I guess that would be the question on general knowledge . . . had I probably been given more time I would have what we call pad the bibliography where you fill in these gaps and put in footnotes.").

On almost every page of Dr. Longley's reports, there are assertions and images that lack any citation or identifiable source. This is particularly troubling because, in at least three instances, Dr. Longley misstates his source material. First, as discussed above, Dr. Longley mischaracterized

a photograph of Army National Guardsmen filling a water buffalo in New Jersey as "Marines fill water buffalo, Hadnot Point." Ex. 1 at 34. Second, Dr. Longley mischaracterized a photo of President Nixon at Camp Pendleton in San Diego, CA as "President Nixon at main parade grounds" at Camp Lejeune. *Id.* at 13. Not only is the picture incorrectly captioned, but as Dr. Longley later acknowledged, President Nixon never visited Camp Lejeune. Ex. 3 at 34. Unlike many of the photographs in Dr. Longley's December 7, 2024 report, the Nixon photo does have a citation; yet the citation provided was misleading because no such source exists and the photo instead came from a film with a different title and date. *Compare* Ex. 1 at 13, *with* **Exhibit 18**, Apr. 3, 2025 Longley Dep. Ex. 27; *see* Ex. 4 at 329:5-330:9. Third, Dr. Longley captioned an uncited photo as "Water Treatment Plant near Holcomb Boulevard, 1960s." However, construction of the Holcomb Boulevard Water Treatment Plant was not completed until 1972 and the photograph used by Dr. Longley first appeared in *The Globe* on August 10, 1972. *Compare* Ex. 1 at 10; *with* **Exhibit 19**, *The Globe*, Aug. 10, 1972, at 6. In short, without thorough documentation of his sources, it is impossible to know whether Dr. Longley's assertions have any reliable basis. The number of assertions that the United States was able to verify as incorrect casts doubt on the reliability of the many assertions without source citations throughout Dr. Longley's report.

Dr. Longley also mischaracterized his sources by improperly referring to interviews as "oral histories." For oral historians, there is a sharp distinction between interviews, which are associated with journalistic practices, and oral histories, which are associated with historical practices and carry greater demands. Specifically, oral histories must be "[1] recorded, [2] processed in some way, [3] made available in an archive, library, or other repository, or reproduced in relatively verbatim form for publication." Ex. 12 at 8.

16

When the United States sought "all transcripts and recordings" of the oral histories Dr. Longley conducted for his Dec. 7, 2024 report, PLG explained that Dr. Longley "simply asked the individuals questions and put the information directly into his report." Ex. 13 at 1; Ex. 14 at 1. The following week, PLG amended their response to indicate that "Over the weekend, Dr. Longley did locate notes from his call with Allan Howard dated August 30, 2024. . . ." **Exhibit 20**, Letter from PLG to Dep't of Justice (Jan. 21, 2025). However, Dr. Longley only provided general notes from the "oral history" he had taken of Allan Howard, along with similarly general notes from the "oral histories" of Mike Partain and Jerome Ensminger taken on January 7, 2025 in preparation for his January 13, 2025 report. *See, e.g.*, **Exhibit 21**, Jan. 7, 2025 Interview with Jerome Ensminger; **Exhibit 22**, Aug. 30, 2024 "Oral History" of Allan Howard; **Exhibit 23**, Jan. 7, 2025 "Oral History" of Mike Partain. No recordings, transcripts, or notes have ever been produced for the "oral history" of Jerome Ensminger that Dr. Longley relied on for his December 9, 2024 report.

Dr. Longley's notes are more aligned with journalistic practices than the exacting standards required of oral historians. *See generally Ex. 12* at 8 ("Journalists frequently interview without attribution, collecting off-the-record responses simply for background information with no intention of revealing these sources in their stories."). Dr. Longley's notetaking practices are problematic for an oral historian because he, "run[s] the risk of hearing only what [he] want[s] to hear rather than what the interviewee actually says." *See id.* at 104.

This is evidenced by Dr. Longley's December 7, 2024 report, which contains facts that are different from those in his "oral history" notes. For example, Dr. Longley stated in his report that marches at Camp Lejeune could stretch fifty miles. *See* Ex. 1 at 32. However, the notes from Mr. Howard's "oral history" indicate that marches were only fifteen miles. Ex. 21 at 1. Without

transcripts of plaintiffs' interviews, there is no way to verify whether Dr. Longley made mistakes in what he heard from plaintiffs.

## II. NOTWITHSTANDING DR. LONGLEY'S ATTEMPTS TO CORRECT HIS METHODOLOGICAL FAILINGS AFTER SUBMITTING HIS INITIAL REPORT, HIS TESTIMONY WILL NOT HELP THE COURT

Dr. Longley's belated attempt to conduct a proper "oral history" of Mr. Partain and Mr. Ensminger, several months after authoring his December 7, 2024 report will not help the Court understand the history of Camp Lejeune. Any opinions based on this "oral history" fail to meet the standards required by Rule 702.

On March 10, 2025, after receiving a report from the United States' expert criticizing Dr. Longley's use of "oral histories," Dr. Longley conducted an "oral history" of Mr. Partain and Mr. Ensminger via Zoom. **<u>Exhibit 24</u>**, Mar. 10, 2025 "Oral History" of Jerome Ensminger and Mike Partain. According to Dr. Longley, he conducted this "oral history" to provide the United States with a "sample . . . of how [he] would have preferred to have" conducted the "oral histories" for this litigation "had [he] had the time." Ex. 4 at 116:20-25.

This "oral history," however, was methodologically unsound and, for all intents and purposes, largely perfunctory. Dr. Longley failed to transcribe and archive this "oral history," as is required to meet the higher methodological standard for oral histories. Ex. 4 at 309:12-17, 310:25-311:19; Exhibit 3 at 2-3; *see generally* Ex. 12 at 1, 103-105 (discussing the methodological importance of oral histories to be recorded, transcribed, and archived). Dr. Longley, surprisingly, also delegated a crucial part of the historian's method—critically evaluating sources—to the plaintiffs themselves. In the interview, Dr. Longley asked Mr. Partain and Mr. Ensminger how they account for their own biases. Exhibit 21 at 57:45. In response, Mr. Partain stated that "[a]s a historian, everyone has a bias. I mean that's part of history and when you're writing history there's

a bias… I mean there is a bias, I've been affected by it." *Id.* at 58:00-59:13. Mr. Partain goes on to explain how he critically evaluated his own bias in his master's thesis related to Camp Lejeune:

> And in the introduction to my master's thesis I clearly identify my bias as someone who was born on Camp Lejeune and was diagnosed with cancer and has been involved in this fight for the past – at the time, 15 or 16 years. So, there is a human bias involved. You minimize that by being transparent with your information – where you got it from, what it is, and not you know interjecting your own opinions and things.

*Id.* at 59:20-59:52. However, as mentioned above, Dr. Longley's reports do not contain this type of analysis. Dr. Longley as a historian is required to critically evaluate his sources *himself* before forming an opinion—an action that he did not take here. *See Langbord*, 832 F.3d at 194–95; *Kantengwa*, 781 F.3d at 561–63. Instead, Dr. Longley delegated the critical step of evaluating his sources to the sources themselves.

Mr. Ensminger and Mr. Partain reviewed the historical reports by experts for both PLG and the United States prior to giving their "oral history" on March 10, 2025. Even if inadvertently, these reports likely colored the impressions of or skewed the memories of Mr. Ensminger and Mr. Partain. For example, Mr. Ensminger echoed Dr. Longley's report stating that "Camp Lejeune is like a county. And Hadnot Point would be the county seat…and the main heartbeat of the county. And the outlying camps were little communities that answered to the county seat." *Compare* Ex. 24 at 31:59-32:15 *with* Ex. 1 at 16 ("No matter where a person lived on base, and even for the small number of Marines that sometimes lived in off-base housing. Hadnot Point was the functional 'county seat' for Camp Lejeune, and people frequented it daily in many cases.") *See also,* Ex. 24 at 45:45-46:07; 1:16:17-1:17:00 (Mr. Ensminger references "the defense historian's" report); *Id.* at 58:00-58:34 (Mr. Partain references the United States' experts, Dr. Kelman and Dr. Brigham).

19

It is also unclear how much of this "oral history" was influenced by Dr. Longley, as his questions were framed in an argumentative and leading way, and not in a manner that a historian would typically frame questions to get factual historical information. For instance, Dr. Longley stated that "[t]he *defense*, or the government's historian, spent an *inordinate* amount of time on the water buffalos and *trying to sow the seeds of doubt* that people could get their water from these water buffalos from any part of the base. How would you respond to that Jerry?" Ex. 24 at 49:20-49:39 (emphasis added). In response, Mr. Ensminger stated that:

> [A]ll the people in charge…they could tell that PFC or Lance Corporal, "you take this thing to Courthouse Bay and fill it," or "take this thing to Camp Geiger and fill it," or wherever. You know what? When that kid would leave out in the field and get back on the highway, he wasn't gonna go to Courthouse Bay…He wanted to go to Hadnot Point, where the PXs and stuff were at and he could stop while he's in there filling up that water buffalo and get a soda and get something to eat.

*Id.* at 50:32-51:23.

In addition to retaking the "oral history" of Mr. Ensminger and Mr. Partain in an attempt to cure deficiencies in his initial report, Dr. Longley also attempted to correct his erroneous characterizations from his December 7, 2024 report via an errata sheet. **Exhibit 25**, Apr. 4, 2025 Longley Dep. Ex. 28. However, Dr. Longley's errors, coupled with his failure to follow a standard historical citations practice, reflect of a larger problem that justifies exclusion. His failure to follow appropriate methodologies prevents the United States, its experts, and this Court from verifying and challenging his statements presented as historical facts. If Dr. Longley can be shown to be in error in the few instances where the United States was able to check sources—such as the water buffalo photograph, the Nixon visit, and the water plant operation date—the number of additional errors that may exist but cannot be brought to light because of Dr. Longley's failure to follow proper historical practice methodologies is unknown.

It is simply impossible to know whether Dr. Longley's assertions are properly supported, misstated, or based only on the word of a plaintiff or PLG. Further, Dr. Longley's later reports rely upon the same flawed research and analysis he employed for his December 7, 2024 report. Thus, none of Dr. Longley's reports are immune from his methodological failings.

## **<u>CONCLUSION</u>**

Due to Dr. Longley's overarching unreliable application of the historian's method, his testimony will not help the Court, and therefore, should be excluded in its entirety under Rule 702.

Dated: April 29, 2025

Respectfully submitted,

YAAKOV ROTH
Acting Assistant Attorney General
Civil Division

JONATHAN GUYNN
Deputy Assistant Attorney General
Civil Division

J. PATRICK GLYNN
Director, Torts Branch
Environmental Torts Litigation Section

BRIDGET BAILEY LIPSCOMB
Chief, Camp Lejeune Unit

ADAM BAIN
Special Litigation Counsel

HANLEY GIBBONS
SARA MIRSKY
SHARON SPRAYREGEN
Trial Attorneys

*/s/ Cindy M. Hurt*
CINDY M. HURT
Trial Attorney
United States Department of Justice
Civil Division, Torts Branch
Environmental Torts Litigation
1100 L Street, NW
Washington, DC 20005
(202) 307-5788
Fax (202) 616-4473
Cindy.M.Hurt@usdoj.gov
Virginia Bar No. 86826

Attorney inquiries to DOJ regarding CLJA:
(202) 353-4426

*Attorneys for Defendant,*
*United States of America*

22

## CERTIFICATE OF SERVICE

I hereby certify that on April 29, 2025, I electronically filed the foregoing using the Court's

Case Management/Electronic Case Files system, which will send notice to all counsel of record.


*/s/ Cindy M. Hurt*
CINDY M. HURT

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this document complies with the applicable word limit in Local Rule

7.2(f)(3), and that this document has 6,620 words, as calculated by Microsoft Word.


*/s/ Cindy M. Hurt*

CINDY M. HURT