# EXHIBIT 3

**Response to Dr. Brigham and Dr. Kelman Reports dated 2/7/25**

**Dr. Kyle Longley**

## I.     <u>Summary and Overview.</u>

I have reviewed the reports of Dr. Brigham and Dr. Kelman dated February 7, 2025.[1]  Dr. Brigham largely continues to repeat arguments from his earlier report dated December 9, 2024, relying on limited sources and broad oversimplifications, as I highlighted in my prior report of January 13, 2025. Dr. Kelman has conducted no primary research on the topic of the history of the base and cites no original documents nor original witness statements or testimony. His efforts to critique my research methods lack adequate context as discussed below, and he seeks to define too narrowly the nature of "oral history" which may appropriately be used in an expert report.

The main problem with Dr. Brigham's analysis, as stated in my prior report dated January 13, 2025, is that he uses source material that fails to fully substantiate his points, and he relies too heavily on narrow sources, mainly government ones. He fails to provide evidence to support his arguments. These include his contention that people in the outlying areas of Camp Lejeune rarely went to Hadnot Point or other areas that had the historically contaminated water as per the publications by the Agency for Toxic Substances and Disease Registry's ("ATSDR"). There is an absence of data to support Dr. Brigham's claims that residents only used the PXs, swimming pools, recreational facilities, and clubs in the outlying areas and did not go to Hadnot Point. He fails to refute the fact that the limited existence of facilities in the outlying areas of the base provided an impetus to residents to visit the central Hadnot area. Dr. Brigham seeks to argue that distances and traffic congestion limited movement, but this contention discounts the robust bus and public transportation system and the normal circulation of the Marines and others around the base.  Dr. Brigham's report fails to refute the centrality of Hadnot Point for purposes of access to jobs, the main PX, the Naval Hospital complex, school facilities supplied water by Hadnot Point, and recreational and cultural activities.

The criticisms by Dr. Kelman and Dr. Brigham of the use of "oral history" sources in my reports are of limited import since such sources only played a small part in my reliance materials. Beyond that, their effort to narrowly constrict the definition of "oral history" ignores the fact that there are many varieties of historical evidence sources that come in the form of personal recollection and eyewitness statement. The sources of facts for historians are multitudinous and include archived reports, statements by individuals captured in old documents, quotations and paraphrases from people related by journalists in news and periodical articles and pieces, recorded statements, sworn affidavits and declarations, transcripts of testimony, formally recorded (audio and/or video) "oral histories" that are saved in archives and repositories, and less formal oral input that a historian may receive from an individual and use in an analysis or a report without having recorded or transcribed the same. A historian as with other authors and experts does not need to record and place in an archive every source they speak with.  Often, for example, an author will cite to a personal communication he or she had with a source, without having necessarily recorded it. In interacting with a living individual as a source of information, the resultant documentation

---

[1] The reports issued to date by Jay L. Brigham, Ph.D. were dated 12/9/24 and 2/7/25.  The report issued by Ari Kelman, Ph.D. was dated 2/7/25.  My prior reports were dated 12/7/24 and 1/13/25.

1

can run from something as informal as a note taken by the researcher, to something as formal as a full-blown audio/video recorded interview to be kept in an archive. However, there is no methodological prerequisite to the effect that unless the person is interviewed formally, recorded, and the recording is stored, the information from that person cannot be used. Indeed, publications and reports may often simply cite to the source individual and the fact that the author made notes of the interaction.

It is noteworthy that neither Dr. Brigham nor Dr. Kelman has conducted any interviews of their own with individuals who spent time at Camp Lejeune during the pertinent historical period of time. Their reports criticize mine for purportedly not including enough oral history yet fail to include any oral history of their own, as they define it. Neither Government-retained historian has undertaken work to speak with and interview any of the surviving individuals who lived and worked on the base during the statutorily relevant time period (1950s to 1980s). The Government's experts seek to dismiss my reports due to the fact that the witness statement and oral history sources I have used are limited, yet without seeking to obtain any other witness statements or oral histories to assist the Court with understanding the true facts of the matter on the merits. The Government's experts contend that my reports should be excluded due to perceived limitations on oral history sources, when they have used no such sources whatsoever.

Turning to historical witnesses who lived through relevant events and are still alive, so as to draw upon their statements and recollections, is a widely accepted part of a historian's methodology, and is a tool not only used by historians but also by scholars in anthropology, sociology, and political science. The failure on the part of Dr. Brigham and Dr. Kelman to engage in any witness communications or interviews with relevant living witnesses for purposes of understanding the historical facts of Camp Lejeune is a significant weakness in their reports. Their refusal to incorporate personal experiences of people at Camp Lejeune during the statutory period forecloses them from reliance on this time-honored tool of a historian's research methodology.

In addition to not conducting any witness interviews nor undertaking to collect any oral history information of their own, as they define it, Dr. Brigham and Dr. Kelman also fail to access or cite other types of witness statements or materials. They cite no diaries, letters, memoirs, or other such documents from people who served and were otherwise at the base during the pertinent times relating their recollections and experiences particularly with regard to using the water or being at contaminated or uncontaminated areas of the base. There is no input from any people who lived in the outlying areas that Dr. Brigham seeks to focus upon. For example, while Dr. Brigham seeks to press the case that a Marine could have resided or worked at the Courthouse Bay or Rifle Range areas, he includes no actual information derived from any interviews or discussions with any individuals who had spent time at those areas from the 1950s to 1980s.

I agree that for purposes of thoroughness of historical research, the more sources the better. Certainly, if had I had more time and resources, I would conduct more interviews and discussions with people who lived or worked at various relevant areas of the base at relevant times. For purposes of this report, and to further confirm that my original reports were accurate, I have conducted an additional oral history discussion with the well-known fact witnesses and historians Jerry Ensminger and Mike Partain, and with this report I am providing an audio-video "Zoom" style electronic recording of the entire interview. The topics addressed in the interview focus on

the points of contention as between myself and the Government's experts on the merits, and also abide by a basic oral history template. As the matter herein proceeds and Plaintiffs and witnesses are called to testify, it is likely that additional light will be shed on the topics. As historians, we must use a method which is accumulative and iterative. While I do not agree with much of the input of Dr. Brigham and Dr. Kelman, I welcome it as further work to get to the truth. Likewise, I welcome any additional information from witnesses which may emerge as the cases proceed, as they may serve to uncover additional facts.

I acknowledge that oral histories have challenges (as do most primary sources) as raised by Dr. Kelman. However, Dr. Kelman has limited experience with the subject as it pertains to working with eyewitnesses as oral historians. Dr. Kelman's own curriculum vitae and his publications reflect that his areas of specialization include the 19th Century as well as topics such as the Jewish experience. In his books, he has written on subjects distanced in time to the point that any first-hand eyewitnesses were deceased at the time of his research. *See* Kelman's *Battle Lines: A Graphic History of the Civil War* (Hill and Wang, 2015). For example, in writing of the Sand Creek incident in 1864, those he spoke to obviously had not been at the incident, and so, his focus with them became the nature of the cultural memory of the matter. *See* Kelman, *A Misplaced Massacre: Struggling Over the Memory of Sand Creek* (Harvard University Press, 2013).

Dr. Kelman critiques my work based on what he faults as reliance on statements of Plaintiffs that could be biased. He casts doubt on the usefulness of witness documents related to court proceedings such as affidavits, depositions, and courtroom testimony. However, he himself has cited testimony from proceedings that followed the Sand Creek incident, in his above-mentioned book. More broadly, it is not logical or practical to contend that witness testimony under oath for purposes of court proceedings is in some manner too unreliable or biased to be used by a historian. The purpose of court proceedings is to access the truth. The method of American judicial proceedings includes rules of procedure and evidence meant to maximize the ability of the process to glean the truth. Witnesses are placed under oath and can be cross-examined. This in itself is a reliable methodology when combined with analysis and corroboration from other sources.

Dr. Kelman in his past publications has drawn on documentation of human memories such as legal documents, testimony and letters. *See* Kelman, *A Misplaced Massacre*, Chapter 1 (citing letters and testimony by John Chivington). Each format carries its own potential biases and weaknesses that must be tested when applied, just like a formally recorded oral history interview. However, the possible presence of those biases and weaknesses is not grounds to reject the use of such materials wholesale. History inevitably must include a human and subjective component and part of the interpretative and accumulative methodology of the historian is to account for that reality. While some in the historical field may question the use of oral history, many such as my colleague, Dr. Don Ritchie[2] (whom Dr. Kelman acknowledges as a leader in the field), have shown its importance as a tool.

I have employed the basic historian's methodology of working through documents and sources of all sorts, for many years, going back to my first book published in 1997 and continuing through my most recent works. It appears the Government in seeking to refute my reports did not

---

[2] *See generally* https://en.wikipedia.org/wiki/Donald_A._Ritchie.

provide access to Camp Lejeune Marines and surviving eyewitnesses and former residents for its own historian experts so that they could perform their own interviews on the key issues.

The reliability of my methodology is further reflected by the fact that I have a robust publication record nor has my work to my knowledge ever been refuted based on grounds of purported methodological deficiencies. I direct the Court to my work as an author of ten books, including several prize-winning ones, multiple journal articles and scholarly essays, and a host of other written materials published in outlets such as *Time* or *Newsweek*. My point is not to self-aggrandize but to note that I have a long track record of heavily reviewed and scrutinized work, subject to examination and critique by editors, reviewers, and the audiences. Reviews of my work corroborate the reliability of my methodology.[3] Some of my key publications have been:



Dr. Brigham's report also reflects reliance to an indeterminate amount on "staff." For example, he states that he "participated in a telephone call with Mr. John Lyles, Chief Archivist of the Marine Corps History center at Quantico, VA, after which my staff collected command chronologies for many of the Marine Units stationed aboard Camp Lejeune." (Brigham 2/7/25 report, p. 5). By contrast, for purposes of my reports I worked on the matter extensively including traveling to and exploring historical records collections and archives personally over four days. I examined collections, command chronologies and photographs myself rather that reviewing material pre-selected by others. Again, Dr. Brigham describes that "members of my staff conducted research at the Library of Congress." (Brigham 2/7/25 report, p. 5). The reliance on others to perform primary document inspection and exploration raises the question of whether and how material was pre-screened, pre-selected, or pre-excluded, before the historian received it, something I seek to avoid.

---

[3] For sample book reviews, see: *The Sparrow and the Hawk: Costa Rica and the United States during the Rise of Jose Figueres* (1997). Winner of the A.B. Thomas Prize for outstanding book from the Southeastern Council on Latin American Studies; Charles D. Ameringer, *Hispanic American Historical Review* (1998) 78:1, p. 147; *Senator Albert Gore, Sr.: Tennessee Maverick* [foreword by Vice President Al Gore] (2004), Mike Bowen, "The Martyr of Moderation," H-Net, H-Tennessee, March 2005, https://www.h-net.org/reviews/showrev.php?id=10333; *Grunts: The American Combat Soldier in Vietnam* (first edition, 2008), reviewed by Peter Kindsvatter, *Pacific Historical Review* (2009), 78:4, 655-657; *see also* Seth Givens, *Army History* (2011) 79: pp. 57-58; *The Morenci Marines: A Tale of Small Town America and the Vietnam War*, Winner of the Best Book in Arizona History and the Southwest Book Award, reviewed by Joe Abodeely, *Journal of Arizona History*, 56:4 (Winter 2015), 494; *LBJ's 1968: Power, Politics, and the Presidency in America's Year of Upheaval,* reviewed by Patrick Sharma, *Diplomatic History*, 43:3 (June 2019): 583-586; *and see* Tim Stanley, *Literary Review*, April 2018; William Allison, H-NET, Dec. 2018, https://www.h-net.org/reviews/showrev.php?id=52648.

The Government experts criticize my citation form for oral history sources. (*E.g.*, Kelman 2/7/25 report, pp. 1, 10). However, the format of a written expert report used in a legal proceeding need not be in its editorial and formal parameters identical to a submission accepted and published in an academic journal or in a book. The citations and descriptions I used were practical and functional and accompanied by a reference list. (See the reliance lists provided for the reports). The reliance list for my report dated December 7, 2024 is lengthy and detailed, with 198 entries. The entries related to witness or individual interviews, discussions, or written or oral testimony, are clear and detailed. (See my 12/7/24 report, reliance list, at item nos. 127 (Allan Howard, oral history by Zoom, 8/30/24); 128 (Allan Howard declaration, 11/26/24); 129 (Allan Howard deposition, 2/16/24); 130 (Gary McElhiney declaration, 11/25/24); 131 (Gary McElhiney deposition, 4/11/24); 133 (Jacqueline Tukes deposition, 4/11/24); 134 (Jacqueline Tukes declaration, 11/26/24); 135 (Benjamin Urquhart deposition, 11/26/24); 136 (Anthony Charles Zinni deposition, 5/28/24); 148 (Jerry Ensminger oral history); and see my 1/13/25 report, reliance list, at item nos. 2 (Ensminger oral history/email); 3 (Mike Partain oral history); 28 (Terry Dyer deposition, 4/10/24); 31 (Zinni deposition, *supra*); 34 (William Walters deposition, 5/20/24); 35 (James Claude Branham deposition, 10/16/24)).

The vast majority of the reliance list items are documentary versus relying on speaking to eyewitnesses. My citations in my report footnotes and in reliance lists reflect that I drew on a wide variety of sources, including government documents, archival materials, newspapers and magazines, and many others. In fact, the vast majority of these reliance materials were not "oral histories" in the sense of facts gleaned from personal conversations with witnesses, but rather, historical materials dating back further in time. Many of those cited materials themselves include facts and information related to news article writers by individuals in the past, or other such materials. For example, articles from the base publication the *Globe* include much relevant content. All of these sources were appropriate for use and consideration by a historian.

Some of the sources that Dr. Brigham cites are also ones that I have cited. In that sense, there is agreement among us as to some of the reliable sources. For example, Dr. Brigham describes how, as a component of his methodology, he or his staff reviewed publications reflecting ATSDR work, including ATSDR, "Summary of the Water Contamination Situation at Camp Lejeune," Nov. 12, 2024; and M. Maslia, et al., Reconstructing Historical VOC Concentrations in Drinking Water for Epidemiological Studies at a U.S. Military Base: Summary of Results, Water, 8, 449 (2016). I agree that these texts are reliable and useful.

Below, I further address various topics brought up by the Government's historians.

## II.    Going Off Base, Water Buffaloes, and Cars.

Dr. Brigham in his report seeks to address the topics of going off-base, use of water buffaloes, and use of cars. (Brigham 2/7/25 report, pp. 29-39). He overstates my position on the matter, ignoring the distinctions drawn in my report and failing to obtain any new oral history or witness interviews or statements to assist with the critique of my historical methodology or to refute the facts presented in my report with more intensive primary source research.

5

Dr. Brigham seeks further to develop facts supporting the proposition that the Marines often went off the Camp Lejeune base. (Brigham 2/7/25 report, pp. 29-32). In the end, of course, for purposes of the named Plaintiffs in these matters, to the extent they (or relevant relatives) are still alive, it is their own testimony (along with each Plaintiff's relevant individual records and documents) which will be most important as to where each individual Plaintiff spent time on the base. Beyond that, we do not deny that Marines could take leave or go off-base to places such as Jacksonville, NC. Likewise, civilians who worked on the base typically resided off-base.[4] Nonetheless, factors existed encouraging those on the base to stay on the base, as I have previously discussed. For Marines with limited income, the costs of going off base were a consideration. Marines on the base often lacked cars, which limited their ability to leave the base. Marines with leisure time were aware of the presence of quality social, athletic, entertainment and cultural activities offered at Camp Lejeune, with the major facilities such as Goettge Memorial Field House located at Hadnot Point (and others which I have outlined extensively). Marines and families also could obtain lower-cost, subsidized meals and commodities from the stores at Hadnot Point. (See my 12/7/24 report, pp. 11-30).

Dr. Brigham seeks to cite various advertisements supporting the existence of activities off-base or outside of Hadnot Point on the base. One important point to note in this regard is the development of the area over time. For example, while earlier issues of the *Globe,* e.g., for May 29, 1975,[5] or June 5, 1975,[6] had few or no advertisements about or features discussing attractions or businesses off-base, later issues of the publication included more advertisements and content regarding off-base locations. In that regard, an issue of the *Globe* dated October 10, 1985 reflected advertisements for off-base hotels and car lots.[7] Meanwhile, the earlier issues reflect less content about off-base than on-base activities. *See, e.g.,* the *Globe*, June 5, 1975, at page 2, referencing Jacksonville in "K-9 guard dog" article; evening classes offered by Eastern Carolina University at Camp Lejeune High School in same article; referencing Onslow Beach and Main Exchange in article entitled "Looking behind the shield" – discussing how "[w]e also saw a lot of dirty soldiers in the Exchange Saturday afternoon and they bought more 'comfort' than health items. But before you get all mad and say, 'Yea, I saw 'em too', think about the real reason that huge Exchange is in business. The real reason is still the troops and we hope they aren't dirty all the time;" on the same page another article entitled "Get thrifty with Navy relief" describes "Camp Lejeune, a city within a base." *See also id.* at p. 3 (photo caption references crabbing recreation at recreational area "located on the New River in Tarawa Terrace;" article on gas pumps references "gasoline pumps at the Midway Park Exchange Service Station" and "[t]he Hadnot Point and MCAS, New River stations;" article entitled "Reaching the goal" referencing Naval Medical Field Research Laboratory, Naval Regional Medical Center and Naval Regional Dental Center; photo caption

---

[4] Also, senior enlisted personnel and officers, typically married, could live off base, but they worked on it.

[5] The *Globe,* 29 May 1975, Vol. 31, No. 22, available at https://www.dvidshub.net/publication/issues/60238.

[6] The *Globe,* 5 June 1975, Vol. 31, No. 23, available at https://www.dvidshub.net/publication/issues/60237.

[7] The *Globe*, 10 Oct. 1975, Vol. 41, No. 41, available at https://www.dvidshub.net/publication/issues/58953. *See* page 7 (advertisement for Holiday Inn "weekend room specials" and restaurant located at 701 North Marine Boulevard – this was a Jacksonville address, today identified as 701 N Marine Blvd, Jacksonville, NC 28540); page 8 (ad for "Military TV & Stereo," with locations at 2113 Lejeune Blvd [Jacksonville, NC 28546], 238 S. Wilmington Highway [Jacksonville], and 721 Court Street [Jacksonville]); page 11 (ads for law firm, jewelry store, natural foods store, in Jacksonville); etc.

reflecting "change of command ceremonies at WPT Field here" [WPT Field refers to William P.T. Hill Field, dedicated as the Base Parade Ground in 1967[8]]).

In other words, the historical facts changed over time. As of the 1950s, the area and surrounding areas were less developed. The general prevalence of motor vehicle ownership was reduced. By the 1980s, the base and surrounding off-base areas all had been further developed. The costs of motor vehicles had come down relative to wages and a greater number of individuals owned their own cars.

While people could and did go off-base, the historical evidence shows the existence of factors that would have encouraged Marines and others to not leave the base. Again, as one goes further back in time, generally the pay was lower, the access to private transportation to leave the base was less, and the build-up of stores, hotels, restaurants and other venues off the base was less than later on. As time progressed, in the 1970s, the military transitioned to an All-Volunteer Force and the pay increased as well as subsidies for housing and other benefits. The prevalence of motor vehicles for personal use increased.

Regardless of whether Marines had transportation options, Jacksonville was not a large city and also, had less amenities earlier in the 1950s to '80s time frame compared to later. *See, e.g.*, in a transcript of an interview of MSgt. Ralph Freeman, USMC (Retired), by L.J. Kimball, dated 11 Aug. 1999, where Mr. Freeman described that he was at Lejeune including in 1943, 1962, and 1965 (*id.* at pp. 13, 45, 49-51), and emphasizing: "Q: Did you get a chance to go out on liberty into Jacksonville? A: Not in Jacksonville. Wasn't anything go on liberty for.").[9]

In addition, like many base-adjacent towns across the country, Jacksonville had issues of prostitution, crime, and other maladies that made visiting it unattractive for many. Further, compared to other large bases like Camp Pendleton, Camp Lejeune did not have as many off-base attractions and amenities as it was in a more rural environment. Near Camp Pendleton are such off-base communities such as Oceanside, San Clemente, and Carlsbad with hotels, restaurants, stores, and beautiful beaches stretching many miles.

As noted in my prior reports, military policies and the very design and infrastructure of Camp Lejeune itself reflect intentional efforts by the military to encourage servicemembers and married couples to stay on base which I have outlined in detail in my prior reports. The military kept prices down at PXs and ensured the ready presence of other benefits such as health care, entertainment, and schools on base. Further, the best and biggest facilities were at Hadnot Point, the nerve center of the base. It was at Hadnot Point that the central hospital complex was to be found. The main parade grounds were located there. The large Goettge auditorium for sports and other events was located at Hadnot Point. The main Marine barracks facilities were in the area. Most single people lived at Hadnot Point historically as compared to other base areas. And, beyond Hadnot Point, many of the married couples and families resided at the Tarawa Terrace community which, according to the ATSDR reports, was also historically subjected to the contaminated water.

---

[8] The *Globe,* 15 Dec. 1967, Vol. 23, No. 50, p. 1, available at https://media-cdn.dvidshub.net/pubs/pdf_61073.pdf.
[9] Available at U.S. Marines website, https://www.lejeune.marines.mil/Portals/27/Documents/EMD/Cultural-Resources/Oral%20History%20Project/Freeman.pdf.

With regard to the issue of the filling and use of water buffalo mobile water tankers, while different locations did exist where they could be filled, the historical evidence reflects that the best and most common place to do so was at the industrial park at Hadnot Point where the main logistics units had their headquarters. The large standpipes at Hadnot Point (noted by Dr. Brigham at Brigham 2/7/25 report, pp. 32-36) had the water pressure and height to load the largest water supply trucks and water buffaloes in the quickest time. Further, the single-Marine barracks were located there. In this regard, see also the oral history recording provided herewith reflecting my interview with Jerry Ensminger and Mike Partain, where they relate additional facts on the water buffalo topic. (See March 10, 2025 Ensminger and Partain oral history recording in that regard)

While there were other filling locations on base, the commanders understood, as outlined in testimony and other evidence I have cited previously, that Hadnot Point was the best place (fastest and easiest) to get water. It should surprise no one that has studied military bases that there were better and more convenient, versus worse and less convenient, places on base to do anything from steam-cleaning a truck to dumping materials. Dr. Brigham notes that Camp Geiger had services but does not offer information on when these came online or how much people used them. Meanwhile, the 2d Force Service Regiment/2d Force Service Support Group were a chief resource and stationed primarily at the industrial area at Hadnot Point.

In his report, Dr. Brigham also seeks to highlight historical references to traffic congestion at Camp Lejeune to support the inference that that this congestion limited movement around the base and kept individuals in outlying areas around the base from leaving them to go inward to Hadnot Point. I agree that traffic during peak times when civilian workers and others drove into the base in the morning and left in the evening created some challenges. Nonetheless, base-wide mobility was readily available including by means of public transportation which the Marines provided (for free) and which reached central parts of the base as have outlined in detail in my 12/7/24 report at pages 15-17 and 1/13/25 report at pages 11-13. Further, this was after all a military base with fixed and very limited entry and exit points. The congestion when off-base civilians came in for work purposes did not mean the base roads in general were congested. (See March 10, 2025 Ensminger and Partain oral history recording in that regard).

Dr. Brigham in his report at pages 36-39 cites the number of car registrations on base increasing over time. He notes that *The Globe* in a 1962 article stated that there were 22,000 privately owned vehicles registered at Camp Lejeune and per sources cited, that number increased to 38,000 in 1972 to 39,800 in 1981. (Brigham 2/7/25 report, pp. 37-38). Again, however, I never disputed that there were cars on base. Rather, as I have noted, there is historical evidence that cars were less available in the past, and for many young Marines, cost prohibitions limited their purchases of motor vehicles until the creation of the All-Volunteer Force and the introduction of cheaper foreign vehicles in the 1970s.

Also, the increasing number of vehicles cuts both ways for purposes of this matter. It is true that greater numbers of vehicles meant an enhanced ability for some individuals residing on the base in contaminated areas like Hadnot Point or Tarawa Terrace to leave the base. But by the same token, it also meant that individuals located in outlying areas of the base such as Onslow Beach, Camp Geiger, Rifle Range or New River Air Station, or in communities like Holcomb Boulevard during times it was not contaminated, had a greater ability to travel easily from those

areas to the contaminated areas. As more cars became available, part of their use would have been to allow more travel from the outlying areas of the base to Hadnot Point area and its facilities. Over time, greater mobility would have provided individuals and families not only with more of an ability to leave the base, but also, more of an ability to travel to other areas on the base, not least of which, the central attractions of Hadnot Point.

With more motor vehicles, for example, wives of married Marines could more easily access the main PX at Hadnot Point, the many social clubs at Hadnot Point where major events occurred, or the middle and high schools at Hadnot Point or tied to its water system where many children attended and had extracurricular activities. More mobility made it easier for those residing outside of the Hadnot Point area to travel to the Hadnot Point area for a variety of reasons such as to swim in the Hadnot Point indoor pools, to engage in or attend athletic activities, to go to concerts and major events like July 4th and the Marine Corps Birthday celebrations and dances, and to receive medical care at the Naval Hospital. This was outlined in my prior reports, but it is worth citing additional historical materials. For example, the below article from the *Globe* from 1974 alludes to the well-frequented nature of the Main Exchange located at Hadnot Point:

## ' Children, children, everywhere!!!

**Open Line:**

Children, children, children everywhere — especially in the Main Exchange. Most of them are there without being accompanied by a parent, or at least it seems so. Why must customers be constantly caught up in a game of "Cops and Robbers," attacked by a bundle of fury bounding from beneath racks of clothing or from some other unsuspecting place.

The Exchange is a place where all of us should be able to go and shop without having to constantly be on the lookout for someone else's children or becoming so frustrated that we leave the store with uncompleted shopping lists.

No, moms and dads, I love children and feel they need to be protected, especially when out in public places. They are your responsibility and you should not leave it up to others to look out for their safety and well-being while you yourself browse throughout the Exchange. If you do not intend to take care of your children while you are shopping then you should not bring them in the Exchange to run wild. Not only do they upset other patrons, they often destroy or mutilate property to such an extent it has to be surveyed.

Oh, I know you are not one to shy away from your responsibility of paying for any damages done, but why shy away from the greater responsibility of controlling your children?

Just recently I was in the store and a lady brought a small child to the Manager's Office, stating the child had followed her to her car twice and she did not even know the child. The word was passed for someone to come pick the child up. Eventually an unconcerned mother arrived, spanked the child, sent it on its way to the Toy Department and she went to the Ladies Department. Parents, aren't you concerned what could happen to your child?

**Article from 1974 on number of children at Main PX at Hadnot Point, the Camp Lejeune *Globe*, 13 June 1974.[10]**

The article expressly discusses the "Main Exhange." It discusses the prevalence of children there, and alludes to "moms and dads" who travel from time to time to the Exchange, described as a "store," with their "shopping lists." The article further references how the Exchange contained both a "Ladies Department" and a "Toy Department." The reasonable inference to draw from this document is that as of 1974, the Main Exchange functioned like a department store as well as grocery store, and drew parents and families to it. It was located in the Hadnot Point area.

---

[10] The *Globe*, 13 June 1974, Vol. 30, No. 24, available at https://www.dvidshub.net/publication/issues/60297.



## family news

**SHOPPING SPREE WINNER** — Mrs. Jean Mechuta, piles her grocery cart to over flowing at the Hadnot Pt., Commissary during a five minute shopping spree, sponsored by the C. Lloyd-Johnson Company, Nov. 5. During the 5 minute period Mrs. Mechuta bagged $367.04 worth of groceries. Her tally for the most items of one kind was meat. When asked what she would do with all the food, she smiled and said, "I have six children that's all the explanation I need." Besides Mrs. Mechuto, there were two other winners, plus entries submitted by commissary shoppers here and at all military installations in 1975, will be eligible for a Grand Shop-a-thon. Winners will be selected at random and announced in December, Mrs. Mechuta is married to MGySgt. Edward Mechuta, Communication Company, Headquarters Battalion, 2d Marine Division.

The *Globe*, 13 Nov. 1975, Vol. 31, No. 46, p. 6.[11]

The photo and accompanying caption text from a 1975 issue of the *Globe* likewise indicates that parents and families traveled to Hadnot Point to shop. The above photo reflects food items and a shopping cart being used by a woman at the Hadnot Point Commissary to participate in a contest to collect as much as she could in five minutes.

The 1969 feature excerpted below also reflected details as to the nature and use of the large Naval Hospital complex as of that time and underscores its importance to the whole community.

---

[11] Available at https://www.dvidshub.net/publication/issues/60213.

# Naval Hospital Marks 26th Anniversary

By SGT. ANDY FIELDS

This week, the Naval Hospital celebrates more than a quarter-century of service to the World's Most Complete Amphibious Training Base- Camp Lejeune.

The hospital, presently commanded by Captain J.H. Suitor, U.S. Navy, was commissioned on May 1, 1943 at a construction cost of $7,500,000. On that date, patients were admitted as transfers from the then temporary Field Hospital, which up to that time had provided care for the sick and injured of the former Marine Barracks, New River.

The Naval Hospital, is a self-contained activity under the command and support control of the Bureau of Medicine and Surgery, Navy Department. Coordination control is exercised by the Commanding General, Marine Corps Base.

The mission of the hospital includes support for military personnel and dependents of Marine Corps Base, Force Troops, 2d Marine Division, Marine Corps Air Station, New River, and Marine Corps Air Station, Cherry Point, North Carolina. The hospital also cares for retired personnel.

The authorized operating bed capacity is 600. This can be expanded to care for as many as 1,117. The highest patient load during World War II was 2,087 and during the Korean Conflict the peak census was 1,865, including many Army patients. At present, average occupied beds, total 460.

Since commissioning, the hospital has admitted approximately 87,000 military patients and 77,500 others. A total of more than 45,500 births have been recorded.

In March 1958, the hospital assumed responsibility for outpatient care of dependents, a mission previously assigned to the Base Dispensary. In order to provide this support, Wards 1 and 2 were converted into outpatient clinics. The clinics average approximately 10,000 patient visits per month.

Constructed to fill a war-time need, the hospital has added progressively to its initial medical capabilities. Services now available include general medicine, general surgery, orthopedic surgery, obstetrics, gynecology, pediatrics, opthalmology, urology, radiology, pathology, pharmacy, physical therapy, otorhinolaryngology, dentistry and neuropsychiatry.

The population supported includes more than 32,000 military, 36,000 dependents and some 400 retired personnel.

In addition, active support is furnished all civilian medical activities in the vicinity on a humanitarian basis. Although not a teaching hospital, it is fully accredited by the Joint Commission on Accreditation of Hospitals.





COOKS prepare some "medicine" — hot chow.

The *Globe*, 2 May 1969, Vol. 25, No. 18, p. 10.[12]

The above feature from 1969 describes that as of that date, the Naval Hospital facility had been in existence for more than 25 years in service to Camp Lejeune. The population as of then that was "supported" included "more than 32,000 military" and "36,000 dependents" as well as "400 retired personnel." The hospital had been commissioned in 1943. The hospital's purpose was "support for military personnel and dependents of Marine Corps Base, Force Troops, 2d Marine

---

[12] Available at https://www.dvidshub.net/publication/issues/60911.

Division, Marine Corps Air Station, New River, and Marine Corps Air Station, Cherry Point, Norh Carolina. The hospital also cares for retired personnel." The hospital then had 600 beds which could be expanded up to 1,117 beds. "At present, average occupied beds, total 460." Since when it was commissioned (i.e., from 1943 to 1969) the hospital according to the story had recorded "87,000 military patients" and "77,500 others." It included "[a] total of more than 45,500 births have been recorded." The article goes on to report that "[i]n March 1958, the hospital assumed responsibility for outpatient care of dependents" who had previously been "assigned to the Base Dispensary." "The clinics average approximately 10,000 patient visits per month."[13] The centrality of Hadnot Point clearly is demonstrated by the health care facilities.

## III.    __The Outlying Areas.__

Dr. Brigham tries to sow seeds of doubt about the centrality of Hadnot with his fixation on the outlying areas. No one has argued that people did not live in different parts of the base such as Camp Geiger, Camp Johnson, New River/MCAS, Onslow Beach, the Rifle Range, or Courthouse Bay. But with few exceptions, Dr. Brigham's report lacks statistics such as on numbers of people over time at various locations. His report also fails to acknowledge that people could live in one area but work in another; particularly, Hadnot Point. As noted, Hadnot facilities included both barracks, motor pools and machinists' shops and garages for maintenance, schools, the hospital, and administrative offices. My prior reports outlined these facts through the use of oral histories, command chronologies, issues of the *Globe* and other relevant documents.

Below are some further relevant examples of the importance of Hadnot Point in the everyday life of Camp Lejeune.  In the article below from 1967, it is described how wives from all over base gathered for an orientation, with reference to presentations at the Camp Theatre and a reception at the Marston Pavilion:

---

[13] The *Globe*, 2 May 1969.

# 500 Wives Entertained At Orientation Program

More than 500 military wives attended the Wives Orientation Program held here July 27. The first program, held in March for enlisted wives, met with such popularity that the Marine Corps Base sponsored a second program for all military wives -- officer and enlisted, Navy and Marine -- whose husbands are stationed here.

The purpose of the program was to familiarize wives with military living at Camp Lejeune and in the surrounding community.

Chaplain Frank R. Morton,

Base Protestant Chaplain, opened the program at 9 a.m. with an invocation. Following an introduction by Base Sergeant Major J.C. Palma and a welcome address by Major General Joseph O. Butcher, Commanding General, Marine Corps Base, presentations were given by representatives of various base organizations.

Fourteen presentations, augmented with picture slides, information pamphlets and other visual aids, explained services, recreational facilities and assistance programs available at

Camp Lejeune. Mr. W.R. Page, Jacksonville Chamber of Commerce President, explained facilities available in Jacksonville and the surrounding area.

Comments overheard following the program indicated that the program was beneficial to wives new to military life, as well as those new to Camp



GUEST SPEAKER-- W. R. "Pete" Page, Jacksonville Chamber of Commerce President welcomed more than 500 military wives to this area and outlined facilities available in the city. He told of the churches, banks, schools, shopping centers and recrea-



WIVES PROGRAM--Wives of Camp Lejeune servicemen await busses at the recent Wives Orientation Program conducted here. The two part program included presentations at the Camp Theatre and a reception at Marston Pavilion.

**Base programing at Camp Theatre and Marston Pavilion, the *Globe*, 4 Aug. 1967.[14]**

The Camp Lejeune Base Theater is located in on the Main Service Road at C Street, in the Hadnot Point area of Camp Lejeune.[15] The Marston Pavilion is also located in the Hadnot Point area.[16] The fact that the event is for wives is significant since historically the predominance of the

---

[14] The *Globe*, 4 Aug. 1967, Vol. 23, No. 31, p. 4, available at https://www.dvidshub.net/publication/issues/61097.
[15] *See* official U.S. Marines map available at
https://www.mcieast.marines.mil/portals/33/documents/contracting/contracting_map.pdf.
[16] *See id.*

Case 7:23-cv-00897-RJ     Document 362-4     Filed 04/29/25     Page 15 of 51

service members was male and the wives would have included ones residing at married-Marine housing areas on-base including Tarawa Terrace.

Other historical articles reflect that such orientation programs or sessions for the wives were events that occurred repeatedly over time, as opposed to being one-off events that only occurred once in the 1950s to 80s time frame. *See, e.g.,* an article in a March 1967 issue of the *Globe*[17] describing an "Enlisted Wives Orientation Program" that was "fully supported by the Staff NCO, Midway Park and Tarawa Terrace Wives Club" and which would be held "in the Hadnot Point Staff NCO Club." The article describes that "[s]ome of the topics to be covered are Base housing, schools, Marine Corps Exchange services, Special Service Activities, Religious Programs, Legal Assistance, role of the Provost Marshal, Hospital care, Civil Service Employment, Navy Relief and the Red Cross." In addition, to make it easier for wives to attend, "free limited baby sitting service will be offered at the Midway Park and Tarawa Terrace Nurseries." Further, round trip transportation was being provided by "[b]ase busses" including with stops at Tarawa Terrace, Midway Park and Camp Geiger.

There were many other events at Hadnot Point that drew large groups over the years. The photo below from a 1973 issue of the *Globe* highlights the Marine Corps Birthday, in its caption noting that a mother held her child to shelter her from the cold that "more than 9,000 spectators" braved to attend ceremonies honoring the Corps 198th Anniversary:

---

[17] The *Globe*, 9 March 1967, Vol. 23, 10, p. 1, available at https://media-cdn.dvidshub.net/pubs/pdf_61119.pdf.



**HUDDLED AGAINST THE COLD** — A youngster huddles in her mother's arms against the damp cold that more than 9,000 spectators braved at Camp Lejeune to attend ceremonies honoring the Corps 198th Anniversary last Friday. The Corps' anniversary was celebrated by many Marines that night aboard Lejeune with formal balls and celebrations repeated the following night.

The *Globe*, 15 Nov. 1973, p. 5.

Dr. Brigham's contentions that I only focused on the Hadnot Point and Tarawa Terrace areas of the base and failed to account for other areas is incorrect. My December 7, 2024 report discusses other areas of the base such as New River (12/7/24 report, p. 7), Holcomb Boulevard (*id*. at p. 10), Knox Trailer Park, Midway Park, Paradise Point, and Berkeley Manor (*id*. at p. 24), etc. Having said that, there was no requirement that the subject matter of my report be organized in the manner Dr. Brigham prefers. I have included ample content in my reports discussing parameters of the base as a whole, both for everyday life and training. Further, to the extent there is a focus on Hadnot Point, it is an organic result of the very fact of Hadnot Point's centrality. Furthermore, the fact that the allegedly historically contaminated areas were centered

on Hadnot Point, Tarawa Terrace and Holcomb Boulevard makes appropriate a focus on those areas. Nonetheless my focus has not been myopic.

As I stated at page 2 of my report: "I am advised that the primary contaminated communities/systems per the ATSDR studies and publications with regard to the drinking water issues at Lejeune were three: the Hadnot Point/Mainside barracks region (Hadnot water system), the Tarawa Terrace area (Tarawa Terrace water system), and the Holcomb Boulevard area (Holcomb Boulevard water system). I reviewed other regions and areas of the base and referenced them below as may be relevant." (12/7/24 report, p. 2). Accordingly, I focused on the Hadnot, Tarawa and Holcomb areas of the base as those were the areas designated and found by the ATSDR agency as being the areas with contamination in the finished water. I included detail regarding historical facts as to those areas but also addressed topics that went beyond them even while including them such base infrastructure, the fire stations, the bus routes, the schools, the roads, and other aspects of the base. As noted, I also discussed the water buffaloes which traversed multiple areas; the evidence as per my prior reports is that they were in large part replenished and re-filled from standpipes located in the industrial park at Hadnot Point.

One important category of infrastructure facilities in Hadnot Point or using its water was the schools. Middle and high school facilities that were located at Hadnot Point or were nearby and drew from its water system served married families with children generally not merely those who lived in Hadnot Point. These schools were attended by numerous students over the years during the statutory period, as reflected by the citations to Command Chronologies and information on the schools from the *Globe* in my 12/7/24 report, pages 29-39.

Further, the available information reflects that the high school and junior high were centers of not only education, but also of other cultural and social activities that brought together parents, children and other members of the community for events on grounds of schools located in the Hadnot Point area (or dependent on its water). Historical records reflect that school students would go on excursions to other areas of the base that drew on the Hadnot Point water system, such as Naval Hospital (until 1983 when the hospital moved to a new facility[18]):

---

[18] See U.S. Marines website, "Welcome to Naval Medical Center Camp Lejeune," https://camp-lejeune.tricare.mil/About-Us.



'HURRAY' FOR HORTICULTURE — Students enrolled in the Horticulture Class at Lejeune High School receive practical education while planting tulips at the Naval Hospital. Under the guidance of M.C. Jackson, class instructor, the students have applied their theme "Learning by doing" in various projects throughout Camp Lejeune as well as school grounds.

**The *Globe*, 9 May 1974.**[19]

In the above 1974 captioned photo, it is described that students from Lejeune High School (located in the Hadnot Point area) went to plant flowers at the Naval Hospital (also located in the Hadnot Point area).

The article below taken from a 1970 issue of the *Globe* describes the homecoming celebration at the Camp Lejeune high school and emphasizes the centrality of the middle and high school to people on base:

---

[19] The *Globe*, 9 May 1974, Vol. 30, No. 13, p. 5, available at https://www.dvidshub.net/publication/issues/60302.



The *Globe*, 13 Nov. 1970.[20]

In the above-excerpted article, LCpl. Ken Plant wrote that "[d]espite the loss of the game, Lejeune High's Homecoming was an overwhelming success as a new queen was crowned, an exciting football game played, a very entertaining half time, and a swinging homecoming dance." Further, the author described how "[h]omecoming events came to an end Saturday night as the Camp Lejeune High School Auditorium rocked to the heavy sound of the 'Grapes of Wrath,' a local rock group in Jacksonville. The dance was a smash when the class queens and their escorts 'socked-it-to' a surprise filled pinata." Here, the vigorous and clear journalistic prose of the servicemember author is noted. I have found the *Camp Lejeune Globe* to be a reliable and accurate publication and it is apparent the writers sought to provide useful reporting and base news (just like towns across the country). The bottom half of the article is shown below:

---

[20] Vol. 26, No. 46, p. 1, available at https://media-cdn.dvidshub.net/pubs/pdf_60762.pdf.



By: LCpl. Ken Plant

Despite the loss of the game, Lejeune High's Homecoming was an overwhelming success as a new queen was crowned, an exciting football game played, a very entertaining half time, and a swinging homecoming dance.

Miss Claire Weinert was crowned the 1970 Lejeune High Homecoming Queen. Crowning the new queen was Debbie Ann Pollack, Homecoming Queen for 1968.

Half time activities were spurred on as Lejeune led Winnet High, visiting team from Georgetown, 6-0. Steve Myslinski

ran 37 yards to make the Devil Pups first score of the game, bringing about the half time to which an exciting half hour of entertainment was provided by the Devil Pups Drill Team and the Lejeune High Marching Band.

Homecoming events came to an end Saturday night as the Camp Lejeune High School Auditorium rocked to the heavy sound of the "Grapes of Wrath," a local rock group in Jacksonville. The dance was a smash when the class queens and their escorts "socked-it-to" a surprise filled pinata.

THE CORONATION . . .

A KISS . . .

HOMECOMING QUEEN AND ESCORT — Pretty Miss Claire Weinert is being accompanied by her escort, Rick Montera, off the field after her coronation as Lejeune's 1970 Homecoming Queen.

The *Globe*, 13 Nov. 1970.[21]

Other historical *Globe* articles reinforce a continuity of many of the base activities and periodic traditional events, even as in other respects, over time at the base there was change. There was continuity in terms of the base high school for purposes of events like sports. Compare the article above from 1970 regarding the football game at the high school to the article below from nine years earlier, 1961, regarding a high school football game:

---

[21] Vol. 26, No. 46, p. 1, available at https://media-cdn.dvidshub.net/pubs/pdf_60762.pdf.



THE CAMP LEJEUNE GLOBE — THURSDAY, NOVEMBER 9, 1961

# Devilpups Go Against Ayden In State Playoff Tilt Saturday

Two undefeated high school football teams—one with an explosive offense and the other with a very stingy defense—will lock horns at Kinston Saturday night to see who takes the first step toward a regional football title. Camp Lejeune High's Devilpups, who have averaged almost 30 points per game this season, will try to extend their first undefeated season in history to 10 straight against Ayden, a team that has given up only four touchdowns all season in winning 10 games. The only two mutual opponents testify to an even contest between Ayden and Camp Lejeune. Ayden knocked off Have-

lock in their season opener, 6-0, and a week later the Devilpups racked the same team, 26-19; Lejeune then forced a come-from-behind win over Beaufort by a 14-7 score, and Ay-

den edged the Seadogs by the same margin the following week, 7-0.

**Strong Offense**

Lejeune's total offense rolled up 2,327 yards this season to 1__ for their opponents, but 636 of their opponents' yards came through the air. The Devilpups appear to have solved that problem as they wiped out the Quantico eleven in their last game, 35-0, by picking off six enemy aerials.

Coach Tom McGhee has a tough all-around backfield in quarterbacks Jim Barrett, the junior with the sling-shot arm, and Bob Richards, who runs a devastating ground game; halfback speedsters Dick Dube, Rick Lowder, Ned Paulson, and Al Kyle; and talented fullback Randy Fridley.

**Pruiett Leads Defense**

The Devilpups' defense is built around linemen Ron Pruiett and Dick Batdorff and defensive backs Lowder and Dube.

"Pruiett carried this club a long way through the early part of the season, before some of our other boys developed. He's a big, strong boy and I think he's an excellent college prospect," Coach Tom McGhee said.

Pruiett at 6'1", 205, anchors a line which includes Ends Dan Paetow, 6'4", 205, and Chuck Pelon, 6', 165, Pruiett and Bob Jaffe, 6', 200, at tackles, Dick Batdorff, 5'9", 165, and Charles Churchill, 5'10", 165, at the guards and the lightest man on the team, Gary Ward, 5'8", 135, at center.

TD TIME—Fullback John Parrinello (40) follows his blockers in for the Marines' first touchdown Sunday at Ft. Lee. Leading the way on this play, which covered 27 yards, are tackle Tom Montgomery (67), guard Norm Hafler (64) and end Lee Russ (80). (Photo by Pvt. P. W. Freeland, MCB Photo Lab)

**The *Globe*, 9 Nov. 1961, p. 14.**

Indeed, such traditions are mainstays throughout normal town environments in our nation and the same also existed at Camp Lejeune. Each year, during football season, the Camp Lejeune Devilpups would play. At the base there was only one high school: the one in the area served by the Hadnot Point water system during the 1950s onward until when the Holcomb Boulevard water system opened in 1972.[22] Likewise, each season, each year, to each game, parents attended, both to see their children and to socialize with each other and be entertained. Other siblings of children on the teams would come, for the same reasons from all over the base. There would be associated events such as post-game homecoming dances. The historical dominance of males aboard the base

---

[22] *See* The Few the Proud website, at https://tftptf.com/images/5.pdf (Holcomb water plant built in 1972).

Case 7:23-cv-00897-RJ    Document 362-4    Filed 04/29/25    Page 22 of 51

also would have encouraged sports activities as young men traditionally enjoy engaging various sports as well as watching sports matches including basketball, baseball, wrestling, and others in which the high schoolers also participated.

Sports and events also occurred at the schools including at Tarawa Terrace, something I outlined in my original report for both schools and summer programs. It is important to note that Tarawa was such a large residential community that it had its own primary school, which was connected as well to its water system by my understanding. Below is an image of the flag raising ceremony occurring at the Tarawa Terrace 1 Elementary School, located in the Tarawa Terrace area which according to the ATSDR was contaminated during pertinent times:



**The *Globe*, 2 May 1969.**

In the photo, the figure of a teacher in the background reminds us that it was not just children who spent time at the schools at Tarawa Terrace or at Hadnot Point, but also teachers, as well as other staff, maintenance workers, and so forth.

In focusing on the lesser facilities available in the areas of the base outside of Hadnot Point, Dr. Brigham fails to provide much detail for countering our points about the centrality of Hadnot Point. He offers no statistical or numerical information on the use of the facilities outside of Hadnot Point, such as stores, recreational and cultural facilities. He fails to provide data as to how many individuals used the outlying swimming pools, PXs, or clubs, although it is clear from documents that the best facilities were at Hadnot Point. Meanwhile, the documentary records I have cited in my prior reports in this matter and herewith reflect that as a practical matter, it is clear that people from all over the base, including the soldiers and their families, often frequented Hadnot Point.

Mr. Brigham's preoccupation with the outlying areas distracts from the full picture of the historical facts. In this regard, the perspective is analogous to that of other government actors who

have been criticized – including by academic historians – for seeking to present limited and selective information in connection with contamination events and environmental disasters such as nuclear test release radiation exposures, Agent Orange characteristics and exposures, and as to burn pits. *See, e.g.*, Jacob Hamblin and Linda Richards, *Making the Unseen Visible: Science and the Contest Histories of Radiation Exposure*, Ed Martini, *Agent Orange: History, Science, and the Politics of Uncertainty*, and Joseph Hickman, *The Burn Pits: The Poisoning of America's Soldiers*.[23] These works reflect that in other analogous incidents, on one or more occasions there was reported by historians to be evidence that government officials or actors and/or interested private companies at first denied a relevant chemical exposure connection or after one was discovered, sought to delay investigations and obstruct access to data and information.

## IV.    <u>Oral Histories</u>.

Dr. Brigham and Dr. Kelman spend much time focusing on the oral history information that I cited. They seek to critique my work based on how I only did a limited number of interviews, and I did not record and archive each interaction or communication. First, if one reviews the oral history-related citations in my reports, most are documented and with those documents having been produced. *See* my 12/7/24 report, reliance list item nos. 128 (Allan Howard declaration, 11/26/24); 129 (Allan Howard deposition, 2/16/24); 130 (Gary McElhiney declaration, 11/25/24); 131 (Gary McElhiney deposition, 4/11/24); 133 (Jacqueline Tukes deposition, 4/11/24); 134 (Jacqueline Tukes declaration, 11/26/24); 135 (Benjamin Urquhart deposition, 11/26/24); 136 (Anthony Charles Zinni deposition, 5/28/24); 28 (Terry Dyer deposition, 4/10/24); 31 (Zinni deposition, *supra*); 34 (William Walters deposition, 5/20/24); and 35 (James Claude Branham deposition, 10/16/24). There should not be an issue of the reliability of any of these source materials for purposes of use and consideration by an expert opining or explaining as to matters regarding the relevant history of Camp Lejeune. Written witness testimony in court proceedings is a historically accepted source of content which can be used and cited in historical writings and historical analyses.

Of the reliance items that were citations to "oral history" per se, these are cited in the reliance list for my 12/7/24 report at item number 148 (described as Jerry Ensminger oral history); and the reliance list for my 1/13/25 report, at item nos. 2 (Ensminger oral history/email); and 3 (Mike Partain oral history). To rebut defendant's experts on this newly raised issue, I have conducted an additional interview of Partain and Ensminger, and we recorded it as a formal oral history session. The content of the recorded oral history corroborates and corresponds to the prior information I had received from them that I had not formally recorded and saved by audio or video due to time constraints. In addition, to further refute the critique by Defendant's historians, I submit a declaration from Mr. Partain, who while not a retained expert in this matter, does have specialized historian credentials, knowledge, and experience particularly with regard to Camp Lejeune water issues. Mr. Partain is at the same time, a named Plaintiff in this matter but this does not negate his status as a historian and extensive work on the matter for many years. With regard to Mr. Ensminger, he has been a primary source for Mr. Partain for historical facts, and is a historian

---

[23] Jacob Hamblin and Linda Richards, eds., *Making the Unseen Visible: Science and the Contested Histories of Radiation Exposure* (Corvallis: Oregon State University Press, 2023); Ed Martini, *Agent Orange: History, Science, and the Politics of Uncertainty* (Amherst: University of Massachusetts Press, 2012); Joseph Hickman, *The Burn Pits: The Poisoning of America's Soldiers* (New York: Hot Books, 2016).

himself, due to his own longstanding involvement in efforts to develop the historical facts of the base for the public record. (*See* Partain declaration dated March 17, 2025).

As to the oral history by Zoom of Allan Howard that my prior report cited, it should be noted that I also cited written testimony of Mr. Howard. *See* my 12/7/24 report, compare reliance list item no. 127 (Allan Howard, oral history by Zoom, 8/30/24); to nos. 128 (Allan Howard declaration, 11/26/24 and 129 (Allan Howard deposition, 2/16/24).

Defendant's experts question the use of the depositions and court testimony as a form of oral history, arguing that such sources are unreliable. In fact, oral history information can be documented in a variety of forms. Source material for a historian's analysis runs the gamut from oral history fragments embedded in the form of persons quoted or paraphrased in old *Globe* articles, to documented "oral history" written transcripts available to the public;[24] to testimony on history matters in the form of oral or written congressional hearings and proceedings;[25] to courtroom testimony, to recorded "oral history" interviews which are then archived in some manner. Further, testimony in a court proceeding, given that it is under oath and subject to cross-examination, can be very reliable and useful. I believe that all such sources and materials can be useful especially when corroborated by other research which I have done, wherein I have cited to and incorporated a variety of facts gleaned from archive records, government documents, newspapers, and magazines.

The information I obtained from the limited number of interviews I performed has helped supplement other more dry and technical materials by giving them a human dimension. Also, the statements by these living oral histories reflect some of the prospective testimony that could be offered at trial. My understanding is that as of the date of this report no trials have occurred. Mr. Partain and Mr. Ensminger (for his deceased daughter's estate) are both named Plaintiffs as are other sources I have cited such as Ms. Tukes and Mr. Howard. Accordingly, their testimony including by written declarations or deposition transcripts may be relevant and useful. If possible, and if the Court allowed, I would want to further supplement my opinions based upon Plaintiff or witness testimony occurring in the future.

In summary, I believe that it is important to consider a variety of sources of information when seeking to understand, from a historical perspective, the many facets of the relevant Camp Lejeune topics. The information I have located, researched and cited is hoped to assist for the purposes of assessing the nature of the activities of the Marines, wives, children and civilians at the base during the pertinent times. The historical summary and reliance material items may be of use at trial. For example, if a given Plaintiff can recall that they went to the high school, it may be relevant to have the fact historically confirmed that during pertinent times, the sole high school on base was served by Hadnot Point water for many years. I have cited sources that shed light on

---

[24] *See, e.g.,* Oral Memoirs of Michael Partain, interview conducted by Amanda Hill, March 6, 2014, for the Community Veterans History Project and the Lone Sailor Memorial Project, University of Central Florida, available online at https://richesmi.cah.ucf.edu/omeka/items/show/5085.

[25] *See, e.g.*, U.S. Senate Committee on the Judiciary, The Freedom of Information Act: Safeguarding Critical Infrastructure Information and the Public's Right to Know, Full Committee Hearing, March 13, 2012, available at https://www.judiciary.senate.gov/committee-activity/hearings/the-freedom-of-information-act-safeguarding-critical-infrastructure-information-and-the-publics-right-to-know/ including testimony by Jerry Ensminger, Retired Marine Sergeant, Camp Lejeune Marine Base.

other subjects revolving around Hadnot Point such as the use of the year-round indoor swimming pools, the religious activities, and the shopping and social opportunities. Historical materials document the administrative and mechanical jobs at Hadnot Point and attractions such as the popular bowling alley and various officer and enlisted clubs. By exploring a variety of materials, I have sought to drill down and report on the human dimensions of life at the base of relevance. It is natural that such an effort includes not merely reviewing archived materials and records but also communicating with people who lived there during the statutory period and incorporating facts from their first-person accounts.

As for the methodology of oral history, I am a very experienced oral historian, having used the methodology for nearly three decades of work. I take steps to ensure my method is reliable. I do not use witness reports in a vacuum, but rather, as I did here, I also search out other historical sources with which to compare the input from living individuals with whom I can communicate and who have first-person knowledge. I constantly test for bias and mistakes through the use of multiple primary sources for reference and comparison. I have done oral history work before including with prominent figures such as Vice President Al Gore, Senator Eugene McCarthy, Senator George McGovern, Bill Moyers, Joseph Califano, as well as many veterans and their families. Over the years, moreover, I have worked with many people in the field, and I am a close friend and colleague the eminent Don Ritchie, whom Dr. Kelman cited. (Kelman report p. 10). I have collaborated with many other historians and scholars who have used oral histories over the years, including those associated with the public history program at Arizona State where I taught for nearly twenty-five years as well as during my time as director of the LBJ Presidential Library.

In terms of oral histories or interviews, Dr. Brigham does not recite having himself or his staff have any communications or interviews with any surviving Camp Lejeune eyewitnesses. There is no citation to material reflecting that Dr. Brigham or Dr. Kelman took any oral histories from any former service member or civilian residents on the base who are still surviving. This includes no oral histories or other first-person accounts with any individuals who drank or may have been exposed to the contaminated water from the 1950s through the 1980s. Nor does it appear that either defense expert was provided by the Defendant with any oral histories that are available in the public record regarding Camp Lejeune and that could have been supplied to them. The lack of use of transcripts or other eyewitness/Lejeune resident oral history materials is especially puzzling since Camp Lejeune-related oral history transcripts appear on the official U.S. Marines website. This fact reflects that the Marines must believe oral history information does have some use. *See, e.g.,* transcript of oral history interview of Sgt. Maj. Ihor Sywanyk, by L.J. Kimball, dated 29 July 1999, at pp. 10 (went to Camp Lejeune in February of 1964), 21 (back to Lejeune again in 1980), 25 (again to Lejeune in 1984), 36 (describes changes to base area over time);[26] transcript of oral history interview of Sgt. Maj. Mary Sabourin, by L.J. Kimball, 26 July 1999, at pp. 6 (first at Lejeune in 1945, worked at the main PX), 9 ("Then I was assigned to the PX [Post Exchange] and the PX system. At first, they thought, well, maybe we'll send you over to our club. See, in the women's area, that, I don't know whether it's the library, or, sort of that nicer building that's not a barracks, that was our club [Building 62]. The women's club, that only women could go to. Well, men could come, but they had to have a woman escort them into the club. So, about a week I worked in the club was, you know, then we had beer and all the rest. And then I went over

---

[26] Available at https://www.lejeune.marines.mil/Portals/27/Documents/EMD/Cultural-Resources/Oral%20History%20Project/Sywanyk.pdf.

to the main PX. Do you know where the Chaplain's offices are? The little low building? That was our main PX [Building 37].")，20 ("I think I was in Jacksonville once and I can't remember anything there. All I can remember from Camp Lejeune into Jacksonville, there was nothing on the highway. It seems to me I remember a sort of a big tent that was probably a beer joint. You know, and that's all that was there…. There was nothing…. I guess I was just satisfied to stay on the base."), 28 (went back to Lejeune in 1953 to go to Leadership School in the women's area not Camp Geiger).[27] *See also* oral history interview of MSgt. Bruce and Virginia Morris, by L.J. Kimball, 22 Sept. 1999, pp. 41 (went to Lejeune in 1949, worked at the "Sales Commissary"), 42 (the Sales Commissary was "[s]ame as the Commissary now," and you could buy coffee and cigarettes), 43 (old commissary was located across the street from new one), 65-66 (back to Lejeune in 1956 or 1958), 73 (describing how during four year tour at Camp Lejeune from 1959 to 1963 they initially lived in a trailer, then got quarters at Tarawa Terrace; at the time those who lived at Tarawa Terrace included "staff NCOs" and officers who lived at "the edges" in "the duplexes around Tarawa I and Tarawa II," there were also civilians who worked in the schools, and "Warrant Officers and I think Second Lieutenants lived in duplexes around the edges of Tarawa Terrace."), 77 (at that time they had the same Commissary/PX).[28] And see transcript of interview of Sgt. Maj. Nathaniel James, USMC (Retired), by L.J. Kimball, 20 Aug. 1999, pp. 9 (came to Lejeune in 1961), 11 (in 1963, returned to Lejeune and was at area of Montford Point, later known as Camp Johnson, went to Service Support School at Camp Geiger), 21 (back to Lejeune in 1971, was a First Sergeant in the H&S Battalion, aka DSSG, which later was called FSSG), 37 (as a Gunnery Sergeant he lived at Berkley Manor community).[29] *See also* transcript of interview of Gy. Sgt. Margaret (Maggie) Flanagan, by L.J. Kimball, 29 July 1999, pp. 50-51 (was at Lejeune including in 1960 as military spouse/civilian and worked as a civilian at Headquarters Marine Corps, until retired in 1972), 65-68 (also graduated from NCO Leadership School, Class #10 Camp Lejeune, 11 December 1953; as to going to Jacksonville, her answer was "[n]ot really," because "[w]e didn't have cars").[30]

The ability of the Government to compile oral history transcripts for other purposes, such as in the above examples found on the Marine Corps website, raises the question of why the Government did not authorize its expert witness historians to do so here.

Dr. Brigham does state that he "participated in a telephone call with Mr. John Lyles, Chief Archivist of the Marine Corps History center at Quantico, VA." Brigham 2/7/25 report, p. 5. However, his report does not list any reliance documents in that regard nor any recordings, thereby reflecting how not all oral communications with sources of information used in a historian expert report may be documented by a recording or a transcript.

I agree oral histories can have a bias (as do almost all sources) and some limitations if not effectively vetted and tested. Being aware makes it where you recognize the shortcomings and

---

[27] Available at https://www.lejeune.marines.mil/Portals/27/Documents/EMD/Cultural-Resources/Oral%20History%20Project/Sabourin.pdf.

[28] Available at https://www.lejeune.marines.mil/Portals/27/Documents/EMD/Cultural-Resources/Oral%20History%20Project/Morris.pdf.

[29] Available at https://www.lejeune.marines.mil/Portals/27/Documents/EMD/Cultural-Resources/Oral%20History%20Project/James.pdf.

[30] Available at https://www.lejeune.marines.mil/Portals/27/Documents/EMD/Cultural-Resources/Oral%20History%20Project/Flanagan.pdf.

then find other sources to corroborate them. Would I have liked to have more time to do more, of course, but the Court unlike my academic colleagues has strict deadlines and also there are practical limits on what can be done. But I would be more than willing to work with Dr. Brigham, Dr. Kelman, or other historians on the matter should the Court find it useful to obtain more oral history information, including not only from individuals who resided or work at Hadnot Point or Tarawa Terrace but also who resided or worked in the outlying areas. From a perspective of data compilation and historical accuracy, having a larger sample would be optimal and would open up avenues to further developing the story of life at Camp Lejeune during the statutory period, and linking it to other data pertaining to the water contamination and the related and asserted health issues including latent disease issues.

I believe the ultimate efforts to diminish or dismiss oral histories made by the defense experts herein allows the inference that the Defendant knows, or predicts, that oral history evidence may not correspond with their desired framing. Dr. Brigham had every opportunity to conduct his own and started his research earlier than I started mine. Yet instead of pursuing oral history interviews or research as a tool in his methodology, he has avoided using the tool and dismisses it as having bias or limited scope. The same might be said for Dr. Kelman, a respected 19th Century historian who obviously had no living people around to conduct interviews with when he published on events such as the Civil War or an Indian massacre in 1864, although he did conduct interviews of people living today about their once-removed memories of Sand Creek. Instead of dismissing the opportunity to engage in generating or compiling oral history materials here, Dr. Brigham and his research assistants could have done their own work on the matter.

In his report, Dr. Kelman laments that there is not a full transcript of the oral history for Allan Howard on 30 August 2024. (Kelman 2/7/25 report p. 10). However, what I documented and provided were adequate notes reflecting my short interview. The main point of the oral history was to confirm what he had said in his *fully transcribed deposition* and fleshing out a few details such as whether he participated in athletics. The full text of the notes is as follows:

Oral History of Alan Howard, 30 August 2024, Via Zoom

1. When asked if played any sports while at Camp Lejeune, he responded: He did no intramural or organized sports. However, he started running on his own like the growing sports craze of the late 1970s. He would run to stay in shape and be ready for the long humps and PT. Ultimately, he competed in a half marathon while in training.

2. When asked if there were any manuals or written instructions provided regarding the use of water, he responded there were no instructions handed out and rarely any directions. Squad leaders paid attention to the issue and passed along the need to stay hydrated. He reemphasized that he always had additional canteens of water just in case others needed more water as some did not plan well.

3. When asked what other forms of water management beyond being equipped with canteens were there, he responded that medics and leaders distributed salt tablets. Unfortunately, he noted that this made you even more thirsty.

4. When asked do you remember any other designations of your unit, he responded he always was within the company distributed as a weapons platoon where he carried a 27.5 pound machine gun and on marches a 60 pound rut. It was a hard and tiring duty for someone barely weighing 160 pounds, especially during the hot months when he lost a lot of weight during heavy training.

5. When asked to please describe PT training, he noted that there were all kinds of exercises involving body weight resistance exercises such as pull-ups, sit ups, push ups, use the weapons at resistance that included aerobic and anaerobic exertion. If in shorts, tank tops, and running shoes, they often did 6-7 mile runs. At other times, they carried their gear and dressed in camo gears and marched 4 miles, but sometimes up to 15 miles depending on the day. They also ran obstacle courses, climb ropes, and other physical training. Mr. Howard emphasized it drove the instructors and leaders crazy to see Marines sitting around.

The water for these exercises were spread at the beginning and end which determined consumption as they would get water from big jugs or their canteens filled with water from their own bays or on maneuvers the water buffaloes.

6. When asked what did you drink if not at meals or out of canteens, he noted: Almost always drank water, never soda. He did like the sugar infused Kool Aid, but no caffeine and only the occasional beer. But, mostly he drank water at meals and when in the field. Rarely anything else.

*See* my 12/7/24 report, reliance list item 127.

It was a good representation of what Mr. Howard said, even without quotes around the sentences or a transcribed transcript. Dr. Kelman in this regard never conducted any research on the topic of Camp Lejeune on his own to seek to refute the content from Mr. Howard, nor does he acknowledge that Howard is consistent across his interview, declaration and deposition, each of which provides further context and validation/corroboration. *See* reliance list from my 12/7/24 report, items 127 (Howard, Allan. Oral History by author via Zoom, 30 Aug. 2024) 128 (Declaration of Allan Howard, In re: Camp Lejeune Water Litig., 26 Nov. 2024) and 129 (Video Deposition of Allan Wayne Howard, Dayton, Ohio, 16 Feb. 2024).

Dr. Kelman and Dr. Brigham critique that I did not have a large number of oral histories. However, as noted, my time and resources were limited. And, my methodology also used other tools, including the many other categories of items found in my reliance lists. As those show, I was not working in a vacuum and for purposes of preparing my reports I have consulted numerous other sources. Further, some of those other sources in fact contained within them their own oral history materials including citations and references to depositions, statements at congressional hearings, content from the 2011 documentary, "Semper Fi: Always Faithful," and content from Mike Magner's book, *A Trust Betrayed*. These materials, credible and reliable in themselves, reflect numerous other witness contacts and interviews from which content was drawn.

Obviously, with unlimited time and resources, interviews can be conducted in larger numbers and transcribed. I have done this often for purposes of my published books and to this day have retained quite a few on tape or other formats. When I work on a book project it can take many years. My note taking is something that I have done at other times and based on my familiarity with the work habits and methods of other authors is comparable. Further, as to all of my books, essays, and articles, never once to my knowledge has anyone questioned my techniques or the outcomes of the oral histories I have conducted.

In addition, Dr. Kelman contends that "Dr. Longley's use of the interview with Mr. Ensminger points to another methodological shortcoming in his report: a failure to critically evaluate his sources." (Kelman 2/7/25 report, at p. 11). This is untrue and how does he even know? Was he part of the process? Was he with me when I reviewed hundreds of documents and thousands of pages of materials? I am a professional practicing historian and always test the information, no matter what type of primary source. With regard to Ensminger, his statements regarding pertinent facts as to the base are set in a context of prior congressional hearing testimony and statements that Ensminger has provided, including but not limited to:

    a. Testimony of Ensminger on file with U.S. Senate.[31]

    b. Testimony of Ensminger on file with U.S. Senate, dated June 8, 2011.[32]

    c. Testimony of Ensminger on file with the U.S. House of Representatives.[33]

    d. Oral statement of Ensminger, written prepared statement, and questioning responses, at pages 17-29, 31-43, in Poisoned Patriots: Contaminated Drinking Water at Camp Lejeune, Hearing before the Subcommittee on Oversight and Investigations of the Committee on Energy and Commerce, U.S. House of Representatives, June 12, 2007.[34]

    e. Statements by Ensminger found in US DHHS ATSDR meetings of the Camp Lejeune Community Assistance Panel (CAP) meetings, e.g., Dec. 6, 2007, transcribed in verbatim form.[35]

    f. Statement of Ensminger and Partain regarding EPA ban on TCE, Dec. 9, 2024.[36]

I checked Ensminger's statements against these and other such as those in the documentary, "Semper Fi." I understand and always critique oral histories as well as all sources for bias, truthfulness, and context, and then corroborate them as much as possible. Once more, I have been employing this methodology for over 30 years in the course of researching and writing my books,

---

[31] https://www.veterans.senate.gov/services/files/B995DDE1-E066-42A4-BB1B-785669D6537E.

[32] https://www.veterans.senate.gov/services/files/4A964881-45E3-41F5-B057-02DD324527D2.

[33] https://republicans-science.house.gov/_cache/files/6/b/6b43caeb-0acd-4d78-b745-3c3e625cf2d1/432B71F13EA7D7AA6B09FFA2BDB7741E.061208-ensminger.pdf.

[34] https://www.govinfo.gov/content/pkg/CHRG-110hhrg37793/pdf/CHRG-110hhrg37793.pdf

[35] https://www.atsdr.cdc.gov/camp-lejeune/media/pdfs/CAPtranscript12_07.pdf.

[36] https://www.ewg.org/news-insights/statement/2024/12/statement-jerry-ensminger-and-mike-partain-final-epa-tce-ban.

essays, and articles. I have read reviews of my published works by others who have scholarly qualifications and not once have I been aware of a reviewer questioning my methods or conclusions related to any of the oral histories included in my work.

Dr. Kelman contends that in order to be used as a reference or reliance source for an expert historian report in litigation, oral history information must be "archived appropriately." (Kelman 2/7/25 report p. 1). This is not correct. There is no federal rule or other legal obligation that oral history information must somehow be placed in a library in order to be useful or usable. The same is also true of historical records. While desired, many archives do not have the space or other resources to store all the information, especially those not transcribed. People often, myself included, keep the oral histories with their personal archives. In thirty years, I have never once had some request to review my oral histories, showing this is a red herring regarding efforts to question the oral histories used in the report.

Dr. Kelman also contends that "[o]ral histories must meet a higher methodological standard than interviews or depositions." (Kelman 2/7/25 report, p. 1). I disagree. For example, depositions are a form of witness testimony under oath (oral histories are not). They are regularly admitted in court and at trials under the rules of evidence. It is inaccurate to suggest that depositions cannot function as a reliable source of historical evidence. In fact, in court cases, experts in a variety of fields commonly cite to and rely on deposition testimony as well as other forms of testimony under oath, i.e., trial testimony transcripts, sworn declarations or sworn affidavits. Ironically, Kelman does not have any problem in citing court documents in his own work. In his book, *A River and Its City: The Nature of Landscape In New Orleans*, his bibliography has citations for 25 different court cases where he uses testimony and court proceedings in his research.[37]

Dr. Brigham echoes Dr. Kelman stating, "I do not consider deposition testimony or declarations to be oral histories." (Brigham 2/7/25 report p. 5). First, this criticism is limited by the fact that where it serves his cause, Dr. Brigham himself cites deposition testimony. (Brigham 2/7/25 report, pp. 2 (citing Zinni, McElhiney, Urquhart testimony), 33-35 (same); and see Brigham 12/9/24 report, pp. 26 (citing Melts deposition), 28 n. 84 (same)). Second, the fact remains that depositions and declarations are perfectly acceptable materials which are often cited by many types of non-historian experts in their reports in cases. Why, then, would declarations and depositions and other testimony be set aside as a source to consider for a historian? Certainly, deposition testimony and sworn statements can provide valuable and relevant information for a historian and can be cited and relied on by historians in a wide variety of contexts.

Dr. Brigham writes in his report that "Dr. Longley relies exclusively on declarations and depositions, which were taken or written decades after the training, for his discussion of what occurred during such training." (Brigham 2/7/25 report, p. 14). He earlier stated: "These depositions were taken in 2024, and the declarations were written in 2024, some 40 years after these individuals were at Camp Lejeune. Without additional source material, Dr. Longley cannot make assertions about what transpired at other times during the 34-year statutory period to corroborate his assertions regarding water use." (Brigham 2/7/25 report, p. 13). Implicit in such statements is also the idea that I did not take into consideration how people's memory might have

---

[37] Ari Kelman, *A River and Its City: The Nature of Landscape In New Orleans* (Berkeley: University of California Press, 2003), 255.

been affected or that there was bias. But, I would also point out that many memories remain very strong and can be validated in many different ways, which I have often done.

To make the point, I have reviewed Dr. Kelman's work, *A Misplaced Massacre*, whose title I noted he developed because his original thoughts on the location of the massacre were wrong which highlights the value of working on a project for many years (it appears this project took at least a decade or more from start to finish). The oral histories in the book coming in the form of transcripts or media of interviews of living persons were taken decades after the massacre itself, one that occurred on November 29, 1864. No massacre participants, victims or eyewitnesses remained alive at the time when Dr. Kelman researched his book published in 2013. Dr. Kelman's book itself cites to individuals who themselves had accumulated substantial historical knowledge about the massacre, such as Alexa Roberts, former National Parks Superintendent of the Sand Creek Massacre Site and now Board Chair of the Sand Creek Massacre Foundation.[38] In his book, he notes that his interview with Glenn Morrison involved taking notes, not reliance on a recording.[39] This would appear identical to the less formal recording or documenting he criticizes in my reports. With regard to interviews and conversations he conducted with his sources, at no point in his book is it clear about how he ruled out the issues of bias or memory flaws.

I agree with the statement that with regard to the information in declarations and depositions, "[a]s Dr. Kelman discusses, such sources <u>could</u> be biased." (Brigham 2/7/25 report, p. 14, emphasis added). But that does not *per se* exclude those as sources. Rather, because I recognize this potential for bias, I make sure to test the findings of the oral histories against other primary sources. In this regard, obtaining and using oral history as a historian does not happen in a vacuum, but rather occurs as part of a process involving spending significant time exploring the assertions against the numerous other documents that I have examined over the course of my research on the topic.

While the scope of Dr. Kelman's critique extends primarily only to the topic of oral histories, the fact is that the vast majority of the sources used for my original expert report came not from oral histories but from a myriad of other historical documentary and other sources, all of which are credible and reliable. In fact, of the 198 total reliance list identified citation items in the reliance list, only 10 of them (Items 127-131, 133-136, 148) – about 5% -- reflect an oral history interview, declaration, or deposition testimony. And of those ten items, only two (items 127, 148) were specifically oral history entries. Thus, even if one were to accept the conclusions of Kelman, which I reject fully, the vast majority of my report and opinions remains unscathed.

## V.      Diving into the Minutiae and the Search for the Minor Mistakes.

When people struggle to critique the substance of an argument in my classes or my profession, they often digress to the minutiae and minor mistakes to try to distract people from their failure. That is true here. First, what Dr. Brigham and Dr. Kelman fail to understand with this

---

[38] *See* website article entitled, "Former National Park Superintendent: 'Striking Similarities' Between Thacker Pass and Sand Creek Massacre Sites, 12 Sept. 2022, https://www.protectthackerpass.org/former-national-park-superintendent-striking-similarities-between-thacker-pass-and-sand-creek-massacre-sites/.

[39] Ari Kelman, *A Misplaced Massacre: Struggling Over the Memory of Sand Creek* (Cambridge: Harvard University Press, 2013), p. 301.

exercise is that we are not writing an article for the *American Historical Review* or the *Journal of Military History*, and certainly not a book. The work was done over months, not years as often the case with many research projects. One of my projects, *The Morenci Marines*, which Dr. Kelman noted, took thirteen years to research and write from start to finish, during a process which included gathering large quantities of data, including numerous oral histories in traditional forms of collection. This prize-winning book showcased my research abilities, but it only had loose deadlines for completion, and so I had the luxury of taking extra time to refine its content. With *The Morenci Marines,* I wrote a 300-plus page book that became the basis of a PBS documentary, "On Two Fronts."[40]

By contrast, for purposes of this case, I received five months for research and about six weeks to write the long narrative (approximately 110 double spaced pages) without the support of research assistants. I did not just call John Lyles at the Marine Corps Archive (as Dr. Brigham did), but I spent four days there doing research from the finding aids that Lyles and his staff compiled for me about life at Camp Lejeune. I went document by document, reviewing a large quantity of materials and taking notes when relevant (not all research reviewed makes it to the narrative but often still informs it), reviewing everything possible and assimilating the materials into my overall knowledge base. Thus, I could have thrown a host of additional materials into the footnotes and the reliance list with more time, but that is the point of how the historian's methodology is accretive and accumulative. The methodology used as I researched and prepared the report of December 7, 2024 and the rebuttal of January 13, 2025 was proper.

Both Dr. Brigham and Dr. Kelman state that they want historical standards of publication followed. If that is the norm, then so would be asking people to review books or articles for historical journals being considered experts in their particular fields. Kelman would not want his book on the Sand Creek Massacre of 1864 reviewed by someone who studies the German military during World War II or a colonial American historian because those people have not read the exhaustive bibliography or done primary research in the field over years. Dr. Brigham apparently has not been a practicing professional in the field in over 30 years and focused on rural electrification with limited publications. Dr. Kelman is mainly known for his work as a mid-19th Century historian who has written on a massacre of Native Americans during the civil war and a history of the environment of New Orleans, primarily in the 19th Century. It is unlikely that a major historical journal such as the *Journal of American History* (the flagship journal of American history) or *Journal of Military History* would have asked either to review a publication related to a topic on military history focused on the Marines in the period after 1941. It is more likely such a journal would reach out to people like Heather Venable, Allan Millett, John Curatola, or Aaron O'Connell, all experts on the historical topic of the Marine Corps in the 20th Century.

Some critiques highlight the lack of experience with the topic of military history. On page 13 of his report, Dr. Kelman discusses my noting that days for Marines could begin at 6 a.m. with "a regimen of calisthenics" and that Marines "often performed hours of resistance exercises with body weight." (Kelman 2/7/25 report, p. 13). He claims that these were "fact that are not common knowledge." That reflects his lack of experience with the information under review. Anyone who

---

[40] *See* transcript of PBS segment, "On Two Fronts: Latinos and Vietnam," Arizona PBS, Sept. 17, 2015, available at https://azpbs.org/horizonte/2015/09/on-two-fronts-latinos-and-vietnam/ (describing relation between the book and the documentary projects).

served or has studied the military, especially the Marine Corps, knows about the seriousness and extensiveness of fitness activities and training in both boot camp and in contexts of advanced infantry training as well as subsequent training when units focus on staying fit. There are so many sources that make this common knowledge for anyone that has spent any time studying the subject. *See generally* E.B. Sledge's *With the Old Breed* (WWII), Philip Caputo's *Rumor of War* (Vietnam), Nate Fick's *One Bullet Away* (Afghanistan/Iraq), and many more books on experiences of soldiers including during the eras of Vietnam, Iraq and Afghanistan to see how common this description is. One could also visit the Texas Tech University Vietnam War's oral history collection and read the many manuscripts with discussions of training. Here, the points I make regarding physical activity, training and fitness are corroborated by numerous articles and photos from The *Globe*, such as the one below:



**Marines doing physical training at Camp Lejeune, the *Globe*, 20 July 1972.**

Dr. Brigham complains: "Throughout Dr. Longley's report, there are numerous images and pictures that have no citations or incomplete citations." (Brigham 2/7/25 report, p. 11). However, the length and detail of the reliance lists for my reports reflect a diligent effort to cite all sources thoroughly and completely.

Dr. Kelman states that his assignment was just a "limited focus on his [Longley's] methodology." (Kelman 2/7/25 report, p. 1). Dr. Kelman did not review my substantive conclusions or engage in his own historical research on the substance of the relevant facts about Camp Lejeune. The Government employed Dr. Kelman to review my methodology, but did not allow Dr. Kelman to go and do any oral histories of his own or for that matter, any primary research in the archives, the source materials, the science reports, or elsewhere to provide him with an ability to contextualize the information.

Beyond that, there was a focus on the minutiae to try to distract readers from the substantive arguments. Dr. Brigham described that "[t]he mischaracterization of the image of President Nixon

allegedly visiting Camp Lejeune, the photograph of the water buffalo, and the photograph of the Holcomb Boulevard WTP are especially egregious oversights for a trained historian such as Dr. Longley and make me further call into question his findings." (Brigham 2/7/25 report, p. 19). Indeed, here I appreciate his input, as he (or his assistants) is correct, but he seeks to inflate scattered errors into something much bigger. There was a mistake made in finalizing the report with regard to the photo of President Nixon, confusing a visit to Camp Pendleton with Camp Lejeune. It was an isolated mistake out of a lengthy report. Further, the mere fact that President Nixon did not visit the base does not dimmish the fact that other presidents did visit the base, including during the statutory period, including President Kennedy in 1962 with the Shah of Iran (he also visited Camp Bogue and President Reagan in 1983 (and later outside the 1950s to 80s period, Bill Clinton, George W. Bush, and Barack Obama and Franklin Roosevelt before during WWII).[41]



**John Kennedy at Camp Lejeune on April 14, 1962 (*The Daily News,* 4 Sept. 2020).**

---

[41] Calvin Shomaker, "U.S. President Who Visited Camp Lejeune While in Office," *The Daily News*, 4 September 2020.



**John Kennedy at Camp Lejeune on April 14, 1962 (*The Daily News,* 4 Sept. 2020).**[42]



**Ronald Reagan at Camp Lejeune, 4 Nov. 1983 (The Ronald Reagan Library, C18099-12).**[43]

---

[42] https://www.jdnews.com/news/u-s-presidents-who-visited-camp-lejeune-while-in-office/article_38787c91-67f4-5dfc-8ed4-366617b67731.html.

[43] President Reagan and Nancy Reagan attend Memorial Service for Lebanon and Grenada Casualty Victims, Camp Lejeune, North Carolina," 4 Nov. 1983, C18099-12, https://www.reaganlibrary.gov/archives/audiovisual/white-house-photo-collection-galleries/grenada-and-lebanon [accessed 28 Feb. 2025].

Other major political figures as well as important and eminent military figures over the years visited the base, each time drawing crowds of individuals to the main parade grounds and other parts of the Hadnot Point area.   As some examples:



**Camp Lejeune *Globe*, 12 April 1979, Vol. 35, No. 15, p. 1.[44]**



**Camp Lejeune *Globe*, 9 July 1959, p. 3.[45]**

[44] https://www.dvidshub.net/publication/issues/59792.
[45] https://www.dvidshub.net/publication/issues/62007.

## ASSISTANT CMC TO ATTEND

# Ceremonies tomorrow

Leading a long list of VIPs at tomorrow's change of command and retirement ceremonies will be Gen. Earl E. Anderson, Assistant CMC.

The ceremony will be held at W.P.T. Hill Field at 10 a.m. BrigGen. Herbert L. Wilkerson will assume command of Marine Corps Base from retiring MajGen. Carl A. Youngdale. The new commanding general's promotion to brigadier general is scheduled for today.

All base personnel, dependents, guests and other interested persons are invited to attend tomorrow's ceremonies. In case of inclement weather, the event will be held in Goettge Memorial Field House.

Gen. Anderson will be representing the Commandant of the Marine Corps at the Change of Command and Gen. Youngdale's retirement.

Several hundred special guests are expected to attend the ceremonies. The list includes military officials of local commands, a number of prominent members of Jacksonville and surrounding communities, numerous retired Marines living in the area and some officers and enlisted Marines from other duty stations.

Camp Lejeune *Globe*, 29 June 1972, Vol. 28, No. 26, p. 3.[46]

---

[46] https://www.dvidshub.net/publication/issues/60727



FINAL PASS AND REVIEW — General Louis H. Wilson, 26th Commandant of the Marine Corps (left), leaves the parade field May 10 after he observed his final pass and review from Camp Lejeune Marines. The general spent most of his one-day visit talking with the Marines he has commanded for the past four years. Major General Edward J. Bronars, commanding general, 2nd Marine Division accompanies the commandant.

USMC photo by Sgt. Ron Mozer

**Camp Lejeune Globe, 17 May 1979, Vol. 35, No. 20, p. 7.**[47]

      The articles cited above reflect how political figures and luminaries periodically visited the base. Crowds would descend on Hadnot Point for these occasions. Further, Hadnot Point and its main parade grounds were used extensively for other significant events drawing large crowds involving luminaries who were not presidents or political or military figures. See my prior references in my reports to such events as a concert of the Guess Who, changes of commands, July 4th ceremonies, the Marine Corps Birthday in November, and other events central to the base when people from all over the base congregated by the thousands to celebrate, participate or attend. Just to make the point, below are additional examples:

---

[47] https://www.dvidshub.net/publication/issues/59787



THE BIG NIGHT — Officers and their guests dance and socialize at their ball at Goettge Memorial Field House. Two big nights of entertainment were held for the officers.

Photo by GySgt. R.V. Ashley

**Hundreds gathered for Marine Corps Ball at Goettge Gymnasium, the *Globe*, 15 Nov. 1973.**



AN ESTIMATED 15,000—Several reports estimated that more than 15,000 turned out to witness the fireworks show. The parade ground bleachers, above, were filled to capacity some 45 minutes before the first rocket burst. Every piece of available real estate in sight of the parade ground was overflowing with spectators.

**An estimated 15,000 gather for the fireworks at main parade ground, the *Globe*, 9 July 1959.**

Dr. Brigham is also correct that the caption to the demonstrative photo of people filling water buffalo was not from Camp Lejeune. It was intended as a demonstrative photo showing what a water buffalo looked like, and this was an editing mistake in the caption. (*See* Brigham 2/7/25 report, p. 17). Likewise, another photo caption was erroneous, reciting a 1960s date when it was actually 1972. (*See* Brigham 2/7/25 report, p. 18). These honest and minor mistakes do not invalidate my work, my methodology or my opinions. Perfection is difficult in history and in this regard, Dr. Kelman agrees that the method of a historian is one of "accretion." (Kelman report 2/7/25, p. 4). The overwhelming majority of my citations found in my December 7, 2024 report's 132 footnotes and numerous reliance list items have not been challenged.

## VI.    <u>Conclusion.</u>

In conclusion, I used a normal and acceptable methodology. I conducted numerous hours of research in different archives including assembling the items that were cited in my reports as well as cataloguing ideas and stories that corroborated many of my assertions but never made it into the reports. This is part of the professional and practicing historian's process. I have closely followed standard methods of reporting information while using a variety of methodological tools including oral histories, but also others. I have sought to apply the same methods for my reports in this case as were employed in my long list of books, articles, and essays. I acknowledge the scattered errors alluded to above, but they do not invalidate the methodology or the central arguments and conclusions in my reports.

Dated: March **17**, 2025.


_Kyle Longley_
Dr. Kyle Longley
Executive Director of the Society for Military History
Henry Salvatori Professor of American Values and Traditions
Professor of History
Chapman University
Orange, California 92866
longley@chapman.edu

**RELIANCE LIST**

1. Jerry Ensminger and Mike Partain, recording of oral history interview, 10 March 2025.
2. Ari Kelman, *Battle Lines: A Graphic History of the Civil War* (Hill and Wang, 2015).
3. Ari Kelman, *A Misplaced Massacre: Struggling Over the Memory of Sand Creek* (Harvard Univ. Press, 2013).
4. Book review of Longley, *The Sparrow and the Hawk: Costa Rica and the United States during the Rise of Jose Figueres*, Charles D. Ameringer, *Hispanic American Historical Review* (1998) 78:1, p. 147. Available at https://read.dukeupress.edu/hahr/article/78/1/147/145059/The-Sparrow-and-the-Hawk-Costa-Rica-and-the-United.
5. Review of Longley. *Senator Albert Gore, Sr.: Tennessee Maverick*, Mike Bowen, "The Martyr of Moderation," H-Net, H-Tennessee, March 2005, available at https://www.h-net.org/reviews/showrev.php?id=10333.
6. Review of Longley, *Grunts: The American Combat Soldier in Vietnam*, Peter Kindsvatter, *Pacific Historical Review* (2009), 78:4, 655-657. Abstract at https://online.ucpress.edu/phr/article-abstract/78/4/655/78969/Review-Grunts-The-American-Combat-Soldier-in?redirectedFrom=fulltext.
7. Review of *Grunts*, Seth Givens, *Army History* (2011) 79: pp. 57-58. Available at https://www.jstor.org/stable/e26296818.
8. *The Morenci Marines*, review by Joe Abodeely, Journal of Arizona History, 56:4 (Winter 2015), 494, available at https://www.jstor.org/stable/i40158893.
9. *LBJ's 1968: Power, Politics, and the Presidency in America's Year of Upheaval*, review by Patrick Sharma, Diplomatic History, 43:3 (June 2019): 583-586, available at https://academic.oup.com/dh/article-abstract/43/3/583/5307911.
10. *LBJ's 1968: Power, Politics, and the Presidency in America's Year of Upheaval*, review by, Tim Stanley, Literary Review, April 2018, available at https://literaryreview.co.uk/a-valediction-to-power.
11. *LBJ's 1968: Power, Politics, and the Presidency in America's Year of Upheaval,* review by William Allison, H-NET, December 2018, https://www.h-net.org/reviews/showrev.php?id=52648.
12. ATSDR, "Summary of the Water Contamination Situation at Camp Lejeune," Nov. 12, 2024, available at https://www.atsdr.cdc.gov/camp-lejeune/about/summary-of-the-water-contamination-situation.html.
13. M. Maslia, et al., Reconstructing Historical VOC Concentrations in Drinking Water for Epidemiological Studies at a U.S. Military Base: Summary of Results, Water, 8, 449 (2016).
14. The Camp Lejeune *Globe,* 29 May 1975, Vol. 31, No. 22, available at https://www.dvidshub.net/publication/issues/60238.
15. The *Globe,* 5 June 1975, Vol. 31, No. 23, available at https://www.dvidshub.net/publication/issues/60237.
16. The *Globe*, 10 Oct. 1975, Vol. 41, No. 41, available at https://www.dvidshub.net/publication/issues/58953.
17. Transcript of interview of MSgt. Ralph Freeman, USMC (Retired), by L.J. Kimball, dated 11 Aug. 1999, available at

https://www.lejeune.marines.mil/Portals/27/Documents/EMD/Cultural-Resources/Oral%20History%20Project/Freeman.pdf.

18. The *Globe*, 13 June 1974, Vol. 30, No. 24, available at https://www.dvidshub.net/publication/issues/60297.

19. The *Globe*, 13 Nov. 1975, Vol. 31, No. 46, p. 6, available at https://www.dvidshub.net/publication/issues/60213.

20. The *Globe*, 2 May 1969, Vol. 25, No. 18, p. 10, available at https://www.dvidshub.net/publication/issues/60911.

21. The *Globe*, 4 Aug. 1967, Vol. 23, No. 31, p. 4, available at https://www.dvidshub.net/publication/issues/61097.

22. U.S. Marines map available at https://www.mcieast.marines.mil/portals/33/documents/contracting/contracting_map.pdf.

23. The Globe, 9 March 1967, Vol. 23, 10, p. 1, available at https://media-cdn.dvidshub.net/pubs/pdf_61119.pdf.

24. The *Globe*, 15 Nov. 1973, Vol. 29, No. 16, available at https://www.dvidshub.net/publication/issues/64562.

25. The *Globe*, 9 May 1974, Vol. 30, No. 13, p. 5, available at https://www.dvidshub.net/publication/issues/60302.

26. The *Globe*, 13 Nov. 1970, Vol. 26, No. 46, p. 1, available at https://media-cdn.dvidshub.net/pubs/pdf_60762.pdf.

27. The Globe, 13 Nov. 1970, Vol. 26, No. 46, p. 1, available at https://media-cdn.dvidshub.net/pubs/pdf_60762.pdf.

28. The *Globe*, 9 Nov. 1961, Vol. 17, No. 45, available at https://www.dvidshub.net/publication/issues/61712.

29. The *Globe,* 2 May 1969, Vol. 25, No. 18, available at https://www.dvidshub.net/publication/issues/60911.

30. Jacob Hamblin and Linda Richards, *Making the Unseen Visible: Science and the Contest Histories of Radiation Exposure*.

31. Ed Martini, *Agent Orange: History, Science, and the Politics of Uncertainty*.

32. Joseph Hickman, *The Burn Pits: The Poisoning of America's Soldiers*.

33. Partain declaration dated March 17, 2025.

34. Oral Memoirs of Michael Partain, interview conducted by Amanda Hill, March 6, 2014, for the Community Veterans History Project and the Lone Sailor Memorial Project, University of Central Florida, available online at https://richesmi.cah.ucf.edu/omeka/items/show/5085.

35. U.S. Senate Committee on the Judiciary, The Freedom of Information Act: Safeguarding Critical Infrastructure Information and the Public's Right to Know, Full Committee Hearing, March 13, 2012, testimony by Jerry Ensminger, Retired Marine Sergeant, Camp Lejeune Marine Base, available at https://www.judiciary.senate.gov/committee-activity/hearings/the-freedom-of-information-act-safeguarding-critical-infrastructure-information-and-the-publics-right-to-know/.

36. Transcript of interview of Sgt. Maj. Ihor Sywanyk, by L.J. Kimball, dated 29 July 1999, available at https://www.lejeune.marines.mil/Portals/27/Documents/EMD/Cultural-Resources/Oral%20History%20Project/Sywanyk.pdf.

37.  Transcript of interview of Sgt. Maj. Mary Sabourin, by L.J. Kimball, 26 July 1999, available at https://www.lejeune.marines.mil/Portals/27/Documents/EMD/Cultural-Resources/Oral%20History%20Project/Sabourin.pdf.

38.  Transcript of interview of MSgt. Bruce and Virginia Morris, by L.J. Kimball, 22 Sept. 1999, available at https://www.lejeune.marines.mil/Portals/27/Documents/EMD/Cultural-Resources/Oral%20History%20Project/Morris.pdf.

39.  Transcript of interview of Sgt. Maj. Nathaniel James, USMC (Retired), by L.J. Kimball, 20 Aug. 1999, available at https://www.lejeune.marines.mil/Portals/27/Documents/EMD/Cultural-Resources/Oral%20History%20Project/James.pdf.

40.  Transcript of interview of Gy. Sgt. Margaret (Maggie) Flanagan, by L.J. Kimball, 29 July 1999, available at https://www.lejeune.marines.mil/Portals/27/Documents/EMD/Cultural-Resources/Oral%20History%20Project/Flanagan.pdf.

41.  Testimony of Ensminger on file with U.S. Senate, available at https://www.veterans.senate.gov/services/files/B995DDE1-E066-42A4-BB1B-785669D6537E.

42.  Testimony of Ensminger on file with U.S. Senate, dated June 8, 2011, available at https://www.veterans.senate.gov/services/files/4A964881-45E3-41F5-B057-02DD324527D2.

43.  Testimony of Ensminger on file with the U.S. House of Representatives, available at https://republicans-science.house.gov/_cache/files/6/b/6b43caeb-0acd-4d78-b745-3c3e625cf2d1/432B71F13EA7D7AA6B09FFA2BDB7741E.061208-ensminger.pdf.

44.  Oral statement of Ensminger, written prepared statement, and questioning responses, at pages 17-29, 31-43, in Poisoned Patriots: Contaminated Drinking Water at Camp Lejeune, Hearing before the Subcommittee on Oversight and Investigations of the Committee on Energy and Commerce, U.S. House of Representatives, June 12, 2007, https://www.govinfo.gov/content/pkg/CHRG-110hhrg37793/pdf/CHRG-110hhrg37793.pdf.

45.  ATSDR Camp Lejeune Community Assistance Panel (CAP) meeting transcript, Dec. 6, 2007, available at https://www.atsdr.cdc.gov/camp-lejeune/media/pdfs/CAPtranscript12_07.pdf.

46.  Statement of Ensminger and Partain regarding EPA ban on TCE, Dec. 9, 2024, https://www.ewg.org/news-insights/statement/2024/12/statement-jerry-ensminger-and-mike-partain-final-epa-tce-ban.

47.  Ari Kelman, *A River and Its City: The Nature of Landscape In New Orleans* (Berkeley: University of California Press, 2003), 255.

48.  "Former National Park Superintendent: 'Striking Similarities' Between Thacker Pass and Sand Creek Massacre Sites, 12 Sept. 2022, https://www.protectthackerpass.org/former-national-park-superintendent-striking-similarities-between-thacker-pass-and-sand-creek-massacre-sites/.

49.  PBS segment, "On Two Fronts: Latinos and Vietnam," Arizona PBS, Sept. 17, 2015, available at https://azpbs.org/horizonte/2015/09/on-two-fronts-latinos-and-vietnam/.

50.  E.B. Sledge, *With the Old Breed*, Presidio Press (1981).

51.  Philip Caputo, *A Rumor of War*, Henry Holt and Co. (1977).

52.  Nate Fick, *One Bullet Away*, Houghton-Mifflin (2005).

53.  The *Globe*, 20 July 1972, available at https://www.dvidshub.net/publication/issues/60727.

54. Calvin Shomaker, "U.S. President Who Visited Camp Lejeune While in Office," *The Daily News*, 4 Sept. 2020, available at https://www.jdnews.com/news/u-s-presidents-who-visited-camp-lejeune-while-in-office/article_38787c91-67f4-5dfc-8ed4-366617b67731.html.

55. Photo of President Reagan and Nancy Reagan at Memorial Service for Lebanon and Grenada Casualty Victims, Camp Lejeune, North Carolina, 4 Nov. 1983, C18099-12, https://www.reaganlibrary.gov/archives/audiovisual/white-house-photo-collection-galleries/grenada-and-lebanon [accessed 28 Feb. 2025].

56. The *Globe*, 12 April 1979, Vol. 35, No. 15, p. 1, available at https://www.dvidshub.net/publication/issues/59792.

57. The *Globe*, 9 July 1959, p. 3, available at https://www.dvidshub.net/publication/issues/62007.

58. The *Globe*, 29 June 1972, Vol. 28, No. 26, p. 3, available at https://www.dvidshub.net/publication/issues/60727.

59. The *Globe*, 17 May 1979, Vol. 35, No. 20, p. 7, available at https://www.dvidshub.net/publication/issues/59787.

60. The *Globe*, 9 July 1959, available at https://www.dvidshub.net/publication/issues/62007.

61. U.S. Marines website, "Welcome to Naval Medical Center Camp Lejeune," https://camp-lejeune.tricare.mil/About-Us.

62. The Few the Proud website, at https://tftptf.com/images/5.pdf.

# <u>DECLARATION OF MIKE PARTAIN</u>

I, Michael Partain, of full age, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury as follows:

1. According to one of the founders of Public History, Robert Kelly, "Public History refers to the employment of historians and the historical method outside of academia: in government, private corporations, the media, historical societies and museums, even in private practice. Public Historians are at work whenever, in their professional capacity, they are part of the public process. An issue needs to be resolved, a policy must be formed, the use of a resource or the direction of an activity must be effectively planned and an historian is called upon to bring in the dimension of time: this is Public History."[1]

2. My discovery of the Camp Lejeune drinking water issue came shortly after my diagnosis with male breast cancer in April of 2007. The discovery came with a phone call from my father as I was leaving a post-operative doctor's appointment following my radical right mastectomy. My father informed me that he had just watched a CNN news story involving a retired Marine Master Sergeant who testified to Congress earlier that day about how the government was studying the children born at Camp Lejeune from 1968 to 1987 due to their exposures to toxic drinking water at Camp Lejeune, my place of birth in January of 1968. Prior to my diagnosis, I worked as a claims adjuster for State Farm Insurance and before that, I was a History teacher at the International Baccalaureate High School in Bartow, Florida. My undergraduate degree is in History and I subsequently completed my Master's Degree in History in 2021. My thesis was on Camp Lejeune.

3. After the phone call from my father, I rushed home and immediately turned on the TV to view the story my father had called me about and called Capitol Hill. I spoke with the office of Congressman Bart Stupak and left a message requesting they pass my contact information to Msgt. Jerry Ensminger, USMC (Ret). By the time I first spoke to Mr. Ensminger a few days later, he, along with Maj. Tom Townsend USMC (Ret) had been working on the Camp Lejeune drinking water contamination issue for ten years. I had a lot to learn in order to catch up. For the next six months, Jerry and I spoke regularly, often past midnight, as he briefed me on both the course of events and the historical details surrounding the drinking water contamination. During this time, I also began to examine the Marine Corps' website, government inquiries and timeline.

4. It was during this time that Jerry and I realized that we needed a historical timeline of events with citations to help us educate both the media and members of Congress. The timeline itself was modeled after a homework assignment I used to give my I.B. students with their history assignments with one important modification. Due to the fact that we were openly calling into question the Marine Corp's established narrative of the historical record, each entry on the timeline was hyper-linked to the actual Marine Corps, Navy, EPA or State of North Carolina document from which the entry was made. This enabled the reader to instantly fact check our information. Concurrently with the timeline project,

<hr>

[1] Kelley, Robert. "Public History: Its Origins, Nature, and Prospects." The Public Historian, vol. 1, no. 1, 1978, pp. 16–28. JSTOR, https://doi.org/10.2307/3377666. Accessed 16 Mar. 2025.

1

Andrea Byron, a dependent child exposed aboard the base, and I took the website started by Jeff Byron and continued by Mr. Ensminger (and now with me involved), "The Few, The Proud, The Forgotten," and revamped the website to serve as a platform for the Camp Lejeune timelines and the documents the public had at our disposal regarding the contamination events. This project was completed by the Fall of 2008.

5. Throughout this fight for justice, Mr. Ensminger has been one of my primary sources of knowledge for Camp Lejeune and the drinking water contamination. His time aboard the base, his training as a Marine Corps drill instructor and subsequent twenty-five-year career with the Marine Corps has made him an indispensable asset to the community. Simply put, we would never have been able to achieve any form of justice had it not been for Mr. Ensminger and his undying love for his daughter, Janey. My father and grandfather were both Marine officers and while I have knowledge of the Marine Corps culture and history, without Mr. Ensminger, I would not have been able to curate, interpret, and evaluate the mountains of documents pertaining to Camp Lejeune.

6. Following my first visit to Capitol Hill with Mr. Ensminger in January of 2009, it became readily apparent that in order for us to gain any headway with Congress, we had to locate, organize, and educate our community. Many of the Marines and their families who served aboard Camp Lejeune during the contamination period from 1952-1987 left the base and returned back to small town America. My family was no exception and we settled in Florida two years after my father left the Marine Corps. My education in the field of History was critical in this regard, as we were engaged in a fight for justice with what I termed the "Institution of honor integrity". Mr. Ensminger held me and all of us involved to a high standard of conduct, as would be expected of any historian who would otherwise be accused of bias. As Mr. Ensminger told me and countless others, "don't speculate, don't be sensationalistic and if you can't back up your statements with a document or fact, keep your mouth shut! Because, if you don't and make an unsubstituted claim to the media or congress, our credibility and our fight is over." I applied the academic standards I learned as an undergraduate, the skill sets acquired as a teacher and the investigative nature of my work as a claims adjuster for property and liability claims to all of my research and work for the Camp Lejeune drinking water issue.

7. One of the roles Mr. Ensminger, Mr. Townsend and I have undertaken over the years has been to serve as representatives of the community to the government agency tasked with investigating the health effects for our exposures at Camp Lejeune. The Agency for Toxic Substances and Disease Registry (ATSDR) was tasked by Congress under Title 42 to investigate National Priority Listed (NPL) sites such as Camp Lejeune. The main product of their work for NPL sites is what is called a Public Health Assessment (PHA). Camp Lejeune's PHA was initially issued in 1997. Our group was established in 2005 and termed the Community Assistance Panel (CAP). The CAP was comprised of members of the community and academic specialists who volunteered their time. Mr. Ensminger and Mr. Townsend were founding members of the CAP and I joined in 2007. Our meetings were held at the CDC in Atlanta every quarter and were recorded and transcribed by a court recorder. The CAP served as a vital conduit between the government scientists and the community.

2

8. Initially, our CAP meetings were attended by the Navy's Judge Advocate General attorneys along with members of the Department of the Navy. In April 2009, the voluminous handwritten Freedom of Information Act request submitted by Mr. Townsend along with investigations and research completed by Mr. Ensminger and I led to the ASTDR's withdrawal of their PHA for Camp Lejeune due to errors, missing documentation and the omission of benzene in their assessment. The withdrawal of the Camp Lejeune PHA was monumental because prior to this event, the agency had never rescinded a PHA for an NPL contamination site. Shortly after the April meeting, the Department of the Navy stopped sending their representatives from Camp Lejeune and attorneys to the ATSDR's CAP meetings. Instead, they sent a note taker to record and relay information between the ATSDR, the CAP and the Department of the Navy. It was also at this time that we discovered, through the ATSDR, the Department of the Navy had created a password-protected electronic document portal housing the documents and investigations into the estimated one million plus gallon fuel leak emanating from the base fuel depot over a 50-year period. The fuel from this leak was the source of the benzene missed in the initial ATSDR PHA for Camp Lejeune, to my understanding. The discovery of the electronic portal and subsequent media stories led to an inquiry by the Senate Judiciary Committee to ascertain whether or not the Navy was withholding other key documents about the Camp Lejeune drinking water contamination.

9. Sadly, Mr. Townsend passed away before the Camp Lejeune Justice Act was passed into law. Jerry and I continue to serve on the ATSDR CAP and have been involved in the projects undertaken by the ATSDR including but not limited to the health studies for Camp Lejeune, the Camp Lejeune water modeling projects, and the first of its kind Cancer Incidence Study on Camp Lejeune utilizing the cancer registries for all of the states in the U.S. Our role as CAP members was to provide information about the community and the base and suggestions for future studies. Often, we found ourselves functioning as fact checkers of the historical background used by the ATSDR in their work. Our meetings were open to the public and many times, members of the Camp Lejeune community at large were in attendance. Mr. Ensminger and I interviewed these people to expand our knowledge aboard the base, the history and the day-to-day lives of others who lived, served and worked at Camp Lejeune. In turn, we interacted with the scientists of the ASTDR to provide information for their work that many times was not otherwise available.

10. In one instance, we were shocked to discover that the Department of the Navy had failed to provide the well operation logbooks and the water treatment plant operation logbooks to the ATSDR scientists working on the water models for Camp Lejeune. Without these materials, the scientist had to make scientific estimates on which group of wells operated for a water treatment plant on any given day and what volume of water each well produced. These critical documents should have been retained under CERCLA documentation retention requirements when the base was listed on the NPL in 1989, to my understanding. Mr. Ensminger and I located a surviving water treatment plant operator to assist the ATSDR with their understanding of how the base's water treatment systems operated during the contamination period. This same former water treatment

3

plant operator also turned over to me well logbooks and a water treatment plant logbook he found in the trash in the 1990s for one of the water treatment systems aboard the base. It was not from one of the systems (Hadnot, Tarawa, Holcomb) under investigation by the ATSDR. But these surviving logbooks showed that such logbooks indeed used to exist, but now the others had apparently been lost by the Department of the Navy. I showed these documents to the ATSDR scientists and kept these documents until I turned them over to be placed in the document repository created by a Court Order in this ongoing matter, where they now can be found. The historical logbooks we recovered had entries dating back decades, as far back as the 1960s or earlier.

11. A testament to the validity of our work on Camp Lejeune is the fact that between Mr. Ensminger and myself, we have been asked to testify eleven times before Congress about the Camp Lejeune contaminated drinking water issue and we have both been guests to the White House for the Presidential signing of both of Camp Lejeune legislations. Our work was also memorialized in the award-winning documentary titled: "Semper Fi: Always Faithful", released in 2011.

12. According to the ATSDR, up to an estimated one million Marines, Sailors, their families and base employees were exposed to the contaminated drinking water at Camp Lejeune between 1952 through 1987. Unlike their civilian counterparts across the country, the day-to-day life and operations aboard domestic military bases are not preserved for posterity and study beyond what is known as Command Chronologies. The base newspaper, The Globe, does provide us with an insightful weekly snapshot of base life and is a useful tool. Military communities aboard bases, like Camp Lejeune, are transitory in nature. A military base is a closed community inaccessible to the general public. Without preservation, critical knowledge about life during the Camp Lejeune drinking water contamination will be left to speculation. Our population is also aging and fading into history.

13. As a Historian, I feel that I have an obligation to raise the following question to the Court: as an element of appropriate relief under the Camp Lejeune Justice Act, may the Court consider taking steps to Order that there be a program to actively record the oral histories from this community? Camp Lejeune represents one of the biggest, if not the largest documented public drinking water contamination exposure event in this country's history. Do we not owe it to future historians and public health scientists to capture as much information as we can about the exposed population at Camp Lejeune? Unfortunately, some, like my father, have passed. However, many others, like my mother and myself, remain. Through us and others, we have a collective memory which I respectfully submit needs to be preserved. In this digital age, it is a far less daunting task than when the World War II Oral History projects were first undertaken in the late 1980s, forty years after the close of the war. Yet, clearly it was felt by the Marines that recording these oral histories for World War II survivors was worthwhile forty or more years after the fact, as such oral histories can be found on the Marines website today.[2]

---

[2] *See* https://www.lejeune.marines.mil/Offices-Staff/Environmental-Mgmt/Cultural-Resources/Preservation-in-Action/Oral-History-Project.aspx.

4

14. In the context of Camp Lejeune, many who passed through the base from the 1950s to the 1980s are still alive. The time elapsed from 1955 to 2025 is 70 years but from 1985 to 2025 is only 40 years. There are many living individuals who were at Camp Lejeune during the relevant period and were exposed to and consumed the contaminated water. Obtaining their oral histories could be of great assistance for future work to assess and analyze the effects of the water and chemical exposures and could be combined with obtaining DNA and blood samples and medical data for future scientific study.

15. It is also my hope that the document repository that has now been created by Court Order may be sustained into the future so that materials can be protected and archived, for the benefit of the service members, their families, their descendants, the general public and for purposes of medical science and other academic study and research. One or more universities may have an interest in assisting with such a project.

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 17, 2025 in _Homosassa_, Florida.

Michael Partain