# EXHIBIT 12

# Doing Oral History

Third Edition

DONALD A. RITCHIE



OXFORD
UNIVERSITY PRESS

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Ritchie, Donald A.. Doing Oral History, Oxford University Press, Incorporated, 2014. ProQuest Ebook Central,
Created from gmu on 2025-01-22 16:14:54.

# 1

# An Oral History of Our Time

*What is oral history?*

Memory is the core of oral history, from which meaning can be extracted and preserved. Simply put, oral history collects memories and personal commentaries of historical significance through recorded interviews. An oral history interview generally consists of a well-prepared interviewer questioning an interviewee and recording their exchange in audio or video format. Recordings of the interview are transcribed, summarized, or indexed and then placed in a library or archives. These interviews may be used for research or excerpted in a publication, radio or video documentary, museum exhibition, dramatization, or other form of public presentation. Recordings, transcripts, catalogs, photographs, and related documentary materials are often posted on websites. Oral history does not include random or surreptitious recordings, nor does it refer to recorded speeches, wiretapping, personal diaries on tape, or other sound recordings that lack the dialogue between interviewer and interviewee.[1]

To avoid repeating common mistakes, oral historians have created standards for doing interviews and established principles for dealing ethically with their interviewees. But oral history is too dynamic and creative a field to be entirely captured by any single definition. For every rule, an exception has worked. Imaginative interviewers are constantly developing and sharing new methods and uses of oral history. Any definition of the oral history process, or any method of interviewing, must reflect the goals of the specific project, the resources available, and other practical considerations.[2]

*When did people begin collecting oral history?*

As distinct from oral traditions—stories that societies have passed along in spoken form from generation to generation—oral history *interviewing* has been occurring since history was first recorded. Three thousand years ago, scribes of the Zhou dynasty in China collected the sayings of the people for the use of court historians, and, several centuries later, the Greek historian

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Ritchie, Donald A.. *Doing Oral History*, Oxford University Press, Incorporated, 2014. *ProQuest Ebook Central*,
Created from gmu on 2025-04-23 15:01:47.

Herodotus combined his own observations with what others told him, including those stories he regarded skeptically. "Such as think the tales told by the Egyptians credible are free to accept them for history," he wrote; and "This is the account which some of the Persians gave…but there are others who relate the matter differently." Thucydides similarly interviewed participants in the Peloponnesian Wars and complained that "different eyewitnesses give different accounts of the same events, speaking out of partiality for one side or the other or else from imperfect memories."[3]

During the European conquest of the Americas in the sixteenth century, Spanish chroniclers relied on oral sources to reconstruct the history of the indigenous people, from the Aztecs to the Incas. To assist in both colonization and conversion, they collected the testimony of survivors of these once great civilizations, concentrating on their social, economic, and religious traditions. Although strongly colored by the colonizers' cultural assumptions, these histories remain important sources for the new world's pre-Columbian history.[4]

In 1773, when Samuel Johnson argued against the proposition that an impartial history could not be written in the lifetime of those who had experienced the events, he reasoned that "a man, by talking with those of different sides, who were actors in it and putting down all that he hears, may in time collect the materials of a good narrative." Johnson admonished that "all history was at first oral" and noted that this was how Voltaire had prepared his histories of the French kings. Indeed, Voltaire wrote that he had questioned "old couriers, servants, great lords, and others" and recording only "those facts about which they agree." Jules Michelet studied the French Revolution, a half century after it took place, by contrasting the official documents with the recollections of "peasants, townsfolk, old men, women, even children; which you can hear if you enter an evening into a village tavern."[5]

Dr. Johnson's companion and biographer, James Boswell, made himself notorious by writing down and publishing many of his conversations. Others in Johnson's circle found this practice invasive, but Boswell defended his efforts: "How delightful should we have been if thus introduced in to the company of Shakespeare and Dryden, of whom we know scarcely anything but their admirable writings! What pleasure would it have given us to have known their petty habits, their characteristic manners, their modes of composition and their genuine opinion of preceding writers and their contemporaries! All these are now irrevocably lost."[6]

Soon after the battles of Lexington and Concord launched the American Revolution in 1775, a Congregationalist minister named William Gordon interviewed the participants, among them Paul Revere. Gordon's recounting of Revere's elaborate preparations contradicted efforts to portray the battles as unprovoked attacks by the British, and revolutionary leaders managed to suppress the story. Two centuries later the historian David Hackett Fischer declared Gordon's essay drawn from Revere's interview "remarkably full and

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Ritchie, Donald A.. Doing Oral History, Oxford University Press, Incorporated, 2014. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/gmu/detail.action?docID=1657143.
Created from gmu on 2025-04-23 15:01:47.

accurate." In the 1870s the California publisher Hubert Howe Bancroft compiled his seven-volume *History of California* (1884–1890) by sending students out to collect the papers and the reminiscences of nineteenth-century Mexican military governors and *alcaldes* (civilian officials) and of the first American settlers.[7]

It seemed reasonable to consult oral as well as written sources until the late nineteenth century, when the German school of scientific history promoted documentary research to the exclusion of other, less "objective" sources. Leopold von Ranke asserted that documents created at the time historical events occurred are the most reliable form of historical evidence; Ranke's followers helped turn history from a literary form into an academic discipline dependent on the rigorous use of evidence. They trained historians to scrutinize documents in their search for truth and dismissed oral sources as folklore and myth, prized only by well-meaning but naive amateurs and antiquarians. They deemed oral evidence too subjective—shoddy memories told a biased point of view.[8]

Ironically, historians turned away from oral sources just as other professions and disciplines were embracing the interview. Journalists made interviewing a mainstay of their craft around the time of the American Civil War. In 1859, when New York *Tribune* editor Horace Greeley went west to conduct a highly publicized interview of Mormon patriarch Brigham Young in Salt Lake City, he launched a trend in newspaper interviews. By 1868, President Andrew Johnson, facing impeachment by Congress, sought to present his side to the public by giving the first presidential interviews for attribution. "I want to give those fellows hell," Johnson told the reporter who was interviewing him, as he gestured towards the Capitol, "and I think I can do it better through your paper than through a message, because the people read the papers more than they do messages." Interviews quickly became so popular that clever politicians took to preparing their own question-and-answer dialogues, which obliging journalists published as news. Newspaper interviewing spread to Great Britain as part of a "new journalism" that sought to attract mass audiences.[9]

Groups that had not created extensive paper archives became the focus of the first organized scholarly interviewing. During the 1890s, the U.S. Bureau of Ethnography dispatched researchers to record on wax cylinders the songs and stories of various Native American tribes. At the same time, those historians trying to dispel the prevailing romantic images of the antebellum South were engaged in research to prove that slavery was not a benevolent institution. They realized that many former slaves and slave owners were still living and had something to say. The historian Frederic Bancroft traveled through the South, talking to freedmen and their former masters to gather recollections of the slave trade, and recorded their comments in his diaries. Harrison Trexler conducted similar field research in Missouri in 1912. He reported being thrilled to have gotten "a list of old settlers and newspapermen and have their

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Ritchie, Donald A.. Doing Oral History, Oxford University Press, Incorporated, 2014. ProQuest Ebook Central,
Created from gmu on 2025-04-23 15:01:47.

statements. I also ran down many old slaves." Historians at black colleges in the South also started interviewing former slaves, as did the Federal Writers Project, a division of the Depression-era Works Progress Administration (WPA), which hired unemployed writers to chronicle the lives of ordinary citizens, including those whom had once been enslaved. Ben Botkin, who directed the project, said the narratives had "the forthrightness, tang, and tone of people talking." The interviewees "gave answers which only they can give, to questions we still ask: What does it mean to be a slave? What does it mean to be free?" Because of the limited nature of recording devices at that time, only a few of these interviews were recorded verbatim; most were recreated from notes. For many years, most historians dismissed these interviews with "aged survivors" as less reliable than the records kept by slave owners. Decades later, when historians finally accepted this testimony—comprising thousands of pages of interviews—it fundamentally altered the historical interpretation of American slavery.[10]

When the United States entered World War II, President Franklin D. Roosevelt ordered all military branches and civilian agencies of the government to prepare records of their wartime experiences. Planning not only a postwar history, but also a series of morale-boosting "American Forces in Action" booklets, the U.S. Army dispatched historians into the battlefields, armed with heavy wire recorders. Directed by Lt. Col. S. L. A. Marshall, a World War I veteran and journalist turned army historian, they pioneered the postcombat interview, debriefing soldiers immediately after the battle to reconstruct the events of the day. Sgt. Forrest Pogue spent D-Day interviewing wounded soldiers who had been evacuated to a hospital ship anchored off Normandy Beach. Recalling concerns that his bulky wire recorder might attract sniper fire, Pogue noted that the army wanted live history—"and live historians."[11]

Not all war-related interviews were with the military. The Chicago psychiatrist David Boder traveled to Europe in 1946 with a wire recorder and conducted 130 interviews with displaced persons (DPs), many of whom had survived the Holocaust. He intended to let them tell their stories while their memories were still fresh, "not only in their own language but in their own voice," but he was unprepared for the horrific accounts they related. Other wartime and postwar interviews were conducted by the Jewish Historical Institute and the Central Historical Commission in Germany.[12]

## What is the derivation of the term "oral history"?

Although the term had occasionally been applied to troubadours, not until the 1940s did "oral history" attach itself to interviewing. A Harvard-educated bohemian, Joseph Gould, otherwise known as "Professor Sea Gull," wandered around Greenwich Village collecting what he called "An Oral History of Our Time." The writer Joseph Mitchell's profile of Gould that appeared in the *New Yorker* in 1942 drew attention to his crusade to record the stories of

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Ritchie, Donald A.. Doing Oral History, Oxford University Press, Incorporated, 2014. ProQuest Ebook Central,
Created from gmu on 2025-04-23 15:01:47.

average people. "What people say is history," Gould insisted. "What we used to think was history—kings and queens, treaties, inventions, big battles, beheadings, Caesar, Napoleon, Pontius Pilate, Columbus, William Jennings Bryan—is only formal history and largely false. I'll put down the informal history of the shirt-sleeved multitude—what they had to say about their jobs, love affairs, vittles, sprees, scrapes, and sorrows—or I'll perish in the attempt." This quest garnered many a free meal for Gould, but after his death no oral history notebooks were ever found. He left nothing behind but the name.[13]

Another journalist-turned-historian, Allan Nevins, created the first modern oral history archives at Columbia University in 1948. A decade earlier, in his book *The Gateway to History*, Nevins had proposed reinvigorating historical study by making "a systematic attempt to obtain from the lips and papers of living Americans who had led significant lives, a fuller record of their participation in the political, economic and cultural life of the last sixty years." Recognizing that modern communication and transportation were making letter writing and diary keeping obsolete, Nevins conducted interviews that were recorded in shorthand. The results were disappointing, but when the first reel-to-reel tape recorders became commercially available, Nevins founded the Columbia Oral History Research Office. This new effort raised complaints from those who considered "Oral History" either too imprecise or too Freudian. But by the 1960s, Nevins's successor, Louis Starr, could point out that the term had so worked its way into the language that newspapers were referring to it in the lower case. "Oral history, like it or not, is here to stay," Starr declared. "It's gone generic."[14]

The University of California at Berkeley launched a similar oral history program in 1954, as did UCLA in 1958. The Harry S. Truman Library inaugurated the first presidential library oral history program in 1960. The John F. Kennedy Library began interviewing shortly after Kennedy's assassination, even before the library was constructed. Oral history soon became standard practice for building presidential collections. In 1967 the Oral History Association was founded, gaining membership throughout the United States and abroad.[15]

In 1969 a conference at the British Institute of Recorded Sound created a committee that in time led to the founding of the Oral History Society four years later. By 1972 the Imperial War Museum in London had established a Department of Sound Records to collect and preserve oral testimony of those servicemen and women who "for lack of inclination, opportunity, or literary skill" would leave no other records for history. The History Workshop movement in Britain, which promoted labor and feminist history, saw oral history as a tool for incorporating the less powerful into the historical narrative. This impetus gave British oral history more of a grounding in social history than the U.S. projects, which had begun by focusing on eminent personalities in political, military, and business history. Oral history projects spread to every continent, and many national oral history organizations were formed. A 1987

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Ritchie, Donald A.. Doing Oral History, Oxford University Press, Incorporated, 2014. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/gmu/detail.action?docID=1657793.
Created from gmu on 2025-04-23 15:01:47.

meeting at Oxford University established the International Oral History Association, which meets biannually around the world.[16]

Worldwide political and social revolutions during the last decades of the twentieth century confronted historians with sweeping changes in society and an inadequacy of archival documentation, which often reflected a discredited former regime. Newly emerging nations in Asia and Africa found that the written documents reflected the views of former colonial masters and used oral history to revive buried national identities. When the Soviet Union dissolved, Russian and central and eastern European oral historians began to reexamine and rewrite their discredited official histories by collecting personal testimony suppressed under Communist regimes. In Brazil and Argentina, oral history projects focused on periods of military dictatorship to record the experiences of those brutalized by state terrorism. South Africans similarly turned to oral history in their search for truth and healing in the post-Apartheid era. Interviewers in many nations have found interviewing a critical tool when confronting issues of repression and reconciliation.[17]

Daniela Koleva, a historian in Bulgaria, began conducting oral history soon after the 1989 revolution when she and her colleagues realized that life was changing dramatically before their eyes. "We felt that there was a distinct culture, a whole way of life, that was disappearing already at that moment, and we wanted to capture it in the memories of our interviewees and preserve it for future generations just to know."[18]

### Who is being interviewed?

In the United States the first oral history archives studiously avoided Joe Gould's "shirt-sleeved multitudes." Allan Nevins was a political historian who interviewed the major players in government, business, and society. Long after Nevins's retirement, Columbia continued to interview people of the stature of judges, cabinet members, senators, publishers, business executives, and civic leaders. By contrast, European oral history projects from the start were the domain of social historians who sought to record the everyday lives and experiences of working-class people. One practitioner called it "doubly radical, doubly democratic, in that it recovered the voices of ordinary people seen as left behind or forgotten by the forces of progress and in that it began outside the universities, pioneered by non-professional historians."[19]

The first influential oral history study in Great Britain was Ronald Blythe's *Akenfield* (1969), which he called a "quest for the voice" of a rural village that over the previous half century had seen "the swift destruction of the old pattern of life." Another pathbreaking work, Paul Thompson's account of early twentieth-century social change, *The Edwardians* (1975), was drawn from Britain's first national oral history project. Ronald Fraser's *Blood of Spain* (1979) retold the Spanish Civil War through interviews conducted in post-Franco Spain, when people were finally able to talk freely.[20]

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Ritchie, Donald A.. Doing Oral History, Oxford University Press, Incorporated, 2014. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/gmu/detail.action?docID=1657938.
Created from gmu on 2025-04-23 15:01:47.

As a young historian teaching at a black college in Atlanta, Georgia, Staughton Lynd one day encountered a colleague tape recording an interview with two civil rights activists recently released from jail. "It was a moment of enlightenment," Lynd later recalled. He had been using the WPA's ex-slave interviews in his classes. "Suddenly it seemed possible actually to do oral history oneself." Lynd and his wife, Alice, began conducting interviews and published *Rank and File: Personal Histories by Working-Class Organizers* (1973). At the American Historical Association conference in 1971, Lynd ran a workshop on "Oral History and People's Struggle," which attracted favorable notice for its "methodological innovation."[21]

A new generation of American historians began writing history "from the bottom up." Many of these interviewers came out of the civil rights, antiwar, and feminist movements. Eager to write the history of those groups left out of the standard history texts, they lacked the abundant manuscript resources and formal documentation available on the elites and turned instead to oral sources. Encouraging these efforts were the best-selling books of Studs Terkel, a Chicago radio talk-show host and former WPA interviewer whose books, such as *Hard Times* (1970), *Working* (1974), and *The "Good War"* (1984) captured the voices of everyday people in a compelling manner. Alex Haley's *Roots* (1976) similarly inspired people, especially African Americans, to collect their family histories through interviews. The availability of convenient and relatively inexpensive cassette tape recorders and video recorders further helped popularize oral history.[22]

For years oral historians argued the respective merits of "elite" versus "nonelite" interviewing. As the debate tapered off, oral history projects grew more all-inclusive. The more that interviewers studied their practice, the more they realized that no one group had an exclusive understanding of the past, and that the best projects were those that cast their nets wide, recording as many different participants in events or members of a community as possible. Once, a military oral historian was questioned about the possibility of using oral histories to reconstruct the social acculturation of barracks life. He responded coolly, "I only interview generals." Since then, oral history has changed, even in the military, where historians now conduct interviews with all ranks of enlisted personnel and officers, in garrison and in combat, to build important research collections.

### When journalists interview, are they doing oral history?

A journalist's interviews are more targeted than those of an oral historian. Reporters usually interview subjects for specific purposes, whether to produce a newspaper story, magazine article, or news broadcast. Working on deadlines, reporters depend heavily on oral rather than written sources. They may corner someone in a corridor or phone to ask highly focused questions; often they have no time to elicit or listen to lengthy elaborations. Only a few short

Ritchie, Donald A.. Doing Oral History, Oxford University Press, Incorporated, 2014. ProQuest Ebook Central,
Created from gmu on 2025-04-23 15:01:47.

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

quotations may appear in their articles or as sound bites in their broadcasts. Journalists frequently interview without attribution, collecting off-the-record responses simply for background information with no intention of revealing these sources in their stories. Sometimes their interviews are recorded—especially if intended for broadcast—but after the story appears, journalists do not retain the original interviews and notes for long. The record that journalists leave for the future consists primarily of their published articles or tapes of their broadcasts. Journalists rarely expect to deposit their interview recordings or notes in a library of archives where other researchers might examine them.

In this regard, journalists are not unlike scholarly researchers who conduct interviews to provide documentation for their articles or books without planning to open the interviews for general research. Usually they only excerpt the interviews in their books, rather than reproduce their full notes or transcripts. After the book is published, these documents most often languish in the author's files, packed away in a basement or attic.

An interview becomes an oral history only when it has been recorded, processed in some way, made available in an archive, library, or other repository, or reproduced in relatively verbatim form for publication. Availability for general research, reinterpretation, and verification defines oral history. By preserving the recordings and transcripts of their interviews, oral historians seek to leave a complete, candid, and reliable record as possible.[23]

Regarding daily news reporting as the "first rough draft of history," journalists have regularly applied their talents to writing history, for which they instinctively turned to oral sources. Drawing on their skills as interviewers, they produced some notable works of oral history, such as Howell Raines's *My Soul Is Rested: Movement Days in the Deep South Remembered* (1977), and Wallace Terry's *Bloods: An Oral History of the Vietnam War* (1984). Two of Lyndon Johnson's leading biographers are Robert Caro, an investigative journalist turned biographer, and Robert Dallek, a professional historian. When asked to explain the differences in their approaches to the same subject, Caro pointed to the extensive interviews he conducted with key participants, in comparison to Dallek, a university professor who relied more on manuscripts than interviews. To this, Dallek rebutted, "I'm not a journalist."[24]

*What does it take to become an oral historian?*

Oral history has always been multidisciplinary. While many professional historians conduct oral history, a degree in history has never been a prerequisite for entering the field. Well-established scholars sometimes make poor interviewers, and those who are part of the community or profession being interviewed, if properly trained in conducting oral history, have advantages in establishing rapport and in prior knowledge. Law students have interviewed judges, women coal miners have successfully interviewed other women coal miners, and members of a community have conducted oral histories with their

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Ritchie, Donald A., et al. Doing Oral History, Oxford University Press, Incorporated, 2014. Accessed April 24, 2025. ProQuest Ebook Central.
Created from gmu on 2025-04-23 15:01:47.

neighbors. In Alaska, a portrait artist conducted interviews with the people she was painting to gain a deeper understanding of the personalities she was trying to capture on canvas. In Japan, a physician interviewed his elderly patients in a fishing community that was rapidly disappearing. He wrote the resulting book from his office overlooking a new expressway built on the riverbed. "That vanished river, that water's edge, once rang out with the shouts of men hauling in their net as couples on houseboats waited among the reeds for night to fall. It wasn't so very long ago, and yet that era, that scenery, and the life-breath of those people have all vanished liked phantoms," the doctor wrote. The oral histories he collected stood as a tribute "to the too-swift passing of time."[25]

Saying that a PhD in history is no requirement for doing oral history does not mean that anything anyone records is oral history. The Oral History Association has developed best practice guidelines to raise the consciousness and professional standards of all oral historians. There are interviewing skills to be learned. There are right and wrong ways to conduct an oral history. There are great differences between useable oral history and useless ones, and there are far too many of the latter.

Oral history has room for both the academic and the layperson. With reasonable training, through oral history courses, workshops, or manuals, anyone can conduct a useable oral history. Oral history conferences are notable for the variety of participants, among them radio and video documentary makers, museum curators, archivists, journalists, gerontologists, anthropologists, and folklorists. Unlike historians, who seek the past, other disciplines are often more concerned with the present. Regardless of their diverse objectives, however, they share many common methods of interviewing. "If an interview goes well, then we say it's magic," the Canadian investigative reporter John Sawatsky commented. "But it's not magic. It happens for an understandable reason. It's rational. It's a skill. It's easy to teach someone skills."[26]

### How reliable is the information gathered by oral history?

"The most naive policeman knows that a witness should not always be taken at his word," wrote the French historian Marc Bloch. "Similarly, it has been many a day since men first took it into their heads not to accept all historical evidence blindly." Oral history is as reliable or unreliable as other research sources. No single piece of data of any sort should be trusted completely, and all sources need to be tested against other evidence. The historian James MacGregor Burns, who was trained under S. L. A. Marshall to interview American soldiers during World War II, found that the interviews generated some spurious information (about how frequently infantrymen fired their rifles in combat) and also some startling insights (about how many troops were killed by friendly fire). Burns concluded that "such interviews were a most valuable contribution to military history, but only if used in careful conjunction with more conventional sources, like documents and enemy records."[27]

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Ritchie, Doing Oral History : Oxford: Oxford University Press, Incorporated, 2014. Accessed April 24, 2025. ProQuest Ebook Central.
Created from gmu on 2025-04-23 15:01:47.

Although archival documents have the advantage of not being influenced by later events or otherwise changing over time, as an interviewee might, documents are sometimes incomplete, inaccurate, and deceiving. Researchers have found more than one occasion of a local newspaper ignoring an entire event, such as a strike against one of its major advertisers. Until the 1960s, most general circulation newspapers ignored news from black communities. As a result of such blind spots, oral history can develop information that might not have appeared in print. As the novelist Gore Vidal commented: "Since I have been written about perhaps a bit more than most historians, I am not as impressed as they are by what I see in print, no matter how old and yellow the cutting."[28]

Scholars have accepted correspondence, diaries, and autobiographies as legitimate documentation, although their authors may be biased or incorrect. Public figures have kept diaries with publication in mind, designing them to present themselves in the best possible light. Oral history interviews are often conducted years after the event, when memories have grown imprecise, but they have the advantage of being conducted by a trained interviewer who can raise questions and challenge dubious answers. As any researcher can attest, letter writers and diary keepers do not always address all the issues that scholars are researching. Autobiographers are often unaware of all the issues that interest researchers. Well-trained interviewers can coax interviewees into areas of concern to researchers that the interviewees might never have thought of discussing otherwise.

## Why are some historians still skeptical about oral history?

The historian A. J. P. Taylor once dismissed oral history as "old men drooling about their youth."[29] Such skeptics regard oral testimony as nostalgic and unreliable, and distrust eyewitness accounts as too subjective. They seek objectivity—moving beyond personal biases and prejudices to see things as they are. When historians describe evidence as "objective," they mean not only unbiased but also unchanging, such as documents that remain the same over time even if interpretations of them shift. "Subjective" suggests a partial and a partisan point of view, less reliable because it is subject to alteration over time. When the oral historian Alessandro Portelli wrote of the need for broadly based interviewing that would "tell us not what people did, but what they wanted to do, what they believed they were doing, what they now think they did," he was criticized for passivity and "unsystematic" reasoning. Some social historians have accused oral historians of swallowing whole the stories that informants tell them. They argue that a truer "people's history" must be based on statistical analysis and other objective data rather than on subjective individual testimony.

The correlated assumption is that the historian, with hindsight and thorough research, perceives past events more clearly than those who lived through them. Or, as David Lodge asserted in his autobiographical novel *Out of the*

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Ritchie, Donald A. Doing Oral History, Oxford University Press, Incorporated, 2014. Accessed April 24, 2023. ProQuest Ebook Central.
Created from gmu on 2025-04-23 15:01:47.

*Shelter* (1989), history is the verdict "of those who weren't there on those who were."[30]

Others express skepticism of the accuracy of human memory—a view sometimes shared by researchers who were themselves part of the history they study. After Abraham Lincoln's death, two of his private secretaries, John Nicolay and John Hay, collaborated on writing his biography. They naturally anticipated a great advantage in having access to Lincoln's closest confidants, but as Hay commented: "We ascertained after a very short experience that no confidence whatever could be placed in the memories of even the most intelligent and most honorable men when it came to narrating their relations with Lincoln." Nicolay likewise regarded most reminiscences of Lincoln as "worthless to history," and so the pair relied almost exclusively on written documents. Ironically, their preserved interviews have appeared more convincing to later scholars. Nicolay and Hay had rejected testimony that reflected poorly on Lincoln, especially those personal observations of Lincoln's bouts with depression and his troubled marriage. Other sources subsequently corroborated the stories that the protective secretaries chose to suppress.[31]

At the Russian and Eastern European Institute at Indiana University, scholars engaged in a dispute over the validity of oral sources. Two members of the faculty had been mining statistics and documentary evidence to determine why Russian women continued to have fewer children even after Stalin outlawed abortion. One day they looked at each other with a common thought: "Why don't we just ask them?" After conducting a hundred interviews, they came to the conclusion that peasant women, whose mothers often borne ten to twelve children, many of whom had died in infancy, simply ignored official orders and had illegal abortions. Another member of the same institute dissented from this conclusion on the grounds that Russian peasants "tended to rely on rumor, so the reliability of their stories is not as interesting as their meaning." Yet even the dissenter agreed that the oral sources "may not tell you much about what Stalin was doing, but they are terribly useful in telling you about people's minds."[32]

### Should the interviewer be an objective—or neutral—observer?

People often seem surprised that an interviewer might have a point of view. The social critic Edward Rothstein insisted that an oral historian should do little more "than hold up a mirror, just making sure the glass is clean." He offered that definition in order to warn readers "who presume they are being presented history without perspective, just a series of oral histories" that the interviews may be shaped by the interviewer's ideological perspectives. Rothstein was specifically targeting the legendary interviewer Studs Terkel, an unabashed "man of the political left," but his assessment raised questions about all interviewers.[33]

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Case 7:23-cv-00897-RJ Document 362-13 Filed 04/29/25 Page 13 of 73

Oral historians have debated how much an interviewer should intervene in the interview. Initially, some argued that independent researchers—those doing interviews for their own research—were too biased to conduct oral histories, and that archival oral historians would be better interviewers because they had no vested interest in any interpretation. In the type of oral history Allan Nevins pioneered at Columbia, the interviewer was envisioned as a neutral, objective collector of other people's reminiscences; this concept was carried to such extremes that the questions were eliminated entirely in Columbia's first transcripts. The interviewee's responses appeared as an uninterrupted narrative. Although Columbia soon adopted the question-and-answer format for its transcripts, many books featuring oral history testimony continue to expunge the interviewer. Studs Terkel, for example, disclosed only a few of the questions that elicited such compelling replies from his interviewees.[34]

Other oral historians rejected the image of the neutral questioner and saw their role as that of an active agent in the process. The founder of the Duke University's Oral History Program, Lawrence Goodwyn, insisted that interviewers who remained passive surrendered too much of their professional capacity. Goodwyn acknowledged, however, that more active interviewers risk distorting their interviews by introducing their cultural assumptions and political perspectives. Accepting subjectivity as inherent in the process and impossible to avoid, advocates of a more active, scholarly interviewer believed that the interviewer's questioning actually involved "a first interpretation" of the interviewee's narrative. Influenced by trends in anthropology, literary criticism, and social history, they examined not only what was said but also what was left unsaid, and they speculated about lapses in historical memory. The more methodologically oriented oral historians criticized the uncritical acceptance of oral testimony, called for more thorough research and higher standards in conducting interviews, and lamented that the lack of scholarly analysis, by both interviewers and interview users, had turned oral history into "movement without aim."[35]

Over time, a proliferation of methodological studies has added not only "aim" but also increasing depth and sophistication to oral history. Still, a difference remains between analyzing oral evidence *after* it has been collected and suggesting that theorizing *precedes* the interview. An interviewer must always be prepared to abandon carefully prepared questions and follow the interviewee down unexpected paths, always helping the interviewee by questioning, guiding, coaxing, and challenging. Michael Frisch offered a middle ground in his book, *A Shared Authority* (1990), whose clever title promotes the notion that both participants in an interview are responsible for its creation and share its authorship. Interviewers may believe they are more than an equal partner in this shared authority, since their questions shape the responses, and they are extracting the raw material of memory for use in scholarship. But interviewers are actually less than an equal partner in the sense that the ultimate value of oral history lies in the substance of the interviewee's story.

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Ritchie, Donald A. Doing Oral History. Oxford University Press, Incorporated, 2014. ProQuest Ebook Central,
Created from gmu on 2025-04-23 15:01:47.

Nor does the interpretation of the interview rest exclusively on the interviewer's side of the microphone, for interviewees are constantly reinterpreting and analyzing their own motives and actions as they recall and describe them. On both sides there is much more to interviewing than holding up a mirror.[36]

### Is it appropriate for interviewers to interpret the oral histories they collect?

Oral historians are often concerned with more than simply collecting information. Ronald Grele, who headed the oral history archives at UCLA and Columbia, has pointed to the shift in interest from data to text. The first generation of interviewers spent much of their time pondering the accuracy of human memory and how they could test for it. The next generation got more interested in how people organized their memories of the past—they were less concerned with the accuracy of memory than its reconstruction. They wanted to know more about how to analyze a narrative and understand the person who was telling it.[37]

Just as historians who uncover archival evidence must interpret it and put it in historical context, oral historians recognize that the words they record are not "unvarnished history." They are interpretations of what happened, filtered through interviewees' memories and their efforts to answer our questions.[38] Linguistic theory also influenced oral history. When deconstructionists argued that there is nothing outside of text, historians grappled with the idea that texts were simply constructions of reality. Seen this way, oral sources are no less reliable than printed sources. An interview is what people said happened, and what they remember and say is open to analysis.[39]

As historians sort through the information they gather, it is only human for them to choose what to pay attention to, what to play down, and what to disregard entirely. The historian William McNeill argued that this process takes place even when historians "seek to hide the way they shape the history they write, 'proving' their organizing ideas by appealing to what always has to be a small selection from the noisy confusion of 'all available sources.'" Despite their best efforts at scholarly detachment, historians work with only partial information and must interpret what they collected in order to make sense of it, hoping to "winnow out the less plausible versions of the past and retain those that more adequately explain what happened."[40]

Discussions of oral history practices have been enriched by new applications of communications theory, feminist interviewing, and psychological studies of memory. Beginning oral historians should not be discouraged by the complexity of hermeneutics (the principles of interpretation), discourse analysis (language in use), or deconstruction (hidden and unspoken information in a narrative). Rather than start by trying to put any particular theory into practice, a new oral historian would be better advised to adopt the more pragmatic approach of "putting practice into theory." First gain some experience in conducting interviews before plunging too deeply into

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

theoretical issues. Doing interviews actually raises curiosity about methodological debates, since it soon becomes apparent that the interviewer is more than collecting "just the facts."[41]

These debates over theory and methodology date back to the first oral history colloquium in 1966. In a review of the proceedings of that meeting, Herman Kahn noted that the participants spent much time worrying about the nature and validity of oral history. All their self-questioning reminded him of an adolescent peering into a mirror and wondering, "What am I?" and, "Why am I not better known and more popular?" Introspection will and should continue, but Kahn urged oral historians to get on with their job of interviewing: "They will need to cultivate patience, acquire self-assurance, and be content to leave the proof of their pudding to the scholars who are its ultimate consumers."[42]

### If doing an oral history is a shared responsibility between the interviewer and the interviewee, which one is the oral historian?

Both interviewer and interviewee participate in the oral history, and neither one's role should be minimized, but, for all practical purposes, the oral historian is the one who schedules, prepares for, conducts, processes, and interprets the interview. The interviewer participates in the give-and-take of an interview by questioning and following up on the interviewee's responses and by providing names, dates, and other commonly forgotten information. But interviewers—especially when doing life histories—should never forget whose story is being told.

What's in a name? Some oral historians reject "interviewee" for its passive sound and have embraced more active designations like "informant," "respondent," "witness," and "narrator," the latter term often used by folklorists and social scientists. The weight assigned to the two terms is reflected in the index to a collection of essays on oral history, whose various authors used both "interviewee" and "narrator." The index listing for "interviewee" is divided into "abandonment of," "apparent contradiction of," "deception of," "manipulation of," and "misinformation by." The index terms for "narrator" included "free expression," "power of," and "in negotiation with researcher." The role of both is the same; only the nomenclature differs. Such vocabulary concerns aim to make oral historians more aware of how inequalities in the interviewer-interviewee relationship can influence the interview. Whatever terms employed, keep in mind that an oral history is a joint product, shaped by both parties.[43]

## Memory and Oral History

### Isn't oral history limited by the fallibility of human memory?

The human brain can store the equivalent of three terabytes of information, according to the statistician Nate Silver. "And yet that is only about

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Ritchie, Donald A. Doing Oral History, Oxford University Press, Incorporated, 2014. ProQuest Ebook Central,
Created from gmu on 2025-04-23 15:01:47.

one-millionth of the information that IBM says is now produced in the world *each day*. So we have to be terribly selective about the information we choose to remember."[44]

Dealing with memory is risky business, but it is inescapably the interviewer's business. Every interviewer has a story about someone interviewed too late, when memory had lost its sharpness, begun to dim, or faded almost entirely. Such disappointments are balanced by experiences with interviewees who possess remarkable recall, who remember individuals and incidents clearly, and whose accounts can be corroborated in other evidence. As one of the interviewers who collected oral histories with immigrants for the Ellis Island museum noted, elderly interviewees "might not remember their daughter's phone number. But they do remember what it was like when they got off the boat."[45]

Motivated by the death of baseball legend Ty Cobb in 1961, Lawrence Ritter set out to interview as many of the surviving pre–World War I baseball players as he could find. Traveling thousands of miles, he tracked down a group of elderly men who shared a remarkable storehouse of memories and an ability to articulate them vividly. "Many of the people I talked to had to think longer to get the names of all their great-grandchildren straight than they did to run down the batting order of the 1906 Chicago Cubs," he observed. But they were not garrulous old men chewing over oft-repeated stories. "Well, this is more than I've talked about in years, and it's good," said "Wahoo Sam" Crawford, who had played for the Detroit Tigers at the turn of the century. "I don't see many people, and even when I do I don't talk about baseball too much." As a skeptical researcher, Ritter went back to the old newspapers to verify the stories he heard, and almost without exception found that the events had occurred just as the old-time players had described them, embellished only occasionally "to dramatize a point, to emphasize a contrast, or to reveal a truth."[46]

The study of memory by psychologists often concentrates on short-term memory rather than on the long-term recall of a life span. Short-term memory studies that evaluate the accuracy of an individual's perception of events are of little help in explaining the uncanny preciseness with which some interviewees recall events that took place decades ago or in understanding how interviewees who had reached obvious senility—forgetful even that they had scheduled the interview—can still speak authentically about events far in the past. Long-term memory has been less thoroughly explored, although the phenomenon has often been commented upon. The Confederate leader Jefferson Davis, for instance, on his deathbed began recalling scenes from his youth as a West Point cadet. "I seem to remember more every day," Davis marveled.[47]

The gerontologist Robert Butler postulated that all people, as they grow older and perceive that they are approaching death, undergo a mental process of life review—accounting for depression and despair in some, and for candor, serenity, and wisdom in others. The past "marches in review," permitting the

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

elderly to survey and reflect especially on moments of unresolved conflict. Older people will review their lives whether anyone asks them about their memories or not, either mulling over their thoughts silently, or regaling family, neighbors, and visitors. In this process, the elderly may reveal details of their lives, and characteristics about themselves, previously unknown to their families and friends. Butler concluded that memory "serves the sense of self and its continuity; it entertains us; it shames us; it pains us. Memory can tell our origins; it can be explanatory; and it can deceive."[48]

Oral history is an active process in which interviewers seek out, record, and preserve such memories. Knowing that with age most people find it difficult to recall names and dates, oral historians conduct preparatory research to assist interviewees, give some context and structure to the dialogue through their questions, and mutually address any seeming misstatements and contradictions in the testimony.[49]

### What should interviewers take into consideration about memory?

People remember what *they* think is important, not necessarily what the interviewer thinks is most consequential. When an artist approached Abraham Lincoln with a proposal to paint the scene of the president's first reading of the Emancipation Proclamation to his cabinet, a year after that memorable event, Lincoln had forgotten the exact date and conflated that cabinet meeting with another. It was the significance of the event that remained foremost in the president's mind, not the specifics of the setting.[50]

An oral historian studying Texas teachers who made the transition from the one-room schoolhouse to modern consolidated schools found that white teachers said almost nothing about racial segregation or the details of the integration process. Blacks, Hispanic Americans, and disabled students remained largely "invisible" in their memories. African American teachers by contrast recalled the days of integration vividly because it affected their lives so personally.[51]

Regardless of the project's worthy objectives, a good oral history will always leave room for interviewees to speak their minds, and will not try to shoehorn their responses into a prepared questionnaire or mindset. Since people remember best what was most exciting and important to them; their most vivid memories are often of the earliest days of their careers, when events were fresh and invigorating, even if their status at the time was relatively insignificant. By the time they had risen in stature and assumed more important positions, daily events had actually become more routine, making details of later life harder to isolate and identify during an interview. One interviewee summed up her three decades on the U.S. Senate staff by observing that when she began work, she was young and the senators were old; when she retired, she was old and the senators were young. As is often the pattern, her descriptions of her youthful experiences were lengthier and richer in detail than her recollections of more recent events.[52]

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

After the Second World War, when Congress investigated the Japanese bombing of Pearl Harbor, the chief of naval operations, Adm. Harold Stark, could not recall where he had been the night before the Japanese attacked on December 7, 1941. By contrast, Stark's flag lieutenant, H. D. Kirk, remembered precisely that they and their wives had gone to see a performance of *The Student Prince*, and then returned to the admiral's home, where Stark received a telephone call from President Roosevelt. One of the investigating senators asked Kirk how he could remember the occasion so well, considering that Stark could recall nothing. "Because I was a small fish, and great things were transpiring" Kirk replied, "and you don't forget that sort of thing."[53]

People regularly reevaluate and reexplain their past decisions and actions. Just as historians rewrite history to incorporate new evidence and fit different theories, individuals use the insights gained from current events to help reshape them and make new sense out of past experiences. There is nothing invalidating about this reflectivity, so long as interviewers and researchers understand what is occurring and take it into account.[54]

Memories start with the initial perception. Interviewees speak from their own points of view, and no two will tell a story exactly alike. Not everyone had a clear picture of what happened, understood what it meant, or felt self-assured enough to accept responsibility. The contradictory tales told in the classic film *Rashomon* (1951) represented the tellers' differing impressions, self-images, and self-delusions, but not poor memories. In combat, generals in the rear may see the broad sweep of the battle, and battlefield troops will have a more microscopic view of the action. As Lieutenant John F. Kennedy wrote from the Solomon Islands during World War II: "Frankly I don't know a god-damned thing, as my copy of the Washington Times-Herald arrives two months late, due to logistical difficulties, and it is pretty hard to get the total picture of a global war unless you are sitting in New York or Washington, or even Casablanca. I understand we are winning it, which is cheering, albeit hard to see, but I guess the view improves with distance. I know mine would."[55]

Those at the center of events can well recount their own accomplishments, but those on the periphery are often better able to make comparisons between the principal actors. Perceptions that were originally flawed will produce distorted memories. Distant and secondhand information is more susceptible to distortion. By contrast, direct, dramatic, and emotional situations tend to produce more fixed and lasting memories. For these reasons, oral history projects attempt to collect a wide range of interviews to piece the puzzle together from various points of view.[56]

Not every perceived event is retained in memory. When the radio and television newscaster David Brinkley wrote *Washington Goes to War* (1988), about the years when he first came to the capital as a young broadcaster during the Second World War, he was surprised to find so much in the old newspaper files that had faded from his memory. "I've always thought I had a good memory.

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Case 7:23-cv-00897-RJ    Document 362-13    Filed 04/29/25    Page 19 of 73

Now I know I don't," Brinkley commented. "Things I knew very well and in fact stood and watched and interviewed people about, I'd totally forgotten. That was the startling thing—how much I'd forgotten." Once-meaningful information can become irrelevant or insignificant by comparison to later events. Since Brinkley continued to absorb current news as a journalist, the more events grew distant from the latest headlines, the less he would think about or retain them.[57]

The passage of time enables people to make sense out of earlier events in their lives. Actions take on new significance depending on their later consequences. Certain players grow more important in the story, and others diminish over time. People's memories may take on a more mature, mellow, or disillusioned cast according to their mood and condition at the time of the interview. Community members who share a common experience, such as the trauma of a flood or tornado, will talk about it among themselves for years, reinforcing the memories. By the necessity of availability, oral historians interview "survivors," those who lived through it, stuck to it, stayed behind, or otherwise succeeded—all factors that shape how and what they remember.[58]

Memory sometimes depends on the questions being asked. Robert Gildea described his first interview as a disaster: "I asked an old lady in Angers if she had any memories of the man who had been mayor in 1942. She looked confused. Of course she didn't. I panicked." He took a deep breath and asked, "OK, tell me about your life under the German occupation." That question triggered numerous memories of the war, the bombings, and the neighbors who had died, none of which she had forgotten. Oral historians realize that for most people historical and personal experiences rarely intersect and that memories of the past reflect the individual ways people lived rather than the broad panoply of history.[59]

Interviewers have to consider how credible their interviewees are as witnesses. Were they in a position to experience events firsthand or are they simply passing along secondhand information? What biases might have shaped their original perceptions? Have interviewees forgotten much of their past because it was no longer important to them or because the events were so routine that they were simply not memorable? Do interviewees feel differently now about the events they are recalling? What subsequent incidents might have caused them to rethink and reinterpret their past? How closely does their testimony agree with other documentary evidence from the period, and how do they explain the discrepancies? None of these considerations would disqualify an interviewee from giving testimony, but answering these questions as completely as possible helps the interviewer and future researchers to assess the value of the information recorded.[60]

The memories of direct participants are sources far too rich for historical researchers to ignore. Interviewers must be aware of the peculiarities of

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Case 7:23-cv-00897-RJ   Document 362-13   Filed 04/29/25   Page 20 of 73

memory, adept in their methods of dealing with it, conscious of its limitations, and open to its treasures.

### Don't people's memories tend to become nostalgic?

In his typically tart manner, President Calvin Coolidge once reflected that the folks of his hometown of Plymouth, Vermont, "remember some of the most interesting things that never happened." Coolidge was referring to how history can be inflated by retrospective associations. It is common to encounter rosy reminiscences about "the good old days," considering that oral historians interview older people about their youth, when even disappointments can be remembered as adventurous incidents. Dissatisfaction with present conditions makes the past look far better, and people's very survival can convince them that the hard times were not so bad after all.[61]

What might appear to be nostalgia can be a reflection on what has been lost. Oral histories of African American women who lived through the Jim Crow era in the American South revealed them looking fondly on the past—not on the humiliations of segregation but on the benefits of a more tightly knit community with its vigilant concern for each other, especially when it came to disciplining the neighborhood children. Anne Valk and Leslie Brown, who traveled the South conducting the interviews, concluded that their narrators' positive memories of strict discipline was a longing for a community that had nurtured, supported, and protected its own.[62]

Many interviewees will talk about the pain and suffering in their lives, about humiliation, harassment, and discrimination, about disappointments and losses, but others will block out the most negative aspects of the past or rewritten their own histories, consciously or subconsciously. It is the oral historian's task to move the interview away from nostalgia to confront the past candidly and critically. If things were different in the past, what were they like? When did they change? How did they change? Why did they change?

In the reaction against the elitist practice of interviewing only famous people, oral historians expanded their focus to community-based "people's history." But after letting the people speak, historians examining community history projects soon realized "that 'the people' weren't speaking unadulterated truth." Linda Shopes, who interviewed for the Baltimore Neighborhood Heritage Project, has argued: "So many people want to do oral histories in well-intentioned but extremely naive ways: to get interesting stories, to get the anecdotes, to get the colorful stories, to get the cute things. People don't want to confront the fact that history is…not a happy little story of days gone by." Quite often people do not want to talk about difficult issues, such as the changing ethnic and racial composition of a community or one generation's rejection of another generation's values. Interviewers must be prepared to ask questions about painful and embarrassing subjects—although they must also respect people's right not to answer such questions, if they so choose.[63] But

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Case 7:23-cv-00897-RJ   Document 362-13   Filed 04/29/25   Page 21 of 73

being positive about the past can be more than simply a sense of nostalgia, it can be a sense of self-worth, of having overcome obstacles and made the best of a situation—something that interviewers who did not live through that era might not expect to hear.[64]

Nostalgia is hardly limited to social history. Political historians have observed that the longer politicians are out of office, the more highly people rate them, a phenomenon that has been characterized as the "law of rising recollections."[65] Presidents still in office are compared to their predecessors; out of office they are measured against their successors. The uncertainty of today's headlines sometimes turns past anxiety and turbulence into images of happy days. It becomes more of a challenge for interviewers recording the reminiscences among members of a presidential administration, or associates of some other retired or deceased high-ranking official, to keep them from mentioning only the most positive aspects of their former leader—the side they too often assume is all that the interviewer wants to hear about.

Whole groups may blank out unpleasant memories. When the Southern Oral History Project interviewed the men and women who worked in southern cotton mills during the 1930s, they encountered mostly silence about the General Strike of 1934, "a kind of social amnesia, born of defeat and of the failure of trade unionism to take root in a living tradition." One mill worker explained: "You see, after we come back and got out of the union and got back to work, why that was a thing of the past. . . . You forget about things in the past, 'cause you don't think about them, you don't talk about them, and that leaves your mind." The lack of oral testimony sent the researchers back to the documentary evidence of these events, even if current memories suppressed them.[66]

Oral historians documenting traumatic events of the past have found that many survivors will refrain from talking about those events, even to their own children. Researchers point out that the first stage of grief is shock, and the second stage is denial. People can stay in denial for a very long time. But as they grow older, and as others who shared the experience die, the survivors will grant interviews as a way of reconciling a haunting record and also of ensuring that future generations do not forget. J. Robert Slaughter was part of the first regiment of American troops sent ashore at Omaha Beach on D-Day, which suffered appalling casualties. He and other survivors had great difficulty in readjusting to civilian life. In the 1970s, a British television crew tried to interview him for a documentary, but he could remember nothing, having blocked out the painful memories. Not until the 1990s was he able to confront them. "For a long time nobody wanted to think or talk about all that and what it cost," he commented. "For a long time nobody cared. I began to have nightmares that we'd have to do it again someday." An oral history project of Vietnamese refugees found that parents often kept stories from their American-born children. "They have survived extreme types of experiences— war displacement, the death of half their family, the immigration process,

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Ritchie, Donald A.. Doing Oral History, Oxford University Press, Incorporated, 2014. Accessed April 24, 2025. ProQuest Ebook Central.
Created from gmu on 2025-04-23 15:01:47.

refugee camps—the experiences have left a silence in the community," said the project director, Thuy Vo Dang. "When it comes to the home space, it is very difficult to share these stories." Researchers of the Holocaust hear a similar refrain from victims: "I kept quiet for many years, but soon I will be gone and now I must tell my children."[67]

### What is "public memory?"

By contrast to individual memories of personal experiences, public memory represents a society's collective conceptions about the past. Public memory involves symbols and stories that help a community define and explain present conditions according to how it remembers (or wants to remember) the past. These can take the form of parades, reunions, reenactments and celebrations, or via monuments and landmarks that often represent reconciliation and healing after a war or tragic event. Such commemorations often have a political connotation, the historian John Bodnar observed, designed to "stress the desirability of maintaining the social order and existing institutions."[68]

Since individuals experience events differently and maintain different social objectives, they will hotly contest issues of public memory. Arguments predictably erupt over the design and location of monuments and the inscriptions placed upon them. The dispute over an appropriate Vietnam veterans memorial, for instance, invoked earlier controversies as groups who had differed over fighting the war now disagreed over how to portray it. Politics lies behind every public monument and also explains the absence of monuments and memorials to people and events that communities would prefer to forget. Public memory can also influence personal memory, since people within a community absorb the public debates and internalize particular positions. Interviewers need to be conscious of a community's collective beliefs and try to move beyond public memory to the personal experiences of those they interview.[69]

Recognizing that what people remember can be shaped by their social environment, scholars have analyzed the ways in which communities construct and use their collective memory, and what they pass along to succeeding generations. Alessandro Portelli conducted interviews in the Italian town of Terni, where he gathered several versions of the death of Luigi Trastulli. A twenty-one-year-old steel worker, Trastulli had died in a clash with police. Contemporary newspaper accounts placed the date of his death in 1949, when steelworkers walked out of their factory to attend a communist-sponsored rally against the Italian government's joining the North American Treaty Organization (NATO). But as time passed, the townspeople collectively altered the story to give it epic form. One interviewee after another shifted the date and context of the Trastulli's death from the anti-NATO rally to the street fighting that followed a massive layoff of steelworkers four years later. Wondering why so many people got it "wrong," Portelli concluded the community had

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Ritchie, Donald A. *Doing Oral History*. Oxford University Press, Incorporated, 2014. Accessed April 24, 2023, ProQuest Ebook Central.
Created from gmu on 2025-04-23 15:01:47.

been unable to accept Trastulli's death as an accidental shooting in a minor scuffle over a fleeting political issue. Instead, people had relocated the event to a far bigger dispute that involved their basic livelihood. As transfigured, Trastulli's death helped heal the community's wounds and to instruct the next generation: "He died for you."[70]

### Is public memory the same as "collective memory"?

Sociologists began discussing "collective memory" a century ago, but the term did not catch on among historians until the 1970s, when they began paying more attention to how popular and folk cultures constructed the past. "Collective memory" became an all-encompassing category that covered "folk history," "popular history," and even "myth." It included the shared stories that individuals within the same group remembered.[71]

Alessandro Portelli has avoided using the term "collective memory" on the grounds that "no two persons' memories, like fingerprints—indeed, like voices—are exactly alike." Memory may be shaped by peoples' social environment, but the act of remembering is deeply personal. His experience as an interviewer taught him that memory is not "a passive depository of facts, but an active process of creation of meanings." The changes in people's memories over time reveal their efforts to make sense of the past and to place their stories into some historical context.[72]

While oral historians have found value in the expanding scholarship on collective memory, and have learned much about interviewing within a community, they also regularly encounter ways that individual memories do not fit collective patterns. The historian Anna Green argued that "contemporary theorizing around collective memory has paid too little attention to the capacity of individuals to reflect critically upon both their own experience and practice, and those of others." Oral historians, by contrast, want "to keep space for the resilient, curious, rebellious, thoughtful, purposeful human subject."[73]

### Don't movies, television, and novels distort the way people remember their own experiences?

Film and fictional portrayals of historic events can filter into people's memories, confusing images with real events. Interviewers need to take popular culture into account and scrutinize the collective evidence. But skepticism does not justify a blanket dismissal of the memories and opinions of the bulk of participants in the actual events.

The Vietnam War became such a staple in movies that sociologist Jerry Lembcke recommended that students stop interviewing Vietnam veterans altogether. He dismissed the veterans' memories as collectively unreliable. Lembcke reasoned that Vietnam veterans felt pressure "to conform to the conventional images of what a veteran is suppose to be" and told "easily digestible

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Case 7:23-cv-00897-RJ   Document 362-13   Filed 04/29/25   Page 24 of 73

war stories," particularly about their coming-home experiences. In particular, he objected to the frequently told stories of veterans being spat on when they came home from the war because he found no contemporary news reports to support those claims. In *The Spitting Image: Myth, Memory and the Legacy of Vietnam* (1998), he concluded that if accounts of veterans being verbally and physically assaulted could not be documented, they must have been conjured up.[74]

By contrast, when Bob Greene surveyed veterans for his book *Homecoming* (1989), the responses he collected divided roughly between those who had stories of abuse, including spitting, and those who doubted that anyone was spat on. Although he could not prove their authenticity, Greene concluded that "there were simply too many letters, going into too fine a detail, to deny the fact."[75] The absence of news accounts neither disproves memory nor proves the absence of actions.

Since writers will disagree in their interpretations, no book can offer a definitive version of the past. The mass of interviews conducted with Vietnam veterans will similarly produce conflicting accounts. Lembcke conceded that image of the spat-on veteran was, "of course, only the grounding image for a larger narrative of betrayal." Being "spit on" might be verbal shorthand for a variety of forms of disparagement and disappointment they felt returning from an unpopular war. Lembcke recommends that students' education "might be better served by reading a good history book about the war than interviewing the veteran." But reading and interviewing are not exclusive actions; good interviews depend on prior research. It would be better to listen to the veterans' complaints than to write them off as mass delusion.[76]

### What's the difference between oral history and folklore?

Oral historians and folklorists both use interviews to collect information, but not necessarily the same type of information. The two practices have been described as opposite ends of a continuum: oral historians concentrate on recording the personal experiences of the interviewee, and folklorists collect the traditional stories, songs, and other expressions of the community—fact or fiction. An oral historian would most likely interview a husband and wife separately, seeking to identify the unique perspective of each spouse. A folklorist, being as interested in the way a story is told as in its substance, would interview the couple together to observe the interplay as one begins a story and the other finishes it. The folklorist Barbara Allen has observed that historians "tend to see oral historical sources as mines of raw data from which historical evidence can be extracted," while folklorists are more concerned with "recognizing identifiable patterns" in the way people shape their narrative.[77]

For years, historians were suspicious of folklore as little more than folktales and hearsay. Social and cultural history finally helped bring the disciplines together, facilitated by oral history because of the shared interest in oral

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

testimony. Oral historians, folklorists, ethnographers, cultural anthropologists, sociologists, and linguists, all interview but have different objectives that influence their methodologies. "Field-oriented" disciplines rely on participant observation and may not even take notes in the presence of those they are studying, waiting to write their notes later from memory. Unlike historians, who seek concrete evidence of what actually happened and to document it as fully as possible, folklorists, ethnographers, and anthropologists are often less interested in verification of facts and see folktales and folklore as no less legitimate than other stories. Linguists will often be more concerned with the manner of telling a story than its substance. Despite the distinctive way that these assorted disciplines analyze and use interviews, the intersection of their methodological techniques has permitted collaborative, cross-disciplinary oral history projects on a range of community, racial, ethnic, and immigration issues.[78]

Oral history has helped bring the disciplines of history and folklore closer together out of a shared interest in the oral transmission of knowledge. Folklorists watched with some bemusement as oral historians gradually came to grips with stereotype and myth in the oral testimonies they were collecting, "learning to detect versions of folktales and to listen to testimonies as oral literature. In so doing they were, of course, re-entering a field long worked by folklorists."[79]

In the 1930s and '40s, when the folklorist Alan Lomax began recording American folk music, he also recorded hundreds of hours of interviews with such legendary performers as Huddie "Leadbelly" Ledbetter, McKinley "Muddy Waters" Morganfield, Ferdinand "Jelly Roll" Morton, and Woodrow Wilson "Woody" Guthrie. Lomax interviewed Guthrie over a three-day period and recorded—for scholarly research rather than commercial release—to show how folk culture captured American working-class life. Lomax asked Guthrie to introduce his songs and also posed questions to draw Guthrie out on the songs' origins and themes. Lomax also recorded countless folk musicians who never made names for themselves. "It is the voiceless people of the planet who really have in their memories the 90,000 years of human life and wisdom," he said. "I've devoted my entire life to an obsessive collecting together of the evidence."[80]

### Can storytelling be considered oral history?

Diverse cultures depend on storytelling to pass along knowledge and understanding. The storyteller might be a parent teaching a child, a tribal elder recalling communal traditions, a preacher illustrating a point in a sermon, an Old Salt spinning a yarn, or anyone else able to recount past experiences in a manner entertaining enough to hold a crowd. Folklorists find that tales passed down, family lore, and community legends have value as much for their

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

form—how they are told—as for their content. Such stories are often communal in nature, transcending the individual experiences they describe. Recurring stories within a community that emerge in oral history collections also reveal what people consider to be the key aspects of their historical experience.[81]

In those cases where storytelling takes place without an interviewer who can pursue issues raised in the stories by questioning the narrator, it does not fit the standard definition of oral history, but its study illuminates some significant issues facing oral historians. Most storytellers aim not so much to preserve a permanent record as to inform and influence their immediate audience. Although the storyteller usually controls the performance, the particular setting and audience can affect the story's presentation. Telling a story in a new setting, to a new audience creates new meanings. Storytelling reminds us that all oral presentations involve a degree of performance, and that the audience (even an audience of one, as in the interviewer) can affect that performance. Stories told in an interview often involve a retelling of something the interviewee heard from someone else or has previously told to others. As the "audience," the interviewer can affect in subtle or even striking ways the content of the story. The process continues after the interview is completed. The oral historian William Schneider has pointed out that "once the narrator stops talking and the recorder leaves with the tape, the teller no longer knows who will hear it and how they will understand what he or she said." Some sensitivity to the nature of storytelling is therefore essential to the management of oral history collections. To be fair to participants, Schneider advises, "We have to be mindful of a wide range of considerations, not the least of which is the oral tradition from which the narrator may have built the telling and from which the audience derives its background for understanding what has been shared."[82]

### What is StoryCorps?

Since 2003, a not-for-profit organization called StoryCorps has collected thousands of brief interviews that highlight dramatic and emotional moments in people's lives. The project provides recording booths where friends and family can bring someone whose story they want to record and allots them forty minutes to talk to each other. StoryCorps's founder, Dave Isay, notes that most people tend to ask "the big life questions," about what they have learned or how they want to be remembered. Many of their stories revolve around the relationship between the interviewer and interviewee, as parents and children, siblings and friends. They are ordinary people who recount small acts of kindness or courage. Doing a StoryCorps interview reassures them that they matter and that their stories will not be forgotten. At the end of the session, they receive a copy of the recording. A second copy is sent to the Library of Congress to become part of "an oral history of America." Edited excerpts of selected interviews are then broadcast weekly on National Public Radio and posted on the

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

StoryCorps website. The project inspired the British Broadcasting Corporation (BBC) to launch a similar Memory Share program.[83]

StoryCorps broadcasts are often characterized by tearful moments—a box of tissues being standard equipment for the recording booth. Oral history interviews may also contain poignant interludes but not as their focus or their intent. StoryCorps interviews lack the advance research and the sustained examination involved in a full life interview, making the typical StoryCorps interview what critics have called "a highly ritualized performance." Although StoryCorps deviates from standard oral history practices, it has helped popularize the idea of oral history. It has given many who might not have been interviewed otherwise a chance to tell their stories, in abridged format, helping them see their personal experiences as history.[84]

### Is it better to interview immediately after an event or wait until years later?

There are advantages and disadvantages to each course of action. The military pioneered debriefing interviews with soldiers immediately after a battle or after returning from a combat tour of duty. Memories of details will be sharper the closer to the actual events that the interview occurs. But interviews conducted long after the events benefit from the interviewee's reflections that better enable them to weigh the events and sort the significant from the trivial. Debriefings tend to be shorter and more focused interviews. Later oral histories, especially life review interviews, tend to be more extensive.

The day after the bombing of Pearl Harbor in 1941, Alan Lomax contacted other folklorists around the country to collect "man on the street" reactions. Recordings of interviews that ranged from janitors to physicians, cab drivers, housewives, students, and soldiers were then sent to the Library of Congress and used to create a radio documentary program for national broadcast and distribution to schools. Sixty years later, within a week of the terrorist attacks on September 11, 2001, oral historians began interviewing witnesses and survivors. The Columbia Oral History Research Office, together with the New-York Historical Society and other New York museums, quickly launched a project to interview those who had escaped the World Trade Towers, families of victims, police and fire fighters, rescue and relief workers, and members of nearby Muslim communities. Underwritten by the National Science Foundation, the project not only conducted initial debriefings but also planned additional interviews in later years to examine the durability of memories of traumatic events. At the Library of Congress, the American Folklife Center initiated the "September 11, 2001, Documentary Project" to record the thoughts and feelings of citizens across the country. Historians for the National Park Service and the Red Cross taped interviews with eyewitnesses to the tragedies, while historians for the military services interviewed those who experienced the plane crash at the Pentagon. The Senate Historical Office conducted interviews

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Ritchie, Donald A. Doing Oral History, Oxford University Press, Incorporated, 2014. ProQuest Ebook Central,
Created from gmu on 2025-04-23 15:01:47.

concerning the evacuation of the Capitol Building on September 11 and the anthrax contamination that closed the Hart Senate Office Building for three months. "Down the road, researchers also will use newspaper accounts, videos and film, government documents and mementos culled from the destruction to study that day. There will be intelligence reports, declassified years from now, to add to the record," the *Wall Street Journal* noted. "But it is the oral histories that are most likely to help researchers understand what it felt like to be under attack on that late summer morning."[85]

### What distinguishes a "life history" from other interviews?

Gerontologists refer to the "life review" process of the elderly, and oral historians speak of conducting "life histories," by which they mean full-scale autobiographical accounts that allow interviewees to relate their entire life, from childhood to the present. Social scientists may concentrate on a series of shorter interviews with members of a group in a particular community or environment, such as workers on a shop floor. Oral historians call these "episodic" interviews. Shorter interviews conducted with members of a group soon after they shared a mutual experience are referred to as "debriefings." Conducting life histories usually means selecting fewer interviewees and devoting more time, and multiple interview sessions, to each one. Life histories give the interviewee enough time to relate what both the interviewer seeks and the interviewee wants to tell. The oral historian conducting even a subject-oriented project should seriously consider expanding the scope of its questions to record as much as possible about each interviewee's life. Broader questioning establishes links that neither the interviewer nor the interviewee may have considered in a more narrowly focused interview session.[86]

When the Oregon Historical Society launched an oral history of the federal court system in its state, it focused on the people who conducted the court rather than the institution of the court itself. Following a full biographical approach proved especially useful when dealing with the appointment of judges. An institutional approach might also have included questions about a judge's appointment, but interviewers found that the meaning and significance of the responses were enhanced when told within the context of the judge's full life history.[87]

The first presidential library oral history projects concentrated almost exclusively on the interviewees' relationships with the president or roles in the administration. This produced a large number of relatively short interviews. In later years, some of the libraries returned to reinterview the key players in more depth. In this second round of interviewing, the oral historian at the Lyndon B. Johnson Library conducted thirty-six hours of interviews with Lawrence O'Brien (who served as congressional liaison and postmaster general), and sixty-four interview sessions with Joseph Califano (who was special assistant to the president for domestic affairs). Although

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Ritchie, Donald A.. Doing Oral History : Oxford University Press, Incorporated, 2014. ProQuest Ebook Central,
Created from gmu on 2025-04-23 15:01:47.

this level of in-depth interviewing lies beyond the budget of most oral historians, other projects should aim, at least on a selective basis, to do fuller life histories. Even individual researchers need to look beyond their immediate interests when interviewing. The American Historical Association has advised that "to the extent practicable, interviewers should extend the inquiry beyond their immediate needs to make each interview as complete as possible for the benefit of others."[88]

When women at the Washington Press Club Foundation launched the Women in Journalism oral history project, the journalists debated why they, professional interviewers, needed to hire oral historians. After several sessions, in which an interviewer asked open-ended questions, listened intently, and encouraged the interviewee to speak at length about her life and career, the journalist being interviewed observed, "Now I understand why we hired oral historians."[89]

## Public History and Oral History

*What is the role of oral history in "public history"?*

Public history was once defined exclusively in terms of historians' activities in public agencies and as private consultants outside the university. But the definition has expanded beyond place of employment to include the audiences that historians try to reach. Public historians aim for an out-of-school public audience, which might be officials in a government agency, corporation, union, philanthropic organization, or professional association that employs the historian or which might be the library-using, documentary-viewing, museum-going general public. Other professional historians, for whom the bulk of historical literature is intended, account for only a small portion of the public historian's audience.[90]

Public history is an organized effort to bring accurate, meaningful history to a public audience, and oral history is a natural tool for reaching that goal. The oral history and public history movements share a natural affinity, both having attracted practitioners and audiences different from those of more traditional history writing. Both oral and public history have experimented with the use of audio and video, and interactive videos, in museum exhibits, dramatic performances, and other applications outside the classroom and in publications and websites.[91]

*How pervasive is oral history within government?*

Governments at all levels have come to appreciate the utilitarian aspects of oral history. Government agencies hire historians on staff or on contract to use oral history as a tool for collecting and presenting information relating to that agency's operations. When the Washington-based Society for History in

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Ritchie, Donald A.. Doing Oral History, Oxford University Press, Incorporated, 2014. Accessed April 24, 2025, ProQuest Ebook Central.
Created from gmu on 2025-04-23 15:01:47.

the Federal Government conducted a survey, it found oral history projects in all branches of the military, the intelligence agencies, many cabinet departments, Congress, the federal courts, the Smithsonian museums, and independent agencies from NASA to the National Institutes of Health. The National Park Service has the most ongoing oral history projects, with historians and rangers across the country collecting interviews for use in documenting the sites and producing visitor-orientation materials. In addition to documenting wilderness environments, Park Service interviews explore social history topics from ethnicity to civil rights, at locations ranging from the Statue of Liberty National Monument to the Selma to Montgomery National Historic Trail. The U.S. Forest Service has partnered with local universities to collect interviews with the "rough and ready" rangers who built trails, bridges, and ranger stations; acted as fire guards; and strung the first telephone wires through the national forests in the 1920s and '30s; and those who followed them.[92]

Perhaps the most common programs interview the staff of the sponsoring agency, who discuss their careers and evaluate the political appointees, policymaking, and institutional changes they have witnessed. Retired staff members, whose obscurity and anonymity mask the often significant roles they played in their agencies, offer recollections that can explain and unravel the voluminous, impersonal, and unrevealing written records of the modern bureaucracy. Public historians possess several advantages in conducting these staff interviews. As employees of the same agency, they have a better chance of obtaining access to agency files, whether open or classified. They share a familiarity with arcane agency procedure that helps not only in preparing questions but also in establishing rapport and obtaining candid responses.

Most often, oral history is a component part of a government historical office rather than its primary mission. Periodically, however, Congress has appropriated funds specifically for an oral history. In 1998, when Congress directed the National Park Service to establish a historic site in Tuskegee, Alabama, that would memorialize the World War II African American pilots known as the Tuskegee Airmen, it earmarked funds for an oral history with the survivors. Their experiences dated to the era when both training and combat assignments had been racially segregated. Two years later, Congress authorized the American Folklife Center at the Library of Congress to establish a nationwide Veterans History Project. Citizens responded by donating tens of thousands of audio and video oral histories with war veterans from World War I to the war in Afghanistan.[93]

The British Library has conducted more than 2,500 in-depth interviews in its National Life Stories on every aspect of British life, including the oil and steel industries, the food sector, utilities, science and technology, computing, aerospace, the crafts, art and photography, architecture and design, horticulture, charitable activities, banking and finance, publishing and authorship, theater and fashion design, and the media. Historians in the British Parliament, more

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Ritchie, Donald A. *Doing Oral History*, Oxford University Press, Incorporated, 2014. ProQuest Ebook Central,
Created from gmu on 2025-04-23 15:01:47.

accustomed to dealing with parchments as they wrote biographies of former MPs, have begun to create a sound archives for the modern era. Although often dealing with already very well-documented lives, their oral histories have gone beyond the boundaries of institutional history to record the members' personal and emotional experiences, how they felt about events as well as what they did.[94]

Local governments everywhere have also delved into oral history to promote a community anniversary or some other significant event, or to document the workings of the government. Projects have ranged from a metropolitan transit authority's collection of interviews with subway workers to a state department of natural resources sponsoring a video history of the state's park, forest, and wildlife management. On a worldwide basis, local councils from Sidney to Southampton have funded oral history to record events of significance to their communities.

### How have oral historians marketed their services?

The public presentation of oral history has generated a number of independent enterprises. Oral historians have set up businesses to conduct family interviews, and they work as freelance interviewers for corporations, charitable trusts, scientific organizations, and various other government and private agencies. Charles Morrissey, who made a career as a freelance oral historian in fields ranging from politics to biomedical research, commented, "To my total amazement, once my availability evidenced itself to others, the number of clients seeking help from me as an oral historian became formidable."[95]

Some interviewers operate independently, while others have formed business organizations. Bruce Weindruch created the History Factory to conduct oral histories and build and preserve corporate archives. His clients have included corporations that had merged or otherwise transformed over the years and were concerned about losing their character or wanted to commemorate an anniversary. Philip Cantelon founded History Associates, which has done oral histories for government agencies and various corporations. University-based oral history projects have similarly partnered with corporations. The Amfac Land Company contracted with the Center for Oral History at the University of Hawaii to interview longtime laborers and managers at the company's former sugar mills and plantations in the islands, a century-old way of life that is ending. Such projects have been remarkably successful, but as one independent interviewer noted, "When your funding depends on grants, as mine does, I spend more time writing reports and applying for grants than I do interviewing."[96]

Business executives began to appreciate the need to capture history "before it walks out the door." They saw the value of interviewing during changes in management and corporate cohesion, and before veteran employees' retirements; they used interviews for long-time employee recognition as well as for

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Ritchie, Donald A. Doing Oral History, Oxford University Press, Incorporated, 2014. Accessed April 23, 2025. ProQuest Ebook Central.
Created from gmu on 2025-04-23 15:01:47.

the introduction of new staff to the business. They have applied it to learning lessons from disasters, for health and safety training, and for brand building. When the president of Atlantic Richfield Company (ARCO) concluded that the corporation was losing knowledge of its "epochal events" because employees and manager with firsthand knowledge of those events were dying, he commissioned an oral historian to conduct interviews that would produce both an oral history archival collection and a written history of the company. The book was intended to make the company "more human and real" to the public, as well as to help ARCO employees better understand and thereby identify with the company so that they would become "more loyal and dedicated employees." Management used the oral histories to develop case studies on decision-making processes and for workshops to train potential corporate executives.[97]

Oral historians studied the change in leadership at Royal Philips Electronics that underwent a reorganization eliminating 55,000 employees, which created a deeply emotional time for the corporation. Using a three-tiered approach, the first phase of interviews involved general questions, the second round was more specific, and the third round became almost a debate. As a group, the interviewees were asked to reflect on the history of the organization. Through this approach, the interviews reconstructed how corporate decisions were made, and they were then used in the application of organizational studies.[98]

In contrast to such corporate activities, oral history has also been used for public-interest projects. In the Southwest, anthropologists, historians, legal scholars, lawyers, folklorists, and oral historians worked together to assist citizens in fighting for land and water rights. The New Mexico-based Center for Land Grant Studies was particularly concerned with protecting the rights of Native Americans and Mexican Americans who lacked the traditional types of ownership documentation to their lands. Representatives of the center used oral history as part of their courtroom testimony—a use that required proper techniques for gathering oral evidence and a greater need to assess the reliability of the oral testimony.[99]

### What are the potential drawbacks of doing corporate oral history?

Doing corporate oral histories may involve some unique challenges. Business executives may schedule interviews for fifteen minutes before lunch, keep the interviewer waiting, or bring a public relations officer to the interview. These circumstances will require some negotiating to set more favorable interviewing conditions. An even trickier challenge is dealing with interviewees' criticisms of the company that is paying for the project. Corporate interviewers who have been commissioned to record a company history "warts and all" sometimes find that their clients had not bargained for so many warts.[100]

In Great Britain, the economic turmoil that led to the failure of Barclays Bank and the merger with the Royal Bank of Scotland led both institutions to

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Case 7:23-cv-00897-RJ    Document 362-13    Filed 04/29/25    Page 33 of 73

launch oral history projects when they determined that their written archives inadequately told their story. Similar projects developed within the British Broadcasting Company, the *Guardian* newspaper, and the Sainsbury grocery store chain. Corporations used these interviews for diagnostic purposes, for development planning, and to boost employee morale. But criticism has been leveled at corporate oral history, Rob Perks has noted, for being "a cozy and comfortable public relations exercise" rather than a serious academic study, and that "such projects are fatally flawed through being commissioned and funded by corporate bodies."[101]

Oral historians sometimes have trouble explaining their purposes and translating their work to corporate executives. Those hired to do corporate projects report that many corporate executives and policymakers do not understand how historians work or how they use oral histories and that they need to be educated about the methods of historical research. Managers and other corporate executives often do not value or use their corporate archives and fear the consequences of allowing outsiders to see their records. They will not open records even for the historians they hire. They assume that oral historians, like journalists, can interview anyone, anytime, without extensive research. Oral historians have to explain their needs to see records to prepare adequately for their interviews. Sometimes, however, these records will not be forthcoming. In the 1960s, for instance, interviewers for the John F. Kennedy Library were initially denied access to Kennedy's records.

Charles Morrissey has observed that corporate managers tend to select prospective interviewees depending on their rank in the corporate hierarchy, whereas oral historians want to interview those who actually shaped the issues being studied, "even if they are obscure figures in the structured bureaucracies and do not command power or deference within their institutions." In fact, these seemingly anonymous members of the institution may have drafted the letters and speeches of higher executives and may have proposed the policies that the hierarchy adopted. They often have the least biased perspective on the institution. Lower level staff members may actually have a clearer view of how policies evolved, be better able to evaluate people and programs, and have not only more detailed memories but also a greater "willingness to impart what they remember."

Interviewers should try to align with one of the senior members of an organization, such as the chairman of the board, the chief executive officer, or the director of a public agency, who can open doors for the project and get access to records. The interviewer should brief top policymakers about the project as it evolves, giving them an idea of what methods are being employed and what information is being collected. Public historians are not public relations specialists and should not be required to tailor their work to reaffirm the picture an institution may promote to the public. To be useful to clients, a historical study has to be honestly critical. The public historian's need to maintain

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

professional standards works both ways: not only must historians be honestly critical, but they must also be willing to keep information confidential according to the policies of the organization that hired them.[102]

### Can exit interviews be considered oral histories?

Corporations, associations, and government agencies may conduct exit interviews with employees as they leave the organization to collect feedback on what they did and why they are leaving. These interviews may then used to assess a position and determine whether it should be revamped. The U.S. Army mandates "end-of-tour" interviews with division commanders and makes them available to their successors to better understand the issues that they faced and how they dealt with them. Exit interviews tend to be brief and conducted from a questionnaire. Usually they are conducted face-to-face, but they may also be done by mail or electronically.[103]

Exit interviews resemble oral histories, except that by nature they are briefer and less detailed. They may be a requirement of the job, which can make the relationship between the interviewer and interviewee more formal. Yet, such short interviews can serve as a preliminary guide to selecting the best candidates for longer life review oral histories, providing an outline of what they did and determining who are the most forthcoming narrators. Participants will often cooperate because they see the interview as their final contribution to the company where they spent their careers.

### What will future historians want from our oral histories?

Researchers will want to hear the first-person observations of events great and small, and to learn what sense those people made of the events in their lives. Motivations and objectives are especially important. Other sources can usually provide the who, what, when, and where of history; interviews can offer better insights into the how and why. The historian's job is to pull together a multitude of evidence from documents, objects, interviews, and other resources, weaving them together to create a narrative that makes sense of all the, often conflicting, evidence.

Not all human activity is coherent and purposeful, the historian Elie Kedourie pointed out; it is more often a complex of choices producing unpredictable effects. Kedourie defined history as an account of people "in the peculiarity, idiosyncrasy, and specificity of their personalities, outlooks, capacities, and positions, confronting or dealing with other [people] differently placed in respect to these things, and confronting or dealing with them in situations different from one another at least in respect of time and place, initiating, originating, taking measures, parrying, responding, reacting; the vocabulary we use to describe all this amply indicating that here are present and involved purpose and choice, mind and will." Or, as Ecclesiastes 9:11 instructs, "The race is not to the swift, nor the battle to the strong…but time and chance

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Case 7:23-cv-00897-RJ   Document 362-13   Filed 04/29/25   Page 35 of 73

happeneth to them all." Oral history records both the purposeful and the accidental. Interviewers who allow people a chance to assess why they did what they did will most likely capture the peculiarities and idiosyncrasies of the history of our time.[104]

Historians writing a dissertation or a book, planning an exhibit or scripting a documentary, will have their own set of questions they want to ask but may not have the opportunity to ask those questions personally. I first used oral history while writing a biography of a man who had died ten years earlier. Fortunately, he had given a lengthy oral history to Columbia University just months before he died. It was a thoroughly detailed, in-depth life history, amounting to 700 pages of transcripts. Since I could no longer question the man, Columbia's interviewer served as my surrogate. Today's oral historians are doing the preliminary work of tomorrow's biographers and researchers, hoping they will not have to agonize too often over the questions we failed to ask.[105]

Oral history is about asking questions. While researching the history of Methodist camp meetings in Southern Mississippi, Charles Sullivan sought to visit every campground still operating. One day he mentioned to a student each of the camps that he had identified. "Yes, and M[ount] Pleasant, too," the student responded, explaining that it was a black Methodist campground established after emancipation from slavery. Astonished, Sullivan wondered why no one had mentioned this camp before. "Probably because you never asked," was the reply. That is the reason for doing oral history: to ask the questions that have not been asked and to collect the reminiscences that otherwise would be lost.[106]

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Ritchie, Donald A.. Doing Oral History, Oxford University Press, Incorporated, 2014. ProQuest Ebook Central,
Created from gmu on 2025-04-23 15:01:47.

# 4

# Using Oral History in Research and Writing

*Oral history methodology seems geared to large projects; how much of it can the individual researcher apply to interviews for a book or an article?*

Individual resources may be more limited than those of a group project, but many an individual researcher is no less concerned about making interviews fully usable. Since researchers are the primary users of the information they collect, they ought to set their own standards to at least equal, if not surpass, those of an oral history project or archives. Both projects and individual researchers want to collect oral documentation that is complete, accurate, and reliable; but researchers scrutinize even more intensely than do project interviewers what they hear in the interviews they conduct and apply a higher degree of professional skepticism to them. They seek verification in other sources for information gathered through interviews, and they evaluate contradictory material to draw their own conclusions.

Despite their focused efforts and self-defined goals, individuals doing their own interviewing bear definite professional responsibilities. The American Historical Association has issued the following recommendations for individual interviewers:

1. Interviews should be recorded on tape but only after the person to be interviewed has been informed of the mutual rights and responsibilities involved in oral history, such as editing, confidentiality, disposition, and dissemination of all forms of the record. Interviewers should obtain legal releases and document any agreements with interviewees.

2. The interviewer should strive to prompt informative dialogue through challenging and perceptive inquiry, should be grounded in the background and experiences of the person being interviewed, and, if possible, should review the sources relating to the interviewee before conducting the interview.

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Ritchie, Donald A.. Doing Oral History. Oxford: Oxford University Press, Incorporated, 2014. Accessed January 22, 2025. ProQuest Ebook Central.
Created from gmu on 2025-01-22 16:43:10.

3. To the extent practicable, interviewers should extend the inquiry beyond their immediate needs to make each interview as complete as possible for the benefit of others.

4. The interviewer should guard against possible social injury to or exploitation of interviewees and should conduct interviews with respect for human dignity.

5. Interviewers should be responsible for proper citation of oral history sources in creative works, including permanent location.

6. Interviewers should arrange to deposit their interviews in an archival repository that is capable of both preserving the interviews and making them available for general research. Additionally, the interviewer should work with the repository in determining the necessary legal arrangements.

7. As teachers, historians are obligated to inform students of their responsibilities in regard to interviewing and to encourage adherence to the guidelines set forth here.[1]

*Why bother to record interviews? Why are notes not sufficient?*

After years of scribbling notes during class lectures, many researchers feel perfectly able to take coherent notes during an interview. They consider a recorder an unnecessary expense, a bother to worry about, and a possible barrier to a candid interview—whether with public figures, who may be overly cautious about having their words recorded, or with nonpublic figures, who may be intimidated by talking into a microphone. Some researchers consider note taking superior to tape recording. Barbara Tuchman, for instance, complained that tape recorders simply encouraged people to "ramble effortlessly and endlessly." She described note taking as a "crystallizing process" in which the writer automatically distinguishes the significant from the insignificant. Others have cited the risk of the recorder breaking down at crucial moments as their rationale for not recording.[2]

Such responses combine cogent truths and unnecessary rationalizations. Audio and video recorders are no longer such an expense or a novelty. They can be purchased for a reasonable cost, are easy to operate, and have become so commonplace that few interviewees will be surprised or uncomfortable to see one. More important, recording radically expands and improves any interview. The longer interviews last, the more interviewers tire and miss nuances. Later, when listening to the recording, interviewers inevitably hear more than they did during the interview itself. Note takers may make honest mistakes in what they hear or find their handwriting hard to decipher. Note takers also run the risk of hearing only what they want to hear rather than what the interviewee actually says—a recurring phenomenon to which anyone interviewed by the media can readily attest.

Note taking makes some researchers feel more comfortable because it helps focus their attention—as they listen to what is being said—on the exact points

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Ritchie, Donald A.. Doing Oral History, Oxford University Press, Incorporated, 2014. Accessed January 22, 2025. ProQuest Ebook Central.
Created from gmu on 2025-01-22 16:43:10.

they anticipate later using. But there is no reason not to record and take notes at the same time. The notes can serve as the recording's index, which is especially useful if a full transcript cannot be made.

Recording is the researcher's best means of self-protection. Interviewees may object to how they were quoted or may not be willing to stand behind statements they made in their interviews. A recording of the interview provides the documentation to defend against such reactions. Some interviewees, especially the more prominent, may be so skittish about being misquoted that they will insist that the interview be recorded. For his biography of Henry Kissinger, Walter Isaacson interviewed former President Richard M. Nixon. Isaacson took notes, while Nixon recorded the interview. When the tape recorder broke down, Nixon commented, "I've never been very good with these things."[3]

### What if a potential interviewee refuses to be recorded?

Interviewers operate under ground rules that interviewees set. For an oral history project, such an objection would likely cause that person stricken from the list of potential interviewees, since there usually remains little reason to conduct an oral history if it cannot be recorded. But the individual researcher may consider the person a critically important source, regardless of the ground rules. Notes may be inferior to a recording, but they are better than nothing. As soon as the interview session is over, the interviewer needs to write down as full an account as notes and memory permit.

An interviewee may decline to be recorded out of fear or vanity, emotions that can sometimes be overcome by some reassurances and flattery. The late historian Gordon Prange, whose ego matched the monumental books he wrote on the Second World War, refused to be recorded during an interview on the grounds that Gen. Douglas MacArthur had never allowed his interviews to be recorded. The interviewer took notes for a few minutes and then injected, "What a shame that this isn't being recorded, Professor Prange, because my notes will never do justice to your cogent thoughts and beautifully crafted sentences." Accepting that as a point well taken, Prange permitted the recorder to run for the rest of the interview.[4]

### But why make a recording if you cannot afford to transcribe it?

You can make notes from your own recordings without having to transcribe them entirely. Having the recording allows you to quote accurately and to pick up nuances you may have missed during the interview. The recording can be quoted, cited, deposited in a library, and referred back to for proof should any queries arise about the accuracy of the material.

Transcripts are costly and time-consuming to create, but they increase the usefulness of an interviewer to everyone, including the original interviewer. Researchers planning to conduct extensive interviews for a dissertation, book, or other project should seek a logical repository, whether it be a university

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Ritchie, Donald A.. Doing Oral History, Oxford University Press, Incorporated, 2014. Accessed January 22, 2025, ProQuest Ebook Central.
Created from gmu on 2025-01-22 16:43:10.

# 4

# Using Oral History in Research and Writing

*Oral history methodology seems geared to large projects; how much of it can the individual researcher apply to interviews for a book or an article?*

Individual resources may be more limited than those of a group project, but many an individual researcher is no less concerned about making interviews fully usable. Since researchers are the primary users of the information they collect, they ought to set their own standards to at least equal, if not surpass, those of an oral history project or archives. Both projects and individual researchers want to collect oral documentation that is complete, accurate, and reliable; but researchers scrutinize even more intensely than do project interviewers what they hear in the interviews they conduct and apply a higher degree of professional skepticism to them. They seek verification in other sources for information gathered through interviews, and they evaluate contradictory material to draw their own conclusions.

Despite their focused efforts and self-defined goals, individuals doing their own interviewing bear definite professional responsibilities. The American Historical Association has issued the following recommendations for individual interviewers:

1. Interviews should be recorded on tape but only after the person to be interviewed has been informed of the mutual rights and responsibilities involved in oral history, such as editing, confidentiality, disposition, and dissemination of all forms of the record. Interviewers should obtain legal releases and document any agreements with interviewees.

2. The interviewer should strive to prompt informative dialogue through challenging and perceptive inquiry, should be grounded in the background and experiences of the person being interviewed, and, if possible, should review the sources relating to the interviewee before conducting the interview.

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Ritchie, Donald A. Doing Oral History, Oxford University Press, Incorporated, 2014. ProQuest Ebook Central.
http://ebookcentral.proquest.com/lib/gmu/detail.action?docID=1777649.
Created from gmu on 2025-04-23 14:06:03.

3. To the extent practicable, interviewers should extend the inquiry beyond their immediate needs to make each interview as complete as possible for the benefit of others.

4. The interviewer should guard against possible social injury to or exploitation of interviewees and should conduct interviews with respect for human dignity.

5. Interviewers should be responsible for proper citation of oral history sources in creative works, including permanent location.

6. Interviewers should arrange to deposit their interviews in an archival repository that is capable of both preserving the interviews and making them available for general research. Additionally, the interviewer should work with the repository in determining the necessary legal arrangements.

7. As teachers, historians are obligated to inform students of their responsibilities in regard to interviewing and to encourage adherence to the guidelines set forth here.[1]

*Why bother to record interviews? Why are notes not sufficient?*

After years of scribbling notes during class lectures, many researchers feel perfectly able to take coherent notes during an interview. They consider a recorder an unnecessary expense, a bother to worry about, and a possible barrier to a candid interview—whether with public figures, who may be overly cautious about having their words recorded, or with nonpublic figures, who may be intimidated by talking into a microphone. Some researchers consider note taking superior to tape recording. Barbara Tuchman, for instance, complained that tape recorders simply encouraged people to "ramble effortlessly and endlessly." She described note taking as a "crystallizing process" in which the writer automatically distinguishes the significant from the insignificant. Others have cited the risk of the recorder breaking down at crucial moments as their rationale for not recording.[2]

Such responses combine cogent truths and unnecessary rationalizations. Audio and video recorders are no longer such an expense or a novelty. They can be purchased for a reasonable cost, are easy to operate, and have become so commonplace that few interviewees will be surprised or uncomfortable to see one. More important, recording radically expands and improves any interview. The longer interviews last, the more interviewers tire and miss nuances. Later, when listening to the recording, interviewers inevitably hear more than they did during the interview itself. Note takers may make honest mistakes in what they hear or find their handwriting hard to decipher. Note takers also run the risk of hearing only what they want to hear rather than what the interviewee actually says—a recurring phenomenon to which anyone interviewed by the media can readily attest.

Note taking makes some researchers feel more comfortable because it helps focus their attention—as they listen to what is being said—on the exact points

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Case 7:23-cv-00897-RJ   Document 362-13   Filed 04/29/25   Page 41 of 73

they anticipate later using. But there is no reason not to record and take notes at the same time. The notes can serve as the recording's index, which is especially useful if a full transcript cannot be made.

Recording is the researcher's best means of self-protection. Interviewees may object to how they were quoted or may not be willing to stand behind statements they made in their interviews. A recording of the interview provides the documentation to defend against such reactions. Some interviewees, especially the more prominent, may be so skittish about being misquoted that they will insist that the interview be recorded. For his biography of Henry Kissinger, Walter Isaacson interviewed former President Richard M. Nixon. Isaacson took notes, while Nixon recorded the interview. When the tape recorder broke down, Nixon commented, "I've never been very good with these things."[3]

### What if a potential interviewee refuses to be recorded?

Interviewers operate under ground rules that interviewees set. For an oral history project, such an objection would likely cause that person stricken from the list of potential interviewees, since there usually remains little reason to conduct an oral history if it cannot be recorded. But the individual researcher may consider the person a critically important source, regardless of the ground rules. Notes may be inferior to a recording, but they are better than nothing. As soon as the interview session is over, the interviewer needs to write down as full an account as notes and memory permit.

An interviewee may decline to be recorded out of fear or vanity, emotions that can sometimes be overcome by some reassurances and flattery. The late historian Gordon Prange, whose ego matched the monumental books he wrote on the Second World War, refused to be recorded during an interview on the grounds that Gen. Douglas MacArthur had never allowed his interviews to be recorded. The interviewer took notes for a few minutes and then injected, "What a shame that this isn't being recorded, Professor Prange, because my notes will never do justice to your cogent thoughts and beautifully crafted sentences." Accepting that as a point well taken, Prange permitted the recorder to run for the rest of the interview.[4]

### But why make a recording if you cannot afford to transcribe it?

You can make notes from your own recordings without having to transcribe them entirely. Having the recording allows you to quote accurately and to pick up nuances you may have missed during the interview. The recording can be quoted, cited, deposited in a library, and referred back to for proof should any queries arise about the accuracy of the material.

Transcripts are costly and time-consuming to create, but they increase the usefulness of an interviewer to everyone, including the original interviewer. Researchers planning to conduct extensive interviews for a dissertation, book, or other project should seek a logical repository, whether it be a university

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Case 7:23-cv-00897-RJ   Document 362-13   Filed 04/29/25   Page 42 of 73

library, a state archives or historical society, or a community library, to donate the completed tapes. The repository will have legal release forms that the interviewer can use. If the interviews meet the repository's standards, it may be able to have its own staff transcribe the interviews or join the interviewer in seeking a grant for transcription.

### Once the article or book is published, is it necessary to save the interview recordings?

Researchers have a professional obligation to preserve the unique documentation they collected, both to leave a record for future investigators and to protect their own reputations. Political scientist Alexander Lamis interviewed the political operative Lee Atwater, who offered a crude and candid assessment of the racial aspects of modern southern politics. Lamis first published the interview anonymously. After Atwater died, he included the interview in another book, this time attributing the incendiary remarks to him. After Lamis died, critics charged that he had fabricated the quotation. His widow released the recording to show that her husband's use of the quotation had been accurate and scholarly rather than politically motivated.[5]

### Why should independent researchers make their interviews available to anyone else?

Scholars have a professional obligation to permit access to their sources. A footnote citing "personal interview in the author's possession" leaves much open to question, especially if the interviewee has died. Readers may question how accurately the researcher quoted or paraphrased the interview. Even when a researcher quotes an interview meticulously, in all probability he or she needs to cite only a small portion of it. Future researchers may make different use of the same material.

While writing her doctoral dissertation on the Office of War Information Holly Cowan Shulman discovered that another historian had conducted an interview with a key official of the agency. Her graduate advisor, however, dissuaded her from asking to see a copy of the interview, on the grounds that it was someone else's work. Although she complied at the time, she came to feel that it had been wrong not to examine the interview for her research since interviews "were a piece of historical evidence just as much as letters or diaries." Seeking to raise the consciousness of the historical profession on the issue, Shulman has argued:

When we conduct interviews, we are creating evidence. When the next historian comes along interested in another aspect or interpretation of the same topic, he or she should have access to the interviews we did. This is the very nature of the rules of history. Otherwise, I could hide all of my evidence to protect myself from competition and argument. Or

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

I could make up anything I wanted and assert its truth citing interviews I supposedly conducted but would let no one else see. In other words, if we historians don't treat interviews seriously, we raise a series of problems which could hurt the profession as a whole.[6]

The use of archived interviews has been more closely linked to historical research than to the social sciences. Although social scientists accumulate a great deal of qualitative data, including interviews, field notes and correspondence, many are reluctant to conduct secondary analysis of this information. Ethnographers have raised concerns over the disconnect with the original researcher, and because it ran against "the ethnographic principles of seeking to understand settings or people in their own terms." After considerable debate, however, the practice has become more acceptable, especially after scholars realized that the process of using secondary data was so similar to using their own interviews.[7]

### Must individual researchers get signed legal releases for their interviews?

Yes, because both publishers and archives will want to determine who owns the copyright to the interviews. If you intend to publish anything extensively drawn from an interview, you will need to assure the publisher that you have obtained the interviewee's permission. If not, publishers will send you back with their own legal releases—usually formidable documents—for the interviewees' signature.

A legal release is also essential if you intend to deposit the recording or transcript in a library or archive. By signing a legal release, the interviewee indicates that he or she understood what the interview would be used for and establishes its ownership. Just having recorded another person's words does not give the interviewer copyright on those words, and making quotations beyond "fair use" length might stimulate a legal challenge. The problem may not come from the interviewee but from the interviewee's heirs, who may seek compensation for the interview's publication.

Failing to obtain releases limits the interview's future use. While depositing the interviews in an archives, the interviewer must go back to get signatures on legal releases. Sometimes interviewees have died and their next of kin must be located. It is always easier to have the legal releases signed when the interview is conducted.

Researchers at many universities must also deal with institutional review boards that want to see evidence of the interviewee's "informed consent." Standard oral history release forms should suffice, indicating that the interviewee understands and approves of the purpose and intended uses of the interviews. Some institutional review boards further require release forms to stipulate that the interviewee can decline to participate, can choose to remain

Ritchie, Donald A. Doing Oral History, Oxford University Press, Incorporated, 2014. ProQuest Ebook Central,
http://ebookcentral.proquest.com/lib/gmu/detail.action?docID=1777649.
Created from gmu on 2025-04-23 14:06:03.

anonymous, and understands the potential risks involved in participation—factors more applicable to medical and behavioral science projects than to oral history. (See chapter 7 for further issues relating to institutional review boards.)

*With limited time and resources, why should independent researchers ask questions beyond their immediate research interests?*

Researchers understandably think of interviews as filling in gaps in their work or expanding their own knowledge of the particulars and want to ask questions precisely about that area and nothing else. But this attitude is counterproductive in a number of ways. First, the interviewee's memory may not immediately be able to dredge up the specific information that the interviewer is seeking. Interviewers need to spend some time establishing rapport, building up to the central issue, and understanding its context in the interviewee's life. Interviewers need to be sensitive to the feelings of interviewees and to not dismiss other areas of their life they may consider relevant to the interviewer's questions.

Paul Thompson began interviewing in the 1970s for a study of Edwardian England. He conducted a large survey but asked about people's experiences only up to 1918, not about what happened to them afterward. "Now, failing to do that was a very large mistake," he later concluded, "because it meant that there were all sorts of things that we could have asked of those people that we failed to ask." There were many more questions he wished he had raised for his subsequent research, but by then it was too late; that generation had passed. Thompson encourages researchers to be willing to divert from their narrow interests to a broader picture of those they are interviewing: "I think it's much better to have a life story interview rather than one which just focused on a particular period of somebody's life."[8]

In 1974, I interviewed the New Deal official Benjamin V. Cohen about his role in creating the Securities and Exchange Commission in 1934. Watergate was the news when the interview took place, and Cohen wanted to talk about Nixon. But for my dissertation, I needed to hear about Franklin D. Roosevelt. Not willing to follow his tangents, I constantly steered the interview back to my immediate interests. Not until later did I realize that I had missed the opportunity to capture Cohen's thoughts about Watergate and to find out whether the development of the "imperial presidency" had in any way changed his opinion about the expansion of the executive branch during the 1930s.

Often within a few years of completion of an oral history project, many of the older interviewees will die. There is no guarantee that these people will have been interviewed by any other programs A researcher's notes, recordings, and transcripts of interviews therefore become valuable sources for other researchers, who no longer have access to the deceased.

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Ritchie, Donald A. Doing Oral History, Oxford University Press, Incorporated, 2014. ProQuest Ebook Central,
http://ebookcentral.proquest.com/lib/gmu/detail.action?docID=1777649.
Created from gmu on 2025-04-23 14:06:03.

*Does the independent interviewer have any advantages over the
oral historian in a group project?*

Anyone working on a specific book or article becomes far more steeped in the
subject matter and has a much more personal stake in the process. Their inter-
views lead to publication and promote their professional advancement, per-
haps even earn them royalties. Researchers can verge on obsession with their
projects, wanting to know *everything*. They press interviewees to go into greater
detail than does an interviewer for a more general project. A number of inter-
viewers participated in the Former Members of Congress oral history project,
and, not surprisingly, one of the lengthiest and most detailed interviews was
conducted by an interviewer who was also writing a doctoral dissertation on
the senatorial interviewee. The interviewer pressed the senator on any number
of issues, even persuading him to sing his campaign song.[9]

Individual researchers may express disappointment with the project-directed
interviews they read in oral history archives because the project interviewers
did not dig deep enough into the subject. The main themes may have been
covered, but not enough of the smaller details are included. Because individ-
ual researchers generally are seeking answers to specific questions, they may
undervalue the parts of an archival interview that do not directly address their
needs. The curse of oral history is failure to pursue details.

*Can an independent researcher's interviews be considered
an oral history?*

There are differences between interviews conducted for one researcher's
express purposes and those conducted as oral histories for general use. Oral
histories are broadly conceived and conducted, then processed, preserved, and
made available to other scholars in archives. Research interviews fill the nar-
row needs of the individual interviewer, are rarely recorded or transcribed, and
generally wind up in the interviewer's file cabinets or in boxes in basements
and attics.[10]

These distinctions blur when a researcher's interviews are recorded or tran-
scribed and deposited somewhere so that other researchers can use them. Oral
historians have long objected to the use of the term "oral history" to describe
every interview, regardless of whether it was recorded or simply handwritten
notes were taken. "Historians have been interviewing people for hundreds of
years; there's nothing new about that, and I don't think they've been doing
oral history," observed Philip Brooks of the Harry S. Truman Library in 1966.
"I think there's a *real* distinction here between a researcher who interviews
people for his *own* purpose to derive information for *his own* book, and that of
what I sometimes call a 'pure' oral historian, who is accumulating a stock of
evidence for the use of other researchers, any and all researchers, as we do in an
archival agency, I think this is related somewhat to the question of objectivity."
More recently, oral historians have conceded that all interviewing—archival

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Ritchie, Donald A. Doing Oral History : A Practical Guide, Oxford University Press, Incorporated, 2014. ProQuest Ebook Central,
http://ebookcentral.proquest.com/lib/gmu/detail.action?docID=1777649.
Created from gmu on 2025-04-23 14:06:03.

or individual—is subjective, and that the earlier distinctions posed a false dichotomy.[11]

Some interviews may not be worthy of permanent preservation, particularly if the researcher has not followed other criteria for oral history interviewing, preparation, and processing or has not been sensitive to oral history ethical considerations. Still, in the long run, institutions—whether public libraries soliciting and collecting family history interviews for their local history sections or major research libraries working with authors and documentary film producers to collect oral history project interviews—stand to gain from a closer partnership with individual researchers.

It would be a mistake to define oral history so narrowly that it applied only to large archival collections. But to do oral history, interviewers must live up to its standards and assume its legal, ethical, and methodological responsibilities, including that of making their interviews available to other researchers for verification and further use.

*Is it better to conduct interviews at the beginning of one's research or near the end?*

There is no set formula. Historians have found that conducting interviews during the early stages of research can help them determine what to look for in the archives and give them a sense of what was likely not written down. Interviews conducting during the later stages of research can fill in gaps in the record, add flavor to the story compiled from the archives, and may be more fully informed by archival research. As a general rule, however, the more research performed in advance, the better the interview.[12]

## Oral Evidence

*How valid is oral history as historical evidence?*

A White House aide interviewed for a book once cautioned: "Everybody has a different recollection, sometimes of the same facts." The interviewer agreed, noting that "sources lie. They embellish. They omit. They have agendas, hidden or not. They exaggerate their own prescience and the folly of their rivals. And sometimes their memories honestly fail them." That was why he also asked his sources for relevant documents. But the aide pointed out, "Documents are sometimes misleading, too."[13]

Treat oral evidence as cautiously as any other form of evidence. Documents written at the time have an immediacy about them and are not influenced by subsequent events, and yet those documents can be incomplete, in error, or created to mislead. In 1966 President Lyndon Johnson invited the television critic Jack Gould to meet with him in the Oval Office. A memo from a White House aide later reported to Johnson that Gould had stopped at his office after the meeting and wondered, "Why doesn't the President appear on television

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

the same way he talked to me—the President is so gracious, affable and well informed." Subsequently, scholars have frequently cited that memo when writing about Johnson and the media. Gould's son, a historian, came across the quote in the mid-1980s and asked his father about the incident. Gould recalled that he had left the White House immediately after the interview, had not seen the aide, and had not said what was credited to him in the memo. The episode impressed his son as "a cautionary tale about relying on archival material without double-checking the sources used."[14]

Autobiographies written years after the events occurred may present an inflated self-image. "Half the fascination of studying the memoirs of the past is the endeavor, by making allowance for the prejudices and predilections of the writer, to sift truth from falsehood," wrote Duff Cooper, the biographer of the French diplomat Talleyrand, who left him much to sift. Similarly, Maya Jasanoff, after searching through the personal narratives written by Loyalists who had been forced into exile by the American Revolution, concluded: "No sources of this kind are ever purely objective. But the way people tell their stories—what they emphasize, what they leave out—can tell the historian as much about their times as the concrete details they provide."[15]

Statements are not necessarily truer if written down at the time, written in later memoirs, or recalled in testimony. Whether written or oral, evidence must be convincing and verifiable. A federal court jury on which I served was presented with a written statement that the prosecutor described as the defendant's "signed confession." The defense insisted that the prosecution had misinterpreted the statement, whose many grammatical errors obscured its meaning. In the jury room, jurors repeatedly read the statement, trying to decipher exactly what it meant, before concluding that it failed the test of convincing evidence.

Oral history can be unconvincing. Some interviewees' remarks are self-serving; they remember selectively, recall only events that cast themselves in a good light, and seem to always get the better of opponents. Interviewers may be too polite or too timid to ask probing questions about events that did not turn out well. Sometimes interviewees honestly cannot remember. They jumble names and dates and confuse people and places. Sometimes they deliberately recast their past to fit their current self and public image. Whole series of interviews can be faulted for paying attention to only one side of the issue or for interviewing only those people who would speak positively about the individual who was the subject of the project.[16]

A biographer seeking to reconstruct the life of the labor journalist Eva McDonald Valesh found that although few of her letters had survived, she had given an interview to the Columbia Oral History Research Office a few years before her death. The interview was largely factual in the details of her public life, and other evidence bolstered her opinions, but her account of her private life proved misleading. Valesh told the interviewer that her husbands

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Ritchie, Donald A. Doing Oral History, Oxford University Press, Incorporated, 2014. ProQuest Ebook Central,
http://ebookcentral.proquest.com/lib/gmu/detail.action?docID=1777649.
Created from gmu on 2025-04-23 14:06:03.

had died, which was "true only in the sense that they were dead at the time of the interview." Research revealed that she had been twice divorced, not twice widowed. "There are some minor problems with telescoping of time. And, yes, she lied about her age. She did that more than half her life, so it is with great consistency and with the excuse that she did look younger than her age."[17]

Enough bad oral histories have been done to satisfy the worst suspicions of traditionalists, and yet enough good interviews have been conducted to validate the process. Properly done, an oral history helps interpret and define written records and makes sense of the most obscure decisions and events. An interview with a thoughtful participant and perceptive eyewitness can generate new ideas and avenues of inquiry that a researcher might have never thought of pursuing. Interviews can explore the use of language by subgroup—such as jazz slang, black English, shop-floor jargon, and even the acronyms of government bureaucrats—and discover word meanings that might otherwise have eluded researchers outside the subgroup.

Oral evidence does not always derive from oral history. The French historian Emmanuel LeRoy Ladurie published what amounted to an oral history of a fourteenth-century village in the Pyrennes, Montaillou. His sources were depositions taken during the Inquisition by Bishop Jacques Fournier, who interrogated some 500 suspected heretics between 1318 and 1325. Scribes copied down the questions and answers and gave the accused the opportunity to correct the transcripts. The final copies were deposited in the Vatican archives, where six centuries later they enabled Ladurie to quote the words of the common folk of Montaillou, people who stood in stark contrast to the nobles who dominate the chronicles of the Middle Ages. *Montaillou* (1979) became a best seller in France and elsewhere, possibly because of its explicit accounts of sexual relations within the village. Prurient interests aside, the first-person accounts make the book compelling reading for even nonmedievalists.[18]

Similarly, the pension application process for militiamen in the American Revolutionary War amounted to what the historian John C. Dann has called "one of the largest oral history projects ever undertaken." In 1832, when Congress agreed to pay a yearly pension to any militiamen who served for more than six months in the Revolution, thousands of elderly veterans applied. Since written records were scarce, the government required them to dictate their reminiscences to court reporters, giving as many names, dates, and other details as possible. Government clerks then scrutinized these testimonies to determine their accuracy. Selecting from a great mass of applications a century and a half later, Dann published the first-person eyewitness accounts of foot soldiers, runaway slaves, and women who followed their husbands into combat. Their accounts authentically describe not only combat but also everyday life in the camps, wounds, diseases, and the whole social setting of the Revolutionary War.[19]

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Ritchie, Donald A.. Doing Oral History, Oxford University Press, Incorporated, 2014. ProQuest Ebook Central,
http://ebookcentral.proquest.com/lib/gmu/detail.action?docID=1777649.
Created from gmu on 2025-04-23 14:06:03.

Oral history makes a critical addition to oral evidence: a trained interviewer who can guide an interviewee's recital of events that he or she may not have thought about for years but can recall vividly when asked. Questions prompt interviewees to discuss issues they might otherwise have skipped over. Interviewers can question inconsistencies between the oral account and written documentation. A good oral history can present and preserve convincing evidence and put it in quotable, first-person prose that enlivens historical narratives. But oral history should not stand alone as a single source. Researchers need to seek out available material to substantiate both written and oral evidence. If written and oral information contradict each other, then the researcher must dig even deeper to determine which is more accurate.

While preparing to interview Stuart McClure, the former chief clerk of the Senate Labor, Education, and Public Welfare Committee, much of the research centered on the National Defense Education Act. In 1957, when the Soviet Union launched *Sputnik*, the first earth-orbiting satellite, McClure wrote a memo to the committee's chairman, Lister Hill, suggesting that the public attention generated by *Sputnik* might help pass the education bill that had stalled in Congress—if they called it a "defense education act." One account of the bill's passage devoted a chapter to the fight between the Senate, which wanted to make the money available as grants in the form of scholarships, and the House, which insisted on making it available as loans. During the interview, when asked why the Senate lost the battle, McClure laughed and replied:

> Oh, that was another clever, clever ploy. That was done on the House side. They narrowed the issue. There were millions of dollars for all kinds of other things, but Carl Elliott [the Alabama representative who chaired the House subcommittee on education] and his guys narrowed the issue to whether we should have the federal government hand out scholarships or loans....The House denounced scholarships, it was a waste of money and socialism and all of that. And the minute the damn scholarship issue was done for, dead, the bill swooped through. I don't thing anybody had read any other title in it. Oh, that was clever stuff. Carl Elliott was a brilliant strategist, as good as Lister Hill in his way, in different houses.[20]

Here oral history exposed a legislative ploy that not only fooled most members of the House of Representatives but also the scholar who had published a history based on official documentation. The debate over loans versus scholarships had been a subterfuge designed to allow the House, which had previously defeated federal education bills, to save face and claim victory. McClure's story has the ring of credibility—first, because it is logical, and second, because Senate staff rarely give credit to House members, except to express sheer admiration for a brilliant legislative strategy.

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

*Do courts accept oral history as evidence?*

Without the interviewee being present for cross-examination, courts generally regard the recording or transcript of an oral history as hearsay. Nevertheless, they have permitted oral histories to be subpoenaed as evidence and have accepted oral traditions in rendering verdicts. In dealing with land claims of native peoples, courts in several nations have acknowledged the inadequacy of written documents—although legal obstacles to those native claims remain formidable. When those fighting a land claim in Canadian courts argued that oral histories "did not accurately convey historical truth," the chief justice of the Canadian Supreme Court ruled that "stories matter" and that the legal convention of hearsay could be waived in regard to the oral traditions of Canada's "first people."[21]

When South Africa established a Truth and Reconciliation Commission to examine past government tactics used to suppress resistance to Apartheid, critics of the commission argued that the oral history it gathered was unreliable and grossly inaccurate. The stories that victims told were subjective, they charged, telling "their understanding of what happened to them and not necessarily what happened." A minority report asserted: "Exaggeration is a natural consequence of human suffering." These critics assumed that when the alleged perpetrators took the stand, having been granted amnesty, they would refute the victims' claims of human rights violations. Instead, the perpetrators confirmed the most outrageous of the stories and affirmed the reliability of the oral history.[22]

*Can information from an oral history ever be cited by itself, without other supporting evidence?*

It depends on the information. Max Hastings, who interviewed hundreds of World War II veterans around the world for his books, argued that even when they played a small role in events their memories "contribute to a sense of mood, time, and place that can make an important contribution to a portrait of how things seemed to contemporary participants." A personal description, the expression of an opinion, or the telling of a colorful anecdote would permit citation of the interview as the single source. But the more controversial the subject, the less an interview can stand alone. Critics would question the authority of the interviewee. Was that person in a position to know, or does the interview constitute simply secondhand speculation? When in doubt, employ the journalist's practice of seeking at least two witnesses before asserting a statement of fact—if, indeed, a second witness is still alive.[23]

Independent researchers can also borrow from journalists the practice of having one interviewee comment on what another has said. A novice reporter, sent to cover a dispute involving a local developer, interviewed the developer

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Case 7:23-cv-00897-RJ   Document 362-13   Filed 04/29/25   Page 51 of 73

and wrote his story. "Did you talk to the architect?" asked his editor. The reporter dutifully interviewed the architect and added his comments to the story, but his editor was still not satisfied. "Take what the architect said back to the developer and get him to respond," the editor instructed, "then take what the developer said back to the architect, and after they've answered each other's charges, then you write your story."

In cultural resource-management projects that included oral history interviews, despite the misgivings of archaeologists and others on the team who were not oral historians, efforts have been made to determine the quality of evidence that the interviews gathered. The oral historian Dan Utley described how, in one project collecting information about a defunct farming community, each interviewee was encouraged to talk at length about the annual hog killing, a universal experience within the community. "The hog killing stories were then compared and used as a rough guide to evaluate the memories, descriptive abilities, and involvement of the interviewees," he explained. "It was not easy to sit through numerous descriptions of the slaughter process, especially after breakfast, but they did provide an important comparative dimension to the overall project."[24]

*Isn't most oral history anecdotal?*

People naturally recount events and personalities anecdotally, in small self-contained stories that illuminate or instruct. Anecdotes often focus on humorous situations and characteristics and in conversation are designed to stimulate a smile or a laugh. In many ways, the anecdote is a writer's freshest material. The term derives from the Greek word *anekdota*, meaning "things unpublished," and it is often the telling stories taken from interviews that make a book original and different from previously published sources. *Anecdotal* is not synonymous with *apocryphal*, meaning spurious or unverifiable information. Names, dates, and other facts can usually be more reliably obtained elsewhere, but each interviewee has a unique store of anecdotes.

Although scholars sometimes denigrate anecdotes as the antithesis of analysis, these accounts can actually be informative, offering their analysis in a vivid and colorful manner and enlivening a narrative, often with a touch of humor. Good writers have an eye and an ear for a lively and believable anecdote that can make their points both memorably and compactly. Critics also dismiss oral history and other forms of narrative history because anecdotal information, by its nature, is randomly gathered and not statistically significant enough to make generalizations from. Social scientists look to census data, marriage licenses, death certificates, and voting statistics rather than to interviews, unless they are using a standard questionnaire and questioning a large, representative sample. Oral historians tailor their questions for individual interviewees, and time and financial limitations tend to restrict their pool of interviewees.

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Ritchie, Donald A. Doing Oral History. Oxford University Press, Incorporated, 2014. ProQuest Ebook Central.
http://ebookcentral.proquest.com/lib/gmu/detail.action?docID=1777649.
Created from gmu on 2025-04-23 14:06:03.

Case 7:23-cv-00897-RJ    Document 362-13    Filed 04/29/25    Page 52 of 73

Although anecdotal information has a personal flavor, the collected stories from a group reinforce each other and show common threads in the lives of the group's members. Mixing anecdotal information with the hard data of statistical abstracts, the skilled researcher and writer can re-create a colorful as well as a convincing portrait of the past.[25]

### Can an interviewer argue with interviewees if they seem wrong about what they are saying?

Individual researchers have more liberty than archival oral historians to inject the interviews with their own opinions and to challenge the interviewees. Remember, however, that all interviews are voluntary and last only as long as the interviewee desires. Keep in mind that too forceful an intervention by the interviewer may also distort the interviewee's responses.

Deliberate carefully when trying to decide whether interviewees' stories are accurate, misleading, or erroneous. An individual researcher usually approaches an interview with a thesis to prove and may assume that anything contradicting that thesis is wrong. Give the speaker a fair hearing, and then challenge any inconsistencies in the testimony with other sources. When pressed, the interviewee may provide some additional rationale or even hard evidence to support previously unsubstantiated assertions. An impaired ability to listen can be a dangerous affliction for interviewers.[26]

"Research involves the shedding, not the confirmation, of our preconceptions," the historian Blair Worden has asserted. "If historians go to the archives expecting certain answers to their questions, careful study of the evidence will almost invariably change their minds." Living sources can magnify this condition by looking interviewers in the eye and telling them they are wrong and by revealing unexpected information. Interviewees may see things entirely differently from the researcher, and although interviewees might be biased or just plain wrong, so might the researcher's thesis. The best information to emerge from an oral history is often completely unexpected: a different way of looking at something, turning preconceived notions upside down. An interviewer may want to argue points with an interviewee, but it is self-defeating to seek out people to interview and then ignore what they have to say. Or as Lyndon Johnson used to say, "I ain't never learned nothin' talkin'."[27]

Although interviewers strive to take a neutral role during the interview, neutrality may not be acceptable in its publication. When James Green published his interview with the historian C. Vann Woodward in the *Radical History Review*, it stimulated a series of angry letters to the editor expressing outrage that Green had not rebutted Woodward's critical remarks about the Marxist historian Herbert Aptheker. The opinions had been Woodward's, but Green took the blame for his silence and apologized for not challenging Woodward's assertions. "My purpose in interviewing Woodward for RHR was not, however, to expose our political differences," Green explained, "but to examine his

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Ritchie, Donald A.. Doing Oral History, Oxford University Press, Incorporated, 2014. ProQuest Ebook Central,
http://ebookcentral.proquest.com/lib/gmu/detail.action?docID=1777649.
Created from gmu on 2025-04-23 14:06:03.

contribution to the Left's understanding of Southern history and to the study of race, class and region in U.S. history."[28]

Some caution is always advisable. A best-selling book about the atomic destruction of Hiroshima, *The Last Train from Hiroshima: The Survivors Look Back* (2010), received superlative reviews and was considered for production as a movie, until reports surfaced that a key source had been an imposter who fabricated his role in the bombing and made up events out of whole cloth. The author said he was stunned, and the publisher stopped selling the book.[29]

### Is it possible to get a worthwhile interview from someone with whom you profoundly disagree?

The emphasis on interviewing "from the bottom up" has presumed that interviewers at least admire their interviewees even when they do not agree with them. But some researchers record the lives of people whose politics and ideologies they find "unsavory, dangerous, or deliberately deceptive." The sociologist Kathleen Blee, who interviewed former Ku Klux Klan members from Indiana, has no sympathy for the Klan's anti-Semitic, anti-Catholic, and racist politics, and violent attitudes. She found it unnecessary to appear empathetic when interviewing Klan members and made little effort to shy away from controversial topics. She anticipated "no rapport, no shared assumptions, no commonality of thought or experience" and expected her interviewees to be too wary of her to reveal their true attitudes. But her expectations proved groundless. Not only did the former Klan members seem at ease during their interviews, but they assumed that she, "a native of Indiana and a white person," had to agree, even if secretly, with their views. "Even challenging their beliefs had no effect on their willingness to talk," Blee noted, concluding that despite profound differences, rapport was disturbingly easy to achieve.[30]

Interviewers may encounter people with whom they disagree profoundly but who can expand their perspectives on an issue. After publishing an article on the internment of Japanese Canadians during World War II, Pamela Sugiman received an angry e-mail from Lois Hashimoto, a woman who had lived in the relocation camps but did not see herself as a victim. In Hashimoto's mind, those who had been interned had not only survived but also flourished in triumph over their unjust treatment. Rather than dismiss the criticism, Sugiman contacted Hashimoto and interviewed her—even if listening to such views made Sugiman squirm. Although neither one changed her opinion, they built a warm relationship. Sugiman reasoned that researchers "cannot exclude memories from our accounts because they are inconsistent with public memory or from what we view as historical truth." To best understand the complexities of the past, oral historians must remain open to hearing and learning from other perspectives, no matter how much they might conflict with our own views.[31]

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Case 7:23-cv-00897-RJ   Document 362-13   Filed 04/29/25   Page 54 of 73

*Won't interviewees try to convince their interviewers to adopt their viewpoints?*

A certain amount of intellectual seduction—interviewees trying to make interviewers agree with them—may take place. Sitting down to talk with prominent figures can be a heady experience, and it is all too easy to slip into a false sense of intimacy that can diminish scholarly distance and detachment. The makers and shakers who spend their careers assiduously trying to manipulate the media may treat historical researchers in much the same manner. They want the researcher to see events from their perspective to validate their positions. Some of them are campaigning for historical vindication just as energetically as they did for public office.

Researchers can also be captivated by less prominent individuals who have lived noble lives, suffered oppression, or been crusading spirits. Empathy helps greatly in conducting interviews. Allan Nevins once said that an interviewer needs *gemutlichkeit*, an "obvious sympathy with the person whom he interviews, friendliness and tact, as well as courage." But researchers much also demonstrate scholarly skepticism. Interviewees were players and partisans in the events and often have positions and reputations to defend. Researchers are observers, not players, and must not let personal admiration keep them from weighing the evidence dispassionately and creating a convincing account of people, movements, and past events.[32]

*How does a researcher go about finding oral history interviews that have been collected and are open for research?*

Although researchers may feel an impulse to grab a recorder and begin interviewing for themselves, the best place to start is with oral histories that have already been collected, transcribed, and opened. Many authors have used these collections and many books have cited them, but only a small portion of these vast resources have been tapped.

Internet search engines have greatly facilitated locating oral history interviews thus boosting their use. Many oral history archives have posted their directories and catalogs online, sometimes accompanying them with full transcripts and audio and video clips. The websites of the various national and regional oral history associations include links to many of these repositories.

*Is it legitimate for a researcher to use interviews conducted for someone else's earlier book?*

As researchers' periods of study move further into the past and survivors are no longer available to interview, they have to rely more on "second-generation" use of oral history, reexamining interviews that were conducted for other publications. The original interviewer may have cited only portions of the material or may have overlooked significant clues buried in the testimony. Seemingly innocent remarks may take on new meaning in light of later developments.

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Ritchie, Donald A. Doing Oral History, Oxford University Press, Incorporated, 2014. ProQuest Ebook Central,
http://ebookcentral.proquest.com/lib/gmu/detail.action?docID=1777649.
Created from gmu on 2025-04-23 14:06:03.

New trends in historical research may highlight issues that earlier researchers considered marginal or insignificant. Second-generation research potential increases the importance of depositing and preserving interviews in libraries and archives—for verification, reinterpretation, and reuse long after the interviewee and the interviewer are gone.

When Mark Stoler wrote his concise biography of General George C. Marshall, he worked in the shadow of Forrest Pogue's monumental four-volume biography of Marshall. Although General Marshall had steadfastly refused lucrative offers to write his memoirs in the 1950s, Pogue persuaded him to give interviews. Eventually, Marshall warmed to being interviewed and left behind a rich, reflective commentary on his impressive career, particularly his earlier years. Since General Marshall died years before Stoler began his research, the historian made use of Pogue's interviews at the Marshall Research Foundation in Lexington, Virginia. Repeatedly, Stoler quoted from Pogue's interviews for Marshall's evaluations of his colleagues and self-assessments of his actions. Although drawing from the same sources that had been available to Pogue, Stohler's book was a fresh interpretation of the material Marshall shared with the earlier researcher.[33]

### How reliable are an interviewee's reconstructions of conversations with others?

People often recall events in the form of conversation ("so she said to me…"). They remember the words of presidents and other famous people they have met; they remember arguments, warnings, humorous and ironic remarks, and beautifully turned phrases. People reconstruct dialogue not only in oral histories but also in their letters and diaries; the results can be colorful but treacherous.

Interviewers hear only one party's version of a conversation, generally years after it took place. In evaluating such evidence, think about whether the comments are characteristic of the person to whom they are attributed and whether they make sense in the context of the time and place of the conversation. Be suspicious of interviewees who always managed to get the last word or administer the perfect squelch. They may be recalling what they wish they had said or may be claiming credit for lines spoken to them rather than by them. The humorist Garrison Keillor once confessed in a radio monologue that his childhood reminiscence about an overripe tomato thrown with perfect aim was absolutely true—except that his sister had thrown it at him, not the other way around.

The historian Arthur Schlesinger, Jr., noted that remembered dialogue helps "impart immediacy to narrative" but warned that such information should only be used when the remarks are "plausibly supported by context or other evidence." He added: "I have extended this tolerance to oral history and employed the literary convention with the same critical caution I hope

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Ritchie, Donald A. Doing Oral History. Oxford University Press USA - OSO, ProQuest Ebook Central.
http://ebookcentral.proquest.com/lib/gmu/detail.action?docID=1777649.
Created from gmu on 2025-04-23 14:06:03.

illustrious predecessors have applied to written documents. It remains a convention." [34]

### How legitimate is it to cite anonymous interviews?

Disciplines that emphasize fieldwork and participatory observation regularly construct pseudonyms to conceal the identities and protect the privacy of the communities they observe. Anthropologists, linguists, and sociologists may interview people as representatives of types rather than as identifiable individuals. Their fieldwork techniques permit the creation of fictional identities for people and places. They believe that anonymity encourages interviewees to speak more candidly and that it protects interviewees, their families, and their jobs from retribution. This does not mean that they hide the purpose of their research from their interviewees. A sociologist who studied watermen in the Chesapeake Bay for a dissertation never admitted to the families who took her into their homes that she was using them for her research and secretly recording their conversations. Protests over her book prompted the American Sociological Association to approve more stringent guidelines for professional conduct in fieldwork. Oral historians agree that deception is never justified. [35]

Some anthropologists have found that even when they anticipated using anonymity, their participants were willing and eager to be named. That was the case when Penny Robinson studied Pakeha women in New Zealand. Since she was also photographing them, "it seemed rather a farce to not name them." Those doing visual anthropology regard it as contradictory to include people's faces and villages while concocting pseudonyms for them. [36]

Oral historians influenced by the social sciences have felt a similarly strong need to protect interviewees' well-being by not revealing their names. They feel that sometimes the general message carries more significance than the particular speaker. For instance, the historian Sherna Gluck regretted that the political climate in the Middle East prevented her from revealing the real names of the Palestinian women she interviewed. "They have made it clear, however, that this personal recognition is less important to them than making their story public." [37]

Yet anonymity clashes with some of oral history's most fundamental objectives. Having sought to give "voice to the voiceless," it is inconsistent to render them nameless. Oral historians conduct life review biographical interviews because they consider interviewees important as individuals and want to record their unique experiences and perceptions. Future historians using those interviews will also expect some verification of sources. They will want to know where the information came from and what biases might have affected the testimony. Just as critics of journalistic practices have complained that unbridled anonymity allows public officials to evade responsibility for their views, oral historians believe that their interviewees should be held accountable for what they say for the record. Nothing based on anonymous sources can be proven,

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Ritchie, Donald A. Doing Oral History, Oxford University Press, Incorporated, 2014. ProQuest Ebook Central,
http://ebookcentral.proquest.com/lib/gmu/detail.action?docID=1777649.
Created from gmu on 2025-04-23 14:06:03.

and the evidence remains at the level of rumor and innuendo. "When sources choose anonymity," the oral historian William W. Moss warned, "whether out of privacy, humility, or fear, the record produced not only suffers the loss of user confidence that accompanies any anonymous testimony, but the primacy assertion of oral history that the individual indeed matters is also lost."[38]

Sensitive interviews can be sealed for safe periods of time, but the Oral History Association has recommended anonymity only in extremely sensitive circumstances.[39] By accepting anonymity under dire circumstances, oral historians indicate that it should never be a routine practice. When authors claim that their books are based on hundreds of interviews and cite none specifically, or assert that none of their interviewees chose to be identified, there is a strong suspicion that anonymity was part of the researcher's design and that interviewees were never encouraged or given the opportunity to speak for the record. The use of blanket anonymity also raises the question of the expiration of that anonymity. Was the promise of anonymity eternal, or can the interviewees' identities be restored to them at some safe point in the future?

One solution for writers seeking to balance their interviewees' anonymity with scholarly verification is to deposit the recordings and transcripts in a library or archives with provisions for identifying the interviewees after a safe interval. The political scientist Richard Fenno gave his interviews with members of Congress to the National Archives. Since these interviewees had left public life, they could be identified without fear of political embarrassment, thereby enhancing the future research value of the collection. A history of the U.S. space program drew heavily from interviews with past and present employees of NASA (National Aeronautics and Space Administration), asking about their personal backgrounds, the type of work they did in the space program, and their perspectives on how the agency changed over time. Given that many of the interviewees were still NASA employees, they were assured that their names would not appear next to any quotations used in the published history—which identified each interview only by number—but that the transcripts, linking names to the numbers, would be preserved in the NASA History Office.[40]

*What about sensitive issues in transcripts that are posted online?*
The impulse to post interviews promptly online clashes with the reality that candid accounts may make the interviewees vulnerable. Applicants for schools and jobs, undocumented immigrants, and members of ethnic and religious minorities may be penalized for exposing their life stories to online searches. The easiest solution is to hold the collection in an archives for future release rather than to post it right away. Some projects, however, are eager to disseminate their findings to promote their causes and are thus unwilling to wait. The Student Liberation Activist Movement (SLAM!) oral history project, which conducted interviews with young radical political protestors, chose to post the

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Case 7:23-cv-00897-RJ Document 362-13 Filed 04/29/25 Page 58 of 73

audio interviews without the transcripts, to make them less searchable, and to use only the first names of the interviewees online.[41]

## Theory

### What is the role of theory in oral history?

Any interview involves an interpretation of the past. People will remember events and express opinions from their own particular viewpoints. Interviewers will ask questions about things they consider significant. Those processing the interviews will index or otherwise highlight the major themes to facilitate future use. Researchers will then interpret the interviews to draw out meaning for their own purposes. Some oral historians manage to combine all of those roles. Whatever your connection to the process, it is useful to consider the range of theories that have developed regarding the interpretation of oral history.

A critic once contended that the practice of oral history "claims to be self-effacing and world-revealing. How can a collection of interviews be anything else? But if you look closely at these oral histories, you can never forget who has shaped them and to what end." Although meant as a negative—that oral histories actually reflect the perspectives of the interviewer as well as the interviewee, and that readers should be forewarned they are not dealing with "just a series of oral histories"—this assertion simply states a fact. Interviewers do indeed shape their interviews by whom they choose to interview, what questions they ask, and what extracts they select for publication. The role of the interviewer in steering the interview, the peculiarities of memory, and many other issues amply demonstrate that oral history goes far beyond holding up a mirror to society.[42]

Theorists pay attention to more than the information that interviewees provide. Such efforts began by questioning the validity and reliability of memory, and soon spread to other analytical issues. In Europe, oral historians encountered widespread silence and unwillingness to talk about past support of fascism. The Italian historian Luisa Passerini came to appreciate that her interviews were an expression of culture that mixed "the dimensions of memory, ideology and subconscious desires." She accepted the subjective nature of her sources: oral histories are not "static recollections of the past" but memories reworked according to the interviewees' later experiences. Her realization led other oral historians to consider what people remember and forget and the ways in which those memories of the past are produced "through the prism of the present."[43]

Because they create their sources, rather than rely exclusively on archival documents, oral historians saw the resemblance between their research methods and those in the social sciences who utilized fieldwork. They began studying how those disciplines analyzed interviews. For instance, anthropologists

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

and sociologists considered individuals in the context of their communities and raised issues of how gender, race, and ethnicity determine how members of a community remember and retell the past. Linguists examined the structures of communication. Psychologists raised questions about memory and trauma.

Interpretation has become an inescapable feature of oral history at every stage. Interviewers engage in interpretation during the interview. (Why is this person evading the subject? Could I frame the question differently? What could that have meant?) The transcript prompts further interpretation between the transcriber and the interviewer who audit-edits. (What was that word? Is that an acronym? Where should the punctuation go?) The researchers who use the interviews—whether or not they conducted them—then seek to extract meaning from what was or was not said. Theory is therefore present in the process and its outcome, assisting the oral historian in doing the interview and in analyzing it later.

### What is grounded theory?

As opposed to the individual testimonies that oral historians conduct, anthropologists employ ethnography as a method of collecting data about groups of people and use interviews to examine a collective society (although these distinctions are often blurred). The anthropologist Heather Howard notes that "the art of good ethnography is precisely in how well the many layers of data are woven together." Where anthropologists use interviewing to understanding different cultures from the perspectives of those within the culture, sociologists conduct interviews to link individual experiences with larger cultural and structural issues. These social sciences view the social world as patterned and predictable, which enables them to apply scientific methods to examine the variables and test their hypotheses. Traditionally, social scientists have conducted quantitative research, using standard questionnaires from which they could generalize, and promising anonymity to the participants. More recently, these disciplines have experimented with a type of qualitative interviewing that more closely resembles oral history practices. Once the social scientists finish their interviews they engage in data analysis. The cycles of interviewing and analysis that they conduct is called "grounded theory." The idea behind it is that each cycle of analysis will inform the next round of interviews.[44]

### What theories have been applied to oral history?

Those theories most applicable to oral history involve narrative and memory. Narrative theory grew out of literary studies before it came to influence sociology, anthropology, and history. Memory theories began with experimental psychology and clinical psychoanalysis, and spread into history, autobiography, and aging, while also influencing folk history, popular history, public history, and oral history. Memory studies have included autobiographical memory,

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Ritchie, Donald A. Doing Oral History, Oxford University Press, Incorporated, 2014. ProQuest Ebook Central,
http://ebookcentral.proquest.com/lib/gmu/detail.action?docID=1777649.
Created from gmu on 2025-04-23 14:06:03.

aging, gender, and collective memory. In fact, there are so many themes and variations that one historian has dubbed them "the memory industry."[45]

Oral history interviewees will often say, "You got me thinking." Some of the stories they tell during interviews are well rehearsed from regular repetition. Other stories have been buried in their memory and will surprise people as they recall them. Rather than accepting all memory as true, oral historians consider what people remember, what they forget, and what they get wrong. Whenever possible they try to verify the information provided in an interview—seeking objectivity—but they have increasingly found the subjective nature of nature of memory worthy of study.[46]

The historian Lynn Abrams makes the point that it is "the *practice* rather than the content that marks out oral history as distinctive within historical research." Oral history differs from other historical sources in that it exists only because the interviewer has selected the participants, conducted the interviews, and preserved the results. By asking questions and engaging in exchanges with the interviewees, the interviewer becomes a participant in the process. Recognizing this fact, oral historians looked to the social sciences, where researchers conduct fieldwork, and imported many of their interpretations about the narrators' interactions with their interviewers.[47]

*How does narrative theory relate to oral history?*

Narrative theory weighs the relationship between language and thought. It views an interview as a multilayered document that is the result of an interviewer and interviewee "negotiating and creating a text." It also postulates that they way people tell stories follows "conventions of process and purpose, presentation and style, place and performance." Instead of accepting outward behavior as having a rational purpose, those engaged in narrative theory believe it reflects underlying signs and symbols. Narrative theory has challenged the notion of objective history, seeing the past as recalled and recounted as simply a construction, shaped by the way it is told.[48]

Oral historians influenced by narrative theory grew less concerned about the factual accuracy of an interview than in trying to understand why the story was told that way. This meant that an oral history could be analyzed both for the information it provided about events as well as the narrator's attitude toward those events. Rather than highlight the uniqueness of each narration, however, narrative theory focuses on the similarities among many stories, suggesting that the memories people retain are shaped by their cultural values and environment, reflecting a society's collective memory.[49]

Although useful in interpreting oral testimony, narrative theory can distract from testimonies that do not fit collective patterns. Nor does narrative theory pay much attention to the ability of interviewees to reflect critically on their own experiences. "Human subjectivity is more active, engaged, and critical than contemporary theory permits," the oral historian Anna Green has

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

argued. "We must keep space for the resistant, curious, rebellious, thoughtful, purposeful human subjects."[50]

*How have memory theories informed oral historians?*

Ten months after an airplane crash in Amsterdam—a story all over the news— Dutch psychologists interviewed residents of the city about what they remembered. When asked if they had seen the television coverage of the actual crash, more than half said yes and went on to describe it in detail, even though there had been no film of the accident. People were responding to blatantly suggestive questions. This incident serves as a reminder that the questions asked can unduly influence the answers received. Researchers who seek confirmation for ideas they have already formed and hope for specific answers, must be careful not to plant ideas by the way they frame their questions or even by their body language. It is always better to ask open-ended questions that do not presume the answers.[51]

Daniel Schacter, a professor of psychology, has studied the way people remember and forget and categorized what he calls the "seven sins of memory." He lists three sins of omission:

1. Transience: the weakening of memory over time.
2. Absent-mindedness: the breakdown between attention and memory.
3. Blocking: thwarting information we are trying to retrieve; for example, when people say, "It's on the tip of my tongue."

He also lists four sins of commission:

1. Misattribution: assigning a memory to the wrong source.
2. Suggestibilty: memories implanted from leading questions, comments, and suggestions.
3. Bias: rewriting our past experience to meet current beliefs.
4. Persistence: obsessing or ruminating on disturbing memories we would prefer to forget.

Among these "sins," the most pervasive is transience. Recent experiences block out memories of older ones. This is the same process that helps people sort out the humdrum from their more meaningful experiences—those memories last longer. Schacter warns us not to think of memory as snapshots from a family album that "if stored properly, could be retrieved in precisely the same condition in which they were put away." Memories work differently, allowing us to extract key elements from our experiences and store them. Later we reconstruct memories of those experiences rather than retrieve exact copies of them. In the process of reconstructing we will likely express feelings, draw conclusions, and even add information obtained after the experience.[52]

Dwelling on memory's imperfections might cast doubt on human memory as a valid source of historical information, but Schacter calls this view

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Ritchie, Donald A. Doing Oral History, Oxford University Press, USA, 2014. ProQuest Ebook Central,
http://ebookcentral.proquest.com/lib/gmu/detail.action?docID=1777649.
Created from gmu on 2025-04-23 14:06:03.

misguided. He points out that the problems raised actually reveal memory's adaptability. Despite its sins of omission and commission, memory provides "the scaffolding upon which all mental life is constructed." Memory allows us to draw on past experiences to inform the present, preserves present experiences for future reference, and permits us to revisit the past at will. Memory's vices of memory are also its virtues: "elements of a bridge across time which allows us to link the mind with the world."[53]

Oral historians are learning much from the scholarship on memory studies. Paula Hamilton and Linda Shopes observe that those conducting memory studies tend to frame their work differently than oral historians: "They ask questions about the broader social and cultural process at work in remembrance, and they are equally concerned with written forms of self-representation, from autobiography to blogging." This approach helps remind oral historians to look beyond a narrow focus on an individual narrator's life story and to appreciate that an interview is just "one form of memory taking."[54]

### What is the effect of people frequently retelling their stories?

Telling a story over and over again makes it more durable. A psychological study of people who experienced a major earthquake found no correlation between the accuracy of memories and their closeness to the epicenter. Living through such an event was "definitely worth talking about," especially when friends and relatives called to check up on them. "Once you realize you have a story to tell," the psychologist reasoned, "it's hard to stop." Frequent retelling helps consolidate the story in long-term memory. At the same time, the story becomes more rehearsed and polished. A form of reconstruction takes place in which the story changes with each retelling, sometimes subtly, sometimes significantly.

Remembering and retelling help people make sense of their personal experiences and locate them within the larger historical context. In the 1980s, the Popular Memory Group at the University of Birmingham studied the ways in which the British remembered World War II. The researchers compared private and public memories, and the ways in which some memories became dominant and others were marginalized. They could see that the state, the media, and educational institutions all influenced people's memories of a collective experience, but they also found that individuals' novel experiences played a role in generating different ways to explain that past. The retelling of one's own personal stories helps those memories survive the onslaught of a national narrative.[55]

### Does trauma affect memory?

Traumatic events register differently from everyday experiences in people's memories. Those who have interviewed survivors of hurricanes and other disasters report that the interviewees were "more focused on the rich details of the 'how' and 'what' when it comes to more recent memories," which affected

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Case 7:23-cv-00897-RJ Document 362-13 Filed 04/29/25 Page 63 of 73

the way they answered questions. Interviewers should be prepared to deal with stories that are thicker in detail than usual.[56]

Oral historians who deal with trauma say that they work at the intersection between tragedy and memory. They must take care not to intrude on those who are trying to put their lives back together and not badger them about painful experiences. However, they often find that victims of traumatic events are eager to talk about their suffering. The act of remembering those events can help people make sense of them.[57]

Some painful memories are suppressed for years, and people only become willing to talk about them later in life. Other memories may be so painful that people cannot suppress them, even when they try. Those individuals become "stuck" or focused on the past, which can lead to psychological distress. Recollections of trauma can be disabling, but psychologists also call them protective, since they remind us of responses to life-threatening dangers.[58]

After the terrorist attacks on September 11, the Columbia Oral History Research Office set out to interview New Yorkers about their experiences before media coverage had a chance to shape the collective memory. They began by interviewing those who escaped from the World Trade Center, those who were in the immediate vicinity, those who lost family members, and those whose lives were indirectly traumatized, notably the city's Muslim population. Seeking to understand how people constructed meaning out of what happened, they found great ambiguity in people's minds and a reluctance to draw immediate conclusions. "A person might describe the horror of their experience and then go on to describe some aspect of the day of 9/11 that was very ordinary," observed Mary Marshall Clark, who directs the project. "People had trouble integrating the experience, which tells us something about the impact of the trauma." The project created one of the largest archives of qualitative interviewing on massive trauma, which scholars can use to assess the social and psychological impact of catastrophe.[59]

*In what ways have oral historians explored traumatic subjects?*
Beyond interviewing survivors of natural disasters, oral historians have focused on individuals and groups that were uprooted, exiled, repressed, and impoverished; on the impact of dictatorship and disease; and on oppression, struggle, vulnerability, suffering, discrimination, and contested identity. These themes are most notably evident in work taking place in regions that have undergone major political, social, and cultural changes, where researchers explore the roots of repression in past regimes.

*Do interviewers need any special qualities when conducting oral histories about trauma?*
The 9/11 project concluded that interviewers dealing with trauma must be able to connect "viscerally and emotionally" with those they interview.

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Beyond the usual concerns and practices of conducting an oral history, they need to create a neutral and supportive environment for the interview and not express excessive emotion over what they are hearing. Although they need to connect with the interviewee, they also need to avoid identifying with their interviewee's experiences. One older woman who escaped the towers unharmed later collapsed from the stress and was bedridden for weeks. Her interviewer fell into a similarly depressed condition. After a visit to the project's trauma specialist, the interviewer realized that she was identifying with the victim.[60]

Oral history is not psychology, but a clinical psychologist who does video interviews with Holocaust survivors has recommended using multiple interview sessions to draw out memories, thus conducting a deeper conversation rather than simply obtaining a testimony. In these sessions, questions help memories take shape and find words to express them. "One thought sparks another, and then another, that I may not have even thought I had," marveled one survivor. "We're learning together."[61]

Those who have worked with victims of political repression and other traumas recommend conducting the interviews in their homes or another location where they will feel safe and making the interview more conversational. These are also factors in reminiscence therapy, which conducts end-of-life interviews that often involve personal anguish. Medical care givers sometimes worry that interviews will cause their patients emotional upset. Susanna Johnston has responded to this by arguing that older people can gain strength from sharing emotions and "take a pride or somber satisfaction in recalling the dangers and emotional upheavals they have survived."[62]

### *What do oral historians mean by interviews as a form of "empowerment"?*

Some interviewers have embraced oral history as a form of advocacy for groups that have been marginalized, oppressed, or otherwise excluded from the historical narrative. Lynn Abrams has called this "part of a more general move to encourage 'victims' to see themselves as 'survivors.'" They see the interpretation of history as a power struggle and have sought to help such groups take control of memory and history. The overthrow of totalitarian regimes has also encouraged oral historians to conduct interviews that will rewrite the older, official histories and rethink commemorations—although opening this discourse usually has to wait until the regime has fallen. Those concerned with empowerment point to the power imbalance between interviewer and interviewee, and seek to shift the balance of power from the interviewer to the interviewee and thereby democratize the project's product.[63]

Theories about empowerment view oral history as a form of social justice. By studying the culture, speech, and behavior of those on the periphery of society—including disabled people, individuals with mental problems, the

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

homeless, and prisoners—researchers believe they can learn more about their own society as a whole and about themselves as individuals.[64]

Ronald Grele has cautioned against the notion that people's lives will be changed by being interviewed or that they will somehow be introduced to historical consciousness. Interviewers may raise questions that interviewees might not have considered before, and lift the events of daily life to an object of investigation, but when the interview is over, both will go back to their separate spheres. "So I don't know what this empowerment in the interview might mean," Grele commented. In some cases it may cause people to question aspects of their lives that had previously been unquestioned. In other cases it may encourage members of a community to engage in collecting their own history. "That is another sense of empowerment, where the power of interpretation moves from the academy to the community, but it's a power of interpretation. It does not necessarily mean there's going to be a shift in the economic, social or political forces at play in that community."[65]

## Publishing Oral History

### *How much editing of interviews is acceptable for publication?*

Transcripts of recordings are edited, and most published oral histories have been further edited, condensing and highlighting remarks and in some cases rearranging testimony for chronological and narrative purposes. But how much is too much? Oral historians have expressed suspicion over the popular books of Studs Terkel, who usually removed his own questions and sometimes reordered his interviewee's answers. When Charles Morrissey questioned some of the Vermonters quoted in Terkel's *American Dreams, Lost and Found* (1980), they objected to the way their remarks had appeared in print. One complained that Terkel "applied his thoughts to my words and came up with the version in his book." Another felt that his words had been rearranged "in such a way that I can't make sense of it."[66]

Some of the best known "oral history" books have been produced by professional writers who lacked training in historical research and handled oral documentation rather loosely. Serious questions were raised about the authenticity of Alex Haley's *Roots* (1976); many felt it was a work of historical fiction more than history. Merle Miller's *Plain Speaking: An Oral Biography of Harry S. Truman* (1974), in a similar fashion, seems to mix Truman's recollections with Miller's creative writing. Miller did not publish his interviews until after Truman's death, and some of the statements he attributed to Truman strain credulity. Miller's rambling remarks to an Oral History Association meeting in 1975 augmented the audience's worst suspicions. "I don't consider myself an oral historian," Miller later admitted. He then added, "Oral historians don't either. I spoke at their national convention several years ago and they loathed me, detested me, because since I don't know the rules of oral

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Case 7:23-cv-00897-RJ    Document 362-13    Filed 04/29/25    Page 66 of 73

history—and operate as a reporter, which I consider myself—I violate them." After Miller's death, seven hours of his recorded interviews with Truman, conducted in 1961–62, were opened for research at the Truman Library. Historians who reviewed the tapes found nothing in them to support his book's more sensational claims.[67]

The work of some professional historians has also been called into question, notably the historian Stephen Ambrose's interviews with President Dwight Eisenhower. Eisenhower's appointment books showed that Ambrose spent much less time with Eisenhower than he had claimed. They met only three times for a total of less than five hours and were never alone together. Ambrose's books on Eisenhower, published after the president's death, listed more interviews, raising suspicion that he had embellished his evidence.[68]

Editing and rearranging interviews for clarification and cutting away tangential material are appropriate so long as the original meaning is retained. The goal is to sharpen the focus without putting words in the interviewee's mouth or altering the essence of what was said. For instance, if an interviewee spoke at length about someone's positive characteristics and fleetingly of one negative quality, it would be misleading and unfair to quote only the latter.

In reproducing large sections of oral history interviews for publication, researchers should consider including the questions as well as the answers. Some subjects may not have been discussed simply because the interviewer asked nothing about them. Other subjects came up precisely because that was what the interviewer wanted to know about. By leaving as many of their questions in the text as feasible, oral historians not only show what questions elicited the responses but also demonstrate that the interviewee did not necessarily volunteer the information and may even have had to be coaxed to reveal private and potentially embarrassing information. Without the questions, the basic dialogue of an oral history is lost, creating the impression that people raised the issues when, in fact, they were responding to queries. Similarly, when several interviewees focus on a particular trait or make a similar observation, it could be simply because they are all responding to the same question.

Oral history has become fashionable among popular writers and other purveyors of popular culture who are not always careful about its presentation. Cullom Davis, who directed the oral history program at the University of Illinois at Springfield, warned of its "debasement" by those who fail to "observe the canons of our profession." He charged that publication or oral history without interpretation produces little more than a scissors-and-paste scrapbook and a disorganized mass of recollections. "As serious practitioners, whether lay or professional," Davis argued, "we must identify the hucksters and charlatans who exploit oral history's intrinsic appeal for their own shallow, ahistorical and even unethical ends."[69]

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Ritchie, Donald A. Doing Oral History, Oxford University Press, Incorporated, 2014. ProQuest Ebook Central,
http://ebookcentral.proquest.com/lib/gmu/detail.action?docID=1777649.
Created from gmu on 2025-04-23 14:06:03.

*Should oral history interviewees speak for themselves, or do they require scholarly interpretation?*

In one of his novels, David Lodge imagined a dialogue between a newspaper interviewer and the writer she was trying to interview. The reporter saw her interviews as real life because she used a recorder and invented nothing, but the writer noted that she left out the dull bits that would be too boring to read. "I concede the point," she replied. "An interview is not an exact record of reality. It's a selection. An interpretation." The writer defined it as a game for two players. "The question is, what are the rules, and how does one win? Or lose, as the case may be." The reporter rebutted, "I don't see it as a game. I see it as a transaction. A barter. The interviewer gets copy. The interviewee gets publicity."[70]

The compelling nature of the spoken word, the enjoyment of reading the vernacular, the honesty and humor of so many interviewees, has kindled a strong interest in allowing oral sources to "speak for themselves." This approach, which often involves little interpretation on the part of the compiler, sometimes results in books that resemble collages. The literary critic Elizabeth Hardwick dismissed "tape recording without an interpretive intelligence" as "a primitive technology for history" designed to relieve the author of the burden of writing. Hardwick insisted that a book requires an author's "signature of responsibility."[71]

Reviewing the biography of Robert F. Kennedy by Arthur Schlesinger, Jr., Henry Fairlie dismissed oral history as testimonials of dubious value. It is up to the historian "to do the hard work of sifting," wrote Fairlie. "When we are given the personal words of various actors, that is all we are given, and we have either to take or reject their word that something happened as they say . . . . That is what we have historians for: to take their word that this was so." Historians act as judges, interpreters, and critics, compiling and analyzing sources of the past. Historians are rarely eyewitnesses to the events they write about. They reconstruct events and the temper of the time from a mixture of sources, balancing the reliability of one piece of data against another, arranging them in a coherent pattern to make sense of what happened.[72]

The very act of editing and arranging interviews shows that the author has not simply allowed interviewees to speak for themselves. Editorial intervention begins with determining whom to interview, what questions to ask, which interviews to include in the volume, in which order, and how much of the original interviews to publish. Even if the editor refrains from adding an overt interpretation, he or she is still deciding which interviewees are most worthy of being recorded and published. Having gone that far then, the editor owes something more to readers. At the minimum, authors of oral history collections should provide some background for their interviews to place the interviewees in context, offering suggestions about why they said what they did and took certain positions, and sometimes spelling out where interviewer and interviewee did not agree.

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Ritchie, Donald A. Doing Oral History. : Oxford University Press USA - OSO, 2014. ProQuest Ebook Central.
http://ebookcentral.proquest.com/lib/gmu/detail.action?docID=1777649.
Created from gmu on 2025-04-23 14:06:03.

A certain romantic belief has developed that putting a microphone in front of people will miraculously provide the road to truth. In his influential review of oral history literature, Michael Frisch has argued that what historians do—interpreting evidence, weighing, testing, and connecting people and events—is still critically important. "And yet, at the same time the exciting thing about oral history is that the process becomes a less exclusive one," he added. The scholar and the subject collaborate: "They come together and provide a good advantage for understanding the meaning of the experience." This is the notion that Frisch calls a "shared authority": "the grounds of authority are very different, and have different meaning, but there is a kind of sharing in the process of the interpretive authority, which is one of the exciting things about doing oral history."[73]

### If writers quote from interviews they conducted, do they need to first submit them to their interviewees for review?

Some researchers allow their interviewees to check their quotes before they use them. "I think it's only fair," Arthur Schlesinger, Jr., reasoned, "that when you talk to people, you should give them the same kind of control over an interview as they have over an oral history transcript." Other researchers might chafe over this idea, given that an interviewee might change or delete something entirely. Yet anyone who has ever been interviewed by a reporter and then misquoted in the newspaper article can appreciate how differently the teller of the tale and the listener can hear the same story. Context is essential for accuracy, and even a perfectly quoted sentence can have its meaning altered when taken out of the larger text.[74]

At the same time, interpreting what the interviewees said remains the historian's domain. A researcher and an interviewee may form entirely different opinions about the events being discussed. Even though interviewees were eyewitness, their perspectives could be distorted, and their memories incorrect. By collecting evidence from a multitude of sources, the historian may come to a different conclusion. The author's duty is to quote the interviewee correctly and not distort the remarks to fit a thesis. Otherwise, the author is entirely responsible for the finished product.

### What do reviewers look for when reviewing oral history books?

Reviewers have been notoriously inconsistent in dealing with oral history. Too often a review begins with an admission that the reviewer knows little about oral history or does not trust oral sources, characteristics that never seem to disqualify them from reviewing the book. They distance themselves from the methodology and consequently add little to our understanding. At the root of their complaints, however, is a fairly common call for the author to assume a more interpretive role. Commenting on the increased appearance of books based on interviews, the novelist and frequent reviewer Diane Johnson

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Case 7:23-cv-00897-RJ    Document 362-13    Filed 04/29/25    Page 69 of 73

asserted, "There does seem in this technique an almost cowardly reluctance to think."[75] In the same vein, Timothy Foote began a review of an oral history of the Second World War by noting: "Anything calling itself oral history probably ought to be approached with deep suspicion. Time is short. There is much to read. We're already awash in ill-chosen words. And though tape recorders are splendid gimmicks, people who present interviews as history are farther from the mark than a cook who insists that a loose collection of eggs, sugar, milk, vanilla, flour, and a few squares of bitter chocolate are in fact a chocolate cake."[76]

Reviewers more experienced with oral history have reacted to the literature through the lens of their own disciplines or tailored their reactions to fit the publications in which their reviews appear. After conducting a survey of oral history reviews, the book review editor Linda Shopes observed that reviewers in the *Oral History Review* generally wanted to know more about the interviewing process and procedures than about the subject matter and particular findings of a project, although the accuracy of the information gathered was often a major touchstone of *OHR* reviews. Reviewers commented on whatever unique insights and perspectives emerged from the interviews but took the authors to task for not testing the accuracy of oral evidence through corroborating sources. Reviews in the more theoretically oriented journals are more likely to be interpretive, focusing on subjectivity and how oral tradition and narratives "can reveal the complex consciousness of a culture." Reviews in the more ideologically oriented journals tend to raise questions of a political nature.

Reviewers for general, non-oral history journals express more concern about oral history's substantive contributions to historical knowledge. These reviews emphasize the importance of first-person narrative in conveying a sense of people as historical actors and actresses. General historical reviewers tend to respond best to authors who use a variety of interviewees together with other documentary sources, and who place the data in a broad analytical context. The chief conclusion that emerged from this sampling of reviewers was that the author of an oral history volume will inevitably be judged as a historian and cannot escape that role by suggesting that the sources "speak for themselves."[77]

Publishers tend to view reviews as idiosyncratic. Unless a consensus emerges from every corner, they will take a bad review with a grain of salt. They pay more attention to where the review coverage comes from—whether in highly focused scholarly journals or more broadly mainstream publications. This indicates the audience that is most likely to respond to the book, which makes publishers think about whether to include more books in their lists of the type reviewed.

*How should oral histories be cited as references?*

How to cite interviews is a question that touches on the one of how seriously researchers take oral sources. Of all the academic disciplines engaged in

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

interviewing as a research tool, professional historians have devoted the least amount of methodological attention to its problems and potentials. This laxity contrasts sharply with the intense seriousness historians bring to written sources. Authors dutifully list every manuscript collection, book, and article consulted, and then limit the bibliography of oral sources to a few lines acknowledging those who "shared their knowledge" in "conversations" with the author. Footnotes identify the interviews with cryptic initials and often without dates or other information that would tell the interested reader how the interview was collected. Some interviews are not cited at all. Substantial numbers of histories drawn from oral sources give no indication of whether the recordings and transcripts are deposited somewhere, either for other researchers' use or for verification. It remains puzzling why professional historians have accepted on faith the author's reliability in note taking, transcribing, and even interpreting oral information.[78]

Guides to historical writing specify that the standard reference should begin with the name of the interviewee. The title of the interview (if there is one) should be in quotation marks. The citation should include "interviewed by [name of the interviewer]" and mention whether the interview is a recording or transcript, and whether it has been published as part of a book or journal article or in any other medium, with standard references to such publication. The citation should indicate whether the interview is in the author's possession or has been deposited in a library or archive. Keep in mind that the purpose of a citation is to show where the information comes from and to help the reader find the original source. Page numbers for transcripts, or other publications, should be provided. For interviews found on the Internet, cite the archives where the collection is physically located as well as its electronic address.[79]

The following are examples of citations of interviews from oral history archives, from independent research, and from published sources:

Woodrow Crockett, interviewed by Bill Mansfield, March 15, 2001, recording and transcript, Tuskegee Airmen National Historic Site, National Park Service, Tuskegee, Alabama.

Sen. Hugh D. Scott, interviewed by the author, January 27, 1986, recording and transcript deposited at the Senate Historical Office, Washington, D.C.

Harry Bridges, interview by Harvey Schwartz, *Solidarity Stories: An Oral History of the ILWU* (Seattle: University of Washington Press, 2009), 9–31.

### What do publishers seek in oral history books?

Among the prime questions publishers ask are: Who is the intended audience, and how will this book serve it? What contributions will it make to the field,

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Ritchie, Donald A. Doing Oral History, Oxford University Press, Incorporated, 2014. ProQuest Ebook Central,
http://ebookcentral.proquest.com/lib/gmu/detail.action?docID=1777649.
Created from gmu on 2025-04-23 14:06:03.

Case 7:23-cv-00897-RJ Document 362-13 Filed 04/29/25

and how will it be different from everything else that's out there? Have you obtained the necessary copyright permissions from your interviewees to publish their interviews?

Publishers have different primary objectives. Some trade book publishers and university presses tend to be national and international in scope, while others might be more locally oriented. Consequently, some topics will appeal more to one than the other. As with any topic, look over the oral history titles on their backlists to see what they have published in the past as a guide to what new works they might accept.

The publisher's guidelines will be available online. Follow them carefully in preparing a proposal (not a manifesto) that summarizes the content of the book and its major themes. Tell them something about your background and experience to establish your credibility. A table of contents, introduction, and a few sample chapters that show what you intend to do with the interviews will also help—the more material the better to give an idea of the shape of the book. Proposals will probably be reviewed not only by the editors but also by experts in the field, who may make suggestions for improvement. Again, the more material these reviewers have, the more they will understand the scope of the project. Otherwise, reviewers may focus on issues that are *not* included, even if you already had that in mind, which may require additional submissions. As an author, you do not need to embrace all their suggestions—especially if you feel they contradict your intentions—but you will need to take them seriously and explain to the publisher what revisions you are prepared to make. Remember that editors are there to make your book as presentable as possible.

It is unlikely that publishers will want to see anything the size of *Gone with the Wind*. Such doorstops are expensive and unfeasible for course adoption. Aim for a manuscript somewhere between 70,000 and 120,000 words (the latter including notes). This means you may need to eliminate or substantially reduce some interviews, which can be a painful process if the interviewees are still living. Include the most colorful and representative in the text and thank the others in the acknowledgments, making sure to identify where the rest of the interviews are available for research.

If the interviews and analysis are available elsewhere as published articles or unrevised dissertations, publication might be regarded as redundant. You will need to rework the material in a meaningful way. A dissertation will serve a graduate student in getting a degree, but it usually requires substantial revision to address a wider audience than one's doctoral committee. Take time to step back, dump or define any jargon, polish the prose, and incorporate and highlight new material.

In the digital age, not every oral history needs to appear in a book. Interviews can be made just as widely available online, often with audio and video components. But printed books will remain a significant medium for storytelling

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Ritchie, Donald A. Doing Oral History, Oxford University Press, Incorporated, 2014. ProQuest Ebook Central,
http://ebookcentral.proquest.com/lib/gmu/detail.action?docID=1777649.
Created from gmu on 2025-04-23 14:06:03.

and scholarship, and will continue to play a role in the scholarly universe, particularly for faculty seeking promotion and tenure. Books are an appropriate medium for making arguments and explaining interpretations. They set a frame around the interviews, offering context that differentiates them from the original transcripts. In that sense, they produce something that is cooked rather than raw. Through editing and analysis, books organize the information so that readers can engage in it and connect it with other literature. Books are a collaboration between authors, editors, and publishers that shape ideas into attractive and approachable products. Publication has helped give substance to oral history, articulating trends and providing platforms for new ideas and analysis.

Copyright © 2014. Oxford University Press, Incorporated. All rights reserved.

Ritchie, Donald A.. Doing Oral History, Oxford University Press, Incorporated, 2014. ProQuest Ebook Central,
http://ebookcentral.proquest.com/lib/gmu/detail.action?docID=1777649.
Created from gmu on 2025-04-23 14:06:03.