**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**SOUTHERN DIVISION**
**No. 7:23-CV-897**

| | |
|---|---|
| IN RE: ) | **MEMORANDUM IN SUPPORT OF** |
| ) | **UNITED STATES' MOTION IN** |
| **CAMP LEJEUNE WATER LITIGATION** ) | **LIMINE TO EXCLUDE VAPOR** |
| ) | **INTRUSTION EVIDENCE AND** |
| **This Document Relates To:** ) | **TESTIMONY** |
| **ALL CASES** ) | |

## INTRODUCTION

With the Camp Lejeune Justice Act of 2022, Congress created a federal cause of action to permit personal injury claims against the United States based on exposure to "water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States." Pub. L. No. 117-168, § 804(b), 136 Stat. 1759, 1802-04 (2022). The CLJA does not refer anywhere in its statutory text to vapor intrusion and emissions at Camp Lejeune because Congress did not intend to permit personal injury claims based on soil or groundwater vapor intrusion and emissions at Camp Lejeune. Exposure to vapor intrusion and emissions constitutes exposure to gas vapors emanating directly from groundwater through soil into the atmosphere rather than to "water supplied by, or on behalf of, the United States."

Nevertheless, the United States anticipates that Plaintiffs may offer evidence or testimony about vapor intrusion and emissions at Camp Lejeune as part of their CLJA claims. Accordingly, the United States moves in limine to exclude evidence and expert testimony regarding soil or groundwater vapor intrusion and emissions at Camp Lejeune. Because Congress did not intend to permit claims stemming from vapor intrusion and emissions from groundwater through soil at Camp Lejeune, such evidence and testimony is irrelevant and will not help the trier of fact.

Moreover, any probative value of evidence or testimony about vapor intrusion and emissions at Camp Lejeune is substantially outweighed by the risks of undue delay and wasting time.

## STATEMENT OF FACTS

**I.**     **Soil and Groundwater Vapor Intrusion and Emissions.**

The Agency for Toxic Substances and Disease Registry ("ATSDR") has defined vapor intrusion as "when contaminated shallow groundwater can evaporate and move upward through the ground surface into indoor air of overlying or nearby buildings." *See* ATSDR, Vapor Intrusion PHA, https://www.atsdr.cdc.gov/camp-lejeune/php/public-health-assessments/vapor-intrusion-pha.html; https://perma.cc/2WD3-BTYE. Similarly, the Environmental Protection Agency has defined vapor intrusion as "a migration of vapor-forming chemicals from any sub-surface source into an overlying building." EPA, What is Vapor Intrusion?, https://www.epa.gov/vaporintrusion/what-vapor-intrusion; https://perma.cc/LDP4-QZE9.

Figure 1 below from the EPA's website depicts the migration of vapors in soil gas from contaminated soil and groundwater into buildings.



**Figure 1: Migration of Soil Vapors to Indoor Air**

These soil gas vapors seep into buildings through cracks in the foundation and openings for utility lines. The weather, atmospheric conditions, and building ventilation can influence soil gas intrusion.

With respect to Camp Lejeune, ATSDR has determined that "[b]reathing indoor air contaminants in Marine Corps Base (MCB) Camp Lejeune's buildings due to vapor intrusion is a potential pathway of exposure to shallow groundwater contaminants." *See* ATSDR, Vapor Intrusion Public Health Assessment ("VI PHA"), https://www.atsdr.cdc.gov/camp-lejeune/php/public-health-assessments/vapor-intrusion-pha.html; https://perma.cc/2WD3-BTYE. Thus, ATSDR is performing a VI PHA considering about 150 buildings at Camp Lejeune to evaluate (1) "whether people's health might be harmed from current or past exposures to indoor air contamination that may have resulted from vapor intrusion into buildings on the base" and (2)

"the effectiveness of current vapor intrusion systems designed to reduce indoor air contaminant amounts installed in some buildings on base." *Id.* The ATSDR's VI PHA is ongoing and expected to be published in the fourth quarter of 2025. Status Conf. Tr. (Oct. 22, 2024), 21:1-3, D.E. 294.

## II.     Vapor Intrusion and Emissions in the CLJA Litigation.

### A.     Plaintiffs' Leadership Group Raised and Maintains a Purported Right to Offer Evidence of Vapor Intrusion and Emissions at Camp Lejeune.

On June 28, 2024, the Court issued an Order requiring resolution of "two threshold issues." Order (Jun. 28, 2024), D.E. 247 at 1. "First, Plaintiffs must establish the alleged chemicals in the water at Camp Lejeune from 1953 to 1987." *Id.* at 2. "Second, Plaintiffs must satisfy their general causation burden for each Track 1 Illness." *Id.* Accordingly, expert discovery in the CLJA litigation is proceeding in three sequential phases: Phase I is focused on water contamination; Phase II is focused on general causation; and Phase III is focused on specific causation and damages issues. Phases I and II are aimed at resolving competing expert testimony on threshold issues before moving to expert testimony on plaintiff-specific issues such as specific causation and damages in Phase III.

At the Court's request, the Parties engaged in discussions to negotiate and propose language to the Court concerning the scope and nature of the proof required to satisfy the Plaintiffs' burdens in Phases I and II. Order (Aug. 8, 2024), D.E. 271. On October 15, 2024, PLG proposed "the introduction of evidence regarding vapor intrusions and emissions" during Phase I (water contamination). J. Status R. (Oct. 15, 2024) at 2, D.E. 291. According to PLG, "such evidence is relevant to Phase I as vapor and emission evidence goes to the 'fate and transport' of water at Camp Lejeune… ." *Id.* However, PLG offered "to stay the presentation of evidence regarding vapor intrusions and emissions during Phase I, if the United States agrees to not object to the presentation of such evidence during Phases II and III." *Id.* The United States opposed PLG's

proposal, noting that a legal question exists on whether the CLJA permits claims based on soil or groundwater vapor intrusion and emissions at Camp Lejeune, and that to the extent the Court were to permit such claims, presentation of vapor intrusion and emissions evidence would be most appropriate in Phase III because vapor intrusion levels are dependent on plaintiff-specific circumstances such as the groundwater at different locations on the base and the time period of claimed exposure. J. Status R. (Oct. 15, 2024) at 6, D.E. 291; Status Conf. Tr. (Oct. 22, 2024), 9:22-11:5, D.E. 294.

During the October 22, 2024, Status Conference, Magistrate Judge Jones questioned whether vapor intrusion constitutes "water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States" under the CLJA, stating:

> I mean, the showerhead -- the showerhead -- or I think an example you used earlier the -- whatever the mechanism in the cafeteria that makes the steam, that's water that's being presumably sucked up in some well somewhere on Lejeune and pumped out to these places. That's water that's being supplied. What is -- and to Mr. Bain's argument, what's being supplied? Is there -- who is supplying the water that's emanating out of the ground –

Status Conf. Tr. (Oct. 22, 2024), 13:19–14:2, D.E. 294. Pointing to ATSDR's ongoing VI PHA, PLG proposed "that we delay that issue until we get a little further down the road without waiving that. And I think that's the way to go." *Id.* at 14:8-15.

On March 3, 2025, the Parties submitted a Joint Notice in advance of the Court's March 25, 2025, *en banc* hearing on Phase I. J. Not. (Mar. 3, 2025), at 2, D.E. 329. In that Joint Notice, the Parties proposed the following agreed upon language summarizing the nature of the evidence to be presented by experts during Phase 1:

> In Phase 1, the Court will be presented with evidence pertaining to the concentration levels for the chemicals in drinking (finished) water at Camp Lejeune from 1953 to 1987. To help the Court "understand the chemicals in the water at Camp Lejeune during the

operative period," D.E. 247 at 2, the Parties may present evidence from experts in fields such as history, engineering, hydrology, environmental sciences and mathematical modeling pertinent to the fate and transport of contaminants in groundwater and in drinking (finished) water for family housing areas and other facilities at Camp Lejeune from 1953 to 1987. The evidence will include the contamination sources, the fate and transport of the contaminants within the groundwater underlying Camp Lejeune, the supply of water through wells to the various treatment plants at Camp Lejeune, and the distribution of the water from the treatment plants to relevant areas of Camp Lejeune during this time frame.

*Id.* The language proposed by the Parties in the Joint Notice does not address the presentation of evidence or expert testimony regarding vapor intrusion and emissions at Camp Lejeune. However, PLG has previously indicated that "our thought is that vapor intrusion and emission is part and parcel of fate and transport of water." Status Conf. Tr. (Oct. 22, 2024), 18:14–16, D.E. 294.

     B.     <u>Plaintiffs' Expert Reports for Phases I and II Contain Quantitative and Qualitative Opinions regarding Vapor Intrusion and Emissions at Camp Lejeune</u>.

Plaintiffs' expert reports for Phase I and II contain both qualitative opinions and quantitative data on vapor intrusion and emissions at Camp Lejeune. Plaintiffs disclosed multiple Phase I experts that offer qualitative and quantitative opinions on vapor intrusion and emissions at Camp Lejeune in their expert reports. *See*, *e.g.*, **Exhibit. 1**, Morris Maslia Report, p. 177 ("Analyses of the distribution of vapor-phase PCE and PCE degradation by-products indicate there is potential for vapors to enter buildings at Tarawa Terrace, thereby providing a potential exposure pathway from inhalation of PCE and PCE degradation by-product vapors."); **Exhibit 2**, Mustafa Aral Expert Report, p. 16 ("This application was used to explore saturated and unsaturated zones and vapor phase contaminant distributions at the Camp Lejeune site"); *Id.* at 50 ("The specific pathways and processes considered in the ATSDR water modeling study are: (i) saturated groundwater; (ii) unsaturated groundwater; (iii) vapor emissions… ."); *Id.* at 58 ("The TechFlow MP model predicted very high vapor concentrations. For example, TechFlow MP predicted that

the PCE vapor concentration in the 10 ft of soil beneath the Tarawa Terrace elementary school should be 1,418 ug/L. Studies of PCE vapor concentrations in buildings that house or are near a drycleaning facility have reported measured concentrations around 55 ug/L.); *Id.* at 58 ("[T]he maximum simulated PCE concentration in groundwater (model layer 1) at the Tarawa Terrace elementary school was 1,418 ug/L (Figure A15b), whereas the maximum simulated vapor-phase PCE (in the top 10 ft of soil was 137 ug/L (Figure A20a)"; *Id.* at 59 ("[T]he predicted vaporized PCE concentrations in the pore space of the soil at the center of the school area (x = 2,580 m, y = 1,975 m) are about 15.5 ug/L during December 1984 (Figure 2a)… .")

Similarly, Plaintiffs disclosed multiple Phase II experts on general causation that offer qualitative opinions on vapor intrusion at Camp Lejeune in their expert reports. *See*, *e.g.*, **Exhibit 3**, Kathleen Gilbert Expert Report (Bladder Cancer), p. 30 ("Breathing indoor air contaminants in Camp Lejeune's buildings due to vapor intrusion is another potential pathway of exposure to shallow groundwater contaminants. Volatile chemicals such as TCE and PCE in contaminated shallow groundwater can evaporate and move upward through the ground surface into indoor air of overlying or nearby buildings—this process is called vapor intrusion. At this time ATSDR is evaluating about 150 buildings at Camp Lejeune. Although the values obtained will reflect current rather than historical levels of contaminants in the groundwater, they may at least provide some insight into the contribution of this exposure pathway to total exposure."); **Exhibit. 4**, Steven Bird Expert Report (Bladder Cancer), p. 12 ("Many organic solvents are volatile (easily evaporated), leading to possible exposure through inhalation… [t]hey can also enter homes through groundwater in a process known as vapor intrusion.").

## STANDARD OF REVIEW

Evidence is relevant only if (1) "it has a tendency to make a fact more or less probable than it would be without the evidence" and (2) "the fact is of consequence in determining the action."

Fed. R. Evid. 401. "Irrelevant evidence is not admissible." Fed. R. Evid. 402. Even relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Moreover, expert testimony is only admissible if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).

**ARGUMENT**

**I. The CLJA's Plain Language Demonstrates That Congress' Intent Was to Permit Claims Only Based on Exposure to "Water at Camp Lejeune, North Carolina, That Was Supplied By, or on Behalf of, the United States," Not Claims Based on Exposure to Soil or Groundwater Vapor Intrusion and Emissions at Camp Lejeune.**

The starting point for analysis of a statute is its "ordinary meaning." *See In re Camp Lejeune Water Litig.*, No. 7:23-CV-897, 2024 WL 457770, at *4 (E.D.N.C. Feb. 6, 2024), D.E. 133 at 7 [hereinafter Jury Demand Order], *app. certification denied*, No. 7:23-CV-897, 2024 WL 2198651 (E.D.N.C. May 13, 2024) D.E. 204, *mandamus denied sub nom.*, *In re McBrine*, No. 24-1542, 2024 WL 5237643 (4th Cir. Aug. 23, 2024), *cert. pending sub nom.*, *McBrine v. United States*, No. 24-658; *see also U.S. Dep't of Lab. v. N.C. Growers Ass'n*, 377 F.3d 345, 350 (4th Cir. 2004) ( "[W]e start with the plain language.") (*citing Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004)). "[W]hen the language of a statute is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Lamie*, 540 U.S. at 534 (internal citation omitted). Courts give words their ordinary meaning and consider their context when interpreting statutes. *N.C. Growers Ass'n*, 377 F.3d at 350; *see also In re Camp Lejeune Water Litig.*, 736 F. Supp. 3d 311, 318 (E.D.N.C. 2024), D.E. 227 at 3 [hereinafter "Specific Causation Order"]. "The inquiry ceases if the statutory language is

unambiguous and the statutory scheme is coherent and consistent." *Barnhart v. Sigmon Coal, Co.*, 534 U.S. 438, 450 (2002) (internal quotation omitted); Specific-Causation Order (Jun. 6, 2024), D.E. 227 at 3 (*quoting In re Sunterra Corp.*, 261 F.3d 257, 265 (4th Cir. 2004)).

Furthermore, a court may not "lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply." *Jama v. ICE*, 543 U.S. 335, 341 (2005). In fact, the *casus omissus* (omitted-case) canon dictates that "[n]othing is to be added to what the text states or reasonably implies." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 93–94 (2012). That is, "a matter not covered is to be treated as not covered—a principle so obvious that it seems absurd to recite it." *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 590 U.S. 432, 440 (2020) (internal quotation marks omitted). Thus, a court may not import language to provide coverage for a matter outside the reasonable interpretation of a statute. *Id.*

Here, the CLJA does not mention vapor intrusion or emissions anywhere in its statutory text. Congress could have easily addressed the viability of these claims under the CLJA based on exposure to soil and groundwater vapors and emissions at Camp Lejeune, but it chose not to do so. "The silence is dispositive here[.]" *GE Energy Power*, 590 U.S. at 440. The *casus omissus* canon provides a clear directive for interpreting the CLJA: vapor intrusion and emissions at Camp Lejeune were not covered by the statute, and therefore must be treated as not covered.

Instead, the CLJA's plain language only permits claims based on exposure to "water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States." By definition, vapors or emissions emanating from groundwater through soil at Camp Lejeune do not originate from "water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States." The CLJA's legislative history and context further demonstrate that Congress

intended to limit the CLJA to claims based on exposure to finished "drinking" or "tap" water supplied by the United States through Camp Lejeune's water distribution system.

A.    The CLJA's Plain Language Only Permits Claims Based on Exposure to "Water at Camp Lejeune, North Carolina, That Was Supplied By, or on Behalf of the United States."

Section 804(b) of the CLJA reads:

> An individual…who resided, worked, or was otherwise exposed…during the period beginning on August 1, 1953, and ending on December 31, 1987, **to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States** may bring an action in the United States District Court to obtain appropriate relief for harm that was caused by exposure to the water at Camp Lejeune.

CLJA, Pub. L. No. 117-168, § 804(b), 136 Stat. 1759, 1802–04 (2022) (emphasis added). Later sections of the CLJA refer back to Section 804(b)'s plain language by referring to "the water at Camp Lejeune." For example, Section 804(c) regarding "Burdens and Standards for Proof" states that "[t]he burden of proof shall be on the party filing the action to show one or more relationships between **the water at Camp Lejeune** and the harm" and that a party shall produce evidence showing "the relationship between **exposure to the water at Camp Lejeune** and the harm… ." CLJA § 804(c)(1)-(2) (emphasis added); *see also* CLJA § 804(e)(2)(B)(permitting an offset by the amount of any disability award, payment, or benefit "in connection with health care or a disability relating to exposure to **the water at Camp Lejeune**.") (emphasis added).[1]

---

[1] The ordinary meaning of "water" refers to H2O's liquid state. *See* Water, BLACK'S LAW DICTIONARY (12th ed. 2024) ("The transparent liquid that is a chemical compound of hydrogen and oxygen (H2O)."); Water, MERIAM-WEBSTER ONLINE DICTIONARY (2025) ("[T]he liquid that descends from the clouds as rain, forms streams, lakes, and seas, and is a major constituent of all living matter and that when pure is an odorless, tasteless, very slightly compressible liquid oxide of hydrogen H2O… ."). On the other hand, the ordinary meaning of "vapor" refers to the gaseous state of a chemical or compound in the air. Vapor, MERIAM-WEBSTER ONLINE DICTIONARY (2025) ("1: diffused matter (such as smoke or fog) suspended floating in the air…2: a substance in the gaseous state as distinguished from the liquid or solid state."). Nevertheless, the United States is

Consistent with the CLJA's plain language, the Court's specific causation order, signed by all four District Court Judges, repeatedly recognized that the CLJA permits claims based only on exposure to "water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States." Specific-Causation Order (Jun. 6, 2024), D.E. 227 at *passim*. Furthermore, in briefing their motion for summary judgment on specific causation, PLG acknowledged the CLJA's reference to "water … supplied by … the United States.":

> [T]here is no reason to think the term "exposure" in section 804(c) is referring to something wholly different than the 30-day exposure period in the previous section, **any more than one would read "water" in section 804(c) to include Camp Lejeune water that was not supplied by the United States.**

Specific-Causation MSJ Reply (Mar. 3, 2024), D.E. 152 at 6 (emphasis added); *see also id.* (PLG stating "that the **'water' must have been 'supplied by… the United States**.'" (emphasis added)). Thus, the Court and the Parties agree that the CLJA's plain language permits claims only based on exposure "to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States."

B. <u>Vapor Intrusion and Emissions at Camp Lejeune that Emanate from the Groundwater through the Soil Do Not Constitute "Water at Camp Lejeune, North Carolina, That Was Supplied By, or on Behalf of, the United States."</u>

The CLJA's plain language only permits claims based on exposure to "water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States." CLJA, § 804(b). The ordinary meaning of "supply" is to "furnish or provide (a person) with something." Supply, OXFORD ENGLISH DICTIONARY (September 2024); *see also* Supply, MERRIAM-WEBSTER ONLINE DICTIONARY (2025) ("To make available for use."); Supply, BLACK'S LAW DICTIONARY (12th ed.

---

not challenging the presentation of evidence or testimony regarding exposure to water vapors from activities like showering or cooking involving finished, drinking water at Camp Lejeune that was supplied by, or on behalf of, the United States.

2024) ("A means of providing a constant flow of something as needed, esp. with a system of distribution or circulation; a system that is used for furnishing some essential or important commodity.").

In the context of water, to "supply" means to affirmatively furnish or provide water to a person. Most commonly, this is achieved through a system of treatment and distribution to users of the water. *See, e.g.,* Safe Drinking Water Act ("SDWA"), 42 U.S.C. § 300(f)(5) ("The term 'supplier of water' means any person who owns or operates a public water system."); SDWA § 300f(4) ("The term 'public water system' means a system for the provision to the public of water for human consumption through pipes or other constructed conveyances... ."); *Rhodes v. E.I. du Pont de Nemours & Co.*, 636 F.3d 88, 92 (4th Cir. 2011) ("The plaintiffs . . . are customers of . . . the Water Department[ ], which supplies water to homes located in Wood County.").

The word "supplied" likewise has been interpreted in the context of other federal statutes. For example, 35 U.S.C. § 271(f)(1) states "[w]hoever without authority supplies or causes to be supplied" a portion of a patented invention for manufacture outside the United States is liable for infringement. Applying this text, the Federal Circuit, found that "[t]he ordinary meaning of 'supply' is to 'provide that which is required,' or 'to furnish with…supplies, provisions, or equipment.' These meanings imply the transfer of a physical object." *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 576 F.3d 1348, 1364 (Fed. Cir. 2009) (internal citation omitted).

Similarly, the Miller Act uses the word "supply," and the United States District Court for the District of Hawaii gave that term its ordinary meaning. *United States of ex rel. Atlas Copco Compressors LLC v. RWT LLC*, No. CV 16-00215-ACK-KJM, 2017 WL 2177968, at *5 (D. Haw. May 17, 2017) (interpreting 40 U.S.C. § 3131(b)). There, "the Court [found] that the plain

meaning of 'supply' is to provide or furnish someone with something and to put something into someone's possession for use or consumption." *Id.*

Here, vapor intrusion and emissions are not water supplied by the United States, but instead emanate naturally from the groundwater, through the soil into buildings or the environment. ATSDR describes its ongoing VI PHA as evaluating "current or past exposures to **indoor air contamination** that may have resulted from vapor intrusion into buildings on the base." *See*, *e.g.*, ATSDR, VI PHA, https://www.atsdr.cdc.gov/camp-lejeune/php/public-health-assessments/vapor-intrusion-pha.html; https://perma.cc/2WD3-BTYE (emphasis added). Similarly, the EPA defines vapor intrusion as migration of "vapor-forming chemicals" which pose "threats to **indoor air quality** via the vapor intrusion pathway." *See* EPA, What is Vapor Intrusion?, https://www.epa.gov/vaporintrusion/what-vapor-intrusion; https://perma.cc/LDP4-QZE9. According to EPA, "[r]ecognition of soil vapor intrusion to buildings and other enclosed spaces occurred in the 1980s with concerns over **radon** [gas] intrusion." *Id.* (emphasis added).

Numerous federal district courts have recognized vapor intrusion and emissions that emanate naturally through soil into buildings. *See, e.g.*, *Gatzke v. City of West Bend, Wisconsin*, 601 F.Supp.3d 384 (E.D. Wisc. 2022) ("Vapor intrusion occurs when volatile chemicals from underground pass though the foundation of a home or other structure and accumulate inside. The process is similar to radon gas seeping into homes."); *Schmucker v. Johnson Controls, Inc.*, 477 F.Supp.3d 791 (N.D. Ind. 2020) ("For obvious reasons, homes are designed to prevent gases in the sewer lines from entering indoor air. The presence of vapors in the sewers thus does not mean that a home is at risk of vapor intrusion."); *United States v. Apex Oil Co., Inc.*, No. 05-CV-242-DRH, 2008 WL 2945402 at * 29 (N.D. Ill. Jul. 28, 2008) ("Migration of vapor-phase hydrocarbons from the subsurface to indoor air is governed by properties that are known as advection and

diffusion…[d]iffusion is the tendency of a gas to migrate away from an area of higher gas concentration.").

Thus, as other courts have recognized, vapor intrusion and emissions at Camp Lejeune are the migration of chemical gas vapors from sub-surface sources like soil and groundwater that migrate into the indoor air of overlying or nearby buildings. By contrast, the United States supplied water at Camp Lejeune through water treatment plants and water distribution systems. *See, e.g.,* SDWA, 42 U.S.C. § 300(f)(5) ("The term 'supplier of water' means any person who owns or operates a public water system.")

Should the Court see any ambiguity in the CLJA's text, the sovereign immunity canon requires a narrow construction. "[L]imitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied." Jury Demand Order, D.E. 133 at 8 (*quoting Soriano v. United States*, 352 U.S. 270, 276 (1957)); *see F.A.A. v. Cooper*, 566 U.S. 284, 291 (2012) ("For the same reason that we refuse to enforce a waiver that is not unambiguously expressed in the statute, we also construe any ambiguities in the scope of a waiver in favor of the sovereign."). Here, there is no basis from which to imply that Congress intended to waive immunity for vapors emanating from soil and groundwater. Congress explicitly expressed a willingness to waive sovereign immunity only for exposure to "water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States," but no more. CLJA, § 804(b). Accordingly, under the sovereign immunity cannon, vapor intrusion claims fall outside the scope of claims permitted by the CLJA.

C.    The CLJA's Legislative History and Context Demonstrate that Congress Intended the CLJA to Permit Claims Based on Exposure to Finished "Drinking" or "Tap" Water at Camp Lejeune.

"If the statute's language is plain, that is where the inquiry should end." *Dep't of Social Services v. Webb*, 908 F.3d 941, 945-46 (4th Cir. 2018) (internal quotation marks and citation

omitted). But, should the Court find any ambiguity in the CLJA's plain language, the Court may look to the CLJA's legislative history and context. *See* Specific-Causation Order, D.E. 227 at 3 ("[T]o the extent that it is relevant, the legislative history supports treating the CLJA as distinct from the rest of the PACT Act."); Jury Trial Order, D.E. 133 at 33 ("The court has considered the parties' arguments about legislative history."); *Ashley v. Civil Air Patrol*, No. 2:04-CV-22-FL, 2007 WL 9718314, at *2 (E.D. N.C. May 4, 2007) (Flanagan, J.) ("If the court finds the plain language to be unclear and ambiguous, however, then the court must attempt to determine Congress's intent, through a review of the legislative history of the statute.").

Consistent with the CLJA's plain language referring to "water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States," the CLJA's legislative history repeatedly references "drinking" or "tap" water at Camp Lejeune. For example, the Representatives who introduced the CLJA bill expressly described the CLJA as allowing individuals to file claims based on exposure to "drinking" or "tap" water at Camp Lejeune:

> Today, U.S. Representatives Matt Cartwright (D-PA-08), Greg Murphy, M.D. (R-NC-03) and David Price (D-NC-04) introduced legislation to ensure servicemembers and their families can receive justice for their exposure to toxic chemicals in ***drinking water*** at Camp Lejeune.

> Over a 30-year period spanning the 1950s through the 1980s, thousands of Marines, their families, civilian workers and personnel used government provided ***tap water*** that was contaminated with harmful chemicals, found at levels ranging from 240 to 3400 times the levels permitted by safety standards.

> ****

> "The federal government has a responsibility to care for our veterans, servicemembers, and their families – but that's not what happened at Camp Lejeune when thousands were exposed to ***contaminated tap water*** for decades. They deserve justice – and their day in court," said Rep. Price.

*See Cartwright, Murphy, Price Introduce Camp Lejeune Justice Act*, March 26, 2021, https://murphy.house.gov/media/press-releases/cartwright-murphy-price-introduce-camp-lejeune-justice-act; https://perma.cc/HT68-4VZB (emphasis added); *see also* 168 Cong. Rec. 39 (Extension of Remarks, Mar. 3, 2022) (statement of Rep. Anna Eshoo) ("Importantly, H.R. 3967 finally puts into place a legal recourse for veterans and their families who were exposed to toxic chemicals in ***drinking water*** at Camp Lejeune, North Carolina.") (emphasis added); 168 Cong. Rec. H1187-01, H1192 (March 1, 2022) (statement of Rep. David Price) ("This legislation would allow marines and their families who were exposed to contaminated ***drinking water*** at Camp Lejeune [to file suit].") (emphasis added).

Similarly, ATSDR's water modeling and health studies, on which PLG heavily relies and even points to as part of the CLJA's legislative context, focus on drinking water contamination from certain water distribution systems between August 1, 1953, and December 31, 1987—consistent with the timeframe and scope of permissible claims under the CLJA. *See*, *e.g.*, *Analyses of Groundwater Flow, Contaminant Fate and Transport, and Distribution of **Drinking Water** at Tarawa Terrace and Vicinity, U.S. Marine Corps Base Camp Lejeune, North Carolina: Historical Reconstruction and Present-Day Conditions, Chapter A: Summary of Findings (2007)*; *Analyses and Historical Reconstruction of Groundwater Flow, Contaminant Fate and Transport, and Distribution of **Drinking Water** Within the Service Areas of the Hadnot Point and Holcomb Boulevard Water Treatment Plants and Vicinities, U.S. Marine Corps Base Camp Lejeune, North Carolina, Chapter A: Summary and Findings (2013);* ATSDR's *Assessment of the Evidence for the **Drinking Water** Contaminants at Camp Lejeune and Specific Cancers and Other Diseases* (2017); *Public Health Assessment for Camp Lejeune **Drinking Water** Public Health Assessment: U.S. Marine Corps Base Camp Lejeune, North Carolina (2017)*; *Cancer Incidence among Marines*

*and Navy Personnel and Civilian Workers Exposed to Industrial Solvents in* **Drinking Water** *at US Marine Corps Base Camp Lejeune: A Cohort Study (2024).*

PLG argues that ATSDR's ongoing VI PHA indicates that the CLJA must permit claims based on vapor intrusion and emissions at Camp Lejeune. However, the VI PHA is not expected to be completed until the fourth quarter of 2025, over three years after the CLJA was passed in August 2022. It is unlikely that Congress had this ongoing and unpublished study in mind when enacting the CLJA, which would explain why vapor intrusion at Camp Lejeune was not addressed anywhere in the CLJA's text. Moreover, remediation of contaminated sites at Camp Lejeune, which can be ongoing sources of vapor intrusion, has continued far beyond the statutory time frame of the CLJA, which ended in December of 1987. Indeed, at some locations, remediation did not even start until 1987, and it continues today. U.S. E.P.A., 11105788, Final Record of Decision, Site UXO-06, Operable Unit 24, Marine Corps Baser Camp Lejeune, North Carolina (2018).  By contrast, the CLJA's statutory timeframe, from August 1, 1953 to December 31, 1987, corresponds to the ATSDR's review of contaminated water supply systems at Camp Lejeune.  There is no basis to conclude that Congress intended the CLJA to permit claims based on vapor intrusion or emissions at Camp Lejeune before 1987 but exclude the same type of claims after that point when vapor intrusion and emissions may be ongoing. Rather, the more reasonable explanation, consistent with the statutory language, is that Congress intended only to allow claims based on the potential period of contamination of certain Camp Lejeune water supply systems.

In short, the CLJA's legislative history and context demonstrate that Congress intended the CLJA to permit claims based on exposure to finished "drinking" or "tap" water at Camp Lejeune—consistent with the CLJA's plain language permitting claims based on exposure to Camp Lejeune water "supplied by, or on behalf of, the United States."

II.    **Vapor Intrusion Evidence and Testimony Are Inadmissible.**

    A.    <u>Vapor Intrusion Evidence and Testimony Are Irrelevant and Waste Time.</u>

Because the CLJA does not permit vapor intrusion claims, evidence regarding vapor intrusion and emissions at Camp Lejeune does not tend to make a fact of consequence more or less likely in determining a CLJA action. Accordingly, evidence and testimony about vapor intrusion and emissions are irrelevant and inadmissible under Fed. R. Evid. 401 and 402.

Even if marginally relevant, this evidence should be excluded because the probative value of the evidence is substantially outweighed by the risks of undue delay and wasting time. Fed. R. Evid. 403. Presentation of evidence and testimony about soil or groundwater vapor intrusion and emissions at Camp Lejeune would require additional expert testimony and pose a serious danger of confusing two separate issues: (1) exposure to drinking water "supplied by, or on behalf of the United States" at Camp Lejeune (permitted by the CLJA) and  (2) exposure to vapors and emissions migrating through groundwater and soil in chemical gas form at Camp Lejeune (not permitted by the CLJA). The evidence would also create undue delay and waste the Court's time hearing evidence of marginal relevance at best. The United States would be required to expend time cross-examining Plaintiffs' experts about the scope and reliability of their opinions on vapor intrusion and emissions at Camp Lejeune, and in turn the Court would expend unnecessary time hearing this evidence. The United States would also would likely have to put up its own experts to rebut the expert testimony offered by Plaintiffs. Accordingly, evidence of vapor intrusion also should be excluded under Fed. R. Evid. 403.

Indeed, federal district courts routinely exclude evidence and testimony about claims that have been dismissed or fail as a matter of law. *See*, *e.g.*, *Maine v. Becerra*, No. 23-1521, 2024 WL 3949261 at *3 (4th Cir. Aug. 27, 2024) ("Maine next challenges the district court's order granting the NIH's motion *in limine* precluding Maine from introducing evidence of dismissed claims at

trial…[t]he district court did not abuse its discretion in granting the motion *in limine*. There was only one discrete issue at trial—whether Maine's transfer was retaliatory. Evidence of other claims would have been irrelevant."); *Gillis v. Murphy-Brown, LLC*, 7:14-cv-000185-BR, 2018 WL 5834689 at *1 (E.D.N.C. Nov. 6, 2018) ("[T]he court finds that evidence of dismissed and abandoned claims and parties is not relevant in this case and further, presents a substantial risk of causing jury confusion."); *Baxter Diagnostics, Inc. v. Novatek Medical, Inc.*, No. 94-cv-5220(AJP), 1998 WL 665138 at *3 (S.D.N.Y. Sept. 25, 1998) ("Thus, the Court rules that both parties' punitive damage claims are dismissed and evidence that relates only to punitive damages is excluded.").

B.   <u>Vapor Intrusion Evidence and Testimony Will Not Help the Trier of Fact</u>.

As stated above, expert testimony about vapor intrusion and emissions at Camp Lejeune will not "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Federal district courts routinely strike irrelevant expert opinions that will not help the trier of fact. *See*, *e.g.*, *Sibert v. Wells Fargo Bank, N.A.*, No. 3:14-CV-737–HEH, 2015 WL 12806529 at *1 (E.D. Va. May 8, 2015) ("[E]xpert testimony at trial regarding the appropriate measure of attorney's fees is irrelevant with respect to the merits of Plaintiff's claim. It will not 'help the trier of fact to understand the evidence or to determine a fact in issue,' [and, as such,] will not be admitted at trial."); *In re Pratt*, No. 1:13-cv-1083, 2016 WL 9777263, at *3 (W.D. Mich. Aug. 15, 2016) ("Because Gurulé's testimony does not relate to any issue in the case, the Court agrees that it is irrelevant and 'non-helpful.'… [As such, the Court] strikes the Gurulé Report and will preclude Gurulé from testifying as an expert.") (citations omitted); *Morgan v. Chao*, No. 16-cv-04036-PHX-DLR, 2017 WL 3215647 at *3 (D. Ariz. Jul. 28, 2017) ("Having decided to dismiss Plaintiff's accident-related claim for damages, the Court finds the expert testimony of Dr.

Sullivan to be irrelevant to any issue in the case. His testimony in this matter therefore is precluded.") (citations omitted).

## CONCLUSION

The Court should exclude evidence and expert testimony regarding soil or groundwater vapor intrusion and emissions at Camp Lejeune. The CLJA permits personal injury claims against the United States based on exposure to "water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States." The CLJA does not permit claims based on soil or groundwater vapor intrusion and emissions at Camp Lejeune. Evidence and testimony regarding soil or groundwater vapor intrusion and emissions at Camp Lejeune are irrelevant and will not help the trier of fact. Moreover, any probative value of evidence or expert testimony about soil or groundwater vapor intrusion and emissions at Camp Lejeune is substantially outweighed by the risks of undue delay and wasting time.

Dated: April 29, 2025

Respectfully submitted,

YAAKOV ROTH
Acting Assistant Attorney General
Civil Division

JONATHAN GUYNN
Deputy Assistant Attorney General,
Civil Division

J. PATRICK GLYNN
Director,
Environmental Torts Litigation Section

BRIDGET BAILEY LIPSCOMB
Chief, Camp Lejeune Unit

ADAM BAIN
Special Litigation Counsel

ALLISON O'LEARY
GIOVANNI ANTONUCCI
ALANNA HORAN
KAILEY SILVERSTEIN
Trial Attorneys

*/s/ Haroon Anwar*
HAROON ANWAR
Trial Attorney
United States Department of Justice
Civil Division, Torts Branch
Environmental Torts Litigation
1100 L Street, NW
Washington, DC 20005
(202) 305-2661
Fax (202) 616-4473
Haroon.Anwar@usdoj.gov

Attorney inquiries to DOJ regarding CLJA:
(202) 353-4426

*Attorneys for Defendant,*
*United States of America*

21

**CERTIFICATE OF SERVICE**

I hereby certify that on April 29, 2025, I electronically filed the foregoing using the

Court's Electronic Case Filing system, which will send notice to all counsel of record.


*/s/Haroon Anwar*
HAROON ANWAR