# EXHIBIT 22

Page 1

1            UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF NORTH CAROLINA
2                   SOUTHERN DIVISION

3

LAURA J. JONES,              )
4                            )
        Plaintiff,           )
5                            )
vs.                          )
6                            )  CASE NO. 7:09-CV-106-BO
UNITED STATES OF AMERICA,    )
7                            )
        Defendant.           )
8    _____)

9

10
                        *   *   *
11

12                   Deposition of
          MORRIS L. MASLIA P.E., D.WRE, DEE
13

14

                   June 30, 2010
15                   9:18 a.m.

16

        Centers for Disease Control and Prevention
17            1600 Clifton Road, N.E.
                 Atlanta, Georgia
18

19

          By Amy L. Dunning, CCR B-2079
20

21

     ****************************************************
22

23          PROFESSIONAL COURT REPORTERS LLC
            3569 Chattahoochee Summit Drive
24            Atlanta, Georgia  30339
            T.770.952.0604  F.770.952.0603
25          www.ProfessionalCourtReporters.com

1                 I N D E X  T O  E X H I B I T S

2    PLAINTIFF'S
     EXHIBITS            DESCRIPTION              PAGE
3
     P-1  Booklet entitled Chapter I:  Parameter      53
4         Sensitivity, Uncertainty, and Variability
          Associated with Model Simulations of
5         Groundwater Flow, Contaminant Fate and
          Transport, and Distribution of Drinking
6         Water

7    P-2  Booklet entitled Chapter A:  Summary of     76
          Findings
8
     P-3  TTHM Surveillance Report Form              121
9         Date collected October 21, 1980

10   P-4  TTHM Surveillance Report Form              121
          Date collected December 18, 1980
11
     P-5  TTHM Surveillance Report Form              121
12        Date collected February 26, 1981

13   P-6  August 10, 1982 letter from Bruce A.       121
          Babson to Commanding General
14
     P-7  Memorandum From Ms. Betz to Mr. Sharpe     123
15        dated August 19, 1982

16   P-8  Notice to Residents of Tarawa Terrace

17   P-9  Letter dated January 24, 1986 from         166
          Director, Natural Resources and
18        Environmental Affairs Division

19   P-10 Letter to Ms. Yvonne Walker from Carol
          H. Aloisio
20
     P-11 Letter to Lt. General Kramlich from        138
21        Howard Frumkin, M.D., Dr.P.H.

22

23

24

25

1             I N D E X   T O   E X A M I N A T I O N S

2    Examination By:  Mr. Anderson              06

3    Examination By:  Mr. Bain                  182

4    Examination By:  Mr. Anderson              184

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   APPEARANCES OF COUNSEL:

 2   On behalf of the Plaintiff:

 3            JOSEPH L. ANDERSON
             MICHAEL J. PANGIA
 4           Attorneys at Law
             Anderson Pangia & Associates, PLLC
 5           2615 Sparkling Place
             Winston-Salem, North Carolina  27103
 6           Phone:  800.735.4062
             Fax:    866.489.2916
 7           E-mail: janderson@andersonpangia.com

 8   On behalf of the Defendant:

 9            ADAM BAIN
             Attorney at Law
10           U.S. Department of Justice
             Environmental
11           P.O. Box 340
             Washington, DC  20044
12           Phone:  202.616.4209
             Fax:    202.616.4473
13           E-mail: adam.bain@usdoj.gov

14   Office of the General Counsel Public Health
     Division/CDC:
15
              KENYA S. FORD
16           Attorney at Law
             Centers for Disease Control
17           and Prevention
             1600 Clifton Road, N.E.
18           M/S D53
             Atlanta, Georgia  30333
19           Phone:  404.639.7200
             Fax:    404.639.7351
20           E-mail: kford@cdc.gov

21

22

23

24

25
```

Page 5

```
 1    APPEARANCES OF COUNSEL:
      (Continued)
 2

 3    Office of the Director/Office of the General Counsel:

 4               SUDEVI GHOSH
                 Attorney at Law
 5               Centers for Disease Control
                 and Prevention
 6               1600 Clifton Road, N.E.
                 Building 21, M/S D53
 7               Atlanta, Georgia  30333
                 Phone:  404.639.7016
 8               Fax:    404.639.7351
                 E-mail: sghosh@cdc.gov
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          MORRIS L. MASLIA, P.E., D.WRE, DEE,

2    having been first duly sworn, testified as follows:

3                    EXAMINATION

4    BY MR. ANDERSON:

5        Q    State your full name, please, for the

6    record, sir.

7        A    Full name is -- first name is Morris,

8    M-o-r-r-i-s; middle name, Lavi, L-a-v-i; and last

9    name is Maslia, M-a-s-l-i-a.

10       Q    And what is your residence address, sir?

11       A    2681 Canna, C-a-n-n-a, Ridge Circle,

12   Atlanta, Georgia 30345.

13       Q    All right.  Thank you.  Have you had your

14   deposition taken previously?

15       A    No.

16       Q    Okay.  The first time.

17       A    First time.

18       Q    Let me just tell you -- I'm sure you've been

19   advised of this by counsel, but from my perspective,

20   it's very important that you and I communicate

21   effectively here today and that we take care to

22   listen to each other so we're sure we have precision

23   in both the questions and the answers.  Will you work

24   with me to try to accomplish that?

25       A    Yes, sir.

1    Q    If I ask you a question and you don't

2    understand it, just let me know, and I'll try to

3    restate it someway to make sure we're communicating.

4    Okay?

5    A    Okay.

6    Q    Because I think it's in the interest of

7    everyone that we have a clear record.

8    A    Okay.

9    Q    If you need to take a break or anything like

10   that, just let us know.  This is not an endurance

11   contest.  I'm not here to try to be hard on Morris

12   Maslia.

13         What, if any, preparation have you had for

14   talking with me today?

15   A    I met yesterday for about two hours with

16   Mr. Bain and just went over the rules of the

17   deposition, just as you explained them with that, and

18   basically was told to answer as technically correct

19   or with my knowledge that I have.

20   Q    And obviously truthfully.

21   A    Yes, yes.

22   Q    You're aware this is a case in federal

23   court, are you?

24   A    I have not been told the specifics of the

25   case.  I have just been told that there's litigation

1   involved.

2       Q    Okay.  Well, it is a case in federal court.

3   And under the rules of federal court, although you're

4   certainly entitled to preparation and breaks and so

5   forth, once the deposition begins, it's improper to

6   talk about the answers and questions that I pose with

7   your lawyer, with the exception of very limited

8   privilege-related issues.

9           You realize obviously you're under oath.

10      A    Yes, sir.

11      Q    And you realize that the penalties of

12  perjury would apply to your testimony here today.

13      A    Yes, sir.

14      Q    Okay.  Fair enough.  Tell me a little bit --

15      A    Can I just make sure my cell phone is on

16  vibrate?

17      Q    Oh, yeah.  In fact --

18      A    I apologize, but --

19      Q    Let's all do that.

20          I'd like to talk with you for a few minutes

21  at the beginning here about your background.

22      A    Okay.

23      Q    Tell me a little bit about your education,

24  if you would, sir.

25      A    Got a bachelor's degree in civil

1    engineering -- it's actually a BCE -- from the

2    Georgia Institute of Technology.  I was awarded that

3    in March of 1976.  I have a Master's of Science in

4    civil engineering from the same institute, that was

5    awarded in March of 1980.  I have subsequent courses

6    towards a doctorate in civil engineering.  I do not

7    have a doctorate of any kind, but I -- course work

8    towards that.

9         Q    Okay.  Any other education or particular

10   training that would be relevant to the work that you

11   did here?

12        A    Well, in terms of -- basically worked for

13   the U.S. Geological Survey, developing groundwater --

14   they transport models and applying them.

15        Q    How long were you with them?

16        A    I was with them for a little over nine

17   years.  Began in 1980 and then left the

18   U.S. Geological Survey in -- I think it was November

19   of 1989.  And then I worked with a consulting firm,

20   Geosyntech Consulting Engineers, for a couple of

21   years, establishing their water resources department.

22   I was the manager of the water resources department

23   there, bringing online codes and things of that

24   nature.

25             And then in January of 1992, I accepted a

1    position over at the Agency for Toxic Substances and

2    Disease Registry as an environmental engineer.  And I

3    then developed and was one of the principal coauthors

4    of the agency's exposure to Dose Reconstruction

5    Program.  And I have since been classified as a

6    research environmental engineer under the Research

7    Grade Evaluation program that runs throughout the

8    civil service or the government.

9        Q    What was your role when you were at the

10   U.S. Geological Survey those nine years?  What did

11   you do?

12       A    There were a couple of things.  I worked on

13   some studies in Southwest Georgia looking at the

14   impacts of agricultural pumping.  Southwest Georgia,

15   at the time in the early eighties, was one of the

16   last untapped resources for groundwater for large-

17   scale irrigation practices, and there was an interest

18   as to see what the impact that would have, and, of

19   course, fertilizers and things like that.  I also

20   worked on the USGS's regional aquifer system analysis

21   programs, which Congress had mandated them to do in

22   the late seventies and throughout the eighties.  And

23   I worked on the Florida aquifer, which is basically

24   Southwest Georgia and Northwest Florida.

25              And at the same time, I became involved with

```
 1   a case just because of the modeling ability that I

 2   had, or specialized modeling ability, in a case to

 3   assist USEPA up at Love Canal in Hyde Park, New York.

 4   That was the precursor of Superfund, and they used

 5   part of our analysis to, in fact, promulgate

 6   Superfund.

 7        Q    So your analytical techniques and

 8   methodologies in that instance became part of the

 9   basis for the Superfund system?

10        A    I would not go that far.  I would say that

11   the modeling that we did -- that we did because of

12   the area that it was located in -- it was Love Canal

13   in Hyde Park area in New York -- was the impetus for

14   Congress passing Superfund legislation.  So we were a

15   technical consultant to EPA.

16        Q    In connection with the passage of Superfund.

17        A    No.  It was in connection with a lawsuit.

18   From what I understand, we were being sued by the

19   Canadians because of supposed contaminated water

20   coming over Niagara Falls, because it's a fractured

21   dome right there and Hooker Chemical Company had some

22   waste there.  And so the U.S. was being sued by the

23   Canadians, or a group within Canada.  And so a

24   colleague of mine was requested to provide testimony

25   in a court hearing.
```

1      And one of the things that came out of that

2  is that he suggested in 1980 that we could use

3  computer methods to answer some questions rather than

4  speculating based on limited field data.  So that's

5  when he brought me in, and we did a computer model of

6  the area.

7      Q    You must have been using big-box hardware

8  like AS/400s and things like that.

9      A    No.  Actually we were renting computer time.

10 At that time you used to have to rent computer time.

11     Q    I remember, yeah.  I was at Berkeley at that

12 point.

13          Mike wants me to ask you about your business

14 card, and I should have done that.  It says here

15 "PE."  Could you just tell me what that is.

16     A    Sure.  PE is a professional engineer, and

17 I'm registered and current in the state of Georgia as

18 a professional engineer and have been for a number of

19 years.  And then the DEE means I'm a diplomat of the

20 American Academy of Environmental Engineers.  And

21 then does it say "D.WRE" on there?  Yes.  Okay.  And

22 that's a diplomat of the water resources -- I forget

23 the exact title.  But there's the Academy -- American

24 Academy of Environmental Engineers.  And then there's

25 the American Society of Civil Engineers, and that's

1    their equivalent diplomat designation.

2        Q    And what does it mean to be a diplomat?

3        A    Basically you can -- it's based on the

4    number of years of experience you have in a certain

5    specialty area.  And then they can -- depending on

6    the organization, they can put you in front of a

7    panel to answer specific questions to test your

8    knowledge.

9        Q    Have you been through those processes?

10       A    Yes.

11       Q    And you passed?

12       A    Yeah.  That's what they tell me.  Yes, I

13   have.

14       Q    How long have you been a licensed

15   professional engineer here in the state of Georgia.

16       A    I'm trying to think.  Let's see now.  I

17   graduated in 1980, I believe, because you had to have

18   four years of practice with a master's degree.  So I

19   believe it was 1980.  You can probably go through the

20   Secretary of State's office and pull it up online.

21       Q    And have you consistently been licensed

22   since that time?

23       A    Yes.  It's never lapsed.

24       Q    Returning to the subject of Love Canal and

25   Hyde Park which we were talking about before, you

1   twice mentioned that as somehow, in your mind,

2   connected to the advent of Superfund.  Can you

3   explain that relationship.

4        A    Well, just if you look at the history of the

5   Superfund legislation, what promulgated the

6   congressional action was the press, the notoriety of

7   Love Canal.  And the reason we mentioned Hyde Park is

8   because actually Hyde Park was significantly more

9   contaminated and more toxic than Love Canal.

10  However, Hyde Park was an industrial area owned by

11  Hooker Chemical, whereas Hyde Park, you had citizens

12  living -- you know, it was a residential area.

13       Q    You mentioned that in connection with those

14  contaminated sites, you apparently for the first time

15  recommended the use of what were then new computer

16  modeling techniques to answer some of the questions

17  associated with those sites?

18       A    I did not recommend.  My colleague, Richard

19  Johnson, who has just deceased this past December,

20  actually was an engineer/geologist back in the 1960s

21  when they were digging the power canal for the Mohawk

22  Power Company.  And so he saw the geology and how the

23  water was flowing and all of that.  And this is in

24  deposition, so you can pick that up.  But they were

25  asking him questions that you really could not answer

1    without a computer simulation program.

2           And so that's -- he and I worked on the

3    Florida Rassa, so he was head of the Florida Rassa.

4    So that's why I was working with him at the USGS.

5    And so as sort of a side project, he suggested to

6    them that computer simulation could address a lot of

7    the questions that they were being asked in court

8    under litigation, rather than speculating.

9        Q    And were those models, in fact, put

10   together?

11       A    We put a model together.  We put a

12   cross-sectional model together.

13       Q    And the computer model that you and

14   Dr. Johnson put together, did it generate data

15   results?

16       A    Yes.

17       Q    And the data and results that were generated

18   from that computer model, did they become part of the

19   data set that represented the findings with respect

20   to what had happened at Love Canal?

21       A    They represented the -- at that time,

22   current 1980 to 1982 conditions of groundwater

23   flowing through a section of limestone that exited to

24   the gorge of Love Canal, of which the Hooker Chemical

25   Company landfill was sitting on top.  And it

1    presented results of how long it would take a

2    particle of water -- and, hence, a particle that may

3    have been contaminated -- to flow from the landfill

4    to the gorge.  And it provided different ranges of

5    values depending on the different geologic medium,

6    whether it was glacial till or fractured rock.

7         Q    And did those results from that computer

8    model then go on to be relied upon by people making

9    decisions about --

10        A    They were presented to EPA, and then they, I

11   assume, were -- they were presented to EPA, and EPA

12   used them -- or used the results in their legal

13   briefs.  I did not ever see the legal briefs.

14        Q    Of course.  But the results were used.

15        A    Yes, the results were used.

16        Q    And then subsequent to that whole Love Canal

17   use of those results, politically we then see

18   Superfunds spring up from that?

19        A    That's correct.  That's correct.

20        Q    And that was really my question.

21             I want to return back to the subject of your

22   work in Georgia when you were dealing with that

23   situation where you had historically significant

24   agricultural pumping from that aquifer and you were

25   studying the effect of that.

1           Was what you were studying have been fate

2    and transport?

3       A    We did not study fate and transport for a

4    couple of reasons; the first being, we had a

5    cooperative agreement with the State of Georgia, and

6    our specific task was to look at the impact of

7    pumping in terms of water withdrawal, okay, not in

8    terms of, say, pesticides and all of that.  Secondly,

9    at that time the State of Georgia did not acknowledge

10   that there was any pesticide contamination.  Okay.

11   We obtained samples with pesticide contamination in

12   there, and I don't recall which ones they were.  It's

13   in a report that I did, and I have that.

14          But it was really our task -- the motivation

15   was, you had at that time the banks requiring, as

16   collateral, farmers installed irrigation systems.

17   And these are not small irrigations.  These are

18   center pivot systems that can be a mile in diameter.

19   And from the area you see the big circle in the

20   ground.  And they withdraw, you know, hundreds of

21   thousands of gallons of water.  And in South Georgia,

22   you could drill down, you know, a couple of hundred

23   feet to just a thousand feet, which is very

24   inexpensive, and sink a well and irrigate.

25          So the State was concerned about ordering

1    the aquifer.  And so as part of the USGS cooperative

2    agreement with them, we had this study to go on to

3    assess what impact the current pumping -- at that

4    time, 1980 -- and what potential there was for

5    further development of the agricultural lands.

6         Q    And what methods did you use?

7         A    We used a computer model.  We used a

8    two-dimensional finite difference computer model at

9    the time that the USGS had developed, and gathered

10   field data and calibrated the model and produced the

11   results and produced a couple of reports.

12        Q    The use of these computer models that you've

13   described now in a couple of different contexts, is

14   that a standard practice in your professional field?

15        A    Yes.

16        Q    Are these accepted methodologies?

17        A    Yes.

18        Q    And how are their reliability -- how is

19   their reliability assured?

20             MR. BAIN:  Objection; vague.

21   BY MR. ANDERSON:

22        Q    Well, how is the reliability of these types

23   of computer models tested?

24        A    The models are calibrated, meaning that you

25   have gathered or have obtained some field

1   information, that data.  And the model --

2       Q    Let me stop you there.  And just so this

3   record is clear, when you say you've obtained some

4   field information, some data, are you talking about

5   actual sample results?

6       A    Yes.

7       Q    Okay.  Go ahead.

8       A    And depending on the purpose of the model,

9   you will obtain different types of data.

10      Q    For instance, if you're trying to just

11  figure out whether you're draining the aquifer, you

12  might obtain samples showing the quantity of water.

13  But if you're trying to determine pollution, you

14  might take samples of the contaminants?

15           Is that what you mean?

16      A    Qualitatively, that's correct.  Technically,

17  we would go and measure water levels and wells.  They

18  may be existing wells.  Or if we want to make sure we

19  have accurate water level readings, we will go and

20  install what we refer to as monitor wells, where

21  there are standards for properly constructing them

22  and so on.  And then you will obtain water level

23  readings from them.  And depending on the focus of

24  your study and the characteristic of the aquifer

25  you're looking at, you may do repeated sampling, you

1    may do continuous sampling.  It's very broad, and the

2    nature and character of the study would dictate

3    how -- the frequency and what type of sampling you

4    would do.

5        Q    Fair enough.  And I distracted you a little

6    bit from the main question, which was:  How is the

7    validity, accuracy, and scientific reliability of

8    these computer models assured?

9            MR. BAIN:  Objection to form.

10   BY MR. ANDERSON:

11       Q    How do you check to see if these models are

12   going to give you accurate data?

13       A    The models will give you results, and then

14   there are numerous statistical methods to compare

15   them with the data that you have collected.  The

16   model results -- you would compare the model results

17   with the data that you've collected.  And you may

18   decide a priori that you want to be within a certain

19   range.

20           For example, at water levels I may want to

21   be within plus or minus 10 feet of what I measure.

22   It depends on the size of the model of the area that

23   you're modeling and the purpose of the model.  And

24   you will use different statistical and visualization

25   techniques to demonstrate that, in fact, the model

1    provides an acceptable range of reliability compared

2    to the data that you have collected.

3         Q    Okay.  These statistical methods that are

4    used to calibrate, are these used to calibrate the

5    model?  Is that correct lingo?

6         A    No.  They are used to assess the

7    calibration.

8         Q    Okay.  All right.  I think I understand.

9    These statistical methods that you use to assess the

10   calibration of your computer model, how long have

11   those statistical methods been used?

12        A    They have been used since the beginning of

13   time for -- to compare other techniques and other

14   areas, not just modeling, in other words.  So since

15   modeling began, we have needed -- in the late fifties

16   or early sixties, we have needed to test the results

17   of the models because the purpose of developing the

18   model is to obtain information where you have limited

19   or nonexisting data.

20        Q    Is it fair to say that these statistical

21   methods that are used to check the calibration of

22   your computer simulation, to compare the model

23   results of the field data, are based in statistics,

24   the science that is well known to many of us?

25        A    Yes.

1    Q    Founded on that science.  It's fine.  I'll

2    withdraw the question.  When you went to Geosyntech

3    Consulting Engineers, you mentioned you had some role

4    having to do with getting the codes online.

5         What was that?

6    A    They were a small consulting company, and

7    their primary business was in design and installation

8    of liners for landfills, sanitary landfills.  And in

9    doing that, of course, you have to demonstrate that

10   the liner is going to leak, how much it's going to

11   leak over time.  And so one way of doing that, you

12   can test that in the lab, but you can also show

13   what's going to happen when you design a landfill

14   where the groundwater is going to flow.  And so you

15   need models to do that.

16        Again, you can instrument beforehand, but

17   most state regulators would like to see some evidence

18   that the liner is going to work.  And so they did not

19   have -- their primary business was a liner design,

20   not modeling.  And so they brought me in along with

21   another colleague, an older colleague of mine that

22   had retired from USGS.  And I set up some computer

23   codes and some analysis methods so that we -- you

24   know, when they needed to assess a design or they

25   needed to answer some litigation, then we could run

1   the models.

2       Q    Is it fair to say that at Geosyntech you

3   used the same essential techniques that you had used

4   at the United States Geological Survey -- that is,

5   computer modeling, statistical analyses -- to check

6   the calibration of the model?

7       A    Yes.

8       Q    Are those well-established techniques that

9   people in your profession use?

10      A    Yes, they are well established.

11      Q    And how long have they been established, 30,

12  40 years?

13      A    At least, yes.

14      Q    And then when you moved to the Agency for

15  Toxic Substance and Disease Registry in 1992, you

16  came in, I believe you said, as an environmental

17  engineer.

18      A    That's correct.

19      Q    And you told me, I think, you developed and

20  coauthored the exposure and dose reconstruction

21  program?

22      A    That's correct.

23      Q    Tell me a little bit about that.

24      A    Okay.  At the time that I came in in 1992,

25  the agency was right in the midst of answering a GAO.

1    At that time, I think it's Government Accounting

2    Office.  I think now it's Government Accountability

3    Office.  They have changed names.  Basically

4    critiquing the agency because they had reviewed

5    something like 900 NPL sites.  And basically,

6    Congress gave them a limited number of -- a couple of

7    years to review like all 900 of them.  And obviously

8    they could not answer certain questions based on,

9    say, one data point at a site who may have been

10   exposed or when they were exposed.

11            And so the science director of my division

12   as well as the assistant administrator of my agency

13   at the time saw the need to have some quantitative

14   computational ability to predict or reconstruct --

15   for my agency, primarily reconstruct historical

16   conditions, perhaps predict current conditions

17   and/or -- or predict future conditions.  And so we

18   wrote a -- out a plan to have such a program funded

19   that would bring in different techniques,

20   state-of-the-art techniques, impart some of this

21   knowledge on the health assessors of the agency, as

22   well as establish, say, a cooperative agreement with

23   a university partner who develops models all of the

24   time.

25            And if we need a certain model that we don't

1  have in hand and we don't have the personnel or the

2  funds to dedicate to developing it, we could go to a

3  university partner through a cooperative agreement

4  and work with that.  And that program, I think, was

5  established in 1993, and it goes every five years.

6  And it was just renewed again for -- a couple of

7  years ago for the next five years.

8       Q    You used an acronym NPL sites.  Do you mean

9  National Priority List?

10      A    Yeah, the list --

11      Q    The federal list of sites?

12      A    Yes.

13      Q    Contaminated sites?

14      A    Put on by EPA.

15      Q    The answer is yes?

16      A    Yes.

17      Q    And in terms of the exposure, slash, dose

18  reconstruction program, was the purpose of your work

19  in connection with that to aid in the assessment of

20  how much people had been exposed to various chemicals

21  in various situations?

22      A    It was more general than that.

23      Q    Tell me what you mean.

24      A    It was to assist the agency in quantifying

25  exposures where we had limited or nonexisting data or

1   information, and also to develop techniques, these

2   type of computational techniques, so that the health

3   assessors at the agency would have these tools

4   available to them.

5        Q    All right.  But in terms of its function,

6   ultimately it had do with the exposure in dose

7   reconstruction.  That's what its name was.

8        A    That's what its name was.  Okay.

9        Q    And why was it called exposure and dose

10  reconstruction?

11       A    It was basically to try to provide a program

12  for two different disciplines.  The area that we

13  worked in, exposure analysis, is really at the

14  intersection between environmental science and health

15  science and toxicology.  In environmental science, we

16  speak about concentrations and exposure to that.  Can

17  be exposure.  And toxicology and health science, you

18  speak about doses, internal doses.  And so the

19  program was really meant to help bridge a gap in

20  there so the engineers could sort of speak to the

21  toxicologists on the same level or understand each

22  other.

23       Q    And your computer models would provide the

24  reconstruction of information to allow the connection

25  between exposure and dose?

1       A    Yes.

2       Q    And in doing that work at the Agency for

3    Toxic Substances and Disease Registry, were you

4    working on behalf of the federal government?

5       A    Yes.

6       Q    And you were doing that work within the

7    course and scope of your duties?

8       A    Yes.

9       Q    And the methods that you employed in the

10   course of that work were the same methods that you

11   described before; statistics-based, computation-based

12   models?

13      A    Yes.

14      Q    And they were reliable for the same reasons

15   that you described previously?

16      A    Yes.

17      Q    And, in fact, the U.S. Geological Survey is

18   also an agent of the federal government, correct?

19      A    That's correct.

20      Q    And you, as you told me before, used those

21   same methods within the course and scope of your work

22   as an agent of the federal government during those

23   nine years that you worked for U.S. Geological

24   Survey, correct?

25      A    Correct.

1      Q      Nowadays you're a research environmental

2  engineer?

3      A      That's correct.

4      Q      Could you tell us what that means.

5      A      That's a classification in the civil service

6  part of the government.  The Office of Personnel

7  Management has a classification that is referred to

8  as a research grade system.  And under that system,

9  you can be both promoted and, I assume, demoted based

10  on certain criteria of the position, as opposed to

11  just a standard civil service position.  For example,

12  on the complexity of the research project that you're

13  working on, on the colleagues internally and

14  externally that you associate with.  And probably the

15  heaviest, weighted -- there are four factors to

16  assess you, and the fourth one being -- which is

17  weighted twice as much -- is the publications that

18  you produce in both peer-reviewed to non-peer-

19  reviewed outlets.

20      Q      Through that process that you just

21  described, have you ever been promoted?

22      A      Yes, I have.

23      Q      Has that been repeatedly?

24      A      Yes.

25      Q      And that's been within the course and scope

1    of your work for the United States Government?

2        A    That's correct.

3        Q    Have you ever been demoted?

4        A    No, I have not.

5        Q    And what is the total number of years of

6    experience that you have, as you sit here today, with

7    the computer models and the statistical methods used

8    to check their reliability?

9        A    Approximately 34 to 35 years.  That's going

10   back to my bachelor's degree.

11       Q    And your publications -- have you published

12   anything?

13       A    Yes, sir, I have.

14       Q    Have any of your publications been peer

15   reviewed?

16       A    Yes; many of them.

17       Q    Have any of your peer-reviewed publications

18   dealt with the methodological techniques you

19   described previously, the computer models and the

20   statistical methods used to check their reliability?

21       A    Yes, they have.

22       Q    And have those techniques been peer

23   reviewed?  That is, your --

24       A    The techniques themselves have not because

25   those are established techniques.  The use of those

1    techniques described in the peer-review publications

2    have been peer reviewed and published.

3         Q    Thank you for the precision of that.

4    Repeatedly, I take it.

5         A    Yes.

6         Q    In what areas would you consider yourself to

7    have expertise at this point?

8         A    Numerical modeling -- broad category --

9    environmental engineering, environmental fate and

10   transport analyses, and scientific report writing.

11        Q    What is fate and transport?

12        A    Fate and transport describes the process

13   that a contaminant undergoes irrespective of the

14   media it's in, whether it's air, soil, water,

15   groundwater; where transport refers to the movement

16   of a particle of contaminant with, say, a drop of

17   water; and the fate refers to either chemical

18   degradation, decay, different properties, chemical

19   properties, that a compound may undergo as it's

20   moving along a path.

21        Q    Would that include breakdown products?

22        A    Yes.

23        Q    We'll come back to that subject a little

24   later on.  And you mentioned scientific report

25   writing.  Certainly having read some of your work, I

1   can see that that, in and of itself, is quite an

2   undertaking.

3          What, if any, basic ground rules are there

4   that you have learned with respect to scientific

5   report writing?

6          MR. BAIN:  Objection; vague.

7   BY MR. ANDERSON:

8     Q   You can answer.  He can object for the

9   record.  It's okay.

10          MR. BAIN:  Go ahead and answer.

11          THE WITNESS:  Oh, okay.  I wasn't sure.

12   BY MR. ANDERSON:

13     Q   Here is the question again:  What are the

14   rules, if any, for writing one of these scientific

15   reports?

16     A   There are no rules, but there are general

17   guidelines to go by.  That is, clearly state the

18   problem that you're writing about, present the data

19   as field data and clearly identify it as field data,

20   clearly identify what is computer simulation, state

21   the assumptions and limitations that you are using,

22   and justify why you are making those assumptions and

23   limitations.  And then finally draw the conclusions

24   based on the problem, the data, the assumptions, and

25   the results that you reviewed.

1    Q    You mentioned clearly identifying the field

2    data.  I note that you and your work on the Marine

3    Corps base at Camp Lejeune, which obviously we're

4    going to talk about, you cite repeatedly to the

5    source material, identifying the field data and other

6    documents reviewed in footnotes and by name.

7             Is that part of the method that you have

8    employed in the course of your scientific report

9    writing?

10    A    That is a more specific method that we used

11    in this particular case.

12    Q    Okay.

13    A    And other cases like journal articles, you

14    may just reference other peer-reviewed documents and

15    not go into quite as much detail as we have done with

16    the Camp Lejeune publications.

17    Q    Are there internal rules or advisories from

18    the Agency for Toxic Substances and Disease Registry

19    with respect to citing documents in studies like

20    these?

21    A    They have policies.

22    Q    Could you tell me about those.

23    A    The policy is to reference the information

24    and identify the source.

25    Q    Is it correct that the policy, in fact, is

Page 33

1   to reference each and every source that you rely

2   upon?

3       A    I could not state that specifically because

4   it's been a while since I've actually read their

5   policy, so I can't speak about the agency's specific

6   policy.

7       Q    How would that policy be described if we

8   wanted to request a copy of it from Mr. Bain?

9       A    I would say it would be their scientific

10  publication policy.

11      Q    Okay.  And in terms of the work you actually

12  did regarding Camp Lejeune, did you, in fact, attempt

13  to cite everything you were relying upon?

14      A    We cited everything that we used in a

15  specific report.  So although the Tarawa Terrace

16  analysis is compromised of, say, 11 different

17  reports, different reports might not use the same --

18  Chapter A may not use all of the references that

19  Chapter B or Chapter C, so I would not need to

20  reference those documents unless I was referring to

21  out of Chapter B or C in Chapter A.

22      Q    Sure.  And I understand that.

23           But with respect to whatever it was that you

24  were referring to, you cited it, didn't you?

25      A    Yes, sir.

1      Q    And anything that you relied upon in any of

2  those 11 reports as part of the basis for your

3  scientific study, you cited it.

4      A    Yes, sir.

5      Q    What was your role with regard to that

6  study?  And I'm just going to -- if it's all right

7  with you, I'm going to call it the Camp Lejeune

8  study.  Can we agree to call it that, or how would

9  you --

10      A    Can I just see what --

11      Q    I'm looking right now at the summary of

12  findings --

13      A    I would call that the Tarawa Terrace

14  analyses because there is a difference, if that's

15  okay.

16      Q    Yeah, that's better.  And let's use Tarawa

17  Terrace -- T-a-r-a-w-a, Terrace -- to refer to, if we

18  can, all of the work you did on that.  And I know it

19  comprises a whole body of reports, you'll be glad to

20  know we're not going to cover every page of every one

21  of them.

22      A    Thank you.

23      Q    Can we call it the Tarawa Terrace report?

24      A    That's acceptable.

25      Q    What was your role in the Tarawa Terrace

1   report?

2       A    My role was really three-fold, from a -- and

3   I'll start with a larger or systematic overview --

4   was to provide results for the epidemiological case

5   control study in terms of monthly concentrations of

6   specific contaminants in the drinking water at Tarawa

7   Terrace.

8       Q    Did you do that?

9       A    Yes, we did.

10      Q    Did you do any sort of probabilistic

11  analysis to determine the reliability of your

12  results?

13      A    Yes, we did.

14      Q    And what was the outcome of that

15  probabilistic analysis?

16      A    And that is actually published in Chapter A

17  as well as a subsequent chapter in more detail.  And

18  those results and those chapters show that there was

19  a range of between two and a half and three, meaning

20  that for whatever concentration the model came out

21  with at a certain given point in time -- let's just

22  say 50 micrograms per liter, and I'm using that just

23  as an example -- then the rage of that value -- that

24  value could range anywhere from two and a half --

25  higher to two and a half times lower than that value.

1      Q    So if we had generated model results of --

2   we used the words "micrograms per liter" -- say you

3   had 81 micrograms per liter, it could actually be two

4   and a half times that much or it could be two and a

5   half times smaller.

6      A    That is correct.

7      Q    That, to me, sounds very loosey-goosey.

8      A    In fact, it's not.

9      Q    Explain.

10     A    It's considered a -- what we refer to as a

11  very tight range, because typically when we're

12  dealing with water quality, type of data or

13  simulation, the general rule of thumb is to be within

14  one order of magnitude or a factor of ten.  So the

15  fact that we were well within the level factor of

16  five even, we felt provided a very robust reliability

17  for the model.

18          And, in fact, we were told by the senior

19  epidemiologist on the Camp Lejeune project that that

20  was well within acceptable ranges that they could use

21  to work with.  It was, as they put it, much more

22  refined than the crude epidemiological methods that

23  they used.

24     Q    And you're referring to Frank Bove and his

25  team?

1    A    That is correct.

2    Q    All right.  Now, you used the phrase

3    "micrograms per liter," and I -- forgive me.  If I

4    was really capable at math, I would probably be a

5    doctor at this point.

6         How does that relate to parts per billion?

7    A    That's the equivalent.  We use them

8    interchangeably.

9    Q    Okay.  So if something says 80 micrograms

10   per liter, that's 80 parts per billion?

11   A    In this situation, it is.  With these

12   contaminants in the situation at Camp Lejeune, that

13   is correct.

14   Q    And explain that to me so that I understand.

15   When would it not be correct, and why is it correct

16   here?

17   A    Well, there -- to do the calculations, it

18   involves density properties and temperature, standard

19   temperature, standard things.  And if those -- and

20   under these conditions, we do not have density

21   effects --

22   Q    I see.

23   A    -- in other words, dissolved in water.  So

24   we can make an equivalent computation to show that

25   it's the same.

```
1        Q    Okay.  So if there were density issues, you

2   could not make the -- you could not just assume that

3   micrograms per liter equals parts per billion, but

4   because they are not here, you can.  Is that fair?

5        A    You would have to have a conversion

6   factor -- a conversion factor.  Here the conversion

7   factor is one, okay, in other words.  But you would

8   have to have a conversion factor, and then you can

9   convert micrograms per liter to parts per billion.

10       Q    Will the same be true for benzene?

11       A    Yes, it will.

12       Q    And is the fact that the conversion factor

13  with these chemicals -- now I'm talking about

14  benzene, trichloroethylene, and tetrachlorethylene --

15  is one, that is, from micrograms per liter to parts

16  per billion as a equivalency.  Is that a generally

17  scientifically accepted fact?

18       A    Yes.

19       Q    What was the goal of the Tarawa Terrace

20  study?  What was it trying to do?

21       A    It was -- the goal was to quantify monthly

22  concentrations of specific contaminants in drinking

23  water.

24       Q    Why?

25       A    The epidemiological study being conducted is
```

1   referred to as a case control study.  And for that,

2   they needed to know what the concentration of the

3   water that people who were exposed to contaminated

4   water ingested so they could compare that to the

5   concentration of water that people who were not

6   exposed, or in their analysis.  And so they have to

7   have the -- since we're doing in utero and up to one

8   year of age study, they needed to know per month what

9   the concentration of the drinking water that the

10  mother and/or fetus and/or child up to one year of

11  age ingested.

12      Q    Why did they want to know that?

13      A    They need that to do the case control study

14  to compare experiences or diseases -- experience of

15  those people with disease against those people who do

16  not have the disease.

17      Q    Is a simple way to say this, that this whole

18  Tarawa Terrace study and the epidemiology that it

19  relates to is trying to figure out how much disease

20  the water has caused, if any?

21           MR. BAIN:  Objection to form.

22  BY MR. ANDERSON:

23      Q    Is that what this is about?

24      A    That has never been stated to me in that

25  way.

1      Q    Why are they doing an epidemiological study

2   with mamas and babies and trying to determine how

3   much chemicals they were exposed to in the water and

4   then talking about the disease history?

5           MR. BAIN:  Object to form.

6   BY MR. ANDERSON:

7      Q    Help me understand that.  What's your

8   understanding of it?

9           MR. BAIN:  Same objection.

10          Go ahead.

11          THE WITNESS:  My understanding is, the

12          reason you do a childhood in utero study, because

13          we're studying rare diseases.  And rare diseases,

14          you need to take out confounders that adults

15          would experience, such as life experiences;

16          smoking, where you live, drug usage, legal and

17          otherwise.  And so children do not have those

18          experiences, so you can take those confounders

19          out of the calculations.

20          And so -- so you look at -- so from that

21          standpoint, you can get a much better

22          understanding of any associations between

23          exposure to contaminated media and rare diseases

24          such as birth defects, childhood cancers.  And

25          that is the purpose of our current study, is to

1      establish, in fact, are there associations

2      between ingesting contaminated drinking water and

3      a higher prevalence of childhood birth --

4      specific childhood birth defects and specific

5      cancers.

6  BY MR. ANDERSON:

7      Q    Why did they wonder about that?  In other

8  words, why was there even a question about whether

9  there might be associations between exposure to these

10  types of chemicals and these diseases in children?

11          MR. BAIN:  Objection; lack of foundation.

12          Go ahead.

13  BY MR. ANDERSON:

14     Q    Well, I mean, I'm just parroting the last

15  answer you gave.  You told me there's an inquiry into

16  whether there are associations between exposures in

17  these chemicals and certain diseases in children.

18  And I'm wondering:  Why did that question arise?

19          MR. BAIN:  Objection.

20  BY MR. ANDERSON:

21     Q    You can answer.

22     A    That was a recommendation out of the 1997

23  public health assessment that recommended that there

24  was lack of knowledge of the effects of compounds --

25  certain compounds described in the health

1    assessment -- on children.  And so it recommended

2    follow-up studies of -- follow-up health studies, of

3    which the current study is just one part, one

4    particular study, to address that.

5        Q    Had there been prior indications in the

6    literature that these chemicals were harmful or might

7    be?

8        A    That's really outside my area of expertise.

9    You need a toxicologist to answer that.

10       Q    And I understand.  I'm just -- I'm asking

11   you based on what you read in connection with your

12   work.  I mean, did you read the 1997 public health

13   assessment?

14       A    Yes, I have.

15       Q    And so you know, don't you, Doctor, that

16   there were prior studies and scientific reports

17   suggesting an association between exposure to these

18   chemicals and various types of disease?  You know

19   that, don't you?

20            MR. BAIN:  Objection.  Document speaks for

21        itself.

22            Go ahead and answer if you know.

23            THE WITNESS:  The reason our current study

24        is being done is because there's a lack of

25        studies.  In other words, the studies are

1       inconclusive to date.  There are very few of

2       them.  And so one of the reasons this study is

3       being done is to try to build that scientific

4       body of knowledge.

5   BY MR. ANDERSON:

6       Q    Right.  I mean, it's not every day that you

7   get a whole bunch of people exposed to these kinds of

8   chemicals to where you can actually study them,

9   right?

10      A    That is correct.

11      Q    And so that's one of the reasons why there's

12  not a lot of studies.

13      A    That is correct.

14      Q    But in terms of the studies that there are,

15  you know, as you're sitting here now, that some of

16  those studies suggested associations between exposure

17  to these types of chemicals and various diseases,

18  don't you?

19          MR. BAIN:  Same objection; lack of

20      foundation.

21          THE WITNESS:  Some have established that,

22      yes.

23  BY MR. ANDERSON:

24      Q    Yeah.  Now, in terms of the database for the

25  Tarawa Terrace work that you did, what have you

1    reviewed and studied in preparing those reports?

2         A    We have gathered, reviewed, extracted field

3    data from the Tarawa Terrace area; basically,

4    hydraulic data, hydrologic data, geohydrologic data,

5    contaminant data, and -- at Tarawa Terrace and

6    outside of Tarawa Terrace, as well as other analyses

7    of similar fate and transport and modeling analyses.

8         Q    Obviously you knew that this was very

9    important work you were doing.

10        A    Yes.

11        Q    And you understood that it could potentially

12   have an impact on perhaps even millions of people's

13   lives.

14             MR. BAIN:  Objection; lack of foundation.

15   BY MR. ANDERSON:

16        Q    You realize there's about 1.3 million people

17   who potentially were exposed to this contaminated

18   water at Camp Lejeune?

19        A    I have not heard that figure being that

20   high.

21        Q    Well, you knew it was important to get it

22   right.

23        A    I know it's important -- this goes for

24   anything that we do -- to have a product that is

25   scientifically defensible.

1      Q     And you -- from what I can tell reading it,

2   you took every step you could to ensure that that was

3   the case.

4      A     That is correct.

5      Q     Okay.  And you employed methods that you

6   believe, as you're sitting here now with 34, 35 years

7   of experience, were scientific valid.

8      A     Correct.  That's correct.

9      Q     And they were the same methods that you had

10  utilized at the other agencies of the United States

11  Government such as the U.S. Geological Survey,

12  correct?

13     A     That is -- generally speaking, we used, I

14  believe, more sophisticated methods.

15     Q     Well, were they in any way so sophisticated

16  as to be, you know, novel and unreliable?

17     A     Not unreliable.  Novel application, yes.

18     Q     Tell me about that.

19     A     We were predicting -- or reconstructing

20  backwards in time for 30, 35 years at a monthly

21  interval, which is a -- from a groundwater modeling

22  standpoint, a fairly fine timeline, typically.  And

23  in terms of, say, remediation practices where they

24  use these similar models, you may look at years -- or

25  five -- of years trying to clean up.  So you do not

1    necessarily see published results in terms of monthly

2    values.  So that was a very refined time step in

3    terms of a groundwork model.

4              So from that standpoint, that's probably,

5    you know, edge of the envelope of what's been done.

6    And we also went to numerous methods to look at some

7    different aspects.  Once we obtained initial reports,

8    calibrated results, we then went to look at, well,

9    what happens if the wells pump at a different rate

10   than we assumed; also looking at the degradation

11   byproducts and things like that.  So we employed

12   numerous models to, again, not only refine our

13   understanding but also may show that our results were

14   scientifically defensible.

15        Q    Okay.  There's a law called Daubert which

16   says that the only kind of evidence that a federal

17   court will consider that has a scientific aspect to

18   it is evidence that's scientifically reliable.

19              And when you say that the getting down so

20   fine as to determine monthly exposure values is,

21   quote, edge of the envelope, is that scientifically

22   indefensible, edge of the envelope, or is that

23   just -- tell me -- explain to me and explain to the

24   judge who may be reading your words someday why we

25   can rely on the monthly results you obtained.

1          MR. BAIN:  Object as to form.

2          You can go ahead and answer it.

3          THE WITNESS:  We could rely on the results

4     because we followed a scientific practice, as we

5     previously discussed, of laying out all of the

6     data, the information, showing the assumptions --

7     clearly stating the assumptions we made, clearly

8     stating the limitations, and calibrating the

9     model to compare the model stimulated results

10    with the field data; and then also conducting

11    sensitivity analyses, which means -- part of that

12    is the probabilistic analysis that shows that the

13    model does produce different values but they are

14    contained within a certain envelope or a certain

15    range.  And that range is within an acceptable

16    limit for anybody who does this or is involved in

17    this type of work, not just the epidemiologist

18    but I'm talking about the environmental

19    engineers.

20  BY MR. ANDERSON:

21     Q    Did you use in preparing this report the

22  same essential tools of your career, that is, the

23  computer models, the calibration of the models, the

24  statistical analyses?

25     A    Yes.

1      Q      Generally accepted scientific techniques.

2      A      Yes.

3      Q      And was your work peer reviewed?

4      A      Yes, it was.

5      Q      And was it found to be scientifically

6   reliable by the peer-review process, or was it peer

7   approved, I guess?

8      A      It was peer approved.

9      Q      I noted that in the forward to the summary

10  of findings, it says that the study protocol received

11  approval from the Centers for Disease Control and

12  Prevention institutional review board.

13             Is that correct?

14     A      That is correct.

15     Q      Tell me what that involved.

16     A      You would have to ask Dr. Bove because that

17  involves human subjects and the epidemiological side.

18     Q      But your study protocol did receive

19  approval.

20     A      The entire study, not the modeling.  The

21  health study received.

22     Q      Okay.  And then it says that you used -- it

23  says:  ATSDR is using water-modeling techniques and

24  the process of historical reconstruction to quantity

25  concentrations of particular contaminants in finished

1  water and to compute the level and duration of human

2  exposure to contaminated drinking water.

3          Is that a true statement?

4    A    That is a correct statement.

5          MR. BAIN:  Counsel, can you tell me what

6      page you're reading from.

7          MR. ANDERSON:  III.

8          THE WITNESS:  The forward.

9  BY MR. ANDERSON:

10    Q    In terms of the peer review you described,

11  was there peer review of the results of your study or

12  a peer review of the techniques used to do your

13  study?

14    A    Peer review of the report.  When a report --

15  a draft report is completed, we will send it out --

16  or it's my practice to send it out to colleagues --

17  they can be internal or external; in this case it was

18  external -- who have expertise in these methods and

19  these types of analyses.  And so we sent this report

20  out.

21          Chapter A, let's talk about Chapter A.  And

22  offhand I can't remember if it's two or three

23  different people that I sent it to, the

24  documentation.  But I don't recall how many people I

25  sent it to.  It was at least two.  To review the

1    report, both -- you will choose whether you want to

2    review it from the report entity itself, from a

3    public health standpoint, from a technical modeling

4    standpoint.

5              So you will send it to different people like

6    that, and they will provide you comments back on it.

7    And, of course, you are free to accept or not accept

8    the comments depending on what their particular

9    comments are.  But we do -- for these all -- the

10   Tarawa Terrace series reports, they all underwent

11   peer review.

12        Q    And all were peer approved?

13        A    Yes.

14        Q    Now, you mentioned Chapter A as having been

15   through the peer review process as well, and that is

16   the summary of findings for Tarawa Terrace.

17        A    That is correct.

18        Q    And so your actual report findings on Tarawa

19   Terrace have been peer reviewed.

20        A    That is correct.

21        Q    And peer approved.

22        A    I would say peer reviewed is the correct

23   term that I've always used.  Never heard the term

24   "peer approved."

25        Q    Well, I just made it up.  What I mean to

1    suggest is, when you had your peer review, they

2    didn't tear the thing up and throw it in the trash.

3    They came back and said, Well, we may comment here

4    and there, but we're peer reviewing it in a positive

5    fashion.

6         A    That is correct.

7         Q    Okay.  That's all I meant.

8         A    That is correct.

9         Q    And you reached results obviously.

10             Am I correct that the monthly results that

11   we have mentioned several times are included in

12   Appendix I-5?

13        A    I've have got a copy -- oh, okay, since

14   you've got that.  I-5 is from Chapter I, I believe.

15   Oh, maybe not.  Let me.  Appendix I-5.

16        Q    There's a front page to that.

17        A    Okay.  Because I think -- oh, Appendix I-5.

18   Yeah.  If I can, I've got both Chapter A and

19   Chapter I here, and I forget how we named the

20   appendices.

21        Q    Why don't you just show me where your

22   bottom-line results are, and we'll use your copy.

23        A    Chapter I is really the enhanced sensitivity

24   analysis, whereas Chapter A is the summary.  So,

25   yeah, Chapter I -- the -- Chapter I -- Appendix I is

1   from Chapter I.

2        Q    Okay.

3        A    And, yeah, that's the probabilistic

4   analysis, which I do not believe we put in Chapter A

5   in its entirety.  So that's the difference.  The

6   same -- the same, what I call, mean value results

7   that are shown in Chapter A in the appendix, like A-2

8   and so on, are also in Chapter I, but what Chapter I

9   does is give the range of values.

10       Q    Okay.  Well, if a person wanted to know, for

11  instance, what he or she was exposed to living at

12  Tarawa Terrace at a particular month that was covered

13  by your study, where would we look?

14       A    The best place to look is in Chapter I

15  because it would give you the 50 percent or median

16  value and then it would give you the range with the

17  high and with the low.  Again, if you just wanted to

18  speak about an average value, then you could refer to

19  Chapter A because it's the equivalent, basically, to

20  the median value in the statistical analyses

21  presented -- probabilistic analyses shown in

22  Chapter I.

23       Q    Well, in terms of -- since you suggest

24  Chapter I as more complete --

25       A    It is more informative.

```
1       Q    Let's use that.  Let's use the most
2   informative.
3            Is the copy that I have here, is that the
4   most informative and complete that you're referring
5   to, or do I need to use the copy you brought?
6       A    That should be.  If you pulled it off the
7   Web or made a copy of the published report, then
8   that's the same that we have sitting right here on
9   the table, and that is for PCE.  Okay.
10      Q    Would it be all right with you if I used
11  your published report as an exhibit?
12      A    Sure, sure.
13      Q    Thanks.  I will just mark it as --
14           MR. BAIN:  It's not your only copy, is it?
15           THE WITNESS:  No, no, no.  I mean -- no, no,
16       we got a couple hundred more at the office.  But
17       it's my own copy too.
18           MR. BAIN:  Let's go off the record.
19           (Brief discussion ensued off the record.)
20  BY MR. ANDERSON:
21      Q    I'll just mark it as Exhibit 1 to your
22  deposition.  And I appreciate you letting me have it.
23           (Plaintiff's Exhibit Number 1 was marked for
24       identification.)
25           THE WITNESS:  I would -- if I could just
```

1       preface that, is, Chapter A was meant to give a

2       complete summary of all of the analyses we did;

3       geohydrologic, water quality, and things of that

4       nature.  Whereas Chapter I was specifically

5       targeted to assess the model simulations.

6  BY MR. ANDERSON:

7       Q    In what sense?  What do you mean by that, to

8  assess?

9       A    Well, good modeling practice requires that

10  you conduct -- after you calibrate a model, you

11  conduct a sensitivity analysis; that is, how

12  sensitive are model parameters, because we don't have

13  data for each parameter, that if you change -- if you

14  happen to a year from now get some additional

15  information that changes a value of a parameter that

16  you coded into the model, how would that impact your

17  final results.

18            And so we provide a quick summary in

19  Chapter A, but Chapter I is the more in-depth

20  analysis.  And it not only does the groundwater flow

21  model, fate and transport, it also does the water

22  distribution system model.

23            (Brief discussion ensued off the record.)

24  BY MR. ANDERSON:

25       Q    What is this -- I'm now looking at the

1    Appendix I-5 -- what do those numbers reflect?

2         A    Okay.  In Appendix I-5, basically the stress

3    period is model jargon.  That's equivalent.  One

4    stressor is equal to a month of a year.  So stress

5    period number one would be like January 1950, I

6    think -- January 1951 would be stress period one.

7    And then it goes each month -- each stress period.

8    That's so that we could easily identify in the model.

9    The model doesn't know about months.

10        Q    Right, right.

11        A    So that's what that means.  The month and

12   year corresponds to the month and year that the model

13   simulation was applied to, starting in January '51

14   and going all the way through -- in this report, we

15   stopped at March '87 which is when the last water

16   supply well was operated.

17        Q    And then the next one?

18        A    Then the calibrated PCE concentration.  That

19   is the mean value that came out of the model of the

20   original mod flow MT3DMS models.  We have always said

21   that represented a mean value.

22        Q    And --

23        A    Or an average value.

24        Q    And you mentioned mod flow and MTDMS.

25        A    MT3DMS.

1      Q    MT3DMS.  Are those models?

2      A    Those are computer codes.  Mod flow is

3  produced by the U.S. Geological Survey and publicly

4  available.  And MT3DMS is a fate and transport model

5  code, I believe, out of the University of Alabama.

6  And it, to use layman's terms, hooks on or uses the

7  results out of mod flow to do the fate and transport.

8      Q    And have both of those -- that is, mod flow

9  and MT3DMS -- have both of those been utilized in

10  other studies and other settings?

11      A    Yes.

12      Q    Are both generally accepted?

13      A    Yes.

14      Q    All right.  Go on and tell me now.  It says:

15  Calibrate PCE concentration --

16      A    So those are the values also reported in

17  Chapter A that represent the mean or average monthly

18  concentration of PCE.

19      Q    Are those reported in micrograms per liter?

20      A    Everything I talk about will be in

21  micrograms per liter.

22      Q    Which is in this case the same as parts per

23  billion?

24      A    Parts per billion; that is correct.  Then

25  the remaining columns represent the probabilistic

1    analysis that we conducted, that is described in

2    detail in the main text of Chapter I.  And we used

3    the terminology and approach that is similarly used

4    in other branches of science like petroleum

5    engineering when they want to know what's the

6    probability of finding oil.  There is no one value.

7    There's a median value, and then there's a two and a

8    half percent and 97.5 percent range.

9        Q    Okay.

10       A    And so we used the same approach.  That's a

11   standard way of presenting this in tabular form.  And

12   so that gives you the low range -- low value and the

13   high value of what the concentration could have

14   ranged at any particular month and time that the

15   simulation was applied to.

16       Q    All right.  Let's break that down a little

17   bit.  There's a scenario one and a scenario two.

18   Tell me about those two different scenarios?

19       A    In scenario one, we varied number model

20   parameters, but we kept pumping.  The amount of water

21   was drawn from the ground -- from the water supply

22   wells the same as we did in our original model.  We

23   assumed that it was not probabilistically

24   distributed.  That is, there was no uncertainty to

25   the pumping.

1     Q    It was static?

2     A    The pumping changed month to month, but the

3 value of the pumping, there was no uncertainty about

4 it.

5     Q    Okay.

6     A    Okay?  And that's what --

7     Q    I see.

8     A    -- we did, okay, in other words.  That was

9 scenario one.  Scenario two assumed that even pumping

10 was uncertain, so that if someone was pumping, you

11 know, 2000 gallons per minute, that may have been a

12 mean value, but that could have a range on either

13 side.

14     Q    By a factor of what?

15     A    We used a normal distribution, and I

16 couldn't -- there's a graph -- there's a typical

17 graph in there.  I couldn't really tell you a factor.

18 But we generated a probabilistic distribution for

19 pumping for each month.

20     Q    Okay.  And these two scenarios are called

21 Monte Carlo simulations.

22     A    That's -- I think that's used.

23     Q    Sure.  And I understand it.  I'm

24 wondering -- for the Court, can you just explain what

25 a Monte Carlo simulation is.

1      A      It gets it's name obviously from Monte

2  Carlo, gambling casino, because you've got different

3  odds of winning or losing.  And it uses the same

4  technique.  It generates many, many -- in this case,

5  several hundred -- five or six hundred different

6  times.  So for each month, the model is run over and

7  over and over again with different parameter values

8  based on different probabilistic distributions, not

9  just the mean value but a range of probabilistic

10 distributions.  And so you can get different

11 combinations of values.

12            And what we want to see, again, does that

13 infinite range of parameter combination and values --

14 does that give you reliable results, or does that

15 give you such a large range that you can say the

16 results are not necessarily reliable.

17      Q      And in this case, what did you find?

18      A      We found out that our results were very

19 consistent and had a very narrow spread or a very

20 narrow range in value for each given month about the

21 mean.

22      Q      All right.  How should we understand this in

23 terms of what you're actually saying?  If you could

24 turn to stress period 350.

25      A      Okay.  Right here.  Got it.

1    Q    This is the February 1980 set of values.

2    A    Right.

3    Q    Now, the mean value is -- I'm going to use

4   parts per billion.

5    A    That's fine.

6    Q    122.98 parts per billion.  And just for the

7   record, what does mean value indicate?

8    A    Mean is the average -- average value.  Let

9   me --

10   Q    Go ahead.

11   A    Let me explain something.  Look at -- we've

12  got one thing that says it's calibrated as mean

13  value, and we also have a column that says "P50,"

14  which is a 50 percent value.

15   Q    Yeah, I see it.

16   A    We are assuming that our results -- and this

17  is a typical assumption -- that they are normally

18  distributed.  Many things in science and engineering

19  behave according to a bell-shaped curve.  Okay?  And

20  so what we are assuming is that the mean, the median,

21  and the mode are the same value, meaning it's a

22  normal distribution.  It's not going be exactly that.

23  But you can see, for example, the mean value or the

24  average value is 122.98, which we can say 123 for

25  argument sake, round it off.  And the P50 is 122.

1      Q    Right.

2      A    They are nearly -- you would call that the

3   same value.  Okay?

4      Q    Right.

5      A    And that's just a reference and, again,

6   presenting the P50 as a standard practice in other

7   sciences.  It basically shows you the spread about a

8   middle value, and we're assuming that spread is bell-

9   shaped curve.

10     Q    Okay.  And you have P2.5 --

11     A    Right.

12     Q    -- and P97.5.  Those are at the outer edges

13  of --

14     A    Those are at the -- what we refer to as the

15  tails of the distribution if you have a bell-shaped

16  curve.  So the P50 is right at the center and then

17  the other two at the other two extremes.

18     Q    Okay.  And that's the -- what you told me

19  about before when you said it could be off by an

20  order of magnitude of two.

21     A    I said it could be off by a factor of two,

22  two and a half, like that.  That's basically --

23     Q    That's what's reflected here?

24     A    That's where we derive that general number

25  from, is we went through all of these and looked at

1    the spread on that.  And I'm using two and a half as

2    a round figure.  It could be less than that.  In this

3    case, it's, you know -- that's right in there to --

4    to -- in other words, 123.  The high is 171.  So it's

5    much narrower than that.  But there are some places

6    where that does spread out.  But it was well below

7    five and well below an order of magnitude.

8        Q    And so, therefore, useful for the

9    epidemiologist.

10       A    Yes.

11       Q    In looking at this now, I see that the mean

12   value is 122.98, and I'm going to go ahead and use

13   the precise figures because of the record.  I'm

14   looking at stress period 350.  The mean value is

15   122.98.  The P50 value under Monte Carlo simulation,

16   scenario one, is 121.80, which you indicated for

17   practical purposes is essentially the same thing.

18       A    Right.

19       Q    And then if you go over to Monte Carlo

20   simulation two, the mean value -- the P50 -- excuse

21   me -- is 131.23, again, right in there.

22       A    That's correct.

23       Q    The other figures on that line, you know,

24   the outliers obviously somewhat mirror each other.

25            But does the fact that the mean value and

1    the P50 under both Monte Carlo simulations is so

2    consistent -- does that tell us anything?

3        A    It basically confirmed to us that, in fact,

4    assuming a normal distribution was appropriate, that

5    it was behaving that way, appropriately.

6        Q    Does it tell us that --

7        A    The model was behaving appropriately and

8    that we did not make an assumption that it was

9    normally distributed parameters.  And then the

10   results are way out in left field.

11       Q    Okay.  So it tended to confirm the

12   reliability of your assumption of a normal

13   distribution.

14       A    That is correct.

15       Q    And, therefore, tended to confirm the

16   validity of the work you were doing, the results you

17   were getting.

18       A    That is correct.

19       Q    Does the fact that the mean value, the Monte

20   Carlo scenario one P50 value and the Monte Carlo

21   simulation scenario two P50 value, are so similar

22   tell us anything about the actual -- the likely

23   actual exposure -- or I should say the likely actual

24   quantity of contaminants in that month?

25            In other words, does the fact that those

1    things are similar numbers give us any information

2    about what the actual numbers should be?  I'm trying

3    to ask:  Does it help us rule out, for instance, the

4    206.13 and the 77.7?

5         A    No, it does not --

6              MR. BAIN:  Wait a minute.

7              Objection as to form.

8              Go ahead.

9    BY MR. ANDERSON:

10        Q    Go ahead.

11        A    No, it does not; because all of those

12   numbers -- basically in the probabilistic

13   distribution, we're saying those numbers are equally

14   likely.  Okay?  In other words, that's what we're

15   saying, and that's why that's important for the

16   epidemiologist to use.  They can use that range --

17   that range in there.  What it does say to me is that,

18   in fact, yes, there is some uncertainty associated

19   with pumping, with the actual pumping, because it is

20   a slightly different number.

21        Q    Right.

22        A    And that we should take into account the

23   variability and uncertainty with all model

24   parameters, which is what we did.  Pumping, just like

25   any other model parameter, contaminant source, or

1   anything is subject to uncertainty because we do not

2   have -- even when we have measured data, we do not

3   have a complete set of information.  So it's

4   important to conduct these analyses.  But it does

5   give us confidence in our results.

6       Q     So all we know -- and I don't mean to

7   suggest that this is not a lot -- but at the end of

8   the day, we know that for stress period 350 from

9   February 1980, the amount of contaminants in the

10  water at Tarawa Terrace ranged from 77.70 to 206.13.

11          MR. BAIN:  Object to form.

12  BY MR. ANDERSON:

13      Q    Is that the truth?

14          MR. BAIN:  Object to form.

15  BY MR. ANDERSON:

16      Q    Is it somewhere in between those?

17      A    That's a factual statement based -- that's

18  what these numbers represent.

19      Q    Right.  And you're talking about, in this

20  one, PCE only; is that right?

21      A    This is only PCE.

22      Q    Is there a table in there for any other

23  contaminant like TCE?

24      A    I do not believe we conducted this for --

25  for the degradation products.  I did not publish a

1  probabilistic analysis for the degradation products

2  of PCE and TCE, DCE, and vinyl chloride, although the

3  same technique could be used.

4       Q    Is there a reason why that wasn't done?

5       A    Just space and time.  We presented the mean

6  values of those degradation products in Chapter A as

7  well as Chapter G, which was specifically on the

8  degradation products.  And my feeling was, if I could

9  demonstrate how to apply this method just to PCE, the

10  same technique could be applied to the -- to the

11  other values, and you could generate ranges as well.

12      Q    What is your understanding of the

13  contaminants in the water at Tarawa Terrace?  I'm

14  understanding that there is both TCE and PCE.  Is

15  that your understanding?

16      A    There's PCE and TCE.  We also had

17  measurements of DCE.

18      Q    Which is -- for the record, it's

19  1,2-dichlorethylene?

20      A    That's right.  And there's two different

21  congeners, a trans and A Syst.  And if I can look in

22  here and see which ones we did, because one was

23  not -- it was the trans that was predominantly at

24  Tarawa Terrace.

25      Q    Now, let me come back to that in a second.

1    I just want to ask you:  Is it your understanding

2    that all of the TCE at Tarawa Terrace was as a result

3    of degradation of PCE?

4              MR. BAIN:  Object to a lack of foundation.

5    BY MR. ANDERSON:

6         Q    You can answer.

7         A    Our assumption was that, in fact, the PCE at

8    Tarawa Terrace was a degradation product, not a

9    source contaminant.

10        Q    What are sources of TCE other than as a PCE

11   degradation byproduct?

12             MR. BAIN:  Objection to form.

13             Go ahead.

14             THE WITNESS:  A puriform TCE is used as an

15        industrial solvent.  So in many industrial

16        settings, they will use TCE as a solvent.

17        Q    Degreaser?

18        A    Yes, degreaser.  It is also used -- just for

19   the record, so we're clear -- TCE can also be used as

20   a dry-cleaning product just like PCE.  And, in fact,

21   that issue was raised by our office of science when

22   they were reviewing the report, who asked if we had

23   considered TCE.  And since we were dealing with one

24   dry cleaner, the ABC Dry Cleaners, that we knew from

25   their deposition specifically what compound they

1    used.  And that was tetrachlorethylene and

2    perchloroethylene.  And so --

3         Q    PCE?

4         A    PCE.  So there was no source that we could

5    locate or find for trichloroethylene.

6         Q    So you made the assumption in your work

7    based on that that whatever trichloroethylene we see

8    there is a PCE degradation byproduct.

9         A    That is correct.

10         Q    Did you make inquiries as to whether there

11    were any use of industrial solvents that contained

12    TCE in the Tarawa Terrace area?  Did you inquire as

13    to that?

14         A    We looked at the literature and source

15    documents to see what industries may have been in

16    there and all of that, and Tarawa Terrace is

17    primarily a residential area.  And so with the

18    exception of, say, a gas station, something like

19    that, there was no industry there.  And, in fact, the

20    state of North Carolina in 1985 -- the Shiver Report,

21    in fact, pointed to that ABC One-hour Cleaners, was,

22    in fact, the source for the PCE in the -- in one

23    water supply well on base.

24         Q    Did you, in the course of requesting

25    documents from the Department of the Navy and the

1    folks at Camp Lejeune, ask to see any documents that

2    had to do with TCE usage at Tarawa Terrace?

3        A    We asked for -- not specifically.  Not

4    specifically.

5        Q    Why not?

6        A    Because we wanted to be the ones to

7    determine how different compounds may have gotten

8    into the soil, the groundwater.  What we wanted to

9    see was -- and we asked for this -- any and all

10   documents that may contain relevant information for

11   water modeling, that is, documents containing

12   geohydrology, geophysical logs, water-level readings,

13   water-quality sampling.  They did provide us -- we

14   asked for building use on base, things like that.

15   But we -- it's important not to sort of -- I tell

16   them I want Document X so I can prove Z.  Okay.

17           In other words, we need to be the ones --

18   meaning ATSDR -- to make -- read that document and

19   make that understanding.  So we ask for every -- all

20   documents that we could use in our water modeling

21   analyses.  And we provided them on several occasions

22   with the type of documents and/or the type of data

23   these documents might contain.

24       Q    Would it have been your understanding that

25   your request for documents were broad enough that

1    they would have included any documents that would

2    have shown, for instance, the disposal of TCE in the

3    Tarawa Terrace area?

4         A    Yes.

5         Q    Would your documents requests have been

6    broad enough to also have covered the presence of

7    fuel tanks in the Tarawa Terrace area?

8         A    Yes.

9         Q    Containing fuel that contains benzene?

10        A    Yes.

11        Q    Did you receive from the government, in the

12   course of those document requests, any information

13   about presence of fuel tanks in Tarawa Terrace?

14        A    Yes, we did.

15        Q    You were aware at the time that this Tarawa

16   Terrace study was published, that there was, for

17   example, a 10,000-gallon fuel tank near the school?

18             MR. BAIN:  Object as to form; lack of

19        foundation.

20             Answer if you know.

21   BY MR. ANDERSON:

22        Q    Did you know about that?

23        A    I can't specifically say that I personally

24   knew about it.  But we have a Chapter E report, and

25   in Chapter E we discuss with me the benzene

1    occurrences at Tarawa Terrace.

2         Q    Okay.  And did your report on Tarawa

3    Terrace, the one we have been discussing this

4    morning, take into account all that was known to you

5    and your team about the underground storage tanks in

6    Tarawa Terrace in terms of the results here?

7         A    We did not simulate or conduct model

8    simulations for benzene at Tarawa Terrace.

9         Q    Why not?

10        A    After reviewing the data and the analyses

11   that we did based on the underground storage tanks,

12   we did not -- number one -- we felt, number one, that

13   whatever gasoline -- because at Tarawa Terrace there

14   was gasoline holding tank leaks -- was small enough

15   in nature that it did not impact any of the supply

16   wells.  So there was no major source of benzene.

17            And, in fact, the results -- there are, I

18   think, two or three samples at the water treatment

19   plant that are, say, 1 to 4 -- maybe there's a 7 --

20   micrograms per liter, were substantially low, that it

21   did not, again, indicate that there was a source at

22   Tarawa Terrace for benzene contamination of

23   groundwater supplies that would impact drinking

24   water.

25        Q    So you just said, I believe, that there were

1   gasoline holding tank leaks at Tarawa Terrace?

2       A    Yes.  That's documented in Chapter E.

3       Q    And the treatment plant found benzene in the

4   water, but you felt it was a sufficiently low

5   quantity.

6       A    That's correct.

7       Q    That it would not impact your study.

8       A    That's correct.  That's correct.

9       Q    Were the wells actually tested for benzene

10  at Tarawa Terrace?

11      A    I do not -- I do not know if they were

12  tested or not.

13      Q    Now, we've been talking about Chapter I, and

14  you showed me some data there.  Can you show me how

15  that relates to the data that you described as being

16  in Chapter A.

17      A    Sure.  And I will just go to the results

18  here.  If you go to Appendix A -- yeah, Appendix A-2,

19  example in Chapter A.  I'm on page A82.  Or, for

20  example, let's use the one we've been talking about,

21  stress period 350, just so we can compare apples and

22  apples.  And that's on page A91.  If we look at

23  February 1980 in Chapter A --

24      Q    Can I come around and stand by --

25      A    Oh, sure, yeah.

1      Q    My copy doesn't go that far.  If you don't

2    mind, I won't loom over you, but I just want to see

3    what you're talking about.

4      A    In fact, if we go here to my same stress

5    period, same month and year -- and here we've got

6    single specie using MT3DMS model.  So that is the

7    concentration, as a model, PCE in micrograms per

8    liter, parts per billion.  And then we go to stress

9    period 350, and we get 122.98.  If we go to Chapter I

10   where it says calibrated PCE concentration, stress

11   period three -- 122.98.  So this column in Chapter I

12   is the same as this column in Chapter A, identical.

13   I mean, we didn't make additional models.  That is

14   those results.

15     Q    Right.

16     A    The rest of the columns are the degradation

17   product in Chapter A.

18     Q    Are they a subset of the PCE single-specie

19   number?

20     A    Not a subset.  It's using -- you have to use

21   a more sophisticated model and degrade the PCE.

22     Q    Sure.  Are these figures in addition to the

23   PCE, or are they the PCE as degraded?

24     A    It's the PCE as degraded.

25     Q    Okay.

1    A    And, in other words -- so this is why you'll

2    see -- and we'll go back to 350, whereas our single

3    specie -- look only at PCE -- is 122.98.  For the

4    degradation model, PCE has to be lower because

5    there's other mass for other products.  Okay.

6         In other words, we're -- in the single

7    specie, we are lumping all of the degradation

8    products.  And in the same, PCE does not degrade.

9    That is what we call the most conservative approach.

10   In other words, that would give you the maximum hit

11   of PCE in the water.

12   Q    Right.

13   A    This is a refined and a -- well, not a

14   preferred approach but a more sophisticated approach.

15   And in doing these analyses, that is something that

16   you want to do.  This also says that this is in check

17   because we should have a higher value of PCE for the

18   single species as opposed to the degraded value.

19   Q    I understand.  And so taking that page A91

20   in Chapter A for stress period 350, February 1980,

21   your values are, single-specie PCE was 122.98.  As we

22   discussed in Chapter I, the PCE component of the

23   multi-species would be 98.2.

24   A    That's correct.

25   Q    And then you have 1,2-DCE at 13.49 --

1       A       That's correct.

2       Q       -- TCE at 4.04, and vinyl chloride at 7.56.

3       A       That's correct.

4       Q       And so assuming -- I take it this assumes

5    that the -- that PCE underwent a normal

6    biodegradation process.

7       A       That is correct.  That is correct.

8       Q       So assuming that the PCE at Camp Lejeune

9    underwent a normal biodegradation process, you have a

10   chemical cocktail in the water.

11      A       That is correct.

12              MR. BAIN:  Objection to form.

13   BY MR. ANDERSON:

14      Q       That's the truth, isn't it?

15              MR. BAIN:  Objection to form.

16              Do we have an answer?

17   BY MR. ANDERSON:

18      Q       Can we have an answer.

19      A       Yes.  It's underwent, and you had multiple

20   compounds in the water.

21      Q       Right.  Multiple contaminants.

22      A       Multiple contaminants.

23      Q       Multiple chemical contaminants.

24      A       That is correct.

25      Q       Yeah.  Would it be all right if I also mark

1    the Chapter A?  I'm sorry for marking your copies.

2         A    Go right ahead.

3              (Plaintiff's Exhibit Number 2 was marked for

4         identification.)

5              MR. BAIN:  Do you want to take a break about

6         now?  It's about 11:00 o'clock.

7              MR. ANDERSON:  Can I ask him one or two more

8         questions?

9    BY MR. ANDERSON:

10        Q    Chapter A is going to be Exhibit 2 to the

11   deposition.  And what I wanted to ask you before we

12   go out for our break is just a couple of quick

13   things.

14             What, if anything, do you know about the

15   health risks associated with these other chemicals in

16   the water, for instance, vinyl chloride?  Does that

17   have any health-effect history that you're aware of?

18             MR. BAIN:  Object to foundation -- lack of

19        foundation.

20             Go ahead.

21             THE WITNESS:  I'm not a toxicologist, and I

22        could only answer in very generalized terms.  Not

23        specific health impacts.

24   BY MR. ANDERSON:

25        Q    Right.  And I'm not looking for more than

1    what you know.  I'm just asking based on what you've

2    read in the field that you are in, does vinyl -- is

3    vinyl chloride in the water a good thing?  Is that

4    something we want, strive for?

5         A    No, no.  You do not want vinyl chloride in

6    the water.

7         Q    And trichloroethylene, do you want that in

8    the water?

9         A    You don't want any chemical compound in the

10   water.

11        Q    So you don't want trichloroethylene, and you

12   don't want 1,2-TDCE.

13        A    That is correct.

14        Q    And obviously you don't want all of those

15   things together, right?

16        A    You don't want any compound contaminants in

17   the water.

18        Q    Why not?

19             MR. BAIN:  Object as to form; lack of

20        foundation.

21   BY MR. ANDERSON:

22        Q    Why not?

23        A    They have certain compounds that have been

24   shown to be carcinogens.

25        Q    And then the last thing I wanted to ask you

1    so I can think about it, frankly, when we're on our

2    break is:  How am I to understand this data and these

3    tables that we have been discussing?  Say, for

4    instance, I was at Camp Lejeune, living in Tarawa

5    Terrace from stress period 350 to stress period 390.

6    Okay?

7        A    Okay.

8        Q    How do I quantitatively deal with the

9    numbers in that box?  You would just draw a box

10   around it like I did on my copy.  Do you add those up

11   in terms of your exposure?  What do you do with that

12   data?

13           MR. BAIN:  Object as to form.

14   BY MR. ANDERSON:

15       Q    I was there, I drank this water, I showered

16   in this water.  I want to know how much I was exposed

17   to.  Do I get out a calculator and start adding month

18   upon top of month?

19           MR. BAIN:  Object as to form.

20           THE WITNESS:  You would have to ask really

21       an epidemiologist that specific question because

22       that is not what I do nor what I was tasked with

23       doing.

24       Q    Okay.

25       A    We have provided a similar table like this

1    on our Web site for anyone to access.  And we state

2    there -- it just says the likelihood and the range of

3    what a person may have been -- we use the word, I

4    believe, may have been exposed to in their drinking

5    water at that particular month and day.  And that's

6    all I can say, and that's all the modeling results

7    presented in this can say.

8        Q    Okay.  That Web site -- there was a Web site

9    at one time where you could actually go in and put in

10   your physical address.  Do you remember that?

11       A    Yes.

12       Q    And then it would tell you how much of these

13   various chemical contaminants were in your water at

14   your house?

15       A    That's correct.

16       Q    And then that Web site got taken down.

17       A    That's correct.

18       Q    Why?

19            MR. BAIN:  Objection; lack of foundation.

20   BY MR. ANDERSON:

21       Q    Just tell me what you know.  I'm not asking

22   you for anything you don't know.  I'm just getting

23   inside your head and trying to find out what you do

24   know.

25       A    It was -- in working with the Department of

1  Navy, they expressed some reservations that there

2  were insufficient qualifiers on the data, not the

3  table itself.  But when somebody just put in an

4  address and got a value out, it did not explain to

5  them the limits of the data or the simulated data.

6  And they objected to that -- it was the actual

7  application that got taken off of that.

8          And in working with -- which we want to do

9  working as a -- with a partner, and the Navy being

10 one of them.  We decided that the reports were out

11 there.  Anyone could grab the reports.  We put the

12 table out there.  So we took it down off that.  The

13 Department of Navy requested that that application,

14 you know, be taken off of the Web site.

15     Q    When did they make that request

16 approximately?

17     A    I really don't recall, but it was after this

18 report was published.

19     Q    So recently, I mean, within the last couple

20 of years.

21     A    Yes, yes.

22          MR. BAIN:  Can we take a break?

23          MR. ANDERSON:  Just one more, one or two

24     more.  I'm sorry.  All right, all right.  I don't

25     want to lose my train of thought.

1   BY MR. ANDERSON:

2       Q    When the DON objected to that application

3   and asked that it be taken down, was that objection

4   stated in writing?

5       A    Not to my knowledge.  I never received a

6   written request.

7       Q    Who would have received that at the ATSDR if

8   there -- if there was a request that that Web site be

9   taken down?

10      A    They probably would have communicated to the

11  deputy director or the assistant administrator at the

12  time.  It was more discussed.  We have monthly

13  conference calls with the Department of Navy and

14  other -- and that may have been discussed at that

15  time.  There were several repeated references by DON

16  to that application on the Web site.

17           And, in fact, now that I recall, there

18  probably is a letter where they critiqued the Tarawa

19  Terrace model, or reviewed it.  I don't mean

20  critiqued it.  But they reviewed the model, and they

21  may have said something to that effect in that

22  letter.

23      Q    What is that letter called if I wanted to

24  request it from Mr. Bain?

25      A    It's the Navy's review of the Tarawa Terrace

1  model, and it's dated 2007 or '8, something like

2  that.  And we have -- we responded to that letter

3  point by point on --

4      Q    I remember.

5          MR. ANDERSON:  Okay.  Let's take a break.

6          (A brief break was taken.)

7          MR. ANDERSON:  Okay.  Let's go back on.

8  BY MR. ANDERSON:

9      Q    Dr. Maslia, before we took a break, we

10  talked about the -- some of the various chemicals

11  that were combined -- chemical contaminants combined

12  in the drinking water at Camp Lejeune.  And when we

13  listed those several chemicals, first of all, those

14  were in the finished water that comes through a

15  person's tap, right?

16      A    That is correct.

17      Q    And you mentioned that in addition to those

18  there was also some benzene in that water.

19      A    No.  What I said was that we had two or

20  three hits at the water treatment plant there.  And I

21  just could not say what happened to the benzene

22  because it was such low -- low concentrations of it.

23      Q    Based on the documents that the government

24  gave you.

25      A    That's correct, yes.

1      Q    And if you found benzene at the water

2   treatment plant, is there any reason to think it

3   somehow gets taken out of the water once it leaves

4   the treatment plant and flows to the consumer?

5      A    No.  It may have been diluted, though.

6      Q    Right.  Sure.  And we don't know.

7      A    That's correct.

8      Q    And then you mentioned also that the study

9   assumed no additional source of TCE on Tarawa

10  Terrace.  And just to be clear for the Court, the

11  multi-species, multi-phase model in Appendix A2, when

12  it includes TCE as an assumed breakdown product from

13  PCE, that doesn't encompass if, in fact, there was

14  another source of TCE like industrial solvents

15  onsite.

16     A    That is correct.  That model, again, uses

17  PCE as the source, the same value we use for the

18  single species.  It just let's it break down through

19  the breakdown process.

20     Q    So if it would be shown by the evidence and

21  from its greater weight that there was actually TCE

22  degreasing done on Tarawa Terrace, that would not yet

23  be taken into account by the multiple chemicals you

24  found in the water in your model.

25     A    Another source of TCE was not -- a source,

1    not another one -- a source of TCE was not taken into

2    account because we did not see any evidence of a

3    source like there was for PCE.

4         Q    And that, again, as with the benzene, was

5    based on the documents that the government gave you.

6         A    That is correct.

7         Q    Now, who at the Department of the Navy asked

8    that that Web site for the families to type in their

9    addresses be taken down?

10        A    It was just in general conversation.  Again,

11   we have monthly conference calls, and they also

12   critiqued the Tarawa Terrace model, and I cannot put

13   a name, that I specifically remember that person said

14   X, Y, and Z, but that definitely Navy and/or Marine

15   Corps staff expressed that sentiment.

16        Q    That they expressed their displeasure with

17   that Web site and asked that it be taken down.

18        A    With that application.

19        Q    Okay.  The one that allowed family members

20   to type their address in --

21        A    Yes.

22        Q    -- and find out how many chemicals they had.

23        A    That is correct.

24        Q    Now, you mentioned that the Department of

25   Navy critiqued your model.  You said that.

1     A     That is correct.

2     Q     They did that in writing, didn't they?

3     A     Yes, they did.

4     Q     And they sent that to you.

5     A     Yes.

6     Q     What is that document called, or how would I

7   ask for it to get it from Mr. Bain?

8     A     You could ask for it in two ways.  One, you

9   can see it on our Web site.  We have our response to

10   it.  We have the ATSDR -- I think it's called

11   response.  If you go under the water modeling for

12   Tarawa Terrace and go down through all of the

13   publications and stuff, you'll see something to the

14   effect of ATSDR response to the Department of Navy

15   review of Tarawa Terrace model.  And in that, we

16   include their letter because we refer to certain

17   sections of their letter.  So you'll see their letter

18   there.

19          And you could then see the date of their

20   letter and just ask them for the date of that letter.

21   And offhand I do not remember if they sent it

22   directly to me or they sent it to Dr. Frumkin who was

23   the assistant administrator of ATSDR at the time.  I

24   just don't recall that.

25     Q     Who wrote that attack on your model?

1          MR. BAIN:  Object to form.

2    BY MR. ANDERSON:

3        Q    Who wrote it?

4          MR. BAIN:  Objection.

5          THE WITNESS:  The cover letter was signed

6      by, I believe, Mr. Harrison.

7    BY MR. ANDERSON:

8        Q    Is he part of the Department of the Navy?

9        A    Yes.

10       Q    Is he a scientist?

11       A    He has a "PE" after his name, so I'm

12   assuming he's a registered engineer.  I really would

13   like to look at the letter again, if I can see that.

14   We deal with him and also Richard Mock who is his

15   supervisor.

16       Q    Do you have a copy of that with you?

17       A    No, I do not.

18       Q    Well, we can get it on this computer in a

19   minute.  The -- maybe at our next break so we're not

20   wasting time.  I'll dig it out with your assistance.

21          The critique of your model, was it -- that

22   is the critique peer reviewed?

23       A    Their letter or --

24       Q    Their letter.

25       A    I don't know.  You would have to ask them.

1      Q     Did you agree with their critique of your

2  model?

3      A     We disagreed with many of their points that

4  they made in their letter, and we addressed each one.

5      Q     Did you, as a result of going through that

6  process, become convinced that there were problems

7  with the work you had done on Tarawa Terrace?

8      A     No.  I was convinced even more strongly that

9  we did a scientifically defensible work.

10      Q     Why more strongly?

11      A     Because we were able to, in addressing some

12  of their critiques, point out where in the literature

13  elsewhere these techniques had been used.  And, in

14  fact, some of the critiques that they provided, we

15  were able to show that, in fact, at other locations

16  the Department of Navy used the exact same approach

17  that we had used and it was acceptable to the Navy at

18  that location.

19      Q     And did you point that out in your letter?

20      A     Yes.

21      Q     So that's available to me on the Web site?

22      A     Yes.  Yes, it is.

23      Q     And those are the same methods and

24  techniques that you utilized in your study.

25      A     That is correct.

1      Q    Going back now to the tables indicating the

2   multiple chemicals to which people at Tarawa Terrace

3   were exposed in their drinking water, I just want to

4   talk to you for a second about the routes of

5   exposure.

6           Given that these several chemicals are

7   coming out of the tap, is it fair to say, based on

8   your understanding, that people would be exposed to

9   these chemicals through drinking, inhalation, skin

10  absorption?

11     A    Yes; all three.

12     Q    So if somebody was living there on the base

13  in base housing at Tarawa Terrace, they would be

14  exposed whenever they drank, cooked, bathed, washed

15  clothes.

16     A    Yes.

17     Q    And the routes of exposure would include not

18  only the actual drinking of it but inhaling the

19  volatile heated water, for instance, when you're

20  standing in the shower and all that steam is in your

21  face?

22     A    Yes.

23     Q    Or when the washer or dryer is running?

24          MR. BAIN:  Object to lack of foundation.

25          THE WITNESS:  I really could not answer that

1     specific question.

2  BY MR. ANDERSON:

3     Q     Skin absorption when you're washing

4  dishes --

5     A     Yes.

6     Q     -- and have your hands in the hot water,

7  steam coming up, inhalation?

8     A     Yes.

9     Q     And best of your understanding based on the

10  work you did, that would have been day in and day

11  out, right?

12     A     Yes.

13     Q     Are these chemicals additive in the adipose

14  tissue?

15          MR. BAIN:  Objection; lack of foundation.

16          THE WITNESS:  This is outside of my area of

17     expertise.

18  BY MR. ANDERSON:

19     Q     You don't know if they are bioaccumulators?

20     A     No.

21     Q     Do you know whether these chemicals are

22  interactive, that is, whether vinyl chloride in the

23  context of PCE interacts?

24          MR. BAIN:  Objection; lack of foundation.

25          THE WITNESS:  I have no expertise in that

1    area.

2  BY MR. ANDERSON:

3      Q    So when it comes to just how toxic this

4  chemical cocktail is, you couldn't say.

5          MR. BAIN:  Objection for lack of foundation.

6          THE WITNESS:  That's, again, outside my area

7      of expertise.

8  BY MR. ANDERSON:

9      Q    And you've talked now about the routes of

10  exposure.  What is your understanding about who was

11  exposed?

12     A    Anyone who was living in Tarawa Terrace

13  housing, because the water distribution system

14  provided water to Tarawa Terrace housing.  So that

15  would be, you know, children, adults, workers.  In

16  other words, if there's a restaurant or whatever on

17  base or shopping center, people who -- you know,

18  there is a swimming pool there.  People who went

19  swimming.

20     Q    Marines?

21     A    Yes.

22     Q    Their wives?

23     A    Yes.

24     Q    Their children?

25     A    Yes.

1      Q      Pregnant wives of Marines?

2      A      Yes.

3      Q      Infants?

4      A      Yes.

5      Q      Pouring this water in an infant formula and

6   so forth.

7      A      I have no knowledge of the feeding practices

8   back then.  So --

9      Q      Or through the breast milk.

10      A      Yes.

11      Q      Now, in terms of these tables, you know, now

12   the DON has got that site taken down, and the

13   families can't go on there anymore and type in their

14   address.  But they can get ahold of your study.  And

15   if they want to -- if they do find your study and

16   want to read about their exposure -- let's just go to

17   that, if you would, stress period 349 again, January

18   of 1980, when Laura Jones -- actually February 1980,

19   350 stress period when Laura Jones came on base.

20             She could look and she could see her

21   exposure to total PCE and then the other chemicals

22   that you listed as breakdown products.  For that

23   month, you see under stress period 350, and she would

24   know she had those exposures in that month.  Is that

25   how we read this?

1      A    That would be her average exposure.

2      Q    In that particular month.

3      A    That is correct.

4      Q    So each day of that month on average, she

5    would have been exposed to that much of those

6    chemicals; is that the understanding?

7      A    No, no.  I would say over a month period,

8    the average exposure would be this value.  We cannot

9    go down -- the model does not go down to a day.

10     Q    No, I understand that, Morris.  But I'm

11   asking -- what I'm asking -- I want to make sure that

12   the record is clear.  You're saying and you already

13   told me it would be each and every day that this

14   exposure occurs.

15          What I'm asking you is:  You're saying here

16   on average in February of 1980, she's exposed to

17   these chemicals throughout the month.

18     A    No, no.  I'm saying the average exposure

19   which is different than on average.

20     Q    Okay.  The average exposure per month.

21     A    Yes.

22     Q    Okay.  So this is a monthly value?

23     A    That is correct.  That is correct.

24     Q    Okay.  So the average exposure per month for

25   February 1980 is this series of numbers.

```
 1        A    That is correct.

 2        Q    Okay.  And then let's say she stays for

 3   stress period 351.  Then the next month the average

 4   per month is, she's exposed to the next set of

 5   values.

 6        A    That is correct.

 7        Q    And so on and so forth throughout the entire

 8   time she's there.

 9        A    That is correct.

10             MR. ANDERSON:  Let's go off the record for a

11        second.

12             (Brief discussion ensued off the record.)

13   BY MR. ANDERSON:

14        Q    And just for final clarification on the

15   issue of exposure, if there is another source of TCE,

16   she would have been exposed to that in addition to

17   what you have here.

18        A    Not unless it got in through the water

19   treatment plant.

20        Q    Right.

21        A    Okay.  And, again, that really would be

22   speculating based on here, because our model is based

23   on only one source and that's PCE and degraded TCE.

24        Q    Right.  And that's the only one you know

25   about.
```

1       A     That is correct.

2       Q     And if it were shown from the evidence that

3   there was another source that got into the water,

4   then that would be in addition to what is reflected?

5       A     If it got into the supply well and then into

6   the water treatment plant, then that would be an

7   addition.  But it would be -- you could not defend

8   just taking that value and adding it to this model,

9   because then the model would not have incorporated

10  that other source.  We would have to rerun the model

11  to do that.

12      Q     Understood.  And the same would be true if

13  there was a significant source of benzene.  You would

14  have to rerun the model.

15      A     We would have to rerun the model with a

16  caveat that if we could assume it was dissolved, low

17  enough concentration, in other words, not floating

18  above the water table but just dissolved like these

19  were, then you could rerun the same model that we

20  had.  If, in fact, it is substantial enough that it's

21  floating on top of the water table, then you have an

22  entirely different complicated model.  You could not

23  use these models.

24      Q     And if, in fact, you were running a model

25  for TCE or PCE and you were about finished with the

1    model years into it and somebody told you, Hey,

2    there's a million gallons of benzene that have not

3    previously been accounted for, would that mean you

4    would have to start a lot of work over?

5        A    It means you would have to look at what

6    assumptions the model that you have developed thus

7    far -- what assumptions you have made and see if, in

8    fact, you could include that, or, in fact, you would

9    have to bring in a more complicated model.

10            You would have to evaluate that because

11    benzene also has -- even if it's dissolved, it has

12    different, what we would call, retardation factors,

13    the speed or lack thereof that it moves once it's

14    mixed with water.  It would move at a different rate

15    than PCE would.  So you would have to rerun the model

16    and take that into account, and there would be some

17    time involved in doing that.

18        Q    He's asking -- Mike Pangia wants me to ask

19    you:  If, in fact, there was found to be benzene in

20    this water, does that mean that your -- the work you

21    did and the model you ran is inaccurate?

22        A    No, not at all.

23        Q    Now, stepping back again from the data

24    itself and so forth to the subject of your model more

25    broadly with regard to Tarawa Terrace, did you check

1    the results of your simulations against any actual

2    data points, that is, known data like you described

3    doing in Georgia?

4         A    Yes, we did.

5         Q    Were they -- were your simulation results

6    consistent or inconsistent with the known levels of

7    contamination?

8         A    We were very consistent.

9         Q    What did that tell you?

10        A    It told us that we had a reliable and, more

11   importantly, what we believe is a scientifically

12   defensible product.

13        Q    All right.  So that gave you added assurance

14   of the accuracy of your results because of the fit

15   between the study results and the known levels of

16   contaminants.

17        A    That is correct.

18        Q    Were there any other checks on

19   methodological reliability that you did after you had

20   run your simulations?

21        A    Well, Chapter I, which is the probabilistic

22   and sensitivity analysis, is another check because,

23   again, it demonstrated that the range of values were

24   fairly narrow, were within acceptable limits for the

25   epidemiologist to use.  And we felt that they showed

1    that our results were consistent over time.

2         Q     So that was another confirmation of the

3    reliability.

4         A     Yes.

5         Q     And then you've already told us you had the

6    study peer reviewed.

7         A     Yes.

8         Q     You mentioned that the Department of the

9    Navy had criticized your study.  Has the study been

10   criticized by anybody else?

11            MR. BAIN:  Objection to the form.  The word

12        used was critiqued.

13            MR. ANDERSON:  All right.  Well, I'm not

14        going to get into that level of semantics.

15   BY MR. ANDERSON:

16        Q     By whom?

17        A     The National Research Council.

18        Q     All right.  Tell me about that.

19        A     About the council or about --

20        Q     About the criticism or critiquing of your

21   model by the National Research Council.

22        A     Okay.  They produced a report in June of --

23   is it 2009 or 2010?  I forget the year.  And they

24   spent an entire -- Chapter 2 is what they referred to

25   as their exposure assessment chapter, and they spent

1   the entire chapter critiquing the modeling approach,

2   the model that we used.

3           One of their biggest critiques that they

4   made -- not only did we disagree with but the data

5   contradict their critique -- is that we did not

6   analyze the VOCs as DNAPL, which are dense

7   non-aqueous phase liquids, which means they have a

8   density of greater than one or they are denser than

9   water.  And they indicated that that was a severe

10  limitation.  That was one.

11          They also critiqued in a different

12  chapter -- Chapter G, I think -- we do a vapor

13  analysis, look at the vapor of the different

14  constituents going into the soil above the water

15  table.  And they critiqued that by comparing it to

16  vapor intrusion in a dry cleaner in New York City.

17  And, again, we were baffled as to why they would

18  compare soils, sandy limestone soils in North

19  Carolina with an urban dry cleaner in New York, but

20  that's the comparison they made.  And, again, we

21  addressed all of their -- internally we addressed all

22  of their critiques.  But they critiqued it.

23      Q   When you addressed these internally, were

24  there documents generated that -- where you addressed

25  these critiques?

1    A    I generated a document and sent it to my

2    branch chief and division director as an e-mail

3    attachment.

4    Q    Who is that person?

5    A    My branch chief is Susan Moore, M-o-o-r-e;

6    and my division director is Dr. William Cibulas,

7    C-i-b-u-l-a-s.

8    Q    And so you attached that response to the

9    National Research Council and gave it to your

10   superior.

11   A    That's correct.

12   Q    How did you deal with the issue of your

13   supposed failure to treat the contaminants as dense,

14   nonaqueous-phase liquids?

15   A    Well, in fact, they used data that we

16   published in Chapter E, which is the water quality

17   chapter.  And I think the highest value was 20,000

18   micrograms per liter.  And what we said was, all that

19   is is an indication of a source but there's no other

20   data anywhere near there and so they could not prove

21   that that was DNAPL.  In other words, that does not

22   prove there's DNAPL there.  And so they used the data

23   that we published.

24        That was one of our -- if you want to call

25   it -- complaints about -- internally our senior

1    leadership is that they took data that we published,

2    misinterpreted it, and then put it out there for the

3    public as scientific gospel, because they are the

4    National Research Council.

5        Q    Who are they anyway?  I mean, you know, who

6    are those people?

7        A    National Research Council is an independent

8    agency that is contracted out by any -- typically by

9    any agency within the U.S. Government.  If they want,

10   you know, high-level scientific work or analysis,

11   they do many types of different analyses.

12       Q    So they are paid for hire, available to be

13   hired by some agency, for instance, the Department of

14   Navy?

15            MR. BAIN:  Object as to form.

16            THE WITNESS:  The Department of Navy did pay

17        for the National Research Council review.  My

18        understanding is that they were mandated to do so

19        by Congress in one of the defense authorization

20        bills.

21   BY MR. ANDERSON:

22       Q    Do you know who introduced that --

23       A    No, I don't.

24       Q    -- amendment to the legislation?

25       A    No, I do not.

1       Q      That's interesting.   In expressing your

2   concerns internally about the fact that, as you put

3   it, the DNR -- or DRC -- excuse me -- let me start

4   over.

5              In expressing your concerns here internally

6   about the fact that the National Research Council

7   had, in your words, misinterpreted our data and

8   represented it to the public as scientific gospel,

9   did you and others within the ATSDR write e-mails and

10  memos about that subject, discussing it?

11      A      We wrote a formal -- at my level, response.

12  I did it for my particular chapter of interest which

13  is the Chapter 2.   I know Dr. Bove did the toxicology

14  and epidemiology.   And, like I said, I sent mine by

15  e-mail.   But we had numerous discussions with agency

16  leadership -- at that time, Assistant Administrator

17  Dr. Howard Frumkin and Deputy Director Dr. Tom Sinks

18  -- and we were told on several occasions in no

19  uncertain terms that the agency would not respond the

20  NRC report.

21      Q      Why?

22      A      They said these were scientists of national

23  repute, okay, and that the agency was not going to

24  respond to the NRC report.

25      Q      So you were ordered not to respond.

1          MR. BAIN:  Object as to form.

2    BY MR. ANDERSON:

3        Q    Were you ordered not to respond?

4        A    I was told the agency would not respond.

5        Q    Did you have any choice?  Did you have a

6    choice to respond anyway?

7        A    I wrote -- I wrote my document and sent it

8    by e-mail to my branch chief and division director,

9    and that's as far as I could go --

10       Q    So if you --

11       A    -- as an employee of ATSDR.

12       Q    So the public only sees one side of the

13   story.  They see what the National Research Council

14   has misinterpreted from your data --

15          MR. BAIN:  Object as to form.

16   BY MR. ANDERSON:

17       Q    -- but they don't see your response; is that

18   the truth?

19       A    The public has not seen my response as an

20   official ATSDR response to that section of my

21   expertise in the NRC report.

22       Q    How about Bove's response to the NRC's

23   toxicology stuff:  Has the public seen that?

24       A    No, they have not.

25       Q    So the public has seen one side of the story

1   and not your side of the story?

2              MR. BAIN:  Objection as to form;

3       argumentative.

4   BY MR. ANDERSON:

5       Q    I'm just asking:  What is the truth?  Is

6   that the truth?

7       A    Our internal scientific response to the

8   document -- both epidemiology, toxicology, and

9   exposure assessment -- was not released -- were not

10  released as ATSDR responses to the NRC report.

11      Q    Were they released in any form to the

12  public?

13      A    The agency did release a -- if you want to

14  call it a work plan, okay, or a plan going forward.

15  And in it, they did not subscribe to all of the NRC's

16  recommendations.  Okay.  In other words, however, we

17  always felt from the technical and scientific

18  standpoint that that significantly watered down our

19  work because it did not, you know, go point by point.

20  But the agency did put forth a plan going forward in

21  which the agency did not accept all of the

22  recommendations of the NRC.

23      Q    And I believe you said that the NRC

24  misinterpretation was funded by the Department of the

25  Navy?

1     A     The NRC work -- the work the NRC interprets

2  or cites, there's a committee there, and they do what

3  they do to get the ball running.  In other words, to

4  get funding to look at the water contamination at

5  Camp Lejeune, that product was -- my understanding --

6  was funded through authorization in one of the

7  defense authorizations.

8     Q     And that was by the Department of Navy,

9  right?

10    A     I'm not clear if it's the Department of

11 Defense or Department of Navy.  In other words, I

12 don't recall specifically.

13    Q     One or the other or both.

14    A     Right, that's correct.

15    Q     When you read what the National Research

16 Council had come up with about your model, did you

17 come away from that feeling that your model was

18 invalid in some ways, or did you come away from that

19 convinced of your model's validity?

20    A     Neither.  I was convinced there was

21 significant misunderstanding and misinterpretation of

22 information and, in fact, lack of understanding of

23 the whole Camp Lejeune issue on the part of the NRC

24 committee and specifically those people on the

25 committee who were responsible for doing, say, the

1    exposure assessment part.

2        Q    Why do you say that?

3        A    I had several e-mails back and forth from

4    one particular individual on the committee.

5        Q    Who was that?

6        A    Dr. Prabhakar Clement.  Last name is

7    C-l-e-m-e-n-t.  And I think he's out of Auburn

8    University.  Early on when -- in 2007, 2008, asked

9    me -- asking me about what -- what particular

10   approaches we were using and, for example, how we

11   were treating the PCE source and the model, what

12   option in the model we were using.  I'm putting this

13   in layperson's terms, if that's okay.

14       Q    I appreciate it.

15       A    And I explained and all of that.  And, in

16   fact, I have an e-mail from him saying, Boy, this is

17   great.  You know, the public is lucky to have an

18   agency like -- ATSDR is doing such a good job and all

19   that sort of stuff.

20            And then somewhere along the line in 2008,

21   2009 -- it was after we published these results for

22   Tarawa Terrace -- I didn't hear anything, but then

23   the NRC came back.  And it was like totally opposite

24   of what we had been communicating in an e-mail, and I

25   wasn't sure where the change -- and, of course, the

1   reports -- a committee report.  And somewhere in -- I

2   think it was 2008 or so -- I had sent an e-mail to

3   the chair -- oh, not the chair of that committee but

4   the NRC staff person who oversees the committee.

5          Q     Who is that?

6          A     Susan Martel.

7          Q     M-a-r-t-e-l?

8          A     M-a-r-t-e-l.  Susan.

9          Q     Okay.  Keep going.

10         A     Suggesting that it would be good for the

11  committee or for us to meet with the committee again

12  because I thought there were political budget and

13  scientific issues that perhaps the committee needed

14  more clarification on.

15                And so I sent her that e-mail.  We met once

16  with the NRC committee.  They had a public meeting in

17  Washington.  I forget the date of it.  That's public

18  record.  And, you know, I presented a 20-minute

19  presentation of what we were doing with Florida

20  modeling.  Dr. Bove presented 20 minutes on the EPI

21  side.  The Marine Corps -- one Marine Corps

22  general -- I do not recall his name, but I have got

23  the -- there's a an agenda of who spoke -- got up and

24  stated what the Marine Corps was hoping to get out of

25  the NRC committee and all of that sort of stuff.

1          And so the rest of it -- that's the only

2    time we presented details of what we were doing.  The

3    rest of these are through e-mail requests of the

4    results or whatever or data that we had.  And, as I

5    said, as things progressed, I felt that the -- I felt

6    personally or professionally -- professionally that

7    the -- it was a lack of understanding, as I said, of

8    the politics, the complexity, budget issues, and

9    approaches that we were using and that it would

10   behoove the committee just to hear from ATSDR on

11   those subjects.  And I sent that e-mail to Susan

12   Martel.

13        Q    What was the response?

14        A    Her response was that she would forward my

15   e-mail to the chair of the NRC committee but it would

16   be up to the chair of the NRC committee to make a

17   decision if they wanted additional information from

18   ATSDR or additional -- I don't know if it's called

19   testimony or not but, you know --

20        Q    And what happened after that?

21        A    Nothing.

22        Q    You mean, you -- so you never heard back

23   from the chair of the --

24        A    No.

25        Q    -- NRC?

1           Who was it that told you that the rebuttal

2    that you had produced to the NRC interpretation could

3    not be made public?

4       A    We were told that ATSDR was not going

5    publicly rebut, and that was Dr. Sinks, Dr. Tom

6    Sinks, as well as my division director and the

7    division of health studies director, which is

8    Dr. David Williamson.  They are obviously one level

9    bureaucratically below Dr. Sinks.

10      Q    So he was the top man responsible for that

11   decision?

12      A    I couldn't say if he was personally

13   responsible or not.  I'm not involved in those

14   discussions at that high level.  But he was the -- at

15   the time, assigned to oversee the whole Camp Lejeune

16   health study, and that's what we were told on several

17   occasions.

18      Q    The question that comes to mind is this, you

19   know, the government spent a lot of money to allow

20   you to do the study that we have talked about, and

21   it's printed in these beautiful reports.  First of

22   all, how much money -- how much money did your study

23   cost?

24      A    It's been averaging about 1.5 to 1.8 million

25   per year.

1       Q       How long has it been going on?

2       A       Since 2004.

3       Q       So the -- and the government is paying for

4   that, the taxpayers are paying for that study,

5   correct?

6       A       That is correct.

7       Q       So the government -- help me understand --

8   the government spends many millions of dollars to

9   support your work because you guys are the experts.

10      A       That is correct.

11      Q       And they fund you.  And now the Department

12  of the Defense or the Department of the Navy comes

13  along and gets another organization.  This -- uses

14  another organization also funded by the government,

15  funded by the taxpayers, to attack the work that you

16  did, funded by the taxpayers, right?

17              MR. BAIN:  Object to form.

18      Q       Is that true?

19              MR. BAIN:  Objection.

20              THE WITNESS:  They used another scientific

21          body to critique our work.  That's fine.  And our

22          work is public information, so anybody can

23          critique it, whether it's an individual or

24          consulting company or any other organization.  I

25          believe it's scientifically defensible.  And what

1        I asked for and what my colleagues at ATSDR and,

2        in fact, our cooperators like Georgia Tech

3        requested, that we be allowed to defend it on the

4        same playing field.

5    BY MR. ANDERSON:

6        Q    And that was the request that was denied.

7        A    That's correct.

8        Q    I mean, you know, just kind of

9    simplistically, if, say, Toyota did this, you know,

10   they fund a study of their gas pedals and then they

11   hire -- they also fund a study to critique their

12   study of their gas pedals, that would be nonsensical.

13        How does it make sense that we're paying, as

14   taxpayers, for a multimillion dollar study by you

15   guys who are the experts and then we're also paying

16   for the National Research Council to come along and

17   critique that?  How does that make sense?

18        MR. BAIN:  Object to form; lack of

19   foundation.

20        THE WITNESS:  I haven't got an answer for

21   that.

22   BY MR. ANDERSON:

23        Q    In reviewing the documents that cover the

24   known data regarding the actual contamination that

25   were provided to you by the Department of the Navy,

1    were you relying on the Department of the Navy to

2    provide you with everything that they had?

3         A    Yes.

4         Q    And what documents did you see?

5         A    We saw anything from handwritten notes to

6    lab reports to engineering reports to remedial

7    investigation reports to unidentified slips of paper.

8         Q    Did you see these documents that were

9    attached to our lawsuit.  I'm going to show you

10   exhibit pages E, F, G, also known as CLW4306, 438,

11   443.  Did you use those as known data points?

12        A    These are -- actually what these are -- CLW,

13   we have termed -- and it's in our reference section

14   as Came Lejeune water document, and they are all

15   listed, not necessarily in sequential order, all in

16   the DVDs.

17        Q    Right.

18        A    And what these particular ones -- let's

19   looks at CLW0436.  At the time, this is 1980.  And

20   this is how the volatile organic compounds were

21   actually discovered at Camp Lejeune.  Because at the

22   time they were looking for trihalomethane

23   constituents, and that's what's listed here:  CHCL3;

24   CHCVR is the bromide; and so on and so forth.

25   Because they were -- these were byproducts of --

1    disinfection byproducts, and they were concerned

2    about high levels.  And so they --

3            MR. BAIN:  Excuse me.  You got to listen to

4        his question, and answer.  He's just asking you

5        if you saw these and used these.

6            THE WITNESS:  Oh, okay, okay.  Well, I was

7        getting to why we did not -- sorry -- it's

8        elongated -- why we did not use as data in our

9        model.  So the answer to your question, we did

10       not use these particular documents as data in our

11       model.

12   BY MR. ANDERSON:

13       Q    Okay.  Go ahead and tell me why not, just in

14   the interest of hearing that.

15       A    Because they relate to trihalomethanes and

16   this is infection of byproducts.  They do not relate

17   to volatile organic compound contamination.  However,

18   they were having difficulty with the analytical

19   methods in there, and they had indicated possible or

20   likely VOC interference.

21           Okay.  So while it does not give us a value

22   to put in or compare the model with, it does tell us

23   that in 1980 there were most likely high levels of

24   VOCs in the water.  And, in fact, the model confirms

25   from a quantitative standpoint.  So we used them

1   indirectly in our model.

2        Q    And they were consistent with what you

3   found.

4        A    Yes.

5        Q    Okay.  And I guess that document, that first

6   one there, says:  Water is highly contaminated with

7   low molecular weight halogenated hydrocarbons of

8   strong interference, et cetera, et cetera.

9             Do you know who prepared these documents,

10  these -- I guess it says William Neal, chief of

11  laboratory services.

12       A    It was prepared by the laboratory section of

13  Camp Lejeune.  And Elizabeth Betz was a chemist whose

14  name you will see many times on such documents.

15       Q    So these documents in 1980, which you

16  indicate reflect high levels of volatile organic

17  compounds in the water, also reflect an awareness, a

18  knowledge, on the part of the Department of the

19  Navy's staff, Marine Corps staff, of the presence of

20  those chemicals as of that time; is that true?

21       A    Let me put it this way:  I don't know how

22  the Department of Navy handled its internal

23  communications.  They indicate that a lab analysis

24  was done and a chemist provided an information sheet

25  to someone in their environmental management

1    division.  That's all I can say from that document
2    and their repeated references to interference with
3    VOCs.
4        Q    Right.  But, I mean, these documents --
5    CL436, 438, and 443 -- based on your knowledge, your
6    training, and your experience, these were documents
7    generated by the Department of the Navy.
8        A    No, no.
9        Q    Or the Marine Corps.
10       A    Marine Corps.
11       Q    Right there at the base --
12       A    That is correct.
13       Q    -- in 1980.
14            MR. BAIN:  Do you want to look at all of the
15       pages that he referenced to see --
16            THE WITNESS:  Yeah --
17            MR. ANDERSON:  Yeah, and then give me the
18       answer after you look at them all.
19            THE WITNESS:  Yeah, these are -- these are
20       all part of the CLW documents.  CLW number was
21       put on subsequent to -- probably during the time
22       that we started our health study.  These
23       particular documents were prepared locally at
24       Camp Lejeune.
25    BY MR. ANDERSON:

1      Q    And so they're government documents; they're

2  documents of the United States Government?

3      A    Yes.

4      Q    An agency of the government.

5      A    Yes.

6      Q    Is the Marine Corps a part of the Department

7  of the Navy?

8      A    Yes.

9      Q    And just to come back to my question because

10 it got a little interfered with, ironically, those

11 documents reflect that the Marine Corps knew as of

12 1980 that there were high levels of volatile organic

13 compounds in the water at Camp Lejeune.

14         MR. BAIN:  Object to form; lack of

15     foundation.

16 BY MR. ANDERSON:

17     Q    Isn't that the truth?

18         MR. BAIN:  Same objection.

19         THE WITNESS:  The chemist and the person

20     that she provided these documents were made aware

21     of it.

22 BY MR. ANDERSON:

23     Q    They knew it.

24     A    Where it went -- I mean, I cannot speak for

25 the entire Marine Corps or the Navy.

1      Q     But some agent of the Marine Corps knew as

2  of 1980 that there were high levels of volatile

3  organic compounds in the water.

4            MR. BAIN:  Object as to form and lack of

5       foundation.

6  BY MR. ANDERSON:

7      Q     Answer?

8      A     They -- they were told that there was

9  interference with their mass spectrometer on there.

10     Q     Did you tell me before that this indicates

11  high levels of volatile organic compounds?

12     A     High level of VOC that's interfering with an

13  analytical test.  It is not a direct confirmation

14  that there are VOCs in the water.

15     Q     But it ended up being consistent with what

16  you found.

17     A     That is correct.

18     Q     Which was high levels of VOCs in the water.

19     A     That's correct.

20     Q     So some agent of the Marine Corps knew in

21  1980 that there were high levels of VOCs interfering

22  with their samples at Camp Lejeune.

23     A     That is true.

24            MR. BAIN:  Object as to form and lack of

25       foundation.  The document speaks for itself.  He

```
 1      wasn't --
 2              MR. ANDERSON:  Let's have him testify here.
 3      I want this on the record.
 4  BY MR. ANDERSON:
 5      Q    Is that the truth, sir?
 6      A    Could you repeat the question.
 7      Q    Yeah, yeah.  Some agent or agents of the
 8  Marine Corps working in their lab in 1980 knew from
 9  these documents that there were high levels of
10  volatile organic compounds in the water interfering
11  with their sampling.
12              MR. BAIN:  Object as to form and lack of
13          foundation.
14              Go ahead and answer it.
15              THE WITNESS:  That is correct.
16  BY MR. ANDERSON:
17      Q    That's is the truth, isn't it?
18              MR. BAIN:  Objection, same objection.
19  BY MR. ANDERSON:
20      Q    Simple.
21      A    I wouldn't phrase it as truth or not.  I'd
22  say the facts based on those --
23      Q    All right.  That's the facts.
24      A    That is what those sheets or those lab
25  results are showing.  That is that chemist's
```

1    interpretation.

2        Q    An interpretation which was subsequently

3    borne out by what you studied and what you concluded.

4        A    That is correct.

5        Q    And peer reviewed.

6        A    That is -- yes, it was peer reviewed, yes.

7        Q    Did you also review the Grainger report from

8    August of 1982 in connection with the review of the

9    known data points?

10       A    Yes.

11       Q    And was that one of the data points that you

12   use as a check on your simulation?

13       A    Yes.

14       Q    And were those data points consistent with

15   what your simulation discovered?

16       A    Yes.

17       Q    And it indicates here Bruce Babson had

18   prepared that Grainger report and sent it to the

19   commanding general of Camp Lejeune.

20            Did I read that correctly?

21       A    That's how all we even address things to the

22   commanding general.

23       Q    Did I read it correctly?

24       A    Oh, yeah, you read it correctly.  It says

25   it's sent to the commanding general.

1      Q    Does this document also indicate that,

2   again, now, two years later, the Marine Corps is

3   aware of high levels of volatile organic compounds in

4   the drinking water at Tarawa Terrace and now even the

5   quantities of some of these?

6      A    Yes.

7      Q    Did you see documents contemporaneous to

8   this document indicating any knowledge on the part of

9   the Marine Corps of the health risks associated with

10  exposing the Marines and their wives and children to

11  these chemicals at that time?

12     A    The Grainger letter in the first paragraph

13  or second -- I don't have it in front of me, so --

14     Q    Now you do.

15     A    Okay.  Thank you.  Yeah, what I said -- what

16  brought this particular letter to our attention is

17  their statement in there basically stating that the

18  Marine Corps should not be so much concerned with the

19  earth environmental issues but with the health

20  issues, because it said in here, these appeared --

21  meaning the concentrations of the -- albeit high

22  levels -- and, hence, more important from a health

23  standpoint than the total THM content.  Okay?

24          And so that's what caught -- from both my

25  standpoint and the epidemiologist's standpoint is

1    that the -- a lab -- I assume this is a contract lab

2    to the Marine Corps -- had informed them of in the

3    first paragraph of that.

4         Q    Of the health risks; is that right?

5         A    Well, the health concerns.  They did not

6    quantify.  We tend to talk in terms of risks in

7    quantifiable numbers.  They did not quantify that, so

8    I would say that's, you know, health concern.

9         Q    Right.  And they said that the interferences

10   which were thought to be chlorinated hydrocarbons

11   hindered the quantification of certain

12   trihalomethanes:  These appear to be at high levels

13   and, hence, more important from a health standpoint

14   than the total high trihalomethane content.  For

15   these reasons, we called the situation to the

16   attention of Camp Lejeune personnel.

17             Is that what we're talking about?

18        A    That's what I just read from.

19        Q    Okay.  So bottom line, again, here, the

20   folks at Camp Lejeune are being put on notice that

21   not only are there high levels of volatile organic

22   compounds in the water but that these raise human

23   health concerns?

24        A    That is how we interpreted -- or interpret

25   that.

1      Q     All right.  And I just want to put these

2   documents into the record so that the record is

3   complete.

4            (Plaintiff Exhibit Numbers 3, 4, 5, and 6

5       were marked for identification.)

6   BY MR. ANDERSON:

7      Q     I'm going to put in as Exhibit 3 the CLW436;

8   Exhibit 4 to your deposition, CLW438; Exhibit 5 to

9   your deposition, CLW443.  And Exhibit 6 is a two-page

10  document, CLW5177 and 5178, the Grainger report,

11  G-r-a-i-n-g-e-r.

12           And you mentioned Elizabeth Betz.  And in

13  August of 1982, she, in the course of reviewing the

14  Grainger letter that we just saw, remarked, did she

15  not, on some of the health -- human health effects of

16  exposure to this group of chemicals?

17     A     I need to look at the particular document.

18     Q     Who was Elizabeth Betz?

19     A     She was the base chemist.  That's how I

20  refer to her.  I don't know her exact title.  Okay?

21  But that's in the documents that I've seen.  She was

22  always dealing with the water quality analyses.

23     Q     She worked for the Marine Corps and was an

24  employee of the United States Government?

25           MR. BAIN:  Object to form; lack of

1    foundation.

2            THE WITNESS:  I really could not say.  I've

3        just seen her name on internal Marine Corps

4        documents.  I do not know if she was a contract

5        employee or a civilian government employee.

6   BY MR. ANDERSON:

7        Q    Okay.  But in whatever specific capacity she

8   worked, she was working on behalf of the Marine

9   Corps, correct?

10       A    That is correct.

11       Q    And she was working over there at the base,

12  from what it looks like in these documents.

13       A    That is correct.

14       Q    And she in August 1982, showing you

15  Exhibit 7, remarked upon the health risks to human

16  beings of exposure to some of these chemicals that

17  you found were, in fact, in the water and that the

18  Grainger report had found in the water.

19       A    That is correct.

20       Q    She found things like liver damage, kidney

21  damage, central nervous system disturbances in

22  humans, correct?

23           MR. BAIN:  Can you refer where you're

24       referring.

25           MR. ANDERSON:  Paragraph 5.

1          THE WITNESS:   That's what she reports and

2       reports about, suggested guidances and things of

3       that nature.

4    BY MR. ANDERSON:

5       Q    So the answer was yes?

6       A    She stated what she -- I mean, what she

7    states in the letter is what she stated.

8       Q    Well, she, working on behalf of the Marine

9    Corps in 1982, stated in her report that these

10   chemicals can cause in humans liver and kidney damage

11   and central nervous system disturbances, correct?

12      A    That's what she says in here.

13      Q    Do you know of anything that would refute

14   that, say that is not true?

15      A    You would have to ask a toxicologist.

16      Q    And then that, for the record, was CLW606

17   and 607, which is now Exhibit 7.

18           (Plaintiff's Exhibit Number 7 was marked for

19      identification.)

20   BY MR. ANDERSON:

21      Q    So this, again, reflects, you know, in 1982,

22   the knowledge of at least some agents over there at

23   the Marine Corps, of the risk of allowing families --

24   children, infants, neonates -- to be exposed to these

25   chemicals, doesn't it?

1          MR. BAIN:  Objection to form.

2          THE WITNESS:  Again, it expresses their

3      concerns --

4  BY MR. ANDERSON:

5      Q    All right.

6      A    -- of health risks, but it does not quantity

7  the risk.

8      Q    Right.  They knew there was a risk.

9      A    I would say that's correct.

10     Q    When you reviewed the documents that you

11  reviewed from the time that these people knew there

12  was a risk and knew there were volatile organic

13  compounds and knew they posed a threat to human

14  health, from that time forward, did you see any

15  evidence that the Department of the Navy or the

16  Marine Corps took action to protect the Marines and

17  their families from these contaminants?

18         MR. BAIN:  Objection to form.

19         THE WITNESS:  We were not reviewing the

20      documents to assess what the Marine Corps did or

21      did not do.  We reviewed documents to see if they

22      contained pertinent or relevant data or

23      information to use for developing the water --

24      from the water model.

25  BY MR. ANDERSON:

1    Q    Did you review a lot of documents?

2    A    Yes.

3    Q    In the course of your review, did you happen

4  to see any documents that showed what action showed

5  them taking action to protect the families?

6    A    There were some memos where there were

7  instructions on how to operate the distribution

8  system.

9    Q    When were those memos?

10    A    I would say around 1985 or so.

11    Q    So five years after the -- Exhibit 3 and

12  three years after Betts's acknowledgment of human

13  health effects.

14    A    Be approximately correct.

15    Q    Did you, in the course of reviewing all of

16  those thousands of pages that your -- that you

17  reviewed, find the Department of the Navy or the

18  Marine Corps taking any step in those intervening

19  years to protect the Marines and their wives and

20  children from these chemicals?

21         MR. BAIN:  Object to form.

22         THE WITNESS:  There were internal memos

23    about replacing certain wells and not operating

24    certain wells.

25  BY MR. ANDERSON:

1     Q     In '85.

2     A     Again, right around '85.

3     Q     I'm asking you before that.  Between 1980

4  and '85, did you see them take steps, action -- take

5  action to protect the families?

6          MR. BAIN:  Objection to form.

7          THE WITNESS:  I really did not review the

8       documents for what action, again, the Marine

9       Corps took.  But, rather, did it provide -- in

10      other words, if they were to take an action where

11      they were to turn on a well or turn off a well,

12      that would have implications for the water --

13  BY MR. ANDERSON:

14     Q     Right.  And you told me that happened in

15  '85.

16          My question is:  Do you know -- can you tell

17  me any action that you know of that the government

18  took to protect the people -- the wives, the

19  children, the Marines -- from this water and its

20  contaminants between 1980 and 1985?  Do you know of

21  any?

22          MR. BAIN:  Objection to form; asked and

23      answered.

24          MR. ANDERSON:  It's not been answered.

25  BY MR. ANDERSON:

```
1       Q    I want to know what you know --

2            MR. BAIN:  He's answered it.

3   BY MR. ANDERSON:

4       Q    I want to know if you know of any action

5   that they took to protect the families.

6            MR. BAIN:  He answered it.  He didn't review

7        it for that reason.  That's what he answered.

8            MR. PANGIA:  Does that mean he doesn't know?

9            MR. BAIN:  He's already answered the

10       question.

11           THE WITNESS:  Again, I reviewed the

12       documents to see particularly, as an example, did

13       they turn a well on and off and when did they do

14       it.  We did not have any indication if a well was

15       in existence, that they turned it off, except for

16       maintenance, in other words.

17  BY MR. ANDERSON:

18      Q    Okay.  So let me come at it from that

19  standpoint.

20           Did you see where after they knew that this

21  water was highly contaminated and they knew about the

22  risks to human heath, that they shut the contaminated

23  wells down and didn't let anybody drink any more of

24  it?  Did you see that?

25      A    At '85 and afterwards, they shut down the
```

1   wells.

2       Q    But what about in '81:  Did they do it then?

3       A    No.

4       Q    Did they do it in '82?

5       A    No.

6       Q    Did they do it in '83?

7       A    No.

8       Q    Did they do it in '84?

9       A    No.

10      Q    So all of those years, based on what you

11  know, the families were drinking this highly

12  contaminated water.

13      A    Water contaminated with volatile organic

14  compounds that we described in our analyses were, in

15  fact, being delivered to the residential housing and

16  other locations at Tarawa Terrace.

17      Q    Did you review the BUMEDs, B-U-M-E-D-s?

18      A    I know what they are.  Only after they were

19  brought to our attention in a congressional hearing

20  June of 2007, I believe, June 13th.

21      Q    That was the first time you became of aware

22  of that.

23      A    Yes.

24      Q    Did you learn of the base order at that time

25  with respect to the water?

1      A      Yes.

2      Q      But not before.

3      A      Not before.

4      Q      What did they require?

5             MR. BAIN:   Objection as to form; calls for a

6      legal conclusion.

7   BY MR. ANDERSON:

8      Q      You can answer.

9      A      I did not review the BUMEDs in detail.  We

10  felt they were, for the water modeling, not pertinent

11  because they spoke about water quality onboard ships,

12  and also some of the levels or standards that they

13  described in there having to do with pesticides and

14  things of that nature that we were not analyzing for.

15            And so we -- again, we reviewed documents to

16  extract data and information specifically to develop

17  and calibrate the groundwater flow and fate and

18  transport model.  And they were brought to our

19  attention after we had concluded that.  And we looked

20  at them and said that does not change the results or,

21  in fact, the assumptions of our model.

22     Q      All right.  They had to do with keeping the

23  water from having contaminants, didn't they?

24     A      That is correct.

25     Q      During those years that they kept pumping

1    this water to the Marines and their families there at

2    Tarawa Terrace, did the government -- did you see

3    anywhere where the government gave notice to those

4    people that they were drinking water that had these

5    contaminants in it?

6         A    There's a CLW document -- and I do not

7    recall the number on it -- from, I believe, the base

8    commander, and I think that was in 1985 where they

9    were having water shortage.  And going over how they

10   were going to conserve water.  But assured residents

11   that there were only minute or trace amounts of

12   contaminants in the water and it was safe to drink.

13        Q    And that wasn't true, was it?

14        A    There were not minute amounts in the water.

15        Q    And that document is Exhibit 8, isn't it?

16        A    Yeah.  This is the one I'm thinking of, yes.

17        Q    And he told him, Go ahead and drink it and

18   go ahead and swim in it.

19        A    And this was actually just for the record,

20   because I don't see a CLW document.  This is one of

21   the CERCLA administrative records files, and I'm

22   trying to see the number on it.  But it doesn't have

23   a CLW stamp on it, but there's probably a similar one

24   with a CLW in these documents.  But looking at the

25   number on top, I can tell you that's a CERCLA

1    administrative record file.

2         Q    And that's the document you were talking

3    about.

4         A    Yes.

5         Q    And told them, Go ahead and drink it and go

6    ahead and swim in it.

7              MR. BAIN:  Objection as to form.  The

8         document speaks for itself.

9    BY MR. ANDERSON:

10        Q    These are minute quantities.

11        A    It was minute quantities that caught our

12   attention.  I think they used the word "trace

13   amounts."

14        Q    And that caught your attention?

15        A    Yes.

16        Q    Why?

17        A    Well, to us, a trace amount would be less

18   than the MCL which would be less for PCE, less than

19   5 micrograms per liter.

20        Q    So that document is not accurate, is not

21   true.

22             MR. BAIN:  Object as to form.

23             THE WITNESS:  It contradicts what has

24        been -- what was measured, and it contradicts

25        what the model shows.

1    BY MR. ANDERSON:

2        Q    And it even contradicts the Grainger

3    report, doesn't it?

4        A    It does, yes.

5        Q    Which was three years before.

6        A    That is correct.

7        Q    Other than that misleading notice that you

8    indicated was given in 1985, Exhibit 8, did you, in

9    your review, see anywhere during those intervening

10   years that the government was sending this poisonous

11   water to the people any notice of the true situation?

12           MR. BAIN:  Object as to form.

13           THE WITNESS:  I do not recall any -- any

14       documents that I have -- I have reviewed or my

15       staff have reviewed to that effect.

16   BY MR. ANDERSON:

17       Q    Now, I understand that there was a

18   memorandum of understanding -- I believe it was in

19   1991 -- between the ATSDR and the Department of the

20   Navy so that the ATSDR would have access to all of

21   the relevant documents for its water model.

22           Is that my --

23       A    That is correct.

24       Q    Did the ATSDR rely upon base personnel to

25   provide all of the relevant documents?

```
 1      A    Yes.

 2      Q    Did the ATSDR ever have trouble getting

 3  information out of the Department of the Navy or the

 4  Marine Corps?

 5           MR. BAIN:  Object to lack of foundation.

 6           MR. ANDERSON:  I'm just asking.

 7           MR. BAIN:  Well, you haven't established

 8       that he speaks on behalf of the ATSDR.

 9           MR. ANDERSON:  Come on.

10  BY MR. ANDERSON:

11      Q    Did you ever have trouble getting documents

12  from the Marine Corps or the Department of Navy?

13           MR. BAIN:  Can you limit it to him, then?

14           MR. ANDERSON:  Okay.

15  BY MR. ANDERSON:

16      Q    Are you aware -- I'm not going play games --

17  are you aware of the ATSDR and its agents, to include

18  yourself, having any trouble getting documents you

19  needed to do your work here from either the

20  Department of the Navy or the Marine Corps?

21      A    We have had difficulty in the Marine Corps

22  and Navy identifying documents that we need.

23      Q    Tell me about that.

24      A    We have provided -- since we became involved

25  in the health -- with the health studies in the
```

1    summer of 2003 and forward -- the types of data and

2    types of documents that we needed, we have requested

3    inventories or a list.  And when we specifically

4    identify, for example, we want a lab report by a

5    certain name, then they will go and look for it.

6    Okay?

7         But if -- in our general -- our approach is

8    to say -- since they are the experts with their

9    documents and not us -- we want documents for

10   geohydrology, water quality documents that anybody

11   who is trained in environmental engineering or

12   dealing with base documents in their environmental

13   management program, that we believe should know what

14   those are.  We have had difficulty and -- until we

15   have specifically identified we want X, Y and Z of

16   obtaining those documents.

17        Q    Has there been correspondence about those

18   difficulties?

19        A    Yes.

20        Q    Is it correct that you maintain a file of

21   e-mails and letters that you've sent trying to obtain

22   information you needed for your studies?

23        A    Yes.

24        Q    What would that file be called?

25        A    Well --

1        Q     How would we describe it to request it?

2        A     I have e-mail files specific to underground

3     storage tanks, okay, because that one I have

4     specifically put together because that has come up

5     most recently.  And also the fact that the agency is

6     going to a different e-mail system, I thought I'd

7     better preserve it in a different way.

8              And so I have a chronology of e-mails back

9     and forth to the Marine Corps, requesting these types

10    of documents.  In this case it happened to be

11    underground storage tank documents and information.

12       Q     All right.  And you -- have you maintained

13    also other documents relating to request for

14    information that didn't have to do with simply the

15    underground storage tank issue?

16       A     Yes.  There are official letters wherein the

17    head -- or Dr. Frumkin or Dr. Sinks have written

18    letters to their equivalent, which would be the --

19    like deputy or assistant commandant of logistics and

20    installation at Marine Corps headquarters, and we

21    would present what information we were looking for.

22    We would say, What happens if we don't get the

23    information?  And there are a series -- or two --

24    two, you know, back and forth; our letter, their

25    response, our letter, back and forth.

1     Q     Have you got copies of those?

2     A     Yes, I do.

3     Q     Let me show you -- this problem of getting

4     information from the Department of the Navy and the

5     Marine Corps goes back quite a ways, doesn't it?

6     A     Yes, it does.

7     Q     The memorandum of understanding was found in

8     1991.  I'm showing you one document that I just

9     pulled out as an example from 1994.  Reading from the

10    second full paragraph, it says -- second sentence

11    says:  You are aware we have had much difficulty

12    getting the needed documents from MCB Camp Lejeune.

13    We have sent MCB Camp Lejeune several requests for

14    information.  And in most cases, the responses were

15    inadequate, and no supporting documentation was

16    forwarded.  For example, ATSDR does not have any of

17    the remedial investigation documents.

18          Did I read all of that correctly?

19    A     That's correct.

20    Q     It goes on to say:  The situation -- and

21    this is the last sentence of that paragraph:  The

22    situation at MCB Camp Lejeune is also somewhat

23    complicated, in that several of our public health

24    request questions could not be answered with

25    information from the RI reports, for example, lead in

1   the drinking water.

2               Did I read that correctly?

3       A    That's correct.

4       Q    And then the next paragraph, the second

5   sentence:  For an ATSDR public health assessment to

6   be useful, it is important that all pertinent

7   information be provided for evaluation.

8               Is that correct?

9       A    That's correct.

10      Q    And we must rely on the base personnel to

11  identify and provide the documentation; is that

12  correct?

13      A    That's correct.

14      Q    Do you agree with those statements in this

15  letter, Exhibit 11.

16      A    I was not at -- well, that's 1994.  I was at

17  ATSDR, but I was not involved in any way with Camp

18  Lejeune at the time.

19      Q    All right.  But you know that these problems

20  with getting documents from the Department of the

21  Navy and the Marine Corps continued, don't you?  You

22  know those problems continued.

23      A    We had similar requests in the tone or

24  verbiage in the letters that we officially wrote --

25  I say officially, meaning our agency leadership

1    wrote -- contained a similar message to this.

2         Q    And those are the letters that you have in

3    that file of yours.

4         A    That's correct.

5         Q    And I misspoke before.  I described this as

6    Exhibit 11.  It was actually Exhibit 10.  I'm going

7    to show you Exhibit 11 which is another letter

8    probably in that file of yours, December of 2005.

9              (Plaintiff's Exhibit Number 11 was marked

10        for identification.)

11   BY MR. ANDERSON:

12        Q    This is to the Department of Navy,

13   Lieutenant General Kramlich.  I'm reading the first

14   paragraph.  It says:  The Agency for Toxic Substances

15   and Disease Registry is conducting an epidemiologic

16   case control study of the children whose mothers were

17   pregnant while living on base.  ATSDR staff briefed

18   Lieutenant General Kelly and other headquarters

19   Marine staff on the status of the study, including

20   the water modeling, in August 2005.  The purpose of

21   this letter is to seek your assistance in resolving

22   outstanding issues that delay ATSDR's ability to

23   complete the current health study on time.  ATSDR has

24   experienced delays in obtaining requests for

25   information and data pertaining to water quality

1    sampling data and site remedial investigation

2    reports.  ATSDR has recently been made aware of the

3    existence of a substantial number of additional

4    documents previously unknown and not provided to

5    ATSDR staff.  These documents are designated as CLW

6    documents.

7         Did I read that right?

8    A    Yes.  I wrote the letter.

9    Q    Oh, I'm sorry.

10   A    I drafted the letter.

11   Q    Right.  It was signed by Frumkin.

12   A    Yeah, but I drafted the letter.

13   Q    All right.  Fair enough.

14        So you were well aware of these problems.

15   A    Yes.

16   Q    So am I to understand that as of December of

17   2005, you had not been provided the CLW documents?

18   A    We had not been provided some of the CLW

19   documents, or we had not been provided all of their

20   CLW documents.  We had been provided some of them.

21   Q    But not all of them.

22   A    But we were aware, from making trips to Camp

23   Lejeune and some inventory that they were doing, that

24   I had noticed that we had not -- we did not have in

25   our possession some additional CLW documents that

1    some went on base and shown me.

2         Q    A substantial number.  That's what you

3    wrote.

4         A    Yes.

5         Q    Who on base showed you the additional -- the

6    existence -- who revealed the existence of the

7    additional CLW documents in 2005?

8         A    It was not -- when you say "revealed the

9    existence," we really did not operate in that manner.

10   We would come up there occasionally.  And I was up

11   there in November 2005, and they were inventorying.

12   They were inventorying the base, and they were

13   showing me the CLW documents that were had, because I

14   raised the issue at a meeting, asking if their

15   inventory company was going to inform us of any

16   water-related documents.  And that's when I found out

17   that they had this whole listing or drawing, if you

18   want to call it, of CLW documents.

19              And I could tell by the numbers that they

20   had shown me in 2005 that they had exceeded the

21   numbers, the CLW numbers, that we had in our

22   possession at ATSDR.  And so that's when I expressed

23   my concern to both my division director and our

24   agency leadership, concern that we might -- those

25   additional documents might contain information that

1   we were calibrating the model with and not be aware

2   of.

3       Q    Who at the base was present when you found

4   out about that?

5       A    That was Scott Williams.

6       Q    Scott Williams.  And where does he work?

7       A    He's assigned to Marine Corps headquarters.

8   He's our point of contact at headquarters, and that's

9   currently.

10      Q    And you said that there was something about

11  the numbering that let you know that there were

12  documents that had not been provided to you.

13           Do you recall how high your Camp Lejeune

14  water documents went to, Bates-number-wise, before

15  you got the additional documents in 2006?

16      A    I seem to recall that ours went up to the

17  3,000s, and I had seen documents when I went on base

18  in the four, five, six, and seven thousands.  Again,

19  we recognized they were not sequential.  I think

20  that's important to say.  But all I knew is that they

21  were not document numbers I had ever seen before.

22      Q    And you mentioned that there were a

23  substantial number missing.  That would be in the

24  order of thousands of pages, wouldn't it?

25      A    Potentially, yes.

1      Q     Well, I mean, in fact, you later found out

2   it was on the order of thousands of pages.

3      A     Yes.

4      Q     And that was a discovery you made in 2005,

5   years after your water model had begun on Tarawa

6   Terrace.

7      A     Our water model had -- it was probably in

8   the -- probably been going on for about a year and a

9   half.

10      Q     This is the end of 2005.

11      A     Right, right.  We did field testing for a

12   good part of 2004, from the spring through the fall

13   of 2004, and did not really begin water modeling

14   activities until 2005.

15      Q     And these documents that had not been

16   provided previously, they were actually stamped "CLW"

17   for Camp Lejeune water?

18      A     Yes.

19      Q     Would it be too simplistic to say that in

20   all likelihood something called a CLW, Camp Lejeune

21   water document, might well be relevant to a Camp

22   Lejeune water model?

23      A     Would be pertinent, yes.

24      Q     You went on on the second page to talk about

25   the fact that you needed all documents immediately.

1           Did I read that correctly?

2      A    We requested timely sharing of these

3 documents.

4      Q    "To attempt to meet our project completion

5 timeline, we must be provided all documents that

6 relate to base-wide water issues immediately."  First

7 full paragraph.

8      A    Oh, okay.  Okay.  I mean, I wrote -- drafted

9 the letter, so yes.

10      Q    And that was true.

11      A    That is correct.

12      Q    You indicated that discovery of this

13 documentation must not rely on specific requests from

14 our staff but on our shared goal of ensuring the

15 scientific accuracy of our study and DOD's

16 responsibility to provide the information.

17      A    That is correct.

18      Q    You went on to say that a thorough review

19 and assessment of such a large volume of additional

20 documents at this late date and the incorporation of

21 related information into a nearly complete model may

22 require additional funding to review these documents

23 and modify our model if necessary.

24           Did I read that correctly?

25      A    That is correct.

1      Q    "Completion of this assessment and required

2    modifications to our model extend the timeline for

3    six months to a year."

4      A    That is correct.

5      Q    Have there been additional problems getting

6    documents from the Department of the Defense and the

7    Marine Corps since then?

8      A    It would be similar of the identification

9    issue.  When we specifically mention a document

10   number or document type, they will provide it.  But

11   if we say we need -- as we did, you know, just

12   underground storage tank documents, it -- the process

13   is elongated.

14     Q    So the answer is, yes, there have been

15   continued problems.

16     A    Yes.

17     Q    A lot of those problems had to do with the

18   underground storage tanks and the benzene; is that

19   correct?

20     A    That is correct.

21     Q    I thought that the Department of the Navy

22   and the Marine Corps were supposed to be a partner.

23   You were supposed to be partners.

24     A    We are partners.  That's the purpose of the

25   memorandum of understanding.

1       Q    Now, we've been talking about a lot of

2   e-mails and so forth that are on your computer and

3   folders and things.  And you mentioned that there's

4   going be a new e-mail system at the ATSDR.  And I'd

5   like to state on the record that we want them

6   preserved no matter what happens to the computer

7   system.  If you have to go home today and burn it

8   onto a CD, every document that we've talked about

9   during this deposition, we intend to request.  He has

10  been making a list of them.  So I don't want to hear

11  -- and I don't think the federal judge is going to

12  want to hear -- that we had a change in e-mail

13  systems and all of it got gone.

14          MR. BAIN:  Well, we have to have, as we

15      mentioned, a Rule 26 conference, a reasonable

16      scope of request that you produce to us, which

17      was agreed to in our joint status conference

18      report.  We still have not received that scope of

19      preservation yet.  We have taken steps through

20      the agencies to preserve information that we

21      believe is related.  But until you identify what

22      the scope is, you need to do that.

23          Also, I should say at this point, we did

24      receive the notice of deposition for Mr. Maslia's

25      deposition on Sunday, which should include an

1    attachment requesting certain documentation.  We

2    did not bring any documentation with us in

3    response to that today, other than the report on

4    Tarawa Terrace which Mr. Maslia has brought,

5    because, for one, it was produced on Sunday which

6    was not a reasonable time to comply with the

7    request.  Secondly, it was overbroad in that it

8    requested basically everything that could, you

9    know, under the sun, could be related to his

10   work.  And finally, it likely requested

11   information that would be subject to privilege.

12   So for that reason, we did not bring anything in

13   response to that today.

14        MR. PANGIA:  Well, that's fair enough.  I

15   just hope that the Justice Department doesn't

16   play the same game that the Department of Navy

17   has been playing with the ATSDR.

18        MR. ANDERSON:  Why don't we take a break.

19        (A brief break was taken.)

20   BY MR. ANDERSON:

21        Q    Based on the information available to you,

22   what kind of an area is Tarawa Terrace?  Is it mostly

23   housing.

24        A    It's mostly housing.

25        Q    Is there shopping, swimming, bowling,

1    movies, other resources of entertainment there, to

2    your knowledge?

3         A    There's a shopping center.  There's a

4    school.  I don't know about bowling specifically at

5    Tarawa Terrace.

6         Q    Is the movie theater over at Hadnot Point.

7         A    Yeah.  There's a movie theater and bowling

8    at Hadnot Point.

9         Q    And there's a shopping center at Hadnot

10   Point.

11        A    It's the exchange.

12        Q    Yeah.  So the answer is yes?

13        A    Yes.

14        Q    If a person was living at Tarawa Terrace and

15   wanted to have access to those resources, they would

16   obviously have to travel over to Hadnot Point if they

17   wanted to go bowling without going off the base, for

18   instance.

19        A    That is correct.

20        Q    And in the course of going over to Hadnot

21   Point, a person who lived at Tarawa Terrace would

22   have had exposure to the Hadnot Point water supply

23   had they, say, for example, ordered a Coke at the

24   Hadnot Point theatre or a drink from the supermarket

25   water fountain.

1      A     If they drank from the supermarket water

2  fountain, yes, that would have been Hadnot Point

3  water at that point.

4      Q     Or if they swam in the Hadnot Point pool.

5      A     Yes.

6      Q     And those exposures obviously would be in

7  addition to any exposure that they had at Tarawa

8  Terrace.

9      A     That is correct.

10     Q     So you would have to add those exposure on

11  top of the figures that is we saw in Exhibits 1

12  and 2.

13     A     That is correct.

14     Q     Now, I understand that these days you're

15  working on a water model for Hadnot Point.

16            Is that right?

17     A     Hadnot Point and Holcomb Boulevard.

18     Q     Okay.  And you've not finish that yet?

19     A     No.

20     Q     You started that some years ago, didn't you?

21     A     We just recently this past year started the

22  actual model.  We've been in a -- putting databases

23  together for the model since about 2007.

24     Q     2007.  And what does that involve, putting

25  data bases together?  Gathering data?

1      A      Again, it is going through disparate types

2   of documents, pulling out pertinent data --

3   geohydrologic, hydraulic, water quality

4   information -- and then putting -- conducting QA/QC

5   on the data before you -- and then developing

6   databases that are appropriate for the model that

7   you're going to use.

8      Q      Okay.  And so you've been gathering the

9   documents relating to the Hadnot Point, slash,

10  Holcomb Boulevard water model since 2007.

11     A      That is correct.

12     Q      Were you provided all of the appropriate and

13  necessary information for the Hadnot Point/Holcomb

14  Boulevard water model in a timely fashion?

15     A      We were provided documents when we

16  specifically asked for a specific document type or --

17  a document type.

18     Q      So if you knew something existed

19  specifically and you were able to ask for it, you

20  would get it?

21     A      Yes.

22     Q      But if you just asked for all documents

23  relating to the water, that's where you would run

24  into trouble.

25     A      Again, we made that request several times,

1    and we still obtained additional documents after

2    those requests.

3        Q    Had supposedly been fulfilled.

4        A    Say that again.

5            MR. BAIN:  Objection to the form.

6    BY MR. ANDERSON:

7        Q    And this is now having to do with the -- the

8    next model at Hadnot Point/Holcomb Boulevard.

9        A    Right.

10        Q    So same thing again.

11        A    Uh-huh.

12        Q    Well, let me ask you this:  Was the contents

13    or even the existence of the underground storage

14    tank, electronic portal disclosed to you when you

15    began your study at Hadnot Point and Holcomb

16    Boulevard?

17        A    No.

18        Q    Why not?

19            MR. BAIN:  Objection; foundation, form.

20            THE WITNESS:  I have no answer for that.

21    BY MR. ANDERSON:

22        Q    Because you don't know.

23        A    I can't answer.  I mean, you'd have to ask

24    the Marine Corps or the Navy.

25        Q    You don't know why they weren't disclosed.

1      A    No.

2      Q    Did that impact your study?

3      A    Yes.

4      Q    How?

5      A    Well, we had completed a review of what is

6  referred to as the Installation Restoration Program

7  sites, IRP sites, and that is described in an

8  ATSDR-approved report.  We call it Chapter C for

9  Hadnot Point.  And the data is very voluminous even

10 for that, and so we were under the impression that we

11 had all of the information that we needed to start

12 preparing the databases for the model.

13          And when we started QA'g/QC'g our own

14 report, we realized that had there were substantial

15 documents, underground storage tank documents, that

16 existed that we did not have possession of nor did we

17 know the quantity or volume of those documents.

18     Q    How did you make that discovery?

19     A    During our QA/QC process -- approximately in

20 January through March of 2009, we were QA/QC'g the

21 Chapter C report.  And in checking, for example, we

22 made list of reference in the text.  Okay.  You want

23 to make sure that you got that reference in the

24 reference section.  Okay.  So it jives.  We came

25 across mention of these particular documents that we

1    had never seen before, okay, in reading that.  And so

2    our contractor sent a request, requesting a half a

3    dozen of these documents.

4         Q    Was that Bob Fay?

5         A    That was Bob Fay.  Bob Fay.  And he asked me

6    if he could just do it.  And I say, Yeah, you don't

7    need to go through me.  Just go inform me of what

8    you're doing.  So he sent an e-mail request to the

9    folks at -- actually, Scott Williams who was at

10   headquarters.  And he sent that request down to the

11   environmental management division folks at Camp

12   Lejeune.  And, again, it's because we identified half

13   a dozen, say, documents.  They turned out to be UST

14   documents that we mad mentioned or had reports on but

15   we had never seen, the actual document.

16              And so they sent them, one or two.  And then

17   I see these e-mails going back and forth.  Well, this

18   document is too large to send by e-mail.  Do you have

19   an FTP site?  Back and forth.  And can you burn it on

20   a CD?  And it became apparent that the person Mr. Fay

21   was in contact with was not excited about having to

22   do document after document -- you know, send it by

23   e-mail or figuring out a way to either hard -- print

24   it off and mail it or whatever.

25              So she said, Why don't I just give you

1    access to a Web portal, okay, and you can download

2    whatever you want.  And that's the first -- and that

3    was right around March of 2009.  That's the first

4    that we had heard of a Web portal specifically

5    dedicated towards -- for underground storage tank

6    documents and information.

7         Q    Did you ever come to learn why you weren't

8    told about those benzene documents until then?

9         A    No.

10        Q    The existence of leaking underground storage

11   tanks, did that have, you know, an impact on your

12   work in terms of your modeling the exposure

13   assessment?

14        A    Not on the -- at this point, not on the

15   modeling.  And we're talking about March 2009?

16        Q    Uh-huh.

17        A    At that point, not on the modeling work.

18        Q    It was more the data collection.

19        A    It forced us to now put Chapter C as only

20   the installation restoration program sites and make

21   another Chapter D of underground storage tank.

22        Q    And did it ultimately add to the complexity

23   of the model by virtue of the fate and transport

24   characteristics of benzene?

25        A    Would not add to the complexity of the

1   model.  It would make the model take into account all

2   information that's available.

3       Q     Now, I understand that you concluded that

4   approximately 1.2 million gallons of fuel is or may

5   be missing, having leaked out of various tanks at

6   Hadnot Point and Holcomb Boulevard.

7             Is that accurate?

8       A     That is not our conclusion.

9       Q     What is that based on?  Whose conclusion is

10  that?

11            MR. BAIN:  If I can object at this point.

12        And preliminary for purposes of whether it -- a

13        certain privilege.  Has there been a conclusion

14        reached about that?

15            THE WITNESS:  No.  No conclusion has been

16        reached.

17            MR. BAIN:  So to the extent that you're

18        asking him about a conclusion about that, I'm

19        going to object and instruct him not to answer

20        because it's a deliberative process.

21            MR. ANDERSON:  Okay.  I'm not sure I

22        understand the basis for a claim of privilege.

23        But let me just ask a few questions and try to

24        trench around it a little bit and see if I need

25        to worry about it.

1   BY MR. ANDERSON:

2       Q    Are you telling me that you all are still

3   studying how many gallons of fuel may be missing?

4       A    Yes.

5       Q    Okay.  Is part of the reason why you don't

6   know that yet, the fact that the Department of the

7   Defense and the Marine Corps didn't tell you all

8   about the new electronic portal until March of 2009?

9       A    That is part of it.

10      Q    When do you expect to have an answer to how

11  much benzene was -- how much fuel and how much

12  benzene got into the water for those folks?

13      A    We are projecting or estimating at this

14  point that our water modeling will be complete

15  between December of 2011 and March 2012.

16      Q    Well, when do you think you'll have an

17  answer for how much fuel was lost?

18      A    The same time.

19      Q    Is benzene a known human carcinogen?

20      A    Yes.

21      Q    How does the fact of leaking underground

22  storage tanks affect your exposure assessment?  Does

23  it affect it beyond what we have already talked

24  about?

25      A    You mean the data itself?

1       Q    Well, just the fact that over at Hadnot

2   Point and Holcomb Boulevard you now have a

3   substantial quantity of benzene apparently that's

4   going be found in the water, does that affect your

5   assessment of people's exposure and their --

6       A    That would be for the epidemiologist to

7   address.

8       Q    Is Camp Lejeune a Superfund site?

9       A    Camp Lejeune is a Superfund site, an NPL

10  site -- NPL site.

11      Q    National Priority List?

12      A    National Priority List site.

13      Q    Is that the same thing as what people call

14  Superfund?

15      A    Yes.

16      Q    And what does it mean exactly to be on the

17  National Priority List?

18      A    Well, EPA conducts an analysis to evaluate

19  the hazard and looks at different pathways, and

20  they've got some scoring mechanism.  And then a site

21  has to be proposed for inclusion on the NPL list or

22  Superfund site.  They announce it in the federal

23  register, and then it's either put on or not put on.

24      Q    It has to be bad enough to be put on it?

25      A    It has to have a certain hazard ranking.

1     Q    Is it true that CERCLA applies to those

2  sites?

3     A    To NPL sites?

4     Q    Yeah.

5     A    Yes.

6     Q    And, to your knowledge, does CERCLA require

7  that any documents regarding a release of

8  contaminants at an NPL site be made public?

9          MR. BAIN:  Objection; lack of foundation.

10          THE WITNESS:  I'm not CERCLA expert, legal

11      expert.

12  BY MR. ANDERSON:

13     Q    You don't know the answer?

14     A    I don't know.

15     Q    Have the benzene documents on that

16  electronic portal been released to the public?

17     A    Be more specific, I guess.

18     Q    Sure.  You told me before that in March 2009

19  Bob Fay became aware of the existence of an

20  underground storage tank, electronic portal, and that

21  contained substantial documents previously not

22  disclosed to the ATSDR in the course of its review.

23          Have those documents been made public?

24     A    Not -- a substantial number of them have

25  not -- a substantial number of them have not.

1      Q      Why?

2      A      Well, we were provided documents by the Navy

3  or Marine Corps under what they call, for official

4  use only, classification, which means we can use them

5  as we warrant.  But in order to release them, either

6  as references in a report like this or to the public,

7  we have to ask the Navy or Marine Corps to allow us

8  to release them.

9      Q      Have you asked to be allowed to release

10 those documents?

11     A      Yes, we have.

12     Q      What was the response?

13     A      The response was that they would have to

14 assign somebody to review the documents and see what

15 they needed to or not needed to redact and that they

16 would get back to us.

17     Q      Why would they want to redact stuff from the

18 benzene-related documents?

19             MR. BAIN:  Objection; lack of foundation.

20             THE WITNESS:  I'm not a lawyer.  That gets

21        into the legal --

22 BY MR. ANDERSON:

23     Q      You don't know?

24     A      I don't know.

25     Q      You don't know what part of it that they

1   want to hide?

2           MR. BAIN:  Objection.

3           MR. ANDERSON:  Well, that's what redacting

4       is, isn't it?  You block -- look at this one.

5       Look at this.  You block this out, right?  Isn't

6       that what it is?

7           MR. BAIN:  Or following the law, the Privacy

8       Act, et cetera.

9           MR. PANGIA:  So nobody sees it.

10  BY MR. ANDERSON:

11      Q    You don't know which part of it they want to

12  redact.

13      A    They have not indicated what they plan to or

14  plan not to redact.

15      Q    You just know it's going to take a while.

16      A    They said -- they asked us back in January

17  when we needed them by.  We said August of 2010.  And

18  I sort of checked on that request a couple of months

19  ago, and they said August 2010.  So we are assuming

20  that is what they are going to stick by.

21      Q    So you told me before, you know, you

22  can't -- you can't cite documents in your report

23  until they have been made public.

24           So presumably until you get those documents

25  redacted and given to you, you can't come out with

1    your report; is that fair?

2         A    We can come out with the report.  The issue

3    is on scientific integrity.  Anyone has the right to

4    ask us for any of the reference material, and we need

5    to be able to produce it so they can reproduce our

6    analysis or whatever.  And so if we can't use a

7    reason, well, we're not allowed to release a certain

8    document that from a scientific -- as I said --

9    integrity standpoint, that does not hold to the --

10   any, you know, water.  No pun intended.

11        Q    So, you know, your report -- your report

12   can't come out until they review their documents and

13   redact whatever they're going to redact.

14        A    The Chapter D report, which is UST, and the

15   model, the Chapter C report, which is the

16   installation/restoration program sites, is, in fact,

17   in the process of being published.  That's using a

18   different set of files that are public.

19        Q    All right.  But the other reports can't be

20   published until --

21        A    That is correct.

22        Q    -- the documents are reviewed, redacted, and

23   finally furnished.

24             Has anybody besides the ATSDR been asking

25   for those documents to be released to the public?

1      A      Yes.

2      Q      Who?

3      A      The community assistance panel.  The CAP,

4      the Camp Lejeune committee assistance panel.

5      Q      And that's a group of citizens who are

6      involved in the ongoing study of Lejeune?

7      A      They are not involved in the study itself.

8      They are a citizens group made up by former or past

9      Marines.  And they -- at times, we look to them to

10     advise either -- or provide input to us, direction of

11     the study or questions we may have specific to

12     Lejeune.  Since obviously the former Marines have

13     been at Lejeune, they may have specific questions

14     about that.

15     Q      Are you aware of any senators demanding the

16     release of those documents to the public?

17     A      I'm aware of discussions with Senators Burr

18     and Hagan.  I'm not aware of a specific order or

19     letter or -- that.

20     Q      Just to clarify, are we to understand that

21     as of now the ATSDR has some of the documents from

22     that electronic portal that have not been made

23     public?

24     A      We have all of the documents listed in an

25     index provided to us this year in March 2010, that

1    lists all of the documents, and we have all of the

2    UST documents in that portal.

3          Q     Okay.  And can you describe for me the types

4    and categories of documents that are on that list,

5    that you're aware of.

6          A     They are consulting reports assessing

7    different points of contamination actually all over

8    the base, not just what is relevant to us, in other

9    words, of all of Camp Lejeune.

10         Q     Including Tarawa Terrace?

11         A     Yes.

12         Q     Okay.  Those are documents you were not --

13   obviously were not aware of at the time you completed

14   your Tarawa Terrace model?

15         A     No.  Actually on the DVDs and in Chapter E,

16   there are underground storage tank documents for

17   Tarawa Terrace specifically; 30 or so, maybe, 50.

18   And they're on the DVDs.  At the time, though, we did

19   not make the connection and we were not informed that

20   they were taken from an underground storage tank

21   portal.  We just asked about underground storage tank

22   documents.

23              We work on Tarawa Terrace specifically

24   because of the benzene hits that we saw, and they

25   provided us some of these documents.  They were never

1  identified as coming from an underground storage tank

2  Web portal or a possible --

3      Q    And the index with all of the documents for

4  that portal, that's something that you currently

5  possess.

6      A    Yes.  We received that in March of 2010.

7      Q    And looking through those benzene-related

8  electronic portal documents yourself, is there

9  anything that you see that seems to be missing from

10  what you've gotten?

11      A    We are still going through that because, as

12  I said, that portal provides documents not just for

13  Hadnot Point, Holcomb Boulevard, and Tarawa Terrace,

14  but also other areas of the base like the air

15  station, the rifle range, and all that.  So we first

16  have had to separate out those that are pertinent to

17  our area.

18      Q    So the answer is:  At this point, we don't

19  know whether anything is missing or not.

20      A    We have a complete set for the portal.

21      Q    Let me give you a for instance.

22      A    Okay.

23      Q    For example, you know, the contractor

24  progress reports for the firm Environmental Science

25  and Engineering?

1      A     Right.

2      Q     Did you notice that some of those are

3   missing, that is, the progress reports from August

4   '84 on?  Have you found those?

5      A     I'm really not aware of such things as

6   progress reports.  Again, we are still

7   inventorying -- our contractor is still inventorying

8   all of the documents.  So --

9      Q     You don't know what's missing?

10     A     I don't know what -- other than the

11  technical consulting-type reports, annual monitoring

12  reports, things like that.  When you get down to

13  progress reports, I'm not specifically aware that, in

14  fact, they were even part of that or that -- you

15  know, how many there should be or should not be.

16     Q     Yeah, there were monthly reports from a firm

17  called Environmental Science and Engineering.  And,

18  you know, I'm aware that the report dated July 6th,

19  1984, states that the firm had sampled and was to

20  test immediately thereafter Hadnot Point Well 602.

21  And the August report, if you look at the earlier

22  reports, the way it worked was, they sample one month

23  and report the next.

24         The August 1984 result -- report would have

25  shown the results of that Hadnot Point 602 test

1    which, you know, based on what you know as you sit

2    here now, it would have shown benzene, right?

3        A    Yes.

4            MR. BAIN:  Objection.

5    BY MR. ANDERSON:

6        Q    The answer was yes, wasn't it?

7            MR. BAIN:  Same objection.

8            MR. ANDERSON:  Did you get his answer?

9    Okay.

10   BY MR. ANDERSON:

11       Q    And so, you know, I'm puzzled to learn that

12   the August 1984 progress report and actually all of

13   the subsequent progress reports from Environmental

14   Science and Engineering are missing from the set.  I

15   just want -- my only question is:  Have you noted

16   that at this point?

17       A    I personally have not noted that.

18       Q    You're not aware.  This is the first time

19   you're hearing it.

20       A    Yes.

21       Q    All right.  Fair enough.

22            Now, there were yearly summaries you

23   mentioned a minute ago.  There was one Camp Lejeune

24   water CLW dock, 1406, which I'm now going to mark out

25   of sequence as Exhibit 9 because I skipped a number

1    earlier and our good court reporter told me that.

2              (Plaintiff's Exhibit Number 9 was marked for

3         identification.)

4    BY MR. ANDERSON:

5         Q     This is CLW1406.  It's Exhibit 9, and it's a

6    yearly summary that showed benzene at 2500 parts per

7    billion as of November 1985, on the second page

8    there, CLW1407.  Shouldn't there be data sheets

9    associated with this document?

10        A     Yes.

11        Q     Okay.  Have you found those?

12        A     No.

13        Q     And then I noted on the cover letter, it

14   says that these enclosures indicate no immediate

15   concern.

16              Did I read that correctly?

17        A     That is correct.

18        Q     And then it goes on to talk in paragraph 3

19   about the cost.  It says:  The cost of analysis of

20   the sampling shown on these enclosures was

21   approximately -- looks like 20 to 30 thousand.  I

22   can't read it -- funding by the Atlantic provision.

23   Naval facilities engineering command of this analysis

24   is anticipated to end not later than the end of this

25   fiscal year.  And, of course, we're in 1986 here.

1    NREAD has entered 120,000 in the 1988 POM to reflect

2    the overall loss of funding for laboratory analysis.

3            And then in paragraph 4:  It is apparent

4    that careful planning will be required to absorb this

5    additional cost and to hold actual sampling to the

6    essential minimum.

7            Did I read that correctly?

8        A    Yes.

9        Q    And then it goes on to say in the next

10   paragraph:  Accordingly, the environmental engineers

11   required to -- and then it's blanked out with a pen

12   and redacted.

13           Have you seen an unredacted copy of this?

14       A    Not this specific document.

15       Q    I mean, do you know what it says underneath?

16       A    No, I do not.  I do not.

17       Q    And at -- you know, at 2500 parts per

18   billion of benzene human carcinogen, is that of

19   concern to you?

20           MR. BAIN:  Objection to form.

21           THE WITNESS:  That would really -- again, a

22       toxicologist would --

23   BY MR. ANDERSON:

24       Q    Could convey about this.

25       A    Yeah.

1      Q    Go ahead.

2      A    I was going to say, these are -- this is a

3  CLW, but it's actually also a CERCLA document.  We

4  have no unredacted CERCLA documents.  In other words,

5  what they provided us is what we published.

6      Q    And it's redacted.

7      A    Okay.

8      Q    So, again, your data is only what you get

9  from the -- from the defendant at Department of the

10 Navy and the Marine Corps.

11     A    That's right.

12     Q    I mean, you're relying on them.

13     A    That is correct.

14     Q    Right.  We talked before about the 10,000-

15 gallon underground storage tank that was near one of

16 the Tarawa Terrace -- near the school over there.

17 And I just -- I forgot to ask you at the time we were

18 talking about it.

19          But when the children went to school at

20 Tarawa Terrace, they drank the same water from that

21 same Tarawa Terrace water system the whole time they

22 were at school, right?

23     A    That is correct.

24     Q    So that water would have had the same

25 contaminants that are listed in your reports?

1     A    That is correct.

2     Q    Did you see where the Department of the Navy

3  or the Marine Corps took any step between 1980 and

4  1985 to make sure that the school kids received

5  bottled water instead of continuing to drink the

6  water that the Marine Corps was aware had these

7  contaminants?

8     A    Give the same answer I did that you asked

9  before, of the only thing we note is the memo.

10     Q    Claiming it was a trace amount.

11     A    Of that.  And no wells were shut down.

12     Q    So the answer would be, no, you saw no

13  bottled water brought into the school.

14     A    Well, I have no knowledge of any mention of

15  bottled water.

16     Q    With regard to the Tarawa Terrace water

17  system, water treatment system, have you ever heard

18  of people claiming that there were pipes for that

19  water system that used vinyl linings inside of

20  asbestos pipes, linings that had been glued in with

21  glue that had been thinned by PCE?

22     A    No, I have not.

23     Q    Did you ever investigate how the pipes were

24  constructed?

25     A    Do you mean the materials that the pipes are

1  made of?

2      Q    Yes.

3      A    Well, yes.  We did that when we did the

4  water distribution system model, and that's the water

5  that distributes from the water treatment plant.

6  Through the pipes, we classify the types by what

7  types of materials.  We need that information to

8  assign certain properties in the -- for the

9  distribution model.  And they -- so we do have that

10  information.

11      Q    And, in fact, the pipes were not using vinyl

12  linings, were they?

13      A    The pipes were made from both cast iron and

14  PBC.

15      Q    Oh, so there was probably vinyl chloride

16  piping in --

17      A    The newer pipelines -- they replaced

18  pipelines -- as they replaced older cast iron, they

19  tend to replace them with -- sometimes with PBC.

20      Q    Did you consider that as a potential source

21  of additional contamination?

22      A    No.

23      Q    Did you consider the glue that would be used

24  to glue those pipes together as a potential source?

25      A    No.

1      Q    Regarding the design of the Tarawa Terrace

2    treatment plant itself, if you had a sample showing

3    contaminated water coming out of the treatment plant,

4    what would that tell you about the contamination?

5      A    It would tell you that that's the same

6    amount that anyone within Tarawa Terrace within a

7    week would have received, because at Tarawa Terrace

8    all of the wells are mixed and then it goes into

9    the -- mixed in a raw water tank and then it goes

10   into the treatment process.

11          So if you have a sample after the treatment

12   process of a certain concentration, we, in fact, in

13   Chapter I show the model results that after a week or

14   so, the concentration stabilizes throughout the

15   entire distribution system to equal the concentration

16   at the water treatment plant.

17     Q    So if the water coming out of that water

18   treatment plant is contaminated, as you found, in

19   order to figure out where the contamination was

20   coming from, you would have to go back behind the

21   water treatment plant to the individual wells for

22   testing.

23     A    That is correct.

24     Q    Do you know why that wasn't done in 1980?

25          MR. BAIN:  Objection; lack of foundation.

1          THE WITNESS:  Be more specific.

2    BY MR. ANDERSON:

3          Q    Was it done in 1980?

4          A    At Camp Lejeune?

5          Q    Yes.

6          A    In 1980, throughout North American, people

7    were not specifically testing for volatile organics

8    anywhere.

9          Q    After they were alerted to them.

10         A    Oh, okay, okay.

11         Q    And alerted that these things were in the

12   finished water.

13              To know the source and know which well or

14   wells was causing the contamination to be brought

15   into the treatment plant, you would have, would you

16   not, to test individual wells?

17              MR. BAIN:  Objection; lack of foundation.

18   BY MR. ANDERSON:

19         Q    Isn't that logical?

20              MR. BAIN:  Objection.

21              THE WITNESS:  You would have to ask the

22         folks at Camp Lejeune because that would be part

23         of the, say, environmental management division or

24         order of quality branch.

25   BY MR. ANDERSON:

1    Q    I would have to ask them why they didn't do

2  certain things.

3    A    Yes.

4    Q    But in terms of knowing where that

5  contamination was coming from, your model proves

6  beyond any doubt that if we want to know, we have to

7  look back of the treatment plant in the system

8  because all of the wells go in there and mix

9  together.  We have to look at individual wells, don't

10 we?

11          MR. BAIN:  Objection to form; lack of

12      foundation.

13          Go ahead.

14          THE WITNESS:  I would say first that the

15      model presents evidence within the reliability of

16      the model, that certain wells were contaminated

17      and that is what drove the contamination at the

18      water treatment plant.

19          MR. ANDERSON:  Okay.  If we can just have a

20      few minutes and maybe we can go off the record

21      for a second.

22          (A brief break was taken.)

23 BY MR. ANDERSON:

24    Q    Dr. Maslia, if there were another source of

25 trichloroethylene beyond what you're aware of with

1   the ABC Dry Cleaners as a breakdown product of PCE of

2   substantial quantities, is that something that you

3   would want to know about?

4       A    Yes.

5       Q    Do you know of any other source -- have you

6   been told about any other source of substantial

7   quantities of trichloroethylene in the Hadnot Point/

8   Holcomb Boulevard area?

9       A    In the Hadnot Point?

10      Q    Yeah.

11      A    Oh, okay.  Because you said ABC Cleaners.

12           MR. BAIN:  Are you talking about Tarawa

13      Terrace?

14  BY MR. ANDERSON:

15      Q    It's a different question now.

16      A    Okay.  Well, we know about sources of

17  trichloroethylene at Hadnot Point.

18      Q    What do you know?

19      A    Well, there is an entire industrial area.

20  And as with any industrial area, there's going be,

21  you know, industrial solvents, TCE being one of them,

22  PCE being another.  They may, in fact, have used --

23  because there was an on-base dry cleaner near in the

24  Hadnot Point area, they may have used both compounds,

25  both industrially and in the dry cleaners too.  So we

1    are aware of TCE at the Hadnot Point.  And there's

2    obviously a source or sources for that, and that's

3    what we -- we'll be relying on the model to help

4    refine that understanding.

5          Q     Are you aware of disposal of contaminated

6    used -- trichloroethylene solvents in the Hadnot

7    Point area?

8          A     Yes.  There is a landfill there as well, and

9    they used disposable practices at the time to dispose

10   of, you know, industrial waste and stuff like that.

11         Q     What disposable practices are you aware of

12   with respect to the solvents at Hadnot Point?

13         A     Well, all I know in a general sense is that

14   that landfill was used to dispose of, you know,

15   solvents and things of that nature.

16         Q     Are you talking about the volatile organic

17   compounds?

18         A     Yes.

19         Q     And you talking about pouring drums of used

20   trichloroethylene solvents into a hole in the ground?

21   What are you talking about?

22         A     It could be just -- because there's a -- in

23   that area, they, you know, repair vehicles and all of

24   that and all of the military equipment.  So it could

25   be just waste from that, and they needed to dispose

1    of it.  How they disposed of it, we don't know.  It's

2    a complexity of challenge, unlike the Tarawa

3    Terrace -- or the ABC Dry Cleaners where we know

4    there was like a sledge pit and that's where they put

5    it in there.  We don't have specific documentation as

6    to the actual practice of, you know, from point A to

7    point B to point C of what they did with the -- with

8    the waste product.

9        Q    So as far as Hadnot Point goes, as you sit

10   here today, you don't know anything about a sledge

11   pit for TCE waste.

12       A    No.

13       Q    And have you asked for documents that would

14   have revealed the existence of that -- such a pit?

15       A    We have asked for all documents related to

16   Hadnot Point/Holcomb Boulevard and to assist us to

17   reconstruct historical concentrations.

18       Q    Have you been advised, as you sit here

19   today, about efforts to spray the used

20   trichloroethylene waste into the trees along the edge

21   of the base?

22       A    I have not heard that previously.

23       Q    How about burning of the trichloroethylene

24   sledge waste?

25       A    There are some burn pits that I'm aware of,

1    just in the documents.

2        Q    You have seen documents that confirm the

3    presence of those burn pits, haven't you?

4        A    Yes.

5        Q    Have you seen documents that confirm the

6    burning of trichloroethylene waste?

7        A    Not myself personally, I have not.

8        Q    Have people described to you such documents?

9        A    Former -- not documents.  They have

10   described activities.  Members of the camp have.

11       Q    Okay.  And how do you know about that?

12       A    Well, just in general discussions.  As we

13   were formulating our approach to Hadnot Point and

14   what areas we should or should not consider, we had

15   selected three areas to look at in our water model

16   for the Hadnot Point/Holcomb Boulevard area.  And

17   there are multiple contamination sites in those

18   general areas.  And we had to limit our analyses both

19   because of time and funding and to try to get the

20   epidemiological study concluded.  So we limited it to

21   three major areas that we felt would address the

22   epidemiological study and the historical exposures.

23       Q    What three areas?

24       A    The Hadnot Point industrial area, HPIA; the

25   Hadnot Point landfill; and then what we were

1  referring to as the HP645 area, which is actually at

2  Holcomb Boulevard.  It's Building 645, associated

3  with Water Supply Well 645.

4        Q     Why there?

5        A     Benzene.

6        Q     You said you were aware of burning of -- I

7  think you said you were aware of burning of

8  trichloroethylene sledge from people at the camp, in

9  conversations or something.

10       A     No.  I was just aware that they used a,

11  quote, burn pit to dispose of waste products.  I

12  don't have -- I have not read specific documents, and

13  I have no specific knowledge of specific practices.

14       Q     Have you seen the burn pits?

15       A     I have not, no.

16       Q     The funding for the ATSDR studies -- who

17  controls what funding you guys get for what studies?

18       A     We put in a request along with our Division

19  of Health studies because we are basically technical

20  consultants.  My division is.  And so they put in how

21  much total money the agency needs.  And then we put

22  that in each years what we call annual plan of work,

23  the APOW.  Okay?  It's what it's called.  And we list

24  what we are going to do in general terms.

25             You know, we've got a water modeling

1    component.  We've got a health study component.  And

2    that's what we request from the Department of -- now

3    it's the Department of Navy.  At one point, it was

4    the Marine Corps.  It switches back and forth.

5        Q    So you -- what you get to study and how much

6    money you get to study is actually controlled by the

7    Department of the Navy?

8        A    Not necessarily what we get to get.  But

9    they either approve our budget or don't approve our

10   budget.  But, yes, we have to ask -- the money comes

11   through the Department of Navy.

12       Q    Are your analyses of any of the Holcomb

13   Boulevard and Hadnot Point areas that you have told

14   me you're studying -- is any part of that work now

15   complete, complete enough to tell me about?

16       A    No, no.  Not -- it's in draft or -- I forget

17   the exact label or term for it.  But it's -- what I

18   would consider in draft form, has not gone through

19   any kind of review.

20       Q    Peer review?

21       A    Peer review, agency policy clearance review,

22   or anything like that.

23       Q    All right.  Do you anticipate that you will

24   personally look through the documents that we

25   discussed today about Hadnot Point/Holcomb Boulevard

1    are, for instance, documents having do with burning

2    TCE and all that kind of thing?

3         A    Now that you mentioned it, I will look at

4    them.

5         Q    And the documents relating to pouring it

6    into the ground, will you look at those too?

7         A    It's really a generalized term only

8    because -- I say that because, again, we did not --

9    we do not have specific documentation of their

10   operational practices, in other words.  So it's hard

11   to ask for information or go in and search and say,

12   you know, pour in TCE into the ground.

13              You're not going to find -- even with the

14   documents we have, it's more of a discovery process

15   of reading documents and saying -- or if it's brought

16   to our attention -- I say former Marine -- that this

17   is what happened, then we may try to find a document

18   that supports that type of operation.

19        Q    If you searched for TCE and pit, can you run

20   a search like that?

21        A    We can run a search on the available CERCLA

22   administrative record documents that's on the DVD in

23   Chapter A.

24        Q    Okay.  You mentioned that if a Marine told

25   you that they were disposing of this by pouring it in

1  sledge pits, then you could go and look for

2  documentation to support that report.

3       What have you done to interview about that

4  issue?

5       A    About the sledge pit?

6       Q    Yeah.

7       A    I'd really have to ask my other staff if

8  they've had conversations with the -- with the former

9  Marines, only because we're not at the stage of

10  looking at the transport of contaminants at Hadnot

11  Point.  We are still working on the actual -- just a

12  groundwater flow model part.

13       Q    I understand.

14       A    And when we get to that part, it would be

15  important to identify how and when sources originate,

16  because we have to tell the model where the source is

17  or the frequency of the source to do that.  So we're

18  not at that point yet.

19       Q    But you will get there, and that information

20  would be important.

21       A    That information would be important.

22            MR. ANDERSON:  Okay.  Anything else?

23            MR. BAIN:  I just have a few questions of

24       you, Mr. Maslia.

25                      EXAMINATION

1  BY MR. BAIN:

2      Q    First of all, counsel gave you this notice

3  to the residents of Tarawa Terrace, which is Exhibit

4  Number 8, and asked you about the description in

5  here.  I think the word that was used was minute

6  quantities of the contaminants.

7           Do you remember that?

8      A    Yes.  I remember that conversation.

9      Q    And counsel asked you whether that was

10  correct or not.  And I believe you said it was not

11  correct based upon the maximum contaminant levels for

12  those contaminants.  Is that right?

13           MR. ANDERSON:  Object to form.

14           THE WITNESS:  Yeah.  I think we used the

15      word "trace amounts," and I said I would not

16      consider that a trace amount.

17  BY MR. BAIN:

18      Q    And that was based upon what the maximum

19  contaminant levels were for those chemicals; is that

20  right?

21           MR. ANDERSON:  Object to form.

22  BY MR. BAIN:

23      Q    That was the basis for your answer?

24      A    Yes.

25      Q    And as of the date of this particular

1    document, 1985, had a maximum contaminant level been

2    establish for either trichloroethylene or

3    tetrachlorethylene?

4          A    No.

5          Q    Okay.  Another subject that I want to ask

6    you about was, there was a lot of discussion about

7    the documents that had been provided you by the

8    Marine Corps and the Department of the Navy.

9               Have there ever been any situations where

10   you were aware of a particular document or a set of

11   documents and requested it from the Navy or the

12   Marine Corps and they refused to provide it to you?

13         A    No.  They have never refused to provide us

14   documents that we have specifically requested.

15         Q    And finally, counsel just asked you about

16   documentation of past practices with respect to the

17   Hadnot Point industrial area, of that area.

18              And you're aware, aren't you, that that area

19   has been studied as part of the CERCLA process; is

20   that right?

21         A    That's correct.

22         Q    And that would include a review of

23   documentation and, if necessary, interviews with

24   people?

25         A    Right, yes.

1     Q    And that is something that you would rely

2  upon in looking into that question for the purposes

3  of your model at the Hadnot Point area?

4     A    Yes.  It would be in, say, remedial

5  investigation reports and/or feasibility studies,

6  that they typically would go back through

7  historically and describe what practices may have

8  occurred or did not occur and document that.

9     Q    Those documents which were produced as part

10  of the CERCLA process or, as the military called it,

11  the installation/restoration program, those are made

12  part of the administrative record; is that right?

13     A    That is correct.

14     Q    And as you mentioned previously, that record

15  is publicly available.

16     A    Yes.

17         MR. BAIN:  Okay.  That's all of the

18     questions that I have.

19         MR. ANDERSON:  I just have one or two more

20     last questions.

21                FURTHER EXAMINATION

22  BY MR. ANDERSON:

23     Q    Would you consider the amounts that were

24  reported in the Grainger report to be a trace?

25     A    The concentrations of -- I just look at this

1    letter again just to make sure we are -- the ones

2    where you have an indication of less than one or one

3    would be considered trace amounts.

4         Q    And the others?

5         A    And the others would not be considered trace

6    amounts.

7         Q    And what was the date of the Grainger

8    document?

9         A    The date is August 10th, 1982.

10        Q    And what was the date of the memo saying it

11   was a trace?

12        A    April 1985.  I can't read the exact date on

13   here.

14             MR. ANDERSON:  Thank you.  That's it.

15             MR. BAIN:  The last thing I would like to --

16        you have an opportunity read and sign the

17        deposition, and I would request that you do that.

18             THE WITNESS:  What?

19             MR. BAIN:  Read the deposition and sign it.

20             THE WITNESS:  Oh, sure.

21             (Deposition concluded at 1:50 p.m.)

22                            *   *   *

23

24

25

1                    C E R T I F I C A T E

2

3           I hereby certify that the foregoing
    transcript was reported, as stated in the caption;
4   that the witness was duly sworn and elected to
    reserve signature in this matter; that the
5   colloquies, questions and answers were reduced to
    typewriting under my direction; and that the
6   foregoing pages 1 through 186 represent a true,
    correct and complete record of the evidence given.
7           The above certification is expressly
    withdrawn and denied upon the disassembly or
8   photocopying of the foregoing transcript, unless said
    disassembly or photocopying is done under the
9   auspices of Professional Court Reporters, LLC,
    Certified Court Reporters, and the signature and
10  original seal is attached thereto.
            Pursuant to Article 10B of the Rules and
11  Regulations of the Board of Court Reporting of the
    Judicial Council of Georgia, I make the following
12  disclosure:  That I am a Georgia Certified Court
    Reporter, here as an independent contractor for
13  Professional Court Reporters, LLC; that I was
    contacted by the offices of Professional Court
14  Reporters, LLC to provide court reporting services
    for this deposition; that I will not be taking this
15  deposition under any contract prohibited by Georgia
    law; and that I am not disqualified as a reporter for
16  a relationship of interest under the provisions of
    O.C.G.A. 9-11-28(c).
17          This, the 20th day of July, 2010.

18

19

20                    _____

                      AMY L. DUNNING, B-2079
21

22

23

24

25

```
 1              E R R A T A   S H E E T

 2

                Pursuant to Rule 30(e) of the Federal Rules
 3      of Civil Procedure and/or O.C.G.A. 9-11-30(e), any
        changes in form or substance which you desire to make
 4      to your deposition testimony shall be entered upon
        the deposition with a statement of the reasons given
 5      for making them.

 6              To assist you in making any such
        corrections, please use the form below.  If
 7      supplemental or additional pages are necessary,
        please furnish same and attach them to this errata
 8      sheet.

 9
                            - - -
10

11

                I hereby certify that I have read the
12      foregoing deposition and that said transcript is true
        and accurate, with the exception of the following
13      changes noted below, if any:

14

15

        Page_____/Line_____/Should Read:_____
16
        _____
17
        Reason:_____
18

19      Page_____/Line_____/Should Read:_____

20      _____

21      Reason:_____

22
        Page_____/Line_____/Should Read:_____
23
        _____
24
        Reason:_____
25
```

1    Page_____/Line_____/Should Read:_____

2    _____

3    Reason:_____

4    Page_____/Line_____/Should Read:_____

5    _____

6    Reason:_____

7

8    Page_____/Line_____/Should Read:_____

9    _____

10   Reason:_____

11   Page_____/Line_____/Should Read:_____

12   _____

13   Reason:_____

14

15   Page_____/Line_____/Should Read:_____

16   _____

17   Reason:_____

18

19   Page_____/Line_____/Should Read:_____

20   _____

21   Reason:_____

22   Page_____/Line_____/Should Read:_____

23   _____

24   Reason:_____

25

1    Page_____/Line_____/Should Read:_____

2    _____

3    Reason:_____

4
     Page_____/Line_____/Should Read:_____
5
6    _____

     Reason:_____
7

8    Page_____/Line_____/Should Read:_____

9    _____

10   Reason:_____

11
     Page_____/Line_____/Should Read:_____
12
13   _____

     Reason:_____
14

15   Page_____/Line_____/Should Read:_____

16   _____

17   Reason:_____

18

19                  _____

                    MORRIS L. MASLIA, P.E., D.WRE, DEE
20

21
     Sworn to and subscribed before me,
22   _____, Notary Public.

23   This _____ day of _____, 2010.

24   My Commission Expires:_____.

25