IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
Civil Action No.: 7:23-CV-00897

| | |
|---|---|
| IN RE: | ) |
| | ) |
| CAMP LEJEUNE WATER LITIGATION | ) |
| | ) |
| This Pleading Relates to: | ) |
| | ) |
| ALL CASES. | ) |
| | ) |
| | ) |

**PLAINTIFFS' LEADERSHIP GROUP'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE CERTAIN OPINIONS OF REMY J.-C. HENNET, PH.D.**

Pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 609 U.S. 579 (1993), and for the reasons that follow, the Plaintiffs' Leadership Group ("PLG") respectfully moves the Court to exclude certain opinions of Remy J.-C. Hennet, Ph.D.

### I. INTRODUCTION AND RELIEF SOUGHT

This motion seeks an order excluding certain opinions of Remy J.-C. Hennet, Ph.D., a geologist/geochemist/hydrologist and senior principal at S.S. Papadopulos & Associates (SSPA) who was hired by the U.S. Department of Justice (DOJ) to "evaluate the work that had been done by ATSDR." [Ex. 1, Hennet Deposition at 32:2-5; 35:20; 54:6-7]

Although Plaintiffs take issue with all of Dr. Hennet's opinions, Plaintiffs have filed – consistent with the case law – a targeted motion and will employ cross examination to address the remainder of their disagreements. Plaintiffs move to exclude Dr. Hennet's opinions regarding:

- Contaminant volatilization when water buffaloes are filled via the manhole;
- Alleged contaminant losses from disposal of spent spiractor solids, sand filter backwash water and suspended solids;

- "Anomalous" HP-634 contaminant concentration data; and
- "Representative" flow paths and travel time at TT-26.

## II. LEGAL STANDARD

Expert testimony is admissible only if the expert is qualified, the testimony is relevant, and the testimony is based on reliable scientific methodology. *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579, 594-95 (1993); Fed. R. Evid. 702. Factors that guide the reliability analysis may include: (1) whether a theory or technique can be (or has been) tested; (2) whether it has been subjected to peer review and publication; (3) its potential rate of error; (4) whether standards exist to control the technique's operation; and (5) the degree of acceptance of the methodology within the relevant scientific community. *Daubert*, 509 U.S. at 593-94; *Nix v. Chemours Co. FC*, No. 7:17-CV-189-D, 7:17-CV-197-D, 7:17-CV-201-D, 2023 WL 6471690, at *7 (E.D.N.C. Oct. 4, 2023). The objective of the reliability requirement is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). Responsive and rebuttal experts must demonstrate that they used reliable methodology both in forming their opinions and in critiquing those of Plaintiffs' experts. *In re Ethicon Inc. Pelvic Repair Systems Prod. Liab. Litig.*, MDL No. 2327, 2018 WL 11245148, *3 (S.D. W.Va. July 26, 2018); *see also Funderburk v. South Carolina Elec. & Gas Co.*, 395 F.Supp.3d 695, 716-17 (D.S.C. 2019). As the proponent of Dr. Hennet's testimony, DOJ has the burden of showing it to be reliable. Fed. R. Evid. 702 (requiring proponent to demonstrate "to the court that it is more likely than not" that, *inter alia*, "the testimony is the product of reliable principles and methods").

Another factor that courts consider in the reliability analysis is whether the expert

developed his opinions expressly for the purpose of testifying. *Daubert v. Merrell Dow Pharms, Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) ("One very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying."); Fed. R. Evid. 702, Advisory Comm. Notes (2000 Amendments); *Kadel v. Folwell*, 620 F.Supp.3d 339, 361 (M.D.N.C. 2022). "An 'expert' opinion is considered unreliable and inadmissible under *Daubert* where ... the expert has developed the opinions expressly for purposes of testifying in the case ....". *Wehling v. Sandoz Pharm. Corp.*, 162 F.3d 1158, 1998 WL 546097, at *5 (4th Cir. 1998) (unpublished).

### III. BACKGROUND OF DR. HENNET

Dr. Hennet has been working on Camp Lejeune-related matters for the Department of Justice since at least 2005. [Ex. 1, Hennet Deposition, at 25:14-24; 29:8-21] According to the DOJ,[1] all of Dr. Hennet's work related to Camp Lejeune for the past twenty years has been performed for the purpose of and/or in anticipation of litigation. DE-354 at 12-13; Ex. 3, 4/21/25 DOJ Letter, at 3.

Dr. Hennet's testimony has been previously excluded pursuant to Federal Rule of Evidence 702 on the grounds that it "was based on sheer speculation rather than sufficient facts or data and was not the product of reliable principles or methods." *United States v. Dico, Inc., et al.*, 265 F.Supp.3d 902, 971 n.33 (S.D. Iowa 2017). Several of Dr. Hennet's opinions in this case suffer from the same deficiencies.

---

[1] Plaintiffs suspect that Dr. Hennet worked on non-litigation matters too, including advising the Navy on matters including soil and water testing, as well as monitoring well locations, in years prior to and after 2005.

3

# IV. ARGUMENT

**A. Dr. Hennet's Opinion regarding Contaminant Volatilization through Water Buffalo Manholes is New (not in his Report), Speculative and Unreliable.**

Based on his deposition testimony, it appears that Dr. Hennet plans to offer an opinion regarding the amount of volatilization of the chemicals of concern when water buffaloes are filled via the manhole at the top of the water tank. Dr. Hennet has performed no calculations in support of this opinion; rather, he relies only on his observation of the filling of one water buffalo in February 2025, two months after his expert report was served in December 2024. This opinion should be excluded because it is not in Dr. Hennet's report and it is based on sheer speculation.

Water buffaloes are mobile tanks for the storage and transportation of drinking water for use in areas of the base not served by a water supply. Water buffaloes may be filled with water in more than one way. Prior to 1972, some of the Army Technical Manuals instructed to fill the water buffaloes through a filler pipe, which has a strainer. [Ex. 4, Sabatini Report, Water Buffalo Appendix, at 14][2] Beginning in 1972, the Technical Manuals instructed that the buffaloes should be filled through the manhole opening (after the cover is removed), which does not contain a strainer. *Id*. at 14 & 16-17 (instructions for M107s).[3] Certain models of water buffaloes were not even equipped with a filler hatch and strainer. *Id*. at 9-11 (describing the M149A1, which was manufactured as early as January 1968 and could only be filled through the manhole opening).

The calculations in Dr. Hennet's report only concern the filling of water buffaloes via the filler pipe with strainer, using a formula that comes from a publication regarding volatilization

---

[2] The instructions varied. For example, instructions for the WWII-era 250-gallon Tank Trailer included instructions for filling through both the manhole cover and the "bell strainer" (which was used when filling with a hand pump). [Ex. 4, Sabatini Report, Water Buffalo Appendix, at 4 (citing BRIGHAM_USA_0000043040)]

[3] Inventory records from 1968 establish that Camp Lejeune had 84 M107s at that time. [Ex. 4, Sabatini Report, Water Buffalo Appendix, at 19].

losses in showers. [Ex. 2, Hennet Report, at 5-40 – 5-41; Ex. 1, Hennet Deposition at 256:23-257:2] Dr. Hennet emphasized in his report the effect of the strainer on volatilization. *E.g., id*. at 5-40 (hypothesizing that volatilization would occur "through increased contact between water and air due to the forcing of water through a strainer that generates water jets and droplets that greatly increases the surface area of the water/air interface for COC [contaminants of concern] exchange to the tank air."). Dr. Hennet testified that filling through a manhole is analogous to filling a bathtub as opposed to a shower. *Id*. at 265:12-19.

Dr. Hennet observed the filling of a water buffalo via the manhole during his February 2025 Camp Lejeune site visit and then concluded based on his observations (with no calculations) that there would be "substantial loss that is comparable to what I calculated for the strainer. That's basically – I didn't do calculations, but I did for myself an evaluation of that." [Ex. 1, Hennet Deposition at 265:12-266:3; *see also* 121:16-20 ("I just basically thought about what I observed on February 11, especially under filling of the water buffalo that I witnessed. But I didn't write anything or I did not calculate anything."); 260:7-21 (describing the water buffalo filling on Feb. 11)]

Expert opinions and the basis for same must be stated in expert reports. Fed. R. Civ. P. 26(a)(2)(B) ("The report must contain (i) a complete statement of all opinions the witness will express and the basis and reasons for them…"). Dr. Hennet's failure to offer an opinion on the nature and extent of volatilization expected when a water buffalo is filled via the manhole warrants exclusion of his testimony on this basis alone. *See, e.g.*, *United States v. 685.76 Acres of Land, More or Less in Bethel Township, County of North Carolina*, No. 2:07-CV-2-FL, 2008 WL 11429304, at *2 (E.D.N.C., Mar. 21, 2008) (holding that defense expert reports failed to comply with Rule 26 and explaining that "the Rule envisions that the reports will disclose 'not only what

5

an opposing expert's opinions are, but also the manner in which they were arrived at, what was considered in doing so, and whether this was done as a result of an objective consideration of the facts, or directed by an attorney advocating a particular position.'").

Independently, Dr. Hennet's opinion regarding the nature and extent of volatilization via the manhole is not reliable. Dr. Hennet employed no methodology in support of his opinion other than his observation of the filling of one water buffalo in 2025. Dr. Hennet took no measurements, collected no data,[4] and performed no calculations in support of this opinion. The chemicals of concern cannot be seen with the naked eye; Dr. Hennet could not have seen them volatilizing. And to the extent that Dr. Hennet claims that any observed splashing or aeration equates to volatilization, Dr. Hennet has cited no authority, peer-reviewed literature, data or anything else that supports quantifying volatilization of any chemical based solely on a single visual observation.

Dr. Hennet should not be permitted to testify about the nature and extent of volatilization via manhole filling for the same reasons that the Supreme Court rejected the tire expert's testimony in *Kumho Tire*. Both Dr. Hennet and the expert in *Kumho Tire* employed a mode of analysis – visual inspection – that is subjective. *See Kumho Tire,* 526 U.S. at 155. As in *Kumho Tire*, Dr. Hennet has failed to identify other experts who use his methodology, nor has he cited to any articles or papers that validate his approach. *Id*. at 157. At bottom, as in *Kumho Tire*, the methodology of relying on a visual inspection is unreliable. "A reliable expert opinion must be based on scientific, technical other specialized *knowledge* and not on belief or speculation, and inferences must be derived using scientific or other valid methods." *Oglesby v. General Motors Corp*., 190 F.3d 244, 250 (4th Cir. 1999) (emphasis in original).

Relying on *Kumho Tire,* other courts have excluded expert testimony based solely on visual

---

[4] Dr. Hennet did time how long it took to fill the water buffalo, Ex. 1, Hennet Deposition at 260:7-21, but offers no analysis as to how that equates to quantification of volatilization.

6

Case 7:23-cv-00897-RJ    Document 374    Filed 04/29/25    Page 6 of 16

observations. *E.g.*, *Precision Fabrics Group, Inc. v. Tietex Int'l, Ltd.*, No. 1:13-CV-645, 2016 WL 6839394, at *8, (M.D.N.C., Nov. 21, 2016). Collecting cases, the court explained:

> First, it strains credulity to believe that anyone can measure near microscopic swelling of a 45-micron sized film. Second, even if Horrocks has such extraordinary vision, in this context its use is not proven to produce reliable results. *Ruffin v. Shaw Indus., Inc.,* 149 F.3d 294, 299 (4th Cir. 1998) (excluding the testimony of the plaintiff's expert on Rule 702 grounds because "[n]o organization, public or private, has been able to independently obtain consistent findings using the techniques employed by" the expert and his equipment). In some instances visual observation could produce a reliable result (such as when something changes color), but here Horrocks' testimony is no more than an *ipse dixit* declaration unsupported by testable, reliable science. *Durkin v. Equifax Check Servs., Inc*., 406 F.3d 410, 420–22 (7th Cir. 2005) (excluding expert testimony as "untestable say-so"); *BASF Corp. v. Sublime Restorations, Inc*., 880 F. Supp. 2d 205, 212–14 (D. Mass. 2012) (holding that an expert "eyeballing" the products at issue in a breach of contract case produced "an unknown error rate" and lacked reliability); *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 282–83 (S.D.N.Y. 2010) (excluding expert testimony that was "little more than conclusory say-so"); *United States v. Frabizio*, 445 F. Supp. 2d 152, 159 (D. Mass. 2006) (excluding expert's testimony distinguishing between real and digitally altered images because his methodology of visual observation was unreliable).

*Id*. Like the expert in *Precision Fabrics*, Dr. Hennet has failed to provide a scientific basis for his opinion regarding volatilization via manhole filling. Because Dr. Hennet's opinion is based on speculation rather than sufficient facts or data and is not the product of reliable principles or methods, it should be excluded. *See Small v. WellDyne, Inc*., 927 F.3d 169, 177 (4th Cir. 2019) ("Without testing, supporting literature in the pertinent field, peer reviewed publications or some basis to assess the level of reliability, expert opinion testimony can easily, but improperly, devolve into nothing more than proclaiming an opinion is true 'because I say so.'").

   **B. Dr. Hennet's Opinions regarding Contaminant Losses from Disposal of Spent Spiractor Solids, Sand Filter Backwash Water and Suspended Solids are Speculative and Unreliable and Should be Excluded.**

Dr. Hennet opines that "Disposal to waste of spent spiractor solids that contain COCs [contaminants of concern]" and "Disposal to waste of sand filter backwash water and suspended

7

solids that contain COCs" are two of "three main processes or operations that lead to the removal of COCs from the water supply during storage or treatment." [Ex. 2, Hennet Report, at 5-2] Dr. Hennet did not quantify these losses, but he suggests that the loss due to spent spiractor solids is "likely to be significant" and the loss due to disposal of backwash water is "non-negligible." Dr. Hennet applies no calculations and admits he has no data to support contaminant losses via these methods. *Id*. at 5-13. Instead, Dr. Hennet has provided his "best estimates" based on his "education and experience." *Id*.

Dr. Hennet's opinions regarding contaminant losses from disposal of spent spiractor solids, sand filter backwash water and suspended solids are not reliable. He employed no stated methodology other than estimations based on his education and experience. However, when an expert's opinion is based on the expert's experience, the expert must explain "'[1] how that experience leads to the conclusion reached, [2] why that experience is a sufficient basis for the opinion, and [3] how that experience is reliably applied to the facts.'" *SMD Software, Inc. v. EMove, Inc.*, 945 F.Supp.2d 628, 644 (E.D.N.C. 2013) (quoting Fed. R. Evid. 702 Advisory Committee's note (2000)). Nowhere in Dr. Hennet's report does he identify what experience he has that is related to contaminant loss from disposal of spent spiractor solids, sand filter backwash water and suspended solids. Dr. Hennet does not explain how his experience led to his conclusions or why his experience is a sufficient basis for his opinions, nor has he tied any of his experience to the facts of this case.[5]

Dr. Hennet cites Schwarzenbach (1993) as support for his proposition that a portion of COCs would precipitate or sorb on the minerals in spiractor solids and be removed from the water,

---

[5] Dr. Hennet also does not explain how his education informed his opinion. Dr. Hennet is not a civil, environmental or water resources engineer – in fact, he is not an engineer of any kind. [Ex. 1, Hennet Deposition at 54:6-10 & 23]

8

but the cited text does not support his conclusions. [Ex. 2, Hennet Report, at 5-12] As a threshold matter, Dr. Hennet does not specify whether these hypothetical contaminant losses are intended as part of the treatment process or incidental. Dr. Hennet has not identified any treatment facility, textbook or peer-reviewed literature that uses, or advocates the use of, sorption onto mineral surfaces as a treatment process for removal of the contaminants at issue here. *See* Ex. 4, Sabatini Rebuttal Report, at 12 (noting that VOC sorption onto mineral surfaces is not discussed as a treatment process in textbooks). To the extent Dr. Hennet maintains that it would be an incidental instead of an intended loss, such losses would be negligible, which is likely why he does not include them in his contaminant loss estimates. *Id*. at 13. Schwarzenbach (1993) discusses removal of organic solutes onto minerals, showing high losses for highly hydrophobic solutes combined with high surface area minerals, while at Camp Lejeune, the contaminants of concern were not highly hydrophobic and the minerals likely did not have the requisite high surface area. *Id*. Moreover, the detention time of the water in the spiractor was 0.15 hours versus the typical 24 hours in the sorption studies reported in Schwarzenbach (1993), leaving minimal time for sorption to occur. *Id*.

Once again, Dr. Hennet's opinion is based on speculation rather than sufficient facts or data and is not the product of reliable principles or methods. *See Small v. WellDyne, Inc.*, 927 F.3d 169, 177 (4th Cir. 2019) ("Without testing, supporting literature in the pertinent field, peer reviewed publications or some basis to assess the level of reliability, expert opinion testimony can easily, but improperly, devolve into nothing more than proclaiming an opinion is true 'because I say so.'"). For these reasons, it should be excluded.

### C. Dr. Hennet's Results-Driven Opinion regarding Well HP-634 Contaminant Concentration Data should be Excluded.

Dr. Hennet opines that "[s]upply well HP-634 was not contaminated with TCE." [Ex. 2,

9

Hennet Report, at 5-31] He reaches this conclusion by disregarding a sample collected on January 16, 1985 at well HP-634 with a measurement of 1,300 ug/L TCE for four reasons, none of which justify this cherry-picking of data.

First, Dr. Hennet states that "sample vials for January 16, 1985, the source of the 1,300 ug/L measurement, were part of a set of vials that were broken during transport." *Id*. However, he does not say that the samples for *this* analysis were broken, so, as Dr. Konikow points out, the relevance of this assertion is not apparent. [Ex. 5, Konikow Rebuttal Report, at 22 ("I doubt that the lab would or could perform an analysis or report a value on a sample taken from a broken vial.")] At deposition, Dr. Hennet speculated that "all the samples could have been contacted by the broken vials in the package," but he has pointed to no evidence of this. [Ex. 1, Hennet Deposition, at 195:19-24.] He also posited that the broken vials raised a "QA/QC flag," such that the Navy should have resampled, *id*., but he identifies no QA/QC standards from the laboratory at issue or from any other laboratory in support of this opinion.

Second, Dr. Hennet writes that "[a] summary of the data for HP-634 attributes the 1,300 ug/L value to chloroform, not TCE. In that report summary, TCE is attributed a value of 10 ug/L." [Ex. 2, Hennet Report, at 5-31] However, the laboratory that actually performed the analysis reported 1,300 ug/L,[6] and Dr. Hennet provides no explanation as to why the summary report should be trusted or believed over the primary source laboratory report. And elsewhere, Dr. Hennet insists that he relies on original or primary documents as opposed to summaries. [*E.g.*, Ex. 1, Hennet Deposition, at 214:24-215:1 ("I put more credential to basically documents that are close to when things happen or when things happened."); 240:12-14 (I just always to [stet] the original document,

---

[6] Ex. 1, Hennet Deposition, at 199:25-200:12 (agreeing that Exhibit 17, the laboratory data sheet, shows 1,300 ug/L and that nothing on the sheet says anything about the sample being compromised or there being an issue with the sample).

or as close to that as I can do")[7]; 208:25-209:5 (noting that chronologies tend to have errors); 204:8-12 (disregarding ATSDR documents because they are "not primary source of information")]

Third, Dr. Hennet asserts that "When HP-634 was in use and pumping, the data show that the well was not contaminated with TCE." [Ex. 2, Hennet Report, at 5-31] The fact that there were two non-detects (which were taken only 6 days apart) for HP-634 "when the well was pumping"[8] does not invalidate this sample. The value of contaminants measured at Camp Lejeune changed by similarly large magnitudes at other wells in short time frames. For example, the value of PCE at TT-26 changed from 1580 to 3.8 ug/L in successive samples taken 4 weeks apart, mirroring the change at HP-634 from non-detect to 1,300 ug/L in a similar 4-week time frame. [Ex. 5, Konikow Rebuttal Report, at 22] This variability in sampling data is characteristic of groundwater-quality data and is expected at sites like Camp Lejeune.[9]

Fourth, Dr. Hennet claims that "the 1,300 ug/L reported value for TCE is an outlier by comparing with the entirety of the data for HP-634." [Ex. 2, Hennet Report, at 5-31] The "entirety of the data" consists of four non-detects (two taken within six days of each other in December 1984; one in November 1986; and one in January 1991) and the 1,300 ug/L sample that Dr. Hennet chooses to disregard. As stated above, variability in sampling data is characteristic of groundwater-quality data and is expected at sites like Camp Lejeune. [Ex. 5, Konikow Rebuttal Report, at 22]. Dr. Hennet does not address the fact that, as of November 1984, TCE had moved very close to Well HP-634 from its previous location in the industrial area in all three model layers and, specifically in Model Layer 3, the TCE plume is coincident with the location of well HP-634.

---

[7] This quote has been modified to conform to Dr. Hennet's signed errata sheet.
[8] Plaintiffs dispute that HP-634 was not operational on January 16, 1985. *See* Ex. 6, Maslia Rebuttal Report, at 19-23.
[9] To the extent Dr. Hennet is adopting Dr. Spiliotopoulos's allegations regarding contaminant transport in support of this opinion, Plaintiffs incorporate part IV.D of their Motion to Exclude Certain Opinions of Alexandros Spiliotopoulos into this motion as if set forth herein.

11

*Id*. at 22-23.  Nor has Dr. Hennet explained the relatively high levels of DCE and VC in the same January 16, 1985 sample, which refute the 1,300 ug/L TCE measurement being an isolated "outlier." *Id*.

Dr. Hennet's rejection of the January 16, 1985 sample is not based on sufficient facts or data, nor is it the product of reliable principles and methods.  Fed. R. Evid. 702. Dr. Hennet's labeling of the 1300 ug/L sample as "anomalous"[10] without the identification of a reliable methodology, performance of any calculations, or citation to authority is speculative and unreliable, and is the sort of cherry-picking of data that has been rejected by the Fourth Circuit. "Result-driven analysis, or cherry-picking, undermines principles of the scientific method and is a quintessential example of applying methodologies (valid or otherwise) in an unreliable fashion. '[C]ourts have consistently excluded expert testimony that 'cherry-picks' relevant data,' because such an approach 'does not reflect scientific knowledge, is not derived by the scientific method, and is not 'good science.'" *In re Lipitor*, 892 F.3d 624, 634 (4th Cir. 2018) (citing *EEOC v. Freeman,* 778 F.3d 463, 469 (4th Cir. 2015) and *In re Bextra & Celebrex Mktg. Sales Practices & Prods. Liab. Litig.,* 524 F. Supp. 2d 1166, 1176 (N.D. Cal. 2007).

Significantly, all of the work Dr. Hennet has done to form his opinions in this case was done for or in anticipation of litigation, *i.e*., "expressly for the purpose of testifying." *Daubert v. Merrell Dow Pharms, Inc*., 43 F.3d 1311, 1317 (9th Cir. 1995).  In contrast, neither the laboratory at issue nor the ATSDR – neither of which performed their work in anticipation of litigation – determined that this sample was "anomalous" or "erroneous."  Dr. Hennet's results-driven analysis for HP-634 is unsupported, unreliable, and should be excluded.

---

[10] Ex. 2, Hennet Report at 5-32.

### D. Dr. Hennet's Results-Driven Opinion regarding "Representative" Flow Paths and Travel Time at TT-26 is Unreliable and should be Excluded.

Dr. Hennet opines that the travel time for PCE to reach Well TT-26 was 15 to 25 years, based on "three *representative* flow paths." [Ex. 2, Hennet Report at 5-15 (emphasis added)] Dr. Hennet does not provide a basis in his report for these flow paths being "representative," and he could not articulate a basis for this at his deposition. [Ex. 1, Hennet Deposition at 270:13-271:25] As explained by Dr. Konikow in his rebuttal report, Dr. Hennet's analysis fails to consider variation in hydraulic gradients, which results in faster flow of water and contaminants closer to the well, and does not include the critical flow path in the shallow aquifer where travel time would be closer to 3.5 to 5 years. [Ex. 5, Konikow Rebuttal Report, at 29 (describing that "the hydraulic gradient potentially driving downward flow is about 3 times greater closer to the well than it is halfway between the well and the contaminant source" and "the assumption that it is the same at all locations cannot be supported. Dr. Hennet does not account for the steeper vertical gradient in layer 2 for the path closer to the pumped well, nor does he account for the faster velocity in layer 3 when the travel distance is only 200 ft.")] These are basic fundamentals of hydrogeology and groundwater hydraulics, and Dr. Hennet does not and cannot explain why these large variations in hydraulic gradient, which can be readily estimated, should be disregarded. A more critical flow path would follow a longer path in the shallow aquifer, just 200 feet further than the maximum value of 800 feet considered by Dr. Hennet, and therefore a shorter flow distance in the slower deeper aquifer. This flow path is certainly representative of how contaminants can migrate away from ABC Cleaners and would yield a travel time as short as about 3.5 years (assuming Dr. Hennet's average values). *Id.* Without any explanation or scientific basis, during his deposition Dr. Hennet declared that consideration of this more critical flow path was "too extreme."

13

Dr. Hennet has failed to identify or articulate a reliable methodology in support of his selection of "representative flow paths," and, as a result, has no support for his opinion regarding PCE travel time to Well TT-26. In the absence of pre-litigation research or peer review, it is imperative that an expert "point to some objective source – a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like – to show that they have followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field." *Daubert*, 43 F.3d at 1318-19. Dr. Hennet has failed to point to any external source to validate his methodology.

Dr. Hennet's "representative flow paths" were crafted at the DOJ's request for purposes of litigation. His report does not cite to any literature, standards, or any other authority in his field in support of his overly simplified theory. Instead, his opinions regarding PCE's flow paths and travel time to Well TT-26 are classic *ipse dixit* and should be excluded. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (stating that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *Small v. WellDyne, Inc.*, 927 F.3d 169, 177 (4th Cir. 2019) ("Without testing, supporting literature in the pertinent field, peer reviewed publications or some basis to assess the level of reliability, expert opinion testimony can easily, but improperly, devolve into nothing more than proclaiming an opinion is true "because I say so.")

## **CONCLUSION**

For the foregoing reasons, the PLG respectfully requests the Court to exclude the opinions discussed herein offered by Remy J.-C. Hennet, Ph.D.

*[Signature page to follow.]*

DATED this 29th day of April 2025.

| | |
|---|---|
| /s/ J. Edward Bell, III | /s/ Zina Bash |
| J. Edward Bell, III (admitted *pro hac vice*) | Zina Bash (admitted *pro hac vice*) |
| Bell Legal Group, LLC | Keller Postman LLC |
| 219 Ridge St. | 111 Congress Avenue, Suite 500 |
| Georgetown, SC 29440 | Austin, TX 78701 |
| Telephone: (843) 546-2408 | Telephone: 956-345-9462 |
| jeb@belllegalgroup.com | zina.bash@kellerpostman.com |
| | |
| *Lead Counsel for Plaintiffs* | *Co-Lead Counsel for Plaintiffs and Government Liaison Counsel* |
| | |
| /s/ Elizabeth J. Cabraser | /s/ W. Michael Dowling |
| Elizabeth J. Cabraser (admitted *pro hac vice*) | W. Michael Dowling (NC Bar No. 42790) |
| Lieff Cabraser Heimann & Bernstein, LLP | The Dowling Firm PLLC |
| 275 Battery Street, 29th Floor | Post Office Box 27843 |
| San Francisco, CA 94111 | Raleigh, North Carolina 27611 |
| Telephone: (415) 956-1000 | Telephone: (919) 529-3351 |
| ecabraser@lchb.com | mike@dowlingfirm.com |
| | |
| *Co-Lead Counsel for Plaintiffs* | *Co-Lead Counsel for Plaintiffs* |
| | |
| /s/ Robin L. Greenwald | /s/ James A. Roberts, III |
| Robin L. Greenwald (admitted *pro hac vice*) | James A. Roberts, III |
| Weitz & Luxenberg, P.C. | Lewis & Roberts, PLLC |
| 700 Broadway | 3700 Glenwood Ave., Ste. 410 |
| New York, NY 10003 | Raleigh, NC 27612 |
| Telephone: 212-558-5802 | Telephone: (919) 981-0191 |
| rgreenwald@weitzlux.com | jar@lewis-roberts.com |
| | |
| *Co-Lead Counsel for Plaintiffs* | *Co-Lead Counsel for Plaintiffs* |

/s/ Mona Lisa Wallace
Mona Lisa Wallace (N.C. Bar No.: 009021)
Wallace & Graham, P.A.
525 North Main Street
Salisbury, North Carolina 28144
Tel: 704-633-5244
mwallace@wallacegraham.com

*Co-Lead Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I, J. Edward Bell, III, hereby certify that the foregoing document was electronically filed on the Court's CM/ECF system on this date, and that all counsel of record will be served with notice of the said filing via the CM/ECF system.

This the 29th day of April 2025.

                                                        */s/ J. Edward Bell, III*

                                                        J. Edward Bell, III