IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

No. 7:23-CV-897

| | |
|---|---|
| IN RE: )<br>)<br>CAMP LEJEUNE WATER LITIGATION )<br>) | O R D E R |
| This Document Relates To: )<br>ALL CASES )<br>) | |

This matter is before the court on Plaintiffs' Leadership Group's ("PLG" or "Plaintiffs") motion to exclude evidence related to Dr. Remy Hennet's ("Dr. Hennet") February 2025 visit to Marine Corps Base Camp Lejeune ("Motion") [DE-348]. Defendant opposes the motion [DE-352]. For the reasons that follow, the Motion is granted in part.

I. Background

This dispute concerns the ongoing Camp Lejeune Justice Act ("CLJA") litigation in this district.[1] *See* Pub. L. No. 117-168, § 804, 135 Stat. 1759, 1802–04. With the CLJA, Congress created a new federal cause of action permitting "appropriate relief for harm that was caused by exposure to the water at Camp Lejeune" for individuals who resided, worked, or were otherwise exposed for not less than 30 days during the period between August 1, 1953, and December 31, 1987. *See id*. § 804(b). To better manage this litigation, the court entered case management orders streamlining pretrial procedures in all CLJA cases. *See, e.g.*, [DE-23].

The court is phasing this litigation into separate "Tracks." [DE-23] 8. Each Track comprises several different illnesses and proceeds on its own pretrial timeline. The court entered an order confirming 25 Track 1 Trial Plaintiffs to proceed on a separate pretrial timeline. [DE-250] 2. Fact discovery for the Track 1 Trial Plaintiffs closed on August 11, 2024. *Id*. at 4. The

---

[1] There are more than 2,900 individual CLJA lawsuits currently pending in this district. [DE-354] 1.

court also entered a scheduling order regarding expert discovery and motion practice for three Track 1 issue "Phases": (1) Water Contamination ("Phase 1"); (2) general causation ("Phase 2"); and (3) residual issues, including specific causation and damages ("Phase 3"). *See id*.; [DE-270]; [DE-312]. The Track 1 Trial Plaintiffs are currently conducting expert discovery. *See* [DE-270]. The disclosure deadline for Defendant's Phase 1 experts was December 9, 2024. *See id*. Any associated expert reliance files were due December 16, 2024. *See id*.

The parties agreed to the following language regarding the nature of proof for Phase 1:

> In Phase 1, the Court will be presented with evidence pertaining to the concentration levels for the chemicals in drinking (finished) water at Camp Lejeune from 1953 to 1987. To help the Court "understand the chemicals in the water at Camp Lejeune during the operative period," [DE-247] 2, the Parties may present evidence from experts in fields such as history, engineering, hydrology, environmental sciences and mathematical modeling pertinent to the fate and transport of contaminants in groundwater and in drinking (finished) water for family housing areas and other facilities at Camp Lejeune from 1953 to 1987. The evidence will include the contamination sources, the fate and transport of the contaminants within the groundwater underlying Camp Lejeune, the supply of water through wells to the various treatment plants at Camp Lejeune, and the distribution of the water from the treatment plants to relevant areas of Camp Lejeune during this time frame.

[DE-329] 2 (cleaned up). The "chemicals" at issue are tetrachloroethylene ("PCE"), trichloroethylene ("TCE"), dichloroethylene ("DCE"), vinyl chloride, and benzene (collectively, "Contaminants"). *Id*; [DE-25] 9.

The present dispute stems from a February 2025 Camp Lejeune site visit conducted by Defendant's Phase 1 expert Dr. Hennet ("February Site Visit"). [DE-349] 1–2. Dr. Hennet was retained by Defendant to evaluate and respond to Plaintiffs' allegations in the Master Complaint [DE-25], Plaintiffs' expert reports regarding Camp Lejeune groundwater contamination, and the Agency for Toxic Substances and Disease Registry's ("ATSDR") historic Camp Lejeune water contamination reports. [DE-349-2] 10. Defendant properly disclosed Dr. Hennet as a Phase 1

2

expert and provided the PLG with a report ("December Report") and reliance files pursuant to the court's pretrial discovery schedule [DE-270].[2]  The PLG timely disclosed Dr. David Sabatini's ("Dr. Sabatini") Phase 1 rebuttal report on January 14, 2025, which responds to the December Report.  [DE-270]; [DE-349-6].

Relevant here, the December Report contains a series of opinions regarding Contaminant volatilization at Camp Lejeune.[3]  Dr. Hennet opines that a substantial proportion of the Contaminants volatized from water into the air during water treatment processes and filling of water buffaloes.[4]  *See, e.g.*, [DE-349-2] 12, 14.  In other words, some percentage of Contaminants present in well water at Camp Lejeune did not make it into the water consumed on base.  Dr. Hennet believes this volatilization occurred at numerous points during the water treatment and distribution process.  Dr. Sabatini disputes significant portions of Dr. Hennet's opinions regarding Contaminant volatilization at Camp Lejeune.  [DE-349] 3; [DE-349-2] 9.

Two areas of potential volatilization are central to the dispute.  First, when water moves up Hadnot Point water treatment plant spiractors[5] and drops through effluent pipes.  There is no dispute that this falling water effect would result in some Contaminant volatilization.  *See* [DE-349-2] 38; [DE-349-6] 11.  However, Drs. Hennet and Sabatini disagree about the degree of potential Contaminant volatilization, namely, the actual distance water falls from the spiractor

---

[2] Dr. Hennet's report is dated December 9, 2024.  [DE-349-2] 3.
[3] Volatile organic compounds (including the Contaminants) are organic chemical compounds whose composition makes it possible for them to evaporate under normal atmospheric conditions of temperature and pressure.  *See* 40 C.F.R. § 51.100(s).
[4] Water buffaloes at Camp Lejeune are portable water tanks mounted on towable trailers used to supply Marine Corps personnel with water during various field training exercises.  [DE-25] 21.
[5] At the Hadnot Point water treatment plant, large cone-shaped devices called spiractors are used to soften raw water on base by adding lime for removing metals and other minerals.  *See* Marine Corps Installations East-Marine Corps Base Camp Lejeune, *2024 Interim Water Quality Report: Hadnot Point Water Treatment System PWSID # 04-67-041*, https://www.lejeune.marines.mil/Portals/27/Documents/EMD/Annual-Reports/2024_Semi-Annual_HP_Water_Treatment_System_Water_Quality_Report.pdf.

3

through the effluent pipe. *Compare* [DE-349-2] 38–39 with [DE-349-6] 11–12. Whereas Dr. Hennet calculates the fall height as two feet, Dr. Sabatini calculates the fall height as one foot. *See id*. For his December Report, Dr. Hennet calculated the fall height by measuring an allegedly similar replacement effluent pipe in a non-operational Holcomb Boulevard spiractor. [DE-349-2] 38–39. Dr. Sabatini disagrees, instead relying on measurements taken and memorialized in a 2004 report by the Department of Navy's consultant AH Environmental Consultants, Inc. ("AH Environmental"). [DE-349-6] 11. There is no dispute that a one-foot fall height variance results in different conclusions regarding Contaminant volatilization at the Hadnot Point spiractors. *Compare id*. at 12 with [DE-349-6] 40.

Second, Drs. Hennet and Sabatini disagree on potential Contaminant volatilization when filling water buffaloes on base. Relevant here, Dr. Sabatini disagrees with Dr. Hennet's assessment of how water buffaloes were filled; Dr. Hennet assumes this occurred through a filler pipe with a strainer on the end while Dr. Sabatini argues they were more likely filled through the tank manhole. [DE-349-2] 74; [DE-349-6] 23, 35–61. Filling water buffaloes with a pipe and strainer creates a "shower" effect resulting in more volatilization versus filling with an unstrained pipe through the tank manhole. [DE-349-2] 74–77; [DE-349-6] 23–25.

After receiving Dr. Sabatini's report, Dr. Hennet performed the February Site Visit to Camp Lejeune during which he took photographs, performed a fall height measurement at a Hadnot Point spiractor effluent pipe, and timed the filling of a water buffalo via the tank manhole. [DE-352] 2, 4–5. Defendant disclosed the photographs and Dr. Hennet's handwritten notes to the PLG on February 25, 2025, several weeks before Dr. Hennet's scheduled deposition but after the deadline for disclosing expert reliance documents. *Id*. at 3, 5. There is no dispute that Dr. Hennet's materials from his February Site Visit were disclosed after the court's deadline for Phase 1 expert

4

disclosures. *See* [DE-378] 44; [DE-270]; Fed. R. Civ. P. 26(a). Phase 1 expert discovery did not close until March 15, 2025. *See* [DE-270].

Initially, the PLG attempted to compromise with Defendant, offering to waive their objections to Dr. Hennet's late disclosures if Dr. Sabatini could perform a similar site visit. [DE-349] 4. Defendant refused. *Id*. Now, the PLG seeks an order excluding all observations, opinions, measurements, experiments, notes, videos and photographs related to Dr. Hennet's February Site Visit. [DE-349] 1.

II.   Legal Standard

Rule 26(a)(2) governs the disclosure of expert testimony. Fed. R. Civ. P. 26(a)(2). The rule provides that a party's disclosures regarding an expert witness must include a report, which in turn must contain, among other things, "(i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; (iii) any exhibits that will be used to summarize or support them . . . ." Fed. R. Civ. P. 26(a)(2)(B). The report must indicate "the testimony the witness is expected to give during direct examination, together with the reasons therefor." Fed. R. Civ. P. 26 advisory committee's note to 1993 amendments. And Rule 26(a)(2)(E) requires the parties to supplement these disclosures "when required under Rule 26(e)." Fed. R. Civ. P. 26(a)(2)(E). That rule provides:

> For an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition. Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due.

Fed. R. Civ. P. 26(e)(2). Here, the pretrial scheduling order [DE-270] set deadlines for both the disclosure of expert reports and for any supplementation of those reports for all three pretrial Phases. The PLG alleges that Defendant's supplementation of Dr. Hennet's expert disclosures

5

with materials from the February Site Visit violates the court's pretrial scheduling order. *See generally* [DE-349]. Accordingly, the court's inquiry into whether there have been any violations is governed by Rule 16(f). Fed. R. Civ. P. 16(f); *see Akeva LLC v. Mizuno Corp.*, 212 F.R.D. 306, 309 (M.D.N.C. 2002); *see also Goodwin v. Cockrell*, No. 4:13-CV-199-F, 2015 WL 575861, at *2 (E.D.N.C. Feb. 11, 2015).

III. Discussion

Whether the PLG is entitled to the requested relief is a two-part inquiry. First, the court must determine if Dr. Hennet's supplemental disclosures from the February Site Visit violate Rule 26 and the court's pretrial scheduling order. Fed. R. Civ. P. 26. Second, if Defendant did commit a violation, what sanctions are warranted.

Defendant's purported violation of the pretrial schedule order [DE-270] hinges on whether Dr. Hennet's late disclosures from the February Site visit are supplementation under Rule 26(e)(1) or improper "bolstering." Fed. R. Civ. P. 26(e)(1); *see Severn Peanut Co. v. Indus. Fumigant Co.*, No. 2:11-CV-00014-BO, 2014 WL 198217, at *2 (E.D.N.C. Jan. 15, 2014) (quoting *Akeva*, 212 F.R.D. at 310). An expert report may be supplemented pursuant to Rule 26(e) only when the original report was "defective in some way so that the disclosure was incorrect or incomplete and, therefore, misleading." Fed. R. Civ. P. 26(e); *Akeva*, 212 F.R.D. at 310. Courts distinguish true supplementation (e.g., correcting inadvertent errors or omissions) from gamesmanship. *OmniSource Corp. v. Heat Wave Metal Processing, Inc.*, No. 5:13-CV-772-D, 2015 WL 3452918, at *9 (E.D.N.C. May 29, 2015) (citations omitted).

The *Severn Peanut* court determined that certain plaintiff supplemental expert reports— disclosed four months after initial disclosures—did not qualify as valid supplementation under Rule 26(e). 2014 WL 198217 at 2 (citing Fed. R. Civ. P. 26(e)). There, plaintiffs produced

6

supplemental reports memorializing tests conducted after initial disclosures for the purpose of bolstering the experts' opinions in their original reports—not to correct an incomplete or misleading disclosure. *Id*. Though Dr. Hennet has not produced a supplemental report, the measurements and materials stemming from the February Site Visit were disclosed to bolster his previous opinions regarding Contaminant volatilization at Camp Lejeune spiractors and water buffaloes. Indeed, Defendant admits Dr. Hennet "returned to Camp Lejeune . . . to measure the fall height" because of the "importance of the [measurement]" and "Dr. Sabatini's opinion that the AH Environmental report's 'visual estimate' . . . was reliable." [DE-352] 2. In other words, after receiving Dr. Sabatini's rebuttal report Defendant sent Dr. Hennet back out to the field to double-check his work.

Defendant does not allege that anything in Dr. Hennet's December Report was inaccurate. On the contrary, Dr. Hennet's findings have not changed. [DE-352] 3. Nor was the December Report incomplete. "Incomplete" in this context means tending to mislead because of missing information; it does not mean "less thorough than the report might have been." *See Coles v. Perry*, 217 F.R.D. 1, 3 (D.D.C. 2003). Dr. Hennet provided bases for his two-foot spiractor fall height measurement and assumptions about water buffalo filling. *See generally* [DE 349-2]. Apparently unsatisfied with those bases after receiving Dr. Sabatini's rebuttal report, Dr. Hennet returned to Camp Lejeune to acquire better ones. In this district, that is improper supplementation under Rule 26(e). Fed. R. Civ. P. 26(e); *see Severn Peanut*, 2014 WL 198217 at 2–3 (finding additional testing conducted post-disclosure deadline was improper bolstering even if the underlying expert opinions had not changed); *see also MISTEE ROBBINS et al, Plaintiff, v. BOSTON SCIENTIFIC CORPORATION, Defendant.*, No. 2:12-CV-01413, 2016 WL 3189248, at *11 (S.D.W. Va. June 7, 2016) (finding supplemental report based on additional pathological examinations was an

untimely expert disclosure). Accordingly, Defendant has violated the pretrial scheduling order [DE-270].

Next, the court must determine what sanction, if any, is appropriate. The court "has wide latitude in imposing sanctions on parties who fail to comply with pretrial orders and procedures." *Cahoon v. Edward Orton, Jr. Ceramic Found.*, No. 2:17-CV-63-D, 2020 WL 918753, at *4 (E.D.N.C. Feb. 24, 2020) (quoting *World Wide Demil, LLC v. Nammo*, 51 F. App'x 403, 407 n4 (4th Cir. 2002) (per curiam) (unpublished)). The sanctions authorized by Rule 37(b)(2)(A)(ii)–(vii) are available to the court. Fed. R. Civ. P. 37(b)(2)(A)(ii); Fed. R. Civ. P. 16(f); *see Severn Peanut*, 2014 WL 198217 at 3. The main consideration of a Rule 16(f) analysis is "whether [Defendant] has shown good cause for its failure to timely disclose." *Id.* (citing *Akeva*, 212 F.R.D. at 311; Fed. R. Civ. P. 16(f)).

When making this analysis, courts in this district have often applied the factors set out in *Akeva*, specifically: (1) the explanation for the failure to obey the order; (2) the importance of the expert opinion; (3) the prejudice to the opposing party by allowing the disclosures; (4) the availability of alternative or lesser sanctions; (5) the interest in expeditious resolution of litigation; (6) a court's need to manage its docket; and (7) public policy favoring disposition of cases on the merits.[6] *Severn Peanut*, 2014 WL 198217 at 3 (citing *Akeva*, 212 F.R.D. at 309); *see also*

---

[6] Defendant would have the court utilize the Rule 37(c)(1) factors set out in *Southern States Rack & Fixture Inc. v. Sherwin–Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003) (citing Fed. R. Civ. P. 37(c)(1)). These include "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." 318 F.3d at 597. Several courts in the Fourth Circuit have applied the *Southern States* factors when considering sanctions under Rule 16(f). Fed. R. Civ. P. 16(f); *see, e.g.*, *SMD Software*, 2013 WL 5592808 at n9 (gathering cases); *Goodwin*, 2015 WL 575861 at n1. This is a nuance without any impact on the court's determination; the first six *Akeva* factors effectively match the five in *Southern States*, and *Akeva* factor seven (public policy favors disposition of cases on the merits) essentially goes to "importance of the evidence." *See Barnhill v. Accordius Health At Greensboro, LLC*, No. 1:22CV322, 2023 WL 7634449, at *5–7 (M.D.N.C. Nov. 14, 2023), report and recommendation adopted, No. 1:22-CV-322, 2023 WL 8281570 (M.D.N.C. Nov. 30, 2023).

*Goodwin,* 2015 WL 575861 at 2; *SMD Software, Inc. v. EMove, Inc.*, No. 5:08-CV-403-FL, 2013 WL 5592808, at *4 (E.D.N.C. Oct. 10, 2013).

Considering the *Akeva* factors, the court finds that exclusion of Dr. Hennet's testimony regarding the February Site Visit is inappropriate. As to factor one, Defendant explains that the February Site Visit was conducted in response to two purportedly incorrect opinions in Dr. Sabatini's rebuttal report—that the Hadnot Point spiractor fall height was one-foot and that water buffaloes were mostly filled through the tank manhole. [DE-352] 10. Defendant cannot justify late disclosure by identifying potentially problematic opinions in a rebuttal report; that is the whole point of rebuttal experts. More convincing is Defendant's reference to new information included in Dr. Sabatini's report, namely affidavits by Mark Cagiano and Ernest Hunt supporting the PLG's manhole filling theory. *See* [DE-349-6] 54–55. Moreover, the Hadnot Point spiractor effluent pipe measurement conducted at the February Site Visit was apparently "difficult and dangerous" relative to Dr. Hennet's prior measurements. [DE-352] 10. It makes sense Defendant would attempt less intrusive measurements first before resorting to methods used at the February Site Visit. Factor one leans slightly in Defendant's favor.

Factor two supports allowing Dr. Hennet's testimony on the February Site Visit. Any volatilization that reduced Contaminant concentrations in finished drinking water supplied by the United States at Camp Lejeune is squarely relevant to this litigation. And the parties agree that Hadnot Point spiractors and water buffaloes present two such occasions for Contaminant volatilization. Dr. Hennet and Dr. Sabatini's conflicting theories about the degree of that volatilization directly inform the causal analysis. For the same reasons, factor seven also supports allowing this testimony.

The PLG has demonstrated some prejudice under factor three. Specifically, the PLG states

9

Case 7:23-cv-00897-RJ    Document 380    Filed 05/08/25    Page 9 of 12

it spent significant time at Dr. Hennet's deposition discussing the February Site Visit in lieu of other questions. [DE-349] 8. The PLG also expressed frustration at Dr. Hennet's allegedly hazy memory and poor record keeping of the February Site Visit, leaving them unable to effectively cross examine him. *Id*. at 8–9. However, the PLG cannot really show surprise at the late disclosures. Dr. Hennet did not change his opinions based on the February Site Visit. Indeed, the February Site Visit further supported his original conclusions. *See Dugger v. Union Carbide Corp.*, No. CV CCB-16-3912, 2019 WL 4754004, at *2 (D. Md. Sept. 30, 2019) (allowing late disclosures in part due to lack of surprise). The PLG had multiple weeks to analyze Dr. Hennet's late disclosures prior to his deposition. Also, the bench trial format tempers potential the prejudice to the PLG as there is no possibility of jury confusion or misunderstanding. *See Cap. Funding Grp., Inc. v. Zuccari*, No. CV RDB-19-1272, 2021 WL 1339387, at *6 (D. Md. Apr. 9, 2021) (finding defendants' concern about potential "confusing or misleading" expert testimony "much less significant with this Court sitting as the trier or fact[]").

Factors five and six weigh in favor of sanction. The court has continuously expressed its goal of adjudicating this litigation expeditiously. *See, e.g.*, [DE-333] 4. While recognizing the ostensible importance of Dr. Hennet's late disclosures, allowing unlimited bolstering of properly disclosed expert opinions after receiving conflicting rebuttal testimony will push this litigation off track and further delay bellwether trials. *Akeva*, 212 F.R.D. at 310 ("To construe supplementation to apply whenever a party wants to bolster or submit additional expert opinions would [wreak] havoc in docket control and amount to unlimited expert opinion preparation.").

Finally, considering factor four and the above analysis, lesser sanctions are appropriate. Though not requested in the Motion, the PLG originally asked for Dr. Sabatini to perform a similar site visit, which Defendant refused. [DE-349] 4. The PLG now believes that absent alterations to

the current pretrial schedule, a site visit is untenable. [DE-378] 33. However, the PLG identified difficulty with preparing for Dr. Hennet's deposition, during which the PLG was "not able to finish questions they had planned to ask" and "only had time to ask about a handful of the 100 or so photographs and videos [from the February Site Visit]." [DE-349] 8. The court will allow the PLG to depose Dr. Hennet for an additional four hours to complete its questioning. This alleviates some of the identified prejudice to the PLG while "keep[ing] this case on its current [pre]trial track." *SMD Software*, 2013 WL 5592808 at 9. The PLG can include any relevant portions of that supplemental testimony in its reply brief for its separate motion to exclude certain opinions of Dr. Hennet [DE-373].[7]

This relief accords with the *Akeva* factors considered under Rule 16(f), the court's authority under Rule 30(d)(1), and the court's "wide latitude in imposing sanctions on parties who fail to comply with pretrial orders and procedures." *Cahoon*, 2020 WL 918753 at 4 (citation omitted); Fed. R. Civ. P. 16(f); Fed. R. Civ. P. 30(d)(1); *see Akeva*, 212 F.R.D. at 310.

IV. Conclusion

For the foregoing reasons, the court grants the Motion in part and orders the following:

A. Defendant shall use its best efforts to make Dr. Hennet available for a supplemental deposition within the next 30 days ("Supplemental Deposition");

B. The PLG shall be entitled to an additional four hours of time to depose Dr. Hennet; and

C. Within seven days of the Supplemental Deposition, the parties shall submit a joint statement to the court of no more than five pages apprising it of any relevant updates, including any potential impacts to briefing and/or discovery deadlines. *See* [DE-270].

---

[7] Reply briefs are due July 3, 2025. *See* [DE-270].

SO ORDERED. This 6 day of May, 2025.

Robert B. Jones, Jr.
United States Magistrate Judge