```
 1                IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF NORTH CAROLINA
 2

 3   IN RE:                        )   CASE NO. 7:23CV897
                                   )
 4      CAMP LEJEUNE WATER LITIGATION )  Wilmington, North Carolina
                                   )   Monday, April 28, 2025
 5                                 )   11:02 a.m
     _____
 6

 7                TRANSCRIPT OF THE STATUS CONFERENCE
 8              BEFORE THE HONORABLE ROBERT B. JONES
                   UNITED STATES MAGISTRATE JUDGE
 9

10   APPEARANCES:

11   For the Plaintiffs:

12           James A. Roberts, III, Jenna Butler, Charles Ellis,
             Kevin Dean, Laura Baughman, Zina Bash (by phone)
13           Mona Lisa Wallace (by phone)

14
     For the Government:
15
             Adam Bain, Joshua Carpenito, Allison O'Leary,
16           Bridget Bailey Lipscomb (by phone),
             Sara Mirsky (by phone)
17

18   For the Settlement Master team:

19           Ken Knight (by phone), Eleanor Slota (by phone)

20

21   Court Reporter:          BRIANA L. CHESNUT, RPR
                              Official United States Court Reporter
22                            P.O. Box 615
                              Welcome, North Carolina 27374
23

24
             Proceedings recorded by mechanical stenotype reporter.
25          Transcript produced by computer-aided transcription.
```

Case 7:23-cv-00897-RJ   Document 382-12   Filed 05/12/25   Page 1 of 58

P R O C E E D I N G S

1

2     **THE COURT:**  Good morning.

3         Okay.  Mr. Roberts, you're talking on behalf of the

4  Plaintiffs?

5     **MR. ROBERTS:**  Yes, Your Honor.  Good morning.

6     **THE COURT:**  Good morning.

7     **MR. ROBERTS:**  On the way to the courthouse this

8  morning, I got word from Mr. Bell.  He's had something

9  unexpected come up, and he sends his regrets that he's not

10  going to be able to be here.

11         Your Honor, there are certain issues that I'm sure

12  we're going to get a little deeper into.

13         Ms. Butler is here.  Kevin Dean with Motley Rice is

14  here and Ms. Laura Baughman.  So there certainly will be issues

15  they are going to be addressing.

16         Judge, I can report to the Court that I think, by and

17  large, we've been getting along, moving the ball down the

18  court.  There are a couple of issues that are outstanding that

19  we are going to need to address this morning.

20         Phase I depositions have been completed.  Phase II

21  have all -- Phase II expert depositions have all been

22  scheduled.  And we're working closely with the Government to

23  schedule our Phase III specific causation and damages experts.

24         One issue relates to a Plaintiff, Mr. Mousser.  He

25  was originally a kidney client.  I'm sure Your Honor has

Case 7:23-cv-00897-RJ    Document 382-12    Filed 05/12/25    Page 2 of 58

1  probably heard of Mr. Mousser.

2          **THE COURT:**  Right.

3          **MR. ROBERTS:**  He was recently diagnosed with bladder

4  cancer.  So we're working closely with the Government to figure

5  out how to address this new diagnosis.  The Government on

6  Friday sent its proposal on how to handle Mr. Mousser's

7  additional diagnosis.  We've agreed to allow them to do an IME.

8  So that's something that I anticipate we'll reach resolution

9  on.

10         One question that I would like to bring to the

11  attention of the Court is the issue of supplementation of

12  information considered by experts.  A couple of instances --

13  after our experts have given their reports, additional

14  information has come to their attention.  There's been

15  additional scientific studies.  What we've done is we've

16  notified the Government prior to the deposition to allow them

17  to know, look, he's considered this additional piece of

18  evidence.

19         **THE COURT:**  Before the deposition?

20         **MR. ROBERTS:**  Yes, sir, before the deposition.

21         So there's nothing unusual about that, Your Honor.

22  And, you know, as you know, things happen, new studies come

23  out, and so forth.  So that's another question that the Court

24  will probably hear about today.

25         We're also doing a quarterly supplement on our

1  profile form.  So if anything is ongoing that, you know, we

2  believe needs to be addressed, you know, we're certainly giving

3  the Government a heads-up on that.

4          The next three issues on my agenda:

5          One relates to subpoenas on Phase I experts,

6  Mr. Hennet and Spiliotopoulos.  With the Court's permission, I

7  think Mr. Dean will address that issue.

8          There was also a clawback objection that I'm sure

9  Your Honor saw in our report.  That's another issue from

10  Mr. Dean.

11          So the final issue relates to the motion to exclude

12  certain opinions of Mr. Hennet that were based upon his site

13  visit after the discovery had closed, and I think Ms. Laura

14  Baughman will address that.

15          So, Your Honor, I'm filling in for Mr. Bell.  But

16  those are the issues that I understand need to be addressed by

17  the Court this morning.

18          **THE COURT:**  Okay.  What have you got?

19          **MR. BAIN:**  Your Honor, I agree with Mr. Roberts'

20  agenda for the most part.  I will say, with respect to the

21  Phase I depositions, those are complete, except that we

22  received some supplemental information from one of the

23  Plaintiffs' experts, Mr. Maslia, just late last week.  And the

24  Plaintiffs offered to make Mr. Maslia available for an

25  additional hour of deposition based on that late-submitted

1 material.  We are considering that, and we'll be conferring
2 with the Plaintiffs regarding that.
3       But I think that also goes to the issue regarding
4 supplementation that Mr. Roberts suggested.  Some of these
5 supplemental materials-considered lists we're getting on the
6 eve of deposition.  So right before the deposition, we're
7 getting a list of additional materials that the Plaintiffs are
8 considering.
9      **THE COURT:**  Is that pushing back the depo date or the
10 depo or --
11      **MR. BAIN:**  Well, we're considering it on a
12 case-by-case basis.  We're usually going forward with the
13 deposition and reserving our rights to continue it if we don't
14 have adequate time to prepare.  But we are somewhat troubled
15 that we're getting these supplements right on the eve of the
16 deposition.
17      So the other issues Ms. O'Leary and Mr. Carpenito
18 will be addressing as they come up.
19      **THE COURT:**  Okay.
20      **MS. BUTLER:**  Your Honor, if you have any concerns
21 about the late supplementations, I can address more detail.
22 For example, there was one deponent where an additional study
23 was noted the night before the deposition.  That was
24 Dr. Gilbert.  But that was one study, and we did notify them
25 before the deposition, rather than being surprised at her

1  deposition, that there's an additional study.

2        The others -- for example, there were deposition

3  transcripts that were provided that were reviewed after the

4  rebuttal report.  They were new depositions.

5        So we're working through it, and I don't believe

6  there has been any prejudice or harm.  And, certainly, we're

7  addressing the issue, and we acknowledged the Gilbert issue.

8  And it hasn't occurred on the eve of deposition.  Again, I just

9  want to make sure you don't think that's a recurrence.

10        **THE COURT:**  But all these were occurring before the

11  deposition; correct?

12        **MS. BUTLER:**  Yes, Your Honor.

13        **THE COURT:**  All right.  I'll hear -- well,

14  Mr. Roberts, did you say Mr. Dean and Ms. Baughman?

15        **MR. ROBERTS:**  Yes, Your Honor.

16        **THE COURT:**  I guess I'll hear from Mr. Dean first.

17        **MR. DEAN:**  Good morning, Your Honor.

18        **THE COURT:**  Good morning.

19        So which issue are you talking about?

20        **MR. DEAN:**  I am going to talk about the clawback

21  issue.  There's one email, one document, that has --

22        **THE COURT:**  Is this not resolved?  I thought in your

23  report, Mr. Bain, you said that the Plaintiffs said they will

24  not be using the document.  So I just assumed that it was

25  resolved.

```
1            Is it not resolved?
2            MR. DEAN:  Actually, what we said was we would not be
3  using the document in any depositions or motions practice until
4  it was resolved.  We do need the Court to review the document
5  in camera.  We believe it's not confidential or privileged in
6  any manner.  I believe the DOJ has a different view.  So we do
7  need the Court to review the document in camera, and I have
8  brought it for the Court.
9            THE COURT:  So you've got it?
10            MR. DEAN:  Yes, sir.
11            THE COURT:  Okay.
12            MR. DEAN:  It's just one page, front and back.
13            THE COURT:  Do I need to -- I don't know that I've
14  got any briefing on this.
15            MR. DEAN:  Well, that was the other point.  We
16  weren't sure.  That's why it's in the scheduling -- I mean, the
17  status report.
18            THE COURT:  Right.
19            MR. DEAN:  We needed some guidance from the Court.
20  We're happy to brief the issue, a small brief.  I'm prepared to
21  make a little presentation about why it's not privileged.  But,
22  again, we can brief it.  It's not --
23            THE COURT:  What do you want to do?  Do you want to
24  brief it or just tell me?
25            MR. CARPENITO:  Good morning, Your Honor.  Joshua
```

Case 7:23-cv-00897-RJ    Document 382-12    Filed 05/12/25    Page 7 of 58

1   Carpenito with the United States.

2           We're happy to do whatever the Court prefers.  We can

3   certainly address it in chambers after the hearing.  I do agree

4   with Mr. Dean; it's a page and a half, two pages.  So I think

5   we could probably get through it pretty quickly.

6           **THE COURT:**  Okay.

7           **MR. CARPENITO:**  But if the Court prefers a brief, I'm

8   happy to do that as well.

9           **THE COURT:**  Well, let's see what we can do.  Yeah, I

10  guess I'll receive it and hear from you all.

11          **MR. DEAN:**  Right now?

12          **THE COURT:**  Whatever you want to do.

13          **MR. DEAN:**  Sure.

14          **THE COURT:**  Okay.  Do you want to tell me about it?

15  How do you want to proceed?  Or do you just want to do this in

16  chambers?

17          **MR. DEAN:**  I've done my part.  I was supposed to

18  tender the document.

19          **THE COURT:**  Okay.

20          **MR. DEAN:**  I don't see any problem with the document;

21  but if he wants to talk about it in chambers, I am perfectly

22  fine to do that as well, Your Honor.

23          **MR. CARPENITO:**  Yeah, I believe we would prefer to

24  discuss it in chambers.

25          **THE COURT:**  Okay.  We'll talk about it in chambers.

```
 1          MR. CARPENITO:  Thank you.

 2          THE COURT:  So you're done?

 3          MR. DEAN:  I'm done, Your Honor.

 4          THE COURT:  Oh.  All right.

 5          MR. DEAN:  Three and a half hours to hand you one

 6 page.

 7          THE COURT:  Okay.  I guess Ms. Baughman?

 8          MS. BAUGHMAN:  Yes.  Thank you, Your Honor.

 9          I have two issues to discuss with you.  The first one

10 would be the issues on discovery with respect to the

11 Plaintiffs' subpoena to Dr. Spiliotopoulos and Dr. Hennet,

12 which is discussed --

13          THE COURT:  And that's for the billing?

14          MS. BAUGHMAN:  Yes.  And some of this -- that's

15 correct.  It's discussed on page 6 and 7 of the --

16          THE COURT:  So it's the substance of the compensation

17 records; it's the compensation records for work performed

18 before August 2022; and notes, memos, and documents regarding

19 2005 ATSDR panel; and, fourthly, interview notes and summaries.

20          Correct?

21          MS. BAUGHMAN:  That's exactly right.

22          THE COURT:  Okay.

23          MS. BAUGHMAN:  My understanding regarding the first

24 two items, which were both compensation records, is that the

25 DOJ plans to submit -- produce those later this week.  So while
```

Case 7:23-cv-00897-RJ    Document 382-12    Filed 05/12/25    Page 9 of 58

1  I think it's clear that we're entitled to those, I'm not sure
2  that --
3          **THE COURT:**  What is it exactly you're saying you're
4  entitled to?  Because the rule just says "statement"; right?
5  It says "statement."  I can think of -- and I found some cases
6  where it said it wasn't billing records; it was just a
7  statement, a fee summary --
8          **MS. BAUGHMAN:**  Well, I think there's --
9          **THE COURT:**  -- is sufficient.
10         **MS. BAUGHMAN:**  I'm sorry to interrupt you.
11         The rule says what needs to be provided with an
12  expert report.
13         **THE COURT:**  Right.
14         **MS. BAUGHMAN:**  But there's nothing that prevents us
15  from issuing discovery in addition, right.  So we submitted a
16  subpoena asking for more information than that --
17         **THE COURT:**  Right.
18         **MS. BAUGHMAN:**  -- including what they did on an
19  hourly basis, the backup, in other words, for their billing
20  records.
21         **THE COURT:**  So what was the purpose of the subpoena?
22         **MS. BAUGHMAN:**  Why do we want that?
23         **THE COURT:**  Yeah.  For the same purpose as the rule
24  allows?  Because if you're relying on -- if your relevance
25  argument is the rule allows for it, well, the rule says it's

Case 7:23-cv-00897-RJ    Document 382-12    Filed 05/12/25    Page 10 of 58

1 just a statement that you get.

2     **MS. BAUGHMAN:**  Our argument would be more than just

3 that the rule allows it.  There are -- there is case law

4 talking about whether we are entitled to this information in

5 order to determine how much time the expert put into the report

6 to get to whether the expert actually really wrote the report

7 or whether substantial pieces of the report may have been

8 actually written by the attorney.

9     We believe, based on the content of

10 Dr. Spiliotopoulos' report and testimony that he's provided,

11 that it may be that substantial portions of his report have

12 actually not been written by him.

13     So we want to look at -- so this is for the first of

14 the four items.

15     **THE COURT:**  Well, can't you just ask him that at a

16 deposition?

17     **MS. BAUGHMAN:**  He claims that he wrote it.  But I

18 brought a case from -- a district case from the Fourth Circuit

19 about this that talks about that's just not enough if there are

20 underlying issues that indicate that, in fact, maybe the expert

21 didn't write the report.  And saying he did, when there are

22 indications that he didn't, entitles us to the underlying

23 billing records.

24     And I will say that on our side the Plaintiff Group

25 has provided detailed billing records that don't just say this

1 is the amount of money that we paid them, but this is what they

2 did, you know, on a daily basis, how many hours and what was

3 done. And on the other side, they're just giving us -- and I

4 brought the records, if Your Honor would like to see them.

5    **THE COURT:** Was there like a reciprocal agreement

6 that whatever they would give that you would give?

7    **MS. BAUGHMAN:** To my knowledge, there isn't a

8 reciprocal agreement on that. But we did issue a subpoena.

9 They did not issue the same sort of subpoena. And there's

10 nothing in the federal rules that says that we can't ask for

11 additional information if it's relevant, and --

12    **THE COURT:** Well, yeah, but Rule 26 is going to

13 govern; right?

14    **MS. BAUGHMAN:** Right. And if it's relevant

15 information, we're entitled to it. And what the expert did --

16 let me -- and I can approach and provide you with a copy of the

17 billing records, if you would like to see them. They don't

18 even tell us which person at the company, SSPA, actually did

19 the work.

20    So it's the same consulting company that employs both

21 Dr. Hennet and Dr. Spiliotopoulos. And many other people

22 within their organization did work. We can't even tell what

23 Spiliotopoulos and Hennet did.

24    **THE COURT:** This is really kind of shaping up like

25 that *Seaman* case from the Middle District, right, where it

1  was -- I think it was two experts that were being used from a

2  single company, and Judge Webster -- I think Judge Webster

3  allowed for the total amount billed attributed to the experts'

4  work, so more than just the fee rate in the case.

5         **MS. BAUGHMAN:**  And I believe in that case you had to

6  indicate what each person did as opposed to the company --

7         **THE COURT:**  Right.  It was like a carve-out.

8         **MS. BAUGHMAN:**  Correct.  Correct.

9         **THE COURT:**  Okay.  So this is something that you

10 haven't been able to resolve; correct?

11        **MS. BAUGHMAN:**  That's true.  But what I started out

12 by saying is that DOJ has indicated that they're going to

13 produce records, including records indicating the amount done

14 per day and the task and that that will be produced later this

15 week.

16        So for the first two of the four issues that I'm

17 addressing right now, I believe we should put those on hold and

18 see what's produced first.

19        **THE COURT:**  Okay.  And that's a substance issue, but

20 it's also a time period issue; correct?

21        **MS. BAUGHMAN:**  Yes.

22        **THE COURT:**  Before August of 2022 and the substance

23 of the records?

24        **MS. BAUGHMAN:**  Correct.

25        There's one issue -- the first issue that's -- we

1    went through four.  The first one has to do with what they did

2    for this case, right.  But the background of this -- and this

3    has some overlap with what Mr. Dean has been talking about --

4    is that this same consulting company, and, in particular,

5    Dr. Hennet, has been working on Camp Lejeune-related issues

6    since at least 2005, and those issues are not related to this

7    case, okay.  I mean, it wasn't in anticipation of this case.

8    This case wasn't filed until, I believe, 2022.  So it couldn't

9    have been, right.  This was more than 15 years before the case

10   was filed.

11          And we believe that some of this information -- or

12   some of the work that Dr. Hennet did, based on documents that

13   DOJ is not claiming are privileged, includes things like

14   directing where wells should be drilled and what should be --

15   what contaminants should be tested for.  And it appears to us

16   that that would not be in anticipation of litigation.  It looks

17   like he was actually working on investigation or maybe

18   remediation of this site.  And so to the extent that work is

19   not in anticipation of litigation, we believe those documents

20   should be produced and the billing records related to that work

21   ought to be produced.

22          And this sort of overlaps into -- it goes into the

23   third issue that I've got on the one through four there.  The

24   third issue has to do with Dr. Spiliotopoulos who -- now, this

25   is different from the drilling of Dr. Hennet.  But, in 2005,

Case 7:23-cv-00897-RJ    Document 382-12    Filed 05/12/25    Page 14 of 58

1  Dr. Spiliotopoulos went as an observer, according to him,

2  according to his deposition testimony, to the 2005 expert peer

3  review panel that ATSDR put on where it was tying to figure --

4  it was trying to get feedback on the methodology it was using

5  for the water molding, okay.

6          So there were two -- there was -- 2005 and 2009 they

7  did this, two days each time, where they brought in experts

8  from around the country to provide feedback to them.  And

9  Dr. Spiliotopoulos went to the two-day meeting in 2005 as an

10  observer, and we believe he took notes, and we believe he

11  reported back to SSPA about what -- and his supervisors

12  there -- about what he heard and saw and maybe what his

13  impressions were.

14          Now, DOJ is claiming work product.  Well, work

15  product is supposed to protect the impressions and the opinions

16  of attorneys.  Dr. Spiliotopoulos testified that he didn't even

17  know -- to the extent that was for litigation, he wasn't aware

18  of it.  He didn't know what litigation it would have been for.

19  He was just there to observe and report back.

20          So I don't see how his notes would reflect attorney

21  observations or attorney thought processes here.  He didn't

22  know what litigation, if any, it was for.

23          And why is it relevant?  Well, because if he's saying

24  something then that contradicts what he says later when he's a

25  retained expert, that's relevant.  That's fodder for

Case 7:23-cv-00897-RJ    Document 382-12    Filed 05/12/25    Page 15 of 58

1   cross-examination.

2          And on the flip side, right, Mr. Maslia has been

3   working from the ATSDR on these issues since 2004, and all of

4   his notes, all of his emails, all of the work that he did was

5   produced all the way up through the entire time --

6          **THE COURT:**  Didn't you say the same thing about any

7   lecture he's given or talk about anything that's relevant?

8          **MS. BAUGHMAN:**  We've produced everything that we have

9   on Mr. Maslia.

10          **THE COURT:**  I mean, it just -- it seems that this

11   would be endless -- this would be endless discovery.

12          **MS. BAUGHMAN:**  To the -- I don't think there is an

13   endless amount of work that Dr. Spiliotopoulos did on Camp

14   Lejeune.

15          Maybe one idea would be for the DOJ to provide a

16   privilege log so we could see what exactly exists.  Also, I

17   believe under work product, if they're claiming it's in

18   anticipation of litigation --

19          **THE COURT:**  I'm not even talking about privilege.

20   I'm talking about relevance.

21          **MS. BAUGHMAN:**  Relevance would have to do with

22   cross-examining him on whether he's taking inconsistent

23   positions now than he did before when he wasn't a retained

24   expert.

25          **MR. DEAN:**  Judge, may I supplement that with just one

1  fact?

2         I took Dr. Hennet's deposition.

3         **THE COURT:**  Again, I don't know anything about these

4  depositions.  I don't know anything about the reports.

5         This sounds to me like it's something that would be

6  in an expert's credentialing, in their CV; right?  He gave --

7  he or she gave a lecture in 2005 about ATSDR.  Well, I imagine

8  they gave a lot of lectures.  Experts generally do that.

9         Couldn't you say the same kind of argument about

10  every single lecture an expert gives, where you would be going

11  endlessly through their prior experiences of giving lectures

12  and taking notes on issues, and then you're saying that all of

13  that would be discoverable because it's germane to the --

14         **MR. DEAN:**  Judge, this is a little different, and

15  I'll try not to get into what we're going to talk about in

16  chambers.  But it is a fact from a Government-sponsored website

17  called usaspending.gov that the only and first contract between

18  S.S. Papadopulos & Associates and the Department of Justice was

19  only approved and authorized retention and work to be done on

20  November 30, 2005.

21         Now, Spiliotopoulos and Mr. Hennet are doing work

22  prior to that date for -- we believe for the Navy, for NAVFAC,

23  might have been consulting with the Department of Justice.  But

24  only the contract that existed for which these two experts now

25  in this case could have been billing against was a 2002 General

1 Services Administration $18 million contract that expired in
2 2009.  So they couldn't have billed their work for the 2005
3 contract when they did this work, including Mr. Spiliotopoulos.

4          And the only reason we need Mr. Spiliotopoulos' notes
5 is, like Ms. Baughman said, if I have Mr. Hennet on
6 cross-examination and he signed an affidavit in a case called
7 Baby Washington in 2020 where he's utilized ATSDR's findings,
8 relied upon it, claiming that that Baby Washington was not
9 contaminated, he's sort of taking an inconsistent position now.
10 And then for 20 years prior to that, he had access to all this
11 information, all this data.  Mr. Spiliotopoulos showed up at a
12 working expert panel meeting and never voiced objection, never
13 said anything over 20 years was wrong with ATSDR's work.

14          That's why Ms. Baughman and I sort of bulldog on this
15 issue, with all due respect, Your Honor, is to show that these
16 experts had 20 years to say what they are now saying, and we
17 need to know exactly what it is they had access to and what
18 they did back in 2005 through 2022 and who were they working
19 for.

20          The Spiliotopoulos issue -- I didn't mean to digress,
21 but the Spiliotopoulos issue is solely his notes and
22 information he developed at this meeting.  He didn't lecture.
23 He just was at the meeting just taking down notes.  He was a
24 participant.  We don't even know who he was participating for.
25          **MS. BAUGHMAN:**  Let me be clear about that.  He

testified that he was there at the request of his superiors,

his boss at SSPA, right, and that he had been asked to go there

as an observer to take notes.  He did not know whether it was

for litigation or not.  If it was for litigation, he didn't

know what litigation it was for, but he did say that the client

was the Department of Justice.

So this is different from something like -- again,

every piece of paper that Mr. Maslia created from 2005 and

earlier and all the way up until he left the ATSDR has been

produced.  They have all of it.  They have everything he wrote,

everything he thought, everything he said at these meetings.

And we're just asking for -- if they're -- they are the ones

who brought up that Dr. Spiliotopoulos was at that meeting.  We

want his notes from that meeting, and it's not work product

because it wasn't for litigation.

**THE COURT:**  Well, so what?  What's in the notes?

**MS. BAUGHMAN:**  We don't know.

**THE COURT:**  What do you think is in the notes?  Why

do you want them?

**MS. BAUGHMAN:**  Possibly statements that contradict

what he wrote in his report about the substance of --

**THE COURT:**  So opinions that he jotted down while he

was listening to a lecture?

**MS. BAUGHMAN:**  Your Honor, I don't know what he wrote

without seeing it.  I think it's relevant what he thought to

Case 7:23-cv-00897-RJ    Document 382-12    Filed 05/12/25    Page 19 of 58

1 write down, what he thought was important, what he reported

2 back in a nonlitigation setting about the same thing he's

3 talking about now.

4        **THE COURT:** Okay. So that was three and four?

5        **MS. BAUGHMAN:** That's three.

6        Number four, we have been told that despite the fact

7 that Dr. Spiliotopoulos wrote in his report that he was relying

8 on summaries of interviews, in fact, that was from some sort of

9 template that he used for his report, and, in fact, there are

10 no such summaries. That's part of multiple lines of inquiry of

11 why are there things in his report that he doesn't know about,

12 that he couldn't back up at his deposition, and that's in his

13 report, but now they're saying, well, that was from a template;

14 he didn't really have any witness summary. So they're saying

15 it doesn't exist. So number four goes away based on that.

16        **THE COURT:** All right. Mr. Bain?

17        **MR. BAIN:** Yes, Your Honor.

18        On the billing records, as you mentioned, there are

19 two parts of that. With respect to the billing records for

20 this case, we're looking into presenting or providing more

21 detailed information that the Plaintiffs are seeking and will

22 be doing that this week.

23        With respect to the old work which was not related to

24 this case but was for prior litigation, we're looking at

25 providing some basic information, but not the detailed billing

Case 7:23-cv-00897-RJ    Document 382-12    Filed 05/12/25    Page 20 of 58

1 records.  We think that goes beyond what should be provided.

2 It was not for this case, which is what Rule 26 is limited to.

3        The notes -- and we can get into some of this in

4 chambers because it is related to this email that Mr. Dean has

5 provided to you about whether or not these particular experts

6 were involved in litigation at the time.  But our position is

7 that they are protected work product information because the

8 experts were involved in consulting for litigation at that

9 time.

10        Moreover, CMO-17 protects notes of experts if they

11 are not the only document relating to facts that are otherwise

12 available to them.  Mr. Spiliotopoulos was at a meeting of

13 ATSDR taking notes.  The meeting was transcribed.  The

14 Plaintiffs have access to that meeting transcription.  So they

15 know what occurred at that meeting.  Dr. Spiliotopoulos' notes

16 were just notes of that meeting and his impressions, which are

17 protected.  And it's protected not only by attorney work

18 product but by CMO-17.  The Plaintiffs relied on CMO-17 for

19 protecting their own experts' notes.

20        With respect to the notes that Mr. Spiliotopoulos

21 referred to in his report, he did make a mistake that there

22 were interview notes that he did not have.  Plaintiffs' experts

23 had made mistakes about similar things, such as that their own

24 expert looked at their own historian's report, and he did not.

25        So these are just the errors that occur when you are

1  producing a lot of reports over a short period of time.

2          **MS. BAUGHMAN:**  Your Honor, may I briefly respond?

3          **THE COURT:**  Yes, ma'am.

4          **MS. BAUGHMAN:**  Okay.  The statement that there are

5  other records of what was said at that meeting in 2005 is true,

6  but the protection that is claimed is only if that document is

7  work product, okay.  And what we're saying is we don't think

8  it's work product.

9          And Dr. Spiliotopoulos testified -- and this is on

10 page 118 of his deposition, lines 3 through 7.  He was asked:

11 "You don't know whether or for what reason Dr. Hennet asked you

12 to be at that expert panel meeting, whether it is for

13 litigation or something else; right?"  His answer:  "I have no

14 idea."

15         So I don't see how him attending that meeting could

16 be for litigation if he didn't even know that he was there for

17 litigation.  And it may be that the thing to do here would be

18 for the DOJ to provide a privilege log that identifies these

19 documents, to and from, like who wrote it, who received it, the

20 CCs, and what litigation specifically this was done in

21 anticipation of, which case, because I don't think there is a

22 broad, you know, you can hire an expert and let them do

23 anything they want to do and then later say it was for

24 litigation.

25         In another vein, DOJ has said, well, these were part

1  of an expert report.  These were notes that were part of an

2  expert report, but which expert report, because he didn't even

3  know he was there for litigation.  So we don't know which

4  litigation or which report or whose report, because he's never

5  been retained as an expert except, he said, in 2022 or '23 for

6  this case.

7          With respect to CMO-17, my interpretation of CMO-17

8  is that's talking about work done and notes taken for this

9  litigation, not notes that the expert had done 15 years ago,

10  okay.

11          So -- and we did cite case law, admittedly from the

12  Ninth Circuit, saying that experts' notes and memorandum, or

13  whatnot, are not covered by work product where it wasn't done

14  as part of the report and for litigation.  You can't just say

15  all the work the expert ever did that's relevant and related to

16  the case is work product.  It has to be specifically done in

17  anticipation of specific litigation and for that report.

18          And there's no -- we haven't been told which report,

19  which litigation for -- by which expert.  He didn't write a

20  report until 2024 or '5.

21          **THE COURT:**  Okay.

22          **MR. BAIN:**  One thing I would say, Your Honor, is the

23  representation that he didn't know what he was going there

24  for -- he was very junior at the time.  He was sent by the

25  people we have hired as retained experts to go to this meeting

1   and take notes 20 years ago.

2   **THE COURT:**  I'm going to have to have a lot more

3   information.  You all are much more informed on this than I am.

4   And so to make a decision on this, I'm going to have to have a

5   lot more information, whether that's through a privilege log or

6   whether it's briefing.

7   Tell me what you think.

8   **MS. BAUGHMAN:**  Your Honor, I would suggest as an

9   initial matter, there'd be a privilege log.  And then that may

10  resolve it.  And if it doesn't resolve it, then we could file a

11  motion.

12  **THE COURT:**  Okay.  I would like to know what I'm

13  looking at, though.

14  **MR. BAIN:**  Your Honor, I think we could discuss this

15  a little more in chambers and give you a little more

16  information, and then we can decide where to go from there.

17  **MR. DEAN:**  All of this kind of ties together.  I

18  think in ten minutes we can tell you what's going on.

19  **THE COURT:**  Okay.

20  **MS. BAUGHMAN:**  Your Honor, just to be clear, I have

21  another issue that's not related to those four.

22  **THE COURT:**  Right.

23  **MS. BAUGHMAN:**  And I don't know if you want to hear

24  oral argument.  At the last status conference, I was on the

25  phone, and we discussed this issue of Dr. Hennet having gone to

Case 7:23-cv-00897-RJ    Document 382-12    Filed 05/12/25    Page 24 of 58

1   Camp Lejeune and done a significant amount of work that he's

2   now relying on as a basis for his opinions in this case.  And

3   you suggested --

4           THE COURT:  You've got a motion.

5           MS. BAUGHMAN:  -- that we file a motion.  We did file

6   a motion.

7           THE COURT:  Yeah.

8           MS. BAUGHMAN:  It's fully briefed.  I don't know

9   whether the Court wants oral argument, but I'm prepared to

10  argue it today.  And I believe that DOJ represented that it

11  would be prepared to argue as well.

12          THE COURT:  Okay.  Otherwise, you're done with

13  your --

14          MS. BAUGHMAN:  Yes, sir.

15          THE COURT:  What have you got?

16          MR. BAIN:  Mr. Carpenito has a few items to address,

17  and then Ms. O'Leary is here if you want to have an argument on

18  that motion.

19          THE COURT:  Okay.  We'll go to Mr. Carpenito.  You

20  can go first.

21          MR. CARPENITO:  Thank you, Your Honor.

22          Just one point with respect to something Mr. Roberts

23  stated at the beginning.  I believe he said that PLG was

24  supplementing the DPPFs quarterly.  The parties' agreement was

25  that PLG is supplementing a spreadsheet quarterly.  When we

1  attempted to ask for supplemented DPPFs quarterly, PLG

2  responded that that was too burdensome.  So that's how we

3  reached the agreement with respect to an updated spreadsheet.

4  PLG provided that first update April 10, and I believe an

5  updated DPPF will come one time closer to trial.  So I just

6  wanted to make sure that the record accurately reflects that

7  agreement.

8          Next, if I may, with respect to the Mousser case,

9  which is the kidney cancer Plaintiff --

10         **THE COURT:**  Right.

11         **MR. CARPENITO:**  -- who was recently diagnosed with

12  bladder cancer, Mr. Roberts is correct; we did respond to PLG

13  last Friday with our proposed timeline.  The only thing I'd

14  like to note for the Court, Your Honor, is we are not yet sure

15  whether PLG intends to submit rebuttal reports to our

16  supplemental reports, and that may disrupt deposition timing.

17  Obviously, we have not crossed that bridge at this time.  I

18  just wanted to raise that for the Court.

19         **THE COURT:**  Okay.  Is that it for you?

20         **MR. CARPENITO:**  Your Honor, if I may, at the last

21  status conference, the United States did raise its intention to

22  propose a deadline for final expert supplementation.  We had a

23  meet-and-confer with PLG on this issue on April 16th, during

24  which the United States proposed setting a supplementation

25  deadline for expert causation opinions --

1        **THE COURT:**  Right.

2        **MR. CARPENITO:**  -- that would not impact the overall

3    discovery schedule.  PLG acknowledged that the discussion was

4    beneficial, but that it was premature to set such a deadline at

5    this time.

6        So the parties will continue to engage on that issue,

7    and I just wanted to make the Court aware of that.

8        **MS. BUTLER:**  Your Honor, I can address that if you

9    want to hear more.  That's an ongoing issue.  As Mr. Carpenito

10   stated, we reached an agreement with DOJ on the DPPF

11   supplementation.  We have a spreadsheet.

12       **THE COURT:**  Right.

13       **MS. BUTLER:**  We supplemented it April 10.  We're

14   doing that every quarter for so long as this case goes on with

15   a final supplementation of the DPPF 120 days before trial.

16       Separate from that, the DOJ had requested that there

17   be essentially a cutoff after which these Plaintiffs, who have

18   obvious serious health issues and ongoing diagnoses, treatment,

19   and additional diagnoses -- that there be some sort of cutoff

20   after which they can't recover.  And we have rejected that, but

21   we are in ongoing negotiations about how to deal with that.  I

22   don't think there is any issue before the Court right now that

23   happens --

24       **THE COURT:**  Well, yeah, I think it was in the future

25   expert supplementation portion of the status report.

Case 7:23-cv-00897-RJ    Document 382-12    Filed 05/12/25    Page 27 of 58

1          **MS. BUTLER:**  That's -- they wanted a date after which

2    no additional medical issues could be considered so that --

3          **THE COURT:**  Right.

4          **MS. BUTLER:**  -- they could supplement reports.

5          **THE COURT:**  Right.  And you all said that it would be

6    resolved through the normal course and appropriate procedures.

7    And my notes were what are -- what is the normal course to

8    address this and the appropriate procedures.

9          **MS. BUTLER:**  Well, I mean -- and Mr. Ellis and

10   Mr. Roberts can address this as well.  But this is an ongoing

11   issue in cases involving, you know, ongoing health issues, and

12   it's addressed in the normal course through supplementation.

13   And if an additional hour needs to be taken for -- it would be

14   addressed on a case-by-case basis, and it kind of depends.  Is

15   there another Mr. Mousser situation, you know, where you have a

16   kidney cancer plaintiff who has additional serious, serious

17   health issues, or is it something more minor that can be

18   addressed in another manner?  You just address it case by case,

19   depending on the issues, and hopefully agreement can be

20   reached.

21         But we don't think that the Plaintiffs should be cut

22   off from presenting damages based on ongoing health issues, and

23   that's really the rub.

24         **MR. CARPENITO:**  Your Honor, may I respond?

25         **THE COURT:**  Sure.

1          **MR. CARPENITO:**  We do not dispute supplementing with

2     respect to the Plaintiffs' evolving conditions for damages

3     purposes, but what we did propose in this meet-and-confer was

4     with respect to causation opinions.  So I do want to make that

5     distinction for the record.

6          We also discussed during that meet-and-confer, as

7     Ms. Butler noted, the potential for a case-by-case review.

8     During the March 25th hearing, the Court seemed interested in

9     setting certain deadlines, and so we were trying to come to an

10    agreement to expedite things.  But, certainly, we would be open

11    to a discussion in another case such as Mr. Mousser's.  But,

12    openly, we cannot agree to something like that until we were

13    confronted with such.  But we were just trying to come to an

14    agreement on the front end.

15         **MS. BUTLER:**  Well, we've already agreed as part of

16    the DPPF agreement that we've addressed before this Court that,

17    you know, any requests to reopen depositions, you know, any

18    requests for further supplementation of reports we'll address

19    on a case-by-case basis.

20         I mean, without a trial date being set and not

21    knowing how far into the future we're looking, it's really hard

22    to set a deadline.  And I don't think the Plaintiff should be

23    precluded from having their experts or their damages consider

24    ongoing health issues.  So I think at this point we have an

25    agreement to discuss things on a case-by-case basis.  That's

1    what we've been doing.

2            **THE COURT:**  This has just been limited to Mr. Mousser

3    at this point; correct?

4            **MS. BUTLER:**  Correct.

5            **THE COURT:**  Okay.

6            **MS. BUTLER:**  But should another Mr. Mousser come up,

7    we'll address it in a similar fashion.  We just -- we really do

8    not believe there should be a cutoff date for ongoing health

9    issues.

10           **THE COURT:**  Okay.  All right.

11           Did we talk about clawback?

12           **MR. CARPENITO:**  Your Honor, if I may, that was what

13   we were going to address in chambers.

14           **THE COURT:**  Okay.  All right.  I was just going

15   through my notes here.

16           Were the parties rethinking disease selection for

17   Track 3?  I think Mr. Bell mentioned last time rethinking

18   diseases for Track 3.

19           **MR. BAIN:**  Mr. Bell did raise that at the last status

20   conference.  He has not reached out to us yet about that.

21           **THE COURT:**  Okay.  The Court is interested in disease

22   census information for claims to the DON.  I guess that would

23   come from you guys?

24           **MR. BAIN:**  Yes.  Would you like that submitted before

25   the next status conference?

Case 7:23-cv-00897-RJ    Document 382-12    Filed 05/12/25    Page 30 of 58

```
1            THE COURT:  That would be great, as well as
2    complaints filed in court.
3            MR. BAIN:  I think Mr. Bell said he had that
4    information.
5            THE COURT:  So the Court would like that information.
6            Okay.  I think I'm ready to hear from Ms. Baughman
7    on --
8            MS. BAUGHMAN:  Thank you, Your Honor.
9            THE COURT:  -- the site visit.
10           MS. BAUGHMAN:  Yes.  So Plaintiffs have filed a
11   motion, and there's been a response.  I am going to be
12   referring to some of the exhibits to the motion.  I think I
13   have some of them in hard copy here, if the Court wants them.
14   But let me just --
15           THE COURT:  Are they already submitted?
16           MS. BAUGHMAN:  They've been submitted.  The only one
17   that hasn't, if I could approach, Your Honor, and provide it,
18   is the -- actually, no, it's submitted as part of the DOJ's
19   response.  Dr. Sabatini's deposition was taken after the
20   Plaintiffs filed their motion but before the DOJ filed its
21   response, but that was provided with DOJ.
22           So with that, then, the Court has everything already.
23           THE COURT:  Okay.  I am going to give my outline for
24   this discussion after reading the briefing, and here it is:
25           Ask the parties to summarize their respective
```

1  positions.

2          Two, what is the core factual dispute?

3          Three, is it just a disagreement over the water fall

4  height at the Hadnot Point's spiractor effluent pipes?  Is this

5  just a subjective question or is it objective?  So which

6  measurement is correct?

7          Plaintiffs originally proposed a compromise whereby

8  Dr. Sabatini was allowed a similar site visit to Dr. Hennet's

9  visit in February 2025.  Is this still adequate relief to solve

10 the dispute?

11         And then does either party plan to file a motion to

12 seal either of the proposed sealed exhibits?

13         **MS. BAUGHMAN:**  Okay.  Let me start with -- I am going

14 to start with the question that you asked about is Dr. Sabatini

15 going to the site -- would that solve the problem.  The issue

16 with that is the schedule that we have here.  Plaintiffs asked

17 for the visit to occur before Dr. Sabatini was going to be

18 deposed so that, just like Dr. Hennet, he could rely on what he

19 saw in his deposition testimony so that he could see what

20 Dr. Hennet saw, speak to the people Dr. Hennet spoke to,

21 observe the things Dr. Hennet observed, et cetera.  And the DOJ

22 said no to that.

23         So what has happened in the meantime -- we had three

24 weeks to get that done when we asked for it.  It could have

25 happened.  They said no.  They said, well, we want two

1   unrelated depositions in exchange, which has nothing to do with

2   this issue.  All we were trying to do is get on the same

3   footing as Dr. Hennet, and they said no.

4          So what happened then is because we have a schedule

5   in place that all leads up to *Daubert* motions, which are due

6   tomorrow, okay -- ours on their experts and theirs on ours are

7   due tomorrow -- we produced Dr. Sabatini for his deposition.

8   So at this point I think it's too late.  I don't see how

9   allowing Dr. Sabatini out there -- unless we then push back the

10  *Daubert* briefing on Dr. Sabatini and Dr. Hennet, allow the site

11  visit, have new deposition of Dr. Sabatini based on what he

12  observed, and then have the briefing, which we think it's --

13  there is no reason to do that.

14         DOJ had an opportunity to cure what it did in

15  violation of this Court's scheduling order, and they chose not

16  to, right.  We have a scheduling order.  It said when

17  Dr. Hennet's report was due.  It was due December 9.  And that,

18  according to the federal rules, meant that his opinions and the

19  bases for his opinions needed to be in that report.

20         And I want to be very clear about something.

21  Dr. Sabatini did not introduce anything new that Dr. Hennet

22  wasn't already aware of regarding this one-foot fall, okay,

23  because the thing is, in Dr. Hennet's report, he puts a figure

24  in there, all right.  And that figure is from the AH

25  Environmental report.

1          So if we go back in time, in 2004, the Navy and the

2    Marines were saying, you know what, we think all of this was

3    resolved by volatilization at the treatment plant.  And so they

4    hire AH Environmental, which is the Navy and Marines'

5    consultant, not ATSDR's consultant, to go out and investigate

6    this and write a report about what the extent of volatilization

7    of these chemicals would have been at the treatment plant; in

8    other words, how much of it escaped just into the air based on

9    what they did at the water treatment plant.

10         AH Environmental did that, and they wrote up a

11   report.  And everybody has that.  It's from 2004.  And it is

12   relied on by Dr. Hennet in his December report, including a

13   schematic from AH that says there was a one-foot drop.

14         And even more importantly, in that same report -- and

15   let me be clear for the record.  The AH Environmental report is

16   Exhibit 3 to Plaintiffs' motion.  And the schematic that I am

17   referring to that says it was a one-foot drop is on page 3-10,

18   and that very same schematic shows up exactly verbatim in

19   Dr. Hennet's December report as -- which is Exhibit 1 to

20   Plaintiffs' motion on page 5-4, showing the one-foot drop.

21         Then, even more importantly, in the AH report, which

22   is Exhibit 3, on page 4-2, AH Environmental explained that

23   there was a big difference in the drop at Hadnot Point versus

24   Holcomb Boulevard.  Why is that important?  Because Dr. Hennet

25   had this report when he wrote his report in December, and he

Case 7:23-cv-00897-RJ    Document 382-12    Filed 05/12/25    Page 34 of 58

1  knew that the Navy's own expert was -- or consultant was saying

2  there's a big difference.  Even though the spiractors are the

3  same at Holcomb Boulevard and Hadnot Point, the drop is

4  different, and the drop is different because there is a

5  recarbonation basin right after the spiractors at Hadnot Point

6  that does not exist at Holcomb Boulevard.  And AH Environmental

7  said why that's important is there is only going to be a

8  one-foot drop because of the backup in the water from that

9  recarbonation basin at Hadnot Point as compared to Holcomb

10 Boulevard.

11        And I'm just going to read this sentence because it's

12 so clear.  They said, AH Environmental, on page 4-2 of

13 Plaintiffs Exhibit 3:  "Because of the downstream recarbonation

14 basin at that plant, the available head does not appear to

15 allow a fall height of greater than approximately one foot and

16 the effluent pipe is likely to be flowing full.  However, at

17 the Holcomb Boulevard water treatment plant, because of the

18 absence of a recarbonation basin, water falls approximately

19 two feet to the bottom of the horizontal pipe section..."

20        So this difference between the two plants was set out

21 in a document that Dr. Hennet had, and Dr. Hennet testified

22 that he was aware of this.  And he asked before his report that

23 he could get a measurement of the drop at Hadnot Point, and he

24 didn't do it.  And, instead, he relied on Holcomb Boulevard.

25        So on that issue, Your Honor, Dr. Sabatini didn't

Case 7:23-cv-00897-RJ   Document 382-12   Filed 05/12/25   Page 35 of 58

1 raise something new that, all of a sudden, Dr. Hennet needed to

2 go and check out after all of the reports were done.  He was

3 aware of it beforehand, and he chose to ignore that and just go

4 with the two-foot and not to do a measurement at Hadnot Point.

5 So this isn't something newly raised by Dr. Sabatini.

6 　　　　　And the other issue -- I know you didn't raise this,

7 but the DOJ did.  The other attempted excuse that DOJ tries to

8 give for why they had to go out in February and do this new

9 site visit and new collection of information and data was that

10 there were these two affidavits from two Plaintiffs about the

11 use of the water buffaloes and how they were filled.

12 　　　　　And let me be very clear about this.  There's a big

13 distinction between knowing that there are multiple ways to

14 fill water buffaloes and how frequently one way was used versus

15 the other, okay.

16 　　　　　So a water buffalo, in case you don't know, is this

17 is a big tank that you can move around the site and provide

18 water where there isn't water where the Marines were training

19 and doing other activities, okay.  So you can fill it different

20 ways.  You can fill it through this little valve that has a

21 strainer, right, or you can go to the top and there is a

22 manhole, right.  You can open it, and you can fill it that way,

23 all right.

24 　　　　　The instructions provided by the Army for how to fill

25 these changed over time.  And their historian, DOJ's historian,

Case 7:23-cv-00897-RJ    Document 382-12    Filed 05/12/25    Page 36 of 58

1  had pictures and had instruction manuals in the report -- in

2  its report about that, okay.  Dr. Sabatini didn't make up the

3  instructions.  The instructions existed before December of 2024

4  when Dr. Hennet issued his report.  Dr. Hennet offered a report

5  solely about how much volatilization there would be if you go

6  through that little spigot with the strain; didn't mention

7  anything at all about how much volatilization there would be if

8  you go through the manhole, okay.

9         Now, if you look at Dr. Sabatini's report, which is

10  Exhibit 5 of the Plaintiffs' motion, there is an appendix -- he

11  has an appendix called the "Water Buffalo Appendix" to his

12  report, again part of Exhibit 5.  On page 4 of that appendix,

13  there's information about a World War II era water buffalo that

14  says there that you can fill it through the cover.  You can do

15  it either way, two ways to fill the water buffalo, okay.  And

16  cited in support of that is a document, BRIGHAM_USA Bates

17  number, which means that's their historian's document showing

18  that it says on the water trailer the manhole cover should be

19  kept closed and held down tightly with the wing nut, except

20  when tank is being filled through this cover.  That's in their

21  only document that they had before December of 2024 when they

22  provided their reports.

23         Then on pages 14 and 16 of the water buffalo

24  appendix, there are additional technical manual documents, one

25  from 1972 and one from 1985, that instruct when that you're

1 filling the water tank, you should open the manhole cover and

2 make sure the tank is clean, flush the tank, and then fill it,

3 okay.

4 So that's -- those are the instructions.  Those are

5 the facts.  Dr. Sabatini didn't make this up or provide

6 anything new, right.  The fact that there are two affidavits

7 saying, yes, in the late 1960s we were filling through the

8 manhole cover, okay, whether those two individuals saw this and

9 what they observed doesn't change the fact that these

10 instructions existed, that the relevant time period here

11 includes 1972 through 1985, that the instructions said to fill

12 through the manhole in 1972.

13 So Dr. Hennet had or should have had all of that

14 information before he provided his report.  He chose to only

15 provide a calculation about how there's volatilization, one

16 method of filling, not the other method of filling.

17 Dr. Sabatini then provides an opinion about both

18 methods of filling, okay.  And then Dr. Hennet realizes he

19 didn't include that.  So he wants to go back and observe

20 filling through the manhole cover and then provide us with

21 notes, which are attached to -- the two pages of notes are

22 attached to Plaintiffs' motion as -- that's Exhibit 6.  Those

23 are the two pages of his notes that the DOJ claims need to be

24 sealed.

25 To answer your question about that, we don't think

1  there's any reason to seal those.  So if there needs to be a

2  motion to seal, that should be filed by the DOJ.  We were just

3  respecting their position on that by filing it under seal.

4         So let me go back.  Dr. Hennet did a lot -- what I'm

5  trying to say about those two things, the two excuses that DOJ

6  is giving that everything -- these were new things that they

7  needed to go look at, they were aware of or should have been

8  aware before.  They knew about the one-foot drop.  They should

9  have known about multiple ways to fill the manhole.  They only

10 covered one way.  That's on them, okay.

11        So what else did Dr. Hennet do when he went out

12 there?  He didn't just address those things.  He also took 100

13 photos.  He also met with base personnel and questioned them

14 about things like how often -- how big were the water

15 fluctuations.  And we don't know, frankly, all of the things he

16 asked them because he didn't provide -- if he was going to do

17 this, he should have provided a supplemental report, because

18 I'm going to get to how are we prejudiced here.

19        We are prejudiced because the federal rules say you

20 have to put the basis for your opinions in your report.  Now

21 he's gone out there and collected 100 -- taken 100 photos, made

22 measurements, interviewed personnel.  He said he had a

23 30-minute meeting where he talked to five different people.  He

24 doesn't know who they were.  He doesn't know what their

25 positions were.  He doesn't know how long they were there.  But

Case 7:23-cv-00897-RJ    Document 382-12    Filed 05/12/25    Page 39 of 58

1  he's relying on this as new information for his opinions.

2        He also viewed -- there was a monitor that had

3  information about fluctuations of water.  Now, it only had it

4  for, I think, the last -- relevant to the last seven days of

5  how much the water had fluctuated in different tanks, but he

6  looked at that.  He didn't take pictures of it.  We don't know

7  what it said, but he's relying on it for his opinions.

8        All of that, Your Honor, under the federal rules

9  should have been in his report.  And so what that means is when

10  he testifies at a hearing or at a trial, if he's allowed to

11  rely on what he did in February, we don't know what he's going

12  to say.  We don't know what he's going to pull out of his hat

13  that someone told him there or that -- some measurement he took

14  that we don't know about or something he saw on the screen

15  because he didn't put it in his report, which is what's

16  required under the rules.

17        He also said, you know, in his deposition, when he's

18  talking about what he did out there --

19        **THE COURT:**  So this wasn't in his report; correct?

20        **MS. BAUGHMAN:**  Nothing regarding what he did in

21  February 2025 is --

22        **THE COURT:**  But this came out in his deposition;

23  right?

24        **MS. BAUGHMAN:**  Yes.  Yes.  Yes.  But we -- to be very

25  clear, we didn't have time to ask him about everything everyone

Case 7:23-cv-00897-RJ    Document 382-12    Filed 05/12/25    Page 40 of 58

1  said, what all of the 100 photos were of because we only had

2  seven hours.  And he just -- we don't know the extent of what

3  he did and what he's relying on because we don't have it in a

4  report, okay.  That leaves him free to just throw anything out

5  at any time in support of his opinions and we won't know.

6        Another thing is he went around and he said he

7  observed turbulence and the bubbling of the tanks.  That's in

8  his notes that are sealed as Exhibit 6.  Again, there's no

9  reason that he couldn't have seen that and put it in his report

10 earlier.

11       So going to what the DOJ claims, they say, well, it's

12 new -- it wasn't new.  I've covered that -- and that we're not

13 prejudiced because of this.  We are prejudiced.  It wasn't

14 harmless, and the reason why is because I've explained that we

15 don't know how that affected the basis of his opinions.  He

16 has -- and he has new opinions.  His new opinions are he's

17 going to opine about the extent of the volatilization through

18 the manhole.

19       **THE COURT:**  Well, I'm sure you asked him about this

20 in his deposition, didn't you?

21       **MS. BAUGHMAN:**  But he didn't do a calculation.

22       We don't -- you know, and the other thing is that he

23 made new measurements and just -- the case law on this, Your

24 Honor, from this Court and from the Middle District of North

25 Carolina cited in Plaintiffs' motion, the *Akeva* case and the

1  *Severn Peanut* case, talk about how you're not allowed -- I'm

2  sorry.  Let me get to this.

3          In *Akeva*, the expert tried to supplement their report

4  with the results of an additional test after the expert report

5  had been provided.  And the court said:  "This Court" cannot

6  allow -- "'cannot accept a definition of supplementation which

7  would essentially allow for unlimited bolstering of the expert

8  opinions.'  To construe supplementation to apply whenever a

9  party wants to bolster or submit additional expert opinions

10 would reek" [sic] "havoc on docket control and amount to

11 unlimited expert opinion preparation."

12         Similarly, in *Severn Peanut*, this court said that

13 "appropriate supplementation occurs when the previous

14 disclosures 'happen to be defective in some way so that the

15 disclosure was incorrect or incomplete and, therefore,

16 misleading,'" focused on "misleading."  You're only allowed to

17 correct something that's misleading.  You're not supposed to go

18 back and correct a mistake where you should have covered

19 something or should have made a measurement or you should have

20 talked about the manhole opening, and you missed it, so you're

21 going to go back and correct it.  That's not what 26(e) is

22 supposed to cover.  So we're prejudiced.

23         We've already taken the depositions, right.

24 Dr. Sabatini has been deposed.  Dr. Hennet has been deposed.

25 Our motions are due tomorrow for *Daubert* on these experts.  And

1 they just went and flouted the Court's order. And they could

2 have raised it with the Court. They could have raised it with

3 us. We could have negotiated something where both experts

4 could go out there, maybe even at the same time. But they

5 didn't in violation of the Court's order and then wouldn't

6 allow us to do the same thing where there was time, where

7 Dr. Sabatini could have gone before his deposition.

8            So the prejudice to us is both his new opinions,

9 right, new opinions on volatilization via the manhole, new

10 opinions -- and providing a new measurement that he didn't have

11 before, and that this is unlimited bolstering basis in his

12 report via the rules.

13            **THE COURT:** Okay. This is not new. We were talking

14 about this the last time and maybe the time before that. So

15 why couldn't you have done something before today? You got

16 reports due tomorrow.

17            **MS. BAUGHMAN:** *Daubert* motions are due tomorrow.

18            **THE COURT:** Yes. So why couldn't you all have worked

19 this out a month ago or six weeks ago?

20            **MS. O'LEARY:** Allison O'Leary for the United States,

21 Your Honor.

22            We did try and work this out when this issue came up

23 from the Plaintiffs, specifically this dispute. We believe

24 that this is a late request that came after the close of

25 Phase I discovery for a site visit that they could have made

1  when they received Dr. Hennet's report or in the years that

2  they had retained Dr. Sabatini before they even received

3  Dr. Hennet's report.

4          I think the issue here is that the Plaintiffs simply

5  don't want the Court to consider relevant information because

6  it's unfavorable to them.

7          Their argument is that Dr. Hennet's site visit

8  information was disclosed after the Court's case management

9  order for 26(a) expert disclosures.  There's no dispute that

10 that is true.  But the Plaintiffs have argued that because it

11 would not be justified independently under Rule 26(e), it's not

12 allowed and the Court must exclude it.  And that's where the

13 argument is flawed.

14         An argument that some sort of information was not

15 disclosed as it was required to be under 26(a)

16 (inaudible/coughing) materials in compliance with the deadline

17 for those materials under the case management order as governed

18 by 37(c), which looks at whether the party who received the

19 late materials was harmed and if the reason was substantially

20 justified.  And the test for looking at that is the *Southern*

21 *States* five factors from the Fourth Circuit, and all of those

22 factors favor allowing Dr. Hennet to rely on the information he

23 learned in his February site visit.

24         The first of those factors is surprise.  And surprise

25 here is very limited.  Dr. Hennet did no new calculation.  He

Case 7:23-cv-00897-RJ    Document 382-12    Filed 05/12/25    Page 44 of 58

1 changed no opinions, though he was asked about that several

2 times at deposition and was very consistent.  He didn't do new

3 experiments.  He just took two new measurements, and those

4 measurements, one of which was at the fall height of the

5 spiractors, confirmed his existing opinion about that height,

6 and the other, which was the timing to fill a water buffalo

7 through a different method than had been in his report, he

8 agreed with the Plaintiffs' experts.

9        Other things that Ms. Baughman brought up was that he

10 observed venting and learned about fluctuations in the heights

11 of water in reservoirs.  And Dr. Sabatini, the Plaintiffs'

12 expert, testified in his deposition that he assumed those

13 things were true, that those were normal and expected in a

14 water treatment plant.

15        In general, just to frame for Your Honor what sort of

16 information it is we're talking about from this site visit, it

17 is, one, the measurement of the fall height at a spiractor,

18 which is used by both Dr. Sabatini and Dr. Hennet for

19 calculating the UFC losses in that treatment process.  And both

20 Dr. Sabatini and Dr. Hennet agree on the method for calculating

21 that.  So the only dispute between them is what that fall

22 height is, which is an input parameter for that calculation.

23        The other information about venting and reservoirs

24 and water towers, about bubbling or turbulence at different

25 aspects of the water treatment plants and the reservoirs and

Case 7:23-cv-00897-RJ    Document 382-12    Filed 05/12/25    Page 45 of 58

fluctuations in the height of storage reservoirs, there are no measurements used in any calculations. These are not input things, and these, again, are things that the Plaintiffs' expert assumed existed.

At the water buffalo, Dr. Hennet timed the filling of it and observed turbulence and splashing during that process. That is the extent of what he learned at his site visit. Dr. Sabatini had observed YouTube videos of the same thing and disclosed those in the materials-considered list for his report, and Dr. Hennet agrees on the time that Dr. Sabatini had.

In terms of the cure, which is the second factor under the *Southern States* setup, the Plaintiffs had the photographs and Dr. Hennet's notes from his site visit more than three weeks before his depositions. They had time to prepare and, in fact, did and asked Dr. Hennet extensive questions about what he had done at his site visit and what he had learned. They did not ask for additional time at his deposition prior to that deposition, though they received the materials three weeks early.

And they have proposed prejudice in the fact that they had to spend time asking him about the site visit, and that is an unsound argument. Dr. Hennet visited Camp Lejeune two times previous to his February site visit, and the Plaintiffs had to ask him about those site visits as well, or

1 at least they felt the need to. Whether they had to ask him

2 about the site visit or not depends on their analysis of the

3 case and not the timing of that site visit. Just like his site

4 visit in May of 2024 was asked about, so was the other one.

5      The third factor is whether it will disrupt the

6 trial. And we have no trial date, no hearing date. And

7 Dr. Hennet's site visit did not even disrupt the Phase I

8 scheduling order because the United States worked quickly when

9 it received Dr. Sabatini's report to schedule Dr. Hennet's site

10 visit so that he could confirm the issues he needed to and

11 provided that information to the Hennets -- or to the

12 Plaintiffs well before Dr. Hennet's deposition.

13      The fourth factor is the importance of the evidence.

14 And on the spiractor fall height measurement, that is the

15 dispute between the parties on losses at storage and water

16 treatment. And both parties' experts agree that the losses at

17 the spiractor are the largest share of treatment and storage

18 losses. They agree on the method, as I mentioned. This is

19 purely a factual dispute about the height.

20      And I should add, too, though Dr. Hennet has a

21 measurement that he took from February and it confirmed what he

22 had assumed based on information about the similarities between

23 the fall height that had been measured at another plant and the

24 Hadnot Point one, Dr. Sabatini testified that he did not think

25 he needed to go to Camp Lejeune for a site visit. He didn't

Case 7:23-cv-00897-RJ    Document 382-12    Filed 05/12/25    Page 47 of 58

1  agree with the manner that Dr. Hennet had taken the measurement

2  of this fall height, and he could not identify a way that he

3  would take such a fall height, which would be difficult.  It

4  would involve trying to somehow measure inside an operating

5  pipe.

6         In terms of the reasons that the United States did

7  this measurement, which is the fifth factor, as I've already

8  explained, the fall height is central to this -- to an

9  important calculation on losses, and there is no methodical

10 dispute.

11        And in terms of the filling of the manhole cover,

12 this is the result of the Plaintiffs' late disclosures.  And I

13 want to make sure that the Court is not misled on what was

14 disclosed with Dr. Sabatini's report.  Dr. Sabatini's report

15 was accompanied by two affidavits from Plaintiffs, one of which

16 said that despite the instructions for these water buffalo

17 saying to fill them one way, they were filled another way.

18        So Dr. Hennet with this information, which had not

19 been disclosed and which should have been disclosed more than a

20 year earlier when the United States sent contention

21 interrogatories asking the Plaintiffs to identify the evidence

22 they were relying on related to water buffalo -- Dr. Hennet

23 then undertook to observe this method of filling that the

24 Plaintiffs disclosed for the first time with Dr. Sabatini's

25 report was the only way that water buffaloes had been filled.

page number

1          I also want to note, too, that the United States has
2   not cross-moved to exclude any of the Plaintiffs' many late
3   disclosures in Phase I because our understanding is that,
4   looking at these factors from *Southern States*, with the
5   exception of a very recent one, we don't think that it's
6   appropriate.
7          But Mr. Bain mentioned earlier whether any of the
8   Plaintiffs' late disclosures had occurred after depositions,
9   and I wanted to clarify that I believe Mr. Bain was referring
10  to the Phase II.  In Phase I, we have gotten multiple
11  disclosures after depositions.  I've mentioned a few in the
12  United States' brief.  When I mentioned the sensitivity
13  analysis on biodegradation rate, that came after the deposition
14  of Mr. Davis and at 10:45 the night before Mr. Jones.  The
15  supplement from those two experts came two weeks after both of
16  their depositions.
17         And then Mr. Maslia disclosed during his deposition
18  that he had done new calculations on a measurement of bias in
19  one of the models, and that, though it had been requested, the
20  notes on that were not disclosed until late last week.  I
21  believe it was Thursday evening.  That is, in fact, a
22  supplemental report including a new methodology that was
23  applied in six calculations.  And what the -- that came with an
24  offer from the Plaintiffs to allow a one-hour deposition by
25  Mr. Maslia on that, but such deposition would have to come

Case 7:23-cv-00897-RJ    Document 382-12    Filed 05/12/25    Page 49 of 58

1 after the deadline for *Daubert* motions that Ms. Baughman said

2 is prejudicing the Plaintiffs, which was not the case for them.

3 So PLG has been disclosing things frequently after

4 depositions in Phase I and, in the case of Mr. Maslia's

5 supplemental report received late last week, to the prejudice

6 of the United States.

7 To address a few of the questions, if I haven't

8 already, you raised Your Honor on whether this is a factual

9 dispute or objective and subjective, in regards to the

10 measurements, I think it's a factual dispute. It's objective,

11 though there is a subjective part that won't be resolved by

12 this, which is whether it's appropriate to measure the way that

13 Dr. Hennet did or to measure a different thing that

14 Dr. Sabatini described, but he could not explain how he would

15 take such a measurement.

16 And whether the Plaintiffs are requesting a site

17 visit, they did not include that in their motion. They have

18 not said they're requesting it now. They did not request

19 additional time for the deposition. They just want the Court

20 not to consider the relevant evidence.

21 And in terms of the plan to seal the proposed

22 exhibit, the notes from Dr. Hennet's site visit, I apologize if

23 we needed to do something more. I understood that by not

24 filing something that would indicate we were not seeking to

25 seal it after a week. And so we're not seeking to seal, and

1  that is why we did not.  If we need to say that affirmatively

2  on the record, we're happy to do so.

3        **THE COURT:**  No.

4        **MS. O'LEARY:**  Thank you.

5        **THE COURT:**  Thank you.

6        **MS. BAUGHMAN:**  May I briefly respond, Your Honor?

7        **THE COURT:**  Sure.

8        **MS. BAUGHMAN:**  Thank you.

9        On the issue, very importantly, of whether there's

10 still a dispute, you could call this a factual issue; but to be

11 very clear, what Dr. Hennet did was made a measurement when the

12 spiractor was not running.  So there was no water in it, okay.

13 So that's the same as what AH said.  You know, there's going to

14 be a two-foot drop if there's no water.

15        What Dr. Sabatini wanted to do, in light of the fact

16 that Dr. Hennet went out there in February, is go out and look

17 at the spiractor, both when it's running and there's water in

18 it, which is what AH documented, and when it's dry, which is

19 what Dr. Hennet did in February.  We asked for both of those

20 things, and that's documented in our motion, Exhibit 7, page 3,

21 the letter asking for the site visit the day after we took the

22 deposition of Dr. Hennet.

23        So if the Court were to deny the Plaintiffs' motion,

24 that doesn't resolve this issue.  There's still going to be an

25 issue of one foot or two foot.

1          And to be clear, when the DOJ says, well, you know,

2     they did a lot of things late and we're not filing a motion, so

3     why did they file a motion, we were very clear in the same

4     letter that's Exhibit 7 we will drop this if you let

5     Dr. Sabatini go out there and do the same things that

6     Dr. Hennet did late in February.  And they said no.

7          If the DOJ is really just trying to get at the truth,

8     how big was the drop, then why not let Dr. Sabatini do the same

9     thing out of time that Dr. Hennet did out of time?

10          This seems like gamesmanship.  It's like they go

11     late.  They violate the Court's order.  Then when they're

12     caught, they say, well, we'll only let you go out there and do

13     exactly what our expert did if you give us two more depositions

14     that are late that aren't even related to this issue.

15          **THE COURT:**  So why not?  Why not let him go out

16     there?

17          **MS. O'LEARY:**  Your Honor, because their expert said

18     he doesn't need to go out there and that he doesn't know how he

19     would take the measurement he says would be the only one that

20     would be useful in terms of measuring the fall height, which is

21     the only measurement where there's any dispute.

22          He said he assumed the venting and fluctuations and

23     reservoir levels that Dr. Hennet observed and learned from

24     employees, and Dr. Hennet, in measuring the fill time of a

25     water buffalo, said that he agreed with the fill time that

Case 7:23-cv-00897-RJ    Document 382-12    Filed 05/12/25    Page 52 of 58

1  Plaintiffs' expert, Dr. Sabatini, had observed in a YouTube

2  video of the same.

3          There is nothing to be gained from a site visit.

4  That's, I think, why the Plaintiffs are not requesting one.

5  They don't want one.  If they'd wanted one, they would have

6  asked for one before Dr. Sabatini wrote his report or certainly

7  after they received Dr. Hennet's report or certainly after they

8  received Dr. Hennet's notes and photographs from his site visit

9  three weeks before his deposition.  They didn't.  They waited

10 until discovery was closed to request a site visit.

11         **MS. BAUGHMAN:**  To be very clear, what Dr. Hennet did

12 happened when discovery was closed.  Discovery was closed six

13 months before Dr. Hennet went out there.

14         And what -- and the DOJ is misrepresenting what --

15 the answer you just got about why they didn't let Dr. Sabatini

16 go out there, his deposition was taken three weeks after we

17 asked for the site visit, and they said no.  They can't be

18 relying on what Dr. Sabatini said in his deposition for saying

19 no to the site visit.  We wanted the site visit before the

20 deposition.  Before the deposition, they said no.  They didn't

21 have a basis for not allowing Dr. Sabatini there except for to

22 have these experts on unequal footing before this Court.

23         And to be clear, in Dr. Sabatini's deposition, which

24 the Court has because it is attached to the DOJ's response to

25 this motion, on page 75, he explained that he, in fact -- there

1 is a big distinction here, Your Honor.  Let's be clear that

2 Dr. Sabatini is only a rebuttal witness, okay.  We got the

3 DOJ's report on December 9th of 2024.  His report was due

4 January 14, 2025.  In that month that he had, he did not

5 believe he needed to go out and measure this fall drop because

6 he was relying on AH Environmental's report, and he's still

7 relying on AH Environmental's report.  And that's what he said

8 in his deposition.

9       But on page 75 of his deposition, he explained that

10 he did want to go out and look at this site for these reasons:

11 In response to Dr. Hennet's visit in February.  That's why he

12 wanted -- he said he wanted, quote, the same opportunity,

13 quote.  Both of that's on page 75.

14       He also explained:  "I don't really know what exactly

15 Hennet did and who he talked to and what he saw."  So it would

16 be to -- meaning why he wants to go out there, to have the same

17 background information that he had.

18       Again, on page 76 and 77, he said:  "I don't know

19 what all he did or what all it meant."  He said the same thing

20 on page 322.

21       So he's saying he could do his calculations based on

22 AH, but once Hennet went out there, he wanted the opportunity

23 to do and see everything Hennet did.  Now, had he figured out

24 how he would measure it?  No.  He didn't have -- his site visit

25 was denied.  So he didn't figure out his methodology.  But he

Case 7:23-cv-00897-RJ    Document 382-12    Filed 05/12/25    Page 54 of 58

1   wanted to go out there, and he wanted to observe this, both

2   when the spiractor was running, in other words, wet, and when

3   it was dry.  And the DOJ did not allow him to do that.

4         On a few other factor -- the issues on these factors

5   that the DOJ talked about in argument, they're trying to say

6   that the -- Dr. Hennet and Dr. Sabatini agree regarding this

7   manhole issue, okay.  I don't think -- I think, to be very

8   clear, they don't agree on how much volatilization comes out of

9   the manhole.  And if they do, if what they're saying is

10  Dr. Hennet, having gone and done his manhole experiment,

11  filling the manhole and measuring timing and whatever, now

12  agrees that Dr. Sabatini got it right on the amount of

13  volatilization, then it's a nonissue.  But that's not what

14  they're saying.  All they're saying is the timing of how long

15  it took to fill it, they agree, how many seconds or how many

16  minutes it took.  They don't agree on how much volatilization.

17        What Dr. Hennet is trying to say is, based on what I

18  saw that day, okay, it would be the same amount of

19  volatilization no matter how you fill it.  That is a new

20  opinion that wasn't in his report in December, and he is not in

21  agreement with Dr. Sabatini about that.  They have very

22  different numbers about how much volatilization there would be

23  through the manhole.  So they are not in agreement, and it is

24  new.

25        Just going through my notes.

Case 7:23-cv-00897-RJ    Document 382-12    Filed 05/12/25    Page 55 of 58

1      And then they're saying, well, what Dr. Hennet did on

2  the fall height, he's just confirming something.  But, again,

3  he didn't -- he didn't take a measurement or even make an

4  observation when it was running.  So he's not confirming

5  anything about the fall height when the spiractor is running.

6      They're saying that on the cure that that would have

7  been -- I'm saying on the cure, it could have been cured.  All

8  this could have been cured if Dr. Sabatini had been allowed to

9  go out there before his deposition, and he wasn't, okay.  That

10  was the cure, and the DOJ didn't allow that to happen.

11      Now, they say, well, it's not going to disrupt the

12  trial; it's not going to disrupt the schedule and whatnot.

13  Well, that's because we're prejudiced, right.  We've continued

14  with the schedule.  Our team doesn't want to delay trials any

15  more than they have already been delayed, but we're having to

16  proceed without the site visit because they want to keep

17  Dr. Sabatini not on the same footing as Dr. Hennet.

18      And the importance of the evidence -- they're saying,

19  well, this evidence is important and whatnot.  If they were

20  trying to get at the truth, they would have allowed

21  Dr. Sabatini to see the same thing as Dr. Hennet.  If they

22  weren't playing games, they would have let Dr. Sabatini out

23  there.

24      **THE COURT:**  Okay.  I think I've got a good idea.

25      **MS. O'LEARY:**  And, Your Honor, if I may, just one

Case 7:23-cv-00897-RJ    Document 382-12    Filed 05/12/25    Page 56 of 58

1  thing I just wanted to clarify to correct the record?

2        Dr. Hennet's February site visit did not occur after

3  the close of discovery.  Phase I expert discovery closed in

4  March.  I think Ms. Baughman may have been referencing fact

5  discovery is closed, but that is not Phase I expert discovery.

6        **THE COURT:**  Okay.

7        **MS. O'LEARY:**  Thank you.

8        **THE COURT:**  We'll take a look at it.  Thank you.

9        What's left?  Just our in camera meeting?

10        **MR. BAIN:**  Yes, sir.

11        **THE COURT:**  Okay.  And we'll talk also about

12  scheduling our next conference.  We'll get a notice out for

13  that.

14        Okay.  Thank you.

15     (END OF PROCEEDINGS AT 12:23 P.M.)

16

17               \* \* \* \* \* \*

18

19

20

21

22

23

24

25

Case 7:23-cv-00897-RJ    Document 382-12    Filed 05/12/25    Page 57 of 58

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NORTH CAROLINA

CERTIFICATE OF REPORTER



          I,  Briana L. Chesnut, Official United States Court

Reporter for the Middle District of North Carolina, certify

that the foregoing transcript is a true and correct transcript

of the proceedings in the above-entitled matter prepared to the

best of my ability.


          Dated this 1st day of May 2025.



                    _____
                    Briana L. Chesnut, RPR
                    Official United States Court Reporter