# EXHIBIT 40

**THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**AGENCY FOR TOXIC SUBSTANCES AND DISEASE REGISTRY**

convenes the

SIXTEENTH MEETING

# CAMP LEJEUNE COMMUNITY ASSISTANCE PANEL (CAP) MEETING

APRIL 29, 2010

The verbatim transcript of the Meeting of the Camp Lejeune Community Assistance Panel held at the ATSDR, Chamblee Building 106, Conference Room B, Atlanta, Georgia, on April 29, 2010.

STEVEN RAY GREEN AND ASSOCIATES
NATIONALLY CERTIFIED COURT REPORTING
404/733-6070

## C O N T E N T S

April 29, 2010


| | |
|---|---|
| WELCOME, INTRODUCTIONS AND ANNOUNCEMENTS<br>CHRISTOPHER STALLARD | 5 |
| RECAP OF JANUARY 2010 CAP MEETING<br>PERRI RUCKART | 13 |
| CAP UPDATES/COMMUNITY CONCERNS<br>CHRISTOPHER STALLARD | 23 |
| DATA DISCOVERY ACTIVITIES AND WATER-MODELING ANALYSES:<br>ATSDR ACTIVITIES AND STATUS, MORRIS MASLIA<br>USMC/DON INVENTORY, ACTIVITIES, STATUS; USMC/DON REPRESENTATIVE(S)(INVITED)<br>CAP INSIGHTS AND SUGGESTIONS, CAP MEMBERS<br>DISCUSSION OF PRIORITIES AND NEXT STEPS, CHRISTOPHER STALLARD | 64 |
| DISCUSSION WITH VA<br>BRADLEY FLOHR | 116 |
| UPDATE ON FUTURE STUDIES:<br>MORTALITY STUDY, HEALTH SURVEY, LOCATION WHERE UNITS WERE BARRACKED; FRANK BOVE, PERRI RUCKART | 172 |
| WRAP-UP<br>CHRISTOPHER STALLARD | 178 |
| ADJOURN<br>CHRISTOPHER STALLARD | 197 |
| COURT REPORTER’S CERTIFICATE | 207 |

**TRANSCRIPT LEGEND**

The following transcript contains quoted material. Such material is reproduced as read or spoken.

In the following transcript: a dash (--) indicates an unintentional or purposeful interruption of a sentence. An ellipsis (. . .) indicates halting speech or an unfinished sentence in dialogue or omission(s) of word(s) when reading written material.

-- (sic) denotes an incorrect usage or pronunciation of a word which is transcribed in its original form as reported.

-- (phonetically) indicates a phonetic spelling of the word if no confirmation of the correct spelling is available.

-- "uh-huh" represents an affirmative response, and "uh-uh" represents a negative response.

-- "*" denotes a spelling based on phonetics, without reference available.

-- “^” represents inaudible or unintelligible speech or speaker failure, usually failure to use a microphone or multiple speakers speaking simultaneously; also telephonic failure.

## P A R T I C I P A N T S

(alphabetically)

ARAL, MUSTAFA, GEORGIA TECH
ATKINS, GLORIA
BOVE, FRANK, ATSDR
BRIDGES, SANDRA, CAP, CLNC
BYRON, JEFF, COMMUNITY MEMBER
CIBULAS, WILLIAM, ATSDR
CLAPP, RICHARD, SCD, MPH, PROFESSOR
DAVIS, DEVRA, PROFESSOR (via telephone)
ENSMINGER, JERRY, COMMUNITY MEMBER
FALK, HENRY, NCEH/ATSDR
FLOHR, BRADLEY, VA
FONTELLA, JIM, COMMUNITY MEMBER
HUNTLEY, TERRI, COMMUNITY MEMBER
MASLIA, MORRIS, ATSDR
MCKENZIE, RICHARD, RETIRED MARINE
MENARD, ALLEN, COMMUNITY MEMBER
PARTAIN, MIKE, COMMUNITY MEMBER
RUCKART, PERRI, ATSDR
SINKS, TOM, ATSDR
TOWNSEND, TOM (via telephone)

**P R O C E E D I N G S**

(9:00 a.m.)

**WELCOME, INTRODUCTIONS AND ANNOUNCEMENTS**

**MR. STALLARD:** I'd like to welcome everyone to our CAP meeting today. We have a very different turnout than we have had in the past. I'd like to welcome everyone off to the sides here. We're going to start this session with welcoming remarks by Dr. Falk, Acting Director of ATSDR. And then I'll go over the operating guidelines that we generally use, and we'll have introductions because we have some new faces here at the table and so we'll get to understand who's here today and we'll go from there.

So Dr. Falk, if you would, please.

**DR. FALK:** Thank you very much. I just wanted to welcome all of you and introduce myself. My name is Henry Falk and I'm the Acting Director of NCEH/ATSDR. I've been in that position now since mid-January and probably you all know there is an active search for a permanent director, and I can't say when that will conclude but could be in the near future, could be longer. I'm not an applicant for that permanent position. I had previously been working at ATSDR as Assistant Administrator in 1999-

2003.

I would like to thank all of you for coming to this Community Assistance Panel meeting on Camp Lejeune. This is really important work for us as you all know. It's extremely important. It's very critical. This is challenging work. The science of this is very complex.

As you know there are so many servicemen and family members and others who have been extremely engaged in this because of concerns about the contaminated drinking water, many unanswered questions, and we value in particular the work of this Community Assistance Panel. You've helped us in many ways, and I think have been very critical to this process.

A lot of hard work that has gone on here has helped our team understand the Camp Lejeune operations during the time in the past when the contamination occurred, helped us understand issues in terms of water utilities, identify critical pieces of environmental data that have been important to the water modeling efforts, and so we're very glad you're here, and we really appreciate the opportunity it presents for dialogue.

In terms of my own role, I've tried as much as

I can over the last three months, and will for as long as I'm in this position, to support the staff here that have been working on this and to facilitate in any way I can with outside stakeholders, with the Department, with our leadership at HHS and CDC and with others. One area that I probably have been most involved in, Tom and I are engaged in discussions with the Deputy Assistant Secretary of the Navy, Don Schregardus, and his staff, in terms of obtaining the funding for the mortality study and the health survey.

I'm under no illusions that my role is determining in that there's been tremendous support, I know, and concern has been registered about having these studies done by yourselves, many of the veterans, public, members of Congress and others. But I was engaged in those discussions and probably hope that that was helpful in securing the funding and so enabling the studies to go on.

I know you're, I've seen reports in newspapers. I did have one meeting with General Panter. He had requested to come down here and essentially introduce himself. He is new, and I was new. We did have that meeting. It was primarily introductions, but I think he was concerned to

express in person his willingness and to assist in ways that they can.

We didn't actually discuss anything in detail other than registering the willingness. It was a very short meeting. I understand that it has generated a lot of concern. I'm very sensitive to that, and so I will keep that in mind for any requests in the future, and I understand the need for all of you to be aware of what we're doing, and for us to be very open. So we'll try to do that as much as possible.

In any event I want to thank you all for being here and for participating and look forward to discussions today. Thank you.

**MR. STALLARD:** Thank you very much.

You all have the agenda. We're going to be going through the welcome, introductions, announcements. Then we're going to turn over to Perri to do an update, and then we will turn to the CAP members to provide their community updates.

But a couple of the things that we go over at every meeting is the operating guidelines. This is for the CAP members, how we interact with each other, and also for the audience. Since we do have a very different turnout than we've had in the past,

it’s important that we understand the guidelines.

This is not a, the public is here to listen unless called upon. We are glad you’re here and that you’re interested in this topic and willing to spend the time and listen. But this is for you to view the interactions of the CAP, okay? This is not a town hall meeting.

So zero personal attacks. We go over that. It sounds elementary, but this is a very difficult topic and situation. It’s the balance between the community members who are impacted with death and disease in their family, with science and trying to determine what are the rigors of proper science, and with organizational dynamics. So it’s a delicate balance between emotion and these other factors. And so we ask for you to please honor that everyone is here with the best intent to move forward and keep focused on the issue at hand. No personal attacks.

That goes to what we consider to be our guiding principles in terms of how we interact upon the CAP with openness, honesty, transparency and respect. We’re trying to work together to solve this very complex issue.

Please turn your cell phones on silent or stun

or off so that they don’t distract the proceedings here today. Please sign in over here if you haven’t when you came in, and take an agenda.

If you are called upon or asked to speak by the CAP, in the audience, you must use this microphone. Everything is being recorded where this is a live stream going out, and it’s being recorded by the court reporter here as well. So we’re here for posterity and historical sake. We need to get your voice on the microphone.

So with that what I’d like to do is to -- oh, yes, and just a reminder for those who might be new here, also it’s very important that when you speak, you say your name first for the court reporter to capture it, and you press this red button to engage the microphone system, and you push it off when you’re finished.

So what I’d like to do is start with those who may be on the phone. Let’s have you introduce yourself, please.

**DR. DAVIS (by Telephone):** This is Devra Davis. I’m a member of the CAP. I’m an epidemiologist/toxicologist.

**MR. STALLARD:** Welcome, Devra, thank you.

**MR. TOWNSEND (by Telephone):** Tom Townsend from the

state of Idaho. I'm pleased to be here and let's proceed. Thank you.

**MR. STALLARD:** Welcome, Tom. Thank you.

Is there anyone else?

(no response)

**MR. STALLARD:** Let's start over here then. Jeff, if you'll go around. We had Dr. Falk already introduced.

**MR. BYRON:** Yes, I'm Jeff Byron with the CAP.

**DR. BOVE:** Frank Bove, Division of Health Studies, ATSDR.

**MS. RUCKART:** Perri Ruckart, ATSDR, Division of Health Studies.

**MR. FLOHR:** Brad Flohr, I'm the Assistant Director for Policy, Compensation and Pension Service in Washington, D.C.

**MR. STALLARD:** Welcome.

**DR. SINKS:** I'm Tom Sinks. I'm the Deputy Director of the National Center for Environmental Health and ATSDR.

**MS. BRIDGES:** I'm Sandra Bridges. Sandra Bridges, and I'm on the CAP.

**MS. HUNTLEY:** Terri Huntley, and I'm on the CAP.

**MR. MENARD:** Allen Menard, and I'm on the CAP.

**MR. ENSMINGER:** Jerry Ensminger, CAP.

**MR. PARTAIN:** Mike Partain, CAP.

**MR. STALLARD:** All right. Thank you very much. Let's take note; we have some new members here, a representative from the VA we're pleased to have sitting with us here today. A special welcome.

And we do not have a representative from the Department of the Navy or the Marine Corps here today. So let's just tag that they're not at the table. We do have a representative in uniform in the audience who is here to take notes but is not here to be an active participant in today's proceedings.

**MR. PARTAIN:** Chris, do we have a reason why from the Marine Corps, why they are not here today? This meeting, about a month ago we circulated dates and there was no objections on dates and what have you and I notice Mary Ann Simmons is not here either.

**MS. RUCKART:** Mike, I'll tell you that Mary Ann never responded to those dates, and we just went ahead and set the date because we needed to have a meeting, and we had consensus for this date.

**MR. PARTAIN:** And what's the official reason why the Marine Corps is not here today? I believe this is the first meeting that they haven't attended?

**MR. ENSMINGER:** That's all right.

**MR. STALLARD:** It is, and I don't have, I'm not privy to that decision-making process so I don't know. But maybe we can talk about that as we go around about things we'd like to know.

**DR. SINKS:** I think you have to direct the question to them. They just said they weren't going to be able to make it. They were going to send someone to take notes. They didn't give us a reason. When I spoke to them they didn't give me a reason.

**RECAP OF JANUARY 2010 CAP MEETING**

**MR. STALLARD:** So, Mike, we're going to go around and do, we're going to have an update, a summary.

And I think it's really important, Perri, one of the things when you talk about the CAP mission, we had a discussion last time about governance, and if you could hit that as part of our update from last time. Thank you.

**MS. RUCKART:** Good morning. I just like to start off our meetings by summarizing what happened at the last meeting so we can set the stage for what we'll be discussing later today. As Christopher said, during the January meeting there was discussion on the CAP mission and membership, and I'm going to read to you what was the agreed-upon mission statement.

(Reading) To represent the interests, consequences and quality of life of those impacted by exposure to toxic substances at Camp Lejeune. ATSDR will look at the potential for future studies at Camp Lejeune with the full inclusion of the community members affected.

And at that time it was also agreed that the membership would include seven community members and two independent experts who would be replaced as needed to maintain these numbers.

Now also discussed at the last meeting, Mike said he was putting together a timeline for the Hadnot Point fuel farm, and you hoped to have that complete by this CAP meeting. Is that completed?

**MR. PARTAIN:** It's still a work in progress.

**MS. RUCKART:** Also, Mike said he was going to e-mail ATSDR the timeline he had put together so far.

**MR. PARTAIN:** Frank, you had it in the past, or do you need it again?

**DR. BOVE:** I've gotten stuff from you. I've gotten some timelines.

**MR. PARTAIN:** I'll go ahead and send one right now.

**DR. BOVE:** The next few days.

**MS. RUCKART:** Also, we had Morris had reported that the expert panel report on water modeling that was

held in April 2009, was posted on the ATSDR Camp Lejeune website.

There was a request at the last meeting for ATSDR to release the Camp Lejeune UST document to the public. However, we need approval from the USMC as to which documents are releasable and the Marines are currently reviewing those documents to determine that.

Scott Williams provided to the CAP via ATSDR PDFs of the maps with the plumes on Hadnot Point and Tarawa Terrace. These were made publicly available at the NRC kick-off meeting in November 2007.

Bob Faye gave a summary of the UST documents regarding the number of documents and the specific data found in those documents that the Agency’s in the process of evaluating.

We had a discussion of our future studies, the mortality study and the health survey, and we’ll be giving further updates on that later this afternoon.

There was also extensive discussion at the last meeting regarding the fuel loss at Hadnot Point, and you can see here what was discussed. I handed out to the members of the CAP the summary.

We also had some discussion on budget and funding. And at that time we had reached agreement

with the Navy on the 2010 annual plan of work for the water modeling, the case-control study of the selected birth defects and cancers and the re-analysis of the reproductive health study.

At that time we had not reached agreement on funding for the health survey and mortality study, but I do want to update you that since then we have received funding for the mortality study and to begin the health survey. And again, I can give you some updates on that this afternoon.

And we had discussion last time about the VA representative, and as you see, we’re happy to have someone here with us today, and he will be giving a presentation later this afternoon and be open to some questions and answers.

And we also had some discussion about male breast cancer, and we discussed some possibilities about what could be done and that’s provided for you here in the handout.

**MR. STALLARD:** Thank you.

Before we move into the CAP member --

**DR. DAVIS (by Telephone):** This is Devra Davis, and at the last meeting I raised the issue of the fact that we need to at least get what information we can about exposures to electromagnetic fields.

**MR. STALLARD:** Yes, you did.

**DR. DAVIS (by Telephone):** And that was not reflected in the minutes just now.

**MS. RUCKART:** Well, Devra, I'm sorry. I didn't e-mail this out to you. I will e-mail it to you and Tom after the meeting, but I just basically gave the highlights and mentioned that we had a lengthy discussion, but there's sub-bullets listed here on my summary where that is reflected and captured.

**DR. DAVIS (by Telephone):** Thank you.

**MS. RUCKART:** You're welcome.

**MR. STALLARD:** All right. Before we move on to the individual CAP member updates, I'd like to get a sense of what is it we want to achieve today. What would be something that we'd like to achieve today and/or avoid?

**MR. ENSMINGER:** Well, I'd like to get the standard set for the CAP on exactly who controls this thing. What are the operating procedures of the CAP. I mean, we got an agenda sent out to us in March. We were asked for comments and input. We did that and approved the final result, and because some people didn't like the final result, they took our agenda and did away with it and rewrote it.

**MR. STALLARD:** Okay, so that is standards set for

the CAP. Who controls and what's the system of governance.

**MR. ENSMINGER:** Another issue is media. Why is the media not allowed into these meetings, these public meetings, without a camera? Why are they not allowed in here with a camera?

**MR. STALLARD:** We have had them in the past so --

**MR. ENSMINGER:** Yes, we have.

**MR. STALLARD:** -- something may have changed so we'd like clarity on that?

**MR. ENSMINGER:** Yeah, I mean, these are public meetings.

**MR. STALLARD:** Okay, what else?

Allen.

**MR. MENARD:** Well, what Jerry said there, you know, transparency. What are we trying to hide? Why can't the cameras be here? I mean, everybody speaks of transparency and openness.

**MR. STALLARD:** We do.

**MR. MENARD:** Well then cameras should be here.

**MR. ENSMINGER:** We have a President of the United States when he was inaugurated that said the federal government would operate in a more open and transparent manner where possible. I don't see anything wrong with the Camp Lejeune CAP being

filmed by the media.

**MR. STALLARD:** We're being filmed right now.

**MR. ENSMINGER:** Well, but that's not the same.

**MR. PARTAIN:** I'll make a comment on that.

**MR. STALLARD:** Is there an achievement or avoid? I'm trying to get on that, and then we're going to drill down on this. Let's stay focused on achieve or avoid. Yes?

**DR. SINKS:** In terms of achievement, to me the most critical thing for us to be discussing really right now is our data discovery process, where we are, the status, whether we have our priorities right. I very much want to discover, if you will, from the CAP, the techniques they've been using because they've been very successful in terms of doing, helping us in what is essentially not their job to do, and yet they're still providing information to us.

So I want to hear from them, what they're doing, want them to know where we are and see if our priorities mesh in terms of where we're going. What are any follow-up we need to be doing on data discovery is to me really critical right now because of where we are.

**MR. STALLARD:** Okay, great, thank you.

**MR. ENSMINGER:** Another achievement would be to find out why we have not received the inventory of documents that's been required since the 1991 MOU. I mean now, the Department of the Navy and the Marine Corps continually beat the hell out of ATSDR and the CDC making them meet all their requirements that are in that Memorandum of Understanding.

Why hasn't ATSDR-CDC made the Department of the Navy and the Marine Corps live up to their requirements of the Memorandum of Understanding? Since 1991 that's been a requirement for the Department of the Navy was to provide ATSDR and their scientists and their technicians all the documents, an inventory of all the documentation related to the Camp Lejeune water contamination and the contamination sites aboard that base. Today is 2010. They still don't have it.

**MR. STALLARD:** So for the purposes of achieve we'd like, you want to understand why we haven't received it or where it's at or what does it look like?

**MR. ENSMINGER:** Well, that and what measures have been taken to force them to get that.

**MR. STALLARD:** So an update from ATSDR on what efforts they've made to do this?

**MR. ENSMINGER:** Yes.

**MR. STALLARD:** Okay, great. Jeff, you got anything?

**MR. BYRON:** Yeah, first, I'd like to welcome the VA representative. It's taken a year to get you here. We started that process, I requested that over a year ago, and actually, I've been to the VA office in Washington eight years ago trying to elicit some help.

**MR. FLOHR:** Actually, a member of my staff was here at the last CAP meeting.

**MR. STALLARD:** Yes.

**MR. BYRON:** Not at the last one but the one before.

**MR. STALLARD:** Well, we're glad you're here.

**MR. BYRON:** What I want to see us achieve is I'd like to find out whether or not, through the VA, whether there is a log at each facility listing Marines who come in and are saying that they're ill due to the exposure at Camp Lejeune. So I'd like to know if that's happening, and I'll wait for your discussion.

**MR. STALLARD:** All right, Jeff, help me capture that. A VA log at each facility to document --

**MR. BYRON:** To document the veterans who are coming in making a claim concerning exposure at Camp Lejeune and what illnesses they are experiencing.

**MR. STALLARD:** Thank you all. What else?

**MR. BYRON:** What about avoids? What do we want to avoid here, besides getting tasered?

**MR. STALLARD:** Yes, we want to avoid personal attacks. We're doing very good so far, no tasers. It's all good.

**MR. PARTAIN:** Another avoid is bloviation.

**MR. STALLARD:** Bloviation.

**MR. PARTAIN:** An answer for a question in five or ten minutes. Just cut to the answer.

**MR. STALLARD:** You know what, that's like a spelling bee question, word. So you mean not going on and belaboring the point or something? Sticking to the topic?

**MR. PARTAIN:** Answer the question.

**MR. STALLARD:** Answer the question, okay. So we want to avoid bloviation.

**MR. MENARD:** And also, missives.

**MR. STALLARD:** What's that?

**MR. MENARD:** We also want to avoid missives.

**MR. STALLARD:** Missives, okay. So what's going to be our signal if somebody's bloviating so that we know when we're there? How about this (demonstrating) or time out, just answer the question? We're a self-regulating group here. So it's not for me. I only have as much power,

influence as you give me. So you have to help us self regulate. If somebody's bloviating, give a sign.

**CAP UPDATES/COMMUNITY CONCERNS**

So let's go around now and start, if you will, with our CAP member updates. Jerry. No? Who would like to go first?

Jeff, would you like to start us off?

**MR. BYRON:** Well, to be honest with you I've been pretty busy so I don't have too much to offer other than that work to getting the VA representative here as much as I could. still running the website, try and inform people.

**MR. STALLARD:** Good, thank you. For those, since we do have some new faces and ears here today, it might be helpful if you say sort of what you do in the CAP, some of the activities that you do and maybe since the last CAP meeting if there was anything substantive you'd like to share that you've done. So thank you for leading us off.

Frank, that means you next, right?

**DR. BOVE:** No, we'll give our update --

**MR. STALLARD:** Okay, so moving along then, Sandra.

**MS. BRIDGES:** Just making contacts, keeping up with everyone, introducing the CAP to the websites.

**MR. STALLARD:** Good. How's that going?

**MS. BRIDGES:** Fine. We're getting a lot more calls. I remember when we had, we were striving, at least here, to get 12,900 people in order to start a survey, and now how many do we have? How many do we have now?

**MR. BYRON:** I believe there's over 160,000 have been notified.

**MS. BRIDGES:** A hundred and sixty thousand?

**MR. PARTAIN:** I'm not sure, what is the website registering now?

**MR. STALLARD:** So these phone calls that you're making in this outreach effort, you're documenting it?

**MS. BRIDGES:** We were striving to get that 12,900 in order for the ATSDR to do the surveys and the studies and we didn't know if we were going to be able to make it or not, and now look how many people we have. So everyone is interested in what's happening here, everyone involved.

**MR. STALLARD:** Very good. Thank you.

Yes, Terri.

**MS. HUNTLEY:** Well, this is my first meeting so basically what I've been working on is getting the awareness out in the Midwest. And it's been slow

going and getting our representatives on board out there.

**MR. STALLARD:** How are you doing that?

**MS. HUNTLEY:** Phone calls, e-mails, walking in their offices.

**MR. STALLARD:** Well, we have seen a growing media interest as Congress gets interested, media gets interested, there seems to be an interest generating here. Welcome.

**MR. MENARD:** I've been basically doing the same thing. I made it my job on this CAP is to help as many veterans as I can to get the word out and help them go through the process at the VA. And I have got a couple people approved for disability because they don't have the resources or don't know how to do it, and I'm in the process of helping a couple more people that have diseases related to the toxic water at Camp Lejeune. So basically, that's what I've been doing, and like I said, I made that my job, to help as many people as I can, that don't have the resources and the know-how.

**MR. STALLARD:** Can you tell me, Allen, what does that mean, helping people to get the disability that they don't have the resources to do?

**MR. MENARD:** Well, first of all, as far as doing any

research on their disease and sending it to them and kind of guiding them through the process on what they need and, you know, what they have to go through and what to expect and sending them any information that I have that would be helpful for their claim at the VA.

**MR. STALLARD:** I see. So these are veterans who have to fill out paperwork, and you're helping them with the materials and resources they need in order to fill out the documentation to go to the VA.

**MR. MENARD:** Right, to prove their case.

**MR. STALLARD:** Great, thank you.

Good morning, Jerry.

**MR. ENSMINGER:** Good morning. Jerry Ensminger. I've spent a lot of time in the last several months at my home away from home, which is Washington, D.C., with a lot of good results. We've achieved funding for FY2010. Thanks to Congressman Miller we have a bill that's been introduced. It's HR-4555, and it's to provide healthcare benefits to veterans and their family members. So hopefully, we'll be able to get that bill through.

This is a never-ending battle. I hear the language from people that we should be forward looking, not backward looking. Now, I'm going to

tell you all something. This situation happened thirty-plus years ago. Much of the documents and the data were created then.

Unfortunately, the Department of the Navy and the United States Marine Corps, whenever this situation first surfaced, decided that they were going to take the deceitful path to deal with it. They didn’t confront it and come out openly. They tried to hide it and deceive people. That continues to this day.

So for us to discover the documentation and everything that has been hidden, because let’s face it, ATSDR’s studies, Morris’s water modeling aren’t worth a damn if you don’t have the right data. So to find the right data we’ve got to look in the past because that’s where the truth lies.

So this forward looking crap and not looking backwards is a bunch of hogwash because these people are still dragging their feet on providing us the truth. And I would like for Mr. Maslia to go up there -- I want to show everybody something. The Department of the Navy and the United States Marine Corps have blasted ATSDR, said it was ATSDR’s fault that benzene didn’t show up in the public health assessment. Okay. ATSDR stepped up to the plate,

and they rescinded that public health assessment for that reason.

They blasted their contractors for letting benzene out of some of their reports or misquoting the levels of benzene in their reports. In 2004, the Commandant of the Marine Corps announced a six-month long blue ribbon panel, his own hand-picked people, to issue a report which was issued and signed on October 6th of 2004.

Guess what's missing off of it, benzene. Every reading of benzene, every sampling, every analytical result, there was no benzene. Guess what else they left off there, the 6th July, 1984 water samples for Well 602. The other thing they left off were the readings of vinyl chloride.

The two known human carcinogens that were in the water at Camp Lejeune were both conveniently left off of the report of the people who say they care so much about the health, safety and welfare of the people they poisoned. I'm tired of this doublespeak. They say one thing publicly, and then behind the scenes they do another. I'm sick of it. I'm tired of people pampering them. They don't deserve pampering. They've lied, and they've been lying since 1985.

**DR. DAVIS (by Telephone):** This is Devra Davis. I think the record is clear that we know benzene was there, and we know it wasn't in the 2004 report. Whether it's a lie or not, I think that's for someone else to determine, but there's no question that the facts are correct as Jerry states.

**MR. STALLARD:** Thank you, Devra.

**MR. PARTAIN:** This is Mike Partain. And since the last CAP meeting I continue to work on the, an updated timeline for the Hadnot Point fuel farm. I have not finished that. Frankly, there's hundreds of pages, thousands of pages of documents I'm trying to assimilate and collate.

Another big problem with that is there's a tremendous document hole that unfortunately members of the CAP, including myself, do not have access to, and that is the Navy's NAVFAC Portal. We asked for it at the last CAP meeting. We were told by Major Evans of the Marine Corps that --

**MR. ENSMINGER:** UST.

**MR. PARTAIN:** -- oh, UST Portal, I'm sorry, the NAVFAC UST Portal. I stand corrected. But we asked Major Evans if we could get these documents because according to the Marine Corps, they're public record. The difference is, their stance is that we

could FOIA them which will be a long time before we see them or we could go to North Carolina, which is not economically cost effective for individuals to do so.

According to the Major right now -- and this may have changed since the last meeting -- he's the only person going through all the documents to approve them for release. And we've also been told by Scott Williams that when they are released there will be no draft versions of the documents released, which we do not accept that either because of the draft, a lot of reports do not make it to final version.

For example, the 1.1 million gallon reference of fuel in the groundwater, my understanding that is in a draft report, not the final report. So technically, the Marine Corps, they're not going to release that document ever which will hamper ATSDR's work because they need that data for their water modeling studies. Hopefully, we'll get something together with the Hadnot Point fuel farm timeline.

Also, and we continue to engage the media. Today, we have here representatives from CANAL + in France who unfortunately were not allowed to bring their cameras into the meeting. For the first time

that I'm aware that this has happened at one of our CAP meetings. But they're here in the audience, following, and we continue, and we also have the St. Pete Times came up to the CAP meeting. And we continue to have meeting engagement and work to get them to get the word out to people.

Bill Levesque) shared with me last night that after the story on Sunday that he had numerous phone calls from people in the St. Pete area who had never heard about Camp Lejeune, knew nothing about it until they saw that article in Sunday's paper. And it almost boggles the mind because the St. Pete Times has been running stories about Camp Lejeune for over a year now, or close to a year. I'm sorry. And there are still people coming forward. So there's people out there.

**MR. BYRON:** This is Jeff Byron. I'd like to know who made the decision that the media could not bring a camera in here.

**MR. STALLARD:** Yeah, I would, too.

**MR. BYRON:** That individual's name.

**MR. ENSMINGER:** We got that on a --

**MR. STALLARD:** Yeah, we're going to find out what the protocol is and why this is different. Okay?

Tom, have you got something for us to check in

here?

**MR. TOWNSEND (by Telephone):** Did you call me?

**MR. STALLARD:** I did. I know it's early there in Idaho.

**MR. TOWNSEND (by Telephone):** It's hard to hear you sometimes. This is Tom Townsend. I have been active with the Veterans Administration. I have a claim pending. I've had a claim pending with them for about three years now. I'm currently 50 percent disabled, 80 percent whatever their other level is, and it seems fruitless at the moment to, if I could have incredibly severe effects that have been defined as related to Camp Lejeune, I just have a claim sitting there of a claimant. And I get tested, it just goes on.

I'm not pushing for it, but I'm pushing to get the claim resolved, but I'm not optimistic it will be. It's going to take some time for the Veterans Administration, I believe, to accept the fact that Marines living at Camp Lejeune that have been harmed. So I keep pushing on that event, and that's about the extent of my efforts in the last three, four months. I appreciate the fact that a representative of the Marine Corps and perhaps not the Navy are there, but at least they'll get the

message with what we'd like to go forward with. Thank you.

**MR. STALLARD:** Thank you, Tom.

I have a few questions --

**THE CAPTIONER:** Captioner needs to break in.

**MR. STALLARD:** Yes, what's that? Captioner?

**THE CAPTIONER:** Yes, my client would like to know the website for which to contact the video. Can you help me with that?

**MR. ENSMINGER:** Yes, I just got a message -– this is Jerry Ensminger. I just got a message from one of the other victims that the streaming video is not working.

**MR. STALLARD:** We have someone checking on that right now. Thank you. Thank you all for that information.

Mike, at the last meeting that was shortly after your national media event with male breast cancer, have there been any more developments on that front, the numbers, for instance?

**MR. PARTAIN:** Well, there's been no media event as far as stories on male breast cancer since September of last year, and we're still at 55 men, but we haven't really been out there again. Now, I understand that the National Academy is looking

doing a study at breast cancer as a whole, and that kicked off several weeks ago. And I spoke on that and once again the same appears, the same format that was used in the National Research Council in Camp Lejeune's report is being used in this study. So unfortunately, I don't have high hopes for this study.

**MS. RUCKART:** Do you want me to say the website address?

**MR. STALLARD:** If you have, yes, they're trying to see if it's on. I'm just limited what we can do, to that response.

Here's the web address. We're checking on the technicalities of the streaming video.

**MS. RUCKART:** ATSDR-dot-CDC-dot-gov-slash-sites, S-I-T-E-S-slash-lejeune. And that brings you to the home page. And when you're on the home page, you should see that the Camp Lejeune CAP meeting is highlighted on there, and that'll take you to a link to view the meeting. And the I-T specialist is looking into that to make sure it's functioning properly.

**MR. STALLARD:** Thank you, Perri.

Tom, you had a response to Mike?

**DR. SINKS:** Yeah, just a question for Mike and maybe

also a question for Devra Davis. When I had heard about the National Academy, I don't know if it's the Institute of Medicine that's doing the review or the National Research Council, but when I heard about it, I didn't realize they were looking at male breast cancer. So it sounds like you actually spoke to them?

**MR. PARTAIN:** Yeah, they're not specifically looking at male breast cancer. What they're looking at is environmental links to breast cancer as a whole, and as a sub-group Jim Fontella, myself and a captain -- I can't remember his last name -- who was at El Toro, which is a PCE-TCE site, and has male breast cancer. We spoke at the meeting. I spoke at the meeting because of concerns over the charge, the way the study's being directed as another literature review. And to me this is another pre-concluded study.

**DR. SINKS:** Right. Let me just ask a related question to Devra Davis. Devra is a real pioneer in this area of breast cancer and environmental causes, and it's great to have her on the committee. I wonder how familiar Devra is with that study and if she wants to make any comments about it. I've known Devra for, goodness, almost 20 years, and my first

involvement with her was on this particular issue.

**DR. DAVIS (by Telephone):** Right. Thank you for those comments. As a matter of fact I have not been involved with the committee. There's been some concerns raised by its membership, and frankly, I'm not familiar with what they're going to do, and I've not been asked to participate in any way at all even though as you may be aware, the concept of phytoestrogens is one that I developed with colleagues almost 20 years ago which gave rise to an understanding that there would be environmental factors that could affect breast cancer risk in women and, of course, in men. And I published on this in great detail. I'm afraid I can't give you any information about that committee.

I can also report that it's been very frustrating for us in the few cases that we put together in case reports of this which we submitted for publication to some of the top peer journals and did not get accepted for publication despite the fact that I published well over a hundred articles. I think there's a general disinterest in hearing about this issue unfortunately, and it makes it very difficult to get credible site-specific work out there at this time, which is why I think it's very

important that ATSDR's work go ahead, and I really want to encourage the development of the case series be done collaboratively with ATSDR. And as I said before, I'd be happy to work directly with you to make that happen if the Department of the Navy would allow it.

**MR. STALLARD:** Thank you for that update. So for me the question is, is there any way for the connection of male breast cancer and Camp Lejeune people who've matriculated through there to be considered in a National Academy of Science, right, review?

**MR. PARTAIN:** Say again?

**MR. STALLARD:** The question is how is it that they can be doing a study and not incorporate this important element as it relates to male breast cancer?

**MR. PARTAIN:** Yeah, that study with the Institute of Medicine is a literature review, so as far as I know there's no studies on male breast cancer. There's a peer --

**DR. DAVIS (by Telephone):** Yeah, let me clarify. The National Academy of Science and Institute of Medicine typically do not do research. They do literature reviews. They recommend priorities for research. They identify data gaps. So this is a

case where, unfortunately, what one would be facing then is that this is a major data gap, let's fill it, but, you know, we've been saying that now for a few years so I'm not sure it's worth a lot of effort.

I think it might be worthwhile for Tom and others to write to the committee and to let the committee know about this issue and the concerns that have been raised because I think they are legitimate and important. But because we don't have a report yet, it can't be in the peer reviewed literature.

On the other hand I would argue that this is, it certainly merits reporting to the National Academy of Sciences and the Institute of Medicine Committee as an area of great concern. And I think that probably a short letter, which I'd be happy to help Tom write on that, would be of value to that committee at this time.

So that was a suggestion to come out of the CAP meeting that we make sure the National Academy of Science's Institute of Medicine Committee is aware of the issue that has been raised here by this series of case reports that are being developed that at this point appear to be 55 individuals and

counting, that that would probably be worth doing. And I would leave it to you to decide if that would be I think a suggestion we could make.

**MR. STALLARD:** Well, let me just ask the CAP members if they feel that that would be something that they would like to pursue or support?

**MR. PARTAIN:** I would like to see a specific study on male breast cancer. And one thing I want to point out, too, and this is important to understand, there are a lot of cancers that are showing up at Camp Lejeune in the population, and the unusual cancers. Things that are strange and have no explanation, you know, clusters per se, such as male breast cancer, are in the past indicative that something happened.

If you've got 55 men whose only commonality that we have male breast cancer, and we all were exposed while at Camp Lejeune, that says something in itself. Now, the fact that it's a rare cancer, and it doesn't show up in the general population at a significant rate makes it more concerning. And there are other cancers out there like that, and I don't want to say we're drawing attention on just one particular type of cancer. But this is something that is unusual. It's strange. The

occurrence rate is extremely low.

The population of men with breast cancer are relatively young compared to when most people are diagnosed with the disease, and therefore, it stands out, and we have a known environmental exposure. Like brain tumors, for example, we have a lot of reports of brain tumors. Unfortunately, most people with brain tumors don't make it very long.

So we're not just focusing on one particular cancer. It's something that stands out that says it's a red flag, you know, the canary in the coal mine.

**MR. BYRON:** Yeah, Mike, this is Jeff Byron. Last night when we were speaking, there's three male breast cancer victims here today, and speaking to those individuals, as they went to find out whether or not their male breast cancer was genetically related, they went and had tests that showed that they were not.

But I'm going to bring this back up, genetic testing. I still personally believe that every one of the children in the in utero study should be genetically tested. If you're really interested in finding out what caused this, you'll look there. My personal opinion, thank you.

**MR. STALLARD:** Thank you, Jeff.

I've been handed a note here that we're having technical transmission problems with CDC's system and that the technicians are aware of it and working on it. And they will notify us as soon as it's resolved. In the meantime though, this is being archived and will be available for those who are not able to see it as a live stream.

Yes, wait a minute, Sandra. Tom raised his hand first.

**DR. SINKS:** Thanks. I had two things. I can only remember one of them. So the first one that I had was I know that Jerry had a presentation he wanted to give, and I'm concerned about timing and where we are. And I very much want to have Jerry have that opportunity, and I thought it was during this session. I know we're running a little behind. So I want to defer to Jerry and make sure that he has that opportunity.

**MR. STALLARD:** And, Sandra, you had a question?

**MS. BRIDGES:** Yes, up until the last couple of meetings we had streaming video that anyone could go back. If they didn't attend the meeting, they could go back, when they got off work tonight, for instance, or whenever, and go back over the whole.

What happened to that? Now, remember -- it is streaming now? I know that you had said there weren't enough people participating or going back and looking at it and that's the reason it was cancelled.

**MS. RUCKART:** No, no, no, let me clarify. We have the court reporter here, and he is transcribing word for word, and we do post that after the meeting. There is a delay, of course, because Ray has to process it, and we proof it and post that. So that is available, and that goes all the way back to our first meeting. There's a month or two delay there.

We previously did post the video of the meeting, and recently we have not done that. It streams live. Right now, obviously, we're having a technical difficulty, but that recently is not posted, the recordings of that. And that's because of 508 compliance. It has to do with closed captioning. We are not able to close caption the recorded video. And you may have noticed that we have the closed captioner calling in for the last few meetings. She is typing it live, so anyone who's watching that has difficulties can see the closed captioning.

Now, it is possible, there is technology

available to provide closed captioning on the recorded video, and the part that you were talking about where we don't have a great viewership, that it is why it was decided that we would not spend the great amount of funds necessary to close caption the recorded videos because we had our web team pull the number of hits that our past archived videos have gotten, and they've not gotten that many.

So again, it was decided that we would stream it live. We would have the closed captioner available for the live streaming. We also have a transcription available so anyone could read through it and see word for word what was said. And we are recording this session on DVDs, and I guess we can make those available. We can discuss that further.

They're working on some upgrades to our system that does stream this video, and in the future, the hope, the plan is that we would be able to post the videos after because the closed captioning would be integrated, and there would be a real-time type of thing.

**MR. STALLARD:** Thank you, Perri.

Allen.

**MR. MENARD:** Just real quick. This is for the VA. I've got some concerns that the VA is not

recognizing that there was benzene in the water at Camp Lejeune when they assess each individual person because I put benzene in my claim to the VA and the only thing they recognized was PCE and TCE.

And also another claim that I helped a gentleman get, and he was approved, was no, it wasn't brought up of TCE and -- I mean, it was brought up of TCE and PCE but no benzene. You know, there was benzene there. We've got proof. It should be recognized, and I don't know if you guys do or not, but that was a concern of mine because you never, was not in the papers that we got.

**MR. FLOHR:** Yes, this is Brad Flohr. Yes, we do. We're aware benzene was in the water, the same as you after the ATSDR public health assessment was issued, and the issue of benzene and the fact that it was in the water was raised, and we're aware of that. And you may have heard recently there was a lot of publicity that claimed the VA granted out of our Boston office that was based on exposure to benzene at Camp Lejeune.

So they're aware of it. We may not be as aware of it throughout the VA's 57 regional offices spread throughout the country and Manila and San Juan because there's not been a lot of publicity to date.

We don't have a whole lot of claims yet, thank goodness, at least that I'm aware of.

But we have just issued an environmental hazards training letter which covers not only Camp Lejeune and Atsugi, Japan, but also the exposure to sodium dichromate in Iraq and exposure to sulfur mining fires in Iraq and other ^ environmental hazards both VA and DOD are tracking. We just now sent that to our field and one of the big article or part of that is on Camp Lejeune and the fact that benzene was present.

**MR. STALLARD:** Thank you.

**MR. BYRON:** This is Jeff Byron. Could we get a copy of that?

**MR. FLOHR:** Yes.

**MR. STALLARD:** We're at a point now where we either take a break or we take ten, 15 minutes. Did you have more you wanted to add, a formal presentation of some sort?

**MR. ENSMINGER:** Well, there were some points in a letter that was written in response to ATSDR's 22 March letter, and the Marine Corps wrote a response back on the 26th of March. And there were some real points in there that were either half truths or total lies. I took great offense to a lot of the

stuff that was said in this letter because it plays right to the issue we discussed already this morning, and that's honesty and integrity and openness.

And the Department of the Navy and the Marine Corps constantly claim that they do not have the technical or professional expertise on their staff to assist ATSDR in determining what documents or what data would be helpful for them in their water modeling and in their studies. What a crock of crap. That's the only way I can put it.

I mean, they've got an Under Secretary of the Navy for environmental issues, a guy by the name of Schregardus, who his previous life he was with EPA Region Five, and he was their water modeling expert. My god. Take a look at the staffing up at the Department of the Navy environmental sections, installations and I and L, Installations and Logistics, NAVFAC, Navy Facilities Engineering Command, both in Washington and in Norfolk.

They've got environmental engineers out the ying-yang. They've got the same thing at the Environmental Management Department in Camp Lejeune. What the hell are they paying these people for? I'll tell you what they're paying them for. They're

paying them to cover this up, not to help to expose it.

They've got epidemiologists at the Navy and Marine Corps Public Health Center or whatever the hell it's called now. It used to be NEHC, Navy Environmental Health Center. I mean, why do we take this crap? Why do we swallow this? I mean, I'm so sick of hearing this.

I mean, ATSDR and the CDC, you've got the chain of command. You've got superiors up your chain. I mean, this goes back to the issue of the inventory of documents that you've never received since 1991. This all goes back to this statement in this letter.

Have you used your chain of command? Have you gone to the Director of the CDC and said, hey, these people aren't helping us? I know you wrote letters to the Marine Corps trying to obtain this stuff, but have you gone up your chain of command all the way up to the Secretary of Health and Human Services and said, hey, you need to go over and slap the Secretary of Defense up side the head. But you go up, and then it comes back down. But I've never seen anybody go up the chain of command all the way to the Health and Human Services and try to get these people to fulfill their requirements.

**MR. STALLARD:** Wait, wait, wait, wait a minute. You had a presentation. So you question the claims of their not having competent staff to do what they need to do, right? And use of chain of command. What else is it that you want to address in this?

**MR. ENSMINGER:** Well, they're constantly stating, and again in this letter, that ATSDR has always had access to these different files. And they describe this library that they've got down at Camp Lejeune as something like this room and the next room, this huge area of the library of documents where you walk in and there's bookshelves and they've got signs suspended from the ceiling that says UST this way, IR Program this way. Bull.

This stuff is so fragmented and stuck in every little cubbyhole. Morris and his people go down there, they've got to play detective.

**DR. DAVIS (by Telephone):** Point of information, this is Devra Davis. Has anyone who's currently there in the room been able to go to Camp Lejeune and sit down in this room? Has any member of the CAP gone there to look at these materials recently?

**MR. ENSMINGER:** No, we're not allowed.

**DR. DAVIS (by Telephone):** Why is that?

**MR. ENSMINGER:** We're not allowed access to these

files. They were, as far as the Memorandum of Understanding. It's just like the meetings that ATSDR holds with the Navy every month. They have secret meetings, not secret, but segregated meetings with ATSDR --

**DR. DAVIS (by Telephone):** Right, well I'd like to raise a que -- I'd like to make a suggestion for the CAP. I'd like to suggest that members of the CAP be designated to go to Camp Lejeune to examine these materials for the CAP. And I'd like to volunteer to be one of the people to do that.

**MR. STALLARD:** Okay, thank you. Morris is going to address his efforts. He's been down into the labyrinth, I do believe, during his investigative work.

Stay right there. I'll bring you the microphone. Would you like to briefly address --

**MR. PARTAIN:** Before you start, Morris, one thing I'd point out, a lot of these documents are neatly organized in the NAVFAC's UST portal, so just give us access to that. Do it from the luxury of our own home.

**MR. STALLARD:** Morris wants to address that because he has been there.

**MR. MASLIA:** Actually, I and several of the water

modeling staff on various occasions have been out to several locations at Camp Lejeune. One is the Environmental Management Division Building, Building 12 actually now that it is. And on the second floor they have a library. It's a repository of notebooks. They have a central room, and then they have –- this is hardcopy now, okay.

And that's why on the record I'm opposed to going back there again or for anybody because it's not the hardcopy reports that we need. We made that point on several occasions.

And then they have in everyone's office, you know, it's a government-type building, and you know in John Smith's office if you ask him, you have the air monitoring reports. And in someone else's office they've got the UST reports, Underground Storage Tank. Someone else's office they've got CERCLA files. And someone else they've got some other notebooks before this program was created from that program. So they do everything sort of cubbyholed.

We were up there in May of 2009, spent three and a half, four days up there going through there and we even have official minutes from our visit that were also approved by the Marine Corps for us

to release. And we did ask them on several occasions are any of these notebooks and the data contained in the notebook, which is what we're concerned with from a water modeling standpoint, in electronic format? Are there any other web portals? And the answer was no, but if you tell us what notebook you want, we will make copies for you and get it to you.

**MR. ENSMINGER:** Red herrings.

**MR. MASLIA:** And that's very disingenuous because they know good and well we have limited staff. It takes much longer, and I'm talking about thousands of hours, to go through hardcopy notebooks. And then if we want the data from it, we still have to transcribe it by hand.

And so, and then there's another building called the Vault, which is a public works. And they've got either hundreds of thousands or millions of documents ranging from contracts to anything under the sun. And again, we have never been denied access to that room or to look around, but again, it's all in hardcopy format.

**MR. ENSMINGER:** And you never received an inventory of all the documents that's required by the MOU?

**MR. MASLIA:** We have never received any inventory of

documents unless we have specifically said do you have document X, Y, Z, and even on some of those we have never received copies of those other than finding out on our own or through the CAP or otherwise.

**MR. PARTAIN:** Morris?

**MR. STALLARD:** Morris is going to have a presentation here in just a bit. We need to wrap up here.

**MR. ENSMINGER:** Let me get back into this here for a minute.

**MR. STALLARD:** Okay.

**MR. ENSMINGER:** Okay. One of the problems with this letter that they wrote is that they continuously say that ATSDR had access to this. There's this public record that's been maintained at the Onslow County Library since 1992. It's the record of the, administrative record. They said that it's been accessible through, on the internet since 1999.

I saw a document today that, where they admitted that the NAVFAC Portal for the NAVFAC Installation Restoration Program website portal for Camp Lejeune has been accessible to the public since 11 January of 2010. That's a lot more recent than 1999. Okay?

Another question is, at Camp Lejeune, and this is a major issue which has become the major issue, is the benzene and fuel contamination, Site 22, the Hadnot Point fuel farm. It was one of the original sites of concern when the Navy's NACIP Program started back in the 1980s. In 1992, the Department of the Navy finagled this thing somehow. I don't know how in the world they did it, but they got it taken out from under CERCLA and put under RCRA.

These public files that they're talking about that everybody supposedly has access to only contains CERCLA documents for superfunding, the Installation Restoration Program. They don't contain any of the documents for sites such as Site 22, RCRA. Where's the public record for those?

Furthermore, the Marine Corps and Department of the Navy are telling ATSDR that they cannot cite these documents in many of their reports because they have not cleared them. They are not public record. Well, I beg to differ. We need to find out -- when this went under the RCRA Program, Site 22 went under the RCRA Program in 1992, it also fell, because it went under RCRA, it became under the control of the State of North Carolina's Underground Storage Tank Program.

By virtue of it falling under the State of North Carolina’s Underground Storage Tank Program, all of these reports and documents and data that’s been established for that site have to be provided to the State of North Carolina. Once they are provided to the State of North Carolina, they are in the public domain. So this thing that they’re saying that they’ve got to review all these documents is a bunch of crap.

**MR. STALLARD:** Are they available to the State of North Carolina?

**MR. ENSMINGER:** They have to provide them to them. Once those reports go final, they have to provide the final reports to the State of North Carolina’s Underground Storage Tank Program.

**MR. STALLARD:** And do we have access to them through the State of North Carolina?

**MR. ENSMINGER:** Well, but see, the problem with the State of North Carolina is that they’re all hard documents. They don’t have electronic files.

**MR. STALLARD:** I see.

**MR. BYRON:** Jerry, this is Jeff. I have a comment. You asked why is this still going on, and, you know, why can’t we get the data? Well first thing I’d like to say is one reason is that I believe that the

Senate Armed Services Committee in their last vote to help victims of Camp Lejeune threw it right back into the hands of the DOD and the VA when they should have put it in the hands of Health and Human Services and the VA.

**MR. ENSMINGER:** That was the Veterans Admin.

**MR. BYRON:** Veterans Affairs, I'm sorry, Veterans Affairs Committee. Threw it into the hands of Senate Armed Services, and as you know, they're not going to take any action. This is the plan. And I'm very disappointed in my own representatives from my state of Ohio, Sherrod Brown. He actually went totally against what the victims wanted. But I wanted to make that as a comment.

But I believe it's emboldened the DOD and the Marine Corps not to be here today, and it's also allowing them to put off giving us the data because they're one of the participants. Instead of it being Health and Human Services and the VA, it ended up DOD. They threw it right back into the hands of the perpetrators.

**MR. STALLARD:** Well, I think what I can say is that based on the turnout we have of ATSDR and those in the audience and leadership at CDC, there's a different response being seen here from our

perspective.

**MR. ENSMINGER:** Yeah, well, go back to what Jeff said, you know, I have to disagree about why the Marine Corps's not here. I already understand why they're not here. I mean, this is the reaction of someone who's had their hand in the cookie jar and got caught, and they don't want to face up to it. But you know, so be it. I call it like I see it.

**MR. STALLARD:** That's a perfect segue for a break.

**MR. PARTAIN:** Well, actually, on the North Carolina document issue, I just want to make a real quick point. Like Jerry's saying, they should have been turned over to the State of North Carolina. There is a records repository. My understanding it's haphazard, what have you. One thing to understand in particular with the CAP, members of the CAP, with the community, we do not receive pay to do this. This is on our time.

And like, for example, today I took vacation time to come here to be at the CAP today. We have other lives. We have family members that are sick. It is infeasible for us to go travel like for me from Tallahassee, Florida to Raleigh, North Carolina to maybe get a couple hours in the library. Just the sheer volume of documents in that library

preclude me spending, making any worthwhile time there.

Now, when you take these library documents, and you put them in electronic format with such as has been done with the ATSDR disk, that allows us to do our work. And the Marine Corps is using a technicality in the fact that these documents are in electronic format that they put them on there to say that we can't have them where, in fact, they'd say, well, you can drive over to North Carolina or send a FOIA request. Okay?

If they were truly concerned about the health, safety and welfare of the Marines and their families and want to get this story out and get the truth out, turn over these documents and let us get into them. And that's just not happening. Senator Burr, I believe, asked for just that and was told no. I mean, my understanding they've given the access to Congress, but when Congress has asked for the public to have access to it, no, send a FOIA request.

So that's an important understanding when we're dealing with any of these document libraries. We have the internet today. We have technology. You can put these on DVD. You can put them on the internet and let us get into them.

**MR. STALLARD:** Hands in the cookie jar made me think of a break.
**MR. MENARD:** Just one quick one. Dr. Falk, and everybody else. Do you object to having a TV camera in here? I mean, can we vote on that and allow the TV camera in here for our second -- after the break here? I mean, I don't see why we can't.
**DR. SINKS:** Let me just kind of try to address that question. The issue is, first of all, there is a TV camera in here. We're all on camera right now, so we're online, although it's unfortunate, I guess there's a technical thing.

There are communication guidelines that CDC as a whole has that affect this campus. There are security issues that relate to where filming can go on and where filming can't. And the decision was made by the Office of Communications that this would not be filmed. It was not made by ATSDR. There are other meetings that CDC has that are not, unlike this, don't deal with this at all. They use the same guidelines.

So when media requests for filming, it's dealt with the Office of Communications, and they make those. That decision was made by them. We won't reopen that for this meeting. When we were actually

surprised by the cameras, the documentary film --

I don't know, Jerry, how long ago, that was a year ago that came. That actually did not get to the Office of Communications. They showed up and it wasn't processed in the way it should have been. So that's really where we are.

The other thing is that in terms of transparency, we're trying to be as transparent as possible. Our main audience here is the public, and that's why we stream this. That's why we have the audio feed and that's what it's for. So I don't want to go back and forth and debate. That's beyond my control.

I did want to respond though to Jerry's comments. First of all, I think Jerry's right on in terms of the issues of the technical expertise that is or is not at the DON and USMC and the inventory. And two of the key points in the letters which I had sent were exactly on those issues. One is we need the assurance from the Department of Navy and USMC that we have the relevant information.

We cannot guess at what information they have. They have the expertise to know what they have. Their response back was more framed as we're not the modelers. That isn't the issue. The issue is what

have you got. So we will persist on that. And, in fact, in Morris's presentation two of the priorities that are on there are actually this assurance issue and the inventory which Jerry and I are right on the same page with.

In terms of the chain of command, the only time we've really elevated way up the chain of command was this past year with the budget. And I think, I actually feel we can be more effective keeping this within areas we can control ourselves in our own leadership, Dr. Falk, Mr. Schregardus, those levels, than pushing this way up because those tend to delay things rather than expedite them.

But I wouldn't close that up, but let's see how productive we can actually be in getting closure in this. It's unfortunate we don't have representation here because those were issues that I had hoped we'd be able to discuss across the table.

**MR. ENSMINGER:** I mean, let's think about having the Department of the Navy and Marine Corps here. They sit out in the audience like a bump on a damn log. I mean, they never respond. You can try to pin them down. They just sit there with their arms folded. They never have any input. All they are is messengers. They came in here and sat and looked.

That's all they did. Now, (brief power outage).

**MR. STALLARD:** Dr. Falk has something to say. One of the things that we're not going to discuss in this group is the strategy for three dimensional bureaucratic chess and have it solve that. I think the message is we need to see action and active participation of all agencies.

**MR. ENSMINGER:** Well, I just wanted to respond to one thing that Dr. Sinks just said. And he said that you know going up the chain of command is not the way to do it. It would cause more delays. How much more of a delay do you need for this inventory? It's been 19 years, I mean, seriously.

**MR. STALLARD:** Okay, Dr. Falk will take us into the break. Thank you.

**DR. FALK:** Yes, this is a very real issue in terms of the adequacy of the data, the access to data. So we need to follow up on that. I mean we, and so I'm listening carefully. We will do that.

**MR. ENSMINGER:** Well, another thing you need to look at while you're doing that is I want to avoid this from happening again. And that's how this site, this CERCLA site, fell out of CERCLA and got slipped into RCRA, and the public record, those documents, there's a black hole there.

There was a black hole there until Mr. Bob Faye by accident found out about this electronic portal where all these documents were located because they weren't in any other files that Morris Maslia and his team had. I mean, when Bob Faye found that thing, he fell into a gold mine. He goes, oh my god, what have we got here?

**MR. STALLARD:** I found it. Well, one of the things -- just think about this because I've got to figure out where to fit it in on the agenda and how we're going to do this, but I want to address what Tom had brought up about in achieve, and that's the data discovery process and priorities which seems to have taken quite a bit of our discussion this morning. And so let's think about how we might address what those are when we come back, okay?

Fifteen minutes, thank you very much. Those of you on the phone, 15 minutes we'll come back.

(Whereupon, a break was taken from 10:28 a.m. until 10:45 a.m. during which Dr. Clapp joined the meeting.)

**MR. STALLARD:** All right. Just before we broke we talked about this issue of data discovery, process and priorities. I am assured that that is going to be covered in our next presentation of Dr. Morris

Maslia. Before we move on though I'd like for us to welcome and acknowledge Dr. Richard Clapp, a CAP member who is here and has joined us. Welcome.

Do we still have people on the phone?

(no response)

**MR. STALLARD:** Okay, we'll hear them beep in when they do.

**THE CAPTIONER:** This is the captioner.

**MR. STALLARD:** Yes.

**THE CAPTIONER:** I'm having a really hard time hearing the speakers.

**MR. STALLARD:** You're having a hard time hearing the speakers.

**THE CAPTIONER:** Yes, it's very muffled audio.

**MR. STALLARD:** Is it? Okay, well, let us try then, speakers make sure that we speak directly into the microphone, meaning face it. Don't necessarily face me or put the microphone so that you're projecting into it. And make sure that you turn it off so that we're not getting ambient noise that might be distracting.

**MS. RUCKART:** I want to make a suggestion. If somebody's trying to watch this and the link isn't working, they can click on the link for closed captioning and listen to it, just get the audio if

that's available.

**MR. STALLARD:** Thank you, and that was Perri Ruckart speaking.

All right, Morris, would you like to take us into this presentation?

**DATA DISCOVERY ACTIVITIES AND WATER-MODELING ANALYSES**

**MR. MASLIA:** Good morning everybody, and as we discussed prior to the break, data discovery is an important issue, and it's part of the water modeling analyses. And so I will be speaking on both topics this morning and give you some updates. And we do have handouts of the slides with the notes. I won't promise to stick by every word on the notes, but there are notes there should you have any questions.

My responsibility on this project is to direct the water modeling analyses for the current health study at Camp Lejeune. I'll present four major issues this morning and one, just review what questions and goals the water modeling team was asked to answer and what goals we were asked to achieve. I will be going over the data discovery and water modeling process.

I'll give you a status of data discovery in terms of some selected databases and information sources. And these are three of them just so we're

all on the same page: installation restoration or IR sites typically refer to CERCLA-type administrative records. Underground storage tank or UST sites, which we heard some about earlier, and then the Access database which we have recently been provided by the Navy and Marine Corps, go into that. And then some priorities for completing data discovery.

To bring everybody up to date, we were tasked with providing technical input to the epidemiological study to determine exposure to the drinking water areas of the base that served base housing. The northwest corner here we've got Tarawa Terrace, and on the middle area we've got the area known as Holcomb Boulevard. And on the southern area here including the two shades of green we've got Hadnot Point. Hadnot Point area is the original of the base water system that was established during the early '40s.

In terms of epidemiological study areas, Tarawa Terrace is assumed to be exposed, and the primary contaminant from an off-base dry cleaner here at ABC One-Hour Cleaners is PCE or dry cleaning fluid. And we have concluded that analysis. That analysis, the water modeling analysis, has been published, is

available on the ATSDR website, and the results have been provided to the epidemiologists.

The Hadnot Point area is also assumed to have been people there exposed to contaminated drinking water. These are three contaminants: TCE, trichloroethylene; PCE, perchloroethylene; and benzene in general BTEX compound. And the PCE --

**MR. ENSMINGER:** Morris? On that slide, what about vinyl chloride?

**MR. MASLIA:** Vinyl chloride is a degradation product from PCE, and we did, in fact, do the degradation analysis. I should say our cooperators at Georgia Tech assisted us and will be assisting us again in degrading PCE to its degradation byproducts.

**DR. DAVIS (by Telephone):** Can you speak into the microphone more, please?

**MR. MASLIA:** I may need to wear a remote if that's possible. Everybody hear me now? Is that better?

**DR. DAVIS (by Telephone):** It's better.

**MR. MASLIA:** Okay, thank you. In the Hadnot Point area one of the principles to understand is that TCE is both a degradation product of PCE, but it is also a source contaminant as well, so we'll be looking at both instances, both situations on that.

Originally when we began the water modeling

analyses, these two areas were the exposed and obviously for a case control study you need an unexposed area. And so Holcomb Boulevard area was assumed to be unexposed, right here. We have since through information gathering and talking to the CAP and other members determined that, in fact, Holcomb Boulevard had some intermittent periods of exposure between June 1972 and 1985 when either the booster pump at 742 or the Marston Pavilion valve at Wallace Creek were opened up during the dry spring, early summer months to supply additional water to Holcomb Boulevard when there was a water shortage.

And finally, also we have noted in reviewing some of the underground storage tank files that, in fact, there's another area of contamination known as HP-645.

So the questions we were asked to answer on behalf of the epidemiological phase of the study were what were the sources of contamination; which chemical compounds contaminated the water supply; when did the contaminated groundwater reach the water supplies and the duration of the contamination; how was that contaminated drinking water distributed throughout the Camp Lejeune water distribution systems; and the frequency, duration

and spatial distribution of exposure to contaminated drinking water.

What's important to understand about these questions and in the follow-up slide that I'll show you in a minute is that these were all presented during October 2003 at a meeting, you can call it a kick-off meeting, where ATSDR was proposing our approach to historically reconstruct the drinking water at Camp Lejeune.

And at those meetings were representatives of the U.S. Marine Corps from Headquarters, U.S. Marine Corps Camp Lejeune, Department of Navy NAVFAC and the Department of Defense. So everyone, all stakeholders, have known our approach and the questions we were tasked to answer and how we were going to try to answer those questions since 2003.

So the goals that we wanted to achieve were as follows: There were four goals. The arrival dates at the contaminated wells.

And these goals were put to us by the epidemiologists in order of if we could only achieve one goal, what would it be. If we could only achieve two goals, what would they be. And so they're listed in the order of must have. It'd be nice to have. It'd be great to have, and this is

better than sliced bread.

So the second goal was the distribution of contaminants by housing location. After we were able to do that then could we provide monthly mean concentrations for every month of the exposure period. And finally, if we could provide mean concentrations, then what were the reliability of those results, the range of the concentrations. Did the synthesized concentrations vary by a factor of two, four or ten, whatever. We needed to give the epidemiologists some sense of confidence in our results.

What I'd like to do at this point is just very briefly go over the areas of the Hadnot Point area that we're currently modeling. We have successfully answered the questions and achieved the goals for the Tarawa Terrace part of the epidemiological study. And again, as I said before, those are available to the public online and in hard copy.

The three areas in HP -- and I'll show you a map on the next slide -- HP industrial area where we were looking at PCE, TCE and benzene; the Hadnot Point landfill area, PCE and TCE; and the HP-645 area, benzene. HP-645 refers to a water supply well in Holcomb Boulevard.

And I'll show you the computational grids. So the HP industrial area is down here in the southern area. We've got the HP landfill area in the central area and the HP-645. On this map you'll see the squares that are in dark maroon or purple. Those represent our current knowledge of underground storage tank sites. I'll get more into that. As of right now we've identified approximately 60 of them. And the shaded larger areas represent the IR, Installation Restoration sites or CERCLA-based document sites.

The computational grid's just some technical information. Because of numerical requirements of the water models in terms of aquifer properties and transport properties, are cells of 50-by-50 feet. So we have to use very small cells in order to abide by some technical criteria for transport modeling.

At this point what I would like to do is move into the information sources and document review options. And there are a number of options that one can use depending on what you're tasked with and what the goals of your investigation are.

You may be tasked with just finding a universe of documents. You're told about all these documents. You have a review option that may be

administrative, legal, historical, technical, whatever it may be. And so the approach then would be perhaps to review the universe of documents, whatever that might be from A to Z, any type of document. And that is one approach.

On the other hand if you've got a more project- or goal-specific task, you may have a subset of documents from here that you need to review. And that's going to be determined by the tasks associated with the project. And one approach might be is to create an inventory or a catalog of documents.

This, in fact, was done, or this approach was used by Booz-Allen-Hamilton who was contracted to the Marine Corps and Navy. They went on base and inventoried a set of documents. It's interesting that they did not inventory every single document on base. They had a certain algorithm or filter that they used. If certain documents fell into that, they would inventory them. And if the documents didn't meet their criteria, they would not inventory those documents. So that's a selective review determined by whomever made that determination.

Another option we would refer to as technical data extraction. And this is the option that we

determined that we would use for the water modeling analysis because we wanted specifically to be able to extract certain types of information and data so that we could build model input data sets needed for the different water models. And so it's the third one here that I will be focusing on and that we have successfully used for Tarawa Terrace and the Installation Restoration site document review.

Now, one of the things we can view this world of document review is in a Venn diagram. And so this outer box may represent all the documents that you have either associated with the project, somebody tells you about it. It says nothing about whether they're pertinent or not. They're just documents.

And within that project document continuum here we may have certain documents that relay certain types of information; for example, geohydrologic information, chemical and contaminant information, hydraulic aquifer characteristic information. And what you notice right away is that these types of documents are a relatively small percentage of this entire universe of documents out there, and so you want to focus in on this smaller area because that's going to be the most probable location of the

information that we need.

More importantly, you will see that the data that can be extracted from this subset is an even smaller subset of these documents here. And, in fact, I'll show you some information later on that'll just show you how small that subset of documents is relative to the universe of project documents that are available. That's from a generalized standpoint.

So let me go over the data extraction process that we have used at Tarawa Terrace and at for the Hadnot Point Installation Restoration sites. Most documents in the subset of documents are not site related, and they do not contain pertinent data and information for modeling analyses. The selected documents are reviewed and they do yield a variety of data. That's those three circles that I showed you on the previous slide of chemical, geohydrologic, hydraulic-type data. And those are the documents and the data that are needed to build model datasets.

And finally, the extracted data are used to build sufficiently robust and calibrated models for epidemiological study needs. What this means is, the very important take-home message from this is

that model calibration does not rely on a process that identifies every document in the subset of documents for the project nor do we need every single data point that is collected.

And that has been the approach, as I said, that we took at Tarawa Terrace and we successfully used it and obviously calibrated those models, published those models. They went through external review and Agency clearance, and, in fact, we successfully applied that to the Installation Restoration site files for Hadnot Point.

So how does the document review process fit into the overall water modeling process? It's a four-stage process. You have your information sources. We use our technical data extraction approach and extract pertinent information, build the electronic databases and then build the model-specific databases, calibrate -- build the model and then calibrate the models. And then, of course, extract model results for the epidemiological study analyses and publication, peer review and all that.

This is the approach again that was used at Tarawa Terrace. I'll get to where we are for different sites and different databases. The two important points to point out here. This activity,

number two here, up to now we have been doing this by hand. That is, when we are told that we have been given access to documents and they're in electronic form, what that means is they have been scanned in, and they are in PDF format.

The data still have to be extracted by hand. They are not in a logic or Boolean-oriented database like MS Access. And so someone, subject matter experts, temporary staff, somebody has to go and then extract every piece of information to first build generalized databases and then build the model databases from that. And that's what has been done at Tarawa Terrace and at Hadnot Point Installation Restoration sites.

A second important aspect of this approach is you'll see this feedback loop here. What this feedback loop does is if there are questions that arise during model calibration and simulation as to whether input data are either correct or values should be changed, the subject matter expert conducting this analysis can go back to the input data files, change the data if needed, and then determine is there a rationale for doing that.

This is what we did at Tarawa Terrace, and if you'll allow me a minute or two to explain, during

model calibration at Tarawa Terrace as part of the input data, we had different wells in there. We had a TT-23, Tarawa Terrace water supply well TT-23, or otherwise known as the TT new well. And we were always told from the day we came on base by the water utility people, environmental management people, the well was built, it was contaminated so we never used it, and so we did not operate it in the model.

The model kept coming back to us and said it needed another source of water. In other words, the model would not balance out. The only other source was that well. So that’s easy. Anyone, again, even a non-subject matter -- can go in here and change the data point. That’s not the key. The key is we operated TT-23 and the model worked.

But now we have to find a reason why the model said it was working when we were told it wasn’t operating. At that point that is when we went back to some of these files that initially we just did a cursory review on. These happen to be the water plant logbooks which were all handwritten notes. And if you read any of them, you’ll see they’re more personnel records than actual water utility records.

And we started reading, and sure enough, in

March of 1985 we found an instance when a colonel told the water plant manager if you're short on water, turn on TT-23 from midnight to 6:00 a.m. That right then gave us the rationale that said if we were short on water, and we were short during the summer of 1984, they would have operated TT-23. And so that feedback loop is almost a QA/QC on that.

And what it does is it allows us to use our data extraction of not reviewing every document first, get the model going and then if there are questions raised, we can go back and we'll get an affirmative subset to see if we can refine our information.

Now with that said, let me go into the status of -– hopefully you can see the table –- of where we are. So for Tarawa Terrace, we have completed through stage four. It's done. Hadnot Point Installation Restoration sites we have looked at the information sources. We have gone through our data extraction method, built our electronic databases, built the model input databases. And we are in the process of running the model. Again, this was all done by hand.

At the HPHB, Hadnot Point-Holcomb Boulevard underground storage tank sites, we are currently

reviewing the information source and we have extracted some information. And I'll talk more about those in a few minutes. And the what is known as the CATLIN-NAVFAC MS Access database. This is a database consisting of anywhere from 700,000 to 1.3 million analytical records of information that we were provided just recently by the contractor for the Marine Corps by a captain who just received it, and so that's why we're just on step one there, having just received it.

At this point I'm going to go through several slides with partial lists of some of these databases or information sources and provide you with additional details about them. This is a partial list. It's a list that was sent up to the Marine Corps and the Navy and Dr. Falk's –- not Dr. Falk's -- Tom Sinks's letter of March 22nd, and it is a much more complete table, but I'll focus on these four databases.

Up here on the top we have the CERCLA documents composed primarily of what are referred to as Camp Lejeune water documents and the Baker web portal documents for the CERCLA administrative records. Then we've got the CATLIN-NAVFAC Underground Storage Tank information. Those are the PDF files, and I'll

talk to you more about that. The CATLIN UST MS Access database also known, the Marines refer to that as Terrabase.

And finally, most recently we have been notified about a NAVFAC public web portal which apparently contains very similar documents to the Baker web portal up here, but due to some internal standards at NAVFAC they have renumbered the files and so we asked them to reconcile the NAVFAC web portal files with the Baker web portal files.

They have done that, and there are about 50 files that are on the public web portal that we do not have on the Baker web portal or on our DVDs that were published with Tarawa Terrace Chapter A. And I have requested those additional 50 files. I don't know if they're early files, later files. I just know they're about 50 files.

And again, as what Jerry said at the beginning, this public website based on the transmittal information that was sent to me earlier this month by the NAVFAC web portal person went live to the public on 11 January 2010.

**MR. ENSMINGER:** Hold on there, Morris.

**MR. MASLIA**: Yes.

**MR. ENSMINGER:** This right here is why this is so

important for this inventory that was required under the Memorandum of Understanding. I mean, if ATSDR does not have this complete inventory, electronic inventory, of all these documents, I mean, every time Morris and his team think they're getting to a point where they're reaching completion, another Jack-in-the-box pops up, another file. I mean, this has got to stop. We've got to have the inventory.

**MR. MASLIA:** Thank you, Jerry.

So at this point what I want to do, as I said I'll go through these top three in more detail. And since this is basically a somewhat duplicate of this one with the exception of the outstanding 50 files, I will not go into the last row.

So with the Camp Lejeune water documents and Baker web portal, again, those are the documents that ATSDR provided in our Tarawa Terrace Chapter C on the DVDs. So this is the location of the Installation Restoration site and the numbers refer to the official numbering from -- if you've read any of the investigation reports, any of the other reports you will see those sites listed by that number.

All the information from these reports again have been hand tabulated. They have been put in

what we're referring to now as ATSDR's Hadnot Point Chapter C report. That report has gone out to external parties for data review, external parties being USEPA Region Four, U.S. Marine Corps Base Camp Lejeune, two people reviewed it there as well as other parties, other stakeholders we sent copies of the report to review.

The reviews came back. Those have been reconciled. It has gone through ATSDR clearance process, and it is in the process of being laid out for electronic publishing and hard copy publishing.

To give you a little information what's contained in the Installation Restoration site files and documents. There are about 4,818 files. Those are the PDF files that I'm referring to. Of that 3,708 are the CERCLA administrative records and 1,110 are the Camp Lejeune water documents.

The key point here, bullet number two, of all those documents only 206 yielded data for the water modeling, again, four percent. That goes back to that Venn diagram that I showed you that using our data extraction approach we keyed in on these. We did not have to read 210, 220 or a thousand other reports. That's not to say we don't look at the reports, but we don't have to read them page by page

by page. We can key in on that and extract the data.

And the third bullet that I just said, this information had to be hand tabulated. Chapter C for those who haven't seen it has 80 data tables, all that composed by hand. And we're awaiting, besides the cartographic labs work that has to be done, there is another issue that is with this report. I'll bring that up later. We need to do another round of QA/QC.

So just to give you a sense of the different types of data, the data points, you see them on the right-hand side, and the left-hand side is the type of data, again going back to that Venn diagram with the chemical, the geohydrologic, the hydraulic-type data and the number of data points.

By comparison for those who have looked at any of the Tarawa Terrace reports you will note that this is at least an order of magnitude greater in number than the data points available for Tarawa Terrace.

So now I'll go on. The next slide we'll go back and look at what is referred to as the CATLIN-NAVFAC UST site information. And that review is in process, and there are about, there at 1,535

documents. This is contained on the web portal that was referred to earlier.

And in fact, we have asked the Navy and Marine Corps to allow us to release those publicly. They have been provided to us with a FOUO letter; that is, for official use only. And what that does is preclude us from citing them as references in scientific documents because if somebody asks for the reference we cannot provide it to them. So that is where we are with those.

And again, as I showed you before, the squares here are the UST sites that we have located to date, documented. There are about 60 of them, and the numbers are the ones with leader lines and labeled on them are those associated to date with major benzene spill and benzene contamination. You've got the fuel farm in that area down here, and you've got the HP-645 area up on top.

**MR. PARTAIN:** Morris, on the UST, the CATLIN-NAVFAC UST site, the documents that you've seen so far, is there any sensitive information, you know, military secrets or things contained in these documents that would preclude them from being released to the public?

**MR. MASLIA:** Not that I have seen, but again, when

we reviewed the CLW documents and the IR documents, I never saw any sensitive information. I don't know what protocol or procedures, you'd have to ask the Navy what their protocol or procedure that they are using to do the review.

**MR. BYRON:** Booz-Allen and Hamilton.

**MR. PARTAIN:** Also on the UST portal I just want to, the data that's in there, you mentioned four percent of the data from the other documents. Is there a percentage of data to delve into what you're doing?

**MR. MASLIA:** Not at this point because we're still in review. Let me just go on because I need to describe the review process first. So I'll do that and then it may or may not answer your question.

Now, I showed you before our review process for Tarawa Terrace and the Installation Restoration sites. As you see, this is the review process that we have currently undertaken for the UST sites. It's quite a bit more complex and it involves quite a number more of subject matter experts here in the orange boxes to the right. And that is because we are being required to review every page of every document and then have a subject matter expert go back over that to review every page of every document whether the document pertains to the sites,

Hadnot Point-Holcomb Boulevard or not. So it’s very costly and very time consuming.

**MR. STALLARD:** Who requires that?

**MR. MASLIA:** I’ll answer that, okay? Let me go on.

There’s two disadvantages and then I’ll answer who’s requiring that.

The first disadvantage is, as I point out, it requires a detailed review of every single document and as I demonstrated with the IR site documents, only four percent of those documents contain relevant information. So you can multiply out those documents.

But secondly, ultimately a subject matter expert has to be diverted to these review tasks, and so what we do is then pull them off other model-pertinent tasks like computations of mass, characterizations of sources of contamination. And so that’s what’s happening now. It was mandated by ATSDR above the technical people, myself, expressed an opinion. It was then told to us, no, you will review every document.

**MR. ENSMINGER:** Well, these requirements that are above and beyond what you did for Tarawa Terrace, are these new requirements creating any kind of delay as far as the water model being completed, the

completion date?

**MR. MASLIA:** Yes, it is creating a delay. We are documenting in the last quarterly report, the one that's going ^ annual plan of work that we send up to the Navy every quarter. This quarter two we have indicated that delays are imminent, and I'll have a slide near the end that, in fact, will tell you by how much we're being delayed.

Let me go on to that and just tell you the status of the UST review. The 1,535 electronic files, and the reason we now know there are 1,535 files is that in March we requested an index from our points of contact at the Marine Corps and their consultant CATLIN. And they provided us with an index of files, okay. Because before, as Bob Faye stated we were basically just batting around in a black box.

They gave us access to the web portal with time and either a title or a type of contamination and some files to pull up, but we didn't know if we had all the files, half the files, whatever. We didn't have a count. So they did provide us with an index, a file name and we know there are 1,535 files in this UST --

**MR. PARTAIN:** Morris, if I understand you right, you

got access to this portal.

**MR. MASLIA:** Right.

**MR. PARTAIN:** From the Navy.

**MR. MASLIA:** That's correct.

**MR. PARTAIN:** And did they tell you how to use it or give you any --

**MR. MASLIA:** No, I'm getting to that. No, one of these files of the 1,535 happens to be a user's manual.

**MR. PARTAIN:** How did you find that? Did they tell you about that?

**MR. MASLIA:** No, we just stumbled across it.

**MR. ENSMINGER:** When?

**MR. MASLIA:** When? A month or so ago. After we got the index then we knew how many files we needed to download. We downloaded all the files and listed at the very bottom was a file titled Web Portal Users Manual.

**MR. ENSMINGER:** So you had this thing for a year flailing around --

**MR. PARTAIN:** And no one bothered to tell you that there was a --

**MR. ENSMINGER:** Nobody bothered to tell you that there was a user's guide involved in there?

**MR. MASLIA:** No, no.

**MR. STALLARD:** Did you ask?
**MR. MASLIA:** Well, no, I did not ask, and I will plead guilty because when I go in to buy a piece of software or a new employee comes to ATSDR to learn how to use the LAN, we usually provide them with a user's manual. I did not think that that was a needed question specifically to ask for a specific document title.
**MR. PARTAIN:** Do you think you should have asked that or is that something that should have been given to you being that you had access to this portal?
**MR. MASLIA:** I suppose if from now on one of the issues is if we had an index of document types, then we would know what to ask for. Not having an inventory or index of the different types of documents then it becomes very difficult.
And the question is, is ATSDR water modeling group tasked with creating an inventory or are we tasked with conducting water modeling? And my approach has been always we were tasked with water modeling.
**MR. PARTAIN:** Like Jerry mentioned before, the 1991 MOU requested a complete index from the Marine Corps and the Navy.

**MR. MASLIA:** Yes.
**MR. PARTAIN:** And you have not received that.
**MR. MASLIA:** No.
**MR. PARTAIN:** And, of course, this would have hopefully revealed this UST portal volume four.
**MR. MASLIA:** Right.
**MR. ENSMINGER:** Not necessarily. They left the RCRA documents.
**MR. MASLIA:** Just to complete the slide, we've reviewed currently 1,070 files to determine if they're even in our study area at Lejeune. And of those, 662 files are within the study area. That says nothing about whether they contain pertinent information or not. That's just phase one.

Now, we did previously, and Bob Faye had gone through 120 of these UST documents before we had the index, and of those we had extracted these number of data points in the middle column. Now what we have to do is go through, if we're going to use this new approach to document review, go through and determine the number of additional data points to be added to this database.

And, of course, this does have an impact on our water modeling. While we can start, and we have started water modeling with the Installation

Restoration site information, the UST does contain additional information for us to add to our water modeling database.

**MR. PARTAIN:** Just curiosity, Morris, on the water level measurements on there, I know that's important for the water levels with the product, especially with the BTEX just free phasing, are those water level measurements taken in all four seasons of the year? Are they quarterly? Are they monthly? Or is it just one time a year?

**MR. MASLIA:** Are they variable? I'll let Bob Faye who is actually --

**MR. PARTAIN:** And the reason why I'm asking this question is because we have BTEX which my understanding, I'm not a scientist, but that's a free phasing product. And typically in your winter, early spring months in that area is in drought so water tables can drop. And then in the summertime ^ with rains and I wonder, like if they're taking measurements in points of drought and not taking when the water level measurements during the points of rain, is that going to affect y'all's models?

**MR. FAYE:** Well, first of all you need to realize that the water level fluctuations regardless of the time of year are relatively small. I mean, at any

one site unless it's being affected by nearby pumping you're only looking at maybe four or five feet of water level fluctuations that occur seasonally.

And to answer your first question, yes, there are water level measurements at most of these sites taken through different seasons. There are monthly measurements. There are quarterly measurements. So the seasonal effects are accounted for.

**MR. MASLIA:** The seasonal effects are kind of like at Tarawa Terrace, for example, we have an infiltration or recharge parameter, and we know how that varies over the month. We take an annual average or whatever. That's discussed actually in the Tarawa Terrace Chapter C report. So that's how that's accounted for in the groundwater flow models.

**MR. PARTAIN:** And the reason why I bring that point up is we recently spoke with a bunch of former firefighters at the base, and they had indicated in times of heavy rains they could actually smell fuel coming up through some part of the ground at Hadnot Point.

**MR. MASLIA:** With that what I want to turn my attention to is this CATLIN-UST-IR which is known by the Marine Corps as Terrabase. And as I said

previously, it is a query-able database of 700,000-plus. As I said, we just got an update so there's about 1.3 million records in there, and it contains analytical data, well construction data, sampling data, all types of information in there. And we are just in the process of learning how to query it, what the parameters of the database mean.

**MR. ENSMINGER:** Now have you asked them for a user's manual for this one?

**MR. MASLIA:** Well, actually I did, and the response was they wanted to have a meeting to explain it to us. And again, I think a better approach would be to get a user's manual or just write down what the parameters are or what that is. I mean, to take our folks and go back up to Camp Lejeune or go up there is a real cost in terms of resources --

**MR. ENSMINGER:** And time.

**MR. MASLIA:** -- and time. And with the electronic nature of communications and everything else, I think we're capable of doing this via internet, via telephone and that type of information. We even have people in-house on the water modeling staff that have taken MS Access courses. And what we need is some definition of variables and things of that nature.

**MR. ENSMINGER:** How long ago did you ask for this user's manual?

**MR. MASLIA:** Well, we were provided the CATLIN database sometime in March, and when we were communicating with the request, and when I was trying to understand exactly what this Terrabase was. At that time I asked can you also send a user's manual. I believe I've got an e-mail somewhere to that effect. And the response came back, well, let us prepare the database for you, send it to you and once you get it, then we'll have a working meeting of telling you about it.

**MR. STALLARD:** Before we move on, just to be sure. Do you feel that you have the technical expertise to use a user's manual?

**MR. MASLIA:** Yes, I believe we have the technical expertise to use a user's manual, assuming it explains what the variables and parameters and querying options are within the database. And that's typically what you go to any commercial software that is MS Access based, and you want somebody to use an application, such a user's manual would come along and define all the Boolean operators, what the parameters are and things like that.

Just as an example there are wells, monitor wells, and other that different consultants have called by different well names. We don’t know if that’s located under different parameters –– for the same well -– different parameters, different well names or what. We have to reconcile all that and then that’s part of a data dictionary or a user’s manual that should come along with it. So right now we are back again in a black box.

**MR. STALLARD:** Thank you.

**MR. MASLIA:** So let me continue because there may be a way of leveraging this Terrabase to our advantage at this point. And that is if we go back to our UST review approach or review process wherein before in the first phase of this we’re going to review every single document.

That has now almost been done. We’ve read two-thirds of them, and we’ve determined certain ones are relevant to our study area, not necessarily containing data that we need, pertinent data, but we have separated out going to 1,070 of them so we’ve got about another 500 to go.

Go ahead in completing that step what may be an option is to, in fact, pull up this CATLIN database, MS Access database, and perhaps if documents are

referenced by document names, type of data in there and so on, we may be able to query this database and then extract out pertinent information. Again the issues remain of multiple names for the same well, multiple locations and some kinds and things of that nature, other data quality.

For example, is a non-detect not entered? As you know in the Tarawa Terrace we listed what the non-detect value was, whereas other people may eliminate non-detects, things of that nature. That’s what we need to query and look into this so that’s another effort by our subject matter experts. But, in fact, if we took this approach it may, in fact, cut some time off in dedicating subject matter experts to re-reviewing every document again. So I’m just throwing that out for consideration.

And the status of where we are on different tasks, the tasks are just referring to tasks that we send up to a much more complete field, and we report our quarterly progress and annual progress to the Department of Navy. But the things to understand here is, as I indicated, some tasks are on hold, mass computations.

Mass computations are important because this would have told us, if they would have been

completed by now, they would have told us that, hey, there's so many hundreds of thousands of gallons of fuel that had been spilled, not 20,000. That's through a mass computation, not modeling, not anything else. But that has been put on hold. That's affecting modeling. We need that for when we do our models.

We also need the source characterization, that's been put on hold, because we're reviewing these UST files. And we've concluded some other tasks. As you see one of the issues is the pumping schedule. This was an issue brought up at the expert panel meeting that, in fact, all this is good, but if we don't know how the wells operated historically, we would still have an issue. And our cooperators at Georgia Tech have in fact developed an algorithm so that we now can synthesize the historical operation of all the water supply wells back historically based on a technique that they have developed.

**MR. PARTAIN:** I know we've said this before, Morris, but for the record the actual pumping logbooks for the wells, the individual wells, and the production logbooks for the plants, would you please comment on where those documents are located or what happened

to them?

**MR. MASLIA:** We were provided with the most recent ten years of daily operations. My understanding is, what we have been told by the Marine Corps is that anything older than ten years they destroyed. I don't know the legal reasons why or why not. I'm not a lawyer, and so we have ten years of what I call present day information daily records. Part of that in fact is used to quote train these wells as to how they operated historically.

**DR. DAVIS (by Telephone):** This is Devra Davis. I want to understand what you just said. You're saying that you only have, so for example, from current information?

**MR. MASLIA:** That is correct. We do have very sparse historical information, and we have completed files on every single well. There are about 100 of them, and noted which wells shut down, which wells were taken out of service, which wells replaced other wells. And today's probably not the time to go into the technical approach that our cooperator has used to develop this training approach that trains historic wells on how to operate based on current information.

But, yes, we've got ten years of daily

information that tells us whether a well is on or off, where they turned it on to take a sample, where they turned it off for whatever reason, whether they took it out of service. So we have that for the present day wells, but we can use that to determine what the historical wells or how they were operated given some assumptions.

**DR. DAVIS (by Telephone):** Do you all have an algorithm that ^ degradations?

**MR. MASLIA:** That has nothing to do with the degradation.

**DR. DAVIS (by Telephone):** Let me finish my question. Do you also have an algorithm that allows you to calculate the amount of vinyl chloride and degradation products from the TCE in the path?

**MR. MASLIA:** That is correct.

**DR. DAVIS (by Telephone):** Do you have an algorithm?

**MR. MASLIA:** Well, that's contained in the fate and transport models. That is what we used at Tarawa Terrace to determine given a source of perchloroethylene at ABC One-Hour Cleaners how much TCE, how much DCE and its various constituents and how much vinyl chloride would degrade. So that is contained in the fate and transport model that is provided to us by Georgia Tech.

**MR. STALLARD:** So the answer to her question is yes.

**MR. MASLIA:** Well, I think categorizing it as an algorithm is a little simplistic, and that's why I wanted to go into that explanation because it's not like an Excel sheet where you just plug it in and get it out. It's far more complex than that.

**MR. STALLARD:** Thank you.

**MR. ENSMINGER:** Morris, their explanation to you was a ten year retention?

**MR. MASLIA:** Yes.

**MR. ENSMINGER:** Ten years?

**MR. MASLIA:** That is correct, ten years.

**MR. ENSMINGER:** Okay, let me point something out. Camp Lejeune was declared a Superfund Site in 1989. Ten years prior to that would have been 1979. So all of the data from 1979 through 1988 should be required by Title 42, the Superfund legislation, should still be retained because it's got a 50 year retention.

**MR. MASLIA:** I'm going by what we have been told by Camp Lejeune.

**MR. BYRON:** First off, I don't think that you could go by what you're told. These guys are liars. One thing I'd like to express –- this is Jeff Byron -– is we have been at this, you sent me a letter ten

years ago concerning the in utero study. We've got the cart before the horse here. We're just now getting all the data? What's been going on for ten years? I mean, seriously. These guys are allowed to just not provide the data and that's okay?

The other disappointing thing is, is Tarawa Terrace is done. Why can't you finalize a report for TT?

**MR. MASLIA:** We did.

**MR. BYRON:** I'm talking about the summary.

**MR. MASLIA:** That has to be, that's in Frank, you're talking about the epidemiological study?

**MR. BYRON:** Yep.

**MR. MASLIA:** That needs to be addressed by Frank --

**MR. BYRON:** How come the report can't be finished?

**MR. MASLIA:** That needs to be addressed by Frank --

**MR. BYRON:** Why does it have to wait for Hadnot Point? Why do these individuals who are suffering out there, the VA's here to hear the evidence and to hear what we need as far as information for finding Marines who are sick. You guys have got the information concerning TT, and you're not releasing it.

**MR. MASLIA:** We have released the modeling results --

**MR. BYRON:** You have the modeling, but you've not given your conclusions and so whether they're being affected or not, and I'd like to know why this is being held up.

**DR. DAVIS (by Telephone):** I'm sorry. This is Devra Davis. I think the answer to the question is the following: As far as I know 2003 the Bush administration exempted U.S. military bases to land a number of environmental reporting requirements. And I believe we determined that one of those was an exemption for certain reporting requirements for Superfunds on military bases.

I don't know its current legal status, but I know the Defense is still trying to modify the agreement through the Pentagon about a number of things. And I believe, and I think ^ might have been included in that, and I know ^ exemptions with the Air Act, RCRA and the Superfund in 2003. Does anyone here have more information on that?

**MR. BYRON:** No, this is Jeff Byron again. That means nothing to me as far as 2004. This started in 2000. They should have been gathering data before 2000. They asked for the in utero study to start in 2000. Jerry's been involved since 1997.

**DR. SINKS:** Devra, this is Tom Sinks. I think, let

me just I think be clear about the environmental exposure data. I think we are interested in getting all the relevant environmental exposure data we need, and I've not heard anything about that rule affecting our access to that. The issue is knowing what's there and making sure we have assurance that we're getting access to it and then our staff doing that.

The question Jeff brought up is actually a little different question which is so we've done the environmental monitoring for the water system at Tarawa Terrace. As many people in the room know, the epidemiology for the children's selected cancer and birth defects data have been collected. We've been waiting for Morris to finish all of the computer modeling before we do any of the epi analysis.

And the question Jeff brought up was why don't we go ahead and do the epi analysis for children's health outcomes for Tarawa Terrace now. I know this has come up before in discussion and Frank is, I think, prepared to answer it.

**DR. BOVE:** There's a couple of issues. The first issue is that we do know that during the dry spring, summer months that Hadnot Point water went over to

Holcomb Boulevard, but we don’t know exactly what portion of Holcomb Boulevard received that water, and we don’t know what the contamination levels were during those dry summer months.

We are concerned about that because when we analyze this data, it’s very important to know what months a woman was living in the housing and what months the contamination occurred because for the birth defects in particular, the first trimester –- in fact you could actually, if we were able to do it, is there are certain months in the first trimester that are key for cleft palate, cleft lip and neural tube defects it’s the first month.

So because we are not sure what the levels are at Holcomb Boulevard –- remember Holcomb Boulevard was always in our minds the unexposed area. And because we don’t know exactly when the contamination occurred over at Holcomb Boulevard, exactly where and exactly what levels, I do not want to do this analysis and then have to go back and make the same mistake or a similar mistake we made back in 1998 when we thought we had unexposed people at Holcomb Boulevard, and they were exposed to Hadnot Point water. So in order to avoid making that mistake again I want to get all the information. Perri and

I want to have all the information.

The second issue, and I'm not sure how important this issue is yet, but as Morris was talking about HP-645, which served Holcomb Boulevard, we do know that in 1985-'86 there were hits of benzene, low hits but hits of benzene at Tarawa Terrace. Now, in order to get a hit of benzene at Tarawa Terrace where none of the supply wells at Tarawa Terrace have benzene in them, the water had –- step back.

In February of '85, the contaminated wells at Tarawa Terrace were shut down. So the water was now coming from Holcomb Boulevard.

**MR. ENSMINGER:** No, not until July.

**DR. BOVE:** Well, all right, well, sometime in '85 it comes over to, Holcomb Boulevard water comes over to Tarawa Terrace. So here's 645 sending water to Holcomb Boulevard treatment plant. It is being mixed with a whole bunch of other wells in the Holcomb Boulevard system, right? It gets diluted. Then it gets sent over to Tarawa Terrace where it's again diluted by several wells over there. And yet, and yet we still detect benzene at Tarawa Terrace with all that dilution.

So I would like to know what the levels were in

’85 as well at Holcomb Boulevard. Again, because Holcomb Boulevard we considered to be our unexposed populace. I want to have a clean, unexposed population in order to compare Tarawa Terrace to that unexposed group and Hadnot Point to that unexposed --

**MR. ENSMINGER:** You want an unexposed population at Camp Lejeune?

**DR. BOVE:** I’ll take that back.

**MR. ENSMINGER:** Good luck.

**DR. BOVE:** I’ll take that back. You are exposed, first of all, in any epi study, people are exposed, right? They spray pesticides in their home, whatever. What we’re talking about here is the additional increment of exposure due to residential exposure to drinking water. That’s what we’re talking about.

I’m well aware that people migrate all around the site. They may go to main side for dinner or lunch. They’re going to get exposed to contaminated drinking water. So everyone probably I would say, I would be surprised if there was someone who wasn’t exposed at some point in time to contaminated drinking water during their daily activities on base.

I'm just saying that what we're focusing on is residential exposure to drinking water. That's the exposure of interest here. And that so, does that explain our position or do you want any further question?

**DR. DAVIS (by Telephone):** This is Devra. Some have -- Why wouldn't the skews expected or based being the national or the state rate? Why would that be in the Marines only? I mean, you know, you can't have two different controls. You could use national. You could use state, but even try to get a level in other Defense Department, for example, in the Coast Guard if you had it. It would seem to me that trying to get controls at Camp Lejeune I think is very problematic.

**DR. BOVE:** At the time the studies were designed we thought that Holcomb Boulevard was an unexposed area. The design would be fine if that was the case. As we learned later, much later after all the data's been collected, we're finding out these issues about the intermittent transfer of water from Hadnot Point to Holcomb Boulevard, so on. We still think we can do the internal analysis.

However, in the future studies that is the reason why we have Pendleton as an unexposed.

Again, Pendleton has toxic waste sites just like Camp Lejeune, but the difference is they do not have contaminated drinking water. And again, that's the key issue here. So for the future studies we have an unexposed population outside of Lejeune just for this reason.

**MR. STALLARD:** Thank you, Frank.

Morris has four more slides to go.

Mike, you had one question to pose?

**MR. PARTAIN:** Yeah, just going back real quick, Morris, on this well logs and what have you. The logs you have are logs that were compiled after a substantial change in the behavior and operating methods at Camp Lejeune. Why I'm saying behavior is because prior to 1985 the well treatment pipe operators were unaware that there was a contaminant and unaware of the issues there so there has to be some type of behavior change there. And also I believe there is, they started using more automated wells later on.

The fact that these documents are missing, the well logs, the water treatment-type production logs, how has that hampered your ability to model what's going on there with Hadnot Point and what kind of delays has that cost?

**MR. MASLIA:** Well, again, the fact that we don't have routine, monthly, whatever operational records from the water utility side going back historically, we have to be inventive about being able to reconstruct an operational history, and that's where we have people like our cooperator at Georgia Tech coming up. And we have a staff member, water modeling staff member, that provides them with information, and they develop these algorithms. So certainly having the operational history would have been preferred.

I mean, that's always preferred, but we have spent time and resources in developing a method. But I think the thing to focus on is that, in fact, we have developed a successful approach to reconstructing the operational history. And again, there are certain assumptions, limitations on that, and if somebody else has some better approach, other than not doing anything, bring it to our attention. But we believe our approach is at this point successful in reconstructing the operational history of these supply wells.

**MR. STALLARD:** That's the difference between scientifically effective and imaginative.

**MR. BYRON:** Yes, I'd like to ask Morris one

question, too, real quick. Concerning Booz-Allen and Hamilton, which none of us as a CAP member have any faith in because they were contracted by the Marine Corps, number one.

What do you know of the expertise of the individual reviewing those documents? In other words is he just some mucky-muck in the office that has no credentials to be looking at water modeling data, not water modeling data but the data taken through testing at these well sites?

**MR. MASLIA:** Let me answer that real briefly, and then I'll answer more after I finish the slides. But that was not the purpose of the BAH. Because I was there. I was there at their kickoff, initial induction, telling the base personnel what they were going to do. And it was never their intent –- and I'm not saying I agree or disagree with it. I'm just telling you –- what their intent was was not to specifically target water-related documents.

Their task was to inventory every building on the base and based on some filtering algorithm to obtain a sampling of certain documents. And if they found a box and it had more than X percent of certain documents, then they might explore that box in more detail.

What they have provided to us is an index, and the index is about 500 pages long. We've gone through that index and said, okay, this document looks interesting. This document looks interesting. We've gone back to, they have a special building on base for BAH that apparently only BAH can get into, and we tell them what the file number is that we need, and they will pull those documents. And that's where we did obtain some of the historical well information, from those documents.

But you'll have to talk to BAH, the Marine Corps or the Navy to find out what exactly their task, their rationale was in all that. But I can tell you it was not, I was told this in no uncertain terms, it was not targeted at water-related documents specifically.

**MR. STALLARD:** Take us through the last five minutes of your presentation.

**MR. MASLIA:** Update on the reports, Chapter C, as I said, is done. However, we've got this issue now hanging over our head is that we've got this 700,000-plus analytical records or Installation Restoration records received on 22 March, and so we have to decide how we now are going to go back in QA/QC Chapter C which was ready to go out the door.

Again, that decision hasn't been made.

I'll be happy to listen to suggestions. Do we QC every single table of the 80 tables? Do we do a ten percent cut? Do we target the critical tables and do that? That decision remains to be made. But the report cannot in good scientific protocol go out the door when we know there's a database sitting out there that has data that we've put in a report that has not been prepared.

Chapter B, which is the geohydrologic framework, and that preparation is in draft. Again, that report will concentrate on the three areas that are groundwater models: HP-645, Hadnot Point landfill and Hadnot Point industrial area.

And Chapter D will be the UST data, pending the UST file review and data extraction.

So water modeling time line. Original target date as we've been talking for the last couple of years, and we've provided a time line in our quarterly updates to the Navy and I think at the expert panel perhaps, is May 30th, 2011. That was to be complete with all water modeling tasks including reports and all that. We have revised tasks.

I'll discuss some of those here, UST file review, the source characterization, multiphase

modeling and uncertainty analysis will be complicated by the benzene modeling. Again, we're having to go to using a free phase float and product-type model as opposed to dissolve phase. And the completion date at this time looks like it's possibly extended by about six months to March 31st of 2012.

Priorities for completing the data discovery process, we obviously have to complete the UST document review and decide how, if we can, speed that up, do something. MS Access database is the 700,000 pound gorilla in the room, especially since we have the report ready to go out the door, to look at. We still need an inventory of information somehow. I agree with you, Dr. Falk.

Somehow we have to get an inventory that everyone says is an inventory and some assurance from the Department of Navy, USMC, their contractors and guidance from the CAP that we have all the relevant environmental information. Again, couch it in terms of our data extraction process. In other words do we have all the relevant information that will allow us to extract the data that we need for our models.

And that concludes the official presentation,

and I will be happy to answer questions at this time or at some other point in time.

**MR. PARTAIN:** Morris, we've got a new date now, March 2012.

**MR. MASLIA:** Yes.

**MR. PARTAIN:** Now assuming, and let me first ask you, the discovery of these document sources, the portal, the Terrabase and everything, you mentioned the change in the type of model. How has this altered your work finding this new data?

**MR. MASLIA:** Let me start I guess with what I consider the easiest is the finding of documents that specifically told us a consultant to the Navy and Marine Corps had developed a simple benzene volume-type model called spillcad that in fact based the results of that model, estimated anywhere from 400,000 to 1.1 million gallons of fuel-loss over time, and additionally, the acknowledgement through data of floating product is probably fifteen feet now probably a little bit less, tells us that it is inappropriate to apply the same model that we applied to Tarawa Terrace which assumed all the contaminants were dissolved in groundwater.

That benzene is now or has been floating so you have to apply the appropriate model. And the

appropriate model is the multiphase model. In terms of uncertainty if we apply an inappropriate model, forget the data uncertainty, I mean, your uncertainty is going to go through the roof because you applied models in inappropriate physical concepts.

So we have to now go back and develop a multiphase model and then apply that. That's another six, 12 months, whatever, worth of effort, and then benchmark it against known solutions, then apply it. It obviously will take some different ^ to run. And that was never put in the plan.

In fact, at the expert panel we presented benzene data, dissolve data. Up there you remember some of the charts we presented. We had experts commenting on using simpler approaches, and I think they based those recommendations upon lack of knowledge that there was in fact a multiphase situation occurring at the fuel farm.

**MR. PARTAIN:** So it would be fair to characterize that you're based on the revelation of these new data sources that y'all's understanding of what was going on at the fuel farm has been substantially changed.

**MR. MASLIA:** Our understanding of what type of model

to use, to apply here, has been changed, yes.

**MR. PARTAIN:** Prior to last year what was ATSDR's -- and maybe Dr. Sinks, Dr. Bove can answer this -- but prior to last year what was ATSDR's understanding of how much product was in the ground at Hadnot Point as far as fuel?

**MR. MASLIA:** As far as fuel the amount documented by the Marine Corps and their consultants and that we were going with was 20-to-30,000 gallons of fuel over time spilled. With that small amount, again, at that time we had not looked at any or seen any of the underground storage tank files or anything like that, but with that small amount that was another reason for using a dissolve phase because that's a real small amount over 40 years and the area.

**MR. PARTAIN:** So prior to last year the Marine Corps did not indicate to anybody at ATSDR that they had lost up to possibly 1.1 million gallons of fuel or more at the Hadnot Point fuel farm?

**MR. MASLIA:** That is correct.

**MR. STALLARD:** Folks, we're going to continue this question and answer. We lose our link and we owe it to the general public to be live with this discussion.

**MR. ENSMINGER**: If you can go live.

**MR. STALLARD**: Well, that's our goal.

So what we will do is come back in one hour at one o'clock. Please come back and we will resume. Morris will avail himself to the questions. Thank you very much; thank you audience for your participation. Please be back in one hour.

(Whereupon, a lunch break was taken from 12:00 p.m. until 1:12 p.m.)

**MR. STALLARD:** I would like to remind you if you would please if you've turned on your communication devices while you were at lunch to please turn them off now or on silent stun. I have done that, too.

Come up and get going here.

**DISCUSSION WITH VA**

**MR. FLOHR:** Okay?

**MR. STALLARD:** Yes, please.

**MR. FLOHR:** Hi, I am from the government, and I'm here to help you. We've all heard that before, right? Just briefly I can tell you that actually that's a very true statement. Right now the VA is compensating more people than they ever have in history, upward of three million veterans are on the compensation rolls being compensated monthly.

Unfortunately, more of them are added each month as our deployed soldiers are coming back from

Oria and Noria^. That's been a major core source of the increase, as well as the aging of our veteran population. As we all get older, not all of us but some of us are getting older, we develop more diseases and we file claims thinking it is somehow related to service and often it is. Sometimes unfortunately it's not, but a lot of times it is.

But I want to talk a little bit today about our involvement in Camp Lejeune that is ours and the Compensation and Pension Service in Washington, which is responsible for policy, for writing regulations, for reviewing court decisions which are precedents and for generally writing training letters on issues such as Camp Lejeune and other environmental hazards and exposures. So we do a lot and have been involved with a lot.

Last week I met with Senator Burr's staff up on the Hill, and with a couple of the people from the Senate Veterans Affairs Committee, ^ Chief Counsel and Chief ^. We talked about what we're doing with Camp Lejeune, and basically they want to know about the registry that the Navy started because they wanted us to have access to it. And my boss, my director, wrote a letter, ended up writing a letter to the Secretary of the Navy asking for access to

that database.

We did get it on a CD finally after going through all levels of approval and security concerns because believe it or not right now PII and personal identity, identity theft, is huge, a huge issue for everybody in government. And I can actually get more data from DOD directly than I can on veterans' healthcare^. The administration works right with us as far as VA.

And in fact, as I said, we got the health register, the Camp Lejeune registry, which has about 150-to-160,000 names on it. The Defense Manpower and Data Center, DMDC, has verified about 45,000 of those actually are veterans who were at Camp Lejeune during the time frame. Trying to get that data, although my office asked for it, it went to our Office of Public Health and Environmental Hazards in the VA chain.

And getting the data from them, you have to sign all kinds of releases of what we're going to do with the data, where is it going to be stored, who's going to have access to it. The data we asked for, we're all VA, what is the deal? It's all about protecting personal information.

And actually looking at the data on the

registry I don't really know what good that is going to do us on the benefits side because it doesn't ask really the appropriate questions. I don't know how it got through how many layers it took of approval and concurrence to get through the questions that were asked in the registry, but none of them asked are you ill? If you are, what is your disability? Things that would be useful to them.

That's not part of the question, so really for veterans' purposes we don't need it. We might insert isolated cases to verify that someone was at Camp Lejeune during the years when the water was contaminated, but generally we get that from the U-214 or from the veteran's personnel records. It's not really a big issue for us to get that information.

**MR. BYRON:** They were also going to have the health survey form go out. Sorry, this is Jeff Byron. They were going to do a health survey and that might be why the question wasn't asked at registration.

**MR. FLOHR:** Possibly, yeah.

But anyway, that's where we are. We're working with the Hill. The Hill, of course, Senator Burr from North Carolina is very interested in this subject. A lot of publicity now is being put out to

the public. As I said earlier we had a case that we granted a claim in Boston. That's really the first one that I'm aware of.

I know from hearing folks here today there have been others, but that was the only one that I personally had heard of at this time which was somewhat unusual to me because my staff among other things we look at difficult or unusual types of claims that are submitted in our 57 regional offices where people don't know what to do. They don't have any guidance, don't have any information, so they ask my office. When they ask me, they ask my staff, we've got this case, what do we do with it? I haven't heard any of those, not gotten any calls, any questions either from a medical or a legal standpoint. So it's very interesting.

And as we continued down here what I've heard this morning from the various studies, I know the Navy has agreed to fund some additional studies for ATSDR for the coming year, four or five year studies, my question was going to be for Dr. Maslia was, well, at the end of the day, at the end of the current study they're doing on the water and the future studies coming, is there going to be a point in time where ATSDR will be able to say someone was

at this place on Camp Lejeune; therefore, they could not have been exposed or they were at this point, and they were exposed or probably were exposed.

That's a big issue for us because we need to know, of course, who the affected population is and the individuals who file claims, whether they were a part of that affected population. As you may know Viet Nam, all the veterans who served in Viet Nam, the land mass or its inland waterways are presumed to have been exposed to Agent Orange. Part of that was because the DOD would not give us the information we needed to determine where the spraying was done or they just didn't know.

They didn't keep records. They didn't know, no good reports, so then the VA first made the decision to presume someone there was exposed, and then Congress legislated and put it in a statute. That happens quite frequently.

But that's what we have, and if we want to get a presumption of exposure to the contaminated drinking water during the affected years, that's fine. It makes it simple for us. We don't have to do anything else, anything else in terms of verifying someone was there and was exposed.

And in fact right now I would venture to say

that any Camp Lejeune veteran who files a claim now is presumed to have been exposed to the contaminated drinking water. We don't ask them where you were on the base. We don't have information to say an individual was in an area where the well was contaminated. We don't know that. I'm quite sure that we just take it as fact if someone files a claim who was at Camp Lejeune was exposed to the contaminated drinking water.

**MR. BYRON:** Just so that you know a little of the history, the Tarawa Terrace water modeling is done, and therefore, any veteran who comes to you who lived at Tarawa Terrace, he can go directly online and get what levels of toxicity were going to his home at this time. My family was getting 200 parts per billion every day for two years at TT; who knows what it may weigh. So that is available to veterans that were at Tarawa Terrace at this time.

**MR. FLOHR:** All right, I have not seen that, seen that report.

**MR. BYRON:** We'll make sure you see it.

**MR. FLOHR:** I do have an epidemiologist that I work closely with in VHA's Office of Public Health and Environmental Hazards. She actually was stationed at Camp Lejeune in the '80s, discharged, retired

from the Navy, so she's interested in this. And I would actually recommend that sometimes she come down here and be part of your CAP group. She probably would have some interesting things that could provide for you.

I want to talk a little bit about the claims process itself and how that ties in with Camp Lejeune claims. By the way, I don't have my e-mail address there but I should. If anybody wants to send me an e-mail, ask me a question, I've got some business cards, but my e-mail is pretty simple. It's brad-dot-flohr-at-VA-dot-gov.

The compensation claims process, VA determines the existence of chronic disabilities. You're compensated for chronic disabilities, not acute or transitory injuries or diseases that come and go and are never heard from anymore, but disabilities that result in loss of earning capacity. That's what our basis for compensation is, to replace average lost earnings.

And there's three requirements for a grant of service connection. An in-service event; that is, if you were injured you may have injured your knee playing basketball. You were on active duty though at the time; therefore, that is a disability that is

capable of being compensated if it results in disability.

Or an event, if you were exposed to an event, for example, a Viet Nam veteran who served in Viet Nam who was exposed to Agent Orange. That’s an event. Someone who was at Camp Lejeune during the years the ‘50s to the mid-‘80s exposed to the contaminated drinking water, that is an event. Therefore, such as the case that we granted out of our Boston office a couple of weeks ago, it ended up being a direct service connection.

There was a medical link between drinking the contaminated water and the development of the disease. Competent medical evidence which was provided by the veteran’s treating physician, Harvard medical physician, medical school. It was significant enough to establish a service connection on a direct basis, not a presumptive basis, a direct basis. There was an event. There’s a disability. There’s a link between the two.

You have to have the correct condition, of course. If you file a claim and you don’t have a disability, you’re probably not going to be granted a service connection. And a medical nexus to establish a link which is competent medical evidence

in terms of what we're looking at. I've got to tell you, the three million veterans we have on the rolls right now, we're getting over 1.2 million claims this fiscal year, FY10.

And that's going to be added onto by the Secretary's decision last October to add three new diseases due to Agent Orange exposure assuming another 200,000 claims this year. Which is going to require us to trying to get the budget to hire about 2,400 more people, and we're already pretty large. But the way the claims are coming in, it's just, it's truly more than we've ever gotten.

And, of course, hiring people doesn't really help, at least it doesn't initially, because you have to train them. It takes a good couple years to train someone to be a good adjudicator, and longer if you put them on probating board, actually making decisions on claims involving medical evidence, which is something I did for ten years as part of my background. I've been with the VA for 35 years, ten years of that I was with on ^.

**MR. ENSMINGER:** What's your current backlog?

**MR. FLOHR:** Current backlog? It's a lot. We have, our standard answer, we have around 400,000 now, and that's an issue. You hear a million. Well, if you

threw in things like appeals, which we don't count in our pending workloads. Those are cases that have already been worked, but they've been appealed.

That's another couple hundred thousand and that doesn't include, for example, it doesn't include the non-, what we call, the rating issues. That is where someone actually has to make a decision using medical evidence which is like 400,000. That doesn't count the claims for adding a dependent, for example. Someone gets married and has a child, doesn't count. Changes of address that come in. There are millions of things we get. The phone calls that we get all the time.

**MR. PARTAIN:** Is the VA tracking the number of people calling in with Camp Lejeune-related claims?

**MR. FLOHR:** Not to my knowledge. I heard just I think a week ago there might have been some guidance put out to our field stations to start charting claims based on Camp Lejeune, but I don't know that for a fact, but I will verify that.

**MR. ENSMINGER:** What's the status of the Marine Corps providing you their registry?

**MR. FLOHR:** They have provided the registry, as I said, to our Office of Public Health and Environmental Hazards. That's what I was talking

about. I don't know that it helps us much because there's nothing really on it other than a person's name. And it doesn't help us that much in determining if a person was there 'cause we can do that easily through other means.

**MR. PARTAIN:** Is there any plan to create like a website or a place for these veterans to go to within the VA to get answers or get questions on what's going on or get some help for them?

**MR. FLOHR:** I don't think yet that that's under discussion. We have a lot of different registries. We have a Gulf War Registry. These are maintained by VHA, Veterans Health Administration. A Gulf War Registry, an Agent Orange Registry, POW Registry, we have a number of registries. Perhaps creating a Gulf War Registry might be, a Camp Lejeune Registry might be something that could happen.

**MR. PARTAIN:** We've got possibly a million population exposed, veterans and dependants. There's still on weeder^ the website, "The Few, the Proud, the Forgotten," we have a lot of questions come in about veterans and what to do, where do I go, and getting turned down. And, for instance, Allen Menard was awarded –- I'm sorry -- 100 percent for his Non-Hodgkin's Lymphoma up in Wisconsin.

**MR. FLOHR:** That's not what he told me.

**MR. MENARD:** No, no, a vet that I got in contact with was, a vet that I helped ended up getting 100 percent compensation in Wisconsin. I got zero percent, but that's because --

**MR. ENSMINGER:** But you're still rated at a hundred percent.

**MR. PARTAIN:** The point in question was in like in different regions of the country we're hearing in Wisconsin we had two vets with Non-Hodgkin's Lymphoma who'd been awarded, and then I know of a vet in Jacksonville, Florida, who also has Non-Hodgkin's Lymphoma, and he was there in the '80s, and he has been denied on appeal. And so where's the consistency?

**MR. FLOHR:** Well, there's no presumption, for example. There's no presumption that having consumed the contaminated water resulted in any disability. So each case is considered on the facts in that particular case. The outcome of the case is going to depend on the quality of the evidence.

And it's up to the rating specialist making the decision to judge the credibility of the evidence, number one, and the, how credible it is and how probative it is. That is, what does it do in terms

of proving the claim. So each individual case can be different. I'm not saying that some are not wrong or could be wrong but just the quality of the evidence might not be the same in one case as in another.

**MR. ENSMINGER:** Once again I take it for these diseases that are directly linked to like benzene exposure, TCE, PCE, vinyl chloride, in the future when the water models are all completed, are you guys going to put together a list of these known diseases and come up with a presumptive?

**MR. FLOHR:** That's a good question and one I can't answer at this point. We know benzene is a Class I carcinogen.

**MR. ENSMINGER:** So is vinyl chloride.

**MR. FLOHR:** Vinyl chloride. We know that it may result, could result in, fortunately it doesn't result in disease in everyone who's exposed to it, but we know it can. Whether or not a presumption is created is something that there's two ways that that could happen. One, Congress can enact legislation and create a presumption. Or the VA Secretary can do it. Only the VA Secretary himself can create a presumption other than Congress doing it.

So in order for the Secretary to do that, he's

going to need to look at studies, reports. And that's why we were looking forward to continued studies from ATSDR and any other groups that are looking at this subject. We'll evaluate them all, and at some point if it appears that a presumption needs or should be made, then that's the recommendation that will go forward to the Secretary. And then the Secretary will decide whether he wants to do it or not.

And we make those recommendations, for example, I know I heard this morning the NRC report is not very well thought of. We have reviewed that report. We have written our review of that report to go to the Secretary. It has not gone yet, but it should in the very near term, and we'll see what he decides to do on that. We talk about benzene in the report as well as the other TCE and PCE, organic volatile compounds.

**UNIDENTIFIED SPEAKER:** Can I ask a question? Is it okay if it --

**MR. STALLARD:** We're going to wait till the end if you don't mind. Thank you.

**MR. FLOHR:** So that's what we're looking for. We're looking for to review studies, look at studies, any information that we can get scientific, credible,

medical evidence. And if at some point it appears that we should create a presumption, then that's the action we will recommend to the Secretary.

**MR. BYRON:** Well, real quick, one reason that the Senate Veteran Affairs Committee basically passed this back over to DOD is because they're very concerned about how many veterans who were exposed are going to come make a claim. They're treating it as though they have 500,000 Marines that were at Camp Lejeune during this period, and that all 500,000 are going to show up and make a claim.

And I think it's totally ridiculous, but we will never know unless we know how many are coming to the VA facilities. And I'll be honest with you, I'm going to make this request right now that when you come back here that you have some numbers or somebody has some numbers that say, yeah, 20 Marines showed up in Cincinnati, Ohio VA or just to say -- I don't care if it's a total -- 400 people showed up. But as it stands now there's 1,600 claims filed, maybe a little more now because there's been more notification, but that's a sure far cry from 500,000. And that was their reasoning for putting it back into the hands of DOD versus in the hands of Health and Human Services.

**MR. FLOHR:** Sixteen hundred claims filed by who, where?
**MR. ENSMINGER:** Filed by not only veterans --
**MR. BYRON:** Really not veterans, it's the dependants because veterans don't --
**MR. PARTAIN:** That's a different animal, Jeff.
**MR. BYRON:** I know it's a different animal, but what you're talking about is exposures that happened at Camp Lejeune. So if you just base it on that, you already know there was at least 500,000. You had this many dependents. You can pretty much estimate you might have that many veterans, but who's going to know if it's never said. We need to know how many people we're dealing with. So my request is when you come back or whoever comes back that they have that collated and that we know how many people are saying they were exposed.
**MR. FLOHR:** I cannot guarantee you that we would have that data. We just don't --
**MR. BYRON:** Well, I know you can't guarantee it now, but you could put procedures in place that say --
**MR. FLOHR:** Well, I can't make procedures, I can't place procedures on people, for example, people who show up at veterans' medical centers. That's not part of my line of authority.

**MR. BYRON:** Yeah, but it is the Secretary's, right?

**MR. FLOHR:** Yeah.

**MR. BYRON:** And I'm requesting that you suggest it to him if that's more appropriate. Thank you.

**MR. STALLARD:** Let me just intervene here that what we will do is after the presentation talk about what are some of the things that to the VA we would like to have conveyed and issues like that.

But, Tom, you're on the line. Did you have something?

**MR. TOWNSEND (by Telephone):** Yes, I'm sorry, but we did not have telephone contact for about the last half hour.

**MR. STALLARD:** Okay, well we started late so we're just into the presentation from Mr. Flohr.

**MR. TOWNSEND (by Telephone):** I do have some comments and questions for the veterans' administration, if I may.

**MR. STALLARD:** What is it? Is it a constructive comment, Tom?

**MR. TOWNSEND (by Telephone):** I hope they're constructive.

**MR. STALLARD:** I do, too.

**MR. TOWNSEND (by Telephone):** I am a VA patient. I have been registered since 1985. I won't go into my

background, but I have filed a claim for disabilities resulting from exposure to contaminated chemicals at Camp Lejeune that has impaired my health. I've been examined at the Spokane VA Medical Facility, and I have a claim going forward ^ of the Veterans Administration.

And my comment basically is there seems to be conflicting information from various Veterans Administration centers across -- because they're not consistent in their handling. I do not have a life-threatening condition, but it is impairing my health. It's service connected, and I would hope that there's some system in place in the Veterans Administration that will start discussing this issue and not holding back. We need to know what conditions they're willing to start talking about.

**MR. STALLARD:** Okay, Tom, great, thanks. We have that noted that you'd like to have conflicting or inconsistent info diminished, so more clear-cut guidance coming from VA to address some of these exposure and coverage issues. So thank you.

We're going to continue with the presentation and then we'll open up the floor to questions after that.

**MR. FLOHR:** Okay, thank you.

For now though we're trying to get the word out. One reason, another reason we've got so many claims is an increase in outreach. And the publicity going out about Camp Lejeune no doubt will result in an increase in claims.

And if you know people that are ill and were at Camp Lejeune, but that's the kind of information you can tell them right now. They need to submit to VA. If they were at Camp Lejeune, they have a current medical condition, and there's some evidence of that, and if they can get a medical opinion linking what they have now to drinking the contaminated water, then that's really the best evidence they can provide the VA right now.

Parts of the claims process claims, then we have a duty to assist. Once a claim is filed we have a duty to assist, a statutory duty to assist the veteran or other claimant, a spouse, et cetera, in developing the evidence that we know of, they make us aware of, that is, getting evidence from our, what is in our custody like VA medical centers, any other VA offices, and private medical evidence if the claimant makes us aware that it's there and exists, we have a duty to try and help them get that evidence as well. And we do that.

Decisions and notices. Once we make a decision we have a requirement to provide them with a notice of the decision, the reasons for the decision and how they may appeal the decision if they don't agree with it. And reconsideration, anyone, when we've made a decision for example, and it's a negative decision, has one year to submit additional evidence, new evidence, related to that claim. And if the claim then is granted, it's as if the denial goes away because the grant would go back to the date the claim was originally submitted.

The need to assist overdue VCAA of 2000 said that we have a statutory duty to notify someone of the evidence needed to prove their claim and a duty to assist in developing the evidence. Service connection, there are a number of ways to get service connection. Direct, as I said, on the Agent Orange- and Camp Lejeune-type cases, an event in-service, current condition, evidence that there's a relationship between the two that's a direct service connection. Aggravation, someone has something before they go on active duty, and it gets aggravated while they're on active duty. Then we pull war service connection for that aggravation.

Secondary, someone has a heart condition and

it's service connected, developed peripheral vascular disease or some other disease that is due to that heart condition. We grant service connection on a secondary basis. Compensation is the same; just the means of awarding the benefit is different. All of them though require competent medical evidence.

And then there's, of course, the presumption. Presumptions go way back. The first presumptions were created in 1917 following World War I. It was for tuberculosis and mental disease because a lot of soldiers came back from World War I, they were exposed to the virus. It did not manifest until after they were already off active duty, and they came back with what we might now call PTSD, but it was from their service in World War I.

So Congress gave a presumption for those two. It's been expanded over the years. In 1945, the 1945 rating schedule added a number of what are called in the statute chronic diseases if they are, such as heart disease, psychoses, diabetes, things of that nature. There's quite a few, 20-, 30-some conditions.

If they're diagnosed at any time within one year following their discharge from service, they're

presumed to have been caused by the service. The presumptions are rebuttable if there's evidence to show there was another cause. Generally, that's within a year of diagnosis, you get service connection for it.

There are presumptions for veterans who were exposed to colon injury. There are presumptions for POWs, former POWs, presumptions for Agent Orange for Viet Nam. There are presumptions for, there's one presumption, Non-Hodgkin's Lymphoma, for sailors who served onboard a ship in the waters offshore Viet Nam. It has nothing to do with exposure to Agent Orange. Regulations call it service in Viet Nam, and it includes service in the waters offshore.

And that is basically, came about because of Admiral Zumwalt. He had a son who was diagnosed with Non-Hodgkin's Lymphoma. He served onboard a ship that was in the offshore waters. He never set foot in Viet Nam. And based on a study by the Centers for Disease Control found a higher than normal increase or rate of Non-Hodgkin's Lymphoma in sailors who served onboard ships in offshore waters. So the presumption is created, and we have that presumption.

**MR. ENSMINGER:** It took an admiral.

**MR. FLOHR:** It took an admiral to get that done.

**MR. ENSMINGER:** Figures.

**MR. PARTAIN:** And his son.

**MR. FLOHR:** ^ compensation disability not be caused by military duties. The statute says for a disability incurred in or aggravated by service. It doesn't say caused by service.

Independent of any military disability rating. Some of you may have heard we joined the DOD, and we have a pilot project for their Disability Evaluation System. It has been expanded now to about 27 military separation sites around the country where only one examination is done. Prior to this it was, you know, DOD would do an examination of someone who was going through the Disability Evaluation System to see if they were fit or unfit to continue on active duty.

When they got out if they were found unfit, they came to VA and generally we would set them up for examinations. They had two examinations. It took time. So one of the things that -- actually, I have to give George Bush credit for that. His decree that we look at ways that we could improve the process and streamline the process for soldiers coming back from ^ who were seriously injured.

And one of those things we could do was have a joint VA-DOD Disability Evaluation System. Where now someone is referred to an MAB, the MAB finds that they should be referred to a PED for fitness, and the PED then finds them unfit. Well, the VA comes in and the VA does the examination and takes a claim for anything else they want to claim, any other condition, and finds those that might be unfit and provides a disability rating. And DOD is bound by that rating as is VA.

In the past one of the things that DOD is doing now, there were untold thousands of soldiers who were being discharged, who were discharged since 9/11, with a zero percent or a ten percent rating for personality disorders or in some cases PTSD, were given a zero or ten percent. Part of the National Defense Authorization Act of 2008 required DOD to review each and every one of those cases.

And there's a board set up in Crystal City, Virginia, outside of Washington. On the Physical Disability Review Board one of my staff members is there two or three days a week assisting the review members and properly applying the VA's rating schedule which the DOD is required to implement and to apply in every case.

And a very large number of those are being overturned and upgraded to 30 percent or more, which has caused, you know, I don't know if you know it, but someone who is discharged with a 30 percent disability, that provides healthcare through ^ for life for their dependents, even at 30 percent. Very expensive but it's the right thing to do, and we're doing it.

So tax-free compensation, it's not taxable. And there's a presumption of soundness. That is someone who enters on active duty or anything not noted on their entrance exam, they're presumed to be in sound health.

And benefit of the doubt. The standard for granting service connection is there are three possible outcomes when you review all the evidence and make the decision on the evidence. One, the evidence in favor of the claim, either, well, it outweighs the evidence that's against the claim. If that is the case, the claim is granted.

If the evidence is in what's called equipoise, that is, there's as much evidence to support the claim as there is against the claim, there's an equal balance, the claim is granted. We have a statutory requirement to provide the benefit of the

doubt. I like to say it’s like the tag goes to the runner in baseball. If the foot hits the plate at the same time the ball hits in the mitt, you’re safe.

So the only possible outcome that is negative to a claimant on a particular issue is where the evidence against the claim outweighs the evidence in favor of the claim.

Presumptive service connection, as I said, veterans must generally prove disability resulting from injury or disease in service. Presumption takes away one of those requirements of them to prove their claim. In the case of Agent Orange, it’s a double presumption. I keep going back to Agent Orange because it’s just, it’s huge.

There’s a presumption that someone was in Viet Nam or its inland waterways that they were exposed to Agent Orange. If they then develop one of the 13-to-15, 18 diseases now that are associated with Agent Orange exposure, then it’s presumed that that was due to their exposure to Agent Orange. So it’s a double presumption.

There are other types of presumption. As far as if you were a POW, and you develop heart disease or psychoses, it’s presumed that that’s due to their

POW experiences. And then they don't have to prove that. They don't have to prove that their disease, they don't have to submit medical evidence showing that their particular disease is due to that exposure.

Presumptions relieve, as I said, the veterans of the burden of proving service connection. First, we're creating the statute in 1921 for, as I said, tuberculosis and neuropsychiatric disease.

Chronic disease of 3.309a^. There's 40 of them. I mentioned that it came about in 1945. Tropical diseases, there's 17 diseases that are presumed to have resulted in disease in the tropics. We normally talk about the Pacific here during World War II. Those came about also in World War II.

Agent Orange was one of the disease categories with more diseases than 11, 18 for POWs. Twenty-one for radiation, exposed atomic veterans, those who were witnessed atomic tests either in the Pacific or at the Nevada Test Site. Gulf War undiagnosed illnesses plus other chronic, medically unexplained multisystem illness such as fibromyalgia, irritable bowel syndrome or chronic fatigue syndrome.

And there's another. We just added nine new diseases based on the IOM report on Gulf War, nine

presumptions that are infectious diseases, very, very rare, will not result in a big increase in claims or things like that. But the IOM report did find a relationship talking about things like Q fever, let's say rare-type diseases. Mustard gas and lewisite, there's 14 conditions presumed to be exposed to mustard gas and lewisite. And as I said earlier, all these presumptions are rebuttable.

But we don't look to rebut the claims. For example, I can tell you that lung cancer is presumptive for Agent Orange exposure. We see claims all the time from veterans who are now within age population is 60-plus, 70 years old now. They've smoked for their whole lives. They get lung cancer. We don't look to rebut that if they were in Viet Nam. We grant most of the claims.

Questions.

**MR. BYRON:** I have a question I think you need to clear up and then it probably will clear up for others. Say we go through all these studies and it's found that the veterans and their dependent family members are presumed to have been exposed and their illnesses are caused by the chemical release at Camp Lejeune. I see that you have an avenue for dealing with veterans. Is there any avenue for

dealing with dependent family members? I know of one instance where you helped --

**MR. FLOHR:** There is. As far as I know the only way for family members to get healthcare through VA is if the veteran is rated 100 percent. ^ then they're entitled to ^ VA which is a medical care program for --

**MR. BYRON:** But the veteran himself has to be disabled?

**MR. FLOHR:** Yes.

**MR. BYRON:** So say you're talking about presumptive illnesses and I have a daughter who six months after I left the Marine Corps comes down with bone marrow disease. Medical records show she's there 50 times in two and a half years. If that'd been me, I would have gotten an award right then because I was within a year.

**MR. FLOHR:** There are certain other conditions actually that come to mind. That's spina bifida for children of Viet Nam veterans, and there are certain diseases, quite a few actually, that are presumed to be exposed, due to exposure to Agent Orange in female veterans. So if the female veteran was exposed, then they can get healthcare.

**MR. TOWNSEND (by Telephone):** I have a question,

please.

**MR. STALLARD:** Tom, hold on. We have someone else first who's about to speak, and then we'll take your question.

**DR. DAVIS (by Telephone):** I would like to say first of all, I hope that everyone there understands that the idea that you would only compensate a child of a woman who was exposed in the military and not that man is biologically non-civil because the paternal genome contributed at least half of the health or illness to any child. That's basic biology. We don't make babies with women alone. And with fathers exposed in the four months prior to conception can have an effect on their children. So I thought I just heard you say that only if mother was exposed.

**MR. FLOHR:** That is correct.

**DR. DAVIS (by Telephone):** Well, that's wrong biologically, and I would be happy to write, correcting that misunderstanding to whomever it needs to be written to. And I would urge the CAP to do that officially because I'm sure other health experts on this committee understand that fathers' exposures have an effect. Even a term for it called male mediated teratogenesis.

**MR. FLOHR:** I don't doubt at all Devra, and I'm sure there's a lot of people in the VHA that are of the same opinion. Unfortunately, as a government agency we're required to implement the laws passed by Congress, and that's one of those laws.

**DR. DAVIS (by Telephone):** Well, I think we need to have changes in that and let's see what we can do to correct it. I've written about it in the technical literature, and frankly, I have written about it in the popular literature ^ the males because it's clear that men cause effect on the health of their children. So I've very concerned. I understand your constraints of the laws, but so we have to make the laws smarter, fairer.

**MR. STALLARD:** Great. Thank you for bringing that up on genomic prudence, and we will take that under advisement.

Tom, please.

**DR. SINKS:** Yeah, thanks. Tom Townsend, it's Tom Sinks. I'm going to step in. I want maybe to both clarify what Jeff has asked you as well as Devra. It's my impression that under the Agent Orange presumptive service connection that any child of a Viet Nam veteran who has spina bifida is a presumption, and that would be a male or a female.

**MR. FLOHR:** Correct.

**DR. SINKS:** So that's just to clarify some of what was said. Devra, there very clearly is a presumption for at least that birth defect under the Agent Orange rule, and it doesn't matter if the veteran was a father or a mother. And that was from studies done at CDC many years ago.

In terms of clarifying maybe what Jeff had asked you, it seems to me there's a difference between the presumptive service connection and whether that applies to dependents versus –- and I forget the term -– the non-presumptive service connection. And I wonder if you could clarify how those differences may work. I presume the presumption is already a presumption that such a trends, you know, a dependent could get this inherited or whatever, that there's a different degree of evidence that's required for a dependent in the non-presumptive connection. Does that make sense?

**MR. FLOHR:** Well, I'm not sure, Tom. I mean, we don't compensate dependents for disability except in those cases of spina bifida or the other birth defects that are recognized as due to Agent Orange exposure. Although we do compensate children who

are over 18 and attending an approved course of public schoolage, and any child who is determined to be helpless prior to age 18.

**DR. SINKS:** So let me --

**MR. FLOHR:** Not directly to the child. It's generally to the veteran.

**DR. SINKS:** Let me put that in the perspective of the CAP and the Camp Lejeune issue in the studies that Frank is doing, Frank Bove, which is we're looking at studies. And many of the CAP members here have offspring who they feel were affected, or dependents. We'll go ahead and we'll do those studies. We either will or we will not find an association between their exposure and certain birth defects and certain childhood cancers.

Let's say we find an association. Does that suggest that without a presumptive service connection that information isn't used by the VA because they are dependents, and therefore, you wouldn't count them? Or would it require a presumptive presumption for that to be considered by the VA?

**MR. FLOHR:** It's not that we wouldn't. We would look at it as we do with all scientific studies. And that's being one involves veterans and their

dependents because actually our credo as voiced by Abraham Lincoln is to care for him who shall have borne the battle and his widow and his orphans. And so of course we would look at that. And if it was a situation where medical evidence, scientific evidence showed a causation or relationship between the veteran who drank the contaminated water and birth defects in a child, then we would look at that and again we would have to determine if we wanted to recommend to the Secretary to create a presumption like we have for the Agent Orange birth defects. And the Secretary would have to determine if he wanted to do it. And he would have to convince Congress and OMB that it was a good idea and we could pay for it. But if ^ then that's what we'll do.

**MR. BYRON:** So just to clarify this question, as a Marine within a year before my second daughter was born with multiple birth defects, learning disabilities, developmental disabilities, and epididymitis, so if I could connect that and then they connect these studies, because I've already seen the genetics workup and how it does attack the male genitalia and then my daughter was born after, is there a presumptive case there due to my medical

history with her or not?

**MR. FLOHR:** No.

**MR. BYRON:** Okay, thank you.

**MR. PARTAIN:** I think it would have to be directed by Congress is what I'm hearing. Congress, they're dealing with the service connection. They have to get through Congress.

**MR. STALLARD:** Before we have anyone jump in on the phone, I have about three people waiting to speak here, and then I will call you on the phone, please. Thank you.

Go ahead, Allen.

**MR. MENARD:** Allen Menard. Like I talked to you earlier my concern as of that, and there's a lot of concern out there for other vets is, like I'll give you my case like I talked to you earlier. I did not know about this until 2008. In 2001 I was going through chemo like I said for almost a year. I had to endure all the medical bills and all that, and I thank God I had good insurance, but I still had a substantial cost. And I believe it's unfair that it's only from the date of filing. At the very least I should be compensated for my medical bills due to my service connection for what I paid out. And there's a lot of families that are financially

ruined out there because of this. And I just wanted to bring that on the record here that I think something needs to be done in that case. I should be at least granted --

**MR. ENSMINGER:** When were you talking about?

**MR. MENARD:** Two Thousand One.

**MR. ENSMINGER:** When were you notified by the Department of the Navy?

**MR. MENARD:** October of 2008.

**MR. FLOHR:** Doesn't make a lot of sense to me.

**MR. MENARD:** And I guess my point is, is I should be at least compensated --

**MR. FLOHR:** I thought we talked about this and we put this to bed already.

**MR. MENARD:** Well, you put it to bed, but I'm still upset about it. And my point is that I should be compensated for the year that I was in my treatment and the six months after like any vet would be that has the active cancer. And plus, I didn't know about it. So, and I understand the law. I understand where you're coming from, but it's unfair.

**MR. STALLARD:** So the big picture on this is the discrepancy between when you're notified and any personal bills that you had to incur up until that

point.

**MR. MENARD:** Because you're darned hooting I'd have been down at the VA in two seconds if I'd have known this back in 2001.

**MR. STALLARD:** So it's at least for our purposes is there something that captures that that's relevant to the VA?

**MR. FLOHR:** No, no. Everything in terms of compensation that's based on the day you file the claim. If you file the claim within one year of separation from service, and you're granted a service connection for whatever you're claiming, you get it back to the day after you got out of the service. More than a year after you get out of the service it's -- can't be effective until the day we receive your claim. And you probably shouldn't have raised this too often about being service connected for this eight years before you found out there was contaminated water because I don't know how you were granted a service connection.

**MR. MENARD:** You don't know? Well, I'll show you all my documents I got to prove where I was at, what I was contaminated with --

**MR. FLOHR:** I know, but there was no notice anywhere of it. What was the basis of the grant?

**MR. PARTAIN:** Congress required the Marine Corps to start notifying the vets after 2008.

**MR. FLOHR:** I know. That's why I wonder how you got service connection in 2001.

**MR. PARTAIN:** He didn't.

**MR. MENARD:** I didn't. I did not know about this.

**MR. STALLARD**: Can you please put your microphone on?

**MR. MENARD**: I found out due to a congressional mandate that they tried to get a hold of all the Marines and whoever was stationed there. Okay? And like I said, I got a letter from the IRS, and I'm going, oh, what did I do? And I opened it up, and here's the Department of the Navy letterhead saying that I was exposed to these chemicals. Well, right away I think, my dermatologist and my oncologist told me, I said to him, how do you get this? And he goes, it's chemical related. I mean, as soon as I read the letter it jumped out, boom.

**MR. FLOHR:** Okay, I'm sorry, I thought you told me you were service connected in 2001.

**MR. MENARD:** No, I was diagnosed in 2001.

**MR. FLOHR:** My mistake.

**MR. STALLARD:** So any other questions for Mr. Flohr? Before I turn that over from the CAP members because

you've asked me to allow some of our community members who have traveled to hear their voice as well. So anything else from here? And we'll get Tom and then we'll come over here.

**MR. BYRON:** I just want a copy of the presentation if that's okay so we can put that on the website.

**MR. STALLARD:** All right, Tom. Go ahead, Tom. You're on.

**MR. TOWNSEND (by Telephone):** Thank you. I don't have the name of the gentleman from the VA, but here's my comment. Background, two Viet Nam tours, exposed to Agent Orange, three-plus years exposure at Camp Lejeune between 1965 and 1967. From my family I lost a son at age three months in 1967, died at the Bethesda Naval Hospital. I have the autopsy report for him.

I lost my wife in 2005 to liver damage that the coroner in my county pointed to exposure to chemicals. There was considerable evidence that long-term exposure to VOC is dangerous to health. What evidence does the Department of Veterans Affairs have to discount claims from the evidence? What do you have to discount our claims for damages?

**MR. FLOHR:** Are you talking about a tort claim?

**MR. TOWNSEND (by Telephone):** Yes, I was talking

about a claim for a veteran.

**MR. FLOHR:** You mean it's a claim for service connection compensation benefits?

**MR. TOWNSEND (by Telephone):** Of course.

**MR. STALLARD:** And your question, Tom, rephrase it for us. Your question is what basis do they have to turn it down?

**MR. TOWNSEND (by Telephone):** The gentleman said that there's theories on both sides of the issue and I'm saying that I do have evidence. What evidence do you have to counter that discounts claims from Viet Nam from VOC exposed personnel from Camp Lejeune?

**MR. FLOHR:** Well, I don't know because I haven't seen your claim so I don't know what evidence is in there. I mean, each case as I said is done on an individual basis. Each case is reviewed.

**MR. TOWNSEND (by Telephone):** I'm not asking, I'm asking you what does the Veterans Administration have evidence to support their denials?

**MR. FLOHR:** Again, I haven't seen your claim. I don't know what evidence is in there. Did they ask for, did the VA office ask for an examination and a medical opinion from the Veterans Health Administration?

**MR. TOWNSEND (by Telephone):** Yes. I’ve had many of those B and B^ exams, and I’m still waiting to find out what you guys don’t like about me. You talked about arguments on both sides of the issue. I’m saying what evidence do you have to support your contention that exposure to chemicals at Camp Lejeune invalidates that assertion?

**MR. STALLARD:** Okay Tom, this is Christopher. What I want to do here is to work with Mr. Flohr and have an ombudsperson to help address your situation because what you heard in the presentation was that there were three ways they look at a claim. And that if the preponderance of the evidence supports it or there’s doubt, then they’re going to lean toward you.

And the only way to turn it down is if there’s a preponderance of evidence that’s greater than the proof that you submit. So your question is what is it that they’re using to refute or that opposes what you’re claiming.

**MR. TOWNSEND (by Telephone):** Yes.

**MR. STALLARD:** So I think the only way we’re going to solve that with this group is if we work with Mr. Flohr and get an ombudsperson and see what we can do in that regard. Is that all right?

**MR. TOWNSEND (by Telephone):** Are they going to establish an ombudsman?

**MR. STALLARD:** I don’t know, but in this case in a room full of 50 people without the documents in front of us, I’m not so sure that we can adequately address the concerns that you expressed. But you got the message that he delivered that, you asked an appropriate question. What is it in your information or your justification or rationale or proof is insufficient that they refute your claim? That’s essentially it, and we --

**MR. FLOHR:** Yeah, I only thought of that. So it would be that there must be some medical opinion that was provided that was negative, that was contrary to your claim, and the person who made the decision on your claim gave more weight and credibility to that evidence than to the evidence you had in favor of your claim. That’s the only way that it could have been determined.

**MR. TOWNSEND (by Telephone):** The examiner in my case could not make a decision. Let it go. I’ll continue to fight.

**MR. STALLARD:** No, no, no. Thank you, Tom. We will move on but not beyond, okay. We’re going to turn it over now --

**MR. ENSMINGER:** I have one thing.
**MR. STALLARD:** What's that, Jerry?
**MR. ENSMINGER:** Your VA's review of the NRC report you said was completed and ready to be submitted to the Secretary?
**MR. FLOHR:** Yes.
**MR. ENSMINGER:** When's that going to be out publicly?
**MR. FLOHR:** I don't know. It has to go through first there's a task force that is composed of the Under Secretaries for Health and Benefits, General Counsel and the Department's Assistant Secretary for Policy and Planning who will be briefed on the report and review the report. If they concur with the report, then they will brief the Secretary. So that could be another month.
**MR. ENSMINGER:** And is the Veterans Affairs Committee going to get copies of this thing?
**MR. FLOHR:** Not at the current stage, not until after the Secretary has seen it.
**MR. STALLARD:** Sandra.
**MS. BRIDGES:** We as a CAP and everyone here has heard from other people that have questions that they wanted us to bring to them, to y'all, to answer. And each one of us can think of a dozen

things that we've been asked. One of which, while you're here, standing here, what about this special health registry, special examinations?

**MR. FLOHR:** For?

**MS. BRIDGES:** Well, you've got Agent Orange, Gulf Operation, the Gulf War, eukiddie duran^ , ionizing radiation. All right. Are Camp Lejeune victims a part of this?

**MR. FLOHR:** No, I mentioned that earlier in my presentation.

**MS. BRIDGES:** What can we do to get them a part of it?

**MR. FLOHR:** That is something that the people in Veterans Health Administration that have those registries, we're looking at that. We're talking about that whether that can be done or should be done, but I don't think a decision's been made yet.

**MS. BRIDGES:** Another question, one of the men on the site, wanted to know about bone marrow biopsies. Is there anything available, can you tell anything from the bone biopsy, bone marrow biopsy and the chemicals, Dr. Clapp?

**DR. CLAPP:** Not that I'm aware of.

**MR. STALLARD:** So you're bringing voice to those that have communicated to your site or whatever.

**MS. BRIDGES:** Exactly. They haven't communicated to the site, but they've all asked questions.

**MR. ENSMINGER:** You're talking about medical evidence from a bone marrow sample?

**MS. BRIDGES:** Right.

**MR. ENSMINGER:** That to where they can tell that your bone marrow's been through, your cells have been damaged?

**MS. BRIDGES:** Right or your receptacle to it.

**MR. ENSMINGER:** Susceptible.

**MS. BRIDGES:** Susceptible, right.

**MR. BYRON:** That's genetics.

**MR. ENSMINGER:** Yeah, that ain't –- I don't know about benzene. There might be for benzene, but I know they haven't identified for chlorinate results.

**DR. DAVIS (by Telephone):** This is Devra Davis. Actually, benzene metabolites are short-lived. You don't get benzene in bone marrow. You get metabolites that end up ^. One of the difficulties in doing human studies on them. So the idea for what is in bone marrow unfortunately it would be accumulated in bone marrow would be metals more likely. That's not something we've been talking about here.

**MR. STALLARD:** For the purposes of this I think we

might want to consider like questions and answers that we have for the VA. Now that we have a representative here and a relationship and an offer of sending someone to be here, I think we can begin that dialogue.

Could we hear please from this gentleman?

**MR. FONTELLA:** Jim Fontella. We just had a vet that's on our site who was denied his claim. And in the analysis it said that at this time there was no proof that the contaminated water causes any diseases at the -- and I heard you mention to before, but this almost mirrors the exact wording of the NRC study that they can't find. So my question was, is the VA using the NR study to deny claims at this point? And when you said before that you have to do some kind of --

**MR. FLOHR:** Not as a matter of policy, no. But the report is available. It's on the internet. It's online and there could be decision makers who are looking at a claim and they're doing research to see what they can find out about contaminated drinking water at Lejeune and disease and come across the NRC report and say, well, there's no connection there.

**MR. FONTELLA:** Right, well, just the fact that there was benzene in the water then, and the amounts of

the massive losses of the fuel, and it’s science and medical, you know, has known for maybe a hundred years that benzene causes cancer. I mean, and the latency period is right around that time. I mean, I would think they’d maybe take a closer look at it, and not say that there’s no proof. Because obviously, benzene and vinyl chloride are Class A carcinogens is what I’m trying to --

**MR. FLOHR:** Correct.

**MR. FONTELLA:** And this was also a fellow that asked me to --

**MR. FLOHR:** Was that a recent decision or --

**MR. FONTELLA:** I think it was last week, two weeks ago?

**MR. ENSMINGER:** It was the week before last.

**MR. PARTAIN:** Yeah, the last couple weeks.

**MR. FLOHR:** Well, he can either, I gave you my card or my e-mail address. You could send me the information. I could check on it. Or the thing you can do now is, the best thing to do, the quickest thing is, he’s been denied his claim. If he appeals it, that’s going to take awhile. But the best thing to do is go to his physician and get a medical opinion where they –- I assume he’s had a cancer of some type -– to get a link between that and the

benzene that's in the contaminated water. The NRC report didn't really address that.

**MR. FONTELLA:** No, no, it did not.

**MR. FLOHR:** So they probably don't even know about it. Well, they will now because as I said earlier today, we just released an environmental hazards training letter which includes information on Camp Lejeune, benzene, TCEs, PCEs.

**MR. STALLARD:** And you were drafting a response back to the NRC? Did I hear that?

**MR. FLOHR:** Not the NRC, no, we were reviewing the NRC report.

**MR. PARTAIN:** Chris, there's a gentleman behind here who wanted to say something.

**MR. STALLARD:** Yes. Please state your name before your question.

**MR. McKENZIE:** My name is Richard McKenzie. I'm from the Pensacola, Florida area. I am a medically retired Marine, and I've been taken very good care of by your organization. By the way, I'd like to say thank you very much.

**MR. FLOHR:** Glad to hear that, thank you.

**MR. McKENZIE:** And the Marine Corps has taken very good care of me as well. However, my concern is for my family, my wife and my child that was born at

Camp Lejeune. I have found many studies on the internet about the chemicals that are in question here and a lot of documentation by this very organization that has been done for the EPA. They've already listed autoimmune diseases as part of a result of being exposed to those chemicals.

I don't even know where to start because this is so new to me. And I've been living for 35 years asking questions, and I have received a lot of answers today. What I would like to know, what will be done for our dependents, because I have been told by my medical doctors that the chemicals that I was exposed to is the trigger that has caused my autoimmune diseases. I've just been diagnosed with secondary lupus. So but I'm more concerned about my dependents.

**MR. FLOHR:** Well, Richard, first of all thank you for your service, appreciate that. And right now the VA's only statutory authority is to compensate veterans. And if they're 100 percent disabled, provide healthcare for their eligible children. There is legislation that was introduced that would have VA provide healthcare for all veterans at Camp Lejeune who come down with disease and that would provide healthcare for their dependents through DOD

strike unit. So that has been introduced. It is in Congress. I don't know if it'll pass.

**MR. McKENZIE:** Do you know if there's an age limit for the dependents? My daughter is 35.

**MR. FLOHR:** I don't know. I don't have a copy of the legislation with me, so I'm not sure if there is. I don't recall there being an age limit.

**MR. MENARD:** Have you got the bill number?

**MR. PARTAIN:** I believe that's HR-4555, and there's no age limit.

**MR. FLOHR:** So if that's passed, then that would certainly take care of all those concerns.

**MR. McKENZIE:** Right, right, I'm just thinking about her future. I mean, I'm not even supposed to be alive according to Bethesda, but I'm a hard head.

**MR. FLOHR:** That's good.

**MR. STALLARD:** Thank you for being here.

Any other questions of our community members who have driven so far to be here?

**MS. BRIDGES:** Did you tell them you came from Florida all the way up here?

**MR. McKENZIE:** Yes.

**THE CAPTIONER:** Excuse me, this is the captioner.

**MR. STALLARD:** Yes.

**THE CAPTIONER:** I have a comment from Michael

Mastain (ph)^.

**MR. STALLARD:** Okay, please convey it.

**THE CAPTIONER:** When will the testing be available for the civilian victims of Camp Lejeune?

**MR. STALLARD:** Please restate that, when will the --

**THE CAPTIONER:** Testing be available for civilian victims of Camp Lejeune?

**MR. PARTAIN:** There are no tests.

**DR. SINKS:** This is Tom Sinks. Let me see if I can interpret that question. When you say testing, are you referring to the epidemiologic studies we're going to be doing of the veterans? Because I'm not aware of any clinical testing that ATSDR is planning to do of either civilians or veterans. We're going to be sending out a health survey, and we're going to be looking at the mortality experience of individuals who were veterans. And there may be some ––

Frank, Perri, are there some civilians who are included in the epi studies?

**MS. RUCKART:** Yes.

**DR. SINKS:** There are some civilians who are included?

**DR. BOVE:** We're going to talk about that.

**DR. SINKS:** Okay, we'll talk about that following up

this segment.

**MR. STALLARD:** Thank you.

Is this related to the VA? Please state your name.

**MS. ATKINS:** My name is Gloria Atkins. My father wasn't (sic) in Viet Nam, so you're saying that he's getting 30 percent VA disability. So if he was to get 100 percent, then that would cause for me and my sisters to be eligible for anything? Is that what you're saying?

**MR. FLOHR:** I believe for Chap VA^, which is VA healthcare for dependents, it is a spouse and eligible children, which are children under the age of 18 --

**MS. ATKINS:** Well, I was when he was in Viet Nam, and I was when he was based at Camp Lejeune.

**MR. FLOHR:** -- 18 and 23 in college or helpless by the age of 18.

**MR. ENSMINGER:** Nice try.

**MS. ATKINS:** What about my ex-husband who committed suicide? He was based at Camp Lejeune. But, you know, he's dead now, so can I file on behalf of my child on his behalf with the VA or is it because he's dead there's nothing I can do?

**MR. FLOHR:** Unless his suicide was determined to be

service connected.

**MS. ATKINS:** How could I prove that? It was supposedly a self-inflicted gunshot wound, and he was exposed highly to the toxic waste at the base. And do I have to go back and prove something like this?

**MR. FLOHR:** Yeah, you'd have to show some relationship between drinking contaminated water and the suicide.

**MR. STALLARD:** Some kind of psychological assessment more or less in addition to that.

**MR. PARTAIN:** The other problem I think or disconnect here, too, is the VA does not look at dependents for care unless they're told by Congress to do so, and other than the exceptions you mentioned earlier. So my understanding -- correct me if I'm wrong -- as it stands right now, as a dependent, which I am, of Camp Lejeune, and I was diagnosed with a disease, I have no recourse to go to the VA.

Even my dad, my dad was exposed to Agent Orange in Viet Nam, and there's nothing for me to do with the VA right now. Now if in the future Congress comes back and says that dependents who were diagnosed with X-Y-Z diseases are entitled to care

through the VA system, then at that time I could present a claim.

But as it stands right now dependents are out of the picture, and the civilian employees as well in the current VA system because the VA's system is not designed to do that until Congress tells them to do that. Is it correct to say that?

**MR. FLOHR:** Correct.

**MR. STALLARD:** Which is the bill pending, right?

**MR. PARTAIN:** And that's the purpose of HR-4555.

**MR. STALLARD:** All right, we're going to --

**MR. PARTAIN:** Also, Chris, I wanted to, there was some stuff that I got right before break that people will come back to me --

**MR. STALLARD:** We are. We're going to. I'm getting the, we're moving on now from the VA.

**MR. FLOHR:** I would like to thank you all for being here.

**MR. PARTAIN:** Thank you for coming.

**MR. ENSMINGER:** Thank you for coming.

**MS. BRIDGES:** Yes, we appreciate it.

**MR. FLOHR:** And we'll come back again. All you need if you want us to be here, and we'll be here.

**MR. PARTAIN:** Just be prepared, there's going to be a lot of questions.

**MR. FLOHR:** This is a big issue, and it's not going away any time soon. The more we can do working together the best that we can and tell you the Congress makes a decision or VA make some kind of decision and provides like presumptions or something, we can't guarantee that's going to happen, but we'll work with all we've got, and that's what we'll do. Thank you.

**MR. STALLARD:** You being here is really a positive step. Thank you very much. And you have to leave for a four o'clock, right?

**MR. FLOHR:** Yes, unfortunately.

**MR. STALLARD:** I think you probably need to go then.

So now we're picking up with where we left off with Morris.

Four o'clock flight. It's 2:30.

**MS. RUCKART:** I think we're just going to move on.

**MR. STALLARD:** We're just going to move on?

**MR. PARTAIN:** No, there's some things that we need to discuss and Morris was talking about it.

**MS. RUCKART:** Well, did you want, updates on the studies I think will be brief, and then go back to the water modeling after that?

**MR. PARTAIN:** Okay, I just want to make sure we have -- it's already 2:24. I want to make sure we have

enough time for some questions that need to get asked.

**UPDATE ON FUTURE STUDIES**

**MR. STALLARD:** All right, well, let's get through the updates real quick.

So go, you're up, Perri.

**MS. RUCKART:** I'll just be very brief. We received money for the mortality study and health survey since the last meeting. We have actually started the mortality study. We have a contractor onboard. That's Westat. We've received approvals through our IRBs to begin working with them. We have to get final approval just to have Westat added as our contractor. We met with them in person earlier this month, and we are going to be transferring the DMDC database to them, and they're going to actively start working on that study. So that's progress and good news on that front.

**DR. BOVE:** Let me just say one other thing. Originally in the protocol we had thought we could only ascertain whether people were alive or dead up until the end of 2008. So now it looks like we'll be able to ascertain alive or dead up to the end of 2009.

It will require a little more extra work from

the contractor to get death certificates because the National Death Index, which is the way we're going to determine the cause of death, is about a year and a half to two years behind. They have a lag so that we won't be able to ascertain cause of death in 2008 and 2009, maybe part of, but most of 2008 and 2009 by using the NDI, National Death Index. Instead we'll have to go to states and get the death certificates for those, but that's been planned for.

So that'll give us another year of follow up. Still it's a young population, at least for the active, former active duty. So it's important for us to get as close to the present as possible and ascertain that and it looks like we'll be able to do that.

**MS. RUCKART:** Now there was a question before about the civilians. The civilian workers will be included in the mortality study, and they're also going to be included in the health survey. Now, the health survey has a larger focus. So the health survey package is currently being reviewed by our CDC's OMB office. It's in the final stages of review.

It was revised due to the fact that we're no longer planning to conduct a pilot. I believe that

information was conveyed last time. Also, we have renamed the health survey. It's more of a semantics thing, Morbidity Study of Former Marines, Dependents and Employees Potentially Exposed to Contaminated Drinking Water at USMC Base Camp Lejeune, just to more accurately reflect what we're doing, how we have the subset of our survey included in our study.

The health survey is now planned to use a phased approach, phase one consisting of mailing out the health surveys. However, the surveys can't be sent out until fall at the earliest because we need to wait until the census is completed.

Another change is that we're going to assemble an expert panel to evaluate the ongoing progress of the first phase, that is, the mailing out of the health surveys and the resulting participation rate. The panel will include four-to-six scientists with backgrounds in epi studies or health survey research analysis. ATSDR, USMC, DON and the CAP will have a chance to nominate candidates for this expert panel.

The panel will consider the power calculations and evaluate the results of the sensitivity analyses and the participation rate and make recommendations on considering how to proceed with the rest of the study. ATSDR will consider the panel's

recommendations in determining how to proceed.

The first phase, mailing out of the health surveys, will continue until all efforts to increase participation rates are exhausted. We discussed this at length, you know, the repeat mailings, the telephone follow-up, et cetera, so I don't want to go into that now since we're short on time.

The second phase of the survey will consist of confirming the self-reported diseases and analyzing the data.

**MR. STALLARD:** Anything else?

Frank?

**DR. BOVE:** One other thing, back to the mortality study because we're going to be asking in the survey where they were barracked or whether they lived in family housing, but for the mortality study we have a situation where we don't know where people were barracked among the bachelors, which is about 70 percent of the active duty. We don't know where their units were barracked on the base.

The key question is whether they're barracked at Mainside Hadnot Point or not Mainside. Now I've put together a spreadsheet with over 500 units on it. This is the basis for how we identify people for both studies. I sent one copy to Scott Williams

asking if he could show it to a retired Marine.

Apparently, the Marine Corps does not know or have any records they claim on where units were barracked. And so the only way they claim that we could get this information is based on people's recollections who were there on base, and so I'm going with that.

I do have command chronologies that I've looked through, and they've been somewhat helpful but really not that helpful. So I'm going to have to rely on the memories of retired Marines. So I did ask Scott Williams to show this to retirees. He did show it to one person so far. I'm hoping he shows it to more. I'll keep pushing him on that.

But I'd also like the CAP members, any of you who know or any of you yourselves remember where units were barracked, I'd like you look at this spreadsheet. It's very simple.

I have zero for meaning they weren't at Mainside and one that I thought they were on Mainside based on previous discussions with former Marines. And for 8th Battalion or 8th Marines, they were both at Mainside and then at Geiger. And I'm trying to find out when they moved.

I'm going to do a little of my own research at

the library up at Quantico in May, but if any of you know when the 8th Marines were shifted from Mainside to Geiger, that would be important information for me, for us.

**MS. RUCKART:** So if anyone who is listening to this now or will be reviewing this later wants to share information with us, they can send it to our Camp Lejeune e-mail address, ATSDR Camp L-E-J-at-C-D-C-dot-gov.

**DR. BOVE:** And I have one copy with me right here so if anyone wants to take it with them and work on it. Jerry has a copy as well.

**MS. RUCKART:** I just want to make one quick announcement because we know that there are some technical difficulties preventing people from viewing or hearing the meeting in real-time, we're going to post a video of the meeting on our website, and we'll keep that up until the written transcript is posted. We realize the posting of non-captioned video may pose a barrier for some of our visitors. Even so, we want to make this available, and we want to give people the opportunity to view the meeting.

**MR. STALLARD:** All right, great. All right, so that was on updates.

**DR. BOVE**: Are there any questions about either

study before we leave this topic?

**DR. CLAPP:** I'd like to suggest somebody from the panel to review the response rate, Professor Tom Mangioni.

**DR. BOVE:** I don't have a pen right now.

**DR. CLAPP:** Should I just send you an e-mail?

**DR. BOVE:** Yeah, sure. It would be good if any experts in survey research in particular would like to assist --

**WRAP-UP**

**MR. STALLARD:** So we have approximately 20 minutes to go back over now and capture CAP insights and suggestions.

And Mike and Jerry, you had some follow-on questions for Morris?

**MR. PARTAIN:** Yeah, I'd like to bring Morris back up.

**MR. STALLARD:** Morris, you have been requested to come back. And since you don't need your slides, we can --

**MR. PARTAIN:** And, Morris, when we left off right before lunch I was asking about the product mass of benzene or fuel at the Hadnot Point fuel farm. Now, we had talked about prior to this discovery that Jim made actually of the quantity of fuel at the Hadnot

Point fuel farm. The Marine Corps pretty much had indicated to you all 30-to-50,000 gallons.

**MR. MASLIA:** Actually, it’s 20,135 to 30,135 gallons of fuel loss.

**MR. PARTAIN:** But above that amount they had not indicated that there was a substantial amount of fuel.

**MR. MASLIA:** No.

**MR. PARTAIN:** And 30,000 is bad, but what we’re hearing with like CLW-1866 states that there’s, that there was a meeting where the contractor states that they had lost 800,000 gallons of fuel and recovered 500,000 gallons. That’s a big jump between thirty-, 50,000 to 800,000. Are you going to be able to use that data to load the model? Or what kind of data are you getting from the Marine Corps so you can load it with what was down there?

**MR. MASLIA:** Let me explain that and see if I can be perfectly clear on this. Again, that goes back to our approach to data extraction. We review documents that provide data that we can cite those documents as scientific references in the back of our reports. If you go to any of the Tarawa Terrace reports, any journal articles, whatever, these documents have to be citable or else you may see in

a report, you know, written communication or verbal communication or whatever.

The document that you're referring to are meeting minutes, and we would consider that as hearsay. The reason is it gives no scientific or technical rationale as to how they arrived at that number of 800,000. It's a number somebody suggested. We've had expert panel meetings here at ATSDR for the water modeling, and people will say whatever people will say. And you have no scientific basis at that meeting or through the meeting transcripts to say whether those numbers are fair.

What we have to do is find citable documents. As it turns out the UST files have citable documents. That is, they have work by consultants. They have their remediation schemes. They have quantity of product that they have removed from the ground. We have since added that up and, of course getting back to doing mass balances, but at this point we have citable documents that we've added up that we believe at this point there's approximately 250-to-300,000 gallons that have been removed.

**MR. PARTAIN:** You mean recovered.

**MR. MASLIA:** Recovered, recovered from the ground.

There's also a document in one of the site files. It's a 600-and-some-odd page document and at a certain location, page 524 to be exact, there is a draft report by Baker Engineers that applied an analytical, that's a simplified model, for product recovery. And that model estimated between 400,000 and 1.1 million. They ran several scenarios, and one of the scenarios they ran happened to come up with a number near 800,000. That document we can cite assuming it's released by the Marine Corps.

**MR. PARTAIN:** What was the date of that?

**MR. MASLIA:** That's a 1990, we peg it right at 1996, somewhere like between December of '95, beginning of 1996. The report itself does not have a date on it, but the illustrations, the consulting illustrations that are contained in the report have a December 1995 stamp on it. So that's why I'm assuming that that report is 1996.

A document of that type we can cite, and in fact, during our review process that is something, or during our mass calculations, that is a number that we would have come up with. We did the same thing with Tarawa Terrace. If you go to the Tarawa Terrace report, we in fact cite a volume of PCE, estimated volume of PCE, that was released based on

an approach that we took, biometric shell approach, of the PCE contours. And then we also compared that with other published information and showed where it was ranked at a certain level compared to other PCE sites and stuff like that in the literature.

And that's what we have to do. We cannot use hearsay, we can't use newspaper articles. We can't use magazine articles. We have to try to use engineering reports, scientific reports that have been peer reviewed because that reflects on the scientific veracity of our analysis.

**MR. PARTAIN:** So my understanding, this report's dated 1996.

**MR. MASLIA:** There's a modeling report within this file, 600-and-some-odd-page file, that contains other information. The modeling report our best guesstimate is 1996. I did talk to an engineer who's no longer on the Baker Camp Lejeune site, and he did confirm that, yes, that's the report that they did. I don't know if it's ever been finalized or not, but it is to the best of my ability to determine based on the drawings in the report, 1996.

**MR. ENSMINGER:** Well, that was a draft report in '96?

**MR. MASLIA:** Yes.

**MR. ENSMINGER:** And you can't find a final report for it?

**MR. MASLIA:** No. I have asked the person who was overseeing that project through e-mail. And to his knowledge there was never a finalized report made of that --

**MR. PARTAIN:** That probably explains why the Marine Corps doesn't want to release draft reports.

**MR. MASLIA:** Well, that question has already been raised to us.

**MR. ENSMINGER:** These reports, we need to find out what they have turned over to the State of North Carolina as well. If they turned it over to the State of North Carolina, it's in the public domain.

**MR. MASLIA:** Let me just clarify. There's no problem since the Marine Corps has provided us with us using it for our models, for our mass balance, all that. Where the issue comes in is when we go through peer review, and as you know, all our Tarawa Terrace reports went through peer, external peer reviews, we cannot release that to peer review because we have to make the reference materials available should someone want the reference materials.

**MR. PARTAIN:** So on this mass of fuel, I mean, 1996

the Marine Corps has an operational knowledge by that date that they've got anywhere from 400,000 to 1.1 million gallons of fuel in the ground.

**MR. MASLIA:** That's correct.

**MR. PARTAIN:** At any point during from 1996 to 2009, did the Marine Corps notify ATSDR, you, Frank, Tom that this stuff was there?

**MR. MASLIA:** I have no knowledge, no communication between myself or our consultants or contractors to the Marine Corps or the Navy. We were always going, and that is why last year and when we had our expert panel we were presenting models for benzene using dissolve phase because twenty-to-30,000 gallons it would be reasonable to assume that over that time period that that was dissolved.

But at this point the volume of mass from that report, 400,000-to-1.1 million, and we will calculate by hand so to speak mass balances, and changes the entire modeling paradigm. It changes the entire focus of the project.

**MR. PARTAIN:** What do you mean by changes the entire meaning?

**MR. MASLIA:** Well, for example, say 1996. We didn't start working on Tarawa Terrace until 2004 and '05. At that time we made a decision to go with Tarawa

Terrace because we thought that was an important first step. But we may have also, if we had seen that there was a multiphase in benzene specifically because benzene's a known carcinogen, we may have gotten together with the epi people and made a decision, no, let's focus on benzene first. Benzene was never primarily focused on because we thought it was a small amount and dissolved.

**MR. PARTAIN:** As far as delays in getting the water model done, I mean, we've discovered multiple sources now in the UST portal.

**MR. MASLIA:** You're talking about information sources.

**MR. PARTAIN:** Yeah, information sources. And I sat here and heard the Marine Corps say, well, all the documents that are out there are available, and then we find the UST portal. Then we find the Terra database. What kind of delays is this causing to you guys? Because I know you said earlier that you're having to go through all the reports, all the pages. And I've done a lot of that myself, and it takes an inordinate amount of time.

**MR. MASLIA:** For example, some of the documents in the UST portal, what they refer to are site files, site file one, two, whatever, may be 400, 500, 600

pages. And it's not just one report. In other words one in particular like the one where the model is, the first eight or ten pages is a hydrogeologic characterization. There may be some well logs in there. Then the model is located on page 524.

So if I don't read throughout, or somebody doesn't read throughout that report in its entirety, we are obviously going to miss some documents. That causes a delay, those types of things. The other thing as I pointed out to you, we've got a Chapter C, which is the Installation Restoration report that has been prepared, has gone through external review, has gone through Agency review. It's being currently laid out.

Again, we now know that there's an electronic database, a query-able database that has similar, not the same data, that we report in the Chapter C. I think it would not be professionally or scientifically prudent to go ahead and release that report without comparing the two. I'm not saying that we're not accepting that there'll be discrepancies. There probably will be some discrepancies, but we need to document what those discrepancies are and do that.

So that puts a delay because whether it's a

temporary worker or a subject matter expert that is going to do that, somebody has to do that comparison and document here or it's the same. And again, that's a decision we have to make as in conjunction with management and the water modeling team as to how are we now going to re-QA/QC. Because I don't want to give you the impression the report wasn't checked prior. It was checked, all 80 tables.

**MR. PARTAIN:** Well, the information checks. Let me ask you, prior to the discovery of these portals there's no, the reference is to 1.1 million gallons or 800,000 or all this fuel that's at Hadnot Point as far as the models go. They're not in the CERCLA files.

**MR. MASLIA:** No, no, no, no. That's not, in other words, the Chapter C report is strictly Installation Restoration. That's again, my point is that has to be now.

**MR. PARTAIN:** Well, I mean the problem I'm talking about is the mass of fuel. The only document that we found that references a large mass of fuel loss at Hadnot Point is CERCLA-1866.

**MR. MASLIA:** Well, no. We've got the UST file now.

**MR. PARTAIN:** Yeah, now, but we didn't have that a year ago.

**MR. MASLIA:** And what we also have now is we can add up how much has been extracted during the remediation of this site, in other words the consultants' report. I'm not sure how they're compensated, but basically they have a plan, and they have to demonstrate that they're going according to some remediation plan. And they have removed X amount of gallons. And we have tabulated some of that, and that's where I'm saying right now we know that's at least 250,000 gallons. So that's an order of magnitude more than any previous documentation of fuel loss.

**MR. ENSMINGER:** The spokesperson for the Marine Corps up at Headquarters Marine Corps, Captain Brian Block, has made the statement to me in writing that they don't have any estimates for the amount of product recovery since 2000.

**MR. BYRON:** That's not true because --

**MR. ENSMINGER:** Whoa, whoa, whoa, what I'm saying is this is what they're saying. But I know for a fact that, number one, how are they justifying running this recovery system, spending millions of taxpayers' dollars, how are they justifying to the regulating agencies whether or not their system of cleanup is working if they don't have these records?

I mean this is ludicrous.

**MR. MASLIA:** I'll answer that by saying that we have gone into the documents now, and we have tabulated what the consulting reports have published as far as volume of mass removed. As of right now our first run through that is somewhere in the neighborhood of 250,000 gallons has been removed to date. And there are numbers past 2000, okay, that's the consultants give either annual reports or ^. So there is documentation to that, and that's what we're using.

**MR. ENSMINGER:** Three two?

**MR. MASLIA:** No, that's through 2009; that's through 2009, okay. And we have tabulated that. We've got a spreadsheet, and that's what we have tabulated through, obviously, there are some periods in there where there may not be. And we've got references to cite where we get the information from and these are the consulting reports.

**MR. ENSMINGER:** So what we're looking at is the possibility of still having 200,000-to-900,000 gallons of fuel still in the ground.

**MR. MASLIA:** Well, let me say if you go to some of the professional publications by the American Petroleum Institute, what they say really is that recovery at best is probably, the most efficient

system's on the order of 70-to-75 percent efficiency if it's run at its most efficient manner. So even if you assume that, you're over 300,000 to 400,000.

But again, when we did this on Tarawa Terrace because we don't have specific data identifying the date, time, how much was spilled, how much recovered, we use mass calculations. That's one method. Then we'll use our model results. See if they're in agreement. Then we'll do the just arithmetic calculations from the consulting reports to see that. And we use all these lines of evidence to see if they're consistent with each other.

And one thing we can say is it's consistently above the twenty-to-30,000 gallons. It's in the hundreds of thousand gallons. Where in that range is what we're trying to do with the water modeling, getting people back to work on mass balance, doing the mass balance calculations. And we need that for the model because obviously we don't have documented a known quantity that was actually lost.

In other words that number is not there so we have to find other methods. One method and if need be perhaps the consultants can tell us how efficient they believe their system is in extracting so we can back out some numbers there and our numerical

models. And that's why it's critical that we use the appropriate model because a simple model like -- when I say simple, a dissolved phase model like we used at Tarawa Terrace, will not come up with the correct mass balance numbers.

**MR. BYRON:** Morris, this is Jeff. Concerning the amount of chemicals coming out of the ground, is this an evaporatory process where they're evaporating this at the surface or are they gathering this in tanker trucks and sending it somewhere? Because bills of lading would tell you how many gallons are in that.

**MR. MASLIA:** I've been told, at least by the folks at Lejeune that I've talked to, that they're not putting it in tanker trucks.

**MR. ENSMINGER:** What are they doing with it? (multiple speakers)

**MR. MASLIA:** Again, that is something to revisit just to document that. In other words there probably will be a series of questions that we need some more definitive answers on, but they as far as process it's --

**MR. PARTAIN:** Well, Morris, have you put a request in writing to the Marine Corps asking the amount of fuel that was lost, to document what they've lost

and also what they recovered? The reason why I ask that is I'm disturbed by the fact that the Marine Corps had some type of, at least by 1996 had an operational knowledge that they had a lot more fuel down there than you guys were thinking.

And it took, what, 12, 13 years for them to, they didn't even volunteer it was found. It was kind of like the catch me if you can thing. So unless something is in writing, Marine Corps, how much fuel do you estimate being in and around Hadnot Point, I'm afraid all the verbal answers really don't carry much water.

**MR. MASLIA:** I think the approach would be is for us to do or refine some of our calculations first. Also, make sure we go through their UST files, and then present a series of questions if we have them back to the Marine Corps. At this point I think it's a little premature to start shooting questions at them because we can't be definitive as we need to be.

In other words a better approach would be, okay, this is the method we used. We have documented X number of hundreds of thousands of gallons lost. Do you agree with this or do you disagree with this?

**MR. BYRON:** Well, Morris, they must have something because they're projecting 2018 is how long it'll take to clean it up. So they obviously know something and one billion dollars by the way.

**MR. STALLARD:** What Morris said was really important about not just throwing something out there piecemeal. I think what that speaks to for the CAP is --

**MR. ENSMINGER:** Get your ducks together.

**MR. STALLARD:** Yeah, a more strategic approach to this whether it's chain of command or whatever coming forward united, this is what we need approach.

We're about ready to wind down here so I need to do a post-check. We can continue on beyond three o'clock, but I think we're going to lose our live feed. I don't know what your transportation arrangements are.

**MR. ENSMINGER:** Yeah, we've got to move.

**MR. STALLARD:** We've got to move, right?

**MR. MASLIA:** Did I answer everyone's questions?

**MR. STALLARD:** I have one question that I'm going to ask on behalf of community members. The question was for Morris. You've done this before with other agencies. Have you had as much difficulty getting

information, what's your experience in getting information?

**MR. MASLIA:** I'll speak about this agency because I worked in different capacities in other agencies. There was no direct public involvement and the tasks were much more streamlined than this groundwater model. But we did similar work at Toms River, Dover Township, New Jersey, for the childhood cancer cluster investigation. We did not do groundwater modeling. We did water distribution system modeling, but we did field testing, and there was a bevy of documents. However, and I actually pointed out this process in a paper we did a few years ago about there are six rules of engagement. And if they're applied correctly to these very public contamination sites, it helps bring closure to it and complete the analysis.

But under that we had a state partner cooperative of New Jersey, and we had Weldon^ Public Health, and we also had a state regulatory agency. So when we needed information, whatever, number one, we could go to the local health department to do our foot work. In other words we didn't have to have people at my level or equivalent going out and say locating valves. They did that. They knew the

public. They knew their local area.

Number two, when we needed to verify some information, and that was correct at one point I said we'll publish what we have unless you can verify it. And within 24 hours we sent that to the state regulatory agency. The head of the water utility sent me an e-mail back saying this is the approach we used. Here, these are the documents that we used. You can find it in X number of documents.

That obviously is missing from Camp Lejeune. At the time we started, I don't know about today, but the time we started, 2003, 2004, North Carolina was not a cooperative partner, state partner with us. There was no local public health, and there is no regulatory body. So it's basically us going to the points of contact and do that.

And so I will agree that's why it's critical that we get an answer back as to do we have, and again, I'm going to say, do we have all the data sources, not necessarily pieces of data. We're capable of determining that, but do we have, are there any other sources of information out there that we're not aware of. And that's what really needs to be finalized.

So, yes, we have done work like that. It's been not necessarily easier, but there have been other parties involved that have helped with the public health aspect of things. And at this point there's nothing we can do about that, but we need to do whatever we can to see that the process moves forward.

**MR. STALLARD:** I just wanted to be sure that you had the concept, give me a chance to ask that question.

**UNIDENTIFIED SPEAKER:** So you kind of give them an ultimatum? You have a protocol that you can kind of put pressure on the parties that are responsible for the contamination? You have a way to put pressure on them.

**MR. MASLIA:** Are you talking about in New Jersey?

**UNIDENTIFIED SPEAKER:** I'm talking anybody, anybody besides --

**MR. MASLIA:** We're not a regulatory -– let me, we are not a, ATSDR is not a regulatory agency so if there is a state regulatory or local, then we can work with them to assist us. All we can do is ask for the information, which I believe we have done on numerous occasions, and depend on, as I said one of my points of equitable partnerships, and that each partner wants to see this issue resolved. And

that’s what we have to depend on, especially in this case. And that’s all we can do.

Again, at my level all I can do is pass my requests on up to management to say help us out, let’s find a way to do that. We have done it from the technical standpoint. We’ve gotten the letters or documents where we’ve identified certain sites. We even identified in 2005, we specifically stated do you have these data in an electronic database like MS Excel or MS Access. That question has been asked directly to a Lieutenant General at the Marine Corps. So it’s not that we haven’t asked, but I guess we have to find another way of asking it.

**MR. STALLARD:** Thank you.

**ADJOURN**

We’re going to move into now and Dr. Falk is going to take us out, just two things --

Thank you. We’re done, Morris. You’re done.

Two questions that came up from Morris’s presentation were about the user’s manual, and he has it now as a hundred percent documentation SME in review issue, that were two high points.

So we need to talk about a time that we’re going to meet next and I guess we’ll do that online, right? And that’s approximately three, four months

from now.

**MR. PARTAIN:** Three.

**MR. STALLARD:** Three, okay.

Dr. Falk.

**DR. FALK:** Yes, I just want to thank everybody for their input today, and I think I mentioned at the beginning that I'm Acting, but in the last several months I've focused on certain areas like particularly trying to work on getting the funding here for the mortality and health surveys. So I'd like to say having listened to this conversation, the three areas that I would like to -- that I would like to particularly focus on in the coming months, and that's in addition to just supporting Morris and Frank and the people who do the work.

So the first area is the question about the inventory and the adequacy of data. That has to be resolved. You can't really go too very far down this road with that uncertainty hanging over the quality of what we're working with. So we will have to figure out the right way to resolve that question, put the question to, you know, the exchange of letters is, please tell us if we have everything and give us the inventory, and the reply is please come up and visit our library and look

around.

So we have to get beyond that and figure out what's the best, what is the effective way to actually make sure that all the relevant data's available. So that's one area we will work on.

The second is I asked Frank whether the question of male breast cancer is covered in the mortality and health surveys, and it may be an uncommon enough illness that it just doesn't show up. You won't get adequate or sufficient data to address a question like that because it's an uncommon, relatively uncommon illness. So we have to figure out what are the ways to address illnesses that are of concern that are not, that may or may not have full data or be able to address it fully. And so that's an area that we will explore and see what solutions we can come up with.

And third is, going back to the original conversation, there ought to be a set of governance rules for this CAP. The question right off, who sets the agenda, things like that. So I think Tom, Perri and the group, we will work on getting something in draft that we can share with you all. Everybody can comment and we can discuss it, but I think there ought to be, we ought not to be still

addressing how do we set the agenda.

I mean, there ought to be some governance structure of how we do things like that that everybody agrees to and we all understand. So we will follow up with an approach to dealing with that. We'll discuss it, it's not a unilateral decision. We want to discuss it, but we want to really all have some input and try to resolve those questions.

So those three areas are things that, for me at least coming out of today's discussion, important things to work on.

**MR. PARTAIN:** Dr. Falk, on these two issues, one with an observation on the CAP, this issue of functionality, protocol, what have you, the CAP. Apparently, it's not been an issue until very recently, and that issue coincides with what I believe is the effectiveness of the CAP and the fact that we're asking hard questions, demanding answers and all of a sudden we find ourselves having to redefine what we're supposed to be doing, hearing language look forward not back, don't be so mean to the Marine Corps and things like that.

Number two on documents and data, ATSDR does not have an investigative arm. That has been

y'all's hovel. The CAP has in essence fulfilled that role through our efforts, through our, going through there, going through the documents that we have available to us assimilating the information and pulling it out.

The whole issue of the public health assessment in 1997, we talked about benzene before, pointed out that there's something wrong. You can't just say there was no exposures. And we were told in the past, oh, there's no evidence that it was in our drinking water.

And then we find documentation showing that benzene was actually pumped with an active well right in the distribution system. So logically you conclude that it's in the drinking water. And lo and behold the public health assessment comes crashing down.

Now, the CAP through our efforts and what we've done have pushed a lot of issues. The interconnection between the Hadnot Point and Holcomb Boulevard and the interconnected exposures there, the whole issue about these document portals, granted Bob Faye found one of them, but the fact that we're asking questions about benzene indirectly led to that.

This whole issue about the amount of fuel that was lost at Hadnot Point, up until recently ATSDR was operating under the assumption that 30,000 gallons of fuel was lost at Hadnot Point, and then we pull a document, 800,000 gallons. And then everything changes. You all have to change the work, what you've done, the type of models and what have you.

Now, the Marine Corps, this new document source granted is not, we can't get to it. We can't see it. You can see it. The Marine Corps can see it. In order to be involved and do our function as a CAP, we have to have access to this portal and these documents to see what is in there.

The more eyes on this, the more people going through it, the more accurate your work's going to be. We can help. We're volunteering. We're doing it. We have a stakeholder in that, and the Marine Corps unfortunately is the holder of the information. They control this. As you know the old adage, knowledge is power. And we cannot operate with ignorance in a vacuum.

And right now until we have these documents, until we can get in there and see what's there and help you guys, there's going to be a question and a

big question hanging over everything y'all do.

**DR. FALK:** I'm with you. I don't want to go further down this road and be questions hanging over us. And I can't tell you right this minute what's the best way to resolve that. I understand you've got a really good role in coming up and helping on obtaining that information. So we will, this is an issue we must address, and we must address it in an effective way. And we will come back to you on that. I mean, that's really a very critical issue. I mean, that's got to be resolved. I mean, I hear you in terms of wanting to have a role in that, and we've got to work that through.

**MR. PARTAIN:** I guess I mean ATSDR does not have an investigative arm. My background is in investigation. My degree's in history, and the past ten years I've worked as an investigator with my employer so I have that mentality. And one of the problems that ATSDR has faced is that there is no baseline of what happened. We're still putting the picture together, and until you have a baseline and understanding of what actually happened and transpired at Camp Lejeune, we're stabbing in the dark.

**DR. FALK:** Yeah, I'm not disagreeing with you. I

hear you.
**MR. STALLARD:** Anybody else?
**DR. DAVIS (by Telephone):** This is Devra Davis. I think we are all in agreement at the next meeting we really have to have the Marine Corps at the table.
**MR. ENSMINGER:** I don't care if they're here or not.
**MR. PARTAIN:** Functional Marine Corps, not just answer people.
**MR. STALLARD:** I think that's a key takeaway is that this is one of the first meetings where we did not have, this is the first meeting where we did not have someone sitting at the table here, and we would like to, moving forward, have active participation. I think that's been expressed by the CAP.
**MR. PARTAIN:** Well, one thing I'll voice my own personal opinion on this with the Marine Corps not being here, I mean, that is their choice, and I do not, as a community member, want to see the Marine Corps use this position as a leverage point to get concessions from ATSDR. If they choose not to be here, so be it. Let them go. That's their own problem, and they can answer to Congress for that.
**DR. DAVIS (by Telephone):** Well, perhaps ^ the CAP.
**MR. ENSMINGER:** We didn't hear you.
**MR. BYRON:** Move to Camp Lejeune. We've made that

recommendation.

**MR. PARTAIN:** I would love to see these CAP meetings be held in Jacksonville.

**MR. ENSMINGER:** Either Jacksonville or Wilmington. I mean, North Carolina has the largest registry, amount of people registered. They don't always have to be at Camp Lejeune either. I mean, we could hold one there. We could hold one up in Washington. We can hold one down in Florida.

**MR. PARTAIN:** And we have 13,000 in Florida; I'd like to see one in Florida. There's a lot of people down there that want answers, too.

**DR. DAVIS (by Telephone):** (Unintelligible).

**MR. STALLARD:** Tom, did you have something?

**DR. SINKS:** No, just I brought up this issue of moving, having the CAP at different locations before. I think we'll be happy to entertain that. That's something that we can consider and maybe put that out, leave it to the CAP members in terms of moving it. And maybe we ought to have it in Idaho so Tom can attend.

**MR. PARTAIN:** Yeah, and not in January. We're doing Florida in January.

**MR. STALLARD:** Well then, Tom and Devra, thank you on the phone for your participation.

**MR. TOWNSEND (by Telephone):** Can I say something?

**MR. STALLARD:** Sure, Tom.

**MR. TOWNSEND (by Telephone):** What is the name of the Veterans Administration gent that came and talked to us?

**MR. PARTAIN:** Brad Flohr, F-L-O-H-R.

**MR. STALLARD:** And he handed out his contact information to some of us, so we'll be sure that you get it.

**MR. PARTAIN:** I'll e-mail you. I'll try to get you an e-mail within tonight.

**MR. TOWNSEND (by Telephone):** Thank you.

**MR. STALLARD:** Thank you, and CAP members, thank you. Be sure to submit your vouchers and stuff on time and those in the audience thank you for the time you've spent here today.

**MR. PARTAIN:** I'd like to say thank you for those in the community that took the time to come out here and sit with us. I appreciate that.

**MR. STALLARD:** We're adjourned.

(Whereupon, the meeting was adjourned at 3:10 p.m.)

**CERTIFICATE OF COURT REPORTER**

**STATE OF GEORGIA**
**COUNTY OF FULTON**

I, Steven Ray Green, Certified Merit Court Reporter, do hereby certify that I reported the above and foregoing on the day of April 29, 2010; and it is a true and accurate transcript of the testimony captioned herein.

I further certify that I am neither kin nor counsel to any of the parties herein, nor have any interest in the cause named herein.

WITNESS my hand and official seal this the 12th day of May, 2010.

___________________________________

**STEVEN RAY GREEN, CCR, CVR-CM, PNSC**
**CERTIFIED MERIT COURT REPORTER**
**CERTIFICATE NUMBER: A-2102**