## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF NORTH CAROLINA

### Civil Action No.: 7:23-CV-00897

| | | |
|---|---|---|
| IN RE: CAMP LEJEUNE WATER LITIGATION | ) ) ) | PLAINTIFFS' LEADERSHIP GROUP'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S |
| This Pleading Relates to: | ) ) | MOTION TO EXCLUDE THE TESTIMONY OF DR. RODNEY KYLE |
| ALL CASES. | ) ) ) | LONGLEY |

3245022.4

# TABLE OF CONTENTS

Page

I.    INTRODUCTION .................................................................................................... 1

II.   FACTUAL BACKGROUND .................................................................................... 2

      A.    Professor Longley is a highly qualified historian whose opinions have
            never been excluded........................................................................................ 3

      B.    Professor Longley employed the same historical methodology that
            characterizes his illustrious career to his work on Camp Lejeune......................... 5

      C.    Defendants' own historial expert acknowledged the usefulness of
            Professor Longley's research. ............................................................................. 8

III.  LEGAL STANDARD .............................................................................................. 8

IV.   ARGUMENT .......................................................................................................... 10

      A.    Professor Longley applied a reliable methodology. ............................................. 11

      B.    Defendant's scattershot objections to Professor Longley's testimony do
            not undermine its admissibility.......................................................................... 13

            1.    Professor Longley's typographical errors do not undermine his
                  methodology. .......................................................................................... 13

            2.    Professor Longley properly surveyed a wide array of primary and
                  secondary sources. .................................................................................. 14

            3.    Professor Longley accounted for bias.................................................... 15

            4.    Professor Longley corroborated his sources. ......................................... 19

            5.    Professor Longley's citation practices are proper................................. 20

      C.    The motion should be denied as premature. ....................................................... 22

V.    CONCLUSION........................................................................................................ 23

CERTIFICATE OF SERVICE ...................................................................................... 25

Pursuant to Local Rules 7.1 and 7.2 and the March 11, 2025 Scheduling Order (D.E. 332), Plaintiffs' Leadership Group ("PLG") respectfully submit their memorandum in opposition to Defendant United States' ("Defendant") Motion to Exclude the Testimony of Dr. Rodney Kyle Longley.  D.E. 360 (D.E. 362 ("Memorandum")).

## I.   <u>INTRODUCTION</u>

Professor Longley's testimony as forecast by his reports is relevant and reliable, satisfying Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Defendant does not challenge his qualifications or the relevance of his opinion, nor could it.  Professor Longley's credentials as a historian are extraordinary and his historical analysis of Camp Lejune is undeniably relevant to this action, because it can fill gaps in the factual foundation relied on by other experts and assist the Court as the finder of fact in a bench trial. Given that Professor Longley was designated to testify both as PLG's historian expert for its case-in-chief and as a rebuttal witness to the government's own historian experts, his testimony is also relevant as rebuttal testimony. The Court should find that he passes *Daubert* muster for both purposes.

Professor Longley's testimony is also reliable. Professor Longley applies the same historical methodology in this case that courts regularly approve and that he has used to write books and articles throughout his distinguished career as an academic military historian, namely researching and reporting on sources of credible historical information. Here, he traveled to archives and sifted through primary sources. He toured the base, spoke with eyewitnesses, consulted public historians, reviewed prior statements and testimony of persons with knowledge, and aggregated and summarized voluminous historical facts regarding the base with an eye on the water contamination and water use issues. He corrected for bias, and extensively cited and footnoted his reports. Such methodological rigor easily passes *Daubert* muster, particularly here, where the Court is the finder of fact so its gatekeeping role to exclude evidence from a jury that

1

might be confused is diminished.

Defendant raises a scattershot of attacks on Professor Longley that rest on mischaracterizations and cherry-picking. None withstand scrutiny, and even if any attack were credible, it would go to the weight of the evidence, not its admissibility.

Finally, Defendant's motion is premature. Until issues in contention are narrowed, it cannot be predicted which of the numerous historical documents and facts cited by the parties' historians may become relevant. For example, it is currently unknown which facts from Professor Longley's reports Plaintiffs may seek to offer at any trial or which facts from the government's experts the government may offer that Professor Longley will address in rebuttal. In seeking to have the Court address the entirety of Professor Longley's reports now, the government seeks an unnecessary advisory opinion. At a minimum, then, the motion should be denied without prejudice to any objections Defendant may seek to raise in the future.

## II.   FACTUAL BACKGROUND

The Camp Lejeune Justice Act of 2022 ("CLJA")[1] allows individuals to recover for injuries caused by exposure to contaminated water at Camp Lejeune between 1953 and 1987. The Court has ordered three phases of expert discovery: the "Water Contamination Phase," "General Causation Phase," and "Residual Expert Phase." D.E. 270 at 2. As of the date of the filing of this brief, the parties are still in the process of producing all reports, completing all discovery and filing all motions with regard to the three phases.

As part of expert discovery, the parties both designated historian experts, whose reports were originally issued partly in Phase 1 and partly in Phase 2.[2] The parties subsequently deemed

---

[1] Pub. L. No. 117-168, § 804, 136 Stat. 1759, 1802-04 (2022).
[2] Plaintiffs designated Dr. Longley and Defendant designated Drs. Brigham and Kelman as historian experts. Defendant originally identified Dr. Brigham as a Phase 1 case-in-chief expert. Plaintiffs originally

2

all respective historian experts to be part of Phase 1 by agreement. The sequence of the reports was as follows:

1. Dr. Longley report dated Dec. 7, 2024.
2. Dr. Brigham report dated Dec. 9, 2024.
3. Dr. Longley report dated Jan. 13, 2025.
4. Dr. Brigham report dated Feb. 7, 2025.
5. Dr. Kelman report dated Feb. 7, 2025.
6. Dr. Longley report dated March 17, 2025.

Each historian expert was deposed (Dr. Brigham on March 27, Dr. Longley on April 3, and Dr. Kelman on April 1 & 8, 2025). Additional historical materials were entered as exhibits at their depositions.

**A.    Professor Longley is a highly qualified historian whose opinions have never been excluded.**

Professor Longley is a highly-qualified historian.[3]  He is the director of the War, Diplomacy, and Society Program at Chapman University; the Henry Salvatori Professor of American Values and Traditions; and Director in War, Diplomacy, and Society.  Professor Longley joined the Chapman faculty in July 2020 after teaching at Arizona State University as the Snell Family Distinguished Professor since 1995.[4]  His voluminous academic qualifications are further detailed in his CV and his reports.[5]

Professor Longley is a prolific scholar. He has published many books, including on military historical topics as here.  His books include *The Sparrow and the Hawk: Costa Rica and the United States During the Rise of José Figueres* (1997); *In the Eagle's Shadow: The United States and*

---

identified Dr. Longley as a Phase 2 case-in-chief expert. Plaintiffs later also identified Dr. Longley as a rebuttal expert in Phase 1, rebutting Dr. Brigham.
[3] *See* Ex. 1, Dr. Longley report dated Dec. 7, 2024, pp. 4-6 (summarizing qualifications); publications list (appended to same); Ex. 10 (Longley CV); *and see* https://www.chapman.edu/our-faculty/kyle-longley.aspx (last accessed May 16, 2025) (Chapman University entry).
[4] *See id.*
[5] *See* Ex. 1, Dr. Longley report dated Dec. 7, 2024, pp. 4-6; Ex. 10, CV.

*Latin America* (2003), *Senator Albert Gore Sr.: Tennessee Maverick* (2004); *Deconstructing Reagan: Conservative Mythology and America's Fortieth President* (editor and contributor) (2006); *Grunts: The American Combat Soldier in Vietnam* (2008), *The Morenci Marines: A Tale of Small Town America and the Vietnam War* (2013); *The Enduring Legacy: Leadership and National Security Affairs during the Presidency of Ronald Reagan* (co-editor and contributor) (2017); *Reagan and the World: Leadership and National Security, 1981-1989* (co-editor and contributor) (2017); LBJ's 1968: *Power, Politics, and the Presidency in America's Year of Upheaval* (2018); and *In Harm's Way: A History of the American Military Experience* (2019).[6]

Moreover, Professor Longley was an associate editor for Encyclopedia of United States-Latin American Relations (2012) with Thomas Leonard and is a lead editor for the Oxford Encyclopedia of Latin America (2018-present). More recently, Professor Longley has been working on book projects involving Afghanistan and Iraq. His books have won prizes including the Southeastern Council on Latin American Relations A.B. Thomas Award, the Best Book on Arizona History from the Arizona/New Mexico Book Co-op Committee, and the Southwest Book Award from the Arizona Historical Society. Professor Longley has also published articles and essays in historical journals.[7]

Professor Longley has been active in organizations including the American Historical Association, the Organization of American Historians and the Society for Historians of American Foreign Relations. Professor Longley has published and taught on the subjects of military history and the Marines.[8] Professor Longley has provided expert reports in the past.[9] He has not previously had his testimony excluded under *Daubert* or Rule 702 grounds in any matter.

---

[6] *See* Ex. 1, Dr. Longley report dated Dec. 7, 2024.
[7] *See id.*
[8] *See id.*
[9] Ex. 1, Dr. Longley report dated Dec. 7, 2024, court cases disclosure.

**B.    Professor Longley employed the same historical methodology that characterizes his illustrious career to his work on Camp Lejeune.**

Plaintiffs retained Professor Longley as an expert in July 2024. Between July and December 2024, Professor Longley researched and wrote his first report. He also gathered much of the material he referred to in his second and third reports. The first report described his research process.[10] In connection with that process, he reviewed pleadings and other background materials provided to him by counsel, visited archives and reviewed countless primary sources, reviewed appropriate secondary sources, traveled to Camp Lejeune and toured the base, and conducted interviews—sometimes called oral histories—with veterans and public historians. He analyzed the entirety of the voluminous materials he reviewed, corrected for any bias, and developed his reports with detailed footnotes and citations.

Specifically, he was provided with copies of pleadings and other background materials by counsel such as documents produced in discovery, which he also reviewed and where appropriate, cited.[11] He reviewed books about military bases in general and Camp Lejeune in particular, and publications regarding the water contamination issues.[12]

As to primary sources, he worked through numerous back issues of the base newspaper, the *Globe*, in publication throughout the statutory period.[13] Professor Longley traveled to the Marine Corps Library at Quantico.[14] There, too, he reviewed primary sources, including back issues of *Leatherneck* magazine and numerous records of government agencies including the

---

[10] *Id.*, Appendix 1, "Research Methodology," pp. 45-48.

[11] *Id.*, Dr. Longley report dated Dec. 7, 2024, p. 48. Defendant criticizes the fact that counsel provided the expert with materials yet Defendant did the same with its expert Dr. Brigham. For example, the DOJ provided him with materials on the subject of the opening date for ABC Dry Cleaners. *See* Ex. 2, Brigham report dated Dec. 9, 2024, pp. 25-33 & Image 9 (High School Yearbook), Image 10 (ad in the Jacksonville Daily News, June 29, 1954); Ex. 7, Dr. Brigham depo. 86:24-87:6 (admitting he was made aware of Yearbook by DOJ); 89:12-90:21 (admitting he was made aware of ad in Jacksonville Daily News by DOJ).

[12] *Id.*, Exhibit 1, Dr. Longley report dated Dec. 7, 2024, pp. 45-46.

[13] *Id.*, p. 47; *and see* reliance list entries, e.g., nos. 9 to 62.

[14] *Id.*, App. 1, p. 46-47; reliance list nos. 6-8.

5

ATSDR, the Department of Defense, Department of Veteran's Affairs, U.S. Congress, Environmental Protection Agency, the Centers for Disease Control and the Government Accountability Office.[15]

In addition, Professor Longley spoke to persons with knowledge and researched first-hand accounts of relevant aspects of life on the base, reviewing depositions, oral histories and memoirs of people who served.[16]

Professor Longley's reports are comprehensive. He cited numerous historical records.[17] With regard to oral history, his initial report cited to a Zoom call with Alan Howard,[18] a communication with Jerry Ensminger,[19] and depositions or declarations of named Plaintiffs Mr. McElhiney, Mr. Howard, and Ms. Tukes, and nonparty witness General Anthony Zinni.[20] Professor Longley noted that "oral history" information could range from words on a phone to witness testimony at congressional hearings.[21] With regard to his methodology for oral history, Professor Longley cited to publications by Don Ritchie (former chief historian of the Senate) and other luminaries in the field.[22] Professor Longley himself has more than 30 years of experience employing oral histories and using them for his books.[23]

Dr. Brigham's first report dated December 9, 2024 "crossed in the mail" with Professor

---

[15] *Id.*, App. 1, p. 47.
[16] Ex. 1, p. 47.
[17] *See* Ex. 1, Dr. Longley report dated Dec. 7, 2024, fn. 1-132 and reliance list nos. 1-198; Exs. 3, 6.
[18] Ex. 1 p. 10 n. 21; p. 32 n. 85; reliance list no. 127.
[19] *Id.* p. 19 n. 46; reliance list no. 148.
[20] *Id.*, reliance list nos. 127-131, 133-136. Mr. McElhiney, Mr. Howard and Ms. Tukes were three of the 25 Track One Plaintiffs. *Id.* at p. 48. "They reflect two men and one woman who resided at the base at distinct time periods in the earlier 1970s, the later 1970s, and the 1980s. One resided at Hadnot Point, one at Tarawa Terrace, and one spent time at both communities." *Id.*
[21] *See id.,* p. 47.
[22] *Id.*
[23] *Id.*

Longley's first report dated December 7, 2024.[24]  Professor Longley's second report, dated January 13, 2025 and styled as a rebuttal report, addressed Dr. Brigham's December 9, 2024 report and included additional citations not included in his first report.[25]  Defendant then served Drs. Brigham and Kelman's February 7, 2025 reports that, *inter alia*, criticized Professor Longley's use of "oral history."  To address that contention, in his third report dated March 17, 2025, Professor Longley provided, *inter alia,* a recorded interview with Jerry Ensminger and Mike Partain, a declaration from Mr. Partain,[26] and discussed oral history materials on the U.S. Marines website in the form of archived transcripts of interviews of Marines.[27] At the government's expert Dr. Brigham's deposition, Dr. Brigham agreed that such information was instructive and could be useful as part of the historical record.[28]

The government's expert Dr. Brigham worked with a staff of a dozen assistants[29] to fact-check Professor Longley's three reports.[30]  Out of the 296 reliance list citations[31] and additional materials found in the reports, Dr. Brigham's team identified only three (3) errors, each of which were photos. Professor Longley corrected them and issued an errata sheet.[32]

---

[24] This occurred because Plaintiffs designated Dr. Longley originally as an expert in Phase 2, while Defendants designated Dr. Brigham as an expert in Phase 1, and the phases have overlapping deadlines.

[25] *See* Ex. 3, Dr. Longley report dated Jan. 13, 2025, reliance list.  Defendant states that "Dr. Longley's second and third reports relied upon the research and analysis of his December 7, 2024 report." D.E. 362, p. 2.  In fact, but his second and third reports also cited to new research. *See* Ex. 3, Dr. Longley report dated Jan. 13, 2025, p. 1 ("For purposes of this rebuttal report, I relied on my 12/7/24 Report, along with additional investigation, research and analysis as discussed below and as cited in my supplemental Reliance List."); Ex. 6, Dr. Longley report dated March 17, 2025 (citing additional materials); Ex. 12 (declaration).

[26] Ex. 6, Dr. Longley report dated March 17, 2025, pp. 23-31 & reliance list nos. 1, 17, 33-45.

[27] Ex. 6, p. 7.

[28] Ex. 7, Brigham depo. 20:12-23, 135:19-136:20.

[29] *Id.* at 8:11-18 (assisted by four senior assistants and about four more research associates), 8:19-10:6 (confirming identities of 12 staff members involved).

[30] *Id.* at 32:20-21 (describing review of Dr. Longley's first report); 162:17-21 (fact-checking of citations), 164:8-18 (same), 165:1-6 (same), 176:12-23 (staff went through report).

[31] *See* Exs. 1, 3, 6 (first Longley report had 198 reliance items; second had 36 items; third had 62 items).

[32] Ex. 1, last page.

**C. Defendants' own historical expert acknowledged the usefulness of Professor Longley's research.**

Professor Longley's voluminous unchallenged citations illuminate many historical facts of potential relevance. To pick but a few examples, Professor Longley provides potentially useful citations to a *Globe* news article reflecting the details of using standpipe to supply water buffaloes at Hadnot Point;[33] bus schedules reflecting how buses went to and from the Tarawa Terrace community;[34] *Globe* features reflecting the uses of the swimming pools at Hadnot Point;[35] and historical information on the starting date of ABC Dry Cleaners.[36] There are numerous other examples of facts and historical documents cited in Professor Longley's reports and potentially of relevance depending how matters unfold at trial. Defendant's expert Dr. Brigham at his deposition agreed that such cited materials were methodologically appropriate and useful information for the historical record.[37]

## III. LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. *See SAS Inst., Inc. v. World Programming Ltd.*, 125 F. Supp. 3d 579, 584 (E.D.N.C. 2015). The proponent of the expert testimony bears the burden of establishing admissibility by a preponderance. *Id.* (citing *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001)). The trial court has broad discretion under Rule 702. *Id.* at 3-4 (citing *United States v. Gastiaburo*, 16 F.3d 582, 589 (4th Cir. 1994)). Rule 702 provides:

---

[33] Ex. 3, Longley report dated Jan. 13, 2025, p. 23.

[34] *Id.* at p. 13.

[35] Ex. 1, Longley report dated Dec. 7, 2012/7/24, pp. 37-39.

[36] Ex. 3, Dr. Longley report dated Jan. 13, 2025, p. 25.

[37] *See* Ex. 7, Brigham depo. 29:9-21 (agreeing historian may consider depositions and affidavits as part of methodology); 120:8-121:1 (Mike Magner book cited by Longley also cited by Brigham), 121:2-25 (Brigham cited ATSDR reports and Maslia publication also cited by Longley), 184:18-185:12 (agreeing that oral history interviews available on U.S. Marines website and cited by Longley may be useful), 204:20-24 (agreeing website cited by Longley may have useful historical information).

8

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702 (last amended Dec. 1, 2023). "Courts have distilled the requirements of Rule 702 into two crucial inquiries: whether the proposed expert's testimony is relevant and whether it is reliable." *See SAS Inst., Inc.*, 125 F. Supp. 3d 579, 584 (E.D.N.C. 2015) (citing cases).

In order to be relevant, the proposed expert testimony must appear to be helpful to the trier of fact. *Id.* (citing *Daubert*, 591 U.S. at 591-92). "Testimony from an expert is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror." *Id.* (quoting *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993)).

The test for reliability is flexible and involves balancing a variety of factors. One factor is the expert's qualifications. *Id.* at 584. Additional factors may include: "(1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether a technique has a high known or potential rate of error and whether there are standards controlling its application; and (4) whether the theory or technique enjoys general acceptance within the relevant community." *Id.* (quoting *Tunnell v. Ford Motor Co.,* 245 F. App'x. 283, 286 (4th Cir. 2007)); *see also United States v. Crisp*, 324 F.3d 261, 265-66 (4th Cir. 2003). The trial court may consider other factors as it deems appropriate. *United States v. Hassan*, 742 F.3d 104, 130 (4th Cir. 2014) (citing *Crisp*, 324 F.3d at 266).

In a bench trial, the court is presumed to be capable of assigning the appropriate weight and reliability to the evidence, so the court's role as a "gatekeeper" to keep out evidence is lessened. *See, e.g., David E. Watson, P.C. v. United States,* 668 F.3d 1008, 1015 (8th Cir. 2012)

9

(so stating); *Novartis Pharms. Corp. & Novartis AG v. Breckenridge Pharm. Inc.,* Civ. A. Nos. 14-1043, 14-1196, 14-1289 (D. Del. Aug. 18, 2016) (denying motions to exclude experts, noting that role as "gatekeeper" is not as critical in bench trial; court reserved both side's rights to renew their objections to the expert testimony at trial) (Ex. 14); *Roake v. Brumley*, 756 F.Supp 219, 232 (M.D. La 2024) (citing cases); *United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005) (accord); *Vifor Fresenius Med. Care Renal Pharma Ltd. v. Teva Pharms. USA, Inc.,* No. 1:20-cv-911-MN, slip op. at 1 (D. Del. May 16, 2022) (citing *In re Unisys*, 173 F.3d 145, 155-58 (3d Cir. 1999)) (Ex. 15).

A Court may hold a hearing prior to deciding a *Daubert* motion but is not required to do so. *See Roake*, at 228 (citing *Carlson v. Bioremedi Therapeutic Sys., Inc*., 822 F.3d 194, 201 (5th Cir 2016)).

## IV. <u>ARGUMENT</u>

Expert historians are routine in litigation and the admissibility of their testimony is subject to the *Daubert* standard.[38] *See, e.g., Saginaw Chippewa Indian Tribe of Mich. v. Granholm*, 690 F. Supp 2d 622, 634 (E.D. Mich. 2010) (applying *Daubert* and evaluating historians under the Rule 702 category of "technical, or other specialized knowledge" that may "assist the trier of fact to understand the evidence or to determine a fact in issue"). Even where historical reports might appear like the "persuasive argument of an advocate" and be "perhaps flawed in some respects," courts nevertheless tend to admit such testimony because it can be subject to cross-examination and considered and weighed appropriately by the Court. *Id.* at 643.

The role of the historian role is magnified in this case, given that the historical facts that

---

[38] *See* Jonathan D. Martin, *Historians at the Gate: Accommodating Expert Historical Testimony in Federal Courts*, 78 N.Y.U.L. Rev. 1518 (2003) (citing cases reflecting use of historian experts in various factual and legal contexts).

10

give rise to potential liability allegedly occurred many decades ago.[39] Given that this Court is the trier of fact, there is no reason at this juncture to keep out the undeniably relevant historical evidence developed by the well-qualified historian Professor Longley using time-tested historical methodology. Professor Longley testimony, should it be introduced at trial, will be subject to cross examination and the Court can appropriately weigh such evidence.

### A.     Professor Longley applied a reliable methodology.

In reviewing the methodologies of history experts, the court "need only determine that the expert, in applying that methodology to form his opinion, is using 'the same level of intellectual rigor' that would be expected in his field." *Plum Creek Timberlands, LP v. Yellow Poplar Lumber Co.*, No. 1:13CV00062, 2016 WL 6837173, at *2 (W.D. Va. Nov. 21, 2016) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).  Where experts on history are qualified and their methodology is reliable, courts regularly deny motions, because opponents may engage in cross-examination at trial.  *See id.* at *6 (declining to exclude testimony where expert was a "historian, with knowledge of the naming conventions historically prevalent in the area in question," noting that opposing counsel "may  choose  to  attack [expert's] opinion via cross-examination and contrary evidence").

Here, Professor Longley is well-qualified as an expert in history generally and military history specifically.[40]  Defendant does not challenge his qualifications.

Professor Longley applied a reliable methodology. *See* Ex. 1, Professor Longley report dated Dec. 7, 2024, pp. 45-48 (summarizing Professor Longley's methodology).  He researched

---

[39] Michael C. Reis & W. David Wiseman Jr., *The Historian's Valuable Role as Expert and Advisor in Environmental Litigation*, 22 *The Env't Litigator* 1, 14 (2011) ("As a matter moves into trial phase, whether before a court or in arbitration, an expert historian can provide relevant and reliable information to assist the trier of fact in understanding and evaluating the evidence where complex historical facts are at issue.").
[40] *See* Ex. 1, Professor Longley report dated Dec. 7, 2024, pp. 4-6 (discussing his qualifications).

11

the topic exhaustively. *See* Exs. 1, 3, 6 and reliance lists citing voluminous sources. He visited the base. Ex. 3, p. 2. He traveled to the archives in Quantico. Ex. 1, p. 46. He reviewed voluminous historical materials from hardcopy and online libraries. Ex. 1, pp. 45-48; and see reliance lists for reports. He prepared reports that presented and discussed numerous historical documents providing a variety of historical facts which may inform various issues in the proceedings with citations. *See id.* As explained in his reports and at his deposition, Professor Longley gathered and consider numerous historical sources of information, and deployed a critical awareness of his own biases and those of sources and witnesses. *See* Ex. 8, Longley depo. 82:17-23, 83:5-85:5 88:13-22, 147:19-148:3.

Courts have routinely held that the historical methodology applied by Professor Longley is sound. It is proper for a historian to found his methodology on the review of pertinent historical documents. *See Langbord v. Dep't of Treasury*, No. 06-CV-05315, 2009 WL 1312576, at *3 (E.D. Pa. May 7, 2009) ("In cases involving the testimony of historians and other social scientists the reliable methodology often consists of the review of the pertinent historical documents."). Here, and as discussed above, Dr. Longley reviewed extensive literature, including a wide variety of archival materials. *See* Background, *supra*. Indeed, he went much further. As discussed above, he conducted interviews, toured the base, spoke to key stakeholders, and conducted a bias analysis. Courts have also found that such methodological precision is sound. *See Burton v. Am. Cyanamid Co.*, No. 07-CV-0303, 2018 WL 3954858, at *5 (E.D. Wis. Aug. 16, 2018) (observing that "[p]roper historical work involves surveying the full array of available sources" and having "a critical awareness of the historian's own biases").

Accordingly, Professor Longley's testimony is eminently reliable.

12

**B.** **Defendant's scattershot objections to Professor Longley's testimony do not undermine its admissibility.**

None of Defendant's arguments undermine the soundness of his methodology. Defendant's objections are based on mischaracterizations and cherry-picking. But even if they were true, they at best go to the weight of the evidence not its admissibility.

**1.** **Professor Longley's typographical errors do not undermine his methodology.**

Defendants attack Professor Longley for purportedly failing to "thorough[ly] document[]" his sources. D.E. 362, p. 5. This is overblown. Defendant's own expert Dr. Brigham agreed at his deposition that his team had thoroughly vetted Professor Longley's reports and found that ***all but three citations*** – out of hundreds – were accurate. *See* Background, *supra*. These citations, moreover, involved photo captioning that have since been corrected. *First*, Defendant points to a photo incorrectly identified as President Nixon at Lejeune.[41] Professor Longley withdrew the citation[42] and provided an errata sheet.[43] He also supplemented with unchallenged citations to two other presidents who had visited the base during the statutory period.[44] The two other errors involved photo captions and were likewise corrected.[45] Correcting errors does not undermine Professor Longley's methodology; it supports it. Part of the historian's methodology is to revise and correct as necessary if there are errors. *See Plum Creek Timerlands*, 2016 WL 6837173, at *2; *Langbord*, 2009 WL 1312576, at *3; *Burton*, 2018 WL 3954858, at *5.

---

[41] Ex. 1, Dr. Longley report dated Dec. 7, 2024, p. 13 and reliance item no. 143; Ex. 4, Dr. Brigham report dated Feb. 7, 2025, pp. 15-16; Ex. 7, Brigham depo. 70:12-14.

[42] Ex. 6, Dr. Longley report dated March 17, 2025, pp. 33-34.

[43] Ex. 1, Dr. Longley report dated Dec. 7, 2024, last page.

[44] Ex. 6, Dr. Longley report dated March 17, 2025, pp. 34-35.

[45] Dr. Longley's first report captioned a photo of a water buffalo as being at Lejeune when the photo was only intended to be demonstrative of the appearance of a water buffalo. *See* Ex. 1, p. 34; Ex. 4, p. 17 (noting error); Ex. 7, Brigham depo. 70:15-19 (discussing same); Ex. 6, p. 40 (error addressed); Ex. 1, last page (errata sheet). Dr. Longley's first report also captioned a *Globe* photo of the Holcomb Boulevard water treatment plant as being from the 1960s, when it was actually from the 1970s. *See* Ex. 1 p. 10; Ex. 4, p. 18; Ex. 7, Brigham depo. 70:20-25; Ex. 6, p. 40; Ex. 1, last page.

13

More generally, such errors do not cast doubt on Professor Longley's *methodology*. Indeed, Defendant's expert Dr. Brigham agreed at his deposition that many of the materials cited and discussed in Professor Longley's reports were accurately cited *and* of potential relevance to the historical record – in other words, reliable and relevant here.[46] Unsurprisingly, Defendant's own experts Dr. Brigham and Dr. Kelman are not immune to mistakes; they have also made mistakes in prior matters and publications.[47]

In any event, even if such error correction was improper (it is not), it goes to the weight of the evidence and does not undermine its admissibility. Courts have observed that "soft sciences" involve "necessarily diminished methodological precision" when compared to scientific disciplines like math and engineering. *Roake*, at 230 (quoting *United States v. Simmons*, 470 F.3d 1115, 1123 (5th Cir. 2006), and *Jenson v. Eveleth Tacontte Co*., 130 F.3d 1287, 1297 (8th Cir 1997)). "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility . . . ." *Id.* at 229 (quoting *United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cnty., Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996), and *Viterbo v. Dow Chem. Co*., 836 F.2d 420, 422 (5th Cir. 1987)).

In short, that Defendants were only able to identify three captioning errors out of hundreds of citations – and that those errors were promptly corrected – does not undermine Professor Longley's methodology.

### 2. Professor Longley properly surveyed a wide array of primary and secondary sources.

Defendant contends that historians should survey a full array of available sources and

---

[46] Ex. 7, Brigham depo. 8:11-18 (recalling he was assisted by four senior assistants and about four more research associates), 8:19-10:6 (12 staff members involved). Dr. Brigham's staff fact-checked Dr. Longley's reports. *Id.* at 32:20-21 (describing they reviewed Dr. Longley's first report for accuracy); 162:17-21 (fact-checking of citations), 164:8-18 (same), 165:1-6 (same), 176:12-23 (staff went through report).
[47] Ex. 9, Kelman depo. 151:15-156:16, 178:1-179:2.

14

"view events from more than one perspective." D.E. 362, pp. 5-6, citing Zachary M. Schrag, *The Princeton Guide to Historical Research* (2021), at 110. This is exactly what Professor Longley did. *See* Background, *supra* (explaining that Professor Longley reviewed books, articles, and substantial primary archival materials, among other sources). Courts have routinely found such a historical methodology appropriate. In *Roake*, for example, the district court approved of a historian expert's methodology which he described as involving reviewing primary and secondary sources, determining the reliability of sources, comparing them to other sources of evidence, and considering the circumstances under which historical materials were generated. *Roake*, slip op. at 233-235. That court noted that while judges can certainly seek to answer historical questions without expert testimony by looking directly at historical texts and sources, historical experts provide valuable assistance. *Id.* at 235. Accordingly, the court found the historian's input acceptable in determining whether to grant a preliminary injunction. *Id*.

Defendants resort to simply mischaracterizing Professor Longley's report as "primarily supported" by oral histories and plaintiff statements. D.E. 362 at 6. That is not true. Professor Longley's opinions are primarily supported by his voluminous document citations, as a review of his report written reports reflects. *See* Exs. 1, 3, 6. But in any event, Defendants cite no case law that oral histories are not appropriate.

Finally, it bears noting that both Dr. Brigham and Professor Longley relied on many similar sources, further underscoring the methodological appropriateness of Professor Longley's work. *See also* Argument § B. 3, *infra* (comparing sources).

### 3. Professor Longley accounted for bias.

Defendant contends that "Professor Longley failed to account for his own biases." D.E. 362, p. 6. This is incorrect. *See* Ex. 6, Professor Longley report dated March 17, 2025, pp. 3 (discussing the subject of bias and how historian must be mindful of bias), 25 ("I constantly test

15

for bias and mistakes through the use of multiple primary sources for reference and comparison.").

Specially, Defendant complains that many of the sources of his documents were from the PLG and other "biased sources." D.E. 362, p. 9. As an initial matter, from whom an expert receives his material does not create a bias. Indeed, Defendant's expert Dr. Brigham himself admitted receiving help from the government. For example, the DOJ provided him with materials on the subject of the opening date for ABC Dry Cleaners. *See* Ex. 2, Brigham report dated Dec. 9, 2024, pp. 25-33 & Image 9 (High School Yearbook), Image 10 (ad in the Jacksonville Daily News, June 29, 1954); Ex. 7, Dr. Brigham depo. 86:24-87:6 (was made aware of Yearbook by DOJ); 89:12-90:21 (ad in Jacksonville Daily News). In any event, Professor Longley did not limit his review to materials provided by the PLG, nor is there any testimony that those materials provided the basis for his opinions. *See* Background, *supra*.

Defendant also argues that Professor Longley is improperly selective in his choices of citations. But many of his citations overlap those of Dr. Brigham.[48] It is not persuasive to argue that Professor Longley is overly selective when he is citing the same documents as its own expert. Further, it is unreasonable to require a party's historian expert to include *all* facts on a topic as broad and variegated as the history of Camp Lejeune and its water use over decades of time.

More broadly, Defendant's argument that Professor Longley is an advocate, while untrue, would not disqualify him. *Saginaw Chippewa Indian Tribe*, 690 F. Supp. 2d at 634 (denying motion to exclude despite noting that retained historical experts of each side tend to appear like persuasive advocacy). It is, of course, commonplace that historians retained by opposing parties may focus on different aspects of a topic. To the extent that Professor Longley focuses more on

---

[48] As one of numerous examples, both Dr. Longley and Dr. Brigham cite some of the same issues of the *Globe* for historical information on water buffaloes. *See* Ex. 2, Dr. Brigham report dated Dec. 9, 2024, p. 103 (citing Dec. 4, 1975 *Globe*); Ex. 3, Dr. Longley report dated Jan. 13, 2025, p. 23 (same); Ex. 13, Brigham depo. ex. 12, at pp. 55-56 (complete image of the standpipe photo and text from the *Globe* issue).

16

Hadnot Point, while Dr. Brigham focuses more on the outlying areas, it is not surprising. And indeed, Dr. Brigham's focus on "Filling of Water Buffaloes <u>Away</u> From Hadnot Point"[49] is properly a subject of rebuttal by Professor Longley, who points out historical evidence indicating filling of water buffaloes <u>at</u> Hadnot Point.[50] Moreover, given Dr. Brigham's focus on the outlying areas, there is no need for Professor Longley's reports to cover the same (less relevant) ground.

Further, as Professor Longley observed, Dr. Brigham himself was selective in the facts that he and his team chose to include or leave out. Ex. 3, pp. 1 (so noting); 9-11 ( Brigham "discusses pools without considering important historical details of their use."), 14 (while Brigham cites back issue of the *Globe* to focus on articles regarding outlying regions, he "omits that in the same issue, there were stories which reflected that people often traveled to Hadnot Point: a photo of a child participating at Marine family day (cover of issue); announcement of a new pool opened at Tarawa Terrace (p. 3); news of a drill competition at Goettge Field (p. 8); a feature on use of the main auto hobby shop (p. 17); a note of children's story time at the Base Library (p. 19); sports league results for football intramural season (p. 25); and an item on a regional golf championship at Paradise Point (p. 26).").[51]

Dr. Longley also properly responded to Dr. Brigham. Dr. Brigham's reports seek to support the Government's position that residents of outlying areas (not contaminated) did not need or want to travel to Hadnot Point (where the contamination was documented). Professor Longley's report, to rebut Dr. Brigham, cites to documents indicating otherwise. For instance, Dr. Brigham cites the

---

[49] Exhibit 4, Dr. Brigham report dated Feb. 7, 2025, p. 32 (emphasis added).
[50] Exhibit 3, Dr. Longley report dated Jan. 13, 2025, pp. 23-24.
[51] As another example, Dr. Brigham admitted he had been aware of the existence of the information showing that Presidents Reagan and Kennedy had been to the base, however he excluded this from his report, even as he criticized Professor Longley for including the inaccurately ascribed Nixon photo. Ex. 7, Brigham depo. 30:15-32:6.

17

same source seven different times across two reports[52] for the proposition that distances between outlying areas of the base and Hadnot Point were "prohibitive" of travel, and his first report has four different subsections[53] titled <u>Separation</u> from Mainside." In rebuttal, Professor Longley cites historical information refuting that distances were not "prohibitive." Thus, Dr. Brigham cited Onslow Beach as an example where "travel distance" was "prohibitive."[54] In rebuttal, Professor Longley properly cited to historical documents tending to refute that travel to or from Onslow Beach was difficult.[55] In this regard, Professor Longley is designated both as an expert supporting the Plaintiffs' case-in-chief, and, as a rebuttal expert against Dr. Brigham. It is appropriate for Professor Longley to cite facts on the importance of Hadnot Point to refute Dr. Brigham.

Defendant argues that while Professor Longley discusses filling of water buffaloes at Hadnot Point, he neglects to discuss the possibility that there were also means to fill them in the outlying regions. D.E. 362, pp. 7-8. In fact, the interaction between Professor Longley and Dr. Brigham as respective experts in that regard reflects the historian's methodology at work. In his first report, Professor Longley cites sources including the depositions of Mr. McElhiney, Mr. Urquhart and General Zinni, on the subject of water buffalo use and how they could be filled at Hadnot Point.[56] In his responsive report, Dr. Brigham noted that elsewhere in the depositions, these deponents give testimony indicating water buffaloes could also be filled elsewhere.[57] In his

---

[52] Ex. 2, Dr. Brigham report dated Dec. 9, 2024, pp. 71, 74, 78, 84; Exhibit 4, Dr. Brigham report dated Feb. 7, 2025, pp. 22, 23, 25.
[53] Ex. 2, Dr. Brigham report dated Dec. 9, 2024, pp. 62, 71, 76, 84.
[54] Ex. 2, Dr. Brigham report dated Dec. 9, 2024, p. 78.
[55] *See, e.g.*, April 12, 1979 issue of the *Globe* ("The Onslow Beach recreation area officially opens April 28 for the summer season... Free parking is available adjacent to each enlisted, staff noncommissioned officer and officer pavilion. For those without transportation, a tractor trailer bus will depart the base bus terminal every hour from 8 am - 7 pm daily."); Exhibit 6, Dr. Longley report dated March 17, 2025, p. 36, and reliance list no. 56 (citing and linking to same).
[56] Ex. 1, p. 34.
[57] Ex. 4, pp. 2, 33-34.

18

third report, Professor Longley replied by adducing additional information from interviewing Mr. Partain and Mr. Ensminger, to the effect that regardless, the Hadnot Point standpipes were preferred.[58]  It is for the finder of fact to weight the respective information and evidence at trial, to the extent testimony on this subject may become relevant to the matters at hand.

### 4.    Professor Longley corroborated his sources.

Defendant asserts that Professor Longley failed to "critically evaluate or corroborate his sources." D.E. 362, p. 9.  Defendant likewise claims that "Dr. Longley's information was not gathered independently and objectively, but largely supplied by counsel or plaintiffs themselves." D.E. 362, p. 11.  *First*, these contentions are false.  Professor Longley largely researched and gathered his own information through his own efforts including travel to archives and review of secondary sources.[59]  In asserting that Professor Longley did not seek to corroborate his sources, the Government simply ignores the facts.[60] And as discussed above, it is no critique at all that experts are given some materials by counsel. That is routine in litigation, as evidenced by Defendant's own expert Dr. Brigham.[61]

*Second*, Defendant contends that it was improper for Professor Longley to converse with or rely on any information from Plaintiffs Mr. Partain or Mr. Ensminger because "[b]oth individuals have a vested interest in the outcome of this litigation as nonbellwether plaintiffs." D.E. 362, p. 12.  However, a historian may consider information derived from sources with a bias,

---

[58] Ex. 6, p. 8.
[59] *See* Ex. 1, pp. 45-48, *see* p. 47 (describing methodology including the work he personally did and documents he personally located); Ex. 6, p. 4 (noting how he engaged in primary research himself so as to avoid dependence on materials from others).
[60] *See* Ex. 1, pp. 45-48, *see* p. 47 (describing methodology including how he worked to have sources "corroborated by other primary or secondary sources"); Ex. 6, pp. 3 (same), 4 (noting how Dr. Longley sought to engage in primary research himself so as to avoid dependence on material that was "pre-screened, pre-selected, or pre-excluded, before the historian received it").
[61] *See* Ex. 7, Brigham depo. 89:12-16; 90:10-18 (admitting it was not his team but the DOJ who found historical records regarding ABC Dry Cleaners that he relied on).

19

3245022.4

so long as the historian seeks to account for that fact, which he did. *See* Ex. 8, Longley depo. 82:17-23, 83:5-85:5, 88:13-22, 147:19-148:3; Ex: 6 at 29 ("I checked Ensminger's statements against these and other[s] such as those in the documentary, 'Semper Fi.' I understand and always critique oral histories as well as all sources for bias, truthfulness, and context, and then corroborate them as much as possible. Once more, I have been employing this methodology for over 30 years in the course of researching and writing my books…."). Thus Defendant is flat wrong that Professor Longley did not explain how he accounted for bias. Doc. 362, p. 12.

But even if Professor Longley had not accounted for bias (he did), Defendant's own VA agency has *also* relied on information from Mr. Partain and Mr. Ensminger, which indicates Defendant thought they were reliable. The VA used the website, "The Few The Proud," as a reliable source of historical information for purposes of training staff on Camp Lejeune water matters.[62] That website is maintained by Mr. Ensminger and Mr. Partain.[63] Both are credible who have testified to Congress.[64] The mere fact that they also allege injury and bring claims here does not negate these facts.[65]

### 5.    Professor Longley's citation practices are proper.

Defendant argues that "Dr. Longley's poor citation practices make it difficult, if not impossible, to know whether the assertions in his report are supported or are inadmissible '*ipse dixit*.'" D.E. 362, p. 14. This is clearly wrong. His three reports include nearly 300 references in the reliance list, along with 213 footnotes.[66] The citations are accurate and can be fact-checked and cite-checked. And, as noted above (*see* Background, *supra*), it appears that Defendant's expert

---

[62] Ex. 3, pp. 5-8.
[63] *Id.*
[64] Ex. 6, p. 29.
[65] *See id.*
[66] Exs. 1, 3, 6 (first report contains 132 footnotes; the second has 34; the third 47).

Dr. Brigham and his staff indeed have thoroughly vetted Professor Longley's reports and found de minimus errors involving the labeling of photos.[67]

Defendant relatedly argues that "[o]n almost every page of Dr. Longley's reports, there are assertions and images that lack any citation or identifiable source." D.E. 362, p. 15. This statement is belied by reviewing the reports themselves which contain ample footnotes and reliance list items. *See* Exs. 1, 3, 6 (including reliance lists and footnotes thereto. Every historical work could have more citations and footnotes). The best example Defendant can come up with is that Professor Longley's report contained four paragraphs with one footnote. Defendant accuses him of improperly relying on "general knowledge" here, but its brief indicates that the discussed contained therein are straightforward. D.E. 362 at 15 (faulting Professor Longley for asserting that "Camp Lejeune required large numbers of civilians," the Marine Corps provided "a security apparatus," and the Marine Corps were interested in keeping Marines on base to prevent trouble with local residents and to spend their money on the base).

Defendant endlessly cites Professor Longley's statements saying that if he had more time, he would have included even more citations. But every work of history *could* include more citations. *Daubert* does not require perfection not does historiography.

Finally, Defendant asserts that the recorded oral interview of Mr. Partain and Mr. Ensminger "will not help the Court understand the history of Camp Lejeune." D.E. 362, p. 18. Yet this is no argument to support the exclusion of Professor Longley. At most, this previews an objection that Defendant may make at trial in the event that the Plaintiffs seek to introduce such evidence. Moreover, this vague conjecture does not undermine the admissibility of such history. In short, the Court can weigh this testimony if it is introduced.

---

[67] Ex. 7, Brigham depo. 32:20-21, 162:17-21, 164:8-18, 165:1-6, 176:12-23.

21

3245022.4

### C.    **The motion should be denied as premature.**

A motion to exclude an expert under Rule 702 may be denied as premature where the expert is qualified and where specific objections may be deferred to trial. *See, e.g., United States v. Weed*, No. 1:04-cr-00103-REB-MEH, slip op. at 3 (D. Colo. March 30, 2007) ("Here again, the alleged flaw goes to the weight, but not the admissibility, of the expert's opinion. For these reasons, the government's objections are for now overruled. My decision in this regard is without prejudice to the government's ability to raise objections to the expert's testimony, under Rule 702 or otherwise, if further development of the evidence at trial suggests that such objections are viable.") (Ex. 16).

Where, as here, the expert is properly qualified and has applied a normal and reliable methodology, any contentions as to specific flaws in his sources or his application of that methodology go to the weight not the admissibility. *See, e.g., United States v. Shea*, 211 F.3d 658, 668 (1st Cir. 2000) ("[A]ny flaws in [an expert]'s application of an otherwise reliable methodology went to weight and credibility and not to admissibility."); *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 294 (5th Cir. 2019) ("As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility."). Here Professor Longley is a qualified historian. *See* Background, *supra*. His reports cover a great deal of ground and prior to trial it can only be speculated which opinions and citations may be offered at trial. Accordingly, the motion should be denied as premature.[68]

Furthermore, Professor Longley is also named as a rebuttal expert. Until Defendant calls

---

[68] *See also CNY Fair Housing, Inc. v. Clover Group Inc.*, No. 5:21cv361 (N.D.N.Y. May 8, 2024) (holding that motion to strike was, at that time, premature; court did not have to resolve the admissibility of the expert opinions before resolving the motions for summary judgment); *City of Bangor v. Citizen Commc'ns Co.*, No. 1:02-cv-00183-GZS, slip op. at 2-3 (D. Maine Sept. 7, 2005) ("In short, the Court is satisfied that Dr. Gustafson's testimony is both relevant and reliable. The issues raised by Plaintiff go to the credibility and weight of that testimony – issues that are best resolved at trial and do not serve as a basis for excluding this witness from testifying at trial. Therefore, the Court DENIES this Motion without prejudice to Plaintiff renewing its objections at trial.") (Ex. 17).

3245022.4

its historian expert at trial, it is not known what rebuttal testimony may be appropriate. In this regard, courts agree that a rebuttal expert may critique another's theories or conclusions, and "need not offer his own independent theories or conclusions." *In re Cessna 208 Series Aircraft Prods. Liab. Litig.*, No. 05-MD-1721-KHV, 2009 WL 1649773, at *1 (D. Kan. June 9, 2009); *see also Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*, No. 0961490-CIV, 2011 WL 2295269, at *5 (S.D. Fla. June 8, 2011) ("A rebuttal expert can testify as to the flaws that she believed are inherent in another expert's report that implicitly assumes or ignores certain facts."). Because Professor Longley is properly qualified as an expert, he may appropriately provide rebuttal testimony as the matter proceeds. *Compare Rothe Dev., Inc. v. Dep't of Defense*, 107 F.Supp.3d 183, 202-03 (D.D.C. 2015) (finding rebuttal expert not to be qualified). For that reason as well, because it is unknown whether the Government will adduce evidence from its historian expert at trial, the motion is premature.

## V. <u>CONCLUSION</u>

Defendant's motion should be denied.

3245022.4

DATED this 4th day of June 2025.

/s/   J. Edward Bell, III

J. Edward Bell, III (admitted *pro hac vice*) Bell Legal Group, LLC
219 Ridge St.
Georgetown, SC 29440
Telephone:            (843)            546-2408
jeb@belllegalgroup.com

*Lead Counsel for Plaintiffs*

/s/   Zina Bash

Zina Bash (admitted *pro hac vice*) Keller Postman LLC
111 Congress Avenue, Suite 500
Austin, TX 78701
Telephone:            956-345-9462
zina.bash@kellerpostman.com

*Co-Lead Counsel for Plaintiffs and Government Liaison Counsel*

/s/   Elizabeth J. Cabraser

Elizabeth J. Cabraser (admitted *pro hac vice*)
Lieff Cabraser Heimann & Bernstein, LLP 275 Battery Street, 29th Floor
San    Francisco,    CA    94111
Telephone:   (415)   956-1000
ecabraser@lchb.com

*Co-Lead Counsel for Plaintiffs*

/s/   W. Michael Dowling

W. Michael Dowling (NC Bar No. 42790)
The Dowling Firm PLLC
Post    Office    Box    27843
Raleigh, North Carolina 27611
Telephone:   (919)   529-3351
mike@dowlingfirm.com

*Co-Lead Counsel for Plaintiffs*

/s/   Robin L. Greenwald

Robin L. Greenwald (admitted *pro hac vice*)
Weitz & Luxenberg, P.C.
700 Broadway
New York, NY 10003 Telephone:
212-558-5802
rgreenwald@weitzlux.com

*Co-Lead Counsel for Plaintiffs*

/s/   James A. Roberts, III

James A. Roberts, III
Lewis & Roberts, PLLC
3700 Glenwood Ave., Ste. 410
Raleigh, NC 27612
Telephone: (919) 981-0191
jar@lewis-roberts.com

*Co-Lead Counsel for Plaintiffs*

/s/   Mona Lisa Wallace

Mona Lisa Wallace (N.C. Bar No.: 009021)
Wallace & Graham, P.A.
525 North Main Street Salisbury,
North Carolina 28144 Tel: 704-633-5244
mwallace@wallacegraham.com

*Co-Lead Counsel for Plaintiffs*

24

## <u>CERTIFICATE OF SERVICE</u>

I, J. Edward Bell, III, hereby certify that the foregoing document was electronically filed on the Court's CM/ECF system on this date, and that all counsel of record will be served with notice of the said filing via the CM/ECF system.

This the 4th day of June 2025.


*/s/ J. Edward Bell, III*

J. Edward Bell, III

3245022.4