# EXHIBIT 5

**Expert Report of Ari Kelman, Ph.D.**

**In the United States District Court
for the Eastern District of North Carolina
Southern Division**

**Case No.: 7:23-CV-897**

**Camp Lejeune Water Litigation**

Prepared by

Ari Kelman, Ph.D.
Chancellor's Leadership
Professor of History
The University of California, Davis
February 7, 2025

## Kelman – Report Table of Contents

| | |
|---|---|
| Introduction and Expert Opinions | p. 1 |
| Witness Qualifications | p. 2 |
| Historical Methods, Historiography, Oral History | p. 3 |
| The Longley Report | p. 9 |
| Conclusion | p. 14 |

## Introduction and Expert Opinions

The United States Department of Justice contacted me in January 2025 about the possibility of reviewing Dr. Longley's report of December 7, 2024, with limited focus on his methodology. Accordingly, I have prepared the following report, which focuses exclusively on methodological issues that I identified in Dr. Longley's report of December 7, 2024, including his collection, use, and citation of oral histories, as well as evidence more broadly. I offer the following three opinions, which, if I receive additional evidence or information, are subject to change:

1) In several instances in his report, Dr. Longley interchangeably references "oral histories," "interviews," "depositions," and other information conveyed verbally. This imprecision is not consistent with generally accepted practices among historians who use direct verbal communication as source material. Oral histories must meet a higher methodological standard than interviews or depositions. That standard includes, among other things, ensuring that oral history records are archived appropriately, making them available to historians, scholars, and other researchers who wish to access them. Therefore, as this report will demonstrate, Dr. Longley transgresses generally accepted standards among historians when he conflates depositions and interviews with the more demanding standards of oral histories.

2) Dr. Longley's collection and use of verbal communications for his report is inconsistent with the generally accepted standards employed by professional historians, who are taught to carefully question all of their sources—considering issues such as context, positionality, bias, and historiography, among many others—before crafting arguments or arriving at conclusions.

3) The citation practices that Dr. Longley employs in his report for verbal communications, visual images, and other important information also fall short of the generally accepted standards of professional historians. In many instances in his report, Dr. Longley does not provide accurate information about the source of an image he uses, and he sometimes fails to include proper citations for other key information or assertions, including facts that are not generally known.

## Witness Qualifications

I received my PhD in history from Brown University in 1998. I have worked since then as a professional historian in academic settings, holding faculty positions at The University of Oklahoma, The University of Denver, The Pennsylvania State University, and The University of California, Davis, where I now serve as Chancellor's Leadership Professor of History. Among my responsibilities in my current role, I periodically offer PhD students seminars in historical methods, including providing practical training in how to collect and employ oral histories.

I am an expert in several subdisciplines of United States history: environmental history, with an emphasis on the history of the built environment and the production of cultural landscapes; the history of the Civil War; Native American history; public history and collective memory; and, most important for this report, historical methods, including oral history and historiography.

I am the author of three books: *Battle Lines: A Graphic History of the Civil War* (Hill and Wang, 2015); *A Misplaced Massacre: Struggling Over the Memory of Sand Creek* (Harvard University Press, 2013), which won numerous national awards, including the Bancroft Prize, often regarded as the most prestigious scholarly honor in the field of U.S. history; and *A River and Its City: The Nature of Landscape in New Orleans* (University of California Press, 2003), which won the Abbott Lowell Cummings Prize. I have also published some fifty essays and articles in publications like *The Nation*, *The New York Times*, *Slate*, *The Times Literary Supplement*, *The Journal of American History*, *The Journal of Urban History*, and *Reviews in American History*.

*A Misplaced Mass*acre is a study of the politics of memory surrounding the infamous Sand Creek massacre of 1864. The book explores the way that historians, other scholars, and members of the public produce and consume knowledge about the American past. *A Misplaced Massacre* rests on written sources that I collected across a decade from archives, and also on approximately one hundred oral histories that I conducted during that same time, including with tribal elders, National Park Service employees, and landowners in southeastern Colorado. Based on standards generally accepted among oral historians, I archived original recordings of those materials at the

National Park Service's Western Archeological and Conservation Center, located in Tucson, Arizona, and the Sand Creek Massacre Visitor and Education Center, in Eads, Colorado.

I have received several prizes in recognition of my dedication to undergraduate teaching and graduate mentoring. I have also contributed to outreach endeavors aimed at K-12 educators and public history projects, including documentary films for the History Channel and PBS's *American Experience* series. Many grants and fellowships have supported my research throughout my career, including from the Guggenheim Foundation, the National Endowment for the Humanities, and the Huntington Library. In 2020, I was elected a member of the Society of American Historians, an organization of some four-hundred acclaimed scholars who work on U.S. history. I am currently writing a book titled *For Liberty and Empire: How the Civil War Bled into the Indian Wars* and editing the scholarly journal *Reviews in American History*.

Attached to this report, you will find my CV, which includes all of my single and co-authored publications for the last decade, as well as a selection of publications from years prior to that time. I have testified as an expert at deposition (May 2020) and trial (July 2020) in one case within the previous four years: *Ideker Farms, Inc. v. United States*, (CFC) 14-cv-183 L. My compensation as an expert witness on the Camp Lejeune Justice Act litigation is $350 per hour.

### Historical Methods, Historiography, Oral History

Historians rely upon an increasingly broad range of approaches to study the past. Some work from the bottom up; others prefer to work from the top down. Some believe that the past can best be understood by studying the actions of elite men; others insist that only by exploring the experiences of all people, including women and members of marginalized communities, can we properly account for the complexity and fluidity of change over time. Some argue that overweening economic structures left little room for individuals to make their mark on the world; others suggest that we should focus our gaze on contingencies or happenstance—often difficult to discern, almost always impossible to predict—as we do our best to chronicle the past.

In the end, historians are typically bound only by a shared methodology that can be traced back to late-nineteenth and early-twentieth century scholars who hoped to confer upon their discipline the elevated status afforded to the natural and physical sciences.[1] That methodology directs historians to examine documents found in repositories—archives of various kinds—where scholars are enjoined to work with different sorts of primary and secondary sources. Primary sources are first-hand accounts, documents produced by individuals who were eyewitnesses to an event or events. Secondary sources are second-hand accounts, documents produced by individuals who were not directly involved, who may, instead, have reconstructed what happened in a given place and time by looking at primary sources or at other secondary sources.

As mentioned previously, in *A Misplaced Massacre: Struggling Over the Memory of Sand Creek*, I explore the work of historians, considering how I and my colleagues produce knowledge, including how we test the accuracy of our documented assertions. I suggest that our methods are exacting by design, that they are "similar to the process of accretion."[2] Historians, I explain, "frame questions about the past and then read, watch, or listen to huge numbers of 'texts,' the current term of art for their sources."[3] These texts can take the form of primary or secondary sources. I continue: "sifting through these materials," historians "take notes, retaining tiny fragments of relevant information for later use. After doing this for months, years, even decades in some instances, they assemble the evidence they have collected, fashioning strata of ideas from an aggregate of facts, before arraying these layers, one atop the next, usually in the form of analytical narratives structured by a central argument."[4] I add that, in this way, "scholars transform fine-grained information into knowledge about the past," before concluding that "this

---

[1] P. Novick, *That Noble Dream: The "Objectivity Question" and the American Historical Profession* (Cambridge University Press, 1988), 26-37.

[2] A. Kelman, A *Misplaced Massacre: Struggling over the Memory of Sand Creek* (Cambridge: Harvard University Press, 2013), 87.

[3] Kelman, *Misplaced Massacre*, 87.

[4] Kelman, *Misplaced Massacre*, 87.

is the historian's method," which "sits at the core of most historians' disciplinary identity, their sense of themselves as professionals both bound and elevated by shared scholarly practices."[5]

The process of interpretation, of analyzing sources and arriving at conclusions about the past, hinges on an additional element of what Marc Bloch, a leading authority on the discipline's methods, has called "the historian's craft."[6] Bloch notes that historians do not merely reproduce words or phrases they find in their sources. Instead, they rely on their training to place these sources in proper context, to question their veracity, to determine if they display bias or bigotry that might inflect their meaning. In Bloch's telling, "from the moment when we are no longer resigned to purely and simply recording the words of our witnesses, from the moment we decide to force them to speak, even against their will, cross-examination becomes more necessary than ever. Indeed, it is the prime necessity of well-conducted historical research."[7] Bloch notes that, "even those texts…which seem the clearest and the most accommodating will speak only when they are properly questioned."[8] In other words, historians have a professional obligation to be more than just stenographers; carefully evaluating sources lies at the heart of their craft. These sources may be written records, typically housed in document repositories. They may be newspapers or different print media. They may be films, songs, or other forms of popular culture. And they may be oral histories, which, as noted below, should always be placed in archives.

In *The Oral History Manual*, Barbara Sommer and Mary Kay Quinlan define "oral history" as "primary-source material created in an interview setting with a witness to or a participant in an event or a way of life."[9] Oral historians, they continue, do their work with "the purpose of preserving the information and making it available to others."[10] Sommer and Quinlan offer many

---

[5] Kelman, *Misplaced Massacre*, 87.

[6] M. Bloch, *The Historian's Craft* (New York: Vintage Books, 1953), title.

[7] Bloch, *The Historian's Craft*, 64.

[8] Bloch, *The Historian's Craft*, 64.

[9] B. Sommer and M. Quinlan, *The Oral History Manual*, 2nd ed. (Lanham, MD: Altamira Press, 2009), 1.

[10] Sommer and Quinlan, *The Oral History Manual*, 1.

traits that define oral history, including "a structured, well-researched interview format," "a controlled, recorded interview setting," "probing follow-up questions that seek depth and detail," "use of high-quality recording equipment," "adherence to careful processing techniques," and, finally, "provisions for making the interviews available to others at an accessible repository."[11]

Considering the professional obligation to archive sources, Donald Ritchie, Historian Emeritus of the United States Senate and the author of the leading primer on oral history, draws a sharp distinction between *interviews*, which he associates with journalistic practices, and *oral histories*, which, in his view, carry significantly greater value as evidence about the past but, as a result, also place significantly greater demands on scholars. "An interview becomes an oral history," Ritchie indicates, "only when it has been recorded, processed in some way, made available in an archive, library, or other repository, or reproduced in relatively verbatim form for publication."[12] He goes on to insist that "availability for general research, reinterpretation, and verification defines oral history."[13] Ritchie concludes: "by preserving the recordings and transcripts of their interviews, oral historians seek to leave a complete, candid, and reliable record as possible."[14]

Historians have an additional methodological responsibility: documentation. They must cite their sources honestly, carefully, and transparently, offering colleagues an opportunity to assess their analyses and conclusions. Put bluntly, historians are not a trusting lot; the profession's methods intentionally foster a disputatious culture. As students, historians are taught to check one another's work, to return to original sources to verify interpretative rigor. They are encouraged to disagree, because out of scholarly conflict emerges a clearer picture of historical events. These arguments cannot be constructive without reference to scholarly apparatus: bibliography, footnotes or endnotes, the raw material from which historical arguments are crafted. Only when

---

[11] Sommer and Quinlan, *The Oral History Manual*, 1.

[12] D. Ritchie, *Doing Oral History*, 3rd ed. (Oxford: Oxford University Press, 2002, 2015), 8.

[13] Ritchie, *Doing Oral History*, 8.

[14] Ritchie, *Doing Oral History*, 8.

arguments are tested—when analysis of sources becomes sophisticated, acute, and refined—can the historiography, the scholarly literature, capture the complexity and richness of the past.[15]

As previously discussed, historians are taught by mentors and through best practices not to accept at face value what they are told by their sources, including oral histories. As Marc Bloch notes by way of analogy, "the most naïve policeman knows that a witness should not always be taken at his word."[16] Bloch underscores that historians, then, should never trust "historical evidence blindly."[17] They must, as noted previously, always question their sources—determining how best to use them, or even if they should be used—and scrutinize them to explore their background, their perspective, their honesty, their integrity, and whether they have an axe to grind or a position that they hope to advance. Again, this is a methodological expectation for historians in every instance, including when they choose to employ oral histories in their work.[18]

The methodological burden for historians who rely on verbal communications has actually been weightier than for historians who rely on more traditional written documents, because some scholars have been particularly suspicious of oral sources. These skeptics have suggested that oral histories should not be valued in the same way as written records, which, they contend, provide more reliable insight into the past. For example, some historians, questioning the utility of ethnographies collected from formerly enslaved people by employees of the Works Progress Administration during the Great Depression, pointed to the fallible nature of memory and to imbalances in power dynamics between interviewers and interviewees that may have skewed results.[19] In a way, these critics suggested that oral histories conducted without close attention to

---

[15] Novick, *That Noble Dream*, 220; J. Appleby, L. Hunt, and M. Jacob, *Telling the Truth about History* (New York: W.W. Norton & Company, Inc., 1994), 162; D. Fischer, *Historians' Fallacies: Toward a Logic of Historical Thought* (Harper Perennial, 1970), 309; and R. Evans, *In Defense of History* (London: Granta Publications, 1997), 166.

[16] Bloch, *Historian's Craft*, 79.

[17] Bloch, *Historian's Craft*, 79.

[18] Bloch, *Historian's Craft*, 79.

[19] "The Limitations of the Slave Narrative Collection," *The Library of Congress*, https://www.loc.gov/collections/slave-narratives-from-the-federal-writers-project-1936-to-1938/articles-and-essays/introduction-to-the-wpa-slave-narratives/limitations-of-the-slave-narrative-collection/.

power imbalances could be coercive, more closely resembling depositions: narratives collected as sworn testimony with a goal of extracting information that sources may wish to distort or hide.

I would add that I believe there are other significant differences in the way that oral histories and depositions are collected, and those differences are typically rooted in the disparate professional methods of historians and attorneys. Although both kinds of researchers, historians and attorneys, seek information, oral historians are encouraged to acknowledge that the material they collect belongs to the person being interviewed. Michael Frisch, a renowned public and oral historian, suggests that historical researchers should never elevate themselves above the communities with which they engage. Rather than policing boundaries or reinforcing hierarchies, Frisch directs scholars to "share authority" with their subjects as a way of encouraging them to be more forthcoming with information that is, again, theirs.[20] Depositions, by contrast, are rooted in inequitable power dynamics.[21] In my experience, deponents are questioned by attorneys who leverage their professional standing and the discomfort of the person being interviewed to glean information that can be used instrumentally through a process that is, by design, adversarial.

Historians sometimes use depositions as sources in their work. But when they do, they must, based on the historian's craft, remain mindful of the differential power dynamics inherent in the deposition process, attending to how those dynamics may shape the sources upon which a scholar relies to reach conclusions about the past. The same guidance applies to oral histories, because historians should always approach all of their sources from a critical distance. And then, as noted above, only by providing access to their sources—by ensuring that they are archived correctly and cited carefully—can historians who rely on depositions, oral histories, or other information conveyed verbally enable other scholars or interested parties to examine the material used in reaching conclusions or constructing arguments. In short, only by fulfilling their methodological obligations can these historians allow their colleagues to determine whether sources have been used appropriately and whether conclusions or arguments are sound.

---

[20] M. Frisch, *A Shared Authority: Essays on the Craft and Meaning of Oral and Public History* (Albany: State University of New York Press, 1990), xv-xxiv.

[21] C. Morrissey, "Beyond Oral Evidence: Speaking (Con)strictly About Oral History," *Archival Issues* 17 (1992), 91.

On balance, though, as oral history methods have become more sophisticated, and when oral historians fulfil their responsibility to evaluate their sources carefully, scholars often recognize that the benefits of oral histories—providing access to subjects that otherwise might remain obscure or out of reach of researchers—outweigh the costs. And so, given methodological imperatives around the close examination of all historical sources and careful practice on the part of oral historians, the evidentiary weight of oral histories is typically no longer discounted, though many historians still prefer to rely on contemporaneous documents for evidence.[22]

Regardless, professional practices and shared methodological norms dictate that scholars must always cite oral histories appropriately. Additionally, historians who are responsible for collecting oral histories that they use as evidence in their scholarship must make those materials, typically either in the form of the original recordings or verbatim transcriptions, available to other interested parties who wish to engage with their interpretations and conclusions.

### The Longley Report

In his report, Dr. Longley uses what he calls "oral histories" when it appears that he should label his sources more accurately: as interviews. For example, on Page 10 of his report, he writes:

> Many Marines and their dependents drank from the water fountains provided around the base as well as from hoses and jugs spread across Camp Lejeune. The only equivalent to today's wide selection of bottled drinks would have been the canteens that the Marines carried. However, they filled these canteens with base tap water from taps, commonly found in the logistics support areas, primarily at Hadnot Point, or from the big jugs of tap water stationed around base to provide for the Marines during training.[23]

---

[22] J. Webster, "'Filling the Gaps': Oral Histories and Underdocumented Populations in *The American Archivist*, 1938-2011," *The American Archivist* 79 (2016), 256 and T. Charlton, L. Myers, and R. Sharpless, *History of Oral History: Foundations and Methodology* (Lanham, MD: Altamira Press, 2007), 43-44.

[23] Longley Report, 12/7/2024, 10.

In Footnote 21, Dr. Longley cites his source for these claims: "Oral History via Zoom with Allan Howard, 30 August 2024." When asked for the full text of that oral history, Dr. Longley produced only general notes from an interview that he conducted with his source, Mr. Howard.[24] Although notes may suffice when conducting interviews, they do not alone meet the standard for a professional oral history. As Donald Ritchie explains in his primer on method, *Doing Oral History*, "Note taking makes some researchers feel more comfortable because it helps focus their attention—as they listen to what is being said—on the exact points they anticipate later using. But there is no reason not to record and take notes at the same time."[25] Ritchie allows that "note takers may make honest mistakes in what they hear"[26] but adds: "Note takers also run the risk of hearing only what they want to hear rather than what the interviewee actually says."[27]

Readers cannot know whether Dr. Longley made honest mistakes in what he heard or whether he heard what he wanted to hear rather than what Mr. Howard actually said when interviewed. That is exactly the reason for Ritchie's and Sommer and Quinlan's methodological prescriptions to record, transcribe, and archive interviews if a scholar wants them to be considered oral histories: so that the interviewer and other interested parties can verify the validity of how the source material is being used. Dr. Longley should be aware of his methodological responsibilities, because on Page 47 of his report, he indicates that Ritchie's *Doing Oral History* and Sommer and Quinlan's *The Oral History Manual* guided his approach to the practice of oral history.[28]

Dr. Longley falls short methodologically in a similar way when he uses evidence derived from Mr. Ensminger. On Page 19 of his report, Dr. Longley discusses Marines who washed weapons in the showers at Camp Lejeune, noting that "another oral historian, former Master Sergeant Ensminger, says it was not the authorized method for cleaning weapons, but it happened a lot." Readers cannot know if Dr. Longley meant to write "in another oral *history*" rather than "another

---

[24] Oral History of Allan Howard, 8/30/2024, Via Zoom, CL_PLG-EXPERT_LONGLEY_0000000014.

[25] Ritchie, *Doing Oral History*, 104.

[26] Ritchie, *Doing Oral History*, 104.

[27] Ritchie, *Doing Oral History*, 104.

[28] Longley Report, 12/7/2024, 47.

oral *historian*." Regardless, for evidence of his claim about the use of showers as a location for cleaning weapons, he points in Footnote 46 to "Oral historian statement, Ensminger."[29] Again, as with the case noted above of Mr. Howard, when asked for a complete transcript of his interview with Mr. Ensminger, Dr. Longley produced only notes—dated January 7, 2024, a month after Dr. Longley's December 7, 2024 report—from an interview with his source.[30] This discrepancy of timing and method leaves the collection and content of the source shrouded in uncertainty.

Dr. Longley's use of the interview with Mr. Ensminger points to another methodological shortcoming in his report: a failure to critically evaluate his sources. Donald Ritchie writes in *Doing Oral History* that "just as historians who uncover archival evidence must interpret it and put it in historical context, oral historians recognize that the words they record are not 'unvarnished history.'"[31] In his book *The Morenci Marines: A Tale of Small Town America and the Vietnam War*, Dr. Longley appears to agree with Ritchie's argument. Writing about the promise and peril of oral history, Dr. Longley acknowledges that "historians who use oral history understand the obstacles that exist in employing such materials. The narratives are often compiled many years after the events they describe. In that time, memories fade and details disappear."[32] He goes on to add: "Furthermore, the events become viewed through filters shaped to protect a memory or promote a particular perspective that bears either positively or negatively on the subject." And yet. Dr. Longley fails to bring this caution to bear in his own report.[33]

It is unsurprising that litigants, including Dr. Longley's subjects, have a vested interest in the outcome of litigation. Still, it is incumbent on professional historians to evaluate all of their sources—including for Dr. Longley in this case to consider the impact of his interviewees' potential biases on his analysis. Mr. Ensminger, mentioned above, has testified before Congress

---

[29] Longley Report, 12/7/2024, 19.

[30] Interview with MSgt. (ret.) Jerry Ensminger, 1/07/2025, CL_PLG-EXPERT_LONGLEY_0000000012.

[31] Ritchie, *Doing Oral History*, 13.

[32] K. Longley, *Morenci Marines: A Tale of Small Town America and the Vietnam War* (Lawrence: University Press of Kansas, 2013), 7.

[33] Longley, *Morenci Marines*, 7.

Case 7:23-cv-00897-RJ    Document 398-6    Filed 06/04/25    Page 14 of 31

in favor of various Camp Lejeune initiatives, including the Janey Ensminger Act and the Camp Lejeune Justice Act of 2022.[34] So, too, has Mr. Partain.[35] Nowhere in his report, including in his citations, does Dr. Longley mention this Congressional testimony. Dr. Longley also never makes it clear how—or if—he has adjusted his analysis or conclusions to factor in Mr. Ensminger's and Mr. Partain's potential biases and how those biases may have impacted the information they conveyed verbally. To be clear, there is nothing inherently wrong with those biases. No source and no historian is perfectly objective. The historian's craft, therefore, demands that scholars make it clear how they grapple with their positionality and the positionality of their sources.

In addition to the issues above, another methodological concern appears in Dr. Longley's report: inconsistencies between his factual claims and the information provided in the plaintiffs' depositions and declarations. For example, on Page 12 of his report, Dr. Longley writes: "From the start, the goal was to keep the Marines on base, spending their time and money there to prevent challenges from developing between sometimes rowdy Marines and locals."[36] But two of the four deponents he relied on to substantiate this claim, Mrs. Tukes and Mr. McElhiney, Sr., mostly lived off base: Mr. McElhiney, Sr. lived on base for a bit more than four of twenty-three years of service;[37] Mrs. Tukes lived on base about a year of her several decades in the area.[38]

The same issue arises around Dr. Longley's claims regarding the filling of so-called water buffaloes. On Page 36 of his report, Dr. Longley writes: "In the field there was water available

---

[34] Mr. Ensminger's Congressional testimony can be found in numerous locations, including the following: https://www.govinfo.gov/content/pkg/CHRG-110hhrg37793/pdf/CHRG-110hhrg37793.pdf; https://www.veterans.senate.gov/services/files/4A964881-45E3-41F5-B057-02DD324527D2; https://www.judiciary.senate.gov/imo/media/doc/12-3-13EnsmingerTestimony.pdf; and https://www.congress.gov/114/chrg/CHRG-114shrg21348/CHRG-114shrg21348.pdf.

[35] Mr. Partain's Congressional testimony can be found in numerous locations, including the following: https://republicans-science.house.gov/_cache/files/e/2/e2d4a1f2-d82e-45e9-b284-449754bf6aff/6917E476C613D3421FFAF940A8975922.091610-partain.pdf; https://www.veterans.senate.gov/services/files/071BA053-6068-4305-9337-5243828435C4.

[36] Longley Report, 12/7/2024, 12.

[37] McElhiney, Sr. deposition, 3/5/2024, 44, 53, 63, 75, 84-85, 87, 90-91, 103, 105, 118-119.

[38] J. Tukes deposition, 4/11/2024, 35-38; J. Tukes deposition, 1/15/2025, 45-46; W. Tukes, Jr., deposition, 1/15/2025, 20-21.

for washing skin that was drawn from the sources at Hadnot Point and carried into the field in water buffaloes." Mr. McElhiney, Sr., meanwhile, notes that while he knew that water buffaloes could be filled at Hadnot Point, he also indicated that there was a fill point at Courthouse Bay.[39] Mr. Ensminger, for his part, allows that water buffaloes "could have been" filled at Camp Geiger, but says that he used fire hydrants, which were dangerous.[40] Finally, Mr. Urquhart mentions having used "a big spigot" to fill water buffaloes and gives no indication that he had any trouble with that method, before adding that water buffaloes were filled at "water stations throughout Camp Lejeune."[41] In sum, Dr. Longley failed to consider material facts from his own cited documents, which falls short of generally accepted practices among professional historians.

Furthermore, Dr. Longley's citation practices are inconsistent and fail to meet professional standards of transparency and accuracy. For example, Footnote 85 of Dr. Longley's report comes at the end of a long paragraph filled with information presented as facts about training activities at Camp Lejeune. Historians are not required to cite every fact included in their work. Common knowledge, like the fact that Abraham Lincoln served as president during the Civil War, need not be footnoted. But the paragraph that ends with Footnote 85 contains information specific to Marines stationed at Camp Lejeune, including facts that are not common knowledge: that the daily routine of Marines at Camp Lejeune featured vigorous exercise; that days at Camp Lejeune often began as early as 6 am with a regimen of calisthenics; that Marines at Camp Lejeune "often performed hours of resistance exercises with their body weight;" and that Marines sometimes carried packs that weighed as much as sixty pounds on marches as long as fifty miles.[42]

That Dr. Longley includes only a single footnote at the end of the paragraph mentioned above is not necessarily a problem. Paragraph citations, if they are organized appropriately, can provide adequate information. In this case, though, Dr. Longley's citation lists three sources: two films and an oral history. There are no time codes listed for the films, making it impossible to check

---

[39] Longley Report, 12/7/2024, 36 and McElhiney, Sr., deposition, 3/5/2024, 55. See also McElhiney Exhibit 5.

[40] Interview with MSgt. (ret.) Jerry Ensminger, 1/07/2025, CL_PLG-EXPERT_LONGLEY_0000000012.

[41] Urquhart deposition, 11/13/2024, 74-76.

[42] Longley Report, 12/7/2024, 31-32.

whether the sources support the facts cited. It appears that the oral history has, as with the cases mentioned above, not been appropriately archived. And only a single page of notes has been recorded. As a result, it is again not possible to carefully examine Dr. Longley's sources or his conclusions. In addition, Dr. Longley's report does not accurately reflect facts as recorded in his notes. As indicated above, Dr. Longley suggests that marches at Camp Lejeune could stretch to fifty miles. But notes from his conversation with Mr. Howard indicate that marches were only fifteen miles. These are recurring problems in his report; this paragraph is just one example.[43]

Finally, Dr. Longley sometimes fails to include citations for the images used in his report. This lack of sourcing is particularly challenging because there are images or illustrations on almost every page of Dr. Longley's report. And many pages—for example, Page 13—contain two or even three images. These images often have discursive captions below them, likely written by Dr. Longley. Without offering his readers consistent citations, though, the point of origin of these materials remains mysterious, rendering futile any effort to assess the connections between Dr. Longley's images, his analysis, and his conclusions, including his report's expert opinions.[44]

## Conclusion

Leaving aside the particulars of this litigation, Dr. Longley's report displays significant methodological shortcomings. He sometimes describes interviews and other material apparently conveyed verbally as "oral histories," lending these sources unearned evidentiary authority. He also has not transcribed or archived at least some of the materials he labels oral histories, rendering it impossible to assess whether these materials support his conclusions. In addition, he occasionally fails to provide adequate citations for facts, assertions, and images. Moreover, he has not adequately evaluated all of his sources for bias, suggesting either credulousness in how he utilizes evidence in his report, or, worse still, the possibility of tendentious misconstruals. As a result, Dr. Longley's report fails to meet the standard practices used by professional historians, including some of the scholars whom he claims in his report shaped his approach to oral history.

---

[43] Longley Report, 12/7/2024, 32 and Oral History of Allan Howard, 8/30/2024, Via Zoom, CL_PLG-EXPERT_LONGLEY_0000000014.

[44] Longley Report, 12/7/2024, 13.

Page | 14

# ARI KELMAN

Chancellor's Leadership Professor of History
The University of California, Davis
akelman@ucdavis.edu

## EDUCATION:

Brown University. Ph.D., History, May 1998. Dissertation: "A River and Its City: An Environmental History of New Orleans." Chairs: John L. Thomas and James T. Patterson. Readers: Andrew Isenberg and Naomi Lamoreaux.

Brown University. M.A., History, May 1993.

University of Wisconsin-Madison. B.A. earned with distinction, History, May 1991. Honors Thesis: "Motivation to Fight in the 'Iron Brigade': A Study of 'Manly Courage' in the Civil War." Directors: Jeanne Boydston and Richard Sewell.

## EMPLOYMENT EXPERIENCE:

University of California, Davis. Faculty Advisor to the Chancellor and Provost, 2021-present.

University of California, Davis. Interim Dean of the College of Letters and Science, 2020-2021.

University of California, Davis. Associate Dean for Academic Programs and Planning, College of Letters and Science, 2017-2020.

University of California, Davis. Chancellor's Leadership Professor of History, 2016-present.

The Pennsylvania State University. McCabe Greer Professor of the American Civil War Era, 2014-2016.

University of California, Davis. Associate Vice Provost and Director of University Honors, 2013-2014.

University of California, Davis. Professor of History, 2013-2014.

University of California, Davis. Associate Professor of History, 2005-2013.

University of Denver. Chair, Department of History, 2004-2005.

University of Denver. Associate Professor of History, 2004-2005.

University of Denver. Assistant Professor of History, 2000-2004.

University of Oklahoma. Assistant Professor of Geography, 1998-2000.

University of Oklahoma. Assistant Professor of History, 1998-2000.

University of Oklahoma. Reach for Excellence Honors Professor, 1998-2000.

## TEACHING AND RESEARCH FIELDS:

Civil War and Reconstruction, U.S. West and Borderlands, Native American History, Public History and Historical Memory, Environmental History, Urban History, Historical Geography.

ALL PUBLICATIONS FROM THE LAST TEN YEARS AND SELECTED BEYOND:

BOOKS:

*For Liberty and Empire: How the Civil War Bled into the Indian Wars.* (New York: Basic Books, Under Contract).

*The Indian Wars: A Very Short Introduction.* (New York: Oxford University Press, Under Contract).

*Battle Lines: A Graphic History of the Civil War.* With Jonathan Fetter-Vorm. (New York: Hill and Wang, 2015).

*A Misplaced Massacre: Struggling over the Memory of Sand Cr*eek. (Cambridge, MA: Harvard University Press, 2015). New paperback edition.

*A Misplaced Massacre: Struggling over the Memory of Sand Cr*eek. (Cambridge, MA: Harvard University Press, 2013). Received the 2014 Bancroft Prize, 2014 Avery O. Craven Book Award, 2014 Tom Watson Brown Book Award, 2014 Robert M. Utley Book Award, and the 2015 Antoinette Forrester Downing Book Award.

*A River and Its City: The Nature of Landscape in New Orleans*. (Berkeley: University of California Press, 2006). New paperback edition.

*A River and Its City: The Nature of Landscape in New Orleans*. (Berkeley: University of California Press, 2003). Received the 2004 Abbott Lowell Cummings Award.

SCHOLARLY ESSAYS AND BOOK CHAPTERS:

"The Civil War and Reconstruction." In Nicholas Guyatt (ed.), *The Oxford Illustrated History of the United States*. (New York: Oxford University Press, under contract).

"Seeing the Trees: Searching for Environmental Justice along the Banks of Sand Creek." In Mary Mendoza and Traci Brynne Voyles (eds.), *Not Just Green, Not Just White: Race, Justice, and Environmental History*. (Lincoln: University Nebraska Press, 2025), 321-347.

"After the Opening: Shared Authority and Multivocality at the Sand Creek Massacre National Historic Site." In Christina Gish Hill, Matthew Hill, and Brooke Neely (eds.), *Native Parks, National Sovereignty: Experiments in Collaboration*. (Norman: The University of Oklahoma Press, 2024), 117-134.

"Ripples of Memory from Sand Creek." *Parks Stewardship Forum: The Interdisciplinary Journal of Place-Based Conservation*, 39 (2023), 461-473.

"Vanishing Indians." In Kevin Kruse and Julian Zelizer (eds.), *Myth America: Historians Take on the Biggest Lies and Legends About Our Past*. (New York: Basic Books, forthcoming 2023), 189-201.

"From Manassas to Mankato: How the Civil War Bled into the Indian Wars." Kent Blansett, Cathleen Cahill, Andrew Needham (eds.), *Indian Cities: Histories of Indigenous Urbanism*. (Norman: University of Oklahoma Press, 2022), 84-103.

"Go West." *Reviews in American History*, 47 (March 2019), 1-2.

ALL PUBLICATIONS FROM THE LAST TEN YEARS AND SELECTED BEYOND (cont.):

SCHOLARLY ESSAYS AND BOOK CHAPTERS (cont.):

"Boundaries of Memory at Sand Creek." In Gary W. Gallagher and J. Matthew Gallman (eds.), *Civil War Places: Seeing the Conflict through the Eyes of Its Leading Historians*. (Chapel Hill: University of North Carolina Press, 2019), 49-55.

"The Sand Creek Massacre in History and Memory." *The Essential Civil War Curriculum* (October, 2018), https://www.essentialcivilwarcurriculum.com/the-sand-creek-massacre.html.

"Sand Creek." In Andrew Lichtenstein and Alex Lichtenstein (eds.), *Marked, Unmarked, Remembered: A Geography of American Memory*. (Morgantown: West Virginia University press, 2017), 61-65.

"Comment: Borderlands of Violence." *Journal of the Early Republic*, 37 (Summer 2017), 349-352.

"The Civil War West: A Special Issue." (Guest Editor.) *The Journal of the Civil War Era*, 6 (December 2016), 479-591.

"Reconstruction in the U.S. West." In Greg Downs and Kate Masur, *Reconstruction: The Official National Park Service Handbook*. (Washington: Eastern National Press, 2016), 124-135.

"For Liberty and Empire: Remembering Sand Creek, Rethinking the Civil War." *Common-place* (May 2014), http://www.common-place-archives.org/vol-14/no-02/kelman/#.XL9ZeZNKgWo.

"What's in a Name? The Fight to Call Sand Creek a Battle or a Massacre." In Ronald K. Wetherington and Frances Levine (eds.), *Battles and Massacres on the Southwest Frontier: Historical and Archaeological Perspectives*. (Norman: University of Oklahoma Press, 2013), 116-133.

"Boundary Issues: Clarifying New Orleans's Murky Edges." Reprinted in Char Miller (ed.), *Cities and Nature in the American West.* (Reno: University of Nevada Press, 2010), 195-204.

"In Harm's Way." *Public Works History*, 88 (Winter 2006), 3.

"Even Paranoids Have Enemies: Rumors of Levee Sabotage in New Orleans's Lower Ninth Ward." *Journal of Urban History*, 35 (July 2009), 627-639.

"Forgetting to Remember." *Habitus*, 4 (Fall-Winter 2008), 62-79.

"New Orleans' Blessing, New Orleans' Curse." Reprinted in Lester Faigley (ed.), *Backpack Writing: Reflecting, Arguing, Informing, Analyzing, Evaluating*. (New York: Pearson-Longman, 2008), 217-221.

"Boundary Issues: Clarifying New Orleans's Murky Edges." *Journal of American History*, 94 (December 2007), 695-703.

"New Orleans's Phantom Slave Insurrection of 1853: Racial Anxiety, Urban Ecology, and Human Bodies as Public Spaces." In Andrew Isenberg (ed.), *The Nature of Cities: New Directions in Urban Environmental History*. (Rochester: University of Rochester Press, 2006), 3-23.

"The Necropolis of the South." Reprinted in Howard Chudacoff (ed.), *Major Problems in American Urban and Suburban History*. (Boston: Houghton-Mifflin, 2005), 155-161.

"'The Cat Became the Companion of the Crawfish': The Struggle to Reclaim New Orleans's Wetlands." *Historical Geography*, 32 (Fall 2004), 157-180.

ALL PUBLICATIONS FROM THE LAST TEN YEARS AND SELECTED BEYOND (cont.):

SCHOLARLY ESSAYS AND BOOK CHAPTERS (cont.):

"A Referendum on the River: The Mississippi Jetties Controversy." *Gulf South Historical Review*, 19 (Fall 2003), 46-71.

"Deadly Currents: John Ross's Decision of 1861." Reprinted in Albert Hurtado (ed.), *Major Problems in American Indian History*. (Boston: Houghton-Mifflin, 2001), 285-299.

"Forests and Other River Perils: Henry Shreve, The Mississippi Steamboat, and Public Memory." In Craig Colten (ed.), *Transforming New Orleans and its Environs: Centuries of Change*. (Pittsburgh: University of Pittsburgh Press, 2000), 45-63.

"Deadly Currents: John Ross's Decision of 1861 Sheds Light on Race and Sovereignty in the Cherokee Nation." *Chronicles of Oklahoma*, LXII (spring 1995), 80-103.

REVIEW ESSAYS:

"The Myth of the Vanishing Indian. *The Times Literary Supplement*, (July 18, 2019), 12.

"Black Lives Mattered." *The Times Literary Supplement*, (December 7, 2016), 4-7.

"Slaving for Profits." *The Times Literary Supplement*, (April 1, 2015), 7-8.

"Lies and Steals." *The Times Literary Supplement*, (February 11, 2015), 7-8.

"'We Are All Americans': Native Peoples in the National Narrative." *Reviews in American History*, 42 (December 2014), 661-669.

"Perimeters of Pain." *The Times Literary Supplement*, (July 26, 2013), 8-9.

"An Impertinent Discourse." *The Times Literary Supplement*, (February 24, 2012), 7-8.

"The Hills are Alive." *The Nation*, (July 4, 2011), 34-37.

"Before Macbeth." *The Times Literary Supplement*, (April 22, 2011), 24.

"Nature's Ghosts." *The Nation*, (May 10, 2010), 34-36.

"Freedom Road." *The Times Literary Supplement*, (May 29, 2009), 3-5.

"For What?" *The Times Literary Supplement*, (July 25, 2008), 7.

"Lincoln Before the Legend." *The Times Literary Supplement*, (January 11, 2008), 27.

"Silent Witness." *The Nation*, (September 10, 2007), web edition.

"John Brown's Bodies." *The Times Literary Supplement*, (February 16, 2007), 3-4.

"Unnatural Disaster." *The Nation,* (October 2, 2006), 32-36.

"Cities of Gold: San Francisco and Denver Despoil their Hinterland." *Journal of Urban History*, 32 (September 2006), 891-899.

ALL PUBLICATIONS FROM THE LAST TEN YEARS AND SELECTED BEYOND (cont.):

REVIEW ESSAYS (cont.):

"Water Damaged:  Disaster History in New Orleans and on the Gulf Coast." *Reviews in American History*, 34 (June 2006), 222-230.

"Nature Bats Last:  Some Recent Works on Technology and Urban Disaster." *Technology and Culture*, 47 (April 2006), 391-402.

"We Are the Valley:  Environmental History Reaches for Much."  With D. Graham Burnett. *The Times Literary Supplement*, (January 21, 2000), 35.

EXPERT WITNESS EXPERIENCE (retained by the United States Department of Justice):

*Frank Labruzzo, Bernard D'Arcangelo, Mary Rose Labruzzo D'Arcangelo, Clarissa M. Balfour Trust, Clarissa M. Balfour, Trustee and Orpheum Street, Inc. ("Plaintiffs") v. United States of America* (Court of Federal Claims).

*The State of Mississippi et al., v. United States of America* (Court of Federal Claims).

*Big Oak Farms, et. al. v United States of America* (Court of Federal Claims).

*Ideker Farms, et. al. v. United States of America* (Court of Federal Claims).

PUBLIC HISTORY, POPULAR WRITING, COMMUNITY OUTREACH:

*The Edge of the American West*.  Co-founder and co-editor, 2007-2014.

The History Project.  Principal Investigator, secondary school outreach program, 2007-2014.

PBS, The American Experience Documentary Series. Senior creative consultant and on-camera commentator for *New Orleans*, 2005-2007.

The History Channel. Series consultant for *Ten Days That Unexpectedly Changed America*, 2004-2006.

"In the Shadow of Disaster:  Rebuilding in Harm's Way." *The Nation*, (January 2, 2006), 13-14.

National Public Radio. Commentator for *Forum*, *The Ian Masters Show*, *Insight*, *On Point*, 2005-2006.

"Rebuilding in the Shadow of Disaster:  What To Do About New Orleans…And What Not To Do." *House and Garden*, (November 2005), 78.

"And a Pony." *Grist*, (October 24, 2005).

BBC Radio, Consultant for "Katrina" and "When the Music Stopped" radio documentaries, 2005.

"The President Dressed Up Like a Democrat." *The Sacramento Bee*, (September 23, 2005), B-7.

"From Cotton Port to Beach Town: Galveston's 1900 Hurricane." *Slate*, (September 23, 2005).

"America's Underclass Exposed." *The Christian Science Monitor*, (September 12, 2005), 9.

"Don't Blame Nature for this Disaster." *Baltimore Sun*, (September 4, 2005), 5-C.

PUBLIC HISTORY, POPULAR WRITING, COMMUNITY OUTREACH (cont.):

"City of Nature." *Slate*, (August 31, 2005).

"Patriot Acts Then and Now." *The Denver Post*, (July 6, 2003), E-1.

The National Humanities Center. Secondary school education consultant, 1998-2000.

PBS, The American Experience Documentary Series. On- and off-camera consultant for *Secrets of a Master Builder*, 1998-1999.

AWARDS, GRANTS, HONORS, AND FELLOWSHIPS:

RESEARCH:

Elected a member of the Society of American Historians, 2020.

Guggenheim Foundation Fellowship, 2019-2020.

Antoinette Forrester Downing Book Award, 2015. Presented by the Society of Architectural Historians for *A Misplaced Massacre: Struggling Over the Memory of Sand Creek*.

Robert M. Utley Book Award, 2014. Presented by the Western History Association for *A Misplaced Massacre: Struggling Over the Memory of Sand Creek*.

Tom Watson Brown Book Award, 2014. Presented by the Society of Civil War Historians for *A Misplaced Massacre: Struggling Over the Memory of Sand Creek*.

Bancroft Prize, 2014. Presented by the Trustees of Columbia University for *A Misplaced Massacre: Struggling Over the Memory of Sand Creek*.

Avery O. Craven Book Award, 2014. Presented by the Organization of American Historians for *A Misplaced Massacre: Struggling Over the Memory of Sand Creek*.

"Top Young Historian," History News Network, 2007.

The Huntington/National Endowment for the Humanities Summer Seminar, 2005. "The Redemptive West: Nationhood and Healing in the Post-Civil War American West."

National Endowment for the Humanities Research Fellowship, 2004-2005.

Temple Hoyne Buell Foundation Research Fellowship, 2004-2005.

Colorado State Historical Fund Education Grant, 2004-2005.

Abbot Lowell Cummings Award, 2004. Presented by the Vernacular Architecture Forum for *A River and Its City: The Nature of Landscape in New Orleans*.

Colorado Endowment for the Humanities Program Grant, 2002.

Louisiana Endowment for the Humanities Publishing Subvention Grant, 2001-2002.

National Endowment for the Humanities Summer Institute, 1999. "The Built Environment of the American Metropolis, Public and Private Realms"

AWARDS, GRANTS, HONORS, AND FELLOWSHIPS (cont.):

RESEARCH (cont.):

Martha Joukousky Dissertation Prize, 1998. Runner-up.

John Nicholas Brown Center for the Study of American Civilization Fellowship, 1997.

American Historical Association Littleton-Griswold Research Grant, 1996.

Historic New Orleans Collection Williams Research Fellowship, 1995.

TEACHING:

UC Davis Distinguished Graduate Teaching and Postdoctoral Mentoring Award, 2018.

UC Davis Distinguished Undergraduate Teaching Award, 2012.

University of Denver Learning Effectiveness Program LEP Teaching Award, 2002.

Brown University President's Award for Excellence in Teaching, 1995.

PUBLIC AND PROFESSIONAL SERVICE:

Cliopatria Award, 2008. Presented for *The Edge of the American West*.

PROFESSIONAL PRESENTATIONS AND INVITED LECTURES:

"Indian Cities: Forging Connections Between Indigenous and Urban History." Plenary session. Western History Association annual meeting. Portland, Oregon, October 29, 2022.

"For Liberty and Empire: How the Civil War Bled into the Indian Wars." Public Lecture. The Peninsula Foundation, Peninsula, Ohio, October 21, 2022

"Indigenous Urbanism During the Era of the Civil War." Invited Lecture. Vanderbilt University. Nashville, Tennessee, October 28, 2019.

"What Does Public History's Future Look Like?" Invited Lecture. Boise State University. Boise, Idaho, October 3, 2019.

"Public History, History's Publics." Invited Lecture. Pontificia Universidad Católica de Chile. Santiago, Chile, September 16, 2019.

"From Manassas to Mankato: How the Civil War Bled into the Indian Wars." Invited Lecture. The University of Cambridge. Cambridge, United Kingdom, May 13, 2019.

"From Manassas to Mankato: How the Civil War Bled into the Indian Wars." James P. Jones Lecture. Florida State University. Tallahassee, Florida, March 7, 2019.

"From Manassas to Mankato: How the Civil War Bled into the Indian Wars." Invited Lecture. Duke University. Durham, North Carolina, January 9, 2019.

"From Manassas to Mankato: How the Civil War Bled into the Indian Wars." Invited Lecture. The Huntington Library. San Marino, California, September 14, 2018.

PROFESSIONAL PRESENTATIONS AND INVITED LECTURES (cont.):

"For Liberty and Empire: How the Civil War Bled into the Indian War." Invited Lecture. University of Paris. Paris, France, May 28, 2018.

"Transnational Histories of Settler Colonialism." Invited Lecture. University of Tel Aviv. Tel Aviv, Israel, March 26, 2018.

"The Civil War as an Indian War." The George M. Blackburn Lecture. Central Michigan University. Mount Pleasant, Michigan, April 21, 2017.

"For Liberty and Empire: How the Civil War Bled into the Indian Wars." The C. Ruth and Calvin P. Horn Lecture. The University of New Mexico. Albuquerque, New Mexico, February 23, 1017.

"Remembering Sand Creek." Invited Lecture. Colorado College. Colorado Springs, Colorado, October 3, 2017.

"Battle Lines: A Graphic History of the Civil War." Invited Lecture. Northwestern University. Evanston, Illinois, February 3, 2016.

"For Liberty and Empire: How the Civil War Bled into the Indian Wars." The Hampton Lecture. The University of Montana. Missoula, Montana, October 30, 2015.

"From Manassas to Minnesota: The Civil War as an Indian War." Invited Lecture. The University of Minnesota. Minneapolis, Minnesota, October 1, 2015.

"A Misplaced Massacre: Struggling Over the Memory of Sand Creek." Plenary session. Organization of American Historians annual meeting. St. Louis, Missouri, April 17, 2015.

"Graphic History, Public History, Historical Narrative." Invited Lecture. University of Massachusetts, Boston. Boston, Massachusetts, March 3, 2015.

"A Misplaced Massacre: Struggling Over the Memory of Sand Creek." Invited Lecture. The University of Georgia. Athens, Georgia, December 4, 2014.

"Remembering Sand Creek, Rethinking the Civil War." The Ray Allen Billington Lecture. The Huntington Library. San Marino, California, November 11, 2014.

"Historical Trauma as Historical Memory." Invited Lecture. United States Holocaust Memorial Museum. Washington, District of Columbia, November 6, 2014.

"Graphic History, Public History, Historical Narrative." Invited Lecture. Cornell University. Ithaca, New York, October 27, 2014.

"A Misplaced Massacre: Struggling Over the Memory of Sand Creek." Invited Lecture. The University of California, Berkeley. Berkeley, California, October 10, 2014.

PROFESSIONAL PRESENTATIONS AND INVITED LECTURES (cont.):

"A Misplaced Massacre:  Struggling Over the Memory of Sand Creek."  Invited Lecture.  The National Museum of the American Indian.  Washington, District of Columbia, October 9, 2014.

"The Civil War as Indian War."  Invited Lecture.  The University of Colorado, Boulder.  Boulder, Colorado, September 19, 2014.

"How Graphic a Graphic History?"  Invited Lecture.  The University of Virginia.  Charlottesville, Virginia, September 17, 2014.

"A Misplaced Massacre:  Struggling Over the Memory of Sand Creek."  Invited Lecture.  El Tesoro Cultural Center.  Denver, Colorado, October 13, 2013.

"The Indian Wars and Western Public Memory."  Commenter.  Western History Association annual meeting.  Tucson, Arizona, October 12, 2013.

"A Misplaced Massacre:  Struggling Over the Memory of Sand Creek."  Invited Lecture.  The University of Oklahoma.  Norman, Oklahoma, September 24, 2013.

"Remembering the Civil War in Indian Country."  Invited Lecture.  The University of Tulsa.  Tulsa, Oklahoma, September 23, 2013.

"A Misplaced Massacre:  Struggling Over the Memory of Sand Creek."  Invited Lecture.  The University of Texas-Austin.  Austin, Texas, September 20, 2013.

"For Liberty and Empire:  Sand Creek and the American Civil War."  Invited Lecture.  The William P. Clements Center for Southwest Studies.  Dallas, Texas, September 19, 2013.

"An American Empire in the West:  Sand Creek and the Civil War."  Invited Lecture.  The University of Washington.  Seattle, Washington, May 7, 2013.

"A Misplaced Massacre:  Struggling Over the Memory of Sand Creek."  Invited Lecture.  School of American Research.  Santa Fe, New Mexico, February 27, 2013.

"Massacres and Memory:  The Civil War as a War of Empire."  Invited Lecture.  The University of New Mexico.  Albuquerque, New Mexico, February 26, 2013.

"Public History and Public Memory:  Sand Creek and the Civil War."  Invited Lecture.  Colorado State University, Colorado Springs.  Colorado Springs, Colorado, February 22, 2013.

"Sand Creek, The Civil War, and American Empire."  Invited Lecture.  Colorado State University.  Fort Collins, Colorado, February 21, 2013.

"History, Memory, Sand Creek."  Invited Lecture.  Colorado Historical Society.  Denver, Colorado, February 19, 2013.

"Rethinking Public History."  Invited Lecture.  The University of Colorado, Boulder.  Boulder, Colorado, February 18, 2013.

PROFESSIONAL PRESENTATIONS AND INVITED LECTURES (cont.):

"Digital Urban Environmental Histories:  New Visualizations and Models."  Commenter.  American Society for Environmental History annual meeting.  Madison, Wisconsin, March 31, 2012.

"A Misplaced Massacre:  Struggling Over the Memory of Sand Creek."  Presenter.  Western Historical Association annual meeting.  Lake Tahoe, Nevada, October 14, 2010.

"Blogging History:  Explorations in a New Medium."  Roundtable. The Organization of American Historians annual meeting.  Seattle, Washington, March 27, 2009.

"Boundary Issues:  Clarifying New Orleans's Murky Edges."  Invited lecture.  The Mahan Symposium, The University of South Alabama, Mobile, Alabama, March 8, 2007.

 "Assessing the Aftermath:  Historical Perspective and Progress Reports on Post-Hurricane Recovery Efforts in Louisiana."  Plenary roundtable. The American Society for Environmental History annual meeting, Baton Rouge, Louisiana, March 2, 2007.

"The Levee after Katrina."  Invited lecture.  The American Society for Environmental History annual meeting, Baton Rouge, Louisiana, February 28, 2007.

"Remembering Katrina."  Invited lecture. The Ethel and Herman L. Midlo International Center for New Orleans Studies, The University of New Orleans, New Orleans, Louisiana, February 27, 2007.

"Forgetting to Remember Sand Creek."  Invited lecture. The University of British Columbia Department of History, Vancouver, British Columbia, December 8, 2006.

"Living and Dying on the Levee in New Orleans."  Invited lecture.  The University of British Columbia Department of History, Vancouver, British Columbia, December 7, 2006.

"New Orleans Going Forward." Plenary roundtable.  The Urban History Association annual meeting, Tempe, AZ, October 20, 2006.

"Living in Harm's Way:  Considering the Environmental History of New Orleans in light of Hurricane Katrina." Plenary roundtable, The American Studies Association annual meeting, Washington, DC, November 4, 2005.

"Katrina:  An Environmental History."  Invited lecture.  Institute for Governmental Affairs, University of California, Davis, Davis, California, October 25, 2005.

"A Misplaced Massacre:  History, Memory, and the Struggle to Preserve Sand Creek in the New West." Invited lecture. Environmental Studies Residential Program, University of Colorado, Boulder, Colorado, November 23, 2004.

"Remembering Sand Creek."  Invited lecture. Provost's lecture, University of Denver, Denver Colorado, October 20, 2004.

"New Orleans's Phantom Slave Insurrection of 1853:  Racial Anxiety, Urban Ecology, and Human Bodies as Public Spaces."  Invited lecture.  "The Nature of Cities:  New Perspectives in Urban Environmental History," Shelby C. Davis Center for Historical Studies, Princeton University, Princeton, New Jersey, December 18, 2003.

PROFESSIONAL PRESENTATIONS AND INVITED LECTURES (cont.):

"The Built Environment." Commentator. The American Society for Environmental History annual meeting. Denver, Colorado, March 22, 2002.

"The 'Nature' of Environmental Change under the Law." Chair and commentator. The Legal History Society annual meeting, Chicago, Illinois, November 15, 2001.

"The Unnatural History of Natural Disasters." Commentator. The Western History Association annual meeting, San Diego, California, October 18, 2001.

"Bays and Shorelines: Key Sites for Environmental Histories." Chair. The American Society for Environmental History annual meeting, Durham, North Carolina, March 31, 2001.

"Public Space and Environmental History: New Orleans and the Mississippi." Presenter. The American Society for Environmental History annual meeting. Tacoma, Washington, March 18, 2000.

"Privatizing Public Landscapes: 'Progressive' Transformations of New Orleans's Waterfront." Presenter. Western History Association annual meeting, Sacramento, California, October 17, 1998.

"Forests and Other River Perils: Henry Shreve, Mississippi Steamboats, and Public Memory." Invited lecture. Tulane University, New Orleans, Louisiana, October 16, 1998.

"Rethinking New Orleans's Riverfront." Invited lecture. The John Nicholas Brown Center for the Study of American Civilization, Brown University, Providence, Rhode Island, April 12, 1998.

"The Second Battle of New Orleans: Race and Public Space in the 1958 Mississippi Riverfront Expressway Controversy." Presenter. The American Studies Association annual meeting, Washington, D.C., November 1, 1997.

"Who Owns Big Muddy's Mud?" Presenter. The American Society for Environmental History annual meeting, Baltimore, Maryland, March 8, 1997.

"Warehouses as Walls on the Waterfront: A Sense of Place on the Mississippi Riverfront." Presenter. The Social Science History Association annual meeting, New Orleans, Louisiana, October 12, 1996.

PROFESSIONAL SERVICE:

Pacific Coast Branch of the American Historical Association. President, 2024-president.

Gilder Lehrman Institute of American History. Scholarly board, 2021-present.

National Humanities Center. Fellowship application referee, 2018-present.

American Philosophical Society. Fellowship Application referee, 2018-present.

George and Ann Richards Civil War Era Center. Advisory board, 2018-present

*Reviews in American History*. Editor-in-Chief, 2018-present.

Oxford University Press. Board of delegates, 2017-present.

University of Nebraska Press "Many Wests" series. Editor, 2017-present.

University of Virginia Nau Center for Civil War History. Board of directors, 2017-present.

PROFESSIONAL SERVICE (cont.):

*American Historical Review*.  Article referee, 2005-present.

Harvard University Press.  Manuscript referee, 2005-present.

*Journal of American History*.  Article referee, 2004-present.

National Endowment for the Humanities. Fellowship application referee, 2006-present.

Oxford University Press.  Manuscript referee, 2005-present.

*Pacific Historical Review*.  Article referee, 2003-present.

University of Georgia Press Southern environmental history series. Editorial board, 2005-present.

Yale University Press. Manuscript referee, 2006-present.

National Council on Public History Annual Conference. Program Committee, 2019-2020.

National Council of Public History. Board of directors, 2020-2024.

Western History Association. Council, 2020-2024.

Pacific Coast Branch of the American Historical Association. Nominating committee chair, 2019-2021.

Society of Civil War Historians. Chair, Tom Watson Brown Prize Committee, 2018-2019.

Society for the History of the Early American Republic. Program committee, 2018-2019.

Western Historical Association. Robert M. Utley Prize committee, 2018-2019.

*Journal of American History*.  Editorial board, 2015-2018

The University of Minnesota Department of History external review. Committee chair, 2017.

American Historical Association, Pacific Coast Branch.  Executive committee, 2011-2015.

*Environmental History*.  Editorial board, 2010-2015.

American Council of Learned Societies. Fellowship application referee, 2006-2012.

*Encyclopedia of Environmental History*.  Editorial board, 2005-2012.

Massachusetts Institute of Technology Press.  Manuscript referee, 2005-2012.

*Journal of the Early Republic*.  Article referee, 2005-2007.

National Science Foundation.  Fellowship application referee, 2005-2007.

American Society for Environmental History Conference.  Planning committee, 2003.

American Society for Environmental History Conference.  Chair, planning committee, 2002.

American Society for Environmental History Conference.  Program committee, 2002.

PROFESSIONAL SERVICE (cont.):

The University of Oklahoma Conference, "The Role of Museums in the Modern World." Chair, planning committee, 2000.

## UNIVERSITY AND DEPARTMENTAL SERVICE:

University of California, Davis. Chair, faculty subcommittee for chancellor search committee, 2016-2017.

University of California, Davis. Campus free expression committee, 2016-2017.

The Pennsylvania State University. History department promotion and tenure committee, 2014-2016.

The Pennsylvania State University. Chair, undergraduate education reform committee, 2015-2016.

The Pennsylvania State University. AD14 review committee for history department head, 2014-2015.

University of California. Coordinating Committee on Graduate Affairs, 2012-2013.

University of California, Davis. Chair, history graduate program committee, 2007-2013.

University of California, Davis. Vice Chair, Graduate Council, 2012-2013.

University of California, Davis. Senate Committee to Investigate the Pepper-Spray Incident of November 2011, 2011-2012.

University of California, Davis. Graduate Council, 2011-2012.

University of California, Davis. Native American Studies search, 2011-2012.

University of California, Davis. Native American Studies search, 2008-2009.

University of California, Davis. Chair, antebellum gender historian search, 2006-2007.

University of California, Davis. Asian American historian search, 2005-2006.

University of Denver, Writing across the Disciplines Committee. Chair, 2003-2005.

University of Denver, Marsico Initiative Steering Committee. Co-chair, 2002-2005.

University of Denver, Department of History. Latin American historian search, 2003-2004.

University of Denver Undergraduate Council. 2002-2004.

University of Denver, Program in Judaic Studies. Director search, 2002-2003.

University of Denver, Department of History. Tenure and promotion committee, 2001-2002.

University of Denver, Division of Arts, Humanities, and Social Sciences. Graduate program planning committee, 2001-2002.

University of Denver, Division of Arts, Humanities, and Socials Sciences. Humanities/Social Sciences CORE lecturer search, 2001-2002.

University of Denver, Program in Judaic Studies. Historian search, 2000-2001.

UNIVERSITY AND DEPARTMENTAL SERVICE (cont.):

University of Oklahoma, Department of Geography.  Ecologist search, 1999-2000.

University of Oklahoma Honors College. Native Americanist search, 1999-2000.

University of Oklahoma, Interdisciplinary Perspectives in the Environment Program. Executive committee, 1998-2000.

University of Oklahoma Honors College.  Historian of science search, 1998-1999.

University of Oklahoma Honors College.  Labor historian search, 1998-1999.

University of Oklahoma, Department of History. U.S. historian, pre-1750 search, 1998-1999.