# EXHIBIT 7

1          UNITED STATES DISTRICT COURT

2      FOR THE EASTERN DISTRICT OF NORTH CAROLINA

3               SOUTHERN DIVISION

4          Civil Action No. 7:23-CV-00897

5

6    - - - - - - - - - - - - - - - - - - )

7    IN RE:  CAMP LEJEUNE WATER LITIGATION )

8    - - - - - - - - - - - - - - - - - - )

9

10                    Thursday, March 27, 2025

11

12

13

14              Videotaped Deposition of JAY L.

15    BRIGHAM, PH.D., a witness herein, called for

16    examination by Counsel for Plaintiffs in the

17    above-entitled matter, taken at the Offices of

18    Keller Postman, 1101 Connecticut Avenue, NW, Suite

19    1100, Washington, D.C. 20036, pursuant to

20    agreement, the witness being duly sworn by

21    Joe Strickland, RPR, CRR, CRC, a Certified

22    Stenographic Reporter and Notary Public in and for

23    the District of Columbia, the proceedings being

24    taken down by Stenotype by Joe Strickland, RPR,

25    CRR, CRC, and transcribed under his direction.

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com
Case 7:23-cv-00897-RJ     Document 398-8     Filed 06/04/25     Page 2 of 40

1    APPEARANCES:

2

3    On behalf of the Plaintiffs Leadership Group:

4         JOHN S. HUGHES, IV

5         Wallace and Graham

6         525 North Main Street

7         Salisbury, North Carolina  28144

8         704-633-9434

9

10   On behalf of the U.S. Department of Justice,

11   Civil Division

12        CINDY M. HURT, ESQ.

13        HANLEY W. GIBBONS, ESQ.

14        1100 L Street, NW  LST 4085

15        Washington, D.C.  20005

16        202-307-5788

17        Cindy.M.Hurt@usdoj.gov

18        Hanley.W.Gibbons@usdoj.gov

19

20   Also Present by Videoconference:

21         Deanna Havai, Motley Rice

22        Dennis Reich, Mark Doby, Sharon Sprayregen,

23        Whitney Wallace, Zina Bash, SPAC, Jmens

24

25   VIDEOGRAPHER:   Bradley Loy

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com
Case 7:23-cv-00897-RJ    Document 398-8    Filed 06/04/25    Page 3 of 40

1          C O N T E N T S
2     WITNESS:  JAY BRIGHAM, PH.D.
3  EXAMINATION BY:                              PAGE
4  Mr. Hughes.................................... 4
5  Ms. Hurt..................................... 214
6

7             E X H I B I T S
8  EXHIBITS     DESCRIPTION                     PAGE

9  Exhibit 1    Brigham Report:  12-9-2024      44
10 Exhibit 2    Second Brigham Report: 2-7-2025  113
11 Exhibit 3    Benz Deposition, 1-10-2023      140
12 Exhibit 4    Longley Report:  12-2024        154
13 Exhibit 5    Second Longley Report:  1-13-2025 156
14 Exhibit 6    Longley Report:  3-17-2025      176
15 Exhibit 7    Brigham Report:  Harrington 2007 188
16 Exhibit 8    Photo:  Mr. and Mrs. McElhiney  190
17 Exhibit 9    Photo:  Mr. McElhiney           191
18 Exhibit 10   Depository Pages: Well log images 193
19 Exhibit 11   Partain thesis                  197
20 Exhibit 12   Photos for The Globe            210
21
22
23
24
25

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com
Case 7:23-cv-00897-RJ     Document 398-8     Filed 06/04/25     Page 4 of 40

1          MS. HURT:  Objection to form.

2          THE WITNESS:  No, I have not.

3     BY MR. HUGHES:

4          Q.   Okay.  In this matter you've had people

5     assisting you doing the work; correct?

6          MS. HURT:  Objection to form.

7          THE WITNESS:  I've had people assisting

8     me.  I've also done quite a bit of work.  It's a

9     collaborative effort with my staff.

10    BY MR. HUGHES:

11         Q.   And you use the word "staff" in your

12    report?

13         A.   I do.

14         Q.   Okay.  How many people are covered by

15    that term, "staff," for purposes of this project?

16         A.   The staff includes four of my senior

17    research associates and then about four more

18    research associates.

19         Q.   Okay.  The DOJ was kind enough to

20    provide us with some supplemental information in

21    the last day or two.  It indicated some people

22    that I want to ask you about and see if they were

23    staff or if they were involved in helping with the

24    work on this project.  Okay?

25         A.   Okay.

1          Q.   The first is Annemarie Moore.  Do you
2      know if she was involved?
3          A.   Yes, she was.
4          Q.   And then Clara Barclay?
5          A.   Yes, to a lesser degree.
6          Q.   Jai -- J-A-I Alterman.
7          A.   Yes, Jai Alterman was.
8          Q.   Jennifer Lapp, L-A-P-P?
9          A.   Yes, Jennifer was also involved.
10          Q.   Karen Luu, L-U-U?
11          A.   Yes, she was.  Correct.  Karen was also
12      involved.
13          Q.   Peter James?
14          A.   Yes.
15          Q.   Rori Cochran?
16          A.   Yes.
17          Q.   Clifford -- gosh, I'm going to spell
18      this one -- O-R-A-T-O-K-H-A-I?
19          A.   Yes, Oratokhai.  At the beginning, but
20      he didn't have a lot of involvement.
21          Q.   Sarah, with an H, Casella,
22      C-A-S-E-L-L-A?
23          A.   Yes, again her -- she was also involved,
24      more so at the beginning.
25          Q.   Daphne N-G-O?

Golkow Technologies,
877-370-3377            A Veritext Division            www.veritext.com
Case 7:23-cv-00897-RJ    Document 398-8    Filed 06/04/25    Page 6 of 40

1        A.    Yes, Daphne was last summer.

2        Q.    Randy Scott?

3        A.    He was also involved.

4        Q.    And Jenna Hill -- J-E-N-N-A Hill.  Was

5    she involved?

6        A.    Yes, she was.

7              MR. HUGHES:  And when we go off, I can

8    give you any spellings.

9    BY MR. HUGHES:

10       Q.    And it looks like the amount of the

11   bills that your firm has sent to date to the

12   Government for the work on this cases and out at a

13   little over $843,000.  Does that sound correct?

14       A.    Yes, approximately correct, yeah.  Yes,

15   excuse me.  I should say yes.

16       Q.    At any time -- strike that.

17             Can you think of any other staff that

18   helped you on the project besides the ones we

19   named?

20       A.    The other name that appears on some of

21   those would be Ari Kelman.

22       Q.    Kelman, the other historian expert the

23   Government has retained?

24       A.    Yes.

25       Q.    Have you looked at his report?

1    sorry; I did not think he was correct when he

2    stated that the B29s used the Bosch spark plugs.

3    BY MR. HUGHES:

4        Q.   Right.  But other parts of his testimony

5    like about B29s, you were not challenging; fair?

6        A.   Again, you know that report was written

7    18 years ago.  I don't remember.  I think my

8    recognition as I sit here today is my primary

9    point of challenge was the Bosch spark plugs.

10       Q.   And he was testifying more than 40 years

11    after World War II; right?

12       A.   If my memory serves me right, that was a

13    preservation deposition taken in the late 90s.

14       Q.   Okay.

15       A.   So it would certainly be at least four

16    decades or more after he would have been stationed

17    at Harrington Army Airfield.

18       Q.   And you would agree that testimony by a

19    living witness who had gone through historical

20    events decades earlier can have value?  That is a

21    general statement.

22          MS. HURT:  Objection to form.

23          THE WITNESS:  Well, again, as a general

24    statement, I will agree with that.  But testimony,

25    like all historical evidence that historians use,

1    needs to be evaluated.  My assignment for the
2    Harrington Army Airfield case was if TCE was used
3    or not used.  And that is why I focused on the
4    Bosch spark plug comments, and not really his
5    other comments about B29s.
6              I do now recall that he said they had a
7    TCE vapor degreaser there that had been made, but
8    we never found any reference to that either.  And
9    there were other discussions.  But really the
10   point of reference and the point of my interest
11   was the Bosch spark plugs.
12        Q.   I understand.  Are you aware that there
13   are oral histories on the U.S. Marines website for
14   people that served at Lejeune as far back as the
15   40s?
16        A.   I just have become aware of that, yes.
17        Q.   Why didn't you review any of those in
18   connection with any of your work in this matter?
19        A.   I did.  My staff and I -- myself in
20   conjunction with my staff, we did an extensive
21   review of the websites, and I never came across
22   those oral histories.  I never became aware of
23   them until recently.
24        Q.   Have you looked at them now that you
25   have been aware of them?

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com
Case 7:23-cv-00897-RJ     Document 398-8     Filed 06/04/25     Page 9 of 40

1       A.    I have not.  One of my staff members is
2       taking a cursory look at some of them.
3       Q.    And they're addressed in one of the
4       Longley's reports, which we will get to him.  Have
5       you reviewed Longley's -- all of his reports?
6       A.    Yes.
7       Q.    Do you know what a BUMEDS is --
8       B-U-M-E-D-S?
9       A.    I do not.
10      Q.    Or NAVNEDS, N-A-V-N-E-D-S?
11      A.    I believe I have seen that word, but I
12      don't recall what it means.
13      Q.    Are you aware that there are historical
14      regulations pertaining to the Navy and to the
15      operation of its bases and sometimes they are
16      called by in shorthand things like NAVNED?
17      A.    I now realize -- I think you are using
18      the shorthand.  So BUMED might be Bureau of
19      Medicine.
20      Q.    Yes.
21      A.    And NAVNED would be navigation -- I
22      don't remember the rest of it.
23      Q.    Do you know whether a complete set of
24      the historical Navy regulations exists to cover
25      the only time period from say the 40s to the 80s?

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com
Case 7:23-cv-00897-RJ    Document 398-8    Filed 06/04/25    Page 10 of 40

1    of the people that were there?

2        A.   As I said, I'm very wary of using

3    deposition testimony because I see a lot of

4    contradictions in it.  I'm not sure --

5    Mr. Urquhart said everything that was filled at

6    Hadnot Point, but then there were a lot of filling

7    stations all over the base.  That seems somewhat

8    contradictory to me.

9        Q.   Do you think the deposition testimony is

10   something that a historian can consider as part of

11   methodology?

12       A.   It's certainly something you can

13   certainly consider it, yes.

14       Q.   Do you think that sworn affidavits or

15   sworn declarations under oath are materials that a

16   historian can consider as part of his or her

17   historical methodology?

18       A.   I think they can be considered.  But as

19   I believe I testified to not too along, they have

20   to be weighed and considered along with other

21   sources.

22       Q.   And one of the historian's jobs is to

23   weigh and consider different sources of evidence

24   and different incoming information; correct?

25       A.   Yes.

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com
Case 7:23-cv-00897-RJ    Document 398-8    Filed 06/04/25    Page 11 of 40

1      Q.    Okay.  And as additional information
2    comes in, a historian may, as a matter of
3    methodology, need to revise, amend, or correct
4    what they said earlier; right?
5      A.    That's part of a process of historical
6    writing.
7      Q.    And in this case, Dr. Longley issued an
8    initial report which identified President Nixon as
9    having been at Camp Lejeune.  You remember that?
10     A.    Yes, I do.
11     Q.    And your report refuted that and showed
12   evidence that President Nixon never was at Camp
13   Lejeune during the time period; correct?
14     A.    Yes, that's correct.
15     Q.    And a supplemental report where he found
16   that President Kennedy had been at Lejeune in the
17   60s and I think President Reagan had been at
18   Lejeune.  Do you remember that?
19     A.    Yes.  Kennedy obviously in the early 60s
20   and I believe President Reagan was in 1983 after
21   the Beirut disaster, for lack of a better word.
22     Q.    Before you saw that in Dr. Longley's
23   report, were you aware that Kennedy or Reagan had
24   been at Lejeune during the time period?
25     A.    When I was reviewing The Globe, I

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com
Case 7:23-cv-00897-RJ    Document 398-8    Filed 06/04/25    Page 12 of 40

```
 1    asked to address -- I'm not saying those are not
 2    important, but they were not germane to what I was
 3    writing about in my report.  I could write a
 4    report with all of those types of people visiting.
 5    It would be a very long report, but it certainly
 6    could have been done.
 7    BY MR. HUGHES:
 8         Q.   Don't you think it's germane if there is
 9    an issue, if you go out of your way to say
10    Dr. Longley was incorrect.  President Nixon wasn't
11    there.
12              MR. HURT:  Objection to form.
13              THE WITNESS:  Which begs the question
14    were other Presidents there, but then you don't
15    even mention that.  Do you see what I'm talking
16    about?
17              MS. HURT:  Objection to form.
18              THE WITNESS:  I understand your
19    questions.  I just don't know that I agree with
20    it.  We were reviewing Dr. Longley's report for
21    accuracy and we found these inaccuracies.  And so
22    that's why I wrote about them in my February
23    report.
24    BY MR. HUGHES:
25         Q.   Right.  And the reason why Longley had
```

Golkow Technologies,
A Veritext Division
877-370-3377                                    www.veritext.com
Case 7:23-cv-00897-RJ    Document 398-8    Filed 06/04/25    Page 13 of 40

1      cited to the Nixon photo was he was trying to
2      establish that major figures would come to Hadnot
3      and speak and, therefore, servicemembers and
4      others would come to see them.  Do you remember
5      that topic in Longley's report?
6                  MS. HURT:  Objection to form.
7                  THE WITNESS:  I do.
8      BY MR. HUGHES:
9          Q.   Okay.
10         A.   I do remember that discussion, and I do
11     not disagree with Mr. Longley that people went to
12     Hadnot Point to see such speakers.  Speakers such
13     as an important person like a President or a
14     Governor, Secretary of Defense, whoever it may be,
15     as well as entertainment.  I don't disagree with
16     the characterization that Hadnot Point was the
17     center of activity at Camp Lejeune.
18         Q.   You don't disagree with that?
19         A.   No, my point is that there were other
20     areas of Camp Lejeune as well.
21         Q.   I understand.  A historical
22     methodology -- can we call it a search for the
23     truth, or no?
24         A.   Well, that begs the question:  What is
25     historical truth?  You say that every generation

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com
Case 7:23-cv-00897-RJ    Document 398-8    Filed 06/04/25    Page 14 of 40

1    writes its own history.  That doesn't mean all
2    past generations were being dishonest.
3         Q.   Right.
4         A.   All historians, whether it is
5    Dr. Longley, Dr. Kelman, or myself, are doing our
6    best to seek an understanding of what we are
7    writing about, doing this kind of public history
8    or academic history.
9         Q.   You mentioned public history.  Do you
10   agree this there is a category called the public
11   historian?
12        A.   Yes, I very much agree that there is a
13   field of public history.  There is a journal about
14   public history.  I consider the work that I do,
15   and those who work for me, as a form of public
16   history.  Public history, I've heard told, is a
17   very broad area that can include -- a person I was
18   in graduate school with the Director of the
19   American Museum at the Smithsonian.  That is
20   public history.  People who work there are public
21   history.  There are all kinds of fields of public
22   history.
23        Q.   Okay.  You know if Michael Partain would
24   be reasonably called a public historian?
25        A.   I believe he -- based upon his

Golkow Technologies,
877-370-3377        A Veritext Division        www.veritext.com
Case 7:23-cv-00897-RJ    Document 398-8    Filed 06/04/25    Page 15 of 40

1    activities, research activities and his education,

2    I think he fits the bill.

3         Q.   Okay.  So am I correct that one topic

4    you and your team were not asked to look at was

5    the history of the disclosure of information

6    regarding the opening of ABC Dry Cleaners?

7              MS. HURT:  Objection to form and

8    foundation.

9              THE WITNESS:  I want to make sure I

10   understand your question.  So when you say the

11   disclosure, do you mean previous attempts to

12   locate information on the opening?

13   BY MR. HUGHES:

14        Q.   What I mean is the contamination is

15   discovered, according to the timelines, around

16   1980.  Does that match your recollection looking

17   at the general facts?

18        A.   Yeah, 1980, the early 1980s concern

19   started to be expressed.

20        Q.   At that point we had some empirical

21   water sampling and lab analysis of samples from

22   the base.  Do you have a general understanding

23   that that happened?

24        A.   I do.

25        Q.   Okay.  Now, Mike Partain's timeline,

Golkow Technologies,
877-370-3377              A Veritext Division              www.veritext.com
Case 7:23-cv-00897-RJ    Document 398-8    Filed 06/04/25    Page 16 of 40

1          THE WITNESS:  Correct.

2     BY MR. HUGHES:

3          Q.   There are different references to the

4     total number of people that may have passed

5     through the gates of Lejeune during that time

6     period could have been a million people.  Have you

7     seen that?

8          A.   I have seen numbers of around a million,

9     yes.

10         Q.   And given what I just walked you through

11    in terms of longevity and dates, would you agree

12    it's reasonable to conclude that there are

13    thousands of people alive today that lived or

14    worked at Lejeune during that statutory time

15    period?

16         MS. HURT:  Objection to form.

17         THE WITNESS:  Yes.

18    BY MR. HUGHES:

19         Q.   Okay.  And your team has not interviewed

20    a single one of them; correct.

21         A.   Correct.

22         Q.   Are you aware that there is a

23    court-ordered repository of documents in this

24    case?

25         A.   I don't Know if I am or not.

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com
Case 7:23-cv-00897-RJ    Document 398-8    Filed 06/04/25    Page 17 of 40

1          Q.   I take it you've never -- you and your
2    staff have never gone to look at the documents in
3    a court ordered repository in this case?
4          A.   I know we've never had such an
5    undertaking, no.
6          Q.   Are you aware that sometimes in large
7    litigations a permanent archive of repository
8    documents would be created?
9          A.   Yes.
10         Q.   Would you agree from a historian's
11   perspective that could be a good thing to help
12   preserve historical information; correct?
13         A.   It's certainly possible, yes.
14         Q.   Would you agree that if the court were
15   to order a permanent repository archive of all the
16   Lejeune documents and data that have been brought
17   forward for this litigation, if a court ordered
18   that, from a historian's perspective that would be
19   a good thing?
20              MS. HURT:   Objection to form.
21              THE WITNESS:   Well, as a historian, I'd
22   like to have everything kept.
23   BY MR. HUGHES:
24         Q.   So is that a yes?
25         A.   Yes.

Golkow Technologies,
877-370-3377              A Veritext Division              www.veritext.com
Case 7:23-cv-00897-RJ    Document 398-8    Filed 06/04/25    Page 18 of 40

1      A.    I would go with one of the conclusion
2    and if I was drafting that sentence on page 26, I
3    would add the word "likely."
4      Q.    Okay.  And that's an iterative aspect to
5    history.  Right?  The historical method is
6    sometimes you have to correct things; right?
7              MS. HURT:  Objection to form.
8              THE WITNESS:  As I said, yes, you do
9    have to correct things.  I said earlier, every
10   generation likes to write its own history.
11   BY MR. HUGHES:
12     Q.    I understand.  So in Dr. Longley's case,
13   he had to correct the Nixon reference; right?
14     A.    Yes.
15     Q.    And there was a demonstrative photo of a
16   water buffalo which was captioned as being at
17   Hadnot, but it wasn't.  He had to correct that;
18   correct?
19     A.    Correct.
20     Q.    There was a photo of the Holcomb
21   Boulevard water treatment plant which I believe he
22   was -- said the photo was dated from one year but
23   it was actually dated from another year.  You
24   remember that?
25     A.    Yes.

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com
Case 7:23-cv-00897-RJ    Document 398-8    Filed 06/04/25    Page 19 of 40

1        Q.   And in his subsequent reports, following

2    your identification of those errors, he tried to

3    fix them; correct?

4              MS. HURT:  Objection to form.

5              THE WITNESS:  Yes.

6    BY MR. HUGHES:

7        Q.   And that's a proper part of an

8    historical methodology; right?

9              MS. HURT:  Objection to form.

10             THE WITNESS:  Yes.

11   BY MR. HUGHES:

12       Q.   Water buffalos -- on the bottom of page

13   2 they talk about water buffalos.

14       A.   One moment.  Okay.  I'm there.

15       Q.   So first, you reference water buffalos

16   or water bulls.  Where did get the phrase "water

17   bulls"?  Do you remember?

18       A.   I do remember.  When I was on base in

19   May of this past year, we were told by Marines

20   that they call them water bulls.  So I put both in

21   to try to be inclusive.

22       Q.   Yes, sir.  Okay.  Do you have an

23   understanding of how the historical water buffalos

24   were filled mechanically.  In other words, do you

25   have an understanding of whether they were filled

1       land.
2       BY MR. HUGHES:
3            Q.   On page 26 of your report you cite to
4       the deposition of Mr. Melts; correct?
5            A.   Yes, that's correct.
6            Q.   And you cite to how the ATSDR cited to
7       the Melts deposition; correct?  That's at the top
8       of the page.
9            A.   Yes, footnote 75 is reference to the
10      ATSDR documents.
11           Q.   Yes.
12           A.   And then that continues into footnote 76
13      and footnote 77.
14           Q.   Are you aware that Mr. Melt's deposition
15      is linked on the timeline on the website, The Few,
16      the Proud?
17           A.   Yes.
18           Q.   And you are aware that there are places
19      in that deposition where Mr. Melts testifies to
20      the effect that ABC was running in 1953; correct?
21               MS. HURT:  Objection to form.
22               THE WITNESS:  Correct.
23      BY MR. HUGHES:
24           Q.   Okay.  If we keep going, on page 27 we
25      have an image on the Camp Lejeune High School

Golkow Technologies,
877-370-3377                    A Veritext Division                    www.veritext.com
Case 7:23-cv-00897-RJ    Document 398-8    Filed 06/04/25    Page 21 of 40

1    yearbook from 1954; correct?

2         A.    Yes.

3         Q.    How did you all find that, if you know?

4         A.    This was -- I was made aware of that by

5    the DOJ.  I went to Classmates.com and bought my

6    own copy -- reproduction of this document.

7         Q.    Okay.  Do you know why the Model and

8    Hobby Shop ad is reversed on the right-hand side?

9    It's upside down.

10        A.    Yes, it's really upside-down, and I

11    don't know why that happened, unless somebody put

12    the book together wrong.

13        Q.    The viewpoint for that is that the Model

14    and Hobby Shop, as best you can tell, was on the

15    same premises as what ABC Dry Cleaners ended up

16    being on.  And so your inference is if the Hobby

17    Shop was in the yearbook in 1954, then the dry

18    cleaners couldn't have replaced it for the whole

19    year of 1954.  Is that fair?

20             MS. HURT:  Objection to form.

21    BY MR. HUGHES:

22        Q.    Put it in your own words.

23        A.    That's fine.  Other documents talk about

24    that the ABC One Hour Cleaners went in where the

25    Hobby Shop had been.  So my inference is not just

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com
Case 7:23-cv-00897-RJ    Document 398-8    Filed 06/04/25    Page 22 of 40

1    based on the yearbook.

2         Q.   Okay.  And so the difference between the

3    1953 date and the 1954 date is less than a year;

4    correct?

5              MS. HURT:  Objection to form.

6              THE WITNESS:  It would be approximately

7    ten months.

8    BY MR. HUGHES:

9         Q.   And you don't have any knowledge of

10   whether that ten months makes any significant

11   difference in the water modeling analysis; right?

12             MS. HURT:  Objection to form.

13   BY MR. HUGHES:

14        Q.   How are you using the word

15   "significant"?

16        A.   If you look at the reports by the

17   Plaintiffs' experts on Phase 1, they indicate that

18   even if you move the start date for ABC ahead or

19   back by 10 months, the contamination still occurs

20   and grows and gets to the levels that the ATSDR

21   estimated using a curve that's pretty similar,

22   whether it's the 52 days or the 54 days.

23             But the question I'm asking you is, you

24   don't have an opinion one way or another as to

25   whether it makes a difference in the analysis;

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com
Case 7:23-cv-00897-RJ     Document 398-8     Filed 06/04/25     Page 23 of 40

1 correct.

2         MS. HURT:  Objection to form.

3         THE WITNESS:  I have done a lot of these

4 TCE cases and you asked initially about the

5 Harrington Army Airfield.

6 BY MR. HUGHES:

7     Q.  Yes, I did.

8     A.  I have a lay person's knowledge, like

9 fate and transport, and that's all it is.  So I

10 know some time difference can make a little bit of

11 change, but I'm not qualified to say how much.

12     Q.  Fair enough.  Then we get to the grand

13 opening ad on page 28.  How did you guys find this

14 back issue of the Jacksonville Daily News?

15     A.  This was provided to me by the

16 Department of Justice.

17     Q.  So when you say that, does that mean

18 they found it and gave it to you, versus your team

19 finding it?

20     A.  My team looked and looked and looked and

21 they were unable to find a back issue of the

22 Jacksonville Daily News.

23     Q.  Yes, sir.  But then your client found it

24 for you?

25         MS. HURT:  Objection to form.

Golkow Technologies,
877-370-3377    A Veritext Division    www.veritext.com
Case 7:23-cv-00897-RJ    Document 398-8    Filed 06/04/25    Page 24 of 40

1          THE WITNESS:  We were looking for it.
2     We had heard about it.  We couldn't find it.  It
3     was given to us.  We tried to find it again
4     ourselves, but we were unable to.
5     BY MR. HUGHES:
6          Q.   And the yearbook, that's another one you
7     couldn't find, your team couldn't find it, but the
8     Government could find if for you?
9          MS. HURT:  Objection to form.
10          THE WITNESS:  Again, I don't recall how
11     I became aware of the yearbook.  I went out, as I
12     said, on Classmates.com and was able to view the
13     page in question, so I bought it.
14     BY MR. HUGHES:
15          Q.   But you had been told about this first;
16     right?
17          A.   Yeah, I was provided with the entire
18     page.
19          Q.   All right.  The bottom of page 27, a
20     grand opening advertisement.
21          A.   Right.
22          Q.   Sitting here today, do you know whether
23     ABC One Hour Cleaners was in operation on June 28,
24     1954?
25          MS. HURT:  Objection to form.

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com
Case 7:23-cv-00897-RJ    Document 398-8    Filed 06/04/25    Page 25 of 40

1      A.    I see now.  Thank you.

2      Q.    Have you revised any of your opinions

3    since the date of the February 7th, 2025, report?

4      A.    Well, you previously asked and as I

5    responded, Dr. Longley did correct the errors --

6    Dr. Longley's most recent report he made

7    corrections to some of the errors that I pointed

8    out in this report, if that makes sense.

9      Q.    Yes, sir.  On page 1, you say -- first

10   numbered paragraph, you talk about three instances

11   where you say that:  Dr. Longley entirely and

12   egregiously misrepresents the source material;

13   correct?

14     A.    Which point was that under, sir?  Okay,

15   thank you.

16     Q.    We talked about it earlier.  You find

17   three instances where Dr. Longley's report was

18   incorrect.  The first was the Nixon photo, the

19   second one was the demonstrative photo of water

20   buffalos at Hadnot Point, and the third was the

21   date range for the Holcomb water plant.  Are those

22   the three instances you are talking about?

23     A.    Yes, they are.

24     Q.    And your understanding is he has sought

25   to correct those three in his subsequent report?

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com
Case 7:23-cv-00897-RJ    Document 398-8    Filed 06/04/25    Page 26 of 40

1        A.    Yes.

2        Q.    Okay.  Now page 1, the numbered

3    paragraph 2 --

4        A.    Okay.

5        Q.    -- at the end of it you say -- first

6    page:  Although Hadnot Point is the center of many

7    activities at Camp Lejeune, there are other areas,

8    et cetera.

9            So you will agree with me, correct, that

10   during our historical time period Hadnot Point was

11   the center of many activities at Camp Lejeune?

12           MS. HURT:  Objection to form.

13           THE WITNESS:  Yes, I have never denied

14   that.

15   BY MR. HUGHES:

16       Q.    Top of page 2, you note -- you discussed

17   other water treatment plants, the ones aside from

18   Hadnot and Tarawa.  And you said the ATSDR did not

19   conclude that those other water treatment plants

20   were further contaminated; correct?

21       A.    That's what I said.

22       Q.    Having said that, you are not aware of

23   whether there were significant levels of

24   trichloromethane found in the New River Air

25   Station system in the early 1980s; correct?

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com
Case 7:23-cv-00897-RJ    Document 398-8    Filed 06/04/25    Page 27 of 40

1          Q.   Do you agree that there are things in

2     Dr. Longley's report that are not included in your

3     report?

4          A.   I would say quite a bit.

5          Q.   And there are things in your report that

6     are not in Dr. Longley's report; correct?

7          A.   Again, I would say there is quite a bit.

8          Q.   On page 3 of your second report, towards

9     the bottom you cite to Mike Magner's book.  Do you

10    see that?

11         A.   Yes, I'd do:  A Trust Betrayed.

12         Q.   Did you read the book?

13         A.   I have the book.  I reviewed it.  I'm

14    not going to say I read it word by word.  When I

15    purchased these books, I was looking for

16    historical information.

17         Q.   Did you find Mike Magner's book to be

18    reliable as far as you could tell?

19              MS. HURT:  Objection to form.

20              THE WITNESS:  I just don't recall.  It's

21    been nearly a year ago.

22    BY MR. HUGHES:

23         Q.   Okay.  But you did cite it in your

24    report; correct?

25         A.   I certainly listed it here.  I don't

1    recall if I cited it in the body of my report.

2         Q.   Fair enough.  And then on page 4 -- this

3    is your second report February 2nd, 2025 -- top of

4    page 4, you cite to reports prepared by ATSDR;

5    correct?

6         A.   Yes, I do.

7         Q.   Including a summary of the water

8    contamination situation at Camp Lejeune dated 2024

9    from the website; correct?

10        A.   Yes.

11        Q.   And the Maslia publication in the

12   journal called Water from 2016; correct?

13        A.   Yes.

14        Q.   And there is no caveat here.  In other

15   words, I don't see here whether as a historian you

16   commented that either one of these publications

17   was not entirely reliable; correct?

18             MS. HURT:  Objection to form.

19             THE WITNESS:  I did not say that.

20   BY MR. HUGHES:

21        Q.   As far as you know, those two

22   publications are entirely reliable; correct?

23             MS. HURT:  Objection to form.

24             THE WITNESS:  I certainly think they are

25   reliable.

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com
Case 7:23-cv-00897-RJ    Document 398-8    Filed 06/04/25    Page 29 of 40

 1           THE WITNESS:  Yeah, corroborative
 2     sources would good.
 3     BY MR. HUGHES:
 4           Q.   And you understand since the time of his
 5     first report, Dr. Longley, he's endeavored to do
 6     more work.  He, for example, took the formal oral
 7     history recording of Mr. Partain and
 8     Mr. Ensminger, which has been provided; correct?
 9           A.   Yes.
10           Q.   On page 13 of your report, you see
11     numbered paragraph 6?
12           A.   Yes.
13           Q.   Okay.  And it talks about six lines
14     down, how the depositions were taken in 2024 -- or
15     the declaration was in 2024, but that was four
16     years after the individuals were at Lejeune.  You
17     see that?
18           A.   Yes.
19           Q.   And as we discussed, you are aware now
20     that on the U.S. Marines official website there
21     are oral histories of individuals that relate to
22     historical events going all the way back to World
23     War II; correct?
24           A.   Yes.
25           Q.   And so clearly, in some cases oral

Golkow Technologies,
877-370-3377                    A Veritext Division                    www.veritext.com
Case 7:23-cv-00897-RJ     Document 398-8     Filed 06/04/25     Page 30 of 40

 1    histories can be of oral historians who are being

 2    asked to recall events from decades earlier and it

 3    can be a meaningful and valuable process; correct?

 4              MS. HURT:  Objection to form.

 5              THE WITNESS:  That's correct.  That is

 6    exactly what I was saying in the paragraph just

 7    discussed.

 8    BY MR. HUGHES:

 9         Q.   Well, what -- tell me what you are

10    saying.  I was focused on the reference to

11    40 years after.

12         A.   Okay.  The deposition was taken in 2024,

13    and the declarations were written 2024, some

14    40 years after these individuals were at Camp

15    Lejeune.  So that is certainly the case.

16              My concern, what I was pointing out was

17    really the last sentence where I wrote:  Without

18    additional source material, Dr. Longley cannot

19    make assertions about what transpired at other

20    times during the 34-year statutory period.

21              So this goes to something else we were

22    talking about, point-in-time references.

23    Sometimes they are very, very good at telling us

24    exactly what happened at a given time in history.

25    But I think all historians, we have to be careful

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com
Case 7:23-cv-00897-RJ    Document 398-8    Filed 06/04/25    Page 31 of 40

1    we don't extrapolate too much from those types of
2    documents.
3         Q.    Okay.  So one phrase there to focus on
4    is "additional source material"?  Right?
5         A.    Yes.
6         Q.    And that goes back to what we talked
7    about about additional source material can be
8    helpful; correct?
9         A.    Yes.
10        Q.    All right.  Then if we go to page 18 on
11   this report.
12        A.    I'm there.
13        Q.    On page 18, we see the screenshot from
14   Longley's first report where he had a photo of the
15   water treatment plant near Holcomb Boulevard and
16   it was captioned 1960s.  But you went behind -- or
17   your team did -- and you found that fact-checking
18   it, actually that picture was from August 10th,
19   1972; correct?
20        A.    That's correct.
21        Q.    And so your point -- one of your points
22   is that the photo is actually of the Holcomb
23   Boulevard plant in '72, while that is also
24   consistent with what we read from the ATSDR about
25   when the Holcomb plant opened; correct?

Golkow Technologies,
A Veritext Division
877-370-3377                                        www.veritext.com
Case 7:23-cv-00897-RJ    Document 398-8    Filed 06/04/25    Page 32 of 40

1      Q.   Right.  And you considered it relevant
2    to this issue of when ABC Dry Cleaners started;
3    right?
4      A.   Absolutely.
5      Q.   But that work -- to your knowledge, no
6    work like that was done back in 2012; right?
7           MS. HURT:  Objection to form and
8    foundation.
9           THE WITNESS:  Not to my knowledge, no.
10   BY MR. HUGHES:
11     Q.   And as of 2012, if you look at page 6 of
12   Dr. Longley's report, the VA was actually using
13   the Partain website to train it's own people.
14          MS. HURT:  Objection to form and
15   foundation.
16   BY MR. HUGHES:
17     Q.   You see the VA slide on page 6; right?
18     A.   I'm looking at it right now.
19     Q.   Did you all fact-check this?  Do we
20   know?  Did you fact-check this?
21     A.   This should have been fact-checked, yes.
22     Q.   And do you have any reason to critique
23   it or dispute it sitting here today?
24          MS. HURT:  Objection to form.
25          THE WITNESS:  I have no reason to think

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com
Case 7:23-cv-00897-RJ    Document 398-8    Filed 06/04/25    Page 33 of 40

1        Q.    And on the timeline they would have

2    seen, if they looked long enough, the reference to

3    ABC starting in 1953; correct?

4            MS. HURT:  Objection to form.

5            THE WITNESS:  Yes, looking at it, they

6    would have.

7    BY MR. HUGHES:

8        Q.    Look at page 13, if you will.  Do you

9    see a bigger image of the bus schedule on page 13?

10       A.    Yes.

11       Q.    This one is the youth activities bus

12   schedule; correct?  It says it at the top.

13       A.    Yes.

14       Q.    And this is cited as coming from The

15   Globe, July 26, 1962; right?

16       A.    Right.

17       Q.    You all would have fact-checked it?

18       A.    Yes.

19       Q.    And sitting here today, you don't have a

20   critique; correct?

21       A.    No, I don't.

22       Q.    And if we go to page 14, you see a photo

23   from The Globe from '83 showing a cultural event,

24   the Guess Who rock band at Camp Lejeune; right?

25       A.    Yes, indeed.

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com
Case 7:23-cv-00897-RJ    Document 398-8    Filed 06/04/25    Page 34 of 40

1          Q.   If you go to page 16, you can see a
2     picture of the bowling alley at Hadnot in 1964
3     from The Globe; right?
4          A.   Yes.
5          Q.   And y'all fact-checked that as well?
6          A.   Correct.
7          Q.   Page 17, the cattle cars.  Now, in
8     Longley's report here he says:  Brigham also omits
9     mention of cattle cars.  Do you see that sentence,
10    page 17?
11         A.   Yes, that's just what I was reading.
12         Q.   Is that true?  Did you omit mention of
13    cattle cars in your first report?
14         A.   I did not discuss cattle cars.
15         Q.   Why not?
16         A.   Well, again, it really was not what I
17    was tasked to do in my report.
18         Q.   Your report talks about travel.
19         A.   Well, yes, it does.  But it's really
20    more the areas of the base.
21         Q.   Which the cattle cars would go to?
22         A.   That's true.
23         Q.   But your point is the omission was not
24    malicious in nature; right?
25         A.   No.

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com
Case 7:23-cv-00897-RJ     Document 398-8     Filed 06/04/25     Page 35 of 40

1    at 14:34.

2              (Whereupon, the deposition was recessed

3    from 2:34 p.m. to 2:43 p.m.)

4              We are on the record at 14:43.

5    BY MR. HUGHES:

6         Q.   Dr. Brigham, let's mark and show you

7    Exhibit Number 6.

8                   (Whereupon, Deposition Exhibit

9                   No. 6 was marked for

10                  identification.)

11   MY MR. HUGHES:

12        Q.   I will represent this is a copy of

13   Dr. Longley's report dated March 17th, 2025.  Have

14   you seen this one before?

15        A.   Yes.

16        Q.   All right.  Have you and your group done

17   fact-checking on it to your knowledge?

18        A.   We have reviewed it.  My staff, we've

19   gone through it.  I'm not sure of the degree of

20   fact-checking we did on the first report.

21        Q.   Are there any Nixon type inaccuracies in

22   it as we sit here today that you are aware of?

23        A.   None come to mind right now.

24        Q.   If you look at page 2, first full

25   paragraph beginning "It is noteworthy..."  do you

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com
Case 7:23-cv-00897-RJ    Document 398-8    Filed 06/04/25    Page 36 of 40

1    months?  Am I doing my math right?  It would be an
2    awful lot to do to get an expert report together
3    in four months.  I had a lot of people doing a lot
4    of different things.
5         Q.   Okay.  All right.  So from a perspective
6    of being an expert historian in a case, four
7    months -- if you had your druthers, you would
8    rather have more than four months to do a project
9    like this; is that true?
10        A.   It is true.  Because there are many
11   things in historical research that are out of the
12   historian's control, like how many hours can you
13   work at the Archives?  How many hours can you go
14   to the Library of Congress?  You don't want to be
15   gone forever.  But four-month would be a very
16   tight schedule.  Obviously that changed, which was
17   helpful.
18        Q.   If you look at page 25 going to 26 of
19   this report from Dr. Longley, do you see the
20   string cites with excerpts from other oral
21   histories on the U.S. Marines website?
22        A.   You said 25 on to 26?
23        Q.   Yes.
24        A.   Yes, I see this.  I've seen this before.
25        Q.   And you can see how it is referencing

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com
Case 7:23-cv-00897-RJ    Document 398-8    Filed 06/04/25    Page 37 of 40

1    here things like the commissary, NCOs, Tarawa

2    Terrace, et cetera; correct?

3         A.    Yes, I see those things you just

4    mentioned.

5         Q.    Would you agree that culling this sort

6    of information can be useful in terms of

7    historical methodology on a topic like the history

8    of Lejeune and the water contamination and water

9    use at Lejeune?

10              MS. HURT:  Objection to form.

11              THE WITNESS:  Yes, it certainly could

12   prove useful.

13   BY MR. HUGHES:

14        Q.    At page 27, do you see the notes for the

15   Allan Howard witness dated August 2024?  Do you

16   see that?

17        A.    Yes, toward the bottom, yes.

18        Q.    Now, as I understand your testimony, a

19   formal full-fledged oral history would have a

20   recording and a transcript.  It wouldn't be just

21   be paraphrase or a summary; correct?

22        A.    Correct.

23        Q.    However, you will agree that a

24   historian, it's not required for a historian have

25   to have a reliable methodology for him only to use

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com
Case 7:23-cv-00897-RJ     Document 398-8     Filed 06/04/25     Page 38 of 40

1           A.    Yes.

2           Q.    But you would also agree that

3    Mr. Partain can still be a reliable public

4    historian, notwithstanding the fact that he came

5    to a different conclusion than you did as to the

6    start date?

7                 MS. HURT:  Objection to form.

8                 THE WITNESS:  Yes.  In the instance of

9    ABC One Hour Cleaners, my choice of June of 1954

10   is based on the research that my staff and I did.

11   BY MR. HUGHES:

12          Q.    I understand.  Do you think that someone

13   needs to have a Ph.D. in history to be qualified

14   as an expert in history for court purposes?

15          A.    No, I know people who don't have Ph.D.s

16   who have given testimony in court.

17          Q.    As historians?

18          A.    Yes.

19          Q.    As historian experts?

20          A.    Yes.

21          Q.    Give me an example.

22          A.    A number of years ago I had a

23   navigability for title project, and a person from

24   a firm similar to MorganAngelBrigham testified and

25   the individual had his master's degree.

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com
Case 7:23-cv-00897-RJ    Document 398-8    Filed 06/04/25    Page 39 of 40

1       Q.   From what you've seen of Mr. Partain,

2   could he be qualified as a historian expert?

3          MS. HURT:  Objection to form.

4   Foundation.

5          THE WITNESS:  I can't say one way or

6   another.  I'd have to just do more review.

7   BY MR. HUGHES:

8       Q.   Okay.  Well, we encourage you to do

9   that.  If you look at page 6 going into page 7 of

10  his report, at the bottom of page 6, he says:  A

11  final goal of this paper and project is to

12  memorialize this work in an academic database such

13  as the University of Central Florida's

14  STARS(Showcase of Text, Archives, Research and

15  Scholarship) Digital Repository and preserve the

16  Camp Lejeune Community Digital Archive in a

17  sustainable manner for future scholars to utilize.

18  Do you see that language?

19      A.   Yes.

20      Q.   From what you have seen of the The Few

21  and the Proud website, would you agree with me

22  that it has useful historical information on it?

23         MS. HURT:  Objection to form.

24         THE WITNESS:  Yes.

25  BY MR. HUGHES: