# EXHIBIT 8

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE EASTERN DISTRICT OF NORTH CAROLINA

3

    IN RE:                          )

4                                   ) Case No. 7:23-cv-00897

    CAMP LEJEUNE WATER LITIGATION   )

5                                   )

                                    )

6    This Document Relates to:      )

    ALL CASES                       )

7    _____)

8

9

10                      - - -

11                  APRIL 3, 2025

12                      - - -

13

14          Videotaped deposition of RODNEY KYLE

15    LONGLEY, Ph.D. conducted at The U.S. Department of

16

17    Justice, 411 W. Fourth Street, Suite 800, in Santa

18

19    Ana, California, commencing at 9:36 A.M. PST on the

20

21    above date before Pamela Cotten, CSR, RDR, Certified

22

23    Realtime Reporter, Certificate No. 4497.

24

25                      - - -

```
1     A P P E A R A N C E S:
2
      For the Defense:
3
              U.S. DEPARTMENT OF JUSTICE
4             BY:  HANLEY GIBBONS, ESQ.
                   CINDY HURT, ESQ.
5             P.O. Box 340, Ben Franklin Station
              Washington, D.C.  20044
6             hanley.w.gibbons@usdoj.gov
              cindy.hurt@usdoj.gov
7
8
9     For the Plaintiffs:
10            WALLACE AND GRAHAM, PA
              BY:  JOHN S. HUGHES, IV
11            525 North Main Street
              Salisbury, North Carolina  28144
12            704.633.5244
              Fax - 704.633.9434
13            jhughes@wallacegraham.com
14
15    ALSO PRESENT:
16            MICHAEL KELLEY, Videographer
              (714) 904-0891
17
18
19
20
21
22    (Appearances continued on the following page)
23
24
25
```

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com
Case 7:23-cv-00897-RJ    Document 398-9    Filed 06/04/25    Page 3 of 12

```
 1    A P P E A R A N C E S (Continued):

 2

 3    ALSO PRESENT REMOTELY VIA ZOOM:

 4            JESSICA ANS, ESQ.
             U.S. DEPARTMENT OF JUSTICE

 5
             SARA J. MIRSKY, ESQ.

 6           U.S. DEPARTMENT OF JUSTICE

 7           SHARON SPRAYREGEN, ESQ.
             U.S. DEPARTMENT OF JUSTICE

 8
             LESLIE LaMACCHIA, ESQ.

 9           Bell Legal Group

10           WHITNEY WALLACE, ESQ.
             Wallace & Graham, P.A.

11
             JAY BRIGHAM, Ph.D.

12           Morgan, Angel, Brigham & Associates, LLC

13           PETER C. JONES, M.A.
             Senior Research Associate

14           Morgan, Angel, Brigham & Associates, LLC

15           ANNEMARIE MOORE, Ph.D.
             Senior Research Associate

16           Morgan, Angel, Brigham & Associates, LLC

17           DENNIS REICH, ESQ.
             PLG

18

19

20

21

22

23

24

25
```

1     A    But, again, if that's the question, that's

2    easy to address.

3     Q    Understood.

4     A    But I would go back and say there was one

5    thing I would point out, Dr. Kelman, for example,

6    critiquing common knowledge about what life was like

7    on -- in terms of physical training and things like

8    that, a military historian would have no doubt that

9    that is common knowledge.  You as a former officer

10    would have no doubt, that is just common knowledge.

11    But, again, I don't think he had an expertise in

12    military history or 20th Century history to be able

13    to understand.  I wouldn't go back and critique him

14    on some of his 19th century choices.

15     Q    That's fair enough.

16     A    Yeah.

17     Q    But would you be able to analyze his

18    historical methodologies for how he arrived at his

19    conclusions?

20     A    I would to a point.  For example, I would

21    question him wholeheartedly on how he determined how

22    I evaluated my oral history and bias and things like

23    that.  Much like I would not question him on that, I

24    would trust him as a professional that he had

25    already made those decisions, and given the long

Golkow Technologies,
877-370-3377       A Veritext Division       www.veritext.com
Case 7:23-cv-00897-RJ    Document 398-9    Filed 06/04/25    Page 5 of 12

1    track record I have in that area, I would think he

2    would respect that.

3         Again, as I noted in Report 3, nobody has

4    ever came back and questioned my oral histories.

5         Q    Would you say that the sources you relied

6    on, then, were biased in some way?

7         A    All sources are biased.

8         Q    Okay.

9         A    Everything has been used and any -- whether

10   it is Dr. Kelman's work or wherever it may be, you

11   always have to try to ascertain what the bias is.

12   You have to understand the context of something --

13   for example, Dr. Kelman has never interviewed

14   someone that actually was alive for the event.  He

15   interviewed people about their memory of the event.

16   He didn't interview anyone from the massacre in 1864

17   for the obvious reasons.  So that's a different

18   beast than interviewing somebody about memory.

19        Q    Interesting.

20             Did you address the potential biases

21   anywhere in your report?

22        A    No.  You do that in the -- when you are

23   evaluating the sources themselves.  For example, a

24   government report depends on who is writing the

25   report.  Is the Marine Corps writing the report?  Is

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com
Case 7:23-cv-00897-RJ     Document 398-9     Filed 06/04/25     Page 6 of 12

1    the EPA writing the report?  You try to do that to
2    the best of your ability throughout the process of
3    evaluating your research.  And I think that's
4    something that I, you know -- again, anything can
5    have a bias.  And, again, you got to contextualize
6    it.  You can't put a document that is from the 1960s
7    and then try to use the current context to say that
8    1960s document within -- what is going on in 2025.
9    You wouldn't want to do that with DADT.  "Don't Ask,
10   Don't Tell."  It is a very different discussion in
11   the 1990s than it is in 2025, although it has almost
12   come full circle.
13        Q    So I understand your point.  My question is
14   did you describe that process anywhere in your
15   report?
16        A    No.  You don't do that.  That's not
17   what's -- a description in a book or things of that
18   order.  As a professional historian, it is
19   understood that you are going to be testing your
20   materials, much like I would not question
21   Dr. Kelman's oral history for his book on Sand Creek
22   the oral histories he did with National Park Service
23   because I know he understands that the National Park
24   system person that he interviewed extensively has a
25   bias because she is running the monument.  And she

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com
Case 7:23-cv-00897-RJ    Document 398-9    Filed 06/04/25    Page 7 of 12

```
 1        is also afraid of what could be interpreted, and so,

 2        like with anything, you understand people a lot of

 3        times what they say isn't always exactly what

 4        they -- they always have that context in mind.

 5             Q    Okay.

 6                  MR. HUGHES:  I'm going to ask that we go

 7        off the record for a bit and talk.  I've gotten some

 8        texts from co-counsel, and I need to talk to y'all

 9        about it off the record.  Is that okay?

10                  MS. HURT:  Sure.

11                  MR. GIBBONS:  Yeah, can we wait just like

12        five minutes or is this urgent?

13                  MR. HUGHES:  They have a concern about

14        people that are showing up on the -- on the

15        attendance and they are highly concerned that this

16        reading of assistance, being on without advance

17        permission is not what leadership agreed to.  So I

18        need to get you on the phone with them as soon as we

19        can.

20                  MR. GIBBONS:  Okay.  All right.  Let's take

21        a break.  Give me one second.

22                  VIDEO OPERATOR KELLEY:  This is the end of

23        Media File Number 2.  We are now going off the

24        record.  The time is 11:21 a.m.

25                  (Recess taken.)
```

Golkow Technologies,
877-370-3377                A Veritext Division                www.veritext.com
Case 7:23-cv-00897-RJ    Document 398-9    Filed 06/04/25    Page 8 of 12

1          VIDEO OPERATOR KELLEY:  This is the
2     beginning of Media File Number 3.  We are now going
3     on the record.  The time is 11:36 a.m.
4          MR. HUGHES:  This is John Hughes for the
5     plaintiffs.  I'm putting on the record that from the
6     plaintiffs' point of view, the language in the
7     deposition protocol about attendance and the
8     language about assistance or people assisting the
9     litigation does not mean that automatically parties
10    can have experts attend depositions without advance
11    approval.  We are fine with continuing this
12    deposition today with Dr. Brigham or people on his
13    team on the attendance.  We ask that before the next
14    deposition of an expert that the lead counsel talk
15    to each other and see if they can work out a
16    protocol for that.
17          What we suggest is that the protocol would
18    be that if either side wants to have experts on
19    depositions of other experts, that they give advance
20    notice so there's notice and consent.
21          And so that is my statement for the record.
22    And I understand that Mr. Gibbons' position is that
23    the plaintiffs themselves have had experts on one or
24    more occasions without advance consent and so he is
25    not willing to agree to a protocol right now, but

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com
Case 7:23-cv-00897-RJ     Document 398-9     Filed 06/04/25     Page 9 of 12

1    Maslia, a retained expert of the plaintiffs,

2    attended the expert depositions of Remy Hennet and

3    Alex Spiliotopoulos with no prior coordination, and

4    the United States did not object then.  The United

5    States maintains that any person who is assisting in

6    litigation includes experts attending all other

7    expert depositions.

8            MR. HUGHES:  Okay.  Thanks for letting me

9    speak, and I understand what you said.

10           You want to continue with your questioning?

11           MR. GIBBONS:  Sure.

12   BY MR. GIBBONS:

13       Q    Dr. Longley, I apologize for that.  I

14   believe we were talking about bias and sources, oral

15   histories, or other materials.  I would like to go

16   back to that.

17           I believe you said that your position is

18   that a professional historian does not need to

19   explain in detail how they evaluated their sources

20   for bias because it is an inherent part of a

21   historian's practice.  Is that correct?

22       A    That is correct.

23       Q    And as we've already discussed, the

24   targeted readers for this report are not generally

25   other historians but primarily the Court.

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com
Case 7:23-cv-00897-RJ    Document 398-9    Filed 06/04/25    Page 10 of 12

1          don't have -- many of them don't have

2          Ph.D.s but they are still

3          practicing.")

4               THE WITNESS:  So I don't think I made any

5     kind of -- again, Bob Caro does not have a Ph.D. nor

6     does Meacham nor does Doris Kearns Goodwin, but most

7     people would recognize them as -- David McCullough.

8     I can give you a whole litany.  So I wouldn't say

9     they had to have a Ph.D.  You can be a good

10    researcher without a Ph.D. and so that is not a

11    qualification that obviously has to be there.

12    BY MR. GIBBONS:

13         Q    Okay.  I understand.  Sorry.  Maybe I

14    misinterpreted your answer.  I apologize.

15         A    No apologies necessary.  I just didn't

16    think I had said that.  If my membership found out

17    that I had said something like that, they would come

18    find me.

19         Q    You acknowledged in several of your books,

20    I think specifically in Grunts, that bias always

21    enters into the process as we discussed earlier,

22    correct?

23         A    Correct.

24         Q    Okay.

25         A    And, again, you try to test that bias and

1    again through corroboration, understanding it's

2    there, and cognizant of it, but then weighing that

3    against a variety of factors.

4              (The document referenced below

5         was marked Deposition Exhibit 9 for

6         identification and is appended

7         hereto.)

8    BY MR. GIBBONS:

9         Q    I'm going to enter Exhibit 9.  What is

10   going to be Exhibit 9 is an excerpt from Grunts,

11   American Combat Soldier in Vietnam.

12             You authored this book, correct?

13        A    Yes.

14        Q    Do you recognize this passage from your

15   book?

16        A    Which one?

17        Q    This entire page.  Do you --

18        A    Yes, I recognize the page.  I'm sorry.  I

19   thought you were already referring to something

20   specific.

21        Q    Okay.  Okay.  Beginning on Roman numeral XX

22   of the text toward the end, the last paragraph says:

23             "There are many challenges in the

24        use of materials employed in the

25        study.  Oral histories and memoirs,

Golkow Technologies,
877-370-3377                   A Veritext Division              www.veritext.com
Case 7:23-cv-00897-RJ    Document 398-9    Filed 06/04/25    Page 12 of 12