# EXHIBIT 12

# **DECLARATION OF MIKE PARTAIN**

I, Michael Partain, of full age, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury as follows:

1. According to one of the founders of Public History, Robert Kelly, "Public History refers to the employment of historians and the historical method outside of academia: in government, private corporations, the media, historical societies and museums, even in private practice. Public Historians are at work whenever, in their professional capacity, they are part of the public process. An issue needs to be resolved, a policy must be formed, the use of a resource or the direction of an activity must be effectively planned and an historian is called upon to bring in the dimension of time: this is Public History."[1]

2. My discovery of the Camp Lejeune drinking water issue came shortly after my diagnosis with male breast cancer in April of 2007. The discovery came with a phone call from my father as I was leaving a post-operative doctor's appointment following my radical right mastectomy. My father informed me that he had just watched a CNN news story involving a retired Marine Master Sergeant who testified to Congress earlier that day about how the government was studying the children born at Camp Lejeune from 1968 to 1987 due to their exposures to toxic drinking water at Camp Lejeune, my place of birth in January of 1968. Prior to my diagnosis, I worked as a claims adjuster for State Farm Insurance and before that, I was a History teacher at the International Baccalaureate High School in Bartow, Florida. My undergraduate degree is in History and I subsequently completed my Master's Degree in History in 2021. My thesis was on Camp Lejeune.

3. After the phone call from my father, I rushed home and immediately turned on the TV to view the story my father had called me about and called Capitol Hill. I spoke with the office of Congressman Bart Stupak and left a message requesting they pass my contact information to Msgt. Jerry Ensminger, USMC (Ret). By the time I first spoke to Mr. Ensminger a few days later, he, along with Maj. Tom Townsend USMC (Ret) had been working on the Camp Lejeune drinking water contamination issue for ten years. I had a lot to learn in order to catch up. For the next six months, Jerry and I spoke regularly, often past midnight, as he briefed me on both the course of events and the historical details surrounding the drinking water contamination. During this time, I also began to examine the Marine Corps' website, government inquiries and timeline.

4. It was during this time that Jerry and I realized that we needed a historical timeline of events with citations to help us educate both the media and members of Congress. The timeline itself was modeled after a homework assignment I used to give my I.B. students with their history assignments with one important modification. Due to the fact that we were openly calling into question the Marine Corp's established narrative of the historical record, each entry on the timeline was hyper-linked to the actual Marine Corps, Navy, EPA or State of North Carolina document from which the entry was made. This enabled the reader to instantly fact check our information. Concurrently with the timeline project,

---

[1] Kelley, Robert. "Public History: Its Origins, Nature, and Prospects." The Public Historian, vol. 1, no. 1, 1978, pp. 16–28. JSTOR, https://doi.org/10.2307/3377666. Accessed 16 Mar. 2025.

1

Andrea Byron, a dependent child exposed aboard the base, and I took the website started by Jeff Byron and continued by Mr. Ensminger (and now with me involved), "The Few, The Proud, The Forgotten," and revamped the website to serve as a platform for the Camp Lejeune timelines and the documents the public had at our disposal regarding the contamination events. This project was completed by the Fall of 2008.

5. Throughout this fight for justice, Mr. Ensminger has been one of my primary sources of knowledge for Camp Lejeune and the drinking water contamination. His time aboard the base, his training as a Marine Corps drill instructor and subsequent twenty-five-year career with the Marine Corps has made him an indispensable asset to the community. Simply put, we would never have been able to achieve any form of justice had it not been for Mr. Ensminger and his undying love for his daughter, Janey. My father and grandfather were both Marine officers and while I have knowledge of the Marine Corps culture and history, without Mr. Ensminger, I would not have been able to curate, interpret, and evaluate the mountains of documents pertaining to Camp Lejeune.

6. Following my first visit to Capitol Hill with Mr. Ensminger in January of 2009, it became readily apparent that in order for us to gain any headway with Congress, we had to locate, organize, and educate our community. Many of the Marines and their families who served aboard Camp Lejeune during the contamination period from 1952-1987 left the base and returned back to small town America. My family was no exception and we settled in Florida two years after my father left the Marine Corps. My education in the field of History was critical in this regard, as we were engaged in a fight for justice with what I termed the "Institution of honor integrity". Mr. Ensminger held me and all of us involved to a high standard of conduct, as would be expected of any historian who would otherwise be accused of bias. As Mr. Ensminger told me and countless others, "don't speculate, don't be sensationalistic and if you can't back up your statements with a document or fact, keep your mouth shut! Because, if you don't and make an unsubstituted claim to the media or congress, our credibility and our fight is over." I applied the academic standards I learned as an undergraduate, the skill sets acquired as a teacher and the investigative nature of my work as a claims adjuster for property and liability claims to all of my research and work for the Camp Lejeune drinking water issue.

7. One of the roles Mr. Ensminger, Mr. Townsend and I have undertaken over the years has been to serve as representatives of the community to the government agency tasked with investigating the health effects for our exposures at Camp Lejeune. The Agency for Toxic Substances and Disease Registry (ATSDR) was tasked by Congress under Title 42 to investigate National Priority Listed (NPL) sites such as Camp Lejeune. The main product of their work for NPL sites is what is called a Public Health Assessment (PHA). Camp Lejeune's PHA was initially issued in 1997. Our group was established in 2005 and termed the Community Assistance Panel (CAP). The CAP was comprised of members of the community and academic specialists who volunteered their time. Mr. Ensminger and Mr. Townsend were founding members of the CAP and I joined in 2007. Our meetings were held at the CDC in Atlanta every quarter and were recorded and transcribed by a court recorder. The CAP served as a vital conduit between the government scientists and the community.

8. Initially, our CAP meetings were attended by the Navy's Judge Advocate General attorneys along with members of the Department of the Navy. In April 2009, the voluminous handwritten Freedom of Information Act request submitted by Mr. Townsend along with investigations and research completed by Mr. Ensminger and I led to the ASTDR's withdrawal of their PHA for Camp Lejeune due to errors, missing documentation and the omission of benzene in their assessment. The withdrawal of the Camp Lejeune PHA was monumental because prior to this event, the agency had never rescinded a PHA for an NPL contamination site. Shortly after the April meeting, the Department of the Navy stopped sending their representatives from Camp Lejeune and attorneys to the ATSDR's CAP meetings. Instead, they sent a note taker to record and relay information between the ATSDR, the CAP and the Department of the Navy. It was also at this time that we discovered, through the ATSDR, the Department of the Navy had created a password-protected electronic document portal housing the documents and investigations into the estimated one million plus gallon fuel leak emanating from the base fuel depot over a 50-year period. The fuel from this leak was the source of the benzene missed in the initial ATSDR PHA for Camp Lejeune, to my understanding. The discovery of the electronic portal and subsequent media stories led to an inquiry by the Senate Judiciary Committee to ascertain whether or not the Navy was withholding other key documents about the Camp Lejeune drinking water contamination.

9. Sadly, Mr. Townsend passed away before the Camp Lejeune Justice Act was passed into law. Jerry and I continue to serve on the ATSDR CAP and have been involved in the projects undertaken by the ATSDR including but not limited to the health studies for Camp Lejeune, the Camp Lejeune water modeling projects, and the first of its kind Cancer Incidence Study on Camp Lejeune utilizing the cancer registries for all of the states in the U.S. Our role as CAP members was to provide information about the community and the base and suggestions for future studies. Often, we found ourselves functioning as fact checkers of the historical background used by the ATSDR in their work. Our meetings were open to the public and many times, members of the Camp Lejeune community at large were in attendance. Mr. Ensminger and I interviewed these people to expand our knowledge aboard the base, the history and the day-to-day lives of others who lived, served and worked at Camp Lejeune. In turn, we interacted with the scientists of the ASTDR to provide information for their work that many times was not otherwise available.

10. In one instance, we were shocked to discover that the Department of the Navy had failed to provide the well operation logbooks and the water treatment plant operation logbooks to the ATSDR scientists working on the water models for Camp Lejeune. Without these materials, the scientist had to make scientific estimates on which group of wells operated for a water treatment plant on any given day and what volume of water each well produced. These critical documents should have been retained under CERCLA documentation retention requirements when the base was listed on the NPL in 1989, to my understanding. Mr. Ensminger and I located a surviving water treatment plant operator to assist the ATSDR with their understanding of how the base's water treatment systems operated during the contamination period. This same former water treatment

3

plant operator also turned over to me well logbooks and a water treatment plant logbook he found in the trash in the 1990s for one of the water treatment systems aboard the base. It was not from one of the systems (Hadnot, Tarawa, Holcomb) under investigation by the ATSDR. But these surviving logbooks showed that such logbooks indeed used to exist, but now the others had apparently been lost by the Department of the Navy. I showed these documents to the ATSDR scientists and kept these documents until I turned them over to be placed in the document repository created by a Court Order in this ongoing matter, where they now can be found. The historical logbooks we recovered had entries dating back decades, as far back as the 1960s or earlier.

11. A testament to the validity of our work on Camp Lejeune is the fact that between Mr. Ensminger and myself, we have been asked to testify eleven times before Congress about the Camp Lejeune contaminated drinking water issue and we have both been guests to the White House for the Presidential signing of both of Camp Lejeune legislations. Our work was also memorialized in the award-winning documentary titled: "Semper Fi: Always Faithful", released in 2011.

12. According to the ATSDR, up to an estimated one million Marines, Sailors, their families and base employees were exposed to the contaminated drinking water at Camp Lejeune between 1952 through 1987. Unlike their civilian counterparts across the country, the day-to-day life and operations aboard domestic military bases are not preserved for posterity and study beyond what is known as Command Chronologies. The base newspaper, The Globe, does provide us with an insightful weekly snapshot of base life and is a useful tool. Military communities aboard bases, like Camp Lejeune, are transitory in nature. A military base is a closed community inaccessible to the general public. Without preservation, critical knowledge about life during the Camp Lejeune drinking water contamination will be left to speculation. Our population is also aging and fading into history.

13. As a Historian, I feel that I have an obligation to raise the following question to the Court: as an element of appropriate relief under the Camp Lejeune Justice Act, may the Court consider taking steps to Order that there be a program to actively record the oral histories from this community? Camp Lejeune represents one of the biggest, if not the largest documented public drinking water contamination exposure event in this country's history. Do we not owe it to future historians and public health scientists to capture as much information as we can about the exposed population at Camp Lejeune? Unfortunately, some, like my father, have passed. However, many others, like my mother and myself, remain. Through us and others, we have a collective memory which I respectfully submit needs to be preserved. In this digital age, it is a far less daunting task than when the World War II Oral History projects were first undertaken in the late 1980s, forty years after the close of the war. Yet, clearly it was felt by the Marines that recording these oral histories for World War II survivors was worthwhile forty or more years after the fact, as such oral histories can be found on the Marines website today.[2]

---

[2] *See* https://www.lejeune.marines.mil/Offices-Staff/Environmental-Mgmt/Cultural-Resources/Preservation-in-Action/Oral-History-Project.aspx.

14. In the context of Camp Lejeune, many who passed through the base from the 1950s to the 1980s are still alive. The time elapsed from 1955 to 2025 is 70 years but from 1985 to 2025 is only 40 years. There are many living individuals who were at Camp Lejeune during the relevant period and were exposed to and consumed the contaminated water. Obtaining their oral histories could be of great assistance for future work to assess and analyze the effects of the water and chemical exposures and could be combined with obtaining DNA and blood samples and medical data for future scientific study.

15. It is also my hope that the document repository that has now been created by Court Order may be sustained into the future so that materials can be protected and archived, for the benefit of the service members, their families, their descendants, the general public and for purposes of medical science and other academic study and research. One or more universities may have an interest in assisting with such a project.

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 17, 2025 in _Homosassa_, Florida.

_____
Michael Partain