# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF NORTH CAROLINA

### Civil Action No.: 7:23-CV-00897

| | | |
|---|---|---|
| IN RE: CAMP LEJEUNE WATER LITIGATION | ) ) ) | PLAINTIFFS' MEMORANDUM IN RESPONSE TO DEFENDANT |
| This Pleading Relates to: | ) ) | UNITED STATES' MOTION TO EXCLUDE VAPOR INTRUSION |
| ALL CASES. | ) ) ) | EVIDENCE AND TESTIMONY |

3247241.3

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................................. 1

II.     LEGAL STANDARD .......................................................................................... 3

III.    STATUTORY BACKGROUND ........................................................................ 5

IV.    ARGUMENT ...................................................................................................... 8

       A.      The Motion should be denied because it is premature............................ 8

       B.      Even under the Government's reading of the statute, the evidence is not clearly inadmissible for any purpose. ................................................. 10

       C.      The bench-trial format provides additional reasons to deny the motion. ............ 14

       D.      The Government is mistaken about the meaning of the CLJA. .......................... 16

V.     CONCLUSION ................................................................................................. 22

CERTIFICATE OF SERVICE ................................................................................... 24

Plaintiffs, through the Plaintiffs' Leadership Group ("PLG"), pursuant to Local Civil Rules 7.1 and 7.2, and the Order at D.E. 332, hereby respectfully file their response to Defendant United States' Motion in Limine to Exclude Vapor Intrusion Evidence and Testimony. See D.E. 361 (motion), 366 (brief). The motion should be denied.

## I.    <u>INTRODUCTION</u>

Many months before trial, and in the midst of ongoing expert development, the government asks this Court to grant a blanket motion in limine permanently excluding any evidence (at all) concerning "soil or groundwater vapor intrusion and emissions at Camp Lejeune." Mot. at 1.[1] This motion in limine should be denied for several reasons.

*First*, it is premature. The parties are currently in the midst of expert discovery as to Phase 2 (general causation) and Phase 3 (specific causation). The context necessary for this Court to decide the ultimate relevance of water-vapor evidence has not yet been developed. *See Quintero v. Nat'l R.R. Passenger Corp.*, No. 3:20-cv-05677-TL, 2022 WL 4093120, at \*BL 314726, at \*10-11 (W.D. Wash. Sept. 7, 2022) (reserving ruling where plaintiff argued that evidence surrounding a train derailment might be useful as context for the plaintiff's damages); *United States v. Verges*, No. 1:13cr222 (JCC), 2014 WL 559573, at \*3 (E.D. Va. Feb. 12, 2014) ("Though it is difficult to foresee how evidence regarding Verges's child is relevant to the case at hand . . . . [i]t is impossible to conclude that all evidence regarding Verges's child is irrelevant without knowledge of the

---

[1] *See, e.g.*, United States Environmental Protection Agency, webpage entitled "What is Vapor Intrusion," stating in part that "Vapor intrusion occurs when there is a migration of vapor-forming chemicals from any subsurface source into an overlying building." Available at https://www.epa.gov/vaporintrusion/what-vapor-intrusion (last visited May 13, 2025). *See also* ATSDR, webpage entitled "Vapor Intrusion PHA," stating: "Volatile chemicals in contaminated shallow groundwater can evaporate and move upward through the ground surface into indoor air of overlying or nearby buildings—this process is called vapor intrusion (VI)." Available at https://www.atsdr.cdc.gov/camp-lejeune/php/public-health-assessments/vapor-intrusion-pha.html (last visited May 13, 2025).

3247241.3

specific content or purpose for which it will be put forth."); *Luce v. United States*, 469 U.S. 38, 41 (1984) (holding that factual context was required for the court to overturn a lower court's denial of a motion in limine).

*Second*, it is unclear whether the government's central contention—that exposure to water "supplied" by the United States is the *only* kind of water that can ever be considered in a CLJA action—will be relevant to the Track One Plaintiffs. Until the Court has information reflecting an actual issue on the admissibility of "vapor intrusion" evidence at trial, this motion is premature. This is especially true given that the CLJA litigation is currently proceeding via bench trials, in which the need for motions *in limine* are at a minimum given that the Court is both gatekeeper and factfinder. Similarly, there is no prejudice in waiting until trial to decide this complex question of statutory interpretation.

*Third,* if the motion is considered on the merits, there are factual contexts in which vapor intrusion evidence may be relevant and admissible at trial. Therefore, the government cannot carry its burden to show that the evidence would be clearly inadmissible for all purposes. This, too, is reason enough to deny the motion.

Finally, the government's interpretation of the CLJA is incorrect. In order to sue under the CLJA, it is true that a plaintiff must show sufficient exposure to water "supplied by, or on behalf of, the United States." CLJA § (a)(1). But in order to satisfy the burden of proof under the CLJA, a plaintiff is entitled to show a causal relationship between his harm and "the water at Camp Lejeune." CLJA § (b)(1)-(2). That broader term includes more than just government-supplied water. It includes any water so long as it was present at Camp Lejeune. Groundwater is water. The groundwater at Camp Lejeune was present at Camp Lejeune. Evidence about that kind of water is therefore relevant. The Court should reject the government's interpretation of the CLJA.

For all of these reasons, the motion should be denied. At a minimum, the Court should defer ruling until trial.

## II. <u>LEGAL STANDARD</u>

The purpose of a motion in limine is to obtain a preliminary ruling on the admissibility of a particular evidentiary matter at trial. *Luce*, 469 U.S. at 40 n.2. Generally, relevant evidence is admissible unless a statute or rule provides otherwise. Fed. R. Evid. 402. Even on the eve of trial— rather than months in advance, as here—motions *in limine* are disfavored. "[T]he Federal Rules of Evidence do not explicitly authorize *in limine* rulings . . . ." *Luce*, 469 U.S. at 41 n.4. Although a district court of course has "inherent authority to manage the course of trials," "[a] reviewing court is handicapped in any effort to rule on subtle evidentiary questions outside a factual context." *Id.* at 41 & n.4; *see generally Wright & Miller's Federal Practice & Procedure* § 5037.10 (4th ed. 2025) ("Federal appellate courts have generated a weighty list of reasons to justify their hostility to the definitive motion in limine," *i.e.*, a motion like this one that "aims for a final determination of the admissibility of evidence.").

Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence, and the fact is of consequence in determining the action. Fed. R. Evid. 401. According to Fourth Circuit case law, this is a "fairly low bar." *United States v. Elsheikh*, 103 F.4th 1006, 1026 (4th Cir. 2024).

The Court may exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. Fed. R. Evid. 403. "Relevance and prejudice under Rules 401 and 403 are determined in the context of the facts and arguments in a particular case, and thus are generally not amenable to broad per se rules." *United States v. Laudermilt*, 576 F. App'x 177, 181 (4th Cir. 2014) (quoting *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379,

3

387 (2008)). Where a party seeks to introduce evidence that is probative, "the balance under Rule 403 should be struck in favor of admissibility, and evidence should be excluded only sparingly." *United States v. Lentz*, 524 F.3d 501, 525 (4th Cir. 2008) (quoting *United States v. Aramony*, 88 F.3d 1369, 1378 (4th Cir. 1996)).

Under Rules 702 and 703 (as relevant here), expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). The question is not whether an expert's testimony is a "necessity" but whether it will help the trier of fact. *United States v. Brawner*, 173 F.3d 966, 969 (6th Cir. 1999). Under Fourth Circuit law, this simply requires that expert testimony must be "relevant to a fact at issue." *Sardis v. Overhead Door Corp*., 10 F.4th 268, 281 (4th Cir. 2021). Even if expert's opinion is excluded for failure to assist the trier of fact, "the inadmissibility of the expert's ultimate opinion does not necessarily banish him from the stand altogether, because his specialized knowledge may still assist the trier of fact in other ways." *Kopf v. Skyrm*, 993 F.2d 374, 378 (4th Cir. 1993).

Because these evidentiary matters are often not ripe until sufficient information is developed, "[c]ourts routinely defer ruling on motions in limine and evidentiary matters until they have enough information." *Sharp v. Best,* No. 4:21-CV-185-BO, 2025 WL 349724, at *1 (E.D.N.C. Jan. 29, 2025) (quoting *Finch v. Covil Corp.*, 388 F. Supp. 3d 593, 612 n.14 (M.D.N.C. 2019), *aff'd*, 972 F.3d 507 (4th Cir. 2020)); *see also Thomas v. Babb*, No. 5:10-CV-52-BO, 2015 WL 1275393, at *2 (E.D.N.C. Mar. 19, 2015) ("The Court will reserve its ruling on defendants' motion in limine until trial."); *SMD Software, Inc. v. Emove, Inc.*, No. 5:08-CV-403-FL, slip op. at 2 n.1 (E.D.N.C. Nov. 18, 2013) (in denying motion in limine, noting that "[t]he court does not resolve at this time evidentiary objections better suited for address in the context of trial") Ex. 1.

Further, a court can exclude evidence via a motion in limine only if the evidence is "clearly inadmissible for any purpose." *Brown v. United States*, No. 2:21-cv-03801-DCN, 2024 WL 4117328, at *4 (D.S.C. Sept. 9, 2024) (quoting *Hall v. Sterling Park Dist.*, No. 96 C 50116, 2012 WL 1050302, at *2 (N.D. Ill. Mar. 28, 2012)). *See also United States v. Paredes*, 176 F. Supp. 2d 179, 181 (S.D.N.Y. 2001) ("Evidence should be excluded on a motion in limine only when the evidence is clearly inadmissible on all potential grounds.").

## III.   STATUTORY BACKGROUND

The Camp Lejeune Justice Act ("CLJA") contains two provisions relevant here.

The first provision is codified in § 2(a).  That provision is aptly titled "In General."  And that provision creates a *general* threshold requirement for bringing suit against the government *at all*:

> (a) IN GENERAL.—An individual, including a veteran (as defined in section 101 of title 38, United States Code), or the legal representative of such an individual, who resided, worked, or was otherwise exposed (including in utero exposure) for not less than 30 days during the period beginning on August 1, 1953 and ending on December 31, 1987 to <u>water at Camp Lejeune</u>, North Carolina, that was <u>supplied by, or on behalf of, the United States</u> may bring an action in the United States District Court for the Eastern District of North Carolina to obtain appropriate relief for harm that was caused by exposure to the water at Camp Lejeune.

CLJA § (a)(1) (emphasis added).

Thus, to even *bring* a claim under the CLJA, a plaintiff must have been exposed "for not less than 30 days [during the years 1953-1987] . . . to water at Camp Lejeune, North Carolina, that was <u>supplied by, or on behalf of</u>, the United States."  CLJA § 2(a) (emphasis added).  The statute goes on to say what happens if a plaintiff satisfies that requirement: he or she "may bring an action in the United States District Court for the Eastern District of North Carolina."  *Id.*  In other words, once a plaintiff meets this threshold requirement, the courtroom doors are unlocked and the

plaintiff has standing. But satisfying this requirement does not mean that the plaintiff is entitled to judgment in his or her favor.

The second relevant provision is codified in Section 2(b). That provision is far more specific than the general one detailed above. It is entitled "Burdens and Standard of Proof." *Id.* And unlike that threshold provision—while merely defines how a plaintiff gains access to the federal courthouse and secures standing—this second provision details exactly what a plaintiff must show in order to receive judgment in his or her favor:

> (b) BURDENS AND STANDARD OF PROOF.—
>
> (1) IN GENERAL.—The burden of proof shall be on the party filing the action to show one or more relationships between <u>the water at Camp Lejeune</u> and the harm.
>
> (2) STANDARDS.—To meet the burden of proof described in paragraph (1), a party shall produce evidence showing that the relationship between exposure to <u>the water at Camp Lejeune</u> and the harm is—
> > (A) sufficient to conclude that a causal relationship exists; or
> > (B) sufficient to conclude that a causal relationship is at least as likely as not.

CLJA § (b)(1)-(2) (emphasis added).

Thus, to *succeed* on a claim, a plaintiff must produce certain kinds of "evidence" regarding the "relationship between exposure to <u>the water at Camp Lejeune</u> and the harm." CLJA § 2(b)(1), (b)(2) (emphasis added).[2] If the plaintiff does so, then he or she is not simply entitled to sue. He or she is entitled to judgment.

As made clear above, these two provisions have different purposes. The first defines the standard for bringing suit. The second defines the standard for winning one. And the two

---

[2] In particular, the plaintiff must present evidence "sufficient to show that a causal relationship exists" or "sufficient to conclude that a causal relationship is at least as likely as not." CLJA § 2(b)(1)(A), (B).

3247241.3

provisions use materially different language to define what *kind* of water counts for these two different purposes. The threshold provision asks about a plaintiff's exposure to "water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States." CLJA § 2(a). The second provision asks about a plaintiff's exposure to "the water at Camp Lejeune." CLJA § 2(b)(2). The first provision requires that the relevant water be government-supplied. The second provision does not. And critically, there is no definition section, cross-reference, or other indication that the phrase "water at Camp Lejeune" is a shorthand for "water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States." Indeed, in four separate places, the Act does not limit the term "water" by the "supplied" language but rather, only by the "at Camp Lejeune" language. *See* § 804(b) (last clause -- "water at Camp Lejeune"), (c)(1) ("the water at Camp Lejeune"), (c)(2) ("the water at Camp Lejeune"), (d)(2)(B) ("the water at Camp Lejeune").

These distinctions in statutory language are material ones. They make a practical difference in who can bring suit under the CLJA—and who can ultimately recover. Turning first to the threshold provision of § 2(a): if a plaintiff drank water at Camp Lejeune for only 29 days—rather than 30—that would not be enough to bring suit. The government could then move to dismiss. And that dismissal would occur *even if* the plaintiff demonstrated that 29 days of exposure was causally linked to his injury under the relevant standards laid out in Section 2(b).

Turning next to the causation provision of Section 2(b): A plaintiff is entitled to judgment so long as he can show the requisite relationship between his harm and "the water at Camp Lejeune" *simpliciter*. To be sure, in order to get into the courthouse, he or she must first satisfy the threshold requirement of 30 days' exposure to government-*supplied* water. But once he or she

7

has done so, the causation question concerns not just exposure to water "supplied by or on behalf of the United States." It concerns exposure to "the water at Camp Lejeune" writ large.

IV.    **ARGUMENT**

   A.    **The Motion should be denied because it is premature.**

As explained below, Plaintiffs respectfully dispute the government's statutory interpretation and submit that a broader construction of the CLJA is proper. But notwithstanding the merits of that argument, there is certainly no need to resolve it at this time.

When bringing a motion in limine, a party must "identify the specific evidence he fear[s] would be admitted." *United States v. Bradford*, 905 F.3d 497, 505 (7th Cir. 2018). Here, the most the government can muster is that it "anticipates" that Plaintiffs "may offer evidence or testimony about vapor intrusion and emissions at Camp Lejeune." Br. at 1 (emphasis added). But the government's anticipation does not provide enough facts on which the Court can make a determination as to whether (as yet hypothetical) evidence would ultimately be admissible at trial.

As it stands now, it is currently unclear whether—and to what extent—vapor-intrusion evidence will be relevant at all to the causation case presented by any Track One Plaintiffs. The issue of specific causation which is encompassed in expert Phase Three (residual experts), has not yet been briefed. D.E. 332. It is the Plaintiffs' specific causation experts, in Phase Three, who will provide opinions with regard to the issue of exposure and specific causation for each of the 25 Track One Plaintiffs. The government does not seek to challenge the Plaintiffs' ability to reference evidence of steam and vapor released from that potable water, *e.g.*, shower steam or cooking steam. Br. at 10 n. 1 (conceding this point). Because the Track One Plaintiffs can satisfy their causation burden based on exposure to finished water contaminant alone, the motion filed by the Government seeks to have the Court address an unposed and hypothetical question.

3247241.3

In the end, the government's complaint seems to be that certain portions of the Phase One expert reports might potentially be used later in a way that the government believes is not supported by the statutory text. That kind of complaint is premature given the developing factual record. *See United States v. Barletta*, 644 F.2d 50, 57 (1st Cir. 1981) ("[M]any motions to exclude can be decided only on the basis of detailed consideration of other evidence to be introduced at trial."); *Richardson v. Mo. Pac. R.R. Co*., 186 F.3d 1273, 1276 (10th Cir. 1999) ("Normally, such weighing [of relevance and any prejudicial effect] should be done against a backdrop of the actual evidence at trial, making a final decision in a pretrial hearing highly unlikely."); *Wright & Miller*, *supra*, § 5037.15 ("[T]he quintessential ruling that is 'context dependent' is the court's balancing of probative worth against the countervailing factors in Evidence Rule 403."). As a result, this issue need not be decided at this time.

By deferring the issue until it actually arises in reality for a particular Plaintiff, the Court may avoid having to set a bright-line rule with unintended consequences. For example, it is possible that there may be a claimant who worked at the water treatment plants and was exposed to the raw water as it was being processed and treated and then released as finished water. Should any vapor exposure that they suffered, before the water was sufficiently processed to be deemed "finished," be deemed excluded because the water was not yet "supplied" by the Defendant? Is the water only "supplied" once it enters the pipes for distribution after leaving the water treatment plant? As another hypothetical, assume a situation in which contaminated finished water is used to water lawns or wash vehicles and is then absorbed into the ground, later to re-emerge as vapor intrusion in buildings. In that event, would the analysis be that any contribution to the vapor intrusion from the previously finished water can be counted as claimant exposure, but any vapor intrusion attributable to other groundwater cannot?

9

Even under the government's (mistaken) interpretation of the statute, the answers to each of these questions are far from clear. The Court should avoid wading into this thicket now and deny the motion. At a minimum, the Court should reserve ruling—as numerous courts have done in analogous situations.[3] *See Nickerson v. State Farm Mut. Auto. Ins. Co.*, No. 5:10-CV-105, 2011 WL 5192317, at *1 (N.D.W. Va. Oct. 31, 2011) (deferring a ruling on a motion in limine); *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, No. 2:10-CV-248, 2011 WL 7036048, at *2 (E.D. Va. July 5, 2011) (deferring a ruling on a motion in limine so that court could rule on issue as it arises in context of the trial); *Humbert v. O'Malley*, No. WDQ-11-0440, 2015 WL 1569182, at *4 (D. Md. Apr. 6, 2015) (deferring ruling on motions in limine involving questions of relevance and prejudice which could not be resolved outside of the context of trial).

### B. Even under the Government's reading of the statute, the evidence is not clearly inadmissible for any purpose.

Alternatively, considering the motion on the merits, the government has failed to meet its burden for prevailing on its motion in limine. Specifically, the government cannot show that evidence and testimony regarding vapor intrusion would be "clearly inadmissible for any purpose." *See Brown*, 2024 WL 4117328, at *4 (quoting *Hall*, 2012 WL 1050302, at *2) (holding that this showing is required); *see also Paredes*, 176 F. Supp. 2d at 181 ("Evidence should be excluded on a motion in limine only when the evidence is clearly inadmissible on all potential grounds."). Notwithstanding whether Track One Plaintiffs introduce evidence that they were exposed to vapor

---

[3] It is appropriate to note that as of the date of the filing of this brief, the ATSDR is still in the process of a lengthy, multi-year study of vapor intrusion at the base. *See* ATSDR, webpage entitled "Vapor Intrusion PHA," *supra*. When and if study results and conclusions are one day issued while the CLJA litigation remains pending, those study results could further inform the issue. Accordingly, the pendency of the ATSDR study is another reason why the Court need not and should not address the issue at this time, particularly when it is not relevant to the claim of any Track One Plaintiff.

10

intrusion separate from the finished water to prove causation, information on vapor emissions or exposure may nevertheless be relevant and useful for the Court in its capacity as the trier of fact. This is an independent reason to deny the motion.

Vapor, evaporation, steam, and volatilization from the use of the finished water is certainly covered by the statute. The government concedes this point. *See* Br. at 10-11 n.1, 5. The use of the finished water may lead to the release of water vapor and steam and of emissions of chemical contaminants causing harm. For example, Plaintiffs expect to present evidence regarding vapor coming from steam in barracks showers or vapor arising from use of hot water in kitchens or mess halls. The mechanism by which molecules of chemical contaminants such as PCE, TCE, VC and benzene may be released via finished water vapor is similar to the mechanism by which those chemical molecules can also be released via vapor intrusion into buildings. In both situations, as a matter of the fate and transport of the chemical contaminants, they may be liberated and breathed, leading to inhalation exposure. It is proper for experts to comment on the vapor intrusion topic as part of their overall testimony regarding the contaminant properties. Accordingly, vapor intrusion is one part of the overall science and study of these chemicals and may be properly discussed, *e.g.*, by Plaintiffs' experts in connection with general background and science as to these chemicals.

Stated differently, vapor intrusion is part of the history of Camp Lejeune. It is relevant to a discussion of the historical background and nature of the base contamination issues. It is a significant enough issue that it became part of the exhaustive, years-long and still-ongoing study efforts by the ATSDR. That ongoing study work not only concerns vapor intrusion in general, but vapor intrusion also specifically with regard to relevant contaminants. Experts should not be prohibited from testifying about vapor intrusion to the extent the topic is relevant and useful as

11

part of their overall testimony on the ATSDR issues. As part of phase one, Plaintiffs' experts have commented in their reports on vapor intrusion, as reflected by the excerpts filed by Defendant with their motion. *See* D.E. 366-1 through -3.

> As the ATSDR has described:
>
> Vapor intrusion is a way that volatile chemicals (see text box) in soil and groundwater can enter and build up inside buildings. When chemicals spill or leak into the ground, they can contaminate the soil and the groundwater. Depending on the type and amount, these chemical vapors can possibly affect your health if you breathe them in indoor air. If scientists suspect that people are being exposed to chemicals through vapor intrusion, they may conduct a vapor intrusion investigation….
>
> Volatile chemicals are a class of chemicals that are volatile (evaporate easily) and form a vapor in the air. Some common volatile chemicals include the dry cleaning chemical tetrachloroethylene and benzene which is a component of automotive gasoline.[4]

Of course, the chemicals consisting of tetrachloroethylene (aka perchloroethylene or PCE) and benzene are chemicals at issue in the case. Depending on the context and the circumstances at trial, evidence regarding the issue of vapor intrusion at the base may be relevant to the topic of the presence of tetrachloroethylene and benzene at the base and in the finished water supply.

For example, at trial Defendant may seek to offer evidence and testimony trying to minimize the scope of the contamination at the base or the volatile contaminant properties of these chemicals. In addressing and rebutting such contentions, Plaintiffs should be entitled to put on evidence that, in fact, the chemical contamination was heavy, and the volatile nature of these molecules makes them more toxic. Plaintiffs contend that the fact that there were such significant quantities of these chemicals in the groundwater that it has led to evidence of vapor intrusion so

---

[4] *See* "Investigating Vapor Intrusion," available at https://www.atsdr.cdc.gov/media/pdfs/2024/10/atsdr-vapor-intrusion-investigation-H.pdf (last visited May 12, 2025), and linked as "ATSDR Vapor Intrusion Fact Sheet" at ATSDR website at https://www.atsdr.cdc.gov/camp-lejeune/php/public-health-assessments/ongoing-public-health-assessment.html (last visited May 12, 2025).

as to justify a vapor intrusion study by the ATSDR is relevant. So too is evidence that, unlike other chemicals, these particular volatile organic compounds are molecules which behave in a way which allows them to liberally be released into the air and into the lungs – which is the very reason why these particular chemicals are associated with vapor intrusion problems. By trying to gag Plaintiffs from referencing the vapor intrusion properties of these dangerous chemicals, the Defendant improperly seeks to restrain Plaintiffs' ability to present important background and foundational science as to these chemicals.

Again, as ATSDR has stated:

The same contaminants that were present in drinking water at MCB Camp Lejeune may also be of concern for vapor intrusion. These include chlorinated solvents, such as trichloroethylene (TCE), tetrachloroethylene (PCE), vinyl chloride (VC), and related compounds and hydrocarbon compounds, such as benzene, toluene, ethylbenzene, xylenes, and others.[5]

Insofar as it is the "same contaminants" which are at issue with regard to the Plaintiffs' claims for exposure to finished water and that are at issue with regard to the ongoing vapor intrusion study, it is clearly possible that there are situations which may arise at trial in which Defendant may open the door for Plaintiffs to present evidence addressing the vapor intrusion issue. Accordingly, Defendant fails to show that vapor intrusion evidence would be clearly inadmissible at trial. *See Davis III v. Spicer*, No. 1:21-cv-00874-SRF, slip op. at 1 (D. Del. Feb. 17, 2023) ("Evidence should not be excluded pursuant to a motion in limine, unless it is clearly inadmissible on all potential grounds.") (citing *Laws v. Stevens Transport, Inc.*, , 2013 WL 4858653, at *1 (S.D. Ohio Sept. 11, 2013) Ex. 2; *Looney Ricks Kiss Architects, Inc. v. Bryan*, Civ. A. No. 07-572, 2010 WL 5393864,

---

[5] ATSDR, Public Health Response, Work Plan, Evaluation of Potential Exposures from Vapor Intrusion, US Marine Corps Base Camp Lejeune at p. 1 (July 24, 2018), https://www.atsdr.cdc.gov/camp-lejeune/media/pdfs/Camp-Lejeune-VI-Work-Plan-508.pdf.

3247241.3

at *1 (W.D. La. Dec. 22, 2010); *Knowles Elec., LLC v. Microtronic U.S., Inc.*, No. 99 C 4681, 2000 WL 310305, at *1 (N.D. Ill. Mar. 24, 2000).

### C. The bench-trial format provides additional reasons to deny the motion.

The Court previously ruled that Plaintiffs have no right to a jury trial. D.E. 133. In other bench trial settings, courts have noted that preliminary motions *in limine* may be inefficient and unnecessary for several reasons. *First*, because the jury is absent, there is no danger of confusing the jury through having the jury hear evidence or testimony that should have been excluded. *Cf.* Fed. R. Evid. 403.

*Second*, because it is the Court which acts as the finder of fact, it is the Court which will have to adjudicate the evidentiary issue regardless of whether it is present before trial proceedings in a motion in limine, or, during the trial proceedings.

*Third*, in a bench trial proceeding, a court may take a more permissive view of admissibility. Likewise here, the necessity for Defendant's motion in limine is undercut by the fact that the Court has construed the Act as not to permit jury trials as of right. *See, e.g., United States v. Heller*, 551 F.3d 1108, 1112 (9th Cir. 2009) (in a bench trial, the need for an advance ruling on a motion in limine to exclude evidence is "generally superfluous"); *Crane-McNab v. County of Merced*, No. 1:08-cv-01218-WBS-SMS, 2011 WL 94424, at *1 (E.D. Cal. Jan. 11, 2011) (same – noting that the proponent's rationale that motion could save time "is outweighed here by the additional time that would be used in litigating the motions before trial and by the loss of the court's ability to consider evidence in the context of the trial and weigh the probative value of the evidence against the admissibility concerns"); *Hilb Rogal & Hobbs Co. v. Sellars*, No. 07 CVS 19339, 2010 WL 11700756, at *1 (N.C. Super. Ct. Jan. 15, 2010) ("In a jury trial, motions in limine serve the useful purpose of giving counsel advance notice of the scope of evidence that will be considered by the jury. In a bench trial, however, a pretrial ruling on the admissibility of evidence

would be superfluous because the trial judge must (in any event) consider the evidence before ruling."); *Upsher-Smith Lab'ys, LLC v. Zydus Pharms. (USA) Inc.* No. 21-1132-GBW, 2024 WL 3487935, at *1 (D. Del. July 18, 2024) (finding that in a bench trial setting, concerns of confusing the jury did not apply: "While Rule 403 permits the Court to exclude relevant evidence if its relevance is outweighed by the potential for 'unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence,' the portion of Rule 403 referring to prejudicial effect and misleading the jury 'has no logical application in bench trials.' Indeed, USL provides no basis to find that Dr. Tyler's evidence would cause delay or wasted time-this is a bench trial, and any time waste redounds to Zydus.") (quoting *Gulf States Utils. v. Ecodyne Corp.*, 635 F.2d 517 (5th Cir. 1981) and citing *Allen v. Ollie's Bargain Outlet, Inc.*, 37 F.4th 890, 909 (3d Cir. 2022) (Porter, J., concurring); *Wright v. Elton Corp.*, No. CV 17-286-JFB, 2022 WL 1091280, at *1 (D. Del. Apr. 12, 2022). S*ee also Novartis Pharms. Corp. v. Breckenridge Pharm. Inc.,* Civ. A. Nos. 14-1043, 14-1196, 14-1289, 2016 WL 11693821, at *1 (D. Del. Aug. 25, 2016) (denying the parties' motions to exclude each other's expert witnesses in a bench trial setting and observing that "[l]ive testimony and cross-examination are much more likely to result in a correct decision from me about whether the experts are giving appropriate scientific testimony" and that the Court "will only consider evidence actually adduced at trial (whether through cross-examination or testimony from other witnesses) in ruling on any renewed motion"); *Gogol v. City of New York*, No. 15 Civ. 5703(ER), 2018 WL 4616047, at *5 (S.D.N.Y. Sept. 26, 2018) (reserving decision on motion in limine in bench trial until the trial); *Zambito v. United States*, No. 18-CV-3612(SIL), 2025 WL 788930, at *3 (E.D.N.Y. Mar. 11, 2025) ("In a bench trial, the preference is for the admissibility of evidence."); *Com. Funding Corp. v. Comprehensive Habilitation Servs., Inc.*, No. 01 Civ. 3796(PKL), 2004 WL 1970144, at *5 (S.D.N.Y. Sept. 3, 2004) ("While standards

for admissible evidence are not out the window entirely in a bench trial, all doubts at a bench trial should be resolved in favor of admissibility.") (citation omitted).

Given these material differences in the way evidence is evaluated in a bench trial, there is even less need to grant this motion.

**D.     The Government is mistaken about the meaning of the CLJA.**

Finally, the government's interpretation of the CLJA is simply incorrect. Although 30 days' exposure to government-supplied[6] water is required for *standing* under the statute, causation may be based on exposure to any water at Camp Lejeune—whether government-supplied or not.

**1.     The ordinary meaning of "the water at Camp Lejeune" includes groundwater at Camp Lejeune.**

As the government concedes, this analysis should begin with the ordinary meaning of the CLJA. Br. at 8. When "the statute's language is plain," the analysis not only begins there, but ends there as well. *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A.*, 530 U.S. 1, 6 (2000) (quoting *United States v. Ron Pair Enters. Inc.*, 489 U.S. 235, 241 (1989), in turn quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917))). In that situation, "the sole function of the courts . . . is to enforce [the statute] according to its terms." *Id. (*quoting *Hartford*, 530 U.S. 1 at 6); *see also In re Camp Lejeune Water Litig.*, No. 7:23-CV-897, 2024 WL 457770, at *4 (E.D.N.C. Feb. 6, 2024), D.E. 133 at 7 (agreeing that the "ordinary meaning" of a statute is typically controlling).

The language in question is the phrase "the water at Camp Lejeune." The ordinary meaning of that phrase encompasses all "water" ($H_2O$) found "at" a certain place, namely Camp Lejeune.

---

[6] The parties agree that water "supplied by . . . the United States" encompasses the finished water at the base. By finished water is meant, water that was processed through the base's relevant water treatment plants ("WTPs") and distributed and made available to individuals as potable water. By owning and operating the supply wells, WTPs and other infrastructure, the United States "supplied" that finished water.

3247241.3

Contrary to the government's arguments, therefore, that phrase *does* encompass "[water] vapors emanating directly from groundwater" at Camp Lejeune. Br. at 1. And ATSDR has agreed that "vapor intrusion is a potential pathway of exposure to shallow groundwater contaminants." Br. at 3 (citing ATSDR, Vapor Intrusion PHA).

Nor is the government correct when it says that "finished 'drinking' or 'tap' water at Camp Lejeune" is the *only* kind of water that is relevant under the CLJA. Br. at 17. Whether finished or unfinished, in the ground or in the tap, water remains water. To the extent that water is found at Camp Lejeune, it counts as "the water at Camp Lejeune" under the CLJA.[7]

### 2. The interpretive canons confirm this interpretation.

If there were any doubts that this is the proper interpretation of the statute, the interpretive canons dispel them. The "ordinary meaning rule is the most fundamental semantic rule of interpretation." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 69 (2012); *see also United States v. George*, 946 F.3d 643, 645 (4th Cir. 2020) ("[W]e apply the plain meaning of the statute, which is determined by reference to its words' ordinary meaning at the time of the statute's enactment.") (citation omitted); *United States v. Abdelshafi*, 592 F.3d 602, 607 (4th Cir. 2010) (similar); *United States v. Simmons*, 247 F.3d 118, 122 (4th Cir. 2001) (similar). As explained above, the ordinary meaning of "the water at Camp Lejeune" is exactly what it sounds like. Water. At Camp Lejeune. Without limitations.

The general-terms canon makes clear that "general words" are "to be accorded their full and fair scope" and not "arbitrarily limited." Scalia & Garner, *supra*, at 101; *see also United States*

---

[7] The government concedes that the term "water" is not limited to liquids but instead includes "water vapors" at least in the context of showering or cooking with finished water. Br. at 10-11 n.1, 5 (approvingly quoting statements that contaminants in "steam" would be cognizable under the statute). That concession precludes any argument that the groundwater vapors are irrelevant simply because they are in the wrong physical state—*i.e.*, gaseous $H_2O$ rather than liquid $H_2O$.

3247241.3

*v. Weiss*, 52 F.4th 546, 552 (3d Cir. 2022) ("[T]he general-terms canon . . . holds that general terms should be interpreted generally."); *Arizona v. Tohono O'odham Nation*, 818 F.3d 549, 557 & n.4 (9th Cir. 2016); *United States v. Porter*, 745 F.3d 1035, 1042 (10th Cir. 2014) ("General terms are to be given their general meaning.") (citing and quoting Scalia & Garner, *supra*, at 101 for this point). This is because the "point of using general words is to produce general coverage—not to leave room for courts to recognize ad hoc exceptions." Scalia & Garner, *supra*, at 101. The phrase "the water at Camp Lejeune" is a general term. It should be given a general meaning that encompasses all of the water at Camp Lejeune. The Court should reject the government's attempt to insert textual exceptions that appear nowhere in the relevant section of the statute.

Piling on, the presumption-of-consistent usage canon makes clear that the phrase "the water at Camp Lejeune" is broader than the phrase "water at Camp Lejeune that was supplied be, or on behalf of, the United States." *Compare* CLJA § 2(a) *with* CLJA § 2(b). Under the consistent-usage canon, the *same* phrase should "bear the same meaning throughout a text." Scalia & Garner, *supra*, at 170. But "a material *variation* in terms suggests a *variation* in meaning." *United States v. Jones*, 60 F.4th 230, 235 (4th Cir. 2023), *rev'd on other grounds*, 144 S.Ct. 1091 (2024) (quoting Scalia & Garner, *supra*, at 170) (emphasis added); *see also Villarreal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958, 963 (11th Cir. 2016) (same); *United States v. Hernandez-Barajas*, 71 F.4th 1106 n.2 (8th Cir. 2023) (same). For example, if a contract "says *land* in one place and *real estate* later, the second provision presumably includes improvements as well as raw land." Scalia & Garner, *supra*, at 170.

The exact same reasoning applies here. Congress *could have* used the exact same phrase—"water at Camp Lejeune that was supplied by, or on behalf of, the United States"— throughout the CLJA. If Congress had done so, then that phrase would (of course) need to be given the same

18

meaning regardless of where in the statute it had appeared. But Congress did not do that. Instead, Congress used a different phrase—namely "the water at Camp Lejeune." Under the presumption-of-consistent usage canon, that means that the two phrases *cannot* be given the same meaning. And it means that the phrase "water at Camp Lejeune" *must* be given a *different* (and broader) meaning than the *different* (and narrower) phrase "water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States." It must mean all water at Camp Lejeune.

All of this would be different if Congress had *defined* the term "the water at Camp Lejeune" to *mean* "water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States." "Definition sections and interpretation clauses are to be carefully followed." *Scalia & Garner*, *supra*, at 225. And when "a definitional section says that a word 'means' something, the clear import is that this is its *only* meaning." *Id.* at 226; *and see id.* at 227 ("[O]rdinarily, judges apply text-specific definitions with rigor"). But there is no such definition here. Nor is there a "hereinafter," "herein," "see supra," or any other suggestion that Congress was simply using the phrase "the water at Camp Lejeune" as a shorthand for "water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States." Those are in fact different phrases. And nothing in the text suggests that Congress intended those two different phrases to be given the same meaning. Hence they must be given different ones.

### 3. The Government is wrong about the omitted case canon.

The government argues that evidence about the groundwater at Camp Lejeune should be excluded under the "casus omissus (omitted-case) canon." Br. at 9. Under that canon, "nothing is to be added to what the text states or reasonably implies." Mot at 9 (quoting Scalia & Garner, *supra*, at 93-94). And because Congress "did not mention [groundwater] vapor intrusions or emissions anywhere in its statutory text," the government argues, "the silence is dispositive here." Br. at 9.

19

The problem with that argument is that the CLJA is not "silent" on this issue. It simply used a more general term ("water at Camp Lejeune") that encompasses *all* forms of water—tap water, finished water, groundwater, all of it. The omitted-case canon does not empower Courts to exclude specific examples encompassed by a general term once the general term is used. And indeed, the General-Terms Canon flatly *forbids courts* from doing exactly that. *See supra*, at 17.

All of this would again be different if the vapors did not come from *some kind* of water. To take a concrete example, assume a plaintiff tried to show causation based on his exposure to the PCE contained in the drums at the on-base dry cleaner. That kind of exposure might not suffice because it would not implicate "the water at Camp Lejeune" at all. It would be based only on exposure to chemicals that never reached any kind of water at Camp Lejeune. But that kind of exposure is not what this motion is directed toward. It is instead directed toward exposures that arise from a certain *type* of water at Camp Lejeune—namely groundwater. But having used the broad term "water at Camp Lejeune," Congress had no need to use the specific terms "the tap water at Camp Lejeune," "the finished water at Camp Lejeune," "the groundwater at Camp Lejeune," and so on. Congress had said all of those things collectively already. The Court should reject the government's argument based on the omitted-case canon.

### 4. The Government is wrong about the sovereign immunity canon.

The government argues that "the sovereign immunity canon requires a narrow construction." Br. at 14. It does not. Even in the government's view, the sovereign immunity canon applies (if at all) in situations where there is "ambiguity" in the underlying statute. Br. at 14. And there is no such ambiguity here. After first satisfying the threshold 30-day requirement (which does require exposure to government-supplied water), a plaintiff can satisfy the relevant burden-of-proof by showing a causal link between the harm and "the water at Camp Lejeune." The ordinary meaning of that phrase *unambiguously* includes all forms of water at Camp Lejeune,

including groundwater. There is no ambiguity to resolve; hence no reason to deploy the sovereign-immunity canon.

The government responds that Congress waived "sovereign immunity only for exposure to 'water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States,' but no more." Br. at 14. That is true to the extent that the *threshold* showing—required for courthouse access, standing, and the ability to *sue* the government at all—is premised on exposure to government-supplied water. But under the statutory scheme that Congress created, a plaintiff can satisfy his or her burden of proof by showing causal relationships between harm and "water"—any water—so long as it was "at Camp Lejeune."

## 5. The legislative history is irrelevant here.

The government concedes that there is no need to turn to legislative history if "the statute's language is plain." Br. at 14 (quoting *Dep't of Social Services v. Webb*, 908 F.3d 941, 945-46 (4th Cir. 2018)). The language is plain, as detailed above, so there is no need to explore the legislative history.

In any event, the legislative history sheds no definitive light on this issue. True, the legislators spoke about "drinking" water and "tap" water at times. But that is entirely consistent with the plain-meaning interpretation of the statute, given that tap and drinking water are both species of "water" in the same way that groundwater is. And elsewhere, the legislators' statements are much broader, even in the materials cited by the government. The Cartwright press release states that the CLJA was designed to remedy harm caused by "the contaminated water at Camp Lejeune." Press Release, U.S. Dept. of Justice (Sept. 6, 2023). Rep. Eshoo's speech states that the PACT act "establish[es] a federal cause of action related to contaminated water at Camp Lejeune." 168 Cong. Rec. E215 (2022). The House of Representative record states that the bill "also would allow a Federal cause of action related to contaminated water at Camp Lejeune." And

21

there are similar statements throughout that record. *See also* 168 Cong. Rec. H1187-01 (2022) ("I am particularly pleased that this bill includes the Camp Lejeune Justice Act, which gives our service members the opportunity to seek compensation for exposure to contaminated water at Marine Corps Base Camp Lejeune in North Carolina."); *id.* ("H.R. 3967, the Honoring our PACT Act of 2021, recognizes the full range of military toxic exposure, from contaminated water at military bases."); *id.* [168 Cong. Rec. H1187-01] ("[T]wo generations of marines and marine families and employees at Camp Lejeune were poisoned by the water at Camp Lejeune."). All of these statements are entirely consistent with the ordinary-meaning interpretation of § 2(b): When the CLJA says "the water at Camp Lejeune" it means "the water at Camp Lejeune."

## V.    <u>CONCLUSION</u>

The Court should deny the Government's motion in limine to exclude vapor intrusion evidence and testimony. At a minimum, the Court should not grant this motion until a more detailed factual and expert-discovery record is developed.

3247241.3

DATED this 4th day of June 2025.

| | |
|---|---|
| _/s/   J. Edward Bell, III_ | _/s/   Zina Bash_ |
| J. Edward Bell, III (admitted _pro hac vice_)<br>Bell Legal Group, LLC<br>219 Ridge St.<br>Georgetown, SC 29440<br>Telephone: (843) 546-2408<br>jeb@belllegalgroup.com | Zina Bash (admitted _pro hac vice_)<br>Keller Postman LLC<br>111 Congress Avenue, Suite 500<br>Austin, TX 78701<br>Telephone: 956-345-9462<br>zina.bash@kellerpostman.com |
| _Lead Counsel for Plaintiffs_ | _Co-Lead Counsel for Plaintiffs and_<br>_Government Liaison Counsel_ |
| _/s/   Elizabeth J. Cabraser_ | _/s/   W. Michael Dowling_ |
| Elizabeth J. Cabraser (admitted _pro hac vice_)<br>Lieff Cabraser Heimann & Bernstein, LLP<br>275 Battery Street, 29th Floor<br>San Francisco, CA 94111<br>Telephone: (415) 956-1000<br>ecabraser@lchb.com | W. Michael Dowling (NC Bar No. 42790)<br>The Dowling Firm PLLC<br>Post Office Box 27843<br>Raleigh, North Carolina 27611<br>Telephone: (919) 529-3351<br>mike@dowlingfirm.com |
| _Co-Lead Counsel for Plaintiffs_ | _Co-Lead Counsel for Plaintiffs_ |
| _/s/   Robin L. Greenwald_ | _/s/   James A. Roberts, III_ |
| Robin L. Greenwald (admitted _pro hac vice_)<br>Weitz & Luxenberg, P.C.<br>700 Broadway<br>New York, NY 10003<br>Telephone: 212-558-5802<br>rgreenwald@weitzlux.com | James A. Roberts, III<br>Lewis & Roberts, PLLC<br>3700 Glenwood Ave., Ste. 410<br>Raleigh, NC 27612<br>Telephone: (919) 981-0191<br>jar@lewis-roberts.com |
| _Co-Lead Counsel for Plaintiffs_ | _Co-Lead Counsel for Plaintiffs_ |
| _/s/   Mona Lisa Wallace_ | |
| Mona Lisa Wallace (N.C. Bar No.: 009021)<br>Wallace & Graham, P.A.<br>525 North Main Street<br>Salisbury, North Carolina 28144<br>Tel: 704-633-5244<br>mwallace@wallacegraham.com | |
| _Co-Lead Counsel for Plaintiffs_ | |

3247241.3

## CERTIFICATE OF SERVICE

I, J. Edward Bell, III, hereby certify that the foregoing document was electronically filed on the Court's CM/ECF system on this date, and that all counsel of record will be served with notice of the said filing via the CM/ECF system.

This the 4th day of June 2025.

*/s/ J. Edward Bell, III*

J. Edward Bell, III