IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:23-CV-00897

| | | |
|---|---|---|
| IN RE: CAMP LEJEUNE WATER LITIGATION | ) ) ) | PLAINTIFFS' LEADERSHIP GROUP'S OPPOSITION TO UNITED STATES' MOTION TO EXCLUDE GENERAL CAUSATION OPINIONS |
| This Pleading Relates to: | ) ) | |
| ALL CASES. | ) ) | |

Plaintiffs' Leadership Group (the "PLG") respectfully opposes the United States' ("Defendant's") Motion asking the Court to exclude opinions from the PLG's Phase III experts to the extent that they reference general causation.

## I. INTRODUCTION

Defendant asks the Court to exclude portions of the PLG's Phase III expert reports based on the Court's scheduling orders. (DE 409, "Motion") at 2; (DE 410, "Brief") at 10. Defendant's request is untenable and demonstrates a lack of understanding of the fundamentals of how latent disease toxic tort cases are proven in the Fourth Circuit.

First, Plaintiffs did not violate the scheduling order. The Court's scheduling orders have discussed three interrelated phases of establishing causation: Phase 1 consists of experts on water contamination; phase 2 is "general causation;" and phase 3 is *inter alia* "specific causation." As the Court has recognized, exposure, general causation, and specific causation "are not separate elements of a CLJA claim, but rather causation subsumes all three." *In Re Camp Lejeune Water Litigation*, 763 F. Supp. 3d 311, 319 (E.D.N.C. 2024). The concepts are linked and build off one another: both exposure and general causation are often integral parts of an expert's ultimate specific causation analysis. Defendants' own Phase III reports include Phase II (and even Phase I) analysis.

1

Second, even if the Court were to find any violation, the drastic sanction of exclusion is not warranted under Rule 16(f). Defendant has shown no prejudice. Defendant does not argue that Plaintiffs' specific causation experts provide any new arguments on general causation that differ from the record in Phase II. Moreover, two days after Defendant filed this motion, the Court changed its briefing schedule, and combined *Daubert* briefing for general and specific causation on the same timeline. (DE 414). In addition to showing that general and specific causation are interrelated, this schedule change confirms that Defendant has sufficient time to address these related issues together.

Ultimately, this Court is well equipped to consider the evidence without risk of confusion, and no party is harmed by the current sequence in which causation evidence has been disclosed.

## II. FACTUAL BACKGROUND

After discussion at the July 16, 2024 status conference, the Court asked the parties to consider "a single period of expert discovery covering exposure, general causation, specific causation." (DE 258) 2:17–10:14. On August 7, 2024, this Court entered a pretrial expert discovery schedule for toxic chemical exposure, general causation, and "residual experts," including but not limited to specific causation experts. (DE 270). Within this period, the Court required disclosure of PLG's experts on toxic chemical exposure from the water at Camp Lejeune 75 days after the close of fact discovery, experts on general causation 120 days after the close of fact discovery, and experts on specific causation 165 days after the close of fact discovery. (DE 270). On January 2, 2025, this Court set PLG's Phase III disclosure deadline as February 7, 2025. (DE 312). The PLG followed the Court's schedule, and disclosed its specific causation experts on February 7, 2025.

Defendant objects to the discussion, and in some instances the mere mention of, "general causation" by various of the PLG experts disclosed on February 7, 2025, specifically: Thomas Longo, M.D. (Phase III reports in *Criswell* (7:23-cv-01482) and *Dyer* (7:23-cv-00357)); John

Sfakianos, M.D. (reports in *Cagiano* (7:23-cv-00569) and *Laramore* (7:23-cv-00594)); Vincent Bivins, M.D. (report in *Raymond* (7:23-cv-00546)); Vitaly Margulis, M.D. (report in *Downs* (7:23-cv-01145)); Yair Lotan, M.D. (reports in *Downs* and *Fancher* (7:23-cv-00275)); Joseph J. Del Pizzo, M.D. (reports in *Howard*, *Fancher*, and *Mousser* (7:23-cv-00667)); Armine K. Smith, M.D. (reports in *Howard*, *Mousser*, and *Tukes* (7:23-cv-01553)); Damian Laber, M.D. (reports in *Fiolek* (7:23-cv-00062) and *Gleesing* (7:23-cv-01486)); Richard T. Hoppe, M.D. (reports in *Davis* (7:23-cv-00043) and *Howard* (7:23-cv-00490)); Paul J. Michaels, M.D. (report in *Vidana* (7:23-cv-01575)); Richard L. Barbano, M.D. (reports in *Peterson* (7:23-cv-01576) and *McElhiney* (7:23-cv-01368)); Heidi B. Schwarz, M.D. (reports in *Sparks* (7:23-cv-00682) and *Welch* (7:23-cv-01503)); Kristin Andruska, M.D. (report in *Rothchild* (7:23-cv-00858)).

## III. LEGAL STANDARD

Defendant's motion raises a two-part inquiry. First, the Court must determine whether a party actually violated the Court's pretrial scheduling order. *See In re Camp Lejeune Water Litig.*, No. 7:23-CV-897, 2025 WL 1343184, at *4 (E.D.N.C. May 8, 2025). This inquiry is governed by Rule 16(f) of the Federal Rules of Civil Procedure, which states that a Court may impose sanctions if a party "fails to obey a scheduling or other pretrial order." Fed. R. Civ. P. 16(f).

Second, if there was a violation, the Court determines whether any sanctions are warranted (and if so, what sanctions are warranted). *In re Camp Lejeune Water Litig.*, 2025 WL 1343184, at *4. "When making this analysis, courts in this district have often applied the factors set out in *Akeva LLC v. Mizuno Corp.*, 212 F.R.D. 306, (M.D.N.C. 2002)." *Id.* Those factors are:

> [S]pecifically: (1) the explanation for the failure to obey the order; (2) the importance of the expert opinion; (3) the prejudice to the opposing party by allowing the disclosures; (4) the availability of alternative or lesser sanctions; (5) the interest in expeditious resolution of litigation; (6) a court's need to manage its docket; and (7) public policy favoring disposition of cases on the merits.

*In re Camp Lejeune Water Litig.*, 2025 WL 1343184, at *5 (citing *Severn Peanut Co. v. Indus. Fumigant Co.*, No. 2:11-CV-14-BO, 2014 WL 198217, at *3 (E.D.N.C. Jan. 15, 2014)).

IV. **ARGUMENT**

The PLG followed the rules. The PLG's disclosure of specific causation experts did not violate the Court's scheduling order. Specific causation experts should not be categorically precluded from discussing the related topic of general causation because these two topics are interrelated. Even if the disclosures did violate the scheduling order, Defendant's proposed drastic sanctions are not warranted. The *Akeva* factors do not support exclusion of the experts' opinions.

A. **PLG's Phase III Reports Are Consistent with the Court's Scheduling Orders.**

Specific causation experts often address general causation in some form as part of their analysis. Exposure, general causation, and specific causation are interrelated concepts. *See In re Camp Lejeune Water Litig.*, 736 F. Supp. 3d 311, 319 (E.D.N.C. 2024) "Ordinarily, toxic exposure torts proceed in two steps—an expert demonstrates that a particular type of harm can be caused by the exposure to a degree of scientific certainty (general causation) and an expert opines that this plaintiffs exposure was a cause in fact of his or her harm (specific causation)." *Id.* In order to show that a specific plaintiff's exposure caused their harm specifically, it is first appropriate to show that the relevant exposure *can* create that kind of harm generally. *See In re Bausch & Lomb Inc. Contacts Lens Sol. Prods. Liab. Litig.*, 693 F. Supp. 2d 515, 518 (D.S.C. 2010) (noting "the concept of general causation as a necessary precursor to proving specific causation is the rule in all jurisdictions"). It is well established that a differential diagnosis, a standard method for proving specific causation, involves first "ruling in" the alleged toxin as a possible cause of a plaintiff's disease, which inherently includes some discussion of general causation. *See* Reference Manual on Scientific Evidence, Third Ed., Federal Judicial Center, National Research Council of the National Academy of Science Engineering and Medicine, p. 512, nn.21, 26 (2011); *see also Doe v. Ortho-Clinical Diagnostics,*

*Inc.*, 440 F. Supp. 2d 465, 477 (M.D.N.C. 2006) (alleged toxin must first be reliably "ruled in" as a plausible cause in a differential diagnosis).

Defendant argues that it is problematic that some experts "have conducted their own literature reviews related to general causation." Brief at 7. But understanding the set of general causes is a predicate for proving specific causation, whether that understanding is based on other experts' general causation opinions or the specific causation experts' own understanding and/or literature review, or a combination of the two. The proof of causation is proffered twice in virtually all toxic tort latent disease cases—once for establishing the relationship between the exposure and the disease based on peer reviewed literature and again for "determining the possible causes for the patient's symptoms and then eliminating each of these potential causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded is the most likely." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 262 (4th Cir. 1999). Because of this interrelatedness between general and specific causation, courts routinely recognize that a specific causation expert's analysis may include a threshold discussion of general causation. *See, e.g.*, *Doe v. Nw. Mut. Life Ins. Co.*, No. 2:2010-cv-02961, 2012 WL 1533104, at *5 (D.S.C. May 1, 2012) (concluding that "the doctors may testify to general causation to the extent necessary to testify to specific causation").

Defendant's logic would also apply to any discussion of exposure by a specific causation expert, but tellingly, Defendant does not make such a contention in its motion. This shows the underlying flaw in Defendant's position: it asks the Court to exclude analysis of foundational concepts that are integrated into specific causation analysis.

Defendant's position is also contrary to its own experts' Phase III reports. For example, Defendants' Phase III expert Dr. Lisa Bailey undertook her own analysis of ATSDR and other

studies to identify the concentrations of toxins in Camp Lejeune water (Phase I) and calculate the thresholds for each toxin she opines are required to cause injury (Phase II) before applying those to the individual Plaintiffs' facts in her Phase III reports against every single bellwether plaintiff. *See, e.g.*, Ex. A (Phase III Report of Dr. Bailey on Plaintiff Sparks) at 18-19 (relying on ATSDR studies, not just Phase I experts, for water contamination levels), 22-33 (calculating toxicity thresholds for each toxin based on her own literature review). Dr. Bailey's toxicity threshold calculations go to general causation and she relies on them to reach her specific causation opinions. In fact, Dr. Bailey criticizes Plaintiffs' experts for not, in her opinion, "providing a robust analysis of the best available scientific information relevant to the potential causal association between exposure to these chemicals and PD" (or the other diseases at issue in her other reports). *See, e.g., id.* at 43-44; *see also* Ex. B (Phase III Report of Dr. Erba on Plaintiff Connard) at 12 (discussing general causation studies and stating they "are critical to understand" to properly assess specific causation). Defendant's argument that Plaintiffs' experts cannot do what its own experts do is untenable.

### B. There Is No Prejudice to Defendant and Exclusion Is Not Warranted.

Defendant is not prejudiced by the PLG's disclosures. Therefore, under the *Akeva* framework, testimony need not be excluded even if there were any violation of the Court's scheduling orders (which there was not).

First, the PLG is acting in good faith, and nothing in the experts' submission supports DOJ's suggestion that the specific causation experts are attempting to sneak in late general causation experts; these are specific causation reports, and Plaintiffs do not intend to rely on them for other purposes. *Cf. In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*, MDL No. 15-2666 (JNE/DTS), 2018 WL 5801901, at *1 (D. Minn. Nov. 6, 2018) (affirming exclusion of experts disclosed more than a year after the deadline that offered new general causation

testimony and "did not discuss any modeling specific to the bellwether plaintiff"). Unlike *Bair Hugger*, which involved the attempted introduction of "new general causation expert reports" in the case-specific phase, *id.*, to the extent that the PLG's Phase III reports contain general causation discussions, they are included as components of the specific causation analysis. As explained above, specific causation experts may and do routinely reference general causation as part of their *specific causation* methodology (just as they reference exposure). The PLG followed the Court's scheduling orders, which do not prohibit such discussion.

Second, on "the importance of the expert opinion," *Akeva*, 212 F.R.D. at 311, the discussions of general causation provide foundation and background supporting the reliability and admissibility of the specific causation expert's testimony. Offering no opinion or background context as to general causation, either from the experts' review of the general causation literature and/or of the general caustion experts, could undermine the ability of the trier of fact to understand the experts' reasoning for their specific causation conclusions. *See Ortho-Clinical Diagnostics, Inc.*, 440 F. Supp. 2d at 477. But the law doesn't favor one approach over the other; if a specific causation expert prefers to review the general causation literature as part of her differential etiology she is free to do so. Courts permit that background to be provided by reference to other experts' general causation reports (here, from Phase II) and/or from the specific causation experts' own knowledge or literature review, but regardless of the source it is undeniably important that specific causation experts be allowed to discuss general causation as part of ruling in potential specific causes.

Third, Defendant has simply shown no prejudice caused by these specific causation experts' discussions of general causation. *See Akeva*, 212 F.R.D. at 311 (sanctions for scheduling order violations require showing of prejudice). Defendant does not identify any new opinions on

7

Case 7:23-cv-00897-RJ    Document 437    Filed 07/14/25    Page 7 of 10

general causation in the Phase III expert reports; they reach the same conclusions as the general causation record already developed in Phase II. That is enough to deny Defendant's motion. Defendant argues that even if the opinions are not new, Defendant would be prejudiced by their mere existence in Phase III. Brief at 9. But claiming prejudice doesn't make it so and Defendant makes no such showing. What's more, given that now the briefing schedules for general and specific causation are combined (and extended) (DE 414), the parties and the Court can collectively evaluate the overall causation analysis, mindful of the sequential nature of general causation as a predicate to specific causation. *See, e.g.*, *Dunn v. Sandoz Pharms. Corp.*, 275 F.Supp.2d 672, 676 (M.D.N.C. 2003) (in order to show that a drug specifically caused a stroke, plaintiffs had to first establish generally that the drug could generally cause a stroke).

Defendant nonetheless argues that "if the opinions do differ in any material respect," then the prejudice is "apparent." *Id.* Again, DOJ identifies no such different opinions. Moreover, the discovery schedule was staggered to allow Defendant's Phase III experts to respond to any allegedly new analysis. Defendant has the opportunity to depose each specific causation expert on the entirety of their report, and now has more time and can brief the issues together. Like this Court's consideration of prejudice related to Dr. Hennet's February Site Visit, the fact that Defendant has identified no new opinions, that Defendant had multiple weeks to consider and respond to the PLG's specific causation opinions, and "the bench trial format [which] tempers potential prejudice … as there is no possibility of jury confusion or misunderstanding," all weigh against the requisite prejudice here. *In re Camp Lejeune Water Litig.*, 2025 WL 1343184, at *6.

Fourth, allowing Plaintiffs' experts to present a complete and reliable analysis serves "the interest in expeditious resolution of litigation." *Akeva*, 212 F.R.D. at 311 (citation omitted).

Fifth, "the [C]ourt's need to manage its docket," *id.*, is not impacted. The phased structure

of discovery is intended to promote efficiency and clarity for the finder of fact, not to create artificial barriers to the presentation of reliable expert testimony. There is no jury to potentially confuse. The Court can determine whether testimony is reliable and relevant based on its gatekeeping role before trial, promoting the "public policy favoring disposition of cases on the merits." *Id.* Exclusion of expert testimony would prevent the trier of fact from hearing the full basis for the experts' opinions, undermining the search for truth and the fair resolution of claims. Public policy strongly favors allowing these cases to be decided on their merits.

Given that the general causation opinions in question are not new and are an inherent part of the specific causation analysis, no sanction is warranted. Defendant has shown no prejudice, and even if it had, exclusion would not be necessary to remedy it.[1]

## V. CONCLUSION

Accordingly, the PLG asks that the Court deny Defendant's Motion to exclude any discussion of general causation by PLG's specific causation experts.

---

[1] For the reasons explained, no sanctions are warranted, but the fact that lesser sanctions than exclusion would be available also weighs against Defendant's motion. *See, e.g.*, *SMD Software, Inc. v. EMove, Inc.*, No. 5:2008-cv-00403, 2013 WL 5592808, at *9 (E.D.N.C Oct. 10, 2013) (Flanagan, J.) (allowing a lesser sanction that kept the case on its current trial track).

DATED this 14th day of July, 2025.

| | |
|---|---|
| /s/ J. Edward Bell, III | /s/ Zina Bash |
| J. Edward Bell, III (admitted *pro hac vice*) | Zina Bash (admitted *pro hac vice*) |
| Bell Legal Group, LLC | Keller Postman LLC |
| 219 Ridge St. | 111 Congress Avenue, Suite 500 |
| Georgetown, SC 29440 | Austin, TX 78701 |
| Telephone: (843) 546-2408 | Telephone: 956-345-9462 |
| jeb@belllegalgroup.com | zina.bash@kellerpostman.com |
| | |
| *Lead Counsel for Plaintiffs* | *Co-Lead Counsel for Plaintiffs and Government Liaison Counsel* |
| | |
| /s/ Elizabeth J. Cabraser | /s/ W. Michael Dowling |
| Elizabeth J. Cabraser (admitted *pro hac vice*) | W. Michael Dowling (NC Bar No. 42790) |
| Lieff Cabraser Heimann & Bernstein, LLP | The Dowling Firm PLLC |
| 275 Battery Street, 29th Floor | Post Office Box 27843 |
| San Francisco, CA 94111 | Raleigh, North Carolina 27611 |
| Telephone: (415) 956-1000 | Telephone: (919) 529-3351 |
| ecabraser@lchb.com | mike@dowlingfirm.com |
| | |
| *Co-Lead Counsel for Plaintiffs* | *Co-Lead Counsel for Plaintiffs* |
| | |
| /s/ Robin L. Greenwald | /s/ James A. Roberts, III |
| Robin L. Greenwald (admitted *pro hac vice*) | James A. Roberts, III |
| Weitz & Luxenberg, P.C. | Lewis & Roberts, PLLC |
| 700 Broadway | 3700 Glenwood Ave., Ste. 410 |
| New York, NY 10003 | Raleigh, NC 27612 |
| Telephone: 212-558-5802 | Telephone: (919) 981-0191 |
| rgreenwald@weitzlux.com | jar@lewis-roberts.com |
| | |
| *Co-Lead Counsel for Plaintiffs* | *Co-Lead Counsel for Plaintiffs* |

/s/ Mona Lisa Wallace
Mona Lisa Wallace (N.C. Bar No.: 009021)
Wallace & Graham, P.A.
525 North Main Street
Salisbury, North Carolina 28144
Tel: 704-633-5244
mwallace@wallacegraham.com

*Co-Lead Counsel for Plaintiffs*