IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

No. 7:23-CV-897

| | |
|---|---|
| IN RE: ) | |
| ) | |
| CAMP LEJEUNE WATER LITIGATION ) | MEMORANDUM AND |
| ) | RECOMMENDATION |
| This Document Relates To: ) | |
| ) | |
| ALL CASES ) | |
| ) | |

This matter is before the court on the United States' ("Defendant") motion in limine to exclude evidence related to vapor intrusion ("Motion") [DE-361]. The Motion has been fully briefed and referred to the undersigned for a memorandum and recommendation pursuant to Fed. R. Civ. P. 72(a). For the reasons that follow, it is recommended that the Motion be granted in part.

I. Background

This dispute concerns the ongoing Camp Lejeune Justice Act ("CLJA") litigation in this district.[1] *See* Pub. L. No. 117-168, § 804, 135 Stat. 1759, 1802–04. With the CLJA, Congress created a new federal cause of action permitting "appropriate relief for harm that was caused by exposure to the water at Camp Lejeune" for individuals who resided, worked, or were otherwise exposed for not less than 30 days during the period between August 1, 1953, and December 31, 1987. *See id*. § 804(b). The chemicals at issue in the "water" are tetrachloroethylene ("PCE"), trichloroethylene ("TCE"), dichloroethylene ("DCE"), vinyl chloride, and benzene (collectively, "Contaminants"). *Id*; [DE-25] 9.

To better manage this litigation, the court entered case management orders streamlining pretrial procedures in all CLJA cases. *See, e.g.*, [DE-23]; [DE 81-14] 10:16–24. The court is

---
[1] There are more than 3,397 individual CLJA lawsuits currently pending in this district. [DE-417] 1.

phasing this litigation into separate "Tracks." [DE-23] 8. Each Track comprises several different illnesses and proceeds on its own pretrial timeline. The court entered an order confirming 25 Track 1 Trial Plaintiffs to proceed on a separate pretrial timeline. [DE-250] 2. The court established the Track 1 illnesses in CMO 2, specifically (1) bladder cancer, (2) kidney cancer, (3) leukemia, (4) Parkinson's disease, and (5) non-Hodgkin's lymphoma. Fact discovery for the Track 1 Trial Plaintiffs closed on August 11, 2024. *Id*. at 4.

As fact discovery progressed, the court learned that the parties contest certain facts relating to Contaminant levels in the water at Camp Lejeune. For example, at a status conference held on May 16, 2024, Defendant represented that it might stipulate to Contaminant levels *measured* at Camp Lejeune but that it was skeptical of estimating past levels using the Agency for Toxic Substances and Diseases Registry's ("ATSDR") water model.[2][3] [DE-207] 7:10–22. This apparently came as a surprise to the PLG, who indicated they will utilize the ATSDR water model as part of its case in chief. *See id*. at 7:24–8:8; [DE-25] 40.

Plaintiffs cannot "demonstrat[e] their harm was caused by exposure" without proving the relevant Contaminant levels in the water on base. *See In re Camp Lejeune Water Litig.*, 736 F. Supp. 3d 311, 317, 319 (E.D.N.C. 2024) (per curiam) (finding that the CLJA requires claimants to show causation) ("Causation Order"). Accordingly, the court decided to make "Water

---

[2] Defendant has since filed several motions elaborating on its position. *See, e.g.*, [DE-356]; [DE-358]; [DE-367].

[3] The ATSDR has conducted numerous epidemiological studies "to evaluate the potential for health effects from exposures to [the Contaminants] in drinking (finished) water at [Camp Lejeune]." ATSDR, *Analyses and Historical Reconstruction of Groundwater Flow, Contaminant Fate and Transport, and Distribution of Drinking Water Within the Service Areas of the Hadnot Point and Holcomb Boulevard Water Treatment Plants and Vicinities, U.S. Marine Corps Base Camp Lejeune, North Carolina, Chapter A: Summary and Findings* (2013), at iii, https://www.atsdr.cdc.gov/camp-lejeune/media/pdfs/2024/10/ChapterA_FactSheet.pdf. As part of those studies, the ATSDR "us[ed] water-modeling techniques and the process of historical reconstruction to quantify concentrations of particular contaminants in finished water . . . ." *Id*.

2

Contamination" a Track 1 threshold issue appropriate for pretrial resolution. *See* [DE-247].

The court folded the Water Contamination issue into a broader Track 1 scheduling order regarding expert discovery and motion practice for three Track 1 issue "Phases": (1) Water Contamination ("Phase 1"); (2) general causation ("Phase 2"); and (3) residual issues, including specific causation and damages ("Phase 3"). *See id*.; [DE-414]. The court elaborated that Phase 1 required Plaintiffs to "establish the alleged chemicals in the water at Camp Lejeune during the relevant time from 1953 to 1987. For example, what were the [Contaminant] levels . . . present at the Hadnot Point, Holcomb Boulevard, and Tarawa Terrace water distribution systems in 1977?" [DE-247] 2. Based on the existing amended pretrial schedule, entered upon the parties' joint motion [DE-413], the court estimates resolving the three Track 1 Phases by early 2026, followed by Track 1 Trial Plaintiff bench trials. *See* [DE-414].

On August 8, 2024, "in anticipation of Track 1 dispositive motion briefing," the court ordered the parties to engage in "detailed discussion of the order of proof for CLJA bench trials." [DE-271] 2. Throughout Fall 2024, the parties negotiated the nature of proof required to succeed on a CLJA claim. *See, e.g.*, [DE-279] 11:1–13:9; [DE-291] 2–9. The issue of vapor intrusion first arose during these negotiations. *See* [DE-294] 9:14–11:13.

Vapor intrusion ("VI") occurs when volatile organic compounds, such as the Contaminants, vaporize (turn from liquid to gas) from subsurface water and rise through the ground and into buildings. *See* ATSDR, *Vapor Intrusion PHA*, https://www.atsdr.cdc.gov/camp-lejeune/php/public-health-assessments/vapor-intrusion-pha.html; United States Environmental Protection Agency ("EPA"), *What is Vapor Intrusion?*, https://www.epa.gov/vaporintrusion/what-vapor-intrusion. This can occur through cracks in building foundation slabs or basement walls, as illustrated below. *See id*.

3



*See* EPA at fig. 1. The ATSDR is working on a VI Camp Lejeune Public Health Assessment scheduled for completion in late 2025. *See* ATSDR; *see also* [DE-294] 21:1–3.

In their October 15, 2024, status report, the parties set out competing proposals for the nature of proof required for Phase 1. *See* [DE-291] 2–9. The PLG proposed the following:

> In Phase 1, the Court will be presented with evidence of water contamination in the water at Camp Lejeune from 1953 to 1987, including evidence of monthly concentration levels in the finished water, **vapor intrusion and emissions evidence**, and/or other evidence supporting the contamination. To help the court "understand the chemicals in the water at Camp Lejeune during the operative period," [DE-247] 2, the parties may present evidence in the fields of history, civil engineering, hydrogeology, environmental sciences and modeling pertinent to the fate and transport of contaminants in groundwater, in drinking (finished) water, and in vapor emissions for family housing areas and other facilities at Camp Lejeune from 1953 to 1987. This evidence may include the contaminant sources, the fate and transport of the contaminants within the groundwater underlying Camp Lejeune, the supply of water through wells to the various water treatment plants at Camp Lejeune, **vapor emissions**, and the distribution of the water from the treatment plants to relevant areas of Camp Lejeune during this time

4

frame.

*Id*. at 2 (cleaned up) (emphasis added). The PLG stated that VI was relevant for Phase 1 as it goes to the "fate and transport" of water at Camp Lejeune.[4] *See id*. at 3. Defendant disagreed because VI went beyond the court's hypothetical Phase 1 question: "[e]stablish the alleged chemicals in the water at Camp Lejeune from 1953 to 1957 . . . . For example, what were the levels of benzene, TCE, PCE, and vinyl chloride present at the Hadnot Point, Holcomb Boulevard, and Tarawa Terrace water distribution systems in 1977?" *Id*. at 6; [DE-247] 2. Defendant argued that VI was further inappropriate for Phase 1 because it cannot be generally determined—unlike Contaminant concentrations in water. *See* [DE-291] 6. Defendant also raised the possibility that VI may not be "covered by the CLJA[.]" *Id*.

Ultimately, the parties agreed to the following language, setting aside VI, regarding the nature of proof for Phase 1:

> In Phase 1, the Court will be presented with evidence pertaining to the concentration levels for the chemicals in drinking (finished) water at Camp Lejeune from 1953 to 1987. To help the Court "understand the chemicals in the water at Camp Lejeune during the operative period," [DE-247] 2, the Parties may present evidence from experts in fields such as history, engineering, hydrology, environmental sciences and mathematical modeling pertinent to the fate and transport of contaminants in groundwater and in drinking (finished) water for family housing areas and other facilities at Camp Lejeune from 1953 to 1987. The evidence will include the contamination sources, the fate and transport of the contaminants within the groundwater underlying Camp Lejeune, the supply of water through wells to the various treatment plants at Camp Lejeune, and the distribution of the water from the treatment plants

---

[4] "Fate and transport," according to the ATSDR, refers "to how the nature of contaminants might change (chemically, physically, or biologically) and where they go as they move through the environment. Fate and transport evaluations help [ ] determine how likely it is that 1) contaminants have moved or will move beyond the source area, and 2) contamination could migrate and exposures could occur beyond the sampled areas." ATSDR, *Public Health Assessment Guidance Manual, Element 2: Environmental Fate and Transport*, https://www.atsdr.cdc.gov/pha-guidance/conducting_scientific_evaluations/exposure_pathways/environmental_fate_and_transport.html.

5

to relevant areas of Camp Lejeune during this time frame.

[DE-329] 2 (cleaned up). Phase 1 (Water Contamination) expert discovery closed on March 15, 2025. *See* [DE-414]. The parties filed seven motions, including this one, on issues related to Phase 1.[5]

Several of the PLG's expert reports contain opinions related to VI. At least two do so in the context of TechFlowMP, purportedly a "three-dimensional model [used by the ATSDR] capable of simulating multispecies and multiplate (water and vapor) transport of PCE and associated degradation by-products[.]" [DE-366-1] 6. Mr. Morris Maslia, a PLG engineering expert, makes certain conclusions about VI potential based in part on TechFlowMP model simulations:

> As part of the degradation by-product simulation using the TechFlowMP model, results were obtained for PCE and PCE degradation by-products dissolved in groundwater and in the vapor phase (above the water table in the unsaturated zone). Analyses of the distribution of vapor-phase PCE and PCE degradation by-products indicate there is a potential for [VI] at Tarawa Terrace, thereby providing a potential exposure pathway from inhalation of PCE and PCE degradation by-products vapors. At Tarawa Terrace these buildings would include family housing and an elementary school.

*Id*. Professor Mustafa Aral, a PLG modeling and health risk expert, rebuts critiques of the ATSDR's conclusions drawn from the TechFLowMP model[6]:

> **Comment on p. 49 bullet seven** [quoting NRC]: *The **TechFlowMP** model predicted very high vapor concentrations. For example, **TechFlowMP** precited that the PCE vapor concentration in the top 10 ft of soil beneath the Tarawa Terrace elementary school should*

---

[5] The motion filing deadline for Phase 1 was April 29, 2025. *See* [DE-414].
[6] In 2009, the National Academy of Science's National Research Council ("NRC") released its own report on Camp Lejeune water contamination "in response to a request from the U.S. Navy" ("NRC Report"). NRC, *Contaminated Water Supplies at Camp Lejeune: Assessing Potential Health Effects* (Nat'l Academies Press 2009), https://nap.nationalacademies.org/download/12618. The NRC Report levied numerous criticisms of the ATSDR's prior findings about on base water contamination and potential adverse health risks. *See generally id*.

> be 1,418 μg/L[7]. *Studies of PCE vapor concentrations in buildings that house or are near a drycleaning facility have reported measured concentrations around 55 μg/L.*
>
> **Response**: This reference to a vapor concentration at 1,418 µg/L is another example of misrepresentation of the results of the modeling analyses conducted by the ATSDR . . . . The statement provided in the ATSDR report reads . . . ***'the maximum simulated PCE concentration in groundwater (model layer 1) at the Tarawa Terrace elementary school was 1,418 µg/L . . . , whereas the maximum simulated vapor-phase PCE (in the top 10 ft of soil) was 137 µg/L . . . .'***
>
> The above sentence [from the ATSDR] . . . clearly states that the groundwater (not vapor) concentration in layer '1' is at 1,418 µg/L concentration. Vapor concentration is given separately in the paragraph towards the end of that sentence. For the NRC report to represent this number (1,418 µg/L) as the vapor concentration that is simulated at the site to discredit [the ATSDR] is not appropriate for a scientific review.

[DE-366-2] 5 (emphasis and italics original). Mr. Maslia and Professor Aral were disclosed by the PLG as Phase 1 (Water Contamination) experts. [DE-366-1] 2; [DE-366-2] 2.

Two of PLG's bladder cancer experts have opined generally about VI as a potential exposure pathway for on-base individuals. Dr. Kathleen Gilbert stated in her report that "[b]reathing indoor air contaminants in Camp Lejeune's buildings due to [VI] is another potential pathway of exposure to shallow groundwater contaminants." [DE 366-3] 4. And Dr. Steven Bird similarly remarked that "[m]any organic solvents are volatile (easily evaporated), leading to possible exposure through inhalation . . . . They can [ ] enter homes through groundwater [via VI]." [DE-366-4] 6. Dr. Gilbert and Dr. Bird were disclosed by the PLG as Phase 2 (general causation) experts. [DE-366-3] 2; [DE-366-4] 2.

II. Legal Standard

Defendant has moved in limine to exclude evidence and testimony related to VI pursuant

---

[7] μg/L is shorthand for micrograms per liter.

to Fed. R. Evid. 401, 402, and 403. [DE-361]. It is well-established that "[q]uestions of trial management [including motions in limine] are quintessentially the province of the district courts." *United States v. Smith*, 452 F.3d 323, 332 (4th Cir. 2006); *see also Arnold v. E. Air Lines, Inc.*, 681 F.2d 186, 194 (4th Cir. 1982) ("[M]any details of trial management [are] necessarily committed to broad trial court discretion[.]"). A ruling in limine is preliminary and may be subject to change as the trial unfolds. *See Luce v. United States*, 469 U.S. 38, 41–42 (1984).

The general rule regarding the scope of discovery is found in Fed. R. Civ. P. 26(b)(l):

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Evidence is relevant where "it has any tendency to make a fact more or less probable than it would be without the evidence" and "is of consequence in determining the action." Fed. R. Evid. 401. "Relevancy under this rule has been broadly construed to encompass any possibility that the information sought may be relevant to the claim or defense of any party." *Prasad v. Nallapati*, 597 F. Supp. 3d 842, 846 (E.D.N.C. 2022) (first quoting *Equal Emp't Opportunity Comm'n v. Sheffield Fin. LLC*, No. l:06-CV-889, 2007 WL 1726560, at *3 (M.D.N.C. June 13, 2007); then citing *Mainstreet Collection, Inc. v. Kirkland's, Inc.*, 270 F.R.D. 238, 240 (E.D.N.C. 2010) ("During discovery, relevance is broadly construed 'to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case.'") (quoting *Oppenheimer Fund., Inc. v. Sanders*, 437 U.S. 340, 351 (1978))).

Irrelevant evidence is inadmissible. Fed. R. Evid. 402. And the court must ensure that the

probative value of any evidence is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. "The parties and the court have a collective responsibility to consider the proportionality of all discovery and consider it in resolving discovery disputes." *Walls v. Ford Motor Co.*, No. 1:20CV98, 2021 WL 1723154, at *4 (M.D.N.C. Apr. 30, 2021) (citations omitted).

   III.   Discussion

   A.   Statutory Interpretation

The court cannot determine VI's relevancy without knowing its relationship, if any, to proving a claim under the CLJA. CLJA § 804. Thus, at bottom of this dispute is an issue of statutory interpretation, namely, does the phrase "the water at Camp Lejeune" used throughout the CLJA incorporate the modifier attached to its first usage in subsection 804(a): "the water at Camp Lejeune, North Carolina, that was **supplied by, or on behalf of, the United States**." CLJA § 804(a) (emphasis added). The court finds that it does.

The phrase "water at Camp Lejeune" is used six times in the statute.[8] CLJA § 804. First, it is used in the header for section 804: "FEDERAL CAUSE OF ACTION RELATING TO **WATER AT CAMP LEJEUNE**." *Id* (emphasis added).

The phrase is found twice in subsection 804(b), which states that:

> An individual, including a veteran . . . , or the legal representative of such an individual, who resided, worked, or was otherwise exposed (including in utero exposure) for not less than 30 days during the period beginning on August 1, 1953, and ending on December 31, 1987, to **water at Camp Lejeune**, North Carolina, that was supplied by, or on behalf of, the United States may bring an action in the United States District Court for the Eastern District of North Carolina to obtain appropriate relief for harm that was caused by

---

[8] As shorthand, the court may refer to "the water at Camp Lejeune" as "the water."

exposure to the **water at Camp Lejeune**.

*Id*. at § 804(b) (emphasis added).

The phrase is found twice in subsection 804(c) ("BURDENS AND STANDARD OF PROOF"), specifically at subsection 804(c)(1), "[t]he burden of proof shall be on the party filing the action to show one or more relationships between the **water at Camp Lejeune** and the harm[,]" and subsection 804(c)(2), "[t]o meet the burden of proof described in paragraph (1), a party shall produce evidence showing that the relationship between exposure to the **water at Camp Lejeune** and the harm is (A) sufficient to conclude that a causal relationship exists; or (B) sufficient to conclude that a causal relationship is at least as likely as not." *Id*. at § 804(c) (emphasis added).

Finally, it is found in subsection 804(e)(2)(A) relating to damage offsets:

> Any award made to an individual, or legal representative of an individual, under this section shall be offset by the amount of any disability award, payment, or benefit provided to the individual, or legal representative—
> (A) under—
>> (i) any program under the laws administered by the Secretary of Veterans Affairs;
>> (ii) the Medicare program under title XVIII of the Social Security Act (42 U.S.C. 1395 et seq.); or
>> (iii) the Medicaid program under title XIX of the Social Security Act (42 U.S.C. 1396 et seq.); and
> (B) in connection with health care or a disability relating to exposure to the **water at Camp Lejeune**.

*Id*. at § 804(e)(2).

This is not the court's first time interpreting the CLJA. Indeed, the court has issued several rulings on CLJA statutory interpretation affecting all present and future litigants. *See In re Camp Lejeune Water Litig.*, 715 F. Supp. 3d 761 (E.D.N.C. 2024) (per curiam), *motion to certify appeal denied*, No. 7:23-CV-897, 2024 WL 2198651 (E.D.N.C. May 13, 2024) (striking Plaintiffs' jury trial demands) ("Jury Trial Order"); Causation Order, 736 F. Supp. 3d at 311; *In re Camp Lejeune Water Litig.*, No. 7:23-CV-897, 2024 WL 4142748, at *4 (E.D.N.C. Sept. 10, 2024) (per

curiam) (considering legal representative and statute of limitation issues).

To do this, the court must analyze the ordinary meaning of the CLJA's language, construe specific CLJA provisions contextually, and apply the standard interpretive canons. CLJA § 804; *see* Jury Trial Order, 715 F. Supp 3d at 766 (collecting cases); Causation Order, 736 F. Supp 3d at 318. However, "unless there is some ambiguity in the language of a statute, a court's analysis must end with the statute's plain language." *In re Sunterra Corp.*, 361 F.3d 257, 265 (4th Cir. 2004) (quoting *Hillman v. IRS.*, 263 F.3d 338, 342 (4th Cir. 2001)). In interpreting the plain language of a statute, terms are given their "ordinary, contemporary, common meaning, absent an indication Congress intended [them] to bear some different import." *North Carolina ex rel. Cooper v. Tenn. Valley Auth.*, 515 F.3d 344, 351 (4th Cir. 2008) (citation omitted).

The title of the statute ("FEDERAL CAUSE OF ACTION RELATING TO WATER AT CAMP LEJEUNE"**)** generally does not limit the plain language of the body text. CLJA § 804; *see Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 583 U.S. 366, 380 (2018) (citations omitted). Still, the title "suppl[ies] cues" as to Congress's intent—here, that Congress sought to create a claim relating to water at Camp Lejeune. *Id*. (citing *Yates v. United States*, 574 U.S. 528, 540 (2015)).

Turning to the language itself, "[i]t is a rule of law well established that the definite article 'the' particularizes the subject which it precedes. It is a word of limitation as opposed to the indefinite or generalizing force of 'a' or 'an'." *Palisades Collections LLC v. Shorts*, 552 F.3d 327, n1 (4th Cir. 2008) (Niemeyer, P., dissenting) (citing *American Bus Ass'n v. Slater*, 231 F.3d 1, 4–5 (D.C. Cir. 2000)). And "[t]he use of the definite article . . . means that the phrase . . . refers back to earlier language . . . ." *ABS Glob., Inc. v. Cytonome/St, LLC*, 84 F.4th 1034, 1040 (Fed. Cir.

2023).[9] "The reference back 'the' language takes its meaning from the meaning of [its] antecedent." *Id*. (collecting cases).

Next, "water" is "the substance (most commonly encountered as a liquid) which is the principal constituent of seas, lakes, and rivers, and which falls as rain and other forms of precipitation." *Water, N*., Oxford English Dictionary; *see also Water, N.*, Merriam-Webster Dictionary ("[T]he liquid that descends from the clouds as rain, forms streams, lakes, and seas, and is a major constituent of all living matter and that when pure is an odorless, tasteless, very slightly compressible liquid oxide of hydrogen $H_2O$ which appears bluish in thick layers, freezes at 0°C and boils at 100°C, has a maximum density at 4°C and a high specific heat, is feebly ionized to hydrogen and hydroxyl ions, and is a poor conductor of electricity and a good solvent[.]"). Non-liquid forms are included; "water" encompasses the $H_2O$ compound in any matter phase.

"[A]t Camp Lejeune" adds a preposition and a proper noun location, modifying the scope of "water" to include only water located at Marine Corps Base Camp Lejeune.

The first use of "the water at Camp Lejeune" in the body text occurs, with the definite article "the," in section 804(b) (titled "IN GENERAL") as a limitation to which "individual[s]" may "bring a cause of action" in this court, specifically, only those "individual[s]" who were "exposed (including in utero exposure) for not less than 30 days during the period [of August 1, 1953 to December 31, 1987] to water at Camp Lejeune, North Carolina, that was supplied by, or

---

[9] In *ABS Glob., Inc.*, the Fourth Circuit considered—on appeal from the Patent Trial and Appeal Board—whether the term "sample stream" in the phrase "a fluid focusing region configured to focus the sample stream[]" was singular-only or plural-allowing. 84 F.4th at 1040. Based on the use of the definite article, the court referred back to antecedent language—"a sample stream"—in the preceding limitation. In doing so, the court explained that "[t]he reference-back 'the' language takes its meaning from the meaning of the antecedent, so if 'a sample stream' has a plural-allowing meaning, so does the reference-back 'the sample stream' phrase." *Id*. (citations omitted).

12

on behalf of, the United States."[10]  CLJA § 804(b).  "North Carolina" geographically locates "Camp Lejeune."

The additional context "supplied by, or on behalf of, the United States" further narrows the scope of "the water."  "Supply" means "to provide, or provide with, something," or to "furnish or provide (a person) with something; . . . (now usually) to furnish with regular supplies of a commodity . . . ."  *Supply, V.*, Sense I.1.a. Oxford English Dictionary; *see also Supply*, Black's Law Dictionary (12th ed. 2024) ("A means of providing a constant flow of something as needed, esp. with a system of distribution or circulation; a system that is used for furnishing some essential or important commodity <the water supply was cut off>").  Rain that falls on Camp Lejeune is not "supplied by" the United States, even if technically "water at Camp Lejeune."  "[W]ater . . . supplied" means finished[11] water provided to individuals through on base water distribution systems.

Congress uses "the water at Camp Lejeune" again in the same sentence of section 804(b) when describing the cause of action created: to "obtain appropriate relief for harm that was caused by exposure to the water at Camp Lejeune."  CLJA § 804(b).  Undoubtedly this second instance of "the water" in the body text—with a definite article and in the same sentence as the first occurrence—"takes its meaning from . . . [its] antecedent."  *ABS Glob., Inc. v. Cytonome/St, LLC*,

---

[10] When creating federal causes of action, Congress may set thresholds for who qualifies to bring suit in the first instance.  *See* Causation Order, 736 F. Supp. 3d at n4.

[11] "Finished" in a water distribution context means processed water that is ready for consumption.  *See Michigan Dep't of Env't Quality v. City of Flint*, 282 F. Supp. 3d 1002, 1006 (E.D. Mich. 2017) ("finished" water is the same as "treated" water); *City of Portland, Oregon v. E.P.A.*, 507 F.3d 706, 708 (D.C. Cir. 2007) (describing "finished water" as "water that goes directly to consumers without further treatment"); *In re Camp Lejeune Water Litig.*, No. 7:23-CV-897, 2024 WL 2950355, at *1 (E.D.N.C. June 11, 2024) ("In the 2000s, ATSDR began "publish[ing] historical reconstruction results for contaminants delivered in finished water" on base.")  The parties also included the term when describing the nature of proof required for Phase 1.  [DE-291] 2.

13

84 F.4th at 1040. In other words, the second instance is simply a shorthand of the full, contextualized phrase that geolocates the base to North Carolina and attenuates the scope of water to that supplied by the United States.

Having determined that both instances of "the water at Camp Lejeune" in section 804(b) mean the same thing, the court sees no reason why it should not impute that same meaning to "the water" elsewhere in the statute. It is axiomatic that the same term should be given the same meaning wherever it appears in the same statute. *See Sullivan v. Stroop*, 496 U.S. 478, 484 (1990); *Healthkeepers, Inc. v. Richmond Ambulance Auth.*, 642 F.3d 466, 472 (4th Cir. 2011). "This presumption of consistent usage ensures that the statutory scheme is coherent and consistent." *In re Total Realty Mgmt., LLC*, 706 F.3d 245, 251 (4th Cir. 2013) (quotations omitted). Again, "'the' particularizes the subject which it precedes[,]" and each additional occurrence of "water at Camp Lejeune" is preceded by "the." CLJA § 804; *Palisades Collections LLC*, 552 F.3d at n1 (Niemeyer, P., dissenting). This is no different than "the lobster" meaning the same thing in the following:

> The lobster with red and yellow stripes should only be fed fresh shrimp. The lobster should have salt water in its tank.

The definite article preceding both instances of "lobster" makes repetition of "red and yellow stripes" redundant. Likewise, it would be redundant to clarify in later instances of "the water at Camp Lejeune" that "Camp Lejeune" is in "North Carolina[,]" and that "the water" at issue was "supplied by, or on behalf of, the United States[.]" CLJA § 804(b).

This reading is not only consistent with the text itself but with "the specific context in which that language is used, and the broader context of the statute as a whole." *Holland v. Big River Minerals Corp.*, 181 F.3d 597, 603 (4th Cir. 1999) (quotation omitted); *see also Total Realty*, 706 F.3d at 251. The first instance of "the water" in the body text—which includes the "supplied by" modifier—falls in section 804(b), titled "IN GENERAL." CLJA § 804(b). Though subsection

14

headers cannot override the plain language of the text, they still "supply cues" as to Congressional intent. *Rudisill v. McDonough*, 601 U.S. 294, 309 (2024) (quoting *Merit Management Grp., LP*, 583 U.S. at 380) (finding "Bar to duplication" header provided clue that the below provisions "prevent double dipping" of veteran benefits). The "IN GENERAL" subtitle cues the reader that what follows will generally apply to the rest of the statute. CLJA § 804(b). And it makes sense that Congress would fully define "the water" in its first occurrence in the body text, then in the same sentence shorthand it as "the water at Camp Lejeune" with the intention of using the shorthand throughout the statute.

This reading also comports with the CLJA's broader context of creating a cause of action against the United States. As a limited waiver of the United States' sovereign immunity, the CLJA's "limitations and conditions to [that waiver] must be strictly observed and exceptions thereto are not to be implied." *See* Jury Trial Order, 715 F. Supp. 3d at 766–67 (quoting *Soriano v. United States*, 352 U.S. 270, 276 (1957)) (discussing sovereign immunity clear statement canon). Restricting "the water" to that "supplied by, or on behalf of, the United States[,]" is a limitation to the United States' sovereign immunity waiver. CLJA § 804(b). In the first instance, it restricts who can file a CLJA claim against the United States.[12] *Id*. Then assuming the "supplied by" limitation carries through the statute, it also limits: (1) what harm is being redressed, *see* section 804(b); (2) what proof is required, *see* section 804(c)(1)–(2); (2) and what damage offsets are relevant, *see* section 804(e)(2). *Id*. at §§ 804(b)–(c), (e).

To read the CLJA otherwise means Congress chose to curb who can get in the courthouse doors but then, one subsection later, chose to broaden the scope of potentially adequate proof to succeed on a claim. *Id*. This runs counter to the plain language of the text and cuts against the

---

[12] For example, a hypothetical individual who worked for 30 days on base but did not use or otherwise contact finished water provided through the water distribution system likely could not bring a suit.

"strict[] observ[ation]" of sovereign immunity waivers.[13]  Jury Trial Order, 715 F. Supp. 3d at 766–67; *see also* Causation Order, 736 F. Supp. 3d at 327 (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982)) ("[A]bsurd results [are] to be avoided if alternative interpretations consistent with the legislative purpose are available.").

Based on the plain language of the text, "the water at Camp Lejeune" carries the limitations set out in the first instance throughout the statute: "the water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States[.]"  CLJA § 804; *see In re Sunterra Corp.*, 361 F.3d 257 at 265.

B.      Motion in Limine

Having determined that "the water at Camp Lejeune" is shorthand for "the water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States[,]" the court now considers whether evidence and testimony related to VI should be excluded at this pretrial stage.

The court's analysis hinges in large part on whether VI evidence is relevant to proving a CLJA claim.  Fed. R. Evid. 402; *see United States v. Jones*, No. 5:15-CR-324-F-1, 2016 WL 5818534, at *1 (E.D.N.C. Oct. 4, 2016) ("The purpose of a motion in limine is to avoid injecting into trial matters which are irrelevant, inadmissible, [or unfairly] prejudicial.") (citation omitted).  Even so, the court may exclude it if the probative value of admitting such evidence is substantially outweighed by unfair prejudice, time wasting, or confusion issues.  *Id*. at *5; Fed. R. Evid. 403.

The court explained how claimants succeed under the CLJA:

> [S]ubsection 804(b) states that an "individual[] who resided, worked, or was otherwise exposed (including in utero exposure) for not less than 30 days during the period [from August 1, 1953, to

---

[13] To be sure, a broader reading of section 804(e)—meaning more payments could qualify as damage offsets—ostensibly means less potential liability to the United States.  However, taken in broader context it makes sense that claims limited to harm caused by exposure to "the water . . . supplied by" should only be offset by compensation for exposure to "the water . . . supplied by[.]"  CLJA §§ (b), (e); *see Holland*, 181 F.3d 603.

> December 31, 1987,] to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States" may bring suit. *Id*. For those "individual[s]" eligible to bring suit, the CLJA instructs them how to show their harm was "caused by exposure to the water at Camp Lejeune." *Id*. They can prove that their individual exposure caused their harm by proof "sufficient to conclude that a causal relationship exists" between exposure and harm or by a reduced burden of proof ("sufficient to conclude that a causal relationship [between exposure and harm] is at least as likely as not"). *Id*. § 804(c)(2)(A)(B).

Causation Order, 736 F. Supp. 3d at 318–19.

As this court understands it, VI falls outside of the scope of "water at Camp Lejeune . . . that was supplied by, or on behalf of, the United States." CLJA § 804(b). Untreated groundwater and soil are sources of VI—not finished water moving through a water distribution system. *See* ATSDR, *Investigating Vapor Intrusion*, https://www.atsdr.cdc.gov/media/pdfs/2024/10/atsdrvapor-investigation-H.pdf; *see also* EPA, *EPA's Vapor Intrusion Database: Evaluation and Characterization of Attenuation Factors for Chlorinated Volatile Organic Compounds and Residential Buildings*, https://www.epa.gov/sites/default/files/2015-09/documents/oswer_2010_database_report_03-16-2012_final_witherratum_508.pdf (VI is the "migration of vapors from a contaminant source in the subsurface into indoor air"). For that reason, water that is the source for VI cannot have been "supplied by" the United States.

The court has concluded that "the water at Camp Lejeune" referenced in section 804(c) ("BURDENS AND STANDARDS OF PROOF") is limited to that water "supplied by, or on behalf of, the United States[.]" CLJA § 804(c). Thus, given that water sources for VI cannot have been "supplied by the United States[,]" and individuals—at minimum—must present evidence "sufficient to conclude that a causal relationship [between exposure to the water at Camp Lejeune and harm] is at least as likely as not[,]" it follows that evidence of exposure to the Contaminants

17

via VI is irrelevant to proving causation under the statute. *Id*. at §§ 804(b)–(c); Fed. R. Civ. P. 401.

Excluding irrelevant VI evidence from an individual Plaintiff's causation analysis now as opposed to later will save time and narrow the issues for trial. Fed. R. Evid. 401, 402, 403.

At the same time, the court is cautioned against a blanket pretrial ruling against all evidence or testimony related to VI. "Courts routinely defer ruling on motions in limine and evidentiary matters [raised prior to trial] until they have enough information." *United States ex rel. Brown v. Mindpath Care Centers, N. Carolina, PLLC*, No. 5:19-CV-512-BO-RJ, 2025 WL 1384730, at *1 (E.D.N.C. Apr. 3, 2025) (quoting *Finch v. Covil Corp.*, 388 F. Supp.3d 593, n14 (M.D.N.C. 2019) (denying motion in limine as vague); *Sharp v. Best*, No. 4:21-CV-185-BO, 2025 WL 349724, at *1 (E.D.N.C. Jan. 30, 2025) (denying motion in limine in part because "[w]hether to admit [] testimony . . . at trial is an issue better decided once any trial has commenced"). Additionally, the bench trial format makes the possibility of jury confusion or misunderstanding impossible. *See Cap. Funding Grp., Inc. v. Zuccari*, No. CV RDB-19-1272, 2021 WL 1339387, at *6 (D. Md. Apr. 9, 2021); Fed. R. Evid. 703.

Based on Defendant's own submissions, the court sees potential avenues where evidence and testimony related to VI may be relevant at trial. For example, the opinions by Professor Aral rebutting some of the NRC's critiques of the TechFlowMP model regarding the potential for VI— referenced by the Defendant in its Motion—may be admissible for the purpose of contradicting the NRC or NRC-affiliated experts' opinions. [DE-366-2] 5; Fed. R. Evid. 701. Additionally, the ATSDR is apparently working on a VI Camp Lejeune Public Health Assessment scheduled for release later this year. [DE-294] 21:1–3. The court cannot opine on its admissibility before knowing its content. *See United States ex rel. Brown*, 2025 WL 1384730 at *1.

IV. Conclusion

For the foregoing reasons, the undersigned RECOMMENDS that the court:

A. GRANT the Motion in part and bar Plaintiffs from introducing any evidence or testimony related to VI for the purpose of meeting the causation burden set out in subsection 804(c); and

B. Otherwise DENY the Motion without prejudice.

IT IS DIRECTED that a copy of this Memorandum and Recommendation be served on the parties. You shall have until **July 29, 2025**, to file written objections to the Memorandum and Recommendation. The presiding district judge must conduct his or her own review (that is, make a de novo determination) of those portions of the Memorandum and Recommendation to which objection is properly made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.,* 28 U.S.C. § 636(b)(l); Fed. R. Civ. P 72(b)(3); Local Civil Rule 1.1 (permitting modification of deadlines specified in local rules), 72.4(b).

**If you do not file written objections to the Memorandum and Recommendation (M&R) by the foregoing deadline, you will be giving up the right to review of the M&R by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, your failure to file written objections by the foregoing deadline may bar you from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation.** *See Wright v. Collins,* **766 F.2d 841, 846-47 (4th Cir. 1985).**

Submitted, this 15 day of July, 2025.

*Robert Jones Jr.*
_____
Robert B. Jones, Jr.
United States Magistrate Judge