IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
Civil Action No.: 7:23-CV-00897

| | |
|---|---|
| IN RE: CAMP LEJEUNE WATER LITIGATION <br><br> This Pleading Relates to: <br><br> ALL CASES. | PLAINTIFFS' LEADERSHIP GROUP'S MOTION TO APPLY THE COURT'S JULY 22, 2025 ORDER TO ALL EXPERTS |

Plaintiffs' Leadership Group (the "PLG") respectfully moves the Court to apply its July 22, 2025 Order (D.E. 444) concerning the use of general causation findings in Phase III reports equally to experts from both parties.

## I. INTRODUCTION

On July 22, 2025, the Court partially granted Defendant's motion seeking to exclude Phase III expert testimony that Defendant asserted addressed general causation (a Phase II topic). (D.E. 444). In its Order, the Court explained why a "balanced approach" allowing Phase III experts to reference Phase II findings—but not to conduct *new* general causation analyses— would "keep[] the litigation on its current pretrial track." *Id.* at 5. Although the Court's rationale applies equally to both parties' experts, the final order was directed only to Plaintiffs' experts. Plaintiffs now move the Court to apply the Order equally.

## II. FACTUAL & PROCEDURAL BACKGROUND

Pursuant to the Court's orders, expert discovery in this litigation has proceeded in three phases: Phase I (water contamination), Phase II (general causation), and Phase III (specific causation, damages, and residual issues). Each Phase included deadlines for expert disclosures and expert reports by both parties. (D.E. 444) at 1-2; *see generally* (D.E. 270); (D.E. 312); (D.E. 414). As relevant here, this Court ordered Plaintiffs to disclose their experts relating to "general

1

causation for Track 1 illnesses (the 'General Causation Phase')" by December 9, 2024, and ordered the Defendant to "disclose its experts relating to the General Causation Phase" by February 7, 2025. (D.E. 312) at 1, 3. The Court ordered Plaintiffs to disclose their residual experts, including relating to specific causation, by February 7, 2025, and ordered the Defendant to disclose their specific causation and other residual experts by April 8, 2025. (D.E. 312) at 2-3. In other words, both parties had to disclose their Phase II experts in advance of their Phase III experts. Both parties also had opportunities to depose each other's Phase II and Phase III experts.

After Phase III expert reports were served, Defendant moved the Court to exclude portions of Plaintiffs' Phase III specific causation reports, which Defendant contended included new general causation opinions that should have been disclosed in Phase II. *See* (D.E. 409); (D.E. 410) at 6-7. In response, Plaintiffs argued that specific and general causation are interrelated concepts, such that Phase III experts addressing specific causation might inherently include some analysis of general causation. *See* (D.E. 437). Plaintiffs pointed to examples of Defendant's own Phase III reports likewise containing new general causation analysis. (D.E. 437) at 5-6.

On July 22, 2025, the Court entered an Order (the "July 22 Order") partially granting Defendant's motion. The Court concluded that "to the extent Phase III experts offer new, independent general causation analyses, such as fresh literature reviews, novel threshold calculations, or independent application of causation models not previously disclosed, those opinions violate the court's scheduling orders." (D.E. 444) at 5. The Court allowed, however, "Phase III experts to reference Phase II findings," (D.E. 444) at 7, because "each phase informs the next" and not so allowing would "frustrate the court's intent" in creating the phased

2

approach. (D.E. 444) at 5. The Court stated these conclusions generally, not limited to either party's experts. The Court's final order, however, was directed only to Plaintiffs' experts:

> For the foregoing reasons, the court grants the Motion in part and orders the following:
>
> 1. Plaintiffs' Phase III experts may reference general causation evidence, including Phase II opinions and published literature, as part of the specific causation methodology (e.g., differential diagnosis).
>
> 2. Plaintiffs' Phase III experts may not introduce new, independent general causation analyses, including but not limited to fresh literature reviews, novel threshold calculations, or any general causation methodologies that were not timely disclosed in Phase II.

(D.E. 444) at 8. Plaintiffs now respectfully move the Court to apply the July 22 Order to both parties' experts.

Plaintiffs conferred with the Defendant about potentially stipulating that this rule would apply equally to all experts, i.e., that no Phase III expert could provide new opinions on general causation. Plaintiff also raised this matter at the status conference on August 29, 2025. The Defendant did not agree to stipulate or that it would not oppose this motion, and instead stated that the Court's July 22 Order should be limited to those experts subject to Defendant's June 23, 2025 motion.

### III. <u>ARGUMENT</u>

As the Court explained in the July 22 Order, limiting the use of general causation testimony in Phase III expert reports to information generated in Phase II "keeps the litigation on its current pretrial track." (D.E. 444) at 7. The principles on which this Court based its July 22 Order apply equally to both parties, who were both subject to independent Phase II deadlines that preceded their Phase III deadlines. There is no just reason one party's experts should be limited based on the phased scheduling both parties agreed to while the other party's experts are not. That is especially true when the Defendant is that party that sought this relief, and should be

3

equitably estopped from taking positions contrary to those in its June 23, 2025 motion. (D.E. 409-10.) The Court has ample authority to enforce its July 22 Order against both parties' experts.

A. **Applying the July 22 Order to all Experts Promotes Efficiency and Justice.**

In the July 22 Order, this Court explained why excluding new general causation analyses from Phase III expert reports would promote the advancement of the litigation. The July 22 Order was "consistent with the court's decision to proceed in certain pretrial issue Phases." (D.E. 444) at 5. "It would frustrate the court's intent to prevent experts in subsequent Phases from referring to work done by prior experts." *Id.* at 5-6. "However, allowing wholly new general causation analyses could undermine the court's phased discovery process and pretrial schedule." *Id.* at 7. In sum:

> The phased expert discovery schedule is designed to efficiently litigate pretrial threshold issues and conduct bellwether mediations and trials to progress towards global settlement. Allowing Phase III experts to reference Phase II findings avoids duplicative discovery; barring new analyses preserves docket control. This balanced approach keeps the litigation on its current pretrial track.

*Id.* (internal citations omitted).

The "phased expert discovery schedule" applies to both parties, and allowing *either* party to deviate from it by including new Phase II analysis in Phase III reports would interfere with the "efficient[] litigat[ion]" and "progress" envisioned by the Court. *See id.* It was not an accident that the Court's July 22 used broad language applicable to all experts when describing what type of expert testimony would violate the Court's scheduling orders. As the Court stated: "to the extent Phase III experts offer new, independent general causation analyses, such as fresh literature reviews, novel threshold calculations, or independent application of causation models not previously disclosed, those opinions violate the court's scheduling orders." (D.E. 444) at 5. This conclusion was not dependent on any expert-specific analysis. Indeed, the July 22 Order did not discuss a single one of the more-than-a-dozen Plaintiffs' expert reports that Defendant

4

accused of including inappropriate testimony. (D.E. 410) at 2-6. Rather than being based on anything specific to any particular expert, by Plaintiffs or Defendant, the Court's rationale was based on the scheduling order, which applied universally to all experts.

Applying the July 22 Order to Plaintiffs' experts but not Defendants' experts will be prejudicial because, as Plaintiffs discussed in their opposition to Defendant's motion, Defendant's Phase III experts also conducted and relied upon new general causation analyses. For example, at Phase III, Defendant disclosed Dr. Lisa Bailey, who concluded that every Track 1 Plaintiff's disease was not caused by exposure to water at Camp Lejeune. Dr. Bailey used the same methodology to reach this conclusion for every Track 1 Plaintiff. Generally speaking, for every Track 1 Plaintiff, Dr. Bailey conducted what she describes as a "risk assessment" in which she compared her calculation of each Plaintiff's exposure to a relevant chemical to "toxicity criteria," which she described as "doses or concentrations at or below which health adverse health effects are not expected." *See, e.g.*, Bailey Rep. (Welch) at 3-4 (JA Ex. 547, D.E. 503); Bailey Rep. (Sparks) at 3-4 (JA Ex. 546, D.E. 503). The "toxicity criteria" that Dr. Bailey used are not Plaintiff-specific, but apply generally to each chemical. For example, Dr. Bailey identified and applied the same toxicity criteria in each of her reports on Parkinson's Disease Track 1 Plaintiffs, apparently copying and pasting much or all of Section 5.2 of each such report. *Compare* Bailey Rep. (Welch) at 26 (JA Ex. 547, D.E. 503) (table of TCE Toxicity Criteria Applied in the Risk Calculations), *with* Bailey Rep. (Sparks) at 24 (JA Ex. 546, D.E. 503) (same table). In other words, Dr. Bailey's toxicity criteria are Phase II general causation analyses.

But Dr. Bailey did not simply rely on one of the Defendant's Phase II experts to identify toxicity criteria. Instead, Dr. Bailey reviewed US EPA and ATSDR assessments of toxicity criteria, and then made her own choices and adjustments to derive the toxicity criteria that she

5

would compare to each Plaintiff's exposure levels. *See, e.g.*, Bailey Rep. (Kidd) at 29 (JA Ex. 513, D.E. 500) ("I chose to use the higher end of the range of benzene CSFs and IURs provided by US EPA (2003a) in my risk calculations"); Bailey Rep. (Welch) at 25 (JA Ex. 547, D.E. 503) (adjusting EPA data to derive toxicity criterion she applied to Plaintiffs at Camp Lejeune for fewer than 7 years: "I have removed that UF to adjust the value to reflect a subchronic exposure duration (64 µg/m$^3$ x 3), resulting in subchronic TCE toxicity criterion of 192 µg/m$^3$ (0.036 pa1ts per million [ppm]) that can be applied for subchronic exposure durations (i.e., less than 7 years of exposure per US EPA guidelines) for neurological effects."); Bailey Rep. (Sparks) at 24 (JA Ex. 546, D.E. 503) (same verbatim). When the EPA did not provide data on the "exposure concentration or dose that is predicted to be associated with no (or a very low) [health] response," which "is referred to as the point of departure (POD)," Dr. Bailey estimated that threshold dose herself. *See, e.g.*, Bailey Rep. (Kidd) at 11, App'x E (JA Ex. 513, D.E. 500) ("Because the [EPA] does not present points of departure (PODs) for [TCE] or vinyl chloride . . ., I have estimated the PODs . . . used in the margin of exposure (MoE) calculations," and then presenting those calculations).

    Undeniably, Dr. Bailey's Phase III reports offer "novel threshold calculations," which the July 22 Order concluded "violate the court's scheduling orders." (D.E. 444) at 5. These are but a few examples from Defendant's Phase III reports. As the Court concluded in the July 22 Order, allowing Defendant to include such testimony would cause prejudice to Plaintiffs by "risk[ing] unfair surprise… [and] necessitat[ing] additional discovery." (D.E. 444) at 7.

    As such, Plaintiffs move the Court to apply the July 22 Order to both parties' experts. Doing so also promotes efficiency because Plaintiffs may otherwise need to bring a *Daubert* motion against each Defense expert who conducted new analysis, even though the Court has

6

already decided this issue. As the Defendant argued in its successful motion seeking this very relief: "Exclusion of these late opinions will therefore promote resolution on the merits by preserving the Court's phased discovery structure, which ensures that Phase II remains focused on general causation and Phase III on specific causation." (D.E. 410) at 10. Plaintiffs thus request the Court expand the final paragraphs of its July 22 Order to apply to Plaintiffs' *and* Defendant's experts.

### B. The Court Has Authority to Clarify the Scope of the July 22 Order.

The Court has ample authority to apply the July 22 Order to all experts. To begin, "[d]istrict courts have inherent power to manage their dockets with an eye toward speedy and efficient resolutions." *United States ex rel. Nicholson v. MedCom Carolinas, Inc.*, 42 F.4th 185, 196 (4th Cir. 2022). This power is further outlined in Federal Rule of Civil Procedure 16, which allows the Court to take action aimed at "expediting disposition of the action," "discouraging wasteful pretrial activities," "limiting the use of testimony under Federal Rule of Evidence 702," "adopting special procedures for managing potentially difficult or protracted actions," and "facilitating in other ways the just, speedy, and inexpensive disposition of the action." Fed. R. Civ. P. 16(a) & (c)(2). As described above, enforcing the July 22 Order against all experts would be "consistent with the court's decision to proceed in certain pretrial issue Phases," (D.E. 444) at 5, and prevent duplicative *Daubert* motions, thereby promoting efficient resolution.

Moreover, the Court may construe this request as a motion under Federal Rule of Civil Procedure 60. Rule 60(a) grants the Court authority to "correct a[n]…oversight or omission whenever one is found in a[n] order." "The court may do so on motion or on its own." Fed. R. Civ. P. 60(a). If the Court intended to apply the July 22 Order to all experts, as potentially contemplated throughout the ruling, but then directed the final paragraph only towards Plaintiffs' experts, it may correct the Order accordingly. Rule 60(b) further allows the Court to offer relief

7

from an order for "any…reason that justifies relief." Fed. R. Civ. P. 60(b)(6). Here, relief is justified because the Order as it stands would allow Defendant—but not Plaintiffs—to rely on expert testimony that violated the scheduling orders. A motion under Rule 60(b) need only be made "within a reasonable time." Fed. R. Civ. P. 60(c)(1). Plaintiffs seek relief just over a month after the ruling. Plaintiffs raised the issue as soon as it became apparent that doing so would save considerable time and judicial resources.

Finally, because equity requires equal enforcement of the July 22 Order, the Court may rely on its inherent equitable powers. *Cf. Thompson v. U.S. Dep't of Housing & Urban Dev.*, 404 F.3d 821, 830 (4th Cir. 2005) (discussing "the court's inherent equitable power over its own judgments").

## IV. CONCLUSION

Accordingly, the PLG moves the Court to apply its July 22, 2025 Order (D.E. 444) equally to all experts. After the Court does so, the PLG proposes that the parties meet and confer to discuss the most efficient way to limit testimony by any Phase III expert that offered "new, independent general causation analyses" of the type encompassed by the July 22 Order.

DATED this 2nd day of September, 2025.

| | |
|---|---|
| /s/ J. Edward Bell, III | /s/ Zina Bash |
| J. Edward Bell, III (admitted *pro hac vice*) | Zina Bash (admitted *pro hac vice*) |
| Bell Legal Group, LLC | Keller Postman LLC |
| 219 Ridge St. | 111 Congress Avenue, Suite 500 |
| Georgetown, SC 29440 | Austin, TX 78701 |
| Telephone: (843) 546-2408 | Telephone: 956-345-9462 |
| jeb@belllegalgroup.com | zina.bash@kellerpostman.com |
| | |
| *Lead Counsel for Plaintiffs* | *Co-Lead Counsel for Plaintiffs and Government Liaison Counsel* |

| | |
|---|---|
| */s/ Elizabeth J. Cabraser* | */s/ W. Michael Dowling* |
| Elizabeth J. Cabraser (admitted *pro hac vice*) | W. Michael Dowling (NC Bar No. 42790) |
| Lieff Cabraser Heimann & Bernstein, LLP | The Dowling Firm PLLC |
| 275 Battery Street, 29th Floor | Post Office Box 27843 |
| San Francisco, CA 94111 | Raleigh, North Carolina 27611 |
| Telephone: (415) 956-1000 | Telephone: (919) 529-3351 |
| ecabraser@lchb.com | mike@dowlingfirm.com |
| | |
| *Co-Lead Counsel for Plaintiffs* | *Co-Lead Counsel for Plaintiffs* |
| | |
| */s/ Robin L. Greenwald* | */s/ James A. Roberts, III* |
| Robin L. Greenwald (admitted *pro hac vice*) | James A. Roberts, III |
| Weitz & Luxenberg, P.C. | Lewis & Roberts, PLLC |
| 700 Broadway | 3700 Glenwood Ave., Ste. 410 |
| New York, NY 10003 | Raleigh, NC 27612 |
| Telephone: 212-558-5802 | Telephone: (919) 981-0191 |
| rgreenwald@weitzlux.com | jar@lewis-roberts.com |
| | |
| *Co-Lead Counsel for Plaintiffs* | *Co-Lead Counsel for Plaintiffs* |

*/s/ Mona Lisa Wallace*
Mona Lisa Wallace (N.C. Bar No.: 009021)
Wallace & Graham, P.A.
525 North Main Street
Salisbury, North Carolina 28144
Tel: 704-633-5244
mwallace@wallacegraham.com

*Co-Lead Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 2 2025, I electronically filed the foregoing using the Court's Case Management/Electronic Case Files system, which will send notice to all counsel of record.

>*/s/ J. Edward Bell, III*
>J. Edward Bell, III

10

Case 7:23-cv-00897-RJ    Document 515    Filed 09/02/25    Page 10 of 10