**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**SOUTHERN DIVISION**
**NO. 7:23-CV-897**

IN RE:

**CAMP LEJEUNE WATER LITIGATION**

**This Document Relates To:**

*Jose Vidana v. United States*,
**Case No. 7:23-cv-01575**

**MEMORANDUM OF LAW IN SUPPORT
OF UNITED STATES' MOTION TO
EXCLUDE THE EXPERT OPINIONS OF
PAUL J. MICHAELS, M.D.**

# TABLE OF CONTENTS

Pages

Table of Contents ........................................................................................................... i

Table of Authorities ...................................................................................................... ii

Introduction .................................................................................................................... 1

Background ...................................................................................................................... 2

I.   Mr. Vidana Lived and Worked at Camp Johnson, an Area that Plaintiffs Do Not Allege Was Supplied with Contaminated Water. ............................................... 2

   A. Mr. Vidana May Have Ventured Off Camp Johnson for Physical Training After Class, but He Does Not Know Where He Went. ............................................. 3

   B. Mr. Vidana Explored On and Off Base on Some Weekends, but He Does Not Know Where He Went. .................................................................................. 4

II.  Dr. Michaels Opines that Exposure to Water at Camp Lejeune was As Likely As Not a Cause of Mr. Vidana's DLBCL. ............................................................. 5

   A. Dr. Michaels is a Pathologist Who Acknowledges Pathology Supplies No Method to Determine Whether NHL Was Caused By PCE, TCE, or Benzene. ... 5

   B. Pathologist Dr. Michaels's Exposure Assessment is Based on His Reading of the ATSDR's 2017 Assessment, the ATSDR's Modeled Contaminant Concentrations for Hadnot Point, Mr. Vidana's Deposition Testimony, and Independent Research. ....................................................................................... 6

   C. Dr. Michaels Opined that Mr. Vidana's Exposure Was of a Sufficient Concentration and Duration to Be *a* Cause of his NHL. ............................... 8

      1. Sufficient Time ....................................................................................... 9

      2. Sufficient Concentrations ....................................................................... 10

Legal Standard ............................................................................................................... 11

I.   Causation ...................................................................................................................... 11

II.  *Daubert* Standard ................................................................................................... 12

Argument ......................................................................................................................... 13

I.   Dr. Michaels's Methodology for Assessing the Sufficiency of Mr. Vidana's Exposure is Unreliable Because it is Based on Public Policy and Speculation, Not Scientific Knowledge. ......................................................................................... 13

II.  Dr. Michaels is Unqualified to Opine on the Daily Lives of Marines at Camp Lejeune in the 1980s. ............................................................................................... 18

III. Dr. Michaels's General Causation Opinions Should be Excluded. ....................... 21

# TABLE OF AUTHORITIES

Pages

Cases

*Belville v. Ford Motor Co.,* 919 F.3d 224, 232 (4th Cir. 2019)....................................... 12

*Blackmon v. G.UB.MK Constructors*, No. 7:14-CV-258-D, 2016 WL 8674646, at *3 (E.D.N.C. Nov. 11, 2016...................................................................................................... 13

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589–90 (1993) ................................. 12, 15

*Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013 ............................... 19

*Nix v. Chemours Co. FC*, No. 7:17-CV-189-D, 2023 WL 6471690 ............................. 14

*SAS Inst., Inc. v. World Programming Ltd.*, 125 F. Supp. 3d 579, 584 (E.D.N.C. 2015) ........... 18

*Small v. WellDyne, Inc.*, 927 F.3d 169, 177 (4th Cir. 2019)........................................... 17

*vonRosenberg v. Lawrence*, 413 F. Supp. 3d 437, 450 (D.S.C. 2019)........................... 19

*Waterhouse v. R.J. Reynolds Tobacco Co.*, 368 F. Supp. 2d 432, 436 (D. Md. 2005)................. 19

*Yates v. Ford Motor Co.*, 113 F. Supp. 3d 841, 850 (E.D.N.C. 2015) ......................... 11

*Zellars v. NexTech Ne.*, LLC, 895 F. Supp. 2d 734, 741 (E.D. Va. 2012) ........................... 11, 13

*Zellers v. NexTech Ne., LLC*, 533 F. App'x 192, 196 (4th Cir. 2013)........................................ 11

Statutes

162 F. App'x 231 (4th Cir. 2006........................................................................... 19

874 F.3d 370 (4th Cir. 2017) ................................................................................. 18

Other Authorities

Camp Lejeune Justice Act of 2022, Pub. L. No. 117-168, § 804, 136 Stat. 1759, 1802–04 (2022) ........................................................................................................ 2

CLJA § 804(b)-(c)................................................................................................. 12

Rules

Federal Rule of Civil Procedure 26(a)(2)(B)(i)…………................................................... 19

Fed. R. Evid 702 ............................................................................................... 12, 18

**TABLE OF EXHIBITS FILED ON THE JOINT APPENDIX**

| JA Exhibit Number | Short Citations | Full Title |
|---|---|---|
| 502 | Michaels Rep. (Vidana) (JA Ex. 502, D.E. 499-7) | Specific Causation Expert Report of Paul J Michaels, MD<br><br>Jose Vidana v United States of America<br><br>US District Court for Eastern District of NC, Southern Division<br><br>Case No 7:23-CV-01575 |
| 182 | ATSDR 2017 Assessment (JA Ex. 182, D.E. 472-3) | Assessment of the Evidence for the Drinking Water Contaminants at Camp Lejeune and Specific Cancers and Other Diseases |
| 596 | Michaels Dep. Tr. (JA Ex. 596, D.E. 508-5) | August 6, 2025 Deposition Transcript of Paul J. Michaels, M.D. |
| 6 | Brigham 1st Rep. (JA Ex. 6, D.E. 459-7) | Expert Report of Jay L Brigham, PhD |
| 43 | Maslia Rep. (JA Ex. 43, D.E. 462-1) | Expert Report of Morris L Maslia, PE, DWRE, DEE, Fellow EWRI |
| 47 | Maslia 1st Dep. Tr. (JA Ex. 47, D.E. 462-5) | September 26, 2024 Deposition Transcript of Morris L. Maslia |
| 234 | Cohn 1994 (JA Ex. 234, D.E. 479-11) | Drinking Water Contamination and the Incidence of Leukemia and Non-Hodgkin's Lymphoma |
| 193 | Bove 2024 Mort. Study (JA Ex. 193, D.E. 472-14) | Evaluation of mortality among Marines, Navy personnel, and civilian workers exposed to contaminated drinking water at USMC base Camp Lejeune: a cohort study |
| 503 | Michaels MCL (Vidana) (JA Ex. 503, D.E. 499-8) | Additional Materials Considered - Expert Report of Paul J Michaels (Vidana) |
| 326 | PLG Phase III 2d Am. Exp. Discl. (JA Ex. 326, D.E. 487-2) | PLG's Phase III Second Amended Expert Disclosure (March 31, 2025) |

# INTRODUCTION

Plaintiffs proffer Dr. Paul Michaels, a pathologist, to opine that Mr. Vidana's exposure to 1.2 liters of water at Hadnot Point on Camp Lejeune for up to 15 days during May and June of 1983 was at least as likely as not a cause of his non-Hodgkin's Lymphoma ("NHL"). Dr. Michaels's opinion that Mr. Vidana's exposure was "for sufficient time and at sufficient concentrations" is not sufficiently reliable to be admitted under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), because it is not supported by scientific knowledge. Michaels Rep. (Vidana) at 14 (JA Ex. 502, D.E. 499-7). For example, Dr. Michaels claims he determined that thirty days is sufficient time at Camp Lejeune for exposure based on the ATSDR's 2017 *Assessment of the Evidence for the Drinking Water Contaminants at Camp Lejeune and Specific Cancers and Other Diseases* (JA Ex. 182, D.E. 472-3, hereinafter "2017 ATSDR Assessment"). Michaels Dep. Tr. at 92:15–94:4 (JA Ex. 596, D.E. 508-5). But the 2017 ATSDR Assessment found that "sufficient evidence for a threshold is lacking" so any "specific minimum duration for policy purposes will primarily be based on social, economic and legal factors." ATSDR 2017 Assessment at 11 (JA Ex. 182, D.E. 472-3).

Dr. Michaels's opinion also rests on independent research outside the bounds of his expertise. Dr. Michaels determined that Mr. Vidana traveled away from the uncontaminated Camp Johnson, where Mr. Vidana lived and worked, to go to Hadnot Point, which was intermittently supplied by contaminated water. This was based on his opinion about the daily lives of Marines at Camp Lejeune in the 1970s and 1980s. Dr. Michaels lacks any qualifications to render this opinion, and he failed to even mention Camp Johnson or that the water was uncontaminated there in his report. Dr. Michaels also based his opinions on his independent general causation analysis, but failed to disclose it in Phase II as required by this Court's Order. For these reasons, the United States requests that this Court exclude the opinions of Dr. Michaels in their entirety.

1

**NATURE OF THE CASE**

Mr. Vidana filed an action for personal injury related to exposure to contaminated water pursuant to the Camp Lejeune Justice Act of 2022, Pub. L. No. 117-168, § 804, 136 Stat. 1759, 1802–04 (2022).

**BACKGROUND**

**I. Mr. Vidana Lived and Worked at Camp Johnson, an Area that Plaintiffs Do Not Allege Was Supplied with Contaminated Water.**

Between May 8, 1983, and June 30, 1983, Mr. Vidana attended a seven-week Basic Supply Stock Control course at Camp Johnson. *See* **Exhibit A**, Copy of Mr. Vidana's Form DD-214, 01575_VIDANA_NARA_0000000074; **Exhibit B**, Vidana Dep. Tr. at 91:4–14; 96:21–25; 97:23–98:3. Camp Johnson, historically referred to as Montford Point, is a 1,600-acre area of Camp Lejeune just south of the city of Jacksonville. It was historically separate from the rest of the base and was served by its own water distribution system. Brigham 1st Rep. at 23, 57 (JA Ex. 6, D.E. 459-7). Morris Maslia, Plaintiffs' water modeling expert and the former project manager of the ATSDR water modeling effort, testified there was no evidence that Camp Johnson was contaminated with volatile organic compounds. *See* Maslia Rep. at 21 (JA Ex. 43, D.E. 462-1) (showing Montford Point outside of the alleged contamination); Maslia 1st Dep. Tr. at 156:8–15 (JA Ex. 47, D.E. 462-4).

For the entirety of Mr. Vidana's seven weeks at Camp Lejeune, he lived and worked at Camp Johnson. Mr. Vidana resided in the barracks located at Camp Johnson. Ex. B, Vidana Dep. Tr. at 99:20–22 ("Q. . . . So you lived in barracks on Camp Johnson; right? A. Correct. Correct."); *see also id.* at 99:2–9, 100:22–101:1, 104:24–105:3. From Monday to Friday for seven weeks, Mr. Vidana's training occurred "at Camp Johnson." *Id.* at 98:11–13, 98:24–99:1 ("Q. So you were at

2

Camp Johnson Monday through Friday for the seven weeks of your MOS training? A. Yes.");
105:6–8.

A typical day for Mr. Vidana began with physical fitness in formation. *Id.* at 114:6–19. He would return to the barracks to shower, shave, brush his teeth, "drink 5 gallons of water off the sink," clean the barracks, and ensure everyone was in proper uniform for inspection prior to marching to the classroom. *Id.* at 114:20–115:24. He was in the classroom each weekday for a "full day of class instruction." *Id.* at 122:21–123:8. Mr. Vidana also recalled that the mess hall was only a "short walk" over dirt and gravel from the barracks and classroom area on Camp Johnson. *Id.* at 125:19–126:11. While in the mess hall, Mr. Vidana drank water from a glass. *Id.* at 151:20–25. When he was not "in a classroom environment" he was "out doing physical training or [he] was out exploring with friends" as he "just wanted to get away from the barracks." *Id.* at 99:2–9; 101:6–14.

### A. Mr. Vidana May Have Ventured Off Camp Johnson for Physical Training After Class, but He Does Not Know Where He Went.

Mr. Vidana would occasionally continue to work on his physical fitness during his free time in the evenings or on weekends. He had "no idea where [he] would end up running. . . . [He] didn't know where the heck [he] was. [He] just knew that at a certain point it was time for [him] to turn around" because it was getting dark or he was tired. *Id.* at 147:8–148:10. He has no memory of stopping for water on his runs. *Id.* at 148:11–16 ("Q. And while you were training on various areas of the base, would you ever stop in different buildings or -- to get a drink of water for example? A. I don't remember. But I know that I would stop and use the restroom if I had to. That makes sense to me. It's possible. Sure."). He would sometimes go "on very long runs" wearing reflective running gear so it is possible he "was off base." *Id.* at 148:17–149:10.

### B. Mr. Vidana Explored On and Off Base on Some Weekends, but He Does Not Know Where He Went.

Mr. Vidana "couldn't tell you exactly where" he explored outside of his classroom hours beyond that it was "on base[,] off base." *Id.* at 101:6–23; *see also id.* at 105:22–106:8 ("Q. So you just mentioned you would sometimes eat or sometimes go to the bar. Were there any other activities you participated in when you explored the base? A. Yeah. Sometimes we would go to other -- other parts of Camp Lejeune. But, you know, I couldn't tell you where they were. I didn't ask. But we went through -- both on and off base to multiple different areas frequently. And because it got dark fast, you know, we tried to just make it back to -- back to the base safely because it gets very dark and very cold. I remember that very well."). Further, Mr. Vidana did not have a car, so he relied on others, *id.* at 101:24–102:4; 127:1–17, which sometimes led to a "late night" where he didn't return to the barracks until between 8:00–10:00 PM. *Id.* at 103:15–104:2; 105:22–106:8.

Mr. Vidana could not recall how frequently he went exploring. While Mr. Vidana explored on the weekend, he "couldn't tell you" if it was all seven weekends, as he explored "only when [he] knew that [he] didn't have a major event going on on Monday that [he] had to prepare for." *Id.* at 127:22–128:1, 102:20–103:14. "And it was almost every Monday that [he] had something formal to prepare for." *Id.* at 106:12–107:1. Specifically, Mr. Vidana recalled "special tests" or "uniform inspections" would keep him from leaving the barracks as he had to "spend some hours and burn the midnight oil to get those uniforms ready for Monday or to sit down and study, have a study circle to prepare for examination on a Monday, then [he] wouldn't take off" on the weekends. *Id.* at 102:20–103:14. In addition to the weekends, Mr. Vidana "took off with [his] friends when [he] had the opportunity." *Id.* at 102:12–18.

Mr. Vidana "[does not] know" where he went exploring on base. *Id.* at 101:20–23. He recalled eating fast food while exploring, but does not "remember where it was … [or] what it was, but we did have a lot of fast food . . . on base[.]" *Id.* at 128:5–16. He also recalled going to bars on base called "E-clubs" where "all the enlisted people that were not on deployment would go . . . on the weekend" to play pool, dance and hang out. *Id.* at 128:17–129:4. While there, he enjoyed "[t]he best nachos in town" and "water with ice and lemon." *Id.* at 158:18–24. "[T]he E clubs were all over the place. So [he] couldn't tell you where it was." *Id.* at 128:17–129:4; 147:8–148:10. However, he "didn't frequent" the E-clubs as he "found them quite boring." *Id.* at 157:22–158:11.

## II.  Dr. Michaels Opines that Exposure to Water at Camp Lejeune Was As Likely As Not a Cause of Mr. Vidana's DLBCL.

Plaintiff's specific causation expert, Dr. Michaels, opined "that Mr. Vidana's exposure to the contaminated water at Camp Lejeune containing elevated mean concentrations of TCE, PCE, and benzene between May 12, 1983, and June 30, 1983, was a at least as likely as not a cause for Mr. Vidana's diffuse large B-cell lymphoma (DLBCL) diagnosed in October of 2007."[1] Michaels Rep. (Vidana) at 14-15 (JA Ex. 502, D.E. 499-7).

### A.  Dr. Michaels is a Pathologist Who Acknowledges Pathology Supplies No Method to Determine Whether NHL Was Caused By PCE, TCE, or Benzene.

Dr. Michaels is a pathologist in Coos Bay, Oregon, with a "strong subspecialty focus in breast and gynecologic pathology, as well as cytopathology[.]" *Id.* at 1. Despite this specialty and "the fact that [he is] not fellowship-trained or board-certified [in hematopathology]," he claimed

---

[1] In reviewing his report to prepare for the deposition, Dr. Michaels noticed he "put May 12th for the first day that he was in Camp Lejeune, and I think I -- when I was looking at some of, I believe, Dr. Reynolds' data, that May 8th was used. So I wasn't sure about where I got May 12th, or if that was a typographical error or what. But … it doesn't change any of the substance of my opinions. So I . . . don't think it's really that important, honestly; it's just a discrepancy that I saw." Michaels Dep. Tr. at 12:7–20 (JA Ex. 596, D.E. 508-5).

that his colleagues often come to him to discuss NHL because he is "a really good diagnostic pathologist" trained at Massachusetts General Hospital where he did "a lot of extra work[,] day to day, as a resident, in hematopathology." Michaels Dep. Tr. at 38:20-41:7 (JA Ex. 596, D.E. 508-5).

    As a pathologist, Dr. Michaels conceded that "there are no biomarkers for TCE or PCE or benzene which would indicate that an NHL had developed in light of exposure to any of those chemicals[.]" *Id.* at 60:12–17. Dr. Michaels has not authored any publications involving TCE, PCE, or benzene; consequently, he has not published on whether these chemicals can cause NHL or whether there is threshold exposure for any of the chemicals that will increase someone's risk for developing NHL. *Id.* at 71:15–72:2. He was "trained" in epidemiology "in medical school" and "uses [it] constantly" but is "not [himself] a Ph.D., [n]or [does he] have any extra specific training in public health with respect to epidemiology." *Id.* at. 72:14–21. He "would not hold [himself] out to be a toxicologist, which some people would consider to be separate from toxicology within clinical pathology." *Id.* at 73:10–19.

> **B. Pathologist Dr. Michaels's Exposure Assessment is Based on His Reading of the ATSDR's 2017 Assessment, the ATSDR's Modeled Contaminant Concentrations for Hadnot Point, Mr. Vidana's Deposition Testimony, and Independent Research.**

    Dr. Michaels relied on the expert report of Plaintiffs' expert, Morris Maslia, and the 2017 ATSDR Assessment to form his opinion "regarding Mr. Vidana's exposure to carcinogens while stationed at Camp Lejeune[.]" Michaels Rep. (Vidana) at 5–6 (JA Ex. 502, D.E. 499-7). Citing the ATSDR's simulated contaminant concentrations for Hadnot Point, Dr. Michaels concluded in his report that "[d]uring the period of time when Mr. Vidana was at Camp Lejeune, the concentrations in finished water ranged from 449-546 µg/L for TCE, 22-27 µg/L for PCE, 7-8 µg/L for benzene, and 36-45µg/L for VC." *Id.* at 6. Significantly, Dr. Michaels never mentioned in his report that

Mr. Vidana lived and worked at Camp Johnson, which was not supplied with contaminated water during Mr. Vidana's short time at Camp Lejeune, though, when pressed at deposition, Dr. Michaels agreed. Michaels Dep. Tr. at 174:4–14 (JA Ex. 596, D.E. 508-5).

Although Plaintiffs' exposure expert, Dr. Reynolds, did an exposure assessment for Mr. Vidana, Dr. Michaels did not include any reference to the assessment in his report, explaining that it was "not something that was a huge factor in coming to [his] ultimate conclusion[.]" *Id.* at 269:16–270:16. While Dr. Michaels claimed at deposition that he reviewed and evaluated a draft of Dr. Reynolds's report, he decided to use the ATSDR modeled Hadnot Point monthly exposure levels instead, even though Mr. Vidana neither lived nor worked at Hadnot Point while at Camp Lejeune. *See id.* at 270:4–16. Dr. Michaels admitted that he did not see Dr. Reynolds's final report until after he submitted his own expert opinions, and that he never compared the draft he reviewed to the final report, though nothing "seemed different." *Id.* at 269:6–15.

Dr. Michaels opined that Mr. Vidana visited Hadnot Point based on his "opinion about the actual daily life of a [M]arine in the 70s and 80s in Camp Lejeune and what was really in the individual areas." *Id.* at 176:22–177:14. He reached this opinion about the daily life of a Marine through independent research that involved looking through the ATSDR reports and "just trying to Google about Camp Lejeune and different locations[.]" *Id.* at 177:15–178:15. In conducting this "evaluation," he determined that "Hadnot Point had the vast majority of the restaurants, which people called Mainside, and they had bars and barracks, et cetera." *Id.*

With respect to Mr. Vidana's water consumption, Dr. Michaels relied on Mr. Vidana's testimony that after he went running, he would "shower and drink 5 gallons of water off the sink," and he would shower "approximately 3 to 5 times per day on weekdays, and 2 to 3 times on weekends, sometimes for more than 15-20 minutes at a time" because he "perspire[ed] so much."

Michaels Rep. (Vidana) at 13 (JA Ex. 502, D.E. 499-7); Michaels Dep. Tr. at 187:25–188:11 (JA Ex. 596, D.E. 508-5). While Dr. Michaels's report completely failed to reference Camp Johnson and its relationship to Hadnot Point, at deposition, Dr. Michaels claimed that he assumed only "one to two days . . . per week . . . [of Mr. Vidana's water consumption] would have actually been at Hadnot Point." Michaels Dep. Tr. at 188:12–189:4 (JA Ex. 596, D.E. 508-5). Dr. Michaels speculated at deposition that it "wasn't clear" that Mr. Vidana showered only in his Camp Johnson barracks because he testified to running around the base, and shower facilities existed at Hadnot Point. *Id.* at 193:3–195:7. And while Dr. Michaels acknowledged that Mr. Vidana's testimony of five gallons of water consumption was "about Monday through Friday" and "likely at Camp Johnson," he stated "those same details were not asked specifically [to Mr. Vidana at deposition] when talking about the weekend." *Id.* at 195:8–196:18. At deposition, Dr. Michaels concluded that Mr. Vidana's likely exposure to Hadnot Point's contaminated water would have been 1–1.2 liters of water on one-to-two days per week. *Id.* at 181:25–182:10; 184:18–185:11; 193:12–195:12. He deemed this frequency a "minimum" given Mr. Vidana's "deposition testimony with respect to going to bars and eating in restaurants and when he would do that[.]" *Id.* at 182:11–24.

### C. Dr. Michaels Opined that Mr. Vidana's Exposure Was of a Sufficient Concentration and Duration to Be *a* Cause of his NHL.

Dr. Michaels used a "differential etiology process applied to the question whether his exposure to the chemicals in the water at Camp Lejeune is 'at least as likely as not' a cause of Mr. Vidana's DLBCL." Michaels Rep. (Vidana) at 14 (JA Ex. 502, D.E. 499-7). He did not opine that Mr. Vidana's exposure is "the only cause" or "the primary cause" because he "was not asked to evaluate that." Michaels Dep. Tr. at 214:2–217:6 (JA Ex. 596, D.E. 508-5). As such, Dr. Michaels concluded:

> Mr. Vidana has only one generally accepted risk factor for NHL – exposure to water at Camp Lejeune for sufficient time and at sufficient concentrations to be a cause

8

of his NHL. We know that Mr. Vidana was exposed to the water at Camp Lejeune for more than 30 days and based on his testimony, that was an exposure consistent with the ATSDR report and the Congressional 30 day time frame. There is no evidence of any other cause here—there was no exposure to other chemicals at work or home, radiation, prior infections, or prior germane medical history. In this context, with an absence of evidence of other causes, and with the length and concentration of exposure to the water at Camp Lejeune, I conclude that his exposure to the Camp Lejeune water is "at least as likely as not" a cause of Mr. Vidana's DLBCL.

Michaels Rep. (Vidana) at 14 (JA Ex. 502, D.E. 499-7).

### 1. *Sufficient Time*

Dr. Michaels defined an exposure sufficient to cause NHL as an unspecified number of days of exposure "over the course of" thirty days, and not thirty "consecutive days of being exposed on every day." Michaels Dep Tr. at 223:25–224:24 (JA Ex. 596, D.E. 508-5). As to Mr. Vidana, Dr. Michaels concluded that based on Mr. Vidana's "time and his testimony" he was "likely not" exposed for thirty days to contaminants at Camp Lejeune. *Id.* at 225:4–7.

Dr. Michaels determined that exposure to TCE, PCE, and benzene "even when only for a short period of time and at low levels, can still lead to irreversible cellular damage that can result in a malignant tumor." Michaels Rep. (Vidana) at 7 (JA Ex. 502, D.E. 499-7). As applied to Camp Lejeune:

This is consistent with the establishment of a minimum duration at Camp Lejeune of 30 days in order to be eligible for the health benefits under the Camp Lejeune Act. This is specifically addressed in the ATSDR 2017 *Assessment of the Evidence for the Drinking Water Contaminants at Camp Lejeune and Specific Cancers and Other Diseases* where it is noted that "the results from the Camp Lejeune mortality studies suggest that a 30-day minimum duration requirement may be appropriate since elevated risks for some of the diseases evaluated were observed for exposure durations of 1-3 months." It went on to report that those "results should not be surprising given that the levels of TCE, PCE, and vinyl chloride measured or estimated in the drinking water systems at Camp Lejeune considerably exceeded their respective MCLs (maximum contaminant levels)."

*Id.*

Dr. Michaels's "understanding" was that the thirty-day minimum duration requirement referenced in ATSDR's 2017 Assessment of the Evidence was based on science, and that NHL was one of the diseases where the ATSDR's mortality studies reported an elevated risk at one to three months' exposure. Michaels Dep. Tr. at 89:19–90:15, 95:17–96:5 (JA Ex. 596, D.E. 508-5). In addition to the 2017 ATSDR Assessment, Dr. Michael testified to referencing "Bove and -- et cetera, Rosenfeld", *id.* at 223:25–224:24, as support for his opinion that an unspecified number of days of exposure over the course of thirty days at Camp Lejeune was sufficient to cause NHL.

## 2. *Sufficient Concentrations*

Dr. Michaels purported to determine "sufficient concentrations" of exposure to cause NHL based on "observational studies in combination with . . . mechanistic data,[2] with the known biological plausibility of how these carcinogens affect tumor cells and normal cell becoming tumor cells." *Id.* at 225:8–226:24. While Dr. Michaels claimed that a "threshold" cannot be defined in the context of a known carcinogen, *id.*, he testified that, in Mr. Vidana's case, the fact that he was exposed to concentrations of contaminants in excess of five parts per billion ("ppb") of TCE and PCE was sufficient to conclude that his exposure was a cause of his NHL. *Id.*

In support of his opinion that exposure to TCE or PCE at five ppb for thirty days increased one's risk of developing NHL, Dr. Michaels cited: (1) the 1994 study by Perry Cohn et al., *Drinking Water Contamination and the Incidence of Leukemia and Non-Hodgkin's Lymphoma*, 102 Env't Health Perspectives 556 (1994), on the incidence of NHL in residents of New Jersey towns that had municipal drinking water contaminated with TCE and PCE; and (2) the 2017 ATSDR Assessment. *See* Cohn 1994 (JA Ex. 234, D.E. 479-11); Michaels Dep. Tr. at 99:12–

---

[2] Mechanistic data includes information on the mechanisms by which the chemical could cause the disease.

101:5, 102:20–104:4, 105:22–107:12 (JA Ex. 596, <u>D.E. 508-5</u>). At deposition, Dr. Michaels claimed that he analyzed those two studies "in combination with . . . the plethora of data as kind of evaluated by IARC with respect to carcinogenicity of [TCE]." Michaels Dep. Tr. at 99:24–101:5 (JA Ex. 596, <u>D.E. 508-5</u>). Dr. Michaels was not just considering "the data that has specifically addressed time and duration and level." *Id.* For PCE, Dr. Michaels stated that he did not "think the data [was] as strong, because it's not considered a known human carcinogen; it's a probable human carcinogen . . . [but the Cohn study] . . . had elevated ratios associated with that same 5 parts per billion." *Id.* at 102:20–104:4; 105:22–106:14. For benzene, Dr. Michaels likewise concluded that exposure to five ppb over thirty days would increase one's risk for developing NHL. *Id.* at 109:10–110:6. In support of this conclusion, he cited to (1) the Nilsson study which had a one-month minimum exposure for inclusion in the study, and (2) while not relying on the maximum contaminant level of 5 ppb, he saw nothing in the literature "to disagree with . . . that level." *Id.* at 108:16–110:6; **Exhibit C**, R.I. Nilsson et al., *Leukaemia, lymphoma, and multiple myeloma in seamen on tankers*, 55 Occupational Env't Med. 517, 517–21 (1998).

## LEGAL STANDARD

### I. <u>Causation</u>

"In order to carry the burden of proving a plaintiff's injury was caused by exposure to a specified substance, the plaintiff must demonstrate the levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 263 (4th Cir. 1999) (internal punctuation and citations omitted). "Ordinarily, toxic exposure torts proceed in two steps—an expert demonstrates that a particular type of harm can be caused by the exposure to a degree of scientific certainty (general causation) and an expert opines that this plaintiff's exposure was a cause in fact of his or her harm (specific causation)." *In re Camp Lejeune Water Litig.*, 736 F. Supp. 3d 311, 319 (E.D.N.C. 2024) (citations

omitted). In other words, a plaintiff must show that their "level of exposure is comparable to the levels of exposure that are hazardous as a general matter." *Yates v. Ford Motor Co.*, 113 F. Supp. 3d 841, 850 (E.D.N.C. 2015); *see also Zellars v. NexTech Northeast, LLC*, 895 F. Supp. 2d 734, 742 (E.D. Va. 2012) ("'Ruling in' exposure to a particular substance as a possible cause of a patient's medical condition requires (1) a reliable determination of the level of exposure necessary to cause the condition and (2) a reliable determination that the patient was exposed to the substance at this level."); *In re Camp Lejeune Water Litig.*, 736 F. Supp. 3d at 320–21 (collecting cases).

Specific to the Camp Lejeune Justice Act of 2022 ("CLJA"), Congress requires "claimants to establish that his or her harm was 'caused by exposure to the water at Camp Lejeune'[.]" *Id.* at 319 (citing CLJA § 804(b)). As such, a Plaintiff must prove causation—which "subsumes" all three elements of "exposure, general causation, and specific causation." *Id.* It is the "claimant's 'individual . . . expos[ure]' [that] determines whether he or she meets the 30-day prerequisite and must be considered to see if that claimant can establish causation. CLJA § 804(b)–(c)." *Id.* at 323. This Court rejected the Plaintiffs' arguments "to dispense with specific causation and individual exposure" in finding that they are critical elements of the CLJA for which the Plaintiff bears the burden of proof. *Id.* at 319 (rejecting "'fast trials' during which a plaintiff shows 'I was present at Camp Lejeune for more than 30 days [exposure]; I was diagnosed with an illness that as likely as not can be caused by exposure to the water at Camp Lejeune [general causation]; and I have suffered the following harm from that illness [damages]'").

## II.    *Daubert* **Standard**

Under Federal Rule of Evidence 702, expert testimony is admissible if it (a) "will help the trier of fact to understand the evidence or to determine a fact in issue," (b) "is based on sufficient facts or data," (c) "is the product of reliable principles and methods," and (d) "reflects a reliable application of the principles and methods to the facts of the case." Under this Rule, courts must

"ensur[e] that an expert's testimony . . . rests on a reliable foundation." *Belville v. Ford Motor Co.,* 919 F.3d 224, 232 (4th Cir. 2019) (quoting *Daubert*, 509 U.S. at 597). The Court must assess "whether the reasoning or methodology underling the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93.

## ARGUMENT

Dr. Michaels's methodology for assessing the sufficiency of Mr. Vidana's exposure is unreliable because it is not based on scientific knowledge and it is based on analysis outside the bounds of his expertise. First, Dr. Michaels attempts to substitute policy for science in opining that thirty days' presence at Camp Lejeune is "sufficient time" for Mr. Vidana's exposure to be at least as likely as not a cause of his NHL. He bases this opinion on the 2017 ATSDR Assessment. The study says no such thing. Instead, the 2017 ATSDR Assessment found that Congress's use of thirty days in the Camp Lejeune VA statute was a policy decision. Second, Dr. Michaels, as a pathologist specializing in gynecology, is not qualified to opine on the movements of a Marine stationed at Camp Lejeune in the 1980s. Third, Dr. Michaels's general causation opinions violate this Courts' order because they should have been disclosed in Phase II. For these reasons, Dr. Michaels's opinion that exposure to water at Camp Lejeune from May to June of 1983 was at least as likely as not a cause of Mr. Vidana's NHL should be excluded.

## I. Dr. Michaels's Methodology for Assessing the Sufficiency of Mr. Vidana's Exposure is Unreliable Because it is Based on Public Policy and Speculation, Not Scientific Knowledge.

Dr. Michaels's opinion that Mr. Vidana's exposure was for "sufficient time and at sufficient concentrations to be a cause of his NHL," Michaels Rep. (Vidana) at 14 (JA Ex. 502, D.E. 499-7), is not "competent expert testimony" because it is not rooted in science. *Blackmon v. G.UB.MK Constructors*, No. 7:14-CV-258-D, 2016 WL 8674646, at *3 (E.D.N.C. Nov. 11, 2016)

(citation omitted). "Without reliable scientific knowledge of what level of exposure . . . is needed to produce Plaintiffs' injuries, the experts can only speculate whether the level of Plaintiffs'' exposure . . . was high enough to cause their injuries, and their opinions as to specific causation are unreliable and must be excluded." *Zellars,* 895 F. Supp. 2d at 741.

Dr. Michaels's determination that thirty days of exposure to water at Camp Lejeune is "sufficient time" "to be a cause of [Mr. Vidana's] NHL" is based on the 2017 ATSDR Assessment. Michaels Rep. (Vidana) at 7, 14 (JA Ex. 502, D.E. 499-7). It was his understanding that the thirty days were based on science. *See* Michaels Dep. Tr. at 90:6–8 (JA Ex. 596, D.E. 508-5) ("Q. Okay. Is it your understanding that those 30 days are based on science? A. Yes."). He is wrong, and, because courts routinely hold that specific causation opinions must be based on scientific knowledge, he has not reliably determined that the duration of Mr. Vidana's exposure was sufficient to be a cause of Mr. Vidana's NHL. *See Nix v. Chemours Co. FC*, No. 7:17-CV-189-D, 2023 WL 6471690, at *8 (E.D.N.C. Oct. 4, 2023) (collecting cases).

According to Dr. Michaels, that thirty days is sufficient to cause NHL "is specifically addressed [in the 2017 ATSDR Assessment] where it is noted that 'the results from the Camp Lejeune mortality studies suggest that a 30-day minimum duration requirement may be appropriate since elevated risks for some of the diseases evaluated were observed for exposure durations of 1-3 months.'" Michaels Rep. (Vidana) at 7 (JA Ex. 502, D.E. 499-7). Dr. Michaels also notes that thirty days is "consistent" with the Acts established by Congress that relate to Camp Lejeune. *Id.* at 7 & 14.

But the 2017 ATSDR Assessment found that there was insufficient evidence to establish a minimum exposure duration. It reports that the ATSDR looked into "whether there was sufficient information in the scientific literature to determine a minimum duration at Camp Lejeune, or a

minimum level of exposure, necessary to increase the risk of one or more of the diseases being assessed." ATSDR 2017 Assessment at 11 (JA Ex. 182, D.E. 472-3) (section "Assumptions on Duration of Exposure"). Because "sufficient evidence for a threshold is lacking," "ATSDR recognizes that a decision to establish a specific minimum exposure duration for policy purposes will primarily be based on social, economic and legal factors." *Id.* This stems from the fact that "[t]he studies evaluated . . . provide very limited information concerning the level or duration of exposure associated with an increased risk of a cancer or other disease." *Id.* Therefore, the thirty-day duration of exposure to Camp Lejeune water that Dr. Michaels found "sufficient" was based on a policy decision by Congress, rather than scientific knowledge and it cannot meet Rule 702's requirements for admissibility. *See Daubert*, 509 U.S. at 589–90 ("The subject of an expert's testimony must be 'scientific . . . knowledge.' The adjective 'scientific' implies a grounding in the methods and procedures of science.").

It was also Dr. Michaels's "understanding" that the mortality studies referenced by the 2017 ATSDR Assessment established elevated risk for NHL at one to three months' duration at Camp Lejeune. Michaels Dep. Tr. at 95:3-96:5 (JA Ex. 596, D.E. 508-5). That understanding is wrong. The mortality studies that Dr. Michaels reviewed do not establish elevated risks for NHL, nor, more specifically, for DLBCL, at one to three months of exposure. *See* Michaels Rep. (Vidana) at 7 (JA Ex. 502, D.E. 499-7). The 2014 Mortality Study for Marines and Navy Personnel conducted by ATSDR's epidemiologist, Dr. Bove, the same author as the 2017 ATSDR Assessment, "did not reveal an increased risk of non-Hodgkin lymphoma after adjusting for sex, race, rank, and education with a 10-year lag (HR = 0.81; 95% CI = 0.56–1.18)." *Id.* at 12.

A later cancer incidence study published in 2024 by ATSDR also concluded that there was no positive association between time spent at Camp Lejeune as Marine/Navy personnel during the

alleged contaminated period and the development of Mr. Vidana's type of NHL, diffuse large B-cell lymphoma. *See* Michaels Report at 13 ("In a recent study of personnel and civilian workers stationed or employed at Camp Lejeune during a period when the drinking water was contaminated, positive associations for marginal zone lymphoma and mantle cell lymphoma (two separate non-Hodgkin lymphomas) were seen with Marine/Navy personnel, but not for all non-Hodgkin lymphomas, DLBCL, or follicular lymphoma."). While it found a non-statistically significant association for civilian workers, Mr. Vidana does not fall into that cohort. *Id.* A 2024 ATSDR mortality study found a *decreased* risk of mortality from NHL for the Marine/Navy personnel. 2024 Bove Mort. Study at 8 (Table 4 showing a RR 0.87 (95% CI: 0.68 – 1.10)) (JA Ex. 193, D.E. 472-14). Dr. Michaels downplayed this study. Michaels Report at 13 ("A mortality study done by the same group also evaluating Camp Lejeune and Camp Pendleton subjects did not show a significant increased risk of non-Hodgkin lymphoma, again with the caveat that mortality studies are insensitive to detect associations with cancers, such as some non-Hodgkin lymphomas, with either an indolent clinical course or relatively high remission/cure rates, like DLBCL.").

Notably, for Mr. Vidana's exposure, Dr. Michaels's opinion on the minimum duration of exposure required to cause NHL is "not the 30 consecutive days of being exposed on every day. It's that he was there for a period greater than 30 days." Michaels Dep. Tr. at 223:25–224:24 (JA Ex. 596, D.E. 508-5). This is important because "based on [Mr. Vidana's] time and his testimony" he "likely [was] not" exposed for thirty days. *Id.* at 225:4–7. Applying Dr. Michaels's assessment of Mr. Vidana's exposure, 1–1.2 liters on weekend days, Mr. Vidana's maximum exposure was only fifteen days. Michaels Dep. Tr. at 184:18–185:11, 193:12–195:7, 226:25–228:18 (JA Ex. 596, D.E. 508-5).



**Figure 1:** Calendar of May and June of 1983, with dates between May 8, 1983 and June 30, 1983, corresponding to Mr. Vidana's time at Camp Lejeune, bolded. Weekend days during that time are highlighted.

Dr. Michaels also referenced a study by Rosenfeld et al. to support his conclusion that the thirty days need not be consecutive. The study, which purports to provide a methodology for assessing risk, assessed cancer risk generally and does not establish a minimum exposure duration of thirty days for an increased risk of NHL. **Exhibit D**, Paul E. Rosenfeld et al., *Camp Lejeune Marine Cancer Risk Assessment for Exposure to Contaminated Drinking Water From 1955 to 1987*, 235 Water, Air, & Soil Pollution (2024) 124, 13 (2024). It also concluded that because "the three [water treatment plants at Camp Lejeune that were ever contaminated] have different concentrations of contaminants, a Marine's individual cancer risk is dependent on the specific WTPs that serviced the different areas of the base." *Id.* at 11; *see* Michaels Rep. (Vidana) at 12 (JA Ex. 502, <u>D.E. 499-7</u>). In short, it provides no support for Dr. Michaels's conclusion that 15 non-consecutive days of exposure to water at Hadnot Point is sufficient to increase risk for NHL, let alone cause it.

"Without testing, supporting literature in the pertinent field, peer reviewed publications or some basis to assess the level of reliability, expert opinion testimony can easily, but improperly,

devolve into nothing more than proclaiming an opinion is true 'because I say so.'" *Small v. WellDyne, Inc.*, 927 F.3d 169, 177 (4th Cir. 2019). Dr. Michaels's "say so" that thirty days is a "sufficient time" is a thinly veiled attempt to avoid performing any specific causation exposure analysis based in scientific knowledge. The ATSDR made clear that the thirty-day minimum duration found in the various Camp Lejeune statutes was a policy decision based on "social, economic and legal factors." ATSDR 2017 Assessment at 11 (JA Ex. 182, D.E. 472-3). This Court has already rejected the Plaintiffs' attempt to do away with specific causation by simply requiring a plaintiff prove that they were at Camp Lejeune for thirty days. *See In re Camp Lejeune Water Litig.*, 736 F. Supp. 3d at 319. It follows that Dr. Michaels cannot incorporate the CLJA's thirty-day standing requirement that has no basis in scientific knowledge as a substitute for an individualized exposure assessment. For this reason, Dr. Michaels's opinion that Mr. Vidana had sufficient exposure to contaminated Camp Lejeune water to cause his NHL based on his limited time on Camp Lejeune should be excluded in its entirety.

## II. Dr. Michaels is Unqualified to Opine on the Daily Lives of Marines at Camp Lejeune in the 1980s.

Dr. Michaels's opinions on the specific cause of Mr. Vidana's NHL hinge on his opinion, disclosed at deposition, that Mr. Vidana would have likely visited Hadnot Point on weekends. This guess was based on his limited research on the "daily life of a [M]arine" in the 1970s and 1980s, rather than on depositions, records related to Mr. Vidana, or the reports of the several historians who have offered opinions in this case. Because Dr. Michaels is unqualified to opine on such historical military activities, this opinion, and his specific causation opinion that depends on it, should be excluded. Fed. R. Evid. 702; *SAS Inst., Inc. v. World Programming Ltd.*, 125 F. Supp. 3d 579, 584 (E.D.N.C. 2015), *aff'd*, 874 F.3d 370 (4th Cir. 2017) ("A witness may qualify to render

expert opinions in any one of the five ways listed in Rule 702: knowledge, skill, experience, training, or education.").

Mr. Vidana never testified that he visited a part of the base that Plaintiffs allege was contaminated. Yet, Dr. Michaels opined that Mr. Vidana was, in fact, exposed to contaminated water at Hadnot Point. *See* Michaels Dep. Tr. at 179:17–181:24 (JA Ex. 596, D.E. 508-5). This was based on Mr. Vidana's limited testimony, described above, that he sometimes visited bars and restaurants in unknown locations, and Dr. Michaels's own independent research on "the actual daily life of a [M]arine in the 70s and 80s in Camp Lejeune and what was really in the individual areas." *Id.* at 176:23–177:14. Based on this limited, undocumented, and unsystematic research, Dr. Michaels opined that Mr. Vidana would have been exposed to an average of 1.2 liters of contaminated water at Hadnot Point once or twice per week.[3] *Id.* at 182:11–24.

Dr. Michaels's opinion on the history of Camp Lejeune is unreliable and inadmissible. Dr. Michaels has never been to Camp Lejeune. *Id.* at 75:16–18. As a pathologist specializing in gynecologic pathology, Dr. Michaels has no "knowledge, skill, experience, training, or education," *SAS Inst., Inc.*, 125 F. Supp. at 584, that inform his opinion testimony on "the actual daily life of a [M]arine in the 70s and 80s in Camp Lejeune and what was really in the individual areas.*" Id.* at 176:23–178:15. Dr. Michaels has therefore failed to demonstrate that he is qualified to offer an opinion based on a specialized knowledge of history, either through credentials, principles, or methodology. *See Waterhouse v. R.J. Reynolds Tobacco Co.*, 368 F. Supp. 2d 432, 436 (D. Md. 2005), *aff'd*, 162 F. App'x 231 (4th Cir. 2006).

---

[3] This opinion was offered for the first time at deposition, and does not appear in Dr. Michaels's report, in contravention of Federal Rule of Civil Procedure 26(a)(2)(B)(i). *See generally* Michaels Rep. (Vidana).

Dr. Michaels's late-disclosed opinions on the daily lives of Marines are comparable to those excluded in *Waterhouse*, a Fourth Circuit case upholding the exclusion of a medical doctor who offered opinion testimony on historical facts. 162 F. App'x at 436–37. As with the expert in *Waterhouse*, Dr. Michaels is a pathologist with no known education or training in historical research methods. *Id.*

Furthermore, Dr. Michaels failed to even review the expert reports of the United States' or the PLG's historians. *Id.* at 77:14–78:2; *see Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) (Historians offer specialized knowledge that can aid the trier of fact by, for example, "offer[ing] background knowledge or context that illuminates or places in perspective past events."); *see also vonRosenberg v. Lawrence*, 413 F. Supp. 3d 437, 450 (D.S.C. 2019). Moreover, even if Dr. Michaels were qualified to offer an expert opinion on historical practices, his opinion fails to meet the other requirements of Rule 702. Dr. Michaels's opinion on the location of the bars and restaurants that Mr. Vidana visited is based on his reading of ATSDR's reports, and his own Google searches. Michaels Dep. Tr. at 177:15-178:5 (JA Ex. 596, D.E. 508-5). Because Dr. Michaels's report did not include this opinion, let alone the reasoning and basis for it, the Court, as gatekeeper, can only guess as to what exactly Dr. Michaels relied on in forming it. Dr. Michaels did not supply specific references with this information from ATSDR reports or provide his Google searches. Michaels MCL (Vidana) at 1 (JA Ex. 503, D.E. 499-8). He could offer no more detail at his deposition beyond general hand-waiving and pointing to "the ATSDR." Michaels Dep. Tr. at 177:15–178:15. As for Dr. Michaels's efforts to use Google to determine Mr. Vidana's whereabouts on Camp Lejeune, even qualified historians have been precluded from testifying as to Google search results. *See vonRosenberg*, 413 F. Supp. 3d at 451.

Again, Dr. Michaels is a pathologist, not a historian. He has no specialized knowledge that can help the Court understand what parts of Camp Lejeune Mr. Vidana may have visited in 1983. Accordingly, under Rule 702, his testimony regarding Mr. Vidana's exposure to contaminated water at Hadnot Point should be excluded.

### III. <u>Dr. Michaels's General Causation Opinions Should be Excluded.</u>

Additionally, the United States moves to exclude Dr. Michaels's general causation opinions, in which he opines that "[c]hemicals found in the water in camp Lejeune, including trichloroethylene (TCE), tetrachloroethylene (PCE), and benzene, are carcinogens and have been found to increase the risk for development of various non-Hodgkin lymphomas in both animals and humans, including Diffuse Large B-cell Lymphoma." Michaels Rep. (Vidana) at 1 (JA Ex. 502, <u>D.E. 499-7</u>). Dr. Michaels provides support for this opinion in sections VI–VII of his report. *Id.* at 5–13; *see also* Michaels Dep. Tr. at 78:3–6 (JA Ex. 596, <u>D.E. 508-5</u>) ("Q. And you performed your own general causation analysis that you've included in your report, correct? A. That's correct.").

Dr. Michaels's general causation opinions are untimely. General causation opinions were due in Phase II of this litigation on or before December 9, 2024. *See* D.E. 444 at 1. Dr. Michaels did not disclose his general causation opinions until months later. PLG Phase III 2d Am. Exp. Discl. at 10 (JA Ex. 326, <u>D.E. 487-2</u>). On July 22, 2025, U.S. Magistrate Judge Robert B. Jones granted in part the United States' motion to exclude portions of PLG's Phase III expert reports. *See id.* Specifically, Judge Jones ruled that Plaintiffs' Phase III experts "may not introduce new, independent general causation analyses . . . that were not timely disclosed in Phase II." *Id.* at 8. Dr. Michaels's independent general causation opinions pertain specifically to NHL. They are "new" opinions that Dr. Michaels presents as his own, and thus fall within the scope of Judge Jones's Order. Accordingly, Dr. Michaels's general causation opinions should be excluded.

Dr. Michaels made clear during his deposition that his opinions on the specific causation of Mr. Vidana's NHL are based on his untimely general causation analysis. Michaels Dep. Tr. at 151:19–152:6 (JA Ex. 596, D.E. 508-5). Dr. Michaels testified that, while he agrees with "the vast majority of" Plaintiffs' general causation reports, he did not rely on them in forming his opinions. *Id.* at 79:3–14; 147:7–148:2. In fact, Dr. Michaels is the only plaintiffs' expert to opine that exposure to water containing five ppb of PCE, TCE, or benzene over the course of 15 days over at least thirty-days at Camp Lejeune is sufficient to cause NHL.

Apart from his untimely general causation opinions, Dr. Michaels provided no other support for his decision to rule in exposure to contaminated water at Camp Lejeune as a potential cause of Mr. Vidana's NHL in his differential etiology. Michaels Rep. (Vidana) at 5–13 (JA Ex. 502, D.E. 499-7). Dr. Michaels repeatedly denied relying on the timely general causation opinions of other plaintiffs' experts. Michaels Dep. Tr. at 79:3–14; 147:7–148:2 (JA Ex. 596, D.E. 508-5). As Dr. Michaels admits, "you can't really have, by definition, a specific causation in any individual case without having an underlying general causation that that can happen." *Id.* at 152:3–6; *see* Fed. Jud. Ctr., *Reference Manual on Scientific Evidence* 618 (3d ed. 2011) ("Although differential etiologies are a sound methodology in principle, this approach is only valid if general causation exists . . . ."). Accordingly, Dr. Michaels lacked a basis to perform a differential etiology where exposure to water at Camp Lejeune could be ruled in as a potential cause of NHL.

Dr. Michaels's report violated the Court's scheduling order by disclosing untimely general causation opinions. Absent his untimely independent research, Dr. Michaels had no basis to rule in exposure to water at Camp Lejeune as a potential cause of Mr. Vidana's NHL for purposes of a differential etiology. Accordingly, Dr. Michaels's opinions must be excluded in full.

**CONCLUSION**

For these reasons, the United States requests that Dr. Michaels's opinions be excluded in their entirety.

Dated: September 9, 2025

Respectfully submitted,

BRETT SHUMATE
Assistant Attorney General,
Civil Division

JONATHAN GUYNN
Deputy Assistant Attorney General,
Torts Branch

BRIDGET BAILEY LIPSCOMB
Chief, Camp Lejeune Justice Act Section

ADAM BAIN
Special Litigation Counsel

ALLISON O'LEARY
GIOVANNI ANTONUCCI
Trial Attorneys

*/s/ Alanna Horan*
ALANNA HORAN
DC Bar No. 1671335
Trial Attorney
United States Department of Justice
Civil Division, Torts Branch
Camp Lejeune Justice Act Section
1100 L Street, NW
Washington, DC 20005
(202) 532-5068
alanna.r.horan@usdoj.gov

Attorney inquiries to DOJ regarding CLJA:
(202) 353-4426

*Attorneys for Defendant,*
*United States of America*

**Certificate of Service**

I hereby certify that on September 9, 2025, I electronically filed the foregoing using the Court's Electronic Case Filing system, which will send notice to all counsel of record.

*/s/ Alanna Horan*
ALANNA HORAN