**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**SOUTHERN DIVISION**
**NO. 7:23-CV-897**

**IN RE:**

**CAMP LEJEUNE WATER LITIGATION**

**This Document Relates To:**[1]

**<u>Leukemia Cases</u>:**
***Amsler v. United States* 7:23-cv-00284**
***Connard v. United States* 7:23-cv-01557**
***Fiolek v. United States* 4:23-cv-00062**
***Gleesing v. United States* 7:23-cv-01486**
***Hill v. United States* 7:23-cv-00028**

**<u>NHL Cases</u>:**
***Carter v. United States* 7:23-cv-01565**
***Davis v. United States* 7:23-cv-00043**
***Keller v. United States* 7:23-cv-01501**
***Kidd v. United States* 7:23-cv-01489**
***Vidana v. United States* 7:23-cv-01575**
***Howard v. United States* 7:23-cv-00490**[2]

# MEMORANDUM OF LAW IN SUPPORT OF THE UNITED STATES' MOTION TO EXCLUDE GENERAL CAUSATION OPINIONS OF PLAINTIFFS' LEUKEMIA AND NHL EXPERTS UNDER FEDERAL RULE OF EVIDENCE 702(c) FOR:

1) **Improperly grouping distinct diseases together;**

2) **Relying on an untested "synergy" theory; and**

3) **Relying on the inadmissible "any exposure" theory.**

---

[1] The Parties have reached agreement in principle on a settlement amount in *Fiolek* and *Vidana*. The Parties are finalizing the terms of the settlements. The United States will notify the Court and withdraw this motion as to *Fiolek* and *Vidana* once the settlements are final.

[2] Plaintiff Allan Howard was selected as a Trial Plaintiff for kidney cancer, but he subsequently added a claim for NHL. *See* Trial Order Confirming the Track 1 Trial Plaintiffs, D.E. 250, at 2 (designating Allan Howard as a Track 1 Trial Plaintiff for kidney cancer); Third Amended Short Form Complaint, No. 7:23-cv-00490, D.E. 15, at 3 (adding claim for NHL).

## TABLE OF CONTENTS

Pages

Table of Contents ..... i

Table of JOINT APPENDIX EXHIBITS ..... iii

Table of Abbreviations ..... vi

Introduction ..... 1

Background ..... 2

Legal Standard ..... 3

Argument ..... 4

I. Plaintiffs' Experts' Opinions Concerning Broad Disease Categories of Leukemia or Non-Hodgkin's Lymphoma Rather Than a Particular Disease Subtype Are Inadmissible Under Federal Rule of Evidence 702. ..... 5

A. Leukemia and Non-Hodgkin's Lymphoma Are Umbrella Terms for Diverse Groups of Distinct Cancers. ..... 6

1. Leukemia. ..... 7

2. Lymphoma. ..... 8

B. General Causation for Leukemias and NHLs Must be Disease-Specific—Not Based on Broad Disease Categories like Hematopoietic Cancer, NHL, or Leukemia that Obscure Known Differences in the Causes of the Plaintiffs' Alleged Diseases. ..... 9

C. Dr. Felsher's "Hematopoietic Cancer" Supergroup is not Disease Specific and Lacks Scientific Support. ..... 11

1. Dr. Felsher's Reliance Materials and His Co-Expert (Dr. Gondek) Refute His Method of Grouping Together Leukemias and Lymphomas. ..... 12

2. IARC Refutes Dr. Felsher's Method. ..... 14

D. Plaintiffs' Experts Cannot Meet General Causation Standards by Opining on Broad Disease Categories Instead of the Plaintiffs' Actual Diseases. ..... 16

1. Subtype Risk Results Vary Significantly in Studies. ..... 16

2. Plaintiffs' Experts Perform Grouped Causation Analyses Despite Admitting Significant Differences Between Disease Subtypes. ..... 21

II. Plaintiffs' Synergy Opinions Are Inadmissible Under Rule 702. ..... 24

A. Plaintiffs' Untested Synergy Hypothesis is Speculative and Unscientific. ..... 25

1. Dr. Bird. ..... 26

2. Dr. Gilbert. ..... 27

3. Dr. Felsher. ..... 27

4. Dr. Mallon. 27
5. Dr. Gondek. 28
6. Dr. Hu. 28

III. Drs. Hu, Gondek, and Felsher Rely on the Untested Linear "Any Exposure," No-Threshold Theory, So Their Opinions Are Inadmissible Under Rule 702. 29

A. Plaintiffs' Untested Linear No-Threshold Theory is Speculative and Unscientific. 30

B. Dr. Hu's Opinion that "Any Amount" of Exposure to TCE, PCE, and Benzene Can Cause NHL is Unreliable and Warrants Exclusion. 32

C. Dr. Felsher's "Any Exposure" Theory and Refusal to Identify Harmful Levels of TCE, PCE, and Benzene Warrant Exclusion. 36

Conclusion 39

Certificate of Service 41

## TABLE OF JOINT APPENDIX EXHIBITS

| Exhibit Number | Short Title | Full Title |
|---|---|---|
| 160 | Gondek GC Dep. Tr. | Gondek - General Causation Deposition Transcript |
| 201 | IARC 2014 Monograph 106 | IARC Monographs on the Evaluation of Carcinogenic Risks to Humans Volume 106: TRICHLOROETHYLENE, TETRACHLOROETHYLENE, AND SOME OTHER CHLORINATED AGENTS |
| 202 | IARC 2018 Monograph 120 | (p 1-64) IARC Monographs on the Evaluation of Carcinogenic Risks to Humans Volume 120: Benzene |
| 202 | IARC 2018 Monograph 120 | (p 65-119) IARC Monographs on the Evaluation of Carcinogenic Risks to Humans Volume 120: Benzene |
| 202 | IARC 2018 Monograph 120 | (p 287-301) IARC Monographs on the Evaluation of Carcinogenic Risks to Humans Volume 120: Benzene |
| 455 | Gondek SC Rep. (Amsler) | Gondek - Specific Causation Report - Karen Amsler |
| 456 | Gondek SC Rep. (Connard) | Gondek - Specific Causation Report - Stephen Connard |
| 459 | Laber Rep. (Fiolek) | Specific Causation Expert Report of Damian A Laber, MD, FACP (Fiolek) |
| 461 | Laber Rep. (Gleesing) | Specific Causation Expert Report of Damian A Laber, MD, FACP (Gleesing) |
| 451 | Felsher Am. SC Rep. (Hill) | Specific Causation on Amended Expert Report of Dean W Felsher, MD, PhD |
| 490 | Hu SC Rep. (Carter) | Specific Causation Expert Report of Howard Hu, MD, MPH, ScD Frances Carter (for the Estate of Ronald Lee Carter) v United States of America US District Court for Eastern District of NC, Southern Division Case No 7:23-cv-01565 |
| 486 | Hoppe Rep. (Davis) | Specific Causation Expert Report of Richard T Hoppe, MD, FACR, FASTRO, FARS Cometto J Davis v United States of America US District Court for Eastern District of NC, Southern Division Case No 7:23-cv-00043 |
| 389 | Hoppe Rep. (Howard) | Richard T Hoppe, MD, FACR, FASTRO, FARS (Howard) |
| 482 | Felsher SC Rep. (Keller) | Specific Causation Expert Report of Dean W Felsher, MD, PhD: Scott Richard Keller v United States of America |

| | | |
|---|---|---|
| | | US District Court for Eastern District of NC, Southern Division Case No 7:23-cv-01501 |
| 496 | Hu SC Rep. (Kidd) | Specific Causation Expert Report of Howard Hu, MD, MPH, ScD<br>Robert Kidd v United States of America US District Court for Eastern District of NC, Southern Division Case No 7:23-cv-01489 |
| 502 | Michaels Rep. (Vidana) | Specific Causation Expert Report of<br>Paul J Michaels, MD<br>Jose Vidana v United States of America<br>US District Court for Eastern District of NC, Southern Division<br>Case No 7:23-CV-01575 |
| 98 | Mallon GC Rep. (Leukemia) | General Causation Expert Report of Timothy M Mallon, MD, MPH, MS<br>Leukemia |
| 96 | Gondek GC Rep. | Gondek - General Causation Report (Leukemia) |
| 474 | Erba Rep. (Connard) | Erba - Specific Causation Report - Stephen Connard |
| 111 | Hu GC Rep. | General Causation Expert Report of Howard Hu, MD, MPH, ScD |
| 107 | Felsher GC Rep. (NHL-Leuk) | General Causation Expert Report of Dean W Felsher, MD, PhD<br>Leukemia & Non-Hodgkin Lymphoma |
| 515 | Ambinder Rep. (Carter) | Expert Report of Richard F Ambinder, MD, PhD: Estate of Ronald Carter v United States, No. 7:23-cv-01565 |
| 108 | Gilbert Rep. (NHL-Leuk) | General Causation Expert Report of<br>KATHLEEN M GILBERT, PHD<br>TCE, Non-Hodgkin Lymphoma, and Leukemia |
| 590 | Hoppe Dep. Tr. | Deposition Transcript |
| 500 | Hu SC Rebuttal Ambinder (Kidd) | Rebuttal to Report of Dr Richard F Ambinder re: Robert Arnold Kidd |
| 164 | Felsher GC Dep. Tr. | Deposition Transcript |
| 475 | Erba Rep. (Fiolek) | Erba - Specific Causation Report - Robert Fiolek |
| 103 | Bird GC Rep. (NHL-Leuk) | Bird - General Causation Report - NHL & Leukemia |
| 152 | Savitz 1st Dep. Tr. | Deposition Transcript 61024 |
| 154 | Savitz 3d Dep. Tr. | Deposition Transcript |
| 293 | Savitz 2023 | Epidemiology and the Law (Juris Publishing, Inc) |
| 162 | Hu GC Dep. Tr. | Deposition Transcript - General Causation |
| 148 | Bird GC Dep. Tr. | Bird - General Causation Deposition Transcript |

| | | |
|---|---|---|
| 602 | Hu SC Dep. Tr. | Deposition Transcript - Specific Causation |
| 183 | ATSDR 2017 PHA | Public Health Assessment for Camp Lejeune Drinking Water |
| 234 | Cohn 1994 | Drinking Water Contamination and the Incidence of Leukemia and Non-Hodgkin's Lymphoma |
| 73 | Gilbert Rep. (Bladder) | General Causation Expert Report of KATHLEEN M GILBERT, PHD<br>TCE, PCE, benzene and bladder cancer |
| 165 | Gilbert Dep. Tr. | Deposition Transcript |

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| ALL | Acute lymphoblastic leukemia |
| AML | Acute myeloid leukemia |
| CLJA | Camp Lejeune Justice Act |
| CLL | Chronic lymphoid leukemia |
| DLBCL | Diffuse large B-cell lymphoma |
| GC Rep. | General Causation Report |
| MCL | Mantle cell lymphoma |
| MZL | Marginal zone lymphoma, |
| NHL | Non-Hodgkin's lymphoma |
| PCE (or PERC) | Perchloroethylene or Tetrachloroethylene |
| PLG | Plaintiffs' Leadership Group |
| SC Rep. | Specific Causation Report |
| TCE | Trichloroethylene |
| WHO | World Health Organization |

## INTRODUCTION

The United States submits this Memorandum in Support of its Motion under Federal Rule of Evidence 702(c) to exclude the Phase II opinions of Drs. Bird, Felsher, Gondek, Gilbert, Hu, and Mallon, as the product of unreliable methodologies.

First, no Plaintiff in this case has just "leukemia" or non-Hodgkin's lymphoma ("NHL"). They have one of the distinct subtypes of leukemia or NHL that the World Health Organization classifies by unique characteristics, including etiology. For example, there is strong evidence for an association between occupational benzene exposure and acute myeloid leukemia, but not between benzene exposure and acute lymphoblastic leukemia.

Despite this, Plaintiffs' experts, often at their counsel's direction, did not analyze for the Plaintiffs' subtypes specifically, but rather for leukemia or NHL generally. This overgeneralization blurs the biological differences among the subtypes that impact development, treatment, and risk of disease that Plaintiffs' experts acknowledge. It obscures differences in epidemiology for specific subtypes by collapsing them all into a single result. And it assumes that what is true for the disease group is true for the individual subtypes—a point unsupported by scientific evidence, that Plaintiffs use to avoid addressing the lack of causation evidence for specific subtypes.

Plaintiffs cannot prove that this is a reliable methodology, and in fact, outside of litigation many of these experts author articles, diagnose patients, and treat patients according to their distinct subtype. Dr. Dean Felsher amplified this methodological error by combining the general groups of leukemia and NHL into one larger group, hematopoietic cancer, an approach that even his co-expert testified is analytically unsound. Plaintiffs cannot meet their burden of demonstrating, by a preponderance of the evidence, that they had a reliable method for evaluating whether exposure to contaminated water at Camp Lejeune caused the distinct leukemia and NHL subtypes Plaintiffs allege. Consequently, their opinions should be excluded under Rule 702(c).

Second, Drs. Bird, Felsher, Gilbert, Gondek, and Mallon all opine that the alleged contaminants produce a synergistic effect—that their combined exposure increases the risk of leukemia or NHL more than the sum of each agent's individual effect. This theory is untested, unsupported speculation. Thus, these opinions should likewise be excluded under Rule 702(c).

Lastly, Drs. Hu, Felsher, and Gondek rely upon the "any exposure" theory that courts nationwide reject as unreliable under Rule 702. In line with judicial precedent, and because Plaintiffs have failed to meet their burden of demonstrating the reliability of "any exposure," or the "linear no-threshold," theory to the facts presented, the United States moves to exclude the general causation opinions that Drs. Hu, Felsher, and Gondek offer based on this theory.

## BACKGROUND

Plaintiffs sued the United States under the Camp Lejeune Justice Act of 2022, alleging that the water at Camp Lejeune contained trace amounts of trichlorethylene ("TCE"), tetrachlorethylene ("PCE"), trans-1,2-dichloroethylene ("DCE"), vinyl chloride ("VC"), and benzene, and that it caused their diseases.

The leukemia and NHL bellwethers consist of seven distinct diseases: acute myeloid leukemia ("AML"), acute lymphocytic leukemia ("ALL"), chronic lymphoid leukemia ("CLL"), mantle cell lymphoma ("MCL"), marginal zone lymphoma ("MZL"), diffuse large B-cell lymphoma ("DLBCL"), and an immunoblastic variant of diffuse large B-cell lymphoma.

Plaintiffs disclosed the following general causation experts, whose opinions the United States moves to exclude as follows:

| **Expert** | **Opinions to be Excluded** |
|---|---|
| Dr. Bird | TCE, PCE, and benzene can each cause leukemia and NHL.<br><br>TCE, PCE, VC, and benzene have a synergistic effect. |
| | |

| | |
|---|---|
| Dr. Felsher | TCE, PCE, and benzene can each cause leukemia and NHL.<br><br>TCE, PCE, VC, and benzene have a synergistic effect.<br><br>Any amount of TCE, PCE, and benzene can cause leukemia and NHL. |
| Dr. Hu | TCE, PCE, and benzene can each cause NHL.<br><br>Any amount of TCE, PCE, and benzene can cause NHL. |
| Dr. Gilbert | TCE can cause leukemia and NHL.<br><br>TCE, PCE, VC, and benzene have a synergistic effect. |
| Dr. Gondek | TCE, PCE, and benzene can each cause leukemia.<br><br>TCE, PCE, VC, and benzene have a synergistic effect.<br><br>Any amount of TCE, PCE, and benzene above background levels can cause leukemia. |
| Dr. Mallon | TCE, PCE, and benzene can each cause leukemia.<br><br>TCE, PCE, VC, and benzene have a synergistic effect. |

## LEGAL STANDARD

No presumption of admissibility exists under Federal Rule of Evidence 702(c). *Engilis v. Monsanto Co.*, No. 23-4201, 2025 WL 2315898, at *6 (9th Cir. Aug. 12, 2025). Instead, Plaintiffs must demonstrate by a preponderance of the evidence that their expert witnesses' opinions are the product of reliable methods. *United States v. Rouse*, No. 22-4479, 2024 WL 2044630, at *1 (4th Cir. May 8, 2024) (per curiam); *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001). This standard is independent of the burden of proof. *Compare Rouse*, 2024 WL 2044630 (beyond all reasonable doubt), *with Cooper*, 259 F.3d at 198 (more likely than not); *see also Samuel v. Ford Motor Co.*, 112 F. Supp. 2d 460, 468 (D. Md. 2000) ("During trial there is an important distinction between the threshold requirements for admissibility of the plaintiff's evidence, and the weight of that evidence and whether it is sufficient to meet the plaintiff's burden

of proof.). If Plaintiffs cannot meet Rule 702's preponderance standard, then their experts' opinions are inadmissible. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-95 (1993).

For an expert to be permitted to testify before the factfinder, the proponent must demonstrate four things are more likely than not. One, the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue. Two, the testimony is based on sufficient facts or data. Three, the testimony is the product of reliable principles and methods. Four, the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702. "Courts have distilled the requirements of Rule 702 into two crucial inquiries: 1) whether the proposed expert's testimony is relevant; and 2) whether it is reliable." *Yates v. Ford Motor Co.,* 113 F. Supp. 3d 841, 845 (E.D.N.C. 2015) (Flanagan, J.).

"[I]t is the trial court's duty to play a gatekeeping function in deciding whether to admit expert testimony: 'The trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *United States v. Crisp*, 324 F.3d 261, 265 (4th Cir. 2003) (quoting *Daubert*, 509 U.S. at 589). Part of the district court's inquiry is to the expert's principles and methodology. *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999) At the same time, "conclusions and methodology are not entirely distinct from one another," and "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. v. Joiner,* 522 U.S. 136, 146 (1997).

## ARGUMENT

This Motion to Exclude has three distinct arguments: (1) Plaintiffs' experts opined on broad disease categories that are not reliable surrogates for the Plaintiffs' diagnosed diseases; (2) Plaintiffs' experts' synergy opinions are untested hypotheses, unsupported by scientific knowledge; and (3) Plaintiffs' experts' rely on the "any exposure," linear no-threshold theory,

another untested hypothesis, unsupported by scientific knowledge. Each of these methodological errors warrants exclusion under Rule 702.

## I. Plaintiffs' Experts' Opinions Concerning Broad Disease Categories of Leukemia or Non-Hodgkin's Lymphoma Rather Than a Particular Disease Subtype Are Inadmissible Under Federal Rule of Evidence 702.

Rather than assessing whether the alleged contaminants can cause the Plaintiffs' specific leukemia or NHL subtypes, Plaintiffs' experts proceeded as if individual subtypes all share the same causes. This blurs biological, clinical, and etiological differences that they acknowledged in their depositions; moreover, the experts could not articulate a reliable basis to use broad disease categories as reliable surrogates for Plaintiffs' diagnosed diseases. Dr. Felsher compounds this error by combining all leukemias and all lymphomas into one unalleged larger group: "hematopoietic cancers."

The approach of these experts sidesteps studies that analyze the Plaintiffs' specific subtypes, including the 2024 Cancer Incidence Study at Camp Lejeune. It also contradicts the analysis performed by the World Health Organization's International Agency for Research on Cancer ("IARC"), which focuses on disease subtypes in its determination of disease etiology (cause). This is telling given that Plaintiffs' own experts rely on IARC's analyses.

In sum, instead of opining on the Plaintiffs' actual diagnosed diseases (*e.g.*, AML, CLL, MZL), these experts ended their inquiry at "leukemia," "NHL," or even "hematopoietic cancers"—the latter being a level of generality that Plaintiffs' own expert, Dr. Gondek, testified is analytically unsound for causal analysis. Gondek GC Dep. Tr. at 23:19-24:3 (JA Ex. 160, D.E. 469-14). Plaintiffs cannot meet their burden under Rule 702(c) to show that their opinions are the product of reliable methods. Therefore, the opinions of Plaintiffs' experts on broad categories of disease should be excluded as inadmissible.

### A. Leukemia and Non-Hodgkin's Lymphoma Are Umbrella Terms for Diverse Groups of Distinct Cancers.

Leukemia and NHL subtypes arise in different cells, have different genetic mutations, have different diagnostic criteria, require different treatments, and have different risk factors. *See* Exhibit 1, World Health Organization ("WHO") Classification of Tumours Editorial Board, Haematolymphoid Tumours, International Agency for Research on Cancer, 14-15 (5th ed., vol. 11, 2024) ("WHO Classification"). WHO's classifications under umbrella terms like "leukemia" and "NHL" are complicated and have varied over time. *Compare, e.g.*, IARC 2018 Monograph 120 at 290 (JA Ex. 202, D.E. 475-3) (evaluating whether benzene causes ALL under the NHL umbrella), *with* IARC 2014 Monograph 106 at 271 (JA Ex. 201, D.E. 473-9) (evaluating whether TCE and PCE cause ALL under the leukemia umbrella). None of the Plaintiffs have just "leukemia" or "NHL." Each of them has a unique subtype of one of these disease categories noted in their specific causation reports:

K. Amsler: "[D]iagnosed with Acute Lymphoblastic Leukemia" (Gondek SC Rep. (Amsler) at 1 (JA Ex. 455, D.E. 496-7)).

S. Connard: "[D]iagnosed with acute myeloid leukemia" (Gondek SC Rep. (Connard) at 4 (JA Ex. 456, D.E. 496-8)).

R. Fiolek: "[D]iagnosis of Chronic Lymphocytic Leukemia" (Laber Rep. (Fiolek) at 3 (JA Ex. 459, D.E. 496-11)).

J. Gleesing: "[D]iagnosis of Chronic Lymphocytic Leukemia" (Laber Rep. (Gleesing) at 12 (JA Ex. 461, D.E. 496-13)).

B. Hill: "Mr. Hill has Chronic Lymphocytic leukemia" (Felsher Am. SC Rep. (Hill) at 9 (JA Ex. 451, D.E. 496-3)).

R. Carter: "[D]iagnosed with Stage IV mantle cell lymphoma" (Hu SC Rep. (Carter) at 5 (JA Ex. 490, D.E. 498-9)).

C. Davis: "[H]is diagnosis of marginal zone lymphoma" (Hoppe Rep. (Davis) at 7 (JA Ex. 486, D.E. 498-5)).

R. Howard: "[H]is diffuse large B-cell lymphoma" (Hoppe Rep. (Howard) at 12 (JA Ex. 389, D.E. 491-13)).

S. Keller: "[C]onsistent with immunoblastic lymphoma" (Felsher SC Rep. (Keller) at 14 (JA Ex. 482, D.E. 498-1)).

R. Kidd: "[D]iagnosis of diffuse large B-cell Non Hodgkin's Lymphoma" (Hu SC Rep. (Kidd) at 5 (JA Ex. 496, D.E. 499-1)).

J. Vidana: "[D]iagnosed with Diffuse Large B-cell Lymphoma" (Michaels Rep. (Vidana) at 1 (JA Ex. 502, D.E. 499-7)).

### *1. Leukemia.*

Leukemia occurs in blood and bone marrow cells. Mallon GC Rep. (Leukemia) at 6 (JA Ex. 98, D.E. 465-3). Blood cells are divided into two major subtypes: myeloid and lymphoid. Gondek GC Rep. at 5 (JA Ex. 96, D.E. 465-1). The bone marrow contains stem cells that become myeloid or lymphoid cells. Erba Rep. (Connard) at 4 (JA Ex. 474, D.E. 497-7). Myeloid cells include white blood cells, platelets, and red blood cells. Mallon Rep. at 6. Lymphoid cells include B lymphocytes, T lymphocytes, and natural killer cells. *Id.* When the genes that govern this differentiation process mutate, leukemia arises. Erba Rep. (Connard) at 4. The leukemia classification depends on whether a myeloid or lymphoid cell mutates. Gondek GC Rep. at 5 (JA Ex. 96, D.E. 465-1).

Myeloid and lymphoblastic leukemia are further classified as acute or chronic based on the rate of disease progression, the type of cancer cells that accumulate, and treatment methodology. Mallon GC Rep. (Leukemia) at 6 (JA Ex. 98, D.E. 465-3); Erba Rep. (Connard) at 5 (JA Ex. 474, D.E. 497-7). Chronic leukemias progress slowly. Mallon GC Rep. (Leukemia) at 6. Acute leukemias, AML or ALL, progress quickly and require immediate chemotherapy. Erba Rep. (Connard) at 5. These diseases also differ in age distributions: for example, AML has a median diagnosis age of sixty-eight years, while ALL is primarily a disease of children with three-quarters of cases occurring at less than six years old. Gondek GC Rep. at 5-6 (JA Ex. 96, D.E. 465-1). Lastly, certain risk factors are unique to myeloid but not lymphoid cells and vice versa, *i.e.*, one

cannot assume a cause of myeloid leukemia also causes lymphoid leukemia. *See* IARC Monograph 2018 at 297 (JA Ex. 202, D.E. 475-3) (concluding that benzene can cause acute myeloid leukemia but making no causal conclusion between benzene and acute lymphoid leukemia).

***2. Lymphoma.***

Lymphomas are cancers of lymphocytes (white blood cells). Hu GC Rep. at 9 (JA Ex. 111, D.E. 466-5). Unlike leukemia, which arises primarily in the blood, lymphoma occurs primarily in solid masses like lymph nodes or extra-nodal tissues. *Id.* Lymphomas that feature a cancer cell called a Reed-Sternberg cell are classified as Hodgkin's lymphomas, and all other lymphomas, meaning all lymphomas that lack Reed-Sternberg cells, are classified as non-Hodgkin's lymphomas. Felsher GC Rep. (NHL-Leuk) at 10 (JA Ex. 107, D.E. 466-1); Ambinder Rep. (Carter) at 5 (JA Ex. 515, D.E. 501-1). Over sixty types of NHLs are known, including CLL, which was previously classified as a leukemia. Gilbert Rep. (NHL-Leuk) at 11 (JA Ex. 108, D.E. 466-2).

Like leukemia, NHL is sub-classified based on its cell of origin (B-cell, T-cell, NK-cell), the patterns of arrangements of cells, and genetic characteristics such as chromosomal translocations and specific mutations. Exhibit 1, WHO Classification at 295-304, 635-42; Hu GC Rep. at 9 (JA Ex. 111, D.E. 466-5). The specific mutations associated with NHL subtypes arise at different stages of stem cell differentiation into lymphocytes. Felsher SC Rep. (Keller) at 9 (JA Ex. 482, D.E. 498-1).

The causes of NHL are poorly understood. Ambinder Rep. (Carter) at 6 (JA Ex. 515, D.E. 501-1). But when a cause is known, it is often associated with a particular type of NHL. *Id.* at 7; Felsher SC Rep. (Keller) at 10 ("Some risk factors are specific to subtypes[.]"); Hoppe Dep. Tr. at 138:19-21 (JA Ex. 590, D.E. 507-11) ("Q: Do you believe that all NHLs have the same risk factors or do they differ by subtype? A: They differ by subtype."). For example, Epstein-Barr virus is linked to an NHL called African Burkitt lymphoma; HIV infection and Hepatitis C are linked to

B-cell NHLs; and certain breast implants are linked to an NHL called anaplastic large cell lymphoma. Ambinder Rep. (Carter) at 6 (JA Ex. 515); Exhibit 1, WHO Classification at 303. It is an oversimplification to assume that all NHLs arise from the same causes. Hu SC Rebuttal Ambinder (Kidd) at 2 (JA Ex. 500, D.E. 499-5) ("In short, I agree with Dr. Ambinder that is an oversimplification that all lymphomas or all NHL share the same causation for all possible carcinogens[.]"). Current knowledge holds that there are unique underlying causes for NHL subtypes. D.E. 501-1 at 6; Exhibit 1, WHO Classification at 302-03; AMERICAN CANCER SOCIETY, *Non-Hodgkin Lymphoma Causes, Risk Factors, and Prevention*, at 7 https://www.cancer.org/content/dam/CRC/PDF/Public/8718.00.pdf (Feb. 15, 2024) ("Researchers have found that non-Hodgkin lymphoma (NHL) is linked with a number of risk factors, but the cause of most lymphomas is not known. This is complicated by the fact that there are many types of lymphomas [that] are actually a diverse group of cancers, which might have different causes."); *see also* Hu SC Dep. Tr. at 218:5-19 (JA Ex. 602, D.E. 508-11).

### B. General Causation for Leukemias and NHLs Must be Disease-Specific—Not Based on Broad Disease Categories like Hematopoietic Cancer, NHL, or Leukemia that Obscure Known Differences in the Causes of the Plaintiffs' Alleged Diseases.

General causation requires evidence that the alleged agent can cause the specific disease at issue. *See Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 881 (10th Cir. 2005) ("General causation is whether a substance is capable of causing a particular injury or condition in the general population...."); *Yates v. Ford Motor Co.*, 2015 WL 3463559, at *4 (E.D.N.C. May 30, 2015) ("The field [of epidemiology] 'focuses on the question of general causation (i.e., is the agent capable of causing disease?)'" (quoting Michael D. Green, et al., "Reference Guide on Epidemiology," *Reference Manual on Scientific Evidence*, 569 (3d ed. 2011) ("RMSE"))); *Doe v. Ortho-Clinical Diagnostics, Inc.*, 440 F. Supp. 2d 465, 471 (M.D.N.C. 2006); *Chambers v. Exxon*

*Corp.*, 81 F. Supp. 2d 661, 664 (M.D. La. 2000), *aff'd*, 247 F.3d 240 (5th Cir. 2001).

Because of the differences in leukemia and lymphoma subtypes, which Plaintiffs' experts acknowledge, a plaintiff's specific subtype is the inquiry for general causation. *See, e.g.*, *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 782-83 (10th Cir. 1999) (finding experts failed to "bridge the gap between ... two types of leukemia" where experts improperly relied on literature for acute leukemia to prove causation of chronic leukemia); *Chambers*, 81 F. Supp. 2d at 664, *aff'd*, 247 F.3d 240 (same); *Perry v. Novartis Pharms. Corp.*, 564 F. Supp. 2d 452, 465–66 (E.D. Pa. 2008) (focusing on generalized lymphoma data rather than the NHL-specific data is "highly questionable"); *Whiting v. Bos. Edison Co.*, 891 F. Supp. 12, 22 (D. Mass. 1995) ("[L]eukemia comes in markedly different types which can fairly be classified as distinct diseases, some of which can be induced by radiation and some of which, like chronic lymphocytic leukemia, cannot."). For example, if benzene has been associated with AML in the scientific literature, but not ALL (a leukemia subtype) or CLL (an NHL subtype formerly classified as a leukemia), simply opining that benzene causes leukemia in a case in which a plaintiff has ALL or CLL fails to answer the question for general causation and reflects a flawed and unreliable methodology. *See Exxon Corp. v. Makofski*, 116 S.W.3d 176, 186 (Tex. App. 2003) ("[L]umping distinct diseases together as 'leukemia' … ignor[es] proof that some types have much greater associations with benzene than others").

This flaw of collapsing unique diseases into broader categories applies to other categories of disease aside from leukemia and NHL.[3] In *In re Acetaminophen - ASD/ADHD Products*

[3] Dr. Felsher commits an amplified error of combining leukemias and lymphomas into hematopoietic cancers. *See Lindis Biotech, GmbH v. Amgen Inc.*, No. 22-35-GBW, 2023 WL 4826470, at *11-12 (D. Del. July 27, 2023). In *Lindis Biotech* (a patent case), the district court ruled in a claim construction dispute that lymphoma does not include leukemia. *Id.* It reasoned that the plain and ordinary meaning of lymphoma is a "cancer of the lymphatic system (but expressly excluding leukemia)." *Id.* It added that "the extrinsic evidence is persuasive in that "lymphoma" and "leukemia" are referenced separately throughout medical literature." *Id.*

*Liability Litigation*, 707 F. Supp. 3d 309 (S.D.N.Y. 2023), the court excluded expert opinions on the broad category of "neurodevelopmental disorders" rather than the specific alleged conditions of autism spectrum disorder ("ASD") and attention-deficit/hyperactivity disorder ("ADHD"). 707 F. Supp. 3d at 339–40, 347–48. Plaintiffs argued that because ASD and ADHD share symptoms and are both classified as neurodevelopmental disorders ("NDD"), a causation analysis for NDD was sufficient. The court disagreed, emphasizing that ASD and ADHD have distinct diagnostic criteria and the fact that the diseases shared a classification did not allow the experts to forego individual analyses for the plaintiffs' disorders. *Id.* at 340, 366. Because the plaintiffs were unable to prove such a methodology was reliable, the opinions could not be admitted under Rule 702. *Id.* at 340, 356, 366. The court reasoned that it would be difficult to discern whether there is support for a causation opinion for a specific disorder, since a grouped analysis blurs tensions among studies and any contradictory conclusions without individualized analyses. *Id.* at 339-40.

### C. Dr. Felsher's "Hematopoietic Cancer" Supergroup is not Disease Specific and Lacks Scientific Support.

Like the excluded experts' approach in *Acetaminophen*, Dr. Felsher proceeded "by evaluating blood cancers (lymphoma and leukemia) as one group." Felsher GC Rep. (NHL-Leuk) at 12 (JA Ex. 107, D.E. 466-1). His causation analysis, including application of the Bradford Hill criteria are all for one broad category: "hematopoietic cancers." *Id.* at 40-44. But the fundamental question for these cases alleging subtypes of leukemia or NHL is whether the alleged agent can cause the specific disease at issue. *Dunn v. Sandoz Pharms. Corp.*, 275 F. Supp. 2d 672, 676 (M.D.N.C. 2003); *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007). Dr. Felsher gives no answer, because <u>none</u> of his causation analyses or conclusions are for the specific

diseases at issue. D.E. 466-1 at 41-44 (framing each analysis and conclusion for "hematopoietic cancers"). Plaintiffs cannot demonstrate that Dr. Felsher's grouped analysis is a reliable method under Rule 702 because, as discussed below, it is refuted by Dr. Felsher's co-expert (Dr. Gondek), Dr. Felsher's reliance materials, and IARC.

### *1. Dr. Felsher's Reliance Materials and His Co-Expert (Dr. Gondek) Refute His Method of Grouping Together Leukemias and Lymphomas.*

Plaintiffs' leukemia expert, Dr. Gondek, agrees that Dr. Felsher's method is unsound. Dr. Gondek testified that combining leukemias and lymphomas into one category obscures whether an agent can cause a leukemia, a lymphoma, or both. Gondek GC Dep. 15:13–16:7 (JA Ex. 160, D.E. 469-14). He also testified that the statement "TCE can cause hematopoietic cancer" is too broad to tell whether TCE can cause a given leukemia or an NHL subtype. *Id.* at 15:13-16:7. Yet, this is exactly how Dr. Felsher presents his conclusions for benzene, TCE, and PCE. Felsher GC Rep. (NHL-Leuk) at 44 (JA Ex. 107, D.E. 466-1).

Dr. Felsher offers no scientific justification for his hematopoietic cancer grouping. Instead, he claims, without support, that all leukemias and lymphomas are "thought to" begin in the same cell type, so they can all be analyzed as one. *Id.* at 11-12. If Dr. Felsher were correct, Dr. Gondek would not have disagreed in his analysis of the issue, and IARC—discussed below—would not have provided unique profiles for every subtype, detailing different causes and development for the various subtypes. Even Dr. Felsher admits that some risk factors are unique to specific subtypes. *Id.* at 8.

Additionally, Dr. Felsher cites no peer-reviewed study, agency review, or regulatory framework supporting his aggregation of hematopoietic cancers. *Id.* at 11-12. In fact, the same studies he touts as strong and standing out reject his method and analyze risk by individual disease subtype instead. *See, e.g.*, *id.* at 15 ("[T]he pooled InterLymph analysis conducted by Cocco stands

out as the most detailed, as it analyzed NHL subtypes and incorporated a robust exposure assessment."). Moreover, several studies he relies on underscore how critical the differences among subtypes are to a causal analysis:

> Fagliano (1990)[4]: "Although we have analyzed total leukemias in this study, we recognize their clinical and etiologic diversity … [c]ombining histological subtypes together in these ecological analysis may have obscured an effect if the hypothesized etiological agent, VOC-contaminated drinking water, is specific to a particular histological type."
>
> Morton (2014)[5]: "The etiology of NHL is incompletely understood and increasing evidence suggests that risk factors may vary by NHL subtype … NHL is composed of numerous closely related yet heterogeneous diseases with distinctive, morphologic, immunophenotypic, genetic, and clinical features."
>
> Liu (2022)[6]: "Due to heterogeneity between the different subtypes, diagnosis and clinical classification of NHL is very challenging, making evaluation of its epidemiological characteristics even more difficult."

Felsher GC Rep. (NHL-Leuk) at 19-22, 24 (JA Ex. 107, D.E. 466-1).

When confronted at deposition with these papers that Dr. Felsher himself cited, Dr. Felsher responded that: (1) the statements in the papers were vague, (2) the questions about the statements were "scientifically absurd," (3) the statements in the papers were wrong, and (4) the papers were too old. Felsher GC Dep. Tr. at 87:22-97:7 (JA Ex. 164, D.E. 470-3). The last explanation was contradicted by the fact that Dr. Felsher cited even older papers in his report to support his own opinions: D.E. 466-1 at 8 (1986), 16 (1989), 19 (1987), 22 (1981), 24 (1981), 35 (1969), 36 (1974). D.E. 470-3 at 86:24-92:14. Dr. Felsher's opinions are a good example of an expert offering conclusions regarding studies that the study authors were unwilling to make. He broadened their

---

[4] Exhibit 2, Fagliano, *Drinking Water Contamination and the Incidence of Leukemia: An Ecologic Study*, 80 AM. J. PUB. HEALTH 1209, 1212 (1990).
[5] Exhibit 3, Morton, *Rationale and Design of the International Lymphoma Epidemiology Consortium (InterLymph) Non-Hodgkin Lymphoma Subtypes Project*, 48 J. NAT'L CANCER INST. MONOGRAPHS 1, 1 (2014).
[6] Exhibit 4, Liu, *Benzene Exposure Increases the Risk of Non-Hodgkin's Lymphoma: A Systematic Review and Meta-Analysis of Observational Studies*, 11 TRANSLATIONAL CANCER RES. 1750, 1751 (2022).

conclusions to "hematopoietic cancer" (all leukemias and lymphomas combined) despite the papers' warnings regarding the importance of considering disease subtypes. This created an analytical gap between his conclusions and those reached by the papers' authors. *Acetaminophen*, 707 F. Supp. 3d 309, 353-54.

Moreover, the above three studies underscore why NHL subtypes are distinct pathologic entities and cannot necessarily be considered as one disease. *See* Ambinder Rep. (Carter) at 5-9 (JA Ex. 515, D.E. 501-1) (noting that known lymphoma causes are associated with specific subtypes, not lymphoma in general); Erba Rep. (Fiolek) at 6-7 (JA Ex. 475, D.E. 497-8) (noting that Morton (2014) demonstrates the subtypes of non-Hodgkin lymphoma are distinct pathologic entities and cannot be necessarily considered as one). As described in the next section, the IARC[7] sources on which Plaintiffs' experts rely emphasize this point.

### 2. *IARC Refutes Dr. Felsher's Method.*

Unlike Dr. Felsher, IARC—the WHO's specialized cancer agency—pays careful attention to leukemia and lymphoma subtypes in classifying diseases and analyzing causation. Its Classification of Haematolymphoid Tumours (5th ed. 2024)—the global standard for classifying blood cancers[8]—defines leukemia and lymphoma as distinct categories comprising numerous subtypes, each with unique genetic, morphological, and clinical profiles. Exhibit 1, WHO Classification at xii-xiii. IARC emphasizes that the "evidence-based classification of disease is fundamental for the treatment of individual patients; for monitoring of global disease incidence;

---

[7] " IARC and the U.S. National Toxicology Program (NTP) have formal processes to evaluate the weight of evidence that a chemical causes cancer. Each classifies chemicals on the basis of epidemiological evidence, toxicological findings in laboratory animals, and mechanistic considerations, and then assigns a specific category of carcinogenic potential to the individual chemical or exposure situation (e.g., employment as a painter)." RMSE at 655.

[8] Since 2001, WHO classifications have been incorporated into the International Classification of Diseases (ICD) and serve as a foundation for cancer diagnosis, treatment, and epidemiological surveillance worldwide. Exhibit 1, WHO Classification at 14.

and for investigating all aspects of disease causation, prevention and therapy." WHO Classification at 14 (emphasis added). Nowhere does IARC use the term "hematopoietic cancer" to classify a leukemia or lymphoma. *See id.* at vii-x. Its causation evaluations for benzene, TCE, or PCE do not use "hematopoietic cancer" either. *See* IARC 2018 Monograph 120 at 297 (JA Ex. 202, D.E. 475-3); IARC 2014 Monograph 106 at 189, 329 (JA Ex. 201, D.E. 473-9).

IARC treats AML and ALL not only as diagnostically different, but also as different in etiology, prognosis, and typical patient demographics (e.g., the median diagnosis age for AML is 69, but just 17 for ALL). Exhibit 1, WHO Classification at 110-62, 328-64, 368-77; *see also* Gondek GC Rep. at 5-6 (JA Ex. 96, D.E. 465-1). IARC also treats NHL subtypes as distinct, including those alleged by Plaintiffs: CLL, DLBCL, MCL, MZL, and immunoblastic DLBCL. Exhibit 1, WHO Classification at 461-97, 443-53, 399-417.

Similarly, when IARC evaluates whether a suspected carcinogen can cause cancer, it pays close attention to specific subtypes. For example, IARC's Monograph on Benzene claims "sufficient" human evidence exists (no dose specified) that benzene causes AML, but not other subtypes. *See* IARC 2018 Monograph 120 at 297 (JA Ex. 202, D.E. 475-3). The evaluation notes just a "positive association" (a lower ranking) for NHL, but its analysis calls NHL a "broad category" and specifies that its evaluation is for a "heterogeneous classification of NHL." *Id.* at 290-91, 297. When IARC reviewed studies on subtypes of NHL (including DLBCL, follicular lymphoma ("FL"), and mantle B-cell lymphoma), it noted that results were inconsistent. *Id.* at 291. Dr. Felsher purports to rely on IARC (Felsher GC Rep. (NHL-Leuk) at 6, 12 (JA Ex. 107, D.E. 466-1)), but his method contradicts a key principle of IARC's classifications and causation evaluations: hematolymphoid malignancies are evaluated at the subtype level, not as undifferentiated categories. *See* WHO Classification at xii-xiii.

Dr. Felsher's opinions are based on an overbroad grouping method that cannot reliably answer the fundamental question at this stage: whether the alleged agents can cause the Plaintiffs' diseases. *Dunn*, 275 F. Supp. 2d 672, 676. His broad grouping of leukemias and NHL into "hematopoietic cancers" lacks scientific support; it was rejected by Plaintiffs' expert Dr. Gondek and is contradicted by IARC. Therefore, Dr. Felsher's testimony should be excluded under Rule 702 as unreliable.

### D. Plaintiffs' Experts Cannot Meet General Causation Standards by Opining on Broad Disease Categories Instead of the Plaintiffs' Actual Diseases.

Drs. Bird, Gilbert, Gondek, Hu, and Mallon evaluate causation for leukemia or NHL, instead of the Plaintiffs' specific diseases. These experts assume that if an agent is associated with leukemia or NHL, then they do not need to evaluate causation for the Plaintiffs' specific forms of leukemia or NHL. Plaintiffs offer no accepted justification for their assumption. In fact, several key points undermine it: (1) high-quality epidemiological studies analyze risk by subtype showing that the risks vary significantly by subtype; and (2) Plaintiffs' experts admit there are major differences between subtypes.

#### *1. Subtype Risk Results Vary Significantly in Studies.*

The validity of these experts' grouping method is belied by the fact that: (a) studies they cite have subtype data, and (b) those results differ significantly.

For example, the 2024 Cancer Incidence Study at Camp Lejeune—cited by each expert—compared the incidence of specific forms of cancer between Marines and civilian workers at Camp Lejeune with their counterparts at Camp Pendleton.[9] It provided risk results for nearly all of the

[9] The 2024 Cancer Incidence study expressed its results as estimates of risk called hazard ratios ("HR"). An HR of 1.0 means no effect was observed. *See In re Acetaminophen*, 707 F. Supp. 3d at 322. An HR above 1.0 means the risk of that specific cancer subtype was greater at Camp Lejeune than at Camp Pendleton. *See id.* An HR below 1.0 means the risk was less at Camp Lejeune. *See id.* Next to the HR, the study provides a range of values where the true risk, not just an estimate, is likely to be. *See id.* This is

Plaintiffs' subtypes. These results vary in statistical significance, risk result, and whether the disease risk is elevated:

| Disease | Risk result |
|---|---|
| Acute lymphocytic leukemia | 0.94 (0.53, 1.67): decreased; not significant |
| Acute myeloid leukemia | 1.38 (1.03, 1.85): increased; significant |
| Chronic lymphocytic leukemia | 1.02 (0.79, 1.32): increased; not significant |
| Mantle cell lymphoma | 1.26 (0.73, 2.19): increased; not significant |
| Diffuse large B-cell lymphoma | 0.89 (0.72, 1.10): decreased; not significant |
| Marginal zone B-cell lymphoma | 1.45 (0.92, 2.28): increased; not significant |

Plaintiffs may argue that these results were based on a small sample size. But their experts emphasize favorable results in other studies that are based on small numbers. *See e.g.*, Felsher GC Rep. (NHL-Leuk) at 18 (JA Ex. 107, D.E. 466-1) ("[The *Cocco* study authors] explained that although based on small numbers of exposures, the risk of all major NHL subtypes, namely diffuse large B-cell lymphoma, FL, and CLL, showed increases in risk ranging 2-3.2-fold in the highest category of exposure intensity."); Hu GC Rep. at 18 (JA Ex. 111, D.E. 466-5) ("Although based on small numbers of exposed, risk of all the major NHL subtypes, namely diffuse large B-cell lymphoma (DLBCL), FL, and CLL, showed increases in risk ranging 2–3.2-fold in the highest category of exposure intensity.")

Plaintiffs may also argue that analyzing risk by subtype is too granular, but this is belied by their own experts, who rely on studies that do just that, and it is their burden to prove that their experts' methods of evaluating causation of umbrella categories like leukemia and NHL are reliable surrogates for determining causation of the specific diseases alleged. *See e.g.*, Felsher GC Rep. (NHL-Leuk) at 15 (JA Ex. 107, D.E. 466-1) ("Cocco stands out as the most detailed, as it

called a confidence interval. *See id.* To evaluate whether the increased risk result is due to a true association and not random chance, epidemiologists look at whether 1.0 (no effect) is included in the confidence interval. *See id.* If 1.0 is included (*e.g.*, 0.53-1.67), then the result is not significant because we cannot sufficiently rule out random chance. If 1.0 is not included (*e.g.*, 1.03-1.85), then the result is considered significant. *See id.*

analyzed NHL subtypes and incorporated a robust exposure assessment."); Gondek GC Rep. at 19 ("Workers with highest exposure to TCE … had significantly increased risk of lymphoma in general … but also for various lymphoma subtypes including both B- and T-cell lymphomas (Seidler et al. 2007)."); Bird GC Rep. (NHL-Leuk) at 60 (JA Ex. 103, D.E. 465-8) ("For example, a pooled analysis of four international case-control studies found elevated risks of specific NHL subtypes with TCE exposure [Cocco P. Occup Environ Med 2013;70:795-802].").

In addition to the varying risk results noted above, the 2024 Cancer Incidence study at Camp Lejeune also gives dose-response data for subtypes, measured by duration of time at Camp Lejeune. A dose-response relationship exists when disease risk increases as exposure increases; it is "an important factor in establishing causation." *Newman v. Motorola, Inc.*, 78 F. App'x 292, 294 (4th Cir. 2003). As PLG's epidemiology expert stated, when risk consistently increases as exposure increases, there is greater confidence that a true association is present. Savitz 1st Dep. Tr. at 139:21-140:2 (JA Ex. 152, D.E. 469-6). Other patterns, such as no increased risk at low or medium exposures but a jump at high exposures, or an increase at medium exposure but a drop at high exposures, can offer some insight, but are less informative. *Id.* at 140:3-141:13. But where a positive "dose-response gradient supports a causal effect, the absence of such a gradient calls it into question." 484-4); Savitz 3d Dep. Tr. at 136:3-11 (JA Ex. 154, D.E. 469-8).

Evaluating the presence or absence of dose-response, sometimes called biological gradient, is a major component of the Bradford Hill method of assessing causation, which is the method relied upon by these experts.[10] *See* Bird GC Rep. (NHL-Leuk) at 54 (JA Ex. 103, D.E.

[10] The Bradford Hill methodology involves (a) identifying a clear-cut association, and then (b) evaluating the association with nine factors that guide epidemiologists in making judgments about causation: (1) Temporal relationship, (2) Strength of the association (3) Dose–response relationship; (4) Replication of the findings; (5) Biological plausibility (coherence with existing knowledge); (6) Consideration of alternative explanations; (7) Cessation of exposure; (8) Specificity of the association, and (9) Consistency with other knowledge. RMSE at 599-600.

465-8); Felsher GC Rep. (NHL-Leuk) at 41 (JA Ex. 107, D.E. 466-1); Gondek GC Rep. at 24 (JA Ex. 96, D.E. 465-1); Hu GC Rep. at 33 (JA Ex. 111, D.E. 466-5); Mallon GC Rep. (Leukemia) at 31 (JA Ex. 98, D.E. 465-3).

At Camp Lejeune, the dose-response results differed significantly for each subtype, further illustrating how grouping them together obscures key information. For example, the risk for ALL consistently decreased as exposure increased; AML and CLL first decreased, then increased; and the remainder increased first but then decreased. None consistently increased and none decreased or increased by the same amount.

| **Disease** | **Low duration** | **Medium duration** | **High duration** |
|---|---|---|---|
| ALL | 0.96 (0.49,1.89) | 0.93 (0.35, 2.45) | 0.79 (0.25,2.49) |
| AML | 1.36 (0.97, 1.90) | 1.11 (0.66, 1.87) | 1.90 (1.12, 3.21) |
| CLL | 1.04 (0.77, 1.40) | 0.98 (0.63, 1.53) | 1.10 (0.67, 1.82) |
| MCL | 1.04 (0.52, 2.08) | 1.85 (0.85, 4.04) | 1.20 (0.41, 3.47) |
| DLBCL | 0.91 (0.71, 1.17) | 0.97 (0.68, 1.39) | 0.78 (0.50, 1.21) |
| MZL | 1.39 (0.82, 2.35) | 1.64 (0.79, 3.41) | 1.57 (0.62, 3.95) |

Unsurprisingly, IARC also pays special attention to study results by subtype. In its 2018 Monograph on benzene, IARC reported varying results by subtype across numerous epidemiology studies. It also reported groupings by myeloid, lymphoid, or acute leukemias. Importantly, these grouped results differed, sometimes greatly, from the individual subtype results. For example, in *Stenehjem* (2015), the AML results were over 200% higher than the grouped myeloid results, indicating that without including AML in the myeloid group, the result would be far lower.

| **Study** | **Disease** | **Result** |
|---|---|---|
| *Stenehjem* (2015) | Myeloid leukemias | 2.24 (0.65-7.71) |
| *Stenehjem* (2015) | AML | 4.85 (0.88-27.0) |
| *Collins* (2015) | Myeloid leukemias | 1.93 (0.53-4.94) |
| *Collins* (2015) | AML | 1.39 (0.17-5.03) |
| *Collins* (2015) | Lymphoid leukemias | 1.31 (0.16-4.72) |
| *Linet* (2015) | Myeloid leukemias | 2.2 (1.1-4.6) |
| *Linet* (2015) | Acute leukemias | 3.5 (0.6-66.1) |


Case 7:23-cv-00897-RJ Document 556 Filed 09/10/25 Page 26 of 48

| | | |
|---|---|---|
| *Linet* (2015) | ALL | 4.5 (0.8-83.9) |
| *Linet* (2015) | AML | 2.1 (0.9-5.2) |
| *Kirkeleit* (2008) | ALL | 2.20 (0.30-16.60) |
| *Kirkeleit* (2008) | AML | 2.89 (1.25-6.67) |

*See* IARC 2018 Monograph 120 at 108-114 (JA Ex. 202, D.E. 474-2).

For NHLs, IARC noted the difficulty of comparing results across epidemiology studies, as the classification of NHLs has changed, and few epidemiology studies used the current WHO classification system. *Id.* at 124. IARC therefore reported NHL results as defined in the original studies along with risks for multiple subtypes when available. *Id.* Many of the studies included multiple myeloma, which is no longer considered an NHL, and the studies' extreme variation in subtypes considered and results underscores the heterogeneity of NHLs and other lymphocytic cancers that have been studied with them. *See id.* at 125-28. Highlighted below are the results from the few studies that reported results for CLL separate from other diseases grouped as NHLs.

| **Study** | **Disease** | **Result** |
|---|---|---|
| *Linet* (2015) | NHL for ICD-9 (codes 200, 202) (incidence) | 3.9 (1.5-13.2) |
| *Linet* (2015) | NHL for ICD-9 (codes 204.1, 204.2) - ***CLL (incidence)*** | 2 (CI not reported) |
| *Stenehjem* (2015) | NHL (B-cell lymphoma) for ICD-10 (codes C82-C91) | 1.49 (0.9-2.48) |
| *Stenehjem* (2015) | NHL for ICD-10 (codes C83.0, C91.1) - ***CLL*** | 6.74 (0.75-60) |

*See id.*

Additional studies relied upon by Plaintiffs' experts underscore that associations with exposure vary greatly by subtype. Dr. Hu testified that the *Karami* study that he cited found an increased risk for NHL from TCE exposure, but not for the NHL-subtype CLL. Hu GC Dep. Tr. at 184:10-25 (JA Ex. 162, D.E. 470-1). He conceded that it was possible that TCE does not have the same effect for all NHL subtypes. *Id.* Drs. Gilbert and Mallon also rely on *Karami* but omitted

the results for CLL. Gilbert Rep. (NHL-Leuk) at 14-15, Mallon GC Rep. (Leukemia) at 11. Dr. Gondek relies on the *Stenehjem* (2015) paper (Gondek GC Dep. 205:5-10) (JA Ex. 160, D.E. 469-14), which not only gave subtype data, but "split the case group into finer subgroups of cancers, in order to display the value of detailed diagnostic data." Exhibit 5, J.S. Stenehjem, et al., *Benzene exposure and risk of lymphohaematopoietic cancers in 25,000 offshore oil industry workers*, 112 BRIT. J. CANCER 1603, 1605 (2015). Notably, the risk results varied significantly by subtype. *Id.* at 1608-09. Dr. Bird relies on *'t Mannetje* (2016) (Bird GC Rep. (NHL-Leuk) at 16, 32 (JA Ex. 103, D.E. 465-8)), which notes that risk differs by NHL subtype; that NHL subtype is a core variable alongside age and smoking status; and that risk analysis by NHL subtype is "an important step towards improving our understanding of NHL etiology." Exhibit 6, Andrea 't Mannetje, et al., *Occupation and Risk of Non-Hodgkin Lymphoma and Its Subtypes: A Pooled Analysis from the InterLymph Consortium*, 124 ENVTL. HEALTH PERSPS. 396, 397, 403 (2016).

#### ***2. Plaintiffs' Experts Perform Grouped Causation Analyses Despite Admitting Significant Differences Between Disease Subtypes.***

Drs. Bird, Gilbert, Gondek, Hu, and Mallon also testified that the subtypes differ in clinically and biologically significant ways, which underscores the unreliability of grouping subtypes for causation. Yet, Plaintiffs' experts fail to offer plausible explanations for why they ignored these clinical and biological differences when analyzing causation.

Dr. Bird testified that leukemia subtypes can originate from different cells, follow different progressions, and require different treatments. Bird GC Dep. Tr. at 127:9–132:14 (JA Ex. 148, 469-2). Drs. Gondek and Mallon agree that leukemia is classified by cell lineage (lymphoid vs. myeloid) and by progression (acute vs. chronic). Gondek GC Report at 5 (JA Ex. 96, D.E. 465-1); Mallon GC Report at 6 (JA Ex. 98, D.E. 465-3). Dr. Gondek admitted that grouping subtypes can mask risk differences, Gondek GC Dep. 196:13–17 (JA Ex. 160, D.E. 469-14). Additionally, Dr.

Gondek has published on specific leukemia subtypes. Additionally, Dr. Gondek has published on specific leukemia subtypes (*id.* at 24:9-16) and states that ALL and AML differ substantially: ALL arises in lymphoid cells and affects mostly children; AML arises in myeloid cells and is typically diagnosed in older adults. Gondek GC Report at 5-6. Of note, Drs. Gondek and Hu both testified that they opined on leukemia or NHL in a categorical way, rather than on the subtypes at issue, at the request of Plaintiffs' counsel. Gondek GC Dep. 17:8-22; Hu GC Dep. Tr. at 77:7-12 (JA Ex. 162, D.E. 470-1). Dr. Hu conceded that different forms of NHL arise in different cells and that known risk factors vary by subtype. *Id.* at 73:16-74:1. Dr. Hu was unsure whether TCE could cause all NHL subtypes, but he nonetheless opined that TCE causes NHL, generally. Hu SC Dep. Tr. at 146:20-23 (JA Ex. 602, D.E. 508-11) ("So just getting back to your question, I'm not sure I have an opinion on that, whether TCE can cause any subtype of NHL.").("So just getting back to your question, I'm not sure I have an opinion on that, whether TCE can cause any subtype of NHL.").

Dr. Hu did claim that benzene could cause all NHL subtypes, but he could not provide a plausible explanation for how. *Id.* at 140:18-22. His theory was based on research suggesting that benzene may cause genetic mutations in stem cells before they began differentiating, in the case of NHL, into lymphocytes. Dr. Hu could not explain how this research suggests that benzene causes NHL subtypes associated with genetic mutations that occur after stem cell differentiation, though he thought at least some NHL subtypes were associated with such post-differentiation mutations. *Id.* at 150:19-151:1.[11] And Dr. Hu admitted that he had no evidence that this hypothesis had ever been tested. *Id.* at 306:3-18. In short, his method amounted to inscrutable speculation.

[11] Dr. Hu referred to stem cells before they begin differentiating into other cells as "pluripotential." *See, e.g.*, Hu SC Dep. Tr. at 150:19-151:1 (Q: Is there any evidence that benzene's impact on hematopoietic is relevant to more than just the pluripotential state of the cell differentiation process? A: I can't answer that because I haven't specifically looked into that question."). The word "pluripotent" means "not fixed as to developmental potentialities, *especially*: capable of differentiating into one of many cell types."

Next, to evaluate causation, each expert performed a Bradford Hill analysis, but they did so unreliably because they uniformly chose to do so at the categorical level of "leukemia" or "NHL" rather than at the level of the alleged subtypes. As the court in *Acetaminophen* held, conducting such a categorical Bradford Hill analysis is unreliable. 707 F. Supp. 3d at 339. The court specifically faulted the plaintiffs' experts for not separately analyzing the Hill factors for the alleged diagnoses (ASD and ADHD). *Id.* at 347-48. Bradford Hill is a framework for evaluating causation based on available evidence. But when applied to undifferentiated disease categories, it yields conclusions that may not apply to the distinct disease actually alleged. *See id.* at 339-348. That is not a reliable scientific analysis—it is an overgeneralization.

Here, the experts analyzed every Bradford Hill factor for leukemia or NHL generally, rather than for a Plaintiff's specific disease (*e.g.*, AML, CLL, mantle cell lymphoma).

> Bird: "Bradford Hill Analysis – [Benzene and leukemia; benzene and NHL; TCE and leukemia; TCE and NHL; PCE and leukemia; PCE and NHL; TVOC and leukemia; TVOC and NHL.]" Bird GC Rep. (NHL-Leuk) at 4 (JA Ex. 103, D.E. 465-8).
>
> Gilbert: "Taken together, the weight of evidence leads to the conclusion that TCE exposure causes NHL and leukemia." Gilbert Rep. (NHL-Leuk) at 8, 22 (JA Ex. 108, D.E. 466-2).
>
> Gondek: "Collectively, these factors strongly support the conclusion that benzene, TCE, and PCE exposure can cause leukemia." Gondek GC Report at 24 (JA Ex. 96, D.E. 465-1).
>
> Hu: "TCE is a cause of NHL." Hu GC Report at 24 (JA Ex. 111, D.E. 466-5); "[P]rovide support for PCE as a cause of NHL." *Id.* at 34; "Benzene exposure more likely than not causes NHL." *Id.* at 40.
>
> Mallon: "TCE, more likely than not, causes Leukemia." Mallon GC Report (Leukemia) at 18 (JA Ex. 98, D.E. 465-3); "[B]enzene is a cause of leukemia." *Id.* at 32; "PCE is a cause of leukemia." *Id.* at 40.

---

*Pluripotent*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/pluripotent (last visited Sept. 3, 2025).

Like in *Acetaminophen*, none of these experts assess whether the chemicals are causally linked to the specific disease subtypes that Plaintiffs allege, much less at the levels of exposure at Camp Lejeune. This is like claiming that all compact cars are dangerous because some Ford Pintos exploded in rear-end collisions, even though the explosion was not linked to the Pinto's compact size. *See Grimshaw v. Ford Motor Co.*, 119 Cal. App. 3d 757, 774 (Cal. Ct. App. 1981) (describing aesthetics-based design flaws in the Pinto fuel system and bumper), *disapproved on other grounds by Kim v. Toyota Motor Corp.*, 424 P.3d 290 (Cal. 2018). Moreover, nowhere do these experts justify their extrapolation from broad categories to specific subtypes, much less their decision to forego analyzing the Plaintiffs' diseases, so their opinions are inadmissible. *See Rouse*, 2024 WL 2044630, at *1 (proponent of expert testimony must prove it is admissible).

## II. <u>Plaintiffs' Synergy Opinions Are Inadmissible Under Rule 702.</u>

Under Rule 702, expert testimony based on an untested theory is inadmissible because it is unsupported speculation rather than scientific knowledge. Several of Plaintiffs' experts proffer the untested theory that exposure to a mixture of contaminants may have a synergistic effect. The United States moves to exclude these opinions under Rule 702 as to the following experts:

<u>Dr. Bird</u>: "[Q]ualitative conclusion" of "multiplicative effect." (Bird GC Rep. (NHL-Leuk) at 53 (JA Ex. 103, D.E. 465-8));

<u>Dr. Felsher</u>: "[P]ossibly" synergistic effect (Felsher GC Rep. (NHL-Leuk) at 43-44 (JA Ex. 107, D.E. 466-1));

<u>Dr. Gilbert</u>: Synergistic effects of chemicals "likely promotes" disease at concentrations that would be less harmful for any of the chemicals alone (Gilbert Rep. (NHL-Leuk) at 36 (JA Ex. 108, D.E. 466-2));

<u>Dr. Gondek</u>: "[P]otentially" synergistic effect (Gondek GC Rep. at 27 (JA Ex. 96, D.E. 465-1));

<u>Dr. Mallon</u>: "[T]heoretically possible" for synergy (Mallon GC Rep. (Leukemia) at 41 (JA Ex. 98, D.E. 465-3)).

### A. Plaintiffs' Untested Synergy Hypothesis is Speculative and Unscientific.

These experts all theorize that benzene, TCE, PCE, and vinyl chloride may have a synergistic effect—meaning that their combined exposure increases the risk of leukemia or NHL more than the sum of each chemical's individual effect. Because Plaintiffs' experts' synergy theory is untested speculation, Rule 702 precludes admission of these opinions.

An expert's opinion must be based on "scientific … knowledge" to be admissible. *Daubert*, 509 U.S. at 589-90 (1993). "Scientific … knowledge" is more than subjective belief or unsupported speculation. *Id.* at 590. An untested hypothesis falls short of the level of scientific knowledge required by Rule 702. *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 289-93 (4th Cir. 2021) (affirming exclusion of expert for relying on untested hypothesis); *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017) (same); *Cavallo v. Star Enter.*, 100 F.3d 1150, 1159 (4th Cir. 1996) (same). "Scientific" implies a grounding in the scientific method, which is based on generating and testing hypotheses to see if they can be falsified. *Daubert*, 509 U.S. at 593. "[S]cientists whose conviction about the ultimate conclusion of their research is so firm that they are willing to aver under oath that it is correct prior to performing the necessary validating tests [may] properly be viewed by the district court as lacking the objectivity that is the hallmark of the scientific method." *Mitchell*, 165 F.3d at 783 (10th Cir. 1999) (quoting *Claar v. Burlington N. Ry. Co.*, 29 F.3d 499, 503 (9th Cir. 1994)).

Here, Plaintiffs' experts couch their hypotheses as synergistic opinions. Their reports are riddled with qualifying language on what "could be expected" or what is "theoretically possible" when benzene, TCE, PCE, and vinyl chloride are combined. *See e.g.*, Felsher GC Rep. (NHL-Leuk) at 43 (JA Ex. 107, D.E. 466-1); Gilbert Rep. (NHL-Leuk) at 36-37 (JA Ex. 108, D.E. 466-2); Gondek GC Rep. at 27 (JA Ex. 96, D.E. 465-1); Mallon GC Rep. (Leukemia) at 41 (JA Ex. 98, D.E. 465-3); Bird GC Rep. (NHL-Leuk) at 38-39, 53 (JA Ex. 103, D.E. 465-8). When questioned

at their depositions, they walked back their opinions to mere suggestions. *See e.g.,* Gondek GC Dep. Tr. 48:13-14 (JA Ex. 160, D.E. 469-14)("perhaps there may be a synergistic effect"); Felsher GC Dep. Tr. 31:14-15 (JA Ex. 164, D.E. 470-3) (there are contexts where the effects "may be synergistic"); Bird (there are contexts where the effects "may be synergistic"); Bird GC Dep. Tr. 338:3-8 (JA Ex. 148, 469-2) ("a lot is unknown" about interactions among the VOCs). Plaintiffs' experts lack evidence to support their theory – because there is none. *See* ATSDR 2017 PHA at xix, 33-34 (JA Ex. 183, D.E. 472-3) (noting only interactions between TCE and PCE, and TCE and VC have been studied, with no synergistic effects for the former and a reduced toxic effect for the latter). Their synergistic opinions should therefore be excluded.

Drs. Bird, Gilbert, Felsher, Mallon, and Gondek's lack of evidence to support their synergy hypothesis is detailed below:

***1. Dr. Bird.***

Dr. Bird cited no evidence on testing at all, much less evidence of testing supporting the synergy hypothesis. Instead, he cited one speculative statement from a study that had no individual exposure data and was limited to the potential synergistic effects of TCE and PCE: "the carcinogenic activity of TCE and PCE may be compounded by joint exposure because TCE and PCE appear to share toxic metabolic pathways." Bird GC Report (NHL-Leukemia) at 52 (JA Ex. 103, D.E. 465-8) (emphasis added) (quoting *Cohn* 1994 at 561 (JA Ex. 234, D.E. 479-11)). Notably, this tentative statement was not an observation of study results and was not specific to any form of cancer; instead, it was merely an ancillary comment in a paragraph discussing the comparability of rodent studies. *Id.* Dr. Bird's other references are to the synergistic effects of obesity and arsenic-associated lung and bladder cancer; the synergistic effects of asbestos and cigarette smoke in relation to lung cancer; and the synergistic effects of γ-irradiation and ethyl methanesulfonate in relation to genotoxicity (not even cancer) in mouse cells. *Id.* at 52-53.

Significantly, he cited nothing on the chemicals at issue here in combination. The most he could say was that the science on synergistic interactions is "evolving." *Id.* at 53.

***2. Dr. Gilbert.***

Dr. Gilbert admitted that the study of toxic co-exposures is "still relatively new" and that few epidemiological studies have been done to quantify the additive or synergistic effects of exposures to multiple chemicals. Gilbert Rep. (Bladder) at 36 (JA Ex. 73, D.E. 463-12). At deposition, Dr. Gilbert further conceded that there are no studies to directly support an opinion that the effects of the chemicals at Camp Lejeune could be synergistic and increase the incidence of any cancer. Gilbert Dep. Tr. 229:17-25 (JA Ex. 165, D.E. 470-4) (there are no studies "pinpoint[ing] the additive or synergistic effects on any particular cancer").

***3. Dr. Felsher.***

Dr. Felsher also admitted the uncertainty surrounding synergy: "[t]he exact relationship between the interactions of TCE, benzene, PCE, and VC is not known …." Felsher GC (NHL-Leuk) at 43 (JA Ex. 107, D.E. 466-1). At deposition, he was unable to identify a single study on whether benzene, TCE, PCE, and vinyl chloride—or any combination of these four—behave synergistically. Felsher GC Dep. Tr. 32:24-33:7 (JA Ex. 164, D.E. 470-3). Moreover, his conclusion on the synergistic combined effect of the alleged chemicals is the only opinion for which he omitted a Bradford Hill analysis. Felsher GC Rep. (NHL-Leuk) at 40-44 (JA Ex. 107, D.E. 466-1). He testified that his Hill analysis for chemical combinations is "implied," but he could not identify a single study he considered for synergy on even the first Hill consideration—strength of association. D.E. 470-3 at 37:19-40:8.

***4. Dr. Mallon.***

Similarly, Dr. Mallon admitted that research and studies on mixtures of carcinogens are lacking: "there are no epidemiological, toxicological, or mechanistic studies that specifically

assess the risk of leukemia in individuals who are exposed to TCE, PCE, benzene and vinyl chloride…." Mallon GC Rep. (Leukemia) at 41 (JA Ex. 98, D.E. 465-3). He conceded that this means there is no testing or evidence for a synergy theory. *Id.* He specifically stated, "the lack of research and peer reviewed studies that provides substantive evidence regarding the risks posed by 'mixtures' of carcinogens has been acknowledged for a long time, with recent initiatives begun to advance a common framework for research in the laboratory as well as in epidemiological studies." *Id.*

***5. Dr. Gondek.***

Dr. Gondek walked back his synergy opinion to a "suggestion." In his report, Dr. Gondek stated that he *expects* a synergistic effect: "[t]he cumulative impact of these agents is expected to be significantly greater than the effects observed with exposure to any one toxin individually." At deposition, he testified, "I suggested it may have synergistic effect. I don't think I specifically stated that was the case … perhaps there may be a synergistic effect." Gondek GC Dep. Tr. 47:22-48:14 (JA Ex. 160, D.E. 469-14). Notably, in his literature search, Dr. Gondek did not even look for studies where the alleged chemicals were combined. Gondek GC Report at 4 (JA Ex. 96, D.E. 465-1); D.E. 469-14 at 43:20-44:3. Like Dr. Felsher, Dr. Gondek performed a Bradford Hill analysis for the chemicals individually, but not as a mixture, likely because as Plaintiffs' other experts admit, there are no studies to analyze—*i.e.*, the hypothesis has not been tested. *See* Gondek D.E. 465-1 at 24-26.

***6. Dr. Hu.***

Plaintiffs' expert, Dr. Howard Hu,[12] acknowledged the uncertainty of a synergy theory in his NHL report. He readily conceded that "two chemicals may interact in some way that results in

[12] Because Dr. Hu did not propose a synergy theory, he is not a subject of this challenge.

an overall risk of NHL that is less than the sum of the individual risks, perhaps by mutual interference." Hu GC Report at 43 (JA Ex. 111, D.E. 466-5); Hu Dep. Tr. 136:3-8 (JA Ex. 162, D.E. 470-1). Additionally, he acknowledged that "there simply isn't direct experimental or epidemiologic evidence with which to demonstrate empirically what the combined effect would be." *Id.* at 135:13-136:1.

In sum, Plaintiffs' experts, Drs. Bird, Gilbert, Felsher, Mallon, and Gondek, concede that there are no epidemiologic, toxicologic, or mechanistic studies supporting their synergistic theory—and none of these experts applied a reliable method to test it independently. Their opinions do not rely on scientific knowledge (Rule 702(c)), nor are they the product of a reliable application of method to the facts of the case (Rule 702(d)). They rely on speculation, not science. Because Rule 702 does not permit expert testimony grounded in untested hypothesis—especially when the experts themselves admit that the theory remains theoretical—the Court should exclude their opinions on a synergistic effect. *Sardis*, 10 F.4th at 289-93; *Nease*, 848 F.3d at 229; *Cavallo*, 100 F.3d at 1159.

## III. Drs. Hu, Gondek, and Felsher Rely on the Untested Linear "Any Exposure," No-Threshold Theory, So Their Opinions Are Inadmissible Under Rule 702.

Several of Plaintiffs' experts proffer the additional untested theory that "any exposure"[13] to TCE, PCE, and benzene can cause NHL or leukemia. The United States moves to exclude under Rule 702 such opinions of the following experts:

---

[13] The "any exposure" theory shows up under many names, including no safe dose, every exposure, linear no-threshold, one-hit, and cumulative exposure, but they all mean the same thing: an unaccepted, untestable theory of causation where any amount of exposure to a toxin, no matter how small, purportedly increases one's risk of cancer. *Yates*, 113 F. Supp. 3d at 846; *Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 675 (6th Cir. 2011); *Krik v. Crane Co.*, 76 F. Supp. 3d 747, 752 (N.D. Ill. 2014); William L. Anderson & Kieran Tuckley, *How Much Is Enough? A Judicial Roadmap to Low Dose Causation Testimony in Asbestos and Tort Litigation*, 42 AM. J. TRIAL ADVOC. 39, 42 (2018); Mark A. Behrens & William L. Anderson (FNd1), *The "Any Exposure" Theory: An Unsound Basis for Asbestos Causation and Expert Testimony*, 37 SW. U. L. REV. 479, 490 (2008).

Dr. Hu: "[N]o threshold" and "any exposure" theory. (Hu GC Report at 40-41 (JA Ex. 111, D.E. 466-5));

Dr. Felsher: "[J]ust one breath" theory (Felsher GC Report at 39 (JA Ex. 107, D.E. 466-1));

Dr. Gondek: "[N]o 'minimum threshold' to harm" (Gondek GC Report at 10 (JA Ex. 96, D.E. 465-1)); "no established and agreed-upon safe level" (id. at 27); any exposure above background increases risk. Gondek GC Dep. Tr. 171:3-7, 173:10-13 (JA Ex. 160, D.E. 469-14).

### A. Plaintiffs' Untested Linear No-Threshold Theory is Speculative and Unscientific.

In an attempt to meet Plaintiffs' burden to prove that the "plaintiff[s'] injur[ies] w[ere] caused by exposure to a specified substance," by showing "the levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure," *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig. (No. II) MDL 2502*, 892 F.3d 624, 639 (4th Cir. 2018) (citations omitted), these experts all theorize that there is no safe threshold exposure level for benzene, TCE, and PCE where the exposure does not increase the risk of leukemia or NHL. Because Plaintiffs' experts' "any exposure" theory is untested, Rule 702 precludes admission of these opinions.

As explained in the preceding section, "scientific" implies a grounding in the scientific method, which is based on generating *and testing* hypotheses to see if they can be falsified. *Daubert*, 509 U.S. at 593. Because an untested hypothesis falls short of the level of scientific knowledge required to support an expert's opinion under Rule 702, these experts' opinions are inadmissible. *See Sardis*, 10 F.4th at 289-93 (affirming exclusion of expert for relying on untested hypothesis); *Nease*, 848 F.3d at 229 (same); *Cavallo*, 100 F.3d at 1159 (same).

Courts across the country—including this Court and the Fourth Circuit—have repeatedly excluded expert opinions that any amount of a substance can cause harmful effects because such opinions are not grounded in scientific knowledge. *See Yates*, 113 F. Supp. 3d at 846 ("Numerous

courts have excluded expert testimony or evidence grounded in [the any exposure theory], reasoning that it lacks sufficient support in facts and data." (citing cases)); *see also Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 677 (7th Cir. 2017) (noting that "more than thirty other federal courts and state courts have held that this cumulative 'any exposure' theory is not reliable"); *Milward v. Rust-Oleum Corp.*, 820 F.3d 469, 474 (1st Cir. 2016) (expert's "no-safe threshold hypothesis" properly excluded because the theory "did not turn on the validity of any of the epidemiological studies"). The "any exposure" theory is inconsistent with a "central tenet" in toxicology that "the dose makes the poison," i.e., that "all chemical agents are intrinsically hazardous, whether they cause harm is only a question of dose." *Yates*, 113 F. Supp. 3d at 850–51 (citing RMSE at 636); *Lipitor II*, 892 F.3d at 639 (opinions that "any" exposure to a product may increase the risk of an illness are legally insufficient for plaintiffs to withstand summary judgment because they run counter to "[o]ne of the central tenets of toxicology"—that "the dose makes the poison.").

"In a long line of decisions … [the Fourth Circuit has] emphasized that proof of causation must be such as to suggest 'probability' rather than mere 'possibility,' precisely to guard against raw speculation by the fact finder." *White v. Dow Chem. Co.*, 321 F. App'x 266, 273 (4th Cir. 2009) (quoting *Sakaria v. Transworld Airlines*, 8 F.3d 164, 172–73 (4th Cir. 1993)). "[E]ven assuming that exposure to a single molecule of a substance may *theoretically* be capable of causing cancer, the law does not provide recovery for remote, speculative, theoretical possibilities." *Hostetler v. Johnson Controls, Inc.*, No. 3:15-cv-226-JD, 2020 WL 5543081, at *4 (N.D. Ind. Sept. 16, 2020) (emphasis added) (excluding causation opinion of Dr. Kathleen Gilbert, Plaintiffs' expert immunologist here); *In re Zantac (Ranitidine) Prods. Liab. Litig.*, 644 F. Supp. 3d 1075, 1109 (S.D. Fla. 2022) ("[S]ince an actionable exposure threshold dose cannot, as a matter of law, be merely *anything*, that means it must be *something provable*." (emphasis in original)).

"Likewise, applying the *Daubert* factors, courts have found that the ['each and every exposure'] theory cannot be tested, has not been published in peer-reviewed works, and has no known error rate." *Yates*, 113 F. Supp. 3d at 846 (citing cases); *see also Sutera v. Perrier Grp. of Am. Inc.,* 986 F. Supp. 655, 666 (D. Mass. 1997) (The model is "merely an hypothesis," with "no known or potential rate of error."); *Wills v. Amerada Hess Corp.,* 379 F.3d 32, 49 (2d Cir.2004) (affirming exclusion of theory that decedent's cancer was caused by a single exposure to toxic chemicals, regardless of dosage, based on *Daubert* factors); *see generally* RMSE*,* at 643 n.28.

Furthermore, "[a]n inability to prove that a particular exposure is 'safe' is not the same as proof that exposure at [the plaintiff's exposure] level has a causal connection to adverse effects." *Hostetler*, 2020 WL 5543081, at *4; *Krik v. Crane Co.*, 76 F. Supp. 3d 747, 752 (N.D. Ill. 2014) ("[T]he notion that it is theoretically possible that any amount of exposure could cause injury is different from an opinion that the particular level of dosage experienced by a plaintiff was sufficient to cause his or her particular injury.").

### B. Dr. Hu's Opinion that "Any Amount" of Exposure to TCE, PCE, and Benzene Can Cause NHL is Unreliable and Warrants Exclusion.

Dr. Hu offered no evidence in his reports regarding the specific levels of TCE, PCE, or benzene exposure that are harmful to humans, generally. Rather, he addressed "low-level exposures in a general sense" and relied on the "no threshold" theory. Hu GC Rep. at 40-41 (JA Ex. 111, D.E. 466-5); Hu GC Dep. Tr. at 98:20-99:7 (JA Ex. 162, D.E. 470-1). Accordingly, Dr. Hu opined that any level of TCE, PCE, or benzene exposure has the theoretical "potential to initiate the kinds of changes that can eventually lead to cancer," including NHL. *Id.* at 89:3-9; 99:6-12; 99:22-25.

Such an argument is counter to the "central tenet" of toxicology that "the dose makes the poison," which Dr. Hu acknowledged in both his General Causation Report and deposition

testimony. Hu GC Rep. at 23, 33, 39 (JA Ex. 111, D.E. 466-5) (noting dose-response relationship for TCE, PCE, and benzene exposure and NHL in his Bradford Hill analyses under Biological Gradient); Hu GC Dep. Tr. at 55:9-56:6 (JA Ex. 162, D.E. 470-1). Entirely absent from Dr. Hu's Bradford Hill causation analyses is any mention of harmful dose ranges or thresholds, much less actual levels that are harmful to humans. Hu GC Rep. at 22-24, 32-34; Hu GC Dep. Tr. at 89:3-9.[14]

The linear no-threshold theory of causation also "has no known or potential rate of error." *Whiting*, 891 F. Supp. at 25. Dr. Hu conceded that "there are no studies that can possibly test that hypothesis that any exposure can cause cancer, at least from an epidemiology point of view," Hu GC Dep. Tr. at 99:17-20, and he admitted that he was unaware of any peer-reviewed studies that have found that any dose of a toxin can cause NHL. *Id.* at 89:10-15. He also admitted that the "any exposure" theory is "a hypothesis" that cannot be tested and has not been published in peer-reviewed works. *Id.* at 99:13-20.

Dr. Hu also acknowledged the lack of consensus among the scientific community for the "any amount" theory and the linear no-safe threshold analysis for determining causation. D.E. 466-5 at 41; D.E. 470-1 at 88:10-14. He further recognized that the no-threshold theory has "been challenged in on-going debates."[15] 466-5 at 41; D.E. 470-1 at 88:10-14. Dr. Hu nonetheless chose to rely on regulatory agencies' adoption of the linear no threshold model in the radiation context

---

[14] As recognized by the RMSE, "[f]or agents that produce effects other than through mutations, it is assumed that there is some level that is incapable of causing harm .... Theoretically, any exposure at all to mutagens may increase the risk of cancer, although the risk may be very slight and not achieve medical probability." RMSE at 426.

[15] On page 40 of his Report, Dr. Hu stated that "[o]ne of the long-running challenges to this topic [extent to which TCE, PCE, benzene may pose risks of cancer at low levels of exposure] is the lack of data that can be used to establish the risks posed by most carcinogens at low levels of exposure, given that epidemiological studies have limited power to detect such phenomena and experimental studies of animals have similar limitations, since the vast majority are conducted on sample sizes of 50 or fewer animals." Hu GC Rep. at 40 (JA Ex. 111, D.E. 466-5).

but ignored the health protective role of those agencies. "Courts have recognized a distinction between evaluations made by regulatory agencies and the standard of causation necessary to show tort liability." *Yates,* 113 F. Supp. 3d at 847 (citing *Mitchell*, 165 F.3d at 783, n.3; *see also Milward v. Acuity Specialty Prods. Grp., Inc.*, 969 F. Supp. 2d 101, 110 (D. Mass. 2013), *aff'd sub nom. Milward v. Rust-Oleum Corp.*, 820 F.3d 469 (1st Cir. 2016) (EPA's application of a linear dose-response curve for benzene is "the classic example of a cautious prophylactic administrative rule; but it does not support the reliability of the linear, no-threshold model in establishing specific causation"); *Sutera*, 986 F. Supp. at 664 (finding it inappropriate to use OSHA standards to determine causation of a disease).

As demonstrated in the many cases cited *supra*, Dr. Hu's embrace of the speculative, untested "no threshold" theory is unreliable and his opinions embracing it should therefore be excluded.

### C. Dr. Gondek's Opinion that "Any Amount" of Exposure to TCE, PCE, and Benzene Can Cause Leukemia is Unreliable and Warrants Exclusion.

Dr. Gondek's "any exposure" opinions are also inadmissible. Dr. Gondek concluded that the levels of exposure at Camp Lejeune were sufficient to cause leukemia based on the following premises: (1) the benzene, TCE, and PCE exposure levels at Camp Lejeune were higher than what individuals are exposed to in daily life (*i.e.*, background levels); (2) any exposure to benzene, TCE, or PCE above background levels increases the risk of leukemia. Gondek GC Dep. Tr. 173:10-13, 183:5-12 (JA Ex. 160, D.E. 469-14). But as discussed above with respect to Dr. Hu, Dr. Gondek's second premise is an unproven, untested theory. As such, courts across the nation routinely exclude experts like Dr. Gondek who rely upon such a theory in forming their causation opinions. *Yates*, 113 F. Supp. 3d at 846; *Krik*, 870 F.3d 669, 677; *Milward*, 820 F.3d at 474. Under *Westberry*, it is insufficient for Dr. Gondek to simply state that exposure to "anything above background"

increases risk. 178 F.3d at 263. Instead, he is required to identify the levels of exposure harmful to human health. *Id.* He failed to do so.

In his report, Dr. Gondek performed causal analyses for benzene, TCE, and PCE, and concluded that they can cause leukemia. Gondek GC Rep. at 24-26 (JA Ex. 96, D.E. 465-1). But, similar to Dr. Hu, Dr. Gondek failed to include any reference to exposure levels necessary to cause leukemia. *Id.* Instead, he merely opined that there is no known safe level of exposure for these agents. *Id.* at 7. When pressed at deposition to identify the harmful levels of benzene, TCE, and PCE, Dr. Gondek testified that every exposure above background levels increases leukemia risk. But he still would not identify a level. He stated:

> A. No. So I think we live in an industrial society. So we are all exposed to certain levels of toxins. My opinion is that the above background level of exposure to benzene or TCE and PCE increases the risk of leukemia."
>
> ****
>
> Q. What I'm trying to get at is how far above background exposure do we need to get before you can say that's enough to cause leukemia?
> MR. TELAN: Object to the form of the question.
>
> A. I don't think we can precisely estimate how far above background. If it's -- if the exposure is linear in a certain range, every level above the background increases the risk proportionally.

Gondek GC Dep. Tr. at 171:3-173:2 (JA Ex. 160, D.E. 469-14).

Dr. Gondek was also unable to explain his method for distinguishing background levels for his "any exposure above background" theory. He testified that background levels are a moving target, based on various factors like location, time of year, and local circumstances:

> Q. So it varies by location, correct?
>
> A. The level varies by location definitely.
>
> Q. And, therefore, the amount that someone is exposed to varies by where they are?
>
> A. That is correct.
>
> Q. Someone in Camp Lejeune, North Carolina will be exposed to a different background level than someone in Los Angeles, California, correct?

A. That is correct.
Q. It may also vary by time of year, right?
A. Correct.
Q. It can vary by local circumstances, correct?
A. Yes.

*Id.* at 181:7-20.

Dr. Gondek must identify harmful levels, *Westberry*, 178 F.3d at 263, not just "above background," *Yates*, 113 F. Supp. 3d at 848 ("At any rate, 'above background' is an amorphous concept. As plaintiffs admit, background levels vary widely between communities."). By Dr. Gondek's logic, the level of an agent that is biologically harmful varies by location or season. He had no method for determining whether plaintiffs were actually exposed to higher-than-background contaminant levels at Camp Lejeune, because he has no analysis of what "background levels" people were exposed to during their lives. Because Dr. Gondek offered opinions based on an "any exposure" theory, his methodology is unreliable and his causation opinions should be excluded.

### C. Dr. Felsher's "Any Exposure" Theory and Refusal to Identify Harmful Levels of TCE, PCE, and Benzene Warrant Exclusion.

Dr. Felsher's opinion that TCE, PCE, and benzene exposure can cause leukemia and NHL (which he lumps together as "hematopoietic cancers") is also based on the inadmissible "any exposure" theory and a novel "any breath" theory. Both theories are unreliable under Rule 702 because they bypass the scientific requirement of dose assessment; they cannot be tested; they have not been published in peer-reviewed literature; and they lack a known error rate. *Krik*, 870 F.3d at 677 ("[M]ore than thirty other federal courts and state courts have held that this

cumulative/'any exposure' theory is not reliable.");[16] *Yates*, 113 F. Supp. 3d at 846 ("Likewise, applying the *Daubert* factors, courts have found that the [any exposure] theory cannot be tested, has not been published in peer-reviewed works, and has no known error rate.")

Dr. Felsher also recasts Plaintiffs' burden of identifying hazardous human exposure levels as scientifically impossible (Felsher GC Rep. (NHL-Leuk) at 37-38 (JA Ex. 107, D.E. 466-1)), thereby side-stepping the Fourth Circuit's general causation standard and tacitly admitting a lack of sufficient evidence to meet that standard. *Westberry*, 178 F.3d 257 at 263 ("[T]o carry the burden of proving a plaintiff's injury was caused by exposure to a specified substance, the plaintiff must demonstrate the levels of exposure that are hazardous to human beings generally ….") (internal quotation marks omitted); *see also Krik*, 76 F. Supp. 3d at 752.

Like Drs. Hu and Gondek, Dr. Felsher's opinion breaks with the toxicological maxim that the dose makes the poison. *See Yates*, 113 F. Supp. 3d at 850; Bernard D. Goldstein and Mary Sue Henifin, "Reference Guide on Toxicology," in RMSE; *Mancuso v. Consol. Edison Co.*, 967 F. Supp. 1437, 1445 (S.D.N.Y. 1997) ("[A]ll chemical agents, including water, are harmful if consumed in large quantities.") By arguing no safe dose, Dr. Felsher tries to flip the burden of proof to the United States to prove that a particular exposure level is safe.

Dr. Felsher opined in his report that "just one breath" of a contaminant can cause cancer:

> As another way of illustrating the potency of carcinogenesis, I point out that for VOCs at a concentration of even 1 PPB or 1PPT this would involve an individual breathing in through a single breath on average over around 30 trillion or 30 billion respectively, molecules (there are around 30 trillion-billion, or 10x10^23, molecules inhaled per breath). *Recognize that is just one breath*. For cancer to

---

[16] *Milward*, 969 F. Supp. 2d at 110 (benzene and AML case); *Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1166 (E.D. Wash. 2009) (same); *Cunningham v. Masterwear, Inc.*, No. 4-1616, 2007 WL 1164832, at *5 (S.D. Ind. Apr. 19, 2007) (PCE exposure case); *Adams v. Cooper Indus., Inc.*, No. 3-476, 2007 WL 2219212, at *7 (E.D. Ky. July 30, 2007) (TCE exposure case); *Hostetler*, 2020 WL 5543081, at *4 (TCE exposure case).

> initiate, progress, or become therapeutically less responsive, even a single mutation in a single cell can be contributory to drive cancer.

Felsher GC Rep. (NHL-Leuk) at 39 (JA Ex. 107, D.E. 466-1) (emphasis added). He also testified that any amount of benzene in water is too much. Felsher GC Dep. Tr. at 161:16-20 (JA Ex. 164, D.E. 470-3).

Dr. Felsher cites nothing in his report to support his "any breath" hypothesis. Instead, he cloaks his unsupported theory in scientific-sounding rhetoric. First, he used variability in individual susceptibility to suggest no single threshold can be identified. D.E. 466-1 at 37 ("In general, each individual has a different susceptibility to carcinogenesis that is based upon individual factors including: genetic, social and biologic parameters (age) and hence exhibit what scientists describe as a heterogeneity in response."). Second, he claimed that the threshold at which a chemical can cause harm was an unanswerable individualized prediction, then dismissed it. *Id.* ("Evaluating whether one would not have gotten a disease if he/she had not been exposed to a particular carcinogen is similarly scientifically illogical, because no expert can predict what could have happened, and what might happen, such as other risk factors and exposures."). Third, he implied that any dose could cause cancer, rather than identifying levels proven to be hazardous. *Id.* ("The most sensitive methodologies that exist have found that even at the lowest doses measurable for the limitations of each method, there is evidence for mutagenesis.") Finally, he stated that it was practically impossible to opine on levels known to be hazardous. *Id.* at 37-38 ("Thus, it is simply impossible to sample the DNA of every cell … but we know that cancer arises from a single cell ….").

His refusal to identify the levels that are known to be hazardous to human health, as required for general causation, is also evident in his Bradford Hill analyses which lack any dose ranges, much less any actual levels, despite Dr. Felsher's claims that the dose-response factor is

met (biological gradient). Felsher GC Rep. (NHL-Leuk) at 41-43 (JA Ex. 107, D.E. 466-1). Dr. Felsher testified that the reader must look elsewhere in his report for this information. Felsher GC Dep. Tr. at 60:10-61:6 (JA Ex. 164, D.E. 470-3). But Dr. Felsher's report does not provide it. His literature review for TCE cites over fifteen studies, but he only gives the exposure levels for two. Felsher GC Rep. (NHL-Leuk) at 15-19. For the others, he either omits the data entirely or just says "low" or "high" exposure, giving no indication of the exposure levels. *Id.* The two exposure levels he gives are "[greater than] > 35 ppm-years" and "[greater than] > 150 ppm-hours." *Id.* at 17-18. These figures not only have no ceiling, but they start in another stratosphere from Camp Lejeune exposures, which were in parts per billion (a thousand times smaller than a part per million). Likewise, Dr. Felsher's literature review for benzene cites a dozen studies but gives no exposure numbers for any of them. *Id.* at 19-21. The same is true for PCE, where he cites fifteen studies but never states a PCE exposure level. *Id.* at 21-22. Because Dr. Felsher offered opinions based on an "any exposure" theory, his methodology is unreliable, and the court should exclude his causation opinions.

## CONCLUSION

For all the foregoing reasons, Drs. Bird, Felsher, Gilbert, Gondek, Hu, and Mallon should have their general causation opinions on leukemia and NHL excluded under Rule 702.

Dated: September 10, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General,
Civil Division

JONATHAN D. GUYNN
Deputy Assistant Attorney General,
Torts Branch

BRIDGET BAILEY LIPSCOMB
Chief, Camp Lejeune Justice Act Section

ADAM BAIN
Special Litigation Counsel

TRACI C. MCKEEVER
DAVID R. ORTIZ
PATRICK J. RYAN
JENNIFER F. ADAMS
ALLISON M. O'LEARY
AMY KLIMEK
ALANNA HORAN
GIOVANNI ANTONUCCI
WILLIAM V. KLOTZBUCHER
MATTHEW B. ELLIOT
Trial Attorneys

*/s/ Marcus O. Tubin*
Marcus O. Tubin
NY Bar No. 5583299
Trial Attorney
United States Department of Justice
Civil Division, Torts Branch
Camp Lejeune Justice Act Section
1100 L Street, NW
Washington, DC 20005
(202) 616-8289
marcus.o.tubin@usdoj.gov

Attorney inquiries to DOJ regarding CLJA:
(202) 353-4426

*Attorneys for Defendant,*
*United States of America*

## CERTIFICATE OF SERVICE

I hereby certify that on September 10, 2025, I electronically filed the foregoing using the Court's Electronic Case Filing system, which will send notice to all counsel of record.

*/s/ Marcus O. Tubin*
Marcus O. Tubin