**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**SOUTHERN DIVISION**
**No. 7:23-CV-897**

**IN RE:**

**CAMP LEJEUNE WATER LITIGATION**

**This Document Relates To:**

**Leukemia Cases:**
***Amsler v. United States* 7:23-cv-00284**
***Connard v. United States* 7:23-cv-01557**
***Fiolek v. United States* 4:23-cv-00062**[1]
***Gleesing v. United States* 7:23-cv-01486**
***Hill v. United States* 7:23-cv-00028**

**NHL Cases:**
***Carter v. United States* 7:23-cv-01565**
***Davis v. United States* 7:23-cv-00043**
***Howard v. United States* 7:23-cv-00490**[2]
***Keller v. United States* 7:23-cv-01501**
***Kidd v. United States* 7:23-cv-01489**
***Vidana v. United States* 7:23-cv-01575**

**UNITED STATES' MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO EXCLUDE PLAINTIFFS' PHASE II LEUKEMIA AND NHL EXPERTS STEVEN BIRD, LUKASZ GONDEK, KATHLEEN GILBERT, TIMOTHY MALLON, and HOWARD HU**

**(LEUKEMIA and NHL)**

**LITERATURE REVIEW MOTION**

---

[1] The Parties have reached agreement in principle on a settlement amount in *Fiolek*. The Parties are currently finalizing the terms of the settlement. The United States will notify the Court and withdraw this motion as to *Fiolek* once the settlement is final.

[2] Plaintiff Allan Howard was selected as a Trial Plaintiff for kidney cancer, but he subsequently added a claim for NHL. *See* Trial Order Confirming the Track 1 Trial Plaintiffs, D.E. 250, at 2 (designating Allan Howard as a Track 1 Trial Plaintiff for kidney cancer); 3d Am. Short Form Compl., No. 7:23-cv-490, D.E. 15, at 3 (adding claim for NHL).

**TABLE OF CONTENTS**

Pages

Table of Contents ........ i

Table of Joint Appendix Exhibits ........ iii

Table of Abbreviations ........ vi

Introduction ........ 1

Background ........ 2

I. Plaintiffs' Experts Offer Opinions Based on Improper Literature Reviews, Including Flawed Literature Searches and Cherry-Picked Studies and Results ........ 2

II. Plaintiffs' Own Expert, Dr. David Savitz, Explains How to Conduct a Proper Literature Review ........ 4

Legal Standard ........ 6

Argument ........ 7

I. Plaintiffs' Experts Failed To Use a Reliable Method To Obtain the Landscape of Relevant Literature ........ 7

A. Dr. Bird Used Unreliable Methodologies to Obtain the Landscape of Relevant Literature. ........ 8

B. Dr. Lukasz Gondek Used Unreliable Methodologies to Obtain the Landscape of Relevant Literature. ........ 10

C. Dr. Gilbert Used Unreliable Methodologies to Obtain the Landscape of Relevant Literature. ........ 11

D. Dr. Mallon Used Unreliable Methodologies to Obtain the Landscape of Relevant Literature. ........ 12

E. Dr. Hu Used Unreliable Methodologies to Obtain the Landscape of Relevant Literature. ........ 13

F. Plaintiffs' Experts Should Be Excluded Because They Relied on Search Methodologies that Were Not Reliable, Reproduceable, or Neutral. ........ 14

II. Experts Must Not Cherry-Pick from the Relevant Literature. ........ 15

A. Drs. Bird, Gondek, Gilbert, Mallon, and Hu Each Ignored Numerous Unfavorable Studies. ........ 17

B. Plaintiffs' Experts Ignored Relevant Studies for Each Chemical and Each Disease on Which They Opined. ........ 18

i. Plaintiffs' NHL Experts Ignored Relevant Studies Evaluating Whether a Causal Association Exists Between TCE and NHL and PCE and NHL. ........ 18

ii. Plaintiffs' Leukemia Experts Ignored Relevant Studies Evaluating Whether a Causal Association Exists Between TCE and Leukemia and PCE and Leukemia.... 19

iii. Plaintiffs' NHL Experts Ignored Relevant Studies Evaluating Whether a Causal Association Exists Between Benzene and NHL.... 23

iv. Plaintiffs' Leukemia Experts Ignored Relevant Studies and Findings Evaluating Whether a Causal Association Exists Between Benzene and Leukemia.... 24

C. Plaintiffs' Experts Ignored the Findings of the NRC Regarding Lack of Associations Between TCE and PCE and Either Leukemia or NHL.... 27

D. Dr. Hu Ignored Camp Lejeune Cohort Studies in His Opinion on NHL.... 28

E. Drs. Bird, Gilbert, and Mallon Excluded from Their Reports Studies that Were Included in Their Other Disease Reports in this Litigation.... 29

F. Plaintiffs' Experts Did Not Evaluate Study Quality.... 32

III. Experts Must Not Cherry-Pick Results from Within the Literature on Which They Relied.... 36

A. Plaintiffs' Experts Cherry-Picked Results from Within the Camp Lejeune Studies.... 36

1. Dr. Gondek.... 36

2. Dr. Gilbert.... 37

3. Dr. Bird.... 39

4. Dr. Mallon.... 40

5. Dr. Hu.... 40

B. Plaintiffs' Experts All Cherry-Picked Results from Within Other Epidemiological Studies on Which They Relied.... 41

CONCLUSION.... 43

Certificate of Service.... 45

## TABLE OF JOINT APPENDIX EXHIBITS

| JA Exhibit Number | Short Title | Full Title |
|---|---|---|
| 83 | Bird GC Rep. (Kidney) | Bird - General Causation Report - Kidney Cancer |
| 88 | Gilbert Rep. (Kidney) | General Causation Expert Report of KATHLEEN M GILBERT, PHD TCE and Kidney Cancer |
| 92 | Mallon GC Rep. (Kidney) | General Causation Expert Report of Timothy M Mallon, MD, MPH, MS |
| 96 | Gondek GC Rep. | Gondek - General Causation Report (Leukemia) |
| 98 | Mallon GC Rep. (Leukemia) | General Causation Expert Report of Timothy M Mallon, MD, MPH, MS Leukemia |
| 102 | Goodman Rep. (Leukemia) | Trichloroethylene, Perchloroethylene, Benzene, Vinyl Chloride, and trans-1,2-Dichloroethylene Exposure and Leukemia Risk |
| 103 | Bird GC Rep. (NHL-Leuk) | Bird - General Causation Report - NHL & Leukemia |
| 104 | Bird GC MCL (NHL-Leuk) | Bird - Materials Considered List to NHL & Leukemia Report |
| 108 | Gilbert Rep. (NHL-Leuk) | General Causation Expert Report of KATHLEEN M GILBERT, PHD TCE, Non-Hodgkin Lymphoma, and Leukemia |
| 111 | Hu GC Rep. | General Causation Expert Report of Howard Hu, MD, MPH, ScD |
| 114 | Hu GC Suppl. Rep. | January 31, 2025 Supplement to the December 9, 2024 General Causation Expert Report of Howard Hu, MD, MPH, ScD |
| 135 | Shields Rep. | General Causation Peter G Shields, MD |
| 148 | Bird GC Dep. Tr. | Bird - General Causation Deposition Transcript |
| 151 | Mallon GC Dep. Tr. | Deposition Transcript |
| 154 | Savitz 3d Dep. Tr. | Deposition Transcript |
| 160 | Gondek GC Dep. Tr. | Gondek - General Causation Deposition Transcript |

| **JA Exhibit Number** | **Short Title** | **Full Title** |
|---|---|---|
| 162 | Hu GC Dep. Tr. | Deposition Transcript - General Causation |
| 165 | Gilbert Dep. Tr. | Deposition Transcript |
| 189 | Bove 2014 Mort. Study - Civ. | Mortality study of civilian employees exposed to contaminated drinking water at USMC Base Camp Lejeune: a retrospective cohort study |
| 190 | Bove 2014 Mort. Study - Mil. | Evaluation of mortality among marines and navy personnel exposed to contaminated drinking water at USMC base Camp Lejeune: a retrospective cohort study |
| 191 | Bove 2024 Cancer Incid. Study | Cancer Incidence among Marines and Navy Personnel and Civilian Workers Exposed to Industrial Solvents in Drinking Water at US Marine Corps Base Camp Lejeune: A Cohort Study |
| 193 | Bove 2024 Mort. Study | Evaluation of mortality among Marines, Navy personnel, and civilian workers exposed to contaminated drinking water at USMC base Camp Lejeune: a cohort study |
| 198 | EPA 2020 PCE Risk Eval. | Risk Evaluation for Perchloroethylene (Ethene, 1,1,2,2-Tetrachloro-) (CASRN: 127-18-4) (Final) |
| 199 | EPA 2020 TCE Risk Eval. | Risk Evaluation for Trichloroethylene (CASRN: 79-01-6) (Final) |
| 201 | IARC 2014 Monograph 106 | IARC Monographs on the Evaluation of Carcinogenic Risks to Humans Volume 106: TRICHLOROETHYLENE, TETRACHLOROETHYLENE, AND SOME OTHER CHLORINATED AGENTS |
| 205 | NRC 2009 Report | Contaminated Water Supplies at Camp Lejeune: Assessing Potential Health Effects |
| 208 | NTP 2021 PCE | Tetrachloroethylene (CAS No 127-18-4) |
| 209 | NTP 2021 TCE | Trichloroethylene (CAS No 79-01-6) |
| 216 | Aschengrau 1993 | Cancer risk and tetrachloroethylene contaminated drinking water in Massachusetts |
| 222 | Boice 1999 | Mortality among aircraft manufacturing workers |

| **JA Exhibit Number** | **Short Title** | **Full Title** |
|---|---|---|
| 231 | Chang 2003 | A cohort mortality study of workers exposed to chlorinated organic solvents in Taiwan |
| 235 | Collingwood 1996 | An updated cohort mortality study of workers at a northeastern United States petroleum refinery |
| 241 | Dagg 1992 | An updated cause specific mortality study of petroleum refinery workers |
| 244 | Divine 1999a | Update of the Texaco mortality study 1947-93: Part I Analysis of overall patterns of mortality among refining, research, and petrochemical workers |
| 255 | Greenland 1994 | A case-control study of cancer mortality at a transformer-assembly facility |
| 259 | Hansen 2013 | Risk of cancer among workers exposed to trichloroethylene: Analysis of three Nordic cohort studies |
| 260 | Honda 1995 | An updated study of mortality among workers at a petroleum manufacturing plant |
| 272 | Lynge 1997 | Risk of cancer and exposure to gasoline vapors |
| 288 | Radican 2008 | Mortality of Aircraft Maintenance Workers Exposed to Trichloroethylene and Other Hydrocarbons and Chemicals: Extended Follow-Up |
| 293 | Savitz 2023 | Epidemiology and the Law (Juris Publishing, Inc) |
| 308 | Sung 2007 | Increased standardized incidence ratio of breast cancer in female electronics workers |
| 312 | Travier 2002 | Cancer incidence of dry cleaning, laundry and ironing workers in Sweden |
| 316 | Tsai 2007 | Long-Term Follow-Up Mortality Study of Petroleum Refinery and Chemical Plant Employees |
| 321 | Silver 2014 | Retrospective cohort study of a microelectronics and business machine facility |

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| ATSDR | Agency for Toxic Substances and Disease Registry |
| CLJA | Camp Lejeune Justice Act of 2022 |
| CI | Confidence Interval |
| DCE | Dichloroethylene |
| HR | Hazard Ratio |
| OR | Odds Ratio |
| PCE | Perchloroethylene or Tetrachloroethylene |
| PLG | Plaintiffs' Leadership Group |
| NHL | non-Hodgkin's Lymphoma |
| NRC | National Research Council |
| TCE | Trichloroethylene |
| VC | Vinyl Chloride |
| VOC | Volatile Organic Compound |

## INTRODUCTION

Plaintiffs allege that, while at Marine Corps Base Camp Lejeune ("Camp Lejeune") between 1953 and 1987, they were exposed to water contaminated with the volatile organic compounds ("VOC") trichloroethylene ("TCE"), perchloroethylene ("PCE"), benzene, vinyl chloride ("VC"), and dichloroethylene ("DCE") (collectively, the "VOCs").[3] They further allege that such exposure caused their leukemia or non-Hodgkin's Lymphoma ("NHL"). In order to recover under the Camp Lejeune Justice Act of 2022 ("CLJA"), Plaintiffs must demonstrate both that leukemia or NHL "can be caused by the exposure to a degree of scientific certainty (general causation)," and that the "exposure was a cause in fact of his or her harm (specific causation)." June 5, 2024, Order, D.E. 227, at 4. In support of their general causation theories for leukemia and NHL, Plaintiffs disclosed the opinions of six experts: Dr. Steven Bird, Dr. Lukasz Gondek, Dr. Kathleen Gilbert, Dr. Dean Felsher, Dr. Timothy Mallon, and Dr. Howard Hu. Dr. Felsher is not a subject of this motion.

The opinions of Drs. Bird, Gondek, Gilbert, Mallon, and Hu should be excluded because Plaintiffs do not meet their burden of showing that these opinions are admissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993). The opinions of Drs. Bird, Gondek, Gilbert, Mallon, and Hu are unreliable, and thus inadmissible. Accordingly, for the reasons that follow, the United States' Motion to Exclude those opinions should be granted.

[3] As is addressed in the United States' Motion for Partial Summary Judgment Concerning Dichloroethylene, Plaintiffs have failed to offer any expert opinion testimony in support of their claims that DCE can cause any of the Track 1 diseases. *See* D.E. 520.

## BACKGROUND

This motion concerns five of Plaintiffs' six disclosed Phase II experts who offered general causation opinions on leukemia and NHL based upon the epidemiological literature.[4] Their opinions are summarized as follows:

1. **Dr. Steven Bird**, an emergency room physician, opined that TCE, PCE, and benzene "more likely than not" cause both leukemia and NHL. *See* Bird GC Rep. (NHL-Leuk) (JA Ex. 103, D.E. 465-8) [hereinafter, Bird Rep.];

2. **Dr. Lukasz Gondek**, a physician and professor of oncology, opined that TCE, and PCE "at least as likely as not"[5] cause leukemia, and that benzene, even at the low levels that may have been present at Camp Lejeune, "at least a likely as not" causes leukemia. *See* Gondek GC Rep. at 5 (JA Ex. 96, D.E. 465-1) [hereinafter, Gondek Rep.];

3. **Dr. Kathleen Gilbert**, an immunologist, opined that TCE "more likely than not" causes both leukemia and NHL. *See* Gilbert Rep. (NHL-Leuk) (JA Ex. 108, D.E. 466-2) [hereinafter, Gilbert Rep.];

4. **Dr. Timothy Mallon**, an occupational medicine physician, opined that TCE, and benzene "more likely than not" cause leukemia, and that PCE "at least as likely as not" causes leukemia. *See* Mallon GC Rep. (Leukemia) (JA Ex. 98, D.E. 465-3) [hereinafter, Mallon Rep.]; and

5. **Dr. Howard Hu**, a physician and epidemiologist, opined that TCE, PCE and benzene exposure "more likely than not" cause NHL. *See* Hu GC Dep. Tr. at 202:15-203:13 (JA Ex. 162, D.E. 470-1). *See* Hu GC Rep. at 8, 35 (JA Ex. 111, D.E. 466-5) [hereinafter, Hu Rep.].

## I. <u>Plaintiffs' Experts Offer Opinions Based on Improper Literature Reviews, Including Flawed Literature Searches and Cherry-Picked Studies and Results.</u>

Drs. Bird, Gondek, Gilbert, Mallon, and Hu all conducted improper literature reviews. Their opinions are unreliable, and thus inadmissible under Rule 702 for three main reasons: (1) their methods for finding the relevant literature on which they based their general causation opinions are flawed; (2)

[4] Plaintiffs' experts who offer opinions on leukemia, Drs. Bird, Gondek, Gilbert, and Mallon, are collectively referred to as "Plaintiffs' Leukemia Experts." Likewise, Plaintiffs' experts who offer opinions on NHL, Drs. Bird, Gilbert, and Hu, are collectively referred to as "Plaintiffs' NHL Experts." None of these experts have opined that VC alone can cause either leukemia or NHL.

[5] The United States has separately moved to exclude any expert's general causation opinions that are couched in the "at least as likely as not" standard. *See* D.E. 539.

they failed to review and consider certain key studies; and (3) they internally cherry-picked from within the studies they relied on in their reports.

***First***, none of Plaintiffs' experts used reliable methodologies to obtain and analyze the landscape of relevant literature. Drs. Bird, Mallon, and Hu did not keep records of all their search terms, did not save their searches, and admitted that their searches could not be independently replicated. Drs. Bird and Mallon also did not list their criteria for excluding studies. Dr. Gilbert's literature search was designed improperly from the start. She admitted that she included only studies that showed positive associations between TCE and leukemia and NHL and excluded any that did not. Dr. Gondek applied inconsistent search strategies for different chemicals. For benzene, he used narrow, disease-specific queries, while for TCE, PCE, and VC, he used only broad terms. Had Dr. Gondek conducted similarly specific searches for PCE, TCE, and VC, he would have found a much smaller body of literature linking those chemicals to leukemia. Since none of Plaintiffs' experts performed formal, transparent literature searches, they failed to obtain a neutral and complete snapshot of the existing literature on which they purportedly based their opinions in this litigation.

***Second***, Plaintiffs' experts cherry-picked studies that were favorable to their opinions while ignoring studies that contradicted their opinions. Drs. Bird, Gilbert, and Mallon, all of whom produced multiple disease reports in this litigation, included studies in their literature reviews for another Track 1 disease when it supported their opinions and then excluded those same studies from their NHL or leukemia opinions when the same studies did not support their opinions.[6] Across the board, Plaintiffs' experts ignored numerous key studies that contradicted their opinions, including important findings for each chemical and each disease on which they opined.

---

[6] Drs. Bird, Gilbert, and Mallon also offered general causation opinions on the other Track 1 Disease cases at issue in the CLJA litigation. Dr. Bird offered such opinions on all three of the other Track 1 Diseases (Bladder Cancer, Kidney Cancer, and Parkinsons Disease); Dr. Gilbert offered opinions on the two other cancers (Bladder Cancer and Kidney Cancer); and Dr. Mallon offered an opinion on Kidney Cancer.

***Third***, egregiously, Plaintiffs' experts also often ignored contrary results from within the very studies they relied on, and in doing so, misrepresented the studies' overall findings. Plaintiffs' experts nonetheless all concluded that the VOCs at Camp Lejeune can cause leukemia and NHL.

## II. <u>Plaintiffs' Own Expert, Dr. David Savitz, Explains How to Conduct a Proper Literature Review.</u>

Another one of Plaintiffs' experts, Dr. David Savitz, describes the appropriate methodology for reviewing epidemiological literature in order to render a general causation opinion. Dr. Savitz is a well-known and highly respected expert in the field of epidemiology. He has authored three books, including *Epidemiology and the Law*, in which he discusses epidemiology as it relates to the litigation of causation in toxic tort cases. In *Epidemiology and the Law*, Dr. Savitz explains that, "[t]o assist the court and the jury, the ultimate product needed from an expert in epidemiology is an informed, carefully reasoned, evidence-based judgment about the probability that the exposure of interest acts as a cause of the health outcome of concern in the case." Savitz 2023 at 49 (JA Ex. 293, D.E. 484-4). Importantly, "[r]eaching an evidence-based judgment does not imply arbitrarily dismissing evidence that points in the opposite direction, but considering *the totality of the evidence* and reaching an informed, balanced judgment." *Id.* at 50 (emphasis added).

Dr. Savitz instructs that a proper literature review "begins with a methodical approach to identifying and screening all the literature that may contribute to helping answer the question of interest," and then "using a well-defined protocol to winnow down the list to the ones that will be most informative." *Id.* at 109. An expert should "examine [the studies] and organize them based on their methods," which will be "informative regarding how accurate the study is likely to be." Savitz 3d Dep. Tr. at 165:5-19 (JA Ex. 154, D.E. 469-8). Dr. Savitz explains the reason for this in his book. He states:

> Epidemiologic studies can vary substantially in their quality and hence vary in the confidence that can be placed in their results. Even when findings are mixed across studies, some supportive of an effect and others not, if those that are methodologically strongest tend to provide the most support for a potential causal association, the overall weight of evidence tips in that direction. . . . Of course, the converse is equally true. If

> the methodologically stronger studies find no association with only the weaker ones indicating a possible effect, the scales tip in the other direction.

Savitz 2023 at 77 (JA Ex. 293, D.E. 484-4).

When analyzing and interpreting epidemiological studies, Dr. Savitz acknowledges that it is appropriate for an expert to emphasize certain studies over others where "the weight is being driven by the quality of the methods," and "not by the results." D.E. 469-8 at 161:13-162:18. "[W]hen you focus based on the quality of the methods," and not "what the results are, [t]he methods determine the quality of the study. And then the results are whatever – however they come out." *Id.* at 162:1-6. On the other hand, "if an expert were to ignore methodologically strong studies that find no association in support of an opinion of causation or alternatively were to ignore strong studies finding an association but just focusing on ones that found no association in support of an opinion finding no causation, in either of those cases, that would be cherry-picking." *Id.* at 163:14-22. Put simply, cherry-picking occurs when "when you – you find results that you like and emphasize the studies that generate the results you like," *id.* at 161:18-25, which is "not giving an accurate presentation of what the overall set of studies has to say," *id.* at 163:9-13.

Dr. Savitz also described how cherry-picking can even occur within a study: "If the data are analyzed in enough different ways and a large enough array of results are presented, it is almost inevitable that some glimmer suggestive of a positive association will be found." *Id.* at 167:1-10. Dr. Savitz elaborated as follows:

> [T]here's various examples of this. We do a lot of studies that look at biomarkers and we may look at 10 biomarkers and we may look at the association with a number of different health outcomes . . . . And then we may look among males and females separately. We may look among younger and older people separately. Well, you generate an array of results. Every one of those questions may be reasonable, but at the end when you say . . . this is the meaningful take away from the study, it is – it's a form of within study cherry-picking.

*Id.* at 167:11-168:3. Internal cherry-picking is "looking for positive results and any glimmer I find, I'm going to cite." *Id.* at 168:9-16. Instead, a better interpretation would be, "we didn't see anything overall. There's some uncertainty. . . . [I]t will take more research to figure it out." *Id.* at 168:4-8.

**LEGAL STANDARD**

Under Federal Rule of Evidence 702, expert witness testimony is not presumptively admissible. *Engilis v. Monsanto Co.*, No. 23-4201, 2025 WL 2315898, at *6 (9th Cir. Aug. 12, 2025); *see also CSX Transp., Inc. v. Bonsal Am., Inc.*. No. 3:21-CV-00480, 2025 WL 1908107, at *2 (W.D.N.C. July 9, 2025) (discussing the 2023 amendments to Rule 702, which clarified that "expert testimony is [not] presumed to be admissible"). Instead, the proponent must prove by a preponderance of the evidence that their expert's opinions reflect a reliable application of the principles and methods to the facts of the case. *United States v. Rouse*, No. 22-4479, 2024 WL 2044630, at *1 (4th Cir. May 8, 2024) (per curiam); *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001). This standard is the same irrespective of the burden of proof. *Compare Rouse*, 2024 WL 2044630 (beyond all reasonable doubt), *with Cooper*, 259 F.3d at 198 (more likely than not).

Expert testimony is admissible if it (a) "will help the trier of fact to understand the evidence or to determine a fact in issue," (b) "is based on sufficient facts or data," (c) "is the product of reliable principles and methods," and (d) "reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. Expert testimony is only admissible if it "rests on a reliable foundation and is relevant to the task at hand." *Belville v. Ford Motor Co.,* 919 F.3d 224, 232 (4th Cir. 2019) (quoting *Daubert*, 509 U.S. at 597). The Court must assess "whether the reasoning or methodology underling the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 232 (quoting *Daubert*, 509 U.S. at 592–93). The objective of Rule 702 and *Daubert* "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level

of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

Courts "must probe the reliability and relevance of expert testimony any time 'such testimony's factual basis, data, principles, methods, or their application are sufficiently called into question.'" *EEOC v. Freeman*, 778 F.3d 463, 472 (4th Cir. 2015) (Agee, J., concurring) (quoting *Kumho Tire*, 526 U.S. at 149).

## ARGUMENT

This Court should exclude the opinions of Plaintiffs' experts because they failed to follow a reliable methodology to obtain the relevant literature and because they improperly cherry-picked data favorable to their conclusions while ignoring a wealth of contrary data. These failures render Plaintiffs' proffered expert testimony inadmissible because their testimony is unreliable and ultimately unhelpful to this Court in reaching its decision on general causation.

### I. Plaintiffs' Experts Failed To Use a Reliable Method To Obtain the Landscape of Relevant Literature.

"[A] literature review can be an appropriate part of a method of determining general causation." *Doe v. Ortho-Clinical Diagnostics, Inc.*, 440 F. Supp. 2d 465, 472 (M.D.N.C. 2006) (citing *Benedi v. McNeil-P.P.C., Inc.*, 66 F.3d 1378, 1384 (4th Cir. 1995)). "However, a literature review must still be performed appropriately." *Id.* "A reliable literature review 'uses formal search methods to allow a researcher to obtain a neutral "snapshot" of the existing research on a particular question.'" *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig.*, 174 F. Supp. 3d 911, 929 (D.S.C. 2016) (citation omitted). "The search for relevant literature should be clearly documented and be 'as comprehensive as possible,' to ensure that the relevant studies are identified and to allow other researchers to validate the process." *In re Paraquat Prods. Liab. Litig.*, 730 F. Supp. 3d 793, 831 (S.D. Ill. 2024) (quoting Lisa A. Bero, Ph.D., *Evaluating Systematic Reviews and Meta-Analyses*, 14 J.L. & POL'Y 569, 577 (2006)). The search should be "transparent" and "reproducible," *id.*, because

"acceptable scientific methodology does not rest on an expert's say-so," *In re Valsartan, Losartan, & Irbesartan Prods. Liab. Litig.*, No. 19-2875 (RBK/SAK), 2023 WL 1818922, at *44 (D.N.J. Feb. 8, 2023) (excluding expert's opinion, in part, for failing to "detail her literature search query to show she has conducted a sufficient literature search").

### A. Dr. Bird Used Unreliable Methodologies to Obtain the Landscape of Relevant Literature.

Dr. Steven Bird, an emergency room physician, offered his general causation opinion for all five of the Track 1 Diseases at issue in the CLJA litigation. In his report on leukemia and NHL, Dr. Bird opined that "the water at Camp Lejeune . . . posed a clear risk of causing hematopoietic cancer, specifically NHL and leukemia to those exposed to it." Bird Rep. at 8 (JA Ex. 103, D.E. 465-8).

To reach his opinions, Dr. Bird stated that he performed a literature review where he "conducted many searches of the PubMed database using terms including (*but not limited to*)":

> (TCE OR PCE OR benzene OR vinyl chloride OR trichloroethylene OR tetrachloroethylene OR perchloroethylene) AND leukemia
>
> (TCE OR PCE OR benzene OR vinyl chloride OR trichloroethylene OR tetrachloroethylene OR perchloroethylene) AND (non-Hodgkin lymphoma OR NHL OR chronic lymphocytic leukemia OR CLL OR multiple myeloma OR MM OR acute lymphocytic leukemia OR ALL OR follicular lymphoma OR B-cell lymphoma)

*Id.* at 6 (emphasis added). He stated that he "also performed numerous searches using Google Scholar" and "reviewed the articles cited in the manuscripts [he] reviewed," as well as "toxicology and medical toxicology textbooks," "chemical toxicity databases,"[7] and "records and other materials that counsel for Plaintiffs sent to [him]." *Id.* Dr. Bird's report contains only a sampling of the search terms and databases he used to conduct his search but does not indicate (1) any other search terms he used in his

[7] Dr. Bird stated that he also reviewed "chemical toxicity databases *such as* the Hazardous Substances Data Bank, United States Environmental Protection Agency's (EPA) Integrated Risk Information System (IRIS), and Agency for Toxic Substances and Disease Registry (ATSDR)." D.E. 465-8 at 6 (emphasis added). It is not clear from Dr. Bird's report whether this is a comprehensive list, or just a sampling of some of the databases he reviewed.

"numerous searches;" (2) how many results were retrieved using his search methods; or (3) his criteria for including or excluding the results in his overall consideration. Nor did he provide any way to reproduce his "numerous searches using Google Scholar" and "chemical toxicity databases." *Id.* At his deposition, Dr. Bird confirmed that he did not keep any records of the search terms he used to identify the scientific literature for his review, Bird GC Dep. Tr. at 235:22-237:7 (JA Ex. 148, D.E. 469-2); nor did he keep "a record of how many studies were retrieved in [his] searches," or which studies "were excluded and what the basis for the exclusion was," *id.* at 88:1-89:17. Dr. Bird could not recall which, if any, studies he excluded "based on study design, outcome, and exposure," *id.* at 89:18-90:9, or "based upon an incompatible control group or incompatible statistical methods," *id.* at 90:21-91:19.

Recently, however, Dr. Bird published a literature review analyzing the association between antipsychotic medication use and breast cancer. **Exhibit 1**, Steven B. Bird, *Antipsychotic-induced hyperprolactinemia: Toxicologic mechanism and the increased breast cancer risk*, 14 TOXICOLOGY REPS. (June 2025). In that review, Dr. Bird used the "Preferred Reporting Items for Systematic Reviews and Meta-Analyses (PRISMA) checklist,"[8] identified his "specific search terms," explained his method and criteria for "selection of studies," and identified the number of studies included or excluded (along with the reasons). *Id.* at 2-3. In short, he used the methodological hallmarks of a rigorous literature review, something he failed to do in his Camp Lejeune reports. Dr. Bird's literature review he conducted outside of his litigation work shows that he does, in fact, know how to conduct a methodologically sound literature review, but he chose not to do so here.

[8] The PRISMA 2020 checklist is "an expanded checklist that details reporting recommendations for each item, an abstract checklist, and template flow diagrams for original and updated reviews." PRISMA, *Prisma 2020*, https://www.prisma-statement.org/prisma-2020 (last visited Sept. 6, 2025). "To ensure a systematic review is valuable to users, authors should prepare a transparent, complete, and accurate account of why the review was done, what they did (such as how studies were identified and selected) and what they found (such as characteristics of contributing studies and results of meta-analyses)." BMJ, *The PRISMA 2020 statement: an updated guideline for reporting systematic reviews*, 2021;372:n71, https://www.bmj.com/content/372/bmj.n71 (last visited Sept. 6, 2025).

### B. Dr. Lukasz Gondek Used Unreliable Methodologies to Obtain the Landscape of Relevant Literature.

Plaintiffs retained Dr. Lukasz Gondek to offer an expert opinion on "the causal relationship between exposure to [TCE, PCE,] benzene, and vinyl chloride . . . and the development of leukemia." Gondek Rep. at 3 (JA Ex. 96, D.E. 465-1). Dr. Gondek concluded that "benzene, TCE, and PCE exposure can cause leukemia." *Id.* at 24. Although Dr. Gondek based his opinions upon a review of scientific literature, his method for finding the literature was flawed.

Dr. Gondek applied inconsistent search strategies for different chemicals. For benzene, he used narrow, disease-specific queries (*e.g.*, "benzene + acute myeloid leukemia"), while for TCE, PCE, and VC, he used only broad terms (*e.g.*, "[chemical] + cancer"). *Id.* at 4. He ran all searches on PubMed, a free public database. *See* Gondek GC Dep. Tr. at 43:20–46:5 (JA Ex. 160, D.E. 469-14). As the table below shows, this approach misrepresents the true scope of the literature relevant to the specific diseases at issue available on PubMed:

| **Dr. Gondek's Terms (number of results)** | **Omitted Searches (number of results)** |
|---|---|
| benzene + acute myeloid leukemia (318)<br>benzene + acute lymphoblastic leukemia (62) | benzene + leukemia (1,409)<br>benzene + cancer (4,111) |
| perchloroethylene + leukemia (24)<br>perchloroethylene + cancer (239)<br>tetrachloroethylene + leukemia (20)<br>tetrachloroethylene + cancer (194) | perchloroethylene + acute myeloid leukemia (1)<br>perchloroethylene + acute lymphoblastic leukemia (2)<br>tetrachloroethylene + acute lymphoblastic leukemia (1)<br>tetrachloroethylene + acute myeloid leukemia (1) |
| trichloroethylene + leukemia (32)<br>trichloroethylene + cancer (517) | trichloroethylene + acute myeloid leukemia (3)<br>trichloroethylene + acute lymphoblastic leukemia (2) |
| vinyl chloride + leukemia (31)<br>vinyl chloride + cancer (832) | vinyl chloride + acute myeloid leukemia (2)<br>vinyl chloride + acute lymphoblastic leukemia (0) |

Had Dr. Gondek conducted similarly specific searches for PCE, TCE, and VC, he would have found a much smaller body of literature on PubMed linking those chemicals to acute myeloid leukemia

("AML") or acute lymphoblastic leukemia ("ALL"). This is highly relevant context that the factfinder is entitled to see—but Dr. Gondek omitted it.

When confronted with these inconsistencies, Dr. Gondek admitted that he broadened his searches when the specific queries returned too few results:

> Q. So the results didn't come back with as many as you wanted?
> A. Maybe not.
> Q. So you broadened the search, correct?
> A. Correct.

*Id.* at 194:20-195:2. This is not a scientific justification—it is a litigation strategy. It demonstrates that Dr. Gondek modified his methodology to generate more favorable material, not to accurately represent the state of the science.

Dr. Gondek also testified that he may have performed narrower searches that yielded few or no results, but he did not include those in his report:

> Q. So there were searches that you performed that you did not list here?
> A. I -- perhaps -- I assume it's just because I don't remember, but every time I included something more broad than AML and ALL, that was probably the reason why, because there was either zero results or one result that was not relevant to our discussion.

*Id.* at 196:6-12. This reflects a fundamental flaw: Dr. Gondek omitted low-yield searches without tracking them or disclosing their results.

### C. Dr. Gilbert Used Unreliable Methodologies to Obtain the Landscape of Relevant Literature.

Dr. Kathleen Gilbert offered a general causation opinion for leukemia and NHL in one combined report, in which she opined that TCE "more likely than not" causes leukemia and NHL. Gilbert Rep. at 12 (JA Ex. 108, D.E. 466-2).

Dr. Gilbert's literature review had a biased design from the start. Dr. Gilbert, who is not an epidemiologist, *see* Gilbert Dep. Tr. at 56:15 (JA Ex. 165, D.E. 470-4), admitted in both her report and at deposition that she selected *every* study for the purpose of supporting her opinion that TCE causes leukemia and NHL by choosing *only* studies that showed a positive association and rejecting any study

that did not. *See* Gilbert Rep. at 12 (D.E. 466-2) ("For inclusion in the epidemiological assessment of NHL and leukemia . . . studies had to demonstrate . . . convincing positive associations represented by a Risk Ratio (RR) . . . greater than 1.1 . . . .); *see also* Gilbert Dep. Tr. at 50:21-51:21 (D.E. 470-4). As Dr. Gilbert explained at deposition, she performed a PubMed search to identify studies on the chemicals at issue, found studies with positive associations and those without positive associations, discarded any negative studies, and included in her epidemiological opinion only studies to suggest that a causal relationship exists. *Id.* at 59:9-61:25 ("I just put the ones in the [epidemiological] table that satisfied the – what I thought was the need to show a causal relationship."). Dr. Gilbert provided no other criteria to explain how she rejected certain studies, only that she used the Camp Lejeune Justice Act's legal standard as her guide: ". . . I made that [epidemiological table on page 14] with the Camp Lejeune Act in mind. So, they wanted . . . information to show that this was sufficient to conclude that a causal relationship exists. So I used the studies that did that." *Id.* at 57:11-59:8. By limiting the studies she included to only those with positive associations, Dr. Gilbert's literature review was flawed by design to be unrepresentative of the relevant body of scientific literature, and, instead, was entirely results-driven.

### D. Dr. Mallon Used Unreliable Methodologies to Obtain the Landscape of Relevant Literature.

Dr. Timothy Mallon submitted a general causation expert report for leukemia, opining that there is a causal relationship between TCE, PCE, and benzene, and leukemia. Mallon Rep. at 3 (JA Ex. 98, D.E. 465-3).

Like many of the other experts, Dr. Mallon's report did not include any of his search terms or any discussion of how he included or excluded studies from his consideration.[9] Dr. Mallon explained

[9] At deposition, Dr. Mallon testified that he included in his report "every single article that was a hit when [he] put the searches in the PubMed and Cochrane databases," except for the ones that were published "after the report was written." Mallon GC Dep. Tr. at 65:4-15 (JA Ex. 151, D.E. 469-5). However, he also testified that "[t]here were some articles that [he] did not include" based on "study

that his methodology included "[c]onducting PubMed searches of peer-reviewed scientific literature examining associations between TCE, PCE, benzene, and/or vinyl chloride and leukemia," as well as "[s]earching the Cochrane database for systematic reviews and meta-analyses," and "[r]eviewing and analyzing reports from national and international agencies[.]" Mallon Rep. at 5 (JA Ex. 98, D.E. 465-3). Dr. Mallon admitted at deposition that he did not maintain records of the search terms or search results that informed his general causation opinions. Mallon GC Dep. Tr. at 63:13-17; 64:18-65:3 (JA Ex. 151, D.E. 469-5). Dr. Mallon also stated that there were "multiple, multiple search terms" that he used but were not listed or saved "anywhere." *Id.* at 63:13-17. The only way "for someone to reproduce [his] searches" would be "if they sat . . . at the computer terminal with [him]." *Id.* at 63:18-64:2. As such, there is no way to assess the reliability of Dr. Mallon's searches and literature review.

### E. Dr. Hu Used Unreliable Methodologies to Obtain the Landscape of Relevant Literature.

Dr. Howard Hu offered a general causation opinion for NHL, in which he opined that TCE, PCE, and benzene "can cause NHL." Hu Rep. at 8, (JA Ex. 111, D.E. 466-5).

Dr. Hu stated in his report that he "reviewed the relevant peer-reviewed scientific literature and reports of international and national agencies" to conduct his evaluation. *Id.* at 6. However, Dr. Hu did not provide any of the search terms he used to identify the literature he reviewed to form his opinions. *Id.* At his deposition, Dr. Hu testified that he was aware of some agency reports prior to the litigation, but "then [he] did a search." Hu GC Dep. Tr. at 38:19-39:3 (JA Ex. 162, D.E. 470-1). As to his method for identifying additional reports and studies, Dr. Hu stated he "usually uses Pubmed," as well as Google and "some artificial intelligence search machines." *Id.* at 38:19-39:21. When asked whether he documented his searches, Dr. Hu replied that he "made a list of citations" and "downloaded the primary articles," but some of those articles "will have their own references," which "sometimes" led him to

---

quality," "outcome of interest, study methodology," and other "less statistically reliable [studies] that [he] might have excluded." *Id.* at 67:8-68:11.

additional studies he might not have seen in his primary search. *Id.* at 38:19-39:21; 40:15-41:8. Dr. Hu maintained that he could replicate the searches he conducted through re-interrogating the online sources he identified with "search terms that are relevant," *id.*, but did not explain how anyone else could replicate his searches, as he neither recorded his search terms or search results, nor was he able to identify them from memory. As with Dr. Mallon, there is simply no way to evaluate the reliability of Dr. Hu's methodology for obtaining the landscape of relevant literature.

**F. Plaintiffs' Experts Should Be Excluded Because They Relied on Search Methodologies that Were Not Reliable, Reproduceable, or Neutral.**

Plaintiffs' experts failed to apply a formal search methodology to retrieve the scientific literature on which they based their opinions. As detailed above, their approaches to gathering literature were anything but "methodical." *See* Savitz 2023 at 109 (JA Ex. 293, D.E. 484-4). Their searches were not clearly documented, not comprehensive, and, by the experts' own admissions, cannot be reproduced by other researchers. *See In re Paraquat Prods.*, 730 F. Supp. 3d at 831. Drs. Bird, Mallon, and Hu could not identify search terms and admitted that their searches could not be reproduced by a third party. Dr. Mallon did not offer even a single example search term in his report, instead merely alluding to PubMed and Cochrane database searches. Dr. Hu was not even sure which databases or "artificial intelligence search machines" he may have used for his searches. Because Plaintiffs' experts failed to detail their literature search queries to show that they conducted a sufficient literature search, the Court has no "basis to assess the level of reliability" of their searches. *Small v. WellDyne, Inc.*, 927 F.3d 169, 177 (4th Cir. 2019). They are essentially proclaiming their opinions to be true because they "say so." *Id.*; *see also In re Valsartan*, 2023 WL 1818922, at *44 (noting that "acceptable scientific methodology does not rest on an expert's say-so").

Plaintiffs' experts also cannot establish that their literature searches obtained a neutral "snapshot" of the relevant scientific literature. *In re Lipitor*, 174 F. Supp. 3d at 929. Instead, their reports and deposition testimony depict haphazard, results-driven literature searches. Dr. Gondek

revised and manipulated his search to get the broader results he wanted, and Dr. Gilbert's methodology was biased by design, as she intentionally included only literature that showed positive associations between TCE and leukemia and NHL.

The "level of intellectual rigor" applied to the search methodologies by Drs. Bird, Gondek, Gilbert, Mallon, and Hu contrasts sharply with the level of rigor applied outside of litigation. *Kumho Tire*, 526 U.S. at 152. In his non-litigation work, Plaintiffs' own expert explained the importance of "using a well-defined protocol to winnow down the list to the [literature] that will be most informative." Savitz 2023 at 109 (JA Ex. 293, D.E. 484-4). Plaintiffs' experts know how to perform a proper literature search, as Dr. Bird recently did outside of this litigation. As one court observed in a similar circumstance, the "difference in [the expert's] methodology when conducting a literature review for publication and when preparing his testimony in this case is quite telling." *In re Lipitor*, 174 F. Supp. 3d at 929. Because the opinions of Plaintiffs' experts are based on literature searches that were inconsistent, opaque, and results-driven, they are precisely the type of litigation-driven science that courts routinely exclude. *See id.* (excluding expert who failed to conduct a "formal, transparent, and reproducible" literature review and failed to provide a "neutral snapshot" of the scientific evidence).

## II. Experts Must Not Cherry-Pick from the Relevant Literature.

"Result-driven analysis, or cherry-picking, undermines principles of the scientific method and is a quintessential example of applying methodologies (valid or otherwise) in an unreliable fashion." *Nix v. Chemours Co.*, No. 7:17-CV-189-D, 2023 WL 6471690, at *7 (E.D.N.C. Oct. 4, 2023) (quoting *Lipitor (Atorvastatin Calcium) Mktg. v. Pfizer, Inc.*, 892 F.3d 624, 634 (4th Cir. 2018)); *see also Freeman*, 778 F.3d at 468-69 (collecting cases). "An expert's opinion may be unreliable if he fails to account for contrary scientific literature and instead selectively chooses his support from the scientific landscape." *Yates v. Ford Motor Co.*, 113 F. Supp. 3d 841, 858 (E.D.N.C. 2015) (Flanagan, J.) (citations and internal quotation marks omitted). Put another way, "if the relevant scientific literature contains evidence tending to refute the expert's theory and the expert does not acknowledge or account

for that evidence, the expert's opinion is unreliable." *Id.* (citation omitted) (collecting cases); *see also In re Lipitor*, 174 F. Supp. 3d at 932 (observing that "failing to adequately account for contrary evidence is not reliable or scientifically sound" (citing *McEwen v. Balt. Wash. Med. Ctr.*, 404 F. App'x 789, 791-92 (4th Cir. 2010) and collecting cases).

"[C]ourts have consistently excluded expert testimony that 'cherry-picks' relevant data because such an approach does not reflect scientific knowledge, is not derived by the scientific method, and is not 'good science.'" *Lipitor*, 892 F.3d at 634 (citations and internal quotation marks omitted). An expert may not "'pick and choose' from the scientific landscape and present the Court with what he believes the final picture looks like. This is hardly scientific." *Lust v. Merrell Dow Pharms.*, 89 F.3d 594, 596 (9th Cir. 1996) (cleaned up) (citation omitted). Nor may an expert, "recognizing the lack of objective support for his findings," merely "emphasize[] his own 'education and experience.'" *Brown v. Ill. Cent. R.R. Co.*, 705 F.3d 531, 536-37 (5th Cir. 2013). "Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible." *Small*, 927 F.3d 169, 177 (citation and internal quotation marks omitted). Indeed, "[t]he Federal Rules of Evidence do not require 'a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.'" *Nix*, 2023 WL 6471690, at *7 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) and citing *Small*, 927 F.3d at 177).[10]

---

[10] *See also Small*, 927 F.3d at 177 (cautioning that "[w]ithout testing, supporting literature in the pertinent field, peer reviewed publications[,] or some basis to assess the level of reliability, expert opinion can easily, but improperly, devolve into nothing more than proclaiming an opinion is true because 'I say so'"); *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) ("A witness who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term."); *Tolentino v. City of Yonkers*, No. 15-CV-5894, 2017 WL 4402570, at *4 (S.D.N.Y. Oct. 2, 2017) (excluding testimony of forensic pathologist who "described his methodology as relying on his 'general knowledge' and 'practical experience'").

### A. Drs. Bird, Gondek, Gilbert, Mallon, and Hu Each Ignored Numerous Unfavorable Studies.

An expert must consider all relevant scientific evidence, including evidence that detracts from the conclusion reached. *Burst v. Shell Oil Co.*, No. 14–109, 2015 WL 3755953, at *13–14 (E.D. La. June 16, 2015). Plaintiffs' experts failed this standard in multiple ways. There are at least 173 studies showing no statistically significant association or a decreased risk of association between NHL and leukemia and the chemicals at issue. For NHL, there are 29 for TCE; 22 for PCE; and 48 for benzene.[11] For Leukemia, there are 25 for TCE; 16 for PCE; and 33 for benzene.[12] Drs. Bird, Gondek, Gilbert, and Mallon each uniformly ignored the majority of these studies, sometimes ignoring the contradictory literature *entirely*.[13] For example:

A. Dr. Bird's report ignored 26 out of 29 of these TCE studies (90%) for NHL; 18 out of 22 of these PCE studies (82%) for NHL; 46 out of 48 of these benzene studies (96%) for NHL; 18 out of 25 of these TCE studies (72%) for leukemia; 11 out of 16 of these PCE studies (69%) for leukemia; and 31 out of 33 of these benzene studies (94%) for leukemia. Bird Rep. (JA Ex. 103, D.E. 465-8).

B. Dr. Gondek's report ignored 16 out of 25 of these TCE studies (64%) for leukemia; 16 out of 16 of these PCE studies (100%) for leukemia; and 27 out of 33 of these benzene studies (82%) for leukemia. Gondek Rep. (JA Ex. 96, D.E. 465-1).

C. Dr. Gilbert's report (which opined on TCE only) ignored 26 out of 29 of these TCE studies (90%) for NHL; and 20 out of 25 of these TCE studies (80%) for leukemia. Gilbert Rep. (JA Ex. 108, D.E. 466-2).

D. Dr. Mallon's report ignored 11 out of 25 of these TCE studies (44%) for leukemia; 15 out of 16 of these PCE studies (94%) for leukemia; and 27 out of 33 of these benzene studies (82%) for leukemia. Mallon Rep. (JA Ex. 98, D.E. 465-3).

---

[11] *See* **Exhibit 2**, Studies Plaintiffs' Experts Ignored, at Tables 1-3. The tables in this Exhibit identify studies with no statistically significant association or a decreased risk of association between each chemical of interest and NHL and leukemia. These studies are identified in Goodman Rep. (NHL) at Attachments D, F, and H (JA Ex. 117, D.E. 466-11) and Goodman Rep. (Leukemia) at Attachments D, F, and H (JA Ex. 102, D.E. 465-7). Some of the studies listed considered multiple chemicals at issue.

[12] *See* Ex. 2, Studies Plaintiffs' Experts Ignored, at Tables 4-6.

[13] Regarding Dr. Hu, see discussion at p. 18, *infra*.

E. Dr. Hu's report ignored 5 out of 29 of these TCE studies (17%) for NHL; 6 out of 22 of these PCE studies (27%) for NHL; and 25 out of 48 of these benzene studies (52%) for NHL. Hu Rep. (JA Ex. 111, D.E. 466-5). While the number of studies ignored by Dr. Hu may seem smaller, it is because Dr. Hu testified that he reviewed all of the NHL studies previously summarized in various publications by the National Toxicology Program ("NTP") and the International Agency on Cancer Research ("IARC"). However, he failed to discuss most of these studies in his report.[14]

By ignoring so many relevant studies and relying on an incomplete picture of the body of scientific literature, Plaintiffs' experts cannot show that their principles and methodologies on which they based their opinions are reliable.

### B. Plaintiffs' Experts Ignored Relevant Studies for Each Chemical and Each Disease on Which They Opined.

Plaintiffs' experts have opined that the VOCs (TCE, PCE, and benzene) each independently can cause leukemia or NHL. However, they failed to consider relevant epidemiological studies that contradict their opinions. Each of Plaintiffs' experts ignored numerous studies for each chemical and each disease on which they opined. Some examples are discussed below.

#### *i. Plaintiffs' NHL Experts Ignored Relevant Studies Evaluating Whether a Causal Association Exists Between TCE and NHL and PCE and NHL.*

Plaintiffs' NHL Experts (Drs. Bird, Gilbert,[15] and Hu) all ignored relevant studies showing *no increased risk* for NHL with likely exposure TCE or PCE exposure, including the following studies:[16]

---

[14] For example, Dr. Hu admitted at deposition that he did not mention in his report the following studies analyzed and summarized by IARC, all of which found *no statistically significant association* between TCE and NHL: *Persson & Fredrikson* (1999); *Miligi* et al. (2006); *Seidler* et al. (2007); *Christensen* et al. (2013); *Cocco* et al. (2010); *Greenland* et al. (1994); *Boice* et al (2006); *Lipworth* et al (2011); and *Radican* et al. (2008). Hu GC Dep. Tr. at 149:21-156:19 (JA Ex. 162, D.E. 470-1). According to Dr. Hu, "since [the above studies] were summarized by the IARC report, [he] felt no need to go over those" in his report. *Id.* at 156:22-157:2. Dr. Hu did, however, feel the need to discuss individual studies and meta-analysis studies that were addressed by IARC and found *positive associations* between TCE exposure and NHL. *See* D.E. 466-5 at 23 (discussing only positive associations in "Strength of association" analysis).

[15] Dr. Gilbert opined on TCE only.

[16] Saberi Hosnijeh, F., et al., *Occupation and Risk of Lymphoid and Myeloid Leukaemia in the European Prospective Investigation Into Cancer and Nutrition (EPIC),* 70 Occup. Environ. Med. 7 (May 2013) (**Exhibit 3**); Talibov, M., et al., *Occupational Solvent Exposure and Adult Chronic Lymphocytic Leukemia: No Risk in a Population-based Case-control Study in Four Nordic Countries*,

**TCE**

> **Saberi (2013)** – 241,465 subjects. Reported no statistically significant increased risk estimates for CLL with any level of TCE exposure.
>
> **Talibov (2017)** – 20,615 cases. Reported no statistically significant increased risk of CLL with any level of cumulative TCE exposure, and there were no statistically significant dose-response trends when considering both sexes together or separately.
>
> **t'Mannetje (2008)** – 291 subjects. Reported no increased risk of NHL in workers with likely TCE exposure.

**PCE**

> **Fabbro-Peray (2001)** – 445 cases. Reported no statistically significant increased risk of NHL with occupational exposure to dry-cleaning solvents.
>
> **Travier (2002)** – Reported no statistically significant increased risk of NHL among dry-cleaning workers.
>
> **Lynge (2006)** – 249 cases. For PCE, reported no statistically significant increased risk of NHL with any duration of employment in dry-cleaning.
>
> **Pukkala (2009)** – 14.9 million subjects. Reported no statistically significant increased risk of NHL or CLL among male or female laundry and dry-cleaning workers.

By failing to consider at least some of these relevant studies, and by ignoring numerous others that failed to show a statistically significant association between TCE and NHL or PCE and NHL, Plaintiffs' experts have failed to present an accurate picture of the scientific landscape. *See* Ex. 2 (showing many other relevant TCE and PCE studies ignored by each expert).

***ii. Plaintiffs' Leukemia Experts Ignored Relevant Studies Evaluating Whether a Causal Association Exists Between TCE and Leukemia and PCE and Leukemia.***

Similarly, Plaintiffs' Leukemia Experts (Drs. Bird, Gondek, Gilbert [TCE only], and Mallon) all ignored relevant studies analyzing the association between TCE, PCE, and leukemia, including, for

---

141 Int. J. Cancer (2017) (**Exhibit 4**); 't Mannetje, A., et al., *High Risk Occupations for Non-Hodgkin's Lymphoma in New Zealand: Case-Control Study*, 65 Occup. Environ. Med. 5 (2008) (**Exhibit 5**); Fabbro-Peray, P., et al., *Environmental Risk Factors for Non-Hodgkin's Lymphoma:A Population-based Case-control Study in Languedoc-Roussillon, France*, 12 Cancer Causes Control 3 (2001) (**Exhibit 6**); Travier 2002 (JA Ex. 312, D.E. 485-7); Lynge E., et al., *Cancer in Persons Working in Dry Cleaning in the Nordic Countries*, 114 Evntl. Persps. 213 (2006) (**Exhibit 7**); Pukkala, E., et al., *Occupation and Cancer - Follow-up of 15 Million People in Five Nordic Countries*, 48 Acta Oncol. 5 (2009) (**Exhibit 8**).

example, the *Saberi* (2013), *Sung* (2007), *Pukkala* (2009), and *Chang* (2003) studies, all of which show *no increased risk* for leukemia with likely TCE or PCE exposure:[17]

> **Saberi Hosnijeh (2013)** – 241,465 workers. No statistically significant increase of myeloid or lymphoid leukemia with any level of TCE exposure.
>
> **Sung (2007)** – 63,982 workers. No statistically significant increased leukemia risk among female electronics factory workers.
>
> **Pukkala (2009)** – 14.9 million subjects. No statistically significant increased risk of AML or other leukemias in male or female workers with likley exposures to TCE . No statistically significant increased risk of leukemia in female laundry and dry-cleaning workers or AML in male Laundry and dry-cleaning workers. Statistically significant decreased risk of leukemia in male laundry and dry-cleaning workers.
>
> **Chang (2003)** – 86,868 workers. No statistically significant increased leukemia risk in workers at an electronics factory.

*See* Ex. 2 (showing many other relevant TCE and PCE studies ignored by each expert).

Moreover, despite relying on IARC, NTP, the Environmental Protection Agency ("EPA"), and the ATSDR in their reports, Plaintiffs' Leukemia Experts all ignored the findings of those agencies when those findings showed insufficient evidence to conclude PCE or TCE is associated with leukemia.

*First*, IARC is a branch of the World Health Organization, and Plaintiffs' experts consider it a reliable source: "[i]t is a generally accepted practice in my field to rely on IARC classifications where available because IARC provides a robust and authoritative analysis of peer-reviewed scientific literature regarding potential carcinogens." Gondek Rep. at 11 (JA Ex. 96, D.E. 465-1).[18] Plaintiffs'

[17] Saberi (2013) (Ex. 3); Sung 2007 (JA Ex. 308, D.E. 485-3); Pukkala (2009) (Ex. 8); Chang 2003 (JA Ex. 231, D.E. 479-8).

[18] *See also* Mallon GC Dep. Tr. at 85:15-17 (JA Ex. 151, D.E. 469-5) (IARC is an "authoritative body on cancer"); Gilbert Rep. at 21 (JA Ex. 108, D.E. 466-2) (relying on IARC); Bird Rep. at 8-9 (JA Ex. 103, D.E. 465-8) (same).

Leukemia experts embraced IARC's conclusions when they supported Plaintiffs' case—for example, on TCE and kidney cancer or benzene and AML—but ignored them when they did not.[19]

In 2014, IARC published its monograph on the carcinogenicity of TCE and PCE, finding *no evidence of an association* with leukemia for either agent. *See* IARC 2014 Monograph 106 at 329 (JA Ex. 201, D.E. 473-9) (PCE); 189 (TCE). However, Plaintiffs' experts all disregarded IARC's conclusions of no evidence of association for TCE, PCE, and leukemia and concluded that TCE (all Plaintiffs' Leukemia Experts) and PCE (all but Dr. Gilbert, whose opinion was limited to TCE) can cause leukemia. This selective approach signals an outcome-driven analysis, not an objective review.

To illustrate how Plaintiffs' Leukemia Experts selectively reported IARC's findings, Dr. Bird cited IARC's finding of sufficient evidence for a causal association between benzene and AML, but in the very next section of his report on TCE, noted only that IARC classified TCE as a human carcinogen. He failed to report that the same monograph found insufficient evidence of an association between TCE and leukemia. Bird Rep. at 9 (JA Ex. 103, D.E. 465-8); *see also id.* at 15. Similarly, Dr. Mallon reported IARC's conclusion that benzene can cause AML. Mallon Rep. at 20 (JA Ex. 98, D.E. 465-3). But, regarding TCE, Dr. Mallon stated only, "[o]verall, IARC concluded that epidemiologic, animal, and mechanistic evidence is sufficient to cause cancer. I agree with the conclusions of IARC regarding TCE and its carcinogenicity." *Id.* at 15. Again, nowhere in his report did Dr. Mallon acknowledge that IARC found insufficient evidence that TCE can cause leukemia.[20] Dr. Gondek made the same results-driven decision to report IARC's conclusion that "benzene causes AML," while excluding IARC's disease-specific findings on TCE and PCE. *See* Gondek Rep. at 11, 13 (JA Ex. 96, D.E. 465-1) (noting

---

[19] *See, e.g.*, Bird GC Dep. Tr. at 265:12-20 (JA Ex. 148, D.E. 469-2); Gondek Rep. at 15 (JA Ex. 96, D.E. 465-1); Gilbert Rep. (Kidney) at 18 (JA Ex. 88, D.E. 464-9); Mallon Rep. at 20 (JA Ex. 98, D.E. 465-3); Mallon GC Rep. (Kidney) at 21-22 (JA Ex. 92, D.E. 464-13).

[20] Regarding PCE only, Dr. Mallon acknowledged IARC's findings that "no clear exposure–response relationships were found, the numbers of observed/expected cases were small and there was contradictory evidence that exposure to PCE is associated with malignant neoplasms." D.E. 465-3 at 32.

only that IARC "classified TCE as carcinogenic to humans" and PCE as "probably carcinogenic to humans").

*Second*, the NTP is part of the U.S. Department of Health and Human Services. One of Plaintiffs' Leukemia Experts stated, "NTP monographs, like those from IARC, are another trusted resource used by experts to evaluate the causal relationships between toxic exposures and disease." Mallon Rep. at 15 (JA Ex. 98, D.E. 465-3); *see also* Mallon GC Dep. Tr. at 144:1-9 (JA Ex. 151, D.E. 469-5) (describing NTP monographs "as highly credible and influential, with conclusions that hold significant authority"). In 2021, NTP's 15th Report on Carcinogens profiled both PCE and TCE and did not report an association with leukemia in humans for either agent. The NTP's standard is merely that the agent "may pose a cancer hazard," NTP Intro. at 1,[21] yet NTP failed to find this standard was met for PCE or TCE and leukemia, *see* NTP 2021 PCE (JA Ex. 208, D.E. 477-1); NTP 2021 TCE (JA Ex. 209, D.E. 477-2).[22] Once again, Plaintiffs' Leukemia Experts selectively included the findings of NTP when those findings supported their opinions and excluded NTP's findings when they did not. *See* Mallon Rep at 27-28 (JA Ex. 98, D.E. 465-3) (noting NTP's evidence of association between benzene and leukemia but failing to note NTP's conclusions on TCE, PCE, and leukemia); Bird Rep. at 16 (JA Ex. 103, D.E. 465-8) (noting only that "NTP has opined that PCE is 'reasonably anticipated to be a human carcinogen,'" but excluding NTP's findings of no association between PCE and leukemia).

*Third*, in 2020, the EPA performed risk evaluations for PCE and TCE to determine whether these substances present unreasonable risk of injury to health or the environment. EPA 2020 PCE Risk Eval. at 34 (JA Ex. 198, D.E. 473-6); EPA 2020 TCE Risk Eval. at 30 (JA Ex. 199, D.E. 473-7). The

---

[21] *See* NTP, 15th Report on Carcinogens 1 (2021), https://ntp.niehs.nih.gov/sites/default/files/ntp/roc/content/introduction_508.pdf [hereinafter, NTP Intro].

[22] Though far from established, NTP's TCE profile indicates evidence for an association with chronic lymphocytic leukemia (CLL), but CLL has been reclassified as NHL.

EPA's Risk Evaluations for PCE and TCE did not note any positive associations for leukemias in humans. D.E. 473-6 at 328-29; D.E. 473-7 at 245. However, Dr. Bird chose to report only that EPA classified PCE as a "likely carcinogen," but not that EPA found insufficient evidence for a causal association between PCE and leukemia. Bird Rep. at 9 (JA Ex. 103, D.E. 465-8); *see also id.* at 16 (discussing EPA's findings on NHL and PCE , but nothing on EPA's findings on leukemia and PCE).

If Plaintiffs' experts had considered the entire body of relevant literature, rather than cherry-picking studies and ignoring selective findings of agencies, they could not have reached the broad causation opinions they offer. Their extreme cherry-picking is not a scientifically valid methodology. *Daubert* 509 U.S. at 592.

#### ***iii. Plaintiffs' NHL Experts Ignored Relevant Studies Evaluating Whether a Causal Association Exists Between Benzene and NHL.***

Plaintiffs' experts Drs. Bird and Hu, who opined on benzene and NHL, also ignored numerous relevant studies, including for example: *Blair* (1989), *Dagg* (1992), *Wong & Raabe* (2000), *Honda* (1995), *Collingwood* (1996), *Divine* (1999a), *Tsai* (2007), and *Lynge* (1997), all of which show *no increased risk* with likely exposure to benzene:[23]

> **Dagg (1992)** – 13,397 subjects. No statistically significant increased risk of mortality from lymphosarcoma and reticulosarcoma (combined) associated with oil refinery work overall, or with duration of oil refinery work.
>
> **Wong & Raabe (2000)** – Meta-analysis. Observed no statistically significant increased risk of NHL mortality associated with benzene exposure. There was a statistically significant decrease in risk of NHL for three of six occupational categories.
>
> **Honda (1995)** – 9,796 subjects. No statistically significant increased risk of lymphosarcoma with work in a petroleum manufacturing plant.
>
> **Collingwood (1996)** – 4,855 subjects. No statistically significant increased risk of CLL with oil refinery work. No statistically significant increased risk of lymphosarcoma and

[23] Dagg 1992 (JA Ex. 241, D.E. 480-1); Wong, O. and Raabe, GK., *Non-Hodgkin's Lymphoma and Exposure to Benzene in a Multinational Cohort of More than 308,000 Petroleum Workers, 1937-1996*, 42 J. Occup. Environ. Med. 5 (2000) (**Exhibit 9**); Honda 1995 at (JA Ex. 260, D.E. 481-4); Collingwood 1996 at (JA Ex. 235, D.E. 479-12); Divine 1999a (JA Ex. 244, D.E. 480-4); Tsai 1993 (JA Ex. 313, D.E. 485-8); Lynge 1997 (JA Ex. 272, D.E. 482-5).

reticulosarcoma (combined) associated with oil refinery work overall, or with any duration of oil refinery work.

**Divine (1999a)** – 24,604 subjects. No statistically significant increased risk of CLL or NHL-related mortality among refinery, petrochemical facility, and research laboratory employees.

**Tsai (2007)** – 9,764 subjects. No statistically significant increased risk of NHL-or CLL-related mortality among refinery or chemical workers overall or with any duration of employment.

**Lynge (1997)** – 18,969 subjects. No statistically significant increased risk of NHL or CLL for males or females with service station work.

Again, by ignoring relevant studies, Plaintiffs' experts have based their opinions on too few studies to provide a neutral "snapshot" of the evidence. *In re Lipitor*, 174 F. Supp. 3d at 929. *See* Ex. 2 (showing many other relevant benzene studies ignored by each expert).

#### *iv. Plaintiffs' Leukemia Experts Ignored Relevant Studies and Findings Evaluating Whether a Causal Association Exists Between Benzene and Leukemia.*

Similarly, Plaintiffs' experts Drs. Bird, Gondek, and Mallon, who opined on benzene and leukemia, ignored numerous relevant studies, including for example: *Lewis* (2003), *Costantini* (2008), *Tsai* (2003, 2007), *Collingwood* (1996), *Pukkala* (1998), *Lynge* (1997), and *Saberi* (2013), all of which show *no increased risk* for leukemia with likely exposure to benzene.[24] *See* Goodman Rep. (Leukemia) at Attachment H (JA Ex. 102, D.E. 465-7).

In addition, Dr. Gondek failed to address the Pliofilm cohort studies, which the EPA says represent the "best published set of data"[25] for evaluating benzene's carcinogenicity, though he was

---

[24] Also worth noting is that Plaintiffs' Leukemia Experts all rely heavily on the *Cohn* (1994) study to support their opinions that TCE and PCE can cause leukemia. *See, e.g.*, Gondek GC Rep. at 21 (JA Ex. 96, D.E. 465-1); Bird GC MCL (NHL-Leuk) at 36 (JA Ex. 104, D.E. 465-9); Mallon GC Rep. (Leukemia) at 14 (JA Ex. 98, D.E. 465-3). But none of them included *Cohn's* finding that "No association was detected between leukemia or NHL incidence and . . . other VOCs such as benzene . . . ." *Cohn* at 559.

[25] EPA 1998 Benzene at viii-ix (JA Ex. 194, 473-2). The Pliofilm studies included eleven studies that evaluated the association between benzene exposure and leukemia, AML, acute myelocytic or acute monocytic leukemia (AMML), or ANLL risk in rubber workers from three plants in Ohio (*Infante*

aware of them. Gondek GC Dep. Tr. at 237:4–239:11, 312:12–19 (JA Ex. 160, D.E. 469-14). These studies showed that AML risk from benzene occurs only at exposures orders of magnitude higher than any Camp Lejeune exposure. *See, e.g.*, *Rhomberg* (2016) at 416.[26] *See also* Goodman Rep. (Leukemia) at 78, 87 (JA Ex. 102, D.E. 465-7); Shields Rep. at 129 (JA Ex. 135, D.E. 468-1).

Drs. Bird and Gondek compounded their errors by selectively reading certain epidemiolocal studies in order to support their opinions and ignoring important findings within those same studies that do not. While AML (but not other subtypes of leukemia) is associated with benzene, that association has been studied for decades in thousands of workers exposed to industrial levels of benzene, and the high-quality epidemiology research consistently finds that AML risk only increases after cumulative exposures of 40-75 ppm-years. *See*, *e.g.*, *Linet* (2019).[27]

Dr. Bird failed to acknowledge the 40 ppm-years threshold at all. *See, e.g.,* Bird Rep. at 32 (JA Ex. 103, D.E. 465-8) (citing Chinese worker studies with no discussion of ppm-years limitations). Dr. Gondek merely noted the ppm-years finding but declined to address its significance. *See* Gondek Rep. at 16 (JA Ex. 96, D.E. 465-1) (citing *Linet* (2019) and statistically insignificant findings below 40-ppm years). In contrast to Drs. Bird and Gondek, Dr. Mallon at least *mentioned* the association between benzene and AML at high occupational levels. *See, e.g.,* Mallon Rep. at 23 (JA Ex. 98, D.E. 465-3) (discussing *Rhomberg* (2016) and noting that the highest association for AML was in the highest

---

et al., 1977; *Rinsky* et al., 1981, 1987, 2002; *Crump*, 1994; *Paxton* et al., 1994a,b, *Wong*, 1995; *Silver* et al., 2002; *Rhomberg* et al., 2016; *Finkelstein* et al., 2000).

[26] Rhomberg, LR., et al., *Evaluation of Acute Nonlymphocytic Leukemia and Its Subtypes with Updated Benzene Exposure and Mortality Estimates: A Lifetable Analysis of the Pliofilm Cohort*, 58 J. Occup. Environ. Med. 4 (2016) (**Exhibit 10**). *Rhomberg* found that AML mortality risks were only higher than expected based on rates in the US general population in Pliofilm workers with cumulative exposures > ~75 ppm-years. For example, in analyses incorporating a 5-year lag, cumulative exposures ≥78.07 ppm-years were associated with an increase of AML mortality (SMR = 10.27, 95% CI: 3.77-22.36). *Id.*

[27] Linet, MS., et al., *Benzene Exposure Response and Risk of Myeloid Neoplasms in Chinese Workers: A Multicenter Casecohort Study*, 111 J. Natl. Cancer Inst. 5 (2019) (**Exhibit 11**).

exposure category, 400 ppm-years). However, Drs. Mallon, Bird and Gondek all failed to discuss pertinent results of these studies, which contradict their opinions that benzene at Camp Lejeune levels can cause leukemia. On the other hand, Dr. Gondek discussed extensively the findings of the *Glass* (2003) study to *support* his hypothesis that low levels of benzene can cause leukemia, D.E. 465-1 at 10, but ignored the findings of numerous relevant studies, some of which he relied on, when they *contradicted* his opinion. As will be discussed in more detail below, this is an example of Plaintiffs' experts selecting only the data they like and ignoring contrary data from the same studies. As Plaintiffs' epidemiology expert Dr. Savitz has stated, "[r]eaching an evidence-based judgment does not imply arbitrarily dismissing evidence that points in the opposite direction, but considering the totality of the evidence and reaching an informed, balanced judgment." Savitz 2023 at 50 (JA Ex. 293, D.E. 484-4). Here, Drs. Bird, Gondek, and Mallon have ignored significant studies and findings in the literature they cited in order to achieve the result they desired. *See* Ex. 2 (showing many other relevant benzene studies ignored by each expert).

In all, Plaintiffs' experts neglected to include the vast majority of cohort studies, case control studies, and meta-analyses that reported either negative or statistically insignificant findings with respect to the VOCs and leukemia and NHL, making their epidemiological assessments and opinions biased and woefully incomplete. Plaintiffs' experts provided no reliable basis for excluding these studies from their reports. Nor could they – they failed to *even mention* these studies at all. An objective expert would engage with evidence on both sides, weighing the evidence according to the "quality of the methods" used in the studies. Savitz 3d Dep. Tr. at 162:16-18 (JA Ex. 154, D.E. 469-8). Plaintiffs' experts cherry-picked favorable results and failed to examine the landscape of the literature and assess it on the quality of methods. Even if Plaintiffs' experts could offer some explanation for the studies with negative findings that they excluded, it is far more likely that they excluded a majority of these studies because the findings did not support their opinions.

### C. Plaintiffs' Experts Ignored the Findings of the NRC Regarding Lack of Associations Between TCE and PCE and Either Leukemia or NHL.

Further, whereas Plaintiffs' experts considered a variety of agency and regulatory determinations, they each selectively ignored the National Research Council's 2009 report on Camp Lejeune, entitled "Contaminated Water Supplies at Camp Lejeune: Assessing Potential Health Effects" ("NRC 2009 Report"), even though that report addressed the very same questions that Plaintiffs' experts were tasked with answering.

The National Research Council ("NRC") is the operating arm of the National Academy of Sciences ("NAS"). The NRC organized a committee of leading scientists, chaired by Plaintiffs' expert epidemiologist Dr. David Savitz, to study the scientific evidence on associations between historical data on prenatal, childhood, and adult exposures to contaminated water at Camp Lejeune and adverse health effects. NRC 2009 Report at v, ix (JA Ex. 205, D.E. 476-3). The NRC 2009 Report concluded that there is "inadequate/insufficient evidence to determine whether an association exists" between TCE or PCE and leukemia. *Id.* at 8 (capitalization omitted). The NRC 2009 Report likewise concluded that there is "inadequate/insufficient evidence to determine whether an association exists" between TCE or PCE and NHL. *Id.*

Dr. Bird admitted that he was aware of, and reviewed, the NRC 2009 Report, but failed to address it in his report. Bird GC Dep. Tr. at 38:40-20 (JA Ex. 148, D.E. 469-2). Dr. Gondek reviewed other Camp Lejeune studies and ATSDR materials provided by counsel but did not request or even inquire about any other materials that were relevant to his analysis. Gondek GC Dep. Tr. at 44:8-46:10, 240:7-13 (JA Ex. 160, D.E. 469-14). Dr. Gilbert listed the report among her materials considered but at deposition said she did not remember it and "certainly [had] not evaluated it extensively." Gilbert Dep. Tr. at 131:5-132:6 (JA Ex. 165, D.E. 470-4). This is remarkable given that Dr. Gilbert had previously worked with the NRC "several times over the years" to review TCE-related health risks. Gilbert Rep. at 5 (JA Ex. 108, D.E. 466-2). Dr. Mallon admitted that he was aware of the NRC 2009

Report and its "causation determinations for . . . leukemia, which [were] the relevant ones that [he] needed to be concerned about," yet he failed to address it in his leukemia report. Mallon GC Dep. Tr. at 257:20-258:15 (JA Ex. 151, D.E. 469-5).[28] Similarly, Dr. Hu completely omitted any analysis of the NRC 2009 Report, although he testified that he was aware of the study and, in fact, was serving on the Board of Environmental Studies and Toxicology for the NAS when the Report was commissioned. Hu GC Dep. Tr. at 15:19-16:5, 108:19-21 (JA Ex. 162, D.E. 470-1). In short, despite their awareness of the NRC 2009 Report and its relevance to the questions they were tasked with answering, Plaintiffs' experts ignored it and failed to consider it.

### D. Dr. Hu Ignored Camp Lejeune Cohort Studies in His Opinion on NHL.

In addition to ignoring the NRC 2009 Report, Dr. Hu ignored two of four highly relevant Camp Lejeune Cohort Studies, the 2014 Camp Lejeune Mortality Studies.[29] Despite the obvious relevance of the two studies, Dr. Hu inexplicably failed to account for them in his report, presumably because they reported outcomes adverse to his opinions. As Dr. Hu acknowledged at deposition, both 2014 Mortality Studies showed a lower standard mortality ratio ("SMR") for NHL among Marines and civilians at Camp Lejeune in comparison to similar groups at Camp Pendleton, and even lower than the general population when adjusted for age, race, and sex. Hu GC Dep. Tr. at 112:2-113:5; 113:24:-116:7 (JA Ex. 162, D.E. 470-1). Dr. Hu further acknowledged that the adjusted hazard ratio ("HR") comparing

---

[28] At deposition, Dr. Mallon testified that he cited the NRC 2009 Report in both general causation reports he authored. D.E. 469-5 at 257:20-258:15. However, despite his admission that the NRC's leukemia causation determinations were "relevant," *id.*, a careful review of his leukemia report reveals that he failed to even mention the NRC or its 2009 report.

[29] The four Camp Lejeune Cohort Studies compared like cohorts at Camp Lejeune and Camp Pendleton, California: (1) the 2014 Marines Mortality Study evaluated mortality rates and causes among Marines and Navy personnel, Bove 2014 Mort. Study - Mil. (JA Ex. 190, D.E. 472-11); (2) the 2014 Civilian Mortality Study compared mortality rates and causes among civilian workers, Bove 2014 Mort. Study - Civ. (JA Ex. 189, D.E. 472-10); (3) the 2024 Cancer Incidence Study compared cancer incidence for both military personnel and civilians, Bove 2024 Cancer Incid. Study (JA Ex. 191, D.E. 472-12); and (4) the 2024 Mortality Study evaluated mortality rates and causes among both military personnel and civilians, Bove 2024 Mort. Study (JA Ex. 193, D.E. 472-14).

Camp Lejeune Marines to Camp Pendleton Marines was 0.81 (95% CI: 0.56-1.18), which suggested that Marines at Camp Lejeune had a lower incidence of NHL than Marines at Camp Pendleton. *Id.* at 113:6-17. Similarly, the adjusted HR comparing Camp Lejeune civilians to Camp Pendleton civilians is 0.83 (95% CI: 0.26-2.67). *Id.* at 116:8-21. As Dr. Hu conceded at deposition, neither of the 2014 Mortality Studies supports his opinion that there is an association between NHL and exposure to contaminants in the water at Camp Lejeune. Hu GC Dep. Tr. at 113:6-22; 116:14-21 (JA Ex. 162, D.E. 470-1). In sum, Dr. Hu ignored highly relevant Camp Lejeune studies simply because they refuted his opinion. Dr. Hu's failure to acknowledge the 2014 Mortality Studies is inexcusable.

Also inexcusable is Dr. Hu's failure to review the 2024 Cancer Incidence Study in time to incorporate it into his NHL Report. Dr. Hu testified at deposition that he was unaware of the study until it was brought to his attention by Plaintiffs' counsel, when it was too late to include in his initial report. Dr. Hu submitted a supplemental report addressing the 2024 Cancer Incidence Report on January 31, 2025, six weeks *after* Plaintiffs' general causation reports were due. *See* Hu GC Suppl. Rep. (JA Ex. 114, D.E. 466-8). Dr. Hu has offered a general causation opinion on whether VOCs that may have been present in the water at Camp Lejeune can cause NHL, yet he failed to account for studies on Camp Lejeune that addressed the very questions he was tasked with answering.

**E. Drs. Bird, Gilbert, and Mallon Excluded from Their Reports Studies that Were Included in Their Other Disease Reports in this Litigation.**

Plaintiffs' experts also cherry-picked studies for inclusion in their own disease reports. Dr. Bird submitted four reports in this litigation, opining on all of the Track 1 diseases. Dr. Mallon submitted two reports, one on leukemia and on kidney cancer, and Dr. Gilbert submitted three reports, on all four cancers. However, several of the studies that these experts *excluded* for purposes of their analyses on one disease were *included* in their analyses of other diseases.

For example, Dr. Bird cited the *Ruder* (2001) study in his Kidney Cancer Report to show that PCE could cause kidney cancer. D.E. 464-4 at 14 (citing *Ruder* SMR of 1.41 (95% CI: 0.46-3.30) for

kidney cancer and PCE). The same study, however, in the same Table cited by Dr. Bird for kidney cancer, also shows an SMR of 0.76 (95% CI: 0.41-1.30) for lymphatic and hematopoietic cancers and PCE, but this result was excluded from Dr. Bird's Leukemia and NHL Reports.[30] Like Dr. Bird, Dr. Mallon also cited the *Ruder* study in his kidney cancer report: "Elevated but not statistically significant risks [between PCE and kidney cancer] were found by *Ruder* et al. (2001)." D.E. 464-13 at 34. But, like Dr. Bird, Dr. Mallon intentionally excluded the *Ruder* study and its showing of a decreased risk between PCE and lymphatic and hematopoietic cancers from his Leukemia Report. *See generally* D.E. 465-3.

Similarly, both Drs. Bird and Mallon included the *Greenland* (1994) study in their respective Kidney Cancer Reports to support their contention that benzene can cause kidney cancer. D.E. 464-4 at 15 (citing OR of 4.29 (1.33, 13.8) for kidney cancer and benzene); D.E. 464-13 at 29 (same). However, the *Greenland* study also shows a decreased association for benzene and leukemias (OR 0.90 (95% CI: 0.26, 3.08)) and a null association for lymphomas and benzene (OR 1.00 (95% CI: 0.22, 4.53)) in the very same Table cited by both Drs. Bird and Mallon for the kidney cancer results. *Greenland* 1994 at 52, Table 3 (JA Ex. 255, D.E. 480-15). Yet neither expert included the results for leukemias or lymphomas in their reports on leukemia (Drs. Bird, Mallon) or NHL (Dr. Bird).

Dr. Gilbert also excluded numerous studies from her discussion of one disease and included those same studies for other disease reports. As an example, in her bladder cancer report, Dr. Gilbert cited the *Morgan* (1998) study to show an association between the VOCs and bladder cancer, but excluded it from her NHL analysis because it did not show an increased incidence in NHL from increasing exposure to TCE. *Compare* D.E. 463-12 at 12, *with* D.E. 466-2 at 15. As another example, Dr. Gilbert cited the *Spirtas* (1991) study in her Kidney Cancer Report and again in her NHL analysis,

---

[30] Ruder, AM., et al., *Mortality in Dry-cleaning Workers: An Update*, Am. J. Ind. 39 Med. 39 (2001) (**Exhibit 12**).

but excluded it from her leukemia analysis because it did not demonstrate an association between TCE and leukemia.[31] *Compare* D.E. 464-9 at 15, *with* D.E. 466-2 at 14-18. Similarly, Dr. Gilbert cited the *Wartenberg* (2000)[32] meta-analysis in her Kidney Cancer Report to show an association between TCE and kidney cancer, but she excluded the study from her leukemia analysis because *Wartenberg*, which identified 14 cohort studies, did not report an association between TCE and leukemia for any tier of study quality. *Compare* D.E. 464-9 at 15, *with* D.E. 466-2 at 17-18.

Additionally, Dr. Gilbert cited to all four of the Camp Lejeune Cohort studies in her epidemiological assessments for both kidney cancer and leukemia. *See* D.E. 464-9 at 14-15; D.E. 466-2 at 17-18. However, in her epidemiological analysis on NHL, contained within the *same report* as her analysis of leukemia, she cited only two of them—the 2014 Marines Mortality Study and the 2024 Cancer Incidence Study. Further, she admitted that she included the wrong data from the 2014 Marines Mortality Study in her NHL analysis. Gilbert Dep. Tr. at 110:15-111:2 (JA Ex. 165, D.E. 470-4) (acknowledging wrong results). Dr. Gilbert erroneously included the hazard ratios for *Hodgkin's* lymphoma and VOCs, TCE, VC and benzene instead of the hazard ratios for NHL (*non-Hodgkin's* lymphoma). The hazard ratios for Hodgkin's lymphoma all showed increased associated risks above 1.1. D.E. 466-2 at 14. Remarkably, Dr. Gilbert admitted during deposition that she would *not* have included the NHL results from this study in her epidemiological assessment for NHL because the results show a decreased risk of mortality from NHL when comparing Marines at Camp Lejeune to the Marines at Camp Pendleton: HR 0.81 (95% CI: 0.56 – 1.11). D.E. 470-4 at 111:14-113:2 (acknowledging that she "would not have included [2014 Marines Mortality Study]").

[31] Spirtas, R., et al., *Retrospective Cohort Mortality Study of Workers at an Aircraft Maintenance Facility*, 48 Br. J. Ind. Med. (1991) (**Exhibit 13**).

[32] Wartenberg, D., et al., *Trichloroethylene and Cancer: Epidemiologic Evidence,* 108 Environ. Health Persps. Suppl. 2 (2000) (**Exhibit 14**).

The two Camp Lejeune cohort studies that Dr. Gilbert intentionally left out of her NHL analysis, while including the results from those studies in her leukemia analysis and in her kidney cancer analysis, show decreased risks for NHL. The 2014 Civilians Mortality Study showed fewer deaths at Camp Lejeune than at Camp Pendleton, with a hazard ratio of 0.83 (95% CI: 0.26 – 2.67). D.E. 472-10 at 8. And the 2024 Mortality Study showed no increased risk of death from NHL, reporting a risk ratio of 0.87 (95% CI: 0.68 – 1.10) for Navy and Marine personnel and 0.98 (95% CI: 0.61 – 1.58) for civilian personnel. D.E. 472-14 at 6-7. When asked to explain why certain of these studies were left out of her reports, Dr. Gilbert admitted that her epidemiological tables were designed to support her opinions, and if the studies did not support her opinions, "it didn't make sense to put them in the table." D.E. 470-4 at 90:17-91:14; 92:7-93:7. That is the definition of cherry-picking.

Plaintiffs' experts cannot justify why they included studies in one disease report but excluded the same relevant studies from another. The obvious answer is that they relied on these studies only when the studies supported their opinions.

### F. Plaintiffs' Experts Did Not Evaluate Study Quality.

Not only did Plaintiffs' experts unreliably *exclude* studies from their literature review; they also unreliably *included* methodologically weaker studies that supported their opinions. An expert must consider study limitations, such as study design, bias, and confounding. *In re Acetaminophen – ASD-ADHA Prods. Liab. Litig.*, 707 F. Supp. 3d 309, 322 (S.D.N.Y. 2023) (excluding expert, in part, for failing to consider study limitations); Fed. Judicial Ctr., *Reference Manual on Scientific Evidence* 553, 598 (3d ed. 2011) ("RMSE") (noting that chance, bias, study design, and confounding must all be considered); *see also* Savitz 2023 at 110, 133 (JA Ex. 293, D.E. 484-4). Plaintiffs' experts could have applied a number of objective criteria for including a study based on the study's robustness. But here, their reviews did not reflect a reliable application of those principles and methods to assess the quality of the studies.

For example, Dr. Gilbert admitted that she did not take into account a study's confidence interval when including it in her report, Gilbert Dep. Tr. at 58:5-9 (JA Ex. 165, D.E. 470-4). In fact, many of the studies Dr. Gilbert relied on have wide and statistically insignificant confidence intervals. From Dr. Gilbert's NHL assessment, she cited: *Anttila* TCE results, SIR 3.24 (95% CI: 0.67-9.45), and PCE results SIR 3.2 (95% CI: 0.39-11.6); *Blair* Female PMR 3.8 (95% CI: 0.8-18.9); *Cocco* OR 2.2 (95% CI: 0.7-6.7); *Seidler* PCE results OR 3.2 (95% CI: 0.6 -16.7); and *Spirtas* SMR 2.86 (95% CI: 0.78-7.31).[33] *See* Savitz 3d Dep. Tr. at 22:13-17 (JA Ex. 154, D.E. 469-8) (the wider the confidence interval, the less precision there is in the result); *see also* Mar. 26, 2025 Hr'g Tr., D.E. 343, at 33 (noting the importance of confidence intervals: "I don't see confidence intervals anywhere in these [ATSDR] models, and *there has to be for them to be scientifically valid*." (Myers, C.J.) (emphasis added)).

As another example, although Dr. Hu claims "to have identified and relied upon studies and reports that, in [his] opinion, comprise the most rigorous and authoritative documents relevant to the issues inherent in this evaluation," Hu Rep. at 7 (JA Ex. 111, D.E. 466-5), several of the studies he relied upon do not meet these criteria. Dr. Hu cites to *Hardell* (1994)[34] as a study that he claims provides evidence of "a strong association between TCE exposure and NHL." *Id.* at 22-23. As Dr. Hu stated in his Report, Hardell "found an Odds Ratio for the association of TCE with NHL of 7.2 (95% CI: 1.3-42)." *Id.* at 23. At deposition, however, Dr. Hu, acknowledged that the Hardell study's odds

[33]Additionally, although Dr. Gilbert acknowledged that confounding biases were important in evaluating a study's quality and indicated that she had "evaluated [the studies] for whether possible confounding variables -- such as exposure to smoking or other risk factors -- were taken into account," Dr. Gilbert merely checked a box in each of her epidemiological tables noting a whether a particular study included a confounder adjustment. *See* Gilbert Rep. at 14-18 (JA Ex. 108, D.E. 466-2). Other than checking a box, however, Dr. Gilbert failed to discuss, analyze, or weigh whether the studies she cited sufficiently controlled for confounding bias.

[34] Hardell, L., et al., *Exposure to Phenoxyacetic Acids, Chlorophenols, or Organic Solvents in Relation to Histopathology, Stage, and Anatomical Localization of Non-Hodgkin's Lymphoma*, 54 Cancer Res. 9 (1994) (**Exhibit 15**).

ratio was based on only four NHL exposure cases, which resulted in the "large and imprecise" confidence interval of 1.3 to 42. Hu GC Dep. Tr. at 172:10-19; 173:5-8 (JA Ex. 162, D.E. 470-1). Dr. Hu further acknowledged that "a wider confidence interval weakens the interpretation [of a risk estimate] with respect to precision," and that both strength of association and precision are needed for a study to support a causal connection. *Id.* at 54:12-16; 55:5-8.[35] Similarly, Dr. Hu cited to *Xu* et al (2003)[36] as a study that "provides evidence of a strong association between benzene exposure and NHL" "finding an odds ratio of 2.78 (95% CI: 1.68-14.32)" *Id.* at 38; Hu Rep. at 38-39 (JA Ex. 111, D.E. 466-5). At his deposition, Dr. Hu acknowledged not only that the confidence interval of this study was wide, but also that the 2018 IARC working group had found the study to be low quality and excluded the study from its evaluation and analysis based on the study's inadequate exposure assessment. Hu GC Dep. Tr. at 238:4-239:2; 225:14-225:21 (JA Ex. 162, D.E. 470-1).

Drs. Bird, Gondek, and Mallon all similarly relied on studies with wide confidence intervals. For example, they all relied heavily on the *Aschengrau* (1993) study to support their opinions that TCE and PCE can cause leukemia. *See* D.E. 465-8 at 25 (Bird); D.E. 465-1 at 22 (Gondek); D.E. 465-3 at 35 (Mallon). However, *Aschengrau* only reported increased risk of leukemia with very wide confidence intervals.[37] Dr. Hu also cited *Aschengrau* for NHL, but admitted at deposition that

[35] Dr. Hu further conceded at deposition that both IARC and NTP noted significant faults with the *Hardell* study. D.E. 470-1 at 174:23-175:2. Specifically, NTP found the study to be of low quality, observing that the "high increased risk reported by Hardell, et al., should be viewed with caution because it was based on small numbers of exposed cases and controls, and [the] study had several methodological limitations." *Id.* at 173:18-174:13.

[36] Xu et al., *A Case-control Study for Assessing the Relation Between Incidence of Malignant Lymphoma and Environmental Factors in Sichuan Province*, 24 Chinese J. Epidemiology 10 (October 2003) (**Exhibit 16**).

[37] *See, e.g.*, Aschengrau 1993 at 284 (JA Ex. 216, D.E. 478-7) (reporting an adjusted odds ratio of 1.96 (95% CI: 0.71-5.37) with latency and an adjusted odds ratio of 2.13 (95% CI: 0.88-5.19) without latency; and among subjects whose exposure level was over the 90th percentile, an adjusted odds ratio of 5.84 (95% CI: 1.37-24.91) with latency and an adjusted odds ratio of 8.33 (95% CI: 1.53-45.29) without latency).

*Aschengrau* presented no data for NHL. Hu Dep. Tr. at 101:24-102:7 204 (JA Ex. 162, D.E. 470-1). Dr. Bird relied on *Costas* (2002), a childhood leukemia study observing rates of childhood leukemia based on maternal consumption of contaminated water with an *extremely wide* confidence interval, with a risk ratio of 14.0 (95% **CI: 0.92-224.52**). D.E. 465-8 at 38. Dr. Mallon also cited *Costas*, but failed to even mention the risk estimate or confidence interval. *See* D.E. 465-3 at 35. Dr. Gondek relied on the *Stenehjem* (2015) study showing a hazard ratio for AML of 2.18 (95% CI: 0.41-10.00) and, in the highest exposure category, a hazard ratio of 4.84 (95% CI: 0.88-27.00). D.E. 465-1 at 16. Finally, Dr. Mallon relied heavily on the *Glass* (2003) study, which reported an increased risk of leukemia with odds ratios of 3.9 (95% CI: 0.9-17.1) and 6.1 (95% CI: 1.4-26). *See* D.E. 465-3 at 24. These are just a few examples of instances in which Plaintiffs' experts included methodologically weaker studies to support their opinions, while excluding the majority of the relevant literature.

By failing to discuss the vast majority of the studies unfavorable to their opinions, each expert "fail[ed] to account for contrary scientific literature." *Yates*, 113 F. Supp. 3d at 858. They failed to even acknowledge many relevant studies "contain[ing] evidence tending to refute [their] theor[ies]." *Id*. With respect to the 173 studies showing no increased risk or no statistically significant association between the VOCs and leukemia or NHL, Plaintiffs' experts failed in various ways to "acknowledge or account for that evidence" – rendering their opinions unreliable. *Id*. Although Drs. Bird, Gondek, Gilbert, Mallon, and Hu might not be required to cite *every* relevant study,[38] the substantial deficiencies in their analyses show that their opinions lack a sufficient basis and are the product of an unreliable methodology.

[38] *See* Fed. R. Evid. 702 committee note to 2023 amendment ("*If the court finds it more likely than not that an expert has sufficient basis to support an opinion*, the fact that the expert has not read every single study that exists will raise a question of weight and not admissibility.") (emphasis added).

## III. Experts Must Not Cherry-Pick Results from Within the Literature on Which They Relied.

Related to ignoring a study's limitations, when an expert discusses only "findings within studies" that "support [the expert's] conclusions" while "disregard[ing] contrary data," the opinion is unreliable. *Daniels-Feasel v. Forest Pharms., Inc.*, No. 17 CV 4188-LTS-JLC, 2021 WL 4037820, at *16 (S.D.N.Y. Sep. 3, 2021), *aff'd*, 2023 WL 4837521 (2d Cir. July 28, 2023); *see also*, *e.g.*, *In re Acetaminophen*, 707 F. Supp. 3d at 357 (excluding expert, in part, because he "repeatedly cherry picks isolated findings in studies" and "ignores inconsistent results"); *Burst*, 2015 WL 3755953, at *13-14 (excluding plaintiff's expert, in part, because he failed to discuss the pertinent results of several studies he relied on that contradicted his opinions in case alleging AML was caused by exposure to gasoline).

### A. Plaintiffs' Experts Cherry-Picked Results from Within the Camp Lejeune Studies.

Here, all of Plaintiffs' experts chose results from within studies they relied upon that supported their opinions but conveniently ignored results in those same studies that were contradictory to their opinions. In other words, they were unreliably selective in which findings within a study were "important" enough to discuss in their reports. This occurred most notably within the Camp Lejeune cohort studies, which are highly relevant to this case. *See*, *e.g.*, Bird GC Rep. (Kidney) at 34 (JA Ex. 83, D.E. 464-4) (describing the Camp Lejeune studies as "of most importance").

#### 1. *Dr. Gondek*

The four Camp Lejeune Cohort studies all included results for leukemia. Plaintiffs' expert Dr. Gondek relied on all four studies, but carefully carved around any results that were contrary to his opinions, thereby sculpting a misleading presentation of the studies' overall results. For example, Dr. Gondek reported the overall leukemia result from only one of these four studies, the 2014 Civilians Mortality Study, which among all four cohort studies is the result with the highest hazard ratio for leukemia (a statistically insignificant HR of 1.59 (95% CI: 0.66, 3.84)). Gondek GC Dep. Tr. at 118:3–20 (JA Ex. 160, D.E. 469-14); Gondek Rep. at 23 (JA Ex. 96, D.E. 465-1). From the other three Camp

Lejeune Cohort studies, Dr. Gondek omitted leukemia results entirely and instead reported elevated risk results for *unrelated cancers* like esophageal and breast cancer. D.E. 469-14 at 71:3–11; D.E. 465-1 at 23. When asked why he chose to report on cancers that were not at issue, he said only that "they were part of the studies." D.E. 469-14 at 71:3–11. Yet, although he conceded that it would have been more relevant to his report to provide the leukemia results, *id.* at 71:19-72:7, he obviously chose not to include them because they failed to show statistically significant increased risks.[39]

Dr. Gondek also produced two specific causation reports in this litigation for two bellwether leukemia cases, one involving AML, and the other involving ALL. Despite this, from the 2024 Cancer Incidence study, Dr. Gondek cited only the AML findings but omitted ALL results, which failed to show increased risks (Navy/Marine personnel aHR 0.94 (95% CI: 0.53 – 1.67); civilian personnel HR 0.27 (95% CI: 0.03 – 2.63). *Id.* at 118:22-120:4.

**2. *Dr. Gilbert***

Dr. Gilbert was also unreliably selective in choosing which results to report. In attempting to show an association between the VOCs at Camp Lejeune and NHL, Dr. Gilbert cited selective findings in the dose-response analysis from the 2024 Camp Lejeune Cancer Incidence Study, which reported results for both Marine and civilians at Camp Lejeune compared to Camp Pendleton. This analysis was meant to look for dose-response relationships, not to draw comparative conclusions about actual risk for certain cohorts; indeed, the numbers were too small to yield statistically significant results as demonstrated by the relatively wide confidence intervals. Nevertheless, Dr. Gilbert cited the hazard

---

[39] Among the results excluded by Dr. Gondek**,** the 2014 Marine Mortality Study reported an HR of 1.11 (95% CI: 0.75, 1.62) for leukemia-related mortality among military personnel at Camp Lejeune compared to Camp Pendleton; the 2024 Mortality Study reported a leukemia SMR of 1.13 (95% CI: 0.89, 1.13) for military personnel at Camp Lejeune compared to Camp Pendleton and a leukemia SMR of 1.00 (95% CI: 0.61, 1.64) for civilian employees at Camp Lejeune compared to Camp Pendelton; the 2024 Cancer Incidence Study reported an aHR of 1.07 (95% CI: 0.91, 1.25) for leukemia incidence among military personnel at Camp Lejeune compared to Camp Pendleton and an aHR of 0.86 (95% CI: 0.54, 1.36) for leukemia incidence among civilian employees at Camp Lejeune compared to Camp Pendleton.

ratio of 1.31 (95% CI: 0.84-2.03) from the *low/medium duration category* for Camp Lejeune civilians compared to Camp Pendleton civilians. Gilbert Rep. at 32 (JA Ex. 108, D.E. 466-2). Dr. Gilbert failed to report the hazard ratio of 1.05 (95% CI: 0.62, 1.80) for civilians in the *high duration exposure category*. Bove 2024 Cancer Incid. Study at Table 6 (JA Ex. 191, D.E. 472-12). This omission is significant because, as Dr. Savitz explains, the existence of a positive monotonic dose-repose relationship—i.e., greater exposures consistently increasing the incidence of disease—is an important factor supporting a causal relationship. Savitz 3d Dep. Tr. at 132:8-17 (JA Ex. 154, D.E. 469-8); *see also id.* at 88:12-18; Savitz 2023 at 76 (JA Ex. 293, D.E. 484-4); RMSE at 603. And, just as a positive "dose-response gradient supports a causal effect, the absence of such a gradient calls it into question." D.E. 484-4 at 82; D.E. 469-8 at 136:3-11. By discussing only the low/medium exposure category and not the high exposure category, Dr. Gilbert took the value out of context and failed to acknowledge the lack of a dose-response relationship—a quintessential example of in-study cherry-picking.

Further, Dr. Gilbert failed to report that the risk results for Marines stationed at Camp Lejeune compared to Marines at Camp Pendleton failed to show any dose-response relationship and were below her threshold of 1.1 for the *low duration* category (HR 1.02 (95% CI: 0.89 – 1.17)) (on Base approximately 3 months – 1.5 years), for the *medium duration* category (HR 1.01 (95% CI: 0.83 – 1.24)) (on Base 1.75 years to 2.5 years), and for the *high duration* category (HR 1.00 (95% CI: 0.79 – 1.26)) (on Base more than 2.5 years). Bove 2024 Cancer Incid. Study at Table 5 (JA Ex. 191, D.E. 472-12).

In her report, Dr. Gilbert purported to assess and "best identify those studies with the highest utility" by selecting studies from the longest duration categories: "Exposure miscalculation can be lessened if the results were observed in the population determined to be the most likely exposed to the **highest concentrations** of TCE or exposed for the **longest duration.** Thus, values associated with the highest or most likely exposure to TCE were shown here." Gilbert Rep. at 13 (JA Ex. 108, D.E. 466-2) (emphasis added); *see also id.* ("ORs [odds ratios] for the **highest or most likely TCE exposure** . .

. were included in the [epidemiolocal] tables.") (emphasis added). Here, by reporting results in the low/medium exposure category (but not the high exposure category), Dr. Gilbert ignored her own criteria and simply chose the result associated with the highest risk. Cherry-picking selective values in dose-response analysis out of context, as Dr. Gilbert did, is unreliable and misleading.

### *3. Dr. Bird*

Dr. Bird, who opined on both leukemia and NHL, cited two hazard ratios from the 2024 Mortality Study indicating an increased risk of leukemia mortality in Camp Lejeune military personnel when compared to Camp Pendleton, Bird Rep. at 43 (JA Ex. 103, D.E. 465-8). But Dr. Bird completely ignored the hazard ratio for NHL (two lines above the leukemia finding), indicating a 13% *decrease* in NHL in the very same cohort, *See* Bove 2024 Mort. Study at 8 (JA Ex. 193, D.E. 472-14).

Dr. Bird made the same error as Dr. Gilbert in highlighting selective numbers from the dose-response analysis out of context while failing to acknowledge the absence of a dose-response relationship which calls into question any conclusion of a causal effect. In his discussion of the 2024 Cancer Incidence Study, Dr. Bird reported that Marines and Navy personnel had a leukemia hazard ratio of 1.11 (95% CI: 0.92–1.33) in the low duration exposure category and that the "risk was even greater for AML," with a hazard ratio of 1.36 (95% CI: 0.97, 1.90) in the low duration category. D.E. 465-8 at 43-44. However, Dr. Bird excluded from his report results showing that Marines in the medium duration category (i.e., those who were at Camp Lejeune longer and with more exposure) had a *decreased* risk of leukemia compared to Marines at Camp Pendleton, aHR 0.91 (95% CI: 0.69 – 1.21), and that the risk for AML also *decreased* in the medium exposure category aHR 1.11 (95% CI: 0.61 – 1.58). Bove 2024 Cancer Incid. Study at Table 5 (JA Ex. 191, D.E. 472-12). By discussing only the low exposure category, Dr. Bird took the value out of context and failed to acknowledge the lack of a dose-response relationship.

#### 4. *Dr. Mallon*

Like Dr. Gondek, Dr. Mallon cited misleading results from the 2024 Cancer Incidence Study by noting its findings of increased risk of myeloid cancers, and myelodysplastic and myeloproliferative syndromes, while ignoring the same study's findings for *leukemias*, which showed an adjusted HR of only 1.07 (0.91, 1.25) for Navy and Marine personnel at Camp Lejeune. Mallon Rep. at 10 (JA Ex. 98, D.E. 465-3); *see also* Mallon GC Dep. Tr. at 189:17-196:16 (JA Ex. 151, D.E. 469-5). Further, from the 2024 Mortality Study, Dr. Mallon cited results for leukemia subtypes AML and chronic myeloid leukemia ("CML"), while ignoring the ALL-subtype results showing a decreased risk of mortality for Marines at Camp Lejeune compared to Camp Pendleton. *See* D.E. 465-3 at 9-10. Even though there are no leukemia bellwether cases involving CML, Dr. Mallon apparently chose to use the CML result because it was elevated. *Id.* In sum, Dr. Mallon searched the Camp Lejeune studies for any results that supported his conclusions and avoided those that did not.

#### 5. *Dr. Hu*

Finally, like all of the other experts, Dr. Hu also cherry-picked from within the studies cited in his reports, including the 2024 Bove Cancer Incidence Study. Dr. Hu concluded that the Cancer Incidence study provides direct evidence that the combination of TCE, PCE, and benzene at the levels of exposure experienced at Camp Lejeune is "more likely than not" a risk factor for NHL. Hu GC Suppl. Rep. at 2-3 (JA Ex. 114, D.E. 466-8). As evidence, Dr. Hu noted that compared with Camp Pendleton, Camp Lejeune military personnel had adjusted hazard ratios (aHRs) ≥1.20 for lymphoma subtypes mantle cell and marginal zone B-cell. *Id.* at 2. But Dr. Hu omitted the fact that NHL overall among the Camp Lejeune military members was essentially null (aHR 1.01 (95% CI: 0.90, 1.14), and that NHL subtypes follicular and Diffuse large B-cell had either very slightly increased or decreased incidence, respectively. Bove 2024 Cancer Incid. Study at Table 3 (JA Ex. 191, D.E. 472-12). Similarly, in his report's discussion of the 2024 Bove Mortality Study, Dr. Hu fails to mention that the study showed a higher percentage of both Marine and civilian cohort deaths at *Camp Pendleton*

attributed to NHL than at Camp Lejeune. Hu Dep. Tr. at 120:13-123:17 (JA Ex. 162, D.E. 470-1). Once again, this is an example of an expert who selectively chose results from a study to support his opinion and excluded results that did not, thereby misrepresenting the studies' overall findings.

### B. Plaintiffs' Experts All Cherry-Picked Results from Within Other Epidemiological Studies on Which They Relied.

Plaintiffs' experts also all uniformly relied on cherry-picked data from within epidemiological studies not specifically about Camp Lejeune. As an example, both Drs. Gondek and Bird cited the *Talibov* (2014) study for its TCE results, but failed to mention the study's reported results for benzene exposure and leukemia, which showed no-dose response trend and risk ratios at null and below.[40] D.E. 465-1 at 19-20 (citing *Talibov* (2014) for TCE results only); D.E. 465-8 at 15, 32 (same). Similarly, Drs. Mallon and Gondek cited *Greenland* (1994) for its statistically insignificant slightly elevated risk of leukemia with TCE exposure but failed to report same study's results for benzene and leukemia, which showed statistically insignificant risks below null in the direct exposure category and slightly elevated in the highest exposure category. Mallon Rep. at 13 (JA Ex. 98, D.E. 465-3); Gondek Rep. at 19 (JA Ex. 96, D.E. 465-1). Dr. Bird discussed the *Silver* (2014) study's results for TCE and leukemia only but failed to mention the corresponding result for NHL and TCE, a hazard ratio of 0.87 (95% CI: 0.57-1.35).[41] *See* Bird Rep. at 32 (JA Ex. 103, D.E. 465-8). Dr. Hu likewise extrapolated what he deemed favorable PCE exposure data from *Radican* (2008) and *Boice* (1999),[42] but failed to mention that both of these studies also examined TCE and found no significant associations between TCE exposure and NHL. Hu GC Dep. Tr. at 215:16-20; 216:8-14; 217:19-218:3 (JA Ex. 162, D.E. 470-1).

---

[40] Talibov, M., et al., *Occupational Exposure to Solvents and Acute Myeloid Leukemia: A Population-based, Case-control Study in Four Nordic Countries*, 40 Scand. J. Work Environ. Health 5 (2014) (**Exhibit 17**).

[41] *Silver* 2014 (JA Ex. 301, D.E. 484-12).

[42] *Radican* 2008 (JA Ex. 288, D.E. 483-7); Boice 1999 (JA Ex. 222, D.E. 478-13).

Plaintiffs' experts also cited partial results from within studies that do not accurately represent the overall findings. For example, Dr. Gilbert relied on the *Fagliano* (1990) study in her leukemia analysis, an ecologic study that measured VOC contamination of drinking water in New Jersey, and which did not separate out TCE individually.[43] Dr. Gilbert cited *Fagliano's* result for VOC & Females only (SIR 1.53). She ignored the study's results showing there was no association for males in any exposure category. Similarly for the *Hansen* (2013) study cited in her leukemia analysis, Dr. Gilbert reported the standard incidence ratio for Males only (SIR 1.19); however, the study did not observe an increase in leukemia incidence in its analysis of men and women combined (SIR = 1.06, 95% CI: 0.67-1.60). *Hansen* 2013 at 5 Table 2 (JA Ex. 259, D.E. 481-3). Similarly, Dr. Hu cited the *Cohn* (1994) study's NHL risk ratio of 1.36 (95% CI: 1.08-1.70), Hu Rep. at 12 (JA Ex. 111, D.E. 466-5), but failed to mention that the 1.36 risk ratio was only for women and that the study found no statistically significant increased risk ratio among men. Hu GC Dep. Tr. at 105:9-106:17 (JA Ex. 162, D.E. 470-1).

Here, all of Plaintiffs' experts "repeatedly cherry pick[ed] isolated findings in studies" and "ignore[d] inconsistent results." *In re Acetaminophen*, 707 F. Supp. 3d at 357. This "suggests a methodology driven by an attempt to achieve a particular result" in this litigation. *Burst*, 2015 WL 3755953, at *14. Plaintiffs' own expert, Dr. Savitz, described the appropriate rigor applied by experts within the field. A reliable researcher should not "just isolate and zero [their] attention in on a single number and a single table;" rather "a more informative approach" is to "describe[e] the overall constellation of evidence." Savitz 3d Dep. Tr. at 169:13-17 (JA Ex. 154, D.E. 469-8). As Dr. Savitz summed up the issue, if "I am looking for positive results and any glimmer I find, I'm going to cite," then the researcher is cherry-picking and the methodology is unreliable. *Id.* at 168:5-16.

---

[43] Fagliano J., et al., *Drinking Water Contamination and the Incidence of Leukemia: an Ecologic Study*, Am. J. Pub. Health (Oct 1990) (**Exhibit 18**).

Because Drs. Bird, Gondek, Gilbert, Mallon, and Hu failed to apply the same level of intellectual rigor to their literature review here, their opinions are inadmissible. *See Kumho Tire*, 526 U.S. at 152. Although researchers in the field apply formal search criteria, none of these experts could show that they did so here. And even if they could, their review of the literature was inconsistent in studies and findings. The only aspect of their literature review that *was* consistent was the selective highlighting of findings that supported their conclusions and the side-stepping of findings that contradicted their conclusions.

**CONCLUSION**

Based on the foregoing, the Court should grant this Motion and exclude these experts' general causation opinions.

Dated: September 10, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General,
Civil Division

JONATHAN GUYNN
Deputy Assistant Attorney General,
Torts Branch

BRIDGET BAILEY LIPSCOMB
Chief, Camp Lejeune Justice Act Section

ADAM BAIN
Special Litigation Counsel

ALLISON O'LEARY
AMY KLIMEK
ALANNA HORAN
GIOVANNI ANTONUCCI
MATTHEW ELLIOTT
WILLIAM V. KLOTZBUCHER
JENNIFER E. ADAMS
MARCUS TUBIN
DAVID ORTIZ
PATRICK RYAN
Trial Attorneys

*<u>/s/ Traci McKeever</u>*
TRACI MCKEEVER
TN Bar No. 020704
Trial Attorney
United States Department of Justice
Civil Division, Torts Branch
Camp Lejeune Justice Act Section
1100 L Street, NW
Washington, DC 20005
(202) 616-9296
traci.c.mckeever@usdoj.gov

Attorney inquiries to DOJ regarding CLJA:
(202) 353-4426

*Attorneys for Defendant,*
*United States of America*

## CERTIFICATE OF SERVICE

I hereby certify that on September 10, 2025, I electronically filed the foregoing using the Court's Electronic Case Filing system, which will send notice to all counsel of record.

*/s/ Traci McKeever*
TRACI MCKEEVER