IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
Civil Action No.: 7:23-CV-00897

| | |
|---|---|
| IN RE: | ) |
| | ) |
| CAMP LEJEUNE WATER LITIGATION | ) |
| | ) |
| This Pleading Relates to: | ) |
| | ) |
| Jefferson Criswell (7:23-cv-01482-M-BM) | ) |
| Mark Cagiano (7:23-cv-00569-M-RN) | ) |
| Terry Dyer (7:23-cv-00357-M-RJ) | ) |
| Jimmy Laramore (7:23-cv-00594-M) | ) |
| David Downs (7:23-cv-01145-BO-BM) | ) |
| David Fancher (7:23-cv-00275-BO-BM) | ) |
| Allan Howard (7:23-cv-00490-BO) | ) |
| Frank Mousser (7:23-cv-00667-BO-RN) | ) |
| Jacqueline Tukes (7:23-cv-01553-BO-BM) | ) |
| Karen Amsler (7:23-cv-00284-D-BM) | ) |
| Stephen Connard (7:23-cv-01557-D-RN) | ) |
| Joseph Gleesing (7:23-cv-01486-D) | ) |
| Bruce Hill (7:23-cv-00028-D-KS) | ) |
| Ronald Carter (7:23-cv-01565-D-KS) | ) |
| Cometto Davis (7:23-cv-00043-D-BM) | ) |
| Scott Keller (7:23-cv-01501-D) | ) |
| Robert Kidd (7:23-cv-01489-D) | ) |
| | ) |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' LEADERSHIP GROUP'S MOTION TO EXCLUDE EXPERT DR. MICHAEL J. MCCABE, JR.**

## TABLE OF CONTENTS

**Page**


I. INTRODUCTION ..... 1

II. LEGAL STANDARD ..... 3

III. DR. MCCABE'S BACKGROUND & OPINIONS ..... 5

IV. ARGUMENT ..... 7

- A. Dr. McCabe's Methodology Is Unreliable Because He Applied Bradford Hill Incorrectly. ..... 7
  - 1. Dr. McCabe Misapplied the Biological Plausibility Factor by Demanding Mechanistic Certainty. ..... 10
  - 2. Dr. McCabe's Concessions on Immunotoxicity Undermine His Rejection of Plausibility. ..... 12
  - 3. Dr. McCabe Demands an Impossible Standard that Neither Science nor Law Requires. ..... 15
- B. Dr. McCabe's Opinions Do Not "Fit" the Case Because He Failed to Consider the Full Range of Biologically Plausible Pathways (Combined Mechanisms). ..... 17
- C. Dr. McCabe's Opinions Reduce to Ipse Dixit and Parroting of Defense Epidemiologists Rather than an Independent Methodology. ..... 18
- D. Dr. McCabe Applied No Legal Causation Standard and Therefore Cannot Assist the Trier of Fact. ..... 20

V. CONCLUSION ..... 21

## TABLE OF AUTHORITIES

**Page**

**Cases**

*In re Abilify (Aripiprazole) Prods. Liab. Litig.*,
299 F. Supp. 3d 1291 (N.D. Fla. 2018)....................8, 11, 12, 13

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993).................... *passim*

*In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Prods. Liab. Litig.*,
546 F. Supp. 3d 666 (S.D. Ohio 2021) ....................20

*In re Ethicon Inc. Pelvic Repair Sys. Prod. Liab. Litig.*,
MDL No. 2327, 2018 WL 11245148 (S.D. W. Va. July 26, 2018)....................4

*Funderburk v. S.C. Elec. & Gas Co.*,
395 F. Supp. 3d 695 (D.S.C. 2019)....................4, 20

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997)....................8, 17, 20

*In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Litig.*,
509 F. Supp. 3d 116 (D.N.J. 2020) ....................8, 10

*Kadel v. Folwell*,
620 F. Supp. 3d 339 (M.D.N.C. 2022) ....................4

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)....................4, 17

*In re Neurontin Mktg., Sales Pracs., & Prods. Liab. Litig.*,
612 F. Supp. 2d 116 (D. Mass. 2009) ....................13

*Nix v. Chemours Co. FC*,
No. 7:17-CV-189-D, 7:17-CV-197-D, 7:17-CV-201-D, 2023 WL 6471690 (E.D.N.C. Oct. 4, 2023) ....................4

*Wehling v. Sandoz Pharms. Corp.*,
162 F.3d 1158, No. 97-2212 (4th Cir. 1998) ....................5

*Westberry v. Gislaved Gummi AB*,
178 F.3d 257 (4th Cir. 1999) ....................11

*Yates v. Ford Motor Co.*,
113 F. Supp. 3d 841 (E.D.N.C. 2015)....................4



Case 7:23-cv-00897-RJ Document 598 Filed 09/10/25 Page 3 of 28

<u>**TABLE OF AUTHORITIES**</u>

**Page**

**Rules**

Federal Rule of Evidence 702 ........................................................................................ *passim*

Pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and for the reasons that follow, the Plaintiffs' Leadership Group ("PLG") respectfully moves the Court to exclude the general causation opinions of Michael J. McCabe, Jr., Ph.D.[1]

## I. INTRODUCTION

The government has designated general causation expert Dr. Michael J. McCabe to offer a narrow opinion on "biological plausibility, by addressing whether perturbation of the immune system and inflammatory processes by TCE, PCE, benzene, and vinyl chloride, alone or in combination with one another, may be linked as valid mechanisms involved in the etiology of [kidney cancer, bladder cancer, NHL, and leukemia]." McCabe Rep. (NHL-Leuk) at 6–7 (JA Ex. 113, D.E. 466-7); McCabe Rep. (Bladder) at 9 (JA Ex. 80, D.E. 464-1); *see also* McCabe Rep. (Kidney) at 9 (JA Ex. 95, D.E. 464-16). Dr. McCabe concedes that he does not offer an opinion on whether these chemicals cause any of the diseases at issue and that he did not conduct a weight-of-the-evidence evaluation. He further acknowledges that trichloroethylene (TCE) and benzene are immunotoxic and that immunosuppression is a recognized risk factor for the development of cancer. Despite these concessions, he ultimately concludes that "studies do not show that modulation of the immune system is a plausible mechanistic pathway by which TCE, PCE, benzene, and vinyl chloride cause [kidney cancer/bladder cancer]." McCabe Rep. (Bladder) at 6 (JA Ex. 80, D.E. 464-1); McCabe Rep. (Kidney) at 6 (JA Ex. 95, D.E. 464-16);

[1] In addition to the Plaintiffs listed in the case caption, Dr. McCabe also testified as to the cases of Plaintiffs Edward Raymond, Sr. (7:23-cv-00546), Robert Fiolek (4:23-cv-00062), and Jose Vidana (7:23-cv-01575). Dr. McCabe's testimony is not admissible in those cases for the same reasons stated here. On September 9, 2025, Plaintiffs Raymond, Fiolek, and Vidana accepted settlement offers. Plaintiffs therefore do not include their cases in this motion. Should these Plaintiffs' cases proceed for any reason, Plaintiffs reserve the right to apply the arguments made here to those cases, and to supplement these arguments if the Court permits.

*see also* McCabe Rep. (NHL-Leuk) at 2 (JA Ex. 113, D.E. 466-7) ("studies do not show that modulation of the immune system is a plausible mechanism by which TCE, PCE, and vinyl chloride cause NHL or leukemia, nor is it a plausible mechanism by which benzene causes NHL or most leukemias.").

That conclusion is inadmissible under Rule 702 for several reasons. First, Dr. McCabe misapplies the Bradford Hill framework by demanding mechanistic certainty that even Sir Austin Bradford Hill himself expressly rejected. Biological plausibility requires only consistency with current scientific knowledge, not definitive proof of every step in the causal chain. Such a burden is a biological impossibility. By redefining plausibility into a requirement of absolute proof, Dr. McCabe imposes a litigation-driven standard that no toxic tort plaintiff—or scientist—could ever satisfy.

Second, his testimony does not "fit" the case. Plaintiffs do not contend that immunotoxicity acts alone to cause these cancers. The scientific evidence shows that immunotoxicity interacts with other mechanisms—such as genotoxicity, oxidative stress, and metabolic activation—to promote cancer. Dr. McCabe does not evaluate these combined pathways and instead limits his critique to a single slice of biology, ensuring his testimony does not address the actual causation theory before the Court.

Third, what remains is merely *ipse dixit* rather than an independent methodology. Dr. McCabe insists he is not relying on the government's epidemiologists and is instead conducting his own independent mechanistic analysis. Yet his own reports belie that claim. In his report, he carves out a narrow exception—acknowledging that immunotoxicity caused by benzene could be a cause of acute myeloid leukemia (AML). He does so only because the defense epidemiologists have already conceded that point. The mechanistic evidence he cites for benzene and AML is no

different from the evidence supporting immunotoxicity as a biologically plausible pathway for TCE/Benzene and the other cancers at issue here. If he accepts that evidence as sufficient for benzene and AML, consistency requires that he accept it for the other chemicals and cancers as well. But while he demands impossible proof for every other chemical and disease, he accepts the benzene–AML link at face value because the defense epidemiologists do not deny it. That double standard underscores both the absence of an independent analysis, his flawed methodology, and the litigation-driven nature of his opinions.

Finally, Dr. McCabe admits he does not know and did not apply the governing causation standard under the Camp Lejeune Justice Act. Instead, he applied a personal standard of certainty far more stringent than the statute requires. Expert testimony that disregards the applicable legal standard cannot assist the trier of fact.

Because Dr. McCabe abandoned the accepted scientific framework, imposed an impossible evidentiary burden, and failed to apply the governing legal standard, his opinions are neither reliable nor relevant. They should be excluded in full.

## II. LEGAL STANDARD

Expert testimony is admissible only if the expert is qualified, the testimony is relevant, and the testimony is based on reliable scientific methodology. *Daubert*, 509 U.S. at 594–95; Fed. R. Evid. 702. As the proponent of Dr. McCabe's testimony, DOJ has the burden of showing it to be reliable. *See* Fed. R. Evid. 702 (requiring proponent to demonstrate "to the court that it is more likely than not" that, *inter alia*, "the testimony is the product of reliable principles and methods").

In assessing reliability, courts consider factors such as: (1) whether a theory or technique can be (or has been) tested; (2) whether it has been subjected to peer review and publication; (3) its potential rate of error; (4) whether standards exist to control the technique's operation; and (5)

the degree of acceptance of the methodology within the relevant scientific community. *Daubert*, 509 U.S. at 593–94; *Nix v. Chemours Co. FC*, No. 7:17-CV-189-D, 7:17-CV-197-D, 7:17-CV-201-D, 2023 WL 6471690, at *7 (E.D.N.C. Oct. 4, 2023). The objective of the reliability requirement is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Responsive and rebuttal experts are obligated to demonstrate that they used reliable methodology both in forming their opinions and in critiquing those of Plaintiffs' experts. *See In re Ethicon Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, MDL No. 2327, 2018 WL 11245148, at *3 (S.D. W. Va. July 26, 2018); *see also Funderburk v. S.C. Elec. & Gas Co.*, 395 F. Supp. 3d 695, 716–17 (D.S.C. 2019).

The "relevance" inquiry—often described as "fit"—asks whether the testimony is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591; *Yates v. Ford Motor Co.*, 113 F. Supp. 3d 841, 845 (E.D.N.C. 2015). "Fit is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Daubert*, 509 U.S. at 591–92.

Another consideration is whether the expert developed his opinions independent of litigation. Courts recognize that "one very significant fact" is whether the opinion "grow[s] naturally and directly out of research [the expert] ha[s] conducted independent of the litigation, or whether [the expert] [] developed their opinions expressly for purposes of testifying." *Daubert*, 43 F.3d at 1317; Fed. R. Evid. 702, Advisory Comm. Notes (2000 Amendments); *Kadel v. Folwell*, 620 F. Supp. 3d 339, 361 (M.D.N.C. 2022). "An 'expert' opinion is considered unreliable and inadmissible under *Daubert* where . . . the expert has developed the opinions

expressly for purposes of testifying in the case..." *Wehling v. Sandoz Pharms. Corp.*, 162 F.3d 1158, No. 97-2212, at *5 (4th Cir. 1998) (unpublished).

## III. DR. MCCABE'S BACKGROUND & OPINIONS

Dr. Michael J. McCabe, Jr. is a toxicologist whose research has focused almost exclusively on metal immunotoxicology, particularly the effects of lead, mercury, and arsenic. He has never published on trichloroethylene (TCE), perchloroethylene (PCE), benzene, or vinyl chloride—the contaminants at issue in this litigation. McCabe Dep. Tr. 16:20–17:21 (JA Ex. 177, D.E. 471-6). He is currently affiliated with Temple University and serves as a principal scientist at Intertox, where his responsibilities consist of consulting and expert witness work. *Id.* at 15:24–16:2, 22:8–16 (JA Ex. 177, D.E. 471-6). Approximately ninety percent of his annual income comes from Intertox in the form of salary and bonuses, with the remaining ten percent derived from his part-time academic role. *Id.* at 23:16–24:11 (JA Ex. 177, D.E. 471-6).

By contrast, Dr. Kathleen Gilbert—the Plaintiffs' expert whom McCabe is designated to rebut—has spent decades conducting federally funded research directly on TCE. She has published more than thirty peer-reviewed articles on the chemical, edited the textbook on its toxicity, and served as an advisor to the EPA, NIH, and the National Academy of Sciences. McCabe Dep. Tr. 47:18–50:19 (JA Ex. 177, D.E. 471-6). Dr. McCabe himself acknowledges her stature in the field. In his report, he admitted that "Plaintiffs' expert, Dr. Gilbert, has made many important contributions to the literature in this area." McCabe Rep. (NHL-Leuk) at 41 (JA Ex. 113, D.E. 466-7). And in his deposition, he stated that Dr. Gilbert is a leading expert in understanding how an environmental chemical like TCE can provoke changes in the immune system and that she has all of the credentials one would need to be considered a leading expert on TCE. McCabe Dep. Tr. 47:4–48:17; 50:14-19 (JA Ex. 177, D.E. 471-6).

In contrast, Dr. McCabe advances a litigation-driven opinion: that immunotoxicity is not

a biologically plausible mechanism by which TCE, PCE, benzene, or vinyl chloride can cause kidney cancer, bladder cancer, non-Hodgkin lymphoma, or leukemia. His reports repeatedly attempt to dismiss immunotoxicity as irrelevant unless and until it has been proven to operate as the precise stepwise cause of a particular cancer. Yet Dr. McCabe admits the very scientific premises that support immunotoxicity as a biologically plausible pathway. He concedes that TCE is immunotoxic "under certain circumstances" and acknowledges that immunotoxicity and hematopoietic cancer are "well-established health effects of benzene". McCabe Rep. (Kidney) at 24 (JA Ex. 95, D.E. 464-16); McCabe Dep. Tr. 94:15–95:4 (JA Ex. 177, D.E. 471-6). He further admits that immunosuppression is a recognized risk factor for cancer. McCabe Rep. (NHL-Leuk) at 3, 30–31 (JA Ex. 113, D.E. 466-7); McCabe Rep. (Kidney) at 29 (JA Ex. 95, D.E. 464-16); see also McCabe Dep. Tr. 234:13–17 (JA Ex. 177, D.E. 471-6). In deposition, he confirmed that individuals with congenital immune deficiencies exhibit higher rates of non-Hodgkin lymphoma. McCabe Dep. Tr. 183:15–21 (JA Ex. 177, D.E. 471-6). And despite his respect for the research and accomplishments of Dr. Gilbert, he ignores her decades of research in reaching his opinions.

Dr. McCabe also acknowledged that the Environmental Protection Agency (EPA) identified the immune system as the most sensitive endpoint for TCE toxicity—meaning it is the first system harmed at the lowest levels of TCE exposure. He admitted that EPA concluded "the immune system is a potential target of TCE toxicity" and that the agency derived its occupational exposure limit of 0.0040 ppm based on immunotoxicity, a determination that served as the basis for EPA's ban of TCE. McCabe Dep. Tr. 139:24–141:18, 157:3–159:18 (JA Ex. 177, D.E. 471-6). When pressed on the mechanistic evidence, Dr. McCabe described TCE's immune effects as "plausible hypothes[e]s" but insisted that such plausibility was meaningless absent "direct experimental proof" that those mechanisms in fact cause those cancers. McCabe Rep. (NHL-

Leuk) at 54 (JA Ex. 113, D.E. 466-7); see also McCabe Dep. Tr. 172:11–173:18 (JA Ex. 177, D.E. 471-6).

In other words, Dr. McCabe does not dispute that TCE and benzene are immunotoxic, or that immunosuppression is a recognized risk factor for cancer, or that the government's lead regulatory agency has identified the immune system as the most sensitive endpoint for TCE. Dr. McCabe recognizes that the chemicals at issue are tied to an increased cancer risk, but he simply refuses to recognize biological plausibility unless it is proven to operate as a specific causal chain for a given cancer type. That impossible standard is factually impossible and legally flawed, and it stands in stark contrast to Dr. Gilbert, who—by Dr. McCabe's own admission—has made "many important contributions" to the field and is a "leading expert" on TCE's immunological effects. Dr. McCabe's testimony is therefore reduced to dismissals of Dr. Gilbert's decades of peer-reviewed work, while clinging to a definition of plausibility that even he admits excludes "plausible hypothes[e]s." This approach is not science; it is litigation advocacy.

## IV. ARGUMENT

### A. Dr. McCabe's Methodology Is Unreliable Because He Applied Bradford Hill Incorrectly.

Dr. McCabe expressly limited his assignment to a narrow mechanistic critique about ***how*** immunotoxicity might (or might not) operate. He did not undertake—and says he does not perform—the kind of weight-of-the-evidence causation evaluation that integrates epidemiology, animal, and mechanistic data. At deposition, he confirmed that his "jumping in" place (where he supposedly picked up from other defense experts) "is on mechanism," and that he was not endorsing "one way or another" whether the chemicals cause disease. McCabe Dep. Tr. 57:2–19 (JA Ex. 177, D.E. 471-6). He further testified that formal weight-of-the-evidence work "[is] not

something that I do," distinguishing what scientists and regulatory bodies do from what he did in this case. McCabe Dep. Tr. 58:5–20 (JA Ex. 177, D.E. 471-6).

Rule 702 requires reliable principles and methods "*fit*" to the question presented. Where an expert has not synthesized the full evidentiary record—and instead offers *ipse dixit* or ignores critical scientific evidence (here, epidemiology)—exclusion is proper. Courts in this District and Circuit recognize that there is no "fit" when a large analytical gap separates the facts reviewed from the opinion offered, and that opinions connected to data only by the expert's say-so are inadmissible. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

Dr. McCabe's testimony identifies no discernible methodology—only narrative critique unmoored from any transparent, reproducible, or testable framework. First, he did ***not*** conduct a weight-of-the-evidence analysis. He made no attempt to synthesize epidemiological, toxicological, animal, and mechanistic data into an integrated causation assessment, as credible scientists and regulators do. He did not apply the Bradford Hill criteria except to invoke biological plausibility—and even there, he misapplied it by demanding conclusive mechanistic proof rather than asking whether proposed mechanisms are consistent with known biology. *In re Abilify (Aripiprazole) Prods. Liab. Litig.*, 299 F. Supp. 3d 1291, 1308 (N.D. Fla. 2018); *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Litig*., 509 F. Supp. 3d 116, 173–75 (D.N.J. 2020).

Second, he expressly disclaimed any role in evaluating the epidemiological evidence. He testified that he defers to other defense experts, such as Drs. Goodman and Shields, on whether the epidemiology supports an association between VOCs and these blood cancers. By doing so, he abdicated a core responsibility of a causation expert: assessing whether the body of scientific

evidence—including epidemiology—supports causation. Instead, he positions himself as a commentator on mechanisms only, without integrating or applying that evidence to the causation question before the Court.

His reports underscore this limitation. Rather than independently evaluating the epidemiology, he cites a defense epidemiologist (Dr. Julie Goodman) for the proposition that the epidemiologic evidence does not support causal associations, and he then frames his task as an "independent . . . analysis to evaluate the immunotoxic effects . . . to determine whether modulation of the immune system is a relevant mechanism..." *See* McCabe Rep. (NHL-Leuk) at 1 (JA Ex. 113, D.E. 466-7); McCabe Rep. (Bladder) at 5 (JA Ex. 80, D.E. 464-1); McCabe Rep. (Kidney) at 5 (JA Ex. 95, D.E. 464-16). That is not a general-causation assessment; it is a targeted mechanistic commentary that, by his own account, does not integrate all lines of evidence.

Third, his work product is not replicable or testable. He provides no objective framework for determining when mechanistic studies suffice to support causation—no criteria, metrics, or standards. His deposition testimony makes plain that his "method" is simply to reject biological plausibility unless direct experimental proof exists—an impossible standard. That is not science; it is the definition of *ipse dixit*.

Because Dr. McCabe (1) disclaims a weight-of-the-evidence causation analysis; and (2) limits his role to a single mechanism and does not evaluate whether the totality of the evidence shows that these chemicals cause the diseases at issue, any "general causation" opinions he might offer fall outside his stated methodology and lack the Rule 702 reliability and fit required. They should be excluded.

### *1. Dr. McCabe Misapplied the Biological Plausibility Factor by Demanding Mechanistic Certainty.*

Biological plausibility[2], as originally framed by Sir Austin Bradford Hill in 1965, does not require definitive proof of a mechanistic pathway before causation can be inferred. Hill explained: "It will be helpful if the causation we suspect is biologically plausible. But this is a feature I am convinced we cannot demand. What is biologically plausible depends upon the biological knowledge of the day." **Ex. A**, Austin Bradford Hill, *The Environment and Disease: Association or Causation?*, 58 PROC. R. SOC. MED. 295, at 298 (1965).

Dr. McCabe concedes this point. In his deposition, he agreed that Hill expressly stated plausibility is not something we can require before making a causal inference. See McCabe Dep. Tr. 174:24–175:4–8 (JA Ex. 177, D.E. 471-6). He further admitted that under Hill's framework, plausible means only that a mechanism is "possible, reasonable, or consistent with the current scientific understanding, not that it has to be proven." *Id.* at 175:15–177:3 (JA Ex. 177, D.E. 471-6).

The Federal Judicial Center's Reference Manual on Scientific Evidence reinforces this understanding:

> Biological plausibility is not an easy criterion to use and depends upon existing knowledge about the mechanisms by which the disease develops. When biological plausibility exists, it lends credence to an inference of causality. . . . However, observations have been made in epidemiologic studies that were not biologically plausible at the time but subsequently were shown to be correct. When an observation is inconsistent with current biological knowledge, it should not be discarded, but the observation should be confirmed before significance is attached to it. The saliency of this factor varies depending on the extent of scientific knowledge about the cellular and subcellular mechanisms through which the disease process works. The mechanisms of some diseases are understood quite well based on the available evidence, including from toxicologic research, whereas other

[2] *See In re Johnson & Johnson*, 509 F. Supp. 3d at 172 ("[B]iological plausibility, i.e., whether the purported association biologically plausible and consistent with existing scientific knowledge.").

> mechanism explanations are merely hypothesized--although hypotheses are sometimes accepted under this factor."

**Ex. B**, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (Federal Judicial Center ed., 3rd ed. 2011), at 604–05.

Despite acknowledging these standards, Dr. McCabe redefines plausibility in a way that is scientifically and legally improper. In his report, he states: "[M]y work on this case focuses on the analysis and consideration of biological plausibility, by addressing whether perturbation of the immune system and inflammatory processes by TCE, PCE, benzene, and vinyl chloride, alone or in combination with one another, may be linked as valid mechanisms involved in the etiology of [NHL-Leukemia/bladder cancer/kidney cancer]." McCabe Rep. (NHL-Leuk) at 6–7 (JA Ex. 113, D.E. 466-7); *see also* McCabe Rep. (Bladder) at 9 (JA Ex. 80, D.E. 464-1); McCabe Rep. (Kidney) at 9 (JA Ex. 95, D.E. 464-16).

Dr. McCabe then limits his analysis to a single pathway and demands conclusive evidence that such mechanisms are "valid" causes of disease. In short, he transforms Bradford Hill's plausibility factor into a requirement of mechanistic certainty—a standard that Hill himself expressly rejected. This is a methodological flaw, not merely a dispute about conclusions. By imposing an impossible standard of proof, Dr. McCabe abandoned the very framework he claims to be applying.

Courts applying Daubert have consistently rejected such rigidity. In *Westberry v. Gislaved Gummi AB*, the Fourth Circuit emphasized that Rule 702's focus is on the "'principles and methodology' employed by the expert, not on the conclusions reached" and that "the court need not determine that the expert testimony a litigant seeks to offer into evidence is irrefutable or certainly correct" for it to be admissible. 178 F.3d 257, 261–62 (4th Cir. 1999). Likewise, in *In re Abilify*, the court explained: "Importantly, biological plausibility is not the same as

biological certainty." 299 F. Supp. 3d at 1308. *See also id.* (quoting *Daubert*, 509 U.S. at 590) ("Of course, it would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science.").

Dr. McCabe's approach runs contrary to both science and law. By insisting on definitive mechanistic proof, he disregards Hill's own guidance, the Reference Manual, and controlling precedent. His testimony is not a proper application of Bradford Hill, but a litigation-driven distortion designed to impose an impossible standard. As such, it is not the product of reliable principles and methods, and it fails Rule 702.

Finally, even if his narrow approach were reliable, it would still fail to "fit" this case. Plaintiffs' experts do not contend that immunosuppression, standing alone, is the cause of NHL, leukemia, bladder cancer, or kidney cancer. They explain that immunotoxicity interacts with other biological mechanisms, such as oxidative stress and genotoxicity, and thus promotes the development of cancer. Dr. McCabe's insistence on ruling out immunotoxicity as a standalone cause addresses a question that no party has raised; it offers nothing helpful to the trier of fact.

#### ***2. Dr. McCabe's Concessions on Immunotoxicity Undermine His Rejection of Plausibility.***

Dr. McCabe makes numerous concessions across his deposition and all three of his reports (NHL-Leukemia, bladder cancer, kidney cancer) that directly contradict his ultimate opinion that immunotoxicity is not a biologically plausible pathway for these cancers.

Dr. McCabe states that his "work on this case focuses on the analysis and consideration of biological plausibility". McCabe Rep. (NHL-Leuk) at 6–7 (JA Ex. 113, D.E. 466-7); McCabe Rep. (Bladder) at 9 (JA Ex. 80, D.E. 464-1); McCabe Rep. (Kidney) at 9 (JA Ex. 95, D.E. 464-16). He agrees that Bradford Hill expressly did not require biological plausibility as a precondition to causal inference. McCabe Dep. Tr. 174:24–175:4 (JA Ex. 177, D.E. 471-6). He

also concedes plausibility means possible/reasonable/consistent with current science, not proven. McCabe Dep. Tr. 175:15–177:3 (JA Ex. 177, D.E. 471-6).

Courts have emphasized the same point. "[A]n expert on biological plausibility need not definitively prove the biological means by which a drug acts in the body." *In re Abilify (Aripiprazole) Prods. Liab. Litig.*, 299 F. Supp. 3d 1291, 1308 (N.D. Fla. 2018); *see also In re Neurontin Mktg., Sales Pracs., & Prods. Liab. Litig.*, 612 F. Supp. 2d 116, 149 (D. Mass. 2009) (finding that biological plausibility supported expert's opinion on causation despite the fact that there was "robust debate in the scientific community" on the proposed mechanism).

Dr. McCabe conceded at his deposition that immunosuppression is a recognized risk factor for cancer, that EPA has determined TCE is immunotoxic, and that EPA set its most protective exposure limit (the ECEL) based on immunotoxicity. McCabe Dep. Tr. 155:24–159:18, 206:12–18 (JA Ex. 177, D.E. 471-6). He further admitted that animal studies—including those conducted by Plaintiffs' expert Dr. Gilbert—demonstrate that TCE can cause immune disease, and that blocking TCE's metabolism prevents immune effects in mice. McCabe Dep. Tr. 142:1–143:6, 193:4–16 (JA Ex. 177, D.E. 471-6).

His own reports also recognize plausible immune mechanisms. In his reports, Dr. McCabe writes (emphasis added throughout):

- "[T]he reactive metabolites derived from the glutathione conjugation pathway of TCE and PCE have been shown to elicit downstream biochemical reactions as well as cellular disruptions such as mitochondrial dysfunction and oxidative stress … capable of causing genotoxic and non-genotoxic outcomes. ***These findings provide a conceptual framework supporting the plausibility that such adverse toxic effects could be operant mechanistically in the carcinogenic process, generally.***" (NHL-Leuk Rep. at 15 (JA Ex. 113, D.E. 466-7)). Asked about this at deposition, he agreed: Q: "So when you say this pathway provides a conceptual framework supporting plausibility, you're saying it's biologically possible; right?" A: "***Sure, . . . cellular biochemical reactions would be a component of biology. So it's biologically possible.***" McCabe Dep. Tr. 168:23–169:8 (JA Ex. 177, D.E. 471-6).

- He also concedes: "***There is*** little ***doubt that the tumor microenvironment in NHL or leukemia can be shaped by immune and inflammatory processes, . . . (i.e., anti-tumor) or, . . . (i.e., tumor progression leading to clinical disease).***" NHL-Leuk Rep. at 54 (JA Ex. 113, D.E. 466-7); McCabe Rep. (Bladder) at 60 (JA Ex. 80, D.E. 464-1), McCabe Rep. (Kidney) at 58 (JA Ex. 95, D.E. 464-16).

- "At best, the existing ***literature concerning TCE immunotoxicity provides a conceptual framework (i.e., background) for formulating a hypothesis that TCE causes NHL or leukemia through mechanisms that involve perturbations of the immune response*** or inflammatory processes." NHL-Leuk Rep. at 54 (JA Ex. 113, D.E. 466-7); McCabe Rep. (Bladder) at 60 (JA Ex. 80, D.E. 464-1), McCabe Rep. (Kidney) at 58 (JA Ex. 95, D.E. 464-16). When pressed, he admitted: "the background information [] ***would serve as the framework for proposing the hypothesis, that's sound and that's plausible.***" McCabe Dep. Tr. 170:20–171:4 (JA Ex. 177, D.E. 471-6).

Dr. McCabe's deposition testimony echoes these concessions (emphasis added throughout):

- "Under certain circumstances, ***the immune system . . . can promote tumor progression, yes.***" McCabe Dep. Tr. 169:24–170:2 (JA Ex. 177, D.E. 471-6).

- "Under certain circumstances, ***immunosuppression has been tied as a cause—causative link or risk factor for NHL.***" McCabe Dep. Tr. 189:13–24 (JA Ex. 177, D.E. 471-6).

- Q: "[D]o you specifically take issue with the idea that immune suppression is a risk factor for NHL?" A: "***Course not.***" McCabe Dep. Tr. 234:13–17 (JA Ex. 177, D.E. 471-6).

- Q: "But you're not saying that it's impossible that it causes these cancers?" A: "***Of course not.***" McCabe Dep. Tr. 173:20–22 (JA Ex. 177, D.E. 471-6).

Despite all of these acknowledgments, Dr. McCabe ultimately concludes in all three reports: "My independent analysis demonstrates that relevant animal and human studies do not show that modulation of the immune system is a plausible mechanistic pathway by which TCE, PCE, benzene, and vinyl chloride cause [NHL-Leukemia/bladder cancer/kidney cancer]." McCabe Rep. (Bladder) at 61 (JA Ex. 80, D.E. 464-1); McCabe Rep. (Kidney) at 59 (JA Ex. 95, D.E. 464-16); *see also* McCabe Rep. (NHL-Leuk) at 54 (JA Ex. 113, D.E. 466-7).[3]

That conclusion flatly contradicts his own report text and deposition testimony

[3] Dr. McCabe carves out an exception for benzene–AML. Rather than reflecting any independent analysis, this exception parrots the DOJ epidemiology opinions of Drs. Goodman and Shields. McCabe Rep. (NHL/Leuk) at 1 (JA Ex. 113, D.E. 466-7); discussed *supra* § A, 3.

recognizing: (1) immunosuppression as a risk factor; (2) EPA's finding that TCE is immunotoxic; (3) studies showing immunotoxicity consistent with tumor promotion; (4) the absence of any contrary study; and (5) Hill's instruction that plausibility requires consistency with current knowledge, not mechanistic certainty.

These contradictions confirm that Dr. McCabe is not reliably applying Bradford Hill. He admits that immunosuppression is a biologically plausible risk factor, but then rejects plausibility because no study has proven the full causal chain. That is not a methodological application of plausibility—it is a litigation-driven demand for certainty. And because Plaintiffs do not contend that immunotoxicity alone is the cause of these cancers, his narrow rejection of that pathway does not "fit" the issues the trier of fact must decide.

#### ***3. Dr. McCabe Demands an Impossible Standard that Neither Science nor Law Requires.***

Dr. McCabe's rejection of biological plausibility ultimately rests not on contrary evidence, but on the absence of an unattainable form of proof. To obtain the level of proof Dr. McCabe is requesting, one would need a study where individuals are exposed to TCE, a subgroup's immune effects are blocked by a hypothetical drug that does not exist, and both groups are followed for decades to compare cancer incidence. He admitted such a study would be unethical and cannot be done, yet he continues to reject plausibility absent this type of evidence. McCabe Dep. Tr. 196:24–198:2 (JA Ex. 177, D.E. 471-6). That flaw alone confirms the unsoundness of his methodology.

When pressed on what type of direct experimental evidence he would require, Dr. McCabe invoked Koch's postulates, testifying: "This goes back to . . . circa 1905 with Koch's postulates . . . the way you show that in a sequence of A causes B causes C, [is] that you come up with experimental approaches . . . that show that if [] you think A causes B causes C, then you

either interfere with A causing B or overexpress B." McCabe Dep. Tr. 196:11–19 (JA Ex. 177, D.E. 471-6). This is a demand for microbiological proof—an A→B→C chain of causation proven by direct experimental manipulation—that cannot be met in chemical toxicology or cancer epidemiology.

Leading scientific authorities have explained why Koch's postulates are not an appropriate framework for chronic disease and cancer. The International Agency for Research on Cancer (IARC) has made this explicit:

> Historically, causal relationships in infectious diseases have been assessed using the mechanistic-based Henle-Koch's postulates, which are based on the expectation that the microbial agent must be necessary, specific, and sufficient for the disease to occur. ***These postulates are only of indirect help in assessing cancer or chronic disease etiology, since they imply the causation of the immediate infectious disease or condition that originated from the agent, and not the final malignant process*** at the end of a lengthy chain of events triggered by the infection itself. A case-in point is the causal pathway represented by the acquisition of infection with HBV in non-immune individuals, followed by the development of acute hepatitis, chronic hepatitis, and finally, many years later, the onset of hepatocellular carcinoma. Each step in succession has different proportions of patients that progress. Henle-Koch's postulates are useful up to the first or second steps of this pathway, but are of no guidance for the implication of the causal link between the point of beginning and termination of events.

**Ex. C**, F. Coutlée & E.L. Franco, *Infectious Agents*, IARC Sci. Publ. No. 163, at 175–87 (2011), PMID: 22997862 (emphasis added).

By requiring cancer causation to be proven through Koch-like experimentation, Dr. McCabe imposes a framework that IARC itself has rejected as unworkable for carcinogens and chronic diseases. His testimony thus confirms that his standard is not rooted in toxicology, epidemiology, or accepted methodology, but in an impossible evidentiary demand no plaintiff—or scientist—could ever satisfy.

Even more telling, Dr. McCabe selectively accepts an association between benzene and

acute myeloid leukemia (AML) at high doses, citing Dr. Goodman's report, while rejecting all other cancers under a far stricter standard. He notes "an association between benzene and acute myeloid leukemia (AML) at exposures greater than 40 to 75 ppm-years" and that benzene's interaction with the aryl hydrocarbon receptor "may be a relevant mechanism." McCabe Rep. (NHL-Leuk) at 1, 3–4 (JA Ex. 113, D.E. 466-7). In other words, he applies a lower evidentiary bar to benzene→AML than to benzene or TCE→NHL, bladder cancer, or kidney cancer, even though the mechanistic and epidemiological evidence is no more definitive for AML than for other blood cancers. His selective acceptance of AML reflects litigation-driven inconsistency, not scientific rigor.

Dr. McCabe's refusal to recognize plausibility absent conclusive "direct experimental proof" is both a methodological flaw and a fit flaw. Methodologically, it abandons the Bradford Hill framework in favor of criteria that leading scientific bodies reject as irrelevant to chronic disease. Substantively, it ensures his opinions will never assist the trier of fact, because no party could ever produce the kind of evidence he demands. Courts have consistently rejected such "moving the goalposts." As the Supreme Court explained in *Daubert*, "it would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science." 509 U.S. at 590. By imposing an impossible evidentiary standard—demanding proof that no toxic tort plaintiff could ever meet—Dr. McCabe is not applying science, but advocacy. Under *Daubert*, *Joiner*, and *Kumho Tire*, such *ipse dixit* cannot be admitted as expert testimony.

### B. Dr. McCabe's Opinions Do Not "Fit" the Case Because He Failed to Consider the Full Range of Biologically Plausible Pathways (Combined Mechanisms).

Dr. McCabe repeatedly represents that his role is to provide an opinion on the Bradford Hill factor of biological plausibility and to analyze ***how*** these chemicals could cause the cancers

at issue. But Dr. McCabe does not do what he claims. Rather than evaluating whether the observed associations are consistent with the full range of current biological knowledge, he narrows his inquiry almost entirely to immunotoxicity. He then demands conclusive proof before crediting even that pathway. While he gestures toward other recognized mechanisms—genotoxicity, oxidative stress, epigenetic change, metabolic activation—he declines to give any opinion on whether those pathways are biologically plausible.

This approach is not a plausibility analysis in the sense Bradford Hill intended. Biological plausibility asks whether the associations are consistent with the biological knowledge of the day. That inquiry necessarily includes the full range of mechanisms currently supported in the literature. Dr. McCabe expressly declined to undertake that inquiry, limiting his review to one slice of the evidence.

Nor does his testimony "fit" the issues the jury must decide. Plaintiffs' experts do not contend that immunosuppression alone is the cause of these cancers. They explain that immunosuppression acts in combination with other mechanisms—such as oxidative stress and DNA damage—to promote cancer. Dr. McCabe's refusal to consider those pathways means his opinion does not address the actual causation theory at issue and will not aid the trier of fact.

Rule 702 requires that expert testimony be the product of reliable principles and methods reliably applied to the facts. By restricting himself to a single mechanistic pathway and refusing to evaluate others, Dr. McCabe did not apply the principles of Bradford Hill at all. His testimony is therefore unreliable, irrelevant, and inadmissible.

### C. Dr. McCabe's Opinions Reduce to Ipse Dixit and Parroting of Defense Epidemiologists Rather than an Independent Methodology.

Dr. McCabe insists that he is not endorsing the causation opinions of other defense experts. Yet his own reports and deposition reveal the opposite: he simply parrots the

conclusions of Drs. Julie Goodman and Peter Shields. For example, in his NHL-Leukemia report, Dr. McCabe states that "epidemiological evidence does not support a causal association between benzene and leukemia, except for an association between benzene and acute myeloid leukemia (AML) at exposures greater than 40 to 75 ppm-years[,]" citing directly to Dr. Goodman's report. McCabe Rep. (NHL-Leuk) at 1 (JA Ex. 113, D.E. 466-7). He later repeats Dr. Goodman's refrain that while benzene exposure may suppress immunosurveillance, such a mechanism is only "relevant . . . for high dose benzene exposure associated with AML but not for other forms of leukemia or NHL." *Id.* at 3–4. These passages demonstrate that Dr. McCabe's "exception" for AML is lifted wholesale from Dr. Goodman's analysis, not derived from any independent methodology of his own.

This selective reliance underscores the *ipse dixit* character of his testimony. Dr. McCabe's treatment of mechanistic evidence is not consistent or independent. The mechanistic data linking benzene to acute myeloid leukemia (AML) is no stronger than the mechanistic data linking Benzene and TCE to other cancers. Yet Dr. McCabe accepts benzene–AML as biologically plausible because DOJ's epidemiology experts have acknowledged a causal association at high exposures. For every other cancer, however, where DOJ's epidemiologists reject causation, Dr. McCabe likewise rejects the mechanistic evidence. His opinions thus rise or fall entirely on whether DOJ's epidemiologists have already recognized an association, showing that he is not applying a consistent or independent analysis of the mechanistic literature.

From a methodological standpoint, parroting the conclusions of others is not science—it is advocacy. Rule 702 requires expert testimony to be the product of reliable principles and methods of the expert proffering an opinion, reliably applied to the case. Simply adopting Dr. Goodman's and Dr. Shields's general causation conclusions without independent analysis or

validation does not satisfy that requirement. Courts have routinely excluded experts who merely "parrot" another expert's conclusions. See *Funderburk*, 395 F. Supp. 3d at 721–22 (excluding expert who repeated another expert's opinion without providing additional corroboration, validation, or explanation); *In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Prods. Liab. Litig.*, 546 F. Supp. 3d 666, 674 (S.D. Ohio 2021) (excluding parroting testimony). As the Supreme Court emphasized in *Joiner*, "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." 522 U.S. at 146.

Dr. McCabe's reliance on Drs. Goodman and Shields, coupled with his refusal to employ any independent or transparent methodology, places his opinions squarely in the category of *ipse dixit* that *Daubert* and Rule 702 forbid.

### D. Dr. McCabe Applied No Legal Causation Standard and Therefore Cannot Assist the Trier of Fact.

As explained in Plaintiffs' contemporaneously filed Motion to Exclude Expert Opinions that Fail to Apply the CLJA's Burden of Proof (D.E. 567), Dr. McCabe's testimony should be excluded because he failed to apply the causation standard governing this case. The burden of proof under the CLJA requires only that a plaintiff "produce evidence showing that the relationship between exposure to the water at Camp Lejeune and the harm is sufficient to conclude that a causal relationship exists; or ***sufficient to conclude that a causal relationship is at least as likely as not***." CLJA §§ 804(b)–(c) (emphasis added). Expert testimony is admissible only if it is "help[ful]" to the trier of fact under the relevant legal framework. *Daubert*, 509 U.S. at 592.

Dr. McCabe admitted that he does not know—and has never applied—the causation standard in this case:

- Q: “Do you know what the legal standard is in this case?” A: “I don’t know. Yeah, I’m not—I’m not certain about legal standards. I don’t use legal standards in what I do. So the answer to your question is no, I’m not.” McCabe Dep. Tr. 221:24–222:8 (JA Ex. 177, D.E. 471-6).

- Q: “No one has ever told you what the legal standard is in this case?” A: “I think I read in Dr. Gilbert’s reports some information about what may be the legal standard, but I really—I didn’t really pay too much attention to that because it doesn’t mean anything to me.” McCabe Dep. Tr. 222:13–22 (JA Ex. 177, D.E. 471-6).

- Q: “And I assume you’ve never seen the statute relating to the Camp Lejeune Justice Act; is that right?” A: “I may have seen it, but, again, it’s just that’s the guiding statute for the case, not the work that I did in the case, as I understand.” McCabe Dep. Tr. 222:24–223:5 (JA Ex. 177, D.E. 471-6).

Not only did Dr. McCabe fail to apply the CLJA’s “at least as likely as not” standard, he exceeded even the traditional “more likely than not” standard by demanding conclusive mechanistic proof before acknowledging causation. His testimony repeatedly rejects causation absent definitive, step-by-step evidence of a biological mechanism—an impossible threshold that is not only inconsistent with the CLJA but also unreliable, because it has no field-accepted analogue.

Because Dr. McCabe did not apply the CLJA’s “at least as likely as not” standard—and instead imposed a higher, litigation-driven requirement—his testimony is unreliable, irrelevant, and inadmissible under Rule 702.

## V. CONCLUSION

The Court should exclude the testimony of Dr. McCabe in its entirety under Rule 702. His opinions are not the product of reliable methodology, and they do not “fit” the issues the trier of fact must decide. He invoked the Bradford Hill framework but failed to apply it, narrowed his analysis to a single pathway judged under an impossible evidentiary standard, and reduced his testimony to parroting the conclusions of other defense experts. He further admitted he does not know or apply the governing causation standard under the CLJA. Such testimony is neither

reliable nor relevant, and it cannot assist the trier of fact.

If exclusion in full is not granted, the Court should at minimum:

(a) **Preclude any broad general causation testimony.** Dr. McCabe concedes he did not perform a weight-of-the-evidence analysis and therefore cannot offer an overarching opinion on whether TCE, PCE, benzene, or vinyl chloride cause any cancer.

(b) **Confine Dr. McCabe to mechanistic commentary on immune modulation only.** He expressly disclaimed opinions on other mechanisms such as genotoxicity, oxidative stress, and metabolic activation. He should not be permitted to expand his testimony to those topics.

(c) **Exclude any testimony requiring conclusive proof of a mechanistic pathway.** Dr. McCabe's demand for conclusive proof is contrary to Bradford Hill, inconsistent with accepted scientific methodology, and imposes a legal standard higher than the CLJA requires.

Because Dr. McCabe failed to apply a reliable methodology, disregarded the governing legal standard, and offered opinions that will not assist the trier of fact, his testimony should be excluded in full, or at the very least limited as set forth above.

*[Signatures appear on the following page]*

DATED this 10th day of September 2025.

*/s/ J. Edward Bell, III*

J. Edward Bell, III (admitted *pro hac vice*)
Bell Legal Group, LLC
219 Ridge St.
Georgetown, SC 29440
Telephone: (843) 546-2408
jeb@belllegalgroup.com

*Lead Counsel for Plaintiff*

*/s/ Zina Bash*

Zina Bash (admitted *pro hac vice*)
Keller Postman LLC
111 Congress Avenue, Suite 500
Austin, TX 78701
Telephone: 956-345-9462
zina.bash@kellerpostman.com

*Co-Lead Counsel for Plaintiffs and Government Liaison Counsel*

*/s/ Elizabeth J. Cabraser*

Elizabeth J. Cabraser (admitted *pro hac vice*)
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
*ecabraser@lchb.com*

*Co-Lead Counsel for Plaintiffs*

*/s/ W. Michael Dowling*

W. Michael Dowling (NC Bar No. 42790)
The Dowling Firm PLLC
Post Office Box 27843
Raleigh, North Carolina 27611
Telephone: (919) 529-3351
mike@dowlingfirm.com

*Co-Lead Counsel for Plaintiffs*

*/s/ Robin L. Greenwald*

Robin L. Greenwald (admitted *pro hac vice*)
Weitz & Luxenberg, P.C.
700 Broadway
New York, NY 10003
Telephone: 212-558-5802
rgreenwald@weitzlux.com

*Co-Lead Counsel for Plaintiffs*

*/s/ James A. Roberts, III*

James A. Roberts, III
Lewis & Roberts, PLLC
3700 Glenwood Ave., Ste. 410
Raleigh, NC 27612
Telephone: (919) 981-0191
jar@lewis-roberts.com

*Co-Lead Counsel for Plaintiffs*

*/s/ Mona Lisa Wallace*

Mona Lisa Wallace (N.C. Bar No.: 009021)
Wallace & Graham, P.A.
525 North Main Street
Salisbury, North Carolina 28144
Tel: 704-633-5244
mwallace@wallacegraham.com

*Co-Lead Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I, J. Edward Bell, III, hereby certify that the foregoing document was electronically filed on the Court's CM/ECF system on this date, and that all counsel of record will be served with notice of the said filing via the CM/ECF system.

Dated: September 10, 2025.

*/s/ J. Edward Bell, III*_________________
J. Edward Bell, III