**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**SOUTHERN DIVISION**
**NO. 7:23-CV-897**

**IN RE:**

**CAMP LEJEUNE WATER LITIGATION**

**This Document Relates To:**

***Downs v. United States,* 7:23-cv-01145**
***Fancher v. United States*, 7:23-cv-00275**
***Howard v. United States*, 7:23-cv-00490**
***Mousser v. United States*, 7:23-cv-00667**
***Tukes v. United States*, 7:23-cv-01553**

**UNITED STATES' MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO EXCLUDE OPINIONS OF DRS. BIRD, FREEMAN, HATTEN, AND MALLON RELATED TO PCE, BENZENE, AND VINYL CHLORIDE**

**("KIDNEY CANCER NO THRESHOLD ASSOCIATION")**

## TABLE OF CONTENTS

Pages

Table of Contents ..... i

Table of Joint Appendix Exhibits ..... iii

I. Exhibits from Joint Appendix ..... iii

II. Additional Exhibits ..... v

Table of Abbreviations ..... vi

Introduction ..... 1

Background ..... 2

A. Almost All Epidemiology Studies Show No Statistically Significant Associations between the Three Chemicals at Issue and Kidney Cancer. ..... 3

B. The Few Statistically Significant Associations Plaintiffs' Experts Identify are in Occupational Studies or Unreliable Studies. ..... 3

Legal Standard ..... 4

Argument ..... 5

III. The First Step of the Bradford Hill Analysis Requires the Expert to Identify an Association that is Statistically Significant or Otherwise Beyond the Play of Chance In a Relevant and Reliable Study. ..... 5

A. Courts Exclude Experts Who Do Not Satisfy the First Step of the Bradford Hill Analysis. ..... 5

B. The Threshold Association Must be Statistically Significant or Otherwise Beyond the Play of Chance. ..... 6

C. The Threshold Association Must Be Observed at Plaintiffs' Exposure Levels ..... 9

1. Exposures in Occupational Studies are Much Higher than Exposures at Camp Lejeune. ..... 10

D. The Studies Supporting a Threshold Association Must be Reliable ..... 11

IV. Plaintiffs' Experts Did Not Identify Any Studies that Satisfy Bradford Hill's Threshold Association Requirement for PCE, Benzene, and Vinyl Chloride. ..... 13

A. Plaintiffs Fail to Identify a Study with a Threshold Association between PCE and Kidney Cancer. ..... 13

1. PCE Levels are Much Higher in Occupational Studies than at Camp Lejeune. ..... 13

2. Ma 2009 is an Unreliable Ecological Study. ..... 15

3. The 2018 ATSDR Morbidity Study is an Unpublished Study with Significant Limitations that was Strongly Criticized by its Author. ..... 17

B. Plaintiffs' Experts Fail to Identify a Study with a Threshold Association between Benzene and Kidney Cancer. 19

1. Benzene Levels are Much Higher in Occupational Studies than at Camp Lejeune. 19

2. Lynge 1997 and Greenland 1994 are Unreliable Studies. 21

C. Plaintiffs Fail to Identify a Study with a Threshold Association between Vinyl Chloride and Kidney Cancer. 22

Conclusion 23

Certificate of Service 25

## TABLE OF JOINT APPENDIX EXHIBITS

### I. Exhibits from Joint Appendix

| J.A. Ex. | D.E. | Short Citation | Full Title |
|---|---|---|---|
| Expert Reports and Depositions | | | |
| 83 | 464-4 | Bird GC Rep. (Kidney) | Steven B. Bird, *General Causation Expert Report of Steven B. Bird, MD – Kidney Cancer* (Dec. 9, 2024) |
| 86 | 464-7 | Freeman Rep. (Kidney) | Michael D. Freeman, *Camp Lejeune Water Contamination Litigation: Kidney cancer outcome* (Dec. 8, 2024) |
| 90 | 464-11 | Hatten GC Rep. (Kidney) | Benjamin Hatten, *Camp Lejeune: Kidney Cancer Expert Report of Benjamin Hatten, M.D., M.P.H.* (Dec. 8, 2024) |
| 92 | 464-13 | Mallon GC Rep. (Kidney) | Timothy M. Mallon, *General Causation Expert Report of Timothy M. Mallon, M.D., M.P.H., M.S.* (Dec. 9, 2024) |
| 94 | 464-15 | Goodman Rep. (Kidney) | Julie E. Goodman, *Trichloroethylene, Perchloroethylene, Benzene, Vinyl Chloride, and* trans-*1,2-Dichloroethylene Exposure and Kidney Cancer* (Feb. 7, 2025) |
| 144 | 468-10 | Savitz Rebuttal | Rebuttal Report on Methodological Considerations in Epidemiological Studies: Evaluating Random Error and Statistical Significance Testing |
| 154 | 469-8 | Savitz 3d Dep. Tr. | David Savitz 3d Dep. Tr. (May 16, 2025) |
| 142 | 468-8 | Madigan Rebuttal | Comments on Camp Lejeune Defendants' Reports<br>David Madigan, PhD |
| 149 | 469-3 | Madigan Dep. Tr. | Deposition Transcript |
| 202 | 474-1<br>474-2<br>474-3<br>475-1<br>475-2<br>475-3 | IARC 2018 | IARC, *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Benzene* |
| Other Epidemiology Studies | | | |
| 293 | 484-4 | Savitz 2023 | David Savitz, *Epidemiology and the Law* (2023) |
| 274 | 482-7 | Mandel 1995 | International renal cell cancer study: IV. Occupation |

| | | | |
|---|---|---|---|
| 228 | 479-5 | Callahan 2019 | Extended mortality follow-up in a cohort of dry cleaners |
| 286 | 483-5 | Purdue 2017 | Occupational exposure to chlorinated solvents and kidney cancer: A case-control study |
| 184 | 472-5 | ATSDR 2018 Morbidity Study | Morbidity Study of Former Marines, Employees, and Dependents Potentially Exposed to Contaminated Drinking Water at US Marine Corps Base Camp Lejeune |
| 255 | 480-15 | Greenland 1994 | A case-control study of cancer mortality at a transformer-assembly facility |
| 261 | 481-5 | Hu 2002 | Renal cell carcinoma and occupational exposure to chemicals in Canada |
| 272 | 482-5 | Lynge 1997 | Risk of cancer and exposure to gasoline vapors |
| 283 | 483-2 | Pesch 2000a | Occupational risk factors for renal cell carcinoma: Agent-specific results from a case-control study in Germany |
| 284 | 483-3 | Pesch 2000b | Occupational risk factors for urothelial carcinoma: Agent-specific results from a case-control study in Germany |
| 298 | 484-9 | Seyyedsalehi 2024 | Occupational benzene exposure and risk of kidney and bladder cancers: A systematic review and meta-analysis |
| 320 | 486-4 | Wong 1987b | An industry wide mortality study of chemical workers occupationally exposed to benzene II Dose response analyses |
| 243 | 480-3 | DeMoulin 2024 | Occupational benzene exposure and cancer risk among Chinese men: A report from the Shanghai Men's Health Study |
| 230 | 479-7 | Carreón 2014 | Coronary Artery Disease and Cancer Mortality in a Cohort of Workers Exposed to Vinyl Chloride, Carbon Disulfide, Rotating Shift Work, and o-Toluidine at a Chemical Manufacturing Plant |

## II. Additional Exhibits

| **Ex.** | **Short Citation** | **Full Title** |
|---|---|---|
| 1 | Gold 2008 | Systematic Literature Review of Uses and Levels of Occupational Exposure to Tetrachloroethylene |
| 2 | Ma 2009 | Association between Residential Proximity to PERC Dry Cleaning Establishments and Kidney Cancer in New York City |

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| ATSDR | Agency for Toxic Substances and Disease Registry |
| CI | Confidence Interval |
| CLJA | Camp Lejeune Justice Act of 2022 |
| DCE | Dichloroethylene |
| HR | Hazard Ratio |
| IARC | International Agency for Research on Cancer |
| PCE (or PERC) | Perchloroethylene, or tetrachloroethylene |
| TCE | Trichloroethylene |

## INTRODUCTION

Plaintiffs David Downs, David Fancher, Allan Howard, Frank Mousser, and Jacqueline Tukes (collectively, "Plaintiffs") allege that, while at Marine Corps Base Camp Lejeune ("Camp Lejeune") between 1953 and 1987, they were exposed to water contaminated with trichloroethylene ("TCE"), perchloroethylene ("PCE"), benzene, vinyl chloride, and dichloroethylene ("DCE"). They further allege that such exposure caused their kidney cancer. In support of their general causation theories concerning PCE, benzene, and vinyl chloride (the "three chemicals at issue"), Plaintiffs disclosed the opinions of four experts: Dr. Steven Bird, Dr. Michael Freeman, Dr. Benjamin Hatten, and Dr. Timothy Mallon.[1]

All of their opinions concerning the three chemicals at issue should be excluded because Plaintiffs do not meet their burden of showing that the opinions are admissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). Each expert claimed to employ the Bradford Hill methodology to determine causation. Yet, each expert failed to identify even a single, clear-cut association from a relevant and reliable study that links any of the three chemicals at issue and kidney cancer, which is a necessary threshold step of the Bradford Hill methodology. As discussed below, to meet this threshold showing, an expert must identify an association between each chemical and kidney cancer that is (i) statistically significant or otherwise beyond the play of chance, (ii) observed at the Plaintiffs' level of exposure, and (iii) observed in a reliable study. Because Drs. Bird, Freeman, Hatten, and Mallon fail to identify any such association for PCE, benzene, and vinyl chloride, their applications of the Bradford Hill methodology are unreliable and their opinions regarding these three chemicals are inadmissible.

[1] A fifth expert, Dr. Kathleen Gilbert, did not opine on the relationship between PCE, benzene, and vinyl chloride and kidney cancer (her opinions concerned TCE only), and her opinions are not the subject of this motion.

## BACKGROUND

Plaintiffs disclosed four experts to offer general causation opinions based upon the epidemiological literature related to PCE, benzene, and vinyl chloride:

1. **Dr. Steven Bird**, an emergency room physician, *see* Bird GC Rep. (Kidney) (J.A. Ex. 83, D.E. 464-4) (hereinafter, "Bird Rep.");
2. **Dr. Michael Freeman**, a professor of forensic medicine, *see* Freeman Rep. (Kidney) (J.A. Ex. 86, D.E. 464-7) (hereinafter, "Freeman Rep.");
3. **Dr. Benjamin Hatten**, a medical toxicologist, *see* Hatten GC Rep. (Kidney) (J.A. Ex. 90, D.E. 464-11) (hereinafter, "Hatten Rep."); and
4. **Dr. Timothy Mallon**, an occupational medicine physician, *see* Mallon GC Rep. (Kidney) (J.A. Ex. 92, D.E. 464-13) (hereinafter, "Mallon Rep.").

Each opined that PCE "more likely than not" causes kidney cancer, benzene "as likely as not" causes kidney cancer, and vinyl chloride "as likely as not" causes kidney cancer. To reach these conclusions, each claimed to employ the Bradford Hill methodology. Bird Rep. at 5-6, 47-51 (J.A. Ex. 83, D.E. 464-4); Freeman Rep. at 23-26 (J.A. Ex. 86, D.E. 464-7); Hatten Rep. at 14-15, 27-28, 31-32, 34-45 (J.A. Ex. 90, D.E. 464-11); Mallon Rep. at 13-16, 31-32, 39-41, 45-47 (J.A. Ex. 92, D.E. 464-13). "The Bradford Hill criteria are metrics that epidemiologists use to distinguish a causal connection from a mere association." *In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.,* 858 F.3d 787, 795 (3d Cir. 2017); *see also* Federal Judicial Center, Reference Manual on Scientific Evidence (3d ed. 2011) ("RMSE") at 599-600.[2] As that statement implies, and as discussed below, courts require that an expert first identify an association between the exposure and the outcome of interest before examining whether the Bradford Hill causal criteria are met.

[2] The criteria are temporal relationship, strength of the association, dose-response relationship, replication of the findings, biological plausibility, consideration of alternative explanations, cessation of exposure, specificity of the association, and consistency with other knowledge. *See* RMSE at 59-600.

### A. Almost All Epidemiology Studies Show No Statistically Significant Associations between the Three Chemicals at Issue and Kidney Cancer.

There are numerous epidemiology studies showing no statistically significant association between the three chemicals at issue and kidney cancer. Plaintiff's experts have failed to mention the vast majority of these studies. Specifically, they failed to mention at least 17 studies showing no associations with PCE, at least 20 studies showing no associations with benzene, and at least 3 studies showing no associations with vinyl chloride. *See* United States' Memorandum of Law in Support of its Motion to Exclude Phase 2 Opinions of Drs. Bird, Hatten and Mallon "United States' Literature Review Memorandum") at 15-16 (D.E 575); *see also id.* Ex. 4 at 4-6.[3] Moreover, in all but a few of these studies, the authors conducted multiple statistical analyses. For example, Vlaanderen 2013 (J.A. Ex. 317, D.E. 486-1) examined the relationship between kidney cancer and cumulative PCE exposure in men, women, and both sexes combined; the study also conducted separate statistical analyses for those with the lowest, middle and highest tertile of exposure, and found no associations in any analyses. Thus, the authors of these studies evaluated many associations between kidney cancer and the chemicals at issue and still failed to find *any* statically significant associations.

### B. The Few Statistically Significant Associations Plaintiffs' Experts Identify are in Occupational Studies or Unreliable Studies.

As discussed in the United States' Literature Review Memorandum, Plaintiffs' experts focused on a largely overlapping, cherry-picked subset of studies that provided the most support

[3] Many of these epidemiology studies showing no statistically significant associations are identified, and summarized, in Goodman Rep. (Kidney) (J.A. Ex. 94, D.E. 464-15) at Tables F.2 (PCE and Kidney Cancer Cohort Study Results); F.4 (PCE and Kidney Cancer Case-Control Study Results); H.2 (Benzene and Kidney Cancer Cohort Study Results); H.4 (Benzene and Kidney Cancer Case-Control Study Results); H.5 (Benzene and Kidney Cancer Meta-Analysis Results); J.2 (Vinyl Chloride and Kidney Cancer Cohort Study Results) (there is not table for case control studies of the relationship between vinyl chloride and kidney cancer).

for their conclusions—and ignored most of the studies that did not. *See* D.E 574. Nonetheless, even within this cherry-picked subset, they identified only: (1) six studies of PCE with any statistically significant associations; (2) five studies and one meta-analysis of benzene with either statistically significant associations or where the lower boundary of the confidence interval is 1[4]; and (3) one study of vinyl chloride with any statistically significant associations. None of these studies, however, satisfy the first step of the Bradford Hill analysis, which requires identifying a clear-cut association in a relevant and reliable study. Rather, each of these studies with statistically significant associations (1) is an occupational study with exposures that are orders of magnitude higher than Plaintiffs' potential exposures from the Camp Lejeune water, rendering it not relevant and/or (2) is unreliable.

## LEGAL STANDARD

Expert testimony is admissible if it (a) "will help the trier of fact to understand the evidence or to determine a fact in issue," (b) "is based on sufficient facts or data," (c) "is the product of reliable principles and methods," and (d) "reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. Expert testimony is only admissible if "it rests on a reliable foundation and is relevant to the task at hand." *Belville v. Ford Motor Co.,* 919 F.3d 224, 232 (4th Cir. 2019) (citing *Daubert*, 509 U.S. at 597). The Court must assess "whether the reasoning or methodology underling the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Belville*, 919 F.3d at 232 (citing *Daubert*, 509 U.S. at 592–93). The objective of Rule 702 and *Daubert* "is to make certain

[4] As discussed, *infra*, Point I.B, in an epidemiology study, an association is not statistically significant if the confidence interval includes 1. If the lower boundary of the confidence interval is exactly 1 (and the upper boundary is higher), the association is *not* statistically significant. *See id.; see also* Goodman Rep at 8 (J.A. Ex. 94, D.E. 464-15). Three of the five referenced benzene studies have associations with lower boundaries at exactly 1. While such studies are not statistically significant, for the purposes of this motion, the United States considers these studies as though they had a statistically significant association.

that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

Courts "must probe the reliability and relevance of expert testimony any time 'such testimony's factual basis, data, principles, methods, or their application are sufficiently called into question.'" *EEOC v. Freeman*, 778 F.3d 463, 472 (4th Cir. 2015) (Agee, J., concurring) (quoting *Kumho Tire*, 526 U.S. at 149). As recently amended, Rule 702 states that "expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." Fed. R. Evid. 702 committee note to 2023 amendment.

## ARGUMENT

## III. The First Step of the Bradford Hill Analysis Requires the Expert to Identify an Association that is Statistically Significant or Otherwise Beyond the Play of Chance In a Relevant and Reliable Study.

### A. Courts Exclude Experts Who Do Not Satisfy the First Step of the Bradford Hill Analysis.

Plaintiffs' experts each purported to apply the Bradford Hill method to evaluate whether an association is due to a causal relationship. *See* Bird Rep. at 5-6, 47-51 (J.A. Ex. 83, D.E. 464-4); Freeman Rep. at 23-26 (J.A. Ex. 86, D.E. 464-7); Hatten Rep. at 14-15, 27-28, 31-32, 34-45 (J.A. Ex. 90, D.E. 464-11); Mallon Rep. at13-16, 31-32, 39-41, 45-47 (J.A. Ex. 92, D.E. 464-13). The method has two steps. "Step 1 of this methodology is to look at whether an association exists [; that is], whether two variables 'occur together more frequently than one would expect by chance.'" *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*, 174 F. Supp. 3d 911, 914, 924 (D.S.C. 2016) ("*Lipitor I*") (citing RMSE at 566). In the second step, the

expert analyzes whether the association is causal by considering the Bradford Hill criteria. *See* RMSE at 597-600.

"Courts exclude expert testimony that attempts to start at step two, applying the Bradford Hill criteria without adequate evidence of an association." *Lipitor I*, 174 F. Supp. 3d at 925; *see also, e.g.*, RMSE at 599 n.1 ("In a number of cases, experts attempted to use these guidelines to support the existence of causation in the absence of any epidemiologic studies finding an association. . . . There may be some logic to that effort, but it does not reflect accepted epidemiologic methodology."); *In re Mirena IUD Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 258-67 (S.D.N.Y. 2018), *aff'd sub nom. In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 982 F.3d 113 (2d Cir. 2020) ("[A] statistical, or strong, association between the cause under review and its asserted effect . . . is a necessary, or *gating*, factor for any Bradford Hill analysis to proceed, such that, *if such a statistical association is not found, there is no charter to undertake a Bradford Hill analysis at all.*" (emphasis added)).[5]

### B. The Threshold Association Must be Statistically Significant or Otherwise Beyond the Play of Chance.

The association that the expert identifies in the first step of the Bradford Hill method must be "perfectly clear-cut" and beyond chance. *See* Sir Austin Bradford Hill, *The Environment and Disease: Association or Causation?,* 58 Proc. Royal Soc'y Med. 295, 295 (1965) (D.E. 554-2) ("Hill 1965"); RMSE at 566 ("An association between exposure to an agent and disease exists

[5] A number of other courts have also discussed the two steps of the Bradford Hill methodology. *See, e.g., McMunn v. Babcock & Wilcox Power Generation Grp., Inc.,* No. CIV.A. 10–143, 2013 WL 3487560, at *15 (W.D. Pa. July 12, 2013 ("Step one looks to whether there is a statistically significant association between a substance and a specific disease . . . . If no association between the exposure and the disease is supported by the scientific literature, there is no basis to find a causal relationship exists and the analysis should end there."); *Frischhertz v. SmithKline Beecham Corp.,* No. CIV.A. 10–2125, 2012 WL 6697124, at *3 (E.D. La. Dec. 21, 2012) ("The Bradford–Hill criteria can only be applied after a statistically significant association has been identified.").

when they occur together *more frequently than one would expect by chance*." (emphasis added)); *Lipitor I*, 174 F. Supp. 3d at 924-25 ("[The] Bradford Hill method . . . requires at the outset a statistically significant association before applying the Bradford Hill factors . . . .").

To assess chance, researchers test for statistical significance and/or evaluate the precision reflected by the confidence interval. *See In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*, 892 F.3d 624, 634 (4th Cir. 2018) ("*Lipitor II*"). "A study that is statistically significant has results that are unlikely to be the result of random error [i.e., chance] . . . ." RMSE at 573. More specifically, if a result is statistically significant at the 0.05 level,[6] that "means that the probability is 5% of observing an association at least as large as that found in the study when in truth there is no association." *Id.*; *see also Lipitor II,* 892 F.3d at 642 (citing RMSE at 577). Epidemiologists can also evaluate the precision of a result by a confidence interval. A 95% confidence interval is the "traditional and certainly most commonly used" confidence interval, Savitz 3d Dep. Tr. 17:17-18 (J.A. Ex. 154, D.E. 469-8), and "a reasonable interpretation of a 95% confidence interval" is that the interval "is 95% certain to bracket the true value." Savitz Rbt'l at 4 (J.A. Ex. 144, D.E. 468-10). [7]

---

[6] The 0.05 level is "the most common significance level." RMSE at 577.

[7] Dr. Savitz explained that the technically correct definition is that "95% of such intervals would (if truth were known) contain the true value." Savitz Rbt'l at 4 (J.A. Ex. 144, D.E. 468-10)). The *Lipitor I* court also explained the meaning of a confidence interval: The *Lipitor I* court also explained the meaning of a confidence interval:

> A confidence interval is essentially a 'margin of error' for the estimated relative risk ratio. *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.,* 524 F. Supp. 2d 1166, 1174 (N.D. Cal. 2007). It is the "range of possible values" for the actual relative risk ratio, given the data and pre-selected level of confidence. RMSE at 580. "So, for example, if a given study showed a relative risk of 1.40 (a 40 percent increased risk of adverse events), but the 95 percent confidence interval is .8 to 1.9, we would say that we are 95 percent confident that the true value, that is, the actual relative risk, is between .8 and 1.9." *In re Bextra & Celebrex,* 524 F. Supp. 2d at 1174. "Because the confidence interval includes results which do not show any increased risk, and indeed, show a decreased risk,

In the "specific context" of the Bradford Hill methodology "the analysis requires [an expert] to find a statistically significant association at step one before moving on to apply the factors at step two." *Lipitor II,* 892 F.3d at 642.[8] Accordingly, the Fourth Circuit held that the district court properly excluded an expert for failing to identify such an association. *Id*. It reasoned that the *Daubert* factors "suggest a lack of reliability," because plaintiffs had not shown (1) reliance on only non-statistically significant results is "accepted in [the expert's] field"; (2) such non-statistically significant results had "served as the basis for any epidemiologist's causation opinion in peer-reviewed literature" (*id*.); and (3) that standards existed "controlling the technique's operation." *Id*. The Fourth Circuit's analysis aligns with Bradford Hill's original paper, the Federal Reference Manual on Scientific Evidence, and numerous cases, including the six supporting cases cited in *Lipitor I*.[9] *See* Hill (1965); RMSE at 598-599, 599 n.141, *Lipitor I*, 174 F. Supp. 3d at 924-25.

While some courts have held that meta-analyses[10] may satisfy the threshold association requirement, such meta-analyses generally have statistically significant overall results or include

> that is, it includes values less than 1.0, we would say the study does not demonstrate a 'statistically significant' increased risk of an adverse outcome." *Id.*

*Lipitor I*, 174 F. Supp. 3d at 915.

[8] Though, the Fourth Circuit noted that, in general, statistical significance is not a gate to admissibility. *Id.* at 642.

[9] The cases are: *Mathews v. Novartis Pharm. Corp.*, No. 3:12–CV–314, 2013 WL 5780415, at *27 (S.D. Ohio Oct. 25, 2013)·; *McMunn v. Babcock & Wilcox Power Generation Grp., Inc.*, No. CIV.A. 10–143, 2013 WL 3487560, at *15 (W.D. Pa. July 12, 2013); *Frischhertz v. SmithKline Beecham Corp.*, No. CIV.A. 10–2125, 2012 WL 6697124, at *3 (E.D. La. Dec. 21, 2012); *Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 803 (E.D. La. 2011); *In re Fosamax Products Liab. Litig.*, 645 F.Supp.2d 164, 188 (S.D.N.Y.2009); *Soldo v. Sandoz Pharm. Corp.*, 244 F. Supp.2d 434, 461 (W.D. Pa.2003).

[10] "Meta-analysis is the use of statistical methods to summarize the results of multiple independent studies." Madigan Rebuttal at 2 (J.A. Ex. 142, D.E. 468-8); *see also* Madigan Dep. Tr. at 26:3-5 (J.A. Ex., D.E. 469-3).

studies with statically significant results. *See, e.g.*, *In re Paraquat Prods. Liab. Litig.*, 730 F. Supp. 3d 793, 827-30 (S.D. Ill. 2024) (reasoning the threshold association requirement could be satisfied by a well-conducted meta-analysis but excluding testimony because the expert did not "reliably apply" the accepted methodologies for conducting meta-analyses); *In re Tasigna (Nilotinib) Prods. Liab. Litig.*, No. 21-3006, 2024 WL 1343157, at *1-5 (M.D. Fla. Jan. 15, 2024) (threshold association satisfied by a well-conducted meta-analysis that showed a statistically significant near tripling of risk).

Additionally, experts cannot satisfy Bradford Hill's first step with mechanistic data. *Lipitor I*, 174 F. Supp. 3d at 919. In *Lipitor I* the court ruled that mechanistic studies "cannot substitute for studies showing an association"—for the first step—but "are still relevant to the second step of an epidemiological causation opinion," as a factor in evaluation of the nine Bradford Hill criteria. *Id.* The court reasoned that mechanistic studies evaluate how an agent can cause a disease, but do not show the increased incidence of (or mortality from) the disease that is needed to establish a threshold association. *Id.*

### C. The Threshold Association Must Be Observed at Plaintiffs' Exposure Levels.

The evidence supporting the threshold association must also be observed at the plaintiff's exposure levels: "a risk estimate from a study that involved a greater exposure is not applicable to an individual exposed to a lower dose." RMSE at 613 n.196; *Lipitor I*, 174 F. Supp. 3d at 918. As this Court stated, "the plaintiff must demonstrate the levels of exposure that are hazardous to human beings generally as well as the *plaintiff's actual level of exposure*." D.E. 227 at 7 (emphasis added); *see also Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 263 (4th Cir. 1999). Accordingly, a plaintiff's expert must identify a threshold association at the level of exposure of the plaintiff, not at levels of exposure that are orders of magnitude higher than the plaintiff's level of exposure. For example, in *Lipitor*, the court excluded an expert's general causation opinion for

the 10 mg dose of a drug, but not the 80 mg dose, because he identified statistically significant associations for the 80 mg dose, but not for the 10 mg dose. *See Lipitor I*, 174 F. Supp. 3d at 922-26, *Lipitor II,* 892 F.3d at 642.

While pharmaceutical cases like *Lipitor* often have more precise exposure estimates than environmental tort cases, plaintiffs in the latter must still provide evidence of an association at the relevant levels of exposure. For example, in *Burst v. Shell Oil Co.*, No. CIV.A. 14-109, 2015 WL 3755953, at *12(E.D. La. June 16, 2015), *aff'd*, 650 F. App'x 170 (5th Cir. 2016), the general causation issue was whether exposure to gasoline could cause the deceased plaintiff's disease. The court found the expert's methodology unreliable for several reasons, including that he relied on studies that did not indicate "what levels [of gasoline] the workers were actually exposed [to]." Without knowing the gasoline exposure levels in the studies, the expert could not opine on their relevance to the plaintiff's exposure. *See also Konrick v. Exxon Mobil Corp.*, No. CV 14-524, 2016 WL 439361, at *7-8 (E.D. La. Feb. 4, 2016), *aff'd*, 670 F. App'x 222 (5th Cir. 2016) (excluding general causation expert in an occupational exposure case because, *inter alia*, the expert relied on studies that did not indicate to "what levels the workers [in the epidemiology studies studies] were actually exposed"); *cf. Westberry*, 178 F.3d at 264-65 (evidence of precise talc exposure level not required where workplace evidence showed the plaintiff was covered in talc and left footprints).

#### 1. *Exposures in Occupational Studies are Much Higher than Exposures at Camp Lejeune.*

The levels of PCE, benzene, and vinyl chloride that workers in occupational studies are exposed to are much higher than the Camp Lejeune Plaintiffs' potential exposure levels. Dr. Bird admitted that occupational studies "focused on higher levels of exposure and, by design, did not address the impact of lower levels." Bird GC Rep. (Kidney) at 32 (J.A. Ex. 83, D.E. 464-4). He also explicitly contrasted the exposure levels in occupational studies with the "lower levels of

exposure" in "studies on other water contamination incidents." *Id*. Occupational studies generally measure the concentration in parts per million (ppm). *See* IARC 2018 Monograph 120 at 79-86 (J.A. Ex. 202, D.E. 474-2). In contrast, the modeled concentrations for Camp Lejeune are measured in parts per billion (ppb) (1 ppm = 1,000 ppb). *See* Bird Rep. at 19-21 (J.A. Ex. 83, D.E. 464-4); Freeman Rep. at 64-65 (J.A. Ex. 86, D.E. 464-7); Hatten Rep. at 8-9 (J.A. Ex. 90, D.E. 464-11); Mallon Rep at 9-10 (J.A. Ex. 92, D.E. 464-13). One part per million is comparable to one second in 11.5 days while one part per billion is comparable to one second in 31.7 years.

Thus, Plaintiffs' experts cannot rely on occupational studies to establish a threshold association that satisfies the first step of the Bradford Hill analysis. *See Burst*, 2015 WL 3755953, at *12; *Konrick*, 2016 WL 439361, at *7-8. Moreover, the difference in exposure between the levels of chemicals involved in occupational studies and the levels at Camp Lejeune is so large that it constitutes an analytical gap that renders the studies not useful for proving causation. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (affirming exclusion where there was too great an analytical gap between the data and the opinion proffered).

### D. The Studies Supporting a Threshold Association Must be Reliable.

The studies that an expert relies on to find a threshold association in the first step of the Bradford Hill analysis must be reliable. *In re Mirena* is illustrative. *See* 341 F. Supp. 3d at 258-67. The case concerned whether a particular medical product, an intrauterine device (IUD), caused a rare disease. The court emphasized that finding a threshold association is "the vital precondition for embarking on a Bradford Hill analysis." *Id.* at 268. It then held that an epidemiological study could not "sustain finding such an association," *id*, 267-68, "given the *presence of obvious confounding factors* as noted by the study's authors," *id.* at 266 (emphasis added). Thus, an association in a study with serious flaws is not sufficient to fulfill the threshold association

requirement. Rather, the association must be in a study that is sufficiently free of confounding bias to be reliable.

Other courts have similarly emphasized that evidence of a threshold association must be from a reliable study. For example, in *Burst*, 2015 WL 3755953, at *5, an environmental exposure case, the court noted that an expert should examine the Bradford Hill criteria only after "*first* consider[ing]" "[a]lternative explanations 'such as bias or confounding factors'" (emphasis added) (citing RMSE at 598); *see also In re Paraquat Prods. Liab. Litig.*, 730 F. Supp. 3d at 838-39 (unreliable meta-analysis could not satisfy Bradford Hill's threshold association requirement"); *cf.* RMSE at 553, 598 (noting that chance, bias, study design, and confounding must all be considered).

The issue of confounding exposures is particularly relevant in toxic exposure cases where the studies an expert relies upon must sufficiently isolate and evaluate the exposure at issue. For example, in *Burst*, 2015 WL 3755953 at *12, where gasoline exposure was at issue, the court held that the expert could not rely on studies that examined "workers in certain occupations, such as petroleum distribution workers or gasoline service station attendants, instead of examining gasoline exposure directly." It reasoned that "[w]hile such professions may serve as an imprecise proxy for gasoline exposure, it is impossible to tell, and the studies do not indicate, to what substances . . . the workers were actually exposed." *Id.*; *see also Konrick,* 2016 WL 439361 (excluding expert who "relies on a number of studies that do not isolate exposure to the substances at issue" reasoning that studies of workers who are "exposed to a number of different organic solvents" including substances the plaintiffs were not exposed to, cannot reliably support a general causation opinion).

## IV. Plaintiffs' Experts Did Not Identify Any Studies that Satisfy Bradford Hill's Threshold Association Requirement for PCE, Benzene, and Vinyl Chloride.

### A. Plaintiffs Fail to Identify a Study with a Threshold Association between PCE and Kidney Cancer.

Plaintiffs' experts identify only six studies with any statistically significant associations with kidney cancer: Callahan 2019 (J.A. Ex. 228, D.E. 479-5) ("Callahan 2019"), Purdue 2017 (J.A. Ex. 286, D.E. 483-5) ("Purdue 2017"), Pesch 2000a (J.A. Ex. 283, D.E. 483-2) ("Pesch 2000a"), Mandel 1995 (J.A. Ex. 274, D.E. 482-7) ("Mandell 1995"), Ma 2009, **Exhibit 1** ("Ma 2009"), and the ATSDR 2018 Morbidity Study (J.A. Ex. 184, D.E. 472-5) ("the ATSDR 2018 Morbidity Study").[11] None of these studies satisfy the first step of the Bradford Hill analysis because each study is either: (1) an occupational study with exposures orders of magnitude higher than those alleged at Camp Lejeune, (2) an ecological study with poor exposure assessments, or (3) an unpublished study highly criticized by its author.

#### 1. *PCE Levels are Much Higher in Occupational Studies than at Camp Lejeune.*

Callahan 2019, Purdue 2017, Pesch 2000a, and Mandel 1995 are all occupational studies: Callahan 2019 evaluated exposed dry-cleaning workers, Purdue 2017 evaluated "occupational exposures," Pesch 2000a evaluated "occupational risk factors," and Mandel 1995 evaluated workers exposed to dry cleaning solvents. Dr. Bird admitted that workers in occupational studies have high levels of exposure, *supra*, Point I.C.1. The sources that Callahan 2019 and Purdue 2017

---

[11] *See* Bird Rep. at 14, 14, 37-37 (J.A. Ex. 83, D.E. 464-4) (discussing Callahan 2019, Purdue 2017, the ATSDR 2018 Morbidity Study); Freeman Rep. at 31, 40, 46-47, 50, 52 (J.A. Ex. 86, D.E. 464-7) (discussing Purdue 2017, Pesch200a, Mandel 1995, the ATSDR 2018 Morbidity Study); Hatten Rep. at 25, 26, 27 (J.A. Ex. 90, D.E. 464-11) (discussing Callahan 2019, Purdue 2017, Pesch 2000a, the ATSDR 2018 Morbidity Study); Mallon Rep. at 11-12, 20, 34, 35, 36, 37 (J.A. Ex. 92, D.E. 464-13) (discussing Callahan 2019, Purdue 2017, Pesch 2000a, Mandel 1995, Ma 2009,the ATSDR 2018 Morbidity Study). Drs. Freeman, Hatten and Mallon all discuss the risk estimates in Pesch2000a, but erroneously reference Pesch 2000b (J.A. Ex. 284, D.E. 483-3) ("Pesch 2000b").

relied on to develop their exposure assessments support Dr. Bird's admission and illustrate that the concentrations of PCE in the dry-cleaning industry (the primary industry studied), and other occupational exposures, are much higher than the maximum PCE concentration alleged at Camp Lejeune.

The mean PCE concentrations in the studies Callahan 2019 relied on to develop their exposure assessments ranged from 25 to 280 ppm (25,000-280,000 ppb). *See* Callahan 2019 at 286. According to Gold 2008, **Exhibit 2,**—which Purdue 2017 at 4 & n.2 relied on to determine occupational exposure levels—dry cleaning and degreasing account for the vast majority of PCE occupational exposures (Gold 2008 at 807, 808, 817), and the mean exposures in these occupations was 59 ppm (59,000 ppb) in dry cleaning (Gold 2008 at 807,810) and 95 ppm (95,000 ppb) in degreasing (Gold 2008 at 810). In contrast, based on the ATSDR's models, the *maximum* PCE concentrations at Camp Lejeune were 158 ppb or 183 ppb. *See* Bird Rep. at 18-21 (J.A. Ex. 83, D.E. 464-4); Freeman Rep. at 64-65 (J.A. Ex. 86, D.E. 464-7); Hatten Rep. at 8-9 (J.A. Ex. 90, D.E. 464-11).[12] PCE concentrations in air that occupational studies evaluate are not directly analogous to the concentrations in water that the ATSDR modeled (RMSE at 541); nonetheless, the enormous difference between occupational exposures and the potential exposures at Camp Lejeune (i.e., concentrations of PCE in the *tens of thousands to hundreds of thousands of ppb* in occupational studies compared to a maximum concentration of 183 ppb at Camp Lejeune) shows that workers are exposed qualitatively different levels of PCE than the Plaintiffs.

[12] ATSDR modeled PCE concentrations with two different models, which yielded slightly different maximum PCE concentrations. *See* Morris L. Maslia et al., *Analyses of Groundwater Flow, Contaminant Fate and Transport, and Distribution of Drinking Water at Tarawa Terrace and Vicinity, U.S. Marine Corps Base Camp Lejeune, North Carolina: Historical Reconstruction and Present-Day Conditions – Chapter A: Summary of Finding*s (2007) (D.E. 357-2).

Moreover, in Callahan 2019 and Purdue 2017 the *only results* that are statistically significant are for workers whose exposures are at the *highest* of several categories; those with less exposure did not have a statically elevated risk of kidney cancer incidence or mortality relative to those with no exposure.[13] These workers in the highest exposure categories were exposed to higher concentrations than the mean of 25,000-280,000 ppb (Callahan 2019) or 95,000 ppb (Purdue 2017). These exposures are at a whole different level than maximum peak PCE concentration that the ATSDR modeled for Camp Lejeune at 183 ppb.

In sum, Plaintiffs cannot meet their burden of showing that their experts can rely on occupational studies to supply the required threshold association. Since exposures in these four occupational studies were not at similar levels to the Plaintiffs' potential exposures, these studies cannot provide the threshold association that satisfies Bradford Hill's first step. *See Joiner*, 522 U.S. at 146; *Konrick*, 2016 WL 439361, at *7-8; *Burst*, 2015 WL 3755953, at *12.

### ***2. Ma 2009 is an Unreliable Ecological Study.***

Ma 2009, cited by Dr. Mallon only (Mallon Rep. at 37 (J.A. Ex. 92, D.E. 464-13)), cannot satisfy the first step of the Bradford Hill analysis because it is an unreliable ecological study with poor exposure assessments. Ecological studies evaluate correlations between exposures and health outcomes at the group level (e.g., across counties or other geographic units) and have no individual-level data (e.g., the amount of water an individual consumed or time individual was exposed). RMSE at 561; Savitz 2023 at 15 (J.A. Ex. 293, D.E. 484-4).

[13] Callahan 2019 categorized workers as having "no/low," "medium," or "high exposure," with these categories referring to exposure intensity. Only workers with high exposures had statistically elevated mortality due to kidney cancer. *Id.* at 288. Purdue 2017 categorized workers as having "any exposure intensity," or a "high-intensity exposure," and within each intensity category, further divided workers based on cumulative hours exposed ("unexposed," "tertile 1," "tertile 2," and "tertile 3"). Only workers with "high intensity" exposures *and* the highest cumulative hours exposed (over 1,820, which is over 2 years) had a statistically elevated risk of kidney cancer. *Id.* at 18.

Ecological studies have well-known limitations for evaluating causation. *See, e.g.*, RMSE at 561 ("Such studies may be useful for identifying associations, but they rarely provide definitive causal answers."). Plaintiffs' expert, Dr. David Savitz explained that "ecological studies that evaluated exposure and disease are of very limited value in addressing causal relationships," Savitz 2023 at 64 (J.A. Ex. 293, D.E. 484-4), and are "usually a method only for determining whether more rigorous studies are warranted." *Id.* at 15; *see also Rogero v. Sec'y of Health & Hum. Servs.*, No. 11-770V, 2017 WL 4277580, at *53 (Fed. Cl. Sept. 1, 2017), *aff'd*, 748 F. App'x 996 (Fed. Cir. 2018) (describing the World Health Organization's criticisms of ecological studies as inferior to other study types). Indeed, ecological studies are so error-prone that scientists named a logical fallacy after the study type: The ecological fallacy. *See, e.g.*, *Lewis v. Alamance Cnty., N.C.*, 99 F.3d 600, 605 n.3 (4th Cir. 1996) (describing the fallacy as assuming what is true of the group to be true of the individual group members).

The problems with ecological studies identified by Dr. Savitz and others apply to Ma 2009, which examines whether zip codes in New York City with a higher density of dry-cleaning facilities also had higher rates of hospital discharges for kidney cancer. Dr. Savitz noted that, in ecological studies "exposure information is often indirect and may well not apply equally to all the people within the geographic unit, i.e., some of those in the high exposure area may be heavily exposed while others are not exposed at all." Savitz 2023 at 6 (J.A. Ex. 293, D.E. 484-4). Ma and co-authors admitted that: (1) "[d]ry cleaner density per zip code *is a crude measure of [PCE]exposure*" (Ma 2009 at 6) (emphasis added); (2) there were "no direct measurements of [PCE] levels in the residences" (*id.*); and (3) those living closer to dry cleaning facilities would be more exposed than others in the same zip code (*id*). Dr. Savitz also explained that, in ecological studies that evaluate disease rates within geographic units (such a New York City Zip code), "you

will find the residence address of the person *when they were diagnosed*," will not accurately capture exposure information of those who moved out of the area (and would have been exposed) and those who just moved into the area (and would not have been exposed for a long duration). Savitz 2023 at 16 (J.A. Ex. 293, D.E. 484-4) (emphasis added). In Ma 2009, the authors admitted they "have no information on population mobility, and only know current zip code of residence" (Ma 2009 at 3); perhaps more fundamentally, the authors did not know whether those discharged from a given hospital even lived in the zip code, and if so, for how long they lived in the zip code. *Id*. at 3.

These deficiencies render Ma 2009 unreliable; thus, it cannot provide the threshold association that satisfies the first step of the Bradford Hill analysis. *See In re Paraquat Prods. Liab. Litig.*, 730 F. Supp. 3d at 838-39; *In re Mirena*, 341 F. Supp. 3d at 258-67.

***3. The 2018 ATSDR Morbidity Study is an Unpublished Study with Significant Limitations that was Strongly Criticized by its Author.***

The ATSDR 2018 Morbidity Study cannot satisfy the first step of the Bradford Hill analysis because it has significant limitations; the author, Dr. Bove, strongly criticized the study at his deposition and never published it in a peer reviewed journal due to the flaws he identified.

The study, a survey of Marines at Camp Lejeune and Camp Pendelton, attempted to assess whether there were differences in cancer rates between the two populations, and whether those at Camp Lejeune with greater exposure had higher cancer rates than those with less or no exposure. Dr. Bove testified that he and his co-author "didn't send it to a journal because we thought it was a very limited study," Bove Dep. Tr. at 296:22-24 (D.E. 540-2), and that "we didn't really feel that we could make a lot out of this." *Id.* at 297: 20-21. Dr. Bove admitted there were three problems

with the study. First, he admitted that section bias,[14] was a "significant limitation" of the study, *id.* at 302: 15-17, and, due to this bias, the study "most likely" would "have overestimated any effects resulting in higher odd ratios when comparing Camp Lejeune to Camp Pendleton." *Id*. at 303:1-4. Second, he admitted that another "extreme limitation[]" was that "we really couldn't verify the outcomes," *id*. at 296:10-12—meaning that he and his co-author could not verify whether respondents had the diseases they claimed to have. Third, he noted that exposure misclassification was a problem because he and his co-author did not have accurate information about where on Camp Lejune survey respondents had lived or worked. *Id*. at 201:9-212:20; 299:16-20, 304:15-305:18. This lack of information impacts exposure because only two of Camp Lejeune's water systems were contaminated.

Dr. Bove's testimony about these three significant flaws and his admission that he did not submit the study to any peer-reviewed journals because of the flaws is a concession that the study has significant limitations. Additionally, by recognizing that journals would likely not accept the study, Dr. Bove admitted it failed to satisfy the *Daubert* standard for assessing reliability. *See Daubert*, 509 U.S. at 59294 (factors include (1) whether the methodology has been subjected to peer review and publication and (2) whether the expert's technique is generally accepted by the relevant scientific community); *cf. Lipitor I*, 145 F. Supp. 3d at 593 ("A scientific study not subject to peer review has little probative value." (internal citations omitted)). Given the study's significant limitations, the statistically significant associations between PCE and kidney cancer in the study

[14] "Selection bias is defined as "[e]rror due to systematic differences in characteristics between those who are selected for study and those who are not." RMSR at 153. As Dr. Bove explained, selection bias occurred in the ATSDR 2018 Morbidity Study because "people at Camp Lejeune with health problems would have been more likely to return a survey due to the publicity surrounding the Camp Lejeune contamination," *id.* at 301:18-20, and "on the other side of the coin, [those at] Pendleton wouldn't participate because they. . . either don't have a health problem or don't care." *Id*. at 302:22-25.

do not satisfy the first step first step of the Bradford Hill analysis. *See In re Paraquat Prods. Liab. Litig.*, 730 F. Supp. 3d at 838-39; *In re Mirena*, 341 F. Supp. 3d at 258-67.

### B. Plaintiffs' Experts Fail to Identify a Study with a Threshold Association between Benzene and Kidney Cancer.

Plaintiffs' experts identified 5 benzene studies and one meta-analysis with any statistically significant associations or where the lower boundary of the confidence interval is 1,[15] and *all* are occupational studies: Greenland 1994 (J.A. Ex. 255, D.E. 480-15) ("Greenland 1994"), Hu 2002 (J.A. Ex. 261, D.E. 481-5) ("Hu 2002"), Lynge 1997 (J.A. Ex. 272, D.E. 482-5) ("Lynge 1997") ("Lynge 1997"), Pesch 2000a (identified *supra*), Pesch 2000b (J.A. Ex. 284, D.E. 483-3) ("Pesch 2000b"), and the Seyyedsalehi 2024 meta-analysis (J.A. Ex. 298, D.E. 484-9) ("Seyyedsalehi 2024").[16] None of the associations in these studies satisfy the first step of the Bradford Hill analysis because occupational studies evaluate much higher benzene exposures than any potential benzene exposures at Camp Lejeune. Also, Lynge 1997 and Greenland 1994 do not satisfy Bradford Hill's first step for the additional reason that they are not sufficiently reliable studies.

#### *1. Benzene Levels are Much Higher in Occupational Studies than at Camp Lejeune.*

Dr. Bird's admission that workers in occupational studies have high levels of exposure, *supra*, Point I.C.1, is illustrated by Wong 1987b (J.A. Ex. 320, D.E. 486-4) ("Wong 1987b"), one of the few studies examining the relationship between benzene and kidney cancer that quantified exposures.[17] Wong 1987b evaluated kidney cancer mortality among workers who were

---

[15] As noted above in footnote 4, a study can have a lower boundary of the confidence interval that is 1.0. For the purposes of this motion the United States considers these studies as though the associations are statistically significant. In Lynge 1997, Pesch 2000a, and Pesch 2000b the lower boundary of the confidence interval is 1.0.

continuously exposed to benzene for at least six months. He further divided these workers into three groups based on the peak air concentration exposures: Lowest: < 25 ppm (<25,000 ppb); middle: 25-100 ppm (25,000-100,000 ppb); and highest: >100 ppm (> 100,000 ppb). *Id*. at 384 (Table 2). In contrast, based on the ATSDR's model, the highest benzene concentration at Camp Lejeune was 12 ppb. *See* Freeman Rep. at 65 (J.A. Ex. 86, D.E. 464-7); Hatten Rep. at 8 (J.A. Ex. 90, D.E. 464-11). While the benzene concentrations in air that occupational studies evaluate are not directly analogous to the concentrations in water that the ATSDR modeled (RMSE at 541), there is an enormous difference between occupational exposures as illustrated by Wong 1987b, and potential exposures at Camp Lejeune. The occupational studies considered exposures to concentrations of benzene in the *tens of thousands to hundreds of thousands of ppb*, while the highest modeled benzene concentration at Camp Lejeune was 12 ppb. This shows that workers were exposed to qualitatively different levels of benzene than Plaintiffs' potential exposures at Camp Lejeune. [18]

All the studies the Plaintiffs' experts identified with any statistically significant association between benzene and kidney cancer are occupational studies: Greenland 1994 examined employees of transformer plant; Hu 2002 examined "occupational exposures" in Canada; Pesch 2000a examined "occupational risk factors for renal cell carcinoma"; Pesch 2000b examined

[18] Wong 1987b did not find any statistically significant associations between benzene and kidney cancer mortality. The study is discussed because it provides an example of the levels of benzene exposure in occupational studies. In contrast to Wong 1987b, most studies examining the relationship between occupational benzene exposures and kidney cancer did not quantify the workers' cumulative exposure or state the peak concentrations the workers were exposed to; rather, they grouped workers as "ever/never" exposed, or ranked workers' exposures relative to one another. *See, e.g*. Hu 2002 (subjects classified as ever/ never exposed and, of the exposed, as having "low, "medium" or high" exposures based on an industrial hygienists' evaluations of interviews). The one other study cited by Plaintiffs' experts that quantified cumulative benzene exposure benzene concentrations, DeMoulin 2024 (J.A. Ex. 243, D.E. 480-3), also did not find any statistically significant associations between benzene and kidney cancer.

"occupational risk factors for urothelial cell carcinoma"; Lynge 1997 examined gas station workers; and Seyyedsalehi 2024 conducted a meta-analysis of "occupational benzene exposures." As the exposure levels in these occupational studies were not remotely similar to the Plaintiffs' potential exposure levels, these occupational studies cannot provide the threshold association that satisfies Bradford Hill's first step. *See Joiner*, 522 U.S. at 146; *Konrick*, 2016 WL 439361, at *7-8; *Burst*, 2015 WL 3755953, at *12.

### ***2. Lynge 1997 and Greenland 1994 are Unreliable Studies.***

Lynge 1997 and Greenland 1994 cannot satisfy the first step of the Bradford Hill analysis for the additional reason that they are not reliable studies: Lynge 1997 does not isolate benzene exposure from exposure to other chemicals, and the authors of Greenland 1994 explicitly stated that their conclusions regarding benzene and kidney cancer were "suggestive" only.

Studies that do not "isolate exposure to the substance at issue"—here benzene—are not sufficiently reliable to satisfy the first step of the Bradford Hill Analysis. *See In re Mirena*, 341 F. Supp. 3d at 258-67; *Konrick,* 2016 WL 439361, at *7-8; *Burst*, 2015 WL 3755953, at *12. Lynge 1997 evaluated whether gas station workers identified in a 1970 census had increased cancer risks 20 years later; the study noted that workers were exposed to a number of potentially carcinogenic chemicals in addition to benzene. *Id.* at 454. Since Lynge 1997 did not isolate benzene exposure, its results cannot serve as a threshold association that satisfies Bradford's Hill's first step.

The statistically significant association in Greenland 1994 cannot satisfy the first step of the Bradford Hill analysis because the authors admit that "our results are exploratory and suggestive only." Greenland 1994 at 54. "[A] study that provides merely a suggestion or possibility of a relationship is insufficient for a causation opinion." *Konrick,* 2016 WL 439361, at *6; *see also Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 353 (5th Cir. 2007); *Rhyne v. United States Steel Corp.,* 474 F. Supp. 3d 733, 743–44 (W.D.N.C. 2020).

### C. Plaintiffs Fail to Identify a Study with a Threshold Association between Vinyl Chloride and Kidney Cancer.

Plaintiffs' experts identify only one study with any statistically significant associations: Hu 2002, which examined "occupational exposures."[19] The results in this study do not satisfy the first step of the Bradford Hill analysis because it is a study of occupational exposures, with exposure levels that are orders of magnitude higher than the potential exposure levels at Camp Lejeune.

Dr. Bird's admission that workers in occupational studies have high levels of exposure, *supra*, Point I.C.1, is illustrated by Carreón 2014 (J.A. Ex. 230, D.E. 479-7), a study of occupational vinyl chloride exposures.[20] Carreón 2014 evaluated outcomes among workers at a plant where, according to company officials, ambient air concentrations averaged 53 ppm (53,000 ppb) for vinyl chloride in 1973, 40-50 ppm (40,000-50,000 ppb) for vinyl chloride in 1974, and less than 10 ppm (10,000 ppb) for vinyl chloride in 1974-1988. In contrast, based on the ATSDR's model, the highest estimated vinyl chloride concentration at Camp Lejeune was 67 ppb. *See* Bird Rep. at 19 (J.A. Ex. 83, D.E. 464-4); Freeman Rep. at 65 (J.A. Ex. 86, D.E. 464-7); Hatten Rep. at 8 (J.A. Ex. 90, D.E. 464-11). While the vinyl chloride concentrations in air that occupational studies such as by Carreón 2014 (J.A. Ex. 230, D.E. 479-7) evaluate are not directly analogous to the concentrations in water that the ATSDR modeled (RMSE at 541), there is an enormous difference between occupational exposures as illustrated by Carreón 2014 (J.A. Ex. 230, D.E. 479-7) and the potential exposures at Camp Lejeune The occupational studies considered concentrations of vinyl chloride in the *tens of thousands to hundreds of thousands of ppb,* the

[19] *See* Bird Rep. at 49-50 (J.A. Ex. 83, D.E. 464-4); Freeman Rep. at 53, 55-56 (J.A. Ex. 86, D.E. 464-7); Hatten Rep. at 34-35 (J.A. Ex. 90, D.E. 464-11); Mallon Rep. at 43, 46-47 (J.A. Ex. 92, D.E. 464-13).

[20] Carreón 2014 (J.A. Ex. 230, D.E. 479-7) did not find any statistically significant associations between vinyl chloride and kidney cancer mortality. The study is discussed because it provides an example of the levels of vinyl chloride exposure in occupational studies.

highest modeled vinyl chloride concentration at Camp Lejeune was 67 ppb. While Hu 2002 did not provide vinyl chloride exposure concentrations, as an occupational study, one can reasonably assume that the vinyl chloride concentrations would be in a similar range to those studied in Carreón 2014. For this reason, Plaintiffs cannot meet their burden of showing that their experts can reliably use occupational vinyl chloride studies to supply the predicate association that the Bradford Hill methodology requires.

## CONCLUSION

Based on the foregoing the Court should exclude Dr. Bird, Dr. Freeman, Dr. Hatten and Dr. Mallon's opinions related to PCE, benzene and vinyl chloride.

Dated: September 10, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General,
Civil Division

JONATHAN D. GUYNN
Deputy Assistant Attorney General,
Torts Branch

BRIDGET BAILEY LIPSCOMB
Chief, Camp Lejeune Justice Act Section

ADAM BAIN
Special Litigation Counsel

NATHAN J. BU
KAILEY SILVERSTEIN
LUCAS R. WHITE
Trial Attorneys

*/s/ Sharon V. Sprayregen*
SHARON V. SPRAYREGEN
N.Y. 4955704
Trial Attorney
United States Department of Justice
Civil Division, Torts Branch
Camp Lejeune Justice Act Section
1100 L Street, NW
Washington, DC 20005
202-676-6531
sharon.v.sprayregen@usdoj.gov

Attorney inquiries to DOJ regarding CLJA:
(202) 353-4426

*Attorneys for Defendant,*
*United States of America*

## CERTIFICATE OF SERVICE

I hereby certify that on September 10, 2025, I electronically filed the foregoing using the Court's Electronic Case Filing system, which will send notice to all counsel of record.

*/s/Sharon V. Sprayregen*
Sharon V. Sprayregen