IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:23-CV-897

| | |
|---|---|
| IN RE: | ) |
| CAMP LEJEUNE WATER LITIGATION | ) |
| | ) |
| This Pleading Relates to: | ) |
| | ) |
| ALL TRACK 1 CASES | ) |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' LEADERSHIP GROUP'S MOTION TO EXCLUDE DEFENSE EXPERT DR. LISA BAILEY**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ........ 1

DR. BAILEY'S OPINIONS ........ 2

I. Dr. Bailey's Conclusions ........ 2

II. Dr. Bailey's Background ........ 3

III. Dr. Bailey's Opinions Based on Risk Assessment ........ 5

IV. Dr. Bailey's Opinions Based on Margins of Exposure ........ 8

V. Dr. Bailey's Opinions Based on Comparison With Epidemiology ........ 9

VI. Dr. Bailey Does Not Believe in a No-Threshold Model for Carcinogens ........ 14

LEGAL STANDARD ........ 15

ARGUMENT ........ 16

I. The Court Should Exclude Dr. Bailey's Opinions Because She Failed to Apply the Proper Standard ........ 16

II. The Court Should Exclude Dr. Bailey's Opinions on Risk Assessments ........ 17

III. The Court Should Exclude Dr. Bailey's Opinions on Margins of Exposure ........ 21

IV. The Court Should Exclude Dr. Bailey's Opinions on Epidemiology Comparisons ........ 22

V. The Court Should Exclude Dr. Bailey's Opinions on Threshold Doses ........ 28

CONCLUSION ........ 29

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Am. Key Corp. v. Cole Nat. Corp.*,
762 F.2d 1569 (11th Cir. 1985) ....................23

*Amorgianos v. National Railroad Passenger Corp.*,
137 F. Supp. 2d 147 (E.D.N.Y. 2001) ....................19, 27

*Bouygues Telecom, S.A. v. Tekelec*,
472 F. Supp. 2d 722 (E.D.N.C. 2007)....................16, 23

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993).................... *passim*

*Dew v. E.I. du Pont de Nemours & Co.*,
No. 5:18-CV-73-D, 2024 WL 4349883 (E.D.N.C. Sept. 30, 2024) (Dever, J.) ....................16

*EEOC v. Freeman*,
778 F.3d 463 (4th Cir. 2005) (Agee, J., concurring) ....................24

*General Electric v. Joiner*,
522 U.S. 136 (1997).................... *passim*

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)....................18, 19, 20, 22

*La Gorce Palace Condo. Ass'n, Inc. v. Blackboard Specialty Ins. Co.*,
586 F. Supp. 3d 1300 (S.D. Fla. 2022) ....................23

*In re Lipitor*,
892 F.3d 624 (4th Cir. 2018) ....................15, 24

*In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*,
593 F. Supp. 2d 549 (S.D.N.Y. 2008)....................24

*Milward v. Acuity Specialty Prods. Grp., Inc.*,
639 F.3d 11 (1st Cir. 2011)....................13

*Pacific Life Insurance Co. v. Bank of New York Mellon*,
571 F. Supp. 3d 106 (S.D.N.Y. 2021)....................23

*Sardis v. Overhead Door Corp.*,
10 F.4th 268 (4th Cir. 2021) ....................16

## TABLE OF AUTHORITIES
(continued)

**Page**

*Schoen v. State Farm Fire & Cas. Co.*,
638 F. Supp. 3d 1339 (S.D. Ala. 2022)....................23

*Small v. WellDyne, Inc.*,
927 F.3d 169 (4th Cir. 2019)....................2, 16, 21

*United States v. Crisp*,
324 F.3d 261 (4th Cir. 2003)....................15

*Westberry v. Gislaved Gummi AB*,
178 F.3d 257 (4th Cir. 1999)....................15

*Yates v. Ford Motor*,
113 F. Supp. 3d at 841....................15

**Rules**

Fed. R. Evid. 702....................15, 29

Fed. R. Evid. 703....................23

## INTRODUCTION

Under *Daubert*, it is black-letter law that an expert may not testify based on *ipse dixit* alone. *General Electric v. Joiner*, 522 U.S. 136, 146 (1997). But Dr. Lisa Bailey's own say-so—*i.e.*, *ipse dixit*—is exactly what she *admittedly* bases her opinions on here. Dr. Bailey works for a company called Gradient, a notorious stable of defense-experts-for-hire. Gradient, which has billed the taxpayers more than $6.5 million for work on this litigation—and counting—has been publicly described as "defend[ing] the products of its corporate clients beyond credulity," peddling "junk science," making "false statements," "misrepresenting the science consistently," "making stuff up," and generally being "rented white coats"—among many other criticisms.[1] *See infra* at 3-5. In her deposition, Dr. Bailey was asked time and again whether anyone *outside of Gradient* has ever employed the so-called "methodologies" that she employs here. And time and again, she was forced to admit that the answer is "no." No peer-reviewed literature employs her methodologies. No scientific organizations do. No authorities of any kind do what she does. *See, e.g.*, Bailey Dep. Tr. at 122:24-123:7 (JA Ex. 618, D.E. 510-7) (admitting she cannot name anyone outside Gradient who has done a "risk assessment to calculate an individual person's risk of getting a disease"); *id.* at 185:1-15 (admitting she cannot name anyone outside Gradient who has done "a margin of exposure calculation for an individual person"); *id.* at 139:22-140:18 (admitting she cannot name anyone outside Gradient who discusses "acceptable risks" when evaluating causation); *id.* at 147:19-25 (admitting she cannot name any authority suggesting that rejecting threshold doses for carcinogens is biologically implausible).

The only people Dr. Bailey can identify who employ her methodologies are her fellow rented white coats. Her reasoning for why this is acceptable? To quote Dr. Bailey herself: "I

[1] Exhibit A (David Heath, "Meet the 'Rented White Coats' Who Defend Toxic Chemicals," Center for Public Integrity (Feb. 8, 2016)).

don't think an authority [agreeing with] my evaluation is relevant." Bailey Dep. Tr. 140:13-187 (JA Ex. 618, D.E. 510-7). Her methods "makes sense" to her. *Id.* at 147:19-25. She "know[s] that it's a reasonable approach" even though she cannot "find an article that says that it is." *Id.* at 140:9-11. And "[i]t doesn't matter whether [she's] seen [the methodology done] or not." *Id.* at 123:10-11. In her view, her "expertise in human health risk assessment is what's relevant" instead. *Id.* at 140:16-18.

But under *Daubert*, it certainly does matter whether her methodologies have been recognized before by actual scientists. "Without testing, supporting literature in the pertinent field, peer reviewed publications[,] or some basis to assess the level of reliability, expert opinion testimony can easily, but improperly, devolve into nothing more than proclaiming an opinion is true 'because I say so.'" *Small v. WellDyne, Inc.*, 927 F.3d 169, 177 (4th Cir. 2019). That is precisely what Dr. Bailey's opinions have "devolve[d] into" here. *Id.* For these reasons and those below, the Court should exclude Dr. Bailey's opinions in their entirety, as well as other experts' opinions that rely on Dr. Bailey's.

## DR. BAILEY'S OPINIONS

### I. Dr. Bailey's Conclusions

Dr. Bailey offers the opinion that *none of* the Track 1 Plaintiffs' exposures to *any of* the chemicals at Camp Lejeune are causally associated *in any way* with their diseases. *See e.g.*, Bailey Rep. (Dyer) at 49 (JA Ex. 375, D.E. 490-10); Bailey Dep. Tr. at 10:11-13 (JA Ex. 618, D.E. 510-7) ("I don't believe the exposures were high enough for any of the plaintiffs to be of concern for health effects."). She then copied this same conclusion, with minimal changes, into every single one of her expert reports. Bailey Dep. Tr. at 75:24-76:6 (JA Ex. 618, D.E. 510-7) ("Am I correct that you have essentially [copied] this paragraph, with the exception of the years,

the name and the disease, for every single one of the plaintiffs that you looked at? A. That paragraph is similar[.]"). At no point did Dr. Bailey apply the Camp Lejeune Justice Act's as-likely-as-not standard. *Id.* at 14:6-10 ("Q. In your reports, am I correct you do not apply the as likely as not standard? A. That's not a term that I use in my reports."). She did not calculate the Plaintiffs' exposures in terms of cumulative doses of the chemicals, or microgram-per-liter-months, even though those exposures were directly measured in human epidemiological studies. *Id.* at 102-103.[2] And for her boilerplate conclusions, she has been paid more than $1.7 million dollars. *Id.* at 36:16-20 ("Q. . . . Gradient has billed the government about $1.7 million so far. Is that approximately correct? A. That sounds correct.").[3]

## II. <u>Dr. Bailey's Background</u>

Given these sweeping opinions, one might assume that Dr. Bailey must be a well-renowned expert in these chemicals or in these diseases. She is not. She has never once published on any of these chemicals. *See* Bailey Dep. Tr. at 35:6-10 (JA Ex. 618, D.E. 510-7) ("I don't believe I have a published paper on trichloroethylene."); *id.* at 35:13-16 ("Have you ever published on perchloroethylene? A. As I sit here today, I don't recall that."); *id.* at 35:17-18 ("Q. Benzene? A. I don't recall a publication on benzene."); *id.* at 35:19-20 ("Q. Vinyl chloride? A. No, I have not."). And she has never published on any of these diseases, with the sole exception of a paper dubiously claiming (on behalf of the formaldehyde lobby) that formaldehyde does not cause leukemia. *Id.* at 34:13-35:5. One might also assume, given her

---

[2] If she *had* calculated the plaintiffs' exposures in metrics used in the actual epidemiology, then she would have been forced to admit that their exposures were comparable to—and often *more than*—the exposures in epidemiology studies that showed *increased risk*.

[3] These amounts do not reflect work performed by Dr. Bailey's co-worker at Gradient, Dr. Julie Goodman. Dr. Goodman had billed the government an *additional* $4.3 million as of March 2025. *See* Mot. to Exclude Goodman, filed contemporaneously herewith. Presumably the total has continued to climb over the past 6 months.

prior inexperience with these issues, that she undertook an in-depth study after becoming involved in this case. She did not. Dr. Bailey never performed her own review of the scientific literature in this case. *Id.* at 84:18-21 ("Q. Did you do your own independent literature search to find the epidemiology literature? A. I did not.").

What Dr. Bailey has, instead, is a lengthy track record of providing "no causation" opinions to defendants who badly need them. She has opined that formaldehyde does not cause leukemia, despite a scientific consensus that it does. *Id.* at 58:4-8; *see* Exhibit B, American Cancer Society, "Formaldehyde and Cancer Risk" ("IARC has concluded that formaldehyde is 'carcinogenic to humans' based on sufficient evidence it can cause nasopharyngeal cancer and leukemia."). She has opined that crysotile asbestos does not cause mesothelioma, despite a scientific consensus that it does. *Id.* at 47:5-14; *see* Exhibit C, American Cancer Society, "Asbestos and Cancer Risk" ("All forms of asbestos have been linked to mesothelioma."). She has opined that naphthalene does not cause cancer, despite a scientific consensus that it does. *Id.* at 55:7-10; *see* Exhibit D, National Toxicology Program, *Report on Carcinogens*, "Naphthalene" ("Naphthalene is reasonably anticipated to be a human carcinogen."). These opinions were given (respectively) on behalf of the formaldehyde, asbestos, and naphthalene industries. *Id.* at 67:7-18. Dr. Bailey permitted these industries to comment on the manuscript before publication, *id.* at 50:17-22, something one of the government's other experts agreed was improper. Lakind Dep. Tr. at 89:23-93:8 (JA Ex. 617, D.E. 517-3 And in her many, many years of testifying in litigation, and publishing on behalf of industry, Dr. Bailey has never once—ever—opined that a chemical *does cause* an adverse effect at realistic doses. Bailey Dep. Tr. at 35:6-10 (JA Ex. 618, D.E. 510-7) at 66:7-10.

This is unsurprising. Dr. Bailey works for a for-hire expert firm called Gradient, a

company "employed to manufacture doubt and foment uncertainty about scientific evidence." Exhibit E, International Network for Epidemiology in Policy, "Conflict of Interest and Disclosures in Epidemiology" at 9. As exposed in the press, "Gradient scientists rarely acknowledge that a chemical poses a serious public health risk." Exhibit A at 3. Gradient has been routinely criticized for publishing misleading data, colluding with industry and defense attorneys during litigation to astroturf the scientific literature, "defend[ing] the products of its corporate clients beyond credulity," and generally being (as they have been publicly described) "rented lab coats." *Id.*

## III. Dr. Bailey's Opinions Based on Risk Assessment

Dr. Bailey purported to perform three analyses for each Track 1 Plaintiff.[4]

First, she performed a risk assessment for each of Track 1 Plaintiff. In other words, she purported to calculate the theoretical increased risk of cancer (or Parkinson's Disease) that each Plaintiff would have experienced given her calculation of the amount of the relevant chemicals they were exposed to at Camp Lejeune. She then decided (for every single Plaintiff) that the risk was within the "acceptable risk range." E.g., Bailey Rep. (Dyer) at 39 (JA Ex. 375, D.E. 490-10). And because the calculated risk was within this notional "acceptable" range, Dr. Bailey ultimately concluded "no causation," i.e., that the exposures to the Camp Lejeune water were not "causally associated" with the relevant disease. *Id.*

As Dr. Bailey was forced to admit, however, she has never seen a peer-reviewed article that performs a risk assessment for an individual. Bailey Dep. Tr. at 12:16-21 (JA Ex. 618, D.E.

---

[4] Dr. Bailey employed the same methodology in her reports for every Track 1 Plaintiff (often appearing to cut and paste analysis and conclusions). *See, e.g.*, Bailey Rep. (Dyer) at 2-8 (JA Ex. 375, D.E. 490-10) (executive summary of bladder cancer report); Bailey Rep. (Kidd) at 2-8 (JA Ex. 513, D.E. 500-8) (equivalent executive summary of non-Hodgkin's lymphoma report); Bailey Rep. (Sparks) at 2-7 (JA Ex. 546, D.E. 503) (equivalent executive summary for Parkinson's disease report).

510-7). She has never seen an authority suggesting that risk assessment can be used to evaluate causation. *Id.* at 70:22-71:3 ("Q. Have you ever seen a peer-reviewed publication that uses risk assessment to assess causation in a population? A. As I sit here today, I can't recall of a publication that assesses causation in a population. Q. Using risk assessment? A. Using risk assessment; right.").[5] She was forced to admit that scientific authorities specifically say *not to* discuss notions of "acceptable risk." Bailey Dep. Tr. at 135:20 – 136:5 (JA Ex. 618, D.E. 510-7). She was unable to name any authority (outside of Gradient) suggesting it is methodologically valid to discuss "acceptable" risk ranges for an individual. *Id.* at 140:13-18 ("Q. Any authority you can point to? A. I don't think an authority on my evaluation is relevant. I think my expertise in human health risk assessment is what's relevant."). And she was unable to name a single person in the world—other than her fellow "lab coats for sale" at Gradient—who has ever performed a risk assessment for an individual *at all*. *Id.* at 123-24.[6] Asked whether she had ever seen it done, she said "it doesn't matter whether I've seen it done or not" and that "I don't need to see it anywhere else." *Id.* at 123:10-11, 18-19.

The government experts who do *not* work for Gradient tell a different story. They disagree with Dr. Bailey on the proper use of risk assessment. Dr. Bailey testified that risk assessments can be used to evaluate causation. *Id.* at 25:13-16 ("Do you agree reference values have no place in the estimate of causation? A. I don't agree with that."). She did so throughout

---

5 Government expert Dr. Lipscomb also has never seen this done—and he explained why. Lipscomb Dep. Tr. 136:15-137:1 (JA Ex. 174, D.E. 471-3) ("Q. Okay. And in your 34 years though you haven't seen anybody determine specific causation based on a risk assessment? A. I haven't and the reason I haven't is because EPA and ATSDR specifically indicate that risk assessment values including those for cancer cannot be used to assess the quantified risk above an exposure or the true risk of cancer.").

6 Dr. Bailey also admitted that nobody outside of Gradient has ever used risk assessments to dispute causation, either. *Id.* at 127:6-10 ("Q. The answer is no, never seen it done outside of Gradient; correct? A. Correct, but there's a good reason why. I think I explained it.").

her report. But two other government experts—Dr. Lipscomb and Dr. Lakind—testified in clear terms that this is simply not a proper use of risk assessments at all. *See* Lipscomb Dep. Tr. 50:10-11, 130:8-10, 131:12-17, 162:13-16 (JA Ex. 174, D.E. 471-3) (testifying: "Regulatory risk assessments are not conducted to support causation."; "Risk assessment is not a science directed at the individual level."; "risk assessment cannot make predictions of . . . the likely response at an individual level," one "of the many things that preclude using risk assessment approaches to evaluate individual risk,"; and "Q: And risk assessment is not a causation analysis? [objection] A: Yes."); Lakind Dep. Tr. 103:3-6 (JA Ex. 617 D.E. 517-3) (testifying that risk assessment is "not used for a causality assessment"); *id.* 104:21-24 ("Q. Have you ever seen a peer-reviewed paper use[] a risk assessment to calculate an individual person's risk of getting a disease? A. No."). The list of contradictions goes on. Dr. Bailey testified that "Reference values can be used as part of a causation analysis." Bailey Dep. Tr. at 27:20-24 (JA Ex. 618, D.E. 510-7). But that is not what Dr. Lipscomb and Dr. Lakind said. They testified that "the EPA has been very clear that these reference values cannot be used as estimators of risk or causation." Lipscomb Dep. Tr. at 171:23-172:3 (JA Ex. 174, D.E. 471-3); Lakind Dep. Tr. 133:19-134:2 (JA Ex. 617, D.E. 517-3) (agreeing that "reference values have no place in the estimation of causation"). The government's non-Gradient experts say this because the purpose of risk assessments is not to evaluate causation but instead to "predict health protective measures for possible events for regulatory and policy-making decisions." Lipscomb Dep. Tr. at 38:22-41:2 (JA Ex. 174, D.E. 471-3).[7]

[7] By contrast, epidemiology *is* routinely used to evaluate causation. This is because epidemiology predicts relative risks. *Cf.* Bailey Dep. Tr. 117:17-19 (JA Ex. 618, D.E. 510 7) ("Q. Epidemiology sometimes produces relative risks; true? A. Correct."); *id.* at 117:13-15 ("Risk assessments are not capable of producing relative risks.").

In performing her risk assessments, Dr. Bailey did not consider whether the different diseases have different risk factors. Bailey Dep. Tr. at 166 (JA Ex. 618, D.E. 510 7). She did not consider the various causes of the different diseases. *Id.* at 167. And her risk assessments would come out the same no matter the relevant disease. For example, if two people had the same amount of exposure, she would have provided the *exact same* risk estimate for them no matter whether they got kidney cancer or non-Hodkins lymphoma. *Id.* at 163. After doing this calculation, she then compared her estimates of the risk to the lifetime *total* cancer risk. *Id.* at 158:9-25. In other words, she first purported to calculate the risk of (for example) bladder cancer. But then in reporting her results, she compared that to the risk of getting *any cancer* at all.[8]

## IV. Dr. Bailey's Opinions Based on Margins of Exposure

Second, Dr. Bailey performed so-called "margin of exposure" analyses. As Dr. Bailey admitted, however, nobody outside of Gradient has ever done this kind of analysis for an individual before. Bailey Dep. Tr. 185:1-15 (JA Ex. 618, D.E. 510-7). Like risk assessments, margins of exposure are used to guide population-level policymaking, not to evaluate causation. Dr. Bailey was also forced to admit that margins of exposure are not designed to look at cancer risks at all. She was unable to identify anyone (again outside of her science-for-hire expert firm) who had ever performed this kind of analysis. *Id.* at 185:17-23 ("Q. You apply this analysis to noncancer and cancer endpoints; correct? A. I do. Q. And have you seen it done for cancer endpoints even with respect to a population? A. As I sit here right now, I can't recall when that has been done.").

[8] This is highly misleading, because it obscures the fact that the risk of getting any particular cancer is orders of magnitude lower than the risk of getting cancer generally.

There is a good reason why nobody else has ever used margins of exposure to assess causation: It makes little sense to do so. As Dr. Bailey defines it, the margin of exposure is defined by the following equation: MoE = [the exposure corresponding to a theoretical 1% absolute increased risk] divided by [her calculation of the Plaintiff's exposure]. *See, e.g.*, Bailey Rep. (Dyer) at 22 (JA Ex. 375, D.E. 490-10) (defining MoE as "POD"/individual exposure); Bailey Dep. Tr. at 173:21-174:2 (JA Ex. 618, D.E. 510-7) (conceding that the POD corresponds to a 1% increased risk on an absolute basis). In Dr. Bailey's view, if that MoE number is greater than 1.0—*i.e.*, if the Plaintiff received *any* less exposure than the level corresponding to a 1% absolute increased risk—then Dr. Bailey decided there was no causation for that Plaintiff. *See* Bailey Rep. (Dyer) at 41 (JA Ex. 375, D.E. 490-10) ("If the MoE is greater than 1 . . . [that] provid[es] support that adverse health effects would not be expected for the individual.").

Dr. Bailey offered no basis for her causation cut-off at exposures increasing disease risks by at least an absolute 1%. The background rates for some of these diseases are themselves quite low—often 1% or less.[9] Adding an additional 0.9% of risk amounts to a substantial increase in the cancer risk. That is strong evidence *in favor* of causation. It is not, as Dr. Bailey concluded, evidence that "adverse health effects would not be expected for the individual." Bailey Rep. (Dyer) at 41 (JA Ex. 375, D.E. 490-10).

## V. <u>Dr. Bailey's Opinions Based on Comparison With Epidemiology</u>

Finally, Dr. Bailey states that she did a "comparison of epidemiology." Bailey Dep. Tr. at 120:11-18 (JA Ex. 618, D.E. 510-7). Specifically, she says that she performed "[a]

[9] For kidney cancer, the lifetime risk is 1.4% for women and 2.3% for men. Exhibit G, American Cancer Society, "About Kidney Cancer." For NHL, the lifetime risk is 1.35%. Exhibit H, American Cancer Society, "Key Statistics for Non-Hodgkin Lymphoma." For leukemia and bladder cancer, the lifetime risk is 1.8% and 3.4%, respectively. Exhibit I, American Cancer Society, "Lifetime Risk of Developing or Dying From Cancer." The lifetime incidence of Parkinson's Disease is not well defined, but of course it is a rare illness.

comparison of the estimated exposures for the plaintiff to exposure information from relevant epidemiology or animal studies." Bailey Rep. (Dyer) at 8 (JA Ex. 375, D.E. 490-10). And because (in her view) the Plaintiffs' exposure estimates are "below the concentrations in these studies," that means there is no causation. *Id.* (stating that this provides "additional support that Ms. Dyer's exposures would not have been expected to lead to her bladder cancer").

This analysis is doubly flawed. First, the fact that a Plaintiff's exposure was less than the exposures showing an increased risk in a study in no way implies (as a matter of logic) that *lower* exposures do not also increase the risk. If a study found that 6 drinks was enough to cause intoxication in a certain population, that in no way implies that 4 drinks would not do the same. Similarly, the studies that Dr. Bailey cites say nothing at all about what happens at lower exposure levels than those studied: these studies simply did not look at people with exposures similar to those experienced by the people at Camp Lejeune. Thus, the fact that the Plaintiffs' exposures were lower than in the occupational studies that Dr. Bailey cites in no way implies (as Dr. Bailey says) that the "exposures would not have been expected to lead to [the relevant disease]." *Id.*

Second, Dr. Bailey did not actually compare the Plaintiffs' exposures to the vast majority of the relevant studies here. There are in fact studies looking at what happens to people who are exposed to levels of exposure similar to Camp Lejeune.[10] Dr. Bailey admitted that it would have been helpful to review those kinds of studies looking at lower exposure. Bailey Dep. Tr. at

---

[10] *See, e.g.*, Exhibit J, Hadkhale et al., "Occupational exposure to solvents and bladder cancer: A population-based case control study in Nordic countries" (2017); Exhibit K, Aschengrau et al., "Cancer Risk and Tetrachloroethylene contaminated Drinking Water in Massachusetts" (1992); Exhibit L, Cohn et al., "Drinking Water Contamination and the Incidence of Leukemia and Non-Hodgkin's Lymphoma" (1994); Exhibit M, Andrew et al., "Kidney Cancer Risk Associated with Historic Groundwater Trichloroethylene Contamination" (2022); Exhibit O, Parker and Rosen, "Woburn: Cancer Incidence and Environmental Hazards 1969-1978" (1981)

233:10-22 (JA Ex. 618, D.E. 510-7). But Dr. Bailey chose not to compare the Plaintiffs' exposures to those studies. *See id.* at 238 (no comparison of Plaintiff exposures to certain results in the Hadkhale study); *id.* at 269 (no comparison of Plaintiff exposures to the Aschengrau 1993 study); *id.*at 283 (no comparison of Plaintiff exposures to the Cohn study); Bailey Rep. (Dyer) at 42 (JA Ex. 375, D.E. 490-10) (stating that she "did not consider exposure estimates" from *any* of the Camp Lejeune epidemiology studies).

For most of these studies, she chose not to read them at all. *See, e.g.*, Bailey Dep. Tr. at 235 (JA Ex. 618, D.E. 510-7) (admitting she has not read the Andrew 2022 study); *id.* at 238 (admitting she has not read the Moore 2010 study); *id.* at 245 (admitting she has not read the Parker and Rosen study); *id.* at 210 (admitting she read only one of the numerous studies regarding Camp Lejeune). Nevertheless, Dr. Bailey purports to offer an opinion that every Plaintiff's exposure was "orders of magnitude below the concentrations in these studies." Bailey Rep. (Dyer) at 8 (JA Ex. 375, D.E. 490-10).

The only way that Dr. Bailey is able to provide such an opinion is by taking a gerrymandered view of the epidemiology. This is not because Dr. Bailey performed a literature review. She did not. Bailey Dep. Tr. at 84 (JA Ex. 618, D.E. 510-7). Nor is it because she has any independent opinions on whether the studies are reliable. She does not. *Id.* at 19 ("[Y]ou don't have any opinions on the Camp Lejeune epidemiology; true? A. I don't have opinions written in my report about the Camp Lejeune epidemiology."). Nor could she, given how few of them she actually read.

Instead, Dr. Bailey unflinchingly accepts what another expert, Dr. Julie Goodman, says about the various studies. *See id. at* 82:17-21 ("Q. Did you defer to Dr. Goodman's interpretation of what studies were reliable? A. I used Dr. Goodman's report for a summary of

reliable studies, yes. But I agree with her methodology."); *id*. at 19:7-11 ("Q. For that you're relying entirely on Dr. Goodman? A. I'm relying on Dr. Goodman's methodology, yes. I'm relying on her conclusions for those studies.").

Dr. Goodman is a colleague who works at Gradient with Dr. Bailey. And Dr. Goodman has personally—indeed by name—been called out in the press for (among other things) making "false statements" about the relevant science, falsely claiming that there is a "safe dose" of asbestos, having inappropriate contact with defense attorneys, and generally "making stuff up." Exhibit A at 7. She has been cited as a textbook example of an expert willing to deploy "junk science," "obstruct" safety measures, "foment uncertainty" and "manufacture doubt." Exhibit E at 1. She is "one of the go to people that the oil and chemical industries hire when they want someone to put together a study showing that a particular chemical might not be as cancerous or harmful to public health as other scientists claim." Exhibit P ("Julie Goodman – Advocate for Industry") at 1. In short, Dr. Goodman is an "industry apologist" who has a professional "reputation of misrepresenting the science consistently." Exhibit A at 10.[11] This is who Dr. Bailey relies on. Dr. Bailey relies on Dr. Goodman's view of what counts as a "reliable" study *in toto* and entirely uncritically. She made no effort to fact-check Dr. Goodman, confirm that Dr. Goodman's analysis was correct, or even make sure that she agreed with her.

The most Dr. Bailey could muster (repeatedly) was that she made sure she agreed with Dr. Goodman's "methodology." Bailey Dep. Tr. at 40:16 (JA Ex. 618, D.E. 510-7) ("I agree with her methodology."); *id.* at 41:3-6 (same), 42:4-5 (same), 43:17-18 (same), 44:7 (same), 82:11-12 (same), 82:20-20-21 (same), 84:25:85:1 ("And again, I agree with her methodology."). But Dr. Goodman's "methodology" was hardly akin to conducting a controlled experiment or

[11] This does not reflect the entire universe of public criticism of Dr. Goodman and Gradient, and there are other examples of objective third-party entities believing Dr. Goodman is a biased and unobjective scientist.

performing a well-known calculation. With those kinds of methodologies, an expert could note that they agree and be confident in the result. But here Dr. Goodman's "methodology" was simply to evaluate "the weight of the evidence." *Id.* at 41:7-10 ("Q. When you say 'the methodology,' are you talking about the weight-of-the-evidence methodology? A. Yes."). Although that methodology can be employed by an expert, by its nature (looking at the evidence and then making a judgment about it), it means that "the role of judgment . . . is more readily apparent than it is in other methodologies." *Milward v. Acuity Specialty Prods. Grp., Inc.*, 639 F.3d 11, 18 (1st Cir. 2011). Conclusions generated by this kind of analysis simply cannot be verified from afar. An expert must actually review the studies—*i.e.*, the "evidence"—and determine that he or she agrees.

Dr. Bailey agreed with nearly all of these points, at least in the abstract. She admitted that "when doing a weight-of-the-evidence analysis, you definitely need to review all the evidence." Bailey Dep. Tr. at 41:21-24 (JA Ex. 618, D.E. 510-7). She admitted that when doing a weight-of-the-evidence analysis, an expert has "to weigh the evidence, some more strongly and some less strongly." *Id.* at 43:5-9. She agreed you cannot do that weighing "without actually reviewing the evidence." *Id.* at 43:10-12. And she agreed that the weight-of-the-evidence approach "involves some degree of scientific judgment" "based on the [actual] evidence." *Id.* at 44:1-3. But she was forced to admit that she did not review the studies herself,[12] that she did not even read all of Dr. Goodman's reports, and that she did *nothing* to "independently verify" that she even agreed with Dr. Goodman's judgment. *Id.* at 42:22-43:3, 44:6-8.

---

[12] In fact, Dr. Bailey admitted she had not even read the entirety of the studies on *her own* materials considered list. *Id.* at 205:13-206:6.

## VI. Dr. Bailey Does Not Believe in a No-Threshold Model for Carcinogens

The scientific community employs a "no-threshold" model to evaluate the risk of cancer. Exhibit F (*Reference Manual on Scientific Evidence*, National Academy of Sciences (3rd Ed. 2011)) at 642 (Genetic mutations leading to cancer "are believed to occur without any threshold."). Put differently, the scientific community believes that there is no safe dose of a genotoxic carcinogen, and that even small exposures increase the risk of getting cancer. *Id.* In her report, Dr. Bailey nevertheless decided not to follow that scientific consensus. In her idiosyncratic view, "a non-threshold mechanism of carcinogenesis" is not even "biologically plausible." Bailey Rep. (Dyer) at 19 (JA Ex. 375, D.E. 490-10). In other words, the scientific community says it is *true* that there is no threshold for carcinogens. Dr. Bailey says not only is it untrue, but *impossible* for there to be no threshold for carcinogens.

In holding this niche view, Dr. Bailey seems to be alone. She was unable to say what the threshold dose is for TCE or any of the relevant diseases. Bailey Dep. Tr. 130:7-12 (JA Ex. 618, D.E. 510-7) ("Q. So what's the threshold dose for TCE and kidney cancer? A. I don't know. Q. How about TCE and NHL? A. I don't know[.]"). She was forced to disagree with the (numerous) scientific authorities that state that carcinogens do not have threshold doses. *Id.* at 155:12-16 ("Q. Do you see where it says, 'Trichloroethylene is a non-threshold carcinogen'? A. Yes. Q. Do you disagree with that; right? A. I do."). And in the end, she was unable to identify any other scientist who believes (as she does) that carcinogens should be evaluated assuming the existence of a threshold dose. *Id.* at 132:4-8 ("Q. So what authority says it's not even biologically plausible to believe that carcinogens don't have a threshold dose? A. So I'm not basing it on an authority. I'm basing it on my understanding of the science."); *id.* at 154:9-13 ("Q. Well, can you give me any authority saying that there is a threshold for TCE? A. I don't

know if there's an authority that says that, but based on my review of the science, I believe there is."). Dr. Bailey's opinions are admittedly "not bas[ed] . . . on an authority," but her say-so.

## LEGAL STANDARD

Under Rule 702, the proponent of expert testimony bears the burden to demonstrate that the expert "will help the trier of fact to understand the evidence or to determine a fact in issue," that "the testimony is based on sufficient facts or data," that "the testimony is the product of reliable principles and methods," and that "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid 702. When evaluating expert testimony, the district court "assumes a 'gatekeeping role' to ensure that the 'testimony both rests on a reliable foundation and is relevant to the task at hand.'" *In re Lipitor*, 892 F.3d 624, 631 (4th Cir. 2018). In other words, "[t]he touchstones for admissibility under Daubert are two: reliability and relevancy." *United States v. Crisp*, 324 F.3d 261, 268 (4th Cir. 2003). The reliability of an expert's methods "may be indicated by testing, peer review, evaluation of rates of error, and general acceptability." *Oglesby,* 190 F. 3d at 250 (citing *Daubert*, 509 U.S. at 593-94). When considering whether expert testimony is reliable, a court considers (among other things) "whether the theory has been subjected to peer review and publication," and "whether the technique has achieved general acceptance in the relevant scientific or expert community." *Yates v. Ford Motor*, 113 F. Supp. 3d at 841 (quoting *Crisp*, 324 F.3d at 266 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593-94 (1993)).

The *Daubert* inquiry should focus "on the 'principles and methodology' employed by the expert, not on the conclusions reached." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999) (quoting *Daubert*, 509 U.S. at 594-95). That said, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is

connected to existing data only by the ipse dixit of the expert." *GE v. Joiner*, 522 U.S. 136, 146 (1997). "Without testing, supporting literature in the pertinent field, peer reviewed publications[,] or some basis to assess the level of reliability, expert opinion testimony can easily, but improperly, devolve into nothing more than proclaiming an opinion is true 'because I say so.'" *Small v. WellDyne, Inc*., 927 F.3d 169, 177 (4th Cir. 2019).

For an expert opinion to be reliable, "it must be based on scientific, technical, or other specialized knowledge and not on belief or speculation." *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 289 (4th Cir. 2021). "Result-driven analysis, or cherry-picking, undermines principles of the scientific method and is a quintessential example of applying methodologies (valid or otherwise) in an unreliable fashion." *Dew v. E.I. du Pont de Nemours & Co.*, No. 5:18-CV-73-D, 2024 WL 4349883, at *4 (E.D.N.C. Sept. 30, 2024) (Dever, J.). "[A]n expert with a perhaps overlapping, yet admittedly different, area of expertise should [not] be permitted to merely adopt and incorporate verbatim another's 'expert' opinion." *Bouygues Telecom, S.A. v. Tekelec*, 472 F. Supp. 2d 722, 729–30 (E.D.N.C. 2007).

## ARGUMENT

Dr. Bailey's opinions should be excluded for the following reasons.

### I. The Court Should Exclude Dr. Bailey's Opinions Because She Failed to Apply the Proper Standard

First, Dr. Bailey's opinions should be excluded because she failed to apply the CLJA's as-likely-as-not standard. *See* D.E. 567 (Mot. to Exclude Opinions Failing to Apply CLJA Standard). In order to be admissible, expert testimony must be "help[ful]" to the trier of fact under the relevant standard. *Daubert*, 509 U.S. at 592. And when experts fail to apply the proper standard, courts have excluded those opinions. *See, e.g.*, *Sardis*, 10 F.4th at (expert testimony applying wrong legal standard is irrelevant under *Daubert*).

There is no question that Dr. Bailey failed to apply the proper standard here. Dr. Bailey did not read the CLJA statute. Bailey Dep. Tr. 13:11-13 (JA Ex. 618, D.E. 510-7) (Q. Have you ever read the text of the Camp Lejeune Justice Act? A. I have not read the text."). She was not asked to apply the standard from that statute. *Id.* at 13:14-19. She was not asked to determine whether "it was at least as likely as not that the chemicals contributed to the plaintiffs' injuries." *Id.* at 13:21-14:2. And she did not ultimately apply the "as likely as not standard." *Id.* at 14:4-10 ("Q. In your reports, am I correct you do not apply the as likely as not standard? A. That's not a term that I use in my reports."). Her opinions should therefore be excluded.

## II. <u>The Court Should Exclude Dr. Bailey's Opinions on Risk Assessments</u>

Second, Dr. Bailey's risk-assessment opinions should be excluded because they are based entirely on *ipse dixit*. As detailed above, risk assessments are useful for policymakers who must make *population-based* decisions on how likely the theoretical risk of harm really is. *See supra*, at 6-7. But they are not designed to be used to assess causation. The government's *own experts* agree with this point. *See* Lipscomb Dep. Tr. 50:10-11, 130:8-10, 131:12-17, 162:13-16 (JA Ex. 174, D.E. 471-3) (testifying: "Regulatory risk assessments are not conducted to support causation."; "Risk assessment is not a science directed at the individual level."; "risk assessment cannot make predictions of . . . the likely response at an individual level," one "of the many things that preclude using risk assessment approaches to evaluate individual risk,"; and "Q: And risk assessment is not a causation analysis? [objection] A: Yes."); Lipscomb Dep. Tr. 158:23-160:8 (JA Ex. 174, D.E. 471-3); Lakind Dep. Tr. 103:3-6 (JA Ex. 617, D.E. 517-3) (testifying that risk assessment is "not used for a causality assessment"); *id.* 104:21-24 ("Q. Have you ever seen a peer-reviewed paper use[] a risk assessment to calculate an individual person's risk of getting a disease? A. No."). *See supra,* at 6-7. There is no peer-reviewed literature recognizing

this as a valid way to assess causation. Bailey Dep. Tr. 12 (JA Ex. 618, D.E. 510-7). Bailey Dep. Tr. 12. There are no scientific authorities recognizing this as a valid way to assess causation. *Id.* at 71. And indeed Dr. Bailey was unable to name a single person in the world (besides her fellow for-hire experts at Gradient) who had ever performed this kind of analysis. When asked what her support was, Dr. Bailey testified that "it doesn't matter whether I've seen it done or not" and that "I don't need to see it anywhere else." *Id.* at 123:10-11, 18-19. That is a literal *ipse dixit*: Because I say so. It is black-letter grounds for exclusion under *Daubert*. *See Joiner*, 522 U.S. at 146 (1997).

It is true that the *Daubert* analysis must focus on "principles and methodology" rather than outcomes. But the point here is purely methodological. Dr. Bailey's *method* was to conduct an individual risk assessment of each of the Plaintiffs and then use that to render an opinion on causation. That *method* is not one employed by actual experts operating outside the courtroom. Dr. Bailey's opinion should be excluded for that reason alone. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (holding that an expert must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field").

Even assuming this were a valid methodology—and nobody thinks it is besides Gradient—Dr. Bailey's execution still would not survive *Daubert*. Her risk assessment opinion did not take into account different risk factors for disease. She did not even know the various causes of the diseases before doing her analysis. Bailey Dep. Tr. 166 (JA Ex. 618, D.E. 510-7). Her analysis produces the exact same results for each type of cancer. *Id.* at 163. And she ultimately compared the *specific* cancer risk to the *total background* cancer risk for all cancers. *Id.* at 158:9-25; *see generally supra*, at 7-8. This is simply not "the same level of intellectual

rigor" that scientists outside the courtroom employ before purporting to offer a causation opinion. *Kumho Tire*, 526 U.S. at 152. This too, is grounds for exclusion.

Putting all that aside, Dr. Bailey's risk assessment opinions must be excluded for another reason: There is too great an "analytical gap" between the data she uses and the conclusions she reaches. *See Joiner*, 522 U.S. at 146; *Amorgianos v. National Railroad Passenger Corp.*, 137 F. Supp. 2d 147, 190 (E.D.N.Y. 2001). When evaluating causation here, Dr. Bailey chooses to use risk assessments (which show little increased risk) rather than human epidemiology results looking at the Camp Lejeune exposures (which show high increased risks). That makes little sense. The best measurement of whether there is an increased risk for people at Camp Lejeune is whether people at Camp Lejeune have shown an increased risk. Dr. Bailey nowhere explains why looking at *theoretical estimates* is superior to looking at *actual observed results*. Nor could she.

A concrete example illustrates the point vividly. The Goldman 2023 study "examined the risk for PD [Parkinson's disease] among all Marines and Navy personnel who resided at Camp Lejeune, North Carolina (contaminated water) [] or Camp Pendleton, California (uncontaminated water)[] for at least 3 months between 1975 and 1985." Exhibit Q (Goldman, et al., "Risk of Parkinson Disease Among Service Members at Marine Corps Base Camp Lejeune," JAMA Neurology (2023)) at 673. The study found that "Camp Lejeune veterans had a 70% higher risk of PD." *Id.* And the authors concluded that "the risk of PD is 70% higher in veterans who were exposed to TCE and other VOCs 40 years ago." *Id.* at 679.

Plaintiff Edgar Peterson squarely falls within these results. He "was stationed at Camp Lejeune" for two years. *See* Bailey Rep. (Peterson) at 36 (JA Ex. 544, D.E. 503-7). That is substantially *more than* the three-month minimum exposure examined in the Goldman 2023

study.  Mr. Peterson was there from 1975-1977, squarely within the time period examined in the Goldman 2023 study.  *Id.* And Mr. Peterson later developed Parkinson's Disease, as did the cohort examined in the Goldman 2023 study.

Based on all this, one would think that Dr. Bailey would conclude that Mr. Peterson was at an increased risk for PD given his exposure to the Camp Lejeune water.  Instead, Dr. Bailey states that "Mr. Peterson was not exposed to [the relevant chemicals] at levels that are of concern for human health, including for PD" and she concludes that Mr. Peterson's exposures to chemicals in Camp Lejeune water are not "causally associated with his PD."  Bailey Rep. (Peterson) at 40 (JA Ex. 544, D.E. 503-7).

In sum, the Goldman 2023 study shows an increased risk for people like Mr. Peterson. But Dr. Bailey says he is not at increased risk.  So how does Dr. Bailey reach this conclusion? By simply ignoring the Goldman 2023 results and using a theoretical risk assessment instead. Even though Dr. Bailey claims to have read the Goldman 2023 study, Bailey Dep. Tr. at 279:1 (JA Ex. 618, D.E. 510-7), she was forced to admit that she does not consider it in her expert analysis at all.  *Id.* at 279:2-8.  Instead of relying on the actual observed results, Dr. Bailey simply relies on theoretical calculations of increased risk and then proclaims "no causation." This is exactly the kind of "analytical gap" that *Daubert* is designed to forbid.  *Joiner*, 522 U.S. at 146.  At a minimum, an expert "outside the courtroom" would attempt to reconcile his or her theoretical estimates with the actual observed results.  *Kumho Tire*, 526 U.S. at 152.  Dr. Bailey chose to ignore the observed results entirely.

For all of these reasons, the Court should exclude Dr. Bailey's causation opinions based on risk assessments.

## III. The Court Should Exclude Dr. Bailey's Opinions on Margins of Exposure

The reliability of Dr. Bailey's "margin of exposure" analysis is based on her say-so alone. Although margin-of-exposure analyses are sometimes done at the population level, and for non-cancer risks, Dr. Bailey used it to evaluate *cancer* causation in *individuals*. Dr. Bailey was unable to identify anyone outside of Gradient who has ever used margins-of-exposure to evaluate cancer risks. Bailey Dep. Tr. at 185 (JA Ex. 618, D.E. 510-7). And she was unable to identify anyone outside of Gradient who has ever used margins-of-exposure to assess causation in an individual. *Id.* at 185. Her say so—in other (Latin) words, *ipse dixit*—is all she has in support of this method. Under *Daubert* that is grounds for exclusion all by itself. *Joiner*, 522 U.S. at 146 (forbidding expert opinions premised in *ipse dixit*); *Small*, 927 F.3d at 177 (forbidding expert opinions premised on "because I say so" justifications).

Even if this margin-of-exposure *methodology* were recognized as a reliable one—and per the above, it is not—Dr. Bailey did not apply this methodology in a reliable way. Although dressed up in complicated math, her opinion at bottom is this: If the Plaintiff received a dose of the chemicals corresponding to a theoretical 1% absolute increase in risk, then Dr. Bailey's opinion is that "adverse health effects would not be expected for the individual." Bailey Rep. (Peterson) at 41 (JA Ex. 544, D.E. 503-7). But Dr. Bailey cites no scientific authority, nor references any basis, for arbitrarily cutting off any contribution to causation at her invented 1% threshold. *See id.* at 17-18 (describing margin-of-exposure methodology and 1% threshold without attribution). This arbitrary threshold also does not make logical sense. It certainly does not logically apply with respect to diseases (like the five at issue here) where the background risk is quite low (in the low single digit percentages). Adding an additional 1% chance of developing the disease—in absolute terms—is massive. A scientist employing the "level of intellectual rigor

that characterizes the practice of an expert in the relevant field" would view that kind of risk as tremendously material. *Kumho Tire*, 526 U.S. at 152. Dr. Bailey—without any support—chooses to view it as *de minimis*. Indeed, she views it as affirmative evidence *against* causation. That kind of opinion does not survive *Daubert* scrutiny.

## IV. **The Court Should Exclude Dr. Bailey's Opinions on Epidemiology Comparisons**

Unlike Dr. Bailey's other two methodologies, her decision to compare the Plaintiffs' exposures to those found in the epidemiology literature is at least one that other scientists have done before. The problem with this particular methodology—unlike the other two—is not that Dr. Bailey misapplied (or made up) a methodology in a way unrecognized by the scientific field. The problem is that she did not actually utilize the methodology. Dr. Bailey did not actually take the Plaintiffs' exposures and compare them to the full set of epidemiology results in this literature.

To begin with, Dr. Bailey did not actually do a comparison of the epidemiology for the simple reason that she did not actually read the epidemiology. She did not perform a literature review. Bailey Dep. Tr. at 84:18-21 (JA Ex. 618, D.E. 510-7) ("Q. Did you do your own independent literature search to find the epidemiology literature? A. I did not."). She does not have independent opinions on what epidemiology studies are reliable. *Id.* at 19:3-6 ("[Y]ou don't have any opinions on the Camp Lejeune epidemiology; true? A. I don't have opinions written in my report about the Camp Lejeune epidemiology."); *id.* at 220:14-17 ("Q. Did you do an independent review of other studies looking at TCE and kidney cancer? A. I did not do that for my report."); *id.* at 246 (admitting that she did not review the literature looking at the link between PCE and kidney cancer). She did not perform a comparison with most relevant studies. *Id.* at 268 (admitting she did not compare exposures to the Hadkhale study); *id.* at 269 (admitting

she did not compare exposures to the Aschengrau study); *id.* at 283 (admitting that she did not compare exposures to the Cohn study). She did not review many of these studies *at all*. *Id.* at 210: 4-7 (admitting that she reviewed only one of the Camp Lejeune studies); *id.* at 238 (admitting she did not review Moore 2010); *id.* at 245 (admitting that she did not review Parker and Rosen); *id.* at 235 (admitting that she did not review Andrew 2022); *id.* at 282 (admitting that she discusses a single leukemia study in her report); *id.* at 276 (admitting that discusses a single PD study in her report).

Instead, she simply parrots the view of another expert—Dr. Julie Goodman—and then adds that she agrees. But experts are not allowed to simply be a "mouthpiece" for another expert's opinion. *See Bouygues Telecom*, 472 F. Supp. 2d at 728; *Pacific Life Insurance Co. v. Bank of New York Mellon*, 571 F. Supp. 3d 106, 116 (S.D.N.Y. 2021); *Am. Key Corp. v. Cole Nat. Corp.*, 762 F.2d 1569, 1580 (11th Cir. 1985) ("Expert opinions ordinarily cannot be based upon the opinion of others whether those opinions are in evidence or not."); *La Gorce Palace Condo. Ass'n, Inc. v. Blackboard Specialty Ins. Co.*, 586 F. Supp. 3d 1300, 1306 (S.D. Fla. 2022) (Rule 703 "does *not* permit an expert to 'simply repeat or adopt the findings of another expert without attempting to assess the validity of the opinions relied upon.'"); *Schoen v. State Farm Fire & Cas. Co.*, 638 F. Supp. 3d 1339, 1349 (S.D. Ala. 2022) (same). Dr. Goodman's opinions are inadmissible for the reasons described in the motion to exclude her. *See* Mot. to Exclude Goodman, filed contemporaneously herewith. But Dr. Bailey cannot be permitted to offer Dr. Goodman's opinions herself given that she (Dr. Bailey) did not actually review the body of epidemiology on which her opinion is based.

Moreover, an expert is not permitted to "cherry pick" data. An expert is not permitted to analyze studies that are favorable to his or her side, ignore studies that are unfavorable, and then

give an opinion. *See In re Lipitor*, 892 F.3d at 634 ("Courts have consistently excluded expert testimony that cherry-picks relevant data because such an approach does not reflect scientific knowledge, is not derived by the scientific method, and is not good science."); *EEOC v. Freeman*, 778 F.3d 463, 469-70 (4th Cir. 2005) (Agee, J., concurring) (explaining that "cherry-picking data produces a misleadingly favorable result by looking only to 'good' outcomes").

There is no question that Dr. Bailey cherry-picked the data here. There are numerous studies in the literature that looked at exposures similar to those the Plaintiffs experienced. *See generally* Bird GC Rep. (Bladder) (JA Ex. 67, D.E. 463-6); Bird GC Rep. (Kidney) (JA Ex. 83, D.E. 464-4); Bird GC Rep. (NHL-Leuk) (JA Ex. 103, D.E. 465-8); Bird GC Rep. (PD) (JA Ex. 118, D.E. 467-1). Those studies include epidemiology looking at Camp Lejeune itself, epidemiology looking at other water contamination events, and some epidemiology (albeit fewer) looking at those exposed to relatively smaller exposures in their occupations. And those studies show an increased risk at levels of exposure similar to those experienced by the Plaintiffs here. *See generally id.*

How did Dr. Bailey deal with these unfavorable results? Oftentimes she simply declined to read them at all. *See supra*, at 11-12. When she did read them, she refused to compare the Plaintiffs' exposures to these studies. *See supra*, at 21. And in general, she decided (again, without any actual review) that the studies were "unreliable." This is the essence of cherry-picking. *Daubert* forbids it. *See In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 593 F. Supp. 2d 549, 557 & n. 48 (S.D.N.Y. 2008). (focusing on "one study … from the dozens of reported studies" is not reliable and methodologically unsound).

Putting all that aside, Dr. Bailey's opinions do not pass muster even on their own terms. Even if she had reviewed the literature herself (and she did not), and even if she had not cherry-

picked the studies (she did), her conclusions do not follow from the data she analyzed. In other words, there is "too great an analytical gap between the data and the opinion preferred." *Joiner*, 522 U.S. at 146.

In this section of her reports, Dr. Bailey's opinions run as follows. First, she identifies occupational studies that show *increased risk* for the relevant diseases at high levels of exposure. *See, e.g.*, Bailey Rep. (Mousser) at 38 (JA Ex. 426, D.E. 494-9) (admitting based on the Charbotel study that "very high occupational TCE exposures (*e.g.*, >335 ppm-years)" are sufficient to cause kidney cancer). Second, she calculates that the Plaintiffs' exposure was lower than the exposures in these occupational studies. *See id.* at 38 ("Mr. Mousser's exposure estimates are well below 335 ppm-years."). And from those two premises, she concludes that the chemicals in the water played no role in the development of the Plaintiffs' diseases. *See id.* at 40 ("Therefore, Mr. Mousser's estimated exposures while stationed at Camp Lejeune would not have been expected to lead to his kidney cancer.").

This reasoning simply does not follow. Unlike in a clinical trial, epidemiologists are not able to control the amounts of a substance the subjects in a study are exposed to. Epidemiologists are instead limited to examining exposures that have occurred—usually accidentally, and often tragically—out in the real world. They then determine whether the exposures *that happened to have been observed* in the study are associated with a certain disease. Those results, of course, do not suggest the absence of causation at different levels of exposure. The fact that people developed a disease when exposed to high levels of a chemical in a study certainly does not *rule out* the potential for causation at lower levels of exposure. Again, a study showing that six drinks is enough to cause intoxication in no way implies that four drinks is not also enough. But that is exactly the reasoning that Dr. Bailey employed. The "analytical gap"

here is a yawning one.

A concrete example from Dr. Bailey's reports again makes the point clear. To evaluate the link between TCE and kidney cancer, Dr. Bailey relied on a single epidemiology study, Charbotel (2006). *See* Bailey Rep. (Mousser) at 38 (JA Ex. 426, D.E. 494-9). In that study, researchers in France administered a questionnaire to factory workers employed in a region where TCE was common in the relevant industry. Exhibit R (Charbotel et al., *Case–Control Study on Renal Cell Cancer and Occupational Exposure to Trichloroethylene*, Ann. Occup. Hyg., Vol. 50, No. 8 (2006)) at 778 (stating that "exposure assessment" was done using "information from the occupational questionnaires"). Based on that questionnaire, the researchers estimated the total amount of TCE that the workers had been exposed to. *Id.* Based on that estimate, they then sorted the workers into three exposure groups—low, medium, and high. *Id.* at 781. These groups corresponded to exposures of 1-150 ppm-years, 155-335 ppm-years, and more than 335-ppm years, respectively.[13] *Id.*

The Charbotel authors then looked at the rates of kidney cancer for workers in each exposure group. Ultimately, they found an increased risk of kidney cancer in each of the groups. *Id.* at 782 (showing a relative risk of 1.62, 1.15 and 2.16 for the three groups, with the high group reaching statistical significance). And they found a dose-response relationship as well. *See id.* ("A significant trend was also identified between cumulative dose and [kidney cancer] risk."). In other words, they found that as the amount of TCE exposure increased, so did the rate of kidney cancer in the population. No threshold dose was anywhere identified—the authors never concluded that there was *no* risk of kidney cancer below a certain level. To the contrary, they concluded that "a dose-response relationship was identified" and that "*further epidemiological*

---

[13] A ppm-year is defined as exposure to 1 part per million of exposure for a year.

*studies* are necessary to assess the effect of lower levels of exposure." *Id.* at 785.

What conclusion did Dr. Bailey draw from the data from this one study? She decided that, if a Plaintiff had exposures less than the highest-exposure workers in France had, then the Plaintiff was not at any increased risk for kidney cancer. Bailey Dep. Tr. at 229:20-230:6 (JA Ex. 618, D.E. 510-7) (stating that 335 ppm-years is "the threshold" for kidney cancer risk that she assumed based on Dr. Goodman's analysis). But this self-evidently does not follow. Yes, the French workers *were* exposed to high levels. And those workers *did* show an increased risk of kidney cancer. Exhibit R at 77 ("This study suggests an association between exposures to high levels of TCE and increased risk of RCC."). But that says nothing at all about whether there is a risk at lower levels. To know whether there is a risk at lower levels of exposure, one would need to review studies looking at the risk of lower levels of exposure. That is what the Charbotel authors themselves said: "further epidemiological studies are necessary to assess the effect of lower levels of exposure." Exhibit R at 785.

Dr. Bailey refused to do this. She did not review, evaluate, or in some instances *even read* the studies looking at lower levels of exposure. *See supra*, at 21-22. Instead, she offered the opinion that there is no causation simply because the Plaintiffs' exposures were less than those in one single study in the occupational literature. This does not follow as a matter of logic or good science. In *Daubert* terms, the "analytical gap" is simply too great. *See Amorgianos*, 137 F. Supp. 2d at 190 (excluding expert's testimony because the studies upon which plaintiffs' expert relied did not include circumstances similar enough to the case such that there was "simply too great an 'analytical gap' between the studies on which the plaintiffs' experts rely and the conclusions they draw from those studies for their opinions to be reliable.") (citation omitted). Dr. Bailey's purported comparisons with the epidemiology should be excluded.

## V. The Court Should Exclude Dr. Bailey's Opinions on Threshold Doses

As detailed above, Dr. Bailey's opinions should be excluded in their entirety. But if the Court denies that request, in the alternative the Court should exclude Dr. Bailey's opinions that the Camp Lejeune carcinogens exhibit a threshold dose, *i.e.*, a level below which there is *no risk* of cancer at all, not even a small one. That opinion is entirely *ipse dixit*, devoid of any support in the medical literature. It is premised on Dr. Bailey's say-so alone.

Dr. Bailey offers the opinion that mutagenic carcinogens have a threshold dose. In fact, she offers that opinion in its most aggressive form: She intends to testify that it is *not even biologically plausible* for carcinogens *not* to have a threshold dose. Bailey Rep. (Dyer) at 20 (JA Ex. 375, D.E. 490-10) ("[T]he concept that there is 'no safe dose' for carcinogens, or that there is no threshold below which cancer risk is unlikely, is not biologically plausible."). In other words, she intends to testify that it is *impossible* for there not to be a threshold for carcinogens.

The problem is that the entire scientific community disagrees. Exhibit F at 642 (Genetic mutations leading to cancer "are believed to occur without any threshold."); Exhibit S, National Academy of Sciences, "Drinking Water and Health" (1977) at 54 ("There is no scientific basis for such estimations of safe doses in connection with carcinogenesis."); Exhibit T, World Health Organization, "Principles and Methods for Risk Assessment of Chemicals" (2009) at lxii ("For substances that are genotoxic and carcinogenic, the traditional assumption is that there may not be a threshold dose and that some degree of risk may exist at any level of exposure."). It is true that for most diseases, there is a threshold dose needed to cause harm. Exhibit U, EPA, "Guidelines for Carcinogen Risk Assessment" (2005) at 3-24] ("For effects *other than cancer* . . . there is an "assumption of biological thresholds."). But mutagenic carcinogens are an exception to this rule. There is no level of exposure to a carcinogen that carries with it no risk.

At low levels, there might be low risk; at infinitesimal levels, there might be infinitesimal risk. But a "threshold" suggests that there is some dose below which there is *zero* risk. And in the unique setting of genotoxic carcinogens, the scientific community agrees that there is no such dose. Exhibit F at 642 ("However, the risk is not zero."). Dr. Bailey stands alone.

When asked about this during her deposition, Dr. Bailey all but admitted she is relying on *ipse dixit*. She believes there is a threshold for these chemicals, but she has no idea what the threshold is. Bailey Dep. Tr. at 130 (JA Ex. 618, D.E. 510-7). She was unable to name a single authority saying what she does, i.e., that the absence of a threshold is biologically impossible. *Id*. at 147. She was forced to *disagree* with the numerous scientific authorities who say that carcinogens such as TCE do *not have* a threshold. *Id.* at 155. She said that her opinion was based on "the metabolites" of TCE, but then she was unable to identify any such metabolites. Not even one of "the metabolites" could she name. *Id.* at 153. She ultimately admitted that her opinion was based on her own vague sense that a threshold "is logical scientifically" and "makes sense" to her. *Id.* at 140, 147. The only concrete basis for her opinion that she could provide was her own expertise—i.e., say so, or *ipse dixit*. *Id.* at 154:14-21 ("Q. So no authority saying TCE probably has a threshold? A. I consider myself an authority on or an expert in the area of evaluating TCE toxicity and mechanistic information and risk assessment. So based on my expertise."). That kind of testimony is inadmissible under *Daubert.*

## CONCLUSION

The Court should exclude the testimony of Dr. Lisa Bailey in its entirety under Rule 702, as well as any other experts' opinions to the extent they rely on Dr. Bailey's opinions. In the alternative, the Court should exclude Dr. Bailey's opinions that carcinogens exhibit a threshold dose.

*[Signature appear on the following page.]*

DATED this 10th day of September 2025.

*/s/ J. Edward Bell, III*
J. Edward Bell, III (admitted *pro hac vice*)
Bell Legal Group, LLC
219 Ridge St.
Georgetown, SC 29440
Telephone: (843) 546-2408
jeb@belllegalgroup.com

*Lead Counsel for Plaintiff*

*/s/ Zina Bash*
Zina Bash (admitted *pro hac vice*)
Keller Postman LLC
111 Congress Avenue, Suite 500
Austin, TX 78701
Telephone: 956-345-9462
zina.bash@kellerpostman.com

*Co-Lead Counsel for Plaintiffs and Government Liaison Counsel*

*/s/ Elizabeth J. Cabraser*
Elizabeth J. Cabraser (admitted *pro hac vice*)
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
*ecabraser@lchb.com*

*Co-Lead Counsel for Plaintiffs*

*/s/ W. Michael Dowling*
W. Michael Dowling (NC Bar No. 42790)
The Dowling Firm PLLC
Post Office Box 27843
Raleigh, North Carolina 27611
Telephone: (919) 529-3351
mike@dowlingfirm.com

*Co-Lead Counsel for Plaintiffs*

*/s/ Robin L. Greenwald*
Robin L. Greenwald (admitted *pro hac vice*)
Weitz & Luxenberg, P.C.
700 Broadway
New York, NY 10003
Telephone: 212-558-5802
rgreenwald@weitzlux.com

*Co-Lead Counsel for Plaintiffs*

*/s/ James A. Roberts, III*
James A. Roberts, III
Lewis & Roberts, PLLC
3700 Glenwood Ave., Ste. 410
Raleigh, NC 27612
Telephone: (919) 981-0191
jar@lewis-roberts.com

*Co-Lead Counsel for Plaintiffs*

*/s/ Mona Lisa Wallace*
Mona Lisa Wallace (N.C. Bar No.: 009021)
Wallace & Graham, P.A.
525 North Main Street
Salisbury, North Carolina 28144
Tel: 704-633-5244
mwallace@wallacegraham.com

*Co-Lead Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I, J. Edward Bell, III, hereby certify that the foregoing document was electronically filed on the Court's CM/ECF system on this date, and that all counsel of record will be served with notice of the said filing via the CM/ECF system.

Dated: September 10, 2025.

*/s/ J. Edward Bell, III*_________________
J. Edward Bell, III