IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:23-CV-897

| | |
|---|---|
| IN RE: | ) |
| CAMP LEJEUNE WATER LITIGATION | ) |
| | ) |
| This Pleading Relates to: | ) |
| | ) |
| ALL CASES. | ) |
| | ) |

# PLAINTIFF LEADERSHIP GROUP'S MOTION TO RESERVE ADMISSIBILTY DETERMINATIONS AND EXPEDITE TRACK 1 BELLWETHER TRIALS

## INTRODUCTION

Hundreds of thousands of Camp Lejeune claimants await a global resolution to this litigation, decades (in some cases over half a century) after their exposures to harm, and several years after Congress acknowledged, and this Court undertook, a process toward the determination of their right to compensation and closure. This Court has repeatedly invoked Fed. R. Civ. P. 1, at the very outset of this litigation and at every opportunity since, to keep this litigation moving toward that end. Plaintiff's Leadership Group (PLG) and, we believe, the Defendant, both recognize that global resolution will be expedited and facilitated by the best technique that courts managing mass tort litigation have devised to advance informed resolutions: bellwether trial verdicts.[1]

Recognizing that the Track 1 bellwethers will proceed as bench trials, the PLG was sparing and targeted with its *Daubert* motions. Yet the parties and the Court are now awash in

---

[1] "Bellwether trials are meant to produce a sufficient number of representative verdicts and settlements to enable the parties and the court to determine the nature and strength of the claims, whether they can be fairly developed and litigated on a group basis, and what range of values the cases may have if resolution is attempted on a group basis." *In re Depuy Orthopaedics, Inc.*, 870 F.3d 345, 348–49 (5th Cir. 2017); *see also* Alexandra D. Lahav, "Bellwether Trials," 76 Geo. Wash. L. Rev. 576, 579-81 (2008) (describing Judge Hellerstein's use of bellwether trials in the 9/11 litigation).

-1-

**more than 30 *Daubert* and summary judgment motions filed by the Defendant** (for Phase II and III alone), seeking exclusion of every Plaintiff's expert and the dismissal of every Track 1 bellwether case. The devotion of judicial resources to sorting through these motions needlessly delays the actual bellwether trials at a time of increased urgency, and creates a lose-lose proposition. While Plaintiffs opposed all of the Defendant's nearly three dozen motions and believe them to be meritless, such considerations are not necessary at this stage nor the purpose of the instant motion. Regardless of the outcome of either party's motions, their adjudication will have wasted a huge amount of resources and time by the Court and the parties, delaying trial and resolution for naught. What's more, the result sought by Defendant's motions essentially advocates for starting over, as it would prevent the Track 1 bellwethers from serving their purpose of providing valuable guidance for remaining cases and global resolution. And these non-preclusive bellwether results would not bar other Track 1, 2, and 3 disease claims from renewing the quest to seek their day in court. The past two years of work by the Court and the parties would be largely wasted.

This motion, respectfully submitted pursuant to Fed. R. Civ. P. 1 and 16(c)(2), offers an alternative path, at a juncture in the case when it is urgently needed. This motion seeks to fulfill the purpose of bellwether trails, and recognizes the flexibility this Court possesses in sequencing and structuring Track 1 disease bench trials. Because this Court will serve as the factfinder at CLJA trials, the Court may provisionally admit all expert testimony and/or reserve decision on all pending motions related to expert admissibility—from both the Defendant and the PLG—until trial. The judges of this Court are capable of hearing all the evidence, evaluating expert testimony, and appropriately disregarding inadmissible evidence. By reserving decision on the dozens of pending admissibility briefs, the work for this Court before trial would be drastically

reduced and precious resources would be redirected to bellwether trials and, hopefully, global resolution. Prioritizing trials within the next six months, even of a subset of bellwether Plaintiffs' cases, over resolution of Defendant's sea of meritless motions would speed the way to any global resolution.

The Court can also sequence the Track 1 trials to maximize efficiency. By scheduling trials for one Track 1 disease group at the earliest opportunity, the Court (or the assigned judge) can focus attention on the smaller set of motions related to those Plaintiffs first. The resolution of those motions and other issues that arise related to those Plaintiffs' trial(s) will inform the resolution of the remaining motions (to the extent necessary). In particular, early kidney cancer trials would likely provide the most widely relevant information for potential global resolution. Kidney cancer is among the most common diseases of Marines and civilian workers who were at Camp Lejeune during the contamination period. Kidney cancer has definitive stages of progression, and those stages apply to myriad other cancers. Thus, judgments that address stages of cancer development would inform other diseases in future track diseases. It is also the most curable cancer; thus, Plaintiffs are often still alive. And to the extent other track diseases have similar survivability rates, judgments in kidney cancer bellwether trials will inform other future cases with high survivability and, hopefully, global resolution. In contrast, for example, hematopoietic cancers, are rarer cancers, and Parkinson's disease is a unique disease that has less application to the other diseases among the Camp Lejeune population.

The PLG has met and conferred with Defendant about these proposals, asking whether it would agree to recommend to this Court that it (a) reserve determination on expert admissibility motions until trial, and (b) schedule one disease group for trials first (particularly kidney cancer). Defendant replied that they oppose this motion. Defendant suggested that deciding such motions

before trial is the standard procedure in its litigation. But this is not a run of the mill case that can be handled with standard procedures. This is an unprecedented case, under the authority of an unprecedented statute, involving hundreds of thousands of claims by claimants who are sick, dying, or grieving. Due to the decades of delay in acknowledging the harms caused at Camp Lejeune, and in providing a path to justice, Defendant's proposal to slow-slog through a protracted and unnecessary *Daubert* exercise is disproportional to the needs of the case and departs from the principles of Federal Rule of Civil Procedure 1.

The PLG believes that the proposals in this motion are critical to reaching the first bellwether trials in the first half of 2026, to conducting as many bellwether trials as practicable throughout 2026, and thus meaningfully advancing all claims and cases toward resolution next year. If the case proceeds as Defendant wants, the 40-plus admissibility motions for just Track 1 bellwethers will consume the Court's time instead. The PLG and the bellwether Plaintiffs commit to being ready to try any bellwether case quickly—as soon as this Court sets a trial date. The PLG and bellwether Plaintiffs also stand ready to aid the Court with any steps that would speed and smooth the path to trial, including (while preserving Plaintiffs' rights) withdrawing motions, conferring with the Defendant, Judge Jones, and the Settlement Masters to reach trial stipulations or consider other efficiency tools, all with the goal of conducting the bellwether trials on an expedited basis.

I. **The Problem: This Court Has Been Burdened with Overwhelming and Unnecessary Motion Practice that Will Unacceptably Delay Trials and Global Resolution.**

This Court has stressed the importance of moving these cases toward resolution efficiently since the very first status conference, when Judge Dever warned the parties that otherwise these cases could last the length of the Roman Empire. [D.E. 9] at 5-10. More than two years have passed since then, and the parties have essentially completed discovery in all Track 1

-4-

bellwether cases.[2] The parties have jointly stated their "commitment to try any Track 1 cases, as necessary, in 2026." [D.E. 413] at 2. It is critical that these trials happen as soon as possible. Global resolution likely depends on verdicts, and any potential compensation for the vast majority of the more-than-400,000 Camp Lejeune Justice Act claimants depends on global resolution. After all, relatively few claimants are eligible for the government's Elective Option, and most of them have not received offers. [D.E. 648] at 1, 11. Most importantly, claimants are dying. Evidence is receding into history unreckoned with. After the many decades these claimants have had to wait since exposure to contaminated water, and more than three years after Congress recognized the importance of granting them the opportunity to seek justice, fairness suggests that a factfinder assess the evidence and reach a verdict.

In the face of this urgent need to try these cases, Defendant has thrown dozens of wrenches into the proceedings. While the PLG was sparing and selective in filing *Daubert* requests, Defendant filed more than 30 motions to exclude experts or for summary judgment, seeking dismissal of every bellwether case before trial. Instead of reserving pretrial motions for select issues that would help the Court expedite the path to trials, Defendant has attacked every single expert for Plaintiffs on every ground it could think of, no matter how tenuous. These motions are a waste of time many times over: they are voluminous, redundant, confusingly organized, and raise frivolous arguments that match neither the law nor the experts' testimony. The PLG's separate opposition briefs explain why each should be denied. But denying them would require the Court to analyze them, and Defendant has chosen to make that so onerous that it would prejudicially delay trials.

---

[2] Only expert discovery on some damages issues remains, and that discovery will close on March 5, 2026. *See* [D.E. 630] at 2 (latest schedule).

-5-

The scale of these motions cannot reflect a party that seriously wants this Court to try cases soon (or at all). Defendant's opening briefing for Phase II/III motions alone spans 690 pages of substantive argument with more than 233,000 words—longer than *Moby Dick*. Added to that are the innumerable referenced exhibit pages, the many additional documents among the 82 docket entries Defendant filed with these motions, and the opposition and reply briefing Defendant's motions necessitate, which will more than double the briefing pages submitted to the Court. This Court has four judges, who each have significant caseloads outside of the CLJA. Defendant has manufactured an extremely onerous pretrial burden for this Court and the parties, precisely when the parties should be focusing their energies on preparing to present their evidence to the Court and move these cases toward resolution.

To complicate the task ahead even more, Defendant's motions Defendant organized many of its motions by argument rather than by expert, and repeated arguments against experts for each Track 1 disease. Nearly half of Defendant's 30 Phase II/III motions address three issues raised against different combinations of experts. At least six motions address differential etiology, at least four address the issue of literature reviews, and another four address Bradford Hill. Defendant's choice to organize its *Daubert* briefing this way—instead of expert by expert— is highly unusual. *See, e.g.*, *Nix v. Chemours Co. FC, LLC*, No. 7:17-CV-189-D, 2025 WL 2924613, (E.D.N.C. Sept. 30, 2025) (ruling on expert-by-expert *Daubert* motions). Defendant's organizational choice here not only maximizes redundancy, but it also will make it difficult to piece together the arguments and outcomes applicable to each individual expert. It also permits the Defendant to target each individual expert with far more than the 30 pages permitted by

Local Rule 7.2(f)(2)(A). For example, Defendant seeks the exclusion of Plaintiff's expert Dr. Steven Bird in seven motions containing more than 300 pages of argument.[3]

These issues are thus better addressed at the bellwether trials when the focus can be on relevant issues relating to experts proffered at trial.

Not only are Defendant's motions long and repetitive, but they primarily argue that Plaintiffs' expert testimony is not admissible for the Court to hear even at a *bench trial*, where *Daubert* has scant a role to play, since "the judge serves as the fact finder," and thus the "risk of confusion is significantly less of a concern, if any at all." *Tailored Chem. Prods., Inc. v. DAFCO Inc.,* 2023 WL 5944162, at *3 (W.D.N.C. Sept. 12, 2023). As courts across the country agree, when "the district court [is] also the trier of facts, the district court's evidentiary gatekeeping function [is] relaxed." *United States v. Wood*, 741 F.3d 417, 425 (4th Cir. 2013); *see also David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1015 (8th Cir. 2012) ("we relax *Daubert*'s application for bench trials"); *United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005) ("There is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself."); *Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 852 (6th Cir. 2004) ("The 'gatekeeper' doctrine was designed to protect juries and is largely irrelevant in the context of a bench trial."). Defendant's motions, in the context of a bench trial, are much ado about nothing.

---

[3] *Cf. Zelaya v. A+ Tires, Brakes, Lubes, and Mufflers, Inc.*, No. 5:13-CV-00810-F, 2017 WL 464375, at *1 (E.D.N.C. Feb. 2, 2017) ("Plaintiffs circumvented Local Civil Rule 7.2(f) by filing two separate motions for summary judgment. . . . This type of legal maneuvering will not be condoned."); *Guessford v. Pennsylvania Nat'l Mut. Cas. Ins. Co.*, No. 1:12CV260, 2013 WL 12136501, at *2 (M.D.N.C. May 24, 2013) ("If parties were allowed to file multiple summary judgment motions addressing separately each issue in a single case, the page limitations imposed under Local Rule 7.3(d) and Local Rule 56.1(c) would be effectively rendered moot."). The PLG has done its best to respond efficiently to Defendant's motions, but because Defendant repeated arguments against different experts and disease groups, Plaintiffs' oppositions repeat rebuttals to those arguments where appropriate for equivalent motions.

The Court should not have to wade through a mire of *Daubert* briefing rather than putting experts to a true test at trial. That is especially so for Defendant's arguments that Plaintiffs' experts should not be allowed to testify (at bench trials) that the Camp Lejeune toxins can cause the *Track 1* diseases, even though the ATSDR—an agency of the Defendant—already concluded that they can (applying the same standards adopted by Congress in the CLJA.

In sum, while claimants are dying and when the parties have practically all the evidence they need to start trying cases, Defendant is asking this Court to spend precious time on dozens of redundant briefs referencing innumerable exhibit pages and raising frivolous grounds to challenge expert *admissibility* for *bench trials*, including on general causation for diseases that ATSDR has *already concluded* meet the CLJA's causation standard. It is appropriate, of course, for Defendant to ensure resolutions to these cases are evidence-based and direct the public fisc toward compensating the claimants with the greatest injuries caused by exposure to the water at Camp Lejeune. Defendant's briefing strategy, however, goes far beyond the bounds of that goal and undermines the efficient resolution of these cases.

## II. The Solution: Provisionally Admit All Expert Testimony/Reserve Admissibility Determinations and Schedule One Disease Group for Trial As Soon As Possible.

Fortunately, the Court need not indulge the Defendant's invitation to delay. As Judge Dever suggested at the first status conference, this Court must "seize the elasticity in Rule 16 of the Federal Rules of Civil Procedure in managing the cases." [D.E. 9] at 9. This brief proposes an efficient path through the morass to reach trial and resolutions as fast as possible. This proposal does not reflect the strength of Defendant's motions, but addresses *when* they should be considered given the circumstances of this case.

### A. This Court Should Provisionally Admit All Expert Testimony.

First, there are very few motions the Court truly needs to decide before the first trial. Because these bellwether cases will involve bench trials, any motion to exclude expert testimony (and Defendant's motions for summary judgment premised on the granting of its *Daubert* motions) should be reserved for decision at trial. The Court may provisionally admit all expert testimony and determine after hearing from the experts directly whether any fails to meet the requirements of Rule 702, without the risk of confusing a jury. As stated in *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006), "where the factfinder and the gatekeeper are the same, the court does not err in admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702." *See also UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 833 (3d Cir. 2020) (district courts may "conditionally admit the expert testimony subject to a later Rule 702 determination"); *Pender v. Bank of Am. Corp.*, 2016 WL 6133850, at *3 (W.D.N.C. Oct. 20, 2016) ("As this is a bench trial, the Court can freely accept or reject an expert's testimony at trial as the trier of fact."). Each judge of this Court is more than capable of hearing all the evidence and appropriately considering only the admissible evidence to reach fair verdicts.

Reserving motions for decision at trial will allow the parties to proceed to at least some trials without waiting for this Court to undertake the enormous project of deciding all pending motions first. It would also allow the first bellwether trials to be decided on the merits, which would increase the perception of fairness to the hundreds of thousands of claimants and their families. The CLJA is best honored not by a year of slogging through meritless motion practice, but by proceeding to the merits adjudication by the Court of representative bellwether claims in order to test the claims, assess values, inform potential global resolution, and provide an actual day in court for at least some of those affected. *See supra*, note 1. The PLG appreciates that this

Court set up the bellwether process with an eye towards expedited adjudication of the bellwether cases, advancing with alacrity to Track 2 and beyond, and ensuring that the case does not take decades to resolve.

Of course, the PLG proposes that this same procedure of reserving judgment for trial apply not only to Defendant's *Daubert* motions but also to the PLG's own motions. This motion is designed to accomplish one thing: allowing this Court to assess the evidence on the merits as soon as possible, which necessarily means adjudicating the merits of the case simultaneously with preserving the Court's ability to consider admissibility of expert testimony at trial.

Provisionally admitting all testimony will not require overlong trials. The Court would still retain its power to structure trial presentation and set time limits. Parties will have to select which experts to present and manage the time given by the Court.

This Court would not be breaking new ground by provisionally admitting expert testimony in this case. For example, in one of the bellwether trials remanded from the massive opioids multi-district litigation, Judge Charles Breyer presided over a bellwether bench trial on San Francisco's public nuisance claims that a major chain pharmacy unlawfully and substantially contributed to the opioid epidemic there. Judge Breyer allowed the trial to begin before any ruling on defendants' motions to exclude plaintiff's expert testimony, including on controversial topics like addiction. It was only after one week of trial that Judge Breyer issued his order on defendants' *Daubert* motions (largely denying them). *See City and County of San Francisco v. Purdue Pharma, L.P.*, No. 18-cv-07591, 2022 WL 22837828 (N.D. Cal. May 6, 2022). The Court's comprehensive, post-liability phase Findings of Fact and Conclusions of Law addressed the remaining expert challenges. *City and County of San Francisco v. Purdue Pharma, L.P.*, No. 18-cv-07591, 620 F. Supp. 3d 936 (N.D. Cal. Aug. 10, 2022).

### B. Before Trial the Court Need Only Resolve a Small Number of Motions.

Second, if this Court reserves decision on pending motions to exclude expert testimony, as it is permitted to do, the number of pending motions the Court must resolve before trial would shrink dramatically, allowing the first trials to be held much sooner.

In their October 14 status report, the parties agreed that the highest priorities for this Court are pending motions regarding Phase I water contamination and certain motions relating to the overall legal standards applicable under the CLJA. These may also be the only motions requiring consideration by all judges of this Court before trial begins.

The parties both recommended that this Court prioritize resolving pending motions to exclude testimony regarding Phase I water contamination, particularly the motions relating to ATSDR water modeling ([D.E. 367] and [D.E. 428]), because these motions are applicable to all illnesses and potentially all CLJA claimants. *See* [D.E. 648] at 13-14, 19-20 (joint status report listing the pending Phase I motions as [D.E. 356, 358, 360, 367, 373, 376, 428, and 434]). Plaintiffs note that all pending Phase I motions relate to the admissibility of expert testimony, and, as with Phases II and III, the Court could choose to provisionally admit all Phase 1 expert testimony and exclude or disregard any testimony later deemed inadmissible in the course of deciding the merits of Phase I.

The parties also agreed in their October 14 status report that two motions merit rapid decisions because they bear on the applicable standards across all cases: [D.E. 539], in which Plaintiffs ask this Court to confirm the applicability of the CLJA's "as likely as not" standard, and [D.E. 567], in which Defendant disputes the applicability of the CLJA's "as likely as not" standard. *See* [D.E. 648] at 14, 19-20 (joint status report). The Court's rulings on these motions and its holdings as to the appropriate standards under the CLJA could provide valuable information for further pretrial proceedings, trial presentations, and potential resolution.

The Court could reserve decision on all remaining Phase II and III motions relating to the admissibility of expert testimony. This procedure would leave the Court needing only to make Phase I determinations, and decide as few as two pending Phase II/III motions (if the Court also reserved decision on pending Phase I Daubert motions).[4] This is the fastest path to providing a day in court to a representative set of Track 1 plaintiffs, the most efficacious (and apparently necessary) catalyst to resolution of these cases, and the only path that does not leave the four judges of this Court saddled with an overwhelming (and unnecessary) burden.

### C. Scheduling One Disease Group for Trial As Soon As Possible Is the Most Efficient Way to Promote Global Resolution and to Resolve Pending Motions.

Third, as the PLG suggested in the October 14 status report, [D.E. 648] at 12-13, this Court may select one Track 1 disease group to proceed to trial first, allowing the parties and the Court to focus efforts there. Among the Track 1 disease groups, kidney cancer trials would create the most valuable, relevant information for potential global settlement. More than 23,000 CLJA claimants have or had kidney cancer, according to Navy data. Kidney cancer is a particularly well-defined disease, with four distinct stages, which could inform the resolution of claims for other diseases with similar stages.

If kidney cancer bellwether Plaintiffs were scheduled for trial first, motions related to the other disease groups would not be relevant to these trials. The Court would not need to decide, at or before kidney cancer trials, at least 20 of the Defendant's pending motions, and at least

---

[4] This procedure honors the Court's careful phasing of this case, because the PLG still recommends the Court make Phase I determinations first, and the Court may still phase the merits as it deems appropriate at trials. The Court's phasing does not require pausing this case and delaying trials to resolve unnecessary and burdensome motions that do not go to the merits. Moreover, the Court decided to phase this case before it knew how Defendant would burden this Court with this many disorganized motions. As the Court emphasized on day 1, this Court must "seize the elasticity in Rule 16" in order to manage these cases efficiently. [D.E. 9] at 9.

-12-

three of the PLG's pending motions. Of the briefs relevant to kidney cancer Plaintiffs, the Court could reserve judgment on all those relating to the admission of expert testimony until during the trial. As stated above, before kidney cancer trials the Court would need only determine Phase I questions and as few as two motions relating to the CLJA standards.[5]

If and when the Court did decide these motions—and the PLG reiterates its strong position that most pending motions need not and should not be decided before trial—those decisions would significantly inform the resolution of similar motions for other disease groups. For example, resolving Defendant's Daubert motions in kidney cancer cases regarding literature reviews [D.E. 574], Bradford Hill [D.E. 609], and differential etiology [D.E. 569], would help resolve equivalent motions Defendant filed for other disease groups on literature reviews [D.E. 541, 543, 559, and 584], on Bradford Hill [D.E. 547, 554, and 582], and on differential etiology [D.E. 530, 533, 537, 543, 553, 557, 586]. And of course, the pretrial motions, stipulations, and trial experience gained by the Court and the parties through the first set of trials would significantly inform and expedite any subsequent trials for other disease groups.

Defendant's arguments that resolving its motions for some disease groups would not inform the resolution of motions for other disease groups is incorrect. *See* [D.E. 648] at 20 (status report statement by Defendant). The legal standards for admissibility of expert testimony, for tort causation, and for CLJA claims are the same across motions. Many of Plaintiffs' experts used similar methodologies. And Defendant repeated many of the same arguments over and over again against experts for all disease groups across its 30 pending Phase II/III motions. The similarity in Defendant's motions relating to different disease groups demonstrates their

---

[5] Even if the Court wanted to resolve relevant *Daubert* motions before trial, scheduling kidney cancer cases for trial before other diseases would allow the Court to resolve only the motions relevant to the kidney cancer cases while deferring ruling on the others. This would still expedite the first trials (and any resulting resolutions) by avoiding waiting for the Court to decide dozens of motions for other diseases.

-13-

relatedness. If anything, Defendant's arguments reflect a failure to recognize the purpose and value of bellwether cases, which are meant (among other things) to establish legal and factual determinations that relate to the broader set of claims and aid global resolution. To avoid this litigation lasting the length of the Roman Empire, the parties and the Court will need to recognize that the similarities between claims are more important than their differences and that bellwether trials should begin as soon as possible.

## CONCLUSION

Seventy-two years after the first service members began to be exposed to Camp Lejeune's toxic water, three years after the enactment of the CLJA, and after two years of intense litigation and discovery, it is time to give America's poisoned Marines their day in Court. Liability discovery is complete, and damages discovery will close in March 2026 (and could be completed sooner). The PLG respectfully urges the Court to order the parties to prepare to present the evidence on the merits, and set a Track 1 bellwether trial date in early 2026. In this brief, the PLG has respectfully proposed the most efficient way for the Court to manage the overwhelming number of unnecessary motions filed and schedule the earliest possible trials. In particular, the PLG strongly encourages the Court to use its authority to provisionally admit, or reserve decision on, expert testimony in bench trials to allow at least some trials to begin before all pending motions are resolved. The PLG and the bellwether Plaintiffs commit to being prepared to try any bellwether case quickly as soon as this Court sets a trial date, and stand ready to assist the Court in any other way that paves the way to efficient bellwether trial and promotes global resolution.

Dated: November 12, 2025.

| | |
|---|---|
| */s/ J. Edward Bell, III* | */s/ Zina Bash* |
| J. Edward Bell, III (admitted *pro hac vice*) | Zina Bash (admitted *pro hac vice*) |
| Bell Legal Group, LLC | Keller Postman LLC |
| 219 Ridge St. | 111 Congress Avenue, Suite 500 |
| Georgetown, SC 29440 | Austin, TX 78701 |
| Telephone: (843) 546-2408 | Telephone: 956-345-9462 |
| jeb@belllegalgroup.com | zina.bash@kellerpostman.com |
| *Lead Counsel for Plaintiffs* | *Co-Lead Counsel for Plaintiffs and Government Liaison Counsel* |

*/s/ Elizabeth J. Cabraser*
Elizabeth J. Cabraser (admitted *pro hac vice*)
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
ecabraser@lchb.com

*Co-Lead Counsel for Plaintiffs*

*/s/ W. Michael Dowling*
W. Michael Dowling (NC Bar No. 42790)
The Dowling Firm PLLC
Post Office Box 27843
Raleigh, North Carolina 27611
Telephone: (919) 529-3351
mike@dowlingfirm.com

*Co-Lead Counsel for Plaintiffs*

*/s/ Robin L. Greenwald*
Robin L. Greenwald (admitted *pro hac vice*)
Weitz & Luxenberg, P.C.
700 Broadway
New York, NY 10003
Telephone: 212-558-5802
rgreenwald@weitzlux.com

*Co-Lead Counsel for Plaintiffs*

*/s/James A. Roberts, III*
James A. Roberts, III
Lewis & Roberts, PLLC
3700 Glenwood Ave., Ste. 410
Raleigh, NC 27612
Telephone: (919) 981-0191
jar@lewis-roberts.com

*Co-Lead Counsel for Plaintiffs*

*/s/ Mona Lisa Wallace*
Mona Lisa Wallace (N.C. Bar No.: 009021)
Wallace & Graham, P.A.
525 North Main Street
Salisbury, North Carolina 28144
Tel: 704-633-5244
mwallace@wallacegraham.com

*Co-Lead Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

    I, J. Edward Bell, III, hereby certify that the foregoing document was electronically filed on the Court's CM/ECF system on this date, and that all counsel of record will be served with notice of the said filing via the CM/ECF system.

Dated: November 12, 2025.

                                            */s/ J. Edward Bell, III*
                                            J. Edward Bell, III