IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
NO. 7:23-CV-897

| | |
|---|---|
| IN RE: <br><br> **CAMP LEJEUNE WATER LITIGATION** <br><br> **This Document Relates To:** <br><br> ALL CASES | **UNITED STATES' RESPONSE TO PLAINTIFFS' MOTION TO RESERVE ADMISSIBILITY DETERMINATIONS AND EXPEDITE TRACK 1 BELLWETHER TRIALS [D.E. 721]** |

# TABLE OF CONTENTS

Pages

**TABLE OF CONTENTS** ................................................................................................ i

**TABLE OF JOINT APPENDIX EXHIBITS** ............................................................... ii

**INTRODUCTION** ........................................................................................................ 1

**ARGUMENT** ................................................................................................................ 3

    I.   Pre-Trial Determination of Daubert Motions Is Consistent with the Court's Methodical Phased Case Management Plan that Positions the Litigation for Global Resolution. ............................................................................................. 3

    II.   Pretrial Determination of Daubert Motions Is Required by the Recent Amendments to the Federal Rules of Evidence and Is Good Case Management. ................................................................................................. 4

    III. Pre-Trial Determination of Daubert Motions Will Not Be Unduly Burdensome for the Court. The United States Filed the Number of Daubert Motions Necessary to Raise Important Scientific Issues that Will Assist in Resolution of this Massive Litigation. ........................................................ 9

    IV. Proceeding to Trial with Individual Kidney Cancer Cases, Without First Resolving the Threshold Issues, Will Not Assist, and Could Hinder, Global Resolution. ............................................................................................. 13

**CONCLUSION** ........................................................................................................... 15

**CERTIFICATE OF SERVICE** .................................................................................. 17

# TABLE OF JOINT APPENDIX EXHIBITS

| JA Exhibit Number | Short Citation | Full Title |
|---|---|---|
| 67 | Bird GC Rep. (Bladder) (JA Ex. 67, D.E. 463-6) | Bird - General Causation Report - Bladder Cancer |
| 90 | Hatten GC Rep. (Kidney) (JA Ex. 90, D.E. 464-11) | Hatten – General Causation Report – Kidney Cancer |
| 98 | Mallon GC Rep. (Leukemia) (JA Ex. 98, D.E. 465-3) | General Causation Expert Report of Timothy M Mallon, MD, MPH, MS – Leukemia |
| 111 | Hu GC Rep. (JA Ex. 111, D.E. 466-5) | General Causation Expert Report of Howard Hu, MD, MPH, ScD – NHL |
| 131 | Freeman Rep. (PD) (JA Ex. 131, D.E. 467-14) | General Causation Expert Report of Michael D. Freeman – Parkinson's Disease |
| 148 | Bird GC Dep. Tr. (JA Ex. 148, D.E. 469-2) | Bird - General Causation Deposition Transcript |
| 151 | Mallon GC Dep. Tr. (JA Ex. 151, D.E. 469-5) | Mallon – General Causation Deposition Transcript |
| 158 | Hatten GC Dep. Tr. (JA Ex. 158, D.E. 469-12) | Hatten – General Causation Deposition Transcript |
| 159 | Freeman Dep. Tr. (JA Ex. 159, D.E. 469-13) | Freeman – General Causation Deposition Transcript |
| 162 | Hu GC Dep. Tr. (JA Ex. 162, D.E. 470-1) | Hu – General Causation Deposition Transcript |

# INTRODUCTION

This Court has thoughtfully structured this litigation to facilitate global resolution of hundreds of thousands of cases and claims that have been filed under the Camp Lejeune Justice Act ("CLJA"). But just as the important motions that will greatly assist in that endeavor are on the verge of being fully briefed, the Plaintiffs' Leadership Group ("PLG") has filed the present Motion to Reserve Admissibility Determinations and Expedite Track 1 Bellwether Trials. D.E. 721. PLG's motion proposes upsetting the Court's established case management process by moving several cases involving one disease to trial without a preliminary determination of whether there is any reliable science to support those claims, or the claims related to any other Track 1 diseases. Contrary to PLG's argument, upsetting the Court's phased case management plan will not advance global resolution of the cases and claims but will likely burden the Court with trials of cases that have no reliable scientific bases to support them. Moreover, even if a few individual cases proceed to judgment for plaintiffs, it is highly unlikely that those specific cases alone will provide the type of information that will materially advance global resolution due to the expansive statutory time period and the many different illnesses alleged. On the other hand, resolution of Phase I on water contamination—as well as resolution of the broader *Daubert* and summary judgment motions in Phases II and III—offer a high probability of providing information that will allow substantial progress towards global settlement.

Pre-trial resolution of the Parties' *Daubert* motions is consistent with the Court's phased approach and best positions this case for global resolution. The large number of motions that the United States was forced to file is not the result of government's aggressive litigation tactics, as PLG argues. Rather, it was necessary due to the scores of duplicative expert reports that PLG submitted from dozens of experts who used unreliable scientific methods to reach their opinions. If there were any litigation tactics at play, it was PLG's gambit that the Court would not possibly

1

exclude all their duplicative causation experts on a particular disease despite the unreliable methods they universally employed.

Contrary to PLG's repeated assertion, the United States did not move to exclude all PLG's Phase II and Phase III experts. While the United States had significant issues with PLG's Phase III exposure expert, Dr. Kelly Reynolds, who calculated exposures for each of the twenty-five Track 1 bellwether plaintiffs, the United States did not file a Rule 702 challenge to her opinions. As further explained below, the United States also did not file motions to exclude certain opinions of some of PLG's other Phase III experts.

The Phase II and Phase III experts whom the United States challenged offered opinions on general and specific causation that are essential to bellwether plaintiffs' claims. In the United States' view, those opinions are based on several fundamental methodological flaws that go to reliability. The Court's rulings on whether those opinions are admissible under Federal Rule of Evidence 702 will determine the reliability of experts' causation methodologies for the remainder of the litigation and will control resolution of cases and claims beyond Track 1. Moreover, if the Court finds that particular opinions of PLG's Phase II and Phase III experts are inadmissible, certain plaintiffs' claims may be subject to summary judgment and never face a trial on damages. The recent 2023 amendments to Rule 702, as well as the Rules Committee Note explaining the amendments, require deciding these important evidentiary issues as preliminary questions under Federal Rule of Evidence 104(a), rather than "provisionally" admitting the evidence and deferring ruling to trial. The Court's methodical case management plan continues to provide the best path for global resolution of this litigation.

# ARGUMENT

## I. Pre-Trial Determination of Daubert Motions Is Consistent with the Court's Methodical Phased Case Management Plan that Positions the Litigation for Global Resolution.

In an early Case Management Order, this Court ruled that "[b]efore Track 1 trials commence, the court will resolve two threshold issues: (1) toxic chemical exposure from the water at Camp Lejeune and (2) general causation for the Track 1 Illnesses." *See* D.E. 247 at 1. That orderly, phased structure was intentional. As the Court recently emphasized, "[e]ach Phase informs the next—like building blocks in the parties' cases in chief." D.E. 444 at 5. Deferring these threshold determinations and related *Daubert* rulings until individual plaintiff trials would be inconsistent with this directive and would undermine the efficient resolution of these threshold scientific issues. Rulings on the pending *Daubert* and summary judgment motions will clarify which expert opinions are admissible and what scientific issues remain in dispute, likely reducing (or eliminating) the need for individual trials in certain bellwether cases. Proceeding to trial without those rulings would risk inefficient, piecemeal litigation and could require the Court to rule on expert admissibility issues for the first time during individual trials.

Resolving the threshold issues of "toxic chemical exposure" and "general causation" before any trials of individual cases begin will streamline proceedings. This will promote, rather than delay, global resolution. For example, the Court has indicated that its determinations in the "toxic chemical exposure" phase will inform the rest of the litigation. D.E. 247 at 1 ("This case is about water[.]") (quoting D.E. 207 at 9:8-11). Similarly, rulings on general causation will determine whether the chemicals in the Camp Lejeune water can cause each individual Track 1 illness, which will control whether cases claiming that illness will go to trial on specific causation and damages at all. Likewise, pretrial rulings on *Daubert* motions will narrow issues for trial and inform the parties on the Court's view of the admissibility of scientific evidence for this case. These

3

procedures promote efficiencies for the Parties' and Court's resources and best position this case for global resolution of hundreds of thousands of claims.

II. **Pretrial Determination of Daubert Motions Is Required by the Recent Amendments to the Federal Rules of Evidence and Is Good Case Management.**

PLG's argument that the Court should reserve admissibility determinations until a bench trial of individual cases is not consistent with the 2023 Amendments to Rule 702 nor is it an efficient method for positioning the litigation for global resolution.

In 2023, the Rules Committee amended Federal Rule of Evidence 702 "to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." Fed. R. Evid. 702 Advisory Committee's note to the 2023 amendments. Thereafter, the note cites "*See* Rule 104(a)." *Id.* Federal Rule of Evidence 104(a) provides that "the Court must decide ***any preliminary question*** about whether a witness is qualified, a privilege exists, or evidence is admissible." (emphasis added). In the note to the 2023 Amendments to Rule 702, the Committee identifies the Rule 104(a) standard as governing the reliability-based determinations of Rule 702, including: that an expert's testimony be "based on sufficient facts and data;" that the expert's testimony be "the product of reliable principles and methods;" and that "the expert's opinion reflect[] a reliable application of principles and methods to the facts of the case." *See* Fed. R. Evid. 702 advisory committee's notes to 2023 amendment.

"The amendment clarifies that the preponderance standard applies to the three reliability-based requirements added in 2000—requirements that many courts have incorrectly determined to be governed by the more permissive Rule 104(b) standard." *Id.* Rule 104(b) permits courts to "admit the proposed evidence on the condition that the proof be introduced later." By amending Rule 702 to mirror Rule 104(a), the Advisory Committee made clear that courts must be satisfied

4

that expert testimony is, more likely than not, admissible, and that courts cannot blindly defer those decisions until trial.

For example, according to the committee notes, there is a threshold level of facts or data sufficient for an expert to have a reliable basis to support his or her expert opinion testimony. *Id.* While that level of sufficiency does not require the expert to consider "every single study," the reliability challenges to adequate sufficiency go to admissibility and not weight. *Id.* Only after the reliability threshold has been crossed do additional challenges—such as the failure to consider one particular study—go to weight. *See id.* The court cannot, however, determine whether a challenge goes to weight without having first "find[ing] it more likely than not that an expert has a sufficient basis to support an opinion." *Id.*[1] The crux of the 2023 amendment is that reliability challenges under Rule 702 are preliminary questions under Rule 104(a) and not inquiries under Rule 104(b) that allow the Court to provisionally admit the evidence on the condition that the proof be introduced later. *See id; see also* Archibald Cruz, *The Paradigm Shift in the Proposed Amendment to Federal Rule of Evidence 702*, 75 Baylor L. Rev. 265, 280 (2023) (noting that application of Rule 104(b)'s more permissive standard to Rule 702 challenges "is legal error," and

---

[1] The 2023 amendment to Rule 702 and its committee note align with Fourth Circuit precedent instructing that district courts should scrutinize the reliability and admissibility of an expert's opinions. *See, e.g., Sardis v. Overhead Door Corp.*, 10 F.4th 268, 284 (4th Cir. 2021) ("[U]nfortunately many courts have held that the critical questions of the sufficiency of an expert's basis [for his testimony], and the application of the expert's methodology, are generally questions of weight and not admissibility. These rulings are an incorrect application of Rules 702 and 104(a) and are rejected by this amendment.") (quoting Rule 702's then-draft (later adopted) 2023 advisory committee notes); *Nease v. Ford Motor Co.*, 848 F.3d 219, 231 (4th Cir. 2017) ("In sum, the district court did not perform its gatekeeping duties with respect to Sero's testimony. The fact that an expert witness was 'subject to a thorough and extensive examination' does not ensure the reliability of the expert's testimony; such testimony must still be assessed before it is presented to the jury."); *Tyger Constr. Co. Inc. v. Pensacola Constr. Co.*, 29 F.3d 137, 143 (4th Cir. 1994) ("The court may not abdicate its responsibility to ensure that only properly admitted evidence is considered by the jury.").

5

"in cases where experts are necessary to prove certain elements of a claim or defense, applying the wrong standard may very well be outcome determinative").

The cases that PLG cites all pre-date the December 1, 2023 amendments to Rule 702, and none of them involved a mass toxic tort personal injury case in which pre-trial determinations on significant expert admissibility issues would have far reaching effects. *See*, *e.g.*, *Tailored Chem. Prods., Inc. v. DAFCO Inc.*, No. 5:21-CV-00069-KDB-SCR, 2023 WL 5944162, at * 2 (W.D.N.C. Sept. 12, 2023) (contribution action under the Comprehensive Environmental Response Compensation and Liability Act); *United States v. Wood*, 741 F.3d 417, 418 (4th Cir. 2013) (civil commitment action under the Adam Walsh Act); *David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1012 (8th Cir. 2012) (tax refund action for overpayment of employment taxes under the Federal Insurance Contribution Act); *United States v. Brown*, 415 F.3d 1257, 1260 (11th Cir. 2005) (criminal case for conspiracy to distribute controlled substances); *Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 852 (6th Cir. 2004) (review of an administrative law judge's coverage determination under the Individuals with Disabilities Education Act).

In particular, PLG's cases that endorse "provisionally" or "conditionally" admitting expert opinion evidence subject to later determinations at trial, such as *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825 (3d Cir. 2020) and *City and County of San Francisco v. Purdue Pharma L.P.*, 620 F. Supp. 3d 936 (N.D. Cal. 2022), are thrown into doubt by the 2023 amendments to Rule 702. In particular, the Advisory Committee note's clarification that Rule 702 admissibility determinations are preliminary questions that the Court must decide under Rule 104(a), and that Rule 104(b), which allows the court to "admit the proposed evidence on the condition that the proof be introduced later," is inapplicable. Moreover, as the Third Circuit emphasized in *UGI Sunbury LLC*, even in a bench trial, the district court does not have "'discretion

6

to abandon the gatekeeping function' or 'perform the function inadequately.'" 949 F.3d at 833 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 158–59 (1999) (Scalia, J., concurring)). While the district court has some discretion in choosing "among *reasonable* means of excluding expertise," *id.* (emphasis in original) (quoting *Kumho Tire*, 526 U.S. at 158–59), a "failure to conduct any form of 'assessment' of an expert and the proposed testimony *before admitting the testimony* is an abuse of discretion," *id.* (emphasis added) (citing *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 592–93 (1993)).

Here, each Party took extensive depositions of the other side's experts, and the *Daubert* and summary judgment briefing and exhibits allow the Court to decide these important issues on the papers at the Court's convenience. If the Court is concerned about deciding these issues on motions without hearing from the experts, then the proper remedy is to schedule a pre-trial evidentiary hearing, rather than proceeding straight to trials of individual cases.

Pretrial determination of *Daubert* challenges in complex cases finds support in the Manual for Complex Litigation (Fourth) (2004), https://www.uscourts.gov/sites/default/files/mcl4.pdf ("MCL"), and Duke Law School's Guidelines and Best Practices for Large and Mass-Tort Multi-District Litigations. *See* Bolch Judicial Institute, Duke Law School, *Guidelines and Best Practices for Large and Mass-Tort MDLs* (2d ed. Sept. 2018), https://scholarship.law.duke.edu/cgi/viewcontent.cgi?article=1004&context=bolch ("*Duke Guidelines*"). The MCL provides that "[j]udges should strive to resolve objections to evidence . . . before trial." MCL § 11.642 at 124. "Pretrial rulings on admissibility save time at trial . . . . In addition, such rulings may narrow the issues and enable counsel to plan more effectively for trial." *Id.* at 125. In particular, "[p]retrial rulings are . . . advisable with respect to proffered expert testimony that may be pivotal." *Id.* The MCL elaborates:

7

> It is helpful to decide objections to expert evidence relating to admissibility, qualifications of a witness, or existence of a privilege in advance of trial whenever possible. Exclusion of evidence may in some cases remove an essential element of a party's proof, providing the basis for summary judgment.

*Id.* § 23.35 at 506-07 (citing *Daubert*, 509 U.S. at 592–93 (1993) ("Before admitting expert testimony, the trial court must make a 'preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid.'")). The MCL further notes:

> Reserving consideration of the reliability of expert testimony until trial . . . probably carries more disadvantages than advantages. Cases that could have been resolved at the summary-judgment stage instead proceed to trial, with its attendant time and expense. In addition, because of the demands of trial, the judge may not have as full an opportunity to consider the merits of the motion.

*Id.* § 23.352 at 508. For complex mass tort litigation, the MCL confirms an approach consistent with the Court's case management orders in this case. Given the likelihood of disagreements "about crucial scientific evidence" and the recognition that "resolution of the admissibility of [evidence on scientific issues] will as a practical matter be dispositive of the litigation," the Court's schedule should allow time for "resolving *Daubert* motions" prior to trial. *Id.* § 22.87 at 441. PLG argues that the Court should dispense with pretrial resolution of these matters because the CLJA cases will be bench trials. However, the MCL cautions that, "[a]lthough nonjury trials require less formality, procedures to promote clarity and expedition are still important." *Id.* § 12.5 at 164.

The *Duke Guidelines* also support this Court's approach and early resolution of important evidentiary issues, emphasizing "giv[ing] priority to deciding issues broadly applicable to multiple claimants." *Duke Guidelines* at 5. Moreover, they state that "meaningful settlement discussions" may not be possible "until completion of discovery and extensive testing of the parties' contentions through decisions on dispositive and *Daubert* motions." *Id*. at 96. And contrary to PLG's argument, the dismissal of a bellwether case *can* advance global resolution. The dismissal can have "significant predictive value, particularly if the court has made pretrial rulings." *Id*. at 27.

8

"The rulings themselves, regardless of the fate of the particular case, place parties in a better position to gauge the direction of the litigation." *Id.*

Indeed, at an October 2023 hearing before several judges of the Court, Chief Judge Myers recognized that preliminary resolution of *Daubert* motions is most efficient procedurally. He stated:

> To the extent it's necessary on the Track One diseases on causation, Daubert, getting those set so that we can know where we are and if we're moving forward, before we spend a lot of attorney time and a lot of plaintiff time as well as the Government's time on individualized cases. If we can't get through the science first – I think going through the science first has been very successful in other litigation of similar type. So in my own cases, I will be very interested in early Daubert, particularly for those cases where we don't have stipulation as to general causation.

Oct. 30, 2023 Tr., D.E. 38, at 7:9-20.

Subsequently, on June 28, 2024, the Court entered its Case Management Order endorsing a phased approach to deciding scientific issues. D.E. 247. That Order stated that "[b]efore Track 1 Trials commence, the [C]ourt will resolve two threshold issues: (1) toxic chemical exposure from the water at Camp Lejeune and (2) general causation for the Track 1 Illnesses." *See id.* at 1. Deciding *Daubert* motions before trial is consistent with this approach. PLG's proposal to rush individual cases to trial is inefficient, is unlikely to promote global resolution, and is directly at odds with the Court's order.

### III. Pre-Trial Determination of Daubert Motions Will Not Be Unduly Burdensome for the Court. The United States Filed the Number of Daubert Motions Necessary to Raise Important Scientific Issues that Will Assist in Resolution of this Massive Litigation.

PLG's complaint about the number of *Daubert* and dispositive motions that the United States filed is unfounded and incorrect. First, contrary to PLG's repeated assertion, the United States did not challenge every PLG Phase II and Phase III expert. *See* D.E. 721 at 2 (claiming the United States is "seeking exclusion of every Plaintiff's expert"); *id.* at 5 ("Defendant has attacked

9

every single expert for Plaintiffs on every ground it could think of, no matter how tenuous."). For example, one of PLG's Phase III experts, Dr. Kelly Reynolds, used an arguably reliable methodology in calculating exposures for each of the twenty-five bellwether plaintiffs. While the United States has significant issues with some of the assumptions that Dr. Reynolds used and the calculations that she performed, those concerns go to weight and not admissibility of her opinions. The United States also did not file a Rule 702 challenge to exclude the Phase III opinions offered by Dr. Matthew Cooper (a kidney disease expert), or the "substantial exposure" Phase III opinions offered by Dr. Steven Bird and Dr. Benjamin Hatten for bladder cancer cases.

More importantly, the United States filed the number of *Daubert* motions necessary to bring before the Court important scientific issues that will assist in resolution of this massive litigation. The United States filed *Daubert* challenges to the admissibility of several of PLG's expert opinions because of the significant and common scientific flaws in their methodologies. The number of challenges was necessary because PLG served multiple duplicative expert reports for each disease that employed common, fundamental methodological flaws across experts. While PLG complains that the combined volume of the United States' motions is longer than Moby Dick, reading PLG's expert reports is like reading a series of over forty pulp fiction novels, each employing the same tired plot lines. For example, many reports quote the CLJA's burden of proof; yet at deposition, the experts denied ever having referenced an "as likely as not" or "equipoise and above" standard in prior work. *See*, *e.g.*, Bird GC Rep. (Bladder Cancer) at 7 (JA Ex. 67, D.E. 463-6) (quoting CLJA); Hatten GC Rep. (Kidney Cancer) at 3–4 (JA Ex. 90, D.E. 464-11) (quoting CLJA); Freeman Rep. (Parkinson's Disease) at 23 (JA Ex. 131, D.E. 467-14) (quoting CLJA); Bird GC Dep. Tr. at 220:21-221:5 (JA Ex. 148, D.E. 469-2) (stating that he never used "equipoise and above" in prior academic or litigation work); Hatten GC Dep. Tr. at 220:7–19 (JA Ex. 158,

10

Case 7:23-cv-00897-RJ    Document 733    Filed 12/03/25    Page 13 of 20

D.E. 469-12) (stating that he has never used an "as likely as not" standard outside of Camp Lejeune); Freeman Dep. Tr. at 293:1–6 (JA Ex. 159, D.E. 469-13) (stating that he has never used an "as likely as not" standard in thousands of prior expert reports). Some reports included identical, or nearly identical, paragraphs; when confronted with the language at deposition, the experts had no explanation why the language in their reports so closely resembled the language that other experts used.[2]

Significantly, for purposes of PLG's motion, PLG's experts repeatedly employed the same fundamental methodological flaws in reaching their opinions. They conducted opaque literature reviews. They cherry-picked the same unreliable studies. They failed to properly apply Bradford Hill's predicate association requirement. They ignored idiopathy.

For each disease, PLG submitted multiple expert reports on general causation that were largely duplicative: five for kidney cancer, five for bladder cancer, seven for Parkinson's disease, and six for leukemia/non-Hodgkin's lymphoma. Likewise, many of PLG's specific causation reports were duplicative in their methodological flaws. This included thirteen for kidney cancer,[3] five for bladder cancer, five for Parkinson's disease, and nine for leukemia/non-Hodgkin's lymphoma. In all, PLG submitted over forty expert reports in Phase II and Phase III.

---

[2] For example, PLG disclosed general causation reports—ostensibly by different experts—that contained almost identical paragraphs. *Compare* Mallon GC Rep. (Leukemia) at 39-40 (JA Ex. 98, D.E. 465-3) with Hu GC Rep. at 24 (JA Ex. 111, D.E. 466-5). The paragraphs disclosed the "authors'" opinions that two different chemicals caused two different Track 1 Diseases. *See id.* But in Dr. Timothy Mallon's report, the paragraph begins by proclaiming that PCE causes leukemia, then shifts mid-paragraph to a discussion of TCE and NHL—which are the topics of Dr. Howard Hu's nearly identical paragraph. *See id.* When asked about the similarities at deposition, Dr. Mallon testified that "it wouldn't surprise" him that Dr. Hu's "verbiage is very similar to what I wrote" because the two considered similar evidence. Mallon GC Dep. Tr. at 254:7-14 (JA Ex. 151, D.E. 469-5). Dr. Hu testified that "[p]erhaps Dr. Mallon looked at my report." Hu GC Dep. Tr. at 35:8-13(JA Ex. 162, D.E. 470-1).

[3] For kidney cancer, a fourteenth Phase III report was initially submitted, but PLG withdrew that expert shortly after his deposition.

PLG would have the United States file over forty *Daubert* challenges to address each expert report individually. However, for purposes of efficiency, and because each judge will be deciding questions of causation as it pertains to an individual disease, the United States combined its *Daubert* challenges by disease and common methodological flaws.[4] There are only four *Daubert* motions for five kidney cancer cases; four *Daubert* motions for five bladder cancer cases; four *Daubert* motions for five Parkinson's disease cases; and seven *Daubert* motions for ten leukemia/non-Hodgkin's lymphoma cases. In other words, the United States filed twenty *Daubert* challenges in twenty-five cases involving expert opinions in over forty reports. That is less than one *Daubert* challenge per case. Aside from the four summary judgment motions that are entirely dependent on the Court's *Daubert* rulings, the United States' remaining dispositive motions deal primarily with issues of statutory interpretation with global implications.

Given the magnitude of this litigation, the number of reports that PLG served, and the implications of these rulings for thousands of future cases, this number of motions is not unduly burdensome. Indeed, well-reasoned resolution of these issues now promises great efficiency in the future for resolving the CLJA cases and claims. By contrast, rushing to trials of individual cases will not likely assist, and could hinder, global settlement.

---

[4] PLG's claim that the United States' multiple motions seek to circumvent the Court's page limits rings hollow. D.E. 721 at 6-7 & n.3. The United States' grouping of motions and combining of experts into common memoranda allowed for more efficient briefing than repeating the same arguments in separate motions for each of PLG's duplicative experts. The United States also previewed this approach at a Status Conference before the Court and PLG did not object at that time. Aug. 8, 2025 Tr., D.E. 513, at 19:15-20:7. PLG also filed an "issue" motion challenging the failure of the United States' experts to incorporate the CLJA's burden of proof into their methodologies and opinions. D.E. 567.

12

Case 7:23-cv-00897-RJ   Document 733   Filed 12/03/25   Page 15 of 20

## IV. Proceeding to Trial with Individual Kidney Cancer Cases, Without First Resolving the Threshold Issues, Will Not Assist, and Could Hinder, Global Resolution.

The United States disagrees with PLG's proposal to prioritize kidney cancer as the first disease group for trial while staying the other disease groups pending the outcome of the kidney cancer trials.[5] While certain experts may overlap across disease groups, their opinions and the relevant scientific literature differ significantly from disease to disease. Thus, the best path for settling claims for any given disease is by evaluating the science for that given disease. Further, as described above, those issues are close to being fully briefed, after significant investigation by the Parties. There is no reason to undo all that work at this late hour.

For example, the United States' experts opine that whether trichloroethylene ("TCE") can cause kidney cancer is dependent on the level of exposure. But, for other chemicals and diseases, the Parties' experts disagree on whether the chemicals can cause the disease at any level. The Parties' experts also draw differing conclusions for subtypes within Track One diseases, particularly for leukemia and non-Hodgkin's lymphoma. The expected latency period between exposure to a cancer-causing agent and a disease is highly variable among cancers. Some of the cancers have well-known causes and risk factors, other cancers are largely idiopathic. Parkinson's disease is unique because it is not a cancer at all. Motions that the Parties have filed with respect to each of these diseases address issues that are unique to the disease. While there are some cross-cutting fundamental issues—such as (1) application of an expert's methodology employed for retrieving, evaluating, and explaining the literature and (2) consideration of idiopathy in evaluating the cause of disease—even those issues differ from disease to disease. The literature on whether

---

[5] PLG offers no explanation regarding why cases involving other diseases should be stayed while one disease proceeds to trial. Rather than staying any Track 1 Cases, the Court should proceed with its methodical case management plan.

toxic chemicals can cause kidney cancer is much more extensive than the literature on whether toxic chemicals can cause Parkinson's disease. The rate of idiopathy also differs significantly from disease to disease. These differences are discussed in the various motions related to each disease; resolving those motions will provide the best information for how to resolve claims for each disease.

On the other hand, the Parties have filed some motions that are universally applicable to all cases. Under PLG's proposal, the judge trying expedited individual kidney cancer cases would have to decide the global issues raised by those universal motions as part of resolving the individual cases. It would be more efficient for the *en banc* Court to decide these universal motions before trial to avoid the possibility of inconsistent decisions. These motions include: (1) the Parties' motions in Phase I concerning the water modeling and history experts; (2) the Parties' motions regarding whether causation experts can and should incorporate the CLJA's burden of proof into their analyses of the scientific evidence and their opinions; (3) the United States' motion for summary judgment in cases that lack of expert testimony on but-for causation, and (4) PLG's motion to exclude the United States' epidemiologist and toxicologist, Dr. Julie Goodman.

Finally, expedited trials of individual cases without preliminary rulings on water contamination issues and admissibility of expert testimony on causation could create inefficiencies that would delay global resolution. The Parties will have to determine the extent to which decisions in those cases provide information that might help resolve cases involving different diseases and different periods of exposure. For example, a decision on a case of a kidney cancer plaintiff who was at Camp Lejeune in the 1980s is unlikely to help resolve the case of a Parkinson's disease plaintiff who was at Camp Lejeune in the 1960s. The more efficient path to resolving cases

involving different diseases and different periods of exposure is to resolve the motions involving those diseases, as well as the currently pending motions related to Phase One.

By comparison, a trial and judgment in an individual case will require a large investment of the Parties' and the Court's time and resources, beyond what has thus far been briefed. And extrapolating the results of that trial to other diseases is less informative (and leaves more room for disagreement between the Parties) than motions specific to those other diseases or global issues. By contrast, decisions on water contamination and many *Daubert* issues will provide information that is universally applicable and will substantially assist with global resolution.

## CONCLUSION

The United States does not minimize the burden that the CLJA has placed on this Court. But following the phased approach that the Court has already ordered and issuing pre-trial legal decisions on fundamental evidentiary issues will provide the best opportunity for keeping that burden to a minimum. PLG's approach potentially invites inefficiency as decisions on individual cases will likely provide little, if any, guidance on how the cases and claims should be resolved globally.

For the foregoing reasons, PLG's Motion to Reserve Admissibility Determinations and Expedite Track 1 Bellwether Trials should be denied.

Dated: December 3, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General,
Civil Division

JONATHAN D. GUYNN
Deputy Assistant Attorney General,
Torts Branch

BRIDGET BAILEY LIPSCOMB
Chief, Camp Lejeune Justice Act Section

HAROON ANWAR
SARA J. MIRSKY
Acting Assistant Directors

ALLISON M. O'LEARY
TRACI C. MCKEEVER
ELIZABETH K. PLATT
ANNA E. ELLISON
NATHAN J. BU
MELANIE KONSTANTOPOULOS
JESSICA L.D. ANS
JENNIFER E. ADAMS
Trial Attorneys

*/s/ Adam Bain*
ADAM BAIN
Special Litigation Counsel
IN Bar No. 11134-49
Special Litigation Counsel
United States Department of Justice
Civil Division, Torts Branch
1100 L Street, NW
Washington, DC 20005
(202) 598-0930
adam.bain@usdoj.gov

Attorney inquiries regarding CLJA:
(202) 353-4426

*Attorneys for Defendant,*
*United States of America*

## CERTIFICATE OF SERVICE

I hereby certify that on December 3, 2025, I caused to be electronically filed the foregoing using the Court's Electronic Case Filing system, which will send notice to all counsel of record.

<u>*/s/ Adam Bain*</u>
ADAM BAIN