IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:23-cv-897

| | |
|---|---|
| IN RE: )<br>)<br>CAMP LEJEUNE WATER LITIGATION )<br>)<br>This Document Relates To: )<br>ALL CASES ) | UNITED STATES' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO STRIKE DR. JULIE GOODMAN'S CORRECTED SUMMARY TABLES<br>(L. Civ. R. 7.1(f)) |

## INTRODUCTION

The United States asked Dr. Julie Goodman to undertake an immense task: examine the scientific evidence to determine whether the contaminants alleged to be in the drinking water at Camp Lejeune could cause the diseases alleged by the Plaintiffs in this case. Dr. Goodman did not treat this responsibility lightly. She spent over two years directing a staff of Ph.D. scientists as they reviewed hundreds of studies, analyzed hundreds of thousands of data points, and evaluated the weight of the evidence. They conducted systematic reviews on the five Track 1 diseases and five contaminants of concern, generating over 1,700 pages of reports. In addition to these reports, Dr. Goodman and her team created summary tables of the studies she reviewed to demonstrate the breadth of the literature review she undertook and to inform the Court of the studies underlying her opinions.

Rule 26 contemplates that mistakes can happen, especially in such a massive undertaking as the review performed by Dr. Goodman in this case. Dr. Goodman stands by all of the opinions in her reports, and she accepts responsibility for the errors. After mistakes in her reports were brought to her attention, Dr. Goodman performed a comprehensive quality control review. The results of that review are presented as Exhibits 2, 4, 6, 8, and 10 to the United States' Response in Opposition to Plaintiffs' Motion to Exclude Dr. Julie Goodman, D.E. 686. *See generally* 686-3; 686-5; 686-7; 686-9; 686-11. Plaintiffs' Motion to exclude these corrections seeks an extreme and disproportionate sanction, the total exclusion of Dr. Goodman's corrections. The *Akeva* factors weigh heavily against striking Dr. Goodman's corrected summary tables. Accordingly, Plaintiffs' Motion to strike Dr. Goodman's

1

corrected summary tables ("Motion to Strike") should be denied.

## STATEMENT OF FACTS

Julie Goodman, Ph.D., DABT, FACE, ATS, is the United States' general causation expert, who was tasked with evaluating whether epidemiologic literature supports a causal conclusion between exposure to any of the five contaminants of concern in this case and any of the five Track 1 illnesses.[1] *See* Goodman Decl., D.E. 686-2, at ¶ 2. The results of these evaluations are presented in her five expert reports, with one report for each Track 1 illness. *See id.* Dr. Goodman "reviewed hundreds of scientific documents regarding bladder cancer, kidney cancer, non-Hodgkin's lymphoma, leukemia, and Parkinson's disease" in rendering her opinions. *Id.* at ¶ 5. For each of Dr. Goodman's five reports, she also appended "numerous tables that summarized relevant information from the studies, including study quality, study characteristics, and study results." *Id.* at ¶ 8. Dr. Goodman's full analyses are presented in her five reports, which total over 1,700 pages. *Id.* at ¶ 6.

At Dr. Goodman's deposition and in their Motion to Exclude Defense Expert Dr. Julie Goodman, Plaintiffs made Dr. Goodman aware of inconsistencies in the tables of her reports. *Id.* at ¶ 9; D.E. 621; D.E. 654; Pls.' Mem., D.E. 725, at 10. These inconsistencies "occurred due to errors in transferring the information from the studies [Dr. Goodman] reviewed to the tables." Goodman Decl., D.E. 686-2, at ¶ 11. Dr. Goodman declared under penalty of perjury that none of these errors "alter or impact any of [her] analyses or opinions," *id.* at ¶ 10, and that her "overall conclusions regarding these studies did not change." *Id.* at ¶ 12.

Many of the errors Dr. Goodman identified in her reports "resulted from simply misprinting the study period or sample size." *Id.* at ¶ 11. As Dr. Goodman explained in the methodology section of her reports, the tables offered summaries of "relevant information on study characteristics and results,

---

[1] The five contaminants of concern in this case are perchloroethylene, trichloroethylene, *trans*-1,2-dichloroethylene, vinyl chloride, and benzene. *See* Goodman Rep. (Bladder) at 7 (JA Ex. 75, D.E. 463-14). The Track 1 illnesses are non-Hodgkin's lymphoma, leukemia, Parkinson's disease, kidney cancer, and bladder cancer. Case Management Order No. 2, D.E. 23, at 8.

as well as study quality." Goodman Rep. (Bladder) at 15 (JA Ex. 75, D.E. 463-14).[2] Accordingly, the information contained in these tables is merely a reproduction or summary of information in the studies; the tables do not reflect Dr. Goodman's ultimate opinions. For example, in listing the study population for Sorahan et al. (2002), one of the 398 sources in her Kidney Cancer Report, Dr. Goodman listed the number of individuals in the total population as well as number in the refinery workers sub-cohort and in the distribution workers sub-cohort. D.E. 686-6 at H-4. In transcribing the refinery workers sub-cohort, a typographical error occurred: she transcribed 28,690, instead of 28,630. *Id.* To ensure that the Court receives the most accurate summary information and to comply with Rule 26, Dr. Goodman corrected this minor typographical error. Other corrections included rectifying the list of sources that a study collected its information from to include a source that was originally omitted from the summary tables.

While Plaintiffs make much of the number of corrections that Dr. Goodman made to her tables, these types of minor corrections make up the vast majority of the corrections that Dr. Goodman made. Other corrections, including changing strengths and weaknesses, involved making judgments on borderline factors across reports for studies to ensure consistency among tables after Plaintiffs' counsel pointed out some inconsistencies. These few inconsistencies occurred because the tables were independently prepared in seriatim by Dr. Goodman with staff assistance over the course of two years and involved thousands of data points.

Based on the history of similar supplemental reports issued by Plaintiffs' experts after discovery deadlines in this case, the United States has already offered Plaintiffs the opportunity to take another deposition of Dr. Goodman, focused on the corrections to her summary tables. *See* **Exhibit 1**, November 13, 2025 Letter to PLG. Plaintiffs have not responded to the United States' letter offering a

---

[2] While the page citation here refers to Dr. Goodman's General Causation Report on Bladder Cancer, all of her reports include the same referenced quotations. *See* Goodman Rep. (Kidney) at 7–41 (JA Ex. 94, D.E. 464-15); Goodman Rep. (Leukemia) at 8–41 (JA Ex. 102, D.E. 465-7); Goodman Rep. (NHL) at 7–40 (JA Ex. 117, D.E. 466-11); Goodman Rep. (PD) at 8–30 (JA Ex. 134, D.E. 467-17).

supplemental deposition of Dr. Goodman. Nevertheless, supplemental deposition time has, customarily, been the appropriate remedy for curing any alleged prejudice to the opposing party caused by out-of-time supplements and corrections to expert reports.

For example, the United States took the deposition of Plaintiffs' Phase II and III expert, Dr. Howard Hu, in July of 2025, during which time he testified to a toxicokinetic model utilized in his report, but which he could not provide any additional details. *See* Hu SC Dep. Tr. at 275:18–281:22 (JA Ex. 602, D.E. 508-11). During Dr. Hu's deposition, the United States requested the production of certain underlying calculations as well as documents omitted from Dr. Hu's report and materials considered list. *See id.* at 280:9–22. The United States reiterated this request by letter to counsel two days later. **Exhibit 2**, July 25, 2025 Letter to PLG. On September 22, 2025, nearly four months after the United States' subpoena to Dr. Hu was issued and nearly two months after the United States requested the information post-deposition, Plaintiffs finally disclosed a supplemental report in response to the United States' letter, which contained new calculations and conclusions. Significantly, this was *after* the Court's September 10, 2025, deadline for opening briefs related to Phases II and III of expert discovery. D.E. 414 at 1; *see* **Exhibit 3**, September 22, 2025 Letter to United States.

Specifically, Dr. Hu's late supplemental report contained citations to previously undisclosed materials considered, as well as corrections to a calculation performed in furtherance of Dr. Hu's specific causation opinion for plaintiff Robert Kidd. *See generally* **Exhibit 4**, Dr. Hu Supplemental Report of Sept. 22, 2025. Dr. Hu admitted in his supplemental report that the results of his corrections bolstered his prior opinions. *See id.* at 2 ("I'm not quite sure how the estimate in my [May 16, 2025] report arrived at a somewhat higher figure, but, if anything, the [corrected] figure further increases the significance of the findings of risk of cancer from benzene exposure found in the UK Biobank study, i.e., *the risk of cancer from benzene exposure is even higher than my report's extrapolation suggested*.") (emphasis added) (citation modified).

In response to the United States' objection to the untimely nature of Dr. Hu's supplement,

Plaintiffs argued that Dr. Hu's corrections were required under Rule 26(e). *See* **Exhibit 5**, Oct. 3, 2025 Letter to United States. During a meet and confer between the Parties, Plaintiffs again argued that these corrections were mandatory under Rule 26(e), and offered a supplemental deposition as a compromise; the United States accepted, and that deposition took place on November 6, 2025. *See generally* **Exhibit 6**, Nov. 6, 2025 Hu Dep. Tr. Because of the requirement for experts to correct errors in their reports under Rule 26(e), the United States accepted the offer of a supplemental deposition to learn more about Dr. Hu's corrections and how they impacted his opinions.

Over the course of this litigation, the Parties and Court have remedied corrections and supplements to expert reports through additional deposition time. *See, e.g.*, *In re Camp Lejeune Water Litig.*, No. 7:23-CV-897, 2025 WL 1343184 (E.D.N.C. May 8, 2025). For example, Plaintiffs' exposure science expert, Dr. Kelly Reynolds, issued three supplemental reports, some several months after the disclosure deadline, in which she corrected errors.[3] The Parties agreed that the appropriate remedy was additional deposition time. Similarly, Plaintiffs' expert, Dr. Richard Hoppe, issued an erratum following his deposition that made substantive changes to his testimony. Joint Status Report, Aug. 1, 2025, D.E. 449, at 7. Once again, the Parties agreed that the appropriate remedy was a supplemental deposition. Joint Status Report, Aug. 22, 2025, D.E. 458, at 3. Rather than continuing to follow the spirit of Rule 26 and the prior practice in this case to allow corrections to expert reports with supplemental deposition time, Plaintiffs have filed the overreaching Motion to Strike.

## LEGAL STANDARD

Federal Rule of Civil Procedure 26(a)(2)(E) requires the Parties to supplement expert witness reports when required under Rule 26(e), which provides that a party "*must* supplement or correct its disclosure . . . in a timely manner if the party learns that in some material respect the disclosure or

---

[3] *See* Reynolds Rep. Err. (Cagiano) (JA Ex. 572, D.E. 506-5); Reynolds Appx (Dyer) (JA Ex. 573, D.E. 506-6); Reynolds Appx (Connard) (JA Ex. 574, D.E. 506-7); Reynolds Appx (Hill) (JA Ex. 575, D.E. 506-8). Dr. Reynolds made these corrections to her appendices, which dramatically impacted the exposure assessments for individual Plaintiffs.

response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties . . . ." Fed. R. Civ. P. 26(e)(1) (emphasis added). Supplementation is appropriate under Rule 26(e) "when the previous disclosures 'happen to be defective in some way so that the disclosure was incorrect or incomplete and, therefore, *misleading*.'" *Severn Peanut Co. v. Indus. Fumigant Co.*, No. 2:11-CV-00014-BO, 2014 WL 198217, at *2 (E.D.N.C. Jan. 15, 2014) (emphasis in original) (quoting *Akeva L.L.C. v. Mizuno Corp.*, 212 F.R.D. 306, 310 (M.D.N.C. 2002)). The Rules supply a deadline for the supplementation of expert witness reports and deposition testimony, which "must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due." Fed. R. Civ. P. 26(e)(2).

Plaintiffs allege that the United States violated the Court's pretrial scheduling order by issuing corrections to Dr. Goodman's reports when it did. Pls.' Mem., D.E. 725, at 10. Accordingly, if the United States is found to have committed a violation of the Court's pretrial scheduling orders in its attempt to comply with Rule 26(e), the issue before the Court is whether sanctions are warranted. *In re Camp Lejeune Water Litig.*, 2025 WL 1343184 at *4. "'[S]anctions of this sort should not be invoked lightly." *Joe Hand Promotions, Inc. v. Hayes*, No. 1:18-CV-531, 2020 WL 9848455, at *2 (M.D.N.C. June 25, 2020) (internal quotation omitted), *R. & R. adopted*, No. 1:18-CV-531, 2020 WL 9848453 (M.D.N.C. July 27, 2020). Indeed, this Court has described striking portions of an expert report under Rule 37(b)(2)(A)(iii) as a "draconian sanction." *Sepracor, Inc. v. Barr Pharms., Inc.*, No. 4:08-CV-89-H(3), 2009 WL 10873178, at *12 (E.D.N.C. Nov. 19, 2009).

As this Court has noted, "[w]hen making this analysis, courts in this district have often applied the factors set out in out" in *Akeva*, 212 F.R.D. at 309. *In re Camp Lejeune Water Litig.*, 2025 WL 1343184 at *5; *see also id.* at *5 n.6 (declining to apply the standard set out in *S. States Rack and Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596–97 (4th Cir. 2003), where, as here, Plaintiffs alleged that the United States violated a pretrial discovery order). These factors include:

(1) the explanation for the failure to obey the order; (2) the importance of the expert

opinion; (3) the prejudice to the opposing party by allowing the disclosures; (4) the availability of alternative or lesser sanctions; (5) the interest in expeditious resolution of litigation; (6) a court's need to manage its docket; and (7) public policy favoring disposition of cases on the merits.

*Id.* (citing *Severn Peanut*, 2014 WL 198217, at *3).

## ARGUMENT

### I. Dr. Goodman's Corrections to Her Summary Tables Comply with Rule 26(e).

Dr. Goodman made corrections to her summary tables as mandated by Rule 26. Fed. R. Civ. P. 26(e) (A party "*must* supplement or correct its disclosure . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect.") (emphasis added). Dr. Goodman's corrected tables are not only permitted but are also mandated by Rule 26. In support of their Motion to Strike, Plaintiffs argue that Dr. Goodman's corrections are "gamesmanship" that seeks to "sneak in new and improved expert opinions." Pls.' Mem., D.E. 725, at 5–6. But Dr. Goodman's opinions, which are found in the body of her reports, have not changed. Even if the summary tables appended to her reports were to contain Dr. Goodman's opinions—which they did not—the corrections to the tables do not rise to the level of "substantive" changes, as Plaintiffs suggest. Ignoring this fact, Plaintiffs seize on Dr. Goodman's requisite corrections as yet another opportunity to smear her, sensationalizing an otherwise unremarkable development in this litigation.

Dr. Goodman's corrections to typographical and inadvertent errors are not a change in her opinions because her opinions are contained in her reports, not in the summary tables. This is evidenced by Dr. Goodman's Declaration, in which she stated that "[n]one of the typographical or inadvertent errors alter or impact any of my analyses or opinions." *See* Goodman Declaration, D.E. 686-2, at ¶ 10. Importantly, this is clear from the corrections themselves. Dr. Goodman corrected typographical or inadvertent errors such as correcting a reported sub-cohort size from 28,690 to 28,630 (D.E. 686-6 at H-4) or correcting the follow-up from twenty years to twenty-two years (D.E. 686-9 at C-1). Other corrections include rectifying the list of sources from which the study collected its information to

include a source that was originally omitted from the summary tables. D.E. 686-4 at D-14. This information would have been apparent from the text of the study, but for clarity and completeness, Dr. Goodman corrected the tables to include all relevant information.[4]

Even where inadvertent errors occurred causing corrections to strengths and weaknesses, the corrections remain just corrections, not alterations of analyses. The determination of strengths and weaknesses often involved making judgments on borderline factors across reports for studies. These changes became necessary to ensure consistency among tables after Plaintiffs' counsel pointed out some inconsistencies. These few inconsistencies occurred because the tables were independently prepared consecutively by Dr. Goodman with staff assistance over the course of two years and involved thousands of data points. For example, Dr. Goodman made corrections to the summary provided of Bove et al. (2014), where she clarified that while it is unclear how the authors accounted for smoking as a potential confounder, they did use negative controls. Pls.' Mem., D.E. 725, at 7; D.E. 686-12, at C-1. Dr. Goodman also corrected the summary table to reflect that the ATSDR's water modeling studies took a limited number of samples into consideration when evaluating exposure. D.E. 686-12, at C-1. These corrections simply bring the text of Dr. Goodman's summary tables in line with the text of the studies themselves, and, contrary to Plaintiffs' implication, did not impact Dr. Goodman's decision to consider, or not consider, the Bove et al. 2014 study. In fact, these studies, which Plaintiffs describe as "the most important studies in this case," are evaluated in detail in the text of Dr. Goodman's reports—not discounted in their entirety. *See, e.g.*, Goodman Rep. (PD) at 33–45 (JA Ex. 134, D.E. 467-17).

As another example, in summarizing relevant information from Morgan et al. (1998), one of the 397 sources she considered on NHL, Dr. Goodman originally stated that the study "[c]ontrolled for

---

[4] Because studies are repeated in multiple tables or across multiple reports, the same typographical or inadvertent error was corrected in each instance. However, it remains the same error.

or considered: age and, sex, and race." D.E. 686-10 at C-7. However, based on her thorough review, Dr. Goodman recognized that the study did not *control* for race, even though the study had information on race. Accordingly, Dr. Goodman corrected the table to more accurately summarize the information in the study, writing "[c]onsidered race but data were 'sparse' and not used." *Id.* In doing so, this correction required correcting the factor from a strength to a weakness in accordance with her systematic methodology, including tables distinguishing qualities as strengths and weaknesses. *See e.g.*, Goodman Rep. (Bladder) at 17 (JA Ex. 75, D.E. 463-14). While Dr. Goodman laid out factors in a standardized format, the studies themselves do not always do the same and, thus, require detailed investigation into the underlying data or supplemental materials to complete each block in her summary tables. As such, Dr. Goodman's corrections seek to provide clarity when her thorough review uncovered a minor error.

Nevertheless, Dr. Goodman's analysis and use of the study did not change nor did her ultimate conclusions. As is clear from the extensiveness of her tables and the thoroughness of her opinions, Dr. Goodman's analysis did not rest on one bullet point—or even multiple bullet points—in her tables. Rather, she took into consideration each element of each scientific study, from population size to population source to location to follow-up period. On top of that, she took into consideration a multitude of factors concerning study quality for each study she reviewed. These factors are outlined in detail in the methodology section of her reports. Plaintiffs' laundry list of concerns regarding the *tables* ignores that Dr. Goodman's analyses and opinions are contained in the body of her reports, not the summary tables in the appendices.

Plaintiffs' contention that Dr. Goodman's corrections to her summary tables constitutes "gamesmanship" is misplaced. Pls.' Mem., D.E. 725, at 5. In support of this argument, Plaintiffs invent a legal standard for evaluating the propriety of corrections under Rule 26(e), which hinges on whether the corrections are "substantive." *See id.* at 7. Plaintiffs do not cite any cases that establish such a standard, nor do they compare Dr. Goodman's corrections to the cases they cite to argue that

9

supplementation is impermissible. *See id.* at 5–9. But even under Plaintiffs' "substantive" analysis, Dr. Goodman's corrections still constitute proper supplementation under Rule 26(e).

For example, Plaintiffs cite *Pierce v. North Carolina State Board of Elections*, No. 4:23-CV-193-D, 2024 WL 5170738 (E.D.N.C. Dec. 18, 2024), to support the proposition that courts routinely reject "supplementation of expert reports with untimely 'new and improved' expert reports." Pls.' Mem., D.E. 725, at 6. In *Pierce*, a case brought under the Voting Rights Act, the plaintiffs' expert witness discussed "four hypothetical 'demonstration [electoral] districts'" in his initial report, then disclosed a rebuttal report containing a new, fifth demonstration district. 2024 WL 5170738, at *1–2. The Court found that the supplement was improper under Rule 26(e) because the plaintiffs were "not attempting to correct an inadvertent error . . . [but] instead attempting to provide a 'new and improved' expert report that will give them another bite at the apple." *Id.* Unlike the *Pierce* experts, Dr. Goodman's corrected tables did not provide any new analyses or opinions, let alone cite new facts or data. *Id.* Dr. Goodman's corrected summary tables are just that—corrections.

Plaintiffs' reliance on *Gallagher v. South Source Packaging, LLC*, 568 F. Supp. 2d 624 (E.D.N.C. 2008), is similarly misplaced. *See* Pls.' Mem., D.E. 725, at 5–6, 9, 11 (citing *Gallagher* for broad propositions of law without offering legal analysis). In *Gallagher*, the defendant filed a supplemental expert report eleven months after the initial deadline for expert reports. *Gallagher*, 568 F. Supp. 2d at 629. In it, defendant's expert "changed his conclusion concerning [defendant's] lost revenue" from $1,335,214.43 to $897,772.13. *Id.* The Court found that this change did not serve "to correct an inadvertent error or omission," but was made solely in response to criticisms leveled at the expert in a motion for summary judgment. *Id.* at 631. Accordingly, the Court found that the *Gallagher* expert's supplemental report was "not 'true supplementation.'" *Id. Gallagher* is clearly distinguishable from the facts here. Unlike in *Gallagher*, Dr. Goodman's corrected summary tables do not constitute new or modified opinions. Goodman Decl., D.E. 686-2, at ¶ 12. Rather, her opinions have remained unchanged; and the tables summarizing the materials she relied on have been corrected to account for

inaccuracies that were not discovered during the normal course of preparing five lengthy reports, with multiple tables for each.

Similarly, Plaintiffs cite *E.E.O.C. v. Freeman*, 961 F. Supp. 2d 783 (D. Md. 2013), *aff'd in part sub nom. E.E.O.C. v. Freeman*, 778 F.3d 463 (4th Cir. 2015), in support of their Motion to Strike, even though the facts of that case differ greatly from the facts at hand. Pls.' Mem., D.E. 725, at 10–11. In *Freeman*, the E.E.O.C. attempted to file three amended reports after the close of expert discovery, even attempting to file an amended report nearly one year after the deadline. *Id.* at 797. The District of Maryland found that the reports were improper supplements under Rule 26(e), reasoning that "supplementation under the Rules means correcting inaccuracies . . . ." *Id.* Rather than merely correcting inaccuracies, the court found that the *Freeman* expert's amended reports contained "continually changing analyses . . . based on materials available to him prior to his initial submission deadline." *Id.* Unlike the expert in *Freeman*, Dr. Goodman's analyses have not changed, and she simply corrected inaccuracies in the summary tables appended to her reports. *See supra* at 7–10. Accordingly, Plaintiffs' reliance on *Freeman* is inapposite.

**II.     Plaintiffs' Motion Seeks Disproportionate and Severe Sanctions Unwarranted by the *Akeva* Factors.**

As explained *supra* in section I, Dr. Goodman's corrected summary tables were proper supplements under Rule 26(e). However, even if the Court were to accept Plaintiffs' argument that Dr. Goodman's corrections do not comport with Rule 26(e), the sanction Plaintiffs have requested is not warranted.[5] The *Akeva* factors counsel against striking Dr. Goodman's corrected summary tables.

First, Dr. Goodman freely admitted the instances where her summary tables contained errors.

---

[5] Hypocritically, Plaintiffs have suggested that if their own experts' opinions are found to be inadmissible under Fed. R. Evid. 702, the Court should allow the experts to "produce a supplemental expert report and/or deposition to address any deficiencies in expert testimony identified by the Court." *See, e.g.,* Pls.' Opp. to United States' Mot. for Summ. J., D.E. 701, at 2. Such a position is in stark contrast to Plaintiffs' draconian remedy for the United States' expert's mere corrections to summary tables.

Goodman Dep. Tr. at 248:18–249:8 (JA Ex. 172, D.E. 471-1) ("I believe that is an error . . . . I think I looked at all of these tables multiple times and I somehow did not notice this mistake in reviewing this table here."). Because many of these "mistakes" were "otherwise made known" to Plaintiffs during Dr. Goodman's deposition, she was not obligated to supplement her reports with regard to those errors. Fed. R. Civ. P. 26(e) (stating that the obligation to supplement disclosures does not apply in situations "when an expert during a deposition corrects information contained in an earlier report"). Additionally, Dr. Goodman was able to explain at deposition why some of the "inconsistencies" between her tables were reasonable and justified. *E.g.*, Goodman Dep. Tr. at 255:9–256:17 (JA Ex. 172, D.E. 471-1) ("Q. So are they inconsistent internally? . . . THE WITNESS: I wouldn't say inconsistent. I would say it's different for cancer and Parkinson's.").[6]

Second, the importance of Dr. Goodman's testimony cannot be overstated. *See Akeva*, 212 F.R.D. at 311. Dr. Goodman is the United States' general causation expert for all five of the Track 1 illnesses. Moreover, in seeking to strike these summary tables, Plaintiffs also seek to deprive the Court of the most complete and accurate summaries of the state of the epidemiological literature as it relates to the contaminants of concern and Track 1 illnesses. As the United States' Federal Rule of Evidence 702 Literature Review Motions demonstrated, Plaintiffs' experts completely failed to offer a comprehensive overview of the relevant epidemiological literature because they cherry-picked

---

[6] Indeed, the sole example Plaintiffs could provide in their Motion to Strike of an instance where Dr. Goodman's corrected summary tables allegedly contradict her report is not, in fact, inconsistent. Pls.' Mem., D.E. 725, at 9 n.7. Plaintiffs complain that Dr. Goodman's corrected summary table, which strikes the phrase "[d]irect chemical exposure measurement" from the "strengths" column of Aschengrau et al. (1993), contradicts her leukemia report. *Id.* But Dr. Goodman's leukemia report defines "direct chemical measurements" as those based on either modeled or sampling data. Goodman Rep. (Leukemia) at 20 (JA Ex. 102, D.E. 465-7) ("Directly measured or modeled chemical concentrations in the environment (*e.g.*, drinking water) are more reliable than exposure estimates that are not based on any quantitative information, but with no direct link between the measurement and true individual-level exposure (*e.g.*, individual-level water consumption data), neither type of estimate is likely to be accurate and reliable with respect to individual exposures."). As the text of her report explains, the study involved modeled exposure. *Id.* at 68. To avoid confusion over the term, which is defined in her report but not in her tables, Dr. Goodman clarified that the Aschengrau et al. (2013) study relied on modeled exposure values, rather than actual sampling data.

literature that supported their causation opinions, while excluding other highly relevant literature. D.E. 541 (Parkinson's Disease); D.E. 559 (NHL/Leukemia); D.E. 574 (Kidney Cancer); D.E. 584 (Bladder Cancer); *see also* Miller GC Dep. Tr. at 45:9–11 (JA Ex. 171, D.E. 470-10) ("I was trying to write a focused review and not an exhaustive analysis of all of the literature."). The epidemiological literature related to the contaminants of concern and Track 1 illnesses is "squarely relevant to this litigation," *In re Camp Lejeune Water Litig.*, 2025 WL 1343184, at *6, given this Court's previous findings regarding the importance of Plaintiffs' burden to prove both general and specific causation. *In re Camp Lejeune Water Litig.*, 736 F. Supp. 3d 311, 319 (E.D.N.C. 2024).

Third, any alleged prejudice to the Plaintiffs from Dr. Goodman's corrected summary tables is minimal and can be mitigated by the supplemental deposition the United States previously offered. *See Akeva*, 212 F.R.D. at 311. Plaintiffs simply cannot show surprise at Dr. Goodman's corrections. *Cf. In re Camp Lejeune Water Litig.*, 2025 WL 1343184 at *6. As Plaintiffs repeatedly acknowledge, they were aware that portions of Dr. Goodman's summary tables contained mistakes. *See, e.g.*, Pls.' Mem., D.E. 725, at 3, 10, 10 n.8 (acknowledging Plaintiffs cross-examined Dr. Goodman about errors in her reports, and raised other errors in a motion to exclude her opinions under Rule 702).

Fourth, "the availability of alternative or lesser sanctions," counsels strongly against excluding Dr. Goodman's corrected summary tables. *Akeva*, 212 F.R.D. at 311. The United States offered Plaintiffs a supplemental deposition to cure any alleged prejudice. *See* Ex. 1. And, of course, Plaintiffs are free to cross-examine Dr. Goodman on the mistakes at trial. All of this would alleviate any alleged "prejudice to PLG while keeping this case on its current pretrial track." *In re Camp Lejeune Water Litig.*, 2025 WL 1343184 at *6.

Plaintiffs' insistence that they would "need to conduct significant, additional discovery" were Dr. Goodman's corrected summary tables allowed to stand is without merit. Pls.' Mem., D.E. 725, at 13. Plaintiffs' unsupported argument that they must now depose "individuals from Dr. Goodman's company who assisted in writing her reports, and expert witnesses who relied on Dr. Goodman" is at

best an unjustified attempt at skewing the *Akeva* factors in their favor, and at worst, an attempt at a second bite at the apple of general and specific causation expert discovery. *Id.* at 13–14.

It is not a surprise to Plaintiffs that Dr. Goodman was supported by a staff of Ph.D. scientists whom she directed. The United States produced detailed billing records from Gradient, which Plaintiffs used in examining Dr. Goodman at deposition. *See, e.g.*, Goodman Dep. Tr. at 155:11–156:19 (JA Ex. 172, D.E. 471-1) (questioning Dr. Goodman on her direction of staff members and number of hours worked on Camp Lejeune litigation related reports). Plaintiffs have already had the opportunity to question Dr. Goodman on the use of staff scientists, and they incorporated this testimony into their motion to exclude her under Rule 702. *See* Pls.' Supp. Mem., D.E. 654, at 19–27. Moreover, the opinions in Dr. Goodman's report—which she reached after directing a team of scientists for over two years—belong to Dr. Goodman. *See* Goodman Dep. Tr. at 152:6–10 (JA Ex. 172, D.E. 471-1). There is simply no reason that Plaintiffs would need to question anyone other than Dr. Goodman on her opinions.

Plaintiffs do not explain how or why it would be necessary to question the United States' other experts on the corrections to summary tables. There is no indication whatsoever that any of the United States' experts relied on Dr. Goodman's summary tables in forming their opinions. Indeed, Plaintiffs do not offer a single example of a specific causation expert who cited Dr. Goodman's summary tables in a report or in deposition testimony, much less to any portion of her summary tables that was later corrected. *See generally* Pls.' Mem., D.E. 725.

Plaintiffs' arguments about the expediency and docket management *Akeva* factors are inapposite. As in *Lightfoot v. Georgia-Pacific Wood Products, L.L.C.*, No. 7:16-CV-244-FL, 2018 WL 4517616, at *8 (E.D.N.C. Sept. 20, 2018), *order amended on reconsideration*, No. 7:16-CV-244-FL, 2018 WL 6729636 (E.D.N.C. Dec. 21, 2018), a trial date has not yet been set. Although Plaintiffs' attempt to distinguish *Lightfoot* on the grounds that there were fewer plaintiffs in that case, the number of plaintiffs in a case has no bearing on whether Dr. Goodman's corrected summary tables might

disrupt a non-existent trial schedule. Pls.' Mem., D.E. 725, at 15. Moreover, Plaintiffs' concerns about expediency ring hollow in light of their repeated objections to setting a deadline for final supplementation of expert reports before trial. *See*, *e.g.*, Joint Status Report, D.E. 354, at 5; Joint Status Report, D.E. 449, at 4.

Finally, Plaintiffs do not address the seventh *Akeva* factor: "public policy favoring disposition of cases on the merits." 212 F.R.D. at 311. This is because it counsels heavily against their preferred relief of striking Dr. Goodman's corrected summary tables. Striking Dr. Goodman's complete and accurate summary tables, which are merely supplemental support to the text of her reports, does nothing to advance the public policy preference for resolving cases on the merits. Rather, striking these tables would serve only to deprive the Court of the best evidence of the epidemiologic literature applicable to this case.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion to Strike should be denied.

Dated: December 10, 2025                    Respectfully submitted,

                                                           BRETT A. SHUMATE
Assistant Attorney General
Civil Division

JONATHAN GUYNN
Deputy Assistant Attorney General
Torts Branch

BRIDGET BAILEY LIPSCOMB
Chief
Camp Lejeune Justice Act Section

HAROON ANWAR
SARA J. MIRSKY
Acting Assistant Directors

ADAM BAIN
Special Litigation Counsel

ELIZABETH K. PLATT
Trial Attorney

 /s/ Giovanni Antonucci
GIOVANNI ANTONUCCI
Trial Attorney
United States Department of Justice
Civil Division, Torts Branch
Camp Lejeune Justice Act Section
1100 L Street NW
Washington, DC 20005
(202) 880-6104
Fax (202) 616-4473
giovanni.antonucci@usdoj.gov
N.Y. Bar No. 6096671

*Attorneys for Defendant,*
*United States of America*

## CERTIFICATE OF SERVICE

I hereby certify that on December 10, 2025, I electronically filed the foregoing using the Court's Case Management/Electronic Case Files system, which will send notice to all counsel of record.

                                               */s/ Giovanni Antonucci*
                                               GIOVANNI ANTONUCCI