IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:23-CV-897

| | | |
|---|---|---|
| IN RE:<br>CAMP LEJEUNE WATER LITIGATION<br><br>This Pleading Relates to:<br><br>ALL CASES | )<br>)<br>)<br>)<br>)<br>) | **PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO EXCLUDE DR. JULIE GOODMAN [D.E. 621]** |

## TABLE OF CONTENTS

**Page**


INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................. 2

I. DEFENDANT CONCEDES THAT DR. GOODMAN'S REPORTS CONTAIN HUNDREDS OF ERRORS AND CONTRADICTIONS. ........................................ 2

II. DR. GOODMAN'S EXPLANATIONS FOR HER ERRORS CANNOT BE RECONCILED. ..................................................................................................... 3

A. Dr. Goodman has given different explanations for her errors under oath. ............ 3

B. Dr. Goodman's methodology is unreliable under each explanation. ..................... 5

III. DR. GOODMAN'S ATTEMPT TO FIX HER ERRORS RESULTED IN NEW ERRORS. ................................................................................................................. 7

IV. DEFENDANT'S OPPOSITION DEMONSTRATES DR. GOODMAN'S BIAS. .......... 8

A. Defendant's statements about the 2017 ATSDR demonstrates Dr. Goodman's bias. ............................................................................................ 8

B. Dr. Goodman's Declaration demonstrates her bias. ............................................ 9

C. Defendant fails to respond to evidence of Dr. Goodman's bias. ......................... 10

V. DEFENDANT'S ATTEMPTS TO DEFEND DR. GOODMAN'S CHERRY-PICKING CONTRADICT HER TESTIMONY AND EXPERT REVIEW. .................. 13

VI. DEFENDANT MISCHARACTERIZES THE PLG'S ARGUMENT. ........................... 14

CONCLUSION ......................................................................................................... 15

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Bouygues Telecom, S.A. v. Tekelec*,
472 F. Supp. 2d 722 (E.D.N.C. 2007)....7

*E.E.O.C. v. Freeman*,
778 F.3d 463 (4th Cir. 2015). ....1, 2

*EEOC v. Freeman*,
961 F. Supp. 2d 783 (D. Md. 2013)....1, 2, 3

*Moore v. Equitrans, L.P.*,
27 F.4th 211 (4th Cir. 2022) ....5, 6, 7

*Pacific Life Ins. Co. v. Bank of N.Y. Mellon*,
571 F. Supp. 3d 106 (S.D.N.Y. 2021)....5, 6, 7

**Rules**

Fed. R. Civ. P. 26(e) ....1

# **INTRODUCTION**

Defendant's Opposition [D.E. 686] to the Plaintiff Leadership Group's ("PLG") motion to exclude Dr. Goodman [D.E. 621] both confirms the arguments in the PLG's motion and provides new reasons to exclude her.

Plaintiffs explained in their motion that Dr. Goodman's reports were rife with contradictions, and therefore unreliable. Defendant responded by submitting some three hundred substantive revisions to these reports, which it attached to its Opposition. The PLG immediately moved to strike these new reports as both improper and untimely under Rule 26(e) because Dr. Goodman cannot "revise her disclosures in light of her opponent's challenges to the analysis and conclusions therein." [D.E. 725] at 5-6 (citing *EEOC v. Freeman*, 961 F. Supp. 2d 783, 797 (D. Md. 2013), *aff'd in part sub nom. E.E.O.C. v. Freeman*, 778 F.3d 463 (4th Cir. 2015). But the fact that Dr. Goodman made hundreds substantive revisions to correct her reports is an admission that the factual basis of Plaintiffs' motion was correct. In short, her actions confirm that her reports are unreliable and her methodology flawed. Her reports should therefore be excluded.

Should the Court, however, not grant the PLG's pending motion to strike her updated reports, Dr. Goodman's revisions contained therein do not solve her reliability problems. They exacerbate them. Dr. Goodman decided not to change the narratives of her reports, but instead to change hundreds of her conclusions contained in appendices. But the narrative of her reports corresponds to the original internally-contradictory appendices, not her revised ones. So while the original reports are internally contradictory because the appendices contradicted each other, the new reports are internally contradictory because the appendices contradict the narratives.

As detailed more fully below, both her original report and improper redo contain an "alarming number of errors," meriting their exclusion. *Freeman*, 778 F.3d at 466.

## ARGUMENT

### I. DEFENDANT CONCEDES THAT DR. GOODMAN'S REPORTS CONTAIN HUNDREDS OF ERRORS AND CONTRADICTIONS.

In their motion, the PLG detailed many examples of Dr. Goodman's errors and contradictions. [D.E. 622] at 19-27. In opposition, Defendant acknowledges these errors and contradictions by trying to correct them. [D.E. 686-2] ¶¶ 9, 14; *see generally* [D.E. 686-4] (Revised Bladder Cancer Charts); [D.E. 686-6] (Revised Kidney Cancer Charts); [D.E. 686-8] (Revised Leukemia Charts); [D.E. 686-10] (Revised NHL Charts); [D.E. 686-12] (Revised Parkinson's Charts). In fact, Dr. Goodman went well beyond the examples given in PLG's motion and admitted to approximately three-hundred substantive errors relating to approximately seventy-five of the most important epidemiology studies in this case. Dr. Goodman's admission of this many errors and internal contradictions is dispositive.

In *Freeman*, the Fourth Circuit upheld the exclusion of expert testimony where the "district court identified an alarming number of errors and analytical fallacies in [the expert's] reports, making it impossible to rely on any of his conclusions." *Freeman*, 778 F.3d at 466. There, the district court found "[m]ost troubling" the 29 errors in a subset of data, including two instances where the expert stated that individuals failed background checks when they passed them, and one were the expert stated an individual passed a background check when he failed. *Id.* at 467. These errors became part of the expert's analysis, rendering the methodology unreliable. *See id.* at 467-68.

Here, Dr. Goodman's errors achieve an even higher degree of magnitude. She tried to fix approximately three hundred errors and contradictions. And these corrections are just like the "most troubling" errors in *Freeman*. For example, she changed her opinions on key facts as to the most relevant epidemiological studies in this case from negative to positive, and vice versa.

*See* Ex. A at 1-97 (Dr. Goodman's Diametrically Different Changes in Her Reports, attached hereto).[1]

Moreover, her revised charts do not even capture all of her errors and contradictions. *See, e.g.*, [D.E. 686-6] (Revised Kidney Cancer Chart) at D-12 (incorrectly reporting the upper confidence interval limit for the risk of kidney cancer due to medium TCE exposure by reporting the confidence interval as approximately *three times wider* than the data); [D.E. 622-31] at 7; [D.E. 686-6] (Revised Kidney Cancer Chart) at C-40 (incorrectly reporting that a "Weakness" of Vamvakas 1998 was "[n]o consideration of latency."); Ex. B at 376, 379 (Vamvakas 1998, attached hereto) (considering latency). The sheer number of errors, combined with the substantive nature of them, render her opinions unreliable under Fourth Circuit law.[2]

## II. DR. GOODMAN'S EXPLANATIONS FOR HER ERRORS CANNOT BE RECONCILED.

### A. <u>Dr. Goodman has given different explanations for her errors under oath.</u>

The PLG cited to deposition testimony where Dr. Goodman was unable to explain the contradictions and inconsistencies in her reports. [D.E. 622] at 24. For example, she stated that it "is true" that if there were inconsistencies in her reports, she did not know "the reason why that would have occurred," and that she could "just speculat[e]." Goodman Dep. Tr. at 258:2-13 (JA Ex. 172, D.E. 471-1). She also claimed although it would be speculation, the most likely

[1] PLG restarts the exhibit lettering from A again in this reply and not from the lettering its Motion. [D.E. 622].

[2] Defendant states that *Freeman* stands for the proposition that an expert report is admissible if it is 70% flawed. [D.E. 686] at 20. That interpretation badly misreads *Freeman*. The Fourth Circuit did not establish a rule that only 30% of an expert report has to be true to satisfy *Daubert*. In *Freeman*, the Fourth Circuit upheld the district court's exclusion of an expert where the lower court examined a *subset* of data where there were errors in 29 of the 41 individuals examined, finding that the dataset was unreliable because of the quantity and nature of the errors. 778 F.3d at 467-68. The same is true here.

explanation for the errors in her reports was that her staff changed her reports without her knowledge:

> So when you were asking what's most likely to have occurred across reports, what I believe happened is that when QCing a study, someone might have found a mistake in terms of saying loss to follow-up versus no weaknesses and then that – that correction didn't get corrected across all reports, which is still a mistake, but I believe that is most likely why that happened.[3]

*Id.* at 256:13-258:1. Dr. Goodman also admitted that she "had junior staff review the studies and fill in information about the studies in tables on both the quality study characteristic and results[.]" *Id.* at 212:24-214:15. Sometimes "those people changed over time," such that more than one person (not her) wrote the same report. *Id.* at 217:14-24. In other words, it is her opinion that the many errors across her reports resulted from different staff members constantly changing each other's work.

But in her Declaration that she filed contemporaneously with Defendant's opposition to this motion, she offers two different explanations for her hundreds of errors. *First*, she claims that many errors occurred during copying and pasting or "transferring the information from the studies [] reviewed to the tables in the reports." [D.E. 686-2] ¶ 11. In other words, she is claiming that a word processor on her staff somehow changed hundreds of words in her reports when copying text into tables. *Second*, she claims that she "independently reviewed and re-considered each study" for "each report [that she] prepared" and came to different conclusions each time. *Id.* ¶ 12. Here, the explanation appears to be that she analyzed the same set of facts differently as she read them on different occasions and is herself responsible for the contradictions.

These are very different explanations for why her reports contains hundreds of errors. That she has offered different explanations underscores the unreliability of her methodology.

[3] Dr. Goodman admitted that the individuals "QCing" her reports were not involved in the initial drafting of the reports and she did not QC her reports. Goodman Dep. Tr. at 226:12-227:1 (JA Ex. 172, 471-1).

### B. <u>Dr. Goodman's methodology is unreliable under each explanation.</u>

In addition to her inability to explain the vast inconsistencies in her own reports, and then changing her story as to how those errors occurred after PLG filed its motion to exclude her, each of Dr. Goodman's explanations (if true) requires exclusion in and of themselves.

*First*, at deposition, Dr. Goodman admitted to relying heavily on staff to draft her reports and was not able to explain how her errors occurred. This is grounds for exclusion. [D.E. 622] at 24; Goodman Dep. Tr. at 258:2-23 (JA Ex. 172, D.E. 471-1); *Pacific Life Ins. Co. v. Bank of N.Y. Mellon*, 571 F. Supp. 3d 106, 115-116 (S.D.N.Y. 2021) (excluding expert who lacked familiarity with the report, could not identify the people who wrote the report, could not recall the analyses they specifically wrote and could not identify how much time was spent editing the report); *Moore v. Equitrans, L.P.*, 27 F.4th 211, 223 (4th Cir. 2022) (finding exclusion of expert appropriate where the expert did not author significant portions of the report and was "unable to answer basic questions regarding how he came to his conclusions").

*Second*, her statements at deposition that other individuals made changes to her reports during "quality control," including substantive changes as to the most important epidemiology studies, require her exclusion. It is not a sound methodology to enable other individuals to make sweeping changes to an expert's report without telling the expert, resulting in significant errors and inconsistencies. This goes beyond using assistants to assist, and enters the realm of other individuals being responsible for the content of the report. *Pacific Life*, 571 F. Supp. 3d. at 115-16 (finding that an expert cannot simply aggregate or recite the opinions of others and must be giving their ***own*** opinion); *Moore*, 27 F. 4th at 223 (citing caselaw holding that exclusion is warranted when experts' "assistants aren't merely gofers or data gatherers but exercise professional judgment that is beyond the expert's ken").

*Third*, Dr. Goodman's copy-and-paste "transferring" explanation in her Declaration submitted in Opposition to the PLG's motion strains credulity, and is fraught with unreliability if it is true. To imply that staff members re-wrote hundreds of words of text when copying and pasting material into tables assumes a rogue word processor. But if it is true, it is further evidence that she has no control over her staff. And it likewise strains credulity that this kind of sloppiness could occur given Dr. Goodman and her business, Gradient, billed the United States government over four million and three hundred thousand dollars for the original five disease reports. Goodman Dep. Tr. at 120:15-21 (JA Ex. 172, D.E. 471-1). If Dr. Goodman's reports were so poorly drafted and edited that after all of the time and money spent there were still approximately 300 errors, the problem is the methodology. If this explanation is allowed to stand, it would create a situation where parties could amend and supplement their expert reports at will, after *Daubert* attacks, and fit their ever-changing opinions to those attacks. That is not methodologically or legally proper. *See, e.g.*, [D.E. 725] (PLG's motion to strike).

*Finally*, Dr. Goodman's statement in her Declaration that she re-reviewed the same studies for different disease reports and came to completely different conclusions is *per se* methodologically unsound.[4] Which conclusion is her actual conclusion? Is it the conclusion she gave under oath at deposition? The conclusion in her Kidney Report? The conclusion in her PD

[4] For example, Dr. Goodman was questioned about inconsistencies regarding her interpretation of the Bove 2014b civilian study in her Parkinson's Disease report and her Kidney Cancer report. Goodman Dep. Tr. 241:22-248:21 (JA Ex. 172, D.E. 471-1). Specifically, in Dr. Goodman's PD report, she originally stated that she believed a "Weakness" of the Bove 2014b study was that it did not adequately account for smoking. *Id.* at 242:7-25. However, in her Kidney Cancer report she stated that a strength of the same study was that Bove2014b *did account for smoking* by using disease controls. *Id.* at 241:22-242:6. When asked which one was correct, Dr. Goodman stated that she believed the PD report was correct, the Kidney Cancer report was incorrect, and Bove 2014b in fact did not properly account for smoking. *Id.* at 248:4-21. She stated this categorically at her deposition. *Id.* But in the now-altered charts, she claims that Dr. Bove did in fact properly account for smoking in the 2014b civilian study. *See* [D.E. 686-12] (Revised Parkinson's Chart) at C-1; [D.E. 686-6] (Revised Kidney Cancer Chart) at C-26-C-27. Dr. Goodman's constant flip-flopping is fatal to her methodology.

Report? Or the conclusion she retrospectively determined was more advantageous after reviewing PLG's motion to exclude her as an expert? It is an axiomatic principle of science that an expert cannot have two contradictory interpretations of the same study at the same time. But that is exactly what she admits her methodology created.

The buck stops with her, and her over-reliance on staff to research and write in her name, and the manifold contradictions that resulted from this methodology, requires her exclusion. *Moore*, 27 F.4th at 223-24; *Bouygues Telecom, S.A. v. Tekelec*, 472 F. Supp. 2d 722, 730 (E.D.N.C. 2007); *Pacific Life*, 571 F. Supp. 3d at 115-16.

## III. DR. GOODMAN'S ATTEMPT TO FIX HER ERRORS RESULTED IN NEW ERRORS.

Dr. Goodman's improper revised reports do not cure the deficiencies in her original reports. They create new ones. As detailed in PLG's motion and in its motion to strike Dr. Goodman's supplemental charts, the narrative parts of Dr. Goodman's reports are based on the charts. [D.E. 622] at 17-19; [D.E. 725] at 8-9; *see also* Goodman Dep. Tr. at 212:24-214:15, 373:20-374:4 (JA Ex. 172, D.E. 471-1). But she has not changed the narrative parts of her reports. These reports are now inconsistent with the new charts because they are based on the old charts. The attached Exhibit C shows examples of these new inconsistencies. Ex. C (Inconsistencies Between Dr. Goodman's New Charts and Her Reports, attached hereto).

What Dr. Goodman has done in attempting to correct the errors and contradictions in her charts is create many more new inconsistencies between her own reports and the charts she seeks to improperly revise in response to the PLG's motion.[5] Furthermore, even after her so-called

[5] Additionally, because both Dr. Goodman's initial reports and charts were inconsistent between different disease reports, the fact that Dr. Goodman has failed to make changes to her reports in addition to her charts means that her reports are still internally inconsistent between the different diseases. For example, the attached Exhibit D shows the inconsistencies between the different disease reports that have no attempted corrections to them. Ex. D (Inconsistencies Between the Body of Dr. Goodman's Reports, attached hereto).

"comprehensive review" there are *more internal inconsistencies*. *See, e.g.*, [D.E. 686-6] (Revised Kidney Cancer Chart) at D-12 (incorrectly reporting the upper confidence interval limit for the risk of kidney cancer due to medium TCE exposure by reporting the confidence interval as approximately *three times wider* than the data); [D.E. 622-31] at 7; [D.E. 868-6] (Revised Kidney Cancer Chart) at C-40 (incorrectly reporting that a "Weakness" of Vamvakas 1998 was "No consideration of latency."); Ex. B at 376, 379 (Vamvakas 1998, attached hereto) (considering latency). These additional inconsistencies and contradictions—even after her improper re-do—is also reflective of an unsound results-driven methodology. Her reports should be excluded.

## IV. DEFENDANT'S OPPOSITION DEMONSTRATES DR. GOODMAN'S BIAS.

### A. Defendant's statements about the 2017 ATSDR demonstrates Dr. Goodman's bias.

The 2017 ATSDR Assessment of the Evidence is a reliable analysis of the evidence. Indeed, Dr. Bove testified that it went through two rounds of external peer-review and "went through agency clearance." [D.E. 622-27] at 248:3-17, 249:15-250:23. But now Dr. Goodman and the Defendant claim that this Court should not utilize the 2017 ATSDR as it relates to Camp Lejeune because it is a "policy" document or uses a "biased framework." *See* [D.E. 686] at 15; Goodman Rep. (Bladder) at 4 (JA Ex. 75, D.E. 463-14); Goodman Rep. (Kidney) at 5 (JA Ex. 94, D.E. 464-15); Goodman Rep. (Leukemia) at 5 (JA Ex. 102, D.E. 465-7); Goodman Rep. (NHL) at 4 (JA Ex. 117, D.E. 466-11); Goodman Rep. (PD) at 4 (JA Ex. 134, D.E. 467-17). To be clear, this was the government's own attempt in 2017 to do the same analysis Dr. Goodman purports to do now.

The reason that Defendant and Dr. Goodman attempt to undermine ATSDR 2017 is transparent: it plainly establishes general causation. To reject the ATSDR 2017 study is itself

indicative of a flawed methodology. But Defendant goes still further, criticizing the PLG's experts for not giving greater weight to NRC (2009), another government study of Camp Lejeune. [D.E. 575] at 24-25. The NRC (2009) report is the same type of analysis but eight years prior to the 2017 ATSDR. Dr. Goodman's dismissal of the 2017 ATSDR in favor of the NRC (2009) is not scientifically sounds, because the 2017 ATSDR is an updated look at the relevant literature. Goodman Rep. (Bladder) at 4, 44 (JA Ex. 75, D.E. 463-14); Goodman Rep. (Kidney) at 5, 42 (JA Ex. 94, D.E. 464-15); Goodman Rep. (Leukemia) at 5, 46 (JA Ex. 102, D.E. 465-7); Goodman Rep. (NHL) at 4, 44 (JA Ex. 117, D.E. 466-11); Goodman Rep. (PD) at 4, 33 (JA Ex. 134, D.E. 467-17). Dismissing a later study that contains updated data in favor of an old study whose conclusions suit the conclusion one wants to reach is a classic example of an improper results-driven methodology.

**B. <u>Dr. Goodman's Declaration demonstrates her bias.</u>**

It is hard to imagine stronger evidence of Dr. Goodman's bias than her own words, under oath, where she stated that each one of the hundreds of substantive changes found in the new charts were "typographical" or "inadvertent" errors. [D.E. 686-2] ¶¶ 11-12. As discussed above, these so-called typos included over one-hundred instances in which Dr. Goodman literally completely changed a previous opinion she had formed as to a fact effecting the quality of an epidemiological study. Ex. A at 1-97 (Dr. Goodman's Diametrically Different Changes in Her Proposed Revisions, attached hereto). In these instances, Dr. Goodman changed her own interpretation and opinion of these facts so drastically that it required moving the newly minted facts from the category of her charts reflecting "Strengths" of a particular study to the "Weaknesses" category, and vice versa.[6] These misstatements and errors evidence her bias.

[6] A cursory review reveals that the alterations are indeed substantive and can only be interpreted as a direct response to the arguments PLG raised at Dr. Goodman's deposition and in its motion to exclude

Her opinion that "[n]one of the typographical or inadvertent errors alter or impact any of my analyses or opinions" also demonstrates bias. [D.E. 686-2] ¶ 10. If Dr. Goodman were truly basing her opinions on a complete and objective review of the literature, making approximately 300 changes to her assessment of approximately seventy-five underlying studies would necessarily require a reassessment and change to at least some "analyses." *Id.* For example, the attached Exhibit E shows just a few examples of where the changes made in the charts would directly impact, and now contradict, the analysis she gives in the conclusion sections of her reports. *See* Ex. E (Changes to the Charts Contradicting Dr. Goodman's Conclusions, attached hereto). The only plausible explanation is that Dr. Goodman's conclusions are not the result of her objectivity but rather her bias and results-oriented approach.

**C. <u>Defendant fails to respond to evidence of Dr. Goodman's bias.</u>**

Defendant attempts to undermine the trove of evidence of public criticism of Dr. Goodman by claiming the evidence consists of "unsubstantiated allegations" reported by "advocacy groups," "investigative journal[ists]," and the New York Times. [D.E. 686] at 30-32. Setting aside that these are reliable sources, Defendant ignores the most damning public comment relating to Dr. Goodman from the International Network for Epidemiology in Policy (INEP). [D.E. 622-2]. This epidemiology society is undeniably reputable, counting as its members the most prestigious epidemiology societies from around the world.[7] The INEP

---

her. Ex. A at 1-97 (Dr. Goodman's Diametrically Different Changes in Her Proposed Revisions, attached hereto).

[7] As of the writing of the position statement, INEP members included the American Academy of Pediatrics Section on Epidemiology, Public Health and Evidence; American College of Epidemiology; American Public Health Association, Epidemiology Section; Association Des Epidemiologistes de Langue Francaise; Australasian Epidemiological Association; Brazilian Association of Public Health; Cameroon Society for Epidemiology; Canadian Society for Epidemiology and Biostatistics; Collegium Ramazzini; Council of State and Territorial Epidemiologists; European Society for Environmental and Occupational Medicine; German Society for Epidemiology; Japan Epidemiological Association; International Epidemiological Association; International Society for Children's Health and the

authored a position statement on the same issue raised in PLG's motion, namely, the potential bias and conflict of interests that exist for some scientists relating to the study of epidemiology. *Id.* at 1**.** The INEP's number one recent example of a conflict of interest in public health was Dr. Goodman and her business Gradient. *Id.* at 1, 21. The INEP put forth a scathing critique of Dr. Goodman, stating that she has engaged in and utilized "junk science" to support the industries paying for her work. *Id.* at 21. The position statement had nine co-authors from top universities and public health agencies from across the globe and had six peer reviewers. *Id.* at 6. Defendant says nothing about this damning evidence of bias.

Defendant also misconstrues Plaintiffs' arguments concerning Dr. Goodman's financial interest in this litigation. [D.E. 686] at 26-29. The PLG is not solely concerned with the magnitude of Dr. Goodman's $4 million dollar (and counting) financial compensation, but also with her financial interest in the subject-matter underlying this litigation: the toxicity of chemicals including TCE and PCE. Defendant does not deny that Dr. Goodman's business, Gradient, is wholly owned by Blackstone, a private equity fund that has significant financial interests in businesses that manufacture TCE and PCE. [D.E. 622-6] at 2, 3, 13. It a clear conflict of interest for an expert whose company is owned and controlled by a private equity fund with financial interests in TCE and PCE manufacturers to opine about them.

Third, Defendant attempts to dismiss the significance of Dr. Goodman's failed attempt to publish junk science by labeling her Smoking-Mesothelioma article "one article on an unrelated subject" amidst a larger body of work that was published. [D.E. 686] at 32. This ignores the

---

Environment; International Society for Environmental Epidemiology; International Society for Pharmacoepidemiology; Italian Association of Epidemiology,; National Association of County & City Health Officials; Public Health Association of South Africa; Romanian Society of Epidemiology; Royal Society for Public Health; Society for the Analysis of African American Public Health Issues; and the Spanish Society of Epidemiology. [D.E. 622-2] at 7 (INEP Position Statement, attached hereto).

reason *why* her article was rejected for publication. Objective scientists, who presumably knew nothing about Dr. Goodman, read her article for peer-review and called it an "opinion piece," "not a scientific article," "not supported by the published literature," and a "highly biased review." [D.E. 622-12] at TEW 188-191. Critically, this publication was commissioned and funded by the defense law firm who represented the very asbestos companies this article was designed to assist. [D.E 622-4] at 13-18. This shows the bias Dr. Goodman has toward the issues in these cases.[8] In sum, Dr. Goodman was caught attempting to pass off her "biased review" as objective science.[9]

Finally, Defendant fails to respond to Dr. Goodman's statements regarding testimony she gave to a public body in Oregon. Dr. Goodman failed to disclose the fact she was being paid to give her testimony by the industry standing to benefit from it. [D.E. 622-15] at 1-2. Dr. Goodman was caught by the New York Times for failing to disclose this critical information, and attempted to retrospectively supplement her testimony with a letter to the public entity. *Id.* at 2; [D.E. 622-25] at 1. However, even this letter failed to fully disclose her financial interests. *See id.* This is consistent with her history of advocacy on behalf of industry groups paying for her testimony.

---

[8] To further prove this point, this information was not voluntarily disclosed by Dr. Goodman or Gradient. The information about Dr. Goodman's publication being commissioned by the defense attorney was only revealed after internal e-mails between Goodman, other Gradient personnel, and the defense attorney were produced in response to a subpoena. [D.E. 622-4] at 16-17. Before that information was public, another Gradient employee denied the attorney's involvement. *Id.* at 14-15. It was only later that Dr. Goodman was force to admit these facts. *Id.* at 17-18.

[9] Defendant's feeble attempt to undermine Plaintiffs' overwhelming evidence of Dr. Goodman's bias by vaguely alleging that the PLG relies on "inadmissible hearsay" fails. [D.E. 686] at 30. Defendant does not identify which documents it claims are hearsay, nor offer any explanation as to why it believes these unidentified documents are inadmissible. Without any further details, it is impossible for the PLG to respond. Regardless, the PLG disputes that the evidence is inadmissible. The PLG further asserts that this Daubert motion is not the place to be having fact-intensive debates over whether the evidence of Dr. Goodman's bias is admissible at trial under the hearsay rules.

## V. DEFENDANT'S ATTEMPTS TO DEFEND DR. GOODMAN'S CHERRY-PICKING CONTRADICT HER TESTIMONY AND EXPERT REVIEW.

Defendant claims that Partanen (1991) fell beyond Dr. Goodman's pre-defined literature search procedure because it was not included in the agency reviews. [D.E. 686] at 9. But Dr. Goodman acknowledged that she "missed" Partanen (1991) in her benzene analysis. Goodman Dep. Tr. at 372:13-21 (JA Ex. 172, D.E. 471-1) (Q. "But you didn't count Partanen; true?" A. "It appears that I missed this study."). These explanations cannot be squared.

Defendant claims that Schlehofer (1995) was not cherry-picked because Dr. Goodman did not consider "non-specific aggregations of chemical exposures." [D.E. 686] at 9-10. But Dr. Goodman did not apply this methodology to her opinions. For example, she reviewed Blair (1989) which assessed cancer risk among coast guard inspectors exposed to a nonspecific "variety of chemicals" that "may include acrylonitrile, carbon tetrachloride, ethylene dibromide, ethylene dichloride, benzene, gasoline, styrene, toluene diisocyanate, tetrachloroethylene, and trichloroethylene." Blair 1989 at 150-51 (JA Ex. 221, D.E. 478-12). She uses Blair (1989) when it benefits her and excludes Schlehofer (1995) when it does not.

Defendant claims that the results Dr. Goodman omitted from Travier (2002) were not important because the statistic was "merely mentioned in the text" and not reported in the results table. [D.E. 686] at 12. This is backwards reasoning. The fact that Travier *et al.* decided to highlight the statistically significant, elevated risk of kidney cancer among group 3 dry-cleaners in the body of the text demonstrates that this result was so significant it is the only one they decided to report. *See* Travier 2002 at 345 (JA Ex. 312, D.E. 485-7). Just as Dr. Goodman's reports are contradictory, Defendant's attempt to defend her is contradicted by her own testimony and expert review.

## VI. DEFENDANT MISCHARACTERIZES THE PLG'S ARGUMENT.

Defendant asserts that the PLG argues Dr. Goodman has no methodology. [D.E. 686] at 29. Not so. The PLG's argument is that Dr. Goodman's methodology is so biased, results-driven, and sloppy that it leads to the same result of no causation virtually every time she engages in this analysis. For example, the PLG stated that virtually every single published systematic review authored by Dr. Goodman has found no causal relationship between the chemical at issue and the disease being studied. [D.E. 622] at 11-12. Similarly, virtually every case Dr. Goodman has worked on as an expert witness has been for the Defense. *Id.* at 6. Defendant does not dispute these facts.

Defendant instead argues that Dr. Goodman's 29 previous systematic reviews are evidence of her application of a "publishable" methodology. [D.E. 686] at 29. This is not correct. First, Defendant's Opposition is devoid of evidence that Dr. Goodman has authored a single systematic review in which she finds a causal relationship between a disease and an exposure at levels to which humans are normally exposed since joining the Gradient.[10] That Dr. Goodman has never found causation, unless it benefits the person who is paying her, is the evidence that her flawed methodology is results-oriented.

Moreover, Defendant ignores that sixteen of the twenty-nine systematic reviews were published in either the journal of *Critical Reviews in Toxicology* or the journal of *Regulatory Toxicology and Pharmacology*. *See* [D.E. 622-19] at 1-17. These two journals have "strong ties to industry" and "[n]early half of Gradient's articles that are peer-reviewed are published" in those two journals. [D.E. 622-4] at 4. In fact, Dr. Goodman's decision to publish in these two journals so frequently shows the biased and un-objective nature of her literature.

---

[10] As the PLG made clear in its motion, she almost never does. [D.E. 622] at 11-12.

## CONCLUSION

For the reasons stated herein, PLG requests that this Court grant its motion to exclude the Defense expert Dr. Julie Goodman [D.E. 622] and further exclude the opinions of the Defendant's other experts to the extent they rely upon the opinions of Dr. Goodman.

Dated: December 12, 2025.


/s/ *J. Edward Bell, III*
J. Edward Bell, III (admitted *pro hac vice*)
Bell Legal Group, LLC
219 Ridge St.
Georgetown, SC 29440
Telephone: (843) 546-2408
jeb@belllegalgroup.com

*Lead Counsel for Plaintiffs*

/s/ *Elizabeth J. Cabraser*
Elizabeth J. Cabraser (admitted *pro hac vice*)
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
ecabraser@lchb.com

*Co-Lead Counsel for Plaintiffs*

/s/ *W. Michael Dowling*
W. Michael Dowling (NC Bar No. 42790)
The Dowling Firm PLLC
Post Office Box 27843 Raleigh, North Carolina 27611 Telephone: (919) 529-3351
mike@dowlingfirm.com

*Co-Lead Counsel for Plaintiffs*

/s/ *Robin L. Greenwald*
Robin L. Greenwald (admitted *pro hac vice*)
Weitz & Luxenberg, P.C.
700 Broadway
New York, NY 10003
Telephone: 212-558-5802
rgreenwald@weitzlux.com

*Co-Lead Counsel for Plaintiffs*

/s/ *James A. Roberts, III*
James A. Roberts, III
Lewis & Roberts, PLLC
3700 Glenwood Ave., Ste. 410
Raleigh, NC 27612
Telephone: (919) 981-0191
jar@lewis-roberts.com

*Co-Lead Counsel for Plaintiffs*

/s/ *Mona Lisa Wallace*
Mona Lisa Wallace (N.C. Bar No.: 009021)
Wallace & Graham, P.A.
525 North Main Street
Salisbury, North Carolina 28144 Tel: 704-633-5244
mwallace@wallacegraham.com

*Co-Lead Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I, J. Edward Bell, III, hereby certify that the foregoing document was electronically filed on the Court's CM/ECF system on this date, and that all counsel of record will be served with notice of the said filing via the CM/ECF system.

This the 12th day of December, 2025.

*/s/ J. Edward Bell, III*
J. Edward Bell, III (admitted pro hac vice)
Bell Legal Group, LLC
219 Ridge St.
Georgetown, SC 29440
Telephone: (843) 546-2408
jeb@belllegalgroup.com

*Co-Lead Counsel for Plaintiffs*