| | |
|---|---|
| **IN RE:** | **UNITED STATES'** |
| **CAMP LEJEUNE WATER LITIGATION** | **MEMORANDUM OF LAW IN** |
| | **OPPOSITION TO PLAINTIFFS' MOTION** |
| **This Document Relates To:** | ***IN LIMINE* TO PRECLUDE** |
| | **INAPPROPRIATE OFFSET EVIDENCE** |
| **ALL CASES** | **(D.E. 805)** |

# TABLE OF CONTENTS

Pages

TABLE OF AUTHORITIES ............................................................................... iii

INTRODUCTION ........................................................................................... 1

BACKGROUND .............................................................................................. 1

LEGAL STANDARD ....................................................................................... 5

ARGUMENT .................................................................................................. 6

    I.   The CLJA Requires Offsets for the Amount of Any Award, Payment, or Benefit Provided to a Plaintiff at Any Time. ....................................................... 7

        A.   The Plain Language of Subsection 804(e)(2) Does Not Include a Temporal Limitation on Offsets. ..................................................... 8

        B.   The CLJA Offset Provision's Use of the Word "Provided" Does Not Limit Offsets to Only Awards, Payments, or Benefits Already Made. ............................... 11

    II.  PLG Argues for an "Equivalent Category" Requirement and Limitations Into Subsection 804(e)(2) Despite the Plain Language Mandating That Offsets Be Applied to "Any Award." ................................................. 17

    III. PLG's Request to Preclude the United States From Entering Evidence of Offsets for Past Medical Expenses Paid by the VA, Medicare, or Medicaid Is Not Properly Before the Court. ................................................. 23

CONCLUSION ............................................................................................... 25

CERTIFICATE OF SERVICE ........................................................................... 27

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alexander v. S.C. State Conf. of the NAACP*,
602 U.S. 1 (2024).................................................................................................. 4

*Ali v. Fed. Bureau of Prisons*,
552 U.S. 214 (2008)............................................................................................... 8

*Almendarez-Torres v. United States*,
523 U.S. 224 (1998)............................................................................................... 9

*Babb v. Wilkie*,
589 U.S. 399 (2020)............................................................................................... 8

*Baker & Taylor, Inc. v. Griffin*,
No. 3:12-CV-00553-MOC, 2015 WL 1307293 (W.D.N.C. Mar. 23, 2015) ........................... 12

*Bernal v. NRA Grp., LLC*,
930 F.3d 891 (7th Cir. 2019) ...................................................................... passim

*Brooks v. United States*,
337 U.S. 49 (1949).................................................................................................. 19

*Buckley v. Taylor* (*In re Taylor*),
388 B.R. 115 (Bankr. M.D. Pa. 2008) ................................................................. 12

*Caraco Pharm. Lab'ys, Inc. v. Novo Nordisk A/S*,
566 U.S. 399 (2012)............................................................................................... 17

*Cawthorn v. Amalfi*,
35 F.4th 245 (4th Cir. 2022) ................................................................................. 13

*Cela v. Garland*,
75 F.4th 355 (4th Cir. 2023) ................................................................................. 11

*Dep't of Hous. and Urb. Dev. v. Rucker*,
535 U.S. 125 (2002)............................................................................................... 18

*Fancher v. United States*,
646 F. Supp. 3d 694 (E.D.N.C. 2022)................................................................ 8, 9

*G.T. v. Bd. of Educ. of the Cnty. of Kanawha*,
117 F.4th 193 (4th Cir. 2024) ............................................................................... 14

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*,
530 U.S. 1 (2000) ................................................................................................ 18

*Henson v. Santander Consumer USA Inc.*,
582 U.S. 79 (2017) .............................................................................................. 11

*Honeywell Int'l Inc. v. OPTO Elecs. Co., Ltd.*,
135 F.4th 170 (4th Cir. 2025) ............................................................................... 4

*In re Abbott*,
No. 15-06822-5-SWH, 2016 WL 6892456 (Bankr. E.D.N.C. Nov. 22, 2016) ....... 12

*In re Camp Lejeune Water Litig.*,
715 F. Supp. 3d 761 (E.D.N.C. 2024) .............................................................. 5, 16

*In re Camp Lejeune Water Litig.*,
736 F. Supp. 3d 311 (E.D.N.C. 2024) .............................................................. 6, 19

*In re Camp Lejeune Water Litig.*,
No. 7:23-cv-897, 2025 WL 3565850 (E.D.N.C. Dec. 12, 2025) ............................ 2

*In re Camp Lejeune Water Litig.*,
No. 7:23-CV-897, 2025 WL 2471070 (E.D.N.C. July 15, 2025) ....................... 5, 16

*In re Camp Lejeune Water Litig.*,
No. 7:23-CV-897, 2025 WL 3452434 (E.D.N.C. Dec. 1, 2025) ........................ 5, 16

*In re McBrine*,
No. 24-1542, 2024 WL 5237643 (4th Cir. Aug. 23, 2024) .................................... 5

*In re Sunterra Corp.*,
361 F.3d 257 (4th Cir. 2004) ................................................................................. 6

*Kubra v. Edmo*nds *(In re Edmonds)*,
No. 11-01064-8-RDD, 2011 WL 5909420 (Bankr. E.D.N.C. Aug. 22, 2011) ....... 12

*Lamie v. U.S. Tr.*,
540 U.S. 526 (2004) ........................................................................................... 17

*Lane v. Pena*,
518 U.S. 187 (1996) ..................................................................................... 16, 17

*Mapoy v. Carroll*,
185 F.3d 224 (4th Cir. 1999) ................................................................................. 8

*Morgan v. United States*,
968 F.2d 200 (2d Cir. 1992) ......................................................................... 20, 22

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
583 U.S. 109 (2018)..................................................................................... 6

*North Carolina ex rel. Cooper v. Tenn. Valley Auth.*,
515 F.3d 344 (4th Cir. 2008) ....................................................................... 6

*Republic of Sudan v. Harrison*,
587 U.S. 1 (2019)......................................................................................... 17

*Roberts v. Sea-Land Servs., Inc.*,
566 U.S. 93 (2012)......................................................................................... 9

*Smith v. Berryhill*,
587 U.S. 471 (2019)....................................................................................... 8

*Soriano v. United States*,
325 U.S. 270 (1957)..................................................................................... 16

*Sturgeon v. Frost*,
577 U.S. 424 (2016)....................................................................................... 9

*Ulrich v. Veterans Admin. Hosp.*,
853 F.2d 1078 (2d Cir. 1988)..................................................................... 19

*United States v. Drake*,
64 F.4th 220 (4th Cir. 2023) ............................................................... 13, 14

*United States v. Funke*,
846 F.3d 998 (8th Cir. 2017) ..................................................................... 11

*United States v. Gonzales*,
520 U.S. 1 (1997)............................................................................... 18, 21, 23

*United States v. Gray*,
199 F.2d 239 (10th Cir. 1952) ................................................................... 19

*United States v. Ickes*,
393 F.3d 501 (4th Cir. 2005) ............................................................. 8, 18, 19

*United States v. Maxwell*,
285 F.3d 336 (4th Cir. 2002) ..................................................................... 18

*United States v. Mitchell*,
445 U.S. 535 (1980)..................................................................................... 16

*Waag v. Permann* (*In re Waag*),
418 B.R. 373 (B.A.P. 9th Cir. 2009)......................................................... 11

v

*Walters v. Metro. Educ. Enters.*,
519 U.S. 202 (1997) ..................................................................................... 18

*Welch v. United States*,
409 F.3d 646 (4th Cir. 2005) ...................................................................... 16

*Young v. United States*,
315 U.S. 257 (1942) ....................................................................................... 4

**Statutes**

1 U.S.C. § 1 ......................................................................................................... 9

28 U.S.C. § 2671 ................................................................................................ 1

38 U.S.C. § 1151 ................................................................................... 9, 21, 22

38 U.S.C. § 1155 .............................................................................................. 19

38 U.S.C. § 1710(e)(1)(F) ................................................................................. 2

38 U.S.C. § 1787(a) ........................................................................................... 2

42 U.S.C. §§ 1395–1395mmm ...................................................................... 2, 3

42 U.S.C. §§ 1396–1396w-8 .......................................................................... 2, 3

Camp Lejeune Justice Act of 2022, Pub. L. No. 117-168, § 804(e)(2), 136 Stat. 1759, 1802–04
(codified at 28 U.S.C. § 2671 note) ................................................. passim

Honoring America's Veterans and Caring for Camp Lejeune Families Act of 2012, Pub. L. No.
112-154, § 102, 126 Stat. 1165, 1167–69 (2012) (codified at 38 U.S.C. § 1710(e)(1)(F) and
38 U.S.C. § 1787(a)) .................................................................................... 2

**Rules**

Fed. R. Evid. 401 ............................................................................................... 5

Fed. R. Evid. 402 ............................................................................................... 5

**Regulations**

38 C.F.R. Part 4 ............................................................................................... 20

38 C.F.R. § 3.309(f) ........................................................................................... 2

38 C.F.R. § 3.321(a) ......................................................................................... 19

38 C.F.R. § 4.10 ............................................................................................... 20

38 C.F.R. § 3.307(a)(7) ........................................................................................................... 2

**Other Authorities**

Fed. Prac. & Proc. Evid. § 5194.1 ........................................................................................ 4

# INTRODUCTION

To date, the United States has paid for and provided over $4.5 million in disability benefits and medical health care collectively for the twenty-two remaining Track 1 Trial Plaintiffs related to injuries covered by government programs that pertain to Plaintiffs' exposure to Camp Lejeune water. As part of the Camp Lejeune Justice Act ("CLJA"), Congress mandated that "*[a]ny award* made to an individual, or legal representative of an individual, under this section ***shall be offset*** by the amount of ***any disability award, payment, or benefit*** provided to the individual, or legal representative" under the Medicare program, the Medicaid program, and any program under the laws administered by the Secretary of Veterans Affairs, so long as the disability award, payment or benefit is "in connection with health care or a disability relating to exposure to the water at Camp Lejeune." Camp Lejeune Justice Act of 2022, Pub. L. No. 117-168, § 804(e)(2), 136 Stat. 1759, 1802–04 (codified at 28 U.S.C. § 2671 note) (emphasis added) [hereinafter the "CLJA Offset Provision" or "Subsection 804(e)(2)"]. For the reasons stated herein, Plaintiffs' Leadership Group's ("PLG") Motion *in Limine*, aside from its requested relief regarding unenumerated programs like TRICARE, should be denied.

# BACKGROUND

In enacting the CLJA Offset Provision, Congress did not paint on a blank canvas. Years before the CLJA became law, the United States began providing awards, payments, and benefits to veterans for disabilities relating to exposure to Camp Lejeune water, and healthcare for veterans and their family members for conditions related to exposure to Camp Lejeune water. In 2012, Congress granted service-connected healthcare to veterans and their family members who were at Camp Lejeune for fifteen illnesses *presumed* to have been caused by exposure to contaminated water at Camp Lejeune. In providing these benefits, Congress acknowledged that "there is insufficient medical evidence to conclude that such illnesses or conditions are attributable to such

1

service." Honoring America's Veterans and Caring for Camp Lejeune Families Act of 2012, Pub. L. No. 112-154, § 102, 126 Stat. 1165, 1167–69 (2012) (codified at 38 U.S.C. § 1710(e)(1)(F) and 38 U.S.C. § 1787(a)). The Department of Veterans Affairs ("VA") Veterans Benefits Administration ("VBA") also provided disability compensation benefits to veterans on a presumptive basis if they met certain service requirements and were diagnosed with a presumptive condition. *See* 38 C.F.R. § 3.309(f) (listing eight diseases presumed by VBA to be caused by exposure to contaminated water at Camp Lejeune); 38 C.F.R. § 3.307(a)(7) (requirements for service connection). Similarly, the Medicare and Medicaid programs, 42 U.S.C. §§ 1395–1395mmm; 42 U.S.C. §§ 1396–1396w-8, cover treatment for alleged Camp Lejeune injuries irrespective of service connection.

In 2022, Congress passed the CLJA, creating a federal cause of action to permit personal injury claims against the United States based on alleged exposure to certain chemicals in drinking water at Camp Lejeune between August 1, 1953, and December 31, 1987. *See In re Camp Lejeune Water Litig.*, No. 7:23-cv-00897, 2025 WL 3565850, at *1 (E.D.N.C. Dec. 12, 2025). To date, Plaintiffs have filed more than 3,700 civil actions in this Court seeking relief under the CLJA. *See id.* In addition, more than 406,000 unique administrative claims have been filed with the Department of the Navy. *See* Feb. 6, 2026 Joint Status Report, D.E. 810 at 1. Although the Congressional Budget Office in 2022 estimated the costs of settlement payouts and legal expenses to be $6.1 billion, collectively, the administrative claims demand trillions of dollars in damages. *See In re Camp Lejeune Water Litig.*, 2025 WL 3565850, at *1 (collecting citations); *see* D.E. 34 at 15; D.E. 648 at 1.

Given the benefits that were already being provided—and will continue to be provided—to many Camp Lejeune veterans, their family members, and others who may have been exposed

to contaminated Camp Lejeune water during the statutory period, the CLJA includes an offset provision in Subsection 804(e)(2) that mandates that various streams of government awards, payments, and benefits be offset from any award. To accomplish this, Congress wrote Subsection 804(e)(2) in very broad terms. In CLJA Subsection 804(e)(2), Congress mandated that any award under the Act shall be offset by an award, payment, or benefit (1) provided to the Plaintiff under a specified program; and (2) in connection with health care or a disability relating to exposure to the water at Camp Lejeune. Specifically, the CLJA Offset Provision states as follows:

> (2) HEALTH AND DISABILITY BENEFITS RELATING TO WATER EXPOSURE.—Any award made to an individual, or legal representative of an individual, under this section shall be offset by the amount of any disability award, payment, or benefit provided to the individual, or legal representative—
>
> > (A) under—
> >
> > > (i) any program under the laws administered by the Secretary of Veterans Affairs;
> > >
> > > (ii) the Medicare program under title XVIII of the Social Security Act (42 U.S.C. 1395 et seq.); or
> > >
> > > (iii) the Medicaid program under title XIX of the Social Security Act (42 U.S.C. 1396 et seq.); and
> >
> > (B) in connection with health care or a disability relating to exposure to the water at Camp Lejeune.

CLJA § 804(e)(2).

On December 3, 2025, the Court held a Status Conference at which PLG announced its intention to file a motion on "threshold issues" for damages and offsets under the CLJA with specific regard to the CLJA Offset Provision. *See* Dec. 3, 2025 Hr'g Tr., D.E. 734 at 3:7–26:17; *see also* Jan. 9, 2026 Hr'g Tr., D.E. 803 at 7:11–24 (reiterating the same issue). PLG stated that this motion would raise "statutory interpretation" issues that were "crosscutting against all diseases and all tracks." Jan. 9, 2026 Hr'g Tr., D.E. 803 at 10:2–11. In relevant part, PLG previewed the following argument: "For example, we will be asking that the Court exclude evidence of future

disability payments as an offset because the statute says that offsets are allowed for disability awards or payments [']provided['] which we believe means already provided at the time and does not extend to the future." *Id.* at 23:11–16.[1] On January 27, 2026, PLG filed its Motion. *See* D.E. 805, 806.

To avoid the broad terms of the CLJA Offset Provision and render it obsolete, PLG offers a cramped, erroneous interpretation of the plain language of Subsection 804(e)(2), limiting offsets to awards, payments, or benefits already provided, and only when they match a particular category of damages that a Plaintiff seeks. PLG even suggests that evidence of any past government award, payment, or benefit for medical care proven by the United States should relieve the Plaintiff of his or her evidentiary burden to prove certain damages. *See* D.E. 806 at 15-17.

PLG's interpretations find no support in the plain language of the CLJA Offset Provision. The only argument that PLG advances with any merit is that the plain language of the CLJA Offset

---

[1] PLG claims that it has sought "for almost a year" to resolve these issues via stipulation. D.E. 806 at 5 n.2. In fact, PLG first raised the possibility of stipulations on some of these offset issues in May 2025. At that time, PLG proposed a number of stipulations on statutory interpretation issues. The United States informed PLG that most of their proposed stipulations were improper because "parties cannot bind the courts by stipulating to questions of law." *Honeywell Int'l Inc. v. OPTO Elecs. Co., Ltd.*, 135 F.4th 170, 176 n.1 (4th Cir. 2025) (citing *Young v. United States*, 315 U.S. 257, 258–59 (1942); 22A Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. Evid. § 5194.1 (2d ed.) ("[P]arties cannot use stipulations to alter the law.")); *see also Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 19 n.6 (2024) ("Parties can stipulate to issues of fact, but they cannot by stipulation amend the law."). In June and July 2025, the United States invited PLG to provide examples of how certain factual offset stipulations would work on a case-by-case basis. In October 2025, PLG responded with virtually the same proposed stipulations that it had sent in May 2025. The United States provided a similar response and continued to ask PLG to provide examples of how factual offset stipulations would work on a case-by-case basis, but PLG failed to send any such examples until January 7, 2026. The United States is currently analyzing PLG's latest submission.

4

Provision only permits an offset of awards, payments, and benefits provided to a Plaintiff under Medicare and Medicaid[2] and by the Secretary of Veterans Affairs. D.E. 806 at 9-10.[3]

## LEGAL STANDARD

Evidence is relevant only if: (1) "it has any tendency to make a fact more or less probable than it would be without the evidence," and (2) "the fact is of consequence in determining the action." Fed. R. Evid. 401. "Irrelevant evidence is not admissible." Fed. R. Evid. 402. Here, whether evidence of certain offsets is admissible turns on the Court's interpretation of the relevant provisions of the CLJA. Thus, the Court may properly decide such issues now.

To interpret the CLJA, the Court must "examine the ordinary meaning of the CLJA's statutory text, [] interpret specific provisions of the CLJA within their broader statutory context, and [] apply certain canons of construction, which are presumptions about how courts ordinarily read statutes." *In re Camp Lejeune Water Litig.*, 715 F. Supp. 3d 761, 766 (E.D.N.C. 2024) (collecting cases), *mandamus denied sub nom.*, *In re McBrine*, No. 24-1542, 2024 WL 5237643 (4th Cir. Aug. 23, 2024); *cert. denied*, *McBrine v. United States*, No. 24-685 (2025). "In interpreting the plain language of a statute, terms are given their 'ordinary, contemporary, common

---

[2] The United States has informed PLG that for purposes of Track 1 only, the United States has not sought data related to the Track 1 Trial Plaintiffs' use of Medicare Part C, Medicare Part D, or Medicaid. The United States understands that some of the Track 1 Trial Plaintiffs utilized or were enrolled in some of these programs. Notwithstanding this, the United States is not presently considering any potential offsets stemming from such use or enrollment for these Plaintiffs. The United States, however, reserves the right to seek offsets for Medicare Parts C and D and Medicaid in future Tracks.

[3] Through the present motion, PLG does not argue that payments by unenumerated programs such as TRICARE are irrelevant for *any* purpose; rather, PLG argues that such payments cannot be considered offsets under the CLJA. Evidence that is irrelevant for one purpose may be relevant for other purposes, and the United States reserves the right to present evidence of payments under unenumerated programs for purposes other than offsets. *See In re Camp Lejeune Water Litig.*, No. 7:23-CV-897, 2025 WL 2471070, at *9-10 (E.D.N.C. July 15, 2025), M & R. *adopted*, No. 7:23-CV-897, 2025 WL 3452434 (E.D.N.C. Dec. 1, 2025) (stating that vapor intrusion evidence may be relevant for purposes other than proving exposure).

meaning, absent an indication Congress intended [it] to bear some different import.'" *In re Camp Lejeune Water Litig.*, 736 F. Supp. 3d 311, 318 (E.D.N.C. 2024) (alteration in original) (quoting *North Carolina ex rel. Cooper v. Tenn. Valley Auth.*, 515 F.3d 344, 351 (4th Cir. 2008)). "'[U]nless there is some ambiguity in the language of a statute, a court's analysis must end with the statute's plain language.'" *Id.* (quoting *In re Sunterra Corp.*, 361 F.3d 257, 265 (4th Cir. 2004)); *see also Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 127 (2018) (similar).

## ARGUMENT

In the CLJA, Congress made clear that any money the government is paying to or on behalf of a Plaintiff under specified programs for exposure to Camp Lejeune water must be subtracted from any award that the Plaintiff receives under the CLJA. In no uncertain terms, the relevant provision provides that "[a]ny award made to an individual . . . under this section shall be offset by the amount of any disability award, payment, or benefit provided to the individual" by the VA, Medicare, or Medicaid "relating to exposure to the water at Camp Lejeune." CLJA § 804(e)(2). Congress deliberately chose broad and mandatory language, providing that "any" payment for medical expenses or medical care provided by or disability awards made under one of the specified programs "shall be" deducted from "[a]ny award" a Plaintiff receives under the CLJA.

The operation of the provision is straightforward. A court must deduct "the amount" paid pursuant to these other programs for Camp Lejeune-related injuries from any "award" in a CLJA action. Recognizing that the United States is already making payments and providing medical care to veterans and their family members and making disability award payments relating to exposure to the water at Camp Lejeune, Congress therefore provided that CLJA awards must be reduced by that amount. PLG seeks to complicate the inquiry by imposing an arbitrary temporal cutoff for which payments qualify and by requiring the Court to apply offsets only to certain categories and amounts of damages that Plaintiffs allege. Those contentions find no support in the statute.

6

Animating all of PLG's arguments is PLG's view that offsets can be applied only to prevent a "double recovery"—a phrase that appears more than twenty times in PLG's Memorandum, but not once in Subsection 804(e)(2). In fact, "double recovery" does not appear in any section of the CLJA, and PLG fails to cite any evidence in the legislative history to support the claim that the CLJA Offset Provision is confined to circumstances where it would prevent double recovery. To the contrary, the CLJA Offset Provision mandates that the United States "shall" offset "***any*** award" by the amount of "***any*** disability award, payment, or benefit" CLJA § 804(e)(2) (emphasis added). Such expansive language recognizes the vast resources that the United States has already spent— and will continue to spend—through the enumerated programs, on individuals with medical conditions and disabilities presumed to have been caused by exposure to the water at Camp Lejeune.

The practical implications of the relief PLG seeks would be to prevent the United States from seeking almost any offset and would render the broad language of the CLJA Offset Provision virtually meaningless. Under PLG's view, offsets would be limited to past awards, payments, and benefits, and any offset for past medical care would be barred as irrelevant because it would automatically be considered a damage in Plaintiff's *prima facie* case. Similarly, PLG would consider disability benefits to be solely commensurate with lost earning capacity. These arguments are contradicted by the plain terms of the CLJA's Offset Provision and should be rejected.

## I. **The CLJA Requires Offsets for the Amount of Any Award, Payment, or Benefit Provided to a Plaintiff at Any Time.**

The language of the CLJA Offset Provision is unambiguous: "[a]ny award . . . shall be offset by the amount of any disability award, payment, or benefit provided to an individual, or legal representative" related to exposure to water at Camp Lejeune. CLJA § 804(e)(2). "Any disability award, payment, or benefit includes those beyond the time of any potential litigation

7

award. The plain language of Subsection 804(e)(2) is expansive and mandatory—requiring offsets for *any* award, payment, or benefit provided to an individual and relating to exposure at Camp Lejeune. Nothing in Subsection 804(e)(2) imposes a temporal limitation on offsets and PLG's reliance on the word "provided" is grammatically incorrect.

### A. The Plain Language of Subsection 804(e)(2) Does Not Include a Temporal Limitation on Offsets.

As this Court has previously made clear, its interpretation of the CLJA starts with the plain meaning of the text. *See Fancher v. United States*, 646 F. Supp. 3d 694, 698-99 (E.D.N.C. 2022). Subsection 804(e)(2) reads in relevant part: "Any award made to an individual, or legal representative of an individual, under this section ***shall be offset*** by the amount of ***any disability award, payment, or benefit provided to the individual, or legal representative*** . . . [under various programs] . . . and . . . in connection with health care or a disability relating to exposure to the water at Camp Lejeune." CLJA § 804(e)(2) (emphasis added). "Congress'[s] use of the word 'any' suggests an intent to use that term expansively." *Smith v. Berryhill*, 587 U.S. 471, 479 (2019) (citation modified) (citing *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 218-19 (2008) ("Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'")); *see also Babb v. Wilkie*, 589 U.S. 399, 405 n.2 (2020) ("We have repeatedly explained that 'the word "any" has an expansive meaning.'" (quoting *Ali*, 552 U.S. at 219)); *United States v. Ickes*, 393 F.3d 501, 504 (4th Cir. 2005) (explaining that "the word 'any' is a term of great breadth" (quoting *Mapoy v. Carroll*, 185 F.3d 224, 229 (4th Cir. 1999))); *Bernal v. NRA Grp., LLC*, 930 F.3d 891, 893 (7th Cir. 2019) ("As the Supreme Court recently reiterated, the word 'any' signifies breadth." (citing cases)).

Nothing in Subsection 804(e)(2) temporally confines offsets to those awards, payments, or benefits made in the past (viewed from the time of any judgment at trial). Providing for a temporal

limitation for operation of a statute is not novel. Indeed, if Congress had wanted to limit offsets to those awards, payments, or benefits made in the past, it could have written Subsection 804(e)(2) as follows: Any award . . . shall be offset by the amount of any disability award, payment, or benefit provided to the individual, or legal representative*, before the time of any award under this section. See* D.E. 806 at 12 (citing 38 U.S.C. § 1151(b)(1)).[4] But the CLJA Offset Provision does not contain any such language. To the contrary, Congress's use of "any" reflects its intent to capture awards, payments, or benefits made *at any time. See, e.g.*, *Bernal*, 930 F.3d at 895 (construing similar language in a contract).

Other indicia of statutory meaning also do not indicate any temporal limitation for the offset. Subsection 804(e)(2)'s title may properly aid statutory interpretation. *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) ("[T]he title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute." (citation and internal quotation marks omitted)). The title reads: "HEALTH AND DISABILITY BENEFITS RELATING TO WATER EXPOSURE." Nothing in the title temporally limits offsets exclusively to awards, payments, or benefits made before judgment. On the contrary, the title is worded in the present progressive tense. And, under the Dictionary Act, "words used in the present tense include the future as well as the present." 1 U.S.C. § 1.

Further, the CLJA "cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Sturgeon v. Frost*, 577 U.S. 424, 438 (2016) (Roberts, C.J.) (quoting *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012)); *see also Fancher*, 646 F.

---

[4] 38 U.S.C. § 1151(b)(1) prevents an individual from receiving certain VA benefits from the date of a judgment until the aggregate amount of benefits that would have been provided equals the total amount included in such judgment.

Supp. 3d at 699 ("[C]ourts must consider the context in which the statutory words are used because courts do not construe statutory phrases in isolation.") (citation modified). The context and broader statutory scheme of the CLJA—and of Subsection 804(e)(2) in particular—strongly support allowing an offset for the present value of any future award, payment, or benefit that any CLJA Plaintiff is reasonably likely to receive. Since 2012, the VA has made various awards, payments, and benefits to individuals exposed to Camp Lejeune water. *See supra* 1-2; *see also* Hope Yen, "U.S. to Pay Billions to Marines Affected by Contaminated Drinking Water," Jan. 13, 2017, *available at https://www.pbs.org/newshour/nation/u-s-pay-billions-marines-affected-contaminated-drinking-water; https://perma.cc/3MJQ-3YTT*. Significantly, while Congress expressly stated that the remedies provided by the CLJA are the exclusive tort remedies, Congress did not preclude the continued receipt of future Camp Lejeune-related remedies through the VA, Medicare, or Medicaid. *See* CLJA § 804(e)(1). Indeed, Plaintiffs will continue to receive medical care and disability awards from the United States into the future.

Finally, the language of the CLJA makes clear that it changed operation of the standard tort cause of action against the government. The CLJA expressly prohibited the procedural and jurisdictional bars to recovery that had precluded tort claims stemming from exposure to contaminated Camp Lejeune water under the FTCA. But besides identifying the specific government programs for offset payments, awards, and benefits, the CLJA did not expressly limit how the offsets would operate. The plain language, title, and context of Subsection 804(e)(2) all lead to the same conclusion: Subsection 804(e)(2) mandates that any award shall be offset by the amount of "*any*" award, payment, or benefit provided at any time, including in the future.

### B. The CLJA Offset Provision's Use of the Word "Provided" Does Not Limit Offsets to Only Awards, Payments, or Benefits Already Made.

Ignoring the word "any," PLG relies instead only on a single word in Subsection 804(e)(2), "provided," to argue that evidence of offsets for reasonably expected future awards, payments, or benefits are precluded. *See* D.E. 806 at 6–9. The premise of PLG's argument—that "provided" necessarily limits Subsection 804(e)(2) to past awards, payments, or benefits—relies upon a grammatically incorrect interpretation of the CLJA.

In Subsection 804(e)(2), "***provided*** to an individual, or legal representative" is a past-participial adjective phrase that modifies the noun phrase "any disability award, payment, or benefit." *See* The Chicago Manual of Style ¶ 5.68 (15th ed. 2003). The word "provided" operates without tense; it does not confine offsets to past awards, payments, or awards as PLG claims. Courts have explained this principle on many occasions. For example, "costs incurred" in a statute requiring restitution for the victims of child sex crimes included *future* costs, such as future therapies. *United States v. Funke*, 846 F.3d 998, 1000–01 (8th Cir. 2017) (collecting cases); *see also Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 84 (2017) ("Past participles . . . are routinely used as adjectives to describe the present state of a thing," e.g., a piece of *burnt* toast, a *fallen* branch, a debt *owed*, etc.); *Cela v. Garland*, 75 F.4th 355, 365 n.11 (4th Cir. 2023) (noting "the *Henson* court's explanation that a past participle—such as 'granted' in § 1159(b)—can be used as a past-tense verb *or* as an adjective describing a present state" (citing *Henson*, 582 U.S. at 83-84)); *Bernal*, 930 F.3d at 895–96 ("Everything depends on the context."); *Waag v. Permann* (*In re Waag*), 418 B.R. 373, 379 (B.A.P. 9th Cir. 2009) ("As noted in one leading grammar treatise, both present and past participles 'can be used for referring to past present or future time' and the past participle 'signifies "perfectiveness" or completion, *but is not restricted to past time*.'" (emphasis in original) (quoting S. Chalker & E. Weiner, *The Oxford Dictionary of English*

*Grammar* 282, 286–87 (1994)); *Buckley v. Taylor* (*In re Taylor*), 388 B.R. 115, 119 (Bankr. M.D.

Pa. 2008) ("A past participle is simply the form of the verb used in the phrase and does not suggest

past action."); *In re Abbott*, No. 15-06822-5-SWH, 2016 WL 6892456, at *2 (Bankr. E.D.N.C.

Nov. 22, 2016); *Kubra v. Edmonds* (*In re Edmonds*), No. 11-01064-8-RDD, 2011 WL 5909420,

at *2 (Bankr. E.D.N.C. Aug. 22, 2011); *Baker & Taylor, Inc. v. Griffin*, No. 3:12-CV-00553-MOC,

2015 WL 1307293, at *2 (W.D.N.C. Mar. 23, 2015).

In *Bernal*, the Seventh Circuit examined at length the temporal implications of a past

participial adjectival phrase similar to the one at issue here. *Compare* CLJA § 804(e)(2) ("any

disability award, payment, or benefit provided to the individual, or legal representative . . . ."),

*with Bernal*, 930 F.3d at 895–96 ("any costs . . . incurred by us in attempting to collect . . . ."). The

Seventh Circuit explained:

> But as mentioned, past participles have a second use. We also use them to form the
> passive voice, where the speaker flips the order of a sentence so that a passive noun
> becomes the subject—"the ball is *thrown* by John" as opposed to "John *throws* the
> ball." Unlike the perfect tenses, the passive voice doesn't necessarily say anything
> about timing: sometimes it does ("the ball was thrown just before sunset") and
> sometimes it doesn't ("a football is usually thrown by a quarterback").
>
> The language at issue—"incurred by us in attempting to collect"—is used in this
> contract to modify the noun "costs." And "[p]ast-participial modifiers are bare
> passives." That is, they play the second of the two roles we described. They are
> "tenseless" because "the verb itself gives no indication of" the relative timing of
> events. The modifier describes the noun, but the actual timing is "determined by
> other elements in the sentence or by context." To give an example, contrast two
> phrases: "those arrested yesterday" and "proposals submitted after today." The
> modifier in the first phrase ("arrested yesterday") refers solely to events that
> occurred in the past, while the modifier in the second phrase ("submitted after
> today") refers solely to events occurring in the future. Everything depends on the
> context.

*Bernal*, 930 F.3d at 895 (citation modified). Thus, the Seventh Circuit reasoned, given that

"nothing in the . . . actual language says much about timing at all[,]" that "silence strongly supports

NRA's argument: absent limiting language, 'any' should mean 'any.' It should include costs

incurred *at any time* . . . ." *Id.* at 896. The Seventh Circuit also observed that, just like the key phrase at issue here in Subsection 804(e)(2), "any costs . . . incurred by us in attempting to collect" explains "*what* the costs are and *who* is paying them." *Id.* The same applies here. "[P]rovided to the individual, or legal representative" explains *which* awards, payment, and benefits qualify— i.e., those provided to a Plaintiff. Thus, "provided" says nothing about the relative timing of "any disability award, payment, or benefit." Therefore, the CLJA's use of the word "provided" does not temporally limit the allowable offset.

In PLG's Memorandum, PLG cites several cases, all of which are distinguishable. In *Cawthorn v. Amalfi*, 35 F.4th 245, 258–59 (4th Cir. 2022), the Fourth Circuit held that the phrase "political disabilities imposed" in the Amnesty Act of 1872 was limited to individuals barred from public office because they had engaged in insurrection or rebellion against the United States during the Civil War and not to every person in the future who may suffer from a disability prohibiting them from office as identified in Section 3 of the Fourteenth Amendment.[5] *Cawthorn* arose out of a unique set of historical circumstances not present here; indeed, the Court emphasized the unique historical context of the Amnesty Act of 1872—granting political amnesty to nearly all ex-Confederates in one fell swoop—which affirmed "the fact that Congress did not purport to remove any disabilities that had not yet been imposed." *Id.* (citation modified). PLG also cites a case involving the Hyde Amendment, which provides that a Court may award attorneys' fees to a prevailing criminal defendant if the Court finds that the United States' prosecution "was vexatious, frivolous, or in bad faith. *See* D.E. 806 at 6 (citing *United States v. Drake*, 64 F.4th 220 (4th Cir. 2023)). *Drake* is inapposite because nothing in the case involved analysis of the temporal

---

[5] The full text at issue read: "That all political disabilities imposed by the third section of the fourteenth article of amendments of the Constitution of the United States are hereby removed from all persons whomsoever," with limited exceptions. 17 Stat. 142.

implications of a past participle used as an adjectival phrase to modify a noun. *See Drake*, 64 F.4th at 225-27. The same is true as to *G.T. v. Bd. of Educ. of the Cnty. of Kanawha*, 117 F.4th 193, 207 n.9 (4th Cir. 2024), where a statute used past tense verbs to set out standards governing a hearing officer's decision concerning whether *prior* conduct violated a child's rights under the statute. *See id.* (discussing 20 U.S.C. § 1415(f)(3)(E)(i)–(ii)).

At bottom, PLG's premise that the word "provided" by itself necessarily imposes a past-temporal limitation is grammatically wrong. In fact, it is a past-participial adjectival phrase that is tenseless. *Bernal*, 930 F.3d at 895–96. Moreover, according to PLG's own grammatical logic, Plaintiffs would be confined to damages that Plaintiffs had already incurred and not future damages because the CLJA provides an action for an individual to "obtain appropriate relief for harm that was *caused* by exposure to the water at Camp Lejeune." CLJA § 804(b) (emphasis added). However, PLG is not limiting their experts to opining on past damages.

What PLG is arguing, in essence, is (1) that any prevailing Plaintiffs should receive, at trial, a lump sum for the present value of any future damages, but (2) that the United States cannot receive, at trial, any offset for the present value of any future awards, payments, or benefits that Plaintiffs will receive with reasonable certainty from the United States after trial. And, despite PLG's many references to the supposed sole purpose of the CLJA Offset Provision to prevent "double recovery," PLG's interpretation would lead precisely to that "double recovery." Indeed, PLG provides no explanation for why Congress would want to deduct Camp Lejeune-related medical expenses that were paid by the VA, Medicare, and Medicaid one day before final judgment but not such expenses that were certain to be paid one day after final judgment.

PLG also asserts that offsets for future awards, payments, or benefits would be unfair and speculative because events in the future are uncertain and Plaintiffs may seek healthcare from non-

government providers. *See* D.E. 806 at 7–9. But those arguments are irrelevant to whether CLJA Subsection 804(e)(2) permits offsets for future awards, payments, or benefits. At trial, the United States will have to prove that future offsets are reasonably probable and not speculative (as well as the amount of those offsets), just as PLG will have to prove that future damages are reasonably probable and not speculative (as well as the amount of those damages). This is a matter of evidence which is irrelevant to the interpretation of the CLJA's Offset Provision. For now, all the Court needs to decide is whether Subsection 804(e)(2)'s plain language includes such offsets. Whether the United States can prove future offsets—or, indeed, whether PLG can prove future damages—is for another day and a fuller record.[6]

Finally, PLG argues that the United States "acknowledged previously that it is entitled to offsets only for amounts already paid," misleadingly relying upon the United States' fifth affirmative defense in its Answer to the Master Complaint. D.E. 806 at 6 (citing Ans., D.E. 50 at

---

[6] PLG misplaces their reliance on cases that generally stand for the proposition that a veteran injured by a VA medical provider is not required to seek future medical care from that provider because those cases are dissimilar to the present actions. Actions brought pursuant to the CLJA permit "[a]n individual, including a veteran . . . or the legal representative of such an individual, who resided, worked, or was otherwise exposed (including in utero exposure) for not less than 30 days during the period beginning on August 1, 1953, and ending December 31, 1987, to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States" to bring an action to obtain appropriate relief. CLJA § 804(b). The cause of action provided by the CLJA cannot be analogized to an FTCA action of a patient suing the government for medical malpractice by a government physician.

Here, Track 1 Trial Plaintiffs were purportedly injured by government actions that caused or allowed contaminated water at Camp Lejeune, N.C., not by government-provided health care. The offsets being referenced here are based upon medical care and disability awards paid for or provided by the VA and Medicare—government agencies that had nothing to do with the contaminated water at Camp Lejeune, N.C. These agencies are not alleged to have caused harm to these Plaintiffs—in fact, they are covering the cost of such care already. Again, PLG's position is inconsistent with the actions of the Track 1 Trial Plaintiffs. The cases in which the United States seeks future offsets are ones in which a Track 1 Trial Plaintiff **has already** decided to receive awards, benefits, and payments from the VA and Medicare. In short, these Plaintiffs have already signaled their intent to receive payments and care from the United States by doing so already.

50). PLG fails to mention the United States' immediately preceding fourth affirmative defense, which provides that "[a]ny award is subject to appropriate offsets under the law." Ans., D.E. 50 at 50. Regardless, PLG's suggestion is irrelevant for purposes of statutory interpretation.

While Subsection 804(e)(2) is unambiguous—as it refers plainly to "any" award and lacks any temporal limitation—the Court must read any ambiguity in the United States' favor because the CLJA's Offset Provision is a condition to the United States' waiver of sovereign immunity in the CLJA. *See In re Camp Lejeune Water Litig.*, 2025 WL 2471070, at *9. As this Court has explained, "[t]he sovereign immunity clear statement canon provides that if a defendant enjoys sovereign immunity (as the United States does), 'abrogation requires an unequivocal declaration from Congress.'" *In re Camp Lejeune Water Litig.*, 715 F. Supp. 3d at 766 (citation omitted). "All waivers of sovereign immunity must be 'strictly construed . . . in favor of the sovereign." *Welch v. United States*, 409 F.3d 646, 650-51 (4th Cir. 2005) (alteration in original) (quoting *Lane v. Pena*, 518 U.S. 187, 192 (1996)). "A corollary to the sovereign immunity clear statement canon is that 'limitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied.'" *In re Camp Lejeune Water Litig.*, 715 F. Supp. 3d at 766–67 (quoting *Soriano v. United States*, 325 U.S. 270, 276 (1957)); *see also United States v. Mitchell*, 445 U.S. 535, 538 (1980) ("A waiver of sovereign immunity cannot be implied but must be unequivocally expressed."). The Court applied these same principles in deciding whether the CLJA encompassed claims based on vapor intrusion. *See In re Camp Lejeune Water Litig.*, 2025 WL 2471070, at *9, *adopted*, 2025 WL 3452434 (E.D.N.C. Dec. 1, 2025). As the Court's analysis in its Order on jury trials suggests, statutory provisions defining the damages or relief that may or may not be available to Plaintiffs against the United States are "limitations and conditions upon which the Government consents to be sued." 715 F. Supp. 3d at 766-67; *see also*,

*Pena*, 518 U.S. at 192 ("To sustain a claim that the Government is liable for awards of monetary damages, the waiver of sovereign immunity must extend unambiguously to such monetary claims.").

Here, while the United States' position is that Subsection 804(e)(2) is not ambiguous for the reasons explained *supra* in Section I.A, to the extent that this Court determines that there is any ambiguity to the temporal scope of Subsection 804(e)(2), it must be construed in the United States' favor. By defining the scope of the United States' required offsets and therefore its potential monetary liability, Subsection 804(e)(2) is a limitation or condition to the United States' waiver of its sovereign immunity in the CLJA. To be sure, if Congress had intended to cabin the temporal scope of offsets strictly to the past, Congress would have said so unequivocally.

## II. PLG Argues for an "Equivalent Category" Requirement and Limitations Into Subsection 804(e)(2) Despite the Plain Language Mandating That Offsets Be Applied to "Any Award."

Without any support from the express language of the CLJA—in fact, despite express language to the contrary—PLG attempts to insert a number of requirements and limitations into the CLJA Offset Provision. PLG argues that offsets can only be applied to undefined "equivalent categor[ies]" of damages *and* only to the extent that a Plaintiff asserts the category and an amount of damages. *See* D.E. 806 at 10–15.

There is simply no support for PLG's proposed category-by-category requirement. Notably, PLG does not cite or reference the actual text of Subsection 804(e)(2) in making this argument. But in analyzing the meaning of a statute, the Court must, again, begin "with the language of the statute itself." *Republic of Sudan v. Harrison*, 587 U.S. 1, 8 (2019) (quoting *Caraco Pharm. Lab'ys*, *Inc. v. Novo Nordisk A/S*, 566 U.S. 399, 412 (2012)). "[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Lamie v. U.S. Tr.*, 540 U.S. 526, 534

(2004) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000)); *see also Walters v. Metro. Educ. Enters.*, 519 U.S. 202, 207 (1997) ("In the absence of an indication to the contrary, words in a statute are assumed to bear their 'ordinary, contemporary, common meaning.'" (citation omitted)).

Here, Subsection 804(e)(2) mandates that the Court "shall" deduct offsets from "[a]ny award made . . . under this section." Thus, if a Plaintiff receives an "award" under the CLJA, then "the amount" paid by the VA, Medicare, and Medicaid "shall" be subtracted from "[a]ny" such "award." Again, the Supreme Court has described "any" as having "an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (citing Webster's Third New International Dictionary 97 (1976)). In *Gonzales*, the Court was asked to interpret a statute that prohibited sentences for certain firearms offenses from "run[ning] concurrently with any other term of imprisonment." 520 U.S. at 2-3 (citing 18 U.S.C. § 924(c)). Noting that "the word 'any' has an expansive meaning," *id.* at 5, the Court declined to limit § 924(c)(1) to only federal sentences and instead held that the prohibition extended to both concurrent state and federal sentences, *id*. at 11. Citing *Gonzales*, the Court again interpreted "any" as having "an expansive meaning" when interpreting a statute allowing a public housing agency to terminate tenancy for "any drug-related criminal activity." *Dep't of Hous. and Urb. Dev. v. Rucker*, 535 U.S. 125, 131 (2002) (discussing 42 U.S.C. § 1437d(l)(6)). In *Rucker*, the Court held that termination is permissible regardless of whether "the tenant knew, or should have known, about" the disqualifying "drug-related criminal activity." 525 U.S. at 130. The Fourth Circuit has similarly found that the language is clear: "any" means "all." *United States v. Maxwell*, 285 F.3d 336, 341 (4th Cir. 2002); *see also Ickes*, 393 F.3d at 504 ("the word 'any' is a term of great breadth"). The Fourth Circuit held that the term "any term of imprisonment" includes both "the

prison term in the current revocation sentence" as well as "all prison time imposed under any prior revocation sentence or sentences," which "must be aggregated." *Id.*

Ignoring the plain language of the CLJA, PLG points the Court to FTCA cases and contends that "[t]here is no basis to apply the CLJA's Offset Provision differently[]" than how offsets apply in the FTCA context. D.E. 806 at 11. On the contrary, the "basis" to apply offsets "differently" in CLJA cases lies in Subsection 804(e)(2)'s plain language. The language of the CLJA controls. *See In re Camp Lejeune Water Litigation*, 736 F. Supp. 3d at 318 (finding that, absent some ambiguity in the language of the statute, the Court "need look no further than the plain language . . . of the CLJA"). Moreover, the FTCA does not have an offset provision equivalent to the CLJA's Offset Provision; thus, the express language of CLJA's Offset Provision overrides the FTCA's approach to offsets, to the extent applicable.[7]

Similarly, PLG misinterprets the VBA's Schedule for Rating Disabilities, 38 U.S.C. § 1155, and equates disability compensation with lost earning capacity. *See* D.E. 806 at 11 ("VA disability benefits provided to Plaintiffs may offset only damages for lost earning capacity, and not other damages categories such as pain and suffering.") The Schedule for Rating Disabilities, established in 38 U.S.C. § 1155, created ten grades of disability evaluations from 10% to 100%. *See* 38 U.S.C. § 1155. These grades are meant to reflect "as far as practicable, . . . the average impairments of earning capacity resulting from such injuries in civil occupations." *Id.*; 38 C.F.R.

---

[7] Notably, federal courts have commented on the absence of express legislative language in guiding their offset analysis. *See, e.g., Ulrich v. Veterans Admin. Hosp.*, 853 F.2d 1078, 1082 (2d Cir. 1988) (noting that "there [was] no statutory authority for setting off" the benefits at issue "against plaintiff's pain and suffering award"); *United States v. Gray*, 199 F.2d 239, 244 (10th Cir. 1952) ("[I]n the complete absence of an express or clearly implied intent on the part of Congress that such an offset or diminution should be made, it is not the function of this court to effectuate it by judicial fiat."); *see also Brooks v. United States*, 337 U.S. 49, 54 (1949) (noting "the statutory scheme and the Veteran's Administration regulations may dictate a contrary result"). Such express language is present in subsection 804(e)(2).

§ 3.321(a). Compensation is based on the nature and severity of the condition using the VA Rating Schedule, which contains different diagnoses and corresponding disability percentages. *See* 38 C.F.R. Part 4, Subparts A and B.

The VA evaluates a veteran's symptoms and matches them with the corresponding disability percentages. The injury type and severity determine, for example, whether the disability is 30% or 60%. The amounts applied to each percentage are meant to estimate how the condition might affect the individual's ability to function economically, but that is not the same as saying VBA benefits only cover lost earnings. For instance, disability evaluations determine "the ability of the body as a whole [or in part] . . . to function under the ordinary conditions of daily life *including employment*." 38 C.F.R. § 4.10 (emphasis added). The examiner provides "a full description of the effects of disability upon the person's ordinary activity" through a medical examination, not a review of the veteran's finances. *Id.* The evaluation is not limited to the categories created or alleged by plaintiffs in potential litigation, but, rather, includes an evaluation of combinations of disabilities represented by noneconomic damages, including, but not limited to, pain and suffering. This point was re-emphasized in a Senate Report, which stated that veterans' disability ratings are based on "the nature and extent of the disability or combination of disabilities, *without regard to whether the particular veteran is or is not actually engaged in gainful occupation or the level of his or her earnings*." *Morgan v. United States*, 968 F.2d 200, 206 (2d Cir. 1992) (emphasis in original) (quoting S. Rep. No. 98-604, 98th Cong., 2d Sess. 31 (1984), *reprinted in* USCCAN 4479).

To further support its argument that the CLJA Offset Provision should model FTCA offsets, PLG refers to this Court's statement that "VA benefits and potential tort damages differ in kind, not degree." D.E. 806 at 11 (quoting D.E. 227 at 18). PLG does not explain the meaning of

this statement, and it misconstrues this Court's statement in its prior Order denying PLG's motion for partial summary judgment on causation. In that Order, the Court disagreed with PLG's interpretation of the CLJA's causation requirement and noted, "[u]nder Plaintiffs' preferred reading, CLJA claimants would face a lower bar than veterans claiming a Camp Lejeune 'presumptive service connection' for purposes of VA benefits." D.E. 227 at 16. In rejecting PLG's statutory interpretation argument, this Court noted that "VA benefits and potential tort damages differ in kind, not degree. Interpreting the CLJA to require less from claimants than a veteran must show to recover VA benefits defies the plain language of the statute and would produce 'absurd results.'" *Id.* at 18 (citation omitted). This is irrelevant to PLG's attempt to apply FTCA caselaw to the interpretation of the CLJA Offset Provision.

PLG also suggests that "[h]ad Congress intended to differentiate CLJA offsets from the common law meaning of the term of art it chose, it would have done so, as it has in other statutes." D.E. 806 at 12. This ignores the fact that the CLJA Offset Provision has specific language that differentiates it from the common law that PLG prefers. Moreover, the example that PLG provides to the Court is, ironically, almost as broad as the language of the CLJA Offset Provision. PLG refers to 38 U.S.C. § 1151(b)(1), which discusses how certain benefits are to be treated in a medical malpractice case against the VA. The statute provides that should an individual be awarded a judgment against the United States, then no benefits are paid to that individual until the "aggregate amount of benefits which would be paid but for [the malpractice] equals the total amount included in such judgment." 38 U.S.C. § 1151(b)(1). The Second Circuit in *Morgan* addressed the issue of "whether the phrase 'total amount included in such judgment' was intended, as the government argue[d], to encompass the total amount of any FTCA award to a veteran for injuries resulting from VA medical treatment or was intended instead, as plaintiffs argue[d], to refer only to that part

of such an FTCA award which represents the veteran's lost earnings." 968 F.2d at 205. Relying on the express language of the statute, the Court stated:

> [W]e reject plaintiffs' reliance on the regulatory scheme for the proposition that "disability" payments under § 351 [now 38 U.S.C. § 1151] compensate[d] only for lost earnings. On its face, § 351's requirement that the statutory payments be offset against "the total amount included in [the FTCA] judgment" seems a relatively straightforward way of referring to the total amount of damages awarded pursuant to the FTCA claim for all components of the veteran's injury as a result of VA hospital malpractice.

*Id.* at 206. The CLJA's language—with its use of "any award" and "any disability award, payment, or benefit"—is similarly broad and is not confined in duration or amount. Indeed, it is difficult to imagine broader program-specific offset language than the language used in the CLJA.

PLG separately seeks to cap the amount of any offset by "the amount of damages Plaintiff claimed in that same category of compensation." D.E. 806 at 13 (emphasis omitted). Again, the language of the CLJA Offset Provision does not provide any such limit or restriction, nor does PLG cite any statutory language or case law supporting its position. Rather, the CLJA Offset Provision mandates that any award shall be "offset *by the amount of any disability award, payment, or benefit provided to the individual*" without any suggestion that the amount of the offset is capped or limited in any way.

PLG's preferred interpretation of the CLJA would limit offsets to an undefined "equivalent category" of damages in an amount equal to or less than a Plaintiff's claimed damages. Nothing in the plain language of the CLJA Offset Provision curtails the CLJA offsets in this way. In fact, the plain language requires an offset against "[a]ny award" and it expressly requires that the offset be "the amount of any disability award, payment, or benefit provided to the individual." PLG's failure to cite Subsection 804(e)(2)'s plain language or offer any argument based on its text is telling and amounts to a tacit admission that PLG's argument is extra-textual and results-driven. Indeed, the practical implication of PLG's proposed "equivalent category" interpretation would restrict the

United States to offsets for past disability awards and would apply only when a Plaintiff has alleged damages for lost earning capacity.

### III. PLG's Request to Preclude the United States From Entering Evidence of Offsets for Past Medical Expenses Paid by the VA, Medicare, or Medicaid Is Not Properly Before the Court.

Lastly, PLG's Motion seeks to prevent the United States from entering evidence of past medical expenses paid by the United States that are related to Track 1 Diseases, arguing that the evidence would constitute proof of a Plaintiff's damages. D.E. 806 at 16-17. Therefore, PLG is asserting that it should be relieved of its burden of proving past medical expenses where costs were covered by VA, Medicare, or Medicaid. *See id.* at 16 ("both parties should be precluded"). PLG argues, without referencing any particular language in the CLJA or case law, that any past medical care covered by the VA, Medicare, or Medicaid that was related to the Plaintiff's Track 1 Disease will "be offset dollar for dollar, thereby zeroing out those damages, regardless of the amount." *Id.* at 15. Based on this misguided analysis, PLG argues that such evidence is irrelevant, and that excluding it will save the Parties and Court time and resources. At bottom, PLG attempts to shift the burden of proving Plaintiffs' own damages to the United States. *See* D.E. 806 at 16–17 ("[I]f Defendant were to successfully prove that it had paid such expenses on Plaintiff's behalf, Defendant's evidence in support of these offsets would also inherently prove, and serve as an admission, that Plaintiff suffered damages in the same amount, and zero out.").

PLG's argument is flawed. First, Plaintiffs have the burden of proving their own damages, including past medical expenses through admissible evidence, and PLG may not use a motion *in limine* to escape that obligation. While some Track 1 Trial Plaintiffs are seeking damages for medical care paid for, or provided by, the United States, others are not. *See* D.E. 806 at 16 ("In some cases, because Plaintiffs recognized that claims for past medical expenses paid for by the VA, Medicare, or Medicaid would be entirely offset under the CLJA, Plaintiffs did not assert

claims for such damages."). Second, the United States must prove any offsets against a potential award. PLG's request attempts to ignore the fact that damages and offsets are matters of proof, and each side must meet its burden. The fact that the amount sought in offsets by the United States for past medical care could be the same amount claimed by Plaintiff does not mean that each party should be relieved of its burden of presenting evidence. PLG cites no law to support such a result.

Disputes exist regarding whether the United States is entitled to offsets for numerous Track 1 Trial Plaintiffs' past medical care claims. By way of example only, one Plaintiff, via his expert, Marjorie Hackett-Wallace, has presently identified that, of the past medical bills regarding his treatment for his Track 1 Disease, approximately $3,446.02 was paid by Medicare. The United States, via its expert, Dr. Wang Ji, has presently identified that Medicare paid $30,870 for the Plaintiff's Track 1 Disease and related conditions. Under PLG's theory, any offset amount that the United States proves can later be claimed by the Plaintiff as a damage resulting in a net zero. However, PLG does not explain how, under their premise, disputes regarding the amounts of expenses paid by the United States will be reconciled. For instance, the illustrative Plaintiff is seeking damages for medical care provided between March 16, 2022, and March 24, 2022, but has not identified this period of service as being paid by Medicare. However, the United States has identified this very same medical care as being paid by Medicare. If the medical care was paid by the United States, then the Plaintiff's current claim for past medical damages (which the United States asserts includes amounts paid by the United States) is inflated. PLG's requested relief does not capture this situation that must be resolved—i.e., the Parties have to agree or the United States has to prove the portions of medical care were actually paid by the United States. This example demonstrates the necessity for each Party to present its evidence to allow the Court to make damages and offset determinations.

PLG's argument that excluding such evidence will save the Parties and the Court time and expense "at expert depositions and trial" is simply not a basis for excluding evidence in the first place. D.E. 806 at 16. Even if it were, PLG's argument is unavailing. Expert depositions for damages experts are presently occurring and are set to be completed by early March 2026. *See* D.E. 630. Briefing for PLG's Motion will, at the earliest, be completed by March 3, 2026. More importantly, while the Parties may eventually be able to save the Court time on this issue, numerous outstanding issues must be resolved before that can occur. A motion *in limine* is simply not the proper vehicle for this request.

PLG's request seeks to alleviate PLG's burden of proving its past medical damages, while simultaneously converting any proof by the United States of offset payments to *de facto* evidence of a Plaintiff's past medical damages. This is not an appropriate request for PLG's Motion and, at the very least, is premature as the Parties do not yet agree on what medical care was provided or paid for by the United States.

## CONCLUSION

Throughout its Motion, PLG has attempted to re-write portions of the CLJA or add requirements found nowhere in the CLJA's plain broad language. PLG's approach seeks to render the CLJA Offset Provision virtually meaningless. However, the statutory text of the CLJA Offset Provision, which this Court must start with, does not support PLG's approach. For the reasons stated herein, PLG's Motion, aside from its requested relief regarding unenumerated programs like TRICARE, should be denied.

Dated: February 17, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General,
Civil Division

JONATHAN D. GUYNN
Deputy Assistant Attorney General,
Torts Branch

BRIDGET BAILEY LIPSCOMB
Chief,
Camp Lejeune Justice Act Section

HAROON ANWAR
SARA J. MIRSKY
Assistant Directors

ADAM BAIN
Special Litigation Counsel

GIOVANNI ANTONUCCI
ERICK M. MARQUINA
DAVID R. ORTIZ
Trial Attorneys

*/s/ Michael W. Cromwell*
MICHAEL W. CROMWELL
N.C. Bar No. 43961
Trial Attorney
United States Department of Justice
Civil Division, Torts Branch
Camp Lejeune Justice Act Section
310 New Bern Ave.
Raleigh, NC 27601
(919) 500-4282
michael.w.cromwell@usdoj.gov

Attorney inquiries to DOJ regarding CLJA:
(202) 353-4426

*Attorneys for Defendant,*
*United States of America*

## CERTIFICATE OF SERVICE

I hereby certify that on February 17, 2026, I electronically filed the foregoing using the Court's Electronic Case Filing system, which will send notice to all counsel of record.

*/s/ Michael W. Cromwell*
MICHAEL W. CROMWELL