IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:23-CV-897

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| CAMP LEJEUNE WATER LITIGATION | ) | |
| | ) | **ORDER** |
| THIS DOCUMENTS RELATES TO: | ) | |
| | ) | |
| ALL CASES | ) | |

On November 12, 2025, the Plaintiffs' Leadership Group ("PLG" or "plaintiffs") moved to reserve admissibility determinations and expedite Track 1 bellwether trials under Federal Rules of Civil Procedure 1 and 16(c)(2) [D.E. 721]. Defendant has also renewed its request for an en banc evidentiary hearing. For the following reasons, the court grants in part and denies in part the PLG's motion, and declines to hold an en banc evidentiary hearing.

## I. BACKGROUND

A.  Camp Lejeune Litigation

The court incorporates by reference the procedural history of litigation arising under the Camp Lejeune Justice Act of 2022 ("CLJA"). *See In re Camp Lejeune Water Litig.*, No. 7:23-CV-897, 2025 WL 3565850, at *1–7 (E.D.N.C. Dec. 12, 2025); March 12, 2025 Notice [D.E. 333] 1–4. The court provides relevant updates to that procedural history as follows.

1.  March 25, 2025 En Banc Hearing

On March 25, 2025, the court held an en banc hearing on Phase 1 issues. *See* Tr. [D.E. 343] (hereinafter, the "March 25, 2025 en banc hearing"). Before that hearing, the parties submitted a joint notice detailing: (1) the agreed-upon language summarizing the nature of Phase 1 expert evidence; and (2) the parties' respective positions on the need for a Phase 1 evidentiary

hearing. *See* [D.E. 329]. As for Phase 1 expert evidence, the parties agreed to the following language:

> In Phase 1, the Court will be presented with evidence pertaining to the concentration levels for the chemicals in drinking (finished) water at Camp Lejeune from 1953 to 1987. To help the Court "understand the chemicals in the water at Camp Lejeune during the operative period," D.E. 247 at 2, the Parties may present evidence from experts in fields such as history, engineering, hydrology, environmental sciences and mathematical modeling pertinent to the fate and transport of contaminants in groundwater and in drinking (finished) water for family housing areas and other facilities at Camp Lejeune from 1953 to 1987. The evidence will include the contamination sources, the fate and transport of the contaminants within the groundwater underlying Camp Lejeune, the supply of water through wells to the various treatment plants at Camp Lejeune, and the distribution of the water from the treatment plants to relevant areas of Camp Lejeune during this time frame.

*Id.* at 2.

Before the March 25, 2025 en banc hearing, the parties also provided their respective positions on "the need for a live evidentiary hearing for Phase One." *Id.* The PLG argued a "time-consuming and resource-intensive" hearing would be unnecessary as the court could decide Phase 1 motions on the parties' briefing. *Id.* The PLG explained that disputed Phase 1 exposure "questions are not suited to be resolved in an *en banc* proceeding," and that those questions are "best left to the particular Judge overseeing each Plaintiff's trial." *Id.* at 3. The PLG stated this "approach is particularly fitting here, where Plaintiffs are relying on the federal government's own water models of the flow and transport of contaminated water on Camp Lejeune, which was developed by the federal Agency for Toxic Substances and Disease Registry [("ATSDR")] for non-litigation purposes." *Id.* at 2. The PLG also noted the court stated in its June 28, 2024 order that there would be an "expedited period of expert discovery . . . followed by *Daubert* and dispositive motion briefing, if necessary," with no mention of an evidentiary hearing. *Id.* at 3; *see* [D.E. 247] 2.

Defendant argued that "[h]olding a single evidentiary hearing" would avoid potential

2

inconsistent findings and presentation of duplicative evidence at trials and would allow the court to determine chemical exposure at Camp Lejeune over the 35-year statutory period. [D.E. 329] 3–4. According to Defendant, the "results of the evidentiary hearing would help the Parties assess the strengths and weaknesses of different cases by establishing early how the Court determines the chemical exposure levels present during the statutory period." *Id.* at 4. Defendant stated it would present evidence at the proposed evidentiary hearing on the purpose of the ATSDR water models to inform epidemiological studies and their limitations for use in the CLJA litigation, the areas of Camp Lejeune that were not impacted by contaminated water systems, and the limited opportunities for contaminant exposure to those who did not live or work in areas served with contaminated water. *See id.*

At the March 25, 2025 en banc hearing, the parties outlined their respective positions on Phase 1 water contamination issues and procedures. *See* Tr. [D.E. 343] 3–5. Defendant reiterated its request for an evidentiary hearing. *Id.* at 32–33. The court questioned the parties about the ATSDR models' reliability and whether Defendant proposes an alternative model. *See id.* at 33–34, 42. Defendant clarified that it does not offer an alternative to the ATSDR models, contending that "there is no way reliably to determine these decades past what the actual [contaminant] concentrations were." *Id.* at 42. The court, however, did not rule on the parties' dispute regarding the need for a Phase 1 evidentiary hearing at the March 25, 2025 en banc hearing. *See id.* at 42–43 (Myers, C.J.) ("But it does raise the question . . . is a hearing going to be necessary. I think we will defer an answer to that question today.").

2. Phase 1 Briefing and the Court's December 12, 2025 Order

On July 3, 2025, Phase 1 briefing deadlines expired. *See* [D.E. 414] 3. On December 12, 2025, the court issued a joint order resolving every Phase 1 motion. *See In re Camp Lejeune Water*
3

*Litig.*, 2025 WL 3565850, at *28. The court denied several of the parties' Rule 702 motions, including Defendant's motion on the PLG's engineering experts Mr. Davis and Dr. Jones, *see id.* at *13–15, the PLG's ATSDR water models expert Dr. Aral, *id.* at *15–16, the PLG's historian Dr. Longley, *id.* at *16–17, as well as the PLG's motion on Defendant's expert Dr. Hennet. *See id.* at *17–21; *see also* [D.E. 356; D.E. 358; D.E. 360; D.E. 373]. The court denied in part the PLG's motion to exclude certain opinions of Defendant's expert Dr. Spiliotopoulos, only excluding Dr. Spiliotopoulos from offering his own opinion on the ABC One-Hour Cleaners source release start date. *See In re Camp Lejeune Water Litig.*, 2025 WL 3565850, at *21–26; [D.E. 376]. The court also denied without prejudice Defendant's motion to exclude certain expert testimony in support of using the ATSDR water models to determine individual plaintiff exposure and denied as moot the PLG's motion to file a sur-reply. *See In re Camp Lejeune Water Litig.*, 2025 WL 3565850, at *26–27; [D.E. 367; D.E. 428]. Finally, the court denied the PLG's motion to file a supplemental Rule 702 motion on Dr. Hennet and denied as moot Defendant's motion to strike or file a sur-reply.[1] *See In re Camp Lejeune Water Litig.*, 2025 WL 3565850, at *21 n.16; [D.E. 423; D.E. 434]. The court stated it "w[ould] address the need for further proceedings in Phase 1" when it resolved the PLG's instant motion to expedite. *In re Camp Lejeune Water Litig.*, 2025 WL 3565850, at *28.

3. Phase 2 and 3 Briefing

44 motions remain for Phases 2 and 3.[2] 34 are Rule 702 motions, inclusive of Defendant's

---

[1] The court denied as moot Defendant's motion to strike or file a sur-reply but labeled Defendant's motion "D.E. 443." *In re Camp Lejeune Water Litig.*, 2025 WL 3565850, at *21 n.16; *see* [D.E. 434]. The court corrects such action now, *see* Fed. R. Civ. P. 60(a), and denies as moot Defendant's motion to strike or file a sur-reply [D.E. 434].

[2] *See* [D.E. 520; D.E. 524; D.E. 525; D.E. 530; D.E. 533; D.E. 535; D.E. 537; D.E. 539; D.E. 541; D.E. 543; D.E. 545; D.E. 547; D.E. 549; D.E. 553; D.E. 555; D.E. 557; D.E. 559; D.E. 567; D.E. 569; D.E. 571; D.E. 574; D.E. 576; D.E. 580; D.E. 582; D.E. 584; D.E. 586; D.E. 588; D.E. 590; D.E. 594; D.E. 597; D.E. 599; D.E. 601; D.E. 605; D.E. 609; D.E. 611; D.E. 612; D.E. 619; D.E. 621; D.E. 624; D.E. 721; D.E. 724; D.E. 730; D.E. 787; D.E. 805].

five motions for summary judgment each dependent on an underlying Rule 702 motion. The court also has entered various procedural orders since the March 25, 2025 en banc hearing, including orders regarding reappointment of the PLG and settlement masters, [D.E. 386; D.E. 442; D.E. 808; D.E. 418], and adopting Magistrate Judge Jones's Memorandum & Recommendation recommending the court grant in part Defendant's motion to exclude evidence related to vapor intrusion. *See In re Camp Lejeune Water Litig.*, No. 7:23-CV-897, 2025 WL 3452434 (E.D.N.C. Dec. 1, 2025); [D.E. 439].

B.   Instant Motion

The PLG requests that the court reserve expert admissibility determinations and expedite Track 1 bellwether trials. *See* [D.E. 721].

First, the PLG requests that the court reserve determination on all Phase 2 and 3 pending expert admissibility motions until trial, arguing reservation is efficient and appropriate under Rule 702.[3]

Second, the PLG requests that the court schedule one Track 1 disease group for bellwether trials first—particularly kidney cancer plaintiffs. The PLG argues that prioritizing trials for one Track 1 disease group will focus the parties' efforts and provide the parties with court decisions that might inform resolution for other disease groups. The PLG also argues kidney cancer trials will create the most relevant information for global settlement because kidney cancer is a well-defined disease with definitive stages of progression and more than 23,000 CLJA claimants allege kidney cancer injuries.

Defendant responds that pretrial "resolution of Phase I on water contamination—as well as

---

[3]   In its motion, the PLG requested that the court reserve determination on all pending expert admissibility motions, including Phase 1 motions. Where the court now has ruled on all Phase 1 motions, *see In re Camp Lejeune Water Litig.*, 2025 WL 3565850, at *28, that portion of the PLG's instant motion is moot, except for whether to hold an en banc evidentiary hearing on Phase 1 issues.

5

resol[ving] the broader *Daubert* and summary judgment motions in Phases II and III"[4] is warranted to facilitate global resolution. Def.'s Resp. [D.E. 733] 4. Defendant contends "[i]t would be more efficient for the *en banc* Court to decide these universal motions before trial to avoid the possibility of inconsistent decisions." *Id.* at 17. As such, in addition to opposing the PLG's request for expedited trials, Defendant renews its requests for an en banc evidentiary hearing on disputed Phase 1 issues.

## II. COURT'S DISCUSSION

A.  Reserving Expert Admissibility Determinations Until Trial

The court incorporates the standard generally governing the admission of expert testimony under Federal Rule of Evidence 702. *See In re Camp Lejeune Water Litig.*, 2025 WL 3565850, at *9–13. The court now explains in more detail the timing and manner of that admissibility determination. Rule 702 requires the court to "make explicit findings, whether by written opinion or orally on the record, as to [any] challenged preconditions to admissibility." *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 283 (4th Cir. 2021).

"In assessing the admissibility of expert testimony, a district court assumes a 'gatekeeping role' to ensure that the 'testimony both rests on a reliable foundation and is relevant to the task at hand.'" *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*, 892 F.3d 624, 631 (4th Cir. 2018) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). The concern underlying Rule 702's screening function is that the jury might be exposed to confusing and unreliable expert testimony. *See Daubert*, 509 U.S. at 595. Moreover, the Fourth Circuit recently cautioned courts to avoid improperly considering "credibility determinations" as questions of "reliability." *Sommerville v. Union Carbide Corp.*, 149 F.4th 408, 423–26 (4th Cir.

---

[4]  Defendant here uses Roman numerals I, II, and III in referring to the respective Phases of this litigation. The court retains Arabic numerals for the sake of consistency with its prior orders.

6

2025). Determining admissibility, which falls within the gatekeeping role of the court, is separate from determining "weight and credibility, which are within the province of the jury in a jury case." *EcoFactor, Inc. v. Google LLC*, 137 F.4th 1333, 1339 (Fed. Cir. 2025) (en banc), *cert. denied*, 146 S. Ct. 333 (2025). District courts retain "latitude" to decide how to apply Rule 702, including "whether or when special briefing or other proceedings are needed" to determine admissibility of expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

The court has "greater discretion regarding procedure" in a bench trial because there is no risk of jury confusion from expert testimony where the court serves as factfinder. *In re Camp Lejeune Water Litig.*, 2025 WL 3565850, at *13 (citing Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Evid. § 6270, at 29 & n.26 (2d ed. 2025)). Indeed, "[i]n bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions." *Harris v. Rivera*, 454 U.S. 339, 346 (1981) (per curiam). And the Fourth Circuit has held "where the factfinder and the gatekeeper are the same, the court does not err in admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702." *United States v. Wood*, 741 F.3d 417, 425 (4th Cir. 2013) (citing *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006)).[5] Accordingly, it is within the court's

---

[5] Virtually every other circuit court has endorsed the district court's discretion to make Rule 702 determinations at a bench trial. *See, e.g.*, *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 833 (3d Cir. 2020) (explaining district courts in a bench trial "may conditionally admit the expert testimony subject to a later Rule 702 determination"); *United States v. McDaniel*, 925 F.3d 381, 385 (8th Cir. 2019) ("The main purpose of *Daubert* exclusion is to protect juries from being swayed by dubious scientific testimony. There is less need for this gatekeeping function in bench trials." (cleaned up)); *United States v. Flores*, 901 F.3d 1150, 1165 (9th Cir. 2018) (affirming district court's decision to make expert admissibility determinations during, rather than in advance of, bench trial); *Att'y Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 779 (10th Cir. 2009) ("Furthermore, while *Daubert*'s standards must still be met, the usual concerns regarding unreliable expert testimony reaching a jury obviously do not arise when a district court is conducting a bench trial."); *United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005) ("There is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself."); *Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 852 (6th Cir. 2004) ("The 'gatekeeper' doctrine was designed to protect juries and is largely irrelevant in the context of a bench trial."); *Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1302 (Fed. Cir. 2002) ("While these concerns are of lesser import in a bench trial, where no screening of the factfinder can take place, the *Daubert* standards of relevance and reliability for scientific evidence

power to reserve expert admissibility determinations until bench trials take place.

Defendant argues that an expert admissibility determination is necessary before trial, citing recent changes to Federal Rule of Evidence 702 and accompanying advisory committee's note. Rule 702 was amended in 2023 to add "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise *if the proponent demonstrates to the court that it is more likely than not that*: . . . (d) the *expert's opinion reflects a reliable application of the* principles and methods to the facts of the case." Fed. R. Evid. 702 (emphasis added). Defendant cites the advisory committee's statement accompanying the 2023 amendment that "the preponderance standard applies to the three reliability-based requirements." Fed. R. Evid. 702 advisory committee's note to 2023 amendment. Defendant interprets this statement to mean "courts cannot blindly defer [expert admissibility] decisions until trial," [D.E. 733] 8, and argues that the 2023 amendment prohibits applying the Rule 104(b) standard to Rule 702 expert testimony, given that Rule 104(b) permits the court to "admit the proposed evidence on the condition that the proof be introduced later" when the court is determining the relevance of evidence that depends on whether a fact exists. Fed. R. Evid. 104(b).

Defendant's argument and reliance upon the advisory committee's note fail on multiple levels. Initially, the PLG does not ask the court to apply the 104(b) standard to the parties' experts. Rather, the PLG asks the court to apply the proper 104(a) preponderance standard to its expert admissibility determination. *See* PLG's Mot. [D.E. 721] 8–9 (urging the court to apply the Rule 702 standard of reliability when hearing from experts at trial without risk of confusing the jury); PLG's Reply [D.E. 789] 4–5 (reiterating the PLG's proposal to apply the 104(a) standard to expert admissibility determinations at bench trials); *see also* Fed. R. Evid. 104(a) ("The court must decide

---

must nevertheless be met."); *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000) ("Most of the safeguards provided for in *Daubert* are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury.").

any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible."). The question before the court is *when* to apply the 104(a) standard: motion-by-motion via the parties' numerous Rule 702 motions or at bellwether trials. The 2023 amendment says nothing about the timing of the court's expert admissibility determination, and the advisory committee note explicitly states "[n]othing in the amendment imposes any new, specific procedures." Fed. R. Evid. 702 advisory committee's note to 2023 amendment; *see EcoFactor*, 137 F.4th at 1339 ("In 2023, Rule 702 was amended to clarify that the proponent of expert testimony bears the burden of establishing its admissibility and to emphasize that an expert's opinion must stay within the bounds of a reliable application of the expert's basis and methodology.").

The 2023 amendment to Rule 702 did not change the well-established understanding that the district court can decide when to make Rule 702 expert admissibility decisions. *See, e.g.*, *UGI Sunbury*, 949 F.3d at 833. Indeed, the court highlighted in its December 12, 2025 order multiple examples where courts deferred Rule 702 expert admissibility decisions until trial:

> *See, e.g.*, *Purdue Pharma L.P. v. Amneal Pharms., LLC*, No. 151152, 2018 WL 11169583, at *2 (D. Del. July 6, 2018) (unpublished) (denying Rule 702 motion without prejudice where court could not "determine whether [expert's] approach involves scientifically-unimportant quibbles or genuine issues without hearing from him . . . at trial."); *Casey v. Coventry Health Care of Kansas, Inc.*, No. 08-201, 2010 WL 4226391, at *5 (W.D. Mo. Oct. 21, 2010) (unpublished) (denying Rule 702 motion without prejudice where court was holding bench trial and "reliability would be best decided after hearing [expert's] testimony in full."); *Furman v. AETC II Privatized Hous., LLC*, No. 5-20-CV-1138, 2023 WL 11916815, at *1 (W.D. Tex. Oct. 13, 2023) (unpublished) (denying Rule 702 motion without prejudice where movant did not "take issue" with expert's qualifications and challenge to "sampling methodology" was better raised in a motion in limine or during cross-examination); *Heritage Handoff Holdings, LLC v. Fontanella*, No. CV 16-691, 2018 WL 11513421, at *1–2 (D. Del. Aug. 10, 2018) (unpublished).

*In re Camp Lejeune Water Litig.*, 2025 WL 3565850, at *27 n.21.

The court also notes that since the 2023 amendment, courts have continued to exercise their Rule 1 power to make Rule 702 determinations at a time efficient and sensible to the court.[6] *See, e.g.*, *Close Armstrong LLC v. Trunkline Gas Co., LLC*, No. 3:18-CV-270, 2024 WL 983764, at *1 (N.D. Ind. Mar. 7, 2024) (unpublished) (stating a proponent of expert testimony must establish its admissibility by a preponderance of the evidence while acknowledging "the court need not conduct a *Daubert* (or Rule 702) analysis before presentation of the evidence" at a bench trial (cleaned up)); *BAE Sys. Norfolk Ship Repair, Inc. v. United States*, No. 2:22-CV-230, 2024 WL 1057773, at *3 (E.D. Va. Feb. 23, 2024) (unpublished) ("The gatekeeping function of the court is more lenient in a bench trial because the court is better equipped than a jury to weigh the probative value of expert evidence.").

Defendant also argues deferring expert admissibility determinations until bellwether trials is less efficient, citing the Manual for Complex Litigation (Fourth) ("MCL") and Duke Law School's Guidelines and Best Practices for Large and Mass-Tort MDLs ("Duke Guidelines"). The MCL states "[p]retrial rulings on admissibility save time at trial" and "such rulings may narrow the issues and enable counsel to plan more effectively for trial." MCL § 11.642 (2004). Defendant cites a section of the MCL that notes "[r]eserving consideration of the reliability of expert testimony until trial . . . probably carries more disadvantages than advantages." *Id.* § 23.352. Defendant also cites various sections of the Duke Guidelines to emphasize that the court should "give priority to deciding issues broadly applicable to multiple claimants" and argues that meaningful settlement discussions may not be possible until there has been "extensive testing of the parties' contentions through decisions on dispositive and *Daubert* motions." Bolch Judicial

---

[6]  Defendant argues that all cases cited in the PLG's motion are not mass toxic tort personal injury cases in which pre-trial determinations on significant expert admissibility issues would have far-reaching effects. *See* [D.E. 733] 9; [D.E. 721] 9–10. True, but Defendant does not demonstrate that this distinction is significant, particularly in a bench trial, and Defendant does not cite any cases sharing its interpretation of the 2023 amendment to Rule 702.

10

Institute, Duke Guidelines 5, 96 (2d ed. 2018).

The court rejects Defendant's argument. The MCL also states "[h]olding a *Daubert* hearing during trial, following formal objection, helps minimize the expense of bringing the expert to court twice, and the judge is likely to better understand the testimony in the context of the case." MCL § 23.352. And while the MCL does state reserving expert admissibility determinations until trial "probably carries more disadvantages than advantages," the accompanying footnote clarifies that most disadvantages concern a jury trial. *Id.* § 23.352 & n.1706. The MCL adds, "nonjury trials require less formality," and "the judge has greater freedom to control the conduct and shape of a bench trial than he or she does a jury trial." *Id.* § 12.5; *see City and Cnty. of San Francisco v. Purdue Pharma L.P.*, No. 18-CV-7591, 2022 WL 22837828 (N.D. Cal. May 6, 2022) (unpublished) (making efficient expert admissibility determinations during bench trial).

Each judge will weigh the downsides to reserving expert admissibility determinations until trial against the delay that resolving many Phase 2 and 3 Rule 702 motions on a one-by-one basis might cause the CLJA litigation. For whichever expert admissibility determinations each judge reserves until trial, that judge as factfinder can evaluate the expert's testimony at trial and make such determinations at that time before admitting the expert's testimony.

Defendant also argues that reserving expert admissibility determinations until bellwether trials will upset the court's scheduling order. In support, Defendant quotes the court's June 28, 2024 order phasing discovery and motion practice on scientific issues: "Before Track 1 Trials commence, the court will resolve two threshold issues: (1) toxic chemical exposure from the water at Camp Lejeune and (2) general causation for the Track 1 Illnesses." [D.E. 247] 1. Defendant suggests that the court committed to resolve all Rule 702 motions before trial, but Defendant's reading finds no support in the order's text. Several sentences after the quoted excerpt, the court

11

stated, "To resolve these issues, the court will order an expedited period of expert discovery limited to those Track 1 issues followed by *Daubert* and dispositive motion briefing, if necessary." *Id.* at 2. Furthermore, the court only ordered the parties to meet and confer "regarding resolution of these Track 1 issues" and submit "a proposed pretrial schedule for these Track 1 issues, including timelines for limited expert discovery as well as *Daubert* and dispositive motion briefing." *Id.* The court's order merely divided pretrial discovery and motion practice into phases, as is standard in complex litigation. *See, e.g.*, Duke Guidelines 6–7 (discussing the common practice of creating "phased production efforts" and "staggered discovery plans" in multi-district litigation (quotations omitted)); MCL § 11.422.

Even if the court's June 28, 2024 scheduling order suggests making admissibility determinations before trials, the court finds good cause to amend such order to "achieve the orderly and expeditious disposition of cases" when the court now has 34 Rule 702 motions on its docket. *See Link v. Wabash R.R. Co.*, 370 U.S. 626, 630–31 (1962).

Accordingly, the court grants the PLG's motion to the extent that each judge may reserve expert admissibility determinations until trial. Each judge retains the inherent power to manage their assigned Track 1 Trial Plaintiffs subject to determinations made on the Master Docket. *See* [D.E. 23] 3. The court, whether before or during trial, will rule on admissibility before admitting such expert testimony into evidence, and in so doing, will ensure each expert's admissibility is established by a preponderance of the evidence. *See* Fed. R. Evid. 702; *Daubert*, 509 U.S. at 589. At the appropriate time, the court will make explicit findings concerning the challenged preconditions of admissibility either by written order or orally on the record. *See Sardis*, 10 F.4th at 283.

B.  Evidentiary Hearing

Defendant argues that even if the court resolves Phase 1 motions on evidentiary admissibility of certain expert opinions, the court still should "hold an evidentiary hearing to determine the historic levels of and timeframes for contamination in the water at Camp Lejeune." [D.E. 662] 9. Defendant made this argument in the parties' November 7, 2025 joint status report:

> The *Daubert* motions currently before the Court address only the evidentiary admissibility of certain expert opinions; they do not address which opinions correctly establish the historic exposure timeframes and levels at different areas of Camp Lejeune. If any of [the] PLG's Phase I expert opinions survive the pending *Daubert* motions, the Court will need to decide historic exposures for certain areas of the base over certain time periods. *This will require an evidentiary hearing, with the issue to be decided by the Court as a whole.*

*Id.* at 9–10 (emphasis added). On December 3, 2025, at a status conference before Magistrate Judge Jones, Defendant explained that a Phase 1 evidentiary hearing would require the court to hear each party's experts, determine which expert opinions are more credible, and make findings of fact en banc as to the correctness of each expert's testimony. *See* Tr. [D.E. 735] 37.

Because Defendant proposes that the court serve as factfinder rather than merely resolve evidentiary admissibility issues, what Defendant proposes is not, in effect, an evidentiary hearing, but a bifurcated trial. *See* MCL § 23.353 ("There is some disagreement as to whether a full-blown evidentiary hearing is ever appropriate. Some courts have afforded an expanded *Daubert* hearing that has taken the form of a minitrial, focused solely on the question of expert admissibility . . . . If an evidentiary hearing is necessary, . . . the court should take care to avoid assessing the credibility of expert testimony and should ensure that it is not encroaching into the province of the jury in deciding factual disputes among the parties."). In essence, Defendant proposes a hearing that would function as a bifurcated trial in which all four district judges preside and serve as factfinder in a single proceeding. As explained below, the court rejects Defendant's proposal because such a bifurcated trial is not included in the court's Pretrial Scheduling Order, is

13

impracticable due to unique features of the CLJA litigation, and would inefficiently expend judicial resources while delaying litigation.

The court recognizes it has the power to bifurcate issues for trial. *See* Fed. R. Civ. P. 42(b) (permitting the court to "order a separate trial of one or more separate issues"). The court, however, has not done so in this litigation. Neither in the original Pretrial Scheduling Order nor in any of the three subsequent amendments did the court order a separate trial on Phase 1 issues. *See* [D.E. 270; D.E. 312; D.E. 414; D.E. 630]. Rather, the court "entered a scheduling order regarding *expert discovery and motion practice* for three Track 1 issue 'Phases.'" [D.E. 333] 7 (emphasis added). The court was clear that issue Phases pertained only to pretrial expert discovery and motion practice. Regarding trials, the court stated, "Based on the existing pretrial schedule, the court estimates resolving these three Track 1 Phases by the end of 2025 and holding Track 1 Trial Plaintiff bench trials beginning in 2026." *Id.*

Defendant again relies on language from the court's June 28, 2024 order to support its position. *See* [D.E. 247]. The order stated, "Before Track 1 Trials commence, the court will resolve two threshold issues: (1) toxic chemical exposure from the water at Camp Lejeune and (2) general causation for the Track 1 Illnesses." *Id.* at 1. Defendant interprets this sentence to mean each phase of this litigation will be *tried* separately. *See, e.g.*, [D.E. 662] 9–10. As discussed, Defendant misinterprets this language. The court stated in the same order, "To resolve these issues, the court will order an *expedited period of expert discovery* limited to those Track 1 issues followed by *Daubert* and dispositive motion briefing, if necessary." [D.E. 247] 2 (emphasis added). The order did not mention an evidentiary hearing, let alone a bifurcated trial. *See id.* And Magistrate Judge Jones entered the order in his role overseeing CLJA discovery and the Master Docket. *See id.*; [D.E. 7]; [D.E. 38] 3:7–18. The parties then proposed pretrial schedules for Track 1 and did

14

not mention an evidentiary hearing or a bifurcated trial on Phase 1 issues. *See* [D.E. 254; D.E. 261; D.E. 262].

Although the court may modify the Pretrial Scheduling Order "for good cause and with the judge's consent," Fed. R. Civ. P. 16(b)(4), the court declines to modify the Pretrial Scheduling Order now that briefing is closed on nearly all issue Phases. *See* [D.E. 414] 3–4; [D.E. 630] 2. Moreover, Defendant's purported Phase 1 challenges to the ATSDR water models for which Defendant requests an en banc evidentiary hearing primarily concern specific causation, which is already provided for by the Pretrial Scheduling Order. For example, Defendant stated in the parties' March 25, 2025 Joint Notice Regarding Hearing:

> At the proposed evidentiary hearing, the United States would present evidence regarding the purpose of the water model[s] developed by the [ATSDR] to inform epidemiological studies and the limitations of its use in the context of the Camp Lejeune Justice Act. The United States would also present evidence regarding areas of Camp Lejeune that were not impacted by contaminated Camp Lejeune water systems and the limited opportunities for contaminant exposure to those who did not live or work in areas served with contaminated water.

[D.E. 329] 4. Defendant contests not that the ATSDR models themselves are inaccurate, but rather that the models' original purpose to inform epidemiological studies renders their results less reliable for certain plaintiffs. Defendant's challenges to the probability that contaminants reached certain plaintiffs are best raised at those plaintiffs' individual trials. And because Defendant does not offer a competing water model for the court to adopt, *see* [D.E. 343] 42, individual trials provide an appropriate opportunity for Defendant to refute specific causation by attacking the reliability of the ATSDR models.

Second, Defendant's proposed hearing functioning as a bifurcated trial where four district judges conduct joint proceedings and serve jointly as factfinder is impracticable due to unique features of the CLJA litigation. For example, during direct and cross-examination of expert witnesses, there is no practical mechanism by which four district judges together would rule on

15

objections from counsel.  If the judges disagree as factfinder, it is unclear what steps the court ought to take to resolve such disagreement.  And holding such a hearing would require four judges to not only coordinate schedules for the entire time period, *see* [D.E. 735] 37, but would also require the four judges to coordinate schedules for any pre-hearing filings, make jointly any pre-hearing rulings, and decide upon jointly any administrative directives for purposes of hearing preparation and proceedings.  Defendant does not address the practical impact upon other court business during the time period for such a hearing.

Defendant argues it would be impracticable for each judge to separately enter findings of fact on Phase 1 issues because it raises the "possibility of inconsistent decisions."  [D.E. 733] 17.  But Defendant is incorrect to concern itself with inconsistent decisions where each judge will enter findings of fact only for cases in which that judge serves as factfinder.  *See* [D.E. 23] 3 (explaining each plaintiff's action remains assigned to a single judge and maintains its own docket, and each judge retains the inherent power to manage such actions subject to determinations made on the Master Docket).  Each judge as factfinder is free to evaluate the parties' arguments as that judge pleases just as each jury in a jury trial would be free to do.  And in a bellwether system, varied outcomes from factfinders are not just permissible, but are an expected feature that helps parties gather data to inform global settlement.  *See* MCL § 22.314–315 (explaining a mature mass tort has "a predictable range of values produced through a number of trials and settlements in a variety of tribunals" and "[t]est cases should produce a sufficient number of representative verdicts and settlements to enable the parties and the court to determine . . . what range of values the cases may have if resolution is attempted on a group basis").

Third, Defendant's proposed hearing functioning as a bifurcated trial would inefficiently expend judicial resources while delaying litigation.  Setting aside the practical considerations, a

16

ruling by the court en banc on all Phase 1 issues would be voluminous. In one proceeding, the court would need to find levels of exposure for each of the five contaminants, at each of the three disputed locations, for all 420 months of the 35-year statutory period. The PLG estimates this process would delay trials on Phase 2 and Phase 3 issues "by months if not a year." [D.E. 735] 37. Instead, under a bellwether system, resolving Phase 1 fact issues through individual bellwether trials will efficiently focus the court's attention on slices of the whole to fill in the overall picture piece-by-piece while providing rolling information to the parties to inform global settlement.

Defendant argues holding an en banc evidentiary hearing on Phase 1 issues would "avoid unnecessary cost and delay by eliminating the need to present duplicative evidence at multiple trials." [D.E. 329] 4. But considering there are only four district judges serving as factfinders in their respective cases, each judge need only hear the parties present once on Phase 1 issues before applying the judge's findings of fact on water contamination to future cases before that judge. And as Defendant previously stated, "[s]iloing the Court's Phase 1 determinations from the issues presented in Phase 2 would be an inefficient use of the Court's and the Parties' resources." [D.E. 291] 7. Furthermore, "the best path for settling claims for any given disease is by evaluating the science for that given disease." Def.'s Resp. [D.E. 733] 16. Bellwether trials accomplish both.

The court has made clear that bellwether trials are critical to achieving prompt global resolution in this litigation. Deviating from expedient administration of bellwether trials frustrates the underlying philosophy to facilitate global resolution based on data points obtained from individual trial results. Defendant appears to no longer agree with the bellwether approach, noting "decisions on individual cases will likely provide little, if any, guidance on how the cases and claims should be resolved globally." *Id.* at 18. For example, Defendant contends, "a decision on a case of a kidney cancer plaintiff who was at Camp Lejeune in the 1980s is unlikely to help resolve

17

the case of a Parkinson's disease plaintiff who was at Camp Lejeune in the 1960s." *Id.* at 17.

Two Track 1 Trial Plaintiffs approximate Defendant's hypothetical and illustrate the potential value of trying bellwether cases. Plaintiff Frank Mousser, a Track 1 Trial Plaintiff alleging kidney cancer injury, worked as a member of the armed services at Camp Lejeune from June 1982 to May 1986 and did not live or work at Hadnot Point or Tarawa Terrace. *See* [D.E. 250] 2; *Mousser v. United States*, No. 7:23-CV-667, [D.E. 11] 2. Plaintiff Gary McElhiney, a Track 1 Trial Plaintiff alleging Parkinson's disease injury, worked as a member of the armed services at Camp Lejeune from June 1972 to October 1988 at both Hadnot Point and Tarawa Terrace. *See* [D.E. 250] 3; *McElhiney v. United States*, No. 7:23-CV-1368, [D.E. 6] 2–3. Comparing trial outcomes between these two plaintiffs might aid the parties' sense of remaining case settlement values based on disease type, time period at Camp Lejeune, total length of time spent at Camp Lejeune, locations at which plaintiff was present, and numerous other relevant factors as determined by the parties and Settlement Masters. Each successive outcome by additional Track 1 Trial Plaintiffs will aid the parties' valuation of remaining cases as the parties negotiate global resolution. Moreover, in Mr. Mousser's case the parties can achieve a trial outcome without litigating Defendant's challenges to the ATSDR's historical reconstruction models of the water's fate and transport because Mr. Mousser was at Camp Lejeune from 1982 to 1986—years in which Defendant obtained test results from the water at Camp Lejeune. *See* [D.E. 25] 13–21.

In sum, expedient administration of bellwether trials achieves judicial economy by only addressing time periods actually at issue rather than adjudicating the entire 35-year statutory period all in one proceeding—along with every associated challenge to the ATSDR's reconstruction methodology—and encouraging settlement between the parties based on each successive trial

result. *See* MCL § 12.52. Therefore, the court declines Defendant's request for an en banc evidentiary hearing to make findings of fact as to Phase 1 water contamination issues before holding bellwether trials.

C.  Prioritizing One Track 1 Disease Group for Trials

The PLG asks the court to prioritize one Track 1 disease group for bellwether trials ahead of others, specifically kidney cancer plaintiffs. While the court maintains discretion to manage its own affairs to achieve the expeditious disposition of cases, *see Link*, 370 U.S. at 630–31, the court's Pretrial Scheduling Order does not contemplate prioritizing one disease group ahead of others. *See* [D.E. 270]. The court does not find good cause to modify the Pretrial Scheduling Order now that briefing is closed on nearly all issue Phases. *See* [D.E. 414] 3–4; [D.E. 630] 2. Furthermore, each judge retains the inherent power to manage actions on that judge's docket subject to determinations made on the Master Docket. *See* [D.E. 23] 3. Because at least one issue of statutory interpretation remains for the court to address jointly, the court will not set Track 1 trial dates at this time. *See* [D.E. 721] 11–12; [D.E. 733] 17.

Accordingly, the court denies the PLG's motion to prioritize one Track 1 disease group for bellwether trials ahead of other Track 1 disease groups. At the appropriate time, the court will schedule Track 1 bellwether trial dates in a manner consistent with the court's prior Case Management Orders and according to each judge's schedule.

### III. CONCLUSION

In sum, the court GRANTS IN PART and DENIES IN PART the PLG's motion to reserve admissibility determinations and expedite Track 1 bellwether trials [D.E. 721]. The court GRANTS IN PART that part of the motion seeking to reserve expert admissibility determinations until trial. Each judge may reserve expert admissibility determinations until trial. The court

DENIES that part of the motion seeking to prioritize scheduling one Track I disease group for bellwether trials. The court DECLINES Defendant's renewed request for an en banc evidentiary hearing to make findings of fact as to Phase I water contamination issues before holding bellwether trials. Accordingly, the court HOLDS IN ABEYANCE ruling on the following Rule 702 motions and summary judgment motions dependent upon Rule 702 determinations: D.E. 524; D.E. 530; D.E. 533; D.E. 535; D.E. 537; D.E. 541; D.E. 543; D.E. 545; D.E. 547; D.E. 549; D.E. 553; D.E. 555; D.E. 557; D.E. 559; D.E. 569; D.E. 571; D.E. 574; D.E. 576; D.E. 580; D.E. 582; D.E. 584; D.E. 586; D.E. 588; D.E. 590; D.E. 594; D.E. 597; D.E. 599; D.E. 601; D.E. 609; D.E. 611; D.E. 612; D.E. 619; D.E. 621; D.E. 624. The court DENIES AS MOOT Defendant's motion to strike or file a sur-reply [D.E. 434].

SO ORDERED. This the 27Th day of February, 2026.

RICHARD E. MYERS II
Chief United States District Judge

TERRENCE W. BOYLE
United States District Judge

LOUISE W. FLANAGAN
United States District Judge

JAMES C. DEVER III
United States District Judge