# Exhibit 651

# Expert Report
# of
# DR. SYED A. HASAN

---

***In re Camp Lejeune Water Litigation***
**7:23-CV-00897 (E.D.N.C.)**

***McElhiney v. United States*, 7:23-cv-1368**
***Peterson v. United States*, 7:23-cv-1576**
***Rothchild v. United States*, 7:23-cv-858**
***Welch v. United States*, 7:23-cv-1503**
***Sparks v. United States*, 7:23-cv-682**

## INTRODUCTION

I, Dr. Syed A. Hasan, submit this expert report of my opinions in the matter of *In re Camp Lejeune Water Litigation*, 7:23-CV-00897 (E.D.N.C.). I am specifically submitting this report with regards to five (5) Parkinson's disease cases: (1) *McElhiney v. United States*, 7:23-cv-1368, (2) *Peterson v. United States*, 7:23-cv-1576, (3) *Rothchild v. United States*, 7:23-cv-858, (4) *Welch v. United States*, 7:23-cv-1503, and (5) *Sparks v. United States*, 7:23-cv-682. The U.S. Department of Justice (DOJ) retained me to provide expert medical billing analysis for various claims pertaining to each Plaintiff's Parkinson's disease treatment and care. I was not retained and I have not been asked to provide any analysis as to whether any individual Plaintiff's Parkinson's disease was caused by their alleged respective exposure to the water at Camp Lejeune and I am not offering any opinion on this subject.

Specifically, I have been retained to provide independent expert analysis:

- As to whether the past medical damages asserted by Plaintiffs' expert, Marjorie Hackett-Wallace, to the extent applicable, are or are not clinically related to each Plaintiff's Parkinson's disease or any conditions stemming from their disease;

- As to whether the past medical treatment received by each Plaintiff as provided by an agency or program of the United States is or is not clinically related to each Plaintiff's Parkinson's disease or any conditions stemming from their disease; and

- As to whether each Plaintiff's service-connected disabilities, as determined by the Veterans Benefit Administration (VBA), is or is not clinically related to each Plaintiff's Parkinson's disease or any conditions stemming from their disease.

## BACKGROUND

I am an internal medicine physician in active practice with over 25 years of experience focused primarily on hospital medicine, and over 20 years of experience as an administrator in managed care organizations (Heritage Provider Network and Regal Medical Group). In my current role, I am the Chief Medical Officer for Regal Medical Group, which is a position I have held since December 2012. My administrative duties include, but are not limited to, professional and institutional claims review, professional contract negotiations, medical necessity for pre-authorization, development of centers of excellence, clinical and medical pathway training for physicians and advanced practice providers (nurse practitioners and physician assistants) to facilitate care through institutional settings, transitions of care, complex care management and site of service optimization. Additionally, I review medical claims on a daily basis as part of my core job duties, which includes making determinations on utilization management and concurrent review. I am well-versed in billing and reimbursement practices for various insurance types/lines of business including, but limited to, Medicare, Medi-cal, TRICARE, VA, and commercial and exchange products.

A copy of my current *curriculum vitae* is attached as **Appendix I**. This includes a list of my prior publications as well as my prior testimony from the last four (4) years. I charge $450 per hour for my services in this litigation.

**DOCUMENTS RELIED UPON**

I was provided medical, billing, and government-agency records for above-identified Plaintiffs. I was also provided specific causation reports prepared by experts in this litigation who are offering specific causation opinions on behalf of the United States and on behalf of Plaintiffs. I was also provided Plaintiffs' Amended Damages Assessment Forms and the expert report of Marjorie Hackett-Wallace (and accompanying appendices) that identified the past medical damages that Plaintiffs claim as damages. Additionally, I reviewed raw medical claims data from the Center for Medicare and Medicaid Services (CMS), the Veterans Health Administration (VHA), Integrated Veteran Care / Community Care Network (CCN), TriWest, and TRICARE. The CMS data is identified as CLJA_CMS_0000000134. The encounter-level VHA data is identified as CLJA_VHA_0000000006. The CCN data is identified as CLJA_CCN_0000000005. The TriWest data is identified as CLJA_TRIWEST_0000000006-008; however, none of the data contained in this data pertained to the Parkinson's disease Plaintiffs who I was asked to evaluate. The TRICARE data is identified as CLJA_TRICARE_0000000056. I also reviewed VBA disability information for each of the Plaintiffs who received disability payments for any kind of service-connected disability. The VBA disability data is identified as CLJA_VBA_0000000019.

I will prepare and serve a list of all materials considered for my report within seven days of serving this report which will include all of the records I relied on, including those referenced above, in forming my opinion. I have also included a list of Plaintiff-specific records relied upon as part of forming my opinions in this case. That list is attached as **Appendix H**.

**METHODOLOGY FOR REVIEW**

My approach to reviewing the provided medical bills, invoices, and governmental medical claims data is consistent with my work as a hospitalist and as a medical director for a managed care organization. I am often tasked with reviewing medical claims, bills, and payments to determine the appropriateness of medical treatment. This involves not only identifying treatment for a given disease but also identifying treatment for any clinically related issues that may occur due to the disease. Within this work, I routinely evaluate the appropriateness of medical coding and corresponding bills which requires an assessment of individual medical records and circumstances to determine the appropriateness of a patient's course of treatment. As a hospitalist, I have experience evaluating and treating a large host of medical conditions, including Parkinson's disease. Using this experience and applicable standards, I reached my opinions for each of the Plaintiffs regarding their claimed medical expense damages, past government medical offsets, and service-connected disability as they related to their Parkinson's disease or any conditions stemming from or clinically related to their Parkinson's disease.

**Methodology for Review of Claimed Medical Expense Damages**

First, I reviewed the specific causation expert reports for each of the five Plaintiffs to inform me of the diagnoses Plaintiffs' experts claim are related to the water at Camp Lejeune. For purposes of this report only, I assumed that these diagnoses were correct solely to determine whether the past medical expenses Plaintiffs claim are related to these diagnoses. Again, I do not form an opinion on whether Plaintiffs' claimed diseases are related to their alleged exposure to water at Camp Lejeune or the accuracy of Plaintiffs' specific causation expert reports.

To determine what charges Plaintiffs claimed as past medical damages, I reviewed the Plaintiffs' expert report prepared by Marjorie Hackett-Wallace and the corresponding charges that were listed in each of the five Plaintiffs' Amended Damages Forms. I then reviewed the charges listed on the Plaintiffs' Amended Damages Forms and the billing and medical records cited by Hackett-Wallace to support those charges to determine whether the charges were clinically related to the diagnoses.

When reviewing the charges to determine if they were clinically related, I first checked to see whether there was a medical provider, hospital/facility/clinic and/or date of service listed on the charge. If so, I would then review notes from that provider or corresponding date in the medical records cited by Hackett-Wallace to determine whether the charge was clinically related to the claimed diseases. I also determined whether the charge was for a service provided prior to a Plaintiff's Parkinson's disease. The same is also true for medications, imaging, tests, and lab results to determine whether the charges were clinically related. If I could not identify direct documents of the procedure or medical encounter, I reviewed other corresponding documents to determine whether other medical records/notes referencing the procedure or service could be found for that date. If no documents could be identified in any of the medical documents cited by Hackett-Wallace, I then analyzed the claimed charges to determine the nature of the medical service being charged to determine if there is any possible clinical relation to Plaintiffs' Parkinson's disease.

I used the same methodology for all cases; however, a value of zero was attributed to Plaintiff McElhiney for past medical expenses because there were none claimed in his Amended Damages Form and Marjorie Hackett-Wallace stated that no private pay billing data was available in her appendix for Plaintiff McElhiney. In making my clinical determinations, I relied on my training, education, and years of clinical experience treating patients with the same conditions as the Plaintiffs who are the subject of this report. For issues related to the ICD-9 and ICD-10 codes referenced in the available document, I refer to and rely upon the CMS coding guidelines and follow the CMS standard conventions.[1]

[1] https://www.cdc.gov/nchs/data/icd/icd9cm_guidelines_2011.pdf; https://www.cms.gov/files/document/fy-2025-icd-10-cm-coding-guidelines.pdf

Plaintiffs' expert, Marjorie Hackett-Wallace, refers to the amounts medical providers charged to quantify the amount of past medical damages for each of the Plaintiffs. The amounts charged, however are simply the initial "retail" price or gross amount a provider invoices for services. It is often an inflated figure that does not reflect the actual market value or what the provider expects to collect. For hospital systems, the "retail" price list is often referred to as a "charge master." Similarly, for professional services rendered in an office setting (non-institutional services), the billed charges are often much higher than actual reimbursement and generally follow the same principles as institutional charge masters. It is an inflated figure that does not reflect the actual market value or what the provider expects to collect. The allowed amount, also called the "negotiated rate," is the maximum amount an insurance company will cover for a service based on its contract with the provider. This figure is often, but not always, reflective of the actual cost of rendering the medical service.[2][3] The final payments are adjusted due to deductibles, co-payments, and other payments that may not be covered by insurance.

I am not offering an opinion regarding the validity of billed charges versus re-imbursed payments in reflecting the cost of care of medical damages. However, I do note the discrepancy between the two amounts. For the purpose of consistency and making equivalent comparisons, I evaluated and quantified billed charges when determining whether any given medical treatment or care was clinically related to each Plaintiff's claimed diseases.

**<u>Methodology for review of past government medical offsets (CMS, TRICARE, VHA, TriWest and CCN)</u>**

To determine whether a past medical offset is clinically related to the diagnoses alleged by Plaintiffs, I reviewed Plaintiffs' payment data from CMS, TRICARE, the VHA, TriWest, and CCN. The data ("Offset Data") I reviewed was a comprehensive list of unfiltered medical claims data from all five agencies for each Plaintiff to determine what was covered and paid for by each respective government agency or program. This information contained numerous medical claims or encounters that were unrelated to Plaintiffs' Parkinson's disease. My role was to determine which claims or encounters contained within this data pertained to Plaintiffs' Parkinson's disease or issues that are clinically related. Plaintiffs' expert Marjorie Hackett-Wallace generically claims there are deficiencies in the collection, extraction, and validation of data and improper billing practices by these government agencies and programs. However, by reviewing this data, I can ensure that my review is not tainted by any such potential deficiencies. My analysis was not focused on billing practices but instead focused on the clinical relatedness of claims.

---

[2] *AMA J Ethics.* 2015;17(11):1046-1052. doi: 10.1001/journalofethics.2015.17.11.stas1-1511.
[3] Linde S, Egede LE. Do Chargemaster Prices Matter?: An Examination of Acute Care Hospital Profitability. Med Care. 2022 Aug 1;60(8):623-630. doi: 10.1097/MLR.0000000000001734. Epub 2022 Jun 1. PMID: 35647741; PMCID: PMC9262858; https://www.va.gov/COMMUNITYCARE/revenue-ops/Fee-Schedule.asp

I reviewed all of these claims and encounters. Providers whose care was unrelated to the claimed conditions were deemed unrelated. Dates that were unrelated to the claimed conditions (care provided prior to first diagnosis and workup of the claimed conditions) were also deemed unrelated. Each encounter was then manually reviewed to ensure that the encounter existed and was related to the claimed conditions using the same metrics as the assessment of past medical damages. If I was unable to match a recorded payment to an entry in the medical records, I considered it unrelated to avoid inaccurate billing. In my calculation of these offsets, I included only the actual amount paid that was reported instead of what was charged to only reflect the actual amount the government paid for each related medical condition. ICD9 and ICD10 codes were not used for primary analysis; rather, they serve as a reference in my analysis of claims.

For offset payments from VHA, the United States' Offset Data source for encounter-level VHA care (CLJA_VHA_0000000006) includes payment data for both total costs and direct costs. I include both of these costs in my analysis without rendering an opinion regarding which costs are valid for the purposes of calculating offset payments. However, in my experience as an administrator in managed care organizations, it is typical for hospitals to charge patients not only for the services they provided but also for the overhead required to provide those services. Generally speaking, the rates hospital systems charge their patients have overhead charges "baked in" to their rates.

In my review of the Offset Data, the re-imbursed medical payments accurately reflect the government's financial payments. This is not necessarily the same as the amounts charged to the government. By way of example only, charges for services provided by medical providers to Medicare are generally significantly higher than the amounts those medical providers are generally reimbursed. However, as discussed above, Plaintiffs' expert Marjorie Hackett-Wallace used billed charges to calculate damages rather than re-imbursed payments and I am not offering an expert opinion regarding the appropriateness of either approach. However, I am noting the discrepancy between amounts reimbursed and amounts charged because these are different quantitative amounts for the exact same services.

**<u>Methodology for Review of Veteran's Service-Connected Disability Determinations</u>**

For the purposes of my report and using the same methodology for clinical relatedness to the claimed conditions, each active service-connected condition contained in the VBA records was reviewed to determine whether each given service-connected condition was or was not clinically related to the Plaintiff's Parkinson's disease. My analysis started with the compiled VBA data located in CLJA_VBA_0000000019 to assess the total service-connected conditions. For purposes of my analysis, I did not need to determine the appropriateness of those

determinations or the ratings assigned. From the compiled list of service-connected conditions with greater than a 0% disability rating, I assessed whether the identified service-connected conditions were or were not clinically related to Plaintiffs' Parkinson's disease.

As noted below, I have made an effort to note situations where a particular condition likely pre-existed Plaintiff's Parkinson's disease, but the Parkinson's disease could have potentially (or, in fact, did) exacerbate the pre-existing condition. Additionally, there are situations where I have determined a particular service-connected condition was not clinically related to the Plaintiff's Parkinson's disease; however, a review of VBA records for the individual Plaintiff show that the VBA has independently determined that same condition or illness is secondary or somehow related to Plaintiff's Parkinson's disease and/or Camp Lejeune. I am not opining whether the VBA's determinations that a certain condition or illness is secondary or connected to a Plaintiff's Parkinson's disease is correct. Instead, I am merely noting that the condition(s) are identified by the VBA as being presumptively connected with Plaintiff's Parkinson's disease and/or his/her Camp Lejeune exposures and therefore, would be considered "related" for the sole purpose of determining amounts paid by the United States in connection to Plaintiff's Parkinson's disease.

## CONCLUSIONS

For each of the five Parkinson's disease Plaintiffs, I have prepared a separate appendix containing my case-specific opinions and explanations. For my opinions regarding Plaintiff Gary McElhiney, please see **Appendix A**. For my opinions regarding Plaintiff Edgar Peterson, please see **Appendix B**. For my opinions regarding Plaintiff Diane Rothchild, please see **Appendix C**. For my opinions regarding Plaintiff Robert Welch, please see **Appendix D**. For my opinions regarding Plaintiff Richard Sparks, please see **Appendix E**.

I hold the opinions offered herein to a reasonable degree of medical certainty. I reserve the right to express additional opinions should more information become available to me.

Recoverable Signature

X 

Syed A Hasan
MD
Signed by: trust_9ae65421-b7cc-45d8-b702-7b60c63846bd

Dr. Syed Ashraf Hasan

12/15/2025
Date

## APPENDIX A

**Plaintiff: Gary McElhiney**

**Overview of Case**

The Plaintiff's expert, Dr. Richard Barbano, opines that "Mr. McElhiney's Parkinson's disease was at least as likely as not caused by his exposure to the contaminated water at Camp Lejeune." Barbano *McElhiney* Report,[4] p. 3. Plaintiff's Parkinson's disease was diagnosed on or about July 18, 2018.[5] Assuming the conclusions from the plaintiff's expert are correct for purposes of my damages opinions, charges related to medical care that is directed towards the management, monitoring, and treatment of Parkinson's disease and alleged symptoms are considered related. Charges for the management, monitoring, and treatment of other medical conditions or pre-existing medical conditions are considered unrelated.

**Summary of Past Medical Expense Damages**

The Plaintiff's expert, Marjorie Hackett-Wallace, did not identify or claim any post medical expenses for Plaintiff Gary McElhiney. Therefore, there is nothing to respond to.

**Summary of Government Offset Payments**

Assuming the specific causation opinions from the Plaintiff's expert, Dr. Barbano, are correct, the United States provided and/or paid for medical care in relation to Mr. McElhiney's Parkinson's disease. This medical care was paid for by the VHA, CCN, CMS/Medicare and TRICRE. In reviewing the data provided by these government agencies or programs,[6] I have determined that the following are amounts of clinically-related payments and benefits towards Plaintiff's claimed conditions:

| Payment Source | Government Payments ($) (with VHA total cost payments) | Government Payments ($) (with VHA direct cost payments) |
|---|---|---|
| **CMS / Medicare** | $3,756.25 | $3,756.25 |
| **VHA** | $24,485.69 | $13,430.03 |
| **CCN** | $59,504.27 | $59,504.27 |
| **TRICARE** | $2,145.03 | $2,145.03 |
| **Total** | **$89,891.24** | **$78,835.58** |

[4] Richard Barbano, p. 3, Report in McElhiney vs. United States, 7:23-cv-1368, Feb. 7, 2025.
[5] Richard Barbano, p. 15, Report in McElhiney vs. United States, 7:23-cv-1368, Feb. 7, 2025.
[6] CLJA_CMS_0000000134; CLJA_VHA_0000000006; CLJA_CCN_0000000005; CLJA_TRICARE_0000000056

My claim-level determinations regarding clinical relatedness for government offset payments made on behalf of Mr. McElhiney with supporting notations are contained in full in **Appendix F**.

**Summary of Veteran's Service-Connected Disability Determinations**

In reviewing the VBA provided data,[7] I have identified that the VBA has provided disability payments to Plaintiff for certain claimed conditions. I have identified those conditions below and determined whether the service-connected conditions receiving disability payments are clinically related to Plaintiff's claimed conditions:

| **Disability Diagnosis - Gary McElhiney** | **Related to the claimed conditions** |
|---|---|
| Lumbar disc disease | N* |
| Degenerative disc disease, lumbar spine, with left leg radiculopathy | N* |
| Left knee impairment surgery | N* |
| Tinnitus | N* |
| Constipation due to Parkinson's disease | Y |
| Rosacea | N* |
| Adjustment disorder with anxiety and depressed mood | N* |
| Balance impairment, Parkinson's disease | Y |
| Left L5 radiculopathy | N* |
| Loss of automatic movements, facies, right, Parkinson's disease | Y |
| Loss of automatic movements, facies, left, Parkinson's disease | Y |
| Loss of sense of smell, Parkinson's disease | Y |
| Radiculopathy right lower extremity | N* |
| Left femoral nerve and tibial nerve (claimed as left leg condition) | N* |
| Right femoral nerve and tibial nerve (claimed as right leg condition) | N* |
| Right 5th cranial nerve with post-herpetic neuralgia (HSV/right temporal arteritis) | N* |
| Tremor, muscle rigidity, bradykinesia, left upper extremity, Parkinson's disease | Y |
| Tremor, muscle rigidity, bradykinesia, right upper extremity, Parkinson's disease | Y |
| Urinary incontinence associated with Parkinson's disease | Y |

* These service-connected conditions are pre-existing conditions that pre-dated Mr. McElhiney's Parkinson's disease diagnosis. While it is possible that these conditions have been exacerbated by Mr. McElhiney's Parkinson's disease, VBA records and/or medical

[7] CLJA_VBA_0000000019

records show that Mr. McElhiney already had these conditions and was being compensated by VBA for them prior to his Parkinson's disease diagnosis.[8] Unless otherwise stated, I am not offering an opinion as to whether these conditions did in fact worsen due to Mr. McElhiney's Parkinson's disease.

Based upon my assessment of Plaintiff's medical records and related VBA documents, I concluded that certain of Mr. McElhiney's service-connected conditions are clinically related to Mr. McElhiney's Parkinson's disease. The conditions identified above as clinically related are conditions typically associated with and caused by Parkinson's disease. For instance, loss of balance, tremors and muscle rigidity are well-known symptoms of Parkinson's disease[9] and occurred concurrent or subsequent to his diagnosis of Parkinson's disease. Anosmia (loss of sense of smell) is often an early non-motor symptom of Parkinson's disease,[10] which was present in Mr. McElhiney, as well as constipation and urinary incontinence[11] and occurred concurrent or subsequent to his diagnosis of Parkinson's disease.

**Conclusions**

To summarize my opinions relating to Mr. McElhiney's past medical treatment, there were no past medical expenses submitted or identified by the Plaintiff's expert, Marjorie Hackett-Wallace. Additionally, the total amount the United States government -- via CMS/Medicare, VHA, CCN, and TRICARE -- paid for Mr. McElhiey's Parkinson's disease and clinically related conditions amounts to **$89,891.24** when accounting for VHA's total costs and **$78,835.58** when accounting for VHA's total direct costs.

---

[8] 01368_MCELHINEY_VBA_0000010052-010070; 01368_MCELHINEY_VA_0000000093-096; 01368_MCELHINEY_VA_0000000721-0726; 01368_MCELHINEY_VBA_0000003768-003792.

[9] Zafar S, Lui F, Yaddanapudi SS. Parkinson Disease. [Updated 2025 Sep 15]. In: StatPearls [Internet]. Treasure Island (FL): StatPearls Publishing; 2025 Jan-. Available from: https://www.ncbi.nlm.nih.gov/books/NBK470193/

[10] "Decline of olfactory function in Parkinson's disease: A ten-year longitudinal study". Roos, D, Klein, M., Doty, R., Berendse, H. J Parkinsons Dis. 2025 May;15(3):673. doi: 10.1177/1877718X251333920. Epub 2025 Apr 2.

[11] Bladder, bowel, and sexual dysfunction in Parkinson's disease.
Sakakibara R, Kishi M, Ogawa E, Tateno F, Uchiyama T, Yamamoto T, Yamanishi T.Parkinsons Dis. 2011;2011:924605. doi: 10.4061/2011/924605. Epub 2011 Sep 12.

## APPENDIX B

**Plaintiff: Edgar Peterson**

**Overview of Case**

The Plaintiff's expert, Dr. Richard Barbano, opines that "Mr. Peterson's exposure to the water at Camp Lejeune is 'at least as likely as not' a cause of his Parkinson's disease due to his exposure to TCE and PCE." Barbano *Peterson* Report,[12] p. 3. Mr. Peterson's Parkinson's disease was diagnosed in or around May 23, 2001. Assuming the conclusions from the plaintiff's expert are correct for purposes of my damages opinions, charges related to medical care that is directed towards the management, monitoring, and treatment of Parkinson's disease and alleged symptoms are considered related. Charges for the management, monitoring, and treatment of other medical conditions or pre-existing medical conditions are considered unrelated.

**Summary of Past Medical Expense Damages**

The Plaintiff's expert, Marjorie Hackett-Wallace, identified certain past medical expenses of Mr. Peterson as past medical damages in the amount of **$614,863.54**. Of the amounts claimed as past medical damages, I determined in my review of the medical and billing records that **$3,127.61** of the claimed charges were clinically unrelated to Mr. Peterson's claimed conditions. Consequently, it is my opinion that of the **$614,863.54** claimed as past medical expense damages, **$611,735.93** were identified as being clinically related to Mr. Peterson's claimed conditions. A table summary of my conclusions below:

| | **Total charges ($)** | **Charges clinically unrelated to claimed conditions ($)** | **Clinically related charges ($)** |
|---|---|---|---|
| Methodist LeBonheur Healthcare | $39,981.49 | $0 | $39,981.49 |
| Semmes-Murphey Clinic, P.C. | $49,851.00 | $0 | $49,851.00 |
| Houston Methodist Leading Medicine | $115,269.60 | $0 | $115,269.60 |
| Methodist University Hospital | $38,763.07 | $2,900 | $35,863.07 |
| Lakeside Behavioral Health System | $10,230.26 | $0 | $10,230.26 |
| Semmes Murphy Clinic | $68,690.00 | $0 | $68,690.00 |
| Campbell Clinic PC | $4,488.00 | $0 | $4,488.00 |
| The Sanders Clinic | $2,829.86[13] | $227.58 | $2602.28 |

[12] Richard Barbano, p. 7, 18, Report in Peterson vs. United States, 7:23-cv-1576, Feb. 7, 2025.

[13] Marjorie Hackett-Wallace identified $2,803.22, which is $26.64 lower than the number determined by United States Greg Russo, because he appears to have identified higher charges on dates of

| | | | |
|---|---|---|---|
| Methodist Minor Medical Center – Memphis | $202.10 | $0 | $202.10 |
| Healthsouth Rehabilitation Hospital of Memphis | $4,067.00 | $0 | $4,067.00 |
| Honeycomb Medical – Home Based | $1,291.13 | $.03 | $1,291.10 |
| Vanderbilt University Medical Center – Nashville | $751.00 | $0 | $751.00 |
| Walgreens | $13,661.61 | $0 | $13,661.61 |
| Methodist Le Bonheur Germantown Hospital | $2,930.00 | $0 | $2,930.00 |
| Optum Lien | $4,966.54 | $0 | $4,966.54 |
| Rawlings Lien | $254,576.93[14] | $0 | $254,576.93 |
| Quest Diagnostics | $1,233.95 | $0 | $1,233.95 |
| Semmes Murphy PC | $1,080.00 | $0 | $1,080.00 |
| **TOTAL** | **$614,863.54**[15] | **$3,127.61** | **$611,735.93** |

**Detailed Review of Claimed Medical Expense Damages**
In general, during my review of the past medical expenses identified by the Plaintiff's expert, Marjorie Hackett-Wallace, I concluded that **$3,127.61** of the claimed damages were clinically unrelated to Mr. Peterson's claimed conditions. I have included a general explanation of why particular categories of charges were clinically unrelated to Mr. Peterson's claimed conditions.

The categories of medical treatment that Mr. Peterson received that were clinically unrelated to his Parkinson's disease include:

- Medical Care at Methodist University Hospital around September 12, 2017 involved Mr. Peterson presenting with cellulitis of lower extremity and claims involve intravenous antibiotics, blood workup and imaging. There is indication this was treatment was related to his Parkinson's disease.[16]
- Medical Care at The Sanders Clinic around August/September 2017 involved Mr. Peterson presenting with cellulitis that later resulted in Emergency Room visit and a later follow-up visit after the ER where he was diagnosed with a

services August 27, 2009 and November 18, 2010. [01576_PETERSON_0000002780; 01576_PETERSON_000002781].

[14] According to Greg Russo, Marjorie Hackett-Wallace appears to have double-counted $1,500 on 01576_PETERSON_0000004547. She identified $43,806 for the Methodist hospital neurosurgery department date of service February 2, 2007. Mr. Russo identified $42,306 for this same provider.

[15] Marjorie Hackett-Wallace claims total charges for all providers in the amount of $616,336.90. When $614,863.54 is added to $1500 and $26.64 is subtracted, the total is $616,336.90.

[16] 01576_PETERSON_MH_000000871

deep vein thrombosis. There is no indication these visits were related to his Parkinson's disease.[17]

- Medical Care received in March and June 2022 involved pneumococcal immunization and colorectal screening. These nominal charges, but this medical treatment is not related to Mr. Peterson's Parkinson's disease.[18]

My claim-level determinations regarding clinical relatedness for the asserted past medical damages are contained in full in **Appendix G**.

**Summary of Government Offset Payments**
Assuming the specific causation opinions from the Plaintiff's expert, Dr. Barbano, are correct, the United States provided and/or paid for medical care in relation to Mr. Peterson's Parkinson's disease. This medical care was paid for by the VHA and CMS/Medicare. In reviewing the data provided by these government agencies or programs,[19] I have determined that the following are amounts of clinically-related payments and benefits towards Plaintiff's claimed conditions:

| Payment Source | Government Payments ($) (with VHA total cost payments) | Government Payments ($) (with VHA direct cost payments) |
|---|---|---|
| **CMS / Medicare** | $141,547.97 | $141,547.97 |
| **VHA** | $7,813.24 | $5,225.52 |
| **Total** | **$149,361.21** | **$146,773.49** |

My claim-level determinations regarding clinical relatedness for government offset payments made on behalf of Mr. Peterson with supporting notations are contained in full in **Appendix F**.

**Summary of Veteran's Service-Connected Disability Determinations**
In reviewing the VBA provided data,[20] I have identified that the VBA has provided disability payments to Plaintiff for certain claimed conditions. I have identified those conditions below and determined whether the service-connected conditions receiving disability payments are clinically related to Plaintiff's claimed conditions:

[17] 01576_PETERSON_0000000117 – 01576_PETERSON_0000000157.
[18] 01576_PETERSON_000000496.
[19] CLJA_CMS_0000000134; CLJA_VHA_0000000006
[20] CLJA_VBA_0000000019

| Disability Diagnosis - Edgar Peterson | Related to the claimed conditions |
|---|---|
| Balance impairment due to Parkinson's Disease | Y |
| Depression with Sleep Disturbance | Y |
| Left Lower Extremity Muscle Rigidity | Y |
| Left Lower Extremity Tremor | Y |
| Left Upper Extremity Tremor | Y |
| Loss of sense of smell | Y |
| Muscle Rigidity Left Upper Extremity | Y |
| Muscle Rigidity Right Upper Extremity | Y |
| Nocturia | Y |
| Right Lower Extremity Muscle Rigidity | Y |
| Right Lower Extremity Tremor | Y |
| Right Upper Extremity Tremor | Y |
| Speech changes | Y |
| Stooped Posture due to Parkinson's disease | Y |

Based upon my assessment of Plaintiff's medical records and related VBA documents, I concluded that each of Mr. Peterson's service-connected conditions are clinically related to Mr. Peterson's Parkinson's disease.[21] For instance, balance impairment, tremors, stooped posture, changes to one's speech, and muscle rigidity are well-known symptoms of Parkinson's disease and occurred concurrent or subsequent to his diagnosis of Parkinson's disease. Nocturnal polyuria, constipation and anosmia are all symptoms of Parkinson's disease[22] that Mr. Peterson developed as a result of his Parkinson's disease. Similarly, depression has been shown to occur in some Parkinson's disease patients, and the VBA has made a determination that Mr. Peterson's depression is secondary to his Parkinson's disease.

**Conclusions**

To summarize my opinions relating to Mr. Peterson's past medical treatment, after a review of the corresponding medical bills and records, I concluded that of the $614,863.54 claimed as past medical damages by the Plaintiff's expert, Marjorie Hackett-Wallace, $3,127.61 was clinically unrelated and $611,735.93 was clinically related to Mr. Peterson's Parkinson's disease and clinically related conditions. Additionally, the total amount the United States government – via CMS/Medicare and VHA – paid for Mr. Peterson's Parkinson's disease and clinically related conditions amounts to $149,361.21 when accounting for VHA's total costs and $146,773.49 when accounting for VHA's total direct costs.

---

[21] 01576_PETERSON_VBA_0000000111-0114; 01576_PETERSON_VBA_0000001568-01579.

[22] Correlation between depressive symptoms and nocturnal disturbances in Japanese patients with Parkinson's disease. Keisuke Suzuki, Masayuki Miyamoto, Tomoyuki Miyamoto, et al. Parkinsonism Related Disorders. 2009 Jan;15(1):15-9.

# APPENDIX C

## Plaintiff: Diane Rothchild

**Overview of Case**

The Plaintiff's expert, Dr. Kristin Andruska, opines that Ms. Rothchild's "exposure to the water at Camp Lejeune is at least as likely as not the cause of her Parkinson Disease." Andruksa *Rothchild* Report,[23] p.64. Records of Plaintiff's initial Parkinson's disease diagnosis are no longer available, but other records suggest the Plaintiff was clinically diagnosed sometime between her initial referral to Dr. Joel Perlmutter in 1999 and 2003. Assuming the conclusions from the Plaintiff's expert are correct for purposes of my damages opinions, charges related to medical care that is directed towards the management, monitoring, and treatment of Parkinson's disease and alleged symptoms are considered related. Charges for the management, monitoring, and treatment of other medical conditions or pre-existing medical conditions are considered unrelated.

**Summary of Past Medical Expense Damages**

The Plaintiff's expert, Marjorie Hackett-Wallace, identified certain past medical expenses of Ms. Rothchild as past medical damages in the amount of **$43,401.44**. Of the amounts claimed as past medical damages, I determined in my review of the medical and billing records that **$4,807.00** of the claimed charges were clinically unrelated to Ms. Rothchild's claimed conditions. Consequently, it is my opinion that of the **$43,401.44** claimed as past medical expense damages, **$38,594.44** were identified as being clinically related to Ms. Rothchild's claimed conditions. A table summary of my conclusions below:

| | **Total charges ($)** | **Charges clinically unrelated to claimed conditions ($)** | **Clinically related charges ($)** |
|---|---|---|---|
| Washington University Physicians – St. Louis | $7,592.00 | $0 | $7,592.00 |
| CVS Pharmacy | $924.29 | $0 | $924.29 |
| Walgreens Pharmacy | $315.67 | $0 | $315.67 |
| St. Lukes Hospital | $32,619.48 | $4,807.00 | $27,812.48 |
| Barnes-Jewish Hospital | $1,950.00 | $0 | $1,950.00 |
| **TOTAL** | **$43,401.44** | **$4,807.00** | **$38,594.44** |

**Detailed Review of Claimed Medical Expense Damages**

[23] Kristin Andruska, MD. Ph.D. Report, p. 64, Report in Rothchild v. United States, 7:23-cv-858, Feb. 7, 2025.

During my review of the past medical expenses identified by the Plaintiff's expert, Marjorie Hackett-Wallace, I concluded that **$4,807.00** of the claimed damages were clinically unrelated to Ms. Rothchild's claimed conditions. I have included a general explanation of why particular categories of charges were clinically unrelated to Ms. Rothchild's claimed conditions.

The categories of medical treatment that Ms. Rothchild received that were clinically unrelated to her Parkinson's disease include:

- Medical Care at St. Lukes Hospital around March 9, 2022. Ms. Rothchild presented with abdominal pain and her work-up (including laboratory, imaging, intravenous antibiotics and professional services) revealed a diagnosis of diverticulitis. There is one claim for the visit that appear related to Ms. Rothchild, because the provider obtained imaging to see if Ms. Rothchild's Parkinson's disease was part of the problem.[24]

My claim-level determinations regarding clinical relatedness for the asserted past medical damages are contained in full in **Appendix G**.

**Summary of Government Offset Payments**

Assuming the specific causation opinions from the Plaintiff's expert, Dr. Andruska, are correct, the United States provided and/or paid for medical care in relation to Ms. Rothchild's Parkinson's disease. This medical care was paid for by CMS/Medicare. Ms. Rothchild is not a Veteran and does not appear to have been a beneficiary of the VHA, CCN, or TRICARE. However, there is data that Ms. Rothchild is a Medicare beneficiary. In reviewing the data provided by CMS/Medicare,[25] I have determined that the following are amounts of clinically-related payments and benefits towards Plaintiff's claimed conditions:

| Payment Source | Government Payments ($) |
|---|---|
| **CMS / Medicare** | $72,276.03 |
| **Total** | **$72,276.03** |

My claim-level determinations regarding clinical relatedness for government offset payments made on behalf of Ms. Rothchild with supporting notations are contained in full in **Appendix F**.

**Summary of Veteran's Service-Connected Disability Determinations**

Ms. Rothchild is not a Veteran and is not a recipient of any disability awards from the VBA.

**Conclusions**

[24] 00858_ROTHCHILD_0000001760 - 02744

[25] CLJA_CMS_0000000134

To summarize my opinions relating to Ms. Rothchild's past medical treatment, after a review of the corresponding medical bills and records, I concluded that of the $43,401.44 claimed as past medical damages by the Plaintiff's expert, Marjorie Hackett-Wallace, $4,807.00 was clinically unrelated and $38,584.44 was clinically related to Ms. Rothchild's Parkinson's disease and clinically related conditions. Additionally, the total amount the United States government – via CMS/Medicare – paid for Ms. Rothchild's Parkinson's disease and clinically related conditions amounts to $72,276.03.

## APPENDIX D

### Plaintiff: Robert Welch

**Overview of Case**
The Plaintiff's expert, Dr. Heidi Schwarz, opines that "Mr. Welch's Parkinson's disease is at least as likely as not due to his exposure to TCE at Camp Lejeune." Schwarz *Welch* Report,[26] p. 2. Mr. Welch's Parkinson's disease was diagnosed in or around November 2021. Assuming the conclusions from the plaintiff's expert are correct for purposes of my damages opinions, charges related to medical care that is directed towards the management, monitoring, and treatment of Parkinson's disease and alleged symptoms are considered related. Charges for the management, monitoring, and treatment of other medical conditions or pre-existing medical conditions are considered unrelated.

**Summary of Past Medical Expense Damages**
The Plaintiff's expert, Marjorie Hackett-Wallace, identified certain past medical expenses of Mr. Welch as past medical damages in the amount of **$5,155.92**. Of the amounts claimed as past medical damages, I determined in my review of the medical and billing records that **$0** of the claimed charges were clinically unrelated to Mr. Welch's claimed conditions. Consequently, it is my opinion that of the **$5,155.92** claimed as past medical expense damages, **$5,155.92** were identified as being clinically related to Mr. Welch's claimed conditions. A table summary of my conclusions below:

| | **Total charges ($)** | **Charges clinically unrelated to claimed conditions ($)** | **Clinically related charges ($)** |
|---|---:|---:|---:|
| San Juan Capistrano Medical Office / Kaiser Permanente | $5,155.92 | $0 | $5,155.92 |
| **TOTAL** | **$5,155.92** | **$0** | **$5,155.92** |

**Detailed Review of Claimed Medical Expense Damages**
My determinations regarding clinical relatedness for the asserted past medical damages are contained in full in **Appendix G**.

**Summary of Government Offset Payments**
I have reviewed data pertaining to medical care provided by and/or paid by the VHA and TRICARE for Mr. Welch. I have determined that none of the currently-provided data was clinically related to Mr. Welch's Parkinson's disease.

[26] Heidi Schwarz, MD, FAAN, p. 2, 9, Report in Welch v. United States, 7:23-cv-1503, Feb. 7, 2025.

**Summary of Veteran's Service-Connected Disability Determinations**

In reviewing the VBA provided data,[27] I have identified that the VBA has provided disability payments to Plaintiff for certain claimed conditions. I have identified those conditions below and determined whether the service-connected conditions receiving disability payments are clinically related to Plaintiff's claimed conditions:

| Disability Diagnosis - Robert Welch | Related to the claimed conditions |
|---|---|
| Cognitive Impairment associated with Parkinson's disease | Y |
| Degenerative Disc Disease, Lumbar spine | N* |
| Degenerative Joint Disease, cervical spine and thoracic spine | N* |
| Parkinson's Disease | Y |
| Right Upper Extremity Muscle Rigidity and Stiffness | Y |
| Tinnitus | N |
| Speech changes | Y |
| Minimal degenerative arthritis, bilateral hips | N* |
| Patellofemoral pain syndrome, left knee | N* |
| Patellofemoral pain syndrome, right knee | N* |
| Left shoulder impingement syndrome | N* |
| Right shoulder impingement syndrome* | N* |
| Gastrocnemius equines with talonavicular joint disease, right ankle | N* |
| Gastrocnemius equines with talonavicular joint disease, left ankle | N* |
| Plantar calcaneal spurs with plantar fasciitis and pes planus, left foot | N* |
| Plantar calcaneal spurs with plantar fasciitis and pes planus, right foot | N* |
| Gastroesophageal Reflux Disease (GERD) | N* |
| Cephalgia | N* |

* These service-connected conditions are pre-existing conditions that pre-dated Mr. Welch's Parkinson's disease diagnosis. While it is possible that these conditions have been exacerbated by Mr. Welch's Parkinson's disease, VBA records and/or medical records show that Mr. Welch already had these conditions and was being compensated by VBA for them prior to his Parkinson's disease diagnosis. Unless otherwise stated, I am not offering an opinion as to whether these conditions did in fact worsen due to Mr. Welch's Parkinson's disease.

Based upon my assessment of Mr. Welch's medical records and related VBA documents, I concluded that certain of Mr. Welch's service-connected conditions are clinically related to Mr. Welch's Parkinson's disease.[28] The conditions identified above as clinically related are conditions typically associated with and caused by Parkinson's disease. The diagnosis of

[27] CLJA_VBA_0000000019

[28] 01503_WELCH_VBA_0000000018-021; 0153_WELCH_VBA_0000000084-088.

Parkinson's disease itself is an identified service-connected condition. Additionally, cognitive impairment, changes in one's speech, and muscle rigidity are well-known symptoms of Parkinson's disease[29] and occurred concurrent or subsequent to his diagnosis of Parkinson's disease.

**Conclusions**

To summarize my opinions relating to Mr. Welch's past medical treatment, after a review of the corresponding medical bills and records, I concluded that of the $5,155.92 claimed as past medical damages by the Plaintiff's expert, Marjorie Hackett-Wallace, $5,155.92 was clinically related to Mr. Welch's Parkinson's disease and clinically related conditions. Additionally, the total amount the United States government has paid for Mr. Welch's Parkinson's disease and clinically related conditions is $0.

---

[29] Rohl A, Gutierrez S, Johari K, Greenlee J, Tjaden K, Roberts A. Speech dysfunction, cognition, and Parkinson's disease. Prog Brain Res. 2022;269(1):153-173. doi: 10.1016/bs.pbr.2022.01.017. Epub 2022 Feb 9. PMID: 35248193; PMCID: PMC11321444.

## APPENDIX E

### Plaintiff: Richard Sparks

**Overview of Case**

The Plaintiff's expert, Dr. Heidi Schwarz, opines that Mr. Sparks' Parkinson's disease is more likely than not due to his exposure to the water at Camp Lejeune containing TCE. Schwarz *Sparks* Report,[30] p. 12. Plaintiff's Parkinson's disease was diagnosed in 2014. Assuming the conclusions from the plaintiff's expert are correct for purposes of my damages opinions, charges related to medical care that is directed towards the management, monitoring, and treatment of Parkinson's disease and alleged symptoms are considered related. Charges for the management, monitoring, and treatment of other medical conditions or pre-existing medical conditions are considered unrelated.

**Summary of Past Medical Expense Damages**

The Plaintiff's expert, Marjorie Hackett-Wallace, identified certain past medical expenses of Mr. Sparks as past medical damages in the amount of **$36,602.89**. Of the amounts claimed as past medical damages, I determined in my review of the medical and billing records that **$3,518.43** of the claimed charges were clinically unrelated to Mr. Sparks' claimed conditions. Consequently, it is my opinion that of the **$36,602.89** claimed as past medical expense damages, **$33,084.46** were identified as being clinically related to Mr. Sparks' claimed conditions. A table summary of my conclusions below:

| | Total charges ($) | Charges clinically unrelated to claimed conditions ($) | Clinically related charges ($) |
|---|---|---|---|
| University of Colorado Health | $29,567.96 | $3,518.43 | $26,049.53 |
| Walgreens (University of Colorado Cancer Center) | $7,034.93 | $0 | $7,034.93 |
| **TOTAL** | **$36,602.89** | **$3,518.43** | **$33,084.46** |

**Detailed Review of Claimed Medical Expense Damages**

During my review of the past medical expenses identified by the Plaintiff's expert, Marjorie Hackett-Wallace, I concluded that **$3,518.43** of the claimed damages were clinically unrelated to Mr. Sparks' claimed conditions. I have included a general explanation of why particular categories of charges were clinically unrelated to Mr. Sparks' claimed conditions.

[30] Heidi Schwarz, MD, FAAN, p. 12, Report in Sparks v. United States, 7:23-cv-682, Feb. 7, 2025.

The categories of medical treatment that Mr. Sparks received that were clinically unrelated to his Parkinson's disease include:

- Medical Care at University of Colorado Hospital around April 6, 2018 involved Mr. Sparks undergoing cardiac stress test for evaluation of dyspnea on exertion and chest pain for patient with significant smoking history as well as oxygen monitoring during stress test.[31]

My claim-level determinations regarding clinical relatedness for the asserted past medical damages are contained in full in **Appendix G**.

**Summary of Government Offset Payments**

Assuming the specific causation opinions from the Plaintiff's expert, Dr. Schwarz, are correct, the United States provided and/or paid for medical care in relation to Mr. Sparks' Parkinson's disease. This medical care was paid for by the VHA. In reviewing the data provided by the VHA,[32] I have determined that the following are amounts of clinically-related payments and benefits towards Plaintiff's claimed conditions:

| Payment Source | Government Payments ($) (with VHA total cost payments) | Government Payments ($) (with VHA direct cost payments) |
|---|---|---|
| **VHA** | $18,891.03 | $10,122.04 |
| **Total** | **$18,891.03** | **$10,122.04** |

My claim-level determinations regarding clinical relatedness for government offset payments made on behalf of Mr. Sparks with supporting notations are contained in full in **Appendix F**.

**Summary of Veteran's Service-Connected Disability Determinations**

In reviewing the VBA provided data,[33] I have identified that the VBA has provided disability payments to Plaintiff for certain claimed conditions. I have identified those conditions below and determined whether the service-connected conditions receiving disability payments are clinically related to Plaintiff's claimed conditions:

[31] 00682_Sparks_0000002124, 2347
[32] CLJA_VHA_0000000006
[33] CLJA_VBA_0000000019

| Disability Diagnosis - Richard Sparks | Related to the claimed conditions |
|---|---|
| Left wrist sprain, secondary to Parkinson's disease | Y |
| Balance impairment secondary to Parkinson's disease | Y |
| Bilateral eye diplopia, secondary to Parkinson's disease | Y |
| Neurocognitive and depressive disorder secondary to Parkinson's disease | Y |
| Obstructive sleep apnea secondary to Parkinson's | Y |
| Right wrist sprain, secondary to Parkinson's disease | Y |
| Seborrheic keratosis with actinic keratosis, secondary to Parkinson's disease | Y* |
| Speech changes, left secondary to Parkinson's disease | Y |
| Speech changes, right secondary to Parkinson's disease | Y |
| Stooped posture secondary to Parkinson's disease | Y |
| Tremor, muscle rigidity, and bradykinesia, left lower extremity secondary to Parkinson's disease | Y |
| Tremor, muscle rigidity, and bradykinesia, left upper extremity secondary to Parkinson's disease | Y |
| Tremor, muscle rigidity, and bradykinesia, right lower extremity secondary to Parkinson's disease | Y |
| Tremor, muscle rigidity, and bradykinesia, right upper extremity with Parkinson's disease | Y |

*Although my opinion is that I am unable to determine whether Plaintiff's seborrheic keratosis with actinic keratosis is clinically related to Mr. Sparks' Parkinson's disease, he specifically received disability benefits for this service-connected condition as associated with his Parkinson's disease as related to his alleged exposure to Camp Lejeune water. I am not offering a medical opinion that Mr. Sparks' seborrheic keratosis is clinically related or caused by his alleged exposure to water at Camp Lejeune. I am mentioning it here because the VBA has been making disability payments for this condition based upon it being secondary to Mr. Sparks' diagnosis of Parkinson's disease.

Based upon my assessment of Mr. Sparks' medical records and related VBA documents, I concluded that certain of Mr. Sparks' service-connected conditions are clinically related to Mr. Sparks' Parkinson's disease. The conditions identified above as clinically related are conditions typically associated with and caused by Parkinson's disease.[34] For instance, cognitive impairment, stooped posture, changes in one's speech, tremors, impaired balance, falls and related sprains, and muscle rigidity are well-known symptoms of Parkinson's disease and occurred concurrent or subsequent to his diagnosis of Parkinson's disease. Similarly, depression has been shown to occur in some Parkinson's disease patients, and the VBA has made a determination that Mr. Sparks' depressive disorder is secondary to his

[34] 00682_SPARKS_VBA_0000000419-0428; 00682_SPARKS_VBA_0000000435-0472; 00682_SPARKS_VBA_0000000364-0368.

Parkinson's disease. Furthermore, both obstructive sleep apnea[35] and diplopia (double vision) were noted and occurred subsequent to his diagnosis of Parkinson's disease.

**Conclusions**

To summarize my opinions relating to Mr. Sparks' past medical treatment, after a review of the corresponding medical bills and records, I concluded that of the $36,602.89 claimed as past medical damages by the Plaintiff's expert, Marjorie Hackett-Wallace, $3,518.43 was clinically unrelated and $33,084.36 was clinically related to Mr. Sparks' Parkinson's disease and clinically related conditions. Additionally, the total amount the United States government – via VHA – paid for Mr. Sparks' Parkinson's disease and clinically related conditions amounts to $18,891.03 when accounting for VHA's total costs and $10,122.04 when accounting for VHA's total direct costs.

[35] Mack J, Marsh L. Parkinson's Disease: Cognitive Impairment. Focus (Am Psychiatr Publ). 2017 Jan;15(1):42-54. doi: 10.1176/appi.focus.20160043. Epub 2017 Jan 11. PMID: 31975839; PMCID: PMC6519621.

# APPENDIX F

Collection of Past Medical Offset Determinations

Attached in Native Form

**APPENDIX G**

Collection of Past Medical Damages Determinations

Attached in Native Form

## APPENDIX H

Plaintiff-Specific Records in Support of Opinions

The collection of past medical records referenced and replied upon in my report and Appendices F and G are included in in the following bates-numbered documents.

| **McElhiney Past Medical Damages and Offsets Records** |
| --- |
| VA Records: 01368_MCELHINEY_VA_0000000001 – 01368_MCELHINEY_VA_0000005073 |
| VBA Records: 01368_MCELHINEY_VBA_000000001 – 01368_MCELHINEY_VBA_0000010228 |
| VHA Records: 01368_MCELHINEY_VHA_0000000001 – 01368_MCELHINEY_VHA_0000003519 |
| Additional Medical Records: 01368_MCELHINEY_HUFFNAGLE_0000000001 – 01368_MCELHINEY_HUFFNAGLE_0000000250 |
| Additional Medical Records: 01368_MCELHINEY_VANDERBILT_0000000001 – 01368_MCELHINEY_VANDERBILT_00000000376 |
| Additional Medical Records: 01368_MCELHINEY_SHERWOOD_0000000001 – 01368_MCELHINEY_SHERWOOD_0000000162 |
| Additional Medical Records: 01368_MCELHINEY_DICKSON_0000000001 – 01368_MCELHINEY_DICKSON_0000000525 |
| Plaintiff-Produced Medical Records: 01368_MCELHINEY_0000000001 – 01368_MCELHINEY_0000001402 |

| **Peterson Past Medical Damages and Offsets Records** |
| --- |
| VBA Records: 01576_PETERSON_VBA_0000000001 – 01576_PETERSON_VBA_0000001681 |
| VHA Records: 01576_PETERSON_VHA_0000000001 – 01576_PETERSON_VHA_0000000249 |
| Methodist Le Bonheur Healthcare: 01576_PETERSON_MH_ 0000000001 - 01576_PETERSON_MH 0000001138 |
| Baptist Memorial Hospital Records: 01576_PETERSON_BMH_0000000001 – 01576_PETERSON_BMH_000001080 |
| Additional Medical Records (Dr. Bertorini): 01576_PETERSON_DRBERTORINI_0000000001 – 01576_PETERSON_DRBERTORINI_0000000109 |
| Additional Medical Records (HealthMark Group): 01576_PETERSON_HM_0000000001 – 01576_PETERSON_HM_0000000178 |
| Lakeside BHS: 01576_PETERSON_LAKESIDE_0000000001 – 01576_PETERSON_LAKESIDE_0000000104 |
| The Sanders Clinic: 01576_PETERSON_SC_0000000001 – 01576_PETERSON_SC_0000000017 |
| Semmes Murphey Clinic: 01576_PETERSON_SMC_0000000001 – 01576_PETERSON_SMC_0000000391 |
| Additional Medical Records: 01576_PETERSON_MEDRECS_0000000001 – 01576_PETERSON_MEDRECS_0000000273 |

| Rothchild Past Medical Damages and Offsets Records |
| --- |
| Medical Records: 00858_ROTHCHILD_STL_0000000001 – 00858_ROTHCHILD_STL_0000010961 |
| Barnes-Jewish Hospital Records: 00858_ROTHCHILD_BJH_0000000001 – 00858_ROTHCHILD_BJH_0000000679 |

| Welch Past Medical Damages and Offsets Records |
| --- |
| VBA Medical Records: 01503_WELCH_VBA_0000000001 – 01503_WELCH_VBA_0000009542 |
| VHA Medical Records: 01503_WELCH_VHA_0000000001 – 01503_WELCH_VHA_0000000615 |
| Kaiser Permanente Medical Records: 01503_WELCH_KAISER_0000000001 – 01503_WELCH_KAISER_0000005238 |
| Additional Medical Records: 01503_WELCH_MEDRECS_0000000001 – 01503_WELCH_MEDRECS_0000006249 |

| Sparks Past Medical Damages and Offsets Records |
| --- |
| VBA Records: 00682_SPARKS_VBA_0000000001 – 00682_SPARKS_VBA_0000021130 |
| VHA Records: 00682_SPARKS_VHA_0000000001 – 00682_SPARKS_VHA_0000001414 |
| 0682_SPARKS_LEEHEY_0000000001 -0682_SPARKS_LEEHEY_0000000165 |
| UCHEALTH Medical Records: 00682_SPARKS_UCH_0000000001 – 00682_SPARKS_UCH_0000003350 |

## **APPENDIX I**

Dr. Syed A. Hasan CV / Resume

# Syed Ashraf Hasan

Ash_hasan@hotmail.com • Calabasas, CA • 6262784500

## Summary of Executive Experience

Regal Medical Group | Northridge, CA

February 2006– Current

During my tenure at Regal Medical Group, I progressed from the role of Hospitalist to Regional Medical Director and was subsequently promoted to Chief Medical Officer (December 2012), reflecting my commitment to leadership and excellence in healthcare management. I have extensive experience in clinical practice, healthcare leadership, and administrative oversight, specializing in Utilization Management (UM) and Prior Authorization. Proven track record in improving patient care quality, implementing clinical protocols, and leading multidisciplinary teams in high-pressure environments.

- Hospitalist Program
  - Oversee a team of 75 hospitalists, training and managing the team in clinical pathways to ensure seamless inpatient care delivery across multiple facilities.
  - Serve as a clinical liaison between hospital administration, nursing staff, and specialists, resolving escalation issues and improving interdisciplinary communication.
  - Monitor key performance indicators (e.g., readmission rates, patient satisfaction, LOS, clinical documentation), achieving improvement in quality metrics through targeted interventions.
  - Train and mentor hospitalists and nurse practitioners, fostering professional development and maintaining high standards of care deliver
- Utilization Management & Prior Authorization:
  - Developed and managed UM programs to ensure appropriate use of medical resources, reducing unnecessary treatments while maintaining high standards of patient care.
  - Implemented training programs for medical staff on UM and Prior Authorization policies to enhance procedural understanding and compliance. Employed and trained nurses to assist with complex case review and understanding contracts and utilization appropriate place of service.
  - Created a specialty grid for tertiary services in a community setting that was shared within the organization. Prevented unnecessary referrals to tertiary centers.
- Leadership and Operations:
  - Directed strategic initiatives to align clinical operations with organizational goals, achieving an increase in patient satisfaction scores.
  - Collaborated with cross-functional teams to enhance care delivery models, focusing on value-based care initiatives.
- Inpatient Utilization Management

- Collaborate with case management teams to optimize inpatient care transitions, reducing readmission rates and saving in annual costs.
- Implemented utilization training for hospitalists ensuring appropriate utilization of observation status.
- Collaborated with case management teams to eliminate avoidable hospital days per month, improving bed turnover rates.
- Lead daily rounds, overseeing treatment of high acuity cases and providing necessary insight regarding appropriate transitions of care.

- HCC Coding
  - Direct HCC coding initiatives, improving risk adjustment scores through physician education and documentation audits, resulting in enhanced reimbursement accuracy.
  - Conducted HCC coding reviews, identifying documentation gaps and increasing RAF (Risk Adjustment Factor) scores.
  - Utilization of Nurse Practitioners to improve HCC coding for Medicare Advantage patients in the inpatient setting as well post-acute care.
- Quality and Compliance:
  - Ensured adherence to regulatory standards including CMS, HIPAA, and state health regulations.
  - Spearheaded quality improvement projects that resulted in a 25% reduction in hospital readmissions.
  - Ensure regulatory compliance with CMS and state-specific mandates.
  - Analyze quality metrics (e.g., HEDIS, CMS Star Ratings), achieving [X]% improvement in key performance indicators like readmission rates
- Hospitalist
  - Rounding daily and taking night and weekend call to ensure optimal care delivery.
  - Oversee a team of 75 hospitalists
  - Collaborated with multidisciplinary teams, including case managers and specialists, to coordinate care plans, reducing average length of stay, minimizing readmissions, and referrals to the appropriate post-discharge team to lower readmits and provide a seemless transition of care.
  - Conducted patient admissions and discharges daily, ensuring timely and accurate documentation in [EMR system, e.g., Epic] to support medical necessity and billing.
- High Risk Program
  - Evaluate and manage care plans for high-risk patients monthly, focusing on chronic disease management, readmission prevention, and cost containment.
  - Conduct detailed chart reviews to assess risk stratification (e.g., HCC coding), improving risk adjustment scores.
  - Collaborate with care coordinators to design interventions for high-utilizers, reducing emergency visits and inpatient admissions.
  - Develop protocols for early identification of at-risk patients, shortening time-to-intervention and improving patient outcomes.
  - Serve as a clinical resource for case managers and outpatient providers, offering expertise on complex comorbidities and care transitions.
- Professional Contracting
  - Develop and execute physician contracts in various specialties
  - Optimize contracts to align goals and incentives

Apollomed Hospitalists | Glendale, CA

January 2005 – March 2006

- At Apollomed Hospitalists, I started as a hospitalist and progressed to Chief Hospitalist working with different medical groups and programs. My work as a hospitalist was what set the stage for my professional and personal growth. I held the following positions at Apollomed: Chief Hospitalist, Glendale Adventist Medical Center: Glendale Physician Alliance
  Chief Hospitalist, Glendale Adventist Medical Center: Safety Net Access Program
  Chief Hospitalist, Glendale Adventist Medical Center: GAMC Employee Program
  Chief Hospitalist, Glendale Adventist Medical Center: Family Care Specialists
  Chief Hospitalist, Glendale Adventist Medical Center: Lakeside Medical Group
  Hospitalist, Glendale Adventist Medical Center: Regal Medical Group, La Vida IPA
  Hospitalist, St. Joseph's Medical Center: Regal Medical Group, La Vida IPA
  - Delivered comprehensive inpatient care to a 25 patient daily census, managing acute conditions and coordinating with specialists to optimize outcomes.
  - Implemented evidence-based protocols, decreasing unnecessary testing and enhancing resource efficiency without compromising quality.
  - Collaborated with multidisciplinary teams, achieving reduction in readmissions through effective care transitions.
  - Collaborate with utilization management to align inpatient care with payer requirements, securing authorization approvals
  - Maintained compliance with Joint Commission and CMS standards, achieving 100% audit pass rate for clinical documentation.

## Clinical Training

Keck USC School of Medicine/ Huntington Memorial Hospital/

Resident in Internal Medicine, Pasadena, CA 91109

California Medical License #A84932, DEA: BH8582226

June 2000-December 2004*

*Additional year of clinical research in hepatitis B and C treatment

## Education

University of Vermont, College of Medicine

May 2000 M.D. Degree

- **Honors** in Psychiatry, Pathology, Cardiology AI
- Extramural: Orthopedic Surgery and Hepatology

University of California, Los Angeles: School of Public Health

1996 M.P.H. Epidemiology

- GPA 3.86
- 1995, 1996 – Dean's List

## Education

University of California, Los Angeles

1993 B.S. Degree Biochemistry

- 1992 – Student Research Project Award
- 1992, 1993 – Dean's List
- 1994 – Coach of the Year: UCLA Special Olympics

## Research Experience/Publications

- "Immunopathologic Features of *Staphylococcus epidermidis-induced* endophthalmitis in the rat."
- Ravindranath RM, **Hasan SA,** Mondino BJ, *Current Eye Research,* 16(10):1036-1043, 1997 "Role of Naturally Occurring IgM Antibodies in Staphylococcal Endophthalmitis in Rats."
- Ravindranath, RM, **Hasan SA,** et al., Investigative Ophthalmology and Visual Science,
- 37(3):3204-3212, 1996
- "Immune Response to S. aureus Endophthalmitis in the Rat." Ravindranath RM, **Hasan SA,** Adamu SA, Mondino *BJ,Associationfor Research in Vision and Ophthalmology* Symposium, 1995 "Immunopathological Features of *Staphylococcus aureus* Endophthalmitis in the Rat." Ravindranath,
- RM, **Hasan SA,** et al., *Investigative Ophthalmology and Visual Science,36(* 12):2482-91, 1995 Grant from Foundation for HIV Research: "Sensitivity and Specificity of L.A. Free Clinics in
- Reporting HIV Status: An impetus for home testing. 1996.

## Skills

- Clinical Governance
- Utilization Management (UM)
- Prior Authorization Processes
- Healthcare Leadership
- Quality Improvement
- Strategic Planning
- Regulatory Compliance
- Patient Care Management

## Litigation Experience

- *HCA v. Regal Medical Group*, California State Court [Deposition, 2025]