# Exhibit 877

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:23-CV-897

-----------------------------

IN RE:
CAMP LEJEUNE WATER LITIGATION

This Document Relates to:
ALL CASES

-----------------------------

REMOTE VIDEO-RECORDED EXPERT DEPOSITION OF
ANDREW MCILROY

Tuesday, February 24, 2026
9:01 AM Eastern Time

JOB NO.: 7887232
Reported by: Denise Dobner Vickery, CRR, RMR

Tuesday, February 24, 2026
9:01 AM Eastern Time

Remote Video-Recorded Expert Deposition of Andrew McIlroy, held in the location of the witness in Washington, DC.

Pursuant to notice, before Denise Dobner Vickery, Certified Realtime Reporter, Registered Merit Reporter, and Notary Public in and for the District of Columbia.

REMOTE APPEARANCES:

Representing the Plaintiffs Leadership Group:
WEITZ & LUXENBERG
BY: BENJAMIN BARTON VANSLYKE, ESQ.
Fisher Building
3011 West Grand Boulevard, 24th Floor
Detroit, MI 48202
313.800.4170
BVanslyke@weitzlux.com

Representing the Plaintiffs Leadership Group:
WALLACE & GRAHAM, PA
BY: WHITNEY WALLACE, ESQ.
525 N. Main Street
Salisbury, NC 28144
704.633.5244
wwallace@wallacegraham.com

REMOTE APPEARANCES: (Continued)

Representing the United States of America:

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, TORTS BRANCH
BY: WILLIAM V. KLOTZBUCHER, ESQ.
BY: MICHAEL W. CROMWELL, ESQ.
1100 L Street NW, Room 4055
Washington, DC 20005
202.532.5193
william.v.klotzbucher@usdoj.gov
Michael.W.Cromwell@usdoj.gov

VIDEOGRAPHER: DAVID LANE

INDEX


| EXAMINATION OF ANDREW MCILROY | PAGE |
|---|---|
| BY MR. VANSLYKE | 9 |
| AFTERNOON SESSION | 128 |


MCILROY DEPOSITION EXHIBITS

(Attached to transcript.)


| NUMBER | | PAGE |
|---|---|---|
| EXHIBIT 1 | Plaintiffs' Notice of Deposition of Andrew McIlroy | 13 |
| EXHIBIT 2 | United States' Responses and Objections to Plaintiffs' Notice of Deposition and Subpoena for the Production of Documents to Andrew McIlroy | 16 |
| EXHIBIT 3 | Curriculum Vitae of Andrew McIlroy and SES Position Description CLJA_USA_MCILROY_0000000001 - 09 | 17 |
| EXHIBIT 4 | VA OIG Office of Audits and Evaluations - "Review of VA's $2.9 Billion Supplemental Funds Request for FY2024 to Support Veterans' Benefits Payments" March 27, 2025 | 41 |
| EXHIBIT 5 | Military.com - "VA Asks for | 44 |

| | | |
|---|---|---|
| | Historic $4.1 Billion for Construction as Agency Weighs Closing Some Aging Medical Facilities" March 13, 2023 | |
| EXHIBIT 6 | Rand Corp. - Planning, Programming Budgeting, and Execution in Comparative Organizations, Volume 6 Additional Case Studies of Selected Non-DoD Federal Agencies | 47 |
| EXHIBIT 7 | The United States' Second Disclosure Of Expert Testimony For Phase III Pursuant to FED.R. CIV.P. 26(a)(2) and D.E. 630 | 51 |
| EXHIBIT 8 | VA FY2026 Budget Submission Budget in Brief May 2025 BiB-1 - BiB-49 | 69 |
| EXHIBIT 9 | CBO - Options for Reducing the Deficit: 2025 to 2034, December\|2024 | 114 |
| EXHIBIT 10 | Statement Of The Honorable Douglas A. Collins, Secretary Of Veterans Affairs, Department Of Veterans Affairs (VA) Before The Committee On Veterans' Affairs United States House of | |

Representatives On Opportunities
With VHA Reorganization
February 11, 2026, Pages 1-4

EXHIBIT 11 Financial Policy Documents 162
2/24/26 Volume VI - Liabilities
Chapter 06 - Federal Employees'
and Veterans' Benefits Liabilities

P R O C E E D I N G S

- - -

THE VIDEOGRAPHER: We are now on the record.

My name is David Lane, videographer for Golkow, a Veritext division.

Today's date is February 24, 2026. Our time on the record is 9:01 AM Eastern Time.

This remote video deposition is being held in the matter of Camp Lejeune Water Litigation.

Our deponent today is Andrew McIlroy.

All parties to this deposition are appearing remotely and have agreed to the witness being sworn in remotely. Due to the nature of remote reporting, please pause briefly before speaking to ensure all parties are heard completely.

Counsel will be noted on the stenographic record.

The court reporter today is

Denise Vickery and will now swear in the witness.

\- - -

ANDREW MCILROY

called for examination, and, after having been duly sworn, was examined and testified as follows:

THE VIDEOGRAPHER: Please begin.

\- - -

EXAMINATION

\- - -

BY MR. VANSLYKE:

Q. Good morning.
A. Good morning.

MR. VANSLYKE: This is Ben VanSlyke from Weitz & Luxenberg on behalf of the Plaintiffs Leadership Group.

Bill, do you want to make an appearance?

MR. KLOTZBUCHER: Right. This is -- my name is William Klotzbucher. I'm with my colleague Michael Cromwell. We're with the U.S. Department of Justice

representing the Defendant.

MR. VANSLYKE: Thank you.

And I see we have Whitney Wallace from Wallace & Graham on behalf of the Plaintiffs as well.

BY MR. VANSLYKE:

Q. Mr. McIlroy, can you please state your full name for the record?

A. Andrew McIlroy.

Q. And have you ever been deposed before?

A. I have not.

Q. Do you understand what a deposition is?

A. I do.

Q. Do you understand that you're under oath today?

A. I do.

Q. As we move through this deposition, I will be asking you a series of questions. If at any point I ask you a question that you do not understand, please let me know and I will rephrase the question. Okay?

A. Very good.

Q. All right. And if at any point today you would like a break, I will ask that you please answer any question that's pending, but other than that, we could take a break at any time. Okay?

A. Understand.

Q. Are you represented by counsel today?

A. DOJ, yes, is here with me.

Q. Do I understand correctly that you do not have a VA counsel with you today?

A. I do not.

Q. And has the DOJ counsel worked with you in coordinating this deposition?

A. They have.

Q. Without telling me anything that was discussed, did you meet with your counsel from DOJ to prepare for this deposition?

MR. KLOTZBUCHER: Answer -- objection. Only you can only answer without discussing the substance of any conversation, but you may continue.

THE WITNESS: He told me the time and kind of the nature of a

deposition.

BY MR. VANSLYKE:

Q. Did you review any documents in preparing for today's deposition?

A. Yes, like the deposition document or something.

Q. Is it fair to say that you reviewed the procedural documents related to this deposition?

A. Yes.

Q. Did you review any other documents in preparing for today's deposition?

A. No.

Q. I'm going to place in chat the notice of deposition.

So, Mr. McIlroy, when I introduce documents today, I'm going to place them in this chat for everybody to have access. That includes the court reporter and your counsel and it also includes you.

Can you please confirm that you can open that document that I just placed in chat?

A. It's file _01?

Q. Correct.

MR. VANSLYKE: And I will mark this document as Exhibit 1.

(Document marked for identification as McIlroy Exhibit 1.)

BY MR. VANSLYKE:

Q. Can you see that document, Mr. McIlroy?

A. One moment.

Yes, I have it in front of me now.

Q. Okay. So throughout the deposition I will also screen share documents for convenience, but I wanted to confirm that you can access it and please at any point feel free to pull up the document yourself and review it as you wish. Okay?

A. Okay.

Q. I am now screen sharing Exhibit 1.

And do you see that this is the Plaintiffs' Notice of Deposition of Andrew McIlroy?

A. I do.

Q. I will scroll so you can briefly review the document.

And, Mr. McIlroy, have you seen this

notice before?
A. Scrolling. Yes, I have.
Q. Did you scroll all the way through the document?
A. You are on what page? Page?
Q. I'm currently on page 2, but I'm trying to make sure I'm keeping up with you.
A. I'm on --
Q. So if we keep scrolling.
A. Okay.
Q. Apologies for speaking over you.
If you keep scrolling, you can see there's a certificate of service followed by the subpoena, and after the subpoena, there is Attachment A. And further down in Attachment A, there is a Requests For Documents. Or Requests For Production.
So, Mr. McIlroy, have you seen this document before?
A. Yes.
Q. Thank you.
And did you review these Requests For Production?
A. Yes.

Q. And did you produce any materials in response to these Requests For Production?
A. A resumé and job description.
Q. I will represent to you that we received those two documents.
Is that the entirety of the documents that you have produced in response to these Requests For Production?
A. Yes.
Q. Thank you.
I'll go ahead and stop sharing.
Are you aware that DOJ provided us with a written response to those Requests For Production?
A. Yes.
Q. Have you reviewed that response?
A. Yes.
MR. VANSLYKE: I will now place that response in the chat, and I will mark as Exhibit 2 the United States' Responses and Objections to Plaintiffs' Notice of Deposition and Subpoena For the Production of Documents to Andrew McIlroy.

(Document marked for identification as McIlroy Exhibit 2.)
BY MR. VANSLYKE:
Q. And I will go ahead and share my screen.
Mr. McIlroy, does this appear to be the response that you indicated you had reviewed?
A. Yes.
Q. Would you like to review this further?
A. I have it on my screen now. I'm reviewing it.
Q. Okay. Please feel free to review and let me know when you finished.
A. (Reviews document.)
Okay.
Q. And now that you finished reviewing, do you still believe this is the response that you indicated you had reviewed?
A. Yes.
MR. VANSLYKE: Thank you.
I will stop sharing.
And I am placing in chat what I will mark as Exhibit 3, which I will

represent to you are the two documents
that we discussed being produced to us,
your CV and job description.
(Document marked for
identification as McIlroy Exhibit 3.)
BY MR. VANSLYKE:
Q. Mr. McIlroy, will you please review that document and confirm that these are the CV and job description that you produced.
A. (Reviews document.)
Yes, that is.
Q. Thank you.
So I'm starting on the first page here and this is your current CV, correct?
A. Yes.
Q. Is there anything within your CV that you believe requires updating?
A. No.
Q. So I'm just going to quickly walk through some of the items on here.
I'm going to scroll down to your education.
So I see that you have a BA in history from St. Olaf College, correct?

A. Correct.
Q. And that was in 1990?
A. Correct.
Q. And then you have a Master of Arts in History from the University of Akron in 1993?
A. Correct.
Q. And you have a Master of Science in Public Policy and Public Management from Carnegie Mellon's Heinz School in 1997, correct?
A. Correct.
Q. So it looks to me like your academic background includes both history and budget or policy training; is that correct?
A. Yes.
Q. And would you say that that gives you a perspective on how federal programs evolve over time?
A. It does. It has, yes.
Q. So you started your career at the Office of Management and Budget in 2001?
A. Correct.
Q. And starting then you were analyzing budget requests and funding recommendations?
A. That is correct.

Q. And this included developing budget plans, correct?
A. Yes.
Q. And then it looks like you worked in that position until July of 2006?
A. Correct.
Q. And from there you moved to a deputy budget officer position at the FBI in July 2006?
A. Yes.
Q. And in this role, you were still working with federal government budgets, correct?
A. Yes.
Q. And in this role, you were supervising staff within the budget office?
A. Yes.
Q. And you were still working on preparing budget options; is that correct?
A. Yes.
Q. And you were also reporting and auditing on budgets?
A. Yes.
Q. I see here in this first bullet point that it says you improved budget justification material; is that correct?

A. Yes.
Q. Can you briefly describe for me what that means?
A. So budgeting is really about describing where you get the money, what you get for the money, and to the extent that you are able to better explain the benefits of spending additional money, that can often lead to an increased budget. So I think that's what's happened there.
At the FBI we demonstrated the value of increased funding for more FBI agents, specifically around counterterrorism, counterintelligence, and financial crimes as well as cyber intrusions.
Q. So am I understanding correctly that the budget justification material is essentially that you have identified a need for funding and you have prepared a justification for why that funding is needed; is that correct?
A. That is correct.
Q. I will keep scrolling up here, and I see that in June 2011 you moved to the role of deputy director of the Office of Budget and

Program Performance with Immigration & Customs Enforcement; is that correct?

A. Yes.

Q. And in this role, you were still leading staff within the budget office; is that correct?

A. Yes.

Q. And I see here it says:

"Served on advisory committee for analysis of alternatives for the selection of a new financial system."

Did I read that correctly?

A. You did.

Q. Could you briefly describe for me the role of serving on an advisory committee?

A. So at that time, ICE had a very old proprietary financial system and it was not in compliance with the then-current requirements for federal -- federal financial management systems. So we looked at a variety of options, and ultimately I think we settled on using a service provided by Department of Transportation at the time.

Q. Do I understand correctly that your

role was essentially to serve as a subject matter expert and provide information to somebody else who was the decision-maker?

A. Yes, that is accurate.

Q. And then in -- excuse me.

In December of 2013, I see you moved to a director role within the Office of Budget at the Office of Energy Efficiency & Renewable Energy within the Department of Energy; is that correct?

A. That is correct.

Q. And in this role, you were still supervising other staff within the budget office?

A. Correct.

Q. And I see in this first line it says that you "directed staff of 20 in budget formulation and execution as budget director"; is that correct?

A. Yes.

Q. So I know in the previous roles we have discussed essentially that you have prepared budget requests.

Is that different in any way from budget formulation?

A. They are essentially the same.

Q. Thank you.

And then in July of 2016, you moved to the budget director role within the Farm Service Agency at the Department of Agriculture?

A. Correct.

Q. And I see again "led staff of 30 to prepare and execute a budget," correct?

A. Yes.

Q. So other than the change in staff, that component of this role is similar to the previous one?

A. Similar --

MR. KLOTZBUCHER: Objection to form.

You may answer. Sorry to talk over you, Mr. McIlroy.

THE WITNESS: You can rephrase or.

BY MR. VANSLYKE:

Q. I see at this role as well you were leading other staff in the budget office, correct?

A. Correct.

Q. And you were still preparing and executing a budget, correct?

A. Correct.
Q. And while the specific programs that are part of the budget have changed, this part of this role where you are leading staff and preparing and executing a budget was a role that you performed in the previous role, correct?
A. Yes.
Q. And is it fair to say that you have performed similar job functions in each of these roles that we have discussed starting at least at the FBI in 2006?
A. Yes, I have long been responsible for preparing and executing budgets.
Q. Okay. So I am back at the first page of this document.
And it looks like in April of 2019 you began working for the Department of Veterans Affairs; is that correct?
A. Actually, in June of 2018, but there are a series of jobs there.
Q. Ah. Thank you for pointing that out.
I see third line down June of 2018 you began working at the Department of Veterans

Affairs, correct?
A. Correct.
Q. And I see it appears to me that you started as associate deputy assistant secretary for budget?
A. Correct.
Q. And then in March -- I'm sorry.
In April of 2019, you transitioned to deputy assistant secretary for budget?
A. Correct.
Q. And from July of 2024 to December of 2024, you were acting deputy assistant secretary for management and deputy CFO?
A. Correct.
Q. Can you briefly explain to me the difference between the associate deputy assistant secretary for budget role versus the deputy assistant secretary for budget role?
A. So the associate deputy assistant secretary for budgets, or the ADAS, is also a senior executive position within the Office of Budget, but it has responsibility for a smaller scope of the budget.
So as ADAS, I had responsibility for

just a couple components of the Department of Veterans Affairs, and as deputy assistant secretary for budget, I have responsibility for all the components of the Department of Veterans Affairs and the entire budget. So it relates to the span and scope of responsibility.

Q. And am I correct that the deputy assistant secretary for budget would oversee the associate deputy assistant secretary for budget?

A. That is correct.

Q. And can you explain to me the difference between the role of deputy assistant secretary for budget versus the role of acting deputy assistant secretary for management and deputy CFO?

A. So within the last administration and transition to the Trump Administration, our politically appointed CFO left and the deputy CFO became the acting CFO. And I then became the acting deputy CFO for the Department of Veterans Affairs, and the deputy CFO has responsibility not only for budget but also accounting and capital assets, as well as actuarial programs and implementation of the new financial system and

management of our entire financial operations.

Q. Could you briefly describe for me what actuarial analysis means?

A. So we use actuaries for kind of two different things in the Department of Veterans Affairs. One, we use actuaries to estimate health care costs.

So the actuaries working on health care estimates look at the veteran population receiving health care and what we know about kind of the average age of death and the average kind of mortality and health care needs of that veteran population, and they extend those costs out into the future.

And then for benefits, the actuaries again look at essentially mortality of the veteran population to estimate how long veterans will live and, thus, how long they will receive veteran -- how long they will receive benefits out into the future.

Q. It sounds like that is a fairly complicated analysis.

Would you agree?

A. You should ask actuaries to

describe. Yes, it is. It appears complicated.
Q. Do I understand correctly then that you would not hold yourself out as an actuary?
A. I am not an actuary.
Q. Are you capable of performing actuarial analysis?
A. I receive actuarial analysis and I use that in the budget process, but I do not do actuarial analysis.
Q. So in this first bullet point, I see it says that you "led VA staff and leaders through 7 years of successful budget formulation," correct?
A. Correct.
Q. Would you say there has been significant overlap in the job duties of these three job titles that you've held since June of 2018?
A. Yes.
Q. And I see here that you reference the "growing VA budget from $201 billion in Fiscal Year 2019 to $441 billion in Fiscal Year 2026"; is that correct?
A. That is correct.

Q. Has the VA budget increased each year in between Fiscal Year 2019 and Fiscal Year 2026?

A. It has.

Q. And I see on the second bullet that you "led consolidation of budget analysts from staff offices to Office of Budget"; is that correct?

A. That is true.

Q. Could you clarify for me? Before they were consolidated, in what way were they separate?

A. So staff offices includes kind of the leadership offices of the Department of Veterans Affairs. So that would be the Office of General Counsel, the Office of Secretary, the Office of Public Affairs, the Office of Congressional Relations and Legislative Affairs, those types of offices, HR as well as OM, Office of Management, which is the CFO.

And prior to consolidation, each of those offices had one or two budget analysts. The contention was that, you know, they were not doing adequate budgetary analysis and not performing the

functions as they should because they were not reporting directly to the CFO.

So we consolidated those functions, and by consolidating we were able to reduce some of the number of staff that had previously been devoted to that work, thereby saving some money and as well as improving the services that those offices received.

Q. Thank you.

I see a bullet a few down from there says:

"Developed compromise proposal to accelerate veteran benefits processing at the Veterans Benefits Administration."

Is that correct?

A. Correct. Yes.

Q. Could you clarify? When you refer to "compromise," between what parties was there a compromise?

A. So at the start of the new administration, we had a new Deputy Secretary Paul Lawrence. He set a goal of reducing the backlog for veteran benefits. So we try to process the claims that veterans file for benefits quickly,

but in some cases we are not able to process them so quickly and they extend beyond 125 days.

We call that a backlog or the claims backlog. And the claims backlog had grown to well above 200,000 at the start of the new administration in January '25, and the goal was to reduce it substantially down to about 100,000 by December.

And so in order to do that, they needed -- VBA, the Veterans Benefits Administration, needed additional funding to work overtime. So more overtime means more claims processed and that goes to reduce the backlog, and so we were able to identify funds within the Office of Information Technology that could be transferred to VBA.

And so we worked with OMB and Congress and got OIT to agree to give up 67 million, and so we worked to transfer that funding to VBA, and they were indeed able to reduce the backlog. And recently they sent out a press release noting that it now had gone below 100,000 in aged claims. So significant and successful.

Q. And just to clarify.

If the parties involved had agreed to that compromise, why did you have to work with OMB and Congress?

A. So there are requirements in the annual preparation law that when we move funds between accounts, we have to notify Congress or in some cases we're not allowed to move funds between accounts, but in this case we were. But it required a notification of Congress and that requires, of course, OMB approval.

Q. Moving down two more bullets, I see that you "formulated and implemented new funding stream, the Toxic Exposures Fund to support implementation of the Honoring our PACT Act of 2022"; is that correct?

A. That is true.

Q. Could you describe for me this new funding stream?

A. So when the PACT Act was in development, it was clear that there would be a surge of new applications for benefits and potentially a surge of veterans seeking new health care or expanded health care that they had not originally sought or had not originally been

eligible for.

So that was clear that it would require additional funding to meet that surge of requests for processing of claims benefits and processing for providing health care.

So Congress in the PACT Act established a new funding stream called the Toxic Exposures Fund, and that is a fund that they have in subsequent years appropriated funds to the TEF that we have used to process claims and to provide for expanded health care benefits.

And often when Congress creates a new thing or a new funding stream, they just provide general outlines and say generally how it is to be used.  But to actually execute the funds in practice requires additional clarification and explanation to folks in the field, who actually do the obligating of funds, to explain to them what is an acceptable use of the TEF and what would not be an acceptable use of the TEF and how we would allocate the funds across the VA.

Q.    And the second sentence under that bullet says:

"This new funding stream will

provide more than $50 billion in funding to the VA for 2022 through 2025."
Correct?
A. That is true. Yes.
Q. Did it end in 2025?
A. No, it has continued and funds were appropriated in FY26 and will likely -- when the President's budget is released, you will see the request again for FY27.
Q. And the following sentence says:
"Developed new cost accounting strategies to justify the new funding stream, explained complicated methodologies to skeptical audiences, and forged consensus among VA staff, the Office of Management and Budget and congressional staff."
Correct?
A. Correct. Yes.
Q. When you refer to "skeptical audiences," could you explain to me what they were skeptical of?
A. So OMB is full of budgeteers and budgeteers are always skeptical of anything new or anything expensive, and the TEF is both new and

big and expensive. So they are appropriately skeptical, and likewise Congressional staff are also. Certainly appropriations staff are skeptical of new things and big things, and so it requires justification of why that is or why the TEF was a reasonable and sound way to fund these veteran benefits.

Q. What makes the Toxic Exposures Fund different from the rest of the VA's funding?

MR. KLOTZBUCHER: Object to form.

You may answer.

THE WITNESS: Okay.

Well, so it's -- in some ways it's similar. It's all about dollars, taxpayer dollars, but this is somewhat unique in that it is a mandatory funding stream.

So in the federal budget process, there are two primary funding streams: discretionary and mandatory. Most VA funding is -- most operational funding.

So for VBA or VHA it has

traditionally been a discretionary fund. Whereas, the benefits funding was always a mandatory fund, but the TEF is also classified as a mandatory fund. So that was one of the new things about the TEF.

BY MR. VANSLYKE:

Q. Am I understanding correctly that you said the operational funding was traditionally discretionary, but the benefits funding was traditionally mandatory?

A. That is true. Yes.

Q. And you said the Toxic Exposures Fund is mandatory?

A. Correct.

Q. If both the benefits funding and the Toxic Exposures Fund are mandatory, they are similar in that way, correct?

A. They both come from -- they are both classified as mandatory expenditures.

Q. Is the Toxic Exposures Fund intended to fund something other than what you described as benefits funding?

A. The Toxic Exposures Fund supports delivery of health care for toxic exposed

veterans, it supports delivery of benefits for toxic exposed veterans, and it supports -- supports research for toxically exposed veterans, as well as kind of associated administrative costs, like IT, for toxically exposed veterans.

Q. So is it fair to say that the Toxic Exposures Fund involves mandatory spending for both items that have traditionally been mandatory and items that have traditionally been discretionary?

A. No. It would be fair to say that the Toxic Exposures Fund supports costs that previously were discretionary.

Q. So you do not agree that it supports costs that were previously mandatory?

A. We have not -- well, the VA is complicated. There was the CHOICE Act that created a funding stream that, I believe, was mandatory following -- it was during the Obama Administration.

But, in general, the work of VBA, the work of VHA, the work of OIT, the work of the staff offices has traditionally been funded by

discretionary funds.

Q. Okay. Let me look through this for one moment.

Okay. I think I'm done with this part of the resumé. I'm going to scroll down to the beginning of the job description.

For reference on the record, the resumé is at Bates pages CLJA_USA_MCILRAY -- MCILROY -- sorry -- 0000000001 through 4, and the job description starts on the same Bates stamp page 5.

Mr. McIlroy, do you see the job description on my screen?

A. I do.

Q. And this is for your current job description; is that correct?

A. It is correct. Yes.

Q. And I see it looks like in row B there is a date of October 31, 2012; is that correct?

A. Correct.

Q. And that is the date that the job description was updated, not any date pertinent to your occupancy of this role; is that correct?

A. I don't know what that -- the HR people wrote that date. So if you want to know what that date means, you should go ask them.

Q. You were not in this role in 2012, correct?

A. Correct.

Q. But you believe that as of today this job description accurately represents the role that you occupy?

A. It does, yes.

Q. Thank you.

All right. I'm going to stop sharing this document.

So just to summarize the things that we've been discussing, you have been in your role for -- I'll rephrase.

You have been working in the budget office of the Department of Veterans Affairs for approximately seven years; is that correct?

A. Since 2018, yes.

Q. And as the deputy assistant secretary for budget, you serve as the VA's chief budget advisor; is that correct?

A. Correct.

Q. So your office leads the formulation and execution of the VA's budget, which now exceeds $400 billion annually?
A. Yes.
Q. And in doing so, you coordinate with the Office of Management and Budget and congressional appropriations committees?
A. I do, yes.
Q. And on the other hand, you work with VA program officials to ensure that budget requests are accurate?
A. Yes.
Q. Do you recall being interviewed by the VA Office of Inspector General in 2024?
A. I've been interviewed by the OIG multiple times.
Q. Do you recall an interview related to the $2.9 billion supplemental funds request for Fiscal Year 2024?
A. I do.
Q. Are you aware that statements made by you are quoted in a report by the VA OIG on this topic?
A. Yes.

MR. VANSLYKE: I will go ahead and share that document to chat, and I will mark that document as Exhibit 4.

(Document marked for identification as McIlroy Exhibit 4.)

BY MR. VANSLYKE:

Q. And, Mr. McIlroy, can you see this document that I'm sharing?

A. Yes, I can.

Q. And this appears to be a document from the U.S. Department of Veterans Affairs, Office of Inspector General, Office of Audits and Evaluations, correct?

A. Correct.

Q. And the title of this document appears to be "Review of VA's $2.9 Billion Supplemental Funds Request for Fiscal Year 2024 to Support Veterans' Benefits Payments."

Is that correct?

A. Correct.

Q. So I see on Page v in the Introductory section, Footnote 18 appears to be the first time that you, "Andrew McIlroy, deputy assistant secretary for budget," are cited as your

"interview with the OIG team."
Do you see that on the screen?
A. I do see that.
Q. And is this the interview that you described recalling on this topic?
A. The OIG interviewed me multiple times over the course of their work on this, and they have interviewed me multiple times for many things, but that is an accurate statement.
Q. Sitting here today, are you aware of any statements made to the OIG in these interviews that you would now disagree with?
A. The statements I gave to the OIG were honest and correct.
Q. Thank you. I may come back to this document later.
In your role, do you also sometimes provide statements to the media related to VA budgeting topics?
A. No. I sometimes respond to questions from the press office, and they then take that and respond to the media.
Q. And if you are quoted in a news article, would you assume that that was the

process by which that quote was obtained?

MR. KLOTZBUCHER: Object to form.

You may answer.

THE WITNESS: I don't know.

BY MR. VANSLYKE:

Q. Do you believe that you are a credible source of information regarding VA budgeting?

A. Yes.

MR. KLOTZBUCHER: Objection. Sorry.

BY MR. VANSLYKE:

Q. Would you be surprised if individuals in the media looked to you for information regarding the VA budget?

MR. KLOTZBUCHER: Objection. Form.

You may answer.

THE WITNESS: If you want to -- if you want to know about what the media thinks, you should go ask them.

MR. VANSLYKE: I will go ahead and share an article from Military.com in

the chat, and I will mark that as
Exhibit 5.
(Document marked for
identification as McIlroy Exhibit 5.)
BY MR. VANSLYKE:
Q. Okay. Can you see my screen shared at this time?
A. Yes.
Q. And do you see at the top of the page there is a logo that indicates this is from Military.com
A. Yes.
Q. And do you see the title of this article is "VA Asks for Historic $4.1 billion for Construction as Agency Weighs Closing Some Aging Medical Facilities"?
A. I do see that.
Q. I will give you a quick moment if you'd like to review this article. Please let me know when you're finished.
A. (Reviews document.)
Okay. I've read through that.
Q. And did you see a quote attributed to you in that article?

A. Can you refer me to the page that you are looking at?

Q. I am on the third page --

A. Okay.

Q. -- and the third to last paragraph. It says:

"'The need for funding and investment in facilities is only going to increase, and this is one of the ways the administration thinks we might be able to get to that issue, starting now,' said Andrew McIlroy, the VA's deputy assistant secretary for budget."

A. I see that, yes.

Q. Could you briefly describe for me the need for funding and investment in facilities within the VA.

A. So the VA has approximately 172 medical centers and 12 to 14 locations of care. The average age of a VA hospital is now reported in the 50- to 60-year-old range. Whereas, the average age of a private sector hospital is maybe in the 10- to 20-year range.

So doctors and care providers often find that VA facilities are not adequate to meet

the care demands of today, and so that's why there is the estimated need for significant replacement or investment in facilities.

Q. Is it fair to say that you're highlighting a gap between what the VA needs for these projects and what has been currently funded?

A. There is a gap, yes, between what is needed and what is funded. That is true.

Q. Thank you.

Mr. McIlroy, we are just about at an hour on the record. Would you like a short break to grab some water, anything like that?

A. Ah, you know, we can keep going. I'm fine. I have some coffee here.

Q. Okay. Are you familiar with the Rand Corporation?

A. In general, yes.

Q. Are you aware that the Rand Corporation reviews budgeting information regarding veterans programs and federal resource allocation?

A. In general, yes.

MR. VANSLYKE: I will share in chat a report from the Rand Corporation.

I will mark that as Exhibit 6.
(Document marked for identification as McIlroy Exhibit 6.)
BY MR. VANSLYKE:
Q. And can you see my screen at the moment?
A. I can.
Q. So at the bottom of the first page, do you see the logo from the Rand Corporation?
A. I do.
Q. And the title appears to be "Volume 6, Planning, Programming, Budgeting, and Execution in Comparative Organizations," correct?
A. Yes.
Q. And the subtitle is "Additional Case Studies of Selected Non-DoD Federal Agencies," correct?
A. It is, yes.
Q. And on the second page, I see this copyright from 2024, correct?
A. I see that as well.
Q. So I have used the Control F feature for the name "McIlroy" and do you see on page 29 as a source they say the "Authors' analysis of

information from McIlroy, 2023"?
A. I see that, yes.
Q. Do you understand what that citation would be to?
A. As I recall, they came to talk to me. We provided them some documents. It's been a while.
Q. So I'm looking at Footnote 54, which says "Fiscal Year 2025 budget and performance guidance was issued on May 2, 2023 (McIlroy, 2023)."
Do you see that?
A. I do.
Q. Could you explain to me what that guidance document is?
A. So I believe they are referencing our annual budgetary guidance. So as you see in the graphic above, there's kind of a process and a timeline for submitting the budget.
So in the early summer, we ask the components of VA to submit their budget requests for the coming budget year. And then in the midsummer, you see there July. We review those generally with the Secretary, and in August we

submit those to OMB.
And so that's OMB's guidance document kicks off the process and says: VA components please submit your budget submissions in this fashion and on this timeline.
Q. And is there subcomponent -- some component of that information that is not available to the public?
A. All that information would be predecisional.
Q. So I'm looking at Footnote 52 now, which says "Andrew McIlroy, Fiscal Year 2025 Internal Budget and Performance Submission Guidance, U.S. Department of Veterans Affairs, May 2, 2023, Not available to the general public."
Do you see that?
A. I do.
Q. Do you understand what that is describing as "not available to the general public"?
A. I do.
Q. Could you explain to me which part of that is not available to the general public?
A. So the budget process is, in

general, considered predecisional and not subject to public release. These would be internal documents directing, like explaining the Secretary's priorities or the President's budgetary priorities, those kind of things. So we do not post those documents to public websites.

Q. Thank you.

I will stop sharing for now.

Is it fair to say that you are recognized in the policy and budget community as an expert on VA funding and appropriations?

MR. KLOTZBUCHER: Objection. Form.

You may answer.

THE WITNESS: I think I have great expertise.

BY MR. VANSLYKE:

Q. Would you agree that others in the policy and budget community appear to cite to you as an authority?

A. Some have, yes.

Q. And over your 20-plus-year career in federal budget work, you have seen multiple administrations and Congresses, correct?

A. That is true, yes.
Q. And has that included shifts in fiscal and political priorities?
A. Yes.
Q. And your work has included adapting to those shifts, correct?
A. Correct.
Q. And it seems that you have been able to do so successfully, correct?
A. I think so, yes.
Q. You have been able to fulfill your job duties under each fiscal year, correct?
A. Correct.
Q. Are you aware that the United States has identified you as a nonretained expert in the Camp Lejeune Water Litigation?
A. Yes.
MR. VANSLYKE: I will place in chat the United States damages disclosures.
THE WITNESS: That's File 3A?
MR. VANSLYKE: Correct, File 3A, and I will mark that as Exhibit 7.
(Document marked for

identification as McIlroy Exhibit 7.)
BY MR. VANSLYKE:
Q. Can you see that I'm sharing my screen?
A. Yes.
Q. And you can see that this is a document in regard -- In re the camp -- excuse me. Let me rephrase.
This is a document In re Camp Lejeune Water Litigation in the United States District Court for the Eastern District of North Carolina, correct?
A. I see that, yes.
Q. And scrolling down, do you see the title "The United States' Second Disclosure of Expert Testimony for Phase III Pursuant to Federal Rule Civil Procedure 26(a)(2) and D.E. 630," correct?
A. I do see that, yes.
Q. And I have searched for your name, which brings me to page 3.
And do you see your name listed here?
A. I do.

Q. And will you briefly review the first paragraph and let me know when you're finished.
A. (Reviews document.)
I finished.
Q. Does that fairly describe the job history that we have just discussed in detail?
A. It does.
Q. And do you see the following paragraph reads:
"Mr. McIlroy is expected to offer testimony under Federal Rule of Evidence 702, 703, or 705 to include opinions about the sources of funding of benefits programs administered by VBA. In particular, Mr. McIlroy is expected to support his opinions based on the following information: A. VA's disability compensation and pension benefits are funded through annual Congressional appropriations. B. These appropriations are from the general fund, meaning VA benefits are funded through general taxpayer revenues and federal borrowing."
Did I read that correctly?
A. You did.

Q. Were you aware that you were expected to offer this testimony?
A. I am aware, yes.
Q. Does this accurately describe all of the testimony that you are aware of being expected to offer at this time?
A. Yes.
Q. Do you agree that the VA's disability compensation and pension benefits are funded through annual congressional appropriations?
A. Yes.
Q. Could you briefly describe for me what that means?
A. So every year, as you saw previously, we go through a budget process where we estimate the needs for veteran compensation and pension. We work through OMB, and the President makes a request to Congress in the annual President's budget. Congress will hold a series of budget hearings and deliberates and then ultimately appropriates funds for disability compensation and pension.
Q. And would you agree that these

appropriations are from the general fund, meaning VA benefits are funded through general taxpayer revenues and federal borrowing?

A. I agree, yes.

Q. And could you please briefly explain to me what that means?

A. So federal government every year collects money from a variety of sources. Most of the money that funds the federal government comes from general taxes, which is personal taxes and corporate taxes, and that's supplemented by federal borrowing because the income is not sufficient to pay all the expenditures, and all that funding goes into the general fund.

The federal government is big. There are a variety of different funds, but in the case of compensation and pensions, those costs are paid through taxes and borrowing that flow into the general fund.

Q. Do I understand correctly that the general fund encompasses more than benefits programs administered by the VBA?

A. It does, yes.

Q. Are there alternative sources of

funding for federal government programs other than the general fund?

A. It depends. You know, so, for example, you and I all pay Social Security tax, and that goes into the Social Security fund. You pay -- when you buy gasoline, you pay a gas tax, and that goes into the kind of road transportation fund. But, in general, individual and corporate income tax goes into the general fund.

Q. And using your example of the Social Security fund, other than the source of the tax funding, could you explain to me the difference between the general fund and the Social Security fund?

MR. KLOTZBUCHER: Object to form and foundation.

You may answer.

THE WITNESS: They are for different purposes. So the general fund funds, in general, the general operations of the federal government. Social Security trust fund funds Social Security benefits.

BY MR. VANSLYKE:

Q. What does it mean when you refer to it as a "trust fund"?

MR. KLOTZBUCHER: Object to foundation.

THE WITNESS: If you want to know about Social Security, you should go ask people from Social Security.

BY MR. VANSLYKE:

Q. In general, how would you describe a trust fund?

A. So a trust fund has kind of -- it depends. A private trust fund could mean, you know, a corpus of funding supports whatever activity through interest of the trust fund. So it can depend.

Q. Does the general fund operate on interest in the same way?

A. No.

Q. And why not?

A. That's how Congress has established it.

Q. What about the general fund precludes it from operating on interest?

A. The federal government operates at a

deficit. So there, you know, the general fund receives funds from taxpayers and borrowing and then, you know, that money is disbursed through the programs of the federal government.

Q. Are there any VA programs that operate on a trust fund?

A. Like, the definition of trust fund is complicated. VA programs operate in a variety of different ways.

Q. Are there any VA programs that operate on interest accrual rather than annual appropriations?

MR. KLOTZBUCHER: Object to form.

THE WITNESS: Yeah.

BY MR. VANSLYKE:

Q. Is there something that you don't understand about that question?

A. Can you rephrase it?

Q. Are there any VA programs that operate on funds not contained in annual congressional appropriations?

A. Yes.

Q. Could you describe those for me?

A. The VA canteen operation, for example. If you go to a VA hospital, you can have lunch at, you know, the lunch counter. We call it the canteen, or there's probably a convenience store, coffee shop at a VA hospital. All those operate on self-funded basis, for example, in general, except during the pandemic.

The VA operates insurance programs and, in general, those are funded through insurance payments of the beneficiaries or of the program participants, rather.

Q. Is it correct to say that none of the VBA benefits are operated on funds other than annual congressional appropriations?

A. The home loan program, for example, the VA guaranteed loan program, in general, much of that operates without an annual appropriation. That's possible because veterans pay an application fee. When they receive the loan, they pay a reduced rate of interest or they pay -- yeah, in general that operates without an annual appropriation.

Q. When you referred to insurance programs, were those for employees of the VA?

A. No. Those are for veterans or service members.

Q. Could you describe those insurance programs for me?

A. There are a variety of insurance programs. You can have -- look on the VA website for details, but they are, in general, life insurance programs. So if you want to have life insurance, this is -- could be an affordable option for obtaining life insurance.

Q. When you referred to those insurance programs, were you including any medical insurance programs?

A. No.

Q. So looking back at this document, under bullet B it says:

"VA benefits are funded through general taxpayer revenues and federal borrowing."

Given that you just described programs that are not funded through general taxpayer revenues and federal borrowing, could you more clearly define which VA benefits are funded through general taxpayer revenues and federal borrowing?

A. Specifically --
MR. KLOTZBUCHER: Objection. Foundation.
You may answer.
THE WITNESS: So specifically disability compensation and pension benefits are funded through the general fund.
BY MR. VANSLYKE:
Q. And would that include all VBA disability payments?
A. It includes disability compensation and pension payments paid through that fund, yes, or that account, rather.
Q. What would be disability and compensation benefits not paid through that account?
A. Oh. Yeah, I don't think there are any. It's complicated, but I don't think there are any. Yeah. No, there are none.
Q. Does this meaning of VA benefits include all variables to VBA disability payments, such as special monthly compensation rates?
A. Yes.

Q. Do you understand what DIC benefits are?
A. You could explain it.
Q. One moment.
Apologies. I was forgetting the acronym for a moment.
DIC is Dependency and Indemnity Compensation benefits.
Are you aware of those benefits?
A. Do you have a further explanation?
Q. My understanding is that DIC benefits are a tax-free monthly payment for eligible surviving spouses, children, or parents of service members who died in the line of duty or from service-related injuries.
Do you understand that to be correct?
A. That sounds accurate, yes.
Q. Is it fair to say that those benefits are distinct from the VBA disability benefits that veterans receive?
MR. KLOTZBUCHER: Objection. Form.
You may answer.

THE WITNESS: Can you rephrase?

BY MR. VANSLYKE:

Q. Would you classify VBA disability benefits and the DIC benefits that we just discussed as the same thing?

A. They are provided for different purposes. They are different.

Q. Are DIC benefits included in this meaning of "VA benefits are funded through general taxpayer revenues and federal borrowing"?

A. They are paid through the compensation and pension account.

Q. And you previously stated that, to the best of your knowledge, all benefits through that account are funded through general taxpayer revenues and federal borrowing, correct?

A. Correct.

Q. Are you aware of the VA Community Care Network?

A. I am.

MR. KLOTZBUCHER: Objection. Foundation.

You may answer.

THE WITNESS: Although you can explain it. Go ahead.
BY MR. VANSLYKE:
Q. My understanding of the Community Care Network is that it is more or less analogous to essentially an out-of-network provider on a private insurance program.
Is that accurate?
MR. KLOTZBUCHER: Objection. Foundation.
THE WITNESS: More or less, you know. Can you give a better description?
BY MR. VANSLYKE:
Q. Apparently my description is inadequate. Could you describe it for me?
MR. KLOTZBUCHER: Objection. Foundation.
You may answer.
THE WITNESS: The Community Care Network is how we provide for veteran health care in non-VA facilities.
BY MR. VANSLYKE:
Q. And are those benefits included in

this statement that "VA benefits are funded through general taxpayer revenues and federal borrowing"?

A. So those benefits are paid through a different account. It's paid through the VA health care account, but it is funded through the general fund. That is true, yes.

Q. Are there differences in how the VA budgets for those two accounts?

A. Yes.

Q. Could you briefly describe the differences?

A. Well, they're budgeting for different things. So in the case of the comp and pen account, we are estimating the payments for veterans and their family members for compensation and pension costs, and in community care for medical services, all the VA health care accounts we are estimating the cost of health care.

So they are different.

Q. You described the Community Care Network as how the VA pays for services not at a VA medical facility; is that correct?

A. That is true.

Q. Would it be fair to describe those payments as reimbursements?

MR. KLOTZBUCHER: Objection. Form and foundation.

You may answer.

THE WITNESS: So doctors or hospitals in the community provide services to veterans. Those services are not free. The VA pays for those services.

BY MR. VANSLYKE:

Q. Mr. McIlroy, you have not prepared a written expert report for this litigation, correct?

A. That is correct.

Q. While I understand you are capable of testifying in much greater detail about these topics, are the topics that we have discussed under bullet points A and B an accurate summary of the opinions that you expect to offer in this litigation?

A. Yes.

Q. Have you reviewed any deposition transcripts from this case in preparation for your

testimony today?
A. I have not.
Q. Have you reviewed any of the expert reports that have been issued in this litigation?
A. I have not.
Q. I am moving to page 2 of the same document.
Do you see that this identifies Jadine Piper?
A. I do.
Q. And it says here that "Jadine Piper has served as Acting Assistant Director for Policy at the VBA since March 10, 2025"; is that correct?
A. I do not personally know Jadine but...
Q. Do you agree that that's what it says in the document shared on the screen?
A. That is what it says, yes.
Q. So you said you do not know Jadine personally, but have you worked with Jadine Piper?
A. I don't recall.
Q. Is it safe to assume then that you have not spoken to her about this case?
A. I have not spoken to her about this

case.

Q. Okay. I'm moving back to your section of this document, and you can see on the screen again bullets A and B, correct?

A. I can, yes.

Q. Do I understand correctly that you are not offering any opinion that VA will pay any specific future benefit amount to any individual plaintiff?

A. I have no knowledge of that.

Q. And similarly, you are not offering any opinion that current benefit laws will remain unchanged for the lifetime of any individual plaintiff, correct?

A. I have no ability to predict the future.

Q. And you are not offering any opinion about how damage calculations should be performed in this litigation, correct?

A. I have no opinion on that.

Q. And you are not offering any opinion predicting specific future congressional actions regarding veterans benefits, correct?

A. I cannot predict what Congress will

do in the future.

MR. VANSLYKE: Okay. I will stop sharing my screen.

I would like to take a short break before we continue.

Can we go off the record?

THE VIDEOGRAPHER: All right. We're going to go off the record at 10:30 AM.

(A recess was taken.)

THE VIDEOGRAPHER: Back on the record at 10:44 AM.

BY MR. VANSLYKE:

Q. Mr. McIlroy, if I refer to the VA's annual Budget in Brief, do you know what I'm referring to?

A. Yes.

MR. VANSLYKE: I am placing in chat the Fiscal Year 2026 Budget in Brief, which I will mark as Exhibit 8.

(Document marked for identification as McIlroy Exhibit 8.)

BY MR. VANSLYKE:

Q. And can you see that I'm sharing my

screen?

A. I can, yes.

Q. And this document says "U.S. Department of Veterans Affairs Fiscal Year 2026 Budget Submission," correct?

A. It does, yes.

Q. And at the bottom it says "Budget in Brief May 2025," correct?

A. Correct.

Q. Were you involved in the creation of this document?

A. Yes.

Q. I have scrolled down to page BiB-3.

And do you see the title "VA Funding"?

A. I do.

Q. And below that is a table "VA Total Appropriations," correct?

A. Correct.

Q. Or would it be more accurate to call this a graph?

A. It is a graph. It's a bar graph, yes.

Q. And then below that is a table

titled "Funding History," correct?
A. Correct.
Q. In the bar graph section, I see the key at the top for mandatory versus discretionary appropriations, correct?
A. Correct.
Q. I know we have talked a little bit so far about mandatory versus discretionary appropriations, but could you please explain the difference between the two?
A. In general -- excuse me.
So, in general, discretionary appropriations are usually or often described as those appropriations that are subject to the annual appropriation action of Congress, and mandatory appropriations are frequently described as funding which is not subject to the annual appropriation action of Congress. However, in the case of VA, that is not true.
The VA mandatory funding is a part of the annual appropriation, and it describes a different stream of funding but still subject to the annual appropriation process.
Q. Is that true for all VA funding

labeled "mandatory" or is there any that is not subject to the annual appropriation?

MR. KLOTZBUCHER: Objection. Foundation.

You may answer.

THE WITNESS: Is -- mandatory funding is -- comes from the annual appropriation process. That is true.

BY MR. VANSLYKE:

Q. Can you explain to me how that's consistent with your previous statement that that is not the case for VA mandatory funding?

MR. KLOTZBUCHER: Objection. Foundation. Form.

THE WITNESS: That was -- that is consistent. I have been consistent.

BY MR. VANSLYKE:

Q. Did I understand correctly that you stated that mandatory funding is typically that which is not subject to the annual congressional appropriation?

A. So that is true of many types of mandatory funding, like food stamps, for example.

The SNAP program is a mandatory program. If you look, that is -- doesn't have an annual appropriation and that is an annual or a mandatory program.

But in the case of VA, Congress can always do what it wants, and Congress chooses to annually appropriate mandatory funding for the VA.

Q. For examples like SNAP benefits that you pointed to, how is that funding provided if not through annual appropriations?

A. Yeah.

MR. KLOTZBUCHER: Objection. Foundation.

THE WITNESS: Yeah. You can -- you can go talk to somebody from USDA about that, but those appropriations often have the language "such sums as necessary" so there's not a specific number.

BY MR. VANSLYKE:

Q. Would it be fair to say that legislation provides instructions to fund programs as necessary without specifying what those funds would be?

MR. KLOTZBUCHER: Objection.
Form.
THE WITNESS: Yeah. I don't
understand the question. Can you
rephrase?
BY MR. VANSLYKE:
Q. I'm trying to understand what you just described for me.
So you said they often use language like "such funds as necessary," correct?
A. Some mandatory programs do use such language. That is true. Yes.
Q. And if Congress uses that language, what does that mean in terms of funds being allocated?
A. Funds are available as needed. So, you know, if you read in the Constitution, as you no doubt have, you know, "no funds shall be drawn from the Treasury but by action of Congress." So that is an action of Congress, and the phrase "such sums as necessary" allows funds to be drawn from -- from to be spent.
Q. And you've stated that VA funding is not allocated in that way, correct?

MR. KLOTZBUCHER: Objection. Form.

BY MR. VANSLYKE:

Q. I'm sorry. Did you answer? I didn't hear.

A. I did not.

Q. Would you like me to rephrase the question?

A. Yes, please.

Q. Are you aware of any VA programs that are funded through mandatory funds in that way?

A. In what way?

Q. In the way that you have described with language like "such funds as necessary."

A. If you look in the annual appropriations bill, you will see that one of the loan programs has that phrase "such sums as necessary," but the other programs like compensation and pension does include an annual specific appropriation number in the appropriation bill.

Q. And is the same true for VHA funding?

MR. KLOTZBUCHER: Objection to foundation.

THE WITNESS: Yeah. Is what true?

BY MR. VANSLYKE:

Q. What you just described about the compensation and pension fund being specified for annual appropriations, is that also true for VHA?

A. Yes, VHA also receives an annual appropriation.

Q. Can you explain to me how mandatory funds subject to an annual appropriation are different from discretionary funds?

A. So they are different in that they are treated differently in congressional accounting and in congressional budgeting. So often in the congressional budget process, there is focus on the discretionary funding.

Specifically if you read news reports about the annual appropriation process, you will hear people talk about they want to see, you know, growth or no growth in the nondefense discretionary accounts -- so VA would be part of that as well as DOJ and other federal agencies --

as opposed to growth in the defense discretionary accounts. So there's often debate about the level of growth of the discretionary funds for defense and nondefense.

Q. And looking at the graph in this document, I see from Fiscal Year 2022 through 2026, the discretionary funds have varied between 116.3 billion to 140.1 billion; is that correct?

A. 140 billion, yes.

Q. The widest range not chronologically is 116.3 to 140.1, correct?

A. Just doing the math from year to year, that is a jump of -- yes, that would be the biggest jump.

Q. And from Fiscal Year 2022 to Fiscal Year 2026, I see a range of 157.5 billion to 301.2 billion, correct?

A. Correct.

Q. Would you agree that the difference between 301.2 billion versus 157.5 billion is greater than the difference between 140.1 billion versus 116.3 billion?

A. Mathematically, yeah.

Q. So is it fair to say that there has

been more change in the mandatory spending than there has been in the discretionary spending?

A. Yes.

MR. KLOTZBUCHER: Objection. Form.

BY MR. VANSLYKE:

Q. Can you explain to me why there has been such a significant change in the mandatory spending?

A. So the primary driver in the mandatory spending is compensation and pension. There's also education benefits in there, and over time the number of veterans who are receiving compensation and pension benefits has increased as well as the average amount of benefits that those veterans has received.

Also within that, those green bars, the mandatory count starting in 2022, there is also the addition of the TEF funding, the Toxic Exposures Fund.

Q. So you indicated that there has been an increase in the average amounts received under the compensation and pension fund, correct?

A. That is true. Yes.

Q. Are you aware of why that average amount has increased?
A. So if you look over time, the average disability rating for veterans has increased.
Q. And you also stated that there has been an increase in the number of veterans receiving those benefits, correct?
A. That is true.
Q. Are you aware of any reasons why that has increased?
A. The PACT Act is a primary contributor to that.
Q. And if I look down at the Funding History table, I'm looking at the Total VA line. It looks like going back to 2016, the total VA budget was 166.9 billion; is that correct?
A. That is correct.
Q. So between 2016 and 2026, it has increased from 166.9 billion to 441.2 billion?
A. That is correct.
Q. Looking at the 2026 mandatory versus discretionary in the graph, is it fair to say that mandatory spending represents roughly two-thirds

of the VA's total budget?

A. Approximately. You could do the math.

Q. Under VA mandatory spending, does that automatically grow as more people qualify for benefits?

A. As more veterans receive benefits, the budget will grow, yes.

Q. But that is still subject to annual congressional appropriations?

A. That is true.

Q. And you have spoken about the general fund operating at a deficit.

Would that deficit increase as these funds increase unless Congress raises revenues in other ways?

A. So the veteran benefit costs and veteran health care costs contributes to total federal expenditures, and those federal expenditures do exceed, you know, taxpayer revenue and force the federal government to borrow. That is true.

Q. So absent other changes to revenue, if the mandatory spending in Fiscal Year 2027 were

to increase by $100 billion then presumably the deficit would increase by $100 billion?

MR. KLOTZBUCHER: Objection. Foundation.

THE WITNESS: There are many factors that go into the deficit calculations.

BY MR. VANSLYKE:

Q. You do agree that the VA mandatory spending comes from the general fund, correct?

A. I do.

Q. And you have stated that the general fund operates at a deficit --

A. That is true.

Q. -- correct?

If the other variables remain the same but the VA mandatory spending increased, the deficit would also increase, correct?

A. That seems logical, yes.

Q. Do you know how many individuals receive benefit payments through the compensation and pensions fund?

A. It's under 7 million. It's in the bid.

Q. And I believe you stated that the compensation and pensions fund is the largest component of the VA's mandatory budget, correct?

A. Yes.

Q. Have you heard disability benefits referred to as appropriated entitlements?

A. Yes.

Q. Do you understand what that refers to?

A. You could explain it.

Q. I don't understand. Could you explain it?

A. Yes. So it's called an "entitlement" because the veterans by law if they meet the criteria for the benefits, they are entitled to receive them. But as we have discussed, it is included in the -- or funding for those benefits is included in the annual appropriations act and is appropriated on an annual basis. So they are called "appropriated entitlements."

Q. Is that different than if something were described simply as an entitlement?

A. I don't know. I suppose it depends

on the context.

Q. If I were to describe VA disability benefits as simply entitlement benefits, would you disagree?

MR. KLOTZBUCHER: Objection. Foundation. Hypothetical.

BY MR. VANSLYKE:

Q. You can still answer.

A. Can you repeat the question?

Q. If I were to refer to disability benefits through the VBA as entitlements, would you disagree?

MR. KLOTZBUCHER: Objection. Foundation and form.

BY MR. VANSLYKE:

Q. You can still answer.

A. No.

Q. You would not disagree with that statement?

A. I would not disagree with that statement.

Q. So you do not think it's necessary to distinguish them as appropriated entitlements?

MR. KLOTZBUCHER: Objection.

Form and foundation.

THE WITNESS: Yeah. It depends on the context.

BY MR. VANSLYKE:

Q. In what context would that distinction matter?

A. In the appropriations process. If there was no appropriation, there would be no money.

Q. And what would that mean?

A. There would be no money to pay those benefits without the annual appropriation.

Q. And what would happen to those benefits?

A. So if there was no appropriated funding, then what happens is, we would hold those payments until there was an appropriation and we would make those back payments.

Q. So looking at this graph, the 2026 fiscal year includes $301.2 billion in mandatory spending, correct?

A. Correct.

Q. And you have stated that this includes the compensation and pensions fund,

correct?

A. Compensation and pensions account, yes.

Q. And if at the end of Fiscal Year 2026 there had been 50 billion additional benefits owed, you would not have funding appropriated for those benefits at this time, correct?

A. In the compensation and pension account, if we had more payments due than we had funding, we wouldn't have been able to pay those benefits. That is correct.

Q. And would the outcome be similar to what you're describing, that you would hold those payments until funding was received?

A. Yes.

Q. And earlier you stated that you cannot predict what Congress will do, correct?

A. I cannot predict what Congress will do, yes. True.

Q. Is it possible that Congress would choose not to fund those benefits entirely?

MR. KLOTZBUCHER: Objection. Foundation.

BY MR. VANSLYKE:

Q. You can still answer.
A. Can you restate the question?
Q. Is it within Congress's power to choose not to fund those benefits entirely?
A. Generally, Congress can do whatever it wants. Historically, they have always funded veteran benefits, though.
Q. Understood.
All right. I will stop sharing.
So we have spoken already about the appropriations process, and I would like to just walk through that cycle.
So your office leads the budget formulation for the VA, correct?
A. Correct.
Q. And the VA prepares a budget request and submits it to OMB?
A. Correct.
Q. And you are very involved in that process, yes?
A. I am, yes.
Q. OMB then reviews that budget request, correct?
A. Correct.

Q. And do they have the ability to make adjustments?
A. They do.
Q. And once OMB approves the budget request, they would include it in the President's budget submitted to Congress, correct?
A. That is true. Yes.
Q. And when Congress considers the VA appropriations, it goes through the appropriations committees and subcommittees?
A. That is true. Yes.
Q. And then once Congress passes an appropriations bill or a continuing resolution and the President signs it, the VA receives budget authority, correct?
A. Yes.
Q. And you've stated that even for mandatory programs like compensation and pensions, Congress must enact an appropriation providing that budget authority each year, correct?
A. Correct.
Q. And after appropriations are enacted, OMB apportions the funds to the VA, correct?

A. That is true. Yes.
Q. So this means that OMB sets limits on how much the VA can obligate in a given period, correct?
A. Within certain parameters of law, they cannot impound the funds, but yes, they can place criteria in the apportionment document.
Q. And the VA must comply with the OMB's apportionment, correct?
A. That is true. Yes.
Q. And the VA cannot obligate more than the apportioned amount?
A. That is true. Yes.
Q. To your knowledge, does OMB have any authority to adjust VA's apportionments or allocations in a way that reflects OMB's priorities among different federal departments?
A. So OMB has authority to make adjustments to the apportionments. The basis for their adjustments, you should ask them.
Q. I'm not asking for a basis, but it sounds like you are confirming that they have the ability to make those adjustments?
A. That is true. Yes.

Q. And then within the VA, you or your office would then allocate funds to the various administrations within the VA, correct?
A. Correct.
Q. And within the VA, do you have authority to adjust allocations across these administrations based on priorities within the VA?
A. No. We are bound to follow the appropriations act and the numbers provided in the apportionments.
Q. And earlier you described if you transfer funds from one account to another that you have to go back and seek approval from OMB and Congress, correct?
A. We have to follow the law. That is true.
Q. Did I mischaracterize the law?
A. No.
Q. Okay. So there are multiple layers of approval required for VA spending, correct?
A. That is correct. Yes.
Q. It requires congressional approval, OMB approval, and VA approval?
A. That is correct.

Q. And if Congress fails to pass appropriations and there's a lapse in funding, the VA cannot make payments even for mandatory programs without appropriated funds, correct?

A. That is true, except Congress in the case of compensation and pension and the health care accounts has provided an advance appropriation. So they are providing money a year in advance which enables us to continue making payments even in the case of a government shutdown, which we call a lapse in appropriations.

Q. You said that was for health care spending, correct?

A. As well as for compensation and pension.

Q. So the compensation and pension is funded a year in advance?

A. Correct.

Q. When you say "a year in advance," do you mean a full year in advance or it is paid through the end of the upcoming fiscal year?

A. A full year in advance. So in FY25, if you look at the appropriation act in FY25, they made an appropriation for the entire estimated

amount for FY26.

Likewise in FY26, in that appropriation act, they appropriated funds for the entire estimated amount of payments in FY27. So we have money today in FY26 for the entire estimated amount for FY27 as of the estimates that we released in May of 2025.

Q. And those estimates would be based on the actual analysis that we discussed earlier, correct?

A. Yes.

Q. So when you describe these funds being allocated in advance, do you know the end date of the current funding?

A. When the funds are appropriated, they are appropriated to be available until expended. So Congress appropriates funds in a variety of fashions. Sometimes they appropriate single year funds. Sometimes they appropriate funds that are available for an obligation or expenditure over the course of multiyears, or in some cases like compensation and pension, they are appropriated until expended. So they are good until they are completely obligated.

Q. When you talk about the estimates that those one year in advance appropriations are based on, what is the end date of those estimates?

A. So the estimates are based on the expected payments to be made in that fiscal year. So in the FY26 budget, we made estimates for the total sum of payments -- in this case compensation and pension payments -- to be made in FY27, and that's the number that was included in the budget request to be made and appropriated in advance for FY27.

Q. So to clarify, those are through the end of Fiscal Year 2027?

A. Correct.

Q. And do I understand that correctly that you would refer to the end of Fiscal Year 2027 as being in 2028 calendar year?

A. No. 20 -- the end of FY27 will be September 30, 2027.

Q. Thank you.

Are you familiar with the Antideficiency Act?

A. I am.

Q. Could you describe for me in your

own words how that applies to the VA and its appropriations?
A. The Antideficiency Act applies to, in general, all federal agencies and all federal appropriations. It says that you cannot exceed or you cannot obligate or expend greater than the appropriated amount.
Q. Is that the basis for what you stated earlier that if funds were not appropriated, you would pause payments until funds were appropriated?
A. That is true. That is one of the reasons why.
Q. Would you agree that in recent years Congress has sometimes failed to pass a full year appropriations by the start of the fiscal year?
A. That is true.
MR. KLOTZBUCHER: Objection. Foundation.
You may answer.
BY MR. VANSLYKE:
Q. And when that happens, Congress sometimes passes a continuing resolution, correct?
A. That is true.

Q. Can you explain to me how a continuing resolution applies to VA's funding?
A. Yes, I can.
Q. Will you please do so?
A. Yes. So essentially when a continuing resolution is passed, that means that agency receives the same level of funding as in the prior year. So yes.
Q. Would you say that a continuing resolution creates any uncertainty for VA budget planning?
A. Yes, it is uncertain.
Q. Can you describe what uncertainties it creates?
A. So when there is a continuing resolution, we do not yet know the full year funding. So that is the degree of uncertainty. We are subject to the prior year funding level.
Q. And are you subject to the entire prior year's funding level or only a portion of it?
A. Depends on from account to account. So in the case of those accounts like compensation and pension where we have advance request or an

advance appropriation, that is the amount of funding that would be available during a CR.

So in those cases, even though there is a CR, for compensation and pension as well as for the medical care accounts, there is no uncertainty because we have the advance appropriation.

Q. We spoke earlier about the mandatory spending can fluctuate based on preexisting legislative instructions, correct?

A. Mandatory spending will vary based on the law. So veterans are entitled to receive benefits. Those benefits are due by the law. So if the law changes, veteran benefits will change.

Q. So if the VA in a given period is subject to a continuing resolution binding them to the prior year's spending, does that allow for increased spending as required by the laws creating mandatory appropriations?

A. So a CR doesn't change the level of benefits to which veterans are entitled.

Q. If the number of veterans entitled to those benefits increases in a period while the VA is subject to a continuing resolution, does the

continuing resolution allow the VA to pay those increased benefits to those additional veterans?

A. So paying benefits requires VBA employees to process the monthly payments. It requires VBA employees to process claims and determine eligibility and, thus, make payments.

But even during the CR, those activities related to the payment of benefits, processing the annual or the monthly payments, receiving claims, reviewing claims, approving claims, all those are considered excepted activities and they continue during a CR.

So a CR doesn't impact veterans receiving benefits.

Q. Would that change after a certain period of time if a full appropriation is not passed?

A. No.

Q. Why not?

A. Because the function in providing claims is considered an excepted function, and it's not related to the duration of the CR. So if the CR was a day or 45 days, those employees in VBA that process claims and provide for the

monthly payments continue to work.

Q. And the payments to the veterans themselves would also continue throughout the CR?

A. Yes, because those payments were -- specifically for compensation and pension were provided in advance. So we have all the funds that we estimated.

So in the case of this year where we had a CR of some 45 days, we had all the advance appropriation for compensation and pension for the estimated amounts of claims in FY26.

Q. If a series of CRs were passed through the end of the advance appropriations, would the CR allow those benefits to continue being paid at the current levels?

A. So historically, yes. So in FY25, for example, there was a full year continuing resolution. So Congress did not enact a normal appropriation. They enacted a full year continuing resolution. And in that bill if you were to look, you would see that Congress appropriated the amount estimated in the President's budget as an advance for FY26.

Q. Do I understand correctly that that

is another instance of specific congressional appropriation for those benefits as opposed to an inherent feature of a CR?

A. If you look in the FY25 appropriations act, which was a full year continuing resolution, you will see that Congress appropriated funds in advance for the compensation and pension account, yes.

Q. If that provision had not been included in the CR, those funds would not have been allocated in advance, correct?

A. Correct.

Q. In addition to appropriations, Congress can also amend statutes governing VA benefits, correct?

A. That is true. Yes.

Q. Are you aware of Congress doing so?

A. Yes.

Q. For example, can Congress change eligibility criteria for VA benefits?

A. They have, yes.

Q. Can Congress change criteria for how ratings are to be applied to disability benefits?

A. They could, yes.

Q. Can Congress change formulas for those benefits?
A. They could, yes.
Q. Can Congress change how cost-of-living adjustments are applied to those benefits?
A. Presumably, yes.
Q. Can Congress change dependency allowances that modify those benefits?
A. They could, yes.
Q. Can Congress change survivor benefits, such as the DIC benefits we discussed earlier?
A. They could, yes.
Q. So all of those potential changes to VA benefits programs are within Congress's power to change, correct?
A. Yes.
Q. And, for example, Congress has previously expanded presumptions related to Agent Orange, correct?
A. That is true. Yes.
Q. Congress has made changes related to the GI Bill and education benefits, yes?

A. Yes.
Q. Have they made changes to housing and readjustment benefits?
A. They have.
Q. So while current law creates an appropriated entitlement structure, future law could reduce or restrict those benefits, correct?
A. The law could change in the future. That is true.
Q. And as you stated previously, you would not be able to predict what Congress would do in this regard, correct?
A. I cannot predict what Congress will do. That is true.
Q. From a budget perspective, a change in eligibility requirements or benefit formulas would directly affect the amount that the VA needed to request in future appropriations, correct?
A. That is true.
Q. Have you made previous adjustments to VA budget requests based on those topics?
A. Yes.
Q. And even if Congress does not change

the underlying benefits themselves, you agree that Congress could fail to appropriate sufficient funds to pay all VA benefits, correct?

A. That is true.

Q. Earlier I referenced Fiscal Year 2024 when the VA made a supplemental appropriations request for 2.9 billion.

Do you recall discussing that?

A. I do.

Q. Would you agree that that supplemental request was made based on a perceived need of concern for inadequate funding?

MR. KLOTZBUCHER: Objection. Form.

You may answer.

THE WITNESS: Yes.

BY MR. VANSLYKE:

Q. Is there something you'd like to clarify about that statement?

A. I think that is an accurate statement. We estimated there was a need for additional funding and we asked for additional funding. Potentially a need for additional funding would be the most correct way to describe

it.

Q. Was it later determined that the VA in fact had sufficient funding?

A. Yes, we did determine that.

Q. But if that had not been the case and the supplemental funding had not been granted, the VA would have faced a shortfall in the compensation and pensions account, correct?

A. That is true. Yes.

Q. Would that have been despite the funds in the compensation and pension account being appropriated a year in advance?

A. Yes.

Q. And that supplemental request had to go the full approval process that we discussed earlier, correct?

A. That is true. We worked with people here at VA and OMB and we made a request through OMB and the President to Congress for additional funds.

Q. So in the event of a shortfall like the one the VA was concerned about in 2024, there is no automatic mechanism to ensure that Congress will always provide supplemental appropriations,

correct?
A. That is true. We have to ask for additional funds.
Q. Would you agree that the VA has no authority to simply create new budget authority on its own?
A. As the law currently reads, we do not have that authority.
Q. And would you agree that the VA cannot spend beyond appropriated amounts?
A. That is true. We cannot spend beyond appropriated funds amounts.
Q. So from a legal and financial control standpoint, the VA's ability to pay benefits is constrained by the amount Congress has appropriated, correct?
A. That is true.
Q. Are you aware generally that external budget analysts often identify veterans benefits as one of several rapidly growing mandatory aid programs?
A. I have --
MR. KLOTZBUCHER: Objection.
You may answer.

Objection.

THE WITNESS: I have heard that, yes.

BY MR. VANSLYKE:

Q. I'm sorry. Can you restate your answer?

A. I have heard that, yes.

Q. If I reference external budget analysts expressing those concerns, you understand what I'm referring to, correct?

A. Generally, yes.

Q. Do you understand that in the broader federal budget debate, mandatory programs are increasingly the focus of deficit reduction discussions?

A. I generally understand there's a lot of talk about that, yes.

Q. Can you explain to me why reducing mandatory spending would be important for deficit reduction?

A. It is a large and fast-growing component of the federal budget.

Q. If I refer to annual caps on discretionary spending, do you know what I'm

referring to?

A. I do.

Q. Could you explain what those annual caps are?

A. Yes. So in the context of the annual federal budget discussion, there are often proclamations or requests or commitments from various people involved in the annual budget process to hold discretionary spending to a certain rate of growth or to hold a component of the discretionary budget, like the nondefense component of the discretionary budget, to a certain rate of growth or to, you know, have a budget at a lower rate of growth or a negative rate of growth. All those are part of the budget discussions.

Q. And is it fair to say that those annual caps are not applied to mandatory spending?

A. You know, Congress can do what it wants, but the discussion is often around discretionary caps.

Q. And even though we have talked about VA benefits requiring annual appropriations, they are still not included within the bucket of funds

that are discussed with these annual caps, correct?

A. Specifically, the compensation and pension account is a mandatory account. So it is not a discretionary account, and the discussion is often about the discretionary accounts or the discretionary budget. That is true.

Q. And to contrast the two, mandatory spending is today a larger and faster-growing share of the federal budget than discretionary spending, correct?

A. That is true. Yes.

Q. Are you familiar with the Congressional Budget Office's periodic publications of budget options?

A. I am.

Q. Do you understand that these are documents that lay out possible ways to reduce federal deficits?

A. I am aware of that, yes.

Q. Are you aware that the Congressional Budget Office has identified options related to veterans benefits?

A. I am aware of that, yes.

Q. I am placing a document in the chat.
Can you see that I am sharing my screen?
A. Yes, I can.
Q. And you see at the top it says this is from the Congressional Budget Office, correct?
A. I see that, yes.
Q. And the title says "Options for Reducing the Deficit: 2025 to 2034," correct?
A. Yes.
Q. I'm scrolling down to the Contents and then to the Mandatory Spending list. It's page 4 of the PDF. It does not appear to have a page number.
You can see this Mandatory Spending list, correct?
A. Yes. Agriculture, Housing, Education, Health. Yes.
Q. And do you understand this to be the Congressional Budget Office identifying options to reduce mandatory spending?
A. Yes.
Q. And if I look at Option 23, it says "Introduce Means-Testing for Eligibility for VA's

Disability Compensation," correct?

A. Yes.

Q. Could you describe what that might mean?

A. You want to know what that means, you should go read what CBO says.

Q. I have the document here. Would you like me to scroll down to that section?

A. Sure.

Q. Okay. So we're on -- there's now a page number. It says page 31 for Option 23. It looks like this section is only one page. The next page starts a new section.

So please take a moment to review page 31 and let me know when you've finished.

A. I will review the documents you provided.

(Reviews document.)

All right. I have read what's on page 31.

Q. Could you summarize your understanding of what this option would do?

A. So currently VA disability benefits are paid without regard to the current income of

the veteran. This would propose to reduce those benefits based on income.

So specifically CBO is suggesting that incomes above 135,000, I guess, would be -- those disability benefits would be reduced.

Q. I am scrolling down.

So I'm looking now at Option 27 on page 35.

Do you see that the title says "Use an Alternative Measure of Inflation to Index Social Security and Other Mandatory Programs"?

A. I do.

Q. Would you like to review this section before you tell me what you understand that to mean?

A. Yes.

Q. Okay. I'll give you time. Please let me know when you finished reviewing.

A. (Reviews document.)

Okay.

Q. And can you summarize for me what you understand that option to mean?

A. So Social Security and other benefits, like compensation and pension program

here at VA, grow based on an annual inflation rate. That's called the cost-of-living adjustment, or a COLA. That is tied to a certain way of calculating the annual creation rate done by the Bureau of Labor Statistics.

There are other ways to calculate those estimates or those annual inflation rates. If you used a lower inflation rate, the costs would grow at a lower rate. So they're proposing to use GCPI, which has historically grown at a lower rate, and that would reduce the cost of benefits, like Social Security and compensation and pension at VA.

Q. Okay. I'm scrolling back up to Option 26. This is on page 34.

Do you see the title that says "Narrow Eligibility for VA's Disability Compensation By Excluding Veterans With Low Disability Ratings"? Do you see that?

A. I do, yes.

Q. Okay. Would you like to review before I ask you to describe it?

A. Yes.

Q. I will give you time. Please let me

know when you're finished.
A. (Reviews document.)
I have completed reading.
Q. And would you please describe for me what you understand this option to mean?
A. So currently, as you read there, veteran benefits are -- veteran benefits for service disabilities are paid according to a disability rating. It goes in 10 percent increments from 0 to 100 percent based on an estimate of kind of earning loss.
And what CBO is proposing is currently veterans start to receive benefits at the 10 percent disability rating. VA suggests that we could narrow the eligibility and only provide benefits to those rated 30 percent or higher. So those less than 30 percent would not receive benefits.
Q. Thank you.
I'm scrolling down to Option 55, which begins on page 65.
Would you like a moment to review this section?
A. Yes, please.

Q. Please let me know when you're finished.

A. (Reviews document.)

Okay. So what CBO is describing here in Option 55 is related to increase income or taxable income to the federal government by. Currently veteran benefits are excluded from tax. CBO proposes that disability benefits would be included in taxable income calculations.

Q. And do you understand that to suggest that the benefits themselves should be increased so that the benefits take home the same amount in their pocket?

A. That does not seem to be part of CBO's proposal.

Q. Do you understand instead that it would decrease the amount that the veteran gets to take home?

A. That would be the practical impact of this proposal, yes.

Q. I will go now to Option 40, which is on page 49.

Would you like a moment to review this section?

A. Yes.
Q. Okay. Please let me know when you're finished.
A. (Reviews document.)
Okay.
Q. And would you please describe what you understand this option to mean?
A. So this is related to how VA provides health care to veterans. So veterans when they enroll in the VA health care system, they are placed in a priority group ranging from 1 -- group 1 to group 8. Group 7 and 8 are tied to income or disability level -- disability rating level.
CBO proposes to unenroll or stop enrolling veterans in priority group 7 and 8. That would reduce the number of the veterans cared for by the VHA health care system and would reduce costs. So that is a way to reduce costs by reducing the number of veterans who receive health care services.
Q. Thank you.
I will stop sharing.
Court reporter, I believe I might

have forgotten to mark that as an exhibit. Is that correct?

Okay. I will mark that as Exhibit 9, please. Thank you.

(Document marked for identification as McIlroy Exhibit 9.)

BY MR. VANSLYKE:

Q. And I believe you, Mr. McIlroy, described those options as suggestions by CBO as to ways that Congress may reduce the budget deficit, correct?

A. That is true.

Q. As VA's budget chief, are you aware of any formal proposals within the current administration to adopt any of those options?

A. I am not.

Q. Are you aware of any proposals in recent administrations to adopt any of those options?

A. No. No.

Q. But the fact that these options are being studied and published reflects that veterans benefits are part of the broader conversation about controlling mandatory spending, correct?

MR. KLOTZBUCHER: Object to form.
You may answer.
THE WITNESS: Certainly benefits are part of the broader conversation about budgets. That's true.
BY MR. VANSLYKE:
Q. And you cannot rule out that future Congresses or administrations might pursue such changes to reduce the deficit, correct?
MR. KLOTZBUCHER: Objection. Foundation. Speculation.
BY MR. VANSLYKE:
Q. You can still answer.
MR. KLOTZBUCHER: You can answer.
THE WITNESS: Congress can do whatever it wants. I cannot rule it in and cannot rule it out.
BY MR. VANSLYKE:
Q. And would be the same be true that you cannot rule in or out whether the Trump Administration might pursue such measures in the future?

A. Hard to --

MR. KLOTZBUCHER: Objection. Foundation.

THE WITNESS: -- President Trump will do.

MR. VANSLYKE: I'm sorry. I couldn't hear you. Did you state an objection?

MR. KLOTZBUCHER: I said: Objection. Foundation.

You may answer.

THE WITNESS: Yes. So my answer is I cannot predict what President Trump will do.

BY MR. VANSLYKE:

Q. And would the same be true that you cannot predict what a future administration might do?

A. That is true. Yes.

Q. Do you know who VA Secretary Doug Collins is?

A. I do know who he is, yes.

Q. Are you aware that Secretary Collins testified before the House Veterans' Affairs

Committee on February 11th of 2026?
A. Yes.
MR. VANSLYKE: I am placing a file in chat. This is the statement published from Secretary Collins in regards to that hearing, and I will mark that as Exhibit 10.
(Document marked for identification as McIlroy Exhibit 10.)
BY MR. VANSLYKE:
Q. Can you see the document shared on my screen?
A. I can.
Q. And you see at the top that says this is the "Statement of the Honorable Douglas A. Collins, Secretary of Veterans Affairs, Department of Veterans Affairs (VA), Before the Committee on Veterans' Affairs, United States House of Representatives on Opportunities with VHA Reorganization, February 11, 2026," correct?
A. I see that, yes.
Q. Would you like a moment to review this document?
A. Do you want me to focus on some

specific part of it?

Q. Sure. Let me scroll down and find the section.

So I'm on page 2 and I'm looking at the first full paragraph, second sentence. Do you see that it says:

"This is the same conclusion we have heard for years from the VA's Office of Inspector General, the Government Accountability Office, and many in Congress - all of whom have repeatedly underscored the need to reorganize VHA."

Correct?

MR. KLOTZBUCHER: I'm going to object to foundation to this question and likely future questions because Mr. McIlroy is testifying to sources of funding of benefits programs administered by VBA, and this refers to the Veterans Health Administration.

So, Mr. McIlroy, you may answer with that caveat.

Objection. Foundation.

MR. VANSLYKE: I will rephrase before I proceed.

THE WITNESS: Okay.

BY MR. VANSLYKE:

Q. Mr. McIlroy, would you agree that in your role you oversee budgetary functions pertaining to VHA?

A. I do.

Q. Do you believe that you are informed as to the budget of the VHA?

A. I am.

Q. Can you speak with knowledge to the budget of the VHA?

A. I can.

Q. Thank you.

And do you see in this paragraph the sentence that I read previously?

A. "This is the same conclusion we have heard for years from VA's OIG, GAO, and many in Congress - all of whom have repeatedly underscored the need to reorganize VHA."

Q. Correct.

A. I see that sentence.

Q. Thank you.

And do you see -- excuse me -- in the first bullet it says:

"In 2016, GAO identified 'deficiencies in VHA's organizational structure and recommended significant restructuring, including eliminating and consolidating program offices and reducing VHA central office staff"?

A. I do see that sentence.

Q. And then the third bullet that says:

"In 2019, GAO noted VHA's lack of a comprehensive policy to define Veterans Integrated Service Network roles and responsibilities."

Correct?

A. I see that sentence as well.

Q. Are you familiar with the Veterans Integrated Service Network?

A. Yes, I am generally familiar with VISN.

Q. Could you describe for me what that is?

A. VISN is kind of geographic area responsibility for, you know, providing guidance and oversight to the health care facilities within its geographic regional responsibility.

Q. Does this include both the VA health care system and the Community Care Network?

A. So the Community Care Network is administered through an office called IVC, Integrated Veteran Care, and they have lead responsibility for interacting with the third party administrators who assemble a network of community care providers.
Q. So am I understanding correctly that the VISN pertains to the VA health care directly and that the Community Care Network is not part of this -- part of this network?
MR. KLOTZBUCHER: Objection. Foundation.
You may answer.
THE WITNESS: You can -- you got VHA people on your list. You can ask them about these things.
BY MR. VANSLYKE:
Q. Are you telling me that you don't know the answer?
A. What was the question?
Q. Am I understanding correctly that the regions you described under the Veterans Integrated Service Network do not apply to the Community Care Network?

MR. KLOTZBUCHER: Same objections.
BY MR. VANSLYKE:
Q. Go ahead and answer.
A. VISNs are primarily responsible for the VA direct care system.
Q. Thank you.
And the last paragraph on this page says:
"Chairman Moran said last year that, 'The VA needs reform. If the status quo were working, we would not have spent two weeks hearing from VSOs on way the VA needs to improve.'"
Correct?
A. I read that sentence there, yes.
Q. Do you have any understanding of what his statement is referring to?
A. VSOs are Veterans Service Organizations. They have a lot to say about how the VA should operate and about the ways VA can improve, and Chairman Moran appears to have held hearings and the VSOs came to those hearings and told Chairman Moran about ways the VA could improve.

Q. So scrolling back up to the first full paragraph, chairman -- I'm sorry, not chairman -- Secretary Collins' statement says, "You do not have to take my word for it," and then proceeds to list these examples.

And this page ends with the statement from Chairman Moran, correct?

A. All those things are on the page. That is true. Yes.

Q. Would you understand that to mean that Secretary Collins' statement here is endorsing the statement by Chairman Moran?

A. Secretary Collins believes the VHA should reorganize. So does Chairman Moran, I guess.

Q. And on the next page, the second paragraph says:

"So there is widespread agreement that VHA needs reorganization and reform, and that is exactly what we are doing."

Does that reflect the statement that you just gave me?

A. That is the statement of Secretary Collins.

Q. That you believe Secretary Collins believes that the VHA needs reform?
A. He put it in his testimony. Yes, I think he does believe that. That's what he testified to.
Q. Thank you.
I will stop sharing this document.
Are you aware of the VHA being restructured to date?
A. Generally, yes. I've read about VIPER. I've heard the hearings.
Q. Has the VA -- excuse me. Strike that.
Has the VHA already been restructured?
A. The VHA has restructured multiple times over the course of its existence.
Q. Could you describe examples of what you're referring to as a restructuring of the VHA?
MR. KLOTZBUCHER: Objection. Foundation.
BY MR. VANSLYKE:
Q. You can still answer.
A. So previous Under Secretaries have

reorganized. Dr. Stone when he was the Under Secretary reorganized. Yeah. So all variations on, you know, how best to organize lines of reporting and organizational structures.

Q. As far as Secretary Collins' statement that he wishes to reorganize the VHA, do you understand that as a desire to improve efficiency and reduce costs?

MR. KLOTZBUCHER: Objection. Foundation again to line of questioning referring to the VHA.

Mr. McIlroy, you may answer.

THE WITNESS: Yes, I think that's what the Secretary thinks he will do.

BY MR. VANSLYKE:

Q. Are you aware of any similar discussions to restructure VBA benefits?

A. No, but -- no.

Q. Are you aware of any discussions to reduce costs stemming from VBA benefits?

A. All federal leaders should be focused on reducing costs.

Q. And if an agency undertakes an

organization with the goal of cost reduction, that can include examining whether current benefit structures are sustainable, correct?
A. Can you rephrase the question?
Q. If you are looking at a government program in attempts to reduce the cost as you -- I'll rephrase again.
You stated that you believe federal programs should be looking towards reducing costs, correct?
A. Good managers should look at their costs, yes.
Q. And if -- excuse me.
If a manager is undertaking to reduce costs, that could include examining whether the current benefit structures and relevant appropriations are sustainable, correct?
A. A good manager should look at everything. So yes.
Q. From a -- from a budgeting perspective, do you believe that agencies should review whether current benefit structures and appropriations are sustainable?
A. Yes.

Q. Just checking in. I'm in a different time zone at the moment, but I believe it's about noon where you are, correct?
A. 12:09. Yes.
Q. Would you like a short lunch break?
A. I would.
MR. VANSLYKE: All right. Now would be a good time. So we'll go off record.
THE VIDEOGRAPHER: All right. We're going to go off record at 12:09 PM.
(Whereupon, at 12:09 PM, a luncheon recess was taken.)

AFTERNOON SESSION

(1:02 PM)

ANDREW MCILROY

called for continued examination and, having been previously duly sworn, was examined and testified further as follows:

EXAMINATION (CONTINUED).

THE VIDEOGRAPHER: We're back on the record. The time is 1:02 PM.

BY MR. VANSLYKE:

Q. Okay. So, Mr. McIlroy, you have described at points today different accounts within the VBA budget, correct?

A. Correct.

Q. Could you explain to me what is the difference between an account and a benefits program?

A. So an account is how Congress appropriates funding and accounts may contain several programs within it. So, for example, the rehabilitation benefits accounts, the RB account contains a variety of education benefits programs within it.

Q. And I believe you have described

compensation and benefits as one distinct account; is that correct?

A. Compensation and pension is an account. C&P.

Q. Apologies. I misspoke.

To rephrase for clarity.

Compensation and pension is one VA account, correct?

A. That's correct. Yes.

Q. Are those two separate programs, compensation versus pension?

A. Yes.

Q. Could you describe the difference between those two programs?

A. So compensation is -- compensation program is related to the payments to veterans for their service-connected injuries or disabilities, and the pension program is for families for other, you know, additional benefits paid to families or veterans.

Q. Would an example of that be the DIC benefits we discussed earlier?

A. Yes.

Q. Are the pensions paid under this VA

account distinct from military pensions?
A. Yes.
Q. Am I correct that the VA itself does not pay military pensions?
A. That is true. Yes.
Q. Am I correct that VHA services are not funded through the compensation and pension account?
A. That is true. Yes.
Q. What would be the account that governs those services?
A. They are generally --
MR. KLOTZBUCHER: Objection.
You may answer.
THE WITNESS: Generally four accounts that fund VHA operations. Those are the four medical care accounts: Medical Services, Medical Community Care, Medical Facilities, and Medical Support and Compliance.
BY MR. VANSLYKE:
Q. Could you briefly explain the distinction between those accounts?
MR. KLOTZBUCHER: Objection.

Foundation.
You may answer.
THE WITNESS: In general, Medical Services supports the cost of health care providers in VHA, the VHA direct care system. The Medical Community Care account funds the cost of care in the community, so in non-VHA facilities.
Medical Support and Compliance is, in general, the administrative functions that go to run the nation's largest integrated health care system.
And Medical Facilities are the cost of maintaining our facilities across the country. So replacements of chillers and those kind of things, as well as the staff that support the buildings.
BY MR. VANSLYKE:
Q. So I think I'm still unclear on the distinction between the first and third accounts.
Am I correct that you said the first account funds the VHA facilities themselves and the third account also funds the VHA facilities

themselves?

A. So the first account was the Medical Services accounts -- account and that's primarily where we pay for doctors and nurses, pharmaceuticals, contracts that support the running of hospitals, and those kind of things.

And in the Medical Support and Compliance account is where we would fund the headquarters staff here at VACO in the Veterans -- Veterans Health Administration, as well as the VISN staff, the regional management offices -- what we call VISNs -- as well as, like, hospital center directors, as well as the police are paid out of that account at a -- at a hospital.

So all the things that go to support health care delivery but are not actual, say, doctors and nurses and drug benefits and those kind of things.

Q. And all of those medical services costs themselves would be attributed to the first account that you described?

A. That is correct.

Q. Are those services provided at the VA facilities administered under a managerial cost

accounting system?

MR. KLOTZBUCHER: Objection.
Foundation.
You may answer.

BY MR. VANSLYKE:

Q. You can answer.

A. Yes.

Q. Could you explain what that means?

A. So as part of the budget process, we look at the estimated costs for caring for veterans at a relatively detailed level based on the expected health care needs of veterans, and those health care needs are based on full cost accounting.

So if you go to the doctor -- if a veteran goes to the doctor at his or her VA medical center, we would estimate the cost of care based on the full cost of care, which would include, you know, the building, electricity, you know, the guards at the front door of the hospital. All those associated costs.

All those associated costs are collected and processed through the managerial cost accounting system.

Q. You understand what I mean when I describe those two categories as direct and indirect costs?

A. Yes.

Q. Would you agree that those are appropriate labels for the distinction you just described?

A. Yes.

Q. Are the indirect costs also under the same account?

A. So you could find indirect costs in the Medical Services account.

Q. Are there portions of the indirect costs that come from another account?

A. Can you rephrase?

Q. Do I understand correctly that you've described the first account for medical services at VA facilities as including all of the costs for medical services at VA facilities, correct?

A. So we pay for the cost of providing care at VA facilities through three accounts: Medical Services, Medical Support and Compliance, and Medical Facilities. You can't have care

without a building. The Medical Facilities account pays for the building costs.

Q. And would a portion of the building costs be reflected as indirect costs?

A. Some accountants would do that, yes.

Q. Is it fair to assume that direct costs would be attributable to the Medical Services account?

A. In general, yes.

Q. But that the indirect costs may be more broad and may include some expenditures from other accounts, correct?

A. That is true. Yes.

Q. So in the process of administering this managerial cost accounting system, is it fair to say that the VA maintains internal data reflecting the average cost of providing care within its own facilities?

MR. KLOTZBUCHER: Objection. Foundation.

You may answer.

BY MR. VANSLYKE:

Q. You can answer.

A. That is true. Yes.

Q. And I believe you described the second account as the source of funding for the Community Care Network, correct?
A. That is true. Yes.
Q. Is that administered by something other than a managerial cost accounting system?
MR. KLOTZBUCHER: Objection. Foundation.
You may answer.
THE WITNESS: Can you rephrase?
BY MR. VANSLYKE:
Q. Would you say that there are differences in how the VA administers costs under the Community Care Network versus costs under VA Facilities?
MR. KLOTZBUCHER: Same objection.
You may answer.
THE WITNESS: So VA collects costs for care from these two pathways of care -- care provided through the direct care system, care provided through the community -- and VA collects those two

cost streams and analyzes those costs and uses those cost streams -- care provided in the community, care provided in the direct care system -- to project future care costs.

BY MR. VANSLYKE:

Q. What is the purpose of those projections of future costs?

A. They're used for a variety of things, including making budget estimates and also using for estimating demand and helping VA plan how care is provided.

Q. Do those projections have any impact in determining the actual costs of future care?

A. What determines the actual cost of future care is the actual costs.

Q. Is that equally true for care provided at VA facilities and care provided through the Community Care Network?

A. Actual costs, no matter where they are provided, are determined by the actual costs.

Q. Does the VA set the costs at VA facilities?

A. So VA determines how many health

care providers to hire. VA determines, you know, what services it will provide in the direct care system. And those factors go to determine the actual costs. Other factors, such as the cost of electricity, are not set by VA but, you know, VA can decide to turn the lights on and off.

Q. So some of the factors are set by VA and some of them are outside of the VA's control, fair?

A. That's true. Yes.

Q. Would you say that the VA sets the costs for services provided under the Community Care Network?

A. So those costs are negotiated. Many of them -- most costs are paid at Medicare rates for care provided in the community. There are some cases where we pay more.

Q. What would determine whether it's the Medicare rate or not?

A. Depends on the service and the location or the negotiated rate that we set with that provider for that need.

Q. So if I'm understanding correctly, the VA negotiates and sets those rates, but it is

based on the rates that Medicare has negotiated, correct?

A. Medicare rates are the basis for what we pay in general for community care. That is true.

Q. So if those negotiated rates are based on the Medicare rates, they are not based on the VA's internal managerial cost accounting for services provided at VA facilities, correct?

A. Yes, that is true.

Q. And when your office is preparing future budget projections involving the Community Care Network, you would use the projected reimbursement rates that we just described, correct?

A. Yes.

Q. So is it fair to say that your future budget projections related to the Community Care Network are also based on the Medicare payment rates?

A. Yes.

Q. Going back to the VA facilities directly, am I understanding your description correctly that there are essentially fixed costs

based on determinations for how many providers to hire, for example, rather than the costs varying based on the number of services provided?
A. So for VA care provided through the direct care system, there are both fixed and variable costs.
Q. Would the variable costs vary based on, for example, whether one patient or two patients are seen in a given day?
A. It depends based on the nature of services.
Q. Could you give me an example of when that would make a difference versus when it would not?
MR. KLOTZBUCHER: I'm going to object to foundation --
THE WITNESS: Yeah.
MR. KLOTZBUCHER: -- for this question and any one in the future that has to do with VHA-related budgetary issues.
MR. VANSLYKE: I understand your objection, counsel.
MR. KLOTZBUCHER: You may

answer.

BY MR. VANSLYKE:

Q. You can still answer.

A. So what's the question? Can you rephrase?

Q. You said that sometimes there would be variable costs based on the services provided, correct?

A. That is true. Costs vary based on the services provided.

Q. Could you give me an example of a scenario where the amount of services provided would or would not change the costs?

A. So, for example, if you were a veteran and you went to a VA medical center for a flu shot, that is a relatively inexpensive treatment versus if you went for open heart surgery. That's a very expensive treatment. So there you have to have two variable cost scenarios based on the nature of care provided.

Q. So under your example, if there were a vaccination day where the staff were already allocated, the vaccines have already been purchased, it would not change the costs based on

how many veterans showed up, correct?
A. Under that scenario, you could -- you could describe the costs in that way under that scenario.
Q. But if two heart surgeries had to be performed in the same day, there would be more costs involved than if it was only one heart surgery, correct?
A. Essentially because there are additional supplies involved in providing heart surgeries. You know, there are a variety of variables that go into estimating costs.
Q. I know we have discussed the actuarial analysis for VBA benefits.
Am I understanding correctly that there are also actuaries analyzing future costs for VHA?
A. That is true. Yes.
MR. KLOTZBUCHER: Objection. Foundation.
You may answer. Sorry to talk over you.
THE WITNESS: No.
That is true. Yes.

BY MR. VANSLYKE:
Q. Would the same be true for the Community Care Network?
MR. KLOTZBUCHER: Objection. Foundation.
You may answer.
THE WITNESS: Actuaries also analyze costs in the community.
BY MR. VANSLYKE:
Q. And would you agree that other entities, such as GAO, have also analyzed costs under both the VHA and Community Care Network?
A. That is true. Yes.
MR. KLOTZBUCHER: Objection.
BY MR. VANSLYKE:
Q. Would you agree that Community Care Network reimbursement rates would tend to reflect higher per-service costs than the incremental cost of providing that care at VHA facilities?
A. That's a very complicated question.
MR. KLOTZBUCHER: Objection. Foundation.
BY MR. VANSLYKE:
Q. Can you explain to me why that's

complicated?

A. So it depends on how you calculate the cost.

Q. How so?

A. So, for example, you know, we're not always comparing apples to apples. VA provides additional services that are not always provided in the community, and those go to the cost of the total VA direct care system.

So, for example, VA provides certain services to help veterans schedule their appointment. VA provides certain services related to transportation to and from appointments, be they in the community or in the direct care system.

VA provides a variety of benefits that are not always available in the community, and the community provides a variety of benefits that the VA doesn't always provide. For example, maternal care. VA is not in the business of delivering babies. So there's no comparable cost there, for example.

So that's why it's complicated.

Q. So I understand that there are some

medical services provided through the Community Care Network that are not provided through VA facilities, correct?

A. That is true. Yes.

Q. So there would be no way to compare the costs between those two programs if only one of them provides that service, correct?

A. That is true. Yes.

Q. And when you describe things like transportation that the VA provides, that would be the opposite scenario where the VA provides something that the Community Care Network does not, correct?

A. Yes.

Q. So there would be no way of comparing those services for the same reason because they are provided through the VA but not through the Community Care Network?

A. That is true. Yes.

Q. And I understand you're saying, depending how you calculate the cost of services provided at the VA, it might include those additional services that are not provided by the Community Care Network, correct?

A. That is true. Yes.

Q. So if that is true, then there are some things that cannot be apples to apples.

Would it be fair to say that the price for a service under the VA facility may not be a direct comparison to the price for the same service under the Community Care Network?

MR. KLOTZBUCHER: Objection. Foundation.

You may answer.

THE WITNESS: Can you restate the question?

BY MR. VANSLYKE:

Q. If the cost of a heart surgery at the VA includes the cost of transportation to and from the heart surgery, there would be a disconnect between comparing that to the cost of a heart surgery through the Community Care Network, correct?

MR. KLOTZBUCHER: Same objection.

You may answer.

THE WITNESS: Yes. It is -- it is difficult sometimes to

compare costs for apparently like procedures.

BY MR. VANSLYKE:

Q. Would you agree that over the last five years community care spending has grown faster than direct care spending?

MR. KLOTZBUCHER: Objection. Foundation.

You may answer.

THE WITNESS: That is true. Yes.

BY MR. VANSLYKE:

Q. And on the note of costs that may be different between the two programs, would you agree that there can be administrative costs for services provided under the Community Care Network that would not be billed in the same way for care through the VA?

A. Yes.

Q. Would it be a closer analogy if you were looking at the indirect cost total rather than the direct cost total?

A. There are many ways to do cost accounting. It would depend on the cost

accounting approach.

Q. Would it be inappropriate to compare the reimbursement rates through Community Care Network to Medicare costs?

A. You know, it depends on what you are doing and the comparison made. I can't say if something is appropriate if I don't know what it is that is being compared for what purpose.

Q. So when you described the managerial cost accounting for the VA facility services, you described that as including the additional costs beyond the medical services themselves, correct?

A. That is true. Yes.

Q. And you said that the Community Care Network services are based on Medicare rates, correct?

A. In general, yes.

Q. Is it fair to say that since the Community Care Network services are based on the Medicare services, they are not based on the VA's accounting for the indirect costs in the way that you do for the VA facilities directly?

A. If you want to know how Medicare determines their rates, you should go talk to

them, but, in general, they are trying to pay reasonable fees for the services provided.

Q. Just to clarify, what you're saying is: Medicare may take those factors into consideration, but the VA does not make those determinations.

The VA pays based on the Medicare negotiated rates, correct?

A. Yes.

Q. Okay. So I'm going to turn back to the VBA disability benefits for now.

We discussed this briefly, but the disability rates are adjusted annually for cost of living, or COLA, correct?

A. That is true. Yes.

Q. And at present, those adjustments are tied to the Consumer Price Index, correct?

A. Tied to Social Security COLA, which is, I believe, tied to the CPI.

Q. Thank you.

There are other measures that could be substituted instead of CPI or instead of the Social Security COLA, correct?

A. Certainly. Anything you want.

Q. And is it fair to say that those annual adjustments are based on statutes that require those adjustments?

A. The COLA is enacted by an annual act of Congress. The COLA happens because of an annual act of Congress.

Q. So each year Congress has to approve the cost-of-living adjustment to VBA disability benefits?

A. Yes.

Q. So presumably it is within Congress's authority to not do so?

A. Presumably, yes.

Q. And in your experience at the VA, have those rates always increased?

A. Yes.

Q. Have they always increased by the Social Security COLA?

A. To my knowledge, yes.

Q. Have those adjustments always been the same or has the Social Security COLA fluctuated over time?

A. Changes over time.

Q. Does inflation play a role in the

Social Security COLA?
A. Yes.
Q. Is it fair to say that in a year with higher inflation the COLA will be higher?
A. Yes.
Q. In general, you are aware that VBA disability benefits are awarded under a rating schedule, correct?
A. I am aware, yes.
Q. And is it your understanding that this rating schedule is essentially the criteria for assigning a disability percentage to a particular veteran?
A. Yes, that's my understanding.
Q. Has the rating schedule ever been revised?
A. Yes.
Q. And when the rating schedule is revised, that can change how the criteria apply to a particular veteran, correct?
A. It's true. Yes.
Q. So if the rating schedule is revised, a veteran's rating could go up or down depending on how the new criteria applies to them,

correct?

A. That would depend on the rating but, theoretically, yes. The rating schedule but, theoretically, yes.

Q. So even for a veteran who is currently rated as 100 percent disabled, there is no guarantee that the rating schedule will not change in a way that reduces their rating, correct?

A. VA would have a variety of ways to implement such a rating change. They might grandfather the veteran but -- so that veterans wouldn't receive a reduction in ratings but, you know, there's a variety of ways to implement such changes if they were to be made.

Q. Am I understanding correctly that you're saying it is possible for a change to have that effect?

A. It is possible, yes.

Q. And that it may be possible for the VA to essentially nullify that effect through other means; is that correct?

A. That is true. Yes.

Q. But there is also no way to

guarantee that the VA would take such an action, correct?

A. There's no way to predict the future. That is true.

Q. And would you agree that it is within the authority of Congress to change the rating schedule such that the VA cannot nullify the effect?

A. Yes.

Q. When we have discussed the actuarial analysis, is that analyzing trends over a population?

A. (Video malfunction).

Q. Can you hear me?

MR. KLOTZBUCHER: I'll object to form. Can you rephrase?

THE VIDEOGRAPHER: I think he's frozen.

MR. VANSLYKE: Can you hear me now?

THE VIDEOGRAPHER: I hear you, but I don't think the witness -- I think the witness is frozen.

MR. VANSLYKE: Ah.

THE VIDEOGRAPHER: Should we go off the record?

THE WITNESS: Mr. McIlroy.

THE VIDEOGRAPHER: Yeah, he jumped off.

All right. We're going to go off the record at 1:40 PM.

(A recess was taken.)

THE VIDEOGRAPHER: Back on the record at 1:40 PM.

BY MR. VANSLYKE:

Q. Okay. I will restate my question.

We have discussed the actuarial analysis that the VA uses to project for future budgetary needs, correct?

A. We have, yes.

Q. Is it fair to say that that analysis is conducted on the entire population of recipients?

A. Yes.

Q. As opposed to being calculated for one plaintiff -- one benefit recipient individually, correct?

A. Correct. It looks at the entire

population.

Q. Would you agree that you cannot predict with certainty what any individual veteran will be paid over their remaining lifetime through VBA benefits?

A. So the premise of actuaries is that you can make reasonable estimates over future costs, but of course individual benefits and individual payments will vary.

Q. So you have agreed with me that Congress has the authority to change eligibility rating criteria, benefit formulas, and the cost-of-living adjustment, correct?

A. That is true. Congress can change the law.

Q. And is it fair to say that changes implemented by Congress can be prospective in the sense that they apply to future benefits?

A. That is true. Yes.

Q. Are you aware that the VA at times provides retroactive awards of benefits?

A. I am aware.

Q. Could Congress enact changes to benefits that would otherwise be awarded

retroactively?
A. Yes.
Q. So as an example, if Congress were to enact means testing for disability compensation, as the Congressional Budget Office has studied, that could reduce or eliminate benefits for some veterans that are currently receiving them, correct?
A. It would depend on the law.
Q. But you would agree that that's at least possible?
A. Congress can make whatever law it likes, yes.
Q. And if that means testing were to be applied to retroactive awards, it could also affect benefits that would otherwise be awarded retroactively, correct?
A. Congress can make retroactive changes. That is true. Yes.
Q. And if Congress decided to freeze cost-of-living adjustments for a period of years, they would have the authority to do so, correct?
A. They do, yes.
Q. And from what I understand from your

earlier testimony, they would not even have to affirmatively freeze it. They would just not enact it in a given year.

Correct?

A. Yes, that would be true.

Q. And if Congress froze or reduced a cost-of-living adjustment for a given year, that would effectively reduce the real value of the benefits in present time, correct?

A. Depends on the state of the economy. You know, so if we were in an inflationary period, it would, but if we weren't in an inflationary period, it wouldn't.

Q. So assuming that there is inflation, the real value of a benefit remaining at the same dollar value would reduce absent a cost-of-living adjustment, correct?

A. Buying power would be reduced, yes, in an inflationary period with no COLA.

Q. And if Congress were to narrow the criteria for secondary service condition, that could also reduce the benefits received by a particular veteran, correct?

A. Could you clarify the question?

Q. Do you understand what a secondary service connection rating is?
A. Can you explain it?
Q. My understanding is that the VA will label a condition as a secondary service condition if, for example, the VA determines that a veteran's kidney cancer is service connected, and then subsequently determines that diabetes was developed secondary to the kidney cancer which has been rated as service connected.
Do you understand my description at least?
A. That is my understanding as well, yes.
Q. Okay. So you understand and agree with my description of secondary service connection, correct?
A. I do, yes.
Q. So if Congress were to narrow the criteria for injuries to be rated as a secondary service connection, that could reduce the benefits received by individual veterans, correct?
A. Well, certainly that potential exists.

Q. And you have no role in deciding whether Congress will or will not make those types of changes, correct?
A. We do support the estimates of potential costs when Congress considers legislation, including changes to benefits, but that is the limit of my role in that process.
Q. Am I understanding correctly that if Congress is considering implementing legislation that would affect VA benefits, the VA will provide an estimate of the additional or saved costs that would result from those changes?
A. That is true. We frequently would.
Q. But the VA would not ultimately decide whether or not Congress will implement those changes, correct?
A. Congress decides. VA -- Congress would no doubt ask VA as the implementing agency, you know, what are the pros and cons of the considered legislation, but ultimately Congress decides.
Q. Do you play a role in providing that advice?
A. For things that are financial

related, the Office of Management, including the Office of Budget, does provide analysis of those potential issues.

Q. Am I understanding correctly that your office would provide the cost estimate but not the pros and cons analysis?

A. You know, pros and cons come from a variety of perspectives or a variety of -- I don't know -- viewpoints. We would certainly say, for example, if a legislation was extremely complicated, complicated is bad because it drives costs and we would point that out.

Q. Would your office provide advice as to whether or not it would be good for veterans to make a certain change?

A. So whether it would be good for veterans or not is a matter of a beholder. Right?

Q. Would your office provide its perspective on whether or not it is good for veterans or would it defer to legislators?

A. In a sense, it's the job of the Secretary to provide his perspective. We provide advice to the Secretary. The Secretary asks us what we thought. We tell them what we think, but

ultimately it's the Secretary's job to offer the department's viewpoint on anything related to veterans.

Q. I think I'm understanding that the primary role that your office would play would be the cost analysis; is that correct?

A. Yes.

Q. Okay. Are you familiar with the VA's Financial Policy Documents?

A. I am.

Q. Could you describe what the Financial Policy Documents are?

A. So the Financial Policy Documents for the VA, like all federal agencies, describes how we are to administer the funds that are provided to VA, and they kind of run the full gamut from very high level to very specific, you know, like how to process travel vouchers, for example.

Q. Have you reviewed the VA's Financial Policy Documents?

A. I have.

MR. VANSLYKE: I am placing a file in chat and I will screen share it

in just a moment, and I will mark this as
Exhibit Number 11.
(Document marked for
identification as McIlroy Exhibit 11.)
BY MR. VANSLYKE:
Q. Okay. Can you see that I'm sharing my screen?
A. I can. Chapter 6.
Q. So this is Volume VI Chapter 6 of the VA Financial Policy Documents, correct?
A. Yes.
Q. I will scroll down. Give me just a moment.
Okay. So I'm starting on page -- the bottom of page 5. You see 0605 Policies?
A. Yes.
Q. So this is describing essentially the requirement to estimate and report on the VA's liability to pay federal employees and veterans benefits, correct?
A. Correct.
Q. And under bullet B I see "OAS."
Do you recall what that acronym stands for?

A. Office of Actuarial Services.
Q. So it says:
"OAS actuaries will calculate the present value of the Veterans Benefits Liabilities using standards established by Actuarial Standards Board and FASAB, for compensation, burial, and education benefits for recordation in VA's accounting system."
Correct?
A. It says that, yes.
Q. And is this referring to the same actuarial analysis that we have discussed previously?
A. This is slightly different.
Q. Could you explain how it's different?
A. So previously we discussed specifically in the case of veterans benefits, primarily talking about compensation benefit -- compensation and pension benefits, the estimates used for preparing the budget request.
This is talking about estimate of liabilities that is reported in the accounting statements and in the annual audit.

Q. Would you say there's a difference in how the analysis is performed or a difference in the purpose for the analysis?
A. The difference is in the purpose for the analysis.
Q. Is it fair to assume that all of the actuarial analysis that we have been discussing would follow the same standards established by Actuarial Standards Board and FASAB?
A. In general, yes.
Q. Do you know what FASAB stands for?
A. Federal Accounting Standards Board or something like that. It's up there. The FASAB. Federal.
Like the FASAB is the GAO, the Treasury or -- no.
Q. If I represent that it's the Federal Accounting Standards Advisory Board --
A. Yes.
Q. -- would you agree with that?
A. Yes. There you go.
Q. Okay. Okay. Give me one moment.
I'll stop sharing instead of making everybody dizzy, and I'll put it back up in a

second.

I can be done with that document, actually. So we'll move on.

Just to confirm, you are familiar with that volume and chapter of the Financial Policy Documents generally, correct?

A. I am.

Q. And you would agree that that addresses the process by which the VA identifies the federal employees' and veterans' benefits liabilities, correct?

A. Yes, it's for different purposes. We previously talked about budgeting. That's for financial reporting, but they are related.

Q. Okay. And you are generally familiar with the actuarial analysis even though you are not yourself an actuary, correct?

A. That is true. Yes.

Q. Do you understand them well enough to understand the actuarial analysis and interpret what it means for the budget?

A. Yes.

Q. Would you agree that actuarial analysis is based on probability models?

A. Yes.
Q. Would you agree that actuarial analysis, in this context at least, is based partially on life expectancy tables?
A. That is true. Yes.
Q. Are you aware that the VA uses veteran-specific life expectancy tools?
A. Yes.
Q. If I refer to the Veteran Eligibility Trends and Statistics sometimes abbreviated as USVETS, do you understand what I'm referring to?
A. USVETS or VetPop?
Q. Yes.
A. Yes.
Q. If I refer to the United States Veterans Life Tables, do you understand what I'm referring to?
A. Generally, but I've never seen them.
Q. But you are aware that they exist, correct?
A. Yes.
Q. And would you agree that this is distinct from general life expectancy tables?

A. The degree to which they differ I don't.

Q. But would you agree that they are not one in the same thing?

A. I understand them to be different because they have different names.

Q. And do you understand that the VA actuaries rely on veteran-specific life expectancy tools such as these?

A. It's my understanding, yes, that the assumptions in the veteran benefits calculations, as well as the veteran health care calculations, rely on the characteristics of veterans including their life expectancy.

Q. And you stated that using this actuarial analysis, the VA is able to reasonably estimate the future benefits to be provided, correct?

A. Yes.

Q. Are actuaries -- I'll rephrase my question.

Would you agree that the role of the actuaries in providing this analysis is to account for variables in the future?

A. Yes, that's part of their job. Yes.
Q. Would you agree that when accounting for variables in the future, there is inherently a degree of uncertainty?
A. Yes.
Q. Would some of those variables include future changes in laws or regulations?
A. Future laws and regulations could change in the future. That is true.
Q. Would those variables include changes in veteran mortality and life expectancy?
A. So the estimates about future mortality and life expectancy are based on historical trends. So they would assume -- it would be unreasonable to assume something anomalous that wasn't supported by the data.
Q. Apologize. Let me rephrase that question.
The variables accounted for by the actuaries would include fluctuations in veteran mortality and life expectancy averaged across the data that they're looking at, correct?
A. That's an inherent part of the job is to use the data to make estimates about future

life expectancy and other characteristics.

Q. Does the actuarial analysis include changes in disability ratings such as reevaluations and appeals?

A. So those things are part of the historical records. So they would be included in estimates going forward.

Q. And would the actuarial analysis also include economic factors affecting cost-of-living adjustments?

A. The actuaries make assumptions about future cost-of-living adjustments, yes.

Q. And is it fair to say that the actuaries are inherently limited by the potential that those assumptions could be incorrect?

MR. KLOTZBUCHER: Objection. Form and foundation.

BY MR. VANSLYKE:

Q. You can still answer.

A. Can you restate the question?

Q. Is it fair to say that actuarial analysis is limited by the assumptions we have discussed, such as cost-of-living adjustment, for example, and that those assumptions may turn out

to be incorrect in the future?
MR. KLOTZBUCHER: Same objection.
You may answer.
THE WITNESS: So actuarial estimates about the future are based on assumptions and assumptions may or may not be correct.
BY MR. VANSLYKE:
Q. Do you believe that the VA's actuarial analysis is of high quality?
MR. KLOTZBUCHER: Objection.
THE WITNESS: Yes.
BY MR. VANSLYKE:
Q. Do you believe that they meet the standards required?
MR. KLOTZBUCHER: Objection to form.
You may answer.
THE WITNESS: So I know that there are certain standards to be -- to be an actuary, and the actuaries here at the VA meet those standards, which are like accreditation by the Actuarial

Standards Board or something like that. You should ask the actuaries themselves these questions.

BY MR. VANSLYKE:

Q. When providing budgeting information for the VA, would you place greater trust in the actuarial analysis performed by the VA's actuaries than you would in projections from an economist unfamiliar with VA benefits?

MR. KLOTZBUCHER: Objection. Foundation.

You may answer.

THE WITNESS: Yeah. I don't know about anonymous economists, but it's certainly logical that the VA actuaries, who deal every day with VA data and have a deep and rich understanding of the programs, can make reasonable estimates based on that deep and rich understanding of the data.

BY MR. VANSLYKE:

Q. Would you agree that VA actuaries developed specialized knowledge of the VA benefits provided?

A. Yes.
Q. Would you agree that that specialized knowledge would enhance their future projections about those benefits?
MR. KLOTZBUCHER: Objection. Foundation.
You may answer.
THE WITNESS: So the quality of estimates is certainly improved by, you know, a better understanding of how the program functions.
BY MR. VANSLYKE:
Q. Is there any other specialized knowledge that you believe would be relevant to those projections?
A. Not currently. I mean -- yeah. So let's say that. The answer is no.
Q. Do you believe that projecting future benefits provided by the VA is a simple process?
A. It is complex.
Q. Do VA actuaries project future benefits to be received by individual plaintiffs?
A. VA actuaries project costs for the

program.

Q. Is it fair to say that that represents an average across all recipients, not one recipient individually?

A. It is the sum of all estimates, yes. So it's for the population as opposed to an individual.

Q. And none of your testimony today seeks to guarantee the scope or duration of any individual plaintiff's benefits, correct?

A. No.

Q. You are also not testifying to the payments that will be received in the future for any individual recipient, correct?

A. That is correct.

Q. If I were to ask you to do so, could you?

A. If you were asking me to do what?

Q. If I were to identify an individual recipient of benefits from the VA and ask you to tell me the value of the benefits they will receive in the future, could you do that?

A. No.

Q. Why not?

A. I don't have the proper data. I don't know anything about the individuals.
Q. And if you were trying to answer that question, that would also be subject to the same sorts of legislative action that we've discussed previously, correct?
A. Can you rephrase the question?
Q. If you were attempting to identify the value of benefits to be received by an individual recipient in the future, any projection could also be altered by the legislative actions we've discussed that could change VA benefits at large, correct?
A. Future benefits means could change as the result of congressional actions. That is true.
Q. Excluding retroactive payments, is it true that disability compensation is paid monthly?
A. That is true. Yes.
Q. And when a veteran dies, do those disability payments stop?
A. Yes.
Q. And any benefits to survivors, such

as the DIC benefits we discussed earlier, you said are separate entitlements, correct?
A. Correct.
Q. Do you know whether those entitlements, DIC specifically, have their own eligibility criteria separate from the now deceased veteran's disability criteria?
A. It is my understanding that they are -- that they have separate criteria.
Q. Do you know whether the payment amounts differ between DIC benefits and veterans disability benefits?
A. They do differ, but I am not intimately familiar with all the details.
Q. Is it fair to say that if a veteran is receiving a certain monthly payment and the veteran were to pass away, you would not assume that any DIC benefits would be in the same amount, correct?
A. That is true. Yes.
Q. Is it fair to say that the total amount of disability compensation a veteran receives will be impacted by how long the veteran lives?

A. Yes.
Q. And if you are looking at the benefits received by an individual veteran, would you be able to predict how long that veteran will live?
A. Would I? I have no basis to make those kind of judgments.
Q. Would you agree that benefits can also be stopped or reduced while the veteran is alive?
A. There are a variety of factors that could change veteran benefits. That's true. Yes.
Q. If the VA reevaluates the veteran's condition and reduces the rating, would that be one way that that could happen?
A. That is possible, yes.
Q. If subsequent medical documentation led the VA to conclude that an injury is not service connected, could that change the benefits being provided?
A. It's my understanding that that is true, yes.
Q. If a veteran's dependency status changes, such as a spouse passing away, could that

change the amount of benefits being provided?

A. To my understanding, yes.

Q. If the veteran becomes incarcerated could that change the amount of benefits being provided?

A. It's my understanding, yes.

Q. So even assuming that the veteran does not pass away, there are multiple ways that a veteran's benefits can change in duration or amount, correct?

A. There are some limited ways that benefits could change. That is true.

Q. And given those potential changes, the actual duration of benefits provided to an individual veteran is uncertain because of the possibility of those changes, correct?

A. It is true that a veteran's benefits may change over time.

Q. And if the duration of benefits changed but the payment amount stayed the same, then the total amount of payment would also change according to the duration, correct?

A. Basic math? Yeah.

Q. If I were to ask you to identify the

total value of disability benefits provided to a veteran from any time in the past, could you identify that number?

A. Could I? No.

MR. KLOTZBUCHER: Objection. Form.

Sorry for talking over you. You may answer.

THE WITNESS: Yeah, I would -- I don't have that data. I mean, like could VA report how much we have paid to a veteran? Yes. Could I? No.

BY MR. VANSLYKE:

Q. You would agree that the VA would have access to a record of payments provided to a veteran, correct?

A. Yes, that is true.

Q. And those payments would be documented, correct?

A. That is my understanding, yes.

Q. And there would be a fixed value attributable to those payments, correct?

A. You could sum up all the payments and, you know, reach a sum.

Q. And that is different than projections for future payments, correct?
A. Yes.
Q. Because the future payments are subject to the uncertainties we've discussed, but the past payments are not, correct?
A. Because the future is the future. That is true.
MR. VANSLYKE: Thank you.
I think I would like to take a short break, and then I think we're getting close to the end.
So can we go off the record?
THE VIDEOGRAPHER: All right. We're going to go off record at 2:20 PM.
(A recess was taken.)
THE VIDEOGRAPHER: Back on the record. Time is 2:30 PM.
BY MR. VANSLYKE:
Q. Mr. McIlroy, I know we've talked about a lot of topics today, and I just want to clarify which things you have stated an opinion on.
So I believe you have provided

testimony based on the VA's budget and appropriation process, correct?

A. Yes.

Q. And the distinction between mandatory and discretionary funding, correct?

A. Correct.

Q. And a sub-distinction where the VA's mandatory funding is still subject to annual appropriations, correct?

A. That is true. Yes.

Q. And the sources of funding of certain VA programs, correct?

A. Correct.

Q. And some details, I'm sure not exhaustive, of how those different funding sources are managed, correct?

A. Yes.

Q. And we've spoken about certain uncertainties within calculations of projected future benefits, correct?

A. That is true. Yes.

Q. And I understand you are not testifying about what offsets should or should not be applied in this litigation, correct?

A. Yes. No -- no -- no knowledge or opinions of that.
Q. And likewise, no knowledge or opinions of the legal standards for damages or offsets in this litigation?
A. Correct.
Q. And are you providing any testimony as to any individual plaintiff in this litigation's medical conditions?
A. I am not.
Q. Any testimony as to any individual plaintiff's life expectancy?
A. No.
Q. Any testimony as to any individual plaintiff's future benefit entitlements?
A. No.
Q. Do you have any opinion on whether any plaintiff's future VA benefits should be used to reduce their damages award in the Camp Lejeune litigation?
A. I have no opinions on that.
Q. If the court or the parties were to decide to use VA benefits to reduce the plaintiffs' damages award, do you have any opinion

on how those benefits should be applied in order to accomplish that reduction?

A. It's a complicated question. That would depend on the nature of whatever the settlements or the agreements and, you know, the bounds of the law and the practicalities of our own financial systems and our capabilities.

Q. Is it safe to say any opinion you provided on that topic would be limited to the value under certain variables?

A. That's infungible, yes.

Q. Are there any other topics that you believe you will express an opinion on in this litigation, other than the things we've just discussed?

A. I'm here at the pleasure of the court on this. So if asked, I will provide my opinion, but I expect to -- I do not expect to be called again.

Q. At this point in time, do you believe that we have covered the full scope of topics upon which you will provide an opinion?

A. To the extent of my knowledge, yes.

Q. Is there anything that we have

discussed today that you believe I am misunderstanding?

A. So you asked me about my ability to estimate future costs for individuals.

I personally cannot do that because I don't have that data but, you know, it's a mathematical calculation. Somebody could if they had the proper data.

Q. Are you referring to identifying the value of an individual recipient's benefits?

A. Yes.

Q. Is it fair to say that if the appropriate person made such a calculation, it would still be subject to the assumptions inherent in a future projection?

A. That is true. Yes.

Q. Is there anything that you would like to clarify or expand on from any of your earlier answers?

A. No.

Q. Have I asked you any questions that at this time you still do not understand?

A. No.

MR. VANSLYKE: Okay. I will

pass the witness.

MR. KLOTZBUCHER: Mr. McIlroy, thank you for your time. I appreciate that you are a very busy man and that you were in the hot seat today. I have nothing further.

MR. VANSLYKE: Likewise, thank you for your time and your expertise.

THE WITNESS: All right.

THE VIDEOGRAPHER: All right. This ends today's deposition. We're going to go off the record at 2:36 PM.

MR. VANSLYKE: Standing order is fine for the transcript.

MR. KLOTZBUCHER: And same for the defense.

(Signature not waived, the deposition concluded at 2:36 PM.)

* * *

ERRATA SHEET

Page No. 45 ______ Line No. 18 _____ Change to: ______________

should be "12,000 to 14,000 locations of care"

Page No. 81 _____ Line No. 24 _____ Change to: ______________

should be "BiB" not "bid"

Page No.______Line No.______Change to:______________

________________________________________________

Page No.______Line No.______Change to:______________

________________________________________________

Page No.______Line No.______Change to:______________

________________________________________________

Page No.______Line No.______Change to:______________

________________________________________________

Page No.______Line No.______Change to:______________

________________________________________________

Page No.______Line No.______Change to:______________

________________________________________________

Page No.______Line No.______Change to:______________

________________________________________________

Page No.______Line No.______Change to:______________

________________________________________________

Page No.______Line No.______Change to:______________

________________________________________________

# DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the 6th day of April, 2026.

____________________________________

ANDREW MCILROY

CERTIFICATE OF REPORTER

DISTRICT OF COLUMBIA )

I, Denise Dobner Vickery, a Registered Court Reporter and Notary Public of the District of Columbia, do hereby certify that the witness was first duly sworn remotely by me.

I do further certify that the foregoing is a verbatim transcript of the testimony as taken stenographically by me at the time, place and on the date herein set forth, to the best of my ability.

I do further certify that I am neither a relative nor employee nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such counsel, and that I am not financially interested in the outcome of this action.

DENISE DOBNER VICKERY, CRR,RMR
Notary Public in and for the
District of Columbia

My Commission expires: March 14, 2028

**&**

**&** 3:4,14 9:17 10:4 21:1 22:8

**0**

**0** 111:10
**0000000001** 5:18 38:9
**01** 12:23
**06** 7:6
**0605** 162:15
**09** 5:18

**1**

**1** 5:9 6:16 13:2 13:4,17 113:12 113:12
**1-4** 7:3
**10** 6:19 45:22 67:13 111:9,14 117:7,9
**100** 81:1,2 111:10 152:6
**100,000** 31:7,22
**10:44** 69:12
**11** 7:3,4 117:20 162:2,4
**1100** 4:8
**114** 6:17
**116.3** 77:8,11 77:22
**11th** 117:1
**12** 45:18
**125** 31:2
**128** 5:4
**12:09** 127:4,11 127:12
**13** 5:9 6:4
**135,000** 109:4
**14** 45:18 187:24
**140** 77:9
**140.1** 77:8,11 77:21
**15207** 187:20
**157.5** 77:16,20
**16** 5:11
**162** 7:4
**166.9** 79:17,20
**17** 5:16
**172** 45:17
**18** 41:22
**1990** 18:2
**1993** 18:5
**1997** 18:9
**1:02** 128:2,9
**1:40** 154:7,10

**2**

**2** 5:11 6:13 14:6 15:20 16:2 48:10 49:15 52:17 67:6 118:4
**2.9** 5:20 40:18 41:16 101:7
**2/24/26** 7:5
**20** 22:15 45:22 50:22 92:18
**200,000** 31:5
**20005** 4:9
**2001** 18:20
**2006** 19:5,8 24:11
**201** 28:21
**2011** 20:23
**2012** 38:19 39:4
**2013** 22:6
**2016** 23:2 79:16 79:19 120:1
**2018** 24:19,23 28:18 39:20
**2019** 24:16 25:8 28:22 29:2 120:8
**202.532.5193** 4:10
**2022** 32:15 34:2 77:6,15 78:18
**2023** 6:4 48:1 48:10,11 49:15
**2024** 6:18 25:11 25:12 40:14,19 41:17 47:20 101:6 102:22
**2025** 5:23 6:15 6:18 34:2,5 48:9 49:12 67:13 70:8 91:7 107:9
**2026** 1:16 2:8 7:3 8:9 28:22 29:3 69:19 70:4 77:7,16 79:19 79:22 84:19 85:5 117:1,20 186:16
**2027** 80:24 92:13,17,19
**2028** 92:17 187:24
**2034** 6:18 107:9
**23** 107:23 108:11
**24** 1:16 2:8 8:8
**24th** 3:7
**25** 31:6
**26** 6:13 52:17 110:15
**27** 5:23 109:7
**28144** 3:17
**29** 47:23
**2:20** 179:15
**2:30** 179:18
**2:36** 184:12,18

**3**

**3** 5:16 16:24 17:5 52:21 70:13
**30** 23:6 92:19 111:16,17
**301.2** 77:16,20 84:20
**3011** 3:7
**31** 38:19 108:11 108:15,20

**313.800.4170** 3:9
**34** 110:15
**35** 109:8
**3a** 51:21,23

**4**

**4** 5:19 38:9 41:3 41:5 107:13
**4.1** 6:1 44:14
**40** 112:21
**400** 40:3
**4055** 4:8
**41** 5:19
**44** 5:24
**441** 28:22
**441.2** 79:20
**45** 96:23 97:9
**47** 6:5
**48202** 3:8
**49** 6:16 112:22

**5**

**5** 5:24 38:11 44:2,4 162:15
**50** 34:1 45:20 85:5
**51** 6:10
**52** 49:11
**525** 3:16
**54** 48:8
**55** 111:20 112:5

**6**

**6** 6:5,7 47:1,3 47:12 162:8,9
**60** 45:20
**630** 6:13 52:17
**65** 111:21
**67** 31:18
**69** 6:14

**7**

**7** 6:10 28:12 51:23 52:1 81:23 113:12 113:16
**702** 53:12
**703** 53:12
**704.633.5244** 3:18
**705** 53:13
**7887232** 1:23
**7:23** 1:4

**8**

**8** 6:14 69:20,22 113:12,12,16
**897** 1:4

**9**

**9** 5:3 6:17 114:4 114:6
**9:01** 1:17 2:9 8:9

**a**

**abbreviated** 166:11
**ability** 68:15 87:1 88:23 103:14 183:3 187:11
**able** 20:6 30:4 31:1,14,20 45:10 51:8,11 85:10 100:11 167:16 176:4
**above** 31:5 48:18 109:4
**absent** 80:23 157:16
**academic** 18:11
**accelerate** 30:13
**acceptable** 33:19,20
**access** 12:18 13:13 178:15
**accomplish** 182:2
**account** 61:14 61:17 63:13,16 65:5,6,15 85:2 85:9 89:12 94:22,22 98:8 102:8,11 106:4 106:4,5 128:16 128:18,21 129:1,4,8 130:1 130:8,10 131:7 131:23,24 132:2,3,8,14,21 134:10,12,14 134:17 135:2,8 136:2 167:23
**accountability** 118:9
**accountants** 135:5
**accounted** 168:19
**accounting** 26:22 34:11 76:16 133:1,14 133:24 135:15 136:6 139:8 147:24 148:1 148:10,21 163:8,23 164:12,18 168:2
**accounts** 32:6,8 65:9,18 76:23 77:2 90:7 94:23 95:5 106:6 128:12,19,21 130:16,17,23 131:21 132:3 134:22 135:12
**accreditation** 170:24
**accrual** 58:11

**accurate** 22:4 40:11 42:9 62:18 64:8 66:19 70:20 101:20 186:8
**accurately** 39:8 54:4
**acronym** 62:6 162:23
**act** 32:14,19 33:6 37:18 79:12 82:19 89:9 90:23 91:3 92:22 93:3 98:5 150:4,6
**acting** 25:12 26:13,19,20 67:12
**action** 71:15,18 74:19,20 153:1 174:5 187:14 187:17
**actions** 68:22 174:11,15
**activities** 96:8 96:12
**activity** 57:14
**actual** 132:16 137:14,15,16 137:20,21 138:4 177:14
**actually** 24:19 33:15,17 165:3
**actuarial** 26:23 27:3 28:6,7,9 91:9 142:14 153:10 154:13 163:1,5,12 164:7,9 165:16 165:20,23 166:2 167:16 169:2,8,21 170:5,11,24 171:7
**actuaries** 27:4 27:6,8,15,24 142:16 143:7 155:6 163:3 167:8,20,23 168:20 169:11 169:14 170:22 171:2,7,15,22 172:22,24
**actuary** 28:3,4 165:17 170:22
**adapting** 51:5
**adas** 25:20,24
**addition** 78:19 98:13
**additional** 6:8 20:8 31:11 33:3 33:16 47:15 85:5 96:2 101:22,22,23 102:19 103:3 129:19 142:10 144:7 145:23 148:11 159:11
**addresses** 165:9
**adequate** 29:24 45:24
**adjust** 88:15 89:6
**adjusted** 149:13
**adjustment** 110:3 150:8 155:13 157:7 157:17 169:23
**adjustments** 87:2 88:19,20 88:23 99:5 100:21 149:16 150:2,3,20 156:21 169:10 169:12
**administer** 161:15
**administered** 53:14 55:22 118:17 121:2 132:24 136:5
**administering** 135:14
**administers** 136:14
**administration** 26:16,17 30:14 30:21 31:6,11 37:21 45:10 114:15 115:23 116:17 118:19 132:10
**administrations** 50:24 89:3,7 114:18 115:9
**administrative** 37:5 131:11 147:15
**administrators** 121:5
**adopt** 114:15 114:18
**advance** 90:7,9 90:17,19,20,22 91:13 92:2,10 94:24 95:1,6 97:6,9,13,23 98:7,11 102:12
**advice** 159:23 160:13,23
**advisor** 39:23
**advisory** 21:9 21:15 164:18
**affairs** 6:21,22 6:23 24:18 25:1 26:2,5,21 27:6 29:15,17,18 39:18 41:11 49:14 70:4 116:24 117:16 117:17,18
**affect** 100:17 156:16 159:10

**affecting** 169:9
**affirmatively** 157:2
**affordable** 60:9
**afternoon** 5:4 128:1
**age** 27:11 45:19 45:21
**aged** 31:23
**agencies** 6:9 47:16 76:24 93:4 126:21 161:14
**agency** 6:2 23:4 44:15 94:7 125:24 159:18
**agent** 99:20
**agents** 20:12
**aging** 6:3 44:15
**agree** 27:23 31:18 37:15 50:18 54:8,24 55:4 67:16 77:19 81:9 93:14 101:1,10 103:4,9 119:3 134:5 143:10 143:16 147:4 147:15 153:5 155:2 156:10 158:15 164:20 165:8,23 166:2 166:23 167:3 167:22 168:2 171:22 172:2 176:8 178:14
**agreed** 8:17 32:1 155:10
**agreement** 123:18
**agreements** 182:5
**agriculture** 23:4 107:17
**ah** 24:21 46:13 153:24
**ahead** 15:11 16:4 41:1 43:23 64:2 122:4
**aid** 103:21
**akron** 18:5
**alive** 176:10
**allocate** 33:21 89:2
**allocated** 74:15 74:24 91:13 98:11 141:23
**allocation** 46:21
**allocations** 88:16 89:6
**allow** 95:17 96:1 97:14
**allowances** 99:9
**allowed** 32:7
**allows** 74:21
**altered** 174:11
**alternative** 55:24 109:10
**alternatives** 21:10
**amend** 98:14
**america** 4:3
**amount** 68:8 78:15 79:2 88:12 91:1,4,6 93:7 95:1 97:22 100:17 103:15 112:13,17 141:12 175:18 175:22 177:1,4 177:10,20,21
**amounts** 78:22 97:11 103:10 103:12 175:11
**analogous** 64:5
**analogy** 147:20
**analysis** 21:10 27:3,22 28:6,7 28:9 29:24 47:24 91:9 142:14 153:11 154:14,17 160:2,6 161:6 163:12 164:2,3 164:5,7 165:16 165:20,24 166:3 167:16 167:23 169:2,8 169:22 170:11 171:7
**analysts** 29:6 29:22 103:19 104:9
**analyze** 143:8
**analyzed** 143:11
**analyzes** 137:1
**analyzing** 18:22 142:16 153:11
**andrew** 1:14 2:12 5:2,10,14 5:16 8:14 9:4 10:9 13:19 15:23 41:23 45:11 49:12 128:3 186:19
**annual** 32:5 48:17 53:18 54:10,19 58:11 58:21 59:14,17 59:21 69:15 71:15,17,21,23 72:2,7,21 73:2 73:3,10 75:16 75:20 76:8,9,12 76:20 80:9 82:18,20 84:12 96:9 104:23 105:3,6,8,18,23 106:1 110:1,4,7 150:2,4,6 163:24 180:8

**annually** 40:3 73:7 149:13
**anomalous** 168:16
**anonymous** 171:14
**answer** 11:3,19 11:20 23:15 35:12 43:4,19 50:14 56:17 61:4 62:24 63:24 64:19 66:5 72:5 75:4 83:8,16 86:1 93:20 101:15 103:24 104:6 115:3,14,16 116:11,13 118:21 121:13 121:19 122:4 124:23 125:12 130:14 131:2 133:4,6 135:21 135:23 136:9 136:19 141:1,3 142:21 143:6 146:10,22 147:9 169:19 170:4,19 171:12 172:7 172:17 174:3 178:8
**answers** 183:19
**antideficiency** 92:22 93:3
**apologies** 14:11 62:5 129:5
**apologize** 168:17
**apparently** 64:15 147:1
**appeals** 169:4
**appear** 16:6 50:19 107:13
**appearance** 9:20
**appearances** 3:1 4:1
**appearing** 8:17
**appears** 25:3 28:1 41:10,16 41:22 47:11 122:21
**apples** 144:6,6 146:3,3
**application** 59:19
**applications** 32:21
**applied** 98:23 99:5 105:18 156:15 180:24 182:1
**applies** 93:1,3 94:2 151:24
**apply** 121:23 151:19 155:18
**appointed** 26:18
**appointment** 144:12
**appointments** 144:13
**apportioned** 88:12
**apportionment** 88:7,9
**apportionments** 88:15,19 89:10
**apportions** 87:23
**appreciate** 184:3
**approach** 148:1
**appropriate** 73:7 91:18,19 101:2 134:6 148:7 183:13
**appropriated** 33:9 34:7 82:6 82:19,20 83:23 84:15 85:6 90:4 91:3,15,16,23 92:10 93:7,10 93:11 97:22 98:7 100:6 102:12 103:10 103:12,16
**appropriately** 35:1
**appropriates** 54:22 91:17 128:19
**appropriation** 59:17,22 71:15 71:18,21,23 72:2,8,22 73:3 75:21,21 76:10 76:12,20 84:8 84:12,17 87:19 90:8,23,24 91:3 95:1,7 96:16 97:10,19 98:2 180:2
**appropriations** 35:3 40:7 50:11 53:19,19 54:11 55:1 58:12,22 59:14 70:18 71:5,9,13,14,16 73:10,16 75:17 76:8 80:10 82:19 84:7 86:11 87:9,9,13 87:22 89:9 90:2 90:11 92:2 93:2 93:5,16 95:19 97:13 98:5,13 100:18 101:7 102:24 105:23 126:17,23 180:9
**approval** 32:10 89:13,20,22,23

89:23 102:15
**approve** 150:7
**approves** 87:4
**approving** 96:10
**approximately** 39:19 45:17 80:2
**april** 24:16 25:8
**area** 120:19
**article** 42:24 43:24 44:14,19 44:24
**arts** 18:4
**asked** 101:22 182:17 183:3 183:21
**asking** 10:20 88:21 173:18
**asks** 5:24 44:14 160:23
**assemble** 121:5
**assets** 26:23
**assigning** 151:12
**assistant** 25:4,9 25:12,16,18,19 26:2,8,9,12,14 39:21 41:24 45:12 67:12
**associate** 25:4 25:16,19 26:9
**associated** 37:4 133:21,22
**assume** 42:24 67:22 135:6 164:6 168:14 168:15 175:17
**assuming** 157:14 177:7
**assumptions** 167:11 169:11 169:15,22,24 170:7,7 183:14
**attached** 5:7
**attachment** 14:15,15
**attempting** 174:8
**attempts** 126:6
**attributable** 135:7 178:22
**attributed** 44:23 132:20
**audiences** 34:14,20
**audit** 163:24
**auditing** 19:20
**audits** 5:19 41:12
**august** 48:24
**authority** 50:20 87:15,20 88:15 88:18 89:6 103:5,5,8 150:12 153:6 155:11 156:22
**authors** 47:24
**automatic** 102:23
**automatically** 80:5
**available** 49:8 49:15,19,23 74:16 91:16,20 95:2 144:17
**average** 27:11 27:11 45:19,21 78:15,22 79:1,4 135:17 173:3
**averaged** 168:21
**award** 181:19 181:24
**awarded** 151:7 155:24 156:16
**awards** 155:21 156:15
**aware** 15:12 40:21 42:10 46:18 51:14 54:1,3,5 62:9 63:19 75:10 79:1,10 98:17 103:18 106:20 106:21,24 114:13,17 116:23 124:8 125:17,20 151:6,9 155:20 155:22 166:6
166:20

**b**

**b** 38:18 53:19 60:16 66:19 68:4 162:22
**ba** 17:23
**babies** 144:21
**back** 24:14 42:15 60:15 68:2 69:11 79:16 84:18 89:13 110:14 123:1 128:8 139:22 149:10 154:9 164:24 179:17
**background** 18:12
**backlog** 30:22 31:3,4,4,13,21
**bad** 160:11
**bar** 70:22 71:3
**bars** 78:17
**barton** 3:5
**based** 53:16 89:7 91:8 92:3 92:4 95:9,11 100:22 101:11 109:2 110:1 111:10 133:11 133:13,18 139:1,7,7,19 140:1,3,7,10 141:7,9,20,24

148:15,19,20 149:7 150:2 165:24 166:3 168:13 170:6 171:19 180:1
**basic** 177:23
**basis** 59:6 82:20 88:19,21 93:8 139:3 176:6
**bates** 38:8,10
**began** 24:17,24
**beginning** 38:6
**begins** 111:21
**behalf** 9:17 10:4
**beholder** 160:17
**believe** 16:18 17:17 37:19 39:7 43:7 48:16 82:1 113:24 114:8 119:7 124:1,4 126:8 126:21 127:2 128:24 136:1 149:19 170:10 170:15 172:14 172:18 179:24 182:13,21 183:1
**believes** 123:13 124:2
**ben** 9:16
**beneficiaries** 59:10
**benefit** 68:8,12 80:17 81:21 100:16 126:2 126:16,22 154:22 155:12 157:15 163:19 181:15
**benefits** 5:23 7:7 20:7 27:15 27:19 30:13,14 30:23,24 31:10 32:21 33:4,11 35:7 36:2,9,15 36:22 37:1 41:18 53:14,18 53:20 54:9 55:2 55:21 56:23 59:13 60:17,22 61:7,16,21 62:1 62:8,9,12,20,21 63:5,5,9,10,15 64:24 65:1,4 68:23 73:8 78:12,14,15 79:8 80:6,7 82:5,15,18 83:3 83:3,11 84:12 84:14 85:5,7,11 85:21 86:4,7 95:13,13,14,21 95:23 96:2,3,8 96:14 97:14 98:2,15,20,23 99:2,6,9,12,12 99:16,24 100:3 100:7 101:1,3 103:15,20 105:23 106:23 108:23 109:2,5 109:24 110:12 111:7,7,13,16 111:18 112:7,8 112:11,12 114:23 115:5 118:17 125:18 125:21 128:16 128:21,22 129:1,19,22 132:17 142:14 144:16,18 149:11 150:9 151:7 155:5,8 155:18,21,24 156:7,16 157:9 157:22 158:21 159:6,10 162:20 163:4,7 163:18,20 165:10 167:11 167:17 171:9 171:23 172:4 172:19,23 173:10,20,21 174:9,12,14,24 175:1,11,12,18 176:3,8,12,19 177:1,4,9,12,14 177:17,19 178:1 180:20 181:18,23 182:1 183:10
**benjamin** 3:5
**best** 63:15 125:3 187:11
**better** 20:7 64:12 172:10
**beyond** 31:2 103:10,12 148:12
**bib** 6:16,16 70:13
**bid** 81:24
**big** 35:1,4 55:15
**biggest** 77:14
**bill** 9:19 75:17 75:22 87:13 97:20 99:24
**billed** 147:17
**billion** 5:21 6:1 28:21,22 34:1 40:3,18 41:16 44:14 77:8,8,9 77:16,17,20,20 77:21,22 79:17 79:20,20 81:1,2 84:20 85:5 101:7
**binding** 95:16

**bit** 71:7
**board** 163:6 164:9,12,18 171:1
**borrow** 80:21
**borrowing** 53:22 55:3,12 55:18 58:2 60:18,21,24 63:11,17 65:3
**bottom** 47:8 70:7 162:15
**boulevard** 3:7
**bound** 89:8
**bounds** 182:6
**branch** 4:5
**break** 11:2,4 46:11 69:5 127:5 179:11
**brief** 6:15 69:15 69:20 70:8
**briefly** 8:20 13:22 20:2 21:14 25:15 27:2 45:14 53:1 54:13 55:5 65:11 130:22 149:12
**brings** 52:21
**broad** 135:11
**broader** 104:13 114:23 115:5
**bucket** 105:24
**budget** 6:14,15 18:12,20,23 19:1,8,14,17,23 20:9,17,24 21:5 22:7,12,15,16 22:21,23 23:3,7 23:21,24 24:3,5 25:5,9,17,18,22 25:23 26:3,5,8 26:9,13,22 28:8 28:12,21 29:1,6 29:7,22 34:8,15 35:19 39:17,22 39:23 40:2,6,10 41:24 43:16 45:12 48:9,19 48:21,22 49:4 49:13,24 50:10 50:19,23 54:16 54:20,21 69:15 69:19 70:5,7 76:17 79:17 80:1,8 82:3 86:13,16,22 87:4,6,14,20 92:6,9 94:10 97:23 100:15 100:22 103:5 103:19 104:8 104:13,22 105:6,8,11,12 105:14,15 106:7,10,14,15 106:22 107:6 107:20 114:10 114:13 119:8 119:11 128:13 133:9 137:10 139:12,18 156:5 160:2 163:21 165:21 180:1
**budgetary** 29:24 48:17 50:5 119:4 140:20 154:15
**budgeteers** 34:22,23
**budgeting** 6:6 20:4 42:19 43:9 46:19 47:12 65:13 76:16 126:20 165:13 171:5
**budgets** 19:11 19:20 24:13 25:20 65:9 115:6
**building** 3:6 133:19 135:1,2 135:3
**buildings** 131:18
**bullet** 19:22 28:10 29:5 30:10 33:23 60:16 66:19 119:24 120:7 162:22
**bullets** 32:11 68:4
**bureau** 110:5
**burial** 163:6
**business** 144:20
**busy** 184:4
**buy** 56:6
**buying** 157:18
**bvanslyke** 3:10

**c**

**c** 8:1
**c&p** 129:4
**calculate** 110:6 144:2 145:21 163:3
**calculated** 154:21
**calculating** 110:4
**calculation** 183:7,13
**calculations** 68:18 81:7 112:9 167:11 167:12 180:19
**calendar** 92:17
**call** 31:3 59:3 70:20 90:11 132:12
**called** 9:5 33:7 82:13,20 110:2 121:2 128:4 182:19

**camp** 1:7 8:12 51:16 52:7,9 181:19
**cancer** 158:7,9
**canteen** 59:1,4
**capabilities** 182:7
**capable** 28:5 66:16
**capital** 26:22
**caps** 104:23 105:4,18,21 106:1
**captioned** 186:6
**care** 27:7,9,10 27:12 32:23,23 33:5,11 36:24 45:18,23 46:1 63:20 64:5,21 64:22 65:6,17 65:18,19,21 80:18 90:7,12 95:5 113:9,10 113:18,21 120:21,24,24 121:1,3,6,8,9 121:24 122:6 130:17,18 131:5,6,7,8,13 132:16 133:12 133:13,17,18 134:22,24 135:17 136:3 136:15,21,22 136:22,23,23 137:2,3,4,5,12 137:14,16,17 137:18,19 138:1,2,13,16 139:4,13,19 140:4,5 141:20 143:3,12,16,19 144:9,14,20 145:2,12,18,24 146:7,18 147:5 147:6,16,17 148:3,14,19 167:12
**cared** 113:17
**career** 18:19 50:22
**caring** 133:10
**carnegie** 18:8
**carolina** 1:2 52:12
**case** 6:8 32:8 47:15 55:17 65:14 66:24 67:23 68:1 71:19 72:12 73:5 90:6,10 92:7 94:23 97:8 102:5 163:18
**cases** 1:10 31:1 32:7 91:22 95:3 138:17
**categories** 134:2
**caveat** 118:21
**cbo** 6:17 108:6 109:3 111:12 112:4,8 113:15 114:9
**cbo's** 112:15
**center** 132:13 133:17 141:15
**centers** 45:18
**central** 120:5
**certain** 88:5 96:15 105:10 105:13 110:3 144:10,12 160:15 170:21 175:16 180:12 180:18 182:10
**certainly** 35:3 115:4 149:24 158:23 160:9 171:15 172:9
**certainty** 155:3
**certificate** 14:13 187:1
**certified** 2:20
**certify** 187:5,7 187:12
**cfo** 25:13 26:15 26:18,18,19,20 26:21 29:20 30:2
**chairman** 122:10,21,23 123:2,3,7,12,14
**change** 23:9 78:1,8 95:14,20 96:15 98:19,22 99:1,4,8,11,17 100:8,15,24 141:13,24 151:19 152:8 152:11,17 153:6 155:11 155:14 160:15 168:9 174:12 174:14 176:12 176:19 177:1,4 177:9,12,18,21 185:3,5,7,9,11 185:13,15,17 185:19,21,23
**changed** 24:3 177:20
**changes** 80:23 95:14 99:15,23 100:2 115:10 150:23 152:15 155:16,23 156:19 159:3,6 159:12,16 168:7,11 169:3 176:24 177:13 177:16 186:9 186:12

**chapter** 7:6 162:8,9 165:5
**characteristics** 167:13 169:1
**chat** 12:14,18 12:22 15:19 16:23 41:2 44:1 46:24 51:19 69:19 107:1 117:4 161:24
**checking** 127:1
**chief** 39:22 114:13
**children** 62:13
**chillers** 131:16
**choice** 37:18
**choose** 85:21 86:4
**chooses** 73:6
**chronologically** 77:10
**citation** 48:3
**cite** 50:19
**cited** 41:24
**civ.p.** 6:13
**civil** 4:5 52:17
**claims** 30:24 31:3,4,12,23 33:4,10 96:5,10 96:10,11,21,24 97:11
**clarification** 33:16
**clarify** 29:10 30:17 31:24 92:12 101:19 149:3 157:24 179:22 183:18
**clarity** 129:6
**classified** 36:4 36:19
**classify** 63:4
**clear** 32:20 33:2
**clearly** 60:22
**clja** 5:18 38:8
**close** 179:12
**closer** 147:20
**closing** 6:2 44:15
**coffee** 46:14 59:5
**cola** 110:3 149:14,18,23 150:4,5,18,21 151:1,4 157:19
**colleague** 9:23
**collected** 133:23
**collects** 55:8 136:20,24
**college** 17:24
**collins** 6:20 116:21,23 117:5,16 123:3 123:11,13,24 124:1 125:5
**columbia** 2:22 187:2,5,22
**come** 36:18 42:15 134:14 160:7
**comes** 55:9 72:7 81:10
**coming** 48:22
**commission** 187:24
**commitments** 105:7
**committee** 6:23 21:9,15 117:1 117:17
**committees** 40:7 87:10
**community** 50:10,19 63:19 64:4,20 65:17 65:21 66:7 120:24 121:1,6 121:9,24 130:18 131:7,8 136:3,15,24 137:3,19 138:12,16 139:4,12,18 143:3,8,12,16 144:8,14,17,18 145:1,12,18,24 146:7,18 147:5 147:16 148:3 148:14,19
**comp** 65:14
**comparable** 144:21
**comparative** 6:7 47:13
**compare** 145:5 147:1 148:2
**compared** 148:8
**comparing** 144:6 145:16 146:17
**comparison** 146:6 148:6
**compensation** 53:17 54:9,17 54:23 55:17 61:6,12,16,23 62:8 63:13 65:16 75:20 76:7 78:11,14 78:23 81:21 82:2 84:24 85:2 85:8 87:18 90:6 90:14,16 91:22 92:7 94:23 95:4 97:5,10 98:7 102:8,11 106:3 108:1 109:24 110:12,18 129:1,3,7,11,15 129:15 130:7 156:5 163:6,19 163:20 174:18

175:22
**completed** 111:3
**completely** 8:21 91:24
**complex** 172:21
**compliance** 21:18 130:20 131:10 132:8 134:23
**complicated** 27:22 28:1 34:13 37:18 58:8 61:19 143:20 144:1 144:23 160:11 160:11 182:3
**comply** 88:8
**component** 23:10 49:7 82:3 104:22 105:10 105:12
**components** 26:1,4 48:21 49:4
**comprehensive** 120:9
**compromise** 30:12,18,19 32:2
**concern** 101:12
**concerned** 102:22
**concerns** 104:9
**conclude** 176:18
**concluded** 184:18
**conclusion** 118:7 119:16
**condition** 157:21 158:5,5 176:14
**conditions** 181:9
**conducted** 154:18
**confirm** 12:21 13:12 17:8 165:4
**confirming** 88:22
**congress** 31:18 32:3,6,9 33:6 33:12 54:19,20 57:20 68:24 71:15,18 73:5,6 74:13,19,20 80:15 85:17,18 85:20 86:5 87:6 87:8,12,19 89:14 90:1,5 91:17 93:15,22 97:18,21 98:6 98:14,17,19,22 99:1,4,8,11,19 99:23 100:11 100:13,24 101:2 102:19 102:23 103:15 105:19 114:10 115:17 118:10 119:18 128:18 150:5,6,7 153:6 155:11,14,17 155:23 156:3 156:12,18,20 157:6,20 158:19 159:2,5 159:9,15,17,17 159:20
**congress's** 86:3 99:16 150:12
**congresses** 50:24 115:9
**congressional** 29:18 34:16 35:2 40:7 53:18 54:10 58:22 59:14 68:22 72:21 76:15,16 76:17 80:10 89:22 98:1 106:14,21 107:6,20 156:5 174:15
**connected** 129:17 158:7 158:10 176:19
**connection** 158:2,17,21
**cons** 159:19 160:6,7
**consensus** 34:14
**consideration** 149:5
**considered** 50:1 96:11,21 159:20
**considering** 159:9
**considers** 87:8 159:5
**consistent** 72:11,16,17
**consolidated** 29:11 30:3
**consolidating** 30:4 120:4
**consolidation** 29:6,21
**constitution** 74:17
**constrained** 103:15
**construction** 6:2 44:15
**consumer** 149:17
**contain** 128:19
**contained** 58:21
**contains** 128:22

**contention** 29:23
**contents** 107:11
**context** 83:1 84:3,5 105:5 166:3
**continue** 11:22 69:5 90:9 96:12 97:1,3,14
**continued** 4:1 34:6 128:4,7
**continuing** 87:13 93:23 94:2,6,9,15 95:16,24 96:1 97:17,20 98:6
**contracts** 132:5
**contrast** 106:8
**contributes** 80:18
**contributor** 79:13
**control** 47:22 103:14 138:8
**controlling** 114:24
**convenience** 13:12 59:4
**conversation** 11:22 114:23 115:6
**coordinate** 40:5
**coordinating** 11:14
**copyright** 47:20
**corp** 6:5
**corporate** 55:11 56:8
**corporation** 46:16,19,24 47:9
**corpus** 57:13
**correct** 12:24 17:14,24 18:1,3 18:6,9,10,13,21 18:24 19:2,6,11 19:17,24 20:20 20:21 21:2,6 22:9,10,13,17 23:5,7,21,22,24 24:1,6,18 25:1 25:2,6,10,14 26:7,10 28:13 28:14,23,24 29:8 30:15,16 32:15 34:3,17 34:18 36:14,17 38:16,17,20,21 38:24 39:5,6,19 39:23,24 41:13 41:14,19,20 42:14 47:13,17 47:20 50:24 51:6,7,9,12,13 51:22 52:12,18 59:12 62:17 63:17,18 65:23 66:14,15 67:13 68:4,14,19,23 70:5,8,9,18,19 71:1,2,5,6 74:10,24 77:8 77:11,17,18 78:23 79:8,17 79:18,21 81:10 81:15,18 82:3 84:21,22 85:1,7 85:11,17 86:14 86:15,18,23,24 87:6,15,20,21 87:24 88:4,9 89:3,4,14,20,21 89:24 90:4,13 90:18 91:10 92:14 93:23 95:10 98:11,12 98:15 99:17,21 100:7,12,19 101:3,24 102:8 102:16 103:1 103:16 104:10 106:2,11 107:6 107:9,16 108:1 114:2,11,24 115:10 117:20 118:12 119:20 120:11 122:14 123:7 126:3,10 126:17 127:3 128:13,14 129:2,8,9 130:3 130:6 131:22 132:22 134:20 135:12 136:3 139:2,9,15 141:8 142:1,8 145:3,7,13,24 146:19 148:12 148:16 149:8 149:14,17,23 151:8,20 152:1 152:9,22 153:2 154:15,23,24 155:13 156:8 156:17,22 157:4,9,17,23 158:17,22 159:3,16 161:6 162:10,20,21 163:9 165:6,11 165:17 166:21 167:18 168:22 170:8 173:10 173:14,15 174:6,13 175:2 175:3,19 177:10,16,22 178:16,19,22 179:2,6 180:2,5 180:6,9,12,13 180:16,20,24 181:6
**corrections** 186:9

**correctly** 11:10 20:16 21:12,24 28:2 36:7 53:23 55:20 68:6 72:19 92:15 97:24 121:7,21 134:16 138:23 139:24 142:15 152:16 159:8 160:4
**cost** 34:11 65:19 99:5 110:2,11 126:1 126:6 131:4,7 131:15 132:24 133:13,17,18 133:24 134:21 135:15,17 136:6 137:1,2 137:15 138:4 139:8 141:19 143:18 144:3,8 144:21 145:21 146:14,15,17 147:21,22,23 147:24 148:10 149:13 150:8 155:13 156:21 157:7,16 160:5 161:6 169:10 169:12,23
**costs** 27:7,13 37:5,13,16 55:17 65:17 80:17,18 110:8 113:19,19 125:8,21,23 126:9,12,15 132:20 133:10 133:21,22 134:3,9,11,14 134:19 135:2,4 135:4,7,10 136:14,15,21 137:1,5,8,14,16 137:20,21,22 138:4,12,14,15 139:24 140:2,6 140:7 141:7,9 141:13,24 142:3,7,12,16 143:8,11,18 145:6 147:1,13 147:15 148:4 148:11,21 155:8 159:5,11 160:12 172:24 183:4
**counsel** 8:22 11:7,11,13,17 12:19 29:16 140:23 187:13 187:15
**count** 78:18
**counter** 59:3
**counterintelli...** 20:14
**counterterrori...** 20:13
**country** 131:16
**couple** 26:1
**course** 32:10 42:7 91:21 124:17 155:8
**court** 1:1 8:24 12:19 52:11 113:24 181:22 182:17 187:4
**covered** 182:21
**cpi** 149:19,22
**cr** 95:2,4,20 96:7,12,13,22 96:23 97:3,9,14 98:3,10
**create** 103:5
**created** 37:19
**creates** 33:12 94:10,14 100:5
**creating** 95:19
**creation** 70:10 110:4
**credible** 43:8
**crimes** 20:14
**criteria** 82:15 88:7 98:20,22 151:11,19,24 155:12 157:21 158:20 175:6,7 175:9
**cromwell** 4:7 9:23
**crr** 1:24 187:21
**crs** 97:12
**current** 17:14 21:18 38:15 68:12 91:14 97:15 100:5 108:24 114:14 126:2,16,22
**currently** 14:6 46:6 103:7 108:23 111:6 111:13 112:7 152:6 156:7 172:16
**curriculum** 5:16
**customs** 21:1
**cv** 1:4 17:3,8,14 17:16
**cyber** 20:15
**cycle** 86:12

## d

**d** 8:1
**d.e.** 6:13 52:17
**damage** 68:18
**damages** 51:19 181:4,19,24
**data** 135:16 168:16,22,24 171:16,20 174:1 178:10 183:6,8
**date** 8:8 38:19 38:22,23 39:2,3

91:14 92:3 124:9 187:10
**david** 4:14 8:5
**day** 96:23 140:9 141:22 142:6 171:16 186:15
**days** 31:2 96:23 97:9
**dc** 2:13 4:9
**deal** 171:16
**death** 27:11
**debate** 77:2 104:13
**deceased** 175:7
**december** 6:18 22:6 25:11 31:8
**decide** 138:6 159:15 181:23
**decided** 156:20
**decides** 159:17 159:21
**deciding** 159:1
**decision** 22:3
**declaration** 186:1
**declare** 186:4
**decrease** 112:17
**deep** 171:17,19
**defendant** 10:1
**defense** 77:1,3 184:16
**defer** 160:20
**deficiencies** 120:2
**deficit** 6:18 58:1 80:13,14 81:2,6,13,18 104:14,19 107:9 114:11 115:10
**deficits** 106:19
**define** 60:22 120:9
**definition** 58:7
**degree** 94:17 167:1 168:4
**deliberates** 54:21
**delivering** 144:21
**delivery** 36:24 37:1 132:16
**demand** 137:11
**demands** 46:1
**demonstrated** 20:11
**denise** 1:24 2:19 9:1 187:3 187:21
**department** 4:4 6:21 9:24 21:22 22:9 23:4 24:17 24:24 26:1,4,20 27:5 29:14 39:18 41:11 49:14 70:4 117:16
**department's** 161:2
**departments** 88:17
**depend** 57:15 147:24 152:2 156:9 182:4
**dependency** 62:7 99:8 176:23
**depending** 145:21 151:24
**depends** 56:3 57:12 82:24 84:3 94:22 138:20 140:10 144:2 148:5 157:10
**deponent** 8:14
**deposed** 10:10
**deposition** 1:13 2:12 5:6,9,13 8:11,16 10:13 10:19 11:14,18 12:1,4,5,9,12 12:15 13:10,19 15:22 66:23 184:11,18 186:6,10
**deputy** 19:7 20:24 25:4,9,12 25:13,16,17,19 26:2,7,9,12,14 26:15,18,20,21 30:21 39:21 41:23 45:12
**describe** 20:2 21:14 27:2 28:1 32:17 45:14 53:6 54:4,13 57:9 58:24 60:3 64:16 65:11 66:1 83:2 91:12 92:24 94:13 101:24 108:3 110:22 111:4 113:6 120:17 124:18 129:13 134:2 142:3 145:9 161:11
**described** 36:21 42:5 60:19 65:21 71:13,16 74:8 75:14 76:6 82:23 89:11 114:9 121:22 128:12,24 132:21 134:7 134:17 136:1 139:14 148:9 148:11
**describes** 71:21 161:14
**describing** 20:5 49:19 85:13 112:4 162:17

**description** 5:17 15:3 17:3 17:9 38:6,10,13 38:16,23 39:8 64:13,15 139:23 158:11 158:16
**desire** 125:7
**despite** 102:10
**detail** 53:7 66:17
**detailed** 133:11
**details** 60:7 175:14 180:14
**determinations** 140:1 149:6
**determine** 96:6 102:4 138:3,18
**determined** 102:2 137:21
**determines** 137:15,24 138:1 148:24 158:6,8
**determining** 137:14
**detroit** 3:8
**developed** 30:12 34:11 158:9 171:23
**developing** 19:1
**development** 32:20
**devoted** 30:6
**diabetes** 158:8
**dic** 62:1,7,11 63:5,9 99:12 129:21 175:1,5 175:11,18
**died** 62:14
**dies** 174:21
**differ** 167:1 175:11,13
**difference** 25:16 26:12 56:12 71:10 77:19,21 128:16 129:13 140:13 164:1,2 164:4
**differences** 65:8,12 136:14
**different** 22:22 27:5 35:9 55:16 56:19 58:9 63:7 63:8 65:5,14,20 71:22 76:13,14 82:22 88:17 127:2 128:12 147:14 163:14 163:16 165:12 167:5,6 179:1 180:15
**differently** 76:15
**difficult** 146:24
**direct** 122:6 131:6 134:2 135:6 136:22 137:4 138:2 140:5 144:9,14 146:6 147:6,22
**directed** 22:15
**directing** 50:3
**directly** 30:2 100:17 121:8 139:23 148:22
**director** 20:24 22:7,16 23:3 67:12
**directors** 132:13
**disabilities** 111:8 129:17
**disability** 53:17 54:9,22 61:6,11 61:12,15,22 62:20 63:4 79:4 82:5 83:2,10 98:23 108:1,23 109:5 110:17 110:19 111:9 111:14 112:8 113:13,13 149:11,13 150:8 151:7,12 156:4 169:3 174:18,22 175:7,12,22 178:1
**disabled** 152:6
**disagree** 42:12 83:4,12,18,20
**disbursed** 58:3
**disclosure** 6:11 52:15
**disclosures** 51:20
**disconnect** 146:17
**discretionary** 35:21 36:1,9 37:11,14 38:1 71:4,8,12 76:13 76:18,23 77:1,3 77:7 78:2 79:23 104:24 105:9 105:11,12,21 106:5,6,7,10 180:5
**discussed** 11:17 17:2 22:20 24:10 53:7 63:6 66:18 82:17 91:9 99:12 102:15 106:1 129:22 142:13 149:12 153:10 154:13 163:12 163:17 169:23 174:6,12 175:1 179:5 182:15 183:1

**discussing** 11:21 39:15 101:8 164:7
**discussion** 105:6,20 106:5
**discussions** 104:15 105:16 125:18,20
**distinct** 62:20 129:1 130:1 166:24
**distinction** 84:6 130:23 131:21 134:6 180:4,7
**distinguish** 83:23
**district** 1:1,2 2:22 52:11,11 187:2,5,22
**division** 1:3 4:5 8:7
**dizzy** 164:24
**dobner** 1:24 2:20 187:3,21
**doctor** 133:15 133:16
**doctors** 45:23 66:6 132:4,17
**document** 1:9 12:5,22 13:2,3 13:6,14,23 14:4 14:19 16:1,15 17:4,8,10 24:15 39:13 41:2,3,4 41:8,10,15 42:16 44:3,21 47:2 48:15 49:3 51:24 52:7,9 53:4 60:15 67:7 67:17 68:3 69:21 70:3,11 77:6 88:7 107:1 108:7,18 109:19 111:2 112:3 113:4 114:5 117:8,11 117:23 124:7 162:3 165:2
**documentation** 176:17
**documented** 178:19
**documents** 5:14 7:4 12:3,8 12:11,17 13:11 14:16 15:5,7,23 17:1 48:6 50:3 50:6 106:18 108:16 161:9 161:12,13,21 162:10 165:6
**dod** 6:9 47:16
**doing** 29:23 40:5 77:12 98:17 123:20 148:6
**doj** 11:9,13,17 15:12 76:24
**dollar** 157:16
**dollars** 35:15 35:16
**door** 133:20
**doubt** 74:18 159:18
**doug** 116:20
**douglas** 6:20 117:15
**dr** 125:1
**drawn** 74:18,21
**driver** 78:10
**drives** 160:11
**drug** 132:17
**due** 8:18 85:9 95:13
**duly** 9:6 128:5 187:6
**duration** 96:22 173:9 177:9,14 177:19,22
**duties** 28:16 51:12
**duty** 62:14

**e**

**e** 8:1,1
**earlier** 85:16 89:11 91:10 93:9 95:8 99:13 101:5 102:16 129:22 157:1 175:1 183:19
**early** 48:20
**earning** 111:11
**eastern** 1:2,17 2:9 8:10 52:11
**economic** 169:9
**economist** 171:8
**economists** 171:14
**economy** 157:10
**education** 17:22 78:12 99:24 107:18 128:22 163:7
**effect** 152:18 152:21 153:8
**effectively** 157:8
**efficiency** 22:8 125:8
**electricity** 133:19 138:5
**eligibility** 96:6 98:20 100:16 107:24 110:17 111:15 155:11 166:10 175:6
**eligible** 33:1 62:13
**eliminate** 156:6
**eliminating** 120:4
**employee** 187:13,15

**employees** 7:6 59:24 96:4,5,23 162:19 165:10
**enables** 90:9
**enact** 87:19 97:18 155:23 156:4 157:3
**enacted** 87:23 97:19 150:4
**encompasses** 55:21
**endorsing** 123:12
**ends** 123:6 184:11
**energy** 22:8,8,9
**enforcement** 21:2
**enhance** 172:3
**enroll** 113:10
**enrolling** 113:16
**ensure** 8:20 40:10 102:23
**entire** 26:5 27:1 90:24 91:4,5 94:19 154:18 154:24 186:5
**entirely** 85:21 86:4
**entirety** 15:6
**entities** 143:11
**entitled** 82:16 95:12,21,22
**entitlement** 82:14,23 83:3 100:6
**entitlements** 82:6,21 83:11 83:23 175:2,5 181:15
**equally** 137:17
**errata** 185:1 186:11
**esq** 3:5,15 4:6,7
**essentially** 20:17 22:1,20 22:24 27:16 64:6 94:5 139:24 142:9 151:11 152:21 162:17
**established** 33:7 57:20 163:5 164:8
**estimate** 27:6 27:17 54:17 111:11 133:17 159:11 160:5 162:18 163:22 167:17 183:4
**estimated** 46:2 90:24 91:4,6 97:7,11,22 101:21 133:10
**estimates** 27:9 91:6,8 92:1,3,4 92:6 110:7 137:10 155:7 159:4 163:21 168:12,24 169:7 170:6 171:18 172:9 173:5
**estimating** 65:15,19 137:11 142:12
**evaluations** 5:20 41:13
**event** 102:21
**everybody** 12:18 164:24
**evidence** 53:12
**evolve** 18:16
**exactly** 123:20
**examination** 5:2 9:5,11 128:4,7
**examined** 9:6 128:5
**examining** 126:2,15
**example** 56:4 56:10 59:2,6,15 72:24 97:17 98:19 99:19 128:20 129:21 140:2,8,12 141:11,14,21 144:5,10,19,22 156:3 158:6 160:10 161:19 169:24
**examples** 73:8 123:5 124:18
**exceed** 80:20 93:5
**exceeds** 40:3
**except** 59:7 90:5 186:9
**excepted** 96:11 96:21
**excluded** 112:7
**excluding** 110:18 174:17
**excuse** 22:5 52:7 71:11 119:23 124:12 126:13
**execute** 23:7 33:15
**executing** 23:24 24:5,13
**execution** 6:6 22:16 40:2 47:12
**executive** 25:21
**exhaustive** 180:15
**exhibit** 5:9,11 5:16,19,24 6:5 6:10,14,17,19 7:4 13:2,4,17 15:20 16:2,24 17:5 41:3,5 44:2,4 47:1,3

51:23 52:1 69:20,22 114:1 114:4,6 117:7,9 162:2,4
**exhibits** 5:6
**exist** 166:20
**existence** 124:17
**exists** 158:24
**expand** 183:18
**expanded** 32:23 33:11 99:20
**expect** 66:20 182:18,18
**expectancy** 166:4,7,24 167:8,14 168:11,13,21 169:1 181:12
**expected** 53:11 53:15 54:2,5 92:5 133:12
**expend** 93:6
**expended** 91:17 91:23
**expenditure** 91:21
**expenditures** 36:19 55:13 80:19,20 135:11
**expensive** 34:24 35:1 141:18
**experience** 150:14
**expert** 1:13 2:11 6:11 22:2 50:11 51:15 52:16 66:13 67:3
**expertise** 50:16 184:8
**expires** 187:24
**explain** 20:7 25:15 26:11 33:18 34:20 48:14 49:22 55:5 56:12 62:3 64:2 71:9 72:10 76:11 78:7 82:10,12 94:1 104:18 105:3 128:15 130:22 133:8 143:24 158:3 163:15
**explained** 34:13
**explaining** 50:3
**explanation** 33:17 62:10
**exposed** 36:24 37:2,4,6
**exposures** 32:13 33:8 35:8 36:12,16,20,23 37:8,13 78:20
**express** 182:13
**expressing** 104:9
**extend** 27:13 31:2
**extent** 20:6 182:23
**external** 103:19 104:8
**extremely** 160:10

**f**

**f** 47:22
**faced** 102:7
**facilities** 6:3 44:16 45:8,15 45:24 46:3 64:22 120:21 130:19 131:9 131:14,15,23 131:24 132:24 134:18,19,22 134:24 135:1 135:18 136:16 137:18,23 139:9,22 143:19 145:3 148:22
**facility** 65:23 146:5 148:10
**fact** 102:3 114:21
**factors** 81:6 138:3,4,7 149:4 169:9 176:11
**fail** 101:2
**failed** 93:15
**fails** 90:1
**fair** 12:7 24:8 37:7,12 46:4 50:9 62:19 66:1 73:21 77:24 79:23 105:17 135:6,15 138:9 139:17 146:4 148:18 150:1 151:3 154:17 155:16 164:6 169:13,21 173:2 175:15 175:21 183:12
**fairly** 27:21 53:6
**familiar** 46:15 92:21 106:13 120:13,15 161:8 165:4,16 175:14
**families** 129:18 129:19
**family** 65:16
**far** 71:8 125:5
**farm** 23:3
**fasab** 163:6 164:9,11,14,15
**fashion** 49:5
**fashions** 91:18
**fast** 104:21

**faster** 106:9 147:6
**fbi** 19:8 20:11 20:12 24:11
**feature** 47:22 98:3
**february** 1:16 2:8 7:3 8:8 117:1,20
**fed.r.** 6:12
**federal** 6:9 7:6 18:16 19:11 21:19,19 35:19 46:20 47:16 50:23 52:16 53:12,21 55:3,7 55:9,12,15 56:1 56:21 57:24 58:4 60:18,21 60:23 63:11,17 65:2 76:24 80:19,19,21 88:17 93:4,4 104:13,22 105:6 106:10 106:19 112:6 125:22 126:8 161:14 162:19 164:12,14,17 165:10
**fee** 59:19
**feel** 13:13 16:13
**fees** 149:2
**field** 33:17
**file** 12:23 30:24 51:21,22 117:4 161:24
**financial** 7:4 20:14 21:11,17 21:19 26:24 27:1 103:13 159:24 161:9 161:12,13,20 162:10 165:5 165:14 182:7
**financially** 187:16
**find** 45:24 118:2 134:11
**fine** 46:14 184:14
**finished** 16:14 16:17 44:20 53:3,5 108:15 109:18 111:1 112:2 113:3
**first** 17:13 19:22 22:14 24:14 28:10 41:23 47:8 53:2 118:5 119:24 123:1 131:21 131:22 132:2 132:20 134:17 187:6
**fiscal** 28:21,22 29:2,2 40:19 41:17 48:9 49:12 51:3,12 69:19 70:4 77:6 77:15,15 80:24 84:20 85:4 90:21 92:5,13 92:16 93:16 101:5
**fisher** 3:6
**five** 147:5
**fixed** 139:24 140:5 178:21
**floor** 3:7
**flow** 55:18
**flu** 141:16
**fluctuate** 95:9
**fluctuated** 150:22
**fluctuations** 168:20
**focus** 76:18 104:14 117:24
**focused** 125:23
**folks** 33:17
**follow** 89:8,15 164:8
**followed** 14:13
**following** 34:10 37:20 53:9,16
**follows** 9:7 128:6
**food** 72:24
**footnote** 41:22 48:8 49:11
**force** 80:21
**foregoing** 187:8
**forged** 34:14
**forgetting** 62:5
**forgotten** 114:1
**form** 23:14 35:11 43:3,18 50:13 56:16 58:14 62:23 66:4 72:14 74:2 75:2 78:5 83:14 84:1 101:14 115:2 153:16 169:17 170:18 178:6
**formal** 114:14
**formulas** 99:1 100:16 155:12
**formulated** 32:12
**formulation** 22:16,23 28:12 40:1 86:14
**forth** 187:10
**forward** 169:7
**foundation** 56:16 57:4 61:3 63:23 64:10,18 66:4 72:4,14 73:13 76:2 81:4 83:6,14 84:1 85:23 93:19 115:12 116:3 116:10 118:14

118:22 121:12 124:21 125:10 131:1 133:3 135:20 136:8 140:16 142:20 143:5,22 146:9 147:8 169:17 171:11 172:6
**four** 130:15,17
**free** 13:13 16:13 62:12 66:9
**freeze** 156:20 157:2
**frequently** 71:16 159:13
**front** 13:9 133:20
**froze** 157:6
**frozen** 153:18 153:23
**fulfill** 51:11
**full** 10:8 34:22 90:20,22 93:15 94:16 96:16 97:17,19 98:5 102:15 118:5 123:2 133:13 133:18 161:16 182:21
**function** 96:20 96:21
**functions** 24:9 30:1,3 119:4 131:12 172:11
**fund** 32:13 33:8 33:8 35:6,8 36:1,3,4,13,16 36:20,21,23 37:8,13 53:20 55:1,14,19,21 56:2,5,8,9,11 56:13,14,19,22 57:2,10,11,12 57:14,16,22 58:1,6,7 61:8 61:13 65:7 73:22 76:7 78:20,23 80:13 81:10,13,22 82:2 84:24 85:21 86:4 130:16 132:8
**funded** 37:24 46:6,8 53:18,20 54:10 55:2 59:6 59:9 60:17,20 60:22 61:7 63:10,16 65:1,6 75:11 86:6 90:17 130:7
**funding** 18:23 20:12,18,20 31:11,19 32:12 32:18 33:3,7,13 33:24 34:1,12 35:9,17,20,22 35:23 36:2,8,9 36:15,22 37:19 45:7,15 50:11 53:14 55:14 56:1,12 57:13 70:15 71:1,17 71:20,22,24 72:7,12,20,24 73:7,9 74:23 75:24 76:18 78:19 79:14 82:17 84:16 85:6,10,14 90:2 91:14 94:2,7,17 94:18,20 95:2 101:12,22,23 101:24 102:3,6 118:17 128:19 136:2 180:5,8 180:11,15
**funds** 5:21 31:14 32:5,7 33:9,15,18,21 34:6 38:1 40:18 41:17 54:22 55:9,16 56:20 56:22 58:2,21 59:13 73:23 74:10,14,16,18 74:21 75:11,15 76:12,13 77:3,7 80:15 87:23 88:6 89:2,12 90:4 91:3,12,15 91:17,19,20 93:9,10 97:6 98:7,10 101:3 102:11,20 103:3,12 105:24 131:7 131:23,24 161:15
**further** 14:15 16:10 62:10 128:6 184:6 187:7,12
**future** 27:14,20 68:8,16,22 69:1 100:6,8,18 115:8,24 116:17 118:15 137:4,8,14,16 139:12,18 140:19 142:16 153:4 154:14 155:7,18 167:17,24 168:3,7,8,9,12 168:24 169:12 170:1,6 172:3 172:19,22 173:13,22 174:10,14 179:2,4,7,7 180:20 181:15 181:18 183:4 183:15
**fy2024** 5:22

**fy2026** 6:14
**fy25** 90:22,23 97:16 98:4
**fy26** 34:7 91:1 91:2,5 92:6 97:11,23
**fy27** 34:9 91:4 91:6 92:8,11,18

**g**

**g** 8:1
**gamut** 161:17
**gao** 119:17 120:1,8 143:11 164:15
**gap** 46:5,7
**gas** 56:6
**gasoline** 56:6
**gcpi** 110:10
**general** 29:16 33:14 37:22 40:14 41:12 46:17,22 49:15 49:19,23 50:1 53:20,21 55:1,2 55:10,14,19,21 56:2,8,9,13,19 56:20,20 57:9 57:16,22 58:1 59:7,9,16,21 60:7,18,20,23 61:7 63:10,16 65:2,7 71:11,12 80:13 81:10,12 93:4 118:9 131:3,11 135:9 139:4 148:17 149:1 151:6 164:10 166:24
**generally** 33:14 48:24 86:5 103:18 104:11 104:16 120:15 124:10 130:12 130:15 165:6 165:15 166:19
**geographic** 120:19,22
**getting** 179:12
**gi** 99:24
**give** 31:18 44:18 64:12 109:17 110:24 140:12 141:11 162:12 164:22
**given** 60:19 88:3 95:15 140:9 157:3,7 177:13
**gives** 18:15
**go** 15:11 16:4 39:3 41:1 43:22 43:23 54:16 57:6 59:2 64:2 69:6,8 73:15 81:6 89:13 102:15 108:6 112:21 122:4 127:8,11 131:12 132:15 133:15 138:3 142:12 144:8 148:24 151:23 154:2,6 164:21 179:13,15 184:12
**goal** 30:22 31:6 126:1
**goes** 31:13 55:14 56:5,7,9 87:9 111:9 133:16
**going** 12:14,17 17:19,21 38:5 39:12 45:8 46:13 69:8 79:16 118:13 127:11 139:22 140:15 149:10 154:6 169:7 179:15 184:12
**golkow** 8:6
**good** 9:14,15 10:24 91:23 126:11,18 127:8 160:14 160:16,19
**governing** 98:14
**government** 19:11 55:7,9,15 56:1,21 57:24 58:4 80:21 90:10 112:6 118:9 126:5
**governs** 130:11
**grab** 46:12
**graham** 3:14 10:4
**grand** 3:7
**grandfather** 152:12
**granted** 102:6
**graph** 70:21,22 70:22 71:3 77:5 79:23 84:19
**graphic** 48:18
**great** 50:16
**greater** 66:17 77:21 93:6 171:6
**green** 78:17
**group** 3:3,13 9:18 113:11,12 113:12,12,16
**grow** 80:5,8 110:1,9
**growing** 28:21 103:20 104:21 106:9
**grown** 31:4 110:10 147:5
**growth** 76:22 76:22 77:1,3 105:10,13,14 105:15

**guarantee** 152:7 153:1 173:9
**guaranteed** 59:16
**guards** 133:20
**guess** 109:4 123:15
**guidance** 48:10 48:15,17 49:2 49:14 120:20

**h**

**hand** 40:9
**happen** 84:13 176:15
**happened** 20:10
**happens** 84:16 93:22 150:5
**hard** 116:1
**headquarters** 132:9
**health** 27:6,8 27:10,12 32:22 32:23 33:5,11 36:24 64:22 65:6,18,19 80:18 90:6,12 107:18 113:9 113:10,18,20 118:19 120:21 120:23 121:8 131:5,13 132:10,16 133:12,13 137:24 167:12
**hear** 75:5 76:21 116:7 153:14 153:19,21
**heard** 8:21 82:5 104:2,7 118:8 119:17 124:11
**hearing** 117:6 122:12
**hearings** 54:21 122:22,22 124:11
**heart** 141:17 142:5,7,10 146:14,16,18
**heinz** 18:9
**held** 2:12 8:12 28:17 122:21
**help** 144:11
**helping** 137:11
**hereof** 186:11
**high** 161:17 170:11
**higher** 111:17 143:18 151:4,4
**highlighting** 46:5
**hire** 138:1 140:2
**historic** 6:1 44:14
**historical** 168:14 169:6
**historically** 86:6 97:16 110:10
**history** 17:24 18:5,12 53:7 71:1 79:15
**hold** 28:3 54:20 84:16 85:13 105:9,10
**home** 59:15 112:12,18
**honest** 42:14
**honorable** 6:19 117:15
**honoring** 32:14
**hospital** 45:19 45:21 59:2,5 132:12,14 133:21
**hospitals** 66:7 132:6
**hot** 184:5
**hour** 46:11
**house** 6:24 116:24 117:18
**housing** 100:2 107:17
**hr** 29:19 39:1
**hypothetical** 83:6

**i**

**ice** 21:16
**identification** 13:4 16:2 17:5 41:5 44:4 47:3 52:1 69:22 114:6 117:9 162:4
**identified** 20:18 51:15 106:22 120:1
**identifies** 67:8 165:9
**identify** 31:14 103:19 173:19 174:8 177:24 178:3
**identifying** 107:20 183:9
**iii** 6:12 52:16
**immigration** 21:1
**impact** 96:13 112:19 137:13
**impacted** 175:23
**implement** 152:11,14 159:15
**implementation** 26:24 32:14
**implemented** 32:12 155:17
**implementing** 159:9,18
**important** 104:19

**impound** 88:6
**improve** 122:13 122:21,24 125:7
**improved** 19:23 172:9
**improving** 30:7
**inadequate** 64:16 101:12
**inappropriate** 148:2
**incarcerated** 177:3
**include** 53:13 61:10,22 75:20 87:5 120:23 126:2,15 133:19 135:11 145:22 168:7 168:10,20 169:2,9
**included** 19:1 51:2,5 63:9 64:24 82:17,18 92:9 98:10 105:24 112:9 169:6
**includes** 12:18 12:20 18:12 29:13 61:12 84:20,24 146:15
**including** 60:12 120:4 134:18 137:10 148:11 159:6 160:1 167:13
**income** 55:12 56:9 108:24 109:2 112:5,6,9 113:13
**incomes** 109:4
**incorrect** 169:15 170:1
**increase** 45:9 78:22 79:7 80:14,15 81:1,2 81:18 112:5
**increased** 20:9 20:12 29:1 78:14 79:2,5,11 79:20 81:17 95:18 96:2 112:12 150:15 150:17
**increases** 95:23
**increasingly** 104:14
**incremental** 143:18
**increments** 111:10
**indemnity** 62:7
**index** 5:1 109:10 149:17
**indicated** 16:7 16:19 78:21 186:10
**indicates** 44:10
**indirect** 134:3,9 134:11,13 135:4,10 147:21 148:21
**individual** 56:8 68:8,13 155:3,8 155:9 158:22 172:23 173:7 173:10,14,19 174:10 176:3 177:15 181:8 181:11,14 183:10
**individually** 154:23 173:4
**individuals** 43:15 81:20 174:2 183:4
**inexpensive** 141:16
**inflation** 109:10 110:1,7 110:8 150:24 151:4 157:14
**inflationary** 157:11,12,19
**information** 22:2 31:15 43:8 43:16 46:19 48:1 49:7,9 53:16 171:5
**informed** 119:7
**infungible** 182:11
**inherent** 98:3 168:23 183:14
**inherently** 168:3 169:14
**injuries** 62:15 129:17 158:20
**injury** 176:18
**inspector** 40:14 41:12 118:8
**instance** 98:1
**instructions** 73:22 95:10
**insurance** 59:8 59:10,23 60:3,5 60:8,9,10,11,12 64:7
**integrated** 120:9,14 121:3 121:23 131:13
**intended** 36:20
**interacting** 121:4
**interest** 57:14 57:17,23 58:11 59:20
**interested** 187:16
**internal** 49:13 50:2 135:16 139:8
**interpret** 165:20

**interview** 40:17 42:1,4
**interviewed** 40:13,15 42:6,8
**interviews** 42:11
**intimately** 175:14
**introduce** 12:16 107:24
**introductory** 41:22
**intrusions** 20:15
**investment** 45:8,15 46:3
**involved** 32:1 70:10 86:19 105:8 142:7,10
**involves** 37:8
**involving** 139:12
**issue** 45:11
**issued** 48:10 67:4
**issues** 140:21 160:3
**items** 17:20 37:9,10
**ivc** 121:2

**j**

**jadine** 67:9,11 67:14,19,20
**january** 31:6
**job** 1:23 15:3 17:3,9 24:9 28:16,17 38:6 38:10,12,15,22 39:8 51:12 53:6 160:21 161:1 168:1,23
**jobs** 24:20
**judgments** 176:7
**july** 19:5,8 23:2 25:11 48:23
**jump** 77:13,14
**jumped** 154:5
**june** 20:23 24:19,23 28:17
**justice** 4:4 9:24
**justification** 19:24 20:17,19 35:5
**justify** 34:12

**k**

**keep** 14:9,12 20:22 46:13
**keeping** 14:7
**key** 71:4
**kicks** 49:3
**kidney** 158:7,9
**kind** 11:24 27:4 27:10,11 29:13 37:4 48:18 50:5 56:7 57:11 111:11 120:19 131:17 132:6 132:18 161:16 176:7
**klotzbucher** 4:6 9:21,22 11:19 23:13 35:10 43:2,11 43:17 50:12 56:15 57:3 58:13 61:2 62:22 63:22 64:9,17 66:3 72:3,13 73:12 74:1 75:1 76:1 78:4 81:3 83:5 83:13,24 85:22 93:18 101:13 103:23 115:1 115:11,15 116:2,9 118:13 121:11 122:1 124:20 125:9 130:13,24 133:2 135:19 136:7,17 140:15,18,24 142:19 143:4 143:14,21 146:8,20 147:7 153:15 169:16 170:2,12,17 171:10 172:5 178:5 184:2,15
**know** 10:22 16:14 22:19 27:10 29:23 39:1,2 43:5,21 44:20 46:13 53:2 56:3 57:6 57:13 58:1,3 59:3 64:12 67:14,19 69:15 71:7 74:17,18 76:22 80:20 81:20 82:24 91:13 94:16 104:24 105:13 105:19 108:5 108:15 109:18 111:1 112:1 113:2 116:20 116:22 120:20 121:19 125:3 129:19 133:19 133:20 138:1,5 142:11,13 144:5 148:5,7 148:23 152:14 157:11 159:19 160:7,9 161:18 164:11 170:20 171:14 172:10 174:2 175:4,10 178:24 179:20 182:5 183:6
**knowledge** 63:15 68:10

88:14 119:10 150:19 171:23 172:3,14 181:1 181:3 182:23

**l**

**l** 4:8
**label** 158:5
**labeled** 72:1
**labels** 134:6
**labor** 110:5
**lack** 120:8
**lane** 4:14 8:5
**language** 73:17 74:9,12,13 75:15
**lapse** 90:2,11
**large** 104:21 174:13
**larger** 106:9
**largest** 82:2 131:13
**law** 32:5 82:14 88:5 89:15,17 95:12,13,14 100:5,6,8 103:7 155:15 156:9 156:12 182:6
**lawrence** 30:22
**laws** 68:12 95:18 168:7,8
**lay** 106:18
**layers** 89:19
**lead** 20:8 121:3
**leaders** 28:11 125:22
**leadership** 3:3 3:13 9:18 29:14
**leading** 21:5 23:21 24:4
**leads** 40:1 86:13
**led** 23:6 28:11 29:6 176:18
**left** 26:18
**legal** 103:13 181:4
**legislation** 73:22 159:6,9 159:20 160:10
**legislative** 29:18 95:10 174:5,11
**legislators** 160:20
**lejeune** 1:7 8:13 51:16 52:10 181:19
**level** 77:2 94:7 94:18,20 95:20 113:13,14 133:11 161:17
**levels** 97:15
**liabilities** 7:5,7 163:4,23 165:11
**liability** 162:19
**life** 60:7,8,10 166:4,7,17,24 167:8,14 168:11,13,21 169:1 181:12
**lifetime** 68:13 155:4
**lights** 138:6
**likely** 34:7 118:15
**likes** 156:13
**likewise** 35:2 91:2 181:3 184:7
**limit** 159:7
**limited** 169:14 169:22 177:11 182:9
**limits** 88:2
**line** 22:14 24:23 62:14 79:15 125:10 185:3,5 185:7,9,11,13 185:15,17,19 185:21,23
**lines** 125:3
**list** 107:12,16 121:15 123:5
**listed** 52:22
**litigation** 1:7 8:13 51:16 52:10 66:13,21 67:4 68:19 180:24 181:5 181:20 182:14
**litigation's** 181:9
**little** 71:7
**live** 27:17 176:5
**lives** 175:24
**living** 99:5 110:2 149:14 150:8 155:13 156:21 157:7 157:16 169:10 169:12,23
**loan** 59:15,16 59:19 75:18
**location** 2:13 138:21
**locations** 45:18
**logical** 81:19 171:15
**logo** 44:10 47:9
**long** 24:12 27:17,18,19 175:23 176:4
**look** 27:9,16 38:2 60:6 73:2 75:16 79:3,14 90:23 97:21 98:4 107:23 126:11,18 133:10
**looked** 21:20 43:15
**looking** 45:2 48:8 49:11

60:15 77:5 79:15,22 84:19 109:7 118:4 126:5,9 147:21 168:22 176:2
**looks** 18:11 19:4 24:16 38:18 79:16 108:12 154:24
**loss** 111:11
**lot** 104:16 122:19 179:21
**low** 110:18
**lower** 105:14 110:8,9,11
**lunch** 59:3,3 127:5
**luncheon** 127:13
**luxenberg** 3:4 9:17

**m**

**made** 40:21 42:11 90:24 92:5,6,8,10 99:23 100:2,21 101:6,11 102:18 148:6 152:15 183:13
**main** 3:16
**maintaining** 131:15
**maintains** 135:16
**make** 9:19 14:7 84:18 87:1 88:18,23 90:3 96:6 140:13 149:5 155:7 156:12,18 159:2 160:15 168:24 169:11 171:18 176:6
**maker** 22:3
**makes** 35:8 54:19
**making** 90:9 137:10 164:23
**malfunction** 153:13
**man** 184:4
**managed** 180:16
**management** 18:8,20 21:19 25:13 26:14 27:1 29:20 34:15 40:6 132:11 160:1
**manager** 126:14,18
**managerial** 132:24 133:23 135:15 136:6 139:8 148:9
**managers** 126:11
**mandatory** 35:17,21 36:3,4 36:10,13,16,19 37:8,9,16,20 71:4,8,16,20 72:1,6,12,20,24 73:1,3,7 74:11 75:11 76:11 78:1,8,11,18 79:22,24 80:4 80:24 81:9,17 82:3 84:20 87:18 90:3 95:8 95:11,19 103:21 104:13 104:19 105:18 106:4,8 107:12 107:15,21 109:11 114:24 180:5,8
**march** 5:23 6:4 25:7 67:13 187:24
**mark** 13:1 15:20 16:24 41:3 44:1 47:1 51:23 69:20 114:1,3 117:6 162:1
**marked** 13:3 16:1 17:4 41:4 44:3 47:2 51:24 69:21 114:5 117:8 162:3
**master** 18:4,7
**material** 19:24 20:17
**materials** 15:1
**maternal** 144:20
**math** 77:12 80:3 177:23
**mathematical** 183:7
**mathematically** 77:23
**matter** 8:12 22:1 84:6 137:20 160:17 186:6
**mcilray** 38:8
**mcilroy** 1:14 2:12 5:2,6,10 5:15,16,18 8:15 9:4 10:7,9 12:16 13:4,7,20 13:24 14:18 15:24 16:2,6 17:5,7 23:16 38:9,12 41:5,7 41:23 44:4 45:11 46:10 47:3,23 48:1,10 49:12 52:1 53:11,15 66:12 69:14,22 114:6 114:8 117:9 118:16,20

119:3 125:12 128:3,11 154:3 162:4 179:20 184:2 186:19
**mean** 57:1,12 74:14 84:10 90:20 108:4 109:15,22 111:5 113:7 123:10 134:1 172:16 178:10
**meaning** 53:20 55:1 61:21 63:10
**means** 20:3 27:3 31:12 39:3 54:14 55:6 88:2 94:6 107:24 108:5 133:8 152:22 156:4 156:14 165:21 174:14
**measure** 109:10
**measures** 115:23 149:21
**mechanism** 102:23
**media** 42:18,22 43:15,22
**medical** 6:3 44:16 45:18 60:12 65:18,23 95:5 130:17,18 130:18,19,19 131:4,6,10,14 132:2,7,19 133:17 134:12 134:17,19,23 134:23,24 135:1,7 141:15 145:1 148:12 176:17 181:9
**medicare** 138:15,19 139:1,3,7,19 148:4,15,20,23 149:4,7
**meet** 11:17 33:3 45:24 82:15 170:15 170:23
**mellon's** 18:9
**members** 60:2 62:14 65:16
**merit** 2:21
**methodologies** 34:13
**mi** 3:8
**michael** 4:7 9:23
**michael.w.cr...** 4:12
**midsummer** 48:23
**military** 130:1 130:4
**military.com** 5:24 43:24 44:11
**million** 31:19 81:23
**mischaracterize** 89:17
**misspoke** 129:5
**misunderstan...** 183:2
**models** 165:24
**modify** 99:9
**moment** 13:8 38:3 44:18 47:6 62:4,6 108:14 111:22 112:23 117:22 127:2 162:1,13 164:22
**money** 20:5,6,8 30:6 55:8,9 58:3 84:9,11 90:8 91:5
**monthly** 61:23 62:12 96:4,9 97:1 174:19 175:16
**moran** 122:10 122:21,23 123:7,12,14
**morning** 9:14 9:15
**mortality** 27:12 27:16 168:11 168:13,21
**move** 10:19 32:5,7 165:3
**moved** 19:7 20:23 22:6 23:2
**moving** 32:11 67:6 68:2
**multiple** 40:16 42:6,8 50:23 89:19 124:16 177:8
**multiyears** 91:21

**n**

**n** 3:16 8:1
**name** 8:5 9:22 10:8 47:23 52:20,22
**names** 167:6
**narrow** 110:17 111:15 157:20 158:19
**nation's** 131:12
**nature** 8:19 11:24 140:10 141:20 182:4
**nc** 3:17
**necessary** 73:18,23 74:10 74:21 75:15,19 83:22
**need** 20:18 45:7 45:15 46:2 101:12,21,23

118:11 119:19 138:22
**needed** 20:20 31:10,11 46:8 74:16 100:18
**needs** 27:12 46:5 54:17 122:11,13 123:19 124:2 133:12,13 154:15
**negative** 105:14
**negotiated** 138:14,21 139:1,6 149:8
**negotiates** 138:24
**neither** 187:13 187:15
**network** 63:20 64:5,6,21 65:22 120:10,14,24 121:1,5,9,10,23 121:24 136:3 136:15 137:19 138:13 139:13 139:19 143:3 143:12,17 145:2,12,18,24 146:7,18 147:16 148:4 148:15,19
**never** 166:19
**new** 21:11 26:24 30:20,21 31:5 32:12,17 32:21,22 33:7 33:13,13,24 34:11,12,23,24 35:4 36:5 103:5 108:13 151:24
**news** 42:23 76:19
**non** 6:9 47:16 64:22 131:8
**nondefense** 76:22 77:4 105:11
**nonretained** 51:15
**noon** 127:3
**normal** 97:18
**north** 1:2 52:11
**notary** 2:21 187:4,21
**note** 147:13
**noted** 8:22 120:8
**notice** 2:19 5:9 5:12 12:15 13:19 14:1 15:22
**notification** 32:9
**notify** 32:6
**noting** 31:22
**nullify** 152:21 153:7
**number** 5:8 30:5 73:19 75:21 78:13 79:7 92:9 95:22 107:14 108:11 113:17,20 140:3 162:2 178:3
**numbers** 89:9
**nurses** 132:4,17
**nw** 4:8

**o**

**o** 8:1
**oas** 162:22 163:3
**oath** 10:17 186:13
**obama** 37:20
**object** 35:10 43:2 56:15 57:3 58:13 115:1 118:14 140:16 153:15
**objection** 11:20 23:13 43:11,17 50:12 61:2 62:22 63:22 64:9,17 66:3 72:3,13 73:12 74:1 75:1 76:1 78:4 81:3 83:5 83:13,24 85:22 93:18 101:13 103:23 104:1 115:11 116:2,8 116:10 118:22 121:11 124:20 125:9 130:13 130:24 133:2 135:19 136:7 136:18 140:23 142:19 143:4 143:14,21 146:8,21 147:7 169:16 170:3 170:12,17 171:10 172:5 178:5
**objections** 5:12 15:21 122:2
**obligate** 88:3 88:11 93:6
**obligated** 91:24
**obligating** 33:18
**obligation** 91:20
**obtained** 43:1
**obtaining** 60:10
**occupancy** 38:24
**occupy** 39:9
**october** 38:19
**offer** 53:11 54:2,6 66:20 161:1 186:12

**offering** 68:7 68:11,17,21
**office** 5:19 18:20 19:14 20:24 21:5 22:7 22:8,12 23:21 25:21 29:7,15 29:16,17,17,19 31:15 34:15 39:18 40:1,6,14 41:12,12 42:21 86:13 89:2 106:22 107:6 107:20 118:8,9 120:5 121:2 139:11 156:5 160:1,2,5,13,18 161:5 163:1
**office's** 106:14
**officer** 19:8
**offices** 29:7,13 29:14,19,22 30:8 37:24 120:5 132:11
**officials** 40:10
**offsets** 180:23 181:5
**oh** 61:18
**oig** 5:19 40:15 40:22 42:1,6,11 42:13 119:17
**oit** 31:18 37:23
**okay** 10:23 11:5 13:10,15,16 14:10 16:13,16 24:14 35:13 38:2,4 44:6,22 45:4 46:15 68:2 69:2 89:19 108:10 109:17 109:20 110:14 110:21 112:4 113:2,5 114:3 119:1 128:11 149:10 154:12 158:15 161:8 162:6,14 164:22,22 165:15 183:24
**olaf** 17:24
**old** 21:16 45:20
**om** 29:19
**omb** 31:17 32:3 32:10 34:22 49:1 54:18 86:17,22 87:4 87:23 88:2,14 88:18 89:13,23 102:18,19
**omb's** 49:2 88:9 88:16
**once** 87:4,12
**open** 12:22 141:17
**operate** 57:16 58:6,8,11,21 59:6 122:20
**operated** 59:13
**operates** 57:24 59:8,17,21 81:13
**operating** 57:23 80:13
**operation** 59:1
**operational** 35:22 36:8
**operations** 27:1 56:20 130:16
**opinion** 68:7,12 68:17,20,21 179:22 181:17 181:24 182:8 182:13,18,22
**opinions** 53:13 53:16 66:20 181:2,4,21
**opportunities** 7:1 117:19
**opposed** 77:1 98:2 154:21 173:6
**opposite** 145:11
**option** 60:10 107:23 108:11 108:22 109:7 109:22 110:15 111:5,20 112:5 112:21 113:7
**options** 6:17 19:17 21:20 106:15,22 107:8,20 114:9 114:15,19,21
**orange** 99:21
**order** 31:9 182:1 184:13
**organization** 126:1
**organizational** 120:2 125:4
**organizations** 6:7 47:13 122:19
**organize** 125:3
**originally** 32:24,24
**outcome** 85:12 187:17
**outlines** 33:14
**outside** 138:8
**overlap** 28:16
**oversee** 26:8 119:4
**oversight** 120:21
**overtime** 31:12 31:12
**owed** 85:6
**own** 93:1 103:6 135:18 175:5 182:7

**p**

**p** 8:1
**pa** 3:14

**pact** 32:14,19 33:6 79:12
**page** 5:2,8 14:5 14:5,6 17:13 24:15 38:11 41:21 44:10 45:1,3 47:8,19 47:23 52:21 67:6 70:13 107:13,14 108:11,11,12 108:13,15,20 109:8 110:15 111:21 112:22 118:4 122:8 123:6,8,16 162:14,15 185:3,5,7,9,11 185:13,15,17 185:19,21,23
**pages** 7:3 38:8
**paid** 55:18 61:13,16 63:12 65:4,5 90:20 97:15 108:24 111:8 129:19 129:24 132:13 138:15 155:4 174:18 178:11
**pandemic** 59:7
**paragraph** 45:5 53:2,10 118:5 119:14 122:8 123:2,17
**parameters** 88:5
**parents** 62:13
**part** 24:3,3 38:5 49:22 71:20 76:23 105:15 112:14 114:23 115:5 118:1 121:9,10 133:9 168:1,23 169:5
**partially** 166:4
**participants** 59:11
**particular** 53:15 151:13 151:20 157:23
**parties** 8:16,21 30:18 32:1 181:22 187:14
**party** 121:5
**pass** 90:1 93:15 175:17 177:8 184:1
**passed** 94:6 96:17 97:12
**passes** 87:12 93:23
**passing** 176:24
**past** 178:2 179:6
**pathways** 136:21
**patient** 140:8
**patients** 140:9
**paul** 30:21
**pause** 8:20 93:10
**pay** 55:13 56:4 56:6,6 59:18,20 59:20 68:7 84:11 85:10 96:1 101:3 103:14 130:4 132:4 134:21 138:17 139:4 149:1 162:19
**paying** 96:3
**payment** 62:12 96:8 139:20 175:10,16 177:20,21
**payments** 5:23 41:18 59:10 61:11,13,22 65:15 66:2 81:21 84:17,18 85:9,14 90:3,10 91:4 92:5,7,8 93:10 96:4,6,9 97:1,2,4 129:16 155:9 173:13 174:17,22 178:15,18,22 178:23 179:2,4 179:6
**pays** 65:22 66:9 135:2 149:7
**pdf** 107:13
**pen** 65:15
**penalty** 186:1,4
**pending** 11:3
**pension** 53:17 54:9,18,23 61:6 61:13 63:13 65:17 75:20 76:7 78:11,14 78:23 85:8 90:6 90:15,16 91:22 92:8 94:24 95:4 97:5,10 98:8 102:11 106:4 109:24 110:13 129:3,7,11,18 130:7 163:20
**pensions** 55:17 81:22 82:2 84:24 85:2 87:18 102:8 129:24 130:1,4
**people** 39:2 57:7 76:21 80:5 102:17 105:8 121:15
**perceived** 101:11
**percent** 111:9 111:10,14,16 111:17 152:6

**percentage** 151:12
**performance** 21:1 48:9 49:13
**performed** 24:6 24:9 68:18 142:6 164:2 171:7
**performing** 28:5 29:24
**period** 88:3 95:15,23 96:16 156:21 157:11 157:13,19
**periodic** 106:14
**perjury** 186:1,5
**person** 183:13
**personal** 55:10
**personally** 67:14,20 183:5
**perspective** 18:16 100:15 126:21 160:19 160:22
**perspectives** 160:8
**pertaining** 119:5
**pertains** 121:8
**pertinent** 38:23
**pharmaceutic...** 132:5
**phase** 6:12 52:16
**phrase** 74:20 75:18
**piper** 67:9,11 67:20
**place** 12:14,17 15:19 51:18 88:7 171:6 187:10
**placed** 12:22 113:11
**placing** 16:23 69:18 107:1 117:3 161:23
**plaintiff** 68:9 68:14 154:22 181:8
**plaintiff's** 173:10 181:12 181:15,18
**plaintiffs** 3:3 3:13 5:9,12 9:18 10:5 13:19 15:21 172:23 181:24
**plan** 137:11
**planning** 6:5 47:12 94:11
**plans** 19:2
**play** 150:24 159:22 161:5
**please** 8:19 9:8 10:7,22 11:3 12:21 13:13 16:13 17:7 44:19 49:4 55:5 71:9 75:9 94:4 108:14 109:17 110:24 111:4 111:24 112:1 113:2,6 114:4
**pleasure** 182:16
**plus** 50:22
**pm** 127:11,12 128:2,9 154:7 154:10 179:15 179:18 184:12 184:18
**pocket** 112:13
**point** 10:21 11:1 13:13 19:23 28:10 160:12 182:20
**pointed** 73:9
**pointing** 24:21
**points** 66:19 128:12
**police** 132:13
**policies** 162:15
**policy** 7:4 18:8 18:13 50:10,19 67:12 120:9 161:9,12,13,21 162:10 165:6
**political** 51:3
**politically** 26:18
**population** 27:9 27:13,17 153:12 154:18 155:1 173:6
**portion** 94:20 135:3
**portions** 134:13
**position** 5:17 19:5,8 25:21
**possibility** 177:16
**possible** 59:18 85:20 106:18 152:17,19,20 156:11 176:16
**post** 50:6
**potential** 99:15 158:23 159:5 160:3 169:14 177:13
**potentially** 32:22 101:23
**power** 86:3 99:16 157:18
**practical** 112:19
**practicalities** 182:6
**practice** 33:16
**precludes** 57:23
**predecisional** 49:10 50:1

**predict** 68:15 68:24 85:17,18 100:11,13 116:13,17 153:3 155:3 176:4
**predicting** 68:22
**preexisting** 95:9
**premise** 155:6
**preparation** 32:5 66:24
**prepare** 11:18 23:7
**prepared** 20:19 22:20 66:12
**prepares** 86:16
**preparing** 12:4 12:12 19:17 23:23 24:5,13 139:11 163:21
**present** 149:16 157:9 163:4
**president** 54:18 87:14 102:19 116:4,13
**president's** 34:8 50:4 54:20 87:5 97:23
**press** 31:21 42:21
**presumably** 81:1 99:7 150:11,13
**presumptions** 99:20
**previous** 22:19 23:11 24:6 72:11 100:21 124:24
**previously** 30:5 37:14,16 54:16 63:14 99:20 100:10 119:15 128:5 163:13 163:17 165:13 174:6
**price** 146:5,6 149:17
**primarily** 122:5 132:3 163:19
**primary** 35:20 78:10 79:12 161:5
**prior** 29:21 94:8,18,20 95:17
**priorities** 50:4 50:5 51:3 88:17 89:7
**priority** 113:11 113:16
**private** 45:21 57:12 64:7
**probability** 165:24
**probably** 59:4
**procedural** 12:8
**procedure** 52:17
**procedures** 147:2
**proceed** 118:24
**proceeds** 123:5
**process** 28:8 30:23 31:1 33:10 35:20 43:1 48:18 49:3 49:24 54:16 71:23 72:8 76:17,20 84:7 86:11,20 96:4,5 96:24 102:15 105:9 133:9 135:14 159:7 161:18 165:9 172:20 180:2
**processed** 31:13 133:23
**processing** 30:13 33:4,5 96:9
**proclamations** 105:7
**produce** 15:1
**produced** 15:7 17:2,9
**production** 5:14 14:17,23 15:2,8,14,23
**program** 21:1 40:10 59:11,15 59:16 64:7 73:1 73:1,4 109:24 120:4 126:6 128:17 129:16 129:18 172:11 173:1
**programming** 6:5 47:12
**programs** 18:16 24:2 26:23 46:20 53:14 55:22 56:1 58:4,5,8 58:10,20 59:8 59:24 60:4,6,8 60:12,13,20 73:22 74:11 75:10,18,19 87:18 90:4 99:16 103:21 104:13 109:11 118:17 126:9 128:20,22 129:10,14 145:6 147:14 171:18 180:12
**project** 137:4 154:14 172:22 172:24
**projected** 139:13 180:19

**projecting** 172:18
**projection** 174:10 183:15
**projections** 137:8,13 139:12,18 171:8 172:4,15 179:2
**projects** 46:6
**proper** 174:1 183:8
**proposal** 30:12 112:15,20
**proposals** 114:14,17
**propose** 109:1
**proposes** 112:8 113:15
**proposing** 110:9 111:12
**proprietary** 21:17
**pros** 159:19 160:6,7
**prospective** 155:17
**provide** 22:2 33:10,14 34:1 42:18 64:21 66:7 96:24 102:24 111:16 138:2 144:19 159:10 160:2,5 160:13,18,22 160:22 182:17 182:22
**provided** 15:12 21:22 48:6 63:7 73:9 89:9 90:7 97:6 108:17 132:23 136:22 136:23 137:2,3 137:12,18,18 137:21 138:12 138:16 139:9 140:3,4 141:7 141:10,12,20 144:7 145:1,2 145:17,22,23 147:16 149:2 161:16 167:17 171:24 172:19 176:20 177:1,5 177:14 178:1 178:15 179:24 182:9
**provider** 64:6 138:22
**providers** 45:23 121:6 131:5 138:1 140:1
**provides** 73:22 113:9 144:6,10 144:12,16,18 145:7,10,11 155:21
**providing** 33:5 87:19 90:8 96:20 120:20 134:21 135:17 142:10 143:19 159:22 167:23 171:5 181:7
**provision** 98:9
**public** 2:21 18:8,8 29:17 49:8,15,20,23 50:2,6 187:4,21
**publications** 106:15
**published** 114:22 117:5
**pull** 13:14
**purchased** 141:24
**purpose** 137:7 148:8 164:3,4
**purposes** 56:19 63:8 165:12
**pursuant** 2:19 6:12 52:16
**pursue** 115:9 115:23
**put** 124:3 164:24

**q**

**qualify** 80:5
**quality** 170:11 172:8
**question** 10:21 10:23 11:3 58:18 74:4 75:8 83:9 86:2 118:14 121:20 126:4 140:19 141:4 143:20 146:12 154:12 157:24 167:21 168:18 169:20 174:4,7 182:3
**questioning** 125:10
**questions** 10:20 42:21 118:15 171:3 183:21
**quick** 44:18
**quickly** 17:19 30:24 31:2
**quo** 122:11
**quote** 43:1 44:23
**quoted** 40:22 42:23

**r**

**r** 8:1
**raises** 80:15
**rand** 6:5 46:16 46:18,24 47:9
**range** 45:20,22 77:10,16
**ranging** 113:11
**rapidly** 103:20

**rate** 59:20 105:10,13,14 105:15 110:2,4 110:8,9,11 138:19,21
**rated** 111:16 152:6 158:10 158:20
**rates** 61:23 110:7 138:15 138:24 139:1,3 139:6,7,14,20 143:17 148:3 148:15,24 149:8,13 150:15
**rather** 58:11 59:11 61:14 140:2 147:21
**rating** 79:4 111:9,14 113:13 151:7 151:11,15,18 151:22,23 152:2,3,7,8,11 153:7 155:12 158:2 176:14
**ratings** 98:23 110:19 152:13 169:3
**rb** 128:21
**reach** 178:24
**read** 21:12 44:22 53:23 74:17 76:19 108:6,19 111:6 119:15 122:15 124:10 186:5,7
**reading** 111:3
**readjustment** 100:3
**reads** 53:10 103:7
**real** 157:8,15
**really** 20:4
**realtime** 2:20
**reason** 145:16
**reasonable** 35:6 149:2 155:7 171:18
**reasonably** 167:16
**reasons** 79:10 93:13
**recall** 40:13,17 48:5 67:21 101:8 162:23
**recalling** 42:5
**receive** 27:18 27:19 28:7 59:19 62:21 80:7 81:21 82:16 95:12 111:13,18 113:20 152:13 173:22
**received** 15:5 30:8 78:16,22 85:14 157:22 158:22 172:23 173:13 174:9 176:3
**receives** 58:2 76:9 87:14 94:7 175:23
**receiving** 27:10 78:13 79:8 96:10,14 156:8 175:16
**recent** 93:14 114:18
**recently** 31:21
**recess** 69:10 127:13 154:8 179:16
**recipient** 154:22 173:4 173:14,20 174:10
**recipient's** 183:10
**recipients** 154:19 173:3
**recognized** 50:10
**recommendat...** 18:23
**recommended** 120:3
**record** 8:4,9,23 10:8 38:7 46:11 69:6,8,12 127:9 127:11 128:9 154:2,7,10 178:15 179:13 179:15,18 184:12
**recordation** 163:7
**recorded** 1:13 2:11
**records** 169:6
**reduce** 30:4 31:7,13,20 100:7 106:18 107:21 109:1 110:11 113:17 113:18,19 114:10 115:10 125:8,21 126:6 126:15 156:6 157:8,16,22 158:21 181:19 181:23
**reduced** 59:20 109:5 157:6,18 176:9
**reduces** 152:8 176:14
**reducing** 6:17 30:22 104:18 107:9 113:20 120:5 125:23 126:9
**reduction** 104:14,20

126:1 152:13 182:2
**reevaluates** 176:13
**reevaluations** 169:4
**refer** 30:17 34:19 45:1 57:1 69:14 83:10 92:16 104:23 166:9,16
**reference** 28:20 38:7 104:8
**referenced** 101:5
**referencing** 48:16
**referred** 59:23 60:11 82:6
**referring** 69:16 104:10 105:1 122:17 124:19 125:11 163:11 166:12,18 183:9
**refers** 82:8 118:18
**reflect** 123:21 143:17
**reflected** 135:4
**reflecting** 135:17
**reflects** 88:16 114:22
**reform** 122:11 123:19 124:2
**regard** 52:7 100:12 108:24
**regarding** 43:8 43:16 46:20 68:23
**regards** 117:6
**regional** 120:22 132:11
**regions** 121:22
**registered** 2:21 187:4
**regulations** 168:7,8
**rehabilitation** 128:21
**reimbursement** 139:14 143:17 148:3
**reimburseme...** 66:2
**related** 12:8 40:17 42:18 62:15 96:8,22 99:20,23 106:22 112:5 113:8 129:16 139:18 140:20 144:12 160:1 161:2 165:14
**relates** 1:9 26:5
**relations** 29:18
**relative** 187:13 187:15
**relatively** 133:11 141:16
**release** 31:22 50:2
**released** 34:8 91:7
**relevant** 126:16 172:14
**rely** 167:8,13
**remain** 68:12 81:16
**remaining** 155:4 157:15
**remote** 1:13 2:11 3:1 4:1 8:11,19
**remotely** 8:17 8:18 187:6
**renewable** 22:8
**reorganization** 7:2 117:20 123:19
**reorganize** 118:11 119:19 123:14 125:6
**reorganized** 125:1,2
**repeat** 83:9
**repeatedly** 118:10 119:18
**rephrase** 10:22 23:18 39:16
52:8 58:19 63:2 74:5 75:7 118:23 126:4,7 129:6 134:15 136:11 141:5 153:16 167:20 168:17 174:7
**replacement** 46:2
**replacements** 131:16
**report** 40:22 46:24 66:13 162:18 178:11
**reported** 1:24 45:19 163:23
**reporter** 2:20 2:21 8:24 12:19 113:24 187:1,4
**reporting** 8:19 19:19 30:2 125:4 165:14
**reports** 67:4 76:20
**represent** 15:4 17:1 164:17
**representatives** 7:1 117:19
**represented** 11:7
**representing** 3:3,13 4:3 10:1
**represents** 39:8 79:24 173:3

**request** 5:21 34:9 40:18 41:17 54:19 86:16,23 87:5 92:10 94:24 100:18 101:7 101:11 102:14 102:18 163:21
**requests** 14:16 14:16,22 15:2,8 15:13 18:23 22:21 33:4 40:11 48:21 100:22 105:7
**require** 33:3 150:3
**required** 32:9 89:20 95:18 170:16
**requirement** 162:18
**requirements** 21:18 32:4 100:16
**requires** 17:17 32:10 33:16 35:5 89:22 96:3 96:5
**requiring** 105:23
**research** 37:3
**resolution** 87:13 93:23 94:2,6,10,16 95:16,24 96:1 97:18,20 98:6
**resource** 46:20
**respond** 42:20 42:22
**response** 15:2,7 15:13,16,19 16:7,18
**responses** 5:11 15:21
**responsibilities** 120:10
**responsibility** 25:22,24 26:3,6 26:21 120:20 120:22 121:4
**responsible** 24:12 122:5
**rest** 35:9
**restate** 86:2 104:5 146:11 154:12 169:20
**restrict** 100:7
**restructure** 125:18
**restructured** 124:9,15,16
**restructuring** 120:3 124:19
**result** 159:12 174:15
**resumé** 15:3 38:5,8
**retroactive** 155:21 156:15 156:18 174:17
**retroactively** 156:1,17
**revenue** 80:20 80:23
**revenues** 53:21 55:3 60:18,21 60:23 63:11,17 65:2 80:15
**review** 5:20 12:3,11 13:14 13:23 14:22 16:9,13 17:7 41:16 44:19 48:23 53:1 108:14,16 109:13 110:21 111:22 112:23 117:22 126:22
**reviewed** 12:7 15:16 16:7,19 66:23 67:3 161:20
**reviewing** 16:12,17 96:10 109:18
**reviews** 16:15 17:10 44:21 46:19 53:4 86:22 108:18 109:19 111:2 112:3 113:4
**revised** 151:16 151:19,23
**rich** 171:17,19
**right** 9:21 11:1 39:12 69:7 86:9 108:19 127:7 127:10 154:6 160:17 179:14 184:9,10
**rmr** 1:24 187:21
**road** 56:7
**role** 19:10,13 20:23 21:4,15 22:1,7,11 23:3 23:10,20 24:4,5 24:6 25:17,18 26:12,13 38:24 39:4,9,15 42:17 119:4 150:24 159:1,7,22 161:5 167:22
**roles** 22:19 24:10 120:10
**room** 4:8
**roughly** 79:24
**row** 38:18
**rule** 52:17 53:12 115:8,18 115:19,22
**run** 131:12 161:16
**running** 132:6

**s**

**s** 8:1
**safe** 67:22 182:8
**salisbury** 3:17
**save** 186:8
**saved** 159:11
**saving** 30:6
**saw** 54:15
**saying** 145:20 149:3 152:17
**says** 19:23 21:8 22:14 28:11 30:11 33:23 34:10 45:6 48:9 49:3,12 60:16 67:11,17,18 70:3,7 93:5 107:5,8,23 108:6,11 109:9 110:16 117:14 118:6 119:24 120:7 122:9 123:3,17 163:2 163:10
**scenario** 141:12 142:2,4 145:11
**scenarios** 141:19
**schedule** 144:11 151:8 151:11,15,18 151:22 152:3,7 153:7
**school** 18:9
**science** 18:7
**scope** 25:23 26:6 173:9 182:21
**screen** 13:11,17 16:5,11 38:13 42:2 44:6 47:5 52:4 67:17 68:4 69:3 70:1 107:3 117:12 161:24 162:7
**scroll** 13:22 14:3 17:21 38:5 108:8 118:2 162:12
**scrolled** 70:13
**scrolling** 14:2,9 14:12 20:22 52:14 107:11 109:6 110:14 111:20 123:1
**searched** 52:20
**seat** 184:5
**second** 6:10 29:5 33:22 47:19 52:15 118:5 123:16 136:2 165:1
**secondary** 157:21 158:1,5 158:9,16,20
**secretaries** 124:24
**secretary** 6:20 25:4,9,12,17,18 25:20 26:3,8,9 26:13,14 29:16 30:21 39:22 41:24 45:12 48:24 116:20 116:23 117:5 117:16 123:3 123:11,13,23 124:1 125:2,5 125:14 160:22 160:23,23
**secretary's** 50:4 161:1
**section** 41:22 68:3 71:3 108:8 108:12,13 109:14 111:23 112:24 118:3
**sector** 45:21
**security** 56:4,5 56:11,13,22,22 57:6,7 109:11 109:23 110:12 149:18,23 150:18,21 151:1
**see** 10:3 13:6,18 14:12 17:23 19:22 20:23 21:8 22:6,14 23:6,20 24:23 25:3 28:10,20 29:5 30:10 32:11 34:8 38:12,18 41:7 41:21 42:2,3 44:6,9,13,17,23 45:13 47:5,9,19 47:21,23 48:2 48:12,17,23 49:16 52:3,6,13 52:14,19,22 53:9 67:8 68:3 69:24 70:14 71:3 75:17 76:21 77:6,16 97:21 98:6 107:2,5,7,15 109:9 110:16 110:19 117:11 117:14,21 118:6 119:14 119:21,23 120:6,12 162:6 162:15,22
**seek** 89:13
**seeking** 32:22
**seeks** 173:9
**seem** 112:14
**seems** 51:8 81:19
**seen** 13:24 14:18 50:23 140:9 166:19
**selected** 6:8 47:16

**selection** 21:10
**self** 59:6
**senior** 25:21
**sense** 155:18 160:21
**sent** 31:21
**sentence** 33:22 34:10 118:5 119:15,21 120:6,12 122:15
**separate** 29:12 129:10 175:2,6 175:9
**september** 92:19
**series** 10:20 24:20 54:20 97:12
**serve** 22:1 39:22
**served** 21:9 67:12
**service** 14:13 21:21 23:4 60:2 62:14,15 111:8 120:10,14 121:23 122:18 129:17 138:20 143:18 145:7 146:5,7 157:21 158:2,5,7,10,16 158:21 176:19
**services** 30:7 65:18,22 66:8,8 66:10 113:21 130:6,11,18 131:4 132:3,19 132:23 134:12 134:18,19,23 135:8 138:2,12 139:9 140:3,11 141:7,10,12 144:7,11,12 145:1,16,21,23 147:16 148:10 148:12,15,19 148:20 149:2 163:1
**serving** 21:15
**ses** 5:17
**session** 5:4 128:1
**set** 30:22 137:22 138:5,7 138:21 187:10
**sets** 88:2 138:11 138:24
**settled** 21:21
**settlements** 182:5
**seven** 39:19
**several** 103:20 128:20
**share** 13:11 16:4 41:2 43:24 46:23 106:10 161:24
**shared** 44:6 67:17 117:11
**sharing** 13:17 15:11 16:22 39:13 41:8 50:8 52:3 69:3,24 86:9 107:2 113:23 124:7 162:6 164:23
**sheet** 185:1 186:11
**shifts** 51:2,6
**shop** 59:5
**short** 46:11 69:4 127:5 179:11
**shortfall** 102:7 102:21
**shot** 141:16
**showed** 142:1
**shutdown** 90:11
**signature** 184:17 187:20
**signed** 186:15
**significant** 28:16 31:23 46:2 78:8 120:3
**signs** 87:14
**similar** 23:10 23:12 24:9 35:15 36:17 85:12 125:17
**similarly** 68:11
**simple** 172:19
**simply** 82:23 83:3 103:5
**single** 91:19
**sitting** 42:10
**skeptical** 34:13 34:19,21,23 35:2,4
**slightly** 163:14
**smaller** 25:22
**snap** 73:1,8
**social** 56:4,5,10 56:13,21,22 57:6,7 109:11 109:23 110:12 149:18,23 150:18,21 151:1
**somebody** 22:2 73:15 183:7
**somewhat** 35:16
**sorry** 23:15 25:7 38:9 43:12 75:4 104:5 116:6 123:2 142:21 178:7
**sorts** 174:5
**sought** 32:24
**sound** 35:6
**sounds** 27:21 62:18 88:22

**source** 43:8 47:24 56:11 136:2
**sources** 53:13 55:8,24 118:16 180:11,15
**southern** 1:3
**span** 26:6
**speak** 119:10
**speaking** 8:20 14:11
**special** 61:23
**specialized** 171:23 172:3 172:13
**specific** 24:2 68:8,22 73:18 75:21 98:1 118:1 161:17 166:7 167:8
**specifically** 20:13 61:1,5 76:19 97:5 106:3 109:3 163:18 175:5
**specified** 76:7
**specifying** 73:23
**speculation** 115:12
**spend** 103:10 103:11
**spending** 20:7 37:8 78:1,2,9 78:11 79:24 80:4,24 81:10 81:17 84:21 89:20 90:13 95:9,11,17,18 104:19,24 105:9,18 106:9 106:11 107:12 107:15,21 114:24 147:5,6
**spent** 74:22 122:12
**spoke** 95:8
**spoken** 67:23 67:24 80:12 86:10 180:18
**spouse** 176:24
**spouses** 62:13
**st** 17:24
**staff** 19:14 21:5 22:12,15 23:6,9 23:21 24:4 28:11 29:7,13 30:5 34:14,16 35:2,3 37:24 120:5 131:18 132:9,11 141:22
**stamp** 38:10
**stamps** 72:24
**standards** 163:5,5 164:8,9 164:12,18 170:16,21,23 171:1 181:4
**standing** 184:13
**standpoint** 103:14
**stands** 162:24 164:11
**start** 30:20 31:5 93:16 111:13
**started** 18:19 25:4
**starting** 17:13 18:22 24:10 45:11 78:18 162:14
**starts** 38:10 108:13
**state** 10:7 116:7 157:10
**stated** 63:14 72:20 74:23 79:6 81:12 82:1 84:23 85:16 87:17 93:9 100:10 126:8 167:15 179:22
**statement** 6:19 42:9 65:1 72:11 83:19,21 101:19,21 117:4,15 122:17 123:3,7 123:11,12,21 123:23 125:6
**statements** 40:21 42:11,13 42:18 163:24
**states** 1:1 4:3 5:11 6:10,24 15:20 51:14,19 52:10,15 117:18 166:16
**statistics** 110:5 166:10
**status** 122:11 176:23
**statutes** 98:14 150:2
**stayed** 177:20
**stemming** 125:21
**stenographic** 8:23
**stenographic...** 187:9
**stone** 125:1
**stop** 15:11 16:22 39:12 50:8 69:3 86:9 113:15,23 124:7 164:23 174:22
**stopped** 176:9
**store** 59:5
**strategies** 34:12
**stream** 32:13 32:18 33:7,13 33:24 34:12

35:18 37:19 71:22
**streams** 35:21 137:1,2
**street** 3:16 4:8
**strike** 124:12
**structure** 100:6 120:2
**structures** 125:4 126:3,16 126:22
**studied** 114:22 156:6
**studies** 6:8 47:16
**sub** 180:7
**subcommittees** 87:10
**subcomponent** 49:6
**subject** 22:1 50:1 71:14,17 71:22 72:2,21 76:12 80:9 94:18,19 95:16 95:24 174:4 179:5 180:8 183:14
**submission** 6:14 49:13 70:5
**submissions** 49:4
**submit** 48:21 49:1,4
**submits** 86:17
**submitted** 87:6
**submitting** 48:19
**subpoena** 5:13 14:14,14 15:22
**subsequent** 33:9 176:17
**subsequently** 158:8
**substance** 11:21
**substantially** 31:7
**substituted** 149:22
**subtitle** 47:15
**successful** 28:12 31:23
**successfully** 51:9
**sufficient** 55:13 101:2 102:3
**suggest** 112:11
**suggesting** 109:3
**suggestions** 114:9
**suggests** 111:14
**sum** 92:7 173:5 178:23,24
**summarize** 39:14 108:21 109:21
**summary** 66:19
**summer** 48:20
**sums** 73:17 74:21 75:18
**supervising** 19:14 22:12
**supplemental** 5:21 40:18 41:17 101:6,11 102:6,14,24
**supplemented** 55:11
**supplies** 142:10
**support** 5:22 32:13 41:18 53:15 130:19 131:10,18 132:5,7,15 134:23 159:4
**supported** 168:16
**supports** 36:23 37:1,3,3,13,15 57:13 131:4
**suppose** 82:24
**sure** 14:7 108:9 118:2 180:14
**surge** 32:21,22 33:3
**surgeries** 142:5 142:11
**surgery** 141:18 142:8 146:14
146:16,18
**surprised** 43:14
**surviving** 62:13
**survivor** 99:11
**survivors** 174:24
**sustainable** 126:3,17,23
**swear** 9:1
**sworn** 8:18 9:6 128:5 187:6
**system** 21:11 21:17 26:24 113:10,18 120:24 122:6 131:6,13 133:1 133:24 135:15 136:6,23 137:4 138:3 140:5 144:9,15 163:8
**systems** 21:19 182:7

**t**

**table** 70:17,24 79:15
**tables** 166:4,17 166:24
**take** 11:4 42:22 69:4 108:14 112:12,18 123:4 149:4 153:1 179:10
**taken** 69:10 127:13 154:8

179:16 186:6 187:9
**talk** 23:15 48:5 73:15 76:21 92:1 104:17 142:21 148:24
**talked** 71:7 105:22 165:13 179:20
**talking** 163:19 163:22 178:7
**tax** 56:4,6,9,11 62:12 112:7
**taxable** 112:6,9
**taxes** 55:10,10 55:11,18
**taxpayer** 35:16 53:21 55:2 60:18,21,23 63:11,16 65:2 80:20
**taxpayers** 58:2
**team** 42:1
**technology** 31:15
**tef** 33:9,19,20 34:24 35:6 36:3 36:5 78:19
**tell** 109:14 160:24 173:21
**telling** 11:16 121:18
**tend** 143:17
**terms** 74:14
**testified** 9:6 116:24 124:5 128:5
**testifying** 66:17 118:16 173:12 180:23
**testimony** 6:11 52:16 53:12 54:2,5 67:1 124:3 157:1 173:8 180:1 181:7,11,14 187:9
**testing** 107:24 156:4,14
**thank** 10:2 14:21 15:10 16:21 17:12 23:1 24:21 30:9 39:11 42:15 46:9 50:7 92:20 111:19 113:22 114:4 119:13 119:22 122:7 124:6 149:20 179:9 184:3,7
**theoretically** 152:3,4
**thing** 33:13 63:6 167:4
**things** 27:5 35:4,4 36:5 39:14 42:9 50:5 65:14 121:16 123:8 131:17 132:6,15,18 137:10 145:9 146:3 159:24 169:5 179:22 182:14
**think** 20:9 21:21 38:4 50:15 51:10 61:18,19 83:22 101:20 124:4 125:13 131:20 153:17,22,22 160:24 161:4 179:10,11
**thinks** 43:22 45:10 125:14
**third** 24:23 45:3,5 120:7 121:4 131:21 131:24
**thirds** 79:24
**thought** 160:24
**three** 28:17 134:22
**tied** 110:3 113:12 149:17 149:18,19
**time** 1:17 2:9 8:9,10 11:5,24 18:17 21:16,23 41:23 44:7 54:6 78:13 79:3 85:7 96:16 109:17 110:24 127:2,8 128:9 150:22 150:23 157:9 177:18 178:2 179:18 182:20 183:22 184:3,8 187:10
**timeline** 48:19 49:5
**times** 40:16 42:7,8 124:17 155:20
**title** 41:15 44:13 47:11 52:15 70:14 107:8 109:9 110:16
**titled** 71:1
**titles** 28:17
**today** 8:14,24 10:17 11:2,8,11 12:17 39:7 42:10 46:1 67:1 91:5 106:9 128:12 173:8 179:21 183:1 184:5
**today's** 8:8 12:4 12:12 184:11
**told** 11:23 122:23
**tools** 166:7 167:9

**top** 44:9 71:4 107:5 117:14
**topic** 40:23 42:5 182:9
**topics** 42:19 66:18,18 100:22 179:21 182:12,22
**torts** 4:5
**total** 70:17 79:15,16 80:1 80:18 92:7 144:9 147:21 147:22 175:21 177:21 178:1
**towards** 126:9
**toxic** 32:13 33:7 35:8 36:12,16 36:20,23,24 37:2,7,13 78:19
**toxically** 37:3,5
**traditionally** 36:1,8,10 37:9 37:10,24
**training** 18:13
**transcript** 5:7 184:14 186:5 187:8
**transcripts** 66:24
**transfer** 31:19 89:12
**transferred** 31:16
**transition** 26:17
**transitioned** 25:8
**transportation** 21:22 56:7 144:13 145:10 146:15
**travel** 161:18
**treasury** 74:19 164:16
**treated** 76:15
**treatment** 141:17,18
**trends** 153:11 166:10 168:14
**true** 29:9 32:16 34:4 36:11 46:8 51:1 65:7,24 71:19,24 72:8 72:23 74:12 75:23 76:4,8 78:24 79:9 80:11,22 81:14 85:19 87:7,11 88:1,10,13,24 89:16 90:5 93:12,17,24 98:16 99:22 100:9,14,20 101:4 102:9,17 103:2,11,17 106:7,12 114:12 115:6 115:21 116:16 116:19 123:9 130:5,9 135:13 135:24 136:4 137:17 138:10 139:5,10 141:9 142:18,24 143:2,13 145:4 145:8,19 146:1 146:2 147:10 148:13 149:15 151:21 152:23 153:4 155:14 155:19 156:19 157:5 159:13 165:18 166:5 168:9 174:16 174:18,20 175:20 176:12 176:22 177:12 177:17 178:17 179:8 180:10 180:21 183:16 186:8
**trump** 26:17 115:22 116:5 116:14
**trust** 56:22 57:2 57:10,11,12,14 58:6,7 171:6
**try** 30:23
**trying** 14:7 74:7 149:1 174:3
**tuesday** 1:16 2:8
**turn** 138:6 149:10 169:24
**two** 15:5 17:1 27:4 29:22 32:11 35:20 65:9 71:10 79:24 106:8 122:12 129:10 129:14 134:2 136:21,24 140:8 141:19 142:5 145:6 147:14
**types** 29:19 72:23 159:2
**typically** 72:20

**u**

**u.s.** 4:4 9:24 41:11 49:14 70:3
**ultimately** 21:21 54:22 159:14,20 161:1
**uncertain** 94:12 177:15
**uncertainties** 94:13 179:5 180:19
**uncertainty** 94:10,17 95:6 168:4

**unchanged** 68:13
**unclear** 131:20
**under** 10:16 33:22 51:12 53:12 60:16 66:19 78:22 80:4 81:23 121:22 124:24 125:1 129:24 132:24 134:9 136:14,15 138:12 141:21 142:2,3 143:12 146:5,7 147:16 151:7 162:22 182:10 186:1,4 186:12
**underlying** 101:1
**underscored** 118:11 119:18
**understand** 10:13,16,22 11:6,10 21:24 28:2 48:3 49:18 55:20 58:18 62:1,16 66:16 68:6 72:19 74:4 74:7 82:8,11 92:15 97:24 104:9,12,16 106:17 107:19 109:14,22 111:5 112:10 112:16 113:7 123:10 125:7 134:1,16 140:22 144:24 145:20 156:24 158:1,11,15 165:19,20 166:11,17 167:5,7 180:22 183:22
**understanding** 20:16 36:7 62:11 64:4 108:22 121:7 121:21 122:16 138:23 139:23 142:15 151:10 151:14 152:16 158:4,13 159:8 160:4 161:4 167:10 171:17 171:19 172:10 175:8 176:21 177:2,6 178:20 186:11
**understood** 86:8
**undertakes** 125:24
**undertaking** 126:14
**unenroll** 113:15
**unfamiliar** 171:9
**unique** 35:17
**united** 1:1 4:3 5:11 6:10,24 15:20 51:14,19 52:10,15 117:18 166:16
**university** 18:5
**unreasonable** 168:15
**upcoming** 90:21
**updated** 38:23
**updating** 17:17
**usa** 5:18 38:8
**usda** 73:15
**usdoj.gov** 4:11 4:12
**use** 27:4,6 28:8 33:19,20 74:9 74:11 109:9 110:10 139:13 168:24 181:23
**used** 33:10,15 47:22 110:8 137:9 163:21 181:18
**uses** 74:13 137:2 154:14 166:6
**using** 21:21 56:10 137:11 163:5 167:15
**usually** 71:13
**usvets** 166:11 166:13

**v**

**v** 4:6 41:21
**va** 5:19,24 6:14 6:22 11:11 28:11,21 29:1 33:21 34:1,14 35:22 37:17 40:10,14,22 42:18 43:8,16 44:14 45:16,17 45:19,24 46:5 48:21 49:3 50:11 53:20 55:2 58:5,8,10 58:20 59:1,2,5 59:8,16,24 60:6 60:17,22 61:21 63:10,19 64:22 65:1,5,8,18,22 65:23 66:9 68:7 70:14,17 71:19 71:20,24 72:12 73:5,7 74:23 75:10 76:23 79:15,16 80:4 81:9,17 83:2 86:14,16 87:8 87:14,23 88:3,8 88:11 89:1,3,5 89:7,20,23 90:3 93:1 94:10

95:15,24 96:1 98:14,20 99:16 100:17,22 101:3,6 102:2,7 102:18,22 103:4,9 105:23 108:23 110:1 110:13 111:14 113:8,10 116:20 117:17 120:23 121:8 122:6,11,13,20 122:20,23 124:12 129:7 129:24 130:3 132:24 133:16 134:18,19,22 135:16 136:14 136:15,20,24 137:11,18,22 137:22,24 138:1,5,5,7,11 138:24 139:9 139:22 140:4 141:15 144:6,9 144:10,12,16 144:19,20 145:2,10,11,17 145:22 146:5 146:15 147:18 148:10,22 149:5,7 150:14 152:10,21 153:1,7 154:14 155:20 158:4,6 159:10,10,14 159:17,18 161:14,16 162:10 165:9 166:6 167:7,16 170:23 171:6,9 171:15,16,22 171:23 172:19 172:22,24 173:20 174:12 176:13,18 178:11,14 180:12 181:18 181:23

**va's** 5:20 35:9 39:22 40:2 41:16 45:12 53:17 54:8 69:14 80:1 82:3 88:15 94:2 103:14 107:24 110:17 114:13 118:8 119:17 138:8 139:8 148:20 161:9 161:20 162:18 163:7 170:10 171:7 180:1,7

**vaccination** 141:22

**vaccines** 141:23

**vaco** 132:9

**value** 20:11 157:8,15,16 163:4 173:21 174:9 178:1,21 182:10 183:10

**vanslyke** 3:5 5:3 9:13,16,17 10:2,6 12:2 13:1,5 15:18 16:3,21 17:6 23:19 36:6 41:1 41:6 43:6,13,23 44:5 46:23 47:4 50:17 51:18,22 52:2 56:24 57:8 58:16 61:9 63:3 64:3,14,23 66:11 69:2,13 69:18,23 72:9 72:18 73:20 74:6 75:3 76:5 78:6 81:8 83:7 83:15 84:4 85:24 93:21 101:17 104:4 114:7 115:7,13 115:20 116:6 116:15 117:3 117:10 118:23 119:2 121:17 122:3 124:22 125:16 127:7 128:10 130:21 131:19 133:5 135:22 136:12 137:6 140:22 141:2 143:1,9 143:15,23 146:13 147:3 147:12 153:19 153:24 154:11 161:23 162:5 169:18 170:9 170:14 171:4 171:21 172:12 178:13 179:9 179:19 183:24 184:7,13

**variable** 140:6 140:7 141:7,19

**variables** 61:22 81:16 142:12 167:24 168:3,6 168:10,19 182:10

**variations** 125:2

**varied** 77:7

**variety** 21:20 55:8,16 58:8 60:5 91:18 128:22 137:9 142:11 144:16 144:18 152:10 152:14 160:8,8 176:11

**various** 89:2 105:8

**vary** 95:11 140:7 141:9 155:9
**varying** 140:2
**vba** 31:10,16,20 35:24 37:22 53:14 55:22 59:13 61:10,22 62:20 63:4 67:13 83:11 96:3,5,24 118:18 125:18 125:21 128:13 142:14 149:11 150:8 151:6 155:5
**verbatim** 187:8
**veritext** 8:6
**versus** 25:17 26:13 71:4,8 77:20,22 79:22 129:11 136:15 140:13 141:17
**veteran** 27:9,12 27:16,18 30:13 30:23 35:7 54:17 64:22 80:17,18 86:7 95:14 109:1 111:7,7 112:7 112:17 121:3 133:16 141:15 151:13,20 152:5,12 155:3 157:23 166:7,9 167:8,11,12 168:11,20 174:21 175:15 175:17,22,23 176:3,4,9,12 177:3,7,15 178:2,12,16
**veteran's** 151:23 158:7 175:7 176:13 176:23 177:9 177:17
**veterans** 5:22 6:21,22,23 7:7 24:17,24 26:2,4 26:20 27:5,17 29:15 30:14,24 31:10 32:22 37:1,2,4,6 39:18 41:11,18 46:20 49:14 59:18 60:1 62:21 65:16 66:8 68:23 70:4 78:13,16 79:4,7 80:7 82:14 95:12,21,22 96:2,13 97:2 103:19 106:23 110:18 111:13 113:9,9,16,17 113:20 114:22 116:24 117:16 117:17,18 118:18 120:9 120:13 121:22 122:18 129:16 129:20 132:9 132:10 133:11 133:12 142:1 144:11 152:12 156:7 158:22 160:14,17,20 161:3 162:19 163:4,18 165:10 166:17 167:13 175:11
**vetpop** 166:13
**vha** 7:2 35:24 37:23 75:23 76:8,9 113:18 117:19 118:11 119:5,8,11,19 120:5 121:15 123:13,19 124:2,8,14,16 124:19 125:6 125:11 130:6 130:16 131:5,5 131:8,23,24 140:20 142:17 143:12,19
**vha's** 120:2,8
**vi** 7:5 162:9
**vickery** 1:24 2:20 9:1 187:3 187:21
**video** 1:13 2:11 8:11 153:13
**videographer** 4:14 8:3,6 9:8 69:7,11 127:10 128:8 153:17 153:21 154:1,4 154:9 179:14 179:17 184:10
**viewpoint** 161:2
**viewpoints** 160:9
**viper** 124:11
**visn** 120:16,19 121:8 132:11
**visns** 122:5 132:12
**vitae** 5:16
**volume** 6:7 7:5 47:11 162:9 165:5
**vouchers** 161:18
**vsos** 122:13,18 122:22

**w**

**w** 4:7
**waived** 184:17
**walk** 17:19 86:12
**wallace** 3:14,15 10:4,4

**wallacegraha...** 3:19
**want** 9:19 39:2 43:20,21 57:5 60:8 76:21 108:5 117:24 148:23 149:24 179:21
**wanted** 13:12
**wants** 73:6 86:6 105:20 115:18
**washington** 2:13 4:9
**water** 1:7 8:13 46:12 51:16 52:10
**way** 14:3 22:22 29:11 35:6 36:17 57:17 74:24 75:12,13 75:14 88:16 101:24 110:4 113:19 122:13 142:3 145:5,15 147:17 148:21 152:8,24 153:3 176:15
**ways** 35:14 45:9 58:9 80:16 106:18 110:6 114:10 122:20 122:23 147:23 152:10,14 177:8,11
**we've** 39:15 174:5,12 179:5 179:20 180:18 182:14
**website** 60:6
**websites** 50:6
**weeks** 122:12
**weighs** 6:2 44:15
**weitz** 3:4 9:17
**weitzlux.com** 3:10
**went** 141:15,17
**west** 3:7
**whitney** 3:15 10:3
**widespread** 123:18
**widest** 77:10
**william** 4:6 9:22
**william.v.klo...** 4:11
**wish** 13:15
**wishes** 125:6
**witness** 2:13 8:18 9:2 11:23 23:17 35:13 43:5,20 50:15 51:21 56:18 57:5 58:15 61:5 63:1 64:1,11,20 66:6 72:6,15 73:14 74:3 76:3 81:5 84:2 101:16 104:2 115:4,17 116:4 116:12 119:1 121:14 125:13 130:15 131:3 136:10,20 140:17 142:23 143:7 146:11 146:23 147:10 153:22,23 154:3 170:5,13 170:20 171:13 172:8 178:9 184:1,9 187:6
**word** 123:4
**words** 93:1
**work** 30:6 31:11 32:2 37:22,23,23,23 40:9 42:7 50:23 51:5 54:18 97:1
**worked** 11:13 19:4 31:17,19 67:20 102:17
**working** 19:11 19:16 24:17,24 27:8 39:17 122:12
**written** 15:13 66:13
**wrote** 39:2
**wwallace** 3:19

**y**

**yeah** 58:15 59:21 61:18,20 73:11,14 74:3 76:3 77:23 84:2 125:2 140:17 154:4 171:13 172:16 177:23 178:9
**year** 28:22,22 29:2,2,2 40:19 41:17 45:20,22 48:9,22 49:12 50:22 51:12 54:15 55:7 69:19 70:4 77:6 77:12,13,15,16 80:24 84:20 85:4 87:20 90:8 90:17,19,20,21 90:22 91:19 92:2,5,13,16,17 93:15,16 94:8 94:16,18 97:8 97:17,19 98:5 101:5 102:12 122:10 150:7 151:3 157:3,7
**year's** 94:20 95:17
**years** 28:12 33:9 39:19 93:14 118:8 119:17 147:5

156:21

**z**

**zone** 127:2