IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

No. 7:23-CV-897

| | | |
|---|---|---|
| IN RE: | ) | |
| CAMP LEJEUNE WATER | ) | |
| LITIGATION | ) | **PLAINTIFFS' RULE 56.1(a)(1)** |
| | ) | **STATEMENT OF** |
| This Document Relates to: | ) | **UNDISPUTED MATERIAL FACTS** |
| | ) | |
| ALL CASES | ) | |
| | ) | |

Plaintiffs, through counsel, in support of the accompanying motion for partial summary judgment on Defendant's claimed offsets based on future awards, benefits, or payments Plaintiffs may receive, and pursuant to E.D.N.C. Local Civil Rule 56.1(a)(1), submit this statement of material facts as to which there is no genuine dispute.

**Defendant's Claimed Future Offsets**

1.      Defendant's expert Tricia Yount identified the following as potential future offsets against Plaintiff Cagiano: future VBA disability benefits of $383,819. Yount Rep. (Cagiano) at 2-3 (JA Ex. 719, D.E. 839-1).

2.      Defendant's expert Tricia Yount identified the following as potential future offsets against Plaintiff Criswell: future VBA disability benefits of $599,976. Yount Rep. (Criswell) at 3-4 (JA Ex. 720, D.E. 839-1).

3.      Defendant's expert Tricia Yount identified the following as potential future offsets against Plaintiff Laramore: future VBA disability benefits of $71,780 and future TriWest medical expenses ranging from $4,168 to $15,664. Yount Rep. (Laramore) at 3-4 (JA Ex. 725, D.E. 839-1).

- 1 -

4.     Defendant's expert Tricia Yount identified the following as potential future offsets against Plaintiff Downs: future VBA disability benefits of $43,120. Yount Rep. (Downs) at 2-3 (JA Ex. 721, D.E. 839-1).

5.     Defendant's expert Tricia Yount identified the following as potential future offsets against Plaintiff Fancher: future VBA disability benefits of $305,169. Yount Rep. (Fancher) at 3-4 (JA Ex. 723, D.E. 839-1).

6.     Defendant's expert Tricia Yount identified the following as potential future offsets against Plaintiff Howard: future VBA disability benefits of $631,798. Yount Rep. (Howard) at 4-5 (JA Ex. 724, D.E. 839-1).

7.     Defendant's expert Tricia Yount identified the following as potential future offsets against Plaintiff Mousser: future VBA disability benefits of $598,174 and future VHA medical expenses ranging from $1,613 to $537,466. Yount Rep. (Mousser) at 4-6 (JA Ex. 726, D.E. 839-1).

8.     Defendant's expert Tricia Yount identified the following as potential future offsets against Plaintiff Tukes: future CMS/TRICARE medical expenses (respective amounts not distinguished) ranging from $110,100 to $406,338. Yount Rep. (Tukes) at 4-5 (JA Ex. 727, D.E. 839-1).

9.     Defendant's expert Dubravka Tosic identified the following as potential future offsets against Plaintiff Gleesing: future VBA disability benefits of $663,358. Tosic Rep. (Gleesing) at 17-19 (JA Ex. 707, D.E. 839-1).

10.     Defendant's expert Dubravka Tosic identified the following as potential future offsets against Plaintiff Hill: future VBA disability benefits of $279,227, future VHA medical

-2-

expenses ranging from $298,345 to $518,916, and future CMS medical expenses ranging from $84,969 to $316,870. Tosic Rep. (Hill) at 20-26 (JA Ex. 708, D.E. 839-1).

11. Defendant's expert Dubravka Tosic identified the following as potential future offsets against Plaintiff Davis: future VBA disability benefits of $327,082. Tosic Rep. (Davis) at 13-15 (JA Ex. 706, D.E. 839-1).

12. Defendant's expert Dubravka Tosic identified the following as potential future offsets against Plaintiff Keller: future VBA disability benefits ranging from $506,582 to $823,058. Tosic Rep. (Keller) at 19-22 (JA Ex. 709, D.E. 839-1).

13. Defendant's expert Andrew Brod identified the following as potential future offsets against Plaintiff McElhiney: past/future VBA disability benefits (respective amounts not distinguished) of $26,858, future VHA/CCN medical expenses (respective amounts not distinguished) ranging from $532,501 to $1,372,014, and future CMS/TRICARE medical expenses (respective amounts not distinguished) ranging from $178,440 to $273,874. Brod Rep. (McElhiney) at 4-9 (JA Ex. 641, D.E. 837-1).

14. Defendant's expert Andrew Brod identified the following as potential future offsets against Plaintiff Peterson: past/future VBA disability benefits (respective amounts not distinguished) of $1,073,280, future VHA medical expenses ranging from $398,577 to $1,167,169, and future CMS medical expenses ranging from $127,172 to $166,887. Brod Rep. (Peterson) at 4-7 (JA Ex. 642, D.E. 837-1).

15. Defendant's expert Andrew Brod identified the following as potential future offsets against Plaintiff Rothchild: future CMS medical expenses ranging from $26,657 to $87,465. Brod Rep. (Rothchild) at 4-6 (JA Ex. 643, D.E. 837-1).

16. Defendant's expert Andrew Brod identified the following as potential future offsets against Plaintiff Sparks: past/future VBA disability benefits (respective amounts not distinguished) of $972,889 and future VHA medical expenses ranging from $333,205 to $1,549,332. Brod Rep. (Sparks) at 4-6 (JA Ex. 644, D.E. 837-1).

17. On February 23, 2018, Plaintiff Cagiano received a 100% VBA disability rating for bladder cancer. Yount Rep. (Cagiano) at Table 3 (JA Ex. 719, D.E. 839-1).

18. That rating was later reduced to 30% beginning on May 1, 2019, and increased to 60% on July 19, 2019. Yount Rep. (Cagiano) at Table 3 (JA Ex. 719, D.E. 839-1).

19. On August 10, 2022, he also received a 100% disability rating for prostate cancer. Yount Rep. (Cagiano) at Table 3 (JA Ex. 719, D.E. 839-1).

20. On August 18, 2011, Plaintiff Downs received a 10% disability rating for lumbar spine with degenerative changes. Yount Rep. (Downs) at Table 3 (JA Ex. 721, D.E. 839-1). This rating was increased to 20% beginning on November 28, 2016. Yount Rep. (Downs) at Table 3 (JA Ex. 721, D.E. 839-1).

**<u>Testimony of Defendant's Government Agency Experts</u>**

<u>Andrew McIlroy</u>

21. On February 24, 2026, Plaintiffs deposed Andrew McIlroy. McIlroy Dep. Tr. at 1:13-1:17 (JA Ex. 779, D.E. 841-1).

22. Andrew McIlroy has served as the Deputy Assistant Secretary for Budget at the Department of Veterans Affairs since April 2019. McIlroy Dep. Tr. at 24:23-27:1 (JA Ex. 779, D.E. 841-1).

-4-

23.     Mr. McIlroy testified that "Dr.s and care providers often find that VA facilities are not adequate to meet the care demands of today, and so that's why there is the estimated need for significant replacement or investment in facilities." McIlroy Dep. Tr. at 45:23-46:3 (JA Ex. 779, D.E. 841-1).

24.     Mr. McIlroy testified that "[t]here is a gap . . . between what is needed and what is funded" for those projects. McIlroy Dep. Tr. at 46:4-46:8 (JA Ex. 779, D.E. 841-1).

25.     Mr. McIlroy explained that the Department of Veteran's Affairs conducts an annual "budget process" in which it "estimate[s] the needs for Veteran compensation and pension," followed by budget hearings and deliberations that "ultimately appropriates funds for disability compensation and pension." McIlroy Dep. Tr. at 54:15-54:23 (JA Ex. 779, D.E. 841-1).

26.     Mr. McIlroy testified that "in the Federal budget process, there are two primary funding streams: discretionary and mandatory." McIlroy Dep. Tr. at 35:19-35:23 (JA Ex. 779, D.E. 841-1).

27.     Mr. McIlroy testified that the "benefits funding" is "classified as a mandatory" expenditure. McIlroy Dep. Tr. at 36:15-36:19 (JA Ex. 779, D.E. 841-1).

28.     Mr. McIlroy agreed that these appropriations for VA benefits are funded through general taxpayer revenues and federal borrowing. McIlroy Dep. Tr. at 54:24-55:4 (JA Ex. 779, D.E. 841-1).

29.     Mr. McIlroy testified that the "primary driver" in VA's increasing mandatory spending "is compensation and pension" because "over time the number of veterans who are receiving compensation and pension benefits has increased as well as the average amount of

benefits that those veterans has received." McIlroy Dep. Tr. at 78:10-78:16 (JA Ex. 779, D.E. 841-1).

30.     Mr. McIlroy testified that the average amount of benefits has increased because "the average disability rating for veterans has increased." McIlroy Dep. Tr. at 79:1-79:5 (JA Ex. 779, D.E. 841-1).

31.     Mr. McIlroy explained that "[a]s more veterans receive benefits, the budget will grow" but agreed it "is still subject to annual congressional appropriations." McIlroy Dep. Tr. at 80:7-80:11 (JA Ex. 779, D.E. 841-1).

32.     Mr. McIlroy agreed that the general fund operates at a deficit and it "seems logical" if "VA mandatory spending increased" that the "deficit would increase." McIlroy Dep. Tr. at 81:16-81:19 (JA Ex. 779, D.E. 841-1).

33.     Mr. McIlroy explained that "[i]n the compensation and pension account, if we had more payments due than we had funding, we wouldn't have been able to pay those benefits," in which case VA "would hold those payments until funding was received." McIlroy Dep. Tr. at 85:8-85:15 (JA Ex. 779, D.E. 841-1).

34.     Mr. McIlroy testified that he had "no knowledge" as to whether "VA will pay any specific future benefit amount to any individual plaintiff." McIlroy Dep. Tr. at 68:6-68:10 (JA Ex. 779, D.E. 841-1).

35.     When asked whether he is "offering any opinion that current benefit laws will remain unchanged for the lifetime of any individual plaintiff," Mr. McIlroy responded that he has "no ability to predict the future." McIlroy Dep. Tr. at 68:11-68:16 (JA Ex. 779, D.E. 841-1).

36.     When asked whether he is "offering any opinion about how damage calculations should be performed in the litigation," Mr. McIlroy responded that he had "no opinion." McIlroy Dep. Tr. at 68:17-68:20 (JA Ex. 779, D.E. 841-1).

37.     When asked whether he is offering "any opinion predicting specific congressional actions regarding veterans benefits," Mr. McIlroy responded that he "cannot predict what Congress will do in the future." McIlroy Dep. Tr. at 68:21-69:1 (JA Ex. 779, D.E. 841-1).

38.     Mr. McIlroy agreed that "even for mandatory programs like compensation and pensions, Congress must enact an appropriation providing that budget authority each year." McIlroy Dep. Tr. at 87:17-87:21 (JA Ex. 779, D.E. 841-1).

39.     Mr. McIlroy agreed that it is "within Congress's power to choose not to fund those benefits entirely." McIlroy Dep. Tr. at 86:3-86:7 (JA Ex. 779, D.E. 841-1).

40.     Mr. McIlroy agreed that "[i]n addition to appropriations, Congress can also amend statutes governing VA benefits," and that he is "aware of Congress doing so." McIlroy Dep. Tr. at 98:13-98:18 (JA Ex. 779, D.E. 841-1).

41.     In particular, Mr. McIlroy agreed that Congress has changed "eligibility criteria for VA benefits," McIlroy Dep. Tr. at 98:19-98:21 (JA Ex. 779, D.E. 841-1), could "change criteria for how ratings are to be applied to disability benefits," *id.* at 98:22-98:24, could "change formulas for those benefits," *id.* at 99:1-99:3, could "change how cost-of-living adjustments are applied to those benefits," *id.* at 99:4-99:7, could "change dependency allowances that modify those benefits," *id.* at 99:8-99:10, and could "change survivor benefits," *id.* at 99:11-99:14.

42.     Mr. McIlroy agreed that the "current law creates an appropriated entitlement structure" and that "future law could reduce or restrict" benefits. McIlroy Dep. Tr. at 100:5-100:9 (JA Ex. 779, D.E. 841-1).

43.     Mr. McIlroy agreed that "each year Congress has to approve the cost-of-living adjustment to VBA disability benefits," and that "presumably it is within Congress's authority not to do so." McIlroy Dep. Tr. at 150:7-150:13 (JA Ex. 779, D.E. 841-1).

44.     Mr. McIlroy agreed that the VBA rating schedule has been revised, and that "when the rating schedule is revised, that can change how the criteria apply to a particular veteran." McIlroy Dep. Tr. at 151:15-151:21 (JA Ex. 779, D.E. 841-1).

45.     Mr. McIlroy agreed that "if the rating schedule is revised, a veteran's rating could go up or down depending on how the new criteria applies to them." McIlroy Dep. Tr. at 151:22-152:4 (JA Ex. 779, D.E. 841-1).

46.     Mr. McIlroy agreed that "even for a veteran who is currently rated as 100 percent disabled, there is no guarantee that the rating schedule will not change in a way that reduces their rating." McIlroy Dep. Tr. at 152:5-152:19 (JA Ex. 779, D.E. 841-1).

47.     Mr. McIlroy agreed that he "cannot predict what Congress will do." McIlroy Dep. Tr. at 100:10-100:14 (JA Ex. 779, D.E. 841-1).

48.     Mr. McIlroy agreed that "changes implemented by Congress can be prospective in the sense that apply to future benefits." McIlroy Dep. Tr. at 155:16-155:19 (JA Ex. 779, D.E. 841-1).

49.     Mr. McIlroy agreed that Congress could "enact changes to benefits that would otherwise be awarded retroactively." McIlroy Dep. Tr. at 155:23-156:2 (JA Ex. 779, D.E. 841-1).

50.     Mr. McIlroy agreed that "even if Congress does not change the underlying benefits themselves," it "could fail to appropriate sufficient funds to pay all VA benefits." McIlroy Dep. Tr. at 100:24-101:4 (JA Ex. 779, D.E. 841-1).

51.     Mr. McIlroy agreed that "in the event of a shortfall . . . there is no automatic mechanism to ensure that Congress will always provide supplemental appropriations," and VA has to "ask for additional funds." McIlroy Dep. Tr. at 102:21-103:3 (JA Ex. 779, D.E. 841-1).

52.     Mr. McIlroy testified that VA "cannot spend beyond appropriated funds amounts." McIlroy Dep. Tr. at 103:9-103:12 (JA Ex. 779, D.E. 841-1).

53.     Mr. McIlroy agreed that "from a legal and financial control standpoint, the VA's ability to pay benefits is constrained by the amount Congress has appropriated." McIlroy Dep. Tr. at 103:13-103:17 (JA Ex. 779, D.E. 841-1).

54.     Mr. McIlroy testified that "actuarial estimates about the future are based on assumptions and assumptions may or may not be accurate." McIlroy Dep. Tr. at 170:5-170:8 (JA Ex. 779, D.E. 841-1).

55.     Mr. McIlroy testified that "somebody" could "estimate the future costs for individuals," but agreed that "it would still be subject to assumptions inherent in a future projection." McIlroy Dep. Tr. at 183:3-183:16 (JA Ex. 779, D.E. 841-1).

56.     Mr. McIlroy agreed that "when a veteran dies . . . disability payments stop." McIlroy Dep. Tr. at 174:21-174:23 (JA Ex. 779, D.E. 841-1).

57. Mr. McIlroy agreed that "if a veteran is receiving a certain monthly payment and the veteran were to pass away," he "would not assume that any DIC [Dependency and Indemnity Compensation] benefits would be in the same amount." McIlroy Dep. Tr. at 175:15-175:20 (JA Ex. 779, D.E. 841-1).

58. Mr. McIlroy agreed that "the total amount of disability compensation a veteran receives will be impacted by how long the veteran lives." McIlroy Dep. Tr. at 175:21-176:1 (JA Ex. 779, D.E. 841-1).

59. Mr. McIlroy agreed that "benefits can also be stopped or reduced while the veteran is alive," explaining that "[t]here are a variety of factors that could change veteran benefits." McIlroy Dep. Tr. at 176:8-176:12 (JA Ex. 779, D.E. 841-1).

60. Mr. McIlroy agreed that benefits could change "[i]f the VA reevaluates the veteran's condition and reduces the rating," "[i]f subsequent medical documentation led the VA to conclude that an injury is not service connected," and "[i]f a veteran's dependency status changes, such as a spouse passing away." McIlroy Dep. Tr. at 176:13-177:2 (JA Ex. 779, D.E. 841-1).

<u>Heather A. Ford</u>

61. On February 25, 2026, Plaintiffs deposed Heather A. Ford. Ford Dep. Tr. at 1:13-1:17 (JA Ex. 773, D.E. 841-1).

62. Heather A. Ford is the Chief Financial Officer of the VHA. Ford Dep. Tr. at 10:21-11:1 (JA Ex. 773, D.E. 841-1).

63. Ms. Ford stated that "VHA submits an annual budget request to Congress through the Administration. That budget request outlines the amount and use of those funds. It breaks it

-10-

down by account. And then once Congress appropriates funds, we receive those based upon the request we submitted." Ford. Dep. Tr. at 75:17-75:22 (JA Ex. 773, D.E. 841-1).

64. Ms. Ford agreed to the statement that "the majority of VHA appropriations are... under Discretionary Funding..." Ford Dep. Tr. at 78:7-78:10 (JA Ex. 773, D.E. 841-1).

65. Ms. Ford described the Medical Services account for the VHA funding as "health care within the VA system... at VA facilities," including "Dr.s, nurses, [and] health care delivery." Ford Dep. Tr. at 78:11-79:18 (JA Ex. 773, D.E. 841-1). She agreed that Plaintiff counsel was "correct" in stating that "the amount requested for Medical Services... has decreased" in the annual budget request to Congress. It was "69 billion in 2024... 69 enacted in 2025, but the request for 2026 is 57 billion, which is a negative change of 12 billion." *Id.* at 80:9-80:14.

66. When asked "what the most significant driver was for the $12 billion decrease," Ms. Ford said, "I believe some of it was loss of staff." Ford Dep. Tr. at 81:7-81:11 (JA Ex. 773, D.E. 841-1).

67. When asked if she had a "personal opinion" on "how [the budget cuts] would have impacted veterans," Ms. Ford answered that she "felt that in some cases there may have been hasty decisions made without a full understanding of impacts..." Ford Dep. Tr. at 89:20-89:22, 90:7-90:11 (JA Ex. 773, D.E. 841-1).

68. When asked if "after pushback from lawmakers and veteran advocacy groups, the VA temporarily paused some of the contract cancellations," Ms. Ford stated, "I believe that is accurate." Ford Dep. Tr. at 91:22-92:10 (JA Ex. 773, D.E. 841-1).

69.     When asked if she recalled that "advocacy groups were significantly concerned about the impact to access to care and increased wait times and delays on receiving medical treatment at VA facilities," Ms. Ford stated "yes." Ford Dep. Tr. at 93:16-94:3 (JA Ex. 773, D.E. 841-1).

70.     When asked if "veterans who are eligible for enrollment in the VHA related to their residency at Camp Lejeune for 30 or more days" fell under "discretionary funding" or "mandatory funding," Ms. Ford stated that "it could be both." Ford Dep. Tr. at 97:6-97:14 (JA Ex. 773, D.E. 841-1).

71.     When told that "the legislation that allowed veterans access to medical care if they were exposed for 30 days or more at Camp Lejeune... was passed in approximately 2012" and asked if, given that fact, it would "make sense to [Ms. Ford] that most of the funding related to those veterans would fall in the discretionary bucket," Ms. Ford said "yes." Ford Dep. Tr. at 99:14-99:19, 100:13-100:20 (JA Ex. 773, D.E. 841-1).

72.     Ms. Ford agreed that "[a]ll VHA funding ultimately depends on federal statutes enacted by Congress," Ford Dep. Tr. at 100:21-100:24 (JA Ex. 773, D.E. 841-1), that "Congress has the authority to amend or repeal those federal statutes," *id.* at 101:1-101:4, and that "that authority applies to both discretionary and mandatory funding statutes," *id.* at 101:5-101:8.

73.     Ms. Ford agreed that "[d]iscretionary VHA funding has to be appropriated annually by Congress." Ford Dep. Tr. at 101:9-101:11 (JA Ex. 773, D.E. 841-1).

74.     Ms. Ford agreed that "Congress may increase, decrease, or maintain that funding level from year to year." Ford Dep. Tr. at 101:16-101:19 (JA Ex. 773, D.E. 841-1).

75. Ms. Ford agreed that "there is no legal guarantee that future discretionary appropriations will remain at the current levels." Ford Dep. Tr. at 101:20-22 (JA Ex. 773, D.E. 841-1).

76. Ms. Ford agreed that "[m]andatory funding exists only for as long as the authorizing statute remains in effect." Ford Dep. Tr. at 102:3-102:6 (JA Ex. 773, D.E. 841-1).

77. Ms. Ford agreed that "Congress can amend or appeal mandatory funding statutes," and that "Congress can modify mandatory funding levels through subsequent legislation." Ford Dep. Tr. at 102:7-102:13 (JA Ex. 773, D.E. 841-1).

78. Ms. Ford testified that "[i]t is possible that funding reductions could result in challenges to access to care." Ford Dep. Tr. at 212:1-3 (JA Ex. 773, D.E. 841-1).

79. Ms. Ford agreed that "Congress can rescind unobligated mandatory balances." Ford Dep. Tr. at 102:14-102:17. (JA Ex. 773, D.E. 841-1)

80. Ms. Ford agreed that "[t]he eligibility criteria for VHA enrollment is established by statute," and that "Congress can modify eligibility categories in the future." Ford Dep. Tr. at 102:22-103:5 (JA Ex. 773, D.E. 841-1).

81. Ms. Ford agreed that "copayment exemptions... can be amended." Ford Dep. Tr. at 103:6-103:88 (JA Ex. 773, D.E. 841-1).

82. Ms. Ford agreed that "the list of covered conditions... the 15 covered illnesses and conditions... can also be revised through legislation." Ford Dep. Tr. at 103:10-103:14 (JA Ex. 773, D.E. 841-1).

83. Ms. Ford agreed that "Congress has the authority to change" "the VA reimbursement methodology as it relates to the Community Care Network, which includes

Medicare base rates for community care." Ford Dep. Tr. at 103:15-103:23 (JA Ex. 773, D.E. 841-1).

84.     Ms. Ford agreed that "[a] patient's access to care depends in the VHA program, not only on eligibility, but also on available funding and staffing." Ford Dep. Tr. at 104:3-104:7 (JA Ex. 773, D.E. 841-1).

85.     Ms. Ford agreed that "[i]f funding levels change . . . operational capacity could be affected." Ford Dep. Tr. at 104:8-104:10 (JA Ex. 773, D.E. 841-1).

86.     Ms. Ford agreed that "future funding levels for the VHA depends on future Congressional decisions." Ford Dep. Tr. at 104:11-104:13 (JA Ex. 773, D.E. 841-1).

87.     Ms. Ford agreed that "whether funding is discretionary or mandatory, continued payment at current levels depends on ongoing Congressional authorizations and appropriations." Ford Dep. Tr. at 104:21-105:3 (JA Ex. 773, D.E. 841-1).

88.     Ms. Ford agreed that in her role as CFO for the VHA, she "cannot obligate funds in excess of" her "appropriated authority for the agency." Ford Dep. Tr. at 105:4-105:8 (JA Ex. 773, D.E. 841-1).

89.     Ms. Ford testified that "there are staffing challenges throughout the department." Ford Dep. Tr. at 106:23-107:1 (JA Ex. 773, D.E. 841-1).

90.     Ms. Ford testified that "it depends on the administration, the office, but there's always staffing issues." Ford Dep. Tr. at 108:3-108:6 (JA Ex. 773, D.E. 841-1).

91.     Ms. Ford testified that in "2025 into 2026," "in excess of 4,000 total people left" from VHA, which she agreed was "a significant loss." Ford Dep. Tr. at 82:5-82:13 (JA Ex. 773, D.E. 841-1). She later stated that this number could be higher today and that she first heard this

-14 -

number in August or September of 2025 and has "not seen any updated numbers" since then. *Id.* at 96:12-96:23.

92.　Ms. Ford agreed that "some of the 4,000 or more vacancies" likely include "physicians, nurses, and specialty providers." Ford Dep. Tr. at 185:15-185:19 (JA Ex. 773, D.E. 841-1).

93.　Ms. Ford testified that "a goal overall for VA" was "to keep VA at the 2019 staffing level," and agreed that this was "regardless of the growing number of veterans in the programs." Ford Dep. Tr. at 92:23-93:10 (JA Ex. 773, D.E. 841-1).

94.　Ms. Ford testified that VA staffing "depends on the facility" and agreed that "some [VA facilities] are fully staffed perhaps and some are not." Ford Dep. Tr. at 109:20-109:24 (JA Ex. 773, D.E. 841-1).

95.　Ms. Ford testified that some staffing "decisions are local decisions... So we would provide money to them, but it's a local decision in terms of hiring." Ford. Dep. Tr. at 166:9-166:15 (JA Ex. 773, D.E. 841-1).

96.　Ms. Ford agreed that "timely hiring as well as background checks and proper training" are "very important factor[s] to ensure that veterans receive quality care from quality medical providers." Ford Dep. Tr. at 168:13-168:21 (JA Ex. 773, D.E. 841-1).

97.　Ms. Ford testified that when a VA facility is not fully staffed, it "can have an impact on health care delivery. It could mean that veterans do not receive care at that facility under a VA physician. They could be referred to the community for that care instead. Or it may delay the time that they have access to VA providers." Ford Dep. Tr. at 110:9-110:16 (JA Ex. 773, D.E. 841-1).

98.     Ms. Ford agreed that "staffing levels can directly affect appointment availability." Ford Dep. Tr. at 185:20-185:22 (JA Ex. 773, D.E. 841-1).

99.     Ms. Ford agreed that "if a specialty clinic is understaffed, it can see fewer patients." Ford Dep. Tr. at 185:23-186:1 (JA Ex. 773, D.E. 841-1).

100.     Ms. Ford agreed that "fewer available equipments can result in longer wait times." Ford Dep. Tr. at 186:2-186:4 (JA Ex. 773, D.E. 841-1).

101.     Ms. Ford agreed that "longer wait times can delay diagnosis or treatment." Ford Dep. Tr. at 186:5-186:8 (JA Ex. 773, D.E. 841-1).

102.     When asked how she would characterize the "40,000 designated positions that aren't filled," Ms. Ford stated "it's possible that people requested positions be added at some point in time with the intent to fill those positions, but those positions were never filled for whatever reason..." Ford Dep. Tr. at 190:1-190:6 (JA Ex. 773, D.E. 841-1).

103.     Ms. Ford agreed that she would "assume" that "when [the positions] were established, there was the intent from the VHA that they were to be filled." Ford Dep. Tr. at 190:14-190:16 (JA Ex. 773, D.E. 841-1).

104.     Ms. Ford agreed that "this is not a situation where the veteran can just go to any doctor he wishes," and that "[t]here is a full process involved with him seeking authorization to receive that care outside of the VA." Ford Dep. Tr. at 114:2-114:7 (JA Ex. 773, D.E. 841-1).

105.     Ms. Ford agreed that "the program only provides reimbursement for certain qualifying medical expenses." Ford Dep. Tr. at 148:7-148:10 (JA Ex. 773, D.E. 841-1).

106.     Ms. Ford testified that "there's general knowledge that VHA has high-risk issues, as identified by GAO." Ford Dep. Tr. at 184:21-184:23 (JA Ex. 773, D.E. 841-1).

107.     Ms. Ford agreed that "The current VHA leadership structure is burdened with redundancies that slow decision making, create confusion, and foster competing priorities – each of which undermine the quality of care for Veterans." Ford Dep. Tr. at 191:16-191:24 (JA Ex. 773, D.E. 841-1).

108.     Ms. Ford agreed that "The current structure also lacks clear accountability, leading to the frustration we hear from Veterans and staff regarding VA operations." Ford Dep. Tr. at 192:2-192:6 (JA Ex. 773, D.E. 841-1).

109.     Ms. Ford agreed that "Weaknesses in VA's governance and oversight have affected many aspects of the program's performance and operations." Ford Dep. Tr. at 192:23-193:10 (JA Ex. 773, D.E. 841-1).

110.     Ms. Ford testified that she is "aware of challenges within the VA health system," including "ambiguous policies and inconsistent processes," "inadequate oversight and accountability," "IT challenges," "inadequate training for VA staff," and "unclear resource needs and allegation priorities." Ford Dep. Tr. at 155:10-156:9 (JA Ex. 773, D.E. 841-1).

111.     Ms. Ford agreed that "issues with staffing, weaknesses in oversight, deficiencies in VHA's organizational structure, and the need for a new governance model" are "problems that still exist today or challenges that still exist today." Ford Dep. Tr. at 202:24-203:14 (JA Ex. 773, D.E. 841-1).

112.     Ms. Ford testified that she is "generally aware that there have been continued concerns around the timely access of care both within VA and the community." Ford Dep. Tr. at 160:10-160:12 (JA Ex. 773, D.E. 841-1).

113. Ms. Ford testified that "no specific budget adjustments were made for this specific need." Ford Dep. Tr. at 166:21-166:23 (JA Ex. 773, D.E. 841-1).

114. Ms. Ford testified that she has been "privy to discussions where mental health needs and mental health care providers are needed in terms of addressing staffing issues and what the potential level of resources would be needed for that." Ford Dep. Tr. at 167:10-167:14 (JA Ex. 773, D.E. 841-1).

115. Ms. Ford agreed that "[t]here are certain types of medical care, such as mental health and specialty care, that are among the hardest to fill." Ford Dep. Tr. at 214:2-214:11 (JA Ex. 773, D.E. 841-1).

116. Ms. Ford agreed that "when positions remain unfilled . . . that can decrease access to care for veterans" "within the VA direct care system." Ford Dep. Tr. at 214:14-214:21 (JA Ex. 773, D.E. 841-1).

117. Ms. Ford agreed that "there hasn't been a fully completed budget assessment done with regard to the reorganization [of the VHA" and testified that "[a] comprehensive budget review of impacts has not been completed" and that "discussions of the reorganization are occurring. However, the mechanics of reorganizing have not begun." Ford Dep. Tr. at 199:2, 199:12-200:2 (JA Ex. 773, D.E. 841-1).

118. Ms. Ford testified that she had "not seen a specific risk analysis involving the reorganization and its impacts to access to care" and agreed that "organizational restructuring can create transitional instability in some cases." Ford Dep. Tr. at 200:16-200:22 (JA Ex. 773, D.E. 841-1).

119. When asked if she would be "able to state with certainty that the scope of VHA care and eligibility will remain... materially unchanged over the coming years," Ms. Ford stated "I can't say with certainty..." Ford Dep. Tr. at 201:11-201:19 (JA Ex. 773, D.E. 841-1).

120. Ms. Ford testified that "sometimes impacts are not felt immediately. They are felt over time... If we changed metrics or a policy change or staffing changes, I would want to see the workload data to better understand the impacts of that because there's a lot of variables that go into development of a budget and the allocation of resources." Ford Dep. Tr. at 202:7-202:19 (JA Ex. 773, D.E. 841-1).

121. When asked whether she could "guarantee to a veteran that the scope of his care and his eligibility care is unlikely to be constrained in the future," Ms. Ford testified that "[t]hat's certainly not a guarantee I could make." Ford Dep. Tr. at 204:1-204:9 (JA Ex. 773, D.E. 841-1).

122. Ms. Ford testified that "[b]eing eligible for VA care does not guarantee necessarily that the veteran receives medical care through the VHA" "because it's a veteran's choice as to whether to receive care from VA." Ford Dep. Tr. at 212:4-212:15 (JA Ex. 773, D.E. 841-1).

123. Ms. Ford agreed that being eligible for VA care does not guarantee that a veteran can receive a timely appointment for needed medical treatment. Ford Dep. Tr. at 213:3-213:7 (JA Ex. 773, D.E. 841-1).

124. Ms. Ford agreed that "being eligible for care does not necessarily mean that there is an available provider within a plaintiff's geographic area that can treat his medical needs at any given time," whether "a VA provider or a community provider." Ford Dep. Tr. at 213:8-213:16 (JA Ex. 773, D.E. 841-1).

-19-

125. Ms. Ford agreed that "[b]eing eligible for VA care does not guarantee the veteran will receive timely medical treatment that he or she needs." Ford Dep. Tr. at 213:22-214:1 (JA Ex. 773, D.E. 841-1).

126. Ms. Ford agreed that "rural veterans face greater barriers to in-person care than urban veterans." Ford Dep. Tr. at 218:8-218:12 (JA Ex. 773, D.E. 841-1).

127. Ms. Ford agreed that "some rural regions may disproportionately lack specialty providers under direct VHA facilities." Ford Dep. Tr. at 218:13-218:19 (JA Ex. 773, D.E. 841-1).

128. Ms. Ford agreed that "[m]aintaining . . . statutory eligibility does not guarantee that any patient will have timely access to care." Ford Dep. Tr. at 220:8-220:16 (JA Ex. 773, D.E. 841-1).

129. Ms. Ford agreed that "maintaining eligibility statutorily does not guarantee that a patient will have access to quality care." Ford Dep. Tr. at 220:18-221:2 (JA Ex. 773, D.E. 841-1).

130. Ms. Ford agreed that "anytime it wants to, Congress could reduce, modify, or increase eligibility for veterans." Ford Dep. Tr. at 222:4-222:7 (JA Ex. 773, D.E. 841-1).

131. When asked whether she had an opinion "that could guarantee plaintiffs would have access to care in the future under the VHA program," Ms. Ford testified that "I can only speak to today's access. I could not hypothesize what the future access would look like." Ford Dep. Tr. at 228:13-228:19 (JA Ex. 773, D.E. 841-1).

<u>Larry Young</u>

132. On February 6, 2026, Plaintiffs deposed Larry Young. Young Dep. Tr. at 1:7-1:18 (JA Ex. 788, D.E. 841-1).

133. Larry Young currently serves as the Deputy Director and CFO of the Centers for Medicare & Medicaid Services ("CMS") Office of Financial Management. Young Dep. Tr. at 9:20-9:25 (JA Ex. 788, D.E. 841-1).

134. Mr. Young testified that "Medicare is primarily governed by Title 18 of the Social Security Act," which is "a statute enacted by Congress, signed into law by the President." Young Dep. Tr. at 59:4-59:13 (JA Ex. 788, D.E. 841-1).

135. Mr. Young testified that CMS produces an "annual financial statement that the agency provides as part of the department's report." Young Dep. Tr. at 35:16-23 (JA Ex. 788, D.E. 841-1).

136. Mr. Young testified that the annual financial statement is a "public report" that "many people have an interest in," including "Congress." Young Dep. Tr. at 35:25-36:4 (JA Ex. 788, D.E. 841-1).

137. Mr. Young testified that Medicare "Part A is funded through a payroll tax" and explained that Part A is funded through a "trust fund" that exists "based on historical payroll taxes which have been collected over time." Young Dep. Tr. at 46:23-47:7 (JA Ex. 788, D.E. 841-1).

138. Mr. Young agreed that Medicare Part B is funded through a "completely different trust fund" called the "Supplementary Medical Insurance, SMI trust fund" and testified that "it's a combination of both general tax revenues" and "income taxes." Young Dep. Tr. at 48:4-48:15 (JA Ex. 788, D.E. 841-1).

139. Mr. Young testified that the Medicare Part B trust fund is based on a "formula" so that a "premium is set every year such that it's actuarially compromised." He explained that the formula is "25 percent of the expected benefit payout" and "then the trust fund and tax revenues have to make up the other 75 percent." Young Dep. Tr. at 48:17-48:19 (JA Ex. 788, D.E. 841-1).

140. Mr. Young testified that Medicare Part C is "funded by the government." Young Dep. Tr. at 55:12-21 (JA Ex. 788, D.E. 841-1).

141. Mr. Young agreed that Medicare "Part D is the prescription drug plan" and that it has "beneficiary contribution in the form of a premium." Young Dep. Tr. at 57:12-57:20 (JA Ex. 788, D.E. 841-1).

142. Mr. Young testified that "an item of service can be denied" Medicare payment "if an auditor or contractor deems that the service was not . . . medically reasonable and necessary." Young Dep. Tr. at 49:25-50:5 (JA Ex. 788, D.E. 841-1).

143. Mr. Young testified that such decisions happen "most often after the fact that the service has been provided" and that Medicare staff are "not in the room making a decision with the clinician." Young Dep. Tr. at 51:8-51:15 (JA Ex. 788, D.E. 841-1).

144. Mr. Young agreed that "Congress has the authority to amend Medicare statutes, including the eligibility rules, the benefits and scope, and the payment methodologies." Young Dep. Tr. at 60:10-60:16 (JA Ex. 788, D.E. 841-1).

145. Mr. Young agreed that "Congress can enact changes that affect the future Medicare coverage and reimbursement levels . . . of Medicare beneficiaries." Young Dep. Tr. at 60:18-60:25 (JA Ex. 788, D.E. 841-1).

146. Mr. Young agreed that "future Medicare coverage and payment levels depend on decisions made by Congress and not necessarily CMS." Young Dep. Tr. at 61:2-61:7 (JA Ex. 788, D.E. 841-1).

147. Mr. Young testified that he "cannot speak to Medicare future payment rates or fee schedules." Young Dep. Tr. at 64:20-64:21 (JA Ex. 788, D.E. 841-1).

148. Mr. Young testified that he "cannot speculate on what the future may hold with respect to the Medicare program." Young Dep. Tr. at 65:10-65:12 (JA Ex. 788, D.E. 841-1).

149. Mr. Young testified that the "annual report of the board of trustees on the status of the Medicare programs' financial situation" is an "annual report" that is "required by Congress" to "report on the financial stability and actuarial projections for the different trust funds which fund the different parts of Medicare." Young Dep. Tr. at 67-69:10 (JA Ex. 788, D.E. 841-1).

150. Mr. Young testified that "the HI [Hospital Insurance] trust fund" is "facing several headwinds and challenges in terms of its being able to continue to be financially solvent" and that the trustees' "report indicated . . . the benefits would exceed the collections as early as 2027 and the fund could be depleted by 2033." Young Dep. Tr. at 71:8-71:15 (JA Ex. 788, D.E. 841-1).

151. Mr. Young testified that the trustees' report is "a factual portrayal based on actuarial projections," "and assumptions that they're aware of at this moment of time of the financial stability of the Medicare A and B trust funds." Young Dep. Tr. at 71:8-71:24 (JA Ex. 788, D.E. 841-1).

152. When asked about a statement in the trustees' report that reads "[c]urrent-law projections indicate that Medicare still faces a substantial shortfall that needs to be addressed

with further legislation," Mr. Young explained that "you can speculate on different things that Congress at the time could elect to do" to fix the deficit. Young Dep. Tr. at 73:7-73:13, 77:1-77:16 (JA Ex. 788, D.E. 841-1).

153.    Mr. Young pointed out a sentence in the trustees' report stating that "[t]here is substantial uncertainty in the economic, demographic, and healthcare projection factors for the HI trust fund expenditures and revenues" and testified that "it's very difficult to say with a degree of certainty what will or will not happen, necessarily." Young Dep. Tr. at 83:5-83:14 (JA Ex. 788, D.E. 841-1).

154.    Mr. Young testified that "any time that the income revenues are being outpaced by the expenditures, it becomes unsustainable in the long term" and explained that "in order to maintain the . . . financial viability in the long term . . . something has to change." Young Dep. Tr. at 87:24-88:9 (JA Ex. 788, D.E. 841-1).

155.    Mr. Young agreed that the expected depletion date has been moved up by three years, Young Dep. Tr. at 79:16-79:22 (JA Ex. 788, D.E. 841-1), and testified that "[i]t's simply a matter of fact that the expenditures increased in a short period of time more quickly than they thought and so they had to move up by three years," *id.* at 80:16-80:19.

156.    Mr. Young testified that "there's been many funding warnings generated over the last few years." Young. Dep. Tr. at 89:24-90:5 (JA Ex. 788, D.E. 841-1).

157.    Mr. Young acknowledged that "Medicare's total expenditures and its dedicated financing sources is projected to exceed 45 percent of expenditures within seven years," which "triggers a Medicare funding warning" for the "ninth consecutive year" and will require

"changes to current law to ensure Medicare sustainability in the future." Young. Dep. Tr. at 90:16-91:24 (JA Ex. 788, D.E. 841-1).

158. Mr. Young agreed that "in the near future, Congress will need to make some changes to current law to ensure Medicare sustainability in the future." Young Dep. Tr. at 91:13-91:24 (JA Ex. 788, D.E. 841-1).

159. Mr. Young acknowledged the trustees' report statement that "Medicare's actual future costs are highly uncertain for reasons apart from the inherent challenges in projecting healthcare cost growth over time." Young Dep. Tr. at 92:1-92:7 (JA Ex. 788, D.E. 841-1).

160. Mr. Young agreed that "if assets are depleted, one of the possibilities is that the full schedule of benefits would not be able to be paid under the program." Young Dep. Tr. at 84:16-84:23 (JA Ex. 788, D.E. 841-1).

161. Mr. Young testified that to reduce expenditures, CMS has "had to apply sequestration, the sequestration of benefit payment dollars," Young Dep. Tr. at 94:4-94:12 (JA Ex. 788, D.E. 841-1), which "reduces the amount that's being paid to the provider by a percentage. Like, the current sequestration we're under is a 2 percent sequestration," *id.* at 95:1-95:5.

162. Mr. Young testified that "a provider does not have to sign up and participate in the Medicare program. It's their choice." Young Dep. Tr. at 96:9-96:12 (JA Ex. 788, D.E. 841-1).

163. Mr. Young agreed that it is a possibility that "one of the risks of sequestration" is that "a provider could stop accepting Medicare rates because they are too low to compensate them for their work." Young Dep. Tr. at 96:25-97:7 (JA Ex. 788, D.E. 841-1).

164. Mr. Young testified that "if Medicare payment rates don't change from their current format, that they're going to," "fall below the providers' actual cost to provide the care to put negative pressure on their ability to serve Medicare beneficiaries." Young Dep. Tr. 104:8-104:15 (JA Ex. 788, D.E. 841-1).

165. When asked whether "provider participation . . . and beneficiary access to that care can depend on payment adequacy," Mr. Young testified that it is "one variable a physician undoubtedly would consider." Young Dep. Tr. at 107:19-108:2 (JA Ex. 788, D.E. 841-1).

166. Mr. Young agreed that "reducing covered services" is also "a possibility" to "reduce expenditures." Young Dep. Tr. at 98:15-98:25 (JA Ex. 788, D.E. 841-1).

167. Mr. Young agreed that it is possible "that the quality of healthcare received by Medicare beneficiaries could fall under the current law." Young Dep. Tr. at 75:9-75:16 (JA Ex. 788, D.E. 841-1).

168. Mr. Young testified that the "trustees' report is prompting Congress, putting them on notice that there's an issue to be addressed . . . [i]n the short-term." Young Dep. Tr. at 116:7-116:13 (JA Ex. 788, D.E. 841-1).

169. Mr. Young agreed that if a Medicare "recipient cannot afford to pay the premiums associated with their coverage," it is possible that they will lose their coverage. Young Dep. Tr. at 127:7-127:10 (JA Ex. 788, D.E. 841-1).

170. Mr. Young agreed that "[f]or Medicare, there is no guarantee that an individual will remain enrolled in the Part B and Part D program." Young Dep. Tr. at 127:17-127:24 (JA Ex. 788, D.E. 841-1).

171. When asked whether he had "any guarantee that Medicare benefits will remain unchanged in the future," Mr. Young testified that "it's not possible for me to project what's going to happen in the future." Young Dep. Tr. at 153:2-153:8 (JA Ex. 788, D.E. 841-1).

172. When asked whether he had "any guarantee that the reimbursement levels will remain the same in the future," Mr. Young testified that he "can't predict that." Young Dep. Tr. at 153:10-153:18 (JA Ex. 788, D.E. 841-1).

Richard Ruck, M.D.

173. Plaintiffs deposed Dr. Richard Ruck, M.D., on February 11, 2026. Ruck Dep. Tr. at 1:13-1:17 (JA Ex. 782, D.E. 841-1).

174. Dr. Richard Ruck serves as Chief Medical Officer for the TRICARE Health Plan at the Defense Health Agency. Ruck Dep. Tr. at 8:18-8:23 (JA Ex. 782, D.E. 841-1).

175. When asked whether he was "testifying as to any changes that may occur to the cost and fee schedule in the future, as might be reflected in a life care plan of the plaintiff," Ruck Dep. Tr. at 26:25-27:3 (JA Ex. 782, D.E. 841-1), Dr. Ruck testified that "[t]he cost fee schedules [for TRICARE] are determined by Congress." Ruck Dep. Tr. at 27:5-27:6 (JA Ex. 782, D.E. 841-1), and agreed that that he does not "know what those yearly costs and fees will be until Congress establishes them" "after 2027" because "currently, we do not have a fee structure for that." Ruck Dep. Tr. at 27:5-27:23 (JA Ex. 782, D.E. 841-1).

176. Dr. Ruck agreed that "in order to qualify for TRICARE, you either have to be active duty or have achieved 20 or more years of service or be a family member of either," or "have been medically retired." Ruck Dep. Tr. at 54:17-54:22 (JA Ex. 782, D.E. 841-1).

177. Dr. Ruck testified that "the VA system does not automatically treat everyone who is a veteran" and that veterans are categorized "based upon their service history, their medical conditions, et cetera. And depending on the VA in that area, you may or may not get care within the VA." Ruck Dep. Tr. at 55:10-55:21 (JA Ex. 782, D.E. 841-1).

178. Dr. Ruck agreed that "all beneficiaries of TRICARE . . . can be subject to deductibles, copayments, premiums, enrollment fees, and coinsurance." Ruck Dep. Tr. at 72:9-72:19 (JA Ex. 782, D.E. 841-1).

179. Dr. Ruck agreed that "just active duty members are the ones that are not subject to copayments or patient payments of any kind." Ruck Dep. Tr. at 73:9-73:13 (JA Ex. 782, D.E. 841-1).

180. Dr. Ruck agreed that "in some circumstances," "a life event such as a divorce, can end an individual's access to TRICARE coverage." Ruck Dep. Tr. at 76:10-76:15 (JA Ex. 782, D.E. 841-1).

181. Dr. Ruck testified that a "[s]pouse's coverage . . . could be conditional based upon marital status." Ruck Dep. Tr. at 79:4-79:6 (JA Ex. 782, D.E. 841-1).

182. Dr. Ruck agreed that if "a qualifying military individual passes away and the surviving spouse remarries," TRICARE eligibility can "be terminated under the plan rules." Ruck Dep. Tr. at 76:18-77:3 (JA Ex. 782, D.E. 841-1).

183. Dr. Ruck testified that "children's eligibility for TRICARE" can "be terminated" "[w]hen they reach certain ages." Ruck Dep. Tr. at 77:5-77:7 (JA Ex. 782, D.E. 841-1).

184. Dr. Ruck agreed that "TRICARE does have a medical necessity requirement." Ruck Dep. Tr. at 82:20-83:1 (JA Ex. 782, D.E. 841-1).

-28-

185. Dr. Ruck testified that "Congress has the ability to place restrictions" on coverage; for example, "TRICARE for Life individuals, we're not allowed to pay for, at this point, GLP-1s for obesity management because it was specifically excluded by Congress." Ruck Dep. Tr. at 84:2-84:9 (JA Ex. 782, D.E. 841-1).

186. Dr. Ruck agreed that it is possible for Congress to "make changes to limit coverage." Ruck Dep. Tr. at 85:8-85:14 (JA Ex. 782, D.E. 841-1).

187. Dr. Ruck agreed that Congress has the ability to make "increases to copayments." Ruck Dep. Tr. at 87:9-87:13 (JA Ex. 782, D.E. 841-1).

188. Dr. Ruck agreed that "Congress can also make changes to cover services, either by improving covered services or by making certain services not available to claimants." Ruck Dep. Tr. at 87:15-87:22 (JA Ex. 782, D.E. 841-1).

189. Dr. Ruck agreed that past changes to the TRICARE fee structure have increased costs to veterans in certain categories, including "higher catastrophic caps, increased cost sharing for some." Ruck Dep. Tr. at 99:22-100:17 (JA Ex. 782, D.E. 841-1).

190. Dr. Ruck agreed that "effective January 1st, 2026, TRICARE beneficiaries are subjected to an increase in their copayments, as it relates to pharmacy copayments." Ruck Dep. Tr. at 102:2-102:11 (JA Ex. 782, D.E. 841-1).

191. Dr. Ruck agreed that TRICARE's predecessor, "the original CHAMPUS program did not have premium and enrollment fees." Ruck Dep. Tr. at 104:4-104:13 (JA Ex. 782, D.E. 841-1).

192.     Dr. Ruck testified that veterans "can choose to go and see a provider who is not a network provider, but you will end up paying more as far as copays or point-of-service charges." Ruck Dep. Tr. at 105:17-105:21 (JA Ex. 782, D.E. 841-1).

193.     Dr. Ruck testified that TRICARE's funding is part "of the defense budget" and agreed that Congress has to "approve a budget every year" "to keep the TRICARE program operating." Ruck Dep. Tr. at 121:2-121:9 (JA Ex. 782, D.E. 841-1).

Jadine Piper

194.     Plaintiffs deposed Jadine Piper on February 26, 2026. Piper Dep. Tr. at 1:11-1:15 (JA Ex. 781, D.E. 841-1).

195.     Jadine Piper serves as the Acting Assistant Director for Policy at the Department of Veterans Affairs. Piper Dep. Tr. at 36:19-36:23 (JA Ex. 781, D.E. 841-1).

196.     Ms. Piper testified that "if a veteran is incarcerated federally, their benefits are reduced, and they are only entitled to 10 percent." Piper Dep. Tr. at 59:15-59:18 (JA Ex. 781, D.E. 841-1).

197.     Ms. Piper testified that "veterans receive different [disability benefits] letters" and "depending on the change in law or if there are new laws, we now have to update those letters based on those change... Like anytime there's a change in law, we have to look at the letters to ensure the letters are still in compliance." Piper Dep. Tr. at 70:23-71:2, 71:13-71:15 (JA Ex. 781, D.E. 841-1).

198.     Ms. Piper agreed that it is possible "that some of the letter modifications are related to how benefits [are] administered" after giving an example of a law that would change

-30-

how benefits are being administered. Piper Dep. Tr. at 72:11-72:12, 73:17-73:24, 74:2-74:6 (JA Ex. 781, D.E. 841-1).

199. Ms. Piper agreed that it is "possible for one veteran to have a 100 percent rating for one injury and a 50 percent for another at the same time." Piper Dep. Tr. at 88:2-88:6 (JA Ex. 781, D.E. 841-1).

200. Ms. Piper testified that if one veteran "had one disability that's rated at 100, another one rated at 50, and then someone else just has 100," with "both people being at 100 percent, the rate that they're paid would be the same no matter how many disabilities they have." Piper Dep. Tr. at 88:11-88:24 (JA Ex. 781, D.E. 841-1).

201. Ms. Piper agreed that "the secretary of the VA has the authority" to "make changes" or "updates" to the rating schedule. Piper Dep. Tr. at 89:5-89:10 (JA Ex. 781, D.E. 841-1).

202. Ms. Piper agreed that "the rating schedule changed" during her tenure at the VBA and testified that "they've been making updates." Piper Dep. Tr. at 90:6-90:12 (JA Ex. 781, D.E. 841-1).

203. Ms. Piper testified that, on top of these "targeted" updates that have occurred during her tenure, the VBA is in the process of completing a "full comprehensive update" of the rating schedule to an extent that has not occurred since the schedule was first created in 1945. Piper Dep. Tr. at 90:6-91:21 (JA Ex. 781, D.E. 841-1).

204. In contrast to other limited updates that have been issued over the last 80 years, in the forthcoming update, Ms. Piper described that "one iteration would involve all of the

disability benefits," noting that such an update "has never happened" but that the VBA is "close to completing it." Piper Dep. Tr. at 90:21-25 (JA Ex. 781, D.E. 841-1).

205. When asked whether "when the schedule is updated, that may cause changes to individual veterans' ratings" Ms. Piper agreed it is possible that "it could change a veteran's evaluation." Piper Dep. Tr. at 92:19-93:2 (JA Ex. 781, D.E. 841-1).

206. Ms. Piper agreed that "a veteran's disability rating may change based on changes in law." Piper Dep. Tr. at 100:12-100:17 (JA Ex. 781, D.E. 841-1).

207. When asked whether she could recall, during her time at VBA, "any changes in law that would have resulted in a change in the ratings of veterans", Ms. Piper answered "I'm sure it has happened. But at this time I can't give you a specific example." Piper Dep. Tr. at 100:19-100:24 (JA Ex. 781, D.E. 841-1).

208. When asked whether she was "generally familiar with a veteran having a rating for a condition and later receiving a different rating for the same condition," Ms. Piper responded: "Yeah. That's normal. So that's basically what happens with most people over time due to age like things get worse." Piper Dep. Tr. at 105:11-105:20 (JA Ex. 781, D.E. 841-1).

209. Ms. Piper agreed that a successful "claim for increase" would "be a rerating based on" the veteran's "physical or mental condition." Piper Dep. Tr. at 107:9-107:12 (JA Ex. 781, D.E. 841-1).

210. Ms. Piper agreed that veterans "typically receive the same benefit for 12 months... but that there are certain things that can cause changes in that" and, when given an example of a particular benefit change, she did not "know exactly what caused the change here." Piper Dep. Tr. at 111:17-111:23 (JA Ex. 781, D.E. 841-1).

211. Ms. Piper agreed that "[i]f a veteran receives an increased award," it "would cause a change" in their benefit. Piper Dep. Tr. at 111:24-112:2 (JA Ex. 781, D.E. 841-1).

212. Ms. Piper agreed that "the COLA [cost-of-living adjustment] adjustment" would "cause a change" in the veteran's benefit "if it was more than a percent." Piper Dep. Tr. at 112:3-112:6 (JA Ex. 781, D.E. 841-1).

213. Ms. Piper agreed that "a change in dependent status," such as "adding a dependent, removing a dependent," "would cause a change whether positive or negative." Piper Dep. Tr. at 112:11-112:20 . (JA Ex. 781, D.E. 841-1)

214. Ms. Piper testified that "[u]sually if the veteran passes away, the benefit stops. It usually is terminated once the veteran passes away. However, if there is a surviving spouse, depending on the criteria, they may or may not be awarded that benefit. It wouldn't be the same amount that a veteran receives." Piper Dep. Tr. at 112:23-113:4 (JA Ex. 781, D.E. 841-1).

215. When asked if "there are certain things that could cause a change in the anticipated cadence of payments," Ms. Piper testified "potentially." Piper Dep. Tr. at 118:6-9 (JA Ex. 781, D.E. 841-1).

216. When asked if "that cadence is not set in stone," Ms. Piper testified that she could not "just make a generalization without knowing," and when given a specific example and asked about a specific veterans future payments, Ms. Piper testified that "we don't know what will occur in the future." Piper Dep. Tr. at 119:11-121:14 (JA Ex. 781, D.E. 841-1).

217. Ms. Piper agreed "that if the veteran filed a new claim, that could be another thing that could cause a change" in their benefit. Piper Dep. Tr. at 134:24-135:2 (JA Ex. 781, D.E. 841-1).

218.    Ms. Piper agreed that "plaintiffs can receive multiple ratings over time." Piper Dep. Tr. at 176:25-177:2 (JA Ex. 781, D.E. 841-1).

219.    Ms. Piper testified that in the case of multiple ratings, "usually more times than not, the latest rating date should be what you use unless you see something that indicates otherwise." Piper Dep. Tr. at 177:7-177:14 (JA Ex. 781, D.E. 841-1).

220.    Ms. Piper testified that "[i]f a veteran disagrees with the decision" on their claim, "they can file an appeal. They can disagree with the effective date. They can disagree with the percentage. They can disagree with the evidence." Piper Dep. Tr. at 217:24-218:3 (JA Ex. 781, D.E. 841-1).

221.    Ms. Piper agreed that "if a veteran is successful in an appeal," "[i]t could potentially change their ratings." Piper Dep. Tr. at 218:10-218:13 (JA Ex. 781, D.E. 841-1).

222.    Ms. Piper agreed that a successful appeal could "change the effective date" of the benefit. Piper Dep. Tr. at 218:14-218:16 (JA Ex. 781, D.E. 841-1).

223.    Ms. Piper testified that a veteran could receive a retroactive award from a claim or appeal. Piper Dep. Tr. at 218:20-218:22 (JA Ex. 781, D.E. 841-1).

224.    When asked how she "would know if a veteran is required to be reevaluated," Ms. Piper answered that "[i]t just depends on the disability. Just looking at the medical evidence . . . For instance, if the veteran has active cancer, we know that we need to reevaluate to, number 1, assess the residuals. Sometimes those treatments can make it worse for the veteran. So even if the veteran is in remission due to the treatment that they receive for those conditions, it can bring about severe residuals. So that's why something like active cancer is – we know that

we have to automatically schedule some type of routine future examination." Piper Dep. Tr. at 243:15-244:7 (JA Ex. 781, D.E. 841-1).

225. When asked to explain the process "if the VA reevaluates a veteran and determines that disability rating should be decreased," Ms. Piper testified that "say, the veteran files a claim for increase, we look at the exam, we see the veteran actually got better. The first time, we actually would do what's called a C&C, which we would confirm and continue the evaluation. However, if the veteran comes in again, we have two exams showing improvement. That's when we submit what's called a proposal to reduce. We would send a veteran a letter to let them know, hey, we propose to reduce your disability X to percentage Y due to this." Piper Dep. Tr. at 245:16-246:2 (JA Ex. 781, D.E. 841-1).

226. Ms. Piper confirmed that "throughout that process, VA can choose to decrease the rating or keep the rating the same." Piper Dep. Tr. at 246:15-246:18 (JA Ex. 781, D.E. 841-1).

227. Ms. Piper agreed that she is "aware that VA regulations provide for routine future examinations." Piper Dep. Tr. at 249:4-249:6 (JA Ex. 781, D.E. 841-1).

228. Ms. Piper confirmed that "those routine future examinations" are "typically scheduled within a few years of the initial rating when improvement is possible." Piper Dep. Tr. at 249:7-249:10 (JA Ex. 781, D.E. 841-1).

229. Ms. Piper confirmed that "for conditions that are not considered static, reevaluation is expected, not rare." Piper Dep. Tr. at 249:12-249:15 (JA Ex. 781, D.E. 841-1).

230. Ms. Piper agreed "that ratings for nonstatic conditions are periodically reevaluated as part of VA's normal process." Piper Dep. Tr. at 252:9-252:12 (JA Ex. 781, D.E. 841-1).

231.    Ms. Piper agreed that if an individual "has a degenerative condition," she would "expect that condition to worsen over time." Piper Dep. Tr. at 256:11-256:14 (JA Ex. 781, D.E. 841-1).

232.    Ms. Piper agreed that "whenever the VA schedules a reexamination, there is a possibility that it could result in a rating change." Piper Dep. Tr. at 252:4-252:8 (JA Ex. 781, D.E. 841-1).

233.    Ms. Piper agreed that it is possible for a veteran to "develop a new condition and obtain an additional rating for that." Piper Dep. Tr. at 257:11-257:14 (JA Ex. 781, D.E. 841-1).

234.    Ms. Piper agreed that her "testimony about these practices is premised upon law and regulation as it exists today." Piper Dep. Tr. at 252:13-252:16 (JA Ex. 781, D.E. 841-1).

235.    Ms. Piper agreed that it is "possible that Congress could amend some of those laws." Piper Dep. Tr. at 252:17-252:19 (JA Ex. 781, D.E. 841-1).

236.    Ms. Piper agreed that it is "possible that amendments, such as those, might change some of these practices" she described. Piper Dep. Tr. at 252:20-252:23 (JA Ex. 781, D.E. 841-1).

### Testimony of Defendant's Economic Experts

#### Dr. Henry Miller

237.    Plaintiffs deposed Dr. Henry Miller on February 20, 2026. Miller Dep. Tr. at 1:1-1:15 (JA Ex. 780, D.E. 841-1).

238.    Dr. Miller agreed that he is not "expressing an opinion on which government payors should be offset under the Camp Lejeune Justice Act." Miller Dep. Tr. at 44:18-44:22 (JA Ex. 780, D.E. 841-1).

239. Dr. Miller agreed that "[i]n this case [he] did not calculate a total offset amount." Miller Dep. Tr. at 43:15-43:18 (JA Ex. 780, D.E. 841-1).

240. Dr. Miller agreed that his "expertise in [his] expert report does not quantify an offset amount." Miller Dep. Tr. at 43:19-43:24 (JA Ex. 780, D.E. 841-1).

241. When asked "as it relates to the persons that the economists for DOJ that took your rates and applied them to the life care plan durations, did you do any – did you check those economists' math at all? Did you ever see those reports?" Dr. Miller answered: "No." Miller Dep. Tr. at 87:11-87:18 (JA Ex. 780, D.E. 841-1).

242. Dr. Miller testified that "there was some services in one of or more of the life care plans that were not covered by somebody that was one of the payors involved in that life care plan, and in that case we used other methods which in effect would be private pay methods." Miller Dep. Tr. at 88:5-88:10 (JA Ex. 780, D.E. 841-1).

243. Dr. Miller agreed that "in the event that the applicable government payor to that plaintiff doesn't cover a service that is represented on the life care plan, [his entry for that] is zero." Miller Dep. Tr. at 88:16-88:24 (JA Ex. 780, D.E. 841-1).

244. Dr. Miller agreed that he "didn't look into what that might cost the plaintiff if he or she . . . had no other insurance or was paying out-of-pocket or had a private insurance" "because all [he] was calculating was how much the government would pay." Miller Dep. Tr. at 88:25-89:5 (JA Ex. 780, D.E. 841-1).

245. Dr. Miller agreed that if the plaintiffs had private insurance, "that private insurance could be primary for some of the medical services identified in the life care plans." Miller Dep. Tr. at 75:3-75:10 (JA Ex. 780, D.E. 841-1).

246. Dr. Miller agreed that he was "unaware if any of [the plaintiffs] would be eligible for private insurance in the future." Miller Dep. Tr. at 78:4-78:7 (JA Ex. 780, D.E. 841-1).

247. Dr. Miller agreed that he was "not offering any testimony on what the reasonable value of uncovered services would have been." Miller Dep. Tr. at 89:6-89:10 (JA Ex. 780, D.E. 841-1).

248. Dr. Miller testified that "[m]y assignment was to identify how much the government would be paying for those services. I didn't have to identify how long those services were going to be provided or how long the government payment was going to go." Miller Dep. Tr. at 90:15-90:19 (JA Ex. 780, D.E. 841-1).

249. When asked "if someone; i.e., the DOJ economist is going to take your numbers and apply them into the future, would you agree with me that – the assumption would be that the plaintiff is remaining eligible for those government programs for the duration of the life care plan?", Dr. Miller answered: "If that person used the numbers throughout the patient's life, the answer would be yes." Miller Dep. Tr. at 91:3-91:11 (JA Ex. 780, D.E. 841-1).

250. When asked "[i]f that person applied the life care plan using your numbers and the durations identified, the assumption underlying that is that the plaintiff is still receiving that government program into the future?", Dr. Miller answered: "That's not my assumption, but the answer is yes." Miller Dep. Tr. at 91:12-91:18 (JA Ex. 780, D.E. 841-1).

251. When asked whether Dr. Miller had "an opinion as to whether those rates would apply into the future," he answered: "No, my opinion is what the rates are and which would be paid for the service. I'm not providing an opinion on how long they'll be provided." Miller Dep. Tr. at 91:23-92:5 (JA Ex. 780, D.E. 841-1).

252.    Dr. Miller agreed that "if the economist took [his] numbers and applied them throughout the plaintiff's life expectancy or for the life of the life care plan," the economist would "be assuming that the plaintiff maintains eligibility for those programs." Miller Dep. Tr. at 92:14-92:19 (JA Ex. 780, D.E. 841-1).

253.    When asked "if the economist was going to take your rates and apply it for the life of the life care plan, which rates are they supposed to use when there is two columns identified," given that his tables "sometimes . . . have CCN and VHA rate and then in the column right beside it they have a Medicare rate, and sometimes the amounts are really similar and sometimes they are different," Dr. Miller answered: "Most often they're the same, but when there are two different rates, that's the relationship, but as far as what the economist does, I don't know. The economist is going to make their own decision. I'm offering the information, but it's their decision." Miller Dep. Tr. at 92:22-93:6, 93:13-93:18 (JA Ex. 780, D.E. 841-1).

254.    When asked to clarify "[y]ou are just doing a if only VHA was used to pay for these services, these are the rates, and if only Medicare was used to pay for these same services, these are the rates. You did not give the economist any instructions specifically as to how those might interplay together or whether they're supposed to be added together," Dr. Miller testified: "I'm just offering the rate and nothing more than that." Miller Dep. Tr. at 94:7-94:18 (JA Ex. 780, D.E. 841-1).

255.    Dr. Miller confirmed that "[t]here is no instruction that [he has] given to the economist or to the Court as it relates to the interplay between those three government payors." Miller Dep. Tr. at 94:19-95:2 (JA Ex. 780, D.E. 841-1).

256. Dr. Miller testified that "[i]n most instances when the plaintiff seeks care, they're asked the question of who is – what is your coverage, you know, what insurance do you have, and if they answer completely and they have Medicare and VHA and TRICARE, the decision on who to bill for the services is really the provider's decision." Miller Dep. Tr. at 95:13-95:18 (JA Ex. 780, D.E. 841-1).

257. Dr. Miller agreed that "as we sit here today, we don't know the provider's decisions in the future as to which government payor they're going to select." Miller Dep. Tr. at 95:25-96:3 (JA Ex. 780, D.E. 841-1).

258. Dr. Miller agreed that "there are some services where two [government providers] may pay, but it will only be the total amount of the bill . . . they won't pay twice." Miller Dep. Tr. at 98:10-98:13 (JA Ex. 780, D.E. 841-1).

259. Dr. Miller agreed that "if a plaintiff is under 65 . . . and has TRICARE and decides to get other insurance for coverage reasons, the TRICARE numbers will no longer be relevant because it's a secondary payor." Miller Dep. Tr. at 99:11-99:16, 99:22-99:25 (JA Ex. 780, D.E. 841-1).

260. Dr. Miller agreed that he did not "do any analysis to ensure that the providers in the plaintiff's geographic area accept payment from those government programs." Miller Dep. Tr. at 100:1-100:4 (JA Ex. 780, D.E. 841-1).

261. Dr. Miller testified that while "[e]ven in a rural area most providers are . . . accepting Medicare," "[t]hat's not always the case for VHA and TRICARE." Miller Dep. Tr. at 101:1-101:5 (JA Ex. 780, D.E. 841-1).

262.	Dr. Miller agreed that for his "rates to be used related to future care, we would assume the continued existence of the government payors of Medicare, VHA and TRICARE." Miller Dep. Tr. at 102:4-102:8 (JA Ex. 780, D.E. 841-1).

263.	Dr. Miller agreed that "all of those rates have been throughout [his] 50-year career subject to change over the years." Miller Dep. Tr. at 102:9-102:13 (JA Ex. 780, D.E. 841-1).

264.	Dr. Miller agreed that the reason his "job is so valuable [is] because [he is] the person that could come in at any given point in time and tell a Court the current rate associated with those services" "along with discussions of how the rates have changed in the past and how they may change in the future." Miller Dep. Tr. at 102:14-102:20 (JA Ex. 780, D.E. 841-1).

265.	Dr. Miller agreed that he did not "issue an opinion on how the rates in [his] tables might change in the future in this case." Miller Dep. Tr. at 102:21-102:24 (JA Ex. 780, D.E. 841-1).

266.	Dr. Miller testified that Medicare part B and D have "premiums, deductibles, and co-pay." Miller Dep. Tr. at 103:21-103:23 (JA Ex. 780, D.E. 841-1).

267.	Dr. Miller testified that his team excluded patient contributions "from the amount that the government would pay for the service" "[t]o the extent we could," and that "the biggest challenge was in terms of Medicare and the deductible. We would have no way of knowing what other bills a patient may have, what other services they may have and when, in fact, they received specific services because those are the factors that would affect the deductible." Miller Dep. Tr. at 104:7-104:24 (JA Ex. 780, D.E. 841-1).

268. Dr. Miller agreed that "most [TRICARE beneficiaries] that are not active service members they pay premiums and their co-pays, deductibles, co-insurance." Miller Dep. Tr. at 112:2-112:7 (JA Ex. 780, D.E. 841-1).

269. Dr. Miller testified that "[t]he method used for TRICARE is the same as the method used for Medicare. The charge that we were given was to calculate how much the government would pay for the specific services in the life care plan, and the government would pay the fee schedule amount, less the co-pay requirement and we did that consistently. We didn't consider insurance. Clearly, that's a patient contribution and nobody – I'm certainly not denying it, but that's outside the scope of my report." Miller Dep. Tr. at 112:13-112:22 (JA Ex. 780, D.E. 841-1).

270. Dr. Miller agreed that TriWest typically "requires additional patient contributions for care that occurs outside of a VA facility." Miller Dep. Tr. at 114:15-114:18 (JA Ex. 780, D.E. 841-1).

271. Dr. Miller agreed that he was "not able to know what patient pay contributions might be applicable to the VHA services that are identified because we don't actually know whether those services are going to be received at a VA facility or whether those services are going to be received by a provider and paid by the VHA and paid by the Community Network Program." Miller Dep. Tr. at 115:1-115:12 (JA Ex. 780, D.E. 841-1).

272. With respect to changes to service costs, Dr. Miller testified that "[f]or Medicare they generally occur once a year when the new regulations come out, and well, that's true for all three for TRICARE and VHA," and that "[s]omtimes changes are made for individual services at

-42 -

different points in the year." Miller Dep. Tr. at 116:13-116:20, 116:24-116:25 (JA Ex. 780, D.E. 841-1).

273.    When asked whether "[b]ased on his 50-year career," Congress has "altered the payment methodologies in the past," Dr. Miller answered: "Not often, but yes." Miller Dep. Tr. at 119:16-119:19 (JA Ex. 780, D.E. 841-1).

274.    Dr. Miller agreed that "payment rates" have "been reduced through competitive bidding and sequestration over the course of [his] career" and explained "for competitive bidding in some instances, and for sequestration when sequestration occurs, that's the purpose of it. It reduces payment rates." Miller Dep. Tr. at 119:20-120:4 (JA Ex. 780, D.E. 841-1).

275.    Dr. Miller agreed that "conversion factors" have "changed annually." Miller Dep. Tr. at 120:5-120:7 (JA Ex. 780, D.E. 841-1).

276.    Dr. Miller agreed that "drug reimbursement methodologies" have "changed for Medicare over the course of [his] career." Miller Dep. Tr. at 120:8-120:12 (JA Ex. 780, D.E. 841-1).

277.    When asked whether "provider participations changed with the Medicare system over the course of [his] career," Dr. Miller testified that "the overall participation has not changed very much, but . . . obviously the participation for individual providers may have changed." Miller Dep. Tr. at 120:17-120:25 (JA Ex. 780, D.E. 841-1).

278.    Dr. Miller agreed that "medical providers under the Medicare system are generally paid some of the lowest competitive rates compared to other insurance payors." Miller Dep. Tr. at 121:1-121:4 (JA Ex. 780, D.E. 841-1).

279. Dr. Miller agreed that "in any given year when Congress goes to set Medicare rates, they could change the payment formulas," "[t]he reimbursement percentages," "[t]he eligibility rules," "[t]he benefit structures and design," "[c]onversion factors," "DOG methodology," "[p]roductivity adjustments," "payroll tax rates within the funding," and "patient payment contributions." Miller Dep. Tr. at 125:14-126:24 (JA Ex. 780, D.E. 841-1).

280. Dr. Miller testified that the Medicare HI trust fund is "going to run out of money at the current – they're going to run out of money given the current circumstances." Miller Dep. Tr. at 129:25-130:14 (JA Ex. 780, D.E. 841-1).

281. Dr. Miller testified that "[g]iven current circumstances," he agrees that "the HI trust fund faces . . . several challenges and headwinds with respect to its financial solvency going forward." Miller Dep. Tr. at 130:6-130:12 (JA Ex. 780, D.E. 841-1).

282. Dr. Miller agreed that it is "likely" this "reflects a short-term problem that Congress will need to make amendments to the Medicare system in order to address." Miller Dep. Tr. at 131:24-132:4 (JA Ex. 780, D.E. 841-1).

283. Dr. Miller agreed that "an option" is "to reduce provider pay." Miller Dep. Tr. at 132:23-133:3 (JA Ex. 780, D.E. 841-1).

284. When asked whether "providers might decline participating in the Medicare system in the future . . . [s]o there could become an access to care issue for Medicare beneficiaries," Dr. Miller answered: "That's clearly an issue that Congress is going to have to address and it's the – it's a key issue in healthcare. You have to have rates that providers will accept." Miller Dep. Tr. at 133:12-133:23 (JA Ex. 780, D.E. 841-1).

285. Dr. Miller agreed that "provider participation in the Medicare system is voluntary." Miller Dep. Tr. at 133:24-134:1 (JA Ex. 780, D.E. 841-1).

286. Dr. Miller agreed that "the funding issue affecting Medicare is a concern in the short term . . . meaning within the life expectancy of the plaintiffs in this litigation." Miller Dep. Tr. at 134:6-134:12 (JA Ex. 780, D.E. 841-1).

287. Dr. Miller agreed that "[a]nother possibility of Congress to respond to the identified funding deficits that were identified by CMS in the annual report could be a reduction in the services offered under Medicare that are compensated." Miller Dep. Tr. at 134:13-134:19 (JA Ex. 780, D.E. 841-1).

288. Dr. Miller agreed that "we don't know which direction Congress might go as we sit here today." Miller Dep. Tr. at 135:20-135:24 (JA Ex. 780, D.E. 841-1).

289. Dr. Miller testified that "[t]he VA is actually a very good healthcare system especially in certain areas, but it's heavily dependent upon the availability of access to hospitals and that's . . . an area of concern because the hospitals are not geared to provide a lot of the services that are now being provided on an outpatient basis." Miller Dep. Tr. at 142:19-142:25 (JA Ex. 780, D.E. 841-1).

<u>Dr. Andrew Brod</u>

290. Plaintiffs deposed Dr. Andrew Brod on February 10, 2026. Brod Dep. Tr. at 1:5-1:12 (JA Ex. 770, D.E. 841-1).

291. Dr. Brod testified that he was "relying on Dr. Miller's expert opinion regarding these medical offsets" for the "five Parkinson's disease cases." Brod Dep. Tr. at 106:12-107:7 (JA Ex. 770, D.E. 841-1).

-45 -

292. Dr. Brod testified that as part of his work in this case, he reviewed or read expert reports from Dr. Miller, Dr. Hasan, and Mr. Staller, and "read the life care plans by Fryar and Hairston in order to implement the offsets in Dr. Miller's report." Brod Dep. Tr. at 202:20-203:7 (JA Ex. 770, D.E. 841-1).

293. When asked what specific determinations he relied on from Dr. Hasan, Dr. Brod answered: "The disability ratings and the identification of different diagnoses as being related to or not related to PD [Parkinson's Disease]." Brod Dep. Tr. at 228:9-228:17 (JA Ex. 770, D.E. 841-1).

294. Dr. Brod confirmed that "when he get[s] a life care plan, [he] rel[lies] on the life care planner's opinions to do [his] work as an economist." Brod Dep. Tr. at 183:11-183:14 (JA Ex. 770, D.E. 841-1).

295. Dr. Brod testified that whether "the life care planner is creating and developing a life care plan to provide the best possible care in the future for that particular client or patient" "are issues between the life care planner and the attorney who hires him or her. My job is not – among my jobs is not to stick my nose into medical issues. I'm not that kind of Dr.. So my job is to take the life care plan as given, and if there are problems with it hypothetically, well, then those are issues for other people to talk about and argue about. It's not for me to say." Brod Dep. Tr. at 183:15-184:6 (JA Ex. 770, D.E. 841-1).

296. When asked whether his review of the Shahnasarian life care plan let him "know the future source of payment for a given procedure or medical service," Dr. Brod answered that he doesn't "believe that life care plan says anything about how it's to be paid. My understanding is that the life care plan, in this case the Shahnasarian life care plans, lay out the cost. The offset

-46-

studies by Dr. Miller address some issues regarding who is to pay and what the cost is net of those payors, but that's just me interpreting the results of the – of the Miller report. I also have nothing to say about his detailed findings, his specific findings. He's an expert in those coverage issues. I'm not. Dr. Shahnasarian is an expert in these cost issues. I'm not. What I am in expert in is the analysis of life care plans. And by the way, a moment ago you . . . asked me about what happens when I reviewed his report. In a way, I did not review his report. I quantified his report. I took his numbers and arranged them in a spreadsheet so that they made sense, you know, chronologically and so on and divided them up by categories and I grew them over time, reduced them to present value, and that's it." Brod Dep. Tr. at 184:8-185:17 (JA Ex. 770, D.E. 841-1).

297. When asked "[i]f projections were being made by the government that pertain to future payments that would be made by TRICARE," whether he "as the forensic economist assess[es] the strength and viability of TRICARE as an organization which would be able to make the payments in the future," Dr. Brod answered: "No. I base my projections in this case and in others on current – the current situation, current policy, etc., etc. TRICARE exists now, and it's on that basis that I made projections. In any case, I would think that any discussion about the future viability of TRICARE might have to be had with Dr. Miller, who is the expert on this kind of coverage. In any case, it would have been speculative of me to assume that it might not exist in the future. The evidence that I have is that it currently exists." Brod Dep. Tr. at 154:11-155:7 (JA Ex. 770, D.E. 841-1).

298. When asked "[w]hen you make your calculations as a forensic economist, do you consider or not whether Medicare will have gone broke five or six years from now?", Dr. Brod answered: "Does the thought ever enter my mind? Sure, but it's not a relevant part of my

analysis. My analysis is based on the data that I can observe and the reality that I know is in place right now. Medicare exists now, and, frankly, it would be speculative of me to start talking about it not existing in the future." Brod Dep. Tr. at 155:18-156:7 (JA Ex. 770, D.E. 841-1).

299. When asked "[w]hen you make your determinations in these five cases about any future payments by TRICARE or Medicare, do you then assume they're in existence today and make the assumption they will be in existence to make these future payments?", Dr. Brod responded that "what I've actually assumed is that there will be some program to cover these medical expenses. I can't say what it might be called. I can't say if it will be Medicare or TRICARE. What I can say is that this coverage exists now. And as I said a couple of times a moment ago, it would be really speculative and, frankly, improper of me to start supposing all manner of different possibilities for the future. Again, what we know is that Medicare and TRICARE exists now. Am I assuming that they will – that they or some program like them will continue to cover these medical expenses in the future? Yes, I am." Brod Dep. Tr. at 156:24-157:22 (JA Ex. 770, D.E. 841-1).

300. Dr. Brod confirmed that he not "holding [himself] out as an expert in TRICARE benefits." Brod Dep. Tr. at 153:6-153:8 (JA Ex. 770, D.E. 841-1).

Tricia Yount

301. Plaintiffs deposed Tricia Yount on February 11, 2026. Yount Dep. Tr. at 1:1-1:11 (JA Ex. 790, D.E. 841-1).

302. Ms. Yount holds herself out as a "forensic economist/accountant." Yount Dep. Tr. at 44:8-14 (JA Ex. 790, D.E. 841-1).

303.    Ms. Yount has no expertise in the areas of bladder cancer or kidney cancer. Yount Dep. Tr. at 18:10-12 (JA Ex. 790, D.E. 841-1).

304.    Ms. Yount has no background, training or experience with respect to veterans disability benefits, how ratings are decided, or how the VBA determines the ratings they assign. Yount Dep. Tr. at 24:22-25:11 (JA Ex. 790, D.E. 841-1).

305.    Ms. Yount did not validate the VBA data that was provided to her. Yount Dep. Tr. at 26:12-26:21, 27:6-27:10 (JA Ex. 790, D.E. 841-1).

306.    Ms. Yount does not have background experience or knowledge regarding, nor did she do any research on, matters such as the viability of the Medicare system in the future or the solvency of the Veteran's Benefit Disability program. Yount Dep. Tr. at 28:12-28:22 (JA Ex. 790, D.E. 841-1).

307.    Ms. Yount has never before calculated veterans' disability benefits in the manner she calculated them for this case. Yount Dep. Tr. at 32:10-32:14.

308.    Ms. Yount did not speak with anyone with the Veterans' Benefit Administration regarding her calculations for this case. Yount Dep. Tr. at 33:15-35:19 (JA Ex. 790, D.E. 841-1).

309.    Ms. Yount did not speak with anyone who had background, experience or training in doing the types of calculations she was doing in this case. Yount Dep. Tr. at 33:21-34:2 (JA Ex. 790, D.E. 841-1).

310.    Ms. Yount simply made calculations. She used data provided by the VBA to make "but-for calculations," meaning "[w]ith the Camp Lejeune conditions and without." Yount Dep. Tr. at 35:1-35:10 (JA Ex. 790, D.E. 841-1).

311. Ms. Yount is relying on other experts for the actual needs of the plaintiffs and the current cost of that care. Yount Dep. Tr. at 51:2-51:7 (JA Ex. 790, D.E. 841-1).

312. Ms. Yount is not opining as to whether the care a plaintiff might need will be available through government programs in the future. Yount Dep. Tr. at 51:8-51:15 (JA Ex. 790, D.E. 841-1).

313. It is outside the scope of Ms. Yount's expertise to opine as to whether the care a plaintiff will need will actually be available through the programs that are offered currently. Yount Dep. Tr. at 51:17-51:24 (JA Ex. 790, D.E. 841-1).

314. Ms. Yount has no training, knowledge or experience in the Veterans Disability system other than through internet searches she conducted for this case. Yount Dep. Tr. at 52:18-24 (JA Ex. 790, D.E. 841-1).

315. Ms. Yount does not have any background in Medicare. Yount Dep. Tr. at 53:1-53:3 (JA Ex. 790, D.E. 841-1).

316. Ms. Yount does not have any background or experience with government payor programs like Triwest or Community Care Network or Tricare. Yount Dep. Tr. at 53:4-53:9 (JA Ex. 790, D.E. 841-1).

317. It is outside the scope of Ms. Yount's expertise to opine as to what veterans disability benefits are intended to compensate a veteran for. Yount Dep. Tr. at 62:22-63:7 (JA Ex. 790, D.E. 841-1).

318. Ms. Yount did not do anything to independently validate or verify the information she put in her reports that came from Dr. Henry Miller. Yount Dep. Tr. at 143:25-144:5 (JA Ex. 790, D.E. 841-1).

319.     Ms. Yount assumes the other experts she relies upon are accurate and she did nothing to verify their reports. Yount Dep. Tr. at 144:7-144:15 (JA Ex. 790, D.E. 841-1).

320.     When asked "what does the variance represent?" Ms. Yount explained "It's the differential. The CLJA rate which includes all ratings minus the no CLJA rate." Yount Dep. Tr. at 183:6-183:9 (JA Ex. 790, D.E. 841-1).

321.     Ms. Yount agreed that "if a veteran that [she had] calculated future disability benefits for were to contract an illness that is service related but not the illness for which they're seeking recovery in the Camp Lejeune litigation, it would change [her] future calculation." Yount Dep. Tr. at 196:2-196:7 (JA Ex. 790, D.E. 841-1).

322.     Ms. Yount admits a plaintiff could receive another diagnosis that could change his or her disability ratings. Yount Dep. Tr. at 223:14-224:10 (JA Ex. 790, D.E. 841-1).

323.     Ms. Yount admits she "could never speculate what [a plaintiff] could or couldn't have in the future." Her reports are based on the conditions the plaintiffs actually have now. Yount Dep. Tr. at 225:16-225:18 (JA Ex. 790, D.E. 841-1).

324.     Ms. Yount admits that she is not rendering an opinion as to the viability of any government agencies to continue to pay for the care that they are currently paying for, or that they will operate in the future with no reduction in services, no reduction of coverage, and no reduced eligibility. Yount Dep. Tr. at 235:1-235:23 (JA Ex. 790, D.E. 841-1).

325.     Ms. Yount admits she is not able to make a determination as to whether a plaintiff will remain exactly as he or she is now with no new conditions, no progression of conditions, and no additional diagnoses so she is assuming those factors will not change. Yount Dep. Tr. at 268:23-270:3 (JA Ex. 790, D.E. 841-1).

326. Ms. Yount admits that a new diagnosis for any of the plaintiffs could change her "but-for" calculation of future veterans disability benefits. Yount Dep. Tr. at 294:21-295:9 (JA Ex. 790, D.E. 841-1).

Dubravka Tosic

327. Plaintiffs deposed Dubravka Tosic on March 5, 2026. Tosic Dep. Tr. at 1:7-1:15 (JA Ex. 787, D.E. 841-1).

328. Dr. Tosic agreed that her methodology is to "take the total award and subtract the award that would be received if the plaintiff only had their unrelated injuries, and you identify the difference as the increased amount received due to the Camp Lejeune-related injuries." Tosic Dep. Tr. at 216:9-216:13 (JA Ex. 787, D.E. 841-1).

329. Dr. Tosic agreed that "the amount a veteran received in VBA disability benefits changes based on the number of dependents that veteran has." Tosic Dep. Tr. at 235:24-236:3 (JA Ex. 787, D.E. 841-1).

330. Dr. Tosic agreed "that for purposes of that modification, a spouse is a covered dependent." Tosic Dep. Tr. at 236:11-236:14 (JA Ex. 787, D.E. 841-1).

331. Dr. Tosic agreed that it is possible a plaintiff's "spouse could die before he dies" and that a plaintiff "and his spouse could get divorced," and testified that "[i]f that were to happen, his benefits may be reduced, holding everything else constant." Tosic Dep. Tr. at 235:24-238:15 (JA Ex. 787, D.E. 841-1).

**Testimony of Defendant's Non-Expert Agency Witnesses**

Diana Zakaryan

332.   Plaintiffs deposed Diana Zakaryan on August 8, 2025. Zakaryan Dep. Tr. at 1:13-1:16 (Ex. C, attached hereto).

333.   Ms. Zakaryan is an Operations Research Analyst at the Defense Health Agency. Zakaryan Dep. Tr. at 11:18-12:2 (Ex. C, attached hereto).

334.   Ms. Zakaryan testified that "my understanding is that just like other insurance providers, there are certain services that are covered and certain services that are not covered [by TRICARE]." Zakaryan Dep. Tr. at 39:15-39:18 (Ex. C, attached hereto).

335.   Ms. Zakaryan testified that she is aware that the "TRICARE Policy Manual" "gets updated over time." Zakaryan Dep. Tr. at 186:2-186:6 (Ex. C, attached hereto).

336.   Ms. Zakaryan testified that "the program has gone through changes" since she has been at TRICARE. Zakaryan Dep. Tr. at 186:24-187:2 (Ex. C, attached hereto).

337.   When asked whether she knew "whether . . . which services are covered under the TRICARE program have changed over time?", Ms. Zakaryan testified that "I have an understanding that services and the coverage of those services changes over time." Zakaryan Dep. Tr. at 187:11-187:18 (Ex. C, attached hereto).

<u>Kimberly Rivas</u>

338.   Plaintiffs deposed Kimberly Rivas on August 26, 2025. Rivas Dep. Tr. at 1:9-1:16 (Ex. B, attached hereto).

339.   Ms. Rivas is a director of claims administration at TriWest. Rivas Dep. Tr. at 9:14-9:17 (Ex. B, attached hereto).

340. Ms. Rivas testified that the "VA CCN [Community Care Network] provider manual" is "generally updated on quarterly, but they could issue and update it at any time if they . . . want to." Rivas Dep. Tr. at 128:18-129:8 (Ex. B, attached hereto).

341. When asked she had any knowledge "as to whether those updates affect the care coverage and eligibility and appropriations for the [CCN]," Ms. Rivas testified that "[t]hey could impact the care. It just depends on what the update is or, you know, is for. It could update, like the level of coverage that we provide or – yeah, like, the level of care provided. It just depends on what the update is for." Rivas Dep. Tr. at 129:9-129:21 (Ex. B, attached hereto).

<u>Kyle Westerlind</u>

342. Plaintiffs deposed Kyle Westerlind on September 18, 2025. Westerlind Dep. Tr. at 1:14-1:16 (Ex. D, attached hereto).

343. Mr. Westerlind is the director of healthcare analytics at TriWest Healthcare Alliance. Westerlind Dep. Tr. at 6:13-6:17 (Ex. D, attached hereto).

344. When asked if he would be able to "estimate future charges for any given treatment," Mr. Westerlind answered: "Yes. So within my group, we do have some actuarial resource and data scientist resources that we could theoretically do some projections on. But there's a wide variety of external factors in delivering health care on behalf of the government like we do. So there's a lot of variation that would go in there." Westerlind Dep. Tr. at 105:12-105:21 (Ex. D, attached hereto).

345. When asked "what kind of variation . . . would affect the actuarial projection," Mr. Westerlind answered: "Well, just in the course of – we talked earlier there's been some wide changes in terms of utilization in what, you know, the veterans' choice pieces. And so legislation

is a big part of that, as that changes. The VA is also unique in trying to project because the – patient can go in and out of the community versus back into the VA for some of their health care. And so this is a dumbed-down example, but when I'm onboarding somebody working is hey, we're really – what's eligible is that veteran's right elbow to go out and get their surgery, not their total health care. Each one goes back to are we going to take that back within the VA, or are we going to leverage TriWest. It goes through that eligibility and all that criteria that they use internally. And so new capabilities at a VA medical center, they might start taking things back in. You know, we've had the one eye Dr. goes on maternity leave. And all of a sudden we tic up for a couple of months, and then we come back down. Those sort of things can happen market to market too. So there's – so there's some wide variety. We also have a big snowbird population. So people go from Minnesota out here to sunny Phoenix during the – during the winter. So there's a lot of factors into that that we would have to take into account. And it's not something we've historically done within our own organization." Westerlind Dep. Tr. at 105:24-107:5 (Ex. D, attached hereto).

346. Mr. Westerlind testified that "When you layer in inside the VA, if they have TriCare benefits, if they have Medicare, there's all sorts of other factors that could go into where they are getting care that we wouldn't necessarily see that. We can only report on the slice that we have." Westerlind Dep. Tr. at 107:24-108:4 (Ex. D, attached hereto).

347. Mr. Westerlind testified that "network versus nonnetwork, and then different – you know, different locations have different reimbursement rates." Westerlind Dep. Tr. at 108:15-108:17 (Ex. D, attached hereto).

<u>Daniel Clarke</u>

-55-

348.	Plaintiffs deposed Daniel Clarke on September 3, 2025. Clarke Dep. Tr. at 1:11-1:15 (Ex. A, attached hereto).

349.	Daniel Clarke is the acting Associate CFO for Managerial Cost Accounting at the Veterans Administration. Clarke Dep. Tr. at 10:24-11:7 (Ex. A, attached hereto).

350.	Mr. Clarke testified that through managerial accounting systems, "[w]e take the actual labor dollars, direct it to a department, oncology. We take other dollars that are, if you will, supply support staff, that support that department, the oncology outpaitient clinic, and then we bring in the workload from the VistA system, the underlying feeder systems to come up with the costed product. So it costs us this much money at that particular facility to provide that level of care. Clarke Dep. Tr. at 38:12-38:20 (Ex. A, attached hereto).

351.	Mr. Clarke testified that "[i]t's better to use the word cost assignment. The allocation is based on indirect costs that are allocated down to products through the departments; whereas, the costs in a department and direct costs that are related to labor, supplies, and equipment, and support staff," and agreed that the cost assignments are "variable" and "from month to month…direct cost assignments can change based on workload in any given department" and "the amount of time with the labor mapping database that is allocated or directed to that specific department." Clarke Dep. Tr. at 40:5-41:3 (Ex. A, attached hereto).

352.	Mr. Clarke testified that the type of data that might be pulled into NDE formulas is "not a snapshot or maybe we can use that word, but it's pulling the actual encounter data that took place for that specific month." Clarke Dep. Tr. at 94:14-94:15 (Ex. A, attached hereto).

353.	When asked whether, if a plaintiff "goes in for his checkup for his bladder cancer, and it's a very, very busy month – they had to hire extra staff – his cost assignment regardless of

the quality of care or what was done at his visit, he might have a higher cost assignment just because it was a busy month in the oncology department," Mr. Clarke answered: "It's possible. I think it's – you know, it's very variable. So you have an oncology department that might be run by a nurse practitioner at your VA. You may have a different VA, in Connecticut, an oncology department that's run by a hematologist. The pay for those two positions are different; right? The provider gets more money. And so, likely, based on this same amount of patients seen in both clinics, that you would have a lower cost with the nurse practitioner than you would with a medical doctor. So it varies based on how the facility staffs that particular department." Clarke Dep. Tr. at 96:22-97:19 (Ex. A, attached hereto).

354.    When asked whether he had "access in the managerial accounting department to the billing data for Community Care Network," Mr. Clarke explained that "[w]e don't utilize that data" and "[w]ithin the VA, I have access to most of the data sources, but there's many data sources I never pull from or look at, but based on my security clearance" and agreed that he "actually [does not] deal with billing data." Clarke Dep. Tr. at 82:11-82:221 (Ex. A, attached hereto).

<u>**Additional Undisputed Facts**</u>

355.    Dr. Brod testified that "from the perspective of the VBA, Mr. McElhiney was 100 percent disabled even before he contracted" Parkinson's Disease, so the "related increment to his regular VBA disability benefit is zero" but the "related increment to his overall VBA disability benefit is the SMC-K benefit, which I assume he will continue to receive." Brod Dep. Tr. at 147:23-25; 148:3-5; 148:19-21 (JA Ex. 770, D.E. 841-1).

356. Defendant's expert Dr. Ji reported that Plaintiff Downs's "lumbar spine with degenerative changes" was "unrelated" to his Track 1 illness. Ji Rep. at 16 (JA Ex. 653, D.E. 837-1).

357. Dr. Miller testified that "what the government will pay in the future for care that occurs in a VA facility" "could be higher or lower than the CCN rate, but we don't have the ability to determine that." Miller Dep. Tr. at 148:14-22 (JA Ex. 780, D.E. 841-11).

358. When asked if he had any reason to disagree with testimony "that there were over 125 changes to the TRICARE policy manual, the 2015 manual," Dr. Ruck answered "I would have to go look up the exact number of times that it was – but that is a reasonable number," and further answered that he had "no reason to disagree" that "[t]here is now a TRICARE policy manual, April 2021 edition, T5, that was last updated on September 12, 2025" and "states the most recent change number was 42." Ruck Dep. Tr. at 90:11-91:8 (JA Ex. 782, D.E. 841-1).

359. Dr. Ji determined that Plaintiff Cagiano's prostate cancer is a related condition to his bladder cancer for purposes of offset calculations. Ji Rep. at 9 (JA Ex. 653, D.E. 837-1).

360. Ms. Yount relied on Dr. Ji's determination that Mr. Cagiano's prostate cancer is a related condition to his bladder cancer for purposes of offset calculations. Yount Rep. (Cagiano) at 2 (JA Ex. 719, D.E. 839-1).

DATED this 27th day of April, 2026.

<table>
<tr>
<td>

/s/    *J. Edward Bell, III*

J. Edward Bell, III (admitted *pro hac vice*)
Bell Legal Group, LLC
219 Ridge St.
Georgetown, SC 29440
Telephone: (843) 546-2408
jeb@belllegalgroup.com

*Lead Counsel for Plaintiffs*

</td>
<td>

/s/   *Elizabeth J. Cabraser*

Elizabeth J. Cabraser (admitted *pro hac vice*)
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
ecabraser@lchb.com

*Co-Lead Counsel for Plaintiffs*

</td>
</tr>
<tr>
<td>

/s/   *W. Michael Dowling*

W. Michael Dowling (NC Bar No. 42790) The
Dowling Firm PLLC
Post Office Box 27843
Raleigh, NC 27611
Telephone: (919) 529-3351
mike@dowlingfirm.com

*Co-Lead Counsel for Plaintiffs*

</td>
<td>

/s/   *Robin L. Greenwald*

Robin L. Greenwald (admitted *pro hac vice*)
Weitz & Luxenberg, P.C.
700 Broadway
New York, NY 10003
Telephone: 212-558-5802
rgreenwald@weitzlux.com

*Co-Lead Counsel for Plaintiffs*

</td>
</tr>
<tr>
<td>

/s/   *James A. Roberts, III*

James A. Roberts, III
Lewis & Roberts, PLLC
3700 Glenwood Ave., Ste. 410
Raleigh, NC 27612
Telephone: (919) 981-0191
jar@lewis-roberts.com

*Co-Lead Counsel for Plaintiffs*

</td>
<td>

/s/   *Mona Lisa Wallace*

Mona Lisa Wallace (N.C. Bar No.: 009021)
Wallace & Graham, P.A.
525 North Main Street
Salisbury, NC 28144
Telephone: 704-633-5244
mwallace@wallacegraham.com

*Co-Lead Counsel for Plaintiffs*

</td>
</tr>
</table>