IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NO. 7:23-CV-897

| | |
|---|---|
| IN RE: | ) |
| CAMP LEJEUNE WATER LITIGATION | ) |
| | ) **PLAINTIFFS' MEMORANDUM IN** |
| This Document Relates to: | ) **SUPPORT OF MOTION TO EXCLUDE** |
| | ) **CERTAIN OPINIONS OF DEFENDANT'S** |
| *Bruce Hill v. USA*, 7:23-CV-028 | ) **PHASE III ECONOMIC EXPERTS** |
| *Jimmy Laramore v. USA*, 7:23-CV-594 | ) **DUBRAVKA TOSIC, TRICIA YOUNT AND** |
| *Frank Mousser v. USA*, 7:23-CV-667 | ) **ANDREW BROD** |
| *Jacqueline Tukes v. USA*, 7:23-CV-1553 | ) |
| *Gary McElhiney v. USA*, 7:23-CV-1368 | ) |
| *Edgar Peterson v. USA*, 7:23-CV-1576 | ) |
| *Diane Rothchild v. USA*, 7:23-CV-858 | |
| *Richard Sparks v. USA*, 7:23-CV-682 | |

**TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ................................................................................................. 1

II. BACKGROUND ................................................................................................. 4

    A.  MILLER'S LIMITED ASSIGNMENT ................................................. 6

    B.  THE ECONOMIC EXPERTS' ASSIGNMENT ................................. 12

III. LEGAL STANDARD ....................................................................................... 14

IV. ARGUMENT .................................................................................................... 15

    A.  DEFENDANT'S ECONOMIC EXPERT OPINIONS ARE NOT BASED ON SUFFICIENT FACTS OR DATA BECAUSE NO EXPERT DETERMINES THE PREDICATE CONDITIONS NECESSARY TO CALCULATE FUTURE OFFSETS ..................................................................... 16

    B.  THE DEFENSE ECONOMIC EXPERTS FAIL TO APPLY ANY METHODOLOGY TO JUSTIFY THEIR ASSUMPTIONS, CREATING AN IMPERMISSIBLE ANALYTICAL GAP ....................................................... 20

    C.  WHERE THE DEFENSE ECONOMIC EXPERTS PURPORT TO APPLY A METHODOLOGY, IT IS UNSUPPORTED. ................................... 23

    D.  DEFENDANT'S ECONOMIC EXPERTS PRESENT MULTIPLE HYPOTHETICAL OUTCOMES WITHOUT ANY METHOD TO DETERMINE WHICH APPLIES, LEAVING THE FACTFINDER TO SUPPLY THE ANALYSIS. ................................................................................ 27

V.  CONCLUSION ................................................................................................. 30

i

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Belville v. Ford Motor Co.*,
919 F.3d 224 (4th Cir. 2019) .................................................................................15, 20

*Coleman v. Union Carbide Corp.*,
No. CIV.A. 2:11-0366, 2013 WL 5461855 (S.D.W. Va. Sept. 30, 2013)................................20

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993)........................................................................ *passim*

*E.E.O.C. v. Freeman*,
778 F.3d 463 (4th Cir. 2015) .................................................................................23

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997)........................................................................ *passim*

*Milward v. Acuity Specialty Prods. Grp., Inc.*,
639 F.3d 11 (1st Cir. 2011)................................................................................20

*Nease v. Ford Motor Co.*,
848 F.3d 219 (4th Cir. 2017) .................................................................20, 26, 30

*Oglesby v. Gen. Motors Corp.*,
190 F.3d 244 (4th Cir. 1999) .................................................................................15

*Roche v. Lincoln Prop. Co.*,
175 F. App'x 597 (4th Cir. 2006) ...........................................................................14

*Sardis v. Overhead Door Corp.*,
10 F.4th 268 (4th Cir. 2021) .................................................................15, 20, 27, 30

*Small v. Wel/Dyne, Inc.*,
927 F.3d 169 (4th Cir. 2019) .................................................................................14

*Tyger Constr. Co. v. Pensacola Constr. Co.*,
29 F.3d 137 (4th Cir. 1994) .................................................................................14, 20

*United States v. Duke Energy Corp.*,
981 F. Supp. 2d 435 (M.D.N.C. 2013) .......................................................................29

*Westberry v. Gislaved Gummi AB*,
178 F.3d 257 (4th Cir. 1999) .................................................................................14

Case 7:23-cv-00897-RJ    Document 865    Filed 04/27/26    Page 3 of 35

**Court Rules**

Fed. R. Evid. 702 ................................................................................................... *passim*

Fed. R. Evid. 702(b)....................................................................................................20

Fed. R. Evid. 702(b), (d) ............................................................................................15

**Treatises**

Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. Evid. § 6270
(2d ed. 2025) .........................................................................................................15

**Other Authorities**

https://tricare.triwest.com/en/provider/tricare-provider-handbook/reimbursement-
methodologies/ ......................................................................................................24

https://tricare4u.com/en/portal/provider/resources/reimbursement;............................24

https://www.cms.gov/data-research/statistics-trends-and-reports/medicare-
program-rates-statistics/market-basket-data .........................................................24

https://www.medpac.gov/# ........................................................................................24

https://www.medpac.gov/wp-
content/uploads/import_data/scrape_files/docs/default-
source/reports/Mar02_AppA.pdf ...........................................................................24

https://www.va.gov/COMMUNITYCARE/revenue-ops/Fee-Schedule.asp ................24

U.S. Bureau of Labor Statistics, Consumer Price Index Frequently Asked
Questions, https://www.bls.gov/cpi/questions-and-answers.htm .............................5

Case 7:23-cv-00897-RJ    Document 865    Filed 04/27/26    Page 4 of 35

## I. <u>INTRODUCTION</u>

Plaintiffs submit this Memorandum in Support of their Motion under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to exclude, in part, the reports of Defendant's economic experts Dubravka Tosic, Ph.D. ("Tosic"), Tricia M. Yount, CPA, MAFF ("Yount"), and Andrew Brod, Ph.D. ("Brod"). Plaintiffs seek to exclude these experts' opinions only to the extent they seek to quantify future medical offset projections under the Medicare, Veterans Health Administration (VHA), and/or TRICARE programs for eight of the Track 1 Bellwether Plaintiffs: Bruce Hill, Jimmy Laramore, Frank Mousser, Jacqueline Tukes, Gary McElhiney, Edgar Peterson, Diane Rothchild, and Richard Sparks. Specifically, Plaintiffs seek to exclude the following report portions and related testimony:

1. Tosic Rep. (Hill), limited to all portions that quantify Mr. Hill's future medical offsets. Tosic Rep. (Hill), at 20-25, App'x A Tables 9-16 (JA Ex. 708).

2. Yount Rep. (Laramore), limited to all portions that quantify Mr. Laramore's future medical offsets. Yount Rep. (Laramore) at 3-4, Table 2 (JA Ex. 725).

3. Yount Rep. (Mousser), limited to all portions that quantify Mr. Mousser's future medical offsets. Yount Rep. (Mousser) at 4-6, Table 3 (JA Ex. 726).

4. Yount Rep. (Tukes), limited to all portions that quantify Ms. Tukes' future medical offsets. Yount Rep. (Tukes) at 4-5, Table 2 (JA Ex. 727).

5. Brod Rep. (McElhiney), limited to all portions that quantify Mr. McElhiney's future medical offsets. Brod Rep. (McElhiney) at 4-9, Tables D, E, F, G, App'x A at 4-11 (JA Ex. 641).

6. Brod Rep. (Peterson), limited to all portions that quantify Mr. Peterson's future medical offsets. Brod Rep. (Peterson) at 5-7, Tables C, D, E, F, App'x A at 5-12 (JA Ex. 642).

7. Brod Rep. (Sparks), limited to all portions that quantify Mr. Sparks' future medical offsets. Brod Rep. (Sparks) at 4-6, Tables C, D, App'x A at 4-7 (JA Ex. 644).

8. Brod Rep. (Rothchild), limited to all portions that quantify Ms. Rothchild's future medical offsets. See *id.* at 4-6, Tables C, D, App'x A at 3-6 (JA Ex. 643).

1

As noted above, Plaintiffs do not seek wholesale exclusion of these experts' opinions. Rather, this motion targets a narrower but critical defect all three experts share: they offer speculative, assumption-driven future medical offset projections under the Medicare, VHA, and/or TRICARE programs as purportedly precise present-value figures, showing specific dollar amounts, despite the absence of any analysis resolving any of the underlying assumptions. In reality, those figures are contingent on unresolved variables, including payer identity, future rates (which are set and periodically changed by Congress and regulatory processes), eligibility, and coverage, which no expert has assessed. These are not peripheral variables; they are basic ones. Presenting such calculations as concrete economic conclusions is unreliable, misleading, and does not assist the trier of fact.

Each of these experts purports to derive lifetime future medical offsets by relying on one expert: Henry Miller, Ph.D. ("Miller"), Defendant's health care costs expert. But Miller merely identified *current* Medicare, Community Care Network ("CCN") (VHA), and TRICARE[1] reimbursement rates for each covered service in the respective life care plans. Miller did not calculate future offsets, project reimbursement rates over time, analyze how government insurance rates have changed historically, attempt to forecast how government payers rates may change in the future, determine which payer will apply to any given service, evaluate future eligibility, or analyze how multiple payers may interact to pay for services in reality.

---

[1] TRICARE is not an enumerated program under the Camp Lejeune Justice Act's offset provision, and thus offsets for TRICARE are not permitted under the CLJA. *See* [D.E. 806] at 9-10. Defendant explicitly declined to oppose Plaintiffs' motion *in limine* to exclude evidence of future offsets with respect to TRICARE. *See* [D.E. 813] at 2, 5 n.3. However, because Plaintiffs' motion *in limine* is still pending and Defendant has asserted future offsets based on anticipated TRICARE benefits, this motion seeks to exclude Defendant's unreliable expert opinions on future offsets based on speculative TRICARE benefits as well as those based on speculative benefits under the CLJA's enumerated programs.

2

Despite those limitations, Defendant's experts Brod, Yount, and Tosic seek to transform Miller's point-in-time, payer-specific rate data into purported plaintiff-specific lifetime offset figures. In doing so, they necessarily assume, without support or analysis, that particular government programs will apply, that plaintiffs will remain eligible for those programs in the future, that those programs will continue to operate exactly as they do today, and that reimbursement rates will persist over time and increase consistent with Consumer Price Index (CPI) standard growth rates. No expert supports or tests those assumptions. Miller does not make them, and the economic experts admit they do not analyze them. Not only are these assumptions unsupported, but they are contrary to Defendant's other experts' consistent testimony that reimbursement rates, eligibility, program structure, program funding, and even program existence change over time and *cannot* be assumed to remain stable.

Courts may consider expert testimony regarding offsets, but only where the expert provides a reliable and fact-based methodology for determining the amount of such offsets. Here, no expert does so. Instead, Defendant present a series of conditional calculations untethered to any defined factual scenario and without guidance as to which, if any, should apply. Because these opinions do not reliably connect methodology to the facts, they should be excluded.[2]

---

[2] Defendant is not entitled to future offsets as a matter of law, as argued in Plaintiffs' motion *in limine* [D.E. 806] and motion for partial summary judgment to deny Defendant's future offsets because there is no dispute they are speculative [D.E. 860]. To the extent future offsets are not recoverable as a matter of law, the economic experts' opinions purporting to quantify such offsets would no longer be relevant to any live issue in the case. Expert testimony that does not bear on a fact in issue cannot assist the trier of fact and is inadmissible under Rule 702. Therefore, if the Court grants either Plaintiff's pending motion *in limine* as to future offsets or Plaintiff's pending motion for partial summary judgment, the Court should grant this motion to exclude related expert testimony for that reason alone. If the Court denies either of those motions, it would not moot the present motion, which is based on the separate ground that Defendant's economic experts' methodologies for extrapolating future offsets are unreliable.

3

## II.    BACKGROUND

This background explains (1) the limited scope of Miller's assignment, and (2) how Defendant's economic experts, without any specialized knowledge of the government programs at issue, extrapolated beyond that assignment to generate projected lifetime future offset figures.

In this litigation, both sides retained life care planning experts to estimate certain Track 1 bellwether plaintiffs' future medical needs and associated costs. Plaintiffs' life care planners (Michael Fryar and Kay Hairston) prepared projections of future medical care and costs for certain plaintiffs. Likewise, Defendant retained its own life care planners (Deborah Navarro and Michael Shahnasarian) who prepared competing life care plans for those same plaintiffs.

For each bellwether plaintiff who is eligible for one or more government insurance programs and who has a submitted life care plan, Defendant retained Miller as an expert to identify the *current* government insurance program reimbursement rates for all identified services contained within the life care plans. Miller was provided with information by Defendant identifying which government programs apply to each plaintiff (i.e. Medicare, VHA, and/or TRICARE) and was asked to determine the current unit reimbursement rates for any CPT-coded services appearing in the parties' life care plans (Miller Dep. Tr. at 69:6-70:1; 92:6-13; 150:19-23 (JA Ex. 780, D.E. 841-11). The current unit reimbursement rate refers to the amount that a particular government program would pay today for a single instance of a specific medical service (such as a doctor visit, therapy session, or procedure) based on its existing fee schedule.

Defendant then assigned a separate expert, either Tosic (Leukemia), Brod (Parkinson's), or Yount (Bladder and Kidney Cancer), to take Miller's reimbursement unit rates, apply the parameters in the respective life care plans (i.e., frequency, duration), and to project future medical offsets under each program. In doing so, each of Defendant's economic experts applied generalized

4

growth assumptions based upon the CPI[3] and present value calculations to Miller's point-in-time data, generating multiple alternative offset scenarios to purportedly project future offsets. As explained below, none of the offset experts conducted any independent analysis of the underlying government programs, including issues such as program viability, coverage, eligibility, historical rate changes, or the use of program-specific indices. Nor did the experts opining on these alleged offsets assess or validate Miller's rate determinations or consult with him regarding how, if at all, those rates should or could be projected over time.

The chart below reflects the structure of these assignments across the relevant plaintiffs.

| Plaintiff | Track 1 Condition | Gov't Insurance Program(s) | Plaintiff Life Care Planner | Defense Life Care Planner | Defense Health Care Cost Expert | Defense Expert Alleging Future Medical Offsets |
|---|---|---|---|---|---|---|
| **Bruce Hill** | Leukemia | Medicare VHA | Fryar | Navarro | Miller | Tosic |
| **Jimmy Laramore** | Bladder | VHA | Fryar | Navarro | Miller | Yount |
| **Frank Mousser** | Kidney | VHA | Fryar | Shahnasarian | Miller | Yount |
| **Jacqueline Tukes** | Kidney | Medicare TRICARE | Fryar | Shahnasarian | Miller | Yount |
| **Gary McElhiney** | Parkinson's | Medicare VHA/CCN TRICARE | Hairston | Shahnasarian | Miller | Brod |
| **Edgar Peterson** | Parkinson's | Medicare VHA | Hairston | Shahnasarian | Miller | Brod |
| **Richard Sparks** | Parkinson's | VHA | Fryar | Shahnasarian | Miller | Brod |
| **Diane Rothchild** | Parkinson's | Medicare | Fryar | Shahnasarian | Miller | Brod |

---

[3] The Consumer Price Index ("CPI") is a measure published by the U.S. Bureau of Labor Statistics that tracks changes over time in the prices paid by consumers for a representative basket of goods and services. CPI reflects out-of-pocket consumer expenditures and does not measure reimbursement rates within government healthcare programs such as Medicare, VHA, or TRICARE. *See* U.S. Bureau of Labor Statistics, Consumer Price Index Frequently Asked Questions, https://www.bls.gov/cpi/questions-and-answers.htm.

5

## A.      MILLER'S LIMITED ASSIGNMENT

Miller's assignment was expressly and admittedly limited. He quantified only the *current* government reimbursement rate of each covered service as identified on the life care plans.

Miller was not asked to, and did not, calculate any aggregate of a plaintiff's future medical expenses or develop any "future offset" amount. Miller Dep. Tr. at 43:15-24, 200:18-22 (JA Ex. 780, D.E. 841-11). Nor did he project reimbursement rates into the future (*id. at* 150:6-23); evaluate how each program's rates have changed in the past (to better understand how and to what extent they may change in the future) (*id.* at 121:7-123:6); determine which payer would apply to any given service (*id.* at 93:19-94:18); evaluate how long a plaintiff would remain eligible for any program (*id.* at. 90:9-92:13); or analyze how multiple government payers would interact over time, including which payer would be primary and what portion of care each would cover (*id.* at 164:8-168:9). He explicitly stated that he did not perform any analysis to quantify future patient payments for the government payers, *and that his report <u>did not</u> represent the cost that the plaintiffs may pay for the future care outlined in the life care plans*. *Id.* at 115:13-116:3.

Miller also testified that, had he been asked to project reimbursement rates into the future, he would have performed a more involved analysis than Tosic, Brod, and Yount did. Specifically, he explained that an economic expert could evaluate how reimbursement rates have historically changed within each government program and use that data, along *with* other information to inform projections of future rate changes. *Id.* at 121:11-123:2 (". . .[T]he way I would do it would be to look at how the rates have changed from year to year within the program. There are price indices that are available to look at how rates change in general - consumer price indexes, produce price indexes - there are different ind[ices] that are available, but there is also data that is available on how much rates have increased from Medicare from year to year, and I would use that information to show an increase. . ."). Miller acknowledged, however, that he did not perform any such

6

historical or program-specific analysis for the services identified in the plaintiffs' life care plans, despite agreeing that such analysis would inform how rates may change in the future. *Id.*

Instead, Miller prepared stand-alone rate tables for each applicable government program, reflecting what that program would reimburse for covered individual services as of the time the data was collected. *Id.* at 92:6-13, 150:19-23. His charts were structured by program: for each plaintiff, he presented reimbursement rates as if a *single* government payer independently applied, even where multiple programs could potentially cover the same plaintiff for the same services or split the cost of services. *Id.* at 164:8-168:9. He did not model or attempt to predict coordination of benefits, cost-sharing between programs, or interactions among payers. *Id.* at 164:8-168:9.

As a visual example, below is an excerpt of a table produced by Miller for Parkinson's plaintiff Edgar Peterson, showing the identified services, projected frequency, corresponding CPT codes, and the differing current reimbursement rates associated with each service depending on whether Medicare or the VHA was assumed to apply:

Table 1
Medicare and VHA Coverage and Costs for Ms. Hairston's Life Care Plan

| Description* | Frequency as Described in LCP | Unit Defined | CPT Code** | Medicare Rate | VHA Rate |
|---|---|---|---|---|---|
| **PHYSICIAN/MEDICAL** | | | | | |
| Primary Care | As indicated | Per Visit | 99213 | $66.35 | $82.94 |
| Neurology | Every 6 months | Per Visit | 99214 | $93.53 | $116.91 |
| Functional Neurosurgery | Every 4-5 years | Per Visit | 99214 | $93.53 | $116.91 |
| Analysis and Programming of the DBS | Annually | Per Visit | SUM(95983, 95984 x 3) | $130.30 | $162.88 |
| Battery Replacement for DBS | Every 4-5 years | Per Visit | | | |
| Battery Replacement for DBS - Physician Fee | Every 4-5 years | Per Visit | 61886 | $620.40 | $775.50 |
| *Facility* | | Per Visit | 61886 | $21,716.70 | $27,145.87 |

Miller Rep. (Peterson) at 12 (JA Ex. 657, D.E. 837-21).

Significantly, with respect to VHA rates, Miller testified that he <u>could not</u> evaluate the actual, current cost of services provided within VA facilities because he did not have access to the internal cost data necessary to do so. Miller Dep. Tr. at 147:1-24; 149:14-150:23 (JA Ex. 780, D.E.

7

841-11). He testified that when care was provided within a VA facility, no bill was generated and no money changed hands. *Id.* at 143:23-144:5. He further explained that "there is no way to determine what the costs in a VA facility are from my perspective" and agreed that, if the Court sought to determine the actual cost to the government for care provided within VA facilities, he did not have the data to make that determination. *Id.* at 147:9-16, 150:6-18. Miller agreed that the cost of care in the VA could be "higher or lower than the CCN rate, but we don't have the ability to determine that." *Id.* at 148:14-22.

By contrast, past VHA-related medical offsets in this case *were* calculated using internal VA cost data where such information was available, highlighting a distinct methodological difference in how past versus future VHA medical costs were calculated by the Defendant's own witnesses in this matter. *See, e.g.*, Clarke Dep. Tr. at 34:2–7; 38:12–20; 40:5–41:3; 94:14–15; 96:22–97:19 (Ex. A, attached hereto). Daniel Clarke, the acting Associate CFO for the VA, admitted in his deposition that the calculation of past medical costs that his department produced for past VA medical care provided to Track 1 plaintiffs was based on an encounter-based managerial cost accounting system that creates cost estimates based on costs assigned to clinical encounters and not based on actual claims or bills. *Id.* at 10:24-11:7; 34:2-7; 120:4-10; 57:21-58:7; 114:7-16. The cost allocations for the encounters include direct and indirect costs (*id.* at 34:12-21) and are "very variable" depending on "how the facility staffs that particular department" (*id*. at 96:22-97:19). Clarke clarified that "we don't utilize [CCN] data" when determining the cost of care within VA facilities (*id.* at 82:11–22) whereas CCN reimbursement data is precisely what Miller relied upon to measure current VA costs. Miller Dep. Tr. at 144:10–145:25 (JA Ex. 780, D.E. 841-11). Notably, Clarke's department has never made future projections with respect to the cost of VA care and was not asked to do so here. Clarke Dep. Tr. at 174:10-21 (Ex. A, attached).

This methodology distinction between calculating past VHA versus future VHA medical costs shows an additional underlying flaw in the reliability of Defendant's experts' future medical reimbursement projections related to future VHA care.

Miller also testified that he could not determine, nor could anyone, whether future services identified in the life care plans would be provided within VA facilities, and could not determine whether the reimbursement rates reflected in his tables would be accurate or inaccurate with respect to those services in the future. *Id*. at 145:16-147:24.

Miller testified in connection with determining which payer would apply in the future, and how multiple payers might interact, that it was "hard to know the future" and matters depended upon plaintiff-specific circumstances. *Id.* at 96:5, 146:15-147:20. He did not account for several variables that could affect future payment scenarios, including:

- whether plaintiffs would maintain eligibility for government programs (*id.* at 90:9-92:21);

- whether plaintiffs had or could obtain private insurance in the future that could become primary (*id.* at 75:3-79:9);

- whether providers would accept government reimbursement rates for outlined services (*id.* at 100-102:3);

- whether multiple government programs would apply to the same services, and if so, how coverage would be coordinated among them, as Miller did not calculate the interplay between payers and instead presented rates assuming a single payer would independently apply to each service, despite acknowledging that in practice programs may split payment responsibilities (*id.* at 94:1-18, 98:7-13; 164:8-9; 226:18-227:2);

- whether services would be delivered within VA facilities (where no reimbursement transaction occurs) or outside through networks such as Community Care Network (CCN) (*id.* at 145:16-150:5); or

- how reimbursement rates may change over time due to regulatory, legislative, or market factors (*id.* at 102:9-13, 116:12-120:4, 125:5-126:24).

Miller acknowledged that Medicare Part A is in its ninth year of a funding warning and that the program's funding status presented a concern in the short term, meaning *within* plaintiffs' life

9

expectancy. *Id.* at 134:2-12. Miller agreed that if a service was no longer covered by a government program, the applicable reimbursement rate would be "zero" for that service, meaning no offset would be available because the service would not be covered. *Id.* at 135:5-19.

For VHA, Miller acknowledged that VA Secretary Doug Collins articulated in a hearing to Congress as recently as February 11, 2026, his desire to conduct a reorganization of the VHA that would shift medical personnel to facilities with high demands and reduce staffing where veteran populations are shrinking. *Id.* at 142:12-25. Miller also acknowledged that it was unsurprising that Secretary Collins testified to Congress that the VA was not fully staffed and had not been fully staffed in 15 years. *Id.* at 142:6-11. Miller testified that he was not opining that any plaintiff was going to be able to receive the care outlined in the life care plans at a VA facility. *Id.* at 143:1-20 ("it wasn't something I was particularly concerned with . . . I'm testifying about the rate"). He did not offer opinions regarding future payment amounts, payer allocation, or the application of those rates over time. As he testified, he was "just offering the rate and nothing more than that." *Id.* at 94:18.

Miller further testified that reimbursement rates for government healthcare programs were not static. Rather, such rate changes "generally occur once a year when the new regulations come out," but "sometimes changes are made for individual services at different points in the year." *Id.* at 116:13-20, 116:24-25. He further testified that these reimbursement systems were subject to ongoing congressional control, and that Congress could change payment formulas, reimbursement percentages, eligibility rules, benefit structures, and related methodologies. *Id.* at 125:14-126:24. Dr. Miller also acknowledged that "we don't know which direction Congress might go" with respect to such changes and that future payment rates could not be predicted with certainty. *Id.* at 135:20-24. These program-level uncertainties were confirmed by the testimony of the

government's own agency witnesses:

**Andrew McIlroy, Deputy Assistant Secretary for Budget, VA**

- Testified he had "no knowledge" whether "VA will pay any specific future benefit amount to any individual plaintiff." McIlroy Dep. Tr. at 68:6-68:10 (JA Ex. 770, D.E. 841-10).

- Confirmed he had "no ability to predict the future" regarding whether "current benefit laws will remain unchanged." *Id.* at 68:11-68:16.

- Acknowledged that Congress could change "eligibility criteria," "formulas," and other aspects of VA benefits. *Id.* at 98:19-99:14.

**Heather A. Ford, Chief Financial Officer, Veterans Health Administration (VHA)**

- Testified that VHA funding depends on annual congressional appropriations and "Congress may increase, decrease, or maintain that funding level from year to year." Ford Dep. Tr. at 101:1-101:19 (JA Ex. 773, D.E. 841-4).

- Confirmed there is no guarantee future funding will stay at current levels. *Id.* at 101:20-22.

- Agreed that Congress could change eligibility, coverage, and reimbursement methodologies, including Community Care Network rates. *Id.* at 103:2-103:23.

**Larry Young, Deputy Director and CFO, CMS Office of Financial Management (Medicare)**

- Testified that Congress could amend Medicare "eligibility rules, benefits and scope, and payment methodologies." Young Dep. Tr. at 60:10-60:16 (JA Ex. 788, D.E. 841-19).

- Confirmed future Medicare coverage and payment levels depend on congressional decisions and that he "cannot speculate on what the future may hold with respect to the Medicare program." *Id*. at 60:18-60:25, 64:20-65:12.

**Dr. Richard Ruck, Chief Medical Officer, TRICARE Health Plan (Defense Health Agency)**

- Testified that eligibility for TRICARE could change based on life events. Ruck Dep. Tr. at 76:10-77:7 (JA Ex. 782, D.E. 841-13).

- Agreed that Congress could "make changes to limit coverage" and increase cost-sharing. *Id.* at 85:8-85:14, 87:9-87:13.

- Confirmed that continued operation of TRICARE depends on annual congressional funding. *Id*. at 121:4-122:12.

In sum, Miller provided only point-in-time reimbursement rates under assumed conditions and did not perform the analysis necessary to apply those rates to any plaintiff's future care.

11

## B. THE ECONOMIC EXPERTS' ASSIGNMENT

After Miller prepared his rate tables, Defendant retained three economic experts, Tosic, Brod, and Yount, to take Miller's current reimbursement rates and calculate projected aggregate lifetime offset amounts for each plaintiff. As set forth above, however, Miller's work was not intended for such use and Miller did not determine which payer would apply, whether coverage will exist, how long any such coverage would continue, or how reimbursement rates would change over time. Rather than performing an independent economic analysis to resolve those foundational issues, Tosic, Yount and Brod simply translated Miller's conditional reimbursement figures into projected lifetime offsets using generalized economic tools.

All three of the experts testified that they lacked familiarity with the structure and operation of government payer programs, including how benefits were determined, how those programs function over time, and how projections would interact depending on which payer applied. Yount admitted she had no expertise regarding VHA, Medicare, or TRICARE benefits, including how eligibility or coverage determinations were made, and instead relied solely on existing materials for her calculations. Yount Dep. Tr. at 25:1-11; 24:19-21 (JA Ex. 790, D.E. 841-21). Tosic likewise testified that she offered no opinions on whether VHA, Medicare, or TRICARE would continue to provide benefits in the future. Tosic Dep. Tr. at 38:20-25; 35:9-15 (JA Ex. 787, D.E. 841-18). Brod similarly confirmed that his analysis was limited to using data provided to him and that he did not develop or independently evaluate the underlying sources. Brod Dep. Tr. at 16:12-16; 17:1-5 (JA Ex. 770, D.E. 841-1).

Miller did not provide instructions or collaborate with Tosic, Yount, and Brod regarding his tables or what use was appropriate. He did not instruct the experts who were relying on his numbers how to assign payers (Miller Dep. Tr. at 93:19-94:18 (JA Ex. 780, D.E. 841-11)), how to address multiple-payer scenarios (*id*. at 164:8-168:9), or how to project rates for various

12

government insurance programs over time (*id.* at 150:6-23). Miller also did not review the other experts' calculations or verify their methodology (*id*. at 173:2-9, 183:20-25, 201:10-202:10) and testified that he could not determine how his tables were used in their analyses (*id*. at 177-178, 201-202). Miller had "no opinion" regarding whether the economic expert totals are accurate. *Id*. at 182.

Miller also confirmed that applying his reimbursement tables would require making determinations he did not perform, including payer selection, duration of coverage, and how rates would apply over time. *Id.* at 93:3-18; 180:4-25. His analysis reflected only what a particular payer might reimburse under *present* conditions, not what will occur in the future, which would depend on variables outside his analysis, including plaintiff- and provider-specific circumstances. *Id.* at 96:11-21 ("What I prepared is what is *possible* and what actually happens is dependent upon the plaintiff and the provider.") (emphasis added).

Despite these limitations, Tosic, Yount and Brod took Miller's conditional reimbursement figures, reflecting only what was "possible" not what will occur, and projected them forward using CPI-based growth assumptions and present-value discounting to generate purported lifetime offsets. But those techniques do not supply the missing analysis. Economic tools are only as reliable as the inputs to which they are applied, and here the inputs - payer applicability, coverage, eligibility, and program operation over time - were neither analyzed nor resolved by any expert.

The defense experts' reliance on CPI-based growth assumptions underscores this analytical gap. The CPI measures general consumer price inflation; it does not measure or predict reimbursement rates within government healthcare programs such as Medicare, VHA, or TRICARE. Applying CPI growth to assumed reimbursement rates presupposes, without analysis, that these programs will (1) continue to exist in their current form, (2) cover the same services,

and (3) adjust reimbursement in line with general inflation/CPI. Despite Defendant's burden to prove any offsets, and Rule 702's requirement that Defendant's future medical offset experts use a reliable methodology that fits the facts of the case, none of those assumptions were tested, supported, or meaningfully considered by the economic experts or reflected in their reports.

In short, Defendant's experts did not apply a reliable methodology to the facts. They accepted unexamined assumptions on government benefits, applied generic economic formulas, and presented the resulting calculations as reliable projections. That is not a reliable application of economic principles, but an impermissible analytical gap between methodology and conclusion.

### III.    <u>LEGAL STANDARD</u>

Under Federal Rule of Evidence 702, the proponent of expert testimony must establish by a preponderance of the evidence that the testimony is based on sufficient facts or data and is the product of a reliable application of methodology to the facts of the case. *See* [D.E. 777] at 19-26. The Court must conduct "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid" and whether the expert has "faithfully appl[ied] the methodology to the facts." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993); *Roche v. Lincoln Prop. Co.*, 175 F. App'x 597, 602 (4th Cir. 2006).

In determining "whether proffered testimony is sufficiently reliable, the court has broad latitude to consider whatever factors bearing on validity that the court finds to be useful; the particular factors will depend upon the unique circumstances of the expert testimony involved." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). Expert testimony is inadmissible if based on speculation, unsupported assumptions, or failure to connect methodology to the facts. *See Tyger Constr. Co. v. Pensacola Constr. Co.*, 29 F.3d 137, 142-43 (4th Cir. 1994).

A court is not required to admit opinion evidence that is connected to existing data only by the expert's *ipse dixit*. *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997); *see also Small v.*

14

*Wel/Dyne, Inc.*, 927 F.3d 169, 177 (4th Cir. 2019) ("Without testing, supporting literature in the pertinent field, peer reviewed publications[,] or some basis to assess the level of reliability, expert opinion testimony can easily, but improperly, devolve into nothing more than proclaiming an opinion is true 'because I say so.'"). An expert's opinion must have a "*valid* scientific connection to the pertinent inquiry." *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021) (citing *Belville v. Ford Motor Co.*, 919 F.3d 224, 232 (4th Cir. 2019)) (emphasis added). The expert's opinion must be "based on scientific, technical, or other specialized *knowledge* and not on belief or speculation." *Id.* (quoting *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999)).

Bench trials have no risk of jury confusion. *See* Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. Evid. § 6270, at 29 (2d ed. 2025). Thus, in bench trials, courts have "greater discretion regarding procedure and even the stringency of gatekeeping." *Id.* at 29 & n.26. Still, Rule 702 does apply in bench trials. *See* [D.E. 777] (applying Rule 702 in advance of bench trials). The court, while both factfinder and law-applier, cannot supply a missing connection between general methodology and specific facts. That gap dooms the challenged opinions here.

## IV.  <u>ARGUMENT</u>

Rule 702 requires that expert testimony be grounded in "sufficient facts or data" and reflect a "reliable application" of methodology to the facts of the case. Fed. R. Evid. 702(b), (d). An expert's opinion is subject to exclusion where the expert employs accepted tools but fails to apply them to a defined and supported factual framework. Here, exclusion is warranted where:

1. The expert fails to establish the foundational facts necessary to perform the analysis, such that the opinion is not based on "sufficient facts or data";

2. The expert assumes critical inputs but does not analyze or test those assumptions, creating an impermissible analytical gap between the data and the conclusion;

3. The expert applies a methodology without demonstrating that it is appropriate for the question presented, resulting in a lack of fit between the methodology and the analysis performed; or

15

4. The expert presents multiple hypothetical outcomes without any method for determining which applies, effectively requiring the factfinder to supply the missing analysis.

Each of these independent defects is present here. As set forth below, Defendant's economic experts (1) fail to determine the factual predicates necessary to perform their calculations; (2) assume, rather than analyze, the inputs on which those calculations depend; (3) apply CPI, an untested and unsupported methodology, to project reimbursement rates; and (4) present materially different outcomes without any framework for selecting among them.

### A. DEFENDANT'S ECONOMIC EXPERT OPINIONS ARE NOT BASED ON SUFFICIENT FACTS OR DATA BECAUSE NO EXPERT DETERMINES THE PREDICATE CONDITIONS NECESSARY TO CALCULATE FUTURE OFFSETS.

The future offset opinions of experts Tosic, Yount, and Brod, should be excluded because they are not based on "sufficient facts or data" as required by Rule 702. The experts' calculations proceed without determining the foundational conditions necessary to perform the analysis.

As set forth above, Miller's role was limited to identifying current reimbursement rates for discrete services under individual government programs. Miller Dep. Tr. at 92:6-13; 150:19-23; 94:17 (JA Ex. 780, D.E. 841-11). His analysis was expressly conditional: it reflects what a particular payer would reimburse if that payer applied on the day of Miller's reports (December 15, 2025). Despite being the Defendant's designated expert on health care costs for government programs, Miller did not project those rates into the future, determine which payer would apply, evaluate eligibility over time, or analyze how multiple payers would interact. *Id.* at 43:19-24; 90:9-94:18; 150:6-23; 164:8-168:7; 200:18-22. He also did not review or validate the economic experts' calculations and stated he had "no opinion" as to whether their totals were accurate. *Id.* at 173:2-9; 182:2-184:18, 201:10-202:10. Thus, Miller provides only payer-specific reimbursement data under assumed conditions, not a determination of any future offset.

16

This defect of lacking "sufficient facts and data" is particularly pronounced with respect to VHA-based projections. Miller testified that he could not access or evaluate the actual cost of care provided within VA facilities because such data is not available to him. Miller Dep. Tr. at 147:1-20; 149:14-150:23 (JA Ex. 780, D.E. 841-11). Instead, he used Community Care Network reimbursement rates as a proxy, while acknowledging that he does not know how those rates compare to the actual internal cost of care within VA facilities, which could be higher or lower. *Id.* at 146:7-148:22. He further testified that he cannot determine whether future care will be provided within VA facilities, where no reimbursement or billing event occurs, or through external networks such as CCN. *Id.* at 145:16-147:24. As a result, the data underlying VHA-based projections does not reflect actual costs and depends on unknown and unresolved conditions, rendering any resulting calculations unreliable. In such circumstances, the calculations based on Miller's opinions depend entirely on unresolved assumptions about where care will be delivered.

Further, to convert those conditional rates into lifetime offset calculations, the experts must determine, at a minimum: (1) which payer will apply to each future medical service; (2) whether the services identified in the life care plans will be covered by that payer; (3) whether plaintiffs will remain eligible for that payer; (4) the duration of such coverage; and (5) how multiple payers will interact over time. Without these predicate facts, there are no "facts or data" to which any economic methodology can be applied. In the absence of these foundational determinations, the experts' calculations are untethered to any defined factual scenario.

In this matter, no defense offset expert performed these steps or conducted any service-level analysis to determine how reimbursement by any of the government programs would apply across the categories of care in the life care plans. The Defendant's offset experts' own testimony confirms that these predicate conditions were never analyzed. Tosic testified that she did not opine

17

on whether any government payer would actually cover the services identified in the life care plans. She presented multiple alternative scenarios depending on the assumed payer, without offering any opinion as to which applied or how those scenarios should be selected. Tosic Dep. Tr. at 202:8-206:5 (JA Ex. 787, D.E. 841-1). Brod likewise testified that his role was limited to "quantify[ing]" the life care plans using figures provided by others, and that issues concerning coverage, payer responsibility, and program operation fell outside the scope of his analysis. Brod Dep. Tr. at 184:8-185:5 (JA Ex. 770, D.E. 841-1). Yount similarly testified that she relied entirely on inputs provided by others and did not offer an opinion on whether plaintiffs will receive care through any government program, whether they will remain eligible, or how those programs would apply to the services identified in the life care plans. Yount Dep. Tr. at 51:8-15, 283:6-284:12 (JA Ex. 790, D.E. 841-21).

These are not peripheral or irrelevant uncertainties: they are the foundational inputs required to perform the offset calculation. Moreover, *these inputs are not static.* Defendant's economic experts' assumptions directly contradict the testimony of *other* defense experts and witnesses, who confirmed that reimbursement rates, eligibility, program structure, program funding, and even program existence are subject to change over time. For example, the Deputy Assistant Secretary for Budget at the Department of Veterans Affairs testified that even mandatory benefits are "subject to annual congressional appropriations," that Congress may change eligibility, payment formulas, and benefit structures, and that he had "no ability to predict the future" or whether current laws will remain in place. McIlroy Dep. Tr. at 80:7-11; 68:11-16 (JA Ex. 779, D.E. 841-10). He further acknowledged Congress could reduce or eliminate benefits and that payments may be withheld if funding is insufficient. *Id.* at 86:3-7; 85:8-15.

Similarly, the Chief Financial Officer of the Veterans Health Administration testified that

all program funding depends on congressional action, that funding levels may increase or decrease from year to year, and that there was "no legal guarantee" that future appropriations will remain at current levels. Ford Dep. Tr. at 100:21-24; 101:16-22 (JA Ex. 772, D.E. 841-4). She further confirmed that eligibility rules, reimbursement methodologies, and access to care may change, and that she could not state "with certainty" that the scope of care or eligibility would remain unchanged in the future. *Id.* at 103:2-5; 201:11-19.

The Deputy Chief Financial Offer and Deputy Director for the Office of Financial Management for CMS, Larry Young, likewise testified that Medicare coverage, reimbursement levels, and eligibility depend on congressional decisions, that future payment rates cannot be predicted, and that the program faces funding pressures requiring future legislative changes. Young Dep. Tr. at 60:10-16; 153:10-18; 91:13-24 (JA Ex. 788, D.E. 841-19).

TRICARE's Chief Medical Officer confirmed that Congress can alter coverage, impose restrictions, and change cost-sharing requirements, and that continued operation of the program depends on annual budget approvals. Ruck Dep. Tr. at 84:2-9; 85:8-14; 121:4-9 (JA Ex. 782, D.E. 841-13). TRICARE's CMO acknowledges that the TRICARE policy manual has been subject to numerous changes historically and does not know how TRICARE cost fee schedules will change in the future. Ruck Dep. Tr. at 26:25-27:23, 90:11-91:8 (JA Ex. 782, D.E. 841-1).[4]

Without determining which payer applies, whether coverage exists, or whether plaintiffs will remain eligible, Defendant's experts' opinions lack the basic factual predicates necessary to generate reliable opinions. As Miller testified, determining these conditions is "hard to know [in] the future" and depends on plaintiff-specific circumstances. Miller Dep. Tr. at 96:5-21 (JA Ex.

---

[4] Plaintiffs have fully chronicled these and other statements of Defendants' experts regarding the speculative nature of future benefits in Plaintiffs' simultaneously filed motion for partial summary judgment [D.E. 860].

19

780, D.E. 841-11).

Rule 702 does not permit an expert to supply calculations while omitting the factual predicates necessary to perform them. Courts routinely exclude expert opinions where the expert assumes, rather than determines, the facts required to apply the methodology. See *Gen. Elec. Co.*, 522 U.S. at 146 (excluding expert testimony where there was "simply too great an analytical gap between the data and the opinion proffered"); *Sardis*, 10 F.4th at 283-84 (expert must reliably apply methodology to the facts; exclusion proper where that connection is lacking); *Nease v. Ford Motor Co.*, 848 F.3d 219, 231-32 (4th Cir. 2017) (excluding expert who failed to apply methodology to facts of the case); *Tyger*, 29 F.3d at 142-43 (expert opinion inadmissible where based on unsupported assumptions rather than sufficient facts or data); *Belville v. Ford Motor Co.*, 919 F.3d 224, 229-30 (4th Cir. 2019) (upholding rejection of expert testimony that relied on arbitrary or faulty assumptions). "Trial judges may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable." *Milward v. Acuity Specialty Prods. Grp., Inc.*, 639 F.3d 11, 15 (1st Cir. 2011). "The accuracy of the model bears a strong positive relationship to the correct inputs being used." *Coleman v. Union Carbide Corp.*, No. CIV.A. 2:11-0366, 2013 WL 5461855, at *23 (S.D.W. Va. Sept. 30, 2013) (rejecting air modeling process for lack of precise inputs).

Here, the opinions of Tosic, Yount and Brod are not based on "sufficient facts or data" and therefore cannot satisfy Rule 702. Fed. R. Evid. 702(b).

**B.    THE DEFENSE ECONOMIC EXPERTS FAIL TO APPLY ANY METHODOLOGY TO JUSTIFY THEIR ASSUMPTIONS, CREATING AN IMPERMISSIBLE ANALYTICAL GAP.**

Even if the assumptions of Tosic, Yount, and Brod are taken as given, their opinions still fail because they do not apply any methodology to analyze, test, or validate those assumptions. Rule 702 requires not only the use of accepted tools, but a reliable application of those tools to the

20

facts of the case. Where an expert assumes the critical inputs to the analysis without evaluating whether those assumptions correspond to real-world conditions, the resulting opinion reflects an impermissible analytical gap.

Here, Tosic, Yount, and Brod uniformly assume that government programs will apply, that plaintiffs will remain eligible for those programs, that services will be covered, and that reimbursement rates will change in accordance with generalized growth assumptions. Yet none of the experts analyze any of those assumptions. None of them have expertise in the structure or operation of the government programs on which their calculations depend. Yet each assumes how those programs will function over decades.

Tosic's testimony illustrates this failure. She testified that her role was limited to applying reimbursement rates to life care plan elements and calculating present value totals, expressly disclaiming any responsibility for determining whether a payer would actually cover those services. She stated, "I don't make that determination" and confirmed that her opinion was limited to calculating growth rates and present value "based on either VA rates or Medicare rates… and nothing more than that." Tosic Dep. Tr. at 202:8-206:5 (JA Ex. 787, D.E. 841-1). Consistent with that limitation, her report presents multiple alternative scenarios depending on the assumed payer but does not evaluate whether any of those scenarios reflects how Plaintiff's care would actually be provided. Her report does not analyze whether Plaintiff will remain eligible for any program, whether the identified services will be covered, or how multiple programs would operate together. She likewise performed no analysis regarding the stability or future viability of the programs on which her calculations depend. *Id*. at 243:5-244:19.

Brod's testimony reflects the same analytical gap. He testified that his role was limited to "quantify[ing]" the life care plans using figures provided by others and that issues concerning

coverage, payer responsibility, and program operation fall outside his expertise. Brod Dep. Tr. at 184:8-185:5 (JA Ex. 770, D.E. 841-1). He did not perform any analysis of how reimbursement rates within Medicare, VHA, or TRICARE have changed over time, nor did he evaluate how those programs set or adjust rates. Instead, he applied generalized growth assumptions based on the CPI without tying those assumptions to any program-specific data. *Id*. at 84:10-90:14; 106:15-21. His calculations therefore assume, without analysis, that reimbursement rates within these programs will change in the same manner as consumer prices in the general economy.

Yount's testimony confirms the same defect. She explained that her role was limited to performing calculations based on inputs provided by others, stating that "Henry Miller did not provide the future medical care offset number. He provided what items would go into it, and I calculated that number," and that she relied entirely on Miller with respect to "his projections about Medicare and TRICARE." Yount Dep. Tr. at 287:23-288:1, 285:25-286:3 (JA Ex. 790, D.E. 841-21). She assumes that government programs will continue to operate as they do today, that plaintiffs will remain eligible, and that services will be covered, without analyzing those assumptions. *Id.* at 234:4-13, 235:1-23; 263:2-7. She further admitted that she has no opinions regarding what care plaintiffs will need or whether they will receive that care through those programs. *Id.* at 263:15-19. She also testified that she does not have background or expertise in Medicare and did not conduct any analysis concerning the future viability of Medicare or other government programs. *Id.* at 53:1-3, 28:12-22.

Miller himself testified that he could not determine how Yount derived her calculations, explaining: "I can't tell you what she did here… she did not use the higher number and she didn't use the lower number." Miller Dep. Tr. at 177:18-178:8 (JA Ex. 780, D.E. 841-11). He further testified that she "made [her] own set of assumptions and I don't know what they are." *Id.* at

22

180:1-3. The inability of the underlying data provider to identify or replicate the methodology underscores that no reliable analytical process was applied.

While "experts commonly extrapolate from existing data," a district court need not "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co.*, 522 U.S. at 146; *see also E.E.O.C. v. Freeman*, 778 F.3d 463, 466-67 (4th Cir. 2015) (upholding exclusion of expert where inputs in data set contained errors and omissions). Because the defense experts assume the critical inputs to their analysis without validating those assumptions, their opinions reflect an impermissible analytical gap and do not constitute a reliable application of methodology to the facts of the case under Rule 702.

### C.  WHERE THE DEFENSE ECONOMIC EXPERTS PURPORT TO APPLY A METHODOLOGY, IT IS UNSUPPORTED.

Defendant's experts Tosic, Yount, and Brod also assume that the CPI provides a reliable basis to project reimbursement rate growth across Medicare, VHA, and TRICARE. Yet no defense expert has evaluated whether CPI, in isolation, is an appropriate proxy for how reimbursement rates within those programs are set or how they change over time. None of the defense experts performed any historical analysis of how reimbursement rates within those programs have actually changed, nor did they assess whether those rates track CPI or any similar index. Brod Dep. Tr. at 84:10-90:14 (JA Ex. 770, D.E. 841-1); Yount Dep. Tr. at 243:18-244:5 (JA Ex. 790, D.E. 841-21); Tosic Dep. Tr. at 202:8-204:15 (JA Ex. 787, D.E. 841-18). Instead, they assume that CPI-based growth rates, applied independently, reflect the growth rates of three specific government programs without testing that assumption against program-specific data.

This is not a challenge to the use of CPI in economic analysis generally. Rather, it is a challenge to the use of CPI in isolation, without the program-specific analysis required to

determine whether it applies in this context. Tosic, Yount, and Brod purport to project reimbursement rates within identified government healthcare programs, yet no expert analyzed whether CPI alone is a reliable methodology to track future government reimbursement rates.

The failure to perform that analysis is particularly significant because the structure of these programs demonstrates that CPI cannot be assumed to apply without program-specific evaluation. Medicare, TRICARE, and the VHA do not set reimbursement rates based on general consumer price inflation, but through statutory, regulatory, and administrative processes that rely on program-specific data and indices.

These program structures confirm that reimbursement rates are not tied to general consumer price inflation and cannot be assumed to track CPI without program-specific analysis:

- **Medicare**: Medicare relies on program-specific input price indexes (e.g., the Medicare Economic Index and various market basket indexes), rather than a single uniform inflation measure.[5] CMS and Congress use input price indexes to update Medicare payment rates, and measures from the general economy may overstate or understate price changes, and could result in payment updates that are too high or too low.[6] In other words, Medicare rate-setting turns on its program-specific payment constructs and health-care input measures, not CPI.

- **TRICARE:** TRICARE allowable charges are "tied by law to Medicare's allowable charges," i.e., TRICARE reimbursement depends on Medicare-linked payment rules rather

---

[5] https://www.cms.gov/data-research/statistics-trends-and-reports/medicare-program-rates-statistics/market-basket-data
[6] https://www.medpac.gov/wp-content/uploads/import_data/scrape_files/docs/default-source/reports/Mar02_AppA.pdf. *See also* https://www.medpac.gov/#

24

than general CPI-based growth.[7]

- **VA:** VA reimbursement depends on Medicare-linked and VA-specific methodologies.[8] VA explains that, where possible, it uses Medicare rates, and where no Medicare rate exists, the VA Fee Schedule methodology relies on "VA claims data, Medicare policies and fee schedules, Medicaid fee schedules, TRICARE fee schedules, and benchmarking data." In other words, VA community-care reimbursement rates are derived from program-specific data, Medicare-linked rates, and benchmarking, and cannot be assumed to track general consumer price indices such as CPI without program-specific analysis.

Accordingly, while CPI may be appropriate in contexts where projections are not tied to a specific payer, such as general life care planning estimates, it is not a standalone methodology for projecting reimbursement rates within specific government healthcare programs, and its use in that manner reflects a lack of fit between the methodology and the question presented. Defendant bears the burden of demonstrating that CPI is a reliable basis to project reimbursement rates for these programs. Yet no expert explains why CPI provides a reliable basis for projecting Medicare or VA rates, nor does any expert analyze how those rates have historically changed within the relevant programs, despite testimony that such analysis informs projections of future rates.

Miller's own testimony confirms the absence of any such analysis. He explained that, if tasked with projecting reimbursement rates into the future, an expert would evaluate how rates have historically changed within each program and use that data—potentially alongside multiple available indices—to inform projections of future rate changes. Miller Dep. Tr. at 121:11-123:2 (JA Ex. 780, D.E. 841-11) ("…there are different ind[ices] that are available, but there is also data

---

[7] https://tricare4u.com/en/portal/provider/resources/reimbursement; *see also* https://tricare.triwest.com/en/provider/tricare-provider-handbook/reimbursement-methodologies/
[8] https://www.va.gov/COMMUNITYCARE/revenue-ops/Fee-Schedule.asp

25

that is available on how much rates have increased by Medicare from year to year, and I would use that information to show an increase…").

Thus, while Miller acknowledged that indices such as CPI may be considered as one input in an appropriate analysis, he made clear that any such projection must be grounded in program-specific historical data and evaluated in conjunction with multiple indices and data sources. By contrast, the defense experts assumed that CPI alone, albeit tailored to categories of medical services, provides a reliable proxy for reimbursement rate growth, without performing the program-specific historical analysis or multi-factor evaluation that Miller described. Miller also acknowledged that he did not perform any such historical or program-specific analysis for the services identified, despite agreeing that such analysis would inform how rates may change in the future. *Id.* This testimony confirms that CPI cannot simply be assumed to apply in isolation; it must be tested against program-specific data, analysis that no defense expert performed here.

As explained above, Defendant's other experts have consistently testified that these government programs are subject to regular change and that reimbursement rates cannot be reliably predicted. *See supra* at 18-19; *see also* Plaintiffs' simultaneously filed motion for partial summary judgment [D.E. 860-861]. Contrary to this undisputed record, Defendant's experts assume that current rates, eligibility, and benefits will persist unchanged over decades. That assumption is directly contradicted by the governing structure of the programs themselves and is utterly unsupported.

Tosic, Yount, and Brod did not apply a tested methodology to determine whether CPI is appropriate; they assumed that CPI applies and performed calculations based on that assumption. This is not a reliable application of economic methodology, it is the substitution of a single index for the analysis required to determine whether that index is appropriate in the first place. The Court

26

is asked to accept, on *ipse dixit*, that CPI provides a valid proxy for future reimbursement rates within complex federal healthcare programs. Rule 702 does not permit such substitution.

Rather, this is precisely the type of analytical gap Rule 702 forbids. An expert must do more than apply accepted tools; the expert must "faithfully appl[y] the methodology to the facts of the case." *Daubert*, 509 U.S. at 592-93; *see also Nease*, 848 F.3d at 231-32. "[I]n order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation, i.e., 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590. Where, as here, the expert assumes how the methodology applies without testing that assumption, the opinion is connected to the data only by the expert's *ipse dixit* and must be excluded. *See Gen. Elec. Co.*, 522 U.S. at 146; *Sardis*, 10 F.4th at 283-84. Because the defense experts' CPI-based projections are unsupported, untested, and untethered to the actual structure of the programs at issue, they reflect a mismatch between the methodology used and the phenomenon being measured and are inadmissible under Rule 702.

### D. DEFENDANT'S ECONOMIC EXPERTS PRESENT MULTIPLE HYPOTHETICAL OUTCOMES WITHOUT ANY METHOD TO DETERMINE WHICH APPLIES, LEAVING THE FACTFINDER TO SUPPLY THE ANALYSIS.

Even if the Defendant's experts' methodology and assumptions were accepted, their opinions still fail because they do not produce a conclusion grounded in the facts of the case. For plaintiffs Hill, Tukes, McElhiney, and Peterson, each of whom has multiple potential government payers, the experts provide no method for determining which set of assumptions governs.

This failure is compounded by the absence of any consistent methodology across the experts. Tosic presents separate, payer-specific calculations and instructs that they be considered "individually," without offering any opinion as to which applies. Tosic Dep. Tr. at 205:9-206:5 (JA Ex. 787, D.E. 841-1). Brod likewise generates alternative outcomes tied to assumed payers

but does not determine which payer governs. Brod Dep. Tr. at 184:8-185:5 (JA Ex. 770, D.E. 841-1). Yount, however, employs a different approach, combining assumptions and inputs from multiple programs without identifying how those programs would interact or whether such combined scenarios would occur in practice. Yount Dep. Tr. at 285:25-286:3; 287:23-288:1 (JA Ex. 790, D.E. 841-1). In other instances, such as Plaintiff Tukes, the experts assume combined coverage by multiple payers without analyzing whether such coordination would occur. Yount Rep. (Tukes) at 4-5, Table 2 (JA Ex. 727, D.E.) No expert explains why these differing approaches are methodologically appropriate, how they should be reconciled, or which approach should govern. The absence of any consistent or articulated methodology confirms that the experts have not applied a reliable analytical framework to the facts of the case.

The effect of these unresolved assumptions is reflected in the experts' own calculations, which vary dramatically depending on the assumed payer, even when the underlying medical care remains unchanged. For example, Tosic estimates that future medical care for Plaintiff Hill would range from approximately $404,246 to $518,916 under VHA, but only $84,969 under Medicare when applying Plaintiff's life care plan. Tosic Dep. Tr. at 202:8-204:15 (JA Ex. 787, D.E. 841-1); Tosic Rep. (Hill) at 41-48 (JA Ex. 708, D.E. 839-6) (see Tables 9-16).

Brod's calculations reflect similar disparities. For Plaintiff McElhiney, projected offsets under a Medicare/TRICARE scenario range from approximately $206,210 to $273,874, while under a VHA/Community Care Network scenario they increase to approximately $532,501 to $600,401, more than doubling based solely on the assumed payer. For Plaintiff Peterson, Medicare-based estimates range from approximately $127,172 to $158,209, while VHA-based estimates increase to approximately $398,577 to $462,381. Brod Dep. Tr. at 84:10-90:14, 106:15-21 (JA Ex. 770, D.E. 841-1); Brod Rep. (McElhiney) at 16-19 (JA Ex. 641, D.E. 837-5); Brod

28

Rep. (Peterson) at 15-18 (JA Ex. 642, D.E. 837-6).

Yount's projections for Plaintiff Tukes underscore a different, but equally fundamental defect: the absence of any discernible methodology at all. Her report presents a single offset figure for each life care plan ($110,100 and $406,338) without identifying whether those figures are derived from Medicare reimbursement rates, TRICARE rates, or some combination of the two. Yount Rep. (Tukes) at 10-11 (JA Ex. 727, D.E. 839-25). Although the underlying tables include separate columns for Medicare and TRICARE reimbursement, the report does not explain how those columns are used to generate the final offset totals. *See id.* As a result, the report does not disclose which payer assumptions underlie the calculation or how those assumptions are applied.

When questioned directly on this issue, even Miller could not discern Yount's methodology. He testified: "I can't tell you what she did here. But she did not use the higher number and she didn't use the lower number." Miller Dep. Tr. at 177:18-178:8 (JA Ex. 780, D.E. 841-11). He further explained that, if Yount was relying solely on his rates and report, she would not have had the information necessary to calculate how multiple government payers would cover services in conjunction. *Id.* at 179:19-180:3. According to Miller, Yount "made [her] own set of assumptions and I don't know what they are." *Id.* at 180:1-3.

Providing multiple scenarios does not cure this defect. Because the experts' calculations are tied to different assumed payers, they necessarily reflect mutually exclusive scenarios. Yet no expert evaluates whether, when, or how those programs would apply in practice, i.e., whether one would be primary, whether coverage would overlap, or how reimbursement responsibility would be allocated over time. Nor do Tosic, Yount, or Brod provide any framework for translating these alternative calculations into a single, unified offset.

Rule 702 requires an expert to apply a methodology that yields a conclusion grounded in

the facts of the case. It does not permit an expert to present multiple inconsistent outcomes and delegate to the factfinder the task of determining which assumptions apply and how the calculation should be performed. See *Daubert*, 509 U.S. at 590 n. 9 (observing that the "reliability" inquiry asks, "does application of the principle produce consistent results?"); *United States v. Duke Energy Corp.*, 981 F. Supp. 2d 435, 443 n.11 (M.D.N.C. 2013) (excluding experts whose conflicting methodologies "generate[d] wildly inconsistent results"). Courts exclude expert testimony where "there is simply too great an analytical gap between the data and the opinion proffered" by the expert. the expert "fails to bridge the analytical gap between the data and the opinion proffered" or leaves critical determinations to the jury. *Gen. Elec. Co.*, 522 U.S. at 146. The Fourth Circuit has likewise made clear that an expert must "reliably appl[y] the methodology to the facts of the case," and may not leave key analytical steps unresolved. *Sardis*, 10 F.4th at 283-84; *Nease*, 848 F.3d at 231-32. Because the defense experts provide no analytical framework for selecting among their alternative scenarios or applying them to the facts, their opinions do not assist the trier of fact and are inadmissible under Rule 702. *See Daubert*, 509 U.S. at 591-93.

## V.  <u>CONCLUSION</u>

The opinions of Tosic, Yount and Brod are not the product of a reliable application of methodology to the facts of the case. They apply projected reimbursement rates to assumed future conditions (payer applicability, eligibility, coverage, and program interaction) without expert analysis. These experts did not determine the foundational inputs necessary to perform their calculations, relied on untested assumptions, and produced materially different results without any framework for selecting among them. These defects reflect a failure to connect data to conclusions, resulting in hypothetical projections untethered to defined facts. Plaintiffs respectfully request that the Court grant their motion to partially exclude the opinions of Tosic, Brod, and Yount.

DATED this 27th day of April, 2026.

/s/    J. Edward Bell, III
J. Edward Bell, III (admitted *pro hac vice*)
Bell Legal Group, LLC
219 Ridge St.
Georgetown, SC 29440
Telephone: (843) 546-2408
jeb@belllegalgroup.com

*Lead Counsel for Plaintiffs*

/s/    Elizabeth J. Cabraser
Elizabeth J. Cabraser (admitted *pro hac vice*)
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
ecabraser@lchb.com

*Co-Lead Counsel for Plaintiffs*

/s/    W. Michael Dowling
W. Michael Dowling (NC Bar No. 42790)
The Dowling Firm PLLC
Post Office Box 27843
Raleigh, NC 27611
Telephone: (919) 529-3351
mike@dowlingfirm.com

*Co-Lead Counsel for Plaintiffs*

/s/    Robin L. Greenwald
Robin L. Greenwald (admitted *pro hac vice*)
Weitz & Luxenberg, P.C.
700 Broadway
New York, NY 10003
Telephone: 212-558-5802
rgreenwald@weitzlux.com

*Co-Lead Counsel for Plaintiffs*

/s/    James A. Roberts, III
James A. Roberts, III
Lewis & Roberts, PLLC
3700 Glenwood Ave., Ste. 410
Raleigh, NC 27612
Telephone: (919) 981-0191
jar@lewis-roberts.com

*Co-Lead Counsel for Plaintiffs*

/s/    Mona Lisa Wallace
Mona Lisa Wallace (N.C. Bar No.: 009021)
Wallace & Graham, P.A.
525 North Main Street
Salisbury, NC 28144
Telephone: 704-633-5244
mwallace@wallacegraham.com

*Co-Lead Counsel for Plaintiffs*