# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### SOUTHERN DIVISION
### NO. 7:23–CV–897

IN RE:

CAMP LEJEUNE WATER LITIGATION

This Document Relates To:

ALL CASES

UNITED STATES' LOCAL CIVIL RULE 56.1(a)(2) STATEMENT OF MATERIAL DISPUTED FACTS

The United States submits the following Local Civil Rule 56.1(a)(2) Opposing Statement of Undisputed Material Facts in support of its Response to Plaintiffs' Rule 56.1(a)(a) Statement of Material Undisputed Facts (D.E. 862). In addition to responding to each of Plaintiffs' numbered paragraphs in their Statement of Material Undisputed Facts, the United States under Local Civil Rule 56.1(a)(2) also submits additional paragraphs containing a statement of additional material facts as to which the United States contends there is a genuine dispute for trial.

For clarity in the record, in Plaintiffs' Statement of Material Facts (the "SOMF"), Plaintiffs generally use "testified" to signal that the quoted language is the witness's own words. Plaintiffs generally use "agreed" to signal that the quoted language is the words of the questioning attorney. The SOMF consists of quotations or paraphrases of testimony from the United States' retained and non–retained expert witnesses (and some fact witnesses). The SOMF repeatedly takes testimony out of context, ignores relevant prior or subsequent testimony, or relies on inadmissible testimony. Consistent with its obligations under Federal Rule of Civil Procedure Rule 56 and Local Civil Rule 56.1(a)(2), the United States has identified which material facts are undisputed and which are disputed while also identifying additional facts disputing the testimony Plaintiffs purport to offer in support of the Motion. All cited materials are filed as part of the Joint Appendix, in the Appendix in support of the SOMF, or in the Appendix in support of this Response in Opposition.

1

## I. United States' Responses to Plaintiffs' Statement of Facts

### Defendant's Claimed Future Offsets[1]

1. It is undisputed that Patricia Yount ("Ms. Yount") opined that, as of December 15, 2025, the present value of future disability benefits that Plaintiff Cagiano would receive from the Veterans Benefits Administration ("VBA") is $383,819. *See* Yount Rep. (Cagiano) at 3 (JA Ex. 719, D.E. 839–17).[2]

2. It is undisputed that Ms. Yount opined that, as of December 31, 2025, the present value of future disability benefits that Plaintiff Criswell would receive from the VBA is $599,976. *See* Yount Rep. (Criswell) at 3 (JA Ex. 720, D.E. 839–18).

3. It is undisputed that Ms. Yount opined that, as of December 15, 2025, the present value of future disability benefits that Plaintiff Laramore would receive from the VBA is $71,780. *See* Yount Rep. (Laramore) at 4 (JA Ex. 725, D.E. 839–23). It is also undisputed that Ms. Yount opined that, as of December 15, 2025, the present value of future medical expenses that Plaintiff Laramore would receive from TriWest and the Community Care Network ("CCN") ranges from $4,168 to $15,664, depending on whether the life care plan of the United States' or Plaintiffs' expert is used. *See id.* at 3.

4. It is undisputed that Ms. Yount opined that, as of December 31, 2025, the present value of future disability benefits that Plaintiff Downs would receive from the VBA is $43,120. *See* Yount Rep. (Downs) at 3 (JA Ex. 721, D.E. 839–19).

---

[1] The United States uses Plaintiffs' headings solely for the convenience of the Court and of the Parties; no admission is intended by doing so.

[2] All offsets were calculated as of the date of the relevant report. The United States reserves the right to update those calculations up to and including at the time of trial under Rule 26(e) of the Federal Rules of Civil Procedure.

5. It is undisputed that Ms. Yount opined that, as of December 31, 2025, the present value of future disability benefits that Plaintiff Fancher would receive from the VBA is $305,169. *See* Yount Rep. (Fancher) at 3 (JA Ex. 723, D.E. 839–21).

6. It is undisputed that Ms. Yount opined that, as of December 15, 2025, the present value of future disability benefits that Plaintiff Howard would receive from the VBA is $631,798. *See* Yount Rep. (Howard) at 4 (JA Ex. 724, D.E. 839–22).

7. It is undisputed that Ms. Yount opined that, as of December 15, 2025, the present value of future disability benefits that Plaintiff Mousser would receive from the VBA is $598,174. *See* Yount Rep. (Mousser) at 5 (JA Ex. 726, D.E. 839–24). It is also undisputed that Ms. Yount opined that, as of December 15, 2025, the present value of future medical expenses that Plaintiff Mousser would receive from the Veterans Health Administration ("VHA") ranged from $1,613 to $537,466, depending on whether the life care plan of the United States' or Plaintiffs' expert is used. *See id.* at 4.

8. It is undisputed that Ms. Yount opined that, as of December 15, 2025, the present value of future medical expenses that Plaintiff Tukes would receive from Medicare and TRICARE would range from $110,100 to $406,338, depending on whether the life care plan of the United States' or Plaintiffs' expert is used. *See* Yount Rep. (Tukes) at 4 (JA Ex. 727, D.E. 839–25).

9. It is undisputed that Dubravka Tosic ("Dr. Tosic") opined that, as of January 1, 2026, the present value of future disability benefits that Plaintiff Gleesing would receive from the VBA is $663,358. *See* Tosic Rep. (Gleesing) at 18 (JA Ex. 707, D.E. 839–5).

10. It is undisputed that Dr. Tosic opined that, as of January 1, 2026, the present value of future disability benefits that Plaintiff Hill would receive from the VBA is $279,227. *See* Tosic Rep. (Hill) at 23 (JA Ex. 708, D.E. 839–6). It is also undisputed that Ms. Tosic opined that, as of

3

January 1, 2026, the present value of future medical expenses that Plaintiff Hill would receive from the VHA ranges from $298,345 to $518,916, depending on whether the life care plan of the United States' or Plaintiffs' expert is used. *See id.* at 26. It is also undisputed that Ms. Tosic opined that, as of January 1, 2026, the present value of future medical expenses that Plaintiff Hill would receive from Medicare ranges from $84,969 to $316,870, depending on whether the life care plan of the United States' or Plaintiffs' expert is used. *See id.*

11.     It is undisputed that Dr. Tosic opined that, as of January 1, 2026, the present value of future disability benefits that Plaintiff Davis would receive from the VBA is $327,082. *See* Tosic Rep. (Davis) at 14 (JA Ex. 706, D.E. 839–4).

12.     It is undisputed that Dr. Tosic opined that, as of January 1, 2026, the present value of future disability benefits that Plaintiff Keller would receive from the VBA ranges from $506,582 to $823,058, depending on whether the trier of fact finds Plaintiff Keller's heart–related illnesses to be related to his alleged exposures at Camp Lejeune. *See* Tosic Rep. (Keller) at 21 (JA Ex. 709, D.E. 839–7).

13.     It is undisputed that Dr. Andrew Brod ("Dr. Brod") opined that, as of December 15, 2025, the present value of past and future disability benefits that Plaintiff McElhiney would receive from the VBA is $26,858. *See* Brod Rep. (McElhiney) at 6 (JA Ex. 641, D.E. 837–5). It is also undisputed that Dr. Brod opined that, as of December 15, 2025, the present value of future medical expenses that Plaintiff McElhiney would receive from Medicare and TRICARE ranges from $178,440 to $273,874, depending on whether the life care plan of the United States' or Plaintiffs' expert is used. *See id.* at 9. It is also undisputed that Dr. Brod opined that, as of December 15, 2025, the present value of future medical expenses that Plaintiff McElhiney would

receive from CCN and the VHA ranges from $532,501 to $1,372,014, depending on whether the life care plan of the United States' or Plaintiffs' expert is used. *See id.*

14.     It is undisputed that Dr. Brod opined that, as of December 15, 2025, the present value of past and future disability benefits that Plaintiff Peterson would receive from the VBA is $1,073,280. *See* Brod Rep. (Peterson) at 7 (JA Ex. 642, D.E. 837–6). It is also undisputed that Dr. Brod opined that, as of December 15, 2025, the present value of future medical expenses that Plaintiff Peterson would receive from Medicare ranges from $127,172 to $166,887, depending on whether the life care plan of the United States' or Plaintiffs' expert is used. *See id.* It is also undisputed that Dr. Brod opined that, as of December 15, 2025, the present value of future medical expenses that Plaintiff Peterson would receive from the VHA ranges from $398,577 to $1,167,169, depending on whether the life care plan of the United States' or Plaintiffs' expert is used. *See id.*

15.     It is undisputed that Dr. Brod opined that, as of December 15, 2025, the present value of future medical expenses that Plaintiff Rothchild would receive from Medicare ranges from $26,657 to $87,465, depending on whether the life care plan of the United States' or Plaintiffs' expert is used. *See* Brod Rep. (Rothchild) at 6 (JA Ex. 643, D.E. 837–7).

16.     It is undisputed that Dr. Brod opined that, as of December 15, 2025, the present value of past and future disability benefits that Plaintiff Sparks would receive from the VBA is $972,889. *See* Brod Rep. (Sparks) at 6 (JA Ex. 644, D.E. 837–8). It is also undisputed that Dr. Brod opined that, as of December 15, 2025, the present value of future medical expenses that Plaintiff Sparks would receive from the VHA ranges from $333,205 to $1,549,332, depending on whether the life care plan of the United States' or Plaintiffs' expert is used. *See id.*

17.     It is undisputed that Plaintiff Cagiano was rated as 100% disabled due to Papillary Urothelial Carcinoma, *inter alia*, on February 23, 2018. *See* Yount Rep. (Cagiano) at Table 3 (JA Ex. 719, D.E. 839–17 at 10).

18.     It is undisputed that Plaintiff Cagiano was rated as 30% disabled due to Papillary Urothelial Carcinoma, *inter alia*, on May 1, 2019. *See id.* It is undisputed that Plaintiff Cagiano was rated as 60% disabled due to Papillary Urothelial Carcinoma, *inter alia*, on July 19, 2019. *See id.*

19.     It is undisputed that Plaintiff Cagiano was rated as 100% disabled due to Prostate Cancer on August 10, 2022. *See id.* The United States disputes that Plaintiff Cagiano's Prostate Cancer is clinically related to his Track 1 illness or treatment for a Track 1 illness. *See* Ji Dep. Tr. at 65:9–66:19 (JA Ex. 778, D.E. 841–9). The United States notes the VBA **presumed** Plaintiff Cagiano's prostate cancer was related to his alleged exposures at Camp Lejeune. *See* Ji Rep. at 9 n.9 (JA Ex. 653, D.E. 837–17) (citing 00569_CAGIANO_VBA_0000003641–46).

20.     It is undisputed that Plaintiff Downs was rated as 10% disabled due to Lumbar Spine with Degenerative Changes on August 18, 2011. *See* Yount Rep. (Downs) at Table 3 (JA Ex. 721, D.E. 839–19 at 10). It is also undisputed that Plaintiff Downs was rated as 20% disabled due to Lumbar Spine with Degenerative Changes on November 28, 2016. *See id.*

### Testimony of Defendant's Government Agency Experts

Andrew McIlroy

21.     Undisputed.

22.     Undisputed.

23.     Undisputed.

6

24.     Disputed. The United States objects to this statement as incomplete and misleading. Mr. McIlroy testified that "[t]here is a gap, yes, between what is needed and what is funded" as to estimated replacement or investment in facilities. McIlroy Dep. Tr. at 45:17–46:8 (JA Ex. 779, D.E. 841–10). Additionally, the SOMF improperly uses the vague term "those projects," which lacks specificity and gives an impression that Mr. McIlroy was referring to overall funding.

25.     Undisputed.

26.     Undisputed.

27.     It is undisputed that Mr. McIlroy testified as follows: "So for VBA or VHA it has traditionally been a discretionary fund. Whereas, the benefits funding was always a mandatory fund, but the [Toxic Exposure Fund] is also classified as a mandatory fund. So that was one of the new things about the [Toxic Exposure Fund]." *Id.* at 35:24–36:5.

28.     Undisputed.

29.     Undisputed.

30.     Undisputed.

31.     Undisputed.

32.     It is undisputed that Mr. McIlroy agreed that it is "logical" that if "other variables remain the same," but the mandatory spending increased by the Department of Veterans Affairs (the "VA"), "the deficit would also increase." *Id.* at 81:16–19. However, it is disputed to the extent Mr. McIlroy clarified that there are "many factors" that "go into the deficit calculations" of the United States' general fund, *id.* at 81:5–7, and that the general fund includes more than the benefits programs administered by the VA. *Id.* at 55:5–23.

33.     Undisputed.

34. Disputed. The United States objects to this statement as incomplete and misleading. Mr. McIlroy's testimony concerned whether he anticipated offering individual plaintiff–specific testimony at trial. *See id.* at 66:12–22, 68:2–10. Mr. McIlroy also testified that estimating future benefits for individuals would be a "***mathematical calculation*** … ***somebody could [do] if they had the proper data***," but that he personally did not have that data. *Id.* at 182:24–183:11 (emphasis added).

35. Undisputed.

36. Disputed. The United States objects to this statement as incomplete. Mr. McIlroy testified that estimating future benefits for individuals would be a "mathematical calculation" that "[s]omebody could [do] if they had the proper data," but that he did not have that data. *Id.* at 182:24–183:11. While it is undisputed that Mr. McIlroy offers no opinions about how damages calculations should be performed, *id.* at 68:17-20, Plaintiffs omit his subsequent testimony.

37. Undisputed.

38. Undisputed.

39. Disputed. The United States objects to this statement as incomplete and misleading. Mr. McIlroy was asked: "Is it within Congress's power to choose not to fund those benefits entirely?" Mr. McIlroy testified that: "Generally, Congress can do whatever it wants. ***Historically, they have always funded veteran benefits, though***." *Id.* at 86:3–7 (emphasis added).

40. Undisputed.

41. Undisputed.

42. Disputed. The United States objects to this statement as misleading. Mr. McIlroy was asked: "So while current law creates an appropriated entitlement structure, future law could

reduce or restrict those benefits, correct?" He answered: "The law could change in the future. That is true." *Id.* at 100:5–9.

43.     Disputed. The United States objects to this statement as misleading. While Mr. McIlroy did agree that Congress has to approve the cost–of–living adjustment to VBA disability benefits each year, and that presumably it is within Congress's authority not to do so, he also agreed those rates have "***always increased***" in his experience. *Id.* at 150:14–16 (emphasis added).

44.     Undisputed.

45.     Undisputed, except that Mr. McIlroy testified that "would depend on the rating [schedule], but, theoretically, yes." *Id.* at 152:2–4.

46.     Disputed. The United States objects to this statement as incomplete and misleading. Mr. McIlroy testified that the VA has a "variety of ways to implement such a rating change[,]" including that: "They might grandfather the veteran . . . so that ***veterans wouldn't receive a reduction in ratings*** but . . . there's a variety of ways to implement such changes if they were to be made." *Id.* at 152:5–23 (emphasis added). While Mr. McIlroy agreed it was "possible" for a rating change to reduce a veteran's benefits, he made clear that the VA had ways to avoid that effect. *See id.*

47.     Undisputed.

48.     Disputed. The United States objects to any purported reliance on any legal conclusions in Mr. McIlroy's testimony concerning the scope of Congress's powers to enact laws affecting veterans' benefits. Legal opinions are not helpful to this Court as the trier of fact—and thus are inadmissible—and Mr. McIlroy lacks any legal expertise whatsoever. Because a motion for summary judgment can only be supported by admissible evidence, *see* Fed. R. Civ. P. 56(c),

9

Plaintiffs' Motion cannot rely on Mr. McIlroy's testimony concerning Congress's powers to enact laws affecting veterans' benefits.

49. Disputed. The United States objects to any purported reliance on any legal conclusions in Mr. McIlroy's testimony concerning the scope of Congress's powers to enact retroactive laws to veterans' benefits. Legal opinions are not helpful to this Court as the trier of fact—and thus are inadmissible—and Mr. McIlroy lacks any legal expertise whatsoever. Because a motion for summary judgment can only be supported by admissible evidence, *see* Fed. R. Civ. P. 56(c), Plaintiffs' Motion cannot rely on Mr. McIlroy's testimony concerning retroactivity.

50. Undisputed, except that Mr. McIlroy was asked earlier: "Is it within Congress's power to chosen not to fund those benefits entirely?" He testified that: "Generally, Congress can do whatever it wants. ***Historically, they have always funded veteran benefits, though***." McIlroy Dep. Tr. at 86:3–7 (JA Ex. 779, D.E. 841-10) (emphasis added).

51. Undisputed, except that Mr. McIlroy was asked earlier: "Is it within Congress's power to choose not to fund those benefits entirely?" He testified that: "Generally, Congress can do whatever it wants. ***Historically, they have always funded veteran benefits, though***." *Id.* at 86:3–7 (emphasis added).

52. Undisputed.

53. Undisputed.

54. Disputed. The United States objects to this statement as incomplete and misleading. Mr. McIlroy testified that he believed the VA's actuarial analysis to be of high quality and that the VA actuaries meet professional licensing standards, though he deferred to the actuaries themselves as to their qualifications and licensure. *Id.* at 170:10–171:3. He further testified that the VA actuaries "deal every day with VA data" and have a "deep and rich understanding of the programs,"

which allows them to make "***reasonable estimates based on that deep and rich understanding of the data***." *Id.* at 171:5–20 (emphasis added).

55.     Disputed. The United States objects to this statement as incomplete and misleading. While Mr. McIlroy agreed that estimating the value of an individual recipient's benefits in the future is subject to assumptions inherent in a future projection, he testified: "So you asked me about my ability to estimate future costs for individuals. I personally cannot do that because I don't have the data, but you know, ***it's a mathematical calculation. Somebody could if they had the proper data***." *Id.* at 183:3–16 (emphasis added).

56.     Undisputed. Mr. McIlroy further explained that any benefits to survivors are based on separate entitlements based on separate criteria. *Id.* at 174:24–175:9.

57.     Undisputed.

58.     Undisputed.

59.     Undisputed.

60.     Disputed. The United States objects to this statement as incomplete and misleading. While it is undisputed that Mr. McIlroy agreed there are ways that the amount of veterans' benefits change (*id.* at 176:13–177:2), he qualified as follows: "***There are some limited ways that benefits could change***." *Id.* at 177:7–12 (emphasis added).

Heather A. Ford

61.     Undisputed.

62.     Undisputed.

63.     Undisputed.

64.     Undisputed.

65. Disputed. It is undisputed that Ms. Ford testified that the Medical Services account of the VHA's budget predominantly includes "health care within the VA system[,]" which would include "doctors, nurses, health care delivery" but "not necessarily some of the facility–related costs." Ford Dep. Tr. at 79: 1–20 (JA Ex. 773, D.E. 841–4). It is also undisputed that Ms. Ford agreed that, for the Medical Services account, VHA requested approximately $12 billion dollars less in *discretionary funding* for 2026. *Id.* at 80:9–14. However, VHA requested approximately $92.49 billion dollars in funding for Medical Services *from all funding sources*. *See* Ford Dep. Ex. 8 at BiB–7, BiB–13 (attached to Appendix as **Exhibit A**).[3] That was approximately $11.477 billion dollars more than enacted in 2025, a 14.2% increase. *See id.* The increase resulted because VHA asked for more funding for Medical Services under the Costs of War Toxic Exposures Fund, which falls under mandatory funding. *See id.* at BiB-5. In sum, therefore, VHA requested a greater amount in 2026 for the Medical Services account from all funding sources.

66. Undisputed, except that Ms. Ford also clarified that "[t]here could be a lot of reasons for that [i.e., the VHA's request to Congress for funding for the Medical Services account] to go down in terms of changes in health care demand. It could be lots of staff that attrited. There could be several reasons for that." Ford Dep. Tr. at 80:15-20 (JA Ex. 773, D.E. 841–4). To the extent that this statement is based on the premise that the Medical Services account budget request decreased in 2026, the United States objects for the same reasons as stated in response to paragraph 65.

---

[3] This document is authentic and admissible. *See* CMO No. 2, D.E. 23, at 7 (Section X) (stating government records, documents, data, and studies are self-authenticating and admissible, absent a specific dispute being raised as to authenticity or admissibility before the close of fact discovery). Plaintiffs used the document as Ford Dep. Exhibit 8 at Ms. Ford's deposition and did not object to the authenticity or admissibility of the document during damages and offsets discovery. Thus, the Court may properly consider it for the purposes of the Motion. *See also* Fed. R. Evid. 803(8).

67. Disputed. The United States objects to this statement as inadmissible, incomplete, and misleading. First, Ms. Ford's "personal opinion" on policy matters does not tend to make more or less probable any fact of consequence to this litigation. It is categorically irrelevant and inadmissible. *See* Fed. R. Evid. 401, 402; *see also* Fed. R. Civ. P. 56(c)(2) (a motion for summary judgment can only be based on admissible evidence). Second, Ms. Ford testified that she had no professional or expert opinion about whether the cancellation of certain government contracts affected veterans. Ford Dep. Tr. at 87:8–90:11 (JA Ex. 773, D.E. 841–4). Third, the statement inaccurately quotes Ms. Ford's testimony, which reads: "I felt that in some cases there may have been hasty decisions made without a full understanding of impacts, *but that was not just for the VA but government–wide.*" *Id.* at 89:20-91:11 (emphasis added). The statement omits the italicized text.

68. Disputed. The United States objects to this statement as inadmissible and irrelevant. This line of questioning concerns political reaction from unidentified "lawmakers and veteran advocacy groups" concerning the cancellation of certain government contracts without any factual relationship to the Track 1 Trial Plaintiffs. It therefore does not have any tendency to make any fact of consequence more or less probable as a categorical matter. *See* Fed. R. Evid. 401, 402; *see also* Fed. R. Civ. P. 56(c)(2). Thus, it cannot be considered for purposes of the Motion.

69. Undisputed.

70. Undisputed.

71. Undisputed.

72. Disputed. The United States objects to any purported reliance on Ms. Ford's testimony concerning the scope of Congress's authority to amend or repeal federal statutes. Legal opinions are not helpful to this Court as the trier of fact—and thus are inadmissible—and Ms. Ford

lacks any legal expertise whatsoever. Because a motion for summary judgment can only be supported by admissible evidence, *see* Fed. R. Civ. P. 56(c), Plaintiffs' Motion cannot rely on Ms. Ford's testimony concerning the scope of Congress's authority to amend or repeal federal statutes.

73. Undisputed.

74. Undisputed.

75. Disputed. The United States objects to any purported reliance on Ms. Ford's testimony concerning the scope of Congress's authority to amend or repeal federal statutes. Legal opinions are not helpful to this Court as the trier of fact—and thus are inadmissible—and Ms. Ford lacks any legal expertise whatsoever. Because a motion for summary judgment can only be supported by admissible evidence, *see* Fed. R. Civ. P. 56(c), Plaintiffs' Motion cannot rely on Ms. Ford's testimony concerning the scope of Congress's authority to amend or repeal federal statutes.

76. Undisputed.

77. Disputed. The United States objects to any purported reliance on Ms. Ford's testimony concerning the scope of Congress's authority to amend or repeal federal statutes, including mandatory funding statutes. Legal opinions are not helpful to this Court as the trier of fact—and thus are inadmissible—and Ms. Ford lacks any legal expertise whatsoever. Because a motion for summary judgment can only be supported by admissible evidence, *see* Fed. R. Civ. P. 56(c), Plaintiffs' Motion cannot rely on Ms. Ford's testimony concerning the scope of Congress's authority to amend or repeal federal statutes.

78. Undisputed.

79. Disputed. The United States objects to any purported reliance on Ms. Ford's testimony concerning the scope of Congress's authority to amend or repeal federal statutes, including rescinding unobligated mandatory balances. Legal opinions are not helpful to this Court

14

as the trier of fact—and thus are inadmissible—and Ms. Ford lacks any legal expertise whatsoever. Because a motion for summary judgment can only be supported by admissible evidence, *see* Fed. R. Civ. P. 56(c), Plaintiffs' Motion cannot rely on Ms. Ford's testimony concerning the scope of Congress's authority to amend or repeal federal statutes.

80. Disputed. The United States objects to any purported reliance on Ms. Ford's testimony concerning the scope of Congress's authority to amend or repeal federal statutes, including eligibility categories. Legal opinions are not helpful to this Court as the trier of fact— and thus are inadmissible—and Ms. Ford lacks any legal expertise whatsoever. Because a motion for summary judgment can only be supported by admissible evidence, *see* Fed. R. Civ. P. 56(c), Plaintiffs' Motion cannot rely on Ms. Ford's testimony concerning the scope of Congress's authority to amend or repeal federal statutes.

81. Disputed. The United States objects to any purported reliance on Ms. Ford's testimony concerning the scope of Congress's authority to amend or repeal federal statutes, including copayment exemptions. Legal opinions are not helpful to this Court as the trier of fact— and thus are inadmissible—and Ms. Ford lacks any legal expertise whatsoever. Because a motion for summary judgment can only be supported by admissible evidence, *see* Fed. R. Civ. P. 56(c), Plaintiffs' Motion cannot rely on Ms. Ford's testimony concerning the scope of Congress's authority to amend or repeal federal statutes.

82. Disputed. The United States objects to any purported reliance on Ms. Ford's testimony concerning the scope of Congress's authority to revise legislation. Legal opinions are not helpful to this Court as the trier of fact—and thus are inadmissible—and Ms. Ford lacks any legal expertise whatsoever. Because a motion for summary judgment can only be supported by

15

admissible evidence, *see* Fed. R. Civ. P. 56(c), Plaintiffs' Motion cannot rely on Ms. Ford's testimony concerning the scope of Congress's authority to revise legislation.

83. Disputed. The United States objects to any purported reliance on Ms. Ford's testimony concerning the scope of Congress's authority to change the VA's reimbursement methodologies or formulas as it relates to CCN. Legal opinions are not helpful to this Court as the trier of fact—and thus are inadmissible—and Ms. Ford lacks any legal expertise whatsoever. Because a motion for summary judgment can only be supported by admissible evidence, *see* Fed. R. Civ. P. 56(c), Plaintiffs' Motion cannot rely on Ms. Ford's testimony concerning the scope of Congress's authority to change statutes or regulations.

84. Undisputed.

85. Undisputed.

86. Disputed. The United States objects to this statement as incomplete and misleading. Ms. Ford testified that the "***funding [VA] request[s] is sufficient to provide health care for that fiscal year***" and the "***amount that [VA] request[s] and then is appropriated typically is . . . matches what we requested and is sufficient to provide health care***" for the fiscal year. *Id.* at 106:8–17 (emphases added). Omitting this subsequent testimony generates a misleading impression that Congress does not typically provide sufficient funding to the VA for the relevant fiscal year.

87. Disputed. The United States objects to this statement as incomplete and misleading. Ms. Ford testified that the "***funding [VA] request[s] is sufficient to provide health care for that fiscal year***" and the "***amount that [VA] request[s] and then is appropriated typically is . . . matches what we requested and is sufficient to provide health care***" for the fiscal year. *Id.* at 106:8–17 (emphases added). Omitting this subsequent testimony generates a misleading

16

impression that Congress does not typically provide sufficient funding to the VA for the relevant fiscal year.

88.     Undisputed.

89.     Undisputed.

90.     Undisputed.

91.     Undisputed.

92.     Disputed. The United States objects to this statement as incomplete and misleading. Ms. Ford agreed there are "likely" vacancies "within those areas" (i.e., physicians, nurses, and specialty providers), but that she "can't speak to specific vacancies." *Id.* at 184:24–185:19.

93.     Undisputed.

94.     Disputed. The United States objects to this statement as incomplete and misleading. Ms. Ford was clear that whether VHA's direct care facilities are fully staffed "would be a facility–by–facility question." *Id.* at 109:1–21. While she "generally agree[d]" with the broad statement that "[s]ome are fully staffed perhaps and some are not[,]" that answer remained subject to her contemporaneous testimony that whether or not VHA direct care facilities are fully staffed "depends on the facility." Plaintiffs' counsel never asked questions about specific facilities, much less specific facilities that served any of the Track 1 Trial Plaintiffs. *Id.* at 109:12–110:1.

95.     Undisputed.

96.     Undisputed.

97.     Undisputed.

98.     Undisputed.

99.     Undisputed.

100.    Undisputed.

17

101. Undisputed.

102. It is undisputed that Ms. Ford testified as follows: "I would describe it as it's possible that people requested positions be added at some point in time with the intent to fill those positions, but those positions were never filled for whatever reasons, and so they have essentially been sitting on our manning document or personnel document . . . . And given that they have been, let's say, vacant for 10 years, they were removed because they were . . . they were seen as not being needed because they had been unfilled." *Id.* at 189:16–190:13.

103. Undisputed.

104. Disputed. The United States objects to this statement as incomplete and misleading. Plaintiffs present this statement as generally applicable to VHA facilities or healthcare, but in fact Ms. Ford's testimony was limited to healthcare provided under CCN, which allows veterans to receive health care outside of VA facilities. *See id.* at 113:1–114:7.

105. Undisputed.

106. Disputed. It is undisputed that Ms. Ford stated: "I believe there's general knowledge that VHA has high–risk issues, as identified by GAO." *Id.* at 184:16–23. However, the term "high–risk issues" is vague and thus it is unclear what Ms. Ford references or how it may be relevant to any of the issues that are raised in the Motion.

107. Undisputed.

108. Undisputed.

109. Undisputed.

110. Undisputed.

111. Undisputed.

112. Undisputed.

113. Disputed. The United States objects to this statement as incomplete and misleading. Ms. Ford was testifying in reference to specific community care staff needs referenced in a specific GAO report. *Id.* at 166:16:23 (the question references "needs . . . identified in this GAO report").

114. Undisputed.

115. Undisputed.

116. It is undisputed that Ms. Ford testified: "I would agree that for the ability to access care within the VA direct care system[,] that could have an impact." *Id.* at 214:13–21.

117. Undisputed.

118. Undisputed.

119. Disputed. The United States objects to this statement as incomplete and misleading. Ms. Ford testified: "I can't say with certainty, but also access to care is in the metrics, and a lot of what we've discussed today is not within the purview of the Office of Finance in terms of how that could change or be impacted out." *Id.* at 201:11–24.

120. Disputed. The United States objects to this statement as incomplete and misleading. Ms. Ford testified: "So we would certainly look at access to – or workload data from a facility perspective. However, sometimes impacts are not felt immediately. They are felt over time and so, again, ***today I could not say whether or not there would be a budgetary impact without seeing data and what that would look like.***" *Id.* at 202:2–11 (emphasis added). Ms. Ford then testified: "If we changed metrics or a policy change or staffing changes, I would want to see the workload data to better understand the impacts of that because there's a lot of variables that go into development of a budget and the allocation of resources." *Id.* at 202:12–19.

121. Disputed. The United States objects to this statement as incomplete and misleading. While it is undisputed that Ms. Ford could not "guarantee" the future, immediately before that

testimony, Ms. Ford agreed that it remained her opinion that "***the general scope of care and eligibility for care for veterans is unlikely to be significantly constricted in the future***[,]" despite the "deficiencies and high–risk designations and issues that we've discussed today[.]" *Id.* at 203:16–24 (emphasis added).

122.    Undisputed.

123.    Undisputed.

124.    Undisputed.

125.    Undisputed.

126.    Undisputed, except that VHA's 2026 budget requested approximately $342 million dollars to support the VHA Office of Rural Health and noted that 61% of rural veterans are enrolled in VHA, compared to 41% of urban veterans. *See* Ex. A at BiB–21 (noting that rural veterans receive more of their healthcare from VHA). The term "rural veterans" is also vague, and the statement fails to cite evidence that any of the Track 1 Trial Plaintiffs qualify as such.

127.    Undisputed.

128.    Disputed. The United States objects to this statement because "timely access to care" is vague and inherently would turn on fact–intensive circumstances.

129.    Disputed. The United States objects to this statement because "access to quality care" is vague and inherently would turn on fact–intensive circumstances.

130.    Disputed. The United States objects to any purported reliance on Ms. Ford's testimony concerning the scope of Congress's authority to reduce, modify, or increase eligibility for veterans by statute. Legal opinions are not helpful to this Court as the trier of fact—and thus are inadmissible—and Ms. Ford lacks any legal expertise whatsoever. Because a motion for summary judgment can only be supported by admissible evidence, *see* Fed. R. Civ. P. 56(c),

Plaintiffs' Motion cannot rely on Ms. Ford's testimony concerning the scope of Congress's authority to reduce, modify, or increase eligibility for veterans by statute.

131.    Undisputed.

Larry Young

132.    Undisputed.

133.    It is undisputed that Mr. Young is the Deputy Chief Financial Officer and Deputy Director for the Office of Financial Management for the Centers for Medicare & Medicaid Services ("CMS"). Young Dep. Tr. at 9:17–25 (JA Ex. 788, D.E. 841–1).

134.    Undisputed.

135.    Undisputed.

136.    Undisputed.

137.    Undisputed, except that the citation provided is incomplete. *See id.* at 45:23–47:7 (Mr. Young testifying that the Medicare Part A trust fund is funded through payroll taxes).

138.    Disputed. The United States objects to this statement as incomplete. Mr. Young testified that Medicare Part B is "funded through . . . a combination of both general tax revenues, income taxes, if you will, for example, *and premiums*." *Id.* at 48:4–19 (emphasis added). However, it is undisputed that Part B is funded separately from Part A. *See id.*

139.    Disputed. The United States objects to this statement as inaccurate. Mr. Young testified that Medicare Part B premiums are set by formula. *Id.* at 48:4–19. The Part B premium "is set every year such that it's actuarially *comprised*, I believe it's 25 percent of the expected benefit payout. And then the trust fund and tax revenues have to make up the other 75 percent." *Id.* (emphasis added). The statement incorrectly uses the word "compromised."

140.    Undisputed.

21

141. Undisputed.

142. Undisputed.

143. Undisputed.

144. Disputed. The United States objects to any purported reliance on Mr. Young's testimony concerning the scope of Congress's "authority to amend Medicare statutes." Legal opinions are not helpful to this Court as the trier of fact—and thus are inadmissible—and Mr. Young lacks any legal expertise whatsoever. Because a motion for summary judgment can only be supported by admissible evidence, *see* Fed. R. Civ. P. 56(c), Plaintiffs' Motion cannot rely on Mr. Young's testimony concerning the scope of Congress's authority to amend statutes.

145. Disputed. The United States objects to any purported reliance on Mr. Young's testimony concerning the scope of Congress's ability to "enact changes that affect . . . future Medicare coverage and reimbursement levels." Legal opinions are not helpful to this Court as the trier of fact—and thus are inadmissible—and Mr. Young lacks any legal expertise whatsoever. Because a motion for summary judgment can only be supported by admissible evidence, *see* Fed. R. Civ. P. 56(c), Plaintiffs' Motion cannot rely on Mr. Young's testimony concerning the scope of Congress's authority to amend statutes.

146. Undisputed.

147. Undisputed.

148. Undisputed.

149. Undisputed.

150. Undisputed.

151. Undisputed.

22

152. Disputed. The United States objects to this statement as misleading. The sections quoted by Plaintiffs appear multiple pages apart in Mr. Young's deposition transcript. Mr. Young testified that "you can speculate on different things that Congress at the time could elect to do" in response to Plaintiffs' question about an entirely different portion of the Trustees' Report, which stated that "[t]he expenditure projections reflect the cost–reduction provisions required under current law but not the payment reductions and/or delays that would result from the HI trust fund depletion, which is projected in this report to occur in 2033. At that point, HI revenues are projected to cover 89 percent of incurred program costs." Young Dep. Tr. at 75:9–77:16 (JA Ex. 788, D.E. 841–1) (HI refers to "Hospital Insurance").

153. It is undisputed that that this sentence appears in the 2025 Annual Report of the Boards of Trustees of the Federal Hospital Insurance and Federal Supplementary Medical Insurance Trust Funds. The United States objects to the remainder of this statement as misleading. Mr. Young was asked: "And so that depletion down to zero — to a zero trust fund balance, under high–cost assumptions could occur as early as 2029, three years from where we are now? Is that true?" In response, Mr. Young testified: "That is what that sentence says. But I will also add that the sentence at the beginning of the paragraph points out 'There is substantial uncertainty in the economic, demographic, and healthcare projection factors for the HI trust fund expenditures and revenue.' So it's very difficult to say with a degree of certainty what will or will not happen, necessarily." *Id.* at 82:25–83:14.

154. Undisputed.

155. Undisputed.

156. Undisputed.

157. Undisputed.

158. Undisputed.

159. It is undisputed that the 2025 Annual Report of the Boards of Trustees of the Federal Hospital Insurance and Federal Supplementary Medical Insurance Trust Funds states that "Medicare's actual future costs are highly uncertain for reasons apart from the inherent challenges in projecting health care cost growth over time," and that Plaintiffs' counsel asked Mr. Young to read this sentence out loud. Young Dep. Tr. at 92:1–7 (JA Ex. 788, D.E. 841–1). Mr. Young further testified, however, that he could not "speculate" as to "why Medicare's actual future costs are so highly uncertain." *Id.* at 92:8–13.

160. Undisputed.

161. Undisputed.

162. Undisputed.

163. Undisputed.

164. Undisputed.

165. Disputed. The United States objects to any purported reliance on Mr. Young's testimony concerning what "variable[s] a physician would . . . consider" in determining whether to participate in Medicare programs. Because Mr. Young is not a physician, this testimony requires speculation as to the state of mind of another person, as evidenced by his answer: "[T]hat's one variable a physician undoubtedly would consider, *I would imagine.*" *Id.* at 107:19–108:2 (emphasis added). Plaintiffs' Motion cannot rely on Mr. Young's testimony concerning the state of mind of other persons, including unidentified physicians.

166. Disputed. The United States objects to this statement as misleading. Mr. Young was asked, "Would reducing covered services also be a way to reduce expenditures?" Mr. Young answered: "Again, there's many possible variables that Congress could choose to — choose to

elect." *Id.* at 98:14–20. He testified that reducing covered services is "one of" the "many possible variables that Congress could choose to . . . elect" to reduce expenditures. *Id.* at 98:14–25.

167. Undisputed.

168. Undisputed.

169. It is undisputed that Mr. Young was asked: "And so if a [Medicare] recipient cannot afford to pay the premiums associated with their coverage, they lose coverage. Is that true?" Mr. Young answered: "Yes, it's possible. They cannot — if they cannot afford to pay their premiums — as I mentioned earlier, for those people that are financially disadvantaged, and if you may be entitled to both Medicare and Medicaid, then Medicaid will actually help pay your premiums for the Medicare program." *Id.* at 127:7–16.

170. Undisputed.

171. Undisputed.

172. Undisputed.

<u>Richard Ruck, M.D.</u>

173. Undisputed.

174. Undisputed.

175. It is undisputed that Dr. Ruck testified as follows: "The cost fee schedules are determined by Congress. They're up through 2027. They are there – they have been published. As far as what they will be after that, you know, Congress will – will set them based upon – you know, they will either issue . . . a new ten–year plan or they will put out . . . any yearly changes to that fee structure based upon health care costs across the country, et cetera." Ruck Dep. Tr. at 26:23–27:15 (JA Ex. 782, D.E. 841–13). It is also undisputed Dr. Ruck testified he does not know costs and fees "after 2027" because "we do not have a fee structure for that." *Id.* at 27:17–23.

176. Undisputed.

177. Disputed. The United States objects to this statement. The United States disclosed Dr. Ruck as a non–retained expert under Rule 26(a)(2)(C) of the Federal Rules of Civil Procedure concerning TRICARE, not the VA. This statement inappropriately concerns testimony about the VA, which exceeds the scope of Dr. Ruck's disclosure and therefore is inadmissible.

178. Disputed. The United States objects to this statement as incomplete and misleading. Dr. Ruck testified: "Yes, depending on the – on which, you know, they are Prime or Select, then, yes. You know, the amount would change, but, yes, they do have" deductibles, copayments, premiums, enrollment fees, and coinsurance for TRICARE beneficiaries. *Id.* at 72:4–19.

179. Undisputed.

180. Undisputed. For clarity, Dr. Ruck testified in full: "Yes, in some circumstances it can or if they remarry." *Id.* at 76:10–15.

181. Undisputed.

182. Undisputed.

183. Undisputed, except that Dr. Ruck explained: "Yes. It's 21, unless you are … in an institute of higher learning, in which case you can continue to age 23. Between 23 and 26, they are, in most cases, eligible for the TRICARE Young Adult Program. And they can also be eligible if they declared – if they are a dependent adult, who . . . relies on their parents who have the benefit and they can then remain eligible for their entire life." *Id.* at 77:5–17.

184. It is undisputed that Dr. Ruck testified that Congress has required that TRICARE health benefits be safe, effective, and medically necessary. *See id.* at 82:7–83:1.

185. Undisputed.

186. Disputed. The United States objects to this statement as incomplete and misleading. Asked if Congress can make changes to limit coverage under TRICARE, Dr. Ruck testified: "It is – it is possible they could do so. *I said most of the time when they make a change is to add a benefit*." *Id.* at 85:8–14 (emphasis added).

187. Undisputed.

188. Undisputed.

189. Undisputed, except that Dr. Ruck testified that catastrophic caps and cost sharing payments are "still much lower than what you would find in most commercial health plans, if you were to try to get your own health insurance. But, yes, they are increased from what they were previous." *Id.* at 100:8–17.

190. It is undisputed that Dr. Ruck was asked if, effective January 1st, 2026, TRICARE beneficiaries are subjected to an increase in their pharmacy copayments, and that he testified: "Yes, *there's a slight increase for home delivery and retail network pharmacy drugs*. The MTF is still free." *Id.* at 102:2–11 (emphasis added); *see also id.* at 71:17–18 (MTF refers to "military treatment facility").

191. Undisputed.

192. Disputed. The United States objects to this statement as incomplete and misleading. Dr. Ruck earlier testified as follows: "[I]f you go to a nonnetwork provider without a referral, meaning – so *if the managed care support contractor sends you to them [i.e., a nonnetwork provider], then the fee structure is the same*. If you – if you go to that because you elect to . . . then your fee structure is higher." *Id.* at 104:15–105:10 (emphasis added).

193. Undisputed.

Case 7:23-cv-00897-RJ     Document 879     Filed 06/02/26     Page 27 of 70

194.    Undisputed.

195.    It is undisputed that Ms. Piper testified her current job title is "[A]cting A[ssistant] [D]irector of the [C]ompensation [S]ervice [P]olicy [S]taff." Piper Dep. Tr. at 36:19–23 (JA Ex. 781, D.E. 841–12).

196.    Undisputed.

197.    Undisputed. *See also id.* at 71:19–21 ("We're updating the letter language to ensure that it's in compliance with the law.").

198.    Disputed. The United States objects to this statement as incomplete and misleading. Ms. Piper testified that letter modification "does not change the . . . administration of the benefit. It is usually just tweaking the language to ensure that we're now incorporating new information." *Id.* at 71:22–72:24. She also testified that "sometimes" the VBA "may have to take something out." *Id.* at 72:24–73:1. While she stated that it is "possible" that some modifications are related to how benefits are administered and others are not, *id.* at 74:2–6, in context, Ms. Piper's testimony referred to whether new benefits are added or removed. This statement gives a misleading impression that modifications change *how* existing benefits are administered.

199.    Undisputed.

200.    Undisputed.

201.    Undisputed.

202.    Undisputed.

203.    Undisputed. For completeness, Ms. Piper testified: "It's close to completion, but last time I checked it's not been a full comprehensive update, but it's close to being fully updated." *Id.* at 91:14–21.

204. It is undisputed that Ms. Piper testified: "They're in the process of making sure that all of the updates have been completed one time. Like, so one iteration that would involve all of the disability benefits[,] that has not happened yet. The last time that has occurred was in 1945 or that's the first – it has never happened. We're close to completing it." *Id.* at 90:19–25. To clarify the record, the reference to "other limited updates that have been issued over the last 80 years" is counsel's characterization, not Ms. Piper's testimony.

205. Undisputed.

206. Undisputed.

207. Undisputed.

208. Undisputed, except that Ms. Piper further explained: "You know, sometimes they usually don't get better, they get worse. So what you're saying is that we are basically looking at something and now it has gotten worse." *Id.* at 105:11–24.

209. Undisputed.

210. Undisputed. For clarity in the record, the "particular benefit change" is referenced elsewhere and Ms. Piper testified that "I would just have to look at it." *See id.* at 110:9–111:10. The cited lines of Ms. Piper's transcript do not contain the reference to the particular change.

211. Undisputed.

212. Undisputed.

213. It is undisputed that Ms. Piper testified: "Yes. Like, if we are – depending on – I mean, I don't know if you want to talk about the types of changes. So, like, if you're adding a dependent, removing a dependent. But, yes, we would – our award lines would change for anything that happened, it would cause a change whether position or negative. But, yes, a change would occur." *Id.* at 112:11–20.

214. Undisputed.

215. Undisputed, except that Ms. Piper elaborated: "[P]otentially . . . if something were to happen with the case, so . . . if the veteran files a claim, it may or may not change the current benefit . . . . Not that it just changes on its own, but it has to be something that happens to cause it to change." *Id.* at 118:5–17.

216. Disputed. The United States objects to this statement as incomplete and misleading. Ms. Piper was asked if the "cadence" of changes to an individual's benefits are "set in stone and required to continue into the rest of the future indefinitely." She testified: "Without looking . . . like I said, . . . everyone has a case by case basis. So without looking to see is I feel like – well, I know you can't just make a generalization without knowing . . . . But without looking at their case, I can't tell you that" as a "general blanket statement for all of them[.]" *Id.* at 119:11–120:6. Asked to comment on Plaintiff Keller's specific case, Ms. Piper testified: "Right. Based off that without knowing … what is going on . . . if it's nothing that happened, like there's nothing in the record to indicate that something was going to happen in the future, we would say that this would continue to increase every 12 months. But who's to say that Mr. Keller didn't file something in June of 2025. [W]ithout taking a . . . well, I know that I can't just say a blanketed statement because we don't know what will occur in the future." *Id.* at 120:16–121:14.

217. Undisputed.

218. Undisputed.

219. Undisputed.

220. Undisputed.

221. Undisputed.

222. Undisputed.

223.     Undisputed.

224.     Disputed. The United States objects to this statement as incomplete and misleading. Ms. Piper testified that, for veterans age 55 and over, the VBA "would not request a routine future examination to look at the current state given the veteran's age[,]" unless "they have a condition in which the medical evidence shows that it's temporary in nature[.]" *Id.* at 242:21–243:12. Ms. Piper testified: "It could change [for veterans age 55 and over], but it's ***highly unlikely that it would change.***" *Id.* at 243:5–12 (emphasis added). This statement omits this immediately prior testimony.

225.     Disputed. The United States objects to this statement as incomplete and misleading. Ms. Piper further testified that "again, it usually takes two examination[s] of improvement before we would even propose to reduce an evaluation" and decisions are based on "current medical evidence[.]" *Id.* at 245:11–246:14. This statement omits this immediately following testimony.

226.     Disputed. The United States objects to this statement as incomplete and misleading. Ms. Piper testified that decisions are based on "current medical evidence[.]" *Id.* at 246:3–14. This statement gives a misleading impression that the VBA's decision is arbitrary.

227.     Undisputed.

228.     Undisputed.

229.     Undisputed.

230.     Undisputed.

231.     Undisputed.

232.     Undisputed.

233.     Undisputed.

234.     Undisputed.

235. Undisputed.

236. Undisputed.

**<u>Testimony of Defendant's Economic Experts</u>**

<u>Dr. Henry Miller</u>

237. Undisputed.

238. Undisputed.

239. Undisputed.

240. Undisputed.

241. It is undisputed that Dr. Miller did not "check" the "math" or review the reports of the United States' retained economists. Miller Dep. Tr. at 87:11–18 (JA Ex. 780, D.E. 841–11).

242. Undisputed.

243. Undisputed.

244. Undisputed.

245. It is undisputed that Dr. Miller was asked: "If one or more of the individuals that you performed reports for had private insurance, would you agree with me that that private insurance could be primary for some of the medical services identified in the life care plans?" Dr. Miller answered: "There are circumstances where it could be primary." *Id.* at 75:3–10.

246. Undisputed.

247. Undisputed.

248. Undisputed.

249. Undisputed.

250. Undisputed, except that Dr. Miller further testified that it is the assumption of the person making that assumption, i.e., the United States' economists. *Id.* at 91:19–22.

251.    Undisputed.

252.    Undisputed.

253.    It is undisputed that Dr. Miller was asked: "The tables that are in your expert reports and I generally want to understand this – sometimes they have CCN and VHA rate and then in the column right beside it they have a Medicare rate, and sometimes the amounts are really similar and sometimes they are different. How if the economist was going to take your rates and apply it for the life of the life care plan, which rates are they supposed to use when there [are] two columns identified?" Dr. Miller answered: "[G]enerally speaking the VHA rates are higher and they cover more services. The Medicare rates are lower. Most often they're the same, but when there are two different rates, that's the relationship, but as far as what the economist does, I don't know. The economist is going to make their own decision. I'm offering the information, but it's their decision." *Id.* at 92:22–93:18. The United States quotes this testimony in full for clarity.

254.    Undisputed.

255.    Undisputed. For clarity, the three government payors referenced in this statement are VHA, Medicare, and TRICARE. *See id.* at 95:3-24.

256.    Undisputed, except that Dr. Miller further testified: "Most of the time I think they would bill Medicare simply because it's easier for them, but it's not . . . [] as though the plaintiff is going and saying, I have these three coverages, but you bill TRICARE. *I suppose that could happen, but that's not the way it usually happens.*" *Id.* at 95:19–24 (emphasis added).

257.    Disputed. The United States objects to this statement as incomplete and misleading. Dr. Miller agreed that "it's hard to know the future," *id.* at 96:5, but this statement omits the immediately preceding testimony that is quoted in the Response to Paragraph 256.

258.    Undisputed.

259. Disputed. The United States objects to this statement as incomplete and misleading. Dr. Miller testified: "I'm just trying to think of circumstances where that would occur, and that's hard to do, but if it occurred the way you describe it, the answer to the question is yes." *Id.* at 99:20–25. When viewed in the light most favorable to the United States, Dr. Miller's answer was a qualified agreement that such a hypothetical scenario was possible, but unlikely, and in fact he was not even able to identify circumstances where that would occur.

260. Undisputed.

261. Disputed. The United States objects to this statement as incomplete and misleading. Dr. Miller agreed that in rural areas most providers accept Medicare, but that is not always the case for VHA or TRICARE. *Id.* at 100:24–101:5. But Dr. Miller also testified that "it's not as though they would get no coverage at all. The coverage might be different if under those circumstances you outlined. I don't see that as a major problem either." *Id.* at 100:5–18. The United States also objects on the grounds that "rural area" is a vague and undefined term.

262. Undisputed.

263. Undisputed.

264. Undisputed.

265. Undisputed.

266. Undisputed.

267. Undisputed.

268. Undisputed.

269. Undisputed.

270. Undisputed.

34

271. Undisputed, except that the question was limited to co–pays or patient contributions. *Id.* at 115:2–3.

272. It is undisputed that Dr. Miller was asked "Do you get notified by any of the government payors when there are rate changes? How do you and your staff go about knowing if there has been a rate change to a service?" He answered: "Well, we're like everybody else. We will see it in the press that a rate has been changed. For Medicare they generally occur once a year when the new regulations come out, and well, that's true for all three for TRICARE and VHA. So when a change is announced, which usually is announced as a change in the federal regulation, we would see it in the trade literature. Sometimes changes are made for individual services at different points in the year, but those t[o]o are announced and there are people who look for them." *Id.* at 116:12–117:2. The United States quotes this language in full for clarity.

273. Undisputed.

274. Undisputed, except that Dr. Miller qualified, "in some instances." *Id.* at 119:24.

275. Undisputed.

276. Disputed. The United States objects to this statement as incomplete and misleading. Dr. Miller was asked "Have coverage determination[s] for Medicare changed over the course of your career?" He answered: "Yes, ***but not substantially***." *Id.* at 120:13–16 (emphasis added).

277. Undisputed.

278. Undisputed.

279. Undisputed.

280. Disputed. The United States objects to this statement as incomplete and misleading. The cited testimony is accurate and undisputed, but Dr. Miller later testified: "You know, the issue that we're facing now with shortfalls in the Medicare and Medicare funding is not . . . it's

somewhat unique or different, but *it has happened before* and in fact, i[n] all during my 50–year [career] there has been considered about the adequacy of Medicare funding, and in all that time, there have – *the Medicare program has acted consistently*. So certainly we don't know exactly what is going to happen, but *based on past history – and the past history is substantial – it is likely that the Medicare program will continue to operate at least similarly to what it does now*." *Id.* at 136:22–137:14 (emphases added). The statement is incomplete because it omits Dr. Miller's subsequent testimony concerning the funding of Medicare.

281.    Disputed. The United States objects to this statement as incomplete and misleading for the same reasons as stated in response to Paragraph 280.

282.    Disputed. The United States objects to this statement as incomplete and misleading for the same reasons as stated in response to Paragraph 280.

283.    Disputed. The United States objects to this statement as incomplete and misleading for the same reasons as stated in response to Paragraph 280.

284.    Disputed. The United States objects to this statement as incomplete and misleading for the same reasons as stated in response to Paragraph 280.

285.    Disputed. The United States objects to this statement as incomplete and misleading for the same reasons as stated in response to Paragraph 280.

286.    Disputed. The United States objects to this statement as incomplete and misleading for the same reasons as stated in response to Paragraph 280.

287.    Disputed. The United States objects to this statement as incomplete and misleading. Dr. Miller shortly thereafter testified: "That's correct, but it's also important that that would be an extremely unpopular decision by Congress when easier decisions are available. Congress can also

address the funding problem by increasing the percentage by which people are taxed, which would not have an impact on the senior citizens who are using Medicare services." *Id.* at 135:5–19.

288. Undisputed.

289. Undisputed, except that Dr. Miller qualified his answer by stating: "Well, this is pretty far afield from the work that I've done in this case[.]" *Id.* at 142:16–18. He then testified that the "VA is actually a very good healthcare system especially in certain areas . . . ." *Id.* at 143:19–20.

Dr. Andrew Brod

290. Undisputed.

291. Undisputed.

292. Undisputed.

293. Undisputed.

294. Undisputed.

295. Undisputed.

296. Undisputed.

297. Undisputed.

298. Undisputed.

299. Undisputed, except that it omits Dr. Brod's immediately prior testimony: "[I]t's not reasonable to expect me to speculate about possible different future scenarios" regarding whether or not Medicare or TRICARE will exist in the future. As Dr. Brod testified: "What I can do is base my projections on data and information that exists now." Brod Dep. Tr. at 156:16–22 (JA Ex. 770, D.E. 841–1).

300. Undisputed.

301. Undisputed.

302. Undisputed.

303. Undisputed.

304. Disputed. The United States objects to this statement as incomplete and misleading. Asked if she had "sufficient background, training, or experience to testify *about VBA in general*[,]" Patricia Yount answered: "No, *not VBA in general*." Yount Dep. Tr. at 24:22–25:3 (JA Ex. 790, D.E. 841-21) (emphases added). "VBA in general" is outside the scope of Ms. Yount's expertise as a forensic accountant / economist. Aside from this objection, it is undisputed that Ms. Yount is not an expert in how VBA benefits are determined or decided. *See id.* at 25:5–11.

305. Disputed. The United States objects to this statement as incomplete and misleading. It is undisputed that Ms. Yount received VBA documents, such as ratings decisions, and made calculations as set out in her reports; however, Ms. Yount was not asked to "validate" or "go back to understand how the ratings decision had been determined." *Id.* at 26:17–27:10.

306. Disputed. The United States objects to this statement as misleading. The cited portions of Ms. Yount's deposition testimony do not support that she "does not have background experience or knowledge regarding . . . matters such as viability of the Medicare system in the future or the solvency of the Veteran's Benefit Disability program." Rather, the cited portions only concern what matters she may have researched on the Internet. *See id.* at 27:12–28:22.

307. Undisputed.

308. Undisputed.

309. Undisputed, except that Ms. Yount possesses background, experience, and training in performing the types of calculations that she provides in her reports. *See id.* at 44:8–14.

310. It is undisputed that Ms. Yount testified concerning the scope of her opinions: "I made calculations, not the determination. So I used the data provided by the VBA to calculate the but–for calculations." *Id.* at 34:20–35:3. She further explained: that the "but for calculation" meant "with the Camp Lejeune conditions and without. I compared what their disability benefits would have been either way." *Id.* at 35:4–10. The United States also objects to the sentence "Ms. Yount simply made calculations" as counsel's characterization of her testimony.

311. Undisputed.

312. Undisputed. Ms. Yount further testified that all of her opinions "assume[] that all the programs that were – that are continuing – that are paying for [medical care the Plaintiffs need] now will continue in the future" and that VBA benefits will continue to pay at the same rates in the future, with a COLA adjustment annually. *Id.* at 169:8–170:20; *see also id.* at 193:12–25 ("Yes, my calculations . . . are based on what we have today. I cannot assume a change in the future unless there's a specific medical – someone to tell me that it's going to change.").

313. Undisputed. Ms. Yount further testified that all of her opinions "assume[] that all the programs that were – that are continuing – that are paying for [medical care the Plaintiffs need] now will continue in the future" and that VBA benefits will continue to pay at the same rates in the future, with a COLA adjustment annually. *Id.* at 169:8–170:20; *see also id.* at 193:12–25 ("Yes, my calculations . . . are based on what we have today. I cannot assume a change in the future unless there's a specific medical – someone to tell that me it's going to change.").

314. Undisputed, except that the United States objects to the vague and undefined phrase "Veterans Disability system."

315. Undisputed.

316. Undisputed.

317. Undisputed.

318. Undisputed.

319. Undisputed.

320. Undisputed.

321. Undisputed.

322. It is undisputed that Ms. Yount was asked if Plaintiff Criswell could receive another diagnosis over the course of his lifetime, and testified: "I don't know what he could get or could not get. He could have another diagnosis." *Id.* at 223:14–224:10.

323. It is undisputed that Ms. Yount testified concerning Plaintiff Criswell: "I could never speculate what he could or couldn't have in the future. This is based on what he actually has now." *Id.* at 225:12–18; *see also id.* at 193:12–25 ("Yes, my calculations . . . are based on what we have today. I cannot assume a change in the future unless there's a specific medical – someone to tell me that it's going to change.").

324. Undisputed. Ms. Yount further testified that all of her opinions "assume[] that all the programs that were – that are continuing – that are paying for [medical care the Plaintiffs need] now will continue in the future" and that VBA benefits will continue to pay at the same rates in the future, with a COLA adjustment annually. *Id.* at 169:8–170:20; *see also id.* at 193:12–25 ("Yes, my calculations . . . are based on what we have today. I cannot assume a change in the future unless there's a specific medical – someone to tell me that it's going to change.").

325. It is undisputed that Ms. Yount was asked concerning Plaintiff Mousser: "And then [you're assuming] Mr. Mousser will remain exactly as he is now with no new conditions, no progression of conditions, no additional diagnoses; is that correct?" Ms. Yount answered: "Correct. I am not able to make those determinations." *Id.* at 269:22–270:3; *see also id.* at 193:12–25 ("Yes,

my calculations . . . are based on what we have today. I cannot assume a change in the future unless there's a specific medical – someone to tell me that it's going to change.").

326. Undisputed. Ms. Yount further testified that "my calculations . . . are based on what we have today. I cannot assume a change in the future unless there's a specific medical – someone to tell me that it's going to change." *Id.* at 193:12–25; *see id.* at 167:1–5 (asked upon what she bases her assumption that VBA disability ratings will not change, Ms. Yount testified: "That there's no – based on the information we have right now, I have no reason to assume that it would change."); 167:18–168:21 (explaining why it is reasonable to assume no changes).

<u>Dubravka Tosic</u>

327. Undisputed.

328. Undisputed.

329. Undisputed.

330. Undisputed.

331. Disputed. The United States objects to this statement as incomplete and misleading. Ms. Tosic testified: "If that were to happen, his benefits may be reduced, holding everything else constant. So assuming nothing else has changed. He could also get divorced and get remarried, and now that we're speculating, we can, you know, assume that he could also get remarried and continue with the same benefits." Tosic Dep. Tr. at 238:6–15 (JA Ex. 787, D.E. 841–18). Ms. Tosic elaborated that "it would be speculative not to assume" Plaintiff Davis will continue to have a spouse while he receives VBA benefits because of "our current knowledge. The information that we have currently available." *Id.* at 238:16–24.

<u>**Testimony of Defendant's Non–Expert Agency Witnesses**</u>

<u>Diana Zakaryan</u>

332. Diana Zakaryan was deposed on August 28, 2025. *See* Zakaryan Dep. Tr. at 1:13–16 (D.E. 863–3; refiled at D.E. 872).

333. Undisputed.

334. Undisputed.

335. Undisputed.

336. Undisputed.

337. It is undisputed that Ms. Zakaryan testified: "I have an understanding that services and the coverage of those services changes over time; however, that is a very broad space, and I cannot speak to that without having a point of reference . . . ." *Id.* at 187:11–20.

<u>Kimberly Rivas</u>

338. Undisputed.

339. Undisputed.

340. Undisputed.

341. Undisputed. Ms. Rivas also previously referenced that there are "changes in the process or obtaining referrals . . . ." Rivas Dep. Tr. at 128:11–17 (D.E. 863–2; refiled at D.E. 871).

<u>Kyle Westerlind</u>

342. Undisputed.

343. Undisputed.

344. Undisputed, except that Mr. Westerlind stated further: "So – but theoretically, yeah, we could look at the data we have and project that out." Westerlind Dep. Tr. at 105:12–23 (D.E. 863–4; refiled at D.E. 873).

345.    Undisputed.

346.    Undisputed.

347.    Undisputed.

Daniel Clarke

348.    Undisputed. (This deposition transcript was refiled at D.E. 870.)

349.    Undisputed.

350.    Undisputed.

351.    Undisputed.

352.    Undisputed.

353.    Undisputed.

354.    Undisputed.

**Additional Undisputed Facts**

355.    Undisputed.

356.    Undisputed.

357.    It is undisputed that the quoted portion of Dr. Miller's testimony is accurate, but it is incomplete because Dr. Miller subsequently testified that "actual costs in VA hospitals are most often are higher than the CCN rates" and using the CCN rates therefore is "conservative." Miller Dep. Tr. at 239:11–20 (JA Ex. 780, D.E. 841–11).

358.    Undisputed.

359.    Disputed. The United States objects to this statement as incomplete and misleading. Dr. Wang Ji included the following explanation:

> Although my opinion is that the plaintiff's prostate cancer and sciatic peripheral neuropathy are medically unrelated to his UTUC, the plaintiff specifically received VBA benefits for his prostate cancer and sciatic peripheral neuropathy as related to his purported Camp Lejeune exposures (00569 CAGIANO VBA 0000003641–

43

03646). I am not offering any opinion that his prostate cancer and sciatic peripheral neuropathy is medically related to or caused by his Camp Lejeune exposures. However, I am noting these conditions were identified by the VBA as being in connection with Mr. Cagiano's purported Camp Lejeune exposures and would, thus presumably be included in any kind of offset calculation as constituting a disability award provided to Mr. Cagiano in connection with his purported Camp Lejeune exposures.

Ji Rep. at 9 n. 9 (JA Ex. 653, D.E. 837–17).

360.     Disputed. The United States objects to this statement as incomplete and misleading. Dr. Wang Ji included an explanation concerning Plaintiff Cagiano's prostate cancer as noted in response to Paragraph 359. However, it is undisputed that Ms. Yount treated Plaintiff Cagiano's prostate cancer as a "related" condition for purposes of VBA disability offset calculations. Yount Rep. (Cagiano) at 2 (JA Ex. 719, D.E. 839–17). The United States disputes that Plaintiff Cagiano's prostate cancer is clinically related to a Track 1 illness or any treatment for a Track 1 illness.

## II. United States' Statement of Additional Material Facts

### Testimony of Plaintiffs' Chief Economist Expert, Mr. Chad Staller

1. Mr. Chad Staller ("Mr. Staller") is Plaintiffs' expert economist who offers opinions about economic damages for various Track 1 Trial Plaintiffs. Staller Dep. Tr. at 34:13–24 (JA Ex. 786, D.E. 841–17).

2. The United States deposed Mr. Staller on March 10, 2026. *Id.* at 1:10–20.

3. Mr. Staller testified: "*We're not here to guarantee with absolute certainty what will happen in the future. We can't do that.*" *Id.* at 112:21–114:6 (emphasis added).

4. When asked if the fact that he did not opine on possible variability in statistical life expectancies rendered his methods and conclusions unreliable, Dr. Staller elaborated:

> No, I think quite the opposite, using what's disclosed in my report, they're quite reliable. They're reliable because I'm using reliable data, using a reliable methodology, and a reliable practice of doing the calculations. *My present value formula is a reliable method that's agreed upon by forensic economists and the government's economists in this case.* Life expectancy data source, agreed upon by the government's economists in this case. The duration period and dataset are agreed upon by the government's economists in this case. *So I think's it's quite the opposite for building a model not to an absolute certainty, which we can't do, but to a reasonable degree of economic certainty using the sources I use and the methodology I employ creates a reliable model for the trier of fact to rely upon.*

*Id.* at 115:2–116:8 (emphases added). Thus, he agreed it is "normal and the standard methodology as a forensic economist to rely on life expectancy tables in formulating" damages opinions. *Id.* at 116:10–15. Mr. Staller also agreed that it is possible that an individual Plaintiff could live less than or more than their statistical life expectancy. *Id.* at 110:2–10.

5. When shown the opinions of another of Plaintiffs' experts, Dr. Peter Rybolt, who opined that failure to account for fluctuations in life expectancy rendered the opinions of the United States' economists based on statistical life expectancies speculative, Mr. Staller stated: "I disagree with his conclusions, yes." *Id.* at 122:1–126:2.

6. Asked if the fact that Plaintiffs may die before their statistical life expectancies rendered his opinions unreasonable, Mr. Staller testified: "No, not in any way. *I don't have, Ms. Yount, Dr. Tosic, and Dr. Brod don't have crystal balls.* If we had those, or if I had it, I know I wouldn't be doing this." *Id.* at 111:6–112:13 (emphasis added). He explained forensic economists offer opinions "going out 10, 15, 20 years" using "reliable data, knowing that *it's not to an absolute certainty*, but to a reasonable degree." *Id.* (emphasis added).

7. Asked if it is fair to say that his calculations for future earning growth assumed, for instance, that a person's job would remain the same through their life or work–life expectancy, Mr. Staller testified: "The job would remain the same industry through their work–life period, yes." And he also agreed that his calculations assumed that the person would be living in the same place for the rest of his or her work–life expectancy. *Id.* at 236:12–23.

8. Mr. Staller agreed that if a person changed jobs and moved into a different industry or location, their "[f]uture wages may change." *Id.* at 237:1–11. When asked about the effect of that potential future change on the reliability of his projections of future earnings for Plaintiffs, he then elaborated: "No, I mean, that's a common question to me, that's a kitchen sink question[.]" *Id.* at 237:12–21. Mr. Staller testified:

> [Y]eah, I mean, *anything could happen, right, and that's why I don't testify to an absolute certainty*, I testify to a reasonable degree of economic certainty. That's the legal standard under the federal rules, almost every state rule, because *we don't have the crystal ball . . . . [S]o, no, just anything could happen to anybody at any time*, but to build a model, I can say to a reasonable degree of economic certainty, my model meets that standard using this data and this presentation that is commonly presented by forensic economists.

*Id.* at 237:24–238:24 (emphases added).

9. Mr. Staller agreed that absolute certainty about the future is not required because "we do not have that ability." *Id.* at 239:1–21. He explained: "O*n certain topics, we have to make*

*certain assumptions . . . . there are certain assumptions that we have to make into the future.*"
*Id.* at 239:23–240:9 (emphases added). By contrast, Mr. Staller testified "political outcomes" and
"Powerball numbers" are future events that one should *not* assume. *See id.*

<u>**Additional Testimony of the United States's Rule 26(a)(2)(C) Witnesses**</u>

<u>**Heather Ford (VHA)**</u>

10.     Ms. Heather Ford is the Chief Financial Officer ("CFO") of the VHA. Ford Dep.
Tr. at 10:21–11:1 (JA Ex. 773, D.E. 841–4).

11.     As the United States set out in its Rule 26(a)(2)(C) disclosures, Ms. Ford will testify
at trial that "***it is reasonable to project that VHA will continue to provide healthcare to Veterans
in the future***, and that ***the general scope of care and eligibility for care are unlikely to be
significantly constricted in the future***." *Id.* at 23:4–16 (emphases added) (referencing the United
States' Rule 26(a)(2)(C) disclosures), 203:16-24.

12.     Ms. Ford has been involved with budgeting for the entire VA since September 2019
and is currently responsible for providing leadership and direction over all VHA budget, finance,
and managerial cost accounting operations. *See id.* at 47:3–18.

13.     She oversees the preparation and execution of the VHA's budget at a high level.
*See id.* at 48:20–49:9. Specifically, Ms. Ford helps to execute the VHA's budget appropriated for
the VHA and to ensure the VHA stays within its appropriations. *See id.* at 51:1–52:7.

14.     Ms. Ford summarized the VHA's funding process: "VHA submits an annual budget
request to Congress through the Administration. That budget request outlines the amount and use
of those funds. It breaks it down by account. And then once Congress appropriates funds, we
receive those based upon the request we submitted." *Id.* at 75:15–22.

15.     Different accounts include Medical Services, Medical Community Care, Medical Support and Compliance, and Medical Facilities. *Id.* at 78:16–21. For example, Medical Services includes providing "health care within the VA system so at VA facilities, as well as support[ing] certain programs that VA is required to provide by law." *Id.* at 79:1–10.

16.     Ms. Ford testified: "The funding we request is ***sufficient to provide health care for that fiscal year*** . . . . The amount that we request and then is appropriated typically is . . . ***matches what we requested and is sufficient*** to provide health care." *Id.* at 106:8–17 (emphases added).

17.     Asked what would happen if Congress fails to pass a full year appropriation by the start of the fiscal year, Ms. Ford testified that VHA receives an "***advance appropriation***" where it receives "the next year's fiscal year funding . . . in advance of the start of that fiscal year. So, for example, as part of the 2026 appropriation, there was an advance appropriation for 2027. ***So VHA has funding appropriated for . . . fiscal year [20]27 today.***" *Id.* at 66:14–67:8 (emphases added).

18.     Accordingly, Ms. Ford testified, "***there are no impacts under a CR*** [i.e., continuing resolution]." *Id.* at 67:12–16 (emphasis added); *see also id.* at 68:14–18 (testifying that a CR would "not have an impact on the VHA because of the advance appropriation").

19.     Ms. Ford testified that VHA requested approximately $57 billion dollars in funding for the Medical Services account in 2026 in *discretionary funding*, a decrease of approximately $12 billion dollars when compared to 2025. *Id.* at 80:9–14; *see also* Ex. A at BiB–4. However, the 2026 request for the Medical Services account from *all funding sources* (not just discretionary funding) *increased* to approximately $92.49 billion dollars. *See* Ex. A at BiB–7; *see also* Ford Dep. Tr. at 111:17–18 (JA Ex. 773, D.E. 841–4) (testifying that "the overall budget did increase from 2025 to 2026"). The United States refers the Court to its response to Paragraph 65 above for further information concerning the 2026 funding request for Medical Services.

20. Ms. Ford explained that VHA uses an "actuarial model that's been developed that informs about 90 percent . . . of our budget request" and to understand the cost of future care in VA facilities. *Id.* at 129:22–130:8; *see also* McIlroy Dep. Tr. at 170:5–172:11 (JA Ex. 779, D.E. 841–10) (testifying about the high quality of VA actuaries and their understanding of the relevant data to project future costs for VA budgetary purposes).

21. Asked if she had seen any data or analysis as to whether the Camp Lejeune veterans and family members' eligibility had been compensated under the discretionary or mandatory VA funding, Ms. Ford stated she had not seen data concerning "how health care was delivered or paid for . . . for those specific veterans." Ford Dep. Tr. at 99:3–10 (JA Ex. 773, D.E. 841–4).

22. However, Ms. Ford stated: "It could be both." *Id.* at 97:3–14.

23. Asked what was driving the 2026 decrease in discretionary funding for the Medical Services account, Ms. Ford testified: "There could be lots of reasons for that to go down in terms of changes in health care demand . . . . There could be several reasons for that." *Id.* at 80:15–20; *see also id.* at 81:1–5 ("There may not be one specific driver for a decrease in funding.").

24. Ms. Ford testified: "Through the lens of budgetary requests and appropriations, the ***VHA budget has grown over time, not decreased. So the overall resources provided by Congress have – have only grown.***" *Id.* at 208:9–22 (emphasis added).

25. For example, Ms. Ford agreed that the PACT Act of 2022 established a new funding stream for providing services to veterans. *Id.* at 126:10–13.

26. Ms. Ford testified: "I believe when you look at the total resources available, both mandatory and discretionary, for [M]edical [S]ervices, it would show that they have grown over time or at least remain[ed] steady-state." *Id.* at 209:2–10; *see also* Ex. A at BiB-7 (reflecting increasing appropriations over time).

27. Ms. Ford agreed that "***Congress has not constricted eligibility for care through VHA since its establishment.***" *Id.* at 211:7–13 (emphasis added); *see also id.* at 222:1–3 ("In general, eligibility has not changed. However, certain statutory changes like a PACT Act can change eligibility.").

28. Ms. Ford testified that typically veterans do not receive a bill for treatment at VHA hospitals and facilities. *See id.* at 128:1–9.

29. Ms. Ford testified that over "4,000 total people left" *VA* in 2025–2026, *id.* at 81:24–82:10, but that she did not know how many physicians left. *See id.* at 81:10–23.

30. When asked if she agreed with Secretary Doug Collins's statement to Congress that the VA is not fully staffed and has not been in 15 years, Ms. Ford—while limiting her response based on her own experience at the VA—testified: "I would not necessarily agree with that." She based her testimony on her observation of "hiring and information contained within the budget documents in terms of requested full–time equivalent levels." *Id.* at 108:8–24.

31. Asked to state her position concerning whether the VA is fully staffed, Ms. Ford stated: "I think it depends on the facility." *Id.* at 109:1–21.

32. Later, Ms. Ford clarified that statistics on how many VHA facilities nationally may be experiencing staff shortages was not in her office's responsibility. *Id.* at 219:10–14.

33. Ms. Ford testified: "So ***we have allocated funding to . . . facilities for staffing***. Again, some of these decisions are local decisions, and so they would be provided a number of people . . . an up–to– number and then those facilities would determine what folks they needed to hire to meet their needs." *Id.* at 166:2–15 (emphasis added). Ms. Ford testified that this statement referred to "needs in terms of staffing overall" at VA. *Id.*

34. Ms. Ford testified that the Secretary of the VA, Doug Collins, is recommending a restructuring of the VA. *See id.* at 60:9–61:1.

35. Asked if Secretary Collins recommended the dissolution of thousands of positions, Ms. Ford testified as follows: "My understanding is that is where previously – those positions have been vacant for some period of time, and depending on how long those positions have been vacant, it's possible – it's likely we had not requested budgetary resources. Those positions may have been on the books for many years without being filled." *Id.* at 61:13–62:7.

36. Ms. Ford testified concerning the purpose of the recommended restructuring: "My understanding is that this is to ***gain efficiencies***, to look at how we change the operational dynamic of VHA, ensure that we do not – that we are ***aligning like functions with like functions***. Ensuring that we create a seamless organization that breaks down barriers and . . . ***helps the veteran's experience in their interaction with VHA***." *Id.* at 62:9–21 (emphases added).

37. Ms. Ford testified further regarding the recommended VA restructuring: "I do not expect a change in our overall way that we go about monitoring and executing resources. And I do not expect that, you know, ***I do not see where we would significantly adjust today the budget for VHA***." *Id.* at 63:8–16 (emphasis added).

38. Asked if she agreed that the proposed restructuring of the VA would recommend the elimination or cancellation of tens of thousands of physicians under the VHA, Ms. Ford did not agree and testified: "My understanding is that ***there will be no reductions in the workforce as a result of reorganization*** . . . . [T]here is no plan[] to reduce the overall size of the workforce as part of that reorganization." *Id.* at 187:24–188:24 (emphasis added).

39. Ms. Ford testified that the "mechanics of reorganizing have not begun" because "there's still ongoing discussions in terms of. . . the organizational structure, and then also the need

to provide Congress . . . notification. So there's still a lot of work that's being done while we work the Congressional notification as well." *Id.* at 200:1–11.

**Larry Young (CMS)**

40. Mr. Young testified that he has worked at CMS for over 35 years. Young Dep. Tr. at 155:2–4 (JA Ex. 788, D.E. 841–19).

41. Mr. Young testified that he has worked on Medicare for the entirety of his employment at CMS. *Id.* at 155:5–9.

42. Mr. Young testified that the Medicare program began in 1965. *Id.* at 155:10–13.

43. Mr. Young testified that "***the propensity is for the [Medicare] program . . . to add benefits.***" *Id.* at 155:18–25 (emphasis added).

44. When asked whether Medicare coverage has ever been decreased, Mr. Young answered: "No, not to my knowledge or recollection." *Id.* at 156:1–3.

45. When asked whether the Medicare program has ever been eliminated or discontinued, Mr. Young answered: "No, absolutely not." *Id.* at 156:4–6.

46. When asked whether, based on his 35 years of experience, it is fair to say that it is reasonably likely that Medicare will continue into the future, Mr. Young answered: "Yes. Based on my experience, what I've lived through, it's — ***it's very reasonable to expect that the program is going to continue into the future.***" *Id.* at 156:7–13 (emphasis added).

47. When asked whether, based on his 35 years of experience, it is fair to say that it's reasonably likely that the programs Medicare currently covers will continue to be covered into the future, Mr. Young answered: "Based on my experience, I would say it — ***the program will continue into the future***. As I've said before, ***the tendency is for the political leadership to accrue***

52

*and accrete benefits and/or expand eligibility over time*. That's — that's been what I have lived and experienced." *Id.* at 156:14–157:3 (emphases added).

48.     The 2025 Annual Report of the Boards of Trustees of the Federal Hospital Insurance and Federal Supplementary Medical Insurance Trust Funds estimates that, if the HI trust fund were depleted by 2033, HI tax revenues are projected to cover 89 percent of incurred program costs. *Id.* at 76:2–24, 111:4–25; Young Dep. Ex. 6 at 5 (CLJA_USA_YOUNG_00000000017) (attached to Appendix as **Exhibit B**).[4]

49.     "Congress has never allowed the HI trust fund to become depleted." Young Dep. Tr. at 112:3–12; *see also* Ex. B at 26 (CLJA_USA_YOUNG_00000000038) (same).

50.     A separate trust fund—the SMI trust fund—funds Parts B and D of Medicare and is not in the same financial position as the HI trust fund, which funds Part A of Medicare. Young Dep. Tr. at 122:6–123:24 (testifying concerning the outlook of the SMI trust fund).

### **Richard Ruck, M.D. (TRICARE)**

51.     Dr. Ruck has served as the Chief Medical Officer of TRICARE since approximately September 2022. Ruck Dep. Tr. at 15:6–9 (JA Ex. 782, D.E. 841–13).

52.     Dr. Ruck opined about "how TRICARE can be utilized and to provide some general information about how the TRICARE health benefit works." *Id.* at 25:7–22. He also "can give . . . examples of how . . . for instance, if they were a [TRICARE] Select patient, a TRICARE for Life

---

[4] This document is authentic and admissible. *See* CMO No. 2, D.E. 23, at 7 (Section X) (stating government records, documents, data, and studies are self-authenticating and admissible, absent a specific dispute being raised as to authenticity or admissibility before the close of fact discovery). Plaintiffs used the document as Young Dep. Exhibit 6 at Mr. Young's deposition and did not object to the authenticity or admissibility of the document during damages and offsets discovery. Thus, the Court may properly consider it for the purposes of the Motion. *See also* Fed. R. Evid. 803(8).

patient, et cetera, how the TRICARE health benefit. . . would affect them and . . . the fee structures, et cetera." *Id.* at 27:25–28:19.

53. Based on Dr. Ruck's expertise concerning TRICARE, he opined that the TRICARE program is reasonably likely to continue into the foreseeable future. *See id.* at 181:20–182:2.

54. When asked to "guarantee the scope of future TRICARE benefits for any individual plaintiff[,]" Dr. Ruck testified: "***[W]e do not anticipate that. . . any benefits to any specific group will be decreasing*** . . . . [A]t this point, we have a – we just started an eight–year contract . . . under T5 and are already preparing for the next contract which will be awarded after that, T6. And – and ***at this point we are anticipating that it [i.e., TRICARE] will continue on as currently structured.***" *Id.* at 29:12–30:4 (emphases added).

55. When asked if Congress is the "ultimate decisionmaker," Dr. Ruck stated: "This is a health benefit that's encoded under Title 10 U.S. Code in the 1070 series. So, yes, Congress is the one who – who enshrined it into law, and they are the ones who decide which benefits to add or to continue. ***However, off of past history, we've never seen a decrease in benefits, only increases in – in what is allowed.***" *Id.* at 30:6–18 (emphasis added).

56. He further testified that "there has been ***no political appetite to remove any benefits*** . . . from the population." *Id.* at 31:8–19 (emphasis added).

57. The history of TRICARE "goes all the way back to the CHAMPUS program, which was started in the 1960s. The TRICARE was reformed into – or renamed, reorganized under the – in TRICARE, under the 1994 National Defense Authorization Act established in 1997. And since then, ***we've only seen additional groups be added to the benefit and none removed.***" *Id.* at 31:21–32:6 (emphasis added).

58. Dr. Ruck testified that he was not aware of any consideration in Congress to remove or eliminate TRICARE. *See id.* at 32:7–33:21 ("No. Actually, I am not aware of any discussion to eliminate it in its entirety.").

59. The Defense Health Agency ("DHA") administers the TRICARE program and is a part of the Department of War. *See id.* at 49:15–20; 105:23–106:3. TRICARE is separate from the VA or CMS. *Id.* at 51:5–14.

60. Retirees and their family members are eligible for TRICARE, and include persons who have "either completed 20 years of service honorably . . . or has been medically retired." *Id.* at 54:5–25; *see also id.* at 57:2–16 (describing medical retirement).

61. For those who are medically retired due to injuries, TRICARE eligibility "is not dependent upon whether or not [the injury] is service connected." *Id.* at 62:1–13.

62. Dr. Ruck testified that "you would have to disenroll or decide to stop payment in order to be disenrolled . . . . [Y]ou don't have to call in every year to re–enroll. You have to do it once . . . and then make sure your payment method stays up to date." *Id.* at 65:13–66:2.

63. Dr. Ruck explained, while TRICARE beneficiaries need not have health insurance, "TRICARE is always second payor" if there is health insurance. *Id.* at 70:24–71:4.

64. Specifically, regarding TRICARE For Life, Dr. Ruck explained: "***[W]e do not establish copays for that group***. You know, your primary coverage is typically Medicare . . . in that group and we are the second payor for that. So we are wraparound insurance. We don't require copays on that. ***We pick up the charges that Medicare doesn't.***" *Id.* at 73:13–23 (emphases added).

65. If someone is eligible for TRICARE For Life, they also must enroll in Part B under Medicare. *See id.* at 73:25–74:7. Dr. Ruck was unaware of a reason why someone would not be eligible for Part B under Medicare. *See id.* at 74:9–18.

66. Congress makes changes to TRICARE, but "*mostly to add benefits through the National Defense Authorization Act each year*." *Id.* at 84:11–19 (emphasis added).

67. Dr. Ruck explained that DHA updates the TRICARE Policy Manual: "Any time there's a change, we update either the operations manual, the policy manual, the reimbursement manual, et cetera. Those always involve redline changes because we change wording within it. I could not tell you the number of times that that has occurred. But any time that something is updated, it's considered a redline change." *Id.* at 89:21–90:9.

68. Dr. Ruck explained that TRICARE is not health insurance, but consists of "health benefit plans." *Id.* at 112:8–113:9; *see also id.* at 106:22–107:13 (describing differences), 117:16–118:15 (similar and testifying "there are lots of differences, but . . . some similarities").

69. Asked if he could say future TRICARE funding is "guaranteed indefinitely," Dr. Ruck testified that: "I can only look to the past . . . . *[W]e have always received funding for the TRICARE programs and CHAMPUS since their inception*. And we – and our direction by . . . our higher–ups within the Department of War, are . . . to continue to operate with the . . . assumption that the – that *funding will continue to be provided.*" *Id.* at 121:11–122:6 (emphases added). As Dr. Ruck further explained, he has received "written directives" that assume "*we will continue to have funding*" and that provide "guidance . . . regarding the preparation for T6" contracting based on that assumption. *Id.* at 123:6–18 (emphasis added).

70. Dr. Ruck testified that TRICARE beneficiaries typically "are very cautious about going to a new program." He elaborated: "*[I]t speaks to the popularity of the plan by how many people choose to retain TRICARE as opposed to going to find their own health plan*." *Id.* at 130:10–19 (emphasis added).

71. Dr. Ruck testified: "The TRICARE – each contract with TRICARE plan coverage changes slightly. *We typically add more benefits* . . . more robust disease management programs, more of a focus on alternate payment methods, bundlings, a greater focus on quality of care outcomes versus fee for service." *Id.* at 138:7–25 (emphasis added).

72. Asked about TRICARE beneficiaries who live in rural areas, Dr. Ruck explained in detail how TRICARE approaches those beneficiaries to "minimize . . . the cost to the individuals themselves." He explained: "[I]f there are no network providers within a radius, then the direction . . . to the managed care support contractors [is] to essentially utilize them as network providers to reimbursement them[,]" despite higher government costs. *Id.* at 167:18–170:12.

73. Dr. Ruck explained that the "TRICARE contract is already funded because it's a contract . . . . So they're not subject to . . . government shutdowns[.]" *Id.* at 171:1–13.

74. Specifically concerning Medicare and TRICARE For Life, Dr. Ruck explained that TRICARE is "not dependent upon Medicare for the operation of the TRICARE For Life program." *Id.* at 173:8–22. Thus, TRICARE For Life "would not shut down if Medicare were to cease to exist" although there might be increased costs. *Id.* at 173:24–174:12.

75. Asked if Congress could change TRICARE for Life, Dr. Ruck testified "Congress can always choose to make changes. *The question would be is would there be a political appetite to do so.*" *Id.* at 174:14–21 (emphasis added).

76. Asked to agree that there is "no guarantee" TRICARE "will continue to exist in its current form" for the Track 1 Trial Plaintiffs' life expectancies, Dr. Ruck agreed that he could not "absolutely" say that TRICARE will remain in the future "in its current form[,]" but explained: "As much as anyone can point to at the moment – *looking at the past history of the health benefit,*

*there does not seem to be any political appetite to remove the benefit*, even if they decided to restructure how it was administered." *Id.* at 176:9–22 (emphasis added).

77.     Asked whether the TRICARE plans that currently exist will exist in the future, Dr. Ruck testified that "since we are – *have just initiated and started a new eight–year contract, all of those programs will continue in their entirety at a minimum through the end of that contract.* And – and, as I said, *we are already planning the next contract* to simply build upon, not to – not to change the existing contract." *Id.* at 174:23–175:13 (emphases added).

### Jadine Piper (VBA)

78.     Ms. Piper works for the VBA. Piper Dep. Tr. at 29:21–25 (JA Ex. 781, D.E. 841–12). She is Acting Assistant Director of the Compensation Service Policy Staff. *Id.* at 36:19–23. During Ms. Piper's entire time at VBA, she has worked with VBA disability benefits. *Id.* at 77:18–21.

79.     The Secretary of the VA is charged with adopting and applying a disability ratings schedule. *See id.* at 84:25–85:3. The Secretary of the VA has authority to alter or update the ratings schedule. *See id.* at 89:1–13; *see also id.* at 89:16–90:5 & Piper Dep. Ex. 10 (disability ratings schedule) (attached to Appendix as **Exhibit C**).[5]

80.     The ratings schedule is a 127–page document. *See generally* Ex. C.

81.     The VBA uses the ratings schedule to make disability benefits awards to veterans. *See generally id.*; *see also* Piper Dep. Tr. at 94:18–25 (JA Ex. 781, D.E. 841–12).

---

[5] This document is authentic and admissible. *See* CMO No. 2, D.E. 23, at 7 (Section X) (stating government records, documents, data, and studies are self-authenticating and admissible, absent a specific dispute being raised as to authenticity or admissibility before the close of fact discovery). Plaintiffs used the document as Piper Dep. Exhibit 10 at Ms. Piper's deposition and did not object to the authenticity or admissibility of the document during damages and offsets discovery. Thus, the Court may properly consider it for the purposes of the Motion. *See also* Fed. R. Evid. 803(8).

82. Specifically, "the job of the ratings specialist [at VBA is] to look at the [medical] exams and apply the rating schedule." Piper Dep. Tr. at 98:10–23 (JA Ex. 781, D.E. 841–12).

83. Compensation benefits are then based on disability ratings for service–connected injuries. *See id.* at 115:5–8, 157:13–20.

84. Asked if VBA "can tell the difference between payments issued to a veteran versus payments anticipated to be made to a veteran in the future[,]" Ms. Piper confirmed that "*in VBA's system, there is also a schedule of payments to be issued in the future*" to veterans. *Id.* at 107:13–110:8 (emphasis added). According to Ms. Piper, the scheduled payments "*stay[] the same for the majority of these people*" for a 12–month period. *Id.* at 110:9–13 (emphasis added), 111:16–19 (agreeing there is a "cadence" such that veterans typically will receive the same benefits for 12 months before there are changes based on COLA adjustments or other factors).

85. Ms. Piper testified: "[I]f there was nothing indicating a future date of change in benefits, then *we would assume that it would continue,* in every December there should be a cost of living adjustment increasing the payment." *Id.* at 124:1–5 (emphasis added).[6] She elaborated: "But if it's just pertaining to the current rating status, we notify the veteran in that rating if there's going to be some type of future action. *If that's not indicated, there's a highly probable chance that it will stay the same* . . . But that last rating decision, *if it did not indicate any future actions . . . it's highly probable that it should stay the same* with no increase unless the veteran comes in and requests something." *Id.* at 124:24–125:12 (emphases added).

86. As Ms. Piper testified: "If there's no future action, no new claim and there was no law that passed COLA, we can say it's *highly likely that it will still be [the same] until we notify the veteran again*." *Id.* at 126:23–127:2 (emphasis added); *see also id.* at 136:8–14 (testifying that

---

[6] Ms. Piper's testimony was referring to Plaintiff Keller's benefits as an example. *See id.*

"if there's been no change in COLA, you – at a minimum, we know this veteran [Plaintiff Keller] will get $4,044.1" in the future).[7]

87.     Ms. Piper explained that, if an examiner indicates in an initial rating that a disability condition should improve within a certain period of time, the VBA would schedule a routine future exam. *See id.* at 230:7–14. If there is no such indication, Ms. Piper testified that "it's likely that it will stay the same unless the veteran . . . comes in for another exam." *Id.* at 230:19–23.

88.     Ms. Piper agreed that it is reasonable to assume that COLA was likely to be applied annually. *Id.* at 242:9–20.

89.     Asked if there are situations where the VA would not look to reevaluate disability ratings, Ms. Piper explained as follows: "Yes. If a veteran is, for instance, 55 or older, unless they have a condition in which the medical evidence shows that it's temporary in nature, we would not request a routine future examination to look at the current state given the veteran's age." *Id.* at 242:21–243:5. Thus, Ms. Piper testified, "***it's highly unlikely that [disability ratings for a veteran age 55 or older] would change***[,]" barring a note in a ratings decision concerning needing a future reevaluation. *Id.* at 243:6–12 (emphasis added).

90.     Ms. Piper confirmed that, if a veteran's disability rating stays the same, the amounts that the veteran receives also stay the same as well (excluding COLA). *Id.* at 244:20–24.

**Additional Testimony of the United States' Rule 26(a)(2)(B) Expert Witnesses**

**Henry Miller, Ph.D**

91.     Henry Miller is an economist with a Ph.D in Accounting and Economics from the University of Illinois and an M.B.A. from the City College of New York. He has over 50 years of

---

[7] Ms. Piper's testimony was referring to Plaintiff Keller's benefits as an example. *See id.*

experience in healthcare costs. *See* Miller Dep. Tr. at 16:20–7, 18:3–4 (JA Ex. 780, D.E. 841–11). He has "reviewed hundreds of life care plans" during his career. *Id.* at 26:13–18.

92.     Dr. Miller disclosed the following reports: *Hill v. United States*; *Rothchild v. United States*; *Peterson v. United States*; *Mousser v. United States*; *McElhiney v. United States*; *Tukes v. United States*; *Laramore v. United States*; *Sparks v. United States*. *See* Miller Rep. (Hill) (JA Ex. 655, D.E. 837–19); Miller Rep. (Rothchild) (JA Ex. 656, D.E. 837–20); Miller Rep. (Peterson) (JA Ex. 657, D.E. 837–21); Miller Rep. (Mousser) (JA Ex. 658, D.E. 837–22); Miller Rep. (McElhiney) (JA Ex. 659, D.E. 837–23); Miller Rep. (Tukes) (JA Ex. 660, D.E. 837–24); Miller Rep. (Laramore) (JA Ex. 661, D.E. 838–1); Miller Rep. (Sparks) (JA Ex. 662, D.E. 838–2). Dr. Miller did not disclose reports in the remaining Track 1 Trial Plaintiffs' cases.

93.     Each of the Plaintiffs in the preceding Paragraph has competing life care plans disclosed by the Parties. *See* Miller Dep. Tr. at 89:14–90:8 (JA Ex. 780, D.E. 841–11).

94.     Dr. Miller testified the scope of his opinions as follows: "The scope is to take the life care plans that were prepared for each plaintiff that we received and identify how much a government program [—] in this case it would be Medicare, VHA or TRICARE [—] would pay for those services or products. We had a plaintiff life care plan and a defense life care plan for each . . . of the plaintiffs that we reviewed, and we did that work for both the plaintiff and defense life care plans." *Id.* at 70:10–24.

95.     Dr. Miller reviewed publicly available data to support the rates that government payors would pay for covered services or products. *Id.* at 74:12–16.

96.     Dr. Miller's reports and opinions use the "most recent available rates" for covered services or products. *Id.* at 69:6–20.

97. The United States' retained expert economists (i.e., Dubravka Tosic for leukemia and non–Hodgkin's lymphoma, Patricia Yount for bladder and kidney cancer, and Andrew Brod for Parkinson's disease) applied separate analyses using Dr. Miller's opinions. *Cf. id.* at 87:11–18 (testifying that he did not review the United States' economists' reports), 168:22–25 ("I don't know what the economist[s] did. My intent was to provide them with information as to how much the government would pay and they have that information right there.").

98. Dr. Miller was asked: "[D]o you have an opinion based on your own experience with Medicare whether it is likely that Medicare will continue to cover healthcare for those 65 and older?" He answered: "I do have such an opinion and I believe that it will." *Id.* at 236:18–23.

99. Dr. Miller testified "[w]ithout question [Medicare rates] have increased" over time and that Medicare rate decreases are "rare." *Id.* at 236:24–237:3. He further testified that Medicare rates "***will definitely increase***" into the future. *Id.* at 237:4–8 (emphasis added).

100. Dr. Miller testified the "vast majority of providers[,] ***close to 95 percent***" accept Medicare, even in rural areas. *Id.* at 100:10–12, 101:1–5 (emphasis added).

101. Dr. Miller, in his reports, noted that funding for Medicare is entrenched in U.S. tax law and support for Medicare is widespread across the political spectrum. *See id.* at 123:7–19. Dr. Miller relied on a survey to support that statement. *See id.* at 20–23.

102. Ultimately, Dr. Miller testified about Medicare's financial problems: "So certainly we don't know exactly what is going to happen, but based on past history – and the past history is substantial – ***it is likely that the Medicare program will continue to operate at least similarly to what it does now.***" *Id.* at 136:22–137:14 (emphasis added).

103. For evaluating future costs associated with life care plans with services covered by VHA, Dr. Miller used Community Care Network ("CCN") and Medicare rates. *Id.* at 237:9–14.

Dr. Miller did so because, when a patient receives treatment at a VA facility, the patient does not receive a bill and no money changes hands. *See id.* at 143:21–144:9.

104. Dr. Miller also explained that "the only time I used . . . the CCN rates was when a service was not covered by Medicare, but covered by VHA. There is a much smaller universe of services." *Id.* at 145:25–146:6; *see also id.* at 150:13–18 (testifying "the VA rates that we're talking about apply to only a small number of services in my reports"), 151:19–20 (testifying "for most services VHA uses the Medicare rate").

105. Dr. Miller explained that his use of CCN rates for future medical care covered by VHA was "***conservative***" because "actual costs in VA hospitals ***most often are higher*** than the CCN rates." *Id.* at 239:6–20 (emphases added); *see also id.* at 153:6–7 (testifying that "we used the most conservative approach each time"), 154:7–8 (testifying "[w]hen there is an option we're always assuming the lower rate").

### Andrew Brod, Ph.D

106. Andrew Brod, Ph.D is a forensic economist who offers opinions about economic damages alleged by the Parkinson's disease Track 1 Trial Plaintiffs. *Cf.* Brod Dep. Tr. at 16:10–16, 18:3–12 (JA Ex. 770, D.E. 841–1).

107. Dr. Brod testified: "Nothing we do when we project into the future provides 100 percent certainty. ***Nothing that anyone does in any field when the future is projected or estimated is 100 percent certain.*** The future is unknown, but that doesn't mean . . . we can't make reasonable projections about the future." *Id.* at 93:14–24 (emphasis added).

108. Asked what he meant by the phrase "opinions to a reasonable degree of certainty," Dr. Brod testified that phrase meant the following to him as a forensic economist: "Well, it means that it is as certain as I can achieve as a human being and someone making projections into the

future. ***It is not 100 percent certain because no projection into the future is 100 percent certain.*** They are all of necessity . . . uncertain to some degree. And so the key thing here is not the word 'certainty' but the phrase 'reasonable degree of certainty.' It's as close to certain as I can make it, and the degree and my effort in this regard has been reasonable. It's not an unreasonable degree of certainty. It's a reasonable degree of certainty." *Id.* at 160:4–21 (emphasis added).

109.    Dr. Brod testified that he has calculated future offsets as a forensic economist many times before doing so in this litigation. *See id.* at 238:9–12.

110.    Dr. Brod testified that, in arriving at his opinions about offsets in the Parkinson's disease Track 1 Trial Plaintiffs' cases, he generally employed the same methodology as he had in the past. *See id.* at 238:13–17.

### Patricia Yount

111.    Patricia Yount is a forensic economist/accountant who offers opinions in the kidney and bladder Track 1 Trial Plaintiffs' cases. Yount Dep. Tr. at 18:4–9, 44:8–14 (JA Ex. 790, D.E. 841-21).

112.    Ms. Yount testified that she assumed the VBA disability ratings for those Plaintiffs would not change as "based on the information we have right now, I have no reason to assume that it would change." *Id.* at 167:1–5.

113.    Ms. Yount testified that was a reasonable assumption because she had "no reason to assume that it would change, and it's based on the facts that we sit here today." *Id.* at 167:18–168:6; *see also id.* at 168:19–21 ("But as we sit here today, we have no reason to assume they would go up or down, and it's based on what we know today.").

114.    Ms. Yount further explained as to VBA disability ratings: "I have assumed no other changes. And if they receive additional ratings, you know, their benefit may not change. It may

stay where it is. If they get reduced, it could change. We don't know, as we sit here today; so we

base it off what we know today and that's what the calculations are." *Id.* at 171:12–25.

115. Ms. Yount testified: "[M]y calculations . . . are based on what we have today. I

cannot assume a change in the future unless there's a specific medical – someone to tell me that

it's going to change." *Id.* at 193:20–25.

### Dubravka Tosic, Ph.D.

116. Dubravka Tosic is an economist who offers opinions in the leukemia and non–

Hodgkin's lymphoma Track 1 Trial Plaintiffs' cases. Tosic Dep. Tr. at 33:18–34:8 (JA Ex. 787,

D.E. 841–18).

117. Asked if her VBA calculations would be inflated if Plaintiff Davis were to lose his

spousal benefit for some reason, Dr. Tosic testified: "If the current information was updated, then

the calculations could be updated. But the current calculations would not be updated based on

some speculations about what could happen in the future." *Id.* at 238:25–239:10.

118. Dr. Tosic explained that it "would be speculative not to assume" Plaintiff Davis

will remain married for the entire time he receives VBA disability benefits based on "our current

knowledge" and the "information that we have currently available." *Id.* at 238:16–24.

### Additional Miscellaneous Facts

119. Managerial cost accounting is not used at the VA to develop future medical costs.

Clarke Dep. Tr. at 172:22–173:6 (D.E. 863–1; refiled at D.E. 870).

120. Mr. Clarke's department at the VA has never made future projections of managerial

cost accounting. *See id.* at 34:8–11.

121. Mr. Clarke testified the purpose of managerial cost accounting is "[t]o provide cost

accounting information for both local, program office, and central office decision–making. It's

used in the . . . yearly budget for each of the facilities." *Id.* at 52:11–21; *see also id.* at 140:19-22 (testifying that managerial cost accounting "provides the cost to deliver [certain] care"), 55:8-17 (testifying that managerial cost accounting is required in federal agencies by law).

122. Plaintiff Mousser testified he "love[s] the VA and what they did for [him.]" Frank Mousser Dep. Tr. at 156:14–15 (attached to Appendix as **Exhibit D**);[8] *see also* Ex. A at BiB–22 (noting that there is a trust rate of 92% in the VA's health service delivery, "surpassing … private sector counterparts").

123. Plaintiffs' expert, Peter Rybolt, could not identify: (1) any pending bills that would reduce the scope of veterans benefits; (2) any veteran benefits that have changed since the current administration took office; (3) the likelihood of benefits changing in the future; or (4) any workforce reductions at the VA. Rybolt Dep. Tr. at 237:11–14, 238:2–24, 239:24–240:5 ("But, no, I have not attempted to try to estimate the likelihood of these things occurring."), 240:12–241:10 (JA Ex. 792, D.E. 841–23).

124. Mr. Rybolt admitted that he did not know what defined "unusual circumstances" warranting a reexamination for veterans over age 55 under 38 C.F.R. § 3.327(b)(2)(iv) and that it would accordingly be "difficult" for him to evaluate whether there were any unusual circumstances for any of the Track 1 Trial Plaintiffs. *Id.* at 189:11–21.

125. Mr. Rybolt was shown a VBA policy letter dated October 7, 2021, providing guidance on routine future examination requests. *Id.* at 166:6–19.

126. In that letter, the VBA "analyzed data on all Veterans who had a [routine future examination] conducted in fiscal years 2018, 2019, and 2020. The analysis revealed that the

---

[8] For convenience, the United States attaches a partial copy of Plaintiff Mousser's deposition transcript, but will file the full transcript upon the Court's request.

majority (77%) of conditions reviewed were confirmed and [continued]." *Id.* Only around 10% were reduced. *Id.* at 167:12–168:19.

128. Plaintiff McElhiney served more than 20 years and therefore has vested TRICARE benefits. *See* 01368_MCELHINEY_VBA_0000012971 (attached as **Exhibit E**).

128. Mrs. Tukes' husband also served more than 20 years and therefore she has vested TRICARE benefits. *See* 01553_TUKES_DPRIS_0000000320 (attached as **Exhibit F**).

129. Each of the Track 1 Trial Plaintiffs for whom future VBA disability benefits have been asserted is over age 55. Rybolt Dep. Tr. at 188:6–18 (JA Ex. 792, D.E. 841–23); *see also* Yount Rep. (Cagiano) at 2 (JA Ex. 719, D.E. 839–17); Yount Rep. (Criswell) at 2 (JA Ex. 720, D.E. 839–18); Yount Rep. (Laramore) at 2 (JA Ex. 725, D.E. 839–23); Yount Rep. (Fancher) at 2 (JA Ex. 723, D.E. 839–21); Yount Rep. (Howard) at 2 (JA Ex. 724, D.E. 839–22); Yount Rep. (Downs) at 2 (JA Ex. 721, D.E. 839–19); Yount Rep. (Mousser) at 2 (JA Ex. 726, D.E. 839–24); Tosic Rep. (Gleesing) at 4 (JA Ex. 707, D.E. 839–5); Tosic Rep. (Hill) at 6 (JA Ex. 708, D.E. 839–6); Tosic Rep. (Davis) at 4 (JA Ex. 706, D.E. 839–4); Tosic Rep. (Keller) at 6 (JA Ex. 709, D.E. 839–7); Brod Rep. (McElhiney) at App. A, 1 (JA Ex. 641, D.E. 837–5 at 13); Brod Rep. (Peterson) at App. A, 2 (JA Ex. 642, D.E. 837–6 at 11); Brod Rep. (Sparks) at App. A, 1 (JA Ex. 644, D.E. 837–8 at 10).

130. As of the dates of the expert reports, many of the Track 1 Trial Plaintiffs for whom the United States has asserted future disability benefits have not had their ratings change in years. *See* Yount Rep. (Criswell) at Table 3 (JA Ex. 720, D.E. 839–18 at 10), Corrected Table (Criswell) attached to Appendix as **Exhibit G**;[9] Yount Rep. (Laramore) at Table 5 (JA Ex. 725, D.E. 839–23

---

[9] At Plaintiffs' request, Ms. Yount supplemented her reports for Plaintiffs Criswell and Howard to include corrected tables as to their disability benefits, which the United States now files.

at 12); Yount Rep. (Fancher) at Table 3 (JA Ex. 723, D.E. 839–21 at 9); Yount Rep. (Howard) at Table 2 (JA Ex. 724, D.E. 839–22 at 9), Corrected Table (Howard) included in Exhibit G; Yount Rep. (Downs) at Table 2 (JA Ex. 721, D.E. 839–19 at 8); Yount Rep. (Mousser) at Table 6 (JA Ex. 726, D.E. 839–24 at 14); Tosic Rep. (Gleesing) at 17 (JA Ex. 707, D.E. 839–5); Tosic Rep. (Hill) at 21 (JA Ex. 708, D.E. 839–6); Tosic Rep. (Davis) at 13 (JA Ex. 706, D.E. 839–4); Tosic Rep. (Keller) at 19 (JA Ex. 709, D.E. 839–7); Brod Rep. (McElhiney) at 5 (JA Ex. 641, D.E. 837–5); Brod Rep. (Peterson) at 4 (JA Ex. 642, D.E. 837–6); Brod Rep. (Sparks) at 4 (JA Ex. 644, D.E. 837–8).

131. Plaintiff Hill, for example, has had a disability rating of 100% for chronic lymphocytic leukemia since August 31, 2015. Tosic Rep. (Hill) at 21 (JA Ex. 708, D.E. 839–6).

132. Dr. Miller testified that VHA coverage is expected to continue for the foreseeable future. Miller Dep. Tr. at 139:7–12 (JA Ex. 780, D.E. 841–11).

133. Dr. Miller testified that he assumes "everybody is going to behave rationally in an economic sense," for example, by accepting TRICARE (if qualified for it) instead of declining it in favor of private health insurance that will "cost them a lot more." *Id.* at 96:16–97:21.

68

Dated: June 2, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

JONATHAN D. GUYNN
Deputy Assistant Attorney General
Torts Branch

BRIDGET BAILEY LIPSCOMB
Chief, Camp Lejeune Justice Act Section

HAROON ANWAR
SARA J. MIRSKY
Assistant Directors

ADAM BAIN
Chief Litigation Counsel

MICHAEL CROMWELL
Senior Trial Counsel

GIOVANNI ANTONUCCI
DAVID ORTIZ
Trial Attorneys

*/s/ David R. Ortiz*
David R. Ortiz
N.C. State Bar No. 55891
Trial Attorney
United States Department of Justice
Civil Division, Torts Branch
Camp Lejeune Justice Act Section
310 New Bern Avenue, Third Floor
Raleigh, NC 27601
202–451–7756
david.r.ortiz@usdoj.gov

Attorney inquiries to DOJ regarding CLJA:
(202) 353–4426

*Attorneys for Defendant,*
*United States of America*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 2, 2026, I electronically filed the foregoing using the Court's

Electronic Case Filing system, which will send notice to all counsel of record.


*/s/ David R. Ortiz*
David R. Ortiz