IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
NO. 7:23-CV-897

**IN RE:**

**CAMP LEJEUNE WATER LITIGATION**

**This Document Relates To:**

**ALL CASES**

**UNITED STATES' OPPOSITION TO PLAINTIFFS' LEADERSHIP GROUP'S MOTION TO COMPEL TO ALLOW REASONABLE USE OF "MARINE CORPS DATA PROJECT" DOCUMENTS**

**TABLE OF CONTENTS**

Pages


Table of Contents ........ i

Introduction ........ 1

Background ........ 2

I. The United States Has Produced All of the Records at Issue in PLG's "Discovery" Motion. ........ 2

II. PLG Immediately Sought to Expand the Use of the MCDP Documents Beyond the Litigation. ........ 4

Argument ........ 5

I. While CLJA Plaintiffs and Claimants Can Easily Access and Obtain Their Own Records, Privacy Laws Restrict Disclosure to the General Public. ........ 5

II. The Court Has Indicated that Its Focus is the CLJA Litigation. ........ 7

III. The Parties Already Agreed to a Common, Unified Approach Toward Global Resolution. ........ 8

A. Questionnaire Process ........ 8

Conclusion ........ 10

Certificate of Service ........ 12

## INTRODUCTION

Plaintiffs' Leadership Group ("PLG") brings its motion to compel "pursuant to Fed. R. Civ. P. 26 and 37, and LR 7.1." Pls.' Mot. at 1, D.E. 930. However, those rules govern discovery, and this is not a discovery dispute. Fact discovery closed in August 2024, and the United States has already produced all of the documents PLG requested, including the nearly 100 million pages of Marine Corps Data Project ("MCDP") documents at issue in PLG's motion.[1] As PLG acknowledges, the United States produced these documents pursuant to "the guardrails of a carefully worded protective order that ensures confidentiality of the data and limited for use *in litigation*." Pls.' Mem. at 2, D.E. 931 (emphasis added).[2] Pursuant to the operative protective order, the Parties are currently operating within "an interim framework under which PLG [is] permitted limited access to the [MCDP] Records solely for the purpose of assessing the nature and utility of the data." Jt. Mot. Am. 2d Am. Stip. Prot. Order, D.E. 796, at 1. The Parties have begun discussing the terms of "additional Protective Order provisions governing further use or disclosure," *id.*, and the United States remains willing to do so.

To be clear, the United States and its relevant stakeholders do not object to the use of the MCDP documents *in litigation* "to provide factual details in support of the Plaintiffs' claims." Pls.' Mem. at 8, D.E. 931. However, due to the highly sensitive and private nature of the information contained in the MCDP documents, the United States must insist on sufficient transparency from PLG—which the United States has requested but not yet received—regarding how PLG intends to use, disclose, or rely upon these records in litigation, and to ensure that this highly sensitive information is adequately protected. Regarding PLG's

[1] The Muster Rolls—the object of PLG's quixotic pursuit throughout this litigation—have been referred to by many names, including the "NAS Database," the "SAN," the "MUDD Database," "PaperVision," and "USMC Digitization Records." *See* D.E. 199 at 2–4; D.E. 796 at 1. Since PLG now refers to these documents as "MCDP data," the United States adopts the same naming convention in this opposition.

[2] It should be noted that the MCDP data did not even exist until long after the close of fact discovery and, as this Court has observed, "'Rule 34 only requires a party to produce documents and information already in existence.'" Mar. 8, 2024 Order at 5, D.E. 157 (quoting *Frasier Healthcare Consulting, Inc. v. Grant Mem'l Hosp. Reg'l Healthcare Ctr.*, No. 2:12-CV-87, 2014 WL 12701042, at *4 (N.D.W. Va. Jan 9, 2014)). That said, the United States ultimately agreed to produce the MCDP documents for their narrow use *in litigation* and, even then, only under the terms of the Parties' agreed-upon protective order.

desire to use the MCDP documents "for the purposes of global resolution efforts generally," *id.* at 9, the Parties have already negotiated and agreed on the processes for obtaining information regarding the claimant population for a potential global resolution; these processes have been ongoing for more than two years.[3] The United States objects at this time to any use of the MCDP documents for non-litigation purposes, including global resolution, and respectfully asks this Court to deny PLG's motion.

## BACKGROUND

### I. The United States Has Produced All of the Records at Issue in PLG's "Discovery" Motion.

The United States learned of the United States Marine Corps' ("USMC") digitization project in late 2023 during the course of fact discovery, and advised PLG of the project, which was "[s]eparate and apart from any prior digitization" and had begun "before the Camp Lejeune Justice Act was enacted." Nov. 27, 2023 Letter to PLG, **Exhibit 1**. At the time, it was not clear which of the digitized documents, if any, would be responsive to PLG's discovery requests or relevant to the CLJA litigation. The United States later learned, and advised PLG, that the documents being scanned by the USMC included "unit diaries, muster rolls, and individual service records ***service-wide***, meaning most of the records are likely not specific to Camp Lejeune." Nov. 7, 2025 Letter to PLG, **Exhibit 2** (emphasis in original). The United States explained that "[t]he digitized records are currently sorted into two overarching categories: 'bulk records,' which consist of unit diaries, muster rolls, and other organizational records; and 'personnel records,' which include individual service member records and other individualized records." *Id.* at 2.[4] The USMC had indicated future plans for "a database that will enable some degree of cataloguing of the PDFs, metadata review, and search functionality," but there was "no estimated completion date for the database with search functionality of data across PDFs." *Id.* Therefore, considering the "marginal utility given the limited ability to search them," the United States advised PLG that "[p]roducing terabytes of scanned PDFs . . . much of which is

[3] PLG asserts that "DOJ incorrectly contends there is no global resolution at this time." Pls.' Mem. at 7, D.E. 931. PLG's basis for this assertion is unknown.

[4] The "personnel records" category contains, among other things, servicemembers' Social Security Numbers, dates of birth, medical records, disciplinary records, and financial records.

unrelated to Camp Lejeune entirely and/or is otherwise available to Plaintiffs," was "beyond the United States' discovery obligations for this litigation." *Id.* at 2–3. Significantly, these documents were available to PLG, apart from the digitization project, in hardcopy as they were ordinarily maintained, during the Track 1 discovery period. The United States offered PLG the opportunity to inspect these records in hardcopy multiple times throughout discovery. *See, e.g.*, *id.* at 2. PLG never accepted the offer. The digitization project was not completed until long after Track 1 discovery had closed.

Ultimately, upon agreement to the terms of the Parties' Third Amended Stipulated Protective Order, the United States produced the MCDP documents—at its own expense—and provided PLG with "limited access to the [MCDP documents] solely for the purpose of assessing the nature and utility of the data." Jt. Mot. Am. 2d Am. Stip. Prot. Order, D.E. 796, at 1.[5] The Parties "agreed that the records will not be used, disclosed, or relied upon beyond this preliminary review *unless and until* the Parties reach agreement on additional Protective Order provisions governing such use." D.E. 802 ¶ 2(l) (emphasis added). The Protective Order reflects the Parties' agreement that "[n]othing in this Protective Order expands the Eastern District of North Carolina's jurisdiction over the Department of the Navy's Camp Lejeune Justice Act administrative claim process ('Administrative Claim Process'), including, but not limited to the EO [Elective Option] process for the Navy's Camp Lejeune Justice Act Administrative Claims." *Id.* On August 7, 2026, the United States completed production of the MCDP documents. These documents consist of nearly 100 million pages of military records spanning over many decades, across the entire United States Marine Corps, and containing personal and sensitive information about numerous servicemembers who were never stationed at Camp Lejeune and have no stake whatsoever in the CLJA litigation.

[5] PLG incorrectly asserts that it "complied with [its] agreement" to "carry the cost and pay for any of the downloading of these records" and "to produce records downloaded at no cost to the DOJ." Pls.' Mem. at 4, D.E. 931. Although PLG *initially* agreed to bear the costs of the production, it later retracted that agreement, *see* Feb. 26, 2026 Jt. Stat. Rpt. at 13–14, D.E. 817, and the United States ultimately paid for production of the records to PLG. The United States also disputes that the MCDP documents are "the PLG's work product." Pls.' Mem. at 5, D.E. 931.

## II. <u>PLG Immediately Sought to Expand the Use of the MCDP Documents Beyond the Litigation.</u>

On August 7, 2026, the same day that the United States produced the final set of MCDP documents, PLG advised the United States: "it is obvious that the [MCDP data] is extremely relevant and necessary for veterans and their families to be able to qualify for the Elective Option potential offers and for the global discussions and ultimate resolution." Aug. 7, 2026 Email from Mona Wallace, **<u>Exhibit 3</u>**. PLG asked the United States to help "develop a process which would allow [PLG] to submit to the Navy and DOJ, relevant claimants' hits on the military records by file name and bates number," and proposed "a central and organized process that would at this time allow only [PLG's] independent vendor to access the data." *Id.*

At the August 17, 2026, Status Conference, PLG told the Court that it had developed a program where someone could type in a servicemember's name and/or Social Security Number and retrieve "Bates stamp numbers" of MCDP documents corresponding to that servicemember. Aug. 17, 2026 Hr'g Tr., D.E. 912, at 7:21-8:11.[6] In response to PLG's expressed desire to use the MCDP documents "for every purpose, for the EO purpose, for the resolution, for the litigation," *id.* at 8:4-11, the Court stated: "We've talked about muster rolls, if not in every status conference, sometimes more substantively than others. They do seem to have bearing on the litigation. *As far as the other matters, pre-litigation, I don't know that I'd have anything to say about that* . . . ." *Id.* at 9:12–19 (emphasis added). On September 3, 2026, in response to PLG's August 24, 2026 Letter, D.E. 930-1 at 6-15, the United States reiterated its request for the "specifics on the work" PLG had done and intends to do "in order to search through the records." Pls.' Ex. 1, D.E. 930-1, at 17-19. In particular, the United States asked for clarification on several issues, including:

- "information in writing regarding any programs, software, or other data manipulation that the PLG Technical Group is performing;"
- clarification as to "which platform is being used and the protections in place to ensure that the data being uploaded is being maintained in a 'closed universe;'"
- a "proposal for how this information will be eventually transmitted to the United States for review;"

[6] It is not clear—and PLG has not explained—how the resulting Bates stamp numbers would definitively prove a servicemember's time and location at Camp Lejeune, and whether PLG would verify the results prior to the records' use in litigation.

- "details as to how any PII within the MCDP records will be secured if the data is available to other parties, and how PLG will protect against violations of the Privacy Act;" and
- "whether PLG intends to require claimants or litigants who may seek to access the MCDP records to consent to joining PLG's Common Benefit Fund."

*Id.* at 1–2. On September 16, 2026, PLG "object[ed] to having to exhaustively detail the work product regarding our consultants and PLG Technical Group simply in order to be able to use the documents," but provided additional general responses and stated: "Once DOJ agrees that the information may be used, PLG will make its consultant available to explain how the data is processed and linked to source records and to address remaining technical questions. PLG is also willing to discuss how the development, use, and sharing costs should be allocated." Pls.' Ex. 1, D.E. 930-1, at 21-22. To date, PLG has not provided the United States with answers to its specific questions regarding the PLG's proposed use of the MCDP documents and, in fact, proposed terms to the Protective Order that raised even more questions. *See id.* at 24-25. The United States is not willing to agree to any use of the documents—either within or outside of litigation—without further explanations, assurances, and provisions in a Protective Order limiting use and protecting the privacy of the information.

## ARGUMENT

### I. <u>While CLJA Plaintiffs and Claimants Can Easily Access and Obtain Their Own Records, Privacy Laws Restrict Disclosure to the General Public.</u>

PLG's motion suggests that the MCDP documents are the only source of documents to substantiate a CLJA claimant's time and location on base, and that it is "manifestly unfair" for the United States to refuse use of the MCDP documents "to substantiate their claims." Pls.' Mem. at 5 n.1, D.E. 931. To the contrary, veterans (or their next-of-kin if deceased) have been able for years to quickly and easily obtain their records without jeopardizing the privacy of their fellow servicemembers. Indeed, the United States, the Settlement Masters, and the Court have advised that individuals can (and should) obtain their own records. Oct. 23, 2025 Order, D.E. 652; IN RE: CAMP LEJEUNE WATER LITIGATION, https://camplejeunecourtinfo.com/questionnaire-information/ (last visited Oct. 20, 2026).

"The National Personnel Records Center, Military Personnel Records (NPRC-MPR)," a division of the National Archives and Records Administration (NARA), "is the repository of millions of military personnel, health, and medical records of discharged and deceased veterans of all services during the 20th century."[7] "NPRC-MPR also stores medical treatment records of retirees from all services and records for dependents and other persons treated at naval medical facilities."[8] Veterans (or their next-of-kin if deceased) can request their own records from several different sources, including NPRC-MPR[9] and the Department of Veterans Affairs.[10] While response times may vary, NPRC-MPR "work[s] actively to respond to each request in a timely fashion."[11] An individual can check the status of a records request online or by telephone after allowing around ten days for NPRC-MPR to receive and begin processing the request.[12]

Military records dated 62 or more years before a veteran's discharge date (currently, a discharge date of 1964 or earlier) "are archival and open to the public."[13] Anyone can request archival records online, by mail or fax, or in person.[14] On the other hand, "[r]ecords of individuals who left service **less than 62**

---

[7] Military Personnel Records, NATIONAL ARCHIVES, https://www.archives.gov/personnel-records-center/military-personnel (last visited Oct. 20, 2026).

[8] *Id.*

[9] Request Military Personnel Records Using Standard Form 180, NATIONAL ARCHIVES, https://www.archives.gov/veterans/military-service-records/standard-form-180 (last visited Oct. 20, 2026).

[10] Claimants can visit va.gov/records to request the files used by the Veterans Benefits Administration to make service-connection determinations on their benefits claims. These files will often contain military records scanned from NARA, as well as diagnosing documents from private and VA medical treatment facilities.

[11] Request Military Service Records, NATIONAL ARCHIVES, https://www.archives.gov/veterans/military-service-records (last visited Oct. 20, 2026).

[12] Access to Official Military Personnel Files (OMPF) for the General Public, NATIONAL ARCHIVES, https://www.archives.gov/personnel-records-center/ompf-access-public (last visited Oct. 20, 2026).

[13] Archival Holdings, NATIONAL ARCHIVES, https://www.archives.gov/st-louis/military-personnel-archival (last visited Oct. 20, 2026).

[14] Official Military Personnel Files (OMPF), Archival Records Requests, NATIONAL ARCHIVES, https://www.archives.gov/personnel-records-center/military-personnel/ompf-archival-requests (last visited Oct. 20, 2026).

**years** ago are non-archival and remain in the legal custody of the Department of [War]."[15] "Access to those records is restricted by privacy laws," *id.*, in order to "strike a balance between the public's right to obtain information from Federal records, as outlined in the Freedom of Information Act (FOIA), and the veteran's right to privacy as defined by the Privacy Act."[16] Without express authorization from the veteran or next-of-kin, the general public is only entitled to limited information from servicemembers' personnel records, which remain the property of the Department of War until archival.[17]

## II. The Court Has Indicated that Its Focus is the CLJA Litigation.

PLG cites the Court's orders appointing Leadership and the Settlement Masters to "pursue global resolution efforts" as justification for this Court to order the United States to allow PLG to use the MCDP documents however it sees fit. *See* Pls.' Mem. at 8–9, D.E. 931. However, the Court appointed PLG "to fairly, effectively, and efficiently represent the interests of all *plaintiffs before this Court*." July 19, 2023 Order at 1, D.E. 10 (emphasis added), not claimants who have not brought lawsuits against the United States in the Eastern District of North Carolina.[18] And to the extent that PLG hopes to use the MCDP documents as a common "database" to be used for global resolution, *see* Pls.' Mem. at 1, D.E. 931; *see also* Pls.' Ex. 1, D.E. 930-1, at 9 ("The MCDP is a very effective tool to assist in resolving many of the remaining 5,000 deficient EOs that still exist and could be an integral part of a prospective settlement matrix."), the Court has already designated a "Government Liaison" and "Database Development Committee" to discuss

[15] *Id.* (emphasis in original).

[16] Access to Official Military Personnel Files (OMPF)for the General Public, NATIONAL ARCHIVES, https://www.archives.gov/personnel-records-center/ompf-access-public (last visited Oct. 20, 2026).

[17] Freedom of Information Act (FOIA) and The Privacy Act, NATIONAL ARCHIVES, https://www.archives.gov/personnel-records-center/foia-info (last visited Oct. 20, 2026).

[18] *See, e.g.*, Mar. 5, 2026 Hr'g Tr., D.E. 824, at 15:23–17:12 (declining to "even discuss too much of [settlement] matters" because the Court is "focused on the litigation"); Oct. 1, 2026 Order, D.E. 20, Case No. 7:24-cv-976 (Myers, J.) (observing that the Parties' stipulated protective order does not expand the Court's jurisdiction over the administrative claim process, including the EO process); Oct. 5, 2026 Order, D.E. 19, Case No. 7:24-cv-982 (Dever, J.) ("The United States controls its discretionary settlement decisions."); Oct. 13, 2026 Order, D.E. 19, Case No. 7:24-cv-973 (Flanagan, J.) ("The court has made efforts to clarify against expansive readings of its prior orders to potentially suggest jurisdiction over the EO claims process.").

such issues with the United States at the appropriate time. *See* July 19, 2023 Order at 4,5, D.E.10.[19] Regarding the Court's appointment of the Settlement Masters and Settlement Liaison, their authority is expressly limited "to facilitating settlement discussions," July 9, 2024 Order at 2, D.E. 251, which have consistently taken place since that appointment. As discussed below, the Parties have been actively engaging with the Settlement Masters and Settlement Liaison for more than two years in pursuit of "a common, unified approach to global settlement of this litigation." *Id.*

## III. The Parties Already Agreed to a Common, Unified Approach Toward Global Resolution.

### A. Questionnaire Process

As part of global resolution efforts, PLG and the United States negotiated a questionnaire, overseen by the Settlement Masters, to be sent to a random sample of 2,500 CLJA claimants currently in the administrative process. Mar. 21, 2025, SM Report, D.E. 340, at 6; Oct. 8, 2025, SM Report, D.E. 647, at 2 ("[T]he Parties and the SMs finalized the questionnaire . . . . Pursuant to that process, a random sample of approximately 2,500 claimants has been asked to complete a detailed questionnaire that will provide additional information about the characteristics of the entire claimant population."); Oct. 23, 2025, Order, D.E. 652. The purpose of the questionnaire was to inform "a matrix that would define compensation based on a set of factors" and "a matrix for assigning values to claims and claimants . . . such that a global settlement and settlement process could be agreed upon . . . ." Mar. 21, 2025, SM Report, D.E. 340, at 5; *see also* Oct. 8, 2025, SM Report, D.E. 647, at 1 ("A questionnaire process . . . would provide detailed information about a sample of cases that the Parties could extrapolate to the population as a whole (more than 400,000 claims including the administrative process)." (emphasis omitted)).

On October 23, 2025, Judge Gates, as Settlement Liaison, entered an Order requiring the 2,500 randomly selected claimants to submit questionnaire responses by November 24, 2025. *See* Oct. 23, 2025, Order, D.E. 652. Judge Gates emphasized that the questionnaire process was "a critical part of the path

[19] The Court has not appointed a new Government Liaison since Ms. Zina Bash's withdrawal from PLG. *See* Jan. 30, 2026 Order, D.E. 808; June 30, 2026 Order, D.E. 893; Sept. 29, 2026 Order, D.E. 925.

toward settlement" that would allow a fuller understanding of "the wide scope of claims that would need to be resolved in a global settlement framework." *Id.* at 1. The questionnaire process was how the Parties agreed to obtain information needed to inform the matrix. The Parties worked for over two years to draft the questionnaire, collect responses, and analyze the resulting data. PLG apparently now wants to abandon the questionnaire process and use the MCDP data as a substitute. However, the results of the questionnaire have been revealing. As PLG reported at the November 14, 2025, Status Conference, the questionnaire process has revealed that "there might be a significant number of people that don't have valid claims." Nov. 14, 2025, Hr'g Tr., D.E. 734, at 13:12–16.[20]

The Parties' global resolution efforts to date have revealed that the collective CLJA plaintiff and claimant pool is likely rife with unsupported claims. PLG's attempt to use the MCDP documents as a back-door vehicle to "gain[] a better understanding of the number of potential participants of the settlement, their locations, and times on base," Pls.' Ex. 1, D.E. 930-1, at 28, is not a sufficient reason to upend the last two years of the Parties' carefully negotiated global settlement efforts and, in the process, potentially jeopardize the privacy of millions of servicemembers who have no connection whatsoever to Camp Lejeune or the CLJA litigation.

It is well within the Court's authority to order the Parties to engage in good-faith settlement efforts, and to appoint Settlement Masters to facilitate such discussions, but the United States posits that it is not for this Court to order that documents produced *in litigation* under the *agreed-upon* terms of a strict protective order must necessarily be shared with and used by non-litigants for non-litigation purposes, including the administrative process and global resolution. *See supra* note 18.

[20] The United States is willing to provide a detailed breakdown of the results from the questionnaire process at the Court's request. The lack of response and substantiation during the questionnaire process reflects the larger issue of lack of substantiation for the 408,500 pending CLJA administrative claims. *See* Dec. 3, 2025, Hr'g Tr., D.E. 735, at 26:20–27:9 (MR. BELL: "I noticed in the status report there is a significant number of people that have not given the minimum information to the Department of Navy . . . The Government has said there are 177,478 claims that have at least one supporting document. And there are 65,000 that could be under the Elective Option. If you take 177,000 out of 409,000, that's a significant number of claims that may not be eligible, Judge.").

## CONCLUSION

PLG's motion regarding use of the MCDP documents in litigation is premature, as the United States has been, and remains, willing to consider such use in litigation once PLG provides the necessary transparency that the United States has requested and a revised Protective Order is entered. Further, PLG's motion regarding use of the MCDP documents outside the litigation, for administrative and global resolution purposes, should be denied because the Parties have already negotiated and agreed to the processes governing such purposes. Finally, the Court has made clear that it will not insert itself into the Parties' negotiations concerning resolution of claims outside the litigation. Accordingly, for the foregoing reasons, the United States respectfully requests that this Court deny PLG's motion.

Dated: October 20, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

JONATHAN D. GUYNN
Deputy Assistant Attorney General
Torts Branch

BRIDGET BAILEY LIPSCOMB
Chief, Camp Lejeune Justice Act Section

HAROON ANWAR
SARA J. MIRSKY
Assistant Directors

ADAM BAIN
Chief Litigation Counsel

*/s/ Jennifer E. Adams*
JENNIFER E. ADAMS
Virginia Bar No. 80149
Trial Attorney
United States Department of Justice
Civil Division, Torts Branch
Camp Lejeune Justice Act Section
1100 L Street, NW
Washington, DC 20005
(202) 702-4998
jennifer.e.adams@usdoj.gov

Attorney inquiries to DOJ regarding CLJA:
(202) 353-4426

*Attorneys for Defendant,*
*United States of America*

## CERTIFICATE OF SERVICE

I hereby certify that on October 20, 2026, I electronically filed the foregoing using the Court's Electronic Case Filing system, which will send notice to all counsel of record.

*/s/ Jennifer E. Adams*
JENNIFER E. ADAMS