# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION | * | MDL No. 2:18-mn-2873 |
| | * | June 20, 2025 |

TRANSCRIPT OF STATUS CONFERENCE

BEFORE THE HONORABLE RICHARD M. GERGEL
UNITED STATES DISTRICT JUDGE, presiding

A P P E A R A N C E S:

For the Plaintiffs:

Motley Rice LLC
BY: FRED THOMPSON III, ESQ.
JOSEPH F. RICE, ESQ.
28 Bridgeside Boulevard
Mt. Pleasant, SC 29464

Douglas and London PC
BY: MICHAEL A. LONDON, ESQ.
59 Maiden Lane, 6th Floor
New York, NY 10038

Napoli Shkolnik PLLC
BY: PAUL J. NAPOLI, ESQ.
1301 Avenue of the Americas
10th Floor
New York, NY 10019

Baron and Budd
BY: SCOTT SUMMY, ESQ.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219

For the Defendants:

Duffy and Young LLC
BY: BRIAN C. DUFFY, ESQ.
96 Broad Street
Charleston, SC 29401

Nelson Mullins
BY: DAVID E. DUKES, ESQ.
1320 Main Street, 17th Floor
Columbia, SC 29201

Williams & Connolly LLP DC
BY: JOSEPH G. PETROSINELLI, ESQ.
725 12th Street NW
Washington, DC 20005

Mayer Brown LLP
BY: MICHAEL A. OLSEN, ESQ.
DAN RING, ESQ.
71 S. Wacker Drive
Chicago, IL 60606

For the United States of America:
US Department of Justice
BY: HAROON ANWAR, ESQ.
SHARI HOWARD, ESQ.
MICHELE GREIF, ESQ.
Environmental Torts, Civil Div.
175 N Street NE
Washington, DC 20002

Court Reporter:
KAREN E. MARTIN, RMR, CRR
PO Box 835
Charleston, SC 29402

Proceedings reported by stenographic court reporter. Transcript produced with computer-aided transcription software.

Friday, June 20, 2025

(WHEREUPON, court was called to order at 9:22 AM)

**THE COURT:** Good morning. Please be seated.

Okay. I figured we must be giving something away today with everybody here. Everybody heard what a great city Charleston is to visit.

Okay. We're going to, sort of the order of things, I think we mostly know this. We're going to go through the status conference first. And then we're going to break. I understand y'all want to do a little setup here. And then we'll proceed to the Science Day. And just for everyone's information, we'll do liver cancer first, plaintiff, defendant. Then we'll do thyroid cancer, plaintiff, defendant.

Okay. Could counsel for the plaintiff who will be speaking identify for the record?

**MR. LONDON:** Good morning, Your Honor. Michael London for the PEC.

**MR. SUMMY:** Scott Summy, Your Honor.

**MR. RICE:** Joe Rice, Your Honor.

**THE COURT:** Thank you.

Okay. And for the defense?

**MR. RING:** Good morning, Your Honor. Dan Ring on behalf of the defense and 3M. And with me is Mr. Duffy standing in for Mr. Olsen and Mr. Petrosinelli and

Mr. Dukes today.

**THE COURT:** He's got big shoes to fill.

**MR. DUFFY:** Battlefield promotion, Your Honor.

**THE COURT:** Yes. You know, those are the first guys that get shot. (Laughter)

**MR. RING:** Thank you for that, Your Honor.

**THE COURT:** But you're second, you know. Revolutionary War they look for the generals, and then they got the brigadiers next.

And for the United States?

**MR. ANWAR:** Good morning, Your Honor. Haroon Anwar. I'm here with my colleague, Michele Greif, and my ENRD colleague Shari Howard, who is here in place of Mr. Knudsen.

**THE COURT:** Well, first of all, welcome.

**MR. ANWAR:** Thank you.

**THE COURT:** And if you hide at the back row, we'll still find you.

**MR. ANWAR:** Noted.

**THE COURT:** Okay. Let me just for a moment talk a little bit about our calendar. Most of these things are known, but a few may not be.

Of course, we received the summary judgment motions and Daubert motions. And the responses are due on July 17 and replies are due on July 31. Now, folks, let

me just make it very clear. At that point, if this case is not resolved, I'm digging in to those motions and I am going to decide them. Okay? We're not messing around with this. So I know y'all are in active discussions. I would not dither. Okay? Because we're going to -- I've got a trial in October and I've got to make -- get in through those documents and make rulings.

I'm going to schedule oral argument on the Daubert and summary judgment motions on September 18. And my goal is to have orders out by September 29 or earlier, so four weeks out from trial. And at that point I will designate whether we're doing one, two, or three kidney cancer cases and which ones we will be doing.

And I'm holding off for the obvious reasons, I need to get through Daubert to see if anything survives. And then I've got to sort out, I'll have a deeper understanding of the cases and the appropriateness of it by then. And then we're going to have a pretrial conference on October 16. And I draw a jury on October 20.

Now, I know there is this request for supplemental jury questionnaires. And maybe it is the backwardness of our court, but I don't think it's just that. I'm not going to send out questionnaires and let me tell you why. I've only done supplemental questionnaires

in 15 years on one case, the United States vs. Dylann Roof, for obvious reasons. I brought the jurors to the courthouse to fill out the questions because I wanted some control over them because I was worried everybody would start doing Google searches. If I send out questionnaires relating to PFAS, we're going to have everybody doing Google searches. And the last I checked, that does not meet the legal standards for admission. And I'm just not going to do it.

We'll do voir dire. Let me say, do not try proposed voir dire questions to do what I call push polling where you're trying to get the jurors to think a certain way. I'm very familiar with how to scratch through those. Okay? And use a little proportionality. I'm not going to let you do a colonoscopy on my jurors. We're looking for general -- we're looking for neutral people, people who don't have a dog in the fight. So I will ask questions that get to that.

But most people, if you -- I'm sure all of you who are involved in this will say -- friends will say what are you working on? I'm working on this thing with AFFF or PFAS. And they look at you bewildered. Okay? They have no idea what you're talking about. Maybe if you say forever chemicals they go, oh, I've heard about that. So we're not talking about people who are carrying around I


Case 7:23-cv-00897-RJ Document 936-2 Filed 10/23/26 Page 7 of 29

think a lot of baggage on these issues, unlike my death penalty case which was loaded with all kinds of potential issues.

So we're going to do it, voir dire. You'll submit your voir dire to me. I will have my red pencil out. And I will often rephrase questions so they are not push polling. But there are issues y'all will point out to me that I think are useful to issues that are useful for further juror inquiry.

Now, with that Mr. London, please proceed.

**MR. LONDON:** Good morning, Your Honor. Michael London. And I'm going to run through the Joint Status Report for Your Honor.

**THE COURT:** Yes.

**MR. LONDON:** I trust those binders are not too -- not related to our status report.

**THE COURT:** Well, you know, they're not. But let me make a small comment about these binders. I've done multiple Science Days. And I've always done ten articles on each side. Thoroughly digestible, right? Even very complicated issues. That's been fine. Somehow these morphed out into 22 articles per cancer. Eighty-eight articles. Ridiculous, folks. Ridiculous. And at least the defendants gave me some mercy. They attached on some of their 22 supplemental data relating to

articles they thought particularly important.

Thank y'all for that.

I still read over 80 articles. I am convinced having read them now y'all could have given me ten total each side and been just fine. Okay? But they are done. The good news is I've read them. The bad news is I've read them. Okay?

Okay. But so the answer, Mr. London, is yes, all these are related to this monstrous production y'all have given me. And this is my total notebook for the status conference. Very typical. Okay. Please proceed.

**MR. LONDON:** Thank you, Your Honor. To move to the Joint Status Report relatively quickly, the updates since the last case management conference in April, document production continues, depositions continue. I believe there were 19 taken since last April.

Moving on to the settlement report, we are happy to report that the 3M first payments, the Phase One Action Fund, have started to go out.

**THE COURT:** The check's cleared?

**MR. LONDON:** Checks have cleared, checks have gone out, and they're rolling out to the Phase One class members, which is terrific. The Dupont payments are following very shortly behind, very, very soon. The Tyco and BASF claim forms have been submitted and are done.


Case 7:23-cv-00897-RJ Document 936-2 Filed 10/23/26 Page 9 of 29

The special needs form deadline was extended until August. But the special master and claims administrator believe that they are on target to be paid this year as well. So that's really terrific news. And they have worked expeditiously and incredibly to oversee a really complex claims form. This is not just simple do you have an injury or did you use a product? So it's really been a Herculean task and they've done it efficiently and effectively I think.

Moving forward, Your Honor, the bellwether report in the Joint Status Report I think Your Honor is well abreast on the Group A cases and has --

**THE COURT:** More than I want to know.

**MR. LONDON:** -- addressed everything that I would have commented on including the dates of the oppositions and the replies. And thank you for telling us when Your Honor will be winnowing the cases from below three, if at all.

The Group B cases, which is the thyroid disease and ulcerative colitis, those are still moving forward through discovery. The Court added a few more ulcerative colitis cases. We'll work with the defense to get expert dates probably in the late fall for those.

And lastly, the Group C cases we are remiss, the high cholesterol and pre-eclampsia. We owe the Court --

we, the royal we here, plaintiffs and defendants, the Court a CMO on how to address those. We'll get something to the Court. If we can't, we'll get a proposal from each side to the Court in short order.

**THE COURT:** Let me just say, folks, sitting here without a dog in the fight, just trying to make sure everyone has a fair field to fight on, I think y'all would be extremely prudent to be flexible enough to look for a global settlement. You really want to spend the rest of your life litigating these claims? I mean, really? I think it's like your grandchildren's lives. This thing is going go on forever unless you folks have the vision and imagination and flexibility to find some path that everyone feels like it may not be the perfect deal, but it's the most reasonable under the circumstances. I know y'all are working towards that.

And I just think the highlight when we're sitting there going through all these -- we've still got testicular cancer. We've got sovereign claims. We've got other claims.

I'm just saying to you, folks, making some incremental progress is going to end up being -- at some point, let me just say, guys, at some point this goes back to the district court that sent me these cases. And that is not a good situation for anyone. In fact, it's a

disaster for everyone, right? Including my colleagues who are going to get all these cases. Okay? But it is going to be, I think, financially ruinous to everyone.

The one propitious moment I view in getting this done might be in the next 60 days. I really do. And I know some of y'all are warriors. You're used to fighting and litigating. That's why y'all were hired by your clients. But you need some negotiators and diplomats in this as well because y'all need to find a path to get this done. And that's my two cents worth.

**MR. LONDON:** Thank you, Your Honor. Noted and we'll work towards that.

I think then moving forward, Your Honor, somewhat apropos to that but not moving forward on the CMO 32 cases, those are the dirt cases, the product ID cases, those are -- parties have served written discovery back and forth, that's being answered. I believe depositions are on target to start being noticed soon, but July and August, those are the property damage cases. The parties have a bit of an ongoing dispute over the scope of two of the plaintiffs that are in the cases. We met last night. Again --

**THE COURT:** What do you mean the scope of the two plaintiffs?

**MR. LONDON:** So there are two plaintiffs, Palm


Case 7:23-cv-00897-RJ Document 936-2 Filed 10/23/26 Page 12 of 29

Beach Airport and Fire Training Center, and it's at both entities, and Shreveport Airport Fire Training Center, and it's at both entities. We are not -- it is not ripe I think for the Court. We spoke last night. We spoke again this morning. And we'll try and come to agreement of how that scope works out. And if we can't agree, we have -- if we cannot agree, we have agreed to submit our proposals to the Court by next Thursday.

**THE COURT:** That's fine. I know how to say no. I'm a parent.

**MR. LONDON:** Well, good, now I know how to phrase the request. (Laughter)

Your Honor, moving forward, I don't think there's much to talk about beyond the Joint Status Report other than defendant discovery status for the Turnout Gear and the other foam defendants.

Which then brings us, Your Honor, to the United States section. There are a few issues to update there. Haroon Anwar is here from the United States. Okay. Your Honor, I could start basically with --

**THE COURT:** Let me hear what you've got to say. Let me just say, when I heard there were 400 -- is it 400 interrogatories and 400 requests to produce or are they 800 total?

**MR. LONDON:** It's 400 and 400.

**THE COURT:** Somebody hadn't read my order. Okay? This is a narrow issue of discovery. Are there policies at other bases like the one we had in our principal case? You know, are there -- is there -- do we have information in other places for accidental discharges? Mistaken neglectful discharges?

I thought this was a fairly limited scope we were looking at. You know, as we dug into this issue, it was more nuanced I think than all of us appreciated. There's a lot of baggage in the case law, difficult for the plaintiffs. I confront this all the time in cases about discretionary review and discretionary decisions and so forth.

So I wasn't expecting -- I thought this was a pretty discrete set of issues. And so here's what I'm saying to you is, Joint Status Reports aren't ways to resolve issues if we've got to -- if we have a real dispute that can't be resolved. I've read -- both sides are saying we are optimistic about it. We're working on it. We're optimistic about it. I'm hoping my statements here will give some guidance.

But somebody needs to file either from the plaintiff's side a motion to compel, from defense side a motion for protective order and I'll rule on it. But I don't even have the discovery requests. It's just when I

hear there are 800 out there, it just seems to me, hold on a minute, that's way overboard.

And we're not relitigating the issue. We spent an exhaustive amount of time -- and I want y'all to remember Ms. Falk, our issues about causation, we're not even there yet that are really, really complicated if you have, say, some accidental discharges and a lot of ones that wouldn't -- that wouldn't be -- that wouldn't fall within the Tort Claims Act. And how do you sort all that out? I'm just saying we've got lots of issues in this case. And I just think y'all do not, despite the fact you've packed a couple courtrooms, you don't have enough resources endlessly to litigate things.

And I just say to you, Mr. London, you'll remember at our first status conference in this case I said to y'all, all this talent in the room and y'all are going to be trying to tear each other's eyes out. You need to be working together to educate Congress the issues here. Because the Tort Claims Act is really a challenge to get the kind of relief that the water districts in particular need. And that something like a 9/11 kind of structure with Congress seems like a particularly appropriate approach. I've thought that then from the beginning of this. And I'm sure y'all have made some efforts. I understand there were some efforts with

firefighters and some early efforts with that, which is a very sympathetic group and a group that's had a lot of exposure.

But I'm just saying to you, you know, there are limits. The law has put some practical limits on your ability to recover, though the Government appears to have some role and some hand in this. But getting it and you'll probably now move on to CERCLA, I think y'all are having issues with CERCLA, right, getting progress in CERCLA?

**MR. LONDON:** That's right, Your Honor. And that is helpful. And you have certainly made those statements and views known from the beginning. And I think we echo them. I think everybody does agree.

It is somewhat misleading to just cast that it's 800 demands and 400 and 400. And I only say that because there's about two dozen sites at play. And 18 interrogatories per site per plaintiff were issued. So 18 times 24, 430 something. So that's where that comes from. I will say -- and the Court's order said complete the discovery in 90 days, which would have been May --

**THE COURT:** Because I thought we were dealing with give me all your policies in these -- I think we were talking about 12 sites or something?

**MR. LONDON:** It's a little bit more than that.

THE COURT: Okay. And give me all your accidental discharges or mistaken or neglected -- that's what I thought was coming. And I thought 90 days was plenty. But that's not -- that doesn't sound like 18 per site. That's a little beyond what I was talking about.

MR. LONDON: So what I think, though, Judge, the good news is out of this, what the parties realize is it's a lot. Whether it's ten interrogatories, 18 interrogatories, ten document demands, 18 document demands, it's a lot. So the proposal of the CMO the Court will be getting from the parties is to triage the sites. Do four of them now.

THE COURT: Right. Four of them --

MR. LONDON: Four of them following that. If necessary, four more.

THE COURT: But you need to narrow -- you need to read my order and they need to be tailored to my order whether there are four or 24. Okay?

MR. LONDON: And that's helpful, Your Honor. The teams that are prosecuting those cases have heard this.

THE COURT: For teams, that's their baby. Okay? But there's got to be command and control in this thing. And that's what I'm looking for my leadership to provide.

MR. LONDON: And I think the narrowing of the

four was very helpful. And we're glad -- that was a great first step.

So, Your Honor, now pivoting to CERCLA, I guess I'll start with the good news. I was going to finish with this, that we've taken nine months but a tolling agreement has been reached.

**THE COURT:** Good.

**MR. LONDON:** And I think will be submitted to the Court shortly. The not so good news, and I'm sure Your Honor saw from the Joint Status Report, we had picked these four exemplar cases almost a year ago to issue demands, do settlement discovery. That was the four cases, the Bakman case, New Mexico Highland Dairy, and Westfield. The pace of resolution or discussions was --

**THE COURT:** Drip, drip, drip.

**MR. LONDON:** Right. And the plaintiffs complained about that in JSR after JSR after JSR.

**THE COURT:** And I've told you that they don't have an obligation to settle with you. And y'all can litigate it.

**MR. LONDON:** Unfortunately, Mr. Knudsen, who was in charge of resolution has moved on within the DOJ. We do not yet know his replacement. So at this point, without somebody --

**THE COURT:** I think we have someone. I think we

were introduced to him. You can go introduce yourself to him in a minute.

MR. LONDON: Certainly will. We intend -- I think some of the plaintiffs intend to file affirmative motions for summary judgment --

THE COURT: That's fine.

MR. LONDON: -- shortly.

THE COURT: I just sort of feel like, you know, from time to time I have in my civil cases I have lawyers complaining, you know, the guy won't settle with me. And I'll say, well, that's why we have juries. We try cases around here. Nobody has to settle and make your motions.

So, yeah, I know y'all are frustrated. And I know that it's disappointing that when you finally felt like you had at least a working model with Mr. Knudsen, he's moved on. Okay? But let me say this, about half the DOJ lawyers have either left or moved on to other departments. So everybody's facing this when litigating against DOJ.

MR. LONDON: We just wish they didn't take Mr. Knudsen. He had the checkbook.

THE COURT: Yes.

MR. LONDON: Well, be that as it may, we'll be -- two plaintiffs I believe will be filing motions for summary judgment. I think a few others may need some

affirmative discovery before they file.

And Your Honor, I think that concludes the PEC's comments. I don't know if --

**THE COURT:** Tell me on the bellwethers, I saw y'all were dismissing -- and I'll bring the Government up after I do the defense. Y'all were dismissing certain parties from the bellwether. Where does that stand?

**MR. LONDON:** So moving back to the personal injury, the leach cases?

**THE COURT:** Yeah, specifically our three kidney cancer bellwethers. I saw that there was -- there was a mention to stipulations of dismissal, which doesn't surprise me because there are probably going to be product ID issues on a number of these defendants. But who looks like they're still sort of look like going to be in the case?

**MR. LONDON:** So, Your Honor, there are five that are still in the case. 3M, Tyco, Chemguard, Dupont Chemours family, BASF, Ciba Geigy defendants, and I guess technically the Kidde, KFI defendants, they're stayed but they're in.

**THE COURT:** That's it?

**MR. LONDON:** That's it. The others have been either previously dismissed or dismissed recently.

**THE COURT:** Are you in discussions about

narrowing that further?

**MR. LONDON:** You know, Your Honor, I talked to Mr. Douglas, I don't believe so. That looks like that's the folks that will be there.

**THE COURT:** Okay. Because I've got to figure out space in courtrooms and all that stuff for that many parties. I don't think these lawyers are going to come just like one solo practitioner for each defendant. Somehow I don't think that's happening.

**MR. LONDON:** That's fine.

Absent anything from the United States on the United States section, Your Honor, that probably -- the rest of the Joint Status Report absent any comments from Mr. Ring, I don't think there's anything to supplement.

**THE COURT:** Very good.

Let me hear from the defense.

**MR. RING:** Briefly, Your Honor, on the jury questionnaire issue you raised at the beginning. The parties did not intend to ask the Court to send it out in advance. It was only a suggestion to use it with the panel once they're here --

**THE COURT:** Very good.

**MR. RING:** -- to screen. And we'll submit those. And we do think --

**THE COURT:** Y'all are a little lengthy. Okay?


Case 7:23-cv-00897-RJ Document 936-2 Filed 10/23/26 Page 21 of 29

And think about this issue that the jurors don't sign up for this gross invasion of their privacy. Okay?

And by the way, the questionnaire we use standard is pretty good. I mean, it's -- I did a lot of -- I always liked litigating in federal court because I thought the questionnaire was so good. And most state judges wouldn't give me the -- let me do all I needed to do. So it's a pretty good start. A lot of times people submit questions as if they hadn't read the questionnaire.

**MR. RING:** And we'll bear that in mind, Your Honor. I think we thought that there may be some things that would be helpful to have in advance that may actually expedite the process in cancer cases where in an open setting that may be more difficult for people to deal with.

**THE COURT:** Let me tell you how I normally do that. Rather than saying do you have kidney cancer? I don't ask that question. But I do say this, something to the effect of this case involves issues related to kidney cancer. If there's anything about that subject that troubles you one way or the other in which you don't think you could be a fair and impartial juror, please stand. And then they come up and they tell me privately, you know, what the issue is. And that's when it comes out, my husband has kidney cancer, I have kidney cancer, my dad

died of kidney cancer, all that kind of stuff. And then we sort of inquire, you know, whether that fact would affect you to be a fair and impartial juror. So that's normally the way I handle it, rather than ask, you know, please publish to these strangers your health information.

**MR. RING:** We appreciate that, Your Honor, and will bear in mind as we think about the proposed voir dire and see if we can work out an agreement.

**THE COURT:** Why don't y'all submit it as sort of voir dire rather than the juror questionnaire. Because it's going to be -- it's a little different when I'm doing it to the group like that.

**MR. RING:** We'll take that into account, Your Honor, and we'll do that.

With respect to CMO 32 and the sites, we have been going back and forth on that for awhile. So we will get that to resolution either by agreement, or if not, we'll submit things next Thursday. And we know where to find you, Your Honor.

**THE COURT:** Thank you. Everyone else does, too, apparently.

**MR. RING:** And I think that's it. No other issues.

**THE COURT:** Very good.

The United States, please? Come forward. I'm

not going to let you speak from the back row.

MR. ANWAR: Good morning, Your Honor.

THE COURT: Good morning.

MR. ANWAR: As Mr. London stated, we have been working hard with the --

THE COURT: First of all, why don't you just introduce again and have them stand up so these lawyers can know who your new team is.

MR. ANWAR: Sure. My ENRD colleague, who will be stepping in for Mr. Knudsen, Shari Howard.

THE COURT: Good.

MS. HOWARD: Good morning, everyone.

THE COURT: And how about -- do you any others?

MR. ANWAR: Yes. My colleague who has worked on this case as well with me for a number of years, Michele Greif.

THE COURT: Good to have you both here.

MR. ANWAR: Thank you, Your Honor. As Mr. London stated, we've been working hard with the PEC to come to an agreement on a CMO that would sort of methodically move things forward. Your guidance here today is extremely helpful. And I think it will go a long way in resolving any remaining issues we have. The proposal we received earlier this week just before the status conference did include withdrawing a number of the

discovery requests that had been served. So we are moving forward and getting closer and closer to an agreement. And we will work very hard to have something submitted to the Court by the end of next week.

**THE COURT:** And I like y'all's idea about doing a limited number, because not only does it make it more manageable for you, but it might help you learn more efficiently how to get to what's important. And it might resolve after sort of a sampling that we don't need more. We've got enough. I just think that all that is worthwhile.

**MR. ANWAR:** Thank you, Your Honor. That was our thinking as well.

**THE COURT:** So what about the CERCLA stuff? What's going on with CERCLA?

**MR. ANWAR:** For that I would ask my colleague, Ms. Howard.

**THE COURT:** Ms. Howard, you thought you were just going to come in and observe, come to Charleston and have a good meal. Come forward.

**MS. HOWARD:** Thank you, Your Honor. We are also in the middle of completing the site-specific discovery that you ordered on the CERCLA sites that are at issue. We completed the first round of global discovery for the written discovery on Wednesday the 18th. So we've turned

that over to plaintiffs counsel. And we have one other set of written discovery that we are working on that is specific to New Jersey. We plan to start with other depositions and further discovery very soon, as soon as we can get it scheduled.

**THE COURT**: You know, obviously, settlement's always, if there's a path, is always good to explore. But at some point, if people -- if the parties can't work it out, we litigate it. Right?

**MS. HOWARD**: Yes, Your Honor.

**THE COURT**: And that's the next stage here. And we've got a lot on our plate here. But I see it as a plausible thing to litigate a CERCLA case at some point if we can't find a path to -- I mean, I knew enough from our review of the Federal Tort Claims Act and of the certain things that led to my two orders. There are some -- you know, there are, obviously, folks like farmers adjacent to military bases and so forth who have potentially very serious claims. And it just seems to me if there's a path to work that out, y'all need to be looking for it because that's the kind of case I'm going to try first, something like that.

**MS. HOWARD**: Yes, Your Honor. And we are reviewing the CERCLA settlement demand letters that we received. We have our experts also reviewing those

claims. But we are aware that EPA has announced that they are reviewing the PFOA and PFAS hazardous substance designations under CERCLA. So we are trying to consider all of those things as we consider these demand letters that have been submitted to us.

**THE COURT:** So the EPA is considering withdrawing the hazardous designation, is that what you're telling me?

**MS. HOWARD:** Yes, Your Honor. And we don't have knowledge whether they will or not. So we are waiting to learn what EPA's decision will be.

**THE COURT:** I do remember, if my memory is correct, that one of the leaders in Congress for PFAS protection was the present EPA Director. Is my memory right about that?

**MS. HOWARD:** Yes, Your Honor, I believe your memory is correct.

**THE COURT:** Y'all do what you've got to do, obviously, and the parties will respond. That is something that materially affects the CERCLA claim, obviously.

**MS. HOWARD:** Yes, Your Honor.

**THE COURT:** Mr. London, you've got something?

**MR. LONDON:** And Your Honor, yes. The EPA has indicated that they would re-evaluate, but there's no

evidence -- and I think it's Mr. Zeldin you're referring to?

**THE COURT:** Yes.

**MR. LONDON:** No evidence that they intend to change this. This is an EPA -- they sought a 60-day abeyance, then a 30-day abeyance. So it's just, in our view, this is just one more opportunity, we think, to delay assessment of the evaluation of these claims for resolution. They are assessing it, but they are not changing, revoking, there's been no evidence to suggest that except requests to delay.

**THE COURT:** I thought there was some action in which the water districts were given some additional time to comply. Am I remembering that right?

**MR. LONDON:** Yes.

**THE COURT:** But others actually were, other families of chemicals related to PFAS were actually taken off of a designation of some type. Is my memory right about that, too?

**MR. LONDON:** That's correct. That's correct.

**THE COURT:** Okay. Well, we'll stand by. Okay? But at some point, to the extent CERCLA has a viable claim, I'm going to -- if y'all don't work it out, I am going to set it on a course for trial.

**MS. HOWARD:** Yes, Your Honor. Thank you.


Case 7:23-cv-00897-RJ Document 936-2 Filed 10/23/26 Page 28 of 29

**THE COURT:** Good to have you.

**MS. HOWARD:** Thank you, Your Honor.

**THE COURT:** Okay. If there are not other matters relating to the status report, I'm going to adjourn. I understand that there are some -- the what kind of time do we need, Mr. London, to set up?

**MR. LONDON:** Your Honor, I think five to ten minutes max.

**THE COURT:** Okay. Good. Well, I'll step out for five or ten minutes. Ms. Perry will let me know when I need to return. And we stand adjourned.

**MR. LONDON:** Thank you.

(WHEREUPON, court was adjourned at 9:56 AM)

***

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

s/Karen E. Martin　　　　　　6/24/2025

____________________________　　_________________

Karen E. Martin, RMR, CRR　　　　Date



Case 7:23-cv-00897-RJ Document 936-2 Filed 10/23/26 Page 29 of 29