IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:23-CV-897

| | | |
|---|---|---|
| IN RE:<br>CAMP LEJEUNE WATER LITIGATION<br><br>This Pleading Relates to:<br><br>ALL CASES | )<br>)<br>)<br>)<br>)<br>)<br>) | **PLAINTIFF LEADERSHIP GROUP'S RESPONSE TO DEFENDANT UNITED STATES' MOTION FOR ENTRY OF A LONE PINE ORDER [D.E. 935]** |

## TABLE OF CONTENTS

Page

INTRODUCTION ........................................ I

BACKGROUND ........................................ 4

I. Defendant's motion for a *Lone Pine* order is premised on false or misleading facts and innuendo. ........................................ 4

ARGUMENT ........................................ 8

I. *Berk* ended federal merits-based *Lone Pine* orders. ........................................ 8

II. Defendant's proposed *Lone Pine* order violates due process at this juncture of the case. ........................................ 10

III. Defendant's proposed order is inconsistent with the Court's prior, well-reasoned orders. ........................................ 11

IV. Each of the *Conklin* factors counsels against the entry of a *Lone Pine* order. ........................................ 15

A. All Non-Track 1 Bellwether Plaintiffs are still in the earliest stages of litigation. ........................................ 16

B. The Court's track-based system is the most efficient way to manage this action's unique case management needs. ........................................ 20

C. The only external agency decision Defendant identifies supports Plaintiffs' claims. ........................................ 22

D. Defendant's proposed *Lone Pine* order would increase the burden on the parties' and Court's time, resources, and expenses. ........................................ 23

E. The types of injuries claimed do not require specific causation expert reports prior to discovery even commencing. ........................................ 24

CONCLUSION ........................................ 25

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Abner v. Hercules, Inc.*,
No. 2:14cv63-KS-MTP, 2014 WL 5817542 (S.D. Miss. Nov. 10, 2014), *amended in part*, No. 2:14cv63-KS-MTP, 2015 WL 13821942 (S.D. Miss. Feb. 5, 2015) ........ 22

*Acuna v. Brown & Root Inc.*,
200 F.3d 335 (5th Cir. 2000) ........ 21

*Adinolfe v. United Techs. Corp.*,
768 F.3d 1161 (11th Cir. 2014) ........ 10

*Adkisson v. Jacobs Eng'g Grp., Inc.*,
No. 3:13-CV-505-TAV-HBG, 2016 WL 4079531 (E.D. Tenn. July 29, 2016) ........ 16

*Matter of AET Inc. Ltd.*,
No. 1:10-CV-51, 2011 WL 13557980 (E.D. Tex. Mar. 22, 2011), aff'd, No. 1:10-CV-51, 2011 WL 13301617 (E.D. Tex. Dec. 14, 2011) ........ 22

*In re AFFF*,
No. 2:18-mn-02873-RMG, (D.S.C. Mar. 13, 2024) ........ 21

*Arnold v. BNSF Ry. Co.*,
No. 3:18-CV-1931-L, 2019 WL 1493160 (N.D. Tex. Apr. 4, 2019) ........ 1

*Berk v. Choy*
607 U.S. 187 (2026). ........ 1, 8, 9

*Conklin v. Corteva, Inc.*,
782 F. Supp. 3d 268 (E.D.N.C. 2025) ........ 15, 16, 19, 23

*Dietz v. Bouldin*,
579 U.S. 40 (2016) ........ 9

*In re Digitek Prod. Liab. Litig.*,
264 F.R.D. 249 (S.D. W. Va. 2010) ........ 15

*In re E.I. Du Pont De Nemours*,
204 F. Supp. 3d 962 (S.D. Ohio 2016) ........ 12

*Hagy v. Equitable Prod. Co.*,
No. 2:10-cv-01372, 2012 WL 713778 (S.D. W. Va. Mar. 5, 2012) ........ 15

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*In re Johnson & Johnson Talcum Powder Products Marketing, Sales Practices, & Prodsucts Liability Litig*ation,
No. MDL 16-2738 (MAS) (RLS), 2026 WL 2111340 (D.N.J. July 22, 2026) .................19, 20

*Manning v. Arch Wood Prot., Inc.*,
40 F. Supp. 3d 861 (E.D. Ky. 2014) .................16, 17

*Matthews v. Eldridge*,
424 U.S. 319 (1976) .................10

*McManaway v. KBR, Inc.*,
265 F.R.D. 384 (S.D. Ind. 2009) .................10

*Roth v. Cabot Oil & Gas Corp.*,
287 F.R.D. 293 (M.D. Pa. 2012) .................10, 16, 17, 18

*Russell v. Chesapeake Appalachia, L.L.C.*,
305 F.R.D. 78 (M.D. Pa. 2015) .................17

*Simeone v. Girard City Bd. of Educ.*,
872 N.E.2d 344 (Ohio Ct. App. 2007) .................10, 16

*Strudley v. Antero Res. Corp.*,
350 P.3d 874 (Colo. App. 2013), *aff'd*, 347 P.3d 149 (Colo. 2015) .................10, 16

*In re Vioxx Prods. Liab. Litig.*,
557 F. Supp. 2d 741 (E.D. La. 2008) .................19, 22

*In re Zantac (Ranitidine) Prods. Liab. Litig.*,
MDL No. 2924, 2021 WL 5415027 (S.D. Fla. Nov. 19, 2021) .................12

**Court Rules**

Fed. R. Civ. P. 1, 16(c)(2)(L), 42(a)(3) .................11

## INTRODUCTION

Defendant's *Lone Pine* motion [D.E. 935] must be rejected. In January 2026, the United States Supreme Court in *Berk v. Choy* foreclosed merits-based dismissals outside of Rule 56, barring the very request Defendant now makes. 607 U.S. 187, 197 (2026). Because the motion requests a pre-discovery summary judgment in all but name, it must be denied.

Even if Defendant's motion were somehow distinguishable from the *Berk* holding (which it is not), the request as applied to this litigation flies in the face of the bedrock principle of Federal Rule of Civil Procedure 1, cited by the Court in Case Management Order ("CMO") No. 2, that all rules "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." The Court has done just this through its Case Management Orders, streamlining this litigation into three tracks, focusing discovery efforts on bellwether Plaintiffs in Track 1, and staying all other cases. *See* [D.E. 23] (CMO No. 2). Indeed, the first bellwether trial is proceeding at the time of this writing.

Defendant's *Lone Pine* motion takes a torch to this process. *See Arnold v. BNSF Ry. Co.*, No. 3:18-CV-1931-L, 2019 WL 1493160, at *6 (N.D. Tex. Apr. 4, 2019) ("*Lone Pine* orders are normally used as a last resort or procedural option, when all other procedural options have been exhausted."). It seeks to replace this Court's approach with an unjust, slow, and expensive one. It would require that elderly Marines file Complaints and pay for and develop some 300,000 specific causation reports (and general causation reports as well) for cases that have had no discovery such that "unsupported claims" can be weeded out through motion practice before this Court. *See* [D.E. 936] (Memorandum in Support of Defendant United States of America's Motion for Entry of *Lone Pine* Order) ("Mem.") at 21. By the Defendant's own math, that works out to about 75,000 *Daubert* motions per judge on specific causation alone. Defendant's proposal maximizes expenses for the

Plaintiffs and places an untenable burden on the Court. It would also take decades. Defendant's proposal is unjust and unworkable and should summarily be denied.

Defendant's motion is made without reference or deference to, or respect for, the orders issued by this Court. *See, e.g.*, [D.E. 23] (CMO No. 2) (governing the adjudication of diseases by tracks). Defendant's passing reference that its motion will facilitate resolution doesn't make it so. To the contrary, the motion is antithetical to the Court's admonishment that the Parties should "use their best efforts to achieve a global settlement by October 30, 2026," [D.E. 925] at 2, runs afoul of Rule 1 by making the case extraordinarily expensive, would delay resolution by years, and, most cruel, is flatly unjust to Marines. Specifically, Defendant's motion would mire Plaintiffs and their counsel in the arduous process of filing complaints and forcing them to spend tens, or perhaps hundreds, of millions of dollars on filing fees and expert reports for cases that are not even in the track system. It would also put an extraordinary burden on this Court, a burden that no court anywhere in the country could absorb, regardless of its size. And, as the Defendant is well aware, its ask is all the more unwieldy in a District with four judges. The instant motion will only make resolution more difficult and essentially wage war between the parties.

Tellingly, the PLG asked Defendant to see its *Lone Pine* motion as part of the meet and confer process, and Defendant refused, filing it on Friday night before the first bellwether trial on Monday. And the *Lone Pine* motion comes on the heels of the PLG's suggestion that it conduct a census for Defendant so it would know the universe of claimants who allege one or more diseases on the PLG disease list, as part of the PLG's efforts to use other tools to move resolution along. *See* [D.E. 937] (Plaintiff Leadership Group's Administrative Motion for An Order Requiring a Census); [D.E. 937-1] (Ex. A). By contrast, Defendant shows no signs of wanting to adhere to the Court's admonition to achieve global settlement by the end of October 2026.

And what does Defendant expect of the Court faced with potentially hundreds of general causation reports and tens of thousands – or even more – specific causation reports? It does not say. Does Defendant expect to file opposing reports in response? Does Defendant expect the Court to adjudicate the claims without input from Defendant? Therein lies the punitive nature of this motion, as Defendant well knows that there is no conceivable way that this Court – or any court across the country – could review and adjudicate this massive volume of filings. And this is precisely why a L*one Pine* order here is counterproductive.

So why did the Defendant file this motion at this time? One answer is certain: it was not to aid the resolution of this litigation, as it summarily claims – without an iota of legal or factual support – that it will do. Is it to divert attention from the kidney cancer trials? Is it to create a forum to provide the Court with its skewed, and often inaccurate and misleading, narrative of this case? Is it to try to tarnish Marines as untruthful or greedy? Is it intended to send a message to Marines that the government does not believe they were harmed while at Camp Lejeune and will not engage in meaningful and fair resolution? Regardless of motive, one incurable impropriety of the submission is unquestionable: the first 14 pages of Defendant's memorandum in support of its motion, which contains nothing other than Defendant's narrative of the litigation to date, without reference or relevance to the motion at hand, is an abuse of process and should be stricken.

Partisan strategy and exploitative publicity should play no part in reaching resolution, and we fear that this has already impeded the process. The Camp Lejeune Marines should not be political pawns. Nor should punitive efforts, such as the unnecessary and onerous *Lone Pine* motion, place additional burdens of cost and delay on claimants who have already waited so long for relief.

## BACKGROUND

### I. DEFENDANT'S MOTION FOR A *LONE PINE* ORDER IS PREMISED ON FALSE OR MISLEADING FACTS AND INNUENDO.

There are numerous false or misleading "facts" in the first 14 pages of Defendant's memorandum, but as stated above, most of these pages rehash prior decisions of this Court or out-of-context statements of the PLG that do not relate to the instant motion and, therefore, Plaintiffs will not spill ink correcting the record. But there are some statements that have not previously been before this Court and require a response to set the record straight.

*First*, Defendant references the Elective Option ("EO") offer accepted by bellwether plaintiff Howard, who has kidney cancer. [D.E. 936] (Mem.) at 7 n.8. Not only does this one settlement acceptance fail to support the issuance of a *Lone Pine* order but it weaponizes an unfortunate moment in time in Mr. Howard's life. What Defendant does not tell the Court is that Mr. Howard accepted the offer just weeks ***before*** Judge Boyle set the kidney cancer cases for trial, at a time when he was in a deep state of depression over his mortality, that he was awaiting a test to determine whether his cancer had returned (which sadly it has), and that he accepted the offer because he wanted to leave his family something before he died. And Defendant knew all of this background because after Mr. Howard accepted the EO offer he had a change of heart and his counsel asked Defendant for reconsideration of the offer acceptance. Defendant denied the request.

*Second*, Defendant has waved the $335 trillion number before Judge Jones in Court several times – and does so again in this motion – as the Plaintiffs' demand to resolve this case and never has been. [D.E. 936] (Mem.) at 1. Reference to this figure is designed for nothing but shock value and has no basis in reality. Defendant knows full well that it is not the Plaintiffs' demand and never has been. It is bad faith. Under the Federal Torts Claim Administrative Process, the monetary demand asserted in the administrate claim is the maximum amount that can be recovered by a

claimant, even if the case goes to trial and a jury or judge were to award more. As a result, attorneys routinely make very high demands in their administrative claims to ensure they do not foreclose a higher verdict should the case proceed to trial. Defendant is well aware of this process as it has been defending FTCA cases for decades. And particularly in this case, which has been in the resolution process for more than two years, Defendant actually ***knows*** that the Plaintiffs do not, and never have, demanded even a fraction of this amount to settle the case globally. Defendant should stop the charade now.

*Third*, Defendant uses the Vidanna bellwether settlement as supposed support for it motion, somehow concluding that because one of 25 plaintiffs was not sufficiently exposed to a Camp Lejeune base area that was supplied with contaminated water demands the draconian measures Defendant now advocates. But it shows the opposite: if only one in 25 cases involves a claimant who was not sufficiently exposed to a contaminated area, that would mean that of the 400,000 claims the Defendant claims exist, there would be only approximately 16,000 claimants in a similar situation to Vidanna. A total of 16,000 is less than five percent of the overall claims and in no scenario would, or could, support Defendant's baseless conclusion that the Vidanna settlement "revealed that the collective CLJA case and administrative claim pool appears to be filled with unsupported CLJA lawsuits and claims." [D.E. 936] (Mem.) at 7. The simple facts illustrate that Defendant's conclusion is absurd.

*Fourth*, Defendant touts that it has "made every effort to do right by veterans, their families, and civilian workers [by making] over 4200 settlement offers totaling over one billion dollars. [D.E. 936] (Mem.) at 3. That is only 1% of the claimants/plaintiffs, according to Defendant. *See id*. at 1 ( "Currently, there are . . . approximately 408,500 CLJA administrative claims pending with the Department of the Navy . . . . "). What's more, Defendant has acknowledged that "[o]nly

a very small percentage of the people with qualifying injuries actually qualify for the Elective Option" because of the latency limit. *See* Dec. 3, 2025 Status Conference Tr. 29:16–21. The EO was intentionally narrow. Additionally, the Navy has quietly *raised* the evidentiary requirements and changed policies over time to make obtaining an EO offer more difficult. That is hardly evidence of best efforts.

*Fifth*, Defendant's stated plan is attrition, not resolution. At the September 9, 2026 pretrial conference for kidney cancer, government counsel Adam Bain described the plan plainly: "Once the Navy starts denying those claims, ninety percent of those claims are going to go away. And so we're dealing with a smaller universe of claims." Sept. 9, 2026 Tr. of Pretrial Conference 16:7–9. Defendant's proposed order aims to make that happen, as any claimant whose administrative claim is denied would have to file suit in this Court with complete medical records and, for any illness outside the ten enumerated in the ATSDR[1], Rule 26(a)(2) expert reports in hand on the day of filing. [D.E. 935-1] ([Proposed] Screening Order Requiring CLJA Plaintiffs to Substantiate Exposure, Alleged Harms, and Causation) ("Prop. Order") ¶ 1.b, Ex. 2. Mr. Bain went on to state that "as the plaintiffs' counsel has admitted before, approximately seventy percent of those cases have no merit." Sept. 9, 2026 Tr. of Pretrial Conference 16:4–5. But that is not what Plaintiffs' Counsel said. To the contrary, in April 2023, before the PLG was established, Plaintiffs' counsel stated that "about 70 percent of these people out there were not studied by the ATSDR. In fact, the VA asked the ATSDR to exclude some illnesses, do not study those, because they were worried it would cost too much for the VA." Apr. 5, 2023 Status Conference Tr. 44:11–15. He further explained that those claimants "most likely have a compensable disease." *Id.* at 44:21–22.

[1] The ten diseases Defendant exempts from its proposed *Lone Pine* order are referred to herein as the "Exempt illnesses."

*Sixth*, Defendant states that "over 75 percent of CLJA claimants have failed to submit sufficient documentation or evidentiary support to the Navy to substantiate the good-faith basis for their individual claims." Mem. [D.E. 936] at 1. Its source says that "[m]ore than 75% of claims reviewed do not have sufficient documentary evidence to support Elective Option (EO) settlement approval." [D.E. 926] (Oct. 2, 2026 Joint Stat. Rep.) at 1. But that is a red herring: Defendant does not disclose how many claims were reviewed, nor does it inform the Court that the filing of an administrative claim never required submission of documents. The Navy required only the claimant's name, sum certain, authority, and signature, and accepted "other" as the injury. Navy Claimant Counsel Q&A (Apr. 2024) at 5.[2] The Navy told claimants that "[a]dditional substantiating documents to filed claims can certainly be submitted after the 10 Aug date." Navy Clarification on Claim Form Filing (Aug. 6, 2024) at 2.[3] And when Judge Jones asked Defendant what moves claimants to upload documents, the Defendant answered: "One of the things would be eligibility for an offer under the Elective Option." Dec. 3, 2025 Status Conference Tr. 28:16–18. However, Defendant complains that not enough people have submitted documentation to the Navy but has not expanded settlement offers to diseases beyond the EO and concedes that even if a claimant has an EO disease they likely don't meet the latency requirement set by the EO.

*Seventh*, Defendant provides yet another false reason why the *Lone Pine* order is necessary: its claim that the PLG seeks to avoid trial. Mem. [D.E. 936] at 18. But Defendant does not cite a single example of PLG seeking to delay trial. In the motion to which Defendant cites, while the PLG requested the Court deny further *Daubert* briefing "so that the parties may focus their time

---

[2] *Available at* https://camplejeunecourtinfo.com/wp-content/uploads/Consolidated-Claimant-Counsel-Questions-and-Answers-April-2024-1.pdf.

[3] *Available at* https://camplejeunecourtinfo.com/wp-content/uploads/DON-Clarification-on-Claim-Form-Filing.8.6.24.pdf.

and efforts on global resolution per this Court's June 30, 2026 Order," PLG explained that in light of the voluminous *Daubert* briefing already completed, "there is no basis for further briefing, unless called for by a particular judge considering the admission of expert opinions in the context of a particular trial if resolution efforts fail." [D.E. 902] (PLG Opp. to Mot. for Leave to File Resp. to Notice of Proposed Order re Order 886) at 2-3. Indeed, the PLG's opposition to further unnecessary briefing unless requested by the trial judge would advance, rather than delay, trials. What's more, in September it was the Defendant that asked to delay the kidney trial. Sept. 9, 2026 Tr. of Pretrial Conference 18:3–5.

*Eighth*, Defendant states that Dr. Bove testified that only two illnesses made sense for the VA presumptions. [D.E. 936] (Mem.) at 13-14. That statement is misleading: Dr. Bove was describing the VA's proposed list of three, one of which was angiosarcoma of the liver, which Dr. Bove stated "you would never see at Camp Lejeune." Ex. A (Bove Dep. Tr. Vol. I 105:12–106:15). The "disagreements" Dr. Bove described were with the VA, which resisted adding diseases he believed were supported: "I thought there was strong evidence for chronic kidney disease and scleroderma." *Id.* at 109:22–23, 110:18–21.

## ARGUMENT

### I. *BERK* ENDED FEDERAL MERITS-BASED *LONE PINE* ORDERS.

The Supreme Court of the United States recently rejected a procedure analogous to Defendant's proposal here. In a near-unanimous decision, the Supreme Court explained that the Federal Rules prescribe a single mechanism for "putting a plaintiff to his proof" before trial: a motion for summary judgment under Rule 56. *Berk*, 607 U.S. at 197. That procedural mechanism carries protections a docket-control order can neither replicate nor remove. Defendant invites this Court to commit error.

In *Berk*, the defendants moved to dismiss the plaintiff's medical malpractice complaint filed in federal court because it was not accompanied by the affidavit of merit that Delaware law required. 607 U.S. at 192–93. The Court held that Federal Rule of Civil Procedure 8 answered the same question the Delaware requirement addressed and therefore displaced it. *Id.* at 193–94. In response to the defendants' proposal that the district court instead require the equivalent of a certificate of merit after the pleadings (but presumably before discovery) and enforceable by dismissal, the Court explained that such a requirement was "no longer a pleading requirement that serves a gatekeeping function; it is a free-floating evidentiary requirement that can serve as the basis for an early dismissal." *Id.* at 197. The Court rejected that device for a reason dispositive here: "the Federal Rules already prescribe a mechanism for putting a plaintiff to his proof: a motion for summary judgment." *Id.* "That defendants cannot fit the affidavit requirement into the Federal Rules," the Supreme Court concluded, "illustrates that it has no place there." *Id.* A district court's case-management authority "cannot be contrary to any express grant of or limitation on the district court's power contained in a rule or statute," and "must be exercised with restraint." *Dietz v. Bouldin*, 579 U.S. 40, 45, 47 (2016).

*Berk* thus establishes a structural rule of decision: a court may not compel a plaintiff to come forward with evidence proving the merits of his claim as a precondition to continued litigation and on pain of dismissal through any device other than Rule 56.

As described above, Defendant would require hundreds of thousands of Marines and their families to provide proof of location on base and expert reports on general and specific causation while case-specific discovery is stayed and on pain of dismissal with prejudice. [D.E. 936] (Mem.) at 1. Defendant makes this unlawful and outrageous proposal while simultaneously obstructing Plaintiffs' attempt to obtain evidence, such as muster rolls. *See* [D.E. 931] (Plaintiffs' Leadership

Group's Brief in Support of Motion to Compel Defendant United States of America to Allow Reasonable Use of Marine Corps Data Project Documents).

## II. **DEFENDANT'S PROPOSED *LONE PINE* ORDER VIOLATES DUE PROCESS AT THIS JUNCTURE OF THE CASE.**

*Lone Pine* orders in these circumstances violate plaintiffs' due process rights because they preclude plaintiffs from receiving a meaningful opportunity to be heard before their claims are dismissed. *See Matthews v. Eldridge*, 424 U.S. 319, 333 (1976) ("The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.") (citation omitted). Courts have repeatedly recognized that "[w]hen the Lone Pine order cuts off or significantly limits the litigant's right to discovery, the order closely resembles summary judgment, albeit without the safeguards that the Civil Rules of Procedure supply." *Simeone v. Girard City Bd. of Educ.,* 872 N.E.2d 344, 350 (Ohio Ct. App. 2007); *see also McManaway v. KBR, Inc.*, 265 F.R.D. 384, 386 (S.D. Ind. 2009) (same); *Roth v. Cabot Oil & Gas Corp.,* 287 F.R.D. 293, 298–99 (M.D. Pa. 2012) (same); *Adinolfe v. United Techs. Corp.*, 768 F.3d 1161, 1168 (11th Cir. 2014) (explaining that *Lone Pine* orders "should not be used as (or become) the platforms for pseudo-summary judgment motions at a time when the case is not at issue and the parties have not engaged in reciprocal discovery"). By relieving defendants of the burden of production to show that summary judgment is proper, *Lone Pine* orders jettison Rule 56's "protective requirement" that "the moving party carry the initial burden to prove that a claim lacks evidentiary support." *Strudley v. Antero Res. Corp.*, 350 P.3d 874, 883 (Colo. App. 2013), *aff'd*, 347 P.3d 149, 159 (Colo. 2015). Furthermore, as the Eleventh Circuit explained in *Adinolfe*, when a district court converts a motion to dismiss into a summary judgment motion based on its consideration of materials outside of the complaint, "such a conversion requires notice to the parties and an opportunity for mutual discovery." 768 F.3d at 1168. By failing to apply these procedural safeguards, *Lone Pine* orders

fail to provide plaintiffs with the opportunity to be heard at a meaningful time and in a meaningful manner before their claims are dismissed. For this reason, too, Defendant's motion must be denied.

## III. <u>DEFENDANT'S PROPOSED ORDER IS INCONSISTENT WITH THE COURT'S PRIOR, WELL-REASONED ORDERS.</u>

The Court has carefully designed a systematic case management approach that allows the parties a fair opportunity to develop their evidence, and applies the knowledge gained throughout the course of the litigation to streamline the subsequent phases. To the extent that further refinements to this process are necessary, the parties have an avenue to approach the Court bilaterally with proposed adjustments. Instead, Defendant's unilateral proposal, which should have paid homage to the Court's prior orders and sought an amendment of those orders, effectively asks the Court to reconsider its Case Management Orders setting forth the track-based bellwether system and create a new approach from scratch, undoing the efficiencies those orders were designed to achieve.

In its first Case Management Order following the opening CLJA status conference, the Court determined that

> "[s]taging discovery and trials by 'tracks' of illnesses is the most efficient way to advance the CLJA litigation and support a global resolution of CLJA claims. The staging approach in this Order comports with the Federal Rules of Civil Procedure and this Court's inherent powers. *See, e.g.*, Link [*v. Wabash R.R. Co.*,, 370 U.S. 626, 630-31 (1962)]; Fed. R. Civ. P. 1, 16(c)(2)(L), 42(a)(3). The staging approach also recognizes that this Court has four United States District Judges and a heavy docket of CLJA and non-CLJA actions."

[D.E. 23] at 8 (CMO No. 2). Since the Court entered CMO No. 2, the parties and the Court have focused their litigation efforts and resources on Track 1. The first Track 1 bellwether trial began on October 26, 2026. The Court has explained that "[e]ach United States District Judge on this Court intends to apply the holdings in Track 1 cases and ensuing Track cases to other parties who

litigate their CLJA actions after Track 1, unless the Party shows why the Court's holdings should not apply." [D.E. 23] at 12 (CMO No. 2).

Other courts managing large and complex litigation have likewise recognized the value of a systematic bellwether approach. For example, the court in *In re 3M Combat Arms Earplug Products Liability Litig*ation, which was charged with managing over 300,000 claims, utilized a bellwether approach supported by a census and stay. No. 3:19-md-2885 (N.D. Fla.), D.E. 775 (establishing initial census requirements), D.E. 922 (setting out bellwether selection protocol). *See also In re Zantac (Ranitidine) Prods. Liab. Litig.*, MDL No. 2924, 2021 WL 5415027 (S.D. Fla. Nov. 19, 2021) (using census forms and bellwether process to manage 1,800 MDL cases and over 150,000 unfiled claims alleging eight cancer types); *In re E.I. Du Pont De Nemours*, 204 F. Supp. 3d 962, 963-65 (S.D. Ohio 2016) (citing Case Management Order No. 17, D.E. 4459) (discussing development of phased discovery and trial plan in MDL involving 70,000 plaintiffs claiming six unique illnesses). Despite the vast number of filed and unfiled claims in *3M*, the court entered a post-settlement *Lone Pine* order only after 16 bellwether trials and 19 verdicts, and only applicable to those plaintiffs who did not accept the global settlement. *See* No. 3:19-md-2885, D.E. 3811.

Defendant's proposed *Lone Pine* order, which would require every Plaintiff asserting a non-ASTDR illness to submit general and specific expert causation reports within 180 days – or simultaneously with the filing of a complaint within six months of the Department of Navy and the DOJ rejecting Plaintiffs' administrative claim – ignores the Court's track-based structure, and the efficiencies it is designed to produce, entirely.[4]

[4] The PLG believes the Defendant's plan, if this motion were granted, would be the mass denials of administrative claims, which necessarily would trigger a concomitant number of filings in the Court. Such action by Defendant would violate the procedures this Court has put in place for the just and speedy adjudication of the case.

*First*, the proposal directly conflicts with CMO No. 9, in which the Court once again "recognize[d] the efficiency gained from a 'track' discovery approach in this litigation," ordering the parties to submit proposed discovery plans for prostate cancer, kidney disease, lung cancer, liver cancer, and breast cancer (the "Track 2 Illnesses"). [D.E. 144] at 1-2. Three of the five Track 2 Illnesses are non-Exempt illnesses. [D.E. 472-3] (2017 Assessment of the Evidence) at 13-14. Contrary to Defendant's own proposed Track 2 discovery plan, in which it emphasized the "diminishing returns" of preparing more Track 2 cases than necessary "to allow the parties to assess the strengths and weaknesses of issues relevant to Track 2 illnesses," [D.E. 156] at 3-4, Defendant now does an about face and requests dispensing with the Track 2 bellwether discovery process and instead seeks to require the Plaintiffs to prepare, and the Court to evaluate, expert reports for each Plaintiff asserting a non-Exempt illness on a case-by-case basis. Furthermore, Defendant's plan would likely delay proceedings for the Track 2 Plaintiffs that do assert an Exempt illness while the court evaluates each individual *Lone Pine* submission in Track 2 and any other diseases for cases in which the Defendant denies the administrative claim.

*Second*, proceedings in each of the cases on file claiming a non-Exempt illness would necessarily be put on hold while each of the individual law firms representing CLJA plaintiffs compete to secure Rule 702-compliant experts from the limited pool available. This is at least a six-month period in which no meaningful progress in the litigation or resolution discussions can be made.

*Third*, Defendant's proposal directly conflicts with the Court's order staying all cases other than the Track 1 bellwether cases. *See* [D.E. 23] (CMO No. 2). Defendant notes that "[a]ll actions subject to this [proposed] Order will be automatically stayed, with the exception of the requirements in this Order." [D.E. 935-1] (Prop. Order) at 7. That "exception" swallows the rule.

At a minimum, Defendant's proposal presumably would require the Court to lift the stay on all cases claiming a non-Exempt illness because motion practice will be required to evaluate Plaintiffs' expert evidence and resolve any motions to dismiss Defendant files. *See id.* at 8 (providing for dismissal with prejudice upon motion by the United States). Unless, of course, the punitive nature of this motion is even more nefarious than meets the eye and Defendant has structured this system in the hopes that the order would cost the Plaintiffs tens, or hundreds of, millions of dollars in expert costs that will likely collect dust given the sheer volume of cases, and without Defendant having to engage in any motion practice, work, or cost whatsoever other than the time it takes to coordinate with the Department of the Navy in the denial of administrative claims.[5] After all, if the Department of the Navy wholesale denies claims in some or all of the non-Exempt illnesses, Defendant would not have the resources to move to dismiss the hundreds of general causation and the tens of thousands of specific causation reports in a timely fashion. What's more, Defendant's motion puts the authority of overseeing this litigation in the Department of Justice's hands, as it

[5] The cost of filing an action is $405.00. Assume a law firm has 5,000 Camp Lejeune clients, and that half of the firm's clients allege non-Exempt illnesses. Assume further that this hypothetical firm's clients allege 8 distinct non-Exempt illnesses. It would cost that firm $1,012,500 to file their non-Exempt Cases in federal court, as they must do within six months of the denial of each client's administrative claim. But that is not all: that firm would have to hire at a minimum eight general causation experts, one for each disease, to perform an analysis on each disease and the chemicals of concern in the Camp Lejeune Water and to write general expert reports. And that firm would potentially have to retain as many as 250 specific causation experts to review the files of and prepare specific causation reports for their 2,500 plaintiffs (if each expert prepares 10 individual reports) or 100 experts if each expert prepares 25 specific causation reports. Assume further that each of the eight general causation reports costs $50,000 and each specific causation report costs $15,000 (both conservative estimates), the expert expenses for this one law firm, in this very conservative hypothetical estimate, is $37,500,000. And this hypothetical doesn't even consider the more serious risk: that there would not be sufficient available experts for the over 800 attorneys with filed CLJA cases, many of whom would have clients with the same non-Exempt illnesses, making it impossible, even ignoring the cost, to retain qualified experts under this proposed plan. There is no purpose in the Defendant's motion besides, once again, harming Marines and their families. The Court should not countenance such punitive conduct.

alone has the power to decide when, for which diseases, and how, to deny plaintiffs' administrative claims that are pending in the Department of the Navy. This despite the Defendant's refusal to make public the list of diseases it views as compensable.

*Finally*, after the Court completed its review and evaluation of each Plaintiff's expert reports, Defendant suggests that the Court would finally be able to determine "how to efficiently manage the remaining cases" including which illnesses will be part of Tracks 2 and 3. [D.E. 936] (Mem.) at 24. The system the Defendant advocates is nonsensical. Rather than "shortcutting what could otherwise take years of litigation to accomplish," *id.*, Defendant's proposal would assign the parties and Court decades of additional work in order to restart the track process from the beginning. This suggestion is not just unnecessary, but absurd, especially in light of the Court's current well-reasoned and thorough case management plan.

## IV. EACH OF THE *CONKLIN* FACTORS COUNSELS AGAINST THE ENTRY OF A *LONE PINE* ORDER.

A *Lone Pine* order is an "extraordinary procedure" that courts regularly find inappropriate where the "consistency and safeguards of the mandated rules" permit the court to control its docket. *Hagy v. Equitable Prod. Co.*, No. 2:10-cv-01372, 2012 WL 713778, at *3-4 (S.D. W. Va. Mar. 5, 2012). As one court in the Fourth Circuit has framed the choice, "[r]esorting to crafting and applying a *Lone Pine* order should only occur where existing procedural devices explicitly at the disposal of the parties by statute and federal rule have been exhausted or where they cannot accommodate the unique issues of this litigation." *In re Digitek Prod. Liab. Litig.*, 264 F.R.D. 249, 259 (S.D. W. Va. 2010). The Court has not exhausted its tools, and a *Lone Pine* order at this juncture of the litigation is plainly inappropriate under the standard applied in *Conklin v. Corteva, Inc.*, 782 F. Supp. 3d 268, 275 (E.D.N.C. 2025). Indeed, and as described below, each factor weighs against the issuance of a *Lone Pine* order now in this litigation.

### A. All Non-Track 1 Bellwether Plaintiffs are still in the earliest stages of litigation.

The first factor weighs strongly against a *Lone Pine* order at this stage of the litigation. As Defendant notes, "[t]he first factor requires the court to examine the posture of [the litigation]." *Conklin*, 782 F. Supp. 3d at 275. All cases have been stayed except Track 1 bellwether Plaintiffs. [D.E. 23] (CMO No. 2) at 4 (stating that "all CLJA actions on individual dockets are stayed pending selection of Plaintiffs for discovery and trial and further orders of this Court"). Accordingly, no discovery have been done as to other Track 1 Plaintiffs, and all Plaintiffs in Track 2 and 3. Defendant therefore asks the Court to enter a *Lone Pine* order where no meaningful discovery has taken place.

But "[g]enerally, courts have been reluctant to grant Lone Pine motions before any meaningful discovery has been conducted." *Manning v. Arch Wood Prot., Inc*., 40 F. Supp. 3d 861, 864 (E.D. Ky. 2014). *See also Adkisson v. Jacobs Eng'g Grp., Inc*., No. 3:13-CV-505-TAV-HBG, 2016 WL 4079531, at *4 (E.D. Tenn. July 29, 2016) ("Lone Pine orders are disfavored in the early stages of the proceedings where no meaningful discovery has taken place."); *Roth*,287 F.R.D. at 298–99 (finding *Lone Pine* order not appropriate given early procedural posture of case and no showing procedures available in rules were not adequate for case); *Strudley v. Antero Res. Corp.,* 350 P.3d at 880 (finding an abuse of discretion to grant *Lone Pine* order before any discovery conducted); *Simeone* 872 N.E.2d at 351 (holding that "issuance of [a] *Lone Pine* order at the stage in the proceedings when there had yet to be any meaningful discovery, followed by the dismissal of the case with prejudice for failure to comply with the order, was an abuse of discretion"). The reasoning of these courts demonstrates why a *Lone Pine* order, and especially one requiring submission of expert reports, would be inappropriate at this stage.

In *Russell v. Chesapeake Appalachia, L.L.C.*, 305 F.R.D. 78, 84 (M.D. Pa. 2015), the defendants argued "that the Court should impose a *Lone Pine* order requiring the Plaintiffs to make an initial *prima facie* evidentiary showing of exposure, injury, and causation before engaging in traditional discovery and case-management practices customary in federal court." The court rejected that request, explaining that "[r]equiring Plaintiffs to prove their *prima facie* case with the specific evidence the Defendants request at this juncture is effectively imposing a summary judgment standard on the Plaintiffs without the benefit of discovery. The Court is not prepared to impose such a one-sided burden at this early stage in the litigation." *Id.*

In *Manning*, 40 F. Supp. 3d at 862-63, the defendants sought a *Lone Pine* order while discovery was in progress that would require the plaintiffs to present proof that the defendants' chromated copper arsenate treated wood caused the plaintiffs' injuries. In denying the motion, the court rejected the defendants' contention that "they are merely asking for information that Plaintiffs should already have as a result of counsel's pre-suit investigation obligations under Federal Civil Rule 11," explaining that "Rule 11 does not require conclusive proof of causation prior to filing suit." *Id.* at 864-65. Accordingly, the court explained that "[t]he nature of Plaintiffs' claims do not command bypassing the procedures set forth in the federal rules in favor of imposing the extraordinary procedure compelled by a *Lone Pine* order, which would require Plaintiffs to establish causation before Defendants are required to participate in discovery." *Id.* at 868.

In *Roth*, 287 F.R.D. at 295, the defendants moved for a pre-discovery *Lone Pine* order that would require plaintiffs to make an "evidential showing of exposure, injury, and causation" in support of their environmental contamination claims. In denying the motion, the court explained that "the nature of the claims in this case do not compel the derogation of the Federal Rules of Civil Procedure in favor of imposing an extraordinary case management procedure that would

force Plaintiffs to establish a *prima facie* case before Defendants may be obligated to respond to discovery or otherwise respond to this litigation." *Id.*

As the above case law overwhelmingly makes clear, a *Lone Pine* order is not appropriate where, as here, no meaningful discovery has taken place. And here, of course, Defendant has already admitted that the water at Camp Lejeune was contaminated. Finally, the Plaintiffs here are Marines and their families, who have been injured while serving their country.

In the face of the clear case law, Defendant simply omits the plain fact of the procedural posture of the non-bellwether Track 1 cases that the parties and the Court know well: they are stayed. Defendant's tired references to "years of litigation" and "the completion of fact and expert discovery," *see, e.g.,* [D.E. 936] (Mem.) at 17-18, is just not true.

Defendant's complaint that the Marine plaintiffs have somehow not been diligent because they have had years to obtain "the basic threshold evidence to support their allegations on exposure and causation" [D.E. 936] (Mem.) at Arg. Section I.B, pp.20-22, ignores reality. First, the Defendant is the official holder of exposure records for Marines and their families. Military records, housing records, school records; all with the Defendant. Defendant also has access to all of the Department of Veterans Affairs medical records for individuals who have gone through that system. The Defendant has made obtaining these records incredibly difficult and now complains that claimants have been dilatory in getting records from the Defendant to give to the Defendant. Setting aside common sense and reality, the Defendant's complaint also ignores the discovery stay, and is at odds with its proposal to require expert causation *reports* for hundreds of thousands of Marines. The PLG has followed the Court's orders and focused on Track 1 bellwether Plaintiffs, so it is perplexing that the Defendant is criticizing the PLG for doing what the Court ordered. If

anything, Defendant's resuscitation of these "facts" serves to underscore how disingenuous its motion is.

Defendant's purported authorities are entirely distinguishable, involving far different litigation contexts and fact patterns. *See* [D.E. 936] (Mem.) at Arg. Section I pp.17-23. As a general matter, many of those cases acknowledged the "advanced stage of the litigation" (*see, e.g*, *In re Vioxx Prods. Liab. Litig*., 557 F. Supp. 2d 741, 744 (E.D. La. 2008)), which is just not true here. *In re Johnson & Johnson Talcum Powder Products Marketing, Sales Practices, & Prodsucts Liability Litig*ation, No. MDL 16-2738 (MAS) (RLS), 2026 WL 2111340, at *5 (D.N.J. July 22, 2026), for example, involved a case that had been litigated for "more than a decade," where the court issued a show cause order after the bellwether plaintiffs withdrew their specific causation experts following an evidentiary hearing by the Special Master. *Id*. at *1, *9. Here, no bellwether Plaintiff has withdrawn their specific causation expert.

Other cases point out that in some instances, plaintiffs should possess "some evidence" tending to show the injuries alleged in their complaints, so it is not a burden for plaintiffs to submit certain evidence early. *See, e.g., Conklin*, 782 F. Supp. 3d at 276. But here, Defendant is actually seeking to require each of the hundreds of thousands of Marines to "prove causation" through individual expert reports. That would require a separate specific causation report for each plaintiff, which would in turn require thousands of experts to write hundreds of thousands of reports that the Court would have to adjudicate. That is the opposite of efficiency and not consistent with evidence that a plaintiff has in his or her possession prior to filing a complaint.[6]

---

[6] Duke Law School's Guidelines and Best Practices for Large and Mass-Tort MDLs (2d ed. 2018), does not support a *Lone Pine* order here either. *First*, this is not an MDL where cases can be transferred back to transferor courts. *Second*, it contemplates that *Lone Pine* orders are "*later* measures" that can help root out spurious claims. *Id*. at 93 (emphasis added). Indeed, it

In any event, Defendant has obstructed the PLG's efforts to obtain evidence that could be relevant for all tracks. For example, Plaintiffs are still seeking, and Defendant is still resisting, the use of the Marine Corps Document Project "muster rolls" data to assist in substantiating the exposure element of plaintiffs' claims. *See* [D.E. 931]. Thus, while no meaningful discovery as to Tracks 2 and 3 have taken place, Defendant has obstructed the PLG's attempt to gather evidence that could eventually inform that discovery. Accordingly, if Defendant is sincere that it needs the PLG to bring forth evidence to assess the viability of certain claims, it should stop obstructing the PLG's efforts to obtain evidence.

**B. The Court's track-based system is the most efficient way to manage this action's unique case management needs.**

The second factor, which considers unique case management needs, also counsels strongly against the Court issuing a *Lone Pine* order now. *See* Arg. Section III, *supra*. The first Track 1 bellwether trial has already begun. By design, many of the findings from Track 1 will be applied to the next tracks to streamline their litigation further. [D.E. 23] (CMO No. 2) at 12.

By contrast, Defendant's proposal would require the Court to adjudicate many thousands of *Daubert* motions as part of a supposed "vetting process." Defendant suggests that the first step is to require each individual plaintiff to provide Rule 26(a)(2) expert reports to demonstrate both general and specific causation for every non-Exempt illness. [D.E. 936] (Mem.) at 21. By Defendant's count, there are "nearly 3,800 lawsuits and 408,500 administrative claims alleging that exposure to contaminated water at Camp Lejeune caused thousands of illnesses." *Id.* at 23. Defendant asserts that approximately 70% of CLJA plaintiffs and claimants have a non-Exempt illness. *Id.* at 5. Thus, by its own math, Defendant's proposal is that this case would be streamlined

---

contemplates *Lone Pine* orders "[i]n preparation for remand," in other words, at the end of discovery. *Id.* at 104.

by requiring some 300,000 reports on specific causation alone. Far from streamlining the litigation, this would require each of the four judges in this district to adjudicate some 75,000 *Daubert* motions just as to specific causation as part of an initial vetting process. That is absurd.

Unsurprisingly, Defendant can cite to no case where a court has ordered such an onerous, inefficient, and frankly wild proposal. Defendant quotes cases that explain that, in some instances, a plaintiff should have to come forward with "at least some information" as to injury, and the basis for believing that a defendant is responsible. *See* [D.E. 936] (Mem.) at 21 (citing *Acuna v. Brown & Root Inc.*, 200 F.3d 335, 340 (5th Cir. 2000)). But that is a far cry from requiring hundreds of thousands of expert reports as to specific causation as part of a vetting process. Furthermore, *Acuna*, 200 F.3d at 340, involved "over one hundred defendants," and the basis for naming these defendants was not clear such that these defendants were on notice.

Defendant's reliance on *In re AFFF*, No. 2:18-mn-02873-RMG, is not helpful to its cause either. *First*, Judge Gergel allowed the plaintiffs to submit a list of the additional injuries they planned to pursue and scheduled an evidentiary hearing to evaluate the general causation evidence for those injuries. *Second*, the Court directed the parties to meet and confer on a *Daubert* and bellwether process for the additional injuries. *Third*, Judge Gergel allowed plaintiffs claiming injuries not on the submitted list to voluntarily dismiss those claims without prejudice, and tolled the statute of limitations for a maximum period of four years. And *fourth*, Judge Gergel allowed claimants with un-submitted injuries who had not yet filed or transferred into the MDL to voluntarily dismiss their claims without prejudice. Case Management Order No. 28, *In re AFFF*, No. 2:18-mn-02873-RMG, (D.S.C. Mar. 13, 2024), D.E. 4681. Thus, AFFF provides stronger support for the Court's track-based system than for Defendant's proposed case-by-case causation evaluation.

Defendant's other cases are similarly off-point. [D.E. 936] (Mem.) at 26. In *Vioxx*, for example, the court entered a *Lone Pine* order *after* conducting six bellwether trials. 557 F. Supp. 2d at 744. As noted, Defendant here requests thousands of expert reports be provided for Tracks where no discovery has taken place and no bellwether trials have been scheduled. Furthermore, *Abner* was not a personal injury case but a diminution in value case. Moreover, the court entered a *Lone Pine* order where "[t]he pleadings offer little, if any, information as to the type and amount of contaminants found . . . or specified theories of how the contaminants traveled from the [alleged contaminated] site to the present alleged locations." *Abner v. Hercules, Inc.*, No. 2:14cv63-KS-MTP, 2014 WL 5817542, at *3 (S.D. Miss. Nov. 10, 2014), *amended in part*, No. 2:14cv63-KS-MTP, 2015 WL 13821942 (S.D. Miss. Feb. 5, 2015). Here, it is very clear how contaminated water ended up in the Plaintiffs' bodies: they drank it.[7]

Defendant has cited to no case, and the PLG is aware of none, where a court has ordered plaintiffs to prepare hundreds of thousands of expert reports in stayed cases where no discovery has commenced in order to streamline litigation. It defies common sense and runs afoul of Rule 1.

**C. The only external agency decision Defendant identifies supports Plaintiffs' claims.**

The third factor weighs against issued a *Lone Pine* order, too. This factors requires the Court to consider agency decisions that may affect the merits. But Defendant points to no agency decision that would undermine Track 2 or Track 3 claims. *See* [D.E. 936] (Mem.) at Arg. III, pp.27-28. In fact, Defendant only points to one study, the ATSDR, that confirms that three water distribution systems in Camp Lejeune were contaminated. Far from undermining Plaintiffs' claims,

[7] *Matter of AET Inc. Ltd.*, No. 1:10-CV-51, 2011 WL 13557980, at *1 (E.D. Tex. Mar. 22, 2011), aff'd, No. 1:10-CV-51, 2011 WL 13301617 (E.D. Tex. Dec. 14, 2011), was an admiralty action where many claims were submitted by individuals not represented by counsel who "mistakenly believed that they [were] entitled to compensation by merely filing a claim." *Id.*

the agency decision Defendant brings up supports Plaintiffs' claims that they drank contaminated water.

Defendant's argument is also perplexing. It tries to undermine the veracity of its own study, the ATSDR, and then appears to argue that Plaintiffs cannot have viable claims unless their claims are supported by the ATSDR. *Id.* Which is it? In any event, what Defendant does not do is point to an agency decision that may affect the merits of the tracks – Track 2 and 3 – for which it demands expert proof. So this factor weights against the issuance of a *Lone Pine* order.

### D. Defendant's proposed *Lone Pine* order would increase the burden on the parties' and Court's time, resources, and expenses.

The fourth factor weighs against a *Lone Pine* order as well. This factor requires the Court to consider "the availability and use of other procedures . . . that would accomplish the same goals as the proposed Lone Pine order" – namely "a balance between efficiency and equity." *Conklin*, 782 F. Supp. 3d at 275 (citation omitted). Plaintiffs submit that the Court has struck that balance by separating the litigation into three tracks, focusing discovery on Track 1 bellwether Plaintiffs while staying Tracks 2 and 3. Another tool available to the Court to further facilitate resolution is the granting of Plaintiffs' pending census motion (*see* Introduction, *supra*), but frontloading expert specific and general causation reports for hundreds of thousands of mostly elderly plaintiffs for stayed cases with no discovery is not it. *See* Arg. Section III*, supra*.

Defendant's argument is essentially that Track 1 bellwether discovery took three years, so Track 2 and Track 3 discovery will also take years. *See* [D.E. 936] (Mem.) at Arg. IV, pp. 28-30. That is not true, as some discovery from Track 1 bellwether Plaintiffs will at a minimum inform Tracks 2 and 3. But if the argument is about time, as Defendant claims, Defendant's proposal of hundreds of thousands of specific causation expert reports will take decades to adjudicate. That is not efficient, and it is certainly not equitable to burden Marines and their families to fight each

other for a limited number of specific-causation experts and front-load the tens of thousands of dollars per plaintiff to generate those reports.

### E. The types of injuries claimed do not require specific causation expert reports prior to discovery even commencing.

The fifth factor weighs against a *Lone Pine* order too. This factor requires the Court to consider the types of injuries alleged and its cause. The Court now has the Plaintiffs Leadership Group's list of diseases that it intends to pursue in resolution of this case, and it has requested a census order to determine the number of claimants who have pending administrative claims alleging one of these diseases. If granted, this order will winnow down the hundreds of thousands of personal injury claims that Defendant claims are pending in the administrative process to a set number of claimants who have a disease covered in the PLG resolution disease list. [D.E. 936] (Mem.) at Arg. Section V p. 30. This is precisely why the PLG's census motion advances efficiencies and illustrates why the Defendant's motion to require hundreds of thousands of specific causation reports is the epitome of inefficiency.

In sum, contrary to Defendant's suggestion that a *Lone Pine* order would facilitate resolution, it would wreak havoc on this litigation. The following closing example illustrates the absurdity of the motion. There are over 800 law firms with Camp Lejeune cases either in the administrative process or filed in court. Assume for argument that 20 percent of these law firms have clients alleging prostate cancer, a non-Exempt illness. Once Defendant and the Department of the Navy orchestrate the denial of the administrative claims alleging prostate cancer, the proposed *Lone Pine* order would require over 160 law firms to submit general causation reports on the association between prostate cancer and the contaminated Camp Lejeune water and specific causation reports for each client showing that the Camp Lejeune water at least as likely as not caused his prostate cancer. That necessarily would create unwieldly competition among the

Plaintiffs to retain prostate cancer experts, and it is likely that at some point there would be no available experts for those who didn't get out ahead in the race. Such chaos is antithetical to the orderly processes this Court established when it created the track systems to adjudicate this case in CMO No. 2. But equally untenable is the havoc such a system would have on this Court.

**CONCLUSION**

For all of the above reasons, the PLG respectfully submits that Defendant's *Lone Pine* motion must be denied in its entirety.

Dated: October 28, 2026.


/s/ *J. Edward Bell, III*
J. Edward Bell, III (admitted *pro hac vice*)
Bell Legal Group, LLC
219 Ridge St.
Georgetown, SC 29440
Telephone: (843) 546-2408
jeb@belllegalgroup.com

*Lead Counsel for Plaintiffs*

/s/ *Elizabeth J. Cabraser*
Elizabeth J. Cabraser (admitted *pro hac vice*)
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
ecabraser@lchb.com

*Co-Lead Counsel for Plaintiffs*

/s/ *W. Michael Dowling*
W. Michael Dowling (NC Bar No. 42790)
The Dowling Firm PLLC
Post Office Box 27843 Raleigh, North Carolina 27611 Telephone: (919) 529-3351
mike@dowlingfirm.com

*Co-Lead Counsel for Plaintiffs*

/s/ *Robin L. Greenwald*
Robin L. Greenwald (admitted *pro hac vice*)
Weitz & Luxenberg, P.C.
700 Broadway
New York, NY 10003
Telephone: 212-558-5802
rgreenwald@weitzlux.com

*Co-Lead Counsel for Plaintiffs*

/s/ *James A. Roberts, III*
James A. Roberts, III
Lewis & Roberts, PLLC
3700 Glenwood Ave., Ste. 410
Raleigh, NC 27612
Telephone: (919) 981-0191
jar@lewis-roberts.com

*Co-Lead Counsel for Plaintiffs*

/s/ *Mona Lisa Wallace*
Mona Lisa Wallace (N.C. Bar No.: 009021)
Wallace & Graham, P.A.
525 North Main Street
Salisbury, North Carolina 28144 Tel: 704-633-5244
mwallace@wallacegraham.com

*Co-Lead Counsel for Plaintiffs*