**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**SOUTHERN DIVISION**
**NO. 7:23-CV-897**

| | |
|---|---|
| **IN RE:** | **REPLY IN SUPPORT OF DEFENDANT UNITED STATES OF AMERICA'S MOTION FOR ENTRY OF A *LONE PINE* ORDER** |
| **CAMP LEJEUNE WATER LITIGATION** | |
| **This Document Relates To: ALL CASES** | **(Fed. R. Civ. P. 16(b)(3) & 16(c)(2)(L))** |

Plaintiffs' Leadership Group's response illustrates why the United States' proposed *Lone Pine* order is needed to advance the Camp Lejeune Justice Act litigation and global resolution efforts. PLG does not dispute that global resolution efforts revealed that "there might be a significant number of people that don't have valid claims." *Compare* Nov. 14, 2025, Stat. Conf. Tr., D.E. 734, at 13:9–16, *with* PLG Resp., D.E. 938, *passim*. Nor does PLG dispute that in the four-plus years since the CLJA's passage, over 75 percent of CLJA claimants have failed to submit sufficient documentation or evidentiary support to the Navy to substantiate the good-faith basis for their individual claims. PLG Resp., D.E. 938, at 7. Rather, PLG describes this failure as a "red herring" purportedly because the United States merely urged but "never required the submission of documents." *Id*. Further, PLG does not dispute that the majority of CLJA claims fall outside the scope of its most critical evidence on exposure and causation: ATSDR's Camp Lejeune water models and 2017 Assessment of the Evidence.[1] *See id*. *passim*.

Nevertheless, despite PLG's acknowledgment of a high percentage of unsupported CLJA administrative claims, PLG asserts, without reservation, that the Navy's denial of administrative claims "necessarily would trigger a concomitant number of filings in Court." PLG Resp., D.E. 938, at 12 n.4. However, in contrast to the filing of an administrative claim, "[b]y filing a complaint, 'an attorney . . .

[1] To the contrary, PLG filed a competing motion seeking a census process "in aid of resolution" in which they abandon all but twenty-five of the thousands of illnesses alleged by CLJA plaintiffs and claimants. PLG Census Mot., D.E. 937, at 1–2. Notably, PLG failed to provide any rationale at all for the twenty-five illnesses they selected, particularly the fifteen illnesses beyond the ten ATSDR illnesses identified in the Assessment of the Evidence. The United States opposes PLG's census motion for reasons outlined in a forthcoming opposition to be filed separately.

certifies,' in pertinent part, 'that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, . . . the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.'" *McCoy v. N.C. Golf & Travel, Inc.*, No. 5:18-CV-107-FL, 2020 WL 4937788, at *10 (E.D.N.C. Aug. 24, 2020) (Flanagan, J.) (quoting Fed. R. Civ. P. 11(b)(3)). Indeed, "[f]iling a lawsuit is serious business." *Torres v. Duke Energy*, No. 5:22-CV-369-D, 2023 WL 2145500, at *2 (E.D.N.C. Feb. 21, 2023) (Dever, J.). Given PLG's acknowledgment of the prevalence of a high percentage of unsupported CLJA claims, PLG's claim that the Navy's denial of CLJA claims "necessarily would trigger a concomitant number of filings" disregards Rule 11 entirely.

Notably, it is common in mass tort litigation for unsupported cases and claims to be used to inflate settlement inventories and values as part of global resolution discussions. *See*, *e.g.*, *In re Mentor Corp. ObTape Transobturator Sling Prods. Liab. Litig.*, No. 4:08–MD–2004 (CDL), 2016 WL 4705827, at *1 (M.D. Ga. Sept. 7, 2016) ("Some lawyers seem to think that their case will be swept into the MDL where a global settlement will be reached, allowing them to obtain a recovery without the individual merit of their case being scrutinized as closely as it would if it proceeded as a separate individual action.").[2] Indeed, PLG defends the filing of cases like *Vidana*, a Track 1 bellwether case involving a plaintiff who could not prove exposure because he lived and worked in an area of Camp Lejeune where the water was not contaminated. *Vidana* was settled for the value of the Court's filing fee after thousands of attorney hours and hundreds of thousands of dollars were spent in discovery and mediation for bellwether cases. According to PLG, *Vidana* may represent "**only** approximately **16,000** claimants." PLG Resp., D.E. 938, at 5 (emphasis added).

Perhaps to distract from the high percentage of unsupported CLJA claims, PLG's response was filled with hyperbole, inflammatory rhetoric, and strawman arguments. For example, PLG describes the

[2] *See also* Cary Silverman, *Curbing Unsupported Claims in Mass Tort Litigation*, 94 U. CIN. L. REV. 1097 (2026) ("Mass tort litigation is plagued by unsupported claims. Many cases—often generated by aggressive advertising and third-party litigation funding—lack basic proof of product use or injury, bloating multidistrict litigation (MDL) dockets, evading individual scrutiny, and amplifying settlement pressure.").

United States' proposed *Lone Pine* order as "absurd" purportedly because it "would mire Plaintiffs and their counsel in the arduous process of filing complaints and forcing them to spend tens, or perhaps hundreds, of millions of dollars on filing fees and expert witness fees for cases that are not even in the track system." PLG Resp., D.E. 938, at 2. However, putting aside public reporting indicating that nearly $2 billion was committed to fund the CLJA litigation,[3] PLG fails to reconcile their litigation cost estimates with their admission that a high percentage of CLJA claims lack merit. Moreover, the Common Benefit Order in this case provides a cost sharing mechanism for common benefit work like general causation expert reports. CMO 7, D.E. 46, at 3 ("Common benefit work product includes work performed for the benefit of all plaintiffs generally, or of particular categories of plaintiffs. . . .").

PLG has failed to offer any good reason for the Court to reject the United States' proposed *Lone Pine* order. It is a common tool used to eliminate meritless claims, and unsupported CLJA claims currently present a significant obstacle to global resolution. Entry of a *Lone Pine* order would not require the Court to abandon its track-based approach in managing this litigation. Nor would it require the Court to rule on thousands of *Daubert* motions as PLG contends. Rather, it would streamline the litigation and increase efficiency. It would also advance global resolution efforts by ensuring that only meritorious cases can move forward in litigation. Finally, the United States' proposed *Lone Pine* order is fair because dismissal is not automatic. The proposed *Lone Pine* order includes an enforcement process that would require the United States to send deficiency letters to CLJA plaintiffs who fail to comply, providing plaintiffs with an

---

[3] *See*, *e.g.*, Mark Behrens, *Third-Party Litigation Funding: A Call for Disclosure and Other Reforms to Address the Stealthy Financial Product that is Transforming the Civil Justice System*, 34:1 CORNELL J. L. & PUB. POL'Y 1, 18 (2025) ("According to *Bloomberg*, litigation funders committed nearly $2 billion to Camp Lejeune lawsuits soon after the passage of a federal law authorizing the claims."); Emily R. Siegel & Kaustuv Basu, *Bogus Claims Threaten to Taint Lejeune Payouts to Veterans*, INS. J. (Oct. 31, 2023), https://perma.cc/KM4S-ZZ7H ("One consultant told Bloomberg Law that lenders by mid-year had committed nearly $2 billion to firms filing Camp Lejeune lawsuits."); *see also* Diana Novak Jones, *Law Firms Vying to Sign Up Camp Lejeune Clients are Sued Themselves*, REUTERS (Aug. 29, 2023), https://perma.cc/UNR6-ZBZT; Emily R. Siegel & Kaustuv Basu, *Litigation Funders Bet Billions on Veterans' Toxic Water Claims*, BLOOMBERG L. (Jul. 20, 2023), https://perma.cc/E6MY-TMB7; Roy Strom, *Camp Lejeune Ads Surge Amid 'Wild West' of Legal Finance*, Tech, BLOOMBERG L. (Jan. 30, 2023), https://perma.cc/PY89-PELK.

opportunity to cure before the United States could move to dismiss their CLJA cases.

## I. The Supreme Court Has Not Prohibited Use of *Lone Pine* Orders.

As a threshold matter, PLG argues that "Defendant invites this Court to commit error" and that the Supreme Court's 2026 decision in *Berk v. Choy*, 607 U.S. 187 (2026), "ended federal merits-based *Lone Pine* orders." PLG Resp., D.E. 938, at 8 (citation modified). *Berk* did no such thing. Rather, *Berk* involved a choice of law question in a federal diversity suit; the Supreme Court simply held that a Delaware state law requiring a medical malpractice plaintiff to submit an affidavit of merit from a medical professional with their lawsuit was unenforceable because it conflicted with the pleading requirements of Fed. R. Civ. P. 8. *Berk*, 607 U.S. at 194. In reaching this decision, the Supreme Court explained that "a valid Rule of Civil Procedure displaces contrary state law even if the state law would qualify as substantive under *Erie*'s test." *Id.* at 192. Nothing in the Supreme Court's reasoning prohibits a federal court from exercising its case management discretion under Fed. R. Civ. P. 16 to use *Lone Pine* orders to efficiently manage a mass tort action, particularly when the action has been pending for several years. *Id.* at *passim*.

As Judge Dever recognized in *Conklin*, "[c]ourts in mass tort cases 'routinely' issue *Lone Pine* orders, often under Federal Rule of Civil Procedure 16(b)(3) and 16(c)(2)(L)." *Conklin v. Corteva, Inc.*, 782 F. Supp. 3d 268, 274 (E.D.N.C. 2025) (Dever, J.) (citations omitted). Notably, following the Supreme Court's decision in *Berk*, two separate federal district courts entered *Lone Pine* orders in mass tort cases. *See Johnson v. SmithKline Beecham Corp.*, No. 11-5782, 2026 WL 1481223, at *1 (E.D. Pa. May 27, 2026) ("[T]here is no authority suggesting that the proposed Order is not permissible. To the contrary, Courts have issued *Lone Pine* Orders in both non-MDL cases and after significant discovery has occurred.") (citing *Conklin*, 782 F. Supp. 3d at 277); *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs., & Prod. Liab. Litig.*, MDL No. 16-2738 (MAS) (RLS), 2026 WL 2111340, at *4 (D.N.J. July 22, 2026) (Singh, Mag. J.) ("Case management orders, including *Lone Pine* orders or similar mechanisms, facilitate the goals of distinguishing meritorious claims from nonmeritorious claims and efficiently reaching a resolution on the merits of the issues presented.").

## II. The United States' Proposed *Lone Pine* Order Does Not Violate Due Process Rights and Does Not Constitute "Pre-Discovery Summary Judgment."

PLG also argues that the proposed *Lone Pine* order would violate the due process rights of CLJA plaintiffs. PLG Resp., D.E. 938, at 8. However, district courts entering *Lone Pine* orders have rejected this exact argument. *See*, *e.g.*, *In re Johnson & Johnson*, 2026 WL 2111340, at *5 ("[a]n order to show cause [based on *Lone Pine*] provides just that: notice and an opportunity to be heard"); *Matter of AET Inc. Ltd.*, No. 1:10-cv-51, 2011 WL 13301617, at *7 (E.D. Tex. Dec. 14, 2011) ("The court concludes that the *Lone Pine* Order does not deprive the claimants of due process.") (internal citations omitted); *Johnson*, 2026 WL 1481223, at *1 ("The Firm does not explain why the proposed *Lone Pine* Order 'violate[s] Plaintiffs' due process rights.' The Order requires only that Plaintiffs provide information that should have been obtained before suit was filed, and to verify allegations in their Complaints.") (internal citation omitted).

PLG also argues that the United States' proposed *Lone Pine* motion is an improper "pre-discovery summary judgment" motion because no discovery has taken place beyond the Track 1 bellwether cases. *See*, *e.g.*, PLG Resp., D.E. 938, at 1, 8, 16. Even if it were true that no discovery had taken place beyond the Track 1 bellwether cases, multiple federal district courts have found pre-discovery *Lone Pine* orders to be permissible, including this Court in Judge Dever's recent decision in *Conklin*. *See*, *e.g.*, *Conklin*, 782 F. Supp. 3d at 279 ("The court rejects plaintiffs' argument that defendants have not exhausted the tools available under the Federal Rules of Civil Procedure."); *Matter of AET Inc. Ltd.*, 2011 WL 13301617, at *7 ("The Buzbee Claimants' characterization of the *Lone Pine* Order as an improper vehicle for summary judgment is unfounded.") (citations omitted); *Abner v. Hercules, Inc.*, No. 14-CV-63, 2014 WL 5817542, at *5 (S.D. Miss. Nov. 10, 2014) ("This case presents an instance where other procedural tools do not appear to be as effective or efficient as those in the proposed *Lone Pine* order. Moreover, *Lone Pine* orders are regularly used in, and were specifically created for, cases alleging mass environmental contamination.").

Regardless, PLG had the opportunity to take extensive fact discovery from the United States on behalf of all CLJA plaintiffs in the litigation. *See* July 19, 2023 Order, D.E. 10, at 7 (appointing PLG to, among other things, "develop and propose schedules for the initiation, conduct, and completion of all

discovery on behalf of all plaintiffs . . ."). Common factual and expert discovery has been completed for all cases, as well as plaintiff-specific fact and expert discovery particular to Track 1 bellwether plaintiffs. The United States has produced over 125 million pages of documents, including extensive documents regarding ATSDR's water models and health studies that underpin PLG's theory of exposure and causation. Moreover, the United States offered multiple current or former government employees for depositions, including Dr. Frank Bove, the ATSDR epidemiologist who drafted ATSDR's 2017 Assessment of the Evidence. The Parties also deposed Dr. David Savitz, the epidemiologist who supervised the National Academy of Science's Report on the Potential Health Effects from Camp Lejeune water. Finally, the Parties completed the depositions of both sides' water modeling experts, including Morris Maslia, the former ATSDR employee who oversaw the development of ATSDR's Camp Lejeune water models.[4]

While PLG makes vague claims about discovery that has yet to take place, PLG does not identify any discovery that is needed to allow individual CLJA plaintiffs to produce threshold evidence substantiating their exposure, injury, and causation. As explained in the United States' opening brief and other filings, the substantiating documentation should be readily available to CLJA Plaintiffs who have had over four years to obtain this information. U.S. Br., D.E. 936, at 13–14. Nevertheless, PLG claims that the United States "obstructed" PLG's discovery efforts, specifically pointing to the recently digitized muster rolls. This assertion is factually incorrect; individual Plaintiffs could have obtained copies of their records with little effort through NARA. Moreover, the Parties are currently negotiating a protective order that may allow PLG to use the recently digitized muster rolls in litigation.

PLG also suggests that the United States' proposed *Lone Pine* order would require the Court to substantively evaluate "many thousands" of expert reports and *Daubert* motions. *See, e.g.*, PLG Resp., D.E. 938, at 20. However, "the Court does not assess whether Plaintiffs' [expert] affidavits are sufficient under a summary judgment standard; it considers merely whether each affidavit would support filing of a lawsuit under a Rule 11 standard." *Matter of AET Inc. Ltd.*, 2011 WL 13301617 at *7 (E.D. Tex. Dec. 14, 2011).

---

[4] Both Dr. Savitz and Mr. Maslia are PLG's retained experts.

## III. The United States' Proposed *Lone Pine* Order Would Advance Global Resolution Efforts.

PLG argues that the United States' proposed *Lone Pine* order is "antithetical to the Court's admonishment. . . . '[to] use their best efforts to achieve a global settlement by October 30, 2026 . . . .'" PLG Resp., D.E. 938, at 2. To the contrary, the United States' request for a *Lone Pine* order complies with that admonishment as it would advance global resolution efforts by helping the Parties to distinguish CLJA claims and illnesses that may be compensable from those that are not. In turn, this would allow the Parties to more accurately value individual claims and assess the value of the entire claimant population. In its opening brief, the United States pointed to a global resolution that was reached in the talc litigation after a *Lone Pine* order was entered. *See* U.S. Br., D.E. 936, at 19–20. Since the United States filed its opening brief, another global resolution was announced in the AFFF MDL to resolve approximately 115,000 to 120,000 personal injury claims stemming from PFAS contaminated water; that resolution closely followed the entry of multiple *Lone Pine* and case-vetting orders. *See* 3M Company, *3M Reaches Broad Resolution of AFFF Personal Injury Litigation* (Nov. 3, 2026), https://perma.cc/X8QL-VGZY.

PLG attempts to distinguish the AFFF MDL by pointing to the methodical process that Judge Gergel developed to narrow the universe of illnesses to six prior to entering his first *Lone Pine* order in 2024. *See In re AFFF*, No. 2:18-mn-02873-RMG, CMO 28, D.E. 4681 (D.S.C. Mar. 13, 2024). Here, such a narrowing process is unnecessary because the contaminants in Camp Lejeune water, unlike PFAS, have been studied for decades, and ATSDR's Assessment of the Evidence underpins PLG's entire theory of causation. *See* PLG Resp., D.E. 938, *passim*. Regardless, Judge Gergel entered a second *Lone Pine* order in August 2025 as to the six remaining illnesses after it was revealed during mediation that a large number of unfiled and unvetted claims existed. *See In re AFFF*, No. 2:18-mn-02873-RMG, CMO 35, D.E. 7823, at 1 (D.S.C. Aug. 15, 2025). Thus, the AFFF MDL settlement came in the wake of *Lone Pine* orders that led to dismissal of unsupported cases. *See*, *e.g.*, *In re AFFF*, No. 2:18-mn-02873-RMG, Order, D.E. 11730 (D.S.C. Sept. 28, 2026) (dismissing thousands of personal injury cases).

PLG also argues for the adoption of a census process rather than the United States' proposed *Lone Pine* order. PLG Resp., D.E. 938, at 12. However, for the reasons outlined in the United States' forthcoming

opposition to the PLG's census motion, a census process will not advance global resolution. Moreover, the CLJA litigation is in a much different posture from the cases PLG cites in which a census process was utilized. Typically, a census process is utilized early in litigation to gain a better understanding of the makeup of the case pool. *See*, *e.g., In re 3M Combat Arms Earplug Prods. Liab. Litig.*, MDL No. 2885, No. 3:19-md-2885 (N.D. Fla. Oct. 22, 2019), D.E. 775 (establishing census process approximately 6 months after creation of MDL on April 3, 2019); *In re Zantac (Ranitidine) Prods. Liab. Litig.*, MDL No. 2924, 2021 WL 5415027 (S.D. Fla. Nov. 19, 2021) (establishing census process less than 2 months after creation of MDL on Feb. 6, 2020).[5] By contrast, here, we are years into the litigation, and PLG has admitted that the claimant pool has a substantial number of unsupported claims. Thus, the current posture of the CLJA litigation favors entering a *Lone Pine* order to vet claims brought into litigation, not a census.

PLG also suggests that the United States "has waved around the $335 trillion number" for "shock value" and that "Defendant knows full well that [$335 trillion] is not the Plaintiffs' demand and never has been." PLG Resp., D.E. 938, at 4. The $335 trillion is based on a true accounting of the demanded amounts in the administrative claims. Tellingly, PLG does not reveal how much it has actually demanded from American taxpayers during global resolution discussions.[6] *See id*. *passim*.

## IV. The United States' Proposed *Lone Pine* Order Is Consistent with the Court's CMOs and Would Work in Conjunction with the Court's Track-Based Approach.

PLG also claims that the United States' proposed *Lone Pine* order "takes a torch" to the Court's track-based approach to managing this litigation. PLG Resp., D.E. 938, at 1, 11. To the contrary, the United States' proposed *Lone Pine* order would have no effect on the progress of pending Track 1 litigation. In fact, as of the date of this filing, the Parties have completed the first two Track 1 kidney cancer bellwether

[5] While PLG dismisses the United States' citation to the Duke Law Guidelines because the CLJA litigation is not an MDL, PLG itself cites to multiple MDLs to support their proposed census process.

[6] In the first bellwether trial before Judge Boyle in *Mousser v. United States*, No. 7:23-cv-667, PLG asked for a damages award between $10 and 11 million. Ten million dollars for each of the 400,000 claims is still $4 trillion, or multiples of the Department of War's yearly budget. In the second bellwether trial before Judge Boyle in *Fancher v. United States*, No. 7:23-cv-00275, PLG asked for a damages award of $4.25 million.

trials before Judge Boyle, and the Parties' post-trial proposed findings of fact and conclusions of law will be submitted in the coming weeks. *See Mousser v. United States*, No. 7:23-cv-667, D.E. 121; *Fancher v. United States*, No. 7:23-cv-0027, D.E. 119. Moreover, Judge Myers has scheduled a Preliminary Pretrial Conference on January 21, 2027, for the Track 1 bladder cancer cases. *See, e.g., Cagiano v. United States*, No. 7:23-cv-00569, D.E. 91. The United States expects that the other District Judges will similarly set pretrial conferences for their Track 1 cases soon. The United States' proposed *Lone Pine* order would allow the Track 1 cases to continue to move forward towards completion, while simultaneously providing a procedure and mechanism for the Parties and the Court to vet the remaining CLJA case pool.

Furthermore, the United States' proposed *Lone Pine* order would not preclude Track 2 from moving forward when the Court decides that is appropriate. For Track 2, the Court selected CLJA cases involving prostate cancer, kidney disease, lung cancer, liver cancer, and breast cancer; the Parties have submitted competing discovery proposals for Track 2, which are pending with the Court. *See* Track 2 Discovery Plan Order (Case Management Order No. 9), D.E. 144, at 1; PLG Track 2 Proposal, D.E. 155; U.S. Track 2 Proposal, D.E. 156. Kidney disease and liver cancer are two of the ten ATSDR illnesses, and the United States' proposed *Lone Pine* order would not require expert reports related to those illnesses, but cases involving those illnesses would still have to comply with the other documentation requirements. The other three illnesses in Track 2 are non-ATSDR illnesses—prostate cancer, lung cancer, and breast cancer—and the United States' proposed *Lone Pine* order would require expert reports on general and specific causation related to those illnesses, in addition to the other documentation requirements.[7] At the time that the Parties submitted their respective Track 2 proposals in March 2024, global resolution efforts had not yet revealed that "there might be a significant number of people that don't have valid claims." Nov. 14, 2025, Stat. Conf. Tr., D.E. 734, at 13:9–16. If the Court were to enter the United States' proposed *Lone Pine* order, the Court,

[7] For Track 2, the United States proposed bifurcating general and specific causation, with PLG to provide expert reports on general causation first, followed by the United States' expert reports. As such, the United States' proposed *Lone Pine* order is in alignment with its Track 2 proposal. *See* U.S. Track 2 Proposal, D.E.156, at 8.

in its discretion, could consider allowing the vetting process to take its course before moving forward with Track 2 to ensure that cases selected to serve as Track 2 bellwethers can provide basic threshold evidentiary support for their claims. While some adjustments would be necessary for Track 2, the United States' proposed *Lone Pine* order would not preclude Track 2 or subsequent tracks from moving forward if needed. Rather, it would inform the Court and Parties about which illnesses and cases in Track 2 and subsequent tracks are most appropriate to spend time, money, and resources litigating. In the meantime, Track 1 would continue to move forward towards completion.

PLG also claims that the United States' proposed *Lone Pine* order would slow down the litigation, while at the same time criticizing the proposed *Lone Pine* order for purportedly violating the Court's stay for all cases except Track 1 bellwethers. *See* PLG Resp., D.E. 938, at 13–14. Regardless, PLG fundamentally fails to address why it would be more efficient for the Court and the Parties to litigate potentially hundreds of thousands of CLJA lawsuits on a case-by-case and track-by-track basis when PLG has acknowledged the prevalence of a significant number unsupported CLJA lawsuits and administrative claims. Expert testimony will be required to prove causation, whether through a *Lone Pine* order or individual case adjudication, because the CLJA is a tort statute that requires plaintiffs to "bear the burden of demonstrating their harm was caused by exposure, necessitating they establish both general and specific causation."[8] *In re Camp Lejeune Water Litig.*, 736 F. Supp. 3d 311, 317 (E.D.N.C. 2024).

In short, meritless claims must be identified and vetted before global resolution can be reached. The United States' proposed *Lone Pine* order would allow the Court and Parties to efficiently identify and separate meritless claims and focus their time and resources on advancing the litigation and global resolution efforts for those cases that have basic threshold evidentiary support.

---

[8] In fact, Congress rejected the administrative compensation scheme proposed by the Department of Justice in favor of passing the CLJA as a tort statute. *See*, *e.g.*, Jan. 24, 2024, Stat. Conf. Tr., D.E. 125, at 17:24–18:10 ("MR. BELL: Judge, I am pretty familiar with the political process that occurred in this case, in this statute. Counsel just mentioned to you that a proposal was made to Congress before the statute passed. . . . That process was submitted to every judicial member of the senate and rejected."); *see also* Kaustuv Basu, *Marines, Toxic Water and Lawyers: A Fight Over Billions in Fees*, BLOOMBERG L. (Mar. 23, 2023), https://perma.cc/89NT-B6DM.

Dated: November 10, 2026

Respectfully submitted,

JONATHAN D. GUYNN
Acting Assistant Attorney General
Civil Division

BRIDGET BAILEY LIPSCOMB
Chief, Camp Lejeune Justice Act Section

ADAM BAIN
Chief Litigation Counsel

SARA J. MIRKSY
Assistant Director

ELIZABETH K. PLATT
TRACI C. MCKEEVER
Senior Trial Counsel

*/s/ Haroon Anwar*
HAROON ANWAR
Assistant Director
United States Department of Justice
Civil Division, Torts Branch
Camp Lejeune Justice Action Section
1100 L Street, NW
Washington, DC 20005
(202) 598-3946
haroon.anwar@usdoj.gov

Attorney inquiries to DOJ regarding CLJA:
(202) 353-4426

*Attorneys for Defendant*
*United States of America*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 10, 2026, I electronically filed the foregoing using the Court's Electronic Case Filing system, which will send notice to all counsel of record.

*<u>/s/ Haroon Anwar</u>*
HAROON ANWAR