**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**SOUTHERN DIVISION**
**NO. 7:23-CV-897**

**IN RE:**

**CAMP LEJEUNE WATER LITIGATION**

**This Document Relates To:**

**ALL CASES**

**THE UNITED STATES' OPPOSITION TO PLAINTIFFS' LEADERSHIP GROUP'S ADMINISTRATIVE MOTION FOR AN ORDER REQUIRING A CENSUS OF PLAINTIFFS' CASES IN AID OF RESOLUTION**

## TABLE OF CONTENTS

Pages

Table of Contents ........ i

Introduction ........ 1

Background ........ 2

Argument ........ 6

I. The Court Lacks Jurisdiction Over Non-Litigation CLJA Claimants. ........ 6

II. The Parties Already Possess the Necessary "Census Data" That PLG Seeks. ........ 8

III. The Parties Agreed to and Executed the Questionnaire Process to Advance Global Resolution. ........ 9

IV. The United States' Proposed *Lone Pine* Order Requires Information that Would Actually Advance a Global Resolution ........ 10

Conclusion ........ 11

Certificate of Service ........ 13

## INTRODUCTION

Plaintiffs' Leadership Group ("PLG") asks this Court to order all "attorneys with CLJA cases, whether filed in this Court or in the administrative process," to submit "census data" for their clients who allege one of twenty-five diseases ("Covered Diseases") that PLG has selectively chosen to pursue for purposes of global settlement. Pls.' Mot. at 1, D.E. 937.[1] PLG states, without explanation, that "[t]his information is vital" to discussing and reaching a global resolution of the Camp Lejeune Justice Act ("CLJA") litigation. *Id.* PLG's motion should be denied for multiple reasons.

***First***, this Court has already indicated that it lacks jurisdiction over the approximately 407,000 CLJA claimants who do not have a lawsuit pending in the Eastern District of North Carolina. ***Second***, the "census data" PLG seeks would not further global resolution as PLG claims, given that the Navy has already collected the requested disease information through the administrative claim process. ***Third***, the Parties spent more than two years negotiating and executing a questionnaire process to supply the necessary information to inform a global settlement, and PLG has no basis for upending that carefully crafted process. ***Finally***, the United

[1] PLG characterizes its motion elsewhere as a "*suggestion* that it conduct a census *for Defendant* so it would know the universe of claimants who allege one or more diseases on the PLG disease list." D.E. 938 at 2 (emphasis added) (citing Pls.' Mot., D.E. 937). The United States has not requested, nor does it need, PLG to conduct a census on its behalf.

Furthermore, the United States does not concede that the twenty-five Covered Diseases selected by PLG are compensable injuries. *See generally* D.E. 936 at 14 (proposing that, "absent some scientific evidence to support other illnesses," the focus of the CLJA litigation should be on the "ten illnesses [identified by ATSDR] as having any evidence of a causal connection to the contaminants in Camp Lejeune water").

PLG provides no explanation for its choice of diseases or their definitions. In fact, PLG has included several illnesses for which the ATSDR found "below equipoise" evidence of causation in its 2017 Assessment of the Evidence, a document that PLG has repeatedly relied upon as the best evidence of causation. In addition, PLG has grouped multiple diseases into categories under the guise of narrowing diseases while still pursuing more than twenty-five individual diseases.

States recently moved for entry of a *Lone Pine* order, requiring all plaintiffs to supply information that would actually advance global resolution—namely, evidence substantiating plaintiffs' (i) exposure (time and location on base), (ii) alleged harm, and (iii) basis for claiming causation. The current posture of the CLJA litigation favors entering a *Lone Pine* order, not a census.

## BACKGROUND

To bring an action under the CLJA, claimants were required to first submit administrative claims to the Department of the Navy within the CLJA's statute of limitations. *See* CLJA § 804(h).[2] The Navy created a Camp Lejeune Claims Management Portal "to intake batches of [CLJA administrative] claims, organize claims, and analyze claims for the purposes of evaluation for settlement." Oct. 30, 2023, Hr'g Tr. at 22:5–16, D.E. 38. Claimants were required to submit a minimum of "five primary elements:" "Date of birth, name of plaintiff filing, amount of the claim, type of injury, and who is the representative status." May 16, 2024, Hr'g Tr. at 23:4–10, D.E. 207. The Navy's portal also requested information regarding claimants' location, time, and exposure at Camp Lejeune, as well as information regarding the specific illnesses they were alleging. At the same time, PLG was "working toward [its own] database . . . for the plaintiffs in court," since "[m]ost of the [claimants] are sitting before the Navy" and PLG "can't order them [to take action]." Oct. 30, 2023, Hr'g Tr. at 46:6–12; 48:10–18, D.E. 38.[3]

[2] "Presentment of an administrative claim is a jurisdictional prerequisite to maintaining a tort claims action against the United States." *Rhodes v. United States*, 995 F.2d 1063 (4th Cir. 1993) (unpublished table decision) (citing *Wilkinson v. United States*, 677 F.2d 998, 1000 (4th Cir. 1982)). Presentment requires "written notice sufficient to cause the agency to investigate" and "a sum-certain value on the claim." *Ahmed v. United States*, 30 F.3d 514, 517 (4th Cir. 1994) (citing *Adkins v. United States*, 896 F.2d 1324, 1326 (11th Cir. 1990)).

[3] PLG advised the Court in June 2024 that it had "set up a database . . . under a company called Rubris. And most of the plaintiffs are entering their data, their client data in this database." June 27, 2024, Hr'g Tr. at 16:1–3, D.E. 249.

To provide some context surrounding the Parties' efforts to collect claimant-specific information—particularly given that PLG has suggested that Rubris host the "census data" they seek to collect—some background on efforts to establish a joint database to house the information is necessary. At the very first Status Conference in this litigation, the United States raised the issue of working together with PLG to "set[] up a database that eventually, hopefully will globally resolve the entire litigation." Oct. 30, 2023, Hr'g Tr. at 32:22–33:4, D.E. 38. In line with the model used by Judge Hellerstein in the first responder litigation, the United States proposed that the Parties "agree on a database vendor," a "third party that the Government and the plaintiffs can both contribute to and will house the data that will be used to ultimately reach a global resolution." *Id.* at 34:9–14. When the United States explained that the vendor would be required by law to have "FedRAMP Moderate" security certification "for any system [the United States] uses that has personal information in it," *id.* at 34:19–23, PLG complained that "the vendors that are acceptable to the Government are kind of the older, dinosaur, slower vendors. And so we're trying to work with somebody that will move quickly," *id.* at 46:19–47:6. However, as Judge Dever pointed out, "perfect is the enemy of better. And it's better for y'all to talk and agree on a vendor . . . . [I]t would seem to me that if it matters to the DOJ, y'all need to work to figuring that out." *Id.* at 47:7–48:24.

At the next status conference, PLG again proposed that, to "get around FedRAMP," PLG could "produce [its own] data in [PLG's] database and transfer it to whichever one [the United States] want[s] to do." Nov. 21, 2023, Hr'g Tr. at 59:2–4, D.E. 76. PLG explained that, while the United States would not have direct access to its system, PLG could "transfer our data with the push of a button to their FedRAMP" vendor and "it will be the same thing . . . they can do anything – they can analyze it and do everything." Dec. 5, 2023, Hr'g Tr. at 53:5–54:12, D.E. 70. The United

States explained that PLG's proposal would not work "because we need to be able to have something joint that we can use together in order to resolve the litigation." *Id.* at 54:13–16. To ensure a "neutral system" like the one used by Judge Hellerstein that has "some guarantee of trustworthiness to it," rather than relying on PLG to "just send the information" and "trust that [PLG] sent everything to [us] in just the right way," *id.* at 56:1–7, the United States explained that "there needs to be a central database that both parties can access, and the Court can access, with this plaintiff's information from the census [that] is going to be fed into it," *id.* at 50:23–51:3.[4] To date, PLG has refused to agree to a joint database, instead choosing to rely solely on its Rubris portal, including in the instant motion. While the United States previously agreed that PLG could use Rubris for some purposes, such as collecting litigation forms[5] and questionnaire data, the United States has never agreed that Rubris would serve as the Parties' operative database for global settlement—nor can it, since Rubris does not have the FedRAMP certification required by law for the United States to use it.[6]

---

[4] By this time, the Court had already designated a "Government Liaison" and a "Database Development Committee" to engage in "discussions with the government" regarding "construction of a global database." July 19, 2023, Order Appointing Leadership at 4, 5, D.E. 10. Ms. Zina Bash, who has since withdrawn from PLG, was the Government Liaison appointed by the Court.

[5] The Court ordered that Rubris be used for "***litigation***-management," which included collection of Short Form Complaints. Nov. 20, 2023, Order Adopting Litig. Mgt. Database, D.E. 47, at 1 (emphasis added). The Parties agreed, and advised the Court, that "other databases, including a global resolution database, will likely become necessary in the future, and such other databases may be created or serviced by separate third parties aside from Rubris." Jt. Mot. for Adoption of Litig. Mgt. Database, D.E. 40, at 2.

[6] The United States also notes that PLG's Rubris portal has presented numerous technical issues since its inception and has proven less than ideal for handling a project of the scale required for this litigation, in addition to the fact that Rubris is not FedRAMP certified. For example, technical issues prevented PLG from producing final Discovery Pool Profile Forms in the agreed format by the agreed deadline for the bellwether cases before Judge Boyle. In addition, there were numerous issues with the data Rubris collected during the questionnaire process, which resulted in significant delay of the United States' review and analysis of the data.

Throughout the litigation, the Parties have advised the Court of the "census data" they had each collected so far, both through the litigation and in the Navy's administrative claims process. *See, e.g.*, Jan. 16, 2024, Jt. Stat. Rpt. at 2, D.E. 113; Jan. 23, 2024, Hr'g Tr. at 12:1–13:20, D.E. 122. In May 2024, the United States provided the Court and PLG with "the census data . . . from the Navy's intake portal, what they have so far, as far as their descriptions of the injuries,"[7] which the Court noted "would be helpful to knowing the population of diseases." May 16, 2024, Hr'g Tr. at 14:9–22, D.E. 207. On April 7, 2025, the Court asked for "an updated disease census, the disease census data that we received in the past." Apr. 7, 2025, Hr'g Tr. at 15:13–16, D.E. 347. The Court suggested perhaps "that information regarding the lawsuits is more appropriately coming from the plaintiffs, and if the defense can submit the admin claims." *Id.* at 15:16–19. The United States provided the breakdown of the approximately 410,000 de-duplicated administrative claims to the Court in May 2025, while PLG reported that it hoped to provide "the census of the diseases in active litigation . . . pretty shortly," May 21, 2025, Hr'g Tr. at 41:3–16, D.E. 393. In June 2025, PLG was still "in the process of getting that information together," June 9, 2025, Hr'g Tr. at 24:17–22, D.E. 407. In August 2025, the United States provided another updated breakdown of administrative claims to the Court, *see* Aug. 8, 2025, Hr'g Tr. at 4:8–12, D.E. 513. At the same hearing, PLG advised that "maybe some [of PLG's disease census data] have been transmitted," but noted that what had been submitted "is the best that we have, Your Honor, because . . . we don't have control over all of the Plaintiffs' firms[,] only the ones that have signed up under our

The United States welcomes the opportunity to discuss with PLG's Government Liaison (once one is appointed to replace former Government Liaison Zina Bash) and its Database Development Committee other suitable, reliable, and neutral platforms available that would be better equipped to handle a litigation of this size, including any future global resolution.

[7] This document included the then-current tally of the top 49 diseases alleged in the Navy's database.

rubris (ph) group, so we – we're almost slaves to the Government data." *id.* at 4:8–22.[8] On July 21, 2026, the United States provided another updated breakdown of administrative claims to PLG and the Settlement Masters. A copy of the current breakdown, as of November 12, 2026, is attached hereto as **Exhibit 1**.[9]

On October 23, 2026, PLG filed the instant motion, asking the Court to "order attorneys with CLJA cases, whether filed in this Court or in the administrative process, to submit census data" to its Rubris database "for each of their clients who allege" one of the twenty-five "Covered Diseases." Pls.' Mot. at 1, 2, D.E. 937. The "census data" PLG seeks consists of "(a) the client's name, (b) the last 4 digits of their social security number, (c) their administrative claim number, and (d) the [Covered] Diseases for which they have been diagnosed." *Id.* at 2. Apart from the last four digits of the claimants' Social Security Numbers, all of this information was collected in the Navy's CLJA Claim Management Portal during the administrative claim process. According to the November 12, 2026 breakdown, a vast majority of the approximately 407,000 de-duplicated administrative claims alleged at least one of the twenty-five Covered Diseases. *See* Ex. 1.

## ARGUMENT

### I. The Court Lacks Jurisdiction Over Non-Litigation CLJA Claimants.

The CLJA established the United States District Court for the Eastern District of North Carolina as the "exclusive venue" with "exclusive jurisdiction over any action *filed* under [the

[8] This argument is particularly unavailing for those individuals who have filed lawsuits. The Court's Case Management Order 2 ("CMO 2") requires every plaintiff to file a Short Form Complaint, which requires disclosure of the plaintiff's name and disease information. *See* CMO 2 § VI, D.E. 23.

[9] In the recent trial of *Fancher v. United States*, Case No. 7:23-cv-00275, the United States reported some of these numbers during closing argument in response to questions from Judge Boyle. This further demonstrates that the number of claimants with certain diseases is currently available to PLG, the Court, and the public, and need not be collected again.

CLJA].” CLJA § 804(d), Pub. L. No. 117-168. § 804(d), 136 Stat. 1759, 1802-04 (2022) (emphasis added). The CLJA did not authorize the Court to exercise jurisdiction over claimants in the administrative process, and PLG does not point to any authority for the Court doing so.[10] The CLJA expressly requires claimants to file an administrative claim with the United States Navy before filing suit. *See* CLJA § 804(h) (citing 28 U.S.C. § 2675). A claimant may only exit the administrative claim process and file suit in this Court when either the Navy has denied the administrative claim or at least six months have passed since the administrative claim was presented to the Navy without disposition. *See* 28 U.S.C. § 2675(a).

In other words, the Court lacks jurisdiction over a CLJA claimant until he or she exits the administrative process and "bring[s] an action under [the CLJA]." CLJA § 804(h). "As a leading treatise explains, '[t]he first step in a civil action in a United States district court is the filing of the complaint with the clerk or the judge.'" *Allen v. Atlas Box & Crating Co.*, 59 F.4th 145, 147 (4th Cir. 2023) (citing Wright & Miller, 4 Fed. Prac. & Proc. Civ. § 1052 (4th ed. 2022)); *see also* Fed. R. Civ. P. 3 ("A civil action is commenced by filing a complaint with the court."). The Court has acknowledged its jurisdictional boundaries at various times during this litigation. *See, e.g.*, Apr. 26, 2024, Hr'g Tr. at 42:7–12, D.E. 182 ("THE COURT: Do I have any say so in the Navy's portal? MR. BAIN: Well, a – we never say you don't have jurisdiction over something. But it is an administrative claims process. It's outside the litigation."); Aug. 17, 2026, Hr'g Tr., D.E. 912, at 9:12–19 ("THE COURT: . . . As far as the other matters, pre-litigation, I don't know that I'd have anything to say about that . . . ."); Oct. 1, 2026, Order at 2–3, D.E. 20, Case No. 7:24-cv-976 (Myers, J.) (observing that the Parties' stipulated protective order does not expand the Court's

[10] In fact, PLG does not cite a single authoritative source in its motion, nor did PLG file a Supporting Memorandum, as are required by Local Civil Rules 7.1(e) and 7.2. *See* D.E. 937 *passim*.

jurisdiction over the administrative claim process). Accordingly, until claimants file CLJA lawsuits in the Eastern District of North Carolina, this Court lacks the necessary jurisdiction to order such claimants (or their attorneys) to submit to PLG the information it seeks.

## II. The Parties Already Possess the Necessary "Census Data" That PLG Seeks.

PLG proposes that all attorneys with clients alleging one of the twenty-five Covered Diseases upload "settlement-targeted information" consisting of their clients' names, administrative claim numbers, last four digits of their Social Security Numbers, and their alleged diseases, "to a secure portal on Rubris that can only be reviewed by PLG and, upon entry of an appropriate protective order, the Department of Justice." Pls.' Mot. at 2, D.E. 937. PLG's proposal is particularly unavailing because the information it considers "settlement-targeted" fails to encompass much of the data that the Parties otherwise agreed may be relevant to global settlement through the questionnaire process, including presence and location at Camp Lejeune. *See infra* Section III. In any event, with the exception of claimant Social Security Numbers, the disease-related information PLG seeks through its census is already available to the Parties, because the Navy collected it from every CLJA claimant during the administrative process.

The requirement for claimants to submit administrative claims to the Navy within the CLJA's statute of limitations was necessary to "provide[] the Federal agency with notice sufficient to investigate the claim, assess its liability under the law, and decide whether to settle without the need for a federal lawsuit." *Fancher v. United States*, 646 F. Supp. 3d 694, 704 (E.D.N.C. 2022) (citations omitted). The Navy's Camp Lejeune Claims Management Portal allowed claimants to provide information to allow the Navy to investigate their claims, including their alleged exposure at Camp Lejeune, alleged illness(es), and damages sought. *See* https://www.navy.mil/Camp-Lejeune-Justice-Act-Claims/Validation-and-settlement-process/. Subsequently, the Navy encouraged claimants to provide documentation to further substantiate their claims. Once the Navy

received all of the claims, it de-duplicated and categorized the claims by disease, and, since 2024, the United States has periodically provided updated breakdowns of the alleged illnesses to the Court and PLG. PLG does not explain how requiring claimants to *resubmit* their individual information to PLG's Rubris portal, when they have already submitted the same information to the Navy as part of their operative administrative claims, would do anything to further a global resolution.[11]

## III. **The Parties Agreed to and Executed the Questionnaire Process to Advance Global Resolution.**

Just one year ago, this Court directed the path to global settlement through the questionnaire process. Oct. 23, 2025, Order, D.E. 652. Judge Gates's Order was the culmination of more than two years of the Parties working together on a questionnaire process "to more fully understand the wide scope of claims that would need to be resolved in a global settlement framework." *Id.* at 1. The Parties carefully negotiated a questionnaire seeking "detailed information about a sample of [2,500] cases," which the Parties agreed "could extrapolate to the population as a whole (more than 400,000 claims including the administrative process)." Oct. 8, 2025, SM Report at 1, D.E. 647 (emphasis omitted). Despite the Court's recognition of the critical

[11] The United States notes that allowing claimants to submit their alleged illnesses to Rubris—two years after the CLJA statute of limitations expired and with notice of the 25 Covered Diseases—swings wide the door for error, whether accidental or intentional. In addition, the Court's Case Management Order No. 7 ("CMO 7") currently requires non-PLG attorneys to contribute to the Camp Lejeune Common Benefit Holdback Fund in order to "access or use common benefit work product, including the use of or access to a database or settlement facility developed with common benefit work or funds." *See* CMO 7 at 19-25, D.E. 46. To date, participation in the Common Benefit Fund has been "voluntary." *See id.* at 19–20. PLG's proposed order essentially seeks to remove the voluntary nature of the agreement by threatening to "preclude [] non-complying client(s) from participating in a global resolution" if their attorneys decline to submit their clients' information to Rubris. Pls.' Prop. Order at 2, D.E. 937-2.

nature of the questionnaire to global resolution, a significant number of claimants—including clients of PLG—failed to respond.[12]

It appears that PLG now wants to use the "census data" as a substitute for the information gained through the questionnaire process, presumably due to the "revealing" results of the questionnaire process, which indicated that "there might be a significant number of people that don't have valid claims," D.E. 933 at 9 (quoting Nov. 14, 2025, Hr'g Tr. at 13:12–16, D.E. 734). However, as discussed above, PLG provides no explanation for how the requested "census data" would help further global resolution. At most, PLG's census aims to collect a bare minimum of claimants' personal information, unlike the questionnaire process, which actually sought information regarding substantiation of claims. Moreover, PLG's decision to abandon diseases beyond its selected twenty-five Covered Diseases would presumably narrow the pool by only a small percent, while also leaving those outside the twenty-five diseases without any defined path forward.[13]

## IV. The United States' Proposed *Lone Pine* Order Requires Information that Would Actually Advance a Global Resolution.

In contrast to the "census data" PLG seeks, the *Lone Pine* order requested by the United States would actually serve to identify and cull unsubstantiated claims from the claimant pool. PLG has argued elsewhere that the United States' *Lone Pine* motion "takes a torch" to the Court's track-based litigation of this case. D.E. 938 at 1. Not so. The proposed *Lone Pine* order would have

[12] As previously offered, the United States is willing, upon the Court's request, to provide a detailed breakdown of the results from the questionnaire process. *See* D.E. 933 at 9 n.20.

[13] PLG claims that its requested "order will winnow down the hundreds of thousands of personal injury claims that Defendant claims are pending in the administrative process to a set number of claimants who have a disease covered in the PLG resolution disease list." D.E. 938 at 24. However, according to the Navy's categorization, PLG's "resolution disease list" encompasses the lion's share of the administrative claims still pending with the Navy, thus "winnow[ing] down" the universe of claims by a mere fraction. *Compare* Ex. 1, *with* Pls.' Ex. A, D.E. 937-1.

no effect on the progress of pending Track 1 litigation and would not preclude Track 1 bellwether trials from moving forward. Furthermore, PLG's claim that compliance with the *Lone Pine* order would require "potentially hundreds of general causation reports and tens of thousands – or even more – specific causation reports" misreads the United States' *Lone Pine* motion. *Id.* at 3. PLG fails to reconcile their litigation estimates with their admission that the majority of CLJA lawsuits and administrative claims lack merit. Claimants alleging one of the ten diseases recognized by the ATSDR's 2017 Assessment of the Evidence as having at least some evidence of a causal connection to the Camp Lejeune contaminants would be exempt from submitting expert reports on either general or specific causation. *See* D.E. 936 at 15; D.E. 935-1. In any event, PLG plans to abandon all but twenty-five of the "over 200[14] individual diseases and medical conditions alleged in the administrative process" without any plan for resolving them. Pls.' Mot. at 2, D.E. 937. Therefore, PLG can satisfy its own burden as to general causation with as few as fifteen expert reports (not "potentially hundreds").

## CONCLUSION

PLG asks this Court to issue an Order to a multitude of CLJA claimants who are outside of its jurisdictional purview. The "census data" PLG wants attorneys to submit to Rubris has already been collected by the Navy, and adds nothing to further a global resolution. PLG fails to explain why the Parties should abandon the two-year questionnaire process and ignore its results. Furthermore, in stark contrast to the lack of any potential utility of the census data PLG seeks, the *Lone Pine* order proposed by the United States is a superior vehicle for *actually* winnowing out unsubstantiated claims. Accordingly, for the foregoing reasons, the United States respectfully requests that this Court deny PLG's motion.

[14] There are actually thousands of diseases alleged in the Navy's database.

Dated: November 12, 2026

Respectfully submitted,

JONATHAN D. GUYNN
Acting Assistant Attorney General
Civil Division

BRIDGET BAILEY LIPSCOMB
Chief, Camp Lejeune Justice Act Section

HAROON ANWAR
SARA J. MIRSKY
Assistant Directors

ADAM BAIN
Chief Litigation Counsel

*/s/ Jennifer E. Adams*
JENNIFER E. ADAMS
Virginia Bar No. 80149
Trial Attorney
United States Department of Justice
Civil Division, Torts Branch
Camp Lejeune Justice Act Section
1100 L Street, NW
Washington, DC 20005
(202) 702-4998
jennifer.e.adams@usdoj.gov

Attorney inquiries to DOJ regarding CLJA:
(202) 353-4426

*Attorneys for Defendant,*
*United States of America*

## CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2026, I electronically filed the foregoing using the Court's Electronic Case Filing system, which will send notice to all counsel of record.

*/s/ Jennifer E. Adams*
JENNIFER E. ADAMS